# Salter Environmental Assessment - Mechanical Treatment Priority




Salter-Salter
Salter-Turkey_Knoll
Salter-Carlyle
Salter-Boggy_North
Salter-Boggy_South

## Mechanical Treatment Priority

Low Priority: Fuel levels are either very low or fire would behave in an ecologically beneficial way.

Moderate- Low Priority: Fuel levels are either low or fire is likely to behave in an ecologically beneficial way without fuel reductions.

Moderate Priority: Fuel levels may be slightly elevated, however, fire in these geographies under certain conditions may also successfully achieve desired fuel reductions.

Moderate-High Priority: Areas are adjacent to communities, have moderate to high fuel loads. A fire without mechanical intervention may result in mixed severity fire that is undesired.

High priority: Areas near communities with high fuel loads, where a fire would result in uncharacteristic fire behavior

Lone Pine EA Project Boundary
San Juan National Forest
DWRF Focal Area

N

0 2.5 5 10 Miles


Salter Environmental Assessment - Insect Occurrence
DOLORES
MONTEZUMA
Dolores
Lewis
Lost Canyon Creek
MESA
USDA Forest Service, State and Private Forestry, Washington Office, Sources: Esri, HERE, Garmin, ntermap, increment P Corp., GEBCO, USGS, FAO, NPS, NRCAN, GeoBase, IGN, Kadaster NL, Ordnance Survey, Esri Japan, METI, Esri China (Hong Kong), (c) OpenStreetMap contributors, and the GIS User Community, Users need to exercise caution regarding the spatial accuracy of these data due to the subjective nature of aerial sketchmapping and the varying scales of source materials. Comparison with other datasets for the same area from other time periods may be inaccurate due to inconsistencies resulting from rounding of decimal coordinates during conversion, changes in mapping conventions over time, change in assignment of damage casual agent, and type of data collection. Any products (hardcopy or electronic) using these data sets shall clearly indicate their source. If the user has modified the data in any way, they are obligated to describe the modifications on all products. The user specifically agrees not to misrepresent these data sets, nor to imply that changes made were
Salter-Salter
Salter-Turkey_Knoll
Salter-Carlyle
Salter-Boggy_North
Salter-Boggy_South
Damage Type Code
Mortality
Other Damage
Defoliation
Damage Type Code
Mortality
Defoliation
Other Damage
Lone Pine EA Project Boundary
San Juan National Forest
0 2.5 5 10 Miles
N
San Juan National Forest
Dolores

FS-000407

# Salter Environmental Assessment - Drinking Water Importance Areas




Salter Environmental Assessment - Recreation Trails and Roads
DOLORES
MONTEZUMA
Plateau Cr
TAYLOR
MESA
View
Yellow Jacket
Lewis
Dolores
HAYCAMP MESA
Sources: Esri, HERE, Garmin, Intermap, increment P Corp., GEBCO, USGS, FAO, NPS, NRCAN, GeoBase, IGN, Kadaster NL, Ordnance Survey, Esri Japan, METI, Esri China (Hong Kong), (c) OpenStreetMap contributors, and the GIS User Community
Trails
Roads
Salter-Salter
Salter-Turkey_Knoll
Salter-Carlyle
Salter-Boggy_North
Salter-Boggy_South
San Juan National Forest
San Juan National Forest
Dolores
N
0
2.5
5
10
Miles


Salter Environmental Assessment - Wildlife
DOLORES
MONTEZUMA
Plateau Creek
STONER MESA
TAYLOR ME
View
Yellow Jacket
Lewis
HAYCAMP MESA
Lost Canyon Creek
Dolores
Sources: Esri, HERE, Garmin, Intermap, increment P Corp., GEBCO, USGS, FAO, NPS, NRCAN, GeoBase, IGN, Kadaster NL, Ordnance Survey, Esri Japan, METI, Esri China (Hong Kong), (c) OpenStreetMap contributors, and the GIS User Community
Salter-Salter
Salter-Turkey_Knoll
Salter-Carlyle
Salter-Boggy_North
Salter-Boggy_South
Mule Deer Migration Corridors
Elk Migration Corridors
Lone Pine EA Project Boundary
San Juan National Forest
DWRF Focal Area
N
0
2.5
5
10
Miles
San Juan National Forest
Dolores

FS-000410

**Rocky Mountain Restoration Initiative - Southwest: POD's Priority Subset - DWRF Priorities**

| POD Label | Entity | Rank | Notes (if available) | community | water | wildlife | recreation |
|---|---|---|---|---|---|---|---|
| 9 | DOL | High | | x | x | x | x |
| 10 | DOL | High | | x | x | x | |
| 12 | DOL | High | | x | | x | |
| 14 | DOL | High | | x | x | | x |
| 15 | DOL | High | | x | x | x | |
| 16 | DOL | High | | x | x | x | x |
| 17 | DOL | High | | x | x | x | x |
| 19 | DOL | High | | x | | | |
| Missing POD between 14 and 30 | DOL | High | Priority particularly on private lands and just over SJNF boundary | x | x | | x |
| 7 | DOL | Medium-high | Priority area is closer to communities and in Boggy Draw area | x | x | x | x |
| 36 | DOL | Medium-high | | x | | x | |
| 4 | DOL | Medium | Southern end of POD is priority | | x | | |
| 5 | DOL | Medium | Southern end of POD is priority | | x | x | |
| 6 | DOL | Medium | Southern end of POD is priority | | x | x | |
| 11 | DOL | Medium | Priority is closer to WUI and river | x | x | | |




# Rocky Mountain Restoration Initiative Potential Operational Delineations

N

1:500,000

0 5 10 20 30 40 Miles

FS-000412




**Wildland Urban Interface (WUI)**

- Low Density WUI
- High Density WUI

- Fireshed - Potential rapid wildfire spread to communities under severe wildfire conditions
- Fireshed - Likely human-caused wildfire ignition zone
- Salter-Salter
- Salter-Turkey_Knoll
- Salter-Carlyle
- Salter-Boggy_North
- Salter-Boggy_South
- Lone Pine EA Project Boundary
- Wildfire Adapted Partnership CAFA Grant - WUI Treatment Opportunity
- San Juan National Forest
- DWRF Focal Area

N

0 2.5 5 10 Miles

# Salter Environmental Assessment - Mechanical Treatment Priority




- Salter-Salter
- Salter-Turkey_Knoll
- Salter-Carlyle
- Salter-Boggy_North
- Salter-Boggy_South

**Mechanical Treatment Priority**

- Low Priority: Fuel levels are either very low or fire would behave in an ecologically beneficial way.
- Moderate- Low Priority: Fuel levels are either low or fire is likely to behave in an ecologically beneficial way without fuel reductions.
- Moderate Priority: Fuel levels may be slightly elevated, however, fire in these geographies under certain conditions may also successfully achieve desired fuel reductions.
- Moderate-High Priority: Areas are adjacent to communities, have moderate to high fuel loads. A fire without mechanical intervention may result in mixed severity fire that is undesired.
- High priority: Areas near communities with high fuel loads, where a fire would result in uncharacteristic fire behavior
- Lone Pine EA Project Boundary
- San Juan National Forest
- DWRF Focal Area

N

0 2.5 5 10 Miles


Salter Environmental Assessment - Insect Occurrence
DOLORES
MONTEZUMA
Lewis
Dolores
Lost Canyon Creek
MESA
USDA Forest Service, State and Private Forestry, Washington Office, Sources: Esri, HERE, Garmin, Intermap, increment P Corp., GEBCO, USGS, FAO, NPS, NRCAN, GeoBase, IGN, Kadaster NL, Ordnance Survey, Esri Japan, METI, Esri China (Hong Kong), (c) OpenStreetMap contributors, and the GIS User Community, Users need to exercise caution regarding the spatial accuracy of these data due to the subjective nature of aerial sketchmapping and the varying scales of source materials. Comparison with other datasets for the same area from other time periods may be inaccurate due to inconsistencies resulting from rounding of decimal coordinates during conversion, changes in mapping conventions over time, change in assignment of damage casual agent, and type of data collection. Any products (hardcopy or electronic) using these data sets shall clearly indicate their source. If the user has modified the data in any way, they are obligated to describe the modifications on all products. The user specifically agrees not to misrepresent these data sets, nor to imply that changes made were
Salter-Salter
Salter-Turkey_Knoll
Salter-Carlyle
Salter-Boggy_North
Salter-Boggy_South
Damage Type Code
Mortality
Other Damage
Defoliation
Damage Type Code
Mortality
Defoliation
Other Damage
Lone Pine EA Project Boundary
San Juan National Forest
0 2.5 5 10 Miles
N
Dolores
San Juan National Forest

FS-000415

# Salter Environmental Assessment - Drinking Water Importance Areas




Drinking Water Importance - Potential consequence of high severity fire on drinking water.
Higher values represent greater negative impact on drinking water.

- 0 - 10
- 11 - 20
- 21 - 30
- 31 - 40
- 41 - 50
- 51 - 60
- 61 - 70
- 71 - 80
- 81 - 90
- 91 - 100
- Salter-Salter
- Salter-Turkey_Knoll
- Salter-Carlyle
- Salter-Boggy_North
- Salter-Boggy_South
- Lone Pine EA Project Boundary







0 2.5 5 10 Miles

FS-000416

# Salter Environmental Assessment - Recreation Trails and Roads




- Trails
- Roads
- Salter-Salter
- Salter-Turkey_Knoll
- Salter-Carlyle
- Salter-Boggy_North
- Salter-Boggy_South
- San Juan National Forest







FS-000417


Salter Environmental Assessment - Wildlife
DOLORES
MONTEZUMA
Plateau Creek
STONER MESA
TAYLOR ME
View
Yellow Jacket
Lewis
HAYCAMP MESA
Lost Canyon Creek
Dolores
Sources: Esri, HERE, Garmin, Intermap, increment P Corp., GEBCO, USGS, FAO, NPS, NRCAN, GeoBase, IGN, Kadaster NL, Ordnance Survey, Esri Japan, METI, Esri China (Hong Kong), (c) OpenStreetMap contributors, and the GIS User Community
Salter-Salter
Salter-Turkey_Knoll
Salter-Carlyle
Salter-Boggy_North
Salter-Boggy_South
Mule Deer Migration Corridors
Elk Migration Corridors
Lone Pine EA Project Boundary
San Juan National Forest
DWRF Focal Area
N
0
2.5
5
10
Miles
San Juan National Forest
Dolores

# DOLORES WATERSHED RESILIENT FOREST COLLABORATIVE (DWRF) ENGAGEMENT TIMELINE WITH THE SALTER EA

This timeline outlines areas of substantive engagement and collaboration between DWRF and the San Juan National Forest (SJNF) during and after the development of the Salter Environmental Assessment. It highlights specific meetings and documents and does not include many monthly DWRF stakeholder meetings that also addressed the Salter EA. This timeline and associated links to supporting documents are meant to serve as a reference to DWRF stakeholders. Italics denote formal NEPA process elements.

## JAN 14 & FEB 5, 2020

Pre-scoping meetings – DWRF & SJNF

- Intention to begin conversations early in planning process, learning from challenges with Lone Pine EA
- Focused on purpose and need, geography, which management areas and other topics
- Developed list of ecological questions/concerns to further explore
- Presentation by SJNF

## FEBRUARY 21, 2020

*Scoping released*

## MARCH 16, 2020

Science review

- Literature review, presentation, and discussion about ecological questions from pre-scoping meetings. Topics built from earlier conversations with Lone Pine EA.

## JULY, 2020

Collaborative prioritization activity. Identified where stakeholder management priorities are across Salter EA landscape based on different interests/values. Priorities communicated to SJNF Dolores District.

## AUGUST 17, 2020

Monitoring and Adaptive Management meeting for Salter EA. Topics:

- Communications flow
- Connections between DWRF DCs (under development at the time) and monitoring
- Ongoing engagement expectations

## SUMMER/FALL, 2020

Stakeholder meeting focused on needs and challenges between recreation and forest management, particularly in context of Salter EA

Identified general goal that stakeholders involved in collaborative dialogue would not put in objections.

## NOVEMBER , 2020

DWRF Ponderosa Pine Ecosystem Resilience Metrics and Desired Conditions completed. Process began in spring, 2020, and was intended to support DWRF engagement with projects across all lands, including Salter EA.

## NOVEMBER 20, 2020

Salter EA Tour at Boggy Draw. Topics included:

- Descending order of tree selection outlined in the EA
- Questions/relationship between DWRF Desired Conditions and EA approach
- Example prescription in a stand
- Community and recreation questions/concerns about management

## FEBRUARY 3 , 2021

Salter Agreements Document completed, outlining expectations and commitments of DWRF and SJNF for collaboration on Salter EA around collaborative processes/recommendations, ongoing engagement, and monitoring and adaptive management.

## FEBRUARY 10, 2021

*Draft EA released*

## FEBRUARY 19 AND MARCH 3, 2021

Feb 19 – DWRF review/discussion of Draft EA and opportunity for direct comments. Identified social, economic, and ecological questions/concerns from stakeholders.

March 3 – SJNF presentation at stakeholder meeting focused on current conditions in Salter EA area and proposed approaches to meet DCs. Additionally, stakeholder views and recreation mitigations were identified/discussed

## APRIL 25, 2021

DWRF Salter tour #2, held at recently completed project areas of Chicken Creek. Tour targeted engaging community members and interests not always present at DWRF meetings, particularly Dolores and Mancos Town Board members and recreation groups.

## JUNE 22 & SEPT, 2021

June 22 – *Final EA, Finding of No Significant Impact, and Draft Decision Notice released*

September – *Objection resolution meeting and later, objection responses*

## DECEMBER, 2021

December 2021 – DWRF Coordinating Committee meetings reviewing/discussing collaborative challenges and successes with Salter

## JUNE 1, 2022

June 1, 2022 – DWRF and SJNF review of collaborative engagement with Salter EA. Goals were to articulate success and challenges to DWRF involvement with Salter, support/expand collaborative trust, and identify lessons learned and steps for moving forward with Salter and future projects. See additional notes here.

## MARCH & APRIL, 2023

Salter monitoring plan development meetings:

- Incorporate updates from Lone Pine EA monitoring for Salter EA
- Enhance alignment between Salter monitoring and DWRF Desired Conditions
- Develop/identify control units to support our understanding of movement towards ecological desired conditions

DWRF Dolores Watershed Resilient Forest Collaborative

Search Files and Folders

PINYON ER

All Files
Recents
Synced
Notes
Relay
Apps
Trash

My Collections
Favorites
01. emma.reinema...
1900Planning
1950NEPAProject...
DoloresRD Workin...
Lands Permits
SW CO CFLRP
Dolores Realty Proj...
SOPs

## Collaborators in Salter

Filter Collaborators | Mail All | Share

| Name | Email Address | Permissions | Date Added |
|---|---|---|---|
| PA Pinyon Workstream Folders A | pinyon_wks_a_non-person@fs.fed.us | Owner | Jul 4, 2020 |
| DC DAVID J CASEY | david.casey2@usda.gov | Co-owner | Apr 8, 2020 |
| TB Travis J Bruch | travis.bruch@usda.gov | Co-owner | Aug 31, 2020 |
| CHRISTOPHER O ALANIS | christopher.alanis@usda.gov | Co-owner | Apr 8, 2020 |
| SB SARA W BRINTON | sara.brinton@usda.gov | Co-owner | Jul 10, 2023 |
| AC Anthony Culpepper | anthony@mountainstudies.org | Co-owner | Jul 8, 2020 |
| DM Danny Margoles | coordinator@dwrfcollaborative.org | Co-owner | Apr 8, 2020 |
| ER Emma Reinemann | Emma.Reinemann@usda.gov | Co-owner | Apr 6, 2023 |
| LH Laura Hanna | laura@mountainstudies.org | Co-owner | Dec 16, 2022 |
| JL Julia Ledford | julia@mountainstudies.org | Co-owner | Dec 22, 2022 |
| JL Jodi L Leingang | jodi.leingang@usda.gov | Editor | Aug 26, 2020 |
| SJ SHAUNA M JENSEN | shauna.jensen@usda.gov | Editor | Aug 26, 2020 |
| JW JOSHUA A WILLS | joshua.wills@usda.gov | Editor | Jul 5, 2020 |
| TY Tiffany A Young | tiffany.young@usda.gov | Editor | Aug 26, 2020 |
| MT Matthew A Traynham | matthew.traynham@usda.gov | Editor | Aug 26, 2020 |
| TR THOMAS B RICE | thomas.b.rice@usda.gov | Editor | Aug 26, 2020 |
| IM IVAN C MESSINGER | ivan.messinger@usda.gov | Editor | Aug 26, 2020 |
| DP Derek J Padilla | derek.padilla@usda.gov | Editor | Jul 5, 2020 |
| PS Patrick Seekins | patrick.seekins@usda.gov | Editor | Aug 26, 2020 |
| GF Gretchen L Fitzgerald | gretchen.fitzgerald2@usda.gov | Editor | Oct 7, 2020 |
| Cody J Jones | cody.j.jones@usda.gov | Editor | Aug 26, 2020 |
| MR Mark D Roper | mark.roper@usda.gov | Editor | Oct 7, 2020 |
| MR Michael Remke | mremke@mountainstudies.org | Editor | Aug 31, 2020 |
| JC John Chmelir | John.Chmelir@usda.gov | Editor | Aug 31, 2020 |
| JL Jodi L Leingang | jodi.leingang@usda.gov | Editor | Jul 4, 2020 |

FS-000420

All Files
Recents
Synced
Notes
Relay
Apps
Trash

My Collections
Favorites
01. emma.reinema...
1900Planning
1950NEPAProject...
DoloresRD Workin...
Lands Permits
SW CO CFLRP
Dolores Realty Proj...
SOPs

Search Files and Folders

PINYON ER

All Files > External EA_DWRF_Collaborative_Exchange > Salter

New + Share

NAME ↑

DWRF and Agency Communication
Implementation Check List
Monitoring

PA Pinyon Workstream Folders A
Owner
ER Emma Reinemann
Co-owner
CHRISTOPHER O ALANIS
Co-owner
DM Danny Margoles
Co-owner
DC DAVID J CASEY
Co-owner
+20 People
Externally Shared
Shared Link
Create Link
File Request
Create Link

FS-000421

Search Files and Folders

PINYON ER

All Files
Recents
Synced
Notes
Relay
Apps
Trash

My Collections
Favorites
01. emma.reinema...
1900Planning
1950NEPAProject...
DoloresRD Workin...
Lands Permits
SW CO CFLRP
Dolores Realty Proj...
SOPs

External EA_DWRF_Collaborative_Exchange > Salter > DWRF and Agency Communication

New + Share

NAME ↑

- Agency to DWRF
- DWRF to Agency
- Collaborative_Communcation_Form_CCF.docx V13

PA Pinyon Workstream Folders A
Owner

ER Emma Reinemann
Co-owner

CHRISTOPHER O ALANIS
Co-owner

DM Danny Margoles
Co-owner

DC DAVID J CASEY
Co-owner

+20 People
Externally Shared

Shared Link
Create Link

File Request
Create Link

Search Files and Folders

PINYON ER

All Files
Recents
Synced
Notes
Relay
Apps
Trash

My Collections
Favorites
01. emma.reinema...
1900Planning
1950NEPAProject...
DoloresRD Workin...
Lands Permits
SW CO CFLRP
Dolores Realty Proj...
SOPs

Salter > DWRF and Agency Communication > Agency to DWRF

New + Share

NAME ↑

Communication 1
Communication 2
Communication 3
Communication 4
Data

PA Pinyon Workstream Folders A
Owner

ER Emma Reinemann
Co-owner

CHRISTOPHER O ALANIS
Co-owner

DM Danny Margoles
Co-owner

DC DAVID J CASEY
Co-owner

+20 People
Externally Shared

Shared Link
Create Link

File Request
Create Link

FS-000423

Search Files and Folders

PINYON ER

All Files
Recents
Synced
Notes
Relay
Apps
Trash

My Collections
Favorites
01. emma.reinema...
1900Planning
1950NEPAProject...
DoloresRD Workin...
Lands Permits
SW CO CFLRP
Dolores Realty Proj...
SOPs

> DWRF and Agency Communication > Agency to DWRF > Communication 1

New + Share

NAME ↑

Collaborative_Communcation_Form_CCF_CSE_Salter_Draft_EA.docx

PA Pinyon Workstream Folders A
Owner

ER Emma Reinemann
Co-owner

CHRISTOPHER O ALANIS
Co-owner

DM Danny Margoles
Co-owner

DC DAVID J CASEY
Co-owner

+20 People
Externally Shared

Shared Link
Create Link

File Request
Create Link

Search Files and Folders

PINYON ER

All Files
Recents
Synced
Notes
Relay
Apps
Trash

My Collections
Favorites
01. emma.reinema...
1900Planning
1950NEPAProject...
DoloresRD Workin...
Lands Permits
SW CO CFLRP
Dolores Realty Proj...
SOPs

> DWRF and Agency Communication > Agency to DWRF > Communication 2

New + Share

NAME ↑

Collaborative_Communcation_Form_CCF_Salter_Draft_EA_Support_Data.docx

PA Pinyon Workstream Folders A
Owner

ER Emma Reinemann
Co-owner

CHRISTOPHER O ALANIS
Co-owner

DM Danny Margoles
Co-owner

DC DAVID J CASEY
Co-owner

+20 People
Externally Shared

Shared Link
Create Link

File Request
Create Link

Search Files and Folders

PINYON ER

All Files
Recents
Synced
Notes
Relay
Apps
Trash

My Collections
Favorites
01. emma.reinema...
1900Planning
1950NEPAProject...
DoloresRD Workin...
Lands Permits
SW CO CFLRP
Dolores Realty Proj...
SOPs

DWRF and Agency Communication > Agency to DWRF > Communication 3

New + Share

| NAME ↑ |
|---|
| RMSTANDPRT.pdf |
| RMSTAND_BEAMXX0001.pdf |
| Salter_Draft_EA_DWRF_Presentation_03012021_Update030321.zip |
| Salter_Draft_EA_DWRF_Presentation_final_PDF.zip |

PA Pinyon Workstream Folders A
Owner

ER Emma Reinemann
Co-owner

CHRISTOPHER O ALANIS
Co-owner

DM Danny Margoles
Co-owner

DC DAVID J CASEY
Co-owner

+20 People
Externally Shared

Shared Link
Create Link

File Request
Create Link

FS-000426

Search Files and Folders

PINYON ER

All Files
Recents
Synced
Notes
Relay
Apps
Trash

My Collections
Favorites
01. emma.reinema...
1900Planning
1950NEPAProject...
DoloresRD Workin...
Lands Permits
SW CO CFLRP
Dolores Realty Proj...
SOPs

DWRF and Agency Communication > Agency to DWRF > Communication 4

New + Share

NAME ↑

r220_ADS.gdb
Dolores_Bark_Beetle_Complex.pdf
SalterEAForest_Health_Flight_2018_2020_Map.pdf
SalterEAForest_Health_Flight_2020_Map.pdf

PA Pinyon Workstream Folders A
Owner
ER Emma Reinemann
Co-owner
CHRISTOPHER O ALANIS
Co-owner
DM Danny Margoles
Co-owner
DC DAVID J CASEY
Co-owner
+20 People
Externally Shared
Shared Link
Create Link
File Request
Create Link

FS-000427

Search Files and Folders

PINYON ER

All Files
Recents
Synced
Notes
Relay
Apps
Trash

My Collections
Favorites
01. emma.reinema...
1900Planning
1950NEPAProject...
DoloresRD Workin...
Lands Permits
SW CO CFLRP
Dolores Realty Proj...
SOPs

> DWRF and Agency Communication > Agency to DWRF > Data

New + Share

NAME ↑

Draft EA Data

Final EA Data

PA Pinyon Workstream Folders A
Owner

ER Emma Reinemann
Co-owner

CHRISTOPHER O ALANIS
Co-owner

DM Danny Margoles
Co-owner

DC DAVID J CASEY
Co-owner

+20 People
Externally Shared

Shared Link
Create Link

File Request
Create Link

FS-000428

All Files
Recents
Synced
Notes
Relay
Apps
Trash

My Collections
Favorites
01. emma.reinema...
1900Planning
1950NEPAProject...
DoloresRD Workin...
Lands Permits
SW CO CFLRP
Dolores Realty Proj...
SOPs

Search Files and Folders

PINYON ER

Agency to DWRF > Data > Draft EA Data

New + Share

| NAME ↑ |
| --- |
| FINAL FVS RUNS |
| BEAMXX_DOBAXX_DOLCXX_HOUSXX.zip |
| MCPHXX_PLATXX_WDOLXX.zip |
| RMSTAND_SalterEA.csv |
| SalterEA_TreeAge_Recon.xlsx |
| Salter_Cutting_Units_and_Mitigations_022321_DL.gdb.zip |
| Salter_Draft_EA_DWRF_Presentation.pptx |

PA Pinyon Workstream Folders A
Owner

ER Emma Reinemann
Co-owner

CHRISTOPHER O ALANIS
Co-owner

DM Danny Margoles
Co-owner

DC DAVID J CASEY
Co-owner

+20 People
Externally Shared

Shared Link
Create Link

File Request
Create Link

FS-000429

Search Files and Folders

PINYON ER

All Files
Recents
Synced
Notes
Relay
Apps
Trash

My Collections
Favorites
01. emma.reinema...
1900Planning
1950NEPAProject...
DoloresRD Workin...
Lands Permits
SW CO CFLRP
Dolores Realty Proj...
SOPs

> Agency to DWRF > Data > Final EA Data

New + Share

NAME ↑

FVS_Data_RM_PP.accdb
Salter Final 386.xlsx
Salter Final COMBINED .xlsx
Salter_FVS_Data_tjb.accdb

PA Pinyon Workstream Folders A
Owner
ER Emma Reinemann
Co-owner
CHRISTOPHER O ALANIS
Co-owner
DM Danny Margoles
Co-owner
DC DAVID J CASEY
Co-owner
+20 People
Externally Shared
Shared Link
Create Link
File Request
Create Link

FS-000430

Search Files and Folders

PINYON ER

All Files
Recents
Synced
Notes
Relay
Apps
Trash

My Collections
Favorites
01. emma.reinema...
1900Planning
1950NEPAProject...
DoloresRD Workin...
Lands Permits
SW CO CFLRP
Dolores Realty Proj...
SOPs

Salter > DWRF and Agency Communication > DWRF to Agency

New + Share

NAME ↑

Communication 2

Communication1_10.5.2020

PA Pinyon Workstream Folders A
Owner

ER Emma Reinemann
Co-owner

CHRISTOPHER O ALANIS
Co-owner

DM Danny Margoles
Co-owner

DC DAVID J CASEY
Co-owner

+20 People
Externally Shared

Shared Link
Create Link

File Request
Create Link

FS-000431

All Files
Recents
Synced
Notes
Relay
Apps
Trash

My Collections
Favorites
01. emma.reinema...
1900Planning
1950NEPAProject...
DoloresRD Workin...
Lands Permits
SW CO CFLRP
Dolores Realty Proj...
SOPs

Search Files and Folders

PINYON ER

> DWRF and Agency Communication > DWRF to Agency > Communication1_10.5.2020

New + Share

NAME ↑

Collaborative_Communcation_Form_CSEDATA.docx

PA Pinyon Workstream Folders A
Owner
ER Emma Reinemann
Co-owner
CHRISTOPHER O ALANIS
Co-owner
DM Danny Margoles
Co-owner
DC DAVID J CASEY
Co-owner
+20 People
Externally Shared
Shared Link
Create Link
File Request
Create Link

Search Files and Folders

PINYON ER

All Files
Recents
Synced
Notes
Relay
Apps
Trash

My Collections
Favorites
01. emma.reinema...
1900Planning
1950NEPAProject...
DoloresRD Workin...
Lands Permits
SW CO CFLRP
Dolores Realty Proj...
SOPs

DWRF and Agency Communication > DWRF to Agency > Communication 2

New + Share

PA Pinyon Workstream Folders A
Owner

ER Emma Reinemann
Co-owner

CHRISTOPHER O ALANIS
Co-owner

DM Danny Margoles
Co-owner

DC DAVID J CASEY
Co-owner

+20 People
Externally Shared

Shared Link
Create Link

File Request
Create Link

**Get started by adding your first file**

Create new documents directly within Box or upload an existing file

Upload

FS-000433

All Files
Recents
Synced
Notes
Relay
Apps
Trash

My Collections
Favorites
01. emma.reinema...
1900Planning
1950NEPAProject...
DoloresRD Workin...
Lands Permits
SW CO CFLRP
Dolores Realty Proj...
SOPs

Search Files and Folders

PINYON ER

External EA_DWRF_Collaborative_Exchange > Salter > Monitoring

New + Share

| NAME ↑ |
| --- |
| Base Units GIS Data |
| Forest Health Aerial Survey Maps |
| MSI Monitoring Framework |
| Stocking Survey Failure Reports |

PA Pinyon Workstream Folders A
Owner
ER Emma Reinemann
Co-owner
CHRISTOPHER O ALANIS
Co-owner
DM Danny Margoles
Co-owner
DC DAVID J CASEY
Co-owner
+20 People
Externally Shared
Shared Link
Create Link
File Request
Create Link

FS-000434

All Files
Recents
Synced
Notes
Relay
Apps
Trash

My Collections
Favorites
01. emma.reinema...
1900Planning
1950NEPAProject...
DoloresRD Workin...
Lands Permits
SW CO CFLRP
Dolores Realty Proj...
SOPs

Search Files and Folders

PINYON ER

Salter > Monitoring > Forest Health Aerial Survey Maps

New + Share

NAME ↑

2020

PA Pinyon Workstream Folders A
Owner

ER Emma Reinemann
Co-owner

CHRISTOPHER O ALANIS
Co-owner

DM Danny Margoles
Co-owner

DC DAVID J CASEY
Co-owner

+20 People
Externally Shared

Shared Link
Create Link

File Request
Create Link

FS-000435

Search Files and Folders

PINYON ER

All Files
Recents
Synced
Notes
Relay
Apps
Trash

My Collections
Favorites
01. emma.reinema...
1900Planning
1950NEPAProject...
DoloresRD Workin...
Lands Permits
SW CO CFLRP
Dolores Realty Proj...
SOPs

Monitoring > Forest Health Aerial Survey Maps > 2020

New + Share

PA Pinyon Workstream Folders A
Owner

ER Emma Reinemann
Co-owner

CHRISTOPHER O ALANIS
Co-owner

DM Danny Margoles
Co-owner

DC DAVID J CASEY
Co-owner

+20 People
Externally Shared

Shared Link
Create Link

File Request
Create Link

**Get started by adding your first file**

Create new documents directly within Box or upload an existing file

Upload

FS-000436

Search Files and Folders

PINYON ER

All Files
Recents
Synced
Notes
Relay
Apps
Trash

My Collections
Favorites
01. emma.reinema...
1900Planning
1950NEPAProject...
DoloresRD Workin...
Lands Permits
SW CO CFLRP
Dolores Realty Proj...
SOPs

Salter > Monitoring > Base Units GIS Data

New + Share

NAME ↑

Salter_Treatment_Unit_Database.gdb_DL100520.zip

PA Pinyon Workstream Folders A
Owner

ER Emma Reinemann
Co-owner

CHRISTOPHER O ALANIS
Co-owner

DM Danny Margoles
Co-owner

DC DAVID J CASEY
Co-owner

+20 People
Externally Shared

Shared Link
Create Link

File Request
Create Link

Search Files and Folders

PINYON ER

All Files
Recents
Synced
Notes
Relay
Apps
Trash

My Collections
Favorites
01. emma.reinema...
1900Planning
1950NEPAProject...
DoloresRD Workin...
Lands Permits
SW CO CFLRP
Dolores Realty Proj...
SOPs

Salter > Monitoring > MSI Monitoring Framework

New + Share

NAME ↑

MSI_Salter_MonitoringFramework.pdf

PA Pinyon Workstream Folders A
Owner

ER Emma Reinemann
Co-owner

CHRISTOPHER O ALANIS
Co-owner

DM Danny Margoles
Co-owner

DC DAVID J CASEY
Co-owner

+20 People
Externally Shared

Shared Link
Create Link

File Request
Create Link

FS-000438

Search Files and Folders

PINYON ER

All Files
Recents
Synced
Notes
Relay
Apps
Trash

My Collections
Favorites
01. emma.reinema...
1900Planning
1950NEPAProject...
DoloresRD Workin...
Lands Permits
SW CO CFLRP
Dolores Realty Proj...
SOPs

> Salter > Monitoring > Stocking Survey Failure Reports

New + Share

NAME ↑

Stand #X

PA Pinyon Workstream Folders A
Owner

ER Emma Reinemann
Co-owner

CHRISTOPHER O ALANIS
Co-owner

DM Danny Margoles
Co-owner

DC DAVID J CASEY
Co-owner

+20 People
Externally Shared

Shared Link
Create Link

File Request
Create Link

Search Files and Folders

All Files
Recents
Synced
Notes
Relay
Apps
Trash

My Collections
Favorites
01. emma.reinema...
1900Planning
1950NEPAProject...
DoloresRD Workin...
Lands Permits
SW CO CFLRP
Dolores Realty Proj...
SOPs

PINYON ER

Monitoring > Stocking Survey Failure Reports > Stand #X

New + Share

PA Pinyon Workstream Folders A
Owner

ER Emma Reinemann
Co-owner

CHRISTOPHER O ALANIS
Co-owner

DM Danny Margoles
Co-owner

DC DAVID J CASEY
Co-owner

+20 People
Externally Shared

Shared Link
Create Link

File Request
Create Link

**Get started by adding your first file**

Create new documents directly within Box or upload an existing file

Upload

FS-000440

USDA United States Department of Agriculture | Forest Service | Dolores Ranger District San Juan National Forest | 29211 Hwy 184 Dolores, CO 81323-9308 Phone 970-882-7296 Fax 970-882-0175 http://www.fs.usda.gov/sanjuan

File Code: 2410
Date: February 21,2020

Dear Interested Party:

The Forest Service is seeking your input regarding a vegetation management proposal on the Dolores Ranger District of the San Juan National Forest (SJNF). The project area is located northeast of Dolores, CO on the Dolores Ranger District. Proposed treatment areas are in the vicinity of Salter Y, Plateau Creek, Carlyle Point, Turkey Knoll, and Boggy Draw. This project is proposed in order to 1) improve or maintain the resistance and resiliency of ponderosa pine forest ecosystems, 2) increase the diversity of ponderosa pine forest ecosystem development stages and, 3) provide economic support to local communities by providing timber products to local industries in a sustainable manner. The Salter Vegetation Management project proposes treatment on approximately 35,000 acres of ponderosa pine forest.

Enclosed, please find the scoping package and associated map. The District is seeking information and comments from individuals, Federal, State, and local agencies, Tribes, and organizations that may be interested in or affected by this proposal. We encourage you to submit substantive comments on this initial proposed action, accompanied by supporting reasons that the responsible official should consider in issuing a decision. We also welcome your questions on the need for action or any aspect of the initial proposed action that is unclear. Comments will help us identify issues and develop alternatives to the proposal as outlined in the National Environmental Policy Act (NEPA). Based on your comments, the project interdisciplinary team will refine the proposed action or develop additional alternatives and conduct an analysis of the proposal. The final decision is expected in September 2020 and will determine whether to conduct the activities described here, and in what manner.

The 30-day scoping comment period will begin on Friday, February 21, 2020. Electronic comments can be submitted through the electronic comment form located on the project webpage. Comments may also be submitted by means of written comment via the U.S. Postal Service or hand delivered, facsimile, by telephone, or in person. Comments should include: 1) your name and postal address, 2) project title (Salter Vegetation Management), and 3) signature or other verification of identity upon request (36 CFR 218.25(a)(3)). Comments received in response to this initial request, including names, addresses, and any other information provided with the comments, will be considered a part of the public record.

This project is authorized under 36 CFR 218 subparts A and B. This rule provides for a pre-decisional objection process, whereby the public is provided an opportunity to comment and express concerns on projects before decisions are made, rather than after. Following preparation and distribution of the draft environmental analysis, a 30-day comment period will be available for you to provide additional comments prior to completion of a final environmental analysis and draft decision notice. A 45-day objection period will follow publication of the final

environmental analysis and draft decision notice. If no objections are received during that period, the final decision will be signed and may be implemented after five business days. If objections are received on this project there will be a 45-day period for resolutions of the identified issues prior to signature and implementation.

For questions or to discuss the project further please contact David Casey, Timber Staff Officer at 970-882-7296 or djcasey@fs.fed.us.

Sincerely,

DEREK J. PADILLA
District Ranger

# Salter Vegetation Management Project Scoping Package

The Forest Service is seeking your input and ideas regarding a vegetation management proposal on the Dolores Ranger District of the San Juan National Forest (SJNF). Our proposal identifies vegetation management across roughly 35,000 acres. This letter and attached maps provide you with detailed information about the purpose and need, the proposed action, and the decision framework. Comments or suggestions concerning this proposal would be most helpful if received by March 23, 2020. Please refer to the "How to Reply" section of this package for additional information about submitting comments.

## Project Area

The project area is located northeast of Dolores, CO, on the Dolores Ranger District (figure 1). Proposed treatment areas are in the vicinity of Salter Y, Plateau Creek, Carlyle Point, Turkey Knoll, and Boggy Draw. The project is bordered in multiple locations by state and private lands; the Dolores River and McPhee Reservoir on the west; and the West Dolores and Dolores Rivers on the east. The project area is located on suitable timber lands within Management Area 5. Management Area 5 emphasizes active management and commodity production in order to meet multiple use goals. The legal description of the project area is: T39N R16W portions of Sections: 10, 11, 12, 13, 14, 15, 23, 24, 25, 26, 35, 36; T39N R15W portions of Sections: 8, 9, 10, 11, 14, 15, 16, 17, 19, 20, 21, 22, 27, 28, 29, 30, 31, 32, 33, 36; T38N R15W portions of Sections: 1, 2, 3, 4, 5, 10, 11, 12, 13, 14, 15, 22, 23, 24, 25, 26, 27, 34, 35, 36; T39N R14W portions of Sections: 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35; T40N R14W portions of Sections: 34, 35, 36; T38N R14W portions of Sections: 2, 3, 4, 5, 6, 7, 8, 9, 16, 17, 18, 19, 20, 29, 30, 31, 32; T37N R15W portions of Section: 1 and; T37N R14W portions of Sections: 5, 6, 7.

The project area has been broken into five individual treatment blocks based on geographical location and transportation system (i.e., Salter, Plateau, Carlyle, Turkey Knoll, and Boggy Draw). Each treatment block has been further divided into subunits for greater site-specific refinement for treatment prescriptions, topography, and transportation systems.

Elevations in the analysis area ranges from 7,800 feet at the southwestern end of the analysis area, to 8,800 feet on the northern end. The topography of the treatment area is predominately mesa top with southwest aspect. Slopes range from 0 to approximately 20 percent, with steeper draws and canyons which intersect the project area throughout.

The dominant vegetative type in the proposed treatment blocks is ponderosa pine with an understory of Gambel oak. The forest conditions in the proposed treatment blocks reflect an even-age structure comprised of densely spaced, over-stocked medium and large pine trees in a single structural layer. Smaller trees, saplings, and seedling are infrequent or lacking entirely. Due to the overstocked

conditions, these stands have closed canopies with few clumps and individual large trees present. The abundance and distribution of Gambel oak (*Quercus gambelii*) in the understory of the proposed treatment blocks lacks variability. Due to fire suppression resulting in longer fire return intervals and ungulate grazing, the understory is dominated Gambel oak that is dense, shrubby, and primarily even-age. The project area also supports small patches of quaking aspen with conifer developing in the understory. Conifer encroachment creates shade and usurps water and nutritional resources, ultimately reducing the vigor of the quaking aspen communities. Non-forested vegetation types within the project area include mountain shrub lands, mountain grasslands, and riparian areas.

The lands contained within and surrounding the Salter project area provide multiple uses to a variety of stakeholders. Timber harvesting has occurred across the entire project area. In the 1920's and 1930's, large scale logging occurred across this part of the forested landscape. Beginning in the 1980's and continuing until the mid-2000's, harvesting continued, but at a smaller scale, with an approach that emphasized treating patches of vegetation and irregular treatment unit patterns. The gentle terrain is ideal for livestock grazing with several active allotments crossing the project area. Many forms of recreation occur in the area, including; big and small game hunting, year-round biking, Nordic skiing, OHV use, and hiking. Residential areas of variable densities are clustered along the federal land boundaries. The Montezuma Community Wildfire Protection Plan identifies the entire project area as Wildland Urban Interface, as does the San Juan National Forest Land and Resource Management Plan (SJNF LRMP). The Boggy Draw block attracts the highest visitor use and contains substantial values at risk. A high voltage power line runs most of the entire length of the block with local power coop lines reaching interior to supply power to the residential areas described above.

## Purpose and Need for Action

The purpose and need for this project is derived from the differences between the existing forest vegetation conditions and the desired forest vegetation conditions, as defined by the SJNF LRMP. Specific guidance is provided for suitable timber lands and Management Area 5 designated lands. The desired conditions for the ponderosa pine cover type and lands managed for forest product offerings are defined in Section 2.2.23 and Section 2.9.1 of the SJNF LRMP.

> **2.2.23: Ponderosa Pine Forests -** Ponderosa pine forests display variable density and structure. Most stands reflect uneven-age structure comprising variable-sized, even-aged clumps of trees. Clumps vary in size, ranging from as few as three trees to as many as 20 or more trees. Tree clumps vary in density from widely spaced large trees to tightly spaced small trees. Collectively, these forests contain multiple canopy layers. Between or surrounding these clumps are shrub- and/or grass/forb-dominated openings. Ponderosa pine seedlings and saplings are present, as are large old, yellow-barked ponderosa pine trees. The presence of other tree species—e.g., Douglas-fir, white fir, blue spruce (*Picea pungens*), or Rocky Mountain juniper (*Juniperus scopulorum*)—is infrequent to rare. The abundance and distribution of Gambel oak (*Quercus gambelii*) and other native shrubs in the understory of these forests is variable and includes small and large patches of all size classes. Native grasses and forbs (including bunchgrasses, Arizona fescue, muttongrass [*Poa fendleriana*], and mountain muhly [*Muhlenbergia montana*]) are present and well distributed in most ponderosa pine forests. Forest litter is common, though highly variable in depth and extent due to fire. Invasive plant species are absent or rare. Presence of snags or large wood (on the ground) is also highly variable due to fire. Low-intensity, high- frequency surface fires are common in most ponderosa pine forests (with frequencies ranging from about 12 to 30 years).

The SJNF LRMP provides further direction relative to the desired conditions associated with suitable

timber lands, as follows:

**2.9.1:** Forest vegetation management on SJNF lands that results in, among other objectives, meeting needs or demands for forest product offerings (commercial, personal, or other use) is done in a manner that:

- maintains or improves ecosystem function, resilience, and sustainability;
- supports, at least, the current level of economic activity in the local timber industry;
- provides economic or social support to local communities;
- ensures current and future needs for Native American tribal use, including that associated with special forest products (e.g., teepee poles);
- utilizes, to the fullest extent practicable, potential products including sawtimber, poles, top wood, or slash (e.g., limbs, foliage);
- supports innovation in utilization, including conversion of cut-tree mass into biofuels, pellets, biochar, or other useful products;
- efficiently balances or reduces costs of implementation of treatment activities; and
- anticipates climate-related plant succession changes (such as favoring heat- or drought-resistant tree species as leave trees, or in reforestation).

A comparison based on common stand exams and field observations between the current and desired conditions shows that the condition of the ponderosa pine cover type found within the Salter Vegetation Management project area is different from the desired conditions associated with that vegetative cover type in the SJNF LRMP. It is well documented that dense, over-stocked, even-age, closed canopy ponderosa pine stands are more susceptible to insect outbreaks and uncharacteristic and stand replacing fire events. It is also well documented that a lack of structural diversity corresponds directly to a reduction in forest resiliency and consequently long term resistance to detrimental natural and human-caused disturbance events. Based on this comparison, the following needs have been identified:

- The need to improve resilience or maintain the resistance of forest ecosystems in an effort to increase protection against epidemic insect and disease outbreaks.
- The need to increase the structural diversity of the ponderosa pine forest represented across the landscape.
- The need to provide economic support to local communities by providing timber products to dependent local industries in a sustainable manner.

## Proposed Action

The Dolores Ranger District is proposing tree-cutting, tree planting, and activity fuel burning in the locations described above and as displayed in figure 1. The combined acreage of these project areas is approximately 35,000 acres. Treatments would lower pine stocking levels, reduce the presence of dwarf mistletoe disease, and remove infested bark beetle trees, and dead trees. The proposed actions would create gaps and small openings in the dense canopy to allow sunlight to reach the forest floor and activity fuel burning would reduce duff; exposing bare soil and creating improved conditions for new tree seedlings to establish. A range of treatments may occur throughout the project area. Table 1 summarizes the types of silvicultural prescriptions that would be applied based on the condition of stands at the time of implementation.

Table 1: Vegetation treatment types and treatment descriptions

| **Treatment Type** | **Description** |
|---|---|
| Commercial Thinning | Silviculture thinning with enhancement objectives in mixed stocking ponderosa pine with a variable residual square feet of tree stem basal area of 50 -70 (BA) per acre depending upon stand condition. |
| Pre-Commercial Thinning | Thinning of ponderosa pine (Less than 5 inches diameter) to spacing specifications. |
| Brush Thinning | Thinning of understory brush species (Less than 6 inches Diameter at Root Collar), mainly Gambel oak to create openings for seedling recruitment and reduce ladder fuel effects on residual trees. |
| Plantation Thinning | Thinning of planted trees to a spacing specification and thinning of intermixed naturally occurring trees according to the Commercial Thinning prescription. |
| Single Tree Selection | Silviculture thinning with regenerative objectives in contiguous stands of ponderosa pine with a variable residual square feet of tree stem basal area of 50 -70 (BA) per acre depending upon stand condition. |
| Reforestation | Planting of trees in the event that a stand(s) within a treatment unit does not meet minimal stocking requirements as described in the LRMP or is projected to fall below the minimum LRMP stocking requirements (based upon stocking survey data and/or forest inventory) for Ponderosa Pine type. |

### Associated Actions

Other activities associated with the proposed vegetation treatment would include maintenance-related road-work. The work would be performed prior to, during, and/or following treatments. The majority of this work would involve reshaping and smoothing of the road surface and restoring any associated drainage ditches or rolling dips. Several additional Maintenance Level 1 (stored roads) that have all been closed and unused for the last 20 to 30 years would be reopened, used and put back in storage after use. These roads may require some level of reconstruction in addition to normal maintenance to return them to an operational status. Reconstruction would largely consist of clearing downed trees and grown-in vegetation, installing or repairing drainage at stream crossings, along roadside ditches or associated with rolling dips and repairing failed sections of the roadway. Table 2 displays the proposed primary haul route. Forest products would be removed off the Forest via the identified Forest Service roads.

Table 2. Proposed primary haul route

| Area | Road Number and Name |
|---|---|
| Salter | FSR 510, 521 |
| Plateau | FSR 523, 514, 521 |
| Carlyle | FSR 525, 514, 526 |
| Boggy Draw | FSR 527, 526 |
| Turkey Knoll | FSR 532, 526 |

No new permanent roads are proposed to be built with this project, though temporary roads may be required to reduce the need for excessive tractor skidding and allow wood products to be moved to the permanent road system. Creating these roads would involve clearing vegetation and minimal construction. They would be constructed, utilized and reclaimed when rainfall and erosion potential is minimal. These segments would be decommissioned within five years of first use.

Any existing system roads currently closed to public motorized use will remain closed (except for permitted use) during and following operations. Closures would be accomplished via a variety of means, such as gates or boulder barriers with disturbed areas scarified and seeded following use. All roads in the project area that are currently open to public car and truck traffic would remain open following operations. For safety, short term closures of publicly accessible roads or trails may be necessary during logging operations.

Other related forestry activities would include the reduction of activity created slash loads. Cutting and removal of trees will result in limbs, tops, un-merchantable boles and stems otherwise called slash. Slash typically concentrates at landing locations or within the treatment units themselves. Landings would be identified by the sale administrator during implementation with guidance from the design features developed during this analysis. Timber sale or stewardship contracts would require concentrations of this material to be disposed of by a) piling for later burning, or b) lopping and scattering throughout the unit, c) a combination of scattering and piling/burning or d) remove. The method used will be dependent upon the amount of slash generated and the mechanical means employed by the contractor as well as specific conditions within the unit

### Other Actions

Wildlife water providers (i.e., guzzler) will be installed within the project area under this decision. The goal is to provide a water source for wildlife during dry months and or in years when drought conditions are present.

### Resource Protection Measures

Resource protection measures that meet or exceed LRMP Standards and Guidelines would be applied. Resource protection measures are a fundamental component of the proposed action and would be implemented as part of the proposed action. Protection measures would be applied to minimize or eliminate potential adverse impacts from the proposed actions on other resources such as soils, aquatics, fisheries, wildlife, cultural resources, and recreation.

## Public Involvement

Your questions, comments and suggestions regarding this proposal are an integral part of the environmental analysis process. This opportunity to provide feedback serves two main purposes: 1) to fulfill the public involvement and scoping for this project as required under the National Environmental Policy Act (NEPA), and 2) to gather constructive ideas that will be used to identify issues, develop Alternative approaches to this proposal or formulate design features. After receiving your comments, the Forest Service will identify and analyze the issues raised, finalize a Proposed Action and design criteria, and if necessary, develop Alternative approaches to the Proposed Action. A draft Environmental Assessment will be published in the future with an additional opportunity to provide comments. We intend to complete the NEPA analysis in June 2020 and make a decision whether or not to implement the proposed action or another alternative in September 2020. Implementation could then begin during the fall of 2020. Those people responding to this scoping letter will be included on the mailing list for future information related to this project.

## Decision Framework

At this time, the Forest Service plans to document and disclose any environmental effects of this proposal in an EA. The Dolores District Ranger will be the Responsible Official. The Ranger's decision will be detailed in a decision notice after the EA is completed. Given the stated purpose and need of the project, the Responsible Official will review the proposed action, any alternative approaches and/or design features in order to make the following decisions:

1. Whether or not to implement the proposed action or an alternative approach and conduct other related activities to address the purposes stated above.

2. If the proposed action or an alternative approach is selected, under what conditions and by which methods would the activities be conducted.

The decision framework of this project does not include reanalyzing existing Management Area prescriptions, standards or guidelines already specified in the existing LRMP nor will it seek to re-examine federal regulations or Forest Service policy regarding timber harvest on National Forest lands.

### Objection Regulations That Apply to this Project

This project is authorized under 36 CFR 218 subparts A and B. This rule provides for a pre-decisional objection process, whereby the public is provided an opportunity to comment and express concerns on projects before decisions are made, rather than after. Following preparation and distribution of the draft EA, a 30-day comment period will be available for you to provide additional comments prior to completion of a final EA and draft decision notice. Only those persons that comment during this scoping opportunity or the 30-day formal comment period will have standing to participate in the objection process. Following the 30-day comment period, a draft decision will be published and this will begin a 45-day objection period. If no objections are received during that period, the final decision will be signed and may be implemented after five business days. If objections are received on this project there will be a 45-day period for resolutions of the identified issues prior to signature of the final decision and implementation.

### How to Reply

The 30-day scoping comment period will begin on Friday, February 21, 2020. Electronic comments can be submitted through the electronic comment form located on the project webpage. Comments may also be submitted by means of written comment via the U.S. Postal Service or hand delivered, facsimile, by telephone, or in person. Comments should include: 1) your name and postal address, 2) project title (Salter Vegetation Management), and 3) signature or other verification of identity upon request (36 CFR 218.25(a)(3)). Comments received in response to this initial request, including names, addresses, and any other information provided with the comments, will be considered a part of the public record.

| |
|---|
| **Written Comments via e-mail:**<br>Use the electronic comment form located at<br>https://www.fs.usda.gov/project/?project=57671 |
| **Written Comments via the U.S. Postal Service or hand delivered:**<br>***(Office hours for hand delivery are 8:00 am to 4:30 pm weekdays)***<br>San Juan National Forest<br>Dolores Public Lands Office<br>Salter Vegetation Management Project<br>Attention: Derek Padilla<br>29211 Highway 184<br>Dolores, CO 81323 |
| **Written Comments via facsimile:**<br>(970) 882-0175<br>Attention: Derek Padilla, Salter Vegetation Management Project |
| **Oral Comments via telephone or in person:**<br>David Casey (970) 882-6830<br>USDA Forest Service<br>29211 Highway 184<br>Dolores, CO 81323 |

**For Further Information:** For further information about this proposal, please contact David Casey, Project Leader, at (970) 882-6830 or djcasey@fs.fed.us .

**Project Map**




Figure 1. Salter Vegetation Management Project Map

Date submitted (UTC-11): 3/2/2020 3:10:15 AM
First name: Cassandra
Last name: Leoncini
Organization:
Title:
Comments:
The forest, though deeply disturbed by human activity, is an active, natural intelligence that is, currently, incomprehensible to us. The best action is to leave it alone. Our uninformed interference is destroying its natural functioning. Stop the controlled burns, seeding, logging, clearing. Allow its natural functions to correct the damage we've already done, even if that means allowing it to burn in wildfires. Leave the forest to heal itself. Limit human activity to hikers and horses. No grazing, no motorized vehicles or bicycles off the Dolores/Norwood Road. Stop building more trails. Stop maintaining trails. Get rid of the cyanide bombs. Allow the forest to heal itself.

Date submitted (UTC-11): 3/2/2020 12:00:00 AM
First name: Tim
Last name: Kyllo
Organization: Montrose Forest Products, LLC
Title: Resource Forester
Comments:
SUBJECT: SALTER VEGETATION MANAGEMENT PROJECT

Mr. Derek Padilla:

Montrose Forest Products, LLC appreciates the opportunity to comment on the Salter Vegetation Management Project. As a member of the timber industry in Western Colorado with a vested interest in harvesting and producing Ponderosa pine lumber, our 95 direct employees at the mill and approximately 120 people that make up our independent logging and trucking contractors are extremely supportive of any effort the San Juan National Forest makes to provide commercial timber for bid. We encourage you and your staff to work through this scoping process in a timely manner to ensure a steady supply of wood fiber to the timber industry.

We would offer the following comments specifically on Design Criteria items:

We strongly urge the SJNF to not limit the construction of temporary road construction to access planned timber sale units as was done on the Lone Pine EA. The Salter Vegetation Management Project lies in areas where slopes, ground conditions and existing road templates require the absolute need for purchasers to be able to build temporary road locations on pre-approved USFS locations as necessary to economically log and haul the timber to mill sites. This must be incorporated into the final decision without restrictions other than those identified in the standard USFS "B" and "C' clauses. Otherwise no-bids on future timber sales may occur.

We urge the USFS to use standard "B" and "C" clauses when dealing with the control and spread of noxious weeds and not add to or further limit harvest operations by requiring additional restrictions, equipment cleaning and so forth in the final decision.

We urge the USFS to keep seasonal restrictions other than identified wildlife operating restrictions to a minimum. By allowing potential timber purchasers as much unimpeded operational timeframes as possible to complete any planned timber sales, you reduce cost to said potential purchasers and expedite the removal of timber in a timely manner. In this way you will help to achieve the overall goal of increasing pace and possibly scale of land/timber management on the SJNF as promoted by the Rocky Mountain Restoration Initiative and National USFS office.

We encourage the USFS to keep residual basal areas where practical at 60 to 80 square feet of basal area per acre to ensure that stands are not overcut during first entries thereby promoting more long-term timber management on the SJNF over time.

We urge you to allow for the previously agreed upon maximum Gross Vehicle Weight of 97,000 lbs. for log trucks removing timber from these planned sales as defined by the COOT hauling rules for 5 axles trucks. Allowing for this weight limit reduces the number of log truck trips out of the USFS, reduces impacts/conflicts with other forest users and reduces costs to potential timber purchasers. We encourage you when re-constructing your main and secondary haul roads to allow for this weight limit.

We ask that hauling restrictions be kept to a minimum and that trucks be allowed to haul on weekends and Federal holidays where practical again to maximize deliveries from the sales during operational seasons.

Where pine beetles are present in the sale areas we encourage you to use Urgent Removal "C" clauses to ensure that infested timber is removed quickly.

Once again thank you for allowing us the opportunity to comment on this project and we look forward to seeing the final decision out in 2020.

Montrose Forest Products, LLC
P.O. Box 1149, Montrose, CO 81402 T: (970) 249-0812

March 2, 2020

San Juan National Forest
Dolores Public Lands Office
Salter Vegetation Management Project
Attention: Derek Padilla
29211 Highway 184
Dolores, Colorado, 81323

SUBJECT: SALTER VEGETATION MANAGEMENT PROJECT

Mr. Derek Padilla:

Montrose Forest Products, LLC appreciates the opportunity to comment on the Salter Vegetation Management Project. As a member of the timber industry in Western Colorado with a vested interest in harvesting and producing Ponderosa pine lumber, our 95 direct employees at the mill and approximately 120 people that make up our independent logging and trucking contractors are extremely supportive of any effort the San Juan National Forest makes to provide commercial timber for bid. We encourage you and your staff to work through this scoping process in a timely manner to ensure a steady supply of wood fiber to the timber industry.

We would offer the following comments specifically on Design Criteria items:

- We strongly urge the SJNF to not limit the construction of temporary road construction to access planned timber sale units as was done on the Lone Pine EA. The Salter Vegetation Management Project lies in areas where slopes, ground conditions and existing road templates require the absolute need for purchasers to be able to build temporary road locations on pre-approved USFS locations as necessary to economically log and haul the timber to mill sites. This must be incorporated into the final decision without restrictions other than those identified in the standard USFS "B" and "C" clauses. Otherwise no-bids on future timber sales may occur.
- We urge the USFS to use standard "B" and "C" clauses when dealing with the control and spread of noxious weeds and not add to or further limit harvest operations by requiring additional restrictions, equipment cleaning and so forth in the final decision.
- We urge the USFS to keep seasonal restrictions other than identified wildlife operating restrictions to a minimum. By allowing potential timber purchasers as much unimpeded operational timeframes as possible to complete any planned timber sales, you reduce cost to said potential purchasers and expedite the removal of timber in a timely manner. In this way you will help to achieve the overall goal of increasing pace and possibly scale of land/timber management on the SJNF as promoted by the Rocky Mountain Restoration Initiative and National USFS office.

- We encourage the USFS to keep residual basal areas where practical at 60 to 80 square feet of basal area per acre to ensure that stands are not overcut during first entries thereby promoting more long-term timber management on the SJNF over time.
- We urge you to allow for the previously agreed upon maximum Gross Vehicle Weight of 97,000 lbs. for log trucks removing timber from these planned sales as defined by the CDOT hauling rules for 5 axles trucks. Allowing for this weight limit reduces the number of log truck trips out of the USFS, reduces impacts/conflicts with other forest users and reduces costs to potential timber purchasers. We encourage you when re-constructing your main and secondary haul roads to allow for this weight limit.
- We ask that hauling restrictions be kept to a minimum and that trucks be allowed to haul on weekends and Federal holidays where practical again to maximize deliveries from the sales during operational seasons.
- Where pine beetles are present in the sale areas we encourage you to use Urgent Removal "C" clauses to ensure that infested timber is removed quickly.

Once again thank you for allowing us the opportunity to comment on this project and we look forward to seeing the final decision out in 2020.

Respectfully

Tim Kyllo
Resource Forester
Montrose Forest Products, LLC

cc. file

Date submitted (UTC-11): 3/3/2020 12:55:32 PM
First name: Ian
Last name: Barrett
Organization:
Title:
Comments:
Thanks for the opportunity to comment and ask questions.
It appears from the outside that only tool considered for forest management in this analysis is logging. Which conflicts with an existing EA in the same area for prescribed fire. Will that be analyzed in the cumulative effects section or has prescribed fire been deemed less valuable for restoration?
What other desired conditions of the LRMP are encompassed in the Salter area and pertain to vegetation management? I would suggest considering these desired conditions as seriously when managing the landscape as the two that have been selected in support of this project. How and why were those other desired conditions considered less important?
Will there be analysis of other methods to manage vegetation within the project area?
What timeline can we expect for impacts to forest user groups and where? Will the logging occur in a shotgun blast pattern or will it start on one side of an area and gradually work across?
Will the document analyze the "current level" of economic activity that the USFS is supporting? It seems as though; one would need to know how much timber (CCF) is required to support this industry over a certain period. If there are other methods to restore the forest structure such as fire or prescribed fire that cause a fraction of the ground disturbance and recreational impact that large scale logging causes then these should be considered as well.
IS there an option to meet the need of the industry without treating the entire area with logging and then potentially utilizing a method closer to a natural process like fire. How do these costs differ? Which one reaches a more desirable ecological condition?
What are the economic impacts of large-scale logging to the recreational interests of the area? In turn, how does this impact the local economy? What brings more economic boost to the area recreation (hunting/biking/etc) or timber industry?
I also think the following statement: "Due to fire suppression resulting in longer fire return intervals and ungulate grazing, the understory is dominated Gambel oak that is dense, shrubby, and primarily even-age." Is partially accurate but misleading. It should be emphasized how timber management has affected the current vegetation in the project area as well as these other factors, which are both valid. We don't have even age and over stocked forests because of fire suppression and grazing alone; timber/forestry management had a pretty big role in shaping the affected environment that should be made clearer. I understand that it's not the "fault" of the USFS, because industry and litigation played a pretty big role in that outcome. But this should be discussed. What happens if in 5 years the timber industry becomes unsustainable again?
I am generally supportive of the project, but I think there needs to be full disclosure of how this EA integrates with previous decisions. From the public perspective, there is a mixed message on what is planned on the landscape. Is prescribed fire to restore the ecosystem still an option? Or is that plan out of consideration and now the intent it to log the entire forest. Or is the plan to log and then burn? It's hard to get a clear grasp of how these large projects are functioning together and hard to have faith there is a coordinated long term management plan for the forest.
It should also be made clear what the costs to the taxpayer is for these treatments, do the sales cover all the analysis and program costs? Or is the taxpayer paying for private industry to log under the assumption that the landscape will be better off in the end? Having toured some of the areas out in Lake and Doe Canyon, I find it troubling to blindly support the use of timber sales to achieve a desirable end state. Many of those sites are devoid of trees and then impacts from the heavy equipment is alarming. What will the checks and balances look like? If the beetle continues to spread across the project area, will this document need to be revisited to include sanitation sales as well? Or does the decision allow the near 100% cuts that have occurred elsewhere on the glade?
I understand that I have asked more questions than provided helpful comments but in summary my suggestion is to fully plan, analyze and communicate the multiple management actions (fire, timber, grazing, recreation, etc) occurring across the landscape and these impacts to the full economic picture not just timber industry.

Thanks,
Ian

Date submitted (UTC-11): 3/5/2020 9:21:50 AM
First name: Molly
Last name: Pitts
Organization: Intermountain Forest Association
Title: Colorado Programs Manager
Comments:

# Intermountain Forest Association
2218 Jackson Blvd, Ste 10, Rapid City, SD 57702
605-341-0875 Fax 605-341-8651

March 3, 2020

San Juan National Forest
Dolores Public Lands Office
Attention: Derek Padilla
29211 Highway 184
Dolores, CO 81323

SUBJECT: Salter Vegetation Management Project

Dear Mr. Padilla:

Intermountain Forest Association (IFA) is a member-based organization that advocates for healthy forests and healthy communities, including actively promoting sound forest management that provides a stable and sustainable supply of timber from public and private forestlands. Given that several of IFA's members heavily rely on timber output from the San Juan National Forest, we are excited about the proposed Salter Vegetation Management project on the Dolores District. On behalf of the members of the Intermountain Forest Association, I appreciate this opportunity to offer comments on the initial scoping.

Overall, we are very supportive of the San Juan National Forest being proactive in responding to the on-going beetle epidemic that is impacting pine stands within the project area. Not only does the project address the recent mortality, it also address the surrounding stands with the goal of making them more resilient and effective in fighting off future beetle attacks. We are also very supportive of your initiative to actively increase age class diversity and structural diversity within the project area. As our forests face increased pressures from climate change, it will be crucial to have forests that are more resilient. Given these conditions, we concur with the Purpose and Need as discussed on pages 2-3, as well as the Proposed Actions on pages 3-5. Below are some other comments we ask you to consider as you move forward:

- IFA members vary significantly in the businesses they run and the materials they can economically utilize. As the project is further developed, please keep in mind that forest product markets change rapidly and therefore it is imperative that flexibility be built into

the overall project design, including design criteria and specific silvicultural treatments. Some prescriptions, such as precommercial hand thinning, commercial thinning, and mastication may need to be accomplished through contracting methods such as stewardship. Ideally, the best quality material would be offered via traditional timber sales, whereas lower quality/ small diameter would be treated via stewardship.

- Most forest product businesses heavily rely on the ability to log the entire year, weather depending. We ask that you consider not limiting the NOS within the NEPA document, other than identified wildlife operating restrictions.
- Similar to limiting the operating season, hauling restrictions can really affect project implementation. We ask that hauling restrictions be kept to a minimum and that trucks be allowed to haul on weekends and Federal holidays where practical.
- Keep in mind that road maintenance (blading, drainage, and surfacing), the reopening of level 1 roads, and road decommissioning can be very expensive. Therefore, the volume per acre and/or unit must be high enough to be cost effective. Furthermore, temporary roads can be very expensive and should be minimized as possible.
- The construction and use of temporary roads is critical in allowing for economically feasible project implementation. We ask that you consider not limiting the construction of temporary roads to access planned timber sale units as was done on the Lone Pine EA.
- On good growing sites (higher site index), we recommend retaining closer to 80 square feet of basal area per acre across each stand. Reducing the basal area down to 50-70 across all stands will limit future growth production and could compromise the industry long-term.

We appreciate your consideration of these comments and suggestions as you move forward with the planning of the Salter Vegetation Management Project. I would be happy to discuss these comments if you have any questions.

Sincerely,

*Molly Pitts*

Molly Pitts
Intermountain Forest Association
Colorado Programs Manger

Date submitted (UTC-11): 3/9/2020 8:31:24 AM
First name: Vance
Last name: Koppenhafer
Organization:
Title:
Comments:
I would like to know more about how the reclaiming and seeding will be done and the effect this will have on grazing and multiple use if any. There needs to be a long-term financial commitment to weed control and reseeding if the first seeding is not successful. Weeds would need to be controlled and monitored for several years.

Date submitted (UTC-11): 3/12/2020 8:15:03 AM
First name: Luke
Last name: Kline
Organization:
Title:
Comments:
Please consider implementing wildlife snags and downed woody debris as a part of the wildlife aspects of this treatment.

Date submitted (UTC-11): 3/18/2020 7:57:22 AM
First name: Michael
Last name: Preston
Organization: Dolores Water Conservancy District
Title: External Relations
Comments:

The letter of comment from DWCD on the Slater Vegetation Management Project Scoping Package is attached as file 1

# Dolores Water Conservancy District

60 S. Cactus St. • P.O. Box 1150 • Cortez, CO 81321
Phone: 970-565-7562 • Fax: 970-565-0870
Email: dwcd@frontier.net


March 18, 2020

Derek Padilla, Dolores District Ranger
San Juan National Forest

RE: Scoping Comments: Salter Vegetation Management Project from
Dolores Water Conservancy District (DWCD)
80 South Cactus, Cortez, CO 81321

The comments that follow are submitted on behalf of the Dolores Water Conservancy District. DWCD is an active partner in the DWRF (Dolores Watershed Resilient Forest) Collaborative, and these comments are informed by ongoing engagement by DWCD with the DWRF Collaborative.

**Project Map - Anticipated Benefits to McPhee Reservoir, Dolores Project Water Users & the Ecology & Recreational Opportunities that Sustain Our Community:**

The Scoping Map identifies treatment areas within the watershed the flows into the Dolores River and McPhee Reservoir, the third largest reservoir in Colorado constructed and owned by the US Bureau of Reclamation and operated in cooperation with DWCD. The benefits that proposed treatments will have on water quality and availability are of profound interest to everyone that relies on McPhee Reservoir as their water source.

McPhee is a feature of the Dolores Project built in the 1980s and fully operational in the early 2000s. McPhee Reservoir supplies irrigation water to over 70,000 acres of irrigated land and municipal water to multiple Towns.

The Dolores Project is a centerpiece of the Colorado Ute Indian Water Rights Settlement which includes the subordination of the Ute Mountain Ute Tribe's senior water rights on the Mancos River in exchange for irrigation and municipal water from the Tribe's participation in the Dolores Project. As a result, the Tribe has a highly efficient and productive 7,600-acre Tribal farm. The Water Rights Settlement brought drinkable water to the Ute Mountain Tribal community of Towaoc for the first time in their history, which has allowed for the housing and commercial expansion that has occurred in Towaoc since domestic water became available in the late 1980s.

When McPhee Reservoir is not able to store enough water to meet Dolores Project obligations, shortages are shared proportionately by the Ute Mountain Farm and Ranch Enterprise, other Dolores Project irrigators and the "base pool" that is released to support the fishery below McPhee Reservoir. By contrast, when the Dolores River yields more water than McPhee can store, all project users have a full supply and there is excess water to release for the 200 miles of excellent boating, with enhanced native fishery water releases.

Carry-over storage benefits everyone: Communities, Ute Mountain Tribe, Irrigators, Boaters and the Fishery are driven by "carry-over storage" in McPhee Reservoir. The Salter Vegetation Management Project will avoid damage and disruption to water supplies by lowering the risk of catastrophic wildfire and the damage done by toxic runoff into the Dolores River from fire scars. These vegetation treatments will also improve forest resilience on a significant scale, which will contribute to the availability and quality of Dolores River water flowing into McPhee Reservoir.

There are a wide range of additional benefits from the Salter Vegetation Management Project. Much of the area on the Scoping Map includes some of the most highly used recreation, wildlife viewing and hunting areas on the San Juan Forest. Areas that have received mechanical and prescribed fire treatments offer improved recreation and hunting opportunities coupled with significant reduction in wildfire risks.

DWCD has also participated in a "Stream Protection Task Team" organized by Duncan Rose of TU "Dolores River Anglers" to evaluate tributaries to the Dolores River above McPhee Reservoir that are home to greenback lineage native trout. Fin studies continue to identify additional native trout populations. The Task Team is evaluating where native populations reside, their risks relative to climate change and water temperature, and what tools will best protect and enhance priority native fish populations going forward.

The Stream Protection Task Team is made up of TU, DWCD, San Juan National Forest and Colorado Parks and Wildlife. In addition to this work group, native trout are called out in DWRF watershed asset mapping. Where these native trout populations intersect with Salter Vegetation Management activities, the well-being of these native trout populations needs to be considered. In some cases, mitigation of wildfire risks could be a very important protection for these trout populations.

With regard to the Dolores River below McPhee Reservoir, DWCD is an active partner in the broad-based Monitoring and Recommendation Team which is aligned to cooperatively implement the Lower Dolores Native Fish Implementation, Monitoring and Evaluation Plan of 2014. Releases of excess water from McPhee Reservoir are carefully planned and monitored to maximize benefits to three sensitive native fish coupled with quality boating experiences. The mutual realization that the quality of the boating experience is directly related to the heath of the river has produced a strong alliance between ecological advocates and boating enthusiasts.

A critical point about the ecological and recreational opportunities below McPhee Reservoir is that these opportunities are driven by "carry-over storage" in McPhee from one year to the next. More resilient forests will support improved water quality and enhanced carry-over storage. Forest resilience is a win for everyone: towns, irrigators, the Ute Mountain Tribe, recreational users, hunters, boaters and native fish advocates.

It is this combination of interests that make the Salter Vegetation Scoping Map broadly significant to our communities and the ecology that sustains us.

**Proposed Action:**

Encompassing 35,000 acres, the Salter Vegetation Management Project Area allows for planning, resilience treatments and monitoring of results on a landscape scale that encompasses the full range values outlined in the Scoping Package and this comment letter. Treatments on this scale have attracted wood products businesses that can realize commercial values from the proposed treatments, making it financially feasible to treat and restore forest resilience on a landscape scale while providing other ecosystem services as an outcome of their work. These wood businesses have already created approximately 100 new jobs, along with the capacity to implement the resilience treatments outlined in the Salter Vegetation Management Project.

Treatments in the Salter Vegetation Project are designed to improve forest resilience, increase structural diversity and provide economic support to local communities.

**Single Tree Selection Units.** The Salter Scoping Map is dominated by "Single Tree Selection Units". This approach supports uneven age conditions with clumps of larger trees and every size class including seedling regeneration. The openings created when these units are treated allow for the introduction of prescribed fire to control oak brush, burn off duff and expose bare soil to support seedlings. Prescribed fire will also reduce ladder fuels, allowing for natural fire to run its course once ponderosa pine stands are returned to their natural "fire adapted" reference conditions.

The "Single Tree Selection Units" in the Salter Project overlap with some of the most highly used recreation, trail and hunting areas on the San Juan Forest. Single tree selection allows for prescriptions that work in and around these high value areas for ecological improvement, recreational enjoyment, asset protection and personal safety.

There are robust discussions going on among our collaborative partners concerning the value placed on retaining older, larger trees which are present in these units. Desired basal area of 50-70 BA per acre is the target for fire and bug resilience and a return to more natural reference conditions. While it is desirable to retain a significant component of larger trees, adequate basal area needs to be available for the full range of age classes which make uneven aged stands most resilient to disturbances.

In ponderosa pine stands, with abundant large trees, some will need to be removed to allow for other age classes. There is an interest in avoiding the removal of "pre-settlement trees." A literature search has indicated that slower growing trees are more resilient to bugs and fire than faster growing trees of similar diameter. If the prescription on any unit involves removal of larger trees to meet basal and uneven age criteria, it would be preferable to save the pre-settlement trees and take out faster growing trees

that established later. If pre-settlement trees can be identified, they should be prioritized for retaining over their faster growing cousins.

**Commercial Thinning, Pre-Commercial Thinning, and Plantation Thinning** are intended to move stands in these categories towards uneven age management. These sites do not include the range of opportunities necessary to pursue single tree selection in the present, but proper treatment will increase resilience in the near term and open up opportunities for single tree selection and uneven aged diversity at a future point of entry. These sites are not as ecologically diverse but the objective is to move them towards greater diversity over time.

**Asset and Resource Protection.** Improved forest resilience will protect community assets. These include water infrastructure, power infrastructure, residential and commercial structures and road and trail systems. Forest resilience must also address soils, aquatics, fisheries, livestock grazing and wildlife. We encourage stewardship contracts, cross boundary treatments and other available means to protect these assets and natural resources. We look to the DWRF Collaborative and the full range of stakeholders to align and monitor these values in relation to proposed treatments. Getting the roads and community awareness in shape to handle the increased level of log truck activity will provide major challenges that must be addressed collaboratively with a strong outreach component that DWRF can help provide.

**Conclusion.** In closing, let me return to the role of DWCD in providing for the water future of the communities we serve. It has become increasingly clear that, as water managers, we must look beyond our reservoirs and water delivery systems to the watersheds that are the source of the water that we manage and distribute.

DWCD is committed to work with the DWRF Collaborative, the Southwest Basin Roundtable and every member entity to advance forest resilience in Southwest Colorado. We will do our part to bring every available resource to bare on making the most of Salter Vegetation Management Project in relation to all of the values described above. It should also be noted that Southwest Colorado has been selected as the focal area for the Rocky Mountain Restoration Initiative (RMRI). We will work with our RMRI partners in support of the Salter Vegetation Management Project and the full range of values that it addresses.

We appreciate this opportunity to comment.

Sincerely,

Michael Preston, External Relations
Dolores Water Conservancy District

Date submitted (UTC-11): 3/20/2020 12:00:00 AM
First name: Jimbo
Last name: Buickerood
Organization: SJCA
Title:
Comments:
RE: SJCA Scoping Comments on Salter Vegetation Management Project

Dolores District Staff,

Thank you for considering our comments on the Salter Project. We note that neither the scoping letter or the Salter Project Scoping Package provide a NEPA project number for reference. Our comments are targeted to address both the design of the upcoming Draft or Preliminary EA as well as the topics and issues we view as necessary to be addressed and included in the document.

Purpose and Need

The Salter scoping document includes this Purpose and Need for Action statement: "The purpose and need for this project is derived from the differences between the existing forest vegetation conditions and the desired forest vegetation conditions, as defined by the SJNF LRMP." We strongly recommend that the Purpose and Need (PN) statement be written to reflect much more than "the existing forest vegetation" condition as defined by the forest plan. While the forest/veg condition may be a starting place, the PN statement should include numerous other desired conditions that are detailed in the LRMP and/or have been recognized in the seven years since the plan was finalized. There are numerous ecological desired conditions that should be recognized in the PN statement such as those associated with overall landscape resiliency as related to climate change, watershed function, wildlife, non-forest vegetation, etc. As well, there are numerous socialrelated desired conditions that need to be recognized in the PN to be sure they are addressed in the project design as well including recreation, the wildland-urban interface, hunting, etc. And finally, there are economic issues expressed in the LRMP to be included regarding such issues as grazing and timber products.

We believe it is vital to provide a robust and all-inclusive list of desired conditions in an effort to design a project that will "as much as possible" meet the wide range, and sometimes conflictive, desired conditions. Unless all of the objectives are delineated and therefore can be addressed in the project design there remains a possibility that important desired conditions will be overlooked and the goal of "finding the sweet spot" of designing a project that meets as many of the conditions as possible will be unobtainable.

Presentation of Possible Management Actions and Development of NEPA Alternatives

The EA should explore and provide numerous possible management actions to meet the desired conditions that are detailed in the 2013 Land and Resource Management Plan. We recommend that the EA provide an array and diversity of possible actions and tools that could be combined to best meet the desired conditions as relevant to the varying conditions on the ground. Providing only a Proposed Action and a No Action Alternative is an insufficient approach to detailing and sharing with the public a diversity of actions that could be utilized for the project. Rather than attempting to wrap any subset of these possible actions into one or two alternatives, we recommend detailing a list of possible actions that pertain specifically to specific desired conditions and a "discussion" in the draft EA regarding their relative merit and disadvantages. Though the Salter project area is quite often considered a homogenous forest, there is indeed significant variance across this landscape, therefore and by necessity a variety of management tools/actions will need to be utilized across the region to move the forest structure from the current condition(s) to the desired condition(s).

Understanding Current Conditions

As noted in the Purpose and Need for Action statement, the Salter project aims to move the project area from current conditions to the desired conditions that are detailed in the LRMP. While the desired conditions are mostly detailed sufficiently in the forest plan, the current conditions across the 35,000 acre project are not, or at least not as currently available to the public. Fortunately, the Dolores District has taken steps through presentations during the "pre-scoping phase" of the Salter project to lay out the current conditions in a generalized manner, and this has been of good service to stakeholders and the public who have been involved to date.

We strongly recommend that the Dolores District take two actions that are the next steps in disseminating information about the project area that will be necessary to the public's involvement in the NEPA process. First, the agency should organize and make available the common stand exam (CSE) data and associated files, shapefiles, etc. along with a key or instructions to access this information for use in providing comments in this NEPA project. The CSE should be organized and exhibited to the public in a manner that is easily understandable to the public, preferably in a format that has a visual representation of the data. For the public to "weigh in" from an informed point of view there likely will be a need to explain the data and provide points of context. This is a great opportunity for the public to be further educated about the forest that is their watershed, recreation area, hunting grounds, firewood collection acreage, etc. Ideally the public will be able to review the document and be able to make informed remarks as related to various metrics of their forest from the shared CSE data and other current condition information.

We recommend a thorough examination within the EA of the possible actions that might be employed per the emphasis on the Salter project area being an MA-5 zone. Over the past several years, both in the field and in meetings with the Dolores Watershed and Resilient Forest, I have heard a variety of suggestions from wood products industry members on how best to proceed per the long term goal of maintaining timber production. An examination of the possible costs and benefits of these various approaches would be a helpful addition to the Draft EA to allow the public to understand and weigh these choices. Amongst the possibilities that have been shared with me (and I'm confident that there are many more) are: 1) key the basal area target entirely off the site index, 2) engage a fairly "light" timber harvest in the coming couple years to better set up an earlier return (25 years was suggested) and 3) open the canopy a good deal and target a low remaining basal area to support faster growth among the remaining trees. Hopefully comments from industry will be of sufficient depth and diversity to set a course for the examination of these possibilities within the EA.

Economic Specific Issues

The Draft EA should include an economic analysis utilizing the most current information regarding the varying actions that could potentially be elements of the project. This should include a review of the costs or income streams from the mix of actions including timber harvest, stewardship contracts, small diameter contracts, firewood, mastication, etc. as well as "nontraditional" funding such as RMRI.

We also suggest that the SJNF foster dialog with the county governments associated with the Salter project area (including associated the haul routes for derived wood products) due to the concern that industry has regarding the viability and funding for maintaining and/or improving these routes. Advance and collaborative planning will provide the opportunity to make the smartest investments in the road system necessary to affect the treatments within the Salter area.

Wildland Urban Interface (WUI) Issues

If the SJNF LRMP has a specific definition of WUI we have yet to find it, however, the Salter project needs to have a firm definition of WUI that will support specific management actions in the WUI. Certainly, with all of the work done with the HVRA and other federal as well as state wildfire hazard mapping there will be much data to utilize for project planning - that's the good news. However, we have the concern that the entire Salter project area will be approached as being WUI which is non-sensical per the reality to apply resources and capacity in a targeted basis per fire mitigation efforts. Intensive "WUI style" treatments are unnecessary numerous miles from critical infrastructure, homes, businesses, etc., however, mis-applying available resources in areas that are truly "beyond the WUI" is a poor use of time, capacity and resources. We all know that the landscape cannot be fire-proofed and therefore we have expectation that the fire hazard mitigation will be defined clearly in the EA and backed by the latest available science.

It would be also useful to the public if opportunities were delineated for "cross-boundary" WUIrelated vegetation treatment with the state and private sectors. Identifying these opportunities and anticipating who the partners are along the necessary authorization and funding would beneficial to potentially maximize the benefits of federal land management actions.

Climate Change

Appendix G in the LRMP provides a good measure of guidance per what should be considered in NEPA processes as related to climate. Though Appendix G is somewhat slim on specifics it does layout some avenues that should be considered in a process such as the Salter project and we suggest that the climate change related issues of forest resilience along with the overall carbon sequestration/balance issue be examined and relayed to the public.

In Appendix G this very specific statement provides the direction we should follow per adaptation and mitigation, "Our primary strategy is to manage for healthy, resilient ecosystems." The Salter NEPA process should detail the possible management actions to be taken that will provide the forest with increased resilience as related to climate change. Such issues should include choices relevant to canopy composition, vegetation/forest species diversity, basal area, relevance to varying site indexes, and others. With climate models indicating significant change across the ponderosa forest landscape, the EA should map possible decision points and opportunities related to enhancing the resiliency of the forest in the project area. This approach is reinforced in 2.9.9 from Appendix G, "Every 3 years review silvicultural prescriptions for incorporation of strategies that anticipate potential plant succession changes relative to warmer and/or drier forested conditions."

Appendix G also supplies very specific direction regarding the carbon sequestration/balance issue, from 2.2.19, "The SJNF and TRFO forested ecosystems provide net positive carbon storage" Of course to meet this recommendation the agency will necessarily need to invest in the determination of the carbon metrics related to the Salter project.

Temporary Roads

The Lone Pine objection process spawned language regarding temporary roads that was utilized in the Decision Notice that should be carried forth into the Slater project. The added specificity per road width, grade, decommissioning timeline, etc. are helpful both to the ecologic well-being of the landscape as well as being helpful to contractors by providing the specifics they need from project bidding all the way to termination.

Conclusion

Thank you for your consideration of our comment and please contact me if there is a need to clarify or discuss any of our recommendations.

Sincerely,

Jimbo Buickerood

Program Manager

Lands and Forest Protection

SAN JUAN CITIZENS ALLIANCE

1309 East Third Avenue
PO Box 2461
Durango, CO 81302
970.259.3583

sanjuancitizens.org

March 20, 2020

Dolores Ranger District
San Juan National Forest
Attention: Derek Padilla
29211 Highway184
Dolores, CO 81323

RE: SJCA Scoping Comments on Salter Vegetation Management Project

Dolores District Staff,

Thank you for considering our comments on the Salter Project. We note that neither the scoping letter or the Salter Project Scoping Package provide a NEPA project number for reference. Our comments are targeted to address both the design of the upcoming Draft or Preliminary EA as well as the topics and issues we view as necessary to be addressed and included in the document.

Purpose and Need

The Salter scoping document includes this Purpose and Need for Action statement: "The purpose and need for this project is derived from the differences between the existing forest vegetation conditions and the desired forest vegetation conditions, as defined by the SJNF LRMP." We strongly recommend that the Purpose and Need (PN) statement be written to reflect much more than "the existing forest vegetation" condition as defined by the forest plan. While the forest/veg condition may be a starting place, the PN statement should include numerous other desired conditions that are detailed in the LRMP and/or have been recognized in the seven years since the plan was finalized. There are numerous ecological desired conditions that should be recognized in the PN statement such as those associated with overall landscape resiliency as related to climate change, watershed function, wildlife, non-forest vegetation, etc. As well, there are numerous social-related desired conditions that need to be recognized in the PN to be sure they are addressed in the project design as well including recreation, the wildland-urban interface, hunting, etc. And finally, there are economic issues expressed in the LRMP to be included regarding such issues as grazing and timber products.

We believe it is vital to provide a robust and all-inclusive list of desired conditions in an effort to design a project that will "as much as possible" meet the wide range, and sometimes conflictive, desired conditions. Unless all of the objectives are delineated and therefore can be addressed in the project design there remains a possibility that important desired conditions will be overlooked and the goal of "finding the sweet spot" of designing a project that meets as many of the conditions as possible will be unobtainable.

Presentation of Possible Management Actions and Development of NEPA Alternatives
The EA should explore and provide numerous possible management actions to meet the desired conditions that are detailed in the 2013 Land and Resource Management Plan. We recommend that the EA provide an array and diversity of possible actions and tools that could be combined to best meet the desired conditions as relevant to the varying conditions on the ground. Providing only a Proposed Action and a No Action Alternative is an insufficient approach to detailing and sharing with the public a diversity of actions that could be utilized for the project. Rather than attempting to wrap any subset of these possible actions into one or two alternatives, we recommend detailing a list of possible actions that pertain specifically to specific desired conditions and a "discussion" in the draft EA regarding their relative merit and disadvantages. Though the Salter project area is quite often considered a homogenous forest, there is indeed significant variance across this landscape, therefore and by necessity a variety of management tools/actions will need to be utilized across the region to move the forest structure from the current condition(s) to the desired condition(s).

Understanding Current Conditions
As noted in the Purpose and Need for Action statement, the Salter project aims to move the project area from current conditions to the desired conditions that are detailed in the LRMP. While the desired conditions are mostly detailed sufficiently in the forest plan, the current conditions across the 35,000 acre project are not, or at least not as currently available to the public. Fortunately, the Dolores District has taken steps through presentations during the "pre-scoping phase" of the Salter project to lay out the current conditions in a generalized manner, and this has been of good service to stakeholders and the public who have been involved to date.

We strongly recommend that the Dolores District take two actions that are the next steps in disseminating information about the project area that will be necessary to the public's involvement in the NEPA process. First, the agency should organize and make available the common stand exam (CSE) data and associated files, shapefiles, etc. along with a key or instructions to access this information for use in providing comments in this NEPA project. The CSE should be organized and exhibited to the public in a manner that is easily understandable to the public, preferably in a format that has a visual representation of the data. For the public to "weigh in" from an informed point of view there likely will be a need to explain the data and provide points of context. This is a great opportunity for the public to be further educated about the forest that is their watershed, recreation area, hunting grounds, firewood collection acreage, etc. Ideally the public will be able to review the document and be able to make informed remarks as related to various metrics of their forest from the shared CSE data and other current condition information.

We recommend a thorough examination within the EA of the possible actions that might be employed per the emphasis on the Salter project area being an MA-5 zone. Over the past several years, both in the field and in meetings with the Dolores Watershed and Resilient Forest, I have heard a variety of suggestions from wood products industry members on how best to proceed per the long term goal of maintaining timber production. An examination of the possible costs and benefits of these various approaches would be a helpful addition to the Draft EA to allow the public to understand and weigh these choices. Amongst the possibilities that have been shared with me (and I'm confident that there are many more) are: 1) key the basal area target entirely off the site index, 2) engage a fairly "light" timber harvest in the coming couple years to better set up an earlier return (25 years was suggested) and 3) open the canopy a good deal and target a low remaining basal area to support faster growth among the remaining trees. Hopefully comments from industry will be of sufficient depth and diversity to set a course for the examination of these possibilities within the EA.

Economic Specific Issues
The Draft EA should include an economic analysis utilizing the most current information regarding the varying actions that could potentially be elements of the project. This should include a review of the costs or income streams from the mix of actions including timber harvest, stewardship contracts, small diameter contracts, firewood, mastication, etc. as well as "non-traditional" funding such as RMRI.

We also suggest that the SJNF foster dialog with the county governments associated with the Salter project area (including associated the haul routes for derived wood products) due to the concern that industry has regarding the viability and funding for maintaining and/or improving these routes. Advance and collaborative planning will provide the opportunity to make the smartest investments in the road system necessary to affect the treatments within the Salter area.

Wildland Urban Interface (WUI) Issues
If the SJNF LRMP has a specific definition of WUI we have yet to find it, however, the Salter project needs to have a firm definition of WUI that will support specific management actions in the WUI. Certainly, with all of the work done with the HVRA and other federal as well as state wildfire hazard mapping there will be much data to utilize for project planning – that's the good news. However, we have the concern that the entire Salter project area will be approached as being WUI which is non-sensical per the reality to apply resources and capacity in a targeted basis per fire mitigation efforts. Intensive "WUI style" treatments are unnecessary numerous miles from critical infrastructure, homes, businesses, etc., however, mis-applying available resources in areas that are truly "beyond the WUI" is a poor use of time, capacity and resources. We all know that the landscape cannot be fire-proofed and therefore we have expectation that the fire hazard mitigation will be defined clearly in the EA and backed by the latest available science.

It would be also useful to the public if opportunities were delineated for "cross-boundary" WUI-related vegetation treatment with the state and private sectors. Identifying these opportunities and anticipating who the partners are along the necessary authorization and funding would beneficial to potentially maximize the benefits of federal land management actions.

Climate Change
Appendix G in the LRMP provides a good measure of guidance per what should be considered in NEPA processes as related to climate. Though Appendix G is somewhat slim on specifics it does layout some avenues that should be considered in a process such as the Salter project and we suggest that the climate change related issues of forest resilience along with the overall carbon sequestration/balance issue be examined and relayed to the public.

In Appendix G this very specific statement provides the direction we should follow per adaptation and mitigation, "Our primary strategy is to manage for healthy, resilient ecosystems." The Salter NEPA process should detail the possible management actions to be taken that will provide the forest with increased resilience as related to climate change. Such issues should include choices relevant to canopy composition, vegetation/forest species diversity, basal area, relevance to varying site indexes, and others. With climate models indicating significant change across the ponderosa forest landscape, the EA should map possible decision points and opportunities related to enhancing the resiliency of the forest in the project area. This approach is reinforced in 2.9.9 from Appendix G, "Every 3 years review silvicultural prescriptions for incorporation of strategies that anticipate potential plant succession changes relative to warmer and/or drier forested conditions."

Appendix G also supplies very specific direction regarding the carbon sequestration/balance issue, from 2.2.19, "The SJNF and TRFO forested ecosystems provide net positive carbon storage" Of course to meet this recommendation the agency will necessarily need to invest in the determination of the carbon metrics related to the Salter project.

Temporary Roads
The Lone Pine objection process spawned language regarding temporary roads that was utilized in the Decision Notice that should be carried forth into the Slater project. The added specificity per road width, grade, decommissioning timeline, etc. are helpful both to the ecologic well-being of the landscape as well as being helpful to contractors by providing the specifics they need from project bidding all the way to termination.

Conclusion
Thank you for your consideration of our comment and please contact me if there is a need to clarify or discuss any of our recommendations.

Sincerely,

Jimbo Buickerood
Program Manager
Lands and Forest Protection

Date submitted (UTC-11): 3/22/2020 11:03:37 AM
First name: William
Last name: Baker
Organization: University of Wyoming
Title:
Comments:
My comments on the Salter project are in the attached pdf.

PO Box 824
Durango, CO 81302
March 21, 2020

Dolores Ranger District
San Juan National Forest
29211 Highway 184
Dolores, CO 81323

Dear Dolores Ranger District,

I am writing to comment on the Salter Vegetation Management Project Scoping Package (Salter VMPSP). I have several concerns at this scoping stage:

(1) The detailed differences between current conditions and desired conditions are not known at this point and yet the desired conditions are quite specific and detailed–exactly what are the differences? This requires detailed analysis and presentation of current vs. desired conditions for every variable in the description of desired conditions so the public can understand the situation.

(2) The main proposed vegetation treatments (Table 1 p 4 in the Salter VMPSP) of commercial and pre-commercial thinning and single-tree selection are not clearly the treatments that are needed to produce the desired conditions. Given the many details in the desired conditions, how does each treatment actually achieve each desired condition? Again, I suggest that tables, figures, and maps likely are needed to show how each desired condition will be achieved with each treatment tool, and how that tool will be applied to produce the desired condition.

(3) It is important to place treatments rationally within this large landscape and an important part of placement is the current condition of the forest. I suggest the past history of disturbances may be an important factor in what the condition of the forest is currently. A substantial part of the forest in this area was railroad logged, which has a distinctive legacy.

(4) This is a commercial timber area in the Forest Plan, but the desired condition could still likely be achieved with a certain amount, as opposed to a maximum commercial timber production in this entry, with the rest accomplished with more natural ecological processes. I would like to see analysis of an alternative, developed by the District after analyzing available data, that uses less timber production and more natural processes (e.g., fire), but still achieves the desired conditions.

(5) I would like to see added to the desired conditions a goal to achieve "heterogeneous stands in heterogeneous landscapes," and specific attention to this concern under all alternatives.

(6) I would like to see an economic analysis, just from the standpoint of the forest's costs and gains, for this project under all alternatives that are analyzed. I do not need the details of costs and benefits to the local timber industry.

(7) Please use the standard definition of WUI, which includes just "intermix" and "interface."

(8) Please protect all extant large trees in the project area to increase resistance/resilience to fire.

The following provide the details of these seven scoping concerns:

**1. Please present detailed scientific evidence about current and desired forest conditions in the project area and the differences between these**

I would like to see scientific evidence made available to the public (downloadable on the project website) at the time of release of the Draft EA, and detailed evidence from analysis by your office presented in the Draft EA itself that together document that the following component of the stated need is correct and explains in detail the differences with the desired condition:

> "A comparison based on common stand exams and field observations between the current and desired condition of the ponderosa pine cover type found within the Salter Vegetation Management project area is different from the desired conditions associated with that vegetative cover type in the SJNF LRMP" (p. 3 Salter VMPSC).

Please provide GIS data for public use at the time of release of the draft EA

No evidence from common stand exam (CSE) data and no details about what the types of differences or magnitudes of differences are with desired conditions are presented in the Salter VMPSP itself. This information is essential to make available in detail in the draft EA.

Please provide a complete set of the CSE data and project data in ArcGIS shapefile or geodatabase format for the project area for download on the Project Website on the day of release of the draft EA, including but not limited to:

a. all available CSE data in GIS shapefiles/geodatabases with associated attribute data, including tree data (species, diameter, height, damage etc.), point data (location, elevation, site index etc.), and polygon data (groups of CSE points, if any).
b. a GIS shapefile/geodatabase showing boundaries for each treatment unit, along with the specific treatments proposed in the unit
c. a GIS shapefile/geodatabase showing the boundary of the project area
d. assuming there are different alternatives analyzed in the draft EA, then shapefiles/geodatabases showing where the treatments will occur and what the treatments will be under each alternative.
e. any other datasets needed to enable the public to independently verify that the CSE and project data support the analysis in the draft EA.

Please analyze and present current forest conditions in the draft EA by treatment unit

For analysis of current conditions, please present in the draft EA figures, tables, and maps showing tree density, basal area, tree species composition, diameter distributions by species by at least 2" size classes, and also present summary data for trees per acre above 16", 18", and 20" dbh, and presence of seedlings and saplings separately for each treatment unit across the project area and overall for the project area. These should be derived from analysis of the CSE data in the project area. You can average or find the median for each variable within a treatment unit or polygon and present it as a label on a GIS map showing each unit. You can show the variability in each variable (e.g., tree density) by presenting a table showing the standard deviation, coefficient of variation, and the quartiles of the distribution of each variable within each treatment unit and across the project area. See Baker (2020 Table 6 on p. 12) for examples of this kind of table showing variability.

However, where there is significant variability across a treatment unit because of variability in past logging, fires, beetle outbreaks, or other significant past disturbances, it would be better to break these up into separate treatment units, or at least present these same analyses for these distinct parts of treatment units.

The following components of desired conditions for Ponderosa Pine Forests presented on p. 2 of the Salter VMPSP are not apparently provided by CSE data. Please collect new data about variability in these across the project area and present these data in the draft EA:
1. Clumpiness (number of trees per clump, clump area) of ponderosa pine
2. Canopy layers of ponderosa pine
3. Area of openings and percent composition (shrubs, native grasses, native forbs, introduced grasses and forbs) of openings between the clumps. Native grasses should be identified and estimated by species, since the key indicator species are specified in the desired condition.
4. Diameter-class distribution of Gambel oak central stems within patches of shrubs and the area of patches of these shrubs
5. Variability in forest litter depth. I would add that variability in duff depth is also important.
6. Extent of invasive plant species
7. Abundance and size of snags and large wood on the forest floor

Please also present and analyze the recent fire rotation for low-intensity fire in the project area using MTBS (Monitoring Trends in Burned Area) and SJNF fire records. Fire rotation, which is the estimated time to burn once across a land area, is calculated as the time period of observation / (sum of area burned by all fires that burned at low intensity/project area). For example, if the period of observation is 1980-2020, the area burned at low intensity over this period was 7,000 acres and the project area is 35,000 acres, then the fire rotation is 40 years/(7,000/35,000) = 200 years. Further explanation, if needed, is in Baker (2009). This estimate of the current rate of burning is essential for comparison with desired conditions and planning future burning.

<u>To provide comparable analysis of desired conditions, please present identical details and scientific evidence for the same forest variables</u>
Please present estimated means, medians, and distributions etc. for desired conditions for all the elements of forest structure and composition described on p. 2 of the Salter VMPSP, which I have also listed in the previous section above.

Please substantiate the scientific basis for each detail of the desired condition by presenting the details from scientific sources already in the Forest Plan, but updated with all available detailed scientific evidence since the Forest Plan. Key scientific sources for the project area must include detailed use of Romme et al. (2009), Baker (2018), and Baker (2020), which are the major scientific sources with abundant ecological information about desired conditions in the project area. I would request that details be presented for each variable in figures, tables, and maps that are otherwise identical to those presented for the modern forest, as explained above.

**2. Please show exactly how each proposed treatment will achieve each desired condition.**
For example, the pre-commercial thinning description in Table 1 says “thinning...to spacing specifications” whereas the desired conditions (p. 2) say “Tree clumps vary in density from widely spaced large trees to tightly spaced small trees.” Since the usual intention of commercial

timber operations is to thin to space trees widely so they grow timber faster, how could commercial thinning lead to the desired condition–it seems that it will instead destroy any variable spacing that exists. If the specification had been to use variable-density thinning to explicitly produce clumps containing a specific range of trees within a certain distance, combined with openings etc. then it would have been clear that the proposed treatments will produce the desired condition.

In the draft EA, I would like to see a list of each desired condition, each current condition, and a detailed specification for how a particular treatment will be used to achieve each desired condition. Please put this information in tables and/or figures, and use maps to show where specific treatments will be used.

**3. Please incorporate the history of past disturbances explicitly into the placement and design of the project's treatment units, since different treatment prescriptions are likely needed to reach the desired conditions.**

The rationale for the project's proposed treatment units is not provided in the Salter VMPSP, although treatment units are already defined on the Project Map (Figure 1 Salter VMPSP). However, it is not obvious how historical disturbances have shaped the treatment units. If they have, please explain that in detail in the draft EA. Yes, of course the plantations require a different treatment, and perhaps the other treatments have some relationship with past disturbance history. However, after a detailed analysis is completed of the CSE data, I would expect that the departures from desired conditions would generally correlate with the distinct histories of past logging and fires, and a reallocation of the treatment units is requested that is congruent with this history and its corresponding departure from desired conditions.

<u>Area subject to railroad logging and other high-grade logging</u>
A substantial part of the project area was railroad logged from about 1924-1948, as documented in several sources (e.g., Chappell 1971). Railroad logging tended to be high-grade logging in which larger, better quality, more merchantable trees were nearly all removed, leaving behind most numerous smaller trees and much fewer unharvested larger trees. The largest body of scientific evidence about the detailed effects of high-grade logging, including railroad logging, on the project-area's forests is in Romme et al. (2009 p. 42-47). Please review, present, and incorporate this best-available scientific evidence into the Draft EA in detail. Of course, there has been other high-grade logging in the project area since the 1924-1948 railroad logging. I do not have a GIS map of those later logging units. The upshot is that in these high-grade logging areas, there likely are few large trees and there is instead likely a preponderance of small to medium-sized logging survivors and post-logging trees, as shown in Romme et al. (2009).

To meet the desired conditions in these areas, it is likely that larger trees must be retained by using a small enough diameter cap, since large yellow-barked trees needed for the desired condition are likely rare. The clumps needed for the desired condition can be created/maintained by retention of small to medium-size trees around these large trees, with harvesting of smaller trees used to recreate desired openings. It is logical for timber harvesting to be used to move these forests into the desired condition, followed by prescribed burning to restore and maintain low-intensity fires. Some mixed- to high-severity fires will likely occur in these areas in the

future, and can be managed for maintaining a heterogeneous forest structure.

Area recovering from historical moderate- to high-severity fires

Forests that burned in moderate- to high-severity fires in the period before the San Juan National Forest was established are, in contrast, likely still mostly recovering from those severe fires (Baker 2018, 2020). Moderate- to high-severity fires from 1850-1910, which were explicitly mapped as "woodlands" in the 1908 Montezuma Forest Atlas (Baker 2018), are shown as the green shaded polygons on the figure below. These woodlands were validated (Baker 2020) as mixed- to high-severity fires. Fire severity during the period from about 1790-1880 was also reconstructed from General Land Office survey data along section lines (Baker 2020), which are also shown on the figure below.

Note that the logging railroads crossed but otherwise generally avoided the large green polygon indicating 1850-1908 mixed- to high-severity fires, suggesting that merchantable timber was likely not sufficient in 1924-1948 for harvesting in these areas. In contrast, note that the gold lines indicating earlier 1790-1880 mixed- to high-severity fires were often likely harvested along the logging railroads, and there is evidence of this logging in remnant large stumps. However, the large expanses of gold lines in the northwestern part of the project area and on the southeastern plateau area likely had less merchantable timber and thus ended up far from the logging railroads and likely not harvested during this 1924-1948 period of high-grade logging. I have walked through several of these areas, and they often contain scattered large trees that are likely the survivors of these fires among a moderate to dense stand of small to medium-sized trees, along






FS-000478

with relatively few stumps, suggesting less past logging than in the railroad-logged areas, although some thinning has occurred. The larger trees in these areas are more likely these scattered surviving trees in a matrix of naturally recovering mid-sized post-fire trees; the smaller trees are more likely trees that have regenerated after fire suppression became effective following greatly increased aircraft use after World War II (Baker 2009).

To meet the desired conditions in these recovering-forest areas, the large trees that survived the 1790-1880 fires all warrant retention since yellow-barked trees are needed to meet desired conditions, and these are primarily the only ones available. These surviving trees plus sufficient medium-sized, naturally recovering trees can be the anchor points for clumps, around which can be retained enough trees of diverse sizes to create the clumpiness of the desired conditions. It is logical in these areas for clumping to be generated largely by retention of large trees and associated smaller trees, with most of the desired conditions produced by thinning from prescribed burning and managed fires for resource benefit.

Please update the fire component of desired conditions

Only a small part of the project area was historically subject to only low-intensity fires, which is one of the desired conditions. It is important to update the desired condition, given the new fire-history evidence in Baker (2018, 2020) to include previously known short-rotation low-intensity fires, but now it is known these were accompanied by long rotation, infrequent mixed- and high-severity fires. The idea for moving toward desired condition would still be the same, to restore low-intensity fires, so that mixed- to high-severity fires remain infrequent, which is likely all that is feasible. The infrequent mixed- and high-severity fires will likely still occur in the future during extreme fire weather, and will likely still help to produce and maintain heterogeneous landscapes, as long as these fires are not suppressed.

Available fire-history data in Baker (2018, 2020) should be cited and incorporated into the draft EA as the science-based source of the rates of low, mixed, and high-severity fires under desired conditions. These two publications include all available fire-history evidence and are updated to use the best measure of fire rates, which is the fire rotation. This is the only measure that should now be used and cited by any agency document, as earlier estimators (e.g., mean fire return interval) have now been discredited and are disappearing from further use.

The project area had a historically variable fire regime that led to substantial heterogeneity in forest structure across the landscape, and this landscape heterogeneity was a central source of historical resilience. It should certainly be part of desired conditions.

**4. Please develop and analyze a feasible alternative that will just meet the minimum needs of Dolores-Montezuma-La Plata County local industry, so that more natural processes can be used to achieve the remainder of the desired ecological conditions. This could be called an Economy and Ecology alternative or something else that explains it briefly.**

I would like to see answered in the draft EA what is the minimum commercial timber production necessary to achieve the desired conditions and provide for existing local industry, so that a large of amount of desired conditions could also be achieved using natural processes, particularly

prescribed fire and managed fire. I would to see an alternative developed and analyzed, after reviewing the CSE data and the disturbance history I presented above, that achieves desired conditions using just essential timber production and the rest using natural processes (e.g., fire).

I am an ecologist, so of course I am interested in using natural ecological processes wherever possible, but I am not opposed to some commercial timber harvesting either. One reason I would like to see this alternative presented and analyzed throughout the draft EA is that we already have lots of timber production occurring in the nearby Lone Pine project, and unless there is something I do not know, it seems that there is no specific need to maximize timber production on the Salter project to sustain the local industry at this time.

I suggest at the outset that prescribed fire and managed fire could be the primary natural processes used to thin forests in a way that promotes the clumping and variability in forest structure that are described in the desired condition. This makes the most sense since it is fire that historically created these desired conditions Managed fire is ecologically recognized as the best tool used to promote both stand- and landscape-scale heterogeneity in these forests and increase future forest resilience to impending disturbances. Of course, some timber harvesting/thinning and prescribed burning may first be needed in the vicinity of highly valued resources and assets.

I also suggest that a good starting point for the timber harvesting areas under this alternative would be the agreements that were achieved at the Lone Pine objection meetings, since it is known that those agreements were acceptable.

Another good starting point is that the large area of land that has a history of high-grade logging is a potentially sensible location for the commercial harvesting for wood production, whereas the large area that is recovering from past moderate- to high-severity fire is potentially a sensible location for primarily use of fire to achieve desired conditions.

**5. Heterogeneous stands in heterogeneous landscapes needed to reduce beetles**

The project description lists two of the needs: (1) “the need to improve resilience or maintain the resistance of forest ecosystems in an effort to increase protection against epidemic insect and disease outbreaks” and (2) “the need to increase the structural diversity of the ponderosa pine forest represented across the landscape” (p. 3), both of which are ecologically sensible.

It is well established that treating individual stands to reduce attack by beetles is ineffective, as explained in Graham et al. (2016), the most comprehensive study of beetle outbreaks in ponderosa pine in North America: “...treating a single stand to be resistant to MPBs would be insufficient to alter MPB dynamics and large areas or landscapes need to be in a resilient condition to keep MPB populations at endemic levels (Bentz et al. 2009; Fettig et al 2014)” (p. 155).

Thus, these authors conclude that: “...heterogeneous landscapes composed of stands with heterogeneous structures and containing densities in the neighborhood of 80 feet$^2$ of basal area are resistant to MPB infestations...” (P. 157). Please review and incorporate the findings of this

key study by Graham et al. into the proposed project.

In particular, please plan the treatments to create heterogeneous stands and heterogeneity across the project area, then document in detail that this will be achieved by showing the variability in residual basal area and tree density, after treatments, expected across the project landscape. Show this as histograms for both basal area and tree density and also show these on a map, using either labels or colors for classes of residual basal area and tree density, also showing the before-harvesting basal area and tree density in each treatment unit.

In locations affected by the roundheaded pine beetle, please leave 50% of the dead and dying trees as mitigation for the documented adverse environmental effects of salvage harvesting (Lindenmayer et al. 2008), and please do not plant trees in these areas, as this will adversely affect the future resistance and resilience of the forests in this area.

**6. Please provide an economic analysis for all alternatives.**
The reason that I am requesting this is that I am very concerned about the cost, in public and private money provided to the Forest, of all alternatives, given the potential economic costs we are facing with Covid-19 and other threats to our local and national economy. Please show us what the estimated costs are for each component (e.g., specific treatments) of the project, and please also show us the details of where the funding comes from. We have long heard about below-cost timber sales; will this be one, or will it not?

**7. Please use the standard, science-based definition of WUI, which includes only intermix and interface. These show there is little to no WUI in the project area.**
The Salter VMPSP says (p. 2) that "The Montezuma Community Wildfire Protection Plan identifies the entire project area as Wildland Urban Interface, as does the San Juan National Forest Land and Resource Management Plan (SJNF LRMP)."

These sources are not citing and using a science-based definition of the WUI. Please instead use Radeloff et al. (2005) for the definitions of the Wildland-Urban Interface in the United States. You can confirm on Wikipedia that intermix plus interface are the standard definition of WUI in the United States. Using the intermix and interface categories from the Radeloff et al. downloadable maps of WUI in the United States for 2010, there really is likely no or almost no WUI in the project area at all (See the Figure).



**8. Please protect all extant large trees in the project area to increase resistance/resilience to fire.**

Based on direct records by land surveyors in the late-1800s, approximately 47% of ponderosa pines were larger than about 16" dbh (40 cm), about 33% were larger than about 20" dbh (50 cm), and about 17% were larger than about 24" dbh (60 cm) in the ponderosa pine zone in the San Juan Mountain study area, which includes the project area–see Baker (2020 Table 9 p. 16). About 59% of ponderosa-pine forest area in the late-1800s would meet today's definitions for old-growth forests (Baker 2020 p. 21). There is no question that high-grade logging removed most of the large, old trees from the project area by about the 1950s although high-grade logging continued into the 1980s (Romme et al. 2009). See the adjacent Figure (Baker 2020 Figure 12 p. 24) showing the estimated historical extent of old growth in the project area in the late-1800s. The numbers are old-growth trees/ha, so divide by 2.47 to estimate old-growth trees/acre.




It is well documented that in ponderosa pine forests it is these large, old trees that provide the essential resistance and resilience to fire that is now particularly needed as fire is increasing with global warming. Large trees have the thickest bark, the highest crown base height, and have the greatest ability to survive substantial crown scorching and still resprout and survive (Baker 2009). Not only do large ponderosas have the greatest likelihood of surviving, thus provide the greatest resistance to fire, but large ponderosas also disproportionately provide the most seed for sexual regeneration after fires, thus they provide most of the essential resilience to fire.

It is thus essential for the draft EA, if the goal is to increase resistance and resilience to fire, to heed and remedy the serious deficiency in large trees as an essential part of the desired conditions for the project area. This requires explicit protection, using diameter caps small enough to ensure the protection of the necessary large trees. I suggest first an analysis of the CSE data showing the percentage of trees in the project area that exceed 16", 18" and 20" be presented before the necessary diameter cap is determined. Please present the science and the CSE results.

Thank you for your attention to these eight scoping concerns.



William L. Baker, PhD.

**References Cited**

Baker, W. L. 2009. Fire ecology in Rocky Mountain landscapes. Island Press, Washington, D.C.

Baker, W. L. 2018. Historical fire regimes in ponderosa pine and mixed-conifer landscapes of the San Juan Mountains, Colorado, USA, from multiple sources. Fire 1, 23. Online at: https://www.mdpi.com/2571-6255/1/2/23

Baker, W. L. 2020. Variable forest structure and fire reconstructed across historical ponderosa pine and mixed conifer landscapes of the San Juan Mountains, Colorado. Land 9, 3. Online at: https://www.mdpi.com/2073-445X/9/1/3/htm

Chappell, G. S. 1971. Logging along the Denver & Rio Grande: Narrow gauge logging railroads of southwestern Colorado and northern New Mexico. Colorado Railroad Museum, Golden, CO.

Graham, R. T., L. A. Asherin, M. A. Battaglia, T. B. Jain, and S. A. Mata. 2016. Mountain pine beetles: a century of knowledge, control attempts, and impacts central to the Black Hills. USDA Forest Serve General Technical Report GTR-353, Rocky Mountain Research Station, Fort Collins, Colorado. Online at: https://www.fs.fed.us/rm/pubs/rmrs_gtr353.pdf

Lindenmayer, D. B., P. J. Burton, and J. F. Franklin. 2008. Salvage logging and its ecological consequences. Island Press, Washington, D. C.

Radeloff, V. C., R. B. Hammer, S. I. Stewart, J. S. Fried, S. S. Holcomb, and J. F. McKeefry. The wildland-urban interface in the United States. Ecological Applications 15: 799-805. Online at: https://www.nrs.fs.fed.us/pubs/jrnl/2005/nc_2005_radeloff_001.pdf

Romme, W. H., M. L. Floyd, and D. Hanna. Historical range of variability and current landscape condition analysis: South central highlands section, southwestern Colorado & northwestern New Mexico. Colorado Forest Restoration Institute, Colorado State University, Fort Collins. On file at the San Juan National Forest Supervisor's Office, Durango.

Date submitted (UTC-11): 3/22/2020 7:34:21 AM
First name: ERIC
Last name: JANES
Organization:
Title:
Comments:
SALTER VEGETATION MANAGEMENT PROJECT
--SCOPING COMMENTS BY E. JANES--

Thanks to the U.S. Forest Service, Dolores Ranger District for preparing a high quality Scoping Package for the Salter Vegetation Management Project.

I notice that on the bottom of page 1, the document characterizes the Ponderosa Pine forests in the project area as "even aged stand structure". This paragraph goes on to state that " the forest condition in the proposed treatment blocks reflects an even-aged structure comprised of densely-spaced, over-stocked medium and large pine trees in a single structural layer." But just a little further into the document Para 2.2.23 (extracted from the SJNF Forest Plan) presents a seemingly conflicting statement that the Ponderosa Pine forest is of an uneven age stand structure. My understanding of the Ponderosa Pine forest stand structure in the Salter project area aligns with the page 1 description. The Forest Plan statement in Para 2.2.23 which I cite above can confuse the reader, especially those who are not familiar with the project area.

I support the Forest Service statement on page 4 that there will be no new roads constructed for the implementation of this project. Temporarily re-opening previously used roads (Maintenance Level 1) that have been put into storage is certainly reasonable, and I concur with Forest Service intent to decommission temporary roads within five years of first use by this project.

My comment on Treatment Type-Single Tree Selection is that I encourage the Service to use the very best and latest scientific knowledge (regarding cone and seed production, forest genetics, and future risk of insect and disease attack) in the decision on which Single Trees are selected for harvest, and which are left. I believe that minimizing the risk of increased round-headed pine beetle infestation into the mature pines that are left standing will be an important criterion in this decision.

My comment on slash material following treatment/harvesting is more of a question on whether there is potential opportunity for the Service to provide forest products permits for citizen- gathering of firewood from large limbs, stems, and undesirable tree boles? Can the Service assess whether this can be done in a way that does not conflict with contracts for timber-sale and stewardship, as well as road conditions? This could reduce the amount slash material that needs to be burned later.

Thanks for the opportunity to comment. For the Record, I am a long-time member of the Dolores Resilient Forests Collaborative, based at Cortez, Colorado.

Eric B. Janes

**SALTER VEGETATION MANAGEMENT PROJECT**
**--SCOPING COMMENTS BY E. JANES--**

Thanks to the U.S. Forest Service, Dolores Ranger District for preparing a high quality Scoping Package for the Salter Vegetation Management Project.

I notice that on the bottom of page 1, the document characterizes the Ponderosa Pine forests in the project area as "even aged stand structure". This paragraph goes on to state that " the forest condition in the proposed treatment blocks reflects an even-aged structure comprised of densely-spaced, over-stocked medium and large pine trees in a single structural layer." But just a little further into the document Para 2.2.23 (extracted from the SJNF Forest Plan) presents a seemingly conflicting statement that the Ponderosa Pine forest is of an uneven age stand structure. My understanding of the Ponderosa Pine forest stand structure in the Salter project area aligns with the page 1 description. The Forest Plan statement in Para 2.2.23 which I cite above can confuse the reader, especially those who are not familiar with the project area.

I support the Forest Service statement on page 4 that there will be no new roads constructed for the implementation of this project. Temporarily re-opening previously used roads (Maintenance Level 1) that have been put into storage is certainly reasonable, and I concur with Forest Service intent to decommission temporary roads within five years of first use by this project.

My comment on Treatment Type-Single Tree Selection is that I encourage the Service to use the very best and latest scientific knowledge (regarding cone and seed production, forest genetics, and future risk of insect and disease attack) in the decision on which Single Trees are selected for harvest, and which are left. I believe that minimizing the risk of increased round-headed pine beetle infestation into the mature pines that are left standing will be an important criterion in this decision.

My comment on slash material following treatment/harvesting is more of a question on whether there is potential opportunity for the Service to provide forest products permits for citizen-gathering of firewood from large limbs, stems, and undesirable tree boles? Can the Service assess whether this can be done in a way that does not conflict with contracts for timber-sale and stewardship, as well as road conditions? This could reduce the amount slash material that needs to be burned later.

Thanks for the opportunity to comment. For the Record, I am a long-time member of the Dolores Resilient Forests Collaborative, based at Cortez, Colorado.

Eric B. Janes

Date submitted (UTC-11): 3/22/2020 7:53:23 AM
First name: Edward
Last name: Zukoski
Organization: Center For Biological Diversity
Title:
Comments:
Ranger Padilla:

Please accept the attached comments from the Center for Biological Diversity on the Salter project.

Thank you for your consideration.

Yours,

Ted Zukoski

CENTER for BIOLOGICAL DIVERSITY Because life is good.

March 22, 2020

Derek Padilla, District Ranger
Dolores Ranger District
29211 Hwy 184
Dolores, CO 81321
Via email: derek.padilla@usda.gov
Via web portal: https://www.fs.usda.gov/project/?project=57671

**Re: Comments on Salter Vegetation Management Project, Project #57671**

Dear Ranger Padilla:

On behalf of the Center for Biological Diversity (the Center), and its more than one million members and online activists, thank you for the opportunity to provide these comments on the Salter Vegetation Management Project Scoping Package. The Center is a 501(c)(3) nonprofit organization based in Tucson, Arizona, with offices across the country including in Crested Butte and Denver, Colorado. The Center is dedicated to protecting and restoring imperiled species and natural ecosystems. The Center uses science, policy, and law to advocate for the conservation and recovery of species on the brink of extinction and the habitats they need to survive. The Center, as it has for decades, continues to actively advocate for increased protections for species and their habitats across Colorado.

## I. THE LONE PINE PROJECT

The Scoping Package states that the project's purpose and need includes:

- The need to improve resilience or maintain the resistance of forest ecosystems in an effort to increase protection against epidemic insect and disease outbreaks.
- The need to increase the structural diversity of the ponderosa pine forest represented across the landscape.
- The need to provide economic support to local communities by providing timber products to dependent local industries in a sustainable manner.[1]

The Scoping Package further asserts that action is needed to address the fact that "the current and desired conditions shows that the condition of the ponderosa pine cover type found within the

[1] San Juan National Forest, Salter Vegetation Management Project Scoping Package (Feb. 2020) at 3 (hereafter "Salter Scoping Package").

Salter Vegetation Management project area is different from the desired conditions associated with that vegetative cover type in the SJNF LRMP."[2]

The project will involve 35,000 acres of treatments in areas of the San Juan National Forest near Dolores in an ecosystem mostly typified by ponderosa pine stands. The Scoping Package states that

> forest conditions in the proposed treatment blocks reflect an even-age structure comprised of densely spaced, over-stocked medium and large pine trees in a single structural layer. Smaller trees, saplings, and seedling are infrequent or lacking entirely. Due to the overstocked conditions, these stands have closed canopies with few clumps and individual large trees present.[3]

## II. ANY ANALYSIS MUST CONTAIN THE NECESSARY SITE-SPECIFIC DETAIL TO COMPLY WITH NEPA.

### A. NEPA Requires the Forest Service to Produce a Spatially and Temporally Specific Analysis for Project-Level Decisions.

NEPA is "'our basic national charter for protection of the environment.'"[4] In enacting NEPA, Congress recognized the "profound impact" of human activities, including "resource exploitation," on the environment and declared a national policy "to create and maintain conditions under which man and nature can exist in productive harmony."[5]

The statute has two fundamental two goals: "(1) to ensure that the agency will have detailed information on significant environmental impacts when it makes decisions; and (2) to guarantee that this information will be available to a larger audience."[6] "NEPA promotes its sweeping commitment to 'prevent or eliminate damage to the environment and biosphere' by focusing Government and public attention on the environmental effects of proposed agency action."[7] Stated more directly, NEPA's "'action-forcing' procedures ... require the [Forest Service] to take

---

[2] Salter Scoping Package at 3.

[3] Salter Scoping Package at 1-2.

[4] *Center for Biological Diversity v. United States Forest Serv.*, 349 F.3d 1157, 1166 (9th Cir. 2003) (quoting 40 C.F.R. § 1500.1).

[5] 42 U.S.C. § 4331(a).

[6] *Envtl. Prot. Info. Ctr. v. Blackwell*, 389 F. Supp. 2d 1174, 1184 (N.D. Cal. 2004) (quoting *Neighbors of Cuddy Mt. v. Alexander*, 303 F.3d 1059, 1063 (9th Cir. 2002)); *see also Earth Island v. United States Forest Serv.*, 351 F.3d 1291, 1300 (9th Cir. 2003) ("NEPA requires that a federal agency 'consider every significant aspect of the environmental impact of a proposed action ... [and] inform the public that it has indeed considered environmental concerns in its decision-making process.'").

[7] *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989) (quoting 42 U.S.C. § 4321).

a 'hard look' at environmental consequences"[8] *before* the agency approves an action. "By so focusing agency attention, NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct."[9] To ensure that the agency has taken the required "hard look," courts hold that the agency must utilize "public comment and the best available scientific information."[10]

NEPA's review obligations are more stringent and detailed at the project level, or "implementation stage," given the nature of "individual site specific projects."[11] "[G]eneral statements about possible effects and some risk do not constitute a hard look, absent a justification regarding why more definitive information could not be provided."[12]

Analyzing and disclosing site-specific impacts is critical because where (and when and how) activities occur on a landscape strongly determines that nature of the impact. As the Tenth Circuit Court of Appeals has explained, the actual "location of development greatly influences the likelihood and extent of habitat preservation. Disturbances on the same total surface area may produce wildly different impacts on plants and wildlife depending on the amount of contiguous habitat between them."[13] The Court used the example of "building a dirt road along the edge of an ecosystem" and "building a four-lane highway straight down the middle" to explain how those activities may have similar types of impacts, but the extent of those impacts – in particular on habitat disturbance – is different.[14] Indeed, "location, not merely total surface disturbance,

---

[8] *Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir. 2000) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989)).

[9] *Marsh*, 490 U.S. at 371 (citation omitted).

[10] *Biodiversity Cons. Alliance v. Jiron*, 762 F.3d 1036, 1086 (10th Cir. 2014) (internal citation omitted).

[11] *Ecology Ctr., Inc. v. United States Forest Serv*., 192 F.3d 922, 923 n.2 (9th Cir. 1999); *see also Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 800-01 (9th Cir. 2003); *New Mexico ex rel Richardson v. Bureau of Land Management*, 565 F.3d 683, 718-19 (10th Cir. 2009) (requiring site-specific NEPA analysis when no future NEPA process would occur); *Colo. Envtl. Coal. v. Ofc. of Legacy Mgmt*., 819 F. Supp. 2d 1193, 1209-10 (D. Colo. 2011) (requiring site-specific NEPA analysis even when future NEPA would occur because "environmental impacts were reasonably foreseeable").

[12] *Or. Natural Res. Council Fund v. Brong*, 492 F.3d 1120, 1134 (9th Cir. 2007) (citation omitted); *see also Or. Natural Res. Council Fund v. Goodman*, 505 F.3d 884, 892 (9th Cir. 2007) (holding the Forest Service's failure to discuss the importance of maintaining a biological corridor violated NEPA, explaining that "[m]erely disclosing the existence of a biological corridor is inadequate" and that the agency must "meaningfully substantiate [its] finding").

[13] *New Mexico ex rel Richardson*, 565 F.3d at 706.

[14] *Id*. at 707.

affects habitat fragmentation,"[15] and therefore location data is critical to the site-specific analysis NEPA requires.

The District Court for the District of Alaska recently set aside the Prince of Wales timber sale because it failed to contain site-specific locations for roads and treatments. In its March 11, 2020 decision, the District Court explains the approach the Forest Service took in the Prince of Wales EIS, describing that the document "analyzed" four alternatives, but that:

> the alternatives do not provide the specific locations or configurations of harvest or roadbuilding within the LSTA [Logging System Transportation Analysis]. Instead, the Project EIS provides that "site-specific locations and methods" for activities such as timber harvest "will be determined during implementation" over the 15-year lifespan of the Project. It explains that siting decisions and the parameters of actual timber sales will be determined pursuant to an Implementation Plan …. However, the EIS makes clear that these subsequent, site-specific decisions will not be subject to additional NEPA review. The Forest Service terms this approach "condition-based analysis."[16]

The Prince of Wales EIS made assumptions "[i]n order to capture the 'maximum effects' of the Project."[17] It also identified larger areas within which smaller areas of logging would later be identified, and approved the construction of 164 miles of road, but "the Project EIS does not include a determination—or even an estimate—of when and where the harvest activities or road construction authorized by each alternative will actually occur."[18]

The Court found the Forest Service's approach violated the law and specifically contradicted Ninth Circuit precedent, *City of Tenakee Springs v. Block*, 778 F.2d 1402 (9th 1995), which set aside the Forest Service's decision to authorize pre-roading in the Kadashan Watershed, without specifically evaluating where and when on approximately 750,000 acres of land on Baranof and Chichagof Islands it intended to authorize logging to occur. The district court evaluating the Prince of Wales project found that the Forest Service's condition-based analysis was equivalent to the deficient analysis set aside in *City of Tenakee Springs,* holding that:

> the Circuit's reasoning [in *Tenakee Springs*] is still binding precedent: NEPA requires that environmental analysis be specific enough to ensure informed decisionmaking and meaningful public participation. The Project EIS's omission

[15] *Id.*

[16] *See Southeast Alaska Conservation Council v. U.S. Forest Serv.*, 2020 U.S. Dist. LEXIS 43499, Case No. 1:19-cv-00006-SLG (D. Alaska Mar. 11, 2020) at *8 (citations omitted), attached as Ex. 1.

[17] *Id.* at *7.

[18] *Id.* at *19.

> of the actual location of proposed timber harvest and road construction within the Project Area falls short of that mandate.[19]

The District of Alaska's decision demonstrates that condition-based management as implemented by the Forest Service cannot comply with law.

NEPA further mandates that the agency provide the public "'the underlying environmental data' from which the Forest Service develop[ed] its opinions and arrive[d] at its decisions."[20] "The agency must explain the conclusions it has drawn from its chosen methodology, and the reasons it considered the underlying evidence to be reliable."[21] In the end, "vague and conclusory statements, without any supporting data, do not constitute a 'hard look' at the environmental consequences of the action as required by NEPA."[22]

CEQ's regulations establish specific ways agencies must analyze proposed actions, including project-level decisions, including a detailed discussion of direct, indirect, and cumulative impacts and their significance; and an analysis of reasonable alternatives to the proposed action. Such analysis is required for both environmental assessments (EAs) and EISs.

The Salter Project is a project-level decision. As a result, any NEPA analysis must include the detailed information and analysis that NEPA and the CEQ regulations require – including identifying the ***when, where,*** and ***how*** of road construction and of specific treatments by stand – because the Forest Service is unlikely to undertake any further NEPA analysis beyond the proposed EA.

The Scoping Package does not contain the required detail. For example, the Scoping Package identifies but does not map the "primary haul routes."[23] The Scoping Package notes that roads closed for 20-30 years may be reopened and reconstructed to facilitate the project but does not identify the location or length of each.[24] The Scoping Package states that temporary road construction may be required but again provides no detail on length and location.[25] The Forest Service has concluded that temporary roads can have many of the same environmental impacts as constructing permanent roads. Further the Scoping Package indicates that the Forest Service will not disclose the location of landings until after the Forest Service has approved the project,[26] violating NEPA's mandate that agencies take a hard look at environmental impacts before the die

---

[19] *Id*. at *19 (emphasis added).

[20] *WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 925 (9th Cir. 2015).

[21] *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1075 (9th Cir. 2011) (citation omitted).

[22] *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 973 (9th Cir. 2006).

[23] Salter Scoping Package at 4.

[24] *Id*.

[25] *Id*.

[26] *Id*. at 5.

is cast. We urge the Forest Service to comply with the law by disclosing this information in any subsequently prepared NEPA document.

### B. The Forest Service Must Disclose the Baseline Conditions of the Project Area.

Any EA or EIS must "succinctly describe the environment of the area(s) to be affected or created by the alternative under consideration."[27] NEPA also requires the action agency to set an appropriate baseline detailing the nature and extent of the resources in the area: "The concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process."[28] "Without establishing ... baseline conditions ... there is simply no way to determine what effect [an action] will have on the environment and, consequently, no way to comply with NEPA."[29]

Without baseline data, neither the public nor the agency can understand the effects of the proposed action or craft and analyze alternatives and mitigation measures to protect these values. As such, the Forest Service must identify the environmental baseline and affected environment, as well as the scope of impacts and where those impacts are most likely to be felt.

We urge the Forest Service in any subsequently prepared NEPA document to include baseline, site-specific information about the project area and the treatment areas within the project, so that the public can better understand and appreciate the values at issue and how the proposed action and alternatives may impact those values. We strongly urge the Forest Service to include:

- the ***common stand exam data*** for stands within the project area, including but not limited to the diameter of ponderosa pine, estimated age, degree of impact from beetles, etc. (We note that while the project proposes to "remove infested bark beetle trees, and dead trees," the Scoping Package contains no information about the extent of beetle kill in the area, or the density of snags.)[30] The Forest Service has common stand exam data already, as the Scoping Package reports:

> A comparison based on common stand exams and field observations between the current and desired conditions shows that the condition of the ponderosa pine cover type found within the Salter Vegetation Management project area is different from the desired conditions associated with that vegetative cover type in the SJNF LRMP.[31]

---

[27] 40 C.F.R. § 1502.15.

[28] *See* Council on Environmental Quality, *Considering Cumulative Effects under the National Environmental Policy Act* (Jan. 1997) at 41, available at https://ceq.doe.gov/publications/cumulative_effects.html (last viewed Mar. 22, 2020).

[29] *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988).

[30] Salter Scoping Package at 3.

[31] Salter Scoping Package at 3.

Common stand exam data would be instrumental in helping the public understand the impacts of the proposed action. Although the San Juan National Forest provided some of this information for the Lone Pine Project only belatedly to the interested public, it greatly assisted some of those who objected to the project in reaching agreement with the Forest Service on that proposal. By providing this information earlier and as part of the NEPA process, the Forest Service would increase transparency and could help avoid future conflicts.

- ***maps*** displaying key values, including management area boundaries, vegetation cover, watersheds, prior fire history, wetland/riparian areas, and important habitat for wildlife.

- ***site-specific information*** about each treatment area. For example, the Scoping Package states that "[t]he Boggy Draw block attracts the highest visitor use and contains substantial values at risk."[32] Any subsequently prepared NEPA document must describe those "substantial values," so that the impacts of logging, burning and road construction to those values can be disclosed, and so that mitigation measures or design features to protect those values can be adopted.

We specifically request that the Forest Service address Colorado Parks and Wildlife (CPW) data concerning the status of elk population in the area. CPW's analysis of recent post-hunt data (from 2018) showed that the elk population in data analysis unit E-24 "is decreasing" and "is now *below our population management objective*."[33] Unit E-24 includes the Salter project area. CPW's Brad Weinmeister, who provided the data, stated: "We really don't know what is causing" a lack of recruitment to the elk population "and [we] currently have a research project to try to get some answers."[34] Mr. Weinmeister provided the following graph depicting elk population in data analysis unit E-24, showing a generally downward trend since 2004.

[32] Salter Scoping Package at 2.

[33] Email of B. Weinmeister, CPW to B. Magee, DNR (Oct. 8, 2019) (emphasis added), attached as Ex. 2.

[34] *Id.*




*Figure 1. Table from email of B. Weinmeister, attached as Ex. 2.*

This downward trend for elk population in the project area is important because the Salter project may further harm elk by displacing animals during the project's duration. Any subsequently prepared NEPA document should acknowledge, address, and ameliorate this downward trend.

### C. The Forest Service Should Disclose Basic Information About the Alternatives and Their Impacts.

The Scoping Package fails to disclose basic information about the proposal that must be contained in any subsequently prepared NEPA document. For example, any NEPA document should disclose:

- The ***duration*** of the project (2 years? 10? 20?)

- The ***location*** of key features to be approved by the proposed action, including maintained, reconstructed, and temporary roads proposed for use; landings; burn piles; skid trails; etc.

- The total ***acreage*** of various treatments. The map provided in the Scoping Package identifies areas where three types of treatments will occur (commercial thinning, plantation thinning, and single tree selection), but fails to disclose the area of those treatments. In addition, the Scoping Package identifies five different treatments (pre-commercial thinning, commercial thinning, brush thinning, plantation thinning, and single tree selection), two of which (pre-commercial thinning and brush thinning)

which are not mapped.[35] The Scoping Package also states that the agency is proposing "tree-cutting, tree planting, and activity fuel burning" within the project area, but it fails to disclose where, when, and to what extent each of those actions will occur, stating only vaguely that "[a] range of treatments may occur throughout the project area."[36]

- The project's ***socio-economic impacts***. The project's purpose includes responding to the "need to provide economic support to local communities by providing timber products to dependent local industries in a sustainable manner."[37] Because supporting local industry is a project goal, any subsequently prepared NEPA document must contain projections and quantifications of the likely board-feet the project will make available to local mills, and the economic impact of the project. The Forest Service has or can generate detailed stand data for the project area, so it would seem to be a relatively straightforward analysis. We note that many other Forest Service project-level analyses estimate board-feet likely to be harvested and project economic impacts.

- The ***science*** supporting the prescriptions in each alternative. For example, the Scoping Package states that logging would be aimed at "reducing the presence of dwarf mistletoe."[38] Dwarf mistletoe is endemic in many western conifer forests, and we are aware of little, if any, scientific evidence supporting the logging of trees infested with dwarf mistletoe for restoration.

- Whether the Forest Service intends to adopt any prescriptions specifically related to ***aspen***. The Scoping Package states: "The project area also supports small patches of quaking aspen with conifer developing in the understory. Conifer encroachment creates shade and usurps water and nutritional resources, ultimately reducing the vigor of the quaking aspen communities."[39] This would appear to indicate that the Forest Service believes that there may be a need to address conifer "encroachment." But the proposed action does not appear to contain any prescriptions addressing this issue. We do not suggest that any such prescription is necessary; we are simply puzzled by the agency's identifying "encroachment" as an issue that it apparently concludes it need not address.

- The indirect impacts of ***road construction and maintenance***, which will encourage illegal use on temporary roads, even after "closure," and more legal use on roads that are improved for the project. The Forest Service must disclose the degree to which past closures have been effective at preventing illegal use off road.

---

[35] Salter Scoping Package at 4, 8.

[36] Salter Scoping Package at 3.

[37] Salter Scoping Package at 3.

[38] Salter Scoping Package at 3.

[39] Salter Scoping Package at 2.

- The impacts of ***artificial water developments***. The Scoping Package states: "Wildlife water providers (i.e., guzzler[s]) will be installed within the project area under this decision."[40] Any subsequently-prepared NEPA document must address: how these developments address the project's purpose and need, which is focused on the "resilience" and "structural diversity" of the forest (issues that appear unrelated to the construction of guzzlers); the purpose, location, number, and design of these developments; what species they intend to benefit; any scientific studies addressing the efficacy and impacts of such developments; whether they will require maintenance by motor vehicles; how they may impact the distribution of wildlife; whether they will make water available to livestock or will be designed to prevent such use; what natural water these structures are meant to replace; and whether they will benefit exotic species less adapted to drier conditions than endemic wildlife, or extend the range of native species. As a general matter, we believe that the use of artificial water must be supported by scientific studies and localized research. We request that the Forest Service analyze at least one action alternative that does not approve the use of artificial water developments.

- Why the Forest Service is adopting ***different prescriptions*** from those recently approved in the Lone Pine project. *See* Table 1, below. We understand that there may be differences in the two project areas (elevation, aspect, precipitation, logging and fire history, etc.), and differences in the projects' purposes, that may have influenced the Forest Service's prescriptions. To help us understand the differences, we request that any subsequently prepared NEPA document address each of the questions in the right-hand column of the table below.

---

[40] Salter Scoping Package at 5.

## TABLE 1. Comparison of Prescriptions in Lone Pine Decision and Salter Scoping Package

| Treatment/ Value | Lone Pine | Salter | Questions |
|---|---|---|---|
| Commercial thinning prescription | "Trees in all size classes **over 10 inches dbh may be harvested during commercial thinning**, with emphasis placed on retaining the healthiest green trees in the groups…. The target basal area in these areas **will be 60 square feet per acre,** but basal area will likely vary between **60 to 80 square feet per acre.**" Lone Pine Decision Notice at 5. | "Silviculture thinning with enhancement objectives in mixed stocking ponderosa pine with a variable residual square feet of tree stem **basal area of 50 -70 (BA) per acre depending upon stand condition**." Salter Scoping Package at 4. | Lone Pine = 60-80 BA/acre with target of 60.<br><br>Salter = 50-70 BA/acre with mo target<br><br>Why the difference? |
| Pre-commercial thin | "Pre-commercial thinning will be used as a follow-up treatment after single tree selection where there is an overabundance of trees smaller than **10 inches dbh.** The intent of this treatment is to improve growth rates and vigor of the remaining trees, thus improving overall stand resilience. The trees removed during pre-commercial thinning after single tree selection **will be in the 4-10 inch dbh range**." Lone Pine Decision Notice at 5. | "Thinning of ponderosa pine (Less than **5 inches diameter**) to spacing specifications." Salter Scoping Package at 4. | Lone Pine = log trees less than 10" DBH.<br><br>Salter = log trees less than 5" DBH.<br><br>Why the difference? |
| Brush thinning | "Oak thinning may be used where pine regeneration is inhibited by dense Gambel oak to create openings where pine may be more likely to regenerate. Oak thinning will be accomplished thru hand thinning and piling, fuel-wood cutting and removal, or mechanical mastication. Oak thinning may also occur where existing regeneration or seed trees are at risk of being damaged by fire (prescribed burning or wildfires). In these areas, either hand thinning or mechanical mastication may be used, depending on the extent of the area in need of treatment." Lone Pine Decision Notice at 7. | "Thinning of understory brush species (Less than 6 inches Diameter at Root Collar), mainly Gambel oak to create openings for seedling recruitment and reduce ladder fuel effects on residual trees." Salter Scoping Package at 4. | Salter has no limits on mechanical treatment; Lone Pine does.<br><br>Why the difference?<br><br>And why a size limit in Salter, but not in Lone Pine? |

| Treatment/ Value | Lone Pine | Salter | Questions |
|---|---|---|---|
| Plantation Thinning | "**Trees in the 4-10 inch dbh size class will be thinned** based on tree form or spacing, as described above. Desired spacing for trees in this size class is from 10 to 15 feet apart, but this will be adjusted on a stand by stand basis and will take into account the location of overstory trees in the final spacing requirements. **A limited amount of commercial thinning of trees 10 inches or larger may also occur** in plantation areas to improve site conditions."<br>Lone Pine Decision Notice at 5. | "Thinning of planted trees to a spacing specification and thinning of intermixed naturally occurring trees **according to the Commercial Thinning prescription**."<br>Salter Scoping Package at 4. | Salter prescription has no DBH limit, but a target of 50 - 70 BA per acre, and no spacing direction.<br><br>Lone Pine has DBH guidance and desired spacing guidance.<br><br>Why the difference? |
| Single-Tree Selection | "Individual trees representing all size classes **above 10 inches dbh** may be harvested to promote the growth of remaining trees and to provide space for regeneration, thereby maintaining or moving the stand toward a multi-age, heterogeneous structure."<br>Lone Pine Decision Notice at at 5.<br>"In single tree selection units the goal is to leave a stand average **basal area of 55 square feet per acre**."<br>Lone Pine Decision Notice at 6.<br>"[A]ll trees over 26 inches in diameter will be retained unless they show evidence of active bark beetle infestation, in which case they will be harvested. Trees in the 21 – 24 inch size class will be retained unless they show evidence of active beetle infestation or severe defects."<br>Lone Pine Decision Notice at 6. | "Silviculture thinning with regenerative objectives in contiguous stands of ponderosa pine with a **variable residual square feet of tree stem basal area of 50 -70 (BA) per acre** depending upon stand condition."<br>Salter Scoping Package at 4. | Salter has a BA target that is potentially higher than that in Lone Pine.<br><br>Why the difference?<br><br>Salter has no DBH guidance for protecting some large trees, while Lone Pine does.<br><br>Why the difference? |
| Large Tree Emphasis/ Commercial Thin Prescription. | "All trees larger than 20" DBH would be retained. **All size classes will be managed up to 20" DBH with the goal of leaving a mix of residual trees smaller than 20" DBH**. Basal area (BA) ranges **would vary from 60 to 80 sq/ft per acre with a target BA of 70 sq/ft per acre**."<br>Lone Pine Decision Notice at 7. | None identified. | Why no prescription/large tree protection for Salter? |
| Large Tree current conditions | | "The forest conditions in the proposed treatment blocks reflect an even-age structure comprised of densely spaced, over-stocked medium and large pine trees in a single structural layer…."<br>Salter Scoping Package at 1. | Salter has "large trees" but no protection for them, unlike the large tree enhancement prescription in Lone Pine.<br><br>Why? |

### D. The Forest Service Should Disclose Meaningful Information about Cumulative Effects.

Any subsequently prepared NEPA document must disclose not only the direct and indirect impacts but also the cumulative impacts of the project when taken together with the impacts of other reasonable foreseeable actions. The Forest Service must disclose the location of nearby projects, whether they overlap with the Slater project area, and what the impacts of those projects might be.

For example, any subsequently prepared NEPA document must disclose the impacts of the Salter project when taken together with:

- The nearby Lone Pine project;
- Past, present, and reasonably foreseeable livestock grazing in the area;
- Past, present, and reasonably foreseeable recreational activity, including off-road vehicle travel and hunting;
- Past logging, fire, and fire suppression, including the disturbance (fire) history of each unit;
- Past, present and predicted beetle activity;
- Climate change, including the ongoing drought in the Four Corners area; and
- Private and state land development within and adjacent to the project, including any efforts (or lack thereof) by private landowners to reduce fuels near homes and structures.

Any NEPA document must do more than merely list other projects and assert that impacts will not rise to the level of significance. The NEPA document must analyze and discuss where the other projects have or will occur, disclose the kinds of impacts they may have, and analyze how they may interact and accumulate with those of the Salter Project.

## III. ANY NEPA DOCUMENT MUST ANALYZE A RANGE OF REASONABLE ALTERNATIVES.

In taking the "hard look" at impacts that NEPA requires, an EA must "study, develop, and describe" reasonable alternatives to the proposed action.[41] The Tenth Circuit explains that this mandate extends to EAs as well as EISs. "A properly-drafted EA must include a discussion of appropriate alternatives to the proposed project."[42] This alternatives analysis "is at the heart of

[41] 42 U.S.C. § 4332(2)(C) & (E); 40 C.F.R. § 1508.9(b) (an EA "[s]hall include brief discussions ... of alternatives").

[42] *Davis v. Mineta*, 302 F.3d 1104, 1120 (10th Cir. 2002) (granting injunction where EA failed to consider reasonable alternatives).

the NEPA process, and is 'operative even if the agency finds no significant environmental impact.'"[43] Reasonable alternatives must be analyzed for an EA even where a FONSI is issued because "nonsignificant impact does not equal no impact. Thus, if an even less harmful alternative is feasible, it ought to be considered."[44] When an agency considers reasonable alternatives, it "ensures that it has considered all possible approaches to, and potential environmental impacts of, a particular project; as a result, NEPA ensures that the most intelligent, optimally beneficial decision will ultimately be made."[45]

In determining whether an alternative is "reasonable," and thus requires detailed analysis, courts look to two guideposts: "First, when considering agency actions taken pursuant to a statute, an alternative is reasonable only if it falls within the agency's statutory mandate. Second, reasonableness is judged with reference to an agency's objectives for a particular project."[46] Any alternative that is unreasonably excluded will invalidate the NEPA analysis. "The existence of a viable but unexamined alternative renders an alternatives analysis, and the EA which relies upon it, inadequate."[47] The agency's obligation to consider reasonable alternatives applies to citizen-proposed alternatives.[48] Courts require that an agency adequately and explicitly explain in the EA any decision to eliminate an alternative from further study.[49]

---

[43] *Diné Citizens Against Ruining Our Env't v. Klein*, 747 F. Supp. 2d 1234, 1254 (D. Colo. 2010) (quoting *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1277 (10th Cir. 2004)). *See also W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013) (in preparing EA, "an agency must still give full and meaningful consideration to all reasonable alternatives" (emphasis added) (internal quotation and citation omitted)); 40 C.F.R. § 1502.14 (describing alternatives analysis as the "heart of the environmental impact statement").

[44] *Ayers v. Espy*, 873 F. Supp. 455, 473 (D. Colo. 1994) (internal citation omitted).

[45] *Wilderness Soc'y v. Wisely*, 524 F. Supp. 2d 1285, 1309 (D. Colo. 2007) (quotations & citation omitted).

[46] *Diné Citizens Against Ruining Our Env't*, 747 F. Supp. 2d at 1255 (quoting *New Mexico ex rel. Richardson*, 565 F.3d at 709).

[47] *Id.* at 1256.

[48] *See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217-19 (9th Cir. 2008) (finding EA deficient, in part, for failing to evaluate a specific proposal submitted by petitioner); *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1171 (10th Cir. 1999) (agency's "[h]ard look" analysis should utilize "*public comment* and the best available scientific information") (emphasis added).

[49] *See Wilderness Soc'y*, 524 F. Supp. 2d at 1309 (holding EA for agency decision to offer oil and gas leases violated NEPA because it failed to discuss the reasons for eliminating a "no surface occupancy" alternative); *Ayers*, 873 F. Supp. at 468, 473.

Agencies cannot "define the project so narrowly that it foreclosed a reasonable consideration of alternatives."[50]

### A. The Forest Service Must Analyze the No Action Alternative.

NEPA mandates that agencies consider the alternative of no action.[51] The comparison between the action alternatives and the "no action" alternative enables the agency and the public to understand the difference between allowing the status quo to continue and taking the proposed action(s). To facilitate this review, EAs and EISs generally contain sections disclosing the environmental consequences of each alternative, including no action, to a variety of impacted resources. The San Juan National Forest took this approach in a 2014 vegetation management project draft EA for the Fosset Gulch/Northern HDs Ecosystem Restoration Project, and for the recently approved Lone Pine Vegetation Management Project.[52]

We urge the Forest Service in any subsequently prepared NEPA document to include a concise description of the no action alternative, and a clear and direct comparison of the impacts of each alternative by resource. This will permit the public to better understand the proposed action and other alternatives.

### B. The Forest Service Should Analyze an Alternative to Protect Old or Large Trees.

Large and old ponderosa pine trees are relatively rare now in the Southwest compared to the period before European settlement because they were heavily logged over the last 150 years. They are likely rare the Salter project area. Large, old ponderosa serve valuable ecosystem functions, have outsize value for wildlife, are more fire resistant, serve as important storehouses of genetic diversity, and store significant amounts of carbon.[53] If the Forest Service seeks to ensure resilience, ensure age class diversity, and reduce high-severity fire risk, as the Salter project's purpose and need statement indicates, it must preserve large and old trees.

As a result, numerous scientific studies, collaboratives, and Forest Service decisions have emphasized the need to protect large and old ponderosa pine trees in order to achieve both

---

[50] *Davis v. Mineta*, 302 F.3d 1104, 1119 (10th Cir. 2002), citing *Colo. Envlt. Coalition v. Dombeck*, 185 F.3d 1162, 1174-75 (10th Cir. 1999); *Simmons v. United States Army Corps of Eng'rs*, 120 F.3d 664, 669 (7th Cir. 1997).

[51] 40 C.F.R. § 1502.14.

[52] *See* San Juan National Forest, Lone Pine Vegetation Management Plan, Final Environmental Assessment (Aug. 2019) ("Lone Pine Final EA") available at http://www.fs.usda.gov/nfs/11558/www/nepa/110005_FSPLT3_4779541.pdf (available in Forest Service files); San Juan National Forest, Fosset Gulch/Northern HDs Ecosystem Restoration Project, Draft Environmental Assessment (June 2014) at 18-51, available at https://www.fs.usda.gov/nfs/11558/www/nepa/97260_FSPLT3_1658988.pdf (last viewed Mar. 22, 2020) (available in Forest Service files).

[53] *See, e.g.*, Four Forest Restoration Initiative, Old Growth Protection & Large Tree Retention Strategy (Sep. 13, 2011) at 3-4 (citing numerous studies), attached as Ex. 3.

ecological restoration and greater resilience to catastrophic events such as wildfire and insect infestations. These decisions have often set an upper limit for the size of trees that can be logged for forest management.

For example, the Four Forest Restoration Initiative, a collaborative guided by science and working to improve management on forests in northern Arizona, has adopted an "Old Growth Protection & Large Tree Retention Strategy."[54] As part of that strategy, "the 4FRI Collaborative has agreed that the 4FRI effort should implement large tree retention and old growth protection strategies that are . . . are based upon a 16" diameter threshold that limits the cutting of trees larger than 16" to circumstances and criteria set forth in pre-defined exception categories."[55] A similar collaborative in New Mexico agreed that "[i]t is generally advisable to maintain ponderosa pines larger than 41 cm (16 inches) diameter at breast height (dbh) and other trees with old-growth morphology regardless of size (e.g. yellow-barked ponderosa pine or any species with large drooping limbs, twisted trunks or flattened tops)."[56]

The pre-eminent peer-reviewed study on the issue concludes:

> Large and old trees, especially those established before ecosystem disruption by Euro-American settlement, are rare, important, and difficult to replace. Their size and structural complexity provide critical wildlife habitat by contributing crown cover, influencing understory vegetation patterns, and providing future snags. Ecological restoration should protect the largest and oldest trees from cutting and crown fires, focusing treatments on excess numbers of small young trees. Given widespread agreement on this point, *it is generally advisable to retain ponderosa trees larger than 41 cm (16 inches) dbh and all trees with old-growth morphology regardless of size (i.e., yellow bark, large drooping limbs, twisted trunks, flattened tops)*. Despite the heterogeneity of forest site and stand conditions in the Southwest, cutting of larger trees will seldom be ecologically warranted as ''restoration'' treatments at this time due to their relative scarcity. Following this guideline would significantly reduce hazards of stand-replacing fires in most cases and also favor the development of future old-growth forest conditions (Moir and Dieterich 1988, Harrington and Sackett 1992).[57]

---

[54] *Id.*

[55] *Id.* at 7.

[56] U.S. Forest Service *et al.*, New Mexico Forest Restoration Principles (May 2006), attached as Ex. 4, available at https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5207898.pdf (last viewed Mar. 22, 2020).

[57] Allen *et al.*, Ecological Restoration of Southwestern Ponderosa Pine Ecosystems: A Broad Perspective, Ecological Applications, 12(5) (2002) at 1425, attached as Ex. 5.

This article notes that managing ponderosa pine forests for ecological restoration can also help to increase forest resilience.[58]

For the San Juan National Forest, including the Salter area, the Forest Service and other stakeholders joined to establish the Ponderosa Pine Partnership (PPP) in the early 1990s. The Partnership developed "An Ecological Prescription for the San Juan Pine Zone," including this prescription: "Retain large trees. Any trees 20 inches or larger in diameter should be retained. In stands with smaller trees, the largest trees should be retained."[59] The San Juan National Forest developed and partially implemented two projects under the PPP, including the Guard Station and Ferris East timber sales. Both of these timber sales included diameter limits. The Guard Station Decision Notice prohibited the logging of trees over 16 inches DBH; the Ferris East Decision notice barred logging of ponderosa over 20 inches DBH.[60] Each of the sales was designed to meet goals that included forest restoration, supplying the needs of the local wood products industry, and reducing the risk of catastrophic wildfire.[61]

We therefore request that the Forest Service consider an alternative that will: retain large trees, either larger than 16" DBH or 20" DBH, and any old trees, as determined by their size, appearance and morphology. The size of the cap may depend on the results of stand exam data. To the extent that the CSE data show few if any trees 20" DBH or larger, the Forest Service should consider a smaller diameter cap to protect the largest trees that remain.

We note that the Forest Service must consider such an alternative reasonable because the San Juan National Forest actually adopted a diameter cap over a portion of the Lone Pine project in a decision issued two months ago. There, the "large tree emphasis/commercial thin" prescription for units covering about a third of the project area stated: "All trees larger than 20" DBH would be retained. All size classes will be managed up to 20" DBH with the goal of leaving a mix of residual trees smaller than 20" DBH."[62]

Despite this recent decision, the Salter Scoping Package fails to address at all diameter limits or any other protection for large, old trees, and Forest Service staff stated in a public meeting last week that diameter limits would not be part of the proposed action. We are disappointed that San

---

[58] *Id*. at 1429. (emphasis added). *See also* P.F. Hessburg, et al., *Restoring fire-prone Inland Pacific landscapes: seven core principles*, Landscape Ecology (2015) Vol. 30, 1805-1835, at 1820-23("Widely distributed large, old trees provide a critical backbone to dry pine and dry to mesic mixed-conifer forest landscapes"), attached as Ex. 6.

[59] D. Lynch, Forest Restoration in Southwestern Ponderosa Pine, Journal of Forestry (Aug. 2000) at 17, attached as Ex. 7.

[60] San Juan National Forest, Guard Station Timber Sale, Decision Notice (May 1996) at 3 ("Cut no trees greater than 16" diameter breast height (DBH)"), attached as Ex. 8; San Juan National Forest, Ferris East Timber Sale, Decision Notice (Feb. 1998) at 3 ("No ponderosa pine in excess of 20 inches in diameter at breast height (DBH) will be harvested."), attached as Ex. 9.

[61] *Id*.

[62] Forest Service, Lone Pine Vegetation Management Project, Final Decision Notice & Finding of No Significant Impact (Jan. 2020) at 7 ("Lone Pine Final Decision").

Juan National Forest officials appear resistant to consider such an alternative weeks after having adopted one. We hope the Forest Service understands from the resolution of the Lone Pine objection process that there is strong science and strong public sentiment supporting the protection of old and large trees.

Further, the alleged "protections" for large and old trees that we understand the Salter project drafters may propose are inconsistent and largely illusory. Forest Service staff indicated that, for the Salter project, the agency would reject diameter limits previously endorsed in favor of a sliding scale that provides only limited protection for some trees, as the agency did over much of the Lone Pine project outside of the "large tree emphasis" prescription units. The Lone Pine Final Decision Notice and FONSI contain a *narrative* description of a prescription covering much of that project area that states:

> In the largest size classes, all trees over 26 inches in diameter will be retained unless they show evidence of active bark beetle infestation, in which case they will be harvested. Trees in the 21 – 24 inch size class will be retained unless they show evidence of active beetle infestation or severe defects.[63]

This narrative is followed in by a *bulleted* description of size classes that will be retained:

- 19.1" to 21.0" dbh Trees (20" diameter class) – leave approximately 50%
- 21.1" to 25.9" dbh Trees (22" and 25. 9" diameter class) - leave approximately 75% (remove trees from this size class only if defective or they show evidence of active bark beetle infestations as nearly half of the stands don't have enough trees to warrant any removal in this class)
- 26.0" dbh trees and up will only be cut if they show evidence of active bark beetle infestation.[64]

As an initial matter, the narrative and bulleted descriptions in the Lone Pine prescription (from which the Salter proposed action may borrow) conflict in at least two respects, making it difficult to determine the prescription's precise definition. First, the *narrative* description provides no limit on logging of trees between 24 and 26 inches, describing only the 21 – 24 inch diameter class and the 26 inch class. Second, the *narrative* description states that "[t]rees in the 21 – 24 inch size class will be retained unless they show evidence of . . . *severe* defects."[65] The *bulleted* description permits logging of trees 21.1" to 25.9" "if defective," without reference to "severe" defects. If the Forest Service intends to adopt this approach for the Salter project, it must, at a minimum, provide for a consistent definition so that the public, the decision-maker, and those in the field implementing any decision can understand precisely what the agency intends to adopt.

---

[63] Lone Pine Final Decision at 6.

[64] Lone Pine Final Decision at 6.

[65] Lone Pine Final Decision at 6 (emphasis added).

Even if the agency proposes a consistent description for the Salter project, there are at least two problems with the sliding scale approach the Forest Service adopted in the Lone Pine decision.

***First***, for the Lone Pine decision, the agency provided no rational basis – and no scientific analysis – supporting its proposed prescriptions which provides a sliding-scale of protection (or lack thereof) for large and old trees. At Lone Pine, the Forest Service alleged that "[t]he proposed treatment prescriptions used for the Lone Pine project were established for the site specific conditions that are currently seen in the analysis area."[66] But the Lone Pine Final EA provided no data or further explanation for why it established its sliding scale prescriptions, or how those relate to "site specific conditions." The Final EA cited no scientific studies, nor provided examples of any other National Forest adopting a similar approach. It would be arbitrary and capricious for the Salter Project to adopt similar prescriptions, or to reject diameter caps/old tree protections as unreasonable, based on this supposedly "protective" prescription.

***Second***, the Forest Service failed to provide any *scientific basis* for rejecting a 16" or 20" diameter cap at Lone Pine. The Ponderosa Pine Partnership (PPP) working with Prof. William H. Romme, a respected professor of landscape ecology and forestry at Colorado State University, specifically developed the "Ecological Prescription for the *San Juan* Pine Zone" as part of the Ponderosa Pine Partnership, which includes the very forest stands at issue at Salter.[67] Thus, this prescription was developed for this site-specific project area. Should the Forest Service reject an alternative based on the PPP's previously-adopted, scientifically-supported, diameter restrictions developed specifically for this Forest, that would violates NEPA's mandate that the agency consider all reasonable alternatives.

The Forest Service must analyze in detail a proposed alternative if it fits within the purpose and need, at least partially, and is not duplicative of other alternatives under consideration. Protecting large, old trees of 16 inches DBH or 20 inches DBH or greater would, *at a minimum*, partially meet the project purpose and need, because it would: increase forest resiliency; promote recovery of forest vegetation; reduce the risk of high severity wildfires; and provide timber products to dependent local industries, albeit likely at a lower volume than that made available with no cap or a sliding scale diameter prescription. This is exactly the kind of trade-off that NEPA demands agencies explore, one that puts in sharp relief the competing values of forest protection and commercial gain. Thus, a 16" DBH or 20" DBH cap, and protection for other old trees, by at least partially meeting the Salter project's purpose and need, is a reasonable alternative that the Forest Service should analyze in full in any subsequently prepared NEPA document.

We note that the sliding-scale prescriptions adopted in Lone Pine and apparently likely to be proposed for Salter are not particularly protective of larger, older trees. While the Lone Pine prescription stated that the agency should leave 75% of trees between 21 and 26 inches, it also permits the Forest Service to "remove trees from this size class only if defective or they show evidence of active bark beetle infestations."[68] The definition of defective – those trees that have "many of the following characteristics: severely overtopped/suppressed, a mistletoe rating ≥3,

---

[66] Lone Pine Final EA, Appendix D at 13.

[67] D. Lynch, Forest Restoration in Southwestern Ponderosa Pine (Ex. 7) at 17.

[68] Lone Pine Final Decision at 6.

major physical defects, dead/damaged terminal leader, are expected to die within 10 years or not respond to release, are beetle infested, and/or have extremely limited crown or very poor vigor"[69] – contained in the Lone Pine prescriptions was so vague as to provide the Forest Service with broad discretion to conclude that most trees in the identified size class are "defective" and thus exempt from protection.

We hope that the Forest Service understands that its preferred course of action is not, and cannot be, the *only* way it can achieve benefits for the landscape consistent with the project's purpose and need. If the agency truly concludes that there is one way and one way only to achieve its purpose, it has, by definition, illegally constrained the purpose and need. As federal courts have concluded: "One obvious way for an agency to slip past the structures of NEPA is to contrive a purpose so slender as to define competing 'reasonable alternatives' out of consideration (and even out of existence). The federal courts cannot condone an agency's frustration of Congressional will."[70]

### C. The Forest Service Must Address Other Reasonable Alternatives.

We propose that the Forest Service consider an alternative that combines some or all of the following elements:

- Limit logging to those areas close to communities, homes, and structures. According to the Scoping Package, "[t]he Montezuma Community Wildfire Protection Plan identifies the entire project area as Wildland Urban Interface, as does the San Juan National Forest Land and Resource Management Plan (SJNF LRMP)."[71] However, Forest Service research has long concluded that the most effective treatments for protecting structures is to treat the area within 40 meters or less of that structure.[72]

- Bar logging and/or road construction within sensitive watersheds or on sensitive soils.

- Adopt measures to protect recreation, including adopting a design feature to avoid scheduling logging, burning, and other associated activates between September 1 and November 15 to avoid conflicts with hunters when practicable.

We also request that the Forest Service specifically address adopting each of these proposed measures as mitigation, and evaluate their effectiveness, as required by NEPA.

---

[69] Lone Pine Final Decision at 6.

[70] *Simmons v. United States Army Corps of Eng'rs*, 120 F.3d 664, 669 (7th Cir. 1997).

[71] Salter Scoping Package at 2.

[72] J. Cohen & B. Butler, Modeling Potential Structure Ignitions from Flame Radiation Exposure with Implications for Wildland/Urban Interface Fire Management, 13th Fire and Forest Meteorology Conference (1998), available at https://www.fs.fed.us/rm/pubs_other/rmrs_1998_cohen_j001.pdf (last viewed Mar. 22, 2020).

## IV. THE FOREST SERVICE MUST ACCOUNT FOR THE IMPACT OF FORESEEABLE CHANGES TO THE FOREST WITHIN THE PROJECT AREA.

Any environmental analysis the Forest Service prepares must include information "of high quality" and must include "[a]ccurate scientific analysis."[73]

Forests within the project area may undergo significant changes in both the next few years and in the next few decades due to two drivers: insect infestations and climate change. Any subsequently-prepared NEPA document should accurately address these potental impacts by including the new, relevant, expert information in any subsequently prepared NEPA document.

First, the Forest Service should account for the potential for insect infestations within the project area. The ongoing roundhead pine beetle infestation is impacting the forest near or within the project area, and those impacts should be addressed and assessed.

Second, in 2017, Forest Service Rocky Mountain Region staff and researchers presented results from bioclimate models concluding that ponderosa pine would likely be lost from much of the Salter project area in the 2056-65 time period, which may call into question the purpose and need and prescriptions proposed for the project.[74] We understand that some have questioned the models' assumptions. However, there appears to be little doubt that temperatures will rise, and that conditions will become dryer, in the project area, stressing plant and wildlife communities.

Failure to address this best available science would violate NEPA.

## V. THE FOREST SERVICE SHOULD CONSIDER PREPARING AN ENVIRONMENTAL IMPACT STATEMENT ON THE SALTER PROJECT.

### A. Agencies Must Prepare EISs When Impacts 'May' Be Significant.

NEPA requires federal agencies to prepare a full environmental impact statement (EIS) before undertaking "major Federal actions significantly affecting the quality of the human environment."[75] As the Tenth Circuit has explained, "[i]f the agency determines that its proposed action *may* 'significantly affect' the environment, the agency must prepare a detailed statement

---

[73] 40 C.F.R. § 1500.1(b).

[74] J. Worrall *et al*., Projected Impacts of Climate Change on Forests of the Dolores Watershed, presentation to the Dolores Watershed Resilient Forest Collaborative (2017) at slides 29, 39 & 52 (showing results of bioclimate models predicting the likely persistence of various forest types, which characterize ponderosa pine as "lost" for the project area), attached as Ex. 10, and available at http://dwrfcollaborative.org/wp/wp-content/uploads/2018/06/projected-impacts-of-climate-change-on-forests-of-the-dolores-watershed.pdf (last viewed Mar. 21, 2019). Other forest types will suffer in the area as well. *See id.* at slide 33 (showing Gambel oak "threatened").

[75] 42 U.S.C. § 4332(C).

on the environmental impact of the proposed action in the form of an EIS."[76] The Ninth Circuit agrees.

> We have held that an EIS *must* be prepared if 'substantial questions are raised as to whether a project ... *may* cause significant degradation to some human environmental factor.' To trigger this requirement a 'plaintiff need not show that significant effects *will in fact occur*,' [but instead] raising 'substantial questions whether a project may have a significant effect' is sufficient.[77]

If an agency "decides not to prepare an EIS, 'it must put forth a convincing statement of reasons' that explains why the project will impact the environment no more than insignificantly. This account proves crucial to evaluating whether the [agency] took the requisite 'hard look.'"[78]

"Significance" under NEPA requires consideration of the action's context and intensity.[79] An agency must analyze the significance of the action in several contexts, including short- and long-term effects within the setting of the proposed action (including site-specific, local impacts).[80] Intensity refers to the severity of the impact and requires consideration of ten identified factors that may generally lead to a significance determination, including: (1) whether the action is likely to be highly controversial; (2) whether the effects on the environment are highly uncertain or involve unique or unknown risks; and (3) whether the action may have cumulative significant impacts.[81] With respect to the degree to which the environmental effects are likely to be highly controversial, the word "controversial" refers to situations where "'substantial dispute exists as to the size, nature, or *effect* of the major federal action.'"[82]

Here, despite the vagueness of the proposal at this early stage, it appears that the Salter project may have significant impacts, triggering the Forest Service's duty to prepare an EIS.

---

[76] *Airport Neighbors Alliance v. U.S.*, 90 F.3d 426, 429 (10th Cir. 1996) (citation omitted) (emphasis added).

[77] *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149-50 (9th Cir. 1998) (citations omitted) (emphasis original). *See also Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 864-65 (9th Cir. 2005) ("To trigger this [EIS] requirement a plaintiff need not show that significlant effects will in fact occur, but raising substantial questions whether a project may have a significant effect is sufficient." (internal quotations, citations, and alterations omitted)).

[78] *Ocean Advoc.*, 402 F.3d at 864.

[79] 40 C.F.R. § 1508.27.

[80] *Id.* § 1508.27(a).

[81] *Id.* § 1508.27(b)(4)-(5), (7)

[82] *Town of Cave Creek v. FAA*, 325 F.3d 320, 331 (D.C. Cir. 2003) (quoting *North American Wild Sheep v. U.S. Department of Agriculture*, 681 F.2d 1172, 1182 (9th Cir. 1982)) (emphasis in original). *See also Middle Rio Grande Conservancy Dist. v. Norton*, 294 F.3d 1220, 1229 (10th Cir. 2002) (same); *Town of Superior v. U.S. Fish and Wildlife Serv.*, 913 F. Supp. 2d 1087, 1120 (D. Colo. 2012) (same).

### B. The Lone Pine Project May Have Significant Impacts.

***The scale of the project itself may be significant***. The Salter project will likely require tens of miles of new, temporary road construction on top of road maintenance and the reopening of many more miles of "close" roads. These impacts and the large scale of logging and burning – proposed for over a 50-square-mile area – support a conclusion of significance.

***The impacts of this project are "highly uncertain"*** because, as discussed above, the project itself – its duration, the location of specific impacts such as roads or logging treatments, the precise nature of treatments themselves – is poorly defined.

Because there is a potential for the proposal to have significant impacts, we recommend that the Forest Service prepare an EIS for the project area.

**CONCLUSION.**

Thank you for this opportunity to comment. If you have any questions about this letter, please contact me at the number or email below.

If the Forest Service issues any draft NEPA document for comment during the coronavirus pandemic, we request that the agency provide the public with additional time to respond, given the disruptions the pandemic is causing and is likely to continue to cause.

Sincerely,

Edward B. Zukoski, Senior Attorney
Center for Biological Diversity
1536 Wynkoop Street, Suite 421
Denver, CO 80202
(cell) (303) 641-3149
tzukoski@biologicaldiversity.org

cc: David Casey, San Juan National Forest, djcasey@fs.fed.us
Travis Bruch, San Juan National Forest, tbruch@fs.fed.us

# TABLE OF EXHIBITS

Exhibit 1. *Southeast Alaska Conservation Council v. U.S. Forest Serv.*, 2020 U.S. Dist. LEXIS 43499, Case No. 1:19-cv-00006-SLG (D. Alaska Mar. 11, 2020)

Exhibit 2. Email of B. Weinmeister, CPW to B. Magee, DNR (Oct. 8, 2019)

Exhibit 3. Four Forest Restoration Initiative, Old Growth Protection & Large Tree Retention Strategy (Sep. 13, 2011)

Exhibit 4. U.S. Forest Service *et al.*, New Mexico Forest Restoration Principles (May 2006)

Exhibit 5. Allen *et al.*, Ecological Restoration of Southwestern Ponderosa Pine Ecosystems: A Broad Perspective, Ecological Applications, 12(5) (2002)

Exhibit 6. Allen *et al.*, Ecological Restoration of Southwestern Ponderosa Pine Ecosystems: A Broad Perspective, Ecological Applications, 12(5) (2002)

Exhibit 7. D. Lynch, Forest Restoration in Southwestern Ponderosa Pine, Journal of Forestry (Aug. 2000)

Exhibit 8. San Juan National Forest, Guard Station Timber Sale, Decision Notice (May 1996)

Exhibit 9. San Juan National Forest, Ferris East Timber Sale, Decision Notice (Feb. 1998)

Exhibit 10. J. Worrall *et al.*, Projected Impacts of Climate Change on Forests of the Dolores Watershed, presentation to the Dolores Watershed Resilient Forest Collaborative (2017)

No *Shepard's* Signal™
As of: March 16, 2020 3:10 PM Z

# Se. Alaska Conservation Council v. United States Forest Serv.

United States District Court for the District of Alaska

March 11, 2020, Decided; March 11, 2020, Filed

Case No. 1:19-cv-00006-SLG

**Reporter**
2020 U.S. Dist. LEXIS 43499 *

SOUTHEAST ALASKA CONSERVATION COUNCIL, et al., Plaintiffs, v. UNITED STATES FOREST SERVICE, et al., Defendants.

## Core Terms

Forest, cards, harvest, site-specific, impacts, timber harvest, subsistence, acres, environmental, map, project area, plans, effects, timber sale, decisions, briefing, national forest, habitat, maximum, Island, Vegetation, Wildlife, acreage, logging, lynx, road construction, agency's action, Plaintiffs', merits, resources

**Counsel:** **[*1]** For Southeast Alaska Conservation Council, Alaska Rainforest Defenders, Center for Biological Diversity, Sierra Club, Defenders of Wildlife, Alaska Wilderness League, National Audubon Society, Natural Resources Defense Council, Plaintiffs: Olivia Elisabeth Glasscock, Thomas S. Waldo, LEAD ATTORNEYS, EARTHJUSTICE (Juneau), Juneau, AK.

For United States Forest Service, United States Department of Agriculture, David Schmid, in his official capacity as United States Forest Service Region 10 Regional Forester, Earl Stewart, in his official capacity as Forest Supervisor for the Tongass National Forest, Defendants: Erika Danielle Norman, LEAD ATTORNEY, U.S. Department of Justice, Environmental & Natural Resources Division, Washington, DC.

For Alaska Forest Association, Amicus: Julie A. Weis, LEAD ATTORNEY, PRO HAC VICE, Haglund Kelley Horngren Jones & Wilder LLP, Portland, OR.

**Judges:** Sharon L. Gleason, UNITED STATES DISTRICT JUDGE.

**Opinion by:** Sharon L. Gleason

## Opinion

**DECISION AND ORDER**

This is an action in which Plaintiffs Southeast Alaska Conservation Council, Alaska Rainforest Defenders, Center for Biological Diversity, Sierra Club, Defenders of Wildlife, Alaska Wilderness League, National Audubon Society, and Natural **[*2]** Resources Defense Council seek the invalidation of portions of the 2018 Environmental Impact Statement and 2019 Record of Decision for the Forest Service's Prince of Wales Landscape Level Analysis Project for the Tongass National Forest. Briefing on the merits concluded on August 23, 2019.[1] Oral argument was held on February

[1] Pursuant to the briefing schedule for administrative agency appeals, *see* L. R. Civ. P. 16.3(c), Plaintiffs' Opening Brief is at Docket 10, Defendants' Brief in Opposition is at Docket 12, and Plaintiffs' Reply Brief is at Docket 19. Plaintiffs subsequently filed a Notice of Errata and Corrected Opening Brief at Docket 22.

7, 2020.[2]

**BACKGROUND**

The factual background for this case was set out at some length in the Court's prior order granting Plaintiffs' motion for a preliminary injunction.[3] It is repeated here to a certain extent with some additions.

The Tongass National Forest ("Tongass") is a 16.7 million-acre forest in Southeast Alaska.[4] The nation's largest national forest,[5] the Tongass has seen timber harvesting of varying intensity over the past 100 years.[6] In the 1950s, the Forest Service awarded several 50-year timber sale contracts in the forest to "provide a sound economic base in Alaska through establishment of a permanent year-round pulp industry."[7] But logging in the Tongass began to slow in the 1980s and 1990s, when several of these long-term contracts were terminated due to market fluctuation, litigation, and other factors.[8]

Prince of Wales Island, a large island in the Alexander **[*3]** Archipelago, lies within the Tongass.[9] Two large pulp mills once operated on the island, where industrial scale logging occurred in the second half of the 20th century, but both mills closed in the 1990s.[10] There are 12 communities on the island with a total of approximately 4,300 residents, many of whom are Alaska Native.[11] Tourism and sport and commercial fishing are important to the local economy,[12] and many residents rely to some degree on subsistence hunting, fishing, and gathering.[13]

Pursuant to the *National Forest Management Act ("NFMA")* and its implementing regulations, the Forest Service has developed land and resource management plans, also called forest plans, to govern its management of the Tongass.[14] Forest plans "operate like zoning ordinances, defining broadly the uses allowed in various forest regions, setting goals and limits on various uses . . . , but do not directly compel specific actions, such as cutting of trees in a particular area or construction of a specific road."[15] Any activity occurring within a national forest must comply with the governing forest plan,[16] which the Forest Service is required to revise at least every 15 years.[17] The current forest plan for the **[*4]** Tongass was issued in 2016, following the completion of an environmental impact statement ("EIS").[18] The Forest Plan provides that "[t]imber harvest unit cards will document resource concerns and protection measures," and requires that these "unit cards, including a map with relevant resource features, . . . be provided electronically when Draft or Final NEPA documents and decisions are published."[19]

In late 2016, the Forest Service initiated environmental planning for a proposed project within the Tongass: the Prince of Wales Landscape Level Analysis Project ("Project").[20] The agency describes the Project as "a large landscape-scale NEPA analysis that will result in a decision whether or not to authorize integrated resource management activities on Prince of Wales Island over the next 15 years."[21] The Forest Service released a final EIS for the Project on October 19, 2018[22] and issued a Record of Decision ("ROD") selecting the preferred

---

[2] Docket 37.

[3] Docket 27 at 2-7

[4] Administrative Record ("AR") 833_0404 at 063052, 063054.

[5] AR 833_0404 at 063407.

[6] AR 833_2077 at 069553-55.

[7] AR 833_2077 at 069553.

[8] AR 833_2077 at 069553-55.

[9] AR 833_0404 at 063054.

[10] AR 833_2167 at 01750.

[11] AR 833_2167 at 01753; *see also* AR 833_2167 at 01751, tbl. 70 (showing population change).

[12] AR 833_2167 at 001750

[13] *See* AR 833_2167 at 001753-57 (describing different communities on the island).

[14] *See* *16 U.S.C. § 1604*.

[15] *Citizens for Better Forestry v. United States Dep't of Agric., 341 F.3d 961, 966 (9th Cir. 2003)*.

[16] *16 U.S.C. § 1604(i)*.

[17] *36 C.F.R. § 219.7(a)*.

[18] AR 833_0404 at 063039-063554 (2016 Tongass Forest Plan); AR 833_2079 at 071034-072626 (EIS for Tongass Forest Plan).

[19] AR 833_0404 at 063265.

[20] AR 833_2167 at 001468.

[21] AR 833_2167 at 001459.

[22] AR 833_2167 at 001437-001863 (Final EIS).

alternative from the EIS on March 16, 2019.[23]

The Project encompasses all of the land within the national forest system on Prince of Wales Island, consisting of roughly 1.8 million acres.[24] It authorizes four categories of activities within this area: vegetation **[*5]** management, including timber harvesting; watershed improvement and restoration; sustainable recreation management; and "associated actions."[25] The EIS for the Project does not specify when and where individual activities will occur within the Project Area. Rather, the Project is designed to be a flexible planning framework intended to allow the Forest Service to tailor resource management to changing conditions on the ground over the course of the Project's 15-year term.

The Forest Service appended to the EIS what it terms an Activity Card for each of the 46 activities included in the four activity categories.[26] "The Activity Cards describe each potential activity and the related resource considerations," and include "[p]roject-specific design criteria and mitigation measures."[27] The Activity Cards were designed using "on-the-ground inventories, computer (GIS) data, and aerial photographs to assess project area conditions and resource-specific concerns."[28] The Activity Cards describe and govern activities at the project level, but they do not identify the specific geographic areas within the Project Area where each activity will occur.[29] Unlike prior sales, the Project EIS was not accompanied **[*6]** by timber harvest unit cards with maps detailing specific harvest configurations.[30]

In preparing the Project EIS, the Forest Service also developed a Logging System Transportation Analysis ("LSTA") to "identif[y] potential stands for timber harvest and the associated transportation network that would be needed."[31] The LSTA "was developed for National Forest System lands within the project area layer using information from the Forest GIS library, aerial photos, and the Forest Service Activity Tracking System database."[32] The LSTA identified 125,529 acres of potential timber harvest in the Project Area: 48,140 old-growth acres and 77,389 young-growth acres.[33] The LSTA also identified 643 miles of new roads, 505 of them temporary and 138 permanent.[34] The Forest Service represented this information in a Commercial Vegetation Management map,[35] which it appended to the ROD, and to which it provided a link in the EIS.[36]

The Project EIS addresses four alternatives in detail, including a no-action alternative.[37] Each activity under each alternative must be consistent with the applicable Activity Card and certain alternative-specific features,

---

[23] AR 833_2427 at 000776-001118; *see also* 42 U.S.C. § 4332(2)(C) (requiring agencies to prepare a "detailed statement" for actions with significant environmental impacts).

[24] AR 833_2167 at 001460-61; *see also* AR 833_2427 at 000781 (map showing distribution of national forest system land on Prince of Wales Island).

[25] AR 833_2167 at 001443.

[26] AR 833_2427 at 000848-001030.

[27] AR 833_2167 at 001492; *see, e.g.*, AR 833_2427 at 000848-52 (Activity Card 01).

[28] AR 833_2167 at 001492.

[29] *See, e.g.*, AR 833_2427 at 000848 (Activity Card 01 explaining that "rotational harvest of young growth using even-aged management" may occur "within the suitable land base based on legal and technical factors" and "within potential harvest units as shown in the [LSTA]"); AR 833_2167 at 001459 ("The Activity Cards are used to identify and analyze a suite of possible activities that could be implemented in the project area. With this approach, activities can vary in magnitude and intensity to respond to resource conditions.").

[30] *Cf.* AR 833_2084 at 061279-80 (card for timber harvest unit 101 in 2007 Kuiu Timber Sale EIS).

[31] AR 833_2167 at 001561.

[32] AR 833_2167 at 001561; *see also* AR 833_2167 at 1561-71 (describing Forest Service's methodology and integration of LSTA into Project EIS); AR 833_1369 at 074744 (providing path for GIS data .zip file for the draft EIS); AR 833_2115 at 074758 (providing path for GIS data .zip file for the final EIS); AR 833_2403 at 074762-074854 (Jan. 1, 2015 spreadsheet documenting raw GIS numbers for entire Tongass National Forest).

[33] AR 833_2167 at 001481. The Forest Service further subdivided the Project Area into 18 Timber Analysis Areas ("TAA") "[t]o allow for more site-specific analysis." *Id.* at 001562; *see also id.* at 001563 (map showing distribution of TAAs); *id.* at 001569-70 (tables showing distribution of old-and young-growth acreage across TAAs).

[34] AR 833_2167 at 001481.

[35] 833_2178. This map is attached as an appendix to this decision. *See* Docket 40-1.

[36] AR 833_2167 at 001480.

[37] AR 833_2167 at 001479-80.

and each activity must also **[*7]** occur within the areas identified for that activity in the LSTA.[38] Each action alternative establishes a maximum potential amount of timber harvest and road construction.[39] Focusing on timber harvest, Alternative 2, the preferred alternative, allows a maximum of 23,269 acres of old-growth harvest and 19,366 acres of young-growth harvest, or roughly 34 percent of the total potential acreage in the LSTA.[40] However, the EIS does not identify where the harvest authorized by each alternative would occur within the potential acreage identified in the LSTA.[41]

In order to capture the "maximum effects" of the Project, the Project EIS makes several assumptions in addressing each alternative.[42] First, in analyzing each alternative, the Forest Service indicates that it assumed that all acres of potential harvest in the LSTA would be harvested and all roads proposed by the alternative would be built.[43] Second, the Forest Service assumed that all acres would be harvested using clear-cut methods.[44] Third, the Forest Service assumed that each Wildlife Analysis Area—a land division used by the Alaska Department of Fish and Game—would be harvested to the maximum acreage available.[45]

As noted **[*8]** above, the alternatives do not provide the specific locations or configurations of harvest or roadbuilding within the LSTA. Instead, the Project EIS provides that "site-specific locations and methods" for activities such as timber harvest "will be determined during implementation" over the 15-year lifespan of the Project.[46] It explains that siting decisions and the parameters of actual timber sales will be determined pursuant to an Implementation Plan, in a way that is consistent with the alternative selected by the ROD and the Activity Cards developed for the EIS.[47] However, the EIS makes clear that these subsequent, site-specific decisions will not be subject to additional NEPA review.[48] The Forest Service terms this approach "condition-based analysis."[49]

The Implementation Plan published with the ROD sets out a nine-step process for making site-specific

[38] *See* AR 833_2167 at 001480 (describing role of LSTA and Activity Cards in comparison of alternatives); *id.* at 001485-92 (describing features specific to the action alternatives).

[39] AR 833_2167 at 001480 ("The total acreage and maximum miles of road construction under any one alternative is expected to change based on the logging systems used and where harvest occurs on the landscape, but would not exceed the amount identified within that alternative.").

[40] AR 833_2167 at 001481. Alternative 3 allows a maximum of 13,014 acres of old-growth and 36,670 acres of young-growth harvest, or roughly 40 percent of the total potential acreage in the LSTA; and Alternative 5 allows a maximum of 6,365 acres of old-growth and 36,670 acres of young-growth harvest, or roughly 34 percent of the total potential acreage in the LSTA. *Id.*

[41] Instead, each alternative considers the Project Area as a whole and "describe[s] the conditions being targeted for treatments and what conditions cannot be exceeded in an area, or place[s] limits on the intensity of specific activities." AR 833_2167 at 001459.

[42] AR 833_2167 at 001639.

[43] *See, e.g.*, AR 833_2167 at 001629 ("[A]ssumptions include that all harvest stands from the LSTA would be harvested . . . ."); AR 833_2167 at 001789-90 (discussing road construction by alternative); *see also* Docket 12 at 31 (describing analytical approach). It is unclear from the record whether the Forest Service assumed that the maximum potential harvest in the LSTA would be harvested or the maximum acreage under each alternative would be harvested; it appears that the agency made different assumptions about harvest intensity depending on the impact under consideration. *See* Docket 39 at 13:23-16:3 (Tr. of Feb. 7, 2020 Oral Arg.) (discussing Forest Service's methodology).

[44] AR 833_2167 at 001450.

[45] *See* AR 833_2167 at 001500. There are 32 Wildlife Analysis Areas in the Project Area. *Id.* at 001514.

[46] AR 833_2167 at 001459.

[47] AR 833_2167 at 001459; *see also* 833_2169 at 002076-002126 (Implementation Plan attached to Project EIS).

[48] *See* AR 833_2169 at 002078. At oral argument, the Forest Service maintained that the Implementation Plan could require supplemental NEPA analysis if new information arose indicating that an "activity is no longer going to have an effect that was disclosed or analyzed" in the Project EIS. Docket 39 at 21:18-25. The Court has been unable to locate a specific provision in the Implementation Plan that mandates supplemental review, but the plan does require the Forest Service to "verify that the effects of the proposed activity [are] within the effects analyzed for the Selected Alternative" in the EIS. AR 833_2427 at 001039.

[49] AR 833_2167 at 001443; *see also* AR 833_2427 at 000802 ("The POWLLA FEIS uses a condition-based approach where specific harvest units and roads will be determined during implementation through a collaborative public process and interdisciplinary review.").

determinations.[50] This process includes checking the action against the relevant Activity Card, the final EIS, and the ROD, as well as engaging in "workshops and other public involvement techniques."[51] It is during this process, also, that site-specific unit cards will be developed that describe particular harvest configurations. **[*9]** [52] The ROD explains that the Implementation Plan "is integral to the analysis of effects in the [Project EIS] and the Selected Alternative in the [ROD]," and was "developed . . . to provide a linkage from the [Project EIS] to the project-specific work without the need for additional NEPA analysis."[53] That said, the ROD describes the Implementation Plan as a "living document" that "may need to be adjusted."[54]

The Forest Service began implementing the Project shortly after issuing the ROD. It held a public workshop on April 6, 2019[55] and published an "Out-Year Plan" for fiscal year 2019 that included a proposed timber sale of 1,156.34 acres, known as the Twin Mountain Timber Sale.[56] The Forest Service also published draft unit cards for the sale, which identify the specific locations and method of timber harvest in graphical and narrative form.[57]

Plaintiffs initiated this case on May 7, 2019.[58] The Complaint is brought pursuant to the *Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702-06*, and alleges that the Project EIS violates three federal laws: (1) the *National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332*; (2) the *Alaska National Interest Lands Conservation Act ("ANILCA"), 16 U.S.C. § 3120*; and (3) the **[*10]** *National Forest Management Act ("NFMA"), 16 U.S.C. § 1604*.[59] The Complaint seeks declaratory judgment, vacatur of the ROD "or portions of it deemed not in compliance with law," and "preliminary and permanent injunctive relief as needed to prevent irreparable harm from implementation of the [Project]."[60] Plaintiffs refine their claim in their merits briefing, requesting vacatur of the "portions of the ROD authorizing vegetation management and road construction."[61]

On September 23, 2019, the Court entered a preliminary injunction, which prohibited the Forest Service from awarding a contract or authorizing ground-disturbing activities associated with the Twin Mountain Timber Sale during the pendency of this case.[62] In the preliminary injunction order, the Court found that Plaintiffs had raised serious questions going to the merits of their NEPA

---

[50] *See* AR 833_2427 at 001037 (graphically describing Implementation Plan).

[51] AR 833_2427 at 001037. The ROD explains that a proposed activity "will take several months to a year to go through all steps of the implementation process." *Id.*

[52] AR 833_2427 at 000826.

[53] AR 833_2427 at 001034. The ROD expanded on the relationship between the Activity Cards and the Implementation Plan, stating that the "Activity Cards provide activity-specific design criteria, best management practices, and mitigation measures and the implementation plan includes site conditions, triggers, or other requirements for each type of activity to inform future data needs and field visits to develop treatment scenarios that are consistent with the NEPA analysis." *Id.*

[54] AR 833_2427 at 001034. The ROD explains that "[a]s activities are designed, the process will likely be smoother and new technology or expertise may be used." *Id.* At oral argument, the Forest Service maintained that the Implementation Plan was "not necessary for NEPA compliance." Docket 39 at 18:18-19; *cf.* Docket 12 at 19 ("Implementation is an integral part of the Project's design.").

[55] *See*, U.S. Forest Serv., Prince of Wales Landscape Level Analysis Project, Dear Planning and Implementation Participant Letter, https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd622020.pdf (last visited March 5, 2020).

[56] *See*, U.S. Forest Serv., Prince of Wales Landscape Level Analysis Project, Out-Year Plan, https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd622075.pdf (last visited March 5, 2020); *see also* Docket 21-1 at 2-3, ¶ 6 (providing size of sale).

[57] *See*, U.S. Forest Serv., Twin Mountain Sale Draft Unit Cards, https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd641767.pdf (last visited March 5, 2020). Plaintiffs have produced an area map of the proposed timber activities. *See* Docket 10-2 at 5 (Ex. A).

[58] Docket 1.

[59] Docket 1 at 15-19, ¶¶ 47, 51, 58.

[60] Docket 1 at 19, ¶¶ 1-5. Plaintiffs also seek "the costs of this action, including reasonable attorneys' fees pursuant to the *Equal Access to Justice Act, 28 U.S.C. § 2412*." *Id.* at 19, ¶ 6.

[61] Docket 22-1 at 43-44. In the alternative, Plaintiffs seek a permanent injunction of "the vegetation management activities and road construction in the ROD." *Id.* at 44-47.

[62] Docket 27 at 25.

claim.[63] The order also informed the parties that the Court intended to issue a final decision on the merits no later than March 31, 2020.[64]

## JURISDICTION

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which "confer[s] jurisdiction on federal courts to review agency action, regardless of whether the APA of its own force may serve as a jurisdictional predicate."[65]

## LEGAL [*11] STANDARD

Plaintiffs' claims arise under the APA.[66] Under that statute, a reviewing court shall not set aside an agency's decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[67] Agency action is arbitrary and capricious if it

> relie[s] on factors which Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it c[an]not be ascribed to a difference in view or the product of agency expertise.[68]

A court's review of whether an agency action is arbitrary and capricious should be "searching and careful," but "narrow," as a court may not substitute its judgment for that of the administrative agency.[69] Courts will generally "uphold agency decisions so long as the agencies have 'considered the relevant factors and articulated a rational connection between the factors found and the choices made.'"[70]

"Agency action is 'not in accordance with the law' when it is in conflict with the language of the statute relied upon by the agency."[71] "Whether agency action is 'not in accordance with law' **[*12]** is a question of statutory interpretation, rather than an assessment of reasonableness in the instant case."[72]

## DISCUSSION

The Court will address Plaintiffs' NEPA, ANILCA, and NFMA claims in turn.

### I. National Environmental Policy Act

Pursuant to NEPA, agencies must prepare an EIS before taking an action "significantly affecting the quality of the human environment."[73] Regulations issued by the Council on Environmental Quality require an EIS to include discussion of the direct and indirect effects of the action, as well as "[t]he environmental effects of alternatives."[74] After completing an EIS, "the agency must select a course of action within the range of alternatives analyzed and issue an ROD," which "explains why the agency chose a particular alternative, whether all practical means for avoiding or minimizing environmental harm have been adopted, and, if not, why not."[75]

"An EIS must 'reasonably set forth sufficient information to enable the decisionmaker to consider the

---

[63] Docket 27 at 20.

[64] Docket 27 at 8.

[65] Califano v. Sanders, 430 U.S. 99, 105, 97 S. Ct. 980, 51 L. Ed. 2d 192 (1977).

[66] Docket 1 at 15-19, ¶¶ 47, 51, 58.

[67] 5 U.S.C. § 706(2)(A).

[68] Protect Our Cmtys. Found. v. Lacounte, 939 F.3d 1029, 1034 (9th Cir. 2019) (alterations in original) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983)).

[69] Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378, 109 S. Ct. 1851, 104 L. Ed. 2d 377 (1989) (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S. Ct. 814, 28 L. Ed. 2d 136 (1971)).

[70] Prot. Our Cmtys. Found., 939 F.3d at 1034 (quoting City of Sausalito v. O'Neill, 386 F.3d 1186, 1206 (9th Cir. 1206)).

[71] City of Cleveland v. Ohio, 508 F.3d 827, 838 (9th Cir. 2007).

[72] Singh v. Clinton, 618 F.3d 1085, 1088 (9th Cir. 2010) (citing ***Northwest Envtl. Advocates v. EPA, 537 F.3d 1006, 1014 (9th Cir. 2008))***.

[73] 42 U.S.C. § 4332(2)(C) (requiring a "detailed statement" analyzing "the environmental impact of the proposed action," among other things).

[74] 40 C.F.R. § 1502.16.

[75] Protect Our Cmtys. Found., 939 F.3d at 1035 (citing 40 C.F.R. §§ 1505.1, 1505.2).

environmental factors and make a reasoned decision.'"[76] The agency meets this obligation if its EIS "contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences."[77] The NEPA process **[*13]** "serves two fundamental objectives": "First, it 'ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and "second, it requires 'that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.'"[78]

"NEPA requires . . . procedural steps but does not require an agency to reach any particular result."[79] Indeed, agencies retain significant discretion over their "methodology and planning strategy" when engaging in environmental review, and "NEPA's 'requisite "hard look" does not require adherence to a particular analytic protocol.'"[80] The act "merely prohibits uninformed—rather **[*14]** than unwise—agency action."[81] To determine whether an agency has complied with NEPA's requirements, courts apply a rule of reason, which involves "a pragmatic judgment whether the EIS's form, content and preparation foster both informed decision-making and informed public participation."[82]

One method available for agencies engaging in long-term planning is to first prepare a programmatic EIS that considers the broad, program-level effects of a coordinated series of actions, and then conduct subsequent site-specific NEPA analysis for each action as it occurs, tiering back to the programmatic EIS.[83] Regarding this approach, the Ninth Circuit has explained that "[t]he detail that NEPA requires in an EIS depends on the nature and scope of the proposed action," and that "[t]he critical inquiry in considering the adequacy of an EIS prepared for a large scale, multi-step project is not whether the project's site-specific impact should be evaluated in detail, but when such detailed evaluation should occur."[84]

---

[76] *Alaska Ctr. for the Env't v. Armbrister, 131 F.3d 1285, 1289 (9th Cir. 1997)* (quoting *Oregon Environmental Council v. Kunzman, 817 F.2d 484, 493 (9th Cir. 1987))*; *see also* *Tenakee Springs v. Block, 778 F.2d 1402, 1407 (9th Cir. 1985)* (explaining that EIS must be "sufficient 'to give to decision makers . . . removed from the initial decision sufficient data from which to draw their own conclusions.'" (omissions in original) (quoting *Coalition for Canyon Preservation v. Bowers, 632 F.2d 774, 782 (9th Cir. 1980)))*.

[77] *WildEarth Guardians v. Mont. Snowmobile Ass'n, 790 F.3d 920, 924 (9th Cir. 2015)* (quoting *City of Sausalito v. O'Neill, 386 F.3d 1186, 1206 (9th Cir. 2004))*.

[78] *Id.* (quoting *Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349, 109 S. Ct. 1835, 104 L. Ed. 2d 351 (1989)*. Put another way:

> The requirement of an EIS serves two ends. A properly prepared EIS ensures that federal agencies have sufficiently detailed information to decide whether to proceed with an action in light of potential environmental consequences, and it provides the public with information on the environmental impact of a proposed action and encourages public participation in the development of that information.

*Or. Envtl. Council v. Kunzman, 817 F.2d at 492*.

[79] *Protect Our Cmtys. Found., 939 F.3d at 1035*.

[80] ***Or. Natural Desert Ass'n v. BLM, 625 F.3d 1092, 1121 (9th Cir. 2010)*** (quoting *Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin., 126 F.3d 1158, 1188 (9th Cir. 1997))*.

[81] *Methow Valley Citizens Council, 490 U.S. at 351*.

[82] *Churchill Cty. v. Norton, 276 F.3d 1060, 1071 (9th Cir. 2001)* (quoting *California v. Block, 690 F.2d 753, 761 (9th Cir. 1982))*.

[83] *See, e.g., W. Watersheds Proj. v. Abbey, 719 F.3d 1035, 1049 (9th Cir. 2013)* (noting that agencies can plan at programmatic or site-specific levels and that "[w]hen an agency develops an EIS for a programmatic plan . . . , the EIS 'must provide "sufficient detail to foster informed decision-making," but "site-specific impacts need not be fully evaluated until a critical decision has been made to act on site development"'" (quoting ***Friends of Yosemite Valley v. Norton, 348 F.3d 789, 800 (9th Cir. 2003))***); *see also* *40 C.F.R. § 1502.20* (NEPA regulation encouraging tiering to "eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review").

[84] *California v. Block, 690 F.2d at 761*. The Circuit added that "[w]hen a programmatic EIS has already been prepared, . . . site-specific impacts need not be fully evaluated until a 'critical decision' has been made to act on site development." *Id.* (quoting *Sierra Club v. Hathaway, 579 F.2d 1162, 1168 (9th Cir. 1978))*; *see also* *City of Tenakee Springs v. Block, 778 F.2d 1402, 1407 (9th Cir. 1985)* ("Where there are large scale plans for regional development, NEPA requires both a programmatic and a site-specific EIS." (citing *40 C.F.R. § 1508.28*, *1502.20*; *Kleppe v. Sierra Club, 427 U.S. 390, 409-14, 96 S. Ct. 2718, 49 L. Ed. 2d 576 (1976))*); *cf.* *Prot. Our Cmtys. Found., 939 F.3d at 1039* (explaining that "a site-specific project demands site-specific analysis" and that "[a]gencies cannot rely on a general

The Forest Service chose not to take that approach here. Instead of preparing a programmatic EIS to be followed by site-specific NEPA analyses for individual **[*15]** timber sales as they occur, the agency compressed its NEPA review for the entire 15-year Project into a single document. The Forest Service maintains that its "landscape-scale NEPA analysis" enables informed decision-making about integrated resource management at the programmatic level and contains sufficient site-specific information and analysis to proceed with individual timber sales over the 15-year Project period without additional NEPA review.[85]

The Court will not here decide whether the nature of the Project required the Forest Service to complete a programmatic EIS to which later planning documents would tier.[86] Nor do Plaintiffs request such a decision.[87] Instead, the Court will evaluate the analytical method that the agency employed and determine whether the Project EIS, a landscape-level long-term planning document, adequately evaluated the site-specific impacts of as-yet undefined timber sales that could potentially occur on certain acreage on Prince of Wales Island over the Project's term.

Plaintiffs contend that the Project EIS does not provide sufficient site-specific information or analysis to comply with NEPA.[88] They argue that this case is governed by the Ninth **[*16]** Circuit's decision in *City of Tenakee Springs v. Block*.[89] In that case, the Circuit reversed a district court's decision not to enjoin "construction of an 11-mile road through the Kadashan watershed" in the Tongass.[90] The plaintiffs had challenged the adequacy of an EIS for a five-year operating plan that "specified no timber harvesting in the Kadashan Watershed in the years 1981 through 1986," but did authorize the construction of the road for future harvest activity.[91] The Circuit ordered the entry of a preliminary injunction, in part due to its conclusion that the plaintiffs had raised serious questions about the merits of their NEPA claim.[92] It explained that the challenged EIS did not "g[ive] any indication of its overall plan for timber harvesting" in the designated area and that "it [was] impossible to determine where and when harvesting will occur on the 750,000 acres of land."[93] The Circuit held that the EIS was inadequate, reasoning that the location and timing of logging would affect "the locating, routing, construction techniques, and other aspects of the road, or even the need for its construction."[94]

In *City of Tenakee Springs*, the Ninth **[*17]** Circuit separately rejected the trial court's conclusion that the Forest Service had discretion to determine the specificity of its environmental review.[95] Instead, it held that "[a]lthough the agency does have discretion to define the scope of its actions, such discretion does not allow the agency to determine the specificity required by NEPA."[96] The Circuit explained that "[w]here there are large-scale plans for regional development, NEPA requires both a programmatic and a site-specific EIS."[97]

Here, Plaintiffs argue that the Project EIS, with its condition-based analysis, is similarly deficient, and that the Forest Service impermissibly limited the specificity of

---

discussion in a programmatic EIS or other document to satisfy [their] NEPA obligations for a site-specific action").

[85] Docket 12 at 24-35; *see also* AR 833_2167 at 001459 (describing purpose of EIS); AR 833_2169 at 002078 (stating that there is no "need for additional NEPA analysis" under the Forest Service's approach).

[86] *See Churchill Cty., 276 F.3d at 1074-79* (cataloguing cases regarding the necessity of programmatic EISs).

[87] Docket 22-1 at 22-36.

[88] Docket 22-1 at 22-36; *see also* Docket 1 at 16-17, ¶¶ 44-47 (Count I of Compl.). The Court has already considered this argument in its order granting Plaintiffs' request for a preliminary injunction, where it found that Plaintiffs had raised serious questions on the merits on their NEPA claim. *See* Docket 27 at 14-20. The Court will necessarily repeat that analysis to a certain degree here.

[89] *778 F.2d 1402 (9th Cir. 1985)*.

[90] *Id. at 1403*.

[91] *Id. at 1408*.

[92] *Id. at 1407-08*.

[93] *Id. at 1408*.

[94] *Id.* (quoting *Thomas v. Peterson, 753 F.2d 754, 760 (9th Cir. 1985)*, *abrogated on other grounds by Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv., 789 F.3d 1075 (9th Cir. 2015))*.

[95] *Id. at 1407*.

[96] *Id.* (citing *California v. Block, 690 F.2d 753, 765 (9th Cir. 1982))*.

[97] *Id.*

its environmental review.[98] The Forest Service maintains that it has complied with NEPA by creating a project-level map that "provide[s] information on where timber harvest and road construction activities may take place."[99]

The Forest Service used the LSTA to identify "potential stands for timber harvest as well as the transportation network needed to access those stands" within the roughly 1.8-million-acre Project Area over a 15-year period.[100] Through this process, the agency identified 125,529 acres of timber for potential harvest: **[*18]** 48,140 acres of old growth and 77,389 acres of young growth.[101] The Project EIS links to a Commercial Vegetation Management map, which portrays this potential acreage graphically.[102] However, the EIS expressly leaves site-specific determinations about the actual location of timber harvest within this potential acreage for future determination.[103] For example, Alternative 2—the selected alternative—allows 23,269 acres of old-growth harvest, but does not specify where this harvest will be located within the 48,140 acres of old growth identified as suitable for harvest in the Project Area.[104] The Activity Cards likewise do not identify with specificity where harvesting will occur, although they do contain mitigation measures that could constrain future siting decisions.[105]

The Forest Service maintains that it properly exercised its discretion to determine the scope of the Project while at the same time providing the specificity required by NEPA.[106] The agency argues that through Project EIS, it "has provided information on where timber harvest and road construction may take place and is not 'attempt[ing] to justify' any lack of information, or to opt-out of any **[*19]** of NEPA's requirements."[107] However, similar to the EIS found inadequate by the Ninth Circuit in *City of Tenakee Springs*, the Project EIS does not include a determination—or even an estimate—of when and where the harvest activities or road construction authorized by each alternative will actually occur.[108] Rather, it reserves actual siting decisions for the future, as individual timber sales are offered.

The Forest Service contends that the phrase from *City of Tenakee Springs* on which Plaintiffs rely—that it "is impossible to determine where and when harvesting will occur on the 750,000 acres of land"—was factually inaccurate, citing the district court's decision on remand.[109] But regardless of that statement's factual accuracy, the Circuit's reasoning is still binding precedent: NEPA requires that environmental analysis be specific enough to ensure informed decision-making and

---

[98] Docket 22-1 at 23-25.

[99] Docket 12 at 26-27, 28-30.

[100] AR 833_2167 at 001480.

[101] *See* AR 833_2167 at 001481 tbl. 2. The Forest Service also determined that a maximum of 505 miles of temporary roads and 138 miles of permanent roads would be necessary to access the potential timber harvest. *Id.*; *see also* AR 833_2178 (showing potential locations of temporary and permanent road construction).

[102] AR 833_2167 at 001480; *see also* AR 833_2178.

[103] AR 833_2167 at 1459 ("The site-specific locations and methods [of activities authorized by the EIS] will be determined during implementation based on defined conditions in the alternative selected in the [ROD] in conjunction with the Activity Cards . . . and Implementation Plan.").

[104] AR 833_2167 at 001481 tbl. 2. Similarly, the Project EIS does not specify where the 129 miles of temporary roads and 35 miles of permanent roads would be located. *See id.* The EIS explains that for each alternative, "[t]he total road miles needed will be determined by the specific harvest units offered and the needed transportation network." AR 833_2167 at 001789.

[105] *See, e.g.*, AR 833_2168 at 001935-36 (Activity Card for old-growth clearcutting requiring Forest Service to, among other things, "limit the size of even-age openings to 100 acres with certain exceptions" and "locate activities outside of required nest/den buffers" where feasible); *but see* Docket 12 at 29 (Forest Service asserting that the "Activity Cards are site-specific to the Project Area in that they reflect analyses by resource specialists who used on-the-ground inventories, GIS data, and aerial photographs to develop them").

[106] Docket 12 at 26-28 (distinguishing *City of Tenakee Springs v. Block, 778 F.2d 1402, 1407 (9th Cir. 1985))*.

[107] Docket 12 at 26-27 (alteration in original) (quoting Docket 22-1 at 24).

[108] *See, e.g.*, AR 833_2167 at 001789 ("The total road miles needed will be determined by the specific harvest units offered [for sale] and the needed transportation network.").

[109] Docket 12 at 27; *see City of Tenakee Springs v. Courtright*, No. J86-024 CIV., 1987 WL 90272, at *3 (D. Alaska June 26, 1987) ("The [Ninth Circuit] opinion also contains puzzling language suggesting that the EIS did not state where and when harvesting would take place in the APC contract area. This may be an improperly-drafted allusion to the fact that the final EIS did not reveal where and when logging would take place along the Kadashan Road . . . .").

meaningful public participation.[110] The Project EIS's omission of the actual location of proposed timber harvest and road construction within the Project Area falls short of that mandate.

The Forest Service maintains that Plaintiffs **[*20]** are demanding more detail than is required by NEPA. The agency relies on *Stein v. Barton*, which concerned a challenge to the EIS for a five-year operating plan for an area of the Tongass that was then being logged pursuant to a long-term contract held by the Ketchikan Pulp Company.[111] Among other issues, the plaintiffs in that case argued the "harvesting plans for each area" were not sufficiently site-specific, "object[ing] that they cannot determine from the FEIS 'where, when, and how logging and roading activities will occur on the 812,477 acres of land.'"[112] The district court rejected this argument, concluding that the EIS "contain[ed] comprehensive, detailed quantitative and qualitative descriptions of the logging and roading plans for each harvest unit."[113] The court noted that "the only details that the FEIS does not disclose are exact timetables and locations on the ground for planned harvesting activities in each harvest unit," but that this was not a fatal omission since "the Forest Service does not develop these details at the pre-implementation stage."[114]

The Forest Service contends that Plaintiffs' arguments are similar here and that NEPA does not require disclosure of the exact **[*21]** location of actual timber harvest in the Project Area.[115] But the EIS that survived review in *Stein* contained significantly greater site-specificity than the Project EIS at issue here. In *Stein*, the district court described a "nine-volume FEIS [that] employ[ed] a combination of annotated topographic maps, textual, and tabular data to describe the project alternatives and their impacts on cognizable values within the affected areas" and contained "comprehensive, detailed quantitative and qualitative descriptions of the logging and roading plans for each harvest unit."[116] Similarly, in *Alliance for the Wild Rockies v. Weber*, another case the Forest Service cites,[117] the district court upheld an environmental analysis for a timber sale that "identif[ied] the project boundaries down to the township and range level" and contained maps that would "allow the Plaintiffs to identify where those activities will take place in relation to bull trout critical habitat," a resource value the plaintiffs had claimed was inadequately addressed.[118]

The Project EIS at issue here does not approach this level of specificity; it does not delineate harvest units, let alone identify **[*22]** planned activities within them and describe their impacts on localized cognizable values. Nor does the Project EIS allow the public to identify where specific harvest activities will occur in relation to various cognizable values on Prince of Wales Island.[119] Far from "unwarranted 'fly-specking,'"[120] Plaintiffs' objections identify serious shortcomings in the sufficiency of the Project EIS's environmental analysis.

Moreover, the district court in *Stein* rejected the plaintiffs'

---

[110] *Tenakee Springs v. Block, 778 F.2d 1402, 1407-08 (9th Cir. 1985)*; *see also Alaska Ctr. for the Env't v. Armbrister, 131 F.3d 1285, 1289 (9th Cir. 1997)* ("An EIS must 'reasonably set forth sufficient information to enable the decisionmaker to consider the environmental factors and make a reasoned decision.'" (quoting *Oregon Environmental Council v. Kunzman, 817 F.2d 484, 493 (9th Cir. 1987)*)). Also, the Court notes that the district court in *City of Tenakee Springs v. Courtright* invalidated an EIS that did not provide sufficient site-specific detail for "information [to] . . . sufficiently correlat[e] with environmental factors, such as distribution of fish and wildlife populations, to facilitate public discussion of the [four alternative road and harvest] configurations." 1987 WL 90272, at *4.

[111] Docket 12 at 26 (citing *740 F. Supp. 743, 746 (D. Alaska 1990)*).

[112] *Stein, 740 F. Supp. at 749* (citing plaintiffs' briefing).

[113] *Id.*

[114] *Id.*

[115] Docket 12 at 26. Plaintiffs note in their reply that they "do not fault the [Project EIS] for lack of timetables." Docket 19 at 13.

[116] *Stein, 740 F. Supp. at 749*.

[117] Docket 12 at 25.

[118] *979 F. Supp. 2d 1118, 1125-28 (D. Mont. 2013)*. Moreover, the district court in *Alliance for the Wild Rockies* held that the Forest Service reasonably concluded that the sale at issue fell within a categorical exclusion, such that no NEPA analysis was required at all. *Id. at 1124-25*; *see also 40 C.F.R. § 1508.4* (authorizing agencies to categorically exclude activities from NEPA's analysis requirements).

[119] As Plaintiffs maintained at oral argument: "The island complex is 130 miles long and 60 miles wide. So if you live in one of the 12 subsistence communities on this island, the timber sales that have been approved in this project might be right next door to you, or they might be a hundred miles away." Docket 39 at 8:24-9:3.

[120] *Stein, 740 F. Supp. at 749*.

site-specificity claims because they had not asserted or "show[n] why disclosure of more details regarding site-specific impacts [was] necessary in order to 'foster both informed decision-making and informed public participation.'"[121] Here, Plaintiffs maintain that more detailed information about the specific location of timber harvest under the Project is necessary to properly assess its ecological and subsistence impacts.[122]

The Forest Service contends, however, that the EIS satisfies NEPA because it analyzes the Project's maximum potential impacts.[123] In its briefing before this Court, the agency describes the Project EIS as assuming that "the entire . . . Project Area would be harvested by clear-cut methods and that every mile of road would be constructed up to the maximum number of harvest acres and miles of road authorized under each alternative."[124] The Forest Service maintains that as a result of this worst-case-scenario analysis, "whatever units [it] ultimately selects within the constraints outlined in the alternatives, Activity Cards, and Implementation Plan, the Project will produce environmental effects that fall within those already disclosed and analyzed in the EIS."[125]

It is not entirely clear from the record, but for at least some of the impacts analyzed, the Project EIS assumes that considerably more timber would be harvested than is actually authorized under each alternative. For example, **[*24]** to determine the effects of each alternative on wildlife and subsistence, the Project EIS focused on the 32 Wildlife Analysis Areas ("WAA")—"land divisions used by [the Alaska Department of Fish and Game] for wildlife analysis and regulating wildlife populations"—situated in the Project Area.[126] In its briefing, the Forest Service explained that "for each WAA, the Service assumed [timber] harvest would be concentrated in that WAA and would occur at the maximum level."[127] At oral argument, the agency confirmed that this approach could cause the EIS to assume that more harvest would occur under each alternative than actually allowed by that alternative.[128] And language in the Project EIS itself indicates that this approach assumed that *all* potential harvest stands identified in the LSTA were cut, regardless of the acreage authorized by the alternative in question.[129] The Project EIS makes these assumptions despite its recognition that "[t]he specific location and amount of harvest in each WAA would be determined during implementation and vary by alternative."[130]

The Forest Service cites *WildEarth Guardians v. Conner* to defend its approach.[131] There, the Tenth Circuit

---

[121] *Id.* (quoting Oregon Environmental Council v. Kunzman, 817 F.2d 484, 492 (9th Cir. 1987)).

[122] *See* Docket 22-1 at 28-34. For example, Plaintiffs argue:

> [W]hile all of [the species occurring within the Project Area] depend to some degree on old growth, the extent of that dependence varies, and they have different needs respecting forest structure, elevation, proximity to beaches and streams, proximity to roads, prey availability, and fragmentation **[*23]** of their habitat. For all these reasons . . . the specific locations proposed for new logging and road construction matter a great deal for wildlife, for hunters, and for other people who use and enjoy the forest.

Docket 22-1 at 34.

[123] Docket 12 at 30-32.

[124] Docket 12 at 31 (citing AR 833_2167 at 001449, 001634).

[125] Docket 12 at 32 (citing *WildEarth Guardians v. Conner*, 920 F.3d 1245, 1258 (10th Cir. 2019)).

[126] AR 833_2167 at 001514.

[127] Docket 12 at 37.

[128] Docket 39 at 19:1-18.

[129] *See, e.g.*, AR 833_2167 at 001629 ("For purposes of analysis [of impacts to wildlife], assumptions include that all harvest stands from the LSTA would be harvested and the only harvest method would be clearcut."); *id.* at 001634 ("The effects of the POW LLA Project [on wildlife] are similar between all alternatives because all alternatives assume that all acres proposed for timber harvest will be harvested.").

[130] AR 833_2167 at 001639.

[131] Docket 12 at 17 n.5, 31, 32 (citing 920 F.3d 1245 (10th Cir. 2019)). The Forest Service also cites *Protect Our Cmtys. Found. v. Jewell, No. 13CV575, 2014 U.S. Dist. LEXIS 50698, 2014 WL 1364453, at *9 (S.D. Cal. Mar. 25, 2014)*, *aff'd* 825 F.3d 571 (9th Cir. 2016), to support its assertion that its maximum-impacts analysis satisfied NEPA. Docket 12 at 31. However, the narrow holding in that case is inapplicable to the Project EIS. There, the Bureau of Land Management ("BLM") "adopted a cautious and conservative approach to measuring turbine noise" in completing the EIS for a proposed wind facility. *2014 U.S. Dist. LEXIS 50698, 2014 WL 1364453, at *9*. This analysis led BLM to conclude that the facility would result in adverse noise impacts and caused it to develop a "site-specific noise mitigation plan." *Id.* The district court rejected the plaintiffs' argument that BLM should have modelled turbine noise using larger turbines and that it had therefore "underestimate[ed] overall noise levels," citing the agency's

upheld an Environmental Assessment **[*25]** ("EA") for a tree-thinning project designed to address a beetle infestation in two national forests.[132] The EA "evaluat[ed] the Project's effects on lynx in a worst-case scenario in which all the mapped lynx habitat in the Project area is treated."[133] Due to the listing of the Canada lynx as a threatened species, the Forest Service had previously amended the forest plans for the two forests to prohibit the clearcutting of more than 15% of lynx habitat or precommercial thinning of more than 1% of lynx habitat in a given analysis area after analyzing the impact of these changes in an EIS.[134] In the subsequent EA for the tree-thinning project, the Forest Service took "the conservative approach of assuming that *all* lynx habitat in the Project area w[ould] be treated."[135] Using that approach, the Forest Service found that only 6% of lynx habitat would be subject to clearcutting, and no more than 0.2% subject to precommercial thinning—well below the percentages prohibited by the governing forest plans.[136] The Tenth Circuit held that because the project's impacts to lynx habitat were below the caps established in the amended forest plans, which had been adopted after a full analysis of the lynx-habitat **[*26]** impacts in the EIS, the Forest Service "could reasonably assess the maximum impact that the Project could have on the lynx and conclude it was unlikely to adversely affect them."[137]

Although in the instant case the Forest Service applied an analytical framework similar to the one it used in *WildEarth Guardians v. Conner*, the difference between an EA and an EIS renders that case inapplicable. An EA is meant to determine whether a proposed action will have a significant impact on the environment, such that an EIS is necessary.[138] In contrast, an EIS must compare the environmental impacts of different alternatives, not just determine whether environmental impacts will occur.[139] While an agency's analysis of a proposed action's maximum potential impacts may be appropriate for an EA, the Forest Service's analytical framework in this case is not sufficient to meet the requirements for an EIS.[140]

The Forest Service candidly acknowledges in the EIS

scientific expertise. *Id.*; *see also* Native Ecosystems Council v. Weldon, 697 F.3d 1043, 1051 (9th Cir. 2012) ("A court generally must be 'at its most deferential' when reviewing scientific judgments and technical analyses within the agency's expertise under NEPA." (quoting N. Plains Res. Council, Inc. v. Surface Transp. Bd., 668 F.3d 1067, 1075 (9th Cir. 2011))). This issue was not raised on appeal, but the Ninth Circuit did address the BLM's consideration of inaudible noise impacts and similarly deferred to the agency's judgment. Protect Our Cmtys. Found. v. Jewell, 825 F.3d 571, 584 (9th Cir. 2016). The present case does not concern a discrete "evaluation of complex scientific data" such as the proper method to model noise impacts from a wind turbine, *id.*; rather, it presents a broad legal question about the general structure of the Project EIS. Moreover, as Plaintiffs note, BLM in *Protect our Communities Foundation* "was not substituting the worst-case analysis for site-specific decisions," but was instead using the analysis to assess the impact produced by a wind facility in a specific location. Docket 19 at 15.

[132] 920 F.3d at 1251.

[133] Id. at 1258.

[134] Id.at 1252-53, 1256. Precommercial thinning is "a process of thinning stands that were clear-cut 20-30 years earlier, so that growth can be concentrated on the more commercially valuable trees." Id. at 1255.

[135] Id. at 1255 (emphasis in original).

[136] Id. at 1255-56.

[137] Id. at 1257.

[138] *See* id. at 1251 (describing purpose of EA).

[139] *See id.*; *see also* 40 C.F.R. § 1502.16(d) (requiring discussion of "[t]he environmental effects of alternatives including the proposed action"); 40 C.F.R. § 1502.14(a) (requiring EIS to "[r]igorously explore and objectively evaluate all reasonable alternatives").

[140] Indeed, the Tenth Circuit explained in *WildEarth Guardians v. Conner* that it had earlier held an EIS inadequate that did not base its analysis of impacts to vegetation and wildlife on the actual location of the project, "reasoning that 'the location of development greatly influences the likelihood and extent of habitat preservation'" because "'[d]isturbances on the same total surface acreage may produce wildly different impacts on plants and wildlife depending on the amount of contiguous habitat between them.'" 920 F.3d at 1257-58 (quoting N.M. ex rel. Richardson v. BLM, 565 F.3d 683, 706-07 (10th Cir. 2009)); *see also* Docket 17 at 14 (Plaintiffs arguing that "[w]here . . . significant environmental impacts demand an EIS for a site-specific project, the agency must disclose with specificity where it intends to undertake the project, what the impacts will be, and what alternatives are available."). Yet the Tenth Circuit was careful to note that its holding in *Richardson* was not "that an agency's EA or EIS *always* must specify the precise locations within a project area that will be affected." WildEarth Guardians v. Conner, 920 F.3d at 1258 (emphasis added).

that its analytical framework overestimates the Project's impacts and is unlikely to reflect the actual extent and nature of activities **[*27]** under each of the proposed alternatives within the Project Area.[141] By focusing on the Project's maximum potential impacts for all alternatives rather than its actual or foreseeable impacts for each alternative, the EIS falls short of NEPA's directive to "contain[] a reasonably thorough discussion of the significant aspects of the *probable* environmental consequences" for each alternative.[142] This approach, coupled with the lack of site-specific information in the Project EIS, detracts from a decisionmaker's or public participant's ability to conduct a meaningful comparison of the probable environmental impacts among the various alternatives. For example, in the introduction to the section discussing the Project's impacts to wildlife habitat, the EIS states that "[t]he effects . . . are similar between all alternatives because all alternatives assume that all acres proposed for timber harvest will be harvested. The analysis also assumes that all acres will be harvested by even-aged harvest methods."[143] Due to these identical assumptions for each alternative, it appears that at least with respect to wildlife impacts, the Project EIS only meaningfully analyzed the different mitigation measures **[*28]** contained in each alternative, not the harvest limits.[144] And where the Project EIS does differentiate between alternatives, it does so in partly conditional terms due to its lack of site-specific information. For example, when discussing impacts to high productive old growth habitat, the EIS concludes that Alternative 2 "*may* result in two [Wildlife Analysis Areas] dropping below 50% habitat remaining."[145]

The Project EIS identified a total acreage of potential timber harvest, but not the distribution of the specific acreage authorized by each alternative within these areas. This omission is meaningful given the duration and scale of the project.[146] Despite "additional parameters that limit the ultimate selection of units and activities,"[147] such as mitigation measures contained in the Activity Cards,[148] the Project EIS's structure creates ambiguity about the actual location, concentration, and timing of timber harvest and road construction on Prince of Wales Island.[149] By doing so, the Project EIS fails to provide a meaningful comparison of alternatives.

By authorizing an integrated resource management plan but deferring siting decisions to the future with **[*29]** no additional NEPA review,[150] the Project EIS violates NEPA. The Forest Service has not yet taken the requisite

---

141 *See, e.g.*, AR 833_2167 at 1634 ("The total acres estimated to be needed to meet timber needs are likely over-estimated and therefore the effects are likely over-estimated as well."). The Forest Service's briefing admits this as well, stating that the Project EIS "analyz[es] the Project's maximum potential impacts, . . . even though in reality impacts would be less." Docket 12 at 31; *see also id.* at 31 n.10 (noting that "under Alternative 2, about fifty-seven percent of the old-growth acreage proposed for harvest would be harvested using uneven-aged harvest prescriptions," even though the EIS's analysis assumed that all acres would be clear-cut).

142 *WildEarth Guardians v. Mont. Snowmobile Ass'n, 790 F.3d 920, 924 (9th Cir. 2015)* (emphasis added) (quoting *City of Sausalito v. O'Neill, 386 F.3d 1186, 1206 (9th Cir. 2004))*.

143 AR 833_2167 at 001634; *see also supra* note 43 and accompanying text.

144 *See*, AR 833_2167 at 001642-43 (differentiating impacts of alternatives to deep snow habitat purely in terms of mitigation measures).

145 AR 833_2167 at 001500 (emphasis added).

146 For example, Alternative 2 authorizes a maximum 42,635 acres of timber harvest—23,269 acres of old growth and 19,366 acres of young growth—which is roughly 34 percent of the 125,529 acres identified for potential old-and young-growth harvest in the Project Area. AR 833_2167 at 001481.

147 Docket 12 at 29.

148 *See, e.g.*, AR 833_2168 at 001935-39 (Activity Card for "Rotational Harvest of Old Growth Using Even-aged Management").

149 *See* Docket 19 at 9 ("Even the maximum level of logging . . . and road-building . . . could be distributed in countless combinations around the 125,529 acres allowed in the Project.")

150 The ROD states that the Implementation Plan is to "provide a linkage from the [Project EIS] to the project-specific work without the need for additional NEPA analysis." AR 833_2427 at 001034. As Plaintiffs note, the Forest Service's "approach might be permissible if the agency were going to prepare a subsequent EIS" for decisions at the site-specific level. Docket 22-1 at 26; *see also* *Tenakee Springs v. Block, 778 F.2d 1402, 1407 (9th Cir. 1985)* ("Where there are large-scale plans for regional development, NEPA requires both a programmatic and a site-specific EIS." (citing *40 C.F.R. §§ 1508.28*, *1502.20*)); *California v. Block, 690 F.2d 753, 761 (9th Cir. 1982)* ("The detail that NEPA requires in an EIS depends upon the nature and scope of the proposed action. . . . The critical inquiry in considering the adequacy of an EIS prepared for a large scale, multi-step project is not whether the project's site-specific impact should be evaluated in detail, but when such detailed evaluation should occur.").

hard look at the environmental impact of site-specific timber sales on Prince of Wales over the next 15 years. The Forest Service's plan for condition-based analysis may very well streamline management of the Tongass and decrease the amount of falldown acreage associated with each timber sale;[151] however, it does not comply with the procedural requirements of NEPA, which are binding on the agency.[152] "NEPA favors 'coherent and comprehensive up-front environmental analysis to ensure . . . that the agency will not act on incomplete information, only to regret its decision after it is too late to correct."[153] Plaintiffs have therefore established Count I of the Complaint; the Project EIS violates NEPA and is therefore not in accordance with law.[154]

## II. Alaska National Interest Lands Conservation Act

Congress enacted ANILCA to "cause the least adverse impact possible on rural residents who depend upon subsistence uses of the resources of [the public lands in Alaska]."[155] To achieve this purpose, *§ 810 of ANILCA* imposes procedural requirements upon federal decisionmakers; pursuant to **[*30]** its terms, an agency proposing an action resulting in the "use, occupancy, or disposition of public lands" must evaluate that action's effects on "subsistence uses and needs," the availability of other lands for the same purpose, and "other alternatives" that would reduce the impacts to subsistence uses.[156] Upon determining that the action "would significantly restrict subsistence uses," the agency must provide notice to the affected communities, hold public hearings, and make three findings:

> [T]hat (A) such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands, (B) the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other disposition, and (C) reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such actions.[157]

When the proposed action requires completion of an EIS, the agency "shall provide the notice and hearing and include the findings required by [*ANILCA § 810(a)*] as part of such [EIS]."[158]

The Project EIS contains a section discussing the impacts to subsistence activities. **[*31]** [159] This section recognizes that "[s]ubsistence hunting, fishing, trapping, and gathering activities are a major focus of life for many residents on Prince of Wales Island."[160] The EIS notes that commenters were particularly concerned about the Project's impacts to Sitka black-tailed deer, which the EIS "considered an 'indicator' for potential subsistence resource effects concerning the resources associated

---

[151] Docket 12 at 10 (describing condition-based management as "superior method to analyze the environmental effects of multi-year, landscape level analyses such as this one"). At oral argument, the Forest Service explained that one motivation behind the decision to adopt condition-based analysis was to minimize downward reductions of harvest volume as sales are finalized, known as "falldown." Docket 39 at 19:20-20:8; *see also* AR 833_2167 at 001561 (describing falldown). The Court notes that while the EIS does discuss falldown, neither it nor the ROD identifies falldown as a motivating factor in the Project's design.

[152] *See* *Protect Our Cmtys. Found. v. Lacounte, 939 F.3d 1029, 1035 (9th Cir. 2019)* ("NEPA requires . . . procedural steps but does not require an agency to reach any particular result."). In its briefing, the Forest Service maintained that "resource concerns and mitigations measures [would be] further refined" through the Implementation Plan "after treatment units are identified." Docket 12 at 29-30. But the Implementation Plan is not a valid substitute for NEPA. For example, NEPA provides for a minimum 45-day comment period on draft EISs, *40 C.F.R. § 1506.10(c)*, while the Implementation Plan allows for only a 30-day comment period. AR 833_2427 at 001035. The ROD notes that the Implementation Plan may be altered by the Forest Service, *see* AR 833_2427 at 000811, and the agency maintained at oral argument that the Project would be NEPA-compliant even if no Implementation Plan existed. Docket 39 at 18:6-13.

[153] *Protect Our Cmtys. Found., 939 F.3d at 1035* (alterations in original) (quoting *Churchill County v. Norton, 276 F.3d 1060, 1072-73 (9th Cir. 2001)*).

[154] *See* *5 U.S.C. § 706(2)(A)*.

[155] *16 U.S.C. § 3112(1)*; *see also* *Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 544, 107 S. Ct. 1396, 94 L. Ed. 2d 542 (1987)* ("The purpose of *ANILCA § 810* is to protect Alaskan subsistence resources from unnecessary destruction.").

[156] *16 U.S.C. § 3120(a)*.

[157] *16 U.S.C. § 3120(a)(1)-(3)*.

[158] *16 U.S.C. § 3120(b)*.

[159] AR 833_2167 at 001540-1559.

[160] AR 833_2167 at 001540.

with old-growth forest habitat."[161] Using the maximum-impact methodology described in the previous section of this order,[162] the Forest Service determined that the Project presents "a significant possibility of a significant restriction for the use of deer," largely "due to the loss of deep snow habitat in some WAAs [Wildlife Analysis Areas]."[163] The Project EIS identified "five WAAs of concern . . . [:] 1214, 1315, 1317, 1318, and 1420," which are "near the communities of Thorne Bay, Coffman Cove, Hollis and Klawock."[164]

In light of this determination, the Forest Service held seven subsistence hearings in Prince of Wales Island communities after issuing the draft EIS.[165] In response to concerns raised at two of these hearings, the agency decided "not to authorize commercial **[*32]** harvest of old-growth stands in the area 'North of the 20 Road, and in VCU 5280."[166] In the final Project EIS, the Forest Service made the three findings required by *ANILCA § 810(a)(3)*.[167]

Plaintiffs contend that "[t]he lack of site-specific information in the [Project EIS] violates not only NEPA, but also *section 810 of ANILCA*."[168] They maintain that "analysis of impacts on subsistence uses under *section 810* should be at least as site-specific as that for the environmental impacts under NEPA."[169] As such, Plaintiffs also argue that the Forest Service's *§ 810(a)(3)* findings were premature since they were made "before deciding the specific location or extent of logging or road construction over the next 15 years."[170]

The Forest Service argues that Plaintiffs have simply repackaged their NEPA claim.[171] However, due to the similarities between the procedural requirements of NEPA and ANILCA, courts have evaluated the two statutes under similar standards.[172] Although there is little case law on the issue, at least one court has looked to NEPA decisions to determine the site-specificity required by *ANILCA § 810*. In *City of Tenakee Springs v. Clough*, the district court rejected the plaintiffs' claims that supplemental EISs were "deficient because they discuss site-specific **[*33]** impacts of proposed harvesting on subsistence resources but do not correlate those impacts with the specific subsistence needs of each affected community."[173] The court cited *Stein v. Barton*'s description of NEPA site-specificity as the relevant standard, stating that "[p]roposed activities must be sufficiently correlated with environmental factors in each affected area to facilitate public discussion of the project."[174] But the court found that no additional site-specificity was necessary to comply with ANILCA

---

[161] AR 833_2167 at 001540.

[162] *See supra* 26-27; *see also* Docket 12 at 37 ("In other words, for each WAA [Wildlife Analysis Area], the Service assumed [timber] harvest would be concentrated in that WAA and would occur at the maximum level.")

[163] AR 833_2167 at 1557. Regarding other subsistence resources, the Forest Service concluded that "[n]one of the project alternatives would present 'a significant possibility of a significant restriction' of subsistence uses for most subsistence resources (food plants, personal use timber, upland game birds and waterfowl, furbearers, and marine mammals)." AR 833_2167 001545; *see also* AR 833_2167 at 001548 (finding same for aquatic resources).

[164] AR 833_2167 at 001550. The Project EIS noted that "[t]he Forest Plan estimates that with full implementation of the Forest Plan, WAAs 1420 and 1421 in the project area may retain 50 percent or less of the estimated deer habitat capability." AR 833_2167 at 001554; *see also* AR 833_2167 at 1500-01 (showing impacts of various alternatives to different habitats).

[165] AR 833_2167 at 001470. The Forest Service held subsistence hearings in Whale Pass, Klawock (twice), Hydaburg, Point Baker, Kasaan, and Naukati. *Id.*

[166] AR 833_2427 at 000787. The "area North of 20 Road" is on the northern tip of Prince of Wales Island, to the East of the communities of Point Baker and Port Protection. *See* AR 833_2178.

[167] AR 833_2167 at 001558-59.

[168] Docket 22-1 at 36; *see also* Docket 1 at 17-18, ¶¶ 48-51 (Count II in Complaint).

[169] Docket 22-1 at 37.

[170] Docket 22-1 at 39.

[171] Docket 12 at 35.

[172] *See, e.g.*, *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison, 67 F.3d 723, 731 (9th Cir. 1995)* (evaluating adequacy of EIS's consideration of alternatives under NEPA and ANILCA together); *Tenakee Springs v. Clough, 915 F.2d 1308, 1310-12 (9th Cir. 1990)* (same); ***Sierra Club v. Penfold, 664 F. Supp. 1299, 1307 (D. Alaska 1987)*** ("NEPA case law is helpful in interpreting *§ 810*.").

[173] *750 F. Supp. 1406, 1422 (D. Alaska 1990)*, *rev'd on other grounds*, *915 F.2d 1308 (9th Cir. 1990)*.

[174] *Id. at 1422* (quoting *Stein v. Barton, 740 F. Supp. 743, 749 (D. Alaska 1990)*).

because the "EIS's identify site-specific impacts on subsistence resources, incorporate maps identifying which sites are important for subsistence use generally, and catalog how and to what extent each community utilizes subsistence resources, including data on per capita consumption."[175]

The Court has already determined that the Project EIS does not contain the level of site-specificity required by NEPA. For the same reasons, the Court finds that despite the public hearings it held and the findings it made, the Forest Service has failed to comply with *ANILCA § 810*. The purpose of that section is to promote informed decision-making, such that the impacts of an **[*34]** action to subsistence activities are considered; those actions "which would significantly restrict subsistence uses can only be undertaken if they are necessary and if the adverse effects are minimized."[176] This purpose can only be fulfilled if specific information about the actual, not the potential, proposed action is available. This is made clear by the statute's command to consider site-specific aspects of a proposed action, such as its effect on local "subsistence uses and needs."[177]

The Forest Service contends that it has fulfilled its duty under ANILCA by "identifying where Project activities would occur, evaluating the maximum impacts of the Project on subsistence uses, and by taking actions to benefit subsistence uses and reduce the adverse effects of the project on . . . those uses."[178] However, as discussed above, the Commercial Vegetation Management map only identifies the potential, and not the actual, locations of timber harvest and road building within the 1.8-million acre Project Area. The Forest Service's evaluation of the Project's maximum impacts does not evaluate the Project's actual expected impacts.[179] By not developing actual site-specific information, the Forest **[*35]** Service limited its ability to make informed decisions regarding impacts to subsistence uses and presented local communities with vague, hypothetical, and over-inclusive representations of the Project's effects over a 15-year period.[180]

The Implementation Plan does envision additional information-gathering and public participation before site-specific decisions are made.[181] However, as Plaintiffs note, this process does not require the Forest Service to make additional findings under *ANILCA § 810(a)(3)* or provide the public with a right of appeal.[182] Moreover, the Implementation Plan is subject to change by the Forest Service, and there is no certainty that its public participation provisions will last for the Project's 15-year duration.[183] Without either an up-front discussion of actual site-specific impacts or future ANILCA analysis when siting decisions are made, the Project EIS and ROD are inconsistent with *ANILCA § 810*. Plaintiffs have therefore established Count II of the Complaint; the Project EIS violates ANILCA and is therefore not in accordance with law.[184]

### III. National Forest Management Act

Pursuant to NFMA, the Forest Service must prepare a land and resource management plan, also called a "forest **[*36]** plan," for each forest it manages.[185] Projects occurring in a national forest must comply with that forest's management plan.[186] Standard and

---

[175] *Id.*

[176] *Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 544, 107 S. Ct. 1396, 94 L. Ed. 2d 542 (1987)*.

[177] *16 U.S.C. § 3120(a)*; *see also supra* note 119.

[178] Docket 12 at 35-36.

[179] *See supra* 30-32. As noted previously, *see supra* note 146, Alternative 2 authorized 42,635 acres of timber harvest, or 34 percent of the 125,529 acres identified for potential harvest by the LSTA, but gave no indication of where that harvest would occur within the total acreage. AR 833_2167 at 001481.

[180] As Plaintiffs note, "subsistence activities are inherently location-specific," and "[p]eople care about the places they use for subsistence and how the action will affect those places and nearby habitat." Docket 19 at 18.

[181] *See* AR 833_2427 at 001037 (describing implementation process).

[182] Docket 19 at 19.

[183] *See* AR 833_2427 at 000811 ("The plan is meant to be a 'living' document and may need to be adjusted . . . .").

[184] *See 5 U.S.C. § 706(2)(A)*.

[185] *See 16 U.S.C. § 1604(a)*.

[186] *16 U.S.C. § 1604(i)*; *see also Friends of Southeast's Future v. Morrison, 153 F.3d 1059, 1068 (9th Cir. 1998)* ("[P]ursuant to the NFMA, the Forest Service must demonstrate that a site-specific project would be consistent with the land resource management plan of the entire forest." (quoting ***Neighbors of Cuddy Mt. v. United States Forest Serv., 137 F.3d 1372, 1377 (9th Cir. 1998)***).

Guideline TIM3.I.C in the 2016 Forest Plan that currently governs management of the Tongass provides:

> Timber harvest unit cards will document resource concerns and protection measures. The unit cards, including a map with relevant resource features, will be provided electronically when Draft or Final NEPA documents and decisions are published. (Consult Tongass National Forest Supplement 1909.15-2015-1.)[187]

Tongass National Forest Supplement 1909.15-2015-1, which "[e]stablishe[d] procedures for producing and distributing unit and road cards associated with NEPA documents,"[188] was rescinded by the Forest Service in October 2018.[189]

The Project EIS does not contain unit cards, and the ROD explains in the section describing Activity Cards that "[u]nit cards would be developed for any timber sales when site-specific locations are determined" through the Implementation Plan.[190] Plaintiffs contend that the "Forest Service violated the forest plan requirement to include unit cards with the draft or final EISs for the Prince of Wales Project."[191]

Responding to comments arguing that the Project EIS had failed to comply with the Tongass Forest Plan, the Forest Service explained that it understood the rescission of Tongass National Forest Supplement 1909.15-2015-1 to have rendered "the timing for when electronic unit cards are provided . . . no longer applicable."[192] The Forest Service added that the Implementation Plan's "opportunity for public comment on the maps, and unit and road cards meets the intent of Forest Plan TIM3.I.C."[193]

In its briefing to this Court, the Forest Service advances a different argument. It now contends that TIM3.I.C is ambiguous regarding "the contents and format of unit cards, *except* that the cards 'will document resource concerns and protection measures' and 'include[e] [sic] a map with relevant resource features.'"[194] The Forest Service maintains that the Activity Cards and Commercial Vegetation Management map provided with the Project EIS comply with this requirement.[195]

The Forest Service argues that its interpretation of TIM3.I.C is entitled to *Auer* deference, which accords "defer[ence] to agencies' reasonable readings of genuinely ambiguous regulations."[196] But *Auer* deference is not automatic; the Supreme **[*38]** Court has explained that "before concluding that a rule is genuinely ambiguous, a court must exhaust all the 'traditional tools' of construction," meaning it "must 'carefully consider[]' the text, structure, history, and purpose of a regulation."[197]

Addressing first the Forest Service's position in the administrative record, the Court finds no ambiguity in TIM3.I.C about when the agency is required to provide unit cards, notwithstanding the rescission of the supplement cited therein. The Standard and Guideline clearly states that "[t]he unit cards . . . will be provided electronically *when Draft or Final NEPA documents and decisions are published*."[198] Under the plain language of the Forest Plan, the Forest Service must provide unit cards when the relevant NEPA document is published.

---

[187] AR 833_0404 at 63265. Forest plans for the Tongass have included a unit-card requirement since at least 1997. AR 833_2076 at 068765 (1997 Tongass Forest Plan).

[188] AR 833_2526 at 074726.

[189] AR 833_2525 at 074720-25.

[190] AR 833_2427 at 000826; *see also id.* at 000802 ("The Implementation Plan identifies that unit and road-specific cards will be developed when specific harvest units and road locations are determined as part of the Implementation Plan process.")

[191] Docket 22-1 at 39; *see also* ***[*37]*** Docket 1 at 18-20, ¶¶ 52-58 (Count III in Complaint).

[192] AR 833_2440 at 000020 (Responses to Comments on Draft ROD); *see also* AR 833_2427 at 000802 (ROD determining that publishing unit cards during Implementation Plan "is an alternative way to fully comply with Forest Plan Standard TIM3.I.C, which is no longer applicable in terms of timing when unit cards are provided").

[193] AR 833_2171 at 002149 (Responses to Comments on Draft EIS).

[194] Docket 12 at 42 (emphasis and alterations in original) (quoting AR 833_0404 at 063265).

[195] Docket 12 at 41-45.

[196] *Kisor v. Wilkie, __ U.S. __, 139 S. Ct. 2400, 2408, 204 L. Ed. 2d 841 (2019)* (citing *Auer v. Robbins, 519 U.S. 452, 117 S. Ct. 905, 137 L. Ed. 2d 79 (1997)*).

[197] *Id.* at 2415 (2019) (second alteration in original) (first quoting *Chevron U.S.A. Inc. v. NRDC, 467 U.S. 837, 843 n.9, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)*, then quoting *Pauley v. BethEnergy Mines, 501 U.S. 680, 707, 111 S. Ct. 2524, 115 L. Ed. 2d 604 (1991)* (Scalia, J., dissenting))).

[198] AR 833_0404 at 63265 (emphasis added).

Regardless of the provision's intent,[199] the Forest Service departed from the unambiguous directive of TIM3.I.C. The agency's decision to delay the publication of unit cards until the Implementation Plan, after NEPA review was completed for the Project, is therefore inconsistent with the Forest Plan.

The Court finds the Forest Service's position in its briefing to be no more convincing. While TIM3.I.C does not **[*39]** fully explain what a unit card should contain, it is clear from the Standard and Guideline's language that each card must relate to a discrete geographic area, or "[t]imber harvest unit," within the Project Area.[200] The Commercial Vegetation Management map does not identify specific timber harvest units,[201] and the Activity Cards "document resource concerns and protection measures at the Project level."[202] They are not unit cards within the meaning of TIM3.I.C.[203]

Moreover, even if TIM3.I.C were ambiguous, the current interpretation advanced in the Forest Service's briefing would not be entitled to *Auer* deference. Throughout the administrative record, the Forest Service's position is consistent: provision of unit cards after the completion of NEPA review complies with TIM3.I.C due to the rescission of Tongass National Forest Supplement 1909.15-2015-1. It is only in its briefing to this Court that the agency asserts that the Activity Cards and the Commercial Vegetation Management map themselves constituted the unit cards required by TIM.3.I.C.[204] "[A] court should decline to defer to a merely 'convenient litigating position' or '*post hoc* rationalization[n] advanced' to 'defend past **[*40]** agency action against attack.'"[205] And the administrative record itself belies the Forest Service's litigation position; in the ROD, the agency differentiated between Activity Cards and unit cards and explained that the latter would be provided through the Implementation Plan in an effort to comply with TIM3.I.C.[206]

---

[199] *See* AR 833_2171 at 002149 (stating that Implementation Plan's "opportunity for public comment on the maps, and unit and road cards meets the intent of the Forest Plan TIM3.I.C").

[200] AR 833_0404 at 63265.

[201] AR 833_2178.

[202] Docket 12 at 44; *see also* AR 833_2427 at 000826 (describing Activity Cards).

[203] *Friends of Southeast's Future v. Morrison, 153 F.3d 1059, 1069 (9th Cir. 1998)* ("However, an agency's interpretation does not control, where, as here, it is plainly inconsistent with the regulation at issue."). The Forest Service has previously used the term "activity cards" collectively to refer to cards "used to explain site-specific proposed activities," including "timber harvest units and proposed and existing roads." AR 833_2084 at 061267 (EIS for Kuiu Timber Sale). Unlike the Activity Cards in this case, the Kuiu Timber Sale unit cards described harvest activities in specific geographic locations, including both graphical and narrative information for each harvest unit. *See* AR 833_2084 at 061279-80 (card for unit 101); *see also id.* at 061268-76 (describing activity cards, as defined by that project, and locating individual harvest units and roads on map of Project Area). Although Forest Supplement 1909.15-2015-1 was still effective when the Kuiu Timber Sale EIS was prepared, the Court finds a comparison between the timber harvest unit cards in that case and the Activity Cards used here to be instructive.

[204] At oral argument, the Forest Service maintained that the agency had twice asserted in the administrative record that the Activity Cards and Commercial Vegetation Management map themselves complied with TIM3.I.C. Docket 39 at 24:24-26:19 (citing AR 833_2427 at 000802 and AR 833_2171 at 002149). Not so. As discussed above, the two pages of the record cited by the Forest Service concern the timing of unit card publication.

[205] *Kisor v. Wilkie, __ U.S. __, 139 S. Ct. 2400, 2417, 204 L. Ed. 2d 841 (2019)* (alteration and emphasis in original) (quoting *Christopher v. SmithKline Beecham Corp., 567 U.S. 142, 155, 132 S. Ct. 2156, 183 L. Ed. 2d 153 (2012))*.

[206] The ROD lays out the difference between Activity Cards and unit cards, explaining that the former inform but do not replace the latter:

> The POWLLA FEIS uses a condition-based approach where specific harvest units and roads will be determined during implementation through a collaborative public process and interdisciplinary review. Activity Cards and maps were included with the FEIS and Draft ROD and will also be part of this Final ROD. The Activity Cards were designed to honor the public process developed at the community level during the POW LLA NEPA process, to be a resource for the public and Forest Service resource specialists, to assist in alternative development, and to accompany the EIS to provide clarity for environmental effects analysis and guide implementation . . . . The Implementation Plan identifies that unit and road-specific cards will be developed when specific harvest units and road locations are determined as part of the Implementation Plan process. This Implementation Plan allows for more collaboration **[*41]** during implementation, and responsiveness to dynamic on-the-ground conditions, new science information, and public input. This process provides for publishing unit and road cards online and providing an opportunity for public review and comment before final line officer decisions on specific project

Due to their failure to include timber harvest unit cards corresponding to discrete geographic locations, the Project EIS and ROD are inconsistent with the 2016 Tongass Forest Plan. Plaintiffs have therefore established Count III of the Complaint; by not complying with the applicable forest plan, the Project violated NFMA and is therefore not in accordance with law.[207]

Nevertheless, the Forest Service asserts that this error was not prejudicial.[208] "Relief is available under the APA only for 'prejudicial error.'"[209] Plaintiffs challenging agency action bear the burden of showing prejudice, but this is not **[*42]** "a particularly onerous requirement."[210] Plaintiffs have met their burden here. They argue that they "were prejudiced by the lack of unit cards that would have given them the opportunity to provide meaningful input on logging locations, impacts, and alternatives."[211] The Ninth Circuit has consistently held that an error that affects the public's ability to meaningfully participate in the NEPA review process is prejudicial.[212]

The Forest Service contends that Plaintiffs had the opportunity to comment on the Activity Cards and Commercial Vegetation Management map, which contain "proposed locations of timber harvest."[213] However, as discussed above, these documents do not contain the level of site-specificity required by TIM3.I.C—or by NEPA for that matter—and did not allow Plaintiffs to meaningfully comment on the specific harvest activities that would have been identified on timber harvest unit cards had they been published with the draft EIS.[214] The Court therefore finds that the NFMA violation was prejudicial and that relief is warranted under the APA.

**IV. Proper Remedy**

Having determined that Plaintiffs prevail on all three counts in their Complaint, the Court **[*43]** turns to the question of the proper remedy. Plaintiffs request a judgment declaring that the Project EIS "violates NEPA, section 810 of ANILCA, and NFMA," and "vacating those portions of the ROD authorizing vegetation management and new road construction."[215] The Forest Service contends that remand without vacatur may be appropriate, and requests the Court to allow supplemental briefing to address the proper remedy.[216]

Vacatur is the default remedy under the APA, which directs reviewing courts to "hold unlawful and set aside" unlawful agency action.[217] The Ninth Circuit has explained that a court should "order remand without vacatur only in 'limited circumstances,'" and "leave an

activities are made. This has been clarified in the Implementation Plan, ROD Appendix 2, under step 4. I have determined this process is an alternative way to fully comply with Forest Plan Standard TIM3.1.C, which is no longer applicable in terms of the timing of when unit cards are provided.

AR 833_2427 at 000802.

[207] *See* 5 U.S.C. § 706(2)(A).

[208] Docket 12 at 45-47.

[209] ***Drakes Bay Oyster Co. v. Jewell, 747 F.3d 1073, 1090-91 (9th Cir. 2014)*** (quoting 5 U.S.C. § 706).

[210] *Shinseki v. Sanders, 556 U.S. 396, 410, 129 S. Ct. 1696, 173 L. Ed. 2d 532 (2009)*.

[211] Docket 19 at 24; *see also supra* note 119.

[212] *See, e.g.,* ***Or. Natural Desert Ass'n v. Jewell, 840 F.3d 562, 571 (9th Cir. 2016)*** (holding error to be prejudicial where "the public was not able to tailor its comments to address concerns regarding the potential winter presence of sage grouse" because "baseline conditions [were] inadequately established"); *Friends of Southeast's Future v. Morrison, 153 F.3d 1059, 1068 (9th Cir. 1998)*; *cf. Cal. Wilderness Coalition v. United States DOE, 631 F.3d 1072, 1091-92 (9th Cir. 2011)* (reaffirming Circuit's "consistent case law holding that 'harmless error' requires a determination that the error 'had no bearing on the procedure used or the substance of [the] decision reached'" (alteration in original) (quoting *Paulsen v. Daniels, 413 F.3d 999, 1006 (9th Cir. 2005)*)).

[213] Docket 12 at 46.

[214] Further, the ability to comment on draft unit cards produced pursuant to the Implementation Plan does not render the error harmless, *see* Docket 12 at 47, since the Implementation Plan is subject to change and does not provide for the same public participation and review process as NEPA. *See supra* note 152.

[215] Docket 22-1 at 43.

[216] Docket 12 at 47-49.

[217] *5 U.S.C. § 706(2)(A)*. Both partial and complete vacatur of the offending agency action are acceptable forms of relief under the APA. *See Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 165-66, 130 S. Ct. 2743, 177 L. Ed. 2d 461 (2010)* ("If a less drastic remedy (such as partial or complete vacatur of APHIS's deregulation decision) was sufficient to redress respondents' injury, no recourse to the additional and extraordinary relief of an injunction was warranted.").

 

invalid rule in place only 'when equity demands.'"[218] To determine whether to remand an action without vacatur, a court is to "weigh the seriousness of the agency's errors against 'the disruptive consequences of an interim change that may itself be changed.'"[219]

The Forest Service maintains that "[b]oth considerations are informed by the Court's decision on the merits," and the agency "believes the consequences of vacatur would be extremely disruptive due to the recent low and uncertain supply of timber in Southeast Alaska, which threatens **[*44]** businesses in the region."[220] The Forest Service maintains that "[t]he economic need for Project timber and the harm that would be caused by delaying timber harvesting activities authorized by the Project cannot be adequately addressed within the page limits for [its] merits brief."[221] In response, Plaintiffs note that the Forest Service "made a strategic choice to devote more pages to the merits of the claims, with no basis to assume it was entitled to supplemental briefing on the remedy."[222] Since Plaintiffs did choose to devote a section of their briefing to the remedy issue, they maintain that allowing supplemental briefing would unfairly prejudice them.[223]

The Court finds that supplemental briefing on the appropriate remedy could be helpful. Any prejudice to Plaintiffs as a result of this delay will be eliminated because the Court will keep the preliminary injunction in effect until the appropriate remedy is determined.

## CONCLUSION

In light of the foregoing, IT IS HEREBY ORDERED that:

Plaintiffs' request at Docket 10 for declaratory relief is GRANTED. The Project EIS violates NEPA, *42 U.S.C. § 4332(2)(C)*, ANILCA, *16 U.S.C. § 3120(a)*, and NFMA, *16 U.S.C. § 1604(i)*. It is therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance **[*45]** with law."[224]

Each party may file a supplemental brief addressing the proper remedy in this case **within 21 days of the date of this order; such brief shall not exceed 15 pages**. Each party will then have **an additional 14 days to file a response, not to exceed 8 pages**.

The preliminary injunction at Docket 27 shall remain in place until the Court enters a final judgment.

DATED this 11th day of March, 2020 at Anchorage, Alaska.

*/s/ Sharon L. Gleason*

UNITED STATES DISTRICT JUDGE

---

End of Document

---

218 *Pollinator Stewardship Council v. United States EPA, 806 F.3d 520, 532 (9th Cir. 2015)* (first quoting *Cal. Cmtys. Against Toxics v. United States EPA, 688 F.3d 989, 994 (9th Cir. 2012)* then quoting *Idaho Farm Bureau Fed'n v. Babbitt, 58 F.3d 1392, 1405 (9th Cir. 1995))*.

219 *Id.* (quoting *Cal. Cmtys. Against Toxics, 688 F.3d at 992*).

220 Docket 12 at 48.

221 Docket 12 at 49.

222 Docket 19 at 26.

223 Docket 19 at 26.

224 *5 U.S.C. § 706(2)(A)*.

---------- Forwarded message ---------
From: **Weinmeister - DNR, Brad** <brad.weinmeister@state.co.us>
Date: Tue, Oct 8, 2019 at 10:26 AM
Subject: Re: Lone Pine EA and elk data
To: Magee - DNR, Brian <brian.magee@state.co.us>
Cc: Mark - SJCA <mark@sanjuancitizens.org>

Hi Mark,

The E24 elk population, which includes GMUs 70, 71, 72, 73, and 711. is decreasing. Below is the most recent population trend through 2018. It is now below our population management objective. The biggest concern we're seeing with our elk herds in southern Colorado is a lack of recruitment. We should be seeing an average of 40 calves per 100 cows. In E24 we have been below 30 calves:100 cows five years. We haven't seen 40 or more since 2009. Last year's calf:cow ratio was 26.5:100. Although other populations are experiencing low recruitment, E24 appears to be the worst. We really don't know what is causing this and currently have a research project to try to get some answers.



September 13, 2011

# Old Growth Protection & Large Tree Retention Strategy

# Contents

I. Old Growth Protection & Large Tree Retention Strategy (OGP&LTRS) Overview...... 3

II. OGP&LTRS Rationale: The Historical Debate Regarding Diameter Caps in the Southwest and the 4FRI's Large Tree Retention Policy.................................................... 5

III. Exception Process for Large Post-Settlement Tree Retention..................................... 8

IV. Exceptions.................................................................................................................. 9

Seeps & Springs............................................................................................................ 9

Riparian........................................................................................................................ 11

Wet Meadows .............................................................................................................. 13

Encroached Grasslands ................................................................................................ 15

Aspen Forest & Woodland........................................................................................... 17

Ponderosa Pine/Gambel Oak Forest (Pine-Oak)......................................................... 19

Within Stand Openings ................................................................................................ 21

Heavily Stocked Stands with High Basal Area Generated By a Preponderance of Large Young Trees............................................................................................................... 23

V. Description of Desired Next Steps and Ongoing Collaborative Clarification of OGP&LTRS................................................................................................................. 25

VI. References................................................................................................................. 26

# I. Old Growth Protection & Large Tree Retention Strategy (OGP&LTRS) Overview

The goals of the Four Forests Restoration Initiative (4FRI) are to restore healthy, diverse stands, supporting abundant populations of native plants and animals; to protect communities in forested landscapes from destructive wildland fire; and to support sustainable forest industries that strengthen local economies while conserving natural resources and aesthetic values. In short, we seek to re-establish largely self-regulating forested landscapes including their associated fire regimes through a process of ecological restoration that benefits communities, economies, ecosystems and biodiversity.

Ecological restoration will require thinning post-settlement ponderosa pine trees[1] in unnaturally dense stands. While there is broad agreement for reducing small diameter tree densities, where and how this should be done has often been the subject of social and scientific debate. The purpose of this document is to affirm recommendations of the 4FRI Stakeholder Group relating to the retention of large post-settlement and old growth trees—recommendations that are critical to moving beyond those debates—and to provide specific, science-based recommendations for incorporation into 4FRI restoration plans and projects.

**Retention of Old Growth and Large Post-settlement Trees**

"The Path Forward"—a foundational document of the 4FRI—calls for blanket old growth protection, regardless of tree size. It states that, "No old-growth trees (pre-dating Euro-American settlement) shall be cut." The document also includes broad recommendations for retaining large post-settlement trees with some carefully specified exceptions.

In southwestern ponderosa pine forests, old-growth trees are important to ecosystem structure and function. They increase genetic diversity on the landscape; old trees have greater genetic diversity than even-aged groups of young trees (Kolanoski 2002) and, thus, may have a better chance of adapting to changing climatic and environmental conditions, an ability they can pass on to their progeny. In addition, when not surrounded by large amounts of fuel, the thick bark of old-growth trees makes them largely resistant to low-intensity surface fire (Agee 1998). Old-growth trees also increase forest structural diversity, which, in turn, provides more wildlife habitat. For example, large trees provide additional structure for bats, which roost under slabs of bark; nest trees for northern goshawks and Mexican spotted owls; continuous canopy for tassel-eared squirrels; and foraging habitat for bark-gleaning birds (Bull and Hohmann 1994, Humes et al. 1999, Dodd et al. 2003). In addition, old trees often become long-lasting snags when they die, which benefits many species of cavity-nesting birds and mammals (Chambers and Mast

[1] Large and old growth tree recommendations offered in this document refer specifically to ponderosa pine trees.

2005). Old, large trees also serve as long-term carbon stores (Harmon et al. 1990) and preserve a record of the past that can inform future research about insect outbreak, fire history, and climate change (Fulé et al. 1997, Soulé and Knapp 2006). Finally, old-growth trees enhance the aesthetics of forests (Brown and Daniel 1984) and, thus, increase public support for restoration projects. Old-growth trees are present on the landscape at similar or lower densities compared to presettlement times (Mast et al. 1999, Moore et al. 2004), depending on how many trees have been removed postsettlement by forest management practices (e.g., clearcut, thinning, seed tree, etc.). The three main threats to old-growth trees are high-severity wildfire, competition from mid- or under-story trees, and drought and subsequent bark beetle attacks (Kolb et al. 2007). Restoration treatments (thinning and prescribed burning) around old-growth trees can cause some mortality. However, this threat can be reduced through careful management (Hood 2010). In addition, restoration treatment should result in a reduced threat of wildfire, a release from competition, and increased tree growth (Fajardo et al. 2007, Fulé et al. 2007).

The Path Forward also calls for retaining large post-settlement trees (defined by the socio-political process as those greater than 16 inches diameter-at-breast height [dbh]) throughout the 4FRI landscape, except: (1) as necessary to meet community protection and public safety goals within the Community Protection Management Areas identified in the Analysis of Small Diameter Wood Supply in Northern Arizona and where stakeholder agreement identifies priority areas within approved CWPPs; and (2) when best available science and stakeholder agreement (as defined in the 4FRI Charter) identify sites where ecological restoration and biodiversity objectives cannot otherwise be met – specifically wet meadows, seeps, springs, riparian areas, encroached grasslands, aspen groves or oak stands, within-stand openings, and heavily stocked stands with high basal area generated by a preponderance of large, young trees.

We recognize that there are multiple causes of ecological degradation that may not be affected by mechanical thinning and different types of burning. The exceptions articulated in the following section are intended to be part of a more comprehensive and concurrent approach to treating causes (rather than just symptoms) of ecological decline. To that end, we are asking the Forests to work collaboratively on a comprehensive restoration assessment that identifies possible management actions to stem/reverse ecological decline. We believe this restoration assessment should focus on a wider range of forest resources than just timber and fire; such as hydrology, range, recreation, and wildlife. We ask the four National Forests to initiate this assessment with the 4FRI Stakeholders, upon release of the Draft EIS for the first project area.

The intention of the exception process is to increase landscape heterogeneity and conserve biodiversity. Thus we do not support implementing any exceptions where removing the trees would conflict with existing recovery/conservation plan objectives for managing sensitive, threatened or endangered species or their habitat. We also recognize there may be additional areas and/or circumstances where large trees need to be removed to achieve restoration. These circumstances should be identified through a site-specific, agreement-based, collaborative process as described in the 4FRI Charter.

# II. OGP&LTRS Rationale: The Historical Debate Regarding Diameter Caps in the Southwest and the 4FRI's Large Tree Retention Policy

**Introduction**

Diameter caps for tree cutting have been used in forest management efforts across the West. They have been and continue to be the subject of much debate. In this section of the Large Tree Retention Strategy document, two different perspectives on diameter caps are presented. Recognizing that the 4FRI Large Tree Retention and Old Growth Protection Strategy is not meant to serve as a strict diameter cap, these perspectives are offered here to illuminate elements of the historical debate that have led to the 4FRI's formulation of the existing Large Tree Retention and Old Growth Protection Strategy.

**Arguments in Favor of Diameter Caps**

There is a generally recognized need to retain larger trees and protect old growth in southwestern ponderosa pine forest restoration. Some proponents of large tree retention have suggested that a 16" diameter cap is both ecologically and socio-politically warranted given the scarcity of mature and old growth forest cover in the region; the need to quickly re-establish lost mature and old forest structure; the necessity of retaining trees larger than 16" dbh to recruit new trees into regionally-underrepresented VSS 5, 6 and "old growth" structural stages; and the regional rarity of trees larger than 16" (approximately 96% of ponderosa pine trees in northern Arizona and New Mexico are smaller than 16-inch dbh).

Such proponents have proposed diameter caps as a means to (1) prevent large-tree logging for production-oriented, uneven-aged silvicultural goals, (2) discourage large-tree logging to pay for small-tree thinning or other activities, (3) favor small-diameter-specific industries over large-tree-dependent ones, (4) avoid population-level effects to imperiled species and wildlife that are associated with larger live and dead trees and denser canopy, (5) mitigate unforeseen large tree mortality during and following restoration treatments, (6) mitigate unknown rates of future large tree mortality resulting from re-establishing natural fire regimes and future climates, (7) mitigate under-estimates of historical tree densities owing to evidence undercounting and loss to fire, logging and decay, (8) accommodate differing reference scales, choices of reference attributes, restoration objectives and desired degrees of precision or rates of change, (9) mitigate uncertainty about future national forest policy, timber and wildlife habitat management, and (10) facilitate a restoration approach that reduces immediate crown fire threat while incrementally moving the forest toward its natural range of variability through a combination of thinning and natural fire.

Diameter limits and exception-thresholds for tree cutting are a common strategy for achieving ecological objectives in western forest landscapes. In their recommendations to Congress and the President, the Eastside Forests Scientific Society Panel proposed a 20" diameter limit for trees younger than 150 years old to protect late-successional and old-growth dry forests of eastern Oregon and Washington. They cited the ecological importance and scarcity of large and old trees and the need to retain them to replenish regionally-depleted supplies of large and old trees, snags, logs and associated wildlife

habitat. Those recommendations formed the basis for interim management direction amending nine national forest plans and establishing a 21" diameter limit in dry forests which in turn carried forward into an exception-threshold of 21" diameter in legislation proposed to restore dry forests of eastern Oregon. The Sierra Nevada Framework set forth a 20" diameter limit for tree cutting to conserve late-seral forests across national forest land in the Sierra Nevada. Larger diameter limit and exception-thresholds in these examples reflect more productive forests and larger mean diameters than in southwestern forests. Diameter limits in Region 3 forest plans restrict large tree cutting in habitat for Mexican spotted owl and northern goshawk for their viability and in "old growth"; diameter-based "vegetative structural stages" guide management of those species' habitats.

**Arguments Against Diameter Caps**

Arbitrary diameter thresholds (or "caps") may assure that trees of a certain size are retained, but they do not guarantee that short- or long-term ecological restoration goals will be achieved. In fact, diameter caps can actually prevent attainment of ecological restoration objectives because they can have unintended consequences such as interfering with the restoration of herbaceous openings and, where unnaturally dense stands of larger, post-settlement trees predominate, caps can limit fuel reduction and, therefore, undermine the agency's ability to re-establish surface fire (Abella et al. 2006, Sanchez-Meador 2009). A diameter threshold also creates a "one-size-fits-all" guideline which can lead to treatments that are inconsistent with site-based conditions.

In general caps are arbitrarily chosen to achieve socio-political objectives that do not necessarily support comprehensive ecological restoration. Contemporary diameter caps, even as an informal agreement, have become the condition that allows fuel reduction and restoration to move forward without lengthy delays due to appeals and litigation. Examples of their arbitrary application include:

- In order to test restoration treatments in the Grand Canyon, a 5-inch cap was required by environmental advocates (Fulé 2006).
- For restoration to proceed in the White Mountains, a 16-inch cap was required (Abrams and Burns 2007).
- A 12-inch cap was employed to define forest biomass appropriate for generating renewable energy (Arizona Corporation Commission, 2006).
- On the Coconino National Forest, a 16-inch cap was imposed to allow restoration projects proposed by the Grand Canyon Forest Partnership to proceed (Friederici 2003).

Further evidence that caps undermine ecological restoration goals is reflected in a recent decision on the Marshall Fuel Reduction and Forest Restoration Project (USFS 2010). The Forest Service rejected an alternative that proposed a 16-inch diameter cap because, "A 16-inch cap would prevent the restoration of natural openings and more natural spatial distribution of clumps of trees important for wildlife habitat and forest health." When administrative and legal challenges to forest thinning and restoration projects prevail it is

generally because of issues related to agency compliance with law and policy (Brown 2009)—not because there is a scientific basis for a diameter threshold.

Finally, a static diameter cap fails to account for the fact that trees grow, that restoration will occur over decades while those trees are growing, and that over time, retention of excess trees may undermine efforts to restore ecosystem resilience in the face of drier conditions associated with climate change (Glicksman 2009, Westerling et al. 2006).

**Conclusions**

Recognizing a need to move beyond the historical debate and move forward with landscape-scale restoration that is ecologically, socially, and economically viable, the 4FRI Collaborative has agreed that the 4FRI effort should implement large tree retention and old growth protection strategies that are not based on strict diameter limits, but are based upon a 16" diameter threshold that limits the cutting of trees larger than 16" to circumstances and criteria set forth in pre-defined exception categories that follow. In addition, we are committed to monitoring the outcomes of treatments that follow this guidance to determine if they achieve our ecological restoration goals. If they do not we are committed to adapting this policy to achieve better ecological outcomes.

It is our hope and expectation that this approach will balance the approaches and opinions expressed above, and will serve as a policy mechanism for supporting comprehensive ecosystem restoration while addressing stakeholders' needs for protecting old growth and large ponderosa pine trees.

## III. Exception Process for Large Post-Settlement Tree Retention

The following section outlines a problem statement, specific identifying circumstances, ecological objectives and selection criteria for instances in which large post-settlement trees may be cut to meet restoration objectives. At specific locations, large trees may need to be removed, felled, or girdled for purposes of ecological restoration and biodiversity conservation. The purpose of this section is to provide sufficient specificity to translate those exception categories—where stakeholder agreement exists to do so—into management actions and tree-marking guidelines. For eight of the nine exception categories programmatic recommendations describe the circumstances and criteria in which large post-settlement trees may need to be removed. For the "Heavily Stocked Stands with High Basal Area Generated by a Preponderance of Large Young Trees" (or "Large Young Tree") exception category, getting to a higher level of social and scientific agreement entails more complexity and challenges, so we propose the initiation of additional collaborative discussion and planning that we hope will bolster restoration efforts by increasing confidence and knowledge-sharing, maximizing agreement and minimizing disagreement.

## IV. Exceptions

### Seeps & Springs

**Suggested Tree Marking Exception Code**: "S"

**Identifiable Circumstance**

Seeps are locations where surface-emergent groundwater causes ephemeral or perennial moist soil or bedrock, where standing or running water is infrequent or absent and that exhibit vegetation and other biological diversity adapted to mesic soils.

Springs are small areas where surface-emergent groundwater causes ephemeral or perennial standing or running water, wet or moist soils and that exhibit vegetation and other biological diversity adapted to mesic soils or aquatic environments (Feth and Hem 1963).

**Problem Statement**

Seeps exhibit unique, often isolated biophysical conditions that can sustain unique, mesic-adapted biological diversity and can facilitate endemism and speciation. In the absence of frequent fires and in the presence of livestock grazing, large post-settlement trees may have established and grown in such proximity to seeps to compromise available soil moisture or light upon that afford those unique biophysical conditions.

Springs exhibit unique, often isolated biophysical conditions that can sustain unique, mesic-adapted or aquatic biological diversity and can facilitate endemism and speciation. Springs also provide water and other habitat to terrestrial wildlife. In the absence of frequent fires and in the presence of livestock grazing, large post-settlement trees may have established and grown in such proximity to springs to compromise available soil moisture (Simonin et al. 2007) or light upon that afford those unique biophysical conditions.

Removal of these trees may constitute a relatively small part of an overall seep and spring restoration effort when compared to addressing root causes of overall degradation. Thinning alone without addressing other sources of degradation is unlikely to restore seeps and springs (Thompson et al. 2002).

**Ecological Objectives**

(1) Conserve and restore the biophysical conditions in seeps and springs upon which terrestrial, mesic-adapted and aquatic native biological diversity depend.

**Criteria**

Large (>16"dbh) post-settlement ponderosa pine trees may be removed to conserve the unique biophysical attributes of seeps & springs according to these criteria:

(1) Where large trees' roots are encroaching on mesic soils associated with a seep or spring, or such trees' drip lines are overlapping or nearly overlapping a seep or spring such that its shading compromises the integrity of a spring's unique biophysical attributes, and;

(2) Where removing the trees does not conflict with existing recovery/conservation plan objectives for managing sensitive, threatened or endangered species or their habitat.

Note:
Where there is evidence of pre-settlement trees having grown in similar root and crown proximity to said seep or spring in the past, leave an equivalent number of large replacement trees.

# Riparian

**Suggested Tree Marking Exception Code:** "R"

**Identifiable Circumstance**

Riparian areas occur along ephemeral or perennial streams or are located down-gradient of seeps or springs. These areas exhibit riparian vegetation, mesic soils, and/or aquatic environments.

**Problem statement**

Riparian areas exhibit unique biophysical conditions that can sustain unique, mesic-adapted or aquatic biological diversity. Riparian areas and the streams, springs and seeps connected to them often harbor imperiled species and can be sources of endemism. Riparian areas also provide water and other habitat to terrestrial wildlife. In the absence of frequent fires and in the presence of livestock grazing, water development projects and other factors, large post-settlement trees may have established and grown within riparian areas such that they compromise available soil moisture or light that support those unique biophysical conditions. However, it is likely to be a very rare circumstance that trees of any size will need to be removed from forested riparian zones.

Cutting of any trees within riparian areas should minimize impacts by following Best Management Practices (BMPs).

Whenever possible, large trees identified for cutting should be left onsite as snags or downed logs.

Removal of these trees may constitute a relatively small part of an overall riparian area restoration effort when compared to addressing fundamental causes of overall degradation. Thinning alone without addressing other sources of degradation is unlikely to restore riparian areas.

**Ecological Objectives**

Conserve and restore the biophysical conditions in riparian habitat upon which terrestrial and aquatic native biological diversity depend.

**Criteria**

Large (>16"dbh) post-settlement ponderosa pine trees may be removed to conserve the unique biophysical attributes of riparian areas according to these criteria:

(1) Where large trees are growing (rooted) within a riparian area and compromising available soil moisture or light that support that area's unique biophysical conditions, and

(2) Where removing the trees does not conflict with existing recovery/conservation plan objectives for managing sensitive, threatened or endangered species or their habitat.

Notes:
Where there is evidence of pre-settlement trees having grown in similar root and crown proximity to said riparian in the past, leave an equivalent number of large replacement trees.

There may be additional areas and/or circumstances identified for riparian restoration through a site specific agreement-based, collaborative process as described in the 4FRI Charter.

# Wet Meadows

**Suggested Tree Marking Exception Code**: "WM"

**Identifiable Circumstance**

High-elevation streamside or spring-fed meadows occur in numerous locations throughout the Southwest. However, less than 1% of the landscape in the region is characterized as wetland (Dahl 1990), and wet meadows are just one of several wetland types that occur. Patton and Judd (1970) reported that approximately 17,700 ha of wet meadows occur on national forests in Arizona and New Mexico.

These areas may be referred to as riparian meadows, montane (or high-elevation) riparian meadows, sedge meadows, or simply as wet meadows. Wet meadows are usually located in valleys or swales, but may occasionally be found in isolated depressions, such as along the fringes of ponds and lakes with no outlets. Where wet meadows have not been excessively altered, sedges (*Carex* spp.), rushes (*Juncus* spp.), and spikerush (*Eleocharis* spp.) are common species (Patton and Judd 1970, Hendrickson and Minckley 1984, Muldavin et al. 2000). Willow (Salix) and alder (Alnus) species often occur in or adjacent to these meadows (Long 2000, 2002, Maschinski 2001, Medina and Steed 2002). High-elevation wet meadows frequently occur along a gradient that includes aquatic vegetation at the lower end and mesic meadows, dry meadows, and ponderosa pine or mixed conifer forest at the upper end. These vegetation gradients are closely associated with differences in flooding, depth to water table, and soil characteristics (Judd 1972, Castelli et al. 2000, Dwire et al. 2006). While relatively rare, wet meadows are believed to be of disproportionate value because of their use by wildlife and the range of other ecosystem services they provide. Wet meadows perform many of the same ecosystem functions associated with other wetland types, such as water quality improvement, reduction of flood peaks, and carbon sequestration.

**Problem statement**

Wet meadows are one of the most heavily altered ecosystems. They have been used extensively for grazing livestock, have become the site of many small dams and stock tanks, have had roads built through them, and have experienced other types of hydrologic alterations, most notably the lowering of their water tables due to stream downcutting, surface water diversions, or groundwater withdrawal (Neary and Medina 1996, Gage and Cooper 2008). In the presence of livestock grazing and hydrologic changes, large post-settlement trees may have established and grown within wet meadows such that they compromise available soil moisture or light creating unique biophysical conditions.

Removal of these trees may constitute a relatively small part of an overall wet meadow restoration effort when compared to addressing root causes of overall degradation. Thinning alone without addressing other sources of degradation is unlikely to restore wet meadows.

**Ecological Objectives**

Conserve and restore the biophysical conditions of wet meadows upon which terrestrial native biological diversity depend.

**Criteria**

Large (>16"dbh) post-settlement ponderosa pine trees may be removed to conserve the unique biophysical attributes of wet meadows according to these criteria:

(1) Where large trees are growing (rooted) in a wet meadow, and

(2) Where removing the trees does not conflict with existing recovery/conservation plan objectives for managing sensitive, threatened or endangered species or their habitat.

Note:
Where there is evidence of pre-settlement trees having grown in similar root and crown proximity to said wet meadows in the past, leave an equivalent number of large replacement trees.

# Encroached Grasslands

**Suggested Tree Marking Exception Code**: "EG"

**Identifiable Circumstance**

Encroached grasslands are herbaceous ecosystems that have infrequent-to-no evidence of pine trees growing prior to settlement. The two prevalent grassland categories in the 4FRI landscape are montane (includes subalpine) grasslands and Colorado Plateau (a subset of Great Basin) grasslands, with montane grasslands being most common (Finch 2004). A key indicator of grasslands is the presence of mollisol soils, which are typically deeper with higher rates of accumulation and decomposition of soil organic matter relative to soils in the surrounding landscape. Grasslands in this region evolved during the Miocene and Pliocene periods, and the dark, rich soils observed in grasslands today have taken more than 3 million years to produce. In addition to their association with mollic soils, grasslands in this region are maintained by a combination of climate, fire, wind desiccation, and to a lesser extent by animal herbivory (Finch 2004).

Typical montane grasslands in this region are characterized by Arizona fescue (Festuca arizonica) meadows on elevated plains of basaltic and sandstone residual soils. Montane grasslands are the most naturally fragmented grasslands in the region, ranging from thousands of acres in size (e.g., in the White Mountains, Baker 1983) down to only a few acres. They generally occur in small (<100 ac.) to medium-sized (100 to 1000 ac.) patches. Historic maintenance of the herbaceous condition in these grasslands is subject to some debate though appears to be primarily driven by periodic fire. The cool-season growth of Arizona fescue also plays a large role in maintenance of parks and openings by directly competing with ponderosa pine seedlings.

Identification of grasslands in this region should use a combination of the Terrestrial Ecosystem Survey, Southwest Regional GAP Analysis, Brown and Lowe Vegetation Classification (Brown and Lowe 1982; TNC GIS Layer 2006) among other existing vegetation and soils data.

This exception category will require an iterative process of collaborative mapping, field verification, and refinement. There are some debate and questions about where and how much the grassland-forest mosaic shifts over time and space. There are also debate and questions about whether some recently-burned areas are early seral forests or stable grasslands, whether or how they may be surrogates for historical grasslands, and if or how that should factor into the overall retention of forest cover. Recognizing the importance of montane grassland restoration, we encourage all parties to seek resolution to these issues on a case-by-case basis through field visits, literature review, and/or discussion.

**Problem statement**

Prior to European settlement, pine trees rarely established in grasslands because they were either outcompeted by production of cool-season grasses or killed by frequent fire (Finch 2004). In the late 1800s, unsustainable livestock grazing practices significantly reduced herbaceous cover, releasing competition pressure on pine seedlings. Coupled with the onset of fire suppression in the early 1900s, pine trees rapidly encroached and recruited into native grasslands (e.g., Allen 1984, Moore and Huffman 2004, Coop and Givnish 2007).Pine encroachment into grasslands has contributed to a significant loss of biodiversity (Stacey 1995) and wildlife habitat particularly for grassland-dependent species such as pronghorn. Plant diversity is particularly important in grassland ecosystems: grassland plots with greater specie diversity have been found to be more resistant to drought and to recover more quickly than less diverse plots (Tilman and Downing 1994); this resilience will become even more important in a warming climate. Pine tree removal, restoration of fire, and complementary reductions in livestock grazing pressure are all necessary to restore structure and function of native grasslands.

**Ecological Objectives**

(1) Enhance, maintain, and restore naturally functioning grasslands.

(2) Ensure native grassland composition, increase native species diversity, improve resilience to drought.

(3) Restore natural fire regime.

**Criteria**

Large (>16” dbh) post-settlement ponderosa pine trees may be cut and/or removed to restore the unique biophysical attributes of grasslands according to these criteria:

(1) Where existing grasslands are being encroached, and large trees are interfering with overall restoration objectives, and

(2) Where removing the trees does not conflict with existing recovery/conservation plan objectives for managing sensitive, threatened or endangered species or their habitat.

There may be additional areas and/or circumstances identified for grassland restoration through a site specific agreement-based, collaborative process as described in the 4FRI Charter.

# Aspen Forest & Woodland

**Suggested Tree Marking Exception Code:** "AF"

**Identifiable Circumstance**

Quaking aspen (*Populus tremuloides*) occurs in small patches throughout the 4FRI area. Bartos (2001) refers to three broad categories of aspen: (1) stable and regenerating (stable), (2) converting to conifers (seral), and (3) decadent and deteriorating. Almost all of the aspen within ponderosa pine of the 4FRI area occurs as seral aspen, and regenerates after disturbance. Favorable soil and moisture conditions maintain stable aspen over time.

**Problem Statement**

Aspen occurs within ponderosa pine forests, and is ecologically important due to the high concentration of biodiversity that depends on aspen for habitat (Tew 1970, DeByle 1985, Finch and Reynolds 1987, Griffis-Kyle and Beier 2003). In addition, stable aspen stands serve as an indicator of ecological integrity (Di Orio and others 2005). However, aspen is currently declining at an alarming rate (Fairweather and others 2008).

The loss of fire as a natural disturbance regime in southwestern ponderosa pine forests since European settlement has caused much of the aspen-dominated lands to succeed to conifers (Bartos 2001). Other factors contributing to gradual aspen decline over the past 140 years include reduced regeneration from browsing by livestock and introduced and native wild ungulates in the absence of natural predators like wolves (Pearson 1914, Larson 1959, Martin 1965, Jones 1975, Shepperd and Fairweather 1994, Martin 2007). More recently, aerial and ground surveys indicate more rapid decline of aspen, with 90% mortality occurring in low elevation aspen sites and over 60% mortality observed in mid-elevations. Major factors thought to be causing this rapid decline of aspen include frost events, severe drought, and a host of insects and pathogens (Fairweather and others 2008) that have served as the "final straws" for already compromised stands.

Removal of encroaching pine trees constitutes part of an overall aspen restoration effort. Thinning alone without addressing other sources of degradation, such as excessive herbivory is unlikely to successfully restore aspen forests.

Some stakeholders expressed that considerable uncertainty exists around fire regimes for aspen in ponderosa pine, and that research questions remain unanswered around the prevalence of mixed-severity fire and its ecological role as a driving force for aspen stands at the top of its elevational range, and on steep slopes within this vegetation type.

**Ecological Objectives**

(1) Conserve and restore aspen forests and woodlands within 4FRI area by restoring appropriate fire regimes and decreasing competition from ponderosa pine.

(2) Protect regeneration, saplings, and juvenile trees from browsing.

**Criteria**

Large (>16"dbh) post-settlement trees may be cut in conifer-encroached seral aspen stands according to the following criteria:

(1) Where current post-settlement ponderosa pine tree numbers are above and beyond residual targets (identified using pre-settlement conifer tree evidences), and

(2) Where fire cannot be used safely and effectively to regenerate or maintain aspen, or

(3) Where site visitation and/or data collection and analysis indicates the need for encroachment mitigation, and

(4) Where removing large trees does not conflict with existing recovery/conservation plan objectives for managing sensitive, threatened or endangered species or their habitat

Note:
There may be additional areas and/or circumstances identified for aspen restoration through a site specific agreement-based, collaborative process as described in the 4FRI Charter.

# Ponderosa Pine/Gambel Oak Forest (Pine-Oak)

**Suggested Tree Marking Code**: "P-O"

**Identifiable Circumstance**

A number of habitat types exist in the southwestern United States that could be described as pine-oak. Ponderosa pine forests are interspersed with Gambel oak trees in locations throughout the 4FRI area in a habitat association referred to as PIPO/QUGA (USFS 1997, USDI FWS 1995). Specifically, any stand within the Pinus ponderosa series where ≥10% of stand basal area consists of Gambel oak (*Quercus gambelii*) ≥13 cm (5 in) diameter at root collar (drc) is considered to be pine-oak within the 4FRI area (USDI FWS 1995). In southwestern ponderosa pine forests, Gambel oak has several growth forms distinguished by stem sizes and the density and spacing of stems within clumps. These include shrubby thickets of small stems, clumps of intermediate-sized stems, and large, mature trees that are influenced by age, disturbance history, and site conditions (Brown 1958, Kruse 1992, Rosenstock 1998, Abella and Springer 2008, Abella 2008a). Different growth forms provide important habitat for a large number of varying wildlife species (Neff and others 1979, Kruse 1992).

Gambel oak provides high quality wildlife habitat in its various growth forms, and is a desirable component of ponderosa pine forests (Neff and others 1979, Kruse 1992, Bernardos et al. 2004). Gambel oak enhances soils (Klemmedson 1987), wildlife habitat (Kruse 1992, Rosenstock 1998, USDI FWS1995, Bernardos et al. 2004), and understory community composition (Abella and Springer 2008). Large oak trees are particularly valuable since they typically provide more natural cavities and pockets of decay that allow excavation and use by cavity nesters than conifers. In addition to its important ecological role, Gambel oak has high value to humans as it is a popular fuelwood that possesses superior heat-producing qualities compared to other tree species (Wagstaff 1984).

**Problem Statement**

Although management on public lands with regard to oak has changed to better protect the species, illegal fuelwood cutting of Gambel oak and elk and livestock grazing negatively impact oak growth and regeneration (Harper et al. 1985, Clary and Tiedemann 1992, Rick Miller, 1993, unpublished report) and continues to result in the removal of rare, large diameter oak trees (Bernardos et al. 2004).

A literature review by Abella and Fule (2008) found that Gambel oak densities appear to have increased in many areas with fire exclusion, especially in the small and medium-diameter stems (<8" dbh). Chambers (2002) found that Gambel oak on the Kaibab and Coconino National Forests was distributed in an uneven-aged distribution, dominated by smaller size classes (<5 cm dbh) and few large diameter oak trees. Because of Gambel

oak's slow growth rate, there may be little opportunity for these small Gambel oak trees to attain large diameters (>85 cm) (Chambers 2002).

Pine competition with oak has been identified as an issue in slowing oak growth, particularly for older oaks (Onkonburi 1999). Onkonburi (1999) also found that for northern Arizona forests, pine thinning increased oak incremental growth more than oak thinning and prescribed fire. Fule (2005) found that oak diameter growth tended to be greater in areas where pine was thinned relative to burn only treatments and controls. Thinning of competing pine trees may promote large oaks with vigorous crowns and enhanced acorn production (Abella 2008b), and may increase oak seedling establishment (Ffolliott and Gottfried 1991).

**Ecological Objectives:**

(1) Maintain and restore all growth forms of Gambel oak, focusing on enhancing and maintaining larger, older oak trees.

(2) Restore frequent, low intensity surface fire to ponderosa pine-Gambel oak forests.

(3) Restore and maintain brushy thicket, pole and dispersed clump growth forms of Gambel oak by allowing natural self-thinning, thinning dense clumps, and/or burning.

(4) Protect Gambel oak growth forms from fuel wood cutting, damage during restoration treatments including thinning and post thinning slash burning.

**Criteria**

In pine-oak, which occurs when ≥10% of the stand basal area consists of Gambel oak >13 cm (5 in) diameter at root collar, large (>16 dbh) post-settlement ponderosa pine trees may be removed to conserve oaks according to these criteria:

*In MSO restricted habitat*:

(1) Within MSO habitat and designated critical habitat, the Recovery Plan for the Mexican spotted owl should be followed to improve key habitat components and primary biological factors, which includes Gambel oak, or

*Outside MSO restricted habitat*: where large post-settlement trees' drip lines or roots overlap with those of Gambel oak trees exhibiting drc of >12"; and

(2) Where removing the trees does not conflict with existing recovery/conservation plan objectives for managing sensitive, threatened or endangered species or their habitat.

# Within Stand Openings

**Suggested Tree Marking Exception Code**: "WSO"

**Identifiable Circumstance**

Within Stand Openings are small openings (generally 0.05 to 1.0 acres) that were occupied by grasses and wildflowers before settlement (Pearson 1942, White 1985, Covington and Sackett 1992, Sanchez-Meador et al. 2009). Pre-settlement openings can be identified by the lack of stumps, stump holes, and other evidence of pre-settlement tree occupancy (Covington et al. 1997). These openings are most pronounced on sites with heavy textured (e.g., silt-clay loam) soils (Covington and Moore 1994). Current openings include fine scaled canopy gaps. It is not necessary that desired within stand openings and groups be located in the same location that they were in before settlement (the site fidelity assumption). Trees might be retained in areas that were openings before settlement, and openings might be established in areas which had previously supported pre-settlement trees. The within stand opening criteria described here are distinct from and should not be considered as guidance relating to regeneration openings. The stakeholder group does not support the cutting of large trees to create regeneration openings.

**Problem Statement**

Within stand openings appear to have been self-perpetuating before overgrazing and fire exclusion (Pearson 1942, Sanchez-Meador et al. 2009). Fully occupied by the roots of grasses and wildflowers as well as those of neighboring groups of trees, these openings had low water and nutrient availability because of intense root competition (Kaye et al. 1999). Heavy surface fuel loads insured that tree seedlings were killed by frequent surface fires, reinforcing the competitive exclusion of tree seedlings (Fulé et al. 1997). These natural openings appear to have been very important for some species of butterflies, birds, and mammals (Waltz and Covington 2004). Often the largest post-settlement trees, typically a single tree, became established in these natural within a stand opening as soon as herbaceous vegetation was removed by overgrazing (Sanchez-Meador et al. 2009). Contemporary within stand openings or areas dominated by smaller post-settlement trees should be the starting point for restoring more natural within stand heterogeneity.

**Ecological Objectives**

(1) Conserve and restore openings within stands to provide natural spatial heterogeneity for biological diversity.

(2) Break up fuel continuity to reduce the probability of torching and crowning.

(3) Restore natural heterogeneity within stands.

(4) Promote snow-pack accumulation and retention to benefit groundwater recharge and watershed processes at small scale.

**Criteria**

Large (>16" dbh) post-settlement ponderosa pine trees may be removed to restore the unique biophysical attributes of within stand openings according to these criteria:

(1) When the presence of such trees would prevent the re-establishment of sufficient within stand openings to emulate natural vegetation patterns based on current stand conditions, pre-settlement evidences, desired future conditions, or other restoration objectives, and

(2) Where desired openings are tentatively identified as ≥0.05 acre (these openings should be established wherever possible by enlarging current within stand openings or where small diameter trees are predominant), and

(3) Where removing the trees does not conflict with existing recovery/conservation plan objectives for managing sensitive, threatened or endangered species or their habitat.

NOTE: It is not necessary that within stand openings and groups be located in the same location that they were in before settlement. That is, trees might be retained in areas that were openings before settlement, and openings might be established in areas that had previously supported pre-settlement trees.

## [2]Heavily Stocked Stands with High Basal Area Generated By a Preponderance of Large Young Trees

**Suggested Tree Marking Exception Code**: "LYT"

**Identifiable Circumstance**
In some areas irruption of post-settlement has been so robust that current stand structure is characterized by high density and basal area of large, young ponderosa pine trees. These stands or groups of stands exhibit continuous canopy promoting unnaturally severe fire effects under severe fire weather conditions. At the small scales, this circumstance applies on a case-by-case basis where the cutting of large trees is necessary to meet site-specific ecological objectives such as reducing potential for crown fire spread into communities or important habitats such as for Mexican spotted owls and/or goshawk nest stands. This circumstance applies where other exception categories, when implemented, would not alleviate the afore-mentioned severe fire effects.

**Problem Statement**
In stands where pre-settlement evidences, restoration objectives, community protection, or other social or ecological restoration objectives indicate much lower tree density and BA would be desirable, large post-settlement pines may need to be removed to achieve post-treatment conditions consistent with a desired restoration trajectory. In stands where evidences indicate that higher tree density and BA would have occurred pre-settlement, only a few large pines may need to be removed. Many of these areas would support crown fire, and thus require structural modification to reduce crown fire potential and restore understory vegetation that supports surface fire.

**Ecological Objectives**

Natural heterogeneity of forest, savannah and grasslands occurs at the landscape scale.

Natural heterogeneity exists within stands.

Canopy fuel discontinuity reduces the probability of torching and crowning and restores herbaceous fuel continuity to carry surface fire.

Natural fire (rather than silviculture) is the principle regulator of forest structure over time.

Restore groups by retaining the largest trees on the landscape to most quickly re-establish old growth structure, where appropriate to site conditions, restoration and species conservation objectives.

---

[2] The "Large Young Tree" exception was drafted, vetted with the Stakeholder Group, finalized and submitted to the USFS on July 15, 2011.

**Criteria**

Large (>16” dbh) post-settlement ponderosa pine trees may be removed to meet restoration objectives according to these criteria:

(1) When the presence of such trees contributes to continuous canopy promoting unnaturally severe mid- or larger-scale (100+ acre) fire effects under severe fire weather conditions;

(2) When the cutting of such trees is necessary to meet site-specific social or ecological objectives such as reducing potential for crown fire spread into communities or important habitats such as for Mexican spotted owls and/or goshawk nest stands;

(3) When other exception categories, if implemented, would not alleviate the afore-mentioned severe fire effects;

(4) When removing the trees does not conflict with existing recovery / conservation plan objectives for managing sensitive, threatened or endangered species or their habitat.

Note: It is not necessary that trees or groups be located in the same location that they were in before settlement. That is, trees might be retained in areas that were openings before settlement, and openings might be established in areas that had previously supported pre-settlement trees.

## V. Description of Desired Next Steps and Ongoing Collaborative Clarification of OGP&LTRS

All of the exception categories listed in this document have been clarified such that they can be operationalized "programmatically", that is, the process of mapping and selecting areas for exceptions is ready to be tested with real data in specific areas. This means that the stakeholder group considers the guidance offered for these exception categories sufficient to operationalize large tree retention/removal per these criteria across the 4FRI area. This process will require the participation of stakeholders and USFS team members to ensure that the suggested process in this document achieves the stated restoration objectives, and is not burdensome in its approach and mechanics.

[3]The "Large Young Tree" exception category listed in this document will require additional collaborative analysis and clarification. Thus far, the group has discussed an opportunity and a need to carry these discussions forward with a combination of additional site visits to representative areas, analysis of USFS stand data, and further exploration of ForestERA remote sensing data that could inform our collective sense of the distribution and extent of areas exhibiting circumstances necessitating large tree removal, and an efficient means of analyzing data and selecting areas for treatment.

Recognizing the importance of finding additional clarity and agreement for these exception categories, the group intends to pursue additional field and data-centered explorations of these exception categories in 2011, working closely with the Forest Service to ensure that additional analysis occurs in a coordinated fashion, and that additional recommendations can be operationalized in a straightforward fashion. Analysis and visitation schedules are intended to be developed by March, 2011, and completed by May 6, 2011.

[3] The "Large Young Tree" exception was drafted, vetted with the Stakeholder Group, finalized and submitted to the USFS on July 15, 2011.

## VI. References

Abella, Scott R. 2008a. Managing Gambel oak in southwestern ponderosa pine forests: the status of our knowledge. Gen. Tech. Rep. RMRS-GTR-218. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. 27pp.

Abella, Scott R. 2008b. Gambel oak growth forms: management opportunities for increasing ecosystem diversity. Res. Note RMRSRN- 37. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. 6pp.

Abella, S. R., W. W. Covington, P. Z. Fulé, L. B. Lentile, A. J. Sánchez Meador, and P. Morgan. 2007. Past, present, and future old growth in frequent-fire conifer forests of the western united states. *Ecology and Society* 12(2):16. [online] URL: http://www.ecologyandsociety.org/vol12/iss2/art16

Abella, Scott R.; Springer, Judith D. 2008. Canopy-tree influences along a soil parent material gradient in Pinus-ponderosa-Quercus gambelii forests, northern Arizona. Journal of the Torrey Botanical Society. 135:26-36.

Abrams, J. and S. Burns. 2007. Case study of a community stewardship success: The White Mountain Stewardship Contract. Flagstaff, AZ: Ecological Restoration Institute-Issues in Forest Restoration. Northern Arizona University.

Agee, J. K. 1998. Fire and pine ecosystems. In: D. M. Richardson, editor. Ecology and biogeography of *Pinus*. Cambridge University Press, Cambridge.

Allen, C. 1984. Montane grasslands in the landscape of the Jemez Mountains, New Mexico. Unpublished MS Thesis, University of Wisconsin-Madison, 195pp.

Arizona Corporation Commission. 2006. Arizona Corporation Commission, Renewable Energy Standard & Tariff. Docket #00000C-05-030, Decision #69127, November 14, 2006. In: Section R14-2-1802.A.2. Page 5.

Baker, W.L. 1983. Alpine vegetation of Wheeler Peak, New Mexico, U.S.A.: gradient analysis, classification and biogeography. Arctic and Alpine Research 15(2): 223-240.

Bartos, D.L. 2001. Landscape dynamics of aspen and conifer forests. Pages 5-14 In: Shepperd, Wayne D.; Binkley, Dan; Bartos, Dale L.; Stohlgren, Thomas J.; and Eskew, Lane G., compilers. 2001. Sustaining Aspen in Western Landscapes: Symposium Proceedings; 13–15 June 2000; Grand Junction, CO. Proceedings RMRS-P-18. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. 460pp.

Bernardos, D.A., C.L. Chambers, and M.J. Rabe. 2004. Selection of Gambel oak roosts by Southwestern myotis in ponderosa pine-dominated forests, Northern Arizona. Journal of Wildlife Management 68(3):595-601.

Brown, S.J. 2009. Issues that lead to administrative and legal challenges in NEPA. Presented at the Conference on Dry Forests & Dependent Wildlife: Yesterday, Today, and in the Future. November 3-4, 2009. Bend, Oregon. http://nw.firelearningnetwork.org/documents/workshop_summaries?page=2

Brown, D. E., and C. H. Lowe. 1982. Biotic communities of the Southwest (scale 1:1,000,000). General Technical Report RM-78, United States Forest Service, Fort Collins, Colorado. Reprinted and revised 1994 by University Utah Press, Salt Lake City.

Brown, T. C., and T. C. Daniel. 1984. Modeling forest scenic beauty: concepts and application to ponderosa pine. Research Paper RM-256, USDA Forest Service, Rocky Mountain Forest and Range Experiment Station, Fort Collins, Colorado, USA.

Bull, E. L., and J. E. Hohmann. 1994. Breeding biology of northern goshawks in northeastern Oregon. The Northern Goshawk: Ecology and Management, Studies in Avian Biology 16:103-105.

Castelli, R.M., J.C. Chambers, and R.J. Tausch. 2000. Soil-plant relations along a soil-water gradient in Great Basin riparian meadows. Wetlands 20(2):251-266.

Chambers, C.L. 2002. Final Report: status and habitat use of oaks. Arizona Game and Fish Heritage Grant I98012. 52pp.

Chambers, C. L., and J. N. Mast. 2005. Ponderosa pine snag dynamics and cavity excavation following wildfire in northern Arizona. Forest Ecology and Management 216:227-240.

Clary, W. P., and A. R. Tiedemann. 1992. Ecology and values of Gambel oak woodlands. Pages 87-95 In P. F. Ffolliott, G. J. Gottfried, D. A. Bennett, V. M. Hernandex, C. A. Ortega-Rubio, and R. H. Hamre, eds. Ecology and management of oak and associated woodlands: perspectives in the southwestern U.S. and northern Mexico. USDA Forest Service GTR RM-218.

Coop, J.D., Thomas J. Givnish. 2007. Spatial and temporal patterns of recent forest encroachment in montane grasslands of the Valles Caldera, New Mexico, USA. Journal of Biogeography 34(5):914-27.

Covington, W.W., and S.S. Sackett. 1992. Soil mineral nitrogen changes following prescribed burning in ponderosa pine. Forest Ecology and Management 54:175-191.

Covington, W.W., and Moore, M.M. 1992. Southwestern Ponderosa Forest Structure: Changes since Euro-American settlement. Journal of Forestry 92(1):39-47.

Covington, W.W., Fulé, P.Z., Moore, M.M., Hart, S.C., Kolb, T.E., Mast, J.N., Sackett, S.S. & Wagner, M.R. 1997. Restoring ecosystem health in ponderosa pine forests of the Southwest. Journal of Forestry 95:23-29.

Dahl, T.E. 1990. Wetland losses in the United States, 1780s to 1980s. U.S. Department of the

Interior, Fish and Wildlife Service, Washington, D.C. 21pp.

DeByle N.V. 1985. Wildlife and animal impacts Pages 133–152, 115–123 In: DeByle, N.V., Winokur, R.P., eds. Aspen: ecology and management in the western United States. Gen. Tech. Rep. RM-119. Fort Collins, CO: USDA, Forest Service, Rocky Mountain Forest and Range Experiment Station.

Di Orio, AP, Callas, R, Schaefer, RJ. 2005. Forty-eight year decline and fragmentation of aspen (*Populus tremuloides*) in the South Warner Mountains of California. Forest Ecology & Management 206: 307-313.

Dodd, N. L., J. S. States, and S. S. Rosenstock. 2003. Tassel-eared squirrel population, habitat condition, and dietary relationships in north-central Arizona. Journal of Wildlife Management 67:622-633.

Dwire, K.A., J.B. Kauffman, and J.E. Baham. 2006. Plant species distribution in relation to water-table depth and soil redox potential in montane riparian meadows. Wetlands 26(1): 131-146.

Fairweather, M.L., Geils, B.W., Manthei, M. 2008. Aspen decline on the Coconino National Forest. Pages 53-62 In: McWilliams, M.G., editor. Proceedings of the 55th Western International Forest Disease Work Conference, 2007 October 15-19, Sedona, Arizona. Salem, Oregon: Oregon Department of Forestry.

Fajardo, A., J. M. Graham, J. M. Goodburn, and C. E. Fiedler. 2007. Ten-year responses of ponderosa pine growth, vigor, and recruitment to restoration treatments in the Bitterroot Mountains, Montana, USA. Forest Ecology and Management 243:50-60.

Feth, J.H., and Hem, J.D. 1963. Reconnaissance of headwater springs in the Gila River drainage basin, Arizona: U.S. Geological Survey Water-Supply Paper 1619–H. 54pp.

Ffolliott, Peter F.; Gottfried, Gerald J. 1991. Natural tree regeneration after clearcutting in Arizona's ponderosa pine forests: two long-term case studies. Res. Note RM-507. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Forest and Range Experiment Station. 6pp.

Finch, Deborah M., Editor. 2004. Assessment of grassland ecosystem conditions in the Southwestern United States. Volume 1. Gen. Tech. Rep. RMRS-GTR-135-vol. 1. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. 167pp.

Finch, D. M., and R. T. Reynolds. 1987. Bird response to understory variation and conifer succession in aspen forests. Pp. 87-96 *In* Proceedings of a national symposium: issues and technology in the management of impacted wildlife (J. Emerick, S. Q. Foster, L. Hayden-Wing)

Friederici, P. 2003. The Flagstaff model. Pages 7–25 *In* P. Friederici, editor, Ecological

restoration of southwestern ponderosa pine forests. Washington, D.C.: Island Press.

Fulé, P.Z., Covington, W.W. & Moore, M.M. 1 997. Determining reference conditions for ecosystem management of southwestern ponderosa pine forests. Ecological Applications 7: 895-908.

Fulé, Peter Z.; Laughlin, Daniel C.; Covington, W. Wallace. 2005. Pine-oak forest dynamics five years after ecological restoration treatments, Arizona, USA. Forest Ecology and Management. 218:129-145.

Fule´ P.Z., W.W. Covington, M. T. Stoddard, and D. Bertolette. 2006. ―Minimal-Impact'' Restoration treatments have limited effects on forest structure and fuels at Grand Canyon, USA. Restoration Ecology 14(3):357-368.

Fulé, P. Z., J. P. Roccaforte, and W. W. Covington. 2007. Posttreatment tree mortality after forest ecological restoration, Arizona, United States. Environmental Management 40:623-634.

Gage, E. and D.J. Cooper. 2008. Historic range of variation assessment for wetland and riparian ecosystems, US Forest Service Region 2. USDA Forest Service, Region 2, Golden, CO.

Glicksman, R.L. 2009. Ecosystem resilience to disruptions linked to global climate change: An adaptive approach to federal land management. *Nebraska Law Review* 87:833-892.

Griffis-Kyle, KL, and P. Beier. 2003. Small isolated aspen stands enrich bird communities in southwestern ponderosa pine forests. Biological Conservation 110:375-385.

Harmon, M. E., W. K. Ferrell, and J. F. Franklin. 1990. Effects on carbon storage of conversion of old-growth forests to young forests. Science 247:699-702.

Harper, K. T., F. J. Wagstaff, and L. M. Kunzler. 1985. Biology and management of the Gambel oak vegetative type: a literature review. USDA Forest Service General Technical Report INT-179. Intermountain Research Station. Ogden, Utah, USA.

Hendrickson, D. A. and W. L. Minckley. 1984. Ciénegas – vanishing climax communities of the American Southwest. Desert Plants 6:131-175.

Hodgson, J., J. W. Monarch, A. Smith, O. Thorne, II, and J. Todd, eds). Thorne Ecological Institute, Boulder, CO.

Hood, S. M. 2010. Mitigating old tree mortality in long-unburned, fire dependent forests: a synthesis. General Technical Report RMRS-GTR-238, USDA Forest Service, Rocky Mountain Research Station, Fort Collins, Colorado, USA.

Humes, M. L., J. P. Hayes, and M. W. Collopy. 1999. Bat activity in thinned, unthinned, and old-growth forests in western Oregon. The Journal of Wildlife Management 63:553-561.

Jones, J. R. 1975. Regeneration on an aspen clearcut in Arizona. U.S. Forest Service Research Note RM-285, Fort Collins, Colorado, USA.

Judd, B.I. 1972. Vegetation zones around a small pond in the White Mountains of Arizona. Great Basin Naturalist 32(2):91-96.

Kaye, J.P., Hart, S.C., Cobb, R.C., Stone, J.E. 1999. Water and nutrient outflow following the ecological restoration of a ponderosa pine-bunchgrass ecosystem. Restoration Ecology 7:252-261.

Kolanoski, K. M. 2002. Genetic variation of ponderosa pine in northern Arizona: implications for restoration. Northern Arizona University, Flagstaff, Arizona, USA.

Kolb, T. E., J. K. Agee, P. Z. Fulé, N. G. McDowell, K. Pearson, A. Sala, and R. H. Waring. 2007. Perpetuating old ponderosa pine. Forest Ecology and Management 249:141-157.
Kruse, William H. 1992. Quantifying wildlife habitats within Gambel oak/forest/woodland vegetation associations in Arizona. Pages 182-186 In: Ffolliott, Peter F.; Gottfried, Gerald J.; Bennett, Duane A.; Hernandez, C., Victor Manuel; Ortega-Rubio, Alfredo; Hamre, R.H., tech. coords. Ecology and management of oaks and associated woodlands: perspectives in the southwestern United States and northern Mexico; 1992 April 27-30; Sierra Vista, AZ. Gen. Tech. Rep. RM-218. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Forest and Range Experiment Station.

Larson, M.M. 1959. Regenerating aspen by suckering in the Southwest. Rocky Mountain Forest and Range Experimental Station, Research Note 39, 2pp.

Long, J. W. 2000. Restoration of Gooseberry Creek. p. 356-358 In P. F. Ffolliot, M. B. Baker Jr., C. B. Edminster, B. Carleton, M. C. Dillon, and K. C. Mora (tech. eds.), Proceedings of land stewardship in the 21st Century: The contributions of watershed management. U.S.D.A. Forest Service Proceedings RMRS-P-13, Rocky Mountain Research Station, Fort Collins, CO, USA.

Long, J. W. 2002. Evaluating recovery of riparian wetlands on the White Mountain Apache Reservation. Ph.D. dissertation, Northern Arizona University, Flagstaff, AZ, USA.

Machinski, J. 2001. Impacts of ungulate herbivores on a rare willow at the southern edge of its range. Biological Conservation 101:119-130.

Martin, E. C. 1965. Growth and change in structure of an aspen stand after a harvest cutting. Res. Note RM-45. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Forest and Range Experiment Station. 2pp.

Martin, T.E. 2007. Climate correlates of 20 years of trophic changes in a high-elevation riparian system. Ecology 88(2):367-380.

Mast, J. N., P. Z. Fulé, M. M. Moore, W. W. Covington, and A. E. M. Waltz. 1999. Restoration

of presettlement age structure of an Arizona ponderosa pine forest. Ecological Applications 9:228-239.

Medina, A. L. and J. E. Steed. 2002. West Fork Allotment riparian monitoring study 1993-1999. USDA Forest Service, Rocky Mountain Research Station, Final Project Report Volume I.

Miller, C. R. 1993. Oak monitoring report for summer 1993. Unpublished report prepared for Arizona Game and Fish Department.

Moore, Margaret M., D.W. Huffman. 2004. Tree Encroachment on meadows of the North Rim, Grand Canyon National Park, Arizona, USA. Arctic, Antarctic, and Alpine Research 36 (4):474-483.

Moore, M. M., D. W. Huffman, P. Z. Fulé, W. W. Covington, and J. E. Crouse. 2004. Comparison of historical and contemporary forest structure and composition on permanent plots in southwestern ponderosa pine forests. Forest Science 50:162-176.

Muldavin, E., P. Durkin, M. Bradley, M. Stuever, and P. Mehlhop. 2000. Handbook of wetland vegetation communities of New Mexico,Volume I: Classification and community descriptions. New Mexico Natural Heritage Program, Biology Department, University of New Mexico, Albuquerque, NM, USA.

Neary, D.G. and A.L. Medina. 1996. Geomorphic response of a montane riparian habitat to interaction of ungulates, vegetation, and hydrology. Pages 143-147 in Shaw, D.W. and D.M. Finch (tech. coords.), Desired future conditions for southwestern riparian ecosystems: bringing interests and concerns together. USDA Forest Service General Technical Report RM-GTR-272. Rocky Mountain Forest and Range Experiment Station, Fort Collins, CO.

Neff, Don J.; McCulloch, Clay Y.; Brown, David E.; Lowe, Charles H.; Barstad, Janet F. 1979. Forest, range, and watershed management for enhancement of wildlife habitat in Arizona. Special report no. 7. Phoenix, AZ: Arizona Game and Fish Department. 109pp.

Onkonburi, Jeanmarie. 1999. Growth response of Gambel oak to thinning and burning: implications for ecological restoration. Flagstaff, AZ: Northern Arizona University. 129pp. Unpublished dissertation.

Patton, D.R. and B.I. Judd. 1970. The role of wet meadows as wildlife habitat in the Southwest. Journal of Range Management 23(4):272-275.

Pearson, G. A. 1914. The role of aspen in the reforestation of mountain burns in Arizona and

New Mexico. Plant World 17: 249-260.

Pearson, G.A. 1942. Herbaceous vegetation a factor in natural regeneration of ponderosa pine in the Southwest. Ecological Monographs 12: 316-338.

Quinn, R.D., and L. Wu. 2001. Quaking Aspen Reproduce From Seed After Wildfire in the Mountains of Southeastern Arizona. USDA Forest Service Proceedings RMRS-P-18.

Rosenstock, Steven S. 1998. Influence of Gambel oak on breeding birds in ponderosa pine forests of northern Arizona. Condor 100:485-492.

Sanchez-Meador, A.J., M.M. Moore, J.D. Bakker, and P.F. Parysow. 2009. 108 years of change in spatial pattern following selective harvest of a Pinus ponderosa stand in northern Arizona, USA. Journal of Vegetation Science 20:79-90.

Shepperd, W.D., Fairweather, M.L. 1994. Impact of Large Ungulates in restoration of aspen communities in a Southwestern Ponderosa Pine Ecosystem. Pages 344-347 In: Conference on Sustainable Ecosystems: Implementing and Ecological Approach to Land Management. July 12-15, 1993, Northern AZ University. GTR-RM-247. Fort Collins, CO: U.S. Department of Agriculture, Rocky Mountain Forest and Range Experiment Station.

Simonin, K. T.E. Kolb, M. Montes-Helu, and G.W. Koch. 2007. The influence of thinning on components of stand water balance in a ponderosa pine forest stand during and after extreme drought. Agricultural and Forest Meteorology 143:266–276.

Soulé, P. T., and P. A. Knapp. 2006. Radial growth rate increases in naturally occurring ponderosa pine trees: a late-20th century CO2 fertilization effect? New Phytologist 171:379-390.

Tew, R.K. 1970. Seasonal variation in the nutrient content of aspen foliage. Journal of Wildlife Management 34(2):475-478.

Thompson, Bruce C., Patricia L. Matusik-Rowan, & Kenneth G. Boykin. 2002. Prioritizing conservation potential of arid-land montane natural springs and associated riparian areas. Journal of Arid Environments 50:527–547.

U.S. Department of Agriculture (USDA), Forest Service. 1996. Coconino National Forest Plan Amendment 11. Flagstaff, AZ: USDA, Forest Service, Southwestern Region, Coconino National Forest. 44pp.

U.S. Department of Agriculture (USDA), Forest Service. 2010. Marshall Fuel Reduction and Forest Restoration Project: Decision Notice and Finding of No Significant Impact. http://a123.g.akamai.net/7/123/11558/abc123/forestservic.download.akamai.com/11558/www/nepa/65970_FSPLT2_032972.pdf.

U.S. Department of Interior (USDI), Fish and Wildlife Service. 1995. Recovery Plan for the Mexican spotted owl: Vol. I. Albuquerque, New Mexico. 172pp.

U.S. Forest Service (USFS). 1997. Plant associations of Arizona and New Mexico Volume 1: Forests. Edition 3 USFS, SW Region Habitat Typing Guides. 291pp.

U.S. Geological Survey National Gap Analysis Program. 2004. Provisional Digital Land Cover Map for the Southwestern United States. Version 1.0. RS/GIS Laboratory, College of Natural Resources, Utah State University.

Wagstaff, E J. 1984. Economic considerations in use and management of Gambel oak for fuelwood. U.S. Forest Service, Intermountain Range Experiment Station, GTR INT-165, Ogden, Utah, USA.

Waltz, A.E.M., and W.W. Covington. 2004. Ecological restoration treatments increase butterfly richness and abundance: mechanisms of response. Restoration Ecology 12:85-96.

Westerling, A.L., H. G. Hidalgo, D. R. Cayan, and T. W. Swetnam. 2006. Warming and earlier spring increase Western U.S. forest wildfire activity. Science 313:940-943.

White, A.S. 1985. Pre-settlement regeneration patterns in a southwestern ponderosa pine stand. Ecology 66:589-594.

**Appendix 1 – Reservations**

From Scott Harger, Coconino NRCD

From: Scott Harger [mailto:cannonbone@msn.com] Sent: Friday, March 04, 2011 6:57 PM To: Windy Greer Subject: Re: Old Growth Protection and Large Tree Retention Strategy Document for Stakeholders' review

Dear Windy, and LTRS Sub-Group of the LSWG:

I appreciate the accelerated effort to push this document for timely delivery to the USFS.

I like the descriptions captured here for the large tree strategy overview and rationale for the document and the 8-of-9 exception categories whose language appear to be resolved. Except for some very turgid prose in section V that can be edited, I can support this draft as a partial or preliminary version, subject to review of the 9th exception. Otherwise, I can support approval of this final draft without conditions. I would also support it if "Problem Description" were changed to "Management Issue" or "Concerns driving the Exception" or something that doesn't suggest that habitats are problems.

Scott Harger
Range Conservationist
Coconino NRCD
Flagstaff, AZ
928.527.9050

From Scott Hunt, Arizona State Forester

From: Scott Hunt [mailto:ScottHunt@azsf.gov] Sent: Friday, March 11, 2011 12:00 PM To: Windy Greer; 'Ethan Aumack'; Ed Smith Cc: Kevin Boness Subject: RE: Old Growth Protection and Large Tree Retention Strategy Document for Stakeholders' review

Thank you Ed and Ethan for the dedicated work on this strategy. The State Forestry Division agrees with reservations on this large tree retention policy. The arguments against diameter caps that you provided in the policy capture most of our reservations. We have two additional items we wish to offer for consideration:

-In the category “Seeps and Springs” under criteria: there should be an allowance for removal of large trees a considerable distance from the seep or spring to help invigorate infiltration and flow. Distance will need to be determined by the effective area that benefits the seep or spring.

-We believe a consideration needs to given for stands that may have a healthy understory of regenerated ponderosa pine with an overstory of trees that are heavily infected with dwarf mistletoe. Objectives for this type of stand may encourage and favor the vigorous, healthy understory. Removal of the larger trees that are infected would be required to meet the stand objectives.

We will look forward the opportunity to comment on the Larger Young Tree removal category when it is developed. Thanks again for all your time and effort.

Scott Hunt

# New Mexico Forest Restoration Principles

## Preamble

These principles were collaboratively developed by a team of dedicated professionals representing industry, conservation organizations, land management agencies, and independent scientists. These principles for restoration should be used as guidelines for project development and they represent the "zone of agreement" where controversy, delays, appeals, and litigation are significantly reduced. They may be appropriate for application to specific restoration projects in New Mexico. These principles were developed for use in designing and implementing projects with a primary objective of ecological restoration while promoting economic and social benefits.

## Participants

The Nature Conservancy in New Mexico
Natural Resources Conservation Service
Bureau of Land Management
Sierra Club, Rio Grande Chapter
Forest Guardians
New Mexico State Forestry Office
U.S. Forest Service
Bureau of Indian Affairs
New Mexico State Land Office
Forest Guild
Center for Biological Diversity
Restoration Solutions
Public Service of New Mexico

## Principles

1. **Collaborate**. Landscape scale assessment, and project design, analysis, implementation and monitoring should be carried out collaboratively by actively engaging a balanced and diverse group of stakeholders.

2. **Reduce the threat of unnatural crown fire.** A key restoration priority must be moving stands toward a more natural restored condition and the reduction of the risk of unnatural crown fires both within stands and across landscapes. Specific restoration strategies should vary based upon forest vegetation type, fire regime, local conditions, and local management objectives. Forests and woodlands characterized by infrequent and mixed-severity fire should be managed toward a stand structure consistent with their historical ranges of variation—including, in some cases, high-density, continuous stands. Discontinuous stand structure may be appropriate to meet community protection objectives in areas such as the wildland urban interface for these forest and woodland types.


FS-000566

3. **Prioritize and strategically target treatment areas**. Key considerations for prioritizing restoration treatment areas are: degree of unnatural crown fire risk, proximity to human developments and important watersheds, protection of old-growth forests and habitats of federally threatened, endangered, or listed sensitive species, and strategic positioning to break up landscape-scale continuity of hazardous fuels. Treatments should be done at a landscape scale to decrease forest vulnerability to unnatural stand-replacing fire. This priority-setting should take place during fire management planning, land management planning, and community wildfire protection planning.

4. **Develop site-specific reference conditions.** Site-specific historical ecological data can provide information on the natural range of variability for key forest attributes, such as tree age structure and fire regimes that furnish local "reference conditions" for restoration design. A variety of constraints, however, prevent the development of historical information on every hectare of land needing restoration. General goals should be to restore ecological integrity and function.

5. **Use low-impact techniques.** Restoration treatments should strive to use the least disruptive techniques, and balance intensity and extensiveness of treatments. In many areas, conservative initial treatments would be the minimum necessary to adequately reduce the threat of unnatural crown fire. Wildland fire use or management ignited fires may be sufficient to reestablish natural conditions in many locations. In the extensive areas where fire alone cannot safely reduce tree densities and hazardous ladder fuels, mechanical thinning of trees may be needed before the introduction of prescribed fire. Patient, effective treatments will provide more options for the future than aggressive attempts to restore 120 years of change at once. In certain areas, however, such as some urban-wildland interfaces, trade-offs with imminent crown fire risks require considerations of rapid, heavy thinning of mostly small diameter trees.

6. **Utilize existing forest structure.** Restoration efforts should incorporate and build upon valuable existing forest structures, such as large trees, and groups of trees of any size with interlocking crowns excluding aspen. These features are important for some wildlife species, such as Abert's squirrels and goshawks, and should not be removed completely just to recreate specific historical tree locations. Since evidence of long-term stability of precise tree locations is lacking, especially for piñon and juniper, the selection of "leave" trees and tree clusters in restoration treatments can be based on the contemporary spatial distribution of trees, rather than pre-1900 tree positions. Maximizing use of existing forest structure can restore historical forest structure conditions more quickly. Leaving some relatively dense within-stand patches of trees need not compromise efforts to reduce landscape-scale crown fire risk.

   The underlying successional processes of natural tree regeneration and mortality should be incorporated into restoration design. Southwestern conifer regeneration occurs in episodic, often region-wide pulses, linked to wet-warm climate conditions and reduced fire occurrence. Periods with major regeneration pulses in the Southwest occurred in the 1910s–1920 and in 1978–1998. Some of this regeneration would have survived under natural conditions. Restoration efforts should retain a proportion of these cohorts.

7. **Restore ecosystem composition.** Missing or diminished compositional elements, such as herbaceous understories, or extirpated species also require restoration attention. The forest understory, including shrubs, grasses, forbs, snags, and down logs, is an important ecosystem

component that directly affects tree regeneration patterns, fire behavior, watershed functioning, wildlife habitat, and overall patterns of biodiversity. Similarly, soil organisms, such as mycorrhizal fungi, are vital elements that can influence community composition and dynamics. A robust understory provides a restraint on tree regeneration and is essential for carrying surface fires. The establishment and maintenance of more natural patterns of understory vegetation diversity and abundance are integral to ecological restoration.

Restoration planning should include the conservation of habitats for diminished or extirpated wildlife species. Comprehensive forest ecosystem restoration requires balancing fire risk reduction with retention of forest structures necessary for canopy dependent species.

Recovery plans and conservation plans for threatened, endangered, and sensitive species should be incorporated to the fullest extent possible in planning for comprehensive forest restoration.

8. **Protect and maintain watershed and soil integrity.** Low impact treatments will minimize sedimentation, disruption of surface runoff, and other detrimental ecosystem effects. Equipment and techniques should be managed according to soil and water conservation "best management practices" applicable to site-specific soil types, physiography and hydrological functions.

   Reconstruction, maintenance, or decommissioning of existing roads to correct for poor hydrologic alignment and drainage condition can greatly reduce soil loss and sedimentation rates. Projects should strive for no net increase in road density.

   Managing forest density and fuels to avoid uncharacteristically intense wildfire events will reduce the likelihood of catastrophic post-fire soil erosion and nutrient depletion from forested landscapes. Soil productivity should be protected and maintained by avoiding soil loss and compaction, and managing for on-site nutrient retention. Avoid repeated whole tree biomass removal from the forest to maximize nutrient retention. Whenever feasible, green foliage should be recycled by scattering on site; followed by prescribed burning to release stored nutrients.

9. **Preserve old or large trees while maintaining structural diversity and resilience.** Large and old trees, especially those established before ecosystem disruption by Euro-American settlement, are important forest components and critical to functionality of ecosystem processes. Their size and structural complexity provide critical wildlife habitat by broadly contributing crown cover, influencing understory vegetation patterns, and providing future snags. Ecological restoration should manage to ensure the continuing presence of large and old trees, both at the stand and landscape levels. This includes preserving the largest and oldest trees from cutting and crown fires, focusing treatments on excess numbers of small young trees.

   Develop "desired" forest condition objectives that favor the presence of both abundant large diameter trees and an appropriate distribution of age classes on the landscape, with a wide distribution of older trees. It is generally advisable to maintain ponderosa pines larger than 41 cm (16 inches) diameter at breast height (dbh) and other trees with old-growth morphology regardless of size (e.g. yellow-barked ponderosa pine or any species with large drooping limbs, twisted trunks or flattened tops).

   Treatments should also focus on achievement of spatial forest diversity by managing for variable densities. Overall, forest densities should be managed to maintain tree vigor and

stand resiliency to natural disturbances. Disease conditions are managed to retain some presence of native forest pathogens on the landscape, but constrained so that forest sustainability is not jeopardized. Guidelines must provide opportunities to apply differing site-specific management strategies to work towards attainment of these goals, and recognize that achievement may sometimes require more than one entry.

Stand level even-aged management may be appropriate for some objectives, including disease management, post wildfire tree regeneration, accelerating development of old growth characteristics, or for, forest types for which even-aged stands are characteristic, such as spruce or aspen. Treatments should be identified through collaboration with key stakeholders.

Some ponderosa pine forests contain extremely old trees and dead wood remnants that may be small but are important because they contain unique and rare scientific information in their growth rings. Such trees have become increasingly rare in the late 20th century, and the initial reintroduction of fire often consumes these tree-ring resources. Restoration programs should preserve them where possible.

10. **Manage to restore historic tree species composition.** Forest density levels and the presence of fire in the ecosystem are key regulators of tree species composition. Where fire suppression has allowed fire-sensitive trees like junipers or shade-tolerant white fir or spruce to become abundant in historical ponderosa pine forests, treatments should restore dominance of more fire-resistant ponderosa pines. However, fire intolerant species sometimes make up the only remaining large tree component in a stand. Retention of these large trees is important to canopy dependent wildlife species. In mixed conifer forests, landscapes should be managed for composition and structure that approximates the natural range of variability.

11. **Integrate process and structure**. Ecological sustainability requires the restoration of process as well as structure. Natural disturbance processes, including fire, insect outbreaks, and droughts, are irreplaceable shapers of the forest. In particular, fire regimes and stand structures interact and must be restored in an integrated way; mechanical thinning alone will not reestablish necessary natural disturbance regimes. At the same time, fire alone may be too imprecise or unsafe in many settings, so a combination of treatments may often be the safest and most certain restoration approach.

    The single best indicator of whether a proposed approach should be considered as “ecological restoration” is to evaluate if the treatment would help successfully restore the fire regime that is natural for that forest type. Approaches that do not restore natural fire regimes will not achieve full ecological restoration.

12. **Control and avoid using exotic species.** Seeding of exotic grasses and forbs should be prohibited as ecologically incompatible with good restoration. Once established, exotic species can be extremely difficult or impossible to remove. Seeding should be conducted with certified or weed free seeds to reduce the risk of contamination by non-native species or varieties.

    In general, it is ecologically desirable to allow native herbaceous vegetation to recover incrementally unless there is potential for serious soil erosion or the potential for establishment of non-native invasive plants. If enhancement of herbaceous vegetation is needed, especially for road closures and recovery, using locally sourced native seeds or transplanting individuals from nearby areas into treatments is ecologically desirable.

Restoration treatments should also routinely incorporate early actions to control the establishment and spread of aggressive exotics that can be expected from restoration-related site disturbance.

13. **Foster regional heterogeneity**. Biological communities vary at local, landscape, and regional scales, and so should restoration efforts. Ecological restoration should also incorporate the natural variability of disturbance regimes across heterogeneous landscapes. Heterogeneity should be fostered in planning and implementing ecological restoration and all spatial scales, including within and between stands, and across landscape and regional scales.

14. **Protect sensitive communities**. Certain ecological communities embedded within ponderosa pine or other types of forests and some riparian areas, could be adversely affected by on-site prescribed burning or mechanical thinning. Restoration efforts should protect these and other rare or sensitive habitats, which are often hotspots of biological diversity, particularly those that are declining in abundance and quality in the region.

15. **Plan for restoration using a landscape perspective that recognizes cumulative effects**. Forest restoration projects should be linked to landscape assessments that identify historical range of variation (reference condition), current condition, restoration targets, and cumulative effects of management. Ecosystems are hierarchical; changing conditions at one level arise from processes occurring at lower levels, and are constrained, in turn, by higher levels. The landscape perspective captures these complex relationships by linking resources and processes to the larger forest ecosystem. Forest restoration projects should incorporate plans for long-term maintenance of ecological processes.

16. **Manage grazing**. Grass, forbs, and shrub understories are essential to plant and animal diversity and soil stability. Robust understories are also necessary to restore natural fire regimes and to limit excessive tree seedling establishment. Where possible, defer livestock grazing after treatment until the herbaceous layer has established its current potential structure, composition, and function.

17. **Establish monitoring and research programs and implement adaptive management**. Well-designed monitoring, research, and documentation are essential to evaluate and adapt ongoing restoration efforts. Monitoring programs must be in place prior to treatment, and must evaluate responses of key ecosystem components and processes at multiple scales. Use research and monitoring results from a variety of sources to adjust and develop future restoration treatments.

    When possible, restoration projects should be set up as experiments with replicates and controls to test alternative hypotheses. The locations and prescriptions for all restoration treatments should be archived in a geographic information system, so that land managers and researchers have access to site-specific records of restoration treatments.

18. **Exercise caution and use site-specific knowledge in restoring or managing piñon-juniper ecosystems and other woodlands and savannas**. These systems are diverse and complex. Knowledge of local reference structure, composition, processes and disturbance regimes is lacking or uncertain for many piñon–juniper ecosystem types. Given the diversity, variability, and complexity of piñon–juniper systems, identification of local reference conditions is critical to the development of restoration objectives. Exercise caution and use best available science and site-specific knowledge in planning and implementing ecological restoration projects. Use the Grassland and Woodland Restoration and Management

Framework for development and implementation of specific projects (The Framework is currently under development).

Active management may be appropriate to mitigate soil erosion, community wildland fire hazard, or degraded hydrologic function in cases where historical ecological dynamics are insufficiently understood to justify ecological restoration. Piñon–juniper sites may be particularly susceptible to ecological damage from treatments, for example, soil erosion and invasion by non-native plants.

*Ecological Applications*, 12(5), 2002, pp. 1418–1433
© 2002 by the Ecological Society of America

# ECOLOGICAL RESTORATION OF SOUTHWESTERN PONDEROSA PINE ECOSYSTEMS: A BROAD PERSPECTIVE

Craig D. Allen,[1,10] Melissa Savage,[2] Donald A. Falk,[3] Kieran F. Suckling,[4] Thomas W. Swetnam,[5] Todd Schulke,[4] Peter B. Stacey,[6] Penelope Morgan,[7] Martos Hoffman,[8] and Jon T. Klingel[9]

[1]*U.S. Geological Survey, Jemez Mountains Field Station, HCR 1, Box 1, #15, Los Alamos, New Mexico 87544 USA*
[2]*Department of Geography, University of California, Los Angeles, California 90095-1524 USA*
[3]*Department of Ecology and Evolutionary Biology, University of Arizona, Tucson, Arizona 85721 USA*
[4]*Center for Biological Diversity, Tucson, Arizona 85702 USA*
[5]*Laboratory of Tree-Ring Research, University of Arizona, Tucson, Arizona 85721 USA*
[6]*Department of Biology, University of New Mexico, Albuquerque, New Mexico 87131 USA*
[7]*College of Natural Resources, University of Idaho, Moscow, Idaho 83844 USA*
[8]*Southwest Forest Alliance, Flagstaff, Arizona 86002 USA*
[9]*New Mexico Department of Game and Fish, P.O. Box 25112, Santa Fe, New Mexico 87504 USA*

*Abstract.* The purpose of this paper is to promote a broad and flexible perspective on ecological restoration of Southwestern (U.S.) ponderosa pine forests. Ponderosa pine forests in the region have been radically altered by Euro-American land uses, including livestock grazing, fire suppression, and logging. Dense thickets of young trees now abound, old-growth and biodiversity have declined, and human and ecological communities are increasingly vulnerable to destructive crown fires. A consensus has emerged that it is urgent to restore more natural conditions to these forests. Efforts to restore Southwestern forests will require extensive projects employing varying combinations of young-tree thinning and reintroduction of low-intensity fires. Treatments must be flexible enough to recognize and accommodate: high levels of natural heterogeneity; dynamic ecosystems; wildlife and other biodiversity considerations; scientific uncertainty; and the challenges of on-the-ground implementation. Ecological restoration should reset ecosystem trends toward an envelope of ''natural variability,'' including the reestablishment of natural processes. Reconstructed historic reference conditions are best used as general guides rather than rigid restoration prescriptions. In the long term, the best way to align forest conditions to track ongoing climate changes is to restore fire, which naturally correlates with current climate. Some stands need substantial structural manipulation (thinning) before fire can safely be reintroduced. In other areas, such as large wilderness and roadless areas, fire alone may suffice as the main tool of ecological restoration, recreating the natural interaction of structure and process. Impatience, overreaction to crown fire risks, extractive economics, or hubris could lead to widespread application of highly intrusive treatments that may further damage forest ecosystems. Investments in research and monitoring of restoration treatments are essential to refine restoration methods. We support the development and implementation of a diverse range of scientifically viable restoration approaches in these forests, suggest principles for ecologically sound restoration that immediately reduce crown fire risk and incrementally return natural variability and resilience to Southwestern forests, and present ecological perspectives on several forest restoration approaches.

*Key words: anthropogenic change; ecological restoration; ecosystem management; fire suppression effects; forest restoration programs; ponderosa pine forests; reference conditions; Southwestern United States, natural range of variation.*

## Introduction

The *Pinus ponderosa* (ponderosa pine) forests of the American Southwest (Arizona, New Mexico, and adjoining portions of Utah and Colorado) have experienced major changes in ecological structure, composition, and process because of recent human activities (Fig. 1). Over a century of livestock grazing, fire suppression, logging, road construction, predator control, and exotic-species introductions have altered most Southwestern ponderosa pine forests from conditions that had prevailed for thousands of years (Covington and Moore 1994, Swetnam et al. 1999). A critical change has been a dramatically increased vulnerability of these forests to large, destructive crown fires that threaten both human and ecological communities.

A general consensus has emerged that it is urgent to restore more natural conditions to these forests, but substantial debate persists about how to best achieve this goal (Nijhuis 1999, Covington 2000, Kloor 2000, Jenkins 2001). The purpose of this paper is to promote a broad and flexible perspective on ecological restoration of Southwestern ponderosa pine forests. We sup-

Manuscript received 15 June 2001; revised and accepted 29 October 2001; final version received 2 January 2002.
[10] E-mail: craig_allen@usgs.gov



FIG. 1. Ponderosa pine forests of the American Southwest. (Top) Open ponderosa pine forest representing ''typical'' pre-1900 conditions, with grassy understory and surface fire activity. (Bottom) Altered ponderosa pine stand in need of restoration, showing changes in both stand structure and species composition. The dense midstory of mixed conifer trees provides ladder fuels that favor crown fire development.

port the development and implementation of a diverse range of scientifically viable restoration approaches in these forests that address the critical issues of forest heterogeneity, scientific uncertainty, and effects on wildlife. In addition, we suggest principles for ecologically sound restoration approaches. It is not our intention to emphasize a critique of any particular model, but we do present ecological perspectives on several alternative forest restoration approaches.

## BACKGROUND

Southwestern ponderosa pine ecosystems were shaped through time by stochastic and deterministic processes, including frequent surface fires, episodic regeneration, insect infestations, and regional climate events such as droughts (Dahm and Geils 1997, Allen and Breshears 1998, Kaufmann et al. 1998, Swetnam and Betancourt 1998). These processes contributed to heterogeneous forest spatial patterns at local and land-



FIG. 2. View looking northwest at the Cerro Grande Fire on the afternoon of 10 May 2000 as it burned toward Los Alamos, New Mexico (USA). Similar large, stand-replacing fires are becoming increasingly common in Southwestern ponderosa pine forests.

scape scales (Cooper 1960, White 1985), with pattern shifts through time within a natural range of variability (Swetnam et al. 1999).

Since European settlement in the middle to late 1800s, pervasive changes have tended to homogenize ponderosa pine forest patterns in the Southwest. Large trees have decreased in number due to logging. Historic livestock grazing and fire suppression have promoted the development of unnaturally dense stands of suppressed young trees. This condition now threatens the remaining large trees through competition and by fueling increasingly extensive crown fires (Covington and Moore 1994, Covington et al. 1994) as in ponderosa pine forests of other regions (Agee 1993, Everett et al. 1997, Smith and Arno 1999). In some stands species compositions have shifted toward less fire-resistant trees such as *Abies concolor* (white fir), *Pseudotsuga menziesii* (Douglas-fir), and *Juniperus* (juniper) species. These changed conditions now affect millions of hectares of ponderosa pine in the Southwest (U.S. General Accounting Office 1999).

Alteration of stand structures and species compositions has in turn altered natural processes in Southwestern forests. Understory grasses and forbs have decreased in abundance and diversity (Covington and Moore 1994, Bogan et al. 1998), replaced by deep mats of slowly decomposing pine needles. As a result, nutrient cycling dynamics have been disrupted (White 1994) and overall biodiversity levels decreased (Allen 1998). Old-growth ponderosa pine forests have become rare (Harrington and Sackett 1992, Noss et al. 1995) and meadows have shrunk due to tree encroachment (Swetnam et al. 1999). Some vertebrate animal species, such as the Northern Goshawk (Reynolds et al. 1992, U.S. Fish and Wildlife Service 1998; but see Kennedy 1997), are thought to have declined in abundance due to habitat alterations. Hydrologic cycles have been modified in more densely forested watersheds, likely decreasing total streamflows, peak flows, and base flows (Ffolliott et al. 1989). An increase in number, size, and severity of stand-replacing fires (Dahm and Geils 1997, Swetnam and Betancourt 1998, Hardy et al. 1999) threatens both human and ecological communities (Moir and Dieterich 1988, U.S. General Accounting Office 1999). The aftermath of such fires includes short-term amplification of erosion and flooding (Agee 1993, White 1996, Robichaud et al. 2000).

Landscape scars created by total canopy destruction may persist as grasslands or shrublands for decades to centuries because ponderosa pine seed production and recruitment is erratic, and the relatively heavy, wingless seeds cannot disperse far from surviving, mature trees. For example, large portions of the 1950 A1 fire near Flagstaff, Arizona, USA, remain as grassland, and the 1953 Circle Cross Fire in the Sacramento Mountains, New Mexico, USA, contains much persistent shrubland (M. Savage, *unpublished data*). If the current trajectories of anthropogenically driven change continue, serious ecological damage to ponderosa pine ecosystems will accumulate (Covington et al. 1994, Noss et al. 1995).

These worrisome trends have long been evident to some forest scientists and ecologists (Weaver 1951, Cooper 1960). Only recently, however, has a broad scientific, social, and political consensus emerged that restoration of ecological sustainability in Southwestern ponderosa pine forests is necessary and urgent (Covington and Moore 1994, Covington et al. 1994, 1997, Suckling 1996, Nijhuis 1999). This social and political consensus has developed rapidly in response to recent major wildfire seasons, such as 2000, when $3 \times 10^6$ ha burned nationwide (Fig. 2). Although much of this burned area was in non-forested landscapes, or in high-elevation forest types that are adapted to high-intensity

FS-000574

Case No. 1:23-cv-01501-RMR Document 14-3 filed 09/29/23 USDC Colorado pg 170 of 196



fires (Morrison et al. 2000), ecologically worrisome crown fires in ponderosa pine and mixed-conifer forests were common, and are a chief focus of concern. Much of this concern also stems from the fact that urban encroachment into these pine-dominant forests is extensive and increasing.

Ecological restoration efforts in the United States have recently been proposed for millions of hectares of public lands by federal, state, and local government agencies (e.g., USDA Forest Service 2000, USDA and USDI 2000*a*, *b*, USDI 2000, Western Governors' Association et al. 2001, Marston et al. 2001, Matthews 2001). These restoration proposals generally seek to thin forests with combinations of tree harvesting and prescribed burning to increase resilience to natural disturbance events such as fires, insects, and regional drought, and thereby reduce the risk of catastrophic fire events.

Vigorous public and scientific debates have developed over the relative risks and trade-offs of different approaches to restore forests in the Southwest (Suckling 1996, Nijhuis 1999, Covington 2000, Kloor 2000, MacNeil 2000, Jenkins 2001), as in other regions (Brown 2000, Marston et al. 2001). Silvicultural approaches focused on tree harvest have been criticized based on concerns that short-term economics rather than ecological sustainability or decreasing fire hazard are the real underlying justifications of treatments. Although prescribed fire programs have been underway for several decades, the scale and intensity of these restoration efforts have been inadequate to reverse the overall trends of degradation in Southwestern pine forests. Concerns about excessive smoke and the risks of prescribed burning (highlighted by the Cerro Grande Fire of 2000) have also constrained public support for the use of fire alone as a restoration treatment.

## A Broad Restoration Perspective

In this paper we offer a broad perspective on ecological restoration of Southwestern United States ponderosa pine forests. We propose not so much a contrast from current models as an expanded view that encompasses and supports a diverse range of scientifically viable restoration approaches. This includes the current, most widely debated and applied Southwestern ponderosa pine model, which involves a relatively precise restoration of presettlement stand structures (Moore et al. 1999). There is a clear need for reference-based approaches that integrate structure, composition, and ecosystem processes. Such restoration models need to be adequately flexible to address the diverse ecological and social conditions in Southwestern forests. We believe that the practice of ponderosa pine restoration will be best served by a variety of approaches across a broad range of forest settings.

Ecological restoration aims to enhance the resilience and sustainability of forests through treatments that incrementally return the ecosystem to a state that is within an historic range of conditions, known as the "natural range of variability" (Landres et al. 1999). The Society for Ecological Restoration (Tucson, Arizona, USA) offers the following definition of "*ecologial restoration*: 'the process of assisting the recovery and management of ecological integrity. Ecological integrity includes a critical range of variability in biodiversity, ecological processes and structures, regional and historic context, and sustainable cultural practices.' "[11] Several key issues suggest a need for a broad perspective on ecological restoration of Southwestern forests: high levels of natural heterogeneity across forest landscapes; current and future conditions that may fall outside the natural range of variability; wildlife habitat and other biodiversity considerations; and our imperfect understanding of these complex systems. We focus here on ecological considerations in ponderosa pine forest restoration, acknowledging that the success of restoration programs also requires political, financial, and social support. Our intent is not to exclude such dimensions, but to clarify the scientific basis for forest restoration programs.

### *The importance of heterogeneity in time and space*

Ecological restoration requires an understanding of, and respect for, the variability of ponderosa pine ecosystems across the Southwest. These forests are created by dynamic interactions among natural processes (such as fire) and forest structure (such as tree density and canopy openings), across variable landscapes. Regeneration and disturbance patterns interact with long- and short-term climate fluctuations and human activities to influence fire frequency, intensity, size, seasonality, and severity (Baisan and Swetnam 1997, Swetnam and Betancourt 1998, Kaye and Swetnam 1999, Grissino-Mayer and Swetnam 2000). Forest patterns and processes often exhibit lagged interactions with climate fluctuations, along with substantial inertia in the face of climate change. Consequently, forests often exist in disequilibrium with current climate.

Variability in structure and process means that patterns of stand density, species composition, and disturbance regimes differ significantly across landscapes and throughout the region. Ponderosa pine grows across a 1500-m elevational gradient in many mountain ranges (e.g., Allen and Breshears 1998), with at least 21 different ponderosa pine "habitat types" recognized across diverse landscape conditions in the Southwest (Alexander and Ronco 1987). Documented pre-1900 mean fire-return intervals varied from about 4 to 36 yr in Southwestern ponderosa pine forests (Swetnam and Baisan 1996). Post-suppression species compositions have been markedly affected by increased recruitment of fire-sensitive *Pinus edulis* (piñon) and juniper species at low elevations and mixed-conifer species at higher elevation (Fig. 1). Mature tree densities (>30

[11] URL: ⟨http://www.ser.org⟩

FS-000575

Case No. 1:23-cv-01501-RMR Document 14-3 filed 09/29/23 USDC Colorado pg 171 of 196






FIG. 3. Schematic representation of the restoration concept. If the natural range of variability is seen as a multidimensional ''envelope'' of ecological conditions, then the goal of restoration is to move an altered ecosystem back toward its pre-disruption envelope (the darkest region), and to allow natural processes over time to dynamically reestablish a range of natural structural conditions.

cm [12 inches] in diameter at breast height) measured ca. 1900 AD in Southwestern pine ecosystems ranged between 19 and 126 trees/ha (8–51 trees/acre) (Woolsey 1911), whereas today densities of all live stems often exceed 2470 trees/ha (1000 trees/acre) (Allen 1998; D. Falk, *unpublished data*).

This variability in ponderosa pine forests affects management approaches, as recognized by Pearson (1950:13): ''Foresters are constantly reminded that since conditions change from one place to another, management cannot be uniform.'' Ecological restoration should recognize and retain the natural heterogeneity characteristic of presettlement forests (White and Walker 1997). Given the heterogeneity of Southwestern ponderosa pine forests, identifying general ecological reference conditions for restoration goals can be difficult, if not arbitrary.

### *Use of the natural-range-of-variability concept for restoration*

The concept of ''natural range of variability'' has some theoretical flaws and practical limitations (Landres et al. 1999, Millar and Wolfenden 1999, Swetnam et al. 1999), but nevertheless has proven useful as a framework for evaluating the current status of ecosystems relative to past conditions, and for identifying ecologically justifiable restoration goals (Kaufmann et al. 1994, Morgan et al. 1994, White and Walker 1997, Landres et al. 1999). Southwestern forests experienced some level of human influence for thousands of years, but human-caused changes in ponderosa pine after 1850 far exceeded the influence of indigenous people (Covington et al. 1994, Kaye and Swetnam 1999, Allen 2002). In particular, the cessation of the historical regime of frequent, low-intensity fires has pushed structural characteristics of many forests well outside the natural range of variability that existed over the past millennium (Swetnam et al. 1999).

Ponderosa pine restoration treatments should be designed to reestablish trends in forest processes, particularly fire, leading to natural ranges of variation in composition and structure (Landres et al. 1999, Moore et al. 1999, Stephenson 1999). If the natural range of variability is seen as an envelope of conditions, then the goal of restoration is to move an altered ecosystem toward its pre-disruption envelope, and to allow, or use, natural processes over time to dynamically reestablish diverse natural structures (Fig. 3).

In the long term, the best way to align forest conditions to track ongoing climate changes is to restore fire, which naturally correlates with current climate. Some stands need substantial structural manipulation before fire can safely be reintroduced, but in many cases fire can then do the preponderance of the work of ecological restoration, recreating the natural interaction of structure and process.

The successful reintroduction of frequent surface fire in the Gila Wilderness, New Mexico, USA, exemplifies how incremental fire treatments can achieve substantial restoration of ponderosa pine forests. Detailed quan-

titative studies of before-and-after forest densities are lacking, but qualitative observations (including repeat photographs) by knowledgeable fire managers (Webb and Henderson 1985; P. Boucher and R. D. Moody, *unpublished report* [1996] to the Gila National Forest [Silver City, New Mexico, USA]) and fire scientists (Rollins 2000; T. W. Swetnam, *personal observations*) suggest that repeated natural fire use (as many as four events since 1975 in some areas) have successfully opened up ponderosa pine stands, and helped to reestablish grassy understories. A key to the Gila's success was a sufficiently large area where smoke and threats of occasional flare-ups during the burning season (sometimes months) do not threaten urban areas. Another key to this success was that managers were patient and incremental in implementing the burning program; most of the large fires were initially allowed to burn only during the relatively cool and wet season after the start of the Southwest monsoons in July or August. Although such large, roadless areas are uncommon, the Gila's example shows that mechnical thinning is not always a prerequisite for forest restoration treatments with fire.

Restoration aims to eventually move forests back to within the natural range of variability. However, this need not necessarily be accomplished in the first treatment or tied to a particular moment in time or past forest structure. Initial treatments can be designed to markedly decrease crown fire risks at stand and landscape scales by decreasing the continuity of hazardous fuel conditions. Conservative initial treatments would be the minimum necessary to reduce vulnerability to stand-replacement fire to an acceptable level. We propose that conservative, incremental treatments involving both mechanical thinning and fire over time periods of years to decades are ecologically appropriate and advisable for many Southwestern forests.

There is a clear need to begin widespread restoration treatments now to reduce the threat of catastrophic fire. Such treatments should use a variety of prescriptions and treatments to address trade-offs and produce diverse restoration outcomes. For example, restoration back to presettlement tree densities through intensive thinnings greatly reduces risk of crown fire spread in areas of concentrated treatment (Fulé et al. 2001), but may generate more slash surface fuels initially than lighter thinnings. Large slash loads can exacerbate the short-term fire hazard unless mitigated (Graham et al. 1999), which can be expensive and/or have substantial environmental effects (e.g., machine crushing slash into the ground surface). Less intensive treatments, sufficient to reduce crown fire risk and strategically placed to interrupt continuous fuels, may be able to more quickly address a larger proportion of the regional forest. While practical and economic considerations, such as direct risk to human communities, may drive treatment strategies in some situations, long-term ecological goals should also guide treatment actions if ecological restoration is desired. Incrementally thinning ponderosa forests over a period of years using varied combinations and intensities of chainsaws and fire may effectively reduce fire risks while maintaining ecological integrity.

### *Biodiversity considerations*

Southwestern ponderosa pine forests provide habitat for at least 250 species of vertebrate animals (Patton and Severson 1989, New Mexico Department of Game and Fish 2000), as well as many plants. When restoration treatments modify the physical and biotic environment, plants and animals are affected in various ways (Rieman and Clayton 1997, Oliver et al. 1998; W. W. Covington, A. Waltz, P. Fulé and G. Verkamp, *unpublished report* to U.S. Bureau of Land Management, Arizona Strip District). Of particular concern is the potential for restoration actions to reduce the viability of metapopulations of sensitive species through habitat alteration and fragmentation (Stacey et al. 1996, U.S. Fish and Wildlife Service 1998, Holthausen et al. 1999). This includes invertebrates and soil organisms that are critical to ecosystem function.

An incremental approach to restoration provides opportunities for the adjustment of future treatments based on wildlife responses, so as not to foreclose future options. Restoration projects should strive to minimize or spatially constrain adverse impacts to rare, sensitive, and declining species. Care should be taken to ensure that adequate habitat is maintained for sensitive species during the phase between initial treatment and final restoration.

Not all wildlife habitat elements are equally vulnerable or irreplaceable. For example, large oak trees grow slowly and are especially valuable habitat for a wide array of wildlife (Rosenstock 1998). Some areas should be left untreated to serve as habitat refuges during the stress of treatments, until new landscape conditions are known to provide adequate habitat.

Native plants and animals are adapted to the naturally high levels of heterogeneity in Southwestern ponderosa pine ecosystems, and some species are dependent upon diverse habitats for their survival (e.g., Reynolds et al. 1992, U.S. Fish and Wildlife Service 1995, Dodd et al. 1998). Thus, biodiversity considerations reinforce the need to avoid creating uniform stand and landscape conditions. A diverse landscape with patches of variable tree densities, including some areas of relatively high density, should be developed to accommodate species with different habitat adaptations. Retaining some dead, deformed, and diseased trees, and some clumps of large trees with interlocking crowns, will maintain structural complexity and important food and nesting habitat (Bennetts et al. 1996, Bull et al. 1997). Such trees are important elements of genetic diversity in their own right as well (Millar and Libby 1989, Rehfeldt 1991, Ledig 1992).

Restoration activities often involve biodiversity

trade-offs, particularly in the short term and at the local scale. For example, snags and downed logs provide essential habitat for many birds and mammals (Bull et al. 1997), but these woody structures are susceptible to destruction in restoration treatments, especially from fire (Tiedemann et al. 2000). However, restoration treatments also provide opportunities to increase habitat heterogeneity and biodiversity. For example, where large snags are scarce because of past management activities, new ones will be created through fire mortality and other disturbances as forests are restored (Pearson 1950). The restoration of more diverse habitat structures and of natural processes such as surface fire and associated nutrient cycling should help many native species (cf. Johnson and Wauer 1996; W. W. Covington, A. Waltz, P. Fulé, and G. Verkamp, *unpublished report* to U.S. Bureau of Land Management, Arizona Strip District). The increased vigor and diversity of native understory plant species after restoration will provide important habitat conditions for many kinds of animals (e.g., Waltz and Covington 1999) and hopefully increase resistance to ongoing and future invasions by exotic plants (Crawford et al. 2001).

### *Scientific uncertainty and the limitations of historical reference conditions*

Ecological restoration must recognize the limits of scientific knowledge. While a large body of research exists on ponderosa pine forests, we are still limited in our understanding of ecosystem function. Historical fire frequency is often the most reliable element of our reconstructions, although it too has limitations (Swetnam et al. 1999). We know less about past distributions of fire size, severity, and spatial pattern than we do about frequency (Morgan et al. 2001). Swetnam and Baisan (1996) and Baker and Ehle (2001) discuss uncertainties and biases associated with the sampling design and data analyses of fire-scar studies.

Uncertainties in the reconstruction of forest stand composition and spatial structure result from missing evidence, such as logs and stumps removed by fire, logging, and decay (M. M. Moore, D. W. Huffman, W. W. Covington, J. E. Crouse, P. Z. Fulé, and W. H. Moir, *unpublished report* to USDA Forest Service, Rocky Mountain Station, Flagstaff, Arizona). Reconstruction of the density and location of large trees is far more reliable than of small-diameter stems and seedlings that decompose rapidly or burn even in surface fires (Stephenson 1987). Reconstructed overstory-tree densities are thus best used conservatively as minimum values for establishing quantitative restoration targets for stand density, rather than as maxima. Knowledge of other ecological conditions in the past, such as wildlife population dynamics, may be highly uncertain because available methods preclude precise reconstructions. Uncertainty will also exist because society is unlikely to invest in the development of detailed reconstructions of past stand structures and fire histories for every restoration site, suggesting the need for site-specific flexibility to develop restoration targets based upon an inferred natural range of variability in stand conditions.

A sense of urgency in reducing the threat of destructive fires should be balanced with patience in accomplishing restoration, along with major commitments to thoughtful experimentation and monitoring to ensure we learn as rapidly as possible. Restoration science is young, and it is difficult to predict the results of our actions. Application of a broad restoration perspective, implemented through a variety of alternative treatments, will be more effective than any single restoration treatment.

## Principles for Ecological Restoration of Southwestern Ponderosa Pine Forests

Here we outline 16 broad principles for restoration of Southwestern United States ponderosa pine forest ecosystems. Application of these principles will foster implementation of a diverse range of ecologically justifiable restoration projects. While focused on ponderosa pine forests, these principles also apply more generally to other forest types in the Southwest, such as some piñon–juniper and mixed-conifer forests.

1) *Reduce the threat of crown fire.*—A key restoration priority must be the rapid reduction of the widespread risk of unnatural crown fires, both within stands and across landscapes. The initial treatment on any site should be substantial enough to decrease forest vulnerability to stand-replacing fire.

2) *Prioritize and strategically target treatment areas.*—Key considerations for prioritizing restoration treatment areas are degree of crown fire risk, proximity to human developments and important watersheds, protection of old-growth forests and habitats of sensitive species, and strategic positioning to break up landscape-scale continuity of hazardous fuels (Weatherspoon and Skinner 1996, Agee et al. 2000, Finney 2001). For example, a landscape of alternating north- and south-facing ridges could have restoration treatments focused on the south-aspect sites to reduce the continuity of hazardous fuels at the landscape scale, and thereby restore more natural conditions at both site and landscape scales.

3) *Develop site-specific reference conditions.*—Site-specific historical ecological data can provide information on the natural range of variability for key forest attributes, such as tree age structure and fire regimes, that furnish *local* "reference conditions" for restoration design. A variety of constraints, however, prevent the development of historical information on every hectare of land needing restoration. General goals should be to restore ecological integrity and functioning, rather than precise stand structural conditions as they existed at a particular point of time in the past.

4) *Implement multiple conservative interventions.*—Incremental restoration through multiple treatments is a conservative approach to achieving desired changes.

Restoration treatments should strive to use the least disruptive techniques, and balance intensity and extensiveness of treatments. In many areas, conservative initial treatments would be the minimum necessary to adequately reduce the threat of unnatural crown fire. For example, a conservative strategy would be the placement of treatment areas to interrupt fuel continuities and thereby reduce overall landscape risk of extensive crown fires, despite treating only a small fraction of the landscape (Agee et al. 2000). Fires ignited by lightning or by people under carefully prescribed conditions may be sufficient to reestablish natural conditions in many locations (e.g., in the Gila Wilderness of New Mexico [USA]). In the extensive areas where fire alone cannot safely reduce tree densities and hazardous ladder fuels, mechanical thinning of trees will be needed before the introduction of prescribed fire. Patient, effective treatments will provide more options for the future than aggressive attempts to restore 120 yr of change at once. In certain areas, however, such as some urban–wildland interfaces, trade-offs with imminent crown fire risks require consideration of rapid, heavy thinning of most small-diameter trees.

5) *Utilize existing forest structure*.—Restoration efforts should incorporate and build upon valuable existing forest structures such as large trees and groups of trees of any size with interlocking crowns. These features are important for some wildlife species, such as Abert's squirrels and goshawks, and should not be removed completely just to recreate specific historical tree locations. Since evidence of long-term stability of precise tree locations is lacking, the selection of ''leave'' trees and tree clusters in restoration treatments can be based on the *contemporary* spatial distribution of trees, rather than pre-1900 tree positions. Historical forest structure conditions can be restored more quickly by maximizing use of existing forest structure. Leaving some relatively dense within-stand patches of trees need not compromise efforts to reduce landscape-scale crown fire risk.

Gus Pearson, the patriarch of ponderosa pine silviculture in the Southwest, recognized the need to be flexible and use existing stand structures. Pearson (1950:29) stated that the use of theoretical tree-density distributions as guides for silvicultural treatments ''are for application in principle rather than in letter, because the stands must be taken as found and remedies must be sought in modification rather than reconstruction.'' This is also true for ecological restoration.

6) *Restore ecosystem composition*.—Where fire suppression has allowed fire-sensitive tree species like junipers or white fir to become abundant in historical ponderosa pine forests, treatments should set a trend toward restoring dominance of the more fire-resistant ponderosa pines. However, mechanical removal of all fire-sensitive invaders is inappropriate, given the heterogeneous and dynamic nature of these forests. Restoration of fire may eventually restore locally appropriate forest tree composition and structure (Miller and Urban 2000).

Missing compositional elements, such as herbaceous understories or extirpated vertebrates and invertebrates, also require restoration attention. The forest understory, including shrubs, grasses, and forbs, is an important ecosystem component that directly affects tree regeneration patterns, fire behavior, watershed functioning, wildlife habitat, and overall patterns of biodiversity. Similarly, soil organisms are vital elements that can influence community composition and dynamics (Hole 1981). A robust understory provides a restraint on tree regeneration and is essential for carrying surface fires. The establishment and maintenance of more natural patterns of understory vegetation diversity and abundance are integral to ecological restoration. Understories should be protected from overgrazing during restoration to allow full recovery of herbaceous biodiversity and biomass, and of associated ecosystem components and processes such as pollinators and surface fires.

The implementation of restoration treatments requires special care to protect soils and watersheds (Jurgensen et al. 1997, Rieman and Clayton 1997). Minimizing mechanical disturbance of soils and avoiding the construction of new roads will minimize sedimentation, disruption of surface runoff, and other detrimental ecosystem effects (Trombulak and Frissell 2000). Minimizing ground disturbance also will reduce impacts to the numerous archeological sites found in many Southwestern forests.

7) *Retain trees of significant size or age*.—Large and old trees, especially those established before ecosystem disruption by Euro-American settlement, are rare, important, and difficult to replace. Their size and structural complexity provide critical wildlife habitat by contributing crown cover, influencing understory vegetation patterns, and providing future snags. Ecological restoration should protect the largest and oldest trees from cutting and crown fires, focusing treatments on excess numbers of small young trees. Given widespread agreement on this point, it is generally advisable to retain ponderosa trees larger than 41 cm (16 inches) dbh and all trees with old-growth morphology regardless of size (i.e., yellow bark, large drooping limbs, twisted trunks, flattened tops). Despite the heterogeneity of forest site and stand conditions in the Southwest, cutting of larger trees will seldom be ecologically warranted as ''restoration'' treatments at this time due to their relative scarcity. Following this guideline would significantly reduce hazards of stand-replacing fires in most cases and also favor the development of future old-growth forest conditions (Moir and Dieterich 1988, Harrington and Sackett 1992). Public concern about forest manipulation would also be reduced by ensuring that ''large'' trees are not being targeted.

Some ponderosa pine forests contain extremely old trees and dead wood remnants that may be small but

are important because they contain unique and rare scientific information in their growth rings (Grissino-Mayer et al. 1997). Such trees have become increasingly scarce in the late 20th century, and the initial reintroduction of fire often consumes these tree-ring resources. Restoration programs should identify, inventory, sample, and preserve them where possible.

8) *Consider demographic processes*.—The underlying processes of natural tree regeneration and mortality should be incorporated in restoration design. Southwestern conifer regeneration occurs in episodic, often region-wide pulses, linked to wet–warm climate conditions and reduced fire occurrence (Savage et al. 1996, Swetnam and Betancourt 1998, Mast et al. 1999). Periods with major regeneration pulses in the Southwest during the 20th century include the 1910s–1920s and 1978–1998 (Savage et al. 1996, Swetnam and Betancourt 1998). Some of this regeneration would have survived under natural conditions. Restoration efforts should retain a proportion of these cohorts, toward the goal of maximizing options for ecosystem resiliency.

9) *Integrate process and structure*.—Ecological sustainability requires the restoration of process as well as structure (Stephenson 1999). Natural disturbance processes, including fire, insect outbreaks, and droughts, are irreplaceable shapers of the forest. In particular, fire regimes and stand structures interact and must be restored in an integrated way; mechanical thinning alone will not reestablish necessary natural disturbance regimes. At the same time, fire alone may be too imprecise or unsafe in many settings, so a combination of treatments may often be the safest and most certain restoration approach.

Perhaps the single best indicator of whether a proposed approach should be considered as ''ecological restoration'' of a ponderosa pine forest is to evaluate whether the treatment will successfully restore surface fire as a keystone process. Approaches that do not include an explicit and long-term commitment to restore frequent surface fire fail to merit the adjective ''ecological.''

10) *Control and avoid using exotic species*.—Seeding of exotic grasses and forbs should be prohibited as ecologically incompatible with good restoration. Once established, exotic species can be extremely difficult or impossible to remove. Even seeding with native species from commercial sources risks the near certainty of exotic weed contaminants and the establishment of non-local genotypes at the expense of locally evolved and adapted genotypes. The common use of annual cereal crops such as rye and barley that typically decline to low levels within a matter of years still leaves persistently altered ecosystems through ''the ghost of competition past,'' as their initial flush of growth tends to monopolize the soil resources, reduce the success of native plants (Barclay 2000), and alter long-term successional outcomes.

If enhancement of herbaceous vegetation is needed, using locally hand-collected wild seeds or transplanting individuals from nearby areas into treatments to serve as seed sources is slower and more expensive, but ecologically safer. In general, it is ecologically desirable to avoid seeding, and to instead allow native herbaceous vegetation to recover incrementally through natural processes of dispersal and establishment after restoration treatments.

The widespread practice of seeding exotic grasses to ''rehabilitate'' watersheds after severe fires could be largely eliminated by preemptive restoration treatments that reduce fire severity and foster recovery of native herbaceous ground cover before crown fires occur. Restoration treatments should also routinely incorporate early actions to control the establishment and spread of aggressive exotics that can be expected from restoration-related site disturbance (Crawford et al. 2001). Control actions should include active detection efforts to identify infestations at an early phase, and treatments ranging from hand-pulling to the careful spot application of biodegradable herbicides.

11) *Foster regional heterogeneity*.—The Southwest is a region of complex topography, hydrology, and soils. As a result, biological communities vary at local, landscape, and regional scales, and so should restoration efforts. Ecological restoration should also incorporate the natural variability of disturbance regimes across heterogeneous landscapes. Heterogeneity should be fostered in planning and implementing ecological restoration at all spatial scales, including within and between stands, and across landscape and regional scales.

12) *Protect sensitive communities*.—Certain ecological communities embedded within ponderosa pine forests, such as some riparian areas, could be adversely affected by on-site prescribed burning or mechanical thinning. Restoration efforts should protect these and other rare or sensitive habitats, which are often hotspots of biological diversity, particularly those that are declining in abundance and quality in the region.

13) *Assess cumulative effects*.—It is important to consider and plan for the cumulative effects of restoration work, since these efforts will take place synchronously throughout large areas in the Southwest. Restoration projects will also occur within a regional context of other human actions such as timber sales, private land developments, roads, and livestock grazing. These land uses have varied impacts at all scales, and often uncertain interactions with restoration efforts must be considered cumulatively.

14) *Protect from overgrazing*.—Grass, forb, and shrub understories are essential to plant and animal diversity and soil stability. Robust understories are also necessary to restore natural fire regimes and to limit excessive pine seedling establishment (Rummell 1951, Madany and West 1983). Where possible, defer livestock grazing after initial surface fire treatment until the herbaceous layer has fully recovered (Belsky and

TABLE 1. Variables that should be considered in the development of an ecological restoration plan. Each restoration project will have a unique plan, based on locally appropriate choices for each variable, reflecting local priorities and the diversity of ponderosa pine forests in the region.

| |
|---|
| Post-treatment structure: age, size, density |
| Stem density, by size class |
| Basal area ($m^2$/ha), by size class |
| Crown cover (%) |
| Snags and down logs (no./ha, mass/ha), by size class |
| Thinning size cap (i.e., maximum-diameter tree removed) |
| Old tree protection measures (e.g., removal of basal fine fuels and ladder fuels; removal of competing understory stems) |
| Composition |
| Retention of fire-sensitive or shade-tolerant native tree species |
| Existing canopy trees (%) |
| Understory recruitment (%) |
| Control or elimination of non-native understory species |
| Spatial configuration |
| Distribution of mature trees, random to clustered |
| Reliance on presettlement cluster locations for post-treatment configuration |
| Use of existing tree clusters in post-treatment configuration |
| Retention of heterogeneous (spatially variable) structure and density at stand and landscape scales |
| Ecosystem processes and disturbances |
| Restoration of natural or prescribed fire regime |
| Projected post-treatment distribution of fire intervals (e.g., mean and range) |
| Post-treatment livestock grazing regime |
| Overall restoration plan |
| Site-specificity of treatment prescription |
| Time span over which thinning treatments are implemented |
| Number of restoration-treatment entries |
| Long-term monitoring commitment |
| Monitoring components (e.g., plants, animals, soil, water) |
| Level of detail of measurements |
| Frequency of measurements |
| Duration of measurements |
| Adaptive management loop in decision process |

Blumenthal 1997). Prevention of overgrazing must be an integral part of ponderosa pine forest restoration.

15) *Establish monitoring and research programs.*—Given the uncertainties about effects of restoration treatments, well-designed monitoring, research, and documentation programs are essential if we are to learn from, and evaluate the success or failure of, ongoing restoration efforts. Wildlife and understory plant populations can be monitored as indicators of ecological change and restoration outcomes. Monitoring programs must be put in place before treatments begin, and must evaluate responses of key ecosystem components and processes at multiple scales (Covington and Moore 1994, Covington et al. 1997). Even better, when possible, restoration projects should be set up as experiments with replicates and controls to test alternative hypotheses (Covington et al. 1997). One benefit of the perspective proposed here is that it will test the ecological effects of restoration efforts across a wide range of treatments and prior forest conditions. The locations and prescriptions for all restoration treatments should be archived in a geographic information system (GIS), so that land managers and researchers now and into the future have access to site-specific records of restoration treatments.

16) *Implement adaptive management.*—Ecological restoration is an incremental process that may take a century or two to fully achieve. It requires a long-term management commitment, especially to maintain natural fire regimes and to protect and develop old-growth stands. Restoration will be most successful where land managers learn from treatment experiences and adaptively adjust their approaches through time (Holling 1978). Extended social and fiscal support will be needed to sustain such long-term restoration programs.

Conceptually, each of the restoration principles outlined above can be thought of as describing one or more axes of variation. For example, intensity of thinning treatment, heterogeneity within the treatment area, post-treatment species composition, experimental unit size, fidelity to location of existing tree clusters, and post-thinning fire frequency constitute design variables for restoration (Table 1). Thus, the principles describe a set of key dimensions in the design of restoration treatments, and any particular project will choose a unique set of values for the variables. These principles

support implementation of a diverse range of ecological restoration projects.

## Ecological Perspectives on Several Forest Restoration Approaches

As debate over restoration of Southwestern United States forests has intensified (Njjhuis 1999, Jenkins 2001), a variety of philosophies and approaches are being presented that differ in their core perspectives and probable on-the-ground outcomes. These approaches include emphases on: (a) fire-risk reduction, (b) economics, (c) natural regulation, and (d) structure-oriented restoration. Here we provide some reflections from an ecological perspective on these varying restoration approaches.

### *Fire risk reduction*

Concerns over catastrophic crown fire impacts to human communities and ecosystems, along with the current availability of substantial funding to reduce hazardous forest fuel conditions (see the National Fire Plan [USDA and USDI 2000*a*]), have the potential to drive ecologically insensitive projects, which are not really restorations. If the primary objective of a project is solely to reduce crown fire risk (which may be an appropriate societal goal in some areas), even ''successful'' treatments may further damage forests rather than restoring them. When ecological principles are applied, however, fire risk reduction can be an essential part of ''ecological restoration'' of ponderosa pine forests (Fulé et al. 2001).

### *Economics*

Concerns exist that legitimate and desirable economic goals, such as sustaining rural economies and minimizing subsidy costs, could also lead to ecologically insensitive thinning or logging projects masquerading as forest ''restoration'' (Hanson, 2000, Jenkins 2001, National Forest Protection Alliance 2001). Projects focused on economic outcomes do not qualify as ''ecological restoration'' unless the treatments are based on ecological principles.

However, if ecological principles are used then economic utilization of forest products may enhance forest restoration. For example, restoration treatments will occur sooner and over larger areas if some costs can be recovered through the sale of wood from small-diameter stems. Restoration can be an opportunity for the re-engagement of local communities in the creation of more sustainable forest-based economies (e.g., see the Community Forest Restoration Act of 2000).

### *Natural regulation*

One perspective on Western forests believes that: (1) stand-replacing fires do not cause severe ecological damage because crown fires are natural; and (2) the forests will heal themselves best if we take a hands-off approach and allow natural processes to function with minimum interference (Wuerthner 1999).

Extensive stand-replacing fires naturally occurred in many western forest types (Agee 1993), but not in Southwestern ponderosa pine forests (Swetnam and Baisan 1996). Recent fire history studies in the Black Hills of South Dakota (USA) (Shinneman and Baker 1997) and in the Front Range of Colorado (USA) (Brown et al. 1999) suggest that ponderosa pine forests in those regions may have sustained crown fires of unknown size in the presettlement era. Although no such evidence has been reported for Southwestern ponderosa pine forests, it is possible that localized crown fires were not unknown in this forest type before 1900. Certainly, fire effects are always variable, and even modern crown fires do not have uniformly devastating effects across all burned landscapes. However, the increasingly large crown fires of recent years in ponderosa pine forests are clearly resulting in extreme hydrological, geomorphic, and ecological responses, including amplified flooding (Veenhuis 2002), accelerated soil erosion and stream channel changes (White 1996, Robichaud et al. 2000), loss of old-growth forest (e.g., the Cerro Grande Fire affected much old-growth forest, including large portions of a ~15 mile$^2$ contiguous patch where essentially all trees were killed [C. Allen, *personal observations*]), increasing abundance of invasive exotics (Crawford et al. 2001), and conversion of forests to different vegetation types (M. Savage, *unpublished data*). The current state of ecological and historical knowledge of Southwestern ponderosa pine forests provides compelling justifications to actively manage to restore more resilient and sustainable conditions (Covington and Moore 1994, Swetnam et al. 1999).

### *Presettlement structure restoration*

The most substantial scientific work to address the need for restoration of Southwestern ponderosa pine forests and to determine the ecosystem effects of treatments has been made by Covington and co-workers at the Ecological Restoration Institute of Northern Arizona University (Kaye and Hart 1998; W. W. Covington, A. Waltz, P. Fulé, and G. Verkamp, *unpublished report* to U.S. Bureau of Land Management, Arizona Strip District). Their efforts have focused on attempts to reconstruct and reestablish specific stand reference conditions that existed just prior to the date of cessation of the natural fire regime (Moore et al. 1999). The goal has been to replicate tree densities and spatial patterns as accurately as possible for sites where presettlement stand structures have been reconstructed. Conceptually, this approach takes a broad view of ''reference conditions,'' and incorporates the restoration of surface fire as a key process. However, there are some ecological issues concerning on-the-ground implementation of this approach.

The choice of a specific moment in time as the initial

restoration target—for example the date of the last widespread fire in the late 1800s (Moore et al. 1999)—is potentially problematic. Any particular moment is unique in the long-term history of an ecosystem, and forests often exist in disequilibrium with current climate to some degree (Millar and Woolfenden 1999). Moreover, an increasing body of evidence indicates that late 20th century and current climate is unprecedented on a time scale of at least 1000 yr (Mann et al. 1998, Crowley 2000).

Restoration of structural characteristics of a forest back to the date of the last widespread fire in the late 19th century implies that tree recruitment processes of the 20th century were entirely unnatural. In fact, post-settlement tree regeneration pulses would have contributed important structural elements to contemporary forests, even if tree-thinning surface fires had continued. It is difficult to estimate what proportion of these cohorts, much less which individual trees, would have survived to maturity (Mast et al. 1999). It may be unwise to automatically choose a century-old date as a regional target condition for current forests, as the replication of plant densities and spatial arrangements that existed at any particular date in the past may compromise ecosystem resilience in future decades and centuries. For example, this structure-oriented approach can result in the aggressive removal of too many trees during the initial entry, which may seriously constrain ecosystem response and management options. Given their relatively slow growth rates, existing trees represent a form of biological capital that should be conserved. Multiple, incremental treatments, using combinations of fire and thinning, may be more conservative and ecologically justifiable than the immediate restoration of a particular structural element, such as the ca. 1880 spatial distribution of overstory tree stems.

Given the great heterogeneity of Southwestern ponderosa pine forests, local data on fire history and presettlement stand structures are required to implement this precise structural restoration approach. Collecting such data is expensive and requires the persistence of presettlement forest ''evidences'' (Fulé et al. 1997), which have been lost in some locations due to logging, harvesting of fuelwood, fire, or decay. As a result, it is not practical, cost effective, or in some cases even possible to reconstruct detailed structural reference conditions for every restoration project area. Moreover, some important data (such as density and spatial distribution of small trees) cannot be reconstructed from remnant historical evidence.

A structure-oriented approach to forest restoration is being proposed for wide implementation in the Southwest because of its methodological clarity, grounding in quantifiable conditions, and scientific and political support (Covington et al. 1997, Moore et al. 1999, Jenkins 2001). We consider historic structure to be one ecologically valid reference criterion for forest restoration. There are, however, theoretical and practical concerns over regional application of a structure-oriented approach (see Morgan et al. [1994], Kaufmann et al. [1994], Landres et al. [1999], Wagner et al. [2000], and Southwest Forest Alliance [2001] for reviews and discussions). We contend that a broader conceptual basis, as outlined in this paper, provides a more comprehensive framework, and one that reflects the diverse ecological conditions that exist in Southwestern forests. We agree with Covington (2000:136) that there is no '''one size fits all' approach to restoring the ecological integrity of ponderosa pine forests.'' A diversity of restoration approaches should be applied in the Southwest.

## Conclusions

A primary goal of ecological restoration should be to enhance resilience and sustainability of ecosystems. Incremental adjustment of ecosystems back within an envelope of natural range of variability should achieve this goal (Covington and Moore 1994, Holling and Meffe 1996, Stephenson 1999). A successful restoration is one that sets ecological trends in the right direction. In Southwestern ponderosa pine ecosystems this means reducing tree density and ladder fuels along with associated crown fire risk, protecting large trees, restoring surface fires, and increasing herbaceous ground cover and overall biodiversity levels. A conservative restoration program would incorporate natural variability by avoiding uniform treatments across extensive areas. Spatial heterogeneity is critical to forest biodiversity. Existing forest structures, such as tree groups and large trees, should not be removed simply to recreate historical tree spatial patterns. While historical reference conditions are useful for identifying the types, magnitudes, and causes of ecosystem change, such reconstructions are best used as general guides rather than as precise and rigid prescriptions (Landres et al. 1999).

Theories of restoration ecology and the practice of ecological restoration are evolving rapidly. We propose not so much a departure from current models as a broader framework that encompasses a diversity of approaches. Restoration science cannot proceed without empirical tests and experimentation across a broad range of conditions, and restoration practice needs to incorporate new insights derived from the scientific and practical creativity of many individuals and institutions. We need steady progress in restoration science in order to sustain the social, political, and financial support required for an effective regional restoration program. Some restoration experiences, however, will probably prove humbling, as our knowledge and methods will always be imperfect.

Risks and trade-offs are inherent in wildland management. For example, a controversial trade-off involves consideration of merchantable timber harvest as part of restoration. Commercial activities can help fund restoration of less hazardous forest fuel conditions

Case No. 1:23-cv-01501-RMR Document 14-3 filed 09/29/23 USDC Colorado pg 179 of 196



more quickly, but raise the risk of extractive economic imperatives dominating decision making about ''restoration'' activities.

We need to begin large-scale restoration of ponderosa pine ecosystems now. The present vulnerability of these forest ecosystems requires that we temper our need for more complete information with an urgency created by the current risk of crown fires. Even restoration failures at this point can provide information useful in refining future work, as long as we simultaneously invest in research and monitoring. At the same time, we must be cautious in our application of restoration treatments. We must manage for surprise, whether from climate variability, human influences, or the synergies among known and unknown factors. It would be prudent to incorporate buffers for uncertainty in restoration work. Impatience, extractive economics, or hubris could lead to widespread application of unduly intrusive treatments that could further damage forest ecosystems. The broad perspective outlined here supports vigorous but conservative approaches for immediately reducing crown fire risk and restoring natural variability and long-term resilience to ponderosa pine forest ecosystems in the American Southwest.

## Acknowledgments

We appreciate the efforts of colleagues at the Grand Canyon Forest Partnership and the Ecological Restoration Institute of Northern Arizona University to share their restoration experiences and perspectives, especially Pete Fulé, Wally Covington, and Brad Ack. Carl Edminster, Bill Block, Jon Keeley, Peter Landres, Dave Parsons, Phil Weatherspoon, and an anonymous reviewer provided helpful comments on earlier versions of this paper. This material is based upon work supported by the USDA Forest Service, U.S. Geological Survey, Wilburforce Foundation, Laird Norton Foundation, New Mexico Community Foundation, and the National Science Foundation under Grant number SBR-969410.

## Literature Cited

Agee, J. K. 1993. Fire ecology of Pacific Northwest forests. Island Press, Covelo, California, USA.

Agee, J. K., B. Bahro, M. A. Finney, P. N. Omi, D. B. Sapsis, C. N. Skinner, J. W. van Wagtendonk, and C. P. Weatherspoon. 2000. The use of shaded fuelbreaks in landscape fire management. Forest Ecology and Management **127**:55–66.

Alexander, R. R., and F. Ronco, Jr. 1987. Classification of the forest vegetation on the national forests of Arizona and New Mexico. USDA Forest Service Research Note **RM-469**.

Allen, C. D. 1998. A ponderosa pine natural area reveals its secrets. Pages 551–552 *in* M. J. Mac, P. A. Opler, C. E. Puckett Haecker, and P. D. Doran, editors. Status and trends of the nation's biological resources. Two volumes. U.S. Department of Interior, U.S. Geological Survey, Reston, Virginia, USA.

Allen, C. D. 2002. Lots of lightning and plenty of people: an ecological history of fire in the American Southwest. Pages 143–183 *in* T. R. Vale, editor. Western wilderness: fire, native peoples, and the natural landscape. Island Press, Covelo, California, USA.

Allen, C. D., and D. D. Breshears. 1998. Drought-induced shift of a forest/woodland ecotone: rapid landscape response to climate variation. Proceedings of the National Academy of Sciences (USA) **95**:14839–14842.

Baisan, C. H., and T. W. Swetnam. 1997. Interactions of fire regimes and land-use history in the central Rio Grande Valley. USDA Forest Service Research Paper **RM-RP-330**.

Baker, W. L., and D. Ehle. 2001. Uncertainty in surface-fire history: the case of ponderosa pine forests in the Western United States. Canadian Journal of Forest Research **31**: 1205–1226.

Barclay, A. D. 2000. Effects of seeding with Rye grass (*Lolium multiflorum*) on vegetation recovery following fire in a ponderosa pine (*Pinus ponderosa*) forest. Thesis. University of Arizona, Tucson, Arizona, USA.

Belsky, A. J., and D. M. Blumenthal. 1997. Effects of livestock grazing on stand dynamics and soils in upland forests of the Interior West. Conservation Biology **11**:315–327.

Bennetts, R. E., G. C. White, F. G. Hawksworth, and S. E. Severs. 1996. The influence of dwarf mistletoe on bird communities in Colorado ponderosa pine forests. Ecological Applications **6**:899–909.

Bogan, M. A., C. D. Allen, E. H. Muldavin, S. P. Platania, J. N. Stuart, G. H. Farley, P. Melhop, and J. Belnap. 1998. Southwest. Pages 543–592 *in* M. J. Mac, P. A. Opler, C. E. Puckett Haecker, and P. D. Doran, editors. Status and trends of the nation's biological resources. Two volumes. U.S. Department of Interior, U.S. Geological Survey, Reston, Virginia, USA.

Brown, P. M., M. R. Kaufmann, and W. D. Shepperd. 1999. Long-term, landscape patterns of past fire events in a montane ponderosa pine forest of central Colorado. Landscape Ecology **14**:513–532.

Brown, R. 2000. Thinning, fire, and forest restoration: a science-based approach for national forests of the interior Northwest. Defenders of Wildlife, Washington, D.C., USA.

Bull, E. L., C. G. Parks, and T. R. Torgersen. 1997. Trees and logs important to wildlife in the Interior Columbia River Basin. USDA Forest Service General Technical Report **PNW-GTR-391**.

Community Forest Restoration Act. 30 October 2000. Public Law 106-393, Statutes at Large **114**:1607–1628.

Cooper, C. F. 1960. Changes in vegetation, structure, and growth of southwestern pine forests since white settlement. Ecological Monographs **30**:129–164.

Covington, W. W. 2000. Helping western forests heal: the prognosis is poor for United States forest ecosystems. Nature **408**:135–136.

Covington, W. W., R. L. Everett, R. Steele, L. L. Irwin, T. A. Daer, and A. N. D. Auclair. 1994. Historical and anticipated changes in forest ecosystems of the Inland West of the United States. Journal of Sustainable Forestry **2**:13–63.

Covington, W. W., P. Z. Fulé, M. M. Moore, S. C. Hart, T. E. Kolb, J. N. Mast, S. S. Sackett, and M. R. Wagner. 1997. Restoring ecosystem health in ponderosa pine forests of the Southwest. Journal of Forestry **95**:23–29.

Covington, W. W., and M. M. Moore. 1994. Southwestern ponderosa pine forest structure: changes since Euro-American settlement. Journal of Forestry **92**:39–47.

Crawford, J. S., C.-H. A. Wahren, S. Kyle, and W. H. Moir. 2001. Responses of exotic plant species responses to fires in *Pinus ponderosa* forests in northern Arizona. Journal of Vegetation Science **12**:261–268.

Crowley, T. J. 2000. Causes of climate change over the past 1000 years. Science **289**:270–277.

Dahm, C. W., and B. W. Geils, techical editors. 1997. An assessment of forest ecosystem health in the Southwest. USDA Forest Service General Technical Report **RM-GTR-295**.

Dodd, N. L., S. S. Rosenstock, C. R. Miller, and R. E. Schweinsburg. 1998. Tassel-eared squirrel population dynamics in Arizona: index techniques and relationships to

habitat condition. Technical Report 27. Arizona Game and Fish Department, Phoenix, Arizona, USA.

Everett, R., D. Schellhaas, D. Spurbeck, P. Ohlson, D. Keenum, and T. Anderson. 1997. Structure of Northern Spotted Owl nest stands and their historical conditions on the eastern slope of the Pacific Northwest Cascades, USA. Forest Ecology and Management **94**:1–14.

Ffolliott, P. F., G. S. Gottfried, and M. B. Baker, Jr. 1989. Water yield from forest snowpack management: research findings in Arizona and New Mexico. Water Resources Research **25**:1999–2007.

Finney, M. A. 2001. Design of regular landscape fuel treatment patterns for modifying fire growth and behavior. Forest Science **47**:219–228.

Fulé, P. Z., W. W. Covington, and M. M. Moore. 1997. Determining reference conditions for ecosystem management of southwestern ponderosa pine. Ecological Applications **7**:895–908.

Fulé, P. Z., A. E. M. Waltz, W. W. Covington, and T. A. Heinlein. 2001. Measuring forest restoration effectiveness in reducing hazardous fuels. Journal of Forestry **99**(11): 24–29.

Graham, R. T., A. E. Harvey, T. B. Jain, and J. R. Tonn. 1999. The effects of thinning and similar stand treatments on fire behavior in western forests. USDA Forest Service General Technical Report **PNW-GTR-463**.

Grissino-Mayer, H. D., and T. W. Swetnam. 2000. Century-scale climate forcing of fire regimes in the American Southwest. The Holocene **10**:207–214.

Grissino-Mayer, H. D., T. W. Swetnam, and R. K. Adams. 1997. The rare old-aged conifers of El Malpais: their role in understanding climate change in the American Southwest. Pages 155–161 *in* K. Mabery, compiler. Natural history of El Malpais National Monument. Bulletin 156. New Mexico Bureau of Mines and Mineral Resources, Socorro, New Mexico, USA.

Hanson, C. 2000. Chopping down the forest won't save it. [Letter to the Editor.] New York Times, National edition, 19 May 2000, Section A: p. 27 (col. 1).

Hardy, C. C., D. L. Bunnell, J. P. Menakis, K. M. Schmidt, D. G. Long, D. G. Simmerman, and C. M. Johnston. 1999. Coarse-scale spatial data for wildland fire and fuel management. USDA Forest Service, Rocky Mountain Research Station, Fire Sciences Laboratory, Missoula, Montana, USA. [Online, URL: ⟨http://www.fs.fed.us/fire/fuelman⟩.]

Harrington, M. G., and S. S. Sackett. 1992. Past and present fire influences on southwestern ponderosa pine old growth. Pages 44–50 *in* M. R. Kaufmann, W. H. Moir and R. L. Bassett, editors. Old-growth forests in the Southwest and Rocky Mountain regions. USDA Forest Service General Technical Report **RM-213**.

Hole, F. D. 1981. Effects of animals on soil. Geoderma **25**: 75–112.

Holling, C. S. 1978. Adaptive environmental assessment and management. John Wiley and Sons, New York, New York, USA.

Holling, C. S., and G. K. Meffe. 1996. Command and control and the pathology of natural resource management. Conservation Biology **10**:328–337.

Holthausen, R. S., M. G. Raphael, F. B. Samson, D. Ebert, R. Hiebert, and K. Menasco. 1999. Population viability in ecosystem management. Pages 135–156 *in* R. C. Szaro et al., editors. Ecological sewardship–a common reference for ecosystem management. Volume II. Elsevier Science, Oxford, UK.

Jenkins, M. 2001. ''Making forests safe again won't be a walk in the park.'' High Country News, 7 May, p. 10.

Johnson, T. H., and R. H. Wauer. 1996. Avifaunal response to the 1977 La Mesa fire. Pages 70–94 *in* C. D. Allen, technical editor. Fire effects in Southwestern forests. Proceedings of the Second La Mesa Fire Symposium. USDA Forest Service General Technical Report **RM-GTR-286**.

Jurgensen, M. F., A. E. Harvey, R. T. Graham, D. S. Page-Dumroese, J. R. Tonn, M. G. Larsen, and T. B. Jain. 1997. Impacts of timber harvesting on soil organic matter, nitrogen, productivity, and health of inland Northwest forests. Forest Science **43**:234–251.

Kaufmann, M. R., R. T. Graham, D. A. Boyce, Jr., W. H. Moir, L. Perry, R. T. Reynolds, R. L. Bassett, P. Mehlhop, C. B. Edminster, W. M. Block, and P. S. Corn. 1994. An ecological basis for ecosystem management. USDA Forest Service General Technical Report **RM-246**.

Kaufmann, M. R., L. S. Huckaby, C. M. Regan, and J. Popp. 1998. Forest reference conditions for ecosystem management in the Sacramento Mountains, New Mexico. USDA Forest Service General Technical Report **RMRS-GTR-19**.

Kaye, J. P., and S. C. Hart. 1998. Ecological restoration alters nitrogen transformations in a ponderosa pine-bunchgrass ecosystem. Ecological Applications **8**:1052–1060.

Kaye, M. W., and T. W. Swetnam. 1999. An assessment of fire, climate, and Apache history in the Sacramento Mountains, New Mexico, USA. Physical Geography **20**:305–330.

Kennedy, P. L. 1997. The Northern Goshawk (*Accipter gentilis atricapillus*): Is there evidence of a population decline? Journal of Raptor Research **31**:95–106.

Kloor, K. 2000. Returning America's forests to their ''natural'' roots. Science **287**:573–575.

Landres, P., P. Morgan, and F. J. Swanson. 1999. Overview of the use of natural variability concepts in managing ecological systems. Ecological Applications. **9**:1179–1188.

Ledig, F. T. 1992. Human impacts on genetic diversity in forest ecosystems. Oikos **63**:87–108.

MacNeil, J. S. 2000. Forest fire plan kindles debate. Science **289**:1448–1449.

Madany, M. H., and N. E. West. 1983. Livestock grazing–fire regime interactions within montane forests of Zion National Park. Ecology **64**:661–667.

Mann, M. E., R. Bradley, and M. K. Hughes. 1998. Northern hemisphere temperatures during the past millennium: inferences, uncertainties, and limitations. Geophysical Research Letters **26**:759–762.

Marston, E. L. Criley, A. Brower, S. Kennedy, J. Downing, H. Nolde, C. Smith, and H. Swartz. 2001. ''Restoring the range of light'' [a series of articles]. High Country News, 27 August, pp. 1, 8–14.

Mast, J. N., P. Z. Fulé, M. M. Moore, W. W. Covington, and A. E. M. Waltz. 1999. Restoration of presettlement age structure of an Arizona ponderosa pine forest. Ecological Applications **9**:228–239.

Matthews, M. 2001. ''Back into the woods: The West goes to work cleaning up its forests.'' High Country News, 7 May, pp. 1, 8–11.

Millar, C. I., and W. J. Libby. 1989. Restoration: Disneyland or a native ecosystem? A question of genetics. Fremontia **17**:3–10.

Millar, C. I., and W. B. Woolfenden. 1999. The role of climate change in interpreting historical variability. Ecological Applications **9**:1207–1216.

Miller, C., and D. L. Urban. 2000. Modeling the effects of fire management alternatives on Sierra Nevada mixed-conifer forests. Ecological Applications **10**:85–94.

Moir, W. H., and J. H. Dieterich. 1988. Old-growth ponderosa pine from succession in pine–bunchgrass forests in Arizona and New Mexico. Natural Areas Journal **8**:17–24.

Moore, M. M., W. W. Covington, and P. Z. Fulé. 1999. Reference conditions and ecological restoration: a Southwestern ponderosa pine perspective. Ecological Applications **9**: 1266–1277.

Morgan, P., G. H. Aplet, J. B. Haufler, H. C. Humphries, M. M. Moore, and W. D. Wilson. 1994. Historical range of

Case No. 1:23-cv-01501-RMR Document 14-3 filed 09/29/23 USDC Colorado pg 181 of 196



variability: a useful tool for evaluating ecosystem change. Journal of Sustainable Forestry **2**:87–111.

Morgan, P., C. Hardy, T. W. Swetnam, M. G. Rollins, and D. G. Long. 2001. Mapping fire regimes across time and space: understanding coarse and fine-scale patterns. International Journal of Wildland Fire **10**:329–342.

Morrison, P. H., J. W. Karl, K. J. Harma, L. Swope, T. K. Allen, and P. Becwar. 2000. Assessment of summer 2000 wildfires: landscape history, current condition, and ownership. Pacific Biodiversity Institute, Winthrop, Washington, USA. [Online, URL: ⟨http://www.pacificbio.org⟩.]

National Forest Protection Alliance. 2001. Restoration and Our National Forests. [Online, URL: ⟨http://www.forestadvocate.org⟩.]

New Mexico Department of Game and Fish. 2000. Biota information system of New Mexico. Electronic database, Version January 2000. New Mexico Department of Game and Fish, Santa Fe, New Mexico, USA. [Available only on CD-ROM].

Nijhuis, M. 1999. ‘‘Flagstaff searches for its forests' future.'' High Country News, 1 March, pp. 8–12.

Noss, R. F., E. T. LaRoe, III, and J. M. Scott. 1995. Endangered ecosystems of the United States: a preliminary assessment of loss and degradation. National Biological Service Biological Report 28. U.S. Department of the Interior, Washington, D.C., USA.

Oliver, C. D., A. Osawa, and A. Camp. 1998. Forest dynamics and resulting animal and plant population changes at the stand and landscape levels. Journal of Sustainable Forestry **6**:281–312.

Patton, D. R., and K. E. Severson. 1989. WILDHARE: a wildlife habitat relationships data model for southwestern ponderosa pine. Pages 268–276 *in* A. Techle, W. W. Covington, and R. H. Hamre, technical coordinators. Multiresource management of ponderosa pine forests. USDA Forest Service General Technical Report **RM-185**.

Pearson, G. A. 1950. Management of ponderosa pine in the Southwest. USDA Forest Service, Agricultural Monograph no. 6. U.S. Government Printing Office, Washington, D.C., USA.

Rehfeldt, G. E. 1991. Models of genetic variation for *Pinus ponderosa* in the inland Northwest (U.S.A.): applications in gene resource management. Canadian Journal of Forest Research **21**:1491–1500.

Reynolds, R. T., R. T. Graham, M. H. Reiser, R. L. Bassett, P. L. Kennedy, D. A. Boyce, Jr., G. Goodwin, R. Smith, and E. L. Fisher. 1992. Management recommendations for the Northern Goshawk in the Southwestern United States. USDA Forest Service General Technical Report **RM-217**.

Rieman, B., and J. Clayton. 1997. Wildlife and native fish: issues of forest health of sensitive species. Fisheries **22**(11): 6–15.

Robichaud, P. R., J. L. Beyers, and D. G. Neary. 2000. Evaluating the effectiveness of postfire rehabilitation treatments. USDA Forest Service General Technical Report **RMRS-GTR-63**.

Rollins, M. G. 2000. Twentieth century landscape fire patterns in the Gila/Aldo Leopold Wilderness Areas, New Mexico, and Selway-Bitterroot Wilderness Area, Idaho/Montana. Dissertation. University of Arizona, Tucson, Arizona, USA.

Rosenstock, S. S. 1998. Influence of Gambel oak on breeding birds in ponderosa pine forests of northern Arizona. Condor **100**:485–492.

Rummell, R. S. 1951. Some effects of livestock grazing on ponderosa pine forest and range in central Washington. Ecology **32**:594–607.

Savage, M., P. M. Brown, and J. Feddema. 1996. The role of climate in a pine forest regeneration pulse in the southwestern United States. Ecoscience **3**:310–318.

Shinneman, D. J., and W. L. Baker. 1997. Nonequilibrium dynamics between catastrophic disturbances and old-growth forests in ponderosa pine landscapes of the Black Hills. Conservation Biology **11**:1276–1288.

Smith, H. Y., and S. F. Arno, editors. 1999. Eighty years of change in a managed ponderosa pine forest. USDA Forest Service General Technical Report **RMRS-GTR-23**.

Southwest Forest Alliance. 2001. Why the Flagstaff presettlement restoration model should not be applied to public forest lands. Southwest Forest Alliance, Flagstaff, Arizona, USA. [Online, URL: ⟨http://www.swfa.org⟩.]

Stacey, P. B., V. A. Johnson, and M. L. Taper. 1996. Migration within metapopulations: the impact upon local population dynamics. Pages 267–291 *in* I. Hanski and M. Gilpin, editors. Metapopulation biology: ecology, genetics and evolution. Academic Press, New York, New York, USA.

Stephenson, N. L. 1987. Use of tree aggregations in forest ecology and management. Environmental Management **11**: 1–5.

Stephenson, N. L. 1999. Reference conditions for giant sequoia forest restoration: structure, process, and precision. Ecological Applications **9**:1253–1265.

Suckling, K. 1996. Forests forever! A plan to restore ecological and economic integrity to the Southwest's National Forests and forest dependent communities. Southwest Forest Alliance, Flagstaff, Arizona, USA.

Swetnam, T. W., C. D. Allen, and J. L. Betancourt. 1999. Applied historical ecology: using the past to manage for the future. Ecological Applications **9**:1189–1206.

Swetnam, T. W., and C. H. Baisan. 1996. Historical fire regime patterns in the Southwestern United States since AD 1700. Pages 11–32 *in* C. D. Allen, technical editor. Fire effects in Southwestern forests. Proceedings of the Second La Mesa Fire Symposium. USDA Forest Service General Technical Report **RM-GTR-286**.

Swetnam, T. W., and J. L. Betancourt. 1998. Mesoscale disturbance and ecological response to decadal climatic variability in the American Southwest. Journal of Climate **11**: 3128–3147.

Tiedemann, A. R., J. O. Klemmedson, and E. L. Bull. 2000. Solution of forest health problems with prescribed fire: Are forest productivity and wildlife at risk? Forest Ecology and Management **127**:1–18.

Trombulak, S. C., and C. A. Frissell. 2000. Review of ecological effects of roads on terrestrial and aquatic communities. Conservation Biology **14**:18–30.

USDA Forest Service. 2000. Protecting people and sustaining resources in fire-adapted ecosystems: a cohesive strategy. USDA Forest Service, Washington, D.C., USA. [Also online, URL: ⟨http://www.fireplan.gov⟩.]

USDA and USDI [USDA Forest Service, and U.S. Department of the Interior]. 2000*a*. National fire plan: managing the impact of wildfires on communities and the environment. A report to the President in response to the wildfires of 2000. [Online, URL: ⟨http://www.fireplan.gov⟩.]

USDA and USDI [USDA Forest Service and USDI Bureau of Land Management]. 2000*b*. Interior Columbia Basin Final Environmental Impact Statement. Interior Columbia Basin Ecosystem Management Project, Boise, Idaho, USA. [Online: ⟨http//www.icbemp.gov/⟩.]

USDI [United States Department of the Interior]. 2000. Reducing the risks and consequences of catastrophic wildland fires on DOI lands. Washington, D.C.

U.S. Fish and Wildlife Service. 1995. Recovery plan for the Mexican Spotted Owl (*Strix occidentalis lucida*). U.S. Fish and Wildlife Service, Albuquerque, New Mexico, USA.

U.S. Fish and Wildlife Service. 1998. Northern goshawk status review. U.S. Fish and Wildlife Service, Portland, Oregon, USA.

U.S. General Accounting Office. 1999. Western national for-

Case No. 1:23-cv-01501-RMR Document 14-3 filed 09/29/23 USDC Colorado pg 182 of 196



ests: a cohesive strategy is needed to address catastrophic wildfire threats. GAO/RCED-99-65. U.S. Government Printing Office.

Veenhuis, J. 2002. Effects of wildfire on the hydrology of Capulin and Rito de los Frijoles Canyons, Bandelier National Monument, New Mexico, Water Resources Investigations Report. U.S. Geological Survey, Albuquerque, New Mexico, USA, *in press*.

Wagner, M. R., W. M. Block, B. W. Geils, and K. F. Wenger. 2000. Restoration ecology: A new forest management paradigm or another merit badge for foresters? Journal of Forestry **98**:22–27.

Waltz, A. F. M., and W. W. Covington. 1999. Butterfly richness and abundance increase in restored ponderosa pine ecosystem (Arizona). Ecological Restoration **17**:244–246.

Weatherspoon, C. P., and C. N. Skinner. 1996. Landscape-level strategies for forest fuel mangement. Chapter 56 *in* Sierra Nevada ecosystem project. Final report to Congress. Volume II. Assessments and scientific basis for management options. Wildland Resources Center Report number 39. Centers for Water and Wildland Resources, University of California, Davis, California, USA.

Weaver, H. 1951. Fire as an ecological factor in Southwestern ponderosa pine forests. Journal of Forestry **49**:93–98.

Webb, D. R., and R. L. Henderson. 1985. Gila Wilderness prescribed fire program. Pages 413–414 *in* J. E. Lotan, B. M. Kilgore, W. C. Fischer, and R. W. Mutch, technical coordinators. Proceedings—Symposium and Workshop on Wilderness Fire. USDA Forest Service General Technical Report **INT-182**.

Western Governors' Association, U.S. Forest Service, and U.S. Department of the Interior. 2001. A collaborative approach for reducing wildland fire risks to communities and the environment: 10-year comprehensive strategy, August 2001. [Online, URL: ⟨http://www.fireplan.gov⟩.]

White, A. S. 1985. Presettlement regeneration patterns in a southwestern ponderosa pine stand. Ecology **66**:589–594.

White, C. S. 1994. Monoterpenes: their effects on ecosystem nutrient cycling. Journal of Chemical Ecology **20**:1381–1406.

White, P. S., and J. L. Walker. 1997. Approximating nature's variation: selecting and using reference information in restoration ecology. Restoration Ecology **5**:338–349.

White, W. D. 1996. Geomorphic responses of six headwater basins fifteen years after the La Mesa fire. Pages 95–113 *in* C. D. Allen, technical editor. Fire effects in Southwestern forests: Proceedings of the Second La Mesa Fire Symposium. U.S. Forest Service General Technical Report **RM-GTR-286**.

Woolsey, T. S., Jr. 1911. Western yellow pine in Arizona and New Mexico. U.S. Forest Service Bulletin 101. U.S. Government Printing Office, Washington, D.C., USA.

Wuerthner, G. 1999. ''Friendly fire.'' Green Roots—the Newsletter of Forest Guardians, Summer 1999, no. 6, p. 5.

Landscape Ecol (2015) 30:1805–1835
DOI 10.1007/s10980-015-0218-0

REVIEW ARTICLE

# Restoring fire-prone Inland Pacific landscapes: seven core principles

**Paul F. Hessburg · Derek J. Churchill · Andrew J. Larson · Ryan D. Haugo · Carol Miller · Thomas A. Spies · Malcolm P. North · Nicholas A. Povak · R. Travis Belote · Peter H. Singleton · William L. Gaines · Robert E. Keane · Gregory H. Aplet · Scott L. Stephens · Penelope Morgan · Peter A. Bisson · Bruce E. Rieman · R. Brion Salter · Gordon H. Reeves**

Received: 17 December 2014 / Accepted: 12 May 2015 / Published online: 26 May 2015
© The Author(s) 2015. This article is published with open access at Springerlink.com

**Abstract**
*Context* More than a century of forest and fire management of Inland Pacific landscapes has transformed their successional and disturbance dynamics. Regional connectivity of many terrestrial and aquatic habitats is fragmented, flows of some ecological and physical processes have been altered in space and time, and the frequency, size and intensity of many disturbances that configure these habitats have been altered. Current efforts to address these impacts yield a small footprint in comparison to wildfires and insect outbreaks. Moreover, many current projects emphasize thinning and fuels reduction within individual forest stands, while overlooking large-scale habitat connectivity and disturbance flow issues.
*Methods* We provide a framework for landscape restoration, offering seven principles. We discuss their implication for management, and illustrate their application with examples.
*Results* Historical forests were spatially heterogeneous at multiple scales. Heterogeneity was the result of variability and interactions among native ecological

P. F. Hessburg (✉) · N. A. Povak · P. H. Singleton · R. B. Salter
Pacific Northwest Research Station, USDA-Forest Service, 1133 N. Western Ave., Wenatchee, WA 98801, USA
e-mail: phessburg@fs.fed.us

D. J. Churchill
College of the Environment, University of Washington, Seattle, WA 98195, USA

A. J. Larson
College of Forestry and Conservation, University of Montana, Missoula, MT 59812, USA

R. D. Haugo
The Nature Conservancy, 32 North 3rd Street, Suite 412, Yakima, WA 98901, USA

C. Miller
Aldo Leopold Wilderness Research Institute, Rocky Mountain Research Station, USDA-Forest Service, 790 East Beckwith Ave., Missoula, MT 59801, USA

T. A. Spies · G. H. Reeves
Pacific Northwest Research Station, USDA-Forest Service, 3200 Jefferson Way, Corvallis, OR 97331, USA

M. P. North
Pacific Southwest Research Station, USDA-Forest Service, 1731 Research Park Drive, Davis, CA 95618, USA

R. T. Belote
The Wilderness Society, 503 West Mendenhall, Bozeman, MT 59715, USA

W. L. Gaines
Washington Conservation Science Institute, 12725 Wilson Street, Leavenworth, WA 98826, USA

R. E. Keane
Rocky Mountain Research Station, USDA-Forest Service, 5775 Highway 10 West, Missoula, MT 59808, USA

patterns and processes, including successional and disturbance processes regulated by climatic and topographic drivers. Native flora and fauna were adapted to these conditions, which conferred a measure of resilience to variability in climate and recurrent contagious disturbances.

*Conclusions* To restore key characteristics of this resilience to current landscapes, planning and management are needed at ecoregion, local landscape, successional patch, and tree neighborhood scales. Restoration that works effectively across ownerships and allocations will require active thinking about landscapes as socio-ecological systems that provide services to people within the finite capacities of ecosystems. We focus attention on landscape-level prescriptions as foundational to restoration planning and execution.

**Keywords** Forest and rangeland restoration · Hierarchical organization · Large fires · Patch size distributions · Successional patches · Topographic controls

## Introduction

Land management in the Inland Pacific United States (US) faces unprecedented challenges:

- A growing human population that demands contradictory or competing ecosystem services (Krieger 2001);
- Impaired ability of some landscapes to provide these services due to past management (Millenium Ecosystem Assessment 2005);
- Increased exposure to large and often severe disturbances (Schoennagel et al. 2004; McKenzie et al. 2004; Agee and Skinner 2005; Hessburg et al. 2005; Peterson et al. 2005; Miller and Davis 2009; Miller et al. 2009; *cf.* Baker 2012; Williams and Baker 2012; Odion et al. 2014);
- New or alternative ecosystem states following large or severe disturbances (Allen et al. 2010; Odion et al. 2010);
- Decline and extinction of some native plant and animal populations, and increasing invasions by non-natives (Noss and Cooperrider 1994; Reed et al. 2003);
- High uncertainty regarding future effects of climate change (Millar et al. 2007);
- Diminished public confidence in land managers (Duncan et al. 2010; Keiter 2005; Williams and Jackson 2007).

To address these challenges, a new collaborative social contract for federal land management in the West is emerging ( Schultz et al. 2012; Butler 2013; Larson et al. 2013; Charnley et al. 2014). Established collaboratives seek to move past once crippling conflicts over natural resource management, forge social consensus around management approaches that can restore or create climate- and fire-resilient landscapes, and improve future options for people (Brown et al. 2004; Cheng and Sturtevant 2012; Charnley et al. 2014; Stephens et al. 2014). To effectively manage landscapes as resilient and adaptable social-ecological systems (Folke et al. 2005; Chapin et al. 2010), collaboratives must work from a solid scientific foundation.

In this review, we present principles from recent landscape science that are relevant to collaborative restoration, to raise the bar for land use planning and management across all ownerships. We emphasize Inland Pacific forests of Washington, Oregon, and California; however, our ideas are useful for landscapes beyond this domain, including the southwestern US and Rocky Mountain regions (Jain et al. 2008; Reynolds et al. 2013). Furthermore, we emphasize management of fire-prone forests, but recognize the importance of other physiognomic types as part of these landscapes, as well as lands intensively used by people.

G. H. Aplet
The Wilderness Society, 1660 Wynkoop St., Suite 850, Denver, CO 80202, USA

S. L. Stephens
Department of Environmental Science, Policy, and Management, University of California, 30 Mulford Hall, Berkeley, CA 94720-3114, USA

P. Morgan
Department of Forest, Rangeland, and Fire Sciences, University of Idaho, 975 Perimeter Drive MS 1133, Moscow, ID 83844, USA

P. A. Bisson
Pacific Northwest Research Station, USDA-Forest Service, 3625 93rd Ave., SW, Olympia, WA 98512, USA

B. E. Rieman
Seeley Lake, MT 59868, USA

Recent research has expanded our understanding of multi-scale heterogeneity in historical fire-prone forests. Fire-prone forests are current or historical dry, mesic, or cold interior forest types that depend on wildfires for regeneration and succession. Heterogeneity resulted from interactions among climate, vegetation, topography, and disturbances that created successional patterns and shaped disturbance regimes to which native flora and fauna are adapted at fine-, meso-, and broad-scales. It evolved dynamically and conferred a measure of resilience to shifts in climate and recurrent contagious disturbances.

## Historical context–unintended consequences

For most of the twentieth century, federal land management in the Inland Pacific emphasized wildfire suppression, domestic livestock grazing, and wood production to meet the demands of a growing society (White 1991; Langston 1995; Robbins 1999). Grounded in a utilitarian view of forests, silvicultural methods were devised to grow, harvest, and regenerate trees (Smith et al. 1997). Wildfires were viewed as threatening to people, infrastructure, and the timber supply.

Silviculture and forest management have focused on *stands* as the basic unit of organization (Puettman et al. 2012). *Stands* are defined as contiguous areas of trees with common structural, compositional, and biophysical conditions ( Helms 1988; Nyland 2002). Delineation of treatment units, 'operational stands'(sensu O'Hara and Nagel 2013), however, is shaped by added operational considerations including economic viability, road access, property boundaries, logging systems, and harvest scheduling.

These treatment units stood out in marked contrast to historical successional *patches*, which were variably-sized and shaped by the surrounding topography and prior disturbances. Even-aged management within operational stands promoted uniformity of tree conditions (e.g., size, density, species, spacing), while reducing costs of harvest, yarding, and log transportation. Uneven-aged management promoted variable size and age distributions, and often led to multistory structures dominated by shade tolerant species. Harvests of all types generally targeted high volume stands and removed large and old trees of fire tolerant species. Furthermore, prescriptions focused on tree conditions within stands and overlooked the larger scale patterns that emerged from this stand-based management.

Over time, timber harvest altered the size distributions, shapes and spatial arrangements of successional patches, while reducing numbers of large trees. Successional patches that had been historically created and maintained by disturbances (sensu Oliver and Larson 1996; O'Hara et al. 1996), often were fragmented by new patterns arising from stand management (Fig. 1; O'Hara and Nagel 2013). Resulting patterns varied by forest type and management. In cool, mesic mixed-conifer forests, where dispersed clear cuts were emphasized, successional patches were bisected by plantations, which were often smaller by two or three orders of magnitude (Franklin and Forman 1987; Belote and Aplet 2014; Hessburg et al. 1999b, 2000a). In marked contrast, in dry pine and mixed-conifer forests, elective removal of large, fire-tolerant trees and subsequent regeneration and release of shade-tolerant conifers increased the patch size and abundance of dense, multistory forest conditions (Hessburg et al. 1999b, 2000a, 2005; Keane et al. 2002, 2009; Hessburg and Agee 2003; Parsons and DeBenedetti 1979). Fire exclusion allowed these conditions to persist. In many areas, livestock grazing removed fine fuels and reduced fire frequency, further contributing to fire exclusion (Savage and Swetnam 1990; Belsky and Blumenthal 1997). Thus, the pattern observed in modern-day managed pine and mixed-conifer landscapes is largely the result of stand management, roads, livestock grazing, and fire exclusion, which is now being altered by wildfires that often defy suppression efforts during extreme weather conditions (Schoennagel et al. 2004; Naficy et al. 2010; Lydersen et al. 2014).

Stand management and dispersed clearcutting necessitated development of extensive road networks to reach high-value stands (Reeves et al. 1995). The new roads altered local hydrology, increased chronic and catastrophic sedimentation, and reduced floodplain functioning via channelization (Luce and Black 1999; Jones et al. 2000). Roads fragmented aquatic habitats, and created fish passage barriers via crossings and culverts (Bisson et al. 2003; Rieman et al. 2003). Roads were effective fuelbreaks during moderate fire weather conditions; they played a role in spreading invasive plants, and provided access for firefighters (Forman 2003). Roads also disturbed wildlife nesting and denning, and interrupted breeding and dispersal



**Fig. 1** Fragmentation of the northern California landscape (*upper left*). Shown in inset views are an area east of Mt. Shasta (*upper right*), an area along the northwest coast (*lower left*), and an area along the west slope of central Sierra Mountains (*lower right*). Note the parcelization of the forest landscape by the emplacement of stand management units. All photos are courtesy of Google Earth 2014. Much of the area with recent clear cuts is on private lands

habitat connectivity (Raphael et al. 2001; Gaines et al. 2003).

Today, successional patchworks of many forest landscapes no longer reflect a tightly linked relationship with their natural disturbance regime calling for restoration of many watersheds and lands (Keane et al. 2009; Wiens et al. 2012; Moritz et al. 2013). Instead, new fire, insect and pathogen disturbance regimes are driven by past management, a warming climate, and contagious patterns of fuels and hosts (Noss et al. 2006), fostering increased numbers of larger and more severe disturbances than occurred historically (McKenzie et al. 2004; Hessburg et al. 2005, 2013; Miller and Davis 2009). Predicted changes in the climate could exacerbate these trends (Millar et al. 2007; Allen et al. 2010; Stephens et al. 2013).

## Moving from stands to landscapes: core principles and management implications

Re-purposing past approaches to forest management will not address the socio-political and ecological challenges that lie ahead (Lertzman and Fall 1998). Many ecologists, managers, and policy-makers are calling for restoration of many watersheds and landscapes (e.g., see Lertzman and Fall 1998; Bosworth 2006; Noss et al. 2006; ISAB 2011; Franklin and Johnson 2012; North 2012; North et al. 2012a; Franklin et al. 2014; Stephens et al. 2014). For example, the federal Forest Landscape Restoration Act of 2009 called for "collaborative, science-based ecosystem restoration of priority forest landscapes." Proposals for landscape-scale restoration have been

**Box 1** Seven core principles and their planning and management implications

Principle 1: Regional landscapes function as multi-level, cross-connected, patchwork hierarchies.

*Implication: Conduct planning and management at appropriate scales to effectively restore multi-level landscape patterns, processes, and dynamics.*

Principle 2: Topography provides a natural template for vegetation and disturbance patterns at local landscape, successional patch, and tree neighborhood scales.

*Implication: Use topography to guide restoration of successional and habitat patchworks.*

Principle 3: Disturbance and succession drive ecosystem change.

*Implication: Move toward restoring natural fire regimes and the variation in successional patterns that supported them so that other processes may follow.*

Principle 4: Predictable patch size distributions historically emerged from linked climate-disturbance-topography-vegetation interactions.

*Implication: Move toward restoring size distributions of historical successional patches and allow changing climate and disturbance regimes to adapt them.*

Principle 5: Successional patches are "landscapes within landscapes".

*Implication: In dry pine, and dry to mesic mixed-conifer forests, restore characteristic tree clump and gap variation within patches.*

Principle 6: Widely distributed large, old trees provide a critical backbone to dry pine and dry to mesic mixed-conifer forest landscapes.

*Implication: Retain and expand on existing relict trees, old forests, and post-disturbance large snags and down logs in these types.*

Principle 7: Land ownership, allocation, management and access patterns disrupt landscape and ecosystem patterns.

*Implication: Work collaboratively to develop restoration projects that effectively work across ownerships, allocations, and access needs.*

developed from the Pacific Northwest to the northern Rockies, Sierra Nevada, and the Southwest. However, to be credible, these efforts will need an operational framework based on multi-scale planning and adaptive management, multi-partner and interdisciplinary collaboration, and core ecological principles that reach across scientific disciplines (Grumbine 1994).

Here, we focus attention on anunderutilized forest management concept: *the landscape prescription.* Scientifically grounded landscape prescriptions are needed to create habitat and successional patterns at local and regional landscape scales that move landscapes towards conditions that confer climate and disturbance resilience, while creating functional, well-connected habitat networks for a broad array of native aquatic and terrestrial species. A landscape prescription can provide clearly articulated restoration objectives, target ranges for both total area (proportion of landscape) and patch size distributions of successional and habitat types, and specific guidance on how and where to adjust the spatial arrangement of patches (Perry et al. 2011; North et al. 2012b; Hessburg et al. 2013; Perera et al. 2004).

Resource managers and stakeholders need a common basis to identify long-term objectives for restorative landscape management. Here, we offer seven principles and we use them to construct a forward-looking framework for management of fire-prone interior forest landscapes. We present these principles to help land managers and partners in the Inland Pacific move ahead with effective landscape restoration. The management implications we discuss for each principle can be applied in forest and project planning, designing treatments, monitoring, and collaborative learning (Box 1).

## Core principles

### Principle 1

*Regional landscapes function as multi-level, cross-connected, patchwork hierarchies* (O'Neill 1986; Urban et al. 1987; Wu and Loucks 1995), with patterns[1] and processes[2] that interact across spatial scales(Holling 1992; Wu and David 2002; Peters et al. 2004; Falk et al. 2007).

[1] For example, successional or habitat conditions, surface and canopy fuels, tree mortality, fire severity patterns.

[2] For example, hydrologic and nutrient cycles, energy flows, and vegetation succession and disturbance dynamics.



**Fig. 2** Landscapes exist within landscapes and there are cross-connections between levels. Shown are the Blue Mountains of northeastern Oregon, USA (*lower right*); the Fields Creek watershed (*lower left*); a patch of headwaters' mixed-conifer forest (*upper left*) in upper Fields Creek, and an individual meadow patch embedded within the mixed conifer patch. Note that all levels exhibit pattern heterogeneity, which influences cross-scale species movements, habitat connectivity and permeability, and disturbance flows. All photos courtesy of Google Earth 2013

We identify four levels of organization, but our framework can accommodate any number (Fig. 2). At the highest level, we identify *ecoregions* and *eco-subregions* (Fig. 3, 100,000's to 1,000,000's of ha; e.g., the Blue Mountains of eastern Oregon, or the Sierra Nevada Foothills of central California). Ecoregions are unique physiographic domains; their seasonal temperature, precipitation, and solar regimes, coupled with unique biotic assemblages, geology, and landforms, yield distinctive lifeform and successional patterns, and disturbance regimes (Küchler 1964; Hessburg et al. 2000b; Hargrove and Hoffman 2004). Ecoregional landscapes comprise *local landscapes* (Fig. 2, 10,000's to 100,000's of ha); groups of 10- or 12-digit hydrologic units [5th or 6th code watersheds and subwatersheds in the NHD watershed hierarchy (http://nhd.usgs.gov/)] may be used. As local landscapes, watersheds and groups of subwatersheds represent local environmental gradients and logical domains where terrestrial and aquatic ecosystem management issues may be simultaneously resolved. Local landscapes comprise *successional patches,* which may be small (<1 ha) to large (1000+ ha) land areas, often strongly associated with topographic features, whose seral status is created by a dominant disturbance, and whose subsequent development depends on interactions among topographic and edaphic environments, stand dynamics processes, and subsequent disturbances. *Tree neighborhoods* comprise the lowest level of our hierarchy; these areas within successional patches have similar arrangements of individual trees, tree clumps and openings in similar micro-environments (Frelich and Reich 1999; Larson and Churchill 2012).In some dry pine forests, where fine grained disturbances are typical, tree neighborhood characteristics may override any obvious successional patchiness.

Over broad scales, historical successional patterns and disturbance dynamics reflected climatic variability and natural disturbance regimes of the



**Fig. 3** Ecological subregions (ESRs, *left*) of the Blue Mountains province (*right*). Individual ESRs are unique areas that share a similar climate geology, geomorphic processes, biotic assemblages, and disturbance regimes. ESRs are taken from Hessburg et al. (2000b)

ecoregion (Whitlock and Bartlein 1997; Swetnam et al. 1999; Whitlock et al. 2003, 2010 Keane et al. 2009; Wiens et al. 2012). Within successional patches, tree clump and gap patterns, tree sizes (living and dead), and tree, shrub, and herb species compositions reflected fine-scale productivity, environmental, climatic, and disturbance controls (Larson and Churchill 2012; Churchill et al. 2013; Lydersen et al. 2013).

Hierarchical levels are connected through so-called "top-down" and "bottom-up" controls that operate within and across spatial scales (Wu and Loucks 1995; Wu and David 2002). In our suggested four-level hierarchy, spatial patterns and processes at the scale of the local landscape are partially constrained by the top-down control of climate, geology, landforms, and biota (Fig. 2; Urban et al. 1987; Turner 1989). Patchworks of local landscapes and those operating within successional patches and tree neighborhoods provide critical "bottom-up" control of processes and patterns (Wu and Loucks 1995; Wu and David 2002). For example, patterns of tree species, tree sizes, and tree vigor at tree neighborhood, and successional patch levels can affect patterns of bark beetle induced mortality in local landscapes by influencing host contagion and beetle dispersal. However, these bottom-up controls can be overridden by the top-down influence of extreme climatic events that reduce host vigor or favor beetle survivorship (Bentz et al. 2010).

## Implication

*Conduct planning and management at appropriate scales to effectively restore multi-level landscape patterns, processes, and dynamics.* A reasonable start is to put forest and woodland landscapes on a path to successional patterns and disturbance dynamics that reflect the natural disturbance regimes of regional and local landscapes (Swetnam et al. 1999; Keane et al. 2009; Wiens et al. 2012), and allow the future climate to adapt them. To place landscapes on this path, pattern modifications across scales will be needed in areas where past management alterations are greatest. Management to modify successional patterns should provide a good match to the disturbance ecology and expected future climatic regime of the landscapes in question.

Local landscape prescriptions are also needed that acknowledge constraints imposed by higher levels in the hierarchy that may limit what is achievable. For example, at the ecoregional level, shifting species ranges in response to warming may preclude the persistence of certain tree species at their trailing edge, while others may expand their ranges (Hampe and Petit 2005; Crookston et al. 2010). Thus, landscape prescriptions need to be compatible with the climate at the ecoregion and local landscape levels.

## Principle 2

*Topography provides a natural template for vegetation and disturbance patterns at local landscape, successional patch, and tree neighborhood scales.* Topography modulates broad- to fine-scale patterns of climate and weather, surface lithologies and soils, geomorphic processes, vegetation productivity, and

Case No. 1:23-cv-01501-RMR Document 14-3 filed 09/29/23 USDC Colorado pg 190 of 196



disturbances (Neilson 1986, 1995; Pearson and Dawson 2003). Thus, topography provides an intuitive and persistent physical template for vegetation patterns within regional and local landscapes.

The effect of this template is expressed most strongly in montane forests where ridges and valleys, benches, toe-slope environments, and north- and south-facing aspect patches shaped characteristic patterns and size distributions of historical successional patches (Lydersen and North 2012a; Fig. 4). For example, north-facing aspects and valley-bottoms historically supported many of the densest and most complex (multi-species, multi-aged and multi-layered) mixed-conifer forest conditions (Camp et al. 1997, Olson and Agee 2005; Fig. 5). When fires occurred, these settings typically experienced more severe fire effects than south-facing aspects and ridges. In contrast, south-facing aspects and ridges displayed relatively low tree density, open canopy conditions, and burned more often and less severely (Agee 1993; Habeck 1994; North et al. 2009). Tree-killing bark beetles played a natural role in attacking fire-scarred, weakened, and low vigor ponderosa and Jeffrey pine, Douglas-fir, white fir and grand fir trees, and because of frequent fires, were generally endemic to the landscape. Likewise, defoliating insects frequented denser mixed-conifer patches, especially on north aspects and in valley bottoms (Hessburg et al. 1994).

Implication

*Use topography to guide restoration of successional and habitat patchworks.* Landscape prescriptions can use topography to tailor species composition, vegetation density, canopy layering, and other structural conditions to edaphic and environmental conditions (Lydersen and North 2012; Merschel et al. 2014). Partitioning the landscape into basic topographic settings, such as valley-bottoms, ridgetops, and south- and north-facing slopes, can be an aid in distributing forest treatments to patch boundaries that are more logical than those based largely on proximity to roads (North et al. 2009, 2012b). Spatially mapped climatic water balance metrics (e.g., actual evapotranspiration and deficit) can be used to further refine and quantify topographic conditions into useful ranges for site potential and species composition determinations, and to guide climate adaptation (e.g., see Stephenson 1998; Dobrowski et al. 2011; Churchill et al. 2013; Kane et al. 2015). Below, we provide a general approach for using topography in a landscape prescription using archetypal forest conditions as example landscapes.

**Fig. 4** Map showing north and south-facing aspect patches, and ▶ ridge and valley *bottom* topographies in the vicinity of La Grande, Oregon. Topographic position is based on a 200-m radius window. Aspect is displayed where the topographic position is neither valley bottom nor ridge top

*Managing low- to mid-elevation south aspects and ridgelines.* Southerly aspects and ridges can be managed to support fire-tolerant species in clumped tree distributions by: (1) favoring medium- (e.g., 40–60 cm dbh) to large-sized(e.g., 60–100 cm dbh, note that size ranges will depend on species and site productivity) trees; (2) promoting vegetation density and composition that is resilient to primarily low- and mixed-severity fires; and (3) maintaining relatively low vegetation density via forest thinning, prescribed burning, and/or managed wildfires. Tree size classes, tree clump and gap size distributions, and total canopy cover would vary from place to place and through time, but ranges of conditions could be calibrated from historical reconstructions (see *Principle 5,* Larson and Churchill 2012) and modified by incorporating expected climatic changes (e.g., see Churchill et al. 2013).

*Managing low- to mid-elevation north aspects and valley-bottoms.* North aspects and valley-bottoms generally support a mix of fire-tolerant and fire-intolerant tree species in relatively dense, often multi-layered arrangements. Because these fuel types typically support mixed surface and crown fire behavior, restorative prescriptions should allow patches of mixed and high-severity fires (see also *Principle 4*). These denser forests may also be subject to insect outbreaks. However, the naturally scattered distribution of north aspect and valley-bottom forests across the landscape (Fig. 4) typically constrains the frequency, severity, and duration of defoliator and bark beetle outbreaks by interrupting host contagion. Special attention to riparian zones is needed because such areas provide key structural elements of aquatic habitats such as large wood and undercut stream banks.

By suggesting topography as a natural template, we do not advise any strict correspondence of forest successional patches with topographic edges. Instead, applying feathered edges on the margins, for example, dry pine patches grading into dry or mesic mixed-



FS-000595




Topographic position is based on a 200 m radius window.
Aspect is displayed where the topographic position is neither valley bottom nor ridge-top.




**Fig. 5** Topography and physiography provided an intuitive natural template for life form, successional, and patch size patterns. This is the Mission Creek landscape just southwest of Wenatchee, in Washington State. Notice how aspect and topographic position influence wildfire and vegetation patterns: historically, south facing slopes and ridge tops display low tree density, early seral species, and open canopy vegetation conditions resulting from frequent low and mixed severity fires, where surface fire effects dominated; north facing slopes and valley bottom were denser and exhibit more moderate site climate, and less frequent but more severe wildfire disturbances. The *bottom* photo was taken in 2010, and provided courtesy of John Marshall. The *top* photo was taken in 1934, and comes from the William Osborne collection (Arnst 1985)

conifer patches(i.e., transitional zones with adjacent patches) might be more typical of the "soft edges" observed under more natural disturbance conditions (Stamps et al. 1987).

## Principle 3

*Disturbance and succession drive ecosystem change.* Variability in climate, lifeform and successional patterns, and topographic and edaphic environments of a region (Fig. 6) determines disturbance regimes, which give rise to characteristic patterns of terrestrial and aquatic habitats (Bisson et al. 2009; Hessburg et al. 1999b; Keane et al. 2009; Merschel et al. 2014; Spies et al. 2012; Wiens et al. 2012). In the West, fire was historically the dominant disturbance; insect, pathogen, and weather disturbances were subordinate but added important variability to lifeform and successional patterns. In contrast, today's patterns are largely a by product of the cumulative effects of human action and altered disturbance regimes. Insect outbreaks and wildfires now occur at larger scales, and both are being driven by a warmer climate (Littell et al. 2009, McKenzie et al. 2004; Bentz et al. 2010; *cf.* Baker 2012; Williams and Baker 2012; Odion et al. 2014). Consequently, large and severe bark beetle outbreaks and wildfires are more rapidly driving landscape change today compared with the past. High-intensity wildfire




**Fig. 6** Historical fire regime groups of the western United States (*left*). Note the relationship of fire regime zones to broad topographic gradients and land surface forms. Data are from www.landfire.gov. Land cover types are shown in the map to the *right*. Notice the high degree of correspondence between the fire regime and land cover maps. Both maps are shown with a 200-m resolution hill-shade with z-augmentation. Data are from the 2006 National Land Cover Dataset (http://www.mrlc.gov/nlcd2006.php)

events and insect outbreaks can rapidly change ecoregional landscape structure and impact large areas, especially in comparison to the area currently influenced by restorative treatments (e.g., see Fig. 7).

## Implication

*Move toward restoring natural fire regimes and the variation in successional patterns that supported them so that other processes may follow.* Planning and management should identify and restore natural disturbance regimes[3] to create resilient landscapes. In some wilderness and roadless areas, the management of natural fire regimes appears to have restored successional patterns and resilient landscapes (Collins et al. 2009, Parks et al. 2015). In other places, creating landscapes where successional patterns, disturbances, and climate dynamics are more in sync will require modification of forest structure and composition patterns. This is especially true of dry to mesic mixed-coniferous forests that are currently most

[3] The fire regime includes the frequency, severity (effects), intensity (energy release), size distribution, and seasonality of

Footnote 3 continued
fires. The natural fire regime is that which generally occurs when variation in fire frequency, severity, seasonality, and extent reflects characteristic interactions between the biota, geology, and climate settings of the forest type and ecoregion (Swetnam et al. 1999; Landres et al. 1999).




**Fig. 7** (*Top*) area burned (millions of hectares) by cumulative prescribed (Rx) versus wildfires, from 1998 to 2013, on all State and federal agency lands throughout the US. Data are available at: http://www.nifc.gov/fireInfo/fireInfo_statistics.html. Note that the ratio of wild to Rx burned ha is ~3:1. (*Bottom*) area burned (thousands of hectares) by cumulative prescribed (Rx) versus wildfires, from 2005 to 2014, on the Okanogan-Wenatchee National Forest (OWNF), eastern Washington. The ratio of wild to Rx burned ha on the OWNF is ~5:1

departed from historical fire regime conditions (Agee 1998). Naturally occurring (e.g., wildfires) and well-planned human-caused disturbances (mechanical and/or prescribed burning treatments) can be used to modify successional patterns so they better match the disturbance ecology of the landscapes in question (see Box 2). Management activities should avoid the development of additional permanent roads. Rather, efforts should work within existing or reduced road networks, staying away from especially sensitive areas (Rieman et al. 2000, 2010).

The historical range of variability (HRV, Keane et al. 2009; Landres et al. 1999; McGarigal and Romme 2012; Wiens et al. 2012) of regional successional patterns can be used to inform management targets, where these reference conditions are based on climates that are similar to those anticipated in the future (Stephens et al. 2008, 2010). Moreover, the climatic variability during the HRV reference period undoubtedly overlaps with future climates, making them a useful reference. However, where HRV reference conditions are based on climates that highly differ from those anticipated in the future, they will be far less useful.

Several authors have referred to a future range of variation (FRV), which identifies alternative reference conditions that are suited to a predicted future climate (Hessburg et al. 2013; Keane et al. 2009; Moritz et al. 2011, 2013). In ecoregions where the anticipated twenty first century climate is much warmer and drier/wetter than that of the early twentieth century, FRV reference conditions will be most useful to guide restoration efforts (USFS 2012; Hessburg et al. 2013). The FRV in some ecoregions is currently being approximated using either historical or contemporary analogue landscapes with successional patterns that have experienced the predicted future climate (Hessburg et al. 2013) or via succession and disturbance simulation modeling techniques (Keane et al. 2002; Loehman et al. 2011; Miller 2007). Both techniques are useful for exploring alternative vegetation patterns that will be fostered by a changing climate and understanding desirable changes to the existing conditions.

In some cases, the restoration approach will need to recognize current vulnerabilities to uncharacteristic disturbances and landscape inertia associated with other ecological processes (Merschel et al. 2014; Stephens et al. 2008, 2010; Stine et al. 2014). For example, in eastern Oregon, Douglas-fir and grand fir regeneration has become so widespread during the period of fire exclusion that seed rain from these species makes it unlikely that ponderosa pine will re-establish as a dominant species even after fires (Merschel et al. 2014). Re-establishment of pine may necessitate extensive cover type manipulation (Stine et al. 2014).

Restoration of resilient landscapes will not be feasible everywhere and some landscape prescriptions will need to acknowledge that long-term, unavoidable shifts in landscapes toward novel or "hybrid" ecosystems have occurred (Hobbs et al. 2009). In the future, western forests will contain more people, non-native

Case No. 1:23-cv-01501-RMR Document 14-3 filed 09/29/23 USDC Colorado pg 195 of 196



**Box 2** A greatly enlarged role for managed surface and crown fires

Conventional restoration activities take place at the stand-scale, but such activities will not likely scale up to accomplish needed ecoregional and local landscape pattern modification. Furthermore, conventional vegetation management practices alone will not restore fire regimes or mimic fire effects. Most of the work of restoring landscapes will likely need to be done using managed wildfires over large areas and prescribed burning (North et al. 2012a, 2015), with mechanical treatments in key areas that require spatial precision of outcomes and existing road access. This increased tolerance for wildfire, especially during moderate fire years and shoulder seasons, will require continued public education on the ecological role of fire, as well as changes in policies and professional incentives for forest managers. Cutting trees, whether commercially or pre-commercially, can emulate fire effects on tree density and layering, but it cannot reproduce the effects of fire on nutrient cycling, snag creation, surface fuel reduction, mineral seedbed preparation, and regenerating associated shrub and herb vegetation (Johnson 1992, Johnson and Miyanishi 1995). If not designed with clear ecological objectives and constraints, commercial timber harvest can result in removal of scarce large-sized trees to cover harvesting costs, reduced snag densities, excessive soil compaction, simplification of spatial patterns, and residual fine fuel buildup that can promote future fire spread. This is a particular concern adjacent to riverine systems, where retention of large dead wood is critical. In contrast, management ignited or managed wildfires burning under moderate fire weather conditions can often accomplish ecological objectives without timber harvest, as has been observed in some wilderness and road less areas, and in forests where mixed and high-severity fires naturally dominate (Meyer 2015).

species, an altered climate, and increased demands for carbon storage, food and water, minerals, wood and other forest products. Some long-term shifts will preclude a return to pre-development conditions (Higgs et al. 2014). Planning for sustainability will require the best efforts of resource economists and physical, biological, and social scientists.

## Principle 4

*Predictable patch size distributions historically emerged from linked climate-disturbance-topography-vegetation interactions*. Low, mixed, and high severity[4] wildfires historically maintained heterogeneous patchworks of burned and recovering vegetation in a fairly predictable variety of successional states and patch sizes (the HRV), with insect, pathogen, and weather disturbances adding to pattern complexity (Agee 1993, 1998). Historically, landscapes were patchworks of small($10^1$ to $10^2$ ha) to large ($10^3$ to $10^4$ ha) patches with dead trees, early seral grasslands and shrublands (pre-forest conditions, Swanson et al. 2010), bare ground, and patches of new forest (Fig. 8; Moritz et al. 2011; Perry et al. 2011). For example, in the Blue Mountains and Northern Cascades provinces, as much as a third of the total area that was capable of producing dry, mesic, or cold forests was in either pre-forest or early seral condition (Hessburg et al. 1999a, b, 2015). The resulting patchwork of successional and environmental conditions resisted abrupt and widespread changes at local and regional landscape scales by reducing fuel contagion and the likelihood of large and severe fires (Collins et al. 2009, Hessburg et al. 1999b; Keane et al. 2009; Malamud et al. 1998; Moritz et al. 2013; Peterson 2002; Stephens et al. 2015). Large wildfires and insect outbreaks (e.g., Miller and Keen 1960) occurred when extreme climate and weather conditions overrode the spatial controls that successional and fuel patterns, and topography provided (Littell et al. 2009; McKenzie et al. 2004; Westerling et al. 2006), but even large fires resulted in patchy successional landscapes (Cansler and McKenzie 2014).

Low, mixed, and high severity fires and resulting successional patches occurred in predictable size distributions, like those shown in Fig. 9. (Hessburg et al. 2007; Moritz et al. 2011; Perry et al. 2011). At any one time, most patches (80–95 %) were relatively small, 1's to 100's of ha, and accounted for a minority of the disturbed area (Malamud et al. 1998; Moritz et al. 2011). The remaining patches were medium- to large-sized, 1000's to 10,000's of ha, and occasionally very large, 100,000's of ha, and together these constituted the majority of area disturbed by fire (Malamud et al. 1998, 2005, Moritz et al. 2011; Perry et al. 2011). The size distribution of disturbance events and the resultant successional patch mosaic approximated a truncated power-law model (Moritz et al. 2011; Perry et al. 2011); a feature that is suspected to have held across disparate ecoregions, despite large variability in biogeoclimatic conditions. Such patterns are also found in the size distribution of

[4] Low severity fires are those where <20 % of the overstory tree cover or basal area is killed by fire and fires are generally surface fires. Mixed severity fires are those where 20–70 % of the overstory tree cover or basal area is killed by fire, and fires typically display a mix of surface and crown fire. High severity fires are those where >70 % of the overstory tree cover or basal area is killed by fire, and fires are primarily crown fires (Agee 1993).



FS-000600




**Fig. 8** Large areas of recently burned and recovering forest were commonplace in early twentieth-century forests of the inland Pacific West. This is the Bethel Ridge landscape in eastern Washington State, which is located east of Mt. Rainier and north of Rimrock Lake. Notice in the *top photograph* recently burned areas in the background that are in a pre-forest condition, while patches with seedlings, saplings, and pole sized trees are evident in mid- and foreground areas. In the *bottom photo*, it is evident that fires have been largely excluded since the *top photo* was taken, and the forest appears to be continuous with little variation in age, density or size. Notice too that many of the areas that were recently burned in the *top photo* show clear evidence of bark beetle mortality (*brown patches*) in the *bottom photo*. The *bottom photo* was taken in 2012 by John Marshall. The *top photo* was taken in 1936, and comes from the William Osborne collection (Arnst 1985)

certain topographic features (e.g., north–south aspect patches), which may indicate topographic control as a partial mechanism for ecosystem resilience to recurrent disturbances (Moritz et al. 2011; Box 3).

## Implication

*Move toward restoring size distributions of historical successional patches and allow changing climate and disturbance regimes to adapt them.* Historical successional patch size distributions were the by product of ongoing disturbances and changes to the climate system, providing a broad landscape resilience mechanism. If successional pattern conditions today were those of pre-management era forests, we would have minimal concern for their capacity to adjust to the climatic changes we are experiencing today.

Successional patches include non-forested "openings", the largest of which may still be evident today, though their margins have been encroached upon (Arno and Gruell 1986; Coop and Givnish 2007). Smaller openings have disappeared (Skinner 1995), and their historical distribution can be determined



FS-000601