# Potential Applications

- Having a good estimate of where species will and will not be suited in the future, we can:
  1. On a given site, apply treatments most appropriate for the future.
  2. Focus efforts where they have the greatest likelihood of long-term success.
  3. Identify sites and strategies to protect special species.
- Planning
  - Forest
  - Landscape assessment
  - Projects

Project area pre-determined

# APPLY TREATMENTS APPROPRIATE FOR PROJECTED FUTURE




Telluride
Rico
Dolores
Cortez
Mancos
Dolores Watershed




# Ponderosa pine


Telluride
Rico
Dolores
Cortez
Mancos
CGH Change Zones for PIED
Lost
Threatened
Persistent
Emergent

Piñon




# Utah juniper

Where should we manage spruce for timber?

# IDENTIFY AREAS ON THE LANDSCAPE WHERE TREATMENTS HAVE THE GREATEST CHANCE OF LONG-TERM SUCCESS






CGH Change Zones for PIEN — Lost · Threatened · Persistent · Emergent

## Engelmann spruce

# Where to manage spruce?

## PERSISTENT zone

– Manage as normal.

## THREATENED zone

– Manage as 2nd priority, but

– Focus more on resilience.

## LOST zone

– Avoid investing in the future of spruce.

– Treat for short-term benefits and to

– Begin pushing cover-type to the future.

What about the EMERGENT zone?

# ASSISTED AND FACILITATED MIGRATION



FS-000693

- Assisted migration:
  - – Movement of species and populations to facilitate range expansion in direct management response to climate change
- Facilitated migration
  - – Enhancing opportunities for self-migration by favoring seed production and dispersal in current habitat and receptive seedbeds in nearby emergent habitat.


Douglas-fir emergent habitat
Telluride
Rico
Dolores
Cortez
Mancos
CGH Change Zones for PSME
Lost
Threatened
Persistent
Emergent


Aspen emergent habitat
Telluride
Rico
Dolores
Cortez
Mancos
CGH Change Zones for POTR5
Lost
Threatened
Persistent
Emergent

# Facilitating Migration




Promote existing (female) aspen near Emergent areas to enhance seed production

Favor disturbances (esp. fire) in newly suitable areas to facilitate aspen establishment

Climate refugia

# PROTECTING SPECIES AT RISK






CGH Change Zones for PIEN: Lost | Threatened | Persistent | Emergent

# Engelmann spruce




# Ponderosa pine



# Ponderosa pine 2060

PIPO Proportion of votes

0-10
10-20
20-30
30-40
40-50
50-60


PIPO
Proportion
of votes
0-10
10-20
20-30
30-40
40-50
50-60

# Conclusion

- Bioclimate models can be used to:
  - Design treatments most appropriate for the future.
  - Focus resources where there is the greatest likelihood of long-term success.
  - Identify best approaches and sites to manage species at risk.

“If you don’t plan for the future,

you’re planning for the past”

Date submitted (UTC-11): 3/30/2020 12:00:00 AM
First name: Matt
Last name: Sturdevant
Organization: Colorado Parks and Wildlife
Title: District Wildlife Manager
Comments:
March 27, 2020

Mr. Derek Padilla,

Dolores District Ranger District

29211 Hwy 184

Dolores, CO 81321

(970) 882-6830

RE: Salter Vegetation Management Project

Dear Mr. Padilla,

Colorado Parks and Wildlife appreciates the opportunity to review and provide scoping comments on the proposed Salter Vegetation Management Project within the San Juan National Forest. The project proposes using a variety of mechanical vegetation thinning, timber harvest, and would potentially use fire on the entire project area to achieve a suite of vegetation goals on 35,000 acres. Most of the goals are interrelated and strive to create a healthier, more natural forest, thereby benefitting many forest users, including wildlife. Colorado Parks and Wildlife understands that the project may require the construction of temporary roads as well as use of roads currently listed as Maintenance Level 1 Roads.

The project area encompasses a variety of ecosystem types, including Ponderosa/Gambel oak forest, stands of aspen, and stands of mixed conifer. These different forest types are generally lacking a diversity of tree size and age, which makes them more susceptible to dwarf mistletoe and many different bark beetles. The project area provides habitat for a multitude of wildlife species including elk, mule deer, black bear, mountain lion, coyote, fox, bobcat, Merriam's turkey, dusky grouse, Cooper's hawk, Red-tailed hawk, Sharp-shinned Hawk, Northern goshawk and many other species. The area incorporates valuable fawning and calving grounds for deer and elk, as well as critical winter range for these same species. The area also incorporates nesting habitat for a suite of both migratory and non-migratory birds.

Big Game

The analysis area contains or is adjacent to calving elk. Colorado Parks and Wildlife recommends that timber harvest activities and or burns be coordinated as closely as possible to avoid crucial sensitive periods for wildlife. Avoiding timber management activities from May15 through June 30 within mapped elk production area would minimize disturbance during this critical production period for big game.

Logging operations in the area will remove overstory and should promote growth of native grass, forbs, and shrubs in the treatment area as well as regeneration of trees. This will encourage use by big game. Live stands of trees and corridors to stands of trees outside of the treatment area should be maintained. These trees provide important hiding and thermal cover near what will become an attractive foraging area. Please include design features for project implementation that will ensure treatment areas will provide security and thermal cover for big game.

Prescribed burns within the project area should be planned to attempt to provide a mosaic of habitat for wildlife. Smaller, patchy fires that maintain pockets of cover and shelter will provide the greatest benefit to both big and small game.

Travel Management

Road densities can impact the use and occurrence of many wildlife species. Colorado Parks and Wildlife is very supportive of travel management decisions with the long-term goals of preserving blocks of unfragmented wildlife habitat, and holding big game, on public lands where they are available for harvest by public land hunters. Road densities, vegetation management, and recreation management are some of the major activities that may impact effective use of habitat by mule deer, elk, and other species. Maintaining or reducing road density will provide more usable habitat within the treatment area for wildlife.

Colorado Parks and Wildlife recommends that all closed system roads, non-system roads, and new temporary roads that would be opened or constructed for the project be closed and rehabilitated after the project is completed. Access to the closed roads should be gated or, where the topography is appropriate, obliterated to prevent use by motorized vehicles. Please incorporate design features that address how project roads will be managed during the project and after project's completion.

Raptors

There is an established body of evidence that human activates and habitat alteration in close proximity to raptor nest sites may adversely impact nest success (Oxley et al. 1974, Scott 1985, Knight and Skagen 1988, Watson and Langslow 1989, Homes et al. 1993, Schomburg 2003, Fuller 2010). Many raptor species return to the same nest locations annually, making their annual breeding success sensitive to direct and inadvertent human disturbance and habitat alteration at existing nest sites (Megown et al. 2007). Protecting existing raptor nest sites and the reproductive activities at those sites is critical for managing long-term raptor population trends in Colorado. Please include in the environmental assessment a discussion on how active raptor nests will be conserved within the analysis area.

Aquatic Species

The project area encompasses several smaller drainages that do not directly support fish, but that drain into the McPhee Reservoir which is a destination trout fishery as well as small/ largemouth bass and supports other fish species including Kokanee Salmon, Crappie, and Perch. Colorado Parks and Wildlife's primary concern regarding aquatic species is to maintain water quality by limiting erosion and sedimentation into streams. Water quality can be maintained by minimizing drainage crossings and surface disturbing construction activities near these resources. Controlled burns should also be planned with an effort to minimize erosion with the watersheds. Please incorporate design features to protect fisheries and water quality from the proposed project.

Non-native Invasive Weeds

Colorado Parks and Wildlife views one of the biggest threats to ecosystem health on federal lands in this area as non-native invasive weeds. Many invasive weeds can already be found throughout the project area. Invasive weeds generally flourish following disturbance, and active weed management should be incorporated post-treatment for any project. Any equipment used for treatments should be cleaned beforehand so that it does not harbor weed seeds and aid in their spread. Please incorporate design features to prevent and reduce the spread of noxious weeds from the proposed project.

Conclusion

Thank you for the opportunity to comment on this proposed project. If you have any questions concerning these comments, please feel free to contact myself at (970) 749-1435. We look forward to working with you for the benefit of wildlife and would be willing to attend any informational meetings that the Forest Service proposes for this project.

Sincerely,

Matt Sturdevant

District Wildlife Manager

Cc: Matt Thorpe, Area Wildlife Manager; Cory Chick, SW Regional Manager; J. Holst SW Region Energy Liaison; B. Magee SW Land Use Coordinator; B. Weinmeister Area 15 Terrestrial Biologist; Area 15 File

References

Fuller, M. R. 2010. Raptor nesting near oil and gas development: an overview of key findings and implications for management based on four reports by Hawk Watch International. U.S. Dep. Inter. Bur. Land Manage. Tech. Note 432. Denver, CO. 11pp.

Holmes, T. L.; Knight, R. L.; Stegall, L., and G. R. Craig. 1993. Responses of Wintering Grassland Raptors to Human Disturbance. Wild. Soc. Bull 21:461-468.

Knight, R. L., and S. K. Skagen. 1988. Effects of Recreational Disturbance on Birds of Prey: A Review. Pages 355-359 in R. L. Glinski, B. G. Pendleton, M. B. Moss, M. N. LeFranc, B. A.

Oxley, D. J., M. B. Fenton, and G. R. Carmody. 1974. The Effects of Roads on Populations of Small Mammals. J. App. Ecology. 11:51-59.

Schomburg, J. W. 2003. Development and Evaluation of Predictive Models for Managing Golden Eagle Electrocutions. M.S. Thesis. Montana State Univ. 98 pp.

Scott, T. A. 1985. Human Impacts on the Golden Eagle Population of San Diego County from 1928-1981. M.S. Thesis. San Diego State Univ. 101pp.

COLORADO
Parks and Wildlife
Department of Natural Resources

Durango Service Center
151 East 16th Street
Durango, CO 81301
P 970.247.0855 | F 970.382.6672

March 27, 2020

Mr. Derek Padilla,
Dolores District Ranger District
29211 Hwy 184
Dolores, CO 81321
(970) 882-6830

RE: Salter Vegetation Management Project

Dear Mr. Padilla,

Colorado Parks and Wildlife appreciates the opportunity to review and provide scoping comments on the proposed Salter Vegetation Management Project within the San Juan National Forest. The project proposes using a variety of mechanical vegetation thinning, timber harvest, and would potentially use fire on the entire project area to achieve a suite of vegetation goals on 35,000 acres. Most of the goals are interrelated and strive to create a healthier, more natural forest, thereby benefitting many forest users, including wildlife. Colorado Parks and Wildlife understands that the project may require the construction of temporary roads as well as use of roads currently listed as Maintenance Level 1 Roads.

The project area encompasses a variety of ecosystem types, including Ponderosa/Gambel oak forest, stands of aspen, and stands of mixed conifer. These different forest types are generally lacking a diversity of tree size and age, which makes them more susceptible to dwarf mistletoe and many different bark beetles. The project area provides habitat for a multitude of wildlife species including elk, mule deer, black bear, mountain lion, coyote, fox, bobcat, Merriam's turkey, dusky grouse, Cooper's hawk, Red-tailed hawk, Sharp-shinned Hawk, Northern goshawk and many other species. The area incorporates valuable fawning and calving grounds for deer and elk, as well as critical winter range for these same species. The area also incorporates nesting habitat for a suite of both migratory and non-migratory birds.

Big Game
The analysis area contains or is adjacent to calving elk. Colorado Parks and Wildlife recommends that timber harvest activities and or burns be coordinated as closely as possible to avoid crucial sensitive periods for wildlife. Avoiding timber management activities from May15 through June 30 within mapped elk production area would minimize disturbance during this critical production period for big game.

Logging operations in the area will remove overstory and should promote growth of native grass, forbs, and shrubs in the treatment area as well as regeneration of trees. This will encourage use

Dan Prenzlow, Director, Colorado Parks and Wildlife • Parks and Wildlife Commission: Michelle Zimmerman, Chair • Marvin McDaniel, Vice-Chair
James Vigil, Secretary • Taishya Adams • Betsy Blecha • Robert W. Bray • Charles Garcia • Marie Haskett • Carrie Besnette Hauser • Luke B. Schafer • Eden Vardy

by big game. Live stands of trees and corridors to stands of trees outside of the treatment area should be maintained. These trees provide important hiding and thermal cover near what will become an attractive foraging area. Please include design features for project implementation that will ensure treatment areas will provide security and thermal cover for big game.

Prescribed burns within the project area should be planned to attempt to provide a mosaic of habitat for wildlife. Smaller, patchy fires that maintain pockets of cover and shelter will provide the greatest benefit to both big and small game.

Travel Management

Road densities can impact the use and occurrence of many wildlife species. Colorado Parks and Wildlife is very supportive of travel management decisions with the long-term goals of preserving blocks of unfragmented wildlife habitat, and holding big game, on public lands where they are available for harvest by public land hunters. Road densities, vegetation management, and recreation management are some of the major activities that may impact effective use of habitat by mule deer, elk, and other species. Maintaining or reducing road density will provide more usable habitat within the treatment area for wildlife.

Colorado Parks and Wildlife recommends that all closed system roads, non-system roads, and new temporary roads that would be opened or constructed for the project be closed and rehabilitated after the project is completed. Access to the closed roads should be gated or, where the topography is appropriate, obliterated to prevent use by motorized vehicles. Please incorporate design features that address how project roads will be managed during the project and after project's completion.

Raptors

There is an established body of evidence that human activates and habitat alteration in close proximity to raptor nest sites may adversely impact nest success (Oxley et al. 1974, Scott 1985, Knight and Skagen 1988, Watson and Langslow 1989, Homes et al. 1993, Schomburg 2003, Fuller 2010). Many raptor species return to the same nest locations annually, making their annual breeding success sensitive to direct and inadvertent human disturbance and habitat alteration at existing nest sites (Megown et al. 2007). Protecting existing raptor nest sites and the reproductive activities at those sites is critical for managing long-term raptor population trends in Colorado. Please include in the environmental assessment a discussion on how active raptor nests will be conserved within the analysis area.

Aquatic Species

The project area encompasses several smaller drainages that do not directly support fish, but that drain into the McPhee Reservoir which is a destination trout fishery as well as small/ largemouth bass and supports other fish species including Kokanee Salmon, Crappie, and Perch. Colorado Parks and Wildlife's primary concern regarding aquatic species is to maintain water quality by limiting erosion and sedimentation into streams. Water quality can be maintained by minimizing drainage crossings and surface disturbing construction activities near these resources. Controlled burns should also be planned with an effort to minimize erosion with the watersheds. Please incorporate design features to protect fisheries and water quality from the proposed project.

Non-native Invasive Weeds

Colorado Parks and Wildlife views one of the biggest threats to ecosystem health on federal lands in this area as non-native invasive weeds. Many invasive weeds can already be found throughout the project area. Invasive weeds generally flourish following disturbance, and active weed management should be incorporated post-treatment for any project. Any equipment used for treatments should be cleaned beforehand so that it does not harbor weed seeds and aid in their spread. Please incorporate design features to prevent and reduce the spread of noxious weeds from the proposed project.

Conclusion

Thank you for the opportunity to comment on this proposed project. If you have any questions concerning these comments, please feel free to contact myself at (970) 749-1435. We look forward to working with you for the benefit of wildlife and would be willing to attend any informational meetings that the Forest Service proposes for this project.

Sincerely,



Matt Sturdevant
District Wildlife Manager

Cc: Matt Thorpe, Area Wildlife Manager; Cory Chick, SW Regional Manager; J. Holst SW Region Energy Liaison; B. Magee SW Land Use Coordinator; B. Weinmeister Area 15 Terrestrial Biologist; Area 15 File

References

Fuller, M. R. 2010. Raptor nesting near oil and gas development: an overview of key findings and implications for management based on four reports by Hawk Watch International. U.S. Dep. Inter. Bur. Land Manage. Tech. Note 432. Denver, CO. 11pp.

Holmes, T. L.; Knight, R. L.; Stegall, L., and G. R. Craig. 1993. Responses of Wintering Grassland Raptors to Human Disturbance. Wild. Soc. Bull 21:461-468.

Knight, R. L., and S. K. Skagen. 1988. Effects of Recreational Disturbance on Birds of Prey: A Review. Pages 355-359 *in* R. L. Glinski, B. G. Pendleton, M. B. Moss, M. N. LeFranc, B. A.

Oxley, D. J., M. B. Fenton, and G. R. Carmody. 1974. The Effects of Roads on Populations of Small Mammals. J. App. Ecology. 11:51-59.

Schomburg, J. W. 2003. Development and Evaluation of Predictive Models for Managing Golden Eagle Electrocutions. M.S. Thesis. Montana State Univ. 98 pp.

Scott, T. A. 1985. Human Impacts on the Golden Eagle Population of San Diego County from 1928-1981. M.S. Thesis. San Diego State Univ. 101pp.

United States Department of Agriculture

# Salter Vegetation Management

## Draft Environmental Assessment



Forest Service Dolores Ranger District, San Juan National Forest February 2021

**For More Information, Contact:**

David Casey
Dolores Public Lands Office
29211 Highway 184
Dolores, CO 81323
Phone: 970-882-6830
Email: david.casey2@usda.gov

We make every effort to create documents that are accessible to individuals of all abilities; however, limitations with our word processing programs may prevent some parts of this document from being readable by computer-assisted reading devices. If you need assistance with any part of this document, please contact the San Juan National Forest 970-882-6830.

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, sex, religious creed, disability, age, political beliefs, or reprisal or retaliation for prior civil rights activity in any program or activity conducted or funded by USDA.

Persons with disabilities who require alternative means of communication for program information (e.g. Braille, large print, audiotape, American Sign Language, etc.), should contact the Agency (State or local) where they applied for benefits. Individuals who are deaf, hard of hearing or have speech disabilities may contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program complaint of discrimination, complete the USDA Program Discrimination Complaint Form, (AD-3027) found online at: How to File a Complaint, and at any USDA office, or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by:

(1) mail: U.S. Department of Agriculture
Office of the Assistant Secretary for Civil Rights
1400 Independence Avenue, SW
Washington, D.C. 20250-9410;

(2) fax: (202) 690-7442; or

(3) email: program.intake@usda.gov.

USDA is an equal opportunity provider.

# Contents

Section 1 - Purpose and Need ... 4
Introduction ... 4
Proposed Project Location ... 4
Historical Background ... 8
Need for this Proposal ... 9
Section 2 - Proposed Action and Alternatives ... 12
Proposed Action (Alternative 2) ... 12
Single Tree Selection ... 13
Commercial Thinning ... 15
Post-fledgling Family Area Thinning (PFAT) ... 15
Pre-commercial Thinning ... 15
Brush Thinning ... 16
Conditions Influencing Silvicultural Treatments ... 16
Connected Actions ... 17
Post –Treatment Vegetation Management ... 17
Transportation System ... 17
Fuels Treatment ... 18
Other Actions ... 18
Project Design Features ... 19
Cultural Resources ... 19
Fuels ... 19
Hydrology and Soils ... 20
Rangelands ... 21
Rare Plants and Invasive Species ... 22
Recreation and Public Safety ... 22
Scenery ... 24
Timber ... 24
Transportation ... 24
Wildlife ... 26
Monitoring and Adaptive Management ... 27
Issue Identification and Alternative Development ... 31
Section 3 - Environmental Effects ... 32
Cultural Resources ... 33
Affected Environment ... 33
Effects of the Alternatives ... 34
Fuels and Fire Management ... 34
Affected Environment ... 34
Effects of the Alternatives ... 36
Invasive Species ... 38
Affected Environment ... 38
Effects of the Alternatives ... 38
Rangelands ... 40
Affected Environment ... 40
Effects of the Alternatives ... 41
Rare Plants ... 43
Affected Environment ... 43
Effects of the Alternatives ... 44
Recreation Activities and Experience ... 47
Affected Environment ... 47

Effects of the Alternatives ... 48
Scenery ... 51
Affected Environment ... 51
Effects of the Alternatives ... 52
Transportation ... 54
Affected Environment ... 54
Effects of the Alternatives ... 55
Vegetation ... 58
Affected Environment ... 58
Effects of the Alternatives ... 59
Watersheds ... 60
Affected Environment ... 60
Effects of the Alternatives ... 62
Cumulative Effects ... 65
Wildlife and Fisheries ... 66
Threatened, Endangered and Proposed Wildlife and Aquatic Species ... 66
Sensitive Species, Species of Special Interest and Migratory Birds ... 67
Affected Environment – Sensitive Species ... 68
Effects of the Alternatives – Sensitive Species ... 71
Affected Environment – Species of Special Interest and Migratory Birds ... 74
Effects of the Alternatives – Species of Special Interest and Migratory Birds ... 75
Cumulative Effects to all Species ... 78
Section 4 - Agencies or Persons Consulted ... 79
Tribal Consultation ... 79
Public Involvement ... 79
Collaboration ... 79
Section 5 - References ... 81
Appendix A. Maps ... 84
Appendix B. Cultural Resources Programmatic Agreement Vegetation Management Activities-Specific Project Design Features ... 94
Appendix C. Resources Dismissed from Detailed Analysis ... 102
Air ... 102
Climate Change ... 102
Economics ... 103
Environmental Justice ... 104

## Tables

Table 1. Treatment acres by treatment block ... 6
Table 2. Vegetation treatment type and treatment description ... 13
Table 3. Proposed primary haul route ... 17
Table 4. Maximum cross-drain spacing in feet based on soil types ... 21
Table 5. Proposed monitoring activities ... 29
Table 6. Proposed adaptive management actions ... 30
Table 7. Known archaeological sites within the proposal's area of potential effects ... 34
Table 8. Summary of environmental effects to invasive plants ... 39
Table 9. Percentage of total allotment acres within the Salter analysis area ... 40
Table 10. Summary of environmental effects to rangeland resources ... 43
Table 11. Miles of each maintenance level road in Salter project area ... 54
Table 12. Watersheds in analysis area ... 60

## Figures

Figure 1. Vicinity map ........ 5
Figure 2. Treatment type by area ........ 6
Figure 3. Salter project area surface fuel model distribution ........ 35
Figure 4. Plateau Fire, percent basal area loss, open and closed evergreen tree canopy, RAVG . 36
Figure 5. Salter treatment block ........ 84
Figure 6. Plateau Creek treatment block ........ 85
Figure 7. Carlyle Point treatment block ........ 86
Figure 8. House Creek treatment block ........ 87
Figure 9. Boggy Draw treatment block ........ 88
Figure 10. Turkey Knoll treatment block ........ 89
Figure 11. Salter transportation system ........ 90
Figure 12. Boggy Draw recreation implementation map ........ 91
Figure 13. Salter wildlife mitigation ........ 92
Figure 14. Salter affected HUC6 watersheds ........ 93

# Section 1 - Purpose and Need

## Introduction

The Forest Service is proposing to treat approximately 22,346 acres of the ponderosa pine-Gambel oak vegetation type on the Dolores Ranger District of the San Juan National Forest to:

- improve resilience and resistance to epidemic insect and disease outbreaks,
- increase the structural diversity of the ponderosa pine forest represented across the landscape, and
- provide economic support to local communities by providing timber products to local industries in a sustainable manner.

This environmental assessment describes the Salter Vegetation Management Project and presents an analysis of the effects related to the proposed action. This environmental assessment is prepared to determine whether the effects of the proposed action may be significant enough to prepare an environmental impact statement. The Forest Service prepared this environmental assessment in compliance with the National Environmental Policy Act (1970) (NEPA), the National Forest Management Act (1976), and Forest Service Handbook 1909.15, the National Environmental Policy Act Handbook. The 2013 San Juan National Forest Land and Resource Management Plan establishes programmatic direction for the management of NFS lands. The ID Team reviewed this direction and determined that the proposed action complies with the Forest Plan.

## Proposed Project Location

The project area is located northeast of Dolores, Colorado, on the Dolores Ranger District (figure 1). Proposed treatment areas are in the vicinity of Salter Y, Plateau Creek, Carlyle Point, Turkey Knoll, and Boggy Draw. The project is bordered in multiple locations by state and private lands; the Dolores River and McPhee Reservoir on the west; and the West Dolores and Dolores Rivers on the east. The project area is located on suitable timber lands within Management Area 5. Management Area 5 emphasizes active management and commodity production in order to meet multiple use goals (USDA 2013). The legal description of the project area is: T37N R14W portions of Sections 5, 6, 7. T37N R15W portions of Section 10. T38N R14W portions of Sections 2-thru-9, 15-thru-20, 29-thru-32. T38N R15W portions of Sections 1-thru-5, 10-thru-15, 22-thru-26, 34-thru-36. T39N R13W portions of Section 6. T39N R14W portions of Sections 1-thru-24, 26-thru-35. T39N R15W portions of Sections 1, 8-thru-6. T39N R16W portions of Sections 10-thru-16, 22-thru-27, 35, 36. T40N R14W portions of Sections 34-thru-36.




**Figure 1. Vicinity map**

The project area has been divided into six individual treatment blocks based on geographical location and transportation system (table 1).

**Table 1. Treatment acres by treatment block**

| Block | Single Tree Selection (STS) | Commercial Thinning (CT) | Post Fledgling Area (PFA) | Plantation |
|---|---|---|---|---|
| Salter | 1,518 | 348 | N/A | 629 |
| Plateau Creek | 2,065 | 479 | N/A | N/A |
| Carlyle Point | 3,605 | 1,334 | 1,057 | N/A |
| House Creek | 220 | N/A | 246 | N/A |
| Boggy Draw | 9,216 | 723 | 739 | N/A |
| Turkey Knoll | 3,051 | 231 | N/A | N/A |

Each treatment block has been further divided into subunits for greater site-specific refinement for treatment prescriptions, topography, and transportation systems (figure 2). Maps depicting individual treatment blocks and subunits are located in appendix A, figures 6-11.




**Figure 2. Treatment type by area**

Elevations in the analysis area range from 7,800 feet at the southwestern end of the analysis area to 8,800 feet on the northern end. The topography of the treatment area is predominately mesa top with southwest aspect. Slopes range from 0 to approximately 20 percent, with steeper draws and canyons which intersect the project area throughout.

The dominant forest type of the proposed project areas is ponderosa pine with an understory of Gambel oak, grass and forbs. The forest structure is variable and includes plantations from the 1980s intermixed with natural regeneration and overstory trees to mature stands that are generally even aged. Although pre-dominantly even aged, modeling suggests that there are two underrepresented size classes relative to stand structure. Large trees, 27 inches in diameter and larger, are poorly represented with only a few trees per acre. In some cases, these trees are relics left from the last harvest entry. Seedlings and saplings are also underrepresented. The 12 -25 inch size class is the most represented on the landscape with reduced representation as the diameter increases.

Gambel oak can be found in the understory in tree and brush form with variable densities and diameters. Natural meadows are occasionally found in low lying draws where aspen is often present. Aspen is a minor tree species but does persist in some areas and can dominant the canopy in microsites that have adequate moisture and soil. Encroachment of conifer species into these areas due to the lack of disturbance has inhibited ponderosa pine recruitment conditions in some stands. Grass and forb production is lacking in most areas of overstory pine where pine litter dominates the ground layer. Many areas contain over 10 inches of litter (duff) which can inhibit seed contact with bare mineral soil which is essential for successful germination. This same abundance of litter in an uncontrolled burning event could create conditions for resonance heat damage with potential for long term root damage and reduced vigor.

The Salter treatment block also includes plantation areas that differ from traditional row planted plantations, as well as, the stands described above. In the 1980s, there was an extensive effort to regenerate and reforest stands that were below stocking levels as a result of minimally regulated harvesting in 1940s and lack of fire disturbance mainly due to fire suppression. The plantations in the Salter project area went many years without meeting stocking requirements. Brush soon occupied seedling recruitment areas and stands were not regenerating. Some areas received mechanical site preparation to encourage conditions conducive to seedling recruitment. As a result, areas with heavy brush component were treated with a combination of disking and or brush mowing to reduce brush populations and expose bare mineral soil to encourage conditions conducive to seedling recruitment. Interplanting was used in areas lacking the heavy brush component with varying success rates. The result is a diversity of both desired and undesired conditions including areas of heavy regeneration, dense groups of mature ponderosa and areas void of stocking. Beetle induced mortality in the over story and density induced mortality is being observed.

The lands contained within and surrounding the Salter project area provide multiple uses to a variety of stakeholders. Timber harvesting has occurred across the entire project area. The gentle terrain is ideal for livestock grazing with several active allotments crossing the project area. Many forms of recreation occur in the area, including big and small game hunting, year-round biking, Nordic skiing, off-highway vehicle use and hiking. Residential areas of variable densities are clustered along the federal land boundaries. The Montezuma Community Wildfire Protection Plan identifies this area as wildland-urban interface (Dietrich et al. 2011). The San Juan National

Forest Land and Resource Management Plan defines portions of the Carlyle Point, Plateau Creek, Boggy Draw and Turkey Knoll blocks as wildland-urban interface (USDA 2013).

The Boggy Draw treatment block attracts the highest visitor use and contains substantial values at risk, such as a high voltage powerline that runs most of the length of the block with local power coop lines reaching interior to supply power to the nearby residential areas.

## Historical Background

The condition of today's pine-oak forest is largely a legacy of historically unprecedented levels of human activities occurring from the late 19th century into the 20th century. Following the arrival of large numbers of Euro-American settlers in the middle-to-late 1800s, the first sawmill was established in the area as early as 1874, approximately 30 years before the national forest was established in 1905. Around the turn of the century, the company town and lumber mill of McPhee, Colorado was established just a few miles north and west of present day Dolores. Large scale commercial harvesting of the pine forest was underway by the early 20th century.

At its peak in 1927, while owned and operated by the New Mexico Lumber Company, McPhee was Colorado's largest and most productive mill town, producing more than half the state's annual lumber. Operations at the McPhee mill effectively ended in 1948 when a catastrophic fire destroyed most of the facility (Mausolf 1981). In these early days, the vast majority of the logging occurred in the ponderosa pine type and focused on harvesting very large trees while leaving smaller trees and species of lesser value. The most obvious effect of the early logging of ponderosa pine forests is the general lack of large, old trees and snags in these forests today (Romme 2009).

Heavy and largely unregulated livestock grazing was occurring simultaneously with the early logging operations; and active fire suppression had also become a widespread policy in the early 20th century. This unique combination of historic events -- the elimination of extensive fires, removal of grass competition by livestock, and the removal of a large component of the forest overstory coincided with unusually wet weather and good seed crops to establish abundant pine regeneration in the early 20th century (Covington & Moore 1994).

More current activities have included several efforts to restore ecological function to the project area. The Ponderosa Pine Partnership was to develop prescriptions based on the most current science from Colorado State University and other forest management research centers of forest management. Through aggressive harvesting and reestablishing of fire frequency the stands would become more productive and develop wildfire and insect and disease resilience. Although the partnership had some innovative approaches to collaboration and contract procurement the Partnership never achieved full success. The lack of industry and consistent markets plagued the economics portions of the project. Diameter caps were also used which limited prescriptions in meeting the full intent for uneven aged management and economically stabile harvests.

In 2014, the Lake Canyon Environmental Assessment was prepared in direct response to the initial identification of the current bark beetle outbreak. This assessment covered approximately 10,000 acres and included harvest, pre-commercial thinning, mastication and prescribed fire activities. Roughly 70-to-80 percent of the harvest and pre-commercial activities have been completed. Prescribed fire activities continue within the project area with activity fuels and first entry broadcast burns. Implementation has been slow on this analysis due to lack of market for ponderosa pine. Another limitation of this treatment was strictly designating cutting units to treat

a moving infestation. Stands that had little to no infestation in 2014 have developed into 70-to-80 percent infestation.

The Lone Pine decision notice was signed in 2019 and includes approximately 36,000 acres of ponderosa pine treatment adjacent to the Salter treatment area. Project implementation has started on Lone Pine and an overlap in implementation periods with Salter vegetation management is anticipated.

## Need for this Proposal

The need for this project is derived from the differences between the existing forest vegetation conditions and the desired forest vegetation conditions, as defined by the San Juan National Forest Land and Resource Management Plan (USDA 2013).

All units proposed for treatment are located within Management Area 5. Management Area 5 is a management area allocation that provides for active management; emphasizing commodity production in order to meet multiple-use goals. In Management Area 5, forest visitors can expect to see a wide range of activities including timber harvesting. These are multiple-use areas where active management occurs in order to meet a variety of social, economic and ecological objectives. These areas are easily accessible, occurring mostly on roaded landscapes and relatively gentle terrain. These are lands where timber harvesting and other management activities influence the composition, structure and landscape patterns of the vegetation. Natural ecological processes and disturbance agents (including succession and fire) are often influenced by humans on many of these lands.

In addition, all units proposed for treatment are identified as suitable timber lands by the land and resource management plan. Timber suitability is determined through a process established through the National Forest Management Act and planning regulations. The San Juan National Forest Land and Resource Management Plan (USDA 2013) provides further direction relative to the desired conditions associated with Management Area 5 and suitable timber lands as well as other general guidance relative to the San Juan National Forest vegetation management program, as provided below.

The timber program across the San Juan National Forest lands will focus treatment in:

- landscapes in the wildland-urban interface that have altered fire regimes and/or have areas with high fuel loadings;
- landscapes at high risk for developing epidemic levels of insect and/or disease infestation;
- landscapes where disturbance (such as fire, insects or disease) has resulted in dead or dying trees;
- areas where vegetation management could most effectively move age classes, size classes, density and species closer to desired conditions;
- areas treated previously in order to maintain sustainable conditions and improve scenic integrity; and
- areas where wood processing facilities can effectively and economically utilize products resulting from vegetation management.

Strategies to meet forest vegetation management objectives across the San Juan National Forest include:

- utilization of forest resources from vegetation management activities, including providing small-diameter and biomass products from treatments in order to support emerging biomass markets;
- trees killed by fire, insects, disease or weather events (such as wind-thrown trees);
- a balance of forest product quantity, size, species and quality in order to maintain forest products industry capacity at current or higher levels;
- integration of the timber and fuels programs to meet overlapping or common goals; and
- a combination of legal authorities and partnerships to broaden opportunities for meeting forest vegetation objectives, in priority landscapes or areas, with cost-effective treatments.

The desired conditions for the ponderosa pine cover type and lands managed for forest product offerings are further defined in sections 2.2.23 and 2.9.1 of the San Juan National Forest Land and Resource Management Plan (USDA 2013).

**2.2.23: Ponderosa Pine Forests -** Ponderosa pine forests display variable density and structure. Most stands reflect uneven-age structure comprising variable-sized, even-aged clumps of trees. Clumps vary in size, ranging from as few as three trees to as many as 20 or more trees. Tree clumps vary in density from widely spaced large trees to tightly spaced small trees. Collectively, these forests contain multiple canopy layers. Between or surrounding these clumps are shrub-and/or grass/forb-dominated openings. Ponderosa pine seedlings and saplings are present, as are large old, yellow-barked ponderosa pine trees. The presence of other tree species—for example, Douglas-fir, white fir, blue spruce (*Picea pungens*), or Rocky Mountain juniper (*Juniperus scopulorum*)—is infrequent to rare. The abundance and distribution of Gambel oak (*Quercus gambelii*) and other native shrubs in the understory of these forests is variable and includes small and large patches of all size classes. Native grasses and forbs (including bunchgrasses, Arizona fescue, muttongrass [*Poa fendleriana*], and mountain muhly [*Muhlenbergia montana*]) are present and well distributed in most ponderosa pine forests. Forest litter is common, though highly variable in depth and extent due to fire. Invasive plant species are absent or rare. Presence of snags or large wood (on the ground) is also highly variable due to fire. Low-intensity, high-frequency surface fires are common in most ponderosa pine forests (with frequencies ranging from about 12-to-30 years).

The San Juan National Forest Land and Resource Management Plan provides additional direction relative to the desired conditions associated with suitable timber lands, as follows:

**2.9.1:** Forest vegetation management on San Juan National Forest lands that results in, among other objectives, meeting needs or demands for forest product offerings (commercial, personal, or other use) is done in a manner that:

- maintains or improves ecosystem function, resilience, and sustainability;
- supports, at least, the current level of economic activity in the local timber industry;
- provides economic or social support to local communities;
- ensures current and future needs for Native American tribal use, including that associated with special forest products (for example, teepee poles);

- utilizes, to the fullest extent practicable, potential products including sawtimber, poles, top wood, or slash (for example, limbs, foliage);
- supports innovation in utilization, including conversion of cut-tree mass into biofuels, pellets, biochar, or other useful products;
- efficiently balances or reduces costs of implementation of treatment activities; and
- anticipates climate-related plant succession changes (such as favoring heat- or drought-resistant tree species as leave trees, or in reforestation).

**Section 2.9.14** of the land and resource management plan identifies appropriate silvicultural systems that meet the management objectives for the landscape or individual stands of trees within a landscape setting. Both even- and uneven-aged management systems can be applied at scales ranging from a few acres to many hundreds of acres. These silvicultural systems are to be applied in a manner that will ensure natural regeneration where artificial regeneration is not necessary for other resource objectives. Tree-stand vegetation management treatments must be approved by certified silviculturists. Table 2.9.4 of the Land and Resource Management Plan indicates that group selection and single tree selection systems are acceptable in the ponderosa pine vegetation type. With respect to post treatment vegetation management, tables 2.9.3 and 2.9.5 of the Land and Resource Management Plan identify that both natural and artificial regeneration methods are acceptable and establishes the minimum number of seedlings for adequately restocking a regeneration site to be 150 seedling/acre.

As a means to implementation of the above management direction, the land and resource management plan identifies those “areas where wood processing facilities can effectively and economically utilize products resulting from vegetation management” as priority areas for treatment. The land and resource management plan also describes the need for industry to be in place, as well as, the presence of conditions conducive to support industry and local economies. In regard to the Salter vegetation management proposal, adequate industry is currently in place, with the desire, and ability to interact with local purchasers to help meet the need described in this proposal. Consistent with land and resource management plan direction, this proposal provides an opportunity to utilize industry to not only meet short-term vegetation management goals but also for accomplishing sustainable long-term goals leading to innovations for increasing utilization.

A comparison based on common stand exam data, Forest Vegetation Simulation modeling, and field observation between the current and desired conditions shows that the condition of the ponderosa pine cover type found within the Salter vegetation management activity area is different from the desired conditions associated with that vegetative cover type in the San Juan National Forest Land and Resource Management Plan.

The structure and size class distributions in the stands identified for this analysis are not within desired conditions described in 2.2.23 based on field reconnaissance and inventory data. Bark beetles have infested adjacent landscapes causing significant mortality. The early stages of a bark beetle infestation is now being observed in the Salter project area. There are portions within the Salter project area that have been moderately burned by wildfire and there are immediately adjacent areas that have been severely impacted by wildfire. It is well documented that dense, over-stocked, even-age, closed canopy ponderosa pine stands are more susceptible to insect outbreaks and uncharacteristic stand replacing fire events (Negron et al. 2008). It is also is well documented (Negron et al. 2008, Negron et al. 2000, USDA-rmrs_2009_gibson_k0022000) that a lack of structural diversity corresponds directly to a reduction in forest resiliency and consequently long term resistance to detrimental natural and human disturbance events.

Based on this comparison, the following needs have been identified:

- improve resilience and resistance to epidemic insect and disease outbreaks,
- increase the structural diversity of the ponderosa pine forest represented across the project area, and
- provide economic support to local communities by providing timber products to local industries in a sustainable manner.

# Section 2 - Proposed Action and Alternatives

This environmental assessment considers three alternatives: (1) no action, (2) the modified proposed action and (3) a large-tree retention alternative that limits harvesting to trees 20.0 inches diameter at breast height

## Proposed Action (Alternative 2)

The Dolores Ranger District is proposing tree-cutting, tree planting, and activity fuel burning in the locations displayed and described in figure 1, table 2, and figures 6-11-appendix A. The combined acreage of these project areas is approximately 22,346 acres. Treatments would lower pine stocking levels, reduce the presence of dwarf mistletoe disease, and remove infested bark beetle trees, and dead trees. The proposed actions would create gaps and small openings in the dense canopy to allow sunlight to reach the forest floor and activity fuel burning would reduce duff; exposing bare soil and encouraging the growth of young trees and understory.

Four silvicultural treatments are proposed to move the treatment area towards the desired conditions. Immediately prior to harvesting, a condition specific prescription based on stand exam data, local knowledge of the area, and walk-thru exams would be applied to each stand. The final prescriptions would vary depending on stand-specific objectives and current conditions.

A group, clump and individual structure distributed across the landscape is desired while achieving basal area targets. This will be achieved through enhancement of current stand components or through harvest designed to achieve conditions conducive to gaining more desired conditions over time. Utilizing harvest to replicate historic tree patterns is intended to improve ecological function and resilience and to return the role of fire on the landscape.

A group is several to many trees, and can be ½ to ¾ of an acre in size with all trees growing in close proximity to each other with interlocking crowns for the most part, with a clearly definable edge. Defining the edge is key in determining a group size as well as undesirable ingrowth in need of removal. Stems can be separated by as much as 20 feet. Typically main stems of the trees in a group have not been influenced greatly by the proximity of neighboring trees. A clump is a small group of trees growing with stems touching at the base or nearly so. The main stems of trees in a clump have likely been influenced by the proximity of neighboring trees. Individual trees are trees within a stand’s matrix that are single trees allowed to be open grown with full canopy sunlight.

Table 2 summarizes the types of silvicultural prescriptions that would be applied based on the condition of stands at the time of implementation.

**Table 2. Vegetation treatment type and treatment description**

| Treatment Type | Treatment Description[1] |
|---|---|
| Single Tree Selection | An uneven-aged regeneration method where individual trees of all size classes up to 26 inches diameter at breast height are evaluated and removed more or less uniformly throughout the stand creating or maintaining a multiage structure of groups, clumps and individuals to promote growth of remaining trees and to provide space for regeneration. Multiple entries of this activity ultimately results in an uneven-aged stand of 3 or more age classes. This would be the preferred and dominate prescription used. 50-to-70 basal area per acre of residual basal area depending upon stand condition. There are 19,675 acres of this treatment type. |
| Commercial Thinning | Silviculture "Free Thinning" with enhancement objectives in mixed stocking ponderosa pine with a variable residual square feet of tree stem basal area of 50 - 70 basal area per acre depending upon stand condition. Individual trees of all size classes up to 26 inches diameter at breast height are evaluated and removed throughout the stand creating or maintaining a multiage structure of groups, clumps and individuals.<br>These stands have some of the following characteristics: recent treatment, structure is more clump than group, inconsistent harvestable volume per acre. Goal is to enhance current qualities of the stand to promote resiliency to disturbances. Includes the plantation units. There are 3,115 acres of this treatment. |
| Post Fledgling Area Thinning (PFAT) | PFA prescription is a free thinning in which trees of all size classes up 22 inches are evaluated for harvest while retaining a 100-to-120 residual basal area target. A focus on large groups of 20-30 trees or more is desired with internal clumps made up of 3-to-5 large and mature trees with interlocking crowns. Individual tree structure and isolated clumping is not desired structure in this treatment type. When structure is not available, thinning should focus on creating conditions for long-term structure moving towards PFA desired conditions. |
| Pre-commercial Thinning | Thinning of ponderosa pine (Less than 5 inches diameter) to variable spacing specifications. Would be implemented in any treatment unit. |
| Brush Thinning | Thinning of understory brush species (generally target brush less than 6 inches diameter at root collar), mainly Gambel oak; to create openings for seedling recruitment and reduce ladder fuel effects on residual trees. Would be implemented in any treatment unit. This prescription is limited to treating no more than 5,000 acres. |

Prescriptions are generally for the mechanical harvesting of vegetation, however, hand manipulation of vegetation may also occur. Processing of the vegetation would occur in harvest units and would be concentrated at landings within the units for final processing prior to transport off the forest. Slash created during treatments would be treated by removal, piling or lop and scattering, based upon recommendations from fuels specialist.

Normal operating season would be from April 1 until November 30. Winter season would be from December 1 until February 28. Snow plowing would be allowed to facilitate access. Additional time outside of those defined above may be granted by the line officer if conditions allow.

## Single Tree Selection

Single tree selection is an un-even aged regeneration harvest method approved for use under the Land and Resource Management Plan at 2.9.14 for ponderosa pine. Single tree removal is an

[1] No tree larger than 26.9 inch diameter at breast height would be cut in alternatives 2 and3.

uneven-aged regeneration method where individual trees of all size classes up to 26 inches diameter at breast height are evaluated and removed more or less uniformly throughout the stand creating or maintaining a multiage structure to promote growth of remaining trees and to provide space for regeneration. Multiple entries of this activity ultimately results in an uneven-aged stand of three or more age classes. The purpose of this entry is regeneration to promote the propagation of a new cohort of trees. Trees are individually selected for removal based on spacing, tree form, insect or disease evidence and species preference. With any un-even aged prescription there is no terminus to the management of the stands, meaning that process continues indefinitely with re-entry every 20-to-25 years. This is referred to as a cutting cycle. The initial cut would reduce basal area, but with most stands, the first entry alone would not achieve the desired uneven-aged structure described above. More specifically, the stands lack enough trees in all the age classes to meet the desired target per age class. To compensate for this more trees than desired would be left in certain age classes to maintain the desired basal area target. Overtime, and with continued entries, the stand would eventually become regulated and then only trees in excess in each size class would be removed at each cutting cycle.

The single tree selection prescription would be applied to the majority of the project area. The prescription that follows was developed on the average stand characteristics taken from stand exam data. All the prescriptions would have the same basic components but may vary slightly due to changes in site conditions and stand locations in the project area as the stands identified for treatment are relatively uniform.

Single tree selection prescriptions would all have the same basic components and would use a BDQ method where “B” is the desired residual basal area, “D” is the maximum tree size (all trees 26.9” and larger diameter at breast height would be retained in all stands) and “Q” describes the diameter distribution as a ratio of the number of trees in succeeding size classes. Based on stand exam data the general prescriptions would target a residual basal area of 50-to-70 $ft^2$/acre with a mean or target of 66 basal area when conditions allow.

For the average stand in the project area, the residual basal area would be 60-to-68 $ft^2$/acre depending upon the silviculture treatment. The maximum diameter to harvest would be 26.9” and the q-factor would be 1.3 (applied to 2 inch diameter classes). The residual stocking level of 50-to-70 $ft^2$ was chosen to allow sufficient growing space to establish new regeneration while reducing severe fire risk and promoting tree vigor. The maximum diameter of 26.9” addresses management objectives by providing a continuous supply of desirable saw timber products without allowing trees to progress into age related decadence while at the same time maintaining a large tree emphasis on the landscape. A q-factor of 1.3 keeps sub-merchantable trees fully stocked for the next cohort. The harvests would take place on a 20 to 25-year cutting cycle to allow for sufficient stand growth while at the same time keeping stand density within the target range.

Aspen trees found in distinguishable groups would be targeted for a lower basal area to increase vigor and promote recruitment conditions. This would be done by thinning around aspen trees to create as close to full sunlight conditions as possible. Aspen is a shade intolerant species and requires full sunlight to vigorously grow and regenerate. The overall goal is to increase light to the forest floor and expand the aspen stands which increases stand composition and enhances wildlife habitat. Aspen comprises less than one percent (90 acres) of the activity area so this effort would provide the growing space to expand this critical species. No aspen trees would be prescribed for cutting under this proposal.

## Commercial Thinning

Thinning is defined as an intermediate harvest treatment designed to improve the overall stand functionality and improve growth rates by reducing trees per acre. Thinning does not have specific silviculture objectives related to regeneration as it is an intermediate prescription, however, conditions will be created that promote regeneration. No modeling was conducted related to commercial thinning due to the intermediate nature of the prescription and related difficulty to accurately model the outcomes. These areas are a minor component of the overall project acres. Based on stand exam data, the general prescriptions would target a residual basal area of 50-to-70 $ft^2$ per acre with a mean or target of 60 basal area, depending on stand conditions. In general, emphasis would be placed on retaining the healthiest green trees in the groups, clumps, and individuals depending upon current structure and stand productivity

Aspen trees would be targeted for a lower basal area to increase vigor and promote recruitment conditions. This would be done by thinning around the aspen trees and removing pine trees to create space which is essential in promoting aspen regeneration. The overall goal is to increase light to the forest floor and expand the aspen cohorts which increases species diversity and improves wildlife habitat. Aspen comprises less than one percent of the stand area so this effort would provide the growing space to expand this critical species. No aspen would be prescribed for cutting under this proposal.

## Post-fledgling Family Area Thinning (PFAT)

The post-fledgling family area thinning applies to currently mapped post-fledgling family areas and is a commercial thinning by definition, and as such, an intermediate harvest treatment. The prescription is also designed to improve the overall stand functionality and improve growth rates by reducing trees per acre while maintaining or promoting a relatively closed canopy structure to meet goshawk habitat. Post-fledgling family area thinning does not have specific silviculture objectives related to regeneration. No modeling was conducted related to commercial thinning due to the intermediate nature of the prescription and the related difficulty to accurately model the outcomes. These areas are a minor component of the overall project acres. The base prescription was developed with technical input from the district wildlife biologist. Trees of all size classes up to 22-inches diameter at breast height are evaluated for harvest and designated for removal, with an emphasis on large leave groups with 20-to-30 trees per group. The objective is to promote clumps of 3-to-5 mature and older trees with interlocking crowns within groups. Individual tree structure and isolated clumping is not desired structure in this treatment type nor is promoting aspen. Small openings of two acres or less could be created when implemented for insects (e.g., bark beetles) or disease (e.g., mistletoe) or to release advanced regeneration (Reynolds et al. 1992). Where existing conditions do not provide for application of this prescription, thinning will focus on enhancing what is desirable and creating conditions for recruitment of the desired structure over time (Reynolds et al. 1992).

## Pre-commercial Thinning

Precommercial thinning could be applied in any unit identified for silviculture treatment. The prescription would attempt to create variable spacing with an emphasis on clumping and individual patterns; considering the overall improvement of growth and resiliency. This pre-commercial thinning prescription would increase resiliency and promote healthy and productive pine stands. Due to a limited number of trees less than 5 inches diameter at breast height; not all stands would require this treatment; each stand would be evaluated by a certified silviculturist prior to implementation to determine the site-specific need.

## Brush Thinning

This treatment could take place in any unit identified for silviculture treatment. The presence of Gambel oak and other woody brush species in this pine ecosystem are both a hindrance and help. Oak specifically plays an important part in pine stands in southwest Colorado, most notably it is a very important species for wildlife habitat providing cover and concealment for big and small game animals and as a food source for a number of species. However, if not controlled with fire or mechanical treatments, oak creates difficulties in the management of pine. Although oak plays a role in nutrient cycling and providing fuels for natural and prescribed fire, it also dominates the understory in many places and competes for light and nutrients needed for young pine trees. There may be instances where the silviculturist needs to prescribe, in conjunction with the wildlife biologist, mastication or hand cutting of brush to reduce its presence in the pine stands. This would be done on a limited basis due to cost and the limited occurrence of this condition on the ground. The focus of these prescriptions would be to remove oak but other brush may be impacted during implementation. Total removal of oak would not be implemented, but rather, a reduction with the purpose of creating openings for pine regeneration in areas that have insufficient stocking levels. The focus of the treatment would be on oak, in the brush form, with a desire to remove species 6 inches diameter at root collar and less.

## Conditions Influencing Silvicultural Treatments

All silviculture prescriptions would be written by a certified silvicultirist and would be condition-based within the effects of this analysis. Stands that have an above average threat of a bark beetle infestation, either from identified stand traits or untreated nearby stands, would have a lower basal area retention prescription applied. Indicators and triggers suggesting the need for the application of a lower basal area retention prescription include: the stand diameter index is greater than 175, the current basal area or the basal area in adjacent stands is greater than 80, or the stand currently has bark beetle populations in or around the stand. Stands displaying these conditions would have the lower basal area retention prescription applied to all or portions of the stand. The goal is to reduce overall stand average basal areas, which in turn lowers the percent chance of an infestation (Negron et al. 2008). Direct control measures would be used to lessen the spread of current infestations. Areas with heavy mistletoe, especially if advanced regeneration is in place, would also be targeted with the lower basal area retention prescription. Typically, the mistletoe in early to mid -stages of infections occupies the upper canopies of a stand. By removing highly infested trees, a reduction in the parasitic plant occurs and a separation of canopies occurs; making it less likely to spread. Areas of stands with advanced regeneration in need of releasing to improve growth would receive a lower basal area retention prescription. Forest inventory has shown one of the underrepresented size class components in these stands is seedlings. If regeneration has occurred, then a reduction in overstory around the regeneration would promote an increase in age and size class diversity while improving vigor of the trees retained. Stands with aspen present in distinguishable groups would receive the lower basal area retention prescription. Increasing sunlight to the forest floor through conifer canopy reduction would enhance recruitment conditions in aspen and reduce overall competition for plant resources.

Retention of upper basal area stand averages would be focused on high productivity areas with minimal eminent risk of infestation of bark beetles or heavy disease. Site index would be used by the silviculturist, in combination with current conditions, to make a final determination at the time of prescription writing as to the variance of options available for tree designation to meet desired conditions. The goal is to move stands to desired conditions given the variables of this landscape.

# Connected Actions

## Post –Treatment Vegetation Management

These actions could potentially be done within any single tree selection unit when conditions occur.

### Site Preparation

This treatment is done prior to planting and involves the following actions:

- Mechanical felling and processing of dead trees to reduce hazardous fuels, except those required to meet San Juan National Forest wildlife snag requirements set forth in Table 2.2.3 of the land and resource management plan. Any live trees that are infested with bark beetles would also be removed, but isolated green trees that are not infested would not be cut.
- Removal of hazardous fuel (dead trees only) utilizing the same approach as harvest in single tree selection but leaving 1/3 of all potential volume to be utilized as enhancements and mitigations.
- Placement of logs on contours for erosion control and placement of logs for microsite creations to enhance planting survivability.
- Hand scraping of ground vegetation (scarification) to expose bare mineral soil and reduce competition.

### Reforestation

- Hand planting of ponderosa pine stock from locally collected seed.

## Transportation System

Other activities associated with the proposed vegetation treatment would include maintenance-related road-work. The work would be performed prior to, during, and/or following treatments. The majority of this work would involve reshaping and smoothing of the road surface and restoring any associated drainage ditches or rolling dips. Several additional Maintenance Level 1, stored roads, that have been closed and unused for the last 20-to-30 years would be reopened, used and put back in storage after use. These roads could require some level of reconstruction in addition to normal maintenance to return them to an operational status. Reconstruction would largely consist of clearing downed trees and grown-in vegetation, installing or repairing drainage at stream crossings, along roadside ditches or associated with rolling dips and repairing failed sections of the roadway. Table 3 below, displays the proposed primary haul route. Figure 11, appendix A depicts the location of the Salter transportation system. Forest products would be removed off the Forest via the identified Forest Service roads. Some primary haul routes would require upgrades to the surface and could include the change of surfacing type to accommodate the volume of forest products being removed.

**Table 3. Proposed primary haul route**

| Treatment Block | Forest Service Road Number and Name |
|---|---|
| Salter | FSR 510 Dry Canyon; FSR 521 Ormiston Point |
| Plateau | FSR 523 Trimble; FSR 514 The Glade; FSR 521 Ormiston Point |

| Treatment Block | Forest Service Road Number and Name |
|---|---|
| Carlyle Point | FSR 524 Plateau; FSR 525 Trail Canyon; FSR 514 The Glade; FSR 526 Dolores Norwood |
| Boggy Draw | FSR 527 Boggy Draw; FSR 526 Dolores Norwood |
| Turkey Knoll | FSR 249 Bald Hill Res; FSR 527 Boggy Draw; FSR 532 Cottonwood; FSR 526 Dolores Norwood |
| House Creek | FSR 526 Dolores Norwood; FSR 529 Beaver Rim |

No new permanent roads are proposed to be built with this project, though temporary roads may be required to reduce the need for excessive tractor skidding and allow wood products to be moved to the permanent road system. Creating these roads would involve clearing vegetation and minimal construction. They would be constructed, utilized and reclaimed when rainfall and erosion potential is minimal. These segments would be decommissioned within five years of first use. Approximately 50-to-75 miles of temporary road construction are analyzed under this proposal.

Any existing system roads currently closed to public motorized use would remain closed (except for permitted use) during and following operations. Closures would be accomplished via a variety of means, such as gates or boulder barriers with disturbed areas scarified and seeded following use. All roads in the project area that are currently open to public car and truck traffic would remain open following operations. For safety, short-term closures of publicly accessible roads or trails may be necessary during logging operations.

### Fuels Treatment

Other related forestry activities would include the reduction of activity fuel. Cutting and removal of trees would result in limbs, tops, un-merchantable boles and stems, referred to as slash. Slash typically concentrates at landing locations or within the treatment units themselves. Landings would be identified by the sale administrator during implementation with guidance from the design features developed during this analysis. Timber sale unit contracts would require concentrations of this material to be disposed of by a) piling for later burning, b) lopping and scattering throughout the unit, c) a combination of scattering and piling/burning or d) removal from the site. The method used would be dependent upon the amount of slash generated and the mechanical means employed by the contractor, as well as, specific conditions within the unit.

## Other Actions

Wildlife guzzlers would be installed within the project area under this proposal. The goal is to provide additional water sources for wildlife during dry months and in years when drought conditions are present, as well as to encourage large game to remain upland on Forest Service land ownership to decrease the potential for damage to private property. The Salter project is mostly situated on flat plateaus, rugged rocky draws or where well-distributed perennial water sources are lacking. The area serves as an important migration route for mule deer and elk; and also supports habitat for other wildlife species, including upland gamebirds and migratory birds.

As a means to supplement natural water sources that do occur in the area, the district would install four guzzlers in strategic locations in the Salter and Plateau treatment block units to provide connectivity to other perennial waters sources. Site locations were chosen by surveying the project area for accessibility and installation suitability. The surrounding landscape, existing

water sources and wildlife movement patterns were also considered. Guzzlers would be catchment-type guzzlers, by which rainwater and snowmelt is funneled into a holding tank (usually via an "apron") and delivered through an open drinking pan. Fencing would be built around the guzzlers to protect the structure from unintended use or damage. The footprint size of a guzzler is approximately 12 by 12 feet, with protective fencing measuring approximately 20-to-25 feet around the site. Site preparation involves clearing the space with hand tools and setting a portion of the guzzler approximately 4-to-12 inches in the ground. Site preparation is dependent on soil conditions and rocky terrain. All materials would be brought in with a UTV or ATV. Temporary road construction is not necessary to maintain or install these guzzlers.

# Project Design Features

Project design features detailed below were developed for the proposed action to minimize or eliminate potential adverse effects during implementation of the Salter vegetation management project. These design features come from a variety of sources including, but not limited to, Forest Plan Standards and Guidelines, direction and guidance provided in Forest Service Handbooks and Manuals (including the Region 2 Watershed Conservation Practices Handbook), Vegetation Management Programmatic Agreement between the Forest Service and Colorado State Historic Preservation Officer (2017), and professional judgement.

The design features listed below are essential to the proposed action, including all actions that occur as the result of adaptive management, and are expected to provide adequate resource protection under the treatments proposed for this project.

## Cultural Resources

The procedure set forth in the 2017 Programmatic Agreement among the United States Forest Service, Rocky Mountain Regional Office, Pike-San Isabel National Forest and Cimarron and Comanche National Grasslands, Routt National Forest, San Juan National Forest and the Colorado State Historic Preservation Officer Regarding Vegetation Management Undertakings (PA) would be followed to satisfy compliance with Section 106 of NHPA. The PA may be used for landscape-scale vegetation management undertakings implemented in phases and for which effects to historic properties have not been fully determined prior to the NEPA decision. Appendix B. Cultural Resources Programmatic Agreement Vegetation Management Activities-Specific Project Design Features identifies a strategy and activity-specific design features intended to mitigate potential adverse impacts of the proposed activities on cultural resources.

## Fuels

1. Timber sale or stewardship contracts would require concentrations of activity fuels to be disposed of by piling and burning, lopping and scattering throughout the unit, and/or removal, as specified in the slash disposal plan for each project area.
2. Machines used to pile slash would be equipped with a brush blade or acceptable equivalent. Piles should consist of only clean forest fuel as described in the California Air Pollution Control Division smoke permit application.
3. Develop a slash disposal plan for each project area in consultation with the wildlife biologist, hydrologist and fire management officer.



FS-000732

4. When in Stage 1 Fire Restrictions or greater all mechanized equipment should be equipped with fire suppression equipment (Fire extinguisher, hand tools and or portable water tank, minimum 100 gallons).
5. Piles of activity fuels generated by the proposed action must be no greater than 3,000 $ft^3$ per acre, regardless of individual pile size in order to remove all piled slash within one average winter season while following Colorado Air Pollution Control Division requirements for pile prescribed fires.
6. Activity fuels that are lopped and scattered must be evenly distributed at an average depth less than one foot in order to maintain residual overstory through broadcast prescribed fire implementation.

## Hydrology and Soils

1. Heavy equipment and vehicles will be prohibited in riparian areas which will include the aquatic management zone (AMZ) unless the ground is protected by either one foot of packed snow or two inches of frozen soil. Seeps and springs with riparian vegetation would have a buffered perimeter of 100 feet. Intermittent streams with riparian vegetation would have a buffer strip width of 100 feet on each side of the channel (based on standard 2.6.30). No-equipment buffer zones do not apply to designated stream crossings, but limit stream crossings to the minimum number necessary. Cross streams perpendicular to the direction of flow in straight and shallow locations and where channels are hardened by gravel, cobble or bedrock. Do not cross streams where banks exceed a 30% slope.
2. Limit equipment operations to sustained slopes less than 40%.
3. When soils are saturated, equipment operations would cease until the ground dries out or freezes. Soils are considered saturated when ruts created by equipment are 4 inches deep (beyond the lug tread of the tire) for 10 feet or longer. Repair any rutting deeper than 4 inches.
4. Avoid mechanical treatments in wetlands, wet meadows and riparian areas. No skidding, decking or loading would be allowed in these areas in order to protect water quality, groundwater hydrology, existing soils and vegetative cover. Removal or mechanical treatment of riparian or wetland vegetation would be prohibited (based on guideline 2.4.28). Establish a 100 foot no treatment buffer zone around riparian and wetland areas unless field visit by hydrologist determines a different site-specific buffer.
5. Avoid ground skidding on sustained slopes steeper than 40 percent. Conduct logging to disperse runoff as practicable. Landings and skid trails would be located and designed to disperse runoff and minimize soil disturbance. Landings should not be located in the aquatic management zone (AMZ). Roads and skid trails adjacent to the landings would be cross-drained or shaped so that runoff does not reach the landing. Skid trails would be located perpendicular to slope angles (along the contour) as much as possible. Avoid skidding up or down drainage bottoms. As needed, install waterbars or outslope, and spread slash on skid trails upon completion of use. Landings would be ripped or scarified and seeded immediately upon completion of use.
6. Where erosion is a concern, enough slash would be well-distributed throughout the cutting units to protect soils from erosion. Wood chips produced by mechanical treatments should be dispersed on the ground at a maximum depth of three inches over at least 80 percent of the covered areas, and no chip piles should exceed 6 inches in depth (based on guideline 2.2.78).

Logging debris may not enter intermittent stream courses to an extent that it adversely affects the natural flow of the stream or diminishes water quality.

7. Temporary roads would be held to the minimum feasible number, width and total length and would be located sufficiently far from streams and other water bodies to minimize discharge into those waters except at necessary water crossings. Stream crossings would be installed on straight and resilient stream reaches as perpendicular to flow as feasible. Maintain stream channel width, depth, and slope. Culverts placed within the drainage network would be positioned at the natural grade of the drainage and would not be modified (for instance, raised or lowered) to maintain the grade of the road. Table 4 below, provides guidelines for maximum spacing of cross-drainage (for example, culverts, rolling dips) on temporary roads. All temporary roads would be obliterated and seeded upon completion of use.

**Table 4. Maximum cross-drain spacing in feet based on soil types**

| Road Grade (percent) | Extra Erodible Silts-Sands with little or no binder | Highly Erodible Silts-Sands with moderate binder | Erodible Gravels + fines & sands with little or no fines | Low Erodible Gravels with little or no fines |
|---|---|---|---|---|
| 1-3 | 600 | 1000 | 1000 | 1000 |
| 4-6 | 300 | 540 | 680 | 1000 |
| 7-9 | 200 | 360 | 450 | 670 |
| 10-12 | 150 | 270 | 340 | 510 |
| 13-15 | 120 | 220 | 270 | 410 |

Source: Forest Service Handbook 2509.25 Management Measure 13.3

8. Proper drainage would be constructed or reconstructed on existing system road and newly constructed temporary roads. Some existing road sections could need to be realigned out of low-lying areas for proper drainage. Road-stream crossings and dips through habitually wet areas on roads open to motorized public use would be hardened. All drainage structures on roads would be inspected by the Timber Sale Administrator, Engineering Representative, or Forest hydrologist at treatment completion to make sure they are in good condition and functioning properly.

## Rangelands

1. U.S. Forest Service rangeland management specialists would be annually informed of the schedule of timber harvest activities.
2. Coordination between the U.S. Forest Service rangeland management specialist and affected grazing permittees would be conducted to discuss harvest timing, potential impacts, and adjustments to rotation schedules needed to mitigate impacts.
3. To mitigate impacts to livestock operations, when possible, timber harvest operations would be concentrated within individual pastures.
4. When determined necessary by the rangeland management specialist, timber harvest operations would avoid long-term range trend monitoring plots. The need to avoid monitoring plots would be made on a case-by-case bases
5. Timber purchasers/contractors are required to repair any damages to range improvements that occur as a result of their operations within the time-frames instructed by the U.S. Forest Service. To address the immediacy of livestock control, purchasers/contractors would be

required to repair any range fences or gates damaged during operations. No fences would be cut unless necessary and agreed to in writing by the U.S. Forest Service. When fences lie within cutting units, effort would be made to design skidding patterns to be parallel to fence lines, pull timber away from fences, or to go through existing gates as feasible. In the event temporary roads and skid trails need to cross livestock fences at locations other than existing gate locations, breach points must be closed with wire or a gate while operations are being conducted to a standard that does not reduce control integrity of the fence for livestock. Should a road have high traffic use from operations, consideration should be given to the installment of a cattleguard. Upon completion of operations, any section of impacted fence would be repaired to the original state of integrity.

6. Pasture gates would remain closed when cattle are in or adjacent to affected pastures or when instructed by Forest Service.

## Rare Plants and Invasive Species

1. Limit each burn pile to ¼ acre or less.
2. Under timber sale contract provisions, all off-road heavy equipment must be washed and free of foreign soil or debris before entering the operations area to minimize spread of invasive species.
3. Sale and contract areas would be monitored for weeds; infestations are to be reported to the U.S. Forest Service rangeland management specialist for management.
4. All seed used for revegetation would be tested for, and free of, invasive non-native species that are problematic for this forest. Contact the agency for the most current list.
5. Monitor noxious weeds/invasive species and treat as needed to contain established infestations and minimize rate of spread.
6. If noxious weeds and invasive species are found to be increasing in infestation size within a treatment unit as direct result of harvest and associated activities, one or both of the following options would be implemented to prevent further spread:
   - Prohibit harvest equipment or vehicles from driving through infestations.
   - Require onsite weed decontamination stations for equipment washing.

## Recreation and Public Safety

1. For public safety purposes once harvest operations begin in either the Boggy Draw or Turkey Knoll treatment blocks and throughout duration of operations in either block, an information station would be set up at the Boggy Draw trailhead. The information center would contain up to date maps displaying location of cutting units with active units identified, as well as, trail locations.
2. Within the Boggy Draw treatment block the following specific project design features apply (unless waiver or variance is approved by Recreation and Timber Staff and documented on the implementation checklist)
   a. Locations of all landings and slash piles would be identified during the implementation checklist process in order to avoid long-term physical impacts to any system trails.

b. The sale administrator will designate crossing corridors for all skidding that requires crossing a system trail.

c. No tracked or wheeled equipment will be allowed within 15 feet of the center line of a system trail in order to protect the integrity of the trail except where a trail crossing for skidding or hauling has been identified.

d. Vegetation management activities (except Rx burning) are limited to 1 compartment at a time when operating within recreation compartments 1-thru-3 (Figure 12, appendix A).

e. No harvest activities or hauling allowed in recreation compartments 1-4 during the annual “Escalante Days” mountain bike race day. From 12:00 A.M. the day of the race to 12:01 A.M. the following day (one day). (Occurs early August).

f. Starting December 1, no plowing of FSR 527 from Junction of 527C to FSR 259 (Boggy Draw trailhead).

g. To reduce conflicts with recreation users during federal holidays, hauling would be not be permitted on FSR 527 from the junction of FSR 527C to FSR 259 (Boggy Draw Trailhead) from 12 P.M. Friday to 12:01 A.M. Monday on Memorial Day, Labor Day and Thanksgiving weekend (Thursday-Monday), Christmas Day and July 3-July 5.

4. For public safety purposes, clear and prominent signage, including maps and cutting units status, would be posted at the Boggy Draw trail head alerting the public to the presence of log trucks, trail closures and the status of cutting units where operations impact any system trails within the Boggy Draw and Turkey Knoll treatment blocks.

5. If trails are substantially damaged by vegetation management activities they would be repaired immediately after timber operations have been completed. Repairs would meet Trail Management Objectives included in the Forest Service publication *Standard Specifications for Construction and Maintenance of Trails (USDA USFS EM-7720-103, September 1996.)*

6. When necessary for public safety, Special Closure Orders will be applied to trails and roads.

7. Opportunities to limit trail closure from the Boggy Draw trailhead would be developed in the project implementation checklist.

8. Where timber operations result in full size vehicles accessing trails width restrictors will be installed.

Trail Management Objective would be followed for all impacted trail segments as part of post timber operation trail reconstruction. Reclamation would be performed to standards outlined in the Forest Service publication *Standard Specifications for Construction and Maintenance of Trails (USDA USFS EM-7720-103, September 1996)* and would be referenced in all contracts associated with the proposed project.

2.14.64. Summer and winter Recreation Opportunity Spectrum maps would guide project-specific decisions and implementation activity. These maps define broad physical, social, and administrative settings for the entire San Juan National Forest.

## Scenery

1. Openings in the canopy would have a natural appearance with uneven edges. The shape would be an irregular pattern that mimics existing natural openings and would avoid straight-line edges. Blend openings with natural landscape features such as natural meadows or openings and rock outcrops.
2. Unit boundary paint would face away from open system roads and trails or be removed; standards for boundary marks should be minimized along these routes.
3. Stumps would be 12 inches high or less.
4. All equipment and construction debris (man-made debris and trash) caused by project operations would be removed from the site at sale completion.
5. Disturbed areas where soils have been exposed, such as temporary roads, skid trails or landings would be closed and re-vegetated with a seed mixture consisting of native grasses and forbs which is as close as possible to the existing native species in the area. Effectiveness of closures would be monitored yearly for revegetation success, as well as, travel management compliance. If ineffective, roads would be reclosed or reseeded.
6. Skid trails would cross at a perpendicular angle but slightly curved to avoid creating straight line corridors when the skid trails connect with open system roads and trails. Skid trails would be held to the minimum number, width and length (See Recreation Design Features). Forest system trails would not be utilized as a skid path unless the trail utilizes a Level 1 Road.
7. A visual corridor would be established on each system trail within Boggy Draw treatment block. To this end, the recreation staff could mark specific leave trees for retention. The area of influence is 9 feet of center line and leave trees would be marked with a 360 foot band of paint.

## Timber

1. Normal operating season would be from April 1 until November 30. Winter season would be from December 1 until February 28 (plowing would be allowed for access). Additional time outside of these defined above may be granted by the line officer if conditions allow.
2. During slash disposal, limit the amount of slash scattered or piled in areas where existing pine regeneration is present and minimize the placement of slash within the driplines.

## Transportation

1. Existing roads would be used for equipment access to the extent road location and condition permit reasonable access. Implementation of mechanical treatments and harvests would attempt to minimize road construction whenever possible.
2. Temporary roads may be used where a designed road is not needed, as determined by the Forest Service. The location and clearing widths of all temporary roads or facilities would be agreed to in writing (between the Forest Service and the contractor) before construction is started. Following use for harvest and treatment implementation, both temporary AND designed roads would be decommissioned, which involves re-contouring where significant side slope exists, elimination of ditches and other structures, out-sloping during construction, removal of ruts and berms, effectively blocking the road to normal vehicular traffic where feasible, and construction of drainage features such as cross ditches and water bars. Final

acceptance of the closure would be made by the Forest hydrologist or engineering representative. Invasive species monitoring would occur after road decommissioning and would be followed by weed treatments where needed. Any weed treatment would be implemented under a different NEPA analysis and decision, as weed treatment is not proposed or analyzed as part of the Salter project. Effectiveness of road closure would also be monitored.

3. Require commercial haulers to perform maintenance commensurate with their use; depositing sufficient funds with the Forest Service may be used in lieu of performance. Surface rock replacement deposits would be collected to maintain currently surfaced roads that are used for timber hauling. Deposits would be collected commensurate with the use. Quarry materials would be collected from a site that has been found to be free of invasive plants.
4. Timber hauling operations would be restricted during wet or thawed conditions, when needed to protect the road surface. When logging occurs over snow or frozen ground, standard Forest Service practices would be followed.
5. Safety signing would be used to alert the public that logging operations are in progress and would meet the requirements of the Manual of Uniform Traffic Control Devices.
6. Use of private roads, encroachment of public roads and rights-of-way, and other access needs outside Forest Service jurisdiction would have the proper approval or authorization in place prior to use.
7. Use suitable road surface stabilization practices and dust abatement supplements on roads where road surface conditions, traffic use and proximity to recreation or public occupancy justify the need. (See FSH 7709.56 and FSH 7709.59).
8. Move snow in a manner that would avoid or minimize disturbance of or damage to road surfaces and drainage structures. Use existing standard contract language (C5.316# or similar) for snow removal during winter logging operations to avoid, minimize, or mitigate adverse effects to soil, water quality, and riparian resources.
9. Use the following measures to conserve water when managing roads for vegetation treatment projects:
    a. When possible, schedule road maintenance activities to coincide with higher moisture content for ease of grading and better compaction.
    b. Minimize road widths to provide for safe use while limiting impermeable surfaces.
    c. Keep ditches open, but do not remove vegetation that does not impede drainage. Vegetation holds the soil in place and reduces sediment loading which is the greater problem.
    d. When installing drainage features, return intercepted runoff to its natural path at the first opportunity.
10. Road maintenance would be conducted in accordance with the T-800 specifications provided in the Timber sale contract.
11. General reconstruction requirements for **standard haul** on aggregate surface ML3 – 4 roads:
    a. Aggregate surface depth of 6 inches (assuming adequate base course)
    b. All culverts have minimum 12 inches of structural cover.

c. All culverts have been evaluated for structural integrity.

d. Cattle guards must have design specification for HL 93 load ratings.

e. Bridges have a completed inspection and meet safety requirements

12. General reconstruction requirements for **overweight haul** on aggregate surface ML3 – 4 roads:

    a. Aggregate surface depth of 8 inches (assuming adequate base course)

    b. All culverts have minimum 18 inches of structural cover.

    c. All culverts have been evaluated for structural integrity.

    d. Cattle guards must have design specification for HL 93 load ratings.

    e. Bridges have a completed inspection and meet safety requirements

## Wildlife

1. Surveys for northern goshawks and other raptors (generally Cooper's hawk and sharp-shinned hawk) would be completed prior to project implementation. If active northern goshawk nests are discovered, all project operations would be restricted annually from March 1 to August 31 within one-half (½) mile of the active nest. If other raptor nests are discovered, all project operations would be restricted annually from March 1 to August 31 within one-quarter (¼) mile of the active nest.

2. Northern Goshawk Prescription (Figure 13, appendix A)

    a. Nest Area. No harvest or treatment of any kind would occur in the nest area (includes 30 acres around nest) of a goshawk nest. This design feature only applies to the Boggy Draw, Carlyle Point and House Creek treatment blocks.

    b. Post-Fledgling Family Area (PFA). An intermediate harvest treatment would be applied to this area adjacent to occupied nest sites. This prescription is designed to improve the overall stand functionality while maintaining or promoting a relatively closed canopy. Trees of all size classes up to 22-inches diameter at breast height are evaluated for harvest and designated for removal, with an emphasis on large leave groups with 20-to-30 trees per group. The objective is to promote clumps of 3-to-5 mature and older trees with interlocking crowns within groups. Individual tree structure and isolated clumping is not desired structure in this treatment type nor is promoting aspen. Small openings of two acres or less could be created when implemented for insects (e.g., bark beetles) or disease (e.g., mistletoe) (Reynolds et al. 1992). Where existing conditions do not provide for application of this prescription, thinning would focus on enhancing what is desirable and creating conditions for recruitment of the desired structure over time (Reynolds et al. 1992).

3. Elk Production Habitat - Operations in Colorado Parks and Wildlife mapped elk production habitat would not occur from May 15 to June 30 without line officer approval. The only operations that would be approved are travel through mapped production areas to units outside of the production areas. This would only be approved after consultation with Colorado Parks and Wildlife about the amount of proposed use and access routes. This design feature only applies to the Turkey Knoll treatment block (Figure 13, appendix A).

4. Critical Elk Winter Range - Operations in Colorado Parks and Wildlife mapped critical elk winter range would not occur from December 1 to April 30 without line officer approval. The only operations that the line officer would approve are travel through mapped winter range areas to units outside of the critical winter range. This would only be approved after consultation with Colorado Parks and Wildlife about the amount of proposed use and access routes. This design feature only applies to a portion of the Boggy treatment block (figure 14, appendix A).
5. To meet the desired conditions, leave a minimum of 1 snag per acre of at least 12 inches diameter at breast height and 25 feet tall. If trees in this size class are not available, then leave 2-to-3 snags per acre of at least 9 inches diameter at breast height and 15 feet tall.
6. Consult with wildlife biologist prior to layout of projects that include oak treatment in order to identify areas to be treated (assure benefit wildlife and maintain clumps of dense understory oak for turkey nesting habitat).
7. Mechanized equipment must not operate within exclosure areas that protect wildlife. Consult with the wildlife biologist when developing marking guidelines for trees within exclosures.

## Monitoring and Adaptive Management

Because conditions continue to change on the landscape analyzed in the Salter environmental analysis, a combination of pre-implementation reviews and an adaptive management approach would be utilized to inform implementation and to provide the opportunity to solicit input from partners that could be incorporated into the decision making process when addressing changing conditions on the ground in real-time.

This effort is intended to provide for communication and collaboration and more flexibility to adjust if changes, such as new or increased insect and disease infestation occur or the area is affected by wildfire. This approach ensures appropriate treatment based on any changed site conditions at the time of implementation. Adaptive management includes reviews of project areas during and after implementation, as well as periodic reviews of NEPA adequacy as time progresses.

The objective of the proposed treatments is to retain ponderosa pine within the identified cutting units for as long as the species continues to regenerate for the purposes of fiber production and ecosystem services within the standards and guidelines of land and resource management plan, specifically, 2.9.14. Adjustments to prescriptions could be made at any time as long as they are within the scope of this analysis.

In addition, this section describes the adaptive management process for site preparation and planting to meet desired conditions. Site preparation and planting will be prescribed to stands that fall below Forest Plan stocking levels for ponderosa pine (i.e., 150 TPA) or are projected to do so based on forest health or lack of cone production.

Another purpose of monitoring and adaptive management approach is to set up a formal communication protocol with outside partners; for example, the DWRF collaborative. If conditions change, or if approaches are not working as described, the adaptive management process identified here would be used to notify partners about the agency's findings. The process would also serve as an opportunity for the public to have direct and formal communication with agency decision makers and resource managers on specific projects. A Collaborative Exchange

Folder (CEF) has been set up on the agency's main database (PINYON) that allows direct exchange of documents between the agency and partners. A Collaborative Communication Form (CCF) has been developed to officially document important communication between the agency and partners. The processes and digital storage protocol of documents are in place for this project and all projects moving forward where this level of information exchange is desired by partners. Table 5 displays the proposed monitoring activities and Table 6 displays the triggers or threshold and associated adaptive management actions. The actions in this section are condition-based, and in addition to, the treatments described above.

**Table 5. Proposed monitoring activities**

| Resource Area | Objective | Methodology | Timing | Reporting |
|---|---|---|---|---|
| Timber | Track trends in mortality/infestation rates of Bark Beetles | Comparison of consecutive Forest Health Aerial Survey flights. Determine percent change in mortality or infestations within Salter treatment units | Prior to treatment at the project scale. Annually at the landscape level. | CSFS annual Forest Health flight data of the treatment units in map form, and placed in the Collaborative Exchange Folder (CEF) |
| Timber | Track silvicultural prescription effectiveness - Single Tree Selection | Regeneration Stocking Surveys | Third and fifth year stocking survey | Share stocking survey results utilizing the Collaborative Communication Form (CCF) and placed in the CEF. |
| Timber | Monitor cone presence as an influence on meeting desired conditions | Pedestrian survey of stand | If a stand fails first year stocking survey a bi-annual cone survey would be performed until stand passes stocking survey. | Initial surveys would be tracked internally and documented in the project record. Copies of this data would be included with a stocking failure CCF if one is sent post year 3 survey. |
| Fuels | Determine post-harvest fuel loading, and post-prescribed fire fuel loading to quantify treatment effectiveness. | Monitoring area review by agency representative through site inspections, photo points, and line intercept plots. | Pre-harvest, post-harvest, pre-prescribed fire, and post-prescribed fire | Site Inspections, photo points, and line intercept plots. |
| Invasive Species/Noxious Weeds | Detect invasive species/noxious weed occurrences and prioritize treatment of infestations (Early detection and rapid response). | Pedestrian survey by forester for noxious weeds in project area pre, during, and/or post project activities. | Pre, during and post implementation of timber harvest and associated project activities. | Forester relays spatial indicator to range specialist for site visit and on-going tracking by range specialist.<br>Spatial indicator includes current location and infestation acreage/footprint.<br>Population inventory and treatments would be reported according to national directives. |

CCF – Collaborative Communication Forum; CEF – Collaborative Exchange Folder.

**Table 6. Proposed adaptive management actions**

| Feature being Monitored | Trigger or Threshold | Proposed Adaptive Management Actions |
|---|---|---|
| Silviculture – Stocking level | After implementation, stocking survey shows single tree selection treated stand in the 3rd year survey has failed and is trending for continued failure in 5th year stocking survey<br>Prior to implementation stand is determined by Certified Silviculturist to be currently below minimal stocking or is trending towards this status. (heavy over story mortality or infestation that would make regeneration problematic due to lack of seed trees or pattern of residual live seed trees within a stand. | Monitor<br>Inform our partners with a CCF.<br>Site Preparation as needed, with inter- planting |
| Silviculture - Post-planting | Planting survivability is less than adequate to pass stocking survey | Monitor and adjust<br>Inform our partners with a CCF.<br>Site prep as needed, with inter- planting<br>Increase seedling container size<br>Adjust elevation band of seedlings being planted within percent mix<br>2.9.1 Anticipates climate-related plant succession changes (such as favoring heat- or drought-resistant tree species as leave trees, or in reforestation). |
| Silviculture Rx – Stand density | Residual stocking level basal area: Above or below 50-70ft$^2$/acre, Stand Density Index greater than 175. | Monitor and adjust marking, as needed. |
| Silviculture Rx – Stand structure | Physiognomy or architecture at the stand-level and fine scale does not begin to develop uneven aged characteristics with even aged definable groups, clumps and individuals. | Monitor and adjust marking, as needed. |
| Invasive Species/Noxious Weeds | Invasive species/noxious weeds are increasing within a treatment unit as a result of timber harvest activities. | Implement the design features requiring onsite decontamination and/or equipment operations in infested areas as applicable. Inform our partners with CCF when trigger has been reached to implement this design feature.<br>Adapt weeds treatment levels and locations as needed site-specifically. |

CCF – Collaborative Communication Forum; CEF – Collaborative Exchange Folder.

# Issue Identification and Alternative Development

Issues are points of concern about effects that may occur as a result of implementing the proposed action. Issues are generated by the public and are in response to the proposed action; others are identified by the interdisciplinary team based on local and specific scientific knowledge and may be used to disclose and compare effects between actions. Issues identified during scoping can either be addressed by developing alternatives to the proposed action or by adjusting the proposed action to resolve conflicts [36 CFR 220.7 (b)(2)(i)].

The Forest Service NEPA procedures allow the responsible official to modify a proposed action as the process progresses and requires such modifications to be made in an open and transparent process obvious to all interested parties. The description of the proposal may include a brief description of modifications and incremental measures developed through the analysis process to develop the alternatives considered. The documentation of these incremental changes to a proposed action or alternatives may be incorporated by reference in accord with 40 CFR 1502.21.

To this end, the comments received during the scoping period (refer to *Agencies or Persons Consulted* of this environmental assessment) were reviewed and assigned to a general subject matter category. Issues that were interrelated were combined into a set of issues or concerns. The following concern groupings were developed to facilitate a comprehensive approach to identifying incremental adjustments that would result in a refined, modified proposed action or additional alternative. This is not a complete list of comments received. All comments received can be located in the project record.

- **Vegetation and Silvicultural Prescriptions**
  - Large tree retention. Apply a 20 inch diameter limit.
  - Basal area. Maintain greater basal area.
  - Proposal requires an effective long-term commitment to invasive species control and monitoring.
- **Recreation**
  - Trail condition. Ground disturbance resulting from vegetation treatments could reduce the quality of the trail and/or result in eliminating access to trailheads and other recreation opportunities during project implementation.
  - Scenery. Treatments could result in a degradation in scenic quality and visitor experience.
- **Wildlife Management**
  - Installation of artificial water developments for wildlife.
  - Goshawk post fledgling family area prescriptions.
- **Economics and Feasibility**
  - Provide flexibility in design due to changing market conditions.
  - Keep restrictions to a minimum:  normal operating season, hauling restrictions, weed prevention measures, etc.
  - Don’t apply restrictions that delay the removal of the wood product.

  - ♦ Provide the ability to expedite removal of wood fiber, particularly those infected with insects or disease.
  - ♦ Provide a steady supply of wood fiber.
- **Transportation System.**
  - ♦ For cost effectiveness, do not limit the construction of temporary roads.
  - ♦ The volume/acre must be commensurate with the required road maintenance costs.
  - ♦ Allow for maximum Gross Vehicle Weight limits of 97,000 lbs. for log trucks removing wood fiber.

The above potential issues and concerns were resolved through project modification, application of best management practices, project design features, or development of an alternative. The initial scoped proposed action referred to as Alternative 2 – Modified Proposed Action in the *Environmental Effects* section of this assessment, was modified by:

- Addition of multiple project design features and identification of avoidance areas for recreation to include protection of trail quality, scenery and to minimize impacts to recreationists. Development of an implementation schedule that is intended to minimize the need for closure of trails and other recreation opportunities during project implementation (Figure 12, appendix A).
- Incorporation of project design features intended to mitigate the adverse impacts of allowing for maximum gross vehicle weight, when authorized.

Resolution of potential issues and concerns also included development of a second action alternative which includes a 20-inch diameter limitation (as compared to a 26-inch diameter limitation). This alternative limits the removal of trees over 20 inches and is intended to emphasize large tree retention. This alternative is referred to as Alternative 3 – Large Tree Retention in the *Environmental Effects* section of this assessment. There are no other differences between Alternative 2 and Alternative 3. All of the other components included in Alternative 2 are also included in Alternative 3. The original scoping package (dated February 21, 2020) is included in the project record.

# Section 3 - Environmental Effects

This section describes the environmental impacts of the modified proposed action (Alternative 2) and the Large Tree Retention Alternative (Alternative 3) in relation to whether there may be significant environmental effects as described at 40 CFR 1508.27. The effects of taking no action are also analyzed and used as a basis for comparison to the action alternatives. Further analysis and conclusions about the potential effects are available in resource specialist reports and other supporting documentation located in the project record. The following effects discussions are summaries from the specialist reports that have relevance with respect to a determination of significance. Appendix C. Resources Dismissed from Detailed Analysis contains a description of the resources that were considered and eliminated from further detailed analysis.

# Cultural Resources

### Consultation under the Streamlined Section 106 Compliance Process

Under the PA, the NEPA scoping process is used as the initial outreach to identify consulting parties and interested parties and to communicate with the public, as required in 36 CFR 800.3(e)-(f). At the same time, a tribal consultation letter is sent to all culturally affiliated Indian tribes, describing the proposal and requesting their participation in subsequently phased treatment sectors. Tribes that request to continue consultation for the proposal are sent the project notification package. Following completion of the inventory for each treatment block identified, these tribes are also sent a letter summarizing the results of the inventory and requesting feedback. If during consultation it is determined that implementation of a proposed treatment block has the potential to affect a property that is identified by a tribe as having traditional cultural or religious importance, the Forest would continue consultation with the tribe regarding the assessment and resolution of effects to the property. Tribal consultation is ongoing for the proposal.

## Affected Environment

### Results of the Class I Literature Review

An Initial Cultural Resources Report was prepared for the proposal and transmitted to Colorado State Historic Preservation Office on June 8, 2020. The area of potential effects (APE) for the Salter EA project is defined for the purpose of this report as the EA analysis area plus a 100-meter buffer, which was applied to account for locations at which the analysis area and treatment units may be coterminous. The area of potential effects measures approximately 50,305 acres in size.

Approximately 156 previous cultural resources inventories have been conducted within the proposed project's area of potential effects. These include approximately 29 class II (reconnaissance) inventories and approximately 127 class III (intensive) inventories. In total, approximately 43,026 acres within the area of potential effects have been surveyed prior to the identification of implementation projects. This figure includes approximately 41,509 acres within the area of potential effects that were surveyed at the class II level and approximately 14,470 acres within the area of potential effects that were surveyed at the class III level.

Two hundred twenty-two previously recorded archaeological sites are located within the area of potential effects for the proposed project. This figure includes one archaeological district that is listed on the National Register of Historic Places (NRHP), one site that is contributing to the National Register eligibility of that archaeological district, two sites that are non-contributing to the National Register eligibility of that archaeological district, one multicomponent site that is listed on the NRHP, 45sites that have been officially determined eligible to the NRHP, 35 sites that have been officially determined Needs Data, 71 sites that have been officially determined not eligible to the NRHP, and 71 sites that are currently unevaluated because an official eligibility determination has not been made.

Preliminary information about the National Register of Historic Places eligibility status of archaeological sites within the area of potential effects by temporal affiliation is shown in table 7, below.

**Table 7. Known archaeological sites within the proposal's area of potential effects**

| Site Temporal Affiliation | NRHP Eligibility Status Eligible[2] | NRHP Eligibility Status Needs Data | NRHP Eligibility Status Not Eligible[3] | NRHP Eligibility Status Unevaluated | Total |
|---|---|---|---|---|---|
| Prehistoric | 20 | 30 | 52 | 39 | 141 |
| Historic | 15 | 2 | 17 | 21 | 55 |
| Multicomponent | 10 | 3 | 2 | 5 | 20 |
| Unknown | | | | 6 | 6 |
| **Total** | **45** | **35** | **71** | **71** | **222** |

In addition, 35 isolated finds have been recorded within the proposal's area of potential effects and determined not eligible to the National Register of Historic Places.

### Effects of the Alternatives

Potential direct and indirect adverse effects to historic properties would be addressed under the PA (USDA 2017). The project design features identified in Appendix B. Cultural Resources Programmatic Agreement Vegetation Management Activities-Specific Project Design Features would be applied consistent with the PA. Therefore, the proposal would have no direct or indirect adverse effects to cultural resources. Although there may be other projects that spatially and/or temporally overlap the area of potential effects for the proposal, the lack of adverse direct or indirect effects means that there would be no adverse cumulative effects to historic properties.

## Fuels and Fire Management

### Affected Environment

The existing vegetation type throughout the project area is primarily Southern Rocky Mountain Ponderosa Pine Woodland (EVT 2054), with areas of Rocky Mountain Gambel Oak-Mixed Montane Shrubland (EVT 2159)(LANDFIRE 2.0.0). Surface fire behavior fuel models throughout these areas are variable, but primarily are moderate load dry climate grass-shrub (GS2), which is identified as the fuel model across 44 percent of the project area. A breakdown of all fuel models that make up over one percent of the project area is shown in figure 3, below.

[2] This column includes sites that have been determined to be contributing to the National Register of Historic Places eligibility of a larger resource.
[3] This column includes sites that have been determined to be noncontributing to the National Register of Historic Places eligibility of a larger resource.




**Figure 3. Salter project area surface fuel model distribution**

Canopy characteristics across the project area are very similar across all treatment areas, with an average canopy cover of 36 percent, average canopy height of 47 feet, and average canopy base height of 6 feet. The average canopy fuel load is approximately 2.24 tons per acre.

In average summer conditions, fire behavior would be predominantly surface based, with flame lengths of approximately four feet and rates of spread near 900 feet per hour. As conditions approach the 90th percentile of fuel dryness, passive crown fire can occur with 20 foot windspeeds as low as 6 miles per hour to initiate torching (Torching Index). Fuels in the project area are generally not conducive to active crown fire, where the entire tree canopy carries fire, with sustained 20 foot winds of 24 miles per hour required (Crowning Index). A 24 miles per hour 20 foot 10-minute average windspeed has not occurred in the past 20 years in May through October at the nearby Salter RAWS (055205). While gusts above 24 miles per hour have occurred approximately 15 percent of the days in fire season, comparing the crowning index with observed windspeeds can help explain why the project area has not seen areas of widespread active crown fire in the recent past. While it is certainly possible for many areas to crown, gentle topography and heavy canopy cover tend to limit windspeeds at the surface which could increase fire intensity above critical thresholds.

In the past ten years, approximately 34 percent of the project area has experienced fire, either wildfire or prescribed, with less than one percent of the project area undergoing mechanical disturbance. The majority of disturbance is due to the 2018 Plateau Wildfire, which burned nearly 20,000 acres during exceptional drought. This fire reduced basal area across the footprint by approximately 32 percent, with most of the fire area (58 percent) experiencing between a 0-to-25 percent reduction in basal area (US Forest Service Rapid Assessment of Vegetation Condition after Wildfire, 2018). The highest category of basal area loss (75 percent-to-100 percent) was generally observed on steep slopes which are outside of the project area.




**Figure 4. Plateau Fire, percent basal area loss, open and closed evergreen tree canopy, RAVG**

The remaining acres of fire disturbance are largely from prescribed fire in 2019, when over 4,000 acres were treated, as well as two other fires from 2016 and 2017, the Long Draw and Draw Fires which together burned nearly 4,500 acres at low severity.

## Effects of the Alternatives

### Effects of the No Action Alternative (Alternative 1)

The no action alternative would leave forest structures at present stand densities until disturbance through either fire or insect mortality altered them. Fires throughout the project area have displayed a mix of low, moderate, and small areas of high severity, which would continue. The scale of unplanned ignitions would be larger in drought years, trending toward a more typical prescribed fire coverage in average precipitation years. Prescribed fire would continue throughout the project area at a rate approaching 3,000-to-5,000 acres per year under the Dolores Ranger District Ponderosa Pine Prescribed Fire Environmental Assessment Decision Notice (USDA 2017).

Insect induced mortality would continue to occur, predominantly in small patches but with some areas of larger higher severity outbreaks likely. The infested stands would display similar characteristics to affected stands in the Lone Pine environment, with similar diameter classes experiencing mortality. As time goes on, these dead standing trees would fall, increasing surface fuel loading and leading to higher severity fires in the future which would allow for ponderosa pine regeneration on the edges of the high severity patches, eventually filling in and creating successional class diversity.

As time continues, if the entire project area did not experience multiple disturbances to reduce surface fuel loading and canopy cover, it would eventually experience active crown fire. Large scale crown fire is not something ponderosa pine is adapted to, and it could lead to a type conversion from forest to shrublands if the area burned at high severity is large enough.

## Direct Effects of Alternative 2 – Modified Proposed Action and Alternative 3 – Large Tree Retention

Given that the difference between the modified proposed action alternative and the large tree Retention alternative is primarily silvicultural, the direct, indirect, and cumulative effects to fuels and fire management of both action alternatives are the same.

The proposed action would result in increased dead surface fuel loading at the one hour (<1/4 inch), 10 hour (1/4 inch-to-1 inch), 100 hour (1 inch to 3 inches) and 1000 hour (3 inches to 8 inches) size classes from timber activities. While canopy cover and canopy bulk density would be decreased by the proposed action; an expected increase in canopy base height, an increase in surface fire intensity and rate of spread is likely in treated areas without follow-up prescribed fire activities. In addition to the surface fuel loading increase, the proposed action would decrease the canopy cover, which would allow surface fuels to dry more quickly due to the lack of shading and experience higher midflame windspeeds due to the lack of sheltering than in the no action alternative.

Fuels would either be piled or lopped and scattered depending on specific site conditions. Where fuels are piled and burned, residual surface fuel loading would be similar to pre-treatment conditions after pile prescribed fire occurs. Residual fuels would be able to dry more quickly than untreated areas, and treated areas would experience higher midflame windspeeds. This would result in an increase in fire behavior relative to adjacent untreated areas, but higher canopy base heights would limit torching and serve to increase both torching and crowning indices in treated stands. Where fuels are lopped and scattered, initial entry broadcast prescribed fire focused on maintaining overstory characteristics would likely reduce 20-40 percent of activity fuel loading resulting from timber management activities. Follow-up treatments must occur within 6-15 years in order to further reduce surface fuel loading.

After prescribed fire occurs, future fire behavior would be largely surface fire until Gambel oak regenerates to a height where it can act as a ladder fuel for residual overstory, roughly 10-15 years post pile prescribed fire. Regeneration resulting from the combination of the proposed action and prescribed fire creating a seedbed for ponderosa pine would likely require little effort to protect from future fires, as high live foliar moisture relative to the broader overstory and compacted and lightly loaded surface fuelbeds typically result in low fire intensity. In the long term, after multiple entries of prescribed fire, piling or lopping and scattering of slash under the proposed action would result in stands which are more resistant to future disturbances and able to recover more rapidly without human intervention.

## Indirect Effects

Prescribed fire is highly dependent on specific weather and fuel moisture parameters to implement, which are typically present in the project area for 50-60 days per year. However, during times of drought fuels can become too dry, as can the overall weather pattern, requiring a delay in prescribed fire implementation until more moderate conditions return. The proposed action would result in several thousand acres of increased surface fuel loading per year. Depending on the slash disposal plan for each project area, fuels would either be piled or lopped and scattered. A dry winter, spring, or summer could significantly delay prescribed fire either by broadcast or pile methods, resulting in a longer amount of time that increased surface fuel loading exists in the project area. Wildfires, both human and naturally ignited, would continue to occur in the project area, and if they are coincident with drought, have the potential to reduce overstory stocking below targeted levels. Conversely, naturally ignited wildfires occurring during near-

average conditions would have the potential to reduce activity fuels to desirable levels while maintaining desired overstory characteristics.

### Cumulative Effects

Historical fire behavior within the project area was a mix of intensities, leading to a heterogenous forest structure created and maintained by low, mixed, and high severity fires (Baker 2018). While in the short-term these areas would experience low severity fire; as shrubs resprout and surface fuel loading increases, an increase in mixed fire severity would occur and in the long-term contribute to maintaining and increasing landscape heterogeneity.

The Salter proposed action would occur simultaneously with the Lone Pine and Dolores Ranger District Prescribed Fire actions. Taken together, these projects would reduce the threat of wildfires impacting communities, watersheds, habitat, and infrastructure, while increasing the likelihood of fire benefitting these resources and assets. The proposed action and ongoing actions would result in approximately 20,000 to 30,000 acres of disturbance per year within the ponderosa pine vegetation type on the Dolores Ranger District. Future fire behavior along mesa tops targeted for timber management activities would be primarily surface fire, with some individual and group tree torching expected, and canyons would demonstrate additional passive and some active crown fire.

# Invasive Species

## Affected Environment

The spatial analysis area for analyzing the direct, indirect, and cumulative effects to invasive species management is the project area total proposed treatment areas and associated roads, because noxious weed establishment would be closely related to the treatment units and associated roadways where ground disturbance or vehicle traffic occurs.

Several different noxious weed species are present within and near the analysis area. Inventory and treatments are ongoing. Acres affected by noxious weeds change as new infestations establish and other infestations are eradicated. The same past and present uses described for livestock grazing have affected noxious weeds in the analysis area. Public recreation, especially motorized use, can add to the spread of noxious weeds across the landscape as it allows for the widest span of distribution. Weed infestations are usually associated with roadways, high recreation use areas such as trailheads and camping areas, and areas where livestock concentrate, such as water developments, fencelines, and salting grounds, where bare ground is created, allowing for infestation. High priority weed infestations are treated with herbicide with the intent of eradication, though eradication is not always achieved. All species on the Colorado Noxious Weeds List B are targeted for eradication. These species are known to be invasive and increase with disturbance. Noxious weed infestations negatively affect ecosystem health, reduce livestock forage, and reduce wildlife habitat among other detrimental effects.

## Effects of the Alternatives

### Direct and Indirect Effect of No Action (Alternative 1)

Invasive species and noxious weeds in the analysis area would not directly increase or decrease as a result of the proposed ponderosa pine harvesting. Impacts from the no action alternative would be the same as the existing conditions described above.

### Direct and Indirect Effects of the Action Alternatives (Alternative 2 – Modified Proposed Action and Alternative 3 – Large Tree Retention)

Noxious weeds could potentially be introduced and/or increase in distribution and acreage as a result of proposed ponderosa pine harvest and associated activities. All vehicles and equipment can serve as vectors for the spread of noxious weeds. Therefore, vehicular traffic for harvest operations may spread noxious weeds. Activities that create bare ground can also lead to noxious weed establishment when desirable competitive species are removed and noxious weed seedbeds are established; activities such as skidding lanes, road construction, landing sites, and pile burning can lead to removal of desirable plant species and bare soil. Mitigation measures as part of design features would reduce the likelihood of noxious weed establishment and the need for follow-up treatments to eradicate established populations. Additionally, design features include use of weed-free seed in reclamation implementation.

### Cumulative Effects

Past and present effects to noxious weeds are the same as those listed under existing conditions, which includes influences from many uses and disturbances. Reasonably foreseeable future actions are similar to past and present actions as the same activities listed as affecting livestock grazing and are expected to continue.

Under the proposed alternatives, noxious weeds within the analysis area would have effects similar to those described for direct and indirect effects in that noxious weeds would potentially increase in distribution and acreage. In particular, potentially increased recreation from increased access would likely occur. User- created routes are sometimes formed from closed logging roads. If this occurs, a large user created route network would result in a greater likelihood of noxious weed spread and establishment. Therefore, noxious weeds in the project area could potentially cumulatively be increased over time under the proposed alternatives, requiring increased treatment and action to limit infestations.

Table 8 summarizes the environmental effects to rangeland resources and invasive plants under the proposed action alternatives.

**Table 8. Summary of environmental effects to invasive plants**

| Resource Element | Indicator/Measure | No action Alternative Effects | Proposed Action Alternatives Effects |
|---|---|---|---|
| Invasive Species | Noxious Weed Establishment/Infested Acres | **Direct and Indirect Effects:** No immediate effects to invasive species would occur. Current weed populations would continue to be targeted for treatment.<br><br>**Cumulative Effects:** No cumulative effects; effects may be less than under the action alternatives | **Direct and Indirect Effects:** Activities associated with timber harvest may increase noxious weed establishment. Implementation of proposed design features would reduce the likelihood of noxious weed establishment and the need for follow-up treatments to eradicate established populations. Treatment of established weed populations would continue.<br>**Cumulative Effects:** Noxious weeds could increase primarily due to increased access over time, requiring increased treatment efforts. |

# Rangelands

## Affected Environment

The spatial analysis area for analyzing the direct, indirect, and cumulative effects of the proposed alternatives to rangeland resources are the 11 active individual livestock grazing allotments with proposed treatment units within them in the project area (table 9).

**Table 9. Percentage of total allotment acres within the Salter analysis area**

| Allotment | Approximate Percentage |
|---|---|
| Bald Hill | 47 |
| Beaver Crossing | 31 |
| Biggs | 68 |
| Calf | 21 |
| House Creek | 5 |
| Koehn | 59 |
| Mavreeso | 9 |
| Oak Knolls | 31 |
| Pease Point | 32 |
| Salter | 3 |
| Trimble | 46 |

Two other allotments overlap the project area – Sagehen and River Corridor – but proposed treatment acreage is minimal, and these allotments are currently vacant. Therefore, the Sagehen and River Corridor allotments are not carried forward in analysis of rangeland resource impacts.

The active allotments were selected as the analysis area for rangeland resources because rangeland and livestock grazing impacts from the proposed alternatives is confined within each individual allotment. While proposed timber harvesting does not necessarily occur in all areas or pastures in an individual allotment, the entire allotment may be affected in terms of livestock forage and operational impacts.

Most of the suitable rangeland in the 11 active allotments is found in open meadow parks, as well as aspen understory vegetation types. Ponderosa pine forests in the analysis area are considered suitable for livestock grazing and do provide understory vegetation for livestock forage to varying levels, but typically not to the level of meadows and aspen understory. Ponderosa pine stands may provide average annual understory production of air-dry vegetation in a range of approximately 900-1,400 pounds per acre dependent on environmental conditions and specific soils and ecological sites (USDA 2001, USDA 2001a). As ponderosa stands continue to mature in absence of other disturbances such as fire, increased tree canopy cover can reduce understory vegetation species presence and/or production levels through shading and competition for resources; this can subsequently reduce livestock forage in these areas over time.

Livestock forage in the analysis area has been affected by historic grazing and past and current logging operations. Other factors that have affected the forage in the treatment area include road infrastructure, recreation uses, wildlife use, and wildland fire, revegetation, among others. Seeding with nonnative grass species such as smooth brome has also occurred. Drought has also

reduced plant forage production and subsequent livestock forage. Noxious weeds have established in certain areas, most commonly in those areas with recreation and vehicular traffic. Noxious weeds can compete with desirable plant species and negatively affect ecosystem health, thereby decreasing forage availability in some areas.

## Effects of the Alternatives

### Direct and Indirect Effects of No Action (Alternative 1)

There would be no immediate effects on forage availability as a result of the no action alternative in the 11 active grazing allotments. There would be no need for adjusting the use on the grazing allotments as it pertains to this project and no other livestock operation impacts would occur from the proposed ponderosa pine logging and associated impacts. Indirectly, as ponderosa stands continue to mature in absence of other disturbances such as fire, increased tree canopy cover would reduce understory vegetation; shading and competition for resources would subsequently reduce livestock forage in these areas over time.

### Direct and Indirect Effects of the Action Alternatives (Alternative 2 – Modified Proposed Action and Alternative 3 – Large Tree Retention)

As described above, the treatment area overlaps with multiple pastures in the allotments. Greater impacts from project-related activities would occur in those allotments and pastures with higher project area treatment acreage (table 9). Some pastures within the allotments would have no proposed treatments, while others would have minimum to high levels. The Biggs Carlyle and Bald Hill Bean pastures would have the highest proportion of treatment acres. Of the approximate total allotment acreage, the Koehn and Biggs allotments would be most affected by the proposed activities with over approximately 50 percent of their respective acreage affected. All other total analysis area allotment acreage impacted would be under approximately 50 percent at varying levels, with the Salter Allotment affected the least by the proposed alternatives in terms of acreage. The proposed treatment units do not overlap with the pastures on the House Creek and Pease Point allotments. For the Salter Allotment, only the Middle pasture is impacted by the proposed alternatives.

During operations, harvesting and thinning of ponderosa pine stands would temporarily reduce forage availability in thinned areas over the short-term. Forage would not be available to livestock if they are restricted from the actively logged areas during operations. Where new temporary roads are constructed, forage would be lost for the life of the road; however, the direct impact to forage loss within pastures would be minimal. Changes to pasture rotations and livestock distribution patterns across the analysis area allotments may be necessary to maintain proper forage utilization levels and to maintain and/or move toward desired vegetation conditions. Coordination between US Forest Service staff and affected grazing permittees regarding the timing and location of active logging and associated activities would minimize this impact.

Once ponderosa pine harvesting operations are concluded, livestock forage in thinned areas would be expected to be similar to pre-harvest conditions or to be improved as palatable understory species potentially increase presence and production with decreased resource competition. Improvement in livestock forage would occur from increases in understory vegetation from decreased ponderosa pine canopy cover and subsequent reduction in resource competition. A study in northern Arizona ponderosa pine forests concluded that ponderosa pine

thinning increased the abundance of native graminoid species within the project area (Griffis et al., 2000). Livestock grazing of palatable grass, forbs, and shrubs in treatment areas would reduce these plants' competition with ponderosa pine seedlings following harvest. Livestock grazing with proper utilization levels and distribution in thinned areas is not anticipated to prevent regeneration of ponderosa pine. Maintaining proper utilization levels, periodic pasture deferment through a rotational grazing system, and use of livestock distribution practices would reduce livestock grazing impacts on ponderosa pine regeneration and long-term ponderosa pine stand condition and additionally help sustain potential livestock forage gains from the thinning of mature stands.

Temporary roads that are reclaimed may contribute to livestock forage once vegetation is established. Livestock forage in harvested areas could decline if noxious weeds are introduced and spread. Design features to mitigate increases in noxious weeds are included in the proposed alternatives.

In terms of livestock operation and range improvement impacts from ponderosa pine harvesting and associated activities, impacts would be temporary and short-term. Potential livestock operation impacts include cattle potentially dispersing more and moving into unauthorized areas with increased traffic and access, and if barriers such as fences are removed, or gates are left open. These impacts would only occur from the proposed alternatives when harvest operations occur at the same time as cattle presence on allotments. Range improvement impacts from operations primarily could occur from allotment pasture and boundary fence removal and/or damage. To help mitigate these potential impacts, design features regarding range improvement maintenance and repair, gate closures, and concentration of operations within pastures are included as part of the proposed action. Coordination with permittees as a design feature would also assist in reducing any potential additional burden on permittees to move and locate livestock due to harvesting operations. Additionally, long-term range trend plots could be damaged if operations and soil disturbance activities such as skidding areas and roads are placed on them. Therefore, design features include avoidance of these plots.

### Cumulative Effects

Under the proposed alternatives, livestock forage in ponderosa pine stands within the analysis area would have effects similar to those described for direct and indirect effects as understory forage may improve over time with a reduced tree canopy cover from harvesting. Therefore, livestock forage across the analysis area in ponderosa pine stands could potentially be cumulatively improved over time under the proposed alternatives if no other disturbances thin mature ponderosa pine stands.

As the Salter Allotment has current ponderosa pine treatments under the Lone Pine Vegetation Management Project, and the cumulative effects of this project and the proposed alternatives only results in an approximately one percent increase in treatment acreage in the Middle pasture. Overall, the cumulative effects of the Lone Pine and the proposed alternative treatment acreage would be 22 percent of the approximate total allotment acreage. For the House Creek Allotment undergoing aspen treatment under the Dolores Aspen Landscape Vegetation Project, the cumulative effects of aspen and the proposed ponderosa treatment acreage would not occur in the same pastures and the overall allotment acreage affected by treatments would remain at approximately five percent. For the Pease Point Allotment also impacted by aspen treatments under the Dolores Aspen Landscape Vegetation Project, the cumulative effects of both aspen and the proposed ponderosa pine harvest raise the total approximate acres affected to 39 percent; however, there is no overlap in pastures affected between these two projects.

Past and present effects on livestock operations are also the same as those listed under existing conditions and are expected to continue. Because direct and indirect effects to livestock operations would be short-term and be lessened with implementation of design features, there would be no long-term cumulative effects under the proposed alternatives. Table 10 summarizes the environmental effects to rangeland resources under the proposed action alternatives.

**Table 10. Summary of environmental effects to rangeland resources**

| Resource Element | Indicator/Measure | No Action Alternative | Proposed Action Alternatives |
|---|---|---|---|
| Rangeland Resources – Forage Availability | Forage Availability - Palatable Plant Species Presence & Pounds of Forage per Acre (Production), Utilization levels | **Direct and Indirect Effects:** No immediate short-term effects on forage availability. Long-term forage availability may decline without natural or anthropogenic disturbances in the ponderosa pine community.<br><br>**Cumulative Effects:** Forage availability in ponderosa pine stands could potentially cumulatively decline over time. | **Direct and Indirect Effects:** Forage availability would decrease in the short-term during harvesting and associated activities.<br>Over the long-term, following conclusion of proposed activities, forage availability in treated ponderosa pine stands would be expected to be similar to pre-harvest conditions or to be improved with proper use, rotations, and implementation of design features.<br>**Cumulative Effects:** Forage availability in ponderosa pine stands could potentially be cumulatively improved over time. |
| Rangeland Resources – Livestock Operations | Pasture Rotations, Forage Utilization, Range Improvement Condition | **Direct and Indirect Effects:** No immediate effects.<br><br>**Cumulative Effects:** No cumulative effects. | **Direct and Indirect Effects:** Impacts would be temporary and short-term and would occur during operations. Implementation of proposed design features would reduce impacts to operations and range improvements.<br>**Cumulative Effects:** Short-term effects would occur, but no cumulative long-term effects. |

Based on the discussion above and following the provided design criteria and mitigation measures, the proposed alternatives would meet or move rangeland resources and invasive plant management toward desired conditions identified in the San Juan Land and Resource Management Plan.

# Rare Plants

## Affected Environment

The analysis area for threatened, endangered, proposed, and sensitive plant species is comprised of the Salter project area treatment units and any existing roads proposed to be potentially used to support project-activities, including a 50-foot buffer around them. Therefore, the rare plant analysis area is over approximately 59,000 acres. Project-related activities may not occur in all of this analysis area.

There are no federally listed threatened, endangered, proposed, or candidate plant species or their habitat known or suspected to occur in the analysis area.

There are 23 Forest Service Region 2 sensitive plant species known or suspected to occur on the Dolores Ranger District. Based on a review of elevation profiles, existing vegetation associations, the most recent sensitive plant data from the Colorado Natural Heritage Program, and soil map unit characteristics and acreages (USDA 2001; USDA 2001a; USDA 2003), there is habitat present in the analysis area for seven of these 23 sensitive plant species. This includes violet milkvetch (*Astragalus iodopetalus*), Missouri milkvetch (*Astragalus missouriensis var. humistratus*), Aztec milkvetch (*Astragalus proximus*), Lone Mesa snakeweed (*Gutierrezia elegans*), Mancos shale packera (*Packera mancosana*), cushion bladderpod (*Physaria pulvinata*), and largeflower triteleia (*Triteleia grandiflora*). These seven species are carried forward for detailed analysis. Sensitive plant species that do not have suitable habitat within the analysis area are not carried forward for detailed analysis.

## Effects of the Alternatives

### Effects of No Action (Alternative 1)

Since there are no federally listed threatened, endangered, proposed, or candidate plant species or their habitat known or suspected to occur in the analysis area, so there would be no effect to these species under the no action alternative. Under the no action alternative, there would be no project-implementation impacts from ponderosa pine logging and associated activities in the analysis area to any Forest Service Region 2 sensitive species present or with habitat in the analysis area. Therefore, potential introduction of invasive species and noxious weeds and ground disturbance would not directly occur from the proposed action in the analysis area. Additionally, there would be no potential beneficial effects to rare plants such as reduced ponderosa pine canopy cover or wildfire intensity reductions from the proposed action alternatives under the no action.

### Effects of the Action Alternatives (Alternative 2 – Modified Proposed Action and Alternative 3 – Large Tree Retention)

A biological evaluation was prepared to review and disclose the effects of the proposed action alternatives. Its analysis and species determinations are included and summarized in the following action alternatives’ effects.

### Threatened, Endangered, Proposed or Candidate Species

Since there are no federally listed threatened, endangered, proposed, or candidate plant species or their habitat known or suspected to occur in the analysis area, a determination of “no effect” was reached.

### US Forest Service Region 2 Sensitive Species

For all Forest Service Region 2 sensitive species potentially occurring within the analysis area as listed above, the following general impacts and previously identified design features for invasive species apply. Additionally, proposed design features for Hydrology and Soils in the environmental assessment limit or prohibit equipment use when soils are saturated, which reduces soil equipment impacts. Proposed design features for Hydrology and Soils also restrict roads, landings, skid trails, concentrated-use sites, and similar soil disturbances to designated sites to no more than 15 percent of any timber sale unit. Limiting the acreage of these soil disturbances reduces the potential impacts to sensitive plants. Proposed implementation of the design features for invasive species and those specific to other resources as listed previously in this

environmental assessment reduces potential for detrimental impacts to any sensitive species population within the Salter analysis area from proposed disturbance activities.

## Associated Project-Implementation Impacts for All Species:

Invasive Species: Some invasive species (noxious weeds) do occur within the analysis area, though in smaller isolated populations. Noxious weeds can negatively affect ecosystem health and compete with native plant species, including sensitive plants. The *San Juan Invasive Species Action Plan* addresses the noxious weeds strategy across the San Juan National Forest. Through contractors, county agreements, and agency applicators, noxious weed species are surveyed and treated on an annual basis. Funding from timber sale contracts return to the district to further supplement the invasive species program. Because soil disturbance and vehicular traffic can increase the spread of noxious weeds, there is a higher risk of spread and infestations where bare ground occurs and along roadways and where motorized use occurs. Therefore, design features are proposed to minimize spread and new infestations. The project area and areas within the analysis area would continue to be surveyed and receive noxious weed treatments as needed.

Equipment Operation, Skidding & Landing Areas, & Temporary Roads: Soil disturbance, compaction, and bare ground areas can occur from equipment operation, skidding and landing areas, and new temporary road construction. Temporary roads may be utilized to access and haul materials from treatment units within the analysis area and can reduce skidding and landing areas. Proposed priorities are to use existing roads prior to the need to construct temporary roads. Attempts to limit temporary road construction reduces the chance of potential soil disturbance where sensitive plants might be present.

Burn Piles: Slash that is piled and later burned can alter soil properties underneath the pile due to high temperatures. Exact locations or quantities of slash piles have not yet been identified. The burning of slash piles and soil sterilization within the pile footprint could potentially harm any individual plants as well as create areas of bare soil where noxious weeds could establish. To reduce the footprint of burn piles and reduce impacts to soils and plants, a design feature is proposed to limit pile size.

### Determinations

**Violet Milkvetch** (*Astragalus iodopetalus)*: Implementation of proposed design features would reduce potential negative impacts to violet milkvetch. Disturbances associated with this project. Impacts would be short-term and past survey attempts have failed to document species presence on the Dolores Ranger District. In addition, this project would not impact the two known location of this species on the San Juan National Forest. Therefore, it has been determined that project activities may adversely impact individuals and the local population, but is not likely to cause a trend to federal listing or a loss of species viability range wide for violet milkvetch.

**Missouri Milkvetch** (*Astragalus missouriensis var. humistratus*): Implementation of proposed design features would reduce potential negative impacts to Missouri milkvetch. Disturbances associated with this project are short-term and past survey attempts have failed to document species presence on the Dolores Ranger District. In addition, this project would not impact the four known location of this species on the San Juan National Forest. Therefore, it has been determined that project activities may adversely impact individuals and the local population, but is not likely to cause a trend to federal listing or a loss of species viability range wide for Missouri milkvetch.

**Aztec Milkvetch** (*Astragalus proximus*): Implementation of proposed design features would reduce potential negative impacts to Aztec milkvetch. Disturbances associated with this project are short-term and past survey attempts have failed to document species presence on the Dolores Ranger District. In addition, this project would not impact the five known location of this species on the San Juan National Forest. Therefore, it has been determined that project activities may adversely impact individuals and the local population, but is not likely to cause a trend to federal listing or a loss of species viability range wide for Aztec milkvetch.

**Lone Mesa Snakeweed** (*Gutierrezia elegans*): Implementation of proposed design features reduce potential negative impacts to Lone Mesa snakeweed. Disturbances associated with this project are short-term and habitat is located outside of proposed project area timber harvest treatment units where the majority of proposed activities would occur. In addition, this project would not impact the five known occurrences, including the one known occurrence located on the San Juan National Forest. Therefore, it has been determined that project activities may adversely impact individuals and the local population, but is not likely to cause a trend to federal listing or a loss of species viability range wide for Lone Mesa snakeweed.

**Mancos Shale Pakera** (*Pakera mancosana*): Implementation of proposed design features reduce potential negative impacts to Mancos shale pakera. Disturbances associated with this project are short-term and habitat for this species is located outside of proposed project area timber harvest treatment units where the majority of proposed activities would occur. In addition, this species is not known to occur on the San Juan National Forest; this project would not impact the know occurrences of this species outside of the San Juan National Forest. Therefore, it is been determined that project activities may adversely impact individuals and the local population, but is not likely to cause a trend to federal listing or a loss of species viability range wide for Mancos shale pakera.

**Cushion Bladderpod** *(Physaria pulvinata*): Implementation of proposed design features reduce potential negative impacts to cushion bladderpod. Disturbances associated with this project are short-term and habitat for this species is located outside of proposed project area timber harvest treatment units where the majority of proposed activities would occur. In addition, this project would not impact the know occurrence of this species on the San Juan National Forest. Therefore, it had been determined that project activities may adversely impact individuals and the local population, but is not likely to cause a trend to federal listing or a loss of species viability range wide for cushion bladderpod.

**Large-flower Triteleia** (*Triteleia grandiflora*): Implementation of proposed design features reduce potential negative impacts to largeflower triteleia. Disturbances associated with this project are short-term, the long term effects of forest thinning are likely to be beneficial, and the known population has been documented to be resilient to disturbance. In addition, the known location of this species in the analysis area is located outside of proposed project area timber harvest treatment units where the majority of proposed activities would occur so this project would not impact the know occurrence of this species on the San Juan National Forest. Therefore, it has been determined that project activities may adversely impact individuals and the local population, but is not likely to cause a trend to federal listing or a loss of species viability range wide for large-flower triteleia.

#### Determination Summary

**Federally Listed Plant Species:** Project-related activities would not affect federally listed threatened, endangered, proposed, or candidate plant species.

**Sensitive Plant Species:** For the seven Forest Service Region 2 sensitive plant species with potential to occur, or habitat in, the Salter project area and greater analysis area, it has been determined that project related activities may adversely impact, but are not likely to cause a trend to federal listing or a loss of species viability range-wide for these species feature.

## Recreation Activities and Experience

This section addresses the potential impacts of the Salter Vegetation Management project on recreation access, opportunity and experience

### Affected Environment

The recreation analysis will focus on the area east of the Dolores River Canyon and north of the town of Dolores, which includes approximately 50,000 acres. Analysis further focuses on the harvest units and roads that would be used to access the cut units. Recreation effects would occur where harvest operations and hauling occur as well as where mechanical treatment and prescribed fire is used. Areas outside of the cut units and access roads are not discussed in detail because they are not affected. Effects to recreation will be considered for up to a 10-year time period. This time period was chosen because this project is anticipated to be completed within that time frame.

The Salter analysis area receives moderate to heavy levels of recreation use during the summer months, moderate to heavy use during big game hunting seasons and low to moderate use during the winter. There are no developed recreation facilities in the general area except for McPhee Reservoir and House Creek Campground. Neither are in the planning area. Dispersed forms of recreational use are dominant in the analysis area and include big game hunting, off-highway vehicle travel (ATVs/UTVs, motorcycles, snowmobiles), driving for pleasure, horseback riding, dispersed camping, hiking, mushroom gathering, firewood cutting, snow biking, mountain biking, and cross country skiing.

The Boggy treatment block is a high use recreation area and one of the most heavily used recreation zones on the District. Over the past five years more than $300,000 of trail infrastructure projects have been completed on the Boggy non-motorized and motorized trail system. Use of the trail system as well as dispersed camping continues to grow. It is a popular destination when the lower country grows hotter throughout the summer and remains a popular mountain bike, equestrian and pedestrian use area during the spring and fall shoulder seasons.

There is trailhead access to the Boggy Draw motorized and non-motorized trail system as well as access to other system routes mostly in the form of forest roads. The trails (and their users) in the project area do have the potential to be adversely affected if impacts are not mitigated. All six blocks include popular dispersed camping areas where vegetation management operations would affect visitors. The users of this area consist of locals that live adjacent to the Forest, including residents of Mancos, Cortez, Durango and Farmington, NM as well as visitors from many states.

The Salter analysis area allows for motorized travel on designated system trails and roads during the summer and fall seasons. Limited cross-country off highway vehicle travel is allowed by big game hunters in some parts of the planning area who are retrieving a downed deer or elk. Winter

travel by the public is open to over snow travel. Pleasure driving uses Management Level 2 and 3 roads, both of which offer a similar viewing experience.

There are commercial operators whose permits include operations within the project area. Colorado Elk Hunters offer guided hunting operations in the area during elk and deer hunting season. In addition, Open Sky operates wilderness therapy sessions in the area but is highly mobile and able to move to areas outside of timber operations. Many private big game hunters use the landscape during archery, muzzle loading and rifle season. There are limited snow bike grooming operations that are conducted in the Boggy block.

Portions of the Boggy Draw trail systems are on Level 1 roads which are routes that are currently in storage. The Boggy Draw non-motorized trail system has 1.94 miles of level 1 roads while the motorized routes include 8.28 miles of level 1 roads. Visitors should expect that the trails with Level 1 roads would see significant impacts to the tread that would need to be mitigated via trail reconstruction.

The current Recreation Opportunity Spectrum for the project is classified as Roaded Natural Setting. Roaded Natural settings are characterized by a higher degree of developments and human footprint than those of primitive and semi-primitive settings. Sights and sounds of human activity are common, as are encounters with other users and types users when in these areas. Users should also expect the presence of active management activities, areas of adjacent or interspersed private lands and development, an extensive trail network and abundant access points for recreational activities. Resource modification and utilization practices are obvious but harmonize with the natural environment. There are no wilderness areas, research natural areas, special recreation areas, developed campgrounds, or restroom facilities within the analysis area.

## Effects of the Alternatives

### No Action (Alternative 1)

Under the no action alternative, no timber harvest would occur. Disruptions to recreation activity from treatment activities would not occur. There would be no Knutsen-Vandenberg allocated funding available to help fund projects to fund recreation improvements including closing user-created/non-system roads. General human uses in the area such as winter and summer motorized activities, dispersed recreation, livestock grazing, hunting, prescribed fire, and fuel wood gathering would continue.

In the long term the proposed action combined with prescribed fire would reduce high severity fire. Canopy reduction reduces high severity canopy dominated fire, which in turn decreases the chance of catastrophic fires that may result in “moonscape” scenery. This type of negative impact to a ponderosa pine stand would have long term impacts above and beyond the impacts of the proposed vegetation management project. In addition, reducing stand sizes would improve far ground scenery viewing opportunities.

### Modified Proposed Action (Alternative 2)

Under the proposed action, recreation experience would be impacted to various degrees depending on the season. Disruptions and impacts to recreationists would result from the sights, sounds and activities associated with the proposed treatments such as road work, truck hauling and cutting operations during project implementation. Groups most likely to be affected during the project operations are motorized users (ATV/UHV), non-motorized trail users (hikers,

equestrians, snowbikers and mountain bikers), big game hunters and snowmobilers. Fall hunting activities would be impacted by the timber cutting operations and noise potentially displacing hunters and campers from their campsites or hunting grounds. There would be no impact to any established outfitter camps that overlay the cut units as none are currently assigned. Horseback riders may be displaced to other areas of the analysis area due to logging operations but could find similar riding opportunities in the area. The extent of negative impacts to recreationalists can be expected to increase noticeably if treatment activities are undertaken during, hiking, biking hunting or snowmobiling seasons when this area witnesses marked increases in use. There would be short-to-long term visual effects encountered on short sections of the trail. Trail users would move through the project area on parts of the trail impacted by operations or can use other trails in the project area not affected by timber operations.

Any affected commercial hunting operations, such as Colorado Elk Camp are permitted elsewhere on the district and can conduct their operations in those areas during any timber operations. Fall hunting activities and summer camping would be impacted by the timber cutting operations and noise potentially displacing hunters and campers from their campsites or hunting grounds for the short term. Dispersed camps during big game hunting seasons may be impacted for the short term.

Motorized and non-motorized trail users, especially those who frequent trails in the Boggy treatment block, would be impacted if any trails are closed during operations. If measures to protect the integrity of trail infrastructure are not followed there is a likelihood of long-term impacts to the tread and in turn the trail user's experience.

Visitors using both Management Level 2 and 3 roads would experience brief exposure to timber unit cuts. These visual impacts would be brief depending upon speeds of the motorized traveler. Travelers such as horseback riders, bikers, hunters or hikers would experience a negative visual impact to their recreational experience if they chose to travel through any units. Impacts would be brief depending upon their rate of travel through the units. Visual impacts would improve for all travelers as they moved beyond any cutting units. Short term, temporary closures of Management Level 2 roads to public use may be required during harvest operations.

There would be little difference in the impacts regardless of the prescription objectives, i.e. Individual Tree Selection with a Restoration Emphasis (ITS), Precommercial Thinning (PCT), Commercial Thinning (CT) or Sanitation/Salvage (SS)

The project proposes to use existing closed roads and construct temporary roads. It would impact the designated motorized and non-motorized routes where access to timber units requires the same road for project access (shared alignment). A transportation plan would be included in the contract package to address safety concerns linked to any road uses.

Winter recreation activities (snowmobiling, skiing and snow biking) would be affected and possibly changed due to the possibility of timber activity during the winter months. However, winter use is low in most blocks except for the Boggy block, where there is a snow biking operation. Winter use of the roads for winter recreational activities would be allowed to coincide with project activities.

Potential impacts to recreationists under this alternative would be the greatest in the vicinities of the treatment units located in the Boggy, House Creek and Turkey Knolls blocks because of the relative popularity of these areas to local users. Displacement of users would occur and could

close trails or dispersed sites for a period of weeks to months with reoccurring timber activity in a block for several years. Over the life of the timber project, the designated routes within the project area would continue to be impacted and require maintenance to sustain the integrity of the road and trail system. Road/trail maintenance and decommissioning responsibilities are included in the timber contract. Most recreationists are accustomed to a working forest landscape so the sights and sounds of harvest is usually accepted although not necessarily appreciated. Any long-term removal of recreation opportunities would have an impact to local community's economies.

### Large Tree Retention (Alternative 3)

Under this alternative larger trees would remain in the view shed and users would have an experience only somewhat similar to their pre-project experience while also providing more shade to trail users.

### Cumulative Impacts

The potential impacts to recreation from this project are anticipated to be long-term and moderate for as long as 10 years. Past and current activities in the area include timber sales and prescribed fire operations. One of the goals of the project is to return stands to a healthy state.

All of the roads in this area were built to accommodate timber or mining projects and have been used by the public and permittees accessing National Forest lands. With increases in population and more leisure time available, driving, hunting, camping, winter sports and other activities are increasing on the National Forest system lands and in the analysis area. The effects to the recreating public would differ depending on the user's perceptions and the time of year but interruptions to outdoor recreationists have occurred and would continue to occur if management activities continue.

Designated motor vehicle use routes concentrate more use on roads and trails because off road motorized travel is prohibited on that part of the district except in the case of limited big game motorize big game retrieval that allows hunters to make one pass in and out to pick up big game taken during the hunting season. In addition, single track non-motorized uses are concentrated on the Boggy Draw system.

The Boggy Glade Travel Management Project resulted in some roads that were once open to public use being closed to public use or decommissioned. This would create minor displacement recreation activities that could overlap in time with the Salter Vegetation Management project. The combined displacement from the two projects occurs on a minor portion of the landscape. Other areas exist nearby within the analysis area and in other locations on the Dolores District allowing visitors to utilize other areas of the forest. A cumulative effect in this regard is not anticipated except in the Boggy treatment block.

The proposed harvest activities are compatible with the Roaded Natural Recreation Opportunity Spectrum setting. A recreation visitor could expect to see signs of management and evidence of human activity. The cut units effect a portion of the analysis area. The remainder of the analysis area is not affected and remains naturally appearing forest with little disturbance. In the long-term, after vegetation management activities are complete, treatment areas would return to a naturally appearing forest.

In the long term the proposed action combined with prescribed fire would reduce high severity fire. Canopy reduction would reduce high severity canopy dominated fire which in turn would

decrease the chance of catastrophic fires that may result in “moonscape” appearing scenery. This type of negative impact to a ponderosa pine stand would have long term impacts above and beyond the impacts of the proposed vegetation management project.

# Scenery

## Affected Environment

Major vegetation types include oak, quaking aspen forests, Ponderosa pine and mixes of these vegetation types. Vegetative patterns are variable due to the diversity of vegetation types and ages as a result of past timber harvesting activities, forest fire suppression and livestock grazing. Forest stands are generally mixed with ponderosa pine and Gambel oak in the lower elevations and aspen at mid-elevation. Mature aspen in larger aspen-only patches occur in the project area and have a high scenic value to recreational users. Openings in the forest canopy occur both naturally and from previous timber harvesting activities. In both cases these openings have natural organic shapes with varied undulating edges and groups of tree islands of various sizes.

The area, especially the Boggy block, provides trail opportunities where special and unique geologic and topographic features are enjoyed by visitors. During pre-planning efforts, portions of units were removed in order to protect these viewscapes although many similar features remain in the project area. These unique canyon vistas and rock outcroppings provide visual diversity in what is otherwise a homogeneous ponderosa pine landscape. Many visitors who use the Boggy block are attracted by the more heavily stocked ponderosa forest type for hiking and camping.

The scenic attractiveness of the project area based on the above characteristics is common to the lower elevations of the La Plata and San Juan Mountains on the Dolores Ranger District. The landscape provides generally positive yet common attributes of scenic quality and is classified as a Moderate Scenic Integrity Objective (SIO). Landscapes are viewed to varying degrees from different locations and subsequently differ in their importance. Concern levels are a measure of the degree of public importance for scenic quality on National Forest lands based on landscapes viewed from travel ways and recreation sites. The type of area and its level of use are indicators of the level of interest that people are likely to have of the surrounding landscape.

The area is viewed from a variety of road and trail corridors accessible from the Dolores Norwood Road. Harvest units are proposed adjacent to roads or trails as well as away from major forest routes. Background views of the project area would show slight vegetation texture differences, vegetative color changes and natural clearings depending on where the viewer is located. Some portions of the analysis area are visible in short sections by travelers on forest roads or trails in middle ground views showing vegetative texture and color differences and obvious evidence of previous or ongoing timber management areas. Although these views do exist, viewers are typically moving quickly along travel ways resulting in limited viewing opportunities. Travelers along secondary roads within the project area see the area in foreground views where evidence of recreational use and past timber harvest activities are most visible. Travelers along single-track trails would experience the most impact due to their lower speeds on trails.

Potential impacts to scenery only occur within and immediately adjacent to the harvest units identified in the project map. However, it should be noted that most forest users are accustomed to the heavier stocked ponderosa forests and would be impacted negatively by the project especially in the Boggy block. This project would not affect the remainder of the analysis area

directly where no harvest units are proposed. The effects of insect and disease agents on forest scenery is noted but is not the focus of this report.

There are no wilderness areas, research natural areas, special recreation areas, roadless areas, developed campgrounds, or restroom facilities within the analysis area. There are no developed areas with high scenic integrity concerns that would be affected. This project is not visible from the San Juan Scenic Byway.

## Effects of the Alternatives

### No Action (Alternative 1)

Under the no action alternative, no timber harvest would occur. Under this alternative, ponderosa stands would remain in their current condition. Bark beetle decline and successional mortality would continue in mature stands as they continue to age. Disruptions to Scenic Integrity Objectives from treatment activities would not occur. Current management activities and interactions between natural processes and human impacts would continue under the no action alternative. General human uses in the area such as winter and summer trail activities, dispersed recreation, livestock grazing, hunting and fuel wood gathering would continue unchanged. Scenic quality would remain in its current condition throughout the area and scenic character would change in the long term from natural processes, livestock and human impacts.

### Modified Proposed Action (Alternative 2)

The resulting clearings from the proposed treatments would be visible from near ground within the project area. In background and middle ground views, scenic value would be reduced only in the short term (1-to-10 years) and would be most apparent in the winter season when snow cover would highlight the open treated areas and in the fall season when fall color over the project area would be reduced. The treatment units would have varied edges, groups of leave trees and irregular sizes and shapes that mimic surrounding naturally occurring openings. As expected, ponderosa regeneration occurs and continues to thrive in the longer term (10-to-30 years) in the proposed treatment areas, the visual impacts would be reduced, and the scenic quality would increase.

Within the project area, the scenic resource would have negative impacts to foreground views of all treatment units in the short term (1-5 years). These impacts would be most visible along primary access routes through or along the project area that receive the highest number of visitors. This impact would be most significant on trails in the Boggy Draw block. Short-term scenery effects that would be evident in foreground views would include evidence of harvest activities such as slash, stumps, root wads, landings, skid trails, temporary roads and marking paint. In general, the longest lasting scenery impact comes from soil disturbance or color contrast generated from logging. The most significant impact would be the change in the stocking level of the forest where trails are and where visitors are attracted to the area due to the density of the vegetation and the privacy it provides.

Visitors using trails would see a dramatic change in the landscape, especially during and immediately after timber harvests. The trail system in the Boggy and Turkey Knolls blocks are very popular with locals and non-locals, many of whom use the system throughout the year. The impacts to those users would be significant since they have an expectation for a denser or more heavily stocked forest that provides shade and a more forested viewshed. This condition would

remain that way for a period beyond the life of this analysis but would be muted as oak brush and other shrub like plants return.

### Large tree Retention (Alternative 3)

Although Alternative 3 would leave some larger trees in the project area, the visitor experience would be like Alternative 2.

### Cumulative Impacts

No future timber harvest projects have been proposed in proximity to the harvest units for the Salter project. Ongoing activities described in the affected environment section would continue. Ongoing implementation of the Boggy Glade Travel Management decision may result in new road signs, route closures, boulders, or areas of ground disturbance. These additional effects would remain within scenic integrity objectives for the Salter area because they would occur at specific locations and not encompass broad areas. Additional prescribed fire activities would result in user displacement. Impacts to visitors who are accustomed to a more heavily stocked or denser forest would continue see the impacts to their experience into the future. As oak brush and other shrubs return the landscape would become less homogeneous resulting in more varying viewsheds. Based on the past, present and future actions discussed above and the proposed action, the cumulative effects of the activities in the area would substantially raise the impact to forest scenery in the Boggy and Turkey Knolls treatment block with less impacts across the rest of the project area if the recommended design criteria are implemented.

The Salter treatment units fall within the Moderate Scenic Integrity Objective. As described in the Final Environmental Impact Statement for the San Juan National Forest Land and Resource Management Plan, a Moderate Scenic Integrity Level refers to landscape where the valued landscape character appears slightly altered. Noticeable deviations must remain visually subordinate to the landscape character being viewed. The Scenic Integrity Objective states “Landscape may be slightly and noticeably altered by management and other activities.”

The uneven age silvicultural treatments proposed in the units do not alter the landscape because residual tree cover is maintained (see silviculture report). In addition Forest Plan Guidelines would be applied including “2.15.25b On the San Juan national Forest, with regard to clearcutting, sanitation salvage, thinning, shelterwood harvests, and overstory removal, foreground views from system trails and roads, and from recreation areas, should be designed in a manner that avoids dominating views of large, continuous openings and is mitigated by the presence of sufficient groups of residual trees. Uncut islands should be reserved within unit(s) in order to reduce apparent size of unit, provide visual diversity, and achieve a more natural-appearing treatment area.” Design features include creating openings with a natural appearance with uneven edges. The shape will be an irregular pattern that mimics existing natural openings and will avoid straight-line edges. Cuts would blend with natural landscape features such as natural meadows or openings and rock outcrops when possible. The Final Environmental Impact Statement for the San Juan Land and Resource Management Plan also recognizes the stability of forest scenery is dependent on ecosystem resiliency.

> Scenery is dependent on a healthy ecosystem. Natural disturbance elements (including fire, flood, landslides, and avalanches) are normal ecosystem processes and create or perpetuate natural scenic conditions. In particular, wildfire is a disturbance factor that has been profoundly affected by fire suppression and other land management activities.

Alternatives 2 and 3 are consistent with 2.15.25a as treatments have been designed to minimize visual contrasts. Design features include leaving large clumps of residual trees or shrubs located within a treatment unit, eliminating straight lines along treatment boundaries and facilitating the re-establishment of native species. See design features above.

Both action alternatives are also consistent with 2.15.25b On the San Juan National Forest, with regard to clearcutting, sanitation salvage, thinning, shelterwood harvests, and overstory removal, foreground views from system trails and roads, and from recreation areas. The treatment units have been designed in a manner that avoids dominating views of large, continuous openings and is mitigated by the presence of sufficient groups of residual trees. Uncut clumps retained within unit(s) would reduce apparent size of unit, provide visual diversity, and achieve a more natural-appearing treatment area.

In sensitive foreground areas (as viewed from system roads, trails and/or developed recreation sites), unit boundaries and tree marking would be accomplished with temporary flagging and removed once need is fulfilled. The proposal is therefore consistent with 2.15.25g.

There are no recreation sites impacted by this project.

# Transportation

## Affected Environment

The National Forest transportation system includes roads and trails. This section will address roads only, trails are addressed in the Recreation section of this assessment. National Forest System Roads (NFSRs) may have any of the following status; closed to all use, open to public use, or open to administrative use but closed to public use. Open roads associated with this project area are depicted on the Motor Vehicle Use Map (MVUM) for the San Juan National Forest, Dolores Ranger District. National Forest System Roads are maintained to one of five operational maintenance levels, based on the intended use and user comfort and convenience. Maintenance levels are fully defined in the Forest Service Handbook 7709.59 sec 62.32. Table 11 below, summarizes the miles of each operational maintenance level in the proposed action. Figure 11, appendix A includes a map depicting the location of the roads within the project area.

**Table 11. Miles of each maintenance level road in Salter project area**

| Operational Maintenance Level | Description | Project Area Approximate Miles |
|---|---|---|
| ML 1 – Basic Custodial Care (Storage of closed roads) | Intermittent use road while placed in storage; closed to all mechanized travel but not decommissioned | 6.1 |
| ML 2 – High Clearance Vehicle | Maintained for travel by high clearance vehicles | 80.0 |
| ML 3 – Suitable for Passenger Cars | Maintained for travel by prudent driver in standard passenger car | 32.3 |
| ML 4 - Moderate Degree of User Comfort | Maintained to Provide a moderate degree of user comfort and convenience at moderate travel speeds | 29.8 |
| ML 5 - High Degree of User Comfort | Maintained to Provide a high degree of user comfort and convenience at most travel speeds | 6.7 |

*Operational maintenance levels 2-5 summarized here also include administrative use roads not open to public use.

The existing condition of the transportation system was evaluated in the summer of 2020 per Forest Plan standards at 2.13.21 and 2.13.22 as a co-operative effort between the San Juan National Forest Supervisory Forester and Engineering. During that evaluation, several general concerns were identified that should be considered when evaluating the impacts of the proposed action on the transportation system. Specifically:

1. A high financial investment in the transportation system would be required to accommodate the proposed level of removal of forest products.
2. The potential for a high level of user conflict in popular, heavily utilized recreation areas.
3. The potential for a large increase in fugitive dust on primary haul routes if left unmitigated.

## Effects of the Alternatives

### Effects of No Action (Alternative 1)

The no-action alternative would continue to implement current operation and maintenance practices. The existing road system would undergo no changes in status. Open roads would continue to provide access for recreational, commercial, and administrative functions as they currently do. Open roads would receive no maintenance beyond that which is normally scheduled. As a result, current sediment delivery from road segments in need of maintenance would continue, especially during heavy run-off events.

Roads that are currently in custodial status (Management Level 1 and administrative use roads) would remain closed. Some of these roads have not been properly stored or maintained to establish a hydrologically stable condition. This can lead to additional road damage, greater sediment transfer, additional environmental impacts, and higher reconstruction costs should the roads be reopened. The no action alternative would result in the continued deterioration of the transportation system due to existing uses and the continually growing maintenance backlog.

### Effects of the Modified Proposed Action (Alternative 2) and Large Tree Retention (Alternative 3)

#### *New System Roads*

No new system roads are proposed for development associated with the proposed action.

#### *Existing Public Road System (Management Level 2-thru-5 Roads)*

The proposed action would result in temporary inconveniences to the public due to temporary road closures as well as increased traffic during project implementation. Increased traffic may result in higher fugitive dust levels and temporarily degraded road surface conditions such as wash-boarding and potholes. The Forest Service or contractor would repair any damage to existing roads that results from implementing the proposed action according to the Project Design Features. In general, the Forest transportation system would benefit from required maintenance efforts and as a result long term public and administrative access would be improved throughout the project area. Forest Service vegetation management contracts require maintenance of roads before, during, and after the work is complete. These maintenance and repair efforts on roads included in the proposed action would improve the condition of 149 miles of maintenance level 2-thru-5 roads in the project area.

The existing maintenance level 2 roads system has been created as a result of some historical use or constructed for specific land management access needs and converted to system roads. These roads are typically maintained on a five-year maintenance cycle. However, in most cases across this landscape the maintenance has been deferred due to lack of adequate maintenance budget. This means the majority of these roads have not been maintained in more than five years. As a result, much of this system will require maintenance to accommodate vegetation management and forest product haul. These maintenance efforts will serve to increase user access and address drainage and erosion concerns.

The existing arterial roads (generally maintenance level 3-thru-5) were constructed or reconstructed between 40 and 60 years ago and have been maintained only to meet the current user needs. These arterial roads are no longer structurally adequate to accommodate consistent use by 85,000 pound state legal loads. Mitigation efforts by upgrading these arterial roads would be required prior to haul. Upgrades would serve as a long-term benefit for local communities and forest users for decades to come.

### *ML1 – Stored Roads*

The Forest Service and contractors would use 6.1 miles of ML1 roads to implement the proposed action. Maintenance level 1 roads would be used intermittently when needed for project access and as haul roads but would remain closed to the public. Travel management during implementation shall be the responsibility of the purchaser. All closed roads should be effectively closed when not in use and/or signage should restrict public access during operations.

These roads would be opened by the Forest Service or a contractor to accommodate the vehicle of the associated treatment prescription. Log hauling trucks would be the design vehicle for vertical and horizontal curve reconstruction. After project implementation, but within one year of completion, these roads would be placed back into custodial care and physically closed. These roads would remain as part of the Forest transportation system.

The process of placing a road back into custodial care includes the implementing activities along the entire length of the road that would be conducted in a manner that hydrologically stabilizes the road prism (toe of fill to top of cut) for the long term. This could include adding or removing drainage features, including culverts, as appropriate. The Forest Service or contractor would also implement closures by installing gates, boulders, or other native material barriers, typically within the first 100 feet of the road. Many roads currently in custodial care have been given this designation without the process as described above and therefore are at risk to cause resource damage. The proposed action has the potential to improve the stability of these roads.

### *Temporary Roads*

Field evaluations have been completed to identify the most efficient use of the existing system and the process by which a temporary system will be developed as described in the Project Design Features. Implementing the proposed action would require development of approximately 106 miles of temporary roads. Per Forest Plan guideline at 2.13.24 these roads should be constructed to minimize disturbance, construction should be limited to clearing vegetation and minimal surface disturbance. They should be built, used, and reclaimed when erosion potential is minimal.

As displayed on the treatments block maps located in Appendix A. Maps, the primary temporary road system has been identified however, additional temporary roads would likely be needed.

These roads would be identified and approved by the engineering representative, sale administrator, and the purchaser. The primary temporary road alignments consist of 69.8 miles of existing non-system roads, and 36.4 miles of new ground disturbance. Primary temporary roads that would need to be developed on undisturbed ground are identified in the "Summary of Concerns" section of the Transportation System Specialist Report located in the project record.

The proposed action includes opening routes that would share alignment with motorized or non-motorized trails that do not typically have shared uses. In these cases temporary closures would be required during project implementation. There are 4.7 miles of temporary roads that share a portion of the same alignment with motorized trails and 1.4 miles of temporary roads that share with non-motorized trials. Further discussion on this topic can be found in the Recreation section of this assessment.

Like Maintenance Level 1 roads, temporary roads would remain closed to public access throughout project implementation. Closure during operations would be achieved by signage. The Forest Service or contractor would physically close temporary roads with barriers during periods of inactivity and at final project closeout.

The proposed action would use temporary roads for short-term access to treatment areas. Though these roads have been theoretically identified, the final alignment may deviate from the plan. Such deviation would be limited to that agreed by the Forest Service (Engineering Representative/Sale Administrator) and the contractor. The implementation of the proposed action should not result in an increase of temporary road mileage greater than 10 percent of the estimated 106 miles of primary temporary roads. Therefore, 11 miles or less of addition temp roads can be expected.

Temporary roads are typically constructed under minimal standards and investment. However, temporary roads can traverse difficult terrain and can require higher standards. In such cases specific survey and design would be required.

After the implementation of the vegetation management prescription, the contractor would be responsible for decommissioning temporary roads. In some cases post-contract activities such as pile burning would be necessary. In these circumstances the Forest Service would be responsible for the decommissioning efforts. Temporary roads would be decommissioned in a timely fashion following implementation, as described in the Project Design Features.

### *The Dolores Norwood Road*

The Dolores Norwood road (NFSR 526) is an arterial system road that serves several remote communities. The portion of the Dolores Norwood Road that would be affected by the proposed action is managed and maintained by three entities- Montezuma and Dolores counties, and the U.S. Forest Service. The first 12 miles (from the Forest boundary) is in Montezuma County and is under a "Schedule A" maintenance agreement. This means the Forest Service is the owner and Montezuma County conducts the primary maintenance. The remaining two miles in the project area have been transferred to Dolores County through a Forest Road and Trails Act (FRTA) easement. This means the operations and maintenance is under their jurisdiction.

Maintenance investments on the Dolores Norwood Road have been significant over the past 10 years. Improvements include new aggregate surfacing, surface stabilization, and the extension of the chip and seal segment of the road. These improvements were designed to accommodate recreational, residential, and limited commercial use.

The Montezuma County segment is open year-round and is approximately 5 miles of asphalt surface and seven miles of chip and seal surface. Montezuma County has expressed concerns about both the paved and the chip and seal segment. The current maintenance activities on the asphalt segment are not adequate to prevent degradation by the current uses. Deformation in the wheel tracks, extensive surface cracking, and significant sections of annual blade patching indicate subgrade failure. The recently installed chip and seal segment was not designed to accommodate heavy loads. This 12-mile segment is open year-round and snow removal operations are conducted.

The Dolores County segment of the Dolores Norwood Road is an aggregate surface. Surface stabilization has occurred in the past however the current level of traffic maximizes the effectiveness of maintenance efforts. Though this segment is no longer the jurisdiction of the Forest Service, the impacts of the proposed action will affect the counties management of the road. Approximately 1.4 miles from the county line to the Cottonwood Road intersection is open year-round, the remaining 0.6 miles typically snow closes in December.

Of the 27,000 acres of proposed action approximately 22,000 acres will use some portion of the Dolores Norwood Road to haul and remove forest products. Haul of these forest products will result in approximately 17,400 loads hauled on the Dolores Norwood Road. In addition, approximately 6,500 loads will come off the Boggy Draw Road. All of these loads, approximately 24,000 will come through the town of Dolores. It is impossible to have and accurate number of loads per day due to logistical timeline of implementation however if you were to spread this out over the estimated 10-year time frame of the project and assume 9 months of hauling per year this would average out to approximately 9 loads per day. This number is purely speculative due to the nature of the forest product business and days of heavy logging traffic should be expected throughout the implementation of these projects. The effects of this projects associated elevated heavy commercial traffic will result in increased maintenance needs on county and city roads and elevated public transportation risk.

#### *Findings*

The implementation of this proposed action has the potential to have significant influence on the transportation system across the landscape. However, the proper implementation of the project design features, and application of Timber sale road maintenance specifications would result in an improved condition. The Transportation System Specialist Report (C. Jones 2020) located in the project record displays site-specific concerns associated with the implementation of the proposed action by treatment block and road number. These concerns can be mitigated with proper planning and implementation of strategies identified in the Transportation section of the Project Design Features by the purchaser or by corrective actions taken by the Forest Service.

## Vegetation

### Affected Environment

Refer to the Proposed Project Location and Historical Background sections of this environmental assessment for the affected vegetation environment and the effects of taking no action (Alternative 1).

## Effects of the Alternatives

### Direct and Indirect Effects of the Action Alternatives (Modified Proposed Action - Alternative 2 and Large Tree Retention – Alternative 3)

Single Tree Selection is an approved method of management for ponderosa pine based on the Land and Resource Management Plan at 2.9.14. The effects of this treatment would be a post-harvest reduction in basal area leading to increased regeneration and movement of the stand towards an uneven-aged condition. The commercial thinning would be an intermediate treatment. Given the expected rotation or merchantable entry into these stands at roughly 20-to-25 years, this approach is expected to enhance the conditions that ultimately increase stand productivity and result in more successful follow-up entries in the future.

The effect was determined through the growth model Forest Vegetation Simulator which analyzed the different alternatives over time in meeting the desired conditions of the project. One representative single tree selection stand from each of the six treatment blocks was selected for detailed display of forest inventory data analysis as it relates to each stand's ability to meet the purpose and need.

This data indicates that alternative 2 – the modified proposed action – not only moves the vegetation toward the desired conditions described in the Land and Resource Management Plan for this land use and species. Alternative 2 better meets the purpose and need by allowing the silviculturist to make the final determination regarding most appropriate prescription to achieve desired conditions on a stand-by-stand basis, over time based on stand type and disturbance frequency. Application of a 20-inch diameter limit would reduce the prescription effectiveness and consequently limit movement towards desired conditions as described in the Land and Resource Management Plan.

Alternative 3 – Large tree retention limits the ability to fully utilize the silviculture systems designated by the Land and Resource Management Plan. Therefore, alternative 3 meets the desired conditions described at 2.2.23 to a lesser degree than alternative 2 – Modified proposed action. The data indicates that the differences between alternatives 2 and 3 are associated with specific locations over time and over cutting cycles. Preliminary feedback of Lone Pine EA Large Tree Retention study areas from post decision reconnaissance and layout of leave tree units have shown mixed results. The effects of applying a diameter limit appear to be more easily tangible at the fine scale. At the fine scale patches of bark beetle and heavily infested dwarf mistletoe trees have to be passed for removal due to the diameter limitation. Basal area retention goals and uneven aged characteristics are being compromised, leaving stands less resilient and making long term resistance less likely to occur. Removing areas from treatment as result of diameter limitation reduces the amount of treatment in an area and subsequently the amount of harvestable volume per acre. The effects described for the small scale are also documented from the mid-scale and potentially the landscape scale (USDA 2013d; USDA 2011).

No action would be in contrast with the primary management guidance described in the Land and Resource Management Plan. The no action alternative, when modeled, clearly displays that stands continue to move away from the desired conditions specifically with respect to the insect mortality risk associated with high stand diameter index and loss of productivity over time.

### Cumulative Effects

A variety of past and ongoing activities and disturbances occurring in the analysis area have and will continue to influence stand structure, condition and composition. These include wildfires and lack thereof along with prescribed and managed fire influences. The heavy timber harvesting of the past, regulated silviculture based harvests of modern times and firewood gathering have all created the mosaic of structure, condition and composition within the stands today. These stand components will continue to influence management on this landscape to meet desired conditions. As described in range section the entire area of activity is covered by multiple grazing allotments and the areas have been grazed for quite some time. This has influenced composition and populations of plants found currently in the activity area. Recreation activities (including dispersed camping and other activities involving legal, off-road vehicle travel) have been and will continue to be prevalent throughout the activity area. Concentrated recreation use occurs in Boggy Draw treatment block, particularly. This has led to negating the need to construct any new permanent roads for this project. Ongoing projects include Dolores Prescribed Fire Pine Ecosystem Restoration Project decision (ongoing), Boggy Glade Travel Management Plan decision (ongoing), Lone Pine (ongoing) and Salter Vegetation Project EA (foreseeable), could also influence the area of activity.

Portions of the Plateau and Carlyle Point blocks experienced a wildfire in 2018 that was a mixed severity fire with mostly beneficial effects acres recorded. Some of the mosaic burned areas with predominately surface fire have been included in analysis. Though some beneficial effects were observed, the fire did not result in the desired improvement in stand structure or stocking levels in these areas. Additional mechanical treatment is needed to meet the desired conditions for these units.

Because the proposed action has design features and project-specific review that will minimize or eliminate potential adverse effects during implementation, the impacts of the proposed action combined with other past, present, and reasonably foreseeable actions are not expected to cause substantial cumulative effects. Some elements of the proposed action may contribute to short-term negative effects, but overall, there will be long-term beneficial effects.

# Watersheds

## Affected Environment

The treatment area intersects ten HUC 6 watersheds in the Upper Dolores River Basin, shown in table 12 and Figure 14, appendix A. The watersheds contain numerous named and unnamed ephemeral and intermittent streams that originate within the analysis area. There are no perennial streams within the treatment area. Perennial streams are present in the lower end of the steep canyons between cutting units.

**Table 12. Watersheds in analysis area**

| Watershed Name | Total Acres in Watershed | Unit Acres | Percent of Watershed |
|---|---|---|---|
| Calf Creek | 13,009 | 279 | 2.1 |
| Cottonwood Creek-Dolores River* | 26,234 | 125 | 0.5 |
| Cover Canyon-Dolores River* | 13,165 | 1,689 | 12.8 |
| Headwaters Beaver Creek | 29,386 | 663 | 2.3 |
| House Creek | 24,327 | 10,118 | 41.6 |

| Watershed Name | Total Acres in Watershed | Unit Acres | Percent of Watershed |
|---|---|---|---|
| McPhee Reservoir-Plateau Creek | 11,990 | 2,060 | 17.2 |
| Outlet Beaver Creek | 16,732 | 6,200 | 37.1 |
| Ponderosa Gorge-Dolores River | 14,619 | 1,358 | 9.3 |
| Stapleton Valley-Dolores River* | 12,030 | 265 | 2.2 |
| Summer Camp Creek-Plateau Creek | 20,507 | 3330 | 16.2 |

*Municipal Watersheds

The topography in the treatment area is predominately mesa top. Slopes across most of the area range from 0 percent to 15 percent. Sustained slopes greater than 40 percent are not present within the treatment area.

Watersheds on the San Juan National Forest were analyzed for their overall condition and vulnerability to disturbance through the Aquatic, Riparian, and Wetland Ecosystem Assessment (ARWA). Vulnerability to human-caused disturbance is based on stream type and gradient in combination with precipitation regime. The House Creek watershed was rated as being "most sensitive to anthropogenic disturbances" due to having lower gradient stream types and a mixed rain and snow precipitation regime that could produce moderate to high yields of both coarse and fine sediment if anthropogenic disturbances were to occur during periods of increased runoff.

A road density analysis was completed to comply with land and resource management plan guideline 2.13.27, which states that in order to protect water quality and watershed function, road densities on San Juan National Forest lands should not exceed two miles/square mile in any 6th-level Hydrologic Unit Code watershed (road density, as it relates to water quality and watershed function, does not include miles of temporary road). Road densities should not exceed 1.5 miles/square mile for municipal watersheds. All watersheds in the analysis area meet these guidelines and are currently in compliance with the Land and Resource Management Plan.

## Soils

The soils within the analysis area are dominated by three different soil types. For these three soil types, erosion hazard (off-road, off-trail) is slight indicating that erosion is unlikely under ordinary circumstances; soil rutting hazard is severe indicating that ruts form readily; and, harvest equipment operability is moderately suitable indicating that one or more soil properties are less than desirable, and fair performance can be expected.

None of the watersheds within the analysis area are identified as having high potential for salinity issues due to a high content (greater than 50 percent) of marine-derived Mancos or Lewis Shale. There are no gypsum soils present within any watershed in the analysis area.

Soils and geolands prone to mass movement are primarily associated with major drainage features. Those features include Salter Canyon, Dry Canyon, Plateau Creek, Beaver Creek, House Creek, and the Dolores River Canyon. Project units largely do not intersect with soils and geolands prone to mass movement. The area with a significant portion of soil prone to mass movement is House Creek block

Histosols are typically associated with riparian and wetland areas. Histosols are present near Peel Spring and Rusty Spring, two springs that occur within the treatment area. There are no other

known riparian areas with enough organic matter and/or soil moisture to support histosols within the treatment area.

### Riparian

Peel Spring is located within treatment unit BS12 and Rusty Spring is located within treatment unit CS3. Aside from these two springs there is very limited riparian vegetation potential in the treatment area.

### Water Quality

The project area contains water quality stream segments as identified by the Water Quality Control Commission of Colorado's Department of Public Health and Environment. The most recent State assessment found all water body segments affected by the treatment area are meeting all State designated uses. There are no Outstanding Waters within the analysis area; all stream segments are designated as "reviewable." Three of the 10 HUC6 watersheds are municipal: Cottonwood Canyon-Dolores River, Stapleton Valley-Dolores River, and Cover Canyon-Dolores River. These watersheds are tributary to the Town of Dolores and the City of Cortez drinking water surface water intakes. Groundwater quality impacts to shallow and/or deep aquifers by the proposed actions are not expected and are therefore not analyzed in this report.

## Effects of the Alternatives

The effects analysis boundary for direct and indirect effects varies with each resource analyzed. For watershed analysis, the boundary is the HUC6. For soils analysis, the boundary is the timber sale unit as well as the roads identified for use. For riparian, the analysis area is the riparian area extent and includes a water influence zone of up to 100 ft. For water quality, the analysis area is the water quality segment as identified by the State from its intersection with the treatment area to its downstream terminus. Cumulative effects are considered at the HUC6 scale.

### Effect of No Action (Alternative 1)

The no action alternative does not propose any tree cutting and removal, oak thinning, slash disposal, pile burning, or road-related activities, so there would be no effects on watershed and soils, riparian areas, or water quality from these actions. However, there is a higher risk of stand-replacing wildfires occurring under the no action alternative, which could have impacts on watershed and soils, riparian areas, and water quality. The risk would be highest in areas with dense, mature, even-aged pine stands with dense Gambel oak in the understory. In areas with less stand density, stand-replacing wildfire is less likely to occur.

#### *Watershed/Soils*

In dense, mature, even-aged pine stands with dense Gambel oak in the understory, stand-replacing wildfire could cause substantial increases in runoff and erosion that can persist for several years after a fire. Increases in runoff and erosion have the potential to impact stream channel form and function and negatively impact watershed vulnerability as defined by the Aquatic, Riparian, and Wetland Ecosystem Assessment.

If no stand-replacing wildfire occurs, watershed processes related to runoff and erosion are not expected to change because watershed processes are currently able to keep pace with changing forest conditions. Watershed vulnerability would remain the same.

#### *Riparian*

Riparian resources would not be affected by the no action alternative except in the event of a stand-replacing wildfire, in which case, seeps and springs could become inundated with sediment and/or eroded by increased overland flows. Sediment may enter stream channels causing channel aggradation and subsequent channel adjustment. Increases in streamflow can initiate vertical erosion of the stream channel. Thus, if a stand replacing wildfire were to occur, stream health would be degraded. If no stand-replacing wildfire occurs, riparian areas would remain similar to current conditions.

#### *Water Quality*

Water quality would not be affected by the no action alternative except in the event of a stand-replacing wildfire. A stand-replacing fire could elevate nutrient concentrations (for instance, nitrogen and phosphorus) in nearby and downstream surface waters; increase total dissolved solids and turbidity; and enhance the mobilization of metals such as iron, manganese, and mercury. Water quality under this scenario would be degraded and beneficial uses would not be fully supported. If no stand-replacing wildfire occurs, water quality would remain similar to current conditions.

### Effect of the Modified Proposed Action (Alternative 2) and Large Tree Retention (Alternative 3)

The proposed action involves tree cutting and removal, oak thinning, slash disposal, pile burning, and road related activities. The adaptive management actions described previously in the Monitoring and Adaptive Management section of this environmental assessment and project design criteria are considered part of the proposed action and are therefore included in the analysis of effects. The activities associated with the proposed action may have localized, short-term effects (less than three years) on watershed and soils, riparian areas, and water quality. However, the hydrology and soils design features listed in Section 2.2.5 would help minimize or eliminate potential adverse effects during implementation, and no negative long-term impacts would occur.

#### *Watershed/Soils*

The proposed activities would result in small, temporary increases in runoff. This is primarily due to water running off of compacted areas during and immediately after harvest. These increases would be of limited extent and severity due to 1) an existing thick layer of duff on the forest floor that would effectively capture excess water and sediment, 2) predominantly gentle slopes throughout the analysis area, and 3) the implementation of design features that were chosen to protect soils and minimize erosion and runoff. This includes the following:

- Soil disturbing actions would be avoided during periods of wet soils (Hydrology and Soils design element 3)
- Logging slash would be well-distributed throughout the cutting units to protect soils from erosion and retain nutrients and organic matter on site (Hydrology and Soils design element 6)
- Skid trails would be located perpendicular to the slope, as much as possible, to reduce the possibility of rutting and gullying along the trail. When not located perpendicular to the slope, cross drains would be installed (Hydrology and Soils design element 5)

- Log landings would be located to limit the potential for erosion and would be designed to have proper drainage (Hydrology and Soils design element 5)
- Organic soils associated with riparian areas, intermittent streams, and the water influence zone (WIZ) would be protected through a no harvest/no mechanized equipment buffer (Hydrology and Soils design element 1)

Soil erosion is also expected to occur as a result of temporary road construction and some sediment delivery to ephemeral and intermittent streams is expected at stream crossings. However, these effects are expected to be short-term (less than three years) and of limited intensity because:

- Temporary roads would be built with appropriate drainage features and stream crossings would be located to provide for the flow and passage of sediment and to withstand expected flood flows (Hydrology and Soils design element 8)
- Stream crossings would be located at straight and shallow locations (slope banks would not exceed 30 percent) where channels are hardened by gravel, cobble, or bedrock (Hydrology and Soils design element 7)

Temporary roads would be reclaimed within five years after use begins to be that assure that erosion and sediment delivery return to pre-use levels (Hydrology and Soils design element 7 and Transportation design element 2).

As a result of the above stated conditions, watershed function would not be adversely affected as a result of the proposed action and therefore watershed vulnerability would remain the same. Road density as it relates to water quality and watershed health would not change because no new permanent roads are proposed and all temporary roads will be decommissioned 5-years after first use. In addition, the use of adaptive management provides the flexibility to adjust and/or prohibit treatments if needed.

### *Riparian*

There would not be any meaningful effects to riparian resources from the proposed action because design features are in place that minimize activities in these areas. Erosion and runoff that could impact riparian areas would be controlled in the manners listed above. The design features specifically intended to prevent or minimize impacts to riparian areas include:

- Heavy equipment and vehicles would be prohibited in the water influence zone (WIZ) unless the ground is protected by either one foot of packed snow or two inches of frozen soil (Hydrology and Soils design element 1)
- Peel and Rusty springs would have a buffered perimeter of 100 feet unless a field visit by hydrologist determines a different site-specific buffer. Intermittent streams with riparian vegetation would have a buffer strip width of 100 feet on each side of the channel unless a field visit by hydrologist determines a different site-specific buffer (Hydrology and Soils design element 1)
- Mechanical treatments would avoid wetlands, wet meadows and riparian areas. No skidding, decking or loading would be allowed in these areas in order to protect water quality, existing soils, and vegetative cover (Hydrology and Soils design element 4)
- Removal or mechanical treatment of riparian or wetland vegetation would be prohibited. (Hydrology and Soils design element 4)

- Stream crossings would be avoided, and if unavoidable, would be kept to the minimum number necessary to treat a unit and would be appropriately designed (Hydrology and Soils design element 1).

As identified in the watershed/soils section, erosion and runoff would be minimized due to the application of design features. This, in addition to the specific riparian protections listed above, would maintain current riparian condition and stream health ratings.

### *Water Quality*

Sediment, temperature, and dissolved oxygen are the primary water quality characteristics that may be affected by the proposed activities. These parameters are influenced by erosion, sediment delivery, and channel and streamside conditions. Erosion and runoff that could impact water quality would be controlled in the manners listed under the watershed/soils and riparian sections above. Effects to water quality, and specifically erosion and runoff, would be negligible because:

- Sediment delivery to the streams channels is unlikely except where temporary roads are hydrologically connected to the stream
- Temporary road crossings would be located at straight and shallow locations (slope banks would not exceed 30 percent) where channels are hardened by gravel, cobble or bedrock (Hydrology and Soils design element 1)
- Seeps, springs, and streamside conditions (amount of stream shading, amount of large woody material in and adjacent to the stream, stream gradient) would not change as a result of the proposed action because all riparian lands in or adjacent to the harvest units would have a no harvest/no mechanized equipment buffer (Hydrology and Soils design element 1).

As a result of the protections provided by the above design features, beneficial uses would be fully supported under the proposed action and water quality standards would continue to be met.

The risk of stand replacing wildfire under the proposed action is reduced, as compared to the no action alternative. However, if stand replacing wildfires do occur, impacts would be similar as those described under the no action alternative but less severe as a result of the proposed treatment.

## Cumulative Effects

Current and future activities and events that may impact watersheds, soils, riparian condition, and water quality in the treatment area include current and historic livestock grazing; natural and prescribed fire; roads and trails (existing and/or new temporary road construction); recreation activities (including dispersed camping and other activities involving legal, off-road vehicle travel); drought; and insect, disease and noxious weed outbreaks. The activities proposed in this EA, in combination with the prescribed fire actions described in the Dolores Prescribed Fire Pine Ecosystem Restoration Project environmental assessment and decision notice (USDA 2018), would help reduce stand density, improve age-class distribution, and increase resiliency during changing environmental conditions that could otherwise adversely affect water resources. Therefore, the result of the proposed action is a lessening of adverse cumulative effects within the effected watersheds. That said, House Creek and Outlet Beaver Creek watersheds have a large percentage of the watershed targeted for treatment (43.2 percent and 37.9 percent, respectively). Timing of implementation (by block or by unit) would need to be considered prior to commencement of activities.

# Wildlife and Fisheries

## Threatened, Endangered and Proposed Wildlife and Aquatic Species

### Species Considered for Analysis

The following information includes listed species, along with associated habitat that are located on the Dolores Ranger District of the San Juan National Forest or are located adjacent to or downstream of the project and could potentially be impacted by proposed activities of the project. A pre-field review was conducted of available information to assemble occurrence records, past survey efforts, describe habitat needs and ecological requirements needed to complete the analysis. Sources of information included Forest Service records and files, the State Natural Heritage Program database, state wildlife agency information and published research. See full Wildlife and Fisheries Biological Evaluation and Assessment for detailed analysis and further information.

Species considered for analysis are based on five criteria listed below. The criteria were used to identify species that would experience "no effect" from the implementation of the proposed action and could, therefore, be eliminated from further analysis.

1. Analysis area is outside the species' range.
2. Potential habitat for the species does not exist within the project area or where proposed activities would take place.
3. No critical habitat occurs in the project area.
4. The type or intensity of the activity in the proposed action is expected to have no impact/effect on these species or their habitat; or proposed activities do not take place in potential or occupied habitat.
5. The associated conservation design of the proposed action eliminates any potential for negative impact on the species.

Wildlife Species Dismissed from Analysis: Habitat is absent or proposed activities would not occur in habitat for Canada lynx, Mexican spotted owl, Gunnison's Sage-grouse, New Mexico meadow jumping mouse and Western yellow-billed cuckoo. Therefore, these species are dismissed from further analysis because the proposed action is not expected to impact these species.

Fish Species Dismissed from Analysis: Habitat for bonytail chub, Colorado pikeminnow, humpback chub and razorback sucker is absent in the project area. Project is outside of its occupied range and does not deplete water from the basin. Therefore, these species are dismissed from further analysis because the proposed action is not expected to impact these species.

**No species were carried forward for analysis and the proposed action will have "No Effect" to any federally listed species.**

## Sensitive Species, Species of Special Interest and Migratory Birds

### Species Considered for Analysis

The following information includes sensitive species and species of special interest, along with associated habitat that are located on the Dolores Ranger District of the San Juan National Forest, or are located adjacent to or downstream of the project and could potentially be impacted by proposed activities of the project. A pre-field review was conducted of available information to assemble occurrence records, past survey efforts, describe habitat needs and ecological requirements needed to complete the analysis. Additional surveys were conducted for species to gather more detailed information of the occurrence, such as northern goshawk. In addition, past surveys were reviewed for species and habitat presence (flannelmouth sucker). Sources of information included Forest Service records and files, the State Natural Heritage Program database, state wildlife agency information, published research and eBird records (eBird 2020).

Sensitive species reviewed for detailed analysis were designated by the Regional Forester due to concerns over their population status, trend, and habitat conditions. Species of Special Interest (formally Management Indicator Species) were selected for detailed analysis due to public interest and management direction in the San Juan National Forest Land and Resource Management Plan (USDA 2013). The Land and Resource Management Plan identifies that some species are to be used to assess long-term population trends and evaluate continued population viability. The sensitive species that could be impacted by the proposed action are the boreal toad, northern leopard frog, flammulated owl, flannelmouth sucker, Lewis's woodpecker, Monarch butterfly, northern goshawk, olive-sided flycatcher, fringed myotis, hoary bat, spotted bat, Townsend's big-eared bat and western bumblebee. Abert's squirrel, big game (Rocky Mountain elk and mule deer), hairy woodpecker and migratory birds (Grace's warbler, olive-sided flycatcher and Virginia's warbler) were selected to represent Species of Special Interest and could be impacted by the proposed action.

Species considered for analysis are based on five criteria listed below. The criteria were used to identify species that would experience "no impact or no effect" from the implementation of the proposed action and could, therefore, be eliminated from detailed analysis.

1. Analysis area is outside the species' range.
2. Potential habitat for the species does not exist within the project area or where proposed activities would take place.
3. The type or intensity of the activity in the proposed action is expected to have no impact/effect on these species or their habitat; or proposed activities do not take place in potential or occupied habitat.
4. Individual animals may be accidental, dispersing, migrating, happenstance, vagrant, nomadic or opportunistic visitors to the habitat(s) impacted by the proposal; however, no affiliation or dependence on these habitat(s) has been shown.
5. The associated conservation design of the proposed action eliminates any potential for negative impact on the species.

Wildlife Species Dismissed from Analysis: Habitat is absent or proposed activities would not occur in habitat for American bald eagle, American bittern, American peregrine falcon, black swift, boreal owl, brewer's sparrow, Columbia sharp-tailed grouse, ferruginous hawk, loggerhead

shrike, northern harrier, purple martin, sagebrush sparrow, short-eared owl, western burrowing owl, white-tailed ptarmigan, Great Basin silverspot butterfly, American marten, desert bighorn sheep, Gunnison's prairie dog, kit fox, mule deer critical winter habitat, river otter and Rocky Mountain bighorn sheep. Therefore, these species are dismissed from further analysis because the proposed action is not expected to impact these species.

Fish Species Dismissed from Analysis: Habitat for Colorado River cutthroat trout, bluehead sucker and roundtail chub is absent in the project area. Therefore, these species are dismissed from further analysis because the proposed action is not expected to impact these species.

## Affected Environment – Sensitive Species

**Boreal Toad:** Habitat for the boreal toad is found on the Forest, primarily within the spruce-fir and alpine zones and generally above 8,000 feet. Mixed conifer, ponderosa and aspen stands can also provide suitable habitat conditions where water features are present. Ponds, wet meadows, wet stands of willow, small lakes, marshes, beaver impoundments, and glacial kettle ponds serve as suitable breeding habitat for this species. Habitats in the Southern Rocky Mountains include subalpine lakes, reservoirs, ponds, creek pools, marshy areas, wet meadows, and adjacent terrestrial habitats. Individuals seek shelter under logs, rocks, rodent burrows and other below-ground spaces as over-wintering hibernacula habitat. Eggs and larvae develop in shallow areas of ponds, lakes, or reservoirs, or in pools of slow-moving streams. Larvae filter suspended organic material or feed on bottom detritus/microbes. Metamorphosed individuals feed on various small terrestrial invertebrates. The project area has a wide variety of aquatic features that have the potential to provide habitat for the boreal toad; however, such features are limited. There are no known boreal toad records in the project area.

**Northern Leopard Frog:** Habitat used by the Northern leopard frog varies throughout its range. In Colorado, it is reported to occur in elevations well below 3,500 feet in northeastern Colorado to above 11,000 feet in southern Colorado (Hammerson 1999). Merrell and Rodell (1968) describe three major habitat divisions: winter habitat (lakes, streams and ponds), summer habitat (post-breeding areas including upland habitats for feeding), and egg/tadpole habitat (shallow breeding ponds). Although aquatic habitats are a central feature in the frog's cycles of life, it may travel a considerable distance from natal and breeding areas to a variety of other habitat types. Typical aquatic features used by the species include wet meadows and the banks and shallows of marshes, glacial kettle ponds, beaver ponds, lakes, reservoirs, streams and irrigation ditches (Hammerson 1999). Streams are often used as dispersal corridors, but upland areas are also used. The project area has a wide variety of aquatic habitat that has the potential to provide habitat for the northern leopard frog. Within the project area there are aquatic features, but these will not be affected by the implementation of the project since there are large aquatic area buffers associated with the project. No activities will directly occur in potential habitat. Although, habitat exists in the project area, there are no known locations.

**Flannelmouth Sucker:** Rees et al. 2005 describe habitat and primary threats for the flannelmouth sucker as, "typically found in slower, warmer rivers in plateau regions of the Colorado River drainage. They usually inhabit the mainstem of moderate to large rivers but are occasionally found in small streams. This species frequents pools and deep runs but can also be found in the mouths of tributaries, riffles, and backwaters. Flannelmouth suckers are occasionally found in lakes and reservoirs, but they generally react poorly to impounded habitats, or habitats influenced by impoundments. Habitat association can be attributed to feeding strategies during specific life stage. The primary threats to the flannelmouth sucker are generally human-induced activities that

divert water and change the flow regime in both tributary and mainstem streams. Specific threats include (a) construction of passage barriers (e.g., diversion dams and reservoirs) that disconnect habitats and cause habitat fragmentation and (b) introduction of non-native species that are both predators on and competitors with the flannelmouth sucker. Other threats include modification of streambeds through channelization, landscape changes resulting from land use, and local degradation of riparian zones that reduces the natural function of the stream ecosystem". The project area is located in flannelmouth sucker habitat. Surveys conducted in 1998 detected this species in Plateau Creek. No activities will directly occur in habitat since there are large aquatic area buffers associated with the project area.

**Flammulated Owl:** The flammulated owl is associated with dry mature mountain forests of ponderosa pine or other large coniferous trees, often interspersed with aspen or oak (Linkhart et al. 2013). Migratory and preferred summer breeding habitat for flammulated owls on the Forest is mature, open-growing stands of ponderosa pine and mixed-conifer (USDA, Forest Service 2013). The species has been detected in many areas of the District during surveys for Mexican spotted owls; however, availability of suitable nest cavities and fragmentation of habitat may act as a limiting factor for this species. The project area provides potential habitat for flammulated owl; however, habitat quality has declined in many areas due to dense and degrading forest health conditions, despite an increase in snag densities. Ponderosa pine snag density increases over the last 20 years are due disease and beetle kill; and as a result, do not provide long-term high-quality habitat. The species does occur in the project area. In addition to Forest survey data, known ebird records exist in the project area and ebird sightings of the species have occurred in areas adjacent.

**Lewis's Woodpecker:** Lewis's woodpecker is associated with open ponderosa pine forests and burned forests with a high density of standing dead trees (snags). They also breed in woodlands near streams, oak woodlands, orchards and pinyon-juniper woodlands. Habitat on the Forest is found in ponderosa pine and Gambel oak woodlands, forested riparian areas with large over story cottonwood trees and ponderosa pine stands adjacent to large open parks and meadows (USDA, Forest Service 2013). In Colorado, Lewis's woodpeckers typically nest at lower elevations, from 4,215 to 6,365 feet in elevation (Colorado Breeding Bird Atlas 2016). Habitat across much of the project area is considered marginal since it occurs at higher elevations, from 7,800 to 8,800 feet. In addition, habitat quality has declined in many areas due to dense and degrading forest health conditions, despite an increase in snag densities. Ponderosa pine snag density increases over the last 20 years are due disease and beetle kill; and as a result, do not provide long-term high-quality habitat. No known records exist in the project area, but ebird sightings of the species have occurred in areas adjacent. Individuals have been sighted in adjacent lower elevation stands located in previously burned stands of ponderosa pine.

**Northern Goshawk:** The northern goshawk (goshawk) a forest generalist because it occurs in all major forest types (coniferous, deciduous, and mixed). Mature forest structures appear to be an important component in the goshawk nesting home ranges. Research suggests that goshawk seldom uses young dense forests and reasons for avoidance of these areas may be due to insufficient space in and below the canopy to facilitate flight and prey capture. Additionally, due to the absence of larger trees, these areas would offer few opportunities for nesting (Reynolds et al. 1992).

Goshawks are predators of forest birds and mammals. While there are variances between regions on type of prey, there is a common trait: The majority of the important prey species reside mainly on the ground and in the lower portions of the tree canopy (Reynolds et al. 1992). The

implications of this are that in areas that have tall and very dense understories, goshawk populations may effectively be diminished since there would be more cover for the potential prey species to hide and escape (Reynolds et al. 1992). Boal and Mannan (1994) found that mammals accounted for 94 percent of the total prey biomass and birds (6 percent) in a Northern Arizona study. They found that cottontail rabbits, Stellar's jays, and northern flickers accounted for the most frequently taken species, accounting for over 65 percent of total number of bird prey taken. Reynolds et al. (1992) found in a study of nest areas on the Kaibab Plateau that mammals contributed 67 percent of the number of prey items identified and birds contributed 38 percent. The most common taken prey in descending order of frequency were cottontail rabbit, tassel-eared squirrel,

The foraging area, due to its large size, consists of a mosaic of forest structural conditions and age classes and encompasses a diversity of landforms. There is a limited amount of information on preferred foraging habitat. Some studies (Fischer 1986) suggest a preference for older age classes. Based on the habitat requirement of favored prey and the hunting techniques used by the goshawk, these areas would be relatively open (40-to-60 percent canopy cover) with well-developed herbaceous and shrubby understories. Reynolds et al. (1992) described important components of foraging habitat as snags, downed logs, woody debris, small openings, large trees, and a range of vegetative structural stages (VSS). Under their conservation recommendations for the southwestern Rocky Mountains (Region 3) they suggested optimum proportions for the various vegetative structural stages ranging from openings dominated by grasses, forbs and shrubs (VSS 1) to old-growth, late successional forest (VSS 6). These components reflect the habitat preferences of preferred prey species, as well as the hunting techniques for the goshawk. Under their recommendations they emphasized a high proportion of foraging habitat in the mid-late successional stages for the maintenance of quality goshawk habitat.

Goshawks exhibit high breeding territory fidelity from year to year. The territory is typically occupied by the goshawk pair from early March at least until late September. Reynolds et al. (1992) identified three components of territory: Nest Area, Post-fledging Family Area (PFA) and Foraging Area (Territory). The following below provides a detailed description of each component.

- Nest Areas (Sites): contain nest sites which are active or historic that represent the nesting activity of a Northern Goshawk Territory. Northern Goshawk often have alternate nest sites, so multiple nests sites can occur in a territory and each have a 30-acre habitat boundary around them.
- Post-fledgling Family Areas (PFAs): represent a concentrated area that surrounds the nest areas/sites and is used by the family from the time the young leave the nest until they are no longer dependent on the adults for food. These areas often vary in forest types, vegetation types and conditions. PFAs are a minimum of 420 acres outside of Nest Areas.
- Foraging Area (Territory) - represents the full use of habitat required to carry out biological functions. These are approximately 5,400 acres.

The project area contains breeding, nesting and foraging habitat. Surveys have been conducted in this area regularly and multiple observations of individual goshawks, along with nesting pairs have been observed. As a result, additional efforts have been made to delineate Post-fledging Family Areas and Nest Area for seven territories in order to manage for the species and its habitat. Methods to delineate these areas used guidelines provided in the Management Recommendations for Northern Goshawk in the Southwestern United States (USDA, Forest Service 1992). The final

areas represent the "best available information" for nest locations, including active, alternate and historic that would contribute to a functioning PFA. Most current information (past surveys and surveys from this summer), activity status, surrounding habitat for historic or alternate sites was used to choose final locations for a PFA. All nest sites considered functioning and useable were delineated and given a 30-acre circular buffer. In some cases, Nest Areas overlap, due to proximity of nest sites to one another and where primary and alternate nest sites were identified.

**Olive-sided Flycatcher:** Olive-sided flycatchers breed mostly in the boreal forest and in western coniferous forests, from sea level to over 10,000 feet elevation, however, in some parts of the range ponderosa pine forests are used (Altman et al. 2012, USDA, Forest Service 2013). Preferred diet includes insects and nesting typically occurs in the mid to upper section of tree. Habitat for olive-sided flycatcher occurs throughout the project area and in proposed treatment units. Known ebird records exist throughout the project area but not in proposed units. Sightings of the species have also occurred in other areas on the Forest.

**Monarch Butterfly and Western Bumblebee:** Monarch butterflies rely completely on milkweed plant species to carry out their entire lifecycle. The state of Colorado is considered a transitional or migratory zone that separates the western and eastern populations. Potential habitat may occur in the area, but no detections of Monarch or milkweed plant have been documented in the project area. Western bumblebees are habitat generalists and are associated with a wide variety of natural, agricultural, urban, and rural habitats, although species richness tends to peak in flower-rich meadows of forests and subalpine zones. No detections of western bumblebee are been documented in the project area, but potential habitat does exist.

**Fringed Myotis, Hoary Bat, Spotted Bat and Townsend's Big-eared Bat:** Listed bat species will be discussed collectively, since information is similar and overlapping. Habitat requirements for many bats in the United States, including those species discussed below, require three basic components for survival - roosting, foraging and drinking sites. Roost sites include dead and dying trees, especially with loose bark, tree cavities and hollows, along with crevices created by lightning strikes. It is not uncommon for bats to use the same roost site in successive years (Bat Conservation International 2020). Foraging habitat includes areas typically near water sources where insects congregate. Roads and forest edges also provide foraging habitat since insects tend to be more abundant in these areas. Drinking areas are critical to the species and bats are dependent on water sources, especially during periods of increased activity, such as rearing young and lactation (Bat Conservation International 2020). Riparian areas, ponds, bogs, meadows with high levels of moisture and relative humidity and guzzlers can provide necessary habitat. Habitat occurs within the project area for all bat species selected for analysis. Proposed activities are also located in suitable habitat. No known records exist for these bat species in the project area.

## Effects of the Alternatives – Sensitive Species

### Direct and Indirect Effects – Alternative 1 - No Action Alternative

**Boreal Toad, Northern Leopard Frog, Flannelmouth Sucker, Monarch Butterfly and Western Bumblebee:** This alternative is expected to have "**No Effect**" to boreal toad, northern leopard frog, flannelmouth sucker, Monarch butterfly or western bumblebee and associated habitat since all habitat conditions would remain unchanged and progress naturally.

**Flammulated Owl, Lewis's Woodpecker, Northern Goshawk, Olive-sided Flycatcher, Fringed Myotis, Hoary Bat, Spotted Bat and Townsend's Big-eared Bat:** The no action

alternative **"may impact individuals or their habitat, but would not likely contribute to a trend towards federal listing or loss of species viability to the population or species"** for flammulated owl, Lewis's woodpecker, northern goshawk and olive-sided flycatcher, fringed myotis, hoary bat, spotted bat and Townsend's big-eared bat, since continued tree mortality across the project area would negatively affect site selection and the potential availability of habitat would be reduced. It is not anticipated that bark beetle activity will slow or stop naturally, and associated fire risk could further impact habitat availability and suitability, both in the short-term (less than 10 years) and long-term (more than 10 years).

### Direct and Indirect Effects – Alternative 2 – Modified Proposed Action and Alternative 3 – Large Tree Retention

**Boreal Toad, Northern Leopard Frog and Flannelmouth Sucker:** Direct and indirect effects of both action alternatives include disturbance of stream habitats from sedimentation and is one of the greatest impacts of timber harvest on aquatic species. Timber harvest activities typically include the development and maintenance of roads, which may further increase erosion and sedimentation in adjacent streams and wetlands. These activities can impact aquatic species most directly during the larval stage, when they are restricted to aquatic habitats or rely on high quality water conditions to feed and develop. Clear-cuts may influence the use of migration corridors due to the decreased moisture and increased heat within the open areas. Shrub understories provide important microhabitats that aid in thermoregulation by providing moisture, water and thermal cover for amphibians.

Other effects from both action alternatives could include incidental mortality of frogs crushed by equipment used during harvest activities. Over-snow operations are expected to have little to no impact since northern leopard frogs overwinter in ponds and lakes that do not freeze over in winter.

**Flammulated Owl, Lewis's Woodpecker, Northern Goshawk, Olive-sided Flycatcher, Monarch Butterfly, Western Bumblebee, Fringed Myotis, Hoary Bat, Spotted Bat and Townsend's Big-eared Bat:** Direct and indirect effects of both action alternatives include a reduction in the habitat availability by reducing the number of trees per acre across the project area. Single Tree Selection and Commercial Thinning prescriptions are intended to improve and maintain age classes and habitat diversity of ponderosa stands. Targeting areas where vegetation management could most effectively move age classes, size classes, density and species closer to desired conditions is also intended. Prescriptions were further developed to address forest health issues in existing ponderosa and Gambel oak habitats, along with aspen stands that occur in the area. The project area, in particular, is at a high risk for developing increased level of insect, disease and fire risk.

Short-term (less than 10 years) impacts to the species would reduce the number of large, live overstory trees and may negatively impact breeding site selection. Design features are intended to retain suitable levels of snags as designate by plan requirements for ponderosa forest types. Plan requirements for ponderosa stands include leaving a minimum of 1 snag per acre of at least 12 inches diameter at breast height and 25 feet tall. If trees in this size class are not available, then leave 2-3 snags per acre of at least 9 inches diameter at breast height and 15 feet tall. If insufficient numbers of snags exist before the treatment, then additional snag recruits would be reserved. Snag recruits should have the following characteristics: evidence of cavities, decay, broken/dead tops or lightning strikes.

Foraging habitat may improve in areas where treatments reduce the density of pine and oak, and subsequently improve the productivity and cover of understory herbaceous species. In the long-term, post-treatment stand structure is expected to provide better foraging habitat than currently exists by providing increased interior edge and more open stands. Proposed activities would also promote the recovery of forest vegetation and create more resilient pine stands across the landscape, resulting in long-term habitat quality.

For northern goshawk, assuming that bark beetle activity slows or stops, the proposed activities are expected to result in short-term (less than 10 years) negative impacts but overall long-term (more than 10 years) beneficial impacts. In areas that receive single tree selection and commercial thinning, basal area after treatment is expected to average around 60-80 square feet per acre, with clumps of trees having higher basal areas. Basal area reductions below 80 square feet per acre in mature stands would affect nesting behavior of northern goshawk because thermal and protective sight cover for nesting will be reduced, which will reduce reproduction. A reduction in canopy cover may also impact foraging success as there will be less ability to hide from prey. These impacts may reduce habitat effectiveness in the short-term (less than 10 years) for this species, but in the long-term (more than 10 years), recovery of forest vegetation and increased age class diversity associated with the proposed action will benefit habitat effectiveness for northern goshawk.

The likelihood of potential habitat for Monarch butterfly and western bumblebee to be impacted by proposed activities is low. Activities are not intended to take place in suitable habitat. Potential habitat may occur along roadways, and in this case, individuals may be impacted by vehicle and truck traffic that creates dust on flowering plants and milkweed plants. Individuals could also be impacted by accidental collisions with vehicles.

### Determination of Effects and Rationale

With all proposed activities combined and resource protection measures, either action alternative **"may impact individuals or their habitat, but would not likely contribute to a trend towards federal listing or loss of species viability to the population or species"** for boreal toad, northern leopard frog, flannelmouth sucker, flammulated owl, Lewis's woodpecker, northern goshawk and olive-sided flycatcher, Monarch butterfly, western bumblebee, fringed myotis, hoary bat, spotted bat and Townsend's big-eared bat since the effects are expected be short-term (less than 10 years) and the long-term (more than 10 years) impacts are intended to be beneficial by providing higher quality habitat that is well distributed in the future. The action alternatives are nearly identical in all aspects except for tree diameter restrictions. Although the modified proposed action alternative may leave less trees on the landscape than the large tree retention action alternative, impacts from proposed activities to this species are still expected to be similar in nature due to the intended basal area target range. Other potential impacts to the species may include disturbance or displacement during harvest activities.

The rationale for this determination is based on the availability of habitat in and adjacent to the project area, along with the occurrence of the species in the project area. Design features are intended to minimize impacts to these species. Aquatic features are not expected to be impacted since the project has been designed to avoid these features. In addition, design features are intended to retain adequate snag levels in the project area, post-treatment. Potential impacts to nesting goshawk will be minimized with application of design features that requires surveys for the species be completed prior to project implementation. This includes the requirement that if active northern goshawk nests are discovered, all project operations would be restricted annually

from March 1st to August 31st within one-half (½) mile of the active nest. Design features requiring the retention of snags will also minimize impacts to prey species.

Additional design features for goshawks were developed to address PFAs and nest areas and prescription modifications in single tree selection and commercial thinning treatments where proposed activities of either action alternative occurred in a PFA or nest area were recommended.

## Affected Environment – Species of Special Interest and Migratory Birds

**Abert's Squirrel:** Abert's squirrel are a ponderosa pine obligate species that span across the San Juan National Forest. These squirrels rely on ponderosa pine forest for nesting, forage, reproduction, and cover. They require interconnected structure in mature conifer forest that produce abundant forage and reproductive habitat. It is normal for the abundance of Abert's squirrels to vary greatly and frequently due to weather conditions and food supplies (Keith 2003). Habitat across much of the project area is considered suitable for Abert's squirrel in the short-term (less than 10 years). A large-scale annual monitoring effort for Abert's squirrel has taken place on the Forest over the past 12 years. This monitoring plan provides a consistent and rigorous framework for the purpose of evaluating population trends of Abert's squirrel. These monitoring efforts show that ponderosa pine habitat on the Forest is currently in a condition that can support Abert's squirrels and populations across the forest appear to be stable at this time.

**Big Game (Rocky Mountain Elk):** Elk are distributed broadly across the landscape and occur throughout the project area. They are identified in the Forest Plan as an early successional management indicator species and quantitative Forest level population data exists, which is collected annually. Elk have three broad habitat requirements - feeding, cover and rearing. Because mule deer and elk utilize cover and forage similarly, elk were selected to represent big game since winter range habitat, critical (known as severe by Colorado Parks and Wildlife) winter range habitat and production area habitat occurs in the project area. No critical winter habitat for mule deer occurs in the project area and mule deer will not be discussed further in this analysis. Topography, elevation, weather, livestock grazing, travel management, soil types and plant communities are the main factors influencing habitat condition and capability. Winter range is the most important habitat for elk, but summer range and production areas also can be important when dry conditions cause a decrease in forage. Elk populations have grown in the past two to three decades, and currently exceed the Colorado Parks and Wildlife objectives. Although habitat quality is important, populations are largely influenced by human population growth and land development (USDA 2013). Security areas (areas that contain both cover and forage that are greater than 250 acres) also exist within the project area. The entire project area is considered Colorado Parks and Wildlife summer range. Portions of the project area fall in CPW mapped elk production habitat. Production areas are defined as that part of the overall range of elk occupied by the females from May 15 to June 30 for calving. There is critical (severe) winter range habitat mapped for elk within the project area. General winter and critical (severe) winter range occurs on the southern side of the project area. The largest elk habitat within the planning area is general winter range habitat. Critical (severe) winter range habitat and production areas make up a very small portion of the project area.

**Hairy Woodpecker:** Hairy woodpeckers are associated with coniferous, pine and burned forests with a high density of standing dead trees (snags). They also breed in woodlands near streams, oak woodlands, orchards and pinyon-juniper woodlands. Habitat on the Forest is found in coniferous stands, ponderosa pine and Gambel oak woodlands, forested riparian areas with large

over story cottonwood trees and ponderosa pine stands adjacent to large open parks and meadows (Jackson et al. 2002, USDA, Forest Service 2013b). This species is a year-round resident and is generally found up to about 6,500 feet elevation. Occurrence at higher elevations tends to be seasonal and attributed to opportunistic foraging or nesting opportunities (large-scale fire events or bark beetle outbreaks). Habitat across much of the project area is considered marginal since it occurs at higher elevations, from 7,800 ft. to 8,800 ft. In addition, habitat quality has declined in many areas due to dense and degrading forest health conditions, despite an increase in snag densities. Ponderosa pine snag density increases over the last 20 years are due disease and beetle kill; and as a result, do not provide long-term high-quality habitat. No known records exist in the project area, but ebird sightings of the species have occurred in areas adjacent. Individuals have been sighted in adjacent lower elevation stands located in previously burned stands of ponderosa pine.

**Migratory Birds:** Migratory birds of conservation concern are those avian species of the United States identified by the U.S. Fish and Wildlife Service for the San Juan National Forest, which due to population declines, naturally small ranges, population sizes, threats to habitat, or other factors, should receive closer monitoring and more proactive conservation than other more abundant species.

Species selected for analysis are Grace's warbler, olive-sided flycatcher and Virginia's warbler. Effects described for these species can be used as a proxy to describe effects on migratory birds that use ponderosa and other pine forest habitats for foraging and nesting. See olive-sided flycatcher analysis in Sensitive Species section for more information. Habitat for Grace's warbler occurs throughout the project area. Known ebird records exist throughout the project area and in proposed units. Sightings of the species have also occurred in other areas on the Forest.

Primary habitat for Virginia's warbler occurs along the rim of the Dolores River canyon and is outside of the project area. Secondary habitat would be ponderosa stands used during migration and occurs throughout the project area. Since Virginia's warbler prefer dense shrublands and scrub forests, habitat use in the project area is expected to be low. Known ebird records exist throughout the project area but not in proposed units. Sightings of the species have also occurred in other areas on the Forest.

## Effects of the Alternatives – Species of Special Interest and Migratory Birds

### Direct and Indirect Effects – No Action Alternative

This alternative is expected to have **"No Effect"** to big game species and associated habitat since all habitat conditions would remain unchanged and progress naturally.

The no action alternative **"may impact individuals or their habitat, but would not likely contribute to a trend towards federal listing or loss of species viability to the population or species"** for Abert's squirrel, big game, hairy woodpecker and migratory birds, since continued tree mortality across the project area would negatively affect site selection and the potential availability of habitat would be reduced. It is not anticipated that bark beetle activity will slow or stop naturally, and associated fire risk could further impact habitat availability and suitability, both in the short-term (less than 10 years) and long-term (more than 10 years).

### Direct and Indirect Effects – Alternative 2 – Modified Proposed Action and Alternative 3 – Large Tree Retention

**Abert's Squirrel:** Direct and indirect effects of both action alternatives include a reduction in the habitat availability by reducing the number of trees per acre across the project area. Single Tree Selection and Commercial Thinning prescriptions are intended to improve and maintain age classes and habitat diversity of ponderosa stands. Targeting areas where vegetation management could most effectively move age classes, size classes, density and species closer to desired conditions is also intended. Prescriptions were further developed to address forest health issues in existing ponderosa and Gambel oak habitats, along with aspen stands that occur in the area. The project area, in particular, is at a high risk for developing increased level of insect, disease and fire risk.

Short-term impacts to the species would reduce the number of trees and may negatively impact site selection. Foraging habitat may improve in areas where treatments retain healthy clusters of pine and conifer. In the long-term, post-treatment stand structure is expected to promote the recovery of forest vegetation and create more resilient pine stands across the landscape, resulting in long-term habitat quality. Without proposed treatments, continued bark beetle outbreaks may occur and decrease nesting and foraging site selection. The long-term impacts of bark beetles would result in an overall loss of habitat as stand conditions continue to deteriorate.

The action alternatives are nearly identical in all aspects except for tree diameter restrictions. Alternative 2 leaves less trees on the landscape than Alternative 3 due to the tree diameter restriction. However, basal area target ranges are the same for both alternatives, thus, the goal is to still provide healthy and resilient stand conditions. As a result, impacts from proposed activities to this species would be similar in nature for both alternatives.

**Big Game (Rocky Mountain Elk):** Direct and indirect effects of both action alternatives include a reduction in the habitat availability by reducing the number of trees per acre across the project area. Single Tree Selection and Commercial Thinning prescriptions are intended to improve and maintain age classes and habitat diversity of ponderosa stands. Targeting areas where vegetation management could most effectively move age classes, size classes, density and species closer to desired conditions is also intended. Prescriptions were further developed to address forest health issues in existing ponderosa and Gambel oak habitats, along with aspen stands that occur in the area. The project area, in particular, is at a high risk for developing increased level of insect, disease and fire risk.

Foraging habitat may improve in areas where treatments reduce density of pine and oak, and subsequently improve the productivity and cover of understory herbaceous species. In the long-term, post-treatment stand structure is expected to provide better foraging habitat than currently exists by providing increased interior edge, more open stands and an increase in herbaceous shrub species. Proposed activities would also promote the recovery of forest vegetation and create more resilient pine stands across the landscape, resulting in long-term habitat quality. The long-term impacts of bark beetles would result in an overall loss of habitat as stand conditions continue to deteriorate.

Proposed activities such as timber harvest and pile burning may cause the temporary displacement of elk. To reduce these impacts, design features will be implemented to restrict access in CPW mapped production areas from May 15 – June 30, (Land and Resource management Plan Guideline 2.3.59) and in CPW mapped critical (severe) elk winter range habitat

from December 1 to April 30 (Land and Resource Management Plan Guideline 2.3.60). There is also a design element requiring consultation with the wildlife biologist prior to late summer or fall operations so that elk are not pushed onto private land areas or pushed out of transition areas and onto winter range ahead of schedule.

Wildlife guzzlers would be installed within the project area under this proposal. The goal is to provide additional water sources for wildlife during dry months and in years when drought conditions are present, as well as to encourage large game to remain upland on Forest Service land ownership to decrease the potential for damage to private property. The Salter project is mostly situated on flat plateaus, rugged rocky draws or where well-distributed perennial water sources are lacking. The area serves as an important migration route for mule deer and elk; and also supports habitat for other wildlife species, including upland gamebirds and migratory birds.

As a means to supplement natural water sources that do occur in the area, the district would install four guzzlers in strategic locations in the Salter and Plateau treatment blocks to provide connectivity to other perennial waters sources. Site locations were chosen by surveying the project area for accessibility and installation suitability. The surrounding landscape, existing water sources and wildlife movement patterns were also considered. Guzzlers would be catchment-type guzzlers, by which rainwater and snowmelt is funneled into a holding tank (usually via an “apron”) and delivered through an open drinking pan. Fencing would be built around the guzzlers to protect the structure from unintended use or damage. The footprint size of a guzzler is approximately 12 by 12 feet, with protective fencing measuring approximately 20-25 feet around the site. Site preparation involves clearing the space with hand tools and setting a portion of the guzzler approximately 4-12 inches in the ground. Site preparation is dependent on soil conditions and rocky terrain. All materials are brought in with a UTV or ATV and temporary road construction is not necessary to install a guzzler.

**Hairy Woodpecker and Migratory Birds:** Direct and indirect effects of both action alternatives include a reduction in the habitat availability by reducing the number of trees per acre across the project area. Single tree selection and commercial thinning prescriptions are intended to improve stand conditions and maintain age classes. Targeting areas where vegetation management could most effectively move age classes, size classes, density and species closer to desired conditions is also intended. Prescriptions were further developed to address forest health issues in existing ponderosa and Gambel oak habitats, along with aspen stands that occur in the area. The project area, in particular, is at a high risk for developing increased level of insect, disease and fire risk.

Short-term (less than 10 years) impacts to hairy woodpecker would reduce the number of overstory trees and may negatively impact breeding site selection. Design features are intended to retain suitable levels of snags as designate by plan requirements for ponderosa forest types. Plan requirements for ponderosa stands include leaving a minimum of 1 snag per acre of at least 12 inches diameter at breast height and 25 feet tall. If trees in this size class are not available, then leave 2-to-3 snags per acre of at least 9 inches diameter at breast height and 15 feet tall. If insufficient numbers of snags exist before the treatment, then additional snag recruits would be reserved. Snag recruits should have the following characteristics: evidence of cavities, decay, broken/dead tops or lightning strikes.

Foraging habitat for hairy woodpecker may improve in areas where treatments reduce density of pine and oak, and subsequently improve the productivity and cover of understory herbaceous species. In the long-term (more than 10 years), post-treatment stand structure is expected to provide better foraging habitat than currently exists by providing increased interior edge and

more open stands. Proposed activities would also promote the recovery of forest vegetation and create more resilient pine stands across the landscape, resulting in long-term (more than 10 years) habitat quality. Although bark beetle outbreaks provide opportunistic foraging, the long-term impacts of bark beetles would result in an overall loss of habitat as stand conditions continue to deteriorate.

Short-term (less than 10 years) impacts to Grace's warbler and Virginia's warbler would reduce the number of trees and may negatively impact habitat use. Foraging habitat may improve in areas where treatments reduce density of pine and oak, and subsequently improve the productivity and cover of understory herbaceous species for native insect species. In the long-term (more than 10 years), post-treatment stand structure is expected to provide better foraging habitat than currently exists by providing increased interior edge and more open stands. Proposed activities would also promote the recovery of forest vegetation and create more resilient pine stands across the landscape, resulting in long-term habitat quality. The long-term impacts of bark beetles would result in an overall loss of habitat as stand conditions continue to deteriorate. Since the project does not include activities in pinyon-juniper, impacts to Virginia's warbler are expected to be minimal.

### Determination of Effects and Rationale

With all proposed activities combined and resource protection measures, either action alternative **"may impact individuals or their habitat, but would not likely contribute to a trend towards federal listing or loss of species viability to the population or species"** for, Abert's squirrel, big game, hairy woodpecker and migratory birds, since the effects are expected be short-term (less than 10 years) and the long-term (more than 10 years) impacts are intended to be beneficial by providing higher quality habitat that is well distributed in the future. The action alternatives are nearly identical in all aspects except for tree diameter restrictions. Although the modified proposed action alternative may leave less trees on the landscape than the large tree retention action alternative, impacts from proposed activities to this species are still expected to be similar in nature due to the intended basal area target range. Other potential impacts to the species may include disturbance or displacement during harvest activities. Design features are intended to minimize impacts to these species.

## Cumulative Effects to all Species

The cumulative effects associated with this project include those past, present, and reasonably foreseeable activities that have or will occur within the project area. There is a history of timber harvests on the Forest and most recent harvests have occurred more than 30 years ago; however, the Lone Pine Vegetation Project is planned in the vicinity and is located adjacent to the Salter Vegetation Management Project.

Recreation opportunities within the area are expected to increase some, but they are not expected to become significant enough to reduce the functionality of any species' habitat.

Habitat is perhaps the most important limiting and controlling factor for the above listed species populations, particularly loss of habitat components as it affects foraging, resting, roosting, breeding, and dispersal. Other limiting factors include habitat fragmentation and geographic isolation, prey availability, low population density, low reproductive potential, predation, weather, parasites and disease.

# Section 4 - Agencies or Persons Consulted

The Forest Service consulted the following individuals, Federal, State, tribal, and local agencies during the development of this EA.

## Tribal Consultation

A government-to-government consultation package with an initial invitation to consult was distributed to 24 consulting Native American tribes (the Hopi Tribe, Jicarilla Apache Nation, Kewa Pueblo, Navajo Nation, Pueblo of Acoma, Pueblo de Cochiti, Pueblo of Isleta, Pueblo of Jemez, Pueblo of Laguna, Pueblo of Nambe, Pueblo of Picuris, Pueblo of Pojoaque, Pueblo of San Felipe, Pueblo of San Ildefonso, Pueblo of Sandia, Pueblo of Santa Ana, Pueblo of Santa Clara, Taos Pueblo, Pueblo of Tesuque, Pueblo of Zia, Taos Pueblo, Southern Ute Indian Tribe, Ute Indian Tribe, Ute Mountain Ute Tribe, and Zuni Pueblo) on February 20, 2020. Two tribes requested to continue consultation for the proposal. A notification package containing the results of the class I literature review will be sent to these tribes when complete. Consultation on subsequent implementations under the NEPA decision would follow the process outlined in the Cultural PA.

## Public Involvement

Scoping packages were distributed to 62 individuals, organizations, permittees, agencies, and congressional representatives on February 21, 2020. A Public News Release was also made to local media on February 21, 2020. The Salter Vegetation project was identified on the San Juan National Forest Schedule of Proposed Actions beginning February 2020. Scoping packages were also made available to participants attending the Dolores Watershed Resilience Collaborative with periodic updates as the project developed. The scoping period was 30 days long; ending March 23, 2020, 11 comment letters were received. Please refer to the previous section Issue Identification and Modified Proposed Action Development for a summary of the comments received.

Project mailing lists of the Federal, State, and local agencies, tribes, and non-Forest Service individuals that were consulted regarding the Salter Vegetation Management project are included in the project record.

## Collaboration

The Dolores Watershed Resilient Forest Collaborative (DWRF) is a diverse group of stakeholders that have worked since 2015 to support and enhance forest, watershed, and community resilience in Montezuma and Dolores Counties, Colorado. With the goal of building trust, public involvement, and enhancing ecosystem resilience, the group provides one avenue for public engagement, discussion, and input on vegetation projects and strives to expand and build support for efforts that improve resilience.

Through efforts like the Rocky Mountain Restoration Initiative and the Collaborative Landscape Restoration Forest Restoration program, DWRF collaborative members have identified treatment priorities for areas within the DWRF upper Dolores River watershed, which includes the Salter landscape. This provides information to the agency to take into consideration when determining treatment priorities. The collaborative has also identified a set of ponderosa pine desired conditions that outlines components of ponderosa pine forest resiliency that are a priority for the

collaborative (DWRF. 2020. *Ponderosa Pine Ecosystem Resilience Metrics and Desired Conditions*). The desired conditions developed by the collaborative are consistent with and integrate well with the standards and guidelines identified in the Land and Resource Management Plan for this landscape. The information and recommendations provided by the collaborative have been given consideration in the design of the Salter Vegetation Management project.

As part of the Salter planning process, the Agency entered into an agreement with the DWRF Collaborative that described commitments and an overall goal of "transparent deliberation and discussion on all proposed projects". The agency and collaborative have met on many occasions throughout the planning process to share information and exchange data. The agreement outlines the use of the collaborative exchange folder (CEF) to facilitate open exchange of information and data. The CEF is located on the agency's corporate system and is accessible as an external shared link specifically for exchange of data, including:  maps, geodatabases, inventory data, documents, etc. The CEF is also intended to be used by the Collaborative and other partners to share information with the agency of any desirable or undesirable trends that are being observed and to provide an avenue to discuss those trends or for further exchange of general information.

The Salter Vegetation management project proposes an adaptive management approach intended to accommodate changing conditions and additional strategies to achieve the identified desired conditions. The adaptive management process encourages communication with the collaborative and other partners via the Collaborative Exchange Folder. As a means to document ongoing communication associated with adaptive management, a Collaborative Communication Form (CCF) has been developed and is located in the Collaborative Exchange Folder. The Collaborative Exchange Folder will also be used in facilitating third-party monitoring and exchanges of data associated with that monitoring. The DWRF Collaborative has committed to working with the Agency and other interested partners to develop an economical approach to third-party monitoring for Salter and communicate the recommended plan to the Forest Service via the Collaborative Exchange Folder. The Forest Service supports third-party monitoring to inform adaptive management and gain insight into the best approaches to achieving desired conditions.

The monitoring should be designed to inform all interested stakeholders of the project's progress towards meeting the priority desired conditions (as related to the Salter project objectives) identified in the San Juan land and Resource Management Plan which, as described above, is consistent with the *Ponderosa Pine Ecosystem Resilience Metrics and Desired Conditions* document described previously. This will allow the DWRF Collaborative and other partners to make informed recommendations to the Forest Service based on their identified priorities. Monitoring associated with the Salter project should also encompass existing monitoring data and the monitoring framework developed by MSI for the adjacent Lone Pine project. The intent of including the methodology from the Lone Pine Monitoring Framework is to initiate a long-term collaborative-based monitoring effort that expands the adaptive management approach to a program-wide strategy.

# Section 5 - References

Altman, B and R Sallabanks. 2012. Olive-sided Flycatcher (Contopus cooperi), version 2.0. In The Birds of North America (P. G. Rodewald, editor). Cornell Lab of Ornithology, Ithaca, New York, USA.

Baker, W. L. 2018. Historical fire regimes in ponderosa pine and mixed-conifer landscapes of the San Juan Mountains, Colorado, USA, from multiple sources. Fire 1: article 1020023. Online at: https://www.mdpi.com/2571-6255/1/2/23

Bat Conservation International. 2020. https://www.batcon.org

Boal, C. W., and R. W. Mannan. 1994. Northern goshawk diets in ponderosa pine forests on the Kaibab Plateau. Studies in Avian Biology 16:97–102.

Colorado Bird Atlas Partnership. 2016. The Second Colorado Breeding Bird Atlas online database. Colorado Bird Atlas Partnership, Denver, CO. Available at: http://www.cobreedingbirdatlasii.org

Colorado Natural Heritage Program. 2012. *Astragalus iodopetalus*. Colorado Rare Plant Guide. Colorado State University. https://cnhp.colostate.edu/rareplants/guide.asp?id=21202.

Colorado Natural Heritage Program. 2013. *Physaria pulvinata*. Colorado Rare Plant Guide. Colorado State University. https://cnhp.colostate.edu/rareplants/guide_print.asp?id=40393

Covington, W.W. & Moore, M.M. 1994, January. Southwestern Ponderosa Forest Structure: Changes Since Euro- American Settlement. Journal of Forestry. pp.39-46.

Decker, K., Rondeau, R.  (2014)  San Juan Tres Rios Climate Change Ecosystem Vulnerability Assessment.  Colorado Natural Heritage Program, Colorado State University, Fort Collins, CO.

Dolores Watershed Resilient Forest Collaborative. 2020 Resilience Metrics and Desired Conditions - Vegetation - Ponderosa Pine

eBird. 2020. eBird: An online database of bird distribution and abundance [web application]. Cornell University, Ithaca, New York. Available: http://eBird.org (Accessed: Date January 2021).

Fischer, D. L. 1986. Daily activity patterns and habitat use of coexisting accipiter hawks in Utah. Dissertation, Brigham Young University, Provo, Utah, USA.

Griffis, K. L., Crawford, J. A., Wagner, M. R., & Moir, W. H. 2000. Understory Response to Management Treatments in Northern Arizona Ponderosa Pine Forests. Forest Ecology and Management. 146 (239- 245).

Hammerson, G. A. 1999. Amphibians and Reptiles in Colorado. 2nd ed. University Press of Colorado and Colorado Division of Wildlife, Denver.

Jackson, Jerome A., Henri R. Ouellet and Bette J. Jackson. 2002. Hairy Woodpecker (*Picoides villosus*), version 2.0. In The Birds of North America (P. G. Rodewald, editor). Cornell Lab of Ornithology, Ithaca, New York, USA.

Keith, J.O. 2003. Abert's Squirrel (Sciurus aberti): a technical conservation assessment. [Online]. USDA Forest Service, Rocky Mountain Region. Available: http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5181932.pdf

Linkhart, Brian D. and D. Archibald McCallum. (2013). Flammulated Owl (Psiloscops flammeolus), version 2.0. In The Birds of North America (P. G. Rodewald, editor). Cornell Lab of Ornithology, Ithaca, New York, USA.

Mausolf, Lisa. 1981.. "Town of McPhee" (PDF). Historic American Engineering Record. Washington, D.C.: Library of Congress. Archived from the original (PDF) on April 27, 2014. Retrieved April 26, 2014.

Merrell, D.J., and C.F. Rodell. 1968. Seasonal selection in the Leopard Frog, Rana pipiens. Evolution 22:284–288.

NatureServe. 2013. NatureServe Explorer: An online encyclopedia of life [web application]. Version 7.1. NatureServe, Arlington, Virginia. Available http://www.natureserve.org/explorer.

Negrón, J., Allen, K., Cook, B., Withrow, J. 2008. Susceptibility of ponderosa pine, Pinus ponderosa (Dougl. Ex Laws.), to mountain pine beetle, *Dendroctonus ponderosae* Hopkins, attack in uneven–aged stands in the Black Hills of South Dakota and Wyoming, USA. Forest Ecology and Management 254: 327–334.

Nunery, J.S. and Keeton, W.S. 2010. Forest carbon storage in the northeastern United States: Net effects of harvesting frequency, post-harvest retention, and wood products. Forest Ecology and Management 259: 1363-1375

Rees, D.E., J.A. Ptacek, R.J. Carr, and W.J. Miller. (2005, April 6). Flannelmouth Sucker (*Catostomus latipinnis*): a technical conservation assessment. [Online]. USDA Forest Service, Rocky Mountain Region. Available: http://www.fs.fed.us/r2/projects/scp/assessments/flannelmouthsucker.pdf [Accessed January 2021].

Reynolds, R. T., R. T. Graham, M. H. Reiser, R. L. Bassett, P. L. Kennedy, D. A. Boyce, G. Goodwin, R. Smith, and E. L. Fisher. 1992. Management Recommendations for the Northern Goshawk in the Southwestern United States. U.S. Forest Service General Technical Report RM-217.

Romme, W.H., M.L. Floyd, and D. Hanna. 2009. *Historical Range of Variability and Current Landscape Condition Analysis: South Central Highlands Section, Southwestern Colorado & Northwestern New Mexico.* Fort Collins, Colorado: Colorado Forest Restoration Institute.

United States Environmental Protection Agency. 2011. National Ambient Air Quality Standards (NAAQS).

USDA Forest Service. 2009. Climate Change Considerations in Project-Level NEPA Analysis.

USDA Forest Service. 2010. Mitigating old tree mortality in long-unburned, fire-dependent forests: a synthesis. General Technical Report RMRS-GTR-238. Rocky Mountain Research Station. Fort Collins, CO. 71 p. https://www.fs.usda.gov/treesearch/pubs/35004

USDA, Forest Service. 2011. FR-R3-16-3. Diameter Caps and Forest Restoration: Evaluation of a 16" Cut Limit on Achieving Desired Conditions Southwestern Region

USDA, Forest Service. 2013. Restoring Composition and Structure in Southwestern Frequent-Fire Forest: A science-based framework for improving ecosystem resiliency. General Technical Report RMRS-GTR-310. Rocky Mountain Research Station. Fort Collins, CO. https://www.fs.fed.us/rm/pubs/rmrs_gtr310

USDA, Forest Service. 2013. Volume II: Final San Juan National Forest and Proposed Tres Rios Field Office Land and Resource Management Plan. Region 2 https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5435985.pdf

USDA, Forest Service-Region 2. 2013. Volume III: Appendices. Appendix I-Vulnerable Watersheds. https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5435655.pdf

USDA, Forest Service. 2013b. Biological Assessment for the Final San Juan National Forest Land and Resource Management Plan. U.S. Forest Service Region 2, San Juan National Forest, Durango, CO.

USDA, Forest Service. 2013b. Final San Juan National Forest and Proposed Tres Rios Field Office Land and Resource Management Plan. U.S. Forest Service, Region 2 – San Juan National Forest, Durango, Colorado.

USDA Forest Service. 2015. Region 2 Regional Forester's Sensitive Species List, FSM 2600-2015-1, Oct. 6, 2015.

USDA Forest Service. 2018. Final Decision Notice and Finding of No Significant Impact Dolores Prescribed Fire Pine Ecosystem Restoration Project. Dolores Ranger District, San Juan National Forest,

USDA, Forest Service. 2020. Rocky Mountain Regional – Endangered, Threatened, Proposed, and Sensitive Species by Unit (based on the revised 2020 sensitive species list, and updated to reflect current ESA listing status). USDA Forest Service, Region 2. Golden, CO. Available on the internet at: http://fsweb.r2.fs.fed.us/rr/R2_TES_Site_2007/sensitive.html#ss1

USDA, Natural, Resources Conservation Service. 2001a. Soil Survey of Animas-Dolores Area, Colorado, Parts of Archuleta, Dolores, Hinsdale, La Plata, Montezuma, San Juan, and San Miguel Counties.

USDA, Natural Resources Conservation Service. 2001b. Soil Survey of Cortez Area, Colorado, Parts of Dolores and Montezuma Counties.

USDA, Natural Resources Conservation Service. 2003 Soil Survey of San Miguel Area, Colorado Parts of Dolores, Montrose, and San Miguel.

# Appendix A. Maps




**Figure 5. Salter treatment block**




**Figure 6. Plateau Creek treatment block**




**Figure 7. Carlyle Point treatment block**




Figure 8. House Creek treatment block



FS-000800




**Figure 9. Boggy Draw treatment block**




**Figure 10. Turkey Knoll treatment block**




**Figure 11. Salter transportation system**




**Figure 12. Boggy Draw recreation implementation map**




**Figure 13. Salter wildlife mitigation**




**Figure 14. Salter affected HUC6 watersheds**

# Appendix B. Cultural Resources Programmatic Agreement Vegetation Management Activities-Specific Project Design Features

1. Screened Undertaking Activities

   Some activities that have limited potential to affect historic properties may be exempt from further Section 106 review and consultation once screened by the Forest Service Heritage Professional. These activities require no additional consultation beyond documentation in the annual report to the State Historic Preservation Officer (SHPO).

   The following landscape vegetation management activities either result in no ground disturbance or are conducted entirely within previously disturbed areas that are not likely to contain intact and distinct soil horizons. The screened undertakings have a low potential to affect historic properties within original depositional contexts to the depth to be excavated and/or modified.

   A. Chemical Treatments and Insect Traps
      i. Insecticide spraying on single trees and small stands of trees.
      ii. Trap tree activities: felled, debarked, hand-piled and burned in previously disturbed burn areas. No heavy machinery is used.
      iii. Lethal trap tree activities: felled, pesticide applied. No trees removed and no heavy machinery used.
      iv. Aggregate (trap-out) beetle activities: funnel traps hand placed in trees.
      v. Semiochemical treatments.
      vi. Application of pesticides that do not have the potential to affect access to or use of the resources by the Tribes.

   B. Slash Disposal
      i. Slash disposal in previously disturbed areas where the slash is piled by hand and burned. Slash is either hand-piled for chipping or bucked by hand, loaded on to rubber-tire vehicles and hauled away. This excludes the use of vehicle over vehicle type Class 3.

   C. Ladder-fuel Reduction and Pruning Activities
      i. Understory removal of non-commercial timber, including aspen and forest enhancement activities, using chainsaws to reduce ladder fuels, break up the continuity of fuel and to improve stand health and resiliency. Slash is either hand piled for chipping or bucked by hand, loaded into rubber-

tired vehicles and hauled away. This excludes the use of vehicles over vehicle type Class 3

ii. Branch pruning activities where selected trees are pruned to improve tree health and resiliency, reduce ladder fuels, and to create defensible space around structures. Slash is either hand piled for chipping or bucked by hand, loaded into rubber-tired vehicles and hauled away. This excludes the use of vehicles over vehicle type Class 3.

iii. Boundary treatments where dead standing trees, down trees, and slash within 100 feet of the national Forest/private-land boundary is cleared with chainsaws, understory ladder fuels are removed, and lower branches on retained trees are pruned to create a fuel break. Slash is either hand piled for chipping or bucked by hand, loaded into rubber- tired vehicles and hauled away. This excludes the use of vehicles over vehicle type Class 3.

D. Defensible Space

i. Creation of defensible space around homes and structures through removal of trees, brush, and other vegetation using chainsaws and hand tools, where such activities do not have the potential to affect the integrity of the setting of nearby historic properties. Slash is either hand piled for chipping or bucked by hand, loaded into rubber-tired vehicles and hauled away. This excludes the use of vehicles over vehicle type Class 3

E. Road and Trail Maintenance

i. Routine trail maintenance limited to brushing and light maintenance of existing tread with hand tools. Routine trail clearing of rocks and debris. This would include the removal of fallen trees and branches from the trail. Rock and debris will be hand carried from the trail and piled without dragging across country. Piles may be left in place, or disposed of by chipping, loaded into rubber-tired vehicles and hauled away. This excludes the use of vehicles over vehicle type Class 3.

ii. Felling and removal of hazard and wind-throw trees from road and trail prisms where deemed necessary for health, safety, or administrative reasons, so long as trees are felled into and removed from existing road or trail prisms (area clearly associated with road construction, from road surface to top of cut and/or toe of fill) where previous disturbance is such that the presence of no known unevaluated cultural resources or historic properties is considered unlikely, and so long as ground disturbance is not allowed off previously disturbed areas associated with road or trail prisms.

iii. Issuance of road-use permits for commercial hauling over existing roads.

iv. Temporary or permanent road closures involving no new ground disturbance.

v. Maintenance or replacements to non-historic (less than 50 years) culverts including placement of rip-rap at inlet and outlets of existing culverts when activities are confined to previously disturbed areas and where there are no historic properties or unevaluated cultural resources and where the culvert itself is not a historic property.

vi. Stockpiling of road related materials in or on existing roads or turnouts.

vii. Installation of roadside safety features such as guardrails, adjacent to existing forest roads, in previously disturbed areas where the road and its features are not historic properties.

F. Other

i. Areas where mowing with a brush hog or similar rubber-tired equipment is proposed, that occurs outside of known historic property boundaries and/or buffer zones as appropriate.

ii. Areas where tree sanitation is proposed, where trees are felled, peeled, piled and removed by hand. No heavy machinery is used, and activities occur outside of known historic property boundaries and/or 50 ft. buffer zones as appropriate.

2. Field Survey Strategy

As specific locations of Implementation Projects are refined, the Forest shall conduct Class II or Class III inventory to identify historic properties. The strategy below may be used, or individual forests may consult with signatories to use alternate strategies or predictive models. If a forest proposes to use something other than the strategy outlined in this appendix, they shall consult with and gain consensus with signatories on their proposed strategy prior to initiating survey.

A. The following areas shall be field surveyed using pedestrian transects within the refined APE of the Implementation Project:

i. Areas of high potential for historic properties:

a. Prehistoric Cultural Resources

- Areas of known high site density and/or known site locations.
- Ecotonal boundary areas (e.g., areas between canopied and non- canopied areas.
- Areas located within ¼ mile of permanent water sources or natural travel routes associated with mountain passes.
- Geographic features within loosely canopied areas including high points and open views, saddles, terraces, benches and ridges (e.g., hunting corridors).

- South, east and west facing slopes less than 15%. On slopes between 15% - 25%, survey will focus on those areas where ground disturbance is possible because of the use of mechanical equipment for project implementation.
- Areas known to contain geological outcrops of tool stone source material.
- Areas that include old growth Ponderosa pine and or Douglas fir that might contain fire sensitive features such as CMTs and wickiups, and other fire sensitive sites listed below.
- Areas of potential importance as identified during tribal consultation.

b. Historic Cultural Resources

- Areas within or near bedrock deposits containing precious or marketable metal ores.
- Natural travel corridors for pack trails, wagon trails, stock driveways, auto roads, and/or railroads.
- Areas located within ¼ mile of permanent water sources or areas in proximity to railroad grades.
- Potential historic cultural resource identified as a result of literature search. The Forest will follow Office of Archaeology and Historic Preservation Survey Manual guidelines with respect to the documentation of historical features including dirt roads, stock ponds, soil perms, fence lines, small irrigation ditches, pastures, or fields unless they are part of a larger site, known to be significant or are named. If the resources are not fully documented, they will be generally described in the survey report.
- Areas that might contain fire sensitive sites, as listed below.
- Areas of potential importance to the public.

ii. Areas where ground-disturbing activities are proposed including, but not limited to the following:

a. Any area where machine piling or any other activity using mechanized equipment, including machine piling, wind rowing, mechanical crushing, skid trails where identified, and cutting units where skid trails are not identified.

b. Road construction.
c. Water bars and other constructed erosional features.
d. Areas where prescribed fire is proposed.
e. Hand and mechanical control lines.
f. Staging and safety areas.
g. Fire sensitive sites, as follows:
   - Historic sites with standing, or down wooden structures or other flammable features or artifacts.
   - Rock art sites.
   - Cliff dwellings.
   - Prehistoric sites with flammable architectural elements and other flammable features or artifacts.
   - Culturally modified trees, including aspen art and peeled/scarred trees.
   - Certain traditional cultural properties (based on consultation with tribes).
   - Other Fire-Sensitive Sites: based on local field conditions, forest-specific concerns, or as recommended as a result of consultation with SHPO staff, tribes, local governments, or other interested parties, fire management staff, fire behavior specialists, or fire effects researchers.

B. The following areas within refined APE of Implementation Projects do not require field survey:
   i. Slopes greater than 25% where modeling based on the results of previous survey work in similar settings, and/or where reconnaissance field survey indicates there is no potential for cultural resources such as rock art, rock shelters, and significant mining features.
   ii. Portions of the APE affected by previous ground disturbance that has modified the surface so extensively that the likelihood of finding cultural resources is negligible.
   iii. Areas of the APE covered by previous adequate survey. Previous survey (i.e., legacy survey) will be considered adequate if it has been previously reviewed by SHPO, and meets the intent of the guidance in the Secretary of Interior's Standards for Archaeological Documentation and the Advisory Council on Historic Preservation’s "Meeting the Reasonable and Good Faith Identification Standard in Section 106 Review". When considering whether previous survey is adequate, Forest Service Heritage Professionals shall rely mostly upon agency guidance put forth in the Forest Service Heritage Program

Management Handbook, FSH 2309.12, Chapter 32, Section 11 (Date Approved 04/08/2008):

*Survey data accumulated during the initial years of Forest Service cultural resource management may not meet current standards or conform to modern technologies (for example, GPS coordinates). Field conditions and surface visibility also change. These older data provide useful information for broad-scale land use planning and for cultural resource identification strategies, but do not negate the requirement for further identification and field survey. When reviewing legacy data for planning or project purposes, Heritage professionals should:*

- *Review past and current survey coverage using project maps, survey designs, transect interval maps, GIS, survey descriptions, photographs, and related field data.*
- *Identify those areas with substandard or inadequately documented survey coverage or areas where additional field survey is warranted due to better ground visibility, new cultural resource information, or other relevant factors as identified by the Heritage professional.*

Generally, previous intensive field survey shall be considered adequate if the corresponding cultural resource report describes field methods that would be used today, and the Forest Service Heritage Professional has confidence in the previous survey. When considering whether a survey is adequate, Heritage Professional should also consider if re-survey is appropriate based on the current undertaking's potential for effects or changed conditions.

3. Site Protection Measures

Various combinations of the following protection measures may be approved by the Forest Heritage Professionals to protect historic properties for projects listed in this agreement. Any use of these measures should be reported in addendum reports. Use of these protection measures will generally be considered to result in a no adverse effect finding. Heritage Professionals may approve additional measures to further protect historic properties; additional measures not listed below shall also be discussed in addendum reports.

A. Prescribed Burning

i. Protect fire-sensitive sites:

- Exclude from project area
- Hand line
- Black line
- Wet line
- Foam retardant

- Structural fire shelter
- Remove heavy fuels from site by hand.
- Prevent in-situ heavy fuels that cannot be removed from ignition (e.g., flush-cut and bury stumps.
- Implement same protective measures for future maintenance burns.

ii. Protect selected other sites from burning (optional).

iii. Allow burning over non fire-sensitive sites, provided:
- No ignition points within site boundaries.
- No staging of equipment within site boundaries.
- No slash piles within site boundaries.

iv. Allow construction of safety zones and additional lines in 100% surveyed areas with archeological monitoring, as appropriate, to assure historic properties are avoided.

B. Thinning, Hand and Mechanical Treatments

i. No treatments or ground disturbance within site boundaries – or- allow treatments within site boundaries, provided:
- Cutting is accomplished using hand-tools only.
- Large diameter trees are felled away from all features.
- Materials removed from the site are removed by hand.
- No dragging of logs, trees, or thinned material across or within site boundaries.

ii. No use of vehicles or other mechanized equipment within site boundaries.

iii. No staging of equipment within site boundaries.

iv. No slash piles within site boundaries.

4. Fuelwood

A. No fuelwood cutting or vehicles within site boundaries -or- allow fuelwood cutting within sites provided that:

i. No vehicles allowed within site boundaries.

ii. No dragging of logs, trees, or cut material across or within site boundaries.

iii. Materials removed from the site are removed by hand.

B. Allow fuelwood cutting in areas of large, continuous, low-density artifact scatters that cover large portions of a landscape provided that:

i. All features and artifact concentrations are recorded and avoided.

ii. Use of vehicles is prohibited during wet ground conditions.

iii. Periodic monitoring is used to assess impacts and if impacts are noted fuelwood cutting will be prohibited in the area.

5. Activities Involving Hazardous Tree Removal, Grapple Piling, Mechanical Treatment, Skid Trails and Landing Areas

A. No mechanical treatment will occur within the site boundary of a historic property, plus a 50-foot buffer around the site. If treatment is necessary, these sites and the 50-foot buffer will be hand-treated.

6. Activities Involving Road Construction, Temporary Road Construction, Fire Control Lines and Skid Trails
   A. A 50-foot buffer around the historic properties will be established. The road control line will be moved to avoid the site and the 50-foot buffer area. If the undertaking consists of construction and there is the potential for unidentified buried cultural remains, the location will be moved to avoid the site and the construction activities in the area will be monitored by an archaeologist

7. If a previously undocumented historic property is discovered, or if inadvertent effects occur to a historic property, all work in the vicinity of the property would cease and the San Juan National Forest archaeologist would be notified immediately. The property would be protected and project activities in the immediate vicinity of the property would not resume until any actions necessary to resolve adverse effects to the property have been completed.

8. Upon the discovery of human remains, funerary items, sacred objects, or objects of cultural patrimony, a San Juan National Forest archaeologist would be immediately notified by telephone, with written confirmation. All project activities would cease in the vicinity of the discovery, and the discovery would be protected for 30 days, or until the contractor is given notice to proceed by a San Juan National Forest archaeologist or the Dolores District Forest Service Representative

# Appendix C. Resources Dismissed from Detailed Analysis

## Air

Under the Clean Air Act, the Environmental Protection Agency sets limits on certain air pollutants and establishes a regulatory framework for states to follow to protect air quality. Federal land management agencies must comply with the National Ambient Air Quality Standards and Prevention of Significant Deterioration, and Air Quality Related Values (AQRVs). AQRV's are a scenic, cultural, physical, biological, ecological, or recreational resource on federal lands which may be affected by a change in air quality as defined by the Federal Land Manager.

The Clean Air Act identifies two types of national ambient air quality standards. Primary standards provide public health protection, including protecting the health of sensitive populations such as asthmatics, children, and the elderly. Secondary standards provide public welfare protection, including protection against decreased visibility and damage to animals, crops, vegetation, and buildings (Environmental Protection Agency 2011).

Prescribed burning in the Salter Vegetation Management project area would require preparation of a written Burn Plan and a Smoke Management Plan that complies with State and Montezuma County Air Quality Management District standards, notification of counties prior to burning, and monitoring of smoke production. Burning would be conducted under wind and weather conditions designed to rapidly disperse smoke and minimize drift into populated areas.

The reduction of activity created slash via pile burning is expected to be implemented within the established State, County, and Federal framework and standards described above, and would therefore, be in compliance with the Clean Air Act.

## Climate Change

Climate change analysis is guided by Climate Change Considerations in Project-Level NEPA Analysis (U.S. Forest Service 2009), which recommends consideration of both the effect of a proposed action on climate change, and the effect of climate change on a proposed action.

Emission of greenhouse gases (associated with adverse effects to climate) are inversely related to carbon sequestration. During project implementation there would be small, incremental losses of carbon sequestration due to burning of vegetation and consumption of fossil fuels by equipment. Trees would be harvested over time; however, carbon could continue to be stored in manufactured wood products that used harvested materials (Nunery and Keeton 2010). As implementation proceeds, there would immediately be small, beneficial effects to carbon sequestration due to growth of vegetation. In the long-term, carbon sequestration would be sustainably increased through continuing growth of a healthy forest. The described changes in greenhouse gas emissions resulting from the proposed action is immeasurable.

The vulnerability of the 14 terrestrial ecosystems were assessed for the San Juan National Forest (Decker 2014). Based on this assessment, the aspen vegetation type is presumed stable. Sections 1 and 2 of this environmental assessment describe current vegetation conditions that have developed, in part, as a result of climate factors such as precipitation and temperature. The

proposed activity would not change the land use and the area would remain forested, as it currently is.

# Economics

Currently the fiber market for ponderosa pine, as indicated by sales of collaborative communication form, is strong on the Dolores District when compared to five or six years ago. It has been several years since a “no-bid” sale has occurred, and small product sales have been on an upward trend. Signs of longevity and a reliable supply of raw fiber in the area have encouraged renewed investments in the wood products industry. The fiber demand of the local area, based on current sales over the past two years, would keep pace with what this proposal would provide as a byproduct of the proposed vegetation management activities. An increase in demand would result in competitive prices for fiber and the ability to utilize funds to perform service and stewardship items such as pre-commercial thinning.

The innovation and development of new equipment is contributing to many aspects of fiber harvesting and processing

Small volume sales under 2,000 collaborative communication form of ponderosa pine is a continued niche market and includes post and pole, firewood on all scales, mine props and dimensional rough cut lumber. These markets have been in relatively consistent demand in the local area. In recent times, markets are expanding beyond southwest Colorado as the supply for raw material has been reliable and processing facilities are consistently running.

Re-engineering and additions to processing facilities occur locally as markets decline or improve. Adaptation has been occurring as fiber supply of specific diameters become more or less available or economical to obtain. The use of round wood or unprocessed logs for items such as mining props is one indicator of the willingness of the industry to adapt to accommodate utilization of available byproducts. In the past that product was being made almost exclusively out of saw log sized material. This also demonstrates that availability of byproduct could contribute to the ability to meet the needs of the Forest for hazardous fuel removal and economic objectives. Large scale fuelwood processing has created an increase in the utilization of non-saw material across the Forest. Material that has historically been very costly to remove has become either more economical or is now fully merchantable. This sector can typically use green and beetle killed trees but rarely burned trees and overall prefers a mixture of size classes to meet multiple niche markets.

Specific markets have developed in relation to the availability of beetle killed dead ponderosa pine due to its unique appearance. This niche market is limited however, as it is dependent on the blue stain fungus which gives the wood a deep blue color after the trees have died. This blue hue is caused by a fungus carried by pine bark beetles, the fungus is one of a dozen or more fungus’s potentially carried by bark beetles. The desired product is a board that has an array of blue intermixed with clear wood giving the final product a mosaic of colors. This product is highly sought after in many places. One local small scale custom furniture maker (Rustic Furniture) deals almost exclusively in blue-stained wood products that are marketed all over the country for high-end interior design. Interior tongue and groove paneling, which is made by milling 4 inch, 6-inch and 8-inch by 1-inch thick boards, does have a wider market potential. The local Aspen Wall Wood Mill located in Dolores, Colorado who until recently utilized only aspen products, has purchased and harvested several timber sales in the vicinity of the project area in the past few years.

Finding dependable outlets for biomass material (less than 5 inches, branches and tops) and to a lesser extent "round wood" also known as "Product Other than Logs" (POL) {5 inches to 8.9 inches diameter at breast height} continues to be problematic.

The smaller the diameter or more inconsistent the material the harder it is to accommodate the harvesting, removal and end product costs. However, with the recent opening of markets and investment, there is a potential to develop a market that would utilize these products. Current contracts for removal include the volume of this material as "timber subject to agreement". The timber subject to agreement approach allows the purchaser the least amount of risk contractually. However, when markets open up or new markets are created, available volumes and pricing become established and agreed upon initially and risk is further reduced.

To require mandatory removal of this material without compensation is not a viable option, in most cases, on large sales. Collaborating with industry to identify markets that utilize small diameter and inconsistent material is important for both the development of sustainable markets and scale-appropriate treatments on the landscape over the long-term.

The "saw log" (equal to or greater than 9 inches diameter at breast height) market demand continues to increase with bid premiums offered on almost every sale, including stewardship contracts, within the last four years. Sales with bid premiums also included additional charges for brush disposal, essential Knutson-Vandenberg Act activities and road maintenance which have not produced bid sales on the district in the past. Offering a mixture of saw log and smaller diameters timber in the right ratio is important to ensure offerings are marketable. The size of these sales is equally important in both volume and acres to ensure the work is completed on time and has a sustained profitability. The ability to include large volumes and achieve vegetation management at landscape level is possible with the existing industry. Local business are already established and providing the secondary needs of the wood products industry including trucking, gravel and road work needs, pre-commercial thinning, firewood sales, fuel sales, mechanic services and other associated needs.

## Environmental Justice

Dolores County and Montezuma County both include low income, minority and tribal populations, however, disproportionately high and adverse human health or environmental effects would not occur. The environmental effects associated with the proposed action occur in the immediate vicinity of the project area. The public involvement process for this project as described earlier in this document included discussions with County commissioners, tribal consultation, and letters mailed to interested individuals and organizations.

USDA United States Department of Agriculture | Forest Service | Dolores Ranger District San Juan National Forest | 29211 Hwy 184
Dolores, CO 81323-9308
Phone 970-882-7296
Fax 970-882-0175
http://www.fs.usda.gov/sanjuan

File Code: 2410
Date: February 10, 2021

Dear Interested Party:

The Dolores Ranger District of the San Juan National Forest has released a draft Environmental Assessment (EA) for the *Salter Vegetation Management* project.

The proposed project consists of vegetation management activities on approximately 22,346 acres of ponderosa pine-Gambel oak vegetation type within an approximately 35,000 acre analysis area. The overall project objectives are to: 1) improve or maintain the resistance and resiliency of ponderosa pine forest ecosystems, 2) increase the diversity of ponderosa pine forest ecosystem development stages and, 3) provide economic support to local communities by providing timber products to local industries in a sustainable manner. The proposed project is located northeast of Dolores, CO in the in the vicinity of Salter Y, Plateau Creek, Carlyle Point, Turkey Knoll, and Boggy Draw.

The draft EA describes the proposed action in more detail and provides a summary of potential effects of the project on various resources. The draft EA, along with other project documents, is available for review at https://www.fs.usda.gov/project/?project=57671 The district is seeking comments on the environmental analysis associated with the proposed action and alternatives.

For this project, compliance with the National Environmental Policy Act (NEPA) and National Historic Preservation Act (NHPA) are being conducted concurrently. In order to better involve the public in the NHPA process, NEPA notification letters and public legal notices invite public comment on the proposal as stipulated by NHPA.

*How to Comment and Timeframe*

The *Salter Vegetation Management* project would implement the San Juan National Forest's existing Land and Resource Management Plan; it is subject to the objection process pursuant to 36 CFR 218 Subparts A and B. The public is encouraged to provide specific written comments (§218.2) on this analysis for the responsible official to consider. Specific comments should be within the scope of and have a direct relationship to the proposed action.

Written comments will be accepted for 30 calendar days following the publication of a legal notice in *The Journal* (Cortez, Colorado). The publication date in the newspaper of record is the exclusive means for calculating the comment period (anticipated date February 10, 2021). The regulations prohibit extending the length of the comment period.

Only those who submit timely and specific written comments during this formally designated comment period will have eligibility to file an objection under §218.8. Issues raised in objections

must be based on previously submitted timely, specific written comments regarding the proposed project unless based on new information arising after the designated comment opportunity. Individuals and organizations wishing to be eligible to object must meet the information requirements in §218.25(a)(3), including that each individual or representative from each entity submitting the comments must provide the name and postal address of the individual or entity submitting the comment, and either sign the comment or verify identity upon request. Comments should also include the project title (*Salter Vegetation Management*). Names, contact information, and the comments will become part of the public record and may be released under the Freedom of Information Act.

Comments must be received by the end of the comment period and may be submitted as follows:

Electronic comments can be submitted through the electronic comment form located on the project webpage – https://www.fs.usda.gov/project/?project=57671

Comments may also be submitted via the U.S. Postal Service or facsimile (970 882-0175)..

For questions or to discuss the project further please contact David Casey, Supervisory Forester at 970-882-7296 or David.casey2@usda.gov

Thank you for your interest in this project and management of the San Juan National Forest.

Sincerely,

DEREK PADILLA

Digitally signed by DEREK PADILLA
Date: 2021.02.09 16:53:40 -07'00'

DEREK J. PADILLA
District Ranger

335365

**Opportunity to Comment Salter Vegetation Management Project United States Department of Agriculture, Forest Service San Juan National Forest, Dolores Ranger District Montezuma County, Colorado**

The Dolores Ranger District of the San Juan National Forest requests your input on the proposed Salter Vegetation Management Project draft Environmental Assessment (EA). The proposed project consists of vegetation management activities on approximately 22,000 acres of ponderosa pine forest.

The project area is located northeast of Dolores, CO on the Dolores Ranger District. Proposed treatment areas are in the vicinity of Salter Y, Plateau Creek, Carlyle Point, Turkey Knoll, and Boggy Draw. This project is proposed in order to 1) improve or maintain the resistance and resiliency of ponderosa pine forest ecosystems, 2) increase the diversity of ponderosa pine forest ecosystem development stages and, 3) provide economic support to local communities by providing timber products to local industries in a sustainable manner.

The draft EA provides more details on the proposed project and provides a summary of potential effects the project could have on various resources.

**How to Comment and Timeframe**

The draft EA and other supporting documents are available online at: https://www.fs.usda.gov/project/?project=576771 Additional information may be obtained by contacting David Casey, Supervisory Forester:

(970) 882-7296
David.casey2@usda.gov

The Forest Service is providing an opportunity to comment, consistent with 36 CFR 218.24. This legal notice also serves to notify and invite public comment on the proposal as stipulated in §800.3 of the National Historic Preservation Act. The public is encouraged to provide specific written comments (§218.2) on this proposal for the responsible official to consider. The District Ranger for the Dolores Ranger District, as the responsible official, will consider the project and decide whether or not to approve implementation. Specific written comments should have a direct relationship to the proposed project.

Written comments will be accepted for 30 calendar days following the publication of the legal notice in The Journal. The publication date in the newspaper of record is the exclusive means for calculating the comment period. With few exceptions, regulations prohibit extending the length of the comment period.

The Salter Vegetation Management Project would



## Public Legals

implement the San Juan National Forest's existing Land and Resource Management Plan and is subject to the objection process pursuant to 36 CFR 218 Subparts A and B. Only individuals or entities (as defined by 36 CFR 218.2) who submit timely and specific written comments during this or any other comment period will have eligibility to file an objection under §218.8. Issues raised in objections must be based on previously submitted timely, specific written comments regarding the proposed project unless based on new information arising after the designated comment opportunity. Individuals and organizations wishing to be eligible to object must meet the information requirements in §218.25(a)(3), including that each individual or representative from each entity submitting written comments must provide the name and postal address of the individual or entity submitting the comment, and either sign the comment or verify identity upon request. Names, contact information, and comments will become part of the public record and may be released under the Freedom of Information Act.

The 30-day comment period will begin on February 10th. Electronic comments can be submitted through the electronic comment form located on the project webpage. Comments may also be submitted by means of written comment via the U.S. Postal Service or facsimile. Written comments must be postmarked by the US Postal Service or submitted via fax (970-882-0175) to the Dolores Ranger District Office by the end of the comment period. Please address written comments to: Dolores Ranger District, Attention: Salter Vegetation Management Project, 29211 Hwy 184, Dolores, CO 81323.

Comments should include: 1) your name and postal address, 2) project title (Salter Vegetation Management Project), and 3) signature or other verification of identity upon request (36 CFR 218.25(a)(3)). Comments received in response to this initial request, including names, addresses and any other information provided with the comments, will be considered a part of the public record.

The U.S. Department of Agriculture is an equal opportunity provider and employer.

Published in The Journal February 10, 2021.

USDA Forest Service
U.S. DEPARTMENT OF AGRICULTURE

San Juan National Forest

# Forest Service News Release

Public Affairs Officer: Lorena Williams
(970) 422-2939
lorena.williams@usda.gov
www.fs.usda.gov/sanjuan/

## Dolores Ranger District seeks comments on Salter Vegetation Management Project draft environmental assessment

**DOLORES, Colo., February 10, 2021**—The Forest Service is seeking public input regarding the proposed Salter Vegetation Management Project draft environmental assessment. The project is located on the Dolores Ranger District of the San Juan National Forest northeast of Dolores, CO in the vicinity of Salter Y, Plateau Creek, Carlyle Point, Turkey Knoll, and Boggy Draw. The analysis area covers approximately 35,000 acres of forested areas on mesa tops and canyons within the Dolores River watershed.

The Forest Service is proposing to treat approximately 22,346 acres of the ponderosa pine-Gambel oak vegetation type to 1) improve resilience and maintain the resistance and adaptability of forest ecosystems in an effort to increase protection against epidemic insect and disease outbreaks, 2) increase the structural diversity of the ponderosa pine forest represented across the landscape, and 3) provide economic support to local communities by providing timber products to local industries in a sustainable manner. Proposed activities include a combination of timber harvest, tree planting, and activity fuel burning to achieve the project purpose.

The 30-day draft environmental assessment comment period begins Wednesday, February 10 and ends March 12, 2021. The comment period provides an opportunity for the public to review and comment on the environmental analysis associated with the Salter Vegetation Management project proposed action and alternatives. Electronic comments can be submitted through the comment form located on the project webpage: https://www.fs.usda.gov/project/?project=57671

For additional information on the proposed Salter Vegetation Management Project, contact David Casey with the Dolores Ranger District at (970) 882-7296 or by email at david.casey2@usda.gov.

All offices on the San Juan National Forest are currently conducting business and providing services virtually. For information on the San Juan National Forest, call (970) 247-4874, visit the forest website, or follow us on social media (Twitter and Facebook).

**-USDA-**

USDA is an equal opportunity provider, employer, and lender.

Date submitted (UTC-11): 2/12/2021 10:14:48 AM
First name: Mike
Last name: Hill
Organization:
Title:
Comments:
My number one concern is the paved road that leaves Dolores on the way to the Boggy Draw area and the Salter area. This road is already excessively traveled and not well maintained. This creates a hazard for the users of the road no matter what purpose. The intensity of logging and heavy trucking will have a significant impact on the condition of the pavement. I hope the project takes this into account and has money set aside from what ever sources to pay for repaving the road. Otherwise I am in favor of the project to improve the overall health of the forest.

Date submitted (UTC-11): 2/17/2021 10:01:52 AM
First name: Tara
Last name: Gray
Organization:
Title:
Comments:
A significant impact would be on the sections of existing trails that happen to be on Level 1 roads (closed roads that are in storage and can be reopened for projects). The EA allows for some of these roads to be reopened and rebuilt for logging operations. This will obviously destroy the singletrack tread and reduce the value of the trail and user experience. Multiply that by the repetitive cutting cycles and the possibility of future projects, and these trail sections may not look natural again for years, if ever. A solution is rerouting ALL non-motorized trail sections off Level 1 roads and/or permanent removal of the Level 1 status from appropriate already closed road sections. SWCCA volunteers have contributed time and resources to these sections, as such, funding for these reroutes should come from the project proceeds. (Ref. EA pages 48 and 57.)
This project will result in temporary trail closures. To "ease the pain" of these closures, mitigate frustrations and minimize the negative economic impact here are solutions:
Lifting closures any time there will be more than a two-week no-work gap in operations.
Utilizing existing, numerous roads as trail detour routes instead of a complete trail closure. SWCCA volunteers are willing to assist with the trail detour routing and the placement of temporary guidance signage.
Only close the trail section when there are dangerous operations within a defined buffer around the trail. SWCCA volunteers are willing to assist posting "Danger, stay on trail." signs and assist in marking buffer area.
Speed limits and slow down signage should be posted and enforced for logging trucks at trail crossings and parking areas.
Removing trees along winter recreation routes could impact snow levels and negatively affect grooming efforts.
The proposed non-motorized trail from the town of Dolores to the Bean Canyon trail becomes more critical when considering the EA's Modified Proposed Action. The proposed trail generally parallels Road 31, providing a safer alternative for trail users versus the heavily trafficked road. Road 31 will be the haul route for the logging trucks in the proposed project. Providing a trail alternative to the road is safer for the trail users and the logging trucks and should be a top priority. A portion of the proposed trail includes a short new section of trail on Forest Service land between the boundary and Bean Canyon Trail and requires FS approval. We urge them to consider rapid approval.
There is not adequate language in the EA addressing the negative economic impact due to the temporary loss of recreational opportunities. The above requests require more attention and management by contractors. While there are economic benefits from the logging operation that are easy to quantify, some of the more significant economic impacts from recreation require a deeper analysis, tracking dollars through numerous hands. Residents opposed to recreation or indifferent about trail impacts may be surprised how they unknowingly benefit. There are abundant statistics and studies available on the internet that could be referenced in your comments, but personal stories and experiences have great impact.

Date submitted (UTC-11): 2/18/2021 3:54:14 PM
First name: Cody
Last name: Dudgeon
Organization:
Title:
Comments:
Please keep the recreational value of the boggy draw mountain bike trails in mind when planning this project. It would be a shame if the trails or the beauty of the landscape around them was damaged. The trail system is a draw for tourism and outdoor recreation in the Dolores area and if the area is damaged or destroyed it could significantly decrease the number of people visiting the area.

Date submitted (UTC-11): 2/18/2021 2:35:22 PM
First name: Kim
Last name: Parr
Organization:
Title:
Comments:
My recommendation would be to work closely with the Southwest Colorado Cycling Association to try and balance the need for forest thinning with the needs of the community for recreation. As a parent of a cross county runner, I have been involved with Dolores school athletic programs that utilize the Boggy Draw trail system for practice and for meets. It would be a shame to lose or reduce use of this area for the youth in our local and surrounding communities.

Date submitted (UTC-11): 2/18/2021 11:27:09 AM
First name: jamie
Last name: seegert
Organization:
Title:
Comments:
I have lived through logging operations in the Prescott National Forest for years now. I had to comment on this operation as I travel to Boggy Draw often to ride and hike there. As an avid mountain biker and hiker, I see what is left behind due to the logging operations and the negative impact it has on the trails and trail users. PLEASE hold the companies that do the logging accountable for re-creating the trails as they were before the logging started. In almost every instance, the trails are almost unusable if they are not policed. Such examples are not using existing roads when they could have, running over existing trails when they do no have to with heavy machinery, and even leaving machine equipment behind on or close to, the trails. All of this has happened in the Prescott National Forest, and it doesn't have to happen to you if they are held accountable during the logging process.

Date submitted (UTC-11): 2/21/2021 11:15:56 AM
First name: Tim
Last name: Bouchard
Organization:
Title:
Comments:
I am generally in favor of the project but would ask that impact to the Boggy Draw trail system be kept to a minimum. Boggy Draw is a major draw for tourism to the area, attracting people from around the SW to mountain bike and camp. It is also an important recreational option for the entire 4 corners area. I drive from Durango to visit the trails.

Date submitted (UTC-11): 2/22/2021 4:53:58 AM
First name: WAYNE
Last name: CLARK
Organization:
Title:
Comments:
Hello,
I am an avid adventurer and am extremely saddened that logging is even going to be considered in Boggy Draw. Boggy is a crucial area for outdoor entertainment. I run there, bike there and camp there. Many people do much more there! Why is this even a consideration to destroy our public lands. Not to mention logging will lower the amount of tourism and outdoor adventurers to the area, that will last for years.
Please DO NOT log this area!

Date submitted (UTC-11): 2/22/2021 5:22:35 AM
First name: Ernest
Last name: Green
Organization:
Title:
Comments:
As others have said, the disruption of the trail system at Boggy Draw must be kept to an absolute minimum. Period! The recreation economy has become as important as the4 extractive economy. Use some kind of single-tree harvesting machine to limit the damage, and only log a small portion of the trail system at a time. The SWCCA volunteers, including myself, did not put in all that sweat equity to see it negated. Thank You.

Date submitted (UTC-11): 2/22/2021 8:12:51 AM
First name: Nancy
Last name: Hoyt
Organization:
Title:
Comments:
To whom it may concern in the US Forest Service,
I want to start off by saying that my husband and I are big fans of the USFS. We appreciate all the work that is done to allow our forests to continue growing and stay healthy. It is important work that needs to be done.
I have personally experienced logging and thinning projects in the Deschutes National Forest in Oregon, so I know how devastating it can be to a single track trail system. I believe it greatly diminishes the recreational users' experience for many, many years. I feel that the Boggy Draw trail system is such a great asset to this community. It has been lovingly created and maintained by the Southwest Colorado Cycling Association. This wonderful trail system not only provides a myriad of outdoor recreation opportunities to the local community; but also brings in visitors from other areas who, in turn, bring uncounted dollars to the local economy.
If too many trees are cut in the winter use area, the grooming and snow retention will be very negatively impacted. I personally use the trails all year; mountain biking in dry weather and cross country skiing and fat biking on the wonderfully groomed snow trails.
I believe that if this project has to move forward it should be done with extreme care and very light touch in the Boggy Draw trail system area. If possible, a plan could be put together along with the SWCCA to protect the areas that need shade in the winter months; minimize the impact on existing single track trails, and minimize length of trail closures. Please require the logging companies to not only tread lightly; but also to help to restore the destroyed areas of trail.
As far as the road 31 where there would be greatly increased large truck and equipment traffic; I would also ask for speedy approval and funds provided for the proposed trail that would parallel the road 31. The existence of a trail separated from the road would positively impact the safety of all who use the road. I also think that the road should be maintained and repaved as necessary.
thank you for your consideration.

Date submitted (UTC-11): 2/22/2021 11:11:31 AM
First name: Karen
Last name: Hughes
Organization:
Title:
Comments:
As a local resident who appreciates the beauty and accessibility of the Boggy Draw area for recreational use, decided to locate here in large part based on these opportunities, and has since contributed to its maintenance, I am very concerned about the potential negative aspects of this project as have been documented by a number of other letters/comments so far. I understand that forests benefit from fire mitigation procedures including thinning and controlled burns in order to limit damage from wildfires or unhealthy conditions, and that logging has its place depending on how and where it's done. However, this project seems to have the potential to result in much more harm than good overall. Decimating trails that have been built by countless volunteer hours, disregarding the importance of preserving quality recreational opportunities for locals and tourists alike, creating dangerous traffic/safety issues on Rd 31, impacting the potential for the town to continue to benefit from those who travel to our area specifically for these opportunities, etc seems unreasonable unless there is absolutely no choice but to do so, esp without careful consideration of the impacts and suggested modifications. Please consult to the greatest extent possible with those who are personally and financially invested in the value of this area, incl. recreational users, bike shops, land conservancies, etc, and esp SWCCA, which thru their volunteer work has devoted much of its existence to responsible trail development and preservation of the Boggy Draw area and local resources we hold so dear. Thank you.

Date submitted (UTC-11): 2/22/2021 10:15:39 AM
First name: Marianne
Last name: Mate
Organization:
Title:
Comments:
This project will result in temporary trail closures. To "ease the pain" of these closures, mitigate frustrations and minimize the negative economic impact here are solutions:
Lifting closures any time there will be more than a two-week no-work gap in operations.
Utilizing existing, numerous roads as trail detour routes instead of a complete trail closure. SWCCA volunteers are willing to assist with the trail detour routing and the placement of temporary guidance signage.
Only close the trail section when there are dangerous operations within a defined buffer around the trail.

CARA_2458_PHASE_3333_Form_Set_Master_Letter_21

| Doc Title | File Name | Upload Date | Author |
|---|---|---|---|
| Public_Comment___Mate__Marianne | cara.txt | 02/22/2021 | Mate, Marianne |
| Public_Comment___Gray__Tara | cara.txt | 02/17/2021 | Gray, Tara |

Date submitted (UTC-11): 2/22/2021 4:23:43 PM
First name: Michael
Last name: Sitton
Organization:
Title:
Comments:
All for it, long over due.

Date submitted (UTC-11): 2/23/2021 3:45:43 PM
First name: Asa
Last name: Van Gelder
Organization:
Title:
Comments:
While I understand the importance of thinning to reduce disease and fire hazards, the scope of this project appears greater than necessary to accomplish the above goals. I also am aware that logging has a financial benefit, however, the financial benefits of the lost recreational users due to the massive scale of this project may outweigh the financial benefits from a smaller project that maintains as many recreational users as possible. I live ~ 65 miles away from Boggy Draw and spend ~ 20 days a year riding my bicycle with my wife on these trails. While I am in Dolores for these activities, I shop at the local market, liquor store, gas stations, restaurants and have even purchased a chainsaw at the local saw shop.
I encourage a review and reduction of the scope of this project to minimize trail users. As the scope stands currently, my time and dollars will be spent elsewhere.
Sincerely,
Asa

Date submitted (UTC-11): 2/25/2021 3:40:55 PM
First name: Christopher
Last name: Metcalf
Organization:
Title:
Comments:
A primary reason that I moved to this area is for the diversity of Mountain Biking and hiking amongst the mature Ponderosa Pines found in the Boggy Draw area. I support the modifications to the proposal by the SWCCA. Every year friends from all over the country convene in Dolores to experience the uniqueness of Boggy Draw and Phil's World. The proposed logging without modification and serious consideration of it's outdoor users would significantly change the experience for the worst and diminish a significant resource of the area. Please do not go forward with the logging without changes proposed by SWCCA
Thank you

Date submitted (UTC-11): 2/25/2021 2:22:36 PM
First name: Quinn
Last name: Swope
Organization:
Title:
Comments:
I just wish to entreat the finalizers of this project to be sure to hold to the needed protections for our local trails. Rerouting and buffers for the trails are both necessary and expected. Local bike club and forest representatives have put years of labor and expense into creating trails that have no nearby equals. I would hate to see that work lost to future users. The Boggy trail system is a driver for local business and a negative outcome would be difficult to handle for them. This sounds like a good project and is much needed but lets be sure not to throw out the baby with the bathwater.

Date submitted (UTC-11): 2/27/2021 12:00:00 AM
First name: Dick
Last name: Artley
Organization:
Title:
Comments:
February 27, 2021

Dear, Supervisor Chadwick and other USFS employees who might be interested,

Hi Kara. I hope you are doing well. I enjoyed working with you on the Nez Perce NF.

Supervisor Chadwick, as you will see you have a major problem on the Dolores Ranger District that needs attention. I just finished reading the Salter Vegetation Management pre-decisional EA. I thought it was a joke.

Never before have I heard of such ham-handed mismanagement of the precious land owned by 332 million Americans. Ranger Padilla proposes to log 38.8 square miles (Table 1 at page 6) and construct 106 miles of temporary road (EA at pages 56 & 57).

EA link:

https://www.fs.usda.gov/nfs/11558/www/nepa/113183_FSPLT3_5584277.pdf

Kara, please exercise your authority and responsibility to restrain and control witless goons like Padilla. I guess the USFS has not yet purged all the line-officers who will trash precious, fully functioning national forest resources to generate volume for personal gain.

My comments will be written in this format.

I will quote Padilla's claims (with page number) and then offer information authored by Ph.D. scientists who are experts in their fields who present "best science" showing why he is not telling the truth. The USFS tells the public its projects are based on "best science." Please examine Opposing Views Science Attachments #10. Most of the Responsible Officials' projects are driven by "best science" [hellip] with the exception of the Salter project. In addition to being contrary to best science, the Salter project violates several of the environmental laws of the United States that apply to proposed federal projects. I will point these out.

Please understand the 332 million Americans who own the national forests expect the employees of the agency that administers these lands to 1) obey the law and 2) use "best science" to design the projects.

Since the Salter project fails them both, I ask you to consider directing Ranger Padilla to withdraw the project before he wastes any more of the American taxpayer's money. Salter will surely be stopped by a Federal District Court judge. I would appreciate receiving the legal ad that does so.

Here is a small sample if the expert opinion I will present.

Destructive federal timber sale program loses nearly $2 billion a year

By John Talberth Ph.D.

Published by the Center for Sustainable Economy, May 2019

https://sustainable-economy.org/destructive-federal-timber-sale-program-loses-nearly-2-billion-a-year/

Excerpt:

"Our federal forests are far more valuable as carbon sinks, recreation destinations, wildlife habitat and natural water filters than they are for timber production."

Forest Roads and Sediment Project

By W. Mike Aust,Ph.D., Kevin McGuire, Ph.D., M. Chad Bolding, Ph.D. and Scott Barrett, Ph.D.

Published by Virginia Tech University, 2017

http://hydro.vwrrc.vt.edu/research/projects/forest-roads-and-sediment-project/

Excerpt:

"Forested watersheds typically release clean water, yet forest roads and trails can drastically impact water quality. Increased stream sedimentation from road and skid trail crossings represent the most significant water quality threat associated with forestry operations."

The USFS is Legally Required to Respond to my Opposing Views Science Attachments

The Opposing Views Science Attachments present quotes authored by scientists (with no interest in volume accumulation) that describe the long-term irreparable damage that will be inflicted to the natural resources in the San Juan National Forest by logging and roading the Salter timber sale. The authors of the science quotes are experts.

Please be aware of what 40 CFR 1502.9(c) and 36 CFR 775.11(b)(1)(ii) requires:

"Final environmental impact statements shall respond to comments as required in part 1503 of this chapter. The agency shall discuss at appropriate points in the final statement any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised."

You must respond to each opposing view that is not irresponsible. If you think the science quote is irresponsible please explain why.

My Comments on Specific Issues in this Draft NEPA Document are shown Below

Supervisor Chadwick, Padilla proposes to apply herbicides to invasive weeds and keeps the brand name of the herbicide secret. Please assure he does not apply herbicides that contain the chemical glyphosate.

At page 38 he says:

"High priority weed infestations are treated with herbicide with the intent of eradication, though eradication is not always achieved."

Breaking News!!!!

Environmental and Farming Groups Start US Legal Action in Attempt to Ban Glyphosate

Posted by Sustainable Pulse, December 24, 2020

https://sustainablepulse.com/2020/12/24/environmental-and-farming-groups-start-us-legal-action-in-attempt-to-ban-glyphosate/?utm_source=newsletter&utm_medium=email&utm_campaign=glyphosate_gmos_and_pesticides_weekly_global_news_bulletin&utm_term=2020-12-25#.X-ZRUlVKi1s

Excerpts:

"Last Friday, Center for Food Safety (CFS) filed the opening arguments and evidence in its litigation challenging the U.S. Environmental Protection Agency's (EPA) re-approval of glyphosate, best known as the active ingredient in Monsanto's "Roundup" pesticides. Representing a broad coalition of farmworkers, farmers, and conservationists, CFS filed the federal lawsuit in the Ninth Circuit Court of Appeals in March. The groups seek to have the pesticide prohibited from use or sale because of its unlawful approval.

Today's filing includes volumes of evidence showing how EPA ignored glyphosate's health risks, including cancer risks, to farmworkers and farmers exposed during spraying. The evidence filed also shows how EPA disregarded glyphosate's ecological impacts and that EPA failed to account for the costs to farmers from glyphosate-resistant "superweeds" and off-field drift damage."

Mexico proposes phasing out Roundup pesticide by 2024

By the Associated Press, December 14, 2020

https://abcnews.go.com/Business/wireStory/mexico-proposes-phasing-roundup-pesticide-2024-74717626

Excerpts:

MEXICO CITY -- Mexico's Agriculture Department has proposed rules for phasing out the use of glyphosate, the active ingredient in weed killer Roundup, by early 2024.

President Andr[eacute]s Manuel L[oacute]pez Obrador has long objected to the pesticide, and in late 2019, Mexico blocked a 1,000-ton shipment of the pesticide from entering the country, citing health and environmental concerns.

"We do not use glyphosate on our crops, but we have been the victims of external contamination by this substance anyway" said Homero Blas Bustamante, president of the organic society. "This has caused economic losses for organic producers, mainly of coffee and honey."

Glyphosate Causes Genetic Changes Leading to Increased Disease in Future Generations - New Study Published by Sustainable Pulse, December 10, 2020

https://sustainablepulse.com/2020/12/10/glyphosate-causes-genetic-changes-leading-to-increased-disease-in-future-generations-new-study/?utm_source=newsletter&utm_medium=email&utm_campaign=glyphosate_gmos_and_pesticides_weekly_global_news_bulletin&utm_term=2020-12-13#.X9a4_FVKi1s

Excerpts:

"The study provides evidence that glyphosate-induced changes to sperm from exposed rats could be used as biomarkers for determining propensity in subsequent generations for prostate and kidney diseases as well as obesity and incurring multiple diseases at once. In fact, by the time third- and fourth-generation rats whose predecessors had been exposed to the chemical were middle-aged, 90% had one or more of these health problems, a dramatically higher rate than the control group.

While limited in scope, the study, which tested generational groups of around 50 rats each, provides a proof of concept that could lead to a new medical diagnostic tool, said Michael Skinner, the corresponding author on the study published in the journal Epigenetics on Dec. 9.

This study follows a 2019 paper in Scientific Reports in which Skinner's lab demonstrated the ability of glyphosate to promote the transgenerational inheritance of disease in mice.

"We need to change how we think about toxicology," Skinner said. "Today worldwide, we only assess direct exposure toxicology; we don't consider subsequent generational toxicity. We do have some responsibility to our future generations." "

EPA Finds Glyphosate Is Likely to Injure or Kill 93% of Endangered Species

By Lori Ann Burd,

Published in Common Dreams, November 25, 2020

https://www.commondreams.org/newswire/2020/11/25/epa-finds-glyphosate-likely-injure-or-kill-93-endangered-species?cd-

origin=rss&utm_term=AO&utm_campaign=Daily%20Newsletter&utm_content=email&utm_source=Daily%20Newsletter&utm_medium=Email

https://sustainablepulse.com/2020/11/28/us-epa-evaluation-finds-glyphosate-likely-to-injure-or-kill-93-of-endangered-species/?utm_source=newsletter&utm_medium=email&utm_campaign=glyphosate_gmos_and_pesticides_weekly_global_news_bulletin&utm_term=2020-12-04#.X8qa1WVKi1s

Excerpts:

"WASHINGTON - The Environmental Protection Agency released a draft biological evaluation today finding that glyphosate is likely to injure or kill 93% of the plants and animals protected under the Endangered Species Act.

The long-anticipated draft biological evaluation released by the agency's pesticide office found that 1,676 endangered species are likely to be harmed by glyphosate, the active ingredient in Roundup and the world's most-used pesticide.

The draft biological opinion also found that glyphosate adversely modifies critical habitat for 759 endangered species, or 96% of all species for which critical habitat has been designated.

"The hideous impacts of glyphosate on the nation's most endangered species are impossible to ignore now," said Lori Ann Burd, environmental health director at the Center for Biological Diversity. "Glyphosate use is so widespread that even the EPA's notoriously industry-friendly pesticide office had to conclude that there are hardly any endangered species that can manage to evade its toxic impacts." "

Glyphosate Fact Sheet: Cancer and Other Health Concerns

Posted in U.S. Right to Know on October 1, 2020 by Stacy Malkan

https://usrtk.org/pesticides/glyphosate-health-concerns/

Excerpts:

"More than 42,000 people have filed suit against Monsanto Company (now Bayer) alleging that exposure to Roundup herbicide caused them or their loved ones to develop non-Hodgkin lymphoma (NHL), and that Monsanto covered up the risks. As part of the discovery process, Monsanto has had to turn over millions of pages of internal records. We are posting these Monsanto Papers as they become available. For news and tips about the ongoing legislation, see Carey Gillam's Roundup Trial Tracker. The first three trials ended in large awards to plaintiffs for liability and damages, with juries ruling that Monsanto's weed killer was a substantial contributing factor in causing them to develop NHL. Bayer is appealing the rulings."

"Monsanto influence in research: In March 2017, the federal court judge unsealed some internal Monsanto documents that raised new questions about Monsanto's influence on the EPA process and about the research regulators rely on. The documents suggest that Monsanto's long-standing claims about the safety of glyphosate and Roundup do not necessarily rely on sound science as the company asserts, but on efforts to manipulate the science."

"The USDA quietly dropped a plan to start testing food for residues of glyphosate in 2017. Internal agency documents obtained by U.S. Right to Know show the agency had planned to start testing over 300 samples of corn syrup for glyphosate in April 2017. But the agency killed the project before it started. The U.S. Food and Drug Administration began a limited testing program in 2016, but the effort was fraught with controversy and internal difficulties and the program was suspended in September 2016. Both agencies have programs that annually test foods for pesticide residues but both have routinely skipped testing for glyphosate."

It's not unusual for legal firms to advertise their services to people who have been diagnosed with non-Hodgkin lymphoma after using Roundup. Why? They do this because they get lots of cases and win most of them. Check out their websites:

James Harris Law

Link:

https://www.recallsuit.com/roundup-lawsuit-b/?msclkid=5be7029551971de0ec305fab2abdbbd2&utm_source=bing&utm_medium=cpc&utm_campaign=Roundup&utm_term=lymphoma%20lawsuits&utm_content=Lymphoma%20Lawsuit

Sokolove Law

Link:
https://roundup.sokolovelaw.com/?src=bing_webppc_328577675_%2Bmonsanto%20%2Blawsuit_%7Bcontent%7D_b_o_lymphoma%20lawsuits%20against%20monsanto&numberToReplace&campaignId&ringPoolId&jpow=aa_328577675_bb_1233652168336312_cc_%2Bmonsanto%20%2Blawsuit_dd_b_ee_o_ff_%7Badposition%7D_gg_c_hh_%7Bdevicemodel%7D_ii__jj_110194_kk__ll_%7Bplacement%7D_mm_%7Btarget%7D_nn_kwd-77103363003058%3Aloc-190_oo_%7Bcreative%7D_pp_%7Brandom%7D_qq_%7Baceid%7D_rr_77103314975124_ss_77103363003058

Class Claims LLC

Link:

https://www.class.claims/round-up-lawsuit

Trustwell Law Group

Link:

https://www.trustwelllaw.com/environmental/roundup/lawsuit?utm_source=bing-ads&utm_medium=paid-search&utm_campaign=roundup&msclkid=7aa5b3c82ae01c32cf94eef65692be31&utm_term=monsanto%20lymphoma%20lawsuit&utm_content=Monsanto%20Lymphoma%20Lawsuit%20%7C%20Exact

Pintas and Mullins Law Firm

Link:
https://roundupsettlements.com/?utm_source=bing&utm_medium=cpc&utm_campaign=369199413&utm_term=roundup%20lawsuit&utm_content=82875860687107&msclkid=1fb4e9f4b0451049b80eb4ca32754d40

ROUNDUPCANCER ATTORNEYS.COM

Link:

https://roundupcancerattorneys.com/roundup-lawsuit?msclkid=b0a975edf092161d3c4628d372a24497&utm_source=bing&utm_medium=cpc&utm_campaign=RoundUp%20Cancer&utm_term=roundup%20lawsuit&utm_content=Lawsuit%20roundup

Carlson Law Firm

Link:

https://www.carlsonattorneys.com/news-and-update/roundup-2019/

A Case for Women

Link:

https://www.acaseforwomen.com/adv/roundup-lawsuit/?utm_campaign=369081443&utm_source=bing&utm_medium=cpc&utm_content=79439809871843&utm_term=roundup%20lawsuit&adgroupid=1271035841951610&msclkid=f2058d93dd24196d73b4d0ad5f144d1c

Saiontz & Kirk

Link:

https://www.youhavealawyer.com/roundup/cancer-settlements-faq/

Greenberg & Bederman, LLC

Link:

https://www.gblawyers.com/roundup-lawsuits/

Rosen Injury Lawyers

Link:

https://roseninjurylawyers.com/roundup-lawsuits/

Garber Law Offices

Link:

https://www.garber.law/glyphosate-roundup/

Monsanto continues to be sued. They claim that their manufactured chemical glyphosate is safe [hellip] and juries continue to rule against them. This would convince intelligent people to use something else.

"More than 13,400 plaintiffs allege that Roundup, which contains glyphosate, caused their non-Hodgkin's lymphoma and that the manufacturer failed to warn about that risk. Most of the lawsuits are pending in state courts." (NY Times, 5/22/2019)

In Nebraska, farmers filed a class action lawsuit against Monsanto. Lawsuits were also filed by a Kona Coffee farm owner in Hawaii, and a widow of a California farmer. All of these lawsuits share one thing in common: Farmers used Monsanto Roundup Weed Killer for years believing it was safe, and were eventually diagnosed with non-Hodgkin's lymphoma.

Involuntary manslaughter is a felony. So is negligent homicide. So is wanton endangerment.

The definition of involuntary manslaughter: the unjustifiable, inexcusable, and intentional killing of a human being without deliberation, premeditation, and malice. The unlawful killing of a human being without any deliberation, which may be involuntary, in the commission of a lawful act without due caution and circumspection.

The definition of negligent homicide: the killing of another person through gross negligence

Here are of 4 recent court opinions. Only a fool would conclude Roundup is safe after reading about them.

Roundup Court Case #1

On March 27, 2019 a San Francisco jury said Monsanto (now owned by BayerAG) was liable for Mr. Edwin Hardeman's non-curable cancer called non-Hodgkin lymphoma. The judge ordered Monsanto to pay Mr. Hardeman $200 million.

The jury stated:

"It is clear from Monsanto's actions that it does not care whether Roundup causes cancer, focusing instead on manipulating public opinion and undermining anyone who raises genuine and legitimate concerns about Roundup. It speaks volumes that not one Monsanto employee, past or present, came live to trial to defend Roundup's safety or Monsanto's actions. Today, the jury resoundingly held Monsanto accountable for its 40 years of corporate malfeasance and sent a message to Monsanto that it needs to change the way it does business."

Here are a 4 of the many links to the case:

Monsanto trial: cancer patient says he used herbicide for three decades

https://www.theguardian.com/us-news/2019/mar/05/monsanto-roundup-trial-cancer-weed-killer

Second Jury Trial Implicates Roundup in Lymphatic Cancer

https://articles.mercola.com/sites/articles/archive/2019/04/03/roundup-guilty-non-hodgkin-lymphoma.aspx

Jury Awards Edwin Hardeman $80.2 Million in Roundup Cancer Lawsuit

https://www.lawyersandsettlements.com/legal-news/monsanto-facing-lawsuits-over-alleged-roundup-cancer/jury-awards-edward-hardeman-80-2-million-in-roundup-cancer-lawsu-23071.html

Did weed killer Roundup cause cancer in Sonoma County resident Edwin Hardeman?

https://www.pressdemocrat.com/news/9363655-181/did-weed-killer-roundup-cause

Roundup Court Case #2

On May 13, 2019 a jury in Alameda County California ruled that the couple, Alva and Alberta Pilliod of Livermore, Calif., both contracted non-Hodgkin's lymphoma because of their use of a glyphosate-based herbicide. They were each awarded $1 billion in punitive damages and an additional $55 million in collective compensatory damages.

Here are a few of the many links to the verdict:

California Jury Awards $2 Billion to Couple In Roundup Weed Killer Cancer Trial

https://www.npr.org/2019/05/13/723056453/california-jury-awards-2-billion-to-couple-in-roundup-weed-killer-cancer-trial

Alva Pilliod & Alberta Pilliod: 5 Fast Facts You Need to Know

https://heavy.com/news/2019/05/alberta-alva-pilliod/

Pilliod v. Monsanto Company | California Roundup JCCP

https://www.baumhedlundlaw.com/pilliod-v-monsanto-trial/

The EPA says a chemical in Monsanto's weed-killer doesn't cause cancer - but there's compelling evidence the agency is wrong

https://www.businessinsider.com/glyphosate-cancer-dangers-roundup-epa-2019-5

Bayer Loses Third Glyphosate Lawsuit; Plaintiffs Awarded More Than $2 Billion in Damages

https://www.agriculture.com/news/business/bayer-loses-third-glyphosate-lawsuit-plaintiffs-awarded-more-than-2-billion-in-damages

Bayer-Monsanto Ordered to Pay $2 Billion to Glyphosate Cancer Victims

https://healthimpactnews.com/2019/bayer-monsanto-ordered-to-pay-2-billion-to-glyphosate-cancer-victims/

Bayer's stock falls after $2 billion verdict against Roundup maker Monsanto

https://www.washingtonpost.com/business/2019/05/14/bayers-stock-falls-after-billion-verdict-against-roundup-maker-monsanto/?noredirect=on&utm_term=.d1848f7731e6

Roundup Court Case #3

In July 2018, Dewayne Johnson (a former school groundskeeper) was diagnosed with non-Hodgkin's lymphoma. He sued Monsanto alleging the chemical glyphosate (an ingredient in Roundup).caused his cancer. Mr. Johnson used Roundup as part of his job. On August 10, 2018 a jury in San Francisco delivered a verdict in Mr. Johnson's favor. The judge ordered Monsanto to pay Mr. Johnson $289 million in total damages.

Here are a few of the many links to the verdict:

4 Must-See Videos of the Huge Win in the Monsanto Trial

https://www.organicconsumers.org/blog/monsanto-trial-verdict-videos

San Francisco Jurors Hear Hours of Scientific Data About Herbicide's Link to Cancer

https://www.law.com/therecorder/2018/07/09/san-francisco-jurors-hear-hours-of-scientific-data-about-herbicides-link-to-cancer/?slreturn=20180713081135

Monsanto Loses Landmark Roundup Cancer Trial, Set to Pay USD 289 Million in Damages

https://mail.google.com/mail/u/0/#inbox/FMfcgxvxBXtJCGsfZgnVKVKfStZmxqSM

Monsanto "Taken To The Cleaners" In Jury Verdict Dwayne Johnson v. Monsanto

https://www.activistpost.com/2018/08/monsanto-taken-to-the-cleaners-in-jury-verdict-dwayne-johnson-v-monsanto.html

Jury rules Monsanto liable in weed killer case

https://abc7news.com/society/verdict-reached-in-lawsuit-against-monsanto/3925454/

Monsanto ordered to pay $289 million in world's first Roundup cancer trial

https://www.reuters.com/article/us-monsanto-cancer-lawsuit/jury-orders-monsanto-to-pay-290-million-in-california-roundup-cancer-trial-idUSKBN1KV2HB

Monsanto Loses $289 Million Verdict in Roundup Cancer Trial

https://www.bloomberg.com/news/articles/2018-08-10/monsanto-s-roundup-caused-groundskeeper-s-cancer-jury-finds

Jury orders Monsanto to pay nearly $290M in Roundup trial

https://www.nbcnews.com/news/us-news/jury-orders-monsanto-pay-290m-roundup-trial-n899811

Roundup Court Case #4

On June 24, 2020 BayerAG was ordered to pay more than $10 billion to end tens of thousands of lawsuits filed over its Roundup weedkiller.

The settlement calls for Bayer to pay from $8.8 billion to $9.6 billion to resolve current Roundup lawsuits. The company will also set aside $1.25 billion to fund payouts for potential claims in the future.

Parts of the deal are pending court approval, including from Judge Vince Chhabria of the U.S. District Court for the Northern District of California.

Here is a link to an explanation of the case:

Bayer To Pay More Than $10 Billion To Resolve Cancer Lawsuits Over Weedkiller Roundup

https://www.npr.org/2020/06/24/882949098/bayer-to-pay-more-than-10-billion-to-resolve-roundup-cancer-lawsuits

Appeals Court Upholds Groundskeeper's Roundup Cancer Trial Win over Monsanto

Excerpts:

"In yet another court loss for Monsanto owner Bayer AG, an appeals court rejected the company's effort to overturn the trial victory notched by a California school groundskeeper who alleged exposure to Monsanto's glyphosate herbicides caused him to develop cancer, though the court did say damages should be cut to $20.5 million, USRTK reported.

The Court of Appeal for the First Appellate District of California said Monday that Monsanto's arguments were unpersuasive and Dewayne "Lee" Johnson was entitled to collect $10.25 million in compensatory damages and another $10.25 million in punitive damages."

Posted online by Sustainable Pulse, Jul 21 2020

https://sustainablepulse.com/2020/07/21/appeals-court-upholds-groundskeepers-roundup-cancer-trial-win-over-monsanto/?utm_source=newsletter&utm_medium=email&utm_campaign=glyphosate_gmos_and_pesticides_weekly_global_news_bulletin&utm_term=2020-07-29#.XyHQIYhKi1s

Federal workers are not exempt from being charged with reckless endangerment which is a felony.

Reckless endangerment is a crime consisting of acts that create a substantial risk of serious physical injury to another person. The accused person isn't required to intend the resulting or potential harm, but must have acted in a way that showed a disregard for the foreseeable consequences of the actions.

Any one of you could be called to testify.

The court will know you have read these comments. This establishes the fact that you knew the consequences of your actions. The plaintiff's attorney will ask why you ignored the science in the Opposing Views Science Attachment #6 and #18 and did not use an alternative to Roundup.

Request for changes to be made to the final NEPA document: Withdraw the timber sale and there will be no problem.

Padilla will be risking the lives of his neighbors who live on the WUI to generate precious volume for personal gain by ignoring Dr. Cohen's findings. He knows line-officers who fail to "get out the cut" are passed over for promotions.

At pages 7 and 8 Padilla says:

"The San Juan National Forest Land and Resource Management Plan defines portions of the Carlyle Point, Plateau Creek, Boggy Draw and Turkey Knoll blocks as wildland-urban interface (USDA 2013)."

Dr. Cohen's research resulted in his fine fuels removal methods which reduce the risk of fire damage should a wildfire occur. Dr. Cohen was a USFS employee before he retired. His methods are used worldwide. You know

about his methods and their effectiveness yet you reject them because they do not generate timber volume. By not applying the most effective fire damage reduction process there is you increase the risk that homes will burn and the residents will be injured or killed.

Involuntary manslaughter is a felony. Here's the definition of involuntary manslaughter:

"the unjustifiable, inexcusable, and intentional killing of a human being without deliberation, premeditation, and malice. The unlawful killing of a human being without any deliberation, which may be involuntary, in the commission of a lawful act without due caution and circumspection."

Federal officials are not exempt from this law.

The EA does not include the word "Cohen."

We both know why Padilla conveniently omitted Dr. Cohen's research findings. Here are some quotes he rejected:

Structure Ignition Assessment Model (SIAM)1

By Dr. Jack Cohen

Presented at the Biswell Symposium: Fire Issues and Solutions in Urban Interface and Wildland Ecosystems, 1995

https://www.fs.fed.us/psw/publications/documents/gtr-158/gtr-158-cover.pdf

Excerpts:

"These results suggest that to reduce ignitions, the distances from a structure for managing vegetation are much smaller than the lofting distances for firebrands. Thus, beyond some relatively short distance from the structure (depending on the vegetation and topography), vegetation management has no significant benefit for reducing flame generated ignitions. Vegetation management, on the other hand, cannot be extensive enough, in a practical sense, to significantly reduce firebrand ignitions. Therefore, the structure and its immediate surroundings should be the focus for activities intended for improving ignition risk." (pg 92)

Community destruction during extreme wildfires is a home ignition problem

By Dr. Jack Cohen and Dave Strohmaier

Published online by The Missoulian, August 9, 2020

https://www.reddit.com/r/chaparral/comments/i6p1qq/community_destruction_during_extreme_wildfires_is/

Excerpts:

"To make this shift, land managers, elected officials, and members of the public must question some of our most deeply ingrained assumptions regarding fire. For the sake of fiscal responsibility, scientific integrity, and effective outcomes, it's high time we abandon the tired and disingenuous policies of our century-old all-out war on wildfire and fuel treatments conducted under the guise of protecting communities. Instead, let's focus on mitigating WU fire risk where ignitions are determined - within the home ignition zone."

Reducing the Wildland Fire Threat to Homes: Where and How Much?

By Dr. Jack Cohen

Presented as the Fire Economics Symposium in San Diego, California on April 12, 1999.

USDA Forest Service Gen.Tech.Rep. PSW-GTR-173

http://www.fs.fed.us/rm/pubs_other/rmrs_1999_cohen_j001.pdf

Excerpts:

"As stated, the evidence indicates that home ignitions depend on the home materials and design and only those flammables within a few tens of meters of the home (home ignitability). The wildland fuel characteristics beyond the home site have little if any significance to WUI home fire losses." (Pg. 193)

"Extensive wildland vegetation management does not effectively change home ignitability." (Pg. 193)

"Home ignitability also dictates that effective mitigating actions focus on the home and its immediate surroundings rather than on extensive wildland fuel management." (Pg. 193)

Built to Burn

By Dr. Jack Cohen

Presented at a fire conference in front of people from the Forest Service and state fire agencies, 1999

https://99percentinvisible.org/episode/built-to-burn/

Excerpts:

"Cohen thought he had come up with a way to save houses and to let fires burn naturally - he thought it was a win-win. And so in 1999, he presented a paper about his findings at a fire conference in front of people from the Forest Service and state fire agencies. These were people who were in a position to change policies. But Cohen says they were totally uninterested. Cohen's research implied that basically everything about how the Forest Service dealt with wildfires was wrong.

The 10 AM rule had left us with a huge fire fighting infrastructure, so the Forest Service was spending hundreds of millions of dollars on planes and fire crews, and was approving massive logging projects on the grounds that thinning out the forest would help reduce the intensity of wildfires and save homes. Cohen was saying: actually, it would be way more effective if you just encouraged homeowners to maintain and retrofit their properties."

Objectives and considerations for wildland fuel treatment in forested ecosystems of the interior western United States (page 10)

By: Dr. Jack Cohen et al (a retired USFS fire physicist)

Published in Forest Ecology and Management, issue 256, 2008

https://www.fs.fed.us/rm/pubs_other/rmrs_2008_reinhardt_e001.pdf

Excerpts:

"Treating fuels to reduce fire occurrence, fire size, or amount of burned area is ultimately both futile and counter-productive." (Pg.1999)

"Some viable fuel treatments may actually result in an increased rate of spread under many conditions (Lertzman et al., 1998; Agee et al., 2000). For example, thinning to reduce crown fire potential can result in surface litter becoming drier and more exposed to wind. It can also result in increased growth of grasses and understory shrubs which can foster a rapidly moving surface fire." (Pg. 2000)

This 2014 High Country News article describes the effectiveness Dr. Cohen's fine fuels removal methods: http://www.hcn.org/articles/the-loss-of-homes-to-wildfire-is-as-much-a-sociopolitical-problem-as-it-is-a-physical

Only a fool would reject Dr. Cohen's research conclusions. Read this to learn more about Dr. Cohen:

https://www.firelab.org/profile/cohen-jack

Without changes between draft & final EIS you and the interdisciplinary team (IDT) members who are preparing the EIS will risk people's lives. There are severe civil penalties for federal officials convicted of knowingly putting the public at risk.

Some Rangers and Supervisors on other national forests do everything they can to protect people living on the WUI.

Here's what they do:

* offer to remove fine fuels near homes in the WUI owned by handicapped and/or elderly residents using USFS employees with written permission from the landowner.

* distribute handouts to WUI residents describing Dr. Cohen's fine fuels removal methods so they can do the work themselves.

* contact the people living in the WUI and announce fine fuels removal workshops will be held to answer questions. These workshops will present Dr. Cohen's research conclusions that prove commercial hazardous fuels logging farther than 100 yards from the WUI is ineffective.

Please include the bulleted actions above as part of the Proposed Action.

Please click on the link below so you can view a video interview with Dr. Cohen. In it he describes how the FS squelches and hides his research on wildfire because it threatens their logging/thinning programs.

https://99percentinvisible.org/episode/built-to-burn/

Other scientists also know logging does NOT reduce fire intensity and rate of spread (see below):

Lots of smoke and mirrors about fires and their causes

By George Wuerthner

George Wuerthner has published 36 books including Wildfire: A Century of Failed Forest Policy. He serves on the board of the Western Watersheds Project.

Published by Columbus Free Press, September 28, 2020

https://columbusfreepress.com/article/lots-smoke-and-mirrors-about-fires-and-their-causes

Excerpts:

"One recent study reviewed 1,500 fires around the West and found the highest severity blazes occurred in areas with "active forest management" while protected landscapes like wilderness areas where presumably, fuels were higher, burned less intensely.

"We cannot preclude large fires through forest management; however, we can reduce the impacts on humans. A shift from logging the forest miles from towns to an emphasis on reducing the flammability of houses, planning evacuation routes, burying power lines, zoning to reduce sprawl, and other measures can enhance the safety of our communities."

The Forest Service Not Only Loses Money Logging, It Makes Fires Worse

Quotes by Dr.Philip Higuera, associate professor of fire ecology, University of Montana

Published by Counterpunch, September 25, 2020

https://www.counterpunch.org/2020/09/25/the-forest-service-not-only-loses-money-logging-it-makes-fires-worse/

Excerpts:

" "Not only does national forest commercial logging lose money, it increases the threat of big wildfires. Dr. Higuera noted: "However, research studies have shown logged areas and young forest plantation projects have little beneficial effect on wildfire spread and can actually aggravate fire growth in some cases."

In the largest wildfire analysis ever done, in 2016 scientists found that forests with the most logging and the fewest environmental protections actually had the highest levels of fire intensity. Why? Because logging opens up the forest allowing more sunlight and wind which dries out forests and makes them more flammable."

Open Letter to Decision Makers Concerning Wildfires in the West

Signed by more than 200 preeminent scientists

Published by The GEOS Institute, August 27, 2018

https://naturalresources.house.gov/imo/media/doc/Letter%20From%20215%20Envrionmental%20Scientists%20Opposing%20Farm%20Bill%20Aug.%2027%202018.pdf

Excerpts:

"Thinning is most often proposed to reduce fire risk and lower fire intensity[hellip]However, as the climate changes, most of our fires will occur during extreme fire-weather (high winds and temperatures, low humidity, low vegetation moisture). These fires, like the ones burning in the West this summer, will affect large landscapes, regardless of thinning, and, in some cases, burn hundreds or thousands of acres in just a few days." (pg 2)

"Thinning large trees, including overstory trees in a stand, can increase the rate of fire spread by opening up the forest to increased wind velocity, damage soils, introduce invasive species that increase flammable understory vegetation, and impact wildlife habitat." (pg 2)

Western National Forests: A Cohesive Strategy is Needed to Address Catastrophic Wildfire Threats

A Report to the Subcommittee on Forests and Forest Health, Committee on Resources, House of Representatives, April 1999

Published by the Government Accounting Office, GAO/RCED-99-65

http://www.gao.gov/archive/1999/rc99065.pdf

Excerpt:

"The notion that commercial logging can prevent wildfires has its believers and loud proponents, but this belief does not match up with the scientific evidence or history of federal management practices. In fact, it is widely recognized that past commercial logging, road-building, livestock grazing and aggressive firefighting are the sources for "forest health" problems such as increased insect infestations, disease outbreaks, and severe wildfires."

"How can the sources of these problems also be their solution? This internal contradiction needs more than propaganda to be resolved. It is time for the timber industry and their supporters to heed the facts, not fantasies, and develop forest management policies based on science, not politics."

Indeed, there is a reason people use fine fuels (i.e. kindling) to start a fire in the fireplace.

See Opposing Views Science Attachment #11

Request for changes to be made to the final NEPA document: Drop the sale and begin working with the people who live in the WUI to teach them Dr. Cohen's methods.

Increases in national forest logging do not stabilize or enhance the economy of small communities located near the forest. Most people who visit the forest for recreation seek out natural areas that have not been logged.

One of the corporate-friendly purposes Padilla lists in the P&N at page 4 for this timber sale is:

"provide economic support to local communities by providing timber products to local industries in a sustainable manner."

Padilla pulls this need straight from the USFS public deception manual. The vast majority of timber sales use this lie. He parrots the USFS untrue claims perfectly.

He must know by pushing logging where it's not needed for cooked-up reasons he simultaneously reject the feelings of the vast majority if the American public who don't want their forests logged at any location for any reason.

He also rejects/ignores the literature available discussing the fact that most national forest visitors are seeking recreational opportunities. Camping, fishing, hiking and wildlife watching are a few. They avoid "managed" (aka logged-over) land. Here's a High Country News article the USFS does not want its employees to see that should guide your actions:

Article Title: Recreation is redefining the value of Western public lands

Excerpts:

"Once, the West's public lands were valued primarily for the timber, minerals and fossil fuels they held, which were extracted and then sold around the world. In the 1970s, more than two dozen Western counties relied on timber for at least a fifth of their revenue, while energy companies expanded onto public lands for coal and natural gas. Small communities swelled with loggers and miners and the businesses that supported them, providing an economy that helped preserve the West's rural feel. Today, though, natural resource economies are waning, and many of those towns are struggling. Public lands are increasingly used for fun and leisure, and the West has joined the Northeast as the two most urbanized regions in the country, according to U.S. Census data analyzed by Headwaters Economics."

"More than 290 million people visited Western public lands in 2017. Despite increasing visits to public lands and the billions of dollars in consumer spending on outdoor recreation that often takes place there, the percent of the federal budget allocated to manage these places has shrunk."

https://www.hcn.org/issues/50.8/recreation-recreation-is-redefining-the-value-of-western-public-lands?utm_source=wcn1&utm_medium=email

What type of person would read the article above and still claim logging (which drives away people who visit their national forest to pursue recreation opportunities) enhances the economies of local communities near the forest.

ECONorthwest reached conclusions similar to those of Dr. Power quoted above:

Excerpts:

"(1) Despite years of rhetoric and misinformation, national and regional economies are not dependent on logging National Forests. The most often cited misconception is that the regional economy of the Pacific Northwest declined after a court injunction and related events reduced National Forest logging. In fact, instead of collapsing, the region's economy expanded and the Pacific Northwest weathered virtually unscathed the national economic recession that occurred at the same time as the court injunction.

(2) National Forests now produce goods and services that are much more significant than the value of logging.

(3) The Forest Service logging program has caused devastating impacts in the ability of the National Forests to provide economically valuable goods and services. Reversing the damage caused by logging will be costly but ignoring the need to restore damaged forests will cost even more."

Seeing Forests for their Green: Economic Benefits of Forest Protection, Recreation, and Restoration"

Published in EcoNorthwest, August 13, 2000

http://econw.com/our-work/publications/seeing-forests-for-their-green-economic-benefits-of-forest-protection-recre/

When the recreating public bypasses and avoids communities with timber driven economies surrounded by "managed" national forest land these communities loose out on their share of the recreation-generated financial community stability benefits reported in 2006 shown below. In the last 13 years these benefits have increased. The level of the 10 year increase in recreation benefits exceeds the total jobs & revenues created by national forest "management" (a.k.a. logging).

Forest recreation:

* Contributes $730 billion annually to the U.S. economy

* Supports nearly 6.5 million jobs across the U.S.

* Generates $88 billion in annual state and national tax revenue

* Provides sustainable growth in rural communities

* Generates $289 billion annually in retail sales and services across the U.S.

* Touches over 8 percent of America's personal consumption expenditures-more than 1 in every 12 dollars circulating in the economy

Source of these statistics: http://outdoorindustry.org/images/researchfiles/RecEconomypublic.pdf?26

Recreation revenue is significantly more than logging revenue on national forests. People will drive long distances to avoid camping, hiking and fishing near cutting units.

"Recreation has replaced logging as the golden egg of the national forest system. While the extensive logging practices lose $1 billion a year, recreation based in national forests provides $111 billion per year to the country's gross domestic product. And that's according to the U.S. Forest Service's own study, which also declares only 3% of jobs in rural communities are linked to logging on public land, while 75% of jobs in rural communities come from recreation based on public lands. Recreation contributes 30 times more income to the nation's economy and creates 38 times more jobs than logging. Yet current Forest Service policy still favors logging over recreation."

From: "Logging vs. Recreation"

By Graham Averill

Published by Blue Ridge Outdoors, July 2008

https://www.blueridgeoutdoors.com/magazine/july-2008/logging-vs-recreation/

"Increased logging on federal lands will not fix these problems. Instead, it will diminish jobs in one of Oregon's fastest growing industries, outdoor recreation. The outdoor recreation industry employs about 140,000 workers in Oregon (logging and wood-products manufacturing employ fewer than 30,000). Nationally, jobs in outdoor recreation are growing 5 percent annually. High-quality recreation attracts middle- and high-income families to settle in rural counties, too, boosting local economic activity. There is abundant research and data showing that

our federal forests would do far more for workers, families and local businesses if managed for ecosystem and human health rather than as tree farms."

From: Logging expansion won't help rural communities

By Ernie Niemi (president of Natural Resource Economics, Inc.) and John Kober (executive director of the Pacific Rivers Council)

Published by Portland Oregonian online, June 29, 2014

http://www.oregonlive.com/opinion/index.ssf/2014/06/logging_expansion_wont_help_ru.html

"Local harvests do not necessarily flow to local mills because logs are often hauled hundreds of miles to the mills that win the timber sale bids. As a result, any employment impact may well not be local."

From: Linking Federal Timber Harvests to the Local Economy: Why Has the Historical Link Been So Weak?

http://www.kettlerange.org/power/Ch3.htm

"The USFS top managers have revealed that outdoor recreation and general ecology uses of National Forests are now of much greater economic value than timber harvest."

From: Forest Recreation's Growing Impact

By Paul McHugh, Chronicle Staff Writer

Published by SFGATE, September 19, 1996

https://www.sfgate.com/sports/article/FOREST-RECREATION-S-GROWING-IMPACT-2965645.php

"The USFS top managers have revealed that outdoor recreation and general ecology uses of National Forests are now of much greater economic value than timber harvest."

From: Forest Recreation's Growing Impact

Published by National Trails Training Partnership

http://www.americantrails.org/resources/economics/EconForestRec.html

"Earlier this year, OIA released its national Outdoor Recreation Economy Report, which found that the outdoor recreation economy generates $887 billion in consumer spending annually and directly sustains 7.6 million American jobs. The state report released today offers a deeper look into a thriving sector that's helping to create healthier economies and healthier communities.

"No matter your political affiliation, where you live or your walk of life, the outdoors brings us together," said Amy Roberts, OIA executive director. "From Maine to California, consumers are spending more on outdoor recreation as millions of Americans depend on it for their livelihoods. Outdoor recreation is a powerful economic engine that contributes to businesses and healthy communities in each and every state and is a vital and sustainable sector that relies on investing in and protecting America's public lands and waters." "

From: Outdoor Industry Association Releases State-By-State Outdoor Recreation Economy Report

Published by The Outdoor Industry Assn. News

https://outdoorindustry.org/article/outdoor-industry-association-releases-state-by-state-outdoor-recreation-economy-report/#oia-press-room

"Outdoor activities generate more than $16 billion annually in Oregon, according to an industry study released to the public on Wednesday."

"According to the association's report on Oregon, the state's spending on outdoor recreation - a sprawling category that the organization uses to include everything from the cost of new bikes or skis, to travel costs associated with outdoor recreation trips - has grown by more than 28 percent since the last iteration of the study was released in 2013.

In addition, the number of people employed in the industry increased from 141,000 to 172,000, a jump of nearly 22 percent. According to the study, 69 percent of Oregonians surveyed said they participate in outdoor recreation each year, up from 60 percent during the previous survey."

From: Outdoor activities generate more than $16 billion in state, according to study

Published by the Bend Bulletin newspaper, July 26, 2017

http://www.bendbulletin.com/localstate/5472143-151/oregon-sees-big-jump-in-outdoor-recreation-spending?referrer=home&referrer=top

Padilla should ask himself why he pursues actions that scores of unbiased independent scientists describe as likely to destroy the proper functioning of important natural resources.

Padilla rejected the research conclusions of 241 Ph.D. scientists quoted in Opposing Views Science Attachment #1 who demonstrate how logging-related harm (and in a few cases destruction) is inflicted on multiple natural resources in and near the sale area. Incredibly, he relies on the advice of 3 or 4 USFS timber employees financially motivated to sell timber. He knows the log for community stability P&N statement appears in at least 80% of all timber sale NEPA documents. This has become the commonly used excuse by USFS line-officers to sell unneeded timber sales.

I have presented him with verified information showing outdoor recreation generates 790 billion dollars and 65 million jobs annually. Most of this benefits local economies. The fact is, the Salter timber sale will harm the economy of the communities near it. People seek out areas that have not been logged for their recreation.

The US Department of Commerce released a report showing the Outdoor recreation contribution to the GDP is larger than that of oil and gas extraction.

Excerpts:

"That information can be useful when advocating for conservation or trying to change policy, Cottingham said."

"The federal report will be a useful advocacy tool, said Katherine Hollis the conservation and advocacy director for the Mountaineers."

Reported in the March 2, 2018 issue of the Spokane Washington Spokesman Review newspaper.

http://montanauntamed.com/get-outside/article_b8da11ba-97fe-5e1e-8d18-c9d994dc5148.html

Request for changes to be made to the final NEPA document: Withdraw the sale.

Caring USFS line-officers do not knowingly take action that will degrade aquatic habitat and water quality. If he cared about maintaining aquatic species' health he would have indicated that all newly constructed temporary roads will be obliterated or decommissioned according to 36 CFR 212.5(b)(2) (see below) after use.

He indicates he will construct 106 miles of temporary road at pages 56 and 57.

He says he will "physically close temporary roads with barriers" temporary roads after use (pg 57). I expect his decommissioning to be consistent with 36 CFR 212.5(b)(2). He must pay special attention to the requirement that you "completely eliminate the roadbed by restoring natural contours and slopes."

Request for changes to be made to the final NEPA document: Since he will not obliterate temp roads the timber sale must be withdrawn. "Physically closing" these roads creates 106 miles of linear sediment generators

I hope the non-timber IDT members working on this NEPA document agree with the wise quotes below.

The public has been led to believe these quotes guide your actions. Perhaps Padilla thinks he knows more than the people quoted below.

"When the last tree is cut down, the last fish eaten, and the last stream poisoned, you will realize that you cannot eat money"

Cree Indian Proverb, about 1885

"A nation that destroys its soils destroys itself. Forests are the lungs of our land, purifying the air and giving fresh strength to our people."

Franklin D. Roosevelt

"Thou shalt not destroy the trees thereof by forcing an axe against them: for thou mayest eat of them, and thou shalt not cut them down (for the tree of the field is man's life).

Deuteronomy 20:19

"We must protect the forests for our children, grandchildren and children yet to be born. We must protect the forests for those who can't speak for themselves such as the birds, animals, fish and trees."

Chief Edward Moody

"It is horrifying that we have to fight our own government to save the environment."

Ansel Adams

"The Eyes of the Future are looking back at us and they are praying for us to see beyond our own time."

Terry Tempest Williams

Padilla apparently thinks he has more experience and resource knowledge than the scientists listed below.

Why else would he plan a timber sale that these experts warn must never occur?

Jerry Franklin, Ph.D.,

David Perry Ph.D.,

Reed Noss Ph.D.,

David Montgomery Ph.D.,

Anne Ehrlich, Ph.D.,

David Foster Ph.D.,

Peter Raven Ph.D., and

Why would these scientists be motivated to misrepresent the truth.?

Perhaps Padilla has the courage to read what the experts say about logging and forest road construction.

"The proposition that forest values are protected with more, rather than less logging, and that forest reserves are not only unnecessary, but undesirable, has great appeal to many with a vested interest in maximizing

timber harvest. These ideas are particularly attractive to institutions and individuals whose incomes depend upon a forest land base." (page 2)

"On the other hand, approaches that involve reserving of a portion of the land base, or harvest practices that leave commercially valuable trees uncut to achieve ecological goals, are often considered much less desirable as they reduce traditional sources of timber income." (page 2)

Simplified Forest Management to Achieve Watershed and Forest Health: A Critique.

By Franklin, Jerry Ph.D., David Perry Ph.D., Reed Noss Ph.D., David Montgomery Ph.D. and Christopher Frissell Ph.D. 2000.

http://www.coastrange.org/documents/forestreport.pdf

"For much of the past century the Forest Service, entrusted as the institutional steward of our National Forests, focused its management on an industrial-scale logging program. The result of the massive logging and road construction program was to damage watersheds, destroy wildlife habitat and imperiled plant and animal species."

"Dr. David R. Foster, a professor of ecology at Harvard University, said that a ban on public-lands logging would not affect the nation's supply of timber. Just 4 percent of the nation's timber comes from federal forest land, according to the letter, an amount Dr. Foster said could be made up through more intensive cutting on tree farms and recycling, among other things."

Scientists Seek Logging Ban on U.S.-Owned Land

By Anne Ehrlich Ph.D., David Foster Ph.D. and Peter Raven Ph.D. 2002

New York Times, April 16, 2002

http://www.nytimes.com/2002/04/16/us/scientists-seek-logging-ban-on-us-owned-land.html

"Among the environmental effects of unimproved roads, those on water quality and aquatic ecology are some of the most critical. Increased chronic sedimentation, in particular, can dramatically change the food web in affected streams and lakes."

"The nearly impervious nature of road surfaces (or treads) makes them unique within forested environments and causes runoff generation even in mild rainfall events, leading to chronic fine sediment contributions."

"If we look at the issue of what we need to learn or the research priorities for forest road hydrology, I would argue that the areas of cutslope hydrology and effectiveness of restoration efforts are perhaps most critical."

"At a few sites in the mountains of Idaho and Oregon a substantial portion of the road runoff (80-95%) came from subsurface flow intercepted by the cutslope (Burroughs et al., 1972; Megahan, 1972; Wemple, 1998)."

Hydrological processes and pathways affected by forest roads: what do we still need to learn?

By Luce, Charles H. Ph.D., USFS, Rocky Mountain Research Station, Boise Aquatic Sciences Laboratory, 2002

https://www.fs.usda.gov/treesearch/pubs/23954

"Few marks on the land are more lasting than roads."

"The negative effects on the landscape of constructing new roads, deferring maintenance, and decommissioning old roads are well documented. Unwanted or non-native plant species can be transported on vehicles and clothing by users of roads, ultimately displacing native species. Roads may fragment and degrade habitat for wildlife species and eliminate travel corridors of other species. Poorly designed or maintained roads promote erosion and landslides, degrading riparian and wetland habitat through sedimentation and changes in

streamflow and water temperature, with associated reductions in fish habitat and productivity. Also, roads allow people to travel into previously difficult or impossible to access areas, resulting in indirect impacts such as ground and habitat disturbance, increased pressure on wildlife species, increased litter, sanitation needs and vandalism, and increased frequency of human-caused fires."

National Forest System Road Management

Federal Register: March 3, 2000 (Volume 65, Number 43) Page 11675

A Notice by the Forest Service on 03/03/2000, signed by USFS Chief Dr. Mike Dombeck on February 25, 2000

https://www.federalregister.gov/documents/2000/03/03/00-5002/national-forest-system-road-management

Concluding Remarks

It frightens me to think Padilla actually believes the Salter timber sale will serve the recreating public.

I'll bet the people who read the Denver Post who hike, fish, camp and view wildlife north of Dolores will want to know about Padilla's shocking, appalling gift to the natural resource extraction corporation.

ATTACHMENTS:

Opposing Views Attachment 1:

Opposing Views Attachment 11:

Opposing Views Attachment 6:

OV Attachment 10:

OV Attachment 18:

extraction corporation.

ATTACHMENTS:

Opposing Views Attachment 1: Quotes by Scientists who are Experts in their Fields Reveals Commercial Timber Harvest Activities will Inflict Major, Tragic Damage to the Natural Resources in and Downstream from any Timber Sale Area.

Opposing Views Attachment 11: Dr. Cohen[rsquo]s fine fuels removal methods

Opposing Views Attachment 6: Glyphosate Dangers

OV Attachment 10: Polls about whether the Public Accepts Logging on National Forests

OV Attachment 18: Following Label Directions on [ldquo]Approved[rdquo] Herbicides Containers does not Assure Safety

extraction corporation.

ATTACHMENTS:

Opposing Views Attachment 1: Quotes by Scientists who are Experts in their Fields Reveals Commercial Timber Harvest Activities will Inflict Major, Tragic Damage to the Natural Resources in and Downstream from any Timber Sale Area.

Opposing Views Attachment 11: Dr. Cohen[rsquo]s fine fuels removal methods

Opposing Views Attachment 6: Glyphosate Dangers

OV Attachment 10: Polls about whether the Public Accepts Logging on National Forests

OV Attachment 18: Following Label Directions on [ldquo]Approved[rdquo] Herbicides Containers does not Assure Safety

# Opposing Views Science Attachment #1

## The Following Compelling, Indisputable Quotes by Scientists who are Experts in their Fields Reveals Commercial Timber Harvest Activities will Inflict Major, Tragic Damage to the Natural Resources in and Downstream from any Timber Sale Area.

**The following "Opposing Views" present scientific information that disproves the USFS claim that logging benefits the natural resources in the forest. The idea that logging "restores" anything but the purchaser's financial bottom line is laughable and absurd.**

---

**600 Ph.D. scientists sign letter urging passage of the Act to Save America's Forests. Here are excerpts from the letter:**

"Clearcutting and other even aged silvicultural practices and timber road construction have caused widespread forest ecosystem fragmentation and degradation. The result is species extinction, soil erosion, flooding, destabilizing climate change, the loss of ecological processes, declining water quality, diminishing commercial and sport fisheries, and recently, mudslides in Oregon which killed American citizens."

"Less than 5% of America's original forests remain, and these forests are found primarily on federal lands. Logging in the last core areas of biodiversity is destroying the remaining intact forest ecosystems in the United States. At the current rate of

logging, these forests and their priceless biological assets will be destroyed within a few decades."

"We believe it is our professional responsibility to ask Congress to align Federal forest management with modern scientific understandings of forest ecosystems. Passage of the Act to Save America's Forests will give our nation's precious forest ecosystems the best chance or survival and recovery into the 21st century and beyond."

**From a 1998 letter to congress**
By Peter Raven, Ph.D., Jane Goodall, C.B.E., Ph.D., Edward O. Wilson, Ph. D.
and over 600 other leading biologists, ecologists, foresters, and scientists from
other forest specialties.
Published by Save America's Forests
http://www.saveamericasforests.org/resources/Scientists.htm

---

**Timber Harvest Opposing View** "We concluded that commercial timber sales do not meet the criteria for forest restoration." (Pg. 11)

**Western Region Audit Report: Forest Service National Fire Plan Implementation**
Long, Richard D., U.S. Department of Agriculture Office of Inspector General
*Report No. 08601-26-SF*, November 2001.
http://www.usda.gov/oig/webdocs/08601-26-SF.pdf

---

**Timber Harvest Opposing View** "Biodiversity in managed ecosystems is poor. Less biodiverse communities and ecosystems are more susceptible to adverse weather (such as drought) and exotic invaders, and have greatly reduced rates of biomass production and nutrient cycling."

**Biodiversity and Ecosystem Functioning: Maintaining Natural Life Support Processes**
Naeem, Shahid Ph.D., F.S. Chapin III Ph.D., Robert Costanza Ph.D.,
Paul R. Ehrlich Ph.D., Frank B. Golley Ph.D., David U. Hooper Ph.D.
J.H. Lawton Ph.D., Robert V. O'Neill Ph.D., Harold A. Mooney Ph.D.
Osvaldo E. Sala Ph.D., Amy J. Symstad Ph.D., and David Tilman Ph.D.

Published in *Issues in Ecology* No. 4. Fall 1999.
http://cfpub.epa.gov/watertrain/pdf/issue4.pdf

---

**Timber Harvest Opposing View** "Logging practices can indirectly result in changes in the biological components of a stream, and can have direct and indirect on the physical environment in streams.

The primary environmental changes of concern are the effects of siltation, logging debris, gravel scouring, destruction of developing embryos and alevins, blockage of streamflow, decrease in surface and intragravel dissolved oxygen, increase in maximum water temperatures, changes in pool/riffle ratios and cover, redistribution of fishes, reduction in fish numbers, and reduction in total biomass."

> **The Alsea Watershed Study: Effects of Logging on the Aquatic Resources of Three Headwater Streams of the Alsea River, Oregon – Part III**
> By John R. Moring Ph.D.
> *Fishery Report Number 9*, Oregon Department of Fish and Wildlife, 1975
> http://www.for.gov.bc.ca/hfd/library/ffip/Moring_JR1975b.pdf

---

**Timber Harvest Opposing View "**Major report findings:

1) If we ended the timber sales program on national forests and redirected the logging subsidies we could provide over $30,000 for each public lands timber worker for retraining or ecological restoration work - - and still have over $800 million left over for taxpayer savings in the first year alone.

2) We don't need to log national forests for our timber supply, given the fact that the timber cut annually from national forests nationwide now comprises only 3.3% of this nation's total annual wood consumption, and less than 4% of the sawtimber used for construction.

3) Logging on national forests INCREASES the risk of forest fires more than any other human activity.

4) A bipartisan nationwide poll conducted in 1998 found that 69% of Americans now oppose allowing timber companies to log our national forests.

**THE FACTS: Ending Timber Sales on National Forests**
By Hansen, Chad, Ph.D.,
Published in the *Earth Island Journal*, June 22, 1999
https://www.questia.com/magazine/1G1-54451556/the-facts-ending-logging-on-national-forests

---

**Timber Harvest Opposing View** "“Late last year a court found the Forest Service in violation of the National Environmental Policy Act for failing to properly address the impacts of logging in roadless areas within the footprint of the 2014 French fire. The court sent the Forest Service back to the drawing board, but the Service has now issued yet another decision authorizing the same logging it had illegally approved. The Center will head back to court to ask that the existing prohibition against logging remains in place, especially given the presence of West Coast fishers.”

“ “It’s appalling to see the Forest Service allowing important wildlife habitat to be destroyed, especially in a roadless area,” said Justin Augustine, an attorney with the Center for Biological Diversity. “Roadless areas represent some of the last, best places for wildlife like fishers to survive. The Forest Service needs to be protecting these places, not logging them.” “

**Forest Service Approves Habitat Destruction in Sierra Nevada Roadless Area---*Decision Allows Post-fire Logging in Habitat Occupied by Rare West Coast Fishers***
Published by the Center for Biological Diversity, April 29, 2016
https://www.biologicaldiversity.org/news/press_releases/2016/fisher-04-29-2016.html

---

**Timber Harvest Opposing View** "In response to the changes described above, the timber industry and the Forest Service have sought to find new justifications for taxpayer-subsidized logging on public lands. In particular, they have tried to emphasize concerns over forest fire, contending that more logging should be used to prevent fire, even though logging actually often leaves forest areas more fire-prone. These calls for more logging have been tied to claims that there is too much fire in forests.”

**National Forest Protection**
By Hanson, Chad, Ph.D.
Published in *Environment Now* (see picture on last page)
http://www.environmentnow.org/forest.html

---

**Timber Harvest Opposing View** "Logging simplifies forest ecosystems (Dudley et al 1995) by narrowing the age range of the stand and suppressing diversification through repeated harvesting, burning to remove slash, and replanting with hybrid seedlings. Simplification affects the health and productivity of the forest because simplified forests lack the variety found in older stands, including species diversity, vertical structure, and microhabitat. From an ecological standpoint, a simplified forest of a particular age has less overall bio-mass per acre than a natural forest of the same age, but a simplified forest produces a higher volume of merchantable timber."

**Forest Clearing in the Gray's River Watershed 1905-1996**
By Mark G. Scott
A research paper submitted in partial fulfillment of the
requirements for the degree of MASTER OF SCIENCE in GEOGRAPHY
Portland State University, 2001
http://www.markscott.biz/papers/grays/chapter1.htm

---

**Timber Harvest Opposing View** "Timber harvest will remove dead and dying material from the site and inhibit the recruitment of downed woody material as time progresses. Timber harvest and associated reduced structural complexity and reduced age and size class diversity are all known to reduce population abundance and diversity of ants and a number of birds.

**Applying Ecological Principles to Management of the U.S. National Forests**
Published in *Issues in Ecology* Number 6 Spring 2000
https://19january2017snapshot.epa.gov/watershedacademy/applying-ecological-principles-management-us-national-forests_.html

**Timber Harvest Opposing View "**According to a 1998 poll by a firm that has worked for several Republican House members and two presidents, 69 percent of Americans oppose commercial logging on federally owned land. The Forests Service's own poll showed that 59 percent of Americans who expressed an opinion oppose timber sales and other commodity production in national forests."

"Many Americans are surprised to learn that logging is even allowed on public lands. Alas, it has been since the Organic Act of 1897 first authorized logging in America's new forest reserves."

**Stop the Logging, Start the Restoration**
By John Byrne Barry
Published in the *The Planet* newsletter, June 1999, Volume 6, Number 5
http://vault.sierraclub.org/planet/199905/ecl1.asp

**Timber Harvest Opposing View** "Federal auditors have found that the Forest Service frequently fails to assess, prevent or correct environmental damage from logging on the national forests.

After inspecting 12 timber projects in the field from 1995 to 1998, the Agriculture Department's inspector general found that all were deficient and that 'immediate corrective action is needed."

**Audit Faults Forest Service on Logging Damage in U.S. Forests**
By John H. Cushman Jr.
Published in the *New York Times*, February 5, 1999
http://query.nytimes.com/gst/fullpage.html?res=9B00E2DF163BF936A35751C0A96F958260&sec=&spon=&pagewanted=print

and

http://www.ncpa.org/sub/dpd/index.php?Article_ID=12468

**Timber Harvest Opposing View** “Logging on national forest land creates more economic harm than good, according to a recent study by the National Forest Protection Alliance and the Forest Conservation Council.

The 75-page report, three years in the making, notes there are dramatic economic and social losses when forests are logged under the U.S. Forest Service's timber-sale program.

The report, "The Economic Case Against Logging National Forests," states that national forest lands are far more valuable to rural communities when trees are left standing, and that the federal logging program creates billions of dollars in unaccounted costs for communities, businesses, and individuals. This expense comes in addition to timber industry subsidies, which cost American taxpayers approximately $1.2 billion a year.”

**National forest logging is bad business, study says**
By Margot Higgins
Posted on CNN.com-*Nature*, March 16, 2000
http://www.cnn.com/2000/NATURE/03/16/forest.logging.enn/index.html

**Timber Harvest Opposing View** “A letter signed by 221 scientists and sent to President Bush today calls for ending all logging on federally owned forests, arguing that the value of the timber produced was minuscule compared with the environmental damage caused by the harvests.

The letter, a project of the Sierra Club and signed by Dr. Edward O. Wilson, Dr. Anne Ehrlich and other prominent scientists, primarily biologists, asserted that the American taxpayer not only subsidizes logging directly, but also indirectly, because logging reduces the economic value of the forest for other uses.

"It is now widely recognized that commercial logging has damaged ecosystem health, clean water, and recreational opportunities," the letter reads. "Annually, timber produces roughly $4 billion per year (from national forests), while recreation, fish and wildlife, clean water and unroaded areas provide a combined total of $224 billion to the American economy each year."

"Dr. David R. Foster, a professor of ecology at Harvard University, said that a ban on public-lands logging would not affect the nation's supply of timber."

"Just 4 percent of the nation's timber comes from federal forest land, according to the letter, an amount Dr. Foster said could be made up through more intensive cutting on tree farms and recycling, among other things."

**Scientists Seek Logging Ban on U.S.-Owned Land**
By Jim Robbins
Published in the *New York Times,* April 16, 2002
http://www.nytimes.com/2002/04/16/us/scientists-seek-logging-ban-on-us-owned-land.html

---

**Timber Harvest Opposing View** "We do not believe, however, that scientific literature or forestry experience supports the notions that intensively managed forests can duplicate the role of natural forests, or that sufficient knowledge and ability exist to create even an approximation of a natural old-growth forest stand." (page 3)

**Forging a Science-Based National Forest Fire Policy**
By Jerry F. Franklin Ph.D. and James K. Agee Ph.D.
Published in *Issues in Science and Technology*. Fall 2003
A National Wildlife Federation publication sponsored by the Bullitt Foundation
http://issues.org/20-1/franklin/

---

**Timber Harvest Opposing View** "Managers on the Wolverine fire still opted to cut one of the largest firelines ever in Washington, logging 114 acres of critical spotted owl habitat and felling big trees — including a giant that had stood for centuries, so large, it

was a one-log load on a semi truck. Steel-tracked heavy equipment tore up fragile ground along streams. Erosive soils unique to the area were bulldozed.

Cut by the U.S. Forest Service with none of the usual environmental review, the firebreak was up to 300 feet wide and stretched more than 50 miles, from the Entiat drainage on the east, to Twin Lakes to the west. Loggers cut enough trees to fill more than 930 logging trucks.

Yet the fire never came anywhere near."

**Rushing to stop a fire that never came, Forest Service logged miles of big trees, critical habitat**
Published on the *Seattle Times*, August 9, 2016
http://projects.seattletimes.com/2016/collateral-damage/

---

**Timber Harvest Opposing View** "This is a lesson for USFS employees (with many pictures) who still think its important to sell dead and dying trees in a post-fire landscape before the trees rot and loose value. Of course logging this rare and important habitat to provide corporate profit opportunities is something an intelligent, professional, caring USFS employee would never consider."

**Protection of Post-Fire Habitat**
Published by the John Muir project, 2014
http://johnmuirproject.org/forest-watch/post-fire-habitat/

---

**Timber Harvest Opposing View** "One trust fund often cited by critics is the Knutson-Vandenberg (K-V) Fund. This account receives an unlimited portion of timber sale receipts, to be used for reforestation, timber stand improvements, and other resource mitigation and enhancement activities in timber sale areas. Forest Service managers can, therefore, fund their programs from timber sales; in the words of one critic, wildlife managers have an incentive to support timber sales that damage wildlife habitat, because they can use the revenues to mitigate that damage and to keep themselves and their staffs employed. (10)"

**Forest Service Timber Sale Practices and Procedures: Analysis of Alternative Systems**
By Gorte, Ross W. Ph.D.
Published by the Library of Congress. A Congressional Research Service, October 30, 1995.
https://digital.library.unt.edu/ark:/67531/metacrs233/

**Timber Harvest Opposing View** “The fact is, commercial logging doesn't prevent catastrophic fires; it causes them. In the latter part of the 19th century, this was common knowledge. Relentless clearing of forests in the Great Lakes region left huge areas largely devoid of the cooling shade of trees, replacing moist natural forest microclimates with the hotter, drier conditions characterized by stump fields. Flammable logging "slash debris" covered the landscape.

It was in this setting that a massive, cataclysmic fire started near Peshtigo, Wisconsin in 1871. More than 1,200 people were killed. Similar blazes erupted in subsequent years.”

**The Big Lie: Logging and Forest Fires**
By Hanson, Chad Ph.D.
Published in the *Earth Island Journal*, spring 2000 issue
http://yeoldeconsciousnessshoppe.com/art6.html

**Timber Harvest Opposing View** "Logging reduces the organic parent material (duff and woody residues) available for soil-formation processes."

**Distribution of Ectomycorrhizae in a Mature Douglas-fir/larch Forest Soil in Western Montana**
By A.E. Harvey, M. J. Larsen, and M. F. Jurgensen
*Published in Forest Science*, Volume 22, Number 4, 1 December 1976, pp. 393-398(6)
https://www.researchgate.net/publication/233704894_Distribution_of_Ectomycorrhizae_in_a_Mature_Douglas-firLarch_Forest_Soil_in_Western_Montana

**Timber Harvest Opposing View** "Shifting value orientations and priorities have resulted in two conflicting management paradigms concerning natural resources. These paradigms and the societal shifts associated with them have been well articulated by Brown and Harris (1992) and Bengston (1994), as well as others. The two competing natural resource paradigms—derived from the ideas of Gifford Pinchot and Aldo Leopold, respectively— have been labeled the "Dominant Resource Management Paradigm" and the postmodern, "New Resource Management Paradigm" (Table 1). The former view advocates the utilitarian belief that natural resource management ought to be directed toward the production of goods and services beneficial to humans, whereas the latter takes a relatively biocentric view that reflects a more environmentally holistic way of thinking about resources. In terms of implementation, the postmodern paradigm questions the wisdom of top-down decision making (Shindler et al. 1996). More directly, many who identify with this paradigm simply do not trust forest management or research experts—especially those who work for the government (Steel et al. 1992)." (page 29)

**Shifting Public Values for Forest Management: Making Sense of Wicked Problems**
By Dr. Bruce Shindler, Department of Forest Resources, and Dr. Lori A. Cramer, Department of Sociology, Oregon State University
Reprinted from the *Western Journal of Applied Forestry,* Vol. 14, No. 1, January 1999.
https://andrewsforest.oregonstate.edu/sites/default/files/lter/pubs/pdf/pub2465.pdf

**Timber Harvest Opposing View** "Congress finds the following:

1. Forest Service polls show that a strong majority of the American people think that natural resources on Federal public lands should not be made available to produce consumer goods.
2. Recreation and tourism in the National Forest System creates over 30 times more jobs, and generates over 30 times more income, than commercial logging on national forests.
3. Timber cut from Federal public lands comprises less than 5% of US annual timber consumption.
4. The vast majority of America's original pristine forests have been logged, and what little primary forest that remains exists almost entirely on public lands.

5. It is in the interests of the American people and the international community to protect and restore native biodiversity in our Federal public lands for its inherent benefits.
6. Commercial logging has many indirect costs which are very significant, but not easily measured, such as flooding damage, damage to the salmon fishing industry; and harm to the recreation and tourism industries.

**House Bill H. R. 1494** text. April 4, 2001
http://www.ontheissues.org/House/Bill_Luther_Environment.htm

**Timber Harvest Opposing View** "Human tampering with nature has not been without costs. Human manipulation of existing ecosystems has also sometimes had unfortunate consequences."

**From Prairie Dogs to Oysters: How Biodiversity Sustains Us**
By Hudak, Mike Ph.D.
from his book review of *The Work of Nature: How the Diversity of Life Sustains Us*
by Yvonne Baskin, 1997
Published in the *Newsletter of Earth Day Southern Tier*, February/March 1999, p. 2
http://www.mikehudak.com/Articles/FromPrairieDogs9902.html

**Timber Harvest Opposing View** “An unprecedented rape of Mother Nature from the 1880s to the 1940s completely changed the wooded landscape in the northern Great Lakes region of America as well as the society and ecology forevermore.”

**Cut and Run: Loggin' Off the Big Woods**
By Mike Monte
Paperback – June 1, 2002
https://www.amazon.com/Cut-Run-Loggin-Off-Woods/dp/0764315293/ref=cm_cr_arp_d_product_top?ie=UTF8

**Timber Harvest Opposing View** “Logging-truck traffic in the Kimsquit Valley in British Columbia resulted in a 78% reduction in use of the “Zone of Hauling Activity” by radio collared bears compared to non-hauling periods (16). For 14 hours/day, 3%-23% of each bear's home range was unavailable to them because of disturbance.”

“Wolverines seem to have been most affected by activities that fragment and supplant habitat, such as human settlement, extensive logging, oil and gas development, mining, recreational developments, and the accompanying access.

**The Effects of Linear**
**Developments on Wildlife: A Review of Selected Scientific Literature**
By M.G. Jalkotzy, P.I. Ross, and M.D. Nasserden
Prepared for Canadian Association of Petroleum Producers. Arc Wildlife Services Ltd., Calgary. 115pp, 1997
http://www.arlis.org/docs/vol1/A/65937142.pdf

**Timber Harvest Opposing View** "Timber harvesting operations affect hydrologic processes by reducing canopy interception and evapotranspiration. Many studies have documented changes in soil properties following tractor yarding (Stone, 1977; Cafferata, l983), and low-ground-pressure skidding (Sidle and Drlica, 1981). More recently, researchers have evaluated cable yarding (Miller and Sirois, 1986; Purser and Cundy, 1992). In general, these studies report decreased hydraulic conductivity and increased bulk density in forest soils after harvest."

**Effects of Human-Induced Changes on Hydrologic Systems**
By Elizabeth T. Keppeler, Robert R. Ziemer Ph.D., and Peter H. Cafferata
An American Water Resources Association publication, June 1994
http://www.fs.fed.us/psw/publications/ziemer/Ziemer94a.PDF

**Timber Harvest Opposing View** "Looking at the study on a larger scale, the potential for changes caused by logging is great. Absence of trees could influence water temperature by altering available sunlight, conductivity by changing the amount of organic matter that collects in the vernal ponds, or pH if the logging process deposits foreign residues to the area. Also heavy equipment used to harvest the timber has the potential to alter the terrain."

**Logging Effects on Amphibian Larvae Populations in Ottawa National Forest**
Al Klein, University of Notre Dame, 2004
http://underc.nd.edu/assets/216499/fullsize/klein2004.pdf

**Timber Harvest Opposing View** "In hopes of ending conflicts over "multiple use," an independent scientific committee has proposed that "ecological sustainability" should become the principal goal in managing the U.S. national forests and grasslands, which since 1960 have been under a congressional mandate to serve industry, recreation, and conservation all at once."

**Call for 'Sustainability' in Forests Sparks a Fire Science**
By Charles C. Mann Ph.D. and Mark L. Plummer Ph.D.
Published in *Science* 26 March 1999: Vol. 283. no. 5410, pp. 1996 – 1998
http://www.sciencemag.org/content/283/5410/1996.summary

**Timber Harvest Opposing View** "Logging removes mature and maturing trees which conserve essential elements, whereas the area containing new very young planted trees following logging are susceptible to erosion and essential element loss." (pg.5)

"Logging removes tree parts that would have created and maintained diversity in forest communities." (pg. 44)

**The Forest to the Sea: A Story of Fallen Trees**
By C. Maser Ph.D., R. F. Tarrant, J. M. Trappe Ph.D., and J. F. Franklin Ph.D.
USDA Forest Service, *GTR-PNW-GTR-229, 1988*
https://www.srs.fs.fed.us/pubs/3073

**Timber Harvest Opposing View** "Logging practices can indirectly result in changes in the biological components of a stream, and can have direct and indirect on the physical environment in streams.

The primary environmental changes of concern are the effects of siltation, logging debris, gravel scouring, destruction of developing embryos and alevins, blockage of streamflow, decrease in surface and intragravel dissolved oxygen, increase in maximum and diel water temperatures, changes in pool/riffle ratios and cover, redistribution of fishes, reduction in fish numbers, and reduction in total biomass."

**The Alsea Watershed Study: Effects of Logging on the Aquatic Resources of Three Headwater Streams of the Alsea River, Oregon – Part III**
By John R. Moring Ph.D.
*Fishery Report Number 9*, Oregon Department of Fish and Wildlife, 1975
http://www.for.gov.bc.ca/hfd/library/ffip/Moring_JR1975b.pdf

**Timber Harvest Opposing View-"**The Forest Service is deforesting our national timberlands at a rate that rivals Brazil's. What remains of America's original virgin forests is being clipped away daily on our public lands, lands that contain the most biomass per acre of any forests on the planet. We are losing intact ecosystems, watersheds, fish habitat, wildlife habitat, recreation lands, and native-species diversity to a degree that may be irreparable."

**THE MISMANAGEMENT OF THE NATIONAL FORESTS**
By Perri Knize
Published on the *Atlantic Monthly*, October 1991

https://andrewsforest.oregonstate.edu/sites/default/files/lter/pubs/pdf/pub3296.pdf

**Timber Harvest Opposing View** "Agroforestry does reduce biodiversity. In forests used for logging, whole-landscape management is crucial."

**Forests as Human-Dominated Ecosystems**
By Ian R. Noble and Rodolfo Dirzo Ph.D.
Published in *Science* Vol. 277. No. 5325, pp. 522 - 525. 25 July 1997.
http://www.sciencemag.org/content/277/5325/522.abstract?maxtoshow=&HITS=10&hits=10&RESULTFORMAT=&fulltext=logging&searchid=1136659907310_5043&FIRSTINDEX=0&journalcode=sci

**Timber Harvest Opposing View** "A federal judge has blocked logging proposed for the Klamath National Forest in Siskiyou County, chiding the U.S. Forest Service for its review of the environmental damage that would result."

"The service should have done a full environmental review and done a better job projecting the impact on wildlife and forest conditions, ruled U.S. District Judge Frank C. Damrell Jr."

**Judge blocks Klamath logging plan**
By Don Thompson
Publoshed by the Environmental Protection Information Center (EPIC), October 16, 2004
http://www.wildcalifornia.org/media/epic-in-the-news/judge-blocks-klamath-logging-plan/

**Timber Harvest Opposing View** "That makes four timber projects since May in which U.S. District Judge Dana Christensen found fault with the U.S. Forest Service and the

U.S. Fish and Wildlife Services' conclusion that cutting and burning in those areas would not significantly harm the big cats' territory."

"Christensen ruled the Endangered Species Act requires the agencies to determine whether lynx "may be present" there, which is a lesser standard than what the agencies used in concluding lynx don't "occupy" the area."

"The judge said the government approved those projects based on an unreliable conclusion they would not harm the lynx's critical habitat."

**Judge stops 3 Montana logging projects over lynx**
By Matt Volz, Associated Press June 26, 2013
http://news.yahoo.com/judge-stops-3-montana-logging-141919567.html

---

**Timber Harvest Opposing View** "If the current pace of logging planned by the Forest Service continues, nearly all of America's ancient and roadless wild forests will soon be lost forever. According to a recent report by the World Resources Institute, only one percent of the original forest cover remains in large blocks within the lower 48 states."

**from a February 9, 2001 letter to Senator Jean Carnahan**
By Peter Raven, Ph.D.,
http://www.saveamericasforests.org/Raven.htm

---

**Timber Harvest Opposing View** "The Water Board has identified wastes associated with timber harvest and vegetation management activities (as defined in Attachment A) as having a potential effect on water quality. These vegetation management activities have the potential to effect water quality by causing soil to discharge to a waterbody, slump or erode by wind, or be compacted or deformed which limits the soil's ability to infiltrate or filter runoff." (pg 2)

**TIMBER HARVEST AND VEGETATION MANAGEMENT ACTIVITIES LAHONTAN REGION,**
Published by the CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, April 10, 2014

http://www.swrcb.ca.gov/lahontan/water_issues/programs/waste_discharge_requirements/timber_harvest/docs/timber_waiver/2014tw.pdf

---

**Timber Harvest Opposing View** “Within this volatile atmosphere the Bush Administration presented a new proposal for fire prevention called the "Healthy Forest Initiative." The plan received wide coverage in the national media in August and September 2002 and continues to be at the center of an attempt to significantly shift public land management in the United States. At the core of the plan is an effort to create private sector incentives to promote logging/thinning projects in the national forests.”

**Physicians of the Forest": A Rhetorical Critique of the Bush Healthy Forest Initiative**
By Brant Short Ph.D. and Dayle C. Hardy-Short Ph.D.
Published in UCLA’s *Electronic Green Journal*, Issue #19, December 2003
http://escholarship.org/uc/item/4288f8j5

---

**Timber Harvest Opposing View** “Four conservation groups — Alliance for the Wild Rockies, Swan View Coalition, Friends of the Wild Swan and Native Ecosystems Council — sued to halt the sale in June 2013. The groups claimed the project would harm grizzly bear, lynx, wolverine and other species and plants while damaging the forest’s remaining old growth.”

“The judge ordered the project be stopped and said these Forest Service lands have to be managed under federal environmental laws to protect native species just like all other national forests, Garrity said.

**Judge Halts Glacier Loon Timber Sale in Swan Valley**
Published in the *Flathead Beacon*, Sep 26, 2014
http://flatheadbeacon.com/2014/09/26/judge-halts-glacier-loon-timber-sale-swan-valley/

**Timber Harvest Opposing View** "Timber harvesting in British Columbia influences (a) forest hydrology; (b) fluvial geomorphology; (c) terrain stability; and (d) integrated watershed behavior. Impacts on forest hydrology are well understood and include increased average runoff, total water yield, increased storm runoff and advances in timing of floods. Stream channels and valley floors are impacted differently by fine sediment, coarse sediment and large woody debris transport. Terrain stability is influenced through gully and mass movement processes that are accelerated by timber harvesting. Impacts on integrated watershed behavior are assessed through disturbed sediment budgets and lake sediments."

**Assessment of the Geomorphic Impacts of Forestry in British Columbia**
By Olav Slaymaker Ph.D.
Published in *AMBIO*: A Journal of the Human Environment 29(7):381-387. 2000
http://www.bioone.org/doi/abs/10.1579/0044-7447-29.7.381

**Timber Harvest Opposing View** This link contains photos of logging around the world. Can you guess which 7 were taken of the after-effects of a timber sale in national forest land?

http://www.bing.com/images/search?q=logging+impact+on+environment&qpvt=logging+impact+on+environment

**Timber Harvest Opposing View** "After logging, peak pipeflow was about 3.7 times greater than before logging."

"The use of heavy logging equipment was expected to compact the soil, reduce infiltration rates, and increase surface runoff. In addition, heavy equipment might

collapse some of the subsurface pipes, increasing local pore water pressure and the chance of landslides (Sidle, 1986)."

**Effect of logging on subsurface pipeflow and erosion: coastal northern California, USA**
By Robert R. Ziemer Ph.D., **an employee of the** Pacific Southwest Research Station,,USDA Forest Service
Proceedings of the Chengdu Symposium, July 1992. *IAHS Publication*. *No. 209*, 1992
http://www.fs.fed.us/psw/publications/ziemer/Ziemer92.PDF

**Timber Harvest Opposing View** "This post-fire renewal, known as "complex early seral forest," or "snag forest," is quite simply some of the best wildlife habitat in forests, and is an essential stage of natural processes that eventually become old-growth forests over time. This unique habitat is not mimicked by clearcutting, as the legislation incorrectly suggests. Moreover, it is the least protected of all forest habitat types, and is often as rare, or rarer, than old-growth forest, due to extensive fire suppression and damaging forest management practices such as those encouraged by this legislation."

**Open Letter to U.S. Senators and President Obama from Scientists Concerned about Post-fire Logging and Clearcutting on National Forests.** September 2015
Signed by 266 Ph.D. scientists
http://johnmuirproject.org/wp-content/uploads/2015/09/Final2015ScientistLetterOpposingLoggingBills.pdf

**Timber Harvest Opposing View** "Recently, so called "salvage" logging has increased on national forests in response to a timber industry invented "forest health crisis" which points the finger at normal forest processes of fire, fungi, bacteria, insects and other diseases. In fact the crisis in the national forests is habitat destruction caused by too much clearcutting.

The real threat facing forests are excessive logging, clearcutting and roadbuilding that homogenize and destroy soil, watersheds and biodiversity of native forests."

**Statement at a Press Conference with Senator Robert Torricelli about S. 977 and HR 1376), the Act to Save America's Forests**

By Partridge, Arthur Ph.D., professor emeritus, University of Idaho
April 28, 1998, U.S. Capitol
http://www.saveamericasforests.org/news/ScientistsStatement.htm

**Timber Harvest Opposing View** "Extreme disturbances, such as wildfire or tractor logging, cause the loss of nutrients, mycorrhizae, and organic matter. These combined losses reduce long-term site productivity and may lead to sustained periods of extended erosion that could exacerbate degradation.

**The effects of forest management on erosion and soil productivity**
By W.J. Elliot; Page-Dumroese, D.; Robichaud, P.R. 1999.
Proceedings of the Symposium on Soil Quality and Erosion Interaction, Keystone, CO, July 7, 1996
Published by the USDA Forest Service Rocky Mountain Research Station
http://forest.moscowfsl.wsu.edu/cgi-bin/engr/library/searchpub.pl?pub=1999c

**Timber Harvest Opposing View** "The lawsuit raises concerns that land managers erred in their finding that the project will not hurt wildlife habitat – particularly that of lynx, bull trout and grizzly bears – and violated the National Environmental Policy Act by never completing an environmental impact statement. The groups have also filed separate legal notices of intent to challenge two similar thinning projects in the Flathead National Forest."

"The South Fork of the Flathead River is a protected wild and scenic river that is home to lynx, wolverine, grizzly bear, gray wolves, fisher and bull trout. The area was designated as critical habitat for lynx and bull trout and deemed essential the survival and recovery of grizzly bears in the Northern Rockies"

**Conservationists sue over timber sale on Flathead's South Fork**
By TRISTAN SCOTT of the *Missoulian*, Feb 29, 2012
http://missoulian.com/news/local/conservationists-sue-over-timber-sale-on-flathead-s-south-fork/article_c7b0e12e-6287-11e1-b6db-001871e3ce6c.html

**Timber Harvest Opposing View "**Indeed, the major justifications given for logging public lands is typically some social or ecological benefit—to reduce fires, clean up bug killed trees, fix watersheds, restore forest health or provide for "economic stability" to rural communities. In far too many cases, all of these are just cover to hide the main reason for logging—to maintain the local timber industry at the expense of our forest's ecological integrity and taxpayer dollars."

WUERTHNER, GEORGE, **Why are Conservation Groups Advocating Logging Public Forests**?
Published by *Counterpunch*, September 27, 2012
http://www.counterpunch.org/2012/09/27/why-are-conservation-groups-advocating-logging-public-forests/

**Timber Harvest Opposing View** "Deforestation is clearing Earth's forests on a massive scale, often resulting in damage to the quality of the land. Forests still cover about 30 percent of the world's land area, but swaths half the size of England are lost each year."

"Deforestation can have a negative impact on the environment. The most dramatic impact is a loss of habitat for millions of species. Eighty percent of Earth's land animals and plants live in forests, and many cannot survive the deforestation that destroys their homes."

**Deforestation**
Published by *National Geographic*, 2017
http://www.nationalgeographic.com/environment/global-warming/deforestation/

**Timber Harvest Opposing View "**It is impossible to overstate the importance of humankind's clearing of the forests. The transformation of forested lands by human actions represents one of the great forces in global environmental change and one of the great drivers of biodiversity loss. The impact of people has been and continues to be profound. Forests are cleared, degraded and fragmented by timber harvest, conversion to agriculture, road-building, human-caused fire, and in myriad other ways. The effort to use and subdue the forest has been a constant theme in the transformation of the earth, in many societies, in many lands, and at most times.  Deforestation has important implications for life on this planet."

**Global Deforestation**
Published by the University of Michigan
http://resilience.earth.lsa.umich.edu/units/deforestation/index.html

**Timber Harvest Opposing View "**Photosynthesis is one of only two significant mechanisms for removing carbon dioxide from the atmosphere (the other being dissolution into water, leading to destructive ocean acidification). Carbon dioxide is released when trees are cut down, and deforestation accounts for at least 15 percent of global carbon emissions. Thus, cutting down trees is a double-whammy because we not only lose carbon capture capacity, but we release more carbon, too."

**Trees Are Our Climate Saviors - So Stop Logging on Public Land**
*The Huffington Post,* 02/12/2014
http://www.huffingtonpost.com/ellen-moyer-phd/trees-are-our-climate-logging_b_4775894.html

**Timber Harvest Opposing View** "Logging activities have numerous impacts on aquatic systems in the Sierra Nevada. The end result of logged landscapes is a highly altered forest system which creates significant problems related to erosion, sedimentation and altered stream flow patterns. Logging removes large trees that normally fall into streams and provide shelter and thermal cover, raises water temperatures and pH, and degrades the chemical and ecological conditions and food webs that fish need to survive. Logging and the roads created to facilitate logging also significantly degrade stream ecosystems by introducing high volumes of sediment into streams, changing natural streamflow patterns, and altering stream channel morphology. Areas that have

been logged are far more likely to suffer from major landslides and erosion events which deposit abnormally high levels of sediment into area streams. Roads, ditches, and newly created gullies form new, large networks of flow paths across the landscape. These logged areas therefore, sustain much higher discharge volumes after a storm event than they ever did when the forest was intact."

**Logging Impacts**
Published by Sierra Forest Legacy, 2012
http://www.sierraforestlegacy.org/FC_FireForestEcology/FFE_LoggingImpacts.php

**Timber Harvest Opposing View**



**Forestry**
Photo: NOAA

"Natural resource use and extraction leading to habitat modification can have significant direct and indirect impacts to salmon populations. Land use activities associated with logging, road construction, urban development, mining, agriculture, and recreation have significantly altered fish habitat quantity and quality. Associated impacts of these activities include: alteration of streambanks and channel morphology; alteration of ambient stream water temperatures; degradation of water quality; reduction in available food supply; elimination of spawning and rearing habitat; fragmentation of available habitats; elimination of downstream recruitment of spawning gravels and large woody debris; removal of riparian vegetation resulting in increased stream bank erosion; and increased sedimentation input into spawning and rearing areas resulting in the loss of channel complexity, pool habitat, suitable gravel substrate, and large woody debris."

**Pacific Salmonids: Major Threats and Impacts**
Published by NOAA fisheries Office, May 15, 2014
http://www.agriculturedefensecoalition.org/sites/default/files/file/us_navy_new/271N_7_2014_NOAA_Pacific_Salmonids_Major_Threats_and_Impacts_Website.pdf

**Timber Harvest Opposing View "**Opponents of HR 1526, including Senate Democrats and the White House, are apprehensive about the bill's measures to decrease regulations on logging, while pointing out that the economic stimulation of logging would counteract the outdoor recreation industries that have flourished in these same regions. An integral part of the bill is a measure to decrease public input, environmental analysis, and federal regulation of timber harvesting projects, which opponents say decreases control over the timber industry and would lead to a resumption of rampant deforestation experienced in the early-to-mid twentieth century. While the logging industry could create more jobs and provide economic stimulation to rural counties, logging would damage the outdoor recreation industry that has flourished in communities adjacent to national parks and forest. Therefore, HR 1526 would essentially destroy one newly established industry in the hope of reinstating what many consider an antiquated industry."

**Logging in National Parks and Forests: A contentious Debate**
By Joseph Palmisano
Published by Law/Street, October 3, 2014
https://lawstreetmedia.com/issues/energy-and-environment/should-logging-be-encouraged-in-national-parks-and-forests-under-hr-1526/

**Timber Harvest Opposing View "Timber cutting damages fisheries.** In the Pacific Northwest 103 salmon species are already extinct and 214 native salmon stocks at risk of extinction. Research has consistently shown that clearcuts and logging roads have catastrophic consequences for our native fish populations."

**"Logging is linked to increased severity of forest fires.** A scientific study of the Sierra Nevada forests, commissioned and funded by Congress, found that "more than any other human activity, logging has increased the risk and severity of fires by removing the cooling shade of trees and leaving flammable debris." These logging-caused forest fires cost lives, as well as several hundred million dollars of taxpayer money each year in forest fire-fighting expenses."

**Legislation Would Ban Logging On Federal Lands**
By Mike Hudak
published in *EarthTimes*, March/April 1998, p. 2
http://www.mikehudak.com/Articles/BillWouldEndLogging9803.html

**Timber Harvest Opposing View "**Juneau, AK — Today, the U.S. Forest Service released its long-awaited proposal for amending the Tongass Land Management Plan and the results are disappointing. We will continue to work with the Obama administration to correct the pervasive mistakes in this plan.

Instead of making the promised rapid transition out of old-growth logging, the Forest Service's proposed plan perpetuates the conflict and controversy of clear-cutting Tongass old-growth forests for at least another 15 years and possibly much longer, destroying the very same forests that support our world-class fishing, hunting, tourism and recreation industries."

**Forest Service Plan Would Perpetuate Destruction of Tongass Old-Growth**
Published by Earth Justice, June 30, 2016
https://earthjustice.org/news/press/2016/forest-service-plan-would-perpetuate-destruction-of-tongass-old-growth

**Timber Harvest Opposing View "**Unfortunately, in this particular case we were forced to go to court to stop the Colt-Summit timber sale, which authorizes 2,038 acres of logging in bull trout, lynx and grizzly bear critical habitat and opens up 17 miles of new or previously closed roads to new noxious weed infestation for the very good reasons listed below."

"If this so-called "collaborative" proposal heeded existing science and followed federal law, the Alliance for the Wild Rockies wouldn't have a problem with it. Unfortunately, that's not the case. Simply put, the agency refuses to listen to well-documented and accurate evidence. Thus, we have asked the Federal District Court to stop this timber sale for the sake of taxpayers and the myriad of old growth dependent species that rely on unlogged national forests."

**'Collaborative' logging proposal destroys wildlife habitat**
Published by *Helena Independent Record*, March 6, 2012

http://helenair.com/news/opinion/collaborative-logging-proposal-destroys-wildlife-habitat/article_fce056bc-675b-11e1-862b-0019bb2963f4.html

---

**Timber Harvest Opposing View "**Losses due to logging damage can be either direct or indirect and are linked to the harvesting system and equipment utilized. It can be argued that the two key harvesting systems used in Ontario are clearcutting and selection/shelterwood cutting"

**Logging Damage**
Posted online by Lakeland University, January 08, 2001
http://flash.lakeheadu.ca/~carbon/Nlgdm.htm

---

**Timber Harvest Opposing View "**Unfortunately, rather than focusing on resources that help people get outdoors, the Forest Service is instead moving to dramatically increase the scale and pace of logging.

In March, the agency proposed intensive logging on 7,200 acres in the Redbird and London Districts, after approving over 2,000 acres of logging in the Stearns District last October. Thousands of acres are now planned for cutting on steep mountain slopes above streams that provide some of the last remaining habitat for both the federally threatened Kentucky arrow darter and endangered snuffbox mussel."

"The Forest Service also proposed amending the forest's management plan to loosen restrictions on logging that were meant to protect endangered Indiana bats — changes that the U.S. Fish and Wildlife Service said would likely "result in increased adverse effects" for Indiana bats and other protected species."

Returning to an emphasis on logging in the Daniel Boone National Forest poses a harmful distraction from other, more critical management needs, like the catastrophic loss of our eastern hemlock trees and the deterioration of recreational infrastructure. Our public lands are special, and ought to be a place where the natural splendor of the landscape can be preserved and sheltered from the economic prerogatives of extractive industries."

Protect Our National Forests From an Increase in Logging
By Jim Scheff
Published by *Counterpunch*, June 18, 2018
https://www.counterpunch.org/2018/06/18/protect-our-national-forests-from-an-increase-in-logging/

**Timber Harvest Opposing View** "America was once covered with one billion acres of towering primeval forests. These forests were teeming with plants and animals, a treasure-trove of evolutionary diversity and biological richness. Giant, centuries-old trees had trunks more than 15 feet wide and soared to the height of 30 story skyscrapers.

In the past 500 years, aggressive logging and development have destroyed over 95% of these original forests. The last remnants of America's virgin and natural forests, with their unique and irreplaceable life, reside mostly on our national forests. The 155 national forests cover a large portion of our country, an area about the size of California Oregon and Washington combined, and stretch from Alaska to Florida. Most states have at least one national forest.

Deforestation is occurring on a massive scale in our national forests and is clearly visible from space. Satellite photos show that the rate of clearcutting in places like the Olympic National Forest of Washington state equals or exceeds the destruction in the Brazilian rainforests. Clearcutting describes logging which cuts down all or most of the trees in a forest area, destroying the forest. A World Resources Institute report concluded that the last of the original forests in this country will be lost without immediate action."

**The Destruction of America's Last Wild Forests**
Published by Save America's Forests, 1998
http://www.saveamericasforests.org/resources/Destruction.htm

**Timber Harvest Opposing View** "The Grant Study was based on 40 years of data from the Willamette National forest, and found that clearcuts and logging roads

increased peak flows in mountain streams by 20% to 50% The effects diminish gradually, but were still apparent 25 years later. This study was completed BEFORE the recent floods and deals with more normal or average rainfall conditions. It has been extensively peer reviewed and has been termed by colleagues as very persuasive.

Shortly after the floods the Pacific Rivers Council contracted with Pacific Watershed Associations, a well-known and highly respected engineering firm, to do aerial overflight studies of damage watersheds on public lands, with some startling results . The damage was so extensive in many streams that it is likely a whole year class of salmon has been lost. Among those runs most affected are many so severely depressed that they qualify for listing under the endangered species act. The text of the Pacific Watersheds study is included below.

Two days after the flood waters receded, the Association of Forest Service Employees for Environmental Ethics (AFSEEE) also did an aerial assessment of its own (using well accepted observer protocols) of the Mapleton Ranger District, and found the f ollowing results:

- "A total of 185 landslides from the February 1996 storm were recorded. Of these, 114 were in-unit slides, 68 were road-related slides, and 3 were natural, in-forest slides."

- "On average, road-related slides appeared substantially larger than in-unit slides, which is also consistent with previous studies. Road-related slides also appeared to cause more damage to streams; several large debris torrents were triggered by road failures." “

**Streams, Landslides, Logging, Roads and Rain**
Published by Northwest Environment Watch, 1996
http://members.efn.org/~jpreed/landsl.html

---

**Timber Harvest Opposing View** “Prior to 1905, forests in the United States were rapidly liquidated into profit gained from "building the Nation." In the process, more and more land and species were disappearing from a landscape that once teamed with life and abundance. Teddy Roosevelt became increasingly concerned with conservation and used his authority to protect wildlife and public lands by creating the United States Forest Service (USFS).

The Forest Service was established as an entity with Gifford Pinchot serving as the first chief of the USFS in 1905 "with a sacred mission to provide wood to the world in order to avert the evils of a "timber famine." Pinchot was central in forming a forest policy and began what he called "the art of producing from the forest whatever it can yield for the service of man." From the beginning, the Forest Service viewed forests as banks the Nation could draw from to increase profit margins. The USFS has consistently, since its beginnings, made decisions based on getting the cut out and turning profits from the forest to the timber industry, stressing that timber needed to be extracted in a way that would prevent a timber famine to ensure the Nation would not bankrupt itself of valuable lumber."

"From the beginning, the Forest Service creates policies based on the idea that the main purpose of forests is to supply timber for the growing Nation while economically benefiting industry. The Service focuses on management to prevent a "timber famine" so those industries can always rely on forest products for their economic stability. This way of perceiving land has dramatically altered, eliminated and damaged the once-intact ecosystems that sustained an incomprehensible diversity of plant and animal species that are now extinct because of that mindset.

The profit-driven mentality causing this destruction is still alive and well within the Forest Service and Congress. Throughout the legislative history of the Forest Service, as is illustrated above, it is clear that budget drives the Forest Service and their policies. When the Forest Service is dependent upon the receipts it gets from timber sales and incentives the government gives the Service to increase logging, it will do what it needs to increase those sales. When environmental laws are passed in order to protect those ecologically significant forests, the industry and the service will do what is necessary to circumvent those laws in order to make a profit even though, in every single case, the government itself is out a huge amount of tax dollars to make those sales happen."

**Stop Thinning Forests**
http://stopthinningforests.org/forest-service-history.html

---

**Timber Harvest Opposing View "**Logging national forests is like grinding Mount Rushmore for gravel, or melting the Statue of Liberty for scrap iron," Tim Hermach says. "Yet the U.S. Forest Service is allowing big timber companies to raze our natural heritage for corporate profit."

"What the Forest Service is doing is taking a public resource and selling it off piece by piece to private timber companies. Of the 193 million acres that represent the U.S.

Forest System, half of it is available for logging, according to current management plans. And the Bush Administration and the U.S. Forest Service have been trying their best to get access to the other half. In 2002, Bush introduced the Healthy Forests Initiative, a forest management policy that gave timber companies greater access to our protected lands—under the guise of fire protection—while stripping away public input into the management process. In 2005, Bush repealed the Roadless Rule, a policy set in place by the Clinton Administration to curb road building and logging on our public lands. In that same year, the Forest Service adopted a management policy that excluded itself from certain aspects of the Endangered Species Act and the National Environmental Policy Act. It's a policy that could have increased logging on our national forests by 80%. The policy was struck down in federal court last year, but the Forest Service adopted a similar plan in the spring of this year. A coalition of conservation groups immediately filed lawsuits again."

**Logging vs. Recreation**
BY GRAHAM AVERILL
PUBLISHED BY BLUE RIDGE OURDOORS, 01 JUL 08
https://www.blueridgeoutdoors.com/magazine/july-2008/logging-vs-recreation/

---

**Timber Harvest Opposing View "**The logging program on America's national forests cannot be justified on economic grounds because it does more harm than good, two environmental groups said today. Their report, "The Economic Case Against National Forest Logging," argues that cutting down the national forests is a money losing proposition, and that standing trees provide ecosystem functions that are much more valuable than their wood alone."

"The 75 page report - the result of three years of research - analyzes the economic value of ecosystem services provided by standing forests, including flood control, water purification, pest control and pollination. These services, the report argues, contribute many times more economic value to rural communities than logging."

"Logging increases the wildfire risk, many ecologists believe. The Sierra Nevada Ecosystem Project's 1996 report notes that, "Timber harvest, through its effects on forest structure, local microclimate and fuels accumulation, has increased fire severity more than any other recent human activity." In 1994, the Forest Service spent almost $1 billion for fire management on national forest lands."

"A common sense alternative is to protect America's national forests from commercial logging by reinvesting the logging subsidies into economically viable programs,"

Representative McKinney said. "Rather than spending taxpayer dollars to degrade our national heritage, we should invest in programs for ecological restoration, adequate school funding, alternative fiber research, vocational training and community economic development." "

**National Forest Logging Costs Outweigh Benefits**
Published by the Environmental News Service, March 13, 2000
http://www.ens-newswire.com/ens/mar2000/2000-03-13-06.html

**Timber Harvest Opposing View "**Forest harvesting can lead to higher levels of sediment in nearby waterbodies. Removal of vegetation can leave the land exposed to erosion by wind or water; for example, without the interception of raindrops by vegetation, the impact of the water on exposed soils can dislodge soil particles that can then be carried into streams by surface runoff. Stream sediment concentrations can also increase if equipment is operated in or driven through a stream, or if the stability of streambanks is reduced by harvesting trees in the riparian zone. Whether carried into the water from the land or disturbed in-stream, higher sediment levels have negative effects on aquatic habitat (AARD 2006)."

**Potential Effects of Forestry on Aquatic Ecosystems**
Published by Regional Aquatics Monitoring Program
http://www.ramp-alberta.org/resources/forestry/potential+effects.aspx

**Timber Harvest Opposing View "**Logging operations are among the biggest sources of water pollution in the country after agriculture. And both Ag and Big Timber have friends in high places that have continued to make regulation of these pollution sources unaccountable to the public and consumers.

In arguing against limitations on such pollution, Ag and Timber, both suggest that internalizing these costs would drive up the price of food and lumber. No doubt they are correct. However, shouldn't those enjoying the benefit of these products be paying the "real" costs to produce them?

What is happening now is that these industries are externalizing their costs. They are making other people, and the land, suffer the negative impacts of their operations. They get to keep the profits, while the rest of us pick up the tab."

**Logging pollution and Clean Water Act**
By George Wuerthner
Published by the Wildlife News, May 21, 2013
http://www.thewildlifenews.com/2013/03/21/logging-pollution-and-clean-water-act/

---

**Timber Harvest Opposing View "**But the main threat to wildlife in the mountains hasn't been crowds of weekend gawkers. It's tended to be smaller groups, mostly riding bull-dozers and packing chainsaws. The logging industry has left its deadly mark on local wildlife habitat. Far too many river valleys in southwest mainland BC have had a logging road punched to the back of the watershed, with its forest cloak ripped to tatters by clearcut logging."

**Logging Creates Habitat Destruction and Endangered Species**
By Joy Foy
Published in the *Sentinel*, September 1, 2012
https://watershedsentinel.ca/articles/logging-creates-habitat-destruction-and-endangered-species/

---

**Timber Harvest Opposing View "**Habitat can be destroyed directly by many human activities, most of which involve the clearing of land for uses such as agriculture, mining, logging, hydroelectric dams, and urbanization. Although much habitat destruction can be attributed to human activity, it is not an exclusively man-made phenomenon. Habitat loss also occurs as a result of natural events such as floods, volcanic eruptions, earthquakes, and climate fluctuations."

**Habitat Loss, Fragmentation, and Destruction**
By Laura Klappenbach
Published by *ThoughtCo*, May 2, 2018
https://www.thoughtco.com/habitat-loss-fragmentation-and-destruction-130129

**Timber Harvest Opposing View "**Forests are vital for the health and well-being of humans, wildlife, and the Earth. They provide habitat for about two-thirds of all land-dwelling animals and plants. Around the world, these critical ecosystems are being ripped apart as a result of a booming demand for furniture, flooring, lumber, and other building materials. Trees are used to make paper, packaging materials, pencils, fuel for cooking and heat, and other wood-based products. In addition to wood products, logging is also occurring at an alarming rate to make room for animal agriculture and subsistence farming, oil and gas extraction, mining operations, and ever-increasing development. The world's natural forests cannot sustain the increasing global demands of current forest management practices.

Years of irresponsible exploitation have destroyed and degraded much of the planet's forests. Half of the Earth's global forest land has already been lost. In the United States, 90 percent of continental indigenous forests have been removed. Around the world, 15 billion trees are being cut down each year. The destruction of important wildlands is displacing communities, endangering habitats of rare and endangered plants and animals, and negatively affecting the environment. Most of the world's remaining indigenous forests are located in Canada, Alaska, Russia and the Northwestern Amazon basin. We must protect what is left before it is too late."

**LOGGING: CUTTING DOWN WILDLIFE HABITATS**
Published by World Animal Foundation, 2018
http://www.worldanimalfoundation.org/articles/article/8949999/186689.htm

**Timber Harvest Opposing View "Habitat destruction** is the process by which natural habitat is rendered incapable of supporting its native species. In this process, the organisms that previously used the site are displaced or destroyed, reducing biodiversity.[1] Habitat destruction by human activity is mainly for the purpose of harvesting natural resources for industrial production and urbanization. Clearing habitats for agriculture is the principal cause of habitat destruction. Other important causes of habitat destruction include mining, logging, trawling, and urban sprawl. Habitat destruction is currently ranked as the primary cause of species extinction

worldwide.[2] It is a process of natural environmental change that may be caused by habitat fragmentation, geological processes, climate change[1] or by human activities such as the introduction of invasive species, ecosystem nutrient depletion, and other human activities."

**Habitat destruction**
The Wikipedia definition
https://en.wikipedia.org/wiki/Habitat_destruction

**Timber Harvest Opposing View** "According to the WWF, trees can essentially act as anchors for soil. Removing those anchors can make the soil more vulnerable to erosion. Raines also points out that removing trees during clear cutting can also take away the bacteria, worms, and fungi that maintain and treat the forest soil, and removing these organisms may also put other forest plants at an increased risk of illnesses. The degradation of soil is one of the most pressing environmental issues facing society at present, and clear cutting only contributes to it."

**Effects of Clear Cutting**
By Megan Stubblefield
Published by
https://greenliving.lovetoknow.com/environmental-issues/effects-clear-cutting

**Timber Harvest Opposing View** "Natural forests are now recognized as dynamic places, subject to natural changes that affect the quantity and quality of available habitat. However, logging has resulted in disturbance on a scale unlike any caused by natural forces. At some time in the last 500 years, 95 percent of all U.S. forests were cut, leaving few old-growth timber stands. Over the last century, much of the North American forests have regrown or been replanted, increasing to 4.6 million km2 in Canada and U.S. (13 percent of the world's forest area)."

**Finding Solutions to Habitat Loss**
Published by Partners in Flight, January 2002
http://eeinwisconsin.org/content/eewi/101706/HabitatLossSolutions.pdf

**Timber Harvest Opposing View** "Today, the loss and degradation of natural habitats can be likened to a war of attrition. Many natural ecosystems are being progressively razed, bulldozed, and felled by axes or chainsaws, until only small scraps of their original extent survive. Forests have been hit especially hard: the global area of forests has been reduced by roughly half over the past three centuries. Twenty-five nations have lost virtually all of their forest cover, and another 29 more than nine-tenths of their forest (MEA 2005). Tropical forests are disappearing at up to 130 000 km2 a year (Figure 4.1)—roughly 50 football fields a minute."

**Habitat destruction: death by a thousand cuts**
By William F. Laurance
Published by *Conservation Biology*, 2010
https://conbio.org/images/content_publications/Chapter4.pdf

**Timber Harvest Opposing View** "Vegetation removal and logging destroy the structure of the habitat since it takes away the vital materials and natural systems responsible for replenishing and purifying the habitat. Removal of vegetation cover and logging also creates room for soil erosion and decrease stormwater infiltration which leads to the degradation of water quality, further destroying the habitat."

**What is a Habitat?**
Published on *Earth Eclipse*, 2018
https://www.eartheclipse.com/ecosystem/reasons-for-habitat-loss-and-destruction.html

**Timber Harvest Opposing View** "Years of irresponsible exploitation have destroyed and degraded much of the planet's forests. Half of the Earth's global forest land has already been lost. In the United States, 90 percent of continental indigenous forests

have been removed. Around the world, 15 billion trees are being cut down each year. The destruction of important wildlands is displacing communities, endangering habitats of rare and endangered plants and animals, and negatively affecting the environment. Most of the world's remaining indigenous forests are located in Canada, Alaska, Russia and the Northwestern Amazon basin. We must protect what is left before it is too late."

**LOGGING: CUTTING DOWN WILDLIFE HABITATS**
Published by World Animal Foundarion, 2012
https://www.worldanimalfoundation.org/articles/article/8949999/186689.htm

---

**Timber Harvest Opposing View "**In a logging operation the removal of vegetation allows an increase in rainfall volumes and the force of raindrops reaching the ground, and thus a greater mobilisation of soil particles can occur. Movement of machinery and dragging of logs causes an increase in compacted areas of soil surface and removal of topsoil, thereby reducing the permeability of the soil and increasing runoff, as well as causing channelling and creating loose soil for easy movement. In the short term the removal of the canopy also decreases transpiration, allowing water tables to rise and the soil to become saturated sooner and begin generating overland flow, particularly nearer streams."

"The increased runoff also acts to increase the erosive force as doubling the depth of overland flow increases the velocity four times, resulting in the movement of particles 4096 times larger than before and an increase of 1024 times in the total mass able to be carried."

**Logging impacts on streams**
Prepared by: Dailan Pugh, 2014
https://d3n8a8pro7vhmx.cloudfront.net/ncec/pages/66/attachments/original/1422834052/NEFA_Logging_Impacts_On_Streams.pdf?1422834052

---

**Timber Harvest Opposing View "**A meta-analysis of 24 studies in North America found that shelterwood harvesting was the only partial harvest method that resulted in smaller reductions in salamander populations than clear-cutting; no method of logging matched unharvested forest controls. Given these results from peer-reviewed research,

substantive portions of the Indiana state forests should be spared from timber harvesting altogether in order to maintain healthy populations of amphibians on the state's public lands."

**The Impact of Logging on Amphibians**
By Robert Brodman Ph.D., a Professor of Biology and Environmental Science, and Chair of the Biology Department at Saint Joseph's College in Indiana, where he teaches a variety of Biology, Zoology, and Ecology classes, and directs undergraduate students in amphibian population research, 2014
https://indianaforestalliance.org/wp-content/uploads/2016/06/Amphibians_DrRobertBrodman_Autumn2014.pdf

**Timber Harvest Opposing View "**The letter authors "do not believe it is scientifically honest or transparent to say that the 10-year timber plan is 'beneficial to wildlife'"—especially on wildlife management areas, they write.

Some area wildlife managers worry species that depend on older forests are at greatest risk of losing their habitats.

"There are many wildlife species that depend on these forests —everything from deer and grouse to woodpeckers and owls," said one area wildlife manager who wasn't allowed to speak publicly on the analysis. "We're concerned what impacts this increased harvest level is going to have on those species."

DNR leadership denies the claims and stands behind its sustainable timber harvest analysis, or STHA."

**DNR staff: Agency leaders disregarding wildlife concerns in timber harvest plan**
By Cody Nelson,
Featured on Minnesota Public Radio news, August 2019
https://www.mprnews.org/story/2019/08/15/dnr-staff-agency-leaders-disregarding-wildlife-concerns-in-timber-harvest-plan

**Timber Harvest Opposing View "**Logging is a controversial due to its environmental and aesthetic impacts.

Logging impacts the environment in two ways, the timber harvest itself, that is, the removal of trees from the forest, and secondly by the disturbance caused by logging operations.

Removal of trees alters species composition, the structure of the forest, and can cause nutrient depletion.

Harvesting also can lead to habitat loss, prominently in high-value, ecologically sensitive lands.

Loss of trees adjacent to streams can increase water temperatures.

Harvesting adjacent to streams can increase sedimentation and turbidity in streams, lowering water quality and degrading riparian habitat."

**Logging is the process in which trees are felled (cut down) usually as part of a timber harvest.**
Published by *Science Daily*, 2019
https://www.sciencedaily.com/terms/logging.htm

---

**Timber Harvest Opposing View "**In a new report released today, the Center for Sustainable Economy has documented taxpayer losses of nearly $2 billion a year associated with the federal logging program carried out on national forest and Bureau of Land Management lands."

According to Dr. John Talberth, Senior Economist from the Center for Sustainable Economy, "Federal forests represent the last remaining islands in a sea of forestlands degraded by industrial logging activities on state and privately owned lands. Our federal forests are far more valuable as carbon sinks, recreation destinations, wildlife habitat and natural water filters than they are for timber production. As such, the economic damage from these logging subsidies is twofold: taxpayers lose money and local economies lose opportunities to diversify and use the land for much more valuable purposes."

**Destructive federal timber sale program loses nearly $2 billion a year**
By John Talberth Ph.D.
Published by the Center for Sustainable Economy, May 2019

https://sustainable-economy.org/destructive-federal-timber-sale-program-loses-nearly-2-billion-a-year/

**Timber Harvest Opposing View "**A new study by researchers based at Oregon State University and the University of Idaho corroborates Center for Sustainable Economy's 2015 and 2017 research demonstrating that logging is by far the number one source of greenhouse gas emissions in Oregon and that changes in greenhouse gas accounting rules are urgently needed to ensure that the climate impacts of logging are accurately reported. Both the new OSU study and CSE's 2017 research estimate annual logging-related emissions to have averaged over 33 million metric tons carbon dioxide equivalent per year (Mmt CO2-e/yr) since 2000. This makes logging by far the largest source of emissions in the state, far larger than the 23 Mmt CO2-e/yr attributed to transportation – the leading source presently accounted for by the Oregon Global Warming Commission (OGWC) and the State's Department of Energy.

"But regardless of carbon flux across the landscape, logging-related emissions are substantial and must be part of annual emissions reporting so that appropriate policy interventions can be designed to ramp such emissions down on par with other sectors being considered for regulation. As noted in the OSU study, "transparent quantification of emissions from the wood product process can ensure realistic reductions in forest sector emissions." "

**OSU Research Confirms that Big Timber is Oregon's Leading Source of GHG Emissions**
By Dr. John Talberth
Published by the Center For Sustainable Economy, April 30, 2018
https://sustainable-economy.org/osu-research-confirms-big-timber-leading-source-greenhouse-gas-emissions-oregon/

**Timber Harvest Opposing View "**A new DNR plan calls for wildlife management areas to produce 12 percent of a new quota of 870,000 cords of wood logged each year off state land. The new quota was first announced by the DNR in March 2018 following a year of scientific modeling of state-owned forested land and with input from both environmental groups and industry officials.

But the DNR's own wildlife experts now say that 12 percent is too much, and they say the agency is favoring the timber industry over wildlife and the people who frequent wildlife management areas to hunt, hike or bird watch.

DNR officials ordered the wildlife managers not to talk to the media about the issue. But in a letter to DNR Commissioner Sarah Strommen, signed by 28 wildlife managers and obtained by the News Tribune's parent company Forum Communications, the concerns are clearly stated: While logging and young forests are good for some species at some times of year — deer, grouse and bear all favor young aspen, for example — the same species also need bigger, older trees in winter."

**Rift within DNR over logging in state wildlife areas**
By: John Myers
Published by the *Duluth News Tribune*, August 12, 2019
https://www.duluthnewstribune.com/news/4608199-Rift-within-DNR-over-logging-in-state-wildlife-areas

# Here is a summary of the plunder:

1) Log landings, skid trails and skyline chutes are sources of sediment during precipitation events that end up in streams which harms aquatic resources.

2) Logging removes dead and dying material from the site and inhibits the recruitment of downed woody material that replaces and maintains the organic material in the soil critical to future soil productivity of the forest. Logging reduces the organic parent material (duff and woody residues) available for soil-formation processes.

3) Removal of dead and dying trees eliminates habitat required by bird species that feed on insects that attack living trees, with the result that outbreaks of pests may increase in size or frequency (Torgersen et al. 1990)

4) Logging equipment compacts soils. This causes overland flow of water that picks up sediment which end up in live water and reduces subsurface water flow.

5) Logged areas are more susceptible to the outbreak of pests (*Schowalter and Means*, 1989; *Franklin, Perry, Schowalter, Harmon, McKee and Spies*, 1989).

6) Logging adversely affects hydrologic processes by reducing canopy interception and evapotranspiration.

7) Logging decreases hydraulic conductivity and increases bulk density in forest soils after harvest.

8) Logging increases water temperature. Most aquatic species are dependent on cold water.

9) Logging disrupts the dead material on the forest floor that harbors a myriad of micro-organisms, from bacteria and actinomycetes to higher fungi.

10) Logging collapses some of the subsurface pipes, increasing local pore water pressure and the chance of landslides (Sidle, 1986).

11) Logging harms visual quality.

12) Forests are natural carbon sinks. Carbon sinks absorb carbon dioxide to thereby reduce the concentration of greenhouse gases that exacerbate climate change. Logging removes the carbon sinks.

# Opposing Scientific Views Attachment #11

**Caring USFS Officials should Always take the most effective action available to reduce the risk of homes burning and loss of life should a wildfire start near homes located in the WUI.**

**Not including actions that would implement Dr. Cohen's fine fuels removal methods discussed below in the Proposed Action indicates the responsible USFS official is not interested in saving lives and homes.**

**The USFS has had 18 years to adopt this science developed by one of their own employees.**

**Still you ignore it.**

## Dr. Cohen's background

Dr. Jack Cohen is a research fire physicist who did his research in the Forest Service's Missoula Fire Sciences Laboratory at the Rocky Mountain Research Station. Dr. Cohen was a Forest Service employee. His research findings clearly show that commercial logging to reduce fuels will not adequately protect homes from wildfire damage in the Wildland Urban Interface (WUI) by itself.

Dr. Cohen's research findings represent best science. Numerous unbiased studies present empirical evidence that shows his fire damage risk reduction methods that remove the fine fuels near the WUI are effective.

# The Following Quotes Represent WUI Home Loss Risk Reduction Best Science. Text Highlighted in RED is Especially Pertinent to the WUI near this Timber Sale.

***Fact Sheet:* Understanding Fire and Fire Behavior**
Fact sheet provided by the Ecological Restoration Institute, Northern Arizona University, 2003
http://www.emifpa.org/PDF/FactSheetUnderstandingFire.pdf

Excerpt:

> "Homeowners are their own first line of defense. Saving a home from wildfire depends primarily on two factors: roofing material and the quality of the "defensible space" surrounding it.[8] Research Physical Scientist Jack Cohen noted after visiting homes that survived the Rodeo-Chediski Fire and those that were consumed, that had homeowners followed guidelines for creating defensible space—described as creating an area around a structure where fuels and vegetation are treated, cleared, or reduced to slow the spread of fire—more homes would have survived."

---

**Congressional testimony before the U.S. House of Representatives Natural Resources Committee, Subcommittee on Oversight and Investigations, September 27, 2017**
Oversight Hearing "Exploring Solutions to Reduce Risks of Catastrophic Wildfire and Improve Resilience of National Forests"
Testimony of Dr. Dominick A. DellaSala, Chief Scientist, Geos Institute, Ashland Oregon
https://naturalresources.house.gov/calendar/eventsingle.aspx?EventID=402870

Excerpt:

> "Thus, given expansion of homes in the WUI, the best way to limit damage to homes is to reduce fire risks by working from the home-outward instead of the wildlands-inward (Syphard et al. 2013). For instance, if a fire-brand travels miles ahead and lands on a flammable roof that home is very likely to burn compared to a home that has a fire resistant roof and cleared vegetation within a narrow defensible space of 100-200 feet immediately surrounding the home (Cohen 2000). Logging outside of this narrow zone does not change home ignition factors."

---

**Objectives and considerations for wildland fuel treatment in forested ecosystems of the interior western United States**
By Elizabeth D. Reinhardt, Dr. Robert E. Keane, David E. Calkin, and Dr. Jack D. Cohen (all USFS research scientists)
Published in *Forest Ecology And Management*, 2008
https://www.fs.fed.us/rm/pubs_other/rmrs_2008_reinhardt_e001.pdf

Excerpts:

> "Many scientists and natural resource agencies suggest extensive fuel treatments to reduce the possibility of severe and intense wildfires that could damage ecosystems, destroy property, and take human life (USDA Forest Service, 2000; GAO, 2003a,b). However, there are a number of misconceptions and misunderstandings about fuel treatments and their use as a panacea for fire hazard reduction across the United States (Finney and Cohen, 2003; Franklin and Agee, 2003)." (Pg.1998)

> "Given the right conditions, wildlands will inevitably burn. It is a misconception to think that treating fuels can ''fire-proof'' important areas. It would be virtually impossible to exclude fire from most temperate terrestrial ecosystems because ignition sources are prevalent and fuels cannot be eliminated. Ignition is rarely affected by fuel treatment." (Pg.1998)

> "Treating fuels to facilitate suppression is an example in circular logic. If fuel treatment makes suppression more successful in general, then less area will be burned in the short run and more acreage will tend to burn under extreme conditions, when suppression is ineffective. The inevitable result is that more area is burned in fewer, more unmanageable events with greater consequences. In addition, fire suppression leads to continued fuel accumulation and, in turn, more difficult conditions for suppression. This phenomenon has been described as ''the wildland fire paradox'' (Brown and Arno, 1991). Rather than creating conditions where fire is easier to suppress, fuel treatments should strive to create conditions where fire can occur without the need for suppression." (Pg.1998)

> "Bessie and Johnson (1995) show weather (fuel moisture and wind) is far more important than fuels in determining fire behavior; reducing fuels may have a limited impact on fire occurrence." (Pg.1999)

> "Treating fuels to reduce fire occurrence, fire size, or amount of burned area is ultimately both futile and counter-productive." (Pg.1999)

> "It may not be necessary or effective to treat fuels in adjacent areas in order to suppress fires before they reach homes; rather, it is the treatment of the fuels immediately proximate to the residences, and the degree to which the residential structures themselves can ignite that determine if the residences are vulnerable." (Pg.1999)

> "Research has shown that a home's characteristics and its immediate surroundings principally determine the WUI ignition potential during extreme wildfire behavior (Cohen, 2000a,c, 2003, 2004). The area that primarily determines WUI ignition potential is called the home ignition zone (Cohen, 2001). WUI fuel treatments can address the home

ignition zone by removing flammable materials immediately adjacent to residences." )Pg. 1999)

"Thinning to reduce crown fire potential requires careful evaluation of the tradeoffs in treatment effects on potential surface fire behavior and crown fire behavior (Scott and Reinhardt, 2001). Thinning will often result in increased potential surface fire behavior, for several reasons. First, thinning reduces the moderating effects of the canopy on windspeed, so surface windspeed will increase (Graham et al., 2004). It also results in increased solar radiation on the forest floor, causing drier surface fuels. It may also cause an increase in flammable grassy and shrub fuels over time, due to the reduced tree competition." (Pg.2000)

"Some viable fuel treatments may actually result in an increased rate of spread under many conditions (Lertzman et al., 1998; Agee et al., 2000). For example, thinning to reduce crown fire potential can result in surface litter becoming drier and more exposed to wind. It can also result in increased growth of grasses and understory shrubs which can foster a rapidly moving surface fire." (Pg.2000)

"Treating fuels may not improve ecosystem health. Ecosystem restoration treatment and fuel treatment are not synonymous. Some ecosystem restoration treatments reduce fuel hazard, but not all fuel treatments restore ecosystems. Ecosystem restoration treatments are often designed to recreate presettlement fire regimes, stand structures and species compositions while fuel treatment objectives are primarily to reduce fuels to lessen fire behavior or severity—this is known as ''hazard Reduction.'' Achieving fuel hazard reduction goals in the absence of ecosystem restoration is insufficient (Dombeck et al., 2004; Kauffman, 2004)." (Pg.2000)

"Conversely, some fuel treatments can reduce fuels but create stands that are quite dissimilar from their historical analogs. Examples include mastication treatments that break, chip, or grind canopy and surface woody material into a compressed fuelbed and thinning treatments that remove the fire adapted species and leave shade-tolerant, late successional species." (Pg.2000)

---

**Wildland-Urban Fire—A different approach**
By Dr. Jack Cohen
Published by *Biomass Monitor*, September 20, 2013
https://thebiomassmonitor.org/2013/09/20/wildland-urban-fire-a-different-approach/

Excerpts:

"Recent research indicates that the potential for home ignitions during wildfires including those of high intensity principally depends on a home's fuel characteristics and the heat sources within 100-200 feet adjacent to a home (Cohen 1995; Cohen 2000; Cohen and Butler 1998). This relatively limited area that determines home ignition potential can be called the home ignition zone."

> "Given that fires adjacent to a home do not ignite it, firebrands can only ignite a home through contact. Thus, the home ignition zone becomes the focus for activities to reduce potential wildland-urban fire destruction. This has implications for reducing home ignition potential before a wildfire as well as implications for emergency wildland-urban fire response strategy and tactics."
>
> "Wildland fire will always occur in forest and rangeland fire environments and will thus have an impact on people, property and resources. We may have some choice of when and where we have wildland fire, but we do not have the choice of not having wildland fire occurrence. Thus, it is not reasonable to form agency and public expectations for the nonoccurrence of wildland fires, including wildland fires encroaching on communities."
>
> "Agencies need to recognize that wildland-urban fire strategy and tactics are fundamentally different from their traditional tasks. The principal efforts for reducing ignitions focus on the home ignition zone before the wildfire occurrence. Since homeowners largely own the home ignition zone, agencies must function as partners and facilitators for implementing wildland-urban mitigations."

---

**Everything you wanted to know about wildland forest fires but were afraid to ask**
Published by the Wild Nature Institute, April 9, 2018
https://phys.org/news/2018-04-wildland-forest.html

Excerpts:

> "According to the (Sierra Nevada, Klamath-Siskiyou), time since fire is not associated with increasing fire risks due to fuel build-up—actually the opposite is true because as these forests mature, they become less flammable. At regional scales, active management (unspecified forms of logging) has been associated with higher levels of high-severity fires, indicating logging tends to heighten fire risk. Most importantly, thinning efficacy is limited under extreme fire weather, the principal factor governing large fires."
>
> "Dr. Timothy Ingalsbee, Director of Fire Fighters United for Safety, Ethics, and Ecology and a co-author of the report said, "Weather-driven wildland fires, the main factor in the largest wildfires, cannot be stopped until the weather changes, yet they incur excessive costs and firefighter risks during ineffective fire suppression. Funding for widespread thinning and suppression would be better spent helping communities prepare for fire via defensible space." "

---

**Reducing the Wildland Fire Threat to Homes: Where and How Much?**
By Dr. Jack Cohen

Presented as the Fire Economics Symposium in San Diego, California on April 12, 1999.
http://www.fs.fed.us/rm/pubs_other/rmrs_1999_cohen_j001.pdf

Excerpts:

> "As stated, the evidence indicates that home ignitions depend on the home materials and design and only those flammables within a few tens of meters of the home (home ignitability). The wildland fuel characteristics beyond the home site have little if any significance to WUI home fire losses." (Pg. 5)
>
> "A senior physicist at the Stanford Research Institute, C.P. Butler (1974), coined the term "urban-wildland interface" and described this fire problem as follows:
>
> > "In its simplest terms, the fire interface is any point where the fuel feeding a wildfire changes from natural (wildland) fuel to man-made (urban) fuel." (Pg. 1)
>
> "The results of the diverse analytical methods are congruent and consistently indicate that ignitions from flames occur over relatively short distances--tens of meters not hundreds of meters. The severe-case estimate of SIAM indicates distances of 40 meters or less. Experimental wood walls did not ignite at 10 meters when exposed to experimental crown fires. And, case studies found that vegetation clearance of at least 10 meters was associated with a high occurrence of home survival." (Pg. 4)
>
> "Analyses of southern California home losses done by the Stanford Research Institute for the 1961 Belair-Brentwood Fire (Howard and others 1973) and by the University of California, Berkeley, for the 1990 Painted Cave Fire (Foote and Gilless 1996) are consistent with SIAM estimates and the experimental crown fire data. Given nonflammable roofs, Stanford Research Institute (Howard and others 1973) found a 95 percent survival with a clearance of 10 to 18 meters and Foote and Gilless (1996) at Berkeley, found 86 percent home survival with a clearance of 10 meters or more." (Pgs. 3 and 4)
>
> "Extensive wildland vegetation management does not effectively change home ignitability." (Pg. 5)
>
> "Home ignitability also dictates that effective mitigating actions focus on the home and its immediate surroundings rather than on extensive wildland fuel management. " (Pg. 5)

---

**Structure Ignition Assessment can Help Reduce Fire Damages in the WUI**
By Dr. Jack Cohen
Published in *Fire Management Notes*, Volume 57 No. 4, 1997
http://www.fs.fed.us/rm/pubs_other/rmrs_1997_cohen_j001.pdf

Excerpts:

> "Vegetation management beyond the structure's immediate vicinity has little effect on structure ignitions. That is, vegetation management adjacent to the structure would prevent ignitions from flame exposure; but vegetation management away from the structure would not affect ignition from flame exposure and would not significantly reduce ignitions from firebrands." (Pg. 4)
>
> "Past reports and recommendations as well as experimental research and modeling suggest that W-UI fire-loss mitigation should concentrate on the residence and its immediate surroundings. Any strategy for effectively reducing the W-UI fire problem must initially focus on residential fire resistance." (Pg. 5 – Conclusion)

---

**Examination of the Home Destruction in Los Alamos Associated with the Cerro Grande Fire July 10, 2000**
By Dr. Jack Cohen
Source: USDA Forest Service, Rocky Mountain Research Station, Missoula, Montana, 2000.
http://www.fusee.org/docs/Preparedness/Cohen_examlosalamos%20copy.pdf

Excerpt:

> "My examination suggests that the abundance and ubiquity of pine needles, dead leaves, cured vegetation, flammable shrubs, wood piles, etc. adjacent to, touching and or covering the homes principally contributed to the residential losses." (Pg. 4)

---

**Commercial Logging Causes Forest Fires**
By Glen Barry, Ph.D. President Forests.org, Inc.
Published in *FOREST CONSERVATION NEWS TODAY*, July 20, 2002
http://wgbis.ces.iisc.ernet.in/envis/doc1999ahtml/biodcomi220928.html

Excerpts:

> "It is well known scientifically that "commercial logging actually increases fire severity by removing large, fire- resistant trees and leaving behind very small trees and flammable "slash debris"--branches, twigs and needles from felled trees. The removal of mature trees also decreases the forest canopy, creating hotter, drier conditions on the ground. The additional sun exposure encourages the growth of flammable brush and weeds. Reduction of flammable underbrush can reduce fire severity, and environmental groups have encouraged such projects."

> "The Forest Service, Bush administration and anti-environmental members of Congress are spreading a great deal of misinformation about wildfire, hoping to capitalize on public fire hysteria and minimize public opposition to increased logging and roadbuilding in our national forests," said Jake Kreilick of the National Forest Protection Alliance based in Missoula, Montana. "With virtually all new timber sales couched in terms of 'reducing fuels' or 'restoring forest health,' fire hysteria has emerged as the driving force behind the Forest Service's logging program and the administration's efforts to 'streamline' our nation's environmental laws," Kreilick said."

---

**Saving Homes from Wildfires: Regulating the Home Ignition Zone**
By Jack Cohen, Nan Johnson, and Lincoln Walther, AICP
Published in *Zoning News,* May 2001
http://idahofirewise.org/assets/library/Fire%20Code/Idaho%20Codes%20and%20Ordinances/zoning%20news%20cohen.pdf

Excerpt:

> "A home with its immediate surroundings (about 100-150 feet from the structure) is called the Home Ignition Zone. Many factors about the HIZ determine the potential for ignition during a wildland fire, such as flammable wood roofs and materials like trees, grass, decks, or adjacent structures leading up to a home." (Pg. 1)

---

**COMMERCIAL LOGGING CAUSED WILDFIRES:Bush & Repub. Party "con job&quot**
Published by Portland Independent Media Center, August 23, 2002
http://portland.indymedia.org/en/2002/08/17464.shtml

Excerpts:

> "The biggest ecological con job in years is being waged by the U.S. Republican party and their timber industry cronies. They are blaming the recent Western wildfires on environmentalists, and assuring the public that commercial logging will reduce the risk of catastrophic wildfires."
>
> "Below are three excellent rebuttals of these lies, which I will quote from and paraphrase here. "Scores of scientists and the federal government's own national fire plan have concluded that the removal of mature trees from forests increases the severity of forest fires. Why then would the Bush administration use the threat of fires to try to increase logging of mature and old-growth trees in our national forests?"

**What is the wildland fire threat to homes?**
By Dr. Jack Cohen
Thompson Memorial Lecture, School of Forestry, Northern Arizona University, Flagstaff, AZ, 10 April 2000. 13 p.
http://idahofirewise.org/assets/library/Science%20of%20Fire/Scientific%20Findings/wildland%20fire%20threat%20cohen.PDF

Excerpts:

> "SIAM calculations indicate that large wildland flame fronts (e.g., forest crown fires) will not result in piloted wood ignitions (e.g., the typical variety of exterior wood walls) at distances greater than 40 meters (Cohen and Butler [In press])." (Pg. 4)

> "Case studies of actual W-UI fires provide an independent comparison with SIAM and the crown fire experiments. The actual fires incorporate a wide range of fire exposures. The case studies chosen examine significant factors related to home survival for two fires that destroyed hundreds of homes. The Bel Air fire resulted in 484 homes destroyed (Howard et al. 1973) and the Painted Cave fire destroyed 479 homes (Foote 1994). Analyses of both fires indicate that home ignitions depend on the characteristics of a home and its immediate surroundings. Howard et al. (1973) observed 95 percent survival for homes with nonflammable roofs and a vegetation clearance of 10 to 18 meters. Foote (1994) observed 86 percent survival for homes with nonflammable roofs and a clearance of 10 meters or more." (Pg. 7)

> "The high survival rate for homes with nonflammable roofs and 10-20 meter vegetation clearances included firebrands as an ignition factor, thus indicating that firebrand ignitions also depend on the ignition characteristics of the home and the adjacent flammable materials." (Pg. 8)

> "Wildland fuel reduction beyond the home ignition zone does not necessarily change home ignitability; therefore, wildland fuel reduction does not necessarily mitigate the W-UI fire loss problem." (Pg. 9)

> "Effective landscape fuel reduction does not necessarily prevent W-UI home fire destruction." (Pg. 10)

> "Fire losses depend on home ignitions and home ignitions depend on home ignitability. Thus, home ignitability, being limited to a home and its immediate surroundings, offers us the opportunity to separate the W-UI structure fire loss problem from other landscape-scale fire management issues. This conclusion has significant implications for the actions and responsibilities of homeowners and fire agencies, such as identifying and mapping the potential for W-UI residential fire destruction, identifying appropriate and

effective mitigating actions, and determining who should take responsibility for home ignitability." (Pg. 10)

"Thus, wildland fuel reduction that is effective for reducing the wildland fire intensity might be insufficient for reducing the destruction of highly ignitable homes. In contrast, a low home ignition potential reduces the chances of fire destruction without extensive wildland fuel reduction. These findings indicate that the W-UI home fire loss problem is a home ignitability issue largely independent of landscape fuel reduction issues." (Pg. 10)

"The extent of the home ignition zone corresponds more to specific home and community ownership than to the landscapes of federal, state and local land management agencies. This suggests a corresponding responsibility for W-UI home fire loss potential residing with homeowners and communities. Thus, the home should not be considered a victim of wildland fire, but rather a potential participant in the continuation of the wildland fire. Home ignitability, i.e., the potential for W-UI home fire loss, is a homeowner and community choice and responsibility." (Pg. 11)

---

**Logging Impacts**
Published by Sierra Forest Legacy, 2012
https://www.sierraforestlegacy.org/FC_FireForestEcology/FFE_LoggingImpacts.php

Excerpt:

"According to the Sierra Nevada Ecosystem Project's (SNEP) report in 1996, "Timber harvest, through its effects on forest structure, local microclimate, and fuels accumulation, has increased fire severity more than any other recent human activity. If not accompanied by adequate reduction of fuels, logging (including salvage of dead and dying trees) increases fire hazard by increasing surface dead fuels and changing the local microclimate. Fire intensity and expected fire spread rates thus increase locally and in areas adjacent to harvest." This conclusion supports the consensus view of fire ecologists that logging operations greatly increase the fire risk on a forest."

---

**Modeling Potential Structure Ignitions from Flame Radiation Exposure with Implications for Wildland/Urban Interface Fire Management**
By Dr. Jack Cohen and Bret W. Butler
Presented at the 13th Fire and Forest Meteorology Conference. Lorne, Australia, 1996
https://www.fs.fed.us/rm/pubs_other/rmrs_1998_cohen_j001.pdf

Excerpts:

> "Model results indicate that ignitions from flame radiation are unlikely to occur from burning vegetation beyond 40 meters of a structure. Thinning vegetation within 40 meters has a significant ignition mitigation effect." (Pg. 81)

> "Vegetation management to prevent ignitions from radiation does not require extensive vegetation removal hundreds of meters from a structure. Our analysis indicated that 40 meters was sufficient for a 20 meter flame height." (Pg. 86 – Conclusions)

---

**Preventing Disaster Home ignitability in the Wildland-Urban Interface**
By Dr. Jack Cohen
Published in the *Journal of Forestry*, March 2000
https://www.fs.fed.us/rm/pubs_other/rmrs_2000_cohen_j002.pdf

Excerpt:

> "Miracles aside, the characteristics of the surviving home and its immediate surroundings greatly influenced its survival." (Pg. 15)

> "Using the model results as guidance with the concurrence of experiments and case studies, we can conclude that home ignitions are not likely unless flames and firebrand ignitions occur within 40 meters of the structure. This finding indicates that the spatial scale determining home ignitions corresponds more to specific home and community sites than to the landscape scales of wildland fire management. Thus, the W-UI fire loss problem primarily depends on the home and its immediate site." (Pg.20)

> "The W-UI fire case studies indicated approximately 90 percent survival with a vegetation clearance on the order of 10 to 20 meters for homes with nonflammable roofs. Thus, the case studies support the general flame-to-structure distance range of 10 to 40 meters as found through modeling and experiments." (Pg.20)

> "A change needs to take place in the relationship between homeowners and the fire services. Instead of home-related presuppression and fire protection responsibilities residing solely with fire agencies, homeowners must take the principal responsibility for ensuring adequately low home ignitability." (Pg.21)

---

**Fourmile Canyon Fire Findings**
By Dr. Russell Graham, Dr. Mark Finney, Chuck McHugh, Dr. Jack Cohen, Dave Calkin, Rick Stratton, Larry Bradshaw, and Dr. Ned Nikolov (all are USFS employees who work in fire research)
Published in USDA Forest Service Gen. Tech. Rep. RMRS-GTR-289. 2012
https://www.fs.fed.us/rm/pubs/rmrs_gtr289.pdf

Excerpts:

> "No evidence was found that the progression of the Fourmile Canyon Fire was altered by the presence of fuel treatments and the treated areas were probably of limited value to suppression efforts on September 6 (Figure 32)." (pg 56)
>
> "Post-fire satellite imagery clearly showed the absence of moderated burn severity inside treated areas compared to neighboring untreated stands (Figure 45). In some cases, treated stands appeared to burn more intensely than adjacent untreated stands, perhaps because of additional surface fuels present as a result of the thinning and higher wind speeds that can occur in open forests compared to those with denser canopies (Figure 46)." (pg 57)
>
> "Claims of fuel treatment performance around homes by the owners are consistent with the knowledge that the removal of surface fuel plays an important role in changing fire behavior." (pg 58)
>
> "Existing research on how residential fire disasters occur and how homes ignite during wildfires indicates that given extreme burning conditions, home characteristics in relation to a home's immediate surroundings (100 ft) principally determine home ignition potential (Howard and others 1973, Foote 1994, Cohen 1995, Cohen 2000a, 2000b; Cohen and Stratton 2003, Cohen 2004, Cohen and Stratton 2008, Cohen 2008). The area of the home and its immediate surroundings is called the *home ignition zone* (HIZ). Commonly home ignition occurs over small distances—a few tens of feet or less. During extreme burning conditions such as crown fires, the flames outside the HIZ (beyond 100 ft) will not ignite a home's combustible materials. Fires spreading into and firebrand ignited fires within the HIZ must be closer than 100 feet and/or contact the flammable parts (e.g., shake roof, wood siding, wood deck) of a home before direct flame ignition occurs. Home ignitions from firebrands require lofted burning embers from whatever distance and source (e.g., burning vegetation and/or structures) to accumulate on a home's flammable materials (e.g., litter covered roof, decorative bark, ornamental shrubs) before ignitions can occur. Figure 55 shows a home from the Fourmile Canyon Fire area that had an ignition resistant HIZ and the home survived." (pg 65)

---

**Why homes are lost to wildfire**
By Melissa Mylchreest
Published in *High Country News*, April 4, 2014
[https://www.hcn.org/articles/the-loss-of-homes-to-wildfire-is-as-much-a-sociopolitical-problem-as-it-is-a-physical](https://www.hcn.org/articles/the-loss-of-homes-to-wildfire-is-as-much-a-sociopolitical-problem-as-it-is-a-physical)

Excerpts:

"Jack Cohen is a research physical fire scientist with the U.S. Forest Service, based at the Missoula Fire Sciences Laboratory. With four decades of experience, he is a preeminent expert on wildfire and home ignitions, and a founder of the Firewise Communities recognition program, a project of the National Fire Protection Association that helps homeowners protect their property against wildfire."

"Years of study have convinced Cohen that the loss of homes to wildfire is as much a sociopolitical problem as it is a physical, on-the-ground problem. Agencies and the public alike approach the issue as a question of fire suppression and control. Cohen, on the other hand, believes that fire is here to stay, and that proper mitigation, awareness and planning can make living with fire a whole lot easier - and safer. HCN contributor Melissa Mylchreest recently spoke with Cohen."

**"Dr. Cohen**" Really, we need to be educating everybody who lives in (the WUI), or near it, or deals with it. Like Southern California, like Colorado Springs, like Denver. Everyone needs to be aware of how this problem works. Additionally, we're dealing with fire agencies that are very paternalistic and patriarchal. So it doesn't come naturally to involve homeowners. On the other hand, homeowners are expecting to be saved. As a society that has largely gone urbanized, we're more remote from dealing with fire on a personal basis - fewer people smoke, so people aren't even used to a book of matches catching on fire now."

---

**The Wildland-Urban Interface Fire Problem**: **A Consequence of the Fire Exclusion Paradigm**
By Dr. Jack Cohen
Published in *Forest History Today*, Fall 2008
https://foresthistory.org/wp-content/uploads/2017/01/Cohen.pdf

Excerpts:

"The wildland fire management approach for preventing WUI fire disasters largely addresses the wildfire outside the home ignition zone rather than a home's ignition potential as determined by the conditions within the home ignition zone. Since 2000, agency fire management policy initiatives have emphasized fire suppression." (Pg. 24)

"Preventing WUI fire disasters requires that the problem be framed in terms of home ignition potential. Because this principally involves the home ignition zone, and the home ignition zone primarily falls within private ownership, the responsibility for preventing home ignitions largely falls within the authority of the property owner. Preventing wildfire disasters thus means fire agencies helping property owners mitigate the vulnerability of their structures. The continued fire management focus on fire suppression suggests the WUI fire problem persists largely as a consequence of framing the WUI fire problem primarily in terms of the fire exclusion paradigm." (Pg. 25)

> "The continued focus on fire suppression largely to the exclusion of alternatives that address home ignition potential suggests a persistent inappropriate framing of the WUI fire problem in terms of the fire exclusion paradigm." (Pg. 25)

---

**The Big Lie: Logging and Forest Fires**
By Dr. Chad Hanson
http://yeoldeconsciousnessshoppe.com/art6.html

Excerpts:

> “It seems every time you turn around these days, there's some timber industry flack screaming about the need to increase deforestation on our national forests--ostensibly to reduce the threat of catastrophic fires.”
>
> “The fact is, commercial logging doesn't prevent catastrophic fires; it causes them. In the latter part of the 19th century, this was common knowledge.”
>
> “The removal of larger trees was found to be the primary cause of forest fires. Another recent Forest Service report revealed that tree mortality in the West due to both fire and disease increases where logging occurs. The worst rates were found to occur on private lands where logging levels are highest and where the least natural forest remains.”

---

**How risk management can prevent future wildfire disasters in the wildland-urban interface**
By: David E. Calkin (USFS research forester), Dr. Jack D. Cohen, Dr. Mark A. Finney {USFS research forester), and Dr. Matthew P. Thompson {USFS research forester)
Published in the Proceedings of the National Academy of Sciences, January 14, 2014
http://www.pnas.org/content/111/2/746.full

Excerpt:

> “If our problem statement is defined as keeping wildfire out of the WUI, it is unobtainable, and large wildfires and residential disasters will continue, and likely increase. Fuel treatments do not stop fires (just change behavior), and treatment alone without HIZ treatment means that inevitable wildfire exposure will result in structure loss. Also, landscape treatment programs managed by public land management agencies suffer from (*i*) lack of available funds at the federal level to treat sufficient area to reduce wildfire transmission, (*ii*) lack of influence over treatment of private lands [the Fourmile Canyon fire began on private land and burned only a small proportion of federal ownership—33% of the area was nonprivate, and only 9.7% was treated (**44**)], and (*iii*)

the challenge of liability issues associated with prescribed burns escaping onto neighboring land. If the problem is identified as reducing the proportion of wildfires entering the WUI, it will take time, significant increase in public and private investment, and a change in social acceptance and liability rules for burning near inhabited areas until the benefits are realized. By contrast, if the problem is identified as home ignition, mitigation of the HIZ is the most cost-effective investment for reducing home destruction, and this can be augmented with other investments (**Fig. 1**).

**Wildfire Protection in the Wildland-Urban Interface**
Congressional Research Service Report, January 30, 2014
https://www.everycrsreport.com/reports/RS21880.html

Excerpts:

"A structure's characteristics and landscaping significantly affect its chance of surviving a wildfire. Evidence from models, experiments, and case studies demonstrates that structural characteristics, especially the roofing materials, largely determine whether a home burns in a wildfire. Homes of brick or adobe with non-flammable roofs (e.g., tile, slate, metal) are far less likely to burn than homes with wood siding and flammable roofs (e.g., wood shingles).[14] Burnable materials (such as trees, shrubs, grass, pine needles, woodpiles, wood decks, and wooden deck furniture) within 40 meters (131 feet) of the structure also strongly influence whether the structure burns in a wildfire.[15]

"Furthermore, the structure and landscape characteristics are more important than the intensity of the fire in determining whether a house burns. The Hayman Fire, in Colorado in June 2002, burned 132 houses—70 houses (53%) were surrounded by crown fire, while 62 houses (47%) were surrounded by surface fire.[16] In addition, 662 homes (83% of all homes within the fire perimeter) survived the fire, even though 35% of the area was severely burned and 16% was moderately burned.[17] This suggests that at least some of the structures survived despite a crown fire around them."

"At a minimum, most would agree on the need for an area of *defensible space* around homes that needs to be cleared of burnable materials—at least 10 meters (33 feet) and possibly as much as 40 meters (131 feet). One observer recommended that protecting communities should include intensive treatment to reduce fuels and burnable materials in the *home ignition zone*, up to 200 meters (655 feet) around structures, with less intensive fuel treatment in the *community protection zone*, generally up to 500 meters (1,640 feet, or about a third of a mile) from structures.[19]"

Source of best science quotes below: **Thoughts on the Wildland-Urban Interface Fire Problem, June 2003**
By Dr. Jack Cohen
http://northernrockiesfire.org/links/cohen.htm

Excerpt:

"For the same reason, mitigating home ignition potential during extreme wildland fires must focus activities within and immediate to the residential area, i.e. the home ignition zone. But the home ignition zone largely corresponds to private property. Thus, with minor exception, the authority for effectively reducing the home ignition potential belongs to homeowners. Public land management agencies can facilitate homeowner mitigations and these agencies may be able to reduce fire intensities and the extent of burning around communities. But these agencies cannot accomplish the necessary and sufficient actions necessary to prevent residential fire disasters during extreme fire conditions by treating beyond the home ignition zone." (Pg. 2)

**Testimony to the Agriculture, Nutrition and Forestry Committee United State Senate. Hearing to Review Healthy Forests Restoration Act, HR 1904 on June 26, 2003**
By: Arthur Partridge Ph.D., Professor Emeritus, University of Idaho
http://www.saveamericasforests.org/congress/Fire/PartridgeSenate03.htm

Excerpt:

"Second, thinning, the primary proposed procedure to "fireproof" our forests is unproven as a reliable method to prevent or reduce the severity of wildfires. In fact, the process of thinning causes the deposition of fine (0 & 1-hr.) fuels on the forest floor that are primary ignition sources. It is impractical to remove such fuel under forest conditions except directly around homes. The current focus on "fuels" is, in itself, misguided because almost anything in a forest will burn, given the right conditions. Any fire specialist will tell you that the principal factors affecting fire are temperature and moisture, not fuels. No legislation will prevent or even reduce fires in the vast areas of the national forests and to pretend so is fraudulent."

“Rather, as I see it, legislation should focus on enabling those who live in or near woodlands to protect themselves, as my family and I have for more than half a century without federal intervention or pork-barreling. The U.S.D.A. Forest Service currently is not directed to work with individuals to enable protecting individual properties. This can be changed immediately with little or no additional costs and with considerable positive impact on those of us who live in the woods.”

---

**Fires necessary to sustain ecological integrity**
By Richard Hutto, professor emeritus of biology and wildlife biology with the Division of Biological Sciences at the University of Montana
Published in the *Missoulian* newspaper, August 16, 2017
http://missoulian.com/opinion/columnists/fires-necessary-to-sustain-ecological-integrity/article_648a3bf0-dfc7-51e9-984c-ebf66f9f36c4.html

Excerpts:

> “Finally, Racicot is mistaken if he believes that “there’s something we can do to minimize, and in many instances even eliminate… the wholesale destruction of natural resources critically important to all of us.” Sorry, Racicot, a large volume of fire research shows, unequivocally, that timber harvest does little to minimize or stop the wind-driven fires during the hot, dry years that typically burn most of our forest lands periodically. Just walk through the old Plum Creek land that burned to a crisp during the 2007 Jocko Lakes fire near Seeley Lake to see for yourself how those fires burned through even the most heavily harvested lands.”
>
> “Even if we could mitigate or prevent severe fire, would really we want to do that anywhere but in or immediately adjacent to our developed communities? The only person who would say that wildfires cause the “wholesale destruction of natural resources” is one who has absolutely no ecological literacy. We need more informed leadership if we are to adopt forest management practices and working forests that are truly conservation-oriented.”

---

Source of best science quotes below: **Fuel reductions ineffective; mandate fire-wise protections**
By George Wuerthner, forest ecologist and author
Published in the *Missoulian* newspaper, September 5, 2017
http://missoulian.com/opinion/columnists/fuel-reductions-ineffective-mandate-fire-wise-protections/article_64841590-c42e-5fd0-80ae-b8a025f94bbe.html

Excerpts:

"Recently, Secretary of the Interior Ryan Zinke, along with Agriculture Secretary Sonny Perdue, U.S. Sen. Steve Daines and U.S. Rep. Greg Gianforte, visited the Lolo fire near Missoula. All proclaimed that more forest "management" (logging) would preclude large fires like Montana and other states have experienced in recent years."

"The problem is the knowledge of forest ecology of most politicians as well as far too many agency personnel is about as sophisticated as the medical profession of a hundred years ago when the most comment treatment for the disease was to bleed the bad blood from a patient."

"In fact, the science, suggests that forest management tends to increase fire severity.

# Concluding Comments

Nearly all Forest Service projects that claim to lessen the risks to homeowners living in the WUI propose to commercially remove hazardous fuels. **Without exception** the NEPA documents that analyze these fuels reduction treatments conveniently do not mention Dr. Cohen's methods because the Purpose & Need is to "reduce fuels" and not reduce the fire damage risk to structures in the WUI as it should be.

Reducing hazardous fuels might be an alternative way to lessen the risks to homeowners living in the WUI. It definitely should not be a goal or objective unto itself and should never appear in the Purpose & Need. Which is more important – human lives or fuels?

# Glyphosate Dangers

**This document contains links to science that clearly shows exposure to Monsanto's manufactured chemical glyphosate causes cancer. Of course we cannot believe everything posted on the web, but you will get 3,940,000 hits when you Google for websites that contain the words "cancer" and "glyphosate."**

**Only a fool would ignore this.**

**See for yourself:**
https://www.google.com/search?ei=MNW-XqfnCr2w0PEP2KalCA&q=cancer+glyphosate&oq=cancer+glyphosate&gs_lcp=CgZwc3ktYWIQARgAMgIIADIGCAAQBxAeMgYIABAHEB4yBggAEAcQHjIGCAAQBxAeMgYIABAHEB4yBggAEAcQHjoECAAQRzoECAAQDToICAAQCBAHEB5Q6SZY1C9g9URoAHABeACAAXaIAbUDkgEDMC40mAEAoAEBqgEHZ3dzLXdpeg&sclient=psy-ab#spf=1589564730308

[redacted]

[redacted]

Please allow me to point out something you and your staff should already know. You propose to apply a potentially lethal chemical to your national forest. I suggest you read the information authored by independent scientists below. Then ask your USFS invasive plant eradication expert who assisted you with this project why they suggested an herbicide containing the chemical glyphosate be applied to public land.

Below I will present compelling, irrefutable research-based evidence that casual exposure to the chemical glyphosate is one of the causes of:

- birth defects,
- miscarriages,

- premature births,
- cancer - non-Hodgkin's lymphoma and hairy cell leukemia,
- DNA damage,
- autism,
- irreparable kidney and liver damage,
- infertility,
- learning disabilities,
- ADHD and other neurological disorders (especially in children),
- mitochondrial damage,
- cell asphyxia,
- endocrine disruption,
- bipolar disorder,
- skin tumors,
- thyroid damage,
- decrease in the sperm count and
- chromosomal damage.

---

# Children are especially susceptible to glyphosate poisoning.

### Weed killer found in wide range of breakfast foods aimed at children

Published by *The Guardian*, August 16, 2018

Excerpts:

> "I grew up eating Cheerios and Quaker Oats long before they were tainted with glyphosate," said EWG's president, Ken Cook. "No one wants to eat a weedkiller for breakfast, and no one should have to do so." Cook said the EWG will urge the EPA to limit the use of glyphosate on food crops but said companies should "step

up" because of the "lawless" nature of the regulator under the Trump administration.

"It is very troubling that cereals children like to eat contain glyphosate," said Alexis Temkin, an EWG toxicologist and author of the report. "Parents shouldn't worry about whether feeding their children healthy oat foods will also expose them to a chemical linked to cancer. The government must take steps to protect our most vulnerable populations."

Link:
https://www.theguardian.com/environment/2018/aug/16/weedkiller-cereal-monsanto-roundup-childrens-food

## Cheerios, Nature Valley cereals contain Roundup ingredient, study finds

Published by CBS news, June 13, 2019

Excerpts:

- 21 oat-based cereal and snack products such as Cheerios tested positive for traces of glyphosate.
- The chemical is the active ingredient in Roundup, which has been at the center of several trials alleging the weedkiller causes cancer.
- All but four of the products tested had glyphosate levels higher than what an environmental group considers safe for children.

Link:
https://www.cbsnews.com/news/glyphosate-breakfast-cereal-still-contains-roundup-ingredient-study-finds/

## Photo images of glyphosate and children

Link:
http://www.bing.com/images/search?q=glyphosate+children&qpvt=glyphosate+children&qpvt=glyphosate+children&FORM=IGRE

## Are Your Children Roundup-Ready?

Published by the *Cornucopia Institute*, October 5, 2015

Excerpt:

"Feeding herbicide-tolerant GE corn and soy to children gives them a dose of glyphosate with every bite. Glyphosate is often portrayed by the manufacturers as safe for human exposure while being deadly to weeds. However, scientific

research indicates that the herbicide is not as harmless as it has been portrayed. Rather, evidence shows that glyphosate may be the most important factor in the development of multiple chronic diseases and conditions now prevalent in Westernized societies."

Link: http://www.cornucopia.org/2015/10/are-your-children-roundup-ready/

## Alleged Glyphosate Poisoning Kills 2 Children, 33 More in Hospital

Published by *Natural Society*, August 2, 2014

Excerpt:

"Two children (ages 3-yrs, and 6 mos.) from the same family suddenly died last week, one en route to the hospital, another just after being released due to a poisoning outbreak of glyphosate in the Huber Duré settlement. Their bodies have been sent to the capital of Paraguay, Asunción, for detailed autopsies which could confirm that glyphosate was the cause of death."

The reported poisoning outbreak in Huber Duré is not the first case. Over the past few years, there have been many reports of poisoning, increased abortions, and the death of farm animals in the areas where heavy pesticide spraying is conducted. Following these cases, local residents protested, but authorities took no action to address their concerns."

Link: http://naturalsociety.com/alleged-glyphosate-poisoning-kills-2-children-33-hospital/

## Glyphosate toxicity – impacts on the environment and non-target species

Published by the Pemaculture College Australia

Excerpt:

"Studies on human cells showed toxicity and hormone disruption at sub agricultural levels with effects within 24 hours caused by concentrations as low as 0.5 parts per million. And DNA damage at 5 parts per million. The impact of glyphosate-based herbicides residues in food, feed or in the environment now has thus to be considered real. PMID: 19539684

The exposure of children to glyphosate should be avoided as recent animal studies have shown that commercial formulation of glyphosate is a potent endocrine (hormone) disruptor, causing disturbances in reproductive development when the exposure was during the puberty period (5)"

Link: http://permaculture.com.au/glyphosate-toxicity-impacts-on-the-environment-and-non-target-species/

---

# As of February 2020, Herbicides that contain glyphosate were banned all over the world

**Denmark, England, Italy, El Salvador, Sri Lanka, France, Holland, Austria, Bulgaria, Germany, Greece, Hungary, Ireland, Japan, Chile, South Africa, Luxembourg, Madeira, Cameroon, New Zealand, Peru, Australia, Russia, France, Switzerland, Columbia, Costa Rica, Africa: Malawi, Vietnam, Thailand, Saudi Arabia, Kuwait, Qatar, Bahrain, Oman, Kuwait and United Arab Emirates, Bermuda, Grenadines, Belgium, Czech Republic, India, Canada, Brazil, Argentina, Belgium, Malta, Mexico, Portugal, Scotland, Slovenia, Spain, and Sweden.**

Please verify this at the links below and open secondary links for each country to learn more.

https://www.baumhedlundlaw.com/toxic-tort-law/monsanto-roundup-lawsuit/where-is-glyphosate-banned/

> https://www.ecowatch.com/european-parliament-ban-glyphosate-2500863218.html
>
> https://sustainablepulse.com/2019/05/28/glyphosate-herbicides-now-banned-or-restricted-in-17-countries-worldwide-sustainable-pulse-research/#.XfAP-avTm1s

https://www.organicconsumers.org/news/germany-13-other-countries-say-no-glyphosate-what-about-us

# California classifies glyphosate as a “”

**California Classifies Glyphosate As Cancer-Causing, FDA Tests Crops For Residue**
Published by CBS SF Bay Area, July 7, 2017

Excerpts:

> *“SAN FRANCISCO (CBS SF) — California added a controversial chemical found in the world’s most popular weedkiller to the list of chemicals known to the state to cause cancer, and the FDA is now testing U.S. crops for residues from that same chemical.*
>
> *Glyphosate, a key ingredient in hundreds of products including Monsanto’s best-selling herbicide Roundup, was added to the state’s Prop 65 list on Friday. The list was created by The Safe Drinking Water and Toxic Enforcement Act of 1986 and includes hundreds of chemicals known to the state to cause cancer or reproductive toxicity.”*
>
> Link:

http://sanfrancisco.cbslocal.com/2017/07/07/california-glyphosate-monsanto-cancer-causing-fda-crops/

**Glyphosate causes cancer, rules California -- All California retailers are required to add cancer warning labels to all products containing glyphosate from July 7, 2017**
Published by *Pgurus*, July 15, 2017

Excerpts:

> *"In a major setback to the multinational seed and chemical company, Monsanto, the US State of California declared glyphosate, the main ingredient in its weed killer Roundup, as a toxic cancer-causing chemical, effective July 7, 2017. This decision by the California Office of Environmental Health Hazard Assessment (OEHHA) is a triumph of environmentalists, farmers who have long fought losing battles with the giant corporations, consumer rights activists and health activists.*
>
> *Declaring glyphosate as a known, cancer-causing carcinogen, the California Office of Environmental Health Hazard Assessment said it would be added to the state's warning list under the "The Safe Drinking Water and Toxic Enforcement Act of 1986," also known as Proposition 65. This law protects California drinking water from toxic, cancer-causing substances and those known to cause birth defects."*
>
> Link:
> https://www.pgurus.com/glyphosate-causes-cancer-california/

**Monsanto Is Suing California for Trying to Inform People That Roundup Causes Cancer**
Published by *Alternet*, March 2, 2016

Excerpts:

> *"Once again, Monsanto is trying to take away our right to know, this time about carcinogenic chemicals used in household products and places all around us. In January, Monsanto filed a lawsuit against the state of California for its intent to list glyphosate, the main chemical used in Monsanto's flagship Roundup herbicide, under California's Proposition 65, a law that mandates notification and labeling of all chemicals known to cause cancer, birth defects or other reproductive harm, and prohibits their discharge into drinking waters of the state.*
>
> *Enacted by California voters via ballot initiative in 1986, Prop 65 prohibits any business from knowingly or intentionally exposing any individual to a chemical known to the state to cause cancer or reproductive toxicity without first giving a*

*clear and reasonable warning, and the discharge of such chemical into a source of drinking water is prohibited. The State relies on the findings of the International Agency for Research on Cancer (IARC) of the World Health Organization (WHO) — the world's leading authority on cancer — as the basis for listing chemicals that are known or probable carcinogens under Prop 65. In 2015, IARC concluded, by a unanimous decision, that glyphosate is "probably carcinogenic."*

Link:
http://www.alternet.org/environment/monsanto-suing-california-trying-inform-people-roundup-causes-cancer

# Law firms are now advertising on television nationwide telling people that they will represent them if they are diagnosed with non-Hodgkin Lymphoma after having been exposed to Roundup.

**James Harris Law**
Link:
https://www.recallsuit.com/roundup-lawsuit-b/?msclkid=5be7029551971de0ec305fab2abdbbd2&utm_source=bing&utm_medium=cpc&utm_campaign=Roundup&utm_term=lymphoma%20lawsuits&utm_content=Lymphoma%20Lawsuit

**Sokolove Law**

Link:
https://roundup.sokolovelaw.com/?src=bing_webppc_328577675_%2Bmonsanto%20%2Blawsuit_%7Bcontent%7D_b_o_lymphoma%20lawsuits%20against%20monsanto&numberToReplace&campaignId&ringPoolId&jpow=aa_328577675_bb_1233652168336312_cc_%2Bmonsanto%20%2Blawsuit_dd_b_ee_o_ff_%7Badposition%7D_gg_c_hh_%7Bdevicemodel%7D_ii__jj_110194_kk__ll_%7Bplacement%7D_mm_%7Btarget%7D_nn_kwd-77103363003058%3Aloc-190_oo_%7Bcreative%7D_pp_%7Brandom%7D_qq_%7Baceid%7D_rr_77103314975124_ss_77103363003058

**Class Claims LLC**
Link:
https://www.class.claims/round-up-lawsuit

**Trustwell Law Group**
Link:
https://www.trustwelllaw.com/environmental/roundup/lawsuit?utm_source=bing-ads&utm_medium=paid-search&utm_campaign=roundup&msclkid=7aa5b3c82ae01c32cf94eef65692be31&utm_term=monsanto%20lymphoma%20lawsuit&utm_content=Monsanto%20Lymphoma%20Lawsuit%20%7C%20Exact

**Pintas and Mullins Law Firm**
Link:
https://roundupsettlements.com/?utm_source=bing&utm_medium=cpc&utm_campaign=369199413&utm_term=roundup%20lawsuit&utm_content=82875860687107&msclkid=1fb4e9f4b0451049b80eb4ca32754d40

**ROUNDUPCANCER ATTORNEYS.COM**
Link:
https://roundupcancerattorneys.com/roundup-lawsuit?msclkid=b0a975edf092161d3c4628d372a24497&utm_source=bing&utm_medium=cpc&utm_campaign=RoundUp%20Cancer&utm_term=roundup%20lawsuit&utm_content=Lawsuit%20roundup

**Carlson Law Firm**
Link:
https://www.carlsonattorneys.com/news-and-update/roundup-2019/

**A Case for Women**
Link:
https://www.acaseforwomen.com/adv/roundup-lawsuit/?utm_campaign=369081443&utm_source=bing&utm_medium=cpc&utm_content=79439809871843&utm_term=roundup%20lawsuit&adgroupid=1271035841951610&msclkid=f2058d93dd24196d73b4d0ad5f144d1c

**Saiontz & Kirk**
Link:
https://www.youhavealawyer.com/roundup/cancer-settlements-faq/

**Greenberg & Bederman, LLC**
Link:
https://www.gblawyers.com/roundup-lawsuits/

**Rosen Injury Lawyers**
Link:
https://roseninjurylawyers.com/roundup-lawsuits/

**Garber Law Offices**
Link:
https://www.garber.law/glyphosate-roundup/

# Monsanto exerts undue influence over USDA employees.

Here are recent papers & articles that explain the ties between Monsanto and the USDA.

**Continued pesticide use ENDANGERS farm workers and children… why are the risks still being ignored?**
Published by USDA Watch, January 24, 2020

> Excerpts:
>
> "Even low doses are enough to cause harm to children, and it's especially risky when they are in critical neurodevelopmental stages. Sadly, many of these

problems aren't evident until years later. More than 90 percent of us have pesticides or pesticide byproducts in our bodies, and most of them came from conventionally grown vegetables and fruits. Some experts have expressed concerns that the limits set by the EPA are too high to really protect children.

"For example, the USDA and FDA track pesticide residues looking at each chemical individually to see if it exceeds EPA safety standards. That doesn't give a true picture of the degree of damage because crops are typically sprayed with multiple chemicals throughout the growing season. The dangers of some pesticides climb dramatically when they are mixed with other chemicals.

Independent analysis of USDA data carried out by the Environmental Working Group found that 70 percent of American produce has at least a trace level of pesticides, and some fare far worse than others. For example, strawberries, spinach, and kale are all near the top of the list when it comes to pesticide load."

Link:
https://usdawatch.com/2020-01-24-pesticide-use-endangers-farm-workers-and-children.html

**White House Has "Monsanto's Back on Pesticides," Newly Revealed Document Says**
Published by US Right to Know, May 7, 2019

Excerpts:

"Internal Monsanto records just filed in court show that a corporate intelligence group hired to "to take the temperature on current regulatory attitudes for glyphosate" reported that the White House could be counted on to defend the company's Roundup herbicides.

"In a report attached to a July 2018 email to Monsanto global strategy official Todd Rands, the strategic intelligence and advisory firm Hakluyt reported to Monsanto the following:

> "A domestic policy adviser at the White House said, for instance: 'We have Monsanto's back on pesticides regulation. We are prepared to go toe-to-toe on any disputes they may have with, for example, the EU. Monsanto need not fear any additional regulation from this administration." "

Link:
https://usrtk.org/monsanto-roundup-trial-tacker/white-house-has-monsantos-back-on-pesticides-newly-revealed-document-says/

## Perdue Statement on Vietnam's Ban on the Importation of Glyphosate
Published by USDA, April 11, 2019

Excerpts:

"U.S. Secretary of Agriculture Sonny Perdue issued the following statement in response to the announcement by Vietnam's Ministry of Agriculture and Rural Development (MARD) that Vietnam will ban the importation of glyphosate:

> "We are disappointed in Vietnam's decision to ban glyphosate, a move that will have devastating impacts on global agricultural production. As I've often said, if we're going to feed 10 billion people by 2050, farmers worldwide need all the tools and technologies at our disposal."
>
> Link:
> https://www.usda.gov/media/press-releases/2019/04/11/perdue-statement-vietnams-ban-importation-glyphosate

## The USDA gives in
Published by *Real Organic* Project, 2019

Excerpts:

"We don't get many wins with the Federal government these days. But we had one last week. USDA had been allowing the use of prohibited substances for hydroponic producers just days before certification. We stopped them from allowing glyphosate and insecticides for hydro berry operations. That means there will be a little less Roundup sprayed in America next year."

"The outrage came months later, after I put out a very public letter. I wrote about meeting with Jenny Tucker (Head of NOP) and asking if such practices were being permitted by the USDA. She said yes they were permitted. The public outrage following that was so extreme that some even accused me of making the whole thing up."

> Link:
> https://www.realorganicproject.org/the-usda-gives-in-evidence-of-glyphosate-in-organic

---

---

# The public is reminded to not become exposed to Roundup or other herbicides that contain the chemical glyphosate. Here are several if the latest warnings published online and/or in print media.

**Fiji Moves Towards Ban on Glyphosate Herbicides**

Published by: Sustainable Pulse, March 28, 2020

Excerpts:

"Fiji's Sugar Industry Tribunal Commissioner, Timothy Brown, told the Fiji Times on Saturday that the ban was in line with the local sugar industry's efforts to ensure Fairtrade Certification for all sugar produced in and exported from the country. Brown stated that "Glyphosate is a toxic and dangerous chemical. As such, our sugar buyers and consumers wish to ensure such chemicals are not used on Fairtrade certified crops sold on their markets." "

Link to article:
https://sustainablepulse.com/2020/03/28/fiji-moves-towards-ban-on-glyphosate-herbicides-with-sugarcane-announcement/?utm_source=newsletter&utm_medium=email&utm_campaign=gl

yphosate_gmos_and_pesticides_weekly_global_news_bulletin&utm_term=2020-04-03#.Xoedo-pKi1s

## Farmer and Eco Groups Sue EPA over Re-Approval of Glyphosate Herbicides

Published by: Sustainable Pulse, March 20, 2020

Excerpts:

“While EPA defends glyphosate, juries in several cases have found it to cause cancer, ruling in favor of those impacted by exposure. Glyphosate formulations like Roundup are also well-established as having numerous damaging environmental impacts. After a registration review process spanning over a decade, EPA allowed the continued marketing of the pesticide despite the agency’s failure to fully assess glyphosate’s hormone-disrupting potential or its effects on threatened and endangered species. The review began in 2009, has already taken 11 years, without a full assessment of the widespread harmful impacts on people and the environment in that time period.

“EPA’s half-completed, biased, and unlawful approval sacrifices the health of farmworkers and endangered species at the altar of Monsanto profits,”**said George Kimbrell, legal director for CFS and counsel for the coalition.**“The reckoning for Roundup is coming.” “

Link to article:
https://sustainablepulse.com/2020/03/20/farmer-and-eco-groups-sue-epa-over-re-approval-of-glyphosate-herbicides/?utm_source=newsletter&utm_medium=email&utm_campaign=glyphosate_gmos_and_pesticides_weekly_global_news_bulletin&utm_term=2020-03-27#.Xn4plepKi1s

## Glyphosate-Based Herbicides Trigger Loss of Biodiversity – New Study

Published by: *Sustainable Pulse*, March 3, 2020

Excerpts:

“One of the world’s most widely used glyphosate-based herbicides, Roundup, can trigger loss of biodiversity, making ecosystems more vulnerable to pollution and climate change, say researchers from McGill University in Canada.”

“To test how freshwater ecosystems respond to environmental contamination by glyphosate, researchers used experimental ponds to expose phytoplankton

communities (algae) to the herbicide. “These tiny species at the bottom of the food chain play an important role in the balance of a lake’s ecosystem and are a key source of food for microscopic animals. Our experiments allow us to observe, in real time, how algae can acquire resistance to glyphosate in freshwater ecosystems,” says post-doctoral researcher Vincent Fugère.”

Link to article:
https://sustainablepulse.com/2020/03/03/glyphosate-based-herbicides-trigger-loss-of-biodiversity-new-study/?utm_source=newsletter&utm_medium=email&utm_campaign=glyphosate_gmos_and_pesticides_weekly_global_news_bulletin&utm_term=2020-03-06#.XmJ8y3JKi1s

**Critics: Trump EPA's Formal Assertion Glyphosate Poses No to Human Health Indication of 'Troubling Allegiance' With Bayer/Monsanto Risk**
Published by: *Common Dreams*, January 30, 2020

Excerpts:

“As *Reuters* reported:

> The conclusion reaffirms the agency’s stance on glyphosate, the key ingredient in Bayer AG's Roundup, despite judgments by U.S. juries that have found that use of the weedkiller was responsible for plaintiffs' cancer in some trials.”

“The EPA's pesticide office is clearly willing to bend over backwards, including disregarding its own guidelines for evaluating cancer risks, to give the industry what it wants," said Burd.

As *Common Dreams* has reported, Trump's EPA has been criticized by advocates for years for its closeness to Bayer/AG and its treatment of glyphosate.”

Link to article:
https://www.commondreams.org/news/2020/01/30/critics-trump-epas-formal-assertion-glyphosate-poses-no-risk-human-health-indication?cd-origin=rss&utm_term=AO&utm_campaign=Daily%20Newsletter&utm_content=email&utm_source=Daily%20Newsletter&utm_medium=Email

## As is the case here, USFS EAs and EISs that propose to apply glyphosate cite research conclusions from the *Human Health and Ecological Risk Assessment* prepared by Syracuse Environmental Research Associates' (SERA).

The References section of USFS EAs and EISs for ptijects that propose to apply herbicides that contain glyphosate include this:

> Syracuse Environmental Research Associates, Inc. 2003a. Glyphosate – Human Health and Ecological Risk Assessment - Final Report. Prepared for: USDA Forest Service. Syracuse, New York.
>
> SERA. (2011a). Glyphosate-Human Health and Ecological Risk Assessment - Final Report. Syracuse, NY, USA: Syracuse Environmental Research Associates, Inc. Retrieved from http://www.fs.fed.us/foresthealth/pesticide/pdfs/Glyphosate_SERA_TR-052-22-03b.pdf

Here is the cover page to the Report:

**Glyphosate**

**Human Health and Ecological Risk Assessment**

FINAL REPORT

Submitted to:

**Paul Mistretta, COR**

USDA/Forest Service, Southern Region

1720 Peachtree RD, NW
Atlanta, Georgia 30309

USDA Forest Service Contract: **AG-3187-C-06-0010**
USDA Forest Order Number: **AG-43ZP-D-09-0031**
SERA Internal Task No. **52-22**

Submitted by:
Patrick R. Durkin
**Syracuse Environmental Research Associates, Inc.**
8125 Solomon Seal
Manlius, New York 13104
March 25, 2011

As you can see above the USFS contracted with SERA to prepare the **Human Health and Ecological Risk Assessment.** Ask yourself why the USFS would sign a contract with SERA. Why did they choose SERA? How much did it cost? How much influence did Monsanto have? Who chose SERA? Who paid for it? Why didn't they prepare a NEPA document analyzing the effects of glyphosate application? Why does the USFS rely on single, dubious SERA report and reject the science research conclusions of hundreds of independent scientists not affiliated with the USDA?

The safety conclusions of most USFS EAs and EISs that analyze and approve application of herbicides that contain glyphosate are based on the SERA report below.

> **Report Name:** *Glyphosate -Human Health and Ecological Risk Assessment Final Repor*t, 2011
> **Prepared by:** Syracuse Environmental Research Associates, Inc.
> **Prepared for:** USDA Forest Service, Contract Number: **AG-3187-C-06-0010**
> Link to the complete SERA Report:
> http://www.fs.fed.us/foresthealth/pesticide/pdfs/Glyphosate_SERA_TR-052-22-03b.pdf

**My examples of SERA deception shown below use the following format:**
I have selected 9 tragic physical conditions science shows is caused by casual glyphosate exposure. First, I present a sample of many reports describing the research conclusions from research conducted in many countries around the world showing glyphosate exposure causes those tragic physical conditions in humans. Then I quote the SERA report's, deceptive, untrue statements denying the "best science" conclusions authored by hundreds of expert.

The statements quoted from the SERA Report intended to disprove independent research conclusions linking glyphosate to tragic health effects are highlighted in **brown** font.

In most cases, the SERA report denies glyphosates connection with health problems. In a few cases, a word search of the SERA report indicates the tragic physical conditions caused by glyphosate that are disclosed by multiple independent scientists below isn't even addressed.

---

## Birth Defects and Miscarriages

Here is one if many articles authored by scientists not connected with the USDA that link glyphosate exposure to birth defects. This scientist has no reason to skew or misrepresent the truth as is the case with the SERA Report that concludes pregnant women who are exposed to glyphosate are **NOT** more likely to have babies with birth defects or miscarriages.

### Lab Study Establishes Glyphosate Link to Birth Defects

By Dr. Mae-Wan Ho
Published by *Science in Society*, April 10, 2010

> Excerpts:
>
> "In April 2010, the first official report commissioned by the State Government of Chaco documented a four-fold increase in both cancer and birth defects in the ten years of 2000 - 2009 [4].
>
> These findings are the latest addition to a long chain of evidence linking glyphosate (and others herbicides) to serious health impacts at concentrations well below the level of recommended agricultural use. In the case of glyphosate herbicides, links to cancers, miscarriages and other reproductive toxicities, liver and cell toxicities, DNA damages, lethality to amphibians and endocrine disrupting action previously made, would more than justify a worldwide ban ([5] (Ban Glyphosate Herbicides Now, *SiS* 43); quite apart from simultaneous evidence of ecological/agronomic disasters caused by the herbicide ([6] Scientists Reveal Glyphosate Poisons Crops and Soil, *SiS* 47), while the spread of glyphosate resistant weeds and superweeds has rendered the GM crop and the herbicide practically useless ([7] GM Crops Facing Meltdown in the USA, *SiS* 46)."

Link:
https://www.i-sis.org.uk/glyphosateCausesBirthDefects.php

I invite you to Google on "glyphosate" and "birth defects." You will get 465,000 hits.

**Here is the SERA Human Health and Ecological Risk Assessment denial of the fact that glyphosate exposure causes birth defects and miscarriages:**

The SERA Risk Assessment at page 19 states: "**There is no indication that glyphosate causes birth defects**."

The SERA Risk Assessment at page 57 states: "**Risk of miscarriage was unrelated to self-reported exposure to glyphosate formulations**."

---

# Cancer

Here are summaries of 3 recent court cases where Monsanto presented the SERA Safety Reports as evidence and was still Monsanto was ordered to pay the plaintiffs $2,479,200,000 on damages.

**Roundup Court Case #1**

On March 27, 2019 a San Francisco jury said Monsanto (now owned by BayerAG) was liable for Mr. Edwin Hardeman's non-curable cancer called non-Hodgkin lymphoma. The judge ordered Monsanto to pay Mr. Hardeman $200 million.

> **Jury Awards Edwin Hardeman $80.2 Million in Roundup Cancer Lawsuit**
> https://www.lawyersandsettlements.com/legal-news/monsanto-facing-lawsuits-over-alleged-roundup-cancer/jury-awards-edward-hardeman-80-2-million-in-roundup-cancer-lawsu-23071.html

**Roundup Court Case #2**

On May 13, 2019 a jury in Alameda County California ruled that the couple, Alva and Alberta Pilliod of Livermore, Calif., both contracted non-Hodgkin's lymphoma because of their use of a glyphosate-based herbicide. They were each awarded $1 billion in punitive damages and an additional $55 million in collective compensatory damages.

> **California Jury Awards $2 Billion to Couple In Roundup Weed Killer Cancer Trial**
> https://www.npr.org/2019/05/13/723056453/california-jury-awards-2-billion-to-couple-in-roundup-weed-killer-cancer-trial

**Roundup Court Case #3**

In July 2018, Dewayne Johnson (a former school groundskeeper) was diagnosed with non-Hodgkin's lymphoma. He sued Monsanto alleging the chemical glyphosate (an ingredient in Roundup).caused his cancer. Mr. Johnson used Roundup as part of his job. On August 10, 2018 a jury in San Francisco delivered a verdict in Mr. Johnson's favor. The judge ordered Monsanto to pay Mr. Johnson $289 million in total damages.

> **Monsanto ordered to pay $289 million in world's first Roundup cancer trial**

https://www.reuters.com/article/us-monsanto-cancer-lawsuit/jury-orders-monsanto-to-pay-290-million-in-california-roundup-cancer-trial-idUSKBN1KV2HB

I invite you to Google on “glyphosate” and “cancer.” You will get 3,940,000 hits.

**Here is the SERA Human Health and Ecological Risk Assessment denial of the fact that glyphosate exposure causes cancer:**

The Risk Assessment at page 69 states: “

**“Studies on the potential carcinogenicity of glyphosate in humans is based primarily on studies involving self-reports of exposure to glyphosate by individuals with cancer. Hardell and Erikson (1999a) reported an increased cancer risk of non-Hodgkin lymphoma (NHL) in individuals in Sweden who reported a history of exposure to glyphosate. The increased risk, however, was not statistically significant.”**

---

# DNA Damage

Here is an article about a scientist who is an expert in her field who concludes Roundup Damages DNA.

## Dr. Wozniak: Roundup Damages DNA in Human Blood Cells at Low Concentrations

By By Henry Rowlands
Henry Rowlands is the Executive Director at The Detox Project
Published in *GMO Evidence*, July 26, 2018

Excerpts:

“Roundup 360 PLUS caused damage to DNA even at 5 μM, while glyphosate and particularly AMPA induced DNA lesions from the concentration of 250 μM and 500 μM, respectively. DNA damage induced by glyphosate and its derivatives increased in order: AMPA, glyphosate, Roundup 360 PLUS”

Link:
https://www.gmoevidence.com/dr-wozniak-roundup-damages-dna-in-human-blood-cells-at-low-concentrations/

I invite you to Google on “glyphosate” and “DNA damage.” You will get 431,000 hits.

**Here is the SERA Human Health and Ecological Risk Assessment denial of the fact that glyphosate exposure causes DNA damage:**

The Risk Assessment at page 148 states: "

**"Lowcock et al. (1997) note increased incidences of DNA damage in frogs in agricultural areas, compared with frogs in non-agricultural areas. Nonetheless, this study does not provide any data specifically linking glyphosate or glyphosate formulations to this effect."**

---

# Autism

Here is one if many articles authored by scientists who are experts in their field that reveal glyphosate exposure causes autism.

### Evidence the U.S. autism epidemic initiated by acetaminophen (*Tylenol*) is aggravated by oral antibiotic amoxicillin/clavulanate (*Augmentin*) and now exponentially by herbicide glyphosate (*Roundup*)

By Dr. Peter Good, Ph.D.
Published by *Clinical Nutrition ESPEN*, February, 2018

> Excerpts:
>
> "Two toxins most implicated in the U.S. autism epidemic are analgesic/antipyretic acetaminophen (Tylenol) and oral antibiotic amoxicillin/clavulanate (Augmentin). Recently herbicide glyphosate (Roundup) was exponentially implicated."

Link:
https://www.sciencedirect.com/science/article/abs/pii/S240545771730102X#!

I invite you to Google on "glyphosate" and "autism." You will get 240,000 hits.

> **Incredibly, the SERA report does not contain the word "autism."**

---

# Alzheimer's

Here is one if many articles authored by scientists who are experts in their field that reveal people exposed to glyphosate are more likely to get Alzheimer's disease.

**What Diseases Does Roundup Cause?**

By Sage Datko
Published in Top Class Actions, April 10, 2020

Excerpts:

"Since Roundup is widely used in commercial agriculture and by private consumers across the United States and the rest of the world, millions of people may have been exposed to it."

"The glyphosate in Roundup, reports EcoWatch, may also **increase the likelihood of developing Alzheimer's disease.** According to lab studies, Roundup exposure can cause the same kind of oxidative stress and neural cell death that occurs with Alzheimer's."

Link:
https://topclassactions.com/lawsuit-settlements/cancer/what-diseases-does-roundup-cause/

I invite you to Google on "glyphosate" and "Alzheimer's." You will get 180,000 hits.

**Incredibly, the SERA report does not contain the word "Alzheimer's."**

**-----------------------------------------------**

# Irreparable kidney and liver damage

Here is one if many articles authored by scientists who are experts in their field that reveal exposure to glyphosate causes kidney and liver damage.

### Glyphosate's Synergistic Toxicity in Combination with Other Factors as a Cause of Chronic Kidney Disease of Unknown Origin

By Sarath Gunatilake M.D., Stephanie Seneff Ph.D., and Laura Orlando[3]
Published in ***Int J Environ Res Public Health***, July 31, 2019

Excerpts:

> "Here, we argue that glyphosate in particular is working synergistically with most of the other factors to increase toxic effects. We propose, further, that glyphosate causes insidious harm through its action as an amino acid analogue of glycine, and that this interferes with natural protective mechanisms against other exposures."

Link:
https://pubmed.ncbi.nlm.nih.gov/31370256/

I invite you to Google on "glyphosate" and "kidney and liver." You will get 311,000 hits.

**Here is the SERA Human Health and Ecological Risk Assessment denial of the fact that glyphosate exposure causes kidney and liver damage:**

The Assessment at page 104 states:

"As discussed by U.S. EPA/OPP (1993b), the multi-generation study in rats by Reyna (1985) failed to note any adverse kidney effects at a dose of 500 mg/kg bw/day, which is about 17 times greater than the presumed LOAEL of 30 mg/kg bw/day in study by Schroeder and Hogan (1981). Consequently, U.S. EPA/OPP (1993b) concurred with the assessment by Schroeder and Hogan (1981) and considers the finding of kidney tubule dilation a spurious effect."

The Assessment at page 142 states:

**"While the study by Gabriel and George (2005) is focused on liver toxicity, it seems likely that mortality and overt signs of toxicity would have been reported. No such observations are made in the publication."**

**------------------------------------------------------**

# Parkinson's-Related Brain Damage

Here is one if many articles authored by scientists who are experts in their field that reveal people who are exposed to glyphosate are more likely to die prematurely from Parkinson's disease.

## Estimated Residential Exposure to Agricultural Chemicals and Premature Mortality by Parkinson's Disease in Washington State

By:

Mariah Caballero Ph.D., Department of Biology, Vassar College, Undergraduate Student, Poughkeepsie, NY 12604, USA

Solmaz Amivi Ph.D. and Pablo Monsivais Ph.D., Department of Nutrition and Exercise Physiology, Elson S. Floyd School of Medicine, Washington State University, Spokane, WA 99202, USA

Justin T. Denny Ph.D., Department of Sociology, Washington State University, Pullman, WA 99164, USA

Perry Hystad Ph.D., College of Public Health and Human Sciences, Oregon State University, Corvallis, OR 97331, USA

Ofer Amram Ph.D., Paul G. Allen School for Global Animal Health, Washington State University, Pullman, WA 99164, USA

Excerpts:

> "The aim of this study was to examine the relationship between estimated residential exposure to agricultural chemical application and premature mortality from Parkinson's disease (PD) in Washington State. Washington State mortality records for 2011–2015 were geocoded using residential addresses, and classified as having exposure to agricultural land-use within 1000 meters. Generalized linear models were used to explore the association between land-use associated with agricultural chemical application and premature mortality from PD. Individuals exposed to land-use associated with glyphosate had 33% higher odds of premature mortality than those that were not exposed (Odds Ratio (OR) = 1.33, 95% Confidence Intervals (CI) = 1.06–1.67). Exposure to cropland associated with all pesticide application (OR = 1.19, 95% CI = 0.98–1.44) or Paraquat application (OR = 1.22, 95% CI = 0.99–1.51) was not significantly associated with premature mortality from PD, but the effect size was in the hypothesized direction. No significant associations were observed between exposure to Atrazine (OR = 1.21, 95% CI = 0.84–1.74) or Diazinon (OR = 1.07, 95% CI = 0.85–1.34), and premature mortality from PD. The relationship between pesticide exposure and premature mortality aligns with previous biological, toxicological, and epidemiological findings. Glyphosate, the world's most heavily applied herbicide, and an active ingredient in Roundup® and Paraquat, a toxic herbicide, has shown to be associated with the odds of premature mortality from PD."

Link:
https://www.mdpi.com/1660-4601/15/12/2885/htm

**Here is the SERA Human Health and Ecological Risk Assessment denial that glyphosate exposure causes Parkinson's disease:**

The Assessment at page 45 states: "

> "Thus, as with the report by Ptok (2009) on speech disorder, the report by Barbosa et al. (2001) is essentially anecdotal and does not demonstrate a causal relationship between glyphosate and the development of Parkinsonism."

## Monsanto continues to be sued. They claim that their manufactured chemical glyphosate is safe … and juries continue to rule against them. This would convince intelligent people to use something else.

"More than 13,400 plaintiffs allege that Roundup, which contains glyphosate, caused their non-Hodgkin's lymphoma and that the manufacturer failed to warn about that risk. Most of the lawsuits are pending in state courts." (NY Times, 5/22/2019)

In Nebraska, farmers filed a class action lawsuit against Monsanto. Lawsuits were also filed by a Kona Coffee farm owner in Hawaii, and a widow of a California farmer. All of these lawsuits share one thing in common: Farmers used Monsanto Roundup Weed Killer for years believing it was safe, and were eventually diagnosed with non-Hodgkin's lymphoma.

Involuntary manslaughter is a felony. So is negligent homicide. So is wanton endangerment.

> The definition of involuntary manslaughter: the unjustifiable, inexcusable, and intentional killing of a human being without deliberation, premeditation, and malice. The unlawful killing of a human being without any deliberation, which may be involuntary, in the commission of a lawful act without due caution and circumspection.
>
> The definition of negligent homicide: the killing of another person through gross negligence

Here are of 3 recent court opinions. Only a fool would conclude Roundup is safe after reading about them.

**Roundup Court Case #1**
On March 27, 2019 a San Francisco jury said Monsanto (now owned by BayerAG) was liable for Mr. Edwin Hardeman's non-curable cancer called non-Hodgkin lymphoma. The judge ordered Monsanto to pay Mr. Hardeman $200 million.

The jury stated:

> *"It is clear from Monsanto's actions that it does not care whether Roundup causes cancer, focusing instead on manipulating public opinion and undermining anyone who raises genuine and legitimate concerns about Roundup. It speaks volumes that not one Monsanto employee, past or present, came live to trial to defend Roundup's safety or Monsanto's actions. Today, the jury resoundingly held Monsanto accountable for its 40 years of corporate malfeasance and sent a message to Monsanto that it needs to change the way it does business."*

Here are a 4 of the many links to the case:

**Monsanto trial: cancer patient says he used herbicide for three decades**
https://www.theguardian.com/us-news/2019/mar/05/monsanto-roundup-trial-cancer-weed-killer

**Second Jury Trial Implicates Roundup in Lymphatic Cancer**
https://articles.mercola.com/sites/articles/archive/2019/04/03/roundup-guilty-non-hodgkin-lymphoma.aspx

**Jury Awards Edwin Hardeman $80.2 Million in Roundup Cancer Lawsuit**
https://www.lawyersandsettlements.com/legal-news/monsanto-facing-lawsuits-over-alleged-roundup-cancer/jury-awards-edward-hardeman-80-2-million-in-roundup-cancer-lawsu-23071.html

**Did weed killer Roundup cause cancer in Sonoma County resident Edwin Hardeman?**
https://www.pressdemocrat.com/news/9363655-181/did-weed-killer-roundup-cause

**Roundup Court Case #2**
On May 13, 2019 a jury in Alameda County California ruled that the couple, Alva and Alberta Pilliod of Livermore, Calif., both contracted non-Hodgkin's lymphoma because of their use of a glyphosate-based herbicide. They were each awarded $1 billion in punitive damages and an additional $55 million in collective compensatory damages.

Here are a few of the many links to the verdict:

**California Jury Awards $2 Billion to Couple In Roundup Weed Killer Cancer Trial**
https://www.npr.org/2019/05/13/723056453/california-jury-awards-2-billion-to-couple-in-roundup-weed-killer-cancer-trial

**Alva Pilliod & Alberta Pilliod: 5 Fast Facts You Need to Know**
https://heavy.com/news/2019/05/alberta-alva-pilliod/

**Pilliod v. Monsanto Company | California Roundup JCCP**
https://www.baumhedlundlaw.com/pilliod-v-monsanto-trial/

**The EPA says a chemical in Monsanto's weed-killer doesn't cause cancer — but there's compelling evidence the agency is wrong**
https://www.businessinsider.com/glyphosate-cancer-dangers-roundup-epa-2019-5

**Bayer Loses Third Glyphosate Lawsuit; Plaintiffs Awarded More Than $2 Billion in Damages**
https://www.agriculture.com/news/business/bayer-loses-third-glyphosate-lawsuit-plaintiffs-awarded-more-than-2-billion-in-damages

**Bayer-Monsanto Ordered to Pay $2 Billion to Glyphosate Cancer Victims**
https://healthimpactnews.com/2019/bayer-monsanto-ordered-to-pay-2-billion-to-glyphosate-cancer-victims/

**Bayer's stock falls after $2 billion verdict against Roundup maker Monsanto**
https://www.washingtonpost.com/business/2019/05/14/bayers-stock-falls-after-billion-verdict-against-roundup-maker-monsanto/?noredirect=on&utm_term=.d1848f7731e6

**Roundup Court Case #3**
In July 2018, Dewayne Johnson (a former school groundskeeper) was diagnosed with non-Hodgkin's lymphoma. He sued Monsanto alleging the chemical glyphosate (an ingredient in Roundup).caused his cancer. Mr. Johnson used Roundup as part of his job. On August 10, 2018 a jury in San Francisco delivered a verdict in Mr. Johnson's favor. The judge ordered Monsanto to pay Mr. Johnson $289 million in total damages.

Here are a few of the many links to the verdict:

**4 Must-See Videos of the Huge Win in the Monsanto Trial**
https://www.organicconsumers.org/blog/monsanto-trial-verdict-videos

**San Francisco Jurors Hear Hours of Scientific Data About Herbicide's Link to Cancer**

https://www.law.com/therecorder/2018/07/09/san-francisco-jurors-hear-hours-of-scientific-data-about-herbicides-link-to-cancer/?slreturn=20180713081135

**Monsanto Loses Landmark Roundup Cancer Trial, Set to Pay USD 289 Million in Damages**
https://mail.google.com/mail/u/0/#inbox/FMfcgxvxBXtJCGsfZgnVKVKfStZmxqSM

**Monsanto "Taken To The Cleaners" In Jury Verdict Dwayne Johnson v. Monsanto**
https://www.activistpost.com/2018/08/monsanto-taken-to-the-cleaners-in-jury-verdict-dwayne-johnson-v-monsanto.html

**Jury rules Monsanto liable in weed killer case**
https://abc7news.com/society/verdict-reached-in-lawsuit-against-monsanto/3925454/

**Monsanto ordered to pay $289 million in world's first Roundup cancer trial**
https://www.reuters.com/article/us-monsanto-cancer-lawsuit/jury-orders-monsanto-to-pay-290-million-in-california-roundup-cancer-trial-idUSKBN1KV2HB

**Monsanto Loses $289 Million Verdict in Roundup Cancer Trial**
https://www.bloomberg.com/news/articles/2018-08-10/monsanto-s-roundup-caused-groundskeeper-s-cancer-jury-finds

**Jury orders Monsanto to pay nearly $290M in Roundup trial**
https://www.nbcnews.com/news/us-news/jury-orders-monsanto-pay-290m-roundup-trial-n899811

## Appeals Court Upholds Groundskeeper's Roundup Cancer Trial Win over Monsanto

Excerpt:

"In yet another court loss for Monsanto owner Bayer AG, an appeals court rejected the company's effort to overturn the trial victory notched by a California school groundskeeper who alleged exposure to Monsanto's glyphosate herbicides caused him to develop cancer, though the court did say damages should be cut to $20.5 million, USRTK reported.

The Court of Appeal for the First Appellate District of California said Monday that Monsanto's arguments were unpersuasive and Dewayne "Lee" Johnson was entitled to collect $10.25 million in  compensatory damages and another $10.25 million in punitive damages."

Posted online by Sustainable Pulse, Jul 21 2020

https://sustainablepulse.com/2020/07/21/appeals-court-upholds-groundskeepers-roundup-cancer-trial-win-over-monsanto/?utm_source=newsletter&utm_medium=email&utm_campaign=glyphosate_gmos_and_pesticides_weekly_global_news_bulletin&utm_term=2020-07-29#.XyHQIYhKi1s

# Attachment #18

# Following Label Directions on "Approved" Herbicides Containers does not Assure Safety

**Following herbicide label directions does not assure safety excerpt-** "Tests done on glyphosate to meet registration requirements have been associated with fraudulent practices.

Laboratory fraud first made headlines in 1983 when EPA publicly announced that a 1976 audit had discovered "serious deficiencies and improprieties" in toxicology studies conducted by Industrial Biotest Laboratories (IBT).[44] Problems included "countless deaths of rats and mice that were not reported," "fabricated data tables," and "routine falsification of data."[44]

IBT was one of the largest laboratories performing tests in support of pesticide registrations.[44] About 30 tests on glyphosate and glyphosate-containing products were performed by IBT, including 11 of the 19 chronic toxicology studies.[45] A compelling example of the poor quality of IBT data comes from an EPA toxicologist who wrote, "It is also somewhat difficult not to doubt the scientific integrity of a study when the IBT stated that it took specimens from the uteri (of male rabbits) for histopathological examination."[46] (Emphasis added.)

In 1991, laboratory fraud returned to the headlines when EPA alleged that Craven Laboratories, a company that performed contract studies for 262 pesticide companies including Monsanto, had falsified test results.[47] "Tricks" employed by Craven Labs included "falsifying laboratory notebook entries" and "manually manipulating scientific equipment to produce false reports."[48] Roundup residue studies on plums, potatoes, grapes, and sugarbeets were among the tests in question.[49]

The following year, the owner/president of Craven Laboratories and three employees were indicted on 20 felony counts. A number of other employees agreed to plead guilty on a number of related charges.[50] The owner was sentenced to five years in prison and fined $50,000; Craven Labs was fined 15.5 million dollars, and ordered to pay 3.7 million dollars in restitution.[48]

Although the tests of glyphosate identified as fraudulent have been replaced, these practices cast shadows on the entire pesticide registration process."

Source--**Quality of Toxicology Testing**

By Cox, Caroline
Journal of Pesticide Reform, Volume 15, Number 3, Fall 1995. Northwest Coalition for Alternatives to Pesticides, Eugene, OR. Glyphosate, Part 1: Toxicology
http://www.inspiringlandscapes.com/hope/glyphos8.htm

**Following herbicide label directions does not assure safety excerpt -** "In 2004 the "Counterpart Regulations," strongly supported by industry, were proposed to streamline EPA's pesticide review process at the expense of the most vulnerable life forms in our country, Endangered and Threatened Species aka Listed Species (1,265 species are "Listed"). The critical change these regulations bring about is elimination of the requirement for consultations with wildlife experts at the U.S. Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS) by EPA reviewers evaluating adverse impacts of pesticides on Listed Species and their habitats. RCC opposed the Counterpart Regulations with comments, but, sadly, the Regulations were issued in final form on July 29, 2004, despite our objections. Over 125,000 public comments were received by the Fish and Wildlife Service, and they ran 2 to 1 against the Counterpart Regulations.

RCC Insight:
Apparently, the public's concerns did not make a difference to the people at FWS and NMFS, or did they? We wonder whether the scientists involved with protecting wildlife at both "Services" would want to be bringing their experience and knowledge to bear on decisions made by EPA with respect to pesticides, if it were up to them. Perhaps they would prefer to be part of the evaluation process and they do not concur with finalizing the Counterpart Regulations. However, the fact is that decision-makers, by finalizing these changes, support an action that will weaken Endangered Species' protection from poisoning and habitat degradation due to pesticides. This latest environmental rollback can mean increasingly hazardous conditions in rivers, lakes and wetlands. A further risk is weakening of the Endangered Species Act itself. (Text of our "Comments" is available through our website -- rachelcarsoncouncil.com)"

Source--**Species from Pesticides – Weakened**
Rachel Carson Council Inc., *Issues & Insights* October, 2004
http://www.rachelcarsoncouncil.org/index.php?page=issues-insights-october-2004

**<u>Following herbicide label directions does not assure safety excerpt</u>** "Used in yards, farms and parks throughout the world, Roundup has long been a top-selling weed killer. But now researchers have found that one of Roundup's inert ingredients can kill human cells, particularly embryonic, placental and umbilical cord cells.

Until now, most health studies have focused on the safety of glyphosate, rather than the mixture of ingredients found in Roundup. But in the new study, scientists found that Roundup's inert ingredients amplified the toxic effect on human cells—even at concentrations much more diluted than those used on farms and lawns.

One specific inert ingredient, polyethoxylated tallowamine, or POEA, was more deadly to human embryonic, placental and umbilical cord cells than the herbicide itself – a finding the researchers call "astonishing."

"The research team suspects that Roundup might cause pregnancy problems by interfering with hormone production, possibly leading to abnormal fetal development, low birth weights or miscarriages.

Monsanto, Roundup's manufacturer, contends that the methods used in the study don't reflect realistic conditions and that their product, which has been sold since the 1970s, is safe when used as directed. Hundreds of studies over the past 35 years have addressed the safety of glyphosate.

"Roundup has one of the most extensive human health safety and environmental data packages of any pesticide that's out there," said Monsanto spokesman John Combest. "It's used in public parks, it's used to protect schools. There's been a great deal of study on Roundup, and we're very proud of its performance."

The EPA considers glyphosate to have low toxicity when used at the recommended doses.

"Risk estimates for glyphosate were well below the level of concern," said EPA spokesman Dale Kemery. The EPA classifies glyphosate as a Group E chemical, which means there is strong evidence that it does not cause cancer in humans."

Source--**Weed-Whacking Herbicide Proves Deadly to Human Cells**
By Crystal Gammon and Environmental Health News June 23, 2009
http://www.scientificamerican.com/article.cfm?id=weed-whacking-herbicide-p

**Following herbicide label directions does not assure safety excerpt** "However, the U.S. government regulatory agencies seem to have given Monsanto a long rope. The clout Monsanto enjoys in the U.S. government is by no means incidental. According to the Organic Consumers Association, Clarence Thomas, before being the Supreme Court Judge who put George W. Bush in office (in his first term), was a Monsanto lawyer; Anne Veneman, the U.S. Secretary of Agriculture, was on the board of directors of Monsanto's Calgene Corporation; Donald Rumsfeld, the Secretary of Defence, was on the board of directors of Monsanto's Searle Pharmaceuticals; Secretary of Health Tommy Thompson received $50,000 in donations from Monsanto during his winning campaign for Wisconsin's governorship; and the two Congressmen who received the most donations from Monsanto during the last election were Larry Combest (Chairman of the House Agricultural Committee) and John Ashcroft (the Attorney-General)."

Source--**A multinational Exposed**
*Frontline*, Volume 22 - Issue 05, Feb. 26 - Mar. 11, 2005
http://www.hinduonnet.com/fline/fl2205/stories/20050311003312500.htm

**Following herbicide label directions does not assure safety excerpt** "A recent study which shows clear links between exposure to the herbicide glyphosate and non-Hodgkin's lymphoma (NHL), a form of cancer that afflicts the lymphatic system, has caused worldwide concern over the safety of the herbicide on humans.

The study was conducted by eminent oncologists Dr Lennart Hardell and Dr Mikael Eriksson of Sweden and published in the journal Cancer by the American Cancer Society on March 15."

**"Monsanto's Argument:**
Previous evaluations conducted by the US Environmental Protection Agency (EPA) and the World Health Organization (WHO) suggest that glyphosate is not a mutagenic or carcinogenic.

WHO and the Food and Agriculture Organization (FAO) have approved the safety of glyphosate residues in genetically-engineered Roundup Ready soyabeans.

**PAN's Counter Argument:**
The EPA and WHO evaluations were done more than five years ago and based mainly on data submitted to them by Monsanto.

These evaluations did conclude that "there is no evidence of mutagenicity or carcinogenicity" based on the available data, but they do not support definitive assertions that glyphosate "is not mutagenic or carcinogenic".

Previous EPA and WHO evaluations which made similar claims for other chemicals had to be revised as new evidence came to light.

The establishment of the WHO's Acceptable Daily Intake (ADI) is based on limited studies using limited parameters which do not account for vulnerable groups such as children, the elderly, the sick and other groups that might have increased susceptibility to glyphosate exposure."

Source--**Concerns Over Glyphosate Use**
*The Sun* (Malaysia), Friday August 20, 1999
http://www.poptel.org.uk/panap/archives/glywb.htm

**<u>Following herbicide label directions does not assure safety excerpt</u>** "To protect our health, the U.S. Environmental Protection Agency (EPA) sets maximum legal residue levels for every pesticide, for dozens of crops. But a new study in the respected journal *Toxicology* has shown that, at low levels that are currently legal on our food, Roundup could cause DNA damage, endocrine disruption and cell death. The study,

conducted by French researchers, shows glyphosate-based herbicides are toxic to human reproductive cells."

"Solvents and surfactants, legally considered 'inert ingredients,' are mixed with glyphosate in products such as Roundup weed killer to create chemical formulations that increase mobility and more direct access to the cells. 'Those same factors that aid penetration into a plant, also aid penetration into the skin,' says Vincent Garry, professor emeritus of pathology at the University of Minnesota. 'These chemicals are designed to kill cells.' "

"Herbicide manufacturers are subject to fewer rules in the testing of inert ingredients than they are for active ingredients, explains Caroline Cox, research director at the Center for Environmental Health in Oakland, Calif. 'The tests the EPA requires for inert ingredients cover only a small range of potential health problems,' Cox says. 'Testing for birth defects, cancer and genetic damage are required only on the active ingredients. But we're exposed to both.' "

" 'Our bodies are gigantic spider webs of chemical communications that work in the parts-per-trillion range,' says Warren Porter, professor of zoology and environmental toxicology at the University of Wisconsin. 'When you put so-called 'insignificant' amounts of toxic chemicals into the mix, you have a molecular bull in a china shop. The possibilities for impact are endless.' "

Source--**Roundup Kills more than Weeds**
By Kimble-Evans, Amanda
*Mother Earth News*, December 2009/January 2010
http://www.motherearthnews.com/Sustainable-Farming/Roundup-Weed-Killer-Toxicity.aspx?page=2

---

---

**Following herbicide label directions does not assure safety excerpt** "Glyphosate is of relatively low oral and dermal acute toxicity. It has been placed in Toxicity Category III for these effects (Toxicity Category I indicates the highest degree of acute toxicity, and Category IV the lowest). The acute inhalation toxicity study was waived because glyphosate is nonvolatile and because adequate inhalation studies with end-use products exist showing low toxicity." (Pg. 2)

"Glyphosate does not cause mutations." (Pg. 2)

“EPA conducted a dietary risk assessment for glyphosate based on a worst-case risk scenario, that is, assuming that 100 percent of all possible commodities/acreage were treated, and assuming that tolerance-level residues remained in/on all treated commodities. The Agency concluded that the chronic dietary risk posed by glyphosate food uses is minimal.” (Pg. 3)

“Occupational and residential exposure to glyphosate can be expected based on its currently registered uses. However, due to glyphosate's low acute toxicity and the absence of other toxicological concerns (especially carcinogenicity), occupational and residential exposure data are not required for reregistration.” (Pg. 3)

“Glyphosate is no more than slightly toxic to birds and is practically nontoxic to fish, aquatic invertebrates and honeybees. Due to the presence of a toxic inert ingredient, some glyphosate end-use products must be labeled, ‘Toxic to fish,’ if they may be applied directly to aquatic environments. Product labeling does not preclude off-target movement of glyphosate by drift. EPA therefore is requiring three additional terrestrial plant studies to assess potential risks to nontarget plants.

EPA does not expect that most endangered terrestrial or aquatic organisms will be affected by the registered uses of glyphosate.” (Pg. 4)

“Based on current data, EPA has determined that the effects of glyphosate on birds, mammals, fish and invertebrates are minimal.” (Pg. 5)

**“Regulatory Conclusion**
The use of currently registered pesticide products containing the isopropylamine and sodium salts of glyphosate in accordance with the labeling specified in this RED will not pose unreasonable risks or adverse effects to humans or the environment. Therefore, all uses of these products are eligible for reregistration.” (Pg. 6)

Source--**R.E.D. FACTS Glyphosate**
EPA publication - EPA-738-F-93-011, September 1993
http://www.epa.gov/oppsrrd1/REDs/factsheets/0178fact.pdf

---

---

**<u>Following herbicide label directions does not assure safety excerpt</u>** “The findings of Richard et al. (2005) are an important addition to our understanding that the health and environmental effects of formulated pesticide products are not fully reflected in tests conducted on the active ingredient(s) alone. It has been long known that the adjuvants

(commonly and misleadingly called "inert" ingredients) may be toxic and may enhance or supplement the toxic effects of the active pesticidal ingredient.

In the case of glyphosate-containing products, this phenomenon was well demonstrated in the data submitted to the (EPA) by the registrant (Monsanto), and summarized by the U.S. EPA in the Reregistration Eligibility Document (RED) for glyphosate (U.S. EPA 1993). For example, based on the registrant's own tests of acute toxicity to freshwater fish, the U.S. EPA classified technical grade glyphosate as "slightly toxic" to "practically non-toxic" and formulated products ranged from "moderately toxic" to "practically non-toxic." Tested alone, the surfactant adjuvant (identified as "inert") was "highly toxic" to "slightly toxic." Similar differences were reported in tests of acute toxicity to freshwater invertebrates.

Based in part on the data in the glyphosate RED (U.S. EPA 1993), the New York State Attorney General's office successfully pursued an action against Monsanto in 1996 (Attorney General of the State of New York 1996). At that time, Monsanto was making advertising claims about the toxicity of the Roundup products based on data from tests on the active ingredient alone. Such claims are scientifically unfounded and inherently deceptive. The Attorney General's action was facilitated by the availability of at least some limited information about the inert ingredients and their toxicity. That same sort of information enabled Richard et al. (2005) to conduct their study.

Unfortunately, that is not always the case, and for many pesticide products, little or no information about the identity of inert ingredients is publicly available. Registrants are generally required to conduct acute toxicity tests on formulated products, but they traditionally conduct chronic toxicity tests on the active ingredient alone. Even when formulated products are tested, the identity of inert ingredients is rarely revealed in the open literature, publicly available regulatory documents, or product labels. Therefore, independent research is stymied, and the public is ill-informed in the marketplace."

Source--**Issue: Cumulative Impacts to Amphibians Species**
By Séralini, Gilles-Eric
A Laboratoire de Biochimie et Biologie Moleculaire publication, Université de Caen, February 2006
http://www.signaloflove.org/clearcutting/reports/cumulativeimpactstoamphibian

**Following herbicide label directions does not assure safety excerpt** "FACT: The EPA (Environmental Protection Agency) does not test pesticides for safety. It relies on

the manufacturers' test data to make judgments. Recent probes have found that the experiments on which these data have been based, have been designed to show only what the manufacturer would like them to show. This criticism of self-serving misrepresentation can be aimed equally validly at irresponsible experimenters bent on demonstrating toxicity of a given pesticide.

It seems that however this problem is approached, the EPA needs to take more affirmative action and responsibility. This is not likely to happen, as the EPA's research program increasingly relies on corporate joint venture, according to agency documents obtained by Public Employees for Environmental Responsibility (PEER). Indeed, a study by the Government Accountability Office (the investigative arm of Congress – the same people who first told us of the $640 toilet seats and $1,000 hammers purchased with Department of Defense money), in April 2005, concluded that the EPA lacks safeguards to "evaluate or manage potential conflicts of interest" in corporate research agreements, as they are taking money from corporations that they are supposed to be regulating."

Source--**MYTH: The Government tests pesticides for safety before they are sold**
*Wild Ones Journal*, Nov 17, 2006
http://www.for-wild.org/download/roundupmyth/roundupmyth.html

---

---

**Following herbicide label directions does not assure safety excerpt** "FACT: The primary focus of the Federal Insecticide, Fungicide, and Rodenticide Act, originally enacted in 1947, was to provide federal control of pesticide distribution, sale, and use. The act has been amended many times over the years. One of these amendments permitted manufacturers protection of trade secrets. It is under these provisions that manufacturers circumvent a law that originally intended all information to be known – at least by the EPA. The fact that today, with mass spectrometers, chemistry can determine the makeup of the inert ingredients, leaves only the end consumer in the dark.

In 1990 the Office of the Attorney General of New York filed a request that all inert ingredients in pesticides be made public. The request was repeated a number of times through the decade, to no avail. Sixteen years later, in August of 2006, the attorneys general of 14 states have filed a similar petition to the EPA. This time the EPA is obliged to respond within a given time period."

Source--**MYTH: There are laws…**

*Wild Ones Journal*, Nov 17, 2006
http://www.for-wild.org/download/roundupmyth/roundupmyth.html

**Following herbicide label directions does not assure safety excerpt** "A recent study by eminent oncologists Dr. Lennart Hardell and Dr. Mikael Eriksson of Sweden [1], has revealed clear links between one of the world's biggest selling herbicide, glyphosate, to non-Hodgkin's lymphoma, a form of cancer [2]."

"In the study published in the 15 March 1999 Journal of American Cancer Society, the researchers also maintain that exposure to glyphosate 'yielded increased risks for NHL.' They stress that with the rapidly increasing use of glyphosate since the time the study was carried out, 'glyphosate deserves further epidemiologic studies.' "

"O' Neill concluded: 'The EPA when authorising Monsanto's field trials for Roundup-ready sugar beet did not consider the issue of glyphosate. They considered this to be the remit of the Pesticides Control Service of the Department of Agriculture. Thus nobody has included the effects of increasing the use of glyphosate in the risk/benefit analysis carried out. It is yet another example of how regulatory authorities supposedly protecting public health have failed to implement the 'precautionary principle' with respect to GMOs.' "

Source--**RoundUp—Lymphoma Connection**
By O' Neill, Sadhbh
*Genetic Concern*, June 22, 1999
http://www.hancock.forests.org.au/docs/herbicidesUpdate0602.htm

**Following herbicide label directions does not assure safety excerpt** "Glyphosate-containing products are acutely toxic to animals, including humans. Symptoms include eye and skin irritation, cardiac depression, gastrointestinal pain, vomiting, and

accumulation of excess fluid in the lungs. The surfactant used in a common glyphosate product (Roundup) is more acutely toxic than glyphosate itself; the combination of the two is yet more toxic."

"Tests done on glyphosate to meet registration requirements have been associated with fraudulent practices."

"Laboratory fraud first made headlines in 1983 when EPA publicly announced that a 1976 audit had discovered "serious deficiencies and improprieties" in toxicology studies conducted by Industrial Biotest Laboratories (IBT).[44] Problems included "countless deaths of rats and mice that were not reported," "fabricated data tables," and "routine falsification of data." "[44]

"IBT was one of the largest laboratories performing tests in support of pesticide registrations.[44] About 30 tests on glyphosate and glyphosate-containing products were performed by IBT, including 11 of the 19 chronic toxicology studies.[45] A compelling example of the poor quality of IBT data comes from an EPA toxicologist who wrote, "It is also somewhat difficult not to doubt the scientific integrity of a study when the IBT stated that it took specimens from the uteri (of male rabbits) for histopathological examination." "[46] (Emphasis added.)

"In 1991, laboratory fraud returned to the headlines when EPA alleged that Craven Laboratories, a company that performed contract studies for 262 pesticide companies including Monsanto, had falsified test results.[47] "Tricks" employed by Craven Labs included "falsifying laboratory notebook entries" and "manually manipulating scientific equipment to produce false reports."[48] Roundup residue studies on plums, potatoes, grapes, and sugarbeets were among the tests in question." "[49]

"The following year, the owner/president of Craven Laboratories and three employees were indicted on 20 felony counts. A number of other employees agreed to plead guilty on a number of related charges.[50] The owner was sentenced to five years in prison and fined $50,000; Craven Labs was fined 15.5 million dollars, and ordered to pay 3.7 million dollars in restitution."[48]

Source--**Glyphosate, Part 1: Toxicology**
By Cox, Caroline.
*Journal of Pesticide Reform*, Volume 15, Number 3, Fall 1995
http://terrazul.org/Archivo/Glyphosate_Fact_Sheets.pdf

**Following herbicide label directions does not assure safety** **excerpt** “EPA Investigates Monsanto

An internal memorandum by an official of the U.S. Environmental Protection Agency [EPA], has accused EPA of conducting a "fraudulent" criminal investigation of Monsanto, the St. Louis chemical corporation. [1]
The 30-page memo, from William Sanjour to his supervisor, David Bussard, dated July 20, 1994, describes a two-year-long criminal investigation of Monsanto by EPA's Office of Criminal Investigation (OCI).

The Sanjour memo says EPA opened its investigation on August 20, 1990 and formally closed it on August 7, 1992. "However, the investigation itself and the basis for closing the investigation were fraudulent," the Sanjour memo says.

According to the Sanjour memo:

- EPA's investigation of Monsanto was precipitated by a memo dated February 23, 1990, from EPA's Dr. Cate Jenkins to Raymond Loehr, head of EPA's Science Advisory Board.

- The Jenkins memo said that EPA had set dioxin standards relying on flawed Monsanto-sponsored studies of Monsanto workers exposed to dioxin, studies that had showed no cancer increases among heavily exposed workers.

- Attached to the Jenkins memo was a portion of a legal brief filed by the plaintiffs as part of a trial known as Kemner v. Monsanto, in which a group of citizens in Sturgeon, Missouri had sued Monsanto for alleged injuries they had suffered during a chemical spill caused by a train derailment in 1979.

- The Jenkins memo had not requested a criminal investigation; instead Jenkins had suggested the need for a scientific investigation of Monsanto's dioxin studies. But in August 1990, EPA's Office of Criminal Investigation (OCI) wrote a 7-page memo recommending that a "full field criminal investigation be initiated by OCI."

- Plaintiffs in the Kemner suit made the following kinds of allegations (which we quote verbatim from the Sanjour memo):

> “Monsanto failed to notify and lied to its workers about the presence and danger of dioxin in its chlorophenol plant, so that it would not have to bear the expense of changing its manufacturing process or lose customers;...
>
> "Monsanto knowingly dumped 30 to 40 pounds of dioxin a day into the Mississippi River between 1970 and 1977 which could enter the St. Louis food chain;

"Monsanto lied to EPA that it had no knowledge that its plant effluent contained dioxin;

"Monsanto secretly tested the corpses of people killed by accident in St. Louis for the presence of dioxin and found it in every case;...

"Lysol, a product made from Monsanto's Santophen, was contaminated with dioxin with Monsanto's knowledge." [The Sanjour memo says that, at the time of the contamination, "Lysol (was) recommended for cleaning babies' toys and for other cleaning activities involving human contact."]

"The manufacturer of Lysol was not told about the dioxin by Monsanto for fear of losing his business;

"Other companies using Santophen, who specifically asked about the presence of dioxin, were lied to by Monsanto;...

"Shortly after a spill in the Monsanto chlorophenol plant, OSHA measured dioxin on the plant walls. Monsanto conducted its own measurements, which were higher than OSHA's, but they issued a press release to the public and they lied to OSHA and their workers saying they had failed to confirm OSHA's findings;

"Exposed Monsanto workers were not told of the presence of dioxin and were not given protective clothing even though the company was aware of the dangers of dioxin;

"Even though the Toxic Substances Control Act requires chemical companies to report the presence of hazardous substances in their products to EPA, Monsanto never gave notice and lied to EPA in reports;

"At one time Monsanto lied to EPA saying that it could not test its products for dioxin because dioxin was too toxic to handle in its labs."...

Source--**EPA Investigates Monsanto**
*RACHEL'S HAZARDOUS WASTE NEWS* #400, July 28, 1994
http://www.ejnet.org/rachel/rhwn400.htm

**Following herbicide label directions does not assure safety excerpt** "A study by French researchers at the University of Caen of glyphosate residue discovered that the inert ingredients in the herbicide (solvents, preservatives, surfactants) increased the toxic effect on human cells. According to the researchers, glyphosate residue can cause birth defects.

"This clearly confirms that the [inert ingredients] in Roundup formulations are not inert," wrote the study authors. "Moreover, the proprietary mixtures available on the market could cause cell damage and even death [at the] residual levels" found on Roundup-treated crops."

"Another study by Argentine scientists also found that glyphosate can cause birth defects at doses considerably lower than what is commonly used on crops, in this case, soybeans. The researchers injected amphibian embryo cells with glyphosate diluted to a concentration 1,500 times less than what is used commercially. The embryos grew into tadpoles with obvious birth defects."

"A 2001 study by Swedish oncologists discovered links between non-Hodgkin's lymphoma and glyphosate. The Swedish researchers found that Swedish people with non-Hodgkin's lymphoma were 2.3 times more likely to be exposed to glyphosate.

Monsanto spokesperson John Combest defended the safety of Roundup. "Roundup has one of the most extensive human health safety and environmental data packages of any pesticide that's out there. It's used in public parks, it's used to protect schools. There's been a great deal of study on Roundup, and we're very proud of its performance." "

Source--**Can A Company That Makes Roundup Be Sustainable?**
By Cheeseman, Gina-Marie
*TriplePundit*, November 20th, 2009
http://www.triplepundit.com/2009/11/can-a-company-that-makes-roundup-be-sustainable/

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬

**Following herbicide label directions does not assure safety excerpt** "Over twenty years ago, the dangers of Monsanto's glyphosate as well as its associated GMOs were known scientifically to cause human health difficulties and Swedish researchers years ago in the Journal 'Cancer' noted glyphosate was connected to human cancer. Anyway, many scientists and public health workers researching it were fired. It's a mad

empire's rush--the U.S empire and its corporate proxies--to desire (hell, the reality of) to own the world's food and dominate the whole world. It is destroying thousands of years of biodiversity security in the process. And Monsanto's empire of glyphosate is in virtually everything in the USA and worldwide. One foolish company, one corrupt federal government of the USA. Everyone should learn more about Monsanto in the film "The World According to Monsanto." (90 minutes). Monsanto's corporate contract should be revoked for endangering world health and killing off global crop biodiversity of thousands of years of work destroyed in one generation--in the mad rush to dominate the whole world's biodiversity.

Monsanto and the USA will go down in history as the organizations that caused most biological devastation and human suffering in human history."

Source--**MONSANTO RoundUp (glyphosate) Empire causes BIRTH DEFECTS...in amphibian embryos, humans?**
*Portland independent media center,* May 3, 2009
http://portland.indymedia.org/en/2009/05/391045.shtml

**Following herbicide label directions does not assure safety excerpt** "BUENOS AIRES, Apr 15 , 2009 (IPS) - Glyphosate, the herbicide used on soybeans in Argentina, causes malformations in amphibian embryos, say scientists here who revealed the findings of a study that has not yet been published."

"The observed deformations are consistent and systematic," Professor Andrés Carrasco, director of the Laboratory of Molecular Embryology at the University of Buenos Aires medical school and lead researcher on the National Council of Scientific and Technical Research (CONICET), told the Inter Press Service news agency IPS.

Reduced head size, genetic alterations in the central nervous system, an increase in the death of cells that help form the skull, and deformed cartilage were effects that were repeatedly found in the laboratory experiments, said the biologist.

The news was reported Monday by the Argentine newspaper *Página 12*.

Monsanto's head of communications in Argentina, Fernanda Pérez Cometto, told IPS that the company has "several studies that show that the herbicide is harmless to humans, animals and the environment."

Source--**Scientists Reveal Effects of Glyphosate**
By Valente, Marcela
*HEALTH-ARGENTINA*, April 15 , 2009
http://www.ipsnews.net/news.asp?idnews=46516

**Following herbicide label directions does not assure safety excerpt** "It's amazing how many organics people still think it's OK to just use a bit of Roundup on those weeds in the bush or the driveway, or …. of course, not on the food, but the bush, that's OK isn't it?

Well, no, actually it isn't, and here's why: Roundup and various other formulations of the active ingredient glyphosate, have the potential to cause serious health and environmental effects, and have caused some severe poisoning problems.

Thorough PR by the developer of Roundup, Monsanto, has resulted in the widespread belief that glyphosate is 'safe'. Registration processes have generally supported this attitude, and there are no national or international bans. However, independent scientific studies and widespread poisonings in Latin America resulting from aerial application are beginning to reveal the true effects of the world's most widely used herbicide."

Source--**Roundup's Not OK**
By Watts, Meriel Ph.D.
*ORGANIC NZ*, November/December 2009
http://www.livingorganics.co.nz/roundups-not-ok.php

**Following herbicide label directions does not assure safety excerpt** Research on genetically modified seeds is still published, of course. But only studies that the seed companies have approved ever see the light of a peer-reviewed journal. In a number of

cases, experiments that had the implicit go-ahead from the seed company were later blocked from publication because the results were not flattering. "It is important to understand that it is not always simply a matter of blanket denial of all research requests, which is bad enough," wrote Elson J. Shields, an entomologist at Cornell University, in a letter to an official at the Environmental Protection Agency (the body tasked with regulating the environmental consequences of genetically modified crops), "but selective denials and permissions based on industry perceptions of how 'friendly' or 'hostile' a particular scientist may be toward [seed-enhancement] technology."

Shields is the spokesperson for a group of 24 corn insect scientists that opposes these practices. Because the scientists rely on the cooperation of the companies for their research - they must, after all, gain access to the seeds for studies - most have chosen to remain anonymous for fear of reprisals. The group has submitted a statement to the EPA protesting that "as a result of restricted access, no truly independent research can be legally conducted on many critical questions regarding the technology."

It would be chilling enough if any other type of company were able to prevent independent researchers from testing its wares and reporting what they find - imagine car companies trying to quash head-to-head model comparisons done by Consumer Reports, for example. But when scientists are prevented from examining the raw ingredients in our nation's food supply or from testing the plant material that covers a large portion of the country's agricultural land, the restrictions on free inquiry become dangerous.

Source-- "Do Seed Companies Control GM Crop Research?"
Scientific American, Editorial, August 2009 edition, published 21 July 2009
Reprinted by Combat-Monsanto.org
http://www.combat-monsanto.co.uk/spip.php?article399

**<u>Following herbicide label directions does not assure safety excerpt</u>** "France's highest court has ruled that U.S. agrochemical giant Monsanto had not told the truth about the safety of its best-selling weed-killer, Roundup. The court confirmed an earlier judgment that Monsanto had falsely advertised its herbicide as "biodegradable" and claimed it "left the soil clean." Roundup is the world's best-selling herbicide.

French environmental groups had brought the case in 2001 on the basis that glyphosate, Roundup's main ingredient, is classed as "dangerous for the environment" by the European Union.

In the latest ruling, France's Supreme Court upheld two earlier convictions against Monsanto by the Lyon criminal court in 2007, and the Lyon court of appeal in 2008, the AFP news agency reports.

Monsanto already dominates America's food chain with its genetically modified seeds. Now it has targeted milk production. Just as frightening as the corporation's tactics, including ruthless legal battles against small farmers, is its decades-long history of toxic contamination."

Source--**France Finds Monsanto Guilty of Lying**
Infowars Ireland, November 23, 2009
http://info-wars.org/2009/11/23/france-finds-monsanto-guilty-of-lying/

---

---

**Following herbicide label directions does not assure safety excerpt** "Monsanto created Roundup in the 1970's to kill weeds and has since catapulted this product to be the world's number one selling herbicide. Before the patent on Roundup was set to expire in 2000, Monsanto needed a surefire way to keep the profits of Roundup from bottoming out. Monsanto quickly began purchasing the majority of the world's seed companies while simultaneously creating GMOs that farmers needed to sign contractual agreements to only use Roundup. Subsequently, revenue from Roundup never dropped and in fact topped more than $4 billion in 2008, up 59% from 2007 [2].

GM-soy is estimated to be present in up to 70% of all food products found in US supermarkets, including cereals, breads, soymilk, pasta and most meat (as animals are fed GM-soy feed). Although Monsanto has consistently relied on industry-funded data to declare the safety of GM-soy and glyphosate, objective research published in peer-reviewed journals tells another story.

Toxicity of Glyphosate
A recently published study by Italian researchers [3] examined the toxicity of four popular glyphosate based herbicide formulations on human placental cells, kidney cells, embryonic cells and neonate umbilical cord cells and surprisingly found total cell death of each of these cells within 24 hours. The researchers reported several mechanisms by which the herbicides caused the cells to die including: cell membrane rupture and damage, mitochondrial damage and cell asphyxia. Following these findings, the

researchers tested G, AMPA and POEA by themselves and concluded that, "It is very clear that if G, POEA, or AMPA has a small toxic effect on embryonic cells alone at low levels, the combination of two of them at the same final concentration is significantly deleterious."

Source--**GM-Soy: Destroy the Earth and Humans for Profit**
By Damato, Gregory Ph.D.
Fourwinds10.com, May 27, 2009
http://www.fourwinds10.com/siterun_data/science_technology/dna_gmo/news.php?q=1243529527

---

---

**Following herbicide label directions does not assure safety excerpt** "If you're still not convinced that Roundup is a highly toxic and persistent pesticide, read on, while at the same time remembering the other contributions that Monsanto has made to society such as:

Saccharin, Astroturf, agent orange, dioxin, sulphuric acid, polychlorinated biphenyls (PCBs), plastics and synthetic fabrics, research on uranium for the Manhattan Project that led to the construction of nuclear bombs, styrene monomer, an endless line of pesticides and herbicides (Roundup), rBGH (recombinant bovine growth hormone that makes cows ill), genetically engineered crops (corn, potatoes, tomatoes, soy beans, cotton), and it's most significant product to date; **Lies, Factual Distortions and Omissions**. Here's one of the distortions that Monsanto had on its website a while back. 'Sustainability - the idea that the resources and people of this world are finite. That for any business decision we make, we must consider the effect it will have on us and our children. That the products we make must not use up all of a natural resource, or even worse, contaminate what is left behind.' "

Source--**Everything you Never Wanted to Know about Monsanto's *Modus Operandi* (M.O.)**
Mindfully.org
http://www.mindfully.org/Pesticide/Monsanto-Roundup-Glyphosate.htm

**Following herbicide label directions does not assure safety excerpt** “ "The U.S. response (to questions about biotech crop safety) has been an extremely patronizing one. They say 'We know best, trust us,'" added Gurian-Sherman, now a senior scientist at the Union of Concerned Scientists, a nonprofit environmental group.”

“So far, that confidence has been lacking. Courts have cited regulators for failing to do their jobs properly and advisers and auditors have sought sweeping changes.”

“The developers of these crop technologies, including Monsanto and its chief rival DuPont, tightly curtail independent scientists from conducting their own studies. Because the companies patent their genetic alterations, outsiders are barred from testing the biotech seeds without company approvals.”

“The agreements disallow any research that is not first approved by the companies. "No truly independent research can be legally conducted on many critical questions regarding the technology," the scientists said in their statement.”

“Outside researchers have also raised concerns over the years that glyphosate use may be linked to cancer, miscarriages and other health problems in people.”

Source--**Patents Trump Public Interest in Monsanto's Ag Empire - Special Report: Are Regulators Dropping the Ball on Biocrops?**
By Gillam, Carey
*Reuters*, April 13, 2010
http://www.commondreams.org/headline/2010/04/13-0

**Following herbicide label directions does not assure safety excerpt** **"**Defining Toxic Asbestos is an extreme example, which I use here and in my book *Pick Your Poison: How Our Mad Dash to Chemical Utopia is Making Lab Rats of Us All* to make a point, but many other "nontoxic" products could be full of toxic chemicals. I'm hoping this essay leaves you with a general distrust of the nontoxic label, both in the past and currently. When you see "nontoxic" on a product, keep the following facts in mind:

- "Nontoxic" can still legally mean that there are no immediate, acute hazards as determined by the LD50 and LC50 tests.

- "Nontoxic" may mean there are little or no chronic data available on the substance. If the substance is not acutely toxic, and one can't prove it is toxic in the long term, many manufacturers feel that they have the right to call it nontoxic. Even if there are studies showing that the substance is toxic, manufacturers in the United States have traditionally waited for absolute, unequivocal proof, which in most cases is never available because we don't study our chemicals.

- An art material is "nontoxic" if a toxicologist paid by the manufacturer decides it is safe. The dramatic failure in this labeling procedure was illustrated with the lead ceramic glazes and asbestos-containing materials such as talc. Asbestos-containing talcs are still found in some art and craft materials today.

Some art materials that have never been evaluated by a toxicologist may be labeled "nontoxic" illegally due to weak enforcement of the art materials labeling law. For example, in 1995, a cameraman and a reporter from Channel 9 in New York went with me to a major art materials outlet. That night on the evening news, we showed viewers about a dozen imported products that did not conform to the law, some labeled "nontoxic," which were being sold illegally. This is still true today, and a little research will lead you to many sources of noncompliant "nontoxic" products.

- Labeling of ordinary consumer products is pretty much up to the manufacturer and its paid advisers. Because there is no enforcement mechanism in the regulations for the chronic hazard labeling of ordinary consumer products, there is not much incentive to provide warnings.

- There is no regulatory requirement to warn consumers about damage to most of the body's organs, such as the lungs, the liver, and the kidneys. Only four types of chronic hazards are covered by the Federal Hazardous Substances Act regulations. These are cancer, and developmental, reproductive, and neurological damage."

Source--**Say What? A Chemical Can Damage Your Lungs, Liver and Kidneys and Still Be Labeled "Non-Toxic**"?
By Rossol, Monona

Ms. Rossol is a research chemist, author and member of the American Industrial Hygiene Association
May 9, 2011
http://www.alternet.org/story/150888/say_what_a_chemical_can_damage_your_lungs%2C_liver_and_kidneys_and_still_be_labeled_%22non-toxic%22?page=entire

---

---

## Following herbicide label directions does not assure safety

| Monsanto's Claims | Independent Research Findings |
|---|---|
| Roundup has a low irritational potential for eye and skin and otherwise is not a risk to human health. | Roundup is amongst the top most reported pesticides causing poisoning incidents (mainly skin irritation) in several countries. It also causes a range of acute symptoms including, recurrent eczema, respiratory problems, elevated blood pressure, allergic reactions. |
| Roundup does not cause any adverse reproductive effects | In laboratory tests on rabbits glyphosate caused long lasting, harmful effects on semen quality and sperm counts. |
| Roundup is not mutagenic in mammals. | DNA damage has been observed in laboratory experiments in mice organs and tissue. |
| Roundup is environmentally safe. | • In the agricultural environment, glyphosate is toxic to some beneficial soil organisms, beneficial arthropod predators, and increases crops' susceptibility to diseases.<br>• Sub-lethal doses of glyphosate from spray drift damages wildflower communities and can affect some species up to 20 metres away from the sprayer.<br>• The use of glyphosate in arable areas may cause dieback in hedgerow trees. |
| Roundup is rapidly inactivated in soil and water. | • Glyphosate is very persistent in soils and sediments.<br>• Glyphosate inhibited the formation of nitrogen fixing nodules on clover for |

| | |
|---|---|
| | 120 days after treatment.<br>• Glyphosate residues were found in lettuce, carrot, and barley when planted a year after glyphosate was applied. |
| Roundup is immobile and does not leach from soils. | • Glyphosate can readily desorb from soil particles in a range of soil types. It can be extensively mobile and leach to lower soil layers.<br>• Glyphosate can be carried by soil particles suspended in run off. |
| Roundup does not contaminate drinking water when used by local authorities on hard surfaces. | In the UK, levels of glyphosate above the EU limit have been detected by the Welsh Water Company every year since 1993. The Drinking Water Inspectorate recommends that glyphosate be monitored, particularly, in areas where it is used by local authorities on hard surfaces. |
| It is nearly impossible for glyphosate resistance to evolve in weeds. | In 1996, glyphosate resistant ryegrass was discovered in Australia. |
| Outcrossing in oilseed rape crops (and the transfer of genes from transgenic crops) occurs over a short distance and can be easily managed. | The densities of oil seed rape pollen are much higher and their dispersal patterns differ from around large fields compared to those found in experimental plots. Wind dispersal of pollen occurs over much greater distances and at higher concentrations than predicted by experimental plots. Significant levels of gene flow from transgenic oil seed crops is inevitable. |
| Roundup Ready crops will reduce levels of herbicide use. | Herbicide resistant crops will intensify and increase dependency on herbicide use in agriculture rather than lead to any significant reductions. A variety of herbicides will have to be reintroduced to control glyphosate resistant volunteers, feral populations of crops and resistant weeds. |
| ***Source: References cited in Health and Environmental Impacts of Glyphosate, (Details available from the Pesticides Trust [now PAN UK]).*** | |

Source--**Resistance to glyphosate**
This data was first published in *Pesticides News* No. 41, September 1998, page 5
http://www.pan-uk.org/pestnews/Issue/pn41/PN41p5.htm

---

---

**Following herbicide label directions does not assure safety excerpt** "FACT: The EPA (Environmental Protection Agency) does not test pesticides for safety. It relies on the manufacturers' test data to make judgments. Recent probes have found that the experiments on which these data have been based, have been designed to show only what the manufacturer would like them to show. This criticism of self-serving misrepresentation can be aimed equally validly at irresponsible experimenters bent on demonstrating toxicity of a given pesticide."

Source--**Herbicide Myths Vs. the Facts**
Published by Wild Ones, November 2006
http://www.for-wild.org/download/roundupmyth/mythvfact.html

---

---

**Following herbicide label directions does not assure safety excerpt** "The extraordinary influence of the biotechnology industry has made U.S. regulation of GM crops largely a rubber-stamp process designed to increase public confidence in, rather than ensure the safety of, genetically modified foods. Weaknesses shared by all three agencies include uncritical reliance on the data and conclusions of the financially interested GM crop developer in regulatory decisionmaking; dogmatic adherence to politically-motivated doctrines such as "substantial equivalence" designed to ease companies' regulatory path to approval; and blindness to the substantial economic harm suffered by U.S. farmers thanks to governmental and industry negligence. As continuing contamination episodes provoke more scientifically-oriented regulators in Europe and Japan to reject shipments of U.S. foodstuffs with untested GM content, one can only hope that the often severe economic fallout for U.S. farmers (if nothing else) will convince U.S. regulators to leave politics behind, and finally adopt a more objective, stringent, and science-based regulatory system."

Source--**Is Government Up to Task**

Published in the January/February 2007 issue of *Biotechnology*
http://www.centerforfoodsafety.org/pubs/FDLI%20Paper%20-%20Jan-Feb%202007.pdf

**<u>Following herbicide label directions does not assure safety excerpt</u>** “GAO's review found that EPA and FTC make limited use of their authority over unacceptable safety advertising c aims. GAO found the same situation nearly 4 years ago and recommended that EPA take steps to strengthen and improve its program for regulating such claims. Neither EPA nor FTC is taking formal enforcement action against safety claims by manufacturers and distributors. Since 1986 EPA has taken only one formal enforcement action involving a lawn care pesticide safety claim made by a manufacturer, while FTC has taken no enforcement action in this area. EPA officials told GAO that safety advertising claims are still a low enforcement priority because of limited resources and because other violations such as pesticide misuse continue to be its primary concern. Fm believes EPA is better able to handle pesticide safety claims because of its technical expertise and legislative authority.

FTC has not acted against claims by professional pesticide applicators, over which EPA has no authority, because it believes EPA has been successfully handling applicator claims informally through its regional offices. Although EPA and Fm officials have discussed GAO's 1986 recommendation, no formal arrangement has been made to ensure that questionable applicator claims would be given appropriate attention.

The lawn care pesticides industry is making claims that its products are safe or nontoxic. GAO's review found nine instances of safety claims, such as "completely safe for humans," made by manufacturers, distributors, and professional applicators. EPA, using its standards for pesticide labels, considers that these claims, when made by manufacturers and distributors, are false and misleading. Such claims are prohibited by because they differ substantially from claims allowed to be made as part of the approved registration. GAO believes that without an effective federal enforcement program, the lawn care pesticides industry will continue to make such claims that could, among other things, persuade consumers to purchase a service they otherwise might not use or discourage the use of reasonable precautions to minimize exposure, such avoiding recently treated areas.”

Source--**LAWN CARE PESTICIDES - Risks Remain Uncertain While Prohibited Safety Claims Continue**
United States General Accounting Office

Report to the Chairman, Subcommittee on Toxic Substances, Environmental Oversight, Research and Development, Committee on Environment and Public Works, U.S. Senate, March 1990
GAO/RCED-90-134
http://www.getipm.com/government/fifra-laws/gao-rpt.htm

**Following herbicide label directions does not assure safety excerpt** "2,4-D has been evaluated by the European Union and included on its list of approved herbicides, stating inter alia that "the review [of 2,4-D] has established that the residues arising from the proposed uses, consequent on application consistent with good plant protection practice, have no harmful effects on human or animal health."[30] Concern over 2,4-D is such that it is currently not approved for use on lawns and gardens in Sweden,[31] Denmark, Norway, Kuwait and the Canadian provinces of Québec [32] and Ontario.[33] 2,4-D use is severely restricted in the country of Belize. In 2005, the United States Environmental Protection Agency approved the continued use of 2,4-D.[34] In Canada, the Pest Management Regulatory Agency (PMRA) has placed a condition of registration on 2,4-D such that the 2,4-D registrant(s) must provide the PMRA with a required developmental neurotoxicity study by September 20, 2009.[35] According to the PMRA, the due date of the study has since been extended to early 2010."

Source--**2,4-Dichlorophenoxyacetic acid**
Published by Wikipedia
http://en.wikipedia.org/wiki/2,4-Dichlorophenoxyacetic_acid

**Following herbicide label directions does not assure safety excerpt** "According to the lawsuit, Parker became the subject of hostile treatment by his supervisors after complaining about what he called a "systemic problem" when it came to proper pesticide use across several forests in New Mexico and Arizona."

Source--**Former Forest Service Official Files Lawsuit over Fi**ring
By Susan Montoya Bryan Associated Press, August 10, 2007
http://earthhopenetwork.net/former_forest_service_official_files_lawsuit_firing.htm

---

---

**Following herbicide label directions does not assure safety excerpt** " According to a recent investigative report, a company known for conducting scientific research for the pesticide industry has, in an attempt to refute research linking pesticides to Parkinson's disease, paid a U.S. government agency, the National Institute for Occupational Safety and Health (NIOSH), to prove that certain pesticides are safe. According to the report, the company, Exponent Inc., is a member of CropLife America, a trade group that represents pesticide manufacturers, and also has worked regularly for Syngenta, which makes paraquat, one of the chemicals it is looking prove as safe. Specifically, the company is looking to refute the research which shows that even small amounts of agricultural chemicals, maneb and paraquat, when combined, can raise the risk of Parkinson's disease.

According to the report, managing scientist of Exponent, Laura McIntosh, PhD, said in an interview that the company donated the money and sought participation at NIOSH to enhance the credibility of its study of maneb and paraquat; they wanted to make their research "bulletproof." "

Source--**Beyond Pesticides Daily News Blog**
entry was posted on Thursday, February 17th, 2011
http://www.beyondpesticides.org/dailynewsblog/?p=4965

---

---

**Following herbicide label directions does not assure safety excerpt** "It's been the official mantra of pesticide companies for decades: "*The dose makes the poison.*" While it makes intuitive sense — you'd think that the more of a chemical you're exposed to, the sicker you'll get — the science has, in fact, been saying otherwise for years.

A team of 12 scientists recently released a report calling on EPA to completely revamp the way they evaluate chemicals, to better reflect this now fully understood reality: *Tiny* amounts of certain chemicals can have devastating effects on human health.

It's all about the hormones. Our systems are largely regulated by these powerful chemical messengers, and the intricate process of fetal development is all but completely orchestrated by them.

The bad news is, some synthetic chemicals look a lot like our natural hormones to the "hormone receptor" trigger cells that turn many functions on and off in our bodies. Particularly for the developing systems of infants and children, it's often the timing — not the dose — that matters most."

Source--**Low doses matter hugely, say scientists**
By Schafer, Kristin
Published in *Groundtruth*, April 2, 2012
Source: http://www.panna.org/blog/low-doses-matter-hugely-say-scientists

# Conclusion

When dealing with health issues like this that involve the unaware public it's better to be safe than sorry.

As the Responsible Official please do not direct your staff to prepare denial or 'it doesn't apply to this project" statements.

Most reasonable managers would not take the chance of killing someone even if the probability of it occurring were low.

Are you ready to take this risk?

# Attachment #10

## Polls about whether the Public Accepts Logging on National Forests

The following 16 polls indicate that average Americans do not want the trees in their national forest commercially logged for corporate profit. They feel they are more valuable when left standing.

Each poll may be validated by accessing the poll itself using the electronic links provided.

If the Responsible Official believes that these polls do not represent the American public, then please cite other polls in the NEPA document (with links to the poll itself) showing that Americans approve of such timber harvest in their national forest. If course none exist. Never again fancy yourself as someone who serves the public.

---

## Poll #1

**Who was Polled:** New England residents

**Number of People Polled:** 1,257 total

Maine - 300,
New Hampshire - 301,
Vermont - 301 and
Massachusetts, Connecticut, and Rhode Island - 355

**Date(s) of Poll:** July 2002

**Question:** How important to you personally is it to ensure that there are areas where people can go for recreation where there are no motorized vehicles or logging?

**Poll Findings:**

| | Southern NE | Northern NE |
|---|---|---|
| Very Important | 74% | 69% |
| Somewhat Important | 20% | 24% |

**Link to Poll:** http://www.brspoll.com/Reports/report-final.pdf

---

## Poll #2

**Who was Polled:** New England residents

**Number of People Polled:** 1,500

**Date(s) of Poll:** summer of 1998

**Question:** Do you oppose or support protection of all remaining undisturbed forest?

**Poll Findings:** 94% supported protection of all remaining undisturbed forest.

**Link to Poll:** http://www.forestwatch.org/content.php?id=53

---

## Poll #3

**Who was Polled:** Americans picked randomly nationwide from voter listings

**Number of People Polled:** 800 registered voters

**Date(s) of Poll:** June 22-25, 1998

**Question:** There has been a national debate about whether the U.S. Forest Service should continue to sell timber from our national forests. Do you favor or oppose continuing to allow timber companies to log in our national forests?

**Poll Findings:**

strongly favor logging in our national forests: 7%
somewhat favor logging in our national forests: 17%
neither: 2%
somewhat oppose logging in our national forests: 19%
strongly oppose logging in our national forests: 50%
don't know 5%

**Link to Poll:** http://www.sdearthtimes.com/et0998/et0998s6.html

## Poll #4

**Who was Polled:** adult residents from across the province of Nova Scotia

**Number of People Polled:** 400

**Date(s) of Poll:** 2003

**Question:** "Some people say that protecting more wilderness areas in Nova Scotia is necessary to conserve native plants and animals and for outdoor recreation. Others say there are already enough protected areas, and that to create more would be too costly, particularly for resource-based industries such as forestry and mining. All things considered, do you personally believe there should be more, the same amount, or fewer protected wilderness areas on publicly owned Crown land in Nova Scotia?"

**Poll Findings:**

- More protected areas: 69%
- Same amount of protected areas: 28%
- Less protected areas: 3%

**Link to Poll:** http://www.publicland.ca/news/040203.html

## Poll #5

**Number of People Polled:** 472 people living in Vermont

**Date(s) of Poll:** February, 2002

**Question:** On a scale of 1 to 10, with 1 not being important and 10 being extremely important, how important is it for the Green Mountain National Forest to provide opportunities for logging, grazing, or mining?

**Poll Findings:** 65% did not favor traditional development activities such as logging, grazing or mining.

**Link to Poll:** http://crs.uvm.edu/wildpoll/exec_summ.pdf

---

## **Poll #6**

**Who was Polled:** North Carolina adults

**Number of People Polled:** 584

**Date(s) of Poll:** Oct. 19-30, 1998

**Question:** In general, do you strongly support, somewhat support, somewhat oppose, or strongly oppose commercial logging in North Carolina's national forests?

**Poll Findings:** 62% of adult residents opposed commercial logging in North Carolina's national forests

**Link to Poll:** http://www.unc.edu/news/archives/feb99/carpoll3.htm

---

## **Poll #7**

**Who was Polled:** Alabama registered voters

**Number of People Polled:** 400

**Date(s) of Poll:** 2000

**Question:** Do you favor logging on national forests?

**Poll Findings:**

74% opposed logging
13% favored logging
13% were not sure.

**Link to Poll:** http://www.wildlaw.org/newsletters/July2000.htm

---

**Poll #8**

**Who was Polled:** Residents of Oregon and Washington

**Number of People Polled:** 600

**Date(s) of Poll:** May 2001

**Question:** Should old-growth forests on national forest lands be protected from logging?

**Poll Findings:** Yes – 75%

**Link to Poll:** http://www.conservationnw.org/library/newsletter/newsletter-pdfs/fall-ecosystemnews-2001.pdf

---

## Poll #9

**Who was Polled:** Randomly selected Georgia residents

**Number of People Polled:** 792

**Date(s) of Poll:** January 21 – February 1, 1998

**Question:** Recently there has been a national debate about whether the United States Forest Service should be allowed to sell timber from Federal public lands, such as the Chattahoochee and Oconee National Forests. In general, do you support or oppose commercial logging in Georgia's national forests?

**Poll Findings:**
Support Logging – 19.6%
Oppose Logging – 72.3%
Don't Know / No Answer – 8.1%

**Link to Poll:** http://www.johnmuirproject.org/resources-summary-of-polling-data-1998.html

---

## Poll #10

**Who was Polled:** Randomly selected Ohio residents

**Number of People Polled:** 476

**Date(s) of Poll:** 1997

**Question:** Do you Support or Oppose Logging in Ohio's Wayne National Forest?

**Poll Findings:**

Support Logging – 26.5%
Oppose Logging – 73.5%

**Link to Poll:** http://www.johnmuirproject.org/resources-summary-of-polling-data-1998.html

---

## Poll #11

**Who was Polled:** Randomly selected registered voters in the United States

**Number of People Polled:** 800

**Date(s) of Poll:** June 9-14, 1999

**Question:** Do you Support or Oppose Logging in Ohio's Wayne National Forest?

**Poll Findings:** 63% felt too little of the national forests are protected from commercial development and would favor a proposal that protects all roadless areas of 1,000 acres and larger.

**Link to Poll:**
http://community.seattletimes.nwsource.com/archive/?date=19990806&slug=2975897

---

## Poll #12

**Who was Polled:** 344 district rangers and 124 forest supervisors randomly selected from a current organizational roster provided by the Washington Office of the Forest Service.

**Number of People Polled:** Of the 468 line officers selected, 246 (72 percent) of the district rangers and 70 (56 percent) of the forest supervisors returned usable questionnaires.

**Date(s) of Poll:** 1990

**Poll Findings and Questions:**

**Table 1 (Pg 455)**
**Mean scores on RPA questions for District Rangers and Forest Supervisors**
**(Scale I to 5, I = Favorable, 5 = Unfavorable)**

| RPA Question | District Rangers N=246 | Forest Supervisors N=70 |
|---|---|---|
| **Increased production of wood from National forest System lands** | 3.91 | 3.99 |
| **Use of herbicides on brush in National Forest management** | 3.02 | 3.40 |
| **Use of pesticide to control insect losses in National Forest management** | 2.85 | 2.71 |
| **User payment for non-market services from National Forest lands** | 2.36 | 2.26 |
| **Development of National Forest lands for recreation purposes** | 1.77 | 1.60 |
| **Livestock forage development on National Forest lands** | 3.06 | 3.01 |
| **Development of energy-related and other minerals on National Forest lands** | 2.84 | 2.74 |

**Link to Poll:**
http://www.nationalaglawcenter.org/assets/bibarticles/brownharris_forest.pdf

---

# Poll #13

**Who was Polled:** randomly selected voters in Washington state likely to vote in the November 2000 general election

**Number of People Polled:** 500

**Date(s) of Poll:** October 14-18, 1999

**Poll Findings:**

68% favor protecting existing natural areas for habitat and recreation by making them off limits to development and activities like logging and mining

Most (80%) likely voters say environmental issues are important to them when deciding how to vote, including a strong majority of Democrats (91%), Independents (80%), and Republicans (69%)

**Link to Poll:** http://www.lcvef.org/programs/polling-research/state-polling/LCVEF_Washington-Poll_Oct1999.pdf

---

# Poll #14

**Who was Polled:** Americans randomly selected in the lower 48 states. A poll contracted by Chief Thomas.

**Number of People Polled:** 5,064

**Date(s) of Poll:** 2002

**Questions and Poll Findings:**

Public Beliefs about the roles of the Forest Service in their administration of the national forests.

| The Forest Service should | Average Public Response | Page |
|---|---|---|
| Conserve and protect watersheds | 4.61 | 32 |
| Preserve natural resources through policies such as no timber, no mining | 4.21 | 37 |
| Protecting ecosystems and wildlife habitat | 4.53 | 55 |
| Restrict timber harvest and grazing | 3.94 | 56 |

1 = public feels that the action is not important for the Forest Service to undertake
5 = public feels that the action should be something emphasized by the Forest Service

**Link to Poll:** http://www.fs.fed.us/rm/pubs/rmrs_gtr095.pdf
USDA Forest Service RMRS GTR-95

## Poll #15

**Who was Polled:** Registered voters in the Western United States

**Number of People Polled:** 1000

**Date(s) of Poll:** between Dec. 28, 1999 to Jan. 2, 2000

**Question:** Do you support or oppose allowing logging, mining and other industrial activities on national forest lands?

**Poll Findings:** Oppose-60% Support-31%

**Link to Poll:** http://www.gilawilderness.com/local/roadsurvy2.htm

## Poll #16

**Who was Polled:** Registered voters 5 Rocky Mountain states

**Number of People Polled:** 2,200

**Date(s) of Poll:** late January 2011

**Question:** Should a person have to choose between a strong economy and clean air and water**?**

**Poll Findings:** Seventy-six percent said we should ensure undeveloped public lands are kept in their natural state.

**Link to Poll:**
http://www.newwest.net/topic/article/poll_rockies_voters_want_stronger_economy_stricter_environmental_regs/C37/L37/

# Here's the Economic Information Most USFS Line-Officers Ignore and Withhold from the Local Public they Claim to Serve. Instead, they Emphasize the Need to Supply Logs to Timber Dependent Communities

### Idaho Outdoor Business Council's February 14, 2013 news release

**Excerpt:**
"BOISE -- Here's a valentine for Idaho's economy: Outdoor recreation creates more than 77,000 jobs, $6.3 billion in consumer spending, $1.8 billion in wages and $461 million in state and local tax revenue, according to a new report from the **Outdoor Industry Association** released today."

Total news release text at:
http://www.idahooutdoorbusinesscouncil.org/news/2013/2/14/outdoor-recreation-in-idaho-supports-77000-jobs-63-billion-i.html

### Washington Dept. of Fish and Game February 10, 2014 news release

**Excerpts:**
"The study concluded that $22.5 billion is spent annually in Washington on outdoor recreation, supporting 227,600 jobs and generating $1.6 billion in state and local tax revenue. Outdoor advocates said the impact is actually greater, since the study did not include equestrian, sailing and diving activities, all of which generate significant economic activity in the state. Jobs in the outdoor recreation sector include outdoor gear and apparel design and sales; lodging and transportation; guiding and outfitting services; and many more.

"We are delighted that Governor Inslee is highlighting the broad business and social benefits of outdoor recreation. The sector is among the state's biggest contributors to economic, community and personal health," said Marc Berejka, who directs REI's government and community engagement. "We look forward to working with the Governor and others to find ways to better support the people, communities and entrepreneurs who help make Washington one of the best states in the country for outdoor recreation." "

Total news release text at:
http://wdfw.wa.gov/news/feb1014a/

## The Timber Scam

by Keith Wright, 6/25/2000

**Excerpts:**
"In fiscal year 1997, over $1.3 billion was appropriated from taxpayers pockets for expenditures associated with the timber sale program on national forests. In addition, the Forest Service spent another $466 million from its off-budget logging accounts for additional expenses of the logging program. In the same year, the logging program generated only $555 million in timber sales receipts, of which $68 million was returned to the federal treasury. So, while the receipts were $555 million, the costs to the taxpayer were $1.7 billion. One forester estimates that the trees taken by the timber industry that year were worth over $3 billion, or, $2.5 billion more than they were sold for.

These dramatic losses are not unique to fiscal year 1997. For example, between 1992 and 1994, the General Accounting Office estimates that the Forest Service lost $1 billion. Such expenditures have gone in the past towards, for example, building and maintaining 440,000 miles of roads; replanting, and other forest management expenses. The John Muir Project reckons that the US Forest timber program gives a great deal to the timber industry. If the Forest Service didnt spend the money on costs related to timber harvesting, then the timber industry would have to. The costs to biodiversity are immeasurable."

"Commercial logging on our national forests was originally illegal. It wasnt until six years after the creation of national forests that commercial interests opened them up to timber sales through an appropriations rider in Congress. The forests were originally created in response to intense destruction of land and the subsequent flooding brought on by an overzealous timber industry. The industry never learned its lesson. Today, the floods that have recently ravaged Oregon are being blamed on over zealous logging in our national forests."

Link to entire paper:
http://www.jacksonprogressive.com/issues/misspolitics/timberscam.html

## National Forests Support Recreation Economy

By Frank Sturges 7/23/2014

**Excerpts:**
"Every year, over 160 million visitors head to our National Forests and Grasslands. Outdoor recreation enthusiasts contribute more to the economy than anything else the

U.S. Forest Service does—more even than timber, grazing, and mineral development combined.

**Tapping our public lands for economic value should emphasize the benefits of the recreation economy rather than shortsighted timber harvest expansions that can harm our landscapes.**

Visitors come to National Forests to hunt and fish, bike and hike, view wildlife, and paddle some of our most incredible rivers. Some head outdoors simply to de-stress and relax. While they're doing that, though, they are making jobs and providing an economic boost.

**Seeing the Forest for the Jobs**
According to a draft report by the U.S. Forest Service, recreation on National Forests contributes $13.6 billion to the country's GDP each year and supports 205,000 jobs. Those numbers far outpace the forest products industry, which generate $2.7 billion and support 42,000 jobs from the National Forest System, or energy and mineral production at $8 billion and 56,000 jobs."

Link: http://blog.nwf.org/2014/07/national-forests-support-recreation-economy/

## Why Doesn't Uncle Sam Count Outdoor Recreation Jobs?

by Tom Kenworthy, Jan 21, 2015

**Excerpts:**
"Even though the outdoor recreation industry, by its own reckoning, employs far more Americans than the oil and gas, timber, and mining industries combined, the federal government does not measure or track the huge impacts of the outdoor economy."

"Outdoor businesses provide billions of dollars in direct impact at the local, state and federal levels," added Steve Barker, interim Executive Director of the Outdoor Industry Association, which is sponsoring the Outdoor Retailer Winter Market trade show which kicked off in Salt Lake City, Utah Wednesday. "Our industry has become a vital contributor to the U.S economy, and the government should recognize and record the economic benefits of outdoor recreation and of the protected land and water on which the outdoor industry relies." "

"There is also research into the connection between the economic health of local communities and their proximity to protected lands, such as a 2012 study by Headwaters Economics that showed western communities near protected areas have better job growth and higher per capita income."

Link: http://thinkprogress.org/climate/2015/01/21/3613721/uncle-sam-count-those-recreation-jobs/

## Logging on Public Land Must be Restricted

123HelpMe.com. 29 Nov 2015

"My argument stems out of this uneconomic use. The United States Forest Service should not allow the overuse of public lands for the purpose of logging because of environmental, as well as economic losses. The government should add new acts or inforce old ones to make the Forest Service adhere to the policies of multiple use and forest conservation. Also, several issues stem out of the policies of the Forest Service when dealing with environmental matters. Without a change in policy, the U.S. government is threatening the future of these public lands not only for economic gains but also as natural areas set aside for nature to run its natural course."

"The environmental issue. There are several environmental issues which must be dealt with when considering the use of public lands. These include, but are not limited to deforestation due to roads, as well as the extraction of the lumber itself. The removal of habitat of native species of animals as well as erosion as losses in soil quality. After viewing all the problem it is very obvious that there is a need to reduce the use of the forests in the production of lumber."

"The environmental benefits claimed by the government include things such as the creation of new habitat and feeding areas as well as the introduction of new and old plant species into the environment, thereby creating a more diverse ecosystem (Booth). These ideas are good ones, however, if we did not create these deserts of stumps we would not have to worry about a more diverse ecosystem. Perhaps we should allow nature to run it's own course. After all, the Earth did fine before humans were around to start influencing it."

"We should allow future generations to enjoy what wilderness we have left, because if we do not we will be lost in a world of nothing but cities, unable to escape. Even the acting Forest Service Chief Jack Ward Thomas states, "above all, we have to remember that these lands have an economic and ecological value as intact ecosystems that is indefinitely greater than their value as timber producers." (Drabelle) I think perhaps he is right. It is up to us to realize, and then act upon the problem in our own, forested, backyard."

Link: http://www.123helpme.com/view.asp?id=10306

## If a tree falls in the watershed: Some question logging on land surrounding Northampton's reservoirs

*Daily Hampshire Gazette*, March 14, 2014

**Excerpts:**
"In a report Matera disseminated Tuesday, he argued that there is no need to log on the land. The reasons not to, he said, include the cost to taxpayers, the ecological impact

and the potential public health risks. He pointed to studies such as one from Harvard University that say the best management approach is to do nothing because logging causes more harm to the ecosystem than it does good.

Large trucks compact soil and the creation of logging trails requires cutting down trees indiscriminately, he said.

Diesel trucks have the potential to leak near reservoirs and the plan suggests that herbicides are an option for dealing with invasive species.

“The fact that they’re even considering using herbicides there doesn’t make sense. This is our drinking water,” he said.”

Date submitted (UTC-11): 2/27/2021 6:49:02 AM
First name: Tom
Last name: Tracey
Organization:
Title:
Comments:

Dear Kara Chadwick,
As you know, countless hours have been applied by volunteers to make the Boggy Draw area an attraction for mountain bikers from around the country. The San Juan National Forest is 1,879,680 acres. I must ask, with this national forest being so big, it is really necessary to harvest timber in the Boggy Draw area? Seems to me, that you could go elsewhere in the your forest in search of suitable ponderosa pine stands to harvest.
Sincerely,
Tom Tracey
===

Date submitted (UTC-11): 3/1/2021 12:00:00 AM
First name: Cap
Last name: Allen
Organization:
Title:
Comments:
Please enter the enclosed attachment in the Salter EA record.

The priority of use of Boggy Draw and its importance to the community needs a significant reprioritization here. My enclosed letter speaks to that.

Cap Allen

Ref: Comments on Salter EA.

I have reviewed the Salter EA. Although forest management policies from the time of Gifford Pinchot have often proved themselves steered in inappropriate directions, I must assume in this case that the science is good and that this form of forest management is the right pathway- for those portions of forest you intend to act upon. I am not well enough informed to comment otherwise.

However, the Forest is a multiple use entity. When one of those multiple uses becomes far more important to a community it needs to be recognized. Not --all uses --all of the time --in all places-- in the forest are promoted or allowed, There are areas where some of the multiple uses are restricted because other uses have become more important in that area. i.e. I have not seen a lot of clear cutting adjacent to ski area slopes, one doesn[rsquo]t see USFS campgrounds get logged.

The Boggy Draw area appears to be about 40% of the area considered for management in this document. The USFS has gone to a lot of trouble in Boggy Draw in recent years working directly with the volunteer labor pool of the area to define, layout, categorize cultural values, and monitor ongoing trail building in partnership with local recreational users. 1000[rsquo]s of volunteer hours have been contributed. One would think that effort was expended with the idea of promoting a long term value in that trail use. Why else would such coordination effort have been expended by USFS?

Although these trails are multiple use, it is clear at Boggy Draw trail system that mountain bikers outnumber hikers or equestrians by a substantial margin. So forgive me if I call it a mountain biking area. It is important to be realistic.

The Boggy Draw area is not just another grouping of trails in the USFS. These are purpose built trails, built by mountain bikers (with some minor help from the other users) with the presumption that the recreational value of the trail use would be preserved. The visual environment is a BIG part of the recreational value. The Boggy Draw area is known far and wide. This past year we saw travellers from adjacent states and beyond coming to that area to camp and ride. Boggy Draw is an excellent [ldquo]ambassador[rdquo] to SW Colorado for certain groups of recreationalists. My travels throughout the country, camping and bringing along my mountain bike, have discovered no other area with the broad appeal from hard core race enthusiasts to families on a mountain bike for the first time. It is a remarkable and unique area in the wide spectrum of biking users it can accommodate. Just like we protect other forest values, this recreational use should be protected.

Boggy Draw and all of its trail system needs to be considered as a stand alone entity. Not just a casual recreational use that the forest thinning activities need to somehow work around. The Salter Plan has significant potential to damage that entity for a long time to come.

I do not see references to actual dollar values that can be realized from timber sales. I have limited experience in my profession, as a private civil engineer in Southwest Colorado for 50 years, that tells me timber sales can be a net wash or negative to the USFS when significant funds are expended to promote the sale or clean up afterwards. What can be expected from the commercial aspect of this management plan is one or a very few lumbering operations are able to muster a profit for their owners and some few employees. That operation may or may not be from the area. And it is a short term gain.

What is that number at 40% of the Salter plan when compared to mountain biking?

In contrast the mountain biking community has a daily mounting benefit to which some dollar amounts can be ascribed. EAs and EISs are notorious for using the value of a recreational day, sometimes in very inflated numbers to justify one or another project. But numbers can be placed with some degree of agreement on these activities.

I will use conservative numbers. I have observed on a frequent basis the Boggy Draw mountain bike uses, so I don[rsquo]t think I am far off. Lets say in the course of a weekend day, there are 40 total cars at the various access locations in Boggy Draw, a low total for an entire day. And for weekday 15 vehicles. This gives a user week of 150 vehicles per week. Lets put 1.5 users in each car. This results in 225 user days per week. Surely a low number. Lets call a season (it really never ends as I rode my fat bike on the snow in February) 180 days, 26 weeks. 5,850 user days.

I will say confidently that a person using Boggy Draw one time has a recreational value of $50 per use. (No, there is no dollar exchange but this is its WORTH). This pales in comparison to the numbers I have seen used in Federal documents. This is about $300,000 per season and I think that is a low number. Low in terms of overall numbers per year and low in terms of value to the user (consider that $150 is being spent for ski tickets and similar numbers for a round of golf.)

Mutiply this $300,000 by the number of seasons the [ldquo]forest management[rdquo] will continue and further consider the number of years it will take for the forest to regain a [ldquo]natural[rdquo] look. X10, x20?

To this you must add the value of mountain biking to the local community. Restaurants are frequented, motels are rented, gasoline is purchased, bicycles are bought, parts are needed. In the extreme I have worked for folks who have come here and purchased a home with the express purpose of having a garage to put mountain bikes in. Each year after the 12 Hours of Mesa Verde bike race, many dozens of riders stay a few days to enjoy Boggy Draw. They continue to spend money in the area. This is not a small impact and it is not slowing down as a draw to this area.

The potential to damage this valuable use of the USFS with a simple logging operation is great. Loggers and bikers are not born friends. A logger will not recognize the impact he has on leaving slash on a trail, parking equipment on same, or even closing off trails. The potential to damage the value Boggy Draw has to the community is great. Temporary closures can lead to long weeks and still be called temporary. Trail damage can be severe. Logging is heavy industry. Heavy industry can be dirty nasty and noisy and polluting and have all those characteristics accepted as [ldquo]that[rsquo]s the way it is[rdquo].

To this we must add the value of the finished product. Having just spent a brief winter skiing in the Chicken Creek area North of Mancos I can tell you that the thinned forest does not resemble what was there before at all. Additionally problematic are the seemingly forever piles of slash. I don[rsquo]t know if slash removal becomes part of this effort or if it is slowly burned off or considered part of the new ecosystem. In any case anyone can go to see the result and see that the Chicken Creek area has lost much of its value as a forest experience. In one case a logging operation opened up so much light from above and left so many ugly slash piles that a significant portion of the permitted Chicken Creek Nordic track was rerouted in acknowledgement of the degradation of the recreational experience by the logging activity.

I urge the review team for the Salter EA to execute a complete 180 in their consideration of the forest health project for Boggy Draw. Instead you need to come at if from [ldquo]how can we reduce fire potential, make the forest healthier, reduce beetle kill potential[rdquo] without damaging the Boggy Draw -Primary- trail resource?

That is the right question to ask. The community will thank you for it.

The USFS has an extremely capable resource mapping ability. It would be possible to define quite completely the view shed corriders of the Boggy Draw Trails. A first suggestion is a 200[rsquo] setback of thinning activities from BOTH SIDES of the trails. In some cases it would be larger because it is view shed, distant prospects, that need preservation. A survey of this type is not difficult given modern mapping capabilities. Process that concept and see what you are left with. It is likely you will still have significant acreage to devote to the project and it is likely you can develop a fire break and beetle break concept from doing this. It will be harder to do, but the Boggy Draw uses warrant the effort.

I think the USFS owes the SW Colorado recreation community the consideration of this approach.

Thank you very much

# Cap Allen Engineering

**Cap Allen, P.E.- 14757 Road 26—Dolores, Colorado, 81323 970-799-0623**

San Juan National Forest
Dolores Public Lands Office
Salter Vegetation Management Project
Attention: Derek Padilla
29211 Highway 184
Dolores, Colorado 81323

Ref: Comments on Salter EA.

I have reviewed the Salter EA. Although forest management policies from the time of Gifford Pinchot have often proved themselves steered in inappropriate directions, I must assume in this case that the science is good and that this form of forest management is the right pathway- for those portions of forest you intend to act upon. I am not well enough informed to comment otherwise.

However, the Forest is a multiple use entity. When one of those multiple uses becomes far more important to a community it needs to be recognized. Not --all uses --all of the time --in all places-- in the forest are promoted or allowed, There are areas where some of the multiple uses are restricted because other uses have become more important in that area. i.e. I have not seen a lot of clear cutting adjacent to ski area slopes, one doesn't see USFS campgrounds get logged.

The Boggy Draw area appears to be about 40% of the area considered for management in this document. The USFS has gone to a lot of trouble in Boggy Draw in recent years working directly with the <u>volunteer labor pool</u> of the area to define, layout, categorize cultural values, and monitor ongoing trail building in partnership with local recreational users. 1000's of volunteer hours have been contributed. One would think that effort was expended with the idea of promoting a <u>long term value</u> in that trail use. Why else would such coordination effort have been expended by USFS?

Although these trails are multiple use, it is clear at Boggy Draw trail system that mountain bikers outnumber hikers or equestrians by a substantial margin. So forgive me if I call it a mountain biking area. It is important to be realistic.

The Boggy Draw area is not just another grouping of trails in the USFS. These are purpose built trails, built by mountain bikers (with some minor help from the other users) with the presumption that the recreational value of the trail use would be preserved. <u>The visual environment is a BIG part of the recreational value</u>. The Boggy Draw area is known far and wide. This past year we saw travellers from adjacent states and beyond coming to that area to camp and ride. Boggy Draw is an excellent "ambassador" to SW Colorado for certain groups of recreationalists. My travels throughout the country, camping and bringing along my mountain bike, have discovered no other area with the broad appeal from hard core race enthusiasts to families on a mountain bike for the first time. It is a remarkable and unique area in the wide spectrum of biking users it can accommodate. Just like we protect other forest values, this recreational use should be protected.

<u>Boggy Draw and all of its trail system needs to be considered as a stand alone entity. Not just a casual recreational use that the forest thinning activities need to somehow work around. The Salter Plan has significant potential to damage that entity for a long time to come.</u>

I do not see references to actual dollar values that can be realized from timber sales. I have limited experience in my profession, as a private civil engineer in Southwest Colorado for 50 years, that tells me timber sales can be a net wash or negative to the USFS when significant funds are expended to promote the sale or clean up afterwards. What can be expected from the commercial aspect of this management plan is one or a very few lumbering operations are able to muster a profit for their owners and some few employees. That operation may or may not be from the area. And it is a short term gain.

What is that number at 40% of the Salter plan when compared to mountain biking?

In contrast the mountain biking community has a daily mounting benefit to which some dollar amounts can be ascribed. EAs and EISs are notorious for using the value of a recreational day, sometimes in very inflated numbers to justify one or another project. But numbers can be placed with some degree of agreement on these activities.

I will use conservative numbers. I have observed on a frequent basis the Boggy Draw mountain bike uses, so I don't think I am far off. Lets say in the course of a weekend day, there are 40 total cars at the various access locations in

Boggy Draw, a low total for an entire day. And for weekday 15 vehicles. This gives a user week of 150 vehicles per week. Lets put 1.5 users in each car. This results in 225 user days per week. Surely a low number. Lets call a season (it really never ends as I rode my fat bike on the snow in February) 180 days, 26 weeks. 5,850 user days.
I will say confidently that a person using Boggy Draw one time has a recreational value of $50 per use. (No, there is no dollar exchange but this is its WORTH). This pales in comparison to the numbers I have seen used in Federal documents. This is about $300,000 per season and I think that is a low number. Low in terms of overall numbers per year and low in terms of value to the user (consider that $150 is being spent for ski tickets and similar numbers for a round of golf.)

Mutiply this $300,000 by the number of seasons the "forest management" will continue and further consider the number of years it will take for the forest to regain a "natural" look. X10, x20?

To this you must add the value of mountain biking to the local community. Restaurants are frequented, motels are rented, gasoline is purchased, bicycles are bought, parts are needed. In the extreme I have worked for folks who have come here and purchased a home with the express purpose of having a garage to put mountain bikes in. Each year after the 12 Hours of Mesa Verde bike race, many dozens of riders stay a few days to enjoy Boggy Draw. They continue to spend money in the area. This is not a small impact and it is not slowing down as a draw to this area.

The potential to damage this valuable use of the USFS with a simple logging operation is great. Loggers and bikers are not born friends. A logger will not recognize the impact he has on leaving slash on a trail, parking equipment on same, or even closing off trails. The potential to damage the value Boggy Draw has to the community is great. Temporary closures can lead to long weeks and still be called temporary. Trail damage can be severe. Logging is heavy industry. Heavy industry can be dirty nasty and noisy and polluting and have all those characteristics accepted as "that's the way it is".

To this we must add the value of the finished product. Having just spent a brief winter skiing in the Chicken Creek area North of Mancos I can tell you that the thinned forest does not resemble what was there before at all. Additionally problematic are the seemingly forever piles of slash. I don't know if slash removal becomes part of this effort or if it is slowly burned off or considered part of the new ecosystem. In any case anyone can go to see the result and see that the Chicken Creek area has lost much of its value as a forest experience. In one case a logging operation opened up so much light from above and left so many ugly slash piles that a significant portion of the permitted Chicken Creek Nordic track was rerouted in acknowledgement of the degradation of the recreational experience by the logging activity.

**I urge the review team for the Salter EA to execute a complete 180 in their consideration of the forest health project for Boggy Draw. Instead you need to come at if from "how can we reduce fire potential, make the forest healthier, reduce beetle kill potential" without damaging the Boggy Draw -Primary- trail resource?**

**That is the right question to ask. The community will thank you for it.**

The USFS has an extremely capable resource mapping ability. It would be possible to define quite completely the view shed corriders of the Boggy Draw Trails. A first suggestion is a 200' setback of thinning activities from BOTH SIDES of the trails. In some cases it would be larger because it is view shed, distant prospects, that need preservation. A survey of this type is not difficult given modern mapping capabilities. Process that concept and see what you are left with. It is likely you will still have significant acreage to devote to the project and it is likely you can develop a fire break and beetle break concept from doing this. It will be harder to do, but the Boggy Draw uses warrant the effort.

I think the USFS owes the SW Colorado recreation community the consideration of this approach.

Thank you very much

Cap Allen
March 1, 2021

Date submitted (UTC-11): 3/3/2021 10:09:17 AM
First name: Leah
Last name: Burkett
Organization:
Title:
Comments:
RE: Salter Vegetation Management Proposal

On the surface, this project seems like an obvious win for the Forest Service. Thinning overgrown, tinder-dry forests is a massive undertaking; increased logging by local wood milling companies seems like a winning arrangement for both parties. However, absent regulation and oversight of the area's wood mills, the risk of wildfire may simply be transferred from deep within the forest to the more populous and equally fire-prone surrounding areas where the sawmills are located.

Fires at sawmills and forestry product plants are a very real threat. Currently, a fire is still smoldering at one of the sawmills included in the Salter Vegetation Management proposal. The Aspen Wall Wood fire began in December as a result of spontaneous combustion of their wood waste pile, which had been bulldozed off the cliff edge of their property for many years. The fire grew to 10 acres before it was contained, and could easily have spread into the surrounding forested areas had it not been for the swift response and cooperation of local firefighters, coupled with the good timing of a heavy winter snow-storm.

While the Cortez Journal reported that Aspen Wall Wood company has not been disposing of wood waste this way for many years, a recent drive-by the smoldering fire tells a different story. Curious about the status of the fire after the Journal's recent report on March 1st, I drove by the site the following day to check it out. I was dismayed to see a huge, fresh new pile of sawdust recently been pushed off the cliff's edge, right on top of known hotspots and a still-smoldering fire. This illustrates that the company has learned little from this fire, now burning for months (and causing neighbors to suffer from the constant smoke).

There are currently no regulations in Montezuma County for how sawmills should manage their highly combustible wood waste products. What will become of the waste from the products the wood mills will produce from logging operations in the Salter/Boggy Forests?

Please, Forest Service, please ensure that proper fire prevention plans are in place for the local sawmills that would benefit from this proposal.

Here are some links to articles in the Cortez Journal about the ongoing fire:

LINK ---- https://the-journal.com/articles/196125-update-fire-threatened-entire-dolores-sawmill-owner-says

LINK -- https://the-journal.com/articles/196734-aspen-wall-wood-fire-continues-to-burn-and-smoke

LINK --- https://the-journal.com/articles/203682-wood-mill-fire-subsides-smoldering-to-continue

And a link with information about the general risk of fire at sawmills:

LINK ---- https://www.biomassengineeringequipment.com/fire-safety-sawmills-forestry-plants-dust-hazard-assessment/


Still smoking
hotspots

Date submitted (UTC-11): 3/3/2021 12:24:08 PM
First name: Peter
Last name: Eschallier
Organization:
Title:
Comments:
To whom it may concern,
I am writing this comment to express my opposition to the Salter Vegetation Project.  While I do believe that some management of our forests can be helpful for the overall health of our beloved forest lands that we all recreate on.  I am concerned that this project would impact the boggy draw trail system negatively, reducing the number of mountain bikers in particularly that visit and use this area.  Being the co-owner of Kokopelli bike and board, we rely on these trail users for as a main source of our revenue and impacting this trail system in any way would be detrimental to our business and our ability to offer employment to our staff.  This project is even more concerning to our business this year as we are opening another store in Dolores this year.  Having any interruption to to access as well as any negative impact to the natural environment that everyone enjoys when they recreate on these lands would jeopardize our new business venture.   We are committed to investing in our sustainable outdoor industry which I believe will be the future of our local economy.  Please consider these comments as any interruption and negative impact to these trails would be disastrous to our business.

Date submitted (UTC-11): 3/8/2021 5:51:25 AM
First name: Jon
Last name: Angus
Organization:
Title:
Comments:
I see Boggy Draw as a jewel that should not be taken for granted. On any given day in any season you'll see license plates from all over the country as people flock to the area to enjoy these lands in various ways. The local economy would be in a sorry state if that was to change. I've spent many hours helping build and maintain trails along with other community volunteers from SWCCO and feel that everything should be done to protect these trails. I'd also propose supporting a new trail from town as an alternative to the road which will be a dangerous place for pedestrians and cyclists with the added logging traffic.

Date submitted (UTC-11): 3/8/2021 7:26:27 AM
First name: Justin
Last name: Brown
Organization:
Title:
Comments:
I object. The trails in this area must be preserved and access maintained. There are not enough trail opportunities available to the influx of trail users in Colorado. Please reconsider this project scope.

Date submitted (UTC-11): 3/8/2021 4:34:07 PM
First name: Ethan
Last name: Clarke
Organization:
Title:
Comments:
Please preserve the beauty of this natural forest and ski not open it up to logging!  The trails here are the main reason my family and friends visit the area!

Date submitted (UTC-11): 3/8/2021 1:54:50 PM
First name: John
Last name: Desmond
Organization:
Title:
Comments:
I object to the destruction of the Boggy Draw trails.

Date submitted (UTC-11): 3/8/2021 6:50:37 AM
First name: ellen
Last name: finch
Organization:
Title:
Comments:
wow. More mucking  up*our*forests. National Forest. To be managed, not exploited. I understand that fire control is necessary. So, do fire control activities. Not lumbering activities. Maintain the peace and beauty of the area that people enjoy along the trails. The views. Please don't do this.

Date submitted (UTC-11): 3/8/2021 4:44:33 AM
First name: Elayne
Last name: Fletcher
Organization:
Title:
Comments:
The Boggy Draw trail system is a valuable asset to both the economical and physical/mental well being of the surrounding communities. People come from all over the world to camp and enjoy the trails here. I have no problem with science based, respectful management of the national forests but I've seen what happens in reality when these areas are logged and it's usually very ugly and permanent in the long term.

Many members of the community have put in long, hard hours to build these trails and they and the areas around them should be preserved. There's no need to destroy cherished public recreation areas and impact people's ability to enjoy and escape to the outdoors.

Date submitted (UTC-11): 3/8/2021 5:19:40 AM
First name: Shaun
Last name: Pettigrew
Organization:
Title:
Comments:
I object to this project, I value the section of  multi use trails and camping area in the planned project area. The trails and wildlife will be affected by the truck traffic, the noise pollution, and dangers of increased trash that will come employees working.

Date submitted (UTC-11): 3/8/2021 12:00:00 AM
First name: Harold
Last name: Ragland
Organization:
Title:
Comments:
To Who It May Concern,

I am Harold Ragland representing Ragland and Son[rsquo]s Logging and Stonertop Lumber. I appreciate the opportunity to voice my opinion and appreciate your proactive approach to these issues. I have worked on the forest for 53 years and am passionate about protecting and responsibly developing our public lands.

First, I would like to address recreation. I think that all types of recreation can coincide with any and all logging operations and neither should be impeded. I have seen firsthand how logging and recreation can operate in a complimentary fashion.

Next, I[rsquo]d like to address forest sales. I believe the Forest Service should be in more control over the forest sales. This could be accomplished by dividing the sales into 20 acres or less and must be completed before they start on another sale. This order of operations is necessary because, if the trees are cut and not removed before another season, it creates habitat/incubation for the bugs and Beatles that damage our forests[rsquo] long-term health. The same goes for the Forest Service Thinning projects that go for firewood.

The Forest Service control Burns have been a complete disaster with no one to be held accountable. A better way would be utilize ground mixing strategies. Excess wood to be decomposed naturally by the microbes in the ground, Increasing in the water retention and the fertility of the soil. The controlled burn has several downsides that outweigh the benefits. All of the shrubs are affected from the burn which is a valuable food source for our wildlife including currents, acorns, serviceberry ,chokecherry, wild tomato, etc. Trees are affected though they continue to grow sometimes they are damaged. This damage to trees is backed by evidence: when the tree is cut you can prove what year it was burned by a mark in the rings. When the tree is cut into lumber it has pitch pockets in it as well. This fire damage turns a piece of wood that could possibly could be used as valuable molding to dunnage which is nearly worthless. The economic impact of the control burns decreases the value of the public[rsquo]s timber by amounts sometimes up to 100 times.

Finally, If the economic and biological reasons to stop control burns are not enough, I also want to express the cruel and inhumane damage done to our wildlife by control burns. It is not in the public interest to burn hundreds of thousands of animals alive. This is an ecological and moral disaster. In the 1970s you could walk to the Pine Forest and see several Kaibab squirrels. Now you can[rsquo]t even find one. If the control burns continue, I have serious concerns that these squirrels will be added to the endangered species list.

Sincerely,
Harold Ragland

To Who It May Concern,

I am Harold Ragland representing Ragland and Son's Logging and Stonertop Lumber. I appreciate the opportunity to voice my opinion and appreciate your proactive approach to these issues. I have worked on the forest for 53 years and am passionate about protecting and responsibly developing our public lands.

First, I would like to address recreation. I think that all types of recreation can coincide with any and all logging operations and neither should be impeded. I have seen firsthand how logging and recreation can operate in a complimentary fashion.

Next, I'd like to address forest sales. I believe the Forest Service should be in more control over the forest sales. This could be accomplished by dividing the sales into 20 acres or less and must be completed before they start on another sale. This order of operations is necessary because, if the trees are cut and not removed before another season, it creates habitat/incubation for the bugs and Beatles that damage our forests' long-term health. The same goes for the Forest Service Thinning projects that go for firewood.

The Forest Service control Burns have been a complete disaster with no one to be held accountable. A better way would be utilize ground mixing strategies. Excess wood to be decomposed naturally by the microbes in the ground, Increasing in the water retention and the fertility of the soil. The controlled burn has several downsides that outweigh the benefits. All of the shrubs are affected from the burn which is a valuable food source for our wildlife including currents, acorns, serviceberry ,chokecherry, wild tomato, etc. Trees are affected though they continue to grow sometimes they are damaged. This damage to trees is backed by evidence: when the tree is cut you can prove what year it was burned by a mark in the rings. When the tree is cut into lumber it has pitch pockets in it as well. This fire damage turns a piece of wood that could possibly could be used as valuable molding to dunnage which is nearly worthless. The economic impact of the control burns decreases the value of the public's timber by amounts sometimes up to 100 times.

Finally, If the economic and biological reasons to stop control burns are not enough, I also want to express the cruel and inhumane damage done to our wildlife by control burns. It is not in the public interest to burn hundreds of thousands of animals alive. This is an ecological and moral disaster. In the 1970s you could walk to the Pine Forest and see several Kaibab squirrels. Now you can't even find one. If the control burns continue, I have serious concerns that these squirrels will be added to the endangered species list.

Sincerely,
Harold Ragland

Date submitted (UTC-11): 3/9/2021 11:57:05 AM
First name: Jamie
Last name: Baker
Organization:
Title:
Comments:
Hello,
I'm an avid trail user at Boggy Draw. I love going to these amazing trails in my hometown to ski, bike, and run. I am excited that USFS is trying to improve forest health. I hope that there is a way to improve forest health while keeping the trails open for human health.
Thanks much!!

Date submitted (UTC-11): 3/9/2021 12:42:20 PM
First name: Ian
Last name: Barrett
Organization:
Title:
Comments:
Thank you for the opportunity to comment. On a whole I support the project but have the following comments to the EA in it's current state.
I would like to focus initially on questions/comments provided in scoping that were not adequately addressed in the Draft EA nor answered in the issues identified but removed from further analysis.
"What timeline can we expect for impacts to forest user groups and where?
The EA identifies the areas but gives no description of how the logging treatments will move across those defined compartments, how long those impacts will be felt by the public, or for what duration.
The proposed action thinning methods state (p-14, p1) "with any un-even age prescription there is no terminus to the management of the stands, meaning that process continues indefinitely with reentry every 20 to 25 years". How long is this EA and decision valid for? Much of the analysis provided (transportation p-58, recreation p-47) use the 10 year benchmark, but the proposed action neglects to clearly define the time period. It completely neglects to answer the part of the comment asking for explanation of how these treatments will move across the project area outside of saying it will be "one compartment at a time."
What are the economic impacts of large-scale logging to the recreational interests of the area? In turn, how does this impact the local economy?
The analysis acknowledges that there will be significant impacts to recreational users but does not answer the above question about the connected economic impacts this disruption will create.
I would also ask the following question be answered before a decision is reached:
What time of day will haul trucks be allowed to operate?
I would suggest adding a design feature that addresses the concern of local residents, such a myself, that trucks will be coming down the hill into town all hours of the night. It is a reasonable concern since log trucks frequently haul off the units in the early hours of the morning. I do like seeing wood products headed down the highway but would be angry to have that occurring at 3 am for example, every day for an unknown period (maybe 10 years?). It is understood that the roads outside of the project area are not USFS controlled but the time at which the material leaves the site is within USFS control and the impacts of haul trucks waking up my small child would be connected.
I would also ask if the analysis of the recreation impacts to users was adequate? Were user groups and day to day users surveyed to determine that this is not "significant"? Was there any quantifiable research done to determine the impacts to the human environment? The use of Boggy Draw has increased dramatically in the last few years, will the design features adequately address the magnitude of effects to these new users and traveling visitors who are less aware of the project proposal than residents. What monitoring system has and will help advise that adaptive management?
Thanks,
Ian

Date submitted (UTC-11): 3/9/2021 3:09:05 AM
First name: Cynthia
Last name: Billings
Organization:
Title:
Comments:
Hello, and thanks for considering our comments.
I am a frequent user of the Boggy Draw recreation trails. I mountain bike there several times throughout the year including FAT biking in the snow. I camp there several nights in both the spring and fall. I'm attracted to Boggy Draw because of its close proximity to Durango, where I live. I don't have to travel far to get a wilderness experience of beauty and quiet. This location is a lovely retreat shared by many.

I appreciate the need to maintain healthy forests through logging, especially now with climate change and beetle kill. My request for the logging project is that the forest service and logging operations do it in such a way that it minimizes the impact in destroying trails that have been so carefully crafted, and minimizes noise and dust to the areas where people enjoy camping and biking. Please work with the Dolores watershed interest group to plan minimization of the impacts to recreational users of the boggy draw area. Thank you!

Date submitted (UTC-11): 3/9/2021 12:42:40 PM
First name: Jim
Last name: Blattau
Organization:
Title:
Comments:
My wife and I are retired. We travel to the Cortez/Dolores area annually to mountain bike the wonderful trails there.
We have read the Salter Vegetation Management  Project Document, and understand the biologic rationale for it.

We only ask that the loggers try to understand the huge amount of volunteer effort that has gone into building and maintaining the Trail System in the Boggy Draw Area. We would hope that given this understanding, the loggers will abide by the Project Guidelines that require restoring trails to their prior condition very soon (days or weeks, not months or years) after logging is complete in a given area.
We would also hope that as much as logistically possible, bikers and other trail users would not be subject to total closure of the area.

Thank you,

Date submitted (UTC-11): 3/9/2021 3:19:46 PM
First name: Susan
Last name: Bryan
Organization:
Title:
Comments:
I'm concerned about this project as it appears it would severely impact the recreational trail and road system in this area. Not only is this system one of the two main sources of my personal recreation, but it's a considerable draw for mountain bike tourists. As many as half of the people I see on these trails are from outside the Cortez, Dolores, Mancos areas, and many are from several states away. The parking lot is always busy and many people in our community invest tremendous personal energy into upkeep and use of these trails, all within the bounds of the governing agencies.

Damaging this system would seriously impact and potentially ruin a much-loved community resource. Logging could do such damage and be a safety issue besides. Please help preserve this system. Thank you.

Date submitted (UTC-11): 3/9/2021 4:38:01 PM
First name: Ryan
Last name: Buff
Organization:
Title:
Comments:
I can understand the need to perform vegetation management.
My hope is that in doing this, the forest service will be willing to work with trail management groups to minimize the impact on the trail systems that have been built in the area. Many miles of trail have taken many hours of volunteer hours to build. Many more people spend many more hours enjoying these trails. The boggy draw trailhead is packed on the weekends. The trails are filled with families enjoying the outdoors. I hope that this project does not change that. It would be a shame for the community. It would be a shame for the local businesses that see the benefit of all these people coming together to enjoy the outdoors.

Date submitted (UTC-11): 3/9/2021 4:55:24 PM
First name: Brian
Last name: Burke
Organization:
Title:
Comments:
NO, NO, NO - please, NO! Do not allow logging or any similar projects at our beloved Boggy Draw. This trail system is an absolute jewel and used by so many people, kids, families, dogs, etc. for camping, biking, fat tire biking, and hiking. NO!!!!

Date submitted (UTC-11): 3/9/2021 2:16:06 PM
First name: Lorna
Last name: Campbell
Organization:
Title:
Comments:
The Salter Vegetation Management proposal covers a significant area of some of the most popular forest for recreation in the Four corners area. While I understand the need for action to improve the long-term health of the forest, this proposal clearly needs to be actioned in a way that to minimises the potential negative impact on users and local communities (recognising there will also be some positive economic benefits from harvesting the resource).

I am a local hiker, trail runner, mountain biker and cross country skier, and enjoy all of these activities in the Dolores National Forest, in particular the trails in the Boggy draw system. As you state in the EA Page 46 "Over the past five years more than $300,000 of trail infrastructure projects have been completed on the Boggy non-motorized and motorized trail system". This is a significant investment, not only of money, but also time from trail volunteers (many from SWCCA) who have literally put blood, sweat and tears into the construction of these trails for the enjoyment of many. This system is a big draw to the area for athletes from Durango, Cortez, Utah, New Mexico and further afield. While the forest may need some "help" to get back to a more natural state as defined by the Forest service, it is already picturesque, and a beautiful respite in the trees at any time of year. This is what attracts many users to the area today. Hopefully the proposal can be conducted in a way to still protect that feeling of escape to the natural environment, even if it is in smaller areas for the better part of a decade.

I am pleased by some of the considerations already made to minimise the effect on recreation, for example proposed signage at the Boggy Draw trail head identifying impact areas and limiting wheeled equipment within 15 feet of trails. However there are still some areas for further consideration that could achieve the project goals but also ensure recreation continues, is safe, and is not impacted:
- Level 1 roads are currently used as part of the trail sustem and are likely to see significant wear over the project. Consider creating trails parallel to the 1.94 miles of Level 1 roads in the Boggy draw area so that trail users would not be on the roads being used by logging trucks
- ensure that no (or minimal) temporary roads are created within the trail system to preserve its integrity
- utilize rerouting of the trails onto available roads or alternate trails rather than closing altogether during work periods
- speed limits and signage should be posted and enforced for logging trucks to ensure they are aware of recreational users (especially heavy on weekends)
- consider a trail alternative to the main road 31 from Dolores to give receational users a safe way to access the trails and minimize interaction with logging trucks
- conduct operations in no more than one area at a time (and get each area done as quickly as possible!) to minimize scenery distruption and noise levels
- even though Winter is a lower use season, the recent fat bike grooming has been fantastic and a big draw for users. Please ensure that consideration is given for Winter trail routes as well (which differ some from the established trail system)

These types of modifications could ensure that trail use is still safe and enjoyable so that people continue to come and use the forest during the project execution. Ten years is an awfully long time - success would mean the coexistance of both.

One additional comment relates to the transportation plan. I was quite surprised to read of the need for more than 100mi of temporary roads (many to be newly constructed) to execute this project over 33,000 acres. While the transport plan has not been finalized, i urge you to consider if the impact needs to be this high to achieve the project goals.

Lastly, it would be very helpful to understand the timeline for the project: likely start date, order and timing of the phases, likely end date. I look forward to hearing more as planning progresses.

Sincerely,
Lorna Campbell

Date submitted (UTC-11): 3/9/2021 3:35:20 PM
First name: Scott
Last name: Darling
Organization: Kokopelli Bike & Board
Title: Co-Owner
Comments:
As an owner and operator of Kokopelli Bike &Board a local bicycle retail establishment we have great concerns about the proposed Boggy Draw and Glade Area Logging proposal. Impacts to the trail and the recreational closures of these trails directly impact our business. We make a living and have several employees that rely on the direct revenue from people's ability to ride mountain bikes on these trails. This proposed logging could not come at a worse time. The trail expansion that was just finish my be altered, negating countless volunteer hours of work. The new trail expansion has created quite a buzz in the cycling world much like the buzz 10 years ago that put Phil's Wold and Cortez on the recreational map. People are ready to come to Dolores and spend money to ride these new trails. We are so confident that Boggy Draw will become a cycling hot spot that we just purchased a building in Dolores to add to the cycling attraction and profit from these recreational opportunities, bringing tourists dollars, tax dollars and jobs to the area, while renovating a historical building to revitalize the Dolores down town.

We realize that the forest need to be maintained to mitigate the risks of catastrophic fires and beetle infestations, as well as bring forestry dollars to the area as well. We do ask that these operations have strict over-site when it comes to impacting the trails and recreational usage. We would like to see minimal impacts to current trails and where trails are impacted that reroutes be aloud so the continuity of the trail system stays intact. Forest service dollars should be set aside for trail repair or construction for trails that are impacted by logging operations, most trails were volunteer labor, please respect the effort by the community If there are trail closures, communication with the Southwest Colorado Trails Association and us Kokopelli Bike & Board be notified so that we can spread the word to the cycling community. We would also like an updated map to be posted out our bike shop with current trail conditions. We also ask that any trail closure be infrequent and for short durations.

Once again we at Kokopelli Bike & Board would like to express our concerns about the timing of this proposed operation. We believe that the area is on the radar for a big economic influx of recreational tourism, stifling these opportunities at this time is probably the worse case scenario. The momentum for cycling in this area parallels that of Phil's World 10 years ago, and with that trail expansion it will gain even more traction. Please manage our forest for all opportunities keeping a mindful eye on the recreational opportunities and the lively hoods of those who will be impacted by the lost revenue of those seeking the recreational aspects. If you have any additional questions or concerns please contact me.

Date submitted (UTC-11): 3/9/2021 1:10:18 PM
First name: Andrew
Last name: DeBoer
Organization:
Title:
Comments:
Hello and thank you for considering public comments on this proposal.  After time spent in the target area and taking the time to read the associated documents I believe the goals of the project north of Dolores are justified and needed.  However, I believe it is also worthwhile to put in the work, even if inconvenient, to preserve and protect the Boggy Draw Trail system throughout the duration of the project.  I am from Cortez and use the trail system regularly for running, mountain biking, and occasionally cross country skiing.  The trail system has value to me as well as many other local residents I know.  I also believe the trail system has economic value in the tourism income it certainly helps generate.  Though I lack facts and figures to prove it, I have met plenty of people camping, hiking, biking, etc. that come from out of the area to enjoy the trail system.  In discussion, this area is one of the primary reasons they chose to come spend time and money in Dolores.
I hope that a decision is made to preserve these trails while taking actions to protect the sustainability of the forest. Thank you for your time and work.
Andrew DeBoer

Date submitted (UTC-11): 3/9/2021 12:45:15 PM
First name: Joseph
Last name: Dillsworth
Organization:
Title:
Comments:
This project, as proposed, looks like it would severely impact the very popular boggy draw trail system. As a resident of Rico, I use this trail system often. It's a nice reprieve from the strenuous mountain biking found in the mountains and it provides a lovely recreational opportunity on my way to Cortez to get groceries. My wife and I enjoy camping amongst the ponderosas, and the trails are a rare option in the region for beginner and intermediate riders. I would urge you to try and balance the need for forest thinning with the needs of the community for recreation. Thank you for the opportunity to comment

Date submitted (UTC-11): 3/9/2021 2:45:28 PM
First name: Keith
Last name: Evans
Organization:
Title:
Comments:
Hello, and thank you for considering input concerning the Salter Vegetation Management Program.

I have lived in Montezuma County since the mid-60s and have enjoyed countless hours spent, camping, hiking, mountain biking, and skiing in the local forest.

I do believe there is a need for conscientious forest management in the area but I am not convinced that logging on such a vastt scale is the best way to achieve the desired results of a healthy forest, a thriving local economy, and a happy and healthy populous.
Over the years I have witnessed firsthand the disruption and destruction that logging causes. I have also witnessed the growing outdoor recreation economy that provides not only jobs and income but quality of life benefits that you can't put a price on.
The recreation economy that is reliant on the trail system at boggy draw brings in and generates an immense amount of income and value which remains local, here in Montezuma County. Logging activity in the Boggy Draw area could be disastrous to that income stream for the local economy while providing a limited number of local jobs and exporting a majority of the profits outside our community. I am certain there will be a number of locals employed by this project but I would hate to see a Company from Canada or even Montrose come in and destroy an incredibly valuable asset and take their profits elsewhere. The damage to the recreational resource, and the local businesses that depend on it, will far outlive the financial benefits for those few locals that are involved in the industry.

Many local volunteers have invested thousands of hours of labor to create the trail system that has become a major draw for visitors from all over the world to our area. In addition to the money that these visitors spend while they are here in our local restaurants, markets, gas stations, and other retail businesses, one must also consider the incredible value that these trails provide for the local citizens!

So, I don't disagree that some sort of comprehensive management for fire and insect infestation is a good thing. I just don't agree that destroying such an economic and quality of life asset is necessary to achieve the desired end product. And let's be honest, that's what this project will accomplish.
Please consider re-examining the scope of the proposed project and eliminate that area which encompasses the boggy draw trail system and those areas in the view shed which will be affected.

Current residents and future generations will be grateful for your conscientious consideration.

Thank You

Keith Evans

p.s. and please, no logging trucks on weekends and holidays!

Date submitted (UTC-11): 3/9/2021 2:34:52 PM
First name: Rob
Last name: Haggart
Organization:
Title:
Comments:
I'm writing in support of a solution that would preserve the existing trails and minimize the disruption to people recreating in the forest. Personally I make at least a dozen trips to Boggy Draw each year to ride with friends and family. In addition to using the trails we support the local economy and always stop by the local grocery store and brewery.

Date submitted (UTC-11): 3/9/2021 2:57:47 PM
First name: Zach
Last name: Hampton
Organization: Maronas Market
Title:
Comments:
The biking and camping at Boggy Draw is extremely important to my family

We spend 30 - 50 days & nights down there every year
as do many members of our community

We appreciate all that the Forest Service does in Colorado
- Please prevent or limit the scale of the proposed logging project in the Boggy Draw area

Thank you
Zach

Date submitted (UTC-11): 3/9/2021 11:42:01 AM
First name: Emily
Last name: Hunter
Organization:
Title:
Comments:
I am writing in support of the plan to improve the health of my local forest. I feel lucky that SW Colorado is seeing this kind of program to prevent fires that are greater in intensity and duration than occurred in the naturally occurring cycle before this drought and current beetle infestation.
I am also excited about the potential of the wood products to be used as local building materials, especially as we are seeing greatly inflated prices for dimensional lumber.
In light of the benefits of extraction I would like to see it done in a way that protect another local economy that is tourism. This system brings in money from visitors and I have seen it being used a recruiting tool to bring in high quality health care providers that have their pick of jobs and towns. I want this whole community to grow financially and in services. Any adjustments that could be made to save existing trails that have been build by this community would be greatly appreciated. I had no idea this project could last up to 10 years, that is a long time to devalue one industry to lift up another.

Date submitted (UTC-11): 3/9/2021 3:17:48 PM
First name: Eric
Last name: Janes
Organization:
Title:
Comments:
I support the Dolores Ranger District's proposed combination of actions that include logging ponderosa pines, planting trees where appropriate, and conducting prescribed burns in an area covering 22,346 acres north of Dolores.  I feel that I have a good understanding of this project because I have been involved in several very informative stakeholder meetings which included the 2020 scoping phase, and explanations provided by Forest Service staff and management since the February 10, 2021 release of the Draft EA for public comment. Regarding the concerns of Dolores town residents about the increased frequency of logging trucks, up to an average of nine load truck/day, I would suggest the USFS clarify in the next stage of NEPA compliance to what degree would possible log truck transport going north to Montrose possibly offset some of the higher estimates on number of log loads going through Dolores?  My impression is that there may be bids on the timber from companies in Montrose County.  I believe that the proposed action will significantly improve the forest resilience to catastrophic wildfire, insects and disease problems, so that we will have a much healthier forest going forward after project completion.  This outcome has to be good news for local recreation users and businesses in the Dolores and Cortez area whose sales are somewhat dependent on recreation use of the forest.   I commend the Dolores Ranger District for building in provisions to the project that will minimize the disruption and short-term closures of some of the trails and use areas in Boggy Draw.  These project mitigations even include some" no-snowplow" assurances for FSR 527 from a northerly junction point down to a trailhead on the southside of Boggy Draw so that cross-country skiers are accommodated.  Foresters and other specialists working with flora and fauna of fire-dependent forests like ponderosa pine have known for over 60 years that there are ecological processes occurring in all these forests, which if poorly understood and not managed, can often lead to undesirable ecological conditions, and can decrease the forest's ability to survive large scale change agents, such as disease and insects, drought, and catastrophic crown fire.  This project has everything needed to address this problem in the project area.  By implementing the proposed actions, my belief is that a more regulated forest will be a more resilient forest. I commend the Forest and the Dolores Ranger District Ranger, timber staff and NEPA specialists for a job well done.

DRAFT SALTER VEGETATION MANAGEMENT PROJECT ENVIRONMENTAL ASSESSMENT- COMMENTS

I support the Dolores Ranger District's proposed combination of actions that include logging ponderosa pines, planting trees where appropriate, and conducting prescribed burns in an area covering 22,346 acres north of Dolores. I feel that I have a good understanding of this project because I have been involved in several very informative stakeholder meetings which included the 2020 scoping phase, and explanations provided by Forest Service staff and management since the February 10, 2021 release of the Draft EA for public comment. Regarding the concerns of Dolores town residents about the increased frequency of logging trucks, up to an average of nine load truck/day, I would suggest the USFS clarify in the next stage of NEPA compliance to what degree would possible log truck transport going north to Montrose possibly offset some of the higher estimates on number of log loads going through Dolores? My impression is that there may be bids on the timber from companies in Montrose County. I believe that the proposed action will significantly improve the forest resilience to catastrophic wildfire, insects and disease problems, so that we will have a much healthier forest going forward after project completion. This outcome has to be good news for local recreation users and businesses in the Dolores and Cortez area whose sales are somewhat dependent on recreation use of the forest. I commend the Dolores Ranger District for building in provisions to the project that will minimize the disruption and short-term closures of some of the trails and use areas in Boggy Draw. These project mitigations even include some" no-snowplow" assurances for FSR 527 from a northerly junction point down to a trailhead on the southside of Boggy Draw so that cross-country skiers are accommodated. Foresters and other specialists working with flora and fauna of fire-dependent forests like ponderosa pine have known for over 60 years that there are ecological processes occurring in all these forests, which if poorly understood and not managed, can often lead to undesirable ecological conditions, and can decrease the forest's ability to survive large scale change agents, such as disease and insects, drought, and catastrophic crown fire. This project has everything needed to address this problem in the project area. By implementing the proposed actions, my belief is that a more regulated forest will be a more resilient forest. I commend the Forest and the Dolores Ranger District Ranger, timber staff and NEPA specialists for a job well done.

Date submitted (UTC-11): 3/9/2021 12:00:00 AM
First name: Jeremy
Last name: Katz
Organization:
Title:
Comments:
Boggy Draw is a sacred place for me and my family. It is a place where we can unplug and re-connect as a family. We strongly oppose the proposed logging project that is set to take place. Camping in this area is second to none. The tall trees, provide a perfect getaway for our family and many families like ours. Hiking, biking, animal watching are all at danger of being lost with this proposed project. For the mental health of me, my family and anyone that uses this space to recreate in, you cannot start logging this one of a kind area.

ATTACHMENTS: Four images of people recreating

ATTACHMENTS: Four images of people recreating

