

Date submitted (UTC-11): 3/9/2021 2:15:04 PM
First name: Abbey
Last name: Lynne
Organization:
Title:
Comments:
The purpose and need or proposed action does not mention Albert's squirrel and their habitat. As Alberts squirrels are the indicator for ponderosa pine forest, it seems that the project should be design to enhance and maintain habitat by providing clumps and openings and maintaining larger nest trees. The project also does not discuss how the project enhances forest resiliency in the face of climate change or what the carbon cost of this project is. Please analyze these important issues and design the project for forest restoration and climate resiliency while providing habitat for key indicator species.

Date submitted (UTC-11): 3/9/2021 11:16:06 AM
First name: J
Last name: Mccaleb
Organization:
Title:
Comments:
I believe this project needs to happen. As a property owner for a long time, it is time for this to happen. And when completed citizens will be happy with the results.
Thank you,

Date submitted (UTC-11): 3/9/2021 2:08:44 PM
First name: Jeanie
Last name: Ringelberg
Organization:
Title:
Comments:
If I understand correctly, the proposed logging roads will lie across and next to the trails. I think the hindrance of recreation at this time is a definite downside of the project. I understand and agree with fire mitigation and forestry management. however, if trails are not rerouted around logging to maintain the level of current recreation, this will impact the community negatively. It will impact ability to safely recreate outside as we get COVID under control and therefore impact health. There will be less trail to spread out hikers, trail runners and bikers.  It will impact recreation economy of town as well. To be real, biking on trails with logging is not the same and people may avoid the area. So, I hope that with this project, for the trails that will be impacted, there will be an equal number of reroutes to continue safe recreation. Thank you.

Date submitted (UTC-11): 3/9/2021 4:37:26 AM
First name: gretchen
Last name: schmeisser
Organization:
Title:
Comments:
Although I understand the purpose of this project, I oppose it due to the fact this is a high use recreational area. In both Winter and summer this area is used as a family friendly area for biking, skiing, hiking and camping. Many families would be impacted by the plans to log this area. The noise and pollution of the large trucks, as well as the falling timber would greatly affect the safety as well as the recreational experience. Thank you, Gretchen Schmeisser Durango Co.

Date submitted (UTC-11): 3/9/2021 11:35:22 AM
First name: Mark
Last name: Varien
Organization:
Title:
Comments:
I am concerned about the proposed Boggy Draw logging project that will impact the Boggy Draw trail system.

I use the Boggy Draw Trail system several times a week for as much as 8 hours a week. It is a key way I maintain a healthy lifestyle. In addition, I have spent dozens of volunteer hours building and maintaining the trails.

I witness the larger numbers of people who similarly use the trail system each day. This includes people from Montezuma County and because the trail system is one of the best in the U.S. West many users from throughout the United States.

The Boggy Draw Trail system is not only vital to our quality of life and health, it is a clear economic benefit to Montezuma County.

The Boggy Draw Trail system is too valuable to ruin with logging. Any logging conducted in this area should avoid all trails both for the quality of the trails and for public safety. In addition, trails should be avoided so there are no trail closures as a result of this logging operation.

As a community, we have given countless hours to developing this community resource  and it needs to be protected. Please ensure that logging in this area does not impact negatively the trail system or the health of our community.

Date submitted (UTC-11): 3/9/2021 3:39:36 PM
First name: Chase
Last name: Wesley
Organization:
Title:
Comments:
To whom it may concern. I am writing in regards to the Salter Vegetation project at the Boggy Draw complex near Dolores, Colorado.

I am a resident of Cortez and was a previous resident of Dolores. I am an avid mountain biker and am concerned with the effects of the project on the current trail system at Boggy Draw. While I am aware of the beetle kill issue and the wildfire risk due to the increasing amount of dead trees. While I know there are benefits with the project my big concern is the impact it will have on hte trail for up to the next 10 years. Many human-powered hours were spent out there building the 50 plus miles of wonderful single track that exists, and I am concerned about the Salter project going through and tearing up the single track. Should there be considerations as to how the single track can remain open and undamaged then I can put my support behind the project to help with the beetle kill issue and the wildfire mitigation

Thank you,

Chase Wesley

Date submitted (UTC-11): 3/9/2021 1:06:10 PM
First name: Helen
Last name: West
Organization:
Title:
Comments:
Please do NOT allow this project to continue. I am an amateur mountain biker and cross-country skier and I LOVE Boggy Drawl Trail system for both these activities. I also bird watch & camp in this area. Logging at or near these sites will greatly impact my ability to enjoy these activities. Birds could even LEAVE the area because of the heavy use and logging.

Boggy Draw is a HUGE sources of tourism for our area as well as our region is known for mountain biking. Do NOT let this project continue PLEASE. Let us mountain bike & play in peace!

I support selective, limit logging and forest management efforts, but not large scale logging projects. Do NOT let this project go through.

Date submitted (UTC-11): 3/9/2021 11:17:16 AM
First name: Coby
Last name: Wiegert
Organization:
Title:
Comments:
Thank you for trying to manage and get ahead of the Beetle Kill in the Boggy Draw Recreational area. Boggy Draw trails system is one of my favorite areas to ride both on the dirt and snow, as well as to camp. I hope you work with the local trails organization to alter any existing trails that might be impacted. It would be nice to avoid heavy traffic while riding. Good luck and thank you again! A healthy forest is one that gets maintenance.

Date submitted (UTC-11): 3/10/2021 1:34:40 PM
First name: Sam
Last name: Bagge
Organization:
Title:
Comments:
Hi,

As a mountain biker who grew up learning to ride on these trails and now as an adult with one degree in Environmental and Sustainability Studies and getting one in Environmental Geoscience, I strongly oppose the project(s) being proposed. I am not opposed to forest management that removes dead logs that pose a threat of high severity fires but the methods being proposed are detrimental to the ecosystem and biking community. There are less invasive management tactics that can be employed. While they will most likely be more costly and timely they are necessary to preserve the unique trail system and the ecosystem it is in.

Thank you for reconsidering,
Sam Bagge

Date submitted (UTC-11): 3/10/2021 5:52:58 AM
First name: Russell
Last name: Batza
Organization:
Title:
Comments:
Boggy Draw is an important area that provides citizens with the opportunity for outdoor recreation and adds to local business income.  While I understand the need for forest management, I request that the project be designed with the goal of preserving the mountain biking and hiking experience being a high priority. Thank you for your consideration.

Date submitted (UTC-11): 3/10/2021 2:54:35 PM
First name: Melanie
Last name: Bell
Organization:
Title:
Comments:
I am very sorry to hear that the Boggy Draw Trail System is going to soon be logged. I have been riding, hiking and skiing at this trail system for decades. In addition to my personal attachment to the location, as a professor of public health at the University of Arizona, I am very aware of the large role that physical activity, particularly in the outdoors, plays in the physical and mental well-being of people. I am also aware that the Boggy Trail System is a great economic driver to Montezuma County and surrounds. People from all over the four corners region, and further, know of this trail system and visit, bringing their tourist dollars. What a shame that this upward growth in an economic resource will be stymied by resource management protocols. The short term economic impact for loggers should not be prioritized over the long term community health and economic development and planning. Please reconsider the timing of this project by starting somewhere else, and reduce it to a thinning project, rather than a full-blown logging operation in Boggy Draw. In 4 or 5 years time, reassess whether this is truly a necessary project, of the scale that is currently proposed.

Date submitted (UTC-11): 3/10/2021 10:01:43 AM
First name: David
Last name: Blaine
Organization:
Title:
Comments:
I used to MTB at Boggy nearly 20 years ago because my wife liked the somewhat easier trails and lower risk level, as compared to Phil's World. But as time went on I got bored with the place. That is until the SWCCA started building new trails there. Holy cow, Boggy has become my favorite haunt! The flow, the amount of new terrain, and the views can't be beat.

But all of that would diminish in quality if logging enterprises got too close to the trails. Hell, there are so many trees out there the USFS could harvest forever and not even make a dent in the resource, BUT you should maintain a 100 yard buffer along the trails that the USFS has already approved.

For instance, in Mancos, up by Chicken Creek there was a beautiful little trail that meandered along a ditch that even in the worst of the drought, had flowing water. Last year, thinning operations opened up the trail to more sunlight, making it less user-friendly for our senior-citizen hikers. Things like this don't have to be done in the name of taking out an extra 50 trees. Open up the zone where it is not being used by recreationalists! Like I said, there are plenty of trees out there.

The same goes with Boggy. Leave the trail system buffer. Please?

You might think I'm a tree hugger. Nope, I have a BS in Forestry from the University of New Hampshire. I have worked for logging companies as a feller and a yard worker. So, I love trees, but I realize their importance to the economy and to keeping the forest fire danger at a minimum.

Thank you.

Date submitted (UTC-11): 3/10/2021 8:01:07 AM
First name: Karel
Last name: Buckley
Organization:
Title:
Comments:
Forest maintenance is necessary however time of the year is difficult to plan around. Forest dweller's breeding & nesting and weather / time of the year.

My concern with any forestry work ie. mulching, cutting timber, etc is the time frame.
Last year 2020 work was done elsewhere in the San Juan Forest during nesting and rearing of birds & baby squirrels, etc. It was heart breaking to see their needed brushy habitat destroyed. Tall ancient oak under story was mulched.

Birds nest & rear young until end June. Small mountain owls fledge in June & July.

I doubt machinery operators are trained to look for cavity dwellers and nests among foliage, thus destroying eggs and nestlings, etc.

Last year I found & photographed proof of late June nests in the Chicken Creek logging area.

Please factor in nesting & breeding seasons.  I know you know there are laws regarding this.

Date submitted (UTC-11): 3/12/2021 12:00:00 AM
First name: Karel
Last name: Buckley
Organization:
Title:
Comments:
Forest Health - Salter Vegetation Management Project #57671

Comment period till 3/12/21

Forest maintenance is necessary however time of the year is difficult to plan around. Forest dweller's breeding & nesting and weather / time of the year.

My concern with any forestry work ie. mulching, cutting timber, etc is the time frame.

Last year 2020 work was done elsewhere in the San Juan Forest during nesting and rearing of birds & baby squirrels, etc. It was heart breaking to see their needed brushy habitat destroyed. Tall ancient oak under story was mulched.

Birds nest till end June. Small mountain owls fledge in June & July.

I doubt machinery operators are trained to look for cavity dwellers and nests among foliage, thus destroying eggs and nestlings, etc.

Last year I found & photographed proof of late June nests in the Chicken Creek logging area.

Please factor in nesting & breeding seasons. I know you know there are laws regarding this.

Addendum: 3/12/21

I also very seriously question the trees / acre that are being taken. I know the cut areas, at Chicken Creek & close to the Bible Camp on Forest Service Rd 559, I believe) look bare.

It seems close to clear cut to me. How can the ground maintain moisture with full sun. As I stated previously, we are in a documented "severe multiyear drought'. I question to age of this forest maintenance plan.

**CARA_2458_PHASE_3333_Form_Set_Master_Letter_82**

| Doc Title | File Name | Upload Date | Author |
|---|---|---|---|
| Public_Comment___Buckley__Karel | cara.txt | 03/10/2021 | Buckley, Karel |
| Public_Comment___Buckley__Karel_1 | cara.txt | 03/12/2021 | Buckley, Karel |

Date submitted (UTC-11): 3/10/2021 7:32:26 AM
First name: Brian
Last name: Demby
Organization:
Title:
Comments:
I feel that it is important to repeat some of the thoughts to this proposed logging process as stated by Scott Darling of Kokopelli Bike and Board, specifically,"We understand the need for the forest to be maintained to mitigate the risks of catastrophic fires and beetle infestations, as well as bring forestry dollars to the area. We do ask that these operations have strict over-site when it comes to impacting the trails and recreational usage. We would like to see minimal impacts to current trails and where trails are impacted that reroutes be aloud so the continuity of the trail system stays intact. Forest service dollars should be set aside for trail repair or construction for trails that are impacted by logging operations, most trails were volunteer labor, please respect the effort by the community If there are
trail closures."

Personally, I ride these trails several times a week. They provide not only exercise for my body, but mental health for my mind and soul. I enjoy seeing local biking friends, but am always surprised to meet so many tourists that chose this trail system. It really has become a tourist destination that greatly helps our economy. We have an amazing resource with these trails that must be maintained. The logging operations should be designed to minimize the impact on the trail system. If the time frame is really 10 years all need to work collaboratively to coexist. The trail system is used by many and will continue to be used long after the profits from logging have left our area.

Date submitted (UTC-11): 3/10/2021 11:47:00 AM
First name: Karla
Last name: Demby
Organization:
Title:
Comments:

I echo the disagreement with introducing for-profit logging businesses within the Boggy Draw trail system area as part of a comprehensive vegetation management plan.

The expansion of the trail system in recent years is the result of a successful collaboration between the Forest Service and Southwest Colorado Cycling Association, combined with many hours of generous volunteer work. Time and money were spent on environmental and cultural impact studies to ensure the trails designed for enjoyment did not create a greater harm. It seems unthinkable to me that commercial logging in this well-planned, popular trail system and recreational area is even being contemplated.

Additionally, the "impact mitigation" strategies being offered are paltry at best. Example: "Roads allowing wheeled or tracked vehicles will be no closer than 15 feet from the center of a trail to prevent impact." We all know that the dust, debris, and rocks from a road 15 feet away will have trail impact. Example: "Damaged trails will be repaired immediately after operations are completed." Is this completion of an operation in a single area or the entire operation? The party responsible for repair is not clarified.

Vegetation management measures an are imperative and must be ongoing. However, the negative impact of commercial logging on the Boggy Draw Trail system would be significant and should not be considered.

Date submitted (UTC-11): 3/10/2021 12:00:00 AM
First name: Janine
Last name: Fitzgerald
Organization:
Title:
Comments:
Thank you for the opportunity to comment on the Salter EA.

I think I oppose this project but must admit that the poor description of the proposed action and the effects analysis make it difficult to tell. Ponderosa Pine management in the Salter area is a good idea. But the confusing nature of this EA and the problems with the Chicken Creek project reduces my trust in the SJNF. The NEPA document seems to harken back to the decades of the 80s and 90s when public land agencies treated NEPA as an annoying federal regulation. The results of those NEPA documents tended to hide the scope of projects and find no impacts as a result of the intended project. Boxes were checked that paved the way for industry to move in and do the work. Such an approach however usually landed the FS/BLM in court with everyone fighting with everyone else.

Some of my concerns and questions are:

1. What is the status of ponderosa pine and beetle kill? How will this project specifically help with mitigating beetle kill? How will it specifically increase the health of the forest? What science has been used to apply best logging practices to improve the health of the forest? What research is available on how to best mitigate the impacts of the roundheaded pine beetle? The EA seems to rely heavily on Negron 2008. Is there more research available?
2. What is the exact impact of the project on the recreational uses of Boggy Draw? What trails will be closed and when? How fast will trucks be going? What are the possible impacts to public safety? What if children, dogs, cows, or even adults are wounded or killed as a result of recreational/industrial interface? What about dust? Why aren[rsquo]t there buffer zones to the trails in this important recreational area?
3. What is the economic impact to the town of Dolores in relation to the disruption of recreational activities on the area?
4.
In specific terms of the Forest plan:

[bull] How does this project maintain or improve ecosystem function?

* How does this project add to the resilience, and sustainability of the ecosystem?
* How does this project provide economic or social support to local communities?
* How does this project ensure current and future needs for Native American tribal use, including that associated with special forest products (for example, teepee poles)?
* How does this project support innovation in utilization, including conversion of cut-tree mass into biofuels, pellets, biochar, or other useful products?
* How does this project efficiently balance or reduce costs of implementation of treatment activities?
* How does this project anticipate climate-related plant succession changes?

1. How much brush will be removed over the project area? Will it be like Chicken creek where most of the oak was removed?
2. What about clumps and openings? Will the treatment resemble the park like status of Chicken Creek where there are neither clumps nor openings? Or will it be like the Chucky Bear Clear cut which is a mess of unimaginable proportion? How does this project differ from those two areas?
3. Where, when, and why will be reforestation done?
4. Where is the monitoring data for Abert squirrels for the Dolores District? Is the population stable throughout the San Juan or does vary from district to district? Isn[rsquo]t clumpiness important for Abert squirrels? Why isn[rsquo]t this addressed in the direct and indirect impacts?
5. What is the trend data for deer and elk? How will the proposed action help these species?
6. What is the trend data for goshawks? How will the proposed action help these species?
7. Why are Merriam[rsquo]s turkey not mentioned?

8. What is the trend data for Hairy Woodpecker? How will this have proposed project effect populations? Why have bird surveys not been conducted? I can assure you that Hairy and Downy Woodpeckers and Olive Sided Flycatchers are present in the project area. Why do you assume that they even are not present?
9. How will you mitigate the impact on nesting birds and violations of the Migratory Bird Treaty Act?
10. Why doesn[rsquo]t this project discuss the relationship with climate change and carbon balance?

Thank you for your interest in my comments,

Thank you for the opportunity to comment on the Salter EA.

I think I oppose this project but must admit that the poor description of the proposed action and the effects analysis make it difficult to tell. Ponderosa Pine management in the Salter area is a good idea. But the confusing nature of this EA and the problems with the Chicken Creek project reduces my trust in the SJNF. The NEPA document seems to harken back to the decades of the 80s and 90s when public land agencies treated NEPA as an annoying federal regulation. The results of those NEPA documents tended to hide the scope of projects and find no impacts as a result of the intended project. Boxes were checked that paved the way for industry to move in and do the work. Such an approach however usually landed the FS/BLM in court with everyone fighting with everyone else.

Some of my concerns and questions are:

1) What is the status of ponderosa pine and beetle kill? How will this project specifically help with mitigating beetle kill? How will it specifically increase the health of the forest? What science has been used to apply best logging practices to improve the health of the forest? What research is available on how to best mitigate the impacts of the roundheaded pine beetle? The EA seems to rely heavily on Negron 2008. Is there more research available?
2) What is the exact impact of the project on the recreational uses of Boggy Draw? What trails will be closed and when? How fast will trucks be going? What are the possible impacts to public safety? What if children, dogs, cows, or even adults are wounded or killed as a result of recreational/industrial interface? What about dust? Why aren't there buffer zones to the trails in this important recreational area?
3) What is the economic impact to the town of Dolores in relation to the disruption of recreational activities on the area?
4) In specific terms of the Forest plan:
    - How does this project maintain or improve ecosystem function?
    - How does this project add to the resilience, and sustainability of the ecosystem?
    - How does this project provide economic or social support to local communities?
    - How does this project ensure current and future needs for Native American tribal use, including that associated with special forest products (for example, teepee poles)?
    - How does this project support innovation in utilization, including conversion of cut-tree mass into biofuels, pellets, biochar, or other useful products?
    - How does this project efficiently balance or reduce costs of implementation of treatment activities?
    - How does this project anticipate climate-related plant succession changes?
5) How much brush will be removed over the project area? Will it be like Chicken creek where most of the oak was removed?
6) What about clumps and openings? Will the treatment resemble the park like status of Chicken Creek where there are neither clumps nor openings? Or will it be like the Chucky Bear Clear cut which is a mess of unimaginable proportion? How does this project differ from those two areas?
7) Where, when, and why will be reforestation done?
8) Where is the monitoring data for Abert squirrels for the Dolores District? Is the population stable throughout the San Juan or does vary from district to district? Isn't clumpiness important for Abert squirrels? Why isn't this addressed in the direct and indirect impacts?

9) What is the trend data for deer and elk? How will the proposed action help these species?
10) What is the trend data for goshawks? How will the proposed action help these species?
11) Why are Merriam's turkey not mentioned?
12) What is the trend data for Hairy Woodpecker? How will this have proposed project effect populations? Why have bird surveys not been conducted? I can assure you that Hairy and Downy Woodpeckers and Olive Sided Flycatchers are present in the project area. Why do you assume that they even are not present?
13) How will you mitigate the impact on nesting birds and violations of the Migratory Bird Treaty Act?
14) Why doesn't this project discuss the relationship with climate change and carbon balance?

Thank you for your interest in my comments,

Janine Fitzgerald,

Mancos Colorado

Date submitted (UTC-11): 3/10/2021 12:00:00 AM
First name: Janine
Last name: Fitzgerald
Organization:
Title:
Comments:
Thank you for the opportunity to comment on the Salter EA.

I think I oppose this project but must admit that the poor description of the proposed action and the effects analysis make it difficult to tell. Ponderosa Pine management in the Salter area is a good idea. But the confusing nature of this EA and the problems with the Chicken Creek project reduces my trust in the SJNF. The NEPA document seems to harken back to the decades of the 80s and 90s when public land agencies treated NEPA as an annoying federal regulation. The results of those NEPA documents tended to hide the scope of projects and find no impacts as a result of the intended project. Boxes were checked that paved the way for industry to move in and do the work. Such an approach however usually landed the FS/BLM in court with everyone fighting with everyone else.

Some of my concerns and questions are:

1. What is the status of ponderosa pine and beetle kill? How will this project specifically help with mitigating beetle kill? How will it specifically increase the health of the forest? What science has been used to apply best logging practices to improve the health of the forest? What research is available on how to best mitigate the impacts of the roundheaded pine beetle? The EA seems to rely heavily on Negron 2008. Is there more research available?
2. What is the exact impact of the project on the recreational uses of Boggy Draw? What trails will be closed and when? How fast will trucks be going? What are the possible impacts to public safety? What if children, dogs, cows, or even adults are wounded or killed as a result of recreational/industrial interface? What about dust? Why aren[rsquo]t there buffer zones to the trails in this important recreational area?
3. What is the economic impact to the town of Dolores in relation to the disruption of recreational activities on the area?
4.
In specific terms of the Forest plan:

[bull] How does this project maintain or improve ecosystem function?

* How does this project add to the resilience, and sustainability of the ecosystem?
* How does this project provide economic or social support to local communities?
* How does this project ensure current and future needs for Native American tribal use, including that associated with special forest products (for example, teepee poles)?
* How does this project support innovation in utilization, including conversion of cut-tree mass into biofuels, pellets, biochar, or other useful products?
* How does this project efficiently balance or reduce costs of implementation of treatment activities?
* How does this project anticipate climate-related plant succession changes?

1. How much brush will be removed over the project area? Will it be like Chicken creek where most of the oak was removed?
2. What about clumps and openings? Will the treatment resemble the park like status of Chicken Creek where there are neither clumps nor openings? Or will it be like the Chucky Bear Clear cut which is a mess of unimaginable proportion? How does this project differ from those two areas?
3. Where, when, and why will be reforestation done?
4. Where is the monitoring data for Abert squirrels for the Dolores District? Is the population stable throughout the San Juan or does vary from district to district? Isn[rsquo]t clumpiness important for Abert squirrels? Why isn[rsquo]t this addressed in the direct and indirect impacts?
5. What is the trend data for deer and elk? How will the proposed action help these species?
6. What is the trend data for goshawks? How will the proposed action help these species?
7. Why are Merriam[rsquo]s turkey not mentioned?

8. What is the trend data for Hairy Woodpecker? How will this have proposed project effect populations? Why have bird surveys not been conducted? I can assure you that Hairy and Downy Woodpeckers and Olive Sided Flycatchers are present in the project area. Why do you assume that they even are not present?
9. How will you mitigate the impact on nesting birds and violations of the Migratory Bird Treaty Act?
10. Why doesn[rsquo]t this project discuss the relationship with climate change and carbon balance?

Thank you for your interest in my comments,

Date submitted (UTC-11): 3/10/2021 6:08:59 AM
First name: Shaine
Last name: Gans
Organization:
Title:
Comments:
I formally object to this project overall. I am particularly concerned with several aspects of the proposed project. First, this project could last 10 years. This too long and will result in long-term negative impacts to the quality of life of local residents, the local economy, and the local property values. The proposed project will have significant impacts on the surrounding neighbors, local community, recreational opportunities and local economy. The movement of heavy equipment to and from the proposed project areas requires that oversize machines and vehicles travel on local paved and unpaved county roads. This poses an unnecessary danger to residents who live on properties near the public lands and members of the local community who must use these roads to gain necessary access to town for work, school, and essential services. Furthermore I object to the lengthy trail closures and trail damage that this project would cause. This would put an undo burden on community recreation organizations to repair and remediate the damage to trails. In the least, this project should be amended to minimize damage and destruction to trails by proactively rerouting trails that are directly in the areas that will be logged, implementing design features to protect the trails, and defining time limitations that the remediation and rehabilitation would have to be completed by or inflict penalties on the respective parties if the rehabilitation work is not completed. Treatments to prevent wildfire and extensive beetle kill need to be performed and managed in a way that minimizes impact to local residents and trail recreation, ensures the safety of local residents, and maintains the economic benefits from recreation that the local communities depend on.

Date submitted (UTC-11): 3/10/2021 2:38:59 AM
First name: Cayce
Last name: Hamerschlag
Organization:
Title:
Comments:
I object to the proposed logging project in the Boggy Draw area. This area has long been a popular recreation area(biking, hiking, skiing, camping...) Recently, much community work has gone into trail building and the area has become even more popular with both locals and tourists. Logging in this area would be harmful to the natural habitats and environment in the area and would send tourism elsewhere.
Thank you for your consideration.

Date submitted (UTC-11): 3/10/2021 4:29:46 PM
First name: Erik
Last name: Hamerschlag
Organization:
Title:
Comments:
While I understand the need for the forestry activities being proposed for Boggy Draw, I believe they need to be carried out with a very high level of effort to mitigate impacts on the recreational activities so many of us rely on that area to provide. I have been mountain biking and hiking in the area since the mid-90s. My kids have learned to ride trails there. I have been seriously impressed by how far it has come, and how much potential it has to develop further. We shouldn't risk damaging that potential. I know that the development of our trail systems have been vital to our local economy, bringing visitors from both near and far. Those visitors shop, eat and stay, supporting our local businesses, creating complex layers of impact. Beyond that I work for a company that relies on recreation resources like Boggy to be able to attract quality employees to the area. So I am in favor of anything we can do to reduce negative impacts on these recreational resources while still achieving the essential goals of the project.
Thank you for your attention.

Date submitted (UTC-11): 3/10/2021 7:08:02 AM
First name: Bill
Last name: Hatcher
Organization:
Title:
Comments:
I am an advid mountain biker, hiker and camper who has been visiting and enjoying the trails of Boggy Draw and the House Creek area for the past 25 years. I have seen the Boggy Draw trail system grow from one 8 mile trail in 1995 to a complex of over 50 miles of mountain biking, hiking and equestrian trails not to mention many miles of OHV trails. The expansion of these trails has turned Boggy Draw into an important recreation resource locally and regionally as well as bringing in an increasing number out of state visitors. The economic benefit to local communities and businesses from visitors coming to walk and ride around Boggy Draw has grown every year.

Regarding the proposed logging operation in this area I would like to see that communication and oversight by forest managers with logging operations is maintain to help mitigate visitation conflicts and damage to existing recreation trails. The Forest Service should closely monitor trail and road safety in logging operations. Including public communications from the Forest Service about trail closures and duration of trail closures at trailheads as well as trail signage about logging operations, trail closure, detours and truck crossings would be helpful. I am also concerned with the traffic conflicts between recreation visitors and the increased logging truck traffic and would like to see alternate road routes used by logging trucks if possible. For safety slow-speed signs and speed bumps should be considered at road approaches to trail crossings and trailheads. I would like to see temporary trail closures kept to a minimum (2 weeks) and only one trail closed at a time.

The surrounding residents, communities, bike clubs and other visitors have contributed thousands of volunteer hours and dollars to building and maintaining trails in the Boggy Draw area not to mention the extensive trail planning and work by land managers. There is no doubt the logging operation will impact these trails and the visitation to this popular recreation venue. But it is my hope that when the logging operation proceeds it is managed in such a way by the Forest Service and it's contractors that the impact to the Boggy Draw trails and the many visitors to the area will be minimal.

With Regards,

Date submitted (UTC-11): 3/10/2021 7:06:06 AM
First name: Cristal
Last name: Hibbard
Organization:
Title:
Comments:
My concerns and comments are as follows:
* TEMPORARY TRAIL CLOSURES - This project will result in temporary trail closures which will hurt local businesses, anger users and deter visitors. To "ease the pain" of these closures, mitigate frustrations and minimize the negative economic impact here are solutions:
o NO-WORK, NO TRAIL CLOSURE - Lifting closures any time there will be more than a two-week no-work gap in operations.
o TRAIL DETOURS - Utilizing existing, numerous roads as trail detour routes instead of a complete trail closure. SWCCA volunteers are willing to assist with the trail detour routing and the placement of temporary guidance signage.
o NO-DANGER, NO TRAIL CLOSURE - Only close the trail section when there are dangerous operations within a defined buffer around the trail. SWCCA volunteers are willing to assist posting "Danger, stay on trail." signs and assist in marking buffer area.
o ROAD/SKID CROSSINGS - Trail skid crossings should be treated like a road crossing with appropriate signage and not a trail closure. If there is resistance to a safety need for logging truck speed limits on FS 527 why would it be any different for crossing a skid road.
o ONE TRAIL CLOSED AT A TIME - Recreation treatment blocks limited to treatment one at a time should include all blocks in the Boggy Trail System 1-5. There are trails like Boggy Draw and Mavericks that are needed to access other trails, closing these makes access to other trails difficult requiring navigating logging vehicles on roads and other project hazards.
* DAMAGE TO TRAIL TREAD - Singletrack tread quality, scenery and trail flow is critically important to most Boggy Draw trail users.
o REROUTE TRAILS OFF HAUL ROADS - While the EA calls for returning any trails damaged by timber management operations to pre operations conditions, a significant impact would be on the sections of existing trails that happen to be on Level 1 roads (closed roads that are in storage and can be reopened for projects). The EA allows for some of these roads to be kept open for slash treatments, and possibly reopened and rebuilt for future logging operations. This will obviously destroy the singletrack tread and reduce the value of the trail and user experience. Efforts to rehab the haul roads back to singletrack trails could be delayed for months/years because of the various project steps requiring road access, like cutting then later dealing with slash piles. The best solution would be to reroute all non-motorized trail sections off the Level 1 roads prior to the logging operations.
o REROUTE HAUL ROADS OFF TRAILS - Another component would be permanently removing the Level 1 status from appropriate already closed road sections overlapping the trail and rerouting haul roads off of trails. There are haul routes that obviously look like old closed roads but there are other sections where there is no sign that the trail was ever a road. Specifically, there is a section of trail where a haul road could be constructed on top of what we consider pristine trail. This section is directly south of the FS 527 and FS 527.H intersection. Rerouting this haul route to 527.H seems logical, shortening the haul distance.
o USE TRAIL AS SUBUNIT PERIMETER WITH BUFFER - When units are broken down further into subunits for contractors there should be an effort made to use trails as perimeters which also help with adding a buffer around trail that is easier for contractors to avoid. This also avoids unnecessary trail crossings. However, both sides of trail should have consistent treatment. This will also reduce marking and management work by having a perimeter only and not an additional corridor to avoid in the middle of a subunit. Also, an effort made to not split subunits between numerous contractors along a stretch of trail avoiding sporadic closures because of varying work schedules.
o TRAIL REHABILITATION AGGRESSIVE AND IMMEDIATE - Rehabilitation of areas disturbed by logging operations should be particularly vigorous within the proximity of trails to maximize visual esthetics immediately after timber operations of that area in the subunit are completed. This could include removing slash immediately and locating slash piles out of view or at least 100 feet from trails, since even after they are burned there would still be visible fire rings. The EA calls for establishing a visual corridor on each system trail. It states that, "The area of influence is 9 feet of center line...". It does not seem clear what this means, and 9 feet to either side of the trail centerline seems awfully narrow. Within this area stumps should be cut flush with ground. The 15' for vehicle tracks is very narrow as well and will leave visible marks easily viewed taking away from the natural experience users are looking for.

o PRE AND POST CONTRACT WORK OVERSITE INVOLVING RECREATION STAKEHOLDERS - We have heard that in another similar project there was not enough oversite to ensure EA requirements were adhered to. Penalties and pre- and post-inspections would help prevent this before it is too late. Trail stakeholders should be able to inspect periodically along with FS recreation personal. Also, some of the required design features are vague. Current Dolores District staff seem to have a good understanding of SWCCA perspectives of these items, but future staff may not be as congruent.

o CAMPING AND VISIBILITY CONSIDERATIONS - The Boggy Draw area is popular for dispersed camping. Each year campers are seen in locations not previously used for camping. As the density of trees is reduced, there may be increased dispersion of campers to previously inaccessible or less accessible locations. This may also degrade from the user experience because campsites can be spotted from longer distances removing the secluded feel when on the trail.

o WINTER RECREATION CAN BE IMPROVED AND USER CONFLICT AVOIDED - Removing trees along winter recreation routes could impact snow levels and negatively affect grooming efforts. However, there may be an opportunity to create alternate/new groomed winter recreational routes. Grooming operations are now on and south of FS 527, but the snow can be better on the north side. More southerly routes already have softer conditions which could be compounded without the canopy. If FS 527 or other currently groomed road haul routes are plowed during grooming season, then rerouting groomed sections off roads permanently would be a solution and potentially a long-term improvement. SWCCA has previously requested alternate routes to groom avoiding FS 527 and FS 259 to mitigate conflict with some traditional user groups that damage the groomed surface. Snow bike grooming is less than 4' so a tighter route between vegetation can be used maintaining snow levels and providing users a more desirable experience.

* VALUE OF TRAIL CONSTRUCTION & MAINTENANCE CONSIDERATIONS - Expensive SWCCA volunteer and FS efforts are impacted by the project.

o REROUTE FUNDING FROM PROCEEDS - The trail realignment should be funded by proceeds from the project and not volunteers. Volunteers (unpaid) already contributed significant effort and should not be tasked with more uncompensated work as a result of this "for profit" project.

o SWCCA CONTRIBUTION VALUE - SWCCA recently constructed 24.4 miles of trails in the Boggy Draw system with a market value of $447,496.00 (Calculations use the published average rate of $3 per foot and $2500 per mile design and layout). This is just the recent expansion and does not include the other previously constructed trails in the network and significant maintenance and improvement efforts. The list of sources for costing is extensive, SWCCA can provide them upon request or many can be viewed doing an internet search.

o FS CONTRIBUTION VALUE - As stated in the EA, some $300,000 worth of FS trail construction has been invested in producing the current (motorized and non-motorized) trail system.

o ADDED TRAIL WORK - Past experience shows that as the ponderosa canopy is reduced, Gambel Oak seem to quickly fill in the newly opened areas. This would seem to interfere with the goal of promoting new Ponderosa growth. Plans to control such oak growth should be defined. Examples are areas on the northeast mesa above horse camp site and northeast mesa point above house creek and bean canyon intersection where there is evidence of historic logging but very limited new growth except thick oak brush. Additional Gambel Oak also creates more trail maintenance. Even past mitigation efforts have short term success and fill back in with oak brush quickly and vigorously. For example, look at Italian Canyon on mesa northwest above Italian canyon and Dolores river canyon intersection. Coincidentally, historic photographs of Boggy Draw that are available in books like "The RGS Story Rio Grande Southern" show far less Gamble Oak.

* ECONOMIC AND COMMUNITY IMPACT

o ECONOMIC LOSS - There is not adequate language in the EA addressing the negative economic impacts due to the temporary loss of recreational opportunities. This could be reduced by tight scheduling of trail closures and limiting the number of trails closed at any given time. The above requests require more attention and management of and by contractors. While there are economic benefits from the logging operation that are easy to quantify, some of the more significant economic impacts from recreation require a deeper analysis, tracking dollars through numerous hands. Residents opposed to recreation or indifferent about trail impacts may be surprised how they unknowingly benefit. There are abundant statistics and studies available on the internet. For example, economic impact output in a Grand Junction study = $7,284,528, Crested Butte study = $10,848,408 and 237 jobs supported for mountain biking alone, not including other trail activities.
https://www.imba.com/.../OA_GMUGNF_MtnBikingStudy2018.pdf

o TALENT RECRUITMENT - Community impact includes recreational opportunities that help recruit talent for otherwise hard to fill positions like medical professionals benefitting everyone in the community. Not just trail users.

o COMMUNITY HEALTH - Another benefit from a great local trail system that is difficult to quantify is how it provides a place to improve community members' mind and body health. Trails provide a release from the stresses of life and a place to improve fitness.

* SAFETY
o SAFER ROUTE OFF CR 31 HAUL ROUTE - Although outside the scope of the EA, the proposed non-motorized trail from the town of Dolores to the Bean Canyon trail becomes more critical when considering the EA's Modified Proposed Action. The proposed trail generally parallels Road 31, providing a safer alternative for trail users versus the heavily trafficked road. Road 31 will be the haul route for the logging trucks in the proposed project. Providing a trail alternative to the road is safer for the trail users and the logging trucks and should be a top priority. A portion of the proposed trail includes a short new section of trail on Forest Service land between the boundary and Bean Canyon Trail and requires FS approval. We urge them to consider rapid approval.
o SPEED LIMITS - Speed limits and slow down signage should be posted and enforced for logging trucks at trail crossings, shared trail routes and parking areas.

CARA_2458_PHASE_3333_Form_Set_Master_Letter_75

| Doc Title | File Name | Upload Date | Author |
|---|---|---|---|
| Public_Comment___Gregory__Dani | cara.txt | 03/12/2021 | Gregory, Dani |
| Public_Comment___Hibbard__Cristal | cara.txt | 03/10/2021 | Hibbard, Cristal |
| Public_Comment___Callicott__David | cara.txt | 03/12/2021 | Callicott, David |
| Public_Comment___Furse__William | cara.txt | 03/12/2021 | Furse, William |
| Public_Comment___Hughes__Karen | cara.txt | 03/11/2021 | Hughes, Karen |
| Public_Comment___Wing__Alex_(Attachment) | 20210312 RTA Boggy Draw Comment.pdf | 03/12/2021 | Wing, Alex |
| Public_Comment___Wing__Alex | cara.txt | 03/12/2021 | Wing, Alex |
| Public_Comment___Richard__Robin | cara.txt | 03/13/2021 | Richard, Robin |
| Public_Comment___Gregory__Dani_(Attachment) | SWCCA_SalterEAComments_031221.pdf | 03/12/2021 | Gregory, Dani |

Date submitted (UTC-11): 3/10/2021 3:34:58 AM
First name: Joseph
Last name: Lantz
Organization:
Title:
Comments:
I mountain bike and cross country ski on a regular basis throughout the year on the Boggy Draw trail system This outdoor recreational activity is an important way for me to maintain my physical and mental health. I realize that our forests need to be periodically thinned to maintain their health, but I hope you can do this in a way that minimizes the damage and access to the Boggy Draw Trail system. Many bikers and skiers depend on the Boggy Draw for their physical and mental health.
Thanks for your consideration.

Date submitted (UTC-11): 3/10/2021 2:28:09 PM
First name: Brett
Last name: LeCompte
Organization:
Title:
Comments:
I am a Granath Mesa resident who lives 2.5 miles from the Boggy Draw Trailhead. My family of four are very active users of the Boggy Draw trail system for a wide variety of activities including mountain biking, snow biking, XC skiing, running, hiking, and camping. In addition, I am the owner of a natural construction company that tries to utilize local timber products from Aspen Wallwood and Stonertop Lumber in much of my work. These facts explain how I am very engaged in our local forest and why I have comments in this logging proposal.

In general, I support the concerns raised by Southwest Colorado Cycling Association on the impacts on the Boggy Draw trail system. Specifically, I urge you to adopt a philosophy of minimizing disruption to the existing trails by rerouting trail sections off proposed haul roads so that the trail usage is not so dependent on the timetable of logging and rehabilitation work. Don't close trails when there is no danger and skid crossings could be signed like road crossings. Close one trail at a time. If trail damage is unavoidable, rehabilitation should be prompt.

In summary, I support the need to minimize wildfire risk and beetle kill damage to improve overall forest health and provide local timber. I believe this must be balanced against potential damage to what has become a very valuable asset to Montezuma County. As a nearly 20 year resident of Granath Mesa, I can attest to the amazing growth in visitation and popularity of the Boggy Draw area. I am sure that the estimated $300,000 worth of local volunteer trailwork has brought real economic benefits to local businesses. For example, Kokopelli Bike and Board is in the process of opening a satellite bike shop in downtown Dolores as a direct result of the popularity of the Boggy Draw trail system. Let's take the extra effort to accomplish the forest management of this special and treasured area without destroying what has already been accomplished. Thanks for your consideration.

Date submitted (UTC-11): 3/10/2021 6:28:30 AM
First name: Matthew
Last name: Lindvall
Organization:
Title:
Comments:
I support the careful mitigation of our forest to prevent beetle kill and wildfire.  Recreation uses also must be protected and any existing trails that are effected should be allowed to be rerouted prior to the heavy logging truck traffic without going thru a long and slow approval process.
Post logging remediation should be quick and well funded on a ongoing basis as the affected area and or trail are no longer active with logging operations.  Don't wait until the whole project is done years from now to repair the trail system segments.

Date submitted (UTC-11): 3/10/2021 3:45:07 AM
First name: Lori
Last name: Mott
Organization:
Title:
Comments:
While I definitely support creating a healthy forest I respectfully ask that the logging roads be built away from the existing trails. As a local resident I enjoy riding the mountain bike trails on a weekly basis. The Boggy Draw trail system adds to the quality of life in our area, please try to preserve the trail system. Thank you!

Date submitted (UTC-11): 3/10/2021 9:20:47 AM
First name: Raiha
Last name: Paewai
Organization:
Title:
Comments:
I would like to express my objection to the Salter Vegetation Management Project based on the following concerns.
1. The risk of wild fires will be an ever increasing threat as long as global warming continues.
2. The solution to the risk of wild fires surely cannot be to rid our environment of every living tree.
3. Why is there a " all or nothing " approach.
4. I note that the project claims to be selective, yet the Montrose logging company are all ready asking for a variance for bigger roads and bigger trucks.
5. The diversity of the wildlife will suffer.
6. The area is not densely populated so surely we can figure out how to protect them without destroying the whole forest.
Thank you Raiha Paewai

Date submitted (UTC-11): 3/10/2021 4:54:26 AM
First name: Ryan
Last name: Schannauer
Organization:
Title:
Comments:
My family and I are trail users of Boggy Draw. This logging activity will irreparably harm this beautiful location. I oppose this effort.

Boggy Draw is an outdoor destination for many people. It has some excellent single track and consistently beautiful views. It is home to (likely) uncountable numbers of wildlife. Logging this area will change all of that. It will uproot and stress animals. It will destroy the beautiful views. It will stop people from coming to Dolores.

In the Summer, Boggy draw is filled with camping families, hikers, runners, dogs, and bike riders.

In the Winter, Boggy Draw is one of the few areas with groomed recreation track. Many people look forward to spending their cold, cold mornings here. This, like all forms of recreation, is a way to find peace in this increasingly chaotic world. Technology is chaos. Logging a serene wild area is chaos.

We won't know the economic impact logging Boggy Draw will have on Dolores until 10 years have passed. What I can say, though, is that I will not continue to visit the area. Why would I want to recreate in a construction zone? Colorado has many other trails and communities where I will visit and spend my money. Who would chose to ride a bike in a forest that is being cut and loaded on a truck?

While it should go without saying that nearly every citizen understands beetle and fire mitigation, can we truly say that this isn't mostly about the almighty dollar bill? In reading some of these other comments by people associated with--for example--Montrose Forest Products, one so non-industry educated might surmise that the tone of the article is focused on money.

Statements like "our 120 employees approve of this" are blatantly about income. Yes, people with jobs need work to do; they need to survive and support their families. Though, at what "cost"? Conversely, is it fair for me to say "thousands of citizens don't support this"? I know we don't have thousands of comments; likely due to most people being unaware of the situation. But think forward to every car that rolls into Boggy Draw in a few years to find it decimated. Further, in this aforementioned letter, you'll find several statements strictly related to money saving requests by the author. This forest is income to those companies. They'll do their job, move on to the next location, and we'll be left with a shard of our previous Boggy Draw.

This forest is peace to its community. An escape from the scars of mankind. This effort will further remind us of the doom that we are spreading throughout our wilds.

Keep money-driven chainsaws out of Boggy Draw.

Date submitted (UTC-11): 3/10/2021 7:15:14 AM
First name: Dusty
Last name: Teal
Organization:
Title:
Comments:
Good morning Forest Management,
I wish to comment on the logging that will be happening in the Boggy Draw Mountain Bike Trail System area. It seems obvious to me that the forest could use thinning, and I expect that it will be done carefully.
I've been riding the trails for the last 9 years. I'm 75 years old. I've ridden trail systems in Arizona as well as Colorado, but Boggy Draw is certainly my favorite and I consider it one of the great treasures of Montezuma County. I've had family join me from 5 years to 50 years of age and from as far away as Norway, Italy and England. 8 of those were my Grandchildren who will be coming back for years. (They stay in accommodations in Dolores, eat out at restaurants, their favorite being the Dolores River Brewery, and also include Montezuma Mexican Restaurant and the Farm in Cortez...they spend money at the local grocery as well. Just a minuscule portion of the visitors that Boggy Draw draws.)
I've spoken to many other riders while I've been riding the trails, from all over, mostly in this area, but throughout the west and people from back east and a few international riders. They all were EXTREMELY impressed with the trail systems at Boggy draw. I see old folks such as myself, families with small kids, groups of teens even, having a great time riding the Boggy Draw trails. And all of those folks end up spending time and money in Dolores and Cortez. Boggy Draw is the perfect compliment to Phil's World. So much is at risk for so many.
I've been working with SWCCA for the last four or five years and helped construct the new trails in Boggy Draw as well in Phil's world and also maintain the Boggy Draw trails. Needless to say, I'm very concerned about the damage to the existing trail system by heavy logging equipment. I would gladly help repair damage whenever necessary caused by this project but hope it will be minimal and all guidelines will be enforced. Once again I consider Boggy Draw to be one of the more unique recreational systems in this entire region. Even the people from Durango and Telluride are amazed.
I'm concerned about the logging trucks coming down Dunlap hill as I've witnessed a recent logging truck spill on HWY 184. That would be devastating in and for the town of Dolores. In closing, I would ask you to PLEASE carefully manage any logging in the Boggy Draw trail systems and LISTEN to suggestions provided by SWCCA.
Sincerely concerned,
Dusty Teal

Date submitted (UTC-11): 3/10/2021 7:52:18 AM
First name: Martha
Last name: Teal
Organization:
Title:
Comments:
Hello,

Boggy Draw is one of the most unique cycling trail systems I've had the pleasure to enjoy. I've ridden mountain bikes for at least 30 years. I've ridden in Flagstaff, Prescott, the greater Tucson area, Sedona, Telluride, Durango, even Laramie, Wyoming and in Pennsylvania and Michigan. I have never seen anything remotely similar to Boggy Draw.

I've gladly introduced many a grandchild, friend, brother, cousins, nieces, nephews, all shapes and sizes to Boggy Draw to share in its delights. Never a bad experience. I've also met 17 extraordinary fellow women riders from right here in our community through an informal riding club at Boggy Draw. Who knows how many of their loved ones they've shared this beautiful system with like I have? The ripple effect is just beginning, for our grandchildren will have their feet in the pedals after we are done.

While I understand the need for thinning and healthy forest management, to learn of a probably life-long and often irreparable damage coming Boggy Draw's way is such a blow. There are so many approaches one can make to help preserve the trails created, using the GREAT suggestions offered by SWCCA, AND accomplish a healthy forest. It shouldn't have to be one or the other.

Not only has the Boggy Draw trail system been something special just for me, it has been a BOON for our year-long COVID restrictions, the perfect answer to be able continue to socialize and it encouraged a huge uptick in outdoor activity. That in turn helps with health, both mental and physical, obviously.

Our local businesses have already suffered terribly due to COVID restrictions but are very much looking ahead with great positive outlook that we're rounding a corner. Now, we're finding that an important element to success for their businesses will now be minimized by careless logging right on the heels of COVID! Surely we want to do everything we can to keep bikers in our area. The suggestions made by SWCCA are attainable and show that we'd all like to work together.

I firmly believe we can attain both, a thinned forest and accommodate a vivacious biking community that provides much needed trickle down dollars to our local businesses.

Sincerely,
Martha Teal

Date submitted (UTC-11): 3/10/2021 10:01:52 AM
First name: Mary
Last name: Thorsness
Organization:
Title:
Comments:
I visit Dolores annually, and one of the highlights of my visit each year is a mountain bike ride (or 2 or 3!) at Boggy Draw. I understand that logging will occur in this area to support the health of the forest. Boggy Draw is a special place: I understand the importance of maintaining the forest, but worry about the potential negative impacts of that maintenance on the forest and its users. I encourage you to do all that you can to minimize those negative impacts of logging on the spectacular trails and scenery at Boggy Draw, and to make every effort to allow continued trail use as the project progresses.

Date submitted (UTC-11): 3/10/2021 8:32:42 AM
First name: Peter
Last name: Thorsness
Organization:
Title:
Comments:
In regards to the Forest Health - Salter Vegetation Management Project #57671, it is important to minimize impact on existing activities that are taking place in the project area (commonly known as Boggy Draw). I have reason to visit the area on at least an annual basis and it is certainly a highlight of the year. I understand the need to maintain a healthy forest, but it is not clear to me that the approach is (1) minimally invasive as it can be and (2) will provide the desired outcome. I stress to you the importance of working with knowledgeable local environmental and trail advocacy groups to assure minimal disturbance to current uses and an ability to rehabilitate the damage caused by the heavy equipment required for the operation. This cannot become a "the operation was a success, but the patient died" type of thing for this forest and the surrounding community.

Date submitted (UTC-11): 3/10/2021 2:38:13 AM
First name: Peter
Last name: Trask
Organization:
Title:
Comments:
I have lived in Colorado my entire life and have had the unfortunate experience being evacuated due to a forest fire. Communities have encroached into the forest ecosystem and the need for responsible mitigation is undeniable. But just as a forest ecosystem is a delicate balance so are the small mountain communities around it.

Places such as Cortez and Dolores struggle with not having the economic diversity of larger metropolitan areas so this adds a great emphasis on the importance of resources in these communities. The Boggy Draw recreational area is a prime example of a critical community resource. This recreational area attracts tourists from all over the world and brings essential revenue into the community. People who are camping, hunting, hiking and biking spend money and a good amount of it at local stores, bars, restaurants, shops, etc. There have been many articles in media sites such as the Men's Journal and Outside magazine that are testament to widespread enthusiasm for Boggy Draw.

The area is also greatly appreciated by the full time residents who sacrifice a lot of convenience and security to be closer to such resources. Residents are so passionate about the area that many groups such as SWCCA devote a lot of time, money and manpower to maintain and improve access to trails for all visitors. It is a vital part of the mental health for many individuals as well who find solace on early morning runs or stress relief whipping around the mountain bike on Boggy Draw trails on a weekly basis.

So while responsible forest mitigation is necessary it should be done with utmost consideration for the community. A 10 year logging project that interrupts the Boggy Draw trail systems could be devastating to the local economy and health of the community. People are creatures of habit and disrupted tourists who cannot make their annual trip to Boggy Draw may not come back. Blocking or closing frequently used trails may pull away attention and resources away from local interest groups. Community members who are no longer able to maintain their routines may move elsewhere.

So please work with the community if the planned logging/mitigation goes forward. Minimize the impact on trails and prevent any closures or disruptions to tourism.

Date submitted (UTC-11): 3/10/2021 2:13:32 PM
First name: Lisa
Last name: Wilk
Organization:
Title:
Comments:
My husband and I are avid mountain bikers. We live in Durango and utilize the Boggy Draw system trails year round. I have read the EA for the SVMP and it is clear that the trail system has been considered in the impact assessment.

I support the SWCCA in their concerns that some issues were not addressed in enough detail in the EA. Their comments are detailed and I'm sure you have them so I don't feel the need to repeat them, but I encourage you to take them very seriously.  Keeping the trails open as much as possible during the logging operation, and restoring vegetation and repairing the trail damage as quickly as possible are priorities for me personally.

These trails are not known just by people in the Four Corners. On any weekend there are vehicles from all over the U.S. at the trailheads. These trails are no secret, especially for avid mountain bikers using trail apps such as Garmin, Trailforks and Mountain Bike Project. Your cooperation with stakeholders is an opportunity to showcase what is possible when we all work together to sustain trail systems during logging operations.

Date submitted (UTC-11): 3/11/2021 3:36:49 AM
First name: Bret
Last name: Ahern
Organization:
Title:
Comments:
Another voice against logging in the Dolores Boggy Draw trail system forest. If it's feasible to log without destroying trails and trail access long term that would be agreeable. Planning a trip to the area this Fall with a large group (Covid permitting) and one of the reasons is that trail system, so please consider also the financial impact this may cause to local businesses. Thanks for reading.

Date submitted (UTC-11): 3/11/2021 12:00:00 AM
First name: Adrian
Last name: Archuleta
Organization: Colorado Parks and Wildlife
Title: Area Wildlife Manager
Comments:
RE: Salter Vegetation Management Project Environmental Assessment

Dear Mr. Padilla,

Colorado Parks and Wildlife (CPW) appreciates the opportunity to review and provide further comments on the proposed Salter Vegetation Management Project Environmental Assessment within the San Juan National Forest. CPW provided scoping comments on this project on March 27, 2020. The project proposes using a variety of mechanical vegetation thinning, timber harvest, and would potentially use fire on the project area to achieve a suite of vegetation goals on the approximately 22,346 acres of the treatment area. Most of the goals are interrelated and strive to create a healthier, more natural forest, thereby benefitting many forest users, including wildlife. Additionally, the project will require the construction of temporary roads as well as use of roads currently listed as Maintenance Level 1 Roads.

The project area encompasses a variety of ecosystem types, including ponderosa/Gambel oak forest, stands of aspen, and stands of mixed conifer. These different forest types are generally lacking a diversity of tree size and age, which makes them more susceptible to dwarf mistletoe and many different bark beetles. The project area provides habitat for a multitude of wildlife species including elk, mule deer, black bear, mountain lion, coyote, fox, bobcat, and Merriam's turkey, dusky grouse, Cooper's hawk, red - tailed hawk, sharp - shinned hawk, northern goshawk and many other species. The area contains valuable fawning and calving grounds for deer and elk, as well as critical winter range for these same species. The area also provides nesting habitat for a suite of both migratory and non-migratory birds. CPW appreciates the potential wildlife habitat improvements and benefit that this project could provide.

Big Game

The analysis area contains and is adjacent to elk calving grounds. The Environmental Assessment specifies that there will be no operations done in areas that CPW has mapped as elk production areas from May 15th to June 30th annually. The Environmental Assessment also specifies that operations will not be done in CPW mapped critical elk winter range from December 1st to April 30th annually without line officer approval. CPW understands that travel

may be necessary through mapped production areas to access non-production areas, and appreciates that we will be consulted about such travel.

Logging operations in the area will remove overstory and should promote growth of native grass, forbs, and shrubs in the treatment area as well as regeneration of trees. This will encourage use by big game. Live stands of trees and corridors to stands of trees outside of the treatment area should be maintained. These trees provide important hiding and thermal cover near what will become an attractive foraging area. Please include design features for project implementation that will ensure treatment areas will provide security and thermal cover for big game.

Prescribed burns within the project area should be planned to attempt to provide a mosaic of habitat for wildlife. Smaller, patchy fires that maintain pockets of cover and shelter will provide the greatest benefit to both big and small game.

Travel Management

Increased road density can impact the use and occurrence of many wildlife species. Vegetation management, and recreation management can impact effective use of habitat by mule deer, elk, and other species. CPW is supportive of this project's proposed travel management that aligns with the long-term goal of preserving blocks of unfragmented wildlife habitat. These blocks help hold big game on public lands where they are available for harvest by public land hunters. Maintaining or reducing road density will provide more usable habitat for wildlife within the treatment area, and will help protect crucial migration corridors between large blocks of habitat.

CPW recognizes that approximately 50 to 75 miles of temporary roads may be constructed for this project. We understand that enforcing public restrictions on these roads is difficult and so ask that any roads constructed for this project be physically blocked and signed when not in use for project actions. That would help deter public use and keep areas as undisturbed as possible for wildlife use. CPW understands that the EA states that the following use for harvest and treatment implementation, both temporary AND designed roads would be decommissioned and CPW supports this.

Raptors

The Environmental Assessment states that surveys to locate raptor nests (specifically of northern goshawks) will be completed prior to the project start. If any goshawk nests are found, all operations will be restricted within one-half mile of the active nest from March 1st to August 31st annually. The same restrictions will be applied to nests of other raptors, except with a one-quarter mile buffer instead of one-half. The level of disturbance that a raptor might experience from this project's operations at those distances will vary with individual raptors, but CPW appreciates these restrictions.

Aquatic Species

The project area encompasses several smaller drainages that do not directly support fish, but that drain into McPhee Reservoir which is a destination for trout fishing, as well as small/ largemouth bass, and supports other fish species including kokanee salmon, crappie, and perch. Colorado Parks and Wildlife's primary concern regarding aquatic species is to maintain water quality by limiting erosion and sedimentation into streams. Water quality can be maintained by minimizing

drainage crossings and surface-disturbing construction activities near these resources. The Environmental Assessment states that temporary roads will be constructed, used, and reclaimed when erosion potential is low. The Watershed/Soils section on pages 63 and 64 lists several features of the plan designed to reduce erosion, including distribution of logging throughout cutting units, and avoiding actions that might disturb soil during periods of wet soil. CPW agrees with these actions and appreciates the effort to preserve water quality.

Non-native Invasive Weeds

CPW views one of the biggest threats to ecosystem health on federal lands in this area as non-native invasive weeds. Many invasive weeds can already be found throughout the project area. Invasive weeds generally flourish following disturbance. The Rare Plants and Invasive Species section on page 22 lists six actions to prevent the spread of invasive plant species. CPW agrees with all six of these actions.

Conclusion

Colorado Parks and Wildlife supports this project since it will improve the health of the forest in the treatment area. We recognize that short term impacts to wildlife may occur from the construction and use of roads, as well as the mechanical and human disturbance during vegetation thinning. However, we believe that the improved wildlife habitat offsets these impacts in the long run.

Thank you for the opportunity to comment on the Salter Vegetation Management project. If you have any questions concerning these comments, please feel free to contact District Wildlife Manager, Matt Sturdevant at (970) 749-1435. We are glad to continue working with you for the benefit of wildlife. Please let us know if you would like to discuss any of our comments or recommendations for this project.

Sincerely,

Matt Sturdevant

District Wildlife Manager

COLORADO
Parks and Wildlife
Department of Natural Resources

Durango Area 15 Office
151 East 16th Street
Durango, CO 81301
P 970-247-0855 | F 970-382.6672

March 10, 2021

Mr. Derek Padilla,
Dolores District Ranger District
29211 Hwy 184
Dolores, CO 81321
(970) 882-6830

RE: Salter Vegetation Management Project Environmental Assessment

Dear Mr. Padilla,

Colorado Parks and Wildlife (CPW) appreciates the opportunity to review and provide further comments on the proposed Salter Vegetation Management Project Environmental Assessment within the San Juan National Forest. CPW provided scoping comments on this project on March 27, 2020. The project proposes using a variety of mechanical vegetation thinning, timber harvest, and would potentially use fire on the project area to achieve a suite of vegetation goals on the approximately 22,346 acres of the treatment area. Most of the goals are interrelated and strive to create a healthier, more natural forest, thereby benefitting many forest users, including wildlife. Additionally, the project will require the construction of temporary roads as well as use of roads currently listed as Maintenance Level 1 Roads.

The project area encompasses a variety of ecosystem types, including ponderosa/Gambel oak forest, stands of aspen, and stands of mixed conifer. These different forest types are generally lacking a diversity of tree size and age, which makes them more susceptible to dwarf mistletoe and many different bark beetles. The project area provides habitat for a multitude of wildlife species including elk, mule deer, black bear, mountain lion, coyote, fox, bobcat, and Merriam's turkey, dusky grouse, Cooper's hawk, red - tailed hawk, sharp - shinned hawk, northern goshawk and many other species. The area contains valuable fawning and calving grounds for deer and elk, as well as critical winter range for these same species. The area also provides nesting habitat for a suite of both migratory and non-migratory birds. CPW appreciates the potential wildlife habitat improvements and benefit that this project could provide.

**Big Game**
The analysis area contains and is adjacent to elk calving grounds. The Environmental Assessment specifies that there will be no operations done in areas that CPW has mapped as elk production areas from May 15th to June 30th annually. The Environmental Assessment also specifies that operations will not be done in CPW mapped critical elk winter range from December 1st to April 30th annually without line officer approval. CPW understands that travel

Dan Prenzlow, Director, Colorado Parks and Wildlife • Parks and Wildlife Commission: Marvin McDaniel, Chair • Carrie Besnette Hauser, Vice-Chair
Marie Haskett, Secretary • Taishya Adams • Betsy Blecha • Charles Garcia • Dallas May • Duke Phillips, IV • Luke B. Schafer • James Jay Tutchton • Eden Vardy

may be necessary through mapped production areas to access non-production areas, and appreciates that we will be consulted about such travel.

Logging operations in the area will remove overstory and should promote growth of native grass, forbs, and shrubs in the treatment area as well as regeneration of trees. This will encourage use by big game. Live stands of trees and corridors to stands of trees outside of the treatment area should be maintained. These trees provide important hiding and thermal cover near what will become an attractive foraging area. Please include design features for project implementation that will ensure treatment areas will provide security and thermal cover for big game.

Prescribed burns within the project area should be planned to attempt to provide a mosaic of habitat for wildlife. Smaller, patchy fires that maintain pockets of cover and shelter will provide the greatest benefit to both big and small game.

**Travel Management**
Increased road density can impact the use and occurrence of many wildlife species. Vegetation management, and recreation management can impact effective use of habitat by mule deer, elk, and other species. CPW is supportive of this project's proposed travel management that aligns with the long-term goal of preserving blocks of unfragmented wildlife habitat. These blocks help hold big game on public lands where they are available for harvest by public land hunters. Maintaining or reducing road density will provide more usable habitat for wildlife within the treatment area, and will help protect crucial migration corridors between large blocks of habitat.

CPW recognizes that approximately 50 to 75 miles of temporary roads may be constructed for this project. We understand that enforcing public restrictions on these roads is difficult and so ask that any roads constructed for this project be physically blocked and signed when not in use for project actions. That would help deter public use and keep areas as undisturbed as possible for wildlife use. CPW understands that the EA states that the following use for harvest and treatment implementation, both temporary AND designed roads would be decommissioned and CPW supports this.

**Raptors**
The Environmental Assessment states that surveys to locate raptor nests (specifically of northern goshawks) will be completed prior to the project start. If any goshawk nests are found, all operations will be restricted within one-half mile of the active nest from March 1st to August 31st annually. The same restrictions will be applied to nests of other raptors, except with a one-quarter mile buffer instead of one-half. The level of disturbance that a raptor might experience from this project's operations at those distances will vary with individual raptors, but CPW appreciates these restrictions.

**Aquatic Species**
The project area encompasses several smaller drainages that do not directly support fish, but that drain into McPhee Reservoir which is a destination for trout fishing, as well as small/ largemouth bass, and supports other fish species including kokanee salmon, crappie, and perch. Colorado Parks and Wildlife's primary concern regarding aquatic species is to maintain water quality by limiting erosion and sedimentation into streams. Water quality can be maintained by minimizing

drainage crossings and surface-disturbing construction activities near these resources. The Environmental Assessment states that temporary roads will be constructed, used, and reclaimed when erosion potential is low. The Watershed/Soils section on pages 63 and 64 lists several features of the plan designed to reduce erosion, including distribution of logging throughout cutting units, and avoiding actions that might disturb soil during periods of wet soil. CPW agrees with these actions and appreciates the effort to preserve water quality.

**Non-native Invasive Weeds**

CPW views one of the biggest threats to ecosystem health on federal lands in this area as non-native invasive weeds. Many invasive weeds can already be found throughout the project area. Invasive weeds generally flourish following disturbance. The Rare Plants and Invasive Species section on page 22 lists six actions to prevent the spread of invasive plant species. CPW agrees with all six of these actions.

**Conclusion**

Colorado Parks and Wildlife supports this project since it will improve the health of the forest in the treatment area. We recognize that short term impacts to wildlife may occur from the construction and use of roads, as well as the mechanical and human disturbance during vegetation thinning. However, we believe that the improved wildlife habitat offsets these impacts in the long run.

Thank you for the opportunity to comment on the Salter Vegetation Management project. If you have any questions concerning these comments, please feel free to contact District Wildlife Manager, Matt Sturdevant at (970) 749-1435. We are glad to continue working with you for the benefit of wildlife. Please let us know if you would like to discuss any of our comments or recommendations for this project.

Sincerely,



Matt Sturdevant
District Wildlife Manager

Cc: Matt Thorpe, SW Deputy Regional Manager; Cory Chick, SW Regional Manager; Brian Magee, SW Land Use Coordinator; Brad Weinmeister, Area 15 Terrestrial Biologist; Becca DeVergie, District Wildlife Manager; Area 15 File

Date submitted (UTC-11): 3/11/2021 7:57:25 AM
First name: Doug and Deanna
Last name: Bagge
Organization:
Title:
Comments:
We are concerned about the longevity of this project and the negative impact it will have on wildlife, damage to existing trails and the local economy. The towns of Dolores and Cortez in cooperation with Mesa Verde Country have worked hard to build the local tourism industry and because of this the popularity in hiking and biking in our area has grown substantially and our local economy has benefitted from this.  Local business owners and all their employees will be greatly impacted by this proposal.  This is not a one season inconvenience, but years of trail disruption that will have a long term negative effect on the economies of Dolores and Cortez. If visitors come here with the expectation of being able to enjoy the Boggy draw area for riding, hiking, hunting, ATV use and Xcountry skiing and are unable to do this because of road and trail closures, they will go else where. Local businesses who are already struggling because of the pandemic may be forced to close due to the decline in tourism.  When the project is finished, Dolores and Cortez will have to start their visitor campaigns over at great expense. We are against the size of this project and believe a less impactive mitigation plan can be used.

Date submitted (UTC-11): 3/11/2021 12:00:00 AM
First name: Ken
Last name: Charles
Organization: Town of Dolores
Title:
Comments:
Please accept the Town of Dolores comments regarding the Salter Vegetation Management Project #57671

Please accept these comments regarding the proposed Salter Vegetation Management Project on behalf of the Town of Dolores Mayor and Trustees.

Introduction

The Town of Dolores supports Alternative 2 for the Forest Service to meet the goal to improve the differences between the existing forest vegetation conditions and the desired forest vegetation conditions.

They include:

[bull] improve resilience and resistance to epidemic insect and disease outbreaks,

[bull] increase the structural diversity of the ponderosa pine forest represented across the landscape, and

[bull] provide economic support to local communities by providing timber products to local industries in a sustainable manner.

The Town has the following comments:

Economic Concerns

There is not adequate language in the Draft EA addressing the negative economic impact due to the temporary loss of recreational opportunities. We suggest that the Draft EA needs more attention regarding economic impacts.

We would like to direct the Forest Service to the Dolores Chamber website as this demonstrates current identity of Dolores. https://www.visitdolores.com

The concept of a quality outdoor recreational experience has become the economic capstone of our focus and efforts. To that extent it needs to be recognized that FS Road 526 leading to county road 31 and either launching or landing in Dolores via 11th Street has been a significant focus point for recreationists to have access to our retail, lodging and services. These dollars are critically important to local business vitality and sustainability. Although mountain biking has drawn a lot of attention in this process it is also important for FS to understand that the historic use of the Forest via 11th Street and CR 31 includes hiking, dispersed camping, hunting, access to McPhee reservoir, and winter recreation like skiing, snowshoeing, sledding, and snowmobiling.

These activities currently serve as the primary economic driver for this town that is not only used by local recreationists but draws visitors from outside the town limits and county to the area. Boggy draw was featured in Outside magazine as a number 1 destination area. Our priority is to maintain safety and access around this driver.

As one example, the Boggy Draw trail system is an extensive system of public land loop trails just outside of Dolores. With over 30 miles of well-groomed trails, Boggy Draw is an extremely popular destination for tourists and locals alike. There are several loops with four distinct levels of difficulty, which provides an outlet for any level of skill. We appreciate the Forest Service's efforts to recognize and treat differently the Boggy Draw trail system from the other areas in the project. To accompany the recognition of this significant recreation area, we offer these comments;

[bull] More specific data is needed on reclamation procedures such as new and existing roads.

[bull] More specific data or models need to be developed and shared for buffering existing trails.

[bull] More specific data on the process for addressing slash piles.

[bull] For this area specifically, we are recommending the Forest Service consider requiring the contractors to work with the Southwest Colorado Cycling Association (SCCA) on "best practices" for how to use existing roads as trail detours instead of a completely closing trails; to advise on trail detour routing and signage, and how this information will be provided to the public. We suggest the trail realignments and restoration work should be funded by proceeds from the Salter project.

[bull] More specific data needs to be developed and shared on Boggy Draw harvest plans.

The Town of Dolores also requests more specific data on project impacts to hunters. The Town engaged in conversations with local business owners around recreational economic drivers that sustained their establishments. Among the highest-ranking recreational activities was hunting. Both in terms of retail sales and lodging, the local business owners indicated that hunting, and more specifically big game hunting was a vital economic recreational sustainer for the success of local businesses going into fall and winter months.

Local business owners also projected that this recreational experience warranted strong protection because of its large purchasing footprint. That is to say that more than other - maybe more passive recreational activities that occur in the proposed Salter Y project area, hunters cover more of the entirety of the Salter Y project area. In addition, hunters come with lots of potential infrastructure needs.

These include needs to purchase food, beverages, ice, fuel, tags, ammunition, supplies, hardware, and they often also seek lodging, laundry, and restaurant services along with their recreational visit to this area. This could yield significantly more economic viability than other more passive or quiet use activities require. When talking to local businesses, this sector of recreational users is what gave local business the final boost before the long winter months. Any further impact to big game hunting areas could significantly reduce the draw of this recreational sector to the area and further impact those businesses who often count on that income to continue to pay into Dolores town sales, property and business taxes, and licensing. This knowledge in conjunction with the knowledge that big game such as elk are in a severe decline in the Salter Y area make it imperative that this project does the most it can to reduce any further impacts.

Safety, Noise and Impacts to Residents

[bull] We ask that more specific data on how speed limits and slow down signage will be posted and enforced for contractors and the public.

[bull] The speed limit at the point where Montezuma County Road 31 and where it becomes a town road on 11th Street is 15 m. p.h. We request this information be made known to contractors and that contractors are notified that this speed will be enforced.

[bull] We request that the Forest Service require contractors to have Jake Brake mufflers on all applicable trucks.

[bull] To prevent project truck traffic from using town roads other than 11th Street, we request the Forest Service work with the town to designate a truck route.

[bull] To alleviate disturbances to residents, we request the Forest Service work with the town to notify industry that truck traffic will be limited on town streets to certain times of the day. The Town will not be allowing commercial truck traffic on 11th street from 10 pm to 6 am throughout the duration of the Salter Y project.

Additional Closure dates: To Be added Under #2 Public Safety;

The Town is providing the additional no harvest activities or hauling dates for recreational compartments 1- 6 Boggy Draw area and or use of FS road 526/ CR 31 leading into 11th Street through the Town of Dolores.

No transport of harvest activities or hauling should include the following critical economic impact dates for the Town of Dolores.

1st Saturday in June: Dolores River Fest

4th Saturday in June: Ride of the Ancients Gravel Grinder

1st Saturday in August: Dolores Boggy Draw Beat Down

1st Saturday in October: Dolores Harvest Fest and Car show

It is recommended that the Town work with a County representative and FS project supervisor to annually identify and confirm significant event days so industry is aware and can adhere to the necessary closure to minimize risk to public safety during congested and economically important events to the town.

Wildlife

We request the Forest Service work closer with the Colorado Division of Parks and Wildlife to mitigate impacts to wildlife.

We have heard from Parks and Wildlife that there is a continuing decline in elk populations in this area. There is not enough information in the EA to understand the impacts in transitionary corridors, calving and wintering grounds. We are requesting more information be provided on the potential impacts and any further mitigations that could be considered to aid in making sure this project does not exacerbate this situation further. Particularly because Dolores is a transition zone and is surrounded by calving and wintering habitat.

The Town is recommending the FS work very closely with Parks and Wildlife staff and biologists to identify. and isolate key big game areas that involve winter range, calving and transitionary areas to protect these locations from logging or the reopening of storage roads. This isolation and protection should occur throughout the entire Salter Y project.

In addition, the Town requests that some of the proposed guzzlers are located in these isolated and protected areas to aid big game in accessing water and potentially reducing the need for migration across project areas to reach water sources.

There is not enough information in the EA to understand impacts to turkey habitat. We have noticed that the project area encompasses the totality of the turkey habitat range. What further mitigations could be considered to aid in making sure this project does not disrupt more than 50% of the turkey habitat area at one time.

The Town is requesting more clarification on potential Impacts to water quality from possible spills and erosion due to the removal of trees and vegetation as well as any remediation efforts that will be done to mitigate any affects it would have on fisheries. In addition, the Town thinks the Forest Service needs to develop a clear and expected management practice for this large project regarding water quality mitigation or repair or restoration.

The Town of Dolores greatly values the Forest Service receiving our comments and would value the support in championing these recommendations and guidelines to aid in making this project favorably received by the Town, its residents, local businesses, visitors, and our wildlife neighbors.

Your strong attention and considerations are appreciated.

3-12-21

From:
Town of Dolores
420 Central Avenue
PO Box 630
Dolores, CO 81323

TO:
U.S Department of Agriculture
Forest Service
Dolores Ranger District
San Juan National Forest
29211 Hwy 184
Dolores, CO 81323

RE:
Project Title: Salter Vegetation Management

3/10/21

Chad Wheelus, Mayor, Town of Dolores Date

Please accept these comments regarding the proposed Salter Vegetation Management Project on behalf of the Town of Dolores Mayor and Trustees.

**Introduction**
The Town of Dolores supports Alternative 2 for the Forest Service to meet the goal to improve the differences between the existing forest vegetation conditions and the desired forest vegetation conditions. They include:

- improve resilience and resistance to epidemic insect and disease outbreaks,
- increase the structural diversity of the ponderosa pine forest represented across the landscape, and
- provide economic support to local communities by providing timber products to local industries in a sustainable manner.

The Town has the following comments:

**Economic Concerns**
There is not adequate language in the Draft EA addressing the negative economic impact due to the temporary loss of recreational opportunities. We suggest that the Draft EA needs more attention regarding economic impacts.

We would like to direct the Forest Service to the Dolores Chamber website as this demonstrates current identity of Dolores. https://www.visitdolores.com

The concept of a quality outdoor recreational experience has become the economic capstone of our focus and efforts. To that extent it needs to be recognized that FS Road 526 leading to county road 31 and either launching or landing in Dolores via 11th Street has been a significant focus point for recreationists to have access to our retail, lodging and services. These dollars are critically important to local business vitality and sustainability. Although mountain biking has drawn a lot of attention in this process it is also important for FS to understand that the historic use of the Forest via 11th Street and CR 31 includes hiking, dispersed camping, hunting, access to McPhee reservoir, and winter recreation like skiing, snowshoeing, sledding, and snowmobiling.

These activities currently serve as the primary economic driver for this town that is not only used by local recreationists but draws visitors from outside the town limits and county to the area. Boggy draw was featured in Outside magazine as a number 1 destination area. Our priority is to maintain safety and access around this driver.

As one example, the Boggy Draw trail system is an extensive system of public land loop trails just outside of Dolores. With over 30 miles of well-groomed trails, Boggy Draw is an extremely popular destination for tourists and locals alike. There are several loops with four distinct levels of difficulty, which provides an outlet for any level of skill. We appreciate the Forest Service's efforts to recognize and treat differently the Boggy Draw trail system from the other areas in the project. To accompany the recognition of this significant recreation area, we offer these comments;

- More specific data is needed on reclamation procedures such as new and existing roads.
- More specific data or models need to be developed and shared for buffering existing trails.
- More specific data on the process for addressing slash piles.
- For this area specifically, we are recommending the Forest Service consider requiring the contractors to work with the Southwest Colorado Cycling Association (SCCA) on "best practices" for how to use existing roads as trail detours instead of a completely closing trails; to advise on trail detour routing and signage, and how this information will be provided to the public. We suggest the trail realignments and restoration work should be funded by proceeds from the Salter project.
- More specific data needs to be developed and shared on Boggy Draw harvest plans.

The Town of Dolores also requests more specific data on project impacts to hunters.
The Town engaged in conversations with local business owners around recreational economic drivers that sustained their establishments. Among the highest-ranking recreational activities was hunting. Both in terms of retail sales and lodging, the local business owners indicated that hunting, and more specifically big game hunting was a vital economic recreational sustainer for the success of local businesses going into fall and winter months.

Local business owners also projected that this recreational experience warranted strong protection because of its large purchasing footprint. That is to say that more than other - maybe more passive recreational activities that occur in the proposed Salter Y project area, hunters cover more of the entirety of the Salter Y project area. In addition, hunters come with lots of potential infrastructure needs.

These include needs to purchase food, beverages, ice, fuel, tags, ammunition, supplies, hardware, and they often also seek lodging, laundry, and restaurant services along with their recreational visit to this area. This could yield significantly more economic viability than other more passive or quiet use activities require. When talking to local businesses, this sector of recreational users is what gave local business the final boost before the long winter months. Any further impact to big game hunting areas could significantly reduce the draw of this recreational sector to the area and further impact those businesses who often count on that income to continue to pay into Dolores town sales, property and business taxes, and licensing. This knowledge in conjunction with the knowledge that big game such as elk are in a severe decline in the Salter Y area make it imperative that this project does the most it can to reduce any further impacts.

**Safety, Noise and Impacts to Residents**

- We ask that more specific data on how speed limits and slow down signage will be posted and enforced for contractors and the public.
- The speed limit at the point where Montezuma County Road 31 and where it becomes a town road on 11th Street is 15 m.p.h. We request this information be made known to contractors and that contractors are notified that this speed will be enforced.
- We request that the Forest Service require contractors to have Jake Brake mufflers on all applicable trucks.
- To prevent project truck traffic from using town roads other than 11th Street, we request the Forest Service work with the town to designate a truck route.
- To alleviate disturbances to residents, we request the Forest Service work with the town to notify industry that truck traffic will be limited on town streets to certain times of the day. The Town will not be allowing commercial truck traffic on 11th street from 10 pm to 6 am throughout the duration of the Salter Y project.

**Additional Closure dates: To Be added Under #2 Public Safety;**

The Town is providing the additional no harvest activities or hauling dates for recreational compartments 1-6 Boggy Draw area and or use of FS road 526/ CR 31 leading into 11th Street through the Town of Dolores. No transport of harvest activities or hauling should include the following critical economic impact dates for the Town of Dolores.

1st Saturday in June: Dolores River Fest
4th Saturday in June: Ride of the Ancients Gravel Grinder
1st Saturday in August: Dolores Boggy Draw Beat Down
1st Saturday in October: Dolores Harvest Fest and Car show

It is recommended that the Town work with a County representative and FS project supervisor to annually identify and confirm significant event days so industry is aware and can adhere to the necessary closure to minimize risk to public safety during congested and economically important events to the town.

**Wildlife**

We request the Forest Service work closer with the Colorado Division of Parks and Wildlife to mitigate impacts to wildlife.

We have heard from Parks and Wildlife that there is a continuing decline in elk populations in this area. There is not enough information in the EA to understand the impacts in transitionary corridors, calving and wintering grounds. We are requesting more information be provided on the potential impacts and any further mitigations that could be considered to aid in making sure this project does not exacerbate this situation further. Particularly because Dolores is a transition zone and is surrounded by calving and

Dolores, Colorado
Est. 1900

wintering habitat.

The Town is recommending the FS work very closely with Parks and Wildlife staff and biologists to identify and isolate key big game areas that involve winter range, calving and transitionary areas to protect these locations from logging or the reopening of storage roads. This isolation and protection should occur throughout the entire Salter Y project.

In addition, the Town requests that some of the proposed guzzlers are located in these isolated and protected areas to aid big game in accessing water and potentially reducing the need for migration across project areas to reach water sources.
There is not enough information in the EA to understand impacts to turkey habitat. We have noticed that the project area encompasses the totality of the turkey habitat range. What further mitigations could be considered to aid in making sure this project does not disrupt more than 50% of the turkey habitat area at one time.

The Town is requesting more clarification on potential Impacts to water quality from possible spills and erosion due to the removal of trees and vegetation as well as any remediation efforts that will be done to mitigate any affects it would have on fisheries. In addition, the Town thinks the Forest Service needs to develop a clear and expected management practice for this large project regarding water quality mitigation or repair or restoration.

The Town of Dolores greatly values the Forest Service receiving our comments and would value the support in championing these recommendations and guidelines to aid in making this project favorably received by the Town, its residents, local businesses, visitors, and our wildlife neighbors.

Your strong attention and considerations are appreciated.

Date submitted (UTC-11): 3/11/2021 7:49:23 AM
First name: susan
Last name: destefano
Organization:
Title:
Comments:
I would like to offer my observations regarding the proposed logging operations at and around the Boggy Draw area.
I moved here from Flagstaff 2 years ago, after watching explosive population growth and increasingly large fires. I can understand the need for brush and dead tree removal from the understory of the forest to remove fuels which can enhance large fires. But it would seem that the thinning of the forest would be less of a priority, as well as creating other hazards.
I lived near the Museum Fire, which in 2019 was started accidentally by an excavator during a forest thinning project meant to prevent wildfires. It caused neighborhoods to evacuate and cost $9 million to control. Not to mention the recreation losses caused by trail damage and forest closures.
I do not blame the forest service for this accident, but would rather see thinning projects take place adjacent to (but not within the boundaries of) the trails that have already been established for recreation. Countless hours have been spent building these trails, and this area needs the tourist income that they generate.
I appreciate your time and consideration.

Date submitted (UTC-11): 3/11/2021 4:22:45 AM
First name: Jesse
Last name: Dudley
Organization:
Title:
Comments:
Supervisor Chadwick and Ranger Padilla,

I live nearby in Norwood and as a frequent visitor to the Ponderosa forests of your district, I am vehemently opposed to the proposal to log Ponderosa trees over 20" dbh in the Salter Vegetation Management Project. Scientific consensus and best forest management practices dictate that large ponderosa trees are an essential element of a healthy ponderosa forest and are the single greatest factor to restore our ponderosa forest closer to historical conditions after the clear cutting of old-growth forests in the late 1800s and early 1900s. Our forests in this area are still recovering from this uninformed destruction, and our only hope to ever see forests remotely similar to those that existed here before European contact is to, at the least, preserve the largest ponderosa trees and let them grow to full size so they can play their critical role in a natural Ponderosa forest.

To better understand the importance of large old trees in Ponderosa forests I recommend the sections on Ponderosa forests and their history in the San Juan and Uncompahgre National Forests in this collaborative publication from the Forest Service and CSU:
https://cfri.colostate.edu/wp-content/uploads/sites/22/2018/03/Romme_HRVSouthCentral-Highlands1.pdf

Clearly old trees are critical to these forests in a myriad of ways that cannot be listed here, many of which I'm sure you're already aware. I urge you to take the long-term view of forest health and integrity and follow good management practices in this project by preserving any trees over 20". Let's not repeat the mistakes of the past that will take another 100-200 years to be resolved.

Sincerely,

Jesse Dudley

Date submitted (UTC-11): 3/11/2021 3:26:53 PM
First name: Katrina
Last name: Managan
Organization:
Title:
Comments:
I love hiking and biking boggy draw! Please don't send logging trucks through and potentially lose the trails!!!

Date submitted (UTC-11): 3/11/2021 5:52:31 PM
First name: Linda B and J Michael
Last name: Olmstead
Organization:
Title:
Comments:
We are mountain bikers from Durango, Co and we ride the Boggy Draw trail system many times each season. We know of many riders, friend and relatives, from Arizona, New Mexico, New York, and many outside areas of Colorado who come to this area for 2 weeks or more to specifically ride mountain bikes and camp in the Boggy Draw area. We are concerned that the large scale, long term logging project, with resulting trail closures encompassing the Boggy Draw trail system will impact this extensive trail and recreation use, by us and so many of these visitors.

To mitigate these closures, please consider the following:
- lifting closures anytime there will be more than a two-week, no-work gap in operations
- utilizing existing roads as trail detours instead of a complete trail closure
- only close the trail section when there are dangerous operations within a defined buffer around the trail

We want you to understand how frequently Boggy Draw gets utilized by recreationalists. Every time we ride there, there are always other vehicles in the parking area when we arrive, and even more when we leave.

We have been riding and using this area for more than ten (10) years. During this time, the usage has definitely increased both by local and non-local biking enthusiasts.

We ask that you seriously consider our suggestions for allowing this recreational activity to continue in concert with the proposed logging project.

Date submitted (UTC-11): 3/11/2021 8:02:20 AM
First name: vladimir
Last name: svesko, MD
Organization:
Title:
Comments:
Dear sir/madam,

This proposed project gives me a great deal of concern and trepidation, particularly after reading comments from the Montrose Forest Products and the Intermountain Forest Association. It's obvious that there is a significant financial incentive at play here, non withstanding environmental fire concerns. Our country is just beginning to rebound from the cataclysmic Covid disaster and our natural, unspoiled surroundings have been so important in helping us to maintain a sense of hope and mental well being through these trying times. For those of us in Dolores and surrounding areas, Boggy Draw has played an important role in lifting both our spiritual and physical spirits. I say this not as a kumbaya tree hugger but as an emergency physician only too aware of the impact that Covid has had on our society. We are just now beginning to emerge from this darkness. Local businesses such as Kokopelli Bike are gearing up to take advantage of the major interest hikers and bikers from all over are showing in the Boggy Draw expanse, interest that will translate into economic windfalls for local businesses. That this project is slated to begin this summer is short sighted and counterproductive, to say the very least.
My wife and I had moved to Dolores two years ago from Flagstaff where a similar project caused the Museum Fire which very nearly burned the town to the ground and cost nearly ten million dollars to control, not to mention the damage to the beauty and the recreational opportunities in the affected forest areas. The immense stacks of discarded wood, the denuded forest groves, the barren meadows permanently scarred by huge tire markings left by that particular FS project were less reflective of "thinning" but more of a "scorched earth" policy. I fear that the Salter project will follow the same pattern and that Boggy Draw will be another casualty of logging profiteering, the public and nature be damned. I strongly urge you to consider not only the dollar value of the extracted timber but also the priceless benefits that Boggy Draw has given to so many of us that love this part of the San Juans.

Date submitted (UTC-11): 3/12/2021 12:00:00 AM
First name: William
Last name: Baker
Organization:
Title:
Comments:
My comments and some of the cited scientific papers are in the attachments. W.L. Baker

Dear Dolores Ranger District,

I am writing to comment on the Draft Environmental Assessment for the Salter Vegetation Management Project (Draft EA hereafter). I appreciate the addition of an alternative that includes a large tree retention strategy, and inclusion of explicit restoration of spatial pattern (individuals, clumps, openings) in the preferred alternative.

However, most of my specific concerns at Scoping were not addressed, and I thus have new concerns (Part A) plus these same, but updated concerns (Part B) with the Draft EA:

PART A. New concerns I would like to have addressed in the Final EA.

A1. The Draft EA does not adequately meet the requirements of the 2013 San Juan National Forest Land and Resource Management Plan (LRMP). The Draft EA does not fully: (1) set the project within the LRMP Sustainable Ecosystem Strategy (LRMP 2.1.1), (2) incorporate Disturbances and the Historical Range of Variability (LRMP 2.1.2), (3) adequately use Ecosystem Management (LRMP 2.1.4), or (4) meet the only timber objective for ponderosa pine forests (LRMP 2.9.5a).

First, the LRMP Sustainable Ecosystem Strategy (LRMP 2.1.1) explains that "Ecological sustainability is intended to provide the ecological conditions that maintain or restore the diversity of native ecosystems and natural disturbance processes...When applied effectively, the sustainable ecosystems strategy will result in ecological conditions similar to those under which native species evolved" (p. 13). The Draft EA is not consistent with this strategy because it does not specifically explain in detail how the proposed project will "provide the ecological conditions that maintain or restore the diversity of native ecosystems and natural disturbance processes." There is no mention of "restore" anywhere in the Draft EA except on p. 8, where past restoration was mentioned. Please add a new section in the Final EA, which explains in detail how the proposed actions will "maintain or restore" the project area's ponderosa pine ecosystems. Please specifically cite and review in this new section the key peer-reviewed scientific evidence about how ecological restoration relative to the HRV is to be accomplished, and implement changes in the project so that proposed actions clearly "maintain or restore the diversity of native ecosystems" in the project area. These key scientific sources, that need to be cited, reviewed, and used include, at a minimum, in addition to sources already used in the Draft EA (e.g., Baker 2018): Covington and Moore (1994), Allen et al. (2002), Romme et al. (2009), and Baker (2020).

Second, the LRMP section on Disturbances and the Historical Range of Variability (LRMP 2.1.2) explains that the Historical Range of Variability (HRV) "is an important concept used in the LRMP to guide the management of ecosystems and to achieve ecosystem sustainability...The HRV is then used to evaluate the current ecological conditions of ecosystems on TRFO and SJNF lands by comparing them to the ecological conditions that occurred during the reference period" (p. 14). This is not sufficiently implemented in the Draft EA: (1) there is only one paragraph copied from the LRMP (2.2.23) that describes the HRV in a general and qualitative way, with insufficient citation and use of published scientific sources, (2) there is no specific review of details about forest structure under the HRV, yet forest structure is the ecosystem component that will be most affected by the proposed actions, and (3) there is no detailed comparison of current forest structure and other ecological conditions to the forest structure and other ecological conditions that occurred under the HRV during the reference period. Scientific evidence with this essential specific evidence about HRV for forest structure in the study area is available in Romme et al. (2009) and Baker (2020), and more general scientific information about HRV in southwestern ponderosa pine forests is available in many regional scientific publications (e.g., Covington and Moore 1994, Allen et al. 2002). The Final EA needs to review, present, and use this scientific evidence about the HRV relative to the same measures in current forests, from CSE data, to reformulate the project around restoring these forests so they are within the HRV, as is required by the LRMP.

Third, the LRMP section on Ecosystem Management (LRMP 2.1.4) explains that: "Ecosystem management on SJNR and TRFO lands, which uses the HRV for reference, will be implemented by maintaining or restoring the composition (plant species, animal species, and vegetation types), structure (size, density, and arrangement of live and dead vegetation, stream channel attributes)function (ecological processes and disturbances), and physical environment (soils, water, and geomorphology) of ecosystems" (p. 15). However, there is no reference at all in the Draft EA to "maintaining or restoring" or "HRV," nor is the project formulated relative to these requirements in the LRMP. The Final EA must enact Ecosystem Management by explicitly using these terms, fully elaborating the details of the HRV, particularly regarding the details of forest structure (e.g., tree density, basal area, size-class distributions, age-class distributions etc.), and explicitly restoring these forests so after harvesting they are within the HRV, with median and variability in forest structure that is close to median and variability in forest structure under the HRV (i.e., details in Baker 2020). The Final EA must explain and document in detail how the proposed actions will maintain or restore forest structure, in particular, and other components of the HRV.

Fourth, the LRMP section on timber shows that this project is not consistent with the Forest Plan. The LRMP lists the following objective for ponderosa pine forests (2.9.5a on p. 81), and this is the only objective listed for ponderosa pine forests: "Within 10 years, conduct thinning-with an emphasis on restoration and fuels reduction of altered forest types-in the ponderosa pine and warm-dry mixed conifer vegetation types on approximately 15,000 to 20,000 acres of SJNF lands" First, this much harvesting has already been authorized in the Lone Pine project, so Salter would substantially exceed this specified timber harvesting acreage limitation in the LRMP. Second, neither Lone Pine nor Salter emphasize restoration and fuel reduction; they are instead like old-style commercial timber harvests of the pre-1990 era (before ecosystem management was declared on National Forests) when large trees were commonly logged. Commercial timber harvesting that maximizes sustained yield of timber products, rather than undertakes restoration and fuel reduction are serious departures from this specified objective for ponderosa pine in the LRMP. Please redo the goals, methods, and scale of this project so that they are specifically designed only for "restoration and fuels reduction" and the total area in Lone Pine and Salter together do not exceed the specified 15,000 to 20,000 acres over 10 years.

Fifth, the proposed alternative does not follow the LRMP and must be changed to follow it. I have heard SJNF officials several times make it clear that the LRMP must be followed, and can only be changed by amendment, which is unlikely to be a common practice. Kara Chadwick and Derrick Padilla both told us this during the development of the CFLRP proposal in January 2020. Kara Chadwick restated this during a recent collaborative training session with Jessica Western.

A2. The DWRF document "Resilience Metrics and Desired Conditions - Vegetation - Ponderosa Pine - 10-29-20" is not reviewed or used in the Draft EA. This document lists multiple metrics of forest structure at both stand and landscape scales that should all be reported and explained as informing desired conditions. The SJNF is a member of DWRF and accepted these resistance and resilience metrics as desirable conditions for the DWRF area, which includes this Salter project. Please explain in detail in the Final EA how these metrics will be addressed.

A3. The Single Tree Selection (p. 13-14) harvesting diameter limit of 26.9" is far too high, given the LRMP requirement to restore and maintain ponderosa pine forests using the HRV, as explained in A1 above, and evidence from peer-reviewed scientific reconstruction of the HRV for an area including the project area, and regional established science.

A3.1. This proposed 26.9" dbh limit is not congruent with the LRMP, which requires an emphasis on restoration or maintenance of forest structure under the HRV, as explained in A1 above. No scientific evidence is presented in the Draft EA that restoration or maintenance requires harvesting trees up to 26.9" dbh, and the best available evidence was not reviewed.

The best available scientific evidence for the project area shows harvesting trees up to 26.9" dbh will move stands in the Salter area further outside the HRV, and will not restore these forests, as required by the LRMP. Baker (2020), which presented the only detailed reconstruction of ponderosa pine diameter distributions under the HRV for an area that includes the project area, was not even cited in the Draft EA, and thus not used at all. I specifically requested in my Scoping comments that this published, peer-reviewed scientific source be reviewed and used. Baker (2020) showed in Table 9 (p. 16) that 46.8% of ponderosa pine trees under the HRV were > 15.7" (40 cm) dbh and 33.1% were > 19.7" (50 cm). I calculated, using SJNF Common Stand Exam (CSE) data from the SJNF for the 16,997 trees in 394 active stands in the Salter project area, that only 42% of

current trees are > 16" dbh and only 20% of current trees are > 20" dbh, thus there is a 5% deficit of trees > 16" and a 13% deficit of trees > 20" relative to the HRV that would need restoration under the LRMP. Proposed harvesting is not ecological restoration, and would further increase these deficits, not reduce them. Please review this evidence in the Final EA and change the preferred alternative so that it will restore these forests.

These required restorations can only be accomplished by avoiding harvest of trees > 16" dbh, since there is a documented deficit of trees of this diameter and larger in diameter. Note that a 16" diameter cap on harvesting is supported by Allen et al. (2002), a widely cited peer-reviewed scientific synthesis on how to restore southwestern ponderosa pine forests:

"Ecological restoration should protect the largest and oldest trees from cutting and crown fires, focusing treatments on excess numbers of small young trees. Given widespread agreement on this point, it is generally advisable to retain ponderosa trees larger than 41 cm (16 inches) dbh and all trees with old-growth morphology regardless of size (i.e., yellow bark, large drooping limbs, twisted trunks, flattened tops). Despite the heterogeneity of forest site and stand conditions in the Southwest, cutting of larger trees will seldom be ecologically warranted as "restoration" treatments at this time due to their relative scarcity." (Allen et al. 2002, p. 1425).

A.3.2. The proposed harvesting is not congruent with well-established scientific methods of ecological restoration of ponderosa pine forests in the Southwest, which leave all presettlement trees (e.g., Moore et al. 1999, Allen et al. 2002), which also requires a 16" diameter cap at Salter. And, these trees are potential old growth, which, under the LRMP, should not be logged.

In 394 active stands with CSE data in the project area, obtained from Mark Roper in December 2020, I found 16,997 trees, but only 224 with ages. I corrected dbh ages to basal age by adding 15 years, based on the CSE data. Of the 224 ages, 10 were > 140 years, having originated in or before ca 1880, a reasonable estimate of the year of settlement by non-Indian people. Thus, the age sample shows that 4.46% of trees > 5" dbh in the project area likely would be pre-settlement trees. I do not have an estimate of current tree density for trees > 5" dbh in the Salter area, but assuming it averages 221 trees/acre over 25,000 acres and 4.46% are presettlement trees, that would be a very large number of trees, about 246,925, about half of which would be harvested under the preferred alternative. My estimate of 221trees/acre is the mean of a forest-wide CSE dataset in ponderosa pine forests. Travis Bruch of the Dolores District has an updated CSE dataset specifically for the Salter area in which only 1.86% of trees of all sizes are estimated to be presettlement. The calculation he gave me in an email is: ".0186 x 570 TPA x 25,000 acres = 265,050 trees." The two estimates are similar, but Bruch's estimate is specific to Salter. Thus, it is reasonable to assume that about half of 265,050 trees, or roughly 132,500 presettlement trees would be harvested under the preferred alternative. Please fully disclose this in the Final EA, and change the preferred alternative to protect all presettlement trees.

Please also report in the Final EA that 140-year-old presettlement trees that survive will become old-growth trees, and some stands would also likely qualify formally as old growth within 20 years, using Mehl's (1992) old-growth definition for southwestern Colorado, just a decade after this project is complete. Also please report that the current extent of formal old-growth ponderosa pine in the San Juan National Forest is well below desired conditions by reporting the current updated numbers. Protecting all these potential old-growth trees, as is required under the LRMP, is another reason that no logging of trees $140 years old should occur within the project area.

The LRMP makes it clear that this proposed logging of presettlement trees is not acceptable. In section 2.9.1, it says: "Forest management on SJNF and TRFO lands that results in, among other objectives, meeting needs or demands for forest product offerings...is done in a manner that: maintains or improves ecosystem function, resilience, and sustainability" (LRMP Ch. 2, p. 80). The science is clear that removing large ponderosa pines reduces stand resistance and resilience to fire. Large ponderosa pines have thicker bark that better resists mortality from the heat of fires, large ponderosa have elevated crowns and fewer branches so that they better resist high-severity fires. Higher resistance means that large ponderosa have a better chance of surviving fires and they disproportionately produce the most seed, providing a higher chance of successful regeneration by seed after severe fires or beetle outbreaks. Thus, large ponderosas, including all the 132,500 that are likely to be logged under the preferred alternative, are key to resilience after disturbances (Baker 2009 and many other scientific publications). Harvesting presettlement trees and potential old-growth trees clearly reduces both stand resistance and stand resilience to fires and other disturbances and also reduces these at the landscape

scale. Please correctly report these scientific realities, and change the proposed alternative to protect all presettlement trees.

Harvesting presettlement trees for these same reasons and many others is also not supported by the best available science on ecological restoration of ponderosa pine forests in the Southwest(e.g., Moore et al. 1999, Allen et al. 2002). Please revise the project to retain all presettlement trees, as in Moore et al. (1999) and Allen et al. (2002), and as is required by the LRMP.

I estimated from the Dec. 2020 best available (n=224) dataset of tree ages in the Salter area, from Mark Roper, that a 16" diameter cap would be needed to prevent the logging of presettlement trees at Salter. There are only 10 trees $140 years old in the dataset of 224 tree ages and the smallest is 16" dbh. These 10 diameters are: 50", 29", 27", 25", 24", 22", 19", 18", 17", and 16").

Please accordingly cite and review Moore et al. 1999 and Allen et al. 2002 in the Final EA, adopt ecological restoration as required by the LRMP, clearly explain that all presettlement trees will not be logged, and adopt a 16" diameter cap for all harvesting in the Salter project area, as is required by the LRMP and as recommended in the best available science for southwestern ponderosa pine forests (Moore et al. 1999, Allen et al. 2002).

A4. Brush thinning (p. 16) need is not supported by data and is not "limited." This section implies brush thinning will be limited by the use of the phrase: "there may be instances" but Table 2 p. 13 indicates limited use is not the case, as this table says "no more than 5,000 acres," which is certainly not limited to just "instances."

Please restrict this treatment to no more than 500 acres, which could be considered "limited," while 5,000 acres is not limited under any definition. Please first present evidence from CSE data that there is a need for this treatment, and, if so, where is the need. Also, please omit all use of mastication, as this can lead to holdover fires from smoldering combustion, and mastication does not replicate any natural process in these ecosystems, thus is definitely not restorative.

A5. The review of environmental effects in Section 3 on Fuels and Fire Management (p. 35) shows that fires have already accomplished much of the desired reduction in basal area and brush thinning, suggesting the proposed actions should be omitted where fires have occurred. Since the Forest Plan requires "restoration" and fires are generally inherently restorative, the Draft EA must present compelling detailed evidence (current tree density and basal area versus tree density and basal area under the HRV, current shrub density versus shrub density under the HRV), by treatment unit, that show why any further removal of trees or any reduction in shrub density beyond reductions from fires is needed to restore treatment units that have burned. Show the CSE estimates of tree density, basal area, and diameter distributions for burned units relative to units that have not burned, so that it is clear whether further treatment is needed or not needed to restore these units so they are congruent with the HRV.

A6. The Draft EA has the spatial structure component of restoration incorrect throughout.

The correct terms in the science are not "group, clump and individual structure" (p. 12, 15), but instead "individual, clump, and opening" (ICO; Churchill et al. 2013). It is important to have small openings inside stands in addition to individual trees not in clumps, and also the clumps. If there is another scientific source for the group vs. clump distinction used in the Draft EA, then cite and explain it, but in any case also include "opening" as an additional component. Otherwise, change all references to the science use of the ICO terms and cite Churchill et al.

A7. The Draft EA needs to add monitoring of restoration of spatial structure. Table 5, p. 29 needs to list that restoration of spatial structure using the ICO method (Churchill et al. 2013) will be monitored using pre- and post-harvest and pre- and post-prescribed fire plots.

A8. The Draft EA needs to provide scientific sources for "Conditions Influencing Silvicultural Treatments" (p. 16). Stand diameter index is not explained, nor is there any scientific source for its use-those must be supplied or this left out as a criterion. What is the scientific source for the 80 basal area criterion? If there is none, it must be left out.

A9. The Draft EA says that "Forest inventory has shown one of the underrepresented size class components in these stands is seedlings" (p. 16), but presents no data, and does not evaluate this relative to the HRV as is

required by the LRMP. Please analyze the CSE data and present seedling and sapling densities per acre on a map or in a table by stand and treatment unit. I can see that this is easily calculated in the CSE data. The Final EA must specifically show, using CSE data, that seedlings are "underrepresented" relative to the HRV, as that is the LRMP standard for whether there is a need for them to be restored. To meet this standard, it is essential to present the evidence in Baker (2020), which shows from multiple sources that ponderosa pine regeneration was typically poor or very sparse in the area under the HRV. Promoting too many seedlings relative to the HRV could set these forests up for excessive future tree density.

A10. Proposed treatment of noxious weeds and invasive species (p. 22) does not attempt to reach desired conditions, and formal monitoring is needed. The desired-condition summary on p. 10 says "Invasive plant species are absent or rare," but the proposed treatment on p. 22 only proposes "to prevent further spread." Cheatgrass and Kentucky bluegrass have become common and even abundant in parts of the ponderosa pine forests of the SJNF. The LRMP clearly requires that if they are found to even be just "rare," then there must be explicit treatment to remove these invasive species. It definitely is not acceptable under the LRMP to simply leave invasive species at any level-please change this section to be very clear that if invasive species are found in any part of the project area, they must be removed, and any activity that would spread them must be stopped or fully mitigated. The desired condition is none, and the proposed action must use all available means to achieve this. Also, since harvesting activities definitely can disturb vegetation and soils in ways that may increase invasive species, it is essential to set up a formal monitoring procedure to collect pre-harvesting and post-harvesting as well as pre-fire and post-fire data.

A11. Reasons given for preferring Alternative 2 over Alternative 3 are not valid relative to the LRMP. The DraftEA explains why Alternative 2 is preferred over Alternative 3 in a series of statements: (1) "Application of a 20-inch diameter limit would reduce the prescription effectiveness and consequently limit movement toward desired conditions as described in the Land and Resource Management Plan," (2) "Large tree retention limits the ability to fully utilize the silviculture systems designated by the Land and Resource Management Plan," and (3) "Basal area retention goals and uneven-aged characteristics are being compromised, leaving stands less resilient and making long term resistance less likely to occur" (p. 59).

These are not valid arguments. The silvicultural system, under the LRMP, does not determine what the forest structure is that is to be left after harvesting-it is clearly the management objectives that determine what the forest structure is: "The silvicultural systems shown, that meet the management objectives for the landscape or individual stands of trees within a landscape can be used..." (LRMP 2.9.14). To determine the management objectives, harvesting in ponderosa pine forests under the LRMP must first be shown to "restore or maintain" forests so they are within the HRV, in the Salter case focusing on forest structure (e.g., tree density, basal area, diameter distributions including large trees, composition etc.). The LRMP clearly requires that management objectives restore or maintain forest structure under the HRV, not forest structure that meets a particular version of an uneven-aged silvicultural system. See Section A1 above for quotes from the LRMP explaining how HRV and restoration determine harvesting goals.

PART B. Comments I provided at Scoping that were not addressed in the Draft EA, and that I now request be addressed in the Final EA. I am here repeating and updating my scoping concerns for which the Draft EA did nothing to address the concern. I removed some points where something was done in the Draft EA. Please address each concern in the Final EA:

B1. Please present detailed scientific evidence about current and desired forest conditions in the project area and the differences between these

I would like to see published scientific evidence about desired forest conditions, in addition to the summary paragraph on p. 10, and detailed evidence about current conditions from analysis of common stand exam data by your office both presented in the Final EA itself that together document that the following component of the stated need is correct and explains in detail the differences with the desired condition:

"A comparison based on common stand exams, Forest Vegetation Simulation modeling, and field observation between the current and desired conditions shows that the condition of the ponderosa pine cover type found within the Salter Vegetation Management activity area is different from the desired conditions associated with that vegetative cover type in the San Juan National Forest Land and Resource Management Plan" (p. 11 Salter Draft EA).

The desired conditions are just a qualitative summary paragraph. Please in the Final EA analyze and present current forest conditions in the Final EA by treatment unit. For analysis of current conditions, please present in the Final EA figures, tables, and maps showing tree density, basal area, tree species composition, diameter distributions by species by at least 2" size classes, and also present summary data for trees per acre above 16", 18", and 20" dbh, and presence of seedlings and saplings separately for each treatment unit across the project area and overall for the project area. These should be derived from analysis of the CSE data in the project area. You can average or find the median for each variable within a treatment unit or polygon and present it as a label on a GIS map showing each unit. You can show the variability in each variable (e.g., tree density) by presenting a table showing the standard deviation, coefficient of variation, and the quartiles of the distribution of each variable within each treatment unit and across the project area. See Baker (2020 Table 6 on p. 12) for examples of this kind of table showing variability.

However, where there is significant variability across a treatment unit because of variability in past logging, fires, beetle outbreaks, or other significant past disturbances, it would be better to break these up into separate treatment units, or at least present these same analyses for these distinct parts of treatment units.

The following components of desired conditions for Ponderosa Pine Forests presented on p. 10 of the Draft EA are apparently not provided by CSE data. Please collect new data about current variability in these across the project area and present these data in the Final EA:

1. Clumpiness (number of trees per clump, clump area) of ponderosa pine

2. Canopy layers of ponderosa pine

3. Area of openings and percent composition (shrubs, native grasses, native forbs, introduced grasses and forbs) of openings between the clumps. Native grasses should be identified and estimated by species, since the key indicator species are specified in the desired condition.

4. Diameter-class distribution of Gambel oak central stems within patches of shrubs and the area of patches of these shrubs

5. Variability in forest litter depth. I would add that variability in duff depth is also important.

6. Extent of invasive plant species

7. Abundance and size of snags and large wood on the forest floor

Please also present and analyze the recent fire rotation for low-intensity fire in the project area using MTBS (Monitoring Trends in Burned Area) and SJNF fire records. Fire rotation, which is the estimated time to burn once across a land area, is calculated as the time period of observation / (sum of area burned by all fires that burned at low intensity/project area). For example, if the period of observation is 1980-2020, the area burned at low intensity over this period was 7,000 acres and the project area is 35,000 acres, then the fire rotation is 40 years/(7,000/35,000) = 200 years. Further explanation, if needed, is in Baker (2009). This estimate of the current rate of burning is essential for comparison with desired conditions and planning future burning.

To provide comparable analysis of desired conditions, please present identical details and scientific evidence for the same forest variables Please present estimated means, medians, and distributions etc. for desired conditions for all the elements of forest structure and composition described on p. 10 of the Draft EA, which I have also listed in the previous section above.

Please substantiate the scientific basis for each detail of the desired condition by presenting the details from scientific sources already in the Forest Plan, but updated with all available detailed scientific evidence since the Forest Plan. Key scientific sources for the project area must include detailed use of Romme et al. (2009), Baker (2018), and Baker (2020), which are the major scientific sources with abundant ecological information about desired conditions in the project area. I would request that details be presented for each variable in figures, tables, and maps that are otherwise identical to those presented for the modern forest, as explained above.

B2. Please show exactly how each proposed treatment will achieve each desired condition.

For example, the pre-commercial thinning description in Table 1 says "thinning...to spacing specifications" whereas the desired conditions (p. 2) say "Tree clumps vary in density from widely spaced large trees to tightly spaced small trees." Since the usual intention of commercial timber operations is to thin to space trees widely so they grow timber faster, how could commercial thinning lead to the desired condition-it seems that it will instead destroy any variable spacing that exists. If the specification had been to use variable-density thinning to explicitly produce clumps containing a specific range of trees within a certain distance, combined with openings etc. then it would have been clear that the proposed treatments will produce the desired condition.

In the Final EA, I would like to see a list of each desired condition, each current condition, and a detailed specification for how a particular treatment will be used to achieve each desired condition. Please put this information in tables and/or figures, and use maps to show where specific treatments will be used.

B3. Please develop and analyze a feasible alternative that will just meet the minimum needs of Dolores-Montezuma-La Plata County local industry, so that more natural processes can be used to achieve the remainder of the desired ecological conditions. This could be called an Economy and Ecology alternative or something else that explains it briefly.

I would like to see answered in the Final EA what is the minimum commercial timber production necessary to achieve the desired conditions and provide for existing local industry, so that a large amount of desired conditions could be achieved using natural processes, particularly prescribed fire and managed fire. I would to see an alternative developed and analyzed, after reviewing the CSE data and the disturbance history I presented above, that achieves desired conditions using just essential timber production and the rest using natural processes (e.g., fire).

I am an ecologist, so of course I am interested in using natural ecological processes wherever possible, but I am not opposed to some commercial timber harvesting either. One reason I would like to see this alternative presented and analyzed throughout the Final EA is that we already have lots of timber production occurring in the nearby Lone Pine project, and unless there is something I do not know, it seems that there is no specific need to maximize timber production on the Salter project to sustain the local industry at this time. If there is, please present evidence.

I suggest at the outset that prescribed fire and managed fire could be the primary natural processes used to thin forests in a way that promotes the clumping and variability in forest structure that are described in the desired condition. This makes the most sense since it is fire that historically created these desired conditions. Managed fire is ecologically recognized as the best tool used to promote both stand- and landscape-scale heterogeneity in these forests and increase future forest resilience to impending disturbances. Of course, some timber harvesting/thinning and prescribed burning may first be needed in the vicinity of highly valued resources and assets.

A good starting point is that the large area of land that has a history of high-grade logging is a potentially sensible location for the commercial harvesting for wood production, whereas the large area that is recovering from past moderate- to high-severity fire (Baker 2018) is potentially a sensible location for primarily use of fire to achieve desired conditions.

B4. Heterogeneous stands in heterogeneous landscapes needed to reduce beetles

The project description lists two of the needs: (1) "the need to improve resilience or maintain the resistance of forest ecosystems in an effort to increase protection against epidemic insect and disease outbreaks" and (2) "the need to increase the structural diversity of the ponderosa pine forest represented across the landscape" (p. 3), both of which are ecologically sensible.

It is well established that treating individual stands to reduce attack by beetles is ineffective, as explained in Graham et al. (2016), the most comprehensive study of beetle outbreaks in ponderosa pine in North America: "...treating a single stand to be resistant to MPBs would be insufficient to alter MPB dynamics and large areas or landscapes need to be in a resilient condition to keep MPB populations at endemic levels (Bentz et al. 2009; Fettig et al 2014)" (p. 155).

Thus, these authors conclude that: "...heterogeneous landscapes composed of stands with heterogeneous structures and containing densities in the neighborhood of 80 feet2 of basal area are resistant to MPB

infestations..." (p. 157). Please review and incorporate the findings of this key study by Graham et al. into the proposed project.

In particular, please plan the treatments to create heterogeneous stands and heterogeneity across the project area, then document in detail that this will be achieved by showing the variability in residual basal area and tree density, after treatments, expected across the project landscape. Show this as histograms for both basal area and tree density and also show these on a map, using either labels or colors for classes of residual basal area and tree density, also showing the before-harvesting basal area and tree density in each treatment unit.

In locations affected by the roundheaded pine beetle, please leave 50% of the dead and dying trees as mitigation for the documented adverse environmental effects of salvage harvesting (Lindenmayer et al. 2008), and please do not plant trees in these areas, as this will adversely affect the future resistance and resilience of the forests in this area.

B5. Please provide an economic analysis for all alternatives.

The reason that I am requesting this is that I am very concerned about the cost, in public and private money provided to the Forest, of all alternatives, given the potential economic costs we are facing with Covid-19 and other threats to our local and national economy. Please show us what the estimated costs are for each component (e.g., specific treatments) of the project, and please also show us the details of where the funding comes from. We have long heard about below-cost timber sales; will this be one, or will it not?

B6. Please protect all extant large trees in the project area to increase resistance/resilience to fire.

Based on direct records by land surveyors in the late-1800s, approximately 47% of ponderosa pines were larger than about 16" dbh (40 cm), about 33% were larger than about 20" dbh (50 cm), and about 17% were larger than about 24" dbh (60 cm) in the ponderosa pine zone in the San Juan Mountain study area, which includes the project area-see Baker (2020 Table 9 p. 16). About 59% of ponderosa-pine forest area in the late-1800s would meet today's definitions for old-growth forests (Baker 2020 p. 21). There is no question that high-grade logging removed most of the large, old trees from the project area by about the 1950s although high-grade logging continued into the 1980s (Romme et al. 2009).

It is well documented that in ponderosa pine forests it is these large, old trees that provide the essential resistance and resilience to fire that is now particularly needed as fire is increasing with global warming. Large trees have the thickest bark, the highest crown base height, and have the greatest ability to survive substantial crown scorching and still resprout and survive (Baker 2009). Not only do large ponderosas have the greatest likelihood of surviving, thus provide the greatest resistance to fire, but large ponderosas also disproportionately provide the most seed for sexual regeneration after fires, thus they provide most of the essential resilience to fire.

It is thus essential for the Final EA, if the goal is to include increased resistance and resilience to fire, to heed and remedy the serious deficiency in large trees as an essential part of the desired conditions for the project area. This is another reason that it is essential to restore these forests using a 16" diameter cap, which would not only protect presettlement trees, but also protect the large and old trees that provide the most resistance and resilience to fire.

Thank you for your attention to these 17 concerns.

William L. Baker, PhD.

References Cited

Allen, C. D., M. Savage, D. A. Falk, K. F. Suckling, T. W. Swetnam, T. Schulke, P. B. Stacey, P. Morgan, M. Hoffman, and J. T. Klinger. 2002. Ecological restoration of southwestern ponderosa pine ecosystems: a broad perspective. Ecological Applications 12: 1418-1433.

Baker, W. L. 2009. Fire ecology in Rocky Mountain landscapes. Island Press, Washington, D.C.

Baker, W. L. 2018. Historical fire regimes in ponderosa pine and mixed-conifer landscapes of the San Juan Mountains, Colorado, USA, from multiple sources. Fire 1, 23. Online at: https://www.mdpi.com/2571-6255/1/2/23

Baker, W. L. 2020. Variable forest structure and fire reconstructed across historical ponderosa pine and mixed conifer landscapes of the San Juan Mountains, Colorado. Land 9, 3. Online at: https://www.mdpi.com/2073-445X/9/1/3/htm

Chappell, G. S. 1971. Logging along the Denver & Rio Grande: Narrow gauge logging railroads of southwestern Colorado and northern New Mexico. Colorado Railroad Museum, Golden, CO.

Churchill, D. J., A. J. Larson, M. C. Dahlgreen, J. F. Franklin, P. F. Hessburg, and J. A. Lutz. 2013. Restoring forest resilience: From reference spatial patterns to silvicultural prescriptions and monitoring. Forest Ecology and Management 291:442-457.

Covington, W. W. and M. M. Moore. 1994. Southwestern ponderosa pine forest structure: changes since Euro-American settlement. Journal of Forestry 92: 39-47.

Graham, R. T., L. A. Asherin, M. A. Battaglia, T. B. Jain, and S. A. Mata. 2016. Mountain pine beetles: a century of knowledge, control attempts, and impacts central to the Black Hills. USDA Forest Serve General Technical Report GTR-353, Rocky Mountain Research Station, Fort Collins, Colorado. Online at: https://www.fs.fed.us/rm/pubs/rmrs_gtr353.pdf

Lindenmayer, D. B., P. J. Burton, and J. F. Franklin. 2008. Salvage logging and its ecological consequences. Island Press, Washington, D. C.

Mehl, M. S. 1992. Old-growth descriptions for the major forest cover types in the Rocky Mountain region. Pages 106-120 In: Kaufmann, M. R., W. H. Moir, and R. L. Bassett, editors. Old-growth forests in the Southwest and Rocky Mountain regions, proceedings of a workshop. USDA Forest Service General Technical Report RM-213, Rocky Mountain Forest and Range Experiment Station, Fort Collins, Colorado.

Moore, M. M., W. W. Covington, and P. Z. Ful[eacute]. 1999. Reference conditions and ecological restoration: a southwestern ponderosa pine perspective. Ecological Applications 9:1266-1277.

Romme, W. H., M. L. Floyd, and D. Hanna. 2009. Historical range of variability and current landscape condition analysis: South central highlands section, southwestern Colorado & northwestern New Mexico. Colorado Forest Restoration Institute, Colorado State University, Fort Collins. On file at the San Juan National Forest Supervisor's Office, Durango.

ATTACHMENTS:

1994Covington: Southwestern Ponderosa Forest Structure Changes since Euro-American settlement

1999Moore: Reference Conditions And Ecological Restoration: A Southwestern Ponderosa Pine Perspective

2002Allen: Ecological Restoration Of Southwestern Ponderosa Pine Ecosystems: A Broad Perspective

2013Churchill: Restoring forest resilience: From reference spatial patterns to silvicultural prescriptions and monitoring

2018Baker: Historical Fire Regimes in Ponderosa Pine and Mixed-Conifer Landscapes of the San Juan Mountains, Colorado, USA, from Multiple Sources

2020Baker: Variable Forest Structure and Fire Reconstructed Across Historical Ponderosa Pine and Mixed Conifer Landscapes of the San Juan Mountains, Colorado

PO Box 824
Durango, CO 81302
February 10, 2021

Dolores Ranger District
San Juan National Forest
29211 Highway 184
Dolores, CO 81323

Dear Dolores Ranger District,

I am writing to comment on the Draft Environmental Assessment for the Salter Vegetation Management Project (Draft EA hereafter). I appreciate the addition of an alternative that includes a large tree retention strategy, and inclusion of explicit restoration of spatial pattern (individuals, clumps, openings) in the preferred alternative.

However, most of my specific concerns at Scoping were not addressed, and I thus have new concerns (Part A) plus these same, but updated concerns (Part B) with the Draft EA:

**PART A. New concerns I would like to have addressed in the Final EA.**

**A1. The Draft EA does not adequately meet the requirements of the 2013 San Juan National Forest Land and Resource Management Plan (LRMP). The Draft EA does not fully: (1) set the project within the LRMP Sustainable Ecosystem Strategy (LRMP 2.1.1), (2) incorporate Disturbances and the Historical Range of Variability (LRMP 2.1.2), (3) adequately use Ecosystem Management (LRMP 2.1.4), or (4) meet the only timber objective for ponderosa pine forests (LRMP 2.9.5a).**

First, the LRMP Sustainable Ecosystem Strategy (LRMP 2.1.1) explains that "Ecological sustainability is intended to provide the ecological conditions that maintain or restore the diversity of native ecosystems and natural disturbance processes...When applied effectively, the sustainable ecosystems strategy will result in ecological conditions similar to those under which native species evolved" (p. 13). The Draft EA is not consistent with this strategy because it does not specifically explain in detail how the proposed project will "provide the ecological conditions that maintain or restore the diversity of native ecosystems and natural disturbance processes." There is no mention of "restore" anywhere in the Draft EA except on p. 8, where past restoration was mentioned. Please add a new section in the Final EA, which explains in detail how the proposed actions will "maintain or restore" the project area's ponderosa pine ecosystems. Please specifically cite and review in this new section the key peer-reviewed scientific evidence about how <u>ecological restoration relative to the HRV</u> is to be accomplished, and implement changes in the project so that proposed actions clearly "maintain or restore the diversity of native ecosystems" in the project area. These key scientific sources, that need to be cited, reviewed, and used include, at a minimum, in addition to sources already used in the Draft EA (e.g., Baker 2018): Covington and Moore (1994), Allen et al. (2002), Romme et al. (2009), and Baker (2020).

Second, the LRMP section on Disturbances and the Historical Range of Variability (LRMP 2.1.2) explains that the Historical Range of Variability (HRV) "is an important concept used in

the LRMP to guide the management of ecosystems and to achieve ecosystem sustainability...The HRV is then used to evaluate the current ecological conditions of ecosystems on TRFO and SJNF lands by comparing them to the ecological conditions that occurred during the reference period" (p. 14). This is not sufficiently implemented in the Draft EA: (1) there is only one paragraph copied from the LRMP (2.2.23) that describes the HRV in a general and qualitative way, with insufficient citation and use of published scientific sources, (2) there is no specific review of details about forest structure under the HRV, yet forest structure is the ecosystem component that will be most affected by the proposed actions, and (3) there is no detailed comparison of current forest structure and other ecological conditions to the forest structure and other ecological conditions that occurred under the HRV during the reference period. Scientific evidence with this essential specific evidence about HRV for forest structure in the study area is available in Romme et al. (2009) and Baker (2020), and more general scientific information about HRV in southwestern ponderosa pine forests is available in many regional scientific publications (e.g., Covington and Moore 1994, Allen et al. 2002). The Final EA needs to review, present, and use this scientific evidence about the HRV relative to the same measures in current forests, from CSE data, to reformulate the project around restoring these forests so they are within the HRV, as is required by the LRMP.

Third, the LRMP section on Ecosystem Management (LRMP 2.1.4) explains that: "Ecosystem management on SJNR and TRFO lands, which uses the HRV for reference, will be implemented by maintaining or restoring the composition (plant species, animal species, and vegetation types), structure (size, density, and arrangement of live and dead vegetation, stream channel attributes) function (ecological processes and disturbances), and physical environment (soils, water, and geomorphology) of ecosystems" (p. 15). However, there is no reference at all in the Draft EA to "maintaining or restoring" or "HRV," nor is the project formulated relative to these requirements in the LRMP. The Final EA must enact Ecosystem Management by explicitly using these terms, fully elaborating the details of the HRV, particularly regarding the details of forest structure (e.g., tree density, basal area, size-class distributions, age-class distributions etc.), and explicitly restoring these forests so after harvesting they are within the HRV, with median and variability in forest structure that is close to median and variability in forest structure under the HRV (i.e., details in Baker 2020). The Final EA must explain and document in detail how the proposed actions will maintain or restore forest structure, in particular, and other components of the HRV.

Fourth, the LRMP section on timber shows that this project is not consistent with the Forest Plan. The LRMP lists the following objective for ponderosa pine forests (2.9.5a on p. 81), and this is the only objective listed for ponderosa pine forests: "Within 10 years, conduct thinning–with an emphasis on restoration and fuels reduction of altered forest types–in the ponderosa pine and warm-dry mixed conifer vegetation types on approximately 15,000 to 20,000 acres of SJNF lands" First, this much harvesting has already been authorized in the Lone Pine project, so Salter would substantially exceed this specified timber harvesting acreage limitation in the LRMP. Second, neither Lone Pine nor Salter emphasize restoration and fuel reduction; they are instead like old-style commercial timber harvests of the pre-1990 era (before ecosystem management was declared on National Forests) when large trees were commonly logged. Commercial timber harvesting that maximizes sustained yield of timber products, rather than undertakes restoration and fuel reduction are serious departures from this specified objective for ponderosa pine in the LRMP. Please redo the goals, methods, and scale of this project so that they are specifically designed only for "restoration and fuels reduction" and the total area in Lone Pine and Salter

together do not exceed the specified 15,000 to 20,000 acres over 10 years.

Fifth, the proposed alternative does not follow the LRMP and must be changed to follow it. I have heard SJNF officials several times make it clear that the LRMP must be followed, and can only be changed by amendment, which is unlikely to be a common practice. Kara Chadwick and Derrick Padilla both told us this during the development of the CFLRP proposal in January 2020. Kara Chadwick restated this during a recent collaborative training session with Jessica Western.

**A2. The DWRF document "Resilience Metrics and Desired Conditions - Vegetation - Ponderosa Pine - 10-29-20" is not reviewed or used in the Draft EA.** This document lists multiple metrics of forest structure at both stand and landscape scales that should all be reported and explained as informing desired conditions. The SJNF is a member of DWRF and accepted these resistance and resilience metrics as desirable conditions for the DWRF area, which includes this Salter project. Please explain in detail in the Final EA how these metrics will be addressed.

**A3. The Single Tree Selection (p. 13-14) harvesting diameter limit of 26.9" is far too high, given the LRMP requirement to restore and maintain ponderosa pine forests using the HRV, as explained in A1 above, and evidence from peer-reviewed scientific reconstruction of the HRV for an area including the project area, and regional established science.**

**A3.1**. **This proposed 26.9" dbh limit is not congruent with the LRMP**, which requires an emphasis on restoration or maintenance of forest structure under the HRV, as explained in A1 above. No scientific evidence is presented in the Draft EA that restoration or maintenance requires harvesting trees up to 26.9" dbh, and the best available evidence was not reviewed.

The best available scientific evidence for the project area shows harvesting trees up to 26.9" dbh will move stands in the Salter area further outside the HRV, and will not restore these forests, as required by the LRMP. Baker (2020), which presented the only detailed reconstruction of ponderosa pine diameter distributions under the HRV for an area that includes the project area, was not even cited in the Draft EA, and thus not used at all. I specifically requested in my Scoping comments that this published, peer-reviewed scientific source be reviewed and used. Baker (2020) showed in Table 9 (p. 16) that 46.8% of ponderosa pine trees under the HRV were > 15.7" (40 cm) dbh and 33.1% were > 19.7" (50 cm). I calculated, using SJNF Common Stand Exam (CSE) data from the SJNF for the 16,997 trees in 394 active stands in the Salter project area, that only 42% of current trees are > 16" dbh and only 20% of current trees are > 20" dbh, thus there is a 5% deficit of trees > 16" and a 13% deficit of trees > 20" relative to the HRV that would need restoration under the LRMP. Proposed harvesting is not ecological restoration, and would further increase these deficits, not reduce them. Please review this evidence in the Final EA and change the preferred alternative so that it will restore these forests.

These required restorations can only be accomplished by avoiding harvest of trees > 16" dbh, since there is a documented deficit of trees of this diameter and larger in diameter. Note that a 16" diameter cap on harvesting is supported by Allen et al. (2002), a widely cited peer-reviewed scientific synthesis on how to restore southwestern ponderosa pine forests:

"Ecological restoration should protect the largest and oldest trees from cutting and crown

fires, focusing treatments on excess numbers of small young trees. Given widespread agreement on this point, it is generally advisable to retain ponderosa trees larger than 41 cm (16 inches) dbh and all trees with old-growth morphology regardless of size (i.e., yellow bark, large drooping limbs, twisted trunks, flattened tops). Despite the heterogeneity of forest site and stand conditions in the Southwest, cutting of larger trees will seldom be ecologically warranted as ''restoration'' treatments at this time due to their relative scarcity." (Allen et al. 2002, p. 1425).

**A.3.2. The proposed harvesting is not congruent with well-established scientific methods of ecological restoration of ponderosa pine forests in the Southwest, which leave all presettlement trees (e.g., Moore et al. 1999, Allen et al. 2002), which also requires a 16" diameter cap at Salter. And, these trees are potential old growth, which, under the LRMP, should not be logged.**

In 394 active stands with CSE data in the project area, obtained from Mark Roper in December 2020, I found 16,997 trees, but only 224 with ages. I corrected dbh ages to basal age by adding 15 years, based on the CSE data. Of the 224 ages, 10 were > 140 years, having originated in or before ca 1880, a reasonable estimate of the year of settlement by non-Indian people. Thus, the age sample shows that 4.46% of trees > 5" dbh in the project area likely would be pre-settlement trees. I do not have an estimate of current tree density for trees > 5" dbh in the Salter area, but assuming it averages 221 trees/acre over 25,000 acres and 4.46% are presettlement trees, that would be a very large number of trees, about 246,925, about half of which would be harvested under the preferred alternative. My estimate of 221trees/acre is the mean of a forest-wide CSE dataset in ponderosa pine forests. Travis Bruch of the Dolores District has an updated CSE dataset specifically for the Salter area in which only 1.86% of trees of all sizes are estimated to be presettlement. The calculation he gave me in an email is: ".0186 x 570 TPA x 25,000 acres = 265,050 trees." The two estimates are similar, but Bruch's estimate is specific to Salter. Thus, it is reasonable to assume that about half of 265,050 trees, or roughly 132,500 presettlement trees would be harvested under the preferred alternative. Please fully disclose this in the Final EA, and change the preferred alternative to protect all presettlement trees.

Please also report in the Final EA that 140-year-old presettlement trees that survive will become old-growth trees, and some stands would also likely qualify formally as old growth within 20 years, using Mehl's (1992) old-growth definition for southwestern Colorado, just a decade after this project is complete. Also please report that the current extent of formal old-growth ponderosa pine in the San Juan National Forest is well below desired conditions by reporting the current updated numbers. Protecting all these potential old-growth trees, as is required under the LRMP, is another reason that no logging of trees ≥140 years old should occur within the project area.

The LRMP makes it clear that this proposed logging of presettlement trees is not acceptable. In section 2.9.1, it says: "Forest management on SJNF and TRFO lands that results in, among other objectives, meeting needs or demands for forest product offerings...is done in a manner that: maintains or improves ecosystem function, resilience, and sustainability" (LRMP Ch. 2, p. 80). The science is clear that removing large ponderosa pines reduces stand resistance and resilience to fire. Large ponderosa pines have thicker bark that better resists mortality from the heat of fires, large ponderosa have elevated crowns and fewer branches so that they better resist high-severity fires. Higher resistance means that large ponderosa have a better chance of surviving fires and

they disproportionately produce the most seed, providing a higher chance of successful regeneration by seed after severe fires or beetle outbreaks. Thus, large ponderosas, including all the 132,500 that are likely to be logged under the preferred alternative, are key to resilience after disturbances (Baker 2009 and many other scientific publications). Harvesting presettlement trees and potential old-growth trees clearly reduces both stand resistance and stand resilience to fires and other disturbances and also reduces these at the landscape scale. Please correctly report these scientific realities, and change the proposed alternative to protect all presettlement trees.

Harvesting presettlement trees for these same reasons and many others is also not supported by the best available science on ecological restoration of ponderosa pine forests in the Southwest (e.g., Moore et al. 1999, Allen et al. 2002). Please revise the project to retain all presettlement trees, as in Moore et al. (1999) and Allen et al. (2002), and as is required by the LRMP.

I estimated from the Dec. 2020 best available (n=224) dataset of tree ages in the Salter area, from Mark Roper, that a 16" diameter cap would be needed to prevent the logging of presettlement trees at Salter. There are only 10 trees ≥140 years old in the dataset of 224 tree ages and the smallest is 16" dbh. These 10 diameters are: 50", 29", 27", 25", 24", 22", 19", 18", 17", and 16").

Please accordingly cite and review Moore et al. 1999 and Allen et al. 2002 in the Final EA, adopt ecological restoration as required by the LRMP, clearly explain that all presettlement trees will not be logged, and adopt a 16" diameter cap for all harvesting in the Salter project area, as is required by the LRMP and as recommended in the best available science for southwestern ponderosa pine forests (Moore et al. 1999, Allen et al. 2002).

**A4. Brush thinning (p. 16) need is not supported by data and is not "limited."** This section implies brush thinning will be limited by the use of the phrase: "there may be instances" but Table 2 p. 13 indicates limited use is not the case, as this table says "no more than 5,000 acres," which is certainly not limited to just "instances."

Please restrict this treatment to no more than 500 acres, which could be considered "limited," while 5,000 acres is not limited under any definition. Please first present evidence from CSE data that there is a need for this treatment, and, if so, where is the need. Also, please omit all use of mastication, as this can lead to holdover fires from smoldering combustion, and mastication does not replicate any natural process in these ecosystems, thus is definitely not restorative.

**A5. The review of environmental effects in Section 3 on Fuels and Fire Management (p. 35) shows that fires have already accomplished much of the desired reduction in basal area and brush thinning, suggesting the proposed actions should be omitted where fires have occurred.** Since the Forest Plan requires "restoration" and fires are generally inherently restorative, the Draft EA must present compelling detailed evidence (current tree density and basal area versus tree density and basal area under the HRV, current shrub density versus shrub density under the HRV), by treatment unit, that show why any further removal of trees or any reduction in shrub density beyond reductions from fires is needed to restore treatment units that have burned. Show the CSE estimates of tree density, basal area, and diameter distributions for burned units relative to units that have not burned, so that it is clear whether further treatment is needed or not needed to restore these units so they are congruent with the HRV.

**A6. The Draft EA has the spatial structure component of restoration incorrect throughout.** The correct terms in the science are not "group, clump and individual structure" (p. 12, 15), but instead "individual, clump, and opening" (ICO; Churchill et al. 2013). It is important to have small openings inside stands in addition to individual trees not in clumps, and also the clumps. If there is another scientific source for the group vs. clump distinction used in the Draft EA, then cite and explain it, but in any case also include "opening" as an additional component. Otherwise, change all references to the science use of the ICO terms and cite Churchill et al.

**A7. The Draft EA needs to add monitoring of restoration of spatial structure.** Table 5, p. 29 needs to list that restoration of spatial structure using the ICO method (Churchill et al. 2013) will be monitored using pre- and post-harvest and pre- and post-prescribed fire plots.

**A8. The Draft EA needs to provide scientific sources for "Conditions Influencing Silvicultural Treatments" (p. 16).** Stand diameter index is not explained, nor is there any scientific source for its use–those must be supplied or this left out as a criterion. What is the scientific source for the 80 basal area criterion? If there is none, it must be left out.

**A9. The Draft EA says that "Forest inventory has shown one of the underrepresented size class components in these stands is seedlings" (p. 16), but presents no data, and does not evaluate this relative to the HRV as is required by the LRMP.** Please analyze the CSE data and present seedling and sapling densities per acre on a map or in a table by stand and treatment unit. I can see that this is easily calculated in the CSE data. The Final EA must specifically show, using CSE data, that seedlings are "underrepresented" relative to the HRV, as that is the LRMP standard for whether there is a need for them to be restored. To meet this standard, it is essential to present the evidence in Baker (2020), which shows from multiple sources that ponderosa pine regeneration was typically poor or very sparse in the area under the HRV. Promoting too many seedlings relative to the HRV could set these forests up for excessive future tree density.

**A10. Proposed treatment of noxious weeds and invasive species (p. 22) does not attempt to reach desired conditions, and formal monitoring is needed.** The desired-condition summary on p. 10 says "Invasive plant species are absent or rare," but the proposed treatment on p. 22 only proposes "to prevent further spread." Cheatgrass and Kentucky bluegrass have become common and even abundant in parts of the ponderosa pine forests of the SJNF. The LRMP clearly requires that if they are found to even be just "rare," then there must be explicit treatment to remove these invasive species. It definitely is not acceptable under the LRMP to simply leave invasive species at any level–please change this section to be very clear that if invasive species are found in any part of the project area, they must be removed, and any activity that would spread them must be stopped or fully mitigated. The desired condition is none, and the proposed action must use all available means to achieve this. Also, since harvesting activities definitely can disturb vegetation and soils in ways that may increase invasive species, it is essential to set up a formal monitoring procedure to collect pre-harvesting and post-harvesting as well as pre-fire and post-fire data.

**A11. Reasons given for preferring Alternative 2 over Alternative 3 are not valid relative to the LRMP.** The DraftEA explains why Alternative 2 is preferred over Alternative 3 in a series of statements: (1) "Application of a 20-inch diameter limit would reduce the prescription effectiveness and consequently limit movement toward desired conditions as described in the Land and Resource Management Plan," (2) "Large tree retention limits the ability to fully utilize

the silviculture systems designated by the Land and Resource Management Plan," and (3) "Basal area retention goals and uneven-aged characteristics are being compromised, leaving stands less resilient and making long term resistance less likely to occur" (p. 59).

These are not valid arguments. The silvicultural system, under the LRMP, does not determine what the forest structure is that is to be left after harvesting–it is clearly the management objectives that determine what the forest structure is: "The silvicultural systems shown, that meet the management objectives for the landscape or individual stands of trees within a landscape can be used..." (LRMP 2.9.14). To determine the management objectives, harvesting in ponderosa pine forests under the LRMP must first be shown to "restore or maintain" forests so they are within the HRV, in the Salter case focusing on forest structure (e.g., tree density, basal area, diameter distributions including large trees, composition etc.). The LRMP clearly requires that management objectives restore or maintain forest structure under the HRV, not forest structure that meets a particular version of an uneven-aged silvicultural system. See Section A1 above for quotes from the LRMP explaining how HRV and restoration determine harvesting goals.

**PART B. Comments I provided at Scoping that were not addressed in the Draft EA, and that I now request be addressed in the Final EA.** I am here repeating and updating my scoping concerns for which the Draft EA did nothing to address the concern. I removed some points where something was done in the Draft EA. Please address each concern in the Final EA:

**B1. Please present detailed scientific evidence about current and desired forest conditions in the project area and the differences between these**

I would like to see published scientific evidence about desired forest conditions, in addition to the summary paragraph on p. 10, and detailed evidence about current conditions from analysis of common stand exam data by your office both presented in the Final EA itself that together document that the following component of the stated need is correct and explains in detail the differences with the desired condition:

> "A comparison based on common stand exams, Forest Vegetation Simulation modeling, and field observation between the current and desired conditions shows that the condition of the ponderosa pine cover type found within the Salter Vegetation Management activity area is different from the desired conditions associated with that vegetative cover type in the San Juan National Forest Land and Resource Management Plan" (p. 11 Salter Draft EA).

The desired conditions are just a qualitative summary paragraph. Please in the Final EA analyze and present current forest conditions in the Final EA by treatment unit. For analysis of current conditions, please present in the Final EA figures, tables, and maps showing tree density, basal area, tree species composition, diameter distributions by species by at least 2" size classes, and also present summary data for trees per acre above 16", 18", and 20" dbh, and presence of seedlings and saplings separately for each treatment unit across the project area and overall for the project area. These should be derived from analysis of the CSE data in the project area. You can average or find the median for each variable within a treatment unit or polygon and present it as a label on a GIS map showing each unit. You can show the variability in each variable (e.g., tree density) by presenting a table showing the standard deviation, coefficient of variation, and

the quartiles of the distribution of each variable within each treatment unit and across the project area. See Baker (2020 Table 6 on p. 12) for examples of this kind of table showing variability.

However, where there is significant variability across a treatment unit because of variability in past logging, fires, beetle outbreaks, or other significant past disturbances, it would be better to break these up into separate treatment units, or at least present these same analyses for these distinct parts of treatment units.

The following components of desired conditions for Ponderosa Pine Forests presented on p. 10 of the Draft EA are apparently not provided by CSE data. Please collect new data about current variability in these across the project area and present these data in the Final EA:
1. Clumpiness (number of trees per clump, clump area) of ponderosa pine
2. Canopy layers of ponderosa pine
3. Area of openings and percent composition (shrubs, native grasses, native forbs, introduced grasses and forbs) of openings between the clumps. Native grasses should be identified and estimated by species, since the key indicator species are specified in the desired condition.
4. Diameter-class distribution of Gambel oak central stems within patches of shrubs and the area of patches of these shrubs
5. Variability in forest litter depth. I would add that variability in duff depth is also important.
6. Extent of invasive plant species
7. Abundance and size of snags and large wood on the forest floor

Please also present and analyze the recent fire rotation for low-intensity fire in the project area using MTBS (Monitoring Trends in Burned Area) and SJNF fire records. Fire rotation, which is the estimated time to burn once across a land area, is calculated as the time period of observation / (sum of area burned by all fires that burned at low intensity/project area). For example, if the period of observation is 1980-2020, the area burned at low intensity over this period was 7,000 acres and the project area is 35,000 acres, then the fire rotation is 40 years/(7,000/35,000) = 200 years. Further explanation, if needed, is in Baker (2009). This estimate of the current rate of burning is essential for comparison with desired conditions and planning future burning.

<u>To provide comparable analysis of desired conditions, please present identical details and scientific evidence for the same forest variables</u>
Please present estimated means, medians, and distributions etc. for desired conditions for all the elements of forest structure and composition described on p. 10 of the Draft EA, which I have also listed in the previous section above.

Please substantiate the scientific basis for each detail of the desired condition by presenting the details from scientific sources already in the Forest Plan, but updated with all available detailed scientific evidence since the Forest Plan. Key scientific sources for the project area must include detailed use of Romme et al. (2009), Baker (2018), and Baker (2020), which are the major scientific sources with abundant ecological information about desired conditions in the project area. I would request that details be presented for each variable in figures, tables, and maps that are otherwise identical to those presented for the modern forest, as explained above.

**B2. Please show exactly how each proposed treatment will achieve each desired condition.**
For example, the pre-commercial thinning description in Table 1 says "thinning...to spacing

specifications" whereas the desired conditions (p. 2) say "Tree clumps vary in density from widely spaced large trees to tightly spaced small trees." Since the usual intention of commercial timber operations is to thin to space trees widely so they grow timber faster, how could commercial thinning lead to the desired condition–it seems that it will instead destroy any variable spacing that exists. If the specification had been to use variable-density thinning to explicitly produce clumps containing a specific range of trees within a certain distance, combined with openings etc. then it would have been clear that the proposed treatments will produce the desired condition.

In the Final EA, I would like to see a list of each desired condition, each current condition, and a detailed specification for how a particular treatment will be used to achieve each desired condition. Please put this information in tables and/or figures, and use maps to show where specific treatments will be used.

**B3. Please develop and analyze a feasible alternative that will just meet the minimum needs of Dolores-Montezuma-La Plata County local industry, so that more natural processes can be used to achieve the remainder of the desired ecological conditions. This could be called an Economy and Ecology alternative or something else that explains it briefly.**
I would like to see answered in the Final EA what is the minimum commercial timber production necessary to achieve the desired conditions and provide for existing local industry, so that a large amount of desired conditions could be achieved using natural processes, particularly prescribed fire and managed fire. I would to see an alternative developed and analyzed, after reviewing the CSE data and the disturbance history I presented above, that achieves desired conditions using just essential timber production and the rest using natural processes (e.g., fire).

I am an ecologist, so of course I am interested in using natural ecological processes wherever possible, but I am not opposed to some commercial timber harvesting either. One reason I would like to see this alternative presented and analyzed throughout the Final EA is that we already have lots of timber production occurring in the nearby Lone Pine project, and unless there is something I do not know, it seems that there is no specific need to maximize timber production on the Salter project to sustain the local industry at this time. If there is, please present evidence.

I suggest at the outset that prescribed fire and managed fire could be the primary natural processes used to thin forests in a way that promotes the clumping and variability in forest structure that are described in the desired condition. This makes the most sense since it is fire that historically created these desired conditions. Managed fire is ecologically recognized as the best tool used to promote both stand- and landscape-scale heterogeneity in these forests and increase future forest resilience to impending disturbances. Of course, some timber harvesting/thinning and prescribed burning may first be needed in the vicinity of highly valued resources and assets.

A good starting point is that the large area of land that has a history of high-grade logging is a potentially sensible location for the commercial harvesting for wood production, whereas the large area that is recovering from past moderate- to high-severity fire (Baker 2018) is potentially a sensible location for primarily use of fire to achieve desired conditions.

**B4. Heterogeneous stands in heterogeneous landscapes needed to reduce beetles**
The project description lists two of the needs: (1) "the need to improve resilience or maintain the

resistance of forest ecosystems in an effort to increase protection against epidemic insect and disease outbreaks" and (2) "the need to increase the structural diversity of the ponderosa pine forest represented across the landscape" (p. 3), both of which are ecologically sensible.

It is well established that treating individual stands to reduce attack by beetles is ineffective, as explained in Graham et al. (2016), the most comprehensive study of beetle outbreaks in ponderosa pine in North America: "...treating a single stand to be resistant to MPBs would be insufficient to alter MPB dynamics and large areas or landscapes need to be in a resilient condition to keep MPB populations at endemic levels (Bentz et al. 2009; Fettig et al 2014)" (p. 155).

Thus, these authors conclude that: "...heterogeneous landscapes composed of stands with heterogeneous structures and containing densities in the neighborhood of 80 $feet^2$ of basal area are resistant to MPB infestations..." (p. 157). Please review and incorporate the findings of this key study by Graham et al. into the proposed project.

In particular, please plan the treatments to create heterogeneous stands and heterogeneity across the project area, then document in detail that this will be achieved by showing the variability in residual basal area and tree density, after treatments, expected across the project landscape. Show this as histograms for both basal area and tree density and also show these on a map, using either labels or colors for classes of residual basal area and tree density, also showing the before-harvesting basal area and tree density in each treatment unit.

In locations affected by the roundheaded pine beetle, please leave 50% of the dead and dying trees as mitigation for the documented adverse environmental effects of salvage harvesting (Lindenmayer et al. 2008), and please do not plant trees in these areas, as this will adversely affect the future resistance and resilience of the forests in this area.

**B5. Please provide an economic analysis for all alternatives.**
The reason that I am requesting this is that I am very concerned about the cost, in public and private money provided to the Forest, of all alternatives, given the potential economic costs we are facing with Covid-19 and other threats to our local and national economy. Please show us what the estimated costs are for each component (e.g., specific treatments) of the project, and please also show us the details of where the funding comes from. We have long heard about below-cost timber sales; will this be one, or will it not?

**B6. Please protect all extant large trees in the project area to increase resistance/resilience to fire.**
Based on direct records by land surveyors in the late-1800s, approximately 47% of ponderosa pines were larger than about 16" dbh (40 cm), about 33% were larger than about 20" dbh (50 cm), and about 17% were larger than about 24" dbh (60 cm) in the ponderosa pine zone in the San Juan Mountain study area, which includes the project area–see Baker (2020 Table 9 p. 16). About 59% of ponderosa-pine forest area in the late-1800s would meet today's definitions for old-growth forests (Baker 2020 p. 21). There is no question that high-grade logging removed most of the large, old trees from the project area by about the 1950s although high-grade logging continued into the 1980s (Romme et al. 2009).

It is well documented that in ponderosa pine forests it is these large, old trees that provide the essential resistance and resilience to fire that is now particularly needed as fire is increasing with global warming. Large trees have the thickest bark, the highest crown base height, and have the greatest ability to survive substantial crown scorching and still resprout and survive (Baker 2009). Not only do large ponderosas have the greatest likelihood of surviving, thus provide the greatest resistance to fire, but large ponderosas also disproportionately provide the most seed for sexual regeneration after fires, thus they provide most of the essential resilience to fire.

It is thus essential for the Final EA, if the goal is to include increased resistance and resilience to fire, to heed and remedy the serious deficiency in large trees as an essential part of the desired conditions for the project area. This is another reason that it is essential to restore these forests using a 16" diameter cap, which would not only protect presettlement trees, but also protect the large and old trees that provide the most resistance and resilience to fire.

Thank you for your attention to these 17 concerns.



William L. Baker, PhD.

**References Cited**

Allen, C. D., M. Savage, D. A. Falk, K. F. Suckling, T. W. Swetnam, T. Schulke, P. B. Stacey, P. Morgan, M. Hoffman, and J. T. Klinger. 2002. Ecological restoration of southwestern ponderosa pine ecosystems: a broad perspective. Ecological Applications 12: 1418-1433.

Baker, W. L. 2009. Fire ecology in Rocky Mountain landscapes. Island Press, Washington, D.C.

Baker, W. L. 2018. Historical fire regimes in ponderosa pine and mixed-conifer landscapes of the San Juan Mountains, Colorado, USA, from multiple sources. Fire 1, 23. Online at: https://www.mdpi.com/2571-6255/1/2/23

Baker, W. L. 2020. Variable forest structure and fire reconstructed across historical ponderosa pine and mixed conifer landscapes of the San Juan Mountains, Colorado. Land 9, 3. Online at: https://www.mdpi.com/2073-445X/9/1/3/htm

Chappell, G. S. 1971. Logging along the Denver & Rio Grande: Narrow gauge logging railroads of southwestern Colorado and northern New Mexico. Colorado Railroad Museum, Golden, CO.

Churchill, D. J., A. J. Larson, M. C. Dahlgreen, J. F. Franklin, P. F. Hessburg, and J. A. Lutz. 2013. Restoring forest resilience: From reference spatial patterns to silvicultural prescriptions and monitoring. Forest Ecology and Management 291:442-457.

Covington, W. W. and M. M. Moore. 1994. Southwestern ponderosa pine forest structure: changes since Euro-American settlement. Journal of Forestry 92: 39-47.

Graham, R. T., L. A. Asherin, M. A. Battaglia, T. B. Jain, and S. A. Mata. 2016. Mountain pine beetles: a century of knowledge, control attempts, and impacts central to the Black Hills. USDA Forest Serve General Technical Report GTR-353, Rocky Mountain Research Station, Fort Collins, Colorado. Online at: https://www.fs.fed.us/rm/pubs/rmrs_gtr353.pdf

Lindenmayer, D. B., P. J. Burton, and J. F. Franklin. 2008. Salvage logging and its ecological consequences. Island Press, Washington, D. C.

Mehl, M. S. 1992. Old-growth descriptions for the major forest cover types in the Rocky Mountain region. Pages 106-120 In: Kaufmann, M. R., W. H. Moir, and R. L. Bassett, editors. Old-growth forests in the Southwest and Rocky Mountain regions, proceedings of a workshop. USDA Forest Service General Technical Report RM-213, Rocky Mountain Forest and Range Experiment Station, Fort Collins, Colorado.

Moore, M. M., W. W. Covington, and P. Z. Fulé. 1999. Reference conditions and ecological restoration: a southwestern ponderosa pine perspective. Ecological Applications 9:1266-1277.

Romme, W. H., M. L. Floyd, and D. Hanna. 2009. Historical range of variability and current landscape condition analysis: South central highlands section, southwestern Colorado & northwestern New Mexico. Colorado Forest Restoration Institute, Colorado State University, Fort Collins. On file at the San Juan National Forest Supervisor's Office, Durango.

PEER REVIEWED



"Our view of the past is compromised by our failure to recognize the uncharacteristic state of our present." (Gould 1991)

Peter Fule

# SOUTHWESTERN PONDEROSA FOREST STRUCTURE

## Changes since Euro-American settlement

By W. Wallace Covington and Margaret M. Moore

BOTH NATURAL RESOURCE professionals and the general public often suffer from the mistaken notion that forests have always looked pretty much like they do today. Nothing could be further from the truth for many forest types, especially the ponderosa pine *(Pinus ponderosa)* forests of the American Southwest. Heavy grazing, logging, and fire exclusion, in conjunction with climatic oscillations and elevated atmospheric $CO_2$, have led to many more younger and smaller trees; fewer older and larger trees; accumulation of heavy forest floor fuel loads; reduced herbaceous production; and associated shifts in ecosystem structure, fire hazard, and wildlife habitat (Wright 1978, Covington et al., in press). Thus the current forest structure is quite different from conditions that were prevalent throughout the evolutionary history of the native microbes, plants, and animals living in western ponderosa forests.

A central tenet of ecology is that irruptions (outbursts) of ecologically dominant species reduce diversity and lead to declines in ecosystem health and integrity as defined by Leopold (1949). He described health as the ability of the system to recover following disturbance, and ecological integrity as maintaining the coevolved diversity of life. Although most of the public is familiar with the consequences of deer population explosions resulting, in part, from overly zealous predator control, many fail to see the analogy to pine tree population explosions as a result of Euro-American settlement.

Southwestern ponderosa pine forests are a classic example of how Euro-American populations changed forest conditions (Rasmussen 1941, Weaver 1951, Cooper 1960, Cooper 1961). Before settlement, these forests were much more open and parklike. Postsettlement increases in tree density have contributed to changes not only in ecological patterns and processes but also in timber, forage, water, wildlife, and esthetic conditions.

This study quantifies some of the as-

***Above:** At an ecological restoration study site at the Gus Pearson Natural Area (Arizona), a restoration prescription applied in November 1993 reduced tree density to about 70 trees per hectare, comparable to presettlement site density. All presettlement trees were conserved. Younger trees were selected to reproduce the spatial patchiness of the mature overstory. Dense trees from the companion control area are visible behind the treated area.*

sociated shifts in ecosystem structure and resource conditions and predicts changes 40 years into the future. The results from this and subsequent studies on other sites should serve as a reference point or baseline for eventual restoration of more nearly natural patterns and processes.

*If we are serious about restoring ecosystem health and ecological integrity, then we must know what the land was like to begin with.*

### Postsettlement Changes

Fire exclusion and other factors associated with Euro-American settlement have greatly altered forest conditions in southwestern ponderosa pine forests (Weaver 1951, Cooper 1960, Cooper 1961, Covington and Sackett 1984, White 1985, Covington and Sackett 1986). One line of qualitative evidence comes from various early accounts that described the large size of pine trees, the forest's open structure, the low abundance of underbrush or small trees, and the excellent grass cover; all indicated the rarity of tree establishment. Cooper (1960, p. 130) quoted E.F. Beale's 1858 report:

> We came to a glorious forest of lofty pines, through which we have travelled ten miles. The country was beautifully undulating, and although we usually associate the idea of barrenness with the pine regions, it was not so in this instance; every foot being covered with the finest grass, and beautiful broad grassy vales extending in every direction. The forest was perfectly open and unencumbered with brush wood, so that the travelling was excellent.

Cooper continued, "The overwhelming impression one gets from the older Indians and white pioneers of the Arizona pine region is that the entire forest was once much more open and parklike than it is today."

Further evidence for postsettlement changes comes from examination of photographic time series *(fig. 1)*. Similar comparisons have been published for South Dakota by Progulske (1974); for Wyoming by Gruell (1980); for Montana by Gruell et al. (1982); and for Colorado by Veblen and Lorenz (1991).

Before European settlement of northern Arizona in the 1860s and 1870s, surface fires occurred in ponderosa pine forests at frequent intervals, perhaps every 2–12 years (Weaver 1951, Cooper 1960, Dieterich 1980). Studies of fire scars suggest the average burn covered approximately 3,000 acres (Swetnam and Dieterich 1985, Swetnam 1990). Cooper's (1960) extensive review concluded that, prior to the 1950s, crown fires were extremely rare or nonexistent. Woolsey (1911, p. 11) stated that "a crown fire in mature timber [ponderosa pine] is almost unheard of."

Several factors associated with European settlement caused a reduction in fire frequency and size. Roads and trails broke up fuel continuity. Domestic livestock grazing, reportedly in the hundreds of thousands of animal units in the 1880s and 1890s, greatly reduced herbaceous fuels. Active fire suppression, which commenced as early as 1908 in the Flagstaff area, was a principal duty of early foresters in the southwestern United States. Overstocked forests were a direct result of interrupting and suppressing these periodic fires.

Postsettlement changes in forest structure (tree density, cover, age distribution) in southwestern ponderosa pine forests have been blamed for many forest management problems. The concerns, primarily attributed to fire exclusion and the resulting increased tree density (Cooper 1960, Biswell 1972, Weaver 1974, Covington and Sackett 1990, Covington and Moore 1992, Covington and Sackett 1992), include

- overstocked patches of saplings and pole-sized trees;
- reduced tree growth and increased mortality, especially of the oldest trees;
- decreased decomposition rates;
- stagnated nutrient cycles;
- irruption of insects and diseases;
- decreased herbaceous and shrub forage quality and quantity;
- ecosystem simplification (increasing dominance of ecosystem productivity by ponderosa pine and its dependent food webs);
- higher fuel loads;
- increased vertical fuel continuity due to dense sapling and pole patches;
- greater canopy closure and landscape homogeneity;
- higher severity and destructive potential of wildfires;
- decreased streamflow and onsite water balance;
- less wildlife habitat for species dependent on herbaceous vegetation; and
- lower esthetic values.

### Studies in the Southwest

Although qualitative descriptions are relatively abundant in the literature, few quantitative studies exist of presettlement ponderosa pine forest structural characteristics and patterns in the Southwest. Whipple (1856) and Beale (1858) reported that the forest "was open and parklike with a dense grass cover." These and other early descriptions agree with Pearson's (1923, p. 38) statement that "rarely does [ponderosa pine] crown cover reach more than 30%, and usually not over 25%." Recent research also found low canopy coverage by trees of presettlement origin, with ranges of 17% (Covington and Sackett 1986) to 22% (White 1985) of the surface area for lightly harvested and unharvested basalt soil sites near Flagstaff, Arizona.

In general, old-growth (presettlement) ponderosa pine trees in the pine/bunchgrass type on basalt soils follow the pattern of trees of different ages aggregated into groups of usually less than an acre According to Woolsey (1911, p. 24), "The typical western yellow pine forest of the Southwest is a pure parklike stand made up of scattered groups from 2 to 20 trees, usually connected by scattering individuals. Openings are frequent and vary greatly in size." Spatial analyses of presettlement trees support this pattern. For example, a contiguous quadrat analysis of data from two study areas in the White Mountains of east-central Arizona determined that presettlement trees were aggregated into groups ranging from 0.16 to 0.32 acre (Cooper 1960). Cooper's 1961 analysis had similar results (0.15–0.35 acre). In another study in the G.A. Pearson Natural Area near Flagstaff (White 1985), the nearest neighbor method showed that presettlement tree groups ranged from 3 to 44 stems within a group, with group size varying from 0.05 to 0.70 acre. Moore et al. (1993) obtained similar results in the same general area—maximum variance (clumpiness) around 0.16 acre with a range of 0.08 to 0.64.



FS-001118

In contrast to conventional wisdom, White (1985) concluded that each presettlement tree group was uneven-aged: "Ages of stems within a group were also variable, with the most homogeneous group having a range of 33 years and the least homogeneous group having a range of 268 years." Although Cooper earlier concluded (1960, 1961) that presettlement trees in this area were in even-aged groups, he presently believes that even-agedness in presettlement times was rare (pers. commun., C.F. Cooper, San Diego State University, San Diego, California, 1992). Isolated even-agedness occurs within groups due to windthrows and other microsite disturbances. In general, seedling establishment was infrequent in presettlement times, with up to three or four decades between regeneration events (White 1985, Savage 1989).

For the southwestern ponderosa pine type, therefore, data suggest that pattern at several scales. Trees may be even-aged at the individual-tree level (2–5 trees originating from the same spot). At the group level, trees are all-aged with sporadic regeneration (White 1985). At the landscape level (several to thousands of square miles), however, several studies have shown that synchronous regeneration correlated with favorable climatic oscillations such as the La Niña (Kerr 1988, Savage 1989, Swetnam 1990). Thus confusion about whether southwestern presettlement pine forests were all-aged or even-aged may be, in part, a matter of scale. Madany and West (1983) discussed the regeneration effects of extended heavy grazing and fire suppression in southern Utah. They suggested that ponderosa pine seedling survival was probably greater in the early 1900s than in presettlement days because of less competition from grasses (through grazing) and reduced thinning effects from fires.

Moir and Dieterich (1988) stressed the role of presettlement fire regimes in directing succession toward old-growth development and reducing fuel loading so large trees could survive wildfires; they stated that most of the old-growth in southwestern ponderosa pine forests has deteriorated because recurrent natural fires have been suppressed. Their 11-stage model of succession (from open meadow to landscapes dominated by dead snags) may be a bit misleading. Several analyses of tree ages indicated that succession proceeds more on an individual tree basis rather than on a stand basis (White 1985).

Postsettlement changes are not unique to the Southwest. Studies in Utah (Madany and West 1983, Stein 1987); Montana (Gruell et al. 1982, Keane et al. 1990); Idaho (Barrett 1988, Steele et al. 1986); Oregon (Dickman 1978); Washington (Weaver 1959); and California (van Wagtendonk 1985, Laudenslayer et al. 1989) suggested that increased tree density, fuel loading, and crown fires are common consequences of fire exclusion throughout the range of the ponderosa pine type (Kilgore 1981). Therefore, although many questions remain regarding the ecological and multiresource implications of postsettlement changes, there is wide consensus that today's ponderosa pine forests are radically different from those present before Euro-American settlement.

## Study Site

A 16,200-acre experimental watershed in Bar-M Canyon (one of the Beaver Creek watersheds approximately 25 miles south of Flagstaff) encompassed the study area. Although Bar-M Canyon was lightly harvested at the turn of the century and again in the late 1940s, it is relatively undisturbed by logging. Since ponderosa pine decomposition rates are extremely slow in the Southwest, stumps and downed logs from the late 1800s are still evident so the Bar-M watershed provided an opportunity to study pre-

G.A. Pearson



*Figure 1. Photographic time series (clockwise from top: 1909, 1949, 1990) from the Pearson Natural Area, Fort Valley Experimental Forest, Coconino National Forest, Arizona.*



Frank Ronco



G.A. Pearson


FS-001119

and postsettlement vegetation structure and patterns.

The Bar-M watershed contains a gently rolling landscape dissected by many steep canyons. Elevations range from 6,360 to 7,710 feet. Plots were located between 6,800 and 7,200 feet. The underlying bedrock consists of igneous rocks of volcanic origin. The soils are mostly silty clays and silty clay loams less than 2.6 feet deep. Average annual precipitation is 25 inches; 64% of the precipitation falls during the winter (October through April) and 32% falls during the summer, particularly in July and August (Brown et al. 1974).

The forests are predominantly ponderosa pine, with a mixture of Gambel oak *(Quercus gambelii)* and alligator juniper *(Juniperus deppeana)*. The understory grasses consist primarily of mutton bluegrass *(Poa fendleriana)*, black dropseed *(Sporobolus interruptus)*, blue grama *(Bouteloua gracilis)*, and bottlebrush squirreltail *(Sitanion hysterix)*. Forbs include showy aster *(Aster commutatus)*, spreading fleabane *(Erigeron divergens)*, showy goldeneye *(Viguiera multiflora)*, western ragweed *(Ambrosia psilostachya)*, and snakeweed *(Gutierrezia* spp.). The shrubs are primarily New Mexican locust *(Robinia neomexicana)*, Gambel oak, and Oregon grape *(Berberis repens)* (Brown et al. 1974). Plant nomenclature follows Kearney and Peebles (1964).

### Field Procedures

For the stratified systematic sampling procedure, areas were stratified by soil type and topography using the USDA Forest Service Region 3 Terrestrial Ecosystem Survey (USDA Forest Service 1986). The Terrestrial Ecosystem (TE) map unit 582 was sampled since it was the most common soil-slope-vegetation unit in the watershed (Typic Argiboroll and Mollic Eutroboralf; low sun cold, with ponderosa pine and Gambel oak as the dominant trees, 0–15% slope). This map unit represents approximately one-fourth of the watershed.

Seventy 0.62-acre plots were systematically located within unit 582. Plot size was selected to incorporate the patchy nature of ponderosa pine and for spatial analysis in subsequent studies. On 62 of these plots, only the presettlement trees were sampled (using dbh and bark criteria). Working at a study area similar to Bar-M, White (1985) determined statistically that the majority of presettlement ponderosa pine would be greater than 14.6" dbh, and that smaller presettlement trees would have "yellow bark." This latter criterion is based on the observation that, in the Southwest, ponderosa pine bark changes from black to yellow as the tree ages (Pearson 1950). All presettlement trees (live, snags, stumps, and downed logs) on these 62 plots were mapped for location, species, condition, and dbh.

An additional eight 0.62-acre plots were sampled more intensively by gathering both pre- and postsettlement tree data: location, species, condition (live, snags, stumps, and downed logs), size class, and dbh. Ten percent of all trees between 3.9" and 14.6" dbh were randomly selected to determine an approximate date of postsettlement tree establishment. All larger trees were aged, as was any pine with yellow bark. Trees smaller than 3.9" dbh were counted but not aged.

Tree rings of all presettlement trees on the eight intensive plots were used to determine total age. All rings to the year of Euro-American settlement (1867 in Bar-M) were counted and measured to determine diameter of each tree at that date and average annual growth since settlement. If the tree was a stump, year of death was determined from logging records; then a regression equation was used to calculate dbh from the stump diameter. For snag or downed material, the year of death was estimated from the tree's condition class (Thomas 1979, Maser et al. 1979, Cunningham et al. 1980, Rogers et al. 1984) and presettlement diameter was determined.

### Simulation Models

To understand the trajectory of forest structure over time, data from the eight intensive plots were linked to the ECOSIM (Rogers et al. 1984) multiresource forest growth-and-yield simulation model. The results were used to project temporal changes in multiresource characteristics from 1867 to 1987, and from 1987 through 2027 (40 years from the sampling date).

The growth-and-yield ECOSIM model is based on the FREP/STEMS model (Belcher 1981, Brand 1981) calibrated with continuous forest inventory data from Arizona and New Mexico. The water yield model was based on the Baker-Kovner model (Brown et al. 1974) in which streamflow is a function of winter precipitation, aspect, slope, and tree density. For herbage production a modification of Clary's (1978) model was used, where herbage is a function of annual precipitation, tree density, and range site class. Forest floor accumulation was estimated as the difference between litterfall (calculated from tree density and canopy biomass) and litter decomposition using Fogel and Cromack's (1977) estimates for ponderosa pine decomposition rates. Near-view scenic beauty was estimated using equations developed by Daniel and Boster (1976) and Schroeder and Daniel (1981). An index of scenic beauty was calculated as a function of the number of large (greater than 16" dbh) and mid-sized (5"–16" dbh) trees, quantity of logging slash, amount of herbage, and number of shrubs.

Each simulation run consisted of entering the dbh of all presettlement trees (live trees, snags, downed trees, and stumps) by diameter class as stand conditions in 1867 for each of the eight intensive plots. Then, based on the regeneration events inferred from the age distribution of the postsettlement trees, trees were entered into the group or stand at appropriate intervals in simulated time To simulate the logging event in the late 1940s, the harvest simulation component of ECOSIM was applied to harvest trees of dbh equal to that of the stumps present on each plot.

The output from these computer runs was a series of tables (1867–2027) that quantitatively estimated changes in forest density in southwestern ponderosa pine since settlement. From the results, we drew inferences about temporal changes in multiresource conditions since Euro-American settlement and forecasted future trends (in the absence of fire or other major disturbances).

The simulation initialized in 1867 included:

- tree density (number and dbh of trees present on each intensive plot in 1867);
- a site index of 75 (base age 100), the site index for TE map unit 582;
- a range (forage) rating factor of 9, based on the forage production potential for unit 582 (this index varies from 0 for poor range sites to 12 for the best sites),
- fuel loading of 0.1 ton/acre of fermentation plus humus layers and 0 1 ton/acre of litter layer on the forest floor



FS-001120

This is based on the fuel loading data from Covington and Sackett's (1986) two-year-interval prescribed burning plots in ponderosa pine forests and the assumption that tree canopy covered approximately 20% of the surface (White 1985, Covington and Sackett 1986); and

• an average annual precipitation of 25" and average winter precipitation of 16 9". This is the 22-year average for the ponderosa pine watersheds in the Beaver Creek drainage (Campbell and Ryan 1982). Precipitation was held constant throughout the simulation.

To simulate the establishment of postsettlement trees, ponderosa pine seedlings and oak seedlings equal to the density of postsettlement trees on each plot were entered in 1904, the date for the beginning of a 26-year wet climatic cycle in northern Arizona (Schubert 1974). These seedlings were specified to take between 15 and 40 years to reach 0 5" dbh, the size at which they are entered ("ingrowth") into the tree stand table for growth simulation. As with the rest of this analysis, regeneration was modeled as a simple (and proportional) deterministic process. Trees were similarly entered into the tree stand tables for each plot between 1919 and 1944. Thus postsettlement trees that were seedlings in 1898, 1900, 1904, 1907, and so on would not reach 0.5" dbh until after 1919; and the last major postsettlement cohort (1924) would not reach this size until 1944.

Mortality in ECOSIM is simulated stochastically as a function of tree diameter Regressions developed from continuous forest inventory data relate mortality to tree diameter, then a uniform random number is generated for each tree represented by the subject tree. If the mortality rate is greater than the random number, then that tree is removed from the tree list and enters a snag list. A locally calibrated snag fall model moves snags from standing to downed and dead woody material and then to a log decomposition model that simulates decay of that ecosystem component (Rogers et al. 1984).

To estimate changes in wildlife habitat characteristics since 1867, the output for tree density by diameter class was used to classify the simulated stand into vegetation structural stages (Thomas 1979). Then the Forest Service Southwest Region's wildlife technical report for forest planning (Byford et al. 1984) was used to determine the change in relative habitat value for individual species from 1867 to the present.

To simulate the harvesting that occurred in the late 1940s, ECOSIM's harvesting algorithm was used to "remove" presettlement trees that are currently stumps from the tree list of live trees for simulated year 1950.

**Table 1. Present-day species composition on eight intensive plots, Bar-M Canyon.**

| Species | Percent |
|---|---|
| Ponderosa pine | |
| Presettlement[1] | 2.0 |
| Postsettlement[2] | 89.0 |
| Gambel oak | |
| Presettlement | 0.2 |
| Postsettlement | 7.4 |
| Alligator juniper | |
| (postsettlement) | 1.3 |
| Total | 99.9 |

*[1] 120 years or older, including live trees, stumps, snags, and downed logs.*
*[2] Less than 120 years old including seedling, sapling, pole-sized, and small sawlog classes as well as stumps, snags, and downed logs.*

### Projected Tree Data

On the intensive (n=8) plots, presettlement trees (pine and oak) on the watershed represented only 2.2% of the tree density (trees/acre), contributed approximately 19 stems/acre, and had a basal area of approximately 65 square feet/acre *(table 1, 2).* The density of presettlement trees for all 70 plots was 23 trees/acre, with a range of 21 to 24.

**Table 2. Average density and basal area (live and dead trees) on eight intensive plots, Bar-M Canyon.**

| Class | Density | Basal area |
|---|---|---|
| | *trees/ac* | *ft²/ac* |
| Presettlement pine (live) | 12.1 | 37.0 |
| Presettlement pine (stumps, snags, downed trees) | 5.3 | 26.0 |
| Postsettlement pine (live) | 757.0 | 120.0 |
| Postsettlement pine (stumps, snags, downed trees) | 1.4 | 0.6 |
| Presettlement oak (stumps) | 1.4 | 2.0 |
| Postsettlement oak | 62.8 | 14.0 |
| Alligator juniper (seedlings below breast height) | 11.1 | — |
| Total | 851.1 | 199.6 |

Postsettlement trees represented 97.7% of tree density, or 832 stems/acre, and had a basal area of approximately 134.6 square feet/acre *(table 1, 2).* Of the postsettlement trees, ponderosa pine represented the largest proportion with 758 stems/acre (89%) and basal area of 120.6 square fee/acre (60%). Trees less than 4" dbh made up 59% of the stems on the TE unit sampled. Data for both pre- and postsettlement trees represented snags, downed trees, and stumps as well as live trees.

### Simulation Model Projections

The projections provided an estimation of the trajectory of ponderosa pine forest conditions over time in the study area. Increases in tree density through 1987 caused an estimated decrease in average herbage production of approximately 1,000 pounds/acre, a 90% reduction *(table 3).* Stream flow was estimated to have declined by 1.8", a 26% reduction, while near-view esthetics (as estimated by a scenic beauty index) declined from a high of 109 in 1867 to −1.5 in 1987. On the other hand, this same increase in tree density caused an estimated increase in average timber volume from 2,263 board feet/acre in 1867 to 7,225 in 1987, despite the decline due to harvesting in the late 1940s (simulated in year 1950). At the same time, forest floor and herbaceous fuel loads were estimated to have increased from an average of less than 1 ton/acre in 1867 to more than 19 in 1987. Vertical diversity, fuel ladder continuity as estimated by vegetation structural stage *(table 4),* and forest floor fuel loading *(table 3)* also increased substantially.

The vegetation structural stage analysis *(table 4)* indicated that the simulated plots changed from a grass-forb structural stage (with too few trees for classification as timber) in the late 1800s, to a seedling-

**Table 3. Mean changes in multiresource characteristics of ponderosa pine (standard errors in parentheses) on eight plots, as simulated by ECOSIM.[1]**

| Simulated date | Basal area | Fuel loading | Herbage production | Stream flow | Scenic beauty index | Timber volume |
|---|---|---|---|---|---|---|
| | *ft²/ac* | *t/ac* | *lbs/ac* | *in.* | | *bd ft/ac* |
| 1867 | 17 (4) | 0.9 (0.2) | 1,134 (119) | 6.9 (.06) | 109 (15) | 2,263 (941) |
| 1887 | 23 (5) | 2.1 (0.4) | 1,000 (123) | 6.8 (.08) | 95 (15) | 3,361 (1113) |
| 1907 | 30 (6) | 3.1 (0.6) | 856 (125) | 6.7 (.11) | 85 (14) | 4,788 (1268) |
| 1927 | 38 (7) | 4.0 (0.7) | 571 (84) | 6.6 (.13) | 61 (11) | 6,560 (1437) |
| 1947 | 60 (6) | 6.5 (0.6) | 134 (9) | 6.1 (.15) | 34 (6) | 8,699 (1660) |
| 1967 | 85 (7) | 11.7 (0.5) | 124 (12) | 5.6 (.16) | 27 (4) | 5,980 (1274) |
| 1987 | 154 (14) | 19.0 (1.1) | 114 (2) | 5.1 (.16) | –1.5 (6) | 7,225 (1590) |
| 2007 | 234 (20) | 30.1 (2.2) | 112 (0) | 4.8 (.14) | –19.5 (8) | 8,719 (1808) |
| 2027 | 306 (22) | 42.0 (2.9) | 112 (0) | 4.7 (0.0) | –28.3 (10) | 12,887 (2148) |

*[1] These results differ somewhat from results presented at a 1992 workshop (Covington and Moore 1992). The 1992 results were based on simulation analysis of a single plot using average conditions; the data in this table came from eight plots simulated individually.*

dominated stage after the turn of the century, then to mature timber, and finally to old-growth trees growing over dense saplings and poles from the 1960s on.

These changes in vegetation since 1867 indicated a shift from a foraging habitat that favors grassland species (pronghorn antelope, grasshoppers, bluebirds, turkeys) to one favoring species that prefer higher tree densities (Abert squirrel, porcupine, bark beetle, pygmy nuthatch). Canopy cover had, of course, increased for all species. In sum, the shift in tree density favored species dependent on closed forest conditions at the expense of those that require some portion of their habitat in the grass/forb stage. Gruell et al. (1982) noted similar changes in wildlife habitat for ponderosa pine/Douglas-fir forests in western Montana.

Under the assumption that no substantial tree mortality (e.g., crown fire or bark beetle epidemics) or intensive forest management occurs between 1987 and 2027, many of these trends are predicted to continue. Basal area will increase to 306 square feet/acre, forest floor fuel loading will increase to 42 tons/acre, and timber volume will increase to almost 13,000 board feet/acre *(table 3)*. Scenic beauty will continue to decline, but herbage production *(table 3)* and streamflow will not be further reduced as they are now near their minimum levels. Of course, the assumptions of no substantial tree mortality and no intensive harvesting are not likely to occur (given current trends) and are addressed below.

**Table 4. Changes in vegetation structural stage (VSS) for simulated southwestern ponderosa pine plots over time (after Appendix III, Byford et al. 1984).**

| Simulated date | VSS |
|---|---|
| 1867 | Grass/forb |
| 1887 | Grass/forb |
| 1907 | Seedling |
| 1927 | Mature timber/seedling |
| 1947 | Mature timber/seedling |
| 1967 | Mature timber/sapling-pole |
| 1987 | Old-growth/sapling-pole |
| 2007 | Old-growth/sapling-pole |

## Discussion

Ponderosa pine forests on basaltic soils near Flagstaff, Arizona, were much more open and parklike than they are today. The dominant tree species are the same; however, the density of trees (especially ponderosa pine) has drastically increased. Presettlement ponderosa pine forests on sites similar to the ones in this study probably contained larger diameter trees averaging 19–24 trees/acre. Today, the forest at Bar-M Canyon has approximately 843 trees/acre (851 including dead trees), consisting primarily of trees less than 4" dbh.

Establishment of ponderosa pine seedlings in presettlement times was infrequent because of frequent low-intensity fires, competition from bunchgrasses, and climate. Successful regeneration occurred locally, especially when mineral soil was exposed (Schubert 1974, White 1985). Fire exclusion, logging (which exposed mineral soil for pine seedling establishment), grazing, and key climatic events all contributed to abundant pine regeneration after the turn of the century (Arnold 1950, Pearson 1950, Cooper 1960, Schubert 1974). The abundant regeneration has become dense thickets of pine, which accounts for most of the individuals in the present-day forests of Bar-M Canyon. This change in age structure and density over the past 120 years has contributed to corresponding changes in multiresource yields and conditions.

Simulation results *(table 3)* are consistent with other lines of evidence for vegetation and resource change. The simulated tree density of 19 trees/acre and 4,788 board feet/acre in 1907 are consistent with Lieberg et al. (1904), who reported approximately 3,000 board feet/acre for T17N R8E, which includes the majority of the Bar-M study area. The simulated density of 154 square feet/acre in 1987 is consistent with the 1987–88 inventory of the eight intensive plots, which averaged 171 square feet/acre in live trees. The decline in herbage from 856 pounds/acre in 1907 to 134 pounds/acre in 1947 agrees with Arnold's (1950) results, which documented a similar decline for grass cover density in northern Arizona ponderosa pine. Streamflow for Bar-M Canyon, which has been monitored since 1958 by the USDA Forest Service and the School of Forestry, Northern Arizona University, varies widely with precipitation. The average streamflow from 1958 to 1986 was 5 9 inches; the simulation model predicted 6.1" in 1947, 5.6" in 1967, and 5.1" in 1987 under an unvarying simulated winter precipitation regime of 16.9".

Increases in tree density and forest floor fuels contributed to the more frequent large crown fires in southwestern ponderosa pine (Barrows 1978). Before settlement, fire behavior in southwestern ponderosa forests in this study area would have been classified as open timber over grass, fuel model 2—characterized by fast-moving fires with low flame heights (Anderson 1982). Today's forests are classified as fuel model 9, closed timber. Un-



FS-001122

der severe conditions crown fires are highly probable in this type, with high rates of spread (300–600 chains/hour) and flame heights of 80–150 feet (Rothermel 1991). Fire simulation studies of ponderosa pine and related forest types (van Wagtendonk 1985, Keane et al. 1990) are consistent with these conclusions.

Furthermore, increased tree density is responsible for decreased growth rates (Sutherland 1983) and hence decreased vigor (Waring 1983), which increases susceptibility to bark beetle attack (Sartwell 1971, Sartwell and Stevens 1975) and other agents of mortality. Numerous studies have demonstrated that the mortality of ponderosa pine increases with both diameter and stand density (McTague 1990). A trend toward increasing rates of mortality, especially of the largest and oldest presettlement trees, is supported by an analysis of Pearson Natural Area data (Avery et al. 1976).

Thus the increase in tree density following Euro-American settlement has resulted in a major increase in forest canopy cover and vertical diversity within the tree canopies and a striking decrease in herbage production. These results are consistent with studies in the northern Rocky Mountains (Gruell et al. 1982, Keane et al 1990) and California (van Wagtendonk 1985, Laudenslayer et al. 1989).

## Management Implications

Disruptions of natural disturbance regimes coupled with postsettlement anthropogenic disturbances have led to forest and woodland conditions that bear little resemblance to natural conditions. Thus old-growth definitions and management objectives based solely on current stand structure may not be compatible with the conservation goal of preserving species diversity by providing the habitats in which species have evolved. In fact, before settlement, none of the plots sampled at Bar-M would satisfy all of the current minimum criteria for basal area, canopy closure, and number of trees per acre (in some cases) under the present old-growth definition (USDA Forest Service 1992).

Setting aside old-growth ponderosa pine stands that most closely meet current old-growth definitions may have unexpected consequences. Such stands, whose canopy closures are higher than in presettlement times, are susceptible to crown fire, low tree vigor, and mortality from drought, insects, and diseases. Definitions of old-growth should take into account conditions before Euro-American settlement, particularly the natural fire regime and patchy nature of the forest. In managing for "more nearly natural" old-growth ecosystems (using pre-European settlement conditions as the yardstick), it may be necessary to use thinning from below, manual fuel treatments, or prescribed burning to restore candidate stands.

> *To restore the forests to more natural conditions, it may be necessary to thin many postsettlement trees, remove heavy fuels, and reintroduce periodic burning.*

Research and development is needed to test environmentally sound methods for reducing postsettlement tree densities and fuel loadings—to protect and conserve not only the remaining ancient trees but also the other ecological components and processes in the southwestern ponderosa pine type. It is not certain that remedial management regimes can be developed that are ecologically, economically, and politically acceptable, especially for wilderness and other natural areas. However, this study suggests we have a fairly narrow 15- to 30-year window of opportunity for doing so. Otherwise, less environmentally acceptable processes (crown fires, large insect and disease outbreaks) will not only reduce tree densities and fuel loads but also kill most of the remaining trees of presettlement origin.

Before embarking on widescale restoration, postsettlement changes in ecological conditions must be determined for a broader range of forest and woodland types in the Rocky Mountain and Southwest regions. Then a combination of adaptive resource management (Walters 1986) and process-oriented simulation modeling (e.g., van Wagtendonk 1985, Keane et al. 1990) could design restoration management regimes appropriate for each set of conditions. Simultaneously, small (10- to 100-acre) studies should examine and monitor the ecological effects and practicality of various restoration treatment scenarios. Integrating historical studies, simulation modeling, and management experiments should ensure that wildland management issues in the ponderosa pine type are addressed in a more coherent and ecologically sound manner.

## Conclusions

Aldo Leopold admonished the forestry and wildlife professions that if we are serious about restoring ecosystem health and ecological integrity, then we must know what the land was like to begin with. Nonetheless, very little is known about variations in presettlement conditions of ponderosa pine and other ecosystems across the landscape. We need adequate reference points. Clearly, one of those reference points must be the ecological conditions that existed before we overgrazed the land, put out all the fires, and liquidated most of the old-growth trees. The forests of today differ substantially from the natural conditions before Euro-American settlement. These changes in ecosystem structure imply changes in wildlife habitat, water relations, nutrient cycling, soils, forest health, and other resource characteristics.

Structural changes have also shifted the fire regime in ponderosa-dominated ecosystems from frequent, low-intensity surface fires to high-intensity crown fires. Crown fires have created increasingly large openings (1,000–5,000 acres), and dwarf mistletoe control has produced localized smaller openings (10–200 acres). In other areas, logging has resulted in forests that are as open as presettlement forests but lack their large, old trees and native bunchgrass understory. The recent occurrence of larger and larger crown fires may indicate a further shift to a regime characterized by very large (more than 10,000 acres) and destructive crown fires. In fact, these changes, in concert with ongoing global changes in atmospheric $CO_2$ and climate, imply the need for intensive ecosystem restoration and management to prevent widescale collapse of existing ecological systems, even in wilderness areas (Covington et al., in press).

It is ironic that Leopold, the father of wildlife management and in many ways

of ecologically based forestry, spent much of his life fighting with the public over deer irruptions, managing in harmony with nature, and restoring ecosystem health and integrity. Unfortunately, many individuals who now recognize the harmful effects of irruptions of dominant wildlife species in the absence of predators find it difficult to see the analogy to tree irruptions in the absence of fire. JOF

## Literature Cited


ANDERSON, H.E. 1982. Aids to determining fuel models for estimating fire behavior. USDA For. Serv. Gen. Tech. Rep. INT-122. 22 p.

ARNOLD, J.F. 1950. Changes in ponderosa pine bunchgrass ranges in northern Arizona resulting from pine regeneration and grazing. J. For. 48:118–26.

AVERY, C.C., F.R. LARSON, and G.H. SCHUBERT. 1976. Fifty-year record of virgin stand development in southwestern ponderosa pine. USDA For. Serv. Gen. Tech. Rep. RM-22. 71 p.

BARRETT, S.W. 1988. Fire suppression's effects on forest succession within a central Idaho wilderness. West. J. Appl. For. 3:76–80.

BARROWS, J.S. 1978. Lightning fires in southwestern forests. Unpubl. rep., North. For. Fire Lab., USDA For. Serv., Missoula, MT. 154 p.

BEALE, E.F. 1858. Wagon road from Fort Defiance to the Colorado River. 35th Cong. 1st Sess., Sen. Exec. Doc. 124.

BELCHER, D.M. 1981. The user's guide to STEMS: stand and tree evaluation and modeling system. USDA For. Serv. Gen. Tech. Rep. NC-70. 49 p.

BISWELL, H.H. 1972. Fire ecology in a ponderosa pine grassland. *In* Proceedings, tall timbers fire ecology conference, p. 69–97. Tall Timbers Res. Stn., Tallahassee, FL.

BRAND, G.J. 1981. GROW—a computer subroutine that projects the growth of trees in Lake States forests. USDA For. Serv. Res. Pap. NC-207. 11 p.

BROWN, H.E., M.B. BAKER, JR., J.J. ROGERS, W.P. CLARY, J.L. KOVNER, F.R. LARSON, C.C. AVERY, and R.E. CAMPBELL. 1974. Opportunities for increasing water yields and other multiple use values on ponderosa pine forest lands. USDA For. Serv. Res. Pap. RM-129. 36 p.

BYFORD, K., L. FAGER, G. GOODWIN, J. MACIVOR, and R. WADLEIGH. 1984. Wildlife coefficients technical report. USDA For. Serv., Albuquerque, NM. 21 p. + app.

CAMPBELL, R.E., and M.G. RYAN. 1982. Precipitation and temperature characteristics of forested watersheds in central Arizona. USDA For. Serv. Gen. Tech. Rep. RM-93. 12 p.

CLARY, W.P. 1978. Producer-consumer biomass in Arizona ponderosa pine. USDA For. Serv. Gen. Tech. Rep. RM-56. 4 p.

COOPER, C.F. 1960. Changes in vegetation, structure, and growth of southwestern pine forest since white settlement. Ecol. Monog. 30:129-164.

———. 1961. Pattern in ponderosa pine forests. Ecol. 42:493–99.

COVINGTON, W.W., and M.M. MOORE. 1992. Postsettlement changes in natural fire regimes: implications for restoration of old-growth ponderosa pine forests. *In* Old-growth forests in the Southwest and Rocky Mountain regions: proceedings of a workshop, p. 81–99. USDA For. Serv. Gen. Tech. Rep. RM-213. 201 p.

COVINGTON, W.W., and S.S. SACKETT. 1984. The effect of a prescribed burn in southwestern ponderosa pine on organic matter and nutrients in woody debris and forest floor. For. Sci. 30:183–92.

———. 1986. Effect of periodic burning on soil nitrogen concentrations in ponderosa pine. Soil Sci. Soc. Am. J. 50:452–57.

———. 1990. Fire effects on ponderosa pine soils and their management implications. *In* Effects of fire management of southwestern natural resources, p. 105–11. USDA For. Serv. Gen. Tech. Rep. RM-191.

———. 1992. Soil mineral nitrogen changes following prescribed burning in ponderosa pine. For. Ecol. & Manage. 54:175–91.

COVINGTON, W.W., et al. Historical changes in forests and woodlands of the Inland West of the United States. J. Sustain. For. (In press.)

CUNNINGHAM, J.B., R.P. BALDA, and W.S. GAUD. 1980. Selection and use of snags by secondary cavity-nesting birds of the ponderosa pine forest. USDA For. Serv. Res. Pap. RM-222. 15 p.

DANIEL, T.C., and R.S. BOSTER. 1976. Measuring landscape esthetics: the scenic beauty estimation method. USDA For. Serv. Res. Pap. RM-167. 66 p.

DICKMAN, A. 1978. Reduced fire frequency changes species composition of a ponderosa pine stand. J. For. 76:24–25.

DIETERICH, J.M. 1980. Chimney Spring forest fire history. USDA For. Serv. Res. Pap. RM-220. 8 p.

FOGEL, R., and K. CROMACK, JR. 1977. Effect of habitat and substrate quality on Douglas-fir litter decomposition in western Oregon. Can. J. Bot. 55:1632–40.

GOULD, S.J. 1991. This view of life: abolish the recent. Nat. Hist. 5:16-21.

GRUELL, G.E. 1980. Fire's influence on wildlife habitat on the Bridger-Teton National Forest, Wyoming. Vol. 1: Photographic record and analysis. USDA For. Serv. Res. Pap. INT-235. 207 p.

GRUELL, G.E., W.C. SCHMIDT, S.F. ARNO, and W.J. REICH. 1982. Seventy years of vegetative changes in a managed ponderosa pine forest in western Montana—implications for resource management. USDA For. Serv. Gen. Tech. Rep. INT-130. 42 p.

KEANE, R.E., S.F. ARNO, and J.K. BROWN. 1990. Simulating cumulative fire effects in ponderosa pine/Douglas-fir forests. Ecology 71:189–203.

KEARNEY, T.H., and R.H. PEEBLES. 1964. Arizona flora. Univ. Calif. Press, Berkeley. 1,085 p.

KERR, R.A. 1988. La Niña's big chill replaces El Niño. Science 241:1037–38.

KILGORE, B.M. 1981. Fire in ecosystem distribution and structure: western forests and scrublands. *In* Proceedings, fire regimes and ecosystem properties, p. 58–89. USDA For Serv. Gen. Tech. Rep. WO-26.

LAUDENSLAYER, W.F., JR., H.H. DARR, and S SMITH. 1989. Historical effects of forest management practices on eastside pine communities of northeastern California. *In* Multiresource management of ponderosa pine forests, A. Tecle, W.W. Covington, and R H Hamre, tech. coords., p. 26–34. USDA For Serv. Gen. Tech. Rep. RM-185.

LEOPOLD, A. 1949. A Sand County almanac. Oxford Univ. Press, New York. 226 p.

LIEBERG, J.B., T.F. RIXON, and A. DODWELL 1904. Forest conditions in the San Francisco Mountain Forest Reserve, Arizona. Ser H, For. 7. US Dep. of Inter., Washington, DC US Geol. Surv. Prof. Pap. 22. 95 p. + app

MADANY, M.H., and N.E. WEST. 1983. Livestock grazing–fire regime interactions within montane forests of Zion National Park, Utah Ecology 64:661–67.

MASER, C., R.G. ANDERSON, K. CROMACK, JR , J.T. WILLIAMS, and R.E. MARTIN. 1979. Dead and down woody material. *In* Wildlife habitats in managed forests—the Blue Mountains of Oregon and Washington, J.W. Thomas, ed., p. 78–95. USDA Agric. Handb. 553

MCTAGUE, J.P. 1990. Tree growth and yield in southwestern ponderosa pine forests. *In* Multiresource management of southwestern ponderosa pine forests: the status of knowledge, Aregai Tecle and W.W. Covington, tech coords., p. 24–120. USDA For. Serv., Washington, DC.

MOIR, W.H., and J.H. DIETERICH. 1988. Old-growth ponderosa pine from succession in pine-bunchgrass forests in Arizona and New Mexico. Nat. Areas J. 8:17–24.

MOORE, M.M., W.W. COVINGTON, and P Z FULE. 1993. Spatial changes in southwestern ponderosa pine since settlement. Bull. Ecol Soc. of Am. 74:365.

PEARSON, G.A. 1923. Natural reproduction of western yellow pine in the Southwest. USDA For. Serv. Bull. 1105. 142 p.

———. 1950. Management of ponderosa pine in the Southwest. USDA For. Serv., Washington, DC. USDA Agric. Monogr. 6. 218 p

PROGULSKE, D.R. 1974. Yellow ore, yellow hair, and yellow pine: a photographic study of a century of forest ecology. South Dakota State Univ., Brookings. Bull. 616. 169 p.

RASMUSSEN, D.I. 1941. Biotic communities of Kaibab Plateau, Arizona. Ecol. Monogr 11:229–76.

ROGERS, J.J., J.M. PROSSER, L.D. GARRETT, and M.G. RYAN. 1984. ECOSIM: a system for projecting multiresource outputs under alternative forest management regimes. USDA For. Serv., Fort Collins, CO. 167 p.

ROTHERMEL, R.C. 1991. Predicting behavior and size of crown fires in the northern Rocky Mountains. USDA For. Serv. Res. Pap. INT-438. 46 p.

SARTWELL, C. 1971. Thinning ponderosa pine to prevent outbreaks of mountain pine beetle *In* Proceedings, precommercial thinning of

coastal and intermountain forests in the Pacific Northwest, D. Baumgartner, ed., p. 41–52. Wash. State Univ., Pullman.

SARTWELL, C., and R.E. STEVENS. 1975. Mountain pine beetles in ponderosa pine: prospects for silvicultural control in second growth stands. J. For. 73:136–40.

SAVAGE, M. 1989. Structural dynamics of a pine forest in the American Southwest under chronic human disturbance. PhD diss., Univ. Colorado, Boulder. 185 p.

SCHROEDER, H., and T.C. DANIEL. 1981. Progress in predicting the perceived scenic beauty of forest landscapes. For. Sci. 27:71–80.

SCHUBERT, G.H. 1974. Silviculture of southwestern ponderosa pine: the status of our knowledge. USDA For. Serv. Res. Pap. RM-123.

STEELE, R., S.F. ARNO, and K. GEIER-HAYES. 1986. Wildfire patterns change in central Idaho's ponderosa pine–Douglas-fir forest. West. J. Appl. For. 1(1):16–18.

STEIN, S.J. 1987. Fire history of the Paunsaugunt Plateau in southern Utah. Great Basin Naturalist 48:58–63.

SUTHERLAND, E.K. 1983. Fire exclusion effects on ponderosa pine growth. MS profess. pap., Univ. Ariz., Tucson. 21 p.

SWETNAM, T.W. 1990. Fire history and climate in the southwestern United States. *In* Effects of fire management of southwestern natural resources, p. 6–17. USDA For. Serv. Gen. Tech. Rep. RM-191. 293 p.

SWETNAM, T.W., and J.H. DIETERICH. 1985. Fire history of ponderosa pine forests in the Gila Wilderness, New Mexico. *In* Proceedings—symposium and workshop on wilderness fire, J.E. Lotan et al., tech. coords., p. 390–97. USDA For. Serv. Gen. Tech. Rep. INT 182.

THOMAS, J.W. 1979. Wildlife habitats in managed forests—the Blue Mountains of Oregon and Washington. USDA For. Serv. Agric. Handb. 553. 512 p.

USDA FOREST SERVICE. 1986. Terrestrial Ecosystem Survey handbook. USDA For. Serv., Albuquerque, NM.

———. 1990. Ecological old-growth definitions for the southwestern region. USDA For. Serv., Albuquerque, NM. 13 p.

———. 1992. Recommended old-growth definitions and prescriptions and old-growth allocation procedure. USDA For. Serv., Albuquerque, NM.

VAN WAGTENDONK, J.W. 1985. Fire suppression effects on fuels and succession in short-fire-interval wilderness ecosystems. *In* Proceedings—symposium and workshop on wilderness fire, J.E. Lotan et al., tech. coords., p. 119–26. USDA For. Serv. Gen. Tech. Rep. INT 182. 434 p.

VEBLEN, T.T., and D.C. LORENZ. 1991. The Colorado Front Range: a century of ecological change. Univ. Utah Press, Salt Lake City. 186 p.

WALTERS, C. 1986. Adaptive management of renewable resources. MacMillan Publ. Co., New York. 374 p.

WARING, R.H. 1983. Estimating forest growth efficiency in relation to canopy leaf area. Adv. in Ecol. Res. 13:327–54.

WEAVER, H. 1951. Fire as an ecological factor in the southwestern ponderosa pine forests. J. For. 49:93–98.

———. 1959. Ecological changes in the ponderosa pine forest of Cedar Valley in southern Washington. J. For. 57:12–20.

———. 1974. Effects of fire on temperate forests: western United States. *In* Fire and ecosystems, T.T. Kozlowski and C.E. Ahlgren, eds., p. 279–319. Academic Press, New York.

WHIPPLE, A.W. 1856. Report of explorations for a railway route near the thirty-fifth parallel of north latitude from the Mississippi River to the Pacific Ocean. Vol. 3. Pac. Railroad Rep., 33 Congr. 2 Sess., House Exec. Doc. 91.

WHITE, A.S. 1985. Presettlement regeneration patterns in a southwestern ponderosa pine stand. Ecology 66:589–94.

WOOLSEY, T.S., JR. 1911. Western yellow pine in Arizona and New Mexico. USDA For. Serv. Bull. 101. 64 p.

WRIGHT, H.A. 1978. The effect of fire on vegetation in ponderosa pine forests: a state-of-the-art review. Texas Tech. Univ. Range & Wildl. Inf. Ser. 2. Coll. Agric. Sci. Publ. T-9-199.

## ABOUT THE AUTHORS

*W. Wallace Covington is professor and Margaret M. Moore is associate professor, School of Forestry, Northern Arizona University, Flagstaff 86011.*




**PERMANENT Boundary Markers**

REDUCES: Survey Costs
Loss of Timber
Litigation
Adverse Possession
Boundary Confusion

Very Economical • Highly Visible
All Aluminum • Machine Lettering
Allows for Growth • Replaces Painting

FOR BROCHURE AND SAMPLE, WRITE:
TREMARK CO.
100 Grande Avenue
Somerset, KY 42501

***Looking for technical yet practical information on western forestry?***

*Upcoming topics:*

**Stand Management**
- *Release treatments for ponderosa pines, shrubs, and ferns*
- *Redwood response to thinning intensities*

**Measurement**
- *Measuring canopy closure*
- *Volume equations for canyon live oak in southern California*

**Tree Improvement**
- *Effects of tree spacing and height reduction on Douglas-fir cone production*
- *Genetically improved vs. nursery-run ponderosa pine seedlings*

**Tree Quality**
- *Effects of thinning on branch diameter of western hemlock*
- *Managing for timber quality in coast Douglas-fir stands*

**Subscriptions start as low as $25!**
*To order, contact Publications Sales, Society of American Foresters, 5400 Grosvenor Lane, Bethesda, MD 20814-2198; (301) 897-8720, ext. 102; fax (301) 897-3690.*

**Subscribe now to the *Western Journal of Applied Forestry!***

Published quarterly by the Society of American Foresters, each issue of the *Western Journal* contains peer-reviewed information on improved or new management practices, successful techniques, and applied research.



*Ecological Applications*, 9(4), 1999, pp. 1266–1277
© 1999 by the Ecological Society of America

# REFERENCE CONDITIONS AND ECOLOGICAL RESTORATION: A SOUTHWESTERN PONDEROSA PINE PERSPECTIVE

MARGARET M. MOORE,[1] W. WALLACE COVINGTON, AND PETER Z. FULÉ

*School of Forestry, Northern Arizona University; Flagstaff, Arizona 86011 USA*

*Abstract.* Ecological restoration is the process of reestablishing the structure and function of native ecosystems and developing mutually beneficial human–wildland interactions that are compatible with the evolutionary history of those systems. Restoration is based on an ecosystem's reference conditions (or natural range of variability); the difference between reference conditions and contemporary conditions is used to assess the need for restorative treatments and to evaluate their success. Since ecosystems are highly complex and dynamic, it is not possible to describe comprehensively all possible attributes of reference conditions. Instead, ecosystem characteristics with essential roles in the evolutionary environment are chosen for detailed study. Key characteristics of structure, function, and disturbance—especially fire regimes in ponderosa pine ecosystems—are quantified as far as possible through dendroecological and paleoecological studies, historical evidence, and comparison to undisrupted sites. Ecological restoration treatments are designed to reverse recent, human-caused ecological degradation. Testing of restoration treatments at four sites in northern Arizona, USA, has shown promise, but the diverse context of management goals and constraints for Southwestern forest ecosystems means that appropriate applications of restoration techniques will probably differ in various settings.

*Key words: ecological restoration; ecosystem management; evolutionary environment;* Pinus ponderosa; *range of variability.*

## INTRODUCTION

In this paper, we apply the concepts of evolutionary environment and reference conditions to ongoing ecological restoration projects in southwestern ponderosa pine (*Pinus ponderosa* Laws.) ecosystems. These concepts are central to restoration, because they describe the environments in which native species evolved, provide a range of sustainable conditions in ecosystem composition, structure, and function, and can be used as a baseline to evaluate effects and outcomes of restoration treatments (Covington et al., *in press*).

Ecological restoration is the ''process of reestablishing *to the extent possible* the structure, function, and integrity of indigenous ecosystems'' (Society for Ecological Restoration 1993 [emphasis added]). However, ecological restoration should not be construed as a fixed set of procedures or as a simple recipe for land management. Rather, it is a broad intellectual and scientific framework that includes the ''ecological fidelity'' of restored systems, as well as developing mutually beneficial human–wildland interactions (Higgs 1997) compatible with the evolutionary history of native ecological systems. In other words, ecological restoration consists not only of restoring ecosystems, but also of developing human uses of wildlands that are in harmony with the natural history of these complex ecological systems (Society for Ecological Restoration 1993). We use the ecological restoration framework in our research to do the following: (1) develop a deeper understanding of ecosystem structure and function in southwestern ponderosa pine ecosystems; (2) bring about conditions as close as possible to reference conditions so that natural processes can continue; and (3) communicate with land managers and the public about ecosystem change and factors to be considered in setting management objectives, such as determining desired future conditions.

In this paper we summarize how concepts about evolutionary environments and reference conditions are applied to four ongoing ecological restoration projects in southwestern ponderosa pine ecosystems in northern Arizona, USA. The projects include the following studies: (1) a small (4-ha) area near Flagstaff, Arizona, the Gus Pearson Natural Area (GPNA), a National Science Foundation (NSF) sponsored experiment on U.S. Forest Service managed lands (Covington et al. 1997); and three larger projects located at (2) Mt. Trumbull near Fredonia, Arizona, managed by the Bureau of Land Management; (3) Camp Navajo near Bellemont, Arizona, managed by Arizona Army National Guard (U.S.

Manuscript received 18 May 1998; revised 22 January 1999; accepted 25 January 1999; final version received 25 February 1999. For reprints of this Invited Feature, see footnote 1 p. 1177.

[1] E-mail: margaret.moore@nau.edu

Department of Defense land); and (4) Grand Canyon National Park, managed by the National Park Service. We work cooperatively with the federal and state agencies in an adaptive management framework to conduct these larger ecological restoration projects (see Walters and Holling 1990).

Each project is unique, in that the environmental conditions and the ''players'' differ slightly at each site, but similar questions and concerns have been raised regarding restoration of southwestern ponderosa pine:

1) What constitutes natural state(s) and processes for these ecosystems (the evolutionary environment concept)?

2) What was the role of humans before and after Anglo-American and Hispanic settlement?

3) What are appropriate reference conditions and variables to measure?

4) What is ecological restoration?

5) What treatments are best for restoration?

We will address each of these questions in relation to pertinent literature and will present our perspective, based on the four northern Arizona projects, on which ecosystem variables are essential to know, and which are practical to apply in an ecological restoration context, for southwestern ponderosa pine.

Southwestern ponderosa pine forests have been the focus of a wealth of conservation and restoration research. Aldo Leopold recognized the negative effects of disrupting natural processes in this region (Leopold 1924, 1937), initiating his lifelong contributions to the land ethic and the importance of restoring biodiversity. Pearson (1923, 1950) initiated ecological and silvicultural studies; Weaver (1951) pioneered prescribed burning research; Cooper (1960) demonstrated changes in ponderosa pine forest structure due to changing land use practices; and Dieterich (1980), Swetnam and Baisan (1996), and others applied and refined dendrochronological techniques for reconstructing fire disturbance regimes. From the establishment of the first Experimental Forest in the U.S. Forest Service (1909, Fort Valley, Arizona), through continuing involvement of agency and academic researchers and practitioners, ecological restoration attempts in the Southwest are based on a broad scientific foundation.

## The Evolutionary Environment Concept

The term evolutionary environment, or evolutionary habitat, refers to the environment in which a species or groups of species evolved, i.e., the environment (or habitat) of speciation (Smith 1958, Geist 1978). Over evolutionary time, species not only adapt to their evolutionary environment, but they may also come to depend upon those conditions for their survival (Mayr 1942, Mooney 1981, Wilson 1992). Thus, the greatest threat to biological diversity is the loss of evolutionary habitats (Noss and Csuti 1994); habitat restoration offers the greatest hope for reversing this loss (MacMahon and Jordan 1994, Dobson et al. 1997). Since evolution is an ongoing process, and rates of evolution are functions of many factors (demography, genetic variability, and selection pressure, among others), assessing the time scale of the evolutionary environment requires an understanding of the paleohistory and ecology of the species involved.

### *Evolutionary environment for ponderosa pine*

Ponderosa pine is the most widespread member of an ecologically similar group of western long-needled pines in the subsection Ponderosae. These pines share evolutionary traits, such as protected buds, thick bark, prolific seed production, rapid seedling growth, long resinous needles, highly flammable litter, and longevity, all of which are interpreted as adaptations to frequent, low-intensity surface fires (Mutch 1970, McCune 1988, Barton 1993).

The oldest confirmed paleoecological record of these western long-needled pines comes from British Columbia, Canada in the Eocene (55–35 $\times$ $10^6$ yr BP) (Axelrod 1986). The evolution and spread of pines during the Cenozoic era appears to be related to the development of aridity and seasonal climates, together with periods of active volcanism and mountain building. These events created new environments and migration routes suitable for the stress-adapted pines (Axelrod 1986) and created conditions conducive to frequent, surface fires (Pyne 1982).

Ponderosa pine (*Pinus* cf. *ponderosa*) first appears in the fossil record in the mid- to late Miocene (17–12 $\times$ $10^6$ yr BP) in western Nevada (Axelrod 1986). Ponderosa pine needles from packrat middens, in the Santa Catalina mountains of southern Arizona, date from ~14 000 yr BP (Van Devender 1990). Pollen records and macrofossils from northern Arizona suggest appearance in the area ~10 600 yr BP (Anderson 1989).

Given the variability in environments over paleoecological times, it is clear that evolution does not occur at specific points on the surface of the earth. Instead, organisms are quite mobile when viewed on evolutionary time scales. Over the ~50 $\times$ $10^6$ yr that western long-needled pine ecosystems have existed, they have presumably moved up and down in elevation and across latitude and longitude, tracking favorable environmental conditions.

In addition to such long-term influences as climatic change and mountain building, the evolutionary environment of southwestern ponderosa pine includes important short-term (decades to centuries) disturbance events including El Niño–Southern Oscillation, drought, fires, and insect outbreaks (Swetnam and Betancourt 1998). These events vary in kind, frequency, and intensity and often control local population structures (Pickett and White 1985, Covington et al. 1994, Swetnam and Betancourt 1998).

*What was the role of Native Americans?*

For North America, the recent evolutionary environment generally includes Native Americans as participants during ≥10 000 yr (Pyne 1982, Parsons et al. 1986, Kay 1995, Hunter 1996). Highly structured cultures existed throughout North America, and these people influenced ecosystems through their cultural, hunting, agricultural, and burning practices (Smith 1989, Denevan 1992, Anderson and Moratto 1996).

Humans lived in southwestern ponderosa pine ecosystems for millennia prior to the late 1800s, and this occupation may have had an appreciable effect on ecosystems in local areas (Hack 1942, Samuels and Betancourt 1982, Altschul and Fairley 1989). At Grand Canyon, for example, there is evidence of long human occupancy beginning in Paleoindian times (11 500–9500 yr BP) and declining ~AD 1150–1200 (Altschul and Fairley 1989). More recent evidence of Native American influence includes the disruption of the local fire regime in the ponderosa pine forests of the Chuska Mountains (northeastern Arizona) ~1830, when sheep grazing caused a dramatic reduction in the herbaceous material (fine fuels) in the area (Savage 1991).

The role of humans in the landscape should not be trivialized, but we also must be cautious not to exaggerate their relative importance in certain locales. For example, in contrast to the role of humans as fire starters in the Sierra Nevada (Anderson and Moratto 1996), Swetnam and Baisan (1996) and Swetnam et al. (1999) argue that the natural fire frequency in the forested areas of the Southwest was high enough that human-caused ignitions would have had a relatively minor impact, except in special circumstances. Such a special circumstance is suggested by Seklecki et al. (1996), where unusual patterns of fire occurrence and seasonality were associated with periods of warfare between Apaches and Hispanic settlers in southern Arizona.

*Importance of Anglo-American and Hispanic settlement*

The environmental pressures associated with Anglo-American and Hispanic settlement are relatively recent in comparison to the evolutionary processes of the past 10 000 yr or longer. Furthermore, of course, the settlement of the region by Anglo-American and Hispanic colonists in the Southwest was not simultaneous. Hispanic settlement dates from the 16th century in parts of New Mexico and Arizona, but the ecological effects of this settlement on upland ecosystems and ponderosa pine fire regimes appears to have been limited and localized, perhaps because people lived in compact communities and did not exploit extensive forage resources away from towns (Touchan et al. 1996, Baisan and Swetnam 1997). Several relatively large areas of Arizona and New Mexico highlands (Kaibab Plateau, Mogollon Rim, and Gila Wilderness) were not settled by Anglo-Americans until the late 1800s. Spanish explorers passed through northern Arizona in search of gold, but did not establish settlements; Anglo-American settlement of northern Arizona did not begin until the 1860s (Altschul and Fairley 1989). Beginning ~1870, industrial-scale resource exploitation, with associated domestic livestock grazing and fire exclusion and suppression, proceeded at a rapid pace throughout the Southwest (Cooper 1960). Consequences have included introduction of exotic plants, animals, and land use practices, as well as the disruption of natural disturbance regimes. These changes are unprecedented in magnitude in the ponderosa pine type of the Southwest and are viewed as creating new evolutionary trajectories (Covington et al. 1994; see also Dobson et al. [1997] for examples from different regions of the United States).

## Reference Conditions

The concept of reference conditions (or range of natural variability or historical range of variability) refers to the following: (1) the spectrum and variablility of natural conditions in ecosystem composition, structure, and function (Kaufmann et al. 1994, 1998, Swanson et al. 1994); (2) a point of reference against which to evaluate changes in ecosystems (Morgan et al. 1994, Kaufmann et al. 1998); and (3) a criterion for measuring the success of ecological restoration treatments and ecosystem management experiments (Christensen et al. 1996).

In theory, characterization of reference conditions should take any and all ecosystem components into account, including organisms, structures, biogeochemical cycles, disturbance processes, abiotic factors, etc., and should include the time depth and spatial scales to assure that all influencing factors are considered. In practice, however, many of these variables are poorly understood (e.g., mycorrhizal associations) or difficult to measure (e.g., belowground production). Holling (1992) argued that at certain scales, ecological thresholds are controlled by a small group of keystone or highly interactive organisms and abiotic processes. Keystone variables, in turn, strongly affect their own environment and entrain other structures and processes.

Relatively long lists of important ecological variables have been suggested for a variety of ecosystems, such as temperate deciduous forests (Keddy and Drummond 1996) and arid regions (Aronson et al. 1993). Experience and practical constraints have led us to select a subset of keystone variables to reflect the evolutionary environment, as well as for developing a set of reference conditions for southwestern ponderosa pine ecosystems.

*Southwestern ponderosa pine*

The evolutionary environment concept is an important guide for identifying key variables of ecosystem structure and process (i.e., reference conditions) in

Case No. 1:23-cv-01501-RMR Document 15-2 filed 09/29/23 USDC Colorado pg 97 of 367



southwestern ponderosa pine. In general, we use the following procedure to establish a set of baseline (or reference) conditions that are practical to measure at each of our project sites: (1) determine the key variables; (2) quantify the key disturbance regime(s), especially the historical fire regime; (3) use dendroecological techniques to quantify forest structure and tree pattern before and after Anglo-American settlement; (4) use other lines of evidence to confirm forest structure and tree pattern before and after Anglo-American settlement; and (5) determine the current and historical understory herbaceous and shrub composition. We feel that this provides the minimum information needed for any ecological restoration project in this habitat; here we present the rationale for choosing these.

*Select key variables.*—The essential set of key variables of process and structure we have chosen to measure is relatively small, based on the evolutionary environment of ponderosa pine, and practical to quantify. In the semiarid setting of southwestern ponderosa pine ecosystems, the key variables include the predominant contagious disturbance process, fire, and the autotrophic organisms (trees, shrubs, and herbaceous plants) responsible for microclimate and primary production (Hunter and Price 1992, Fulé et al. 1997). These dominant organisms entrain other communities (fungi, insects, and vertebrates) and indicate ecosystem function (nutrient cycling and productivity). Human activity has been a significant disturbance force since Anglo-American settlement, including livestock grazing, fire suppression, old-growth tree harvesting, and potential impacts from global climate change.

Other factors have locally important effects in ponderosa pine ecosystems, but are generally less ubiquitous, including bark beetles, defoliators, parasites, disease, lightning, air pollution, tassel-eared squirrels, and microorganisms. We cannot measure a comprehensive set of variables at all restoration sites, but where the project size and resources permit, we have collaborated on studies to improve understanding of the interactions among organisms and processes at a variety of trophic levels (see Covington et al. 1997).

*Quantify the historical fire regime, the key disturbance process.*—Measurement or reconstruction of past fire regimes and forest structure in southwestern ponderosa pine forests is relatively precise compared to many other temperate systems because of the dry climate, slow decomposition rates, and relatively recent impacts of Anglo-American settlement (~1870 in northern Arizona) (Covington and Moore 1994*a*, Swetnam and Baisan 1996, Covington et al. 1997, Swetnam et al. 1999). Dendroecological methods (Fritts and Swetnam 1989, Fulé et al. 1997) can be used to determine fire recurrence within recent evolutionary history, centuries to millennia (e.g., Grissino-Mayer 1995, Swetnam and Baisan 1996, Swetnam et al. 1999). A thorough comparison of southwestern fire history information (Swetnam and Baisan 1996) shows the following: (1) southwestern ponderosa pine ecosystems have experienced high-frequency, low-intensity surface fires for ≥300–500 yr; (2) low-frequency, high-intensity stand replacement fires were very rare or nonexistent; (3) fire frequency fluctuated (with climate) from ~2–20 yr prior to the late 19th century; and (4) a sudden cessation of frequent fire occurred with Anglo-American settlement (1870–1890), due to both heavy grazing by livestock that removed fine fuels (i.e., herbaceous material) and active fire suppression practices.

The range of variability for pre-Anglo-American settlement (hereafter presettlement) fire frequency at many of our northern Arizona project areas is less (~2–8 yr using all trees scarred, and 2–15 yr for larger fires) (Fulé et al. 1997; P. Z. Fulé, *unpublished data*) than the regional estimates (2–20 yr) given by Swetnam and Baisan (1996). However, local variability (2–8 yr) compared to the regional variability (2–20 yr) is substantially less than the subsequent ~120-yr period of fire exclusion (Fulé et al. 1997). The key point is, if fire recurrence could be safely restored to a scale measured in years, rather than centuries, fire would regulate ecosystem structures and processes in a more natural manner in southwestern ponderosa pine than exists today.

*Quantify forest structure and pattern before and after fire regime disruption.*—Trees are dominant structuring organisms in forests. Southwestern forests include ponderosa and pinyon (*Pinus edulis*) pines, oaks (*Quercus* spp.), junipers (*Juniperus* spp.), Douglas-fir (*Pseudotsuga menziesii* [Mirb.] Franco), and white fir (*Abies concolor* [Gordon and Glendinning] Lindl.). These trees are interspersed in a matrix of understory herbaceous and woody plants. In addition to their ecological roles, the long-lived trees and remnant snags, stumps, and logs provide evidence of past vegetation structure (composition, age, size, density, and spatial patterns).

While forest fire regimes can be determined with relative precision for the last 400–500 yr in the Southwest, forest structures and evidence of past regeneration dynamics can be reconstructed, at least to the time of settlement (White 1985), and to some degree even earlier (Mast et al. 1999). For example, complete reconstruction of living and dead tree age distributions in 1876, at the the Gus Pearson Natural Area (GPNA) experimental restoration site, shows that tree establishment ranged ~1–4 trees per hectare per decade over the 300 yr before 1876 (Mast et al. 1999). This rate is several orders of magnitude below the hundreds to thousands of trees per hectare which established following grazing and fire exclusion in the early 20th century (Fig. 1A, B) (Cooper 1960, Covington and Moore 1994*a*, Savage et al. 1996, Covington et al. 1997).

Past forest structure is often reconstructed to ap-




FIG. 1. A 50 × 50 m stem-mapped plot from a typical northern Arizona ponderosa pine project site (Mt. Trumbull). These plots demonstrate (A) reconstructed presettlement forest structure (reference structure) circa 1870; (B) contemporary (1995) forest structure showing live trees only; and (C) density and pattern of the trees after the area had been thinned in a restoration treatment. The shaded areas are projected crowns of live trees, and the small circled × symbols denote evidence of presettlement dead trees (stumps, snags, logs, etc.).

proximately the time of Anglo-American settlement, because the changes in natural disturbance regimes and forest structure initiated by this period are unprecedented in recent evolutionary history. The period in which settlement-related activities began to significantly affect native ecological systems is determined based on the sudden cessation in frequent fires (determined from fire scars) and on other lines of evidence (see *Reference conditions: southwestern ponderosa pine: Multiple lines of evidence*). Through fire scar data, we know that a frequent fire regime existed at our project sites prior to settlement. Ultimately, we infer, given what we know about the evolutionary environment of western long-needled pines, that a relatively open, uneven-aged (or multi-aged) forest structure developed under a frequent, surface fire regime. Of course, the exact species composition, density, and pattern will vary from place to place. For instance, presettlement ponderosa pine tree densities are twice as high on coarse-textured soils, compared to fine-textured soils, in northern Arizona (Covington and Moore 1994*b*), and the pattern of the former is more ''grove-like'' (large areas occupied by continuous, yet rather open, tree cover) (M. M. Moore, *personal observations*), whereas the latter are distinct and smaller groups of trees (Cooper 1961, White 1985). This variability in tree density and pattern must be reflected in site-specific ecological restoration treatments.

The use of a particular reference year around Anglo-American settlement (vs. an earlier date) is also very practical. In the absence of low-intensity surface fires during the past 120 yr, direct evidence of past forest structure (snags, stumps, logs, and old-growth trees) still exists today, due to slow decomposition rates (Fulé et al. 1997). If we used an earlier date (for instance, 1780) as our reconstruction year, then much of the presettlement-era wood evidence would have been consumed by the frequent fires and lost. In other words, structure at the time of settlement is the latest and best estimate of forest structure consistent with the evolutionary environment for a particular site within our study areas. However, this practice of choosing a specific reference year is sometimes misinterpreted as a view of static or ''equilibrium'' ecosystems or some fixed ecosystem structure over time (Shinneman and Baker 1997). This is not the case; ecosystems change over time and continue to evolve. Our approach, comparing predisruptive (presettlement) vegetation conditions to postdisruptive (postsettlement) ones (Leopold 1941, McIntosh 1985, Foster et al. 1990) at a crucial reference year, is simply a reasonable and ecologically sound way to help the land manager visualize and describe what the forest structure looked like prior to fire regime disruption.

*Multiple lines of evidence.*—Comparing the results of dendroecological reconstruction of fire regimes and forest structure with other lines of evidence is a basic component of retrospective ecological research (see Foster et al. 1990, Swetnam et al. 1999). Multiple lines of evidence include historical photographs (Fig. 2; see also Smith and Arno [1999] and Swetnam et al. [1999]), early forest or land surveys and inventories (Woolsey 1911), early historical accounts (Cooper 1960), and results developed by other researchers in other ecosystems.

Currently, we are relocating and measuring permanent stem-mapped plots established in the early 1900s across several ponderosa pine sites in Arizona and New Mexico (Woolsey 1912, Pearson 1923). The approach of remeasuring historical plots (e.g., Minnich et al. 1995) or sampling relatively undisturbed sites where the natural fire regime has continued (Madany and West 1983, Fulé and Covington 1996) are important methods for establishing reference conditions.

*Determine understory herbaceous and shrub composition.*—The understory herbaceous and shrub species in southwestern ponderosa pine ecosystems provide rapid nutrient turnover and a fuel matrix to carry frequent surface fires. The understory plants also provide the majority of plant biodiversity (75–85 species/ha at GPNA, M. Moore, *unpublished data*).

Dendroecological reconstruction supported by historical data provides powerful quantitative support for

Case No. 1:23-cv-01501-RMR Document 15-2 filed 09/29/23 USDC Colorado pg 99 of 367





FIG. 2. A comparison over time of the Mt. Trumbull, Arizona, restoration site as seen from nearby Mt. Logan. The top sketch is by H. H. Nichols, an artist who accompanied John Wesley Powell to the Arizona Strip during Powell's second expedition to the Grand Canyon in 1870 (Powell 1961). The bottom photograph was taken from the same location circa 1994–1995. Note the increased tree density and the reduced herbaceous vegetation in Potato Valley (midground) during the intervening ~125-yr period.

understanding changes in tree structure and fire regimes, but these techniques provide only limited reference data for herbaceous production, abundance, and diversity. Two studies conducted at the GPNA site examine herbaceous plants at different temporal scales. Opal phytolith sampling is being used to investigate the long-term stability of forest–grass patches over centuries and the relative abundance of certain woody and herbaceous species (Kerns and Moore 1997, Kerns 1999), while current biomass production and species composition are measured on an annual basis in this restored experimental site (Covington et al. 1997). These measurements support the development of further hypotheses and help researchers set quantitative targets (or ranges) for the understory component of the ecosystem in an ecological restoration context.

## ECOLOGICAL RESTORATION

One dictionary definition of ''restore'' is to put or bring back into a former or original state; repair or

renew (Merriam-Webster 1989). The Society for Ecological Restoration (1993) defined ecological restoration as ''the process of reestablishing to the extent possible the structure, function, and integrity of indigenous ecosystems and the sustaining habitats that they provide.'' Definitions of ecological restoration remain the subject of much discussion (Jordon et al. 1987, Ralston 1994, Jackson et al. 1995, Hobbs and Norton 1996, Higgs 1997, McQuillan 1998). One common attribute is the desire to reestablish (as closely as possible) previous characteristics of an ecosystem's composition, vertical structure, pattern, function, and dynamics (Jordon et al. 1987, Aronson et al. 1993, Hobbs and Norton 1996, Dobson et al. 1997, Higgs 1997). Thus, a major goal of ecological restoration is the restoration of degraded ecosystems, in order to emulate conditions that prevailed before disruption of natural structures and processes, i.e., environmental conditions that have influenced native communities over recent evolutionary time. Leopold (1941), Dobson et al. (1997), and others further suggest that we will develop a deeper understanding of how ecosystem components function through the process of restoration.

A central premise of ecological restoration is that restoration of natural systems to conditions consistent with their recent evolutionary environments will prevent their further degradation, while simultaneously conserving their native plants and animals (Society for Ecological Restoration 1993).

Practitioners of ecological restoration recognize that a failure to include human interactions with restored systems is not only unrealistic, but also undesirable for long-term sustainability (Higgs 1997). In fact, in cases where novel conditions prevent natural system functions, ongoing management may be required to compensate for the altered conditions. In many respects ecological restoration might best be judged by whether the techniques used are setting the ecosystem on a trajectory that will eventually lead to the recovery of self-sustaining ecosystem structure and function (Bradshaw 1984, MacMahon and Jordan 1994, Jackson et al. 1995). Outside of nature preserves, however, some degree of human interaction will probably always be included in the sustainable system.

### *Ecological restoration treatments suggested for southwestern ponderosa pine*

Based on reference conditions, an ecological restoration prescription tailored to the specific ecological and management concerns at each project site is developed and implemented on test areas. An example at the Gus Pearson Natural Area (GPNA) is described in detail by Covington et al. (1997). The general framework is the following:

1) Leave all presettlement trees (those predating the fire regime disruption date [circa 1870 to 1880] in northern Arizona).

One argument against this practice is that some presettlement trees (>120-yr-old) would have been thinned by surface fires, had the fire regime not been disrupted; therefore, the basal area (and density) of presettlement trees today may be on the high end of pre-1870 reference conditions. There are several reasons, however, why this argument is not appropriate for southwestern ponderosa pine. First, logging throughout the Southwest has removed the majority of presettlement trees. Second, even in unharvested areas, low natural mortality rates that existed prior to fire regime disruption, have increased under the competitive stress of dense postsettlement forests (Biondi 1996, Sackett et al. 1996, Feeney et al. 1998, Mast et al. 1999). Demographic analysis of presettlement age structure in the GPNA study site (Mast et al. 1999) suggests that only ~1–3% of the trees died per decade, consistent with the 3.3% mortality per decade measured by Pearson (1950) on trees >30.5 cm in a virgin ponderosa pine stand from 1925–1940, a period when competitive stress from postsettlement trees was probably still relatively low (Biondi 1996). Low mortality rates make sense in relatively open forest conditions; in contrast, old-growth pines are dying 2–8× faster in current dense GPNA forest conditions (Sackett et al. 1996). Third, presettlement trees are the slowest variable to restore in the system, and they represent centuries worth of genetic and structural diversity. The last reason is a cultural one: many people are willing to reduce the number of trees per hectare in an area as long as the thinned trees are not old.

2) Retain postsettlement trees as necessary to replace dead presettlement trees (snags, stumps, logs, etc.); while restoring, to the greatest extent possible, the species composition, density, age, biomass distributions, and tree pattern present around the time of fire regime disruption. Other postsettlement trees are thinned and removed off site or burned in place (Fig. 1). The exact number of trees retained depends on many factors, including the desires and objectives of the resource agencies and the public. Typically a ''buffer'' of 150–300% of the presettlement tree density has been retained on our project sites to compensate for possible posttreatment mortality and underestimation of presettlement tree densities.

3) Protect the presettlement and large postsettlement trees from cambial girdling and root mortality, by raking the forest floor fuels (>100 yr of accumulated fuels in many cases) from the tree base.

4) Burn under prescription with repeated surface fires to approximate the natural fire cycle. Fire prescriptions are designed to consume thinning residues and forest floor fuels with minimal impacts on retained trees (e.g., raking of fuels from presettlement trees and snags). Initial burns to consume these unnaturally heavy fuels are usually done in the fall for safe burning conditions, but prescribed burns could eventually be

allowed in the natural fire season after restoration of forest structure and light fuel loads.

5) If natural regeneration of the herbaceous and shrub communities is inadequate, then reseed or transplant the treatment area with a species mix of native plants, as needed.

6) Control exotic plant species, as needed.

7) Defer or regulate grazing of ungulates (both domestic and wild), so that the treated area can recover and so that the herbaceous fuels will be adequate for repeated burning at natural intervals.

In general, the two-pronged rationale behind these ecological restoration treatments is (Covington et al. 1997): (1) that facilitating partial recovery of ecosystem structure and function can lead to reestablishment of natural self-regulatory processes that, in turn, will eventually lead to restoration of at least part of the original ecosystem dynamics; and (2) that both restoration of ecosystem structure and reintroduction of fire are necessary for restoring rates of decomposition, nutrient cycling, and net primary production to more natural, predisruptive levels. Restoration of natural conditions is most important where mandated by law or policy (national parks, wilderness, natural areas, etc.), but this goal can be useful in any setting where people place a value on natural ecosystem characteristics (e.g., reduce wildfire hazard, maintain habitat for native species, etc.). In areas where some other goal is predominant, there are still benefits from managing in a manner relatively close to natural conditions. For example, suppose timber production were the primary goal in a particular ponderosa pine forest. Selection of a timber management regime, based on uneven-aged silviculture with frequent underburning, would be fairly likely to support many elements of natural habitats and processes, in contrast to selection of an even-aged, fire suppression management regime.

### *Structure and function*

There have been interesting debates in the literature on whether restoration of frequent-fire ecosystems must include ''intentional structural restoration'' (e.g., thinning) (Bonnicksen and Stone 1985), or if fire alone could do the job (Parsons et al. 1986, Christensen 1987, Parsons 1989, Stephenson 1999). Perhaps the major conclusions from these debates are that it depends: in ecological terms, it depends on the specific species composition, soils, fuels, and so on, of the site; and, in terms of cultural acceptance of alternative management practices, it depends on the specific social and political context.

If it were possible to restore southwestern forests with fire alone, an ecological restoration project could reintroduce low-intensity, surface fires every 2–10 yr over large areas with little or no structural manipulation. However, southwestern ponderosa pine and lower elevation mixed-conifer forests have experienced tremendous increases in tree densities and fuel accumulations over the past century, and most now support fuel conditions that favor high-intensity crown fires. In these altered structures, fire no longer functions as it did in presettlement forests.

Earlier experiments that simply reintroduced fire into these systems often had detrimental effects, from a restoration perspective. For example, S. Sackett, J. Dieterich, and W. Covington initiated such an experiment on the Chimney Spring experimental burning area near Flagstaff, Arizona, in 1976 (Dieterich 1980, Sackett 1980, Covington and Sackett 1984). Their results demonstrated that many old-growth pine trees were killed by cambial girdling and root mortality, while postsettlement poles and saplings were not adequately thinned by fire as originally intended (Sackett et al. 1996). Reestablishment of herbaceous composition and production at Chimney Spring has been slow, probably because of the lack of tree thinning and intense soil heating under presettlement trees (Harris and Covington 1983, Andariese and Covington 1986). In contrast, initial results from the restoration experiment at the GPNA, where many postsettlement trees were removed and litter raked prior to burning, are encouraging (Covington et al. 1997). Herbaceous production in treated areas has rapidly outstripped controls, even in areas that had been dense with postsettlement trees before restoration (Covington et al. 1997). Prior to treatment, these areas had only scattered grasses, sedges, and forbs. Old-growth trees have had an unexpectedly rapid positive response, showing reduced water stress, increased resin flow, and foliar toughness, which are indicators of insect resistance (Feeney et al. 1998). In addition, Kaye and Hart (1998) reported that microbial nitrogen transformation rates increased in the restored sites, relative to the controls, suggesting higher microbial activity in the restored areas.

### *Limitations of our ecological restoration approach*

Despite the initial success of the GPNA experiment—the first site where quantitative posttreatment information has been collected—the ecological restoration approach does have limitations, especially when implemented at the operational level. These limitations, however, are not restricted to restoration-type treatments. They are largely limitations associated with almost any land management activity, especially those involving tree thinning and prescribed burning.

Beginning with the initial concept, ecological restoration projects are bound to be confronted with a wide variety of opinions. This seems to be especially true on federal lands. Project implementation is often bedeviled by disagreements over treatment details and by insufficient funding. Even where environmental groups and resource management agencies appear to advocate nearly identical tree thinning and prescribed burning treatments, for instance, arguments over issues such as

tree diameter limits, single vs. multiple entries, and residual forest density have slowed the progress of initial restoration projects in northern Arizona. In large part, these disagreements may stem more from a long history of antagonistic relationships among the organizations involved, rather than from an actual impasse over the restoration work itself. The low value of the small-diameter forest products removed in the restoration thinnings contributes to the difficulty in funding these projects (Larson and Mirth 1998). In many circumstances land management agencies cannot afford the monitoring investment and thus fall short of adaptive management ideals. When the projects are operationally implemented, there are additional limitations associated with smoke from prescribed fires, slash disposal, and short-term aesthetic degradation from both thinning and prescribed fire activities.

National parks and designated wilderness areas can pose particularly difficult challenges to restoration efforts. These lands are mandated to be managed in their natural conditions, but the types of human activities often needed for restoration, such as tree thinning, may be seen as incompatible with park and wilderness regulations. Recognizing the damage caused by disruption of natural processes, the National Park Service has been a leader in restoring fire regimes in the Sierra Nevada National Parks (Parsons and van Wagtendonk 1996, Stephenson 1999) and elsewhere. Yet arguments continue over the appropriate procedures (see *Ecological restoration: Structure and function*). Currently, Grand Canyon National Park is developing small-scale tests of thinning treatments at sites where changes in forest structure and fuel accumulation have been too great to allow fire-only treatments (Nichols et al. 1994). Relying on a minimum tool analysis, wilderness-sensitive restoration work may rely heavily, or exclusively, on human and animal-powered operations, trading higher costs for decreased mechanical impacts. Additional constraints are posed by the U.S. Forest Service's prohibition of most management ignitions in wilderness (Parsons and Landres 1998).

## Conclusions

The evolutionary environment concept and reference conditions are central to determining ecologically based restoration treatments in southwestern ponderosa pine ecosystems. The goal for the restored ponderosa pine forest ecosystem in our projects is not the creation of an exact copy of the presettlement forest, because trees and other plants have aged, some have died, and animal communities have changed. However, the restored forest is a reasonably close match to the presettlement forest, conserving the structure and pattern of the slowest developing organismic variables (old trees) and providing resources for native herbaceous plants and shrubs to return to their natural, more productive state. Within the restored forest structure, fire and other processes can presumably have ecological effects more similar to the roles they played over evolutionary history.

Ecological restoration is founded in conservation biology principles. Strict-sense restoration (Aronson et al. 1993) is broadly consistent with management goals for parks, wilderness, and natural areas, although restoration practices may not be easily implemented in these areas (see Parsons 1989, Parsons and Botti 1996). On the other hand, a more liberal approach to restoration is central to ecosystem management approaches on many other public lands (Kaufmann et al. 1994, Covington et al., *in press*). For example, Kaufmann et al. (1998) described reference conditions for ecosystem management in the Sacramento Mountains, New Mexico, USA. Fiedler et al. (1996) and Hardy and Arno (1996) described the use of silvicultural and prescribed burning approaches for improving health of ponderosa pine forests in the Inland and Pacific Northwest forests. Dahms and Geils (1997) explain how ecological (or ecosystem) restoration could be used as one strategy for improving forest ecosystem health for lands administered by the U.S. Forest System in the Southwest.

Ecological restoration is not a panacea nor does it meet all land management objectives. Neither the presettlement ecosystem nor any other ecosystem is ideal for providing habitats for each species or individual organism, or for all the commodity and amenity needs of humans (also see McQuillan [1998]). Relatively open forests with frequent fires are probably not best suited to maximize wood production, maximize downed woody debris, or give dense hiding cover to animals. However, real ecosystems cannot simultaneously meet all conflicting objectives. In many settings, restoration of natural ecosystem structure and process will hold a lower priority than other concerns. The hope of restored ecosystems is to reduce and perhaps reverse human-caused degradation, conserve the most fragile links of natural systems (such as rare species and old organisms), and reduce the potential for catastrophic ecosystem change. These are, in our view, appropriate goals for management of natural ecosystems across many federal lands.

## Acknowledgments

Cooperation and financial support for the ecological restoration projects mentioned in this article were provided by the U.S. Department of the Interior Bureau of Land Management (Mt. Trumbull, Arizona), U.S. Department of the Interior National Park Service (Grand Canyon National Park), and Department of Defense National Guard Bureau and Arizona Army National Guard (Camp Navajo). Funding for the Gus Pearson Natural Area ecosystem restoration experiment was provided by the National Science Foundation (Grant DEB-9322706). S. F. Arno, W. H. Moir, D. J. Parsons, P. Morgan, R. K. Vance, and an anonymous reviewer provided comments and reviews that greatly improved earlier versions of this manuscript.

Case No. 1:23-cv-01501-RMR Document 15-2 filed 09/29/23 USDC Colorado pg 103 of 367



## Literature Cited


Altschul, J. H., and H. C. Fairley. 1989. Man, models, and management: an overview of the archaeology of the Arizona Strip and the management of its cultural resources. Report prepared for U.S. Forest Service and U.S. Department of the Interior Bureau of Land Management, by Statistical Research, Plateau Archaeology, Dames and Moore, Contract No. **53-8371-6-0054**.

Andariese, S. W., and W. W. Covington. 1986. Changes in understory production for three prescribed burns of different ages in ponderosa pine. Forest Ecology and Management **14**:193–203.

Anderson, M. K., and M. J. Moratto. 1996. Native American land-use practices and ecological impacts. Pages 187–206 *in* Sierra Nevada Ecosystem Project: final report to Congress, Volume II. University of California, Davis, California, USA.

Anderson, R. S. 1989. Development of the southwestern ponderosa pine forests: what do we really know? Pages 15–22 *in* U.S. Forest Service General Technical Report **RM-185**.

Aronson, J., C. Floret, E. LeFloc'h, C. Ovalle, and R. Pontanier. 1993. Restoration and rehabilitation of degraded ecosystems in arid and semi-arid lands. I. A view from the south. Restoration Ecology **1**:8–17.

Axelrod, D. I. 1986. Cenozoic history of some western American pines. Annals of the Missouri Botanical Garden **73**:565–641.

Baisan, C. H., and T. W. Swetnam. 1997. Interactions of fire regimes and land use in the central Rio Grande Valley. U.S. Forest Service Research Paper **RM-RP-230**.

Barton, A. M. 1993. Factors controlling plant distributions: drought, competition, and fire in montane pines in Arizona. Ecological Monographs **63**:367–397.

Biondi, F. 1996. Decadal-scale dynamics at the Gus Pearson Natural Area: evidence for inverse (a)symmetric competition? Canadian Journal of Forest Research **26**:1397–1406.

Bonnicksen, T. M., and E. C. Stone. 1985. Restoring naturalness to national parks. Environmental Management **9**: 479–486.

Bradshaw, A. D. 1984. Ecological principles and land reclamation practices. Landscape Planning **11**:35–48.

Christensen, N. L. 1987. Succession and natural disturbance: paradigms, problems, and preservation of natural ecosystems. Pages 62–86 *in* J. K. Agee and D. R. Johnson, editors. Ecosystem management for parks and wilderness. University of Washington Press, Seattle, Washington, USA.

Christensen, N. L., et al. 1996. The scientific basis for ecosystem management. Ecological Applications **6**:665–691.

Cooper, C. F. 1960. Changes in vegetation, structure, and growth of southwestern pine forests since white settlement. Ecological Monographs **30**:129–164.

———. 1961. Pattern in ponderosa pine forests. Ecology **42**: 493–499.

Covington, W. W., R. L. Everett, R. W. Steele, L. I. Irwin, T. A. Daer, and A. N. D. Auclair. 1994. Historical and anticipated changes in forest ecosystems of the Inland West of the United States. Journal of Sustainable Forestry **2**:13–63.

Covington, W. W., P. Z. Fulé, M. M. Moore, S. C. Hart, T. E. Kolb, J. N. Mast, S. S. Sackett, and M. R. Wagner. 1997. Restoration of ecosystem health in ponderosa pine forests of the Southwest. Journal of Forestry **95**:23–29.

Covington, W. W., and M. M. Moore. 1994*a*. Southwestern ponderosa forest structure and resource conditions: changes since Anglo-American settlement. Journal of Forestry **92**: 39–47.

Covington, W. W., and M. M. Moore. 1994*b*. Postsettlement changes in natural fire regimes and forest structure: ecological restoration of old-growth ponderosa pine forests. Journal of Sustainable Forestry **2**:153–181.

Covington, W. W., and S. S. Sackett. 1984. The effect of a prescribed burn in southwestern ponderosa pine on organic matter and nutrients in woody debris and forest floor. Forest Science **30**:183–192.

Covington, W. W., W. A. Niering, E. E. Starkey, and J. L. Walker. *In press*. Ecosystem restoration and management of public lands: principles and concepts. *In* N. C. Johnson, A. J. Malk, W. T. Sexton, and R. Szaro, editors. Ecological stewardship: a common reference for ecosystem management. Elsevier Science, Oxford, UK.

Dahms, C. W., and B. W. Geils, technical editors. 1997. An assessment of forest ecosystem health in the Southwest. U.S. Forest Service General Technical Report **RM-GTR-295**.

Denevan, W. M. 1992. The pristine myth: the landscape of the Americas in 1492. Annals of the Association of American Geographers **82**:369–385.

Dieterich, J. H. 1980. Chimney Spring forest fire history. U.S. Forest Service Research Paper **RM-220**.

Dobson, A. P., A. D Bradshaw, and A. J. M. Baker. 1997. Hopes for the future: restoration ecology and conservation biology. Science **277**:515–522.

Feeney, S. R., T. E. Kolb, W. W. Covington, and M. R. Wagner. 1998. Influence of thinning and burning restoration treatments on presettlement ponderosa pines at the Gus Pearson Natural Area. Canadian Journal of Forest Research **28**:1295–1306.

Fiedler, C. E., S. F. Arno, and M. G. Harrington. 1996. Flexible silvicultural and prescribed burning approaches for improving health of ponderosa pine forests. Pages 69–74 *in* U.S. Forest Service General Technical Report **RM-GTR-278**.

Foster, D. R., P. K. Schoomaker, and S. T. A. Pickett. 1990. Insights from paleoecology to community ecology. Trends in Ecology and Evolution **5**:119–122.

Fritts, H. C., and T. W. Swetnam. 1989. Dendroecology: a tool for evaluating variations in past and present forest environments. Advances in Ecological Research **19**:111–188.

Fulé, P. Z., and W. W. Covington. 1996. Changing fire regimes in Mexican pine forests: ecological and management implications. Journal of Forestry **94**:33–38.

Fulé, P. Z., W. W. Covington, and M. M. Moore. 1997. Determining reference conditions for ecosystem management in southwestern ponderosa pine forests. Ecological Applications **7**:895–908.

Geist, V. 1978. Life strategies, human evolution, environmental design: toward a biological theory of health. Springer-Verlag, New York, New York, USA.

Grissino-Mayer, H. D. 1995. Tree-ring reconstructions of climate and fire history at El Malpais National Monument, New Mexico. Dissertation. University of Arizona, Tucson, Arizona, USA.

Hack, J. T. 1942. The changing physical environment of the Hopi Indians of Arizona. Papers of the Peabody Museum of American Archaeology and Ethnology, Harvard University, volume 35, no. 1. Harvard University Press, Cambridge, Massachusetts, USA.

Hardy, C. C., and S. F. Arno, editors. 1996. The use of fire in forest restoration. U.S. Forest Service General Technical Report **INT-GTR-341**.

Harris, G. R., and W. W. Covington. 1983. The effect of a prescribed fire on nutrient and standing crop of understory vegetation in ponderosa pine. Canadian Journal of Forest Research **13**:501–507.

Higgs, E. S. 1997. What is good ecological restoration? Conservation Biology **11**:338–348.

Hobbs, R. J., and D. A. Norton. 1996. Towards a conceptual

Case No. 1:23-cv-01501-RMR Document 15-2 filed 09/29/23 USDC Colorado pg 104 of 367



framework for restoration ecology. Restoration Ecology **4**: 93–110.
Holling, C. S. 1992. Cross-scale morphology, geometry, and dynamics of ecosystems. Ecological Monographs **62**:447–502.
Hunter, M. D., and P. W. Price. 1992. Playing chutes and ladders: heterogeneity and the relative roles of bottom-up and top-down forces in natural communities. Ecology **73**: 724–732.
Hunter, M. L., Jr. 1996. Benchmarks for managing ecosystems: are human activities natural? Conservation Biology **10**:695–697.
Jackson, L. L., N. Lopoukhine, and D. Hillyard. 1995. Ecological restoration: a definition and comments. Restoration Ecology **3**:71–75.
Jordan, W. R., M. E. Gilpin, and J. D. Aber. 1987. Restoration ecology. Cambridge University Press, Cambridge, UK.
Kaufmann, M. R., et al. 1994. An ecological basis for ecosystem management. U.S. Forest Service General Technical Report **RM-246**.
Kaufmann, M. R., L. S. Huckaby, C. M. Regan, and J. Popp. 1998. Forest reference conditions for ecosystem management in the Sacramento Mountains, New Mexico. U.S. Forest Service General Technical Report **RMRS-GTR-19**.
Kay, C. E. 1995. Aboriginal overkill and native burning: implications for modern ecosystem management. Western Journal of Applied Forestry **10**:121–126.
Kaye, J. P, and S. C. Hart. 1998. Ecological restoration alters nitrogen transformations in a ponderosa pine–bunchgrass ecosystem. Ecological Applications **8**:1052–1060.
Keddy, P. A., and C. G. Drummond. 1996. Ecological properties for the evaluation, management, and restoration of temperate deciduous forest ecosystems. Ecological Applications **6**:748–769.
Kerns, B. K. Phytolith assemblages and soil characteristics from a southwestern ponderosa pine–bunchgrass community. Dissertation. Northern Arizona University, Flagstaff, Arizona, USA.
Kerns, B. K., and M. M. Moore. 1997. Use of soil characteristics and opal phytoliths to examine vegetation stability in a ponderosa pine–bunchgrass community. Bulletin of Ecological Society of America **78**:73.
Larson, D., and R. Mirth. 1998. Potential for using small-diameter ponderosa pine: a wood fiber projection. Forest Products Journal **48**:37–42.
Leopold, A. 1924. Grass, brush, timber, and fire in southern Arizona. Journal of Forestry **22**:1–10.
———. 1937. Conservationist in Mexico. American Forests **37**:118–120.
———. 1941. Wilderness as a land laboratory. Living Wilderness **6**:3.
MacMahon, J. A., and W. R. Jordan, III. 1994. Ecological restoration. Chapter 14 *in* G. K. Meffe and C. R. Carroll, editors. Principles of conservation biology. Sinauer, Sunderland, Massachusetts, USA.
Madany, M. H., and N. E. West. 1983. Livestock grazing–fire regime interactions within montane forests of Zion National Park, Utah. Ecology **64**:661–667.
Mast, J. N., P. Z. Fulé, M. M. Moore, W. W. Covington, and A. E. M. Waltz. 1999. Restoration of presettlement age structure of an Arizona ponderosa pine forest. Ecological Applications **9**:228–39.
Mayr, E. 1942. Systematics and the origin of species. Columbia University Press, New York, New York, USA.
McCune, B. 1988. Ecological diversity in North American pines. American Journal of Botany **75**:353–368.
McIntosh, R. P. 1985. The background of ecology: concept and theory. Cambridge University Press. New York, New York, USA.
McQuillan, A. G. 1998. Defending the ethics of ecological restoration. Journal of Forestry **96**:27–31.
Merriam-Webster. 1989. The new Merriam-Webster dictionary. Merriam-Webster, Springfield, Massachusetts, USA.
Minnich, R. A., M. G. Barbour, J. H. Burk, and R. F. Fernau. 1995. Sixty years of change in California conifer forests of the San Bernardino Mountains. Conservation Biology **9**:902–914.
Mooney, H. A. 1981. Adaptations of plants to fire regimes: integrating summary. Pages 322–323 *in* Fire regimes and ecosystem properties. U.S. Forest Service General Technical Report **WO-26**. Washington, D.C., USA.
Morgan, P., G. H. Aplet, J. B. Haufler, H. C. Humphries, M. M. Moore, and W. D. Wilson. 1994. Historical range of variability: a useful tool for evaluating ecological change. Journal of Sustainable Forestry **2**:87–111.
Mutch, R. W. 1970. Wildland fires and ecosystems—a hypothesis. Ecology **51**:1046–1051.
Nichols, T., B. Callenberger, and G. Kleindienst. 1994. Report of the task force review of the hazard fuel situation on the North Rim of the Grand Canyon. Report on file at the Division of Resource Management, Grand Canyon National Park, Arizona, USA.
Noss, R. F. and B. Csuti. 1994. Habitat fragmentation. Pages 237–264 *in* G. K. Meffe and C. R. Carroll, editors. Principles of conservation biology. Sinauer, Sunderland, Massachusetts.
Parsons, D. J. 1989. Restoring fire to the Sierra Nevada mixed conifer forest: reconciling science, policy, and practicality. Pages 271–279 *in* Restoration ’89: the new management challenge. First annual meeting, Society for Ecological Restoration.
Parsons, D. J., and S. J. Botti. 1996. Restoration of fire in National Parks. Pages 29–31 *in* U.S. Forest Service General Technical Report **INT-GTR-341**.
Parsons, D. J., D. M. Graber, J. K. Agee, and J. W. van Wagtendonk. 1986. Natural fire management in National Parks. Environmental Management **10**:21–24.
Parsons, D. J., and P. B. Landres. 1998. Restoring natural fire to wilderness: how are we doing? Pages 366–373 *in* T. L. Pruden and L. A. Brennan, editors. Tall Timbers Fire Ecology Conference Proceedings, No. **20**. Tall Timbers Research Station, Tallahassee, Florida, USA.
Parsons, D. J., and J. W. van Wagtendonk. 1996. Fire research and management in the Sierra Nevada National Parks. Pages 25–48 *in* W. L. Halvorson and G. E. Davis, editors. Science and ecosystem management in the National Parks. The University of Arizona Press, Tucson, Arizona, USA.
Pearson, G. A. 1923. Natural reproduction of western yellow pine in the Southwest. U.S. Forest Service Bulletin No. **1105**. Washington, D.C., USA.
———. 1950. Management of ponderosa pine in the Southwest. U.S. Agriculture Monograph **6**. Washington, D.C., USA
Pickett, S. T. A., and P. S. White. 1985. The ecology of natural disturbance and patch dynamics. Academic Press, Orlando, Florida, USA.
Powell, J. W. 1961. The exploration of the Colorado River and its canyons. Formerly titled: Canyons of the Colorado. Dover, New York, New York, USA.
Pyne, S. J. 1982. Fire in America: a cultural history of wildland and rural fire. Princeton University Press, Princeton, New Jerseu. USA.
Ralston, H., III. 1994. Conserving natural value. Columbia University Press, New York, New York, USA.
Sackett, S. S. 1980. Reducing natural ponderosa pine fuels using prescribed fire: two case studies. U.S. Forest Service Research Note **RM-392**.
Sackett, S. S., S. M. Haase, and M. G. Harrington. 1996.

Case No. 1:23-cv-01501-RMR Document 15-2 filed 09/29/23 USDC Colorado pg 105 of 367



Lessons learned from fire use for restoring southwestern ponderosa pine ecosystems. Pages 53–60 in U.S. Forest Service General Technical Report **RM-GTR-278**.

Samuels, M. L., and J. Betancourt. 1982. Modeling the long-term effects of fuelwood harvest on pinyon–juniper woodlands. Environmental Management **6**:505–515.

Savage, M. 1991. Structural dynamics of a southwestern pine forest under chronic human influence. Annals of the Association of American Geographers **81**:271–289.

Savage, M., P. Brown, and J. Feddema. 1996. The role of climate in a pine forest regeneration pulse in the southwestern United States. Ecoscience **3**:310–318.

Seklecki, M. T., H. D. Grissino-Mayer, and T. W. Swetnam. 1996. Fire history and the possible role of Apache-set fires in the Chiricahua Mountains of southeastern Arizona. Pages 238–246 *in* U.S. Forest Service General Technical Report. **RM-GTR-289**.

Shinneman, D. J., and W. L. Baker. 1997. Nonequilibrium dynamics between catastrophic disturbances and old-growth forests in ponderosa pine landscapes of the Black Hills. Conservation Biology **11**:1276–1288.

Smith, B. D. 1989. Origins of agriculture in eastern North America. Science **246**:1566–1571.

Smith, H. Y., and S. F. Arno, editors. 1999. Eighty-eight years of change in a managed ponderosa pine forest. U.S. Forest Service General Technical Report. **RMRS-GTR-23**.

Smith, M. 1958. Theory of evolution. Penguin Books, New York, New York, USA.

Society for Ecological Restoration. 1993. Mission statement, Society for Ecological Restoration. Restoration Ecology **1**: 206–207.

Stephenson, N. L. 1999. Reference conditions for giant sequoia forest restoration: structure, process, and precision. Ecological Applications **9**:1253–1265.

Swanson, F. J., J. A. Jones, D. A. Wallin, and J. H. Cissel. 1994. Natural variability—implications for ecosystem management. Pages 85–99 *in* U.S. Forest Service, General Technical Report **PNW-GTR-318**.

Swetnam, T. W., C. D. Allen, and J. L. Betancourt. 1999. Applied historical ecology: using the past to manage the future. Ecological Applications **9**:1189–1206.

Swetnam, T. W., and C. H. Baisan. 1996. Historical fire regime patterns in the southwestern United States since AD 1700. Pages 11–32 *in* U.S. Forest Service General Technical Report **RM-GTR-286**.

Swetnam, T. W., and J. L. Betancourt. 1998. Mesoscale disturbance and ecological response to decadal climatic variability in the American Southwest. Journal of Climate **11**: 3128–3147.

Touchan, R., C. D. Allen, and T. W. Swetnam. 1996. Fire history and climatic patterns in ponderosa pine and mixed-conifer forests of the Jemez Mountains, northern New Mexico. Pages 33–46 *in* U.S. Forest Service General Technical Report **RM-GTR-286**.

Van Devender, T. R. 1990. Late Quaternary vegetation and climate in the Sonoran Desert, United States and Mexico. Pages 134–165 *in* J. L. Betancourt, T. R. Van Devender, and P. S. Martin, editors. Packrat middens: the last 40,000 years of biotic change. University of Arizona Press, Tucson, Arizona, USA.

Walters, C. J., and C. S. Holling. 1990. Large-scale management experiments and learning by doing. Ecology **71**: 2060–2068.

Weaver, H. 1951. Fire as an ecological factor in the southwestern ponderosa pine forests. Journal of Forestry **49**:93–98.

White, A. S. 1985. Presettlement regeneration patterns in a southwestern ponderosa pine stand. Ecology **66**:589–594.

Wilson, E. O. 1992. The diversity of life. Norton, New York, New York, USA.

Woolsey, T. S., Jr. 1911. Western yellow pine in Arizona and New Mexico. U.S. Forest Service Bulletin **101**.

———. 1912. Permanent sample plots. Forest Quarterly **10**: 38–44.

*Ecological Applications*, 12(5), 2002, pp. 1418–1433
© 2002 by the Ecological Society of America

# ECOLOGICAL RESTORATION OF SOUTHWESTERN PONDEROSA PINE ECOSYSTEMS: A BROAD PERSPECTIVE

Craig D. Allen,[1,10] Melissa Savage,[2] Donald A. Falk,[3] Kieran F. Suckling,[4] Thomas W. Swetnam,[5] Todd Schulke,[4] Peter B. Stacey,[6] Penelope Morgan,[7] Martos Hoffman,[8] and Jon T. Klingel[9]

[1]*U.S. Geological Survey, Jemez Mountains Field Station, HCR 1, Box 1, #15, Los Alamos, New Mexico 87544 USA*
[2]*Department of Geography, University of California, Los Angeles, California 90095-1524 USA*
[3]*Department of Ecology and Evolutionary Biology, University of Arizona, Tucson, Arizona 85721 USA*
[4]*Center for Biological Diversity, Tucson, Arizona 85702 USA*
[5]*Laboratory of Tree-Ring Research, University of Arizona, Tucson, Arizona 85721 USA*
[6]*Department of Biology, University of New Mexico, Albuquerque, New Mexico 87131 USA*
[7]*College of Natural Resources, University of Idaho, Moscow, Idaho 83844 USA*
[8]*Southwest Forest Alliance, Flagstaff, Arizona 86002 USA*
[9]*New Mexico Department of Game and Fish, P.O. Box 25112, Santa Fe, New Mexico 87504 USA*

*Abstract.* The purpose of this paper is to promote a broad and flexible perspective on ecological restoration of Southwestern (U.S.) ponderosa pine forests. Ponderosa pine forests in the region have been radically altered by Euro-American land uses, including livestock grazing, fire suppression, and logging. Dense thickets of young trees now abound, old-growth and biodiversity have declined, and human and ecological communities are increasingly vulnerable to destructive crown fires. A consensus has emerged that it is urgent to restore more natural conditions to these forests. Efforts to restore Southwestern forests will require extensive projects employing varying combinations of young-tree thinning and reintroduction of low-intensity fires. Treatments must be flexible enough to recognize and accommodate: high levels of natural heterogeneity; dynamic ecosystems; wildlife and other biodiversity considerations; scientific uncertainty; and the challenges of on-the-ground implementation. Ecological restoration should reset ecosystem trends toward an envelope of ''natural variability,'' including the reestablishment of natural processes. Reconstructed historic reference conditions are best used as general guides rather than rigid restoration prescriptions. In the long term, the best way to align forest conditions to track ongoing climate changes is to restore fire, which naturally correlates with current climate. Some stands need substantial structural manipulation (thinning) before fire can safely be reintroduced. In other areas, such as large wilderness and roadless areas, fire alone may suffice as the main tool of ecological restoration, recreating the natural interaction of structure and process. Impatience, overreaction to crown fire risks, extractive economics, or hubris could lead to widespread application of highly intrusive treatments that may further damage forest ecosystems. Investments in research and monitoring of restoration treatments are essential to refine restoration methods. We support the development and implementation of a diverse range of scientifically viable restoration approaches in these forests, suggest principles for ecologically sound restoration that immediately reduce crown fire risk and incrementally return natural variability and resilience to Southwestern forests, and present ecological perspectives on several forest restoration approaches.

*Key words: anthropogenic change; ecological restoration; ecosystem management; fire suppression effects; forest restoration programs; ponderosa pine forests; reference conditions; Southwestern United States, natural range of variation.*

## Introduction

The *Pinus ponderosa* (ponderosa pine) forests of the American Southwest (Arizona, New Mexico, and adjoining portions of Utah and Colorado) have experienced major changes in ecological structure, composition, and process because of recent human activities (Fig. 1). Over a century of livestock grazing, fire suppression, logging, road construction, predator control, and exotic-species introductions have altered most Southwestern ponderosa pine forests from conditions that had prevailed for thousands of years (Covington and Moore 1994, Swetnam et al. 1999). A critical change has been a dramatically increased vulnerability of these forests to large, destructive crown fires that threaten both human and ecological communities.

A general consensus has emerged that it is urgent to restore more natural conditions to these forests, but substantial debate persists about how to best achieve this goal (Nijhuis 1999, Covington 2000, Kloor 2000, Jenkins 2001). The purpose of this paper is to promote a broad and flexible perspective on ecological restoration of Southwestern ponderosa pine forests. We sup-

Manuscript received 15 June 2001; revised and accepted 29 October 2001; final version received 2 January 2002.
[10] E-mail: craig_allen@usgs.gov



FIG. 1. Ponderosa pine forests of the American Southwest. (Top) Open ponderosa pine forest representing ''typical'' pre-1900 conditions, with grassy understory and surface fire activity. (Bottom) Altered ponderosa pine stand in need of restoration, showing changes in both stand structure and species composition. The dense midstory of mixed conifer trees provides ladder fuels that favor crown fire development.

port the development and implementation of a diverse range of scientifically viable restoration approaches in these forests that address the critical issues of forest heterogeneity, scientific uncertainty, and effects on wildlife. In addition, we suggest principles for ecologically sound restoration approaches. It is not our intention to emphasize a critique of any particular model, but we do present ecological perspectives on several alternative forest restoration approaches.

## BACKGROUND

Southwestern ponderosa pine ecosystems were shaped through time by stochastic and deterministic processes, including frequent surface fires, episodic regeneration, insect infestations, and regional climate events such as droughts (Dahm and Geils 1997, Allen and Breshears 1998, Kaufmann et al. 1998, Swetnam and Betancourt 1998). These processes contributed to heterogeneous forest spatial patterns at local and land-



FIG. 2. View looking northwest at the Cerro Grande Fire on the afternoon of 10 May 2000 as it burned toward Los Alamos, New Mexico (USA). Similar large, stand-replacing fires are becoming increasingly common in Southwestern ponderosa pine forests.

scape scales (Cooper 1960, White 1985), with pattern shifts through time within a natural range of variability (Swetnam et al. 1999).

Since European settlement in the middle to late 1800s, pervasive changes have tended to homogenize ponderosa pine forest patterns in the Southwest. Large trees have decreased in number due to logging. Historic livestock grazing and fire suppression have promoted the development of unnaturally dense stands of suppressed young trees. This condition now threatens the remaining large trees through competition and by fueling increasingly extensive crown fires (Covington and Moore 1994, Covington et al. 1994) as in ponderosa pine forests of other regions (Agee 1993, Everett et al. 1997, Smith and Arno 1999). In some stands species compositions have shifted toward less fire-resistant trees such as *Abies concolor* (white fir), *Pseudotsuga menziesii* (Douglas-fir), and *Juniperus* (juniper) species. These changed conditions now affect millions of hectares of ponderosa pine in the Southwest (U.S. General Accounting Office 1999).

Alteration of stand structures and species compositions has in turn altered natural processes in Southwestern forests. Understory grasses and forbs have decreased in abundance and diversity (Covington and Moore 1994, Bogan et al. 1998), replaced by deep mats of slowly decomposing pine needles. As a result, nutrient cycling dynamics have been disrupted (White 1994) and overall biodiversity levels decreased (Allen 1998). Old-growth ponderosa pine forests have become rare (Harrington and Sackett 1992, Noss et al. 1995) and meadows have shrunk due to tree encroachment (Swetnam et al. 1999). Some vertebrate animal species, such as the Northern Goshawk (Reynolds et al. 1992, U.S. Fish and Wildlife Service 1998; but see Kennedy 1997), are thought to have declined in abundance due to habitat alterations. Hydrologic cycles have been modified in more densely forested watersheds, likely decreasing total streamflows, peak flows, and base flows (Ffolliott et al. 1989). An increase in number, size, and severity of stand-replacing fires (Dahm and Geils 1997, Swetnam and Betancourt 1998, Hardy et al. 1999) threatens both human and ecological communities (Moir and Dieterich 1988, U.S. General Accounting Office 1999). The aftermath of such fires includes short-term amplification of erosion and flooding (Agee 1993, White 1996, Robichaud et al. 2000).

Landscape scars created by total canopy destruction may persist as grasslands or shrublands for decades to centuries because ponderosa pine seed production and recruitment is erratic, and the relatively heavy, wingless seeds cannot disperse far from surviving, mature trees. For example, large portions of the 1950 A1 fire near Flagstaff, Arizona, USA, remain as grassland, and the 1953 Circle Cross Fire in the Sacramento Mountains, New Mexico, USA, contains much persistent shrubland (M. Savage, *unpublished data*). If the current trajectories of anthropogenically driven change continue, serious ecological damage to ponderosa pine ecosystems will accumulate (Covington et al. 1994, Noss et al. 1995).

These worrisome trends have long been evident to some forest scientists and ecologists (Weaver 1951, Cooper 1960). Only recently, however, has a broad scientific, social, and political consensus emerged that restoration of ecological sustainability in Southwestern ponderosa pine forests is necessary and urgent (Covington and Moore 1994, Covington et al. 1994, 1997, Suckling 1996, Nijhuis 1999). This social and political consensus has developed rapidly in response to recent major wildfire seasons, such as 2000, when $3 \times 10^6$ ha burned nationwide (Fig. 2). Although much of this burned area was in non-forested landscapes, or in high-elevation forest types that are adapted to high-intensity

fires (Morrison et al. 2000), ecologically worrisome crown fires in ponderosa pine and mixed-conifer forests were common, and are a chief focus of concern. Much of this concern also stems from the fact that urban encroachment into these pine-dominant forests is extensive and increasing.

Ecological restoration efforts in the United States have recently been proposed for millions of hectares of public lands by federal, state, and local government agencies (e.g., USDA Forest Service 2000, USDA and USDI 2000*a*, *b*, USDI 2000, Western Governors' Association et al. 2001, Marston et al. 2001, Matthews 2001). These restoration proposals generally seek to thin forests with combinations of tree harvesting and prescribed burning to increase resilience to natural disturbance events such as fires, insects, and regional drought, and thereby reduce the risk of catastrophic fire events.

Vigorous public and scientific debates have developed over the relative risks and trade-offs of different approaches to restore forests in the Southwest (Suckling 1996, Nijhuis 1999, Covington 2000, Kloor 2000, MacNeil 2000, Jenkins 2001), as in other regions (Brown 2000, Marston et al. 2001). Silvicultural approaches focused on tree harvest have been criticized based on concerns that short-term economics rather than ecological sustainability or decreasing fire hazard are the real underlying justifications of treatments. Although prescribed fire programs have been underway for several decades, the scale and intensity of these restoration efforts have been inadequate to reverse the overall trends of degradation in Southwestern pine forests. Concerns about excessive smoke and the risks of prescribed burning (highlighted by the Cerro Grande Fire of 2000) have also constrained public support for the use of fire alone as a restoration treatment.

## A Broad Restoration Perspective

In this paper we offer a broad perspective on ecological restoration of Southwestern United States ponderosa pine forests. We propose not so much a contrast from current models as an expanded view that encompasses and supports a diverse range of scientifically viable restoration approaches. This includes the current, most widely debated and applied Southwestern ponderosa pine model, which involves a relatively precise restoration of presettlement stand structures (Moore et al. 1999). There is a clear need for reference-based approaches that integrate structure, composition, and ecosystem processes. Such restoration models need to be adequately flexible to address the diverse ecological and social conditions in Southwestern forests. We believe that the practice of ponderosa pine restoration will be best served by a variety of approaches across a broad range of forest settings.

Ecological restoration aims to enhance the resilience and sustainability of forests through treatments that incrementally return the ecosystem to a state that is within an historic range of conditions, known as the "natural range of variability" (Landres et al. 1999). The Society for Ecological Restoration (Tucson, Arizona, USA) offers the following definition of "*ecologial restoration*: 'the process of assisting the recovery and management of ecological integrity. Ecological integrity includes a critical range of variability in biodiversity, ecological processes and structures, regional and historic context, and sustainable cultural practices.' "[11] Several key issues suggest a need for a broad perspective on ecological restoration of Southwestern forests: high levels of natural heterogeneity across forest landscapes; current and future conditions that may fall outside the natural range of variability; wildlife habitat and other biodiversity considerations; and our imperfect understanding of these complex systems. We focus here on ecological considerations in ponderosa pine forest restoration, acknowledging that the success of restoration programs also requires political, financial, and social support. Our intent is not to exclude such dimensions, but to clarify the scientific basis for forest restoration programs.

### *The importance of heterogeneity in time and space*

Ecological restoration requires an understanding of, and respect for, the variability of ponderosa pine ecosystems across the Southwest. These forests are created by dynamic interactions among natural processes (such as fire) and forest structure (such as tree density and canopy openings), across variable landscapes. Regeneration and disturbance patterns interact with long- and short-term climate fluctuations and human activities to influence fire frequency, intensity, size, seasonality, and severity (Baisan and Swetnam 1997, Swetnam and Betancourt 1998, Kaye and Swetnam 1999, Grissino-Mayer and Swetnam 2000). Forest patterns and processes often exhibit lagged interactions with climate fluctuations, along with substantial inertia in the face of climate change. Consequently, forests often exist in disequilibrium with current climate.

Variability in structure and process means that patterns of stand density, species composition, and disturbance regimes differ significantly across landscapes and throughout the region. Ponderosa pine grows across a 1500-m elevational gradient in many mountain ranges (e.g., Allen and Breshears 1998), with at least 21 different ponderosa pine "habitat types" recognized across diverse landscape conditions in the Southwest (Alexander and Ronco 1987). Documented pre-1900 mean fire-return intervals varied from about 4 to 36 yr in Southwestern ponderosa pine forests (Swetnam and Baisan 1996). Post-suppression species compositions have been markedly affected by increased recruitment of fire-sensitive *Pinus edulis* (piñon) and juniper species at low elevations and mixed-conifer species at higher elevation (Fig. 1). Mature tree densities (>30

[11] URL: ⟨http://www.ser.org⟩

Case No. 1:23-cv-01501-RMR Document 15-2 filed 09/29/23 USDC Colorado pg 110 of 367






FIG. 3. Schematic representation of the restoration concept. If the natural range of variability is seen as a multidimensional ''envelope'' of ecological conditions, then the goal of restoration is to move an altered ecosystem back toward its pre-disruption envelope (the darkest region), and to allow natural processes over time to dynamically reestablish a range of natural structural conditions.

cm [12 inches] in diameter at breast height) measured ca. 1900 AD in Southwestern pine ecosystems ranged between 19 and 126 trees/ha (8–51 trees/acre) (Woolsey 1911), whereas today densities of all live stems often exceed 2470 trees/ha (1000 trees/acre) (Allen 1998; D. Falk, *unpublished data*).

This variability in ponderosa pine forests affects management approaches, as recognized by Pearson (1950:13): ''Foresters are constantly reminded that since conditions change from one place to another, management cannot be uniform.'' Ecological restoration should recognize and retain the natural heterogeneity characteristic of presettlement forests (White and Walker 1997). Given the heterogeneity of Southwestern ponderosa pine forests, identifying general ecological reference conditions for restoration goals can be difficult, if not arbitrary.

### *Use of the natural-range-of-variability concept for restoration*

The concept of ''natural range of variability'' has some theoretical flaws and practical limitations (Landres et al. 1999, Millar and Wolfenden 1999, Swetnam et al. 1999), but nevertheless has proven useful as a framework for evaluating the current status of ecosystems relative to past conditions, and for identifying ecologically justifiable restoration goals (Kaufmann et al. 1994, Morgan et al. 1994, White and Walker 1997, Landres et al. 1999). Southwestern forests experienced some level of human influence for thousands of years, but human-caused changes in ponderosa pine after 1850 far exceeded the influence of indigenous people (Covington et al. 1994, Kaye and Swetnam 1999, Allen 2002). In particular, the cessation of the historical regime of frequent, low-intensity fires has pushed structural characteristics of many forests well outside the natural range of variability that existed over the past millennium (Swetnam et al. 1999).

Ponderosa pine restoration treatments should be designed to reestablish trends in forest processes, particularly fire, leading to natural ranges of variation in composition and structure (Landres et al. 1999, Moore et al. 1999, Stephenson 1999). If the natural range of variability is seen as an envelope of conditions, then the goal of restoration is to move an altered ecosystem toward its pre-disruption envelope, and to allow, or use, natural processes over time to dynamically reestablish diverse natural structures (Fig. 3).

In the long term, the best way to align forest conditions to track ongoing climate changes is to restore fire, which naturally correlates with current climate. Some stands need substantial structural manipulation before fire can safely be reintroduced, but in many cases fire can then do the preponderance of the work of ecological restoration, recreating the natural interaction of structure and process.

The successful reintroduction of frequent surface fire in the Gila Wilderness, New Mexico, USA, exemplifies how incremental fire treatments can achieve substantial restoration of ponderosa pine forests. Detailed quan-

titative studies of before-and-after forest densities are lacking, but qualitative observations (including repeat photographs) by knowledgeable fire managers (Webb and Henderson 1985; P. Boucher and R. D. Moody, *unpublished report* [1996] to the Gila National Forest [Silver City, New Mexico, USA]) and fire scientists (Rollins 2000; T. W. Swetnam, *personal observations*) suggest that repeated natural fire use (as many as four events since 1975 in some areas) have successfully opened up ponderosa pine stands, and helped to reestablish grassy understories. A key to the Gila's success was a sufficiently large area where smoke and threats of occasional flare-ups during the burning season (sometimes months) do not threaten urban areas. Another key to this success was that managers were patient and incremental in implementing the burning program; most of the large fires were initially allowed to burn only during the relatively cool and wet season after the start of the Southwest monsoons in July or August. Although such large, roadless areas are uncommon, the Gila's example shows that mechnical thinning is not always a prerequisite for forest restoration treatments with fire.

Restoration aims to eventually move forests back to within the natural range of variability. However, this need not necessarily be accomplished in the first treatment or tied to a particular moment in time or past forest structure. Initial treatments can be designed to markedly decrease crown fire risks at stand and landscape scales by decreasing the continuity of hazardous fuel conditions. Conservative initial treatments would be the minimum necessary to reduce vulnerability to stand-replacement fire to an acceptable level. We propose that conservative, incremental treatments involving both mechanical thinning and fire over time periods of years to decades are ecologically appropriate and advisable for many Southwestern forests.

There is a clear need to begin widespread restoration treatments now to reduce the threat of catastrophic fire. Such treatments should use a variety of prescriptions and treatments to address trade-offs and produce diverse restoration outcomes. For example, restoration back to presettlement tree densities through intensive thinnings greatly reduces risk of crown fire spread in areas of concentrated treatment (Fulé et al. 2001), but may generate more slash surface fuels initially than lighter thinnings. Large slash loads can exacerbate the short-term fire hazard unless mitigated (Graham et al. 1999), which can be expensive and/or have substantial environmental effects (e.g., machine crushing slash into the ground surface). Less intensive treatments, sufficient to reduce crown fire risk and strategically placed to interrupt continuous fuels, may be able to more quickly address a larger proportion of the regional forest. While practical and economic considerations, such as direct risk to human communities, may drive treatment strategies in some situations, long-term ecological goals should also guide treatment actions if ecological restoration is desired. Incrementally thinning ponderosa forests over a period of years using varied combinations and intensities of chainsaws and fire may effectively reduce fire risks while maintaining ecological integrity.

### *Biodiversity considerations*

Southwestern ponderosa pine forests provide habitat for at least 250 species of vertebrate animals (Patton and Severson 1989, New Mexico Department of Game and Fish 2000), as well as many plants. When restoration treatments modify the physical and biotic environment, plants and animals are affected in various ways (Rieman and Clayton 1997, Oliver et al. 1998; W. W. Covington, A. Waltz, P. Fulé and G. Verkamp, *unpublished report* to U.S. Bureau of Land Management, Arizona Strip District). Of particular concern is the potential for restoration actions to reduce the viability of metapopulations of sensitive species through habitat alteration and fragmentation (Stacey et al. 1996, U.S. Fish and Wildlife Service 1998, Holthausen et al. 1999). This includes invertebrates and soil organisms that are critical to ecosystem function.

An incremental approach to restoration provides opportunities for the adjustment of future treatments based on wildlife responses, so as not to foreclose future options. Restoration projects should strive to minimize or spatially constrain adverse impacts to rare, sensitive, and declining species. Care should be taken to ensure that adequate habitat is maintained for sensitive species during the phase between initial treatment and final restoration.

Not all wildlife habitat elements are equally vulnerable or irreplaceable. For example, large oak trees grow slowly and are especially valuable habitat for a wide array of wildlife (Rosenstock 1998). Some areas should be left untreated to serve as habitat refuges during the stress of treatments, until new landscape conditions are known to provide adequate habitat.

Native plants and animals are adapted to the naturally high levels of heterogeneity in Southwestern ponderosa pine ecosystems, and some species are dependent upon diverse habitats for their survival (e.g., Reynolds et al. 1992, U.S. Fish and Wildlife Service 1995, Dodd et al. 1998). Thus, biodiversity considerations reinforce the need to avoid creating uniform stand and landscape conditions. A diverse landscape with patches of variable tree densities, including some areas of relatively high density, should be developed to accommodate species with different habitat adaptations. Retaining some dead, deformed, and diseased trees, and some clumps of large trees with interlocking crowns, will maintain structural complexity and important food and nesting habitat (Bennetts et al. 1996, Bull et al. 1997). Such trees are important elements of genetic diversity in their own right as well (Millar and Libby 1989, Rehfeldt 1991, Ledig 1992).

Restoration activities often involve biodiversity

trade-offs, particularly in the short term and at the local scale. For example, snags and downed logs provide essential habitat for many birds and mammals (Bull et al. 1997), but these woody structures are susceptible to destruction in restoration treatments, especially from fire (Tiedemann et al. 2000). However, restoration treatments also provide opportunities to increase habitat heterogeneity and biodiversity. For example, where large snags are scarce because of past management activities, new ones will be created through fire mortality and other disturbances as forests are restored (Pearson 1950). The restoration of more diverse habitat structures and of natural processes such as surface fire and associated nutrient cycling should help many native species (cf. Johnson and Wauer 1996; W. W. Covington, A. Waltz, P. Fulé, and G. Verkamp, *unpublished report* to U.S. Bureau of Land Management, Arizona Strip District). The increased vigor and diversity of native understory plant species after restoration will provide important habitat conditions for many kinds of animals (e.g., Waltz and Covington 1999) and hopefully increase resistance to ongoing and future invasions by exotic plants (Crawford et al. 2001).

### *Scientific uncertainty and the limitations of historical reference conditions*

Ecological restoration must recognize the limits of scientific knowledge. While a large body of research exists on ponderosa pine forests, we are still limited in our understanding of ecosystem function. Historical fire frequency is often the most reliable element of our reconstructions, although it too has limitations (Swetnam et al. 1999). We know less about past distributions of fire size, severity, and spatial pattern than we do about frequency (Morgan et al. 2001). Swetnam and Baisan (1996) and Baker and Ehle (2001) discuss uncertainties and biases associated with the sampling design and data analyses of fire-scar studies.

Uncertainties in the reconstruction of forest stand composition and spatial structure result from missing evidence, such as logs and stumps removed by fire, logging, and decay (M. M. Moore, D. W. Huffman, W. W. Covington, J. E. Crouse, P. Z. Fulé, and W. H. Moir, *unpublished report* to USDA Forest Service, Rocky Mountain Station, Flagstaff, Arizona). Reconstruction of the density and location of large trees is far more reliable than of small-diameter stems and seedlings that decompose rapidly or burn even in surface fires (Stephenson 1987). Reconstructed overstory-tree densities are thus best used conservatively as minimum values for establishing quantitative restoration targets for stand density, rather than as maxima. Knowledge of other ecological conditions in the past, such as wildlife population dynamics, may be highly uncertain because available methods preclude precise reconstructions. Uncertainty will also exist because society is unlikely to invest in the development of detailed reconstructions of past stand structures and fire histories for every restoration site, suggesting the need for site-specific flexibility to develop restoration targets based upon an inferred natural range of variability in stand conditions.

A sense of urgency in reducing the threat of destructive fires should be balanced with patience in accomplishing restoration, along with major commitments to thoughtful experimentation and monitoring to ensure we learn as rapidly as possible. Restoration science is young, and it is difficult to predict the results of our actions. Application of a broad restoration perspective, implemented through a variety of alternative treatments, will be more effective than any single restoration treatment.

## Principles for Ecological Restoration of Southwestern Ponderosa Pine Forests

Here we outline 16 broad principles for restoration of Southwestern United States ponderosa pine forest ecosystems. Application of these principles will foster implementation of a diverse range of ecologically justifiable restoration projects. While focused on ponderosa pine forests, these principles also apply more generally to other forest types in the Southwest, such as some piñon–juniper and mixed-conifer forests.

1) *Reduce the threat of crown fire*.—A key restoration priority must be the rapid reduction of the widespread risk of unnatural crown fires, both within stands and across landscapes. The initial treatment on any site should be substantial enough to decrease forest vulnerability to stand-replacing fire.

2) *Prioritize and strategically target treatment areas*.—Key considerations for prioritizing restoration treatment areas are degree of crown fire risk, proximity to human developments and important watersheds, protection of old-growth forests and habitats of sensitive species, and strategic positioning to break up landscape-scale continuity of hazardous fuels (Weatherspoon and Skinner 1996, Agee et al. 2000, Finney 2001). For example, a landscape of alternating north- and south-facing ridges could have restoration treatments focused on the south-aspect sites to reduce the continuity of hazardous fuels at the landscape scale, and thereby restore more natural conditions at both site and landscape scales.

3) *Develop site-specific reference conditions*.—Site-specific historical ecological data can provide information on the natural range of variability for key forest attributes, such as tree age structure and fire regimes, that furnish *local* ''reference conditions'' for restoration design. A variety of constraints, however, prevent the development of historical information on every hectare of land needing restoration. General goals should be to restore ecological integrity and functioning, rather than precise stand structural conditions as they existed at a particular point of time in the past.

4) *Implement multiple conservative interventions*.—Incremental restoration through multiple treatments is a conservative approach to achieving desired changes.

Restoration treatments should strive to use the least disruptive techniques, and balance intensity and extensiveness of treatments. In many areas, conservative initial treatments would be the minimum necessary to adequately reduce the threat of unnatural crown fire. For example, a conservative strategy would be the placement of treatment areas to interrupt fuel continuities and thereby reduce overall landscape risk of extensive crown fires, despite treating only a small fraction of the landscape (Agee et al. 2000). Fires ignited by lightning or by people under carefully prescribed conditions may be sufficient to reestablish natural conditions in many locations (e.g., in the Gila Wilderness of New Mexico [USA]). In the extensive areas where fire alone cannot safely reduce tree densities and hazardous ladder fuels, mechanical thinning of trees will be needed before the introduction of prescribed fire. Patient, effective treatments will provide more options for the future than aggressive attempts to restore 120 yr of change at once. In certain areas, however, such as some urban–wildland interfaces, trade-offs with imminent crown fire risks require consideration of rapid, heavy thinning of most small-diameter trees.

5) *Utilize existing forest structure*.—Restoration efforts should incorporate and build upon valuable existing forest structures such as large trees and groups of trees of any size with interlocking crowns. These features are important for some wildlife species, such as Abert's squirrels and goshawks, and should not be removed completely just to recreate specific historical tree locations. Since evidence of long-term stability of precise tree locations is lacking, the selection of ''leave'' trees and tree clusters in restoration treatments can be based on the *contemporary* spatial distribution of trees, rather than pre-1900 tree positions. Historical forest structure conditions can be restored more quickly by maximizing use of existing forest structure. Leaving some relatively dense within-stand patches of trees need not compromise efforts to reduce landscape-scale crown fire risk.

Gus Pearson, the patriarch of ponderosa pine silviculture in the Southwest, recognized the need to be flexible and use existing stand structures. Pearson (1950:29) stated that the use of theoretical tree-density distributions as guides for silvicultural treatments ''are for application in principle rather than in letter, because the stands must be taken as found and remedies must be sought in modification rather than reconstruction.'' This is also true for ecological restoration.

6) *Restore ecosystem composition*.—Where fire suppression has allowed fire-sensitive tree species like junipers or white fir to become abundant in historical ponderosa pine forests, treatments should set a trend toward restoring dominance of the more fire-resistant ponderosa pines. However, mechanical removal of all fire-sensitive invaders is inappropriate, given the heterogeneous and dynamic nature of these forests. Restoration of fire may eventually restore locally appropriate forest tree composition and structure (Miller and Urban 2000).

Missing compositional elements, such as herbaceous understories or extirpated vertebrates and invertebrates, also require restoration attention. The forest understory, including shrubs, grasses, and forbs, is an important ecosystem component that directly affects tree regeneration patterns, fire behavior, watershed functioning, wildlife habitat, and overall patterns of biodiversity. Similarly, soil organisms are vital elements that can influence community composition and dynamics (Hole 1981). A robust understory provides a restraint on tree regeneration and is essential for carrying surface fires. The establishment and maintenance of more natural patterns of understory vegetation diversity and abundance are integral to ecological restoration. Understories should be protected from overgrazing during restoration to allow full recovery of herbaceous biodiversity and biomass, and of associated ecosystem components and processes such as pollinators and surface fires.

The implementation of restoration treatments requires special care to protect soils and watersheds (Jurgensen et al. 1997, Rieman and Clayton 1997). Minimizing mechanical disturbance of soils and avoiding the construction of new roads will minimize sedimentation, disruption of surface runoff, and other detrimental ecosystem effects (Trombulak and Frissell 2000). Minimizing ground disturbance also will reduce impacts to the numerous archeological sites found in many Southwestern forests.

7) *Retain trees of significant size or age*.—Large and old trees, especially those established before ecosystem disruption by Euro-American settlement, are rare, important, and difficult to replace. Their size and structural complexity provide critical wildlife habitat by contributing crown cover, influencing understory vegetation patterns, and providing future snags. Ecological restoration should protect the largest and oldest trees from cutting and crown fires, focusing treatments on excess numbers of small young trees. Given widespread agreement on this point, it is generally advisable to retain ponderosa trees larger than 41 cm (16 inches) dbh and all trees with old-growth morphology regardless of size (i.e., yellow bark, large drooping limbs, twisted trunks, flattened tops). Despite the heterogeneity of forest site and stand conditions in the Southwest, cutting of larger trees will seldom be ecologically warranted as ''restoration'' treatments at this time due to their relative scarcity. Following this guideline would significantly reduce hazards of stand-replacing fires in most cases and also favor the development of future old-growth forest conditions (Moir and Dieterich 1988, Harrington and Sackett 1992). Public concern about forest manipulation would also be reduced by ensuring that ''large'' trees are not being targeted.

Some ponderosa pine forests contain extremely old trees and dead wood remnants that may be small but

are important because they contain unique and rare scientific information in their growth rings (Grissino-Mayer et al. 1997). Such trees have become increasingly scarce in the late 20th century, and the initial reintroduction of fire often consumes these tree-ring resources. Restoration programs should identify, inventory, sample, and preserve them where possible.

8) *Consider demographic processes*.—The underlying processes of natural tree regeneration and mortality should be incorporated in restoration design. Southwestern conifer regeneration occurs in episodic, often region-wide pulses, linked to wet–warm climate conditions and reduced fire occurrence (Savage et al. 1996, Swetnam and Betancourt 1998, Mast et al. 1999). Periods with major regeneration pulses in the Southwest during the 20th century include the 1910s–1920s and 1978–1998 (Savage et al. 1996, Swetnam and Betancourt 1998). Some of this regeneration would have survived under natural conditions. Restoration efforts should retain a proportion of these cohorts, toward the goal of maximizing options for ecosystem resiliency.

9) *Integrate process and structure*.—Ecological sustainability requires the restoration of process as well as structure (Stephenson 1999). Natural disturbance processes, including fire, insect outbreaks, and droughts, are irreplaceable shapers of the forest. In particular, fire regimes and stand structures interact and must be restored in an integrated way; mechanical thinning alone will not reestablish necessary natural disturbance regimes. At the same time, fire alone may be too imprecise or unsafe in many settings, so a combination of treatments may often be the safest and most certain restoration approach.

Perhaps the single best indicator of whether a proposed approach should be considered as ''ecological restoration'' of a ponderosa pine forest is to evaluate whether the treatment will successfully restore surface fire as a keystone process. Approaches that do not include an explicit and long-term commitment to restore frequent surface fire fail to merit the adjective ''ecological.''

10) *Control and avoid using exotic species*.—Seeding of exotic grasses and forbs should be prohibited as ecologically incompatible with good restoration. Once established, exotic species can be extremely difficult or impossible to remove. Even seeding with native species from commercial sources risks the near certainty of exotic weed contaminants and the establishment of non-local genotypes at the expense of locally evolved and adapted genotypes. The common use of annual cereal crops such as rye and barley that typically decline to low levels within a matter of years still leaves persistently altered ecosystems through ''the ghost of competition past,'' as their initial flush of growth tends to monopolize the soil resources, reduce the success of native plants (Barclay 2000), and alter long-term successional outcomes.

If enhancement of herbaceous vegetation is needed, using locally hand-collected wild seeds or transplanting individuals from nearby areas into treatments to serve as seed sources is slower and more expensive, but ecologically safer. In general, it is ecologically desirable to avoid seeding, and to instead allow native herbaceous vegetation to recover incrementally through natural processes of dispersal and establishment after restoration treatments.

The widespread practice of seeding exotic grasses to ''rehabilitate'' watersheds after severe fires could be largely eliminated by preemptive restoration treatments that reduce fire severity and foster recovery of native herbaceous ground cover before crown fires occur. Restoration treatments should also routinely incorporate early actions to control the establishment and spread of aggressive exotics that can be expected from restoration-related site disturbance (Crawford et al. 2001). Control actions should include active detection efforts to identify infestations at an early phase, and treatments ranging from hand-pulling to the careful spot application of biodegradable herbicides.

11) *Foster regional heterogeneity*.—The Southwest is a region of complex topography, hydrology, and soils. As a result, biological communities vary at local, landscape, and regional scales, and so should restoration efforts. Ecological restoration should also incorporate the natural variability of disturbance regimes across heterogeneous landscapes. Heterogeneity should be fostered in planning and implementing ecological restoration at all spatial scales, including within and between stands, and across landscape and regional scales.

12) *Protect sensitive communities*.—Certain ecological communities embedded within ponderosa pine forests, such as some riparian areas, could be adversely affected by on-site prescribed burning or mechanical thinning. Restoration efforts should protect these and other rare or sensitive habitats, which are often hotspots of biological diversity, particularly those that are declining in abundance and quality in the region.

13) *Assess cumulative effects*.—It is important to consider and plan for the cumulative effects of restoration work, since these efforts will take place synchronously throughout large areas in the Southwest. Restoration projects will also occur within a regional context of other human actions such as timber sales, private land developments, roads, and livestock grazing. These land uses have varied impacts at all scales, and often uncertain interactions with restoration efforts must be considered cumulatively.

14) *Protect from overgrazing*.—Grass, forb, and shrub understories are essential to plant and animal diversity and soil stability. Robust understories are also necessary to restore natural fire regimes and to limit excessive pine seedling establishment (Rummell 1951, Madany and West 1983). Where possible, defer livestock grazing after initial surface fire treatment until the herbaceous layer has fully recovered (Belsky and

Case No. 1:23-cv-01501-RMR Document 15-2 filed 09/29/23 USDC Colorado pg 115 of 367



TABLE 1. Variables that should be considered in the development of an ecological restoration plan. Each restoration project will have a unique plan, based on locally appropriate choices for each variable, reflecting local priorities and the diversity of ponderosa pine forests in the region.

| |
|---|
| Post-treatment structure: age, size, density |
| Stem density, by size class |
| Basal area ($m^2$/ha), by size class |
| Crown cover (%) |
| Snags and down logs (no./ha, mass/ha), by size class |
| Thinning size cap (i.e., maximum-diameter tree removed) |
| Old tree protection measures (e.g., removal of basal fine fuels and ladder fuels; removal of competing understory stems) |
| Composition |
| Retention of fire-sensitive or shade-tolerant native tree species |
| Existing canopy trees (%) |
| Understory recruitment (%) |
| Control or elimination of non-native understory species |
| Spatial configuration |
| Distribution of mature trees, random to clustered |
| Reliance on presettlement cluster locations for post-treatment configuration |
| Use of existing tree clusters in post-treatment configuration |
| Retention of heterogeneous (spatially variable) structure and density at stand and landscape scales |
| Ecosystem processes and disturbances |
| Restoration of natural or prescribed fire regime |
| Projected post-treatment distribution of fire intervals (e.g., mean and range) |
| Post-treatment livestock grazing regime |
| Overall restoration plan |
| Site-specificity of treatment prescription |
| Time span over which thinning treatments are implemented |
| Number of restoration-treatment entries |
| Long-term monitoring commitment |
| Monitoring components (e.g., plants, animals, soil, water) |
| Level of detail of measurements |
| Frequency of measurements |
| Duration of measurements |
| Adaptive management loop in decision process |

Blumenthal 1997). Prevention of overgrazing must be an integral part of ponderosa pine forest restoration.

15) *Establish monitoring and research programs*.—Given the uncertainties about effects of restoration treatments, well-designed monitoring, research, and documentation programs are essential if we are to learn from, and evaluate the success or failure of, ongoing restoration efforts. Wildlife and understory plant populations can be monitored as indicators of ecological change and restoration outcomes. Monitoring programs must be put in place before treatments begin, and must evaluate responses of key ecosystem components and processes at multiple scales (Covington and Moore 1994, Covington et al. 1997). Even better, when possible, restoration projects should be set up as experiments with replicates and controls to test alternative hypotheses (Covington et al. 1997). One benefit of the perspective proposed here is that it will test the ecological effects of restoration efforts across a wide range of treatments and prior forest conditions. The locations and prescriptions for all restoration treatments should be archived in a geographic information system (GIS), so that land managers and researchers now and into the future have access to site-specific records of restoration treatments.

16) *Implement adaptive management*.—Ecological restoration is an incremental process that may take a century or two to fully achieve. It requires a long-term management commitment, especially to maintain natural fire regimes and to protect and develop old-growth stands. Restoration will be most successful where land managers learn from treatment experiences and adaptively adjust their approaches through time (Holling 1978). Extended social and fiscal support will be needed to sustain such long-term restoration programs.

Conceptually, each of the restoration principles outlined above can be thought of as describing one or more axes of variation. For example, intensity of thinning treatment, heterogeneity within the treatment area, post-treatment species composition, experimental unit size, fidelity to location of existing tree clusters, and post-thinning fire frequency constitute design variables for restoration (Table 1). Thus, the principles describe a set of key dimensions in the design of restoration treatments, and any particular project will choose a unique set of values for the variables. These principles

Case No. 1:23-cv-01501-RMR Document 15-2 filed 09/29/23 USDC Colorado pg 116 of 367



support implementation of a diverse range of ecological restoration projects.

## Ecological Perspectives on Several Forest Restoration Approaches

As debate over restoration of Southwestern United States forests has intensified (Njjhuis 1999, Jenkins 2001), a variety of philosophies and approaches are being presented that differ in their core perspectives and probable on-the-ground outcomes. These approaches include emphases on: (a) fire-risk reduction, (b) economics, (c) natural regulation, and (d) structure-oriented restoration. Here we provide some reflections from an ecological perspective on these varying restoration approaches.

### *Fire risk reduction*

Concerns over catastrophic crown fire impacts to human communities and ecosystems, along with the current availability of substantial funding to reduce hazardous forest fuel conditions (see the National Fire Plan [USDA and USDI 2000*a*]), have the potential to drive ecologically insensitive projects, which are not really restorations. If the primary objective of a project is solely to reduce crown fire risk (which may be an appropriate societal goal in some areas), even ''successful'' treatments may further damage forests rather than restoring them. When ecological principles are applied, however, fire risk reduction can be an essential part of ''ecological restoration'' of ponderosa pine forests (Fulé et al. 2001).

### *Economics*

Concerns exist that legitimate and desirable economic goals, such as sustaining rural economies and minimizing subsidy costs, could also lead to ecologically insensitive thinning or logging projects masquerading as forest ''restoration'' (Hanson, 2000, Jenkins 2001, National Forest Protection Alliance 2001). Projects focused on economic outcomes do not qualify as ''ecological restoration'' unless the treatments are based on ecological principles.

However, if ecological principles are used then economic utilization of forest products may enhance forest restoration. For example, restoration treatments will occur sooner and over larger areas if some costs can be recovered through the sale of wood from small-diameter stems. Restoration can be an opportunity for the re-engagement of local communities in the creation of more sustainable forest-based economies (e.g., see the Community Forest Restoration Act of 2000).

### *Natural regulation*

One perspective on Western forests believes that: (1) stand-replacing fires do not cause severe ecological damage because crown fires are natural; and (2) the forests will heal themselves best if we take a hands-off approach and allow natural processes to function with minimum interference (Wuerthner 1999).

Extensive stand-replacing fires naturally occurred in many western forest types (Agee 1993), but not in Southwestern ponderosa pine forests (Swetnam and Baisan 1996). Recent fire history studies in the Black Hills of South Dakota (USA) (Shinneman and Baker 1997) and in the Front Range of Colorado (USA) (Brown et al. 1999) suggest that ponderosa pine forests in those regions may have sustained crown fires of unknown size in the presettlement era. Although no such evidence has been reported for Southwestern ponderosa pine forests, it is possible that localized crown fires were not unknown in this forest type before 1900. Certainly, fire effects are always variable, and even modern crown fires do not have uniformly devastating effects across all burned landscapes. However, the increasingly large crown fires of recent years in ponderosa pine forests are clearly resulting in extreme hydrological, geomorphic, and ecological responses, including amplified flooding (Veenhuis 2002), accelerated soil erosion and stream channel changes (White 1996, Robichaud et al. 2000), loss of old-growth forest (e.g., the Cerro Grande Fire affected much old-growth forest, including large portions of a ∼15 mile$^2$ contiguous patch where essentially all trees were killed [C. Allen, *personal observations*]), increasing abundance of invasive exotics (Crawford et al. 2001), and conversion of forests to different vegetation types (M. Savage, *unpublished data*). The current state of ecological and historical knowledge of Southwestern ponderosa pine forests provides compelling justifications to actively manage to restore more resilient and sustainable conditions (Covington and Moore 1994, Swetnam et al. 1999).

### *Presettlement structure restoration*

The most substantial scientific work to address the need for restoration of Southwestern ponderosa pine forests and to determine the ecosystem effects of treatments has been made by Covington and co-workers at the Ecological Restoration Institute of Northern Arizona University (Kaye and Hart 1998; W. W. Covington, A. Waltz, P. Fulé, and G. Verkamp, *unpublished report* to U.S. Bureau of Land Management, Arizona Strip District). Their efforts have focused on attempts to reconstruct and reestablish specific stand reference conditions that existed just prior to the date of cessation of the natural fire regime (Moore et al. 1999). The goal has been to replicate tree densities and spatial patterns as accurately as possible for sites where presettlement stand structures have been reconstructed. Conceptually, this approach takes a broad view of ''reference conditions,'' and incorporates the restoration of surface fire as a key process. However, there are some ecological issues concerning on-the-ground implementation of this approach.

The choice of a specific moment in time as the initial

restoration target—for example the date of the last widespread fire in the late 1800s (Moore et al. 1999)—is potentially problematic. Any particular moment is unique in the long-term history of an ecosystem, and forests often exist in disequilibrium with current climate to some degree (Millar and Woolfenden 1999). Moreover, an increasing body of evidence indicates that late 20th century and current climate is unprecedented on a time scale of at least 1000 yr (Mann et al. 1998, Crowley 2000).

Restoration of structural characteristics of a forest back to the date of the last widespread fire in the late 19th century implies that tree recruitment processes of the 20th century were entirely unnatural. In fact, postsettlement tree regeneration pulses would have contributed important structural elements to contemporary forests, even if tree-thinning surface fires had continued. It is difficult to estimate what proportion of these cohorts, much less which individual trees, would have survived to maturity (Mast et al. 1999). It may be unwise to automatically choose a century-old date as a regional target condition for current forests, as the replication of plant densities and spatial arrangements that existed at any particular date in the past may compromise ecosystem resilience in future decades and centuries. For example, this structure-oriented approach can result in the aggressive removal of too many trees during the initial entry, which may seriously constrain ecosystem response and management options. Given their relatively slow growth rates, existing trees represent a form of biological capital that should be conserved. Multiple, incremental treatments, using combinations of fire and thinning, may be more conservative and ecologically justifiable than the immediate restoration of a particular structural element, such as the ca. 1880 spatial distribution of overstory tree stems.

Given the great heterogeneity of Southwestern ponderosa pine forests, local data on fire history and presettlement stand structures are required to implement this precise structural restoration approach. Collecting such data is expensive and requires the persistence of presettlement forest ‘‘evidences’’ (Fulé et al. 1997), which have been lost in some locations due to logging, harvesting of fuelwood, fire, or decay. As a result, it is not practical, cost effective, or in some cases even possible to reconstruct detailed structural reference conditions for every restoration project area. Moreover, some important data (such as density and spatial distribution of small trees) cannot be reconstructed from remnant historical evidence.

A structure-oriented approach to forest restoration is being proposed for wide implementation in the Southwest because of its methodological clarity, grounding in quantifiable conditions, and scientific and political support (Covington et al. 1997, Moore et al. 1999, Jenkins 2001). We consider historic structure to be one ecologically valid reference criterion for forest restoration. There are, however, theoretical and practical concerns over regional application of a structure-oriented approach (see Morgan et al. [1994], Kaufmann et al. [1994], Landres et al. [1999], Wagner et al. [2000], and Southwest Forest Alliance [2001] for reviews and discussions). We contend that a broader conceptual basis, as outlined in this paper, provides a more comprehensive framework, and one that reflects the diverse ecological conditions that exist in Southwestern forests. We agree with Covington (2000:136) that there is no ‘‘‘one size fits all’ approach to restoring the ecological integrity of ponderosa pine forests.’’ A diversity of restoration approaches should be applied in the Southwest.

## Conclusions

A primary goal of ecological restoration should be to enhance resilience and sustainability of ecosystems. Incremental adjustment of ecosystems back within an envelope of natural range of variability should achieve this goal (Covington and Moore 1994, Holling and Meffe 1996, Stephenson 1999). A successful restoration is one that sets ecological trends in the right direction. In Southwestern ponderosa pine ecosystems this means reducing tree density and ladder fuels along with associated crown fire risk, protecting large trees, restoring surface fires, and increasing herbaceous ground cover and overall biodiversity levels. A conservative restoration program would incorporate natural variability by avoiding uniform treatments across extensive areas. Spatial heterogeneity is critical to forest biodiversity. Existing forest structures, such as tree groups and large trees, should not be removed simply to recreate historical tree spatial patterns. While historical reference conditions are useful for identifying the types, magnitudes, and causes of ecosystem change, such reconstructions are best used as general guides rather than as precise and rigid prescriptions (Landres et al. 1999).

Theories of restoration ecology and the practice of ecological restoration are evolving rapidly. We propose not so much a departure from current models as a broader framework that encompasses a diversity of approaches. Restoration science cannot proceed without empirical tests and experimentation across a broad range of conditions, and restoration practice needs to incorporate new insights derived from the scientific and practical creativity of many individuals and institutions. We need steady progress in restoration science in order to sustain the social, political, and financial support required for an effective regional restoration program. Some restoration experiences, however, will probably prove humbling, as our knowledge and methods will always be imperfect.

Risks and trade-offs are inherent in wildland management. For example, a controversial trade-off involves consideration of merchantable timber harvest as part of restoration. Commercial activities can help fund restoration of less hazardous forest fuel conditions

more quickly, but raise the risk of extractive economic imperatives dominating decision making about ''restoration'' activities.

We need to begin large-scale restoration of ponderosa pine ecosystems now. The present vulnerability of these forest ecosystems requires that we temper our need for more complete information with an urgency created by the current risk of crown fires. Even restoration failures at this point can provide information useful in refining future work, as long as we simultaneously invest in research and monitoring. At the same time, we must be cautious in our application of restoration treatments. We must manage for surprise, whether from climate variability, human influences, or the synergies among known and unknown factors. It would be prudent to incorporate buffers for uncertainty in restoration work. Impatience, extractive economics, or hubris could lead to widespread application of unduly intrusive treatments that could further damage forest ecosystems. The broad perspective outlined here supports vigorous but conservative approaches for immediately reducing crown fire risk and restoring natural variability and long-term resilience to ponderosa pine forest ecosystems in the American Southwest.

## Acknowledgments

We appreciate the efforts of colleagues at the Grand Canyon Forest Partnership and the Ecological Restoration Institute of Northern Arizona University to share their restoration experiences and perspectives, especially Pete Fulé, Wally Covington, and Brad Ack. Carl Edminster, Bill Block, Jon Keeley, Peter Landres, Dave Parsons, Phil Weatherspoon, and an anonymous reviewer provided helpful comments on earlier versions of this paper. This material is based upon work supported by the USDA Forest Service, U.S. Geological Survey, Wilburforce Foundation, Laird Norton Foundation, New Mexico Community Foundation, and the National Science Foundation under Grant number SBR-969410.

## Literature Cited

Agee, J. K. 1993. Fire ecology of Pacific Northwest forests. Island Press, Covelo, California, USA.

Agee, J. K., B. Bahro, M. A. Finney, P. N. Omi, D. B. Sapsis, C. N. Skinner, J. W. van Wagtendonk, and C. P. Weatherspoon. 2000. The use of shaded fuelbreaks in landscape fire management. Forest Ecology and Management **127**:55–66.

Alexander, R. R., and F. Ronco, Jr. 1987. Classification of the forest vegetation on the national forests of Arizona and New Mexico. USDA Forest Service Research Note **RM-469**.

Allen, C. D. 1998. A ponderosa pine natural area reveals its secrets. Pages 551–552 *in* M. J. Mac, P. A. Opler, C. E. Puckett Haecker, and P. D. Doran, editors. Status and trends of the nation's biological resources. Two volumes. U.S. Department of Interior, U.S. Geological Survey, Reston, Virginia, USA.

Allen, C. D. 2002. Lots of lightning and plenty of people: an ecological history of fire in the American Southwest. Pages 143–183 *in* T. R. Vale, editor. Western wilderness: fire, native peoples, and the natural landscape. Island Press, Covelo, California, USA.

Allen, C. D., and D. D. Breshears. 1998. Drought-induced shift of a forest/woodland ecotone: rapid landscape response to climate variation. Proceedings of the National Academy of Sciences (USA) **95**:14839–14842.

Baisan, C. H., and T. W. Swetnam. 1997. Interactions of fire regimes and land-use history in the central Rio Grande Valley. USDA Forest Service Research Paper **RM-RP-330**.

Baker, W. L., and D. Ehle. 2001. Uncertainty in surface-fire history: the case of ponderosa pine forests in the Western United States. Canadian Journal of Forest Research **31**: 1205–1226.

Barclay, A. D. 2000. Effects of seeding with Rye grass (*Lolium multiflorum*) on vegetation recovery following fire in a ponderosa pine (*Pinus ponderosa*) forest. Thesis. University of Arizona, Tucson, Arizona, USA.

Belsky, A. J., and D. M. Blumenthal. 1997. Effects of livestock grazing on stand dynamics and soils in upland forests of the Interior West. Conservation Biology **11**:315–327.

Bennetts, R. E., G. C. White, F. G. Hawksworth, and S. E. Severs. 1996. The influence of dwarf mistletoe on bird communities in Colorado ponderosa pine forests. Ecological Applications **6**:899–909.

Bogan, M. A., C. D. Allen, E. H. Muldavin, S. P. Platania, J. N. Stuart, G. H. Farley, P. Melhop, and J. Belnap. 1998. Southwest. Pages 543–592 *in* M. J. Mac, P. A. Opler, C. E. Puckett Haecker, and P. D. Doran, editors. Status and trends of the nation's biological resources. Two volumes. U.S. Department of Interior, U.S. Geological Survey, Reston, Virginia, USA.

Brown, P. M., M. R. Kaufmann, and W. D. Shepperd. 1999. Long-term, landscape patterns of past fire events in a montane ponderosa pine forest of central Colorado. Landscape Ecology **14**:513–532.

Brown, R. 2000. Thinning, fire, and forest restoration: a science-based approach for national forests of the interior Northwest. Defenders of Wildlife, Washington, D.C., USA.

Bull, E. L., C. G. Parks, and T. R. Torgersen. 1997. Trees and logs important to wildlife in the Interior Columbia River Basin. USDA Forest Service General Technical Report **PNW-GTR-391**.

Community Forest Restoration Act. 30 October 2000. Public Law 106-393, Statutes at Large **114**:1607–1628.

Cooper, C. F. 1960. Changes in vegetation, structure, and growth of southwestern pine forests since white settlement. Ecological Monographs **30**:129–164.

Covington, W. W. 2000. Helping western forests heal: the prognosis is poor for United States forest ecosystems. Nature **408**:135–136.

Covington, W. W., R. L. Everett, R. Steele, L. L. Irwin, T. A. Daer, and A. N. D. Auclair. 1994. Historical and anticipated changes in forest ecosystems of the Inland West of the United States. Journal of Sustainable Forestry **2**:13–63.

Covington, W. W., P. Z. Fulé, M. M. Moore, S. C. Hart, T. E. Kolb, J. N. Mast, S. S. Sackett, and M. R. Wagner. 1997. Restoring ecosystem health in ponderosa pine forests of the Southwest. Journal of Forestry **95**:23–29.

Covington, W. W., and M. M. Moore. 1994. Southwestern ponderosa pine forest structure: changes since Euro-American settlement. Journal of Forestry **92**:39–47.

Crawford, J. S., C.-H. A. Wahren, S. Kyle, and W. H. Moir. 2001. Responses of exotic plant species responses to fires in *Pinus ponderosa* forests in northern Arizona. Journal of Vegetation Science **12**:261–268.

Crowley, T. J. 2000. Causes of climate change over the past 1000 years. Science **289**:270–277.

Dahm, C. W., and B. W. Geils, techical editors. 1997. An assessment of forest ecosystem health in the Southwest. USDA Forest Service General Technical Report **RM-GTR-295**.

Dodd, N. L., S. S. Rosenstock, C. R. Miller, and R. E. Schweinsburg. 1998. Tassel-eared squirrel population dynamics in Arizona: index techniques and relationships to

Case No. 1:23-cv-01501-RMR Document 15-2 filed 09/29/23 USDC Colorado pg 119 of 367



habitat condition. Technical Report 27. Arizona Game and Fish Department, Phoenix, Arizona, USA.

Everett, R., D. Schellhaas, D. Spurbeck, P. Ohlson, D. Keenum, and T. Anderson. 1997. Structure of Northern Spotted Owl nest stands and their historical conditions on the eastern slope of the Pacific Northwest Cascades, USA. Forest Ecology and Management **94**:1–14.

Ffolliott, P. F., G. S. Gottfried, and M. B. Baker, Jr. 1989. Water yield from forest snowpack management: research findings in Arizona and New Mexico. Water Resources Research **25**:1999–2007.

Finney, M. A. 2001. Design of regular landscape fuel treatment patterns for modifying fire growth and behavior. Forest Science **47**:219–228.

Fulé, P. Z., W. W. Covington, and M. M. Moore. 1997. Determining reference conditions for ecosystem management of southwestern ponderosa pine. Ecological Applications **7**:895–908.

Fulé, P. Z., A. E. M. Waltz, W. W. Covington, and T. A. Heinlein. 2001. Measuring forest restoration effectiveness in reducing hazardous fuels. Journal of Forestry **99**(11): 24–29.

Graham, R. T., A. E. Harvey, T. B. Jain, and J. R. Tonn. 1999. The effects of thinning and similar stand treatments on fire behavior in western forests. USDA Forest Service General Technical Report **PNW-GTR-463**.

Grissino-Mayer, H. D., and T. W. Swetnam. 2000. Century-scale climate forcing of fire regimes in the American Southwest. The Holocene **10**:207–214.

Grissino-Mayer, H. D., T. W. Swetnam, and R. K. Adams. 1997. The rare old-aged conifers of El Malpais: their role in understanding climate change in the American Southwest. Pages 155–161 *in* K. Mabery, compiler. Natural history of El Malpais National Monument. Bulletin 156. New Mexico Bureau of Mines and Mineral Resources, Socorro, New Mexico, USA.

Hanson, C. 2000. Chopping down the forest won't save it. [Letter to the Editor.] New York Times, National edition, 19 May 2000, Section A: p. 27 (col. 1).

Hardy, C. C., D. L. Bunnell, J. P. Menakis, K. M. Schmidt, D. G. Long, D. G. Simmerman, and C. M. Johnston. 1999. Coarse-scale spatial data for wildland fire and fuel management. USDA Forest Service, Rocky Mountain Research Station, Fire Sciences Laboratory, Missoula, Montana, USA. [Online, URL: ⟨http://www.fs.fed.us/fire/fuelman⟩.]

Harrington, M. G., and S. S. Sackett. 1992. Past and present fire influences on southwestern ponderosa pine old growth. Pages 44–50 *in* M. R. Kaufmann, W. H. Moir and R. L. Bassett, editors. Old-growth forests in the Southwest and Rocky Mountain regions. USDA Forest Service General Technical Report **RM-213**.

Hole, F. D. 1981. Effects of animals on soil. Geoderma **25**: 75–112.

Holling, C. S. 1978. Adaptive environmental assessment and management. John Wiley and Sons, New York, New York, USA.

Holling, C. S., and G. K. Meffe. 1996. Command and control and the pathology of natural resource management. Conservation Biology **10**:328–337.

Holthausen, R. S., M. G. Raphael, F. B. Samson, D. Ebert, R. Hiebert, and K. Menasco. 1999. Population viability in ecosystem management. Pages 135–156 *in* R. C. Szaro et al., editors. Ecological sewardship–a common reference for ecosystem management. Volume II. Elsevier Science, Oxford, UK.

Jenkins, M. 2001. ''Making forests safe again won't be a walk in the park.'' High Country News, 7 May, p. 10.

Johnson, T. H., and R. H. Wauer. 1996. Avifaunal response to the 1977 La Mesa fire. Pages 70–94 *in* C. D. Allen, technical editor. Fire effects in Southwestern forests. Proceedings of the Second La Mesa Fire Symposium. USDA Forest Service General Technical Report **RM-GTR-286**.

Jurgensen, M. F., A. E. Harvey, R. T. Graham, D. S. Page-Dumroese, J. R. Tonn, M. G. Larsen, and T. B. Jain. 1997. Impacts of timber harvesting on soil organic matter, nitrogen, productivity, and health of inland Northwest forests. Forest Science **43**:234–251.

Kaufmann, M. R., R. T. Graham, D. A. Boyce, Jr., W. H. Moir, L. Perry, R. T. Reynolds, R. L. Bassett, P. Mehlhop, C. B. Edminster, W. M. Block, and P. S. Corn. 1994. An ecological basis for ecosystem management. USDA Forest Service General Technical Report **RM-246**.

Kaufmann, M. R., L. S. Huckaby, C. M. Regan, and J. Popp. 1998. Forest reference conditions for ecosystem management in the Sacramento Mountains, New Mexico. USDA Forest Service General Technical Report **RMRS-GTR-19**.

Kaye, J. P., and S. C. Hart. 1998. Ecological restoration alters nitrogen transformations in a ponderosa pine-bunchgrass ecosystem. Ecological Applications **8**:1052–1060.

Kaye, M. W., and T. W. Swetnam. 1999. An assessment of fire, climate, and Apache history in the Sacramento Mountains, New Mexico, USA. Physical Geography **20**:305–330.

Kennedy, P. L. 1997. The Northern Goshawk (*Accipter gentilis atricapillus*): Is there evidence of a population decline? Journal of Raptor Research **31**:95–106.

Kloor, K. 2000. Returning America's forests to their ''natural'' roots. Science **287**:573–575.

Landres, P., P. Morgan, and F. J. Swanson. 1999. Overview of the use of natural variability concepts in managing ecological systems. Ecological Applications. **9**:1179–1188.

Ledig, F. T. 1992. Human impacts on genetic diversity in forest ecosystems. Oikos **63**:87–108.

MacNeil, J. S. 2000. Forest fire plan kindles debate. Science **289**:1448–1449.

Madany, M. H., and N. E. West. 1983. Livestock grazing–fire regime interactions within montane forests of Zion National Park. Ecology **64**:661–667.

Mann, M. E., R. Bradley, and M. K. Hughes. 1998. Northern hemisphere temperatures during the past millennium: inferences, uncertainties, and limitations. Geophysical Research Letters **26**:759–762.

Marston, E. L. Criley, A. Brower, S. Kennedy, J. Downing, H. Nolde, C. Smith, and H. Swartz. 2001. ''Restoring the range of light'' [a series of articles]. High Country News, 27 August, pp. 1, 8–14.

Mast, J. N., P. Z. Fulé, M. M. Moore, W. W. Covington, and A. E. M. Waltz. 1999. Restoration of presettlement age structure of an Arizona ponderosa pine forest. Ecological Applications **9**:228–239.

Matthews, M. 2001. ''Back into the woods: The West goes to work cleaning up its forests.'' High Country News, 7 May, pp. 1, 8–11.

Millar, C. I., and W. J. Libby. 1989. Restoration: Disneyland or a native ecosystem? A question of genetics. Fremontia **17**:3–10.

Millar, C. I., and W. B. Woolfenden. 1999. The role of climate change in interpreting historical variability. Ecological Applications **9**:1207–1216.

Miller, C., and D. L. Urban. 2000. Modeling the effects of fire management alternatives on Sierra Nevada mixed-conifer forests. Ecological Applications **10**:85–94.

Moir, W. H., and J. H. Dieterich. 1988. Old-growth ponderosa pine from succession in pine–bunchgrass forests in Arizona and New Mexico. Natural Areas Journal **8**:17–24.

Moore, M. M., W. W. Covington, and P. Z. Fulé. 1999. Reference conditions and ecological restoration: a Southwestern ponderosa pine perspective. Ecological Applications **9**: 1266–1277.

Morgan, P., G. H. Aplet, J. B. Haufler, H. C. Humphries, M. M. Moore, and W. D. Wilson. 1994. Historical range of

Case No. 1:23-cv-01501-RMR Document 15-2 filed 09/29/23 USDC Colorado pg 120 of 367



variability: a useful tool for evaluating ecosystem change. Journal of Sustainable Forestry **2**:87–111.

Morgan, P., C. Hardy, T. W. Swetnam, M. G. Rollins, and D. G. Long. 2001. Mapping fire regimes across time and space: understanding coarse and fine-scale patterns. International Journal of Wildland Fire **10**:329–342.

Morrison, P. H., J. W. Karl, K. J. Harma, L. Swope, T. K. Allen, and P. Becwar. 2000. Assessment of summer 2000 wildfires: landscape history, current condition, and ownership. Pacific Biodiversity Institute, Winthrop, Washington, USA. [Online, URL: ⟨http://www.pacificbio.org⟩.]

National Forest Protection Alliance. 2001. Restoration and Our National Forests. [Online, URL: ⟨http://www.forestadvocate.org⟩.]

New Mexico Department of Game and Fish. 2000. Biota information system of New Mexico. Electronic database, Version January 2000. New Mexico Department of Game and Fish, Santa Fe, New Mexico, USA. [Available only on CD-ROM].

Nijhuis, M. 1999. "Flagstaff searches for its forests' future." High Country News, 1 March, pp. 8–12.

Noss, R. F., E. T. LaRoe, III, and J. M. Scott. 1995. Endangered ecosystems of the United States: a preliminary assessment of loss and degradation. National Biological Service Biological Report 28. U.S. Department of the Interior, Washington, D.C., USA.

Oliver, C. D., A. Osawa, and A. Camp. 1998. Forest dynamics and resulting animal and plant population changes at the stand and landscape levels. Journal of Sustainable Forestry **6**:281–312.

Patton, D. R., and K. E. Severson. 1989. WILDHARE: a wildlife habitat relationships data model for southwestern ponderosa pine. Pages 268–276 *in* A. Techle, W. W. Covington, and R. H. Hamre, technical coordinators. Multiresource management of ponderosa pine forests. USDA Forest Service General Technical Report **RM-185**.

Pearson, G. A. 1950. Management of ponderosa pine in the Southwest. USDA Forest Service, Agricultural Monograph no. 6. U.S. Government Printing Office, Washington, D.C., USA.

Rehfeldt, G. E. 1991. Models of genetic variation for *Pinus ponderosa* in the inland Northwest (U.S.A.): applications in gene resource management. Canadian Journal of Forest Research **21**:1491–1500.

Reynolds, R. T., R. T. Graham, M. H. Reiser, R. L. Bassett, P. L. Kennedy, D. A. Boyce, Jr., G. Goodwin, R. Smith, and E. L. Fisher. 1992. Management recommendations for the Northern Goshawk in the Southwestern United States. USDA Forest Service General Technical Report **RM-217**.

Rieman, B., and J. Clayton. 1997. Wildlife and native fish: issues of forest health of sensitive species. Fisheries **22**(11): 6–15.

Robichaud, P. R., J. L. Beyers, and D. G. Neary. 2000. Evaluating the effectiveness of postfire rehabilitation treatments. USDA Forest Service General Technical Report **RMRS-GTR-63**.

Rollins, M. G. 2000. Twentieth century landscape fire patterns in the Gila/Aldo Leopold Wilderness Areas, New Mexico, and Selway-Bitterroot Wilderness Area, Idaho/Montana. Dissertation. University of Arizona, Tucson, Arizona, USA.

Rosenstock, S. S. 1998. Influence of Gambel oak on breeding birds in ponderosa pine forests of northern Arizona. Condor **100**:485–492.

Rummell, R. S. 1951. Some effects of livestock grazing on ponderosa pine forest and range in central Washington. Ecology **32**:594–607.

Savage, M., P. M. Brown, and J. Feddema. 1996. The role of climate in a pine forest regeneration pulse in the southwestern United States. Ecoscience **3**:310–318.

Shinneman, D. J., and W. L. Baker. 1997. Nonequilibrium dynamics between catastrophic disturbances and old-growth forests in ponderosa pine landscapes of the Black Hills. Conservation Biology **11**:1276–1288.

Smith, H. Y., and S. F. Arno, editors. 1999. Eighty years of change in a managed ponderosa pine forest. USDA Forest Service General Technical Report **RMRS-GTR-23**.

Southwest Forest Alliance. 2001. Why the Flagstaff presettlement restoration model should not be applied to public forest lands. Southwest Forest Alliance, Flagstaff, Arizona, USA. [Online, URL: ⟨http://www.swfa.org⟩.]

Stacey, P. B., V. A. Johnson, and M. L. Taper. 1996. Migration within metapopulations: the impact upon local population dynamics. Pages 267–291 *in* I. Hanski and M. Gilpin, editors. Metapopulation biology: ecology, genetics and evolution. Academic Press, New York, New York, USA.

Stephenson, N. L. 1987. Use of tree aggregations in forest ecology and management. Environmental Management **11**: 1–5.

Stephenson, N. L. 1999. Reference conditions for giant sequoia forest restoration: structure, process, and precision. Ecological Applications **9**:1253–1265.

Suckling, K. 1996. Forests forever! A plan to restore ecological and economic integrity to the Southwest's National Forests and forest dependent communities. Southwest Forest Alliance, Flagstaff, Arizona, USA.

Swetnam, T. W., C. D. Allen, and J. L. Betancourt. 1999. Applied historical ecology: using the past to manage for the future. Ecological Applications **9**:1189–1206.

Swetnam, T. W., and C. H. Baisan. 1996. Historical fire regime patterns in the Southwestern United States since AD 1700. Pages 11–32 *in* C. D. Allen, technical editor. Fire effects in Southwestern forests. Proceedings of the Second La Mesa Fire Symposium. USDA Forest Service General Technical Report **RM-GTR-286**.

Swetnam, T. W., and J. L. Betancourt. 1998. Mesoscale disturbance and ecological response to decadal climatic variability in the American Southwest. Journal of Climate **11**: 3128–3147.

Tiedemann, A. R., J. O. Klemmedson, and E. L. Bull. 2000. Solution of forest health problems with prescribed fire: Are forest productivity and wildlife at risk? Forest Ecology and Management **127**:1–18.

Trombulak, S. C., and C. A. Frissell. 2000. Review of ecological effects of roads on terrestrial and aquatic communities. Conservation Biology **14**:18–30.

USDA Forest Service. 2000. Protecting people and sustaining resources in fire-adapted ecosystems: a cohesive strategy. USDA Forest Service, Washington, D.C., USA. [Also online, URL: ⟨http://www.fireplan.gov⟩.]

USDA and USDI [USDA Forest Service, and U.S. Department of the Interior]. 2000*a*. National fire plan: managing the impact of wildfires on communities and the environment. A report to the President in response to the wildfires of 2000. [Online, URL: ⟨http://www.fireplan.gov⟩.]

USDA and USDI [USDA Forest Service and USDI Bureau of Land Management]. 2000*b*. Interior Columbia Basin Final Environmental Impact Statement. Interior Columbia Basin Ecosystem Management Project, Boise, Idaho, USA. [Online: ⟨http//www.icbemp.gov/⟩.]

USDI [United States Department of the Interior]. 2000. Reducing the risks and consequences of catastrophic wildland fires on DOI lands. Washington, D.C.

U.S. Fish and Wildlife Service. 1995. Recovery plan for the Mexican Spotted Owl (*Strix occidentalis lucida*). U.S. Fish and Wildlife Service, Albuquerque, New Mexico, USA.

U.S. Fish and Wildlife Service. 1998. Northern goshawk status review. U.S. Fish and Wildlife Service, Portland, Oregon, USA.

U.S. General Accounting Office. 1999. Western national for-

ests: a cohesive strategy is needed to address catastrophic wildfire threats. GAO/RCED-99-65. U.S. Government Printing Office.

Veenhuis, J. 2002. Effects of wildfire on the hydrology of Capulin and Rito de los Frijoles Canyons, Bandelier National Monument, New Mexico, Water Resources Investigations Report. U.S. Geological Survey, Albuquerque, New Mexico, USA, *in press*.

Wagner, M. R., W. M. Block, B. W. Geils, and K. F. Wenger. 2000. Restoration ecology: A new forest management paradigm or another merit badge for foresters? Journal of Forestry **98**:22–27.

Waltz, A. F. M., and W. W. Covington. 1999. Butterfly richness and abundance increase in restored ponderosa pine ecosystem (Arizona). Ecological Restoration **17**:244–246.

Weatherspoon, C. P., and C. N. Skinner. 1996. Landscape-level strategies for forest fuel mangement. Chapter 56 *in* Sierra Nevada ecosystem project. Final report to Congress. Volume II. Assessments and scientific basis for management options. Wildland Resources Center Report number 39. Centers for Water and Wildland Resources, University of California, Davis, California, USA.

Weaver, H. 1951. Fire as an ecological factor in Southwestern ponderosa pine forests. Journal of Forestry **49**:93–98.

Webb, D. R., and R. L. Henderson. 1985. Gila Wilderness prescribed fire program. Pages 413–414 *in* J. E. Lotan, B. M. Kilgore, W. C. Fischer, and R. W. Mutch, technical coordinators. Proceedings—Symposium and Workshop on Wilderness Fire. USDA Forest Service General Technical Report **INT-182**.

Western Governors' Association, U.S. Forest Service, and U.S. Department of the Interior. 2001. A collaborative approach for reducing wildland fire risks to communities and the environment: 10-year comprehensive strategy, August 2001. [Online, URL: ⟨http://www.fireplan.gov⟩.]

White, A. S. 1985. Presettlement regeneration patterns in a southwestern ponderosa pine stand. Ecology **66**:589–594.

White, C. S. 1994. Monoterpenes: their effects on ecosystem nutrient cycling. Journal of Chemical Ecology **20**:1381–1406.

White, P. S., and J. L. Walker. 1997. Approximating nature's variation: selecting and using reference information in restoration ecology. Restoration Ecology **5**:338–349.

White, W. D. 1996. Geomorphic responses of six headwater basins fifteen years after the La Mesa fire. Pages 95–113 *in* C. D. Allen, technical editor. Fire effects in Southwestern forests: Proceedings of the Second La Mesa Fire Symposium. U.S. Forest Service General Technical Report **RM-GTR-286**.

Woolsey, T. S., Jr. 1911. Western yellow pine in Arizona and New Mexico. U.S. Forest Service Bulletin 101. U.S. Government Printing Office, Washington, D.C., USA.

Wuerthner, G. 1999. ''Friendly fire.'' Green Roots—the Newsletter of Forest Guardians, Summer 1999, no. 6, p. 5.

Forest Ecology and Management 291 (2013) 442–457

Contents lists available at SciVerse ScienceDirect

Forest Ecology and Management

journal homepage: www.elsevier.com/locate/foreco

# Restoring forest resilience: From reference spatial patterns to silvicultural prescriptions and monitoring

Derek J. Churchill[a,*], Andrew J. Larson[b], Matthew C. Dahlgreen[c,1], Jerry F. Franklin[a], Paul F. Hessburg[d], James A. Lutz[e]

[a] School of Environmental and Forest Sciences, College of the Environment, University of Washington, Seattle, WA 98195, USA
[b] Department of Forest Management, College of Forestry and Conservation, The University of Montana, Missoula, MT 59812, USA
[c] USDA Forest Service, Okanagon–Wenatchee National Forest, Wenatchee, WA 98801, USA
[d] USDA Forest Service, Pacific Northwest Research Station, Forestry Sciences Laboratory, Wenatchee, WA 98801, USA
[e] College of the Environment, University of Washington, Seattle, WA 98195, USA

ARTICLE INFO

*Article history:*
Received 20 August 2012
Received in revised form 2 November 2012
Accepted 4 November 2012
Available online 17 January 2013

*Keywords:*
Spatial pattern
Resilience
Fuels treatments
Forest restoration
Climate analogs
Reference conditions

ABSTRACT

Stand-level spatial pattern influences key aspects of resilience and ecosystem function such as disturbance behavior, regeneration, snow retention, and habitat quality in frequent-fire pine and mixed-conifer forests. Reference sites, from both pre-settlement era reconstructions and contemporary forests with active fire regimes, indicate that frequent-fire forests are complex mosaics of individual trees, tree clumps, and openings. There is a broad scientific consensus that restoration treatments should seek to restore this mosaic pattern in order to restore resilience and maintain ecosystem function. Yet, methods to explicitly incorporate spatial reference information into restoration treatments are not widely used. In addition, targets from reference conditions must be critically evaluated in light of climate change. We used a spatial clump identification algorithm to quantify reference patterns based on a specified inter-tree distance that defines when trees form clumps. We used climatic water balance parameters, downscaled climate projections, and plant associations to assess our historical reference sites in the context of projected future climate and identify climate analog reference conditions. Spatial reference information was incorporated into a novel approach to prescription development, tree marking, and monitoring based on viewing stand structure and pattern in terms of individuals, clumps, and openings (ICO) in a mixed-conifer forest restoration case study. We compared the results from the ICO approach with simulations of traditional basal area and spacing-based thinning prescriptions in terms of agreement with reference conditions and functional aspects of resilience. The ICO method resulted in a distribution of tree clumps and openings within the range of reference patterns, while the basal area and spacing approaches resulted in uniform patterns inconsistent with known reference conditions. Susceptibility to insect mortality was lower in basal area and spacing prescriptions, but openings and corresponding opportunities for regeneration and *in situ* climate adaptation were fewer. Operationally, the method struck a balance between providing clear targets for spatial pattern directly linked to reference conditions, sufficient flexibility to achieve other restoration objectives, and implementation efficiency. The need to track pattern targets during implementation and provide immediate feedback to marking crews was a key lesson. The ICO method, especially when used in combination with climate analog reference targets, offers a practical approach to restoring spatial patterns that are likely to enhance resilience and climate adaptation.

© 2012 Elsevier B.V. All rights reserved.

## 1. Introduction

Increasing ecological resilience has become a central objective in management of public forestlands due to the combined effects of past management and projected climate change (Baron et al., 2009; Joyce et al., 2009). Ecological resilience (hereafter, resilience) includes the capacity to persist through and re-organize after disturbance, adapt to shifting environmental conditions, and maintain basic ecosystem structure and function over time (Walker et al., 2004). There is increasing evidence that spatial heterogeneity at multiple scales, in addition to forest structure and composition, is a critical component of ecosystem resilience (Levin, 1998; Moritz et al., 2011; North et al., 2009; Stephens et al., 2008). General

* Corresponding author. Tel.: +1 206 391 39832; fax: +1 206 685 0790.
*E-mail address:* derekch@uw.edu (D.J. Churchill).
[1] Present address: The Nature Conservancy, Eastern Washington Field Office, Wenatchee, WA 98801, USA.

0378-1127/$ - see front matter © 2012 Elsevier B.V. All rights reserved.
http://dx.doi.org/10.1016/j.foreco.2012.11.007

frameworks that incorporate ecologically-based guidelines for spatial pattern have been developed for some forest ecosystems (Carey, 2003; Franklin and Johnson, 2012; Hessburg et al., 2004, 1999; Franklin et al., 2007; Mitchell et al., 2006). A major remaining task is the identification of spatial pattern targets for specific ecosystems that are empirically linked to resilience, climate adaptation, and desired ecological functions (Puettmann et al., 2009). A related challenge is translating such targets into operationally-efficient prescriptions and monitoring protocols (North and Sherlock, 2012; O'Hara et al., 2012).

In frequent-fire pine and mixed-conifer forests in western North America (hereafter, *dry forests*), pre-settlement era forests are commonly used as reference systems to inform treatment targets (Larson and Churchill, 2012). Contemporary dry forests with minimally altered or restored fire regimes are increasingly being used as reference sites as well (Lydersen and North, 2012; Stephens et al., 2008; Taylor, 2010). At the stand level, tree patterns in these forests are commonly characterized by an uneven-aged mosaic of individual trees, clumps ranging from 2 to more than 20 trees, and openings (Kaufmann et al., 2007; Larson and Churchill, 2012). Such mosaics persisted for centuries in a dynamic system of fine-scale, gap-phase replacement driven primarily by frequent fire and insect mortality (Agee, 1993; Cooper, 1960). Patch size and within-patch heterogeneity varied temporally at individual sites, and across different biophysical environments (Kaufmann et al., 2007). Infrequent moderate to high-severity disturbances did occasionally reset these stand-level patterns as well (Arno et al., 1995; Hessburg et al., 2007). Here, we refer to stands as patches embedded in a hierarchy of landscape organization; smaller than sub-watersheds and larger than the largest tree clumps and openings (Urban et al., 1987). Historical patch size distributions of stands in dry forests ranged from 1 to $10^4$ ha (Perry et al., 2011), different from the traditional view of stands as 10–50 ha management units.

The fine-scale mosaic pattern is thought to be a key factor underpinning the resilience of dry forest ecosystems (Allen et al., 2002; Binkley et al., 2007; Stephens et al., 2010). Irregular tree patterns, large openings, and resulting variation in surface fuels inhibit the spread of crown fire and perpetuate variable post-fire patterns (Beaty and Taylor, 2007; Pimont et al., 2011; Stephens et al., 2008), analogous to strategic placement of fuel treatments at larger spatial scales (Finney et al., 2007). Heterogeneous stand structures impede the buildup of epidemic insect outbreaks by disrupting pheromone plumes and breaking up the continuity of susceptible species, as well as age and size classes (Fettig et al., 2007).

Similarly, openings create barriers to the spread of dwarf mistletoes and fungal pathogens (Goheen and Hansen, 1993; Hawksworth et al., 1996; Shaw et al., 2005). Likewise, openings and frequent disturbances facilitate periodic tree regeneration in dry forests (Boyden et al., 2005; Sánchez Meador et al., 2009), which is thought to be partly responsible for high levels of local genetic diversity of trees (Linhart et al., 1981; Hamrick et al., 1989). Snow retention is highest where canopy openings are large enough reduce canopy interception, but small enough to be shaded and protected from wind (Varhola et al., 2010). In addition, the contrasting light, moisture, and soil nutrient environments in heterogeneous stands increase understory plant abundance and diversity (Dodson et al., 2008; Moore et al., 2006).

There is a growing scientific consensus that to increase resilience, mechanical and prescribed-fire treatments should seek to restore the range of mosaic patterns found in reference stands (Allen et al., 2002; Franklin et al., 2008; Hessburg et al., 2005; Moore et al., 1999; North et al., 2009; Perry et al., 2011), in addition to retaining large and old fire-tolerant trees and following other resilience principles (Table 1). Widespread adoption of prescription approaches based on spatial reference information has been slow, however, despite numerous operational-level research studies (e.g. Graham et al., 2007; Knapp et al., 2012; Lynch et al., 2000; USFS, 2008; Waltz et al., 2003).

The fundamental challenge facing managers is the mismatch between the grain and variation of pattern found in dry forests and the tools commonly used to quantify and manage them. Most silvicultural methods are based on stand-average density metrics originally designed to create homogenous stands (Puettmann et al., 2009). Modifying these approaches to manage for within-stand spatial variability requires re-conceptualizing "stands" as mosaics of variably sized canopy patches (Puettmann et al., 2009). This shift—and the associated changes in mensuration tools, operational methods, and contractual mechanisms—can be initially complex and time consuming (Knapp et al., 2012; North and Sherlock, 2012). Thus, many managers continue to employ stand-average basal area or spacing-based approaches (e.g. Powell, 2010). There is concern that these approaches create evenly spaced stands inconsistent with ecologically important fine-scale processes, and may have unintended negative effects to wildlife and disturbance behavior. The tradeoffs between the effort of transitioning to new approaches and gains in ecological functionality and resilience are unknown, however.

Projected changes in climate and related shifts in disturbance behavior present an additional challenge to the use of historical

**Table 1**
Comparison of three stand-level treatment approaches in dry-mixed conifer forests: fuels treatments and hazard reduction, restoration of pre-settlement or current reference conditions, and climate adaptation/resilience management. Treatment targets for different strategies may vary considerably between the three different approaches.

| Recommended strategies | Fuels treatments[a] | Restoration[b] | Resilience/ adaptation[c] |
|---|---|---|---|
| 1. Reduce surface and ladder fuels; increase crown base height | x | x | x |
| 2. Reduce and maintain lower tree densities; decrease crown bulk density. | x | x | x |
| 3. Increase relative composition of fire and drought tolerant species | x | x | x |
| 4. Increase mean tree diameter and individual tree vigor by generally retaining larger trees with healthy crowns | x | x | x |
| 5. Conserve existing species and genetic diversity, including pre-settlement trees | | x | x |
| 6. Restore horizontal spatial heterogeneity of forest structure, including openings where early-seral species can establish | | x | x |
| 7. Re-introduce fire to reduce fuel loads, stimulate understory species, and maintain desired fuel beds | x | x | x |
| 8. Reduce and/or maintain appropriate levels of pathogens, insects, and other disturbances in order to create decadence, mortality, and interactions with fire that lead to regeneration of new tree cohorts and diverse understories | | x | x |
| 9. Replant desired native species, especially after high severity disturbances | | | x |
| 10. Plant new genotypes and/or species | | | x |
| 11. Monitor key processes such as mortality, regeneration, growth, fuel accumulation, and new species colonization to inform future management | x | x | x |

[a] Agee and Skinner (2005), Graham et al. (2004), and Peterson et al. (2005).
[b] Allen et al. (2002), Covington et al. (1997) and Franklin and Johnson (2012).
[c] Chmura et al. (2011), Peterson et al. (2011), Spies et al. (2010) and Stephens et al. (2010). These include resistance, resilience, response, and realignment options.

reference conditions (Franklin et al., 1991; Peterson et al., 2011; Williams et al., 2007). Pre-settlement-era dry forests developed from pattern-process linkages that persisted through centuries of frequent disturbances and climatic fluctuation and thus serve as a general guide for increasing resilience (Fule, 2008; Keane et al., 2009; Moritz et al., 2011). Restoration approaches based on reference conditions follow almost all of the strategies recommended for climate adaptation (Table 1). Restoring historical spatial pattern, composition, and density for a specific site, however, may not ensure resilience. Targets derived from reference conditions must be critically evaluated, and potentially modified, based on projected future climates and ecological knowledge to provide operative targets for restoration (Keane et al., 2009; Spies et al., 2010; Stephens et al., 2010). Climate analog reference sites offer a constructive approach to evaluating and using historical reference conditions. A climate analog site is one that developed in a climate similar to the projected future climate of the treatment site (Gärnter et al., 2008). Climate analogs provide an empirical basis for integrating climate adaptation with ecosystem restoration and can provide ecologically based targets for resilience, response, or realignment adaptation strategies (Stephens et al., 2010).

In this paper we address two central challenges of dry forest restoration: managing for resilient spatial patterns consistent with reference sites, and the use reference conditions in conjunction with climate change adaptation. We employ a spatial clump identification algorithm to quantify reference patterns in terms of individual trees and clumps (Plotkin et al., 2002). We assess our historical reference sites in the context of projected future climate using climatic water balance parameters (annual Actual Evapotranspiration and Deficit), plant associations, and downscaled climate model outputs. We then introduce a novel method to incorporate reference spatial pattern targets into silvicultural prescriptions and tree marking guidelines, which we term the ICO method (for individuals, clumps, openings), in an operational case study. We evaluate the practical utility of the ICO method, and compare it with simulated basal area and spacing-based prescriptions in terms of alignment with reference conditions and effects on several functional aspects of resilience. We hypothesized that: (1) the pattern created using the ICO method would fall within the range of variation, or envelope, of past and climate analog reference patterns; and (2) basal area and (3) spacing-based prescriptions would be outside of these envelopes.

## 2. Methods

### 2.1. Background and study area

In 2008, managers from the Okanogan-Wenatchee National Forest (OWNF) selected a 30 ha harvest unit within the Wildcat Timber Sale to test stand-level implementation of the OWNF Restoration Strategy (Gaines et al., 2010). The project area is located within the Tieton River drainage in the eastern Cascade Mountains, 30 miles west of Yakima, Washington and immediately north of Rimrock Reservoir. The site lies on a south-facing aspect with slopes of 10–45%, at an elevation of 975–1060 m. Soils are derived from volcanic ash deposits layered over basalt colluvium (NRCS, 2009), and are deep (>150 cm), well drained, and moderately productive (100 year site index, 29 m) (Barret, 1978). Modeled precipitation from 1971–2000 averaged 1103 mm annually, falling mostly as snow between November and April (ClimateWNA, 2012). Mean January and July temperatures were −2.1 °C and 15.7 °C.

Forest structure, composition, and management history in the project area is representative of dry-forest biophysical environments common throughout the Eastern Cascades of Washington and Oregon. Tree species consist of ponderosa pine (*Pinus ponderosa*) and interior Douglas-fir (*Pseudotsuga menziesi* var. *glauca*) with a minor component of grand fir (*Abies grandis*). The dominant plant association is Douglas-fir/shiny-leaf spirea (*Spirea betulifolia*))/pinegrass (*Calamagrostis rubescens*) (Lillybridge et al., 1995). Members of the Yakama Nation extensively utilized the area prior to Euro-American settlement in the 1880s. Intensive grazing by sheep and cattle occurred from the 1880s until the early 1900s (USFS, 1998), followed by logging in the 1930s and 1970s that removed almost all large-diameter ponderosa pines and spaced out residual overstory trees. Fire exclusion and suppression began at the turn of the century and has continued to the present. Current forest structure is dominated by trees established between 1890 and 1930. A pre-settlement multi-age structure with the oldest trees greater than 250 years was inferred from field ring counts of stumps. Pre-settlement disturbance was likely dominated by low and mixed severity fire with a return interval of 5–20 years (USFS, 1998), as well as native insect and pathogenic disturbances (Hessburg et al., 1994).

### 2.2. Tree clump identification

To characterize within-stand tree patterns, we use a clump identification algorithm from Plotkin et al. (2002). The algorithm partitions a stem map of tree locations into clumps at a specified inter-tree distance ($t$), measured from tree center to tree center. Trees are members of the same clump if they are within distance $t$ of at least one other tree in the clump. Trees with no neighbors within distance $t$ are termed individuals. This method has been previously used to identify tree clumps in dry forests (Abella and Denton, 2009; Sánchez Meador et al., 2011) and to compare silvicultural treatments with patterns from reference old-growth forests (Larson and Churchill, 2008; Larson et al., 2012).

We elected not to use any edge correction method following Plotkin et al. (2002). Yamada and Rogerson (2003) explored the effects of edge correction methods and concluded that there is no advantage in using corrections when the goal is to describe an observed pattern. However, the use of edge correction is important when testing for departure from a null pattern with point pattern statistics. Sánchez Meador et al. (2011) developed an edge correction technique for the clump identification method, where clumps that have trees within distance $t$ of the edge are removed. We implemented this correction for comparison.

### 2.3. Climate analog reference conditions

The pre-settlement era reference conditions used to guide prescription development were based on a 100 m × 100 m stem-map plot installed within the Wildcat project area as well as 32, 50 m × 100 m plots from Harrod et al. (1999), (hereafter, Harrod sites). Harrod et al. (1999) is the only spatially explicit reconstruction of pre-settlement conditions from the eastern Cascade Range of Washington. The Harrod sites reside approximately 85 km northeast of the harvest unit, and display similar biophysical conditions, forest types, and pre-settlement era disturbance regimes; however, approximately half of the 32 plots are in plant associations that are warmer and/or drier than the plant association in the Wildcat unit (Lillybridge et al., 1995).

Our rationale for using the two reference datasets was to compare the reference plot from the Wildcat site against a known range of variation of structure and pattern. This allowed us to determine that the Wildcat site was not an outlier and also compare its pattern and structure with warmer and drier sites. We followed the reconstruction protocols used by Harrod et al. (1999) for the Wildcat reference plot. All live trees, stumps, snags, and logs that were estimated to have originated before 1865 were

Case No. 1:23-cv-01501-RMR Document 15-2 filed 09/29/23 USDC Colorado pg 125 of 367



considered "historical" and mapped. The plot was subjectively located in an area with relatively homogenous slopes, aspects, and soil conditions that were typical of the project area, where stumps, snags, and logs from the pre-settlement forest were well preserved. The slope and aspect of the plot location was compared in GIS with the overall project area to ensure it was not anomalous.

To assess whether the Harrod locations were suitable climate analog reference sites, we compared current climate (1971–2000) from the Harrod sites to the projected climate of the Wildcat site for three future time periods (2011–2040, 2041–2070, 2071–2100). We used current and projected temperature and precipitation from the Climate WNA database (ClimateWNA, 2012). The Climate WNA methodology downscales projections from general circulation models (GCMs) by combining PRISM downscaling methods (Daly et al., 2008) for 800 m grid cells with local lapse rates to account for elevation differences (Wang et al., 2012). We used an ensemble of 15 general circulation models (GCMs) to capture the variability in GCM predictions and create an envelope of future climatic conditions (see Appendix for a list of the 15 GCMs). We chose the A1B and A2 emissions scenarios (IPCC, 2007) as they reflect the most likely scenarios given current trends (Rogelj et al., 2009).

To compare the climate regimes of the sites, we used temperature, precipitation, and soil water-holding capacity to calculate annual actual evapotranspiration (AET) and annual climatic water deficit (Deficit), the difference between potential evapotranspiration (PET) and AET. AET and Deficit have been shown to be good predictors of species presence/absence and growth rates (Littell et al., 2008; McKenzie et al., 2003; Stephenson, 1998, 1990); and have been used to project shifts in species distributions and disturbance regimes (Littell et al., 2010; Lutz et al., 2010; Shafer et al., 2001). We used a Thornthwaite-type model for PET (Lutz et al., 2010; Thornthwaite et al., 1957) and a soil water balance model from Dingman (2002) based on soil water-holding capacity in the top 150 cm of the soil profile (NRCS, 2009).

We added a multiplier to the PET equation for solar radiation similar to the approach used by Stephenson (1998) and Lutz et al. (2010) to account for differences introduced by aspect, slope, and latitude. We calculated solar gain at each Harrod plot center in ArcMAP v10 (ESRI, 2012). We then normalized PET using the ratio of solar gain of each plot to the average value for the study area, which was derived from a 90 m × 90 m grid of points distributed across the 6500 ha study area. Plant associations from Lillybridge et al. (1995) were used to assess the ecological significance of relative AET and Deficit and evaluate which of the Harrod sites and respective plant associations represented appropriate climate analogs for the Wildcat site. Plant associations were used as indicators of site potential in terms of productivity (site index), carrying capacity (SDI levels for full stocking), and species viability (whether sites can support Douglas-fir and grand fir); not as stationary communities (Daubenmire, 1976). After assessing the AET and Deficit of plant associations, we combined similar associations to more easily compare the current and projected climates of the Wildcat site against the current climate of Harrod sites. Plant associations were combined into four groups based on defining tree species, proximity of average AET and Deficit values, and overlap of ranges of Deficit values. The four groups were PIPO High, PSME High; PSME Moderate, and PSME Low.

### 2.4. Prescription development using the ICO method

Translation of the reference spatial patterns into prescription guidelines was done by using the Plotkin et al. (2002) clump algorithm to derive clump size distributions for the reference plots. This distribution summarizes the percent of trees arranged as individuals and in clumps of different sizes at a specified inter-tree distance (Table 2). We selected a single inter-tree distance threshold of 6 m to define tree clumps based on the observed distance at which most mature ponderosa pine trees (>120 years) in our study area display interlocking crowns and form patches of continuous canopy (Graham et al., 2007). Crown radius data from the US Forest Service Forest Inventory and Analysis database for similar plant associations on the OWNF were consistent with distances between 5 m and 7 m. The 6 m distance represented the 33rd percentile of crown diameter for ponderosa pine. Abella and Denton (2009) and Sánchez Meador et al. (2011) used a similar process to derive a clump distance and used 6 and 5.3–6.6 m, respectively. We then generated cumulative clump size distributions using the 6 m threshold to compare the Wildcat and Harrod sites and to assess differences in clump size distributions among plant associations. Visual inspection of these distributions revealed no major difference in pattern between the associations, and the distribution from the Wildcat reference site lay in the middle third of the Harrod distributions.

**Table 2**
Proportional clump size distribution for 1 ha Wildcat reference plot.

| *t* | Cluster size (# of trees) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| *Percent of total trees* | | | | | | | | | | |
| 1 m | 96 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2 m | 67 | 21 | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3 m | 60 | 17 | 6 | 0 | 0 | 0 | 0 | 17 | 0 | 0 |
| 4 m | 58 | 8 | 6 | 8 | 0 | 0 | 0 | 0 | 19 | 0 |
| 5 m | 52 | 12 | 6 | 8 | 0 | 0 | 0 | 0 | 0 | 21 |
| *6 m* | *42* | *17* | *12* | *8* | *0* | *0* | *0* | *0* | *0* | *21* |
| 7 m | 35 | 17 | 19 | 8 | 0 | 0 | 0 | 0 | 0 | 21 |
| 8 m | 35 | 17 | 19 | 8 | 0 | 0 | 0 | 0 | 0 | 21 |
| 9 m | 33 | 17 | 19 | 0 | 10 | 0 | 0 | 0 | 0 | 21 |
| 10 m | 31 | 17 | 19 | 0 | 0 | 12 | 0 | 0 | 0 | 21 |
| *Percent of total trees with edge correction* | | | | | | | | | | |
| 6 m | 32 | 18 | 9 | 12 | 0 | 0 | 0 | 0 | 0 | 29 |
| *Percent of total plot basal area* | | | | | | | | | | |
| 6 m | 51 | 17 | 11 | 4 | 0 | 0 | 0 | 0 | 0 | 17 |
| *Mean dbh of trees (cm)* | | | | | | | | | | |
| 6 m | 90 | 81 | 77 | 57 | 0 | 0 | 0 | 0 | 0 | 73 |

*t* is the inter-tree distance.
6 m values were selected to guide prescription development.

The next step in prescription development was to determine the average leave tree density and pattern to be approximated in tree marking. We chose 100 trees ha$^{-1}$ (tph) based on the desired range of 50–75 tph in dry, old forest structure described in the OWNF restoration strategy (Gaines et al., 2010) and allowance for post-treatment mortality from prescribed fire, inter-tree competition, and ongoing insect and pathogen disturbance. We then multiplied the proportion of trees each clump size from the Wildcat reference pattern by the target of 100 tph to generate the target number of tph in each clump size.

To facilitate marking and tracking of clumps in the field, we grouped clump sizes together into three bins: individual trees (clump size = 1), 2–4 tree clumps, and 5+ tree clumps. We divided the target number of trees in each bin by the average number of trees for that bin (3 for 2–4 tree clumps and 6 for 5+ tree clumps) to derive the target number of clumps per hectare for each bin (Table 3). To ensure that large clumps would exist in the future, the target for 5+ tree clumps was increased by 30% because we expected more density-dependent bark beetle mortality in large clumps vs. individuals. Bin size was based on observed functional differences between clump sizes: for example, 5+ clumps typically contain "interior trees" that are more susceptible to competitive stress and insect related mortality (Olsen et al., 1996); smaller clumps do not. Moreover, understory shading and micro-climatic

**Table 3**
Derivation of prescription targets for clumps from proportional clump size distribution of reference plot at 6 m.

| | Clump size (# of trees) | | |
|---|---|---|---|
| | 1 | 2–4 | 5+ |
| *Target trees per hectare is 100* | | | |
| Percent of trees in clumps in reference plot (%) | 42 | 37 | 21 |
| Rx target for trees per ha | 42 | 37 | 21 |
| Rx target for clumps per ha | 42 | 12 | 5[a] |

[a] The target for 5+ tree clumps was increased by 30% to hedge against higher anticipated rates of mortality in large clumps vs. individual trees.

effects begin occurring in larger clumps (~5+ trees), which can affect understory development, wildlife use, and fire behavior (Dodd et al., 2006; Ma et al., 2010). Individual trees have faster growth rates and distinct crown architecture which can affect bark thickness, fire and insect resistance, resin response to wounding, and sensitivity to climatic fluctuation (Carnwath et al., 2012).

The purpose of the prescription was not to replicate the clump size distribution of the reference stand on every hectare but to promote a mosaic pattern of individual trees, clumps, and openings within the envelope of historic conditions. Consequently, the per hectare targets for individuals and clumps were not rigid targets but approximate averages to be obtained over the entire unit. The marking guidelines also included instructions to retain all trees >110 years old, generally thin from below, favor ponderosa pine, and leave trees with live crown ratios >40% (see Appendix for complete marking guidelines). The overall goal was to work with existing stand conditions to achieve the approximate individual tree and clump targets, while meeting the other criteria. We assumed that leaving over 50% of the target density in clumps would result in the desired range of opening sizes and thus did not provide explicit instructions to create openings. Leave tree marking was used with crews tallying the number of residual individuals and clumps by bin size. The results were tallied after the marking was completed, so no adjustments were made during marking. This treatment was called the ICO treatment (individuals, clumps, and openings).

### 2.5. Monitoring and simulated treatment alternatives

To monitor and evaluate the implementation of the prescription, we installed a 2 ha plot (141 m × 141 m) prior to harvest, in which all trees >15 cm dbh were mapped. The 15 cm cutoff was based on a commercial thinning minimum diameter threshold. We derived clump size distributions at 6 m and determined that too few large clumps were retained. This presented an opportunity for adaptive learning through simulation of an adaptive management marking scenario. In this scenario, we adapted the initial mark to better achieve the 5+ tree clump targets, and create larger openings that better reflected conditions of the reference plot. This simulated marking scenario was labeled the adaptive management (AM) treatment and was intended to be an example of how tallying clump totals during marking could have been used to make adjustments to the original ICO treatment.

We also simulated basal area (BA) and spacing-based (Space) prescriptions to compare our method with these more standard thinning approaches. The BA simulated marking scenario sought to achieve a uniform target basal area throughout the 2 ha monitoring plot, with a ±50% allowance for natural openings and denser areas. The target basal area was the same as that retained on the 2 ha plot in the actual marking. Variable radius plots were simulated on a 20 m × 20 m square grid within the 2 ha using a basal area factor of 4.59. The same leave tree criteria used in the ICO treatment, minus the clump targets, were followed on each plot until the basal area target was met. Ponderosa pine was selected for retention over Douglas-fir if dwarf mistletoe (*Arceuthobium douglasii*) infections were present, or if the pines were similar in diameter (within 5 cm dbh). The BA simulation was implemented in sequential strips within the stem map, similar to how a marking crew ordinarily moves through a stand.

The third simulated marking scenario (Space) followed a spacing-based prescription where all trees within 6.7 m of a larger tree were cut, while retaining all ponderosa pine >50 cm dbh. The distance of 6.7 m was calculated to achieve the same tph as the ICO treatment. This approach, called Designation by Description (D × D), is used in some contemporary dry, mixed conifer forests in the Pacific Northwest and northern Rockies (Wynsma and Keyes, 2010). The BA and Space treatments resulted in post-treatment basal areas (16.9 and 17.5 $m^2$ $ha^{-1}$) and stocking levels (30% and 31% of maximum SDI) similar to other dry forest fuel reduction and restoration treatments conducted in the region (Larson et al., 2012; Powell, 1999; Prichard et al., 2010; Youngblood et al., 2006).

### 2.6. Comparing treatment alternatives and reference plots

We used a combination of global and local point pattern analysis methods to provide a robust evaluation (*sensu* Perry et al., 2006) of whether the field ICO treatment and the three simulated treatments fell within the envelope of spatial patterns found in the Wildcat and Harrod reference plots. The pair correlation function, $g(t)$, was selected as the primary global pattern statistic (Wiegand and Moloney, 2004). The $g(t)$ function is a non-cumulative form of Ripley's $K(t)$ (Ripley, 1988), and is calculated by taking the derivative of the kernel smoothed $K(t)$ distribution (Wiegand and Moloney, 2004). The $g(t)$ function avoids the problem of "cumulative effects" associated with $K(t)$ or $L(t)$, where patterns at short $t$ values can lead to incorrect assessments of clumping, randomness, or inhibition at longer $t$ values (Fortin and Dale, 2005; Perry et al., 2006; Illian et al., 2008). We generated reference pattern envelopes from the Harrod plots using the $g(t)$ function at a range of $t$ distances from 0 to 12.5 m, or 1/4 of the distance of the shortest length of the plots (Diggle, 2003). Results of the $g(t)$ function from the Wildcat reference site and four treatments were then plotted against the reference envelopes to visually assess departure.

To test our hypotheses of no differences between the reference and treatment patterns, we tested all patterns against a null hypothesis of complete spatial randomness (CSR) across a specified range of t values. This allowed us to infer statistical differences even though patterns were not directly tested against each other (Fortin and Dale, 2005; Perry et al., 2006; Illian et al., 2008). We first tested for overall departure from CSR at 0–12.5 m using the Cramer–von Mises goodness-of-fit (GoF) test from Loosmore and Ford (2006) with $g(t)$. Values of the test pattern were ranked against the $g(t)$ values of 1000 simulated CSR patterns based on the squared difference from the mean of the CSR patterns. The null hypothesis, no departure from CSR, was tested with a one tailed test using the rank of the test pattern with critical value of 0.05. We then inferred clustering, randomness, or inhibition (even spacing) at specific inter-tree distances based on where $g(t)$ values of the test pattern were above, within, or below the 95th percentile of 1000 CSR patterns respectively (Wiegand and Moloney, 2004). We applied an isotropic (Ripley, 1988) edge correction to all $g(t)$ tests based on an analysis of edge correction methodologies by Yamada and Rogerson (2003).

We plotted clump size distributions at 6 m to visually assess departure of the treatment patterns from reference pattern envelopes, and also used a modified version of the Loosmore and Ford (2006) GoF test. To quantify departure, the Harrod plots were used as the null pattern distribution in place of simulated CSR patterns (Illian et al., 2008). Ranks were based on the sum of differences

between the test pattern and the mean cumulative proportion of trees in 1 to 18 tree clumps; 18 was the largest observed clump size. Ranks were converted to percentiles with the 100th percentile representing the pattern with the highest proportion of trees as individuals and in small clumps, while the lowest percentile indicated the pattern with the greatest proportion in large clumps. This test was also done at 5 m and 7 m to assess how using a different threshold distance for defining clumps would affect the results.

As the Harrod et al. (1999) plots were 0.5 ha (100 × 50 m), we partitioned the 1 ha Wildcat reference plot and the 2 ha treatment plot into three and six 100 m × 50 m subplots, respectively, using a moving window with 10–20 m of overlap. This subsampled local variation in pattern across the treatment plots and provided comparisons at the same spatial extent. We also plotted the Harrod clump size distributions by plant association grouping to assess relationships between AET/Deficit and levels of clumping. Finally, we derived clump size distributions at 2 m and 10 m distances to compare patterns at multiple distances.

### 2.7. Evaluating functional attributes of resilience

To assess the potential implications for climate adaptation of the different treatment alternatives, we quantified several functional attributes of resilience. First, species composition and diameter distributions were compared to determine the extent to which treatments favored drought- and fire-tolerant species and larger size classes (Table 1). Second, potential susceptibility to mountain pine beetle (MPB; *Dendroctonus ponderosae*) was compared by characterizing inter-tree competition using Stand Density Index (SDI). We derived critical MPB mortality thresholds for the different plant association groupings using methods from Cochran (1994), with data from Lillybridge et al. (1995), and results from other empirical studies (Negron and Popp, 2004; Olsen et al., 1996). SDI was calculated around each individual ponderosa pine




**Fig. 1.** Actual evapotranspiration (AET) and climatic water deficit (Deficit) for the contemporary climate (1971–2000) for Harrod sites, and current and projected future climates for the Wildcat site. Climate projections include A2 and A1B emissions scenarios from 15 GCMs. See Stephenson (1998) for a detailed explanation of the relationship between AET and Deficit. Plant association groupings are: PIPO High: *Pinus ponderosa/Purshia tridentata/Agropyron spicatum;* PSME High *Pseudotsuga menziesii/Purshia-tridentata/Agropyron spicatum;* PSME Moderate: *P. menziesii/Symphoricarpos albus/Calamagrostis rubescens*, and *P. menziesii/Calamagrostis rubescens*, PSME Low: *P. menziesii/Symphoricarpos oreophilus*, *P. menziesii/Spirea-betulifolia/Calamagrostis rubescens*, and *P. menziesii/Carex geyer*.

using an 8 m radius following methods of Negron and Popp (2004). SDI is commonly used to quantify density relative to maximum carrying capacity (Reineke, 1933) and is an adequate predictor of BA increment (Contreras et al., 2011) and bark beetle vulnerability (Fettig et al., 2007).

A third aspect of resilience we quantified was the amount and size of openings. Delineating and quantifying individual gaps in forests with low canopy cover is challenging due to irregular gap shapes and lack of clear boundaries. Instead, we used the empty space function $F(t)$ to quantify openings in terms of distance from the nearest tree, or distance from the nearest gap edge. The $F(t)$ function generates a grid of cells, set to 1 m in our case, and then derives the distance from the center of each grid cell to its nearest tree. We created histograms of binned $F(t)$ distances for all the grid cells, using 3 m bins. This quantified the proportion of the total plot area in the different bin sizes. A graphical plot of this function was also created to visually assess the spatial distribution of cells in the 3 m bins across each treatment. We defined large openings as those with distances $\geqslant$15 m from the nearest tree or gap edge, based on minimum light requirements for ponderosa pine growth and associated gap sizes (Gersonde et al., 2004; York et al., 2004). Openings of this width are also likely to impede the spread of active or independent crown fire (Peterson et al., 2005).

All analyses were implemented in R v.2.8.1.and made use of functions in the *spatstat* package (Baddeley and Turner, 2005). The R code for the Plotkin et al. (2002) algorithm is available upon request and instructions for implementing it in ArcMAP v10 are provided in the Appendix.

## 3. Results

### 3.1. Climate analog reference conditions

Annual AET and Deficit values at the Harrod sites were generally consistent with the productivity and moisture gradients of the respective plant associations described in Lillybridge et al. (1995). Ponderosa pine associations had the highest Deficit followed by the Douglas-fir/bitterbrush/bunchgrass (*Purshia-tridentata/Agropyron-spicatum*; PSME-High). Ponderosa pine associations are found on low productivity sites, too droughty for Douglas-fir, while the PSME-High association is found at the dry end of the Douglas-fir ecotone (Lillybridge et al., 1995). The PSME-Moderate and PSME-Low groups contained plant associations found on cooler and moister sites, with generally higher productivity and carrying capacity (Fig. 1).

The present-day Deficit value for the Wildcat site fell well within the range of the same plant association on the Harrod sites (Douglas-fir/shiny-leaf spirea-pinegrass) although AET values were higher. Deficit projections for the Wildcat site for the 2011–2040 period were within AET-Deficit levels for the PSME-Moderate group. By the 2041–70 period, the Wildcat AET-Deficit projections were similar to the ponderosa pine and PSME-High groupings. At the end of the 21st century, only the lowest Wildcat Deficit projections were similar to current ponderosa pine sites. The variability of the AET and Deficit projections increased through time due to increasing difference between the A2 and A1B emissions scenarios and the GCM projections in the second half of the century (IPCC, 2007).

### 3.2. Prescription development, implementation, and adaptive management

After initial training period, the marking crew implemented the prescription efficiently and created a mosaic pattern of clumps and openings (Fig. 2). The proportion of trees left in 2–4 tree clumps




**Fig. 2.** Upper panel displays tree spatial patterns for reference plot (100 m × 100 m), pre-treatment, and 4 treatment alternatives in the 2 ha monitoring plot (141 m × 141 m). ICO: individuals, clumps, and openings. PP: *Pinus ponderosa*. PM: *Pseudtosuga menziesii*. Projected crown radii are 3 m to indicate interlocking crowns and clump formation. Larger clump sizes are shown in darker green colors. Background coloration indicates the distance to nearest tree or gap edge from the centers of a 1 m cell grid – a graphical representation of the empty space function. The areas colored dark orange in plots are areas that are approximately 15 m from the nearest tree or gap edge. An opening with a relatively circular center of dark orange, such as in the Pre-treatment plot, has an approximate area of 0.07 ha (the area of a circle with a radius of 15 m). The long, sinuous opening the AM pattern, for example, has dark red in the middle indicating that it is roughly 50 m wide (2 × 25 m distance to the gap edge). The lower panel displays histograms that show the proportion of area in 3 m distance to nearest tree bins with corresponding colors. Bin labels are maximum values (e.g. 6 m = 3.01–6 m). (For interpretation of the references to color in this figure legend, the reader is referred to the web version of this article.)

closely approximated the target; 34–37% respectively, however, an insufficient number of trees were left in 5 + tree clump (4% vs. the target of 21%). Results from the 2 ha monitoring plot were similar (Fig. 3), but 10% of trees were left in 5+ tree clumps. Through discussions with the marking crew, we learned that the crew had difficulty deciding when to thin from below and when to leave smaller trees to form larger clumps. In addition, we had not defined the upper range of clump size for the 5+ tree clumps. Consequently, the crew left mostly 5–6 tree clumps and no clumps with more than eight trees. Most importantly, tracking results were not tallied until after marking was completed, so bias was not detected early in the implementation process when corrections could have been made. There was also some confusion as to whether stream buffer zones (no-entry "skips") should count as large clumps. Finally, our assumption that large openings would occur as a result of creating clumps did not prove correct (Fig. 2). Crews were uncomfortable with creating large openings, especially when it required marking large trees for removal.

Case No. 1:23-cv-01501-RMR Document 15-2 filed 09/29/23 USDC Colorado pg 129 of 367






**Fig. 3.** Proportion of trees in different clump size bins across different inter-tree distances in the 1 ha reference plot and pre-treatment and four treatment alternatives on the 2 ha monitoring plot: the actual treatment (ICO), adaptive management (AM), basal area (BA), and spacing based (Space). Clump size is defined as the number of trees comprising the clump. Six meters was used to define tree clumps in subsequent analyses (Fig. 5).

### 3.3. Treatment alternative and reference pattern envelopes

We accepted the hypothesis of no difference between the ICO treatment pattern and those of Harrod sites, as well as the hypotheses that the BA and Space treatment patterns were different than the Harrod sites. Most Harrod plots (23 out of 32) showed statistically significant deviance from complete spatial randomness (CSR) in the GoF test, and were clustered patterns. The remaining 9 plots displayed no difference from CSR, and none were uniform (see Appendix). The ICO treatment was also different from CSR and clustered, but was close to being a random pattern ($p = 0.048$) (Table 4, Fig. 4). Both the Wildcat reference site and the simulated AM treatment were different than CSR and clearly clustered ($p = 0.001$ and $p = 0.002$ respectively). The two patterns also followed a similar pattern of clustering and randomness at short (<6 m), intermediate (6–12 m), and long intermediate distances (>12 m). The BA and Space treatments displayed significant deviance from CSR and were uniform, although the BA pattern was close to random ($p = 0.047$). Compared directly to the Harrod $g(t)$ pattern envelope as opposed to a CSR envelope, the BA and Space treatments were near the boundary, or outside, of the Harrod envelope (Fig. 4B).

Comparison of the cumulative clump size distributions and the modified GoF rankings confirmed the results of the GoF tests (Table 4 & Fig. 5). Of the treatment patterns, the AM treatment was the most clumped, and was on the high end of clumping relative to the Harrod envelope (40th percentile). Approximately 1/3rd of the trees in this treatment were individuals, 1/3rd were in small clumps (2–4 trees), and 1/3rd were in medium clumps (5–9) (Fig. 3). It displayed high variation in the subsample of 0.5 ha plots laid out across the 2 ha plot (Figs. 2 and 5). The ICO treatment was less clumped relative to the Harrod envelope (65th percentile), with 52% of trees as individual trees, 40% in small clumps, and 8% in medium clumps; and more modest variation in the 0.5 ha subsamples. In the BA treatment, 70% of the trees were individuals trees with the remainder in small clumps. The pattern had little variation in the 0.5 ha subsamples, and was near the low clumping boundary of the Harrod envelope (95th percentile). The Space treatment created a pattern outside the Harrod envelope (100th percentile) with 90% of the trees as individuals, and no variation in the 0.5 ha subsamples. The percentile rankings of the four treatments varied somewhat using clump size distributions based on 5 and 7 m distances, but results were generally the same (Table 4).

Finally, the cumulative clump size distributions of the Harrod plots were plotted by AET/Deficit plant association group to assess

**Table 4**
Summary information for 1 ha reference plot and different patterns on 2 ha monitoring plot.

| | Plot/pattern | | | | | |
|---|---|---|---|---|---|---|
| | Reference | Pre-treat | ICO | AM | BA | Space |
| *Density and size* | | | | | | |
| Trees per ha | 48 | 221 | 64 | 70 | 67 | 65 |
| Mean dbh (cm) | 77.5 | 40.4 | 55.6 | 53.1 | 54.5 | 56.6 |
| Basal area ($m^2$/ha) | 24.9 | 32.7 | 16.7 | 16.9 | 16.9 | 17.5 |
| % Max stocking[1] | 40% | 64% | 30% | 31% | 30% | 31% |
| *Species composition* | | | | | | |
| PIPO (%BA) | 74% | 35% | 48% | 49% | 42% | 39% |
| PSME (%BA) | 26% | 65% | 52% | 51% | 58% | 61% |
| Pattern type | Clumped | Clumped | Clumped | Clumped | Uniform | Uniform |
| *PCF results* | | | | | | |
| *p*-Value | 0.001 | 0.001 | 0.048 | 0.002 | 0.048 | 0.008 |
| Distances (m) | 0.1–6.7 and 9.8–12.5 | 0.1–9.3 and 14.0–15.1 | 0.3–3.7 | 0.1–5.8 and 6.7–10.2 | 0.1–2.2 and 3.5–6.4 and 11.2–12.5 | 0.1–7.7 |
| *Harrod percentile rank* | | | | | | |
| 5 m | 22% | | 68% | 49% | 95% | 97% |
| 6 m | 35% | | 65% | 41% | 95% | 100% |
| 7 m | 46% | | 49% | 39% | 81% | 100% |

ICO (individuals, clumps, and openings) is actual field treatment. AM is adaptive management, BA is basal area. Percent of maximum stocking is calculated in Stand Density Index with a maximum value of 800. PIPO: *Pinus ponderosa*. PSME: *Pseudotsuga menziesii*. PCF (pair correlation function) *p*-values are derived from a Monte Carlo goodness of fit test to test for significant difference from complete spatial randomness (CSR) from 0–12.5 m. Distances are the inter tree distances at which the pattern differs from the maximum or minimum envelope of 1000 CSR patterns. Harrod percentile ranks are the percentile rank of the pattern relative to the 32 Harrod patterns; lower values are more clumped and higher values are more uniform.




**Fig. 4.** Point pattern statistics for study plots and Harrod et al. (1999) plots. Panels A and B compare envelopes of the pair correlation function of 32 Harrod et al. (1999) plots with the reference plot, field treatment (ICO), and 3 simulated treatments: adaptive management (AM), basal area (BA), and spacing based (Space). The majority (72%) of the Harrod plots display clustered tree patterns, while the remainder are random (panel A) based on a Monte Carlo goodness of fit test which evaluated patterns from 1 m to 12.5 m. Panels C and D show pair correlation functions of study plots with 95th percentile CSR envelopes. Distances at which curves are within CSR envelopes indicate spatially random tree patterns, while curves above or below CSR envelopes indicate clustered or uniform patterns, respectively. The CSR envelope of reference plot (panel C) is larger due to its lower point density.

the effect of AET/Deficit on pattern (Fig. 5). Patterns dominated by medium to large clumps (10+ trees), as well as patterns with mostly individual trees and small clumps, were found in all of the plant association groupings. The ponderosa pine grouping had only one medium clump pattern, however, with the rest containing predominantly individuals and small clumps (2–4 trees).

### 3.4. Functional attributes of resilience

By design, density and average diameter measures were similar among the ICO and three simulated treatments (Table 4). A major difference was the greater retention of small and mid-size pine in the ICO and AM treatments compared to the BA and Space treatments (Fig. 6). In the AM treatment, removing additional large trees (>65 cm dbh) was necessary to create openings. This resulted in retention of 7.5 vs. 10 large (>65 cm dbh) Douglas-fir per ha and 7.5 vs. 8 large pine per ha in the AM vs. ICO treatments, respectively. Large trees were also cut in the BA and Space treatments, but to achieve uniform spacing. The proportion of pine basal area was 10% higher in the ICO and AM treatments compared with the BA and Space treatments, but was still 25% less than the reference plot (Table 4).

The BA and Space treatments resulted in zero pine susceptible to mountain pine beetle mortality based on the critical SDI thresholds from the Wildcat site (Fig. 7). If the lower SDI thresholds from the High-Deficit PIPO and PSME plant associations on the Harrod sites are considered, approximately 25% of the pine were susceptible (the extent of the boxplot above the threshold lines in Fig. 7). In the ICO and AM treatments, approximately 50% and 66% of the pine were susceptible, respectively, using the lower SDI thresholds. Trees in the Harrod plots, pooled by plant association grouping, and the Wildcat reference site showed a wider range of inter-tree competitive conditions than any of the treatments. In all groupings, 30–45% of the pines were above their site specific critical SDI thresholds (Fig. 7). Extreme SDI values (2000+) caused by large clumps of large diameter trees were not uncommon in the reference stands.

The spatially explicit plots and histograms of the $F(t)$ function showed differences in the total area, size, and shape of openings among the patterns (Fig. 2). Large openings, defined as those with the opening center $\geqslant$15 m from a tree or gap edge, were generally sinuous, ill-defined, and lacked distinct boundaries. The shape and approximate area of large openings can be estimated by examining the background color surfaces of the stem maps in Fig. 2 Approximately 21% of the area in the Wildcat reference plot was >15 m

FS-001162

Case No. 1:23-cv-01501-RMR Document 15-2 filed 09/29/23 USDC Colorado pg 131 of 367






**Fig. 5.** Comparison of the cumulative clump size distributions for reference and treatment plots against shaded envelope of Harrod et al. (1999) plots. Top row compares plots from Harrod et al. (1999) by plant association groupings from Fig. 1. Bottom row displays the reference plot, and four treatment alternatives: actual treatment (ICO), adaptive management (AM), basal area (BA), and spacing based (Space). In bottom row, bold lines show the distributions of the whole plots. Narrow lines are 0.5 ha sub-samples taken across each large plot using a 0.5 ha (100 m × 50 m) moving window. Clump size is the number of trees in a clump and is based on a 6 m inter-tree distance.




**Fig. 6.** Diameter distributions of reference plot, ICO treatment, and three simulated treatment alternatives: adaptive management (AM), basal area (BA), and spacing based (Space). Only leave trees are shown.

from a tree or gap edge, while the AM and ICO treatments displayed 10% and 2%, respectively. The BA and Space treatments did not contain any area >15 m from a gap edge.

## 4. Discussion

### *4.1. Prescription development, implementation, and adaptive management*

The ICO method proved to be a useful framework for conceptualizing stands as mosaics of individuals, clumps and openings. Spatially assessing variation in tree density in terms of individuals and clumps instead of basal area or spacing required training, but resulted in a more intuitive and concrete way for the marking crew to understand and create the desired heterogeneity. Use of a single distance based on crown interlock was necessary to clearly define tree clumps and make implementation operationally tractable. There is no single correct crown overlap distance (Sánchez Meador et al., 2011), however, and choosing a 5 m or 7 m distance would have resulted in somewhat different target proportions for clumps and individuals. Selecting a 5, 6, or 7 m distance would have resulted in highly similar patterns, as the proportion of trees in small, medium, and large clumps increased in a roughly linear fashion with inter-tree distances from 4 m to 7 m (Fig. 3).

The insufficient number of large clumps and openings in the ICO mark demonstrated the need for monitoring and adaptive learning when transitioning to new approaches (Knapp et al., 2012). In subsequent restoration projects, we have added a bin for larger clumps and now use four: individual trees, small clumps (2–4




**Fig. 7.** Boxplot showing distribution of Stand Density Index values for 8 m radius plots placed around all ponderosa pine trees for reference plot; four treatment alternatives; and plots from Harrod et al. (1999) grouped by plant association/water balance deficit level from Fig. 1. Black lines in center of boxes are medians, boxes show the interquartile range (25–75%) and whiskers show the 10–90% range. Critical threshold values are for mountain pine beetle mortality. SDI values are in metric units; to convert to English units divide by 2.47. The proportion of trees above the thresholds for a plot (as shown by the intersection of the respective boxplot and the threshold line) is the proportion of trees considered at risk to mountain pine beetle mortality.

trees), medium clumps (5–9 trees) and large clumps (10–20 trees). We also created a simple tracking system for both leave and cut tree marking that provides real time feedback during marking. Crews are now consistently meeting the clump targets in ongoing projects based on results from this tracking system. Once crews are familiar with the methods, we are finding that it takes a similar amount of time to implement as more traditional marking approaches. More details on implementing the method are available from the corresponding author.

Another lesson learned was the need to provide explicit direction for the creation of large openings. Retaining large, fire tolerant trees is a key principle of dry forest restoration and increasing resilience (Agee and Skinner, 2005; Hessburg and Agee, 2003; Taylor and Skinner, 2003), and removal of pre-settlement era trees (old trees) is not necessary to restore pattern (Franklin and Johnson, 2012). However, we concur with others that rigid diameter limits, with no flexibility for young trees or fire intolerant species, can conflict with restoration of spatial pattern and other objectives (Abella et al., 2006; North et al., 2007). Other factors to consider when creating openings are edaphic conditions such as shallow soils and disturbance processes, including prescribed fire. Refining methodologies to quantify openings in reference patterns is also needed to provide more explicit guidelines for openings.

The ICO method is one approach to implementing variable density (Carey, 2003; O'Hara et al., 2012) or free thinning (Tappeiner et al., 2007). A key challenge for any approach that seeks to create within-stand heterogeneity is to balance the needs for (1) concrete, ecologically based targets for spatial pattern that can be objectively monitored, (2) sufficient flexibility to achieve other structural and compositional objectives (e.g., Table 1), and (3) operational simplicity and efficiency (North and Sherlock, 2012; O'Hara et al., 2012). In designing the ICO method, we explicitly sought to balance these needs by combining elements of other approaches that use spatial information from dry forest reference conditions. The direct, transparent link to reference conditions is similar to the methods of Covington et al. (1997) and Waltz et al. (2003), who used the locations of pre-settlement stumps, snags, and downed logs to guide spatial patterns of tree retention. However, the ICO method is not based off the pre-settlement locations of clumps and thus does not require that evidence of pre-settlement pattern be present. Our approach seeks a middle ground between direct reliance on pre-settlement structures and more flexible "free selection" methods (Lynch et al., 2000; Graham et al., 2007; Jain et al., 2008; Mitchell et al., 2006), which typically lack concrete targets for spatial pattern, require more judgment to implement, and can result in stands that are overly clumped relative to reference conditions (North et al., 2007). Our method is similar to approaches that prescribe a target distribution of basal area or SDI and instruct marking crews to create patches of different densities while incorporating other leave tree criteria (Harrod et al., 1999; USFS, 2008). Similar to Knapp et al. (2012), we have found that identifying and tracking tree clumps is more intuitive and efficient than using basal area. Finally, the ICO method is conceptually similar to several uneven-age, multi-cohort management approaches (e.g. Bailey and Covington, 2002; O'Hara, 1996), and would benefit from more rigorous quantification of growing space allocation using tools from these approaches.

No prescription approach is optimal for all stand conditions, operational systems, and objectives. The ICO method works best in even-age stands simplified by past management. It may not be the right tool in stands with serious forest health issues, poor live crown ratios, or where a major shift in species composition is needed. In stands with large numbers of live pre-settlement era trees, simply retaining these trees can restore spatial pattern (Larson et al., 2012; Lutz et al., 2012), although the ICO method can be useful for managing younger cohorts in such stands.

Another challenge is obtaining stem map data. Stem maps are not mandatory to implement the method, however. Regional reference datasets exist for most areas of the interior western US (Larson and Churchill, 2012). An effort is underway to quantify regional reference pattern envelopes through a meta-analysis of all existing reference stem maps and make the information available to managers in a user friendly format. Additional 3–10 ha stem maps will be needed to ensure that existing datasets indeed capture the range of variation in pattern across the dry forest landscape. Use of remote sensing tools in areas with minimally altered or intact fire regimes to derive reference clump and opening size distributions over larger spatial extents is needed to examine variation in pattern relative to shifts in biophysical conditions, as well as to ensure that the upper range of clump and opening sizes

is captured. Field methods to sample clump and opening size distributions without a full stem map are also needed. Finally, further examination of the edge effects on clump size distributions is warranted.

### 4.2. Climate analog reference conditions

Climate analog reference conditions offer a way of utilizing information from pre-settlement era conditions while factoring in climate change projections (Gärnter et al., 2008; Keane et al., 2009). By modeling the climate envelopes of plant associations instead of species presence/absence, we were able to show that future projected AET-Deficit of our study site may be within the range of the Harrod sites, at least through the middle of the century. This suggests that Douglas-fir and ponderosa pine will likely be viable species in this area for multiple decades, although productivity and carrying capacity may decline. Other studies have found similar results using climate envelope models (Littell et al., 2010; Rehfeldt et al., 2006), as well as mechanistic models (Coops and Waring, 2011; Griesbauer et al., 2011). Deficit is also a major driver of the two primary disturbance agents in this ecosystem: fire occurrence and severity (Littell et al., 2009; Westerling et al., 2006) and insect related mortality (Littell et al., 2010).

As forest structure and spatial pattern at this scale are shaped by the interaction of vegetation types, fine-scale biophysical variables, disturbances, and climate (Moritz et al., 2011), we assumed that the Harrod sites on moderate and high Deficit plant associations (Fig. 1) were reasonable climate analog reference sites. The plots on these plant associations encompassed almost the full range of the spatial patterns found in the Harrod reference envelope (Fig. 5), whereas the plots on ponderosa pine associations contained predominantly individual trees and small clumps, with only one large clump of 11 trees. This suggests that moisture and site productivity limited pattern only on the harshest Harrod sites, which are currently at the forest and shrub-steppe ecotone (Lillybridge et al., 1995). Abella and Denton (2009) also found reduced clumping on soils with lower moisture and nitrogen levels in ponderosa pine forests in Northern Arizona and attributed it to limitations on tree establishment. Based on the observed relationships between plant association groupings, clump size distributions, and AET-Deficit relations, the full Harrod pattern envelope is a reasonable reference pattern envelope for the Wildcat site through the first climate projection period (2010–2040). After that, the ability of the site to support large clumps may be diminished.

As with all climate change projections, our conclusions must be interpreted and applied in the context of the associated model uncertainty. Climate change models and projected ecological effects are best interpreted at watershed (10,000+ ha) or larger scales (Peterson et al., 2011). Downscaling climate data to the stand scale introduces additional error, especially in complex terrain with strong orographic and microsite effects, such as in our study area (Lundquist and Cayan, 2007). Our method does not factor in localized and fine-scale weather patterns such as cold air drainage and pooling (Daly et al., 2010). Furthermore, changes in other climate variables such as growing season timing and length and minimum winter temperatures may result in additional physiological stress and maladaptation issues (Chmura et al., 2011; Griesbauer et al., 2011). Climate envelope approaches such as ours rely on the assumption that current species ranges are constrained primarily by climate, a top-down spatial control, and that past and future climates will feature similar climate envelopes for each species.

Despite these limitations, use of climate analog reference conditions translates climate projections into site-specific information for managers that is based on empirical relationships between the predicted climate, potential species viability, and site potential. The fact that AET and Deficit captured differences among plant associations reasonably well confirm that they are good composite variables for the components of the biophysical environment that affect plant distributions (Stephenson, 1998). Perhaps most importantly, the climate analog approach facilitates a forward-looking forest restoration paradigm that is not based on recreating historical conditions, but seeks to utilize historical information to restore pattern-process relationships appropriate to specific climatic conditions.

While recommended, we stress that climate analog reference conditions are not required to use the ICO approach. The ICO method is a way to incorporate spatial reference information into prescriptions and marking guidelines, while the climate analog approach is a framework for selecting climate-appropriate reference conditions. Dry forest treatments based on historical reference conditions alone are generally a positive step towards climate adaptation and resilience (Keane et al., 2009; Spies et al., 2010), and spatial patterns can be adjusted in future entries as the climate changes.

### 4.3. Treatment alternatives and reference pattern envelopes

The BA and Space simulated treatments resulted in patterns that differed from the Harrod reference envelopes and the AM and ICO treatments in two key ways. First, the BA and Space patterns were uniform *and* had relatively high densities (tph). Many of the Harrod patterns (30%) were random and the rest clustered, similar to other reconstruction studies (Abella and Denton, 2009; Binkley et al., 2008; North et al., 2007; Youngblood et al., 2004). A few were close to being statistically uniform, but these had much lower densities than the 64–70 tph of the treatment alternatives (see Appendix). The higher densities, combined with more regular spacing, explain why the BA and Space patterns are statistically different from the Harrod patterns using the GoF test, but within part or all of the Harrod envelopes for the $g(t)$ and clump size distributions. As density increases, the "additional" trees are more likely to be found in larger clumps rather than spaced out evenly across the stand. This is an intuitive result given that regeneration in dry forests is typically clumped and often associated with patchy mortality of overstory trees (Sánchez Meador et al., 2009). The BA and Space patterns also lacked of variation in the 0.5 ha subsamples across the 2 ha plot (Fig. 5). Regularly spaced, individual trees are indeed a component of reference patterns. However, the Harrod plots, along with other studies (Abella and Denton, 2009; Youngblood et al., 2004), suggest that regularly spaced trees rarely cover more than 0.5 ha of contiguous area at densities >50 tph.

It is clear that applied over entire stands, or especially multiple contiguous stands, stand-average basal area and spacing based prescriptions do not restore the range of patterns that existed when frequent fire occurred. Over time, prescribed fire, natural disturbances, and post-treatment stand development will cause mortality, openings, regeneration, and new clump formation (Stephens et al., 2009; Waltz et al., 2003). These processes will likely nudge the BA and Space patterns into the reference envelope over time. However, it may take a long time for natural processes to create openings, and clumps of overstory trees will take many decades to re-form if eliminated during treatments. Basal area and spacing approaches can be modified to leave a greater range of density (e.g. USFS, 2008), but explicitly prescribing the creation of openings and retention of large clumps in such prescriptions may be necessary to achieve the desired pattern.

### 4.4. Managing for resilience

The primary objective of the treatment was not to recreate the pre-settlement forest but to enhance resilience. Tree patterns in the AM treatment displayed a steeper "gradient of resistance" to different disturbance agents across the plot (*sensu* Moritz et al.,

2011), similar to many of the Harrod plots. At one end of this gradient are "fences" of high resistance that may slow or stop the spread of high intensity disturbance, such as openings or areas of widely spaced trees. At the other end of the gradient are patches of potential instability that can lead to decadence, mortality, and subsequent regeneration of early-seral species (Odion and Sarr, 2007). Examples include high density clumps that are well above critical beetle thresholds, mistletoe patches, or multistory tree clumps conducive to torching. The steeper gradient of resistance in the AM pattern compared to the other patterns predisposes it to higher variation in disturbance effects and post-disturbance development pathways (Parisien et al., 2010; Thaxton and Platt, 2006; Waltz et al., 2003). In theory, patterns with more fences and corridors are less susceptible to high severity disturbances that reset entire stands (North et al., 2009; Stephens et al., 2010) and initiate non-linear shifts to new system states (Messier and Puettmann, 2011; Paine et al., 1998). As the pattern of past disturbances influences future distances (Collins et al., 2009; Peterson, 2002), the mosaic will theoretically be more likely to replenish itself and maintain its basic pattern elements over time through fine-scale, gap phase replacement even as the climate changes. Larger scale climate drivers and disturbances will occasionally override the effects of stand level patterns, however (Turner, 2010).

Tree patterns in the BA and Space treatments contain fewer ponderosa pines susceptible to mortality from mountain pine beetle attack due to more uniform spacing and a lower proportion of pine to Douglas-fir. Higher clumping levels in the AM treatment would likely sustain higher endemic levels of bark beetle mortality, especially during drought periods (Olsen et al., 1996) and where warming trends lead to non-linear changes in beetle life histories and survivorship (Bentz et al., 2010). However, the fact that 30–45% of pines were above beetle thresholds in the Harrod plots demonstrates that many old trees are able to persist in high density clumps, embedded in a mosaic of individuals and openings, for multiple centuries. High severity insect outbreaks did occur historically (Weaver, 1961).

From a climate adaptation standpoint, ongoing tree mortality from endemic levels of insects and pathogens is an important element of resilience and system adaptation. Periodic mortality and subsequent regeneration pulses likely select for genotypes adapted to a wider range of climate regimes than regeneration that establishes quickly after a single severe disturbance event, thereby taping into the high level of local genetic variability in ponderosa pine and Douglas-fir (Hamrick et al., 1989; Linhart et al., 1981). The larger openings in the AM pattern and potential for "time release mortality" of clumps and subsequent regeneration may lead to higher levels of establishment and faster growth of seedlings (Boyden et al., 2005; Fajardo et al., 2006; Sánchez Meador et al., 2009; York et al., 2004). Regeneration will thus more quickly attain size classes capable of reproduction, which may facilitate a gradual *in situ* shift to Douglas-fir and pine genotypes adapted to new climates (Chmura et al., 2011). More uniform treatments may result in less mortality in the short run, but if implemented over large areas may lead to landscapes that have less capacity to adapt to new climates.

There is no single, optimal stand-level approach to maximizing resilience and adaptive capacity for all future conditions. As the climate changes, shifts in the interactions among the vegetation, disturbances, and the climate are likely to give rise to evolving communities and pattern-process relationships (McKenzie et al., 2009; Williams et al., 2007). A resilience strategy that maximally conserves options is prudent. Thus, it is sensible to vary patterns and structure types between stands, thereby varying risk levels and functional tradeoffs among different organisms and processes, as well as economic and social factors. Applying any single treatment type over a large area will increase risks of unintended consequences. Selection of specific strategies and targets for individual stands first requires planning over larger spatial extents in order to link stand-level prescriptions to larger scale resilience strategies (Gaines et al., 2010; Keane et al., 2009; Peterson et al., 2011; Spies et al., 2010). In many cases, disparate stands may need to be blended together into larger patches to restore resilient patch size distributions (Hessburg et al., 2004; Moritz et al., 2011). In other cases, stands may need to be broken up into smaller patches. Stand-level reference envelopes can be used to accomplish this, while also providing ecologically based targets for within-stand heterogeneity. For example, reference patterns that contain high levels of clumping and openings can be used to guide prescriptions for some stands and less clumped patterns used for others. Varying overall density and species composition targets, guided by biophysical setting (North et al., 2009), will also enhance resilience.

## 5. Conclusion

Managing dry forest landscapes to increase resilience in the face of changing climate and fire regimes poses an immense challenge. Considerable research confirms that dry forest landscapes were heterogeneous at multiple scales prior to the period of fire suppression, and that this heterogeneity was an important driver of the resilience of these systems. This research identified methods that (1) quantified a range of spatial reference patterns to provide concrete targets for stand-level restoration treatments, (2) translated these ranges into operationally efficient marking guidelines, and (3) facilitated monitoring and evaluation of treatment effectiveness. Furthermore, we developed a tractable method to critically evaluate historical reference targets in light of climate change based on empirical correlations between pattern and biophysical conditions, expressed through site water balance and plant association groups. Climate envelope modeling can indicate a site's projected future water balance, thereby allowing managers to select treatment targets from reference sites that are analogous to the projected future conditions of the treatment site. But with or without a climate analog assessment, restoring mosaics of individual trees, clumps, and openings can make future forests more resilient by re-establishing pattern-process linkages. Minimizing treatments that result in spatial homogeneity over large areas can avoid conditions that are likely more susceptible to large-scale, high severity disturbance events. The ICO method provides a quantitative framework to vary pattern both within and among stands that is directly related to reference conditions and can be tailored to the current and future conditions of specific stand. Although initially challenging, managing for spatial heterogeneity can be done.

## Acknowledgements

We thank Richy Harrod and Brad McRae for sharing data from their reconstruction plots. We thank David L. Peterson, Jon Bakker, Amy Waltz, Kerry Melten, and Rick Brown, and two anonymous reviewers for constructive and helpful reviews. We especially acknowledge Dave Lucas and Miles Porter for their willingness to do the tree marking and assist with stem mapping. Funding was provided by NSF IGERT Grant: DGE-0654252. Jodi Leingang from the Naches Ranger District of the Okanogan–Wenatchee National Forest provided key staffing resources. Bert Loosmore developed the R code for the clumping algorithm. Ryan Huago assisted with stem mapping.

## Appendix. Supplementary material

Supplementary data associated with this article can be found, in the online version, at http://dx.doi.org/10.1016/j.foreco.2012.11.007.

## References


Abella, S.R., Denton, C.W., 2009. Spatial variation in reference conditions: historical tree density and pattern on *Pinus ponderosa* landscape. Canadian Journal of Forest Research 39, 2391–2403.

Abella, S.R., Fule, P.Z., Covington, W.W., 2006. Diameter caps for thinning southwestern ponderosa pine forests: viewpoints, effects, and tradeoffs. Journal of Forestry 104, 407–414.

Agee, J.K., 1993. Fire Ecology of Pacific Northwest Forests. Island Press, Washington, DC.

Agee, J.K., Skinner, C.N., 2005. Basic principles of forest fuel reduction treatments. Forest Ecology and Management 211, 83–96.

Allen, C.D., Savage, M., Falk, D.A., Suckling, K.F., Swetnam, T.W., Schulke, T., Stacey, P.B., Morgan, P., Hoffman, M., Klingel, J.T., 2002. Ecological restoration of Southwestern ponderosa pine ecosystems: a broad perspective. Ecological Applications 12, 1418–1433.

Arno, S.F., Scott, J.H., Hartwell, M.G., 1995. Age-class Structure of Old Growth Ponderosa Pine/Douglas-Fir Stands and Its Relationship to fiRe History. US Department of Agriculture, Forest Service, Intermountain Research Station.

Baddeley, A.J., Turner, R., 2005. Spatstat: an R package for analyzing spatial point patterns. Journal of Statistical Software 12, 1–42.

Bailey, J.D., Covington, W.W., 2002. Evaluating ponderosa pine regeneration rates following ecological restoration treatments in northern Arizona, USA. Forest Ecology and Management 155, 271–278.

Baron, J., Gunderson, L.H., Allen, C., Fleishman, E., McKenzie, D., Meyerson, L., Oropeza, J., Stephenson, N.L., 2009. Options for national parks and reserves for adapting to climate change. Environmental Management 44, 1033–1042.

Barret, J.W., 1978. Height Growth and Site Index Curves for Managed, Even-aged Stands of Ponderosa Pine in the Pacific Northwest. USDA Forest Service. Pacific Northwest Research Station Research Paper PNW-RP-232.

Beaty, M.R., Taylor, A.H., 2007. Fire disturbance and forest structure in old-growth mixed conifer forests in the northern Sierra Nevada, California. Journal of Vegetation Science 18, 879–890.

Bentz, B.J., Regniere, J., Fettig, C.J., Hansen, E.M., Hayes, J.L., Hicke, J.A., Kelsey, R.G., Negron, J.F., Seybold, S.J., 2010. Climate change and bark beetles of the western United States and Canada: direct and indirect effects. BioScience 60, 602–613.

Binkley, D., Sisk, T., Chambers, C., Springer, J., Block, W., 2007. The role of old-growth forests in frequent-fire landscapes. Ecology and Society 12, 18.

Binkley, D., Romme, B., Cheng, T., 2008. Historical forest structure on the Uncompahgre Plateau: informing restoration prescriptions for mountainside stewardship. . Colorado Forest Restoration Institute, Colorado State University.

Boyden, S., Binkley, D., Shepperd, W., 2005. Spatial and temporal patterns in structure, regeneration, and mortality of an old-growth ponderosa pine forest in the Colorado Front Range. Forest Ecology and Management 219, 43–55.

Carey, A.B., 2003. Biocomplexity and restoration of biodiversity in temperate coniferous forest: inducing spatial heterogeneity with variable-density thinning. Forestry 76, 127–136.

Carnwath, G.C., Peterson, D.W., Nelson, C.R., 2012. Effect of crown class and habitat type on climate–growth relationships of ponderosa pine and Douglas-fir. Forest Ecology and Management 285, 44–52.

Chmura, D.J., Anderson, P.D., Howe, G.T., Harrington, C.A., Halofsky, J.E., Peterson, D.L., Shaw, D.C., 2011. Forest responses to climate change in the northwestern United States: ecophysiological foundations for adaptive management. Forest Ecology and Management 261, 1121–1142.

ClimateWNA, 2012. ClimateWNA: A Program to generate climate normal data for genecology and climate change studies in western North America (WWW Document). <http://www.genetics.forestry.ubc.ca/cfcg/ClimateWNA/ClimateWNA.html> (accessed 4.10.12).

Cochran, P.H., 1994. Suggested Stocking Levels for Forest Stands in Northeastern Oregon and Southeastern Washington. USDA Pacific Northwest Research Station Reseach Note PNW-RN-513.

Collins, B.M., Miller, J.D., Thode, A.E., Kelly, M., van Wagtendonk, J.W., Stephens, S.L., 2009. interactions among wildland fires in a long-established sierra Nevada natural fire area. Ecosystems 12, 114–128.

Contreras, M.A., Affleck, D., Chung, W., 2011. Evaluating tree competition indices as predictors of basal area increment in western Montana forests. Forest Ecology and Management 262, 1939–1949.

Cooper, C.F., 1960. Changes in vegetation, structure, and growth of southwestern pine forests since white settlement. Ecological Monographs 30, 130–164.

Coops, N.C., Waring, R.H., 2011. Estimating the vulnerability of fifteen tree species under changing climate in Northwest North America. Ecological Modelling 222, 2119–2129.

Covington, W.W., Fule, P.Z., Moore, M.M., Chan, S.C., Kolb, T.E., Mast, J.N., Sackett, S.S., Wagner, M.R., 1997. Restoring ecosystem health in ponderosa pine forests of the southwest. Journal of Forestry 95, 23–29.

Daly, C., Halbleib, M., Smith, J.I., Gibson, W.P., Doggett, M.K., Taylor, G.H., Curtis, J., Pasteris, P.P., 2008. Physiographically sensitive mapping of climatological temperature and precipitation across the conterminous United States. International Journal of Climatology 28, 2031–2064.

Daly, C., Conklin, D.R., Unsworth, M.H., 2010. Local atmospheric decoupling in complex topography alters climate change impacts. International Journal of Climatology 30, 1857–1864.

Daubenmire, R., 1976. Use of vegetation in assessing productivity of forest lands. Botanical Review 42, 115–143.

Diggle, P.J., 2003. Statistical Analysis of Spatial Point Patterns. Academic Press, New York, NY.

Dingman, S.L., 2002. Physical Hydrology. Prentice Hall, Upper Saddle River, NJ.

Dodd, N.L., Schweinsburg, R.E., Boe, S., 2006. Landscape-scale forest habitat relationship to tassel-eared squirrel populations: implications for ponderosa pine forest restoration. Restoration Ecology 14 (14), 537–547.

Dodson, E.K., Peterson, D.W., Harrod, R.J., 2008. Understory vegetation response to thinning and burning restoration treatments in dry conifer forests of the eastern Cascades, USA. Forest Ecology and Management 255, 3130–3140.

ESRI, 2012. ArcGIS Desktop 10 – An Overview of the Solar Radiation Tools. <http://help.arcgis.com/en/arcgisdesktop/10.0/help> (accessed 12.05.12).

Fajardo, A., Goodburn, J.M., Graham, J., 2006. Spatial patterns of regeneration in managed uneven-aged ponderosa pine Douglas-fir forests of Western Montana, USA. Forest Ecology and Management 223, 255–266.

Fettig, C.J., Klepzig, K.D., Billings, R.F., Munson, A.S., Nebeker, T.E., Negrón, J.F., Nowak, J.T., 2007. The effectiveness of vegetation management practices for prevention and control of bark beetle infestations in coniferous forests of the western and southern United States. Forest Ecology and Management 238, 24–53.

Finney, M.A., Seli, R.C., McHugh, C.W., Ager, A.A., Bahro, B., Agee, J.K., 2007. Simulation of long-term landscape-level fuel treatment effects on large wildfires. International Journal of Wildland Fire 16, 712–727.

Fortin, M.J., Dale, M.R.T., 2005. Spatial Analysis: A Guide for Ecologists. Cambridge University Press, Cambridge, UK.

Franklin, J.F., Johnson, K.N., 2012. A restoration framework for federal forests in the Pacific Northwest. Journal of Forestry. http://dx.doi.org/10.5849/jof.10-006.

Franklin, J.F., Swanson, F.J., Harmon, M.E., Perry, D.A., Spies, T.A., Dale, V.H., McKee, A., Ferrel, W.K., Means, J.E., 1991. Effects of global climatic change on forests in northwestern North America. Northwest Environmental Journal 7, 233–254.

Franklin, J.F., Mitchell, R.J., Palik, B.J., 2007. Natural Disturbance and Stand Development Principles for Ecological Forestry. USDA Forest Service Northern Research Station General Technical, Report NRS-GTR-19, pp. 1–44.

Franklin, J.F., Hemstrom, M.A., Van Pelt, R., Buchanan, J.B., 2008. The Case for Active Management of Dry Forest Types in Eastern Washington: Perpetuating and Creating Old Forest Structures and Function. Washington State Department of Natural Resources Report, Olympia, WA.

Fule, P.Z., 2008. Does it make sense to restore wildland fire in changing climate? Restoration Ecology 16, 526–531.

Gaines, W.L., Harrod, R.J., Dalhgreen, M.C., 2010. The Okanogan-Wenatchee National Forest Restoration Strategy: A Process for Guiding Restoration Projects Within the Context of Ecosystem Management. Okanogan-Wenatchee National Forest, Wenatchee, WA.

Gärnter, S., Reynolds, K.M., Hessburg, P.F., Hummel, S., Twery, M., 2008. Decision support for evaluating landscape departure and prioritizing forest management activities in a changing environment. Forest Ecology and Management 256, 1666–1676.

Gersonde, R., Battles, J.J., O'Hara, K.L., 2004. Characterizing the light environment in Sierra Nevada mixed-conifer forests using a spatially explicit light model. Canadian Journal of Forest Research 34, 1332–1342.

Goheen, D.J., Hansen, E.M., 1993. Effects of pathogens and bark beetles on forests. In: Schowalter, T.D., Filip, G.M. (Eds.), Beetle–Pathogen Interactions in Conifer Forests. Academic Press, London, UK, pp. 175–196.

Graham, R., Jain, T., Sandquist, J., 2007. Free selection: a silvicultural option. In: Powers, R.F. (Ed.), Restoring Fire-adapted Ecosystems: Proceedings of the 2005 National Silviculture Workshop. USDA Forest Service, Pacific Southwest Research Station General Technical, Report. GTR-PSW-203, pp. 121–156.

Graham, R., McCaffrey, S., Jain, T., 2004. Science basis for changing forest structure to modify wildfire behavior and severity. USDA, Forest Service Rocky Mountain Research Station. General Technical, Report RMRS-GTR-120.

Griesbauer, H.P., Green, D.S., O'Neill, G.A., 2011. Using a spatiotemporal climate model to assess population-level Douglas-fir growth sensitivity to climate change across large climatic gradients in British Columbia, Canada. Forest Ecology and Management 261, 589–600.

Hamrick, J., Blanton, H., Hamrick, K., 1989. Genetic-structure of geographically marginal populations of ponderosa pine. American Journal of Botany 76, 1559–1568.

Harrod, R.J., McRae, B.H., Hartl, W.E., 1999. Historical stand reconstruction in ponderosa pine forests to guide silvicultural prescriptions. Forest Ecology and Management 114, 433–446.

Hawksworth, F.G., Wiens, D., Geils, B.W., Nisley, R.G., 1996. Dwarf Mistletoes: Biology, Pathology, and Systematics. Agricultural Handbook 709. USDA, Forest Service, Washington, DC.

Hessburg, P.F., Agee, J.K., 2003. An environmental narrative of Inland Northwest United States forests, 1800–2000. Forest Ecology and Management 178, 23–59.

Hessburg, P.F., Mitchell, R.G., Filip, G.M., 1994. Historical and Current Roles of Insects and Pathogens in Eastern Oregon and Washington Forested Landscapes. Pacific Northwest Research Station General Technical, Report PNW-GTR-327.

Hessburg, P.F., Smith, B.G., Salter, R.B., 1999. Detecting change in forest spatial patterns from reference conditions. Ecological Applications 9, 1232–1252.

Hessburg, P.F., Smith, B.G., Kreiter, S.D., Richmond, M.B., 2004. Using a decision support system to estimate departures of present forest landscape patterns from historical conditions: an example from the Inland Northwest Region of the United States. In: Perera, A.H., Buse, L.J., Weber, M.G. (Eds.), Emulating Natural Forest Landscape Disturbances: Concepts and Applications. Columbia University Press, New York, NY, pp. 158–175.

Hessburg, P.F., Agee, J.K., Franklin, J.F., 2005. Dry forests and wildland fires of the inland Northwest USA: contrasting the landscape ecology of the pre-settlement and modem eras. Forest Ecology and Management 211, 117–139.

Hessburg, P.F., Salter, R.B., James, K.M., 2007. Re-examining fire severity relations in pre-management era mixed conifer forests: inferences from landscape patterns of forest structure. Landscape Ecology 22, 5–24.

Illian, J., Penttinen, A., Stoyan, H., Stoyan, D., 2008. Statistical Analysis and Modelling of Spatial Point Patterns Statistics. John Wiley & Sons, Chichester, UK.

IPCC, 2007. Climate Change 2007: WG I The Physical Science Basis. Cambridge University Press, New York, NY.

Jain, T.B., Graham, R.T., Sandquist, J., Butler, M., Brockus, K., Frigard, D., Cobb, D., Sup-Han, H., Halbrook, J., Denner, R., Evans, J.S., 2008. Restoration of northern Rocky Mountain moist forests: integrating fuel treatments from the site to the landscape. In: Deal, R.L. (Ed.), Integrated Restoration of Forested Ecosystems to Achieve Multiple Resource Benefits: Proceedings of the 2007 National Silviculture Workshop. USDA Forest Service, Pacific Northwest Research Station General Technical, Report. PNW-GTR-733, pp. 147–172.

Joyce, L.A., Blate, G.M., McNulty, S., Millar, C.I., Moser, S., Neilson, R.P., Peterson, D.L., 2009. Managing for multiple resources under climate change: national forests. Environmental Management 44, 1022–1032.

Kaufmann, M.R., Binkley, D., Fule, P.Z., Johnson, M., Stephens, S.L., Swetnam, T.W., 2007. Defining old growth for fire-adapted forests of the Western United States. Ecology and Society 12.

Keane, R.E., Hessburg, P.F., Landres, P.B., Swanson, F.J., 2009. The use of historical range and variability (HRV) in landscape management. Forest Ecology and Management 258, 1025–1037.

Knapp, E.E., North, M.P., Benech, M., Estes, B., 2012. The variable-density thinning study at Stanislaus-Tuolumne experimental forest. In: North, M.P. (Ed.), Managing Sierra Nevada Forests. USDA Forest Service, Pacific SW Research Station General Technical, Report. PSW-GTR-237, pp. 127–140.

Larson, A.J., Churchill, D., 2008. Spatial patterns of overstory trees in late-successional conifer forests. Canadian Journal of Forest Research 38, 2814–2825.

Larson, A.J., Churchill, D.C., 2012. Tree spatial patterns in fire-frequent forests of western North America, including mechanisms of pattern formation and implications for designing fuel reduction and restoration treatments. Forest Ecology and Management 267, 74–92.

Larson, A.J., Stover, K.C., Keyes, C.R., 2012. Effects of restoration thinning on spatial heterogeneity in mixed conifer forest. Canadian Journal of Forest Research 42, 1505–1517.

Levin, S.A., 1998. Ecosystems and the biosphere as complex adaptive systems. Ecosystems 1, 431–436.

Lillybridge, T.R., Kovalchik, B.L., Williams, C.K., Smith, B.G., 1995. Field Guide for Forested Plant Associations of the Wenatchee National Forest. USDA Forest Service. Pacific Northwest Research Station General Technical Report PNW GTR-359.

Linhart, Y., Mitton, J., Sturgeon, K., Davis, M., 1981. Genetic-variation in space and time in a population of Ponderosa pine. Heredity 46, 407–426.

Littell, J.S., Peterson, D.L., Tjoelker, M., 2008. Douglas-fir growth in mountain ecosystems: water limits tree growth from stand to region. Ecological Monographs 78, 349–368.

Littell, J.S., McKenzie, D., Peterson, D.L., Westerling, A.L., 2009. Climate and wildfire area burned in western U.S. ecoprovinces, 1916–2003. Ecological Applications 19, 1003–1021.

Littell, J.S., Oneil, E.E., McKenzie, D., Hicke, J.A., Lutz, J.A., Norheim, R.A., Elsner, M.M., 2010. Forest ecosystems, disturbance, and climatic change in Washington State, USA. Climatic Change 102, 129–158.

Loosmore, N.B., Ford, E.D., 2006. Statistical inference using the G or K point pattern spatial statistics. Ecology 87, 1925–1931.

Lundquist, J.D., Cayan, D.R., 2007. Surface temperature patterns in complex terrain: daily variations and long-term change in the central Sierra Nevada, California. Journal of Geophysical Research 112, D11124.

Lutz, J.A., van Wagtendonk, J.W., Franklin, J.F., 2010. Climatic water deficit, tree species ranges, and climate change in Yosemite National Park. Journal of Biogeography 37, 936–950.

Lutz, J.A., Larson, A.J., Swanson, M.E., Freund, J.A., 2012. Ecological importance of large-diameter trees in a temperate mixed-conifer forest. PLoS ONE 7, e36131.

Lydersen, J., North, M.P., 2012. Topographic variation in structure of mixed-conifer forests under an active-fire regime. Ecosystems 15, 1134–1146.

Lynch, D.L., Romme, W.H., Floyd, M.L., 2000. Forest restoration in southwestern ponderosa pine. Journal of Forestry 98, 17–24.

Ma, S.Y., Concilio, A., Oakley, B., North, M., Chen, J.Q., 2010. Spatial variability in microclimate in a mixed-conifer forest before and after thinning and burning treatments. Forest Ecology and Management 259, 904–915.

McKenzie, D., Peterson, D.W., Peterson, D.L., Thornton, P.E., 2003. Climatic and biophysical controls on conifer species distributions in mountain forests of Washington state, USA. Journal of Biogeography 30, 1093–1108.

McKenzie, D., Peterson, D.L., Littell, J.S., 2009. Global warming and stress complexes in forests of Western North America. In: Bytnerowicz, A., Arbaugh, M., Andersen, C., Riebau, A. (Eds.), Wildland Fires and Air Pollution. Developments in Environmental Science. Elsevier, Amsterdam, The Netherlands, pp. 319–338.

Messier, C., Puettmann, K.J., 2011. Forests as complex adaptive systems: implications for forest management and modelling. Italian Journal of Forest and Mountain Environments 66, 249–258.

Mitchell, R.J., Hiers, J.K., O'Brien, J.J., Jack, S.B., Engstrom, R.T., 2006. Silviculture that sustains: the nexus between silviculture, frequent prescribed fire, and conservation of biodiversity in longleaf pine forests of the southeastern United States. Canadian Journal of Forest Research 40, 596.

Moore, M.M., Covington, W.W., Fule, P.Z., 1999. Reference conditions and ecological restoration: a southwestern ponderosa pine perspective. Ecological Applications 9, 1266–1277.

Moore, M.M., Casey, C.A., Bakker, J.D., Springer, J.D., Fule, P.Z., Covington, W.W., Laughlin, D.C., 2006. Herbaceous vegetation responses (1992–2004) to restoration treatments in a Ponderosa pine forest. Rangeland Ecology & Management 59, 135–144.

Moritz, M.A., Hessburg, P.F., Povak, N.A., 2011. Native fire regimes and landscape resilience. In: McKenzie, D., Miller, C., Falk, D.A. (Eds.), The Landscape Ecology of Fire. Springer, pp. 51–88.

Negron, J.F., Popp, J.B., 2004. Probability of ponderosa pine infestation by mountain pine beetle in the Colorado Front Range. Forest Ecology and Management 191, 17–27.

North, M.P., Sherlock, J.W., 2012. Marking and assessing forest heterogeneity. In: North, M.P. (Ed.), Managing Sierra Nevada Forests. USDA Forest Service, Pacific SW Research Station General Technical, Report. PSW-GTR-237, pp. 95–105.

North, M., Innes, J., Zald, H., 2007. Comparison of thinning and prescribed fire restoration treatments to Sierran mixed-conifer historic conditions. Canadian Journal of Forest Research 37, 331–342.

North, M., Stine, P., O'Hara, K.L., Zielinski, W.J., Stephens, S.L., 2009. An Ecosystem Management Strategy for Sierran Mixed-Conifer Forests. USDA Forest Service. Pacific Southwest Research Station General Technical, Report PSW-GTR-220.

NRCS, 2009. Soil Survey of Wenatchee National Forest, Naches Area, Washington, Parts of Kittitas and Yakima Counties. USDA Natural Resources Conservation Service.

Odion, D.C., Sarr, D.A., 2007. Managing disturbance regimes to maintain biological diversity in forested ecosystems of the Pacific Northwest. Forest Ecology and Management 246, 57–65.

O'Hara, K.L., 1996. Dynamics and stocking-level relationships of multi-aged Pondersoa Pine Stands. Forest Science, Monograph 33 (42), 1–34.

O'Hara, K.L., Leonard, L.P., Keyes, C.R., 2012. Variable-density thinning and a marking paradox: comparing prescription protocols to attain stand variability in coast redwood. Western Journal of Applied Forestry 27, 143–149.

Olsen, W.K., Schmid, J.M., Mata, S.A., 1996. Stand characteristics associated with mountain pine beetle infestations in ponderosa pine. Forest Science 42, 310–327.

Paine, R.T., Tegner, M.J., Johnson, E.A., 1998. Compounded perturbations yield ecological surprises. Ecosystems 1, 535–545.

Parisien, M.A., Miller, C., Ager, A.A., Finney, M.A., 2010. Use of artificial landscapes to isolate controls on burn probability. Landscape Ecology 25, 79–93.

Perry, G.L.W., Miller, B.P., Enright, N.J., 2006. A comparison of methods for the statistical analysis of spatial point patterns in plant ecology. Plant Ecology 187, 59–82.

Perry, D.A., Hessburg, P.F., Skinner, C.N., Spies, T.A., Stephens, S.L., Taylor, A.H., Franklin, J.F., McComb, B., Riegel, G.M., 2011. The ecology of mixed severity fire regimes in Washington, Oregon, and Northern California. Forest Ecology and Management 262, 703–717.

Peterson, G.D., 2002. Contagious disturbance, ecological memory, and the emergence of landscape pattern. Ecosystems 5, 329–338.

Peterson, D.L., Johnson, M.C., McKenzie, D., Agee, J.K., Jain, T.B., Reinhardt, E.D., 2005. Forest Structure and Fire Hazard in Dry Forests of the Western United States. USDA Forest Service, Pacific Northwest Research Station GTR-PNW-628.

Peterson, D.L., Halofsky, J.S., Johnson, M.C., 2011. Managing and adapting to changing fire regimes in a warmer climate. In: McKenzie, D., Miller, C., Falk, D.A. (Eds.), The Landscape Ecology of Fire. Springer, pp. 249–268.

Pimont, F., Dupuy, J.L., Linn, R.R., Dupont, S., 2011. Impacts of tree canopy structure on wind flows and fire propagation simulated with FIRETEC. Annals of Forest Science 68, 523–530.

Plotkin, J.B., Chave, J.M., Ashton, P.S., 2002. Cluster analysis of spatial patterns in Malaysian tree species. American Naturalist 160, 629–644.

Powell, D.C., 1999. Suggested Stocking Levels for Forest Stands in Northeastern Oregon and Southeastern Washington: An Implementation Guide for the Umatilla National Fores. USDA Forest Service, Pacific Northwest Region, Umatilla National, Forest F14-SO-TP-03-99.

Powell, D.C., 2010. Estimating crown fire susceptibility for project planning. Fire Management Today 70, 8–15.

Prichard, S.J., Peterson, D.L., Jacobson, K., 2010. Fuel treatments reduce the severity of wildfire effects in dry mixed conifer forest, Washington, USA. Canadian Journal of Forest Research 40, 1615–1626.

Puettmann, K.J., Coates, D.K., Messier, C., 2009. A Critique of Silviculture: Managing for Complexity. Island Press, Washington, DC.

Rehfeldt, G.E., Crookston, N.L., Warwell, M.V., Evans, J.S., 2006. Empirical analyses of plant-climate relationships for the western United States. International Journal of Plant Sciences 167, 1123–1150.

Reineke, L.H., 1933. Perfecting a stand density index for even-aged forests. Journal of Agricultural Research 46, 627–638.

Ripley, B.D., 1988. Statistical Inference for Spatial Processes. Cambridge University Press, Cambridge, UK.

Rogelj, J., Hare, B., Nabel, J., Macey, K., Schaeffer, M., Markmann, K., Meinshausen, M., 2009. Halfway to Copenhagen, No Way to 2 °C. Nature Reports, Climate Change, pp. 81–83.

Case No. 1:23-cv-01501-RMR Document 15-2 filed 09/29/23 USDC Colorado pg 137 of 367



Sánchez Meador, A.J., Moore, M.M., Bakker, J.D., Parysow, P.F., 2009. 108 years of change in spatial pattern following selective harvest of a Pinus ponderosa stand in northern Arizona, USA. Journal of Vegetation Science 20, 79–90.

Sánchez Meador, A.J., Parysow, P.F., Moore, M.M., 2011. A new method for delineating tree patches and assessing spatial reference conditions of ponderosa pine forests in Northern Arizona. Restoration Ecology 19, 490–499.

Shafer, S.L., Bartlein, P.J., Thompson, R.S., 2001. Potential changes in the distributions of western North America tree and shrub taxa under future climate scenarios. Ecosystems 4, 200–215.

Shaw, D.C., Chen, J.Q., Freeman, E., Braun, D., 2005. Spatial and population characteristics of dwarf mistletoe infected trees in an old-growth Douglas-fir/western hemlock forest. Canadian Journal of Forest Research 35, 990–1001.

Spies, T.A., Giesen, T.W., Swanson, F.J., Franklin, J.F., Lach, D., Johnson, K.N., 2010. Climate change adaptation strategies for federal forests of the Pacific Northwest, USA: ecological, policy, and socio-economic perspectives. Landscape Ecology 25, 1185–1199.

Stephens, S.L., Fry, D.L., Franco-Vizcaino, E., 2008. Wildfire and spatial patterns in forests in northwestern Mexico: the United States wishes it had similar fire problems. Ecology and Society 13.

Stephens, S.L., Moghaddas, J.J., Edminster, C., Fiedler, C.E., Haase, S., Harrington, M., Keeley, J.E., Knapp, E.E., McIver, J.D., Metlen, K., Skinner, C., Youngblood, A., 2009. Fire and fire surrogate treatment effects on vegetation structure, fuels, and potential fire behavior and severity from six western United States coniferous forests. Ecological Applications 19, 305–320.

Stephens, S.L., Millar, C.I., Collins, B.M., 2010. Operational approaches to managing forests of the future in Mediterranean regions within a context of changing climates. Environmental Research Letters 5, 1–9.

Stephenson, N.L., 1990. Climatic control of vegetation distribution: the role of the water balance. American Naturalist, 649–670.

Stephenson, N.L., 1998. Actual evapotranspiration and deficit: biologically meaningful correlates of vegetation distribution across spatial scales. Journal of Biogeography 25, 855–870.

Tappeiner, J.C., Maguire, D.A., Harrington, T.B., 2007. Silviculture and Ecology of Western U.S. Forests. Oregon State University Press, Corvalis, OR.

Taylor, A.H., 2010. Fire disturbance and forest structure in an old-growth Pinus ponderosa forest, southern Cascades, USA. Journal of Vegetation Science 21, 561–572.

Taylor, A.H., Skinner, C.N., 2003. Spatial patterns and controls on historical fire regimes and forest structure in the Kalamath mountains. Ecological Applications 13, 704–719.

Thaxton, J.M., Platt, W.J., 2006. Small-scale fuel variation alters fire intensity and shrub abundance in a pine savanna. Ecology 87, 1331–1337.

Thornthwaite, C.W., Mather, J.R., Carter, D.B., 1957. Instructions and tables for computing potential evapotranspiration and the water balance. Publications in Climatology 10, 181–311.

Turner, M.G., 2010. Disturbance and landscape dynamics in a changing world 1. Ecology 91, 2833–2849.

Urban, D.L., Oneill, R.V., Shugart, H.H., 1987. Landscape ecology. Bioscience 37, 119–127.

USFS, 1998. Upper Tieton Watershed Analysis. USDA Forest Service. Okanagon Wenatchee National Forest, Naches Ranger District, Naches, WA.

USFS, 2008. Glaze Forest Restoration Project, Environmental Assessment. USDA Forest Service, Deschutes National Forest, Sisters Ranger District, Sisters, OR.

Varhola, A., Coops, N.C., Weiler, M., Moore, R.D., 2010. Forest canopy effects on snow accumulation and ablation: an integrative review of empirical results. Journal of Hydrology 392, 219–233.

Walker, B., Hollin, C.S., Carpenter, S.R., Kinzig, A., 2004. Resilience, adaptability and transformability in social–ecological systems. Ecology and Society 9.

Waltz, A.E.M., Fule, P.Z., Covington, W.W., Moore, M.M., 2003. Diversity in ponderosa pine forest structure following ecological restoration treatments. Forest Science 49, 885–900.

Wang, T., Hamann, A., Spittlehouse, D.L., Murdock, T.Q., 2012. ClimateWNA—high-resolution spatial climate data for Western North America. Journal of Applied Meteorology and Climatology 51, 16–29.

Weaver, H., 1961. Ecological changes in the ponderosa pine forest of cedar valley in southern Washington. Ecology 42, 416–420.

Westerling, A.L., Hidalgo, H.G., Cayan, D.R., Swetnam, T.W., 2006. Warming and earlier spring increase western US forest wildfire activity. Science 313, 940–943.

Wiegand, T., Moloney, K., 2004. Rings, circles, and null-models for point pattern analysis in ecology. Oikos 104, 209–229.

Williams, J.W., Jackson, S.T., Kutzbacht, J.E., 2007. Projected distributions of novel and disappearing climates by 2100 AD. Proceedings of the National Academy of Sciences of the United States of America 104, 5738–5742.

Wynsma, B., Keyes, C.R., 2010. Biomass Utilization Opportunities to Achieve Diverse Silvicultural Goals. USDA Forest Service Rocky Mountain Research Station Proceedings RMRS-P-61, pp. 135–143.

Yamada, I., Rogerson, P.A., 2003. An empirical comparison of edge effect correction methods applied to K-function analysis. Geographical Analysis 35, 97–109.

York, R.A., Heald, R.C., Battles, J.J., York, J.D., 2004. Group selection management in conifer forests: relationships between opening size and tree growth. Canadian Journal of Forest Research 34, 630–641.

Youngblood, A., Max, T., Coe, K., 2004. Stand structure in eastside old-growth ponderosa pine forests of Oregon and northern California. Forest Ecology and Management 199, 191–217.

Youngblood, A., Metlen, K.L., Coe, K., 2006. Changes in stand structure and composition after restoration treatments in low elevation dry forests of northeastern Oregon. Forest Ecology and Management 234, 143–163.

*fire*

MDPI

*Article*

# Historical Fire Regimes in Ponderosa Pine and Mixed-Conifer Landscapes of the San Juan Mountains, Colorado, USA, from Multiple Sources

**William L. Baker**

Program in Ecology/Department of Geography, University of Wyoming, Laramie, WY 82071, USA; bakerwl@uwyo.edu

Received: 28 May 2018; Accepted: 7 July 2018; Published: 9 July 2018

check for updates

**Abstract:** Reconstructing historical fire regimes is difficult at the landscape scale, but essential to determine whether modern fires are unnaturally severe. I synthesized evidence across 725,000 ha of montane forests in the San Juan Mountains, Colorado, from forest atlases, forest-reserve reports, fire-scar studies, early reports, and newspaper accounts. Atlases mapped moderate- to high-severity fires during 1850–1909 (~60 years), and 86% of atlas area was attributable to 24 fire years. Historical fire rotations from atlases were mostly 225–360 years for high-severity fires and 133–185 years for moderate- to high-severity fires. Historical low-severity fire from tree-ring data at 33 sites revealed a median fire rotation of 31 years in ponderosa pine, 78 years in dry mixed-conifer, and 113 years in moist mixed-conifer forests. Only 15% of montane sites had "frequent-fire" forests with fire rotations <25 years that kept understory fuels at low levels. Moderate- to high-severity fire rotations were long enough to enable old-growth forests, but short enough to foster heterogeneous landscapes with expanses of recovering forests and openings. About 38–39% is still recovering from the 1850–1909 fires. Large, infrequent severe fires historically enhanced resilience to subsequent beetle outbreaks, droughts, and fires, but have burned at lower rates in the last few decades.

**Keywords:** wildfires; megafires; high-severity fires; frequent fire; historical fires; fire regimes; forest atlases; San Juan Mountains; Colorado; USA

## 1. Introduction

Evidence about historical fire across large landscapes is needed even though climatic change is shifting fire regimes. It is essential to accurately characterize and model historical variability to be able to correctly parse the climatic-change component of recent fire rates and patterns [1]. Historical fire also remains relevant as a guide for restoration. Research on historical ponderosa pine and mixed-conifer landscapes of the montane zone in the San Juan Mountains, Colorado, USA, was based on limited landscape-scale evidence, as this evidence was simply unavailable.

Limited landscape-scale evidence is not unusual for montane forests, but this leaves an incomplete and possibly biased perspective on historical fire regimes. The problem is that tree-ring reconstructions, the main source of evidence about historical fire regimes, are difficult to execute at scales exceeding ~10,000 ha. In the San Juan Mountains, only two fire-history studies have been able to reach scales of 7000–8000 ha [2,3] in a mountain range with >750,000 ha of montane forests. Tree-ring studies in smaller areas can provide invaluable, but potentially biased samples of large landscapes, particularly if focused in old forests to obtain long records of fire [4]. Old forests typically have persisted because they did not have intense wildfires that killed many trees, thus may inherently underestimate fire intensity in larger landscapes [4]. Probabilistic studies that used early aerial photographs, land-survey records, or systematic early records across large landscapes are relatively few. These have shown

Case No. 1:23-cv-01501-RMR Document 15-2 filed 09/29/23 USDC Colorado pg 139 of 367



that, where studied, historical montane landscapes in the western USA were much more diverse in forest structure, than shown by tree-ring studies, because of variable fire regimes that included some severe fires that killed many trees [5–7]. Thus, the key question addressed here, where spatially comprehensive, probabilistic evidence was until now not available, is whether historical fire regimes in the montane zone of the San Juan Mountains were also diverse and included large, severe fires? Evidence presented here shows that large, severe fires did also occur historically in ponderosa pine and mixed-conifer landscapes of this large mountain range.

I used a new source, historical forest atlases, with tree-ring reconstructions and corroboration by early documents, to reconstruct historical fire regimes across a large part of the montane landscapes of the San Juan Mountains, Colorado to add to a previous synthesis [8].

*Background on Sources for Reconstructing Montane Historical Fire Regimes in the San Juan Mountains*

How can multiple sources be used to reconstruct historical fires and fire severity across large landscapes? First, fires left surviving trees with fire scars that provide potential fire dates and estimates of rates of fire, particularly low-severity fires [4]. Studies typically reported mean/median intervals between fires in a composite list of fire dates found on any tree in a set of trees in a study site. These mean or median "composite fire intervals (CFIs)" [9] are based on counts of fires, a rough measure since fires vary substantially in area. Land managers need estimated area burned, not just counts. The key spatial estimator is the fire rotation, the expected time (in years) for fire to burn across a particular land area once, estimated by adding up areas burned by fires over some period of observation in a study area, then dividing the period by the fraction of the area burned [4,9]. Thus, if 20 fires together burned area equal to half a study area in 10 years, then the fire rotation was an estimated 20 years. From analysis of CFI studies spanning dry forests in the western United States, I found it possible to estimate low-severity fire rotations from CFIs using regression [4].

Second, some fire-scar studies also collected age-structure data, from trees, that allow reconstruction of fire severity, by showing, for example, whether fires had few survivors and were followed by pulses of tree regeneration [10]. Fire severity, effects on tree populations, is often characterized as low severity if ≤20% of the basal area of trees was killed, moderate severity if 20–70% was killed, and high severity if ≥70% was killed [11]. Stand-origin data, usually obtained by dating the largest trees, can be used to estimate when stands originated after high-severity fires [2].

Third, maps are available showing areas burned by fires in the late-1800s and early 1900s on some National Forests. Soon after creation of National Forests, in and after 1905, staff were tasked with completing maps [12], using surveyed plats, showing topographic contours, natural features (e.g., lakes, streams), and human uses (e.g., towns, railroads, timber claims). These were typically done in black and white at 1" to 1 mile (1:63,360) scale or better on 45.7 × 53.3 cm (18" × 21") sheets assembled in a "folio" for each forest [12]. Graves [13] reported that 190 folios and nearly all National Forests had been mapped. Some forests added color maps showing grasslands and shrublands, timber volume, fires, blowdowns, insect mortality, logging, and cultivation, a choice left to each forest [12]; most chose not to add this information. Maps were made in the field by plane table and compass surveys, using chaining to measure distances, often supplemented by prior topographic mapping. Mapping followed standards, including consistent coloring [12,13]. I used color 1908–1909 forest atlases for three forests (Montezuma, San Juan, and Rio Grande) in the southern 2/3 of the San Juan Mountains. The rest of the San Juan Mountains was not apparently mapped in color.

Fourth, prior to the establishment of most National Forests, a "forest-reserve" report was completed by government scientists that described the condition of the forests, including some assessment of fires, as well as human activities (e.g., logging, roads) in the forests. We used forest-reserve reports to assess historical fire and forest conditions in other parts of the Rocky Mountains [14]. I used the Dubois [15] forest-reserve report on the eastern part of the current San Juan National Forest and the southern Rio Grande National Forest and the Dubois [16] forest-reserve report on the Montezuma National Forest, now the western part of the current San Juan National Forest.

FS-001171

Fifth, an early report by Michelsen [17] provided maps of large fires in 1900 in Colorado, along with estimates of area burned by county and descriptions of some of the fires. Finally, miscellaneous early newspaper reports, forest histories, and other early documents corroborate some fires and describe some of their details.

## 2. Materials and Methods

### *2.1. Study Area*

The study area in the southern San Juan Mountains, Colorado contains six large watersheds over ~1.7 million ha, about 2/3 of the mountain range (Figure 1a). The study area is limited to this area, because forest atlases with fire information cover only these watersheds. In addition, fire-history data from tree rings are available only for five of these watersheds and only four have >1 site. The San Juan and Montezuma forest atlases are on the moister west side of the continental divide, and the Rio Grande forest atlas is on the drier east side.

Montane forests in the San Juan Mountains have often been classified into: (1) ponderosa pine forests primarily with *Pinus ponderosa* and few other tree species; (2) dry mixed-conifer forests that have abundant ponderosa pine, but also common other trees, including possibly white fir (*Abies concolor*), blue spruce (*Picea pungens*), Douglas-fir (*Pseudotsuga menziesii*), southwestern white pine (*Pinus strobiformis*), or quaking aspen (*Populus tremuloides*); and (3) moist mixed-conifer forests that have some or all the above trees, except ponderosa pine is rare to absent and some subalpine trees (e.g., *Picea engelmannii*) may also occur [8].

To limit the study approximately to historical ponderosa pine and mixed-conifer zones, I made digital maps of the three forest zones (Figure 1a) from current forests and then added some aspen forests, grasslands, and shrublands. I first obtained maps, in the form of ArcGIS geodatabases (ESRI, Inc., Redlands, California), of current vegetation from the San Juan ($n$ = 24,576 polygons) and Rio Grande ($n$ = 54,536 polygons) National Forests. I began by extracting records from the "LOCAL_TYPE" field in each map that provided classifications of polygons, from remote sensing and field surveys, as ponderosa pine forests (TPP-PP), dry mixed-conifer forests (TMC-WD), and moist mixed-conifer forests (TMC-CM), the focus of this study. Current quaking aspen forests were not assigned in LOCAL_TYPE to the three forest zones. To assign aspen forests to the three forest zones, I extracted records for aspen forests without conifers (TAA), aspen forests with conifers (TAA-SW), and spruce-fir forests (TSF). For the TAA-SW category, I reclassified records as: (a) TMC-WD if the next most abundant tree, given in other fields in the attribute table, was *Pinus ponderosa*, *Juniperus osteosperma*, or *Pinus edulis*; or (b) TMC-CM if the next most abundant tree was *Abies concolor*, *Picea pungens*, or *Pseudotsuga menziesii* and there was little or no *P. ponderosa*. I deleted other records in TAA-SW, which generally represented subalpine spruce-fir forests.

Since associated conifers were not available for the TAA records, but some of these aspen stands likely also occurred in dry mixed-conifer (TMC-WD), moist mixed-conifer (TMC-CM), or spruce-fir (TSF) forest zones, I roughly estimated which zone to assign to each TAA record. To do so, I first exported the attribute data and completed a simple linear discriminant analysis (LDA, [18]) of these three types in Minitab 18 (Minitab, Inc., State College, Pennsylvania), based on their elevation, aspect, and slope, which were in the attribute table. I did not separate the data into model-building and validation subsets, or test predictive accuracy, because this is only a rough approximation from environmental setting. This LDA for the San Juan National Forest, correctly classified 77.9% of 15,516 records in these three categories. I then applied this LDA to all the TAA records ($n$ = 2473), then kept records predicted as TMC-WD and TMC-CM and deleted all TSF. This procedure places records that represent seral, semi-persistent, or stable aspen [19], which cannot be discriminated with available compositional data, into its approximate mixed-conifer zone. I followed the same procedure for the Rio Grande National Forest map, where the LDA correctly classified 79.4% of the 16,308 records in these three categories. I again applied the LDA to all the TAA records ($n$ = 1970), then kept

records predicted as TMC-WD and TMC-CM and deleted all TSF. Both mountain grasslands, with *Festuca arizonica*, *F. thurberi* and other bunchgrasses, and mountain shrublands, with *Quercus gambelii*, *Amelanchier utahensis*, and other shrubs, could also in part have been forests in these zones in the historical period. There is substantial evidence that grasslands and shrublands can be created or renewed by severe forest fires in the Rocky Mountains [9]. I included those <2950 m elevation, in the ponderosa pine and mixed-conifer zones of the San Juan and <3140 m elevation on the Rio Grande. The resulting map is Figure 1a. These zones only delimit the extent of the area within which fires may have occurred that are likely within one of the current and historical montane forest zones.




**Figure 1.** (**a**) The full study area on the current San Juan and Rio Grande National Forests, Colorado, including their ponderosa pine, dry mixed-conifer, and moist mixed-conifer forest zones. The continental divide is between these forests. Watersheds are from left to right the Dolores, Animas and Mancos, Piedra and Florida, San Juan and Navajo, and Alamosa-La Jara-Conejos Rivers. The Rio Grande watershed is at the right and above these others. (**b**) The three atlas boundaries (black lines) and the fires (red) and woodlands (green) shown on the atlases within the area of ponderosa pine and mixed-conifer forests. Fires were likely mostly stand-replacing, and woodlands likely moderate- and high-severity fires, 1850–1909. Fire and woodland numbers are used in tables and text.

The two current national forests in the study area contain ponderosa pine and mixed-conifer zones covering about 725,000 ha, about 3/4 on the current San Juan National Forest (Table 1, Columns

1–3). Moist mixed conifer totaled most area, ponderosa pine intermediate, and dry mixed conifer the least. The San Juan part of the study area had almost all the shrublands and the Rio Grande had disproportionate grassland area. Shrublands and grasslands covered substantial area.

**Table 1.** Area of forests, shrublands and grasslands in the full study area and the atlas area (Columns 1–4), and the area of fires, woodlands, and total burned area, as well as rates of fire (Columns 5–11). Fire atlases show fire and woodland area from fires in forests over about the preceding 60 years, from 1850 to 1910.

| | | | | High Severity | | | | | Mod.-High Severity | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Modern Vegetation Types** | **Full Area (Figure 1a)** | | **Atlas Area (Figure 1b)** | **Fire Area** | **1/2 Woodland Area** | **Total Burn Area** | **Fraction Burned** | **Fire Rotation** | **Fraction Burned [1]** | **Fire Rotation** |
| | **(ha)** | **(%)** | **(ha)** | **(ha)** | **(ha)** | **(ha)** | | **(years)** | | **(years)** |
| *San Juan National Forest* | | | | | | | | | | |
| Grasslands | 73,509 | 13.6 | 48,847 | 277 | 9586 | 9863 | 0.20192 | 297 | 0.60008 | 100 |
| Shrublands | 118,302 | 21.9 | 73,257 | 263 | 14,965 | 15,228 | 0.20787 | 289 | 0.41215 | 146 |
| Ponderosa pine | 136,494 | 25.4 | 113,249 | 1201 | 17,785 | 18,986 | 0.16756 | 358 | 0.32469 | 185 |
| Dry mixed conifer | 75,690 | 14.0 | 66,853 | 2637 | 12,477 | 15,114 | 0.22608 | 265 | 0.41271 | 145 |
| Moist mixed conifer | 135,252 | 25.1 | 119,692 | 6714 | 21,568 | 28,282 | 0.23629 | 254 | 0.41649 | 144 |
| Total-San Juan | 539,247 | 100.0 | 421,898 | 11,092 | 76,381 | 87,473 | 0.20733 | 289 | 0.38836 | 154 |
| *Rio Grande National Forest* | | | | | | | | | | |
| Grasslands | 87,908 | 47.4 | 60,626 | 2385 | 7512 | 9897 | 0.16325 | 368 | 0.45040 | 133 |
| Shrublands | 907 | 0.5 | 414 | 20 | 52 | 72 | 0.17391 | 345 | 0.29952 | 200 |
| Ponderosa pine | 20,188 | 10.9 | 7175 | 125 | 251 | 376 | 0.05240 | 1145 | 0.08725 | 688 |
| Dry mixed conifer | 14,313 | 7.7 | 13,634 | 899 | 2170 | 3069 | 0.22510 | 267 | 0.38426 | 156 |
| Moist mixed conifer | 62,113 | 33.5 | 58,846 | 4962 | 10,774 | 15,736 | 0.26741 | 224 | 0.45050 | 133 |
| Total-Rio Grande | 185,429 | 100.0 | 140,695 | 8391 | 20,759 | 29,149 | 0.20718 | 289 | 0.35472 | 169 |
| Total-both forests | 724,676 | | 562,593 | 19,483 | 97,140 | 116,620 | 0.20729 | 289 | 0.37996 | 158 |

[1] Fraction burned in this case is the total area of woodlands, rather than half this area, plus fire area, divided by atlas area.

### *2.2. Moderate- to High-Severity Fires from Forest Atlases and Early Reports*

Forest atlases in the National Archives have been scanned and are available from several sources. I downloaded from the Biodiversity Heritage Library [20], the full folio of 17 maps published in 1908 for the Montezuma National Forest. I downloaded 15 available maps of 16 published in 1909 in the folio for the original San Juan National Forest. Map sheet #2 is missing from all archives; it may be missing in originals at the National Archives. I downloaded all 15 maps in the folio published in 1909 for the Rio Grande National Forest, only a part of the current forest; the northern part, the original Cochetopa National Forest, was done only in black and white without fire information. Similarly, atlases are available only in black and white for the Gunnison and Uncompahgre National Forests in the northern San Juans.

I georectified the scanned maps in ArcGIS 10.5 (ESRI, Redlands, California) using online U.S. Geological Survey (1:24,000 scale) topographic maps as the spatial reference, generally placing about 10–20 control points on each map sheet at section or township corners or distinct topographic features (e.g., mountain peaks and stream junctions). After rectification and mosaicking the maps in each forest, I used the ArcGIS measuring tool to measure the distance between the same feature at 30 points on the atlases and the topographic maps, then calculated the root mean square error (RMSE), a common

Case No. 1:23-cv-01501-RMR Document 15-2 filed 09/29/23 USDC Colorado pg 143 of 367



measure of mapping error. RMSE was 572 m for the Montezuma, 630 m for the San Juan, and 555 m for the Rio Grande. In contrast, Kulakowski et al. [21] obtained a 173 m RMSE after georectifying an 1898 smaller-scale map. Thus, the forest atlases used here are not very spatially accurate. I could see that peaks, for example, were at times within 100–200 m, but other times were >1000 m off, suggesting variable accuracy, likely a consequence of variable visibility for plane-table mapping in complex mountain terrain.

Fires and woodlands are the atlas features of interest (Figure 2a). Atlas fires lacked many unburned areas, and mapping categories indicated stages of recovery (Figure 2b), which imply high-severity fire removed most trees. These were likely primarily fires in forests, because fires in grasslands and shrublands recover within a few years [9], so that fires are no longer visible and mappable, whereas forest fires are visible and mappable for several decades after the fire because of standing dead and down wood. As shown later, mapped fires were from more than a few years prior to the 1908–1909 atlases. Atlas fires are also corroborated as stand-replacing fires in forests (very high-severity fires) in two cases. The Rio Grande atlas (Figure 3b) records a stand-replacing fire reconstructed and dated to 1876 by Margolis et al. [22] at Squaw Creek (Figure 3a). An 1898 photograph (Figure 3d) shows the southern part of an atlas fire (Figure 3c), the 1879 Lime Creek burn (Table S1), which appears to have burned as stand-replacing fire over ~1000 ha of ponderosa pine and mixed conifer. Atlas fires were likely mostly stand-replacing fires in forests (sensu [2,22]).




**Figure 2.** Digitizing the atlas evidence: (**a**) zoomed view of a woodland patch and a fire patch, showing the dots that demarcate the margin of the patches; and (**b**) part of a legend, showing timber volumes and post-fire recovery classes.

Woodlands are explained by Dubois in the Montezuma Forest-Reserve Report: "Woodland signifies all bodies of immature or worthless forest too large to be classed as brush or seedlings growth" [16] (p. 9). These are not woodlands in the modern sense, but instead mostly are burned areas with little timber. Dubois indicated that half of woodland area had very little timber volume: "Allowing an average stand of 3000 feet to the acre on the unburned commercial forest and 500 feet per acre on one-half of the woodland, which is conservative ... " [16] (p. 11). Dubois attributed this half of woodland area with almost no timber volume (only 500 feet/acre) to past severe fires:

> "It is safe to say that 50 per cent of the area classified as woodland has been run over and seriously damaged by fire .... These burns are in all stages, from areas covered with dead standing trees and down timber with no re-growth what so ever on the ground, such as the area at the head of Burnt Timber Creek in the La Plata, to large areas covered by stands of aspen of varying ages with a few scattering groups of conifers in mixture, such as are found on the hills on each side of the main Dolores along which runs the railroad". ([16]; p. 21).

Similarly, in the Cochetopa Forest-Reserve Report on the northern part of the current Rio Grande National Forest, just north of my study area, Hatton ([23]; p. 19) further explained: "Woodlands. Under this head are included lands which for the most part have been burned over and have since come up to lodgepole pine [*Pinus contorta*] or aspen" and "Burned-over forest lands [equivalent to atlas fires in the San Juan and Rio Grande forest-reserve reports] comprise the more recent burns, and differ from woodlands in that there is little or no reproduction to date. In time these areas will probably come under the head of woodlands".




**Figure 3.** Examples of two mapped atlas fires, showing they were stand-replacing fires (very high severity): (**a**) an 1876 fire dated by Margolis et al. [22] at Squaw Creek on the Rio Grande National Forest, © Canadian Science Publishing or its licensors; (**b**) the Rio Grande Forest Atlas representation of this fire, which appears to have extended over a larger area than the stand-replacing aspen focal area of the Margolis et al. study; (**c**) the 1909 San Juan Forest Atlas representation of the southern part of the 1879 Lime Creek Burn, which burned >1814 ha of ponderosa pine and mixed-conifer forests; and (**d**) about 1000 ha of this area in the southern part of the 1879 Lime Creek Burn, 19 years after the fire, photographed by Charles Whitman Cross, No. 370, original caption: "Potato Hill and slopes of West Needle Mountains from hill west of the mouth of Cascade Creek. Engineer Mountain quadrangle, San Juan County, Colorado. 1898" from the U.S. Geological Survey Denver Library Photographic Collection.

Half of woodlands thus represent high-severity fires that had a few more survivors than in the more stand-replacing atlas fires, or were older stand-replacing high-severity fires that had more post-fire regeneration by the time of mapping. The second half of woodlands more likely burned at

moderate severity, given this half also was "immature or worthless forest too large to be classed as brush or seedlings growth" ([16]; p. 9). This second half had >500 feet to the acre of timber volume, but not much more, as the next category was "Less than 2000 B.F. per acre" (Figure 2b). Early reports, reviewed in Section 3.1, corroborate this half was also burned. Hatton's quote above also indicates woodlands, including this second half, were mostly burned. Moderate- rather than low-severity fires are indicated by low timber volume in this second half, as low-severity fires do not keep timber volume so low. Low-severity fires likely spread between some mapped patches.

Some small parts of this second half of woodlands could also represent forests on naturally unproductive sites or from logging. At high elevations, some patchy treeline forests in mapped woodlands may not indicate preceding moderate-severity fires, nor may some very dry low-density woodlands, possible anywhere, but especially on the Rio Grande side. Woodlands were not described as from logging [15,16]. Moreover, "cuttings" are a separate category in atlas legends and are mapped elsewhere, but not adjacent to, or within woodland areas. Some woodlands could possibly have resulted from railroad logging in the Pagosa Springs area (Figure 4a), the main area on the San Juan side described in 1903 as having logging [15]. Some railroad logging had also begun east of Dolores (Figure 4b) in 1907–1914 [24]. Tracks were laid during 1899–1900 from Pagosa Junction to Pagosa Springs and from Edith to southeast of Pagosa Springs (Figure 4a) during 1902–1904 [18]. Logging began quickly, with sawmills at Edith, Chromo, Pagosa Junction, and Dyke, and was done or well underway by the time of the atlases. It is unclear how far from the tracks logging occurred. The government restricted cutting to the immediate vicinity of the right-of-way, but timber companies assumed they could cut any timber reachable by spurs or by horse or oxen [25]. Routes avoided woodlands in several areas (Figure 4a), clearly targeting larger timber, and later railroad logging north of Dolores (1924 to 1948) avoided most woodlands (Figure 4b), corroborating they had little timber to log. In the area north and east of Dolores, timber claims were mapped only among larger timber later railroad logged, not within woodlands. Claims scattered within woodland areas near Pagosa Springs were mostly homestead claims, with few timber claims. Logging on the Rio Grande side primarily selected Douglas-fir for ties on the South Fork of the Rio Grande [15], likely not reducing timber volume to low levels. Thus, this second half of woodlands was likely mostly from moderate-severity fires, occasionally from environmental limitations, but seldom from logging.




**Figure 4.** Logging railroads through ponderosa pine and mixed-conifer landscapes in: (**a**) the area near and south of Pagosa Springs; and (**b**) the area north and east of Dolores. Woodlands are shown in green. Railroad locations were digitized from maps in Ormes [24] and Chappell [25], and from online U.S. Geological Survey topographic maps that may show old railroad grades.

Using the georectified forest-atlas mosaics as the backdrop, I zoomed in on screen and hand digitized the boundaries of each atlas fire or woodland polygon, following dots used to demarcate feature boundaries (Figure 2a). Fires are identified in map legends by vertical cross-hatched lines (Figure 2b) and woodlands by light green shading (Figure 2a). The resulting digitized fires and woodlands are available (Data S1). The georectified forest-atlas mosaics are also available (Data S2).

In analyzing the forest-atlas data, I restricted analysis of fires and woodlands to the area of ponderosa and mixed-conifer forests, inside the six watersheds in the San Juan Mountains, that was also within area covered by the atlases (Figure 1b). On the San Juan side, the full area of ponderosa pine and mixed-conifer forests was 539,247 ha, but the atlases covered 421,898 ha (78%). On the Rio Grande side, the full area of ponderosa pine and mixed-conifer forests was 185,429 ha, but the atlas covered 140,695 ha (76%). Total atlas area in the ponderosa and mixed-conifer zones was 562,593 ha (78%) of the 724,593 ha in the full area of ponderosa and mixed conifer (Table 1, Columns 1–4). I used ArcGIS to analyze atlas areas and atlas fires and woodlands (Figure 1b) within the ponderosa pine, dry mixed-conifer, and moist mixed-conifer zones (Figure 1a) of the study area.

I used tree-ring studies and early records to corroborate atlas fires and the extent to which woodlands represented fires and particular fire years. The 1700–1909 period, most likely the later part of it, likely includes the historical period in which I hypothesized that atlas fires and woodlands were most likely to successfully detect fires, since evidence of fire disappears over time. A key question is: to what extent and how far back were dated or recorded moderate- to high-severity fires in this period actually recorded as fires or woodlands in the atlases? I analyzed this by counting fires, known from tree-ring studies and early records (Table S1), that were correctly or incorrectly detected by atlas fires or woodlands. Since atlases are at 1:63,360 scale, and have substantial locational error, larger fires were likely mapped best, locations may have been displaced, and there were likely some omissions. To address fire size, I categorized each fire at tree-ring sites by its size. It is also likely the most recent (first) moderate- to high-severity fires would be mapped best, because evidence would be most visible and freshest, and little of it had been burned over by subsequent fires. To address this, I numbered fires at each site in inverse order by year, and calculated the percentage of fires, by severity if available, correctly identified. Seven tree-ring studies analyzed age structure [10,26–31], which can be used to reconstruct fire severity [10], and three others dated stand-origins to identify high-severity fires [2,3,22]. I used these ten studies to identify years and locations of historical moderate- to high-severity fires. I mapped study sites to enable overlays.

Since atlas fires and woodlands were generally corroborated (see results), I analyzed attributes of the resulting sets of atlas fires and woodlands, in the area of ponderosa pine and mixed-conifer zones, inside atlas areas. I first calculated total area of fire burned at high severity, based on the report of Dubois [16], that about half the area of woodlands represented severe, high-severity fires and evidence that atlas fires represented mostly stand-replacing fires, also high-severity fires. I then assumed that all atlas woodland area plus all fire area equals area burned at moderate- to high-severity combined. I calculated fire rotations as 60 years/fraction of the total area burned within the ponderosa pine and mixed-conifer area and by forest zone. Use of 60 years is explained in Section 3.1. I graphed a size distribution for severe parts of better-dated fires. The evidence and these methods allow only an approximation. Dubois' estimate is based on detailed field examinations, but is only a rough summary. Results may overestimate by including some areas that were woodlands because of environmental limitations, not fires. However, results may underestimate by omitting smaller fires (see results), and some area mapped as fires and woodlands may have burned more than once.

To provide some independent corroboration for the approximations, I separately estimated fire rotations for both high- and moderate- to high-severity fires at 19 smaller tree-ring sampling sites where moderate- to high-severity fires were reconstructed as present or absent from 1700–1909. I used only smaller sites, excluding Tepley and Veblen's sites [10] where fires were mapped, and the Romme et al. [2] and Aoki [3] sites, because the purpose was to use presence/absence at points, not areas, and only from scar-based tree-ring reconstructions, not stand-origin dating, to independently estimate fire rotations. Since a landscape sample of points estimates the population mean fire interval (PMFI), and PMFI is equivalent to the fire rotation [9], this provides an independent, potentially corroborating estimate, although these point estimates are not a probabilistic sample.

### 2.3. Low-Severity Fire Rotations and Fire Years from Tree-Ring Studies

Nine fire-scar studies provided data about fire frequency, particularly for low-severity fires, in these forests [10,26–33]. Data are only available for the southern and western part of the San Juan Mountains, except one site at Hot Creek on the eastern slope of the San Juan Mountains (Figure 5a). I used regression equations in Baker [4] to estimate fire rotation from reported mean/median CFI estimates in the nine studies (Table 2). These are simple linear regression equations without an intercept, that can be applied to reported CFI estimates by multiplying the CFI estimate by the regression coefficient, given in [4] (Table 2). Equations are preliminary for nine moist mixed-conifer sites, which were not in the calibration, but these likely are still reasonable estimates. I extracted data on mean or median CFI for all fires, for ≥10% scarred, and for ≥25% scarred, which represent increasing fire sizes, from all the sites used in each fire-history study, placed these in a spreadsheet and did the multiplication in Minitab. Reported CFIs are for all fire severities combined, not just for low-severity fires, which would have longer rotations if moderate- to high-severity fires were excluded [4]. I converted fire rotations to annual probabilities, then subtracted moderate- to high-severity fire rotations from all-severity fire rotations to derive low-severity fire rotations [4]. Input data are in Table 2. I placed study sites in the three forest zones using author determinations. I mapped approximate locations of each study site in ArcGIS, using author descriptions and maps. These data are available in a digital shapefile (Data S3).

Fire rotation data were not normally distributed. I completed a Kruskal–Wallis nonparametric test of the null hypothesis that median low-severity fire rotations differed among the three forest zones, at $\alpha = 0.05$. In Minitab, I produced summary statistics (e.g., median) across all 33 study sites and separately within each of the three forest types, then a scatterplot to help understand potential influences of elevation, aspect, and forest zone on fire rotations. This led to regression analysis to determine whether elevation, aspect, or forest zone could predict rotations.

**Table 2.** Fire-history data for composite fire intervals (CFIs) and their corresponding estimated fire rotation (FR) in ponderosa pine (Ponderosa), dry mixed-conifer (Dry MC), and moist mixed-conifer (Moist MC) zones.

| Author(s) | Site | Forest Zone | Best Source | Value | Regr. Coeff. | All-Severity FR (yrs) [a] | Low-Severity FR (yrs) [b] |
|---|---|---|---|---|---|---|---|
| Bigio et al. [31] | Haflin Creek North | Dry MC | CFI-All | 30.0 | 2.440 | 73.2 | 147.8 |
| Bigio et al. [31] | Haflin Creek South | Ponderosa | CFI-25% | 26.0 | 1.715 | 44.6 | 58.8 |
| Bigio et al. [31] | Marina East | Dry MC | CFI-25% | 29.0 | 1.715 | 49.7 | 75.6 |
| Bigio et al. [31] | Marina West | Dry MC | CFI-25% | 19.0 | 1.715 | 32.6 | 42.1 |
| Bigio et al. [31] | Steven's Creek North | Dry MC | CFI-All | 46.0 | 2.440 | 112.2 | 496.0 |
| Bigio et al. [31] | Steven's Creek South | Ponderosa | CFI-25% | 24.0 | 1.715 | 41.2 | 53.0 |
| Brown et al. [32] | Hot Creek | Ponderosa | CFI-All | 9.5 [c] | 2.450 | 23.3 | 24.1 |
| Brown and Wu [27] | Archuleta Mesa | Ponderosa | CFI-All | 14.1 | 2.440 | 34.4 | 42.3 |
| Fule et al. [28]; Korb et al. [29] | Lower Middle Mountain | Dry MC | CFI-25% | 32.3 | 1.715 | 55.4 | 89.7 |
| Grissino-Mayer et al. [33] | Benson Creek | Ponderosa | CFI-All | 8.0 | 2.440 | 19.5 | 21.8 |
| Grissino-Mayer et al. [33] | Burnette Canyon | Dry MC | CFI-All | 30.0 | 2.440 | 73.2 | 147.8 |
| Grissino-Mayer et al. [33] | Five Pine Canyon | Ponderosa | CFI-All | 7.0 | 2.440 | 17.1 | 18.8 |
| Grissino-Mayer et al. [33] | Hermosa Creek | Dry MC | CFI-All | 11.0 | 2.440 | 26.8 | 32.9 |
| Grissino-Mayer et al. [33] | Monument | Dry MC | CFI-All | 21.0 | 2.440 | 51.2 | 79.1 |
| Grissino-Mayer et al. [33] | Plateau Creek | Ponderosa | CFI-All | 6.0 | 2.440 | 14.6 | 15.9 |
| Grissino-Mayer et al. [33] | Smoothing Iron | Ponderosa | CFI-All | 13.0 | 2.440 | 31.7 | 38.3 |
| Grissino-Mayer et al. [33] | Taylor Creek | Dry MC | CFI-All | 19.0 | 2.440 | 46.4 | 68.2 |
| Grissino-Mayer et al. [33] | Turkey Springs | Ponderosa | CFI-All | 11.0 | 2.440 | 26.8 | 31.3 |
| Korb et al. [29] | Grassy Mountain | Dry MC | CFI-25% | 10.0 | 1.715 | 17.2 | 19.5 |
| Tepley and Veblen [10] | Aspen | Moist MC | CFI-All [d] | 18.0 | 2.440 | 43.9 | 63.2 |
| Tepley and Veblen [10] | Dry MC | Dry MC | CFI-All [d] | 20.8 | 2.440 | 50.8 | 78.2 |
| Tepley and Veblen [10] | Moist mixed conifer | Moist MC | CFI-All [d] | 32.3 | 2.440 | 78.8 | 174.0 |
| Wu [26] | Bear Park 1 | Dry MC | CFI-25% | 14.7 | 1.715 | 25.2 | 30.5 |
| Wu [26] | Bear Park 2 | Moist MC | CFI-25% | 17.7 | 1.715 | 30.4 | 38.5 |
| Wu [26] | Bear Park 3 | Moist MC | CFI-25% | 21.7 | 1.715 | 37.2 | 50.2 |
| Wu [26] | Corral Mountain 1 | Moist MC | CFI-25% | 41.5 | 1.715 | 71.2 | 140.8 |
| Wu [26] | Corral Mountain 2 | Dry MC | CFI-25% | 41.5 | 1.715 | 71.2 | 139.9 |
| Wu [26] | Corral Mountain 3 | Moist MC | CFI-25% | 36.9 | 1.715 | 63.3 | 113.0 |
| Wu [26] | Corral Mountain 4 | Moist MC | CFI-25% | 41.5 | 1.715 | 71.2 | 140.8 |
| Wu [26] | Jackson Mountain 1, 2 | Moist MC | CFI-25% | 62.7 | 1.715 | 107.5 | 424.1 |
| Wu [26] | Jackson Mountain 3 | Moist MC | CFI-25% | 20.9 | 1.715 | 35.8 | 47.6 |
| Wu [26]; Korb et al. [29] | Jackson Mountain 4 | Dry MC | CFI-25% | 29.8 | 1.715 | 51.1 | 78.9 |
| Wu [26]; Korb et al. [29] | Jackson Mountain 5 | Dry MC | CFI-25% | 23.5 | 1.715 | 40.3 | 55.8 |

[a] All-severity fire rotations are derived by multiplying the regression coefficient ([4] (Table 2)) times the "Value" which is the CFI estimate from the "Best source". The best source is the source that produces the best regression equation, based on $R^2_{adj}$ in Baker [4] (Table 2). [b] The low-severity fire rotation is estimated by partitioning the moderate- to high-severity fire rotations out of the all-severity fire rotations (see text for details). [c] The only estimate reported was median CFI-All, which is used here. [d] This study assigned fire scars within up to 300 m to transects. Since a radius of 300 m corresponds with 9 ha, this substantially overcompensates for the number of trees estimated to be needed to detect a fire if one occurred [4], and this produces then what is effectively an all-tree composite fire interval at the transect scale. The study also targeted trees with open catfaces and used recorders, as traditionally used in composite-fire-interval studies. However, since this study used ancillary information from the transect area itself, including scars found on increment cores (<1/3 of scars) and tree-regeneration pulses likely linked to fires, it is likely that the fire information is not overcompensated in cases where evidence is primarily from the transect area itself. Thus, it may be appropriate to view the fire rotation estimates as upper estimates, with the true values lower by a variable and unknown amount.

Case No. 1:23-cv-01501-RMR Document 15-2 filed 09/29/23 USDC Colorado pg 149 of 367






**Figure 5.** The 33 study sites listed in Table 2 and the three stand-origin sites (WSJ = western San Juans [2]; SQU = Squaw Creek [22]; CHA = Chama [22]): (**a**) site names are generally abbreviated by their first two or three letters; (**b**) the estimated historical all-severity fire rotation (years) at each site; and (**c**) the estimated historical low-severity fire rotation (years) at each site. The red lines are boundaries for the six watersheds, which are from left to right the Dolores, Animas and Mancos, Piedra and Florida, San Juan and Navajo, and Alamosa-La Jara-Conejos Rivers. The Rio Grande watershed is at the right and above these others.

### *2.4. Fire Information from Forest-Reserve Reports, the Michelsen Report and Other Early Sources*

The Forest-Reserve reports [15,16] provided descriptions of the forests, including their understories, and descriptions of fires and woodlands. I used these to cross-check and corroborate other sources. Henry Michelsen of the Colorado Forestry Association published an account of fires in 1900, which he reported burned >200,000 ha in Colorado, including estimates of area burned by county and a map showing general areas burned [17]. I specifically sought early newspaper accounts of the 1900 fires by searching the Colorado Historic Newspapers Collection [34], which allows multiple papers to be searched, using publication-date ranges and other constraints. I searched other early historical records, including forest histories, for any information about historical fires.

Case No. 1:23-cv-01501-RMR Document 15-2 filed 09/29/23 USDC Colorado pg 150 of 367



## 3. Results

### 3.1. Moderate- to High-Severity Fires from Tree-Rings, Early Records, and Forest Atlases

Nine tree-ring studies found 28 years with moderate- to high-severity fires during 1700–1909 (Table 3). Reconstructing fire size was not a goal and most sites were small: nine <500 ha, four 1100–1600 ha, and two 7000–8000 ha [2,3]. Maps of fire years were reconstructed at two 1330–1340 ha sites [10]. These studies show that severe fires occurred, but not their spatial extent.

**Table 3.** Moderate- to high-severity fires during 1700–1909 identified by tree-ring studies that reconstructed historical fire severity. There were fires before 1700, but this period is most relevant to whether atlas fires and woodlands detect these fires in historical forests.

| Fire-History Evidence | | | | | | Atlas Evidence | | |
|---|---|---|---|---|---|---|---|---|
| **Fire Year** | **Fire No.** [1] | **Site** | **Author(s)** | **Fire Severity** | **Fire Size** [2] | **Fires** | **Wood-Lands** | **C/I** [3] |
| *Sites with age-structure or stand-origin evidence of moderate- to high-severity fires* | | | | | | | | |
| 1902 | 1 | WIL | Tepley and Veblen [10] | Moderate [4] | M | No | No | I |
| 1899 | 1 | SQU | Tepley and Veblen [10] | High | M | No | Yes | C |
| | | | | Moderate | L | Yes | Yes | C |
| 1896/1891 | 2 | WIL | Tepley and Veblen [10] | High | S | No | No | I |
| | | | | Moderate | M | No | No | I |
| 1880–1860 | 1 | WSW | Romme et al. [2] [5] | High | L | No | Yes | C |
| 1879 | 1 | WES [6] | Aoki [3] (p. 16, 19, 21) [6] | High | L | No | Yes | C |
| 1879 | 1 | MAR2 | Bigio [30]; Bigio et al. [31] | High, mixed | M | No | No | I |
| 1879 | 3 | WIL | Tepley and Veblen [10] | High | M | No | Yes | C |
| | | | | Moderate | L | No | Yes | C |
| 1879/1878 | 2 | SQU | Tepley and Veblen [10] | High | L | Yes | Yes | C |
| | | | | Moderate | L | Yes | Yes | C |
| 1879 | 1 | BPK1 | Wu [26] (p. 101) | High | S | No | No | I |
| 1876 | 1 | SQW | Margolis et al. [22] | High | M | Yes | No | C |
| 1873 | 1 | JAK1 | Wu [26] (p. 101) | High | S | No | No | I |
| 1873 | 1 | JAK4 | Wu [26] (p. 101) | High | S | No | No | I |
| 1870 | 1 | SC4 | Bigio [30]; Bigio et al. [31] | High, mixed | S | No | No | I |
| 1861 | 1 | All | Brown and Wu [27] | Moderate [7] | M | No | Yes | C |
| 1861 | 1 | All | Fulé et al. [28] | Moderate [8] | M | No | No | I |
| 1861 | 4 | WIL | Tepley and Veblen [10] | High | M | No | Yes | C |
| | | | | Moderate | M | No | Yes | C |
| 1861/1860 | 3 | SQU | Tepley and Veblen [10] | High | M | Yes | Yes | C |
| | | | | Moderate | M | Yes | Yes | C |
| 1851 | 2 | MAR2 | Bigio [30]; Bigio et al. [31] | High, mixed | M | No | No | I |
| 1851 | 1 | CHA | Margolis et al. [22] | High [9] | L | No | Yes [9] | C |
| 1851 | 5 | WIL | Tepley and Veblen [10] | Moderate | S | No | No | I |
| 1851 | 1 | CRL1 | Wu [26] (p. 132) | High | M | No | No | I |
| 1851 | 1 | CRL2 | Wu [26] (p. 101) | High | M | No | Yes | C |
| 1847 | 4 | SQU | Tepley and Veblen [10] | High | S | Yes | Yes | C |
| | | | | Moderate | M | Yes | Yes | C |
| 1838 | 1 | HC3 | Bigio [30]; Bigio et al. [31] | Low, mixed | M | No | No | I |
| 1836 | 6 | WIL | Tepley and Veblen [10] | High | M | No | No | I |
| | | | | Moderate | L | No | Yes | C |
| 1834 | 5 | SQU | Tepley and Veblen [10] | Moderate | S | No | Yes | C |
| 1824 | 2 | All | Fulé et al. [28] | Moderate [8] | M | No | No | I |

**Table 3.** *Cont.*

| Fire-History Evidence | | | | | | Atlas Evidence | | |
|---|---|---|---|---|---|---|---|---|
| **Fire Year** | **Fire No.** [1] | **Site** | **Author(s)** | **Fire Severity** | **Fire Size** [2] | **Fires** | **Wood-Lands** | **C/I** [3] |
| 1822/1820 | 7 | WIL | Tepley and Veblen [10] | Moderate | L | No | No | I |
| 1819 | 6 | SQU | Tepley and Veblen [10] | High | S | No | Yes | C |
| | | | | Moderate | L | Yes | Yes | C |
| 1818 | 2 | All | Brown and Wu [27] | Moderate [7] | M | No | Yes | I |
| 1818 | 1 | HC4–6 | Bigio [30]; Bigio et al. [31] | High, mixed | M | No | No | I |
| 1806/1797 | 8 | WIL | Tepley and Veblen [10] | Moderate | M | No | Yes | C |
| 1806 | 7 | SQU | Tepley and Veblen [10] | Moderate | S | Yes | Yes | C |
| 1795 | 1 | JAK3 | Wu [26] (pp. 100, 134) | High | M | No | No | I |
| 1786 | 2 | JAK3 | Wu [26] (pp. 100, 134) | High | M | No | No | I |
| 1786 | 9 | WIL | Tepley and Veblen [10] | High | L | No | No | I |
| | | | | Moderate | M | Yes | Yes | C |
| 1786 | 8 | SQU | Tepley and Veblen [10] | High | M | Yes | Yes | C |
| | | | | Moderate | L | Yes | Yes | C |
| 1778 | 1 | SC2 | Bigio [30]; Bigio et al. [31] | Mixed | S | No | No | I |
| 1778 | 2 | SC5–6 | Bigio [30]; Bigio et al. [31] | Low, mixed | S | No | No | I |
| 1774 | 9 | SQU | Tepley and Veblen [10] | Moderate | S | No | Yes | C |
| 1773 | 10 | WIL | Tepley and Veblen [10] | Moderate | M | No | No | I |
| 1748 | 11 | WIL | Tepley and Veblen [10] | High | M | No | Yes | C |
| | | | | Moderate | M | No | Yes | C |
| 1748 | 1 | BPK2 | Wu [26] (pp. 100, 132) | High | M | No | No | I |
| 1748 | 2 | CRL1 | Wu [26] (pp. 100, 132) | High | M | No | No | I |
| 1748 | 1 | JAK2 | Wu [26] (pp. 100, 132) | High | M | No | No | I |
| 1748 | 1 | JAK5 | Wu [26] (pp. 100, 132) | High | M | No | No | I |
| 1724 | 12 | WIL | Tepley and Veblen [10] | Moderate | M | No | Yes | C |
| 1707 | 13 | WIL | Tepley and Veblen [10] | Moderate | S | No | No | I |
| *Sites with age-structure evidence of no high-severity fires in the 1800s, only low- to moderate-severity fires* | | | | | | | | |
| - | | HC1–2 | Bigio [30]; Bigio et al. [31] | Low-4 [10] | S | No | No | C |
| - | | MAR1 | Bigio [30]; Bigio et al. [31] | Low-5 [10] | S | No | No | C |
| - | | SC1,3 | Bigio [30]; Bigio et al. [31] | Low-4 [10] | S | No | No | C |
| - | | GRA | Korb et al. [29] | Low-11 [10] | S | No | No | C |

[1] Fire No. is the sequential number of the fires within a single site, starting with the latest and going backwards in time. [2] Fire size is abbreviated as follows: S = small, means a different age class or the sampling area boundary was found within <500 m of most of the patch area; M = medium, means within 500–2000 m; L = large, means within >2000 m. [3] Whether the forest-atlas evidence from fires or woodlands correctly (C) or incorrectly (I) identified the occurrence of the fire, accepting that fire-atlas evidence could be spatially displaced by 500–1000 m at times. [4] The Tepley and Veblen [10] study did not provide a direct equivalence between their percentile ranges for fire severity and traditional fire-severity categories. I chose to consider their ">90th percentile" category as high severity and their "50th to 90th percentile" categories as moderate severity. This is an arbitrary, but likely conservative, criterion. [5] Romme et al. dated stand origins successfully at 57 sites across several townships and found 16 of them originated in the 1860s and 1870s. [6] Aoki [3] had sites on the west (WES) side of the Navajo River, at Beaver Creek, Elephant Head, and Dolomite Lake, that are overlapped by the San Juan Forest Atlas. The five sites on the east side of the Navajo River are not covered in an atlas. [7] The 1818 and 1861 fires documented in this study were not linked by the authors to the pulses of tree regeneration evident in the age structure [27] (Figure 2); this is my interpretation. Since the largest pulse, including "other trees" was after 1861, I interpret that this large pulse is likely the only structure detected by woodlands at this site. [8] The 1824 and 1861 fires documented in this study were not linked by the authors to the post-fire pulses of tree regeneration evident in the age structures [28] (Figure 5); this is my interpretation. [9] For the Chama site, Margolis does not show the location, which I estimated based on elevation and location near the Chama River. The Atlas does not extend to this site, but a large patch of woodland appears to have extended to the site. Since Aoki [3] detected an 1851 fire to the west of this site, the 1851 fire was likely large in this area. [10] This is the number of low-severity fires in the 1800s.

Atlas fires and woodlands detected fires found at these tree-ring sites (Table 3), but only back to about 1850. I found that, among first fires, some were correctly detected by fires or woodlands back to 1851, but none was correctly detected prior to 1851. Of first fires during 1851–1909, four of four large

fires (100%) were correctly detected, but only four of eight medium fires (50%) were correctly detected, and none of four small fires (0%) was correctly detected. Among first and second fires, the trends were similar: none was correctly detected prior to 1851, and only the largest fires were all correctly detected after 1851. Sites that had only low-severity fires in the 1800s were all correctly detected (Table 3). Atlas fires and woodlands may thus generally detect large fires over the period since about 1850 or over about 60 years prior to the atlases, but about half the medium and most small fires were likely not mapped, thus total burned area would be underestimated somewhat and fire-size distributions would underestimate smaller fires. Atlas fires and woodlands can be seen in shapefiles (Data S1).

It was possible to identify 24 moderate- to high-severity fires in atlas fires and woodlands, and the years they burned, between about 1850 and 1909, or at least narrow the range of possible years (Table S1, Figure 1b, and Table 4). Larger fires often had parts that burned in separate fire years or dating could only be narrowed to a set of possible years. The 24 fires covered 86% of total area of atlas woodlands and fires within the ponderosa and mixed-conifer zones. The remaining 14% was undocumented in early reports, tree-ring dates or other sources I found. Entries for reported fires (Table S1) corresponded with atlas woodlands and fires in 41 of 57 cases (72%); the other 28% were either small or medium-sized fires the atlases do not detect well (Table 3) or were vague or likely incorrect. Most reported moderate- to high-severity fires during 1850–1909 were recorded in atlas fires and woodlands (Table S1). More recent fires were better corroborated. The 1900 fires had newspaper accounts and a report [17]. Two large fires, fire 1 on the Dolores River, and fire 22 south of Pagosa Springs (Table 4), need more dating or records. Two atlas fires, in 1876 and 1879, are shown to be reasonably mapped relative to independent sources (Figure 3). Fire locations were usually reported relative to drainages or other physiographic features and mapped locations were quite similar in most cases (details in Table S1). Fire sizes were seldom reported or estimated, but one atlas fire (Fire 4) and two large fires from both atlas fires and woodlands (Fires 6 and 9) had mapped sizes and locations that were quite similar to reported fire sizes and locations. Another from both atlas fires and woodlands (Fire 19) appeared quite similar but a map is missing that completes the fire area. Together, these corroborations support the interpretation that atlas fires were very high severity (stand-replacing) and atlas woodlands were mostly also burned severely.

Accounts of fires in Michelsen [17] and newspapers offered vivid early evidence of severe fires in 1900, as compiled in Table S1. For example, Michelsen reported large 1900 fires on the Rio Grande side, particularly Fire 9: "The length of the path burned over was about forty-five miles" and one (Fire 6) north of Pagosa Springs on the San Juan side in which "some forty square miles (10,364 ha) of Yellow Pine forest were burnt over" [17] (p. 59).

High-severity fire rotations from atlas fires and woodlands overall were 289 years on both sides of the study area, and were mostly in the range of about 225–360 years in all three forest zones on both sides of the study area, except 1145 years in ponderosa pine on the Rio Grande side (Table 1). High-severity fire rotations were generally shortest in moist mixed-conifer forests and longest in ponderosa pine forests. Combined moderate- to high-severity fire rotations were 154 and 158 years overall on the two sides of the study area, mostly 133–185 years in forest zones, except 688 years in ponderosa pine on the Rio Grande (Table 1, Columns 5–11). Note that these are approximations in part because only 60 years of data, a fraction of a full rotation, are available from the atlases.

Fire rotations from tree-ring reconstructions (Table 3) were 235 years for high-severity fire and 166 years for moderate- and high-severity fire from 1700–1909, in the same ballpark as the atlas' 289 year high-severity and 154–158 year moderate- and high-severity fire rotations. Point estimates for 1850–1909 were 114 years for high-severity and 95 years for moderate- to high-severity fire. These unexpectedly short rotations may be because the sample size is small ($n$ = 12 fires) in this period relative to the 1700–1909 period ($n$ = 24 fires). In addition, tree-ring sites are not a probabilistic sample. Corroboration with the longer tree-ring period but not 1850–1909 leaves this comparison uncertain.

**Table 4.** The 24 moderate- to high-severity historical fires identified between about 1850 and 1909 on the San Juan (SJ) and Rio Grande (RG) National Forests using atlas woodlands (Wood.) and fires, early historical reports, and tree-ring studies (details in Table S1). Fires are ordered by years, and possible years include all the years that may have affected parts of the woodland or fire polygons. MC = mixed conifer. Total area is for ponderosa pine and mixed-conifer forests and associated grasslands and shrublands.

| Fire No. | SJ or RG | Where | Poss. Years | Total Area (ha) | Ponderosa | | Dry MC | | Moist MC | | Grasslands | | Shrublands | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Wood (ha) | Fire (ha) | Wood (ha) | Fire (ha) | Wood (ha) | Fire (ha) | Wood (ha) | Fire (ha) | Wood (ha) | Fire (ha) |
| 1 | SJ | Dolores River | Unknown 1900, 1878 | 32,828 | 4787 | 0 | 5070 | 89 | 13,023 | 247 | 3727 | 15 | 5870 | 0 |
| 2 | SJ | N of Durango | 1900 | 66 | 0 | 0 | 0 | 0 | 0 | 64 | 0 | 0 | 0 | 2 |
| 3 | SJ | N of Durango | 1900 | 211 | 15 | 0 | 21 | 0 | 175 | 0 | 0 | 0 | 0 | 0 |
| 4 | SJ | Vallecito River | 1900 | 95 | 0 | 0 | 0 | 15 | 0 | 80 | 0 | 0 | 0 | 0 |
| 5 | SJ | Piedra River | 1900, 1898 1879, 1861 | 13,872 | 6148 | 311 | 4127 | 334 | 973 | 406 | 510 | 29 | 1012 | 22 |
| 6 | SJ | N of Pagosa Springs | 1900, 1898 | 13,088 | 1432 | 4 | 2665 | 80 | 5271 | 180 | 1952 | 10 | 1481 | 13 |
| 7 | SJ | San Juan River | 1900 | 845 | 99 | 0 | 92 | 0 | 493 | 121 | 40 | 0 | 0 | 0 |
| 8 | RG | S Fork Rio Grande | 1900 | 1145 | 91 | 0 | 55 | 41 | 145 | 298 | 116 | 399 | 0 | 0 |
| 9 | RG | Alamosa-Conejos | 1900, 1875, 1873 | 21,585 | 159 | 0 | 2441 | 149 | 12,879 | 812 | 5030 | 89 | 26 | 0 |
| 10 | SJ | NE of Mancos | 1898, 1892 1884–1850 | 18,167 | 2633 | 0 | 3374 | 0 | 6907 | 0 | 1776 | 0 | 3477 | 0 |
| 11 | RG | Platoro | 1898, 1875 | 23 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 23 | 0 | 0 |
| 12 | RG | E of Creede | 1893 | 136 | 0 | 0 | 14 | 0 | 40 | 6 | 76 | 0 | 0 | 0 |
| 13 | RG | W of Creede | 1893 | 2375 | 0 | 0 | 0 | 0 | 1612 | 0 | 601 | 0 | 162 | 0 |
| 14 | RG | S of Creede | 1893 | 2635 | 0 | 11 | 19 | 5 | 752 | 908 | 598 | 342 | 0 | 0 |
| 15 | RG | S of Del Norte | 1893, 1892 | 6892 | 105 | 17 | 574 | 243 | 3343 | 583 | 1908 | 110 | 9 | 0 |
| 16 | RG | Cat Creek | 1887 | 234 | 0 | 0 | 0 | 14 | 0 | 209 | 0 | 11 | 0 | 0 |
| 17 | RG | Wagon Wheel Gap | 1900, 1881 | 4252 | 21 | 98 | 83 | 234 | 561 | 1967 | 496 | 772 | 0 | 20 |
| 18 | SJ | Lime Creek | 1879 | 1814 | 0 | 323 | 0 | 674 | 0 | 744 | 0 | 1 | 0 | 72 |
| 19 | SJ | Upper Pine River | 1879, 1860 | 1132 | 0 | 89 | 0 | 209 | 0 | 827 | 0 | 6 | 0 | 1 |
| 20 | RG | SW of Creede | 1879 | 373 | 0 | 0 | 66 | 5 | 4 | 0 | 282 | 16 | 0 | 0 |
| 21 | RG | La Garita Creek | 1872 | 507 | 0 | 0 | 10 | 0 | 400 | 0 | 97 | 0 | 0 | 0 |
| 22 | SJ | S of Pagosa Spr. | 1899 1879–1878 1861–1860 | 62,135 | 18,006 | 0 | 8011 | 16 | 11,118 | 441 | 9783 | 0 | 14,759 | 1 |
| 23 | RG | Squaw Creek | 1876 | 169 | 0 | 0 | 0 | 117 | 0 | 0 | 0 | 52 | 0 | 0 |
| 24 | RG | Chama River | 1851 | 89 | 0 | 0 | 26 | 0 | 0 | 0 | 63 | 0 | 0 | 0 |
| Total area burned in the 24 atlas fires and woodlands | | | | 184,668 | 33,496 | 853 | 26,648 | 2225 | 57,696 | 7893 | 27,055 | 1875 | 26,796 | 131 |
| Total area burned in all atlas fires and woodlands | | | | 213,763 | 36,072 | 1326 | 29,294 | 3536 | 64,684 | 11,676 | 34,196 | 2662 | 30,034 | 283 |

Case No. 1:23-cv-01501-RMR Document 15-2 filed 09/29/23 USDC Colorado pg 154 of 367



Size distributions were limited by the 7 of 24 fires that could not be assigned to a single year (Table 4) and by woodland patches that could be from more than one fire. The moderate- to high-severity parts of the 17 fires appeared to have an inverse-J shaped size distribution, with more small than large areas; two severe fire areas exceeded 13,000 ha (Figure 6). Fire and woodland Patches were larger and had more consistent patterns of orientation on the San Juan than the Rio Grande side (Figure 1b). Most striking were very large woodland patches, along the Dolores River from Dolores to Rico and south and west of Pagosa Springs (Figure 1b). Fires often (Fires 1, 5, and 22), but not always (Fires 6 and 10), had a southwest to northeast orientation on the San Juan side, but fires on the Rio Grande side appeared less consistently oriented.




**Figure 6.** Size distributions for moderate- to high-severity parts of 17 fires dated mostly to a single year.

### 3.2. *Low-Severity Fire Rotations from Tree-Ring Studies*

The 33 scar-based low-severity study sites were well distributed spatially, although unevenly, across the five large watersheds that cover the southern San Juan Mountains (Figure 5) and the three forest zones. There were 9 sites in ponderosa, 15 in dry mixed-conifer, and 9 in moist mixed-conifer forests (Tables 2 and 5), also a little uneven. Overall, across the 33 sites, the mean historical all-severity fire rotation in ponderosa pine and mixed-conifer forests was about 48 years, with a median of 44 years (Table 5). The distribution of fire rotations was skewed toward values less than the mean, so the median of 44 years is a better measure of central tendency. The mean historical low-severity fire rotation overall was almost twice as long, at 93.3 years, likely because of two exceptionally long estimates of 424.1 and 496.0 years. The median historical low-severity fire rotation of 58.8 years is again a better measure of central tendency. I focus here on low-severity fire rotations, rather than reviewing the all-severity data.

The southern San Juan Mountains had a surprisingly large overall range of historical low-severity fire rotations, from 16 to 174 years, except two longer rotations (Table 5). Four watersheds each had close to this full range (Figure 5c), suggesting a tendency toward similar variability across the mountain range. Based on quartiles, 1/4 of sites had low-severity fire rotations shorter than about 36 years and 1/4 longer than about 126 years (Table 5). Median low-severity fire rotations also differed significantly among forest zones (Kruskal–Wallis H = 11.13, $p = 0.004$). Among the nine ponderosa-pine sites, the historical median low-severity fire rotation was 31 years (Table 5). Variability was lower than in the other two forest zones, ranging only from about 16–59 years for low-severity fire rotations (Table 5). Based on quartiles, 1/4 of rotations were shorter than about 20 years and 1/4 were longer than about 48 years. Among the 15 dry mixed-conifer sites, the historical median low-severity fire rotation was 78 years (Table 5). Variability was highest among the three forest zones, ranging from about 20–496 for low-severity fire rotations (Table 5). Based on quartiles, 1/4 of rotations were shorter than 42 years

and 1/4 longer than 140 years. Among the nine moist mixed-conifer sites, the historical median low-severity fire rotation was 113 years (Table 5). Variability was intermediate, with low-severity fire rotations ranging from about 39–424 years (Table 5). Based on quartiles, 1/4 of rotations were shorter than about 49 years and 1/4 longer than about 157 years (Table 5).

**Table 5.** Statistics of the distributions of historical all-severity and low-severity fire rotations overall and for the three forest zones. Table entries are all in years, except *n*, which is a count.

| Type of Fire Rotation/Statistic | Overall | Ponderosa Pine | Dry Mixed Conifer | Moist Mixed Conifer [1] |
|---|---|---|---|---|
| *All-Severity Fire Rotations* | | | | |
| *n* | 33 | 9 | 15 | 9 |
| Mean | 47.5 | 28.1 | 51.8 | 59.9 |
| Standard deviation | 24.4 | 10.6 | 23.9 | 25.3 |
| Minimum | 14.6 | 14.6 | 17.2 | 30.4 |
| 1st quartile | 28.6 | 18.3 | 32.6 | 36.5 |
| Median | 43.9 | 26.8 | 50.7 | 63.3 |
| 3rd quartile | 67.2 | 37.8 | 71.2 | 75.0 |
| Maximum | 112.2 | 44.6 | 112.2 | 107.5 |
| 95% confidence interval for mean | 38.9–56.2 | 20.0–36.3 | 38.5–65.0 | 40.5–79.4 |
| 95% confidence interval for median | 33.5–51.2 | 17.6–39.6 | 35.5–65.3 | 36.2–77.1 |
| *Low-Severity Fire Rotations* | | | | |
| *n* | 33 | 9 | 15 | 9 |
| Mean | 93.3 | 33.8 | 105.5 | 132.5 |
| Standard deviation | 104.8 | 15.3 | 115.5 | 119.8 |
| Minimum | 15.9 | 15.9 | 19.5 | 38.5 |
| 1st quartile | 35.6 | 20.3 | 42.1 | 48.9 |
| Median | 58.8 | 31.3 | 78.2 | 113.0 |
| 3rd quartile | 126.4 | 47.7 | 139.9 | 157.4 |
| Maximum | 496.0 | 58.8 | 496.0 | 424.1 |
| 95% confidence interval for mean | 56.1–130.4 | 22.0–45.6 | 41.5–169.4 | 40.4–224.6 |
| 95% confidence interval for median | 42.2–79.0 | 19.5–50.6 | 47.2–121.1 | 48.2–166.5 |

[1] Equations and results are preliminary, as these forests were not in the regression calibration.

There were modest, significant trends for fire rotations to increase exponentially from lowest to highest elevations (Figure 7). Two sites ([26] (Jackson Mt. 1, 2); [31] (Steven's Creek N)), outliers with exceptionally long rotations, were omitted from regressions. Data on aspect were available for only 30 of 33 sites and were reported at times in general terms (e.g., southerly-facing), so analysis is rough. Aspect improved regressions very little. Zone improved low-severity equations ($R^2_{adj}$ = 0.438) over equations in Figure 7b ($R^2_{adj}$ = 0.350) for all three forest zones: historical ponderosa pine rotations = $e^{-2.040+0.002192*\text{elevation}}$, dry mixed-conifer rotations = $e^{-1.47+0.002192*\text{elevation}}$ and moist mixed-conifer rotations = $e^{-1.46+0.002192*\text{elevation}}$.




**Figure 7.** *Cont.*

Case No. 1:23-cv-01501-RMR Document 15-2 filed 09/29/23 USDC Colorado pg 156 of 367






**Figure 7.** Historical fire rotations versus elevation, aspect, and forest zone, and the equation for estimating fire rotations from elevation: (**a**) historical all-severity fire rotations; and (**b**) historical low-severity fire rotations. For aspect, open circles = southerly-facing sites; dark squares = northerly-facing sites; pluses = easterly- and westerly-facing sites; and triangles = unknown aspects. For forest zones, P = ponderosa pine; D = dry mixed conifer; and M = moist mixed conifer. Moist mixed-conifer forest estimates are preliminary.

## 4. Discussion

### *4.1. Low-Severity Fire Rotations and Population Mean Fire Intervals from Tree-Ring Data*

Ponderosa pine and mixed-conifer forests in the southern San Juan Mountains historically were not generally frequent-fire forests with historical fire rotations <25 years [4]. Only 5 of 33 sites (about 15%), four in ponderosa pine and one in dry mixed-conifer forests, had historical low-severity fire rotations <25 years (Table 2). This is similar to the overall pattern in the western USA, where only about 14% of 342 sites, mostly in the southwest, had frequent fire with historical fire rotations <25 years [4]. Frequent-fire forests were concentrated in Arizona and New Mexico, which had 96% and 56% frequent-fire forests, respectively [4]. Understory fuels typically recover after low-severity fires to pre-fire levels within about 7–25 years, thus would have been kept generally at or below fully recovered levels in frequent-fire forests [4]. In contrast, 28 of 33 or about 85% of historical low-severity fire rotations in montane forests in the southern San Juan Mountains were multi-decadal. In ponderosa pine forests with 31-year median historical low-severity fire rotations, understory shrubby fuels would often have been fully recovered historically between fires. In mixed-conifer forests with 78–113 year median historical low-severity fire rotations (Table 5), understory fuels would have nearly always been fully recovered for almost a century before the next fire. Trees would have been able to regenerate and reach sufficient size to resist mortality in the next fire, enabling the diverse tree composition found historically in mature mixed-conifer forests [10]. The predominant understory shrub, Gambel oak (*Quercus gambelii*), would have commonly been able to resprout after fire [9], and remain at maturity for many decades before the next fire. Most other common shrubs in these forests also resprout [9], so that dense shrubby understories were historically probable. However, Gambel oak is also vulnerable to frost [35].

Early scientific observations corroborate that historical fire rotations, and perhaps long periods without heavy frost, allowed dense shrubby understories to predominate in these forests, but with variable tree regeneration. Dubois [15], in the San Juan Forest-Reserve Report, described regeneration in ponderosa pine and dry mixed conifer: "Reproduction of bull pine is poor. In many places groups of seedlings are coming in, but in the large blanks made by cutting, restocking is slow" (p. 7). Bull

pine is younger ponderosa pine. Dubois also said: "The underbrush is very heavy, chiefly oak brush, choke-cherry, scarlet thorn, and wild rose" [15] (p. 7). The Montezuma Forest-Reserve Report [16] also described tree regeneration: "In the virgin forest and in the poor open stand on thin soil there is practically no reproduction" [16] (p. 9), and a dense shrubby understory: "The underbrush of oak, service berry, wild rose, thornbush, and buffalo berry is very heavy".

The southern San Juan Mountains had a high diversity of historical low-severity fire rotations in montane forests over short distances (Figure 5c) and, partly related to forest zone and topography. Shorter fire rotations predominated in ponderosa pine forests at lower elevations and on southerly-facing aspects, while longer rotations predominated in mixed-conifer forests at higher elevations and on northerly-facing aspects ( Figures 5c and 7b). Other unstudied factors, including topographic position (e.g., canyon vs. ridge) could also help explain variability.

These low-severity fire-rotation estimates have some limitations. First, they are from CFIs, which have error from using small plots, and error is associated with equations used to estimate fire rotations [4]. Second, CFI studies were not probabilistic samples of landscapes; old forests were typically targeted, since the goal was to obtain long fire records [4]. Younger forests predominant today likely burned at longer fire rotations than the estimates reported here [4]. Of course, tree-ring records cannot distinguish ignition sources, but ignitions by Indians were likely relative low [36].

### 4.2. Moderate to High-Severity Fires from Forest Atlases and Other Sources

Mapped atlas fires and woodlands were shown to be generally reliable in reconstructing larger severe fires across this study area. Here, 24 moderate- to high-severity fires, which covered 86% of total atlas fire and woodland area, were corroborated by multiple sources (Table 4, Table S1, and Figure 3). Corroboration for landscape-scale fire history will always be incomplete, as corroborating sources are imprecise and typically cover only parts of large fires. Tree-ring dating could be used to fill in some missing information and resolve some ambiguity in fire dates, but the land area is too large to cover very fully. Atlases provide an imperfect, but unique and important source of information, particularly when corroborated as well as possible with multiple other sources.

Estimated historical high-severity fire rotations were mostly 225–250 years in moist mixed-conifer, 265 years in dry mixed-conifer, and >350 years in ponderosa pine forests (Table 1). Ponderosa pine and dry mixed-conifer estimates, if pooled, would be roughly congruent with pooled estimates of 271 years in the Colorado Front Range [37] and 281–354 years in the western Sierra [38], but longer than the 217-year rotation on Black Mesa, northern Arizona [37], and the 175-year rotation on the Uncompahgre Plateau, which is just north of the San Juan Mountains [39].

The atlases document that about 19,000 ha of ponderosa pine forest burned at high severity in the 1850–1909 period in the San Juan National Forest, which led to the high-severity fire rotation estimate of 358 years (Table 1). About 1/3 of ponderosa-pine forest area in the San Juan National Forest had evidence of either moderate- or high-severity fire in the 1850–1909 period, a rotation of about 185 years. High-severity fires also burned historically in dry mixed-conifer forests, where ponderosa pine was dominant; about 18,000 ha of high-severity fire was documented by the atlases during 1850–1909 (Table 1). Evidence of high-severity fire has been found in nearly all other ponderosa pine and dry mixed-conifer landscapes where probabilistic landscape-level historical evidence has been studied [6,40,41]. Large high-severity fires in ponderosa pine and dry mixed-conifer forests had not been documented by tree-ring studies in the San Juan Mountains, likely because tree-ring fire studies often cannot reach sufficiently large landscape scales. Tree-ring studies were valuable, but often not probabilistic samples of landscapes, focusing in older forests with long records of fire. Tree-ring studies found some of the large, severe fires, but could not determine they were very large.

Fires appeared to have reached much larger sizes and appeared more uniformly oriented on the San Juan than Rio Grande side (Figure 1b). Larger fires on the San Juan side may have occurred in part because it has much more abundant, dense understory shrubs that promote higher-severity fires. However, much of the area of large patches (Fires 1, 5, and 22 in Figure 1b) also had a

southwest-to-northeast orientation typical of fires that expanded under the influence of strong winds, possibly associated with passing cold fronts or other windstorms [3]. This effect, if it partly explains the pattern, also likely was enhanced by the common southerly- or southwesterly-facing river valleys on the San Juan side, which are lacking on the Rio Grande side (Figure 1b). However, other large fires on the San Juan side (Fires 6 and 10) have different orientation or expanded more broadly (Fire 22) across large landscapes with modest topography. Fires on the Rio Grande side appeared to lack a consistent orientation, and instead appeared constrained by a smaller area of montane forests and more diverse orientations of river valleys (Figure 1b). Some fires burned from valley bottoms in the montane zone up to treeline (e.g., Fire 1 and 18, and the atlas fire on the East Fork of the San Juan River southeast of Fire 7 in Figure 1b), although only the montane forest parts are shown.

How large did historical fires become? Moderate- to high-severity parts of fires appear mostly <5000 ha (Figure 6), but with two or more >13,000 ha in ponderosa pine and mixed conifer, similar to the 14,873 ha of moderate- to high-severity fire in the 2002 Missionary Ridge fire, based on MTBS data [42]. However, potential total area burned in a fire, not just in the montane, at moderate to high severity could historically have reached 38,805 ha (Fire 5), 54,631 ha (Fire 1), 55,975 ha (Fire 9), or even 73,925 ha (Fire 22), approaching the 75,000–90,000 ha estimated to have burned in 1879 on the Uncompahgre Plateau, just north of the San Juan Mountains [39]. If an added 1/3 to 1/2 burned at low severity, as in modern fires, total fire areas could have reached 50,000–100,000 ha, about 2–4 times the 27,903 ha of the 2002 Missionary Ridge fire. However, these very large historical fires need more research, as some could be from smaller adjoining fires in separate years. In any case, these represent very large contiguous areas, likely all burned in a 60-year period, that are still undergoing natural recovery, evident today as large patches of aspen [2,22], middle-aged forests, and openings.

A historically complex landscape with heterogeneous stages of recovery is expected, given high-severity fire rotations of 225–360 years, and moderate- to high-severity fire rotations of about 133–185 years (Table 1), and is documented by the atlases. These rotations were long enough to allow old-growth forests to develop, but short enough so that large fractions of landscapes had younger, recovering forests. About 17% of the ponderosa-pine zone and 21% of all three zones was likely <60 years old, after high-severity fires, at the time of the 1908–1909 atlases, and about 38–39% of these landscapes was burned at moderate to high severity between 1850 and 1909 (Table 1), and is still recovering from these fires. This is a substantial amount of severe fire, but is corroborated by a 1905 observation of limited large ponderosa pine timber on the San Juan relative to other areas (Table S2).

Atlas evidence of moderate- to high-severity fires has several limitations. Large spatial errors affect atlas utility in spatial overlays with modern data. Overlays with parts of the ponderosa and mixed-conifer zones could include some fire area not in the zone, and some parts of the zone could be mis-assigned. A significant constraint is that the resolution or minimum mapping unit is not specified; some grassland and shrubland patches down to about 15–20 ha were mapped, but smaller fires likely were often missed. Atlas evidence of severe fires extends back only to about 1850, and the period 1850–1909 in other parts of the southern Rockies had evidence of extensive burning due to a climatically favorable period for fire and added ignitions by settlers [9]. Ignitions by Indians likely did occur, but were relatively minor [36]. Mapping dates of 1908–1909 are late relative to expanding land uses after the early 1880s and an increased possibility that fires were human-set and forests had been logged and grazed. I presented evidence that railroad logging likely did not produce most woodlands, but logging could have contributed in some areas, and some fires were caused by railroads and logging in this period [9]. Fire severities were not explained in the atlases and, for woodlands, the best estimate from Dubois [16] is that half of woodland area was severely burned. However, woodlands could include some areas of patchy treeline forests, riparian areas, and naturally dry, low-density forests, these latter particularly on the Rio Grande side. Woodlands likely did not generally originate from other disturbances (e.g., beetle outbreaks and droughts) since they had sharp boundaries and contiguous area unlikely to be from other disturbances, and woodlands were explicitly described as from fires. The year of some fires is not known, and corroboration of others is limited, particularly

with earlier fires. Further research could add more spatial-accuracy analysis, field dating of fires, and analysis of woodlands. Despite limitations, forest atlases currently represent the best available source of landscape-scale historical fire evidence for this land area.

*4.3. Managing Low-, Moderate-, and High-Severity Fires in Montane Landscapes of the San Juan Mountains*

Change in ponderosa pine and mixed-conifer landscapes since Euro-American settlement was previously attributed to suppression of frequent fires, with added impact from logging and livestock grazing, leading to increased tree density and basal area, and tree recruitment in grasslands and shrublands. Restoration thus focused on reducing tree density and basal area and reintroducing frequent fires. However, now it is known that ponderosa pine and mixed-conifer landscapes in the San Juan Mountains had frequent fires only on the lowest and driest 15% of the area, as found elsewhere in Colorado [43]. Most (85%) of the southern San Juan montane zone historically had multi-decadal low-severity fire rotations (Table 2), as elsewhere in Colorado [4]. These longer historical low-severity fire rotations enabled dense shrubby understories to persist in a mature state for decades between fires. This likely partly explains, along with southerly-facing valleys and modest topography, the extensive moderate- to high-severity fires now known in this study area (Figure 1b), as also on the adjoining Uncompahgre Plateau just north of the San Juan Mountains [39].

Together this new evidence shows that ponderosa pine, dry mixed-conifer, and moist mixed-conifer landscapes in the San Juan Mountains were all shaped by both low-severity fires, that helped maintain low-density mature and old-growth forests, and by infrequent moderate- to high-severity fires that fostered large expanses of younger, more heterogeneous forests, as well as grasslands and shrublands, in various states of survival and recovery. The resulting landscape heterogeneity of old forests, younger forests, and openings conferred bet-hedging resistance and resilience to unpredictable subsequent disturbances by fires, insects, and droughts, especially important as we enter a period of climate change with expected natural disturbances and tree mortality [41,44]. Bet-hedging at the landscape scale means that the landscape is not uniformly resistant or resilient to any one type of disturbance, but instead provides resistance and resilience to a diversity of disturbances in different parts of the landscape [41,44].

High-severity fires were often thought to have increased since EuroAmerican settlement, but new landscape-scale evidence here refutes this. Fire rotations for high-severity fires, between 1984 and 2012, in analysis polygons that contain the San Juan Mountains, were 1816 years in ponderosa pine and 926 years in dry mixed-conifer forests [40]. Analysis is not available for rates since 1984 in moist mixed-conifer forests. Since estimated historical high-severity fire rotations in ponderosa pine forests were 358 years on the San Juan and 1145 years on the Rio Grande, and in dry mixed-conifer forests were 265 years on the San Juan and 267 years on the Rio Grande (Table 1), high-severity fires have burned since 1984 at well below historical rates. Thinning and reduction of understory shrubs or other fuels to reduce severe fires, in ponderosa pine and dry mixed-conifer forests, is thus fire suppression, which has known adverse effects on biological diversity and ecosystem functioning [9].

If the goal is ecological restoration, it is essential to protect areas primarily undergoing natural postfire recovery, and focus intentional restoration in areas recovering from logging, grazing, and fire suppression. Thinning and logging trees recovering from severe fires is not ecological restoration; it is natural in these areas for tree density and basal area to increase during recovery. Areas today inside atlas fire and woodland areas are still recovering from the moderate- to high-severity fires of 1850–1909. This is 38–39% of San Juan and Rio Grande ponderosa pine and mixed-conifer forest area (Table 1). Digital atlas fires and woodlands provide mapped locations where facilitating natural recovery can be emphasized during restoration (Data S1). Natural recovery favored shade-tolerant trees (*Abies concolor*, *Pseudotsuga menziesii*, and *Picea pungens*), in the middle- to later-stages of succession in mixed-conifer forests [26]; these trees were even dominant in older dry mixed-conifer forests [10]. Where mixed-conifer forests are recovering, restored fires and other disturbances can readjust the abundance of shade-tolerant trees, and in the meantime recovering forests provide a key component of

bet-hedging resilience at the stand scale [41,44]. For example, recovering forests, which already have small trees, are increasingly valuable because post-fire tree regeneration has been lower with warmer and drier conditions since 2000 [45].

For other areas, the simplest approach to separation of confounded recovery, logging, and fire-suppression effects, to determine restoration needs, is by dating and field observation. Since fire suppression was ineffective until after World War II [9], small trees <65 years old more likely represent fire suppression or recovery from logging, whereas older trees most likely represent natural recovery after low- to moderate-severity fires, except near early-1900s logging railroads (Figure 4). Other logged areas can often be identified in the field by persistent stumps [8]. In these later logged areas, small trees <65 years old could represent recovery after logging itself, livestock grazing, or fire suppression, which have effects that are difficult to separate. Using natural recovery and managed fire to restore these forests can be just as effective, or more so, than are thinning or other mechanical treatments [46], and do not require particular prescriptions. If mechanical treatment is undertaken anyway in these areas, I suggest now retaining all older trees and sufficient trees <65 years old, of as many species as possible, so that after-treatment stand-structure is numerically dominated by small trees of maximum available species diversity and variable density. These provide bet-hedging against impending future beetle outbreaks, droughts, and fires [41,44].

If the fire management goal is to restore heterogeneous San Juan montane landscapes shaped by historical variability in low-, moderate-, and high-severity fires, managed fires for resource benefit, not prescribed fires, can enable the higher-severity fires needed for effective restoration [47]. Fire rotations are the best available rate estimators to use in burning programs because they are area-based estimates of the historical rate of burning [4]. Biological diversity and ecosystem services will certainly be best maintained by mimicking the large variability in historical fire among forest zones and across topography (Table 5, Figures 1b and 5). In addition, most of the total burned area historically came from the few percent of fires that were large [9]. During the intervals between large fires, there can be ample time and variable settings that allow diverse species to recover. This can be mimicked by concentrating burned area into fewer years, rather than burning similarly each year.

It is not easy to restore and live with dangerous, but ecologically important large, severe fires or even with low-severity fires [48]. New landscape-scale evidence shows that montane landscapes are among the most inherently dangerous places to try to live with fire in the San Juan Mountains.

**Supplementary Materials:** The following are available online at http://www.mdpi.com/2571-6255/1/2/23/s1, Table S1: Moderate- to high-severity fires during 1850–1909 in the ponderosa pine and mixed-conifer forests of the southern San Juan Mountains from multiple sources, Table S2: General descriptions of fires and forest structure in Colorado and the San Juan Mountains, Data S1: Digital maps (shapefiles) of atlas fires and woodlands, Data S3: Digital fire-history data. Data S2: Georectified forest-atlas mosaics, are available from the Open Science Framework online at: https://osf.io/jk6ce/ (doi:10.17605/OSF.IO/JK6CE).

**Funding:** This research received no external funding.

**Acknowledgments:** The author appreciates assistance from the San Juan and Rio Grande National Forests with their GIS data, and the U.S. Geological Survey Denver Library Photographic Collection. Comments from peer reviewers significantly improved the manuscript and are appreciated.

**Conflicts of Interest:** The author declares no conflict of interest.

## References

1. Wehner, M.F.; Arnold, J.R.; Knutson, T.; Kunkel, K.E.; LeGrande, A.N. Droughts, floods, and hydrology. In *Climate Science Special Report: Fourth National Climate Assessment*; Wuebbles, D.J., Fahey, D.W., Hibbard, K.A., Dokken, D.J., Stewart, B.C., Maycock, T.K., Eds.; U.S. Global Change Research Program: Washington, DC, USA, 2017; Volume 1, pp. 231–256.
2. Romme, W.H.; Floyd-Hanna, L.; Hanna, D.D.; Bartlett, E. Aspen's ecological role in the West. In *Sustaining Aspen in Western Landscapes: Symposium Proceedings*; Shepperd, W.D., Binkley, D., Bartos, D.L., Stohlgren, T.J., Eskew, L.G., Eds.; USDA Forest Service Proceedings RMRS-P-18; Rocky Mountain Research Station: Fort Collins, CO, USA, 2001; pp. 243–259.

3. Aoki, C.F. Fire History and Serotiny in the Rocky Mountains of Colorado. Master's Thesis, Colorado State University, Fort Collins, CO, USA, 2010.
4. Baker, W.L. Restoring and managing low-severity fire in dry-forest landscapes of the western USA. *PLoS ONE* **2017**, *12*, e0172288. [CrossRef] [PubMed]
5. Hessburg, P.F.; Salter, R.B.; James, K.M. Re-examining fire severity relations in pre-management era mixed-conifer forests: Inferences from landscape patterns of forest structure. *Landsc. Ecol.* **2007**, *22*, 5–24. [CrossRef]
6. Odion, D.C.; Hanson, C.T.; Arsenault, A.; Baker, W.L.; DellaSala, D.A.; Hutto, R.L.; Klenner, W.; Moritz, M.A.; Sherriff, R.L.; Veblen, T.T.; et al. Examining historical and current mixed-severity fire regimes in ponderosa pine and mixed-conifer forests of western North America. *PLoS ONE* **2014**, *9*, e87852. [CrossRef] [PubMed]
7. Baker, W.L.; Williams, M.A. Land surveys show regional variability of historical fire regimes and dry forest structure of the western United States. *Ecol. Appl.* **2018**, *28*, 284–290. [CrossRef] [PubMed]
8. Romme, W.H.; Floyd, M.L.; Hanna, D. *Historical Range of Variability and Current Landscape Condition Analysis: South Central Highlands Section, Southwestern Colorado & Northwestern New Mexico*; Colorado Forest Restoration Institute, Colorado State University: Fort Collins, CO, USA, 2009. Available online: https://cfri.colostate.edu/publications/ (accessed on 7 July 2018).
9. Baker, W.L. *Fire Ecology in Rocky Mountain landscapes*; Island Press: Washington, DC, USA, 2009.
10. Tepley, A.J.; Veblen, T.T. Spatiotemporal fire dynamics in mixed-conifer and aspen forests in the San Juan Mountains of southwestern Colorado, USA. *Ecol. Monogr.* **2015**, *85*, 583–603. [CrossRef]
11. Agee, J.K. *Fire ecology of Pacific Northwest Forests*; Island Press: Washington, DC, USA, 1993.
12. Pinchot, G. *Preparation of the Forest Atlas*; United States Department of Agriculture, Forest Service: Washington, DC, USA, 1907.
13. Graves, H.S. *Instructions for Making Forest Surveys and Maps*; U.S. Government Printing Office: Washington, DC, USA, 1912.
14. Baker, W.L.; Veblen, T.T.; Sherriff, R.L. Fire, fuels and restoration of ponderosa pine-Douglas-fir forests in the Rocky Mountains, USA. *J. Biogeogr.* **2007**, *34*, 251–269. [CrossRef]
15. Dubois, C. *Report on the Proposed San Juan Forest Reserve, Colorado*; Unpublished Report on file at the San Juan National Forest, Supervisor's Office; San Juan National Forest: Durango, CO, USA, 1903.
16. Dubois, C. *The Proposed Montezuma Forest Reserve, Colorado*; Original document is in the National Archives and Records Administration; U.S. Department of Agriculture, Bureau of Forestry: Broomfield, CO, USA, 1904; A Typed Facsimile Version. Available online: https://www.fs.usda.gov/detail/gmug/landmanagement/resourcemanagement/?cid=stelprdb5378367 (accessed on 7 July 2018).
17. Michelsen, H. Colorado forest fires in nineteen hundred. *Forester* **1901**, *7*, 56–61.
18. Snedecor, G.W.; Cochran, W.G. *Statistical Methods*, 6th ed.; Iowa State University Press: Ames, IA, USA, 1967.
19. Shinneman, D.J.; Baker, W.L.; Rogers, P.C.; Kulakowski, D. Fire regimes of quaking aspen in the Mountain West. *For. Ecol. Manag.* **2013**, *299*, 22–34. [CrossRef]
20. Biodiversity Heritage Library. Available online: https://www.biodiversitylibrary.org (accessed on 26 May 2018).
21. Kulakowski, D.; Veblen, T.T.; Drinkwater, S. The persistence of quaking aspen (*Populus tremuloides*) in the Grand Mesa area, Colorado. *Ecol. Appl.* **2004**, *14*, 1603–1614. [CrossRef]
22. Margolis, E.Q.; Swetnam, T.W.; Allen, C.D. A stand-replacing fire history in upper montane forests of the southern Rocky Mountains. *Can. J. For. Res.* **2007**, *37*, 2227–2241. [CrossRef]
23. Hatton, J.H. *The Proposed Cochetopa Forest Reserve: Examination, Report and Recommendations*; Bureau of Forestry, U.S. Department of Agriculture, National Archives and Records Administration: Broomfield, CO, USA, 1904.
24. Ormes, R.M. *Tracking Ghost Railroads in Colorado*; Century One Press: Colorado Springs, CO, USA, 1975.
25. Chappell, G.S. *Logging along the Denver & Rio Grande: Narrow Gauge Logging Railroads of Southwestern Colorado and Northern New Mexico*; Colorado Railroad Museum: Golden, CO, USA, 1971.
26. Wu, R. Fire History and Forest Structure in the Mixed Conifer Forests of Southwest Colorado. Master's Thesis, Colorado State University, Fort Collins, CO, USA, 1999.

27. Brown, P.M.; Wu, R. Climate and disturbance forcing of episodic tree recruitment in a southwestern ponderosa pine landscape. *Ecology* **2005**, *86*, 3030–3038. [CrossRef]
28. Fulé, P.Z.; Korb, J.E.; Wu, R. Changes in forest structure of a mixed conifer forest, southwestern Colorado, USA. *For. Ecol. Manag.* **2009**, *258*, 1200–1210. [CrossRef]
29. Korb, J.E.; Fulé, P.Z.; Wu, R. Variability of warm/dry mixed conifer forests in southwestern Colorado, USA: Implications for ecological restoration. *For. Ecol. Manag.* **2013**, *304*, 182–191. [CrossRef]
30. Bigio, E.R. Late Holocene Fire and Climate History of the Western San Juan Mountains, Colorado: Results from Alluvial Stratigraphy and Tree-Ring Methods. Ph.D. Thesis, University of Arizona, Tucson, AZ, USA, 2013.
31. Bigio, E.R.; Swetnam, T.W.; Baisan, C.H. Local-scale and regional climate controls on historical fire regimes in the San Juan Mountains, Colorado. *For. Ecol. Manag.* **2016**, *360*, 311–322. [CrossRef]
32. Brown, P.M.; Ryan, M.G.; Andrews, T.G. Historical surface fire frequency in ponderosa pine stands in Research Natural Areas, central Rocky Mountains and Black Hills, USA. *Nat. Areas J.* **2000**, *20*, 133–139.
33. Grissino-Mayer, H.D.; Romme, W.H.; Floyd, M.L.; Hanna, D.D. Climatic and human influences on fire regimes of the southern San Juan Mountains, CO, USA. *Ecology* **2004**, *85*, 1708–1724. [CrossRef]
34. Colorado Historic Newpapers Collection. Available online: https://www.coloradohistoricnewspapers.org (accessed on 26 May 2018).
35. Kaufmann, M.R.; Huisjen, D.W.; Kitchen, S.; Babler, M.; Abella, S.R.; Gardiner, T.S.; McAvoy, D.; Howie, J.; Page, D.H., Jr. *Gambel Oak Ecology and Management in the Southern Rockies: The Status of Our Knowledge*; Southern Rockies Fire Science Network Publication 2016-1; Colorado State University: Fort Collins, CO, USA, 2016.
36. Baker, W.L. Indians and fire in the Rocky Mountains: The wilderness hypothesis renewed. In *Fire, Native Peoples, and the Natural Landscape*; Vale, T.R., Ed.; Island Press: Washington, DC, USA, 2002; pp. 41–76.
37. Williams, M.A.; Baker, W.L. Spatially extensive reconstructions show variable-severity fire and heterogeneous structure in historical western United States dry forests. *Glob. Ecol. Biogeogr.* **2012**, *21*, 1042–1052. [CrossRef]
38. Baker, W.L. Historical forest structure and fire in Sierran mixed-conifer forests reconstructed from General Land Office survey data. *Ecosphere* **2014**, *5*, 79. [CrossRef]
39. Baker, W.L. *The Landscapes They Are A-Changin'–Severe 19th-Century Fires, Spatial Complexity, and Natural Recovery in Historical Landscapes on the Uncompahgre Plateau*; Colorado Forest Restoration Institute, Colorado State University: Fort Collins, CO, USA, 2017. Available online: https://cfri.colostate.edu/publications/ (accessed on 7 July 2018).
40. Baker, W.L. Are high-severity fires burning at much higher rates recently than historically in dry-forest landscapes of the western USA? *PLoS ONE* **2015**, *10*, e0136147.
41. Baker, W.L. Transitioning western U.S. dry forests to limited committed warming with bet-hedging and natural disturbances. *Ecosphere* **2018**, *9*, e02288. [CrossRef]
42. Monitoring Trends in Burn Severity. Available online: https://www.mtbs.gov (accessed on 26 May 2018).
43. Sherriff, R.L.; Platt, R.V.; Veblen, T.T.; Schoennagel, T.L.; Gartner, M.H. Historical, observed, and modeled wildfire severity in montane forests of the Colorado Front Range. *PLoS ONE* **2014**, *9*, e106971. [CrossRef] [PubMed]
44. Baker, W.L.; Williams, M.A. Bet-hedging dry-forest resilience to climate-change threats in the western USA based on historical forest structure. *Front. Ecol. Evol.* **2015**, *2*, 88. [CrossRef]
45. Stevens-Rumann, C.S.; Kemp, K.B.; Higuera, P.E.; Harvey, B.J.; Rother, M.T.; Donato, D.C.; Morgan, P.; Veblen, T.T. Evidence for declining forest resilience to wildfires under climate change. *Ecol. Lett.* **2018**, *21*, 243–252. [CrossRef] [PubMed]
46. Zachmann, L.J.; Shaw, D.W.H.; Dickson, B.G. Prescribed fire and natural recovery produce similar long-term patterns of change in forest structure in the Lake Tahoe basin, California. *For. Ecol. Manag.* **2018**, *409*, 276–287. [CrossRef]

47. Van Wagtendonk, J.W.; Lutz, J.A. Fire regime attributes of wildland fires in Yosemite National Park, USA. *Fire Ecol.* **2007**, *3*, 34–52. [CrossRef]
48. Schoennagel, T.; Balch, J.K.; Brenkert-Smith, H.; Dennison, P.E.; Harvey, B.J.; Krawchuk, M.A.; Mietkiewicz, N.; Morgan, P.; Moritz, M.A.; Rasker, R.; et al. Adapt to more wildfire in western North American forests as climate changes. *Proc. Natl. Acad. Sci. USA* **2017**, *114*, 4582–4590. [CrossRef] [PubMed]

© 2018 by the author. Licensee MDPI, Basel, Switzerland. This article is an open access article distributed under the terms and conditions of the Creative Commons Attribution (CC BY) license (http://creativecommons.org/licenses/by/4.0/).

**Table S1.** Moderate- to high-severity fires from 1850-1909 in the ponderosa pine and mixed-conifer forests of the southern San Juan Mountains from multiple sources. Fires can include many patches of atlas woodlands and/or fires.

| **Year and Side/Sources** | **Type of source** | **GIS map** | **Quote and discussion** |
|---|---|---|---|
| **1900-San Juan side** | | | |
| [34] (The Daily Journal, Telluride 7-28-1900)<br><br>[16] (p. 21)<br><br>[20] (Forest Atlas-Montezuma NF 1908 p. 13) | Early report<br><br>Early report<br><br>Early maps | <br><br><br><br>Fire1 Woodland and Fire | "The hazy appearance of the atmosphere yesterday and again today is due to terrific fires raging in the timber south and east of Rico, where a heavy growth covers the mountains. Fires started yesterday afternoon at the head of Remine creek in Deep creek basin, but it is thought this fire has been put out. Over the hill south of town smoke was discovered this afternoon...The month just closing has been the dryest July in the memory of the oldest inhabitants, and the danger from forest fires increases daily. It is said that over a million dollars worth of timber has been consumed near Bear creek on the Dolores below Rico, where on Thursday there was only two or three small fires that could have been easily controlled..."<br>"It is safe to say that 50 per cent of the area classified as woodland has been run over and seriously damaged by fire...These burns are in all stages, from areas covered with dead standing trees and down timber with no re-growth what so ever on the ground, such as the area at the head of Burnt Timber Creek in the La Plata, to large areas covered by stands of aspen of varying ages with a few scattering groups of conifers in mixture, such as are found on the hills on each side of the main Dolores along which runs the railroad."<br>The area described by Dubois on the Dolores matches the 54,631 ha woodland and fire patches from Rico to Dolores, which contain 32,828 ha of the ponderosa and mixed-conifer zones. The fire year is unknown, but likely includes 1900 and 1878. The Telluride paper quote likely represents at least part of a 1900 fire. |
| [34] (The Durango Democrat 7-20-1900)<br><br>[20] (Forest Atlas-San Juan NF 1909 p. 7) | Early report<br><br>Early maps | <br><br>Fire2 Fire only | "North East of Durango in the section east of Baker's bridge is raging the most destructive fire our people have ever known of. The distance from Durango is some fifteen miles, but the flames can almost be detected at mid-day and the volume of smoke is dense and expansive, lays like a huge bank of clouds in the north east. It is in the heavy spruce forests that abound in that section and the loss of such an enormous expanse of red and white spruce is one of millions to the mining industry and railroads. All such visitations can be traced directly to campers who are purposely negligent and the only regret is that they cannot share the heat as a partial reward for cussedness."<br>T36N-T38N R7W shows a large area, possibly of woodland, but the shading switches suddenly at the western township boundary of T37N R7W, so I left this out of the digital map of fires based on woodlands, because of its ambiguity. This patch was about 13,000 ha (32,000 acres) within which was mapped a fire covering 2,296 ha, which could also have been the fire. Only 66 ha of this fire was in the ponderosa and mixed-conifer zones. This fire was reported to have been in 1900. |

| | | | |
|---|---|---|---|
| [34] (The Durango Democrat 7-22-1900)<br><br>[20] (Forest Atlas-San Juan NF 1909 p. 6) | Early report<br><br>Early maps | <br><br>Fire3 Woodland only | "The forest fire up the Animas began near the old Lambert ranch about three miles north of the Steinegar-Thompson ranches, and is sweeping the forests in a northwest direction on north side of range between Junction and Hermosa creeks. It is a destructive blaze and will destroy thousands of pine and spruce trees. Capt. Dudley says it is the worst La Plata has experienced in point of destruction and is now raging in the heavy spruce forests near Oro Fino."<br>T36N R9W-R10W shows the Oro Fino Mine NW of Monument Hill and a narrow stretch of woodland and grassland extending down to the Tripp Gulch area on the west side of the Animas Valley, where there are also old cuttings mapped, that could have been fires, but no actual fires are mapped. The woodland patch itself was 265 ha, with 211 ha in the ponderosa and mixed-conifer zones, and it burned in 1900. |
| [49] (p. 23)<br>[50] (p. 117, 124)<br><br>[20] (Forest Atlas-San Juan NF 1909 p. 8) | Early report<br>Early report<br><br>Early maps | <br><br><br>Fire4 Fire only | "...a sheepherder supposedly set a fire that burned over 500 acres in the Vallecito area."<br>"The Vallecito Country had five hundred acres burned over in 1900, from a fire supposed to have been incendiary and set by one of the sheep herders of that time. Over one thousand dollars worth of damage was the result."<br>T37N-T38N R6W shows a 205 ha fire near Vallecito Creek, but only 95 ha was in the ponderosa pine and mixed-conifer zones, and the fire burned in 1900. |
| [34] (The Pagosa Springs News 8-17-1900)<br>[49] (p. 23)<br><br>[50] (p. 117)<br><br>[20] (Forest Atlas-San Juan NF 1909 p. 9, 13) | Early report<br><br>Early report<br><br>Early report<br><br>Early maps | <br><br><br><br><br><br>Fire5 Woodland and Fire | "In the western part of the county [Archuleta County] several forest fires are reported, which is burning some of the finest timber in this section."<br>"One fire started near the Piedra River, it was believed by lightning, traveled up Sand Creek and Weminuche Creek" This likely is reporting the same fire(s) as the previous reference.<br>"1900 proved to be another bad fire year. The summer was hot and dry when a fire started down the Piedra River and travelled up Sand Creek and Weminuche Creek. This fire was uncontrolled for over three weeks and is believed to have been started by lightning"<br>The entire length of the Piedra River, from where Highway 160 crosses it at the lower end upstream to the Hinsdale-Archuleta County line is part of a large woodland patch and four smaller fires. There is also a woodland patch on Weminuche Creek, but no woodland patch or fire on Little Sand Creek. Much of this may have burned in 1900, but part of this may have burned in 1898, 1879, or 1861. Total burned area is 38,805 ha, with 13,872 ha in the ponderosa and mixed-conifer zones. |

| | | | |
|---|---|---|---|
| [17] (p. 59) | Early report | | "August 30th, the woods fringing the entire northern boundary of Archuleta County were found to be ignited. A large fire was burning near the head of Four Mile Creek, the smoke resembling a huge cloud as it passed over Pagosa Springs. Some forty square miles [10,400 ha, 25,600 ac] of Yellow Pine forest were burnt over. It was asserted that sheep herders who fired the grass in order to improve the pasture for next year are responsible in this case." The table on p. 60 also lists 40 square miles burned in Archuleta County and the map on p. 57 shows the burn area along the northern boundary. This mapped (p. 57) Michelsen fire patch, which I roughly digitized to have been 151,647 ha, extended into southwestern Rio Grande and southern Hinsdale and Mineral Counties. Hinsdale was reported in the table on p. 60 to have had 6 square miles [1,555 ha, 3,840 ac] burned, Mineral to have had 10 square miles [2,591 ha; 6,400 ac] burned. Thus, the area within Archuleta, Hinsdale, and Mineral Counties would have totaled 56 square miles [14,510 ha, 35,840 ac.]. Rio Grande county burned area is discussed later in this table. |
| [49] (p. 23) | Early report | | "Another fire raged between Middle Fork and the East Piedra Rivers" This is likely also this fire, which burned part of the area between the Middle Fork and East Piedra Rivers. |
| [50] (p. 117, 124) | Early report | | "During the same summer [1900] another fire burned over the country between Middle Fork and the East Piedra Rivers. This fire burned for ten days with only four men to fight it." |
| [34] (The Pagosa Springs News 8-17-1900) | Early report | | "Several forest fires are raging in the vicinity of Pagosa Springs. Last Sunday a large fire was doing a great deal of damage near Mrs. Cade's ranch, and another area near the top of the range northeast of town, both of which could easily be seen in Pagosa." |
| [34] (The Pagosa Springs News 8-31-1900) | Early maps | | "If the forest fire above Mrs. Cade's ranch burns much longer there won't be any timber left in that part of the country. It has been burning the last two months."<br>"A big forest fire is reported in Laughlin Park." |
| [20] (Forest Atlas-San Juan NF 1909 p. 11, 13) | | Fire6 Woodland and Fire | Mrs. Cade's ranch east of Pagosa Peak in S35 T37N R2W is within a woodland patch with two associated fires. This 14,145 ha total area, with 13,088 ha in the ponderosa and mixed-conifer zones, matches the 14,510 ha fire reported by Michelsen and matches the locations described in the above sources. This patch goes down to within 0.7 km of Laughlin Park. Most of this burned in 1900, but part could have burned in 1898. |
| [49] (p. 23) | Early report | | "...Several large fires burned over the Pagosa area, particularly one started by campers (from either their camp fire or from smoking) around Borne Lake, Beaver Creek, and a portion of West Fork." |
| [50] (p. 117) | Early report | | "Sometime during the period 1899-1905, the exact year being unknown, several large fires burned in the transitional and spruce types in the Pagosa Country. Apparently no efforts were made to extinguish these fires and many of them burned nearly all summer. Some of them threatened to get down into the lower altitudes. Henry Born father of the James Born now residing near Pagosa Springs, fought fire off-an-on all one summer to save the timber around the Borns Lake. This fire burned out Beaver Creek and part of West Fork and was believed to have been started by campers either from their camp fires or from smoking." |
| [20] (Forest Atlas-San Juan NF 1909 p. 11, 13) | Early maps | Fire7 Woodland and Fire | Borne Lake may be Borns Lake, and Beaver Creek is just upstream from it on the West Fork of the San Juan. This area has a woodland patch with fires on the two sides of the West Fork. The total is 2,324 ha burned, 845 ha in the ponderosa and mixed-conifer zone, likely all in 1900. |

| 1900-Rio Grande side | Type of source | GIS map | Quote and discussion |
|---|---|---|---|
| [51] (p. 2, 7)<br>[17] (p. 59)<br>[20] (Forest Atlas-Rio Grande NF 1909 p. 8) | Early report<br>Early report<br>Early maps | <br>Michelsen<br>Fire8 Woodland only | "Tie Hill...Extensive area of Decker, Goodrich, and Lake Fork Creeks" SW of South Fork on the Rio Grande. "Started from Bengards Mill on the South Fork just below Park Creek."<br>"August 16, two fires originated on the South Fork of the Rio Grande, one east and the other west of the river, within three miles of each other. The one on the west side burned up the mountain and stopped after reaching timber line..."<br>The west side of the South Fork of the Rio Grande is covered by a fire patch and a woodland patch. Total burned area is 2,439 ha, with 1,145 ha in the ponderosa and mixed-conifer zones. Some of the area in a fire patch for Fire17 in 1881, on Goodrich Creek, likely burned in this 1900 fire. |
| [17] (p. 59)<br>[15] (p. 9)<br>[34] (The San Juan Prospector, Del Norte, Colorado 9-1-1900)<br>[20] (Forest Atlas-Rio Grande NF 1909 p. 8, 9) | Early report<br>Early report<br>Early report<br>Early maps | Michelsen<br><br><br>Fire9 Woodland and Fire | "August 16, two fires originated on the South Fork of the Rio Grande...that on the east side burned a swath from five to twenty miles wide, taking everything in its way driving several hundred thousands of cattle and sheep into the valley, and destroying mine buildings, machinery and shaft houses in the whole region at the headwaters of the Alamosa and Conejos rivers. The length of the path burned over was about forty-five miles. All of this devastation can be traced to sheep herders who, either carelessly or maliciously, left their logs burning on breaking camp." The table on p. 60 lists 205 square miles (53,117 ha, 131,200 ac) burned in Rio Grande County, but data appear missing for Conejos County. The map on p. 57 shows a large fire down the west side of both counties.<br>"The effect of denudation [by fire] is shown by the Conejos River...For the past six years [1897-1903] fires have occurred repeatedly in the timber on its headwaters."<br>"The great devastation of timber continues in the country south and west of Del Norte and it is the general belief that the fires are being started intentionally. The State authorities evidently do not think enough of this part of Colorado to make an effort to apprehend the men who are guilty of such work. In the meantime, the loss entailed upon the people of this section is very great. Never within our recollection has the destruction of timber been as great as this season, a destruction that will be felt in a higher price for lumber, a scarcity of mining timber and fuel, and an earlier melting of the snow upon which the farmer relies for water for his crops."<br>The fire start may have been in T39N R3E S21-S22 (p. 9), in a woodland. It is possible to connect up (there are some large gaps, though, where fire either spotted or burned at low severity) along a set of patches to the southeast from the South Fork of the Rio Grande across the headwaters of the Alamosa and Conejos Rivers, which would stretch 77 km (48 miles), if so, going from p. 9 to p. 12-13 to p. 14-15. The resulting set of fire patches would total 55,975 ha, with 21,585 ha in the ponderosa and mixed-conifer zones. Some of this area burned in 1900 may have burned earlier, in 1875 or 1873. |
| | | | |
| **1899-San Juan side** | | | |
| [10]<br>[20] (Forest Atlas-San Juan NF 1909 p. 15). | Tree-rings<br>Early maps | <br>Fire22 Woodland and Fire | Squaretop study area<br>This area contains a fire patch that encloses much of Tepley and Veblen's study area, which also partly overlaps a very large woodland patch. Tepley and Veblen (2015) showed that the fire patch and nearby woodland patch burned in 1899, 1879/1878, and 1861/1860. Their maps show which parts of the atlas fire and adjoining woodland patch burned in these years, but not the whole woodland patch. The total fire area is 73,925 ha, with 62,135 ha in the ponderosa and mixed-conifer zones. |

| 1898-San Juan side | Source | GIS map | Quote and discussion |
|---|---|---|---|
| [49] (p. 23)<br><br>[50] (p. 116)<br><br>[20] (Forest Atlas–San Juan NF 1909 p. 12) | Early report<br><br>Early report<br><br>Early maps | Fire5 Woodland and Fire | "In 1898, a fire, started from an unknown source, near Bayfield burned approximately 5,000 acres..."<br><br>"Near Bayfield there was an area of approximately five thousand acres which had been burned over years before. This area burned over for the second time in 1898, the fire starting from an unknown cause. It burned during the month of August for fourteen days.<br>There is a large woodland patch of 35,143 ha that is in part only about 3 km east of Bayfield; it is likely that part of this large patch burned in 1898, rather than 1900. |
| [49] (p. 23)<br><br>[50] (p. 116-117, 124)<br><br>[20] (Forest Atlas–San Juan NF 1909 p. 9-10) | Early report<br><br>Early report<br><br>Early maps | Fire6 Woodland and Fire | "...another fire started by a hunter's camp fire burned along the west side of middle Fork Creek and up Oak Brush Hill in the Piedra area"<br>"...a forest fire started by a hunter's camp fire burned uncontrolled along the west side of Middle Fork Creek and up Oak Brush Hill in the Piedra country. It burned until extinguished by heavy rains."<br>This is part of a large patch of 14,145 ha, reported to have burned in 1900, that terminates on its western end right in this area; it is likely that part of this area burned in 1898, not 1900. |
| [49] (p. 23)<br><br>[50] (p. 124)<br><br>[20] (Forest Atlas–Montezuma NF 1908 p. 17) | Early report<br><br>Early report<br><br>Early maps | Fire10 Woodland only | "That same year also witnessed a fire that began on Horse Creek when Pat Murphy built a smudge fire to keep flies away from his horses and burned east to Gold Run Creek and north to the Hogback, northeast of Mancos"<br>"Also in 1898 a fire started on Horse Creek and burned East to Gold Run Creek and north to the Hogback which is northeast of Mancos. Messrs. William Young and Herbert Shackley fought this fire to save Mr. Young's cabin and fencing. This fire was started by Pat Murphy who built a "smudge fire" to keep flies away from his horses."<br>This is a large woodland patch of 28,381 ha, that at its southeastern extent, runs across this specific area; it seems likely that about 1,000 ha (2,500 ac) of this large patch burned in 1898, and another 2,000 ha in 1892, but the Romme et al. study suggests fires in or before 1879, in the period from about 1880-1850, in a larger area near this. |
| | | | |
| **1898-Rio Grande side** | **Source** | **GIS map** | **Quote and discussion** |
| [51] (p. 2)<br>[20] (Forest Atlas-Rio Grande NF 1909 p. 12) | Early report<br>Early maps | <br>Fire11 Fire only | "Klondike Mountain Adams Fork, and Globe Creek" in upper Conejos and Alamosa River drainages<br>T36N R4E has a 1,464 ha fire, with only 23 ha in the ponderosa and mixed-conifer zones. This 1898 fire area may be in the same area as reported by Spero to have burned in 1875. |
| | | | |
| **1896/1891-San Juan side** | | | |
| [10]<br>[20] (Forest Atlas-San Juan NF 1909 p. 9) | Tree-rings<br>Early maps | <br>No fire detected | Williams Creek study area<br>The small high-severity fire area and medium moderate-severity fire area were not detected here by atlas fires or woodlands, as the area is mapped as forest with 2,000-5,000 b.f. It is possible that fire in the moderate-severity area reduced timber volume somewhat, leaving this level of b.f., but not enough to produce a woodland. |

| **1895-San Juan side** | | | |
|---|---|---|---|
| [50] (p. 116, 123)<br><br>[20] (Forest Atlas–San Juan NF 1909 p. 4, 8) | Early report<br><br>Early map | <br><br>No fire detected | "In 1895 campers were the cause of a thousand acre fire in the Vallecito country. Five million board feet of timber was destroyed with a value of over five thousand dollars. Most of the early fires, including this one, were allowed to burn until rain put them out."<br>No fires or woodlands are mapped in the Vallecito drainage except a 1900 fire patch. This same description was attributed to 1879 by Romme and Bunting [49] (p. 23). |
| | | | |
| **1893-Rio Grande side** | **Source** | **GIS map** | **Quote and discussion** |
| [51] (p. 2)<br><br>[20] (Forest Atlas-Rio Grande NF 1909 p. 3) | Early report<br><br>Early maps | <br><br>Fire12 Fire only | "Dry Gulch...Entire Gulch," and "Farmers Creek...Upper part of watershed" just east of Creede "Mammoth Mountain South and east exposures" N of Creede. Likely the same fire.<br>This burned area is 2,059 ha in total, with 136 ha in the ponderosa and mixed-conifer zones. |
| [51] (p. 2)<br><br>[20] (Forest Atlas-Rio Grande NF 1909 p. 2) | Early report<br><br>Early maps | <br><br>Fire13 Woodland only | "Willow Creeks East and West Willow, Shallow, Sunnyside Creeks, Dry Gulch and the vicinity of the town of Bachelor" north and west of Creede. Quotes from Nolie Mumey: "The town of Bachelor was threatened by fire on June 23, 1893 when the forest fire which had been burning moved toward town. The people of Jimtown rushed up to Bachelor and helped save the town. The forest fire burned up to the edge of Bachelor devastating East Willow and West Willow Creeks. Shallow Creek and Sunnyside Creek were also burned in the same fire."<br>T42N R1W-R2W–this area has a woodland and two fire patches over 6,841 ha with 2,375 ha of the ponderosa and mixed-conifer zones. Other parts of this area are shown as a grassland of 2,500 ha + (6,000 ac +), which could also be part of the fire area, as there are sharp boundaries with forests. This area burned in 1893. |
| [51] (p. 2, 4, 6)<br><br>[20] (Forest Atlas-Rio Grande NF 1909 p. 2, 7, 8) | Early report<br><br>Early maps | <br><br>Fire14 Woodland and Fire | "Douglas Mountain Lime, McCall, Credit & Deep Creeks. Also the N and NE exposure of Snowshoe Mountain" large circular mountain south of Creede. On p. 4 from LaFont (1922)–"During the summer of 1893 the town [Spar City] was threatened by forest fires. A large forest fire was burning south of Spar City and another to the north. The one to the north burned till the snow fell and its area extended from the Point of Rocks over the Deep Creek Hills, and Snowshoe Mountain...This fire swept Lime Creek and continued in a N/NE direction until snow fell."<br>This 1893 fire area has nine patches of fire and six patches of woodland over 8,488 ha, with 2,635 ha of the ponderosa and mixed-conifer zones. |
| [51] (p. 2, 3, 7)<br><br>[20] (Forest Atlas-Rio Grande NF 1909 p. 13) | Early report<br><br>Early maps | <br><br>Fire15 Woodland and Fire | "Rock Creek" NE of Alamosa River drainage.."In June 1893 in a single day fire swept the entire watershed of North Rock Creek"<br>This area has a total burn area of 10,493 ha, with 6,892 ha of the ponderosa and mixed-conifer zones. It is likely part of this total area burned in 1893 and part in 1892 (see below). |

| **1892-San Juan side** | | | |
|---|---|---|---|
| [50] (p. 123)<br><br>[20] (Forest Atlas–Montezuma NF 1900 p. 17) | Early report<br><br>Early maps | <br><br>Fire10 Woodland only | "In 1892 the Townsend Basin fire started along the East Mancos Creek and burned to timber line. Cause of fire unknown."<br>T36N R12W About 2,000 ha burned in 1892, with about 770 ha of ponderosa pine and mixed-conifer forest, within a large woodland patch of 28,381 ha, that likely also burned in 1898 and 1880-1850. |
| | | | |
| **1892-Rio Grande side** | **Source** | **GIS map** | **Quote and discussion** |
| [51] (p. 2)<br>[20] (Forest Atlas-Rio Grande NF 1909 p. 2) | Early report<br>Early maps | <br>Fire15 Woodland and Fire | "South Rock Creek"<br>Likely part of the Fire15 area, which may also have burned in 1893. |
| | | | |
| **1887-San Juan side** | **Source** | **GIS map** | **Quote and discussion** |
| [49] (p. 23)<br><br>[20] (Forest Atlas–San Juan NF 1909 p. 4, 8) | Early report<br><br>Early maps | <br><br>No fire detected | "...campers ignited a 1,000 acre fire in the Vallecito country that destroyed 5 million board feet of timber, valued at over $5,000"<br>No fires or woodlands are mapped in the Vallecito drainage except a 1900 fire patch |
| **1887-Rio Grande side** | **Source** | **GIS map** | **Quote and discussion** |
| [51] (p. 2)<br>[20] (Forest Atlas-Rio Grande NF 1909 p. 13) | Early report<br>Early maps | <br>Fire16 Fire only | "Cat Creek Entire upper reaches of Cat Creek" in Alamosa drainage.<br>A single fire patch of 316 ha, with 234 ha in the ponderosa and mixed-conifer zones. Could have burned some of the adjoining woodland patch which I assigned to a 1900 fire. |
| | | | |
| **1884-San Juan side** | **Source** | **GIS map** | **Quote and discussion** |
| [49] (p. 23)<br><br>[50] (p. 123)<br><br><br>[20] (Forest Atlas–San Juan NF 1909 p. 4, 8) | Early report<br><br>Early report<br><br><br>Early maps | <br><br><br><br><br>Fire 10 Woodland & cutting | "The next large fire occurred in 1884. Reportedly set by Indians, the fire burned most of the summer."<br>Lacking locational information, it is impossible to validate this fire, but it seems likely it is the same as in York: "In the year 1884 a large fire burned over sections 25, 26, 35 and 36, T. 37 N, R. 14 W, and burned all summer. The Indians are credited as having set it. The area which was covered by this fire now has a stand of Ponderosa Pine."<br>This fire area is partly identified in the atlas by the large woodland patch of 28,381 ha., but is likely also represented on the atlas by an "old cutting," suggesting it was logged after the fire. Based on the locational description it likely covered about 1,035 ha in four sections, all in ponderosa pine and dry mixed conifer with associated grasslands and shrublands. |

| 1881-Rio Grande side | Source | GIS map | Quote and discussion |
|---|---|---|---|
| [51] (p. 2)<br>[20] (Forest Atlas-Rio Grande NF 1909 p. 8) | Early report<br>Early maps | Fire17 Woodland and Fire | "Elk Creek, Raspberry, Trout Soda, Leopard, Roaring Fork and Goose Creeks"<br>This 1881 fire area has 14,912 ha of total burn area, with 4,252 ha of ponderosa and mixed conifer. Some of this area, on Goodrich Creek, likely burned in fire9 in 1900. |
| **1880-1850-San Juan side** | | | |
| [2]<br>[20] (Forest Atlas-San Juan NF 1909 p. 13, 16, 17) | Tree-rings<br>Early maps | Fire10 Woodland only | The Romme et al. study area included all of T37N R12W, the northeastern corner of T37N R13W, the southernmost portion of T38N R12W, and the southeastern corner of T38N R13W (William Romme, Pers. Comm., 1-5-2016). Only 18 of the 57 dated stands in this area (32%) had "last fires" in the 1850s-1870s, which are potentially detectable with atlas fires and woodlands.<br>The study area is half or more occupied by part of a woodland patch of 28,381 ha, with 18,167 ha in the ponderosa pine and mixed-conifer zones. About 1,000 ha of this patch to the south may have burned in 1898. The Romme et al. study suggests fires in or before 1879. A substantial part of the study area had older forests. |
| | | | |
| **1879-San Juan side** | **Source** | **GIS map** | **Quote and discussion** |
| [49] (p. 23)<br>[52] (p. 258-263)<br>[50] (p. 116, 123)<br>[20] (Forest Atlas-San Juan NF 1909 p. 3) | Early report<br>Early report<br>Early report<br>Early maps | Fire18 Fire only | "The century's most significant fire, however, occurred in June, 1879. The subsequently labeled, Lime Creek Burn, fired over 26,000 acres. More significantly, the fire burned not only trees and litter, but the soil itself."<br>Nossaman has an extensive report on the origins of this fire, the direction it burned, a map of the fire, and details of its impacts, too lengthy to quote here.<br>"...in some way a great conflagration was started. Although many old-timers claimed the Indians started the fire, the true cause of the fire has never been definitely ascertained. This horrible fire burned over twenty-six thousand acres of timberland is even to this spoken of as the "Lime Creek Burn." Although over a half a century has passed this ruined forest still bears witness to the deadly effect of fire. The fire burned the needles, leaves, timber, the very soil itself. Each windy day a few more of the scarred snags would fall until now they are on the ground forming a part of the vast waste. Another coating of soil is gradually covering the mass and although timber is still missing, some grazing is available now."<br>This 1879 burn has a single large fire patch of 8,155 ha, with 1,814 ha in the ponderosa and mixed-conifer zones. The full boundary of this fire is truncated on the western margin of the fire apparently by private land, so this is not the entire extent of the fire. This is the Lime Creek burn, as it is still called today. |
| [49] (p. 23)<br>[50] (p. 116, 123)<br>[20] (Forest Atlas-San Juan NF 1909 p. 3) | Early report<br>Early report<br>Early maps | Fire19 Woodland and Fire | "That same year [1879] fire swept through the Cave Basin area, along the Piedra Divide, and in the upper Pine River country."<br>"In the same year as the disastrous Lime Creek burn a fire raged unchecked throughout most of the summer in the Cave Basin country. Also along the Piedra Divide and along the upper Pine River country fires burned. The large area burned over in Cave Basin even now shows but a stand of brush and aspen were one where once stood good timber."<br>This area contains a total fire area of 10,672 ha, with 1,132 ha in the ponderosa and mixed-conifer zones. The upper Pine River area burned extensively, but the Cave Basin creek area itself is not shown to have burned, but perhaps burned at low severity. This 1879 fire also could have been in 1860. |

| | | | |
|---|---|---|---|
| [49] (p. 23)<br><br>[20] (Forest Atlas–San Juan NF 1909 p. 4, 8) | Early report<br><br>Early map | <br><br>No fire detected | "Campers started a 1,000 acre blaze in the Vallecito area that destroyed 5 million board feet of timber."<br><br>No fires or woodlands are mapped in the Vallecito drainage except a 1900 fire patch |
| [3]<br>[20] (Forest Atlas-San Juan NF 1909 p. 16). | Tree-rings<br>Early maps | <br>Fire22 Woodland and Fire | Navajo River study area-western part<br>The western part of Aoki's study area overlaps the eastern edge of a large woodland patch of 72,848 ha, which contains 61,768 ha of ponderosa and mixed conifer. At their Squaretop site further north, Tepley and Veblen (2015) showed that parts of this woodland patch burned in 1899, 1879/1878, and 1861/1860. Aoki found evidence of much high-severity fire in 1879 on the eastern side of the Navajo River, but not on this western side, which may have burned in earlier fires. Aoki did find 1861 and 1851 fire dates. |
| [30-31]<br>[20] (Forest Atlas-San Juan NF 1909 p. 8) | Tree-rings<br>Early maps | <br>No fire detected | MAR2 study area.<br>The atlas does not show either fires or woodlands at this location. Failure to detect this fire may be because it was only medium in size. |
| [10]<br>[20] (Forest Atlas-San Juan NF 1909 p. 9) | Tree-rings<br>Early maps | <br>Fire5 Woodland only | Williams Creek study area<br>The fire area in part intersects a woodland patch, that is in part in the ponderosa and mixed-conifer zones, which may, in part, have also burned in 1900 or in 1861. |
| [26]<br>[20] (Forest Atlas-San Juan NF 1909 p. 9) | Tree-rings<br>Early maps | <br>No fire detected | BPK1 study site<br>A woodland patch was located on the Piedra River about 2 km southeast of the site, but no fire or woodland was mapped in the study site itself. Failure to detect this high-severity fire patch may be because it was small. |
| | | | |
| **1879/1878-San Juan side** | | | |
| [10]<br>[20] (Forest Atlas-San Juan NF 1909 p. 15). | Tree-rings<br>Early maps | <br>Fire22 Woodland and Fire | Squaretop study area<br>This area contains a fire patch that encloses much of Tepley and Veblen's study area, which also partly overlaps a very large woodland patch. Tepley and Veblen (2015) showed that the fire patch and nearby woodland patch burned in 1899, 1879/1878, and 1861/1860. Their maps show which parts of the atlas fire and adjoining woodland patch burned in these years. The total fire area is 73,925 ha, with 62,135 ha in the ponderosa and mixed-conifer zones. |
| | | | |
| **1879-Rio Grande side** | **Source** | **GIS map** | **Quote and discussion** |
| [51] (p. 2)<br>[20] (Forest Atlas-Rio Grande NF 1909 p. 3) | Early report<br>Early maps | <br>No fire detected | "Dry Gulch...Rather small in lower watershed" just east of Creede<br>T42N R2E S31 shows an "Old cutting" of about 120 ha that could have been the fire and was subsequently logged. |

| | | | |
|---|---|---|---|
| [51] (p. 2)<br>[20] (Forest Atlas-Rio Grande NF 1909 p. 7) | Early report<br>Early maps | <br>Fire20 Woodland and Fire | "Middle Mountain, Red and Middle Mountains, and portions of Trout Creek" N of Piedra Peak SW of Creede<br>Total burn area is 1,941 ha with 373 ha in the ponderosa and mixed-conifer zones. |
| [51] (p. 2, 7)<br><br><br><br><br><br><br>[20] (Forest Atlas-Rio Grande NF 1909 p. 12) | Early report<br><br><br><br><br><br><br>Early maps | <br><br><br><br><br><br><br>No fire detected or Fire9 | "Osier Burn," 12,000 ha (30,000 ac) on NM border. "This fire was the most extensive and intensive that occurred locally in the 19th century. Its boundaries were Grouse Creek on the west, the Rio Conejos on the north, the limits of timber on the east, and points far south of the state line on the south. All evidence points to the conclusion that it was started on the railroad. Intensity is still evident: very few snags standing or down were left. Aspen did not come in."..."Most of the burn was in Engelmann spruce-white fir mixture. There were some ponderosa pine, bristlecone pine, and Douglas fir at the lower elevations on the Los Pinos and Conejos Rivers. The fire was believed to have been started by railroad crews."<br>T32N R6E, no fire shown, but a large grassland that might approach the 12,000 ha scale could be it? A substantial patch of woodland to the east possibly part of this fire but instead or also fire9 in 1900. One small patch to the south on the Los Pinos River. Most of this fire likely above the ponderosa and mixed-conifer zones. |
| | | | |
| **1878-San Juan side** | **Source** | **GIS map** | **Quote and discussion** |
| [49] (p. 23)<br><br>[50] (p. 123)<br><br><br>[20] (Forest Atlas-Montezuma NF 1909 p. 13) | Early report<br><br>Early report<br><br><br>Early maps | <br><br><br><br><br>Fire1 Woodland and Fire | "An Indian party was supposedly responsible for setting a fire that consumed a large body of spruce timber on Bear Creek, a tributary of the Dolores River, during the fall of 1878"<br>"In the fall of 1878 an Indian party supposedally [sic] set fire to a large body of spruce on bear creek, a trubutary of the Dolores River. The fire did considerable damage to the timber of the region. At present the area is covered with a dense stand of aspen."<br>Bear Creek adjoins a large woodland patch that extends from Rico to Dolores, which contains 32,828 ha of the ponderosa and mixed-conifer zones. Part of this patch may have also burned in 1900. |
| [49] (p. 22-23)<br><br><br>[50] (p. 115, 123)<br><br><br><br><br>[20] (Forest Atlas-San Juan NF 1909 p. 3) | Early report<br><br><br>Early report<br><br><br><br><br>Early maps | <br><br><br><br><br><br><br><br>No fire detected | "In 1878, a fire for more than forty days burned over 18,000 acres between Rockwood and Silverton. Such fires in the San Juans no doubt resulted from whites. Certainly the indictment of two men by a Silverton grand jury in October, 1877, for setting public land forests on fire indicate as much."<br>"A fire which burned for forty days and covered over eighteen thousand acres burned in the year 1878 between Rockwood and Silverton, over four hundred and fifty millions of board feet of timber were destroyed with an estimated loss in timber of nine hundred thousand dollars. The area burned over was partly in San Juan and partly within La Plata County. M.A. Hubbard, later resident of Aztec, New Mexico, witnessed the fire and supplied the information included here"<br>No fire or woodland patch of this size is visible on the San Juan [12] (Forest Atlas, but this description seems to fit the Lime Creek Burn of 1879, suggesting a possibly unreliable date in this historical report. |
| | | | |

| **1876-Rio Grande side** | **Source** | **GIS map** | **Quote and discussion** |
|---|---|---|---|
| [51] (p. 6)<br><br>[22]<br>[20] (Forest Atlas-Rio Grande NF 1909 p. 6) | Early report<br><br>Tree-rings<br>Early maps | <br><br><br>Fire23<br>Fire only | "Lieutenant C.C. Morrison said in 1876 that 'we crossed the Sangre de Cristo Pass June 15, 1876. From the summit the San Juan range was seen enveloped in smoke of burning forests..."<br>SQW study area<br>This area contains two fire patches, likely parts of the same fire, that span Little Squaw Creek and Squaw Creek. Total burn area is 1,066 ha, with 169 ha in the ponderosa and mixed-conifer zones. |
| | | | |
| **1875-Rio Grande side** | **Source** | **GIS map** | **Quote and discussion** |
| [51] (p. 2, 7)<br><br><br><br>[20] (Forest Atlas-Rio Grande NF 1909 p. 12) | Early report<br><br><br><br>Early maps | <br><br><br><br>Fire9-part Woodland and Fire | "Hayden Expedition topographer Franklin Rhoda stated that great volumes of smoke were coming from the head of the Alamosa River reaching Fort Garland 70 miles away. One week later he reported that in a rough canyon on the Alamosa a great fire was raging in the spruce. This fire accounts for most of the extensive burns within the canon between Stunner and the Worrel Ranch especially around Jasper."<br>A woodland patch of 26,842 ha covers this area and a large area to the south, with 7,950 ha of ponderosa and mixed conifer. This patch was attributed to the 1900 fire, Fire9, which may have burned over this same area. |
| | | | |
| **1874-San Juan side** | **Source** | **GIS map** | **Quote and discussion** |
| [49] (p. 22)<br><br>[52] (p. 257)<br><br><br><br>[20] (Forest Atlas-San Juan NF 1909 p. 3, 6, 7) | Early report<br><br>Early report<br><br><br><br>Early maps | <br><br><br><br><br><br>No fire detected | "In 1874, a 18,000 acre burn consumed over 450 million board feet of timber between Rockwood and Silverton."<br>"The second was in 1874, when a fire in the Animas Canyon straddling what is now the San Juan-La Plata county line burned more than 18,000 acres over a period of 40 days. This fire has been traced from ground signs, and M.A. Hubbard claims to have been an eye-witness to this incident, which was apparently from natural causes."<br>No fire or woodland patch of this size is visible on the San Juan [12] (Forest Atlas on p. 3, 6, or 7, but p. 2 is missing from the folio and could possibly have evidence. Also, parts of this area were not mapped as they were in private claims, particularly just north of Rockwood. |
| | | | |
| **1873-San Juan side** | **Source** | **GIS map** | **Quote and discussion** |
| [26]<br>[20] (Forest Atlas-San Juan NF 1909 p. 10) | Tree-rings<br>Early maps | <br>No fire detected | JAK1, JAK4<br>A woodland patch was located about 1 km northeast of the site, but no fire or woodland was mapped in the study sites. Failure to detect this high-severity fire patch may be because it was small. |

| 1873-Rio Grande side | Source | GIS map | Quote and discussion |
|---|---|---|---|
| [51] (p. 2)<br>[20] (Forest Atlas-Rio Grande NF 1909 p. 12) | Early report<br>Early maps | Fire9-part Woodland and Fire | Jasper/Burnt Creeks, 1,619 ha (4,000 ac) in Alamosa drainage<br>Part of a large woodland patch of 26,842 ha may have burned in 1873 in the Jasper/Burnt Creek area, and possibly burned again in 1875 or 1900. |
| | | | |
| **1872-Rio Grande side** | **Source** | **GIS map** | **Quote and discussion** |
| [51] (p. 3, 6)<br><br>[20] (Forest Atlas-Rio Grande NF 1909 p. 4) | Early report<br><br>Early maps | Fire21 Woodland only | "La Garita Creek" W of La Garita. "A sheepherder stated that he had to leave the Mesa Peak country with his sheep because of the dense smoke from forest fires burning in the La Garita country."<br>This area has burned area totaling 2,653 ha, with one patch of woodland containing 508 ha in the ponderosa and mixed-conifer zones. |
| **1870-San Juan side** | **Source** | **GIS map** | **Quote and discussion** |
| [30-31]<br>[20] (Forest Atlas-San Juan NF 1909 p. 8) | Tree-rings<br>Early maps | No fire detected | SC4<br>The atlas does not show either fires or woodlands at this location. Failure to detect this fire may be because it was small. |
| | | | |
| **1861-San Juan side** | **Source** | **GIS map** | **Quote and discussion** |
| [10]<br>[20] (Forest Atlas-San Juan NF 1909 p. 9) | Tree-rings<br>Early maps | Fire5 Woodland only | Williams Creek study area<br>The fire area in part intersects a woodland patch of 1,461 ha, with 1,379 ha of the ponderosa and mixed-conifer zones, which may, in part, have also burned in 1900, 1898, or 1879. |
| [27]<br>[20] (Forest Atlas-San Juan NF 1909 p. 13) | Tree-rings<br>Early maps | Fire5 Woodland only | Archuleta Mesa study area<br>This study area is within a very large woodland patch of 35,143 ha, with 10,405 ha of ponderosa and mixed conifer, that extends up the Piedra River and west almost to Bayfield. It would be surprising if this large patch originated from a single fire year. Parts of the patch burned in 1900, 1898, 1879 as well as this date of 1861. |
| [29]<br>[20] (Forest Atlas-San Juan NF 1909 p. 13) | Tree-rings<br>Early maps | No fire detected | Lower Middle Mountain study area<br>No fire or woodland patch was mapped in this area. The closest woodland patch is about 1.5 km southeast. The failure of the atlas to record this fire could be because it was medium in size and moderate in severity. |
| | | | |

| 1861/1860-San Juan side | | | |
|---|---|---|---|
| [10]<br>[20] (Forest Atlas-San Juan NF 1909 p. 15). | Tree-rings<br>Early maps | <br>Fire22 Woodland and Fire | Squaretop study area<br>This area contains a fire patch that encloses much of Tepley and Veblen's study area, which also partly overlaps a very large woodland patch. Tepley and Veblen (2015) showed that the fire patch and nearby woodland patch burned in 1899, 1879/1878, and 1861/1860. Their maps show which parts of the atlas fire and adjoining woodland patch burned in these years. The total fire area is 73,925 ha, with 62,135 ha in the ponderosa and mixed-conifer zones. |
| **1860-San Juan side** | **Source** | **GIS map** | **Quote and discussion** |
| [49] (p. 22)<br><br><br><br>[50] (p. 115, 122)<br><br><br><br><br>[20] (Forest Atlas-San Juan NF 1909 p. 3) | Early report<br><br><br><br>Early report<br><br><br><br><br>Early maps | <br><br><br><br><br><br><br><br><br>Fire19 Woodland and Fire | "In 1860, a fire attributed to northern Utes burned about 20,000 acres and an estimated 25 million board feet of timber in Hinsdale and La Plata counties at the head of the Pine and Vallecito Rivers above Durango. Supposedly the Northern Utes had set the fire in order to prevent pursuing Southern Utes, with whom they were at war, from overtaking them."<br>"In the year 1860 a very disastrous fire burned over about twenty-thousand acres in Hinsdale and La Plata Counties at the head of Pine and Vallecito Rivers above Durango. The fire burned up a large amount of timber, estimated to be twenty-five million board feet with a value of over fifty thousand dollars. It is believed the Northern Utes set this fire to stop pursuit by the Southern Utes with whom they were at war at the time. This information was supplied by Chief Buckskin Charlie.<br>This area contains a total fire area of 10,672 ha, with 1,132 ha in the ponderosa and mixed-conifer zones. This area may have burned in 1879 or in 1860. This fire is all in the current Hinsdale county, not in the current La Plata county. |
| | | | |
| **1851-San Juan side** | **Source** | **GIS map** | **Quote and discussion** |
| [30-31]<br><br>[20] (Forest Atlas-San Juan NF 1909 p. 8) | Tree-rings<br><br>Early maps | <br><br>No fire detected | MAR2 study area.<br><br>The atlas does not show either fires or woodlands at this location. Failure to detect this fire may be because it was only medium in size. |
| [22]<br>[20] (Forest Atlas-Rio Grande NF 1909 p. 14) | Tree-rings<br>Early maps | <br>Fire24 Woodland only | The Chama River, CHA, study area in mixed conifer<br>Margolis does not show a detailed location for this site, which I estimated based on elevation and a location near the Chama River. The atlas does not quite extend to this estimated site, but a large woodland patch on the atlas border appears to have extended to the site. The woodland patch is 1,308 ha, with 89 ha in ponderosa and mixed conifer, but was likely larger due to truncation by the mapping. |
| [10]<br>[20] (Forest Atlas-San Juan NF 1909 p. 9) | Tree-rings<br>Early maps | <br>No fire detected | Williams Creek study area<br>This 1851 high-severity fire at the Williams Creek study area was not detected by atlas fires or woodlands, likely because it is a small fire area. |

| | | | |
|---|---|---|---|
| [26]<br>[20] (Forest Atlas-San Juan NF 1909 p. 9) | Tree-rings<br>Early maps | No fire detected | CRL1 study area<br>This study site is only 0.5 km from a woodland patch of 1,061 ha, that contains the companion CRL2 study site. Possibly the failure to detect this fire at this site reflects the known mapping error in the atlases. |
| [26]<br>[20] (Forest Atlas-San Juan NF 1909 p. 9) | Tree-rings<br>Early maps | Fire5 Woodland only | CRL2 study area<br>This study site is within a woodland patch of 1,061 ha, with 988 ha of ponderosa and mixed conifer, that is part of a larger fire patch extending along the full length of the Piedra River. Wu (1999) dated the stand origin at this site to high-severity fire in 1851. |

References are in the main text, except [49]-[54]:
49. Romme, W.H.; Bunting, R. *A History of the San Juan National Forest*; Unpublished report; San Juan National Forest, Supervisor's Office: Durango, CO, USA, 2001.
50. York, R. *Forest History*, *Volume 1*, *1905–1971*; Unpublished report; San Juan and Montezuma National Forests, Supervisor's Office: Durango, CO, USA, 1984.
51. Spero, V. *Fire History of the Rio Grande National Forest*; Unpublished report; Rio Grande National Forest, Supervisor's Office: Monte Vista, CO, USA, 1991.
52. Nossaman, A. *Many More Mountains. Volume 2: Ruts into Silverton*; Sundance Books: Denver, CO, USA, 1993.
53. Hough, F.B. *Report on Forestry*; US Department of Agriculture, Forest Service, US Government Printing Office: Washington, DC, USA, 1882.
54. Anonymous. Yellow pine in the Southwest. The Bureau of Forestry has been studying this important tree in Colorado, Arizona, and New Mexico. *For. Irrig.* **1905**, *11*, 120–124.

**Table S2.** General descriptions of fires and forest structure in Colorado and the San Juan Mountains

| | | |
|---|---|---|
| [53] (p. 196) | Large fires from 1876-1882 in Colorado | "...fully one-third of all the timber accessible among the mountains in [Colorado] has been burned over and killed by fire within the last six years" |
| [15] (p. 21) | Large, severe fires in the San Juan Forest Reserve | "Of the total forest area within the reserve boundaries 12-1/4 percent has been burned over, and 5 percent within ten years. All the Rio Grande side of the range from Hot Springs east, with the exception of bodies of spruce on the heads of creeks, has been burnt, much of it repeatedly. The result is a stand of aspen of varying ages, containing scattering small bodies of conifers, the ground throughout being covered with down timber and thick underbrush. Recent burns, especially above the aspen line, present a scene of complete desolation. Nothing is left but bare burnt poles. Even the top soil is burnt off in many cases, leaving only dust and rock. Such burns are very slow in restocking. After eight or ten years the poles will have fallen, piling up four feet high and making travel next to impossible. Here and there will be bushy, scrubby spruce seedlings, and everywhere on the ground a dense mat of grass which greatly retards reproduction." |
| [54] (p. 121) | San Juan ponderosa pine timber was uneven and less abundant than in the Zuni Mountains in New Mexico | "In the Southwest this species [ponderosa pine] is found scattered over the slopes of the Rocky Mountains at altitudes between 6,000 and 9,000 feet. There are three regions, however, where it extends over large areas in practically pure stands. The first of these is in extreme southwestern Colorado and northwestern New Mexico. Here a belt of western yellow pine forest, twenty-five miles wide, runs northwest and southeast for one hundred miles. There are six important mills operating in this territory, supported mainly by Denver trade and capital...The second region is in west central New Mexico, in the Zuni Mountains. This timber area is smaller than the former–only fifty miles in length by eighteen miles wide. The stand of pine is more uniform than that of the Colorado forest, however, and over a large part of the area it is of better development. The Colorado timber is estimated to yield from 3,000 to 4,000 board feet per acre; the Zuni timber will average from 4,000 to 6,000 board feet per acre. Stands of from 10,000-25,000 feet per acre occur quite frequently in the Zuni Mountains, but are rare in Colorado." |

| | | |
|---|---|---|
| [50] (p. 122) | San Juan National Forest | "On the whole, the area now comprising the San Juan National Forest has suffered less from fires than is the case in many other sections of the west. Even so, there have been some disastrous fires in this territory and in some cases, years after the fire, the areas are entirely barren of timber" |
| [50] (p. 122) | San Juan National Forest | "Throughout the early days, before the white man reached the Western slopes numerous fires burned unchecked over large areas and their origin was contributed to Indians for purposes of securing game or improving grass lands. This theory is reported to be false by people who have lived with and know the Indians. They have never heard of Indians hunting in that manner. Most of those fires were probably caused by lightning. Fall is the dryest time of the year and because that was the time the Indians were hunting they were blamed. The fires burned over large areas owing to the fact that forage at that time was heavier and nobody bothered to put them out. Most of the early fires were allowed to burn until rain put them out. It is also believed that the largest of the fires came after the white man arrived. The old settlers contribute these fires to Indians, but more likely those settlers had the same habits and were as careless as the same type of people today." |

References are in the main text, except [50], [53], [54]:

50. York, R. *Forest History*, *Volume 1, 1905–1971*; Unpublished report; San Juan and Montezuma National Forests, Supervisor's Office: Durango, CO, USA, 1984.
53. Hough, F.B. *Report on Forestry*; US Department of Agriculture, Forest Service, US Government Printing Office: Washington, DC, USA, 1882.
54. Anonymous. Yellow pine in the Southwest. The Bureau of Forestry has been studying this important tree in Colorado, Arizona, and New Mexico. *For. Irrig.* **1905**, *11*, 120–124.

land

MDPI

Article

# Variable Forest Structure and Fire Reconstructed Across Historical Ponderosa Pine and Mixed Conifer Landscapes of the San Juan Mountains, Colorado

**William L. Baker**

Program in Ecology, University of Wyoming, Laramie, WY 82071, USA; bakerwl@uwyo.edu

Received: 31 October 2019; Accepted: 16 December 2019; Published: 20 December 2019

check for updates

**Abstract:** Late-1800s land surveys were used to reconstruct historical forest structure and fire over more than 235,000 ha in ponderosa pine and mixed conifer landscapes of the San Juan Mountains, Colorado, to further understand differences among regional mountain ranges and help guide landscape-scale restoration and management. Historically, fire-resistant ponderosa pine forests with low tree density and relatively frequent fire, the most restorable forests, covered only the lower 15%–24% of the study area. The other 76%–85% had dominance by mixed- to high-severity fires. Both ponderosa pine and dry mixed conifer had generally pervasive, often dense understory shrubs, and ~20% of pine and ~50%–75% of mixed conifer forests also had high historical tree density. Intensive fuel reduction and mechanical restoration are infeasible and likely ineffective in the upper part of the pine zones and in mixed conifer, where restoring historical fire and creating fire-adapted communities and infrastructure may be the only viable option. Old-growth forests can be actively restored in the lower 15%–24% of the montane, likely increasing landscape resistance and resilience to fire, but mixed- to high-severity fires did also occur near these areas. This imperfect resistance suggests that fire-adapted human communities and infrastructure are needed throughout the study area.

**Keywords:** fire; ponderosa pine; mixed conifer; San Juan Mountains; Colorado; land surveys; reconstruction; historical forests; ecological restoration; fire-adapted human communities

---

## 1. Introduction

Landscape-scale reconstructions over the last decade have revealed more severe historical fires and more variability in forest structure than previously known in ponderosa pine and mixed conifer landscapes ("montane landscapes" hereafter) of the western USA [1,2], but unexplained differences were found among some nearby mountain ranges [3]. We speculated that the region from northern Arizona to Colorado could be a tension zone in which infrequent episodes of large, severe fires could rapidly transform landscapes that previously had mostly low-severity fire for extended periods, potentially leaving adjoining mountain ranges in different states [3]. Here, I further explore this question with evidence from another mountain range in this area and consider the implications of this new evidence for landscape-scale restoration and management.

Early tree-ring and fire-scar research in northern Arizona found that low- to moderate-severity fire regimes generally fostered open, low-density montane forests, which were historically resistant to severe fires, but were later disrupted by fire suppression, logging, and livestock grazing, which are thought to have led to uncharacteristically severe fires [4]. However, subsequent, larger landscape-scale studies began to show that historical montane landscapes were more variable, with open to dense and young to old forest areas from a mixture of fire severities [1,5,6].

Now, reconstructions over large land areas (41,214 to 405,214 ha), using General Land Office (GLO) surveys, cover >2 million ha of dry forests (ponderosa pine and dry mixed conifer, but not

moist mixed conifer forests) in the western USA. All reveal considerable variability in historical forest structure and fire severity, including mixed-(moderate) and high-severity fires [3]. Relatively consistent regional differences in historical fire regimes were found, but with some unresolved inconsistencies [3]. Dry forests in Oregon and California had high median tree densities (191–229 trees/ha for trees ≥10 cm) and dominance by mixed-severity fires. In contrast, dry forests over large areas in northern Arizona had low median tree densities (121–124 trees/ha) and dominance by low-severity fires. However, dry forests on adjacent Black Mesa, Arizona, and in two parts of Colorado had moderate median tree densities (137–183 trees/ha) and yet dominance by high-severity fire. This was the basis of the speculation that the region from northern Arizona to Colorado could be a tension zone. This is a hypothesis Hessburg et al. [6] first suggested may be characteristic of a large mixed conifer landscape, in the Pacific Northwest, studied with early aerial photography.

The purpose here is to further analyze this potential tension zone in a new study area, in the San Juan Mountains of southwestern Colorado, which lies between previous study areas in Arizona and Colorado. Historical montane landscapes are poorly known here, with mostly small focused study areas that provide valuable evidence, but an insufficient basis for understanding this potential tension zone or for guiding landscape-scale restoration and management. One recent landscape-scale study in this area, using early forest atlases (1908–1909) and records, did find substantial mixed- to high-severity fire from 1850–1909 with estimated fire rotations of 133–185 years [7]. This study was coarse in resolution and from 1908–1909 data. More detailed GLO data from decades earlier may further clarify the tension zone and revisit the findings from forest atlas data, while improving the foundation for landscape restoration and management.

## 2. Materials and Methods

### 2.1. Overview of Methods

I obtained digital scans of land survey field notes and processed them by manually extracting information and entering it into a geodatabase in ArcGIS 10.6 (Geographical Information System software; ESRI, Redlands, CA), while checking for possible fraud. The study area was refined to remove areas affected by land uses at the time of the surveys. Section-line data, recording dominant trees and shrubs along the line, were used to define vegetation zones for analysis, to provide information about understory shrubs and small trees, and to identify non-forest vegetation that may indicate past mixed- to high-severity fire. Section-corner data, recording bearing-tree information, were used with previously developed algorithms and methods to reconstruct tree density, basal area, quadratic mean diameter, tree species composition, tree diameter distributions, fire severity, fire rotation, and old-growth forests [1]. These reconstructions were cross-validated with data from independent sources (e.g., forest atlas data, early records).

### 2.2. Study Area, Land Survey Data, Zones, and Affected Areas

Original land surveys were completed by government surveyors in the late-1800s following formal instructions [8]. Surveyors laid out ~9.6 × 9.6 km township borders, then subdivided townships into section lines on all sides of 36 sections, each ~1.6 km × 1.6 km. Section corners were marked at the beginning and end of each ~1.6 km section line and quarter corners at the ~0.8 km halfway mark along the section line.

The initial study area in montane forests in the southwestern San Juan Mountains of Colorado (Figure 1) included section-line data over 773,366 ha in parts of 142 land survey townships. However, many surveys in this area had poor corner data (i.e., all required trees at corners seldom recorded), necessitating a smaller section-corner study area over 279,101 ha (Figure 1, Table 1).




**Figure 1.** The study area and the historical vegetation zones. See p. 5 for explanations of zones.

**Table 1.** Initial and unaffected analysis areas by historical vegetation zone, based on section-line and section-corner data.

| Historical Vegetation Zone | Lines (km) | Est. Area in Lines (ha)[1] | Lines (%) | Est. Area in Corners (ha) | Corners (%) |
|---|---|---|---|---|---|
| Initial analysis area | 10,002 | 773,366 | | 279,101 | |
| Removed affected area[2] | −1580 | −106,450 | | −43,217 | |
| Total unaffected area | 8422 | 666,916 | | 235,884 | |
| Removed-not in a zone[3] | −350 | −27,716 | | −97 | |
| Net unaffected area analyzed | 8072 | 639,200 | 100.0 | 235,787 | 100.0 |
| 1. Pine and piñon-juniper | 1071 | 84,809 | 13.3 | 13,192 | 5.6 |
| 2. Pine | 3215 | 254,575 | 39.8 | 104,059 | 44.1 |
| 3. Dry mixed conifer | 1798 | 142,350 | 22.3 | 46,522 | 19.7 |
| 4. Moist mixed conifer | 956 | 75,669 | 11.8 | 38,823 | 16.5 |
| 5. Non-forest[4] | 532 | 42,127 | 6.6 | 18,998 | 8.1 |
| 6. Unknown[5] | 501 | 39,669 | 6.2 | 14,192 | 6.0 |

[1] These are estimated from the ratio of analysis area/line length in the total unaffected area. These estimates are possible, because fraction of section-line length is a valid line-intercept estimator of the area of an attribute in the landscape [9]. [2] See Table 2. [3] Not in a zone includes alpine, human-affected lines, lakes, piñon-juniper woodlands, riparian/wetlands, and rock outcrops. [4] Non-forest vegetation was assigned to the corresponding zone where possible, and thus the reported non-forest area is the only part of non-forest that could not be associated with a forest zone. [5] Unknown includes some aspen forests and unidentified forests, along with lines with vegetation not recorded and lines not surveyed.

Field notes were obtained from the Bureau of Land Management, Denver, Colorado. Data were extracted and entered in a geodatabase in ArcGIS 10.6 (ESRI, Inc., Redlands, CA, USA). Digital section lines (CadNSDI PLSS) were from the U.S. Bureau of Land Management [10]. Median survey year across section lines was 1881, and ~88% was surveyed by 1887 (Figure 2).

Case No. 1:23-cv-01501-RMR Document 15-2 filed 09/29/23 USDC Colorado pg 183 of 367






**Figure 2.** Surveyed section-line length (y-axis) and cumulative percent surveyed for the whole study area. The median survey year was 1881.

Because a GLO fraud syndicate was active in parts of the western USA by 1880 [11], I checked all surveys for fraud. I compared locations of physical features on the plat map with modern topographic maps; fraudulent plats often have obviously mis-mapped physical features. As I entered data into ArcGIS, I periodically measured from distinct recorded physical features (e.g., streams) to these same features on backdrop 1:24,000 scale topographic maps. Some error is in the topographic maps. I found no fraudulent surveys, but I did find some large mapping errors. Most surveyors made some large errors, particularly in difficult terrain (e.g., canyons). A few surveyors made many large errors. I flagged mapping errors ≥140 m. Users can omit these in overlays with other maps, to avoid these errors. After omitting flagged errors, for a sample of the 25 of 39 surveyors, townships had a median of 40.0 m and a standard deviation of 27.7 m in spatial error (Figure 3). This is fairly low error given the optical surveying technology of the late-1800s.




**Figure 3.** Error in surveyor measurements after removing large errors (>140 m). Data for each surveyor are the means for multiple measurements (usually >10) for each of the 25 of 39 surveyors. Means for each of the 25 surveyors are in Table S4.

Land surveys have often been used in the USA to reconstruct historical vegetation [8]. Surveyors had to record canopy trees in order of abundance on each line and data for bearing trees at corners. I used these to classify forests into zones. Surveyors seldom distinguished Douglas-fir (*Pseudotsuga menziesii*), blue spruce (*Picea pungens*), or Engelmann spruce (*Picea engelmannii*), calling all "spruce" (Table S1). Surveyors recorded just "pine" in ponderosa pine (*Pinus ponderosa*) forests, which likely had some limber pine (*Pinus flexilis*) or southwestern white pine (*Pinus strobiformis*). Junipers (*Juniperus osteosperma, Juniperus scopulorum)* were called "cedar" or "juniper" (Table S1). Twoneedle piñon (*Pinus edulis*) was called pinon. This is a short pine, likely not called pine because it is so small.

I defined four historical montane forest zones (Figure 1, Table 1), generally congruent with modern usage [12]. Pine forests (likely mostly ponderosa pine) were defined by lines with pine alone, but could have small amounts of other tree species, including some juniper (likely mostly *Juniperus scopulorum*). A low-elevation pine and piñon-juniper zone was distinguished by lines with pine and pinon, typically

also with junipers (mostly *Juniperus osteosperma*, but some *Juniperus scopulorum*); this zone appeared geographically distinct, not usually spatially intermingled with higher elevation, purer pine forests (Figure 1). Dry mixed conifer forests had pine first (about 75% of lines) or second (about 25% of lines), but with other conifers (blue spruce, Douglas-fir, white fir-*Abies concolor*), and/or quaking aspen (*Populus tremuloides*). Moist mixed conifer had the same trees, sometimes also a few subalpine trees (e.g., Engelmann spruce), but little or no pine (listed in ≥3rd position or not listed).

Section-line segments that were non-forested, not surveyed, or where vegetation was not recorded were placed into the nearest forest zone to enable the zone map (Figure 1) to be as spatially comprehensive as possible and to facilitate analyses by zone. I placed these line segments into the nearest forest zone if all adjacent segments or lines were in this zone, and if elevation and aspect were similar when viewing backdrop US Geological Survey topographic maps while going through unknown line segments. Segments with >1 adjacent zone were left as non-forest, which was the fifth historical zone. These were common where zones nearly met or were interspersed. An Unknown category was used for other segments. I removed line segments in lakes, riparian or wetland areas, identified as rock outcrops, or that represented human land uses (e.g., farm fields).

Limits of the montane were also needed. The lower limit was defined where sagebrush (*Artemisia* spp.) and piñon-juniper without pine became dominant. The upper limit was defined where subalpine forest trees (e.g., subalpine fir-*Abies lasiocarpa*, and Engelmann spruce) became dominant. This upper limit could not be defined by section-line data, since spruce were not distinguished by surveyors. Thus, I identified trees and recorded the GPS elevation of the upper montane limit as I traversed: (1) the southerly-(2925 m) and northerly-facing (2760 m) montane limits on Wolf Creek Pass in the eastern part of the study area, (2) the southerly-facing limit on Coalbank Pass (2900 m) and northerly-facing limit on Red Mountain Pass (2880 m) in the central part of the study area, and (3) the southerly-(2835 m) and northerly-facing (2740 m) limits on Lizard Head Pass in the western part of the study area. Then, I used these as a guide to digitize an approximate upper limit to the montane across the study area. The resulting zone map, thus, approximates historical montane upland forested and non-forested vegetation (Figure 1, Table 1).

Indians were relatively few historically in the study area, and their impacts on the historical fire regime, even after EuroAmerican contact and acquiring horses, were likely limited, concentrated along travel corridors and in other commonly used areas [13]. Their limited effects are considered part of the historical fire regime. Explorers and colonists with horses and mules traveled the Santa Fe Trail south of the San Juan Mountains (Figure 1) in the early 1800s, fur trappers were active by the 1830s, and mining began in the 1870s [14]. The western part was likely grazed by sheep from New Mexico by 1833, but cattle arrived in the 1870s and expanded by the 1880s [14]. In 1903, about 12,000–20,000 cattle grazed the western part of the current National Forest and 268,000 sheep the eastern part [15,16]. Still, many townships recorded good grazing or abundant grass and few settlers at the time of the surveys (Table S2). Logging likely began with mining in the 1870s [16]. Extensive commercial logging likely did not begin until railroad logging in the 1890s near Pagosa Springs [17] and north of Dolores after 1924 [14], although by 1905 six sawmills were operating [18]. Most of the study area was surveyed (Figure 2) before commercial logging and extensive livestock expansion, thus this was a relatively unaltered landscape about to change. The land survey data, although from only a single time period and with some other limitations (Text S1) provide one of the best estimates of the relatively unaltered "historical" forest landscape typically used to guide ecological restoration [8].

In GIS, I buffered land-use locations and removed buffers to focus on relatively unaffected areas. Surveyors recorded locations along or near section lines, when they found land uses (Table 2). They recorded entry and exit locations for larger uses and points for smaller uses. The buffer radii I used (Table 2) approximate an effect zone within which vegetation may have been modified by the land use. The buffer radii were studied in detail in the western Sierra [19]; I analyzed whether the area within varying buffer radii had an elevated abundance of non-forest vegetation indicating clearing or burning. Since lines do not necessarily intersect all land-uses, I erred here toward large buffers.

I combined buffers, then erased affected areas, which were 106,450 ha (13.8%) of the original 773,366 ha total section-line area and 43,217 ha (15.5%) of the 279,101 ha section-corner study area (Table 1). I refer to the remaining ~85% as "unaffected," but buffers are approximations and some land-uses were not fixed in location and could not be fully removed. Total unaffected area was 666,916 ha for section-line data and 235,884 ha for section-corner data (Table 1).

**Table 2.** Buffer radius and number of land uses recorded by surveyors.

| Land Use | Buffer Radius (m) | Number |
|---|---|---|
| Building | 1000 | 86 |
| Campground | 1000 | 0 |
| Corral | 1000 | 8 |
| Ditch | 100 | 26 |
| Farm/field | 1000 | 46 |
| Fence | 1000 | 118 |
| Logging | 4000 | 9 |
| Mining | 1000 | 1 |
| Pasture | 1000 | 0 |
| Power line | 100 | 0 |
| Railroad | 3220 | 46 |
| Ranch | 1000 | 2 |
| Reservoir | 100 | 0 |
| Road | 200 | 585 |
| Stock tank | 1000 | 0 |
| Town | 1000 | 2 |
| Trail | 200 | 304 |
| TOTAL NO. | | 1233 |
| TOTAL LINE LAND-USE AREA (ha) | | 106,450 |
| TOTAL CORNER LAND-USE AREA (ha) | | 43,217 |

### *2.3. Reconstructing Forest Structure from Section-Line and Section-Corner Data*

Surveyors recorded dominant canopy and understory trees and shrubs in order of abundance, using common names (Tables S1 and S3). They were required to record understory shrubs (Table S3), small understory trees (seedlings and saplings <10 cm diameter), and grasses and forbs in order of abundance, using qualitative density terms (e.g., dense, scattered) for shrubs and small trees. Not all surveyors did (Table S4). Few forbs were recorded, and often just "grass." In analyzing general forest understories (e.g., forest/grass, forest/sagebrush), I used only surveyors rated fair or better at understory shrubs (Table S4) and who recorded understory grass at least once. For detailed understories, I used only surveyors who recorded understory trees on at least one line and whose information I rated fair or better for shrubs (Table S4). In analyzing understory tree and shrub density, I included surveyors if they used a density term on at least one section line.

At quarter corners (~0.8 km along a section line), surveyors measured and recorded data for two bearing trees, and at the end (~1.6 km), they recorded data for four trees. For each tree, they recorded species, diameter in inches (2.54 cm) [20], distance in links (~0.2 m), and bearing in degrees. They also recorded some physical features (e.g., streams). An ending township description summarized topography, vegetation, and land-uses (Table S2). Bearing-tree data allow valid reconstruction of tree density, basal area, quadratic mean diameter, composition, diameter distributions, and fire severity [1,20,21]. Surveyors recorded tree data accurately and with little bias [21]. Land survey reconstructions have been critiqued and have some known limitations (Text S1).

I pooled tree data across nearby corners, aiming for a 2:1 ratio of quarter corners to corners in the same zone, to increase accuracy [20]. Six-corner pools (518 ha) were used for tree density, as this pool had lowest relative mean absolute errors (RMAEs = 14%–23%), in accuracy trials in three states [20]. RMAE is absolute error between two variables relative (%) to the variable considered truth, plot data in this case. Similarly, 9 corner pools (777 ha) were used for basal area (RMAEs = 21%–25%), quadratic mean diameter (RMAEs = 12%–16%), and composition, and 12 corner pools for diameters.

I reconstructed tree density using our methods, which estimate the Voronoi area of each bearing tree using regression equations (Table S5) based on estimated crown radius of the tree and mean distance among bearing trees at the same corner [20]. The inverse of mean Voronoi area among trees is tree density, which is for trees generally ≥10 cm diameter-at-stump-height (dsh), about 30 cm [20]. I used the weighted mean-based harmonic Voronoi density (WHVD) estimator, shown to be the only unbiased estimator for both the Mogollon Plateau and the Colorado Front Range, and to have low RMAE of 14%–24% [20]. To calibrate reconstruction equations (Table S5), my assistant and I went to 50 section corners and random sites in relatively undisturbed forests in the study area, on the Uncompahgre Plateau [22], and in the Jemez Mountains, where we repeated a modern survey identical to the original survey. At each point, we measured distance to closest trees in each 90° sector with a laser rangefinder, bearing to the tree with a sighting compass, and tree diameter at 30 cm and at breast height (1.4 m) with a caliper. For each tree, we measured crown radius with a densiometer. To estimate the tree's Voronoi area [23], we measured distance and bearing from the tree's center to the center of ≥5 nearest trees (≥1 tree per 90° sector). I measured the Voronoi area of the tree in ArcGIS. I used 249 trees to develop regression equations for crown radius and Voronoi area (Table S5).

I calculated basal area as the product of mean cross-sectional area of trees in the pool and tree density [20]. I calculated basal area and diameters by converting surveyor measurements of diameter at stump height (DSH; ~30 cm height, [20]) to diameter-at-breast height (DBH; 1.37 m) using regression based on field measurements at the 50 sites (DBH = 1.426 + 0.834 * DSH). I calculated basal area with a PCQ BA estimator in nine-corner pools, which had 21% RMAE in the Colorado Front Range [20]. To reconstruct diameter distributions, using 12 corner pools that were about 87% accurate in the Colorado Front Range [20], I tallied trees in 10 cm bins, congruent with surveyor accuracy. I used a correction for slight under-counting in the smallest size classes [20]. I merged pools across zones for analyzing tree diameters. I relocated bearing trees to resolve uncertain common names (Table S1), and revisited section lines to identify some trees and shrubs (Tables S1 and S3).

### 2.4. Reconstructing Fire Severity and Old-Growth Forests

As in previous research [19,22], I reconstructed fire severity using modeled and direct evidence from four sources: (1) historical forest structure and (2) historical forest openings, both from bearing-tree data, and (3) historical non-forest and (4) historical scattered timber, both from section-line data. Data in (1) and (2) were converted to lines by intersection with section lines for consistent analysis.

We showed, through calibration with 64 tree-ring reconstructions, that historical forest structure reconstructed from bearing-tree data could be used to accurately model fire severity over the preceding century, and we validated this method with tree-ring reconstructions and independent sources [1,3], including early scientific observations [19,24,25]. Low-severity fire was identified by tree density <177.6 trees/ha for trees ≥10 cm dsh, small conifers (<30 cm) <46.9% and large conifers (≥40 cm) >29.2% of all conifers [1]. High severity was identified by small conifers >50.0% and large conifers <20.0% of conifers. Mixed severity was between these. Reconstruction period is the time for trees to grow to 40 cm [1]. This was 92 years for the San Juans, between 103 years on the Uncompahgre Plateau [26] and 80 years in the Jemez Mountains [27] (p. 24). Reconstructions in moist mixed conifer are preliminary, as calibration was in pine and dry mixed conifer, although tree species are the same.

Openings in forests, lacking bearing trees, may indicate disturbance had removed trees over the distance surveyors searched, typically 300 links or ~60 m from the corner. Often, surveyors recorded "no trees within limits." Where all expected bearing trees at a corner were missing, defined here as an

"opening," this area is ≥1.13 ha. As in [19,22], openings were interpreted as high-severity disturbance if canopy density on the line was not recorded (thus likely early- to mid-successional forests). If the forest on the line was mature (e.g., "heavily timbered"), I interpreted openings as likely associated with mixed-severity disturbance.

Historical non-forest that became forested by 2016 was a potential indicator of high-severity fire in forests before the surveys. Non-forest, found on 1372.1 km (17.0%) of 8072.1 km of total section-line length (Table 3, Figure 4), overall was ~52% shrubs, 21% grasslands, 17% dead, fallen, or burned trees, 4% small trees, 3% sagebrush, 2% no timber, and 2% shrubs and small trees (Figure 5, Table 3). Non-forest was only 7%–16% of zones, least in pine and piñon-juniper and most in moist mixed conifer (Table 3). Non-forest was similar in the section-corner area, except non-forest was 13%–20% of zones, and there was less grassland and more dead, fallen, and burned.

Non-forest recorded as: (1) dead, fallen, or burned timber, (2) small trees, or (3) shrubs and small trees likely represents early succession after high-severity forest disturbances. These were either specifically recorded as disturbed or their abundant small trees, particularly fire-stimulated quaking aspen, suggest early recovery after disturbance [12,28–30]. High-severity fires in Rocky Mountain montane forests also historically left behind grasslands and large shrubfields that were slowly re-invaded by trees [31,32]. Surveyors did record some burned forests with non-forest understories of dense shrubs and small trees (Table 4). Non-forest can be permanent in settings unfavorable to forests [31,33]. To distinguish disturbed from more permanent non-forest, in GIS, I intersected historical non-forest with modern forests, from Landfire existing vegetation (Table S6) ca 2016. I considered only non-forest that became forested as potentially created by disturbance, thus a conservative estimate.

**Table 3.** Historical non-forest in the section-line area and in the section-corner area.

| Non-Forest Composition | Overall | Non-Forest Unknown | Pine-PJ | Pine | Dry MC | Moist MC |
|---|---|---|---|---|---|---|
| | | | *Section-line area* | | | |
| Mixed mt. shrubs (%) | 51.8 | 60.3 | 55.4 | 65.6 | 14.7 | 26.4 |
| Grasslands (%) | 21.2 | 25.0 | 9.7 | 21.7 | 12.9 | 22.8 |
| Dead/fallen/burned (%) | 16.7 | 6.5 | 9.7 | 7.6 | 49.9 | 40.8 |
| Small trees (%) | 4.1 | 0.7 | 3.0 | 1.1 | 18.1 | 8.1 |
| Sagebrush (%) | 3.0 | 3.9 | 16.8 | 1.5 | 0.3 | 0.1 |
| No timber (%) | 1.6 | 1.1 | 4.6 | 2.2 | 0.6 | 1.5 |
| Shrubs and small trees (%) | 1.6 | 2.5 | 0.7 | 0.4 | 3.4 | 0.3 |
| Total line length (km) | 1372.1 | 531.0 | 76.9 | 426.7 | 187.1 | 150.4 |
| Percent of zone (%) | 17.0 | - | 7.2 | 13.3 | 10.4 | 15.7 |
| | | | *Section-corner area* | | | |
| Mixed mt. shrubs (%) | 64.4 | 87.3 | 69.2 | 82.3 | 14.3 | 18.2 |
| Grasslands (%) | 6.4 | 7.5 | 16.4 | 7.7 | 2.0 | 3.1 |
| Dead/fallen/burned (%) | 21.7 | 1.0 | 0.0 | 7.2 | 65.0 | 66.6 |
| Small trees (%) | 4.7 | 1.0 | 11.0 | 1.1 | 14.6 | 9.7 |
| Sagebrush (%) | 0.4 | 0.4 | 0.7 | 0.7 | 0.0 | 0.0 |
| No timber (%) | 0.5 | 0.2 | 0.0 | 0.7 | 0.0 | 1.7 |
| Shrubs and small trees (%) | 1.9 | 2.7 | 2.7 | 0.3 | 4.1 | 0.7 |
| Total line length (km) | 683.7 | 231.9 | 21.0 | 234.2 | 124.3 | 72.3 |
| Percent of zone (%) | 23.0 | - | 13.0 | 18.0 | 20.2 | 14.7 |

PJ = piñon-juniper; MC = mixed conifer.

Scattered timber was abundant, making up ~30%–39% of total forest line length (Figure 4, Table 5). Surveyors often recorded entry/exit locations between mature forests and scattered timber along section lines, and thus scattered timber stood out from mature forests at abrupt boundaries. Scattered timber often had too few bearing trees at corners to enable reconstructions. The area of a circle at the typical

300 link limit surveyors had to search was 1.13 ha. If four trees had been at 301 links, then tree density was ~3.5 trees/ha, but trees were often missing, and so density was likely often <3.5 trees/ha, which would certainly have stood out relative to typical dry forests.




**Figure 4.** Historical section lines with recorded forest, non-forest, and scattered timber.

Again, to help distinguish disturbed from more permanent scattered timber, I intersected scattered timber with modern Landfire maps of forests (see above). Some modern areas of forest could have remained sparse, but forest typically implies some canopy closure. Scattered timber that did not become forested more likely represents natural, open, very low-density forests in settings that may not physically support denser forest. It is likely that most historical scattered timber that recovered to forest by ca 2016 represents recovery after moderate- to high-severity disturbances, particularly fire, for several reasons. Very low tree density is consistent with tree density expected after high-severity disturbance (≥70% of tree basal area killed [34]), and modern moderate- to high-severity fires can leave scattered surviving trees. Scattered timber recorded in the Sierra Nevada was validated as 80% high-severity fire by mapping done 9–42 years later in 1902 by Leiberg [19]. On the Uncompahgre Plateau north of this study area, three 1903 photographs show scattered timber from fire in dry forests, and two fire-scar dates in scattered timber identify fire as the agent [22]. In this San Juan study area, surveyors directly recorded two cases where fire produced scattered timber (Table 4). Early observations from the study area and nearby areas corroborate that scattered timber, often with small regenerating trees beneath, resulted from high-severity fires (Table S7: Q1, Q3, Q6–Q9). Some could have been from other disturbances (e.g., severe droughts, bark-beetle outbreaks), but fire is the likely explanation for most scattered timber that recovered to forest. However, the moderate- and high-severity parts cannot be distinguished. To roughly estimate fire rotations, I assumed scattered timber represents half mixed-and half high-severity fire.

Fire was also distinguished from other disturbances by spatial contiguity suggesting fire spread, apparent directional spread, sharp boundaries with mature, unburned vegetation, and by early post-fire vegetation (e.g., quaking aspen) known to be stimulated by fire [28–30]. After applying these criteria with the four sources of fire severity information, I combined them to map fire severity and to estimate fire rotation, the expected time to burn once across a landscape [32].

Old-growth forests can be reconstructed from GLO data using recorded tree diameters and estimated tree density, as in [35], which found old growth across 76% of a 280,000 ha historical dry-forest landscape in Oregon. Here, I used a similar method. To estimate historical old growth, I

used the old-growth definition for interior ponderosa pine in the Southwest [36] for the pine zone and the mixed-species group in [37] for dry and moist mixed conifer. Mehl [36] specified ≥10 trees/acre ≥18" dbh; I used ≥24.7 trees/ha ≥50 cm dbh, a slightly larger diameter, consistent with diameter-class breaks that are congruent with the precision of surveyor diameter estimates [21]. Popp et al. [37] specified ≥12 trees/acre ≥18" dbh for low sites; low and high sites could not be discriminated in GLO data. I used the low site definition. Thus, ≥29.6 trees/ha ≥50 cm dbh. Other criteria (e.g., dead trees, decadence, etc.) in the definitions cannot be reconstructed from GLO data. I used section-line descriptions (e.g., heavy timber) to further understand old growth on lines.

**Table 4.** Examples of surveyor direct records of burned timber, scattered timber, recovering post-fire shrubs and aspen, and large, likely old trees.

| |
|---|
| **Moderate- to High-Severity Fires in All Forest Zones** |
| **Burned pine and piñon-juniper forests** |
| Covered with burnt, dead, and live timber of Pine Pinon and Cedar . . . Scattering grama grass (Tyler & Medary, 1881, T034NR012W) [1] |
| Burnt pinon, Pine & Cedar (Geo. D. Nickel, 1880, T033N R001W) |
| **Burned pine forests** |
| Some grass; dead and young pines (James M. Boggs, 1883, T037NR003W) |
| Burnt Pine Timber (Frank W. Gove, 1881, T038NR013W) |
| Pine and burnt and fallen timber (Gardner & Cleghorn, 1882, T036NR005W) |
| **Burned dry mixed conifer forests** |
| Burnt and fallen timber. Pine and spruce (Gardner & Cleghorn, 1882, T036NR005W) |
| Burnt Pine. Scattering Aspen & Cottonwood (Frank W. Gove, 1881, T038NR013W) |
| Dense undergrowth Aspen. Burnt Pine (Frank W. Gove, 1881, T038NR013W) |
| **Burned moist mixed conifer forests** |
| Timber, aspen and spruce. Burnt and fallen timber (Benjamin Smith, 1883, T033N R001E) |
| Timber Spruce and aspen badly burned and fallen (Edwin H. Kellogg, 1897, T033NR002E) |
| **Scattered Timber from High-Severity Fires** |
| Scattering pine and much burnt and fallen timber (James M. Gardner, 1882, T035NR005W) |
| Some pine, much fallen timber (James M. Gardner, 1882, T035NR005W) |
| **Burned Forests with Recovering Dense Mixed Mountain Shrubs and/or Aspen** |
| **Dead and/or burned timber with a dense understory of Gambel oak (mixed mountain shrubs)** |
| Burnt Pine. Dense undergrowth of Oak brush (Frank W. Gove, 1881, T038NR013W) |
| Dense undergrowth of oak brush. Burnt Pine, Aspen Groves (Frank W. Gove, 1881, T038NR013W) |
| Pine timber with dense undergrowth of oak brush also much fallen timber (James M. Gardner, 1882, T035NR005W) |
| **Dead and/or burned timber with dense young aspen** |
| Dense undergrowth Aspen. Burnt Pine (Frank W. Gove, 1881, T038NR013W) |
| Timber burnt off, followed by a dense undergrowth of aspen (Benjamin H. Smith, 1883, T034NR001) |
| Fire killed timber, and Aspen brush . . . Dead spruce timber (William Cochrane, 1887, T035NR001E) |
| **Potential Old-Growth Forests or Areas of Large Trees** |
| Heavily timbered with large pines, pinons & cedars. Good grass (Tyler & Medary, 1881, T034NR010W-South of the Ute line) |
| Scattered, heavy pine timber. Dense oak brush (Frank W. Gove, 1880, T038NR015W) |
| Some very good pine timber (William H. Clark, 1882, T037NR009W) |
| Lofty pines scattering, no underbrush (William H. Cochrane, 1887, T036NR001W) |
| 2nd half mile Mesa covered with fine large pine timber. Good grass (Henry C. Hopper, 1877, T035NR008W) |

Notes: [1] The surveyor's name, the date of the survey, and the township are given in parentheses.




**Figure 5.** The seven types of non-forest vegetation at the time of the surveys: (**a**) across the study area, and (**b**) their relative extent.

**Table 5.** Historical section-line length recorded as scattered timber and the succession of scattered timber from the median survey year of 1881 to forest circa 2016 by zone.

| | In Section-Line Area | | | In Section-Corner Area | | |
|---|---|---|---|---|---|---|
| **Historical Zone** | **Km[1]** | **% of Forest in Zone[2]** | **% Now Forested[3]** | **Km[1]** | **% of Forest in Zone[2]** | **% Now Forested[3]** |
| Pine and piñon-juniper | 184.6 | 18.7 | 63.4 | 67.4 | 41.8 | 71.0 |
| Pine | 846.9 | 31.7 | 70.1 | 451.8 | 34.8 | 70.8 |
| Dry mixed conifer | 396.6 | 25.0 | 76.1 | 282.9 | 46.0 | 75.9 |
| Moist mixed conifer | 289.5 | 37.7 | 77.0 | 183.7 | 37.2 | 78.5 |
| Unknown | 125.4 | 72.8 | 64.9 | 91.7 | 52.9 | 66.2 |
| TOTAL SCATTERED | 1843.0 | 29.8 | 71.3 | 1077.5 | 39.3 | 72.9 |
| TOTAL FOREST | 6183.8 | | | 2742.1 | | |

[1] Data are the unaffected section-line length recorded as scattered timber, by zone. [2] Data are the percentage of unaffected forested section-line length recorded as scattered timber in historical forests (non-forest omitted), by zone. [3] Data are the percentage of the historical scattered timber that was forested by ca 2016, by zone.

## *2.5. Cross-Validation*

The GLO method already has substantial validation, using large modern accuracy trials and historical cross-validations in several states [3,20]. This validation includes (1) 20 modern validations that replicated the survey method at 499 corners in three states and compared results to data from plots centered over the corner, (2) 47 detailed "specific cross-validations" from overlaying GLO estimates with estimates from independent historical sources, (3) six locations with "general cross-validations" that compared GLO estimates to nearby historical estimates that could not be overlaid, and (4) 99 supporting historical observations and estimates from paleo-reconstructions and early scientific research. In contrast, tree-ring reconstructions have only one major cross-validation at 15 sites [38], which showed tree density is underestimated by ~9%. Similarly, one modern validation shows a spatial fire-history method can estimate fire rotation within ~10% [39].

Here, I further cross-validated locally with a tree-ring reconstruction of tree density and basal area (Tables S8 and S9), with age-structure/charcoal estimates of fire severity (Table S10), and with forest atlases. Corroboration also came from early historical accounts near the study area and the region (Table S7). I did not cross-validate with estimates from stumps [12], as this method is not yet validated. I made specific comparison if I had a GLO reconstruction polygon(s) that covered or was near the site. Otherwise, other studies provided general estimates I compared to overall GLO estimates. I used RMAE as the measure of accuracy. To be used, fire histories had to explicitly reconstruct fire severity using age structure or other methods.

## 3. Results

### *3.1. Reconstructed Tree Density, Basal Area, Composition, Diameters from Section-Corner Data*

Sample areas for each bearing-tree analysis (e.g., Table 6) cover the available area with tree data, and are equal to or are a little less than the area of available 6 corner (105,696 ha), 9 corner (101,983 ha), and 12 corner pools (104,108 ha). The rest of the section-corner analysis area was largely openings, including non-forest, scattered timber, openings in forests, etc.

**Table 6.** Variability in reconstructed historical tree density (trees ≥10 cm dsh) in the section-corner area.

| Variable | Pine and Piñon-Juniper | Pine | Pine Zones | Dry Mixed Conifer | Dry Forests | Moist Mixed Conifer[1] | Whole Montane |
|---|---|---|---|---|---|---|---|
| *Tree density sample* | | | | | | | |
| Sample polygons (n) | 13 | 80 | 93 | 42 | 135 | 38 | 173 |
| Sample area (ha) | 7805 | 46,428 | 54,233 | 25,669 | 79,902 | 24,734 | 104,636 |
| *Tree density* | | | | | | | |
| Mean (trees/ha) | 303 | 144 | 166 | 245 | 191 | 435 | 244 |
| SD (trees/ha) | 320 | 158 | 194 | 170 | 190 | 566 | 328 |
| CV (%) | 106 | 110 | 117 | 69 | 99 | 130 | 134 |
| Minimum (trees/ha) | 56 | 20 | 20 | 35 | 20 | 100 | 20 |
| 1st quartile (trees/ha) | 135 | 69 | 73 | 95 | 80 | 175 | 89 |
| Median (trees/ha) | 209 | 97 | 107 | 200 | 118 | 286 | 150 |
| 3rd quartile (trees/ha) | 320 | 150 | 184 | 393 | 236 | 449 | 301 |
| Maximum (trees/ha) | 1311 | 1160 | 1311 | 672 | 1311 | 3493 | 3493 |
| *Percentage (%) of pools by density class* | | | | | | | |
| <100 trees/ha | 7.7 | 52.5 | 46.2 | 31.0 | 41.5 | 0.0 | 32.4 |
| 100–200 trees/ha | 38.5 | 33.7 | 34.4 | 19.0 | 29.6 | 34.2 | 30.6 |
| >200 trees/ha | 53.8 | 13.8 | 19.4 | 50.0 | 28.9 | 65.8 | 37.0 |
| >300 trees/ha | 23.0 | 8.8 | 10.8 | 35.7 | 18.5 | 47.4 | 24.9 |

Reconstructed mean historical tree densities in a 104,636 ha analysis area were 191 trees/ha across dry forests and 244 trees/ha across montane forests (Table 6, Figure 6a). Median tree densities were 118 trees/ha across dry forests and 150 trees/ha across montane forests (Table 6). Mean and median tree densities were lowest (144 trees/ha and 97 trees/ha, respectively) in pine, but about twice as dense in pine and piñon-juniper (303 trees/ha and 209 trees/ha) and dry mixed conifer (245 trees/ha and 200 trees/ha). Moist mixed conifer had the greatest mean (435 trees/ha) and median (286 trees/ha) tree densities (Table 6). Open, low-density forests (<100 trees/ha), were most common in pine (53% of pools), less so in dry mixed conifer (31%), rare in pine and piñon-juniper (8%), and absent in moist mixed conifer (Table 6). Low-density forests covered some ≥5000 ha contiguous areas (Figure 6a).

Dense forests (>200 trees/ha) in 29% of dry-forest pools and 37% of the montane, were only 14% of pine, but >50% of dry mixed conifer, moist mixed conifer, and pine and piñon-juniper forests (Table 6). Very dense forests (>300 trees/ha) were found across only 9% of pine, but 23% of pine and piñon-juniper, 36% of dry mixed conifer, 47% of moist mixed conifer, 19% of dry forests, and 25% of the montane, Historical tree density was highly spatially variable, with a CV of 134% across montane pools and 69%–130% across pools in individual zones (Table 6). Maps of historical tree density by zone are in Figures S1–S5.

Mean historical basal areas were reconstructed in a 101,983-ha analysis area to have been 11.7 $m^2$/ha in dry forests and 11.6 $m^2$/ha across the montane (Table 7, Figure 6b). Corresponding median basal areas were 10.3 and 10.0 $m^2$/ha. Variability in basal area, with CVs mostly <50%, appeared lower than for tree density, but may just be from larger pools. Mean (11.2–12.8 $m^2$/ha) and median (8.4–10.8 $m^2$/ha) basal areas varied little among forest zones. Low basal area (<8 $m^2$/ha) was found in 10% of pine and piñon-juniper, 24% of pine, 30% of dry mixed conifer, and 42% of moist mixed conifer. High basal area (>15 $m^2$/ha) was found in 30% of pine and piñon-juniper, 15% of pine, 30% of dry mixed conifer, and 17% of moist mixed conifer. The largest quartile of basal areas was 18.1–22.6 $m^2$/ha in pine and piñon-juniper, 13.6–21.7 $m^2$/ha in pine, 15.2–30.6 $m^2$/ha in dry mixed conifer, and 14.4–37.6 $m^2$/ha in moist mixed conifer. QMDs, with CVs of 14%–26%, varied less than basal areas. Mean and median QMDs were 24.9–44.4 cm, highest in pine and lowest in moist mixed conifer (Table 7). Historical basal area by zone is shown in Figures S6–S10. A map of historical QMD across the montane is in Figure S11.




**Figure 6.** Reconstructed historical (**a**) tree density (trees/ha for trees ≥10 cm dsh) and (**b**) basal area ($m^2$/ha) across the montane section-corner study area.

Shade-tolerant trees were rare in both pine zones and more common in mixed conifer zones (Table 8). Shade-tolerant trees appeared to increase up valleys and slopes across the study area (Figure 7). In the lowest pine and piñon-juniper zone, piñon and juniper are left out of this comparison, and so shade-intolerant trees have a mean of only 51%. In pine, there were almost no shade-tolerant trees. In dry mixed conifer, only about a quarter of the zone had >4% shade-tolerant trees, but in that quartile, they ranged from 4% to 70% with a mean of 22%. Shade-tolerant trees were 44% of trees in moist mixed conifer. This pattern matches classification; as pine has aspen and some shade-tolerant trees, the dry mixed conifer zone is defined, and as pine declines and shade-tolerant trees and aspen become dominant, the moist mixed conifer zone is defined.

**Table 7.** Variability in reconstructed historical basal area and quadratic mean diameter in the section-corner area.

| Variable | Pine and Piñon-Juniper | Pine | Pine Zones | Dry Mixed Conifer | Dry Forests | Moist Mixed Conifer[1] | Whole Montane |
|---|---|---|---|---|---|---|---|
| *Basal area and quadratic mean diameter sample* | | | | | | | |
| Sample polygons (n) | 10 | 54 | 64 | 27 | 91 | 24 | 115 |
| Sample area (ha) | 7869 | 46,063 | 53,932 | 24,290 | 78,222 | 23,761 | 101,983 |
| *Basal area* | | | | | | | |
| Mean ($m^2$/ha) | 12.8 | 11.2 | 11.5 | 12.2 | 11.7 | 11.2 | 11.6 |
| SD ($m^2$/ha) | 5.5 | 4.4 | 4.6 | 5.9 | 5.0 | 8.5 | 5.8 |
| CV (%) | 43.0 | 39.3 | 40.0 | 48.4 | 42.7 | 75.9 | 50.0 |
| Minimum ($m^2$/ha) | 4.3 | 4.0 | 4.0 | 5.3 | 4.0 | 2.7 | 2.7 |
| 1st quartile ($m^2$/ha) | 9.4 | 8.2 | 8.6 | 7.6 | 8.2 | 5.1 | 7.6 |
| Median ($m^2$/ha) | 10.8 | 10.1 | 10.2 | 10.4 | 10.3 | 8.4 | 10.0 |
| 3rd quartile ($m^2$/ha) | 18.1 | 13.6 | 14.1 | 15.2 | 14.4 | 14.4 | 14.4 |
| Maximum ($m^2$/ha) | 22.6 | 21.7 | 22.6 | 30.6 | 30.6 | 37.6 | 37.6 |
| *Percentage (%) of pools by basal-area class* | | | | | | | |
| <8 $m^2$/ha | 10.0 | 24.1 | 21.9 | 29.6 | 24.2 | 41.7 | 27.8 |
| 8–15 $m^2$/ha | 60.0 | 61.1 | 60.9 | 40.8 | 54.9 | 41.7 | 52.2 |
| >15 $m^2$/ha | 30.0 | 14.8 | 17.2 | 29.6 | 20.9 | 16.6 | 20.0 |
| *Quadratic mean diameter (cm)* | | | | | | | |
| Mean (cm) | 32.9 | 44.4 | 42.6 | 35.1 | 40.4 | 24.9 | 37.1 |
| SD (cm) | 6.8 | 6.0 | 7.4 | 7.0 | 8.0 | 4.2 | 9.7 |
| CV (%) | 20.7 | 13.5 | 17.4 | 19.9 | 19.8 | 16.9 | 26.1 |
| Minimum (cm) | 21.2 | 30.6 | 21.2 | 24.5 | 21.2 | 17.3 | 17.3 |
| 1st quartile (cm) | 27.1 | 41.3 | 39.1 | 28.3 | 34.2 | 21.1 | 28.3 |
| Median (cm) | 33.5 | 44.2 | 43.0 | 35.2 | 41.8 | 25.3 | 39.4 |
| 3rd quartile (cm) | 38.4 | 47.9 | 47.4 | 41.0 | 45.3 | 27.0 | 44.4 |
| Maximum (cm) | 43.6 | 58.0 | 58.0 | 46.3 | 58.0 | 34.6 | 58.0 |

Bearing trees were numerous enough in a 104,108 ha analysis area for diameter distributions by zone (Figure 8). Total trees were 2924. Juniper, piñon, and quaking aspen had inverse J-shaped distributions with most <40 cm. Pine distributions were peaked in the 30–40 cm size class in both pine zones and dry mixed conifer (Figure 8). Small trees (<40 cm dbh) dominated all zones (Figure 8). Trees <40 cm were 70.1% of all trees and 51.3% of pines. In pine and piñon-juniper, most junipers and piñons and 61% of pines were <40 cm dbh. In pine, 53% of trees were <40 cm. In dry mixed conifer, most aspen, shade-tolerant trees, and 41% of pines were <40 cm. In moist mixed conifer, >90% of trees were <40 cm dbh.

Case No. 1:23-cv-01501-RMR Document 15-2 filed 09/29/23 USDC Colorado pg 194 of 367



However, ecologically significant large pines were prominent in the three dry-forest zones (Figure 8, Table 9). Percentage of large pines of all sizes increased from pine and piñon-juniper to dry mixed conifer, which consistently had the most large trees (Table 9). In the pine zones, almost half of pines were >40 cm, about 1/3 was >50 cm, and about 1/6 was >60 cm. Very large pines (>80 cm) were only 1.3% of pines in the pine zones, but 3.6% in dry mixed conifer. The six largest recorded bearing trees were pines. One was 183 cm just east of Weber Reservoir near Mancos, one was 142 cm, one was 137 cm, three were 122 cm, and two were about 1.6 km north of Weber Reservoir.

**Table 8.** Historical tree composition, in the section-corner area, that was shade-tolerant (blue spruce, Douglas-fir, and white fir), and shade-intolerant trees (quaking aspen and pine).

| | Pine and Piñon-Juniper | Pine | Dry Mixed Conifer | Moist Mixed Conifer |
|---|---|---|---|---|
| Sample polygons (n) | 10 | 54 | 27 | 24 |
| Sample area (ha) | 7869 | 46,063 | 24290 | 23761 |
| *Shade-tolerant trees (blue spruce, Douglas-fir, white fir)* | | | | |
| Mean (%) | 0.76 | 0.22 | 5.98 | 43.71 |
| SD (%) | 1.60 | 0.92 | 15.13 | 22.72 |
| Minimum (%) | 0.00 | 0.00 | 0.00 | 0.00 |
| 1st quartile (%) | 0.00 | 0.00 | 0.00 | 27.63 |
| Median (%) | 0.00 | 0.00 | 0.00 | 43.21 |
| 3rd quartile (%) | 0.00 | 0.00 | 4.35 | 61.55 |
| Maximum (%) | 4.00 | 4.17 | 70.00 | 86.96 |
| *Shade-intolerant trees (pine and quaking aspen)* | | | | |
| Mean (%) | 51.39 | 95.91 | 91.21 | 55.14 |
| SD (%) | 34.53 | 6.75 | 15.44 | 23.14 |
| Minimum (%) | 6.25 | 73.08 | 30.00 | 12.00 |
| 1st quartile (%) | 21.09 | 95.18 | 90.91 | 38.45 |
| Median (%) | 43.32 | 100.00 | 96.30 | 56.00 |
| 3rd quartile (%) | 88.29 | 100.00 | 100.00 | 72.37 |
| Maximum (%) | 100.00 | 100.00 | 100.00 | 100.00 |




**Figure 7.** Reconstructed historical composition (%) of shade-tolerant conifers (blue spruce, Douglas-fir, and white fir).

Case No. 1:23-cv-01501-RMR Document 15-2 filed 09/29/23 USDC Colorado pg 195 of 367



**Table 9.** Percentage of total pines recorded as bearing trees, in each zone and in the two pine zones together, that exceeded particular diameters.

| Diameter (DBH) | Pine and Piñon-Juniper | Pine | Pine Zones | Dry Mixed Conifer |
|---|---|---|---|---|
| >30 cm (%) | 70.2 | 75.8 | 75.4 | 80.3 |
| >40 cm (%) | 39.3 | 46.8 | 46.2 | 59.1 |
| >50 cm (%) | 17.9 | 33.1 | 31.9 | 41.4 |
| >60 cm (%) | 5.3 | 17.2 | 16.2 | 18.1 |
| >70 cm (%) | 0.9 | 4.5 | 4.2 | 7.4 |
| >80 cm (%) | 0.0 | 1.4 | 1.3 | 3.6 |
| Pines (n) | 110 | 1266 | 1376 | 343 |

### *3.2. Reconstructed Forest Understories and Their Trees and Shrubs from Section-Line Data*

Forest understories varied, with some consistent understories across large areas and other areas having finer mixes (Figure 9). Forest understories were dominated by mixed mountain shrubs in all zones, except possibly in moist mixed conifer (Table 10, Figure 9). Dry mixed conifer had 85% and pine had 83% coverage of understory mixed mountain shrubs. Pine and piñon-juniper, in contrast, had 42% grass, 14% sagebrush, and only 44% mixed mountain shrubs. Moist mixed conifer likely also had less mixed mountain shrubs, possibly just 28%, but understories are uncertain in this zone. Understory trees were present on only 1% of the two pine zones, but on 13%–14% of dry and moist mixed conifer (Table 11). Quaking aspen were almost all the understory trees in all zones. In mixed conifer, understory trees were dense (fraction 0.73 in dry mixed conifer, 0.94 in moist mixed conifer).




**Figure 8.** Historical tree diameter distributions (diameter at breast height or dbh; about 1.37 m above the base) by species, including only tree species with >35 trees. Shade-tolerant conifers included blue spruce, Douglas-fir, and white fir.

FS-001227

In the few places they occurred. Mixed-mountain-shrub understories were dominated by Gambel oak, recorded first on 98%–99% of line lengths except in pine and piñon-juniper where it was first on 90% of line length, sagebrush was first on 8.5%, and Utah serviceberry first on 1.5% of line length (Table 11). Shrubs other than Gambel oak were present, but usually on <15% of line length, and often were mostly Utah serviceberry or sagebrush. Understory shrubs were dense over a fraction of 0.60 to 0.78 of their area (Table 11), and thus they were often pervasive and dense.




**Figure 9.** Generalized historical forest understories.

**Table 10.** Generalized forest understories recorded in section-line data.

| | Pine and Piñon-Juniper | | Pine | | Dry Mixed Conifer | | Moist Mixed Conifer | |
|---|---|---|---|---|---|---|---|---|
| **Forest Understory** | **All** | **Best**[1] | **All** | **Best** | **All** | **Best** | **Min.**[2] | **Max.**[2] |
| Grass (%) | 21.2 | 42.1 | 11.8 | 15.5 | 9.0 | 14.6 | 0.9 | 3.1 |
| Mixed mountain shrubs (%)[3] | 22.2 | 44.1 | 63.4 | 83.1 | 52.4 | 85.4 | 27.5 | 96.9 |
| Sagebrush (%) | 7.0 | 13.8 | 1.0 | 1.3 | 0.0 | 0.0 | 0.0 | 0.0 |
| No grass/shrub recorded (%) | 49.6 | - | 23.8 | - | 38.6 | - | 71.6 | - |
| Sample line length (km) | 794 | 400 | 1911 | 1457 | 960 | 590 | 497 | 141 |

Notes: Within the section-line data, I selected and analyzed records in each zone only for surveyors who recorded understory shrubs and also recorded understory grass (Table S4). Thus, these records represent a sample of the zone. [1] The "Best" estimate is the percentage of all forest categories except "No grass/shrub recorded." This category is excluded because it likely is mostly composed of cases where the surveyor simply forgot to record the understory as was required. [2] In the case of moist mixed conifer, it is likely that the category "No grass/shrub recorded" could at times indicate a lack of understory grass or shrubs, rather than indicating a record where the surveyor forgot to record the understory as required. Thus, I bracketed the potential range by including this category to estimate a minimum and excluding it to indicate a maximum. [3] "Mixed mountain shrubs" refers to mixtures of shrubs typically dominated by Gambel oak, along with antelope bitterbrush, chokecherry, mountain mahogany, roundleaf snowberry, sagebrush, and Utah serviceberry. See Table 11 for more details about understory mixed mountain shrubs.

Case No. 1:23-cv-01501-RMR Document 15-2 filed 09/29/23 USDC Colorado pg 197 of 367



**Table 11.** General Land Office (GLO) section-line lengths in forests, with understory trees and shrubs having particular attributes, by forest zone.

| Attribute | Pine and Piñon-Juniper | Pine | Dry Mixed Conifer | Moist Mixed Conifer |
|---|---|---|---|---|
| UNDERSTORY TREES[1] | | | | |
| Fir (%) | 0.00 | 0.00 | 0.25 | 0.00 |
| Pine (%) | 0.00 | 0.02 | 0.26 | 0.00 |
| Pine-quaking aspen (%) | 0.00 | 0.00 | 0.11 | 0.00 |
| Quaking aspen (%) | 0.88 | 1.11 | 13.23 | 12.93 |
| Quaking aspen-pine (%) | 0.00 | 0.00 | 0.18 | 0.00 |
| Any tree (%)—sum of the above | 0.88 | 1.13 | 14.07 | 12.93 |
| Fraction of trees recorded dense | 0.05 | 0.36 | 0.73 | 0.94 |
| Total line length (km) with data | 187.17 | 2374.41 | 1231.04 | 745.47 |
| Percentage of line length in zone | 17.48 | 73.85 | 68.48 | 78.01 |
| UNDERSTORY MIXED MOUNTAIN SHRUBS[2] | | | | |
| Gambel oak first (%) | 90.01 | 99.14 | 98.85 | 98.43 |
| Gambel oak present (%) | 99.33 | 99.95 | 100.00 | 98.81 |
| Roundleaf snowberry first (%) | 0.00 | 0.00 | 0.00 | 0.00 |
| Roundleaf snowberry present (%) | 0.50 | 1.06 | 1.22 | 0.00 |
| Sagebrush first (%) | 8.50 | 0.83 | 0.00 | 0.00 |
| Sagebrush present (%) | 16.55 | 1.38 | 0.28 | 0.00 |
| Utah serviceberry first (%) | 1.49 | 0.03 | 1.15 | 1.57 |
| Utah serviceberry present (%) | 14.47 | 2.69 | 7.73 | 2.84 |
| Fraction of shrubs recorded dense | 0.74 | 0.60 | 0.70 | 0.78 |
| Total line length (km) with data | 273.70 | 1410.99 | 573.70 | 139.87 |

Notes: Within the section-line data, for the understory tree analysis, I selected and analyzed records in each zone only for surveyors who recorded understory trees (Table S4). Thus, these records represent a sample of the zone. For the analysis of mixed mountain shrubs, I selected and analyzed records in each zone only for surveyors who were rated at least "fair" in recording understory shrubs (Table S4). The sample is different from that in Table 10, because surveyors did not have to also record understory grass. [1] Percentages (%) are relative to total line length (km) with data. [2] Percentages (%) represent relative composition within only the mixed-mountain-shrub category given in Table 10, and thus they are not percentages of total forest line length.

### *3.3. Reconstructed Fire-Severity and Old Growth from Section-Line and Section-Corner Data*

Some of the four sources of potential evidence of fire were contiguous and adjacent, and some boundaries were abrupt, but evidence of directional spread was limited (Figure 10a). Low severity, all from forest structure (Table 12), when overlain in GIS on topography, appeared associated with mesa tops and gentler slopes in the lower elevations of dry forests over some contiguous areas ≥10,000 ha (Figure 10a). Boundaries with scattered timber and non-forest were abrupt, suggesting adjoining severe fire. Mixed-severity areas, ~2/3 from forest structure and 1/3 from openings (Table 12) were smaller, not very contiguous or oriented, but often near low-severity areas (Figure 10a) in the two pine zones (Table 12). Most high-severity area from forest structure was in moist mixed conifer (Table 12) in some contiguous areas of 3000–6000 ha often sharply bounded by mixed- or low-severity areas (Figure 10a), suggesting fire.

About 2/3 of high severity from non-forest that became forested was in pine and dry mixed conifer (Table 12), with much in a contiguous area ≥40,000 ha in the northern part of the large western block (Figure 10a). Scattered timber occurred around it, and in several other cases around or adjacent to

non-forest, particularly in the western half (Figure 10b). In other cases, these occurred in a finer mosaic, especially in the eastern half (Figure 10b). Beetle outbreaks/droughts are less likely than fire to have produced large areas of contiguous non-forest bounded sharply by scattered timber.




**Figure 10.** Reconstructed historical fire severity: (**a**) Based on section-corner and section-line data, and (**b**) based on only section-line data.

In both section-line and section-corner areas, recorded non-forest with: (1) dead/fallen/burned trees (87%–90% now forested), (2) small trees (69%–70%), or (3) shrubs and small trees (66%–76%), especially became forested by 2016 (Figure 11, Table 13). About 71%–73% of scattered timber also recovered to forest (Table 5). Thus, these four were good indicators of forest recovery by 2016; this recovery was underway in the historical period, and thus is not an artifact of fire exclusion. In contrast, only 35%–44% of shrubs and 15%–58% of grasslands became forested. Thus, they were much more

persistent. These criteria together suggest fire was likely the major disturbance for the four, but some role for other disturbances (i.e., beetle outbreaks, droughts) cannot be fully excluded.

Using these sources, the montane in the section-corner area had 24% of area with exclusive low-severity fire, from 2% in moist mixed conifer to 21%–33% in the dry forest zones, including 33% in pine (Table 12, Figures S12–S15). Mixed-severity fire was found in 30% of the montane, with 34% in pine and 44% in pine and piñon-juniper (Table 12, Figures S12–S15). High-severity fire was found in 46% of the montane, 32%–35% in the two pine zones, 50% in dry mixed conifer, and 76% in moist mixed conifer (Table 12, Figures S12–S15). Estimated fire rotations for high-severity fire were 201 years in the montane, shortest (121 years) in moist mixed conifer, longest in the pine zones (260 and 284 years), and intermediate in dry mixed conifer (184 years). Pooled mixed- to high-severity fire had fire rotations of 121 years in the montane, 94 years in moist mixed conifer, 116 years in pine and piñon-juniper, and 138 years in the pine zone (Table 12).

**Table 12.** Reconstructed fire severities and fire rotations by zone within the section-corner area.

| | Pine and Piñon-Juniper | | Pine | | Pine Zones | Dry Mixed Conifer | | Dry Forests | Moist Mixed Conifer | | Montane Overall | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Fire Severity Component[1]** | **(km)** | **(%)** | **(km)** | **(%)** | **(%)** | **(km)** | **(%)** | **(%)** | **(km)** | **(%)** | **(km)** | **(%)** |
| Low severity-structure | 24.3 | 21.0 | 288.3 | 33.4 | 31.9 | 106.9 | 23.4 | 29.2 | 6.6 | 1.9 | 426.1 | 23.9 |
| Mixed severity-structure | 22.5 | | 83.7 | | | 16.2 | | | 14.8 | | 137.2 | |
| Mixed severity-openings | 6.5 | | 54.0 | | | 6.9 | | | 0.4 | | 67.8 | |
| Mixed severity-scattered[2] | 21.7 | | 157.2 | | | 97.8 | | | 61.6 | | 338.3 | |
| Total mixed severity | 50.7 | 43.7 | 294.9 | 34.2 | 35.3 | 120.9 | 26.5 | 32.5 | 76.8 | 22.0 | 543.3 | 30.4 |
| High severity-structure | 0.0 | | 22.1 | | | 19.3 | | | 144.7 | | 186.1 | |
| High severity-openings | 8.5 | | 18.8 | | | 8.5 | | | 5.3 | | 41.1 | |
| High severity-non-forest | 10.8 | | 81.4 | | | 102.8 | | | 54.3 | | 249.3 | |
| High severity-scattered[2] | 21.7 | | 157.2 | | | 97.8 | | | 61.6 | | 338.3 | |
| Total high severity | 41.0 | 35.3 | 279.5 | 32.4 | 32.8 | 228.4 | 50.1 | 38.3 | 265.9 | 76.1 | 814.8 | 45.7 |
| Sum of sources | 116.0 | 100.0 | 862.7 | 100.0 | 100.0 | 456.2 | 100.0 | 100.0 | 349.3 | 100.0 | 1784.3 | 100.0 |
| Total mixed + high severity | 91.7 | 79.0 | 574.4 | 66.6 | | 349.3 | 76.6 | | 342.7 | 98.1 | 1358.1 | 76.1 |
| **Fire-rotation estimate[2]** | | **(yrs)** | | **(yrs)** | **(yrs)** | | **(yrs)** | **(yrs)** | | **(yrs)** | | **(yrs)** |
| High severity | | 260 | | 284 | 280 | | 184 | 240 | | 121 | | 201 |
| Mixed- to high severity | | 116 | | 138 | 135 | | 120 | 130 | | 94 | | 121 |

[1] The components are: (1) structure-modeled fire severity from tree density and fraction of large and small trees, (2) openings-section corners with no recorded bearing trees on lines with either canopy density not recorded (high severity) or canopy dense/thick (mixed severity), (3) section-line length recorded as non-forest at the time of the surveys that by 2016 was forested, and (4) section-line length recorded as scattered timber at the time of the surveys that by 2016 was forested. [2] Fire rotation is calculated assuming that scattered timber that has recovered to forest represents mixed- to high-severity fire, and that 50% of this scattered timber represents mixed-severity fire and 50% represents high-severity fire. Fire rotation is calculated as 92 years/fraction burned. For example, in the pine zone, 0.342 + 0.324 burned at mixed- to high severity, for a total fraction burned of 0.666 in 92 years, and thus fire rotation for pooled mixed- to high severity was 92/0.666 = 138 years.

Old-growth forests were reconstructed to have covered 43% of a 101,648 ha analysis area and 53% of dry forests, from bearing trees at section corners (Figures 12 and 13a, Table 14). However, this is a

Case No. 1:23-cv-01501-RMR Document 15-2 filed 09/29/23 USDC Colorado pg 200 of 367



sample only for the forested area where there were adequate bearing-tree data at section corners at the time of the surveys. Overall, this sample area was only 50.2% of 202,596 ha in the four forest zones in the unaffected section-corner analysis area (Table 1). The rest was openings and non-forest.

About 4% of old growth was in the pine and piñon-juniper zone (Figure S16), ~62% in pine (Figure S17), ~28% in dry mixed conifer (Figure S18), and ~7% in moist mixed conifer (Figure S19). About 59% of pine and 50% of dry mixed conifer in the analysis area was old growth, but only 12–22% of analysis areas in the other two zones (Table 14). Percentages of whole zones were smaller, only 7%–27%. Earlier analysis (Table 9) had shown large percentages of pines (32% in pine, 41% in dry mixed conifer) were ≥50 cm dbh in historical dry forests. Consistent with abundant old trees, much of the "not old growth" still contained 15–24 trees/ha ≥50 cm (e.g., Figure 12), half or more of the old-growth definition. Also, section corners with old growth were on section lines recorded as dense, thick, or heavily timbered over 52% of their length, and on lines recorded as scattered timber over 33% of their length (Table 14), with the remainder mostly not recorded, which included mature timber and old growth at corners and nearby. Some old growth was patchy; the ~1/3 recorded as scattered likely was disturbed at mixed to high severity, and some not-recorded area may indicate earlier disturbances that had partially recovered. Some old-growth patches were in 3000–5000 ha contiguous areas (Figures 12 and 13a). Early railroad logging targeted both the old-growth patches and adjoining patches with many large trees (Figure 12). Surveyors recorded direct observations of large trees in section-line descriptions (Table 4).

**Table 13.** Succession of historical non-forest (median survey year = 1881) to forest (circa 2016) by the zone with which non-forest was associated.

| Non-Forest Now Forested[1] | Overall | Non-Forest Unknown[2] | Pine and Piñon-Juniper | Pine | Dry Mixed Conifer | Moist Mixed Conifer |
|---|---|---|---|---|---|---|
| Section-line area | | | | | | |
| Mixed mt. shrubs (%) | 43.7 | 45.0 | 59.7 | 37.7 | 54.7 | 51.1 |
| Grasslands (%) | 57.8 | 64.0 | 53.5 | 51.4 | 52.2 | 56.5 |
| Dead/fallen/burned (%) | 87.0 | 72.6 | 54.5 | 95.0 | 91.9 | 87.5 |
| Small trees (%) | 69.5 | 33.3 | 77.8 | 41.6 | 76.9 | 69.2 |
| Sagebrush (%) | 40.1 | 30.6 | 45.7 | 59.8 | 41.3 | 40.0 |
| No timber (%) | 48.8 | 54.3 | 23.5 | 44.5 | 65.1 | 82.5 |
| Shrubs and small trees (%) | 65.5 | 59.6 | 94.8 | 0.0 | 89.0 | 96.1 |
| Mean (%) | 56.5 | 51.3 | 55.4 | 45.4 | 78.1 | 69.3 |
| Section-corner area | | | | | | |
| Mixed mt. shrubs (%) | 34.9 | 36.7 | 51.7 | 28.8 | 80.4 | 50.2 |
| Grasslands (%) | 14.6 | 32.7 | 27.1 | 42.7 | 80.4 | 15.2 |
| Dead/fallen/burned (%) | 90.4 | 100.0 | - | 93.3 | 80.4 | 86.7 |
| Small trees (%) | 69.2 | 53.9 | 77.8 | 59.2 | 80.6 | 57.7 |
| Sagebrush (%) | 45.4 | 40.0 | 19.6 | 50.4 | - | - |
| No timber (%) | 66.0 | 100.0 | - | 45.2 | 80.0 | 85.8 |
| Shrubs and small trees (%) | 75.5 | 72.0 | 94.8 | 0.0 | 86.0 | 100.0 |
| Mean (%) | 49.5 | 38.3 | 51.5 | 34.8 | 82.7 | 75.1 |

[1] Percentages are for the non-forest line length (km) present at the time of the surveys, that is now forested ca 201. [2] Non-forest unknown is where the corresponding forest zone could not be determined.




**Figure 11.** Succession of historical non-forest vegetation, with a median survey year of 1881, to forest, by ca 2016, across the whole section-line area: (**a**) The parts of the seven types of historical non-forest vegetation that had succeeded to forest about 135 years later, by circa 2016, the year of the Landfire map of existing vegetation, (**b**) Percentage of each of the seven types of historical non-forest vegetation that had succeeded to forest by ca 2016.

**Table 14.** Old-growth forests in the section-corner study area by zone and indicators on lines.

| Zone | Analysis Area (ha) | Old Growth Area (ha) | % of Analysis Area | % of Whole Zone[1] | Lines-Heavily Timbered (%)[2] | Lines-Scattered Timber (%)[3] |
|---|---|---|---|---|---|---|
| Pine and piñon-juniper | 7349 | 1623 | 22.1 | 12.3 | 57.3 | 28.1 |
| Pine | 45,986 | 27,129 | 59.0 | 26.1 | 61.8 | 28.5 |
| Dry mixed conifer | 24,467 | 12,316 | 50.3 | 26.5 | 37.0 | 45.9 |
| Moist mixed conifer | 23,846 | 2836 | 11.9 | 7.3 | 21.7 | 27.0 |
| Dry forests | 77,802 | 41,068 | 52.8 | 27.3 | - | - |
| Overall | 101,648 | 43,904 | 43.2 | 21.7 | 52.2 | 33.1 |

[1] Estimated unaffected areas by zone are given in Table 1 for the section-corner study area. [2] This is the percentage of all section-line segments that intersected old-growth polygons, where surveyors recorded the forest as dense, thick, heavily timbered, or using similar terms. [3] As in note 1, but where surveyors recorded the timber as scattered.

Reconstruction of old growth is confined to the section-corner area (Figure 13a), but it would be desirable to have some idea of the potential extent of old growth across the whole section-line area, as is roughly estimated in Figure 13b. The best indicators are forest line segments also recorded as dense, thick, heavily timbered, or using similar terms. Section lines recorded this way on average, in the section-corner area where this was analyzed, were 54% old growth and 82% had ≥15 trees ≥50 cm dbh/ha, more than half as many old trees as in old growth. Thus, these lines are reasonable indicators of old growth and areas with lots of old trees, but since ~1/3 of old growth was on line segments recorded as scattered timber, more areas likely had old growth.

### *3.4. Historical Cross-Validations of the Reconstructions*

Historical tree density and basal area in the study area are known from only one tree-ring reconstruction in dry mixed conifer [40], but GLO tree data there were too poor to allow reconstruction. A single reconstruction is also insufficient for a general cross-validation, and thus just shows that tree-ring and GLO reconstructions are congruent, based on 29.6% RMAE for tree density and 13.3% RMAE for basal area (Tables S8 and S9).

The fire severity reconstructions can be cross-validated (Table S10). General cross-validation of the GLO estimate of 23% low, 27% mixed, and 50% high severity across dry mixed conifer landscapes, shows that tree-ring and charcoal reconstructions found a similar mix of these severities, although tree-ring/charcoal evidence is insufficient to accurately estimate percentages (Table S10). Also, where GLO reconstructions found 2% low, 22% mixed, and 50% high across moist mixed conifer landscapes, tree-ring and charcoal reconstructions found mostly mixed- and high-severity fire (Table S10). These general cross-validations suggest substantial congruence.

Fire severity reconstructions also allow three specific comparisons (Table S10). First, at Dolomite Lake near the southeastern boundary of the study area, Aoki [41] found evidence for mixed-severity fire in moist mixed conifer. The GLO reconstruction found both low and high severity, suggesting a mix of fire severities in that area, corroborating both studies. Second, Romme et al. [42] used stand-origin dating in aspen to estimate a historical aspen high-severity fire rotation of ~140 years northeast of Mancos, which the GLO data show was about 84% in historical dry mixed conifer. The GLO reconstruction, which had ~150 km of lines (and corners) in the montane part of their study area: (1) found 56% high-severity and 28% mixed-severity fire, confirming severe fires originated aspen, and (2) estimated a historical fire rotation of 110–165 years, which has an RMAE of 18%–21% relative to their 140 year rotation estimate (Table S10).

Third, the most significant specific cross-validation is for mixed- to high-severity fires from comparing GLO reconstructions (median 1881 date) and forest atlases (1908–1909), with a median 27–28 year difference. These two sources overlap on 164,087 ha (69.6%) of the 235,787 ha section-corner study area. I intersected, in ArcGIS, atlas woodlands and fires (Figure 10b) with the GLO fire severity reconstruction (Figure 10a) to map the cross-validation area (Figure S20), which had 2152 km of section-line length. This intersection provides only a rough comparison, as the atlases have RMSE spatial errors of about 600 m [7]. Nonetheless, atlas woodlands, described in 1904 as the aftermath of mixed- and high-severity fires [7], were confirmed here to be 84% GLO-reconstructed mixed- to high-severity fire area, 38% from scattered timber and 27% from non-forest that both became forested, 15% from forest structure, and 4% from forest openings. This cross-validation spans mixed- to high-severity fire area and woodland area in all four zones. The 16% of woodland area not from mixed- to high-severity fires was reconstructed to have been low-severity area with mature trees at the time of the surveys. This conversion to atlas woodlands could be spatial error, but more likely was from mixed- to high-severity fires after the surveys and before the atlases. Also, ~60% of reconstructed mixed- to high-severity fire area, including 2/3 of scattered timber recorded in surveys, did not end up mapped as woodlands or fires in atlases. A close look at atlases shows scattered timber was often mapped as "lien selection," "timber claim", or "homesteads/patents," but also some in the lowest timber-volume category. Since the GLO reconstruction extends back into the late-1700s, substantial area in the surveys indicating fires could already have been well forested or claimed for private use by the time of the atlases. The atlases and surveys have reconstruction periods that only overlap between 1850 and 1881 A.D. The upshot of this key cross-validation is that atlas woodlands are validated to largely be the aftermath of mixed- to high-severity fires, and the four sources used to reconstruct mixed- to high-severity fires from GLO surveys are also validated across all four zones. Conversion of mixed- to high-severity area to mapped private land uses means atlas woodlands underestimate prior mixed- to high-severity fires.




**Figure 12.** Old growth and not old growth in the western part of the old-growth analysis area. Numbers over polygons are the density (trees/ha) of trees that meet the diameter criteria for old-growth trees. Section lines recorded as dense, thick, or heavily timbered included old growth, but extended out into polygons with fewer than the minimum density of large trees necessary to qualify as old growth. About 1/3 of old growth was not continuous forest, but instead scattered timber. Early railroads, from [7], were directed at the large timber available in and near the old-growth areas.




**Figure 13.** (**a**) Reconstructed old-growth forests in the section-corner area. (**b**) The best indicator of potential old growth across the whole study area is from section-line descriptions that recorded the forest as dense, thick, heavily timbered, or using other similar terms. These lines, in the section-corner area, were ~54% old growth and 82% of section-line length had ≥15 trees ≥50 cm dbh/ha, and so these lines mostly had abundant old trees.

Early scientific reports and observations from the surveyors in the study area (Table 4) and from early reports in the study area and the broader region (Table S7) further corroborate the fire severity and forest-structure reconstructions. High-severity fire was directly recorded by the surveyors in the study area in all zones, including in pine forests (Table 4). Moderate to high-severity fires in mixed conifer areas are confirmed in both the study area and region to have led to dense young aspen, dense shrubs and understory conifers, accompanied by scattered remnant trees from the pre-fire forest (Table S7: Q1–Q3, Q8–Q9, Table 4). This general structure of scattered timber, without reporting that fire caused it, was also reported (Q6). Mixed conifer forests in the study area and region were reported to have

had varying age classes and densities, including young pole stands with surviving older trees, and open, park-like old-growth forests, confirming GLO findings here of a variety of low, moderate, and high-severity fires (Table S7).

The old-growth reconstruction (e.g., Figure 12) is corroborated in four ways. First, the early logging railroads clearly were aimed at areas with old growth, possibly even old growth with the most large trees (Figure 12), substantiating that these were areas with large timber. Second, the woodlands mapped in early forest atlases [7], which were described as severely burned, are generally in areas outside mature forests identified by GLO data in the late-1800s (Figure S21). This corroborates that reconstructed old-growth forests and adjoining non old growth, do identify mature forests, since many were still present in 1908–1909. This also substantiates that forest atlas woodlands were not areas of mature forests, consistent with their early description as having been burned severely [7]. Third, surveyors often directly recorded large trees, good timber, or dense/thick/heavily timbered areas suggestive of old trees and old forests (examples in Table 4). Finally, the method of old-growth reconstruction follows [35], which found old growth historically over 76% of a large area in Oregon; this was corroborated by a later survey that found 78%–82% [35]. Corroboration also came from a tree-ring reconstruction that found 48–52 large trees/ha where GLO data found a median 54.6 large trees/ha [35]. These further validate the accuracy of the method.

## 4. Discussion

### *4.1. Historically Variable Fire Severity*

Historical ponderosa pine and mixed conifer forests across the West are increasingly understood to have had variable or mixed historical fire severities [2,43,44]. Multiple sources show this: (1) GLO-reconstructions [1,3,19,22,24,25,45,46], (2) paleo-charcoal reconstructions (reviewed in [47]), (3) landscape-scale aerial-photos [6], (4) landscape-scale tree-ring reconstructions (e.g. [48,49]), (5) landscape-scale forest atlas data [7], and (6) early scientific reports across large landscapes [5,32].

Fire severity reconstructions here also show this mixture of fire severities across all zones (Table 12), and found the mixture was similar to the mixture in some nearby landscapes. The San Juan's dry forests, with 29% low, 33% mixed, 38% high, and a 240 year high-severity fire rotation (Table 12), was very similar to the Colorado Front Range, which was modeled, based on tree-ring data, to have had ~28% low severity, 36% mixed severity and 36% high severity [48]. Our Front Range GLO study area was small and had more high-severity fire [1]. Black Mesa, northern Arizona, which stands out in northern Arizona for its 12% low, 33% mixed, 55% high, and 217 year high-severity fire rotation [3], was also similar. Other northern Arizona areas had more low-severity area and longer high-severity fire rotations. The Uncompahgre Plateau, just to the north, had little low-severity and more high-severity fire [3].

Exclusive low-severity fire (Figure 10a) over 24% of the montane was mostly in dry forests, 32% of pine zones and 23% of dry mixed conifer (Table 12), largely on mesas and gentler southerly-facing slopes at lower elevations, as in the Colorado Front Range [48]. Fire-history data at 33 sites [7] showed historical low-severity fire rotations were 16–59 years (median 31 years) in pine and 20–496 years (median 78 years) in dry mixed conifer. Frequent fire (low-severity fire rotations <25 years), which kept fuel loads down, was at four of nine sites (44%) in pine, roughly similar to the 32% of pine zones with exclusive low-severity fire found here. Exclusive low-severity fire over 23% of dry mixed conifer is congruent with the three of 15 (20%) dry mixed conifer sites with low-severity fire rotations <30 years on southerly-facing slopes at lower elevations [7]. Agreement corroborates both sources. Overall, frequent low-severity fire, based on tree-ring data, occurred on only 15% of the montane and less than half the pine zones [7], also similar to the Colorado Front Range. Exclusive low-severity fire, which included some longer fire rotations, was found on 24% of the montane (Table 12), again similar to the 28% in the Colorado Front Range [48].

Mixed-severity fires, 30% of the montane, highest in the two pine zones (Table 12), appeared most common within and adjoining low-severity fire areas and scattered timber, and between larger patches of low and higher severity (Figure 10a), supporting the transitional nature of mixed severity. High-severity fires were in contiguous blocks (Figure 10a), particularly in mixed conifer. Half of dry mixed conifer and 3/4 of moist mixed conifer burned at high severity in the 19th century, not unlike the 54%–57% burned in these forests on the Uncompahgre Plateau [22]. Forest atlases from 1908–1909 also show contiguous areas of severe fire in the San Juan montane [7] congruent with this study. This study found more mixed- to high-severity fire, which is likely underestimated by the atlases, but mixed- and high-severity fire estimates here are strongly shaped by extensive scattered timber (Table 12), and its rough assignment as 50% mixed and 50% high. In other areas [22], more evidence was available about its severity, and use of scattered timber as an indicator of fire was not restricted to just recovered forest area.

The 19th-century severe fires in mixed conifer forests are the primary source of extensive (and beautiful) aspen forests that remain prominent in the region [29,30,42,49,50]. Major droughts and alignment of ocean-atmosphere teleconnections favored fire in the southern Rockies in the last half of the 19th century ([32], Figures 10–13), [51]. Millions of acres of forests reportedly burned on the western slope in Colorado (Table S7: Q14–Q15). Severe fires also occurred in montane and subalpine forests in the nearby Sangre de Cristo Mountains and higher-elevation forests in the Jemez Mountains in New Mexico [52]. Short mixed- to high-severity fire rotations of 94–138 years in forests in the study area (Table 12), may reflect this exceptional period and be atypical of longer patterns.

The occurrence of episodes of severe fire supports the hypothesis that Arizona to Colorado is a tension zone, where rapid transformations from episodes of disturbance can leave different nearby landscapes [3]. Areas of open, low-density dry forests could have been permanent in some cases, maintained by low-and mixed-severity fires. But, more likely, based on very different nearby landscapes (Mogollon and Black Mesa, San Juan and Uncompahgre), is that periods of low-severity fires with somewhat higher intensity can result in very open forests that resist higher-severity fire for a while, but subsequently recover to higher density, before another severe fire [6,24,32,53]. Evidence here includes: (1) large areas of scattered timber, likely from mixed- to high-severity fire, (2) unusually extensive low-density pine forests likely from intense low- or mixed-severity fires, and (3) some dense forests, likely recovering from earlier severe fires. Episodic droughts, dense shrubs, exposed topography oriented southwest and aligned with prevailing winds [7], and high topographic diversity likely also played significant roles in shaping highly variable fire severity, as they did in somewhat different ways in nearby mountain ranges [22,48]. The likely reality of this tension zone is that seemingly stable forest structures (e.g., open, low-density, old-growth forests) in this zone were historically vulnerable to rapid transformation in episodes of severe fires.

### *4.2. Historically Heterogeneous Forest Structure*

Varying historical fire severities led to heterogeneous forest structures that were likely a key source of biological diversity, as well as natural resistance and resilience, in San Juan montane landscapes, as elsewhere [54,55]. Historical dry forests in the San Juans were roughly similar in tree density to some other dry forests in the western USA with landscape-scale reconstructions [3], particularly dry forests in northern Arizona. Historical median tree density of 118 trees/ha for trees ≥ 10 cm dsh) in dry forests in the San Juans is very similar to the 121 trees/ha on the Coconino Plateau [46] and 124 trees/ha on the Mogollon Plateau [1] in northern Arizona. Higher median tree density included 137 trees/ha on Black Mesa [1], 162 trees/ha in the Colorado Front Range [1], and 183 trees/ha on the Uncompahgre Plateau [22]. Sierran-Cascade forests were much denser [3].

San Juan dry forests were more heterogeneous in tree density and had more dense forests than in northern Arizona. The coefficient of variation (CV) in tree density was 45%–54% in northern Arizona [46], but 99% in the San Juans (Table 6). Higher variability in tree density may be from greater topographic diversity and/or more diverse fires that led to both more open and dense forests. Open

forests with <100 trees/ha covered 42% of dry forests and 46% of pine zones in the San Juans, much more than the 19% on the Coconino Plateau, 24% on Black Mesa, and 33% on the Mogollon Plateau [46]. In the San Juans, 29% of dry forests were dense (>200 trees/ha), more than the 16%–18% dense forests in northern Arizona [46]. However, the San Juans had more dry mixed conifer, which was 50% dense. In pine only, dense forests were similar in the San Juans (19.4%) and northern Arizona (16–18%). Very dense forests (>300 trees/ha), however, stand out in the San Juans, occurring over 19% of dry forests, including 9% of pine forests and 36% of dry mixed conifer forests (Table 6).

Also, San Juan montane forests included denser zones. First, pine and piñon-juniper and dry mixed conifer zones had means of 303 and 245 trees/ha, medians of 209 and 200 trees/ha, and 54% and 50% of these zones, respectively, with dense forests of >200 trees/ha (Table 6). Second, preliminary data for moist mixed conifer show this zone to have historically had very dense forests, with a mean of 435 trees/ha and median of 286 trees/ha, and dense forests over 66% of this zone (Table 6). On the Uncompahgre Plateau, these forests had a similar mean of 422 trees/ha, median of 284 trees/ha, and dense forests over 52% of the zone [22], congruent evidence of dense forests.

Historical basal area was also similar to that in northern Arizona. Basal area on the Coconino Plateau had a mean of 11.3 $m^2$/ha, a median of 10.9 $m^2$/ha, and ~12% of forest area had >15 $m^2$/ha [46]. This is very similar to the mean of 11.5 $m^2$/ha and median of 10.2 $m^2$/ha in pine in the study area, with about 17% of pools having >15 $m^2$/ha (Table 7). In contrast, the Uncompahgre Plateau had a low median basal area (only 6.5 $m^2$/ha) in dry mixed conifer forests and 74% of area with <8 $m^2$/ha from severe late-1800s fires [22]. Median basal area in moist mixed conifer forests here was only 8.4 $m^2$/ha, also likely from severe fires. Pine and piñon-juniper had a higher mean basal area (12.8 $m^2$/ha) than in purer pine (11.2 $m^2$/ha) and more forest area with >15 $m^2$/ha (30% vs. 15%). Overall, 20% of the montane and 21% of dry forests had >15 $m^2$/ha. This is little compared to Sierran mixed conifer forests, which had median basal areas of 25%–38 $m^2$/ha [19]. Spatial variation in basal area (CV) was 39%–76% (Table 7), lower than for tree density, but larger pools reduce CV. Historical median QMDs were 34–44 cm in dry forests (Table 7). Thus, the tree of mean basal area was less than about a century old. Median QMDs were 44.2 cm in pine, only a little larger than the 39.8 cm for ponderosa on the Coconino Plateau [46].

Definitions used to distinguish zones play a significant role in compositional patterns (Table 8). For example, Tepley and Veblen [49] found high levels of shade-tolerant trees, with white fir and Douglas-fir more abundant than ponderosa pine in dry mixed conifer in the eastern part of my study area. I placed lines with pine recorded third into moist mixed conifer, and so some of Tepley and Veblen's dry-mixed conifer stands could have ended up in moist mixed conifer here. However, 25% of dry mixed conifer did still have substantial (mean = 22%) shade-tolerant trees, up to 70%. Also, my sample is limited near Tepley and Veblen's sites, but shade-tolerant conifers were abundant near there (Figure 7). In contrast, Wu's [56] dry mixed conifer was defined by a structure shaped by low-severity fire where shade-tolerant trees seldom reached the tree canopy. It appears that I generally used mixed conifer definitions between these studies.

Historical montane forests were not numerically dominated by large trees, but instead small trees <40 cm dbh (Figure 8) that were 70% of all trees and 51% of all pines. This was also found in GLO studies over 1.7 million ha in seven dry-forest landscapes with data from 45,171 trees [57]. Small trees historically provided key advance regeneration that enhanced forest resilience to canopy mortality in droughts and insect outbreaks, more significant recent mortality agents than are fires [55,57]. A peak in the 30–40 cm diameter class, in pines, was also found on the Uncompahgre Plateau [22] (Figure S17), but not other study areas [57]. These peaks suggest regional natural disturbance episodes and subsequent pluvials or fire quiescence [58] in the early 1800s. Aspen had inverse-J diameter distributions in mixed conifer (Figure 8), as on the Uncompahgre Plateau [22] (Figure S17), also suggesting regional episodes of high-severity fires that initiated aspen in ~1820–1880 [28–30]. A peak in the 20–30 cm class for shade-tolerant trees in mixed conifer (Figure 8) was also on the Plateau [22] (Figure S17). Regionally

congruent periods of disturbances are thus apparent, further suggesting the possibility that adjoining mountain ranges could be vulnerable to sudden transformation.

Old-growth forests covered 43% of montane forests and 53% of dry forests, but only about half of these percentages if the whole zone is considered, which is much less than the 76% in eastern Oregon dry forests [35]. Nonetheless, large trees still very substantially shaped the ecology of historical San dry forests. Large pines (e.g., >50 cm) historically were prominent components of San Juan dry forests, making up about 1/3 of pines in the two pine zones and 41% of pines in dry mixed conifer (Table 9). Biological diversity and ecological attributes of the few extant old-growth forests in the San Juans were reviewed in Romme et al. [59], who later [12] found most old growth in dry forests had been subjected to high-grade logging, including railroad logging (e.g., Figure 12), where large trees were effectively liquidated before ~1950. Old-growth forests were high-graded into the 1980s [14] and suffered from other mortality [12]. In the railroad-logged part of Figure 12, Romme et al. found, in 1994 ~45 years after railroad logging ended, only ~6% of ponderosa pines were >40 cm dbh [12]. In contrast, GLO data show that historically ~46% of ponderosa pines in pine forests and ~59% of ponderosa pines in dry mixed conifer forests were >40 cm (Table 9). Large trees likely remain significantly deficient across dry forests in the San Juan Mountains.

Understory seedlings/saplings were present in forests over only ~1% of the two pine zones, but ~13% of mixed conifer (Table 11). Almost all were quaking aspen, except pine and fir on <1% of dry mixed conifer. Dubois [16] (p. 9) said of ponderosa in the western San Juans: "In the virgin forest and in the poor open stand on thin soil there is practically no reproduction." Dubois [15] (p. 7) described dry forests in the central and eastern study area: "Reproduction of bull pine is poor. In many places groups of seedlings are coming in, but in the large blanks made by cutting, restocking is slow." Bull pine is young, but established ponderosa pine. Regeneration of ponderosa was variable, but often poor in the Southwest in general [55]. Near absence of seedling/sapling conifers in dry forests in the San Juans also suggests extended unfavorable climate or fires that had recently prevented or removed coniferous seedlings/saplings. Conifer regeneration is favored in southwestern dry forests by canopy disturbances and periods without fire and/or with abundant moisture [58]. In contrast, dense understory aspen in mixed conifer forests with larger surviving trees suggests severe fires before the surveys. This understory aspen in ~13% of mixed conifer forests was recorded as "dense" over 73–94% of line length (Table 11). Surveyor records specifically show dense small aspen occurred after severe fires (Table 4). Early observations in regional forests also show these forests often had abundant dense aspen in the understory after severe fires (Table S7: Q2–Q3, Q8–Q9). Tree-ring dating on the Uncompahgre Plateau, where aspen was also dense in mixed conifer understories, showed many aspen originated after severe fire in 1879 [22,30].

Understory shrubs were found historically on 83%–85% of pine and dry mixed conifer area (Table 10) and were dense over a fraction of 0.60 to 0.70 of that area (Table 11). Shrubs occurred on only 44% of pine and piñon-juniper but were still dense on a fraction of 0.74 of that area and occurred on an uncertain amount of moist mixed conifer (Table 10). Most other historical dry forests had low shrub abundance and low- to moderate dense fractions, respectively, including the Colorado Front Range (<1%, 0.00), Black Mesa, Arizona (7%, 0.00), Mogollon Plateau, Arizona (11%, 0.09), and Blue Mountains, Oregon (18%, 0.58) [1]. Only the Eastern Cascades, Oregon (58%–83%; [24]) equaled abundance here, and it was only exceeded on the Uncompahgre Plateau (79%–90%; [22]) and in the western Sierra (86%–99%; [19]). Shrubs were even denser on the Uncompahgre Plateau (0.81–0.96), but were much less dense in the Cascades (0.23–0.54) and Sierra (0.16–0.46) than here (0.60–0.78). Gambel oak here was most common in mixed mountain shrubs, with some Utah serviceberry and small amounts of roundleaf snowberry. Sagebrush was also common in pine and piñon-juniper (Table 11). Efforts to reduce these shrubs, assuming frequent fire kept them at low levels, are not generally supported. Fire was frequent only in the lowest parts of ponderosa pine and dry mixed conifer zones [7]. Most of these shrubs resprout readily after fires [32], and surveyors reported dense

shrubs after severe fires (e.g., Table 4). Pervasive and often dense understory mixed mountain shrubs were a historical feature of dry forests and other parts of montane forests in southwestern Colorado.

*4.3. Landscape-Scale Fire and Forest Management*

GLO reconstruction of fire severity and evidence from forest atlas data and early records (Table 12, [7]) provide previously unavailable landscape-scale evidence that mixed- and high-severity fires were historically characteristic of all zones in the montane (Table 12, Figures S12–S15). These fires have declined; for example, high-severity fires between 1984–2012 burned in the area with long fire rotations of 1816 years in ponderosa and 926 years in dry mixed conifer [47], a much lower rate than historical high-severity fire rotations of 280 years in pine and 184 years in dry mixed conifer (Table 12). Historically, severe fires likely produced much of the forest openings, non-forest, and scattered timber recorded in the surveys (Tables 5, 12 and 13) and most of the early-successional woodlands recorded in forest atlas data [7]. Creation and maintenance of complex early seral forests (CESFs), the early-successional stages after severe fires, have thus declined (Figure 11). CESFs are significant, supporting a broad array of generalist and specialist plants and animals, complex food webs, and high biological diversity [60]. Uncharacteristically low rates of mixed- to high-severity fires have likely adversely affected montane landscapes by reducing CESFs and non-forest as well as landscape diversity and landscape resilience needed at a time of impending effects from climate change [55].

Proposals for intensive fuel reduction and mechanical restoration of forest structure in upper elevation ponderosa pine and in mixed conifer forests in Colorado [61] have little basis, are likely ineffective, and are also difficult or infeasible. For example, evidence in [61] is unfortunately biased and unreliable; it was primarily from logged forests, which can erase historical fire evidence. Extensive evidence of historically severe fires had already been found in a large sample of unlogged sites in the Colorado Front Range [48] and from entry-exit records from early land surveys across 624,156 ha of the Front Range [45], a large body of direct historical evidence overlooked by Battaglia et al. [61]. These fires were not, through 2012, occurring at rates that exceeded historical rates, although more fire is expected [47]. Moreover, thinning has been extensively implemented in western dry forests, but fires are still increasing; thinning is likely often ineffective because even large fires seldom encounter fuel reductions [62]. Finally, fires in Colorado's historical upper montane landscapes were so temporally and spatially complex, even at times at a fine scale [49], it is likely extremely difficult if not infeasible to restore these landscapes with logging and/or thinning.

Restoring historical fire is likely the most feasible long-term fire-management approach in the upper half of the pine zones and in mixed conifer, although it entails high fire-management skill combined with sophisticated adaptive resilience for residents and infrastructure. New methods for living with fire [62,63] are essential where historical fire was dangerous, as in these zones. Restoring historical fire could have significant other benefits, including restoring CESFs and non-forest that have likely declined. Evidence from a large study suggested that the most feasible long-term approach to indirectly limit bark beetles is to maintain: " ... heterogeneous landscapes composed of stands with heterogeneous structures and containing densities in the neighborhood of 80 feet$^2$ [18.4 m$^2$/ha] of basal area" [64] (p. 157). Since historical mean basal area was <12.9 m$^2$/ha across all montane zones in the study area, and 3/4 or more of montane landscapes had <18.4 m$^2$/ha of basal area (Table 7), restoring fire should also increase resistance and resilience to beetle outbreaks.

An exception where active restoration of forest structure is worthwhile and feasible is in the lower part of the pine zones and a small part of dry mixed conifer, generally on mesas and gently sloping sites, where exclusive low-severity fire, found in this study (Figure 10, Figures S12–S15), coincided with independent evidence of historical low-severity fire rotations of <30 years [7]. These sites often also had old-growth forests or abundant old trees (Figure 12) and relatively low tree density (Figure 6). Large old trees that resist fires and provide resilience (seed) after fires are not easily replaceable, but abundant middle-aged trees here likely mean significant progress could be achieved in the few decades

before the U.S. needs to have reached net-zero for carbon emissions [55]. Restoring old growth and historical fire, guided by the historical variability shown here and in other sources [12], would be ecologically valuable and timely, increasing the variability in forest structure that provides landscape resistance and resilience [55] as fire increases with climate change. Evidence here adds support to the idea that historical landscapes in a tension zone from Arizona to Colorado had imperfect resistance to episodes of severe fires, suggesting that restored montane forests will have increased resistance and resilience, but will remain dangerous places to live.

Evidence that historically severe fires occurred in all zones of the study area means that multiple coordinated efforts are warranted [62,63] to increase the resistance and resilience of both people and nature to the severe fires that occurred and are likely to increase with climate change. This could include: (1) expediting the completion of explicit defenses around and near all highly valued resources and assets, including the entire wildland-urban interface, (2) planning and other methods to limit further expansion of the wildland-urban interface into these dangerous forests, (3) a rapid warning and systematic evacuation system in case of advancing severe fires, (4) active restoration of old-growth forests in the lower part of the pine zones with both prescribed and natural fires, and (5) active restoration of natural fire in the upper part of the pine zone and in mixed conifer zones. It is sensible to move from reducing fire severity and stopping fires everywhere, which are ecologically damaging and increasingly infeasible, to fostering living with fire in restored and resilient forest landscapes with resilient fire-adapted human communities and associated infrastructure. Spatial datasets used in the study (Data S1) could help in creating parts of a systematic, coordinated plan.

## 5. Conclusions

This study found evidence from early land surveys, mostly done by 1887 before extensive expansion of land uses, that episodes of mixed- to high-severity fires, likely associated with regional climate episodes, occurred in the 19th century over about 76% of ponderosa pine and mixed conifer landscapes. This supports the hypothesis that the study area was part of a regional tension zone from Arizona to Colorado that was vulnerable to transformation in episodes of mixed- to high-severity fires. The possibility of these fires is increased by the study area's historically dense understory shrubs, exposed topography oriented southwest in alignment with prevailing winds, and high topographic diversity. Forests with few large trees, and large areas of scattered timber and open shrublands and grasslands that have now recovered to forest, are indicators of these fires, which are corroborated by independent evidence. In contrast, about 32% of pine and 24% of dry mixed conifer zones had evidence of mature forests and only low-severity fires. These mature forests were typical of regional mature historical forests, particularly in northern Arizona, with low—to moderate tree densities and basal areas, including open, old-growth forests over about half their area.

Today's montane forest landscapes likely are still generally recovering from 19th-century mixed- to high-severity fires, with some now reaching middle to older ages. However, large trees in the mature and old-growth forests, present at the time of the surveys, were lost to later fires in some cases, but most were likely logged by the 1950s–1980s, also leaving recovering middle-aged forests. Homogenized, often middle-aged, recovering forests over large areas now face a future of increasing fire, drought, and insect-outbreak episodes with climate change. The most feasible ecological restoration and management in the face of these increasing episodes may be to focus on restoring and managing wildland fires for resource benefit, supplemented by prescribed fires, in the upper part of the pine zones and most of mixed conifer, and using active management to restore fire-resistant old-growth forests in the lower part of the pine zones. These two approaches have the greatest chance to increase stand- and landscape-scale resistance and resilience to disturbances in the next few decades. However, nearby communities and infrastructure would also benefit from becoming fully fire adapted. Incomplete historical forest resistance suggests that it may be difficult to stop episodes of future mixed- and high-severity fires from burning into communities and infrastructure.

**Supplementary Materials:** The following are available online at http://www.mdpi.com/2073-445X/9/1/3/s1. Table S1: Tree names used in the study and by surveyors in line and corner data, Table S2: Vegetation and land-use information in township descriptions, Table S3: Shrub names used in the study and by surveyors in line data, Table S4: Information recorded by surveyors in the study area, Table S5: Equations used in the reconstructions, Table S6: Landfire existing vegetation types (LF 2.0.0-circa 2016 data) used to identify modern upland forests, Table S7: Early observations (up to about 1920) about historical fire and forest structure in forests in and near the study area, Table S8: General cross-validation of the historical GLO median tree density estimate with the only available tree-ring estimate of historical tree density for the study area, Table S9: General cross-validation of the historical GLO median basal-area estimate with the only available tree-ring estimate of historical basal area for the study area, Table S10: GLO-based reconstructions of fire severity and high-severity fire rotation cross-validated with tree-ring and charcoal estimates, Figure S1: Reconstructed tree density (trees/ha) for sample ponderosa pine and piñon-juniper forests in the study area, Figure S2: Reconstructed tree density (trees/ha) for sample ponderosa pine forests in the study area, Figure S3: Reconstructed tree density (trees/ha) for sample dry mixed conifer forests in the study area, Figure S4: Reconstructed tree density (trees/ha) for sample moist mixed conifer forests in the study area, Figure S5: Reconstructed tree density (trees/ha) for sample dry forests in the study area, Figure S6: Reconstructed basal area (m2/ha) for sample ponderosa pine and piñon-juniper forests in the study area, Figure S7: Reconstructed basal area (m2/ha) for sample ponderosa pine forests in the study area, Figure S8: Reconstructed basal area (m2/ha) for sample dry mixed conifer forests in the study area, Figure S9: Reconstructed basal area (m2/ha) for sample moist mixed conifer forests in the study area, Figure S10: Reconstructed basal area (m2/ha) for sample dry forests in the study area, Figure S11: Reconstructed quadratic mean diameter (QMD) in montane forests in the study area, Figure S12: Reconstructed fire severity in the ponderosa pine and piñon-juniper zone, Figure S13: Reconstructed fire severity in the pine zone, Figure S14: Reconstructed fire severity in the dry mixed conifer zone, Figure S15: Reconstructed fire severity in the moist mixed conifer zone, Figure S16: Reconstructed old-growth forests of the pine and piñon-juniper zone in the study area, Figure S17: Reconstructed old-growth forests of the pine zone in the study area, Figure S18: Reconstructed old-growth forests of the dry mixed conifer zone in the study area, Figure S19: Reconstructed old-growth forests of the moist mixed conifer zone in the study area, Figure S20: Cross-validation of the GLO fire severity reconstruction with woodlands and fires mapped in early forest atlases, Figure S21: Cross-validation of the GLO old-growth reconstruction with woodlands, representing mixed- to high-severity fires, mapped in 1908–1909 forest atlases, Text S1: Limitations and critiques of GLO reconstructions, and Data S1: The datasets used in the study.

**Funding:** This research received no external funding.

**Acknowledgments:** Field research could not have been completed without the excellent assistance of Ted Bartlett. I appreciate helpful assistance with historical documents by the Center of Southwest Studies, Fort Lewis College, Durango, Colorado, and the National Archives and Records Administration, Broomfield, Colorado. Mark Roper and other staff at the San Juan National Forest, Durango, Colorado, were very helpful with GIS data and early records. I appreciate the helpful comments of three anonymous peer reviewers.

**Conflicts of Interest:** The author declares no conflict of interest.

## References

1. Williams, M.A.; Baker, W.L. Spatially extensive reconstructions show variable-severity fire and heterogeneous structure in historical western United States dry forests. *Glob. Ecol. Biogeogr.* **2012**, *21*, 1042–1052. [CrossRef]
2. Odion, D.C.; Hanson, C.T.; Arsenault, A.; Baker, W.L.; DellaSala, D.A.; Hutto, R.L.; Klenner, W.; Moritz, M.A.; Sherriff, R.L.; Veblen, T.T.; et al. Examining historical and current mixed-severity fire regimes in ponderosa pine and mixed-conifer forests of western North America. *PLoS ONE* **2014**, *9*, e87852. [CrossRef] [PubMed]
3. Baker, W.L.; Williams, M.A. Land surveys show regional variability of historical fire regimes and dry forest structure of the western United States. *Ecol. Appl.* **2018**, *28*, 284–290. [CrossRef] [PubMed]
4. Covington, W.W.; Moore, M.M. Southwestern ponderosa forest structure: Changes since Euro-American settlement. *J. For.* **1994**, *92*, 39–47.
5. Baker, W.L.; Veblen, T.T.; Sherriff, R.L. Fire, fuels and restoration of ponderosa pine–Douglas-fir forests in the Rocky Mountains. *J. Biogeogr.* **2007**, *34*, 251–269. [CrossRef]
6. Hessburg, P.F.; Salter, R.B.; James, K.M. Re-examining fire severity relations in pre-management era mixed conifer forests: Inferences from landscape patterns of forest structure. *Landsc. Ecol.* **2007**, *22*, 5–24. [CrossRef]
7. Baker, W.L. Historical fire regimes in ponderosa pine and mixed-conifer landscapes of the San Juan Mountains, Colorado, USA, from multiple sources. *Fire* **2018**, *1*, 23. [CrossRef]
8. Schulte, L.A.; Mladenoff, D.J. The original US public land survey records: Their use and limitations in reconstructing presettlement vegetation. *J. For.* **2001**, *99*, 5–10.
9. Butler, S.A.; McDonald, L.L. Unbiased systematic sampling plans for the line intercept method. *J. Range Manag.* **1983**, *36*, 463–468. [CrossRef]

10. U.S. Bureau of Land Management. Data Navigator. Available online: https://navigator.blm.gov/home (accessed on 24 October 2019).
11. Livermore, M. *Fictitious Surveys*; P.O.B. Publishing Co.: Canton, MI, USA, 1991.
12. Romme, W.H.; Floyd, M.L.; Hanna, D. *Historical Range of Variability and Current Landscape Condition Analysis: South-Central Highlands Section, Southwestern Colorado & Northwestern New Mexico*; Colorado Forest Restoration Institute, Colorado State University: Fort Collins, CO, USA, 2009.
13. Baker, W.L. Indians and fire in the Rocky Mountains: The wilderness hypothesis renewed. In *Fire, Native Peoples, and the Natural Landscape*; Vale, T.R., Ed.; Island Press: Washington, DC, USA, 2002; pp. 41–76.
14. Paulson, D.D.; Baker, W.L. *The Nature of Southwestern Colorado: Recognizing Human Legacies and Restoring Natural Places*; University Press of Colorado: Boulder, CO, USA, 2006.
15. Dubois, C. *Report on the Proposed San Juan Forest Reserve, Colorado*; Unpublished Report; San Juan National Forest: Durango, CO, USA, 1903.
16. Dubois, C. *The Proposed Montezuma Forest Reserve: Examination, Report, and Recommendations*; Bureau of Forestry, U.S. Department of Agriculture, National Archives and Records Administration: Broomfield, CO, USA, 1904.
17. Chappell, G.S. *Logging along the Denver & Rio Grande: Narrow Gauge Logging Railroads of Southwestern Colorado and Northern New Mexico*; Colorado Railroad Museum: Golden, CO, USA, 1971.
18. Anonymous. Yellow pine in the southwest. *For. Irrig.* **1905**, *11*, 120–124.
19. Baker, W.L. Historical forest structure and fire in Sierran mixed-conifer forests reconstructed from General Land Office survey data. *Ecosphere* **2014**, *5*, 79. [CrossRef]
20. Williams, M.A.; Baker, W.L. Testing the accuracy of new methods for reconstructing historical structure of forest landscapes using GLO survey data. *Ecol. Monogr.* **2011**, *8*, 63–88. [CrossRef]
21. Williams, M.A.; Baker, W.L. Bias and error in using survey records for ponderosa pine landscape restoration. *J. Biogeogr.* **2010**, *37*, 707–721. [CrossRef]
22. Baker, W.L. *The Landscapes They are a-Changin': Severe 19th-Century Fires, Spatial Complexity, and Natural Recovery in Historical Landscapes on the Uncompahgre Plateau*; CFRI-1704, Colorado Forest Restoration Institute, Colorado State University: Fort Collins, CO, USA, 2017.
23. Delincé, J. Robust density estimation through distance measurements. *Ecology* **1986**, *67*, 1576–1581. [CrossRef]
24. Baker, W.L. Implications of spatially extensive historical data from surveys for restoring dry forests of Oregon's eastern Cascades. *Ecosphere* **2012**, *3*, 23. [CrossRef]
25. Williams, M.A.; Baker, W.L. High-severity fire corroborated in historical dry forests of the western United States: Response to Fulé et al. *Glob. Ecol. Biogeogr.* **2014**, *23*, 831–835. [CrossRef]
26. Matonis, M.S.; Binkley, D.; Tuten, M.; Cheng, T. *The Forests They Are a-Changin'-Ponderosa Pine and Mixed Conifer Forests on the Uncompahgre Plateau in 1875 and 2010–13*; Colorado Forest Restoration Institute, Colorado State University: Fort Collins, CO, USA, 2014.
27. Woolsey, T.S., Jr. *Western Yellow Pine in Arizona and New Mexico*; USDA Forest Service Bulletin 101, U.S. Government Printing Office: Washington, DC, USA, 1911.
28. Pearson, G.A. The role of aspen in the reforestation of mountain burns in Arizona and New Mexico. *Plant World* **1914**, *17*, 249–260.
29. Margolis, E.Q.; Swetnam, T.W.; Allen, C.D. A stand-replacing fire history in upper montane forests of the southern Rocky Mountains. *Can. J. For. Res.* **2007**, *37*, 2227–2241. [CrossRef]
30. Binkley, D.; Alsanousi, A.; Romme, W.H. Age structure of aspen forests on the Uncompahgre Plateau, Colorado. *Can. J. For. Res.* **2014**, *44*, 836–841. [CrossRef]
31. Brown, H.E. Gambel oak in west-central Colorado. *Ecology* **1958**, *39*, 317–327. [CrossRef]
32. Baker, W.L. *Fire Ecology in Rocky Mountain Landscapes*; Island Press: Washington, DC, USA, 2009.
33. Baker, F.S.; Korstian, C.F. *Suitability of Brush Lands in the Intermountain Region for the Growth of Natural or Planted Western Yellow Pine Forests*; USDA Technical Bulletin No. 256, U.S. Government Printing Office: Washington, DC, USA, 1931.
34. Agee, J.K. *Fire Ecology of Pacific Northwest Forests*; Island Press: Washington, DC, USA, 1993.
35. Baker, W.L. Historical Northern spotted owl habitat and old-growth dry forests maintained by mixed-severity wildfires. *Landsc. Ecol.* **2015**, *30*, 655–666. [CrossRef]

36. Mehl, M.S. Old-growth descriptions for the major forest cover types in the Rocky Mountain region. In *Old-Growth Forests in the Southwest and Rocky Mountain Regions, Proceedings of a Workshop*; Kaufmann, M.R., Moir, W.H., Bassett, R.L., Eds.; USDA Forest Service General Technical Report RM-213; Rocky Mountain Forest and Range Experiment Station: Fort Collins, CO, USA, 1992; pp. 106–120.
37. Popp, J.B.; Jackson, P.D.; Bassett, R.L. Old-growth concepts from habitat type data in the Southwest. In *Old-Growth Forests in the Southwest and Rocky Mountain Regions, Proceedings of a Workshop*; Kaufmann, M.R., Moir, W.H., Bassett, R.L., Eds.; USDA Forest Service General Technical Report RM-213; Rocky Mountain Forest and Range Experiment Station: Fort Collins, CO, USA, 1992; pp. 100–105.
38. Moore, M.M.; Huffman, D.W.; Fulé, P.Z.; Covington, W.W.; Crouse, J.E. Comparison of historical and contemporary forest structure and composition on permanent plots in southwestern ponderosa pine forests. *For. Sci.* **2004**, *50*, 162–176.
39. Farris, C.A.; Baisan, C.H.; Falk, D.A.; Yool, S.R.; Swetnam, T.W. Spatial and temporal corroboration of a fire-scar-based fire history in a frequently burned ponderosa pine forest. *Ecol. Appl.* **2010**, *20*, 1598–1614. [CrossRef] [PubMed]
40. Fulé, P.Z.; Korb, J.E.; Wu, R. Changes in forest structure of a mixed conifer forest, southwestern Colorado, USA. *For. Ecol. Manag.* **2009**, *258*, 1200–1210.
41. Aoki, C.F. Fire History and Serotiny in the Rocky Mountains of Colorado. Master's Thesis, Colorado State University, Fort Collins, CO, USA, 2010.
42. Romme, W.H.; Floyd-Hanna, L.; Hanna, D.O.; Bartlett, E. Aspen's ecological role in the West. In *Sustaining Aspen in Western Landscapes: Symposium Proceedings*; Shepperd, W.D., Binkley, D., Bartos, D.L., Stohlgren, T.J., Eskew, L.G., Eds.; USDA Forest Service Proceedings RMRS-P-18, Rocky Mountain Research Station: Fort Collins, CO, USA, 2001; pp. 243–259.
43. Hanson, C.T.; Sherriff, R.L.; Hutto, R.L.; DellaSala, D.A.; Veblen, T.T.; Baker, W.L. Setting the stage for mixed- and high-severity fire. In *The Ecological Importance of Mixed-Severity Wildfires: Nature's Phoenix*; DellaSala, D.A., Hanson, C.T., Eds.; Elsevier: Amsterdam, The Netherlands, 2015; pp. 3–22.
44. Hessburg, P.F.; Spies, T.A.; Perry, D.A.; Skinner, C.N.; Taylor, A.H.; Brown, P.M.; Stephens, S.L.; Larson, A.J.; Churchill, D.J.; Povak, N.A.; et al. Tamm Review: Management of mixed-severity fire regime forests in Oregon, Washington, and northern California. *For. Ecol. Manag.* **2016**, *366*, 221–250. [CrossRef]
45. Williams, M.A.; Baker, W.L. Comparison of the higher-severity fire regime in historical (A.D. 1800s) and modern (A.D. 1984–2009) montane forests across 624,156 ha of the Colorado Front Range. *Ecosystems* **2012**, *15*, 832–847. [CrossRef]
46. Williams, M.A.; Baker, W.L. Variability of historical forest structure and fire across ponderosa pine landscapes of the Coconino Plateau and south rim of Grand Canyon National Park, Arizona, USA. *Landsc. Ecol.* **2013**, *28*, 297–310. [CrossRef]
47. Baker, W.L. Are high-severity fires burning at much higher rates recently than historically in dry-forest landscapes of the western USA? *PLoS ONE* **2015**, *10*, e0136147.
48. Sherriff, R.L.; Platt, R.V.; Veblen, T.T.; Schoennagel, T.L.; Gartner, M.H. Historical, observed, and modeled wildfire severity in montane forests of the Colorado Front Range. *PLoS ONE* **2014**, *9*, e106971. [CrossRef]
49. Tepley, A.J.; Veblen, T.T. Spatiotemporal fire dynamics in mixed-conifer and aspen forests in the San Juan Mountains of southwestern Colorado, USA. *Ecol. Monogr.* **2015**, *85*, 583–603. [CrossRef]
50. Kulakowski, D.; Veblen, T.T.; Drinkwater, S. The persistence of quaking aspen (*Populus tremuloides*) in the Grand Mesa area, Colorado. *Ecol. Appl.* **2004**, *14*, 1603–1614. [CrossRef]
51. Veblen, T.T.; Kitzberger, T.; Donnegan, J. Climatic and human influences on fire regimes in ponderosa pine forests in the Colorado Front Range. *Ecol. Appl.* **2000**, *10*, 1178–1195. [CrossRef]
52. DeBuys, W.; Allen, C.D. A historical chronology of events and observations for the Pecos Wilderness in the Territorial period. *N. M. Hist. Rev.* **2015**, *90*, 415–487.
53. Morrow, R.J. Age Structure and Spatial Pattern of Old-Growth Ponderosa Pine in Pringle Falls Experimental Forest, Central Oregon. Master's Thesis, Oregon State University, Corvallis, OR, USA, 1986.
54. DellaSala, D.A.; Hanson, C.T. (Eds.) *The Ecological Importance of Mixed-Severity Fires, Nature's Phoenix*; Elsevier: Amsterdam, The Netherlands, 2015.
55. Baker, W.L. Transitioning western U.S. dry forests to limited committed warming with bet-hedging and natural disturbances. *Ecosphere* **2018**, *9*, e02288. [CrossRef]

56. Wu, R. Fire History and Forest Structure in the Mixed Conifer Forests of Southwest Colorado. Master's Thesis, Colorado State University, Fort Collins, CO, USA, 1999.
57. Baker, W.L.; Williams, M.A. Bet-hedging dry-forest resilience to climate-change threats in the western USA based on historical forest structure. *Front. Ecol. Evol.* **2015**, *2*, 88. [CrossRef]
58. Dugan, A.J.; Baker, W.L. Sequentially contingent fires, droughts, and pluvials structured a historical dry forest landscape and suggest future contingencies. *J. Veg. Sci.* **2015**, *26*, 697–710. [CrossRef]
59. Romme, W.H.; Jamieson, D.W.; Redders, J.S.; Bigsby, G.; Lindsey, J.P.; Kendall, D.; Cowen, R.; Kreykes, T.; Spencer, A.W.; Ortega, J.C. Old-growth forests of the San Juan National Forest in southwestern Colorado. In *Old-Growth Forests in the Southwest and Rocky Mountain Regions, Proceedings of a Workshop*; Kaufmann, M.R., Moir, W.H., Bassett, R.L., Eds.; USDA Forest Service General Technical Report RM-213; Rocky Mountain Forest and Range Experiment Station: Fort Collins, CO, USA, 1992; pp. 154–165.
60. Swanson, M.E.; Franklin, J.F.; Beschta, R.L.; Crisafulli, C.M.; DellaSala, D.A.; Hutto, R.L.; Lindenmayer, D.B.; Swanson, F.J. The forgotten stage of forest succession: Early-successional ecosystems on forest sites. *Front. Ecol. Environ.* **2011**, *9*, 117–125. [CrossRef]
61. Battaglia, M.A.; Gannon, B.; Brown, P.M.; Fornwalt, P.J.; Cheng, A.S.; Huckaby, L.S. Changes in forest structure since 1860 in ponderosa pine dominated forests in the Colorado and Wyoming Front Range, USA. *For. Ecol. Manag.* **2018**, *422*, 147–160. [CrossRef]
62. Schoennagel, T.; Balch, J.K.; Brenkert-Smith, H.; Dennison, P.E.; Harvey, B.J.; Krawchuk, M.A.; Mietkiewicz, N.; Morgan, P.; Moritz, M.A.; Rasker, R.; et al. Adapt to more wildfire in western North American forests as climate changes. *Proc. Nat. Acad. Sci. USA* **2017**, *114*, 4582–4590. [CrossRef]
63. McWethy, D.B.; Schoennagel, T.; Higuera, P.E.; Krawchuk, M.; Harvey, B.J.; Metcalf, E.C.; Schulz, C.; Miller, C.; Metcalf, A.L.; Buma, B.; et al. Rethinking resilience to wildfire. *Nat. Sustain.* **2019**, in press. [CrossRef]
64. Graham, R.T.; Asherin, L.A.; Battaglia, M.A.; Jain, T.B.; Mata, S.A. *Mountain Pine Beetles: A Century of Knowledge, Control Attempts, and Impacts Central to the Black Hills*; USDA Forest Service General Technical Report RMRS-GTR-353; Rocky Mountain Research Station: Fort Collins, CO, USA, 2016.


© 2019 by the author. Licensee MDPI, Basel, Switzerland. This article is an open access article distributed under the terms and conditions of the Creative Commons Attribution (CC BY) license (http://creativecommons.org/licenses/by/4.0/).

Date submitted (UTC-11): 3/12/2021 12:00:00 AM
First name: Karel
Last name: Buckley
Organization:
Title:
Comments:
Forest Health - Salter Vegetation Management Project #57671

Comment period till 3/12/21

Forest maintenance is necessary however time of the year is difficult to plan around. Forest dweller's breeding & nesting and weather / time of the year.

My concern with any forestry work ie. mulching, cutting timber, etc is the time frame.

Last year 2020 work was done elsewhere in the San Juan Forest during nesting and rearing of birds & baby squirrels, etc. It was heart breaking to see their needed brushy habitat destroyed. Tall ancient oak under story was mulched.

Birds nest till end June. Small mountain owls fledge in June & July.

I doubt machinery operators are trained to look for cavity dwellers and nests among foliage, thus destroying eggs and nestlings, etc.

Last year I found & photographed proof of late June nests in the Chicken Creek logging area.

Please factor in nesting & breeding seasons. I know you know there are laws regarding this.

Addendum: 3/12/21

I also very seriously question the trees / acre that are being taken. I know the cut areas, at Chicken Creek & close to the Bible Camp on Forest Service Rd 559, I believe) look bare.

It seems close to clear cut to me. How can the ground maintain moisture with full sun. As I stated previously, we are in a documented "severe multiyear drought'. I question to age of this forest maintenance plan.

Date submitted (UTC-11): 3/12/2021 12:00:00 AM
First name: Jimbo
Last name: Buickerood
Organization: San Juan Citizens Alliance
Title: Program Manager
Comments:
Please find two attached documents: SJCA's Draft EA comments and Appx A: SJCA Scoping Comments

March 12, 2021

Dolores Ranger District

San Juan National Forest

Attention: Derek Padilla

29211 Highway184

Dolores, CO 81323

RE: SJCA Comments on Draft Environmental Assessment for the Salter Vegetation

Management Project - 57671

Dolores District Staff,

Thank you for considering our comments on the Salter Project.

We have framed many of our comments utilizing the so-called "three-legged stool" that USFS staff often refer to as a basis for their management planning and project implementation - the combined social, economic and ecologic context of a project, or SEE. We agree that addressing all of the SEE issues should be a priority for the Salter project, yet as we have discovered through a review of the Draft EA and associated documents the project does not meet muster in this regard. Unfortunately, our review of the EA also reveals that it misses addressing critical and relevant issues and is deficient in sharing with the public all of the necessary background and foundational information needed for this type of decision document. Our comments will address these informational shortcomings as well as recommend a way forward towards a balanced and scientifically-based decision for the 22,000+ acre Salter Project landscape.

Lack of Data and Related Analysis

Forest/Vegetation Conditions

While the current forest/vegetation conditions of the Salter project area are described in narrative form in the EA, it is described in a general manner and we can find nothing in the EA or associated documents that provides specificity regarding the current conditions. Common stand exam, other types of survey results, and/or other data that provides more detail that a narrative description is necessary for this type of EA both to comply with NEPA standards and to support the public in providing informed comments. In very basic terms, if the starting (current) point is not known than the ability to comment on how best (project treatment design) to reach the desired conditions is not possible.

Economic Information

The EA also lacks the necessary information regarding a wide variety of economic metrics that are necessary to make informed comments on the EA. The EA provides, once again, a narrative description of the wood products industry that provide some insight into this component of the overall economic picture of the project, however, we find no information related to what the project might entail regarding the number of possible employment opportunities, the estimated dollar amount of contracts, the possible economic impacts (positive and negative) to local/regional towns and counties as related to the project, etc. Most troubling is the entirely missing component of non-wood products industry related information, either in narrative or numeric form. The

general impression shed by this NEPA document is that the wood products industry "stands alone" and that the project as envisioned is a "siloed" entity per its interactions with other uses of the forest lands including hunting, biking, hiking, camping, firewood collection, access to boating, etc.

No attempt has been made to quantify the economic value of existing uses of the national forest in the Salter area. Determinations of this information is entirely possible, in fact, the Region 9 Economic Development District is specifically organized to provide this type of information to the community as need for planning purposes, the exact need of this EA. Even amongst the scores of comment letters the public has submitted on this project there are private citizens who are attempting to place dollar values on the diverse recreation economy that now exists in the region, an economy that exists thanks to the visionary planning and determined hard work of elected officials, business entities and hundreds of volunteers from Montezuma County. It is difficult not to assess that the agency has their "head in the sand" when it comes to recognizing the strong recreational economy in the Dolores area based on both residents and visitors with a huge emphasis being on the Boggy Draw trail system.

We find the determination of a Finding of No Significant Impact (FONSI) to be invalid being the EA provides insufficient information on which to make that finding. We believe that it would have been possible to move forward with a project of this scope and complexity as an EA rather and an Environmental Impact Statement (EIS) should a diversity of economic information and related analysis have been provided, and therefore (and with using that metric) now recommend that an EIS is necessary as that is the only avenue to fold in the necessary economic data and analysis for a determination of project design that address the full spread of economic activity and interests in the Salter Project landscape and adjacent affected federal and private lands. The Dolores District had every opportunity to assess numerous conditions and metrics related to this NEPA process and failed to carry forth their responsibility to do so.

Purpose and Need Statement (PNS)

We are exceptionally disappointed that the PNS has not significantly evolved since the scoping document and remains too narrow in its scope. In our scoping comments (3.22.2020 - attached as an appendix) we provided specific suggestions for broadening the scope of the PNS to better reflect a more diverse set of goals that can and should be guidance for the proposed project. We're unsure as to why there is apparent resistance within the agency to a more comprehensive PNS that would more accurately reflect a project that needs to better reflect the social, economic and ecologic aspects of what should necessarily be goals of the project. There is no specific reference to climate, none per restoration, nothing per WUI, and none that recognizes the substantial nature of this multiple use area and it's economic standing in the county. The unfortunate takeaway from this narrow PNS is that the project is intended only to be a timber harvest proposal with no apparent reverence shown to the wider community and their interests. It can and should be much more than that, but without a clear PNS statement to guide the project in light of a much wider set on purposes and needs, it is not.

While we heard District Ranger Padilla specifically comment at the virtual public meeting on March 10, 2021 that the PNS is not open to comment during the Draft EA comment period we are specifically "pushing on" the inadequacy and narrowness of the PNS due to the reality that it is the central framing statement of the EA. By "sticking to" the initial PNS the Dolores District is unfortunately showing a myopic approach to both the wider potential benefits and inherent challenges of this project as framed in the SEE context. The agency must and can do better.

Response to Scoping Comments

I have not fully assessed the alignment between what topics were brought forth during the scoping period by commenters, however, from matching only SJCA scoping comments and those of a couple other commenters it seems apparent that many issues brought forth were never even acknowledged in the EA as salient issues. And these issues were certainly not addressed as significant issues relative to the SEE context of the projects - local non-wood products industry economics, climate issues, restoration prescriptions, and others. Unfortunately, my takeaway is increasingly being one that scoping comments are only a "check-off" within the NEPA process rather input for the agency to incorporate into the process. During the Lone Pine NEPA process there was a significant dismissal of scoping input and though we do not have the all of the details in hand per the Salter process and the range of issues brought forth in scoping comments, a "repeat" of the Lone Pine process per the dismissal of scoping seems to be the reality.

NEPA Alternatives

Unless we missed something in the EA, we find that it only includes one Alternative other than the legally required No Action Alternative. Although there is mention of an Alternative 3, it is not even listed and explained in "Section 2 - Proposed Action and Alternatives" therefore is delegitimized as an Alternative under consideration by the agency and certainly indicates the pre-decisional mindset of the Dolores District. It should be clear to the USFS staff that a legitimate Alternative needs to fully described to serve as an Alternative that can be commented upon by the public, not to mention to serve as a possible alternative management choice to the Proposed Action. On page 32 of the EA it states: "This alternative is referred to as Alternative 3 - Large Tree Retention in the Environmental Effects section of this assessment. There are no other differences between Alternative 2 and Alternative 3." Once again, legitimate Alternatives should all be listed in the relevant Section 2 of the EA, not randomly detailed in the Environmental Effects section.

Climate Issues

The EA is almost entirely silent on how the project interfaces with a variety of aspects related to the he changing climate despite specific the scoping comments of ours (and likely others. While the climate models, including those presented to the DWRF Collaborative by USFS researcher Jim Worrall, indicate a very severe decline in the extent of the ponderosa forest type in the next few decades there is no mention of this project reality in the EA. While the intended increase in resilience of the ponderosa forest seems to be an intended outcome of the Salter project, we find nothing in the project that indicates that attention is being given to the possible loss of the ponderosa forest including what adaptation measures might be considered in light of the climate models. From what we had read in the EA the approach seems rather to be to proceed with blinders on per the imminent (and now current) climate change impacts. The EA proceeds "merely forth" with the supposition that the ponderosa forests will seemingly be there in perpetuity with intended 20-25 year cutting cycles which according to the agency's own science is not the likely future scenario.

Current Conditions

In our scoping comments we specifically called out the need to provide detailed information about the current conditions within the project area, because as it quite obvious it's impossible to examine and determine a project design to obtain the desired conditions when the starting point is not known. The EA does include significant sections of narrative outlining the current conditions of the project area, however, as helpful as the narrative is the data of, or derived from, the common stand exam data should be included in the EA directly, or within another document in the online public access project file. To be clear, public commenters should not be relegated to asking agency staff for specific data on which to base their comments.

Subsequent to the release of the EA a presentation (Salter_Draft_EA_DWRF_Presentation) was given to some stakeholders that included an array of information related to the current conditions. I'm fully baffled, and very disappointed that this information was not provided in the EA as it's exactly the type of information that should be included. It seems evident that the information had already been gathered and synthesized by agency staff, so it's disturbing it was not made available to the public directly in the EA when it was released. Anytime such basic and essential data is not made available to the public the inevitably question arises, why not? Because the information provided in the aforementioned presentation was not included in the EA it will not be addressed in these comments. The lack of such data within the released EA on February 10 indicates yet another reason why a re-issue of a draft EA is indicated or a switch to an EIS be made.

Actions to Meet Desired Conditions

As we understand the project, a central aim is in general to increase the age and size diversity across the project landscape which is a fit with the desired conditions from the 2013 LRMP. Our understanding is that there are two particular size/age classes that are deficient representationally, seedlings/saplings and older/larger ponderosas. (though there is no stand data to quantify such). The younger cohort of trees will hopefully increase in their overall percentage of the stand as a result of numerous outcomes from project activities including a more supportive shading/sun mix, less competition from smaller ponderosas, soil disturbance providing bare ground and the backup (hopefully unnecessary) of planting. That said, regeneration challenges will be significant due to the drying and warming climatic trend.

While the actions and support for increasing the number of young ponderosas seems to be readily agreed upon by a spectrum of stakeholders, the approach to promoting and protecting ponderosas on the other end of the spectrum, the older and larger trees, remains surprisingly controversial. The older/larger trees provide a range of benefit to the forest including being seed sources, being most resistant to fires, and sometimes able to provide specific benefits to wildlife. Because not only are the older/larger ponderosas particularly beneficial, they also exist in fewer numbers ("Large trees, 27 inches in diameter and larger, are poorly represented with only a few trees per acre." EA at page 7.) there is a substantiated need to retain them across the landscape.

Unfortunately, the Salter Project design does not address the need to retain older/larger trees to meet the desired condition noted in the LRMP by providing a sufficiently stout methodology to retain all older/larger trees that are either not significantly diseased or beetle infested. Though the District evidently as a descending order protocol they may apply to the project (or some elements of the project) this information is not included in the EA - again, why not? While such a decision protocol could perhaps be a useful tool, it still provides inadequate protection to the thousands of the larger/older ponderosas that the EA states are "poorly represented" in the project area.

The lack of specific and unqualified (except for diseased and infested trees) direction to maintain all older/larger trees is unjustifiable if he agency is sincere in its professed goal of reaching a more diverse age/class/size structure in the Salter area. The reasoning behind this disinterest in stipulating a size/age metric was described to me (David Casey, Dolores District silviculturist, February 2021) was that the inherent inflexibility of a diameter cap (on large trees) significantly decreases the ability to reach treatment targets such as basal area (BA) goals.

Frankly this defense for a "no-diameter cap" approach seems nonsensical to me. If the issue of concern is the inability to reach a basal area goal per acre, that is hardly an excuse to cut larger/older trees. Because older/larger trees are so "poorly represented" as explained in the EA, it would likely be rare that the density of large trees would prevent reaching a BA goal if the BA target was spread across several acres. Certainly, numerous desired condition goals are not and cannot be reached on every individual acre of the project area, and as such a relative high density or larger trees situated in a somewhat tight configuration spatially need not necessitate their removal to reach a BA goal. The EA indicates in some of it's narrative that there is flexibility to apply prescriptions as necessary to adapt to variety of localized conditions such as site indices, but evidently this does not apply to the retention of older/larger ponderosas.

In sum, we believe there are numerous reasons in the SEE context to retain larger trees. Ecologically, retaining older/larger trees matches the need to increase biologic diversity across the ponderosa pine landscape which would include the desire to more closely reach the historic range of variability that certainly included many old and large ponderosas (including old, large tree) before fire suppression became a commonplace management scheme. Socially, forest visitors as a whole seem often to be thrilled by encountering old/large trees - it seems almost everyone has special appreciations for such old and large elements of the forested landscape. Economically, hopefully we are finally on the cusp of understanding, designing and implementing economics-related measures that are based on sustainability. Retaining older/larger trees can help to provide support for a sustained and healthy ponderosa forest on the landscape that can in turn support the full array of economic benefits provided by multiple forest uses and resources. Sure, a lot of large trees could be harvested to provide short-term financial gain, however, that short-term "take" is not comparable to the long-term value of a sustained and healthy forest providing wood products a return interval. And yes, younger/smaller trees might grow into older/larger trees, but in the rapidly changing world induced by climate change there are many unknowns over the horizon. We did not predict the significantly large beetle outbreak occurring now across much of the pine belt in the Dolores District, and we truly don't know what "twist n's turns" might be on their way - betting that the current crop of smaller trees will necessarily become the older and larger trees of "yesteryear" does not have certainty that it did decades ago. Other than increasing the profits to the timber contractors that will likely already be sufficiently compensated there is no need - either socially, economically or ecologically to harvest old and large trees.

As stated in the EA, there is no intention or goal of reaching desired conditions across most of the ponderosa landscape with a single entry and though it is incredibly hard to conceive how too many old and large trees might "gum up the works" as we pursue an increase diversity in the structure of the ponderosa forest the agency evidently believes that retaining most of the older/larger trees is not a desirable goal.

We disagree that the assertion made on page of the EA that "Diameter caps were also used which limited prescriptions in meeting the full intent for uneven aged management and economically stabile harvests." (Page 8) is relevant to the current situation. This page reference is made to the Ponderosa Pine Partnership (PPP) prescription and harvest activity of the 1990's, an effort that was curtailed and then terminated due to a lack of local industry - hence there was not sufficient time to attempt to reach program goals making it only a partially helpful model for comparative purposes. The PPP effort included a restoration goal, a goal that certainly is applicable to the Salter Project landscape should the agency truly be serious about reaching the desired conditions in a timely manner. To dismiss diameter caps as a management tool due to the PPP experience is "iffy" at best.

The Salter EA contains no information or mention about possible old growth in the project area and therefore we don't know if there is indeed a lack of old growth or if this is an informational omission. Though there is narrative in the EA that indicates that old trees are "underrepresented" that does not necessarily indicate that there is no ponderosa old growth in the project area as described by DBH, spatial density, age, etc. in literature. Due to the lack of information made available we cannot assert that the EA's project design criteria are prohibited by the forest plan, but we do note the forest plan goal: "2.2.7 Old growth ponderosa pine, old growth pinyon-juniper and old growth warm-dry mixed conifer forests are more abundant, occupy more acreage, and are well distributed on SJNF and TRFO lands." Unfortunately, the EA is again deficient on important information to understand the characteristics of the landscape and with that creates a dynamic that makes is impossible to fully understand the possible and proposed actions of the project including its short term, long term and cumulative effects.

Diversity of Economic Interests

Unfortunately, the EA draws an overly tight focus on the economic consequences of the project proposal as related to the wood products industry and almost entirely dismisses the other local economic drivers, most of which are recreation oriented. Hunting, biking, boating (access to McPhee Reservoir), hiking, camping and others are currently very significant in terms of their economic benefit to the region, particularly the town of Dolores.

Additional "sideboards" are needed to protect the Town of Dolores's and Montezuma County's economic and social interests. As a small town adjacent to the national forest, Dolores's economy and lifeways for both residents and visitors are tightly connected to the array of forest activities and resources. As we interpret the design criteria and the associated action that the EA would enable, the Dolores tourism/visitor economy could very well be "runover by logging trucks." Other than the on-the-ground conditions based travel closures that are possible (and likely probable) in later winter/early spring, the EA states there will be closures only for specific federal holidays which amount to 10 or so days annually. Somewhere in the mix evidently there is a commitment to a project activity closure around Escalante Days, too. With weekend days all being possible work days with the exception of the holidays mentioned above, the possibility exists for 9 (to many more - perhaps 15) logging trucks rolling through town every day of the week for 80% (figuring a two month winter/spring closure) of the year in Dolores.

This heavy impact on Dolores town residents, businesses and travelers and all users north of town on the county and USFS road system is excessive and an imbalance amongst forest users and the access and use of forest resources. To provide at least a minimal amount of adjustment to the local road use we would suggest that all Sundays through the year be established as "non-project road use days for heavy equipment/truck use." This would give every local/regional resident and visitor the knowledge (and relief) that they could visit Boggy Draw, McPhee Reservoir access through the Dolores access point, other national forest lands, Granath Mesa, and private properties on Sundays throughout the year without the added stress and worry of negotiating a somewhat narrow and mostly unpaved two lane road.

The Town of Dolores may have additional suggestions for time periods during which road closures for project traffic should be utilized and those should be approved as well. The economic and social well-being of Dolores will not gain much from the Salter Project activities in an economic sense and must not take the brunt of the project's financial gains that will necessarily be distributed either elsewhere in the county, or even in other counties.

Conclusion

We are extremely disappointed in the quality of this Environmental Assessment. This disappointment is heightened by knowing the lengthy period of time it took to develop the document, the wide array of agency staff involved, the numerous presentations and discussions that were engaged with the DWRF Collaborative on the project, the associated field tours, and other efforts made in behalf of creating the document. While the EA has an extensive narrative explaining various components of the proposed project, there is a lack of specifics on numerous critical components of the project as well as there being complete voids of information for some key topics (climate, non-forest industry economics, WUI, etc.) There is almost no mention of the benefits of the project as it relates to the possible reduction of wildfire risk - this despite the reality that this component could certainly be one of the agency's "best marketing" components of the plan - as pointed out by a local municipal official.

The diversity of issues in play and topics needing to be shared with the public, as well as analyzed, is much more than this EA accomplishes. We would recommend a rewrite of the EA with the aim of the second draft being a much more through document, or even perhaps engaging the project planning with an EIS if it is determined that the diversity and depth of issues in play necessitates this level of attention. An insufficient effort to gather, analyze and share relevant information has the possibility of bringing forth significant economic hardship to the Town of Dolores, a very unhappy (perhaps angry) recreational user public, a mistargeted ecological outcome, and other undesirable outcomes.

The agency had it fully within it's possible grasp to design a project that could find adequate balance on the social-economic-ecological "stool," however, the project explained in this EA does not reach that goal. That lack of attainment leads me to wonder "how could that be?" - but I will speculate that too much deference is being given to the wood products industry and their interests in desiring "as much flexibility as possible" to most easily reach their desired profits. Meanwhile, not enough credence to both the other forest users and the ecological well-being of the forest has been recognized and supported in the project design. Can the balance of the stool we readjusted - perhaps "yes', but it will entail the industry living with some additional sideboards and frankly we're doubtful that the agency has the resolve to carry through with that approach.

The Dolores District is receiving scores of comments on this EA - the public is engaged, paying attention and will be closely tuned to the agency's actions relative to this project. The public comments contain a plethora of concerns, solutions and creative ideas to morph this project to one that is balanced on the SEE stool - we'll see soon enough if the Dolores District and the San Juan National Forest is up to this challenge.

Sincerely,

Jimbo Buickerood

Program Manager

Lands and Forest Protection

jimbo@sanjuancitizens.org

ATTACHMENT: Appendix A: SJCA Scoping Salter Project Scoping Comments 3.22.2020

SAN JUAN CITIZENS ALLIANCE
1309 East Third Avenue
PO Box 2461
Durango, CO 81302
970.259.3583
sanjuancitizens.org

March 12, 2021

Dolores Ranger District
San Juan National Forest
Attention: Derek Padilla
29211 Highway184
Dolores, CO 81323

RE: SJCA Comments on Draft Environmental Assessment for the Salter Vegetation Management Project - 57671

Dolores District Staff,

Thank you for considering our comments on the Salter Project.

We have framed many of our comments utilizing the so-called "three-legged stool" that USFS staff often refer to as a basis for their management planning and project implementation - the combined social, economic and ecologic context of a project, or SEE. We agree that addressing all of the SEE issues should be a priority for the Salter project, yet as we have discovered through a review of the Draft EA and associated documents the project does not meet muster in this regard. Unfortunately, our review of the EA also reveals that it misses addressing critical and relevant issues and is deficient in sharing with the public all of the necessary background and foundational information needed for this type of decision document. Our comments will address these informational shortcomings as well as recommend a way forward towards a balanced and scientifically-based decision for the 22,000+ acre Salter Project landscape.

**Lack of Data and Related Analysis**

<u>Forest/Vegetation Conditions</u>

While the current forest/vegetation conditions of the Salter project area are described in narrative form in the EA, it is described in a general manner and we can find nothing in the EA or associated documents that provides specificity regarding the current conditions. Common stand exam, other types of survey results, and/or other data that provides more detail that a narrative description is necessary for this type of EA both to comply with NEPA standards and to support the public in providing informed comments. In very basic terms, if the starting (current) point is not known than the ability to comment on how best (project treatment design) to reach the desired conditions is not possible.

Economic Information

The EA also lacks the necessary information regarding a wide variety of economic metrics that are necessary to make informed comments on the EA. The EA provides, once again, a narrative description of the wood products industry that provide some insight into this component of the overall economic picture of the project, however, we find no information related to what the project might entail regarding the number of possible employment opportunities, the estimated dollar amount of contracts, the possible economic impacts (positive and negative) to local/regional towns and counties as related to the project, etc. Most troubling is the entirely missing component of non-wood products industry related information, either in narrative or numeric form. The general impression shed by this NEPA document is that the wood products industry "stands alone" and that the project as envisioned is a "siloed" entity per its interactions with other uses of the forest lands including hunting, biking, hiking, camping, firewood collection, access to boating, etc.

No attempt has been made to quantify the economic value of existing uses of the national forest in the Salter area. Determinations of this information is entirely possible, in fact, the Region 9 Economic Development District is specifically organized to provide this type of information to the community as need for planning purposes, the exact need of this EA. Even amongst the scores of comment letters the public has submitted on this project there are private citizens who are attempting to place dollar values on the diverse recreation economy that now exists in the region, an economy that exists thanks to the visionary planning and determined hard work of elected officials, business entities and hundreds of volunteers from Montezuma County. It is difficult not to assess that the agency has their "head in the sand" when it comes to recognizing the strong recreational economy in the Dolores area based on both residents and visitors with a huge emphasis being on the Boggy Draw trail system.

We find the determination of a Finding of No Significant Impact (FONSI) to be invalid being the EA provides insufficient information on which to make that finding. We believe that it would have been possible to move forward with a project of this scope and complexity as an EA rather and an Environmental Impact Statement (EIS) should a diversity of economic information and related analysis have been provided, and therefore (and with using that metric) now recommend that an EIS is necessary as that is the only avenue to fold in the necessary economic data and analysis for a determination of project design that address the full spread of economic activity and interests in the Salter Project landscape and adjacent affected federal and private lands. The Dolores District had every opportunity to assess numerous conditions and metrics related to this NEPA process and failed to carry forth their responsibility to do so.

**Purpose and Need Statement (PNS)**

We are exceptionally disappointed that the PNS has not significantly evolved since the scoping document and remains too narrow in its scope. In our scoping comments (3.22.2020 – attached as an appendix) we provided specific suggestions for broadening the scope of the PNS to better reflect a more diverse set of goals that can and should be guidance for the proposed project. We're unsure as to why there is apparent resistance within the agency to a more comprehensive PNS that would more accurately reflect a project that needs to better reflect the social, economic and ecologic aspects of what should

necessarily be goals of the project. There is no specific reference to climate, none per restoration, nothing per WUI, and none that recognizes the substantial nature of this multiple use area and it's economic standing in the county. The unfortunate takeaway from this narrow PNS is that the project is intended only to be a timber harvest proposal with no apparent reverence shown to the wider community and their interests.
It can and should be much more than that, but without a clear PNS statement to guide the project in light of a much wider set on purposes and needs, it is not.

While we heard District Ranger Padilla specifically comment at the virtual public meeting on March 10, 2021 that the PNS is not open to comment during the Draft EA comment period we are specifically "pushing on" the inadequacy and narrowness of the PNS due to the reality that it is the central framing statement of the EA. By "sticking to" the initial PNS the Dolores District is unfortunately showing a myopic approach to both the wider potential benefits and inherent challenges of this project as framed in the SEE context. The agency must and can do better.

**Response to Scoping Comments**
I have not fully assessed the alignment between what topics were brought forth during the scoping period by commenters, however, from matching only SJCA scoping comments and those of a couple other commenters it seems apparent that many issues brought forth were never even acknowledged in the EA as salient issues. And these issues were certainly not addressed as significant issues relative to the SEE context of the projects – local non-wood products industry economics, climate issues, restoration prescriptions, and others. Unfortunately, my takeaway is increasingly being one that scoping comments are only a "check-off" within the NEPA process rather input for the agency to incorporate into the process. During the Lone Pine NEPA process there was a significant dismissal of scoping input and though we do not have the all of the details in hand per the Salter process and the range of issues brought forth in scoping comments, a "repeat" of the Lone Pine process per the dismissal of scoping seems to be the reality.

**NEPA Alternatives**
Unless we missed something in the EA, we find that it only includes one Alternative other than the legally required No Action Alternative. Although there is mention of an Alternative 3, it is not even listed and explained in "Section 2 - Proposed Action and Alternatives" therefore is delegitimized as an Alternative under consideration by the agency and certainly indicates the pre-decisional mindset of the Dolores District. It should be clear to the USFS staff that a legitimate Alternative needs to fully described to serve as an Alternative that can be commented upon by the public, not to mention to serve as a possible alternative management choice to the Proposed Action. On page 32 of the EA it states: "This alternative is referred to as Alternative 3 – Large Tree Retention in the *Environmental Effects* section of this assessment. There are no other differences between Alternative 2 and Alternative 3." Once again, legitimate Alternatives should all be listed in the relevant Section 2 of the EA, not randomly detailed in the Environmental Effects section.

**Climate Issues**

The EA is almost entirely silent on how the project interfaces with a variety of aspects related to the he changing climate despite specific the scoping comments of ours (and likely others. While the climate models, including those presented to the DWRF Collaborative by USFS researcher Jim Worrall, indicate a very severe decline in the extent of the ponderosa forest type in the next few decades there is no mention of this project reality in the EA. While the intended increase in resilience of the ponderosa forest seems to be an intended outcome of the Salter project, we find nothing in the project that indicates that attention is being given to the possible loss of the ponderosa forest including what adaptation measures might be considered in light of the climate models. From what we had read in the EA the approach seems rather to be to proceed with blinders on per the imminent (and now current) climate change impacts. The EA proceeds "merely forth" with the supposition that the ponderosa forests will seemingly be there in perpetuity with intended 20-25 year cutting cycles which according to the agency's own science is not the likely future scenario.

**Current Conditions**

In our scoping comments we specifically called out the need to provide detailed information about the current conditions within the project area, because as it quite obvious it's impossible to examine and determine a project design to obtain the desired conditions when the starting point is not known. The EA does include significant sections of narrative outlining the current conditions of the project area, however, as helpful as the narrative is the data of, or derived from, the common stand exam data should be included in the EA directly, or within another document in the online public access project file. To be clear, public commenters should not be relegated to asking agency staff for specific data on which to base their comments.

Subsequent to the release of the EA a presentation (Salter_Draft_EA_DWRF_Presentation) was given to some stakeholders that included an array of information related to the current conditions. I'm fully baffled, and very disappointed that this information was not provided in the EA as it's exactly the type of information that should be included. It seems evident that the information had already been gathered and synthesized by agency staff, so it's disturbing it was not made available to the public directly in the EA when it was released. Anytime such basic and essential data is not made available to the public the inevitably question arises, why not? Because the information provided in the aforementioned presentation was not included in the EA it will not be addressed in these comments. The lack of such data within the released EA on February 10 indicates yet another reason why a re-issue of a draft EA is indicated or a switch to an EIS be made.

**Actions to Meet Desired Conditions**

As we understand the project, a central aim is in general to increase the age and size diversity across the project landscape which is a fit with the desired conditions from the 2013 LRMP. Our understanding is that there are two particular size/age classes that are deficient representationally, seedlings/saplings and older/larger ponderosas. (though there is no stand data to quantify such). The younger cohort of trees will hopefully increase in their overall percentage of the stand as a result of numerous outcomes from project activities including a more supportive shading/sun mix, less competition from smaller ponderosas, soil disturbance providing bare ground and the backup (hopefully

unnecessary) of planting. That said, regeneration challenges will be significant due to the drying and warming climatic trend.

While the actions and support for increasing the number of young ponderosas seems to be readily agreed upon by a spectrum of stakeholders, the approach to promoting and protecting ponderosas on the other end of the spectrum, the older and larger trees, remains surprisingly controversial. The older/larger trees provide a range of benefit to the forest including being seed sources, being most resistant to fires, and sometimes able to provide specific benefits to wildlife. Because not only are the older/larger ponderosas particularly beneficial, they also exist in fewer numbers ("Large trees, 27 inches in diameter and larger, are poorly represented with only a few trees per acre." EA at page 7.) there is a substantiated need to retain them across the landscape.

Unfortunately, the Salter Project design does not address the need to retain older/larger trees to meet the desired condition noted in the LRMP by providing a sufficiently stout methodology to retain all older/larger trees that are either not significantly diseased or beetle infested. Though the District evidently as a descending order protocol they may apply to the project (or some elements of the project) this information is not included in the EA – again, why not? While such a decision protocol could perhaps be a useful tool, it still provides inadequate protection to the thousands of the larger/older ponderosas that the EA states are "poorly represented" in the project area.

The lack of specific and unqualified (except for diseased and infested trees) direction to maintain all older/larger trees is unjustifiable if he agency is sincere in its professed goal of reaching a more diverse age/class/size structure in the Salter area. The reasoning behind this disinterest in stipulating a size/age metric was described to me (David Casey, Dolores District silviculturist, February 2021) was that the inherent inflexibility of a diameter cap (on large trees) significantly decreases the ability to reach treatment targets such as basal area (BA) goals.

Frankly this defense for a "no-diameter cap" approach seems nonsensical to me. If the issue of concern is the inability to reach a basal area goal per acre, that is hardly an excuse to cut larger/older trees. Because older/larger trees are so "poorly represented" as explained in the EA, it would likely be rare that the density of large trees would prevent reaching a BA goal if the BA target was spread across several acres. Certainly, numerous desired condition goals are not and cannot be reached on every individual acre of the project area, and as such a relative high density or larger trees situated in a somewhat tight configuration spatially need not necessitate their removal to reach a BA goal. The EA indicates in some of it's narrative that there is flexibility to apply prescriptions as necessary to adapt to variety of localized conditions such as site indices, but evidently this does not apply to the retention of older/larger ponderosas.

In sum, we believe there are numerous reasons in the SEE context to retain larger trees. Ecologically, retaining older/larger trees matches the need to increase biologic diversity across the ponderosa pine landscape which would include the desire to more closely reach the historic range of variability that certainly included many old and large ponderosas (including old, large tree) before fire suppression became a commonplace management

scheme. Socially, forest visitors as a whole seem often to be thrilled by encountering old/large trees – it seems almost everyone has special appreciations for such old and large elements of the forested landscape. Economically, hopefully we are finally on the cusp of understanding, designing and implementing economics-related measures that are based on sustainability. Retaining older/larger trees can help to provide support for a sustained and healthy ponderosa forest on the landscape that can in turn support the full array of economic benefits provided by multiple forest uses and resources. Sure, a lot of large trees could be harvested to provide short-term financial gain, however, that short-term "take" is not comparable to the long-term value of a sustained and healthy forest providing wood products a return interval. And yes, younger/smaller trees might grow into older/larger trees, but in the rapidly changing world induced by climate change there are many unknowns over the horizon. We did not predict the significantly large beetle outbreak occurring now across much of the pine belt in the Dolores District, and we truly don't know what "twist n's turns" might be on their way – betting that the current crop of smaller trees will necessarily become the older and larger trees of "yesteryear" does not have certainty that it did decades ago. Other than increasing the profits to the timber contractors that will likely already be sufficiently compensated there is no need – either socially, economically or ecologically to harvest old and large trees.

As stated in the EA, there is no intention or goal of reaching desired conditions across most of the ponderosa landscape with a single entry and though it is incredibly hard to conceive how too many old and large trees might "gum up the works" as we pursue an increase diversity in the structure of the ponderosa forest the agency evidently believes that retaining most of the older/larger trees is not a desirable goal.

We disagree that the assertion made on page of the EA that "Diameter caps were also used which limited prescriptions in meeting the full intent for uneven aged management and economically stabile harvests." (Page 8) is relevant to the current situation. This page 8 reference is made to the Ponderosa Pine Partnership (PPP) prescription and harvest activity of the 1990's, an effort that was curtailed and then terminated due to a lack of local industry – hence there was not sufficient time to attempt to reach program goals making it only a partially helpful model for comparative purposes. The PPP effort included a restoration goal, a goal that certainly is applicable to the Salter Project landscape should the agency truly be serious about reaching the desired conditions in a timely manner. To dismiss diameter caps as a management tool due to the PPP experience is "iffy" at best.

The Salter EA contains no information or mention about possible old growth in the project area and therefore we don't know if there is indeed a lack of old growth or if this is an informational omission. Though there is narrative in the EA that indicates that old trees are "underrepresented" that does not necessarily indicate that there is no ponderosa old growth in the project area as described by DBH, spatial density, age, etc. in literature. Due to the lack of information made available we cannot assert that the EA's project design criteria are prohibited by the forest plan, but we do note the forest plan goal: "2.2.7 Old growth ponderosa pine, old growth pinyon-juniper and old growth warm-dry mixed conifer forests are more abundant, occupy more acreage, and are well distributed on SJNF and TRFO lands." Unfortunately, the EA is again deficient on important information to understand the characteristics of the landscape and with that creates a dynamic that makes

is impossible to fully understand the possible and proposed actions of the project including its short term, long term and cumulative effects.

**Diversity of Economic Interests**
Unfortunately, the EA draws an overly tight focus on the economic consequences of the project proposal as related to the wood products industry and almost entirely dismisses the other local economic drivers, most of which are recreation oriented. Hunting, biking, boating (access to McPhee Reservoir), hiking, camping and others are currently very significant in terms of their economic benefit to the region, particularly the town of Dolores.

Additional "sideboards" are needed to protect the Town of Dolores's and Montezuma County's economic and social interests. As a small town adjacent to the national forest, Dolores's economy and lifeways for both residents and visitors are tightly connected to the array of forest activities and resources. As we interpret the design criteria and the associated action that the EA would enable, the Dolores tourism/visitor economy could very well be "runover by logging trucks." Other than the on-the-ground conditions based travel closures that are possible (and likely probable) in later winter/early spring, the EA states there will be closures only for specific federal holidays which amount to 10 or so days annually. Somewhere in the mix evidently there is a commitment to a project activity closure around Escalante Days, too. With weekend days all being possible work days with the exception of the holidays mentioned above, the possibility exists for 9 (to many more – perhaps 15) logging trucks rolling through town every day of the week for 80% (figuring a two month winter/spring closure) of the year in Dolores.

This heavy impact on Dolores town residents, businesses and travelers and all users north of town on the county and USFS road system is excessive and an imbalance amongst forest users and the access and use of forest resources. To provide at least a minimal amount of adjustment to the local road use we would suggest that all Sundays through the year be established as "non-project road use days for heavy equipment/truck use." This would give every local/regional resident and visitor the knowledge (and relief) that they could visit Boggy Draw, McPhee Reservoir access through the Dolores access point, other national forest lands, Granath Mesa, and private properties on Sundays throughout the year without the added stress and worry of negotiating a somewhat narrow and mostly unpaved two lane road.

The Town of Dolores may have additional suggestions for time periods during which road closures for project traffic should be utilized and those should be approved as well. The economic and social well-being of Dolores will not gain much from the Salter Project activities in an economic sense and must not take the brunt of the project's financial gains that will necessarily be distributed either elsewhere in the county, or even in other counties.

<u>Conclusion</u>
We are extremely disappointed in the quality of this Environmental Assessment. This disappointment is heightened by knowing the lengthy period of time it took to develop the document, the wide array of agency staff involved, the numerous presentations and

discussions that were engaged with the DWRF Collaborative on the project, the associated field tours, and other efforts made in behalf of creating the document. While the EA has an extensive narrative explaining various components of the proposed project, there is a lack of specifics on numerous critical components of the project as well as there being complete voids of information for some key topics (climate, non-forest industry economics, WUI, etc.) There is almost no mention of the benefits of the project as it relates to the possible reduction of wildfire risk – this despite the reality that this component could certainly be one of the agency's "best marketing" components of the plan – as pointed out by a local municipal official.

The diversity of issues in play and topics needing to be shared with the public, as well as analyzed, is much more than this EA accomplishes. We would recommend a rewrite of the EA with the aim of the second draft being a much more through document, or even perhaps engaging the project planning with an EIS if it is determined that the diversity and depth of issues in play necessitates this level of attention. An **insufficient** effort to gather, analyze and share relevant information has the possibility of bringing forth significant economic hardship to the Town of Dolores, a very unhappy (perhaps angry) recreational user public, a mistargeted ecological outcome, and other undesirable outcomes.

The agency had it fully within it's possible grasp to design a project that could find adequate balance on the social-economic-ecological "stool," however, the project explained in this EA does not reach that goal. That lack of attainment leads me to wonder "how could that be?" – but I will speculate that too much deference is being given to the wood products industry and their interests in desiring "as much flexibility as possible" to most easily reach their desired profits. Meanwhile, not enough credence to both the other forest users and the ecological well-being of the forest has been recognized and supported in the project design. Can the balance of the stool we readjusted – perhaps "yes', but it will entail the industry living with some additional sideboards and frankly we're doubtful that the agency has the resolve to carry through with that approach.

The Dolores District is receiving scores of comments on this EA – the public is engaged, paying attention and will be closely tuned to the agency's actions relative to this project. The public comments contain a plethora of concerns, solutions and creative ideas to morph this project to one that is balanced on the SEE stool – we'll see soon enough if the Dolores District and the San Juan National Forest is up to this challenge.

Sincerely,



Jimbo Buickerood
Program Manager
Lands and Forest Protection
jimbo@sanjuancitizens.org

Appendix A: SJCA Scoping Salter Project Scoping Comments 3.22.2020

SAN JUAN CITIZENS ALLIANCE
1309 East Third Avenue
PO Box 2461
Durango, CO 81302
970.259.3583
sanjuancitizens.org

March 20, 2020

Dolores Ranger District
San Juan National Forest
Attention: Derek Padilla
29211 Highway184
Dolores, CO 81323

RE: SJCA Scoping Comments on Salter Vegetation Management Project

Dolores District Staff,

Thank you for considering our comments on the Salter Project. We note that neither the scoping letter or the Salter Project Scoping Package provide a NEPA project number for reference. Our comments are targeted to address both the design of the upcoming Draft or Preliminary EA as well as the topics and issues we view as necessary to be addressed and included in the document.

Purpose and Need

The Salter scoping document includes this Purpose and Need for Action statement: "The purpose and need for this project is derived from the differences between the existing forest vegetation conditions and the desired forest vegetation conditions, as defined by the SJNF LRMP." We strongly recommend that the Purpose and Need (PN) statement be written to reflect much more than "the existing forest vegetation" condition as defined by the forest plan. While the forest/veg condition may be a starting place, the PN statement should include numerous other desired conditions that are detailed in the LRMP and/or have been recognized in the seven years since the plan was finalized. There are numerous ecological desired conditions that should be recognized in the PN statement such as those associated with overall landscape resiliency as related to climate change, watershed function, wildlife, non-forest vegetation, etc. As well, there are numerous social-related desired conditions that need to be recognized in the PN to be sure they are addressed in the project design as well including recreation, the wildland-urban interface, hunting, etc. And finally, there are economic issues expressed in the LRMP to be included regarding such issues as grazing and timber products.

We believe it is vital to provide a robust and all-inclusive list of desired conditions in an effort to design a project that will "as much as possible" meet the wide range, and sometimes conflictive, desired conditions. Unless all of the objectives are delineated and therefore can be addressed in the project design there remains a possibility that important desired conditions will be overlooked and the goal of "finding the sweet spot" of designing a project that meets as many of the conditions as possible will be unobtainable.

Presentation of Possible Management Actions and Development of NEPA Alternatives

The EA should explore and provide numerous possible management actions to meet the desired conditions that are detailed in the 2013 Land and Resource Management Plan. We recommend that the EA provide an array and diversity of possible actions and tools that could be combined to best meet the desired conditions as relevant to the varying conditions on the ground. Providing only a Proposed Action and a No Action Alternative is an insufficient approach to detailing and sharing with the public a diversity of actions that could be utilized for the project. Rather than attempting to wrap any subset of these possible actions into one or two alternatives, we recommend detailing a list of possible actions that pertain specifically to specific desired conditions and a "discussion" in the draft EA regarding their relative merit and disadvantages. Though the Salter project area is quite often considered a homogenous forest, there is indeed significant variance across this landscape, therefore and by necessity a variety of management tools/actions will need to be utilized across the region to move the forest structure from the current condition(s) to the desired condition(s).

Understanding Current Conditions

As noted in the Purpose and Need for Action statement, the Salter project aims to move the project area from current conditions to the desired conditions that are detailed in the LRMP. While the desired conditions are mostly detailed sufficiently in the forest plan, the current conditions across the 35,000 acre project are not, or at least not as currently available to the public. Fortunately, the Dolores District has taken steps through presentations during the "pre-scoping phase" of the Salter project to lay out the current conditions in a generalized manner, and this has been of good service to stakeholders and the public who have been involved to date.

We strongly recommend that the Dolores District take two actions that are the next steps in disseminating information about the project area that will be necessary to the public's involvement in the NEPA process. First, the agency should organize and make available the common stand exam (CSE) data and associated files, shapefiles, etc. along with a key or instructions to access this information for use in providing comments in this NEPA project. The CSE should be organized and exhibited to the public in a manner that is easily understandable to the public, preferably in a format that has a visual representation of the data. For the public to "weigh in" from an informed point of view there likely will be a need to explain the data and provide points of context. This is a great opportunity for the public to be further educated about the forest that is their watershed, recreation area, hunting grounds, firewood collection acreage, etc. Ideally the public will be able to review the document and be able to make informed remarks as related to various metrics of their forest from the shared CSE data and other current condition information.

We recommend a thorough examination within the EA of the possible actions that might be employed per the emphasis on the Salter project area being an MA-5 zone. Over the past several years, both in the field and in meetings with the Dolores Watershed and Resilient Forest, I have heard a variety of suggestions from wood products industry members on how best to proceed per the long term goal of maintaining timber production. An examination of the possible costs and benefits of these various approaches would be a helpful addition to the Draft EA to allow the public to understand and weigh these choices. Amongst the possibilities that have been shared with me (and I'm confident that there are many more) are: 1) key the basal area target entirely off the site index, 2) engage a fairly "light" timber harvest in the coming couple years to better set up an earlier return (25 years was suggested) and 3) open the canopy a good deal and target a low remaining basal area to support faster growth among the remaining trees. Hopefully comments from industry will be of sufficient depth and diversity to set a course for the examination of these possibilities within the EA.

Economic Specific Issues

The Draft EA should include an economic analysis utilizing the most current information regarding the varying actions that could potentially be elements of the project. This should include a review of the costs or income streams from the mix of actions including timber harvest, stewardship contracts, small diameter contracts, firewood, mastication, etc. as well as "non-traditional" funding such as RMRI.

We also suggest that the SJNF foster dialog with the county governments associated with the Salter project area (including associated the haul routes for derived wood products) due to the concern that industry has regarding the viability and funding for maintaining and/or improving these routes. Advance and collaborative planning will provide the opportunity to make the smartest investments in the road system necessary to affect the treatments within the Salter area.

Wildland Urban Interface (WUI) Issues

If the SJNF LRMP has a specific definition of WUI we have yet to find it, however, the Salter project needs to have a firm definition of WUI that will support specific management actions in the WUI. Certainly, with all of the work done with the HVRA and other federal as well as state wildfire hazard mapping there will be much data to utilize for project planning – that's the good news. However, we have the concern that the entire Salter project area will be approached as being WUI which is non-sensical per the reality to apply resources and capacity in a targeted basis per fire mitigation efforts. Intensive "WUI style" treatments are unnecessary numerous miles from critical infrastructure, homes, businesses, etc., however, mis-applying available resources in areas that are truly "beyond the WUI" is a poor use of time, capacity and resources. We all know that the landscape cannot be fire-proofed and therefore we have expectation that the fire hazard mitigation will be defined clearly in the EA and backed by the latest available science.

It would be also useful to the public if opportunities were delineated for "cross-boundary" WUI-related vegetation treatment with the state and private sectors. Identifying these opportunities and anticipating who the partners are along the necessary authorization and funding would beneficial to potentially maximize the benefits of federal land management actions.

Climate Change

Appendix G in the LRMP provides a good measure of guidance per what should be considered in NEPA processes as related to climate. Though Appendix G is somewhat slim on specifics it does layout some avenues that should be considered in a process such as the Salter project and we suggest that the climate change related issues of forest resilience along with the overall carbon sequestration/balance issue be examined and relayed to the public.

In Appendix G this very specific statement provides the direction we should follow per adaptation and mitigation, "Our primary strategy is to manage for healthy, resilient ecosystems." The Salter NEPA process should detail the possible management actions to be taken that will provide the forest with increased resilience as related to climate change. Such issues should include choices relevant to canopy composition, vegetation/forest species diversity, basal area, relevance to varying site indexes, and others. With climate models indicating significant change across the ponderosa forest landscape, the EA should map possible decision points and opportunities related to enhancing the resiliency of the forest in the project area. This approach is reinforced in 2.9.9 from Appendix G, "Every 3 years review silvicultural prescriptions for incorporation of strategies that anticipate potential plant succession changes relative to warmer and/or drier forested conditions."

Appendix G also supplies very specific direction regarding the carbon sequestration/balance issue, from 2.2.19, "The SJNF and TRFO forested ecosystems provide net positive carbon storage" Of course to meet this recommendation the agency will necessarily need to invest in the determination of the carbon metrics related to the Salter project.

Temporary Roads

The Lone Pine objection process spawned language regarding temporary roads that was utilized in the Decision Notice that should be carried forth into the Slater project. The added specificity per road width, grade, decommissioning timeline, etc. are helpful both to the ecologic well-being of the landscape as well as being helpful to contractors by providing the specifics they need from project bidding all the way to termination.

Conclusion

Thank you for your consideration of our comment and please contact me if there is a need to clarify or discuss any of our recommendations.

Sincerely,



Jimbo Buickerood
Program Manager
Lands and Forest Protection

Date submitted (UTC-11): 3/12/2021 12:00:00 AM
First name: James
Last name: Dietrich
Organization: Montezuma County
Title: Natural Resources Director
Comments:
RE; Salter Vegetation Management - 2410

Dear Mr. Padilla,

The Montezuma County Board of County Commissioners would like to provide the following input regarding the Salter Y Vegetation Management proposal.

Montezuma County would like to state that we are generally in agreement with the overall purpose and need for action. We further approve of the three main project desired outcomes stated in the scoping letter;

1.) Improving and maintaining the resistance and resiliency of ponderosa pine forest ecosystems to increase protection against epidemic insect and disease outbreaks.

2.) Increase the structural diversity of ponderosa pine forest represented across the landscape.

3.) The need to provide economic support to local communities by providing timber products to timber dependent local industries in a sustainable manner.

The Project is consistent with the intent of the Montezuma County Comprehensive Land Use Plan. The Project is also consistent with the 2013 Forest Plan. The project area is located on suitable timber lands within Management Area 5. Management Area 5 emphasizes active management and commodity production in order to meet multiple use goals.

Timber harvest has occurred across the entire project area in the past and the terrain is largely suitable, and accessible for commercial timber sales. We also agree that there is substantial high value infrastructure across the landscape that would benefit from landscape level treatment as proposed by this project.

The Boggy Draw block attracts some of the highest visitor use in the area. It is highly valued for its scenery, recreational opportunities, air quality, cultural resources; and it contains numerous and substantial infrastructure values that are at risk. We realize that there will impacts to all of the resources in the project area and that some of them will be negative for a short time. However the long term benefits to all resources will out-weigh the short term inconveniences.

Montezuma County has reviewed the reccommendations made by the Southwest Colorado Cycling Association (SWCCA) which include some sound, common-sense mitigation measures that we feel the USFS should carefully consider.

McPhee Reservoir and the protection of the waterways that flow into the reservoir is also a top priority. We be believe active forest management on upper watersheds, which include components of commercial timber production, service contract forestry, prescribed fire, and we would like to add[hellip]grazing[hellip] are the best opportunities we have to use the tools at our disposal to mitigate, slow and adapt to the effects of climate change.

High value infrastructure and resources have been identified, and analyzed, through the through the Dolores Watershed and Resilient Forest Collaborative, which provided a transparent opportunity for local government, public, academic, and industry input. The proposed action is consistent with the objectives of the Rocky Mountain Restoration Initiative (RMRI) and the Colorado Collaborative Forest Landscape Restoration (CFLRP) Program objectives and will work in concert with those programs.

The baseline conditions of the Salter Y area include a great deal of dense overstocked even aged ponderosa intermingled with dense, small oak shrub. We agree that dense, over-stocked, even-age, closed canopy ponderosa pine stands are more susceptible to insect outbreaks, and uncharacteristic stand replacing fire

events. It is also pretty clear that the lack of structural diversity across the Salter landscape is correlated to a reduction in forest resiliency and consequently, long term resistance to landscape level disturbance events.

In general Montezuma County supports the proposed action in-part; to address insect infestations, and reduce the risk of wildfire to protect public safety, health, and welfare. However we also support the proposals intention to manage the overall forest health by moving it towards an uneven aged, open canopy forest. We believe the benefits will include better wildlife habitat and forage, better livestock forage and improved range conditions, increased watershed yields for McPhee Reservoir, and more consistent, abundant and valuable forestry products for commercial use.

Our vision for ongoing forest management includes a viable, and sustainable commercial timber industry, working in conjunction with low intensity fires used as regular and ongoing maintenance activity across the San Juan National Forest.

With regards to roads, we understand the road strategy, timing and Best Management Practices being proposed to mitigate negative effects of the proposed action. We support mid-winter harvest as much as possible because it reduces the conflicts with most other forest recreational users, reduces erosion and greatly reduces impacts on wildlife.

We support the use of temporary roads and recommend the use of natural materials such as boulders and large trees when closures are necessary. We see no credible threats surrounding potential increase of off road use. All motorized use is already limited to "open" roads, therefore further cumulative environmental impacts have already been greatly reduced. Roads that are newly created or pulled out of storage should be rehabilitated as soon as practicable after harvest operations are complete. Effective weed control is a must across the entire forest and commercial timber operations should be a priority for prevention and abatement. Cumulative impacts may be positive for this project if rehabilitation is creative and promptly completed.

Montezuma County has coordinated with the Town of Dolores on concerns that the Town has with the proposed project. The County will work with the Town to address any maintenance issues that arise on North 11th Street due to the proposed project. The County is prepared to handle any increased maintenance on Road 31.

Montezuma County is working with the Southwest Cycling Association, and the Town of Dolores to create an alternative pedestrian route adjacent to County Road 31 which will help to improve safety concerns from the Town of Dolores to the Forest Service boundary.

Montezuma County shares the concerns of the business community that this proposed action can have a negative effect and create an economic loss for recreation businesses who rely on access to the Boggy Draw Landscape. We request that the USFS do its best to minimize economic impacts to recreation based business, however we place top priority on forest health. The potential for catastrophic wildfire far outweighs the possible economic loss from recreation due to treatment.

Damage to important infrastructure like trails could be devastating from a large wildfire. Activities such as dispersed camping could become nearly none -existent. The overall user experience could be degraded to the point that some people may be turned away completely. Furthermore recovery from a wildfire can take years, if not decades, which would make the economic loss even more unbearable.

We believe that a healthy forest is key to a healthy recreational economy. If the Boggy Draw landscape is overrun by a catastrophic wildfire, the economic cost to everyone in the county will be profound. While we hope that the project can be managed to minimize economic losses, some of the risk management will necessary have to be left up to the private business. One way to mitigate this potential loss is for private business to promote other areas of the forest that are not being treated. We feel confident that the USFS is willing, and can help to direct users to alternative areas, but we need recreational based business to self-advocate as well.

Montezuma County would like to stress that our vision includes a permanent, and sustainable, commercial harvest component. We agree that we are trying to achieve a healthy, resilient forest that is resistant to disease, insect and wildfire outbreaks. However that does not mean that we envision some sort hands-off pre-Columbian forest condition. Rather, we envision a forest that is sustained by our communities in a "hands on" managed forest scenario.

In-turn we will have a forest that sustains our communities through abundant and accessible forest and mineral products, clean and abundant water, clean air, healthy rangelands, and a wide array of recreational opportunities for all Americans.

The long term results of this proposed action will help to achieve a forest that ecologically functions at a high level, while yielding many other positive benefits that helps sustain the safety, health, and welfare of adjacent rural communities.

Thank you for this opportunity to comment.

County Commissioners:
Jim Candelaria
Kent Lindsay
Joel Stevenson
County Administrator:
Shak Powers

**Board of County Commissioners**

109 West Main, Room 302
Cortez, CO 81321
(970) 565-8317
(970) 565-3420 Fax

March 12, 2021

Derek Padilla, District Ranger
Dolores Ranger District 29211
Hwy. 184 Dolores, CO. 81323

**RE; Salter Vegetation Management - 2410**

Dear Mr. Padilla,

The Montezuma County Board of County Commissioners would like to provide the following input regarding the Salter Y Vegetation Management proposal.

Montezuma County would like to state that we are generally in agreement with the overall purpose and need for action. We further approve of the three main project desired outcomes stated in the scoping letter;

1.) Improving and maintaining the resistance and resiliency of ponderosa pine forest ecosystems to increase protection against epidemic insect and disease outbreaks.

2.) Increase the structural diversity of ponderosa pine forest represented across the landscape.

3.) The need to provide economic support to local communities by providing timber products to timber dependent local industries in a sustainable manner.

The Project is consistent with the intent of the Montezuma County Comprehensive Land Use Plan. The Project is also consistent with the 2013 Forest Plan. The project area is located on suitable timber lands within Management Area 5. Management Area 5 emphasizes active management and commodity production in order to meet multiple use goals.

Timber harvest has occurred across the entire project area in the past and the terrain is largely suitable, and accessible for commercial timber sales. We also agree that there is substantial high value infrastructure across the landscape that would benefit from landscape level treatment as proposed by this project.

The Boggy Draw block attracts some of the highest visitor use in the area. It is highly valued for its scenery, recreational opportunities, air quality, cultural resources; and it contains numerous and substantial infrastructure values that are at risk. We realize that there will impacts to all of the resources in the project area and that some of them will be negative for a short time. However the long term benefits to all resources will out-weigh the short term inconveniences.

Montezuma County has reviewed the reccommendations made by the Southwest Colorado Cycling Association (SWCCA) which include some sound, common-sense mitigation measures that we feel the USFS should carefully consider.

McPhee Reservoir and the protection of the waterways that flow into the reservoir is also a top priority. We be believe active forest management on upper watersheds, which include components of commercial timber production, service contract forestry, prescribed fire, and we would like to add…grazing… are the best opportunities we have to use the tools at our disposal to mitigate, slow and adapt to the effects of climate change.

High value infrastructure and resources have been identified, and analyzed, through the through the Dolores Watershed and Resilient Forest Collaborative, which provided a transparent opportunity for local government, public, academic, and industry input. The proposed action is consistent with the objectives of the Rocky Mountain Restoration Initiative (RMRI) and the Colorado Collaborative Forest Landscape Restoration (CFLRP) Program objectives and will work in concert with those programs.

The baseline conditions of the Salter Y area include a great deal of dense overstocked even aged ponderosa intermingled with dense, small oak shrub. We agree that dense, over-stocked, even-age, closed canopy ponderosa pine stands are more susceptible to insect outbreaks, and uncharacteristic stand replacing fire events. It is also pretty clear that the lack of structural diversity across the Salter landscape is correlated to a reduction in forest resiliency and consequently, long term resistance to landscape level disturbance events.

In general Montezuma County supports the proposed action in-part; to address insect infestations, and reduce the risk of wildfire to protect public safety, health, and welfare. However we also support the proposals intention to manage the overall forest health by moving it towards an uneven aged, open canopy forest. We believe the benefits will include better wildlife habitat and forage, better livestock forage and improved range conditions, increased watershed yields for McPhee Reservoir, and more consistent, abundant and valuable forestry products for commercial use.

Our vision for ongoing forest management includes a viable, and sustainable commercial timber industry, working in conjunction with low intensity fires used as regular and ongoing maintenance activity across the San Juan National Forest.

With regards to roads, we understand the road strategy, timing and Best Management Practices being proposed to mitigate negative effects of the proposed action. We support mid-winter harvest as much as possible because it reduces the conflicts with most other forest recreational users, reduces erosion and greatly reduces impacts on wildlife.

We support the use of temporary roads and recommend the use of natural materials such as boulders and large trees when closures are necessary. We see no credible threats surrounding potential increase of off road use. All motorized use is already limited to “open” roads, therefore further cumulative environmental impacts have already been greatly reduced. Roads that are newly created or pulled out of storage should be rehabilitated as soon as practicable after harvest operations are complete. Effective weed control is a must across the entire forest and commercial timber operations should be a priority for prevention and abatement. Cumulative impacts may be positive for this project if rehabilitation is creative and promptly completed.

Montezuma County has coordinated with the Town of Dolores on concerns that the Town has with the proposed project. The County will work with the Town to address any maintenance issues that arise on North 11th Street due to the proposed project. The County is prepared to handle any increased maintenance on Road 31.

Montezuma County is working with the Southwest Cycling Association, and the Town of Dolores to create an alternative pedestrian route adjacent to County Road 31 which will help to improve safety concerns from the Town of Dolores to the Forest Service boundary.

Montezuma County shares the concerns of the business community that this proposed action can have a negative effect and create an economic loss for recreation businesses who rely on access to the Boggy Draw Landscape. We request that the USFS do its best to minimize economic impacts to recreation based business, however we place top priority on forest health. The potential for catastrophic wildfire far outweighs the possible economic loss from recreation due to treatment.

Damage to important infrastructure like trails could be devastating from a large wildfire. Activities such as dispersed camping could become nearly none –existent. The overall user experience could be degraded to the point that some people may be turned away completely. Furthermore recovery from a wildfire can take years, if not decades, which would make the economic loss even more unbearable.

We believe that a healthy forest is key to a healthy recreational economy. If the Boggy Draw landscape is overrun by a catastrophic wildfire, the economic cost to everyone in the county will be profound. While we hope that the project can be managed to minimize economic losses, some of the risk management will necessary have to be left up to the private business. One way to mitigate this potential loss is for private business to promote other areas of the forest that are not being treated. We feel confident that the USFS is willing, and can help to direct users to alternative areas, but we need recreational based business to self-advocate as well.

Montezuma County would like to stress that our vision includes a permanent, and sustainable, commercial harvest component. We agree that we are trying to achieve a healthy, resilient forest that is resistant to disease, insect and wildfire outbreaks. However that does not mean that we envision some sort hands-off pre-Columbian forest condition. Rather, we envision a forest that is sustained by our communities in a “hands on” managed forest scenario.

In-turn we will have a forest that sustains our communities through abundant and accessible forest and mineral products, clean and abundant water, clean air, healthy rangelands, and a wide array of recreational opportunities for all Americans.

The long term results of this proposed action will help to achieve a forest that ecologically functions at a high level, while yielding many other positive benefits that helps sustain the safety, health, and welfare of adjacent rural communities.

Thank you for this opportunity to comment.

The Montezuma County Board of County Commissioners

Jim Candelaria Kent Lindsay Joel Stevenson

Date submitted (UTC-11): 3/12/2021 11:12:05 AM
First name: PATRICIA
Last name: DORSEY
Organization: National Wild Turkey Federation
Title:
Comments:
12 March 2021

Mr. Derek Padilla, District Ranger
Dolores Ranger District
San Juan National Forest

Submitted via https://cara.ecosystem-management.org/Public//CommentInput?Project=57671

RE: SALTER VEGETATION MANAGEMENT - Environmental Assessment

The National Wild Turkey Federation (NWTF) is proud to be one of the Forest Service's most active national partners. We have been engaged with the Forest Service since establishing the Making Tracks Program in 1986. The NWTF is a co-convener, with the US Forest Service, of the Rocky Mountain Restoration Initiative (RMRI). The RMRI is a partner-driven organization of over 70 partner organizations and more than 200 individuals, making it a national pilot and model of shared stewardship with the goal of increasing the pace and scale of forest restoration work.

The four shared values of RMRI: wildlife, water, communities and recreation are at risk from catastrophic wildfire. Past fire suppression, a lack of active forest management, climate change, severe drought, beetles and disease are increasing the risk of catastrophic fire. We understand that prescribed and managed fire are important and necessary on the landscape. We describe "catastrophic fires" as large, high intensity fires that fall outside the natural fire regime, have little ecological benefit and threaten homes, our water supply and other important community values.)

Southwest Colorado was unanimously selected by the RMRI partners as the primary landscape, in which to start this forest restoration work. The Southwest Colorado proposal includes treating a total of 310,000 acres of public and private land in the ponderosa pine forest type, along the US Highway 160 corridor, connecting the local communities of Dolores, Mancos, Durango, Bayfield, etc.

The Salter Vegetation Management plan objectives are to: improve the resiliency of ponderosa pine forest ecosystems, increase the diversity of ponderosa pine forest, and provide economic support to local communities by sustainably providing timber to local industries. These objectives align with the overall goals and values identified by the RMRI partners. Including local industry benefits the community and is a cost-effective way of managing forests into the future. Local industry is a partner in providing forest resiliency, reducing the risk of catastrophic fire and restoring ecosystem services that healthy forests provide.

We realize that there are some short term effects of active management as the US Forest Service works toward the long term objectives. We appreciate that the San Juan National Forest has done a thorough analysis of those effects and has developed mitigation measures to minimize short term, adverse effects to the trail system, recreation, public safety, etc. We also appreciate that the San Juan National Forest has included protection of critical wildlife habitats, such as raptor nests, elk production and winter range, snags and wild turkey feeding areas in their project design. The installation of guzzlers in treated areas without perennial water, as an included/other action shows the coordinated effort to make this a forest vegetation treatment that benefits multiple values.

The adaptive approach chosen allows the San Juan to adjust management with changing conditions. The San Juan also sees this adaptive approach as a vehicle for communication with the Dolores Watershed Resilient Forest collaborative (DWRF). Communication with the interested public will be important in achieving the long term objectives of the project.

We understand the desire of the public and the US Forest Service to keep large trees and the need to maintain some flexibility within the management prescription. We have observed that a diameter cap has limitations and may limit the ability to achieve the long term objectives. Ecosystems are complex and diverse that are not well

served by a one-size-fits-all approach. It is our concern that a 20" diameter cap may perpetuate homogenous forest conditions and create stands that lack diversity of species, age class, and seral stage. Supporting a diverse array of wildlife species requires a forest with diverse composition of tree species, age classes and structure. The danger in prescriptive management is the risk of creating unintended consequences without flexibility to address them.

The NWTF supports science-based alternatives that provide managers with flexibility to address forest health conditions at the landscape level. We also support giving managers the tools needed to meet the goals of achieving forest health and long-term ecological benefits. The proposed alternative allows Forest Service professionals the flexibility to manage on an individual stand basis for desired outcomes, maintain high quality habitat for wildlife, and be accountable to the public, addressing concerns about trust.

The NWTF feels that the proposed alternative goes a long way toward creating fire resilient forests, and enhancing wildlife habitat. Thank you for your consideration of our comments. The NWTF looks forward to working with the Forest Service in developing this amendment. Please keep us informed as this process progresses. If you have any questions or concerns, please reach out to our District Biologist, Jamie Nogle, who can be reached via email.

Sincerely,

Patricia Dorsey
Director of Conservation Operations, West Region
National Wild Turkey Federation

Date submitted (UTC-11): 3/12/2021 2:50:42 AM
First name: Richard
Last name: Gantman
Organization:
Title:
Comments:
I am a resident of Dolores and want to take this opportunity to provide input on the logging project proposed for the Boggy Draw area. I live on 70 acres at 19350 Rd 31, about 2 miles from the Boggy Draw trailhead. We bought our property four years ago and completed construction about 2 years ago. Our property fronts Rd 31 and our driveway is accessed on the road about 1 ½ miles north of town.
I believe that excellent forest management includes well designed harvests as well as other commercial uses. I also believe that excellent management must consider many competing interests. In my career as a school superintendent in Washington State much of our rural district's general fund came from timber harvest on school trust land. The revenue was vital to the quality of program that we offered our children. And, at the same time, the preservation of a healthy ecosystem in the Pacific Northwest rainforest was also of vital, long-term importance. Additionally, the quality of life in small, often underrepresented communities is under constant pressure from competing interests such as over development and over regulation.
Given that context, I want to comment on three topics:
1. Recreation as a vital part of our community and of Colorado at large - we moved here, and our friends and family come to visit, because of the world-class outdoor recreation in the area. The Boggy Draw trail system is part of our lifestyle of mountain biking, hiking, skiing in the winter and ATV riding. We support local businesses for our sports needs and our visitors often stay in town or at local VRBOs. When we travel and talk about where we live, many people around Colorado and in other states know of Boggy Draw and either have or want to ride here. Maintaining the sports and aesthetics integrity of the trail system is of vital importance for our community to ensure local revenue, the reputation of cooperation between the recreation industry and the natural resource extraction industry, and to honor the countless thousands of hours donated by volunteers to build and maintain the trails. With excellent management logging can take place without significant impact to the local recreation industry, the thousands of people who travel to the area, and the local economy that depends on the activity.
2. Co-existence of a rural lifestyle and commercial forest interests - Our local lifestyle is one of close community and the daily enjoyment of the Colorado outdoors. I know my neighbors and frequently gather with them for skiing, bicycling, boating, or just to have a cup of coffee and discuss the local elk herd. We live in equilibrium with traffic to/from, McPhee Resoviour, recreational users of Boggy Draw, open range cattle operators, gravel trucks, and the Kinder Morgan plant. I urge the managers of the logging project to control, manage, and mitigate the risks caused by the logging trucks and related traffic on Rd 31 to avoid creating a lethal conflict of use on the road. There have been several logging truck roll overs lately. Decisive action must be proactively taken to ensure the steep hill on Rd 31 does not become a high risk environment. This must include a bottom-up and a top-down effort including truck drivers, management, law enforcement and the county road department.
3. Local jobs in rural Colorado - as the project moves forward, it is my hope that many of the jobs created by the harvest will be awarded to local businesses that employ local people. This will of course help our struggling economy and will also ensure that the people who do the work have the specific interest of their neighbors at heart.
I urge the planning commission to pay close attention to and to accommodate the specific recommendations being made by the local community in the interest of maintaining the local economy, our rural lifestyle, and the quality of life that Colorado is internationally famous.
Please feel free to contact me for any additional information, input, or discussion that might be useful.
Respectfully,
Richard Gantman, Ed.D.

Date submitted (UTC-11): 3/12/2021 12:00:00 AM
First name: Dani
Last name: Gregory
Organization: Southwest Colorado Cycling Association SWCCA
Title: President
Comments:
Please see attached SWCCA comments. Thanks

To whom it may concern,

Please accept these comments regarding the proposed Salter Vegetation Management Project. Overall, it appears a lot of thought and research was put into the Salter EA. SWCCA understands the need to minimize wildfire risk, beetle kill and improve forest health. Here are some key areas of concern.

[bull] TEMPORARY TRAIL CLOSURES - This project will result in temporary trail closures which will hurt local businesses, anger users and deter visitors. To "ease the pain" of these closures, mitigate frustrations and minimize the negative economic impact here are solutions:

o NO-WORK, NO TRAIL CLOSURE - Lifting closures any time there will be more than a two-week no-work gap in operations.

o TRAIL DETOURS - Utilizing existing, numerous roads as trail detour routes instead of a complete trail closure. SWCCA volunteers are willing to assist with the trail detour routing and the placement of temporary guidance signage.

o NO-DANGER, NO TRAIL CLOSURE - Only close the trail section when there are dangerous operations within a defined buffer around the trail. SWCCA volunteers are willing to assist posting "Danger, stay on trail[hellip]" signs and assist in marking buffer area.

o ROAD/SKID CROSSINGS - Trail skid crossings should be treated like a road crossing with appropriate signage and not a trail closure. If there is resistance to a safety need for logging truck speed limits on FS 527 why would it be any different for crossing a skid road.

o ONE TRAIL CLOSED AT A TIME - Recreation treatment blocks limited to treatment one at a time should include all blocks in the Boggy Trail System 1-5. Also, it is important to consider that trails like Boggy Draw and Mavericks are a primary artery to outlying trails. Closing these makes access to other trails difficult requiring navigating logging vehicles on roads and other project hazards.

[bull] DAMAGE TO TRAIL TREAD - Singletrack tread quality, scenery and trail flow is critically important to most Boggy Draw trail users. o REROUTE TRAILS OFF HAUL ROADS - While the EA calls for returning any trails damaged by timber management operations to pre operations conditions, a significant impact would be on the sections of existing trails that happen to be on Level 1 roads (closed roads that are in storage and can be reopened for projects). The EA allows for some of these roads to be kept open for slash treatments, and possibly reopened and rebuilt for future logging operations. This will obviously destroy the singletrack tread and reduce the value of the trail and user experience. Efforts to rehab the haul roads back to singletrack trails could be delayed for months/years because of the various project steps requiring road access, like cutting then later dealing with slash piles. The best solution would be to reroute all non-motorized trail sections off the Level 1 roads prior to the logging operations.

REROUTE HAUL ROADS OFF TRAILS - Another component would be permanently removing the Level 1 status from appropriate already closed road sections overlapping the trail and rerouting haul roads off of trails. There are haul routes that obviously look like old closed roads but there are other sections where there is no sign that the trail was ever a road. Specifically, there is a section of the Boggy Draw trail where a haul road could be constructed on top of what we consider pristine trail. This section is directly south of the FS 527 and FS 527.H intersection. Rerouting this haul route to 527.H seems logical, shortening the haul distance.

o USE TRAIL AS SUBUNIT PERIMETER WITH BUFFER - When units are broken down further into subunits for contractors there should be an effort made to use trails as perimeters which also helps with adding a buffer around trails that is easier for contractors to avoid. This also avoids unnecessary trail crossings. However, both

sides of trail should have consistent treatment and/or a natural looking blend/transition. This will also reduce marking and management work by having a perimeter only and not an additional corridor to avoid in the middle of a subunit. An effort should be made to not split subunits between numerous contractors along a stretch of trail avoiding sporadic closures because of varying work schedules.

o TRAIL REHABILITATION AGGRESSIVE AND IMMEDIATE - Rehabilitation of areas disturbed by logging operations should be particularly vigorous within the proximity of trails to maximize visual esthetics immediately after timber operations of that area in the subunit are completed. This could include removing slash immediately and locating slash piles out of view or at least 100 feet from trails, since even after they are burned there would still be visible fire rings. The EA calls for establishing a visual corridor on each system trail. It states that, "The area of influence is 9 feet of center line...". It does not seem clear what this means, and 9 feet to either side of the trail centerline seems awfully narrow. Within this area stumps should be cut flush with ground. The 15' for vehicle tracks is very narrow as well and will leave visible marks easily viewed taking away from the natural experience users are looking for.

o PRE AND POST CONTRACT WORK OVERSITE INVOLVING RECREATION STAKEHOLDERS - We have heard that in another similar project there was not enough oversite to ensure EA requirements were adhered to. Penalties and pre- and post-inspections would help prevent this before it is too late. Trail stakeholders should be able to inspect periodically along with FS recreation personal. Also, some of the required design features are vague. Current Dolores District staff seem to have a good understanding of SWCCA perspectives of these items, but future staff may not be as congruent.

o CAMPING AND VISIBILITY CONSIDERATIONS - The Boggy Draw area is popular for dispersed camping. Each year campers are seen in locations not previously used for camping. As the density of trees is reduced, there may be increased dispersion of campers to previously inaccessible or less accessible locations. This may also degrade from the user experience because campsites can be spotted from longer distances removing the secluded feel when on the trail.

o WINTER RECREATION CAN BE IMPROVED AND USER CONFLICT AVOIDED - Removing trees along winter recreation routes could impact snow levels and negatively affect grooming efforts. However, there may be an opportunity to create alternate/new groomed winter recreational routes. Grooming operations are now on and south of FS 527, but the snow can be better on the north side. More southerly routes already have softer conditions which could be compounded without the canopy. If FS 527 or other currently groomed road haul routes are plowed during grooming season, then rerouting groomed sections off roads permanently would be a solution and potentially a long-term improvement. SWCCA has previously requested alternate routes to groom avoiding FS 527 and FS 259 to mitigate conflict with some traditional user groups that damage the groomed surface. Snow bike grooming is less than 4' wide so a tighter route between vegetation can be used maintaining snow levels and providing users a more desirable experience. We urge the Forest Service to consider these alternate routes.

[bull] VALUE OF TRAIL CONSTRUCTION & MAINTENANCE CONSIDERATIONS - Expensive SWCCA volunteer and FS efforts are impacted by the project. o REROUTE FUNDING FROM PROCEEDS - The trail realignment should be funded by proceeds from the project and not volunteers. Volunteers (unpaid) already contributed significant effort and should not be tasked with more uncompensated work as a result of this "for profit" project.

o SWCCA CONTRIBUTION VALUE - SWCCA recently constructed 24.4 miles of trails in the Boggy Draw system with a market value of $447,496.00 (Calculations use the published average rate of $3 per foot and $2500 per mile design and layout). This is just the recent expansion and does not include the other previously constructed trails in the network and significant maintenance and improvement efforts. The list of sources for costing is extensive, SWCCA can provide them upon request, or many can be viewed doing an internet search.

o FS CONTRIBUTION VALUE - As stated in the EA, some $300,000 worth of FS trail construction has been invested in producing the current (motorized and non-motorized) trail system.

o ADDED TRAIL WORK - Past experience shows that as the ponderosa canopy is reduced, Gambel Oak seem to quickly fill in the newly opened areas. This would seem to interfere with the goal of promoting new Ponderosa growth. Plans to control such oak growth should be defined. Examples are areas on the northeast mesa above horse camp site and northeast mesa point above house creek and bean canyon intersection

where there is evidence of historic logging but very limited new growth except thick oak brush. Additional Gambel Oak also creates more trail maintenance. Even past mitigation efforts have short term success and fill back in with oak brush quickly and vigorously. For example, look at the mesa northwest above Italian canyon and the Dolores river canyon intersection. Coincidentally, historic photographs of Boggy Draw that are available in books like "The RGS Story Rio Grande Southern" show far less Gamble Oak.

[bull] ECONOMIC AND COMMUNITY IMPACT o ECONOMIC LOSS - There is not adequate language in the EA addressing the negative economic impacts due to the temporary loss of recreational opportunities. This could be reduced by tight scheduling of trail closures and limiting the number of trails closed at any given time. The above requests require more attention and management of and by contractors. While there are economic benefits from the logging operation that are easy to quantify, some of the more significant economic impacts from recreation require a deeper analysis, tracking dollars through numerous hands. Residents opposed to recreation or indifferent about trail impacts may be surprised how they unknowingly benefit. There are abundant statistics and studies available on the internet. For example, mountain biking economic impact output in a Grand Junction study = $7,284,528, Crested Butte study = $10,848,408 and237 jobs supported, not including other trail activities. https://www.imba.com/sites/default/files/content/resources/2018-11/OA_GMUGNF_MtnBikingStudy2018.pdf

oTALENTRECRUITMENT-Communityimpactincludes recreational opportunities thathelprecruit talent for otherwise hard to fill positions likemedical professionals benefittingeveryone inthe community. Not just trail users.

oCOMMUNITY HEALTH-Another benefitfrom a great local trail systemthat is difficult toquantify is how it providesa place to improve communitymembers' mind and body health.Trails provide a release fromthe stresses of life and aplace to improve fitness.

[bull]SAFETY

oSAFER ROUTE OFF CR31 HAULROUTE-Although outside thescopeof the EA,the proposednon-motorized trail fromthe townof Dolores to theBean Canyon trail becomes morecritical when considering the EA'sModified Proposed Action.The proposed trail generallyparallels Road 31, providing a safer alternative for trail usersversusthe heavily traffickedroad. Road 31will bethe haul route for the logging trucks in the proposed project. Providing a trail alternative tothe road is safer for thetrail users and the logging trucks and should bea top priority. A portion ofthe proposedtrail includesa short new sectionof trail on ForestService land between the boundary and Bean CanyonTrail and requires FS approval. Weurge them to consider rapid approval.

oSPEED LIMITS-Speed limits and slow down signageshould be posted andenforced forlogging trucks at trail crossings, shared trail routes and parking areas.

Sincerely,

Date submitted (UTC-11): 3/12/2021 10:45:18 AM
First name: Tess
Last name: Johnstone
Organization:
Title:
Comments:
As an former wildland firefighter and Forester,I agree that the Forest Service and their many stakeholders are in a position to create a more resilient forest by logging, prescribed fire, restoration and reforestation efforts, road building/closures, pest management, and weed control etc, and overall landscape management. These efforts will no doubt be substantial to local mills and improve jobs in the local community, and above all, reduce the risks of catastrophic fires that may, in some cases, lead to erosion, loss of critical habit, and loss of Forest products. The Forest Service has followed it mission of "Multiple Use" and it appears to be step forward but my take on projects of this scope is that one needs to look at the big picture. Does the Government have the infrastructure, training, and experienced staff to assist with inspections, monitoring efforts, long term planning,fiscal budgets to carry out the proposed projects. These are just some of the issues, along with Climate Change that will be the tipping point in our local Forests. The Southwest Colorado Cycling Association(SWCCA) have been working diligently on trails in the Boggy Draw area and also have a keen interest and concern about trails in the proposed project areas. Those concerns are evident in the comments submitted. In light of our warming temps, my recommendations are to buffer trails as you would a riparian area so that the Forest user can have their forest experience. These trails have been great for the local community and have assisted with peoples healthy lifestyle, not to mention the local communities that have been accommodating them. I broadly support the Salter Vegetation EA but would like my recommendations further analyzed. This compromise between logging proposals and recreation opportunities can be achieved. This could be a long term "Success Story" if carried out properly. Thank you .

Date submitted (UTC-11): 3/12/2021 4:33:08 AM
First name: Carolyn
Last name: Landes
Organization:
Title:
Comments:
As a regular year-round "user" of the area of impact, I thank you for the opportunity to comment on the Salter EA. The need to address forest health in our "backyard" is obvious. This plan is BIG and Long-term. Thus the need to be extremely careful, consistent and inclusive in the decisions, implementation and monitoring of such an endeavor. I am likely not alone in my anxiety to ensure that errors such as occurred during a prescribed burn in the House Creek area a few years ago never occur again with any projects on our Forest. (Yes, admittedly I have some trust issues...)
I've reviewed the draft EA, as best as a layperson is able. I'm supportive of the Alternative that would save the large trees. I appreciate the acknowledgement of the effects of Climate Change in planning efforts. And, I like the potential of adding to the local economy with increased opportunities for well managed wood product light industries.
On more specific areas of concern - Trail closures, damage, value and maintenance; Economic and Community Impact; traffic and SAFETY - I fully echo and support the comments and suggestions of the Southwest Colorado Cycling Association (SWCCA). This is very likely the most experienced, best informed, hard working, cooperative and caring partner group an agency could ask for.
Thank you.

Date submitted (UTC-11): 3/12/2021 8:42:36 AM
First name: Karen
Last name: Overn
Organization:
Title:
Comments:
I recreate in boggy draw all year and want to support protecting the environment from fire and beetlekill but please do so carefully and with respect to the many people who enjoy the area. I buy groceries in Dolores, get gas in Dolores and get food from restaurants in Dolores because of these trails. If they are ruined by logging activity I won't go there anymore. I will find somewhere else and spend my money there. Boggy draw is an amazing jewel that your are putting in peril. The trails and scenery are world class. Don't take it for granted.

Date submitted (UTC-11): 3/12/2021 12:00:00 AM
First name: Molly
Last name: Pitts
Organization: Intermountain Forest Association
Title: Colorado Programs Manager
Comments:
Intermountain Forest Association

445 Milford Street Salida, CO 81201

928-521-9476

SUBJECT: Salter Vegetation Management Project

Submitted via: https://cara.ecosystem-management.org/Public//CommentInput?Project=57671

Dear Mr. Padilla:

Intermountain Forest Association (IFA) is a member-based organization that advocates for healthy forests and healthy communities, including actively promoting sound forest management that provides a stable and sustainable supply of timber from public and private forestlands. Given that several of IFA's members heavily rely on timber output from the San Juan National Forest and have made substantial investments to help facilitate treatments, we are excited about the proposed Salter Vegetation Management project on the Dolores District. On behalf of the members of the Intermountain Forest Association, I appreciate this opportunity to offer comments on draft environmental assessment.

Overall, we are very supportive of the San Juan National Forest being proactive in responding to the on-going beetle epidemic that is impacting pine stands within the project area. Not only does the project address the recent mortality, it also address the surrounding stands with the goal of making them more resilient and effective in fighting off future beetle attacks. We are also very supportive of your initiative to actively increase age class diversity and structural diversity within the project area. As our forests face increased pressures from climate change, it will be crucial to have forests that are more resilient. Therefore, we concur with the Purpose and Need as discussed on pages 9-12. We concur with and strongly support Alternative 2 (the Proposed Action) as written on pages 2

12-16, with the caveat that our comments below are considered and incorporated into the selected alternative.

Given the fact that all units proposed for treatment are located within Management Area 5, we support the Proposed Action (Alternative 2) that allows cutting of trees up to 26.9" dbh. We feel strongly that Alternative 3, with a diameter cap of 20" will not achieve the desired goals and objectives and will put stands at risk from insects and disease and catastrophic wildfire. Furthermore, it will limit flexibility in creating the necessary habitat for wildlife.

Project Design Features

Fuels

[bull] We disagree with the Fuels #6 that requires all activity fuels be lopped and scattered at an average depth less than one foot. We find this requirement to be economically non-feasible and recommend you change to 2 feet.

Rare Plants and Invasive Species

[bull] We disagree with Rare Plants #1 that limits each burn pile to [frac14] acre or less. This is overly restrictive and could be hard to implement. We recommend adding language that states, "unless agreed upon in writing."

[bull] We feel that Rare Plants #6 needs additional clarification regarding the term "increasing in infestation size." We would also like additional information regarding onsite weed decontamination stations.

Recreation and Public Safety

[bull] We feel it is important to include the purchaser during the implementation checklist process. Therefore, we ask that under Recreation and Public Safety #2a, language be added that states landings and slash piles would be identified during the implementation checklist process in coordination with the purchaser.

Scenery

[bull] It is not always necessary to seed areas that have been disturbed and given the expense of seed, we request that you add "as needed" to Scenery #5.

Timber

[bull] Given the overlap between standard operating seasons and timing restrictions for wildlife and recreation, we request the final EA have a graph/chart that outlines the various treatment blocks and the times available for work during a 12-month period.

Environmental Effects

Recreation Activities and Experience

[bull] See note above regarding Timber. We believe a chart that shows when work can occur in a treatment block will help reduce the level of concern regarding impacts to recreation. It would also be helpful to include contract information that explains the process of requiring completion and closing of one block prior to starting another.

Transportation

[bull] Again, further detail and description regarding average length and size of contracts, operating seasons, and typical rates of production would be helpful to better understand the impacts.

Vegetation

[bull] We request additional information regarding current conditions be included within this section.

We appreciate your consideration of these comments and suggestions as you move forward with the planning of the Salter Vegetation Management Project. I would be happy to discuss these comments if you have any questions.

Sincerely,

Molly Pitts

Intermountain Forest Association

Colorado Programs Manger

# Intermountain Forest Association

445 Milford Street Salida, CO 81201
928-521-9476


March 12, 2021

Mr. Derek Padilla, District Ranger
Dolores Ranger District
San Juan National Forest
29211 Highway 184
Dolores, CO 81323

SUBJECT: Salter Vegetation Management Project

Submitted via: https://cara.ecosystem-management.org/Public//CommentInput?Project=57671

Dear Mr. Padilla:

Intermountain Forest Association (IFA) is a member-based organization that advocates for healthy forests and healthy communities, including actively promoting sound forest management that provides a stable and sustainable supply of timber from public and private forestlands. Given that several of IFA's members heavily rely on timber output from the San Juan National Forest and have made substantial investments to help facilitate treatments, we are excited about the proposed Salter Vegetation Management project on the Dolores District. On behalf of the members of the Intermountain Forest Association, I appreciate this opportunity to offer comments on draft environmental assessment.

Overall, we are very supportive of the San Juan National Forest being proactive in responding to the on-going beetle epidemic that is impacting pine stands within the project area. Not only does the project address the recent mortality, it also address the surrounding stands with the goal of making them more resilient and effective in fighting off future beetle attacks. We are also very supportive of your initiative to actively increase age class diversity and structural diversity within the project area. As our forests face increased pressures from climate change, it will be crucial to have forests that are more resilient. Therefore, we concur with the Purpose and Need as discussed on pages 9-12. We concur with and strongly support Alternative 2 (the Proposed Action) as written on pages

12-16, with the caveat that our comments below are considered and incorporated into the selected alternative.

Given the fact that all units proposed for treatment are located within Management Area 5, we support the Proposed Action (Alternative 2) that allows cutting of trees up to 26.9" dbh. We feel strongly that Alternative 3, with a diameter cap of 20" will not achieve the desired goals and objectives and will put stands at risk from insects and disease and catastrophic wildfire. Furthermore, it will limit flexibility in creating the necessary habitat for wildlife.

## Project Design Features

### *Fuels*

- We disagree with the Fuels #6 that requires all activity fuels be lopped and scattered at an average depth less than one foot. We find this requirement to be economically non-feasible and recommend you change to 2 feet.

### *Rare Plants and Invasive Species*

- We disagree with Rare Plants #1 that limits each burn pile to ¼ acre or less. This is overly restrictive and could be hard to implement. We recommend adding language that states, "unless agreed upon in writing."
- We feel that Rare Plants #6 needs additional clarification regarding the term "increasing in infestation size." We would also like additional information regarding onsite weed decontamination stations.

### *Recreation and Public Safety*

- We feel it is important to include the purchaser during the implementation checklist process. Therefore, we ask that under Recreation and Public Safety #2a, language be added that states landings and slash piles would be identified during the implementation checklist process in coordination with the purchaser.

### *Scenery*

- It is not always necessary to seed areas that have been disturbed and given the expense of seed, we request that you add "as needed" to Scenery #5.

### *Timber*

- Given the overlap between standard operating seasons and timing restrictions for wildlife and recreation, we request the final EA have a graph/chart that outlines the various treatment blocks and the times available for work during a 12-month period.

## Environmental Effects

### *Recreation Activities and Experience*

- See note above regarding Timber. We believe a chart that shows when work can occur in a treatment block will help reduce the level of concern regarding impacts to

recreation. It would also be helpful to include contract information that explains the process of requiring completion and closing of one block prior to starting another.

***Transportation***

- Again, further detail and description regarding average length and size of contracts, operating seasons, and typical rates of production would be helpful to better understand the impacts.

***Vegetation***

- We request additional information regarding current conditions be included within this section.

We appreciate your consideration of these comments and suggestions as you move forward with the planning of the Salter Vegetation Management Project. I would be happy to discuss these comments if you have any questions.

Sincerely,

*Molly Pitts*

Molly Pitts
Intermountain Forest Association
Colorado Programs Manger

Date submitted (UTC-11): 3/12/2021 5:04:31 PM
First name: Robin
Last name: Richard
Organization:
Title:
Comments:
Comments on Salter Vegetation Management Project
March 12, 2021

To Whom it concerns:

Having come to care deeply for the ponderosa and PJ forest of the Boggy Draw area over the past 17 years, I appreciate this opportunity to provide comment on the EA for this project.

The staff of the Dolores Ranger District has clearly put time, care, effort, and thoughtfulness into trying to balance the needs of the forest, the timber interests, and the general public in service to improving the long-term resiliency of the forest for the benefit of all.

1) Forest resiliency

The primary purpose of this project is forest resiliency, and that primary purpose must be kept in the forefront at all times as the long-term health of the forest impacts all the humans and non-humans who are supported and nurtured by it. Some of the aspects of the plan, such as removing diseased or structurally unhealthy trees and enhancing the qualities of uneven aged stands certainly serve this purpose, and I support these aspects.

I am concerned, though, about the diameter class size which allows the taking of trees up to 26.9 inches. Trees of this size are well on their way to developing the characteristics of fire resistance, namely, thickening of the bark and dropping of lower branches. If trees this size are too crowded (i.e. their crowns are in close proximity to each other), the need for thinning is there. However, trees of this size also need to be protected as much as possible as the number of large trees is scant. If this size class remains, it is essential that the USFS limit the taking of trees this size to only those that are overcrowded. Preferable, the diameter class size should be reduced to the 20 inch class size.

The nature of the understory is critical to the resilience of the ponderosa forest. Detailed plans regarding the mediation of excessive oak brush must be part of this vegetation management project.

Once the timber extraction is completed, the areas should be planted with native grasses, flowers, and other plants that form the understory of a health ponderosa forest.

I do not know how much the project areas overlap with grazing allotments. Where they do, cows must be kept out of areas to allow them to fully revegetate. The subsequent numbers of cows on those allotments must be kept a sustainable numbers. Obviously, premature grazing and overgrazing of sections of forest is antithetical to the goal of improving forest resiliency.

2) Wildlife

The forest can neither achieve nor maintain good health and resilience if the living beings that co-evolved with the forest are not doing well. The forest depends on all its living creatures from the fungi and microorganisms to the largest mammals to the forbs/grasses to the tree canopy and shrubs for its optimal health. Therefore, disruptions to wildlife, large and small, must be considered in any project.

Logging operations should be kept out of wildlife corridors and out of critical habitat for all animals, not just "big game." Wildlife biologists should be cognizant of nesting and denning times and areas and minimize timber operations during these times and in these places. Especially given that the use of the trail system that many of us enjoy has likely caused significant distress to wildlife, adding additional distress is to be avoided.

3) Hauling

I question the safety of logging trucks on CR 31 which is a winding road with sharp curves. Steps must be taken to ensure the trucks will be going at speeds safe for the pedestrians, cyclists, and motorists who use CR 31.

The information provided at the meeting on March 10, 2021 regarding the number of haul loads per day was vague. Stipulations are needed to ensure that the number of loads per day are limited to a safe maximum number. I would have to defer to transportation experts to determine what that number might be.

4) Recreational Impact/Economic Impact

I appreciate the efforts made to protect areas of beauty and interest by not having timber sale units in these areas.

Information regarding the number of units/subunits that can be in operation in any one time is vague. Also, the number of trail closures/area closures allowed at one time is unclear. The EA should provide clear parameters regarding such numbers. And such numbers should be limited in a way that does not cause unnecessarily broad or prolonged disruptions of the use of these areas by the general public. Furthermore, clear language should be in place stating that a contractor must finish with one area (including restoration) before moving to the next.

Many people are concerned about the aesthetics of these projects. Whenever the aesthetics can be mitigated quickly (e.g. hasty removal of slash piles), they should. However, the desire for aesthetics is secondary to the health of the forest. Decreasing density of the forest and the undergrowth may interfere with the visual aesthetics and the visual buffers that give a sense of seclusion. Wherever possible, such features should be maintained. However, the health and resiliency of the forest must be the primary focus.

The SWCCA has outlined good suggestions for minimizing impact to recreation. I have included excerpts below:

TEMPORARY TRAIL CLOSURES -

NO-WORK, NO TRAIL CLOSURE - Lifting closures any time there will be more than a two-week no-work gap in operations.

TRAIL DETOURS - Utilizing existing, numerous roads as trail detour routes instead of a complete trail closure. SWCCA volunteers are willing to assist with the trail detour routing and the placement of temporary guidance signage.

NO-DANGER, NO TRAIL CLOSURE - Only close the trail section when there are dangerous operations within a defined buffer around the trail. SWCCA volunteers are willing to assist posting "Danger, stay on trail." signs and assist in marking buffer area.

ROAD/SKID CROSSINGS - Trail skid crossings should be treated like a road crossing with appropriate signage and not a trail closure. If there is resistance to a safety need for logging truck speed limits on FS 527 why would it be any different for crossing a skid road.

ONE TRAIL CLOSED AT A TIME - Recreation treatment blocks limited to treatment one at a time should include all blocks in the Boggy Trail System 1-6.There are trails like Boggy Draw and Mavericks that are needed to access other trails, closing these makes access to other trails difficult requiring navigating logging vehicles on roads and other project hazards.

DAMAGE TO TRAIL TREAD:

- Singletrack tread quality, scenery and trail flow is critically important to most Boggy Draw trail users.

REROUTE TRAILS OFF HAUL ROADS - While the EA calls for returning any trails damaged by timber management operations to pre operations conditions, a significant impact would be on the sections of existing trails that happen to be on Level 1 roads (closed roads that are in storage and can be reopened for projects). The EA allows for some of these roads to be kept open for slash treatments, and possibly reopened and rebuilt for future logging operations. This will obviously destroy the singletrack tread and reduce the value of the trail and user experience. Efforts to rehab the haul roads back to singletrack trails could be delayed for months/years because of the various project steps requiring road access, like cutting then later dealing with slash piles. The best solution would be to reroute all non-motorized trail sections off the Level 1 roads prior to the logging operations.

REROUTE HAUL ROADS OFF TRAILS - Another component would be permanently removing the Level 1 status from appropriate already closed road sections overlapping the trail and rerouting haul roads off of trails. There are haul routes that obviously look like old closed roads but there are other sections where there is no sign that the trail was ever a road. Specifically, there is a section of trail where a haul road could be constructed on top of what we consider pristine trail. This section is directly south of the FS 527 and FS 527.H intersection. Rerouting this haul route to 527.H seems logical, shortening the haul distance.

USE TRAIL AS SUBUNIT PERIMETER WITH BUFFER - When units are broken down further into subunits for contractors there should be an effort made to use trails as perimeters which also help with adding a buffer around trail that is easier for contractors to avoid. Using trails as perimeters also avoids unnecessary trail crossings. However, both sides of trail should have consistent treatment. Using trails as perimeters decreases marking and management work by having a perimeter only and not an additional corridor to avoid in the middle of a subunit. Also, an effort made to not split subunits between numerous contractors along a stretch of trail avoiding sporadic closures because of varying work schedules.

PRE AND POST CONTRACT WORK OVERSITE INVOLVING RECREATION STAKEHOLDERS - We have heard that in another similar project there was not enough oversite to ensure EA requirements were

adhered to. Penalties and pre- and post-inspections would help prevent this before it is too late. Trail stakeholders should be able to inspect periodically along with FS recreation personal. Also, some of the required design features are vague. Current Dolores District staff seem to have a good understanding of SWCCA perspectives of these items, but future staff may not be as congruent.

5) General Comments

The intention behind this project is a good one. In order to promote forest health and resiliency, many of us will need to be patient with closures, noise, traffic, changes in aesthetics, etc. As stated above and by so many other commenters, these negative effects should be minimized.

Given that the goal of the project is to ultimately improve forest health, and doing so will allow people to continue to camp, bike, hike, etc. by decreasing the risk of catastrophic wildfire, I suggest the Dolores Ranger District be aggressive with public education regarding the benefits of these projects (if done well and appropriately). Doing so will help locals and visitors alike weather the unpleasant aspects of the project with more patience and perhaps more trust.

Thank you for considering these comments.

Sincerely,

Robin E. Richard

Date submitted (UTC-11): 3/12/2021 4:37:26 AM
First name: Adriana
Last name: Stimax
Organization:
Title:
Comments:
To whom it may concern,
To start, I am grateful that there is consideration for the fire risk and resiliency of the Ponderosa Forest near Dolores. I understand that without treatment, the risk of catastrophic events such as beetle infestation or high intensity fire is much greater. I also understand that controlled burns are not always an option, especially in areas near urban developments. Thank you for seeking alternatives to continue to improve resiliency.

That being said, there are ways in which this project can be improved. I am not a member of SWCCA, but I saw their outline of concerns recently, and I believe they have made some very good points that I agree with. I often use Boggy Draw for my personal enjoyment and also for my work. I know the necessity of this project, and I also think great efforts must be made to gain community support. If you are careful, minimize impact on users, and work to educate the public about the need, you may find that community members will be far more supportive of these efforts.

Thank you

Date submitted (UTC-11): 3/12/2021 2:47:00 PM
First name: Brian
Last name: Westphal
Organization:
Title:
Comments:
After reading the purpose and priorities 1 and 2, I fully expected maps and/or discussion of beetle kill and pondeosa quality levels.   Instead a reference to the San Juan Forest Management Plan (2013) was given where I assume these details are given.  Considering this EA is justifying that an action be performed to help the forest, maybe you should have told your readers about the current status of the forest instead of referring them elsewhere.  So my comment is: In order for this EA to be complete, data from SJFM Plan 2013 should be included instead of referenced, thereby allowing the reader to evaluate the current forest status.

Date submitted (UTC-11): 3/12/2021 12:00:00 AM
First name: Alex
Last name: Wing
Organization: Rico Trails Alliance
Title: President
Comments:
See attached pdf for RTA comment.

To whom it may concern,

Rico Trails Alliance fully supports the comments below from the Southwest Colorado Cycling Association. Many Rico residents enjoy recreating at Boggy Draw, and visitors driving in from the north often stop in Rico and use our businesses on their way to and from Boggy Draw. Please accept these comments regarding the proposed Salter Vegetation Management Project.

[bull] TEMPORARY TRAIL CLOSURES - This project will result in temporary trail closures which will hurt local businesses, anger users and deter visitors. To "ease the pain" of these closures, mitigate frustrations and minimize the negative economic impact here are solutions:

o NO-WORK, NO TRAIL CLOSURE - Lifting closures any time there will be more than a two-week no-work gap in operations.

o TRAIL DETOURS - Utilizing existing, numerous roads as trail detour routes instead of a complete trail closure. SWCCA volunteers are willing to assist with the trail detour routing and the placement of temporary guidance signage.

o NO-DANGER, NO TRAIL CLOSURE - Only close the trail section when there are dangerous operations within a defined buffer around the trail. SWCCA volunteers are willing to assist posting "Danger, stay on trail[hellip]" signs and assist in marking buffer area.

o ROAD/SKID CROSSINGS - Trail skid crossings should be treated like a road crossing with appropriate signage and not a trail closure. If there is resistance to a safety need for logging truck speed limits on FS 527 why would it be any different for crossing a skid road.

o ONE TRAIL CLOSED AT A TIME - Recreation treatment blocks limited to treatment one at a time should include all blocks in the Boggy Trail System 1-5. There are trails like Boggy Draw and Mavericks that are needed to access other trails, closing these makes access to other trails difficult requiring navigating logging vehicles on roads and other project hazards.

[bull] DAMAGE TO TRAIL TREAD - Singletrack tread quality, scenery and trail flow is critically important to most Boggy Draw trail users.

o REROUTE TRAILS OFF HAUL ROADS - While the EA calls for returning any trails damaged by timber management operations to pre operations conditions, a significant impact would be on the sections of existing trails that happen to be on Level 1 roads (closed roads that are in storage and can be reopened for projects). The EA allows for some of these roads to be kept open for slash treatments, and possibly reopened and rebuilt for future logging operations. This will obviously destroy the singletrack tread and reduce the value of the trail and user experience. Efforts to rehab the haul roads back to singletrack trails could be delayed for months/years because of the various project steps requiring road access, like cutting then later dealing with slash piles. The best solution would be to reroute all non-motorized trail sections off the Level 1 roads prior to the logging operations.

o REROUTE HAUL ROADS OFF TRAILS - Another component would be permanently removing the Level 1 status from appropriate already closed road sections overlapping the trail and rerouting haul roads off of trails. There are haul routes that obviously look like old closed roads but there are other sections where there is no sign that the trail was ever a road. Specifically, there is a section of trail where a haul road could be constructed on top of what we consider pristine trail. This section is directly south of the FS 527 and FS 527.H intersection. Rerouting this haul route to 527.H seems logical, shortening the haul distance.

o USE TRAIL AS SUBUNIT PERIMETER WITH BUFFER - When units are broken down further into subunits for contractors there should be an effort made to use trails as perimeters which also help with adding a buffer around trail that is easier for contractors to avoid. This also avoids unnecessary trail crossings. However, both sides of trail should have consistent treatment. This will also reduce marking and management work by having a perimeter only and not an additional corridor to avoid in the middle of a subunit. Also, an effort made to not split subunits between numerous contractors along a stretch of trail avoiding sporadic closures because of varying work schedules.

o TRAIL REHABILITATION AGGRESSIVE AND IMMEDIATE - Rehabilitation of areas disturbed by logging operations should be particularly vigorous within the proximity of trails to maximize visual esthetics immediately after timber operations of that area in the subunit are completed. This could include removing slash immediately and locating slash piles out of view or at least 100 feet from trails, since even after they are burned there would still be visible fire rings. The EA calls for establishing a visual corridor on each system trail. It states that, "The area of influence is 9 feet of center line...". It does not seem clear what this means, and 9 feet to either side of the trail centerline seems awfully narrow. Within this area stumps should be cut flush with ground. The 15' for vehicle tracks is very narrow as well and will leave visible marks easily viewed taking away from the natural experience users are looking for.

o PRE AND POST CONTRACT WORK OVERSITE INVOLVING RECREATION STAKEHOLDERS - We have heard that in another similar project there was not enough oversite to ensure EA requirements were adhered to. Penalties and pre- and post-inspections would help prevent this before it is too late. Trail stakeholders should be able to inspect periodically along with FS recreation personal. Also, some of the required design features are vague. Current Dolores District staff seem to have a good understanding of SWCCA perspectives of these items, but future staff may not be as congruent.

o CAMPING AND VISIBILITY CONSIDERATIONS - The Boggy Draw area is popular for dispersed camping. Each year campers are seen in locations not previously used for camping. As the density of trees is reduced, there may be increased dispersion of campers to previously inaccessible or less accessible locations. This may also degrade from the user experience because campsites can be spotted from longer distances removing the secluded feel when on the trail.

o WINTER RECREATION CAN BE IMPROVED AND USER CONFLICT AVOIDED - Removing trees along winter recreation routes could impact snow levels and negatively affect grooming efforts. However, there may be an opportunity to create alternate/new groomed winter recreational routes. Grooming operations are now on and south of FS 527, but the snow can be better on the north side. More southerly routes already have softer conditions which could be compounded without the canopy. If FS 527 or other currently groomed road haul routes are plowed during grooming season, then rerouting groomed sections off roads permanently would be a solution and potentially a long-term improvement. SWCCA has previously requested alternate routes to groom avoiding FS 527 and FS 259 to mitigate conflict with some traditional user groups that damage the groomed surface. Snow bike grooming is less than 4' so a tighter route between vegetation can be used maintaining snow levels and providing users a more desirable experience.

[bull] VALUE OF TRAIL CONSTRUCTION & MAINTENANCE CONSIDERATIONS - Expensive SWCCA volunteer and FS efforts are impacted by the project. o REROUTE FUNDING FROM PROCEEDS - The trail realignment should be funded by proceeds from the project and not volunteers. Volunteers (unpaid) already contributed significant effort and should not be tasked with more uncompensated work as a result of this "for profit" project.

o SWCCA CONTRIBUTION VALUE - SWCCA recently constructed 24.4 miles of trails in the Boggy Draw system with a market value of $447,496.00 (Calculations use the published average rate of $3 per foot and $2500 per mile design and layout). This is just the recent expansion and does not include the other previously constructed trails in the network and significant maintenance and improvement efforts. The list of sources for costing is extensive, SWCCA can provide them upon request or many can be viewed doing an internet search.

o FS CONTRIBUTION VALUE - As stated in the EA, some $300,000 worth of FS trail construction has been invested in producing the current (motorized and non-motorized) trail system.

o ADDED TRAIL WORK - Past experience shows that as the ponderosa canopy is reduced, Gambel Oak seem to quickly fill in the newly opened areas. This would seem to interfere with the goal of promoting new

Ponderosa growth. Plans to control such oak growth should be defined. Examples are areas on the northeast mesa above horse camp site and northeast mesa point above house creek and bean canyon intersection where there is evidence of historic logging but very limited new growth except thick oak brush. Additional Gambel Oak also creates more trail maintenance. Even past mitigation efforts have short term success and fill back in with oak brush quickly and vigorously. For example, look at Italian Canyon on mesa northwest above Italian canyon and Dolores river canyon intersection. Coincidentally, historic photographs of Boggy Draw that are available in books like "The RGS Story Rio Grande Southern" show far less Gamble Oak.

[bull] ECONOMIC AND COMMUNITY IMPACT o ECONOMIC LOSS - There is not adequate language in the EA addressing the negative economic impacts due to the temporary loss of recreational opportunities. This could be reduced by tight scheduling of trail closures and limiting the number of trails closed at any given time. The above requests require more attention and management of and by contractors. While there are economic benefits from the logging operation that are easy to quantify, some of the more significant economic impacts from recreation require a deeper analysis, tracking dollars through numerous hands. Residents opposed to recreation or indifferent about trail impacts may be surprised how they unknowingly benefit. There are abundant statistics and studies available on the internet. For example, economic impact output in a Grand Junction study = $7,284,528, Crested Butte study = $10,848,408 and 237 jobs supported for mountain biking alone, not including other trail activities.

https://www.imba.com/sites/default/files/content/resources/2018-11/OA_GMUGNF_MtnBikingStudy2018.pdf

o TALENT RECRUITMENT - Community impact includes recreational opportunities that help recruit talent for otherwise hard to fill positions like medical professionals benefitting everyone in the community. Not just trail users.

o COMMUNITY HEALTH - Another benefit from a great local trail system that is difficult to quantify is how it provides a place to improve community members' mind and body health. Trails provide a release from the stresses of life and a place to improve fitness.

[bull] SAFETY o SAFER ROUTE OFF CR 31 HAUL ROUTE - Although outside the scope of the EA, the proposed non-motorized trail from the town of Dolores to the Bean Canyon trail becomes more critical when considering the EA's Modified Proposed Action. The proposed trail generally parallels Road 31, providing a safer alternative for trail users versus the heavily trafficked road. Road 31 will be the haul route for the logging trucks in the proposed project. Providing a trail alternative to the road is safer for the trail users and the logging trucks and should be a top priority. A portion of the proposed trail includes a short new section of trail on Forest Service land between the boundary and Bean Canyon Trail and requires FS approval. We urge them to consider rapid approval.

o SPEED LIMITS - Speed limits and slow down signage should be posted and enforced for logging trucks at trail crossings, shared trail routes and parking areas.

Sincerely,

Alex Wing, President

Rico Trails Alliance

Date submitted (UTC-11): 3/12/2021 4:42:28 AM
First name: Mark
Last name: Youngquist
Organization:
Title:
Comments:
For comment on the Salter EA vegetation plan, although a great deal of thought and care has been put into the initial plan, I believe there are a number of things that could be clarified.

Economic and community impact: Dolores and much of the surrounding area has a long history of being economically dependent on extractive industry like logging, and indeed after the closing of the town of McPhee, and the subsequent building and filling of the reservoir, the economic vitality of the town of Dolores has been severely distressed. As a business owner in the town of Dolores for 20 years, I believe there has been a long and vital effort to create a new economic engine for the community in the form of recreational opportunities including the biking/hiking and camping in the Boggy Draw area. The economic benefits of recreational visitors to our area were especially evident during this recent pandemic year, when many struggling businesses were spared by the influx of people coming to camp, hike and ride in the boggy draw area, and spending their money in the Dolores and Montezuma County businesses. There appears to be little mention of the possible economic impacts of trail closures both temporary and long term on the local businesses other than logging, as well as the impacts on the attractiveness of the vistas and intimacy of the camping experiences available in the Boggy Draw area.

Rerouting existing trails so as to minimize impact long term. Many of the existing trails within the Boggy Draw system utilize portions of level 1 roads that will be reopened to accommodate logging traffic thus destroying the integrity of the trail system for brief or extended periods of time. Existing trails should be rerouted off of level one roads and the economic cost of rerouting these trails should fall on the proceeds of the timber sales, not the volunteers that built the trails to begin with. Planning and rerouting existing trails that may overlap with level 1 roads and other operations will alleviate conflicts with trail users, and increase overall safety for both recreationists and logging workers.

Trail system Buffers: There seems to be little mention of a buffer around existing trails other than a meager "visual corridor" of 9' from center. This corresponds to about the width of an average parking place, and is too vague to be meaningful. This Visual corridor doesn't adequately address the reclamation guidelines, oversight, or accountability process for the overall plan. Of concern would be the overall impact of logging operations on the visual experience of the trail user and camper. Reclamation of areas affected by logging such as slash piles, burn piles, and reclamation of traffic and skid damage should be immediate, swift, and subject to oversight.

Learn as we go: There may be an opportunity to learn about the ways timber harvesting and reclamation operations can be conducted to be less impactful and more efficient by starting on sections furthest away from the Boggy Draw trail system area. I've noticed that past burns of gamble oak in control areas have required extensive maintenance, and that control of gamble oak in areas wherever canopy has been reduced may necessarily increase.

Singletrack trail quality, scenery and trail flow is critically important to most Boggy Draw trail users, and the economic benefit derived from a beautiful and vital trail system cannot be overstated or discounted. I would ask the FS to consider the Boggy Draw trail system as a vital part of Montezuma county's economic vitality and future, and with that consideration, make every effort to minimize and offset the impacts of any logging operations considered now and in the future. Thank you.

Mark Youngquist
Dolores Resident
Owner/Operator Dolores River Brewery

Date submitted (UTC-11): 3/12/2021 12:00:00 AM
First name: Edward
Last name: Zukoski
Organization: Center For Biological Diversity
Title: Attorney
Comments:
Attached please find comments of the Center for Biological Diversity and WildEarth Guardians on the Salter Project.

Two additional submissions will follow with exhibits to this letter.

Thank you for your attention to this matter.

Ted Zukoski

Center for Biological Diversity

Re: Comments on Salter Vegetation Management Project Environmental Assessment, Project #57671

Dear Ranger Padilla:

On behalf of the Center for Biological Diversity (the Center) and WildEarth Guardians, thank you for the opportunity to provide these comments on the draft environmental assessment ("Draft EA") on the Salter Vegetation Management Project.

The Center is a 501(c)(3) nonprofit organization based in Tucson, Arizona, with offices across the country including in Crested Butte and Denver, Colorado, and has 1.7 million members and online activists. The Center is dedicated to protecting and restoring imperiled species and natural ecosystems. The Center uses science, policy, and law to advocate for the conservation and recovery of species on the brink of extinction and the habitats they need to survive. The Center has and continues to actively advocate for increased protections for species and their habitats across Colorado.

WildEarth Guardians is a nonprofit conservation organization headquartered in Santa Fe, NM with offices in several western states. With more than 178,000 members and supporters WildEarth Guardians work to protect and restore wildlife, wild places, wild rivers, and the health of the American West. For many years, WildEarth Guardians has advocated for an environmentally and economically sustainable transportation system on Forest Service lands, with properly managed motorized recreation. We also promote and support actions that restore ecological integrity to degraded ecosystems in order to ensure at-risk species can thrive.

We are concerned that the Salter Project Draft EA fails to meet the National Environmental Policy Act's (NEPA's) standards for disclosure and public involvement in several respects. While we appreciate the inclusion of an alternative that protects some large, old trees, we remain concerned that the proposed action will destroy thousands of pre-settlement trees, some more than a century old. We believe there is no ecological or social basis for doing so. The Draft EA also fails to contain critical information necessary to understand the project's impacts, including information about the baseline conditions of the project and ab 100+ miles of temporary roads. The Draft EA fails to disclose the project's economic impacts despite the fact that economic development is a project purpose. The Draft EA fails to take a hard look at the project's climate impacts, appearing to ignore the Biden administration's emphasis on quantifying and reducing climate pollution. The Draft EA fails to provide a robust review of the varying impacts of the two action alternatives, undermining the heart of the NEPA process, and fails to respond to critical comments and studies provided by experts contradicting the Forest Service's assumptions. Finally, unless the Forest Service addresses these issues and others, there is a potential for the proposal to have significant impacts, requiring the Forest Service to prepare an environmental impact statement (EIS).

I. THE SALTER PROJECT

The Draft EA states that the Forest Service identified the following needs for the project:

[bull] improve resilience and resistance to epidemic insect and disease outbreaks,

[bull] increase the structural diversity of the ponderosa pine forest represented across the project area, and

[bull] provide economic support to local communities by providing timber products to local industries in a sustainable manner.1

The Draft EA further states that the project is needed to move the forest stands in the area toward desired conditions dictated by the Forest Plan:

The need for this project is derived from the differences between the existing forest vegetation conditions and the desired forest vegetation conditions, as defined by the San Juan National Forest Land and Resource Management Plan.2

The Draft EA also alleges that the project is needed to address an ongoing beetle infestation:

Bark beetles have infested adjacent landscapes causing significant mortality. The early stages of a bark beetle infestation is now being observed in the Salter project area.3

The proposal involves "tree-cutting, tree planting, and activity fuel burning" across "approximately 22,346 acres."4 Those activities include "single tree selection," including the logging of trees up to 26.9" diameter at breast height (dbh), or over 7 feet in circumference, across 19,675 acres.5 The treatment would leave "50-to-70 basal area per acre of residual basal area depending upon stand condition. There are 19,675 acres of this treatment type."6 The project will also involve 3,115 acres of commercial thinning, where again trees up to 26.9" dbh could be chainsawed, and again the target would be "a variable residual square feet of tree stem basal area of 50 -70 basal area per acre depending upon stand condition."7

We request that the Forest Service explain why the prescriptions in the Salter Project differ from those in the nearby Lone Pine project approved last year. There, the Forest Service approved:

- Basal area ranging from 60 to 80 square feet per acre with a target basal area of 70 square feet per acre in the "Large Tree Emphasis/Commercial Thin Prescription."8

- Basal area ranging from 60 to 80 square feet per acre with a target basal area of 60 square feet per acre in the commercial thinning prescription.9

Because the purpose and need statements for the Salter and Lone Pine projects are similar, the Forest Service should explain why the San Juan National Forest is proposing to adopt different prescriptions.

II. THE DRAFT EA LACKS THE SITE-SPECIFIC DETAIL NEPA REQUIRES.

NEPA is "'our basic national charter for protection of the environment.'"10 In enacting NEPA, Congress recognized the "profound impact" of human activities, including "resource exploitation," on the environment and declared a national policy "to create and maintain conditions under which man and nature can exist in productive harmony."11

The statute has two fundamental two goals: "(1) to ensure that the agency will have detailed information on significant environmental impacts when it makes decisions; and (2) to guarantee that this information will be available to a larger audience."12 "NEPA promotes its sweeping commitment to 'prevent or eliminate damage to the environment and biosphere' by focusing Government and public attention on the environmental effects of proposed agency action."13 Stated more directly, NEPA's "'action-forcing' procedures ... require the [Forest Service] to take a 'hard look' at environmental consequences"14 before the agency approves an action. "By so focusing agency attention, NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct."15 To ensure that the agency has taken the required "hard look," courts hold that the agency must utilize "public comment and the best available scientific information."16

NEPA's review obligations are more stringent and detailed at the project level, or "implementation stage," given the nature of "individual site specific projects."17 "[G]eneral statements about possible effects and some risk do not constitute a hard look, absent a justification regarding why more definitive information could not be provided."18

NEPA requires site-specificity to fulfill two basic purposes: 1) to ensure agencies are making informed decisions prior to acting and 2) to ensure the public is given a meaningful opportunity to participate in those decision-making processes.19 Federal courts apply these touchstone criteria when evaluating whether an EIS is adequately site-specific.20

Analyzing and disclosing site-specific impacts is critical because where (and when and how) activities occur on a landscape strongly determines that nature of the impact. As the Tenth Circuit Court of Appeals has explained, the actual "location of development greatly influences the likelihood and extent of habitat preservation. Disturbances on the same total surface area may produce wildly different impacts on plants and wildlife depending on the amount of contiguous habitat between them."21 The Court used the example of "building a dirt road along the edge of an ecosystem" and "building a four-lane highway straight down the middle" to explain how those activities may have similar types of impacts, but the extent of those impacts - in particular on habitat disturbance - is different.22 Indeed, "location, not merely total surface disturbance, affects habitat fragmentation,"23 and therefore location data is critical to the site-specific analysis NEPA requires. Merely disclosing the existence of particular geographic or biological features is inadequate; agencies must discuss their importance and substantiate their findings as to the impacts.24

NEPA further mandates that the agency provide the public "'the underlying environmental data' from which the Forest Service develop[ed] its opinions and arrive[d] at its decisions."25 "The agency must explain the conclusions it has drawn from its chosen methodology, and the reasons it considered the underlying evidence to be reliable."26 In the end, "vague and conclusory statements, without any supporting data, do not constitute a 'hard look' at the environmental consequences of the action as required by NEPA."27

CEQ's regulations establish specific ways agencies must analyze proposed actions, including project-level decisions, including a detailed discussion of direct, indirect, and cumulative impacts and their significance; and an analysis of reasonable alternatives to the proposed action.28 Such analysis is required for both environmental assessments and EISs.

The Salter Project is a project-level decision. As a result, any NEPA analysis must include the detailed information and analysis that NEPA and the CEQ regulations require.

While the Draft EA contains some description of the location and nature of proposed vegetation treatments, we are concerned that it still fails to comply with NEPA, as described below.

B. The Draft EA Fails to Disclose Some of the Salter Project's Site-Specific Direct and Indirect Effects.

Although NEPA requires that analysis disclose specific information about the when, where, and how of any agency action, so that the impacts and alternatives can be described and weighed, the Draft EA does not appear to contain some of this data. We request that the Forest Service more directly address these issues.

The where and the how of new temporary road construction are not disclosed, or are disclosed incompletely.

For example, the Draft EA inconsistently identifies the total mileage of temporary roads. At one point, the Draft EA states noncommittally that "temporary roads may be required to reduce the need for excessive tractor skidding and allow wood products to be moved to the permanent road system."29 Despite the fact the temporary roads "may be" required, the Draft EA then asserts that "[a]pproximately 50-to-75 miles of temporary road construction are analyzed under this proposal."30 Elsewhere, the EA states with more assurance that "[i]mplementing the proposed action would require development of approximately 106 miles of temporary roads."31 But even that number is apparently a guestimate because temporary roads will only be laid out later:

Though these roads have been theoretically identified, the final alignment may deviate from the plan. Such deviation would be limited to that agreed by the Forest Service (Engineering Representative/Sale Administrator) and the contractor. The implementation of the proposed action should not result in an increase of temporary road mileage greater than 10 percent of the estimated 106 miles of primary temporary roads. Therefore, 11 miles or less of addition temp roads can be expected.32

Thus, the Forest Service predicts that as many as 117 miles of temporary road may be built for the project, and the agency will not identify the precise location of the routes' final alignment until the Forest Service and the contractor agree, long after the NEPA process has terminated.

Road construction - even for temporary roads - removes all vegetation within the area graded, eliminates and fragments habitat, alters hydrology, and can act as a vector for human-caused fires and the spread of noxious weeds. Road use can cause roadkill, disturb wildlife during critical periods (winter, nesting/calving, etc.), and increase opportunities for poaching. Thus, the nature and location of the road network to be used and constructed is critical to understanding this project's impacts. However, the Draft EA fails to define the location of temporary road use and road construction, and omits other data important to understanding road impacts.

The Forest Service has long acknowledged that temporary roads can have significant impacts. In its analysis of the Roadless Area Conservation Rule - which generally barred the construction of both permanent and temporary roads - the agency stated:

Although only used for relatively short periods, temporary roads present most of the same risks posed by permanent roads, although some may be of shorter duration. Many of these roads are designed to lower standards than permanent roads, are typically not maintained to the same standards, and are associated with additional ground disturbance during their removal[hellip]. While temporary roads may be used for periods ranging up to ten years, and are then decommissioned, their short- and long-term effects can be extensive to terrestrial species and habitats.33

The Final EIS on the Roadless Rule also noted that "[t]he use of temporary roads may have the same long lasting and significant ecological effects as permanent roads, such as the introduction of nonnative vegetation and degradation of stream channels."34 Temporary "[s]kid roads and trails, log landings, and similar disturbances within the [timber] sale area are the main cause of soil erosion and can contribute up to 90% of the sediment generated by timber sale activity (Patric 1976; Swift 1988)."35 The Roadless Rule Final EIS acknowledges that temporary road construction can cause increased risk of surface erosion and landslides, but that this varies widely and depends on local site characteristics.36 But "local site characteristics" are not disclosed in the Draft EA because that document fails to disclose the location of proposed temporary roads.

Maps in the Draft EA fail to appear to hint at where some temporary road construction will occur, but the maps do not appear to disclose where the routes will be constructed within cutting units.37 This may be due to an error in the map display (in which the temporary roads are hidden under the layer for logging units). Whatever the reason, it is difficult to discern where the Forest Service intends to construct temporary roads. The Transportation System report in the project file does little to help the reader understand temporary road impacts.38 While that report provides a unique number for each temporary route and estimates its potential length, it does not provide much useful information about where the roads will be constructed or the resources the roads may impact.

Because the Draft EA fails to disclose the location of temporary roads, or the values and conditions they might impact, it cannot provide the decisionmaker or the public with any idea whether or where these undefined measures may be required. This violates NEPA's hard look mandate.

Further, the width of new roads - which defines the level of direct habitat destruction from bulldozing - is not defined, and the Draft EA provides little guidance as to when, if ever, widths might be restricted, again making it impossible for the public or the agency to know the extent of project impacts.39 The Draft EA states: "Temporary roads would be held to the minimum feasible number, width and total length and would be located sufficiently far from streams and other water bodies to minimize discharge into those waters except at necessary water crossings."40 This provides little helpful information about the location, number, width, or impacts of the routes.

The Draft EA similarly provides little information about skid trails. The Draft EA states that "[s]kid trails would be held to the minimum number, width, and length."41 This provides neither the public nor the decisionmaker with any idea as to the number, length, or scope of potential impacts from such trails, which will crush vegetation, cause a loss of habitat, and compact soil, among other impacts. Further, the amount of surface area that skid trails, roads and similar disturbance is so large that impacts from these features appears certain to be significant. The Draft EA states that "[p]roposed design features for Hydrology and Soils also restrict roads, landings, skid trails, concentrated-use sites, and similar soil disturbances to designated sites to no more than

15 percent of any timber sale unit."42 Given that there are 22,790 acres of logging units, skid trails, roads, etc. could impact up to 3,400 acres - an area of more than five square miles.

The Draft EA cannot take the required hard look at the impacts of temporary roads because it fails to disclose not only the location of these roads but also of the values that could be impacted by road construction and use. For example, the Draft EA fails to define the "where" of sensitive soil resources.

With respect to wildlife, the Draft EA provides no maps showing the location of habitat for any species (apart from elk and goshawk), or the relative value of such habitat, or where such habitat may be impacted by logging, road construction, road use, or fire. This makes it difficult for the public or the agency to understand impacts, or to evaluate whether an alternative to avoid certain areas could be crafted.

In short, specific road construction plans may be designed only after project approval, meaning that only then will the Forest Service have the site-specific information necessary to understand the project's impacts and mitigate them. This gets NEPA compliance backwards. NEPA mandates that agencies look before they leap. We urge the agency to provide the when, where, and how of the project - including temporary roads - in any subsequently prepared NEPA document.

Areas to be avoided/mitigated. The Draft EA notes that it will design treatments to avoid certain areas (e.g. water influence zones), thus potentially concentrating logging activities in remaining areas. But the Draft EA fails to disclose where most of these values may exist that vegetation treatments are designed to protect or avoid, thus making it difficult to understand the impact of these provisions on project design and on the environment.

The Draft EA states that certain design elements will minimize or avoid potential adverse effects to resources including water influence zones (WIZ), riparian areas, and other wetlands. For example, the Draft EA states:

- Organic soils associated with riparian areas, intermittent streams, and the water influence zone (WIZ) would be protected through a no harvest/no mechanized equipment buffer.

- Intermittent streams with riparian vegetation would have a buffer strip width of 100 feet on each side of the channel unless a field visit by hydrologist determines a different sitespecific buffer.43

- Mechanical treatments would avoid wetlands, wet meadows and riparian areas. No skidding, decking or loading would be allowed in these areas in order to protect water quality, existing soils, and vegetative cover.44

But the Draft EA and associated documents made available to the public as part of the EA appear to not identify these areas on maps. Nor is the extent of these areas described or quantified.

The "how" of some of the design elements is also undefined. The Draft EA states, for example, that "[p]roper drainage would be constructed or reconstructed on existing system road and newly constructed temporary roads."45 What "proper drainage" is or how it will influence the location or extent of road construction is not explained. The failure to provide this information violates NEPA.

C. The Draft EA Fails to Disclose Important Baseline Conditions in the Project Area.

The Draft EA's failure to disclose the where and the how of the project also results in a failure to comply with another NEPA requirement: the mandate that agencies "succinctly describe the environment of the area(s) to be affected or created by the alternative under consideration."46 NEPA requires the action agency to set an appropriate baseline detailing the nature and extent of the resources in the area: "The concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process."47 "Without establishing ... baseline conditions ... there is simply no way to determine what effect [an action] will have on the environment and, consequently, no way to comply with NEPA."48

Without baseline data, neither the public nor the agency can understand the effects of the proposed action or craft and analyze alternatives and mitigation measures to protect these values. As such, the Forest Service has

a duty to identify the environmental baseline and affected environment, as well as the scope of impacts and where those impacts are most likely to be felt.

For example, the Draft EA fails disclose significant information about existing forest conditions. While the Draft EA alleges that some forest stands within the project area are impacted by insect infestations,49 it fails to disclose the location of those stands or the extent of the beetle attack.

The effectiveness of the type of treatments could be influenced by beetle activity. But the Draft EA fails to provide maps juxtaposing treatment units and the infestations. The "where" of these infestations on the landscape is not disclosed.

The Draft EA also contains little site-specific information on a variety of other resources, including wildlife and wetlands, among other resources. The Draft EA could also be improved by including maps showing existing stand information such as basal area, which the project would reduce. The Forest Service could also disclose by stand the percentage of trees above several potential size limits (e.g., 16" dbh, 20" dbh, and 26" dbh) so that the public and the decisionmaker could understand the distribution of old and large trees. We understand from reviewing Powerpoint presentations prepared for the DWRF Collaborative that the Forest Service has much of this data. Thus, the Forest Service could likely generate such maps based on existing data.

Baseline information will also better enable the public to understand whether there is a need for the project. The Draft EA states that: "In the past ten years, approximately 34 percent of the project area has experienced fire, either wildfire or prescribed."50 This statement raises numerous questions which we urge the Draft EA to answer: Where are these tens of thousands of acres? What basal area remains in these areas? Are these areas contained in any cutting units? What basal area remains? Did the fires result in residual basal area that approximated what the Salter Project proposes to achieve? Has previous fire covering more than one-third of the project reduce the need for "resilience" treatments because those fires have made the landscape more resilient to beetle infestations or future fire? If not, why not? If these fires have effectively fire-proofed large portions of the project area, or at least greatly reduced the risk of future high intensity fire, is there still a need for the project?

We urge the Forest Service in any subsequently prepared NEPA document to include baseline, site-specific information about the project area so that the public can better understand and appreciate the values at issue and how the proposed action and alternatives may impact those values.

D. The Draft EA Fails to Disclose Meaningful Information about Cumulative Effects.

The Draft EA lacks the necessary detail to understand how the impacts of the Salter Project may interact with other private or Forest Service actions, in at least two key respects.

First, the Draft EA fails to meaningfully address off-road vehicle travel, an activity which may have cumulative effects when viewed together with the proposed action.51 In much of the project area, which is popular with hunters, individuals may drive off-highway vehicles up to one mile from Forest Service roads to retrieve game, according to the motor vehicle use map for the Dolores Ranger District. Full-sized vehicles may also travel up to 300 feet from either side of many of the open roads within the project area for dispersed camping. Thus, motor vehicle use for limited purposes can legally occur off road across the vast majority of the project area. Such vehicle use will likely hinder reforestation, compound damage to soils and watersheds, crush seedlings and make reforestation more difficult, render temporary road closures and obliteration less effective, and increase the potential for the spread of exotic weeds. The fact that the cutting units "are easily accessible, occurring mostly on roaded landscapes and relatively gentle terrain" may make it difficult to effectively close routes.52 Any subsequently prepared NEPA should address the effectiveness of existing road closures.

The Forest Service cannot argue that a prior NEPA document (for the Oct. 2011 Boggy-Glade transportation plan) addresses these impacts. That nearly ten-year-old EA did not take into consideration the Salter Project with its more decade of logging, the up-to-117 miles of temporary road, nearly 150 miles of road improvement, or the beetle infestation. The existing, permissive off-road vehicle management policy is likely to have synergistic and damaging impacts with the Salter Project. We urge the Forest Service to disclose these impacts in any subsequently prepared NEPA document.

Second, the Draft EA identifies several "follow-up" actions that will be required or are otherwise foreseeable, but whose impacts the EA does not appear to disclose. The Forest Service indicates that "[f]ollow-up [prescribed fire] treatments must occur within 6-15 years [of initial broadcast burns] in order to further reduce surface fuel loading."53 This means more smoke and more activity in the project area could be occurring virtually constantly for 25 years following the initiation of the 10-year project. The Draft EA also states within the 3,000+ acres of lands subject to commercial thinning, additional logging will occur in "these stands at roughly 20-to-25 year[]" intervals,54 meaning more noise, more construction, more displacement of wildlife are virtually guaranteed to occur over not just the short-term but the long-term. We urge the Forest Service to address cumulative effects of these foreseeable follow-up actions in any subsequent NEPA document.

III. THE DRAFT EA FAILS TO TAKE A HARD LOOK AT POTENTIALLY SIGNIFICANT IMPACTS.

A. The Draft EA Fails to Take a Hard Look at the Project's Economic Impacts.

A primary purpose and need for the project is to "provide economic support to local communities by providing timber products to local industries in a sustainable manner," and the project includes "commercial thinning" on more than 3,000 acres.55 Despite these facts, the Draft EA "dismissed" the issue of economics "from detailed analysis," and instead includes a general narrative about timber markets in the area with virtually no discussion or analysis of the economic impacts of the Salter Project, and no comparison among the alternatives.56.

What little analysis the Draft EA contains indicates that the San Juan National Forest considers it important to offer large trees for sale as an incentive to entice timber mills to log smaller trees:

Offering a mixture of saw log and smaller diameters timber in the right ratio is important to ensure offerings are marketable. The size of these sales is equally important in both volume and acres to ensure the work is completed on time and has a sustained profitability. The ability to include large volumes and achieve vegetation management at landscape level is possible with the existing industry.57

Although supporting local industry is a project goal, and the Forest Service apparently assumes such benefit will occur, the Draft EA fails to contain any projections or quantification of the likely board-feet the project will make available to local mills, nor the economic impact of the project in terms of income or employment. Because the Forest Service has detailed stand data for the project area, such an analysis would seem relatively straightforward to perform.

The Draft EA's failure to quantify the potential economic impacts not only violates NEPA, it is puzzling in light of the fact that the Forest Service elsewhere performs this analysis as a matter of course. For example, in a recent final EA for a logging project in Montana, the Forest Service estimates for each alternative: the acres harvested; the board footage to be logged; appraised stumpage rates; the predicted high bid; the total revenue to be generated; the present net value of the timber harvest and other resource activities; and the total employment and labor income estimated to be generated over the life of the project.58

Further, if an economic analysis shows no difference between Alternative 2 (cutting trees up to 26.9" dbh) and Alternative 3 (cutting trees up to 20" dbh), that would undermine the argument of some industry supporters that logging larger trees is necessary to ensure the commercial viability of logging in this part of the San Juan NF.

Any analysis the Forest Service performs should address the potential for lost income to the town of Dolores due to the potential impact of the Salter Project on recreation. The area targeted for logging is popular with mountain bikers, equestrians, hikers, hunters, and other recreationists, receiving "moderate to heavy levels of recreation use" in the summer and fall.59 In fact, "[t]he Boggy treatment block is a high use recreation area and one of the most heavily used recreation zones on the District. Over the past five years more than $300,000 of trail infrastructure projects have been completed on the Boggy non-motorized and motorized trail system."60

The constant presence of logging trucks, road graders, and the sound of chainsaws and heavy equipment for a decade (or longer, if follow-on treatments are analyzed) is likely to discourage some from visiting this part of the forest, with the potential for loss of revenue to local businesses.61 While the Draft EA admits the likelihood that recreation will be deterred,62 it fails to address or quantify the economic impacts of that result beyond admitting

that there could be such impacts.63 NEPA's hard look mandate requires more. Given that the town has begun a transition from resource extraction to recreation, the Salter Project may represent a step backward in terms of its economic development, one that should be estimated and quantified, so it can be compared to the alleged economic benefits of logging.

If it is in fact a purpose of the project to "provide economic support to local communities," the Forest Service must evaluate and quantify the extent to which various alternatives will achieve that goal.

B. The Draft EA Fails to Take a Hard Look at the Project's Climate Impacts.

1. The Climate Crisis

The climate crisis is the overriding environmental issue of our time, threatening to drastically modify ecosystems, alter coastlines, worsen extreme weather events, degrade public health, and cause massive human displacement and suffering. Its impacts are already being felt in the United States, and recent studies confirm that time is running out to forestall the catastrophic damage that will result from 1.5 degrees Celsius of warming.64 More recent studies have confirmed that climate change is accelerating, making the need to protect carbon stores even more urgent than it was just a few years ago.65

Climate change is impacting Colorado now. Most of the state has warmed one or two degrees Fahrenheit in the last century. Snowpack on average is declining. Fire season is lengthening. Drought periods are occurring more often.66 Policymakers and legislators have responded by requiring Colorado to adopt a climate action plan that calls for a 25% reduction in greenhouse gas emissions by 2025 and a 50% reduction by 2030. The Forest Service needs to be part of the solution, not part of the problem.

2. President Biden requires prompt action to assess and reduce climate pollution.

On the day he was inaugurated, President Biden committed to overturning the prior administration's failure to address, and its outright denial of, the climate emergency.

It is, therefore, the policy of my Administration to listen to the science; to improve public health and protect our environment; to ensure access to clean air and water; to limit exposure to dangerous chemicals and pesticides; to hold polluters accountable, including those who disproportionately harm communities of color and low-income communities; to reduce greenhouse gas emissions; to bolster resilience to the impacts of climate change; to restore and expand our national treasures and monuments; and to prioritize both environmental justice and the creation of the well-paying union jobs necessary to deliver on these goals.

To that end, this order directs all executive departments and agencies (agencies) to immediately review and, as appropriate and consistent with applicable law, take action to address the promulgation of Federal regulations and other actions during the last 4 years that conflict with these important national objectives, and to immediately commence work to confront the climate crisis.67

Days later, President Biden further committed to taking swift action to address the climate crisis.

Per Executive Order 14,008, he has recognized that "[t]he United States and the world face a profound climate crisis. We have a narrow moment to pursue action at home and abroad in order to avoid the most catastrophic impacts of that crisis and to seize the opportunity that tackling climate change presents."68 Pres. Biden announced that under his administration,

The Federal Government must drive assessment, disclosure, and mitigation of climate pollution and climate-related risks in every sector of our economy, marshaling the creativity, courage, and capital necessary to make our Nation resilient in the face of this threat. Together, we must combat the climate crisis with bold, progressive action that combines the full capacity of the Federal Government with efforts from every corner of our Nation, every level of government, and every sector of our economy.69

Addressing the need for the accurate assessment of climate costs, Pres. Biden announced on day one that "[i]t is essential that agencies capture the full costs of greenhouse gas emissions as accurately as possible,

including by taking global damages into account."70 The President also re-established Interagency Working Group on the Social Cost of Greenhouse Gases, on which the Secretary of Agriculture will serve.71 The President directed the Working Group to publish interim values for the social cost of carbon by February 19, 2021.72 The Working Group that month set that price at $51/ton at a 3% discount rate.73

3. NEPA requires the Forest Service to disclose the climate impacts of proposed actions.

The Forest Service must analyze the direct, indirect, and cumulative impacts of a proposed action.74 NEPA and NFMA require the Forest Service to use high quality, accurate, scientific information to assess the effects of a proposed action on the environment.75

Meaningful consideration of greenhouse gas emissions (GHGs) and carbon sequestration (carbon storage) lies within the scope of required NEPA review.76 As the Ninth Circuit has held, in the context of fuel economy standard rules:

The impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct. Any given rule setting a CAFE standard might have an "individually minor" effect on the environment, but these rules are "collectively significant actions taking place over a period of time."77

Courts have held that a "general discussion of the effects of global climate change" does not satisfy NEPA's hard-look requirement.78

Further, courts have ruled that federal agencies must consider indirect GHG emissions resulting from agency policy, regulatory, and fossil fuel leasing decisions. For example, agencies cannot ignore the indirect air quality and climate change impact of decisions that would open up access to coal reserves.79 An analysis that does not adequately consider the indirect effects of a proposed action, including climate emissions, violates NEPA.80

NEPA requires "reasonable forecasting," which includes the consideration of "reasonably foreseeable future actions [hellip] even if they are not specific proposals."81 That an agency cannot "accurately" calculate the total emissions expected from full development is not a rational basis for cutting off its analysis. "Because speculation is ... implicit in NEPA," agencies may not "shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as crystal ball inquiry."82 The D.C. Circuit has echoed this sentiment, rejecting the argument that it is "impossible to know exactly what quantity of greenhouse gases will be emitted" and concluding that "agencies may sometimes need to make educated assumptions about an uncertain future" in order to comply with NEPA's reasonable forecasting requirement.83

The 2016 final CEQ Guidance on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in NEPA Review provides useful direction on the issue of federal agency review of greenhouse gas emissions as foreseeable direct and indirect effects of a proposed action.84 The CEQ guidance provides clear direction for agencies to conduct a lifecycle greenhouse gas analysis that quantifies GHG emissions or storage because the modeling and tools to conduct this type of analysis are available:

If the direct and indirect GHG emissions can be quantified based on available information, including reasonable projections and assumptions, agencies should consider and disclose the reasonably foreseeable direct and indirect emissions when analyzing the direct and indirect effects of the proposed action. Agencies should disclose the information and any assumptions used in the analysis and explain any uncertainties. To compare a project's estimated direct and indirect emissions with GHG emissions from the no-action alternative, agencies should draw on existing, timely, objective, and authoritative analyses, such as those by the Energy Information Administration, the Federal Energy Management Program, or Office of Fossil Energy of the Department of Energy. In the absence of such analyses, agencies should use other available information.85

The guidance further specifies that estimating GHG emissions is appropriate and necessary for actions such as federal logging projects.

In addressing biogenic GHG emissions, resource management agencies should include a comparison of estimated net GHG emissions and carbon stock changes that are projected to occur with and without implementation of proposed land or resource management actions. This analysis should take into account the

GHG emissions, carbon sequestration potential, and the changes in carbon stocks that are relevant to decision making in light of the proposed actions and timeframes under consideration.

Although the Trump administration withdrew the 2016 CEQ guidance, President Biden on January 20, 2021 rescinded that Trump Executive Order, and directed CEQ to "review, revise, and update" its 2016 climate guidance.86 On February 19, 2021, CEQ effectively reinstated the 2016 GHG guidance:

CEQ will address in a separate notice its review of and any appropriate revisions and updates to the 2016 GHG Guidance. In the interim, agencies should consider all available tools and resources in assessing GHG emissions and climate change effects of their proposed actions, including, as appropriate and relevant, the 2016 GHG Guidance.87

Further, regardless of the guidance, the underlying requirement from federal courts - that NEPA requires agencies to consider, quantify, and disclose climate change impacts, including indirect and cumulative combustion impacts and loss of sequestration foreseeably resulting from commercial logging decisions - has not changed.88

4. The Forest Service's failure to disclose and quantify the Salter Project's climate damage violates NEPA.

The Forest Service categorizes the climate change impacts of the Salter Project as a "Resource[] Dismissed from Detailed Analysis," and spends a mere 10 sentences explaining why the issue is of no import.89 The Draft EA asserts that: "Climate change analysis is guided by Climate Change Considerations in Project-Level NEPA Analysis (U.S. Forest Service 2009), which recommends consideration of both the effect of a proposed action on climate change, and the effect of climate change on a proposed action."90 The Forest Service's reliance on discredited, and long out-ofdate, guidance from the George W. Bush administration runs directly counter to the current administration's aggressive approach to both accounting for and addressing climate change, and further conflicts with CEQ's 2016 guidance.

The Draft EA violates NEPA and is arbitrary and capricious because it focuses exclusively (but qualitatively) on the alleged benefits of purporting to make the forest more "resilient" to the environmental factors made worse by climate change - drought and insect infestations - while effectively denying and declining to quantify the impacts on climate pollution and carbon storage of logging, burning, and trucking trees from the forest. Although responding to climate change appears to be a primary project purpose, the Draft EA contains almost nothing on the project's impact on climate pollution or climate change. The Salter Project will have at least two types of climate impacts that the EA ignores: it will deplete carbon stores by removing trees that fix carbon; and it will result in the combustion of fossil fuels to implement logging and road construction.

a. The Forest Service fails to disclose and quantify the Salter Project's impact on carbon storage.

The Salter Project will have direct, indirect, and cumulative impacts on climate change because logging and burning forests will impact the ecosystem's ability to store carbon.

Science makes clear that the Salter Project will worsen climate emissions by removing large trees that are currently fixing carbon, turning them into wood products (which results in a significant loss of that carbon fixed in wood), and leaving a landscape with no trees and (eventually) seedlings that fix far less carbon than mature forests.

The Draft EA fails to contain any analysis of the Salter Project's impact on climate stores and carbon pollution, although the project will likely remove millions of board feet of timber. In addition, the project will log potentially thousands of old and mature trees, some as large as 7 feet in circumference, and likely decrease the ability of those stands and that land to sequester carbon for years to come. The proposed action will involve removing some trees over a century old, which are assuredly fixing significant amounts of carbon.

Logging old trees in particular worsens climate change by releasing significant amounts of carbon and by preventing such forests from continuing to sequester carbon. As the Forest Service has admitted regarding mature forests in Alaska, such forests "likely store considerably more carbon compared to younger forests in this area (within the individual trees themselves as well as within the organic soil layer found in mature forests)."91 This is so because when a forest is cut down, the vast majority of the stored carbon in the forest is released over time as $CO_2$, thereby converting forests from a sink to a "source" or "emitter."92 According to a

2019 IPCC report, deforestation causes climate pollution, and avoiding deforestation will reduce climate pollution.93

Recent studies agree that maintaining forests rather than cutting them can help reduce the impacts of climate change. "Stakeholders and policy makers need to recognize that the way to maximize carbon storage and sequestration is to grow intact forest ecosystems where possible."94 One report concludes:

Allowing forests to reach their biological potential for growth and sequestration, maintaining large trees (Lutz et al 2018), reforesting recently cut lands, and afforestation of suitable areas will remove additional CO2 from the atmosphere. Global vegetation stores of carbon are 50% of their potential including western forests because of harvest activities (Erb et al 2017). Clearly, western forests could do more to address climate change through carbon sequestration if allowed to grow longer.95

A June 2020 literature review from leading experts found thinning provided little advantage for carbon storage:

There is absolutely no evidence that thinning forests increases biomass stored (Zhou et al. 2013). It takes decades to centuries for carbon to accumulate in forest vegetation and soils (Sun et al. 2004, Hudiburg et al. 2009, Schlesinger 2018), and it takes decades to centuries for dead wood to decompose. We must preserve medium to high biomass (carbon-dense) forest not only because of their carbon potential but also because they have the greatest biodiversity of forest species (Krankina et al. 2014, Buotte et al. 2019, 2020).96

Two experts in the field recently concluded:

Recent projections show that to prevent the worst impacts of climate change, governments will have to increase their pledges to reduce carbon emissions by as much as 80%. We see the next 10 to 20 years as a critical window for climate action, and believe that permanent protection for mature and old forests is the greatest opportunity for near-term climate benefits.97

Further, to address the climate crisis, agencies cannot rely on the re-growth of cleared forests to make up for the carbon removed when mature forest is logged. One prominent researcher explains: "It takes at least 100 to 350+ years to restore carbon in forests degraded by logging (Law et al. 2018, Hudiburg et al. 2009). If we are to prevent the most serious consequences of climate change, we need to keep carbon in the forests because we don't have time to regain it once the forest is logged (IPCC, 2018)."98

Studies also demonstrate that significant volumes - in some cases a majority - of carbon stored in trees are immediately lost when trees are logged and milled, and the rest is likely to be returned to the atmosphere sooner than would occur if the trees were left standing.

[H]arvesting carbon will increase the losses from the forest itself and to increase the overall forest sector carbon store, the lifespan of wood products carbon (including manufacturing losses) would have to exceed that of the forest. Under current practices this is unlikely to be the case. A substantial fraction (25%- 65%) of harvested carbon is lost to the atmosphere during manufacturing and construction depending on the product type and manufacturing method. The average lifespan of wood buildings is 80 years in the USA, which is determined as the time at which half the wood is no longer in use and either decomposes, burns or, to a lesser extent, is recycled. However, many forest trees have the potential to live hundreds of years [hellip].99

Other studies indicate that there is little substitution benefit of using wood compared to using other products (e.g., concrete for building), and that industry talking points to the contrary vastly overestimate the carbon benefits of using wood.100

Even if the logging permitted in the Salter Project - when viewed in isolation - may only result in relatively minor climate impacts, NEPA expressly requires agencies to consider whether agency actions are "related to other actions with individually insignificant but cumulatively significant impacts."101 Thus, the Forest Service may not dismiss and deny the climate impacts of the Salter Project without considering the cumulative significance of the project when added to other past, present, and reasonably foreseeable logging projects and Forest Service timber sales in the state, region, and nation.102 The Forest Service failed to address these cumulative effects, violating NEPA.

The Forest Service's approach also violates NEPA because the Forest Service did not use its best efforts or the best available information to address climate impacts. Methods exist that would have allowed the agency to quantify those impacts. For example, a 2018 study concludes that carbon storage impacts can be estimated, accounted for, and factored into a model that calculated the net amount of carbon lost due to forest logging in Oregon over two five-year periods.103 This is precisely the type of analysis the Forest Service should, and could, have undertaken for Salter EA.

Similarly, Dr. DellaSala's 2016 report addressed carbon stores from wood products and concluded that logging Tongass old-growth forest under the 2016 Forest Plan would result in net annual CO2 emissions totaling between 4.2 million tons and 4.4 million tons, depending on the time horizon chosen.104 The Bureau of Land Management more than a decade ago completed an EIS for its Western Oregon Resource Management Plan in which that agency also predicted the net carbon emissions from its forest and other resource management programs.105 Because agencies and academics have quantified and compared the carbon emissions of alternative logging proposals, NEPA requires the Forest Service to do so here.

Rather than acknowledging current science or availing itself of existing methods for disclosing the climate impacts of logging and burning that the project proposes, the Draft EA dismisses any climate impacts as "immeasurable," or "small."

During project implementation there would be small, incremental losses of carbon sequestration due to burning of vegetation and consumption of fossil fuels by equipment. Trees would be harvested over time; however, carbon could continue to be stored in manufactured wood products that used harvested materials (Nunery and Keeton 2010). As implementation proceeds, there would immediately be small, beneficial effects to carbon sequestration due to growth of vegetation. In the long-term, carbon sequestration would be sustainably increased through continuing growth of a healthy forest. The described changes in greenhouse gas emissions resulting from the proposed action is immeasurable.

This analysis ignores the best available science, described above, which has concluded that:

- Carbon storage in wood products is minimal compared to the carbon stored in living trees.

- There is no proven benefit to thinning forests in terms of increasing carbon storage.

- The impacts of forest logging projects on carbon stores can be estimated/quantified.

- When the impact of logging on carbon stores is estimated, it can and should be quantified in terms of the impacts of climate pollution on the globe via the social cost of carbon.

Dismissing impacts as "small" and "immeasurable" is not only inaccurate, it is a form of climate denial. Every additional molecule of CO2 emitted into the atmosphere will be increasing the amount of warming on Earth for centuries to come. Further, dismissing all impacts as "immeasurable" deprives the public and the decisionmaker of any understanding of the relative impacts of each alternative. For example, it is likely that the large tree retention alternative (Alternative 3) will result in the retention of more carbon stores than Alternative 2 because large trees store more carbon than smaller trees.

The Forest Service's failure to address or acknowledge that there are peer-reviewed scientific approaches to estimating net climate damage caused by logging forests is another independent NEPA violation. NEPA requires agencies to explain opposing viewpoints and their rationale for choosing one viewpoint over the other.106 Courts will set aside a NEPA document where the agency fails to respond to scientific analysis that calls into question the agency's assumptions or conclusions.107

Here, the Draft EA fails to grapple with the most recent national policy direction and science on forests and carbon sequestration, including many of the studies attached here. The Draft EA ignores years of climate science that: underscores the desperate need for action on climate change; shows that forest logging like that proposed in the Salter Project will likely worsen climate pollution and the climate emergency; and demonstrates, contradictory to the Forest Service's lack of analysis, that the climate impacts of the Project can be quantified.

The U.S. District Court for the District of Montana last month set aside a federal agency NEPA analysis for failing to quantify the social costs of agency action's climate pollution.108 As noted above, President Biden has already announced that his administration would reinstate the Interagency Working Groups' Social Cost of Carbon using a metric that includes global damage from climate-forcing pollution, and the Working Group has set a price for agencies to utilize in their analyses.

We note that the Draft EA relies on agency direction that is out of date and out of step with the present administration. The Forest Service relies on guidance entitled "Climate Change Considerations in Project Level NEPA Analysis," a flawed document that was the product of the final week of the George W. Bush administration in January 2009, and that has long been overtaken by both federal case law and CEQ's 2016 guidance, now restored, requiring robust project level NEPA analysis and by improved modeling and scientific data.109 The Forest Service cannot continue to rely on this guidance document unless and until it can explain how the 2009 guidance comports with current CEQ guidance and caselaw.

Finally, while the Forest Service may assert that the logging the forest will prevent fires which will result in greater carbon pollution, at least one study found the opposite: that at least at an aggregate level, logging resulted in many times more carbon pollution than did wildfire.110

b. The Forest Service fails to disclose and quantify the carbon pollution of implementing the Salter Project.

Logging and burning within the project area for a decade will require the use of heavy equipment, almost certainly exclusively powered by fossil-fueled engines, to bulldoze a vast network of up to 117 miles of temporary road, to "reconstruct" other roads, and to chainsaw forests, and remove trees and take them to market. This activity will result in greenhouse gas pollution that will worsen climate change for centuries, and that pollution caused by the proposed action will be over and above the pollution that will occur under the no action alternative. The Draft EA fails to estimate or otherwise address such impacts, or how such pollution would vary by alternative.

This contrasts to the approach taken elsewhere by the Forest Service and other agencies, such as the Office of Surface Mining, which have disclosed in NEPA documents the estimated pollution from internal combustion engines necessary to mine, process, and ship coal to market.111

We do not endorse as sufficient either the OSM or Federal Coal Lease Modifications analyses cited, but they demonstrate that agencies (including the Forest Service itself) can and do attempt to disclose direct climate emissions from construction and transport activities. The Forest Service provides no reasonable basis for failing to do the same for the Salter Project, and thus violates NEPA.

IV. THE DRAFT EA'S RELIANCE ON 'ADAPTIVE MANAGEMENT' VIOLATES NEPA.

The Salter Draft EA relies in part on an "adaptive management" strategy to "inform implementation and to provide the opportunity to solicit input from partners that could be incorporated into the decision making process when addressing changing conditions on the ground in real-time."112 The Draft EA states that pursuant to this plan, "[a]djustments to prescriptions could be made at any time as long as they are within the scope of this analysis."113

To be effective and legal, adaptive management must: (1) clearly identify measurable thresholds that, if exceeded as determined by monitoring, will require a change in management; (2) clearly identify what that changed management will entail; and (3) disclose in this NEPA document the impacts caused by that change in management. Because the Draft EA fails on at least the last counts, the Forest Service cannot rely on the adaptive management strategy as currently divulged in the EA.

A. The Law of Adaptive Management.

Forest Service NEPA regulations, adopted in 2008, define adaptive management as "[a] system of management practices based on clearly identified intended outcomes and monitoring to determine if management actions are meeting those outcomes; and, if not, to facilitate management changes that will best

ensure that those outcomes are met or re-evaluated. Adaptive management stems from the recognition that knowledge about natural resource systems is sometimes uncertain."114 These regulations further state that:

An adaptive management proposal or alternative must clearly identify the adjustment(s) that may be made when monitoring during project implementation indicates that the action is not having its intended effect, or is causing unintended and undesirable effects. The EIS must disclose not only the effect of the proposed action or alternative but also the effect of the adjustment. Such proposal or alternative must also describe the monitoring that would take place to inform the responsible official during implementation whether the action is having its intended effect.115

The preamble to the Forest Service's regulation that adopted the adaptive management definition states that the agency must identify the proposed changes, and their impacts, in the NEPA document. "When proposing an action the responsible official may identify possible adjustments that may be appropriate during project implementation. Those possible adjustments must be described and their effects analyzed in the EIS." 73 Fed. Reg. 43,084, 43,090 (July 24, 2008).

Federal courts have found agencies violated NEPA or the Endangered Species Act (ESA) where the agency relied on an "adaptive management" plan that was vague, set no specific triggers for future action, failed to describe that future action, or failed to ensure that resources will be protected as the adaptive management plan asserts.

In Natural Resources Defense Council v. U.S. Army Corps of Engineers, 457 F. Supp. 2d 198 (S.D.N.Y. 2006), the court found that the Army Corps' attempt to supplement an inadequatelyexplained finding of no significant impact concerning a dredging project was arbitrary and capricious where the agency relied on ill-defined "adaptive management" protocols to conclude that impacts would be mitigated below the level of significance.

The EA makes several promises that it will alter its monitoring plan should it prove necessary. For example, the EA relies on a general promise that it will "as appropriate, reevaluate, the need for altering its dredging methods" [hellip] through the use of its coordination plan and monitoring program. The EA also explains that the Corps will follow "adaptive management practices as it moves through construction of its contracts," thus allowing it to change future contracts should the data indicate it is necessary. These promises, however, provide no assurance as to the efficacy of the mitigation measures. The Corps did not provide a proposal for monitoring how effective "adaptive management" would be.116

Mountaineers v. United States Forest Service, 445 F. Supp. 2d 1235 (W.D. Wash. 2006) set aside a Forest Service decision to open motor vehicle trails where the agency proposed to monitor impacts to wildlife and potentially change the trails later based on an adaptive management plan. The court stated that these adaptive management strategies "amount [hellip] to a 'build-first, study later' approach to resource management. This backward-looking decision making is not what NEPA contemplates."117 Other cases similarly conclude that NEPA forbids the use of ill-defined adaptive management plans to assume away likely impacts of agency action.118

Courts also hold unlawful agency projects that may impact species protected by the Endangered Species Act where the biological opinion is based on the assumption that a vague and ill-defined monitoring and adaptive management plan will mitigate impacts to the species at issue. These cases provide a useful analogy to adaptive management in the NEPA context. Natural Resources Defense Council v. Kempthorne, 506 F. Supp. 2d 322 (E.D. Ca. 2007) is key precedent. There, plaintiffs challenged a proposed plan to manage water diversions in a manner that could dversely impact the delta smelt, a species listed as threatened under the Endangered Species Act. The Fish and Wildlife Service prepared a biological opinion (BiOp) on the proposal which concluded that the project would neither jeopardize the smelt nor adversely modify the smelt's critical habitat. "Although the BiOp recognize[d] that existing protective measures may be inadequate, the FWS concluded that certain proposed protective measures, including [hellip] a proposed 'adaptive management' protocol would provide adequate protection."119

Plaintiffs alleged, among other things, that the BiOp "relie[d] upon uncertain (and allegedly inadequate) adaptive management processes to monitor and mitigate the [project's] potential impacts."120 They asserted that the adaptive management plan, which required a working group meet and consider adaptive measures in light of monitoring, failed to meet the ESA's mandate that mitigation be

"'reasonably specific, certain to occur, and capable of implementation'" because: (1) the [working group] has complete discretion over whether to meet and whether to recommend mitigation measures; (2) even if the [working group] meets and recommends mitigation measures, the [agency management team] group is free to reject any recommendations; (3) there are no standards to measure the effectiveness of actions taken; (4) reconsultation is not required should mitigation measures prove ineffective; and (5) ultimately, no action is ever required.121

The Kempthorne court cited prior caselaw holding that "a mitigation strategy [in the ESA context] must have some form of measurable goals, action measures, and a certain implementation schedule; i.e., that mitigation measures must incorporate some definite and certain requirements that ensure needed mitigation measures will be implemented."122 The court found that adaptive management plan "does not provide the required reasonable certainty to assure appropriate and necessary mitigation measures will be implemented."123 The court concluded that

Adaptive management is within the agency's discretion to choose and employ, however, the absence of any definite, certain, or enforceable criteria or standards make its use arbitrary and capricious under the totality of the circumstances.124

B. The Draft EA's Plan Does Not Comply with Law for Adaptive Management.

Although the Draft EA states that it relies on adaptive management, the proposal it describes does not contain key elements required to comply with NEPA. While adaptive management may be an appropriate tool to assist in management of the Salter Project area, we urge the Forest Service, as part of the NEPA process, to develop a more detailed plan, identify specific management changes in case those triggers are met, and analyze and disclose the impacts of those changes.

The adaptive management approach described in the Draft EA fails to "clearly identify the adjustment(s) that may be made when monitoring during project implementation indicates that the action is not having its intended effect."125 The Draft EA includes vaguely-described adjustments, which violates Forest Service rules concerning adaptive management. For example, proposed "adaptive management actions" for several proposed factors includes - or is limited to - a statement that the agency will "Monitor and adjust" or "Monitor and adjust [hellip] as needed."126 This provides neither the Forest Service nor the public with any detail about how the agency might "adjust" its actions.

And because the Draft EA does not explain what those "adjustment" may entail, the proposed adaptive management plan violates Forest Service regulations requiring that the NEPA analysis "disclose not only the effect of the proposed action or alternative but also the effect of the adjustment."127 The Draft EA fails to disclose what the impacts will be if actions are adjusted pursuant to adaptive management.

Finally, the Draft EA states that a purpose of adaptive management is to set up a formal communication protocol with outside partners; for example, the DWRF [Dolores Watershed and Resilient Forests] collaborative. If conditions change, or if approaches are not working as described, the adaptive management process identified here would be used to notify partners about the agency's findings. The process would also serve as an opportunity for the public to have direct and formal communication with agency decision makers and resource managers on specific projects.

We support the Forest Service working with outside stakeholders, but we urge the Forest Service not to play favorites. The agency cannot rely on select group as a substitute for the public involvement NEPA requires. We urge the Forest Service to use available tools - posting documents on its project page, open houses, press releases, emails, etc. - to engage the entirety of the interested public, including those persons or groups that cannot spend scores of hours participating in collaborative groups. We note that the Forest Service cannot legally rely on a process outside of NEPA in which to test measures previously unidentified and un-analyzed in a NEPA document. For the adaptive management proposal to be legal and sound, the Forest Service must identify the "adjustments" it intends to make and evaluate or estimate their impacts before approving the project.

In sum, the Forest Service has the authority to change a project and/or approve new actions within a project area in response to changes, but it can do so only in accordance with NEPA and the agency's own regulations. The adaptive management plan in the Draft EA currently fails to comply with these laws. We urge the Forest Service to develop a specific plan in cooperation with the public and all stakeholders before it issues any additional NEPA document or proposed decision.

IV. THE DRAFT EA FAILS TO ANALYZE A RANGE OF REASONABLE ALTERNATIVES.

In taking the "hard look" at impacts that NEPA requires, an EA must "study, develop, and describe" reasonable alternatives to the proposed action.128 The Tenth Circuit explains that this mandate extends to EAs as well as EISs. "A properly-drafted EA must include a discussion of appropriate alternatives to the proposed project."129 This alternatives analysis "is at the heart of the NEPA process, and is 'operative even if the agency finds no significant environmental impact.'"130 Reasonable alternatives must be analyzed for an EA even where a FONSI is issued because "nonsignificant impact does not equal no impact. Thus, if an even less harmful alternative is feasible, it ought to be considered."131 When an agency considers reasonable alternatives, it "ensures that it has considered all possible approaches to, and potential environmental impacts of, a particular project; as a result, NEPA ensures that the most intelligent, optimally beneficial decision will ultimately be made."132

In determining whether an alternative is "reasonable," and thus requires detailed analysis, courts look to two guideposts: "First, when considering agency actions taken pursuant to a statute, an alternative is reasonable only if it falls within the agency's statutory mandate. Second, reasonableness is judged with reference to an agency's objectives for a particular project."133 Any alternative that is unreasonably excluded will invalidate the NEPA analysis. "The existence of a viable but unexamined alternative renders an alternatives analysis, and the EA which relies upon it, inadequate."134 The agency's obligation to consider reasonable alternatives applies to citizen-proposed alternatives.135

Courts hold that an alternative may not be disregarded merely because it does not offer a complete solution to the problem.136 Even if additional alternatives would not fully achieve the project's purpose and need, NEPA "does not permit the agency to eliminate from discussion or consideration a whole range of alternatives, merely because they would achieve only some of the purposes of a multipurpose project."137 If a different action alternative "would only partly meet the goals of the project, this may allow the decision maker to conclude that meeting part of the goal with less environmental impact may be worth the tradeoff with a preferred alternative that has greater environmental impact."138

The courts also require that an agency adequately and explicitly explain in the EA any decision to eliminate an alternative from further study.139

A. The Forest Service Must Consider Alternatives that Limit the Logging of Large or Old Trees.

Large and old ponderosa pine trees are relatively rare now in the Southwest compared to the period before European settlement because they were heavily logged over the last 150 years. Large, old ponderosa serve valuable ecosystem functions, have outsize value for wildlife, are more fire resistant, serve as important storehouses of genetic diversity, and store significant amounts of carbon.140

As a result, numerous studies, collaboratives, and Forest Service decisions have emphasized the need to protect large and old ponderosa pine trees in order to achieve both ecological restoration and greater resilience to catastrophic events such as wildfire and insect infestations. These decisions have often done so by setting an upper limit for the size of trees that can be logged for forest management.

For example, the Four Forest Restoration Initiative, a collaborative guided by science and working to improve management on forests in northern Arizona, has adopted an "Old Growth Protection & Large Tree Retention Strategy."141 As part of that strategy, "the 4FRI Collaborative has agreed that the 4FRI effort should implement large tree retention and old growth protection strategies that are [hellip] are based upon a 16" diameter threshold that limits the cutting of trees larger than 16" to circumstances and criteria set forth in pre-defined exception categories."142 A similar collaborative in New Mexico agreed that "It is generally advisable to maintain ponderosa pines larger than 41 cm (16 inches) diameter at breast height (dbh) and other trees with

oldgrowth morphology regardless of size (e.g. yellow-barked ponderosa pine or any species with large drooping limbs, twisted trunks or flattened tops)."143

One peer-reviewed study concludes:

Large and old trees, especially those established before ecosystem disruption by Euro-American settlement, are rare, important, and difficult to replace. Their size and structural complexity provide critical wildlife habitat by contributing crown cover, influencing understory vegetation patterns, and providing future snags. Ecological restoration should protect the largest and oldest trees from cutting and crown fires, focusing treatments on excess numbers of small young trees. Given widespread agreement on this point, it is generally advisable to retain ponderosa trees larger than 41 cm (16 inches) dbh and all trees with old-growth morphology regardless of size (i.e., yellow bark, large drooping limbs, twisted trunks, flattened tops). Despite the heterogeneity of forest site and stand conditions in the Southwest, cutting of larger trees will seldom be ecologically warranted as "restoration" treatments at this time due to their relative scarcity. Following this guideline would significantly reduce hazards of stand-replacing fires in most cases and also favor the development of future old-growth forest conditions (Moir and Dieterich 1988, Harrington and Sackett 1992).144

This article notes that managing ponderosa pine forests for ecological restoration can also help increasing forest resilience.145

For the San Juan National Forest, the Forest Service and other stakeholders joined to establish the Ponderosa Pine Partnership (PPP) in the early 1990s. The Partnership developed "An Ecological Prescription for the San Juan Pine Zone," including this prescription: "Retain large trees. Any trees 20 inches or larger in diameter should be retained. In stands with smaller trees, the largest trees should be retained."146 The San Juan National Forest developed and partially implemented two projects under the PPP, including the Guard Station and Ferris East timber sales. Both of these timber sales included diameter limits. The Guard Station Decision Notice prohibited the logging of trees over 16 inches dbh; the Ferris East Decision notice barred logging of ponderosa over 20 inches dbh.147 Each of the sales was designed to meet goals that included forest restoration, supplying the needs of the local wood products industry, and reducing the risk of catastrophic wildfire.148

This science and social history demonstrate that diameter limits in ponderosa pine on the San Juan National Forest are reasonable, and should be considered in any NEPA analysis concerning logging in such pine forests.

1. The Draft EA fails to address the key differences between Alternatives 2 and 3.

The Salter Project identifies purposes similar to those identified for the Guard Station and Ferris East projects, and proposes one alternative, Alternative 3, that would protect large and old trees over 20 inches dbh.

We appreciate the Forest Service analyzing Alternative 3 in detail. However, the Draft EA fails to disclose the different impacts of the two action alternatives.

The Draft EA concludes that there would be virtually no difference in the impacts between Alternative 2 (which protects trees 26.9" dbh and larger) and Alternative 3 for most of the resources analyzed. For example, the Draft EA states that there would be no difference in the impacts of the two alternatives with respect to fuels and fire management.149 The Draft EA also concludes the impacts to watersheds would be the same, and repeatedly concludes that impacts to different wildlife species under the two alternatives would be "similar."150

While for almost every resource the Forest Service concludes that the impacts of the two action alternatives would be the same or similar, the Draft EA concludes that Alternative 3's large tree retention limits would allow the San Juan NF to meet "desired conditions [hellip] to a lesser degree" at "specific locations" (which the Draft EA does not identify) and "over time and over cutting cycles" (though for how long is not specified).151 The Draft EA further states that under Alternative 3: "Basal area retention goals and uneven aged characteristics are being compromised, leaving stands less resilient and making long term resistance less likely to occur."152 The EA does not disclose how much less resilient, or what the impacts of that allegedly reduced resilience might be. Because the EA concludes that there is little or no difference between Alternatives 2 and 3 in terms of their impact on fire management, watersheds, and wildlife, the level of reduced resilience would appear to be minimal at most.

The Draft EA does identify one major difference: "Removing areas from treatment as result of diameter limitation reduces the amount of treatment in an area and subsequently the amount of harvestable volume per acre."153 This would appear to be the primary trade-off between the two alternatives: increased volume (and perhaps a minimal amount of increased resilience) vs. increased protection for old and large trees. But the EA fails to sharply define the differences between the two action alternatives by failing to quantify (or qualify) the level of difference for any of these factors: how much extra timber would be available for mills under Alternative 2?

How much extra resilience? How many more large trees would remain under Alternative 3 and what would that mean for the potential for increased wildlife snags, carbon storage, etc.? Unless and until the EA grapples with these critical issues, the alternatives analysis fails to address the "heart" of the NEPA analysis.

2. The Forest Service should also analyze a restoration alternative that protects trees 16" dbh and larger.

Because the PPP recommended protecting trees 16" dbh and larger in some cases, and because the Draft EA finds little difference between Alternatives 2 and 3, the Forest Service should also analyze in detail (or explain why it cannot) an alternative that protects trees 16" dbh and larger. This would allow the public and the decisionmaker to compare the relative merits of protecting different size classes of trees, and to understand whether protecting trees 20" dbh is a reasonable middle ground. It is also an alternative that is most likely to protect all pre-settlement trees, which studies have concluded is critical to restore ponderosa pine forests in the Southwest.

We understand that Dr. Bill Baker will present evidence that an alternative that protects trees 16" dbh and larger best constitutes a restoration alternative. Analyzing this alternative will also require the Forest Service to explain why its proposed action (Alternative 2) appears to be out of compliance with Forest Plan direction on restoring ponderosa pine.

IV. THE DRAFT EA FAILS TO ACCOUNT FOR STUDIES PREDICTING THE IMPACT OF CLIMATE CHANGE TO THE FOREST IN THE PROJECT AREA.

For the Draft EA to meet NEPA's mandate that environmental analysis include information "of high quality" and must include "[a]ccurate scientific analysis."154 Forests within the project area are likely to undergo significant changes in the coming years due to climate change. However, the Draft EA, fails to account for the fact that these changes may undercut key project assumptions and goals. We urge the Forest Service to accurately address these impacts by including and addressing in detail the new, relevant, expert information in any subsequently prepared NEPA document.

The Salter Project is premised in part on the conclusion that thinning and other logging projects would, over the "long term," enhance the forest's resilience to fire, insect infestation, and drought; all of these threats are driven and exacerbated by climate change. The likelihood that the project could achieve benefits over the long term must be weighed against the predicted impacts of climate change, which could make the recovery of ponderosa pine in this area difficult if not impossible, even assuming the Salter treatments take place.

A Forest Service study concluded that by the 2050s to 2060s, current forest types in the project area will be lost due to climatic changes brought on by the warming of the planet due to anthropogenic climate change.

In 2017, Forest Service Rocky Mountain Region staff and researchers presented results from bioclimate models concluding that ponderosa pine would likely be lost from the Salter Project area in the 2056-65 time period.155

The Draft EA fails to cite or directly respond to this expert study generated by the Forest Service; the agency must do both in any subsequently prepared NEPA document to comply with the law. Indeed, the Draft EA fails to identify climate change as something likely to have a cumulative impact on vegetation, relegating discussion of the issue to a section entitled "Resources dismissed from detailed analysis."156 This appears to directly conflict with Forest Plan direction that requires vegetation management will "anticipates[]climate-related plant succession changes."157

At a bare minimum, the Forest Service should be honest with the public about the likely fate of the forest in the Salter area in light of climate change, and what that means about the efficacy of the project. The Draft EA fails to do so.

V. THE DRAFT EA FAILS TO RESPOND TO SCIENTIFIC EXPERTS.

A. NEPA Requires Agencies to Respond to Comments, Especially Opposing Scientific Views.

NEPA requires agencies to explain opposing viewpoints and their rationale for choosing one viewpoint over the other.158 Federal courts have set aside NEPA analysis where the agency failed to respond to scientific analysis that calls into question the agency's assumptions or conclusions.159

B. The Draft EA Fails to Address or Acknowledge Expert Opinions of Forest Scientists.

The Draft EA fails to respond or acknowledge comments timely submitted by Dr. Bill Baker in March 2020 concerning scoping. Among other things, his comments presented a detailed reconstruction of ponderosa pine diameter distributions under the historic range of variability (HRV) for an area that includes the Salter Project area, and which demonstrated the importance of retaining trees 16" dbh and larger, given the current deficit in those size classes compared to the HRV. We urge the Forest Service to comply with NEPA by acknowledging, reviewing, and incorporating into any subsequent NEPA analysis the information Dr. Baker presented in scoping, as well as any comments he may submit on the Draft EA.

Further, the Draft EA fails to address Worrall's conclusion that much of the Salter Project area may be devoid of ponderosa pine by 2065.

To comply with NEPA, the Forest Service must respond to these experts who question the utility and impacts of the Salter proposal.

VI. THE DRAFT EA FAILS TO ANALYZE THE EFFECTIVENESS OF MITIGATION MEASURES.

A. NEPA Mandates That Agencies Analyze Potential Mitigation Measures.

NEPA's statutory language implicitly charges agencies with mitigating the adverse environmental impacts of their actions.160 NEPA's implementing regulations require that agencies analyze and proposed mitigation measures.161

The CEQ also has stated: "All relevant, reasonable mitigation measures that could improve the project are to be identified, even if they are outside the jurisdiction of the lead agency or the cooperation agencies ...."162 According to the CEQ, "[a]ny such measures that are adopted must be explained and committed in the ROD."163

The Tenth Circuit has held that an agency's analysis of mitigation measures "must be 'reasonably complete' in order to 'properly evaluate the severity of the adverse effects' of a proposed project prior to making a final decision."164 Mitigation "must be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated."165

"[O]mission of a reasonably complete discussion of possible mitigation measures would undermine the 'action-forcing' function of NEPA. Without such a discussion, neither the agency nor other interested groups and individuals can properly evaluate the severity of the adverse effects."166 A "perfunctory description," of mitigation, without "supporting analytical data" analyzing their efficacy, is inadequate to satisfy NEPA's requirements that an agency take a "hard look" at possible mitigating measures.167 An agency's "broad generalizations and vague references to mitigation measures ... do not constitute the detail as to mitigation measures that would be undertaken, and their effectiveness, that the Forest Service is required to provide."168 Moreover, in its final decision documents, an agency must "[s]tate whether all practicable means to avoid or

minimize environmental harm from the alternative selected have been adopted, and if not, why they were not."169

B. The Draft EA Fails to Analyze the Effectiveness of Mitigation Measures.

The Draft EA does not focus on "mitigation," instead asserting that "Project design elements [hellip] were developed for the proposed action to minimize or eliminate potential adverse effects during implementation."170 While the Draft EA lists many "design elements,"171 it does not evaluate the effectiveness of each measure. Whether some of these measures would be effective at all is open to question because many of them are vague or ill-defined.

For example, one design element directs the agency to "[m]onitor noxious weeds/invasive species and treat as needed to contain established infestations and minimize rate of spread."172 Treating "as needed" to "minimize the rate of spread" provide neither the public nor the decisionmaker with useful information as to what methods the Forest Service will employ or how effective those measures will be.

At least one mitigation measure appears almost certain to be ineffective. The Draft EA proposed to "reduce conflicts with recreation users during federal holidays" by barring hauling "on FSR 527 from the junction of FSR 527C to FSR 259 (Boggy Draw Trailhead) from 12 P.M. Friday to 12:01 A.M. Monday on Memorial Day [and] Labor Day."173 This means hauling would be allowed for all but one minute of the Mondays of Memorial and Labor Days, when recreationists are likely to be using Forest Service roads in higher-than-usual numbers, and conflicts with log hauling are likely to occur. At a minimum, the Forest Service must explain why it intends to permit log hauling on these routes on Memorial Day and Labor Day, but not on the Saturday and Sunday before those days.

The provision allegedly mitigating impact to "elk production habitat" allows the "line officer" to approve operations in those areas.174 No criteria or benchmarks are provided to limit the officer's discretion, and thus it is impossible to tell whether this measure can be effective.

A design element concerning road construction states that "[t]emporary roads would be held to the minimum feasible number, width and total length," but fails to explain how the agency would do so, or how minimal that width could be.175 The measure also states that temporary roads "would be located sufficiently far from streams and other water bodies to minimize discharge into those waters except at necessary water crossings."176 How far will that be? How will the Forest Service determine that distance? How much discharge is "minimized" discharge? Any subsequent NEPA document must address this lack of definition.

Further, some "design elements" are little more than keeping track of damage with no proposal to respond to it. One measure states that "[e]ffectiveness of road closure would also be monitored," with no explanation as to what actions the Forest Service would take it closures were found to be ineffective.177

While the Draft EA identifies several design standards for northern goshawk, one appears to be at odds with best available science, and two prescriptions suggested by that science is omitted. The Management Recommendations for Northern Goshawk (1992) suggests that "[a]ll management activities in the PFA [northern goshawk post fledging-family area] should be limited to the period from October through February."178 The Draft EA does not limit activities in PFAs, but does state that "if active northern goshawk nests are discovered, all project operations would be restricted annually from March 1st to August 31st within one-half ([frac12]) mile of the active nest."179 We request that the Forest Service explain why the limitation on activities for the Salter Project is one month shorter than that recommended by the Management Recommendations. Further, the Management Recommendations state that "forests in the PFAs should contain overstories with a canopy cover greater than 50%," and further that in ponderosa pine forested PFAs, the Forest Service should "[l]eave 5 - 7 tons per acre of woody debris (greater than 3 inches in diameter) and downed logs distributed across areas, after timber harvesting, for small animal habitat and to maintain long-term productivity.180 The Salter Project contains no such prescription that we could find. Any subsequent NEPA document should address these omissions.

The Management Recommendations also suggest that the PFAs ensure suitable prey habitat is available and that "[f]eatures of prey habitat in the PFA include:

1) large (>18 inches DBH) feeding and/or nesting trees for tree squirrels,

2) large (>18 inches DBH and >30 feet tall) snags and/or trees with exposed heartwood for nest cavity excavation by woodpeckers,

3) patches of mid-aged forests with high canopy cover (up to 70%) that provide mesic conditions for fungi (important foods for all the mammalian prey),

4) small (>2 inches in diameter and >8 feet long) downed logs and other woody debris that provide hiding, feeding, denning, and nesting sites used by goshawk prey.

5) large (>12 inches in diameter and >8 feet long) downed logs and other woody debris that provide hiding, feeding, denning, and nesting sites used by goshawk prey."181

The Draft EA contains no comparable guidance, but it does permit the logging of trees up 22 inches dbh, which could conflict with guidance to retain trees 18 inches and greater for specific purposes.182 We request that the Forest Service explain how it intends to resolve this apparent omission/conflict.

In sum, because the Draft EA fails to analyze the effectiveness of individual design elements, and because some of the design elements are unlikely to be effective, the Draft EA violates NEPA. We urge the Forest Service to address this issue by evaluating the effectiveness of each individual mitigation measure or design element in any subsequently prepared NEPA document, and to propose measures that are certain to be implemented and likely to reduce impacts.

## VII. THE FOREST SERVICE MUST PREPARE AN ENVIRONMENTAL IMPACT STATEMENT ON THE SALTER PROJECT.

### A. Agencies Must Prepare EISs When Impacts 'May' Be Significant.

NEPA requires federal agencies to prepare a full environmental impact statement (EIS) before undertaking "major Federal actions significantly affecting the quality of the human environment."183 As the Tenth Circuit has explained, "[i]f the agency determines that its proposed action may 'significantly affect' the environment, the agency must prepare a detailed statement on the environmental impact of the proposed action in the form of an EIS."184 The Ninth Circuit agrees.

We have held that an EIS must be prepared if 'substantial questions are raised as to whether a project ... may cause significant degradation to some human environmental factor.' To trigger this requirement a 'plaintiff need not show that significant effects will in fact occur,' [but instead] raising 'substantial questions whether a project may have a significant effect' is sufficient.185

If an agency "decides not to prepare an EIS, 'it must put forth a convincing statement of reasons' that explains why the project will impact the environment no more than insignificantly. This account proves crucial to evaluating whether the [agency] took the requisite 'hard look.'"186

"Significance" under NEPA requires consideration of the action's context and intensity.187 An agency must analyze the significance of the action in several contexts, including short- and long-term effects within the setting of the proposed action (including site-specific, local impacts).188 Intensity refers to the severity of the impact and requires consideration of ten identified factors that may generally lead to a significance determination, including: (1) whether the action is likely to be highly controversial; (2) whether the effects on the environment are highly uncertain or involve unique or unknown risks; and (3) whether the action may have cumulative significant impacts.189 With respect to the degree to which the environmental effects are likely to be highly controversial, the word "controversial" refers to situations where "'substantial dispute exists as to the size, nature, or effect of the major federal action.'"190

### B. The Salter Project May Have Significant Impacts.

The Salter Project may have significant impacts, triggering the Forest Service's duty to prepare an EIS.

The scale of the project itself may be significant. The proposed action alternatives permit the construction of up to 117 miles of temporary road, a significant amount, and reconstruction or "improv[ing] the condition of [another] 149 miles" of road.191 Logging may take place on more than 35 square miles of forest land, and will occur continuously across this landscape for as long as a decade. Road construction, logging, and road use will conflict with recreational use which is categorized as "moderate to high" for much of the year. The large scale of the project supports a conclusion of significance.

The project may significantly impact soils and watersheds. Construction of temporary roads and landing areas, and the use of an unknown number, length and location of skid trails, have the potential to significantly impact sensitive soils and watersheds. The Draft EA states that "[p]roposed design features for Hydrology and Soils also restrict roads, landings, skid trails, concentrated-use sites, and similar soil disturbances to designated sites to no more than 15 percent of any timber sale unit."192 Because there are 22,790 acres of logging units, the design features permit skid trails, roads, etc. to impact soils on up to 3,400 acres - an area of more than five square miles. This impact is significant.

The project may significantly impact wildlife. The proposed action will render much of the project area unsuitable for northern goshawk, a potentially significant impact. The Draft EA proposes to reduce basal area outside of the tiny 30-acre nest area to as low as 50 square feet per acre. Such logging may damage goshawk habitat in the short term (for years). As the Draft EA admits:

Basal area reductions below 80 square feet per acre in mature stands would affect nesting behavior of northern goshawk because thermal and protective sight cover for nesting will be reduced, which will reduce reproduction. A reduction in canopy cover may also impact foraging success as there will be less ability to hide from prey. These impacts may reduce habitat effectiveness in the short-term [hellip] for this species[hellip].193

The project thus will certainly damage goshawk habitat over a vast area for the 10 years of project implementation and beyond. The promise of increased habitat effectiveness is over the "long term," so the nature of the trade-off between present, certain damage and indeterminant future benefit cannot be understood or compared. The potential for significant impacts to goshawk requires preparation of an EIS.

The project is highly controversial. The project's impacts are uncertain. The Forest Service's proposed prescription of a 26.9" dbh cap conflicts with that developed by the San Juan National Forest's earlier Ponderosa Pine Partnership. Scientific studies suggest that the project will result in the loss of pre-settlement ponderosa pine within the project area, and trees more than a century old, and Forest Service studies indicate that ponderosa pine and aspen may be lost in the project area within a few decades. But the Draft EA assert the project will lead to a diverse-aged forest able to resist future insect infestations. Thus, the effects of the Salter Project meet the "highly controversial" standard, requiring preparation of a full environmental impact statement.

The Forest Service's failure to quantify the project's climate impacts, and reliance on outdated guidance, conflict with new administration guidance and federal caselaw, and the Draft EA appears to rely on discredited science and law. The Forest Service's climate denial also crosses the "highly controversial" threshold.

CONCLUSION.

With a project of this scale and potential for significant impact, we are concerned that the Forest Service must undertake additional disclosure - of baseline information; of mitigation measures; of the location and impacts of roads, among other things - to comply with NEPA. We further oppose adoption of an alternative that permits the logging of large and old trees as proposed in Alternative 2.

Sincerely,

TABLE OF EXHIBITS

Exhibit 1. USDA Forest Service, Final Environmental Impact Statement, Roadless Area Conservation Rule (Nov. 2000) (excerpts)

Exhibit 2. Lolo National Forest, Redd Bull Environmental Assessment (Jan. 2021) (excerpts)

Exhibit 3. IPCC, Summary for Policymakers, Global Warming of 1.5[deg]C. An IPCC Special Report on the impacts of global warming of 1.5[deg]C above pre-industrial levels and related global greenhouse gas emission pathways (2018)

Exhibit 4. H. Fountain, Climate Change Is Accelerating, Bringing World ?Dangerously Close' to Irreversible Change, The New York Times (Dec. 4, 2019)

Exhibit 5. Executive Order 13,990, 86 Fed. Reg. 7037 (Jan. 20, 2021)

Exhibit 6. Executive Order 14,008, 86 Fed. Reg. 7619 (Jan. 27, 2021)

Exhibit 7. Interagency Working Group on Social Cost of Greenhouse Gases, Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates under Executive Order 13990 (Feb. 2021)

Exhibit 8. Council on Environmental Quality, National Environmental Policy Act, Guidance on Consideration of Greenhouse Gas Emissions, 86 Fed. Reg. 10,252 (Feb. 19, 2021)

Exhibit 9. Forest Service, Tongass Land and Resource Management Plan, Final EIS (2016) (excerpts)

Exhibit 10. D. DellaSala, The Tongass Rainforest as Alaska's First Line of Climate Change Defense and Importance to the Paris Climate Change Agreements (2016)

Exhibit 11. Intergovernmental Panel on Climate Change, Special Report on Climate Change, Desertification, Land Degradation, Sustainable Land Management, Food Security, and Greenhouse gas fluxes in Terrestrial Ecosystems, Summary for Policymakers (Aug. 2019)

Exhibit 12. B. Law et al., Land use strategies to mitigate climate change in carbon dense temperate forests, Proceedings of the Nat'l Academy of Sciences, vol. 115, no. 14 (Apr. 3, 2018)

Exhibit 13. Moomaw, et al., Intact Forests in the United States: Proforestation Mitigates Climate Change and Serves the Greatest Good, Frontiers in Forests and Global Change (June 11, 2019)

Exhibit 14. Hudiburg et al., Meeting GHG reduction targets requires accounting for all forest sector emissions, Environ. Res. Lett. 14 (2019)

Exhibit 15. B. Law, et al., The Status of Science on Forest Carbon Management to Mitigate Climate Change (June 1, 2020)

Exhibit 16. B. Law & W. Moomaw, Keeping trees in the ground where they are already growing is an effective low-tech way to slow climate change, The Conversation (Feb. 23, 2021)

Exhibit 17. B. Law & M.E. Harmon, Forest sector carbon management, measurement and verification, and discussion of policy related to mitigation and adaptation of forests to climate change. Carbon Management (2011)

Exhibit 18. M. Harmon, Have product substitution carbon benefits been overestimated? A sensitivity analysis of key assumptions, Environmental Research Letters (2019)

Exhibit 19. See Bureau of Land Management, Western Oregon Proposed RMP Final EIS (2009) (excerpts)

Exhibit 20. N.L. Harris et al., Attribution of net carbon change by disturbance type across forest lands of the conterminous United States, Carbon Balance and Management (2016)

Exhibit 21. Office of Surface Mining & Bureau of Land Management, Environmental Assessment, Colowyo Coal Mine Collom Permit Expansion Area Project (Jan. 2016) excerpts)

Exhibit 22. U.S. Forest Service, Supplemental Final Environmental Impact Statement, Federal Coal Lease Modifications COC-1362 & COC-67232 (Aug. 2017) (excerpts)

Exhibit 23. Four Forest Restoration Initiative, Old Growth Protection & Large Tree Retention Strategy (Sep. 13, 2011)

Exhibit 24. U.S. Forest Service et al., New Mexico Forest Restoration Principles (May 2006)

Exhibit 25. Allen et al., Ecological Restoration of Southwestern Ponderosa Pine Ecosystems: A Broad Perspective, Ecological Applications, 12(5) (2002)

Exhibit 26. D. Lynch, Forest Restoration in Southwestern Ponderosa Pine, Journal of Forestry (Aug. 2000)

Exhibit 27. San Juan National Forest, Guard Station Timber Sale, Decision Notice (May 1996)

Exhibit 28. San Juan National Forest, Ferris East Timber Sale, Decision Notice (Feb. 1998)

Exhibit 29. J. Worrall et al., Projected Impacts of Climate Change on Forests of the Dolores Watershed, presentation to the Dolores Watershed Resilient Forest Collaborative (2017)

FOOTNOTES:

1 San Juan National Forest, Salter Vegetation Management Project, Draft Environmental Assessment (Feb. 2021) at 12 (hereafter, "Draft EA").

2 Draft EA at 9. See also id. at 11 ("The structure and size class distributions in the stands identified for this analysis are not within desired conditions described in [San Juan Forest Plan Sec.] 2.2.23 based on field reconnaissance and inventory data.")

3 Draft EA at 11.

4 Draft EA at 12.

5 Draft EA at 13. Note that while the Draft EA several times states that no trees larger than 26" dbh will be logged, id. at 13 (Table 1), 14, the document also asserts that "[t]he maximum diameter to harvest would be 26.9"," or about three inches greater in circumference. Id. at 14. See also id. at 13 n.1 ("No tree larger than 26.9 inch diameter at breast height would be cut in alternatives 2 and3 [sic]."). We find the use of two different numbers confusing and request that the Forest Service make clear in any subsequent NEPA document that the diameter limit is 26.9 inches, not 26 inches.

6 Draft EA at 13.

7 Draft EA at 13. We note that summing the acres in Table 2 (Draft EA at 13) for commercial thinning and single tree selection treatments results in a project area of 22,790 acres, a figure larger than the "approximately 22,346" acres the Draft EA (at 12) asserts would be treated. We urge the Forest Service to address this discrepancy in any subsequent NEPA document.

8 San Juan National Forest, Lone Pine Decision Notice (Jan. 23, 2020) at 7.

9 Id. at 5.

10 Center for Biological Diversity v. United States Forest Serv., 349 F.3d 1157, 1166 (9th Cir. 2003) (quoting 40 C.F.R. [sect] 1500.1).

11 42 U.S.C. [sect] 4331(a).

12 Envtl. Prot. Info. Ctr. v. Blackwell, 389 F. Supp. 2d 1174, 1184 (N.D. Cal. 2004) (quoting Neighbors of Cuddy Mt. v. Alexander, 303 F.3d 1059, 1063 (9th Cir. 2002)); see also Earth Island v. United States Forest

Serv., 351 F.3d 1291, 1300 (9th Cir. 2003) ("NEPA requires that a federal agency 'consider every significant aspect of the environmental impact of a proposed action ... [and] inform the public that it has indeed considered environmental concerns in its decision-making process.'").

13 Marsh v. Or. Natural Res. Council, 490 U.S. 360, 371 (1989) (quoting 42 U.S.C. [sect] 4321).

14 Metcalf v. Daley, 214 F.3d 1135, 1141 (9th Cir. 2000) (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 348 (1989)).

15 Marsh, 490 U.S. at 371 (citation omitted).

16 Biodiversity Cons. Alliance v. Jiron, 762 F.3d 1036, 1086 (10th Cir. 2014) (internal citation omitted).

17 Ecology Ctr., Inc. v. United States Forest Serv., 192 F.3d 922, 923 n.2 (9th Cir. 1999); see also Friends of Yosemite Valley v. Norton, 348 F.3d 789, 800-01 (9th Cir. 2003); New Mexico ex rel. Richardson v. Bureau of Land Management, 565 F.3d 683, 718-19 (10th Cir. 2009) (requiring site-specific NEPA analysis when no future NEPA process would occur); Colo. Envtl. Coal. v. Ofc. of Legacy Mgmt., 819 F. Supp. 2d 1193, 1209-10 (D. Colo. 2011) (requiring site-specific NEPA analysis even when future NEPA would occur because "environmental impacts were reasonably foreseeable").

18 Or. Natural Res. Council Fund v. Brong, 492 F.3d 1120, 1134 (9th Cir. 2007) (citation omitted); see also Or. Natural Res. Council Fund v. Goodman, 505 F.3d 884, 892 (9th Cir. 2007) (holding the Forest Service's failure to discuss the importance of maintaining a biological corridor violated NEPA, explaining that "[m]erely disclosing the existence of a biological corridor is inadequate" and that the agency must "meaningfully substantiate [its] finding").

19 Stein v. Barton, 740 F. Supp. 743, 749 (D. Alaska 1990).

20 See WildEarth Guardians, 790 F.3d at 921-25 (holding EIS inadequate for failure to disclose location of moose range); Or. Nat. Desert Ass'n v. Rose, 2019 WL 1855419 (9th Cir. 2019) (holding environmental analysis violated NEPA by failing to establish "the physical condition of [roads and trails] and authorizing activity without assessing the actual baseline conditions").

21 New Mexico ex rel. Richardson, 565 F.3d at 706.

22 Id. at 707.

23 Id.

24 Or. Natural Res. Council Fund v. Goodman, 505 F.3d 884, 892 (9th Cir. 2007).

25 WildEarth Guardians v. Mont. Snowmobile Ass'n, 790 F.3d 920, 925 (9th Cir. 2015).

26 N. Plains Res. Council, Inc. v. Surface Transp. Bd., 668 F.3d 1067, 1075 (9th Cir. 2011) (citation omitted).

27 Great Basin Mine Watch v. Hankins, 456 F.3d 955, 973 (9th Cir. 2006); see also Ocean Advocates v. Army Corps of Engineers, 402 F.3d 846, 869 (9th Cir. 2004) (finding that a vague and uncertain analysis is insufficient to meet NEPA's mandate).

28 We request that the Forest Service confirm to the public, in writing, that it intends to rely on the NEPA regulations promulgated in 1978 and in force as of the date scoping on the Salter Project began. Although CEQ issued a final rulemaking in July 2020 fundamentally rewriting those regulations, the new rules apply only "to any NEPA process begun after September 14, 2020," or where the agency has chosen to "apply the regulations in this subchapter to ongoing activities." 40 C.F.R. [sect] 1506.13 (2020) (emphasis added). Scoping on this project began before September 14, 2020, and the Draft EA does not indicate that the agency is opting to use the 2020 CEQ NEPA regulations. In any event, the 2020 regulations have been challenged as illegal in no fewer than four pending lawsuits. See, e.g., Environmental Justice Health Alliance v. CEQ, Case 1:20-cv-06143 (S.D.N.Y. Aug. 6, 2020); Wild Virginia v. CEQ, Case 3:20-cv-00045-NKM (W.D. Va. July 29,

2020); Alaska Community Action on Toxics v. CEQ, Case 3:20-cv-05199-RS (N.D. Ca. July 29, 2020); State of California v. Council on Environmental Quality, Case No. 3:20-cv-06057 (N.D. Cal. Aug. 28, 2020).

29 Draft EA at 18 (emphasis added).

30 Draft EA at 18.

31 Draft EA at 56 (emphasis added). See also id. at 57 ("The primary temporary road alignments consist of 69.8 miles of existing non-system roads, and 36.4 miles of new ground disturbanc").

32 Draft EA at 57.

33 USDA Forest Service, Final Environmental Impact Statement, Roadless Area Conservation Rule (Nov. 2000) at 3-150 excerpts attached as Ex. 1. See also id. at 3-30 ("temporary roads are not designed or constructed to the same standards as classified roads and are not intended to be part of the National Forest System Transportation System. The results can be a higher risk of environmental impacts over the short run."); id. at 3-164 (concluding that "[t]emporary roads present most of the same risks posed by permanent roads" to rare plants, "although some [impacts] may be of shorter duration.").

34 Roadless Area Conservation Rule Final EIS (Nov. 2000) (Ex. 1) at 2-18.

35 Roadless Area Conservation Rule Final EIS (Nov. 2000) (Ex. 1) at 3-45.

36 Roadless Area Conservation Rule Final EIS (Nov. 2000) (Ex. 1) at 3-45.

37 Draft EA, Appendix A, at 84-89.

38 San Juan NF, Transportation System report (no date) (project file).

39 See Draft EA at 24 ("[t]he location and clearing widths of all temporary roads or facilities would be agreed to in writing (between the Forest Service and the contractor) before construction is started.").

40 Draft EA at 21.

41 Draft EA at 24.

42 Draft EA at 44.

43 Draft EA at 64.

44 Draft EA at 64.

45 Draft EA at 21; see also id. at 64 ("Log landings [hellip] will be designed to have proper drainage").

46 40 C.F.R. [sect] 1502.15.

47 See Council on Environmental Quality, Considering Cumulative Effects under the National Environmental Policy Act 41 (January 1997).

48 Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci, 857 F.2d 505, 510 (9th Cir. 1988).

49 Draft EA at 11 (("[t]he early stages of a bark beetle infestation is now being observed in the Salter project area").

50 Draft EA at 35.

51 Existing levels of this activity could also be disclosed in the no action alternative.

52 Draft EA at 9.

53 Draft EA at 37.

54 Draft EA at 59.

55 Draft EA at 12, 13.

56 Draft EA at 102, 103-04.

57 Draft EA at 104.

58 Lolo National Forest, Redd Bull Environmental Assessment (Jan. 2021) at 124-128, available at http://www.fs.usda.gov/nfs/11558/www/nepa/112011_FSPLT3_5580176.pdf (last viewed Mar. 12, 2021), excerpts attached as Ex. 2.

59 Draft EA at 47 ("The Salter analysis area receives moderate to heavy levels of recreation use during the summer months, moderate to heavy use during big game hunting seasons and low to moderate use during the winter.")

60 Draft EA at 47.

61 See Draft EA at 50 ("The potential impacts to recreation from this project are anticipated to be long-term and moderate for as long as 10 years."); see also id. at 58 (burying a description of "the estimated 10-year time frame of the project" in a discussion about projecting the number of log trucks per day traveling through Dolores). We could not locate a clear statement in the Draft EA defining how long it will take to implement the project's logging. We request that the Forest Service estimate and disclose the project's duration in a clear manner in any subsequent NEPA document.

62 Draft EA at 50 ("Disruptions and impacts to recreationists would result from the sights, sounds and activities associated with the proposed treatments such as road work, truck hauling and cutting operations during project implementation").

63 Draft EA at 50 ("Any long-term removal of recreation opportunities would have an impact to local community's economies.")

64 See IPCC, Summary for Policymakers, Global Warming of 1.5[deg]C. An IPCC Special Report on the impacts of global warming of 1.5[deg]C above pre-industrial levels and related global greenhouse gas emission pathways (2018), attached as Ex. 3.

65 See, e.g., H. Fountain, Climate Change Is Accelerating, Bringing World ?Dangerously Close' to Irreversible Change, The New York Times (Dec. 4, 2019), attached as Ex. 4.

66 See EPA, What Climate Change Means for Colorado (Aug. 2016), available at https://19january2017snapshot.epa.gov/sites/production/files/2016-09/documents/climatechange- co.pdf.

67 Executive Order 13,990, 86 Fed. Reg. 7037 (Jan. 20, 2021) at Sec. 1 (emphasis added), attached as Ex. 5.

68 Executive Order 14,008, 86 Fed. Reg. 7619 (Jan. 27, 2021), attached as Ex. 6.

69 Id. at 7622 (Sec. 201).

70 Executive Order 13,990 (Ex. 5), 86 Fed. Reg. at 7040, Sec. 5(a) (emphasis added).

71 Id., Sec. 5(b).

72 Id., Sec. 5(b)(ii)(A).

73 Interagency Working Group on Social Cost of Greenhouse Gases, Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates under Executive Order 13990 (Feb. 2021),

available at https://www.whitehouse.gov/wpcontent/ uploads/2021/02/TechnicalSupportDocument_SocialCostofCarbonMethaneNitrousOxide .pdf (last viewed Mar. 12, 2021) and attached as Ex. 7.

74 Colo. Envtl. Coal. v. Dombeck, 185 F.3d 1162, 1176 (10th Cir. 1999); see also 40 C.F.R. [sect] 1508.25(c) (1978) (when determining the scope of an EIS, agencies "shall consider" direct, indirect, and cumulative impacts).

75 See 40 C.F.R. [sect] 1500.1(b); 36 C.F.R. [sect] 219.3.

76 Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin., 538 F.3d 1172, 1217 (9th Cir. 2008).

77 Id., 538 F.3d at 1216 (quoting 40 C.F.R. [sect] 1508.7 (1978)). See also WildEarth Guardians v. BLM, 870 F.3d 1222, 1237 (10th Cir. 2017) (failure to disclose climate impacts of various alternatives "defeated NEPA's purpose").

78 High Country Conservation Advocates v. U.S. Forest Serv., 52 F. Supp. 3d 1174, 1189-90 (D. Colo. 2014).

79 See Mid States Coal. For Progress v. Surface Transp. Bd., 345 F.3d 520, 532, 550 (8th Cir. 2003); High Country Conservation Advocates v. U.S. Forest Serv., 52 F. Supp. 3d 1174, 1197-98 (D. Colo. 2014); Montana Environmental Information Center v. U.S. Office of Surface Mining, 274 F. Supp. 3d 1074 (D. Mont. 2017), amended in part, adhered to in part, 2017 WL 5047901 (D. Mont. 2017).

80 Ctr. for Biological Diversity v. Bernhardt, 982 F.3d 723, 2020 U.S. App. LEXIS 38033, *20 (9th Cir. 2020).

81 N. Plains Res. Council, Inc. v. Surface Transp. Bd., 668 F.3d 1067, 1079 (9th Cir. 2011) (citation omitted).

82 Id. (citations omitted).

83 Sierra Club v. Federal Energy Regulatory Commission, 863 F.3d 1357, 1373-74 (D.C. Cir. 2017).

84 Notice available at 81 Fed. Reg. 51,866 (Aug. 5, 2016); full guidance available at https://ceq.doe.gov/docs/ceq-regulations-and-guidance/nepa_final_ghg_guidance.pdf (last viewed Mar. 12, 2020).

85 Id. at 16 (citations omitted).

86 Executive Order 13,990 (Ex. 5), 86 Fed. Reg. at 7040, Sec. 7, 86 Fed. Reg. at 7042.

87 Council on Environmental Quality, National Environmental Policy Act, Guidance on Consideration of Greenhouse Gas Emissions, 86 Fed. Reg. 10,252 (Feb. 19, 2021), attached as Ex. 8, and available at https://www.govinfo.gov/content/pkg/FR-2021-02-19/pdf/2021-03355.pdf (last viewed Mar. 12, 2021).

88 See S. Fork Band Council of W. Shoshone v. United States Dept. of Interior, 588 F.3d 718, 725 (9th Cir. 2009); Ctr. for Biological Diversity, 538 F.3d at 1214-15; Mid States Coalition for Progress, 345 F.3d at 550; WildEarth Guardians v. United States Office of Surface Mining, Reclamation & Enf't, 104 F. Supp. 3d 1208, 1230 (D. Colo. 2015) (coal combustion was indirect effect of agency's approval of mining plan modifications that "increased the area of federal land on which mining has occurred" and "led to an increase in the amount of federal coal available for combustion."); Din[eacute] Citizens Against Ruining Our Env't v. United States Office of Surface Mining Reclamation & Enf't, 82 F. Supp. 3d 1201, 1213-1218 (D. Colo. 2015); High Country Conservation Advocates, 52 F. Supp. 3d at 1174.

89 Draft EA at 102-103.

90 Draft EA at 102.

91 Forest Service, Tongass Land and Resource Management Plan, Final EIS (2016) at 3-14, excerpts attached as Ex. 9.

92 See, e.g., D. DellaSala, The Tongass Rainforest as Alaska's First Line of Climate Change Defense and Importance to the Paris Climate Change Agreements (2016) at 5, attached as Ex. 10.

93 Intergovernmental Panel on Climate Change, Special Report on Climate Change, Desertification, Land Degradation, Sustainable Land Management, Food Security, and Greenhouse gas fluxes in Terrestrial Ecosystems, Summary for Policymakers (Aug. 2019) at 7, 23, attached as Ex. 11. See also B. Law et al., Land use strategies to mitigate climate change in carbon dense temperate forests, Proceedings of the Nat'l Academy of Sciences, vol. 115, no. 14 (Apr. 3, 2018) at 3663 ("Proven strategies immediately available to mitigate carbon emissions from forest activities include ... reducing emissions from deforestation and degradation."), attached as Ex. 12.

94 Moomaw, et al., Intact Forests in the United States: Proforestation Mitigates Climate Change and Serves the Greatest Good, Frontiers in Forests and Global Change (June 11, 2019) at 7), attached as Ex. 13 (emphasis added). 95 T. Hudiburg et al., Meeting GHG reduction targets requires accounting for all forest sector emissions, Environ. Res. Lett. 14 (2019) (emphasis added), attached as Ex. 14.

96 B. Law, et al., The Status of Science on Forest Carbon Management to Mitigate Climate Change (June 1, 2020), attached as Ex. 15.

97 B. Law & W. Moomaw, Keeping trees in the ground where they are already growing is an effective low-tech way to slow climate change, The Conversation (Feb. 23, 2021) (emphasis added), attached as Ex. 16, and available at https://theconversation.com/keeping-trees-in-theground- where-they-are-already-growing-is-an-effective-low-tech-way-to-slow-climate-change- 154618 (last viewed Mar. 12, 2021).

98 B. Law, et al., The Status of Science on Forest Carbon Management (Ex. 15) (emphasis added).

99 B. Law & M.E. Harmon, Forest sector carbon management, measurement and verification, and discussion of policy related to mitigation and adaptation of forests to climate change. Carbon Management (2011) 2(1), attached as Ex. 17, and available at https://www.researchgate.net/publication/235591616_Forest_sector_carbon_management_measurement_and_verification_and_discussion_of_policy_related_to_climate_change (last viewed Mar. 12, 2021).

100 "Substitution of wood for more fossil carbon intensive building materials has been projected to result in major climate mitigation benefits often exceeding those of the forests themselves. A reexamination of the fundamental assumptions underlying these projections indicates long-term mitigation benefits related to product substitution may have been overestimated 2- to 100-fold." M. Harmon, Have product substitution carbon benefits been overestimated? A sensitivity analysis of key assumptions, Environmental Research Letters (2019), attached as Ex. 18, and available at https://iopscience.iop.org/article/10.1088/1748-9326/ab1e95/pdf (last viewed Mar. 12, 2021).

101 40 C.F.R. [sect] 1508.27(b)(7) (2019).

102 40 C.F.R. [sect] 1508.7; WildEarth Guardians v. Zinke, 368 F. Supp. 3d 41 (D.D.C. 2019) (holding that BLM erred by failing to consider the cumulative climate impacts of oil and gas leases together with "GHG emissions generated by past, present, and reasonably foreseeable BLM lease sales in the region and nation").

103 See Law et al., Land use strategies (Ex. 12) at 3664 ("Our LCA [life-cycle assessment] showed that in 2001-2005, Oregon's net wood product emissions were 32.61 million tCO2e [tons of carbon dioxide equivalent in net GHG emissions] (Table S3), and 3.7- fold wildfire emissions in the period that included the record fire year (15) (Fig. 2) In 2011-2015, net wood product emissions were 34.45 million tCO2e and almost 10-fold fire emissions, mostly due to lower fire emissions.").

104 DellaSala (Ex. 10) at 14.

105 See Bureau of Land Management, Western Oregon Proposed RMP Final EIS (2009) at 165-181, excerpts attached as Ex. 19.

106 40 C.F.R. [sect] 1502.9(b) (2019) (requiring agencies to disclose, discuss, and respond to "any responsible opposing view").

107 See Ctr. for Biological Diversity v. U.S. Forest Serv., 349 F.3d 1157, 1168 (9th Cir. 2003) (finding Forest Service's failure to disclose and respond to evidence and opinions challenging EIS's scientific assumptions violated NEPA); Seattle Audubon Soc'y v. Moseley, 798 F. Supp. 1473, 1482 (W.D. Wash. 1992) ("The agency's explanation is insufficient under NEPA - not because experts disagree, but because the FEIS lacks reasoned discussion of major scientific objections."), aff'd sub nom. Seattle Audubon Soc'y v. Espy, 998 F.2d 699, 704 (9th Cir. 1993) ("[i]t would not further NEPA's aims for environmental protection to allow the Forest Service to ignore reputable scientific criticisms that have surfaced").

108 WildEarth Guardians v. Bernhardt, 2021 U.S. Dist. LEXIS 20792 at *25-*32, 2021 WL 363955, CV 17-80-BLG-SPW (D. Mont. Feb. 3, 2021) (endorsing magistrate judge's determination that the Office of Surface Mining "failed to take a 'hard look' at the costs of greenhouse gas emissions and failed to reasonably justify its reasoning for not quantifying the costs of the mining plan when the Social Cost of Carbon Protocol ... was available to do just that").

109 See Draft EA at 102 (explicitly relying on Forest Service Jan. 2009 guidance).

110 N.L. Harris et al., Attribution of net carbon change by disturbance type across forest lands of the conterminous United States, Carbon Balance and Management (2016), attached as Ex. 20, and available at https://www.fs.fed.us/nrs/pubs/jrnl/2016/nrs_2016_harris_001.pdf (last viewed Mar. 12, 2021).

111 See, e.g., Office of Surface Mining & Bureau of Land Management, Environmental Assessment, Colowyo Coal Mine Collom Permit Expansion Area Project (Jan. 2016) at 4-15 - 4- 18 (including table assessing "direct GHG emissions" from "drills," "dozers," "graders," "haul trucks," etc., for the proposed action), excerpts attached as Ex. 21; U.S. Forest Service, Supplemental Final Environmental Impact Statement, Federal Coal Lease Modifications COC- 1362 & COC-67232 (Aug. 2017) at 102-113 (publishing tables estimating emissions of air pollutants, including greenhouse gases CO2 and Ch4 (methane) for activities including road and well pad construction, heavy equipment use, and commuter vehicle trips for the no action and proposed action alternatives), excerpts attached as Ex. 22.

112 Draft EA at 27.

113 Draft EA at 27.

114 36 C.F.R. [sect] 220.3 (emphasis added).

115 36 C.F.R. [sect] 220.5(e)(2) (emphasis added).

116 NRDC v. United States Army Corps of Eng'rs, 457 F. Supp. 2d at 234 (citations omitted).

117 Mountaineers v. United States Forest Serv., 445 F. Supp. 2d at 1250.

118 See, e.g., High Sierra Hikers Association v. Weingardt, 521 F. Supp. 2d 1065, 1090-91 (N.D. Ca. 2007) (overturning a Forest Service decision to liberalize the rules limiting campfires in high country parts of a wilderness area on the grounds that the agency could not rely on adaptive management to overcome an inadequate response to the problems raised in the record).

119 NRDC v. Kempthorne, 506 F. Supp. 2d at 333-34 (emphasis in original).

120 Id. at 329.

121 Id. at 352. See also id. at 350 (explaining the "certain to occur" standard and citing Ctr. for Biological Diversity v. Rumsfeld, 198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002)).

122 Id. at 355 (citing Rumsfeld, 198 F. Supp. 2d at1153).

123 Id. at 356.

124 Id. at 387.

125 36 C.F.R. [sect] 220.5(e)(2) (emphasis added).

126 Draft EA at 30.

127 36 C.F.R. [sect] 220.5(e)(2) (emphasis added).

128 42 U.S.C. [sect] 4332(2)(C) & (E); 40 C.F.R. [sect] 1508.9(b) (an EA "[s]hall include brief discussions ... of alternatives").

129 Davis v. Mineta, 302 F.3d 1104, 1120 (10th Cir. 2002) (granting injunction where EA failed to consider reasonable alternatives).

130 Din[eacute] Citizens Against Ruining Our Env't v. Klein, 747 F. Supp. 2d 1234, 1254 (D. Colo. 2010) (quoting Greater Yellowstone Coal. v. Flowers, 359 F.3d 1257, 1277 (10th Cir. 2004)). See also W. Watersheds Project v. Abbey, 719 F.3d 1035, 1050 (9th Cir. 2013) (in preparing EA, "an agency must still give full and meaningful consideration to all reasonable alternatives" (emphasis added) (internal quotation and citation omitted)); 40 C.F.R. [sect] 1502.14 (describing alternatives analysis as the "heart of the environmental impact statement").

131 Ayers v. Espy, 873 F. Supp. 455, 473 (D. Colo. 1994) (internal citation omitted).

132 Wilderness Soc'y v. Wisely, 524 F. Supp. 2d 1285, 1309 (D. Colo. 2007) (quotations & citation omitted).

133 Din[eacute] Citizens Against Ruining Our Env't, 747 F. Supp. 2d at 1255 (quoting New Mexico ex rel. Richardson, 565 F.3d at 709).

134 Id. at 1256.

135 See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin., 538 F.3d 1172, 1217-19 (9th Cir. 2008) (finding EA deficient, in part, for failing to evaluate a specific proposal submitted by petitioner); Colo. Envtl. Coal. v. Dombeck, 185 F.3d 1162, 1171 (10th Cir. 1999) (agency's "[h]ard look" analysis should utilize "public comment and the best available scientific information") (emphasis added).

136 Natural Resources Defense Council, Inc. v. Morton, 458 F.2d 827, 836 (D.C. Cir. 1972).

137 Town of Matthews v. U.S. Dep't. of Transp., 527 F. Supp. 1055 (W.D. N.C. 1981).

138 North Buckhead Civic Ass'n v. Skinner, 903 F.2d 1533, 1542 (11th Cir. 1990).

139 See Wilderness Soc'y, 524 F. Supp. 2d at 1309 (holding EA for agency decision to offer oil and gas leases violated NEPA because it failed to discuss the reasons for eliminating a "no surface occupancy" alternative); Ayers, 873 F. Supp. at 468, 473.

140 See, e.g., Four Forest Restoration Initiative, Old Growth Protection & Large Tree Retention Strategy (Sep. 13, 2011) at 3-4 (citing numerous studies), attached as Ex. 23.

141 Id.

142 Id. at 7.

143 U.S. Forest Service et al., New Mexico Forest Restoration Principles (May 2006), attached as Ex. 24, available at https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5207898.pdf (last viewed July 15, 2019).

144 Allen et al., Ecological Restoration of Southwestern Ponderosa Pine Ecosystems: A Broad Perspective, Ecological Applications, 12(5) (2002) at 1425, attached as Ex. 25.

145 Id. at 1429. (emphasis added).

146 D. Lynch, Forest Restoration in Southwestern Ponderosa Pine, Journal of Forestry (Aug. 2000) at 17, attached as Ex. 26.

147 San Juan National Forest, Guard Station Timber Sale, Decision Notice (May 1996) at 3 ("Cut no trees greater than 16" diameter breast height (DBH)"), attached as Ex. 27; San Juan National Forest, Ferris East Timber Sale, Decision Notice (Feb. 1998) at 3 ("No ponderosa pine in excess of 20 inches in diameter at breast height (DBH) will be harvested."), attached as Ex. 28.

148 Id.

149 Draft EA at 37-38.

150 Draft EA at 63-65 (watersheds), 76-78 (wildlife).

151 Draft EA at 59.

152 Daft EA at 59.

153 Draft EA at 59 (emphasis added).

154 40 C.F.R. [sect] 1500.1(b).

155 J. Worrall et al., Projected Impacts of Climate Change on Forests of the Dolores Watershed, presentation to the Dolores Watershed Resilient Forest Collaborative (2017) at slides 29, 39 & 52 (showing results of bioclimate models predicting the likely persistence of various forest types, which characterize ponderosa pine as "lost" for most of the project area), attached as Ex. 29, and available at http://dwrfcollaborative.org/wp/wp-content/uploads/2018/06/projected-impacts-ofclimate- change-on-forests-of-the-dolores-watershed.pdf (last viewed Mar. 12, 2021). Other forest types will suffer in the area as well. See id. at slide 33 (showing Gambel oak "threatened"); id. at slide 35 (showing aspen "lost" in the project area, even in a "favorable climate" scenario).

156 See Draft EA at 102-03.

157 Draft EA at 10 (quoting San Juan Forest Plan at 2.9.1).

158 40 C.F.R. [sect] 1502.9(b) (requiring agencies to disclose, discuss, and respond to "any responsible opposing view").

159 See Ctr. for Biological Diversity v. U.S. Forest Serv., 349 F.3d 1157, 1168 (9th Cir. 2003) (finding Forest Service's failure to disclose and respond to evidence and opinions challenging EIS's scientific assumptions violated NEPA); Seattle Audubon Soc'y v. Moseley, 798 F. Supp. 1473, 1482 (W.D. Wash. 1992) ("The agency's explanation is insufficient under NEPA - not because experts disagree, but because the FEIS lacks reasoned discussion of major scientific objections."), aff'd sub nom. Seattle Audubon Soc'y v. Espy, 998 F.2d 699, 704 (9th Cir. 1993) ("[i]t would not further NEPA's aims for environmental protection to allow the Forest Service to ignore reputable scientific criticisms that have surfaced"); High Country Conservation Advocates v. Forest Service, 52 F. Supp. 3d 1174, 1198 (D. Colo. 2014) (finding Forest Service violated NEPA by failing to mention or respond to expert report on climate impacts).

160 Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 351-52 (1989); Holy Cross Wilderness Fund v. Madigan, 960 F.2d 1515, 1522 (10th Cir. 1992).

161 40 C.F.R. [sect][sect] 1502.14(f), 1502.16(h).

162 Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18026, 18031 (March 23, 1981).

163 Forty Questions, 46 Fed. Reg. at 18036.

164 Colo. Envt'l Coalition v. Dombeck, 185 F.3d 1162, 1173 (10th Cir. 1999) (quoting Robertson, 490 U.S. at 352).

165 City of Carmel-by-the-Sea v. U.S. Dept. of Transp., 123 F.3d 1142, 1154 (9th Cir. 1997) (quoting Robertson, 490 U.S. at 353).

166 Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 353 (1989).

167 Neighbors of Cuddy Mountain v. U.S. Forest Serv., 137 F.3d 1372, 1380 (9th Cir. 1998).

168 Id. at 1380-81. See also Northwest Indian Cemetery Protective Association v. Peterson, 795 F.2d 688, 697 (9th Cir. 1986), rev'd on other grounds, 485 U.S. 439 (1988) ("A mere listing of mitigation measures is insufficient to qualify as the reasoned discussion required by NEPA."); Idaho Sporting Congress v. Thomas, 137 F.3d 1146, 1151 (9th Cir. 1988) ("Without analytical data to support the proposed mitigation measures, we are not persuaded that they amount to anything more than a 'mere listing' of good management practices.").

169 40 C.F.R. [sect] 1505.2(c).

170 Draft EA at 19.

171 Draft EA at 19-27.

172 Draft EA at 22.

173 Draft EA at 23.

174 Draft EA at 26.

175 Draft EA at 21.

176 Draft EA at 21.

177 Draft EA at 25.

178 R.T. Reynolds et al. Management Recommendations for the Northern Goshawk in the Southwestern United States, GTR-RM-217 (1992) at 6.

179 Draft EA at 73-74.

180 Management Recommendations for the Northern Goshawk at 14, 24.

181 Management Recommendations for the Northern Goshawk at 16.

182 Draft EA at 26.

183 42 U.S.C. [sect] 4332(C).

184 Airport Neighbors Alliance v. U.S., 90 F.3d 426, 429 (10th Cir. 1996) (citation omitted) (emphasis added).

185 Idaho Sporting Cong. v. Thomas, 137 F.3d 1146, 1149-50 (9th Cir. 1998) (citations omitted) (emphasis original). See also Ocean Advocates v. U.S. Army Corps of Eng'rs, 402 F.3d 846, 864- 65 (9th Cir. 2005) ("To trigger this [EIS] requirement a plaintiff need not show that signficlant effects will in fact occur, but raising substantial questions whether a project may have a significant effect is sufficient." (internal quotations, citations, and alterations omitted)).

186 Ocean Advoc., 402 F.3d at 864.

187 40 C.F.R. [sect] 1508.27.

188 Id. [sect] 1508.27(a).

189 Id. [sect] 1508.27(b)(4)-(5), (7)

190 Town of Cave Creek v. FAA, 325 F.3d 320, 331 (D.C. Cir. 2003) (quoting North American Wild Sheep v. U.S. Department of Agriculture, 681 F.2d 1172, 1182 (9th Cir. 1982)) (emphasis in original). See also Middle Rio Grande Conservancy Dist. v. Norton, 294 F.3d 1220, 1229 (10th Cir. 2002) (same); Town of Superior v. U.S. Fish and Wildlife Serv., 913 F. Supp. 2d 1087, 1120 (D. Colo. 2012) (same).

191 Draft EA at 55 (149 miles), 57 (up to 117 miles).

192 Draft EA at 44.

193 Draft EA at 73.

March 12, 2021

Derek Padilla, District Ranger
Dolores Ranger District
29211 Hwy 184
Dolores, CO 81321
Via email: derek.padilla@usda.gov; David.casey2@usda.gov
Via web portal: https://cara.ecosystem-management.org/Public//CommentInput?Project=57671

**Re: Comments on Salter Vegetation Management Project Environmental Assessment, Project #57671**

Dear Ranger Padilla:

On behalf of the Center for Biological Diversity (the Center) and WildEarth Guardians, thank you for the opportunity to provide these comments on the draft environmental assessment ("Draft EA") on the Salter Vegetation Management Project.

The Center is a 501(c)(3) nonprofit organization based in Tucson, Arizona, with offices across the country including in Crested Butte and Denver, Colorado, and has 1.7 million members and online activists. The Center is dedicated to protecting and restoring imperiled species and natural ecosystems. The Center uses science, policy, and law to advocate for the conservation and recovery of species on the brink of extinction and the habitats they need to survive. The Center has and continues to actively advocate for increased protections for species and their habitats across Colorado.

WildEarth Guardians is a nonprofit conservation organization headquartered in Santa Fe, NM with offices in several western states. With more than 178,000 members and supporters WildEarth Guardians work to protect and restore wildlife, wild places, wild rivers, and the health of the American West. For many years, WildEarth Guardians has advocated for an environmentally and economically sustainable transportation system on Forest Service lands, with properly managed motorized recreation. We also promote and support actions that restore ecological integrity to degraded ecosystems in order to ensure at-risk species can thrive.

We are concerned that the Salter Project Draft EA fails to meet the National Environmental Policy Act's (NEPA's) standards for disclosure and public involvement in several respects. While we appreciate the inclusion of an alternative that protects some large, old trees, we remain concerned that the proposed action will destroy thousands of pre-settlement trees, some more than a century old. We believe there is no ecological or social basis for doing so. The Draft EA also fails to contain critical information necessary to understand the project's impacts, including information about the baseline conditions of the project and about the location and impacts of

100+ miles of temporary roads. The Draft EA fails to disclose the project's economic impacts despite the fact that economic development is a project purpose. The Draft EA fails to take a hard look at the project's climate impacts, appearing to ignore the Biden administration's emphasis on quantifying and reducing climate pollution. The Draft EA fails to provide a robust review of the varying impacts of the two action alternatives, undermining the heart of the NEPA process, and fails to respond to critical comments and studies provided by experts contradicting the Forest Service's assumptions. Finally, unless the Forest Service addresses these issues and others, there is a potential for the proposal to have significant impacts, requiring the Forest Service to prepare an environmental impact statement (EIS).

## I. THE SALTER PROJECT

The Draft EA states that the Forest Service identified the following needs for the project:

- improve resilience and resistance to epidemic insect and disease outbreaks,
- increase the structural diversity of the ponderosa pine forest represented across the project area, and
- provide economic support to local communities by providing timber products to local industries in a sustainable manner.[1]

The Draft EA further states that the project is needed to move the forest stands in the area toward desired conditions dictated by the Forest Plan:

> The need for this project is derived from the differences between the existing forest vegetation conditions and the desired forest vegetation conditions, as defined by the San Juan National Forest Land and Resource Management Plan.[2]

The Draft EA also alleges that the project is needed to address an ongoing beetle infestation:

> Bark beetles have infested adjacent landscapes causing significant mortality. The early stages of a bark beetle infestation is now being observed in the Salter project area.[3]

The proposal involves "tree-cutting, tree planting, and activity fuel burning" across "approximately 22,346 acres."[4] Those activities include "single tree selection," including the logging of trees up to 26.9" diameter at breast height (dbh), or over 7 feet in circumference,

[1] San Juan National Forest, Salter Vegetation Management Project, Draft Environmental Assessment (Feb. 2021) at 12 (hereafter, "Draft EA").

[2] Draft EA at 9. *See also id.* at 11 ("The structure and size class distributions in the stands identified for this analysis are not within desired conditions described in [San Juan Forest Plan Sec.] 2.2.23 based on field reconnaissance and inventory data.")

[3] Draft EA at 11.

[4] Draft EA at 12.

across 19,675 acres.[5] The treatment would leave "50-to-70 basal area per acre of residual basal area depending upon stand condition. There are 19,675 acres of this treatment type."[6] The project will also involve 3,115 acres of commercial thinning, where again trees up to 26.9" dbh could be chainsawed, and again the target would be "a variable residual square feet of tree stem basal area of 50 -70 basal area per acre depending upon stand condition."[7]

We request that the Forest Service explain why the prescriptions in the Salter Project differ from those in the nearby Lone Pine project approved last year. There, the Forest Service approved:

- Basal area ranging from 60 to 80 square feet per acre with a target basal area of 70 square feet per acre in the "Large Tree Emphasis/Commercial Thin Prescription."[8]

- Basal area ranging from 60 to 80 square feet per acre with a target basal area of 60 square feet per acre in the commercial thinning prescription.[9]

Because the purpose and need statements for the Salter and Lone Pine projects are similar, the Forest Service should explain why the San Juan National Forest is proposing to adopt different prescriptions.

## II. THE DRAFT EA LACKS THE SITE-SPECIFIC DETAIL NEPA REQUIRES.

NEPA is "'our basic national charter for protection of the environment.'"[10] In enacting NEPA, Congress recognized the "profound impact" of human activities, including "resource exploitation," on the environment and declared a national policy "to create and maintain conditions under which man and nature can exist in productive harmony."[11]

---

[5] Draft EA at 13. Note that while the Draft EA several times states that no trees larger than 26" dbh will be logged, *id*. at 13 (Table 1), 14, the document also asserts that "[t]he maximum diameter to harvest would be 26.9"," or about three inches greater in circumference. *Id*. at 14. *See also id*. at 13 n.1 ("No tree larger than 26.9 inch diameter at breast height would be cut in alternatives 2 and3 [sic]."). We find the use of two different numbers confusing and request that the Forest Service make clear in any subsequent NEPA document that the diameter limit is 26.9 inches, not 26 inches.

[6] Draft EA at 13.

[7] Draft EA at 13. We note that summing the acres in Table 2 (Draft EA at 13) for commercial thinning and single tree selection treatments results in a project area of 22,790 acres, a figure larger than the "approximately 22,346" acres the Draft EA (at 12) asserts would be treated. We urge the Forest Service to address this discrepancy in any subsequent NEPA document.

[8] San Juan National Forest, Lone Pine Decision Notice (Jan. 23, 2020) at 7.

[9] *Id*. at 5.

[10] *Center for Biological Diversity v. United States Forest Serv*., 349 F.3d 1157, 1166 (9th Cir. 2003) (quoting 40 C.F.R. § 1500.1).

[11] 42 U.S.C. § 4331(a).

The statute has two fundamental two goals: "(1) to ensure that the agency will have detailed information on significant environmental impacts when it makes decisions; and (2) to guarantee that this information will be available to a larger audience."[12] "NEPA promotes its sweeping commitment to 'prevent or eliminate damage to the environment and biosphere' by focusing Government and public attention on the environmental effects of proposed agency action."[13] Stated more directly, NEPA's "'action-forcing' procedures ... require the [Forest Service] to take a 'hard look' at environmental consequences"[14] *before* the agency approves an action. "By so focusing agency attention, NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct."[15] To ensure that the agency has taken the required "hard look," courts hold that the agency must utilize "public comment and the best available scientific information."[16]

NEPA's review obligations are more stringent and detailed at the project level, or "implementation stage," given the nature of "individual site specific projects."[17] "[G]eneral statements about possible effects and some risk do not constitute a hard look, absent a justification regarding why more definitive information could not be provided."[18]

NEPA requires site-specificity to fulfill two basic purposes: 1) to ensure agencies are making informed decisions prior to acting and 2) to ensure the public is given a meaningful opportunity

---

[12] *Envtl. Prot. Info. Ctr. v. Blackwell*, 389 F. Supp. 2d 1174, 1184 (N.D. Cal. 2004) (quoting *Neighbors of Cuddy Mt. v. Alexander*, 303 F.3d 1059, 1063 (9th Cir. 2002)); *see also Earth Island v. United States Forest Serv.*, 351 F.3d 1291, 1300 (9th Cir. 2003) ("NEPA requires that a federal agency 'consider every significant aspect of the environmental impact of a proposed action ... [and] inform the public that it has indeed considered environmental concerns in its decision-making process.'").

[13] *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989) (quoting 42 U.S.C. § 4321).

[14] *Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir. 2000) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989)).

[15] *Marsh*, 490 U.S. at 371 (citation omitted).

[16] *Biodiversity Cons. Alliance v. Jiron*, 762 F.3d 1036, 1086 (10th Cir. 2014) (internal citation omitted).

[17] *Ecology Ctr., Inc. v. United States Forest Serv.*, 192 F.3d 922, 923 n.2 (9th Cir. 1999); *see also Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 800-01 (9th Cir. 2003); *New Mexico ex rel. Richardson v. Bureau of Land Management*, 565 F.3d 683, 718-19 (10th Cir. 2009) (requiring site-specific NEPA analysis when no future NEPA process would occur); *Colo. Envtl. Coal. v. Ofc. of Legacy Mgmt.*, 819 F. Supp. 2d 1193, 1209-10 (D. Colo. 2011) (requiring site-specific NEPA analysis even when future NEPA would occur because "environmental impacts were reasonably foreseeable").

[18] *Or. Natural Res. Council Fund v. Brong*, 492 F.3d 1120, 1134 (9th Cir. 2007) (citation omitted); *see also Or. Natural Res. Council Fund v. Goodman*, 505 F.3d 884, 892 (9th Cir. 2007) (holding the Forest Service's failure to discuss the importance of maintaining a biological corridor violated NEPA, explaining that "[m]erely disclosing the existence of a biological corridor is inadequate" and that the agency must "meaningfully substantiate [its] finding").

to participate in those decision-making processes.[19] Federal courts apply these touchstone criteria when evaluating whether an EIS is adequately site-specific.[20]

Analyzing and disclosing site-specific impacts is critical because where (and when and how) activities occur on a landscape strongly determines that nature of the impact. As the Tenth Circuit Court of Appeals has explained, the actual "location of development greatly influences the likelihood and extent of habitat preservation. Disturbances on the same total surface area may produce wildly different impacts on plants and wildlife depending on the amount of contiguous habitat between them."[21] The Court used the example of "building a dirt road along the edge of an ecosystem" and "building a four-lane highway straight down the middle" to explain how those activities may have similar types of impacts, but the extent of those impacts – in particular on habitat disturbance – is different.[22] Indeed, "location, not merely total surface disturbance, affects habitat fragmentation,"[23] and therefore location data is critical to the site-specific analysis NEPA requires. Merely disclosing the existence of particular geographic or biological features is inadequate; agencies must discuss their importance and substantiate their findings as to the impacts.[24]

NEPA further mandates that the agency provide the public "'the underlying environmental data' from which the Forest Service develop[ed] its opinions and arrive[d] at its decisions."[25] "The agency must explain the conclusions it has drawn from its chosen methodology, and the reasons it considered the underlying evidence to be reliable."[26] In the end, "vague and conclusory statements, without any supporting data, do not constitute a 'hard look' at the environmental consequences of the action as required by NEPA."[27]

CEQ's regulations establish specific ways agencies must analyze proposed actions, including project-level decisions, including a detailed discussion of direct, indirect, and cumulative impacts

---

19 *Stein v. Barton*, 740 F. Supp. 743, 749 (D. Alaska 1990).

20 *See WildEarth Guardians*, 790 F.3d at 921-25 (holding EIS inadequate for failure to disclose location of moose range); *Or. Nat. Desert Ass'n v. Rose*, 2019 WL 1855419 (9th Cir. 2019) (holding environmental analysis violated NEPA by failing to establish "the physical condition of [roads and trails] and authorizing activity without assessing the actual baseline conditions").

21 *New Mexico ex rel. Richardson*, 565 F.3d at 706.

22 *Id*. at 707.

23 *Id.*

24 *Or. Natural Res. Council Fund v. Goodman*, 505 F.3d 884, 892 (9th Cir. 2007).

25 *WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 925 (9th Cir. 2015).

26 *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1075 (9th Cir. 2011) (citation omitted).

27 *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 973 (9th Cir. 2006); *see also Ocean Advocates v. Army Corps of Engineers*, 402 F.3d 846, 869 (9th Cir. 2004) (finding that a vague and uncertain analysis is insufficient to meet NEPA's mandate).

and their significance; and an analysis of reasonable alternatives to the proposed action.[28] Such analysis is required for both environmental assessments and EISs.

The Salter Project is a project-level decision. As a result, any NEPA analysis must include the detailed information and analysis that NEPA and the CEQ regulations require.

While the Draft EA contains some description of the location and nature of proposed vegetation treatments, we are concerned that it still fails to comply with NEPA, as described below.

### B. The Draft EA Fails to Disclose Some of the Salter Project's Site-Specific Direct and Indirect Effects.

Although NEPA requires that analysis disclose specific information about the when, where, and how of any agency action, so that the impacts and alternatives can be described and weighed, the Draft EA does not appear to contain some of this data. We request that the Forest Service more directly address these issues.

The where and the how of new temporary road construction are not disclosed, or are disclosed incompletely.

For example, the Draft EA inconsistently identifies the total mileage of temporary roads. At one point, the Draft EA states noncommittally that "temporary roads *may be* required to reduce the need for excessive tractor skidding and allow wood products to be moved to the permanent road system."[29] Despite the fact the temporary roads "may be" required, the Draft EA then asserts that "[a]pproximately 50-to-75 miles of temporary road construction are analyzed under this proposal."[30] Elsewhere, the EA states with more assurance that "[i]mplementing the proposed

---

[28] We request that the Forest Service confirm to the public, in writing, that it intends to rely on the NEPA regulations promulgated in 1978 and in force as of the date scoping on the Salter Project began. Although CEQ issued a final rulemaking in July 2020 fundamentally rewriting those regulations, the new rules apply only "to any NEPA process begun *after* September 14, 2020," or where the agency has chosen to "apply the regulations in this subchapter to ongoing activities." 40 C.F.R. § 1506.13 (2020) (emphasis added). Scoping on this project began before September 14, 2020, and the Draft EA does not indicate that the agency is opting to use the 2020 CEQ NEPA regulations. In any event, the 2020 regulations have been challenged as illegal in no fewer than four pending lawsuits. *See, e.g.*, *Environmental Justice Health Alliance v. CEQ*, Case 1:20-cv-06143 (S.D.N.Y. Aug. 6, 2020); *Wild Virginia v. CEQ*, Case 3:20-cv-00045-NKM (W.D. Va. July 29, 2020); *Alaska Community Action on Toxics v. CEQ*, Case 3:20-cv-05199-RS (N.D. Ca. July 29, 2020); *State of California v. Council on Environmental Quality,* Case No. 3:20-cv-06057 (N.D. Cal. Aug. 28, 2020).

[29] Draft EA at 18 (emphasis added).

[30] Draft EA at 18.

action *would require* development of approximately 106 miles of temporary roads."[31] But even that number is apparently a guestimate because temporary roads will only be laid out later:

> Though these roads have been theoretically identified, the final alignment may deviate from the plan. Such deviation would be limited to that agreed by the Forest Service (Engineering Representative/Sale Administrator) and the contractor. The implementation of the proposed action should not result in an increase of temporary road mileage greater than 10 percent of the estimated 106 miles of primary temporary roads. Therefore, 11 miles or less of addition temp roads can be expected.[32]

Thus, the Forest Service predicts that as many as 117 miles of temporary road may be built for the project, and the agency will not identify the precise location of the routes' final alignment until the Forest Service and the contractor agree, long after the NEPA process has terminated.

Road construction – even for temporary roads – removes all vegetation within the area graded, eliminates and fragments habitat, alters hydrology, and can act as a vector for human-caused fires and the spread of noxious weeds. Road use can cause roadkill, disturb wildlife during critical periods (winter, nesting/calving, etc.), and increase opportunities for poaching. Thus, the nature and location of the road network to be used and constructed is critical to understanding this project's impacts. However, the Draft EA fails to define the location of temporary road use and road construction, and omits other data important to understanding road impacts.

The Forest Service has long acknowledged that temporary roads can have significant impacts. In its analysis of the Roadless Area Conservation Rule – which generally barred the construction of both permanent and temporary roads – the agency stated:

> Although only used for relatively short periods, temporary roads present most of the same risks posed by permanent roads, although some may be of shorter duration. Many of these roads are designed to lower standards than permanent roads, are typically not maintained to the same standards, and are associated with additional ground disturbance during their removal…. While temporary roads may be used for periods ranging up to ten years, and are then decommissioned, their short- and long-term effects can be extensive to terrestrial species and habitats.[33]

---

[31] Draft EA at 56 (emphasis added). *See also id.* at 57 ("The primary temporary road alignments consist of 69.8 miles of existing non-system roads, and 36.4 miles of new ground disturbanc").

[32] Draft EA at 57.

[33] USDA Forest Service, Final Environmental Impact Statement, Roadless Area Conservation Rule (Nov. 2000) at 3-150 excerpts attached as Ex. 1. *See also id.* at 3-30 ("temporary roads are not designed or constructed to the same standards as classified roads and are not intended to be part of the National Forest System Transportation System. The results can be a higher risk of environmental impacts over the short run."); *id.* at 3-164 (concluding that "[t]emporary roads

The Final EIS on the Roadless Rule also noted that "[t]he use of temporary roads may have the same long lasting and significant ecological effects as permanent roads, such as the introduction of nonnative vegetation and degradation of stream channels."[34] Temporary "[s]kid roads and trails, log landings, and similar disturbances within the [timber] sale area are the main cause of soil erosion and can contribute up to 90% of the sediment generated by timber sale activity (Patric 1976; Swift 1988)."[35] The Roadless Rule Final EIS acknowledges that temporary road construction can cause increased risk of surface erosion and landslides, but that this varies widely and depends on local site characteristics.[36] But "local site characteristics" are not disclosed in the Draft EA because that document fails to disclose the location of proposed temporary roads.

Maps in the Draft EA fail to appear to hint at where some temporary road construction will occur, but the maps do not appear to disclose where the routes will be constructed within cutting units.[37] This may be due to an error in the map display (in which the temporary roads are hidden under the layer for logging units). Whatever the reason, it is difficult to discern where the Forest Service intends to construct temporary roads. The Transportation System report in the project file does little to help the reader understand temporary road impacts.[38] While that report provides a unique number for each temporary route and estimates its potential length, it does not provide much useful information about *where* the roads will be constructed or the resources the roads may impact.

Because the Draft EA fails to disclose the location of temporary roads, or the values and conditions they might impact, it cannot provide the decisionmaker or the public with any idea whether or where these undefined measures may be required. This violates NEPA's hard look mandate.

Further, the width of new roads – which defines the level of direct habitat destruction from bulldozing – is not defined, and the Draft EA provides little guidance as to when, if ever, widths might be restricted, again making it impossible for the public or the agency to know the extent of project impacts.[39] The Draft EA states: "Temporary roads would be held to the minimum feasible number, width and total length and would be located sufficiently far from streams and other water bodies to minimize discharge into those waters except at necessary water

---

present most of the same risks posed by permanent roads" to rare plants, "although some [impacts] may be of shorter duration.").

[34] Roadless Area Conservation Rule Final EIS (Nov. 2000) (Ex. 1) at 2-18.

[35] Roadless Area Conservation Rule Final EIS (Nov. 2000) (Ex. 1) at 3-45.

[36] Roadless Area Conservation Rule Final EIS (Nov. 2000) (Ex. 1) at 3-45.

[37] Draft EA, Appendix A, at 84-89.

[38] San Juan NF, Transportation System report (no date) (project file).

[39] *See* Draft EA at 24 ("[t]he location and clearing widths of all temporary roads or facilities would be agreed to in writing (between the Forest Service and the contractor) before construction is started.").

crossings."[40] This provides little helpful information about the location, number, width, or impacts of the routes.

The Draft EA similarly provides little information about skid trails. The Draft EA states that "[s]kid trails would be held to the minimum number, width, and length."[41] This provides neither the public nor the decisionmaker with any idea as to the number, length, or scope of potential impacts from such trails, which will crush vegetation, cause a loss of habitat, and compact soil, among other impacts. Further, the amount of surface area that skid trails, roads and similar disturbance is so large that impacts from these features appears certain to be significant. The Draft EA states that "[p]roposed design features for Hydrology and Soils also restrict roads, landings, skid trails, concentrated-use sites, and similar soil disturbances to designated sites to no more than 15 percent of any timber sale unit."[42] Given that there are 22,790 acres of logging units, skid trails, roads, etc. could impact up to 3,400 acres – an area of more than five square miles.

The Draft EA cannot take the required hard look at the impacts of temporary roads because it fails to disclose not only the location of these roads but also of the values that could be impacted by road construction and use. For example, the Draft EA fails to define the "where" of sensitive soil resources.

With respect to wildlife, the Draft EA provides no maps showing the location of habitat for any species (apart from elk and goshawk), or the relative value of such habitat, or where such habitat may be impacted by logging, road construction, road use, or fire. This makes it difficult for the public or the agency to understand impacts, or to evaluate whether an alternative to avoid certain areas could be crafted.

In short, specific road construction plans may be designed only after project approval, meaning that only then will the Forest Service have the site-specific information necessary to understand the project's impacts and mitigate them. This gets NEPA compliance backwards. NEPA mandates that agencies look before they leap. We urge the agency to provide the when, where, and how of the project – including temporary roads – in any subsequently prepared NEPA document.

*Areas to be avoided/mitigated*. The Draft EA notes that it will design treatments to avoid certain areas (*e.g.* water influence zones), thus potentially concentrating logging activities in remaining areas. But the Draft EA fails to disclose *where* most of these values may exist that vegetation treatments are designed to protect or avoid, thus making it difficult to understand the impact of these provisions on project design and on the environment.

---

[40] Draft EA at 21.

[41] Draft EA at 24.

[42] Draft EA at 44.

The Draft EA states that certain design elements will minimize or avoid potential adverse effects to resources including water influence zones (WIZ), riparian areas, and other wetlands. For example, the Draft EA states:

- Organic soils associated with riparian areas, intermittent streams, and the water influence zone (WIZ) would be protected through a no harvest/no mechanized equipment buffer.

- Intermittent streams with riparian vegetation would have a buffer strip width of 100 feet on each side of the channel unless a field visit by hydrologist determines a different site-specific buffer.[43]

- Mechanical treatments would avoid wetlands, wet meadows and riparian areas. No skidding, decking or loading would be allowed in these areas in order to protect water quality, existing soils, and vegetative cover.[44]

But the Draft EA and associated documents made available to the public as part of the EA appear to not identify these areas on maps. Nor is the extent of these areas described or quantified.

The "how" of some of the design elements is also undefined. The Draft EA states, for example, that "[p]roper drainage would be constructed or reconstructed on existing system road and newly constructed temporary roads."[45] What "proper drainage" is or how it will influence the location or extent of road construction is not explained. The failure to provide this information violates NEPA.

### C. The Draft EA Fails to Disclose Important Baseline Conditions in the Project Area.

The Draft EA's failure to disclose the where and the how of the project also results in a failure to comply with another NEPA requirement: the mandate that agencies "succinctly describe the environment of the area(s) to be affected or created by the alternative under consideration."[46] NEPA requires the action agency to set an appropriate baseline detailing the nature and extent of the resources in the area: "The concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process."[47] "Without establishing ... baseline conditions ... there is simply no way to determine what effect [an action] will have on the environment and, consequently, no way to comply with NEPA."[48]

---

[43] Draft EA at 64.

[44] Draft EA at 64.

[45] Draft EA at 21; *see also id.* at 64 ("Log landings … will be designed to have proper drainage").

[46] 40 C.F.R. § 1502.15.

[47] *See* Council on Environmental Quality, *Considering Cumulative Effects under the National Environmental Policy Act* 41 (January 1997).

[48] *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988).

Without baseline data, neither the public nor the agency can understand the effects of the proposed action or craft and analyze alternatives and mitigation measures to protect these values. As such, the Forest Service has a duty to identify the environmental baseline and affected environment, as well as the scope of impacts and where those impacts are most likely to be felt.

For example, the Draft EA fails disclose significant information about existing forest conditions. While the Draft EA alleges that some forest stands within the project area are impacted by insect infestations,[49] it fails to disclose the location of those stands or the extent of the beetle attack. The effectiveness of the type of treatments could be influenced by beetle activity. But the Draft EA fails to provide maps juxtaposing treatment units and the infestations. The "where" of these infestations on the landscape is not disclosed.

The Draft EA also contains little site-specific information on a variety of other resources, including wildlife and wetlands, among other resources.

The Draft EA could also be improved by including maps showing existing stand information such as basal area, which the project would reduce. The Forest Service could also disclose by stand the percentage of trees above several potential size limits (e.g., 16" dbh, 20" dbh, and 26" dbh) so that the public and the decisionmaker could understand the distribution of old and large trees. We understand from reviewing Powerpoint presentations prepared for the DWRF Collaborative that the Forest Service has much of this data. Thus, the Forest Service could likely generate such maps based on existing data.

Baseline information will also better enable the public to understand whether there is a need for the project. The Draft EA states that: "In the past ten years, approximately 34 percent of the project area has experienced fire, either wildfire or prescribed."[50] This statement raises numerous questions which we urge the Draft EA to answer: Where are these tens of thousands of acres? What basal area remains in these areas? Are these areas contained in any cutting units? What basal area remains? Did the fires result in residual basal area that approximated what the Salter Project proposes to achieve? Has previous fire covering more than one-third of the project reduce the need for "resilience" treatments because those fires have made the landscape more resilient to beetle infestations or future fire? If not, why not? If these fires have effectively fire-proofed large portions of the project area, or at least greatly reduced the risk of future high intensity fire, is there still a need for the project?

We urge the Forest Service in any subsequently prepared NEPA document to include baseline, site-specific information about the project area so that the public can better understand and appreciate the values at issue and how the proposed action and alternatives may impact those values.

---

[49] Draft EA at 11 (("[t]he early stages of a bark beetle infestation is now being observed in the Salter project area").

[50] Draft EA at 35.

### D. The Draft EA Fails to Disclose Meaningful Information about Cumulative Effects.

The Draft EA lacks the necessary detail to understand how the impacts of the Salter Project may interact with other private or Forest Service actions, in at least two key respects.

First, the Draft EA fails to meaningfully address off-road vehicle travel, an activity which may have cumulative effects when viewed together with the proposed action.[51] In much of the project area, which is popular with hunters, individuals may drive off-highway vehicles up to *one mile* from Forest Service roads to retrieve game, according to the motor vehicle use map for the Dolores Ranger District. Full-sized vehicles may also travel up to 300 feet from either side of many of the open roads within the project area for dispersed camping. Thus, motor vehicle use for limited purposes can legally occur off road across the vast majority of the project area. Such vehicle use will likely hinder reforestation, compound damage to soils and watersheds, crush seedlings and make reforestation more difficult, render temporary road closures and obliteration less effective, and increase the potential for the spread of exotic weeds. The fact that the cutting units "are easily accessible, occurring mostly on roaded landscapes and relatively gentle terrain" may make it difficult to effectively close routes.[52] Any subsequently prepared NEPA should address the effectiveness of existing road closures.

The Forest Service cannot argue that a prior NEPA document (for the Oct. 2011 Boggy-Glade transportation plan) addresses these impacts. That nearly ten-year-old EA did not take into consideration the Salter Project with its more decade of logging, the up-to-117 miles of temporary road, nearly 150 miles of road improvement, or the beetle infestation. The existing, permissive off-road vehicle management policy is likely to have synergistic and damaging impacts with the Salter Project. We urge the Forest Service to disclose these impacts in any subsequently prepared NEPA document.

Second, the Draft EA identifies several "follow-up" actions that will be required or are otherwise foreseeable, but whose impacts the EA does not appear to disclose. The Forest Service indicates that "[f]ollow-up [prescribed fire] treatments must occur within 6-15 years [of initial broadcast burns] in order to further reduce surface fuel loading."[53] This means more smoke and more activity in the project area could be occurring virtually constantly for 25 years following the initiation of the 10-year project. The Draft EA also states within the 3,000+ acres of lands subject to commercial thinning, additional logging will occur in "these stands at roughly 20-to-25 year[]" intervals,[54] meaning more noise, more construction, more displacement of wildlife are virtually guaranteed to occur over not just the short-term but the long-term. We urge the Forest Service to address cumulative effects of these foreseeable follow-up actions in any subsequent NEPA document.

---

[51] Existing levels of this activity could also be disclosed in the no action alternative.

[52] Draft EA at 9.

[53] Draft EA at 37.

[54] Draft EA at 59.

## III. THE DRAFT EA FAILS TO TAKE A HARD LOOK AT POTENTIALLY SIGNIFICANT IMPACTS.

### A. The Draft EA Fails to Take a Hard Look at the Project's Economic Impacts.

A primary purpose and need for the project is to "provide economic support to local communities by providing timber products to local industries in a sustainable manner," and the project includes "commercial thinning" on more than 3,000 acres.[55] Despite these facts, the Draft EA "dismissed" the issue of economics "from detailed analysis," and instead includes a general narrative about timber markets in the area with virtually no discussion or analysis of the economic impacts of the Salter Project, and no comparison among the alternatives.[56].

What little analysis the Draft EA contains indicates that the San Juan National Forest considers it important to offer large trees for sale as an incentive to entice timber mills to log smaller trees:

> Offering a mixture of saw log and smaller diameters timber in the right ratio is important to ensure offerings are marketable. The size of these sales is equally important in both volume and acres to ensure the work is completed on time and has a sustained profitability. The ability to include large volumes and achieve vegetation management at landscape level is possible with the existing industry.[57]

Although supporting local industry is a project goal, and the Forest Service apparently assumes such benefit will occur, the Draft EA fails to contain any projections or quantification of the likely board-feet the project will make available to local mills, nor the economic impact of the project in terms of income or employment. Because the Forest Service has detailed stand data for the project area, such an analysis would seem relatively straightforward to perform.

The Draft EA's failure to quantify the potential economic impacts not only violates NEPA, it is puzzling in light of the fact that the Forest Service elsewhere performs this analysis as a matter of course. For example, in a recent final EA for a logging project in Montana, the Forest Service estimates for *each alternative*: the acres harvested; the board footage to be logged; appraised stumpage rates; the predicted high bid; the total revenue to be generated; the present net value of the timber harvest and other resource activities; and the total employment and labor income estimated to be generated over the life of the project.[58]

Further, if an economic analysis shows no difference between Alternative 2 (cutting trees up to 26.9" dbh) and Alternative 3 (cutting trees up to 20" dbh), that would undermine the argument of

---

[55] Draft EA at 12, 13.

[56] Draft EA at 102, 103-04.

[57] Draft EA at 104.

[58] Lolo National Forest, Redd Bull Environmental Assessment (Jan. 2021) at 124-128, available at http://www.fs.usda.gov/nfs/11558/www/nepa/112011_FSPLT3_5580176.pdf (last viewed Mar. 12, 2021), excerpts attached as Ex. 2.

some industry supporters that logging larger trees is necessary to ensure the commercial viability of logging in this part of the San Juan NF.

Any analysis the Forest Service performs should address the potential for lost income to the town of Dolores due to the potential impact of the Salter Project on recreation. The area targeted for logging is popular with mountain bikers, equestrians, hikers, hunters, and other recreationists, receiving "moderate to heavy levels of recreation use" in the summer and fall.[59] In fact, "[t]he Boggy treatment block is a high use recreation area and one of the most heavily used recreation zones on the District. Over the past five years more than $300,000 of trail infrastructure projects have been completed on the Boggy non-motorized and motorized trail system."[60]

The constant presence of logging trucks, road graders, and the sound of chainsaws and heavy equipment *for a decade* (or longer, if follow-on treatments are analyzed) is likely to discourage some from visiting this part of the forest, with the potential for loss of revenue to local businesses.[61] While the Draft EA admits the likelihood that recreation will be deterred,[62] it fails to address or quantify the economic impacts of that result beyond admitting that there could be such impacts.[63] NEPA's hard look mandate requires more. Given that the town has begun a transition from resource extraction to recreation, the Salter Project may represent a step backward in terms of its economic development, one that should be estimated and quantified, so it can be compared to the alleged economic benefits of logging.

If it is in fact a purpose of the project to "provide economic support to local communities," the Forest Service must evaluate and quantify the extent to which various alternatives will achieve that goal.

---

[59] Draft EA at 47 ("The Salter analysis area receives moderate to heavy levels of recreation use during the summer months, moderate to heavy use during big game hunting seasons and low to moderate use during the winter.")

[60] Draft EA at 47.

[61] *See* Draft EA at 50 ("The potential impacts to recreation from this project are anticipated to be long-term and moderate for as long as 10 years."); *see also id.* at 58 (burying a description of "the estimated 10-year time frame of the project" in a discussion about projecting the number of log trucks per day traveling through Dolores). We could not locate a clear statement in the Draft EA defining how long it will take to implement the project's logging. We request that the Forest Service estimate and disclose the project's duration in a clear manner in any subsequent NEPA document.

[62] Draft EA at 50 ("Disruptions and impacts to recreationists would result from the sights, sounds and activities associated with the proposed treatments such as road work, truck hauling and cutting operations during project implementation").

[63] Draft EA at 50 ("Any long-term removal of recreation opportunities would have an impact to local community's economies.")

### B. The Draft EA Fails to Take a Hard Look at the Project's Climate Impacts.

1. The Climate Crisis

The climate crisis is the overriding environmental issue of our time, threatening to drastically modify ecosystems, alter coastlines, worsen extreme weather events, degrade public health, and cause massive human displacement and suffering. Its impacts are already being felt in the United States, and recent studies confirm that time is running out to forestall the catastrophic damage that will result from 1.5 degrees Celsius of warming.[64] More recent studies have confirmed that climate change is accelerating, making the need to protect carbon stores even more urgent than it was just a few years ago.[65]

Climate change is impacting Colorado now. Most of the state has warmed one or two degrees Fahrenheit in the last century. Snowpack on average is declining. Fire season is lengthening. Drought periods are occurring more often.[66] Policymakers and legislators have responded by requiring Colorado to adopt a climate action plan that calls for a 25% reduction in greenhouse gas emissions by 2025 and a 50% reduction by 2030. The Forest Service needs to be part of the solution, not part of the problem.

2. President Biden requires prompt action to assess and reduce climate pollution.

On the day he was inaugurated, President Biden committed to overturning the prior administration's failure to address, and its outright denial of, the climate emergency.

> It is, therefore, the policy of my Administration to listen to the science; to improve public health and protect our environment; to ensure access to clean air and water; to limit exposure to dangerous chemicals and pesticides; to hold polluters accountable, including those who disproportionately harm communities of color and low-income communities; *to reduce greenhouse gas emissions; to bolster resilience to the impacts of climate change*; to restore and expand our national treasures and monuments; and to prioritize both environmental justice and the creation of the well-paying union jobs necessary to deliver on these goals.
>
> To that end, this order directs all executive departments and agencies (agencies) to immediately review and, as appropriate and consistent with applicable law, take action to address the promulgation of Federal regulations and other actions

---

[64] *See* IPCC, Summary for Policymakers, Global Warming of 1.5°C. An IPCC Special Report on the impacts of global warming of 1.5°C above pre-industrial levels and related global greenhouse gas emission pathways (2018), attached as Ex. 3.

[65] *See, e.g.*, H. Fountain, Climate Change Is Accelerating, Bringing World 'Dangerously Close' to Irreversible Change, The New York Times (Dec. 4, 2019), attached as Ex. 4.

[66] *See* EPA, What Climate Change Means for Colorado (Aug. 2016), available at https://19january2017snapshot.epa.gov/sites/production/files/2016-09/documents/climate-change-co.pdf.

> during the last 4 years that conflict with these important national objectives, and *to immediately commence work to confront the climate crisis.*[67]

Days later, President Biden further committed to taking swift action to address the climate crisis. Per Executive Order 14,008, he has recognized that "[t]he United States and the world face a profound climate crisis. We have a narrow moment to pursue action at home and abroad in order to avoid the most catastrophic impacts of that crisis and to seize the opportunity that tackling climate change presents."[68] Pres. Biden announced that under his administration,

> The Federal Government must drive assessment, disclosure, and mitigation of climate pollution and climate-related risks in every sector of our economy, marshaling the creativity, courage, and capital necessary to make our Nation resilient in the face of this threat. Together, we must combat the climate crisis with bold, progressive action that combines the full capacity of the Federal Government with efforts from every corner of our Nation, every level of government, and every sector of our economy.[69]

Addressing the need for the accurate assessment of climate costs, Pres. Biden announced on day one that "[i]t is *essential* that agencies capture the full costs of greenhouse gas emissions as accurately as possible, including by taking global damages into account."[70] The President also re-established Interagency Working Group on the Social Cost of Greenhouse Gases, on which the Secretary of Agriculture will serve.[71] The President directed the Working Group to publish interim values for the social cost of carbon by February 19, 2021.[72] The Working Group that month set that price at $51/ton at a 3% discount rate.[73]

---

[67] Executive Order 13,990, 86 Fed. Reg. 7037 (Jan. 20, 2021) at Sec. 1 (emphasis added), attached as Ex. 5.

[68] Executive Order 14,008, 86 Fed. Reg. 7619 (Jan. 27, 2021), attached as Ex. 6.

[69] *Id*. at 7622 (Sec. 201).

[70] Executive Order 13,990 (Ex. 5), 86 Fed. Reg. at 7040, Sec. 5(a) (emphasis added).

[71] *Id*., Sec. 5(b).

[72] *Id*., Sec. 5(b)(ii)(A).

[73] Interagency Working Group on Social Cost of Greenhouse Gases, Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates under Executive Order 13990 (Feb. 2021), available at https://www.whitehouse.gov/wp-content/uploads/2021/02/TechnicalSupportDocument_SocialCostofCarbonMethaneNitrousOxide.pdf (last viewed Mar. 12, 2021) and attached as Ex. 7.

3. NEPA requires the Forest Service to disclose the climate impacts of proposed actions.

The Forest Service must analyze the direct, indirect, and cumulative impacts of a proposed action.[74] NEPA and NFMA require the Forest Service to use high quality, accurate, scientific information to assess the effects of a proposed action on the environment.[75]

Meaningful consideration of greenhouse gas emissions (GHGs) and carbon sequestration (carbon storage) lies within the scope of required NEPA review.[76] As the Ninth Circuit has held, in the context of fuel economy standard rules:

> The impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct. Any given rule setting a CAFE standard might have an "individually minor" effect on the environment, but these rules are "collectively significant actions taking place over a period of time."[77]

Courts have held that a "general discussion of the effects of global climate change" does not satisfy NEPA's hard-look requirement.[78]

Further, courts have ruled that federal agencies must consider indirect GHG emissions resulting from agency policy, regulatory, and fossil fuel leasing decisions. For example, agencies cannot ignore the indirect air quality and climate change impact of decisions that would open up access

---

[74] *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1176 (10th Cir. 1999); *see also* 40 C.F.R. § 1508.25(c) (1978) (when determining the scope of an EIS, agencies "shall consider" direct, indirect, and cumulative impacts).

[75] *See* 40 C.F.R. § 1500.1(b); 36 C.F.R. § 219.3.

[76] *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008).

[77] *Id.*, 538 F.3d at 1216 (quoting 40 C.F.R. § 1508.7 (1978)). *See also WildEarth Guardians v. BLM*, 870 F.3d 1222, 1237 (10th Cir. 2017) (failure to disclose climate impacts of various alternatives "defeated NEPA's purpose").

[78] *High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1189-90 (D. Colo. 2014).

to coal reserves.[79] An analysis that does not adequately consider the indirect effects of a proposed action, including climate emissions, violates NEPA.[80]

NEPA requires "reasonable forecasting," which includes the consideration of "reasonably foreseeable future actions … even if they are not specific proposals."[81] That an agency cannot "accurately" calculate the total emissions expected from full development is not a rational basis for cutting off its analysis. "Because speculation is ... implicit in NEPA," agencies may not "shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as crystal ball inquiry."[82] The D.C. Circuit has echoed this sentiment, rejecting the argument that it is "impossible to know exactly what quantity of greenhouse gases will be emitted" and concluding that "agencies may sometimes need to make educated assumptions about an uncertain future" in order to comply with NEPA's reasonable forecasting requirement.[83]

The 2016 final CEQ *Guidance on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in NEPA Review* provides useful direction on the issue of federal agency review of greenhouse gas emissions as foreseeable direct and indirect effects of a proposed action.[84] The CEQ guidance provides clear direction for agencies to conduct a lifecycle greenhouse gas analysis that quantifies GHG emissions or storage because the modeling and tools to conduct this type of analysis are available:

> If the direct and indirect GHG emissions can be quantified based on available information, including reasonable projections and assumptions, agencies should consider and disclose the reasonably foreseeable direct and indirect emissions when analyzing the direct and indirect effects of the proposed action. Agencies should disclose the information and any assumptions used in the analysis and explain any uncertainties. To compare a project's estimated direct and indirect emissions with GHG emissions from the no-action alternative, agencies should

[79] *See Mid States Coal. For Progress v. Surface Transp. Bd.*, 345 F.3d 520, 532, 550 (8th Cir. 2003); *High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1197-98 (D. Colo. 2014); *Montana Environmental Information Center v. U.S. Office of Surface Mining*, 274 F. Supp. 3d 1074 (D. Mont. 2017), *amended in part, adhered to in part*, 2017 WL 5047901 (D. Mont. 2017).

[80] *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 2020 U.S. App. LEXIS 38033, *20 (9th Cir. 2020).

[81] *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1079 (9th Cir. 2011) (citation omitted).

[82] *Id.* (citations omitted).

[83] *Sierra Club v. Federal Energy Regulatory Commission*, 863 F.3d 1357, 1373-74 (D.C. Cir. 2017).

[84] Notice available at 81 Fed. Reg. 51,866 (Aug. 5, 2016); full guidance available at https://ceq.doe.gov/docs/ceq-regulations-and-guidance/nepa_final_ghg_guidance.pdf (last viewed Mar. 12, 2020).

> draw on existing, timely, objective, and authoritative analyses, such as those by the Energy Information Administration, the Federal Energy Management Program, or Office of Fossil Energy of the Department of Energy. In the absence of such analyses, agencies should use other available information.[85]

The guidance further specifies that estimating GHG emissions is appropriate and necessary for actions such as federal logging projects.

> In addressing biogenic GHG emissions, resource management agencies should include a comparison of estimated net GHG emissions and carbon stock changes that are projected to occur with and without implementation of proposed land or resource management actions. This analysis should take into account the GHG emissions, carbon sequestration potential, and the changes in carbon stocks that are relevant to decision making in light of the proposed actions and timeframes under consideration.

Although the Trump administration withdrew the 2016 CEQ guidance, President Biden on January 20, 2021 rescinded that Trump Executive Order, and directed CEQ to "review, revise, and update" its 2016 climate guidance.[86] On February 19, 2021, CEQ effectively reinstated the 2016 GHG guidance:

> CEQ will address in a separate notice its review of and any appropriate revisions and updates to the 2016 GHG Guidance. In the interim, agencies should consider all available tools and resources in assessing GHG emissions and climate change effects of their proposed actions, including, as appropriate and relevant, the 2016 GHG Guidance.[87]

Further, regardless of the guidance, the underlying requirement from federal courts – that NEPA requires agencies to consider, quantify, and disclose climate change impacts, including indirect and cumulative combustion impacts and loss of sequestration foreseeably resulting from commercial logging decisions – has not changed.[88]

---

[85] *Id*. at 16 (citations omitted).

[86] Executive Order 13,990 (Ex. 5), 86 Fed. Reg. at 7040, Sec. 7, 86 Fed. Reg. at 7042.

[87] Council on Environmental Quality, National Environmental Policy Act, Guidance on Consideration of Greenhouse Gas Emissions, 86 Fed. Reg. 10,252 (Feb. 19, 2021), attached as Ex. 8, and available at https://www.govinfo.gov/content/pkg/FR-2021-02-19/pdf/2021-03355.pdf (last viewed Mar. 12, 2021).

[88] *See S. Fork Band Council of W. Shoshone v. United States Dept. of Interior*, 588 F.3d 718, 725 (9th Cir. 2009); *Ctr. for Biological Diversity*, 538 F.3d at 1214-15; *Mid States Coalition for Progress*, 345 F.3d at 550; *WildEarth Guardians v. United States Office of Surface Mining, Reclamation & Enf't*, 104 F. Supp. 3d 1208, 1230 (D. Colo. 2015) (coal combustion was indirect effect of agency's approval of mining plan modifications that "increased the area of federal land on which mining has occurred" and "led to an increase in the amount of federal coal available for combustion."); *Diné Citizens Against Ruining Our Env't v. United States Office of Surface*

4. The Forest Service's failure to disclose and quantify the Salter Project's climate damage violates NEPA.

The Forest Service categorizes the climate change impacts of the Salter Project as a "Resource[] Dismissed from Detailed Analysis," and spends a mere 10 sentences explaining why the issue is of no import.[89] The Draft EA asserts that: "Climate change analysis is guided by Climate Change Considerations in Project-Level NEPA Analysis (U.S. Forest Service 2009), which recommends consideration of both the effect of a proposed action on climate change, and the effect of climate change on a proposed action."[90] The Forest Service's reliance on discredited, and long out-of-date, guidance from the George W. Bush administration runs directly counter to the current administration's aggressive approach to both accounting for and addressing climate change, and further conflicts with CEQ's 2016 guidance.

The Draft EA violates NEPA and is arbitrary and capricious because it focuses exclusively (but qualitatively) on the alleged benefits of purporting to make the forest more "resilient" to the environmental factors made worse by climate change – drought and insect infestations – while effectively denying and declining to quantify the impacts on climate pollution and carbon storage of logging, burning, and trucking trees from the forest. Although responding to climate change appears to be a primary project purpose, the Draft EA contains almost nothing on the project's impact on climate pollution or climate change. The Salter Project will have at least two types of climate impacts that the EA ignores: it will deplete carbon stores by removing trees that fix carbon; and it will result in the combustion of fossil fuels to implement logging and road construction.

a. The Forest Service fails to disclose and quantify the Salter Project's impact on carbon storage.

The Salter Project will have direct, indirect, and cumulative impacts on climate change because logging and burning forests will impact the ecosystem's ability to store carbon.

Science makes clear that the Salter Project will worsen climate emissions by removing large trees that are currently fixing carbon, turning them into wood products (which results in a significant loss of that carbon fixed in wood), and leaving a landscape with no trees and (eventually) seedlings that fix far less carbon than mature forests.

The Draft EA fails to contain any analysis of the Salter Project's impact on climate stores and carbon pollution, although the project will likely remove millions of board feet of timber. In addition, the project will log potentially thousands of old and mature trees, some as large as 7 feet in circumference, and likely decrease the ability of those stands and that land to sequester

---

*Mining Reclamation & Enf't*, 82 F. Supp. 3d 1201, 1213-1218 (D. Colo. 2015); *High Country Conservation Advocates*, 52 F. Supp. 3d at 1174.

[89] Draft EA at 102-103.

[90] Draft EA at 102.

carbon for years to come. The proposed action will involve removing some trees over a century old, which are assuredly fixing significant amounts of carbon.

Logging old trees in particular worsens climate change by releasing significant amounts of carbon and by preventing such forests from continuing to sequester carbon. As the Forest Service has admitted regarding mature forests in Alaska, such forests "likely store considerably more carbon compared to younger forests in this area (within the individual trees themselves as well as within the organic soil layer found in mature forests)."[91] This is so because when a forest is cut down, the vast majority of the stored carbon in the forest is released over time as CO2, thereby converting forests from a sink to a "source" or "emitter."[92] According to a 2019 IPCC report, deforestation causes climate pollution, and avoiding deforestation will reduce climate pollution.[93]

Recent studies agree that maintaining forests rather than cutting them can help reduce the impacts of climate change. "Stakeholders and policy makers need to recognize that the way to maximize carbon storage and sequestration is to grow intact forest ecosystems where possible."[94] One report concludes:

> *Allowing forests to reach their biological potential for growth and sequestration, maintaining large trees* (Lutz et al 2018), reforesting recently cut lands, and afforestation of suitable areas *will remove additional CO2 from the atmosphere*. Global vegetation stores of carbon are 50% of their potential including western forests because of harvest activities (Erb et al 2017). Clearly, western forests could do more to address climate change through carbon sequestration *if allowed to grow longer*.[95]

---

[91] Forest Service, Tongass Land and Resource Management Plan, Final EIS (2016) at 3-14, excerpts attached as Ex. 9.

[92] *See, e.g.*, D. DellaSala, The Tongass Rainforest as Alaska's First Line of Climate Change Defense and Importance to the Paris Climate Change Agreements (2016) at 5, attached as Ex. 10.

[93] Intergovernmental Panel on Climate Change, Special Report on Climate Change, Desertification, Land Degradation, Sustainable Land Management, Food Security, and Greenhouse gas fluxes in Terrestrial Ecosystems, Summary for Policymakers (Aug. 2019) at 7, 23, attached as Ex. 11. *See also* B. Law et al., Land use strategies to mitigate climate change in carbon dense temperate forests, Proceedings of the Nat'l Academy of Sciences, vol. 115, no. 14 (Apr. 3, 2018) at 3663 ("Proven strategies immediately available to mitigate carbon emissions from forest activities include ... reducing emissions from deforestation and degradation."), attached as Ex. 12.

[94] Moomaw, *et al*., Intact Forests in the United States: Proforestation Mitigates Climate Change and Serves the Greatest Good, Frontiers in Forests and Global Change (June 11, 2019) at 7), attached as Ex. 13 (emphasis added).

[95] T. Hudiburg *et al*., Meeting GHG reduction targets requires accounting for all forest sector emissions, Environ. Res. Lett. 14 (2019) (emphasis added), attached as Ex. 14.

A June 2020 literature review from leading experts found thinning provided little advantage for carbon storage:

> *There is absolutely no evidence that thinning forests increases biomass stored* (Zhou et al. 2013). It takes decades to centuries for carbon to accumulate in forest vegetation and soils (Sun et al. 2004, Hudiburg et al. 2009, Schlesinger 2018), and it takes decades to centuries for dead wood to decompose. We must preserve medium to high biomass (carbon-dense) forest not only because of their carbon potential but also because they have the greatest biodiversity of forest species (Krankina et al. 2014, Buotte et al. 2019, 2020).[96]

Two experts in the field recently concluded:

> Recent projections show that to prevent the worst impacts of climate change, governments will have to increase their pledges to reduce carbon emissions by as much as 80%. We see the next 10 to 20 years as a critical window for climate action, and believe that *permanent protection for mature and old forests is the greatest opportunity for near-term climate benefits*.[97]

Further, to address the climate crisis, agencies cannot rely on the re-growth of cleared forests to make up for the carbon removed when mature forest is logged. One prominent researcher explains: "It takes at least 100 to 350+ years to restore carbon in forests degraded by logging (Law et al. 2018, Hudiburg et al. 2009). If we are to prevent the most serious consequences of climate change, *we need to keep carbon in the forests because we don't have time to regain it once the forest is logged* (IPCC, 2018)."[98]

Studies also demonstrate that significant volumes – in some cases a majority – of carbon stored in trees are *immediately* lost when trees are logged and milled, and the rest is likely to be returned to the atmosphere sooner than would occur if the trees were left standing.

> [H]arvesting carbon will increase the losses from the forest itself and to increase the overall forest sector carbon store, the lifespan of wood products carbon (including manufacturing losses) would have to exceed that of the forest. Under current practices this is unlikely to be the case. A substantial fraction (25%– 65%) of harvested carbon is lost to the atmosphere during manufacturing and construction depending on the product type and manufacturing method. The

---

[96] B. Law, *et al.*, The Status of Science on Forest Carbon Management to Mitigate Climate Change (June 1, 2020), attached as Ex. 15.

[97] B. Law & W. Moomaw, Keeping trees in the ground where they are already growing is an effective low-tech way to slow climate change, *The Conversation* (Feb. 23, 2021) (emphasis added), attached as Ex. 16, and available at https://theconversation.com/keeping-trees-in-the-ground-where-they-are-already-growing-is-an-effective-low-tech-way-to-slow-climate-change-154618 (last viewed Mar. 12, 2021).

[98] B. Law, *et al.*, The Status of Science on Forest Carbon Management (Ex. 15) (emphasis added).

> average lifespan of wood buildings is 80 years in the USA, which is determined as the time at which half the wood is no longer in use and either decomposes, burns or, to a lesser extent, is recycled. However, many forest trees have the potential to live hundreds of years ….[99]

Other studies indicate that there is little substitution benefit of using wood compared to using other products (e.g., concrete for building), and that industry talking points to the contrary vastly overestimate the carbon benefits of using wood.[100]

Even if the logging permitted in the Salter Project – when viewed in isolation – may only result in relatively minor climate impacts, NEPA expressly requires agencies to consider whether agency actions are "related to other actions with individually insignificant but cumulatively significant impacts."[101] Thus, the Forest Service may not dismiss and deny the climate impacts of the Salter Project without considering the cumulative significance of the project when added to other past, present, and reasonably foreseeable logging projects and Forest Service timber sales in the state, region, and nation.[102] The Forest Service failed to address these cumulative effects, violating NEPA.

The Forest Service's approach also violates NEPA because the Forest Service did not use its best efforts or the best available information to address climate impacts. Methods exist that would have allowed the agency to quantify those impacts. For example, a 2018 study concludes that carbon storage impacts can be estimated, accounted for, and factored into a model that calculated the net amount of carbon lost due to forest logging in Oregon over two five-year periods.[103] This

---

[99] B. Law & M.E. Harmon, Forest sector carbon management, measurement and verification, and discussion of policy related to mitigation and adaptation of forests to climate change. Carbon Management (2011) 2(1), attached as Ex. 17, and available at https://www.researchgate.net/publication/235591616_Forest_sector_carbon_management_measurement_and_verification_and_discussion_of_policy_related_to_climate_change (last viewed Mar. 12, 2021).

[100] "Substitution of wood for more fossil carbon intensive building materials has been projected to result in major climate mitigation benefits often exceeding those of the forests themselves. A reexamination of the fundamental assumptions underlying these projections indicates long-term mitigation benefits related to product substitution may have been overestimated 2- to 100-fold." M. Harmon, Have product substitution carbon benefits been overestimated? A sensitivity analysis of key assumptions, Environmental Research Letters (2019), attached as Ex. 18, and available at https://iopscience.iop.org/article/10.1088/1748-9326/ab1e95/pdf (last viewed Mar. 12, 2021).

[101] 40 C.F.R. § 1508.27(b)(7) (2019).

[102] 40 C.F.R. § 1508.7; *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41 (D.D.C. 2019) (holding that BLM erred by failing to consider the cumulative climate impacts of oil and gas leases together with "GHG emissions generated by past, present, and reasonably foreseeable BLM lease sales in the region and nation").

[103] *See* Law *et al.*, *Land use strategies* (Ex. 12) at 3664 ("Our LCA [life-cycle assessment] showed that in 2001–2005, Oregon's net wood product emissions were 32.61 million tCO2e

is precisely the type of analysis the Forest Service should, and could, have undertaken for Salter EA.

Similarly, Dr. DellaSala's 2016 report addressed carbon stores from wood products and concluded that logging Tongass old-growth forest under the 2016 Forest Plan would result in net annual CO2 emissions totaling between 4.2 million tons and 4.4 million tons, depending on the time horizon chosen.[104] The Bureau of Land Management more than a decade ago completed an EIS for its Western Oregon Resource Management Plan in which that agency also predicted the net carbon emissions from its forest and other resource management programs.[105] Because agencies and academics have quantified and compared the carbon emissions of alternative logging proposals, NEPA requires the Forest Service to do so here.

Rather than acknowledging current science or availing itself of existing methods for disclosing the climate impacts of logging and burning that the project proposes, the Draft EA dismisses any climate impacts as "immeasurable," or "small."

> During project implementation there would be small, incremental losses of carbon sequestration due to burning of vegetation and consumption of fossil fuels by equipment. Trees would be harvested over time; however, carbon could continue to be stored in manufactured wood products that used harvested materials (Nunery and Keeton 2010). As implementation proceeds, there would immediately be small, beneficial effects to carbon sequestration due to growth of vegetation. In the long-term, carbon sequestration would be sustainably increased through continuing growth of a healthy forest. The described changes in greenhouse gas emissions resulting from the proposed action is immeasurable.

This analysis ignores the best available science, described above, which has concluded that:

- Carbon storage in wood products is minimal compared to the carbon stored in living trees.
- There is no proven benefit to thinning forests in terms of increasing carbon storage.
- The impacts of forest logging projects on carbon stores can be estimated/quantified.
- When the impact of logging on carbon stores is estimated, it can and should be quantified in terms of the impacts of climate pollution on the globe via the social cost of carbon.

---

[tons of carbon dioxide equivalent in net GHG emissions] (Table S3), and 3.7- fold wildfire emissions in the period that included the record fire year (15) (Fig. 2) In 2011–2015, net wood product emissions were 34.45 million tCO2e and almost 10-fold fire emissions, mostly due to lower fire emissions.").

[104] DellaSala (Ex. 10) at 14.

[105] *See* Bureau of Land Management, Western Oregon Proposed RMP Final EIS (2009) at 165-181, excerpts attached as Ex. 19.

Dismissing impacts as "small" and "immeasurable" is not only inaccurate, it is a form of climate denial. Every additional molecule of CO2 emitted into the atmosphere will be increasing the amount of warming on Earth for centuries to come. Further, dismissing all impacts as "immeasurable" deprives the public and the decisionmaker of any understanding of the relative impacts of each alternative. For example, it is likely that the large tree retention alternative (Alternative 3) will result in the retention of more carbon stores than Alternative 2 because large trees store more carbon than smaller trees.

The Forest Service's failure to address or acknowledge that there are peer-reviewed scientific approaches to estimating net climate damage caused by logging forests is another independent NEPA violation. NEPA requires agencies to explain opposing viewpoints and their rationale for choosing one viewpoint over the other.[106] Courts will set aside a NEPA document where the agency fails to respond to scientific analysis that calls into question the agency's assumptions or conclusions.[107]

Here, the Draft EA fails to grapple with the most recent national policy direction and science on forests and carbon sequestration, including many of the studies attached here. The Draft EA ignores years of climate science that: underscores the desperate need for action on climate change; shows that forest logging like that proposed in the Salter Project will likely worsen climate pollution and the climate emergency; and demonstrates, contradictory to the Forest Service's lack of analysis, that the climate impacts of the Project can be quantified.

The U.S. District Court for the District of Montana last month set aside a federal agency NEPA analysis for failing to quantify the social costs of agency action's climate pollution.[108] As noted above, President Biden has already announced that his administration would reinstate the Interagency Working Groups' Social Cost of Carbon using a metric that includes global damage from climate-forcing pollution, and the Working Group has set a price for agencies to utilize in their analyses.

---

[106] 40 C.F.R. § 1502.9(b) (2019) (requiring agencies to disclose, discuss, and respond to "any responsible opposing view").

[107] *See Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1168 (9th Cir. 2003) (finding Forest Service's failure to disclose and respond to evidence and opinions challenging EIS's scientific assumptions violated NEPA); *Seattle Audubon Soc'y v. Moseley*, 798 F. Supp. 1473, 1482 (W.D. Wash. 1992) ("The agency's explanation is insufficient under NEPA – not because experts disagree, but because the FEIS lacks reasoned discussion of major scientific objections."), aff'd sub nom. *Seattle Audubon Soc'y v. Espy*, 998 F.2d 699, 704 (9th Cir. 1993) ("[i]t would not further NEPA's aims for environmental protection to allow the Forest Service to ignore reputable scientific criticisms that have surfaced").

[108] *WildEarth Guardians v. Bernhardt*, 2021 U.S. Dist. LEXIS 20792 at *25-*32, 2021 WL 363955, CV 17-80-BLG-SPW (D. Mont. Feb. 3, 2021) (endorsing magistrate judge's determination that the Office of Surface Mining "failed to take a 'hard look' at the costs of greenhouse gas emissions and failed to reasonably justify its reasoning for not quantifying the costs of the mining plan when the Social Cost of Carbon Protocol ... was available to do just that").

We note that the Draft EA relies on agency direction that is out of date and out of step with the present administration. The Forest Service relies on guidance entitled "Climate Change Considerations in Project Level NEPA Analysis," a flawed document that was the product of the final week of the George W. Bush administration in January 2009, and that has long been overtaken by both federal case law and CEQ's 2016 guidance, now restored, requiring robust project level NEPA analysis and by improved modeling and scientific data.[109] The Forest Service cannot continue to rely on this guidance document unless and until it can explain how the 2009 guidance comports with current CEQ guidance and caselaw.

Finally, while the Forest Service may assert that the logging the forest will prevent fires which will result in greater carbon pollution, at least one study found the opposite: that at least at an aggregate level, logging resulted in many times more carbon pollution than did wildfire.[110]

b. The Forest Service fails to disclose and quantify the carbon pollution of implementing the Salter Project.

Logging and burning within the project area for a decade will require the use of heavy equipment, almost certainly exclusively powered by fossil-fueled engines, to bulldoze a vast network of up to 117 miles of temporary road, to "reconstruct" other roads, and to chainsaw forests, and remove trees and take them to market. This activity will result in greenhouse gas pollution that will worsen climate change for centuries, and that pollution caused by the proposed action will be over and above the pollution that will occur under the no action alternative. The Draft EA fails to estimate or otherwise address such impacts, or how such pollution would vary by alternative.

This contrasts to the approach taken elsewhere by the Forest Service and other agencies, such as the Office of Surface Mining, which have disclosed in NEPA documents the estimated pollution from internal combustion engines necessary to mine, process, and ship coal to market.[111]

We do not endorse as sufficient either the OSM or Federal Coal Lease Modifications analyses cited, but they demonstrate that agencies (including the Forest Service itself) can and do attempt

---

[109] *See* Draft EA at 102 (explicitly relying on Forest Service Jan. 2009 guidance).

[110] N.L. Harris et al., Attribution of net carbon change by disturbance type across forest lands of the conterminous United States, Carbon Balance and Management (2016), attached as Ex. 20, and available at https://www.fs.fed.us/nrs/pubs/jrnl/2016/nrs_2016_harris_001.pdf (last viewed Mar. 12, 2021).

[111] *See, e.g.*, Office of Surface Mining & Bureau of Land Management, Environmental Assessment, Colowyo Coal Mine Collom Permit Expansion Area Project (Jan. 2016) at 4-15 – 4-18 (including table assessing "direct GHG emissions" from "drills," "dozers," "graders," "haul trucks," etc., for the proposed action), excerpts attached as Ex. 21; U.S. Forest Service, Supplemental Final Environmental Impact Statement, Federal Coal Lease Modifications COC-1362 & COC-67232 (Aug. 2017) at 102-113 (publishing tables estimating emissions of air pollutants, including greenhouse gases CO2 and Ch4 (methane) for activities including road and well pad construction, heavy equipment use, and commuter vehicle trips for the no action and proposed action alternatives), excerpts attached as Ex. 22.

to disclose direct climate emissions from construction and transport activities. The Forest Service provides no reasonable basis for failing to do the same for the Salter Project, and thus violates NEPA.

## IV. THE DRAFT EA'S RELIANCE ON 'ADAPTIVE MANAGEMENT' VIOLATES NEPA.

The Salter Draft EA relies in part on an "adaptive management" strategy to "inform implementation and to provide the opportunity to solicit input from partners that could be incorporated into the decision making process when addressing changing conditions on the ground in real-time."[112] The Draft EA states that pursuant to this plan, "[a]djustments to prescriptions could be made at any time as long as they are within the scope of this analysis."[113]

To be effective and legal, adaptive management must: (1) clearly identify measurable thresholds that, if exceeded as determined by monitoring, will require a change in management; (2) clearly identify what that changed management will entail; and (3) disclose in this NEPA document the impacts caused by that change in management. Because the Draft EA fails on at least the last counts, the Forest Service cannot rely on the adaptive management strategy as currently divulged in the EA.

### A. The Law of Adaptive Management.

Forest Service NEPA regulations, adopted in 2008, define adaptive management as "[a] system of management practices based on *clearly identified intended outcomes and monitoring* to determine if management actions *are meeting those outcomes*; and, if not, to facilitate management changes that will best ensure that those outcomes are met or re-evaluated. Adaptive management stems from the recognition that knowledge about natural resource systems is sometimes uncertain."[114] These regulations further state that:

> An adaptive management proposal or alternative must *clearly identify the adjustment(s) that may be made* when monitoring during project implementation *indicates that the action is not having its intended effect*, or is causing unintended and undesirable effects. The EIS must disclose not only the effect of the proposed action or alternative *but also the effect of the adjustment*. Such proposal or alternative must also *describe the monitoring that would take place* to inform the responsible official during implementation whether the action is having its intended effect.[115]

The preamble to the Forest Service's regulation that adopted the adaptive management definition states that the agency must identify the proposed changes, and their impacts, in the NEPA document. "When proposing an action the responsible official may identify possible adjustments

[112] Draft EA at 27.

[113] Draft EA at 27.

[114] 36 C.F.R. § 220.3 (emphasis added).

[115] 36 C.F.R. § 220.5(e)(2) (emphasis added).

that may be appropriate during project implementation. Those possible adjustments must be described and their effects analyzed in the EIS." 73 Fed. Reg. 43,084, 43,090 (July 24, 2008).

Federal courts have found agencies violated NEPA or the Endangered Species Act (ESA) where the agency relied on an "adaptive management" plan that was vague, set no specific triggers for future action, failed to describe that future action, or failed to ensure that resources will be protected as the adaptive management plan asserts.

In *Natural Resources Defense Council v. U.S. Army Corps of Engineers*, 457 F. Supp. 2d 198 (S.D.N.Y. 2006), the court found that the Army Corps' attempt to supplement an inadequately-explained finding of no significant impact concerning a dredging project was arbitrary and capricious where the agency relied on ill-defined "adaptive management" protocols to conclude that impacts would be mitigated below the level of significance.

> The EA makes several promises that it will alter its monitoring plan should it prove necessary. For example, the EA relies on a general promise that it will "as appropriate, reevaluate, the need for altering its dredging methods" … through the use of its coordination plan and monitoring program. The EA also explains that the Corps will follow "adaptive management practices as it moves through construction of its contracts," thus allowing it to change future contracts should the data indicate it is necessary. These promises, however, provide no assurance as to the efficacy of the mitigation measures. The Corps did not provide a proposal for monitoring how effective "adaptive management" would be.[116]

*Mountaineers v. United States Forest Service*, 445 F. Supp. 2d 1235 (W.D. Wash. 2006) set aside a Forest Service decision to open motor vehicle trails where the agency proposed to monitor impacts to wildlife and potentially change the trails later based on an adaptive management plan. The court stated that these adaptive management strategies "amount … to a 'build-first, study later' approach to resource management. This backward-looking decision making is not what NEPA contemplates."[117] Other cases similarly conclude that NEPA forbids the use of ill-defined adaptive management plans to assume away likely impacts of agency action.[118]

Courts also hold unlawful agency projects that may impact species protected by the Endangered Species Act where the biological opinion is based on the assumption that a vague and ill-defined monitoring and adaptive management plan will mitigate impacts to the species at issue. These cases provide a useful analogy to adaptive management in the NEPA context. *Natural Resources Defense Council v. Kempthorne*, 506 F. Supp. 2d 322 (E.D. Ca. 2007) is key precedent. There, plaintiffs challenged a proposed plan to manage water diversions in a manner that could

---

[116] *NRDC v. United States Army Corps of Eng'rs*, 457 F. Supp. 2d at 234 (citations omitted).

[117] *Mountaineers v. United States Forest Serv.*, 445 F. Supp. 2d at 1250.

[118] *See, e.g., High Sierra Hikers Association v. Weingardt*, 521 F. Supp. 2d 1065, 1090-91 (N.D. Ca. 2007) (overturning a Forest Service decision to liberalize the rules limiting campfires in high country parts of a wilderness area on the grounds that the agency could not rely on adaptive management to overcome an inadequate response to the problems raised in the record).

adversely impact the delta smelt, a species listed as threatened under the Endangered Species Act. The Fish and Wildlife Service prepared a biological opinion (BiOp) on the proposal which concluded that the project would neither jeopardize the smelt nor adversely modify the smelt's critical habitat. "Although the BiOp recognize[d] that *existing* protective measures may be inadequate, the FWS concluded that certain proposed protective measures, including … a proposed 'adaptive management' protocol would provide adequate protection."[119]

Plaintiffs alleged, among other things, that the BiOp "relie[d] upon uncertain (and allegedly inadequate) adaptive management processes to monitor and mitigate the [project's] potential impacts."[120] They asserted that the adaptive management plan, which required a working group meet and consider adaptive measures in light of monitoring, failed to meet the ESA's mandate that mitigation be

> "'reasonably specific, certain to occur, and capable of implementation'" because: (1) the [working group] has complete discretion over whether to meet and whether to recommend mitigation measures; (2) even if the [working group] meets and recommends mitigation measures, the [agency management team] group is free to reject any recommendations; (3) there are no standards to measure the effectiveness of actions taken; (4) reconsultation is not required should mitigation measures prove ineffective; and (5) ultimately, no action is ever required.[121]

The *Kempthorne* court cited prior caselaw holding that "a mitigation strategy [in the ESA context] must have some form of measurable goals, action measures, and a certain implementation schedule; i.e., that mitigation measures must incorporate some definite and certain requirements that ensure needed mitigation measures will be implemented."[122] The court found that adaptive management plan "does not provide the required reasonable certainty to assure appropriate and necessary mitigation measures will be implemented."[123] The court concluded that

> Adaptive management is within the agency's discretion to choose and employ, however, the absence of any definite, certain, or enforceable criteria or standards make its use arbitrary and capricious under the totality of the circumstances.[124]

---

[119] *NRDC v. Kempthorne*, 506 F. Supp. 2d at 333-34 (emphasis in original).

[120] *Id.* at 329.

[121] *Id.* at 352. *See also id.* at 350 (explaining the "certain to occur" standard and citing *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002)).

[122] *Id.* at 355 (citing *Rumsfeld*, 198 F. Supp. 2d at1153).

[123] *Id.* at 356.

[124] *Id.* at 387.

### B. The Draft EA's Plan Does Not Comply with Law for Adaptive Management.

Although the Draft EA states that it relies on adaptive management, the proposal it describes does not contain key elements required to comply with NEPA. While adaptive management may be an appropriate tool to assist in management of the Salter Project area, we urge the Forest Service, as part of the NEPA process, to develop a more detailed plan, identify specific management changes in case those triggers are met, and analyze and disclose the impacts of those changes.

The adaptive management approach described in the Draft EA fails to "clearly identify the adjustment(s) that may be made when monitoring during project implementation indicates that the action is not having its intended effect."[125] The Draft EA includes vaguely-described adjustments, which violates Forest Service rules concerning adaptive management. For example, proposed "adaptive management actions" for several proposed factors includes – or is limited to – a statement that the agency will "Monitor and adjust" or "Monitor and adjust … as needed."[126] This provides neither the Forest Service nor the public with any detail about how the agency might "adjust" its actions.

And because the Draft EA does not explain what those "adjustment" may entail, the proposed adaptive management plan violates Forest Service regulations requiring that the NEPA analysis "disclose not only the effect of the proposed action or alternative *but also the effect of the adjustment*."[127] The Draft EA fails to disclose what the impacts will be if actions are adjusted pursuant to adaptive management.

Finally, the Draft EA states that a purpose of adaptive management

> is to set up a formal communication protocol with outside partners; for example, the DWRF [Dolores Watershed and Resilient Forests] collaborative. If conditions change, or if approaches are not working as described, the adaptive management process identified here would be used to notify partners about the agency's findings. The process would also serve as an opportunity for the public to have direct and formal communication with agency decision makers and resource managers on specific projects.

We support the Forest Service working with outside stakeholders, but we urge the Forest Service not to play favorites. The agency cannot rely on select group as a substitute for the public involvement NEPA requires. We urge the Forest Service to use available tools – posting documents on its project page, open houses, press releases, emails, etc. – to engage the *entirety* of the interested public, including those persons or groups that cannot spend scores of hours participating in collaborative groups. We note that the Forest Service cannot legally rely on a process outside of NEPA in which to test measures previously unidentified and un-analyzed in a NEPA document. For the adaptive management proposal to be legal and sound, the Forest

[125] 36 C.F.R. § 220.5(e)(2) (emphasis added).

[126] Draft EA at 30.

[127] 36 C.F.R. § 220.5(e)(2) (emphasis added).

Service must identify the "adjustments" it intends to make and evaluate or estimate their impacts *before* approving the project.

In sum, the Forest Service has the authority to change a project and/or approve new actions within a project area in response to changes, but it can do so only in accordance with NEPA and the agency's own regulations. The adaptive management plan in the Draft EA currently fails to comply with these laws. We urge the Forest Service to develop a specific plan in cooperation with the public and all stakeholders before it issues any additional NEPA document or proposed decision.

## IV. THE DRAFT EA FAILS TO ANALYZE A RANGE OF REASONABLE ALTERNATIVES.

In taking the "hard look" at impacts that NEPA requires, an EA must "study, develop, and describe" reasonable alternatives to the proposed action.[128] The Tenth Circuit explains that this mandate extends to EAs as well as EISs. "A properly-drafted EA must include a discussion of appropriate alternatives to the proposed project."[129] This alternatives analysis "is at the heart of the NEPA process, and is 'operative even if the agency finds no significant environmental impact.'"[130] Reasonable alternatives must be analyzed for an EA even where a FONSI is issued because "nonsignificant impact does not equal no impact. Thus, if an even less harmful alternative is feasible, it ought to be considered."[131] When an agency considers reasonable alternatives, it "ensures that it has considered all possible approaches to, and potential environmental impacts of, a particular project; as a result, NEPA ensures that the most intelligent, optimally beneficial decision will ultimately be made."[132]

In determining whether an alternative is "reasonable," and thus requires detailed analysis, courts look to two guideposts: "First, when considering agency actions taken pursuant to a statute, an alternative is reasonable only if it falls within the agency's statutory mandate. Second,

---

[128] 42 U.S.C. § 4332(2)(C) & (E); 40 C.F.R. § 1508.9(b) (an EA "[s]hall include brief discussions ... of alternatives").

[129] *Davis v. Mineta*, 302 F.3d 1104, 1120 (10th Cir. 2002) (granting injunction where EA failed to consider reasonable alternatives).

[130] *Diné Citizens Against Ruining Our Env't v. Klein*, 747 F. Supp. 2d 1234, 1254 (D. Colo. 2010) (quoting *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1277 (10th Cir. 2004)). *See also W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013) (in preparing EA, "an agency must still give full and meaningful consideration to *all* reasonable alternatives" (emphasis added) (internal quotation and citation omitted)); 40 C.F.R. § 1502.14 (describing alternatives analysis as the "heart of the environmental impact statement").

[131] *Ayers v. Espy*, 873 F. Supp. 455, 473 (D. Colo. 1994) (internal citation omitted).

[132] *Wilderness Soc'y v. Wisely*, 524 F. Supp. 2d 1285, 1309 (D. Colo. 2007) (quotations & citation omitted).

reasonableness is judged with reference to an agency's objectives for a particular project."[133] Any alternative that is unreasonably excluded will invalidate the NEPA analysis. "The existence of a viable but unexamined alternative renders an alternatives analysis, and the EA which relies upon it, inadequate."[134] The agency's obligation to consider reasonable alternatives applies to citizen-proposed alternatives.[135]

Courts hold that an alternative may not be disregarded merely because it does not offer a complete solution to the problem.[136] Even if additional alternatives would not fully achieve the project's purpose and need, NEPA "does not permit the agency to eliminate from discussion or consideration a whole range of alternatives, merely because they would achieve only some of the purposes of a multipurpose project."[137] If a different action alternative "would only partly meet the goals of the project, this may allow the decision maker to conclude that meeting part of the goal with less environmental impact may be worth the tradeoff with a preferred alternative that has greater environmental impact."[138]

The courts also require that an agency adequately and explicitly explain in the EA any decision to eliminate an alternative from further study.[139]

### A. The Forest Service Must Consider Alternatives that Limit the Logging of Large or Old Trees.

Large and old ponderosa pine trees are relatively rare now in the Southwest compared to the period before European settlement because they were heavily logged over the last 150 years. Large, old ponderosa serve valuable ecosystem functions, have outsize value for wildlife, are more fire resistant, serve as important storehouses of genetic diversity, and store significant amounts of carbon.[140]

---

[133] *Diné Citizens Against Ruining Our Env't*, 747 F. Supp. 2d at 1255 (quoting *New Mexico ex rel. Richardson*, 565 F.3d at 709).

[134] *Id.* at 1256.

[135] *See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217-19 (9th Cir. 2008) (finding EA deficient, in part, for failing to evaluate a specific proposal submitted by petitioner); *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1171 (10th Cir. 1999) (agency's "[h]ard look" analysis should utilize "*public comment* and the best available scientific information") (emphasis added).

[136] *Natural Resources Defense Council, Inc. v. Morton*, 458 F.2d 827, 836 (D.C. Cir. 1972).

[137] *Town of Matthews v. U.S. Dep't. of Transp.*, 527 F. Supp. 1055 (W.D. N.C. 1981).

[138] *North Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1542 (11th Cir. 1990).

[139] *See Wilderness Soc'y*, 524 F. Supp. 2d at 1309 (holding EA for agency decision to offer oil and gas leases violated NEPA because it failed to discuss the reasons for eliminating a "no surface occupancy" alternative); *Ayers*, 873 F. Supp. at 468, 473.

[140] *See, e.g.*, Four Forest Restoration Initiative, Old Growth Protection & Large Tree Retention Strategy (Sep. 13, 2011) at 3-4 (citing numerous studies), attached as Ex. 23.

As a result, numerous studies, collaboratives, and Forest Service decisions have emphasized the need to protect large and old ponderosa pine trees in order to achieve both ecological restoration and greater resilience to catastrophic events such as wildfire and insect infestations. These decisions have often done so by setting an upper limit for the size of trees that can be logged for forest management.

For example, the Four Forest Restoration Initiative, a collaborative guided by science and working to improve management on forests in northern Arizona, has adopted an "Old Growth Protection & Large Tree Retention Strategy."[141] As part of that strategy, "the 4FRI Collaborative has agreed that the 4FRI effort should implement large tree retention and old growth protection strategies that are … are based upon a 16" diameter threshold that limits the cutting of trees larger than 16" to circumstances and criteria set forth in pre-defined exception categories."[142] A similar collaborative in New Mexico agreed that "It is generally advisable to maintain ponderosa pines larger than 41 cm (16 inches) diameter at breast height (dbh) and other trees with old-growth morphology regardless of size (e.g. yellow-barked ponderosa pine or any species with large drooping limbs, twisted trunks or flattened tops)."[143]

One peer-reviewed study concludes:

> Large and old trees, especially those established before ecosystem disruption by Euro-American settlement, are rare, important, and difficult to replace. Their size and structural complexity provide critical wildlife habitat by contributing crown cover, influencing understory vegetation patterns, and providing future snags. Ecological restoration should protect the largest and oldest trees from cutting and crown fires, focusing treatments on excess numbers of small young trees. Given widespread agreement on this point, *it is generally advisable to retain ponderosa trees larger than 41 cm (16 inches) dbh and all trees with old-growth morphology regardless of size (i.e., yellow bark, large drooping limbs, twisted trunks, flattened tops)*. Despite the heterogeneity of forest site and stand conditions in the Southwest, cutting of larger trees will seldom be ecologically warranted as ''restoration'' treatments at this time due to their relative scarcity. Following this guideline would significantly reduce hazards of stand-replacing fires in most cases and also favor the development of future old-growth forest conditions (Moir and Dieterich 1988, Harrington and Sackett 1992).[144]

---

[141] *Id.*

[142] *Id.* at 7.

[143] U.S. Forest Service *et al.*, New Mexico Forest Restoration Principles (May 2006), attached as Ex. 24, available at https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5207898.pdf (last viewed July 15, 2019).

[144] Allen *et al.*, Ecological Restoration of Southwestern Ponderosa Pine Ecosystems: A Broad Perspective, Ecological Applications, 12(5) (2002) at 1425, attached as Ex. 25.

This article notes that managing ponderosa pine forests for ecological restoration can also help increasing forest resilience.[145]

For the San Juan National Forest, the Forest Service and other stakeholders joined to establish the Ponderosa Pine Partnership (PPP) in the early 1990s. The Partnership developed "An Ecological Prescription for the San Juan Pine Zone," including this prescription: "Retain large trees. Any trees 20 inches or larger in diameter should be retained. In stands with smaller trees, the largest trees should be retained."[146] The San Juan National Forest developed and partially implemented two projects under the PPP, including the Guard Station and Ferris East timber sales. Both of these timber sales included diameter limits. The Guard Station Decision Notice prohibited the logging of trees over 16 inches dbh; the Ferris East Decision notice barred logging of ponderosa over 20 inches dbh.[147] Each of the sales was designed to meet goals that included forest restoration, supplying the needs of the local wood products industry, and reducing the risk of catastrophic wildfire.[148]

This science and social history demonstrate that diameter limits in ponderosa pine on the San Juan National Forest are reasonable, and should be considered in any NEPA analysis concerning logging in such pine forests.

1. The Draft EA fails to address the key differences between Alternatives 2 and 3.

The Salter Project identifies purposes similar to those identified for the Guard Station and Ferris East projects, and proposes one alternative, Alternative 3, that would protect large and old trees over 20 inches dbh.

We appreciate the Forest Service analyzing Alternative 3 in detail. However, the Draft EA fails to disclose the different impacts of the two action alternatives.

The Draft EA concludes that there would be virtually no difference in the impacts between Alternative 2 (which protects trees 26.9" dbh and larger) and Alternative 3 for most of the resources analyzed. For example, the Draft EA states that there would be no difference in the impacts of the two alternatives with respect to fuels and fire management.[149] The Draft EA also

---

145 *Id.* at 1429. (emphasis added).

146 D. Lynch, Forest Restoration in Southwestern Ponderosa Pine, Journal of Forestry (Aug. 2000) at 17, attached as Ex. 26.

147 San Juan National Forest, Guard Station Timber Sale, Decision Notice (May 1996) at 3 ("Cut no trees greater than 16" diameter breast height (DBH)"), attached as Ex. 27; San Juan National Forest, Ferris East Timber Sale, Decision Notice (Feb. 1998) at 3 ("No ponderosa pine in excess of 20 inches in diameter at breast height (DBH) will be harvested."), attached as Ex. 28.

148 *Id.*

149 Draft EA at 37-38.

concludes the impacts to watersheds would be the same, and repeatedly concludes that impacts to different wildlife species under the two alternatives would be "similar."[150]

While for almost every resource the Forest Service concludes that the impacts of the two action alternatives would be the same or similar, the Draft EA concludes that Alternative 3's large tree retention limits would allow the San Juan NF to meet "desired conditions … to a lesser degree" at "specific locations" (which the Draft EA does not identify) and "over time and over cutting cycles" (though for how long is not specified).[151] The Draft EA further states that under Alternative 3: "Basal area retention goals and uneven aged characteristics are being compromised, leaving stands less resilient and making long term resistance less likely to occur."[152] The EA does not disclose how much less resilient, or what the impacts of that allegedly reduced resilience might be. Because the EA concludes that there is little or no difference between Alternatives 2 and 3 in terms of their impact on fire management, watersheds, and wildlife, the level of reduced resilience would appear to be minimal at most.

The Draft EA does identify one major difference: "Removing areas from treatment as result of diameter limitation reduces the amount of treatment in an area and subsequently *the amount of harvestable volume per acre*."[153] This would appear to be the primary trade-off between the two alternatives: increased volume (and perhaps a minimal amount of increased resilience) vs. increased protection for old and large trees. But the EA fails to sharply define the differences between the two action alternatives by failing to quantify (or qualify) the level of difference for any of these factors: how much extra timber would be available for mills under Alternative 2? How much extra resilience? How many more large trees would remain under Alternative 3 and what would that mean for the potential for increased wildlife snags, carbon storage, etc.? Unless and until the EA grapples with these critical issues, the alternatives analysis fails to address the "heart" of the NEPA analysis.

2. The Forest Service should also analyze a restoration alternative that protects trees 16" dbh and larger.

Because the PPP recommended protecting trees 16" dbh and larger in some cases, and because the Draft EA finds little difference between Alternatives 2 and 3, the Forest Service should also analyze in detail (or explain why it cannot) an alternative that protects trees 16" dbh and larger. This would allow the public and the decisionmaker to compare the relative merits of protecting different size classes of trees, and to understand whether protecting trees 20" dbh is a reasonable middle ground. It is also an alternative that is most likely to protect all pre-settlement trees, which studies have concluded is critical to restore ponderosa pine forests in the Southwest.

We understand that Dr. Bill Baker will present evidence that an alternative that protects trees 16" dbh and larger best constitutes a restoration alternative. Analyzing this alternative will also

---

[150] Draft EA at 63-65 (watersheds), 76-78 (wildlife).

[151] Draft EA at 59.

[152] Daft EA at 59.

[153] Draft EA at 59 (emphasis added).

require the Forest Service to explain why its proposed action (Alternative 2) appears to be out of compliance with Forest Plan direction on restoring ponderosa pine.

## IV. THE DRAFT EA FAILS TO ACCOUNT FOR STUDIES PREDICTING THE IMPACT OF CLIMATE CHANGE TO THE FOREST IN THE PROJECT AREA.

For the Draft EA to meet NEPA's mandate that environmental analysis include information "of high quality" and must include "[a]ccurate scientific analysis."[154]

Forests within the project area are likely to undergo significant changes in the coming years due to climate change. However, the Draft EA, fails to account for the fact that these changes may undercut key project assumptions and goals. We urge the Forest Service to accurately address these impacts by including and addressing in detail the new, relevant, expert information in any subsequently prepared NEPA document.

The Salter Project is premised in part on the conclusion that thinning and other logging projects would, over the "long term," enhance the forest's resilience to fire, insect infestation, and drought; all of these threats are driven and exacerbated by climate change. The likelihood that the project could achieve benefits over the long term must be weighed against the predicted impacts of climate change, which could make the recovery of ponderosa pine in this area difficult if not impossible, even assuming the Salter treatments take place.

A Forest Service study concluded that by the 2050s to 2060s, current forest types in the project area will be lost due to climatic changes brought on by the warming of the planet due to anthropogenic climate change.

In 2017, Forest Service Rocky Mountain Region staff and researchers presented results from bioclimate models concluding that ponderosa pine would likely be lost from the Salter Project area in the 2056-65 time period.[155]

The Draft EA fails to cite or directly respond to this expert study generated by the Forest Service; the agency must do both in any subsequently prepared NEPA document to comply with the law. Indeed, the Draft EA fails to identify climate change as something likely to have a cumulative impact on vegetation, relegating discussion of the issue to a section entitled

---

[154] 40 C.F.R. § 1500.1(b).

[155] J. Worrall et al., Projected Impacts of Climate Change on Forests of the Dolores Watershed, presentation to the Dolores Watershed Resilient Forest Collaborative (2017) at slides 29, 39 & 52 (showing results of bioclimate models predicting the likely persistence of various forest types, which characterize ponderosa pine as "lost" for most of the project area), attached as Ex. 29, and available at http://dwrfcollaborative.org/wp/wp-content/uploads/2018/06/projected-impacts-of-climate-change-on-forests-of-the-dolores-watershed.pdf (last viewed Mar. 12, 2021). Other forest types will suffer in the area as well. *See id.* at slide 33 (showing Gambel oak "threatened"); *id.* at slide 35 (showing aspen "lost" in the project area, even in a "favorable climate" scenario).

"Resources dismissed from detailed analysis."[156] This appears to directly conflict with Forest Plan direction that requires vegetation management will "anticipates[]climate-related plant succession changes."[157]

At a bare minimum, the Forest Service should be honest with the public about the likely fate of the forest in the Salter area in light of climate change, and what that means about the efficacy of the project. The Draft EA fails to do so.

## V. THE DRAFT EA FAILS TO RESPOND TO SCIENTIFIC EXPERTS.

### A. NEPA Requires Agencies to Respond to Comments, Especially Opposing Scientific Views.

NEPA requires agencies to explain opposing viewpoints and their rationale for choosing one viewpoint over the other.[158] Federal courts have set aside NEPA analysis where the agency failed to respond to scientific analysis that calls into question the agency's assumptions or conclusions.[159]

### B. The Draft EA Fails to Address or Acknowledge Expert Opinions of Forest Scientists.

The Draft EA fails to respond or acknowledge comments timely submitted by Dr. Bill Baker in March 2020 concerning scoping. Among other things, his comments presented a detailed reconstruction of ponderosa pine diameter distributions under the historic range of variability (HRV) for an area that includes the Salter Project area, and which demonstrated the importance of retaining trees 16" dbh and larger, given the current deficit in those size classes compared to the HRV. We urge the Forest Service to comply with NEPA by acknowledging, reviewing, and incorporating into any subsequent NEPA analysis the information Dr. Baker presented in scoping, as well as any comments he may submit on the Draft EA.

---

[156] *See* Draft EA at 102-03.

[157] Draft EA at 10 (quoting San Juan Forest Plan at 2.9.1).

[158] 40 C.F.R. § 1502.9(b) (requiring agencies to disclose, discuss, and respond to "any responsible opposing view").

[159] *See Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1168 (9th Cir. 2003) (finding Forest Service's failure to disclose and respond to evidence and opinions challenging EIS's scientific assumptions violated NEPA); *Seattle Audubon Soc'y v. Moseley,* 798 F. Supp. 1473, 1482 (W.D. Wash. 1992) ("The agency's explanation is insufficient under NEPA – not because experts disagree, but because the FEIS lacks reasoned discussion of major scientific objections."), *aff'd sub nom. Seattle Audubon Soc'y v. Espy,* 998 F.2d 699, 704 (9th Cir. 1993) ("[i]t would not further NEPA's aims for environmental protection to allow the Forest Service to ignore reputable scientific criticisms that have surfaced"); *High Country Conservation Advocates v. Forest Service*, 52 F. Supp. 3d 1174, 1198 (D. Colo. 2014) (finding Forest Service violated NEPA by failing to mention or respond to expert report on climate impacts).

Further, the Draft EA fails to address Worrall's conclusion that much of the Salter Project area may be devoid of ponderosa pine by 2065.

To comply with NEPA, the Forest Service must respond to these experts who question the utility and impacts of the Salter proposal.

## VI. THE DRAFT EA FAILS TO ANALYZE THE EFFECTIVENESS OF MITIGATION MEASURES.

### A. NEPA Mandates That Agencies Analyze Potential Mitigation Measures.

NEPA's statutory language implicitly charges agencies with mitigating the adverse environmental impacts of their actions.[160] NEPA's implementing regulations require that agencies analyze and proposed mitigation measures.[161]

The CEQ also has stated: "All relevant, reasonable mitigation measures that could improve the project are to be identified, even if they are outside the jurisdiction of the lead agency or the cooperation agencies ...."[162] According to the CEQ, "[a]ny such measures that are adopted must be explained and committed in the ROD."[163]

The Tenth Circuit has held that an agency's analysis of mitigation measures "must be 'reasonably complete' in order to 'properly evaluate the severity of the adverse effects' of a proposed project prior to making a final decision."[164] Mitigation "must be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated."[165]

"[O]mission of a reasonably complete discussion of possible mitigation measures would undermine the 'action-forcing' function of NEPA. Without such a discussion, neither the agency nor other interested groups and individuals can properly evaluate the severity of the adverse effects."[166] A "perfunctory description," of mitigation, without "supporting analytical data" analyzing their efficacy, is inadequate to satisfy NEPA's requirements that an agency take a "hard look" at possible mitigating measures.[167] An agency's "broad generalizations and vague

---

[160] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351-52 (1989); *Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1522 (10th Cir. 1992).

[161] 40 C.F.R. §§ 1502.14(f), 1502.16(h).

[162] Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18026, 18031 (March 23, 1981).

[163] Forty Questions, 46 Fed. Reg. at 18036.

[164] *Colo. Envt'l Coalition v. Dombeck*, 185 F.3d 1162, 1173 (10th Cir. 1999) (quoting *Robertson*, 490 U.S. at 352).

[165] *City of Carmel-by-the-Sea v. U.S. Dept. of Transp.*, 123 F.3d 1142, 1154 (9th Cir. 1997) (quoting *Robertson*, 490 U.S. at 353).

[166] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 353 (1989).

[167] *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998).

references to mitigation measures ... do not constitute the detail as to mitigation measures that would be undertaken, and their effectiveness, that the Forest Service is required to provide."[168] Moreover, in its final decision documents, an agency must "[s]tate whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not."[169]

### B. The Draft EA Fails to Analyze the Effectiveness of Mitigation Measures.

The Draft EA does not focus on "mitigation," instead asserting that "Project design elements … were developed for the proposed action to minimize or eliminate potential adverse effects during implementation."[170] While the Draft EA lists many "design elements,"[171] it does not evaluate the effectiveness of each measure. Whether some of these measures would be effective at all is open to question because many of them are vague or ill-defined.

For example, one design element directs the agency to "[m]onitor noxious weeds/invasive species and treat as needed to contain established infestations and minimize rate of spread."[172] Treating "as needed" to "minimize the rate of spread" provide neither the public nor the decisionmaker with useful information as to what methods the Forest Service will employ or how effective those measures will be.

At least one mitigation measure appears almost certain to be ineffective. The Draft EA proposed to "reduce conflicts with recreation users during federal holidays" by barring hauling "on FSR 527 from the junction of FSR 527C to FSR 259 (Boggy Draw Trailhead) from 12 P.M. Friday to 12:01 A.M. Monday on Memorial Day [and] Labor Day."[173] This means hauling would be allowed for all but one minute of the Mondays of Memorial and Labor Days, when recreationists are likely to be using Forest Service roads in higher-than-usual numbers, and conflicts with log hauling are likely to occur. At a minimum, the Forest Service must explain why it intends to permit log hauling on these routes on Memorial Day and Labor Day, but not on the Saturday and Sunday before those days.

---

[168] *Id*. at 1380-81. *See also Northwest Indian Cemetery Protective Association v. Peterson*, 795 F.2d 688, 697 (9th Cir. 1986), rev'd on other grounds, 485 U.S. 439 (1988) ("A mere listing of mitigation measures is insufficient to qualify as the reasoned discussion required by NEPA."); *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1151 (9th Cir. 1988) ("Without analytical data to support the proposed mitigation measures, we are not persuaded that they amount to anything more than a 'mere listing' of good management practices.").

[169] 40 C.F.R. § 1505.2(c).

[170] Draft EA at 19.

[171] Draft EA at 19-27.

[172] Draft EA at 22.

[173] Draft EA at 23.

The provision allegedly mitigating impact to "elk production habitat" allows the "line officer" to approve operations in those areas.[174] No criteria or benchmarks are provided to limit the officer's discretion, and thus it is impossible to tell whether this measure can be effective.

A design element concerning road construction states that "[t]emporary roads would be held to the minimum feasible number, width and total length," but fails to explain how the agency would do so, or how minimal that width could be.[175] The measure also states that temporary roads "would be located sufficiently far from streams and other water bodies to minimize discharge into those waters except at necessary water crossings."[176] How far will that be? How will the Forest Service determine that distance? How much discharge is "minimized" discharge? Any subsequent NEPA document must address this lack of definition.

Further, some "design elements" are little more than keeping track of damage with no proposal to respond to it. One measure states that "[e]ffectiveness of road closure would also be monitored," with no explanation as to what actions the Forest Service would take it closures were found to be ineffective.[177]

While the Draft EA identifies several design standards for northern goshawk, one appears to be at odds with best available science, and two prescriptions suggested by that science is omitted. The Management Recommendations for Northern Goshawk (1992) suggests that "[a]ll management activities in the PFA [northern goshawk post fledging-family area] should be limited to the period from October through February."[178] The Draft EA does not limit activities in PFAs, but does state that "if active northern goshawk nests are discovered, all project operations would be restricted annually from March 1st to August 31st within one-half (½) mile of the active nest."[179] We request that the Forest Service explain why the limitation on activities for the Salter Project is one month shorter than that recommended by the Management Recommendations. Further, the Management Recommendations state that "forests in the PFAs should contain overstories with a canopy cover greater than 50%," and further that in ponderosa pine forested PFAs, the Forest Service should "[l]eave 5 - 7 tons per acre of woody debris (greater than 3 inches in diameter) and downed logs distributed across areas, after timber harvesting, for small animal habitat and to maintain long-term productivity.[180] The Salter Project contains no such prescription that we could find. Any subsequent NEPA document should address these omissions.

[174] Draft EA at 26.

[175] Draft EA at 21.

[176] Draft EA at 21.

[177] Draft EA at 25.

[178] R.T. Reynolds *et al*. Management Recommendations for the Northern Goshawk in the Southwestern United States, GTR-RM-217 (1992) at 6.

[179] Draft EA at 73-74.

[180] Management Recommendations for the Northern Goshawk at 14, 24.

The Management Recommendations also suggest that the PFAs ensure suitable prey habitat is available and that "[f]eatures of prey habitat in the PFA include:

1) large (>18 inches DBH) feeding and/or nesting trees for tree squirrels,

2) large (>18 inches DBH and >30 feet tall) snags and/or trees with exposed heartwood for nest cavity excavation by woodpeckers,

3) patches of mid-aged forests with high canopy cover (up to 70%) that provide mesic conditions for fungi (important foods for all the mammalian prey),

4) small (>2 inches in diameter and >8 feet long) downed logs and other woody debris that provide hiding, feeding, denning, and nesting sites used by goshawk prey.

5) large (>12 inches in diameter and >8 feet long) downed logs and other woody debris that provide hiding, feeding, denning, and nesting sites used by goshawk prey."[181]

The Draft EA contains no comparable guidance, but it does permit the logging of trees up 22 inches dbh, which could conflict with guidance to retain trees 18 inches and greater for specific purposes.[182] We request that the Forest Service explain how it intends to resolve this apparent omission/conflict.

In sum, because the Draft EA fails to analyze the effectiveness of individual design elements, and because some of the design elements are unlikely to be effective, the Draft EA violates NEPA. We urge the Forest Service to address this issue by evaluating the effectiveness of each individual mitigation measure or design element in any subsequently prepared NEPA document, and to propose measures that are certain to be implemented and likely to reduce impacts.

## VII. THE FOREST SERVICE MUST PREPARE AN ENVIRONMENTAL IMPACT STATEMENT ON THE SALTER PROJECT.

### A. Agencies Must Prepare EISs When Impacts 'May' Be Significant.

NEPA requires federal agencies to prepare a full environmental impact statement (EIS) before undertaking "major Federal actions significantly affecting the quality of the human environment."[183] As the Tenth Circuit has explained, "[i]f the agency determines that its proposed action *may* 'significantly affect' the environment, the agency must prepare a detailed statement on the environmental impact of the proposed action in the form of an EIS."[184] The Ninth Circuit agrees.

---

[181] Management Recommendations for the Northern Goshawk at 16.

[182] Draft EA at 26.

[183] 42 U.S.C. § 4332(C).

[184] *Airport Neighbors Alliance v. U.S.*, 90 F.3d 426, 429 (10th Cir. 1996) (citation omitted) (emphasis added).

> We have held that an EIS *must* be prepared if 'substantial questions are raised as to whether a project ... *may* cause significant degradation to some human environmental factor.' To trigger this requirement a 'plaintiff need not show that significant effects *will in fact occur*,' [but instead] raising 'substantial questions whether a project may have a significant effect' is sufficient.[185]

If an agency "decides not to prepare an EIS, 'it must put forth a convincing statement of reasons' that explains why the project will impact the environment no more than insignificantly. This account proves crucial to evaluating whether the [agency] took the requisite 'hard look.'"[186]

"Significance" under NEPA requires consideration of the action's context and intensity.[187] An agency must analyze the significance of the action in several contexts, including short- and long-term effects within the setting of the proposed action (including site-specific, local impacts).[188] Intensity refers to the severity of the impact and requires consideration of ten identified factors that may generally lead to a significance determination, including: (1) whether the action is likely to be highly controversial; (2) whether the effects on the environment are highly uncertain or involve unique or unknown risks; and (3) whether the action may have cumulative significant impacts.[189] With respect to the degree to which the environmental effects are likely to be highly controversial, the word "controversial" refers to situations where "'substantial dispute exists as to the size, nature, or *effect* of the major federal action.'"[190]

### B. The Salter Project May Have Significant Impacts.

The Salter Project may have significant impacts, triggering the Forest Service's duty to prepare an EIS.

***The scale of the project itself may be significant***. The proposed action alternatives permit the construction of up to 117 miles of temporary road, a significant amount, and reconstruction or

[185] *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149-50 (9th Cir. 1998) (citations omitted) (emphasis original). *See also Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 864-65 (9th Cir. 2005) ("To trigger this [EIS] requirement a plaintiff need not show that significlant effects will in fact occur, but raising substantial questions whether a project may have a significant effect is sufficient." (internal quotations, citations, and alterations omitted)).

[186] *Ocean Advoc.*, 402 F.3d at 864.

[187] 40 C.F.R. § 1508.27.

[188] *Id.* § 1508.27(a).

[189] *Id.* § 1508.27(b)(4)-(5), (7)

[190] *Town of Cave Creek v. FAA,* 325 F.3d 320, 331 (D.C. Cir. 2003) (quoting *North American Wild Sheep v. U.S. Department of Agriculture*, 681 F.2d 1172, 1182 (9th Cir. 1982)) (emphasis in original). *See also Middle Rio Grande Conservancy Dist. v. Norton*, 294 F.3d 1220, 1229 (10th Cir. 2002) (same); *Town of Superior v. U.S. Fish and Wildlife Serv.*, 913 F. Supp. 2d 1087, 1120 (D. Colo. 2012) (same).

"improv[ing] the condition of [another] 149 miles" of road.[191] Logging may take place on more than 35 square miles of forest land, and will occur continuously across this landscape for as long as a decade. Road construction, logging, and road use will conflict with recreational use which is categorized as "moderate to high" for much of the year. The large scale of the project supports a conclusion of significance.

***The project may significantly impact soils and watersheds***. Construction of temporary roads and landing areas, and the use of an unknown number, length and location of skid trails, have the potential to significantly impact sensitive soils and watersheds. The Draft EA states that "[p]roposed design features for Hydrology and Soils also restrict roads, landings, skid trails, concentrated-use sites, and similar soil disturbances to designated sites to no more than 15 percent of any timber sale unit."[192] Because there are 22,790 acres of logging units, the design features permit skid trails, roads, etc. to impact soils on up to 3,400 acres – an area of more than five square miles. This impact is significant.

***The project may significantly impact wildlife.*** The proposed action will render much of the project area unsuitable for northern goshawk, a potentially significant impact. The Draft EA proposes to reduce basal area outside of the tiny 30-acre nest area to as low as 50 square feet per acre. Such logging may damage goshawk habitat in the short term (for years). As the Draft EA admits:

> Basal area reductions below 80 square feet per acre in mature stands would affect nesting behavior of northern goshawk because thermal and protective sight cover for nesting will be reduced, which will reduce reproduction. A reduction in canopy cover may also impact foraging success as there will be less ability to hide from prey. These impacts may reduce habitat effectiveness in the short-term … for this species….[193]

The project thus will *certainly* damage goshawk habitat over a vast area for the 10 years of project implementation and beyond. The *promise* of increased habitat effectiveness is over the "long term," so the nature of the trade-off between present, certain damage and indeterminant future benefit cannot be understood or compared. The potential for significant impacts to goshawk requires preparation of an EIS.

***The project is highly controversial***. The project's impacts are uncertain. The Forest Service's proposed prescription of a 26.9" dbh cap conflicts with that developed by the San Juan National Forest's earlier Ponderosa Pine Partnership. Scientific studies suggest that the project will result in the loss of pre-settlement ponderosa pine within the project area, and trees more than a century old, and Forest Service studies indicate that ponderosa pine and aspen may be lost in the project area within a few decades. But the Draft EA assert the project will lead to a diverse-aged forest

---

[191] Draft EA at 55 (149 miles), 57 (up to 117 miles).

[192] Draft EA at 44.

[193] Draft EA at 73.

able to resist future insect infestations. Thus, the effects of the Salter Project meet the "highly controversial" standard, requiring preparation of a full environmental impact statement.

The Forest Service's failure to quantify the project's climate impacts, and reliance on outdated guidance, conflict with new administration guidance and federal caselaw, and the Draft EA appears to rely on discredited science and law. The Forest Service's climate denial also crosses the "highly controversial" threshold.

**CONCLUSION.**

With a project of this scale and potential for significant impact, we are concerned that the Forest Service must undertake additional disclosure – of baseline information; of mitigation measures; of the location and impacts of roads, among other things – to comply with NEPA. We further oppose adoption of an alternative that permits the logging of large and old trees as proposed in Alternative 2.

Sincerely,

Edward B. Zukoski, Senior Attorney
Center for Biological Diversity
1536 Wynkoop Street, Suite 421
Denver, CO 80202
(303) 641-3149
tzukoski@biologicaldiversity.org

Adam Rissien, ReWilding Advocate
WildEarth Guardians
PO Box 7516
Missoula, MT 59807
(406) 370-3147
arissien@wildearthguardians.org

## TABLE OF EXHIBITS

| | |
|---|---|
| Exhibit 1. | USDA Forest Service, Final Environmental Impact Statement, Roadless Area Conservation Rule (Nov. 2000) (excerpts) |
| Exhibit 2. | Lolo National Forest, Redd Bull Environmental Assessment (Jan. 2021) (excerpts) |
| Exhibit 3. | IPCC, Summary for Policymakers, Global Warming of 1.5°C. An IPCC Special Report on the impacts of global warming of 1.5°C above pre-industrial levels and related global greenhouse gas emission pathways (2018) |
| Exhibit 4. | H. Fountain, Climate Change Is Accelerating, Bringing World 'Dangerously Close' to Irreversible Change, The New York Times (Dec. 4, 2019) |
| Exhibit 5. | Executive Order 13,990, 86 Fed. Reg. 7037 (Jan. 20, 2021) |
| Exhibit 6. | Executive Order 14,008, 86 Fed. Reg. 7619 (Jan. 27, 2021) |
| Exhibit 7. | Interagency Working Group on Social Cost of Greenhouse Gases, Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates under Executive Order 13990 (Feb. 2021) |
| Exhibit 8. | Council on Environmental Quality, National Environmental Policy Act, Guidance on Consideration of Greenhouse Gas Emissions, 86 Fed. Reg. 10,252 (Feb. 19, 2021) |
| Exhibit 9. | Forest Service, Tongass Land and Resource Management Plan, Final EIS (2016) (excerpts) |
| Exhibit 10. | D. DellaSala, The Tongass Rainforest as Alaska's First Line of Climate Change Defense and Importance to the Paris Climate Change Agreements (2016) |
| Exhibit 11. | Intergovernmental Panel on Climate Change, Special Report on Climate Change, Desertification, Land Degradation, Sustainable Land Management, Food Security, and Greenhouse gas fluxes in Terrestrial Ecosystems, Summary for Policymakers (Aug. 2019) |
| Exhibit 12. | B. Law et al., Land use strategies to mitigate climate change in carbon dense temperate forests, Proceedings of the Nat'l Academy of Sciences, vol. 115, no. 14 (Apr. 3, 2018) |
| Exhibit 13. | Moomaw, *et al*., Intact Forests in the United States: Proforestation Mitigates Climate Change and Serves the Greatest Good, Frontiers in Forests and Global Change (June 11, 2019) |
| Exhibit 14. | Hudiburg *et al*., Meeting GHG reduction targets requires accounting for all forest sector emissions, Environ. Res. Lett. 14 (2019) |

Exhibit 15. B. Law, *et al*., The Status of Science on Forest Carbon Management to Mitigate Climate Change (June 1, 2020)

Exhibit 16. B. Law & W. Moomaw, Keeping trees in the ground where they are already growing is an effective low-tech way to slow climate change, *The Conversation* (Feb. 23, 2021)

Exhibit 17. B. Law & M.E. Harmon, Forest sector carbon management, measurement and verification, and discussion of policy related to mitigation and adaptation of forests to climate change. Carbon Management (2011)

Exhibit 18. M. Harmon, Have product substitution carbon benefits been overestimated? A sensitivity analysis of key assumptions, Environmental Research Letters (2019)

Exhibit 19. *See* Bureau of Land Management, Western Oregon Proposed RMP Final EIS (2009) (excerpts)

Exhibit 20. N.L. Harris et al., Attribution of net carbon change by disturbance type across forest lands of the conterminous United States, Carbon Balance and Management (2016)

Exhibit 21. Office of Surface Mining & Bureau of Land Management, Environmental Assessment, Colowyo Coal Mine Collom Permit Expansion Area Project (Jan. 2016) (excerpts)

Exhibit 22. U.S. Forest Service, Supplemental Final Environmental Impact Statement, Federal Coal Lease Modifications COC-1362 & COC-67232 (Aug. 2017) (excerpts)

Exhibit 23. Four Forest Restoration Initiative, Old Growth Protection & Large Tree Retention Strategy (Sep. 13, 2011)

Exhibit 24. U.S. Forest Service *et al*., New Mexico Forest Restoration Principles (May 2006)

Exhibit 25. Allen *et al*., Ecological Restoration of Southwestern Ponderosa Pine Ecosystems: A Broad Perspective, Ecological Applications, 12(5) (2002)

Exhibit 26. D. Lynch, Forest Restoration in Southwestern Ponderosa Pine, Journal of Forestry (Aug. 2000)

Exhibit 27. San Juan National Forest, Guard Station Timber Sale, Decision Notice (May 1996)

Exhibit 28. San Juan National Forest, Ferris East Timber Sale, Decision Notice (Feb. 1998)

Exhibit 29. J. Worrall et al., Projected Impacts of Climate Change on Forests of the Dolores Watershed, presentation to the Dolores Watershed Resilient Forest Collaborative (2017)

Date submitted (UTC-11): 3/12/2021 12:00:00 AM
First name: Edward
Last name: Zukoski
Organization: Center For Biological Diversity
Title: Attorney
Comments:
Attached please find exhibits 1 - 15 of 29 exhibits to the comment letter of Center for Biological Diversity and WildEarth Guardians on the Salter Project.

Ted Zukoski

Center for Biological Diversity

ATTACHMENTS:

Ex. 15 - Law et al. Status of Science on carbon storage (2020)

Ex. 1 - USFS Roadless Area Conservation Rule FEIS (2000) (excerpts)

Ex. 2 - Lolo NF Redd Bull Final EA (Jan. 2021) (excerpts)

Ex. 3 - IPCC Summary for Policymakers 1.5 C (2018)

Ex. 4 - H. Fountain Climate Change Is Accelerating NYTimes (Dec. 2019)

Ex. 5 - Exec. Order 13990 (Jan. 20 2021)

Ex. 6 - Exec. Order 14008 (Jan. 27 2021)

Ex. 7 - TSD on SCC (Feb. 2021)

Ex. 8 - CEQ Climate Guidance 86 Fed. Reg. 10252 (Feb. 19 2021)

Ex. 9 - Tongass NF Plan FEIS (2016) (excerpts)

Ex. 10 - DellaSala GEOS report - Tongass emissions final report compressed

Ex. 11 - IPCC Summary for Policymakers 1.5 C (2018)

Ex. 12 - Law et al. Land use and climte change (2018)

Ex. 13 - Moomaw et al. Proforestation (2019)

Ex. 14 - Hudiburg Meeting GHG reduction targets (2019)

USDA United States Department of Agriculture

**Forest Service**

Washington Office

November 2000

# Forest Service Roadless Area Conservation

## Final Environmental Impact Statement Volume 1



# Acronyms and Abbreviations

| | |
|---|---|
| ANILCA | Alaska National Interest Lands Conservation Act |
| ASQ | Allowable Sale Quantity |
| BBF | Billion board feet |
| BLM | Bureau of Land Management |
| BMP | Best Management Practices |
| CAET | Content Analysis Enterprise Team |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| CFR | Code of Federal Regulations |
| DEIS | Draft Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| ESA | Endangered Species Act |
| FEIS | Final Environmental Impact Statement |
| FEMAT | Forest Ecosystem Management Assessment Team |
| GIS | Geographic Information System |
| ICBEMP | Interior Columbia Basin Ecosystem Management Project |
| LUD | Land Use Designation (Tongass National Forest) |
| MMBF | Million board feet |
| NEPA | National Environmental Policy Act |
| NFMA | National Forest Management Act |
| NFS | National Forest System (includes national forests and grasslands) |
| NOI | Notice of Intent |
| NMFS | National Marine Fisheries Service |
| OHV | Off-highway Vehicle |
| RARE | Roadless Area Review and Evaluation |
| RARE II | Second Roadless Area Review and Evaluation |
| ROD | Record of Decision |
| ROS | Recreation Opportunity Spectrum |
| SAA | Southern Applachian Assessment |
| TEP | Threatened, Endangered, and Proposed |
| TEPS | Threatened, Endangered, Proposed, and Sensitive |
| TLMP | Tongass Land Management Plan |
| USC | United States Code |
| USDA | United States Department of Agriculture |
| USDI | United States Department of the Interior |
| USFWS | United States Fish and Wildlife Service |
| USGS | United States Geological Survey |

United States Department of Agriculture | Forest Service | Washington Office | 201 14th & Independence, SW
Post Office Box 96090
Washington, DC 20090-6090

**File Code:** 1950-3
**Date:** November 9, 2000

Dear Citizen:

I am pleased to present the Roadless Area Conservation Final Environmental Impact Statement. These volumes describe a strategy for conserving National Forest System inventoried roadless areas and their important values. They contain an analysis of management options and the Forest Service's preferred alternative. I expect to render a final decision on this matter in no sooner than 30 days.

I want to thank all those who participated in this rulemaking. The wealth of insights and experience they provided contributed to improvements in development of the proposal and the analysis of social, economic, and environmental effects.

I remain confident that taking action now to conserve roadless areas through this national effort will result in these lands providing lasting values for future generations. I appreciate your participation in achieving this goal.

Sincerely,

Mike Dombeck

MIKE DOMBECK
Chief

# Forest Service Roadless Area Conservation Final Environmental Impact Statement

**Lead Agency:** **USDA Forest Service**

**Responsible Official:** **Mike Dombeck, Chief**
Yates Building
14th and Independence Avenues, SW
Washington, DC 20024

**For Information Contact:** **Scott Conroy, Project Director**
USDA Forest Service
National Forest System Roadless Project
P.O. Box 96090
Washington, DC 20090-6090
(703) 605-5299

**Abstract:** The Forest Service is proposing new regulations to protect inventoried roadless areas within the National Forest System. This final environmental impact statement (FEIS) responds to strong public sentiment for protecting roadless areas and the clean water, biological diversity, dispersed recreational opportunities, wildlife habitat, forest health, and other public benefits provided by these areas. This action also responds to budgetary concerns and the need to balance management objectives with funding priorities. Public comments on the DEIS were considered in development of this FEIS in order to refine the scope of the decision to be made, verify significant issues, modify alternatives, identify possible mitigation measures, and direct the analysis of effects. The preferred alternative would prohibit road construction, reconstruction, and timber harvest except for stewardship purposes in all inventoried roadless areas. Implementation of the preferred alternative on the Tongass National Forest would begin in April 2004 to provide those communities in Southeast Alaska most impacted by the decision a transition period in which to adjust to possible economic changes that may result. Eight alternatives were fully developed and considered, including 4 sets of prohibited activities (including no action), and 4 alternative methods for applying the prohibitions to the Tongass. The procedural alternatives described in the DEIS are not included in this FEIS, since the decision was made to include procedures for roadless area conservation in the final rule for the Land and Resource Management Planning Regulations at 36 CFR 219.

# Forest Service
# Roadless Area Conservation

Final Environmental Impact Statement
Volume 1

## Table of Contents

**SUMMARY OF CHANGES BETWEEN DRAFT AND FINAL EIS ....................... XI**

**EXECUTIVE SUMMARY ...................................................................... ES-1**

**CHAPTER 1. PURPOSE OF AND NEED FOR ACTION....................................... 1-1**

INTRODUCTION ........................................................................................ 1-1
BACKGROUND........................................................................................ 1-5
PUBLIC REVIEW AND COMMENT ON THE DRAFT EIS AND ISSUES CONSIDERED .......... 1-7
PURPOSE AND NEED.................................................................................. 1-16
DECISION TO BE MADE ............................................................................. 1-19
THE PROPOSED ACTION ............................................................................ 1-19
OTHER RELATED PLANNING EFFORTS ....................................................... 1-20
ORGANIZATION OF THE DOCUMENT........................................................... 1-23

**CHAPTER 2. ALTERNATIVES CONSIDERED.................................................. 2-1**

INTRODUCTION ........................................................................................ 2-1
ALTERNATIVES CONSIDERED IN DETAIL......................................................... 2-3
Prohibition Alternatives .................................................................... 2-5
Alternative 1.................................................................................. 2-6
Alternative 2.................................................................................. 2-6
Alternative 3.................................................................................. 2-8
Alternative 4.................................................................................. 2-9
Tongass National Forest Alternatives .............................................. 2-11
Tongass Not Exempt.......................................................................... 2-11
Tongass Exempt.............................................................................. 2-12
Tongass Deferred ............................................................................ 2-12
Tongass Selected Areas ..................................................................... 2-13
The Preferred Alternative .................................................................. 2-15
ALTERNATIVES CONSIDERED BUT ELIMINATED FROM DETAILED STUDY .................. 2-17
COMPARISON OF ALTERNATIVES .................................................................. 2-27

**CHAPTER 3. AFFECTED ENVIRONMENT AND ENVIRONMENTAL CONSEQUENCES .......... 3-1**

OVERVIEW OF INVENTORIED ROADLESS AREAS .......... 3-1
DEMOGRAPHIC TRENDS .......... 3-7
BALANCING DEMANDS .......... 3-16
ACTIVE AND PASSIVE FOREST MANAGEMENT .......... 3-19
EFFECTS OF THE PROHIBITION ALTERNATIVES .......... 3-21
National Forest System Roads .......... 3-21
Access .......... 3-39
Ecological Factors .......... 3-42
Physical Resources .......... 3-44
Water Quantity and Timing .......... 3-46
Water Quality and Drinking Water Source Areas .......... 3-49
Channel Morphology .......... 3-54
Soil Loss, Sedimentation, and Site Productivity .......... 3-55
Landslides .......... 3-58
Air Resources .......... 3-62
Forest Health and Fire Ecology .......... 3-72
Fuel Management .......... 3-76
Fire Suppression .......... 3-97
Burned Area Emergency Rehabilitation .......... 3-117
Insects and Disease .......... 3-118
Biodiversity .......... 3-123
Ecoregions .......... 3-126
Fragmentation .......... 3-128
Size Considerations .......... 3-136
Elevation Distribution .......... 3-141
Terrestrial Animal Habitat and Species .......... 3-142
Aquatic Animal Habitat and Species .......... 3-160
Terrestrial and Aquatic Plant Species .......... 3-173
Threatened, Endangered, Proposed, and Sensitive Species .......... 3-179
Research, Monitoring, and Reference Landscapes .......... 3-191
Human Uses .......... 3-193
Timber Harvest .......... 3-193
Recreation .......... 3-207
Dispersed Recreation Activities .......... 3-208
Developed and Road-based Recreation Activities .......... 3-216
Recreation Special Uses .......... 3-222
Dispersed Recreation Activities .......... 3-222
Developed and Road-based Recreation Activities .......... 3-225
Scenic Quality .......... 3-228
Heritage Resources .......... 3-232
Wilderness .......... 3-237
Other Special Designated Areas .......... 3-242
Real Estate Management .......... 3-247
Boundary Management and Landownership Adjustments .......... 3-247
Access to Non-Federal Ownership within the National Forest System .......... 3-248

Non-recreation Special Uses ........ 3-249
Minerals and Geology ........ 3-252
Locatable Minerals ........ 3-253
Leasable Minerals ........ 3-254
Salable Minerals ........ 3-260
Abandoned and Inactive Mines ........ 3-261
Geological and Paleontological Resources ........ 3-262
Social and Economic Factors ........ 3-264
Non-commodity Values ........ 3-265
Recreation, Scenic Quality,Wilderness, and Recreation Special Uses ........ 3-271
Hunting and Fishing ........ 3-280
Livestock Grazing ........ 3-287
Non-timber Forest Products ........ 3-290
Timber Harvest ........ 3-295
Energy and Non-energy Minerals ........ 3-308
Road Construction ........ 3-324
Forest-dependent Communities ........ 3-326
Local Involvement ........ 3-351
American Indian and Alaska Native Issues ........ 3-352
Civil Rights and Environmental Justice ........ 3-355
Agency Costs ........ 3-362
EFFECTS OF THE TONGASS NATIONAL FOREST ALTERNATIVES ........ 3-371
SUMMARY OF CUMULATIVE EFFECTS ........ 3-392
Effects of the Prohibition Alternatives Across Resources ........ 3-392
Other Federal Policies ........ 3-396
National Forest Management Act Planning Regulations ........ 3-397
Forest Service Transportation Policy ........ 3-397
Unified Federal Policy ........ 3-399
Report to the President on the Wildland Fires of 2000 ........ 3-399
Cohesive Strategy ........ 3-400
Forest Service Strategic Plan ........ 3-401
Sierra Nevada Framework ........ 3-401
Interior Columbia Basin Ecosystem Management Project ........ 3-402
Lynx and Other Listings by the U.S. Fish and Wildlife Service ........ 3-402
Land Management Planning ........ 3-403
SHORT-TERM USES AND LONG-TERM PRODUCTIVITY ........ 3-403
UNAVOIDABLE ADVERSE EFFECTS ........ 3-404
MITIGATION OPTIONS ........ 3-404
IRREVERSIBLE AND IRRETRIEVABLE COMMITMENTS OF RESOURCES ........ 3-406
OTHER REQUIRED DISCLOSURES ........ 3-406

**CHAPTER 4. CONSULTATION AND COORDINATION ........ 4-1**

PUBLIC INVOLVEMENT ........ 4-1
PREPARERS AND CONTRIBUTORS ........ 4-5
DISTRIBUTION OF THE FINAL ENVIRONMENTAL IMPACT STATEMENT ........ 4-15

Case No. 1:23-cv-01501-RMR Document 15-2 filed 09/29/23 USDC Colorado pg 355 of 367



**APPENDIX A**: Inventoried roadless area acreage summarized by State, region, and forest ........ A-1

**APPENDIX B:** State-by-State summaries of key information for the preferred alternative. ........ B-1

**APPENDIX C:** Summary of threatened, endangered, proposed and sensitive species........ C-1

**APPENDIX D**: Civil rights impact analysis population distribution maps ........ D-1

**APPENDIX E:** Tongass National Forest land and resource management plan Prescriptions in Tongass Selected Areas Alternative ........ E-1

**GLOSSARY** ........ G-1

**REFERENCES CITED** ........ R-1

**INDEX** ........ X-1

### No Net Loss and Rotation of Roadless Areas

These alternatives would provide that the current amount of roadless acres be maintained. Existing roadless areas could be roaded provided new roadless areas are created through **decommissioning** or **obliteration** of temporary and classified roads. One approach would involve rotating the roaded and unroaded areas on different parts of each national forest in a one-for-one exchange to maintain the same amount of roadless areas. As an example, after timber harvest activities are completed and the area planted with trees, the roads in the area would be closed or decommissioned returning it to a roadless status. Roads would then be allowed for access to timber in other areas. In this manner, roadless areas would be restored, timber harvest from current roadless areas would continue at the current level, and overall road miles on NFS lands would neither increase or decrease.

These various alternatives were eliminated from detailed study, as they could have the same effects as the No Action Alternative. These options do not meet the purpose and need of the proposed action. The use of temporary roads may have the same long lasting and significant ecological effects as permanent roads, such as the introduction of non-native vegetation and degradation of stream channels. Vegetation recovery after timber harvest can take decades to restore **structure** and **composition**. These alternatives would postpone roaded entry to harvest unroaded areas until the vegetation in the in neighboring harvested areas was sufficiently recovered to mitigate anticipated effects caused by the new entry. Additionally, no-net-loss programs can lead to complicated systems of monitoring, excessive procedural requirements, and complex definitions and criteria.

### Return Treaty-Ceded Lands

There was a request for alternatives to return treaty-ceded lands back to American Indian Tribes to be held in perpetuity as natural ecological and wildlife reserves. This is a legal matter that is outside the scope of this proposal.

## Alternative Sets of Prohibitions Applicable To Inventoried Roadless Areas

A list of possible prohibitions could include off-highway vehicles (OHVs), rights-of-way, grazing, special uses, developed recreation, trails, mineral withdrawal, and other uses in addition to road construction, reconstruction, and timber harvesting. Another possibility is the closure or decommissioning of all roads in inventoried roadless areas.

The criteria used during RARE I and II allowed the presence of some roads in areas that were inventoried for Wilderness consideration (USDA Forest Service 1992). Subsequent roadless area inventories used the same criteria. Today, approximately 9,660 miles of roads currently exist on 5% of the land area in inventoried roadless areas. Some of these roads pre-date the inventories, while others have been constructed where land management plans have allowed development in inventoried roadless areas.

### *Alternative 1 – No Action*

An estimated 1,160 miles of classified and temporary roads (including public roads not under Forest Service jurisdiction and private roads) are planned to be constructed or reconstructed in inventoried roadless areas over the years 2000 to 2004. Table 3-6 shows the miles of classified and temporary road construction and reconstruction in inventoried roadless areas, required to support the **timber offer** volume projected over the same years. The estimated percentage of the classified roads that would be closed after planned use is also displayed. Forty-two percent of the planned timber-related roads are single-purpose roads closed to traffic between uses or are short-term roads that would be decommissioned. In addition, all of the planned temporary roads would be decommissioned within 10 years after use. The Forest and Rangeland Renewable Resources Planning Act of 1974, generally requires temporary roads to be closed and revegetated after use. By closing or decommissioning roads after use, the long-term effects on the environment are reduced. On the other hand, while temporary road construction must comply with law, regulation, and policy, in general, temporary roads are not designed or constructed to the same standards as classified roads and are not intended to be part of the National Forest System Transportation System. The results can be a higher risk of environmental impacts over the short run. The effects of the road construction and reconstruction are described for the prohibition alternatives for each resource later in this chapter.

**Table 3-6. Miles of planned timber-related road construction activities, 2000-2004.**

| Region | Classified road const | Classified road reconst | Temporary road const | Total all categories | Estimated closures of classified roads | Estimated closures of classified roads (%) |
|---|---|---|---|---|---|---|
| Northern (1) | 12 | 33 | 7 | 52 | 26 | 58 |
| Rocky Mountain (2) | 16 | 25 | 18 | 59 | 31 | 76 |
| Southwestern (3) | 0 | 0 | 3 | 3 | 0 | 0 |
| Intermountain (4) | 73 | 15 | 28 | 116 | 49 | 56 |
| Pacific Southwest (5) | 4 | 3 | 4 | 11 | 4 | 57 |
| Pacific Northwest (6) | 16 | 1 | 2 | 19 | 17 | 100 |
| Southern (8) | 5 | 16 | 4 | 25 | 18 | 86 |
| Eastern (9) | 6 | 6 | 35 | 47 | 11 | 92 |
| Alaska (10) | 214 | 0 | 77 | 291 | 32 | 15 |
| **Total** | **346** | **99** | **178** | **623** | **188** | **42** |

Generally, the ecological benefits of protecting more inventoried roadless areas from development and roading include:

Physical Resources

- Conserving water, soil, and air resources
- Protecting aquatic ecosystems
- Ensuring that community drinking water sources are protected
- Protecting overall watershed health

Forest Health

- May reduce the occurrence of human-caused fires
- May reduce the spread of some damaging insects and diseases

Biological Diversity

- Increasing habitat protection
- Protecting areas from additional landscape fragmentation and further loss of connectivity
- Maintaining and/or enhancing native plant and animal communities and reducing opportunities for the spread of nonnative invasive species
- Increasing the protection of a diversity of habitats from low to high elevations
- Conserving habitat for threatened, endangered, proposed, and sensitive species (TEPS)
- Providing important habitat for populations of wide ranging animals that need large areas
- with low human activity levels

## *Physical Resources*

Water, soil, and air resources have measurable characteristics that operate within naturally variable ranges of values. Water yield, timing, and quality, soil erosion, air quality, and other characteristics can vary widely, even in undisturbed situations. Land management practices, such as roading, timber harvest, **prescribed burning**, and other similar activities, can affect these values, and their variability. Sometimes the effects are within natural ranges; sometimes they are not. The most common effects of road construction and timber harvest activities on water, soil, and air resources are loss of ground cover vegetation, soil erosion and compaction, loss of soil productivity, increased potential for landslides, reduced transpiration (use of water by plants), increased water runoff, reduced water quality, and reduced air quality. In this analysis, the specific characteristics discussed are water quantity and timing, water quality, drinking water source areas, channel morphology, soil loss and sedimentation, site productivity, landslides, and air resources. Effects of fire on watersheds are discussed in the Forest Health and Fire Ecology section.

Roads have long been recognized as the primary human-caused source of soil and water disturbances in forested environments (Patric 1976; Egan and others 1996). Most impacts occur during initial road construction and then gradually decrease as roadside vegetation is reestablished and disturbed soil surfaces stabilize. Effects such as landslides persist when a road permanently undercuts unstable soils or landforms, or when roads are continually disturbed by road maintenance. Periodic maintenance activities can cause some of the impacts to briefly, but repeatedly, recur. Areas of particular concern are the

road surface and associated drainage structures such as ditches and water crossings (bridges, culverts, and fords). Poorly maintained roads can result in greater impacts as surface water is diverted, culverts plug, and other road design characteristics are compromised. Lack of maintenance commonly has detrimental effects on water, soil, and air resources. Insufficient maintenance funding is a key reason for the lack of adequate road maintenance (USDA Forest Service 2000h).

Temporary road construction has most of the same effects as permanent road construction, but generally for a shorter term and for a more limited physical extent. Long-term effects can occur if temporary roads receive extended use, and they are not decommissioned. Generation of sediment within timber harvest units is most strongly related to roading and associated facilities (**skid roads and trails**, log landings, etc.) that are needed to remove logs, as opposed to tree cutting (Anderson and others 1976). Skid roads and trails, log landings, and similar disturbances within the sale area are the main cause of soil erosion and can contribute up to 90% of the sediment generated by timber sale activity (Patric 1976; Swift 1988).

Until recently, poorly managed timber harvest activities have been a major source of sediment from a timber sale area (Stone and others 1979; Martin and Hornbeck 1994). Generally, monitoring has shown compliance rates for implementing best management practices to be between 85% and 98%, with compliance rates increasing over time as awareness and training programs take effect (Stuart 1996, State of Oregon 1999, State of Montana 1998, Phillips and others 2000). Results vary between States and ownerships, with Federal lands and large forest industry entities showing highest compliance, but small non-industrial landowners with little access to professional forestry assistance falling behind. A recent report from Oregon found overall compliance rates of 98% to 99% across all ownership classes (State of Oregon 1999), while a study in Maine reported only 34% of best management practices with compliance rates grater than 80% (State of Montana 1998, University of Maine 1996).

Although, best management practices do not completely eliminate water quality impacts, they do reduce impacts to acceptable levels. “Best management practices may not be completely effective, but they do provide a level of protection that the states and the Environmental Protection Agency judged sufficient to meet the goals of the Clean Water Act” (Ice and others 1997). “Audit results showed that 96 percent of the individual practices audited were effective in protecting soil and water resources” (State of Montana 1998). “When used, the forestry BMPs work well” (University of Maine 1996). Concern remains in some aspects of BMP compliance, however. For example, reports from Montana and Oregon both cited below average compliance rates with road maintenance, road drainage, and temporary crossings (State of Montana 1998, University of Maine 1996, State of Oregon 1999). These aspects of best management practices compliance may require additional education and compliance reviews. Although some excellent work is under way on assessing the effectiveness of best management practices, additional work is need is this area (Seyedbagheri 1996).

Currently, all Forest Service permanent and temporary roads needed for timber sales are designed and constructed using water, soil, and air best management practices that meet or exceed those required by individual States under Environmental Protection Agency

Fire regimes have become altered in some vegetation types because of increasing fuel loads and flammability. These changes in vegetation have resulted in habitat losses for species using open old growth and early seral stages such as the flammulated owl and northern goshawk (Smith 2000). Conversely, multi-storied, late-successional forested habitats preferred by species such as the northern spotted owl, pileated woodpecker, and American marten, have been enhanced in some areas.

Response activities for fire suppression in inventoried roadless areas have likely been more limited in the past, due in part to a lower priority being placed on rapid suppression of fires in these areas, relative to fires in roaded and more developed areas. Many of these areas have also had lower levels of commodity timber harvest, which can remove larger and more fire resistant trees, leaving smaller diameter, less fire resistant stems. Stand conditions within these areas may lie within or closer to the historic range of variability, and they may have more normal levels of fuel loading and stand composition and structure. The precise condition of these areas relative to risk of uncharacteristic wildland fire effects has not been determined, but estimates made indicated that approximately 8 million acres, or 14%, of inventoried roadless areas in all fire regimes may be at high risk of uncharacteristic wildfire effects. This compares to an estimate of 38 million acres or 20% of all NFS lands estimated to be at high risk. Further discussion relative to regional levels of risk can be found in the Fuel Management section in this chapter.

Many inventoried roadless areas include plant associations (for example Rocky Mountain lodgepole pine, spruce/fir/whitebark pine and true fir/hemlock) where long fire intervals (70 to 400 years) and stand-replacement fires are consistent with the historic range of variability. In many cases, these are associated with upper elevation fire regimes that encompass a significant amount of inventoried roadless areas. For example, in the western United States 32% and 39% of inventoried roadless areas are > 9,000 feet and 8000-9000 feet in elevation respectively. As exemplified by the 1988 Yellowstone fires, both uniform stand-replacing fire events and mosaic mixed severity fire events are possible in these areas.

For many terrestrial ecosystems, fire has played an important role in creating and maintaining suitable habitat at varying temporal and spatial scales. Many species evolved under the influence of recurrent fire, including stand replacing events, and their long-term persistence relies heavily on the maintenance of important habitat components by these disturbance events. For example, wildland fires that create habitat mosaics can improve foraging habitat for lynx (USDA Forest Service and others 2000a), wild turkey, black bear, elk, and northern goshawk (Smith 2000).

### *Alternative 1 - No Action*

Approximately 40% of the 58.5 million acres of inventoried roadless areas are covered by land management-plan prescriptions that currently prohibit road construction and reconstruction, while the other 60% does not. Projecting future roaded entry using historic levels of road construction, an additional 5% to 10% of inventoried roadless areas are likely to be entered within the next 20 years under Alternative 1. If this rate of entry continues, over the next century, this could equal 50% of inventoried roadless areas being

affected by roaded entry. The actual amount, however, would probably be much lower due to rugged terrain in many of these areas, and public controversy over entry into inventoried roadless areas.

An estimated 1,160 miles of permanent and temporary road construction or reconstruction is planned through 2004. Table 3-32 displays total planned offer volumes and miles of road construction and reconstruction through 2004, by alternative, both with and without the Tongass exemption. Timber harvest under this alternative would occur on an estimated 18,000 acres of inventoried roadless areas per year initially, dropping to about 14,000 acres annually in the long term.

The type and extent of impacts to terrestrial species and habitats from this road construction would depend on road location and design, mitigation measures applied, the activities that are enabled, the amount and kinds of other activities occurring in adjacent areas, current condition of species populations, and the kinds and intensities of natural and human-induced disturbances in the area. With application of current design standards and best management practices, the effects of these kinds of activities have been mitigated or avoided in many situations. Some effects, however, cannot be mitigated, such as increased levels of habitat fragmentation.

**Table 3-32. Total planned timber offer and miles of road construction and reconstruction for all activities through 2004, by alternative.**

| | Total planned offer (MMBF [a]) | | Total miles road construction/reconstruction | |
|---|---|---|---|---|
| Alternative | With Tongass National Forest exemption | Without Tongass National Forest exemption | With Tongass National Forest exemption | Without Tongass National Forest exemption |
| 1 | 1,100 | 1,100 | 1,160 | 1,160 |
| 2 | 840 | 300 | 597 | 293 |
| 3 | 700 | 160 | 597 | 293 |
| 4 | 0 | 0 | 597 | 293 |

[a] Million board feet

Some of the potential direct and indirect adverse effects of road construction and timber harvest include:

- Increased fragmentation and loss of connectivity,
- Adverse edge effects for some species,
- Habitat loss, and losses of habitat suitability and effectiveness for some species,
- Increased risk of introduction and establishment of nonnative invasive species, and
- Increased potential for negative interactions with humans and illegal collection or over harvest of some species.

Some of the potential beneficial effects of road construction and timber harvest include:

- Enhanced access for some plant and wildlife management activities (for example, census survey and collection, and structure maintenance),

- Easier access for habitat restoration and enhancement for some species through stand manipulation,
- Creation of edge habitat and early successional habitat used by some species, and
- Easier access for hunting and wildlife viewing activities.

Almost all roads present some level of benefits and risks. These effects can vary greatly in degree (USDA Forest Service 2000h), and can shift over time. Some effects are immediately apparent, but others may require external events, such as a large storm, to become visible. Still other effects may be subtle, such as increased susceptibility to invasion by nonnative species or pathogens noticed only when they become widespread in the landscape, or with increased road use as recreation styles and motor vehicles change (USDA Forest Service 2000h). A road-related beneficial effect for one species, may, in fact, represent an adverse effect for another. For example, although forest edges, such as those created by road construction and timber harvest, may benefit some species, such as deer and bobwhite quail, they also provide access to interior forest patches for opportunistic or predator species (Norse and others 1986).

Beneficial effects to terrestrial species from timber harvest activities are often due to creating or maintaining some specific habitat condition. Timber harvest creates forest age-class diversity and mosaic habitats used by some species (Wisdom and others 2000; USDA and others 2000; Southern Appalachian Man and the Biosphere 1996c; USDA Forest Service 1995a; USDI Fish and Wildlife Service 1990; USDI Fish and Wildlife Service 1976). Some species require early seral or open-forest habitats that can be created and maintained by properly planned, restorative timber harvest. Timber harvest activities may also reduce the risk of uncharacteristic large stand-replacing insect and disease outbreaks and severe wildland fires. These disturbance events, can present both benefits and risks to some species (Wisdom and others 2000; USDI Fish and Wildlife Service 1995a; USDA and others 1993), at least at a local level. Some examples of timber harvest potential beneficial effects include the following:

- Timber harvest can be used to benefit species like the red-cockaded woodpecker (USDA Forest Service 1995a), Florida scrub jay (USDI Fish and Wildlife Service 1990), and Kirtland's warbler (USDI Fish and Wildlife Service 1976) by creating and maintaining open forest or early seral conditions.
- The Mexican spotted owl may benefit from timber harvest activities that maintain and develop large old-growth pine habitats, and alleviate risk from wildland fire, insects, and disease (USDI Fish and Wildlife Service 1995a).
- The snowshoe hare, a primary lynx prey species, can benefit from properly planned regeneration harvests (USDA Forest Service and others 2000).
- Reynolds and others (1991) suggest that active management activities like tree thinning may be beneficial in producing and maintaining the desired conditions for sustaining goshawks and their prey species.

*Fragmentation and Connectivity* – Landscape fragmentation and loss of connectivity from road and timber harvest causes habitat loss, increases in edge effects, and increases in habitat isolation (British Columbia Ministry of Forest Research Program 1997). As described under the previous section on fragmentation, roads can increase forest fragmentation by breaking up large patches and converting interior forest into edge habitat (Reed and others 1996).

Forest fragmentation affects terrestrial species to different extents and at different scales. In studying fragmentation in Douglas fir forests in northwestern California, Rosenberg and Raphael (1986) found that species showing the most sensitivity to fragmentation included fisher, gray fox, spotted owl, and pileated woodpecker. As road construction, reconstruction, and timber harvest activities increase habitat fragmentation across large areas, populations of some species may become isolated into smaller groups, which increase the risk of local extirpations or extinctions (Noss and Cooperrider 1994). In examining the effects of road construction on wetland biodiversity, Findlay and Bourdages (2000) found increases in local extinction rates and decreases in re-colonization rates, with effects sometimes taking decades to be apparent.
Roads can fragment habitat for some invertebrates, particularly for less mobile, ground dwelling species. In the Klamath-Siskiyou province, researchers have identified habitat fragmentation for common land snails caused by roads and other land-disturbing activities (Frest personal communication). Reasons cited included microclimate changes on the road surface, loss of habitat complexity and structure, effective width of roads greater than actual width, and avoidance of exhaust residues, petroleum products, and other chemicals. Baur and Baur (1990) documented similar road avoidance findings for the land snail *Arianta arbustorum*, which avoids crossing even small, unpaved roads. Timber harvest, particularly where associated with extensive ground disturbance and canopy removal, may have adverse effects on some invertebrate populations (Frest 1993; Frest and Johannes 1995).

*Edge Effects* – Roads create environmental edges whose effects may extend well beyond the actual road. Loss of canopy along road corridors may result in greater temperature extremes, more exposure to winds, more direct sunlight within adjacent zones, and changes in relative humidity (Chen and others 1996; Chen and others 1993). The distance that this effect may extend is highly variable. The zone of disturbance related to road noise is estimated to be as great as one-half mile in forested areas (Forman and Deblinger 2000). Haskell (2000) found a large drop in abundance and diversity of macro invertebrate soil fauna close to NFS roads, with effects extending up to 100 meters into the forest.

Forest edges, such as those created by timber harvest and road construction, may benefit some species, such as deer and bobwhite quail. The close proximity of cover and forage areas at forest edges provides ideal habitat for many game species (see Game Species). However, edges also provide access to interior forest patches for opportunistic species, such as the brown-headed cowbird, with effects extending into forest interiors as far as 600 meters from an edge (Norse and others 1986). Cowbirds are implicated in the decline of certain songbirds in the Sierra Nevada, including the willow flycatcher, least Bell's vireo, yellow warbler, chipping sparrow, and song sparrow (Sierra Nevada Ecosystem Project 1996).

*Habitat Suitability and Effectiveness* – For some mammals, open road density has been shown to be indicative of habitat suitability, with increases in road density related to declines in habitat effectiveness and population viability (Noss and Cooperrider 1994). Some research has shown that the presence of a few large areas with low road density, even when found within an area with an overall high road density, is a key indicator of

suitable habitat for large vertebrates (Rudis 1995). Unroaded areas may provide important security habitat for some species year round. Black bear population size was shown to be negatively associated with road density in the Adirondack Mountains (USDA Forest Service 2000h). Road density is a major determining factor for suitability of habitat for grizzly bear, a species with a home range size of 50 to 300 square miles for females and 200 to 500 square miles for males (USDI Fish and Wildlife Service 1993).

With an expected increase in roaded access into these areas, a corresponding increase in human disturbance is expected. Potential for harassment, disruption, and poaching of some species would increase. Species, such as forest carnivores, that require sites free from human disturbance are likely to be adversely affected. Habitat effectiveness for deer and elk has been shown to decrease with increases in open road density in some areas (Thomas and others 1979). Rowland and others, (in press) found that female elk in the Starkey Experimental Forest consistently used areas away from open roads in spring and summer, and that spatial distribution and distance to roads were more accurate predictors of habitat effectiveness than overall road density.

In their proposal to list the Canada lynx under the ESA, the U.S. Fish and Wildlife Service (USDI Fish and Wildlife Service 1998b) found that this species is threatened by human alteration of forests and by increased levels of human access into lynx habitats. Factors identified as threats to this species included timber management, forest and **backcountry** roads and trails, fragmentation and degradation of lynx **refugia**, and habitat degradation by nonnative invasive plant species. The lynx was listed as threatened on March 24, 2000.

In evaluating species-road relationships for 91 vertebrate species in the Interior Columbia River Basin, Wisdom and others (2000) found that more than 70% of those species could be negatively affected by one or more factors associated with roads. They concluded, from their review of scientific literature, that there are numerous potential adverse effects related to road construction and use. Some of their findings include:

- Road construction converts large areas of habitat to nonhabitat (Hann and others 1997; Reed and others 1996).
- Loss of large trees, snags, and logs in areas adjacent to roads through commercial harvest or firewood cutting has adverse effects on cavity dependent birds and mammals (Hann and others 1997).
- Roads facilitate poaching (Cole and others 1997) of many large mammals such as caribou, pronghorn, mountain goat, bighorn sheep, wolf, and grizzly bear (Dood and others 1985; Knight and others 1988; McLellan and Shackleton 1988; Mech 1970; Stelfox 1971; Yoakum 1978).
- Roads provide access for chronic, negative interactions of humans with wolves and grizzly bears (Mace and others 1996; Mattson and others 1992; Thiel 1985), which increases mortality of both species and often causes high-quality habitats near roads to serve as population sinks (Mattson and others 1996; Mech 1973).
- Reptiles seek roads for thermal cooling and heating and experience substantial mortality from motorized vehicles (Vestjens 1973). Roads facilitate human access into habitats for collection and killing of reptiles.

- Many species are sensitive to harassment or human presence during particular seasons, with potential reductions in productivity, increases in energy expenditures, or displacements in population distribution or habitat use (Bennett 1991; Mader 1984).
- Roads often restrict the movements of small mammals (Mader 1984; Merriam and others 1988; Swihart and Slade 1984) and function as barriers to population dispersal (Oxley and Fenton 1974).

Trombulak and Frissell (2000) drew similar conclusions in their review of scientific literature on the ecological effects of roads. They identified seven general, potential effects of roads: mortality related to construction, mortality from being hit by vehicles, behavioral modifications, changes in the physical environment, changes in the chemical environment, introduction and establishment of nonnative species, and increased human use of roaded areas. They concluded that, although not all species and ecosystems are affected to the same degree by roads, in general, the presence of roads in an area is associated with negative effects for both terrestrial and aquatic ecosystems. These effects included detrimental changes in species distribution, composition, and population size.

Although only used for relatively short periods, temporary roads present most of the same risks posed by permanent roads, although some may be of shorter duration. Many of these roads are designed to lower standards than permanent roads, are typically not maintained to the same standards, and are associated with additional ground disturbance during their removal. Also, use of temporary roads in an area to support timber harvest or other activities often involves construction of multiple roads over time, providing a more continuous disturbance to the area than a single, well-designed, maintained, and use-regulated road. While temporary roads may be used for periods ranging up to ten years, and are then decommissioned, their short- and long-term effects can be extensive to terrestrial species and habitats.

In addition to posing many of the same risks as road construction, road reconstruction could result in substantial changes in the kinds and amount of human uses in an area. Improvements such as realignment or improving road surfacing or gradient to provide easy access for low clearance vehicles may promote increases in the amount of human disturbances and disruptions to species and habitats, exceeding those previously experienced before reconstruction.

*Early Successional Habitat* – Although early successional habitat is well represented in many parts of the country, questions have been raised in some areas relative to the potential effects of the road and timber harvest prohibitions on the availability of this type of habitat, particularly in the Eastern and Southern Forest Service regions. Early successional communities are characterized and shaped by differences in structure, composition, and successional pathways. Such communities can include grasslands, shrublands, semi-forested habitat, and open land communities within larger forest patches.

Types of disturbance affecting the development, availability, and distribution of some early successional habitat include natural processes and events such as fire, wind, insect and disease, and management-induced disturbance associated with land use practices,

significant ecological shifts in vegetation composition and structure, resulting in altered fire regimes by increasing fuel loads and flammability. As discussed under the Terrestrial Habitats and Species section, response activities for fire suppression in inventoried roadless areas have likely been more limited in the past due to a lower priority placed on rapid suppression of fires in these areas, relative to fires in roaded and more developed areas. When this is considered in conjunction with the lower level of past timber harvest activities in many of these areas, it is likely that stand conditions within these areas may lie within or closer to the historic range of variability, with more normal levels of fuel loading and stand composition and structure, as compared to conditions within roaded and more heavily timbered areas.

### *Alternative 1 - No Action*

Alternative 1 would have the greatest potential for additional aquatic habitat loss, degradation, and disturbance associated with roads, timber harvest, and other activities. Approximately 40% of the 58.5 million acres of inventoried roadless areas are covered by land-management plan prescriptions that currently prohibit road construction and reconstruction. Projecting future roaded entry using historic levels of road construction, an additional 5% to 10% of inventoried roadless areas are likely to be entered within the next 20 years under Alternative 1, predominantly in those areas currently open to road construction. The planned timber harvest offer of 1.1 BBF through 2004 would occur on approximately 90,000 acres. Table 3-32 displays planned offer volumes and miles of road construction or reconstruction through 2004, both with and without the Tongass exemption, for each alternative.

*Potential Effects from Roads* – Road construction, maintenance, use, and even the presence of roads in a watershed, can have numerous adverse effects to aquatic systems and the species they support. Recent changes in road designs and application of best management practices have been effective in some instances at moderating or avoiding many adverse effects. The discussion in this section captures the principal effects that have been associated with roads, but these are potential effects, and not every road would necessarily exhibit each or even many of these effects. The Physical Resources section provides a full discussion of potential geomorphic and hydrologic effects of roads on watershed and stream channel conditions.

These effects can potentially include (Furniss and others 1991; USDA Forest Service 2000h):

- Increasing sediment loads in streams;
- Modifying watershed hydrology and stream flows;
- Altering stream channel morphology;
- Increasing habitat fragmentation and loss of connectivity;
- Degrading water quality, including increasing chance of chemical pollution;
- Altering water temperature regimes.

These physical alterations can potentially result in a variety of adverse effects to aquatic species including:

- Loss of spawning and rearing habitat, and deep pools, from excess sediment deposition;
- Increased mortality of eggs and young from lower levels of oxygen in stream gravels;
- Increased susceptibility to disease and predation;
- Increased reproductive failure;
- Shifts in macro invertebrate communities to those tolerating increased sediment or other types of diminished water quality;
- Increased susceptibility to over harvest and poaching;
- Loss of protective cover and resting habitat through changes in channel structure including large woody debris, overhanging banks, and deep pools;
- Competition from nonnative species;
- Loss of habitat caused by habitat degradation, barriers to passage, increased gradient, high temperatures, and other factors; and
- Increased vulnerability of subpopulations to catastrophic events and loss of genetic fitness, related to loss of habitat connectivity.

Trombulak and Frissell (2000) concluded that, although all species and ecosystems are not affected to the same degree by roads, in general, the presence of roads in an area is associated with negative effects for both terrestrial and aquatic ecosystems including changes in species composition and population size.

Temporary roads present most of the same risks posed by permanent roads, although some may be of shorter duration. Many of these roads are designed to lower standards than permanent roads, are typically not maintained to the same standards, and are associated with additional ground disturbance during their removal. Also, use of temporary roads in a watershed to support timber harvest or other activities often involves construction of multiple roads over time, providing a more continuous disturbance to the watershed than a single, well-designed, maintained, and use-regulated road. While temporary roads may be used temporarily, for periods ranging up to 10 years before decommissioning, their short- and long-term effects on aquatic species and habitats can be extensive.

*Potential Effects of Timber Harvest* - The effects of activities associated with timber harvesting (e.g., tree felling, yarding, landings, site preparation by burning or scarification, fuels reduction, brush removal and whip felling, and forest regeneration) are often difficult to separate from the effects of roads and road construction. The road systems developed to harvest timber are often a significant factor affecting aquatic habitats, as discussed above. Some of the potential effects to aquatic habitat from timber harvest can include the following (Chamberlin and others 1991, Hicks and others 1991, Beschta and others 1987):

- Increasing sediment supply and storage in channels,
- Modifying watershed hydrology and streamflow, including the timing or magnitude of runoff events,
- Decreasing stream bank stability, and altering stream channel morphology,
- Degrading water quality,
- Altering energy relationships involving water temperature, snowmelt and freezing,
- Diminishing habitat complexity, and
- Altering riparian composition and function