United States Department of Agriculture

Forest Service

January 2021

# REDD BULL

## Environmental Assessment

**Superior Ranger District, Lolo National Forest**
**Mineral County, Montana**



**For More Information Contact:**

Project Leader Pat Partyka (patricia.partyka@usda.gov)

Plains/Thompson Falls Ranger District
P.O. Box 429
Plains, MT 59859

Telephone: 406-826-3821

Superior District Ranger Carole Johnson (carole.johnson@usda.gov)

Superior Falls Ranger District
P.O. Box 460
Superior, MT 59872

Telephone: 406-822-4233

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at http://www.ascr.usda.gov/complaint_filing_cust.html and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by:

(1) mail: U.S. Department of Agriculture
Office of the Assistant Secretary for Civil Rights
1400 Independence Avenue, SW
Washington, D.C. 20250-9410;

(2) fax: (202) 690-7442; or

(3) Email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer, and lender.

# Contents

UPDATES TO THE ENVIRONMENTAL ASSESSMENT ... 1
CHAPTER 1: PURPOSE AND NEED FOR ACTION ... 1
1.1 Introduction ... 1
1.2 Background and Setting ... 2
1.3 Purpose and Need for Action ... 3
1.4 Original Proposed Action ... 8
1.4.1 Design Criteria ... 8
1.5 Public Involvement ... 9
1.5.1 Issue Resolution ... 10
CHAPTER 2: ALTERNATIVES ... 17
CHAPTER 3: ENVIRONMENTAL EFFECTS ... 31
3.1 Past, Present, and Reasonably Foreseeable Future Actions ... 31
3.2 Vegetation ... 33
3.2.1 Resilient Vegetative Conditions ... 33
3.2.2 Old Growth ... 39
3.2.3 Weeds ... 44
3.2.4 Botany ... 46
3.3 Fire and Fuels ... 50
3.4 Soils ... 62
3.5 Hydrology ... 68
3.6 Fisheries ... 79
3.7 Wildlife ... 85
3.8 Transportation System ... 121
3.9 Economics ... 124
3.10 Roadless ... 128
3.11 Recreation ... 156
Literature Cited ... 163

Appendix A: Maps

Appendix B: Detailed Vegetation Treatments

Appendix C: Resource Protection Measures and Monitoring

Appendix D: Science Basis for Vegetation Restoration Treatments

Appendix E: Forest Plan Amendments and associated maps

Under Alternative 3, recurrent maintenance on NFSR 3848 would be more costly than typical forest roads due to the relatively steep grades that naturally develop more erosion and wash-boarding. More frequent blading would be required to maintain the level of driver comfort currently provided by the existing NFSR 221 route.

Based on experience with similar treatments elsewhere on the Forest, the surface hardening on the 2.5 segment of NFSR 221 would remain effective for several years, but would eventually require maintenance. The low traffic volume and speed on the road would help extend the longevity of the treatment.

### *Forest Plan Consistency*

Alternatives 2, 3, and 4 are consistent with the Lolo Forest Plan. A project-specific travel analysis was conducted to ensure roads within the project area would be the minimum number and meet the design standards to provide for safety and to meet user and resource needs (Forest-wide standard 49, page II-17). Roads within the project area would be managed to provide for resource protection, wildlife needs, commodity removal, and a wide range of recreation opportunities (Forest-wide standard 52, page II-18).

## 3.9 Economics

Three factors were considered in the economic analysis: project feasibility which addresses only the timber harvest component of this project; financial efficiency, which addresses present net value (PNV) or the net monetary costs and benefits of the project; and economic impacts, which are the effects of this project on local jobs and labor income.

*Project feasibility* is used to determine if the timber harvest would be feasible, that is, would it sell, given current market conditions. The determination of feasibility relies on a residual value analysis (price of the timber = revenues – costs) that uses local delivered log prices and stump-to-mill costs. The appraised stumpage rate from this analysis is compared to the base (minimum) rate. The project is considered feasible if the appraised stumpage rate exceeds the base rate.

*Financial efficiency* provides information relevant to the future financial position of the government as the project is implemented. Financial efficiency considers anticipated Forest Service costs and revenues. PNV is the difference between the present value of the revenues and present value of the costs. PNV converts costs and revenues over the entire time frame of the project into a single figure for a selected year. A positive PNV means that the project would generate more financial revenues than financial costs. The NEPA planning is a sunk cost at the time of the decision and is not included in the PNV analysis.

Financial efficiency analysis is not intended to be a comprehensive analysis that incorporates monetary expressions of all known market and non-market benefits and costs. Many of the values associated with natural resource management are best handled apart from, but in conjunction with, a more limited financial efficiency framework. These non-market benefits and costs associated with the project are discussed throughout the various resource sections of this EA.

*Economic impacts* are used to evaluate potential direct, indirect, and cumulative effects of the project on the economy. They are measured by estimating the direct jobs and labor income generated by 1) the processing of the timber volume from the project and 2) Forest Service expenditures for contracted other activities. The direct economic and labor income benefit employees and their families and, therefore, directly affect the local economy. Additional indirect and induced multiplier effects (ripple effects) are generated by the direct activities. Indirect effects are felt by the producers of materials

used by the directly affected industries. Induced effects occur when employees of the directly and indirectly affected industries spend the wages they receive. Together the direct and multiplier effects comprise the total economic impacts to the local economy.

Economic impacts are estimated using input-output analysis, which is a means of examining relationships within an economy, both between businesses and between businesses and final consumers. It captures all monetary market transactions for consumption in a given time period. The resulting mathematical representation allows one to examine the effect of a change in one or several economic activities on an entire economy, all else constant. The model used for this analysis is the 2017 IMPLAN data in conjunction with response coefficients that relate timber harvest quantity to direct jobs and income (Sorenson et al. 2016). IMPLAN translates changes in final demand for goods and services into resulting changes in economic effects, such as labor income and employment of the affected area's economy.

Data used to estimate the direct effects from the timber harvesting and processing were provided by the University of Montana's Bureau of Business and Economic Research (BBER) (Sorenson et al. 2016). This national dataset is broken into multi-state regions and is considered more accurate than that which is available from IMPLAN. The Northern Rockies BBER Region (Montana and Idaho) is used for this analysis. The BBER data represents the results of mill censuses that correlate production, employment, and labor income. The economic impact area for this analysis consists of Mineral and Sanders Counties. Potential limitations of these estimates are the time lag in IMPLAN and the uncertainty of where the timber will ultimately be processed. The analysis assumes the harvested timber volume would be processed in the Mineral and Sanders County impact area. However, if some of the timber were processed outside the region, then a portion of the jobs and income would be lost by this regional economy.

**Table 3.9-1 Project Feasibility and Financial Efficiency Summary (2018 dollars)**

| Category | Measure | Alternative 2 | Alternative 3 | Alternative 4 |
|---|---|---|---|---|
| Timber Harvest Information | Acres Harvested* | 13,136 | 10,701 | 12,514 |
| | Volume Harvested* (CCF) | 223,329 | 181,917 | 212,755 |
| | Base Rates ($/CCF) | $17.35 | $20.12 | $19.54 |
| | Appraised Stumpage Rate ($/CCF) | $19.17 | $17.74 | $19.89 |
| | Predicted High Bid ($/CCF) | $24.82 | $23.39 | $25.54 |
| | Total Revenue | $5,542,000 | $4,255,000 | $5,434,000 |
| Timber Harvest & Required Design Criteria | PNV | $412,000 | $109,000 | $527,000 |
| Timber Harvest & All Other Resource Activities | PNV | -$8,906,000 | -$8,638,000 | -$8,627,000 |

* Volume and acres are estimations
CCF= hundred cubic feet

**Table 3.9-2: Total Employment and Labor Income over the Life of the Project***

| Non-Timber Harvest-related Activities | Alternative 2 | | Alternative 3 | | Alternative 4 | |
|---|---|---|---|---|---|---|
| **Part and Full Time Jobs Contributed** | **Total** | **Annual** | **Total** | **Annual** | **Total** | **Annual** |
| Direct | 63 | 6 | 64 | 6 | 70 | 7 |
| Indirect and Induced | 35 | 4 | 35 | 3 | 37 | 4 |
| **Total** | 98 | 10 | 99 | 9 | 106 | 11 |
| **Labor Income Contributed ($)** | | | | | | |
| Direct | $3,623,000 | $362,000 | $3,592,000 | $359,000 | $3,802,000 | $380,000 |
| Indirect and Induced | $1,215,000 | $121,000 | $1,199,000 | $120,000 | $1,265,000 | $126,000 |
| **Total** | $4,838,000 | $484,000 | $4,791,000 | $479,000 | $5,067,000 | $507,000 |
| **Timber Harvest and Processing** | **Alternative 2** | | **Alternative 3** | | **Alternative 4** | |
| **Part and Full Time Jobs Contributed** | **Total** | **Annual** | **Total** | **Annual** | **Total** | **Annual** |
| Direct | 569 | 81 | 464 | 66 | 543 | 78 |
| Indirect and Induced | 794 | 113 | 646 | 92 | 756 | 108 |
| **Total** | 1,363 | 195 | 1,110 | 159 | 1,299 | 186 |
| **Labor Income Contributed ($)** | | | | | | |
| Direct | $28,273,000 | $4,039,000 | $23,030,000 | $3,290,000 | $26,934,000 | $3,848,000 |
| Indirect and Induced | $29,855,000 | $4,265,000 | $24,319,000 | $3,474,000 | $28,442,000 | $4,063,000 |
| **Total** | $58,128,000 | $8,304,000 | $47,349,000 | $6,764,000 | $55,376,000 | $7,911,000 |
| **All Activities** | **Alternative 2** | | **Alternative 3** | | **Alternative 3** | |
| **Part and Full Time Jobs Contributed** | **Total** | **Annual** | **Total** | **Annual** | **Total** | **Annual** |
| Direct | 632 | 88 | 528 | 73 | 612 | 84 |
| Indirect and Induced | 829 | 117 | 681 | 96 | 793 | 112 |
| **Total** | 1,461 | 205 | 1,209 | 169 | 1,405 | 196 |
| **Labor Income Contributed ($)** | | | | | | |
| Direct | $31,896,000 | $4,401,000 | $26,622,000 | $3,649,000 | $30,737,000 | $4,228,000 |
| Indirect and Induced | $31,070,000 | $4,386,000 | $25,518,000 | $3,594,000 | $29,706,000 | $4,190,000 |
| **Total** | $62,966,000 | $8,788,000 | $52,141,000 | $7,243,000 | $60,443,000 | $8,418,000 |

* It is important to note that these may not be new jobs or income, but rather jobs and income supported by this project.

**Part and Full Time Jobs Contributed** is the total full and part-time wage, salaried, and self-employed jobs contributed to the economic impact area from the change in final demand associated with this project.

**Labor Income Contributed** includes the wages, salaries and benefits of workers who are paid by employers and income paid to proprietors in the economic impact area from the change in final demand associated with this project.

**Direct effects** represent the impacts for the expenditures and/or production values specified as direct final demand changes.
**Indirect effects** represent the impacts caused by the iteration of industries purchasing from industries resulting from direct final demand changes.
**Induced effects** represent the impacts of all local industries caused by the expenditures of new household income generated by the direct and indirect effects of final demand changes.
**Total effects** are the sum of direct, indirect, and induced effects.

### *Alternative 1: Direct, Indirect, and Cumulative Effects*

Under Alternative 1, no activities would occur. Thus, the public would incur no costs or realize any benefits of improved forest health, watershed, and wildlife habitat, reduced fuels, and recreation improvements in this area. Alternative 1 would yield a present net value of $0. However, there would be no return on the planning costs that have already been incurred.

Alternative 1 would support no direct, indirect, or induced employment, and no labor income contribution to local economies. This alternative has the potential to contribute to the decline of timber-related employment in the rural communities of the economic impact area. Decline in timber harvest from NFS lands could potentially impact wood product employment and associated indirect and induced employment.

### *Alternatives 2, 3, and 4: Direct and Indirect Effects*

*Project Feasibility*
The appraised stumpage rate from the feasibility analysis was compared to base rates. As displayed in Table 3.9-1, the appraised stumpage rate for Alternatives 2 and 4 is greater than the base rate, indicating that these alternatives are feasible (likely to sell). However, for Alternative 3, the appraised stumpage is less than the base rates, indicating this alternative is not feasible under the given cost and revenue estimates. In Alternative 3, the timber volume to be harvested isn't sufficient enough to generate the revenue to pay for the post-harvest activities such as site preparation burning and planting. The costs of post-harvest activities and roads would need to be reduced and/or the timber volume would need to be increased in order for Alternative 3 to become feasible.

*Financial Efficiency*
The financial efficiency analysis is specific to the timber harvest and other activities (as directed in Forest Service Manual 2400-Timber Management and guidance found in Forest Service Handbook 2409.18). Costs for sale preparation, sale administration, regeneration, and vegetation restoration activities are included. If exact costs were not known, the maximum of the cost range was used to produce the most conservative PNV result. If actual costs are lower, all else equal, PNV would be higher than the estimates in Table 3.9-1. The expected revenue for the project is the corresponding predicted high bid from the sale feasibility analysis. The predicted high bid is used for the expected revenue (rather than the appraised stumpage rate) since the predicted high bid is the best estimate of the high bid resulting from the timber sale auction.

Because not all costs of the project are related to the timber sale, two PNVs were calculated. One PNV indicates the financial efficiency of the alternatives, including all costs and revenues associated with the timber harvest and required design criteria. A second PNV includes all costs for the alternatives with the required design criteria and for the timber harvest and all other resource activities (e.g., non-commercial thinning, prescribed burning, watershed and recreation improvements).

Results shown in Table 3.9-1 indicate that all action alternatives are financially efficient (positive PNV) for the timber harvest with designed criteria. However, they are financially inefficient (negative PNV) when the other resource activities are added to the timber harvest.

The Responsible Official takes many factors into account in making the decision. When evaluating trade-offs, the use of efficiency measures is just one factor that is considered.

*Economic Impacts*

Alternatives 2, 3, and 4 would support existing jobs through timber harvest-related and other non-commercial activities. Table 3.9-2 displays the direct, indirect and induced, and total estimates for employment (part and full-time) and labor income that may be attributed to the project. Alternative 2 would produce the most jobs and labor income, followed by Alternatives 4 and 3 (Table 3.9-2). The majority of jobs and labor income would stem from the vegetative treatments that yield timber products. Since the expenditures would occur over time, the estimated impacts of jobs and labor income would be spread out over the life of the project. It is important to note that these may not be new jobs or income, but rather jobs and income that are supported by this project.

### *Cumulative Effects*

Management of the Lolo National Forest has an impact on the economies of local counties. However, there are many additional factors that influence and affect the local economies, including changes to industry technologies, management of adjacent National Forests and private lands, economic growth and international trade. The project would provide a variety of opportunities for contracts that may contribute to the local economy and have the potential to attract new business and residents and retain existing businesses and residents.

In addition, there are other foreseeable future Forest Service projects within Mineral County and counties closest to the project area that are in various stages of planning that potentially may add to the Forest's annual timber offerings during the time of implementation of the project. These ongoing and foreseeable projects are expected to add cumulatively to the employment and income of the economic impact area within the life of the Redd Bull project.

### *Forest Plan Consistency*

Consistent with the Forest Plan, an economic analysis has been completed that includes the probable marketability (i.e. economic feasibility) of the commercial timber harvest portion of the project (Forest-wide standard 11, Forest Plan page II-11). The project also contributes to one of the Forest Plan's goals to provide a sustained yield of timber and other outputs at a level that will help to support the economic structure of local communities (Forest Plan, page II-1).

## 3.10 Roadless

Approximately 21,182 acres (26 percent) of NFS land in the Redd Bull project area overlaps 3 inventoried roadless areas (IRAs) (see maps in Appendix A):

- Marble Point (12,607 acres). Redd Bull includes the entire IRA.
- Ward Eagle (4,843 acres). Redd Bull overlaps about 57 percent of the 8,570-acre IRA.
- Sheep Mountain-Stateline (3,732 acres). Redd Bull overlaps approximately 6 percent of the 67,479-acre IRA.

The Wilderness Act of 1964 created the National Wilderness Preservation System. In addition to designating nine million acres of NFS land as wilderness, the Act directed the Secretary of Agriculture to complete a study of 34 administratively designated 'primitive areas' and determine their suitability for wilderness designation.

# Summary for Policymakers

SPM

# Summary for Policymakers

**Drafting Authors:**

Myles Allen (UK), Mustafa Babiker (Sudan), Yang Chen (China), Heleen de Coninck (Netherlands/EU), Sarah Connors (UK), Renée van Diemen (Netherlands), Opha Pauline Dube (Botswana), Kristie L. Ebi (USA), Francois Engelbrecht (South Africa), Marion Ferrat (UK/France), James Ford (UK/Canada), Piers Forster (UK), Sabine Fuss (Germany), Tania Guillén Bolaños (Germany/Nicaragua), Jordan Harold (UK), Ove Hoegh-Guldberg (Australia), Jean-Charles Hourcade (France), Daniel Huppmann (Austria), Daniela Jacob (Germany), Kejun Jiang (China), Tom Gabriel Johansen (Norway), Mikiko Kainuma (Japan), Kiane de Kleijne (Netherlands/EU), Elmar Kriegler (Germany), Debora Ley (Guatemala/Mexico), Diana Liverman (USA), Natalie Mahowald (USA), Valérie Masson-Delmotte (France), J. B. Robin Matthews (UK), Richard Millar (UK), Katja Mintenbeck (Germany), Angela Morelli (Norway/Italy), Wilfran Moufouma-Okia (France/Congo), Luis Mundaca (Sweden/Chile), Maike Nicolai (Germany), Chukwumerije Okereke (UK/Nigeria), Minal Pathak (India), Antony Payne (UK), Roz Pidcock (UK), Anna Pirani (Italy), Elvira Poloczanska (UK/Australia), Hans-Otto Pörtner (Germany), Aromar Revi (India), Keywan Riahi (Austria), Debra C. Roberts (South Africa), Joeri Rogelj (Austria/Belgium), Joyashree Roy (India), Sonia I. Seneviratne (Switzerland), Priyadarshi R. Shukla (India), James Skea (UK), Raphael Slade (UK), Drew Shindell (USA), Chandni Singh (India), William Solecki (USA), Linda Steg (Netherlands), Michael Taylor (Jamaica), Petra Tschakert (Australia/Austria), Henri Waisman (France), Rachel Warren (UK), Panmao Zhai (China), Kirsten Zickfeld (Canada).

**This Summary for Policymakers should be cited as:**

IPCC, 2018: Summary for Policymakers. In: *Global Warming of 1.5°C. An IPCC Special Report on the impacts of global warming of 1.5°C above pre-industrial levels and related global greenhouse gas emission pathways, in the context of strengthening the global response to the threat of climate change, sustainable development, and efforts to eradicate poverty* [Masson-Delmotte, V., P. Zhai, H.-O. Pörtner, D. Roberts, J. Skea, P.R. Shukla, A. Pirani, W. Moufouma-Okia, C. Péan, R. Pidcock, S. Connors, J.B.R. Matthews, Y. Chen, X. Zhou, M.I. Gomis, E. Lonnoy, T. Maycock, M. Tignor, and T. Waterfield (eds.)]. In Press.

# Introduction

This Report responds to the invitation for IPCC '... to provide a Special Report in 2018 on the impacts of global warming of 1.5°C above pre-industrial levels and related global greenhouse gas emission pathways' contained in the Decision of the 21st Conference of Parties of the United Nations Framework Convention on Climate Change to adopt the Paris Agreement.[1]

The IPCC accepted the invitation in April 2016, deciding to prepare this Special Report on the impacts of global warming of 1.5°C above pre-industrial levels and related global greenhouse gas emission pathways, in the context of strengthening the global response to the threat of climate change, sustainable development, and efforts to eradicate poverty.

This Summary for Policymakers (SPM) presents the key findings of the Special Report, based on the assessment of the available scientific, technical and socio-economic literature[2] relevant to global warming of 1.5°C and for the comparison between global warming of 1.5°C and 2°C above pre-industrial levels. The level of confidence associated with each key finding is reported using the IPCC calibrated language.[3] The underlying scientific basis of each key finding is indicated by references provided to chapter elements. In the SPM, knowledge gaps are identified associated with the underlying chapters of the Report.

# A. Understanding Global Warming of 1.5°C[4]

**A.1 Human activities are estimated to have caused approximately 1.0°C of global warming[5] above pre-industrial levels, with a *likely* range of 0.8°C to 1.2°C. Global warming is *likely* to reach 1.5°C between 2030 and 2052 if it continues to increase at the current rate. (*high confidence*) (Figure SPM.1) {1.2}**

A.1.1 Reflecting the long-term warming trend since pre-industrial times, observed global mean surface temperature (GMST) for the decade 2006–2015 was 0.87°C (*likely* between 0.75°C and 0.99°C)[6] higher than the average over the 1850–1900 period (*very high confidence*). Estimated anthropogenic global warming matches the level of observed warming to within ±20% (*likely range*). Estimated anthropogenic global warming is currently increasing at 0.2°C (*likely* between 0.1°C and 0.3°C) per decade due to past and ongoing emissions (*high confidence*). {1.2.1, Table 1.1, 1.2.4}

A.1.2 Warming greater than the global annual average is being experienced in many land regions and seasons, including two to three times higher in the Arctic. Warming is generally higher over land than over the ocean. (*high confidence*) {1.2.1, 1.2.2, Figure 1.1, Figure 1.3, 3.3.1, 3.3.2}

A.1.3 Trends in intensity and frequency of some climate and weather extremes have been detected over time spans during which about 0.5°C of global warming occurred (*medium confidence*). This assessment is based on several lines of evidence, including attribution studies for changes in extremes since 1950. {3.3.1, 3.3.2, 3.3.3}

---

1 Decision 1/CP.21, paragraph 21.

2 The assessment covers literature accepted for publication by 15 May 2018.

3 Each finding is grounded in an evaluation of underlying evidence and agreement. A level of confidence is expressed using five qualifiers: very low, low, medium, high and very high, and typeset in italics, for example, *medium confidence*. The following terms have been used to indicate the assessed likelihood of an outcome or a result: virtually certain 99–100% probability, very likely 90–100%, likely 66–100%, about as likely as not 33–66%, unlikely 0–33%, very unlikely 0–10%, exceptionally unlikely 0–1%. Additional terms (extremely likely 95–100%, more likely than not >50–100%, more unlikely than likely 0–<50%, extremely unlikely 0–5%) may also be used when appropriate. Assessed likelihood is typeset in italics, for example, *very likely*. This is consistent with AR5.

4 See also Box SPM.1: Core Concepts Central to this Special Report.

5 Present level of global warming is defined as the average of a 30-year period centred on 2017 assuming the recent rate of warming continues.

6 This range spans the four available peer-reviewed estimates of the observed GMST change and also accounts for additional uncertainty due to possible short-term natural variability. {1.2.1, Table 1.1}

**A.2 Warming from anthropogenic emissions from the pre-industrial period to the present will persist for centuries to millennia and will continue to cause further long-term changes in the climate system, such as sea level rise, with associated impacts (*high confidence*), but these emissions alone are *unlikely* to cause global warming of 1.5°C (*medium confidence*). (Figure SPM.1) {1.2, 3.3, Figure 1.5}**

A.2.1 Anthropogenic emissions (including greenhouse gases, aerosols and their precursors) up to the present are *unlikely* to cause further warming of more than 0.5°C over the next two to three decades (*high confidence*) or on a century time scale (*medium confidence*). {1.2.4, Figure 1.5}

A.2.2 Reaching and sustaining net zero global anthropogenic $CO_2$ emissions and declining net non-$CO_2$ radiative forcing would halt anthropogenic global warming on multi-decadal time scales (*high confidence*). The maximum temperature reached is then determined by cumulative net global anthropogenic $CO_2$ emissions up to the time of net zero $CO_2$ emissions (*high confidence*) and the level of non-$CO_2$ radiative forcing in the decades prior to the time that maximum temperatures are reached (*medium confidence*). On longer time scales, sustained net negative global anthropogenic $CO_2$ emissions and/or further reductions in non-$CO_2$ radiative forcing may still be required to prevent further warming due to Earth system feedbacks and to reverse ocean acidification (*medium confidence*) and will be required to minimize sea level rise (*high confidence*). {Cross-Chapter Box 2 in Chapter 1, 1.2.3, 1.2.4, Figure 1.4, 2.2.1, 2.2.2, 3.4.4.8, 3.4.5.1, 3.6.3.2}

**A.3 Climate-related risks for natural and human systems are higher for global warming of 1.5°C than at present, but lower than at 2°C (*high confidence*). These risks depend on the magnitude and rate of warming, geographic location, levels of development and vulnerability, and on the choices and implementation of adaptation and mitigation options (*high confidence*). (Figure SPM.2) {1.3, 3.3, 3.4, 5.6}**

A.3.1 Impacts on natural and human systems from global warming have already been observed (*high confidence*). Many land and ocean ecosystems and some of the services they provide have already changed due to global warming (*high confidence*). (Figure SPM.2) {1.4, 3.4, 3.5}

A.3.2 Future climate-related risks depend on the rate, peak and duration of warming. In the aggregate, they are larger if global warming exceeds 1.5°C before returning to that level by 2100 than if global warming gradually stabilizes at 1.5°C, especially if the peak temperature is high (e.g., about 2°C) (*high confidence*). Some impacts may be long-lasting or irreversible, such as the loss of some ecosystems (*high confidence*). {3.2, 3.4.4, 3.6.3, Cross-Chapter Box 8 in Chapter 3}

A.3.3 Adaptation and mitigation are already occurring (*high confidence*). Future climate-related risks would be reduced by the upscaling and acceleration of far-reaching, multilevel and cross-sectoral climate mitigation and by both incremental and transformational adaptation (*high confidence*). {1.2, 1.3, Table 3.5, 4.2.2, Cross-Chapter Box 9 in Chapter 4, Box 4.2, Box 4.3, Box 4.6, 4.3.1, 4.3.2, 4.3.3, 4.3.4, 4.3.5, 4.4.1, 4.4.4, 4.4.5, 4.5.3}

## Cumulative emissions of $CO_2$ and future non-$CO_2$ radiative forcing determine the probability of limiting warming to 1.5°C




Faster immediate $CO_2$ emission reductions limit cumulative $CO_2$ emissions shown in panel **(c)**.

Maximum temperature rise is determined by cumulative net $CO_2$ emissions and net non-$CO_2$ radiative forcing due to methane, nitrous oxide, aerosols and other anthropogenic forcing agents.

**Figure SPM.1 |** Panel a: Observed monthly global mean surface temperature (GMST, grey line up to 2017, from the HadCRUT4, GISTEMP, Cowtan–Way, and NOAA datasets) change and estimated anthropogenic global warming (solid orange line up to 2017, with orange shading indicating assessed *likely* range). Orange dashed arrow and horizontal orange error bar show respectively the central estimate and *likely* range of the time at which 1.5°C is reached if the current rate of warming continues. The grey plume on the right of panel a shows the *likely* range of warming responses, computed with a simple climate model, to a stylized pathway (hypothetical future) in which net $CO_2$ emissions (grey line in panels b and c) decline in a straight line from 2020 to reach net zero in 2055 and net non-$CO_2$ radiative forcing (grey line in panel d) increases to 2030 and then declines. The blue plume in panel a) shows the response to faster $CO_2$ emissions reductions (blue line in panel b), reaching net zero in 2040, reducing cumulative $CO_2$ emissions (panel c). The purple plume shows the response to net $CO_2$ emissions declining to zero in 2055, with net non-$CO_2$ forcing remaining constant after 2030. The vertical error bars on right of panel a) show the *likely* ranges (thin lines) and central terciles (33rd – 66th percentiles, thick lines) of the estimated distribution of warming in 2100 under these three stylized pathways. Vertical dotted error bars in panels b, c and d show the *likely* range of historical annual and cumulative global net $CO_2$ emissions in 2017 (data from the Global Carbon Project) and of net non-$CO_2$ radiative forcing in 2011 from AR5, respectively. Vertical axes in panels c and d are scaled to represent approximately equal effects on GMST. {1.2.1, 1.2.3, 1.2.4, 2.3, Figure 1.2 and Chapter 1 Supplementary Material, Cross-Chapter Box 2 in Chapter 1}

# B. Projected Climate Change, Potential Impacts and Associated Risks

**B.1 Climate models project robust[7] differences in regional climate characteristics between present-day and global warming of 1.5°C,[8] and between 1.5°C and 2°C.[8] These differences include increases in: mean temperature in most land and ocean regions (*high confidence*), hot extremes in most inhabited regions (*high confidence*), heavy precipitation in several regions (*medium confidence*), and the probability of drought and precipitation deficits in some regions (*medium confidence*). {3.3}**

B.1.1 Evidence from attributed changes in some climate and weather extremes for a global warming of about 0.5°C supports the assessment that an additional 0.5°C of warming compared to present is associated with further detectable changes in these extremes (*medium confidence*). Several regional changes in climate are assessed to occur with global warming up to 1.5°C compared to pre-industrial levels, including warming of extreme temperatures in many regions (*high confidence*), increases in frequency, intensity, and/or amount of heavy precipitation in several regions (*high confidence*), and an increase in intensity or frequency of droughts in some regions (*medium confidence*). {3.2, 3.3.1, 3.3.2, 3.3.3, 3.3.4, Table 3.2}

B.1.2 Temperature extremes on land are projected to warm more than GMST (*high confidence*): extreme hot days in mid-latitudes warm by up to about 3°C at global warming of 1.5°C and about 4°C at 2°C, and extreme cold nights in high latitudes warm by up to about 4.5°C at 1.5°C and about 6°C at 2°C (*high confidence*). The number of hot days is projected to increase in most land regions, with highest increases in the tropics (*high confidence*). {3.3.1, 3.3.2, Cross-Chapter Box 8 in Chapter 3}

B.1.3 Risks from droughts and precipitation deficits are projected to be higher at 2°C compared to 1.5°C of global warming in some regions (*medium confidence*). Risks from heavy precipitation events are projected to be higher at 2°C compared to 1.5°C of global warming in several northern hemisphere high-latitude and/or high-elevation regions, eastern Asia and eastern North America (*medium confidence)*. Heavy precipitation associated with tropical cyclones is projected to be higher at 2°C compared to 1.5°C global warming (*medium confidence*). There is generally *low confidence* in projected changes in heavy precipitation at 2°C compared to 1.5°C in other regions. Heavy precipitation when aggregated at global scale is projected to be higher at 2°C than at 1.5°C of global warming (*medium confidence*). As a consequence of heavy precipitation, the fraction of the global land area affected by flood hazards is projected to be larger at 2°C compared to 1.5°C of global warming (*medium confidence*). {3.3.1, 3.3.3, 3.3.4, 3.3.5, 3.3.6}

**B.2 By 2100, global mean sea level rise is projected to be around 0.1 metre lower with global warming of 1.5°C compared to 2°C (*medium confidence*). Sea level will continue to rise well beyond 2100 (*high confidence*), and the magnitude and rate of this rise depend on future emission pathways. A slower rate of sea level rise enables greater opportunities for adaptation in the human and ecological systems of small islands, low-lying coastal areas and deltas (*medium confidence*). {3.3, 3.4, 3.6}**

B.2.1 Model-based projections of global mean sea level rise (relative to 1986–2005) suggest an indicative range of 0.26 to 0.77 m by 2100 for 1.5°C of global warming, 0.1 m (0.04–0.16 m) less than for a global warming of 2°C (*medium confidence*). A reduction of 0.1 m in global sea level rise implies that up to 10 million fewer people would be exposed to related risks, based on population in the year 2010 and assuming no adaptation (*medium confidence*). {3.4.4, 3.4.5, 4.3.2}

B.2.2 Sea level rise will continue beyond 2100 even if global warming is limited to 1.5°C in the 21st century (*high confidence*). Marine ice sheet instability in Antarctica and/or irreversible loss of the Greenland ice sheet could result in multi-metre rise in sea level over hundreds to thousands of years. These instabilities could be triggered at around 1.5°C to 2°C of global warming (*medium confidence*). (Figure SPM.2) {3.3.9, 3.4.5, 3.5.2, 3.6.3, Box 3.3}

---

7 Robust is here used to mean that at least two thirds of climate models show the same sign of changes at the grid point scale, and that differences in large regions are statistically significant.

8 Projected changes in impacts between different levels of global warming are determined with respect to changes in global mean surface air temperature.

FS-001414

B.2.3 Increasing warming amplifies the exposure of small islands, low-lying coastal areas and deltas to the risks associated with sea level rise for many human and ecological systems, including increased saltwater intrusion, flooding and damage to infrastructure (*high confidence*). Risks associated with sea level rise are higher at 2°C compared to 1.5°C. The slower rate of sea level rise at global warming of 1.5°C reduces these risks, enabling greater opportunities for adaptation including managing and restoring natural coastal ecosystems and infrastructure reinforcement (*medium confidence*). (Figure SPM.2) {3.4.5, Box 3.5}

**B.3 On land, impacts on biodiversity and ecosystems, including species loss and extinction, are projected to be lower at 1.5°C of global warming compared to 2°C. Limiting global warming to 1.5°C compared to 2°C is projected to lower the impacts on terrestrial, freshwater and coastal ecosystems and to retain more of their services to humans (*high confidence*). (Figure SPM.2) {3.4, 3.5, Box 3.4, Box 4.2, Cross-Chapter Box 8 in Chapter 3}**

B.3.1 Of 105,000 species studied,[9] 6% of insects, 8% of plants and 4% of vertebrates are projected to lose over half of their climatically determined geographic range for global warming of 1.5°C, compared with 18% of insects, 16% of plants and 8% of vertebrates for global warming of 2°C (*medium confidence*). Impacts associated with other biodiversity-related risks such as forest fires and the spread of invasive species are lower at 1.5°C compared to 2°C of global warming (*high confidence*). {3.4.3, 3.5.2}

B.3.2 Approximately 4% (interquartile range 2–7%) of the global terrestrial land area is projected to undergo a transformation of ecosystems from one type to another at 1°C of global warming, compared with 13% (interquartile range 8–20%) at 2°C (*medium confidence*). This indicates that the area at risk is projected to be approximately 50% lower at 1.5°C compared to 2°C (*medium confidence*). {3.4.3.1, 3.4.3.5}

B.3.3 High-latitude tundra and boreal forests are particularly at risk of climate change-induced degradation and loss, with woody shrubs already encroaching into the tundra (*high confidence*) and this will proceed with further warming. Limiting global warming to 1.5°C rather than 2°C is projected to prevent the thawing over centuries of a permafrost area in the range of 1.5 to 2.5 million km$^2$ (*medium confidence*). {3.3.2, 3.4.3, 3.5.5}

**B.4 Limiting global warming to 1.5°C compared to 2°C is projected to reduce increases in ocean temperature as well as associated increases in ocean acidity and decreases in ocean oxygen levels (*high confidence*). Consequently, limiting global warming to 1.5°C is projected to reduce risks to marine biodiversity, fisheries, and ecosystems, and their functions and services to humans, as illustrated by recent changes to Arctic sea ice and warm-water coral reef ecosystems (*high confidence*). {3.3, 3.4, 3.5, Box 3.4, Box 3.5}**

B.4.1 There is *high confidence* that the probability of a sea ice-free Arctic Ocean during summer is substantially lower at global warming of 1.5°C when compared to 2°C. With 1.5°C of global warming, one sea ice-free Arctic summer is projected per century. This likelihood is increased to at least one per decade with 2°C global warming. Effects of a temperature overshoot are reversible for Arctic sea ice cover on decadal time scales (*high confidence*). {3.3.8, 3.4.4.7}

B.4.2 Global warming of 1.5°C is projected to shift the ranges of many marine species to higher latitudes as well as increase the amount of damage to many ecosystems. It is also expected to drive the loss of coastal resources and reduce the productivity of fisheries and aquaculture (especially at low latitudes). The risks of climate-induced impacts are projected to be higher at 2°C than those at global warming of 1.5°C (*high confidence*). Coral reefs, for example, are projected to decline by a further 70–90% at 1.5°C (*high confidence*) with larger losses (>99%) at 2°C (*very high confidence*). The risk of irreversible loss of many marine and coastal ecosystems increases with global warming, especially at 2°C or more (*high confidence*). {3.4.4, Box 3.4}

9 Consistent with earlier studies, illustrative numbers were adopted from one recent meta-study.

B.4.3 The level of ocean acidification due to increasing $CO_2$ concentrations associated with global warming of 1.5°C is projected to amplify the adverse effects of warming, and even further at 2°C, impacting the growth, development, calcification, survival, and thus abundance of a broad range of species, for example, from algae to fish (*high confidence*). {3.3.10, 3.4.4}

B.4.4 Impacts of climate change in the ocean are increasing risks to fisheries and aquaculture via impacts on the physiology, survivorship, habitat, reproduction, disease incidence, and risk of invasive species (*medium confidence*) but are projected to be less at 1.5°C of global warming than at 2°C. One global fishery model, for example, projected a decrease in global annual catch for marine fisheries of about 1.5 million tonnes for 1.5°C of global warming compared to a loss of more than 3 million tonnes for 2°C of global warming (*medium confidence*). {3.4.4, Box 3.4}

## B.5 Climate-related risks to health, livelihoods, food security, water supply, human security, and economic growth are projected to increase with global warming of 1.5°C and increase further with 2°C. (Figure SPM.2) {3.4, 3.5, 5.2, Box 3.2, Box 3.3, Box 3.5, Box 3.6, Cross-Chapter Box 6 in Chapter 3, Cross-Chapter Box 9 in Chapter 4, Cross-Chapter Box 12 in Chapter 5, 5.2}

B.5.1 Populations at disproportionately higher risk of adverse consequences with global warming of 1.5°C and beyond include disadvantaged and vulnerable populations, some indigenous peoples, and local communities dependent on agricultural or coastal livelihoods (*high confidence*). Regions at disproportionately higher risk include Arctic ecosystems, dryland regions, small island developing states, and Least Developed Countries (*high confidence*). Poverty and disadvantage are expected to increase in some populations as global warming increases; limiting global warming to 1.5°C, compared with 2°C, could reduce the number of people both exposed to climate-related risks and susceptible to poverty by up to several hundred million by 2050 (*medium confidence*). {3.4.10, 3.4.11, Box 3.5, Cross-Chapter Box 6 in Chapter 3, Cross-Chapter Box 9 in Chapter 4, Cross-Chapter Box 12 in Chapter 5, 4.2.2.2, 5.2.1, 5.2.2, 5.2.3, 5.6.3}

B.5.2 Any increase in global warming is projected to affect human health, with primarily negative consequences (*high confidence*). Lower risks are projected at 1.5°C than at 2°C for heat-related morbidity and mortality (*very high confidence*) and for ozone-related mortality if emissions needed for ozone formation remain high (*high confidence*). Urban heat islands often amplify the impacts of heatwaves in cities (*high confidence*). Risks from some vector-borne diseases, such as malaria and dengue fever, are projected to increase with warming from 1.5°C to 2°C, including potential shifts in their geographic range (*high confidence*). {3.4.7, 3.4.8, 3.5.5.8}

B.5.3 Limiting warming to 1.5°C compared with 2°C is projected to result in smaller net reductions in yields of maize, rice, wheat, and potentially other cereal crops, particularly in sub-Saharan Africa, Southeast Asia, and Central and South America, and in the $CO_2$-dependent nutritional quality of rice and wheat (*high confidence*). Reductions in projected food availability are larger at 2°C than at 1.5°C of global warming in the Sahel, southern Africa, the Mediterranean, central Europe, and the Amazon (*medium confidence*). Livestock are projected to be adversely affected with rising temperatures, depending on the extent of changes in feed quality, spread of diseases, and water resource availability (*high confidence*). {3.4.6, 3.5.4, 3.5.5, Box 3.1, Cross-Chapter Box 6 in Chapter 3, Cross-Chapter Box 9 in Chapter 4}

B.5.4 Depending on future socio-economic conditions, limiting global warming to 1.5°C compared to 2°C may reduce the proportion of the world population exposed to a climate change-induced increase in water stress by up to 50%, although there is considerable variability between regions (*medium confidence*). Many small island developing states could experience lower water stress as a result of projected changes in aridity when global warming is limited to 1.5°C, as compared to 2°C (*medium confidence*). {3.3.5, 3.4.2, 3.4.8, 3.5.5, Box 3.2, Box 3.5, Cross-Chapter Box 9 in Chapter 4}

B.5.5 Risks to global aggregated economic growth due to climate change impacts are projected to be lower at 1.5°C than at 2°C by the end of this century[10] (*medium confidence*). This excludes the costs of mitigation, adaptation investments and the benefits of adaptation. Countries in the tropics and Southern Hemisphere subtropics are projected to experience the largest impacts on economic growth due to climate change should global warming increase from 1.5°C to 2°C (*medium confidence*). {3.5.2, 3.5.3}

10 Here, impacts on economic growth refer to changes in gross domestic product (GDP). Many impacts, such as loss of human lives, cultural heritage and ecosystem services, are difficult to value and monetize.

B.5.6 Exposure to multiple and compound climate-related risks increases between 1.5°C and 2°C of global warming, with greater proportions of people both so exposed and susceptible to poverty in Africa and Asia (*high confidence*). For global warming from 1.5°C to 2°C, risks across energy, food, and water sectors could overlap spatially and temporally, creating new and exacerbating current hazards, exposures, and vulnerabilities that could affect increasing numbers of people and regions (*medium confidence*). {Box 3.5, 3.3.1, 3.4.5.3, 3.4.5.6, 3.4.11, 3.5.4.9}

B.5.7 There are multiple lines of evidence that since AR5 the assessed levels of risk increased for four of the five Reasons for Concern (RFCs) for global warming to 2°C (*high confidence*). The risk transitions by degrees of global warming are now: from high to very high risk between 1.5°C and 2°C for RFC1 (Unique and threatened systems) (*high confidence*); from moderate to high risk between 1°C and 1.5°C for RFC2 (Extreme weather events) (*medium confidence*); from moderate to high risk between 1.5°C and 2°C for RFC3 (Distribution of impacts) (*high confidence*); from moderate to high risk between 1.5°C and 2.5°C for RFC4 (Global aggregate impacts) (*medium confidence*); and from moderate to high risk between 1°C and 2.5°C for RFC5 (Large-scale singular events) (*medium confidence*). (Figure SPM.2) {3.4.13; 3.5, 3.5.2}

**B.6 Most adaptation needs will be lower for global warming of 1.5°C compared to 2°C (*high confidence*). There are a wide range of adaptation options that can reduce the risks of climate change (*high confidence*). There are limits to adaptation and adaptive capacity for some human and natural systems at global warming of 1.5°C, with associated losses (*medium confidence*). The number and availability of adaptation options vary by sector (*medium confidence*). {Table 3.5, 4.3, 4.5, Cross-Chapter Box 9 in Chapter 4, Cross-Chapter Box 12 in Chapter 5}**

B.6.1 A wide range of adaptation options are available to reduce the risks to natural and managed ecosystems (e.g., ecosystem-based adaptation, ecosystem restoration and avoided degradation and deforestation, biodiversity management, sustainable aquaculture, and local knowledge and indigenous knowledge), the risks of sea level rise (e.g., coastal defence and hardening), and the risks to health, livelihoods, food, water, and economic growth, especially in rural landscapes (e.g., efficient irrigation, social safety nets, disaster risk management, risk spreading and sharing, and community-based adaptation) and urban areas (e.g., green infrastructure, sustainable land use and planning, and sustainable water management) (*medium confidence*). {4.3.1, 4.3.2, 4.3.3, 4.3.5, 4.5.3, 4.5.4, 5.3.2, Box 4.2, Box 4.3, Box 4.6, Cross-Chapter Box 9 in Chapter 4}.

B.6.2 Adaptation is expected to be more challenging for ecosystems, food and health systems at 2°C of global warming than for 1.5°C (*medium confidence*). Some vulnerable regions, including small islands and Least Developed Countries, are projected to experience high multiple interrelated climate risks even at global warming of 1.5°C (*high confidence*). {3.3.1, 3.4.5, Box 3.5, Table 3.5, Cross-Chapter Box 9 in Chapter 4, 5.6, Cross-Chapter Box 12 in Chapter 5, Box 5.3}

B.6.3 Limits to adaptive capacity exist at 1.5°C of global warming, become more pronounced at higher levels of warming and vary by sector, with site-specific implications for vulnerable regions, ecosystems and human health (*medium confidence*). {Cross-Chapter Box 12 in Chapter 5, Box 3.5, Table 3.5}

# How the level of global warming affects impacts and/or risks associated with the Reasons for Concern (RFCs) and selected natural, managed and human systems

Five Reasons For Concern (RFCs) illustrate the impacts and risks of different levels of global warming for people, economies and ecosystems across sectors and regions.

## Impacts and risks associated with the Reasons for Concern (RFCs)




**Purple** indicates very high risks of severe impacts/risks and the presence of significant irreversibility or the persistence of climate-related hazards, combined with limited ability to adapt due to the nature of the hazard or impacts/risks.
**Red** indicates severe and widespread impacts/risks.
**Yellow** indicates that impacts/risks are detectable and attributable to climate change with at least medium confidence.
**White** indicates that no impacts are detectable and attributable to climate change.

## Impacts and risks for selected natural, managed and human systems




**Confidence level for transition:** *L*=Low, *M*=Medium, *H*=High and *VH*=Very high

**Figure SPM.2 |** Five integrative reasons for concern (RFCs) provide a framework for summarizing key impacts and risks across sectors and regions, and were introduced in the IPCC Third Assessment Report. RFCs illustrate the implications of global warming for people, economies and ecosystems. Impacts and/or risks for each RFC are based on assessment of the new literature that has appeared. As in AR5, this literature was used to make expert judgments to assess the levels of global warming at which levels of impact and/or risk are undetectable, moderate, high or very high. The selection of impacts and risks to natural, managed and human systems in the lower panel is illustrative and is not intended to be fully comprehensive. {3.4, 3.5, 3.5.2.1, 3.5.2.2, 3.5.2.3, 3.5.2.4, 3.5.2.5, 5.4.1, 5.5.3, 5.6.1, Box 3.4}

**RFC1 Unique and threatened systems:** ecological and human systems that have restricted geographic ranges constrained by climate-related conditions and have high endemism or other distinctive properties. Examples include coral reefs, the Arctic and its indigenous people, mountain glaciers and biodiversity hotspots.

**RFC2 Extreme weather events:** risks/impacts to human health, livelihoods, assets and ecosystems from extreme weather events such as heat waves, heavy rain, drought and associated wildfires, and coastal flooding.

**RFC3 Distribution of impacts:** risks/impacts that disproportionately affect particular groups due to uneven distribution of physical climate change hazards, exposure or vulnerability.

**RFC4 Global aggregate impacts:** global monetary damage, global-scale degradation and loss of ecosystems and biodiversity.

**RFC5 Large-scale singular events:** are relatively large, abrupt and sometimes irreversible changes in systems that are caused by global warming. Examples include disintegration of the Greenland and Antarctic ice sheets.

# C. Emission Pathways and System Transitions Consistent with 1.5°C Global Warming

**C.1 In model pathways with no or limited overshoot of 1.5°C, global net anthropogenic $CO_2$ emissions decline by about 45% from 2010 levels by 2030 (40–60% interquartile range), reaching net zero around 2050 (2045–2055 interquartile range). For limiting global warming to below 2°C[11] $CO_2$ emissions are projected to decline by about 25% by 2030 in most pathways (10–30% interquartile range) and reach net zero around 2070 (2065–2080 interquartile range). Non-$CO_2$ emissions in pathways that limit global warming to 1.5°C show deep reductions that are similar to those in pathways limiting warming to 2°C. (*high confidence*) (Figure SPM.3a) {2.1, 2.3, Table 2.4}**

C.1.1 $CO_2$ emissions reductions that limit global warming to 1.5°C with no or limited overshoot can involve different portfolios of mitigation measures, striking different balances between lowering energy and resource intensity, rate of decarbonization, and the reliance on carbon dioxide removal. Different portfolios face different implementation challenges and potential synergies and trade-offs with sustainable development. (*high confidence*) (Figure SPM.3b) {2.3.2, 2.3.4, 2.4, 2.5.3}

C.1.2 Modelled pathways that limit global warming to 1.5°C with no or limited overshoot involve deep reductions in emissions of methane and black carbon (35% or more of both by 2050 relative to 2010). These pathways also reduce most of the cooling aerosols, which partially offsets mitigation effects for two to three decades. Non-$CO_2$ emissions[12] can be reduced as a result of broad mitigation measures in the energy sector. In addition, targeted non-$CO_2$ mitigation measures can reduce nitrous oxide and methane from agriculture, methane from the waste sector, some sources of black carbon, and hydrofluorocarbons. High bioenergy demand can increase emissions of nitrous oxide in some 1.5°C pathways, highlighting the importance of appropriate management approaches. Improved air quality resulting from projected reductions in many non-$CO_2$ emissions provide direct and immediate population health benefits in all 1.5°C model pathways. (*high confidence*) (Figure SPM.3a) {2.2.1, 2.3.3, 2.4.4, 2.5.3, 4.3.6, 5.4.2}

C.1.3 Limiting global warming requires limiting the total cumulative global anthropogenic emissions of $CO_2$ since the pre-industrial period, that is, staying within a total carbon budget (*high confidence*).[13] By the end of 2017, anthropogenic $CO_2$ emissions since the pre-industrial period are estimated to have reduced the total carbon budget for 1.5°C by approximately 2200 ± 320 $GtCO_2$ (*medium confidence*). The associated remaining budget is being depleted by current emissions of 42 ± 3 $GtCO_2$ per year (*high confidence*). The choice of the measure of global temperature affects the estimated remaining carbon budget. Using global mean surface air temperature, as in AR5, gives an estimate of the remaining carbon budget of 580 $GtCO_2$ for a 50% probability of limiting warming to 1.5°C, and 420 $GtCO_2$ for a 66% probability (*medium confidence*).[14] Alternatively, using GMST gives estimates of 770 and 570 $GtCO_2$, for 50% and 66% probabilities,[15] respectively (*medium confidence*). Uncertainties in the size of these estimated remaining carbon budgets are substantial and depend on several factors. Uncertainties in the climate response to $CO_2$ and non-$CO_2$ emissions contribute ±400 $GtCO_2$ and the level of historic warming contributes ±250 $GtCO_2$ (*medium confidence*). Potential additional carbon release from future permafrost thawing and methane release from wetlands would reduce budgets by up to 100 $GtCO_2$ over the course of this century and more thereafter (*medium confidence*). In addition, the level of non-$CO_2$ mitigation in the future could alter the remaining carbon budget by 250 $GtCO_2$ in either direction (*medium confidence*). {1.2.4, 2.2.2, 2.6.1, Table 2.2, Chapter 2 Supplementary Material}

C.1.4 Solar radiation modification (SRM) measures are not included in any of the available assessed pathways. Although some SRM measures may be theoretically effective in reducing an overshoot, they face large uncertainties and knowledge gaps

11 References to pathways limiting global warming to 2°C are based on a 66% probability of staying below 2°C.

12 Non-$CO_2$ emissions included in this Report are all anthropogenic emissions other than $CO_2$ that result in radiative forcing. These include short-lived climate forcers, such as methane, some fluorinated gases, ozone precursors, aerosols or aerosol precursors, such as black carbon and sulphur dioxide, respectively, as well as long-lived greenhouse gases, such as nitrous oxide or some fluorinated gases. The radiative forcing associated with non-$CO_2$ emissions and changes in surface albedo is referred to as non-$CO_2$ radiative forcing. {2.2.1}

13 There is a clear scientific basis for a total carbon budget consistent with limiting global warming to 1.5°C. However, neither this total carbon budget nor the fraction of this budget taken up by past emissions were assessed in this Report.

14 Irrespective of the measure of global temperature used, updated understanding and further advances in methods have led to an increase in the estimated remaining carbon budget of about 300 $GtCO_2$ compared to AR5. (*medium confidence*) {2.2.2}

15 These estimates use observed GMST to 2006–2015 and estimate future temperature changes using near surface air temperatures.

as well as substantial risks and institutional and social constraints to deployment related to governance, ethics, and impacts on sustainable development. They also do not mitigate ocean acidification. (*medium confidence*) {4.3.8, Cross-Chapter Box 10 in Chapter 4}

## Global emissions pathway characteristics

General characteristics of the evolution of anthropogenic net emissions of $CO_2$, and total emissions of methane, black carbon, and nitrous oxide in model pathways that limit global warming to 1.5°C with no or limited overshoot. Net emissions are defined as anthropogenic emissions reduced by anthropogenic removals. Reductions in net emissions can be achieved through different portfolios of mitigation measures illustrated in Figure SPM.3b.




**Figure SPM.3a |** Global emissions pathway characteristics. The main panel shows global net anthropogenic $CO_2$ emissions in pathways limiting global warming to 1.5°C with no or limited (less than 0.1°C) overshoot and pathways with higher overshoot. The shaded area shows the full range for pathways analysed in this Report. The panels on the right show non-$CO_2$ emissions ranges for three compounds with large historical forcing and a substantial portion of emissions coming from sources distinct from those central to $CO_2$ mitigation. Shaded areas in these panels show the 5–95% (light shading) and interquartile (dark shading) ranges of pathways limiting global warming to 1.5°C with no or limited overshoot. Box and whiskers at the bottom of the figure show the timing of pathways reaching global net zero $CO_2$ emission levels, and a comparison with pathways limiting global warming to 2°C with at least 66% probability. Four illustrative model pathways are highlighted in the main panel and are labelled P1, P2, P3 and P4, corresponding to the LED, S1, S2, and S5 pathways assessed in Chapter 2. Descriptions and characteristics of these pathways are available in Figure SPM.3b. {2.1, 2.2, 2.3, Figure 2.5, Figure 2.10, Figure 2.11}

Case No. 1:23-cv-01501-RMR Document 15-3 filed 09/29/23 USDC Colorado pg 22 of 220





# Characteristics of four illustrative model pathways

Different mitigation strategies can achieve the net emissions reductions that would be required to follow a pathway that limits global warming to 1.5°C with no or limited overshoot. All pathways use Carbon Dioxide Removal (CDR), but the amount varies across pathways, as do the relative contributions of Bioenergy with Carbon Capture and Storage (BECCS) and removals in the Agriculture, Forestry and Other Land Use (AFOLU) sector. This has implications for emissions and several other pathway characteristics.

## Breakdown of contributions to global net $CO_2$ emissions in four illustrative model pathways

Fossil fuel and industry  AFOLU  BECCS




P1: A scenario in which social, business and technological innovations result in lower energy demand up to 2050 while living standards rise, especially in the global South. A downsized energy system enables rapid decarbonization of energy supply. Afforestation is the only CDR option considered; neither fossil fuels with CCS nor BECCS are used.

P2: A scenario with a broad focus on sustainability including energy intensity, human development, economic convergence and international cooperation, as well as shifts towards sustainable and healthy consumption patterns, low-carbon technology innovation, and well-managed land systems with limited societal acceptability for BECCS.

P3: A middle-of-the-road scenario in which societal as well as technological development follows historical patterns. Emissions reductions are mainly achieved by changing the way in which energy and products are produced, and to a lesser degree by reductions in demand.

P4: A resource- and energy-intensive scenario in which economic growth and globalization lead to widespread adoption of greenhouse-gas-intensive lifestyles, including high demand for transportation fuels and livestock products. Emissions reductions are mainly achieved through technological means, making strong use of CDR through the deployment of BECCS.

| **Global indicators** | P1 | P2 | P3 | P4 | **Interquartile range** |
|---|---|---|---|---|---|
| *Pathway classification* | No or limited overshoot | No or limited overshoot | No or limited overshoot | Higher overshoot | No or limited overshoot |
| *$CO_2$ emission change in 2030 (% rel to 2010)* | -58 | -47 | -41 | 4 | (-58,-40) |
| *└ in 2050 (% rel to 2010)* | -93 | -95 | -91 | -97 | (-107,-94) |
| *Kyoto-GHG emissions* in 2030 (% rel to 2010)* | -50 | -49 | -35 | -2 | (-51,-39) |
| *└ in 2050 (% rel to 2010)* | -82 | -89 | -78 | -80 | (-93,-81) |
| *Final energy demand** in 2030 (% rel to 2010)* | -15 | -5 | 17 | 39 | (-12,7) |
| *└ in 2050 (% rel to 2010)* | -32 | 2 | 21 | 44 | (-11,22) |
| *Renewable share in electricity in 2030 (%)* | 60 | 58 | 48 | 25 | (47,65) |
| *└ in 2050 (%)* | 77 | 81 | 63 | 70 | (69,86) |
| *Primary energy from coal in 2030 (% rel to 2010)* | -78 | -61 | -75 | -59 | (-78, -59) |
| *└ in 2050 (% rel to 2010)* | -97 | -77 | -73 | -97 | (-95, -74) |
| *from oil in 2030 (% rel to 2010)* | -37 | -13 | -3 | 86 | (-34,3) |
| *└ in 2050 (% rel to 2010)* | -87 | -50 | -81 | -32 | (-78,-31) |
| *from gas in 2030 (% rel to 2010)* | -25 | -20 | 33 | 37 | (-26,21) |
| *└ in 2050 (% rel to 2010)* | -74 | -53 | 21 | -48 | (-56,6) |
| *from nuclear in 2030 (% rel to 2010)* | 59 | 83 | 98 | 106 | (44,102) |
| *└ in 2050 (% rel to 2010)* | 150 | 98 | 501 | 468 | (91,190) |
| *from biomass in 2030 (% rel to 2010)* | -11 | 0 | 36 | -1 | (29,80) |
| *└ in 2050 (% rel to 2010)* | -16 | 49 | 121 | 418 | (123,261) |
| *from non-biomass renewables in 2030 (% rel to 2010)* | 430 | 470 | 315 | 110 | (245,436) |
| *└ in 2050 (% rel to 2010)* | 833 | 1327 | 878 | 1137 | (576,1299) |
| *Cumulative CCS until 2100 ($GtCO_2$)* | 0 | 348 | 687 | 1218 | (550,1017) |
| *└ of which BECCS ($GtCO_2$)* | 0 | 151 | 414 | 1191 | (364,662) |
| *Land area of bioenergy crops in 2050 (million km²)* | 0.2 | 0.9 | 2.8 | 7.2 | (1.5,3.2) |
| *Agricultural $CH_4$ emissions in 2030 (% rel to 2010)* | -24 | -48 | 1 | 14 | (-30,-11) |
| *in 2050 (% rel to 2010)* | -33 | -69 | -23 | 2 | (-47,-24) |
| *Agricultural $N_2O$ emissions in 2030 (% rel to 2010)* | 5 | -26 | 15 | 3 | (-21,3) |
| *in 2050 (% rel to 2010)* | 6 | -26 | 0 | 39 | (-26,1) |

*NOTE: Indicators have been selected to show global trends identified by the Chapter 2 assessment. National and sectoral characteristics can differ substantially from the global trends shown above.*

** Kyoto-gas emissions are based on IPCC Second Assessment Report GWP-100*
*** Changes in energy demand are associated with improvements in energy efficiency and behaviour change*

**Figure SPM.3b |** Characteristics of four illustrative model pathways in relation to global warming of 1.5°C introduced in Figure SPM.3a. These pathways were selected to show a range of potential mitigation approaches and vary widely in their projected energy and land use, as well as their assumptions about future socio-economic developments, including economic and population growth, equity and sustainability. A breakdown of the global net anthropogenic $CO_2$ emissions into the contributions in terms of $CO_2$ emissions from fossil fuel and industry; agriculture, forestry and other land use (AFOLU); and bioenergy with carbon capture and storage (BECCS) is shown. AFOLU estimates reported here are not necessarily comparable with countries' estimates. Further characteristics for each of these pathways are listed below each pathway. These pathways illustrate relative global differences in mitigation strategies, but do not represent central estimates, national strategies, and do not indicate requirements. For comparison, the right-most column shows the interquartile ranges across pathways with no or limited overshoot of 1.5°C. Pathways P1, P2, P3 and P4 correspond to the LED, S1, S2 and S5 pathways assessed in Chapter 2 (Figure SPM.3a). {2.2.1, 2.3.1, 2.3.2, 2.3.3, 2.3.4, 2.4.1, 2.4.2, 2.4.4, 2.5.3, Figure 2.5, Figure 2.6, Figure 2.9, Figure 2.10, Figure 2.11, Figure 2.14, Figure 2.15, Figure 2.16, Figure 2.17, Figure 2.24, Figure 2.25, Table 2.4, Table 2.6, Table 2.7, Table 2.9, Table 4.1}

## C.2 Pathways limiting global warming to 1.5°C with no or limited overshoot would require rapid and far-reaching transitions in energy, land, urban and infrastructure (including transport and buildings), and industrial systems (*high confidence*). These systems transitions are unprecedented in terms of scale, but not necessarily in terms of speed, and imply deep emissions reductions in all sectors, a wide portfolio of mitigation options and a significant upscaling of investments in those options (*medium confidence*). {2.3, 2.4, 2.5, 4.2, 4.3, 4.4, 4.5}

C.2.1 Pathways that limit global warming to 1.5°C with no or limited overshoot show system changes that are more rapid and pronounced over the next two decades than in 2°C pathways (*high confidence*). The rates of system changes associated with limiting global warming to 1.5°C with no or limited overshoot have occurred in the past within specific sectors, technologies and spatial contexts, but there is no documented historic precedent for their scale (*medium confidence*). {2.3.3, 2.3.4, 2.4, 2.5, 4.2.1, 4.2.2, Cross-Chapter Box 11 in Chapter 4}

C.2.2 In energy systems, modelled global pathways (considered in the literature) limiting global warming to 1.5°C with no or limited overshoot (for more details see Figure SPM.3b) generally meet energy service demand with lower energy use, including through enhanced energy efficiency, and show faster electrification of energy end use compared to 2°C (*high confidence*). In 1.5°C pathways with no or limited overshoot, low-emission energy sources are projected to have a higher share, compared with 2°C pathways, particularly before 2050 (*high confidence*). In 1.5°C pathways with no or limited overshoot, renewables are projected to supply 70–85% (interquartile range) of electricity in 2050 (*high confidence*). In electricity generation, shares of nuclear and fossil fuels with carbon dioxide capture and storage (CCS) are modelled to increase in most 1.5°C pathways with no or limited overshoot. In modelled 1.5°C pathways with limited or no overshoot, the use of CCS would allow the electricity generation share of gas to be approximately 8% (3–11% interquartile range) of global electricity in 2050, while the use of coal shows a steep reduction in all pathways and would be reduced to close to 0% (0–2% interquartile range) of electricity (*high confidence*). While acknowledging the challenges, and differences between the options and national circumstances, political, economic, social and technical feasibility of solar energy, wind energy and electricity storage technologies have substantially improved over the past few years (*high confidence*). These improvements signal a potential system transition in electricity generation. (Figure SPM.3b) {2.4.1, 2.4.2, Figure 2.1, Table 2.6, Table 2.7, Cross-Chapter Box 6 in Chapter 3, 4.2.1, 4.3.1, 4.3.3, 4.5.2}

C.2.3 $CO_2$ emissions from industry in pathways limiting global warming to 1.5°C with no or limited overshoot are projected to be about 65–90% (interquartile range) lower in 2050 relative to 2010, as compared to 50–80% for global warming of 2°C (*medium confidence*). Such reductions can be achieved through combinations of new and existing technologies and practices, including electrification, hydrogen, sustainable bio-based feedstocks, product substitution, and carbon capture, utilization and storage (CCUS). These options are technically proven at various scales but their large-scale deployment may be limited by economic, financial, human capacity and institutional constraints in specific contexts, and specific characteristics of large-scale industrial installations. In industry, emissions reductions by energy and process efficiency by themselves are insufficient for limiting warming to 1.5°C with no or limited overshoot (*high confidence*). {2.4.3, 4.2.1, Table 4.1, Table 4.3, 4.3.3, 4.3.4, 4.5.2}

C.2.4 The urban and infrastructure system transition consistent with limiting global warming to 1.5°C with no or limited overshoot would imply, for example, changes in land and urban planning practices, as well as deeper emissions reductions in transport and buildings compared to pathways that limit global warming below 2°C (*medium confidence*). Technical measures

and practices enabling deep emissions reductions include various energy efficiency options. In pathways limiting global warming to 1.5°C with no or limited overshoot, the electricity share of energy demand in buildings would be about 55–75% in 2050 compared to 50–70% in 2050 for 2°C global warming (*medium confidence*). In the transport sector, the share of low-emission final energy would rise from less than 5% in 2020 to about 35–65% in 2050 compared to 25–45% for 2°C of global warming (*medium confidence*). Economic, institutional and socio-cultural barriers may inhibit these urban and infrastructure system transitions, depending on national, regional and local circumstances, capabilities and the availability of capital (*high confidence*). {2.3.4, 2.4.3, 4.2.1, Table 4.1, 4.3.3, 4.5.2}

C.2.5 Transitions in global and regional land use are found in all pathways limiting global warming to 1.5°C with no or limited overshoot, but their scale depends on the pursued mitigation portfolio. Model pathways that limit global warming to 1.5°C with no or limited overshoot project a 4 million $km^2$ reduction to a 2.5 million $km^2$ increase of non-pasture agricultural land for food and feed crops and a 0.5–11 million $km^2$ reduction of pasture land, to be converted into a 0–6 million $km^2$ increase of agricultural land for energy crops and a 2 million $km^2$ reduction to 9.5 million $km^2$ increase in forests by 2050 relative to 2010 (*medium confidence*).[16] Land-use transitions of similar magnitude can be observed in modelled 2°C pathways (*medium confidence*). Such large transitions pose profound challenges for sustainable management of the various demands on land for human settlements, food, livestock feed, fibre, bioenergy, carbon storage, biodiversity and other ecosystem services (*high confidence*). Mitigation options limiting the demand for land include sustainable intensification of land-use practices, ecosystem restoration and changes towards less resource-intensive diets (*high confidence*). The implementation of land-based mitigation options would require overcoming socio-economic, institutional, technological, financing and environmental barriers that differ across regions (*high confidence*). {2.4.4, Figure 2.24, 4.3.2, 4.3.7, 4.5.2, Cross-Chapter Box 7 in Chapter 3}

C.2.6 Additional annual average energy-related investments for the period 2016 to 2050 in pathways limiting warming to 1.5°C compared to pathways without new climate policies beyond those in place today are estimated to be around 830 billion USD2010 (range of 150 billion to 1700 billion USD2010 across six models[17]). This compares to total annual average energy supply investments in 1.5°C pathways of 1460 to 3510 billion USD2010 and total annual average energy demand investments of 640 to 910 billion USD2010 for the period 2016 to 2050. Total energy-related investments increase by about 12% (range of 3% to 24%) in 1.5°C pathways relative to 2°C pathways. Annual investments in low-carbon energy technologies and energy efficiency are upscaled by roughly a factor of six (range of factor of 4 to 10) by 2050 compared to 2015 (*medium confidence*). {2.5.2, Box 4.8, Figure 2.27}

C.2.7 Modelled pathways limiting global warming to 1.5°C with no or limited overshoot project a wide range of global average discounted marginal abatement costs over the 21st century. They are roughly 3-4 times higher than in pathways limiting global warming to below 2°C (*high confidence*). The economic literature distinguishes marginal abatement costs from total mitigation costs in the economy. The literature on total mitigation costs of 1.5°C mitigation pathways is limited and was not assessed in this Report. Knowledge gaps remain in the integrated assessment of the economy-wide costs and benefits of mitigation in line with pathways limiting warming to 1.5°C. {2.5.2; 2.6; Figure 2.26}

16 The projected land-use changes presented are not deployed to their upper limits simultaneously in a single pathway.

17 Including two pathways limiting warming to 1.5°C with no or limited overshoot and four pathways with higher overshoot.

**C.3 All pathways that limit global warming to 1.5°C with limited or no overshoot project the use of carbon dioxide removal (CDR) on the order of 100–1000 $GtCO_2$ over the 21st century. CDR would be used to compensate for residual emissions and, in most cases, achieve net negative emissions to return global warming to 1.5°C following a peak (*high confidence*). CDR deployment of several hundreds of $GtCO_2$ is subject to multiple feasibility and sustainability constraints (*high confidence*). Significant near-term emissions reductions and measures to lower energy and land demand can limit CDR deployment to a few hundred $GtCO_2$ without reliance on bioenergy with carbon capture and storage (BECCS) (*high confidence*). {2.3, 2.4, 3.6.2, 4.3, 5.4}**

C.3.1 Existing and potential CDR measures include afforestation and reforestation, land restoration and soil carbon sequestration, BECCS, direct air carbon capture and storage (DACCS), enhanced weathering and ocean alkalinization. These differ widely in terms of maturity, potentials, costs, risks, co-benefits and trade-offs (*high confidence*). To date, only a few published pathways include CDR measures other than afforestation and BECCS. {2.3.4, 3.6.2, 4.3.2, 4.3.7}

C.3.2 In pathways limiting global warming to 1.5°C with limited or no overshoot, BECCS deployment is projected to range from 0–1, 0–8, and 0–16 $GtCO_2\ yr^{-1}$ in 2030, 2050, and 2100, respectively, while agriculture, forestry and land-use (AFOLU) related CDR measures are projected to remove 0–5, 1–11, and 1–5 $GtCO_2\ yr^{-1}$ in these years (*medium confidence*). The upper end of these deployment ranges by mid-century exceeds the BECCS potential of up to 5 $GtCO_2\ yr^{-1}$ and afforestation potential of up to 3.6 $GtCO_2\ yr^{-1}$ assessed based on recent literature (*medium confidence*). Some pathways avoid BECCS deployment completely through demand-side measures and greater reliance on AFOLU-related CDR measures (*medium confidence*). The use of bioenergy can be as high or even higher when BECCS is excluded compared to when it is included due to its potential for replacing fossil fuels across sectors (*high confidence*). (Figure SPM.3b) {2.3.3, 2.3.4, 2.4.2, 3.6.2, 4.3.1, 4.2.3, 4.3.2, 4.3.7, 4.4.3, Table 2.4}

C.3.3 Pathways that overshoot 1.5°C of global warming rely on CDR exceeding residual $CO_2$ emissions later in the century to return to below 1.5°C by 2100, with larger overshoots requiring greater amounts of CDR (Figure SPM.3b) (*high confidence*). Limitations on the speed, scale, and societal acceptability of CDR deployment hence determine the ability to return global warming to below 1.5°C following an overshoot. Carbon cycle and climate system understanding is still limited about the effectiveness of net negative emissions to reduce temperatures after they peak (*high confidence*). {2.2, 2.3.4, 2.3.5, 2.6, 4.3.7, 4.5.2, Table 4.11}

C.3.4 Most current and potential CDR measures could have significant impacts on land, energy, water or nutrients if deployed at large scale (*high confidence*). Afforestation and bioenergy may compete with other land uses and may have significant impacts on agricultural and food systems, biodiversity, and other ecosystem functions and services (*high confidence*). Effective governance is needed to limit such trade-offs and ensure permanence of carbon removal in terrestrial, geological and ocean reservoirs (*high confidence*). Feasibility and sustainability of CDR use could be enhanced by a portfolio of options deployed at substantial, but lesser scales, rather than a single option at very large scale (*high confidence*). (Figure SPM.3b) {2.3.4, 2.4.4, 2.5.3, 2.6, 3.6.2, 4.3.2, 4.3.7, 4.5.2, 5.4.1, 5.4.2; Cross-Chapter Boxes 7 and 8 in Chapter 3, Table 4.11, Table 5.3, Figure 5.3}

C.3.5 Some AFOLU-related CDR measures such as restoration of natural ecosystems and soil carbon sequestration could provide co-benefits such as improved biodiversity, soil quality, and local food security. If deployed at large scale, they would require governance systems enabling sustainable land management to conserve and protect land carbon stocks and other ecosystem functions and services (*medium confidence*). (Figure SPM.4) {2.3.3, 2.3.4, 2.4.2, 2.4.4, 3.6.2, 5.4.1, Cross-Chapter Boxes 3 in Chapter 1 and 7 in Chapter 3, 4.3.2, 4.3.7, 4.4.1, 4.5.2, Table 2.4}

# D. Strengthening the Global Response in the Context of Sustainable Development and Efforts to Eradicate Poverty

**D.1 Estimates of the global emissions outcome of current nationally stated mitigation ambitions as submitted under the Paris Agreement would lead to global greenhouse gas emissions[18] in 2030 of 52–58 $GtCO_2eq\ yr^{-1}$ (*medium confidence*). Pathways reflecting these ambitions would not limit global warming to 1.5°C, even if supplemented by very challenging increases in the scale and ambition of emissions reductions after 2030 (*high confidence*). Avoiding overshoot and reliance on future large-scale deployment of carbon dioxide removal (CDR) can only be achieved if global $CO_2$ emissions start to decline well before 2030 (*high confidence*). {1.2, 2.3, 3.3, 3.4, 4.2, 4.4, Cross-Chapter Box 11 in Chapter 4}**

D.1.1 Pathways that limit global warming to 1.5°C with no or limited overshoot show clear emission reductions by 2030 (*high confidence*). All but one show a decline in global greenhouse gas emissions to below 35 $GtCO_2eq\ yr^{-1}$ in 2030, and half of available pathways fall within the 25–30 $GtCO_2eq\ yr^{-1}$ range (interquartile range), a 40–50% reduction from 2010 levels (*high confidence*). Pathways reflecting current nationally stated mitigation ambition until 2030 are broadly consistent with cost-effective pathways that result in a global warming of about 3°C by 2100, with warming continuing afterwards (*medium confidence*). {2.3.3, 2.3.5, Cross-Chapter Box 11 in Chapter 4, 5.5.3.2}

D.1.2 Overshoot trajectories result in higher impacts and associated challenges compared to pathways that limit global warming to 1.5°C with no or limited overshoot (*high confidence*). Reversing warming after an overshoot of 0.2°C or larger during this century would require upscaling and deployment of CDR at rates and volumes that might not be achievable given considerable implementation challenges (*medium confidence*). {1.3.3, 2.3.4, 2.3.5, 2.5.1, 3.3, 4.3.7, Cross-Chapter Box 8 in Chapter 3, Cross-Chapter Box 11 in Chapter 4}

D.1.3 The lower the emissions in 2030, the lower the challenge in limiting global warming to 1.5°C after 2030 with no or limited overshoot (*high confidence*). The challenges from delayed actions to reduce greenhouse gas emissions include the risk of cost escalation, lock-in in carbon-emitting infrastructure, stranded assets, and reduced flexibility in future response options in the medium to long term (*high confidence*). These may increase uneven distributional impacts between countries at different stages of development (*medium confidence*). {2.3.5, 4.4.5, 5.4.2}

**D.2 The avoided climate change impacts on sustainable development, eradication of poverty and reducing inequalities would be greater if global warming were limited to 1.5°C rather than 2°C, if mitigation and adaptation synergies are maximized while trade-offs are minimized (*high confidence*). {1.1, 1.4, 2.5, 3.3, 3.4, 5.2, Table 5.1}**

D.2.1 Climate change impacts and responses are closely linked to sustainable development which balances social well-being, economic prosperity and environmental protection. The United Nations Sustainable Development Goals (SDGs), adopted in 2015, provide an established framework for assessing the links between global warming of 1.5°C or 2°C and development goals that include poverty eradication, reducing inequalities, and climate action. (*high confidence*) {Cross-Chapter Box 4 in Chapter 1, 1.4, 5.1}

D.2.2 The consideration of ethics and equity can help address the uneven distribution of adverse impacts associated with 1.5°C and higher levels of global warming, as well as those from mitigation and adaptation, particularly for poor and disadvantaged populations, in all societies (*high confidence*). {1.1.1, 1.1.2, 1.4.3, 2.5.3, 3.4.10, 5.1, 5.2, 5.3. 5.4, Cross-Chapter Box 4 in Chapter 1, Cross-Chapter Boxes 6 and 8 in Chapter 3, and Cross-Chapter Box 12 in Chapter 5}

D.2.3 Mitigation and adaptation consistent with limiting global warming to 1.5°C are underpinned by enabling conditions, assessed in this Report across the geophysical, environmental-ecological, technological, economic, socio-cultural and institutional

18 GHG emissions have been aggregated with 100-year GWP values as introduced in the IPCC Second Assessment Report.

dimensions of feasibility. Strengthened multilevel governance, institutional capacity, policy instruments, technological innovation and transfer and mobilization of finance, and changes in human behaviour and lifestyles are enabling conditions that enhance the feasibility of mitigation and adaptation options for 1.5°C-consistent systems transitions. (*high confidence*) {1.4, Cross-Chapter Box 3 in Chapter 1, 2.5.1, 4.4, 4.5, 5.6}

**D.3 Adaptation options specific to national contexts, if carefully selected together with enabling conditions, will have benefits for sustainable development and poverty reduction with global warming of 1.5°C, although trade-offs are possible (*high confidence*). {1.4, 4.3, 4.5}**

D.3.1 Adaptation options that reduce the vulnerability of human and natural systems have many synergies with sustainable development, if well managed, such as ensuring food and water security, reducing disaster risks, improving health conditions, maintaining ecosystem services and reducing poverty and inequality (*high confidence*). Increasing investment in physical and social infrastructure is a key enabling condition to enhance the resilience and the adaptive capacities of societies. These benefits can occur in most regions with adaptation to 1.5°C of global warming (*high confidence*). {1.4.3, 4.2.2, 4.3.1, 4.3.2, 4.3.3, 4.3.5, 4.4.1, 4.4.3, 4.5.3, 5.3.1, 5.3.2}

D.3.2 Adaptation to 1.5°C global warming can also result in trade-offs or maladaptations with adverse impacts for sustainable development. For example, if poorly designed or implemented, adaptation projects in a range of sectors can increase greenhouse gas emissions and water use, increase gender and social inequality, undermine health conditions, and encroach on natural ecosystems (*high confidence*). These trade-offs can be reduced by adaptations that include attention to poverty and sustainable development (*high confidence*). {4.3.2, 4.3.3, 4.5.4, 5.3.2; Cross-Chapter Boxes 6 and 7 in Chapter 3}

D.3.3 A mix of adaptation and mitigation options to limit global warming to 1.5°C, implemented in a participatory and integrated manner, can enable rapid, systemic transitions in urban and rural areas (*high confidence*). These are most effective when aligned with economic and sustainable development, and when local and regional governments and decision makers are supported by national governments (*medium confidence*). {4.3.2, 4.3.3, 4.4.1, 4.4.2}

D.3.4 Adaptation options that also mitigate emissions can provide synergies and cost savings in most sectors and system transitions, such as when land management reduces emissions and disaster risk, or when low-carbon buildings are also designed for efficient cooling. Trade-offs between mitigation and adaptation, when limiting global warming to 1.5°C, such as when bioenergy crops, reforestation or afforestation encroach on land needed for agricultural adaptation, can undermine food security, livelihoods, ecosystem functions and services and other aspects of sustainable development. (*high confidence*) {3.4.3, 4.3.2, 4.3.4, 4.4.1, 4.5.2, 4.5.3, 4.5.4}

**D.4 Mitigation options consistent with 1.5°C pathways are associated with multiple synergies and trade-offs across the Sustainable Development Goals (SDGs). While the total number of possible synergies exceeds the number of trade-offs, their net effect will depend on the pace and magnitude of changes, the composition of the mitigation portfolio and the management of the transition. (*high confidence*) (Figure SPM.4) {2.5, 4.5, 5.4}**

D.4.1 1.5°C pathways have robust synergies particularly for the SDGs 3 (health), 7 (clean energy), 11 (cities and communities), 12 (responsible consumption and production) and 14 (oceans) (*very high confidence*). Some 1.5°C pathways show potential trade-offs with mitigation for SDGs 1 (poverty), 2 (hunger), 6 (water) and 7 (energy access), if not managed carefully (*high confidence*). (Figure SPM.4) {5.4.2; Figure 5.4, Cross-Chapter Boxes 7 and 8 in Chapter 3}

D.4.2 1.5°C pathways that include low energy demand (e.g., see P1 in Figure SPM.3a and SPM.3b), low material consumption, and low GHG-intensive food consumption have the most pronounced synergies and the lowest number of trade-offs with respect to sustainable development and the SDGs (*high confidence*). Such pathways would reduce dependence on CDR. In modelled pathways, sustainable development, eradicating poverty and reducing inequality can support limiting warming to 1.5°C (*high confidence*). (Figure SPM.3b, Figure SPM.4) {2.4.3, 2.5.1, 2.5.3, Figure 2.4, Figure 2.28, 5.4.1, 5.4.2, Figure 5.4}

## Indicative linkages between mitigation options and sustainable development using SDGs (The linkages do not show costs and benefits)

Mitigation options deployed in each sector can be associated with potential positive effects (synergies) or negative effects (trade-offs) with the Sustainable Development Goals (SDGs). The degree to which this potential is realized will depend on the selected portfolio of mitigation options, mitigation policy design, and local circumstances and context. Particularly in the energy-demand sector, the potential for synergies is larger than for trade-offs. The bars group individually assessed options by level of confidence and take into account the relative strength of the assessed mitigation-SDG connections.






FS-001427

**Figure SPM.4 |** Potential synergies and trade-offs between the sectoral portfolio of climate change mitigation options and the Sustainable Development Goals (SDGs). The SDGs serve as an analytical framework for the assessment of the different sustainable development dimensions, which extend beyond the time frame of the 2030 SDG targets. The assessment is based on literature on mitigation options that are considered relevant for 1.5°C. The assessed strength of the SDG interactions is based on the qualitative and quantitative assessment of individual mitigation options listed in Table 5.2. For each mitigation option, the strength of the SDG-connection as well as the associated confidence of the underlying literature (shades of green and red) was assessed. The strength of positive connections (synergies) and negative connections (trade-offs) across all individual options within a sector (see Table 5.2) are aggregated into sectoral potentials for the whole mitigation portfolio. The (white) areas outside the bars, which indicate no interactions, have *low confidence* due to the uncertainty and limited number of studies exploring indirect effects. The strength of the connection considers only the effect of mitigation and does not include benefits of avoided impacts. SDG 13 (climate action) is not listed because mitigation is being considered in terms of interactions with SDGs and not vice versa. The bars denote the strength of the connection, and do not consider the strength of the impact on the SDGs. The energy demand sector comprises behavioural responses, fuel switching and efficiency options in the transport, industry and building sector as well as carbon capture options in the industry sector. Options assessed in the energy supply sector comprise biomass and non-biomass renewables, nuclear, carbon capture and storage (CCS) with bioenergy, and CCS with fossil fuels. Options in the land sector comprise agricultural and forest options, sustainable diets and reduced food waste, soil sequestration, livestock and manure management, reduced deforestation, afforestation and reforestation, and responsible sourcing. In addition to this figure, options in the ocean sector are discussed in the underlying report. {5.4, Table 5.2, Figure 5.2}

Information about the net impacts of mitigation on sustainable development in 1.5°C pathways is available only for a limited number of SDGs and mitigation options. Only a limited number of studies have assessed the benefits of avoided climate change impacts of 1.5°C pathways for the SDGs, and the co-effects of adaptation for mitigation and the SDGs. The assessment of the indicative mitigation potentials in Figure SPM.4 is a step further from AR5 towards a more comprehensive and integrated assessment in the future.

D.4.3 1.5°C and 2°C modelled pathways often rely on the deployment of large-scale land-related measures like afforestation and bioenergy supply, which, if poorly managed, can compete with food production and hence raise food security concerns (*high confidence*). The impacts of carbon dioxide removal (CDR) options on SDGs depend on the type of options and the scale of deployment (*high confidence*). If poorly implemented, CDR options such as BECCS and AFOLU options would lead to trade-offs. Context-relevant design and implementation requires considering people's needs, biodiversity, and other sustainable development dimensions (*very high confidence*). (Figure SPM.4) {5.4.1.3, Cross-Chapter Box 7 in Chapter 3}

D.4.4 Mitigation consistent with 1.5°C pathways creates risks for sustainable development in regions with high dependency on fossil fuels for revenue and employment generation (*high confidence*). Policies that promote diversification of the economy and the energy sector can address the associated challenges (*high confidence*). {5.4.1.2, Box 5.2}

D.4.5 Redistributive policies across sectors and populations that shield the poor and vulnerable can resolve trade-offs for a range of SDGs, particularly hunger, poverty and energy access. Investment needs for such complementary policies are only a small fraction of the overall mitigation investments in 1.5°C pathways. (*high confidence*) {2.4.3, 5.4.2, Figure 5.5}

## D.5 Limiting the risks from global warming of 1.5°C in the context of sustainable development and poverty eradication implies system transitions that can be enabled by an increase of adaptation and mitigation investments, policy instruments, the acceleration of technological innovation and behaviour changes (*high confidence*). {2.3, 2.4, 2.5, 3.2, 4.2, 4.4, 4.5, 5.2, 5.5, 5.6}

D.5.1 Directing finance towards investment in infrastructure for mitigation and adaptation could provide additional resources. This could involve the mobilization of private funds by institutional investors, asset managers and development or investment banks, as well as the provision of public funds. Government policies that lower the risk of low-emission and adaptation investments can facilitate the mobilization of private funds and enhance the effectiveness of other public policies. Studies indicate a number of challenges, including access to finance and mobilization of funds. (*high confidence*) {2.5.1, 2.5.2, 4.4.5}

D.5.2 Adaptation finance consistent with global warming of 1.5°C is difficult to quantify and compare with 2°C. Knowledge gaps include insufficient data to calculate specific climate resilience-enhancing investments from the provision of currently underinvested basic infrastructure. Estimates of the costs of adaptation might be lower at global warming of 1.5°C than for 2°C. Adaptation needs have typically been supported by public sector sources such as national and subnational government budgets, and in developing countries together with support from development assistance, multilateral development banks, and United Nations Framework Convention on Climate Change channels (*medium confidence*). More recently there is a

FS-001428

growing understanding of the scale and increase in non-governmental organizations and private funding in some regions (*medium confidence*). Barriers include the scale of adaptation financing, limited capacity and access to adaptation finance (*medium confidence*). {4.4.5, 4.6}

D.5.3 Global model pathways limiting global warming to 1.5°C are projected to involve the annual average investment needs in the energy system of around 2.4 trillion USD2010 between 2016 and 2035, representing about 2.5% of the world GDP (*medium confidence*). {4.4.5, Box 4.8}

D.5.4 Policy tools can help mobilize incremental resources, including through shifting global investments and savings and through market and non-market based instruments as well as accompanying measures to secure the equity of the transition, acknowledging the challenges related with implementation, including those of energy costs, depreciation of assets and impacts on international competition, and utilizing the opportunities to maximize co-benefits (*high confidence*). {1.3.3, 2.3.4, 2.3.5, 2.5.1, 2.5.2, Cross-Chapter Box 8 in Chapter 3, Cross-Chapter Box 11 in Chapter 4, 4.4.5, 5.5.2}

D.5.5 The systems transitions consistent with adapting to and limiting global warming to 1.5°C include the widespread adoption of new and possibly disruptive technologies and practices and enhanced climate-driven innovation. These imply enhanced technological innovation capabilities, including in industry and finance. Both national innovation policies and international cooperation can contribute to the development, commercialization and widespread adoption of mitigation and adaptation technologies. Innovation policies may be more effective when they combine public support for research and development with policy mixes that provide incentives for technology diffusion. (*high confidence*) {4.4.4, 4.4.5}.

D.5.6 Education, information, and community approaches, including those that are informed by indigenous knowledge and local knowledge, can accelerate the wide-scale behaviour changes consistent with adapting to and limiting global warming to 1.5°C. These approaches are more effective when combined with other policies and tailored to the motivations, capabilities and resources of specific actors and contexts (*high confidence*). Public acceptability can enable or inhibit the implementation of policies and measures to limit global warming to 1.5°C and to adapt to the consequences. Public acceptability depends on the individual's evaluation of expected policy consequences, the perceived fairness of the distribution of these consequences, and perceived fairness of decision procedures (*high confidence*). {1.1, 1.5, 4.3.5, 4.4.1, 4.4.3, Box 4.3, 5.5.3, 5.6.5}

**D.6 Sustainable development supports, and often enables, the fundamental societal and systems transitions and transformations that help limit global warming to 1.5°C. Such changes facilitate the pursuit of climate-resilient development pathways that achieve ambitious mitigation and adaptation in conjunction with poverty eradication and efforts to reduce inequalities (*high confidence*). {Box 1.1, 1.4.3, Figure 5.1, 5.5.3, Box 5.3}**

D.6.1 Social justice and equity are core aspects of climate-resilient development pathways that aim to limit global warming to 1.5°C as they address challenges and inevitable trade-offs, widen opportunities, and ensure that options, visions, and values are deliberated, between and within countries and communities, without making the poor and disadvantaged worse off (*high confidence*). {5.5.2, 5.5.3, Box 5.3, Figure 5.1, Figure 5.6, Cross-Chapter Boxes 12 and 13 in Chapter 5}

D.6.2 The potential for climate-resilient development pathways differs between and within regions and nations, due to different development contexts and systemic vulnerabilities (*very high confidence*). Efforts along such pathways to date have been limited (*medium confidence*) and enhanced efforts would involve strengthened and timely action from all countries and non-state actors (*high confidence*). {5.5.1, 5.5.3, Figure 5.1}

D.6.3 Pathways that are consistent with sustainable development show fewer mitigation and adaptation challenges and are associated with lower mitigation costs. The large majority of modelling studies could not construct pathways characterized by lack of international cooperation, inequality and poverty that were able to limit global warming to 1.5°C. (*high confidence*) {2.3.1, 2.5.1, 2.5.3, 5.5.2}

**D.7 Strengthening the capacities for climate action of national and sub-national authorities, civil society, the private sector, indigenous peoples and local communities can support the implementation of ambitious actions implied by limiting global warming to 1.5°C (*high confidence*). International cooperation can provide an enabling environment for this to be achieved in all countries and for all people, in the context of sustainable development. International cooperation is a critical enabler for developing countries and vulnerable regions (*high confidence*). {1.4, 2.3, 2.5, 4.2, 4.4, 4.5, 5.3, 5.4, 5.5, 5.6, 5, Box 4.1, Box 4.2, Box 4.7, Box 5.3, Cross-Chapter Box 9 in Chapter 4, Cross-Chapter Box 13 in Chapter 5}**

D.7.1 Partnerships involving non-state public and private actors, institutional investors, the banking system, civil society and scientific institutions would facilitate actions and responses consistent with limiting global warming to 1.5°C (*very high confidence*). {1.4, 4.4.1, 4.2.2, 4.4.3, 4.4.5, 4.5.3, 5.4.1, 5.6.2, Box 5.3}.

D.7.2 Cooperation on strengthened accountable multilevel governance that includes non-state actors such as industry, civil society and scientific institutions, coordinated sectoral and cross-sectoral policies at various governance levels, gender-sensitive policies, finance including innovative financing, and cooperation on technology development and transfer can ensure participation, transparency, capacity building and learning among different players (*high confidence*). {2.5.1, 2.5.2, 4.2.2, 4.4.1, 4.4.2, 4.4.3, 4.4.4, 4.4.5, 4.5.3, Cross-Chapter Box 9 in Chapter 4, 5.3.1, 5.5.3, Cross-Chapter Box 13 in Chapter 5, 5.6.1, 5.6.3}

D.7.3 International cooperation is a critical enabler for developing countries and vulnerable regions to strengthen their action for the implementation of 1.5°C-consistent climate responses, including through enhancing access to finance and technology and enhancing domestic capacities, taking into account national and local circumstances and needs (*high confidence*). {2.3.1, 2.5.1, 4.4.1, 4.4.2, 4.4.4, 4.4.5, 5.4.1 5.5.3, 5.6.1, Box 4.1, Box 4.2, Box 4.7}.

D.7.4 Collective efforts at all levels, in ways that reflect different circumstances and capabilities, in the pursuit of limiting global warming to 1.5°C, taking into account equity as well as effectiveness, can facilitate strengthening the global response to climate change, achieving sustainable development and eradicating poverty (*high confidence*). {1.4.2, 2.3.1, 2.5.1, 2.5.2, 2.5.3, 4.2.2, 4.4.1, 4.4.2, 4.4.3, 4.4.4, 4.4.5, 4.5.3, 5.3.1, 5.4.1, 5.5.3, 5.6.1, 5.6.2, 5.6.3}

## Box SPM.1: Core Concepts Central to this Special Report

**Global mean surface temperature (GMST):** Estimated global average of near-surface air temperatures over land and sea ice, and sea surface temperatures over ice-free ocean regions, with changes normally expressed as departures from a value over a specified reference period. When estimating changes in GMST, near-surface air temperature over both land and oceans are also used.[19] {1.2.1.1}

**Pre-industrial:** The multi-century period prior to the onset of large-scale industrial activity around 1750. The reference period 1850–1900 is used to approximate pre-industrial GMST. {1.2.1.2}

**Global warming:** The estimated increase in GMST averaged over a 30-year period, or the 30-year period centred on a particular year or decade, expressed relative to pre-industrial levels unless otherwise specified. For 30-year periods that span past and future years, the current multi-decadal warming trend is assumed to continue. {1.2.1}

**Net zero $CO_2$ emissions:** Net zero carbon dioxide ($CO_2$) emissions are achieved when anthropogenic $CO_2$ emissions are balanced globally by anthropogenic $CO_2$ removals over a specified period.

**Carbon dioxide removal (CDR):** Anthropogenic activities removing $CO_2$ from the atmosphere and durably storing it in geological, terrestrial, or ocean reservoirs, or in products. It includes existing and potential anthropogenic enhancement of biological or geochemical sinks and direct air capture and storage, but excludes natural $CO_2$ uptake not directly caused by human activities.

**Total carbon budget:** Estimated cumulative net global anthropogenic $CO_2$ emissions from the pre-industrial period to the time that anthropogenic $CO_2$ emissions reach net zero that would result, at some probability, in limiting global warming to a given level, accounting for the impact of other anthropogenic emissions. {2.2.2}

**Remaining carbon budget:** Estimated cumulative net global anthropogenic $CO_2$ emissions from a given start date to the time that anthropogenic $CO_2$ emissions reach net zero that would result, at some probability, in limiting global warming to a given level, accounting for the impact of other anthropogenic emissions. {2.2.2}

**Temperature overshoot:** The temporary exceedance of a specified level of global warming.

**Emission pathways:** In this Summary for Policymakers, the modelled trajectories of global anthropogenic emissions over the 21st century are termed emission pathways. Emission pathways are classified by their temperature trajectory over the 21st century: pathways giving at least 50% probability based on current knowledge of limiting global warming to below 1.5°C are classified as 'no overshoot'; those limiting warming to below 1.6°C and returning to 1.5°C by 2100 are classified as '1.5°C limited-overshoot'; while those exceeding 1.6°C but still returning to 1.5°C by 2100 are classified as 'higher-overshoot'.

**Impacts:** Effects of climate change on human and natural systems. Impacts can have beneficial or adverse outcomes for livelihoods, health and well-being, ecosystems and species, services, infrastructure, and economic, social and cultural assets.

**Risk:** The potential for adverse consequences from a climate-related hazard for human and natural systems, resulting from the interactions between the hazard and the vulnerability and exposure of the affected system. Risk integrates the likelihood of exposure to a hazard and the magnitude of its impact. Risk also can describe the potential for adverse consequences of adaptation or mitigation responses to climate change.

**Climate-resilient development pathways (CRDPs):** Trajectories that strengthen sustainable development at multiple scales and efforts to eradicate poverty through equitable societal and systems transitions and transformations while reducing the threat of climate change through ambitious mitigation, adaptation and climate resilience.

19 Past IPCC reports, reflecting the literature, have used a variety of approximately equivalent metrics of GMST change.

The New York Times https://nyti.ms/2reaFi7

# Climate Change Is Accelerating, Bringing World 'Dangerously Close' to Irreversible Change

By Henry Fountain

Published Dec. 4, 2019 Updated Dec. 5, 2019

More devastating fires in California. Persistent drought in the Southwest. Record flooding in Europe and Africa. A heat wave, of all things, in Greenland.

Climate change and its effects are accelerating, with climate related disasters piling up, season after season.

"Things are getting worse," said Petteri Taalas, Secretary General of the World Meteorological Organization, which on Tuesday issued its annual state of the global climate report, concluding a decade of what it called exceptional global heat. "It's more urgent than ever to proceed with mitigation."

But reducing greenhouse gas emissions to fight climate change will require drastic measures, Dr. Taalas said. "The only solution is to get rid of fossil fuels in power production, industry and transportation," he said.

Seas are warming and rising faster, putting more cities at risk of tidal flooding or worse. Glaciers are melting at a pace many researchers did not expect for decades. The amount of Arctic sea ice has declined so rapidly that the region may see ice-free summers by the 2030s.

Even the ground itself is warming faster. Permanently frozen ground, or permafrost, is thawing more rapidly, threatening the release of large amounts of long-stored carbon that could in turn make warming even worse, in what scientists call a climate feedback loop.

In a recent commentary in the journal Nature, scientists from the Potsdam Institute for Climate Impact Research in Germany and other institutions warned that the acceleration of ice loss and other effects of climate change have brought the world "dangerously close" to abrupt and irreversible changes, or tipping points. Among these, the researchers said, were the collapse of at least part of the West Antarctic ice sheet — which itself could eventually raise sea levels by four feet or more — or the loss of the Amazon rainforest.

"In our view, the consideration of tipping points helps to define that we are in a climate emergency," they wrote.

The societal toll is accelerating, too, United Nations Secretary General António Guterres said in Madrid before the opening this week of the U.N.'s annual climate conference. "Climate-related natural disasters are becoming more frequent, more deadly, more destructive, with growing human and financial costs," he said.



Flooding in Mogadishu, Somalia, in October. Feisal Omar/Reuters



Burnt farms in Piseux, northwest France, in July during a heat wave. Agence France-Presse — Getty Images

For individual extreme weather events or other disasters it can be difficult to fully separate the effects of global warming from those of natural climate variability and other factors. Warming can make wildfires worse, for example — it makes vegetation drier and more combustible — but forest management practices, as well as decisions about where to build, also affect the degree of devastation.

Yet a growing number of studies have shown the influence of global warming in many disasters. Heat waves in Europe in June and July, extreme rainfall in Texas during Tropical Storm Imelda in September, the drought that precipitated the "Day Zero" water crisis in Cape Town in 2018 are among many events shown to have been made more likely, more intense, or both, by climate change.

Effects like loss of sea ice, more severe heat waves and changes in rainfall patterns were long predicted by scientists and described in reports like those of the Intergovernmental Panel on Climate Change and, in the United States, the National Climate Assessments produced by federal researchers.

"So much of what we're seeing is exactly consistent with what's expected from climate change," said Philip B. Duffy, a physicist and president of the Woods Hole Research Center, which studies the environment.

*Want climate news in your inbox? Sign up here for **Climate Fwd:**, our email newsletter.*

At the root of the changes is the basic process of global warming. As carbon dioxide and other greenhouse gases build up in the atmosphere, they trap more of the heat that radiates from Earth's surface as it absorbs sunlight.

The W.M.O.'s state of the global climate report, released at the Madrid talks, said that this decade will almost certainly be the warmest decade on record. And the second half of the decade was much warmer than the first, with global temperatures averaged over the second half about 0.2 degree Celsius (about 0.4 degree Fahrenheit) higher.

"All the time we're breaking records in temperatures," Dr. Taalas said.

The records extend to the oceans as well, which absorb about 90 percent of the excess heat retained by Earth as a result of increased greenhouse gases. Average ocean temperatures so far this year exceed those of 2018, which were records, the report said.

Since the rise of industry in the second half of the 19th century, when widespread emissions of greenhouse gases began, the world has warmed by about 1.1 degrees Celsius.

But how fast temperatures will continue to increase, and how much worse things may get, depends in large part on whether the world reins in greenhouse gas emissions, and by how much. After flattening between 2014 and 2016, annual emissions from burning fossil fuels for energy have risen again.




Filling water buckets from a government water pump in the drought-ravaged Lamhata village in Uttar Pradesh, India, earlier this year. Bryan Denton for The New York Times

Bathing in a fountain in St. Petersburg, Russia, during unseasonably hot temperatures in July. Dmitri Lovetsky/Associated Press

The 2015 Paris agreement called for countries to pursue efforts to limit warming this century to 2 degrees Celsius (3.6 degrees Fahrenheit) above preindustrial levels, with an even stricter target of 1.5 degrees Celsius. But the United States under President Trump is leaving the agreement, and a United Nations report last month suggested that even if countries meet their pledges to cut emissions, and many are far off track, warming would be more than twice the 1.5-degree target.

Acceleration of some elements of climate change has been expected, and has now been detected thanks to improvements in measurements. Sea level readings, for example, are now far more extensive, frequent and precise thanks to satellite sensors in use for the last quarter-century. In the past, scientists had to rely on tide gauges.

Using satellite data, a 2018 study found that global sea level rise is now about 4.5 millimeters a year, or a little less than one-fifth of an inch. The rate is increasing by about a 10th of a millimeter a year.

“We knew the rate of sea level rise was increasing, but we had difficulty detecting that,” said Steven Nerem, a University of Colorado researcher and lead author of the study.

The study estimated that the acceleration would result in sea level rise by the end of this century of 65 centimeters, or about 25 inches, which is more than double the rise if the rate had remained constant.

Sea level rise results from a combination of melting glaciers and ice sheets, and the thermal expansion of seawater as ocean temperatures rise. As with most of the projected effects of climate change, there is a high level of uncertainty about future sea levels.

“No one is terribly sure about what will happen by 2100,” Dr. Nerem said. “If the ice sheets really start to go, things could change dramatically.”

Greenland and Antarctica hold enough ice to raise seas by about 220 feet if it all melted. Complete melting would take many centuries, but melting is speeding up on the Greenland sheet, which currently contributes about two-thirds of a millimeter to sea level rise annually, and on much of the West Antarctic sheet.

“This is a consequence of the warming temperatures of climate change,” said Marco Tedesco, a climate scientist at the Lamont-Doherty Earth Observatory at Columbia University.

“Overall we do not expect Greenland to slow down,” he said. “And we definitely expect an acceleration in mass loss of the West Antarctic ice sheet.” While the West Antarctic sheet currently contributes a small amount to sea level rise, eventually it could contribute as much as Greenland, he said.

Melting permafrost threatening a home in Kivalina, Alaska, a coastal village 83 miles above the Arctic Circle. Joe Raedle/Getty Images

Rivulets of meltwater cleaving the Greenland ice sheet near Ilulissat in August. Sean Gallup/Getty Images

Amid the long term increase in ice-sheet melting there have been some exceptional periods, including this summer in Greenland, when heat from Europe spread north, resulting in temperatures as much as 15 degrees Fahrenheit above normal. Overall this year, Greenland had a net ice loss of about 350 billion tons, about 20 percent more than the average in recent years and enough to add one millimeter to sea levels by itself.

A recent analysis by Dr. Tedesco and a colleague showed that a rare combination of atmospheric conditions, related to instability of the polar jet stream that encircles Earth at high northern latitudes, led to this summer's melting. Some scientists have suggested that this jet stream instability, or wobbling, is a result of climate change, although the idea is not completely accepted.

Warming in the Far North affects more than ice. Louise Farquharson, a geologist and researcher at the University of Alaska-Fairbanks, studies the effect of climate change on permafrost. In the Arctic, ground can be permanently frozen from near the surface to several thousand feet deep.

"We see warming across the board, and generally the rate of warming is increasing," Dr. Farquharson said. "But the impact varies significantly."

Her recent research found rapid thawing of permafrost high in the Canadian Arctic, where there is little surface vegetation to insulate the frozen ground. By 2016 the permafrost had already thawed at depths not expected until 2090 under a model of "moderate" global warming.

While the permafrost at her study sites contains little organic matter, much of the Arctic's permafrost contains large amounts of dead vegetation built up over hundreds or thousands of years. This makes it a huge storehouse of carbon: By some estimates, Arctic permafrost contains about twice as much carbon as is currently in the atmosphere.

When it thaws, the organic matter begins to decompose, and the carbon enters the atmosphere as methane or carbon dioxide, adding to warming.

A floating iceberg in Disko Bay in Ilulissat, Greenland, in August. Sean Gallup/Getty Images

For more news on climate and the environment, follow @NYTClimate on Twitter.

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



# Presidential Documents

**Executive Order 13990 of January 20, 2021**

## Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1**. *Policy.* Our Nation has an abiding commitment to empower our workers and communities; promote and protect our public health and the environment; and conserve our national treasures and monuments, places that secure our national memory. Where the Federal Government has failed to meet that commitment in the past, it must advance environmental justice. In carrying out this charge, the Federal Government must be guided by the best science and be protected by processes that ensure the integrity of Federal decision-making. It is, therefore, the policy of my Administration to listen to the science; to improve public health and protect our environment; to ensure access to clean air and water; to limit exposure to dangerous chemicals and pesticides; to hold polluters accountable, including those who disproportionately harm communities of color and low-income communities; to reduce greenhouse gas emissions; to bolster resilience to the impacts of climate change; to restore and expand our national treasures and monuments; and to prioritize both environmental justice and the creation of the well-paying union jobs necessary to deliver on these goals.

To that end, this order directs all executive departments and agencies (agencies) to immediately review and, as appropriate and consistent with applicable law, take action to address the promulgation of Federal regulations and other actions during the last 4 years that conflict with these important national objectives, and to immediately commence work to confront the climate crisis.

**Sec. 2**. *Immediate Review of Agency Actions Taken Between January 20, 2017, and January 20, 2021.* (a) The heads of all agencies shall immediately review all existing regulations, orders, guidance documents, policies, and any other similar agency actions (agency actions) promulgated, issued, or adopted between January 20, 2017, and January 20, 2021, that are or may be inconsistent with, or present obstacles to, the policy set forth in section 1 of this order. For any such actions identified by the agencies, the heads of agencies shall, as appropriate and consistent with applicable law, consider suspending, revising, or rescinding the agency actions. In addition, for the agency actions in the 4 categories set forth in subsections (i) through (iv) of this section, the head of the relevant agency, as appropriate and consistent with applicable law, shall consider publishing for notice and comment a proposed rule suspending, revising, or rescinding the agency action within the time frame specified.

(i) Reducing Methane Emissions in the Oil and Gas Sector: ''Oil and Natural Gas Sector: Emission Standards for New, Reconstructed, and Modified Sources Reconsideration,'' 85 FR 57398 (September 15, 2020), by September 2021.

(ii) Establishing Ambitious, Job-Creating Fuel Economy Standards: ''The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program,'' 84 FR 51310 (September 27, 2019), by April 2021; and ''The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021–2026 Passenger Cars and Light Trucks,'' 85 FR 24174 (April 30,

2020), by July 2021. In considering whether to propose suspending, revising, or rescinding the latter rule, the agency should consider the views of representatives from labor unions, States, and industry.

(iii) Job-Creating Appliance- and Building-Efficiency Standards: ''Energy Conservation Program for Appliance Standards: Procedures for Use in New or Revised Energy Conservation Standards and Test Procedures for Consumer Products and Commercial/Industrial Equipment,'' 85 FR 8626 (February 14, 2020), with major revisions proposed by March 2021 and any remaining revisions proposed by June 2021; ''Energy Conservation Program for Appliance Standards: Procedures for Evaluating Statutory Factors for Use in New or Revised Energy Conservation Standards,'' 85 FR 50937 (August 19, 2020), with major revisions proposed by March 2021 and any remaining revisions proposed by June 2021; ''Final Determination Regarding Energy Efficiency Improvements in the 2018 International Energy Conservation Code (IECC),'' 84 FR 67435 (December 10, 2019), by May 2021; ''Final Determination Regarding Energy Efficiency Improvements in ANSI/ASHRAE/IES Standard 90.1–2016: Energy Standard for Buildings, Except Low-Rise Residential Buildings,'' 83 FR 8463 (February 27, 2018), by May 2021.

(iv) Protecting Our Air from Harmful Pollution: ''National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units—Reconsideration of Supplemental Finding and Residual Risk and Technology Review,'' 85 FR 31286 (May 22, 2020), by August 2021; ''Increasing Consistency and Transparency in Considering Benefits and Costs in the Clean Air Act Rulemaking Process,'' 85 FR 84130 (December 23, 2020), as soon as possible; ''Strengthening Transparency in Pivotal Science Underlying Significant Regulatory Actions and Influential Scientific Information,'' 86 FR 469 (January 6, 2021), as soon as possible.

(b) Within 30 days of the date of this order, heads of agencies shall submit to the Director of the Office of Management and Budget (OMB) a preliminary list of any actions being considered pursuant to section (2)(a) of this order that would be completed by December 31, 2021, and that would be subject to OMB review. Within 90 days of the date of this order, heads of agencies shall submit to the Director of OMB an updated list of any actions being considered pursuant to section (2)(a) of this order that would be completed by December 31, 2025, and that would be subject to OMB review. At the time of submission to the Director of OMB, heads of agencies shall also send each list to the National Climate Advisor. In addition, and at the same time, heads of agencies shall send to the National Climate Advisor a list of additional actions being considered pursuant to section (2)(a) of this order that would not be subject to OMB review.

(c) Heads of agencies shall, as appropriate and consistent with applicable law, consider whether to take any additional agency actions to fully enforce the policy set forth in section 1 of this order. With respect to the Administrator of the Environmental Protection Agency, the following specific actions should be considered:

(i) proposing new regulations to establish comprehensive standards of performance and emission guidelines for methane and volatile organic compound emissions from existing operations in the oil and gas sector, including the exploration and production, transmission, processing, and storage segments, by September 2021; and

(ii) proposing a Federal Implementation Plan in accordance with the Environmental Protection Agency's ''Findings of Failure To Submit State Implementation Plan Revisions in Response to the 2016 Oil and Natural Gas Industry Control Techniques Guidelines for the 2008 Ozone National Ambient Air Quality Standards (NAAQS) and for States in the Ozone Transport Region,'' 85 FR 72963 (November 16, 2020), for California, Connecticut, New York, Pennsylvania, and Texas by January 2022.

(d) The Attorney General may, as appropriate and consistent with applicable law, provide notice of this order and any actions taken pursuant to section 2(a) of this order to any court with jurisdiction over pending litigation related to those agency actions identified pursuant to section (2)(a) of this order, and may, in his discretion, request that the court stay or otherwise dispose of litigation, or seek other appropriate relief consistent with this order, until the completion of the processes described in this order.

(e) In carrying out the actions directed in this section, heads of agencies shall seek input from the public and stakeholders, including State local, Tribal, and territorial officials, scientists, labor unions, environmental advocates, and environmental justice organizations.

**Sec. 3**. *Restoring National Monuments.* (a) The Secretary of the Interior, as appropriate and consistent with applicable law, including the Antiquities Act, 54 U.S.C. 320301 *et seq.,* shall, in consultation with the Attorney General, the Secretaries of Agriculture and Commerce, the Chair of the Council on Environmental Quality, and Tribal governments, conduct a review of the monument boundaries and conditions that were established by Proclamation 9681 of December 4, 2017 (Modifying the Bears Ears National Monument); Proclamation 9682 of December 4, 2017 (Modifying the Grand Staircase-Escalante National Monument); and Proclamation 10049 of June 5, 2020 (Modifying the Northeast Canyons and Seamounts Marine National Monument), to determine whether restoration of the monument boundaries and conditions that existed as of January 20, 2017, would be appropriate.

(b) Within 60 days of the date of this order, the Secretary of the Interior shall submit a report to the President summarizing the findings of the review conducted pursuant to subsection (a), which shall include recommendations for such Presidential actions or other actions consistent with law as the Secretary may consider appropriate to carry out the policy set forth in section 1 of this order.

(c) The Attorney General may, as appropriate and consistent with applicable law, provide notice of this order to any court with jurisdiction over pending litigation related to the Grand Staircase-Escalante, Bears Ears, and Northeast Canyons and Seamounts Marine National Monuments, and may, in his discretion, request that the court stay the litigation or otherwise delay further litigation, or seek other appropriate relief consistent with this order, pending the completion of the actions described in subsection (a) of this section.

**Sec. 4**. *Arctic Refuge.* (a) In light of the alleged legal deficiencies underlying the program, including the inadequacy of the environmental review required by the National Environmental Policy Act, the Secretary of the Interior shall, as appropriate and consistent with applicable law, place a temporary moratorium on all activities of the Federal Government relating to the implementation of the Coastal Plain Oil and Gas Leasing Program, as established by the Record of Decision signed August 17, 2020, in the Arctic National Wildlife Refuge. The Secretary shall review the program and, as appropriate and consistent with applicable law, conduct a new, comprehensive analysis of the potential environmental impacts of the oil and gas program.

(b) In Executive Order 13754 of December 9, 2016 (Northern Bering Sea Climate Resilience), and in the Presidential Memorandum of December 20, 2016 (Withdrawal of Certain Portions of the United States Arctic Outer Continental Shelf From Mineral Leasing), President Obama withdrew areas in Arctic waters and the Bering Sea from oil and gas drilling and established the Northern Bering Sea Climate Resilience Area. Subsequently, the order was revoked and the memorandum was amended in Executive Order 13795 of April 28, 2017 (Implementing an America-First Offshore Energy Strategy). Pursuant to section 12(a) of the Outer Continental Shelf Lands Act, 43 U.S.C. 1341(a), Executive Order 13754 and the Presidential Memorandum of December 20, 2016, are hereby reinstated in their original form, thereby restoring the original withdrawal of certain offshore areas in Arctic waters and the Bering Sea from oil and gas drilling.

(c) The Attorney General may, as appropriate and consistent with applicable law, provide notice of this order to any court with jurisdiction over pending litigation related to the Coastal Plain Oil and Gas Leasing Program in the Arctic National Wildlife Refuge and other related programs, and may, in his discretion, request that the court stay the litigation or otherwise delay further litigation, or seek other appropriate relief consistent with this order, pending the completion of the actions described in subsection (a) of this section.

**Sec. 5**. *Accounting for the Benefits of Reducing Climate Pollution.* (a) It is essential that agencies capture the full costs of greenhouse gas emissions as accurately as possible, including by taking global damages into account. Doing so facilitates sound decision-making, recognizes the breadth of climate impacts, and supports the international leadership of the United States on climate issues. The ''social cost of carbon'' (SCC), ''social cost of nitrous oxide'' (SCN), and ''social cost of methane'' (SCM) are estimates of the monetized damages associated with incremental increases in greenhouse gas emissions. They are intended to include changes in net agricultural productivity, human health, property damage from increased flood risk, and the value of ecosystem services. An accurate social cost is essential for agencies to accurately determine the social benefits of reducing greenhouse gas emissions when conducting cost-benefit analyses of regulatory and other actions.

(b) There is hereby established an Interagency Working Group on the Social Cost of Greenhouse Gases (the ''Working Group''). The Chair of the Council of Economic Advisers, Director of OMB, and Director of the Office of Science and Technology Policy shall serve as Co-Chairs of the Working Group.

(i) Membership. The Working Group shall also include the following other officers, or their designees: the Secretary of the Treasury; the Secretary of the Interior; the Secretary of Agriculture; the Secretary of Commerce; the Secretary of Health and Human Services; the Secretary of Transportation; the Secretary of Energy; the Chair of the Council on Environmental Quality; the Administrator of the Environmental Protection Agency; the Assistant to the President and National Climate Advisor; and the Assistant to the President for Economic Policy and Director of the National Economic Council.

(ii) Mission and Work. The Working Group shall, as appropriate and consistent with applicable law:

(A) publish an interim SCC, SCN, and SCM within 30 days of the date of this order, which agencies shall use when monetizing the value of changes in greenhouse gas emissions resulting from regulations and other relevant agency actions until final values are published;

(B) publish a final SCC, SCN, and SCM by no later than January 2022;

(C) provide recommendations to the President, by no later than September 1, 2021, regarding areas of decision-making, budgeting, and procurement by the Federal Government where the SCC, SCN, and SCM should be applied;

(D) provide recommendations, by no later than June 1, 2022, regarding a process for reviewing, and, as appropriate, updating, the SCC, SCN, and SCM to ensure that these costs are based on the best available economics and science; and

(E) provide recommendations, to be published with the final SCC, SCN, and SCM under subparagraph (A) if feasible, and in any event by no later than June 1, 2022, to revise methodologies for calculating the SCC, SCN, and SCM, to the extent that current methodologies do not adequately take account of climate risk, environmental justice, and intergenerational equity.

(iii) Methodology. In carrying out its activities, the Working Group shall consider the recommendations of the National Academies of Science, Engineering, and Medicine as reported in Valuing Climate Damages: Updating Estimation of the Social Cost of Carbon Dioxide (2017) and other pertinent scientific literature; solicit public comment; engage with the public and stakeholders; seek the advice of ethics experts; and ensure that the SCC, SCN, and SCM reflect the interests of future generations in avoiding threats posed by climate change.

**Sec. 6**. *Revoking the March 2019 Permit for the Keystone XL Pipeline.* (a) On March 29, 2019, the President granted to TransCanada Keystone Pipeline, L.P. a Presidential permit (the ''Permit'') to construct, connect, operate, and maintain pipeline facilities at the international border of the United States and Canada (the ''Keystone XL pipeline''), subject to express conditions and potential revocation in the President's sole discretion. The Permit is hereby revoked in accordance with Article 1(1) of the Permit.

(b) In 2015, following an exhaustive review, the Department of State and the President determined that approving the proposed Keystone XL pipeline would not serve the U.S. national interest. That analysis, in addition to concluding that the significance of the proposed pipeline for our energy security and economy is limited, stressed that the United States must prioritize the development of a clean energy economy, which will in turn create good jobs. The analysis further concluded that approval of the proposed pipeline would undermine U.S. climate leadership by undercutting the credibility and influence of the United States in urging other countries to take ambitious climate action.

(c) Climate change has had a growing effect on the U.S. economy, with climate-related costs increasing over the last 4 years. Extreme weather events and other climate-related effects have harmed the health, safety, and security of the American people and have increased the urgency for combatting climate change and accelerating the transition toward a clean energy economy. The world must be put on a sustainable climate pathway to protect Americans and the domestic economy from harmful climate impacts, and to create well-paying union jobs as part of the climate solution.

(d) The Keystone XL pipeline disserves the U.S. national interest. The United States and the world face a climate crisis. That crisis must be met with action on a scale and at a speed commensurate with the need to avoid setting the world on a dangerous, potentially catastrophic, climate trajectory. At home, we will combat the crisis with an ambitious plan to build back better, designed to both reduce harmful emissions and create good clean-energy jobs. Our domestic efforts must go hand in hand with U.S. diplomatic engagement. Because most greenhouse gas emissions originate beyond our borders, such engagement is more necessary and urgent than ever. The United States must be in a position to exercise vigorous climate leadership in order to achieve a significant increase in global climate action and put the world on a sustainable climate pathway. Leaving the Keystone XL pipeline permit in place would not be consistent with my Administration's economic and climate imperatives.

**Sec. 7**. *Other Revocations.* (a) Executive Order 13766 of January 24, 2017 (Expediting Environmental Reviews and Approvals For High Priority Infrastructure Projects), Executive Order 13778 of February 28, 2017 (Restoring the Rule of Law, Federalism, and Economic Growth by Reviewing the ''Waters of the United States'' Rule), Executive Order 13783 of March 28, 2017 (Promoting Energy Independence and Economic Growth), Executive Order 13792 of April 26, 2017 (Review of Designations Under the Antiquities Act), Executive Order 13795 of April 28, 2017 (Implementing an America-First Offshore Energy Strategy), Executive Order 13868 of April 10, 2019 (Promoting Energy Infrastructure and Economic Growth), and Executive Order 13927 of June 4, 2020 (Accelerating the Nation's Economic Recovery from the COVID–19 Emergency by Expediting Infrastructure Investments and Other Activities), are hereby revoked. Executive Order 13834 of May 17, 2018

(Efficient Federal Operations), is hereby revoked except for sections 6, 7, and 11.

(b) Executive Order 13807 of August 15, 2017 (Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects), is hereby revoked. The Director of OMB and the Chair of the Council on Environmental Quality shall jointly consider whether to recommend that a replacement order be issued.

(c) Executive Order 13920 of May 1, 2020 (Securing the United States Bulk-Power System), is hereby suspended for 90 days. The Secretary of Energy and the Director of OMB shall jointly consider whether to recommend that a replacement order be issued.

(d) The Presidential Memorandum of April 12, 2018 (Promoting Domestic Manufacturing and Job Creation Policies and Procedures Relating to Implementation of Air Quality Standards), the Presidential Memorandum of October 19, 2018 (Promoting the Reliable Supply and Delivery of Water in the West), and the Presidential Memorandum of February 19, 2020 (Developing and Delivering More Water Supplies in California), are hereby revoked.

(e) The Council on Environmental Quality shall rescind its draft guidance entitled, ''Draft National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions,'' 84 FR 30097 (June 26, 2019). The Council, as appropriate and consistent with applicable law, shall review, revise, and update its final guidance entitled, ''Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews,'' 81 FR 51866 (August 5, 2016).

(f) The Director of OMB and the heads of agencies shall promptly take steps to rescind any orders, rules, regulations, guidelines, or policies, or portions thereof, including, if necessary, by proposing such rescissions through notice-and-comment rulemaking, implementing or enforcing the Executive Orders, Presidential Memoranda, and draft guidance identified in this section, as appropriate and consistent with applicable law.

**Sec. 8**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented in a manner consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.



THE WHITE HOUSE,
*January 20, 2021.*

[FR Doc. 2021–01765
Filed 1–22–21; 11:15 am]
Billing code 3295–F1–P

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



# Presidential Documents

**Executive Order 14008 of January 27, 2021**

## Tackling the Climate Crisis at Home and Abroad

The United States and the world face a profound climate crisis. We have a narrow moment to pursue action at home and abroad in order to avoid the most catastrophic impacts of that crisis and to seize the opportunity that tackling climate change presents. Domestic action must go hand in hand with United States international leadership, aimed at significantly enhancing global action. Together, we must listen to science and meet the moment.

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**PART I—PUTTING THE CLIMATE CRISIS AT THE CENTER OF UNITED STATES FOREIGN POLICY AND NATIONAL SECURITY**

**Section 101**. *Policy*. United States international engagement to address climate change—which has become a climate crisis—is more necessary and urgent than ever. The scientific community has made clear that the scale and speed of necessary action is greater than previously believed. There is little time left to avoid setting the world on a dangerous, potentially catastrophic, climate trajectory. Responding to the climate crisis will require both significant short-term global reductions in greenhouse gas emissions and net-zero global emissions by mid-century or before.

It is the policy of my Administration that climate considerations shall be an essential element of United States foreign policy and national security. The United States will work with other countries and partners, both bilaterally and multilaterally, to put the world on a sustainable climate pathway. The United States will also move quickly to build resilience, both at home and abroad, against the impacts of climate change that are already manifest and will continue to intensify according to current trajectories.

**Sec. 102**. *Purpose*. This order builds on and reaffirms actions my Administration has already taken to place the climate crisis at the forefront of this Nation's foreign policy and national security planning, including submitting the United States instrument of acceptance to rejoin the Paris Agreement. In implementing—and building upon—the Paris Agreement's three overarching objectives (a safe global temperature, increased climate resilience, and financial flows aligned with a pathway toward low greenhouse gas emissions and climate-resilient development), the United States will exercise its leadership to promote a significant increase in global climate ambition to meet the climate challenge. In this regard:

(a) I will host an early Leaders' Climate Summit aimed at raising climate ambition and making a positive contribution to the 26th United Nations Climate Change Conference of the Parties (COP26) and beyond.

(b) The United States will reconvene the Major Economies Forum on Energy and Climate, beginning with the Leaders' Climate Summit. In cooperation with the members of that Forum, as well as with other partners as appropriate, the United States will pursue green recovery efforts, initiatives to advance the clean energy transition, sectoral decarbonization, and alignment of financial flows with the objectives of the Paris Agreement, including with respect to coal financing, nature-based solutions, and solutions to other climate-related challenges.

(c) I have created a new Presidentially appointed position, the Special Presidential Envoy for Climate, to elevate the issue of climate change and underscore the commitment my Administration will make toward addressing it.

(d) Recognizing that climate change affects a wide range of subjects, it will be a United States priority to press for enhanced climate ambition and integration of climate considerations across a wide range of international fora, including the Group of Seven (G7), the Group of Twenty (G20), and fora that address clean energy, aviation, shipping, the Arctic, the ocean, sustainable development, migration, and other relevant topics. The Special Presidential Envoy for Climate and others, as appropriate, are encouraged to promote innovative approaches, including international multi-stakeholder initiatives. In addition, my Administration will work in partnership with States, localities, Tribes, territories, and other United States stakeholders to advance United States climate diplomacy.

(e) The United States will immediately begin the process of developing its nationally determined contribution under the Paris Agreement. The process will include analysis and input from relevant executive departments and agencies (agencies), as well as appropriate outreach to domestic stakeholders. The United States will aim to submit its nationally determined contribution in advance of the Leaders' Climate Summit.

(f) The United States will also immediately begin to develop a climate finance plan, making strategic use of multilateral and bilateral channels and institutions, to assist developing countries in implementing ambitious emissions reduction measures, protecting critical ecosystems, building resilience against the impacts of climate change, and promoting the flow of capital toward climate-aligned investments and away from high-carbon investments. The Secretary of State and the Secretary of the Treasury, in coordination with the Special Presidential Envoy for Climate, shall lead a process to develop this plan, with the participation of the Administrator of the United States Agency for International Development (USAID), the Chief Executive Officer of the United States International Development Finance Corporation (DFC), the Chief Executive Officer of the Millennium Challenge Corporation, the Director of the United States Trade and Development Agency, the Director of the Office of Management and Budget, and the head of any other agency providing foreign assistance and development financing, as appropriate. The Secretary of State and the Secretary of the Treasury shall submit the plan to the President, through the Assistant to the President for National Security Affairs and the Assistant to the President for Economic Policy, within 90 days of the date of this order.

(g) The Secretary of the Treasury shall:

(i) ensure that the United States is present and engaged in relevant international fora and institutions that are working on the management of climate-related financial risks;

(ii) develop a strategy for how the voice and vote of the United States can be used in international financial institutions, including the World Bank Group and the International Monetary Fund, to promote financing programs, economic stimulus packages, and debt relief initiatives that are aligned with and support the goals of the Paris Agreement; and

(iii) develop, in collaboration with the Secretary of State, the Administrator of USAID, and the Chief Executive Officer of the DFC, a plan for promoting the protection of the Amazon rainforest and other critical ecosystems that serve as global carbon sinks, including through market-based mechanisms.

(h) The Secretary of State, the Secretary of the Treasury, and the Secretary of Energy shall work together and with the Export-Import Bank of the United States, the Chief Executive Officer of the DFC, and the heads of other agencies and partners, as appropriate, to identify steps through which the United States can promote ending international financing of carbon-

intensive fossil fuel-based energy while simultaneously advancing sustainable development and a green recovery, in consultation with the Assistant to the President for National Security Affairs.

(i) The Secretary of Energy, in cooperation with the Secretary of State and the heads of other agencies, as appropriate, shall identify steps through which the United States can intensify international collaborations to drive innovation and deployment of clean energy technologies, which are critical for climate protection.

(j) The Secretary of State shall prepare, within 60 days of the date of this order, a transmittal package seeking the Senate's advice and consent to ratification of the Kigali Amendment to the Montreal Protocol on Substances that Deplete the Ozone Layer, regarding the phasedown of the production and consumption of hydrofluorocarbons.

**Sec. 103**. *Prioritizing Climate in Foreign Policy and National Security*. To ensure that climate change considerations are central to United States foreign policy and national security:

(a) Agencies that engage in extensive international work shall develop, in coordination with the Special Presidential Envoy for Climate, and submit to the President, through the Assistant to the President for National Security Affairs, within 90 days of the date of this order, strategies and implementation plans for integrating climate considerations into their international work, as appropriate and consistent with applicable law. These strategies and plans should include an assessment of:

(i) climate impacts relevant to broad agency strategies in particular countries or regions;

(ii) climate impacts on their agency-managed infrastructure abroad (e.g., embassies, military installations), without prejudice to existing requirements regarding assessment of such infrastructure;

(iii) how the agency intends to manage such impacts or incorporate risk mitigation into its installation master plans; and

(iv) how the agency's international work, including partner engagement, can contribute to addressing the climate crisis.

(b) The Director of National Intelligence shall prepare, within 120 days of the date of this order, a National Intelligence Estimate on the national and economic security impacts of climate change.

(c) The Secretary of Defense, in coordination with the Secretary of Commerce, through the Administrator of the National Oceanic and Atmospheric Administration, the Chair of the Council on Environmental Quality, the Administrator of the Environmental Protection Agency, the Director of National Intelligence, the Director of the Office of Science and Technology Policy, the Administrator of the National Aeronautics and Space Administration, and the heads of other agencies as appropriate, shall develop and submit to the President, within 120 days of the date of this order, an analysis of the security implications of climate change (Climate Risk Analysis) that can be incorporated into modeling, simulation, war-gaming, and other analyses.

(d) The Secretary of Defense and the Chairman of the Joint Chiefs of Staff shall consider the security implications of climate change, including any relevant information from the Climate Risk Analysis described in subsection (c) of this section, in developing the National Defense Strategy, Defense Planning Guidance, Chairman's Risk Assessment, and other relevant strategy, planning, and programming documents and processes. Starting in January 2022, the Secretary of Defense and the Chairman of the Joint Chiefs of Staff shall provide an annual update, through the National Security Council, on the progress made in incorporating the security implications of climate change into these documents and processes.

(e) The Secretary of Homeland Security shall consider the implications of climate change in the Arctic, along our Nation's borders, and to National

Critical Functions, including any relevant information from the Climate Risk Analysis described in subsection (c) of this section, in developing relevant strategy, planning, and programming documents and processes. Starting in January 2022, the Secretary of Homeland Security shall provide an annual update, through the National Security Council, on the progress made in incorporating the homeland security implications of climate change into these documents and processes.

**Sec. 104**. *Reinstatement*. The Presidential Memorandum of September 21, 2016 (Climate Change and National Security), is hereby reinstated.

**PART II—TAKING A GOVERNMENT-WIDE APPROACH TO THE CLIMATE CRISIS**

**Sec. 201**. *Policy*. Even as our Nation emerges from profound public health and economic crises borne of a pandemic, we face a climate crisis that threatens our people and communities, public health and economy, and, starkly, our ability to live on planet Earth. Despite the peril that is already evident, there is promise in the solutions—opportunities to create well-paying union jobs to build a modern and sustainable infrastructure, deliver an equitable, clean energy future, and put the United States on a path to achieve net-zero emissions, economy-wide, by no later than 2050.

We must listen to science—and act. We must strengthen our clean air and water protections. We must hold polluters accountable for their actions. We must deliver environmental justice in communities all across America. The Federal Government must drive assessment, disclosure, and mitigation of climate pollution and climate-related risks in every sector of our economy, marshaling the creativity, courage, and capital necessary to make our Nation resilient in the face of this threat. Together, we must combat the climate crisis with bold, progressive action that combines the full capacity of the Federal Government with efforts from every corner of our Nation, every level of government, and every sector of our economy.

It is the policy of my Administration to organize and deploy the full capacity of its agencies to combat the climate crisis to implement a Government-wide approach that reduces climate pollution in every sector of the economy; increases resilience to the impacts of climate change; protects public health; conserves our lands, waters, and biodiversity; delivers environmental justice; and spurs well-paying union jobs and economic growth, especially through innovation, commercialization, and deployment of clean energy technologies and infrastructure. Successfully meeting these challenges will require the Federal Government to pursue such a coordinated approach from planning to implementation, coupled with substantive engagement by stakeholders, including State, local, and Tribal governments.

**Sec. 202**. *White House Office of Domestic Climate Policy*. There is hereby established the White House Office of Domestic Climate Policy (Climate Policy Office) within the Executive Office of the President, which shall coordinate the policy-making process with respect to domestic climate-policy issues; coordinate domestic climate-policy advice to the President; ensure that domestic climate-policy decisions and programs are consistent with the President's stated goals and that those goals are being effectively pursued; and monitor implementation of the President's domestic climate-policy agenda. The Climate Policy Office shall have a staff headed by the Assistant to the President and National Climate Advisor (National Climate Advisor) and shall include the Deputy Assistant to the President and Deputy National Climate Advisor. The Climate Policy Office shall have such staff and other assistance as may be necessary to carry out the provisions of this order, subject to the availability of appropriations, and may work with established or ad hoc committees or interagency groups. All agencies shall cooperate with the Climate Policy Office and provide such information, support, and assistance to the Climate Policy Office as it may request, as appropriate and consistent with applicable law.

**Sec. 203**. *National Climate Task Force*. There is hereby established a National Climate Task Force (Task Force). The Task Force shall be chaired by the National Climate Advisor.

(a) Membership. The Task Force shall consist of the following additional members:

(i) the Secretary of the Treasury;

(ii) the Secretary of Defense;

(iii) the Attorney General;

(iv) the Secretary of the Interior;

(v) the Secretary of Agriculture;

(vi) the Secretary of Commerce;

(vii) the Secretary of Labor;

(viii) the Secretary of Health and Human Services;

(ix) the Secretary of Housing and Urban Development;

(x) the Secretary of Transportation;

(xi) the Secretary of Energy;

(xii) the Secretary of Homeland Security;

(xiii) the Administrator of General Services;

(xiv) the Chair of the Council on Environmental Quality;

(xv) the Administrator of the Environmental Protection Agency;

(xvi) the Director of the Office of Management and Budget;

(xvii) the Director of the Office of Science and Technology Policy;

(xviii) the Assistant to the President for Domestic Policy;

(xix) the Assistant to the President for National Security Affairs;

(xx) the Assistant to the President for Homeland Security and Counterterrorism; and

(xxi) the Assistant to the President for Economic Policy.

(b) Mission and Work. The Task Force shall facilitate the organization and deployment of a Government-wide approach to combat the climate crisis. This Task Force shall facilitate planning and implementation of key Federal actions to reduce climate pollution; increase resilience to the impacts of climate change; protect public health; conserve our lands, waters, oceans, and biodiversity; deliver environmental justice; and spur well-paying union jobs and economic growth. As necessary and appropriate, members of the Task Force will engage on these matters with State, local, Tribal, and territorial governments; workers and communities; and leaders across the various sectors of our economy.

(c) Prioritizing Actions. To the extent permitted by law, Task Force members shall prioritize action on climate change in their policy-making and budget processes, in their contracting and procurement, and in their engagement with State, local, Tribal, and territorial governments; workers and communities; and leaders across all the sectors of our economy.

**USE OF THE FEDERAL GOVERNMENT'S BUYING POWER AND REAL PROPERTY AND ASSET MANAGEMENT**

**Sec. 204**. *Policy*. It is the policy of my Administration to lead the Nation's effort to combat the climate crisis by example—specifically, by aligning the management of Federal procurement and real property, public lands and waters, and financial programs to support robust climate action. By providing an immediate, clear, and stable source of product demand, increased transparency and data, and robust standards for the market, my Administration will help to catalyze private sector investment into, and

accelerate the advancement of America's industrial capacity to supply, domestic clean energy, buildings, vehicles, and other necessary products and materials.

**Sec. 205**. *Federal Clean Electricity and Vehicle Procurement Strategy*. (a) The Chair of the Council on Environmental Quality, the Administrator of General Services, and the Director of the Office and Management and Budget, in coordination with the Secretary of Commerce, the Secretary of Labor, the Secretary of Energy, and the heads of other relevant agencies, shall assist the National Climate Advisor, through the Task Force established in section 203 of this order, in developing a comprehensive plan to create good jobs and stimulate clean energy industries by revitalizing the Federal Government's sustainability efforts.

(b) The plan shall aim to use, as appropriate and consistent with applicable law, all available procurement authorities to achieve or facilitate:

(i) a carbon pollution-free electricity sector no later than 2035; and

(ii) clean and zero-emission vehicles for Federal, State, local, and Tribal government fleets, including vehicles of the United States Postal Service.

(c) If necessary, the plan shall recommend any additional legislation needed to accomplish these objectives.

(d) The plan shall also aim to ensure that the United States retains the union jobs integral to and involved in running and maintaining clean and zero-emission fleets, while spurring the creation of union jobs in the manufacture of those new vehicles. The plan shall be submitted to the Task Force within 90 days of the date of this order.

**Sec. 206**. *Procurement Standards*. Consistent with the Executive Order of January 25, 2021, entitled, ''Ensuring the Future Is Made in All of America by All of America's Workers,'' agencies shall adhere to the requirements of the Made in America Laws in making clean energy, energy efficiency, and clean energy procurement decisions. Agencies shall, consistent with applicable law, apply and enforce the Davis-Bacon Act and prevailing wage and benefit requirements. The Secretary of Labor shall take steps to update prevailing wage requirements. The Chair of the Council on Environmental Quality shall consider additional administrative steps and guidance to assist the Federal Acquisition Regulatory Council in developing regulatory amendments to promote increased contractor attention on reduced carbon emission and Federal sustainability.

**Sec. 207**. *Renewable Energy on Public Lands and in Offshore Waters*. The Secretary of the Interior shall review siting and permitting processes on public lands and in offshore waters to identify to the Task Force steps that can be taken, consistent with applicable law, to increase renewable energy production on those lands and in those waters, with the goal of doubling offshore wind by 2030 while ensuring robust protection for our lands, waters, and biodiversity and creating good jobs. In conducting this review, the Secretary of the Interior shall consult, as appropriate, with the heads of relevant agencies, including the Secretary of Defense, the Secretary of Agriculture, the Secretary of Commerce, through the Administrator of the National Oceanic and Atmospheric Administration, the Secretary of Energy, the Chair of the Council on Environmental Quality, State and Tribal authorities, project developers, and other interested parties. The Secretary of the Interior shall engage with Tribal authorities regarding the development and management of renewable and conventional energy resources on Tribal lands.

**Sec. 208**. *Oil and Natural Gas Development on Public Lands and in Offshore Waters*. To the extent consistent with applicable law, the Secretary of the Interior shall pause new oil and natural gas leases on public lands or in offshore waters pending completion of a comprehensive review and reconsideration of Federal oil and gas permitting and leasing practices in light of the Secretary of the Interior's broad stewardship responsibilities over the public lands and in offshore waters, including potential climate and

other impacts associated with oil and gas activities on public lands or in offshore waters. The Secretary of the Interior shall complete that review in consultation with the Secretary of Agriculture, the Secretary of Commerce, through the National Oceanic and Atmospheric Administration, and the Secretary of Energy. In conducting this analysis, and to the extent consistent with applicable law, the Secretary of the Interior shall consider whether to adjust royalties associated with coal, oil, and gas resources extracted from public lands and offshore waters, or take other appropriate action, to account for corresponding climate costs.

**Sec. 209**. *Fossil Fuel Subsidies*. The heads of agencies shall identify for the Director of the Office of Management and Budget and the National Climate Advisor any fossil fuel subsidies provided by their respective agencies, and then take steps to ensure that, to the extent consistent with applicable law, Federal funding is not directly subsidizing fossil fuels. The Director of the Office of Management and Budget shall seek, in coordination with the heads of agencies and the National Climate Advisor, to eliminate fossil fuel subsidies from the budget request for Fiscal Year 2022 and thereafter.

**Sec. 210**. *Clean Energy in Financial Management*. The heads of agencies shall identify opportunities for Federal funding to spur innovation, commercialization, and deployment of clean energy technologies and infrastructure for the Director of the Office of Management and Budget and the National Climate Advisor, and then take steps to ensure that, to the extent consistent with applicable law, Federal funding is used to spur innovation, commercialization, and deployment of clean energy technologies and infrastructure. The Director of the Office of Management and Budget, in coordination with agency heads and the National Climate Advisor, shall seek to prioritize such investments in the President's budget request for Fiscal Year 2022 and thereafter.

**Sec. 211**. *Climate Action Plans and Data and Information Products to Improve Adaptation and Increase Resilience*. (a) The head of each agency shall submit a draft action plan to the Task Force and the Federal Chief Sustainability Officer within 120 days of the date of this order that describes steps the agency can take with regard to its facilities and operations to bolster adaptation and increase resilience to the impacts of climate change. Action plans should, among other things, describe the agency's climate vulnerabilities and describe the agency's plan to use the power of procurement to increase the energy and water efficiency of United States Government installations, buildings, and facilities and ensure they are climate-ready. Agencies shall consider the feasibility of using the purchasing power of the Federal Government to drive innovation, and shall seek to increase the Federal Government's resilience against supply chain disruptions. Such disruptions put the Nation's manufacturing sector at risk, as well as consumer access to critical goods and services. Agencies shall make their action plans public, and post them on the agency website, to the extent consistent with applicable law.

(b) Within 30 days of an agency's submission of an action plan, the Federal Chief Sustainability Officer, in coordination with the Director of the Office of Management and Budget, shall review the plan to assess its consistency with the policy set forth in section 204 of this order and the priorities issued by the Office of Management and Budget.

(c) After submitting an initial action plan, the head of each agency shall submit to the Task Force and Federal Chief Sustainability Officer progress reports annually on the status of implementation efforts. Agencies shall make progress reports public and post them on the agency website, to the extent consistent with applicable law. The heads of agencies shall assign their respective agency Chief Sustainability Officer the authority to perform duties relating to implementation of this order within the agency, to the extent consistent with applicable law.

(d) To assist agencies and State, local, Tribal, and territorial governments, communities, and businesses in preparing for and adapting to the impacts of climate change, the Secretary of Commerce, through the Administrator

of the National Oceanic and Atmospheric Administration, the Secretary of Homeland Security, through the Administrator of the Federal Emergency Management Agency, and the Director of the Office of Science and Technology Policy, in coordination with the heads of other agencies, as appropriate, shall provide to the Task Force a report on ways to expand and improve climate forecast capabilities and information products for the public. In addition, the Secretary of the Interior and the Deputy Director for Management of the Office of Management and Budget, in their capacities as the Chair and Vice-Chair of the Federal Geographic Data Committee, shall assess and provide to the Task Force a report on the potential development of a consolidated Federal geographic mapping service that can facilitate public access to climate-related information that will assist Federal, State, local, and Tribal governments in climate planning and resilience activities.

**EMPOWERING WORKERS THROUGH REBUILDING OUR INFRASTRUCTURE FOR A SUSTAINABLE ECONOMY**

**Sec. 212**. *Policy*. This Nation needs millions of construction, manufacturing, engineering, and skilled-trades workers to build a new American infrastructure and clean energy economy. These jobs will create opportunities for young people and for older workers shifting to new professions, and for people from all backgrounds and communities. Such jobs will bring opportunity to communities too often left behind—places that have suffered as a result of economic shifts and places that have suffered the most from persistent pollution, including low-income rural and urban communities, communities of color, and Native communities.

**Sec. 213**. *Sustainable Infrastructure*. (a) The Chair of the Council on Environmental Quality and the Director of the Office of Management and Budget shall take steps, consistent with applicable law, to ensure that Federal infrastructure investment reduces climate pollution, and to require that Federal permitting decisions consider the effects of greenhouse gas emissions and climate change. In addition, they shall review, and report to the National Climate Advisor on, siting and permitting processes, including those in progress under the auspices of the Federal Permitting Improvement Steering Council, and identify steps that can be taken, consistent with applicable law, to accelerate the deployment of clean energy and transmission projects in an environmentally stable manner.

(b) Agency heads conducting infrastructure reviews shall, as appropriate, consult from an early stage with State, local, and Tribal officials involved in permitting or authorizing proposed infrastructure projects to develop efficient timelines for decision-making that are appropriate given the complexities of proposed projects.

**EMPOWERING WORKERS BY ADVANCING CONSERVATION, AGRICULTURE, AND REFORESTATION**

**Sec. 214**. *Policy*. It is the policy of my Administration to put a new generation of Americans to work conserving our public lands and waters. The Federal Government must protect America's natural treasures, increase reforestation, improve access to recreation, and increase resilience to wildfires and storms, while creating well-paying union jobs for more Americans, including more opportunities for women and people of color in occupations where they are underrepresented. America's farmers, ranchers, and forest landowners have an important role to play in combating the climate crisis and reducing greenhouse gas emissions, by sequestering carbon in soils, grasses, trees, and other vegetation and sourcing sustainable bioproducts and fuels. Coastal communities have an essential role to play in mitigating climate change and strengthening resilience by protecting and restoring coastal ecosystems, such as wetlands, seagrasses, coral and oyster reefs, and mangrove and kelp forests, to protect vulnerable coastlines, sequester carbon, and support biodiversity and fisheries.

**Sec. 215**. *Civilian Climate Corps*. In furtherance of the policy set forth in section 214 of this order, the Secretary of the Interior, in collaboration with the Secretary of Agriculture and the heads of other relevant agencies,

shall submit a strategy to the Task Force within 90 days of the date of this order for creating a Civilian Climate Corps Initiative, within existing appropriations, to mobilize the next generation of conservation and resilience workers and maximize the creation of accessible training opportunities and good jobs. The initiative shall aim to conserve and restore public lands and waters, bolster community resilience, increase reforestation, increase carbon sequestration in the agricultural sector, protect biodiversity, improve access to recreation, and address the changing climate.

**Sec. 216**. *Conserving Our Nation's Lands and Waters*. (a) The Secretary of the Interior, in consultation with the Secretary of Agriculture, the Secretary of Commerce, the Chair of the Council on Environmental Quality, and the heads of other relevant agencies, shall submit a report to the Task Force within 90 days of the date of this order recommending steps that the United States should take, working with State, local, Tribal, and territorial governments, agricultural and forest landowners, fishermen, and other key stakeholders, to achieve the goal of conserving at least 30 percent of our lands and waters by 2030.

(i) The Secretary of the Interior, the Secretary of Agriculture, the Secretary of Commerce, through the Administrator of the National Oceanic and Atmospheric Administration, and the Chair of the Council on Environmental Quality shall, as appropriate, solicit input from State, local, Tribal, and territorial officials, agricultural and forest landowners, fishermen, and other key stakeholders in identifying strategies that will encourage broad participation in the goal of conserving 30 percent of our lands and waters by 2030.

(ii) The report shall propose guidelines for determining whether lands and waters qualify for conservation, and it also shall establish mechanisms to measure progress toward the 30-percent goal. The Secretary of the Interior shall subsequently submit annual reports to the Task Force to monitor progress.

(b) The Secretary of Agriculture shall:

(i) initiate efforts in the first 60 days from the date of this order to collect input from Tribes, farmers, ranchers, forest owners, conservation groups, firefighters, and other stakeholders on how to best use Department of Agriculture programs, funding and financing capacities, and other authorities, and how to encourage the voluntary adoption of climate-smart agricultural and forestry practices that decrease wildfire risk fueled by climate change and result in additional, measurable, and verifiable carbon reductions and sequestration and that source sustainable bioproducts and fuels; and

(ii) submit to the Task Force within 90 days of the date of this order a report making recommendations for an agricultural and forestry climate strategy.

(c) The Secretary of Commerce, through the Administrator of the National Oceanic and Atmospheric Administration, shall initiate efforts in the first 60 days from the date of this order to collect input from fishermen, regional ocean councils, fishery management councils, scientists, and other stakeholders on how to make fisheries and protected resources more resilient to climate change, including changes in management and conservation measures, and improvements in science, monitoring, and cooperative research.

**EMPOWERING WORKERS THROUGH REVITALIZING ENERGY COMMUNITIES**

**Sec. 217**. *Policy*. It is the policy of my Administration to improve air and water quality and to create well-paying union jobs and more opportunities for women and people of color in hard-hit communities, including rural communities, while reducing methane emissions, oil and brine leaks, and other environmental harms from tens of thousands of former mining and well sites. Mining and power plant workers drove the industrial revolution and the economic growth that followed, and have been essential to the growth of the United States. As the Nation shifts to a clean energy economy,

Federal leadership is essential to foster economic revitalization of and investment in these communities, ensure the creation of good jobs that provide a choice to join a union, and secure the benefits that have been earned by workers.

Such work should include projects that reduce emissions of toxic substances and greenhouse gases from existing and abandoned infrastructure and that prevent environmental damage that harms communities and poses a risk to public health and safety. Plugging leaks in oil and gas wells and reclaiming abandoned mine land can create well-paying union jobs in coal, oil, and gas communities while restoring natural assets, revitalizing recreation economies, and curbing methane emissions. In addition, such work should include efforts to turn properties idled in these communities, such as brownfields, into new hubs for the growth of our economy. Federal agencies should therefore coordinate investments and other efforts to assist coal, oil and gas, and power plant communities, and achieve substantial reductions of methane emissions from the oil and gas sector as quickly as possible.

**Sec. 218**. *Interagency Working Group on Coal and Power Plant Communities and Economic Revitalization.* There is hereby established an Interagency Working Group on Coal and Power Plant Communities and Economic Revitalization (Interagency Working Group). The National Climate Advisor and the Assistant to the President for Economic Policy shall serve as Co-Chairs of the Interagency Working Group.

(a) Membership. The Interagency Working Group shall consist of the following additional members:

(i) the Secretary of the Treasury;

(ii) the Secretary of the Interior;

(iii) the Secretary of Agriculture;

(iv) the Secretary of Commerce;

(v) the Secretary of Labor;

(vi) the Secretary of Health and Human Services;

(vii) the Secretary of Transportation;

(viii) the Secretary of Energy;

(ix) the Secretary of Education;

(x) the Administrator of the Environmental Protection Agency;

(xi) the Director of the Office of Management and Budget;

(xii) the Assistant to the President for Domestic Policy and Director of the Domestic Policy Council; and

(xiii) the Federal Co-Chair of the Appalachian Regional Commission.

(b) Mission and Work.

(i) The Interagency Working Group shall coordinate the identification and delivery of Federal resources to revitalize the economies of coal, oil and gas, and power plant communities; develop strategies to implement the policy set forth in section 217 of this order and for economic and social recovery; assess opportunities to ensure benefits and protections for coal and power plant workers; and submit reports to the National Climate Advisor and the Assistant to the President for Economic Policy on a regular basis on the progress of the revitalization effort.

(ii) As part of this effort, within 60 days of the date of this order, the Interagency Working Group shall submit a report to the President describing all mechanisms, consistent with applicable law, to prioritize grantmaking, Federal loan programs, technical assistance, financing, procurement, or other existing programs to support and revitalize the economies of coal and power plant communities, and providing recommendations for action consistent with the goals of the Interagency Working Group.

(c) Consultation. Consistent with the objectives set out in this order and in accordance with applicable law, the Interagency Working Group shall seek the views of State, local, and Tribal officials; unions; environmental justice organizations; community groups; and other persons it identifies who may have perspectives on the mission of the Interagency Working Group.

(d) Administration. The Interagency Working Group shall be housed within the Department of Energy. The Chairs shall convene regular meetings of the Interagency Working Group, determine its agenda, and direct its work. The Secretary of Energy, in consultation with the Chairs, shall designate an Executive Director of the Interagency Working Group, who shall coordinate the work of the Interagency Working Group and head any staff assigned to the Interagency Working Group.

(e) Officers. To facilitate the work of the Interagency Working Group, the head of each agency listed in subsection (a) of this section shall assign a designated official within the agency the authority to represent the agency on the Interagency Working Group and perform such other duties relating to the implementation of this order within the agency as the head of the agency deems appropriate.

**SECURING ENVIRONMENTAL JUSTICE AND SPURRING ECONOMIC OPPORTUNITY**

**Sec. 219**. *Policy*. To secure an equitable economic future, the United States must ensure that environmental and economic justice are key considerations in how we govern. That means investing and building a clean energy economy that creates well-paying union jobs, turning disadvantaged communities—historically marginalized and overburdened—into healthy, thriving communities, and undertaking robust actions to mitigate climate change while preparing for the impacts of climate change across rural, urban, and Tribal areas. Agencies shall make achieving environmental justice part of their missions by developing programs, policies, and activities to address the disproportionately high and adverse human health, environmental, climate-related and other cumulative impacts on disadvantaged communities, as well as the accompanying economic challenges of such impacts. It is therefore the policy of my Administration to secure environmental justice and spur economic opportunity for disadvantaged communities that have been historically marginalized and overburdened by pollution and underinvestment in housing, transportation, water and wastewater infrastructure, and health care.

**Sec. 220**. *White House Environmental Justice Interagency Council*. (a) Section 1–102 of Executive Order 12898 of February 11, 1994 (Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations), is hereby amended to read as follows:

''(a) There is hereby created within the Executive Office of the President a White House Environmental Justice Interagency Council (Interagency Council). The Chair of the Council on Environmental Quality shall serve as Chair of the Interagency Council.

''(b) Membership. The Interagency Council shall consist of the following additional members:

(i) the Secretary of Defense;

(ii) the Attorney General;

(iii) the Secretary of the Interior;

(iv) the Secretary of Agriculture;

(v) the Secretary of Commerce;

(vi) the Secretary of Labor;

(vii) the Secretary of Health and Human Services;

(viii) the Secretary of Housing and Urban Development;

(ix) the Secretary of Transportation;

(x) the Secretary of Energy;

(xi) the Chair of the Council of Economic Advisers;

(xii) the Administrator of the Environmental Protection Agency;

(xiii) the Director of the Office of Management and Budget;

(xiv) the Executive Director of the Federal Permitting Improvement Steering Council;

(xv) the Director of the Office of Science and Technology Policy;

(xvi) the National Climate Advisor;

(xvii) the Assistant to the President for Domestic Policy; and

(xviii) the Assistant to the President for Economic Policy.

''(c) At the direction of the Chair, the Interagency Council may establish subgroups consisting exclusively of Interagency Council members or their designees under this section, as appropriate.

''(d) Mission and Work. The Interagency Council shall develop a strategy to address current and historic environmental injustice by consulting with the White House Environmental Justice Advisory Council and with local environmental justice leaders. The Interagency Council shall also develop clear performance metrics to ensure accountability, and publish an annual public performance scorecard on its implementation.

''(e) Administration. The Office of Administration within the Executive Office of the President shall provide funding and administrative support for the Interagency Council, to the extent permitted by law and within existing appropriations. To the extent permitted by law, including the Economy Act (31 U.S.C. 1535), and subject to the availability of appropriations, the Department of Labor, the Department of Transportation, and the Environmental Protection Agency shall provide administrative support as necessary.

''(f) Meetings and Staff. The Chair shall convene regular meetings of the Council, determine its agenda, and direct its work. The Chair shall designate an Executive Director of the Council, who shall coordinate the work of the Interagency Council and head any staff assigned to the Council.

''(g) Officers. To facilitate the work of the Interagency Council, the head of each agency listed in subsection (b) shall assign a designated official within the agency to be an Environmental Justice Officer, with the authority to represent the agency on the Interagency Council and perform such other duties relating to the implementation of this order within the agency as the head of the agency deems appropriate.''

(b) The Interagency Council shall, within 120 days of the date of this order, submit to the President, through the National Climate Advisor, a set of recommendations for further updating Executive Order 12898.

**Sec. 221**. *White House Environmental Justice Advisory Council*. There is hereby established, within the Environmental Protection Agency, the White House Environmental Justice Advisory Council (Advisory Council), which shall advise the Interagency Council and the Chair of the Council on Environmental Quality.

(a) Membership. Members shall be appointed by the President, shall be drawn from across the political spectrum, and may include those with knowledge about or experience in environmental justice, climate change, disaster preparedness, racial inequity, or any other area determined by the President to be of value to the Advisory Council.

(b) Mission and Work. The Advisory Council shall be solely advisory. It shall provide recommendations to the White House Environmental Justice Interagency Council established in section 220 of this order on how to increase the Federal Government's efforts to address current and historic environmental injustice, including recommendations for updating Executive Order 12898.

(c) Administration. The Environmental Protection Agency shall provide funding and administrative support for the Advisory Council to the extent permitted by law and within existing appropriations. Members of the Advisory Council shall serve without either compensation or reimbursement of expenses.

(d) Federal Advisory Committee Act. Insofar as the Federal Advisory Committee Act, as amended (5 U.S.C. App.), may apply to the Advisory Council, any functions of the President under the Act, except for those in section 6 of the Act, shall be performed by the Administrator of the Environmental Protection Agency in accordance with the guidelines that have been issued by the Administrator of General Services.

**Sec. 222**. *Agency Responsibilities*. In furtherance of the policy set forth in section 219:

(a) The Chair of the Council on Environmental Quality shall, within 6 months of the date of this order, create a geospatial Climate and Economic Justice Screening Tool and shall annually publish interactive maps highlighting disadvantaged communities.

(b) The Administrator of the Environmental Protection Agency shall, within existing appropriations and consistent with applicable law:

(i) strengthen enforcement of environmental violations with disproportionate impact on underserved communities through the Office of Enforcement and Compliance Assurance; and

(ii) create a community notification program to monitor and provide real-time data to the public on current environmental pollution, including emissions, criteria pollutants, and toxins, in frontline and fenceline communities—places with the most significant exposure to such pollution.

(c) The Attorney General shall, within existing appropriations and consistent with applicable law:

(i) consider renaming the Environment and Natural Resources Division the Environmental Justice and Natural Resources Division;

(ii) direct that division to coordinate with the Administrator of the Environmental Protection Agency, through the Office of Enforcement and Compliance Assurance, as well as with other client agencies as appropriate, to develop a comprehensive environmental justice enforcement strategy, which shall seek to provide timely remedies for systemic environmental violations and contaminations, and injury to natural resources; and

(iii) ensure comprehensive attention to environmental justice throughout the Department of Justice, including by considering creating an Office of Environmental Justice within the Department to coordinate environmental justice activities among Department of Justice components and United States Attorneys' Offices nationwide.

(d) The Secretary of Health and Human Services shall, consistent with applicable law and within existing appropriations:

(i) establish an Office of Climate Change and Health Equity to address the impact of climate change on the health of the American people; and

(ii) establish an Interagency Working Group to Decrease Risk of Climate Change to Children, the Elderly, People with Disabilities, and the Vulnerable as well as a biennial Health Care System Readiness Advisory Council, both of which shall report their progress and findings regularly to the Task Force.

(e) The Director of the Office of Science and Technology Policy shall, in consultation with the National Climate Advisor, within existing appropriations, and within 100 days of the date of this order, publish a report identifying the climate strategies and technologies that will result in the most air and water quality improvements, which shall be made public to the maximum extent possible and published on the Office's website.

**Sec. 223**. *Justice40 Initiative*. (a) Within 120 days of the date of this order, the Chair of the Council on Environmental Quality, the Director of the

Office of Management and Budget, and the National Climate Advisor, in consultation with the Advisory Council, shall jointly publish recommendations on how certain Federal investments might be made toward a goal that 40 percent of the overall benefits flow to disadvantaged communities. The recommendations shall focus on investments in the areas of clean energy and energy efficiency; clean transit; affordable and sustainable housing; training and workforce development; the remediation and reduction of legacy pollution; and the development of critical clean water infrastructure. The recommendations shall reflect existing authorities the agencies may possess for achieving the 40-percent goal as well as recommendations on any legislation needed to achieve the 40-percent goal.

(b) In developing the recommendations, the Chair of the Council on Environmental Quality, the Director of the Office of Management and Budget, and the National Climate Advisor shall consult with affected disadvantaged communities.

(c) Within 60 days of the recommendations described in subsection (a) of this section, agency heads shall identify applicable program investment funds based on the recommendations and consider interim investment guidance to relevant program staff, as appropriate and consistent with applicable law.

(d) By February 2022, the Director of the Office of Management and Budget, in coordination with the Chair of the Council on Environmental Quality, the Administrator of the United States Digital Service, and other relevant agency heads, shall, to the extent consistent with applicable law, publish on a public website an annual Environmental Justice Scorecard detailing agency environmental justice performance measures.

**PART III—GENERAL PROVISIONS**

**Sec. 301**. *General Provisions*. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget, relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.



THE WHITE HOUSE,
*January 27, 2021.*

[FR Doc. 2021–02177
Filed 1–29–21; 8:45 am]
Billing code 3295–F1–P

# Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates under Executive Order 13990

**Interagency Working Group on Social Cost of Greenhouse Gases, United States Government**

**With participation by**

Council of Economic Advisers
Council on Environmental Quality
Department of Agriculture
Department of Commerce
Department of Energy
Department of Health and Human Services
Department of the Interior
Department of Transportation
Department of the Treasury
Environmental Protection Agency
National Climate Advisor
National Economic Council
Office of Management and Budget
Office of Science and Technology Policy

**February 2021**

## Preface

*The Interagency Working Group (IWG) on the Social Cost of Greenhouse Gases is committed to ensuring that the estimates agencies use when monetizing the value of changes in greenhouse gas emissions resulting from regulations and other relevant agency actions continue to reflect the best available science and methodologies. This Technical Support Document (TSD) presents interim estimates of the social cost of carbon, methane, and nitrous oxide developed under Executive Order 13990. These interim values are the same as those developed by the IWG in 2013 and 2016. The current IWG will take comment on recent developments in the science and economics for use in a more comprehensive update, to be issued by January 2022, which will more fully address the recommendations of the National Academies of Sciences, Engineering, and Medicine as reported in Valuing Climate Damages: Updating Estimation of the Social Cost of Carbon Dioxide (2017) and other pertinent scientific literature. As a part of that request for comment, the IWG will seek comment on the discussion of advances in science and methodology included in this TSD and how those advances can best be incorporated into the revised final estimates.*

**Executive Summary**

A robust and scientifically founded assessment of the positive and negative impacts that an action can be expected to have on society provides important insights in the policy-making process. The estimates of the social cost of carbon (SC-$CO_2$), social cost of methane (SC-$CH_4$), and social cost of nitrous oxide (SC-$N_2O$) presented here allow agencies to understand the social benefits of reducing emissions of each of these greenhouse gases, or the social costs of increasing such emissions, in the policy making process. Collectively, these values are referenced as the "social cost of greenhouse gases" (SC-GHG) in this document. The SC-GHG is the monetary value of the net harm to society associated with adding a small amount of that GHG to the atmosphere in a given year. In principle, it includes the value of all climate change impacts, including (but not limited to) changes in net agricultural productivity, human health effects, property damage from increased flood risk natural disasters, disruption of energy systems, risk of conflict, environmental migration, and the value of ecosystem services. The SC-GHG, therefore, should reflect the societal value of reducing emissions of the gas in question by one metric ton. The marginal estimate of social costs will differ by the type of greenhouse gas (such as carbon dioxide, methane, and nitrous oxide) and by the year in which the emissions change occurs. The SC-GHGs are the theoretically appropriate values to use in conducting benefit-cost analyses of policies that affect GHG emissions.

Federal agencies began regularly incorporating social cost of carbon (SC-$CO_2$) estimates in benefit-cost analyses conducted under Executive Order (E.O.) 12866[1] in 2008, following a court ruling in which an agency was ordered to consider the value of reducing $CO_2$ emissions in a rulemaking process. The U.S. Ninth Circuit Court of Appeals remanded a fuel economy rule to DOT for failing to monetize $CO_2$ emission reductions, stating that "while the record shows that there is a range of values, the value of carbon emissions reduction is certainly not zero."[2] In 2009, an interagency working group (IWG) was established to ensure that agencies were using the best available science and to promote consistency in the values used across agencies. The IWG published SC-$CO_2$ estimates in 2010 that were developed from an ensemble of three widely cited integrated assessment models (IAMs) that estimate global climate damages using highly aggregated representations of climate processes and the global economy combined into a single modeling framework. The three IAMs were run using a common set of input assumptions in each model for future population, economic, and GHG emissions growth, as well as equilibrium climate sensitivity (ECS) – a measure of the globally averaged temperature response to increased atmospheric $CO_2$ concentrations. These estimates were updated in 2013 based on new versions of each IAM. In August 2016 the IWG published estimates of the social cost of methane (SC-$CH_4$) and nitrous oxide (SC-$N_2O$) using methodologies that are consistent with the methodology underlying the SC-$CO_2$ estimates. In January 2017, the National Academies of Sciences, Engineering, and Medicine issued recommendations for an updating process to ensure the estimates continue to reflect the best available science. In March 2017, Executive Order 13783 disbanded the IWG and instructed agencies when monetizing the value of changes

[1] Under E.O. 12866, agencies are required, to the extent permitted by law and where applicable, "to assess both the costs and the benefits of the intended regulation and, recognizing that some costs and benefits are difficult to quantify, propose or adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs." As indicated in the discussion above, many statutes also require agencies to conduct at least some of the same analyses required under E.O. 12866, such as the Energy Policy and Conservation Act which mandates the setting of fuel economy regulations.

[2] *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1200 (9th Cir. 2008).

in greenhouse gas emissions resulting from regulations to follow the Office of Management and Budget's (OMB) Circular A-4.

On January 20, 2021, President Biden issued E.O. 13990 which re-established the IWG and directed it to ensure that SC-GHG estimates used by the U.S. Government (USG) reflect the best available science and the recommendations of the National Academies (2017) and work towards approaches that take account of climate risk, environmental justice, and intergenerational equity. The IWG was tasked with first reviewing the SC-GHG estimates currently used by the USG and publishing interim estimates within 30 days of the E.O. that reflect the full impact of GHG emissions, including taking global damages into account. In this initial review, the IWG finds that the SC-GHG estimates used since E.O. 13783 fail to reflect the full impact of GHG emissions in multiple ways. First, the IWG found previously and is restating here that a global perspective is essential for SC-GHG estimates because climate impacts occurring outside U.S. borders can directly and indirectly affect the welfare of U.S. citizens and residents. Thus, U.S. interests are affected by the climate impacts that occur outside U.S. borders. Examples of affected interests include: direct effects on U.S. citizens and assets located abroad, international trade, tourism, and spillover pathways such as economic and political destabilization and global migration. In addition, assessing the benefits of U.S. GHG mitigation activities requires consideration of how those actions may affect mitigation activities by other countries, as those international mitigation actions will provide a benefit to U.S. citizens and residents by mitigating climate impacts that affect U.S. citizens and residents. Second, the IWG found previously and is restating here that the use of the social rate of return on capital to discount the future benefits of reducing GHG emissions inappropriately underestimates the impacts of climate change for the purposes of estimating the SC-GHG (see Section 3.1). Consistent with the findings of the National Academies (2017) and the economic literature, the IWG continues to conclude that the consumption rate of interest is the theoretically appropriate discount rate in an intergenerational context (IWG 2010, 2013, 2016). The IWG recommends that discount rate uncertainty and relevant aspects of intergenerational ethical considerations be accounted for in selecting future discount rates.

While the IWG works to assess how best to incorporate the latest, peer reviewed science to develop an updated set of SC-GHG estimates, it is setting interim estimates to be the most recent estimates developed by the IWG prior to the group being disbanded in 2017. The IWG concludes that these interim estimates represent the most appropriate estimate of the SC-GHG until the revised estimates have been developed. This update reflects the immediate need to have an operational SC-GHG for use in regulatory benefit-cost analyses and other applications that was developed using a transparent process, peer-reviewed methodologies, and the science available at the time of that process. Those estimates were subject to public comment in the context of dozens of proposed rulemakings as well as in a dedicated public comment period in 2013.

At the same time, consistent with its continuing commitment to a transparent process and a desire to move quickly to update SC-GHG estimates to better reflect the recent science, the IWG will be taking comment on how to incorporate the recommendations of the National Academies (2017) and other recent science , including the advances discussed in this Technical Support Document (TSD), both during the development of the fully updated SC-GHG estimates to be released by January of 2022 and in subsequent updates. The IWG will soon issue a Federal Register notice with a detailed set of requests for public comments on the new information presented in this TSD, as well as other topics and issues the IWG will address as we develop the next set of updates.

This TSD presents the IWG's interim findings and provides interim estimates of the SC-$CO_2$, SC-$CH_4$, and SC-$N_2O$ that should be used by agencies until a comprehensive review and update is developed in line with the requirements in E.O. 13990. The TSD maintains the same methodological approach as has been used for global USG SC-GHG estimation to date. The estimates rely on the same models and harmonized inputs and are calculated using a range of discount rates. At this time, the IWG has determined that it is appropriate for agencies to revert to the same set of four values drawn from the SC-GHG distributions based on three discount rates (2.5 percent, 3 percent, and 5 percent) as were used in regulatory analyses between 2010 and 2016 and subject to public comment. However, as described below, based on the IWG's initial review, new data and evidence strongly suggests that the discount rate regarded as appropriate for intergenerational analysis is lower.

Tables ES-1, ES-2, and ES-3 summarize the interim SC-$CO_2$, SC-$CH_4$, and SC-$N_2O$ estimates, respectively, for the years 2020 through 2050. These estimates are reported in 2020 dollars but are otherwise identical to those presented in the previous version of the TSD and its Addendum, released in August 2016. For purposes of capturing uncertainty around the SC-GHG estimates in analyses, the IWG emphasized previously and reemphasizes here the importance of considering all four of the SC-GHG values. In particular, this TSD discusses how the understanding of discounting approaches suggests discount rates appropriate for intergenerational analysis in the context of climate change that are lower than 3 percent. Consistent with the guidance in E.O. 13990 for the IWG to ensure that the SC-GHG reflect the interests of future generations, the latest scientific and economic understanding of discount rates discussed in this TSD, and the recommendation from OMB's Circular A-4 to include sensitivity analysis with lower discount rates when a rule has important intergenerational benefits or costs, agencies may consider conducting additional sensitivity analysis using discount rates below 2.5 percent. Furthermore, the IAMs used to produce these interim estimates do not include all of the important physical, ecological, and economic impacts of climate change recognized in the climate change literature. For these same impacts, the science underlying their "damage functions" – i.e., the core parts of the IAMs that map global mean temperature changes and other physical impacts of climate change into economic (both market and nonmarket) damages – lags behind the most recent research. Likewise, the assumptions regarding equilibrium climate sensitivity and socioeconomic and emissions scenarios used as inputs to the model runs in this TSD will need to be updated. It is the IWG's judgment that, taken together, these limitations suggest that the range of four interim SC-GHG estimates presented in this TSD likely underestimate societal damages from GHG emissions.

**Table ES-1: Social Cost of $CO_2$, 2020 – 2050 (in 2020 dollars per metric ton of $CO_2$)[3]**

| | Discount Rate and Statistic | | | |
|---|---|---|---|---|
| Emissions Year | 5% Average | 3% Average | 2.5% Average | 3% 95th Percentile |
| 2020 | 14 | 51 | 76 | 152 |
| 2025 | 17 | 56 | 83 | 169 |
| 2030 | 19 | 62 | 89 | 187 |
| 2035 | 22 | 67 | 96 | 206 |
| 2040 | 25 | 73 | 103 | 225 |
| 2045 | 28 | 79 | 110 | 242 |
| 2050 | 32 | 85 | 116 | 260 |

**Table ES-2: Social Cost of $CH_4$, 2020 – 2050 (in 2020 dollars per metric ton of $CH_4$)**

| | Discount Rate and Statistic | | | |
|---|---|---|---|---|
| Emissions Year | 5% Average | 3% Average | 2.5% Average | 3% 95th Percentile |
| 2020 | 670 | 1500 | 2000 | 3900 |
| 2025 | 800 | 1700 | 2200 | 4500 |
| 2030 | 940 | 2000 | 2500 | 5200 |
| 2035 | 1100 | 2200 | 2800 | 6000 |
| 2040 | 1300 | 2500 | 3100 | 6700 |
| 2045 | 1500 | 2800 | 3500 | 7500 |
| 2050 | 1700 | 3100 | 3800 | 8200 |

[3] The values reported in this TSD are identical to those reported in the 2016 TSD adjusted for inflation to 2020 dollars using the annual GDP Implicit Price Deflator values in the U.S. Bureau of Economic Analysis' (BEA) NIPA Table 1.1.9: 113.626 (2020)/ 92.486 (2007) = 1.228575 (U.S. BEA 2021). Values are the average across models and socioeconomic emissions scenarios for each of three discount rates (2.5%, 3%, and 5%), plus a fourth value, selected as the 95th percentile of estimates based on a 3 percent discount rate. Values of SC-$CO_2$ are rounded to the nearest dollar; SC-$CH_4$ and SC-$N_2O$ are rounded to two significant figures. The annual unrounded estimates are available on OMB's website for use in regulatory and other analyses: https://www.whitehouse.gov/omb/information-regulatory-affairs/regulatory-matters/#scghgs

**Table ES-3: Social Cost of $N_2O$, 2020 – 2050 (in 2020 dollars per metric ton of $N_2O$)**

| | Discount Rate and Statistic | | | |
|---|---|---|---|---|
| Emissions Year | 5% Average | 3% Average | 2.5% Average | 3% 95th Percentile |
| 2020 | 5800 | 18000 | 27000 | 48000 |
| 2025 | 6800 | 21000 | 30000 | 54000 |
| 2030 | 7800 | 23000 | 33000 | 60000 |
| 2035 | 9000 | 25000 | 36000 | 67000 |
| 2040 | 10000 | 28000 | 39000 | 74000 |
| 2045 | 12000 | 30000 | 42000 | 81000 |
| 2050 | 13000 | 33000 | 45000 | 88000 |

While point estimates are important for providing analysts with a tractable approach for regulatory analysis, they do not fully quantify uncertainty associated with the SC-GHG estimates. Figures ES-1 through ES-3 present the quantified sources of uncertainty in the form of frequency distributions for the SC-GHG estimates for emissions in 2020. The distributions of SC-GHG estimates reflect uncertainty in key model parameters chosen by the IWG such as the equilibrium climate sensitivity, as well as uncertainty in other parameters set by the original model developers. To highlight the difference between the impact of the discount rate and other quantified sources of uncertainty, the bars below the frequency distributions provide a symmetric representation of quantified variability in the SC-GHG estimates for each discount rate. There are other sources of uncertainty that have not yet been quantified and are thus not reflected in these estimates. When an agency determines that it is appropriate to conduct additional quantitative uncertainty analysis, it should follow best practices for probabilistic analysis.[4] The full set of information that underlies the frequency distributions in Figures ES-1 through ES-3 is available on OMB's website[5].

[4] See e.g. OMB's Circular A-4, section on *Treatment of Uncertainty*. Available at: https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/circulars/A4/a-4.pdf.
[5] Available at https://www.whitehouse.gov/omb/information-regulatory-affairs/regulatory-matters/#scghgs

**Figure ES-1: Frequency Distribution of SC-$CO_2$ Estimates for 2020**[6]




[6] Although the distributions and numbers in Figures ES-1, ES-2, and ES-3 are based on the full set of model results (150,000 estimates for each discount rate and gas), for display purposes the horizontal axis is truncated with 0.02 to 0.68 percent of the estimates falling below the lowest bin displayed and 0.12 to 3.11 percent of the estimates falling above the highest bin displayed, depending on the discount rate and GHG.

**Figure ES-2: Frequency Distribution of SC-$CH_4$ Estimates for 2020**




**Figure ES-3: Frequency Distribution of SC-$N_2O$ Estimates for 2020**



# 1 Background

The estimates of the social cost of carbon (SC-$CO_2$), social cost of methane (SC-$CH_4$), and social cost of nitrous oxide (SC-$N_2O$) presented here allow agencies to incorporate the social benefits of reducing emissions of each of these greenhouse gases, or the social costs of increasing such emissions, in decision making. Collectively, these values are referenced as the “social cost of greenhouse gases” (SC-GHG) in this document. The SC-GHG is the monetary value of the net harm to society associated with adding a small amount of that GHG to the atmosphere in a given year. In principle, it includes the value of all climate change impacts, including (but not limited to) changes in net agricultural productivity, human health effects, property damage from increased flood risk natural disasters, disruption of energy systems, risk of conflict, environmental migration, and the value of ecosystem services. The SC-GHG, therefore, should reflect the societal value of reducing emissions of the gas in question by one ton. The marginal estimate of social costs will differ by the type of greenhouse gas (such as carbon dioxide, methane, and nitrous oxide) and by the year in which the emissions change occurs. The SC-GHGs are calculated along a baseline path and provide a measure of the marginal benefit of GHG abatement. Thus, they are the theoretically appropriate values to use when conducting benefit-cost analyses of policies that affect GHG emissions.[7]

## 1.1 Overview of U.S. Government SC-GHG Estimates to Date

Estimates of the social cost of carbon and other greenhouse gases have been published in the academic literature for many years. Meta-reviews of SC-$CO_2$ estimates were available as early as 2002 (Clarkson and Deyes 2002). Federal agencies began regularly incorporating SC-$CO_2$ estimates in regulatory impact analyses in 2008, following a court ruling in which an agency was ordered to consider the SC-$CO_2$ in the rulemaking process. The U.S. Ninth Circuit Court of Appeals remanded a fuel economy rule to the Department of Transportation (DOT) for failing to consider the value of reducing $CO_2$ emissions, stating that “while the record shows that there is a range of values, the value of carbon emissions reduction is certainly not zero.”[8]

---

[7] These estimates of social damages should not be confused with estimates of the costs of attaining a specific emissions or warming limit. Specifically, there is another strand of research that investigates the costs of setting a specific climate target (e.g., capping emissions or temperature increases to a certain level). If total emissions are capped, IAM models can estimate the costs of limiting emissions or temperature increase to that cap. Similarly, other models simulate market trading in a cap and trade system. The price of a permit to emit one ton of carbon provides a measure of the marginal cost of GHG abatement, which can be useful in evaluating policy cost-effectiveness but is not an alternative way to value damages from GHG emissions in benefit-cost analysis. Moreover, a policy that specifies an environmental target implicitly requires a valuation of damages when setting the constraint even though it is not explicitly modeled or estimated. For example, a target set to keep temperature increases below a certain threshold implicitly places value on damages incurred beyond that threshold. For more on how these concepts (e.g., a predetermined target-based approach and a damage (SC-GHG) based approach) can be used when designing climate policy see, for example, Hansel et al. (2020) and Stern and Stiglitz (2021).

[8] *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1200 (9th Cir. 2008).

In 2009, an interagency process was launched, under the leadership of the Office of Management and Budget (OMB) and the Council of Economic Advisers (CEA), that sought to harmonize a range of different SC-$CO_2$ values being used across multiple Federal agencies. The purpose of this process was to ensure that agencies were using the best available information and to promote consistency in the way agencies quantify the benefits of reducing $CO_2$ emissions in regulatory impact analyses. This included the establishment of an IWG which represented perspectives and technical expertise from many federal agencies and a commitment to following the peer-reviewed literature. In 2010, the IWG finalized a set of four SC-$CO_2$ values for use in regulatory analyses and presented them in a TSD that also provided guidance for agencies on using the estimates (IWG 2010). Three of these values were based on the average SC-$CO_2$ from three widely cited integrated assessment models (IAMs) in the peer-reviewed literature – DICE, PAGE, and FUND[9] – at discount rates of 2.5, 3, and 5 percent. The fourth value was included to represent higher-than-expected economic impacts from climate change further out in the tails of the SC-$CO_2$ distribution. For this purpose, it used the SC-$CO_2$ value for the 95th percentile at a 3 percent discount rate.

In May of 2013, the IWG provided an update of the SC-$CO_2$ estimates to incorporate new versions of the IAMs used in the peer-reviewed literature (IWG 2013). The 2013 update did not revisit other IWG modeling decisions (i.e., the discount rates or harmonized inputs for socioeconomic and emission scenarios and equilibrium climate sensitivity). Improvements in the way damages are modeled were confined to those that had been incorporated into the latest versions of the models by the developers themselves in the peer-reviewed literature.[10] In August of 2016, the IWG published estimates of the social cost of methane (SC-$CH_4$) and nitrous oxide (SC-$N_2O$) that are consistent with the methodology underlying the SC-$CO_2$ estimates (IWG 2016a, 2016b).

Over the course of developing and updating the USG SC-GHG, through both the IWG and individual agencies, there were extensive opportunities for public input on the estimates and underlying methodologies. There was a public comment process associated with each proposed rulemaking that used the estimates, and OMB initiated a separate comment process on the IWG TSD in 2013. Commenters offered a wide range of perspectives on all aspects of process, methodology, and final estimates and diverse suggestions for improvements. The U.S. Government Accountability Office (GAO) also reviewed the development of the USG SC-$CO_2$ estimates and concluded that the IWG processes and methods reflected three principles: consensus-based decision making, reliance on existing academic literature and models, and disclosure of limitations and incorporation of new information (U.S. GAO 2014).

---

[9] The DICE (Dynamic Integrated Climate and Economy) model by William Nordhaus evolved from a series of energy models and was first presented in 1990 (Nordhaus and Boyer 2000, Nordhaus 2008). The PAGE (Policy Analysis of the Greenhouse Effect) model was developed by Chris Hope in 1991 for use by European decision-makers in assessing the marginal impact of carbon emissions (Hope 2006, Hope 2008). The FUND (Climate Framework for Uncertainty, Negotiation, and Distribution) model, developed by Richard Tol in the early 1990s, originally to study international capital transfers in climate policy was widely used to study climate impacts (e.g., Tol 2002a, Tol 2002b, Anthoff et al. 2009, Tol 2009).

[10] The IWG subsequently provided additional minor technical revisions in November of 2013 and July of 2015, as explained in Appendix B of the 2016 TSD (IWG 2016a).

In 2015, as part of the IWG response to the public comments received in the 2013 solicitation, the IWG announced a National Academies of Sciences, Engineering, and Medicine review of the IWG estimates (IWG 2015). Specifically, the IWG asked the National Academies to conduct a multi-discipline, two-phase assessment of the IWG estimates and to offer advice on how to approach future updates to ensure that the estimates continue to reflect the best available science and methodologies. The National Academies' interim (Phase 1) report (National Academies 2016a) recommended against a near term update of the SC-$CO_2$ estimates within the existing modeling framework. For future revisions, the National Academies recommended the IWG move efforts towards a broader update of the climate system module consistent with the most recent, best available science and offered recommendations for how to enhance the discussion and presentation of uncertainty in the SC-$CO_2$ estimates. In addition to publishing estimates of SC-$CH_4$ and SC-$N_2O$, the IWG's 2016 TSD revision responded to the National Academies' Phase 1 report recommendations regarding presentation of uncertainty. The revisions included: an expanded presentation of the SC-GHG estimates that highlights a symmetric range of uncertainty around estimates for each discount rate; new sections that provide a unified discussion of the methodology used to incorporate sources of uncertainty; detailed explanation of the uncertain parameters in both the FUND and PAGE models; and making the full set of SC-$CO_2$ estimates easily accessible to the public on OMB's website.

In January 2017, the National Academies released their final report, *Valuing Climate Damages: Updating Estimation of the Social Cost of Carbon Dioxide*, and recommended specific criteria for future updates to the SC-$CO_2$ estimates, a modeling framework to satisfy the specified criteria, and both near-term updates and longer-term research needs pertaining to various components of the estimation process (National Academies 2017). A description of the National Academies' recommendations for near-term updates are described in Section 1.2 of this document. Shortly thereafter, in March 2017, President Trump issued Executive Order (E.O.) 13783 which called for the rescission and review of several climate-related Presidential and regulatory actions as well as for a review of the SC-GHG estimates used for regulatory impact analysis. E.O. 13783 disbanded the IWG, withdrew the previous TSDs, and directed agencies to ensure SC-GHG estimates used in regulatory analyses are consistent with the guidance contained in OMB's Circular A-4, "including with respect to the consideration of domestic versus international impacts and the consideration of appropriate discount rates" (E.O. 13783, Section 5(c)). Benefit-cost analyses following E.O. 13783 used SC-GHG estimates that attempted to focus on the domestic impacts of climate change as estimated by the models to occur within U.S. borders and were calculated using two discount rates recommended by OMB's Circular A-4, 3 percent and 7 percent.[11] All other methodological decisions and model versions used in SC-GHG calculations remained the same as those used by the IWG in 2010 and 2013, respectively.

On January 20, 2021, President Biden issued E.O. 13990, which re-established the IWG and directed it to ensure that USG SC-GHG estimates reflect the best available science and the recommendations of the National Academies (2017). The IWG was tasked with first reviewing the SC-GHG estimates currently used by the USG and publishing interim estimates within 30 days of the E.O. that reflect the full impact of GHG emissions, including by taking global damages into account. The E.O. instructs the IWG to develop final SC-GHG estimates by January 2022. Section 1.3 describes requirements established by E.O. 13990 in greater detail. In addition, the E.O. instructs the IWG to provide recommendations to the President by

[11] OMB Circular A-4 (2003) indicates that sensitivity analysis using lower discount rates than 3 percent and 7 percent may be appropriate where intergenerational effects are important. See Section 3 for further discussion.

September 2021, regarding areas of decision-making, budgeting, and procurement by the Federal Government where the SC-GHG should be applied. The SC-GHG has been used previously in non-regulatory Federal analysis, such as in federal procurement,[12] grant programs,[13] and National Environmental Policy Act (NEPA) analysis,[14] as well as in state level applications; the latter is discussed further in Section 5.

## 1.2 Recommendations from the National Academies of Sciences, Engineering, and Medicine

In 2015, the IWG requested that the National Academies of Sciences, Engineering, and Medicine review and recommend potential approaches for improving its SC-$CO_2$ estimation methodology. In response, the National Academies convened a multidisciplinary committee, the Committee on Assessing Approaches to Updating the Social Cost of Carbon. In addition to evaluating the IWG's overall approach to SC-$CO_2$ estimation, the committee reviewed its choices of IAMs and damage functions, climate science assumptions, future baseline socioeconomic and emission projections, presentation of uncertainty, and discount rates.

In its final report (National Academies 2017), the National Academies committee recommended that the IWG pursue an integrated modular approach to the key components of SC-$CO_2$ estimation to allow for independent updating and review and to draw more readily on expertise from the wide range of scientific disciplines relevant to SC-$CO_2$ estimation. Under this approach, each step in SC-$CO_2$ estimation is developed as a module—socioeconomic projections, climate science, economic damages, and discounting—that reflects the state of scientific knowledge in the current, peer-reviewed literature. In the longer-term, it recommended that the IWG also fund research on ways to better capture interactions and feedbacks between these components. In addition, the committee noted that, while the IWG harmonized assumptions across the IAMs for socioeconomic and emission projections, climate sensitivity, and discount rates when estimating the SC-$CO_2$, using a single climate module in the nearer-term (2-3 years) and eventually transitioning to a single IAM framework will enhance transparency, improve consistency with the underlying science, and allow for more explicit representation of uncertainty. It recommended these three criteria also be used to judge the value of other updates to the methodology. In addition, it recommended that the IWG update SC-$CO_2$ estimates at regular intervals, suggesting a five-year cycle.

Regarding the key components of the SC-$CO_2$, the committee recommended the following improvements in the nearer-term:

- Socioeconomic and emissions projections: Use accepted statistical methods and elicit expert judgment to project probability distributions of future annual growth rates of per-capita GDP and

[12] For example, SC-$CO_2$ estimates have been used in Domestic Delivery Services contracts for USG parcel shipping (https://westcoastclimateforum.com/sites/westcoastclimateforum/files/related_documents/FedGSA_DDS3_green_features_fact_sheet.pdf ).

[13] For example, in 2016 DOT's Transportation Investment Generating Economic Recovery (TIGER) discretionary grant program required a demonstration that benefits justify costs for proposed projects, and the guidance DOT provides to applicants for how to conduct such an analysis specified that they should use the USG SC-$CO_2$ estimates (https://www.transportation.gov/sites/dot.gov/files/docs/BCARG2016March.pdf ).

[14] See Howard and Schwartz (2019) for examples of the use of SC-$CO_2$ estimates in NEPA analyses.

population, bearing in mind potential correlation between economic and population projections. Then using expert elicitation, guided by information on historical trends and emissions consistent with different climate outcomes, project emissions for each forcing agent of interest conditional on population and income scenarios. Additional recommendations were offered for improving the socioeconomic module centered on four broad criteria: time horizon, future policies, disaggregation, and feedbacks.

- Climate science: Adopt or develop a simple Earth system model (such as the Finite Amplitude Impulse Response (FaIR) model) to capture relationships between $CO_2$ emissions, atmospheric $CO_2$ concentrations, and global mean surface temperature change over time while accounting for non-$CO_2$ forcing and allowing for the evaluation of uncertainty. It also recommended the IWG adopt or develop a sea level rise component in the climate module that: (1) accounts for uncertainty in the translation of global mean temperature to global mean sea level rise and (2) is consistent with sea level rise projections available in the literature for similar forcing and temperature pathways. It also noted the importance of generating spatially and temporally disaggregated climate information as inputs into damage estimation. It recommended the use of linear pattern scaling (which estimates linear relationships between global mean temperature and local climate variables) to achieve this goal in the near-term.
- Economic damages: Improve and update existing formulations of individual sectoral damage functions when feasible; characterize damage function calibrations quantitatively and transparently; present spatially disaggregated damage projections and discuss how they scale with temperature, income, and population; and recognize any correlations between formulations when multiple damage functions are used.
- Discounting: Account for the relationship between economic growth and discounting; explicitly recognize uncertainty surrounding discount rates over long time horizons using a Ramsey-like approach; select parameters to implement this approach that are consistent with theory and evidence to produce certainty-equivalent discount rates consistent with near-term consumption rates of interest; use three sets of Ramsey parameters to generate a low, central, and high certainty-equivalent near-term discount rate, and three means and ranges of SC-$CO_2$ estimates; discuss how the SC-$CO_2$ estimates should be combined with other cost and benefit estimates that may use different discount rates in regulatory analysis.

Additional details on each of these recommendations as well as longer term research needs are provided in the National Academies' final report (National Academies 2017).

## 1.3 Executive Order 13990

On January 20, 2021, President Biden issued E.O. 13990, "Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis." Echoing one of the general principles of E.O. 12866 that an Agency "shall base its decisions on the best reasonably obtainable scientific, technical, economic, and other information", E.O. 13990 states that it is essential for Agencies to account for the benefits of reducing GHG emissions as accurately as possible. It emphasizes that a full global accounting of the costs of GHG emissions "facilitates sound decision-making, recognizes the breadth of climate impacts, and supports the international leadership of the United States on climate issues" (E.O. 13990 2021). Specifically, E.O. 13990 reinstates the IWG as the Interagency Working Group on the Social Cost of Greenhouse Gases, names the Chair of the CEA, Director of OMB, and Director of the Office of Science

and Technology Policy (OSTP) as co-chairs of the IWG, and specifies the membership of the IWG to include the following officials, or their designees: the Secretary of the Treasury; the Secretary of the Interior; the Secretary of Agriculture; the Secretary of Commerce; the Secretary of Health and Human Services; the Secretary of Transportation; the Secretary of Energy; the Chair of the Council on Environmental Quality; the Administrator of the Environmental Protection Agency; the Assistant to the President and National Climate Advisor; and the Assistant to the President for Economic Policy and Director of the National Economic Council.

E.O. 13990 tasks the reinstated IWG with the following:

(1) publish an interim update to the SC-GHG (SC-$CO_2$, SC-$CH_4$, and SC-$N_2O$) estimates by February 19, 2021, for agencies to use when monetizing the value of changes in greenhouse gas emissions resulting from regulations and other relevant agency actions until final values are published;

(2) publish a final update to the SC-GHG estimates by no later than January 2022;

(3) provide recommendations, by no later than September 1, 2021, regarding areas of decision-making, budgeting, and procurement by the Federal Government where the SC-GHG estimates should be applied;

(4) provide recommendations, by no later than June 1, 2022, regarding a process for reviewing and, as appropriate, updating the SC-GHG estimates to ensure that these estimates are based on the best available economics and science; and

(5) provide recommendations, to be published with the interim SC-GHG estimates if feasible and by no later than June 1, 2022, to revise methodologies for SC-GHG calculations to the extent that current methodologies do not adequately take account of climate risk, environmental justice, and intergenerational equity.

Finally, the E.O. specifies that in carrying out its activities, the IWG shall consider the recommendations of the National Academies (2017) and other pertinent scientific literature; solicit public comment; engage with the public and stakeholders; seek the advice of ethics experts; and ensure that the SC-GHG estimates reflect the interests of future generations in avoiding threats posed by climate change.

This TSD presents the interim SC-GHG estimates called for in the first of these tasks. It also provides preliminary discussion of how at least one component of SC-GHG estimation, discounting, warrants reconsideration in the more comprehensive update by January 2022 to reflect the advice of the National Academies (2017) and other recent scientific literature.

# 2 The Importance of Accounting for Global Damages

Benefit-cost analyses of U.S. Federal regulations have traditionally focused on the benefits and costs that accrue to individuals that reside within the country's national boundaries. This is a natural result of the fact that most regulations have a limited impact on individuals residing outside of the United States and do not reflect any other scientific, legal, or other rationale. According to OMB's Circular A-4 (2003), an

"analysis should focus on benefits and costs that accrue to citizens and residents of the United States."[15] While Circular A-4 does not elaborate, this guidance towards a focus on U.S. populations in domestic policy analysis is broadly consistent with the fact that the authority to regulate only extends to a nation's own residents who have consented to adhere to the same set of rules and values for collective decision-making (EPA 2010; Kopp et al. 1997; Whittington and MacRae 1986). However, guidance towards a focus on impacts to U.S. citizens and residents is different than recommending that analysis be limited to the impacts that occur within the borders of the U.S. Furthermore, OMB Circular A-4 states that when a regulation is likely to have international effects that "these effects should be reported" though the guidance recommends this be done separately. There are many reasons, as summarized in this TSD, why it is appropriate for agencies to use the global value of damages in making decisions that affect, or may be affected by, GHG emissions. Courts have upheld the use of global damages in estimating the social cost of GHGs, in part in recognition of the diverse ways in which U.S. interests, businesses, and residents may be impacted by climate change beyond U.S. borders.[16]

Unlike many environmental problems where the causes and impacts are distributed more locally, climate change is a true global challenge making GHG emissions a global externality. GHG emissions contribute to damages around the world regardless of where they are emitted. The global nature of GHGs means that U.S. interests, and therefore the benefits to the U.S. population of GHG mitigation, cannot be defined solely by the climate impacts that occur within U.S. borders. Impacts that occur outside U.S. borders as a result of U.S. actions can directly and indirectly affect the welfare of U.S. citizens and residents through a multitude of pathways. Over 9 million U.S. citizens lived abroad as of 2016[17] and U.S. direct investment positions abroad totaled nearly $6 trillion in 2019.[18] Climate impacts occurring outside of U.S. borders will have a direct impact on these U.S. citizens and the investment returns on those assets owned by U.S. citizens and residents. The U.S. economy is also inextricably linked to the rest of the world. The U.S. exports over $2 trillion worth of goods and services a year and imports around $3 trillion.[19] Climate impacts that occur outside U.S. borders can thus impact the welfare of individuals and firms that reside in the United States through their effect on international markets, trade, tourism, and other activities. Furthermore, additional spillovers can occur through pathways such as economic and political destabilization and global migration that can lead to adverse impacts on U.S. national security, public health, and humanitarian concerns (DoD 2014, CCS 2018). As described by the National Academies (2017), to correctly assess the total damages to U.S. citizens and residents, one must account for these spillover effects on the United States.

As an empirical matter, the development of a domestic SC-GHG is greatly complicated by the relatively few region- or country-specific estimates of the SC-$CO_2$ in the literature. At present, the only quantitative

---

[15] OMB's Circular A-4 provides guidance to Federal agencies on the development of regulatory analysis conducted pursuant to Executive Order 12866.

[16] *Zero Zone, Inc. v. Dep't of Energy*, 832 F.3d 654, 678-79 (7th Cir. 2016) (rejecting a petitioner's challenge to DOE's use of a global (rather than domestic) social cost of carbon in setting an efficiency standard under the Energy Policy and Conservation Act, holding that DOE had reasonably identified carbon pollution as "a global externality" and concluding that, because "national energy conservation has global effects, . . . those global effects are an appropriate consideration when looking at a national policy.").

[17] U.S. Department of State's Bureau of Consular Affairs.

[18] BEA Direct Investment by Country and Industry 2019, https://www.bea.gov/data/intl-trade-investment/direct-investment-country-and-industry

[19] BEA National Income and Product Accounts Table 1.1.5.

characterization of domestic damages from GHG emissions, as represented by the domestic SC-GHG, is based on the share of damages arising from climate impacts occurring within U.S. borders as represented in current IAMs. This is both incomplete and an underestimate of the share of total damages that accrue to the citizens and residents of the U.S. because these models do not capture the regional interactions and spillovers discussed above. A 2020 U.S. GAO study observed that "[a]ccording to the National Academies, the integrated assessment models were not premised or calibrated to provide estimates of the social cost of carbon based on domestic damages, and more research would be required to update the models to do so. The National Academies stated it is important to consider what constitutes a domestic impact in the case of a global pollutant that could have international implications that affect the United States" (U.S. GAO 2020).

The global nature of GHGs means that damages caused by a ton of emissions in the U.S. are felt globally and that a ton emitted in any other country harms those in the U.S. Therefore, assessing the benefits of U.S. GHG mitigation activities will require consideration of how those actions may affect mitigation activities by other countries since those international actions will provide a benefit to U.S. citizens and residents. A wide range of scientific and economic experts have emphasized the issue of reciprocity as support for considering global damages of GHG emissions (e.g., Kopp and Mignone 2013, Pizer et al. 2014, Howard and Schwartz 2019, Pindyck 2017, Revesz et al. 2017, Carleton and Greenstone 2021). Carleton and Greenstone (2021) discuss examples of how historic use of a global SC-$CO_2$ may have plausibly contributed to additional international action. Houser and Larson (2021) estimate that under the Paris Agreement, other countries pledged to reduce 6.1 to 6.8 tons for every ton pledged by the U.S. Kotchen (2018) offers a theoretical perspective showing that non-Nash game theoretic behavior can lead countries to optimally chose a social cost of carbon higher than their domestic value to encourage additional reductions from other countries. Using a global estimate of damages in U.S. analyses of regulatory and other actions allows the U.S. to continue to actively encourage other nations, including emerging major economies, to take significant steps to reduce emissions.

The IWG found previously and is restating here that because of the distinctive global nature of climate change that analysis of Federal regulatory and other actions should center on a global measure of SC-GHG. This approach is the same as that taken in regulatory analyses over 2009 through 2016. In the 2015 response to comments, the IWG noted that the only way to achieve an efficient allocation of resources for emissions reduction on a global basis is for all countries to base their policies on global estimates of damages (IWG 2015). Therefore, the IWG continues to recommend the use of global SC-GHG estimates in analysis of Federal regulatory and other actions. The IWG also continues to review developments in the literature, including more robust methodologies for estimating SC-GHG values based on purely domestic damages, and explore ways to better inform the public of the full range of carbon impacts, both global and domestic.

# 3 Discounting in Intergenerational Analyses

GHG emissions are stock pollutants, where damages are associated with what has accumulated in the atmosphere over time, and they are long lived such that subsequent damages resulting from emissions today occur over many decades or centuries depending on the specific greenhouse gas under

consideration.[20] In calculating the SC-GHG, the stream of future damages to agriculture, human health, and other market and non-market sectors from an additional unit of emissions are estimated in terms of reduced consumption (or consumption equivalents). Then that stream of future damages is discounted to its present value in the year when the additional unit of emissions was released. Given the long time horizon over which the damages are expected to occur, the discount rate has a large influence on the present value of future damages. However, the choice of a discount rate also raises highly contested and exceedingly difficult questions of science, economics, ethics, and law.

In 2010, in light of disagreements in the literature on the appropriate discount rate to use in this context, and uncertainty about how rates may change over time, the IWG elected to use three discount rates to span a plausible range of certainty-equivalent constant consumption discount rates: 2.5, 3, and 5 percent per year. The IWG at that time determined that these three rates reflected reasonable judgments under both descriptive and prescriptive approaches to selecting the discount rate.

The 3 percent value was included as consistent with estimates provided in OMB's Circular A-4 (OMB 2003) guidance for the consumption rate of interest. The IWG found that the consumption rate of interest is the correct discounting concept to use when future damages from elevated temperatures are estimated in consumption-equivalent units as is done in the IAMs used to estimate the SC-GHG (National Academies 2017). The upper value of 5 percent was included to represent the possibility that climate-related damages are positively correlated with market returns, which would imply a certainty equivalent value higher than the consumption rate of interest. The low value, 2.5 percent, was included to incorporate the concern that interest rates are highly uncertain over time. It represents the average certainty-equivalent rate using the mean-reverting and random walk approaches from Newell and Pizer (2003) starting at a discount rate of 3 percent. Using this approach, the certainty equivalent is about 2.2 percent using the random walk model and 2.8 percent using the mean reverting approach. Without giving preference to a particular model, the average of the two rates is 2.5 percent. Additionally, a rate below the consumption rate of interest would also be justified if the return to investments in climate mitigation are negatively correlated with the overall market rate of return. Use of this lower value was also deemed responsive to certain judgments based on the prescriptive or normative approach for selecting a discount rate and to related ethical objections that have been raised about rates of 3 percent or higher. Further details about the process for selecting these rates is presented in the 2010 TSD (IWG 2010). Finally, it is important to note that, while the consumption discount rate is the conceptually correct rate for discounting the SC-GHG, and the three rates originally selected were based on this concept, the latest data as well as recent discussion in the economics literature indicates that the 3 percent discount rate used by the IWG to develop its range of discount rates is likely an overestimate of the appropriate discount rate and warrants reconsideration in future updates of the SC-GHG.

This section discusses three issues related to the selected discount rates: (1) why the social rate of return to capital, estimated to be 7 percent in OMB's Circular A-4, is not appropriate for use in calculating the SC-GHG, (2) new evidence on the consumption rate of interest, which may inform the future updates to the SC-GHG, and (3) analytic consistency across discounting within an analysis.

[20] "GHGs, for example, $CO_2$, methane, and nitrous oxide, are chemically stable and persist in the atmosphere over time scales of a decade to centuries or longer, so that their emission has a long-term influence on climate. Because these gases are long lived, they become well mixed throughout the atmosphere" (IPCC 2007).

## 3.1 Social Rate of Return on Capital and Intergenerational Analyses

When analyzing policies and programs that result in GHG emission reductions, it is important to account for the difference between the social and private rate of return on any capital investment affected by the action. Society is not indifferent between a regulation that displaces consumption versus investment in equal amounts. Market distortions, in large part taxes on capital income, cause private returns on capital investments to be different from the social returns. In well-functioning capital markets, arbitrage opportunities will be dissipated, and the cost of investments will equal the present value of future private returns on those investments. Therefore, an individual forgoing consumption or investment of equal amounts as the result of a regulation will face an equal private burden. However, because the social rate of return on the investment is greater than the private rate of return, the overall social burden will be greater in the case where investment is displaced.

OMB's Circular A-4 points out that "the analytically preferred method of handling temporal differences between benefits and costs is to adjust all the benefits and costs to reflect their value in equivalent units of consumption and to discount them at the rate consumers and savers would normally use in discounting future consumption benefits" (OMB 2003). The damage estimates developed for use in the SC-GHG are estimated in consumption-equivalent terms. An application of OMB Circular A-4's guidance for regulatory analysis would then use the consumption discount rate to calculate the SC-GHG, while also developing a more complete estimate of social cost to account for the difference in private and social rates of return on capital for any investment displaced as a result of the regulation. This more complete estimate of social costs can be developed using either the shadow price of capital approach or by estimating costs in a general equilibrium framework, for example by using a computable general equilibrium model. In both cases, displaced investment would be converted into a flow of consumption equivalents.

In cases where the costs are not adjusted to be in consumption-equivalent terms, OMB's Circular A-4 recommends that analysts provide a range of estimates for net benefits based on two approaches. The first approach is based on using the consumption rate of interest to discount all costs and benefits. This approach is consistent with the case where costs are primarily borne as reduced consumption. The second approach, the social opportunity cost of capital (SOC) approach, focuses on the case where the main effect of a regulation is to displace or alter the use of capital in the private sector (OMB 2003). When interpreting the SOC approach from the point of view of whether to invest in a single government project, it is asking whether the benefits from the project would at least match the returns from investing the same resources in the private sector. Interpreting the approach from the standpoint of a benefit-cost analysis of regulation, the approach focuses on adjusting estimates of benefits downward by discounting at a higher rate to offset additional social costs not reflected in the private value of displaced investment.

Harberger (1972) derived a more general version of the social opportunity cost of capital approach, recognizing that policies will most likely displace a mix of consumption and investment and therefore a blended discount rate would be needed to adjust the benefits to account for the omitted costs. In his partial equilibrium approach, the blended discount rate is a weighted average of the consumption interest rate and social rate of return on capital, where the weights are the share of a policy's costs borne by consumption versus investment. This general result has been extended to the general equilibrium context by Sandmo and Drèze (1971) and Drèze (1974) and can be extended to account for changes in foreign direct investment (CEA 2017). This highlights that using the social rate of return for benefits and costs is at best creating a lower bound on the estimate of net benefits that would only be met in an extreme case

where regulatory costs fully displace investment. If the beneficial impacts of the regulation induce private investment whose social returns have not been quantified and fully converted to consumption equivalents, then the net benefits calculated using the social rate of return on capital is not even a lower bound.[21] Li and Pizer (2021) further generalize the SOC framework and demonstrate that temporal pattern of benefits is important and that when benefits occur far in the future discounting using the social rate of return on capital again is not even a lower bound on net benefits.

For regulations whose benefits and costs occur over a relatively short time frame, the range of net benefits computed using the two discounting approaches will be relatively narrow. Therefore, there is less risk in maintaining an uninformed prior over the share of regulatory costs that will displace investment and using the potential bounding cases for net benefits. However, for cases where the costs are borne early in the time horizon and benefits occur for decades or even centuries, such as with GHG mitigation, the two estimates of net benefits will differ significantly. In this case, the risk to society of maintaining an uninformed prior over the share of regulatory costs borne by investment is significantly higher. In turn, the preferred approach is to discount benefits using the consumption rate of interest and strive to provide a more complete measure of costs, accounting for displacement of investment whose social rate of return exceeds the private rate of return, either by using a shadow price of capital approach or a general equilibrium framework, like a computable general equilibrium model.

It is important to note that even if an appropriately specified blended SOC rate could be calculated based on the share of regulatory costs that are expected to displace investment that would not obviate the need to carefully consider issues of uncertainty and ethics when discounting in an intergenerational context, pointing to a lower rate.

For these reasons, the IWG is returning to the approach of calculating the SC-GHG based on the consumption rate of interest, consistent with the findings of the National Academies (2017)[22].

## 3.2 New Evidence on the Consumption Discount Rate

The three discount rates selected by the IWG in 2010 are centered around the 3 percent estimate of the consumption interest rate published in OMB's Circular A-4 in 2003. That guidance was based on the real rate of return on 10-year Treasury Securities from the prior 30 years (1973 through 2002), which averaged 3.1 percent. Over the past four decades there has been a substantial and persistent decline in real interest rates (see Figure 1). Recent research has found that this decline has been driven by decreases in the equilibrium real interest rate (Bauer and Rudebusch 2020).

Re-estimating the consumption rate of interest following the same approach applied in Circular A-4, including using data from the most recent 30 years, yields a substantially lower result. The average rate

[21] The SOC approach as outlined in OMB's Circular A-4 is most applicable to cases where the benefits are represented as consumption equivalents and costs may not be. If the benefits of the policy include the inducement of new private investment, discounting both benefits and costs at the social rate of return for capital is no longer appropriate. The results of Bradford (1975) show that in a case where regulatory costs are primarily borne through reduced consumption and the beneficial impacts of the policy may induce private investment the appropriate rate under the SOC approach could be below the consumption interest rate.

[22] NAS (2017) stated "The estimates that result from the SC-IAMs are measured in consumption- equivalent units: thus, a discount rate that reflects how individuals trade off current and future consumption is defensible in this setting" (p. 236-7).

of return on inflation adjusted 10-year Treasury Securities over the last 30 years (1991-2020) is 2.0 percent. These rates are not without historic precedent, such that over the last 60 years the inflation adjusted 10-year Treasury Securities is 2.3 percent. Current real rates of returns below 2 percent are expected to persist. The U.S. Congressional Budget Office (CBO) in its September 2020 Long Term Budget Outlook forecasts real rates of return on 10-Year Treasury Securities to average 1.2 percent over the next 30 years (U.S. CBO 2020). This new information suggests that the consumption rate of interest is notably lower than 3 percent. CEA (2017) examined additional forecasts of 10-Year Treasury Securities and data on futures contracts, reaching the conclusion that the appropriate consumption discount rate should be at most 2 percent.

**Figure 1: Monthly 10-Year Treasury Security Rates, Inflation-Adjusted**[23]




Several surveys have been conducted in recent years to elicit experts' views on the appropriate discount rates to use in an intergenerational context (e.g., Drupp et al. 2018; Howard and Sylvan 2020). For example, Drupp et al. (2018) offers confirming evidence that the economics profession generally agrees that the appropriate social discount rate is below 3 percent as reflected in the recent trends in data. They surveyed over 200 experts and found a "surprising degree of consensus among experts, with more than three-quarters finding the median risk-free social discount rate of 2 percent acceptable" (Drupp et al. 2018).[24]

[23] Monthly 10-Year Treasury Security returns, adjusted for inflation. Real interest rates prior to 2003 (green line) are calculated by subtracting the annual rate of inflation as measured by the CPI-U from the nominal rate of return on 10-Year constant maturity Treasury Securities. Interest rates from 2003 onwards (brown line) are based on the 10-Year Treasury Inflation-Protected Securities.

[24] For a detailed explanation of discounting concepts and terminology see EPA's *Guidelines for Preparing Economic Analysis* (2010). https://www.epa.gov/environmental-economics/guidelines-preparing-economic-analyses

It is important to note that the new information pointing to a lower consumption rate of interest, lower than 3 percent, does not obviate the need to carefully consider issues of uncertainty and ethics when discounting in an intergenerational context.[25] If 2 percent was used as the consumption interest rate and adjusted for uncertainty using the results of Newell and Pizer (2003) as was done in the 2010 TSD, the process would yield a discount rate lower than 2 percent. Therefore, a consideration of discount rates below 3 percent, including 2 percent and lower, are warranted when discounting intergenerational impacts.

This is consistent with the 2003 recommendation in OMB's Circular A-4 that noted "[a]lthough most people demonstrate time preference in their own consumption behavior, it may not be appropriate for society to demonstrate a similar preference when deciding between the well-being of current and future generations" and found that certainty equivalent discount rates as low as 1 percent could be appropriate for intergenerational problems (OMB 2003). Similarly, if implementing a declining discount rate schedule to account for uncertainty (see next section), an updated consumption rate of interest, based on additional data presented above, may be a starting point for an update.

In light of the evidence and discussion on discount rates presented in this TSD and elsewhere, the recommendation from OMB's Circular A-4 to include further sensitivity analysis with lower discount rates when a rule has important intergenerational benefits or costs, and the direction to the IWG in E.O. 13990 to ensure that the SC-GHG reflect the interest of future generations, the IWG finds it appropriate as an interim recommendation that agencies may consider conducting additional sensitivity analysis using discount rates below 2.5%.

## 3.3 Analytic Consistency and Declining Discount Rates

While the consumption rate of interest is an important driver of the benefits estimate, it is uncertain over time, as may be observed in Figure 1. Weitzman (1998, 2001) showed theoretically and Newell and Pizer (2003) and Groom et al. (2005) confirmed empirically that discount rate uncertainty can have a large effect on net present values. A main result from these studies is that if there is a persistent element to the uncertainty in the discount rate (e.g., the rate follows a random walk), then it will result in an effective (or certainty-equivalent) discount rate that declines over time. This is because lower discount rates tend to dominate over the very long term (see Weitzman 1998, 1999, 2001; Newell and Pizer 2003; Groom et al. 2005; Gollier 2009; Summers and Zeckhauser 2008; Gollier and Weitzman 2010; Arrow et al. 2013; Cropper et al. 2014; and Arrow et al. 2014).

The proper way to specify a declining discount rate schedule remains an active area of research. One approach is to develop a stochastic model of interest rates that is empirically estimated and used to calculate the certainty equivalent declining discount rate schedule (e.g., Newell and Pizer 2003; Groom et al. 2007). An alternative approach is to use the Ramsey equation based on a forecast of consumption growth rates that accounts for uncertainty (e.g., Cropper et al. 2014; Arrow et al. 2013). If the shocks to consumption growth are positively correlated over time then the result of the Ramsey equation will be a certainty-equivalent discount rate schedule that declines over time (Goiller 2014). Others have argued for a less structural approach to specify a declining discount rate schedule (e.g., Weitzman 2001, the United

[25] For a more detailed explanation of ethical and uncertainty considerations around discounting see National Academies (2017) and the 2010 TSD (IWG 2010).

Kingdom's "Green Book" for regulatory analysis (HM Treasury 2020), the declining discount schedule in France (Lebègue 2005) and varying the discount rate based on the time period in Germany (Schwermer 2012, U.S. GAO 2020)). This approach uses a higher discount rate initially, like the current estimate of the consumption interest rate, but applies a graduated scale of lower discount rates further out in time.[26]

Instead of explicitly specifying a declining discount rate schedule, the IWG in 2010 elected to use a constant but lower discount rate to capture the directional effect of the literature on discounting under uncertainty. Specifically, the IWG considered two declining discount rate schedules based on the mean-reverting and random walk models from Newell and Pizer (2003) starting at a discount rate of 3 percent. The 2.5 percent discount rate selected by the IWG in 2010 reflected the midpoint between the average certainty equivalent discount rates of both models. The approach of using a lower, but constant, discount rate to capture the effect of uncertainty has led to inconsistency in regulatory analyses, where impacts occurring in a given year are discounted at different rates depending on whether they are related to climate change (Arrow et al. 2014). The National Academies (2017) and EPA's Science Advisory Board (2021) have recommended that the U.S. Government establish an explicit declining discount rate schedule that is applied to all regulatory impacts in an analysis to capture the effect of uncertainty on long-term discount rates, while also maintaining consistency across impact categories in the analysis. The IWG will consider the literature on declining discount rates and the recommendations of the National Academies (2017) and EPA's Science Advisory Board (2021) as it develops future updates to the SC-GHG. In the interim, the IWG is returning to the use of the 2.5, 3, and 5 percent discount rates in calculating the SC-GHG but recommends that agencies describe potential limitations in their analyses to ensure transparency. As noted above, agencies may also consider discount rates below 2.5 percent as part of a sensitivity analysis.

# 4 Interim Estimates of SC-$CO_2$, SC-$CH_4$, SC-$N_2O$

The interim SC-GHG estimates presented in this TSD rely on the same models and harmonized inputs for the socioeconomic emissions scenarios and equilibrium climate sensitivity distribution used for USG SC-GHG estimates since 2013. Specifically, the SC-GHG estimates rely on an ensemble of three IAMs: Dynamic Integrated Climate and Economy (DICE) 2010 (Nordhaus 2010); Climate Framework for Uncertainty, Negotiation, and Distribution (FUND) 3.8 (Anthoff and Tol 2013a, 2013b); and Policy Analysis of the Greenhouse Gas Effect (PAGE) 2009 (Hope 2013). IAMs are useful because they combine climate processes, economic growth, and feedback between the climate and the global economy into a single modeling framework. They gain this advantage at the expense of a more detailed representation of underlying climatic and economic systems. DICE, PAGE, and FUND all take stylized, reduced-form approaches and have been widely used in the economic and scientific literature since the 1990s. They are periodically updated by the model developers, but as discussed further in Section 5, the versions of the three models used in the 2013 and 2016 TSDs do not reflect the tremendous increase in the scientific and economic understanding of climate-related damages that has occurred in the past decade. The three IAMs

[26] For instance, the United Kingdom applies a discount rate of 3.5 percent to the first 30 years; 3 percent for years 31 - 75; 2.5 percent for years 76 - 125; 2 percent for years 126 - 200; 1.5 percent for years 201 - 300; and 1 percent after 300 years. As a sensitivity, it recommends a discount rate of 3 percent for the first 30 years, also decreasing over time.

were run using a common set of assumptions in each model for future population, economic, and GHG emissions growth, as well as equilibrium climate sensitivity (ECS) – a measure of the globally averaged temperature response to increased atmospheric $CO_2$ concentrations. The socioeconomic and emission projections included five reference scenarios based on the Stanford Energy Modeling Forum EMF-22 modeling exercise (Clarke, et al. 2009; Fawcett, et al. 2009). The models were run using a probability distribution for ECS, calibrated to the Intergovernmental Panel on Climate Change's (IPCC) Fourth Assessment Report findings using the Roe and Baker (2007) distribution. Details on these versions of the IAMs and the harmonized inputs are presented in the 2016 TSD and Addendum and 2010 TSD. (IWG 2010, 2016a, 2016b). The 2016 Addendum also describes the methodology used to calculate the SC-$CH_4$ and SC-$N_2O$ estimates in greater detail.[27] Finally, for the reasons set forth in Section 3 above, the interim estimates were based on three constant discount rates of 2.5, 3, and 5 percent.

The combination of three models and five scenarios produced 15 separate frequency distributions of SC-GHG estimates for each discount rate in a given year, with each distribution consisting of 10,000 estimates based on draws from the standardized ECS distribution (as well as distributions of parameters treated as uncertain in two of the models (FUND and PAGE)). For each discount rate, the IWG combined the distributions across models and socioeconomic emissions scenarios (applying equal weight to each) and then selected a set of four values for use in benefit-cost analyses: an average value resulting from the model runs for each of three discount rates (2.5%, 3%, and 5%), plus a fourth value, selected as the 95th percentile of estimates based on a 3 percent discount rate. The fourth value was included to provide information on potentially higher-than-expected economic impacts from climate change, conditional on the 3% estimate of the discount rate. For this purpose, the SC-GHG value for the 95th percentile at a 3 percent discount rate was presented.[28] For the purposes of capturing the uncertainties involved in analyses, the IWG emphasized previously and emphasizes in this TSD the importance and value of including all four SC-GHG values. In particular, values based on lower discount rates are consistent with the latest scientific and economic understanding of discounting approaches relevant for intergenerational analysis (described in Section 3).

Tables 1-3 show the four selected values for SC-$CO_2$, SC-$CH_4$, and SC-$N_2O$, respectively, in five-year increments from 2020 to 2050. These estimates are reported in 2020 dollars but are otherwise identical to those presented in the previous version of the TSD and its Addendum, released in August 2016.[29] The

---

[27] The IWG calculated the SC-$CH_4$ and SC-$N_2O$ estimates following the approach used in Marten et al. (2015). In order to develop SC-$CH_4$ and SC-$N_2O$ estimates consistent with the methodology underlying the SC-$CO_2$ estimates, Marten et al. (2015) needed to augment the IWG modeling framework in two respects: (1) augment the climate model of two of the IAMs to explicitly consider the path of additional radiative forcing from a $CH_4$ or $N_2O$ perturbation, and (2) add more specificity to the assumptions regarding post-2100 baseline $CH_4$ and $N_2O$ emissions. See IWG (2016b) for more discussion of these two modeling modifications and the peer review and public comment processes accompanying their development.

[28] A detailed set of percentiles by model and scenario combination and additional summary statistics for the 2020 values is available in the 2016 TSD and Addendum (IWG 2016a, 2016b).

[29] The values in Tables 1-3 are the same as those reported in the 2016 TSD and Addendum adjusted for inflation to 2020 dollars using the annual GDP Implicit Price Deflator values in U.S. Bureau of Economic Analysis (BEA) NIPA Table 1.1.9: 113.626 (2020)/ 92.486 (2007) = 1.228575 (U.S. BEA 2021). Values of SC-$CO_2$ presented in this TSD are rounded to the nearest dollar; SC-$CH_4$ and SC-$N_2O$ are rounded to two significant figures. The annual unrounded estimates are available on OMB's website for use in regulatory and other analyses: https://www.whitehouse.gov/omb/information-regulatory-affairs/regulatory-matters/#scghgs.

full set of annual SC-GHG values between 2020 and 2050, calculated using linear interpolation between the numbers shown in Tables 1-3, is reported in the Appendix and the full set of model results are available on the OMB website.[30] The SC-GHG estimates increase over time within the models – i.e., the societal harm from one metric ton emitted in 2030 is higher than the harm caused by one metric ton emitted in 2025 – because future emissions produce larger incremental damages as physical and economic systems become more stressed in response to greater climatic change, and because GDP is growing over time and many damage categories are modeled as proportional to GDP.

**Table 1: Social Cost of $CO_2$, 2020 – 2050 (in 2020 dollars per metric ton of $CO_2$)[31]**

| | Discount Rate and Statistic | | | |
|---|---|---|---|---|
| Emissions Year | 5% Average | 3% Average | 2.5% Average | 3% 95th Percentile |
| 2020 | 14 | 51 | 76 | 152 |
| 2025 | 17 | 56 | 83 | 169 |
| 2030 | 19 | 62 | 89 | 187 |
| 2035 | 22 | 67 | 96 | 206 |
| 2040 | 25 | 73 | 103 | 225 |
| 2045 | 28 | 79 | 110 | 242 |
| 2050 | 32 | 85 | 116 | 260 |

**Table 2: Social Cost of $CH_4$, 2020 – 2050 (in 2020 dollars per metric ton of $CH_4$)**

| | Discount Rate and Statistic | | | |
|---|---|---|---|---|
| Emissions Year | 5% Average | 3% Average | 2.5% Average | 3% 95th Percentile |
| 2020 | 670 | 1500 | 2000 | 3900 |
| 2025 | 800 | 1700 | 2200 | 4500 |
| 2030 | 940 | 2000 | 2500 | 5200 |
| 2035 | 1100 | 2200 | 2800 | 6000 |
| 2040 | 1300 | 2500 | 3100 | 6700 |
| 2045 | 1500 | 2800 | 3500 | 7500 |
| 2050 | 1700 | 3100 | 3800 | 8200 |

[30] https://www.whitehouse.gov/omb/information-regulatory-affairs/regulatory-matters/#scghgs

[31] The values reported in this TSD are identical to those reported in the 2016 TSD adjusted for inflation to 2020 dollars using the annual GDP Implicit Price Deflator values in the U.S. Bureau of Economic Analysis' (BEA) NIPA Table 1.1.9: 113.626 (2020)/ 92.486 (2007) = 1.228575 (U.S. BEA 2021). The IWG combined the distributions across models and socioeconomic emissions scenarios for each of three discount rates (2.5%, 3%, and 5%), plus a fourth value, selected as the 95th percentile of estimates based on a 3 percent discount rate. Values of SC-$CO_2$ are rounded to the nearest dollar; SC-$CH_4$ and SC-$N_2O$ are rounded to two significant figures. The annual unrounded estimates are available on OMB's website for use in regulatory and other analyses: https://www.whitehouse.gov/omb/information-regulatory-affairs/regulatory-matters/#scghgs.

**Table 3: Social Cost of $N_2O$, 2020 – 2050 (in 2020 dollars per metric ton of $N_2O$)**

| | Discount Rate and Statistic | | | |
|---|---|---|---|---|
| Emissions Year | 5% Average | 3% Average | 2.5% Average | 3% 95th Percentile |
| 2020 | 5800 | 18000 | 27000 | 48000 |
| 2025 | 6800 | 21000 | 30000 | 54000 |
| 2030 | 7800 | 23000 | 33000 | 60000 |
| 2035 | 9000 | 25000 | 36000 | 67000 |
| 2040 | 10000 | 28000 | 39000 | 74000 |
| 2045 | 12000 | 30000 | 42000 | 81000 |
| 2050 | 13000 | 33000 | 45000 | 88000 |

Multiplying the SC-GHG in year *t* by the change in emissions in year *t* yields the monetized value of future emission changes from a year *t* perspective. This value must then be discounted to the present before being included in an analysis. For this purpose, the monetized value of future emission changes should be discounted at the same rate used to calculate the initial SC-GHG to ensure internal consistency—i.e., future damages from climate change using the SC-GHG at 2.5 percent should be discounted to the base year of the analysis using the same 2.5 percent rate.

As noted above, to correctly assess the total climate damages to U.S. citizens and residents, an analysis must account for both the impacts that occur within U.S. borders and spillover effects from climate action elsewhere. For the reasons discussed in Section 2 above, estimates focusing on the climate impacts occurring within U.S. borders are an underestimate of the benefits of GHG mitigation accruing to U.S. citizens and residents and, therefore, are not equivalent to a domestic estimate of the SC-GHG. (Section 2 also discusses why analyses should center their attention on a global measure of the SC-GHG). Additionally, models differ in their treatment of regional damages[32] with one of the model developers recently noting that regional damages are "both incomplete and poorly understood" (Nordhaus 2017). The IWG further notes that the domestic focused SC-GHG estimates used under E.O. 13783[33] did not

[32] Both the PAGE and FUND model contain a U.S. region and so the damages for this region are reported directly for those models. The DICE 2010 model does not explicitly include a separate U.S. region in the model. For the domestic focused SC-GHG estimates used under E.O. 13783, the DICE model damages occurring within U.S. borders were approximated as 10 percent of the global estimate from the DICE model runs, based on the results from a regionalized version of the model (RICE 2010) reported in Table 2 of Nordhaus (2017). Although the regional shares reported in Nordhaus (2017) are specific to SC-$CO_2$, they were also used in approximating the share of marginal damages from $CH_4$ and $N_2O$ emissions occurring within U.S. borders. Direct transfer of the U.S. share from the SC-$CO_2$ likely understate the U.S. share of the IWG global SC-$CH_4$ estimates based on DICE due to the combination of three factors: a) regional damage estimates are known to be highly correlated with output shares (Nordhaus 2017, 2014), b) the U.S. share of global output decreases over time in all five EMF-22 based socioeconomic scenarios used for the model runs, and c) the bulk of the temperature anomaly (and hence, resulting damages) from a perturbation in emissions in a given year will be experienced earlier for $CH_4$ than $CO_2$ due to the shorter lifetime of $CH_4$ relative to $CO_2$.

[33] For emissions occurring in 2020, the average estimates of marginal damages occurring within the U.S. borders for $CO_2$, $CH_4$, and $N_2O$ emissions across all model runs that were used in 2017-2020 regulatory analyses were \$7/mt$CO_2$,

benefit from a consensus-based IWG process, were not documented in a dedicated TSD, subjected to a SC-GHG specific notice and comment period, or considered by National Academies in their 2017 review. The IWG will request public comments on the new information presented in this TSD, as well as other topics and issues the IWG will address as we develop the next set of updates (see Section 6).

## 4.1 Treatment of Uncertainty

Uncertainty about the value of the SC-GHGs is in part inherent, as with any analysis that looks into the future, but it is also driven by current data gaps associated with the complex physical, economic, and behavioral processes that link GHG emissions to human health and well-being. Some sources of uncertainty pertain to aspects of the natural world, such as quantifying the physical effects of greenhouse gas emissions on Earth systems. Other sources of uncertainty are associated with current and future human behavior and well-being, such as population and economic growth, GHG emissions, the translation of Earth system changes to economic damages, and the potential extent and costs of adaptation. It is important to note that even in the presence of uncertainty, scientific and economic analysis can provide valuable information to the public and decision makers. Such uncertainty should, however, be acknowledged, communicated as clearly as possible, and taken into account in the analysis whenever possible.

The 2016 TSD and the 2017 National Academies report provide detailed discussions of the ways in which the modeling underlying the development of the SC-GHG estimates addressed quantified sources of uncertainty.

In developing the SC-$CO_2$ estimates, the IWG considered various sources of uncertainty through a combination of a multi-model ensemble, probabilistic analysis, and scenario analysis. For example, the three IAMs used collectively span a wide range of Earth system and economic outcomes to help reflect the uncertainty in the literature and in the underlying dynamics being modeled. The use of an ensemble of three different models is also intended to, at least partially, address the fact that no single model includes all of the quantified economic damages. It also helps to reflect structural uncertainty across the models, which is uncertainty in the underlying relationships between GHG emissions, Earth systems, and economic damages that are included in the models. Bearing in mind the different limitations of each model (discussed in the 2010 TSD) and lacking an objective basis upon which to differentially weight the models, the three IAMs were given equal weight in the analysis.

The IWG used Monte Carlo techniques to run the IAMs a large number of times. In each simulation the uncertain parameters are represented by random draws from their defined probability distributions. In all three models the equilibrium climate sensitivity is treated probabilistically based on the probability distribution described in the 2010 TSD. The equilibrium climate sensitivity is a key parameter in this

---

$190/mt$CH_4$, and $2,300/mt$N_2O$ (in 2020 dollars), respectively, using a 3 percent discount rate, and $1/mt$CO_2$, $59/mt$CH_4$, and $380/mt$N_2O$ (in 2020 dollars) using a 7 percent discount rate. These values increased over time; for 2050 emissions, the average estimates of marginal damages occurring within the U.S. borders are $11/mt$CO_2$, $380/mt$CH_4$, and $4,000/mt$N_2O$ (in 2020 dollars) using a 3% discount rate and $3/mt$CO_2$, $160/mt$CH_4$, and $1,000/mt$N_2O$ (in 2020 dollars) using a 7% discount rate. Using the same approach with a 2.5 percent discount rate, the average estimates of marginal damages occurring within the U.S. borders of $CO_2$, $CH_4$, and $N_2O$ for emissions in 2020 are $10/mt$CO_2$, $240/mt$CH_4$, and $3,300/mt$N_2O$ (in 2020 dollars), respectively; for 2050 emissions, these values increase to $15/mt$CO_2$, $450/mt$CH_4$, and $5,300/mt$N_2O$ (in 2020 dollars).

analysis because it helps define the strength of the climate response to increasing GHG concentrations in the atmosphere. In addition, the FUND and PAGE models define many of their parameters with probability distributions instead of point estimates. For these two models, the model developers' default probability distributions are maintained for all parameters other than those superseded by the IWG's harmonized inputs (i.e., equilibrium climate sensitivity, socioeconomic and emissions scenarios, and discount rates). More information on the uncertain parameters in PAGE and FUND is presented in Appendix C of the 2016 TSD (IWG 2016a).

Finally, based on the review of the literature, the IWG chose discount rates that reflect reasonable judgements under both prescriptive and descriptive approaches to intergenerational discounting. As discussed in the 2010 TSD, in light of disagreement in the literature on the appropriate discount rate to use in this context and uncertainty about how rates may change over time, the IWG selected three certainty-equivalent constant discount rates to span a plausible range: 2.5, 3, and 5 percent per year. However, unlike the approach taken for consolidating results across models and socioeconomic and emissions scenarios, the SC-GHG estimates are not pooled across different discount rates because the range of discount rates reflects both uncertainty and, at least in part, different policy or value judgements.

The outcome of accounting for various sources of uncertainty using the approaches described above is a frequency distribution of the SC-$CO_2$ estimates for emissions occurring in a given year for each of the three discount rates. These frequency distributions reflect the uncertainty around the input parameters for which probability distributions were defined, as well as from the multi-model ensemble and socioeconomic and emissions scenarios where probabilities were implied by the equal weighting assumption. It is important to note that the probability distribution for the SC-GHG calculated using the modeling approach outlined above does not fully characterize uncertainty about the SC-GHG due to impact categories omitted from the models and sources of uncertainty that have not been fully characterized due to data limitations. To name just one example of many known GHG-induced damages omitted in the three IAMs, none of the models include damages associated with ocean acidification, and, therefore, naturally the models do not reflect uncertainty as to the potential severity of those damages.

Figures Figure ***2*** through Figure ***4*** present the frequency distribution of the interim SC-$CO_2$, SC-$CH_4$, and SC-$N_2O$ estimates, respectively, for emissions in 2020 and for each discount rate. Each distribution represents 150,000 estimates based on 10,000 simulations for each combination of the three models and five socioeconomic and emissions scenarios. In general, the distributions are skewed to the right and have long right tails, which tend to be longer for lower discount rates. To highlight the difference between the impact of the discount rate on the SC-GHG and other quantified sources of uncertainty, the bars below the frequency distributions provide a symmetric representation of quantified variability in the SC-GHG estimates conditioned on each discount rate. The full set of SC-GHG results through 2050 is available on OMB's website.

As illustrated by the frequency distributions in Figures Figure ***2*** through Figure ***4*** , the assumed discount rate plays a critical role in the ultimate estimate of the SC-GHG. As explained in Section 3, this is because GHG emissions today continue to impact society far out into the future, so with a higher discount rate, costs that accrue to future generations are weighted less, resulting in a lower estimate. As discussed in Section 3.1, new data and evidence strongly suggest that the consumption interest rate is likely to be less than 3, near 2 percent or lower.

**Figure 2: Frequency Distribution of $SC\text{-}CO_2$ Estimates for 2020**[34]




[34] Although the distributions and numbers in Figure 2 are based on the full set of model results (150,000 estimates for each discount rate), for display purposes the horizontal axis is truncated with 0.81 percent of the estimates falling below the lowest bin displayed and 3.56 percent of the estimates falling above the highest bin displayed.

**Figure 3: Frequency Distribution of SC-$CH_4$ Estimates for 2020**[35]




[35] Although the distributions and numbers in Figure 3 are based on the full set of model results (150,000 estimates for each discount rate), for display purposes the horizontal axis is truncated with 0.12 percent of the estimates falling below the lowest bin displayed and 2.84 percent of the estimates falling above the highest bin displayed.

**Figure 4: Frequency Distribution of SC-$N_2O$ Estimates for 2020**[36]




While the figures above reflect the uncertainties that are explicitly considered in a quantitative manner, there are other areas of uncertainty that are not quantitatively reflected in the interim SC-GHG estimates. The scientific and economics literature has further explored known sources of uncertainty related to estimates of the SC-GHG. For example, published studies explore the sensitivity of IAMs and the resulting SC-GHG estimates to different assumptions embedded in the models (see, e.g., Hope 2013, Anthoff and Tol 2013a, and Nordhaus 2014). However, there remain additional sources of uncertainty that have not been fully characterized and explored due to data limitations and lack of consensus in the scientific or economic literature about how to represent them. Additional research is needed to expand the quantification of various sources of uncertainty in estimates of the SC-GHG (e.g., developing explicit probability distributions for more inputs pertaining to climate impacts and their valuation).

## 4.2 Other Modeling Limitations

The interim SC-GHG estimates presented in this TSD have a number of limitations, as would be expected for any modeling exercise that covers such a broad scope of scientific and economic issues across the complex global landscape. These include the incomplete treatment of catastrophic and non-catastrophic impacts in the IAMs, their incomplete treatment of adaptation and technological change, the incomplete way in which inter-regional and intersectoral linkages are modeled, uncertainty in the extrapolation of

[36] Although the distributions and numbers in Figure 4 are based on the full set of model results (150,000 estimates for each discount rate), for display purposes the horizontal axis is truncated with 0.1 percent of the estimates falling below the lowest bin displayed and 2.85 percent of the estimates falling above the highest bin displayed.

damages to high temperatures, and inadequate representation of the relationship between the discount rate and uncertainty in economic growth over long time horizons.

There are newer versions available of each of the IAMs used to calculate the interim SC-GHG estimates in this TSD that offer improvements in some of these areas beyond the version of the models used for the interim estimates. For example, the latest version of the PAGE model, PAGE-ICE (Yumashev et al. 2019, Yumashev 2020), extends PAGE09 (Hope 2013) with representation of two nonlinear Arctic feedbacks (permafrost carbon feedback and surface albedo feedback) on the global climate system and economy, among other changes. The newest version of the DICE model, DICE2016-R3 (Nordhaus 2017), includes numerous updates, including changes to the carbon cycle (to better simulate the long-run behavior of larger models with full ocean chemistry) and updated methods for estimating economic activity.[37] At comparable discount rates, DICE2016-R3 would result in SC-$CO_2$ estimates roughly twice that of the interim estimates presented in this TSD. For example, using a 3% constant discount rate and other IWG modeling assumptions, DICE2016-R3 yields an average SC-$CO_2$ of $104 (2018 international dollars) for 2020 emissions (Nordhaus 2019a). However, even DICE2016 and PAGE-ICE do not include all of the important physical, ecological, and economic impacts of climate change recognized in the climate change literature and the science underlying their damage functions lags behind the most recent research. Likewise, the socioeconomic and emissions scenarios used as inputs to the models in this TSD do not reflect new information from the last decade of scenario generation or the full range of projections.

The modeling limitations discussed above do not all work in the same direction in terms of their influence on the SC-GHG estimates. However, it is the IWG's judgment that, taken together, the limitations suggest that the interim SC-GHG estimates presented in this TSD likely underestimate the damages from GHG emissions. In particular, the IPCC's Fourth Assessment Report (IPCC 2007), which was the most current IPCC assessment available at the time when the IWG decision over the ECS input was made, concluded that SC-$CO_2$ estimates "very likely…underestimate the damage costs" due to omitted impacts. Since then, the peer-reviewed literature has continued to support this conclusion, as noted in the IPCC's Fifth Assessment report (IPCC 2014) and other recent scientific assessments (e.g., IPCC 2018, 2019a, 2019b; U.S. Global Change Research Program (USGCRP) 2016, 2018; and National Academies 2016b, 2019). These assessments confirm and strengthen the science, updating projections of future climate change and documenting and attributing ongoing changes. For example, sea level rise projections from the IPCC's Fourth Assessment report ranged from 18 to 59 centimeters by the 2090s relative to 1980-1999, while excluding any dynamic changes in ice sheets due to the limited understanding of those processes at the time (IPCC 2007). A decade later, the Fourth National Climate Assessment projected a substantially larger sea level rise of 30 to 130 centimeters by the end of the century relative to 2000, while not ruling out even more extreme outcomes (USGCRP 2018). Section 5 briefly previews some of the recent advances in the

[37] Relative to the previous version of DICE, DICE2013, the DICE2016 updates to the carbon cycle and the methods for estimating economic activity had the greatest impact on the SC-$CO_2$. Based on Archer et al. (2009), DICE2016's three-box carbon cycle model aims to better simulate the long-run behavior of larger models with full ocean chemistry. In measuring economic activity, one of the important changes in DICE2016 was to move from market exchange rates to measures adjusted for purchasing power parity when comparing monetary values across countries. See Nordhaus (2017, 2019a) for more discussion of these and other updates included in DICE2016-R3. Nordhaus has also recently explored side extensions of DICE2016. For example, DICE-GIS extends DICE2016 to include representation of sea level rise from melting of the Greenland Ice Sheet (Nordhaus 2019b, Pizer 2019).

scientific and economic literature that the IWG is actively following and that could provide guidance on, or methodologies for, addressing some of the limitations with the interim SC-GHG estimates.

# 5 Scientific and Economic Advances

The research community has made considerable progress in developing new data and methods that will provide a path forward for bringing the USG SC-GHG estimates closer to the current frontier of climate science and economics and could address many of the National Academies' (2017) recommendations. This research since 2010/2013 has advanced knowledge regarding each key component in the process of estimating the SC-GHG. This TSD does not intend to provide a detailed review of all these advancements, but this section does highlight some of the key research and new information that the IWG will be reviewing as it works to improve the SC-GHG estimates. As part of the process for updating the SC-GHG estimates by January 2022, the IWG will survey the scientific literature, including the economic literature, to identify advances to address the National Academies (2017) recommendations.

***Climate system representation***. There have been advancements in climate science since the publication of the IPCC's Fourth Assessment Synthesis report (IPCC 2007), which was the basis for the IWG decision on what equilibrium climate sensitivity (ECS) input to use in the IAM model runs. The conclusions of recent scientific assessments, e.g., from the IPCC (2014, 2018, 2019a, 2019b), the USGCRP (2016, 2018), and the National Academies (2016b, 2019), confirm and strengthen the science, updating projections of future climate change and documenting and attributing ongoing changes. In addition, there are reduced complexity climate models that could offer meaningful improvement over current representation of climate dynamics in existing IAMs (Nicholls et al. 2020). For example, the National Academies (2017) stated that the FAIR model (Smith et al., 2018) satisfies all of the criteria set by National Academies (2017) recommendations related to the representation of climate system dynamics, generates projections of future warming consistent with more complex, state of the art models, can be used to accurately characterize current best understanding of uncertainty, and can be easily implemented and transparently documented. Reduced complexity sea level rise models are also being developed that can provide projections for damage functions that require sea level estimates, including the contributions of thermal expansion and glacial and ice sheet melting based on recent scientific research (e.g., Wong et al. 2017).

***Damage functions***. At the core of IAMs are "damage functions" that map global mean temperature changes and other physical impacts of climate change into economic (both market[38] and nonmarket[39]) damages. Relative to how much progress has been made in modeling and improving our understanding of climate system dynamics and the physical impacts resulting from temperature change, efforts involved in, and the public resources targeted at, understanding how these physical changes translate into economic impacts have been significantly smaller (Auffhammer 2018). Even so, as illustrated in Figure 5, in the time since the versions of the IAMs used in this TSD were published, there has been an explosion of research on climate impacts and damages.

[38] Examples of market damages include changes in net agricultural productivity, energy use, and property damage from increased flood risk.
[39] Examples of nonmarket damages include services that natural ecosystems provide to society.

**Figure 5. New Research on Climate Impacts**[40]




Source: Greenstone (2016).

Several efforts are underway to draw on recent literature for improving damage functions and to generate new damage estimates. In particular, the Climate Impact Lab is undertaking an effort to quantify and monetize damages at a fine spatial scale, relying on rigorous empirical methods to develop plausibly causal estimates for several sectors, including health (Carleton et al. 2020), energy (Rode et al. 2021), labor productivity (Rode et al. 2020), agriculture, conflict, and sea level rise.[41] Other research efforts have sought to update the damage function for one sector in an existing IAM based on an updated review of the empirical literature on climate impacts pertaining to that sector (e.g., Moore et al. (2017) for agriculture damages in the FUND model). Damage functions specific to impacts within the U.S. have also been developed and improved for a number of sectors, such as impacts on coastal property, mortality due to extreme temperatures, transportation infrastructure, electricity supply and demand, water quality, recreation, and allergies (Neumann et al. 2020) and impacts of climate change on air quality and human health (Fann et al. 2021). There is also an emerging literature focused on incorporating interactions among

---

[40] In many cases, the three IAMs used different studies for calibration. This is particularly true of FUND, which used studies relating to different subsectors of the model, whereas DICE and PAGE did not have as detailed a sectoral breakdown. That means that summing across these different models is likely valid in all but a few isolated cases. The blue bars include studies uncovered from a comprehensive literature review in the economics literature (and a few others in public health or relevant disciplines) by the Climate Impact Lab (CIL) through early 2016. Each of the studies counted in blue was determined by CIL to have employed a research design that allowed for the causal interpretation of results (Greenstone 2016).

[41] The Climate Impact Lab is a multidisciplinary collaboration of climate scientists, economists, computational experts, researchers, analysts, and students working to build empirically derived, local-level estimates of climate change damages and an empirically based SC-$CO_2$. More information on the Climate Impact Lab can be found at: http://www.impactlab.org/.

regions and impacts. For example, biodiversity loss (e.g., animal pollinators) as a result of climate-driven ecosystem stress could amplify impacts of climate change on agriculture. See National Academies (2017) for more discussion of recent research addressing these and other types of interactions.

Related to the development of damage functions, damages from climate change are uncertain and hence pose additional risks. Reductions in GHG emissions reduce not only expected damages, but also reduce the uncertainty and risks of catastrophic events. Evaluating the damages using the mean outcome does not account for the benefits of reducing uncertainty. Some researchers have raised the need to include this consideration in the SC-GHG (e.g., Carleton and Greenstone 2021) consistent with the observation that individuals are regularly willing to pay for insurance against bad outcomes.

Furthermore, E.O. 13990 instructs the IWG to consider how best to reflect environmental justice and intergenerational equity concerns in assessing climate damages. In the context of climate policy, equity considerations are discussed by economists, ethicists, and others in several ways: distributional effects within a specific country, effects across countries, and intergenerational equity impacts. Economists, ethicists, and others have proposed potential ways to incorporate equity into the SC-GHG. For example, IAM developers have introduced the use of equity weights potentially incorporate these concerns (e.g., Hope 2008; Anthoff and Emmerling 2019).

***Socioeconomic and Emissions Projections.*** The socioeconomic and emissions projections underlying current USG SC-GHG estimates were developed around 2007. Since that time, there have been efforts to develop updated baseline scenarios. Several researchers have started using deterministic scenarios available as part of the IPCC's Fifth Assessment Report Working Group 3 database and the Shared Socioeconomic Pathways (SSPs) linked with the Representative Concentration Pathway (RCP) emissions scenarios (Riahi et al. 2017 and Moss et al. 2010) as benchmark scenarios. Resources for the Future (RFF) has engaged in a research effort to implement each of the National Academies' (2017) recommendations, in collaboration with research partners.[42] One part of this effort is focused on developing probability distributions for future paths of population, GDP, and emissions via using econometrics and expert elicitation techniques. For example, economic growth projections are being built off the results of a formal expert elicitation of leading growth economists together with recent research by Muller, Stock and Watson (2020), who have refined a foundational statistical methodology for generating long-run projections of economic growth at the country level. RFF plans to make these probabilistic scenarios easily usable on Mimi.jl, an open-source modular computing platform used for creating, running, and performing analyses on IAMs.[43]

***Discounting.*** Another area of active research relates to discounting, including the best available evidence on the consumption rate of interest and the application of discount rates to regulations in which some costs and benefits accrue intra-generationally while others accrue inter-generationally. As described in Section 3.2, new empirical evidence suggests that consumption interest rates are now below the previous estimate of 3 percent presented in OMB's Circular A-4. This empirical evidence is also consistent with long-term forecasts by the Congressional Budget Office, suggesting these lower rates will persist (U.S. CBO

[42] For more information on RFF's Social Cost of Carbon Initiative, see: https://www.rff.org/topics/scc/.

[43] Mimi.jl was developed by a team of researchers at UC Berkeley led by David Anthoff in response to a core recommendation from the National Academies (2017) to create an integrated modular approach to draw more readily on expertise from the wide range of scientific disciplines relevant to SC-$CO_2$ estimation. Mimi.jl provides an interface for defining components and building models in a modularized, transparent way (mimiframework.org).

2020). Future updates to the SC-GHGs estimates will need to reflect the best available evidence from the time series of risk-free rate data and expectations of these rates into the future.

As described in Section 3.3 uncertainty in the discount rate over time yields a declining certainty-equivalent discount rate schedule and can have a dramatic effect on the size of the SC-GHG. While this is not a new theoretical result, new literature has proposed methods for how to incorporate discount rate uncertainty (e.g., Arrow et al., 2013; Cropper et al., 2014) and other nations have implemented declining discount rate schedules for policy analysis (e.g., United Kingdom, France, and Germany). Recent recommendations by the National Academies (2017) and EPA's Science Advisory Board (2021) have encouraged the development and use of a declining certainty-equivalent discount rate schedule as theoretically appropriate and as a method of introducing consistency into analyses that have both near-term and long-term impacts.

In light of new science and evidence, including many of those highlighted in the paragraphs above, other jurisdictions are already considering or have implemented some of the scientific and economic advances discussed above. For example, some states that use SC-GHG estimates in policy analysis have recently updated their approach to discounting based on the increasing evidence that a 3% discount rate is too high for intergenerational analysis. In December 2020, New York issued guidance recommending state agencies use SC-GHG estimates based the same IWG modeling and input decisions as presented in this TSD but with lower discount rates: 2 percent in central scenarios (\$125/mt$CO_2$ for 2020 emissions (2020 dollars), along with sensitivity analysis at 1 percent and 3 percent (New York Department of Environmental Conservation 2020). Similarly, in Washington state an April 2019 law required utilities to use estimates based on the IWG methodology with a 2.5% discount rate when developing "lowest-cost analyses" for its integrated resource planning and clean energy plans.[44]

Canada is also in the process of updating the SC-GHG estimates used in their regulatory analyses. While the update is underway, they are continuing to use the estimates they adopted in 2016 (which are an adaptation of the IWG global SC-GHG estimates presented in this TSD) as well as a side analysis based on more recent estimates from the academic literature. Based on their review of the literature and latest climatological and economic evidence, they present their current estimates as a "likely underestimate [of] climate-related damages to society" and the side analysis as a way "to illustrate a range of plausible values if the Department were to update its [social cost of carbon] estimate based on new versions of the models currently used."[45] Specifically, the side analysis includes SC-$CO_2$ estimates based on DICE2016 and PAGE-ICE (\$135 and \$440/mt$CO_2$ for 2020 emissions (2019 Canadian dollars)).[46]

The IWG will consider the new science and evidence as it works towards a more comprehensive update, including the new research and information described in this section.

---

[44] Wash. Sen. Bill. 5116 (signed by Gov. Inslee on May 7, 2019). More information on Washington and other states' use of SC-GHG estimates is compiled by the Institute for Policy Integrity at NYU School of Law (see http://www.costofcarbon.org/states) and discussed in U.S. GAO (2020).

[45] Proposed Clean Fuel Regulations (published for public comment on 12/20/20) http://www.gazette.gc.ca/rp-pr/p1/2020/2020-12-19/pdf/g1-15451.pdf.

[46] Proposed Clean Fuel Regulations (published for public comment on 12/20/20) http://www.gazette.gc.ca/rp-pr/p1/2020/2020-12-19/pdf/g1-15451.pdf.

# 6 Path Forward

E.O. 13990 reaffirms that "[a]n accurate social cost is essential for agencies to accurately determine the social benefits of reducing greenhouse gas emissions when conducting cost-benefit analyses of regulatory and other actions" (E.O. 13990 2021). The E.O. instructs the IWG to publish interim SC-$CO_2$, SC-$CH_4$, and SC-$N_2O$ estimates (collectively, SC-GHG estimates) within 30 days and to publish a set of final estimates by no later than January 2022.[47] In doing so, the E.O. instructs the IWG to consider the recommendations of the National Academies of Science, Engineering, and Medicine as reported in Valuing Climate Damages: Updating Estimation of the Social Cost of Carbon Dioxide (2017) and other pertinent scientific literature; solicit public comment; engage with the public and stakeholders; seek the advice of ethics experts; and ensure that the SC-GHG estimates reflect the interests of future generations in avoiding threats posed by climate change.

In developing the SC-GHG estimates in 2010, 2013, and 2016 the IWG used consensus-based decision making, relied on peer-reviewed literature and models, and took steps to disclose limitations and incorporate new information by considering public comments and revising the estimates as updated research became available (U.S. GAO 2014). Going forward the IWG commits to maintaining a consensus driven process for making evidence-based decisions that are guided by the best available science and input from the public, stakeholders, and peer reviewers.

While the IWG assesses the current state of the science in each component of the SC-GHG modeling exercise, the IWG is beginning by asking for public comment on how best to incorporate the latest, peer reviewed science to develop an updated set of SC-GHG estimates. The IWG will soon issue a Federal Register notice with a detailed set of requests for public comments on the new information presented in this TSD, as well as other topics and issues the IWG will address as we develop the next set of updates. Among other things, the IWG will ask for public comment on how to incorporate the best available science in the updated SC-GHG estimates, due to be published by January 2022, and how to incorporate the recommendations of the National Academies (2017).

# References

Anthoff, D., and J. Emmerling. 2019. Inequality and the Social Cost of Carbon. *Journal of the Association of Environmental and Resource Economists* 6(2): 243-273.

Anthoff D, C. Hepburn, and R. Tol. 2009. Equity Weighting and the Marginal Damage Costs of Climate Change. *Ecological Economics* 68:836-849.

Anthoff, D., and Tol, R.S.J. 2010. On International Equity Weights and National Decisions Making on Climate Change. *Journal of Environmental Economics and Management* 60(1): 14-20.

Anthoff, D. and Tol, R.S.J. 2013a. The uncertainty about the social cost of carbon: a decomposition analysis using FUND. *Climatic Change* 117: 515–530.

[47] The Executive Order also requests that the IWG assess the application of the SC-GHG to inform government decision making beyond regulations, in addition to recommending a robust long-term structure for ensuring the SC-GHGs continue to reflect the best available science and economic and that long-term research needs are met.

Anthoff, D. and Tol, R.S.J. 2013b. Erratum to: The uncertainty about the social cost of carbon: A decomposition analysis using FUND. *Climatic Change* 121(2): 413.

Anthoff, D., R. Tol, and G. Yohe. 2009. Risk aversion, time preference, and the social cost of carbon. *Environmental Research Letters* 4: 024002 (7pp).

Arrow, K., Cropper, M., Gollier, C., Groom, B., Heal, G., Newell, R., Nordhaus, W., Pindyck, R., Pizer, W., and Portney, P. 2013. Determining Benefits and Costs for Future Generations. *Science* 341(6144): 349-350

Arrow, K., Cropper, M., Gollier, C., Groom, B., Heal, G., Newell, R., Nordhaus, W., Pindyck, R., Pizer, W., and Portney, P. 2014. Should Governments Use a Declining Discount Rate in Project Analysis? *Review of Environmental Economics and Policy* 8(2): 145–163.

Auffhammer, M. 2018. Quantifying Economic Damages from Climate Change. *Journal of Economic Perspectives* 32(4): 33–52.

Bradford, D.F. 1975. Constraints on government investment opportunities and the choice of discount rate. *American Economic Review* 65(5): 887-899.

Bauer, M. and Rudebusch, G.D. 2020. The Rising Cost of Climate Change: Evidence from the Bond Market. Federal Reserve Bank of San Francisco Working Paper 2020-25. Available at: https://doi.org/10.24148/wp2020-25 (accessed February 5, 2021).

Carleton, T. and Greenstone, M. 2021. Updating the United States Government's Social Cost of Carbon. University of Chicago, Becker Friedman Institute for Economics Working Paper, (2021-04). Available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3764255 (accessed February 5, 2021).

Center for Biological Diversity v. National Highway Traffic Safety Administration, 538 F.3d 1172 (9th Cir.). Available at: https://casetext.com/case/center-for-biological-v-nhtsa (accessed February 5, 2021).

Center for Climate and Security, The. 2018. Military Expert Panel Report Sea Level Rise and the U.S. Military's Mission. Available at: https://climateandsecurity.files.wordpress.com/2018/02/military-expert-panel-report_sea-level-rise-and-the-us-militarys-mission_2nd-edition_02_2018.pdf (accessed February 5, 2021)

Clarke, L., Edmonds, J., Krey, V., Richels, R., Rose, S., and Tavoni, M. 2009. International climate policy architectures: Overview of the EMF 22 International Scenarios. *Energy Economics* 31: S64-S81.

Clarkson, R. and Deyes, K. 2002. Estimating the social cost of carbon emissions. London: HM Treasury.

Council of Economic Advisers (CEA). 2017. Discounting for public policy: Theory and recent evidence on the merits of updating the discount rate. Issue Brief. Executive Office of the President. Available at: https://obamawhitehouse.archives.gov/sites/default/files/page/files/201701_cea_discounting_issue_brief.pdf (accessed February 5, 2021).

Cropper, Maureen L., Mark C. Freeman, Ben Groom, and William A. Pizer. 2014. Declining Discount Rates. *American Economic Review*, 104 (5): 538-43.

Dreze, J.H. 1974. Investment under private ownership: optimality, equilibrium and stability. In *Allocation under uncertainty: equilibrium and optimality* (pp. 129-166). Palgrave Macmillan, London.

Department of Defense. 2014. Climate Change Adaptation Roadmap. Available at: https://www.acq.osd.mil/eie/downloads/CCARprint_wForward_e.pdf (accessed February 5, 2021).

Drupp, M., M. Freeman, B. Groom, and F. Nesje. 2018. Discounting Disentangled. *American Economic Journal: Economic Policy* 10 (4): 109-34.

Executive Order (E.O.) 12866. Regulatory Planning and Review, Section 1(a), October 4, 1993. Available at: https://www.archives.gov/files/federal-register/executive-orders/pdf/12866.pdf (accessed February 5, 2021).

Executive Order (E.O.) 13783. Promoting Energy Independence and Economic Growth March 28, 2017. Available at: https://www.federalregister.gov/documents/2017/03/31/2017-06576/promoting-energy-independence-and-economic-growth (accessed February 5, 2021).

Executive Order (E.O.) 13990. Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis. January 20, 2021. Available at: https://www.federalregister.gov/documents/2021/01/25/2021-01765/protecting-public-health-and-the-environment-and-restoring-science-to-tackle-the-climate-crisis (accessed February 5, 2021).

Fankhauser, S., Tol, R.S.J., and Pearce, D. 1997. The Aggregation of Climate Change Damages: A Welfare Theoretic Approach. *Environmental and Resource Economics* 10: 249-266.

Fann N.L., Nolte C.G., Sarofim M.C., Martinich J., Nassikas N.J. 2021. Associations between simulated future changes in climate, air quality, and human health. *JAMA Netw Open*. 4(1).

Fawcett, A., Calvin, K., de la Chesnaye, F., Reilly, J., and Weyant, J. 2009. Overview of EMF 22 U.S. transition scenarios. *Energy Economics* 31: S198-S211.

Gollier, C. 2009. Expected Net Present Value, Expected Net Future Value, and the Ramsey Rule. *Journal of Environmental Economics and Management,* 59(2): 142-148.

Gollier, C. 2014. Discounting and growth. *American Economic Review,* 104(5): 534-537.

Gollier, C. and Weitzman, M. 2010. How should the distant future be discounted when discount rates are uncertain? *Economics Letters,* 107(3): 350-353.

Goulder, L. 2007. Benefit-Cost Analysis, Individual Differences, and Third Parties. In *Research in Law and Economics, Vol. 23*. Zerbe, R.O. (Ed.) Emerald Group Publishing Limited, Bingley.

Greenstone, Michael. 2016 (May). A New Path Forward for an Empirical Social Cost of Carbon. Presented at The National Academies of Sciences, Engineering, and Medicine, *Assessing Approaches to Updating the Social Cost of Carbon*. Available at: https://sites.nationalacademies.org/cs/groups/dbassesite/documents/webpage/dbasse_172599.pdf (Accessed February 5, 2021).

Groom, B., C. Hepburn, P. Koundouri, and D. Pearce. 2005. Declining Discount Rates: The Long and the Short of It. *Environmental and Resource Economics,* 32: 445-493.

Groom, B., P. Koundouri, E. Panopoulou, and T. Pantelidis. 2007. Discounting the Distant Future: How Much Does Model Selection Affect the Certainty Equivalent Rate? *Journal of Applied Econometrics,* 22(3): 641-656.

Harberger, A.C. 1972. On measuring the social opportunity cost of public funds. In *Project Evaluation* (pp. 94-122). Palgrave Macmillan, London.

Hänsel, M.C., Drupp, M.A., Johansson, D.J., Nesje, F., Azar, C., Freeman, M.C., Groom, B. and Sterner, T., 2020. Climate economics support for the UN climate targets. *Nature Climate Change,* 10(8), pp.781-789.

HM Treasury. 2020. The Green Book: Central Government Guidance on Appraisal and Evaluation. Available at: https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/938046/The_Green_Book_2020.pdf

Hope C. 2006. The marginal impact of CO2 from PAGE2002: an integrated assessment model incorporating the IPCC's five reasons for concern. *The Integrated Assessment Journal* 6(1):19-56.

Hope, C. 2008. Discount Rates, Equity Weights and the Social Cost of Carbon. *Energy Economics,* 30(3): 1011-1019.

Hope C. 2008. Optimal carbon emissions and the social cost of carbon under uncertainty. *The Integrated Assessment Journal* 8(1):107-122.

Hope, C. 2013. Critical issues for the calculation of the social cost of $CO_2$: why the estimates from PAGE09 are higher than those from PAGE2002. *Climatic Change,* 117: 531–543.

Houser and Larson. 2021. Calculating the Climate Reciprocity Ratio for the US. Available at: https://rhg.com/research/climate-reciprocity-ratio (accessed February 5th, 2021).

Howard, P., and Schwartz, J. 2019. Think Global: International Reciprocity as Justification for a Global Social Cost of Carbon. *Columbia Journal of Environmental Law,* 42(S): 203-294.

Howard, P.H., Sylvan, D. 2020. Wisdom of the experts: Using survey responses to address positive and normative uncertainties in climate-economic models. *Climatic Change,* 162: 213–232.

Interagency Working Group on Social Cost of Carbon (IWG). 2010. Technical Support Document: Social Cost of Carbon for Regulatory Impact Analysis under Executive Order 12866. February. United States Government. Available at: https://www.whitehouse.gov/omb/information-regulatory-affairs/regulatory-matters/#scghgs.

Interagency Working Group on Social Cost of Carbon (IWG). 2013. Technical Support Document: Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866. May. United States Government. Available at: https://www.whitehouse.gov/omb/information-regulatory-affairs/regulatory-matters/#scghgs.

Interagency Working Group on Social Cost of Carbon (IWG). 2015. Response to Comments: Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866. July. United States Government. Available at: https://www.whitehouse.gov/omb/information-regulatory-affairs/regulatory-matters/#scghgs

Interagency Working Group on Social Cost of Greenhouse Gases (IWG). 2016a. Technical Support Document: Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866. August. United States Government. Available at: https://www.whitehouse.gov/omb/information-regulatory-affairs/regulatory-matters/#scghgs

Interagency Working Group on the Social Cost of Greenhouse Gases (IWG). 2016b. Addendum to Technical Support Document on Social Cost of Carbon for Regulatory Impact Analysis under Executive Order 12866: Application of the Methodology to Estimate the Social Cost of Methane and the Social Cost of Nitrous Oxide. August. United Stated Government. Available at: https://www.whitehouse.gov/omb/information-regulatory-affairs/regulatory-matters/#scghgs.

Intergovernmental Panel on Climate Change (IPCC). 2007. Core Writing Team; Pachauri, R.K; and Reisinger, A. (ed.), Climate Change 2007: Synthesis Report, Contribution of Working Groups I, II and III to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change, IPCC, ISBN 92-9169-122-4.

Intergovernmental Panel on Climate Change (IPCC). 2014. Climate Change 2014: Synthesis Report. Contribution of Working Groups I, II and III to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change [Core Writing Team, R.K. Pachauri and L.A. Meyer (eds.)]. IPCC, Geneva, Switzerland, 151 pp.

Intergovernmental Panel on Climate Change (IPCC). 2018. Global Warming of 1.5°C. An IPCC Special Report on the impacts of global warming of 1.5°C above pre-industrial levels and related global greenhouse gas emission pathways, in the context of strengthening the global response to the threat of climate change, sustainable development, and efforts to eradicate poverty [Masson-Delmotte, V., P. Zhai, H.-O. Pörtner, D. Roberts, J. Skea, P.R. Shukla, A. Pirani, W. Moufouma-Okia, C. Péan, R. Pidcock, S. Connors, J.B.R. Matthews, Y. Chen, X. Zhou, M.I. Gomis, E. Lonnoy, T. Maycock, M. Tignor, and T. Waterfield (eds.)].

Intergovernmental Panel on Climate Change (IPCC). 2019a. Climate Change and Land: an IPCC special report on climate change, desertification, land degradation, sustainable land management, food security, and greenhouse gas fluxes in terrestrial ecosystems [P.R. Shukla, J. Skea, E. Calvo Buendia, V. Masson-Delmotte, H.-O. Pörtner, D. C. Roberts, P. Zhai, R. Slade, S. Connors, R. van Diemen, M. Ferrat, E. Haughey, S. Luz, S. Neogi, M. Pathak, J. Petzold, J. Portugal Pereira, P. Vyas, E. Huntley, K. Kissick, M. Belkacemi, J. Malley, (eds.)].

Intergovernmental Panel on Climate Change (IPCC). 2019b. IPCC Special Report on the Ocean and Cryosphere in a Changing Climate [H.-O. Pörtner, D.C. Roberts, V. Masson-Delmotte, P. Zhai, M. Tignor, E. Poloczanska, K. Mintenbeck, A. Alegría, M. Nicolai, A. Okem, J. Petzold, B. Rama, N.M. Weyer (eds.)].

Kopp, R., A. Krupnick, and M. Toman. 1997. *Cost-Benefit Analysis and Regulatory Reform: An Assessment of the Science and the Art*. Report to the Commission on Risk Assessment and Risk Management.

Kopp, R.E. and Mignone, B.K. 2013. Circumspection, reciprocity, and optimal carbon prices. *Climatic Change* 120(4): 831-843.

Kotchen, M. 2018. Which Social Cost of Carbon? A Theoretical Perspective. *Journal of the Association of Environmental and Resource Economists,* 5(3): 673-694.

Lebègue, Daniel. 2005. Révision du Taux d'Actualisation des Investissements Publics. Rapport du Groupe d'Experts, Commisariat Général du Plan.

Li, Q., and W.A. Pizer. 2021. Use of the consumption discount rate for public policy over the distant future. *Journal of Environmental Economics and Management* doi: https://doi.org/10.1016/j.jeem.2021.102428.

Marten, A.L., and S.C. Newbold. 2012. Estimating the social cost of non-$CO_2$ GHG emissions: methane and nitrous oxide. *Energy Policy,* 51: 957-972.

Marten, A.L., Kopits, E.A., Griffiths, C.W., Newbold, S.C., and A. Wolverton. 2015. Incremental $CH_4$ and $N_2O$ Mitigation Benefits Consistent with the U.S. Government's SC-$CO_2$ Estimates. *Climate Policy* 15(2): 272-298.

Moore, Frances C., Uris Baldos, Thomas Hertel, and Delavane Diaz. 2017. New Science of Climate Change Impacts on Agriculture Implies Higher Social Cost of Carbon. *Nature Communications,* 8(1): 1-9.

Moss, R.H., J.A. Edmonds, K.A. Hibbard, M.R. Manning, S.K. Rose, D.P. Van Vuuren, T.R. Carter, S. Emori, M. Kainuma, T. Kram, G.A. Meehl, J.F.B. Mitchell, N. Nakicenovic, K. Riahi, S.J. Smith, R.J. Stouffer, A.M. Thomson, J.P. Weyant, and T.J. Wilbanks. 2010. The next generation of scenarios for climate change research and assessment. *Nature,* 463: 747-756.

Muller, U.K., J.H. Stock and M.W. Watson. 2020. An Econometric Model of International Growth Dynamics for Long-Horizon Forecasting. *The Review of Economics and Statistics* 0 0:ja, 1-47. https://doi.org/10.1162/rest_a_00997.

National Academies of Sciences, Engineering, and Medicine (National Academies). 2016a. *Assessment of Approaches to Updating the Social Cost of Carbon: Phase 1 Report on a Near-Term Update*. Washington, D.C.: National Academies Press.

National Academies of Sciences, Engineering, and Medicine (National Academies). 2016b. *Attribution of Extreme Weather Events in the Context of Climate Change*. Washington, DC: The National Academies Press. https://dio.org/10.17226/21852.

National Academies of Sciences, Engineering, and Medicine (National Academies). 2017. *Valuing Climate Damages: Updating Estimation of the Social Cost of Carbon Dioxide*. Washington, D.C.: National Academies Press.

National Academies of Sciences, Engineering, and Medicine (National Academies). 2019. *Climate Change and Ecosystems*. Washington, DC: The National Academies Press. https://doi.org/10.17226/25504.

Neumann, James E., Jacqueline Willwerth, Jeremy Martinich, James McFarland, Marcus C. Sarofim, and Gary Yohe. 2020. Climate Damage Functions for Estimating the Economic Impacts of Climate Change in the United States. *Review of Environmental Economics and Policy,* 14(1): 5-43.

Newell, R., and Pizer, W. 2003. Discounting the distant future: how much do uncertain rates increase valuations? *Journal of Environmental Economics and Management,* 46: 52-71.

New York Department of Environmental Conservation. 2020. Establishing a Value of Carbon: Guidelines for Use by State Agencies. https://www.dec.ny.gov/docs/administration_pdf/vocfguid.pdf.

Nicholls, Z. R. J., Meinshausen, M., Lewis, J., Gieseke, R., Dommenget, D., Dorheim, K., Fan, C.-S., Fuglestvedt, J. S., Gasser, T., Golüke, U., Goodwin, P., Hartin, C., Hope, A. P., Kriegler, E., Leach, N. J., Marchegiani, D., McBride, L. A., Quilcaille, Y., Rogelj, J., Salawitch, R. J., Samset, B. H., Sandstad, M., Shiklomanov, A. N., Skeie, R. B., Smith, C. J., Smith, S., Tanaka, K., Tsutsui, J., and Xie, Z. 2020. Reduced Complexity Model Intercomparison Project Phase 1: introduction and evaluation of global-mean temperature response, Geosci. Model Dev., 13, 5175–5190, https://doi.org/10.5194/gmd-13-5175-2020.

Nordhaus W. 2008. A Question of Balance: Weighing the Options on Global Warming Policies. New Haven, CT: Yale University Press.

Nordhaus, W. 2010. Economic aspects of global warming in a post-Copenhagen environment. *Proceedings of the National Academy of Sciences,* 107(26): 11721-11726.

Nordhaus, W. 2014. Estimates of the Social Cost of Carbon: Concepts and Results from the DICE-2013R Model and Alternative Approaches. *Journal of the Association of Environmental and Resource Economists* 1(1/2): 273-312.

Nordhaus, W.D., 2017. Revisiting the social cost of carbon. *Proceedings of the National Academy of Sciences*, *114*(7), pp.1518-1523.

Nordhaus, W. 2019a. Climate Change: The Ultimate Challenge for Economics. *American Economic Review* 109(6): 1991–2014.

Nordhaus, W. 2019b. Economics of the Disintegration of the Greenland Ice Sheet. *PNAS* 116(25): 12261–12269.

Nordhaus W., and Boyer J. 2000. Warming the World: Economic Models of Global Warming. Cambridge, MA: MIT Press.

Office of Management and Budget (OMB). 2003. Circular A-4, Regulatory Analysis, September 17. Available at: http://www.whitehouse.gov/omb/circulars_a004_a-4/ (accessed February 5, 2021).

Pindyck, R. 2017. Comments from Robert Pindyck, to BLM, on the Social Cost of Methane in the Proposed Suspension of the Waste Prevention Rule (submitted Nov. 6, 2017).

Pizer, W. 2019. Valuing the Greenland ice sheet and other complex geophysical phenomena. *PNAS* 116(25): 12134–12135.

Pizer, W., M. Adler, J. Aldy, D. Anthoff, M. Cropper, K. Gillingham, M. Greenstone, B. Murray, R. Newell, R. Richels, A. Rowell, S. Waldhoff, and J. Wiener. 2014. Using and Improving the Social Cost of Carbon. *Science* 346: 1181–82.

Revesz, R., Greenstone, M., Hanemann, M., Livermore, M., Sterner, T., Grab, D., Howard, P. and Schwartz, J. 2017. Best cost estimate of greenhouse gases. *Science,* 357(6352): 655.

Riahi, Keywan, Detlef P. van Vuuren, Elmar Kriegler, Jae Edmonds, Brian C. O'Neill, Shinichiro Fujimori, Nico Bauer, Katherine Calvin, Rob Dellink, Oliver Fricko, Wolfgang Lutz, Alexander Popp, Jesus Crespo Cuaresma, Samir KC, Marian Leimbach, Leiwen Jiang, Tom Kram, Shilpa Rao, Johannes Emmerling, Kristie Ebi, Tomoko Hasegawa, Petr Havlik, Florian Humpenöder, Lara Aleluia Da Silva, Steve Smith, Elke

Stehfest, Valentina Bosetti, Jiyong Eom, David Gernaat, Toshihiko Masui, Joeri Rogelj, Jessica Strefler, Laurent Drouet, Volker Krey, Gunnar Luderer, Mathijs Harmsen, Kiyoshi Takahashi, Lavinia Baumstark, Jonathan C. Doelman, Mikiko Kainuma, Zbigniew Klimont, Giacomo Marangoni, Hermann Lotze-Campen, Michael Obersteiner, Andrzej Tabeau, and Massimo Tavoni. 2017. The Shared Socioeconomic Pathways and their energy, land use, and greenhouse gas emissions implications: An overview. *Global Environmental Change,* 42: 153-168.

Rode, A., R. Baker, T. Carleton, A. D'Agostino, M. Delgado, T. Foreman, M. Greenstone, T. Houser, S. Hsiang, A. Hultgren, A. Jina, R. Kopp, K. McCusker, I. Nath, M. Pecenco, J. Rising, and J. Yuan. 2020. Labor Disutility in a Warmer World: The Impact of Climate Change on the Global Workforce.

Rode, A., T. Carleton, M. Delgado, M. Greenstone, T. Houser, S. Hsiang, A. Hultgren, A. Jina, R. Kopp, K. McCusker, I. Nath, J. Rising, and J. Yuan. 2021. Estimating a Social Cost of Carbon for Global Energy Consumption.

Roe, G.H. and Baker, M.B. 2007. Why is climate sensitivity so unpredictable? *Science* 318(5850): 629-632.

Sandmo, A. and Dreze, J.H. 1971. Discount rates for public investment in closed and open economies. *Economica* 38(152): 395-412.

Schwermer, S., 2012. Economic Valuation of Environmental Damage—Methodolocical Convention 2.0 for Estimates of Environmental Costs. German Federal Environment Agency (UBA): Berlin, Germany.

Smith, C. J., Forster, P. M., Allen, M., Leach, N., Millar, R. J., Passerello, G. A., and Regayre, L. A. 2018. FAIR v1.3: a simple emissions-based impulse response and carbon cycle model. *Geosci. Model Dev*., 11: 2273-2297, https://doi.org/10.5194/gmd-11-2273-2018.

Stern, N., and J. Stiglitz. 2021. The Social Cost of Carbon, Risk, Distribution, Market Failures: An Alternative Approach. National Bureau of Economic Research Working Paper Series: No. 28472.

Summers, L. and Zeckhauser, R. 2008. Policymaking for posterity. *Journal of Risk and Uncertainty,* 37(2): 115-140.

Tol, R. 2002a. "Estimates of the damage costs of climate change. Part I: benchmark estimates." Environmental and Resource Economics 21:47-73.

Tol, R. 2002b. "Estimates of the damage costs of climate change. Part II: dynamic estimates." Environmental and Resource Economics 21:135-160.

Tol, R. 2009. "An analysis of mitigation as a response to climate change." Copenhagen Consensus on Climate. Discussion Paper.

U.S. Bureau of Economic Analysis (BEA). Implicit Price Deflators for Gross Domestic Product, Table 1.1.9. https://apps.bea.gov/iTable/index_nipa.cfm (accessed February 10, 2021).

U.S. Congressional Budget Office. 2020. Long Term Budget Outlook. September. https://www.cbo.gov/publication/56516.

U.S. EPA. 2010. Guidelines for Preparing Economic Analyses. EPA-240-R-10-001. Office of the Administrator. December.

U.S. EPA. 2016. Technical Guidance for Assessing Environmental Justice in Regulatory Analysis. Available at: https://www.epa.gov/sites/production/files/2016-06/documents/ejtg_5_6_16_v5.1.pdf

U.S. EPA Science Advisory Board. 2021. SAB Peer Review of the EPA's Revised Guidelines for Preparing Economic Analysis. January 6. Available at: https://yosemite.epa.gov/sab/sabproduct.nsf/LookupWebProjectsCurrentBOARD/61C74C0E14BD5956852586550071E058/$File/EPA-SAB-21-002.pdf .

U.S. Government Accountability Office (GAO). 2014. Regulatory Impact Analysis: Development of Social Cost of Carbon Estimates. GAO-14-663. July. Available at: https://www.gao.gov/products/GAO-14-663 (accessed February 5, 2021).

U.S. Government Accountability Office (GAO). 2020. Social Cost of Carbon: Identifying a Federal Entity to Address the National Academies' Recommendations Could Strengthen Regulatory Analysis. GAO-20-254. Available at: https://www.gao.gov/assets/710/707776.pdf.

U.S. Global Change Research Program (USGCRP). 2016. The Impacts of Climate Change on Human Health in the United States: A Scientific Assessment. Crimmins, A., J. Balbus, J.L. Gamble, C.B. Beard, J.E. Bell, D. Dodgen, R.J. Eisen, N. Fann, M.D. Hawkins, S.C. Herring, L. Jantarasami, D.M. Mills, S. Saha, M.C. Sarofim, J. Trtanj, and L. Ziska, Eds. U.S. Global Change Research Program, Washington, DC, 312 pp. https://dx.dio.org/10.7930/J0R49NQX.

U.S. Global Change Research Program (USGCRP). 2018. Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II [Reidmiller, D.R., C.W. Avery, D.R. Easterling, K.E. Kunkel, K.L.M. Lewis, T.K. Maycock, and B.C. Stewart (eds.)]. U.S. Global Change Research Program, Washington, DC, USA, 1515 pp. doi: 10.7930/NCA4.2018.

Weitzman, M.L. 1998. Why the Far-Distant Future Should Be Discounted at Its Lowest Possible Rate. *Journal of Environmental Economics and Management,* 36(3): 201-208.

Weitzman, M.L. 1999. Just keep discounting, but. In *Discounting and Intergenerational Equity,* Portney, P.R. and Weyant, J.P. (Ed.) Resources for the Future, New York.

Weitzman, M.L. 2001. Gamma Discounting. *American Economic Review* 91(1): 260-271.

Whittington and MacRae. 1986. The Issue of Standing in Cost-Benefit Analysis. *Journal of Policy Analysis and Management,* 5(4): 665-682.

Wong, T. E., Bakker, A. M. R., Ruckert, K., Applegate, P., Slangen, A. B. A., and Keller, K. 2017. BRICK v0.2, a simple, accessible, and transparent model framework for climate and regional sea-level projections. *Geosci. Model Dev*., 10: 2741–2760, https://doi.org/10.5194/gmd-10-2741-2017.

Yumashev, D., Hope, C., Schaefer, K. et al. 2019. Climate policy implications of nonlinear decline of Arctic land permafrost and other cryosphere elements. *Nat Commun* 10, 1900.

Yumashev, D. 2020. PAGE-ICE Integrated Assessment Model. https://www.researchgate.net/publication/342396462_PAGE-ICE_Integrated_Assessment_Model.

Zero Zone, Inc. v. U.S. Dep't of Energy, 832 F.3d 654 (7th Cir. 2016). Available at: https://casetext.com/case/zero-zone-inc-v-us-dept-of-energy-1 (accessed February 5, 2021).

# Appendix – Annual SC-$CO_2$, SC-$CH_4$, and SC-$N_2O$ Values, 2020-2050

The values in Tables A-1 through A-3 are the same as those reported in the 2016 TSD and Addendum adjusted for inflation to 2020 dollars using the annual GDP Implicit Price Deflator values in U.S. Bureau of Economic Analysis (BEA) NIPA Table 1.1.9: 113.626 (2020)/ 92.486 (2007) = 1.228575 (U.S. BEA 2021). Values of SC-$CO_2$ presented in this TSD are rounded to the nearest dollar; SC-$CH_4$ and SC-$N_2O$ are rounded to two significant figures. The annual unrounded estimates are available on OMB's website for use in regulatory and other analyses: https://www.whitehouse.gov/omb/information-regulatory-affairs/regulatory-matters/#scghgs.

**Table A-1: Annual SC-$CO_2$, 2020 – 2050 (in 2020 dollars per metric ton of $CO_2$)**

| | Discount Rate and Statistic | | | |
|---|---|---|---|---|
| Emissions Year | 5% Average | 3% Average | 2.5% Average | 3% 95th Percentile |
| 2020 | 14 | 51 | 76 | 152 |
| 2021 | 15 | 52 | 78 | 155 |
| 2022 | 15 | 53 | 79 | 159 |
| 2023 | 16 | 54 | 80 | 162 |
| 2024 | 16 | 55 | 82 | 166 |
| 2025 | 17 | 56 | 83 | 169 |
| 2026 | 17 | 57 | 84 | 173 |
| 2027 | 18 | 59 | 86 | 176 |
| 2028 | 18 | 60 | 87 | 180 |
| 2029 | 19 | 61 | 88 | 183 |
| 2030 | 19 | 62 | 89 | 187 |
| 2031 | 20 | 63 | 91 | 191 |
| 2032 | 21 | 64 | 92 | 194 |
| 2033 | 21 | 65 | 94 | 198 |
| 2034 | 22 | 66 | 95 | 202 |
| 2035 | 22 | 67 | 96 | 206 |
| 2036 | 23 | 69 | 98 | 210 |
| 2037 | 23 | 70 | 99 | 213 |
| 2038 | 24 | 71 | 100 | 217 |
| 2039 | 25 | 72 | 102 | 221 |
| 2040 | 25 | 73 | 103 | 225 |
| 2041 | 26 | 74 | 104 | 228 |
| 2042 | 26 | 75 | 106 | 232 |
| 2043 | 27 | 77 | 107 | 235 |
| 2044 | 28 | 78 | 108 | 239 |
| 2045 | 28 | 79 | 110 | 242 |
| 2046 | 29 | 80 | 111 | 246 |
| 2047 | 30 | 81 | 112 | 249 |
| 2048 | 30 | 82 | 114 | 253 |
| 2049 | 31 | 84 | 115 | 256 |
| 2050 | 32 | 85 | 116 | 260 |

**Table A-2: Annual SC-$CH_4$, 2020 – 2050 (in 2020 dollars per metric ton of $CH_4$)**

| | Discount Rate and Statistic | | | |
|---|---|---|---|---|
| Emissions Year | 5% Average | 3% Average | 2.5% Average | 3% 95th Percentile |
| 2020 | 670 | 1500 | 2000 | 3900 |
| 2021 | 690 | 1500 | 2000 | 4000 |
| 2022 | 720 | 1600 | 2100 | 4200 |
| 2023 | 750 | 1600 | 2100 | 4300 |
| 2024 | 770 | 1700 | 2200 | 4400 |
| 2025 | 800 | 1700 | 2200 | 4500 |
| 2026 | 830 | 1800 | 2300 | 4700 |
| 2027 | 860 | 1800 | 2300 | 4800 |
| 2028 | 880 | 1900 | 2400 | 4900 |
| 2029 | 910 | 1900 | 2500 | 5100 |
| 2030 | 940 | 2000 | 2500 | 5200 |
| 2031 | 970 | 2000 | 2600 | 5300 |
| 2032 | 1000 | 2100 | 2600 | 5500 |
| 2033 | 1000 | 2100 | 2700 | 5700 |
| 2034 | 1100 | 2200 | 2800 | 5800 |
| 2035 | 1100 | 2200 | 2800 | 6000 |
| 2036 | 1100 | 2300 | 2900 | 6100 |
| 2037 | 1200 | 2300 | 3000 | 6300 |
| 2038 | 1200 | 2400 | 3000 | 6400 |
| 2039 | 1200 | 2500 | 3100 | 6600 |
| 2040 | 1300 | 2500 | 3100 | 6700 |
| 2041 | 1300 | 2600 | 3200 | 6900 |
| 2042 | 1400 | 2600 | 3300 | 7000 |
| 2043 | 1400 | 2700 | 3300 | 7200 |
| 2044 | 1400 | 2700 | 3400 | 7300 |
| 2045 | 1500 | 2800 | 3500 | 7500 |
| 2046 | 1500 | 2800 | 3500 | 7600 |
| 2047 | 1500 | 2900 | 3600 | 7700 |
| 2048 | 1600 | 3000 | 3700 | 7900 |
| 2049 | 1600 | 3000 | 3700 | 8000 |
| 2050 | 1700 | 3100 | 3800 | 8200 |

**Table A-3: Annual SC-$N_2O$, 2020 – 2050 (in 2020 dollars per metric ton of $N_2O$)**

| | Discount Rate and Statistic | | | |
|---|---|---|---|---|
| Emissions Year | 5% Average | 3% Average | 2.5% Average | 3% 95th Percentile |
| 2020 | 5800 | 18000 | 27000 | 48000 |
| 2021 | 6000 | 19000 | 28000 | 49000 |
| 2022 | 6200 | 19000 | 28000 | 51000 |
| 2023 | 6400 | 20000 | 29000 | 52000 |
| 2024 | 6600 | 20000 | 29000 | 53000 |
| 2025 | 6800 | 21000 | 30000 | 54000 |
| 2026 | 7000 | 21000 | 30000 | 56000 |
| 2027 | 7200 | 21000 | 31000 | 57000 |
| 2028 | 7400 | 22000 | 32000 | 58000 |
| 2029 | 7600 | 22000 | 32000 | 59000 |
| 2030 | 7800 | 23000 | 33000 | 60000 |
| 2031 | 8000 | 23000 | 33000 | 62000 |
| 2032 | 8300 | 24000 | 34000 | 63000 |
| 2033 | 8500 | 24000 | 35000 | 64000 |
| 2034 | 8800 | 25000 | 35000 | 66000 |
| 2035 | 9000 | 25000 | 36000 | 67000 |
| 2036 | 9300 | 26000 | 36000 | 68000 |
| 2037 | 9500 | 26000 | 37000 | 70000 |
| 2038 | 9800 | 27000 | 38000 | 71000 |
| 2039 | 10000 | 27000 | 38000 | 73000 |
| 2040 | 10000 | 28000 | 39000 | 74000 |
| 2041 | 11000 | 28000 | 39000 | 75000 |
| 2042 | 11000 | 29000 | 40000 | 77000 |
| 2043 | 11000 | 29000 | 41000 | 78000 |
| 2044 | 11000 | 30000 | 41000 | 80000 |
| 2045 | 12000 | 30000 | 42000 | 81000 |
| 2046 | 12000 | 31000 | 43000 | 82000 |
| 2047 | 12000 | 31000 | 43000 | 84000 |
| 2048 | 13000 | 32000 | 44000 | 85000 |
| 2049 | 13000 | 32000 | 45000 | 87000 |
| 2050 | 13000 | 33000 | 45000 | 88000 |

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



Designated Federal Officer, via the contact information listed below to discuss alternate means of submitting your comments. Any statements submitted in connection with the committee meeting will be made available to the public, including publication on the CFTC's website, *http://www.cftc.gov.*

**FOR FURTHER INFORMATION CONTACT:** Andrée Goldsmith, GMAC Designated Federal Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street NW, Washington, DC 20581; (202) 418–6624; *agoldsmith@cftc.gov.*

**SUPPLEMENTARY INFORMATION:** Members of the public may listen to the meeting by telephone by calling a domestic toll-free telephone or international toll or toll-free number to connect to a live, listen-only audio feed. Call-in participants should be prepared to provide their first name, last name, and affiliation.

*Domestic Toll Free:* 1–877–951–7311.

*International Toll and Toll Free:* Will be posted on the CFTC's website, *http://www.cftc.gov,* on the page for the meeting, under Related Links.

*Pass Code/Pin Code:* 9530502.

The meeting time and agenda may change to accommodate other GMAC priorities. For time and agenda updates, please visit the GMAC committee's website at: *https://www.cftc.gov/About/CFTCCommittees/GlobalMarketsAdvisory/gmac_meetings.html.*

After the meeting, a transcript of the meeting will be published through a link on the CFTC's website at: *http://www.cftc.gov.* All written submissions provided to the CFTC in any form will also be published on the CFTC's website. Persons requiring special accommodations to attend the meeting because of a disability should notify the contact person above.

**Authority:** 5 U.S.C. App. 2.

Dated: February 16, 2021.

**Robert Sidman,**

*Deputy Secretary of the Commission.*

[FR Doc. 2021–03405 Filed 2–18–21; 8:45 am]

**BILLING CODE 6351–01–P**

## COUNCIL ON ENVIRONMENTAL QUALITY

### National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions

**AGENCY:** Council on Environmental Quality (CEQ).

**ACTION:** Notice of rescission of draft guidance.

**SUMMARY:** The Council on Environmental Quality (CEQ) is rescinding its ''Draft National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions'' consistent with Executive Order (E.O.) 13990, ''Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis.''

**FOR FURTHER INFORMATION CONTACT:** Jomar Maldonado, Associate Director for the National Environmental Policy Act, 730 Jackson Place NW, Washington, DC 20503, *jomar.maldonadovazquez@ceq.eop.gov* or (202) 395–5750.

**SUPPLEMENTARY INFORMATION:** The National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. 4321 *et seq.,* sets forth a national environmental policy to harmonize environmental, economic, and social goals, and is a cornerstone of the Nation's efforts to protect the environment. *See* 42 U.S.C. 4321, 4331. NEPA also created the Council on Environmental Quality (CEQ), 42 U.S.C. 4342, which oversees its implementation. NEPA requires Federal agencies to consider the environmental effects of its proposed actions and involve the public in its decision-making processes. CEQ's NEPA implementing regulations at 40 CFR parts 1500 through 1508 set forth the procedures for agencies to comply with NEPA. Additionally, CEQ issues guidance to agencies on how to fulfil NEPA's mandates. *See* 40 CFR 1506.7.

Many projects and programs proposed, funded, or approved by Federal agencies have the potential to emit or sequester greenhouse gases (GHGs), and may be affected by climate change. Federal courts consistently have held that NEPA requires agencies to disclose and consider climate impacts in their reviews. *See, e.g., Ctr. for Biological Diversity* v. *Nat'l Highway Traffic Safety Admin.,* 538 F.3d 1172 (9th Cir. 2008). On March 31, 2016, CEQ issued ''Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews'' (2016 GHG Guidance) to help agencies with this requirement. 81 FR 51866 (Aug. 5, 2016).

E.O. 13873, ''Promoting Energy Independence and Economic Growth,'' directed CEQ to withdraw this guidance. E.O. 13783, 82 FR 16093 (Mar. 31, 2017). CEQ withdrew the guidance on April 5, 2017. 82 FR 16576. CEQ then proposed for public comment, but never finalized, ''Draft National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions'' (2019 Draft GHG Guidance). 84 FR 30097 (June 26, 2019), RIN 0331–ZA03.

On January 20, 2021, President Biden issued E.O. 13990, ''Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis,'' to establish a national policy ''to empower our workers and communities; promote and protect our public health and the environment; and conserve our national treasures and monuments, places that secure our national memory.'' 86 FR 7037 (Jan. 25, 2021). Section 7(e) directs CEQ to rescind the 2019 Draft GHG Guidance and review, revise, and update its 2016 GHG Guidance. In accordance with this E.O., CEQ is rescinding the 2019 Draft GHG Guidance. The withdrawal of this guidance does not change any law, regulation, or other legally binding requirement. CEQ will address in a separate notice its review of and any appropriate revisions and updates to the 2016 GHG Guidance. In the interim, agencies should consider all available tools and resources in assessing GHG emissions and climate change effects of their proposed actions, including, as appropriate and relevant, the 2016 GHG Guidance. For more information on NEPA and Federal agency compliance with NEPA, please see *nepa.gov.*

**Jomar Maldonado,**

*Associate Director for the National Environmental Policy Act.*

[FR Doc. 2021–03355 Filed 2–18–21; 8:45 am]

**BILLING CODE 3225–F1–P**

## DEPARTMENT OF EDUCATION

### Applications for New Awards: Disability Innovation Fund—Career Advancement Initiative Model Demonstration Project

**AGENCY:** Office of Special Education and Rehabilitative Services, Department of Education.

**ACTION:** Notice; corrections.

**SUMMARY:** On January 7, 2021, the U.S. Department of Education (the Department) published in the **Federal Register** a notice inviting applications for new awards for fiscal year (FY) 2021 for the Disability Innovation Fund—Career Advancement Initiative Model Demonstration Project, Assistance Listing Number 84.421C (NIA). We are correcting the date that applications were made available to January 8, 2021, the deadline for transmittal of



USDA

United States Department of Agriculture

# Tongass Land and Resource Management Plan

# Final Environmental Impact Statement

## Plan Amendment

Forest Service
Alaska Region

Tongass National Forest

R10-MB-769e,f

June 2016

FS-001515

# Tongass Land and Resource Management Plan Amendment

## Final Environmental Impact Statement

June 2016

| | |
|---|---|
| Lead Agency: | USDA Forest Service |
| Cooperating Agency: | US Fish and Wildlife Service |
| Responsible Official: | M. Earl Stewart, Forest Supervisor<br>USDA Forest Service, Alaska Region,<br>Tongass National Forest |
| For Further Information: | Visit the Forest Web site at: www.fs.fed.us/r10/tongass<br>or Contact:<br>Susan Howle<br>Project Team Leader<br>648 Mission Street<br>Ketchikan, AK 99901<br>(907) 228-6340 |

**Abstract**

Secretary's Memorandum 1044-009, Addressing Sustainable Forestry in Southeast Alaska (issued July 2, 2013), and the 5-Year Forest Plan Review (completed in September 2013) indicated that conditions on the land and demands of the public require the Tongass to modify the 2008 Forest Plan. In the Memorandum, the Secretary of Agriculture, Thomas Vilsack, asked the Forest Service to "Strongly consider whether to pursue an amendment to the Tongass Forest Plan. Such an amendment would evaluate which lands will be available for timber harvest, especially young growth timber stands, which lands should be excluded, and additional opportunities to promote and speed transition to young growth management..." and to "…continue to seek input from and work with stakeholders in the region towards this transition." The Tongass Advisory Committee (TAC) was established under the Federal Advisory Committee Act and was approved by the Secretary to "…provide advice to the Forest Service on how to expedite the transition to young growth management." The 5-Year Forest Plan Review also highlighted a need to make the development of renewable energy resources more permissible.

This Final Environmental Impact Statement (FEIS) responds to the Secretary's Memo and the 5-Year Forest Plan Review by analyzing five alternatives for amending the Plan, including the No-Action alternative. A separate document, called the Land and Resource Management Plan (Forest Plan), has been published with this FEIS to represent the Forest Plan under the preferred alternative (Alternative 5). Alternative 5 is based on the Tongass Advisory Committee's underlying principles, general approach, and recommendations. Appendix F displays a side-by-side comparison of the alternatives to show how they differ from the preferred alternative. Four key issues are identified: 1) transitioning to young-growth-based timber management in 10 to 15 years in an ecologically, socially, and economically sustainable manner; 2) promoting the development of renewable energy projects where it is compatible with National Forest purposes; 3) the effects of potential timber harvest activities in roadless areas; and 4) the effects of forest management on wildlife habitat and the Conservation Strategy. The five alternatives provide a range of options for addressing the issues. Direct, indirect, and cumulative effects of the alternatives are compared and disclosed in Chapters 2 and 3, based on inventory data and modeling.

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at http://www.ascr.usda.gov/complaint_filing_cust.html and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer, and lender.

Federal Recycling Program
Printed on Recycled Paper

# CONTENTS

**CHAPTER 1 PURPOSE AND NEED ........ 1-1**
Introduction ........ 1-1
Forest Planning History on the Tongass National Forest ........ 1-2
Factors That Led to the Need for Change ........ 1-4
Roadless area conservation ........ 1-5
Litigation ........ 1-5
Collaboration ........ 1-5
2012 Planning Rule ........ 1-6
Five-Year Review of the 2008 Forest Plan ........ 1-7
Secretary of Agriculture Memorandum 1044-009 ........ 1-7
Congressional Action ........ 1-8
Change Determination ........ 1-8
Purpose and Need ........ 1-8
Purpose ........ 1-8
Need ........ 1-8
Forest Location and Description ........ 1-9
Public Issues ........ 1-11
Public Participation ........ 1-11
Significant Issues ........ 1-13
The Four Significant Issues ........ 1-13
Issue 1 –Young Growth Transition ........ 1-14
Issue 2 – Renewable Energy ........ 1-14
Issue 3 –Inventoried Roadless Areas ........ 1-14
Issue 4 – Wildlife Habitat and the Conservation Strategy ........ 1-15
Changes between the Draft EIS and Final EIS ........ 1-15
Changes between Proposed Forest Plan and Forest Plan ........ 1-16
Chapter 1 – Introduction ........ 1-16
Purpose ........ 1-16
Relationship to Other Documents ........ 1-16
Plan Organization ........ 1-16
Forest Plan Management Direction ........ 1-16
Priority of Direction ........ 1-16
Forest Location and Description ........ 1-17
Chapter 2 – Goals and Objectives ........ 1-17
Introduction ........ 1-17
Forest Desired Conditions ........ 1-17
Ecosystem Services ........ 1-17
Forest-wide Multiple Use Goals and Objectives ........ 1-17
Chapter 3 – Management Prescriptions ........ 1-17
Land Use Designations ........ 1-17
Chapter 4 – Standards and Guidelines ........ 1-18
Chapter 5 – Plan Content Developed Under the 2012 Planning Rule ........ 1-18
Introduction ........ 1-18
Chapter 6 – Implementation ........ 1-20
Chapter 7 – Glossary ........ 1-20
Appendices ........ 1-20
Appendix A –Timber Resource Land Suitability ........ 1-20
Appendix B – Tongass Advisory Committee Recommendations ........ 1-20
Appendix C – Watershed Analysis ........ 1-20
Appendix E – Communication Sites ........ 1-20
Appendix F – Visual Priority Routes and Use Areas ........ 1-20

# Contents

Appendix G – Log Transfer Facility Guidelines ........ 1-21
Appendix H – Karst and Cave Resources ........ 1-21
Appendix I – ROS Class Standards and Guidelines ........ 1-21
Appendix J – Special Land Designations or Classifications ........ 1-21
Appendix K – Old-growth Habitat Reserve Modification Procedures ........ 1-21
Appendix L – Special Interest Areas and Experimental Forests ........ 1-21
Organization of the Document ........ 1-21
Organization of EIS and Associated Documents ........ 1-21

**CHAPTER 2 ALTERNATIVES ........ 2-1**
Introduction ........ 2-1
Alternative Development Process ........ 2-1
What a Forest Plan Includes ........ 2-1
How Alternatives are Described ........ 2-2
Land Use Designations ........ 2-2
How the 2012 Planning Rule applies ........ 2-2
Future Project Consistency with the Amended Plan ........ 2-3
Alternative Development ........ 2-4
Alternatives Eliminated from Detailed Study ........ 2-5
Develop an Amendment using the 1982 Planning Rule Provisions ........ 2-5
Alaska Mental Health Trust Land Exchange ........ 2-5
State of Alaska Alternative ........ 2-5
Immediate End to Old-growth Logging ........ 2-6
Transition to Limited Young-Growth Logging in Five Years ........ 2-7
Alternatives Considered in Detail ........ 2-8
Alternative 1 (No Action) ........ 2-10
Framework and Expected Outputs ........ 2-10
Land Use Designations ........ 2-12
Management Prescriptions ........ 2-12
Selected Outputs ........ 2-13
Alternative 2 (Proposed Action) ........ 2-15
Framework and Expected Outputs ........ 2-15
Land Use Designations ........ 2-16
Management Prescriptions ........ 2-17
Selected Outputs ........ 2-17
Alternative 3 ........ 2-21
Framework and Expected Outcomes ........ 2-21
Land Use Designations ........ 2-22
Management Prescriptions ........ 2-23
Selected Outputs ........ 2-23
Alternative 4 ........ 2-27
Framework and Expected Outcomes ........ 2-27
Land Use Designations ........ 2-28
Management Prescriptions ........ 2-29
Selected Outputs ........ 2-29
Alternative 5 (Preferred Alternative) ........ 2-33
Framework and Expected Outcomes ........ 2-33
Land Use Designations ........ 2-35
Management Prescriptions ........ 2-35
Selected Outputs ........ 2-35
Comparison of the Alternatives ........ 2-39
Issue 1 – Young-growth Transition ........ 2-39
Issue 2 – Renewable Energy ........ 2-40

# Contents

Issue 3 – Inventoried Roadless Areas....2-41
Issue 4 – Wildlife Habitat and the Conservation Strategy....2-41

**CHAPTER 3 ENVIRONMENT AND EFFECTS....3-1**
Introduction....3-1
Analyzing Effects....3-1
Cumulative Effects....3-3
Geographic Information System Database and Quantification for this EIS....3-5
Land Use Designation Groupings....3-6
Land Divisions....3-6
Watershed....3-7
Geographic Provinces....3-7
Biogeographic Provinces....3-7
Ecological Sections and Subsections....3-7
Value Comparison Units....3-7
Wildlife Analysis Areas....3-7
General Forest Description....3-7
Physical Setting....3-7
Biological Setting....3-8
Socioeconomic Setting....3-9
Organization of Chapter 3....3-10
Physical and Biological Environment....3-11
Climate and Air....3-11
Affected Environment....3-11
Climate....3-11
Climate Change....3-11
Air Quality....3-16
Environmental Consequences....3-19
Direct and Indirect Effects....3-19
Cumulative Effects....3-22
Geology, Karst, and Caves....3-27
Affected Environment....3-27
Geology....3-27
Karst and Caves....3-28
Environmental Consequences....3-33
Direct and Indirect Effects....3-33
Cumulative Effects....3-35
Soils....3-37
Affected Environment....3-37
Environmental Consequences....3-41
Direct and Indirect Effects....3-41
Cumulative Effects....3-48
Mitigation....3-49
Water....3-51
Affected Environment....3-51
Water Quantity....3-51
Water Quality....3-54
Watershed Condition....3-60
Water Use....3-64
Environmental Consequences....3-65
Direct and Indirect Effects....3-65
Cumulative Effects....3-83
Wetlands....3-89
Affected Environment....3-89
Definition and Regulatory Aspects....3-89

## Contents


Wetland Mapping, Classification, and Distribution ....... 3-89
Past Wetland Impacts ....... 3-91
Environmental Consequences ....... 3-92
Direct and Indirect Effects ....... 3-92
Cumulative Effects ....... 3-99
Fish ....... 3-103
Affected Environment ....... 3-103
Fish Habitat ....... 3-108
Special Status and Invasive Species ....... 3-118
Environmental Consequences ....... 3-122
Direct and Indirect Effects ....... 3-122
Cumulative Effects ....... 3-137
Plants ....... 3-143
Affected Environment ....... 3-143
Plant Communities ....... 3-143
Vegetation Classification ....... 3-144
Threatened, Endangered, Sensitive, and Rare Plants ....... 3-146
Invasive Plants ....... 3-149
Environmental Consequences ....... 3-154
Direct and Indirect Effects ....... 3-154
Cumulative Effects ....... 3-169
Forest Health ....... 3-175
Affected Environment ....... 3-175
Current Situation ....... 3-175
Monitoring and Pest Management ....... 3-178
Environmental Consequences ....... 3-179
Direct and Indirect Effects ....... 3-179
Cumulative Effects ....... 3-180
Biodiversity ....... 3-183
Affected Environment ....... 3-183
Ecosystem Classification ....... 3-183
Cover Types ....... 3-187
Overview of Existing Levels of POG Forest on NFS Lands ....... 3-195
Landscape Connectivity and Fragmentation ....... 3-198
Tongass Forest Plan Conservation Strategy ....... 3-200
Environmental Consequences ....... 3-203
Direct and Indirect Effects Common to All Alternatives ....... 3-203
Direct and Indirect Effects Specific to Each Alternative ....... 3-208
Cumulative Effects ....... 3-216
Wildlife ....... 3-221
Affected Environment ....... 3-221
Old-Growth Habitat and the Conservation Strategy ....... 3-221
Landscape Connectivity and Fragmentation ....... 3-222
Wildlife Species ....... 3-222
Endemism ....... 3-247
Invasive Species ....... 3-250
Environmental Consequences ....... 3-252
Direct and Indirect Effects ....... 3-252
Cumulative Effects ....... 3-286
Human Uses and Land Management ....... 3-297
Lands Uses, Ownership, and Adjustments ....... 3-297
Affected Environment ....... 3-297
Land Ownership Adjustment ....... 3-297
Land Use Authorizations ....... 3-302
Environmental Consequences ....... 3-304

## Contents


Direct and Indirect Effects ........ 3-304
Cumulative Effects ........ 3-304
Transportation ........ 3-307
Affected Environment ........ 3-307
Regional Transportation System ........ 3-307
National Forest System Roads ........ 3-309
Log Transfer Facilities ........ 3-310
Transportation and Utility Systems in the Current Forest Plan ........ 3-310
Environmental Consequences ........ 3-311
Direct, Indirect, Effects ........ 3-311
Cumulative Effects ........ 3-314
Renewable Energy ........ 3-315
Affected Environment ........ 3-315
Tongass National Forest Land and Resource Management Plan ........ 3-317
Current Trends ........ 3-319
Renewable Energy Resources ........ 3-321
Environmental Consequences ........ 3-324
Direct and Indirect Effects ........ 3-324
Cumulative Effects ........ 3-326
Timber ........ 3-327
Affected Environment ........ 3-327
Introduction ........ 3-327
Current Condition of the Forest Land Base ........ 3-327
Current Condition of the Timber Resource ........ 3-329
Current Practices ........ 3-333
Tongass Timber Sale Program ........ 3-340
Environmental Consequences ........ 3-341
Suitable Timber Lands ........ 3-342
Silvicultural Systems and Practices ........ 3-343
Projected Timber Sale Quantity ........ 3-345
Future Conditions ........ 3-348
Cumulative Effects ........ 3-349
Minerals ........ 3-351
Affected Environment ........ 3-351
Locatable Minerals ........ 3-351
Leasable Minerals ........ 3-352
Salable Minerals ........ 3-353
Mineral Resource Inventory and Development Potential ........ 3-353
Tongass Land Management for Minerals ........ 3-354
Environmental Consequences ........ 3-354
Direct and Indirect Effects ........ 3-355
Cumulative Effects ........ 3-356
Recreation and Tourism ........ 3-357
Affected Environment ........ 3-357
Supply of Recreation Opportunities ........ 3-359
Existing Use Levels and Trends ........ 3-364
Environmental Consequences ........ 3-374
Direct and Indirect Effects ........ 3-374
Cumulative Effects ........ 3-384
Risk and Uncertainty ........ 3-385
Scenery ........ 3-387
Affected Environment ........ 3-387
Existing Scenic Integrity ........ 3-388
Environmental Consequences ........ 3-390
Direct, Indirect, and Cumulative Forest-wide Effects ........ 3-391
Cumulative Effects ........ 3-415

# Contents


Subsistence....3-417
Affected Environment....3-417
The Legal Context for Subsistence Use....3-418
Subsistence Users....3-419
Economy....3-420
Subsistence Use Areas....3-424
Environmental Consequences....3-425
Direct and Indirect Effects....3-426
Cumulative Effects....3-430
ANILCA Determination....3-431
Heritage Resources and Sacred Sites....3-433
Affected Environment....3-433
Heritage Resources....3-433
Sacred Sites....3-435
Environmental Consequences....3-436
Direct and Indirect Effects....3-436
Cumulative Effects....3-438
Inventoried Roadless Areas....3-441
Affected Environment....3-441
Current Situation....3-441
Environmental Consequences....3-445
Direct, Indirect, and Cumulative Effects....3-445
Cumulative Effects....3-447
Wilderness....3-449
Affected Environment....3-449
Introduction....3-449
Wilderness Overview....3-449
Wilderness in Alaska and the Tongass....3-451
Relative Contribution of Tongass Wilderness....3-452
Wilderness Management in Alaska....3-457
Environmental Consequences....3-460
Direct and Indirect Effects....3-460
Cumulative Effects....3-461
Other Special Land Use Designations....3-463
Affected Environment....3-463
Land Use Designation II Management Areas....3-463
Experimental Forests....3-464
Research Natural Areas....3-465
Special Interest Areas....3-467
Wild and Scenic Rivers....3-470
Environmental Effects....3-473
Direct and Indirect Effects....3-473
Cumulative Effects....3-476
Economic and Social Environment....3-477
Introduction....3-477
Regional and National Economy....3-478
Affected Environment....3-478
Regional Economic Overview....3-478
Natural Resource-Based Industries....3-481
Environmental Consequences....3-506
Direct and Indirect Effects....3-506
Cumulative Effects....3-523
Subregional Overview and Communities....3-525
Introduction....3-525
Subregional Overview....3-525
Population....3-526

## Contents


Age ... 3-527
Employment ... 3-528
Income and Poverty ... 3-532
Communities ... 3-537
Community Assessments ... 3-538
Analyzing Impacts to Communities ... 3-541
Population and School Enrollment ... 3-541
Energy Generation and Use ... 3-543
Potential Effects by Resource Area ... 3-545
Wood Products ... 3-545
Renewable Energy ... 3-545
Recreation and Tourism ... 3-545
Subsistence ... 3-545
Individual Community Assessments ... 3-546
Angoon ... 3-546
Coffman Cove ... 3-551
Craig ... 3-556
Edna Bay ... 3-561
Elfin Cove ... 3-566
Gustavus ... 3-570
Haines ... 3-575
Hollis ... 3-581
Hoonah ... 3-585
Hydaburg ... 3-590
Hyder ... 3-595
Juneau and Vicinity ... 3-598
Kake ... 3-602
Kasaan ... 3-607
Ketchikan ... 3-612
Klawock ... 3-616
Metlakatla ... 3-621
Meyers Chuck ... 3-626
Naukati Bay ... 3-628
Pelican ... 3-633
Petersburg and Kupreanof ... 3-637
Point Baker ... 3-643
Port Alexander ... 3-648
Port Protection ... 3-651
Saxman ... 3-655
Sitka ... 3-659
Skagway ... 3-664
Tenakee Springs ... 3-668
Thorne Bay ... 3-673
Whale Pass ... 3-678
Wrangell ... 3-683
Yakutat ... 3-688
Environmental Justice ... 3-693

**CHAPTER 4 LIST OF PREPARERS ... 4-1**

**CHAPTER 5 LIST OF DOCUMENT RECIPIENTS AND THOSE NOTIFIED ... 5-1**
Federal Agencies ... 5-1
Federal Advisory Committee ... 5-2
State and Federal Congressional Representatives ... 5-3
Alaska Native Tribes and Corporations ... 5-3
State Agencies ... 5-4
City and Borough Agencies, Libraries, and Schools ... 5-4

# Contents

Other Organizations ........ 5-6
Individuals ........ 5-8

**CHAPTER 6 REFERENCES ........ 6-1**

**CHAPTER 7 GLOSSARY ........ 7-1**

**CHAPTER 8 INDEX ........ 8-1**

**VOLUME II**

APPENDIX A SCOPING AND COMMENT SUMMARY REPORT
APPENDIX B MODELING AND ANALYSIS
APPENDIX C CUMULATIVE EFFECTS
APPENDIX D EVALUATING INTEGRITY OF THE TONGASS NATIONAL FOREST OLD-GROWTH HABITAT CONSERVATION STRATEGY
APPENDIX E INTERAGENCY OLD GROWTH RESERVE REVIEW
APPENDIX F COMPARISON OF DIRECTION BY ALTERNATIVE
APPENDIX G TIMBER DEMAND AND SUPPLY
APPENDIX H ALASKA LIMITED EXPORT
APPENDIX I DEIS COMMENTS AND RESPONSES

Generally, the capacity of a forest system to sequester and store carbon depends on the location, age, and species composition of the forest (Birdsey et al. 1993; McKinley et al. 2011). In some forests found in warmer climates, the accumulation of carbon can decrease overtime as the carbon stored in soils and dead vegetative materials are released through the process of organic decay. However, the cool conditions on the Tongass National Forest slow down the rate of decomposition, which includes biomass breakdown/decay and carbon release. The dead or decaying plant matter is incorporated into the system's soil profile within the Tongass National Forest, where it accumulates and resides in various stages of decomposition for prolonged periods. As a result, mature forests within the Tongass National Forest generally store considerable amounts of carbon on the forest floor and in the soil profile. Smith et al. (2004) estimated that approximately 70 tons per acre of carbon are stored on the forest floor in the hemlock-Sitka spruce ecosystems found on the Tongass National Forest. Furthermore, some studies have indicated that trees can continue to accumulate carbon at increasing rates as they mature, thereby resulting in large amounts of carbon stored annually within mature trees (Stephenson et al. 2014). As a result, mature forests on the Tongass National Forest likely store considerably more carbon compared to younger forests in this area (within the individual trees themselves as well as within the organic soil layer found in mature forests).

Although the organic soils of the Tongass National Forest currently store considerable amounts of carbon, D'Amore and Lynn (2002) note that numerous studies have shown that carbon stored in soils may be released to the atmosphere in the form of carbon dioxide or methane, as the climate warms. Davidson and Janssens (2006) noted that many factors can affect the sensitivity of soil decomposition rates to increased temperatures (e.g., the relative mix of organic to mineral substrates, soil moisture levels, as well as other biotic and abiotic conditions) and that not all organic soil types would be equally sensitive to increased temperature; however, D'Amore has indicated that the organic layers in the soil profile of mineral soils as well as organic soils in general on the Tongass National Forest would likely experience increased decomposition rates if average temperatures were to increase (D'Amore et al. 2015; D'Amore 2016). As a result, the projected increases in average temperatures as a result of climate change could result in the release of portions of the carbon currently stored in the Tongass National Forest's soil layers. In addition, the clearing of forested areas during past and ongoing harvesting activities can increase this effect, by increasing the amount of solar energy that is allowed to reach the ground while the forest regenerates following a harvest. The projected increase in average temperatures and longer growing season could also increase the growth rates of fungi in temperate-forests (a taxa that aids in the decomposition of forest material) which would also increase the rate of carbon released to the atmosphere (e.g., currently stem-decay fungi consume approximately 31 percent of the volume of live trees; Wolken et al. 2011). Furthermore, dissolved carbon may be transported to streams and the ocean due to the increased precipitation predicted to occur over the next 50 to 100 years. Increased stream temperatures can also result in an increased rate of carbon released from aquatic systems.

# THE TONGASS RAINFOREST AS ALASKA'S FIRST LINE OF CLIMATE CHANGE DEFENSE AND IMPORTANCE TO THE PARIS CLIMATE CHANGE AGREEMENTS

**Dominick A. DellaSala, Ph.D.**
**Chief Scientist, Geos Institute (Dominick@geosinstitute.org)**



*photo: J. Schoen*

*Executive Summary*: the Tongass is a global champion in sequestering (absorbing) atmospheric carbon and storing it long-term in its ancient trees, productive soils, and dense rainforest foliage. Because it is one of the world's last relatively intact temperate rainforests, and it has a maritime climate, the Tongass is Alaska's first line of climate change defense and a climate refuge for its world-class salmon and wildlife populations. Logging of the Tongass rainforest produces greenhouse gas emissions that damages the region's contribution to a safe climate. Recognizing the critical need to reduce greenhouse gas emissions to keep global warming temperatures below a dangerous 2º C (~4º F) anticipated increase, a climate change agreement was reached in Paris by 195 members of the Conference of Parties (COP 21 also known as the 2015 Paris Climate Conference), including the USA. Articles of the agreement called for forests to be managed as a global "sink" for carbon. Therefore, protecting carbon sinks and reducing forestry emissions are pivotal steps to ensure a safe climate for Alaskans and for future generations.

Given the global importance of the Tongass as a carbon sink, we wanted to: (1) determine if the Tongass Draft Forest Plan Amendment (preferred alternative) was generally consistent with the Paris articles regarding managing forests as a carbon sink; (2) consistent with the Obama Administration's policies on climate change; and (3) whether the timeline for the proposed transition out of old-growth logging was consistent with efforts to end global deforestation under global forest and climate change agreements (e.g., COP 2, NY Forest Declaration). Thus, we estimated $CO_2$ emissions anticipated from logging old growth and young-growth forests as proposed by the Forest Service on the Tongass over the next 25 and 100 years and compared them to emissions under a conservation alternative designed to speed up the transition by relying mostly on soon-to-be-ready-for logging young growth as a replacement for old-growth logging.

*Key Findings (for 100 years)*:

- The agencies' preferred alternative would log 43,167 acres of old growth (OG) and 261,850 acres of young growth (YG) resulting in the equivalent emissions of ~4 million vehicles annually on Alaska roads for the next 100 years. These

estimates account for carbon stored in wood products and capture of carbon by forest regrowth.

- Logging emissions are ~175 times greater than the "reference point" for project emissions recommended by the White House's Council of Environmental Quality (CEQ). Emissions would result in a "social cost of carbon"conservatively estimated at >$100 million annually in global warming damages by the end of the century. Losses are ~10 times the projected timber revenues on the Tongass.
- A conservation alternative proposed by conservation groups (but dismissed by the Forest Service) would rely predominately on 76,000 acres of low controversy YG to support the transition with much less OG (9,125 acres over 100 years) to support specialty products. This alternative yields the equivalent emissions of over ~400,000 vehicles annually for 100 years, 16 times above CEQ emissions reference, but a tenth of the emissions from Forest Service proposed logging.
- The Tongass preferred alternative is out-of-step with efforts by the global community to reduce emissions. The conservation alternative better complies with CEQ guidelines, the Paris climate agreement, and efforts to reduce climate damages from $CO_2$ pollution.
- President Obama showed great interest in Alaska's already extensive climate impacts during his September 2015 Alaska visit to showcase his climate change initiatives prior to the Paris conference. Continued OG logging on the Tongass would further jeopardize Alaska's climate and is out of step with the President's climate change agenda.

**NO OTHER NATIONAL FOREST STORES MORE CARBON THAN THE TONGASS (map shows concentration of Tongass forest-carbon stores)**



**THE TONGASS IS A NATIONAL CARBON SINK**

*Photo: D. DellaSala*



*"This is as good of a signpost as any when it comes to the impacts of climate change." President Obama during his September 2015 tour to Alaska glaciers.*

*Alaska's First Line of Climate Defense*–Alaska is at the front lines of climate change, experiencing higher temperature increases than any other region in the nation along with increasing floods, coastal erosion and displacement of native villages, interior wildfires, die off of certain conifers, thawing of permafrost, and glacial melting (among other changes anticipated over the coming century)[1]. If Alaska is on the front lines, then the Tongass is Alaska's first line of climate defense.

At 16.8 million acres, the Tongass National Forest in southeast Alaska is the crown jewel of the national forest system. It is the nation's largest national forest and one of the world's last relatively intact temperate rainforests and thus it has global significance[2]. Its world-class salmon runs are the backbone of a thriving subsistence, commercial fishery, and recreation-based economy[3]. The Tongass is by far the nation's champion in storing carbon long-term[4] and, in doing so, represents a unique opportunity for the Obama Administration to lead by example regarding its global commitments to the Paris climate change agreements designed to keep global warming below the dangerous 2° C (~4° F) presumed tipping point. During COP 21, the parties recognized the importance of forests as global "sinks" for storing greenhouse gases and called for steps by the global

---

[1]Alaska Department of Environmental Conservation. 2010. Alaska's climate change strategy: addressing impacts in Alaska. http://www.climatechange.alaska.gov
[2]DellaSala, D.A. 2011. Temperate and boreal rainforests of the world: ecology and conservation. Island Press: Washington, D.C.
[3]Crane, L.K., and J.R. Mehrkens. 2013. Indigenous and commercial uses of the natural resources of the North Pacific Rainforest with a focus on Southeast Alaska and Haida Gwaii. Pp. 89-126. In G.H. Orians & J.W. Schoen (eds.). North Pacific Temperate Rainforests. University of Washington Press, Seattle.
[4]Leighty, W.W. et al. 2006. Effects of management on carbon sequestration in forest biomass in southeast Alaska. Ecosystems 9:1051-1065

community to *conserve and enhance* forest sinks to help stabilize what may soon become run-away climate chaos.




*Conference of the Parties (COP 21) Twenty-First session, Paris, December 12, 2015*

*"Recognizes the importance of adequate and predictable financial resources, including for results-based payments, as appropriate, for the implementation of policy approaches and positive incentives for reducing emissions from deforestation and forest degradation, and the role of conservation, sustainable management of forests and enhancement of forest carbon stocks; as well as alternative policy approaches, such as joint mitigation and adaptation approaches for the integral and sustainable management of forests…..*

*Parties should take action to conserve and enhance, as appropriate, sinks and reservoirs of greenhouse gases as referred to in Article 4, paragraph 1(d), of the Convention, including forests."*

*Photo: D. DellaSala*



The Tongass is pivotal to the Obama Administration's climate change commitments. The region's forests not only store more carbon than any national forest, but also may function as a climate refuge (i.e., first line of defense) given maritime influences may moderate more extreme climate events anticipated for interior Alaska and temperate rainforests further south[5]. Relatively intact watersheds provide a refuge for old-growth dependent species (including many that are important to subsistence needs), and buffer salmon populations from cumulative effects of climate change and more extensive logging in the surroundings (non-federal lands)[6].

Notably, prior estimates of net carbon flux from logging scenarios on the Tongass indicate that *only a no-logging scenario* maintains carbon stores through time[4]. Carbon

[5]DellaSala, D.A. et al. 2015. Climate change may trigger broad shifts in North America's Pacific coastal rainforests. Online module – Earth Systems and Environmental Sciences – published by Science Direct
[6]For examples, see Watson, et al. 2013. Mapping vulnerability and conservation adaptation strategies under climate change. Nature Climate Change 3:989-994.

also has future economic value in terms of avoided costs from global warming pollution and development of carbon-offset markets. For instance, if carbon were stored long-term in old-growth forests instead of being released to the atmosphere by logging, the estimated annual economic value of carbon would be comparable to revenue generated from Tongass timber sales should carbon markets mature[4]. Moreover, the Interagency Working Group on Social Cost of Carbon estimated the cost of carbon in economic impacts from global warming would be $27-221 per ton by 2050[7]. Recent evidence suggests the anticipated costs maybe much higher, including large demographic displacements of human populations along coastlines[8].




Planetary carbon cycle with exchange of carbon among land, atmosphere, and oceans (billions of tons of carbon per year)[9]. Yellow numbers represent natural carbon fluxes, red are carbon dioxide emissions in billions of tons of carbon per year. White numbers show stored carbon. Note the fossil fuel related carbon stores in the diagram. Forests are integral to the earth's carbon filtration system. http://en.wikipedia.org/wiki/Carbon_cycle

*Photo: D. DellaSala*



*Forests as a Carbon Sink* – forests are a vital part of the global atmospheric carbon cycle that contribute to climate stabilization by absorbing (sequestering) and storing vast amounts of carbon dioxide ($CO_2$) in trees (live and dead), soils, and understory foliage. As a forest ages, it continues to sequester and store carbon, functioning as a net "sink" for centuries if undisturbed. Ongoing carbon sequestration and storage has been measured in forests >800 years old[10].

**When a forest is cut down, roughly 66% to 80% of the stored carbon in the forest[11] is released overtime as $CO_2$ (some carbon is stored in wood products) thereby converting forests from a sink to a "source" or "emitter." The minimal storage in wood products is an accounting misstep typical of federal agency carbon**

[7] Interagency Working Group on Social Cost of Carbon, United States Government. 2013. *Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis – Under Executive Order 12866*. May.
[8] Pizer et al. 2014. Using and improving the social cost of carbon. *Science* 346:1189-1190. DOI:10.1126/science.125974
[9]Reprinted from DellaSala, D.A. In 2013. The carbon cycle and global change: too much of a good thing. Reference Module in Earth Systems and Environmental Sciences, Elsevier. 3 pp. http://dx.doi.org/10.1016/B978-0-12-409548-9.05874-7
[10]Luyssaert, S. et al. 2008. Old-growth forests as global carbon sinks. Nature 455:213-215
[11]Wayburn, L.A. 2000 (several citations included). Forest carbon in the United States: opportunities and options for private lands. Pacific Forest Trust, San Francisco.

**pronouncements that over value carbon in wood products[12].**

Soon after logging, carbon is emitted to the atmosphere via rapid decomposition of logging slash, fossil-fuel emissions from transport and wood processing, and decay or combustion (within 40-50 years) of forest products in landfills[13]. Planting or growing young trees or storing carbon in wood products does not make up for emissions released from a logged forest. Indeed, after an old forest is clearcut, the young forest remains a net $CO_2$ emitter for 5 to 50 years, depending on site productivity[14].

*Logging on the Tongass is global warming pollution(photo: D. DellaSala)*



Globally, deforestation (8-15%) and forest degradation (6-13%) **contribute more greenhouse gas pollution than the world's entire transportation network**[15], which is why countries, including the U.S., have committed to reducing emissions and protecting forest sinks (COP 21 climate agreements). Recognizing the importance of unlogged forests as carbon sinks, scientists also have repeatedly called on countries to protect their vast forest carbon stores as integral to stabilizing global climate change[16].

[12]The White House. 2015. Climate change and the land sector: improving measurement, mitigation and resilience of our natural resources.
[13]Harmon, M.E. W.K Ferrel, J. F. Franklin. 1990. Effects on carbon storage of conversion of old –growth forests to young forests. Science 247:699-702.
[14]Law, B. E., and M.E. Harmon. 2011. Forest sector carbon management, measurement and verification, and discussion of policy related to climate change. Carbon Management 2:73-84.
[15]Estimates are conservative as they were mainly derived from the tropics where the majority of forest losses occur – boreal and temperate losses are not available at this time. Intergovernmental Panel on Climate Change. 2007. Synthesis report. An assessment of the IPCC on climate change. Houghton, R.A., B.Byers, and A.A. Nassikas. 2012. A role for tropical forests in stabilizing atmospheric $CO_2$. Nature Climate Change 5:1022-1023.
[16]MackeyB., et al. 2014. Policy options for the world's primary forests in multilateral environmental agreements. Conservation Letters 8:139-147 DOI: 10.1111/conl.12120. Also letters sent to the Forest Service and USDA in 2015 signed by 7 scientific societies and hundreds of the nation's leading natural resource scientists calling on the Administration to protect the Tongass old-growth rainforest sink.

*Photo: The Big Thorne logging operation on Prince of Wales Island converted Tongass old-growth rainforest from a carbon sink to a source of emissions (S. Ballhorn)*



> *"The Tongass National Forest is a national treasure. Today, I am outlining a series of actions by USDA and the Forest Service that will protect the old-growth forests of the Tongass while preserving forest jobs in southeast Alaska. I am asking the Forest Service to immediately begin planning for the transition to harvesting second growth timber while reducing old-growth harvesting over time." July 3, 2013 Press Release, USDA Secretary Tom Vilsack.*

*Tongass Is Transitioning But Not Soon Enough* – Agriculture Secretary Tom Vilsack announced in July 2013 that a transition away from old-growth logging would need to occur rapidly on the Tongass National Forest while maintaining a viable timber industry. In November 2015, the Forest Service released a Draft Environmental Impact Statement (DEIS) Plan Amendment to transition the Tongass from predominately old growth to predominately young-growth logging with the preferred alternative adopting recommendations of a multi-stakeholder Tongass Advisory Committee that incorporated years of additional old growth volume as "bridge timber" to accommodate the transition. Here, we compare the Forest Service preferred alternative to a conservation alternative prematurely dismissed by the Forest Service as not producing enough volume. The agencies' decision to dismiss this alternative occurred before completion of independent field inventories that now show sufficient volume from young growth can accommodate a more rapid transition with minimal old growth (Appendix I, report in preparation).

In conducting theTongass logging emissions analysis, we compared the following:

- *Forest Service Preferred Alternative* – proposes logging 43,167 acres of old growth and 261,850 acres of young growth over 100 years with extensive road building (road building was not calculated in emissions scenarios although it certainly contributes to emissions).

- *Conservation Alternative* – proposed by conservation groups to accelerate the transition while meeting timber demand targets of the Forest Service using much less old growth (OG) to transition. Young growth (YG) estimates were provided by Mater Engineering (Appendix I) from field-verified 55-year old pre-commercially thinned (PCT) YG sampled from a land base of 76,000 acres of relatively low controversy areas (i.e., areas not considered environmentally sensitive based on a suite of attributes, manuscript in preparation). An additional 9,125 acres of old growth was estimated for specialty wood products over 100 years (Appendix I).

We estimated carbon stored in young and old forests by interpolating data from prior estimates on the Tongass[4] for above ground biomass, which was higher than estimates used by the Forest Service for live tree carbon only. We projected logging emissions of the two alternatives over 25- and 100-year increments. We then converted logging emissions to equivalent emissions from vehicles using EPAs equivalencies calculator and compared these projected emissions to CEQ's draft "reference point" for minimizing emissions of federal actions. CEQ directs agencies to adopt projects with low emission using a reference of 25,000 metric tons of $CO_2$(e)[17] on an annual basis[18]. We used the CEQ reference for two reasons: (1) to determine if the preferred alternative is generally consistent with the Obama Administration's global warming commitments (COP 21, Paris agreements); and (2) to provide an appropriate regional comparison of logging emissions that is based on easy to understand emissions comparable. Notably, the Forest Service based logging emissions projections on comparisons to the entire U.S. annual greenhouse gas emissions (the wrong scale of comparison), masking the severity of regionally specific climateimpacts.

**ESTIMATING LOGGING EMISSIONS USING VEHICLE EQUIVALENTS**

*Photo: Juneauempire.com*



*Forest Service Preferred Alternative* – In general, the agencies' preferred alternative to log substantially more OG and YG than proposed by the conservation alternative is estimated to generate **annual** emissions that are:

- equivalent to 4 million vehicles annually for 100-years (Appendix II); and
- 175 times > the CEQ emissions reference.

*Conservation Alternative* – the transition proposed by the conservation alternative uses much less OG and is estimated to generate **annual** emissions that are:

- equivalent to 419,535 vehicles annually (Appendix II); and
- 16 times > the CEQ emissions reference.

The conservation alternative, while also exceeding CEQ's reference, yields 10 times less emissions in the long-term compared to the agencies' preferred alternative and therefore should have been kept in the DEIS as a reasonable alternative under NEPA. The agencies' preferred alternative is generally inconsistent with the COP 21 climate agreements

[17]Carbon dioxide equivalents ($CO_2$e) are an internationally accepted term for comparing different greenhouse gas emissions using a common (standardized) unit of analysis.
[18]CEQ 2014. Draft published for public review and comment Dec. 2014. White House.https://www.whitehouse.gov/sites/default/files/docs/nepa_revised_draft_ghg_guidance_searchable.pdf

(Article 4 on greenhouse sinks) to conserve forests as a sink for atmospheric carbon and is well above the CEQ emissions reference.

**SOCIAL COSTS OF CARBON**
*Photo: S. Ballhorn*




Executive Order 12866 requires federal agencies to "*assess both the costs and benefits of the intended regulation and, recognizing that some costs and benefits are difficult to quantify, propose or adopt a regulation only upon a reasoned determination that benefits of the intended regulation justify its costs.*"

We provide an estimate of the social cost of carbon (SCC) derived from relevant published sources as a means for costing emissions in a regional context and to illustrate how the Forest Service could achieve compliance with the Executive Order by documenting climate costs of logging and the benefits of maintaining the Tongass carbon sink.

In any cost-benefit analysis, it is imperative to incorporate the *benefits* (or cost savings) of avoiding damages to the environment, or, in this case, the climate, so as to level the economic playing field (although many ecosystem services critical to properly functioning forests are difficult to quantify). In this case, SCC is expressed as monetized damages associated with incremental increases in emissions, including, but not limited to changes in net agricultural productivity, human health, property damages from increased flood risk, and the value of ecosystem services. An Interagency Working Group on SCC estimated the **annual** cost of releasing emissions to be $27-221 per ton of carbon using 2050 projections. For this analysis, we used the lower bound of $27 per metric ton of $CO_2$(e) to estimate potential costs of logging emissions recognizing costs will escalate overtime as a result of the accumulation of regional and global emissions under status quo emissions scenarios.

*Forest Service Preferred Alternative* - $CO_2$ (e) released from logging would contribute to:

- ~$108 million annually in global warming costs over 100 years. Estimated costs are 10 times greater than the $8-10 million in annual wood products value anticipated by the Forest Service (DEIS Table 3.22-16).

*Conservation Alternative* - $CO_2$(e) released from logging would contribute to:

- ~$11 million annually in global warming costs, a tenth as costly as the Forest Service alternative.

Thus, the conservation alternative represents a cost savings to the foreseeable future climate compared to the Forest Service's preferred alternative that would result in much higher costs due to greater logging emissions and this should have been included in the agencies' NEPA analysis. It should be noted that *only a no-logging alternative* results in maximizing carbon sinks and generating apositive SCC. This is because removing carbon from a forest always results in some costs to the climate (costs are based on the combination of regional logging intensity and global emissions contributions).

**LIMITATIONS, UNCERTAINTIES, AND THE FUTURE CLIMATE**

*Photo: A. DellaSala*



*Follow Up Research and Monitoring* – accurately estimating carbon in regional forest assessments requires the use of new carbon assessment tools and improved inventories (including soils) along with inclusion of sequestration rates (e.g., Net Ecosystem Productivity). Carbon assessments are costly but necessary to develop proper carbon flux estimates from logging and to evaluate SCC as a multiple-use objective. In this case, we approximated emissions from published sources, published estimates of carbon stored in wood products (using conversion factors), and published estimates of carbon capture via forest regrowth (using nationally recognized online carbon tools).

Without the benefit of a comparable analysis, however, the Forest Service claims that logging old-growth forests could result in *either a net loss or gain* of carbon depending on logging practices even though clearcut logging (a substantial emissions source) is the method of choice on the Tongass (some young tree retentions and small (<10 ac) clearcuts are proposed in young forests within Old Growth Reserves and Beach buffers by the agency). Our findings are meant to provide a better estimate of emissions than the DEIS. Moreover, we used an appropriate scale of analysis that tiers to CEQ emissions guidelines and used comparable emission sources (e.g., vehicle equivalents that are locally applicable) to evaluate the magnitude of regional impacts. Follow up work, ideally conducted by the Forest Service in collaboration with scientists, is needed to improve upon these estimates and address uncertainties.

*Climate Shift Happens* – Notably, the effects of climate change on forest productivity represents additional uncertainties. As the climate warms in Alaska, other vegetation types may replace conifer forests that evolved under a cooler climate[3]. For instance, during the Miocene millions of years ago Alaska was a much warmer place dominated by hardwood forests. As climate change now accelerates, it could lower carbon storage in conifer forests as the climate conducive to hardwoods gradually replaces conifers and some conifers die off from climate change effects (thereby releasing $CO_2$ as is currently

happening with an extensive die-off of Alaska yellow cedar[19]). However, the maritime climate of the Tongass might ameliorate some of these shifts compared to more extreme changes anticipated for interior Alaska and temperate rainforests to the south[3].
*Photo: A. DellaSala*



**ALASKA'S FIRST LINE OF CLIMATE CHANGE DEFENSE AT RISK: CONCLUSIONS**

*Although the Obama Administration took a leadership position during the climate negotiations in Paris, its global commitments to lower emissions and end deforestation ostensibly do not extend to Alaska's globally significant Tongass rainforest carbon sink.*

The Administration has a unique opportunity to demonstrate to the world that it takes its climate change commitments seriously by quickening the pace of transition without relying on controversial timber sales that will cost more in future economic losses from climate change than the revenues generated by logging. The Forest Service has not conducted a logging emissions analysis as directed by CEQ. It has not conducted a cost-benefit analysis of the SCC implications of more OG logging and is out of compliance with Executive Order 12866. The feasibility of an accelerated transition was demonstrated in the conservation alternative summarily dismissed by the agency but which uses much less OG and generates far less emissions over time.

A robust analysis using carbon life cycle accounting is needed to more fully assess the social cost of carbon using advancements in forest carbon accounting as declared in recent climate change policies of the White House[11]. The Tongass is a known carbon sink, yet land-use emissions[11]references the importance of climate resilience best achieved through ecosystem and landscape conservation. Ecosystem resilience, and therefore the Tongass carbon sink, will decline on the Tongass with another 100 years of OG logging and road building. Proposed logging will be occurring at a time when the climate is changing the likelihood that the Tongass can function as a climate refuge[3].

*"I loved Alaska and met so many inspiring people. Have to keep up the fight on climate change for their sake—and ours." President Obama on his September visit*

The international community clearly spoke up in Paris about the strategic value of forest sinks in keeping global warming below the dangerous 2° C threshold. Choosing a climate responsible alternative for the Tongass would allow the Obama Administration to live up to its commitments to safeguard Alaska's climate, comply with the COP 21 climate agreements and its pledge to end global deforestation.

[19]Hennon P.E.et al. 2012. Shifting climate, altered niche, and a dynamic conservation strategy for yellow-cedar in the North PacificCoastal Rainforest. Bioscience 62: 147–158.

*"We share the vision of slowing, halting, and reversing global forest loss while simultaneously enhancing food security for all. Reducing emissions from deforestation and increasing forest restoration will be extremely important in limiting global warming to 2°C." United Nations Climate Summit New York Declaration on Forests (agreed to by 157 governments, including the U.S, indigenous groups, corporations, NGOs, and others)*

## APPENDIX I. YOUNG GROWTH LOGGING LEVELS NEEDED TO HIT TIMBER DEMAND THRESHOLDS OF THE FOREST SERVICE CALCULATED FROM MATER 2015 PHASE II CRUISE RESULTS (IN PUBLICATION PREPARATION).

Estimated Avg Length of Tree Residual for PCT Stands When Harvest at 55 yrs Based on 2015 Cruise Results

*(lineal ft from top of merchantable log to tree top)*

| | Trees producing *two* 34' logs (ft) | Trees producing *one and a half* 34' logs (ft) | Trees producing *only one* 34' log (ft) |
|---|---|---|---|
| 2020 | 36 | 27.4 | 40.86 |
| 2025 | 38.7 | 41.1 | 45.23 |
| 2030 | 33.4 | 31.9 | 39.39 |

**Conservation Alternative**

- With 80% merchantable volume growth every 5 yrs per 2015 cruise results
- Focus on *one and a half* log-producing trees

| | | Conservation Alternative |
|---|---|---|
| | | **Annual mbf harvested 2020-2024** |
| | | 33,074 |
| | | **Annual mbf harvested starting 2025** |
| Industry Demand (DEIS) | **46,000** | 46,000 |
| | **Public Law 113-291** | |
| Total acres harvested; first 10 years | **15,000 ac max** | 13,272 ac |
| Annual acres harvested; first 5 years | **3,000 ac max** | 1,696 ac |
| Annual acres harvested; next 5 years | **3,000 ac max** | 958 ac |
| Total acres harvested overall | **50,000 ac max** | 44,636 ac |
| Acres harvested per year after 10 years | **5,000 ac max** | 697 ac |
| Total acres harvested: 25 years | | 23,727 |
| Total acres harvested: 100 years | | 76,002 (44,636 before re-harvest) |

**APPENDIX II: ESTIMATED LOGGING EMISSIONS UNDER THE FOREST SERVICE PREFERRED ALTERNATIVE (DEIS) VS. A CONSERVATION ALTERNATIVE IN 25- AND 100-YEAR INCREMENTS AND IN RELATION TO CEQ'S EMISSIONS GUIDELINES (25,000 METRIC TONS CO2 (E) ANNUALLY)**

| | DEIS<br>• Comply with PL 113-291 (harvest below CMAI) on 14% of acres<br>• Harvest above CMAI on 86% of acres<br>• Harvest above stated FS demand volume (46 mmbf/yr) | Conservation Alternative<br>• Comply with PL 113-291 (harvest below CMAI) on 100% of acres<br>• Harvest capped at FS demand volume (46 mmbf/yr) |
|---|---|---|
| Acres to be harvested first 25 years | • 37,390 ac SG below CMAI (@65 yrs)<br>• 23,223 ac OG (@ 120 yrs) | • 23,727 ac SG below CMAI (@55 yrs)<br>• 3,500 ac OG (@ 120 yrs) |
| Acres to be harvested next 75 years | • 224,460 ac SG above CMAI (@120 yrs)<br>• 19,944 ac OG (@ 120 yrs) | • 52,273 ac SG below CMAI (@55 yrs)<br>• 5,625 ac OG (@ 120 yrs) |
| | After initial harvest, re-growth, and (where applicable) re-harvest: | |
| Total CO2(e) emissions | In 25 years | In 25 years |
| | 105,347,668 tons (4,213,907 tons/yr) | 36,576,407 tons (1,463,056 tons/yr) |
| | In 100 years | In 100 years |
| | 441,068,733 tons (4,410,733 tons/yr) | 41,953,532 tons (419,535 tons/yr) |
| Multiplier above CEQ annual CO2(e) emissions limit of 25,000/yr | In 25 years | In 25 years |
| | x 168 | x 58 |
| | In 100 years | In 100 years |
| | x 175 | x 16 |

*Calculation Notes (all other calculations will be posted online):*

- Carbon values interpolated from Leighty et al. 2006 Fig. 2 for age classes as follows: 55 years (494 tons per ac), 65 years (585 tons per acre), 120 years (776 tons per acre).
- Emissions adjusted to account for wood products stores using published estimates in footnote 10 and then multiplied by 3.67 to convert to metric tons $CO_2$ (e).
- Logging emissions are equivalent to passenger vehicle emissions http://www.epa.gov/energy/greenhouse-gas-equivalencies-calculator.
- CEQ reference = 25,000 metric tons $CO_2$ (e): https://www.federalregister.gov/articles/2014/12/24/2014-30035/revised-draft-guidance-for-federal-departments-and-agencies-on-consideration-of-greenhouse-gas
- PL 113-291 requires: no more than 50,000 acres of initial YG (not including re-harvest acres) logging; total YG logging in first ten years cannot exceed 15,000 ac; 3,000 ac annual acres in first five years; 3,000 acres annual in 6-10 yrs; and 5,000 YG acres annual after 10 years. If the timber volume goal is 46 mmbf/yr and compliance with PL113-291, the conservation alternative would log: 8,480 acres YG in 2020-2024 (1,696 ac/yr @ 13mbf/ac with a 1.5 multiplier for long log to short log recovery factor) producing 33 mmbf/yr.; not enough pre-commercially thinned 55-yr old stands are available at this time to meet the timber target exclusively from YG); 4,790 acres in 2025-2029(958 ac/yr @ 32mbf/ac with a 1.5 multiplier for long log to short log recovery factor meets that target); 697 acres YG annual logging beginning in 2030 (1.5 multiplier for long log to short log recovery factor producing 46 mmbf/yr @ 44 mbf/ac). See Appendix Ifor Mater 2015 YG numbers plus specialty OG products (e.g., 3 mmbf/yr = 75 ac OG logged per year using a mid point of 40,000 board feet per acre Class 6 old growth (Tongass DEIS: 3-295) to back calculate to acres logged).

# Summary for Policymakers

Case No. 1:23-cv-01501-RMR Document 15-3 filed 09/29/23 USDC Colorado pg 144 of 220





SPM

# Summary for Policymakers

**Drafting Authors:**

Myles Allen (UK), Mustafa Babiker (Sudan), Yang Chen (China), Heleen de Coninck (Netherlands/EU), Sarah Connors (UK), Renée van Diemen (Netherlands), Opha Pauline Dube (Botswana), Kristie L. Ebi (USA), Francois Engelbrecht (South Africa), Marion Ferrat (UK/France), James Ford (UK/Canada), Piers Forster (UK), Sabine Fuss (Germany), Tania Guillén Bolaños (Germany/Nicaragua), Jordan Harold (UK), Ove Hoegh-Guldberg (Australia), Jean-Charles Hourcade (France), Daniel Huppmann (Austria), Daniela Jacob (Germany), Kejun Jiang (China), Tom Gabriel Johansen (Norway), Mikiko Kainuma (Japan), Kiane de Kleijne (Netherlands/EU), Elmar Kriegler (Germany), Debora Ley (Guatemala/Mexico), Diana Liverman (USA), Natalie Mahowald (USA), Valérie Masson-Delmotte (France), J. B. Robin Matthews (UK), Richard Millar (UK), Katja Mintenbeck (Germany), Angela Morelli (Norway/Italy), Wilfran Moufouma-Okia (France/Congo), Luis Mundaca (Sweden/Chile), Maike Nicolai (Germany), Chukwumerije Okereke (UK/Nigeria), Minal Pathak (India), Antony Payne (UK), Roz Pidcock (UK), Anna Pirani (Italy), Elvira Poloczanska (UK/Australia), Hans-Otto Pörtner (Germany), Aromar Revi (India), Keywan Riahi (Austria), Debra C. Roberts (South Africa), Joeri Rogelj (Austria/Belgium), Joyashree Roy (India), Sonia I. Seneviratne (Switzerland), Priyadarshi R. Shukla (India), James Skea (UK), Raphael Slade (UK), Drew Shindell (USA), Chandni Singh (India), William Solecki (USA), Linda Steg (Netherlands), Michael Taylor (Jamaica), Petra Tschakert (Australia/Austria), Henri Waisman (France), Rachel Warren (UK), Panmao Zhai (China), Kirsten Zickfeld (Canada).

**This Summary for Policymakers should be cited as:**

IPCC, 2018: Summary for Policymakers. In: *Global Warming of 1.5°C. An IPCC Special Report on the impacts of global warming of 1.5°C above pre-industrial levels and related global greenhouse gas emission pathways, in the context of strengthening the global response to the threat of climate change, sustainable development, and efforts to eradicate poverty* [Masson-Delmotte, V., P. Zhai, H.-O. Pörtner, D. Roberts, J. Skea, P.R. Shukla, A. Pirani, W. Moufouma-Okia, C. Péan, R. Pidcock, S. Connors, J.B.R. Matthews, Y. Chen, X. Zhou, M.I. Gomis, E. Lonnoy, T. Maycock, M. Tignor, and T. Waterfield (eds.)]. In Press.

# Introduction

This Report responds to the invitation for IPCC '... to provide a Special Report in 2018 on the impacts of global warming of 1.5°C above pre-industrial levels and related global greenhouse gas emission pathways' contained in the Decision of the 21st Conference of Parties of the United Nations Framework Convention on Climate Change to adopt the Paris Agreement.[1]

The IPCC accepted the invitation in April 2016, deciding to prepare this Special Report on the impacts of global warming of 1.5°C above pre-industrial levels and related global greenhouse gas emission pathways, in the context of strengthening the global response to the threat of climate change, sustainable development, and efforts to eradicate poverty.

This Summary for Policymakers (SPM) presents the key findings of the Special Report, based on the assessment of the available scientific, technical and socio-economic literature[2] relevant to global warming of 1.5°C and for the comparison between global warming of 1.5°C and 2°C above pre-industrial levels. The level of confidence associated with each key finding is reported using the IPCC calibrated language.[3] The underlying scientific basis of each key finding is indicated by references provided to chapter elements. In the SPM, knowledge gaps are identified associated with the underlying chapters of the Report.

# A. Understanding Global Warming of 1.5°C[4]

**A.1 Human activities are estimated to have caused approximately 1.0°C of global warming[5] above pre-industrial levels, with a *likely* range of 0.8°C to 1.2°C. Global warming is *likely* to reach 1.5°C between 2030 and 2052 if it continues to increase at the current rate. (*high confidence*) (Figure SPM.1) {1.2}**

A.1.1 Reflecting the long-term warming trend since pre-industrial times, observed global mean surface temperature (GMST) for the decade 2006–2015 was 0.87°C (*likely* between 0.75°C and 0.99°C)[6] higher than the average over the 1850–1900 period (*very high confidence*). Estimated anthropogenic global warming matches the level of observed warming to within ±20% (*likely range*). Estimated anthropogenic global warming is currently increasing at 0.2°C (*likely* between 0.1°C and 0.3°C) per decade due to past and ongoing emissions (*high confidence*). {1.2.1, Table 1.1, 1.2.4}

A.1.2 Warming greater than the global annual average is being experienced in many land regions and seasons, including two to three times higher in the Arctic. Warming is generally higher over land than over the ocean. (*high confidence*) {1.2.1, 1.2.2, Figure 1.1, Figure 1.3, 3.3.1, 3.3.2}

A.1.3 Trends in intensity and frequency of some climate and weather extremes have been detected over time spans during which about 0.5°C of global warming occurred (*medium confidence*). This assessment is based on several lines of evidence, including attribution studies for changes in extremes since 1950. {3.3.1, 3.3.2, 3.3.3}

---

1 Decision 1/CP.21, paragraph 21.

2 The assessment covers literature accepted for publication by 15 May 2018.

3 Each finding is grounded in an evaluation of underlying evidence and agreement. A level of confidence is expressed using five qualifiers: very low, low, medium, high and very high, and typeset in italics, for example, *medium confidence*. The following terms have been used to indicate the assessed likelihood of an outcome or a result: virtually certain 99–100% probability, very likely 90–100%, likely 66–100%, about as likely as not 33–66%, unlikely 0–33%, very unlikely 0–10%, exceptionally unlikely 0–1%. Additional terms (extremely likely 95–100%, more likely than not >50–100%, more unlikely than likely 0–<50%, extremely unlikely 0–5%) may also be used when appropriate. Assessed likelihood is typeset in italics, for example, *very likely*. This is consistent with AR5.

4 See also Box SPM.1: Core Concepts Central to this Special Report.

5 Present level of global warming is defined as the average of a 30-year period centred on 2017 assuming the recent rate of warming continues.

6 This range spans the four available peer-reviewed estimates of the observed GMST change and also accounts for additional uncertainty due to possible short-term natural variability. {1.2.1, Table 1.1}

**A.2 Warming from anthropogenic emissions from the pre-industrial period to the present will persist for centuries to millennia and will continue to cause further long-term changes in the climate system, such as sea level rise, with associated impacts (*high confidence*), but these emissions alone are *unlikely* to cause global warming of 1.5°C (*medium confidence*). (Figure SPM.1) {1.2, 3.3, Figure 1.5}**

A.2.1 Anthropogenic emissions (including greenhouse gases, aerosols and their precursors) up to the present are *unlikely* to cause further warming of more than 0.5°C over the next two to three decades (*high confidence*) or on a century time scale (*medium confidence*). {1.2.4, Figure 1.5}

A.2.2 Reaching and sustaining net zero global anthropogenic $CO_2$ emissions and declining net non-$CO_2$ radiative forcing would halt anthropogenic global warming on multi-decadal time scales (*high confidence*). The maximum temperature reached is then determined by cumulative net global anthropogenic $CO_2$ emissions up to the time of net zero $CO_2$ emissions (*high confidence*) and the level of non-$CO_2$ radiative forcing in the decades prior to the time that maximum temperatures are reached (*medium confidence*). On longer time scales, sustained net negative global anthropogenic $CO_2$ emissions and/or further reductions in non-$CO_2$ radiative forcing may still be required to prevent further warming due to Earth system feedbacks and to reverse ocean acidification (*medium confidence*) and will be required to minimize sea level rise (*high confidence*). {Cross-Chapter Box 2 in Chapter 1, 1.2.3, 1.2.4, Figure 1.4, 2.2.1, 2.2.2, 3.4.4.8, 3.4.5.1, 3.6.3.2}

**A.3 Climate-related risks for natural and human systems are higher for global warming of 1.5°C than at present, but lower than at 2°C (*high confidence*). These risks depend on the magnitude and rate of warming, geographic location, levels of development and vulnerability, and on the choices and implementation of adaptation and mitigation options (*high confidence*). (Figure SPM.2) {1.3, 3.3, 3.4, 5.6}**

A.3.1 Impacts on natural and human systems from global warming have already been observed (*high confidence*). Many land and ocean ecosystems and some of the services they provide have already changed due to global warming (*high confidence*). (Figure SPM.2) {1.4, 3.4, 3.5}

A.3.2 Future climate-related risks depend on the rate, peak and duration of warming. In the aggregate, they are larger if global warming exceeds 1.5°C before returning to that level by 2100 than if global warming gradually stabilizes at 1.5°C, especially if the peak temperature is high (e.g., about 2°C) (*high confidence*). Some impacts may be long-lasting or irreversible, such as the loss of some ecosystems (*high confidence*). {3.2, 3.4.4, 3.6.3, Cross-Chapter Box 8 in Chapter 3}

A.3.3 Adaptation and mitigation are already occurring (*high confidence*). Future climate-related risks would be reduced by the upscaling and acceleration of far-reaching, multilevel and cross-sectoral climate mitigation and by both incremental and transformational adaptation (*high confidence*). {1.2, 1.3, Table 3.5, 4.2.2, Cross-Chapter Box 9 in Chapter 4, Box 4.2, Box 4.3, Box 4.6, 4.3.1, 4.3.2, 4.3.3, 4.3.4, 4.3.5, 4.4.1, 4.4.4, 4.4.5, 4.5.3}




**Figure SPM.1 |** Panel a: Observed monthly global mean surface temperature (GMST, grey line up to 2017, from the HadCRUT4, GISTEMP, Cowtan–Way, and NOAA datasets) change and estimated anthropogenic global warming (solid orange line up to 2017, with orange shading indicating assessed *likely* range). Orange dashed arrow and horizontal orange error bar show respectively the central estimate and *likely* range of the time at which 1.5°C is reached if the current rate of warming continues. The grey plume on the right of panel a shows the *likely* range of warming responses, computed with a simple climate model, to a stylized pathway (hypothetical future) in which net $CO_2$ emissions (grey line in panels b and c) decline in a straight line from 2020 to reach net zero in 2055 and net non-$CO_2$ radiative forcing (grey line in panel d) increases to 2030 and then declines. The blue plume in panel a) shows the response to faster $CO_2$ emissions reductions (blue line in panel b), reaching net zero in 2040, reducing cumulative $CO_2$ emissions (panel c). The purple plume shows the response to net $CO_2$ emissions declining to zero in 2055, with net non-$CO_2$ forcing remaining constant after 2030. The vertical error bars on right of panel a) show the *likely* ranges (thin lines) and central terciles (33rd – 66th percentiles, thick lines) of the estimated distribution of warming in 2100 under these three stylized pathways. Vertical dotted error bars in panels b, c and d show the *likely* range of historical annual and cumulative global net $CO_2$ emissions in 2017 (data from the Global Carbon Project) and of net non-$CO_2$ radiative forcing in 2011 from AR5, respectively. Vertical axes in panels c and d are scaled to represent approximately equal effects on GMST. {1.2.1, 1.2.3, 1.2.4, 2.3, Figure 1.2 and Chapter 1 Supplementary Material, Cross-Chapter Box 2 in Chapter 1}

# B. Projected Climate Change, Potential Impacts and Associated Risks

**B.1 Climate models project robust[7] differences in regional climate characteristics between present-day and global warming of 1.5°C,[8] and between 1.5°C and 2°C.[8] These differences include increases in: mean temperature in most land and ocean regions (*high confidence*), hot extremes in most inhabited regions (*high confidence*), heavy precipitation in several regions (*medium confidence*), and the probability of drought and precipitation deficits in some regions (*medium confidence*). {3.3}**

B.1.1 Evidence from attributed changes in some climate and weather extremes for a global warming of about 0.5°C supports the assessment that an additional 0.5°C of warming compared to present is associated with further detectable changes in these extremes (*medium confidence*). Several regional changes in climate are assessed to occur with global warming up to 1.5°C compared to pre-industrial levels, including warming of extreme temperatures in many regions (*high confidence*), increases in frequency, intensity, and/or amount of heavy precipitation in several regions (*high confidence*), and an increase in intensity or frequency of droughts in some regions (*medium confidence*). {3.2, 3.3.1, 3.3.2, 3.3.3, 3.3.4, Table 3.2}

B.1.2 Temperature extremes on land are projected to warm more than GMST (*high confidence*): extreme hot days in mid-latitudes warm by up to about 3°C at global warming of 1.5°C and about 4°C at 2°C, and extreme cold nights in high latitudes warm by up to about 4.5°C at 1.5°C and about 6°C at 2°C (*high confidence*). The number of hot days is projected to increase in most land regions, with highest increases in the tropics (*high confidence*). {3.3.1, 3.3.2, Cross-Chapter Box 8 in Chapter 3}

B.1.3 Risks from droughts and precipitation deficits are projected to be higher at 2°C compared to 1.5°C of global warming in some regions (*medium confidence*). Risks from heavy precipitation events are projected to be higher at 2°C compared to 1.5°C of global warming in several northern hemisphere high-latitude and/or high-elevation regions, eastern Asia and eastern North America (*medium confidence)*. Heavy precipitation associated with tropical cyclones is projected to be higher at 2°C compared to 1.5°C global warming (*medium confidence*). There is generally *low confidence* in projected changes in heavy precipitation at 2°C compared to 1.5°C in other regions. Heavy precipitation when aggregated at global scale is projected to be higher at 2°C than at 1.5°C of global warming (*medium confidence*). As a consequence of heavy precipitation, the fraction of the global land area affected by flood hazards is projected to be larger at 2°C compared to 1.5°C of global warming (*medium confidence*). {3.3.1, 3.3.3, 3.3.4, 3.3.5, 3.3.6}

**B.2 By 2100, global mean sea level rise is projected to be around 0.1 metre lower with global warming of 1.5°C compared to 2°C (*medium confidence*). Sea level will continue to rise well beyond 2100 (*high confidence*), and the magnitude and rate of this rise depend on future emission pathways. A slower rate of sea level rise enables greater opportunities for adaptation in the human and ecological systems of small islands, low-lying coastal areas and deltas (*medium confidence*). {3.3, 3.4, 3.6}**

B.2.1 Model-based projections of global mean sea level rise (relative to 1986–2005) suggest an indicative range of 0.26 to 0.77 m by 2100 for 1.5°C of global warming, 0.1 m (0.04–0.16 m) less than for a global warming of 2°C (*medium confidence*). A reduction of 0.1 m in global sea level rise implies that up to 10 million fewer people would be exposed to related risks, based on population in the year 2010 and assuming no adaptation (*medium confidence*). {3.4.4, 3.4.5, 4.3.2}

B.2.2 Sea level rise will continue beyond 2100 even if global warming is limited to 1.5°C in the 21st century (*high confidence*). Marine ice sheet instability in Antarctica and/or irreversible loss of the Greenland ice sheet could result in multi-metre rise in sea level over hundreds to thousands of years. These instabilities could be triggered at around 1.5°C to 2°C of global warming (*medium confidence*). (Figure SPM.2) {3.3.9, 3.4.5, 3.5.2, 3.6.3, Box 3.3}

---

7 Robust is here used to mean that at least two thirds of climate models show the same sign of changes at the grid point scale, and that differences in large regions are statistically significant.

8 Projected changes in impacts between different levels of global warming are determined with respect to changes in global mean surface air temperature.

B.2.3 Increasing warming amplifies the exposure of small islands, low-lying coastal areas and deltas to the risks associated with sea level rise for many human and ecological systems, including increased saltwater intrusion, flooding and damage to infrastructure (*high confidence*). Risks associated with sea level rise are higher at 2°C compared to 1.5°C. The slower rate of sea level rise at global warming of 1.5°C reduces these risks, enabling greater opportunities for adaptation including managing and restoring natural coastal ecosystems and infrastructure reinforcement (*medium confidence*). (Figure SPM.2) {3.4.5, Box 3.5}

**B.3 On land, impacts on biodiversity and ecosystems, including species loss and extinction, are projected to be lower at 1.5°C of global warming compared to 2°C. Limiting global warming to 1.5°C compared to 2°C is projected to lower the impacts on terrestrial, freshwater and coastal ecosystems and to retain more of their services to humans (*high confidence*). (Figure SPM.2) {3.4, 3.5, Box 3.4, Box 4.2, Cross-Chapter Box 8 in Chapter 3}**

B.3.1 Of 105,000 species studied,[9] 6% of insects, 8% of plants and 4% of vertebrates are projected to lose over half of their climatically determined geographic range for global warming of 1.5°C, compared with 18% of insects, 16% of plants and 8% of vertebrates for global warming of 2°C (*medium confidence*). Impacts associated with other biodiversity-related risks such as forest fires and the spread of invasive species are lower at 1.5°C compared to 2°C of global warming (*high confidence*). {3.4.3, 3.5.2}

B.3.2 Approximately 4% (interquartile range 2–7%) of the global terrestrial land area is projected to undergo a transformation of ecosystems from one type to another at 1°C of global warming, compared with 13% (interquartile range 8–20%) at 2°C (*medium confidence*). This indicates that the area at risk is projected to be approximately 50% lower at 1.5°C compared to 2°C (*medium confidence*). {3.4.3.1, 3.4.3.5}

B.3.3 High-latitude tundra and boreal forests are particularly at risk of climate change-induced degradation and loss, with woody shrubs already encroaching into the tundra (*high confidence*) and this will proceed with further warming. Limiting global warming to 1.5°C rather than 2°C is projected to prevent the thawing over centuries of a permafrost area in the range of 1.5 to 2.5 million $km^2$ (*medium confidence*). {3.3.2, 3.4.3, 3.5.5}

**B.4 Limiting global warming to 1.5°C compared to 2°C is projected to reduce increases in ocean temperature as well as associated increases in ocean acidity and decreases in ocean oxygen levels (*high confidence*). Consequently, limiting global warming to 1.5°C is projected to reduce risks to marine biodiversity, fisheries, and ecosystems, and their functions and services to humans, as illustrated by recent changes to Arctic sea ice and warm-water coral reef ecosystems (*high confidence*). {3.3, 3.4, 3.5, Box 3.4, Box 3.5}**

B.4.1 There is *high confidence* that the probability of a sea ice-free Arctic Ocean during summer is substantially lower at global warming of 1.5°C when compared to 2°C. With 1.5°C of global warming, one sea ice-free Arctic summer is projected per century. This likelihood is increased to at least one per decade with 2°C global warming. Effects of a temperature overshoot are reversible for Arctic sea ice cover on decadal time scales (*high confidence*). {3.3.8, 3.4.4.7}

B.4.2 Global warming of 1.5°C is projected to shift the ranges of many marine species to higher latitudes as well as increase the amount of damage to many ecosystems. It is also expected to drive the loss of coastal resources and reduce the productivity of fisheries and aquaculture (especially at low latitudes). The risks of climate-induced impacts are projected to be higher at 2°C than those at global warming of 1.5°C (*high confidence*). Coral reefs, for example, are projected to decline by a further 70–90% at 1.5°C (*high confidence*) with larger losses (>99%) at 2°C (*very high confidence*). The risk of irreversible loss of many marine and coastal ecosystems increases with global warming, especially at 2°C or more (*high confidence*). {3.4.4, Box 3.4}

9 Consistent with earlier studies, illustrative numbers were adopted from one recent meta-study.

B.4.3 The level of ocean acidification due to increasing $CO_2$ concentrations associated with global warming of 1.5°C is projected to amplify the adverse effects of warming, and even further at 2°C, impacting the growth, development, calcification, survival, and thus abundance of a broad range of species, for example, from algae to fish (*high confidence*). {3.3.10, 3.4.4}

B.4.4 Impacts of climate change in the ocean are increasing risks to fisheries and aquaculture via impacts on the physiology, survivorship, habitat, reproduction, disease incidence, and risk of invasive species (*medium confidence*) but are projected to be less at 1.5°C of global warming than at 2°C. One global fishery model, for example, projected a decrease in global annual catch for marine fisheries of about 1.5 million tonnes for 1.5°C of global warming compared to a loss of more than 3 million tonnes for 2°C of global warming (*medium confidence*). {3.4.4, Box 3.4}

## B.5 Climate-related risks to health, livelihoods, food security, water supply, human security, and economic growth are projected to increase with global warming of 1.5°C and increase further with 2°C. (Figure SPM.2) {3.4, 3.5, 5.2, Box 3.2, Box 3.3, Box 3.5, Box 3.6, Cross-Chapter Box 6 in Chapter 3, Cross-Chapter Box 9 in Chapter 4, Cross-Chapter Box 12 in Chapter 5, 5.2}

B.5.1 Populations at disproportionately higher risk of adverse consequences with global warming of 1.5°C and beyond include disadvantaged and vulnerable populations, some indigenous peoples, and local communities dependent on agricultural or coastal livelihoods (*high confidence*). Regions at disproportionately higher risk include Arctic ecosystems, dryland regions, small island developing states, and Least Developed Countries (*high confidence*). Poverty and disadvantage are expected to increase in some populations as global warming increases; limiting global warming to 1.5°C, compared with 2°C, could reduce the number of people both exposed to climate-related risks and susceptible to poverty by up to several hundred million by 2050 (*medium confidence*). {3.4.10, 3.4.11, Box 3.5, Cross-Chapter Box 6 in Chapter 3, Cross-Chapter Box 9 in Chapter 4, Cross-Chapter Box 12 in Chapter 5, 4.2.2.2, 5.2.1, 5.2.2, 5.2.3, 5.6.3}

B.5.2 Any increase in global warming is projected to affect human health, with primarily negative consequences (*high confidence*). Lower risks are projected at 1.5°C than at 2°C for heat-related morbidity and mortality (*very high confidence*) and for ozone-related mortality if emissions needed for ozone formation remain high (*high confidence*). Urban heat islands often amplify the impacts of heatwaves in cities (*high confidence*). Risks from some vector-borne diseases, such as malaria and dengue fever, are projected to increase with warming from 1.5°C to 2°C, including potential shifts in their geographic range (*high confidence*). {3.4.7, 3.4.8, 3.5.5.8}

B.5.3 Limiting warming to 1.5°C compared with 2°C is projected to result in smaller net reductions in yields of maize, rice, wheat, and potentially other cereal crops, particularly in sub-Saharan Africa, Southeast Asia, and Central and South America, and in the $CO_2$-dependent nutritional quality of rice and wheat (*high confidence*). Reductions in projected food availability are larger at 2°C than at 1.5°C of global warming in the Sahel, southern Africa, the Mediterranean, central Europe, and the Amazon (*medium confidence*). Livestock are projected to be adversely affected with rising temperatures, depending on the extent of changes in feed quality, spread of diseases, and water resource availability (*high confidence*). {3.4.6, 3.5.4, 3.5.5, Box 3.1, Cross-Chapter Box 6 in Chapter 3, Cross-Chapter Box 9 in Chapter 4}

B.5.4 Depending on future socio-economic conditions, limiting global warming to 1.5°C compared to 2°C may reduce the proportion of the world population exposed to a climate change-induced increase in water stress by up to 50%, although there is considerable variability between regions (*medium confidence*). Many small island developing states could experience lower water stress as a result of projected changes in aridity when global warming is limited to 1.5°C, as compared to 2°C (*medium confidence*). {3.3.5, 3.4.2, 3.4.8, 3.5.5, Box 3.2, Box 3.5, Cross-Chapter Box 9 in Chapter 4}

B.5.5 Risks to global aggregated economic growth due to climate change impacts are projected to be lower at 1.5°C than at 2°C by the end of this century[10] (*medium confidence*). This excludes the costs of mitigation, adaptation investments and the benefits of adaptation. Countries in the tropics and Southern Hemisphere subtropics are projected to experience the largest impacts on economic growth due to climate change should global warming increase from 1.5°C to 2°C (*medium confidence*). {3.5.2, 3.5.3}

---

10 Here, impacts on economic growth refer to changes in gross domestic product (GDP). Many impacts, such as loss of human lives, cultural heritage and ecosystem services, are difficult to value and monetize.

B.5.6 Exposure to multiple and compound climate-related risks increases between 1.5°C and 2°C of global warming, with greater proportions of people both so exposed and susceptible to poverty in Africa and Asia (*high confidence*). For global warming from 1.5°C to 2°C, risks across energy, food, and water sectors could overlap spatially and temporally, creating new and exacerbating current hazards, exposures, and vulnerabilities that could affect increasing numbers of people and regions (*medium confidence*). {Box 3.5, 3.3.1, 3.4.5.3, 3.4.5.6, 3.4.11, 3.5.4.9}

B.5.7 There are multiple lines of evidence that since AR5 the assessed levels of risk increased for four of the five Reasons for Concern (RFCs) for global warming to 2°C (*high confidence*). The risk transitions by degrees of global warming are now: from high to very high risk between 1.5°C and 2°C for RFC1 (Unique and threatened systems) (*high confidence*); from moderate to high risk between 1°C and 1.5°C for RFC2 (Extreme weather events) (*medium confidence*); from moderate to high risk between 1.5°C and 2°C for RFC3 (Distribution of impacts) (*high confidence*); from moderate to high risk between 1.5°C and 2.5°C for RFC4 (Global aggregate impacts) (*medium confidence*); and from moderate to high risk between 1°C and 2.5°C for RFC5 (Large-scale singular events) (*medium confidence*). (Figure SPM.2) {3.4.13; 3.5, 3.5.2}

**B.6 Most adaptation needs will be lower for global warming of 1.5°C compared to 2°C (*high confidence*). There are a wide range of adaptation options that can reduce the risks of climate change (*high confidence*). There are limits to adaptation and adaptive capacity for some human and natural systems at global warming of 1.5°C, with associated losses (*medium confidence*). The number and availability of adaptation options vary by sector (*medium confidence*). {Table 3.5, 4.3, 4.5, Cross-Chapter Box 9 in Chapter 4, Cross-Chapter Box 12 in Chapter 5}**

B.6.1 A wide range of adaptation options are available to reduce the risks to natural and managed ecosystems (e.g., ecosystem-based adaptation, ecosystem restoration and avoided degradation and deforestation, biodiversity management, sustainable aquaculture, and local knowledge and indigenous knowledge), the risks of sea level rise (e.g., coastal defence and hardening), and the risks to health, livelihoods, food, water, and economic growth, especially in rural landscapes (e.g., efficient irrigation, social safety nets, disaster risk management, risk spreading and sharing, and community-based adaptation) and urban areas (e.g., green infrastructure, sustainable land use and planning, and sustainable water management) (*medium confidence*). {4.3.1, 4.3.2, 4.3.3, 4.3.5, 4.5.3, 4.5.4, 5.3.2, Box 4.2, Box 4.3, Box 4.6, Cross-Chapter Box 9 in Chapter 4}.

B.6.2 Adaptation is expected to be more challenging for ecosystems, food and health systems at 2°C of global warming than for 1.5°C (*medium confidence*). Some vulnerable regions, including small islands and Least Developed Countries, are projected to experience high multiple interrelated climate risks even at global warming of 1.5°C (*high confidence*). {3.3.1, 3.4.5, Box 3.5, Table 3.5, Cross-Chapter Box 9 in Chapter 4, 5.6, Cross-Chapter Box 12 in Chapter 5, Box 5.3}

B.6.3 Limits to adaptive capacity exist at 1.5°C of global warming, become more pronounced at higher levels of warming and vary by sector, with site-specific implications for vulnerable regions, ecosystems and human health (*medium confidence*). {Cross-Chapter Box 12 in Chapter 5, Box 3.5, Table 3.5}

# How the level of global warming affects impacts and/or risks associated with the Reasons for Concern (RFCs) and selected natural, managed and human systems

Five Reasons For Concern (RFCs) illustrate the impacts and risks of different levels of global warming for people, economies and ecosystems across sectors and regions.

## Impacts and risks associated with the Reasons for Concern (RFCs)




**Purple** indicates very high risks of severe impacts/risks and the presence of significant irreversibility or the persistence of climate-related hazards, combined with limited ability to adapt due to the nature of the hazard or impacts/risks.
**Red** indicates severe and widespread impacts/risks.
**Yellow** indicates that impacts/risks are detectable and attributable to climate change with at least medium confidence.
**White** indicates that no impacts are detectable and attributable to climate change.

## Impacts and risks for selected natural, managed and human systems




**Confidence level for transition:** *L*=Low, *M*=Medium, *H*=High and *VH*=Very high

**Figure SPM.2 |** Five integrative reasons for concern (RFCs) provide a framework for summarizing key impacts and risks across sectors and regions, and were introduced in the IPCC Third Assessment Report. RFCs illustrate the implications of global warming for people, economies and ecosystems. Impacts and/or risks for each RFC are based on assessment of the new literature that has appeared. As in AR5, this literature was used to make expert judgments to assess the levels of global warming at which levels of impact and/or risk are undetectable, moderate, high or very high. The selection of impacts and risks to natural, managed and human systems in the lower panel is illustrative and is not intended to be fully comprehensive. {3.4, 3.5, 3.5.2.1, 3.5.2.2, 3.5.2.3, 3.5.2.4, 3.5.2.5, 5.4.1, 5.5.3, 5.6.1, Box 3.4}

**RFC1 Unique and threatened systems:** ecological and human systems that have restricted geographic ranges constrained by climate-related conditions and have high endemism or other distinctive properties. Examples include coral reefs, the Arctic and its indigenous people, mountain glaciers and biodiversity hotspots.
**RFC2 Extreme weather events:** risks/impacts to human health, livelihoods, assets and ecosystems from extreme weather events such as heat waves, heavy rain, drought and associated wildfires, and coastal flooding.
**RFC3 Distribution of impacts:** risks/impacts that disproportionately affect particular groups due to uneven distribution of physical climate change hazards, exposure or vulnerability.
**RFC4 Global aggregate impacts:** global monetary damage, global-scale degradation and loss of ecosystems and biodiversity.
**RFC5 Large-scale singular events:** are relatively large, abrupt and sometimes irreversible changes in systems that are caused by global warming. Examples include disintegration of the Greenland and Antarctic ice sheets.

# C. Emission Pathways and System Transitions Consistent with 1.5°C Global Warming

**C.1 In model pathways with no or limited overshoot of 1.5°C, global net anthropogenic $CO_2$ emissions decline by about 45% from 2010 levels by 2030 (40–60% interquartile range), reaching net zero around 2050 (2045–2055 interquartile range). For limiting global warming to below 2°C[11] $CO_2$ emissions are projected to decline by about 25% by 2030 in most pathways (10–30% interquartile range) and reach net zero around 2070 (2065–2080 interquartile range). Non-$CO_2$ emissions in pathways that limit global warming to 1.5°C show deep reductions that are similar to those in pathways limiting warming to 2°C. (*high confidence*) (Figure SPM.3a) {2.1, 2.3, Table 2.4}**

C.1.1 $CO_2$ emissions reductions that limit global warming to 1.5°C with no or limited overshoot can involve different portfolios of mitigation measures, striking different balances between lowering energy and resource intensity, rate of decarbonization, and the reliance on carbon dioxide removal. Different portfolios face different implementation challenges and potential synergies and trade-offs with sustainable development. (*high confidence*) (Figure SPM.3b) {2.3.2, 2.3.4, 2.4, 2.5.3}

C.1.2 Modelled pathways that limit global warming to 1.5°C with no or limited overshoot involve deep reductions in emissions of methane and black carbon (35% or more of both by 2050 relative to 2010). These pathways also reduce most of the cooling aerosols, which partially offsets mitigation effects for two to three decades. Non-$CO_2$ emissions[12] can be reduced as a result of broad mitigation measures in the energy sector. In addition, targeted non-$CO_2$ mitigation measures can reduce nitrous oxide and methane from agriculture, methane from the waste sector, some sources of black carbon, and hydrofluorocarbons. High bioenergy demand can increase emissions of nitrous oxide in some 1.5°C pathways, highlighting the importance of appropriate management approaches. Improved air quality resulting from projected reductions in many non-$CO_2$ emissions provide direct and immediate population health benefits in all 1.5°C model pathways. (*high confidence*) (Figure SPM.3a) {2.2.1, 2.3.3, 2.4.4, 2.5.3, 4.3.6, 5.4.2}

C.1.3 Limiting global warming requires limiting the total cumulative global anthropogenic emissions of $CO_2$ since the pre-industrial period, that is, staying within a total carbon budget (*high confidence*).[13] By the end of 2017, anthropogenic $CO_2$ emissions since the pre-industrial period are estimated to have reduced the total carbon budget for 1.5°C by approximately 2200 ± 320 $GtCO_2$ (*medium confidence*). The associated remaining budget is being depleted by current emissions of 42 ± 3 $GtCO_2$ per year (*high confidence*). The choice of the measure of global temperature affects the estimated remaining carbon budget. Using global mean surface air temperature, as in AR5, gives an estimate of the remaining carbon budget of 580 $GtCO_2$ for a 50% probability of limiting warming to 1.5°C, and 420 $GtCO_2$ for a 66% probability (*medium confidence*).[14] Alternatively, using GMST gives estimates of 770 and 570 $GtCO_2$, for 50% and 66% probabilities,[15] respectively (*medium confidence*). Uncertainties in the size of these estimated remaining carbon budgets are substantial and depend on several factors. Uncertainties in the climate response to $CO_2$ and non-$CO_2$ emissions contribute ±400 $GtCO_2$ and the level of historic warming contributes ±250 $GtCO_2$ (*medium confidence*). Potential additional carbon release from future permafrost thawing and methane release from wetlands would reduce budgets by up to 100 $GtCO_2$ over the course of this century and more thereafter (*medium confidence*). In addition, the level of non-$CO_2$ mitigation in the future could alter the remaining carbon budget by 250 $GtCO_2$ in either direction (*medium confidence*). {1.2.4, 2.2.2, 2.6.1, Table 2.2, Chapter 2 Supplementary Material}

C.1.4 Solar radiation modification (SRM) measures are not included in any of the available assessed pathways. Although some SRM measures may be theoretically effective in reducing an overshoot, they face large uncertainties and knowledge gaps

11 References to pathways limiting global warming to 2°C are based on a 66% probability of staying below 2°C.

12 Non-$CO_2$ emissions included in this Report are all anthropogenic emissions other than $CO_2$ that result in radiative forcing. These include short-lived climate forcers, such as methane, some fluorinated gases, ozone precursors, aerosols or aerosol precursors, such as black carbon and sulphur dioxide, respectively, as well as long-lived greenhouse gases, such as nitrous oxide or some fluorinated gases. The radiative forcing associated with non-$CO_2$ emissions and changes in surface albedo is referred to as non-$CO_2$ radiative forcing. {2.2.1}

13 There is a clear scientific basis for a total carbon budget consistent with limiting global warming to 1.5°C. However, neither this total carbon budget nor the fraction of this budget taken up by past emissions were assessed in this Report.

14 Irrespective of the measure of global temperature used, updated understanding and further advances in methods have led to an increase in the estimated remaining carbon budget of about 300 $GtCO_2$ compared to AR5. (*medium confidence*) {2.2.2}

15 These estimates use observed GMST to 2006–2015 and estimate future temperature changes using near surface air temperatures.

as well as substantial risks and institutional and social constraints to deployment related to governance, ethics, and impacts on sustainable development. They also do not mitigate ocean acidification. (*medium confidence*) {4.3.8, Cross-Chapter Box 10 in Chapter 4}

## Global emissions pathway characteristics

General characteristics of the evolution of anthropogenic net emissions of $CO_2$, and total emissions of methane, black carbon, and nitrous oxide in model pathways that limit global warming to 1.5°C with no or limited overshoot. Net emissions are defined as anthropogenic emissions reduced by anthropogenic removals. Reductions in net emissions can be achieved through different portfolios of mitigation measures illustrated in Figure SPM.3b.




**Figure SPM.3a |** Global emissions pathway characteristics. The main panel shows global net anthropogenic $CO_2$ emissions in pathways limiting global warming to 1.5°C with no or limited (less than 0.1°C) overshoot and pathways with higher overshoot. The shaded area shows the full range for pathways analysed in this Report. The panels on the right show non-$CO_2$ emissions ranges for three compounds with large historical forcing and a substantial portion of emissions coming from sources distinct from those central to $CO_2$ mitigation. Shaded areas in these panels show the 5–95% (light shading) and interquartile (dark shading) ranges of pathways limiting global warming to 1.5°C with no or limited overshoot. Box and whiskers at the bottom of the figure show the timing of pathways reaching global net zero $CO_2$ emission levels, and a comparison with pathways limiting global warming to 2°C with at least 66% probability. Four illustrative model pathways are highlighted in the main panel and are labelled P1, P2, P3 and P4, corresponding to the LED, S1, S2, and S5 pathways assessed in Chapter 2. Descriptions and characteristics of these pathways are available in Figure SPM.3b. {2.1, 2.2, 2.3, Figure 2.5, Figure 2.10, Figure 2.11}

## Characteristics of four illustrative model pathways

Different mitigation strategies can achieve the net emissions reductions that would be required to follow a pathway that limits global warming to 1.5°C with no or limited overshoot. All pathways use Carbon Dioxide Removal (CDR), but the amount varies across pathways, as do the relative contributions of Bioenergy with Carbon Capture and Storage (BECCS) and removals in the Agriculture, Forestry and Other Land Use (AFOLU) sector. This has implications for emissions and several other pathway characteristics.

### Breakdown of contributions to global net $CO_2$ emissions in four illustrative model pathways




**P1:** A scenario in which social, business and technological innovations result in lower energy demand up to 2050 while living standards rise, especially in the global South. A downsized energy system enables rapid decarbonization of energy supply. Afforestation is the only CDR option considered; neither fossil fuels with CCS nor BECCS are used.

**P2:** A scenario with a broad focus on sustainability including energy intensity, human development, economic convergence and international cooperation, as well as shifts towards sustainable and healthy consumption patterns, low-carbon technology innovation, and well-managed land systems with limited societal acceptability for BECCS.

**P3:** A middle-of-the-road scenario in which societal as well as technological development follows historical patterns. Emissions reductions are mainly achieved by changing the way in which energy and products are produced, and to a lesser degree by reductions in demand.

**P4:** A resource- and energy-intensive scenario in which economic growth and globalization lead to widespread adoption of greenhouse-gas-intensive lifestyles, including high demand for transportation fuels and livestock products. Emissions reductions are mainly achieved through technological means, making strong use of CDR through the deployment of BECCS.

| **Global indicators** | P1 | P2 | P3 | P4 | **Interquartile range** |
|---|---|---|---|---|---|
| *Pathway classification* | No or limited overshoot | No or limited overshoot | No or limited overshoot | Higher overshoot | No or limited overshoot |
| *$CO_2$ emission change in 2030 (% rel to 2010)* | -58 | -47 | -41 | 4 | (-58,-40) |
| *└ in 2050 (% rel to 2010)* | -93 | -95 | -91 | -97 | (-107,-94) |
| *Kyoto-GHG emissions* in 2030 (% rel to 2010)* | -50 | -49 | -35 | -2 | (-51,-39) |
| *└ in 2050 (% rel to 2010)* | -82 | -89 | -78 | -80 | (-93,-81) |
| *Final energy demand** in 2030 (% rel to 2010)* | -15 | -5 | 17 | 39 | (-12,7) |
| *└ in 2050 (% rel to 2010)* | -32 | 2 | 21 | 44 | (-11,22) |
| *Renewable share in electricity in 2030 (%)* | 60 | 58 | 48 | 25 | (47,65) |
| *└ in 2050 (%)* | 77 | 81 | 63 | 70 | (69,86) |
| *Primary energy from coal in 2030 (% rel to 2010)* | -78 | -61 | -75 | -59 | (-78, -59) |
| *└ in 2050 (% rel to 2010)* | -97 | -77 | -73 | -97 | (-95, -74) |
| *from oil in 2030 (% rel to 2010)* | -37 | -13 | -3 | 86 | (-34,3) |
| *└ in 2050 (% rel to 2010)* | -87 | -50 | -81 | -32 | (-78,-31) |
| *from gas in 2030 (% rel to 2010)* | -25 | -20 | 33 | 37 | (-26,21) |
| *└ in 2050 (% rel to 2010)* | -74 | -53 | 21 | -48 | (-56,6) |
| *from nuclear in 2030 (% rel to 2010)* | 59 | 83 | 98 | 106 | (44,102) |
| *└ in 2050 (% rel to 2010)* | 150 | 98 | 501 | 468 | (91,190) |
| *from biomass in 2030 (% rel to 2010)* | -11 | 0 | 36 | -1 | (29,80) |
| *└ in 2050 (% rel to 2010)* | -16 | 49 | 121 | 418 | (123,261) |
| *from non-biomass renewables in 2030 (% rel to 2010)* | 430 | 470 | 315 | 110 | (245,436) |
| *└ in 2050 (% rel to 2010)* | 833 | 1327 | 878 | 1137 | (576,1299) |
| *Cumulative CCS until 2100 ($GtCO_2$)* | 0 | 348 | 687 | 1218 | (550,1017) |
| *└ of which BECCS ($GtCO_2$)* | 0 | 151 | 414 | 1191 | (364,662) |
| *Land area of bioenergy crops in 2050 (million km²)* | 0.2 | 0.9 | 2.8 | 7.2 | (1.5,3.2) |
| *Agricultural $CH_4$ emissions in 2030 (% rel to 2010)* | -24 | -48 | 1 | 14 | (-30,-11) |
| *in 2050 (% rel to 2010)* | -33 | -69 | -23 | 2 | (-47,-24) |
| *Agricultural $N_2O$ emissions in 2030 (% rel to 2010)* | 5 | -26 | 15 | 3 | (-21,3) |
| *in 2050 (% rel to 2010)* | 6 | -26 | 0 | 39 | (-26,1) |

*NOTE: Indicators have been selected to show global trends identified by the Chapter 2 assessment. National and sectoral characteristics can differ substantially from the global trends shown above.*

** Kyoto-gas emissions are based on IPCC Second Assessment Report GWP-100*
*** Changes in energy demand are associated with improvements in energy efficiency and behaviour change*

**Figure SPM.3b |** Characteristics of four illustrative model pathways in relation to global warming of 1.5°C introduced in Figure SPM.3a. These pathways were selected to show a range of potential mitigation approaches and vary widely in their projected energy and land use, as well as their assumptions about future socio-economic developments, including economic and population growth, equity and sustainability. A breakdown of the global net anthropogenic $CO_2$ emissions into the contributions in terms of $CO_2$ emissions from fossil fuel and industry; agriculture, forestry and other land use (AFOLU); and bioenergy with carbon capture and storage (BECCS) is shown. AFOLU estimates reported here are not necessarily comparable with countries' estimates. Further characteristics for each of these pathways are listed below each pathway. These pathways illustrate relative global differences in mitigation strategies, but do not represent central estimates, national strategies, and do not indicate requirements. For comparison, the right-most column shows the interquartile ranges across pathways with no or limited overshoot of 1.5°C. Pathways P1, P2, P3 and P4 correspond to the LED, S1, S2 and S5 pathways assessed in Chapter 2 (Figure SPM.3a). {2.2.1, 2.3.1, 2.3.2, 2.3.3, 2.3.4, 2.4.1, 2.4.2, 2.4.4, 2.5.3, Figure 2.5, Figure 2.6, Figure 2.9, Figure 2.10, Figure 2.11, Figure 2.14, Figure 2.15, Figure 2.16, Figure 2.17, Figure 2.24, Figure 2.25, Table 2.4, Table 2.6, Table 2.7, Table 2.9, Table 4.1}

**C.2 Pathways limiting global warming to 1.5°C with no or limited overshoot would require rapid and far-reaching transitions in energy, land, urban and infrastructure (including transport and buildings), and industrial systems (*high confidence*). These systems transitions are unprecedented in terms of scale, but not necessarily in terms of speed, and imply deep emissions reductions in all sectors, a wide portfolio of mitigation options and a significant upscaling of investments in those options (*medium confidence*). {2.3, 2.4, 2.5, 4.2, 4.3, 4.4, 4.5}**

C.2.1 Pathways that limit global warming to 1.5°C with no or limited overshoot show system changes that are more rapid and pronounced over the next two decades than in 2°C pathways (*high confidence*). The rates of system changes associated with limiting global warming to 1.5°C with no or limited overshoot have occurred in the past within specific sectors, technologies and spatial contexts, but there is no documented historic precedent for their scale (*medium confidence*). {2.3.3, 2.3.4, 2.4, 2.5, 4.2.1, 4.2.2, Cross-Chapter Box 11 in Chapter 4}

C.2.2 In energy systems, modelled global pathways (considered in the literature) limiting global warming to 1.5°C with no or limited overshoot (for more details see Figure SPM.3b) generally meet energy service demand with lower energy use, including through enhanced energy efficiency, and show faster electrification of energy end use compared to 2°C (*high confidence*). In 1.5°C pathways with no or limited overshoot, low-emission energy sources are projected to have a higher share, compared with 2°C pathways, particularly before 2050 (*high confidence*). In 1.5°C pathways with no or limited overshoot, renewables are projected to supply 70–85% (interquartile range) of electricity in 2050 (*high confidence*). In electricity generation, shares of nuclear and fossil fuels with carbon dioxide capture and storage (CCS) are modelled to increase in most 1.5°C pathways with no or limited overshoot. In modelled 1.5°C pathways with limited or no overshoot, the use of CCS would allow the electricity generation share of gas to be approximately 8% (3–11% interquartile range) of global electricity in 2050, while the use of coal shows a steep reduction in all pathways and would be reduced to close to 0% (0–2% interquartile range) of electricity (*high confidence*). While acknowledging the challenges, and differences between the options and national circumstances, political, economic, social and technical feasibility of solar energy, wind energy and electricity storage technologies have substantially improved over the past few years (*high confidence*). These improvements signal a potential system transition in electricity generation. (Figure SPM.3b) {2.4.1, 2.4.2, Figure 2.1, Table 2.6, Table 2.7, Cross-Chapter Box 6 in Chapter 3, 4.2.1, 4.3.1, 4.3.3, 4.5.2}

C.2.3 $CO_2$ emissions from industry in pathways limiting global warming to 1.5°C with no or limited overshoot are projected to be about 65–90% (interquartile range) lower in 2050 relative to 2010, as compared to 50–80% for global warming of 2°C (*medium confidence*). Such reductions can be achieved through combinations of new and existing technologies and practices, including electrification, hydrogen, sustainable bio-based feedstocks, product substitution, and carbon capture, utilization and storage (CCUS). These options are technically proven at various scales but their large-scale deployment may be limited by economic, financial, human capacity and institutional constraints in specific contexts, and specific characteristics of large-scale industrial installations. In industry, emissions reductions by energy and process efficiency by themselves are insufficient for limiting warming to 1.5°C with no or limited overshoot (*high confidence*). {2.4.3, 4.2.1, Table 4.1, Table 4.3, 4.3.3, 4.3.4, 4.5.2}

C.2.4 The urban and infrastructure system transition consistent with limiting global warming to 1.5°C with no or limited overshoot would imply, for example, changes in land and urban planning practices, as well as deeper emissions reductions in transport and buildings compared to pathways that limit global warming below 2°C (*medium confidence*). Technical measures

and practices enabling deep emissions reductions include various energy efficiency options. In pathways limiting global warming to 1.5°C with no or limited overshoot, the electricity share of energy demand in buildings would be about 55–75% in 2050 compared to 50–70% in 2050 for 2°C global warming (*medium confidence*). In the transport sector, the share of low-emission final energy would rise from less than 5% in 2020 to about 35–65% in 2050 compared to 25–45% for 2°C of global warming (*medium confidence*). Economic, institutional and socio-cultural barriers may inhibit these urban and infrastructure system transitions, depending on national, regional and local circumstances, capabilities and the availability of capital (*high confidence*). {2.3.4, 2.4.3, 4.2.1, Table 4.1, 4.3.3, 4.5.2}

C.2.5 Transitions in global and regional land use are found in all pathways limiting global warming to 1.5°C with no or limited overshoot, but their scale depends on the pursued mitigation portfolio. Model pathways that limit global warming to 1.5°C with no or limited overshoot project a 4 million $km^2$ reduction to a 2.5 million $km^2$ increase of non-pasture agricultural land for food and feed crops and a 0.5–11 million $km^2$ reduction of pasture land, to be converted into a 0–6 million $km^2$ increase of agricultural land for energy crops and a 2 million $km^2$ reduction to 9.5 million $km^2$ increase in forests by 2050 relative to 2010 (*medium confidence*).[16] Land-use transitions of similar magnitude can be observed in modelled 2°C pathways (*medium confidence*). Such large transitions pose profound challenges for sustainable management of the various demands on land for human settlements, food, livestock feed, fibre, bioenergy, carbon storage, biodiversity and other ecosystem services (*high confidence*). Mitigation options limiting the demand for land include sustainable intensification of land-use practices, ecosystem restoration and changes towards less resource-intensive diets (*high confidence*). The implementation of land-based mitigation options would require overcoming socio-economic, institutional, technological, financing and environmental barriers that differ across regions (*high confidence*). {2.4.4, Figure 2.24, 4.3.2, 4.3.7, 4.5.2, Cross-Chapter Box 7 in Chapter 3}

C.2.6 Additional annual average energy-related investments for the period 2016 to 2050 in pathways limiting warming to 1.5°C compared to pathways without new climate policies beyond those in place today are estimated to be around 830 billion USD2010 (range of 150 billion to 1700 billion USD2010 across six models[17]). This compares to total annual average energy supply investments in 1.5°C pathways of 1460 to 3510 billion USD2010 and total annual average energy demand investments of 640 to 910 billion USD2010 for the period 2016 to 2050. Total energy-related investments increase by about 12% (range of 3% to 24%) in 1.5°C pathways relative to 2°C pathways. Annual investments in low-carbon energy technologies and energy efficiency are upscaled by roughly a factor of six (range of factor of 4 to 10) by 2050 compared to 2015 (*medium confidence*). {2.5.2, Box 4.8, Figure 2.27}

C.2.7 Modelled pathways limiting global warming to 1.5°C with no or limited overshoot project a wide range of global average discounted marginal abatement costs over the 21st century. They are roughly 3-4 times higher than in pathways limiting global warming to below 2°C (*high confidence*). The economic literature distinguishes marginal abatement costs from total mitigation costs in the economy. The literature on total mitigation costs of 1.5°C mitigation pathways is limited and was not assessed in this Report. Knowledge gaps remain in the integrated assessment of the economy-wide costs and benefits of mitigation in line with pathways limiting warming to 1.5°C. {2.5.2; 2.6; Figure 2.26}

16 The projected land-use changes presented are not deployed to their upper limits simultaneously in a single pathway.

17 Including two pathways limiting warming to 1.5°C with no or limited overshoot and four pathways with higher overshoot.

**C.3 All pathways that limit global warming to 1.5°C with limited or no overshoot project the use of carbon dioxide removal (CDR) on the order of 100–1000 $GtCO_2$ over the 21st century. CDR would be used to compensate for residual emissions and, in most cases, achieve net negative emissions to return global warming to 1.5°C following a peak (*high confidence*). CDR deployment of several hundreds of $GtCO_2$ is subject to multiple feasibility and sustainability constraints (*high confidence*). Significant near-term emissions reductions and measures to lower energy and land demand can limit CDR deployment to a few hundred $GtCO_2$ without reliance on bioenergy with carbon capture and storage (BECCS) (*high confidence*). {2.3, 2.4, 3.6.2, 4.3, 5.4}**

C.3.1 Existing and potential CDR measures include afforestation and reforestation, land restoration and soil carbon sequestration, BECCS, direct air carbon capture and storage (DACCS), enhanced weathering and ocean alkalinization. These differ widely in terms of maturity, potentials, costs, risks, co-benefits and trade-offs (*high confidence*). To date, only a few published pathways include CDR measures other than afforestation and BECCS. {2.3.4, 3.6.2, 4.3.2, 4.3.7}

C.3.2 In pathways limiting global warming to 1.5°C with limited or no overshoot, BECCS deployment is projected to range from 0–1, 0–8, and 0–16 $GtCO_2\ yr^{-1}$ in 2030, 2050, and 2100, respectively, while agriculture, forestry and land-use (AFOLU) related CDR measures are projected to remove 0–5, 1–11, and 1–5 $GtCO_2\ yr^{-1}$ in these years (*medium confidence*). The upper end of these deployment ranges by mid-century exceeds the BECCS potential of up to 5 $GtCO_2\ yr^{-1}$ and afforestation potential of up to 3.6 $GtCO_2\ yr^{-1}$ assessed based on recent literature (*medium confidence*). Some pathways avoid BECCS deployment completely through demand-side measures and greater reliance on AFOLU-related CDR measures (*medium confidence*). The use of bioenergy can be as high or even higher when BECCS is excluded compared to when it is included due to its potential for replacing fossil fuels across sectors (*high confidence*). (Figure SPM.3b) {2.3.3, 2.3.4, 2.4.2, 3.6.2, 4.3.1, 4.2.3, 4.3.2, 4.3.7, 4.4.3, Table 2.4}

C.3.3 Pathways that overshoot 1.5°C of global warming rely on CDR exceeding residual $CO_2$ emissions later in the century to return to below 1.5°C by 2100, with larger overshoots requiring greater amounts of CDR (Figure SPM.3b) (*high confidence*). Limitations on the speed, scale, and societal acceptability of CDR deployment hence determine the ability to return global warming to below 1.5°C following an overshoot. Carbon cycle and climate system understanding is still limited about the effectiveness of net negative emissions to reduce temperatures after they peak (*high confidence*). {2.2, 2.3.4, 2.3.5, 2.6, 4.3.7, 4.5.2, Table 4.11}

C.3.4 Most current and potential CDR measures could have significant impacts on land, energy, water or nutrients if deployed at large scale (*high confidence*). Afforestation and bioenergy may compete with other land uses and may have significant impacts on agricultural and food systems, biodiversity, and other ecosystem functions and services (*high confidence*). Effective governance is needed to limit such trade-offs and ensure permanence of carbon removal in terrestrial, geological and ocean reservoirs (*high confidence*). Feasibility and sustainability of CDR use could be enhanced by a portfolio of options deployed at substantial, but lesser scales, rather than a single option at very large scale (*high confidence*). (Figure SPM.3b) {2.3.4, 2.4.4, 2.5.3, 2.6, 3.6.2, 4.3.2, 4.3.7, 4.5.2, 5.4.1, 5.4.2; Cross-Chapter Boxes 7 and 8 in Chapter 3, Table 4.11, Table 5.3, Figure 5.3}

C.3.5 Some AFOLU-related CDR measures such as restoration of natural ecosystems and soil carbon sequestration could provide co-benefits such as improved biodiversity, soil quality, and local food security. If deployed at large scale, they would require governance systems enabling sustainable land management to conserve and protect land carbon stocks and other ecosystem functions and services (*medium confidence*). (Figure SPM.4) {2.3.3, 2.3.4, 2.4.2, 2.4.4, 3.6.2, 5.4.1, Cross-Chapter Boxes 3 in Chapter 1 and 7 in Chapter 3, 4.3.2, 4.3.7, 4.4.1, 4.5.2, Table 2.4}

# D. Strengthening the Global Response in the Context of Sustainable Development and Efforts to Eradicate Poverty

**D.1 Estimates of the global emissions outcome of current nationally stated mitigation ambitions as submitted under the Paris Agreement would lead to global greenhouse gas emissions[18] in 2030 of 52–58 $GtCO_2eq\ yr^{-1}$ (*medium confidence*). Pathways reflecting these ambitions would not limit global warming to 1.5°C, even if supplemented by very challenging increases in the scale and ambition of emissions reductions after 2030 (*high confidence*). Avoiding overshoot and reliance on future large-scale deployment of carbon dioxide removal (CDR) can only be achieved if global $CO_2$ emissions start to decline well before 2030 (*high confidence*). {1.2, 2.3, 3.3, 3.4, 4.2, 4.4, Cross-Chapter Box 11 in Chapter 4}**

D.1.1 Pathways that limit global warming to 1.5°C with no or limited overshoot show clear emission reductions by 2030 (*high confidence*). All but one show a decline in global greenhouse gas emissions to below 35 $GtCO_2eq\ yr^{-1}$ in 2030, and half of available pathways fall within the 25–30 $GtCO_2eq\ yr^{-1}$ range (interquartile range), a 40–50% reduction from 2010 levels (*high confidence*). Pathways reflecting current nationally stated mitigation ambition until 2030 are broadly consistent with cost-effective pathways that result in a global warming of about 3°C by 2100, with warming continuing afterwards (*medium confidence*). {2.3.3, 2.3.5, Cross-Chapter Box 11 in Chapter 4, 5.5.3.2}

D.1.2 Overshoot trajectories result in higher impacts and associated challenges compared to pathways that limit global warming to 1.5°C with no or limited overshoot (*high confidence*). Reversing warming after an overshoot of 0.2°C or larger during this century would require upscaling and deployment of CDR at rates and volumes that might not be achievable given considerable implementation challenges (*medium confidence*). {1.3.3, 2.3.4, 2.3.5, 2.5.1, 3.3, 4.3.7, Cross-Chapter Box 8 in Chapter 3, Cross-Chapter Box 11 in Chapter 4}

D.1.3 The lower the emissions in 2030, the lower the challenge in limiting global warming to 1.5°C after 2030 with no or limited overshoot (*high confidence*). The challenges from delayed actions to reduce greenhouse gas emissions include the risk of cost escalation, lock-in in carbon-emitting infrastructure, stranded assets, and reduced flexibility in future response options in the medium to long term (*high confidence*). These may increase uneven distributional impacts between countries at different stages of development (*medium confidence*). {2.3.5, 4.4.5, 5.4.2}

**D.2 The avoided climate change impacts on sustainable development, eradication of poverty and reducing inequalities would be greater if global warming were limited to 1.5°C rather than 2°C, if mitigation and adaptation synergies are maximized while trade-offs are minimized (*high confidence*). {1.1, 1.4, 2.5, 3.3, 3.4, 5.2, Table 5.1}**

D.2.1 Climate change impacts and responses are closely linked to sustainable development which balances social well-being, economic prosperity and environmental protection. The United Nations Sustainable Development Goals (SDGs), adopted in 2015, provide an established framework for assessing the links between global warming of 1.5°C or 2°C and development goals that include poverty eradication, reducing inequalities, and climate action. (*high confidence*) {Cross-Chapter Box 4 in Chapter 1, 1.4, 5.1}

D.2.2 The consideration of ethics and equity can help address the uneven distribution of adverse impacts associated with 1.5°C and higher levels of global warming, as well as those from mitigation and adaptation, particularly for poor and disadvantaged populations, in all societies (*high confidence*). {1.1.1, 1.1.2, 1.4.3, 2.5.3, 3.4.10, 5.1, 5.2, 5.3. 5.4, Cross-Chapter Box 4 in Chapter 1, Cross-Chapter Boxes 6 and 8 in Chapter 3, and Cross-Chapter Box 12 in Chapter 5}

D.2.3 Mitigation and adaptation consistent with limiting global warming to 1.5°C are underpinned by enabling conditions, assessed in this Report across the geophysical, environmental-ecological, technological, economic, socio-cultural and institutional

18 GHG emissions have been aggregated with 100-year GWP values as introduced in the IPCC Second Assessment Report.

dimensions of feasibility. Strengthened multilevel governance, institutional capacity, policy instruments, technological innovation and transfer and mobilization of finance, and changes in human behaviour and lifestyles are enabling conditions that enhance the feasibility of mitigation and adaptation options for 1.5°C-consistent systems transitions. (*high confidence*) {1.4, Cross-Chapter Box 3 in Chapter 1, 2.5.1, 4.4, 4.5, 5.6}

**D.3 Adaptation options specific to national contexts, if carefully selected together with enabling conditions, will have benefits for sustainable development and poverty reduction with global warming of 1.5°C, although trade-offs are possible (*high confidence*). {1.4, 4.3, 4.5}**

D.3.1 Adaptation options that reduce the vulnerability of human and natural systems have many synergies with sustainable development, if well managed, such as ensuring food and water security, reducing disaster risks, improving health conditions, maintaining ecosystem services and reducing poverty and inequality (*high confidence*). Increasing investment in physical and social infrastructure is a key enabling condition to enhance the resilience and the adaptive capacities of societies. These benefits can occur in most regions with adaptation to 1.5°C of global warming (*high confidence*). {1.4.3, 4.2.2, 4.3.1, 4.3.2, 4.3.3, 4.3.5, 4.4.1, 4.4.3, 4.5.3, 5.3.1, 5.3.2}

D.3.2 Adaptation to 1.5°C global warming can also result in trade-offs or maladaptations with adverse impacts for sustainable development. For example, if poorly designed or implemented, adaptation projects in a range of sectors can increase greenhouse gas emissions and water use, increase gender and social inequality, undermine health conditions, and encroach on natural ecosystems (*high confidence*). These trade-offs can be reduced by adaptations that include attention to poverty and sustainable development (*high confidence*). {4.3.2, 4.3.3, 4.5.4, 5.3.2; Cross-Chapter Boxes 6 and 7 in Chapter 3}

D.3.3 A mix of adaptation and mitigation options to limit global warming to 1.5°C, implemented in a participatory and integrated manner, can enable rapid, systemic transitions in urban and rural areas (*high confidence*). These are most effective when aligned with economic and sustainable development, and when local and regional governments and decision makers are supported by national governments (*medium confidence*). {4.3.2, 4.3.3, 4.4.1, 4.4.2}

D.3.4 Adaptation options that also mitigate emissions can provide synergies and cost savings in most sectors and system transitions, such as when land management reduces emissions and disaster risk, or when low-carbon buildings are also designed for efficient cooling. Trade-offs between mitigation and adaptation, when limiting global warming to 1.5°C, such as when bioenergy crops, reforestation or afforestation encroach on land needed for agricultural adaptation, can undermine food security, livelihoods, ecosystem functions and services and other aspects of sustainable development. (*high confidence*) {3.4.3, 4.3.2, 4.3.4, 4.4.1, 4.5.2, 4.5.3, 4.5.4}

**D.4 Mitigation options consistent with 1.5°C pathways are associated with multiple synergies and trade-offs across the Sustainable Development Goals (SDGs). While the total number of possible synergies exceeds the number of trade-offs, their net effect will depend on the pace and magnitude of changes, the composition of the mitigation portfolio and the management of the transition. (*high confidence*) (Figure SPM.4) {2.5, 4.5, 5.4}**

D.4.1 1.5°C pathways have robust synergies particularly for the SDGs 3 (health), 7 (clean energy), 11 (cities and communities), 12 (responsible consumption and production) and 14 (oceans) (*very high confidence*). Some 1.5°C pathways show potential trade-offs with mitigation for SDGs 1 (poverty), 2 (hunger), 6 (water) and 7 (energy access), if not managed carefully (*high confidence*). (Figure SPM.4) {5.4.2; Figure 5.4, Cross-Chapter Boxes 7 and 8 in Chapter 3}

D.4.2 1.5°C pathways that include low energy demand (e.g., see P1 in Figure SPM.3a and SPM.3b), low material consumption, and low GHG-intensive food consumption have the most pronounced synergies and the lowest number of trade-offs with respect to sustainable development and the SDGs (*high confidence*). Such pathways would reduce dependence on CDR. In modelled pathways, sustainable development, eradicating poverty and reducing inequality can support limiting warming to 1.5°C (*high confidence*). (Figure SPM.3b, Figure SPM.4) {2.4.3, 2.5.1, 2.5.3, Figure 2.4, Figure 2.28, 5.4.1, 5.4.2, Figure 5.4}

## Indicative linkages between mitigation options and sustainable development using SDGs (The linkages do not show costs and benefits)

Mitigation options deployed in each sector can be associated with potential positive effects (synergies) or negative effects (trade-offs) with the Sustainable Development Goals (SDGs). The degree to which this potential is realized will depend on the selected portfolio of mitigation options, mitigation policy design, and local circumstances and context. Particularly in the energy-demand sector, the potential for synergies is larger than for trade-offs. The bars group individually assessed options by level of confidence and take into account the relative strength of the assessed mitigation-SDG connections.



**Figure SPM.4 |** Potential synergies and trade-offs between the sectoral portfolio of climate change mitigation options and the Sustainable Development Goals (SDGs). The SDGs serve as an analytical framework for the assessment of the different sustainable development dimensions, which extend beyond the time frame of the 2030 SDG targets. The assessment is based on literature on mitigation options that are considered relevant for 1.5°C. The assessed strength of the SDG interactions is based on the qualitative and quantitative assessment of individual mitigation options listed in Table 5.2. For each mitigation option, the strength of the SDG-connection as well as the associated confidence of the underlying literature (shades of green and red) was assessed. The strength of positive connections (synergies) and negative connections (trade-offs) across all individual options within a sector (see Table 5.2) are aggregated into sectoral potentials for the whole mitigation portfolio. The (white) areas outside the bars, which indicate no interactions, have *low confidence* due to the uncertainty and limited number of studies exploring indirect effects. The strength of the connection considers only the effect of mitigation and does not include benefits of avoided impacts. SDG 13 (climate action) is not listed because mitigation is being considered in terms of interactions with SDGs and not vice versa. The bars denote the strength of the connection, and do not consider the strength of the impact on the SDGs. The energy demand sector comprises behavioural responses, fuel switching and efficiency options in the transport, industry and building sector as well as carbon capture options in the industry sector. Options assessed in the energy supply sector comprise biomass and non-biomass renewables, nuclear, carbon capture and storage (CCS) with bioenergy, and CCS with fossil fuels. Options in the land sector comprise agricultural and forest options, sustainable diets and reduced food waste, soil sequestration, livestock and manure management, reduced deforestation, afforestation and reforestation, and responsible sourcing. In addition to this figure, options in the ocean sector are discussed in the underlying report. {5.4, Table 5.2, Figure 5.2}

Information about the net impacts of mitigation on sustainable development in 1.5°C pathways is available only for a limited number of SDGs and mitigation options. Only a limited number of studies have assessed the benefits of avoided climate change impacts of 1.5°C pathways for the SDGs, and the co-effects of adaptation for mitigation and the SDGs. The assessment of the indicative mitigation potentials in Figure SPM.4 is a step further from AR5 towards a more comprehensive and integrated assessment in the future.

D.4.3 1.5°C and 2°C modelled pathways often rely on the deployment of large-scale land-related measures like afforestation and bioenergy supply, which, if poorly managed, can compete with food production and hence raise food security concerns (*high confidence*). The impacts of carbon dioxide removal (CDR) options on SDGs depend on the type of options and the scale of deployment (*high confidence*). If poorly implemented, CDR options such as BECCS and AFOLU options would lead to trade-offs. Context-relevant design and implementation requires considering people's needs, biodiversity, and other sustainable development dimensions (*very high confidence*). (Figure SPM.4) {5.4.1.3, Cross-Chapter Box 7 in Chapter 3}

D.4.4 Mitigation consistent with 1.5°C pathways creates risks for sustainable development in regions with high dependency on fossil fuels for revenue and employment generation (*high confidence*). Policies that promote diversification of the economy and the energy sector can address the associated challenges (*high confidence*). {5.4.1.2, Box 5.2}

D.4.5 Redistributive policies across sectors and populations that shield the poor and vulnerable can resolve trade-offs for a range of SDGs, particularly hunger, poverty and energy access. Investment needs for such complementary policies are only a small fraction of the overall mitigation investments in 1.5°C pathways. (*high confidence*) {2.4.3, 5.4.2, Figure 5.5}

**D.5 Limiting the risks from global warming of 1.5°C in the context of sustainable development and poverty eradication implies system transitions that can be enabled by an increase of adaptation and mitigation investments, policy instruments, the acceleration of technological innovation and behaviour changes (*high confidence*). {2.3, 2.4, 2.5, 3.2, 4.2, 4.4, 4.5, 5.2, 5.5, 5.6}**

D.5.1 Directing finance towards investment in infrastructure for mitigation and adaptation could provide additional resources. This could involve the mobilization of private funds by institutional investors, asset managers and development or investment banks, as well as the provision of public funds. Government policies that lower the risk of low-emission and adaptation investments can facilitate the mobilization of private funds and enhance the effectiveness of other public policies. Studies indicate a number of challenges, including access to finance and mobilization of funds. (*high confidence*) {2.5.1, 2.5.2, 4.4.5}

D.5.2 Adaptation finance consistent with global warming of 1.5°C is difficult to quantify and compare with 2°C. Knowledge gaps include insufficient data to calculate specific climate resilience-enhancing investments from the provision of currently underinvested basic infrastructure. Estimates of the costs of adaptation might be lower at global warming of 1.5°C than for 2°C. Adaptation needs have typically been supported by public sector sources such as national and subnational government budgets, and in developing countries together with support from development assistance, multilateral development banks, and United Nations Framework Convention on Climate Change channels (*medium confidence*). More recently there is a

growing understanding of the scale and increase in non-governmental organizations and private funding in some regions (*medium confidence*). Barriers include the scale of adaptation financing, limited capacity and access to adaptation finance (*medium confidence*). {4.4.5, 4.6}

D.5.3 Global model pathways limiting global warming to 1.5°C are projected to involve the annual average investment needs in the energy system of around 2.4 trillion USD2010 between 2016 and 2035, representing about 2.5% of the world GDP (*medium confidence*). {4.4.5, Box 4.8}

D.5.4 Policy tools can help mobilize incremental resources, including through shifting global investments and savings and through market and non-market based instruments as well as accompanying measures to secure the equity of the transition, acknowledging the challenges related with implementation, including those of energy costs, depreciation of assets and impacts on international competition, and utilizing the opportunities to maximize co-benefits (*high confidence*). {1.3.3, 2.3.4, 2.3.5, 2.5.1, 2.5.2, Cross-Chapter Box 8 in Chapter 3, Cross-Chapter Box 11 in Chapter 4, 4.4.5, 5.5.2}

D.5.5 The systems transitions consistent with adapting to and limiting global warming to 1.5°C include the widespread adoption of new and possibly disruptive technologies and practices and enhanced climate-driven innovation. These imply enhanced technological innovation capabilities, including in industry and finance. Both national innovation policies and international cooperation can contribute to the development, commercialization and widespread adoption of mitigation and adaptation technologies. Innovation policies may be more effective when they combine public support for research and development with policy mixes that provide incentives for technology diffusion. (*high confidence*) {4.4.4, 4.4.5}.

D.5.6 Education, information, and community approaches, including those that are informed by indigenous knowledge and local knowledge, can accelerate the wide-scale behaviour changes consistent with adapting to and limiting global warming to 1.5°C. These approaches are more effective when combined with other policies and tailored to the motivations, capabilities and resources of specific actors and contexts (*high confidence*). Public acceptability can enable or inhibit the implementation of policies and measures to limit global warming to 1.5°C and to adapt to the consequences. Public acceptability depends on the individual's evaluation of expected policy consequences, the perceived fairness of the distribution of these consequences, and perceived fairness of decision procedures (*high confidence*). {1.1, 1.5, 4.3.5, 4.4.1, 4.4.3, Box 4.3, 5.5.3, 5.6.5}

**D.6 Sustainable development supports, and often enables, the fundamental societal and systems transitions and transformations that help limit global warming to 1.5°C. Such changes facilitate the pursuit of climate-resilient development pathways that achieve ambitious mitigation and adaptation in conjunction with poverty eradication and efforts to reduce inequalities (*high confidence*). {Box 1.1, 1.4.3, Figure 5.1, 5.5.3, Box 5.3}**

D.6.1 Social justice and equity are core aspects of climate-resilient development pathways that aim to limit global warming to 1.5°C as they address challenges and inevitable trade-offs, widen opportunities, and ensure that options, visions, and values are deliberated, between and within countries and communities, without making the poor and disadvantaged worse off (*high confidence*). {5.5.2, 5.5.3, Box 5.3, Figure 5.1, Figure 5.6, Cross-Chapter Boxes 12 and 13 in Chapter 5}

D.6.2 The potential for climate-resilient development pathways differs between and within regions and nations, due to different development contexts and systemic vulnerabilities (*very high confidence*). Efforts along such pathways to date have been limited (*medium confidence*) and enhanced efforts would involve strengthened and timely action from all countries and non-state actors (*high confidence*). {5.5.1, 5.5.3, Figure 5.1}

D.6.3 Pathways that are consistent with sustainable development show fewer mitigation and adaptation challenges and are associated with lower mitigation costs. The large majority of modelling studies could not construct pathways characterized by lack of international cooperation, inequality and poverty that were able to limit global warming to 1.5°C. (*high confidence*) {2.3.1, 2.5.1, 2.5.3, 5.5.2}

**D.7 Strengthening the capacities for climate action of national and sub-national authorities, civil society, the private sector, indigenous peoples and local communities can support the implementation of ambitious actions implied by limiting global warming to 1.5°C (*high confidence*). International cooperation can provide an enabling environment for this to be achieved in all countries and for all people, in the context of sustainable development. International cooperation is a critical enabler for developing countries and vulnerable regions (*high confidence*). {1.4, 2.3, 2.5, 4.2, 4.4, 4.5, 5.3, 5.4, 5.5, 5.6, 5, Box 4.1, Box 4.2, Box 4.7, Box 5.3, Cross-Chapter Box 9 in Chapter 4, Cross-Chapter Box 13 in Chapter 5}**

D.7.1 Partnerships involving non-state public and private actors, institutional investors, the banking system, civil society and scientific institutions would facilitate actions and responses consistent with limiting global warming to 1.5°C (*very high confidence*). {1.4, 4.4.1, 4.2.2, 4.4.3, 4.4.5, 4.5.3, 5.4.1, 5.6.2, Box 5.3}.

D.7.2 Cooperation on strengthened accountable multilevel governance that includes non-state actors such as industry, civil society and scientific institutions, coordinated sectoral and cross-sectoral policies at various governance levels, gender-sensitive policies, finance including innovative financing, and cooperation on technology development and transfer can ensure participation, transparency, capacity building and learning among different players (*high confidence*). {2.5.1, 2.5.2, 4.2.2, 4.4.1, 4.4.2, 4.4.3, 4.4.4, 4.4.5, 4.5.3, Cross-Chapter Box 9 in Chapter 4, 5.3.1, 5.5.3, Cross-Chapter Box 13 in Chapter 5, 5.6.1, 5.6.3}

D.7.3 International cooperation is a critical enabler for developing countries and vulnerable regions to strengthen their action for the implementation of 1.5°C-consistent climate responses, including through enhancing access to finance and technology and enhancing domestic capacities, taking into account national and local circumstances and needs (*high confidence*). {2.3.1, 2.5.1, 4.4.1, 4.4.2, 4.4.4, 4.4.5, 5.4.1 5.5.3, 5.6.1, Box 4.1, Box 4.2, Box 4.7}.

D.7.4 Collective efforts at all levels, in ways that reflect different circumstances and capabilities, in the pursuit of limiting global warming to 1.5°C, taking into account equity as well as effectiveness, can facilitate strengthening the global response to climate change, achieving sustainable development and eradicating poverty (*high confidence*). {1.4.2, 2.3.1, 2.5.1, 2.5.2, 2.5.3, 4.2.2, 4.4.1, 4.4.2, 4.4.3, 4.4.4, 4.4.5, 4.5.3, 5.3.1, 5.4.1, 5.5.3, 5.6.1, 5.6.2, 5.6.3}

## Box SPM.1: Core Concepts Central to this Special Report

**Global mean surface temperature (GMST):** Estimated global average of near-surface air temperatures over land and sea ice, and sea surface temperatures over ice-free ocean regions, with changes normally expressed as departures from a value over a specified reference period. When estimating changes in GMST, near-surface air temperature over both land and oceans are also used.[19] {1.2.1.1}

**Pre-industrial:** The multi-century period prior to the onset of large-scale industrial activity around 1750. The reference period 1850–1900 is used to approximate pre-industrial GMST. {1.2.1.2}

**Global warming:** The estimated increase in GMST averaged over a 30-year period, or the 30-year period centred on a particular year or decade, expressed relative to pre-industrial levels unless otherwise specified. For 30-year periods that span past and future years, the current multi-decadal warming trend is assumed to continue. {1.2.1}

**Net zero $CO_2$ emissions:** Net zero carbon dioxide ($CO_2$) emissions are achieved when anthropogenic $CO_2$ emissions are balanced globally by anthropogenic $CO_2$ removals over a specified period.

**Carbon dioxide removal (CDR):** Anthropogenic activities removing $CO_2$ from the atmosphere and durably storing it in geological, terrestrial, or ocean reservoirs, or in products. It includes existing and potential anthropogenic enhancement of biological or geochemical sinks and direct air capture and storage, but excludes natural $CO_2$ uptake not directly caused by human activities.

**Total carbon budget:** Estimated cumulative net global anthropogenic $CO_2$ emissions from the pre-industrial period to the time that anthropogenic $CO_2$ emissions reach net zero that would result, at some probability, in limiting global warming to a given level, accounting for the impact of other anthropogenic emissions. {2.2.2}

**Remaining carbon budget:** Estimated cumulative net global anthropogenic $CO_2$ emissions from a given start date to the time that anthropogenic $CO_2$ emissions reach net zero that would result, at some probability, in limiting global warming to a given level, accounting for the impact of other anthropogenic emissions. {2.2.2}

**Temperature overshoot:** The temporary exceedance of a specified level of global warming.

**Emission pathways:** In this Summary for Policymakers, the modelled trajectories of global anthropogenic emissions over the 21st century are termed emission pathways. Emission pathways are classified by their temperature trajectory over the 21st century: pathways giving at least 50% probability based on current knowledge of limiting global warming to below 1.5°C are classified as 'no overshoot'; those limiting warming to below 1.6°C and returning to 1.5°C by 2100 are classified as '1.5°C limited-overshoot'; while those exceeding 1.6°C but still returning to 1.5°C by 2100 are classified as 'higher-overshoot'.

**Impacts:** Effects of climate change on human and natural systems. Impacts can have beneficial or adverse outcomes for livelihoods, health and well-being, ecosystems and species, services, infrastructure, and economic, social and cultural assets.

**Risk:** The potential for adverse consequences from a climate-related hazard for human and natural systems, resulting from the interactions between the hazard and the vulnerability and exposure of the affected system. Risk integrates the likelihood of exposure to a hazard and the magnitude of its impact. Risk also can describe the potential for adverse consequences of adaptation or mitigation responses to climate change.

**Climate-resilient development pathways (CRDPs):** Trajectories that strengthen sustainable development at multiple scales and efforts to eradicate poverty through equitable societal and systems transitions and transformations while reducing the threat of climate change through ambitious mitigation, adaptation and climate resilience.

19 Past IPCC reports, reflecting the literature, have used a variety of approximately equivalent metrics of GMST change.

Check for updates

# Land use strategies to mitigate climate change in carbon dense temperate forests

Beverly E. Law[a,1], Tara W. Hudiburg[b], Logan T. Berner[c], Jeffrey J. Kent[b], Polly C. Buotte[a], and Mark E. Harmon[a]

[a]Department of Forest Ecosystems and Society, Oregon State University, Corvallis, OR 97333; [b]Department of Forest, Rangeland, and Fire Sciences, University of Idaho, Moscow, ID 83844; and [c]EcoSpatial Services L.L.C., Flagstaff, AZ 86004

Edited by William H. Schlesinger, Duke University, Durham, NC, and approved January 22, 2018 (received for review November 16, 2017)

**Strategies to mitigate carbon dioxide emissions through forestry activities have been proposed, but ecosystem process-based integration of climate change, enhanced $CO_2$, disturbance from fire, and management actions at regional scales are extremely limited. Here, we examine the relative merits of afforestation, reforestation, management changes, and harvest residue bioenergy use in the Pacific Northwest. This region represents some of the highest carbon density forests in the world, which can store carbon in trees for 800 y or more. Oregon's net ecosystem carbon balance (NECB) was equivalent to 72% of total emissions in 2011–2015. By 2100, simulations show increased net carbon uptake with little change in wildfires. Reforestation, afforestation, lengthened harvest cycles on private lands, and restricting harvest on public lands increase NECB 56% by 2100, with the latter two actions contributing the most. Resultant cobenefits included water availability and biodiversity, primarily from increased forest area, age, and species diversity. Converting 127,000 ha of irrigated grass crops to native forests could decrease irrigation demand by 233 billion $m^3 \cdot y^{-1}$. Utilizing harvest residues for bioenergy production instead of leaving them in forests to decompose increased emissions in the short-term (50 y), reducing mitigation effectiveness. Increasing forest carbon on public lands reduced emissions compared with storage in wood products because the residence time is more than twice that of wood products. Hence, temperate forests with high carbon densities and lower vulnerability to mortality have substantial potential for reducing forest sector emissions. Our analysis framework provides a template for assessments in other temperate regions.**

forests | carbon balance | greenhouse gas emissions | climate mitigation

Strategies to mitigate carbon dioxide emissions through forestry activities have been proposed, but regional assessments to determine feasibility, timeliness, and effectiveness are limited and rarely account for the interactive effects of future climate, atmospheric $CO_2$ enrichment, nitrogen deposition, disturbance from wildfires, and management actions on forest processes. We examine the net effect of all of these factors and a suite of mitigation strategies at fine resolution (4-km grid). Proven strategies immediately available to mitigate carbon emissions from forest activities include the following: (*i*) reforestation (growing forests where they recently existed), (*ii*) afforestation (growing forests where they did not recently exist), (*iii*) increasing carbon density of existing forests, and (*iv*) reducing emissions from deforestation and degradation (1). Other proposed strategies include wood bioenergy production (2–4), bioenergy combined with carbon capture and storage (BECCS), and increasing wood product use in buildings. However, examples of commercial-scale BECCS are still scarce, and sustainability of wood sources remains controversial because of forgone ecosystem carbon storage and low environmental cobenefits (5, 6). Carbon stored in buildings generally outlives its usefulness or is replaced within decades (7) rather than the centuries possible in forests, and the factors influencing product substitution have yet to be fully explored (8). Our analysis of mitigation strategies focuses on the first four strategies, as well as bioenergy production, utilizing harvest residues only and without carbon capture and storage.

The appropriateness and effectiveness of mitigation strategies within regions vary depending on the current forest sink, competition with land-use and watershed protection, and environmental conditions affecting forest sustainability and resilience. Few process-based regional studies have quantified strategies that could actually be implemented, are low-risk, and do not depend on developing technologies. Our previous studies focused on regional modeling of the effects of forest thinning on net ecosystem carbon balance (NECB) and net emissions, as well as improving modeled drought sensitivity (9, 10), while this study focuses mainly on strategies to enhance forest carbon.

Our study region is Oregon in the Pacific Northwest, where coastal and montane forests have high biomass and carbon sequestration potential. They represent coastal forests from northern California to southeast Alaska, where trees live 800 y or more and biomass can exceed that of tropical forests (11) (Fig. S1). The semiarid ecoregions consist of woodlands that experience frequent fires (12). Land-use history is a major determinant of forest carbon balance. Harvest was the dominant cause of tree mortality (2003–2012) and accounted for fivefold as much mortality as that from fire and beetles combined (13). Forest land ownership is predominantly public (64%), and 76% of the biomass harvested is on private lands.

## Significance

**Regional quantification of feasibility and effectiveness of forest strategies to mitigate climate change should integrate observations and mechanistic ecosystem process models with future climate, $CO_2$, disturbances from fire, and management. Here, we demonstrate this approach in a high biomass region, and found that reforestation, afforestation, lengthened harvest cycles on private lands, and restricting harvest on public lands increased net ecosystem carbon balance by 56% by 2100, with the latter two actions contributing the most. Forest sector emissions tracked with our life cycle assessment model decreased by 17%, partially meeting emissions reduction goals. Harvest residue bioenergy use did not reduce short-term emissions. Cobenefits include increased water availability and biodiversity of forest species. Our improved analysis framework can be used in other temperate regions.**

Author contributions: B.E.L. and T.W.H. designed research; B.E.L., T.W.H., and P.C.B. performed research; M.E.H. contributed new reagents/analytic tools; B.E.L., L.T.B., J.J.K., and P.C.B. analyzed data; B.E.L., T.W.H., L.T.B., and M.E.H. wrote the paper; and M.E.H. contributed the substitution model.

The authors declare no conflict of interest.

This article is a PNAS Direct Submission.

This open access article is distributed under Creative Commons Attribution-NonCommercial-NoDerivatives License 4.0 (CC BY-NC-ND).

Data deposition: The CLM4.5 model data are available at Oregon State University (terraweb.forestry.oregonstate.edu/FMEC). Data from the >200 intensive plots on forest carbon are available at Oak Ridge National Laboratory (https://daac.ornl.gov/NACP/guides/NACP_TERRA-PNW.html), and FIA data are available at the USDA Forest Service (https://www.fia.fs.fed.us/tools-data/).

[1]To whom correspondence should be addressed. Email: bev.law@oregonstate.edu.

This article contains supporting information online at www.pnas.org/lookup/suppl/doi:10.1073/pnas.1720064115/-/DCSupplemental.

Published online March 19, 2018.

ENVIRONMENTAL SCIENCES

SUSTAINABILITY SCIENCE



FS-001565




**Fig. 1.** Approach to assessing effects of mitigation strategies on forest carbon and forest sector emissions. NECB is productivity (NPP) minus Rh and losses from fire and harvest (red arrows). Harvest emissions include those associated with wood products and bioenergy.

Many US states, including Oregon (14), plan to reduce their greenhouse gas (GHG) emissions in accordance with the Paris Agreement. We evaluated strategies to address this question: How much carbon can the region's forests realistically remove from the atmosphere in the future, and which forest carbon strategies can reduce regional emissions by 2025, 2050, and 2100? We propose an integrated approach that combines observations with models and a life cycle assessment (LCA) to evaluate current and future effects of mitigation actions on forest carbon and forest sector emissions in temperate regions (Fig. 1). We estimated the recent carbon budget of Oregon's forests, and simulated the potential to increase the forest sink and decrease forest sector emissions under current and future climate conditions. We provide recommendations for regional assessments of mitigation strategies.

## Results

Carbon stocks and fluxes are summarized for the observation cycles of 2001–2005, 2006–2010, and 2011–2015 (Table 1 and Tables S1 and S2). In 2011–2015, state-level forest carbon stocks totaled 3,036 Tg C (3 billion metric tons), with the coastal and montane ecoregions accounting for 57% of the live tree carbon (Tables S1 and S2). Net ecosystem production [NEP; net primary production (NPP) minus heterotrophic respiration (Rh)] averaged 28 teragrams carbon per year (Tg C $y^{-1}$) over all three periods. Fire emissions were unusually high at 8.69 million metric tons carbon dioxide equivalent ($tCO_2e\ y^{-1}$, i.e., 2.37 Tg C $y^{-1}$) in 2001–2005 due to the historic Biscuit Fire, but decreased to 3.56 million $tCO_2e\ y^{-1}$ (0.97 Tg C $y^{-1}$) in 2011–2015 (Table S4). Note that 1 million $tCO_2e$ equals 3.667 Tg C.

Our LCA showed that in 2001–2005, Oregon's net wood product emissions were 32.61 million $tCO_2e$ (Table S3), and 3.7-fold wildfire emissions in the period that included the record fire year (15) (Fig. 2). In 2011–2015, net wood product emissions were 34.45 million $tCO_2e$ and almost 10-fold fire emissions, mostly due to lower fire emissions. The net wood product emissions are higher than fire emissions despite carbon benefits of storage in wood products and substitution for more fossil fuel-intensive products. Hence, combining fire and net wood product emissions, the forest sector emissions averaged 40 million $tCO_2e\ y^{-1}$ and accounted for about 39% of total emissions across all sectors (Fig. 2 and Table S4). NECB was calculated from NEP minus losses from fire emissions and harvest (Fig. 1). State NECB was equivalent to 60% and 70% of total emissions for 2001–2005 and 2011–2015, respectively (Fig. 2, Table 1, and Table S4). Fire emissions were only between 4% and 8% of total emissions from all sources (2011–2015 and 2001–2004, respectively). Oregon's forests play a larger role in meeting its GHG targets than US forests have in meeting the nation's targets (16, 17).

Historical disturbance regimes were simulated using stand age and disturbance history from remote sensing products. Comparisons of Community Land Model (CLM4.5) output with Forest Inventory and Analysis (FIA) aboveground tree biomass (>6,000 plots) were within 1 SD of the ecoregion means (Fig. S2). CLM4.5 estimates of cumulative burn area and emissions from 1990 to 2014 were 14% and 25% less than observed, respectively. The discrepancy was mostly due to the model missing an anomalously large fire in 2002 (Fig. S3*A*). When excluded, modeled versus observed fire emissions were in good agreement ($r^2 = 0.62$; Fig. S3*B*). A sensitivity test of a 14% underestimate of burn area did not affect our final results because predicted emissions would increase almost equally for business as usual (BAU) management and our scenarios, resulting in no proportional change in NECB. However, the ratio of harvest to fire emissions would be lower.

Projections show that under future climate, atmospheric carbon dioxide, and BAU management, an increase in net carbon uptake due to $CO_2$ fertilization and climate in the mesic ecoregions far outweighs losses from fire and drought in the semiarid ecoregions. There was not an increasing trend in fire. Carbon stocks increased by 2% and 7% and NEP increased by 12% and 40% by 2050 and 2100, respectively.

We evaluated emission reduction strategies in the forest sector: protecting existing forest carbon, lengthening harvest cycles, reforestation, afforestation, and bioenergy production with product substitution. The largest potential increase in forest carbon is in the mesic Coast Range and West Cascade ecoregions. These forests are buffered by the ocean, have high soil water-holding capacity, low risk of wildfire [fire intervals average 260–400 y (18)], long carbon residence time, and potential for high carbon density. They can attain biomass up to 520 Mg C $ha^{-1}$ (12). Although Oregon has several protected areas, they account for only 9–15% of the total forest area, so we expect it may be feasible to add carbon-protected lands with cobenefits of water protection and biodiversity.

Reforestation of recently forested areas include those areas impacted by fire and beetles. Our simulations to 2100 assume regrowth of the same species and incorporate future fire responses to climate and cyclical beetle outbreaks [70–80 y (13)]. Reforestation has the potential to increase stocks by 315 Tg C by 2100, reducing forest sector net emissions by 5% by 2100 relative to BAU management (Fig. 3). The East and West Cascades ecoregions had the highest reforestation potential, accounting for 90% of the increase (Table S5).

Afforestation of old fields within forest boundaries and non-food/nonforage grass crops, hereafter referred to as "grass crops," had to meet minimum conditions for tree growth, and crop grid cells had to be partially forested (*SI Methods* and Table S6). These crops are not grazed or used for animal feed. Competing land uses may decrease the actual amount of area that can be afforested. We calculated the amount of irrigated grass crops (127,000 ha) that could be converted to forest, assuming success of carbon offset programs (19). By 2100, afforestation increased stocks by

**Table 1. Forest carbon budget components used to compute NECB**

| Flux, Tg C·$y^{-1}$ | 2001–2005 | | 2006–2010 | | 2011–2015 | | 2001–2015 |
|---|---|---|---|---|---|---|---|
| NPP | 73.64 | 7.59 | 73.57 | 7.58 | 73.57 | 7.58 | 73.60 |
| Rh | 45.67 | 5.11 | 45.38 | 5.07 | 45.19 | 5.05 | 45.41 |
| NEP | 27.97 | 9.15 | 28.19 | 9.12 | 28.39 | 9.11 | 28.18 |
| Harvest removals | 8.58 | 0.60 | 7.77 | 0.54 | 8.61 | 0.6 | 8.32 |
| Fire emissions | 2.37 | 0.27 | 1.79 | 0.2 | 0.97 | 0.11 | 1.71 |
| NECB | 17.02 | 9.17 | 18.63 | 9.14 | 18.81 | 9.13 | 18.15 |

Average annual values for each period, including uncertainty (95% confidence interval) in Tg C $y^{-1}$ (multiply by 3.667 to get million $tCO_2e$).


FS-001566




**Fig. 2.** Oregon's forest carbon sink and emissions from forest and energy sectors. Harvest emissions are computed by LCA. Fire and harvest emissions sum to forest sector emissions. Energy sector emissions are from the Oregon Global Warming Commission (14), minus forest-related emissions. Error bars are 95% confidence intervals (Monte Carlo analysis).

94 Tg C and cumulative NECB by 14 Tg C, and afforestation reduced forest sector GHG emissions by 1.3–1.4% in 2025, 2050, and 2100 (Fig. 3).

We quantified cobenefits of afforestation of irrigated grass crops on water availability based on data from hydrology and agricultural simulations of future grass crop area and related irrigation demand (20). Afforestation of 127,000 ha of grass cropland with Douglas fir could decrease irrigation demand by 222 and 233 billion $m^3 \cdot y^{-1}$ by 2050 and 2100, respectively. An independent estimate from measured precipitation and evapotranspiration (ET) at our mature Douglas fir and grass crop flux sites in the Willamette Valley shows the ET/precipitation fraction averaged 33% and 52%, respectively, and water balance (precipitation minus ET) averaged 910 $mm \cdot y^{-1}$ and 516 $mm \cdot y^{-1}$. Under current climate conditions, the observations suggest an increase in annual water availability of 260 billion $m^3 \cdot y^{-1}$ if 127,000 ha of the irrigated grass crops were converted to forest.

Harvest cycles in the mesic and montane forests have declined from over 120 y to 45 y despite the fact that these trees can live 500–1,000 y and net primary productivity peaks at 80–125 y (21). If harvest cycles were lengthened to 80 y on private lands and harvested area was reduced 50% on public lands, state-level stocks would increase by 17% to a total of ~3,600 Tg C and NECB would increase 2–3 Tg C $y^{-1}$ by 2100. The lengthened harvest cycles reduced harvest by 2 Tg C $y^{-1}$, which contributed to higher NECB. Leakage (more harvest elsewhere) is difficult to quantify and could counter these carbon gains. However, because harvest on federal lands was reduced significantly since 1992 (NW Forest Plan), leakage has probably already occurred.

The four strategies together increased NECB by 64%, 82%, and 56% by 2025, 2050, and 2100, respectively. This reduced forest sector net emissions by 11%, 10%, and 17% over the same periods (Fig. 3). By 2050, potential increases in NECB were largest in the Coast Range (Table S5), East Cascades, and Klamath Mountains, accounting for 19%, 25%, and 42% of the total increase, whereas by 2100, they were most evident in the West Cascades, East Cascades, and Klamath Mountains.

We examined the potential for using existing harvest residue for electricity generation, where burning the harvest residue for energy emits carbon immediately (3) versus the BAU practice of leaving residues in forests to slowly decompose. Assuming half of forest residues from harvest practices could be used to replace natural gas or coal in distributed facilities across the state, they would provide an average supply of 0.75–1 Tg C $y^{-1}$ to the year 2100 in the reduced harvest and BAU scenarios, respectively. Compared with BAU harvest practices, where residues are left to decompose, proposed bioenergy production would increase cumulative net emissions by up to 45 Tg C by 2100. Even at 50% use, residue collection and transport are not likely to be economically viable, given the distances (>200 km) to Oregon's facilities.

## Discussion

Earth system models have the potential to bring terrestrial observations related to climate, vulnerability, impacts, adaptation,




**Fig. 3.** Future change in carbon stocks and NECB with mitigation strategies relative to BAU management. The decadal average change in forest carbon stocks (*A*) and NECB relative to BAU (*B*) are shown. Italicized numbers over bars indicate mean forest carbon stocks in 2091–2100 (*A*) and cumulative change in NECB for 2015–2100 (*B*). Error bars are ±10%.



FS-001567

PNAS PNAS PNAS PNAS

ENVIRONMENTAL SCIENCES

SUSTAINABILITY SCIENCE

and mitigation into a common framework, melding biophysical with social components (22). We developed a framework to examine a suite of mitigation actions to increase forest carbon sequestration and reduce forest sector emissions under current and future environmental conditions.

Harvest-related emissions had a large impact on recent forest NECB, reducing it by an average of 34% from 2001 to 2015. By comparison, fire emissions were relatively small and reduced NECB by 12% in the Biscuit Fire year, but only reduced NECB 5–9% from 2006 to 2015. Thus, altered forest management has the potential to enhance the forest carbon balance and reduce emissions.

Future NEP increased because enhancement from atmospheric carbon dioxide outweighed the losses from fire. Lengthened harvest cycles on private lands to 80 y and restricting harvest to 50% of current rates on public lands increased NECB the most by 2100, accounting for 90% of total emissions reduction (Fig. 3 and Tables S5 and S6). Reduced harvest led to NECB increasing earlier than the other strategies (by 2050), suggesting this could be a priority for implementation.

Our afforestation estimates may be too conservative by limiting them to nonforest areas within current forest boundaries and 127,000 ha of irrigated grass cropland. There was a net loss of 367,000 ha of forest area in Oregon and Washington combined from 2001 to 2006 (23), and less than 1% of native habitat remains in the Willamette Valley due to urbanization and agriculture (24). Perhaps more of this area could be afforested.

The spatial variation in the potential for each mitigation option to improve carbon stocks and fluxes shows that the reforestation potential is highest in the Cascade Mountains, where fire and insects occur (Fig. 4). The potential to reduce harvest on public land is highest in the Cascade Mountains, and that to lengthen harvest cycles on private lands is highest in the Coast Range.

Although western Oregon is mesic with little expected change in precipitation, the afforestation cobenefits of increased water availability will be important. Urban demand for water is projected to increase, but agricultural irrigation will continue to consume much more water than urban use (25). Converting 127,000 ha of irrigated grass crops to native forests appears to be a win–win strategy, returning some of the area to forest land, providing habitat and connectivity for forest species, and easing irrigation demand. Because the afforested grass crop represents only 11% of the available grass cropland (1.18 million ha), it is not likely to result in leakage or indirect land use change. The two forest strategies combined are likely to be important contributors to water security.

Cobenefits with biodiversity were not assessed in our study. However, a recent study showed that in the mesic forests, cobenefits with biodiversity of forest species are largest on lands with harvest cycles longer than 80 y, and thus would be most pronounced on private lands (26). We selected 80 y for the harvest cycle mitigation strategy because productivity peaks at 80–125 y in this region, which coincides with the point at which cobenefits with wildlife habitat are substantial.

Habitat loss and climate change are the two greatest threats to biodiversity. Afforestation of areas that are currently grass crops would likely improve the habitat of forest species (27), as about 90% of the forests in these areas were replaced by agriculture. About 45 mammal species are at risk because of range contraction (28). Forests are more efficient at dissipating heat than grass and crop lands, and forest cover gains lead to net surface cooling in all regions south of about 45° latitude in North American and Europe (29). The cooler conditions can buffer climate-sensitive bird populations from approaching their thermal limits and provide more food and nest sites (30). Thus, the mitigation strategies of afforestation, protecting forests on public lands and lengthening harvest cycles to 80–125 y, would likely benefit forest-dependent species.

Oregon has a legislated mandate to reduce emissions, and is considering an offsets program that limits use of offsets to 8% of




**Fig. 4.** Spatial patterns of forest carbon stocks and NECB by 2091–2100. The decadal average changes in forest carbon stocks (*A*) and NECB (*B*) due to afforestation, reforestation, protected areas, and lengthened harvest cycles relative to continued BAU forest management (red is increase in NECB) are shown.

the total emissions reduction to ensure that regulated entities substantially reduce their own emissions, similar to California's program (19). An offset becomes a net emissions reduction by increasing the forest carbon sink (NECB). If only 8% of the GHG reduction is allowed for forest offsets, the limits for forest offsets would be 2.1 and 8.4 million metric $tCO_2e$ of total emissions by 2025 and 2050, respectively (Table S6). The combination of afforestation, reforestation, and reduced harvest would provide 13 million metric $tCO_2e$ emissions reductions, and any one of the strategies or a portion of each could be applied. Thus, additionality beyond what would happen without the program is possible.

State-level reporting of GHG emissions includes the agriculture sector, but does not appear to include forest sector emissions, except for industrial fuel (i.e., utility fuel in Table S3) and, potentially, fire emissions. Harvest-related emissions should be quantified, as they are much larger than fire emissions in the western United States. Full accounting of forest sector emissions is necessary to meet climate mitigation goals.

Increased long-term storage in buildings and via product substitution has been suggested as a potential climate mitigation option. Pacific temperate forests can store carbon for many hundreds of years, which is much longer than is expected for buildings that are generally assumed to outlive their usefulness or be replaced within several decades (7). By 2035, about 75% of buildings in the United States will be replaced or renovated, based on new construction, demolition, and renovation trends (31, 32). Recent analysis suggests substitution benefits of using wood versus more fossil fuel-intensive materials have been overestimated by at


FS-001568

PNAS PNAS PNAS

least an order of magnitude (33). Our LCA accounts for losses in product substitution stores (PSSs) associated with building life span, and thus are considerably lower than when no losses are assumed (4, 34). While product substitution reduces the overall forest sector emissions, it cannot offset the losses incurred by frequent harvest and losses associated with product transportation, manufacturing, use, disposal, and decay. Methods for calculating substitution benefits should be improved in other regional assessments.

Wood bioenergy production is interpreted as being carbon-neutral by assuming that trees regrow to replace those that burned. However, this does not account for reduced forest carbon stocks that took decades to centuries to sequester, degraded productive capacity, emissions from transportation and the production process, and biogenic/direct emissions at the facility (35). Increased harvest through proposed thinning practices in the region has been shown to elevate emissions for decades to centuries regardless of product end use (36). It is therefore unlikely that increased wood bioenergy production in this region would decrease overall forest sector emissions.

## Conclusions

GHG reduction must happen quickly to avoid surpassing a 2 °C increase in temperature since preindustrial times. Alterations in forest management can contribute to increasing the land sink and decreasing emissions by keeping carbon in high biomass forests, extending harvest cycles, reforestation, and afforestation. Forests are carbon-ready and do not require new technologies or infrastructure for immediate mitigation of climate change. Growing forests for bioenergy production competes with forest carbon sequestration and does not reduce emissions in the next decades (10). BECCS requires new technology, and few locations have sufficient geological storage for $CO_2$ at power facilities with high-productivity forests nearby. Accurate accounting of forest carbon in trees and soils, NECB, and historic harvest rates, combined with transparent quantification of emissions from the wood product process, can ensure realistic reductions in forest sector emissions.

As states and regions take a larger role in implementing climate mitigation steps, robust forest sector assessments are urgently needed. Our integrated approach of combining observations, an LCA, and high-resolution process modeling (4-km grid vs. typical 200-km grid) of a suite of potential mitigation actions and their effects on forest carbon sequestration and emissions under changing climate and $CO_2$ provides an analysis framework that can be applied in other temperate regions.

## Materials and Methods

**Current Stocks and Fluxes.** We quantified recent forest carbon stocks and fluxes using a combination of observations from FIA; Landsat products on forest type, land cover, and fire risk; 200 intensive plots in Oregon (37); and a wood decomposition database. Tree biomass was calculated from species-specific allometric equations and ecoregion-specific wood density. We estimated ecosystem carbon stocks, NEP (photosynthesis minus respiration), and NECB (NEP minus losses due to fire or harvest) using a mass-balance approach (36, 38) (Table 1 and *SI Materials and Methods*). Fire emissions were computed from the Monitoring Trends in Burn Severity database, biomass data, and region-specific combustion factors (15, 39) (*SI Materials and Methods*).

**Future Projections and Model Description.** Carbon stocks and NEP were quantified to the years 2025, 2050, and 2100 using CLM4.5 with physiological parameters for 10 major forest species, initial forest biomass (36), and future climate and atmospheric carbon dioxide as input (Institut Pierre Simon Laplace climate system model downscaled to 4 km × 4 km, representative concentration pathway 8.5). CLM4.5 uses 3-h climate data, ecophysiological characteristics, site physical characteristics, and site history to estimate the daily fluxes of carbon, nitrogen, and water between the atmosphere, plant state variables, and litter and soil state variables. Model components are biogeophysics, hydrological cycle, and biogeochemistry. This model version does not include a dynamic vegetation model to simulate resilience and establishment following disturbance. However, the effect of regeneration lags on forest carbon is not particularly strong for the long disturbance intervals in this study (40). Our plant functional type (PFT) parameterization for 10 major forest species rather than one significantly improves carbon modeling in the region (41).

**Forest Management and Land Use Change Scenarios.** Harvest cycles, reforestation, and afforestation were simulated to the year 2100. Carbon stocks and NEP were predicted for the current harvest cycle of 45 y compared with simulations extending it to 80 y. Reforestation potential was simulated over areas that recently suffered mortality from harvest, fire, and 12 species of beetles (13). We assumed the same vegetation regrew to the maximum potential, which is expected with the combination of natural regeneration and planting that commonly occurs after these events. Future BAU harvest files were constructed using current harvest rates, where county-specific average harvest and the actual amounts per ownership were used to guide grid cell selection. This resulted in the majority of harvest occurring on private land (70%) and in the mesic ecoregions. Beetle outbreaks were implemented using a modified mortality rate of the lodgepole pine PFT with 0.1% $y^{-1}$ biomass mortality by 2100.

For afforestation potential, we identified areas that are within forest boundaries that are not currently forest and areas that are currently grass crops. We assumed no competition with conversion of irrigated grass crops to urban growth, given Oregon's land use laws for developing within urban growth boundaries. A separate study suggested that, on average, about 17% of all irrigated agricultural crops in the Willamette Valley could be converted to urban area under future climate; however, because 20% of total cropland is grass seed, it suggests little competition with urban growth (25).

Landsat observations (12,500 scenes) were processed to map changes in land cover from 1984 to 2012. Land cover types were separated with an unsupervised K-means clustering approach. Land cover classes were assigned to an existing forest type map (42). The CropScape Cropland Data Layer (CDL 2015, https://nassgeodata.gmu.edu/CropScape/) was used to distinguish nonforage grass crops from other grasses. For afforestation, we selected grass cropland with a minimum soil water-holding capacity of 150 mm and minimum precipitation of 500 mm that can support trees (43).

**Afforestation Cobenefits.** Modeled irrigation demand of grass seed crops under future climate conditions was previously conducted with hydrology and agricultural models, where ET is a function of climate, crop type, crop growth state, and soil-holding capacity (20) (Table S7). The simulations produced total land area, ET, and irrigation demand for each cover type. Current grass seed crop irrigation in the Willamette Valley is 413 billion $m^3 \cdot y^{-1}$ for 238,679 ha and is projected to be 412 and 405 billion $m^3$ in 2050 and 2100 (20) (Table S7). We used annual output from the simulations to estimate irrigation demand per unit area of grass seed crops (1.73, 1.75, and 1.84 million $m^3 \cdot ha^{-1}$ in 2015, 2050, and 2100, respectively), and applied it to the mapped irrigated crop area that met conditions necessary to support forests (Table S7).

**LCA.** Decomposition of wood through the product cycle was computed using an LCA (8, 10). Carbon emissions to the atmosphere from harvest were calculated annually over the time frame of the analysis (2001–2015). The net carbon emissions equal NECB plus total harvest minus wood lost during manufacturing and wood decomposed over time from product use. Wood industry fossil fuel emissions were computed for harvest, transportation, and manufacturing processes. Carbon credit was calculated for wood product storage, substitution, and internal mill recycling of wood losses for bioenergy.

Products were divided into sawtimber, pulpwood, and wood and paper products using published coefficients (44). Long-term and short-term products were assumed to decay at 2% and 10% per year, respectively (45). For product substitution, we focused on manufacturing for long-term structures (building life span >30 y). Because it is not clear when product substitution started in the Pacific Northwest, we evaluated it starting in 1970 since use of concrete and steel for housing was uncommon before 1965. The displacement value for product substitution was assumed to be 2.1 Mg fossil C/Mg C wood use in long-term structures (46), and although it likely fluctuates over time, we assumed it was constant. We accounted for losses in product substitution associated with building replacement (33) using a loss rate of 2% per year (33), but ignored leakage related to fossil C use by other sectors, which may result in more substitution benefit than will actually occur.

The general assumption for modern buildings, including cross-laminate timber, is they will outlive their usefulness and be replaced in about 30 y (7). By 2035, ~75% of buildings in the United States will be replaced or renovated, based on new construction, demolition, and renovation trends, resulting in threefold as many buildings as there are now [2005 baseline (31, 32)]. The loss of

ENVIRONMENTAL SCIENCES

SUSTAINABILITY SCIENCE



FS-001569

PNAS PNAS PNAS PNAS

the PSS is therefore PSS multiplied by the proportion of buildings lost per year (2% per year).

To compare the NECB equivalence to emissions, we calculated forest sector and energy sector emissions separately. Energy sector emissions ["in-boundary" state-quantified emissions by the Oregon Global Warming Commission (14)] include those from transportation, residential and commercial buildings, industry, and agriculture. The forest sector emissions are cradle-to-grave annual carbon emissions from harvest and product emissions, transportation, and utility fuels (Table S3). Forest sector utility fuels were subtracted from energy sector emissions to avoid double counting.

**Uncertainty Estimates.** For the observation-based analysis, Monte Carlo simulations were used to conduct an uncertainty analysis with the mean and SDs for NPP and Rh calculated using several approaches (36) (*SI Materials and Methods*). Uncertainty in NECB was calculated as the combined uncertainty of NEP, fire emissions (10%), harvest emissions (7%), and land cover estimates (10%) using the propagation of error approach. Uncertainty in CLM4.5 model simulations and LCA were quantified by combining the uncertainty in the observations used to evaluate the model, the uncertainty in input datasets (e.g., remote sensing), and the uncertainty in the LCA coefficients (41).

Model input data for physiological parameters and model evaluation data on stocks and fluxes are available online (37).

**ACKNOWLEDGMENTS.** We thank Dr. Thomas Hilker (deceased) for producing the grass data layer, and Carley Lowe for Fig. 1. This research was supported by the US Department of Energy (Grant DE-SC0012194) and Agriculture and Food Research Initiative of the US Department of Agriculture National Institute of Food and Agriculture (Grants 2013-67003-20652, 2014-67003-22065, and 2014-35100-22066) for our North American Carbon Program studies, "Carbon cycle dynamics within Oregon's urban-suburban-forested-agricultural landscapes," and "Forest die-off, climate change, and human intervention in western North America."

1. Canadell JG, Raupach MR (2008) Managing forests for climate change mitigation. *Science* 320:1456–1457.
2. Holtsmark B (2013) The outcome is in the assumptions: Analyzing the effects on atmospheric CO2 levels of increased use of bioenergy from forest biomass. *Glob Change Biol Bioenergy* 5:467–473.
3. Repo A, Tuomi M, Liski J (2011) Indirect carbon dioxide emissions from producing bioenergy from forest harvest residues. *Glob Change Biol Bioenergy* 3:107–115.
4. Schlamadinger B, Marland G (1996) The role of forest and bioenergy strategies in the global carbon cycle. *Biomass Bioenergy* 10:275–300.
5. Heck V, Gerten D, Lucht W, Popp A (2018) Biomass-based negative emissions difficult to reconcile with planetary boundaries. *Nat Clim Chang* 8:151–155.
6. Field CB, Mach KJ (2017) Rightsizing carbon dioxide removal. *Science* 356:706–707.
7. Tollefson J (2017) The wooden skyscrapers that could help to cool the planet. *Nature* 545:280–282.
8. Law BE, Harmon ME (2011) Forest sector carbon management, measurement and verification, and discussion of policy related to climate change. *Carbon Manag* 2: 73–84.
9. Law BE (2014) Regional analysis of drought and heat impacts on forests: Current and future science directions. *Glob Change Biol* 20:3595–3599.
10. Hudiburg TW, Luyssaert S, Thornton PE, Law BE (2013) Interactive effects of environmental change and management strategies on regional forest carbon emissions. *Environ Sci Technol* 47:13132–13140.
11. Keith H, Mackey BG, Lindenmayer DB (2009) Re-evaluation of forest biomass carbon stocks and lessons from the world's most carbon-dense forests. *Proc Natl Acad Sci USA* 106:11635–11640.
12. Law B, Waring R (2015) Carbon implications of current and future effects of drought, fire and management on Pacific Northwest forests. *For Ecol Manage* 355:4–14.
13. Berner LT, Law BE, Meddens AJ, Hicke JA (2017) Tree mortality from fires, bark beetles, and timber harvest during a hot and dry decade in the western United States (2003–2012). *Environ Res Lett* 12:065005.
14. Oregon Global Warming Commission (2017) Biennial Report to the Legislature (Oregon Global Warming Commission, Salem, OR).
15. Campbell J, Donato D, Azuma D, Law B (2007) Pyrogenic carbon emission from a large wildfire in Oregon, United States. *J Geophys Res Biogeosci* 112:G04014.
16. King AW, Hayes DJ, Huntzinger DN, West TO, Post WM (2012) North American carbon dioxide sources and sinks: Magnitude, attribution, and uncertainty. *Front Ecol Environ* 10:512–519.
17. Wilson BT, Woodall CW, Griffith DM (2013) Imputing forest carbon stock estimates from inventory plots to a nationally continuous coverage. *Carbon Balance Manag* 8:1.
18. Reilly MJ, et al. (2017) Contemporary patterns of fire extent and severity in forests of the Pacific Northwest, USA (1985–2010). *Ecosphere* 8:e01695.
19. Anderson CM, Field CB, Mach KJ (2017) Forest offsets partner climate-change mitigation with conservation. *Front Ecol Environ* 15:359–365.
20. Willamette Water 2100 Explorer (2017) Assessing water futures under alternative climate and management scenarios: Agricultural water demand, crop and irrigation decisions. Available at explorer.bee.oregonstate.edu/Topic/WW2100/AgSummaries.aspx. Accessed November 13, 2017.
21. Hudiburg T, et al. (2009) Carbon dynamics of Oregon and Northern California forests and potential land-based carbon storage. *Ecol Appl* 19:163–180.
22. Bonan GB, Doney SC (2018) Climate, ecosystems, and planetary futures: The challenge to predict life in Earth system models. *Science* 359:eaam8328.
23. Riitters KH, Wickham JD (2012) Decline of forest interior conditions in the conterminous United States. *Sci Rep* 2:653.
24. Noss RF, LaRoe ET, Scott JM (1995) *Endangered Ecosystems of the United States: A Preliminary Assessment of Loss and Degradation* (US Department of the Interior, National Biological Service, Washington, DC).
25. Jaeger W, Plantinga A, Langpap C, Bigelow D, Moore K (2017) *Water, Economics and Climate Change in the Willamette Basin* (Oregon State University Extension Service, Corvallis, OR).
26. Kline JD, et al. (2016) Evaluating carbon storage, timber harvest, and habitat possibilities for a Western Cascades (USA) forest landscape. *Ecol Appl* 26:2044–2059.
27. Matthews S, O'Connor R, Plantinga AJ (2002) Quantifying the impacts on biodiversity of policies for carbon sequestration in forests. *Ecol Econ* 40:71–87.
28. Arnold S, Kagan J, Taylor B (2000) Summary of current status of Oregon's biodiversity. *Oregon State of the Environment Report* (Oregon Progress Board, Salem, OR), pp 121–126.
29. Bright RM, et al. (2017) Local temperature response to land cover and management change driven by non-radiative processes. *Nat Clim Chang* 7:296–302.
30. Betts M, Phalan B, Frey S, Rousseau J, Yang Z (2017) Old-growth forests buffer climate-sensitive bird populations from warming. *Diversity Distrib*, 10.1111/ddi.12688.
31. Architecture 2030(2017) The 2030 Challenge. Available at architecture2030.org. Accessed October 23, 2017.
32. Oliver CD, Nassar NT, Lippke BR, McCarter JB (2014) Carbon, fossil fuel, and biodiversity mitigation with wood and forests. *J Sustain For* 33:248–275.
33. Harmon ME, Moreno A, Domingo JB (2009) Effects of partial harvest on the carbon stores in Douglas-fir/western hemlock forests: A simulation study. *Ecosystems (N Y)* 12:777–791.
34. Lippke B, et al. (2011) Life cycle impacts of forest management and wood utilization on carbon mitigation: Knowns and unknowns. *Carbon Manag* 2:303–333.
35. Gunn JS, Ganz DJ, Keeton WS (2011) Biogenic vs. geologic carbon emissions and forest biomass energy production. *GCB Bioenergy* 4:239–242.
36. Hudiburg TW, Law BE, Wirth C, Luyssaert S (2011) Regional carbon dioxide implications of forest bioenergy production. *Nat Clim Chang* 1:419–423.
37. Law BE, Berner LT (2015) *NACP TERRA-PNW: Forest Plant Traits, NPP, Biomass, and Soil Properties, 1999-2014* (ORNL DAAC, Oak Ridge, TN).
38. Law BE, Hudiburg TW, Luyssaert S (2013) Thinning effects on forest productivity: Consequences of preserving old forests and mitigating impacts of fire and drought. *Plant Ecol Divers* 6:73–85.
39. Meigs G, Donato D, Campbell J, Martin J, Law B (2009) Forest fire impacts on carbon uptake, storage, and emission: The role of burn severity in the Eastern Cascades, Oregon. *Ecosystems (N Y)* 12:1246–1267.
40. Harmon ME, Marks B (2002) Effects of silvicultural practices on carbon stores in Douglas-fir western hemlock forests in the Pacific Northwest, USA: Results from a simulation model. *Can J For Res* 32:863–877.
41. Hudiburg TW, Law BE, Thornton PE (2013) Evaluation and improvement of the community land model (CLM4) in Oregon forests. *Biogeosciences* 10:453–470.
42. Ruefenacht B, et al. (2008) Conterminous U.S. and Alaska forest type mapping using forest inventory and analysis data. *Photogramm Eng Remote Sens* 74:1379–1388.
43. Peterman W, Bachelet D, Ferschweiler K, Sheehan T (2014) Soil depth affects simulated carbon and water in the MC2 dynamic global vegetation model. *Ecol Modell* 294:84–93.
44. Smith JE, Heath L, Skog KE, Birdsey R (2006) Methods for calculating forest ecosystem and harvested carbon with standard estimates for forest types of the United States (US Department of Agriculture, Forest Service, Northeastern Research Station, Newtown Square, PA), General Technical Report NE-343.
45. Harmon ME, Harmon JM, Ferrell WK, Brooks D (1996) Modeling carbon stores in Oregon and Washington forest products: 1900–1992. *Clim Change* 33:521–550.
46. Sathre R, O'Connor J (2010) Meta-analysis of greenhouse gas displacement factors of wood product substitution. *Environ Sci Policy* 13:104–114.

frontiers in Forests and Global Change

PERSPECTIVE
published: 11 June 2019
doi: 10.3389/ffgc.2019.00027

Check for updates

# Intact Forests in the United States: Proforestation Mitigates Climate Change and Serves the Greatest Good

**William R. Moomaw[1]*, Susan A. Masino[2,3] and Edward K. Faison[4]**

[1] Emeritus Professor, The Fletcher School and Co-director Global Development and Environment Institute, Tufts University, Medford, MA, United States, [2] Vernon Roosa Professor of Applied Science, Trinity College, Hartford, CT, United States, [3] Charles Bullard Fellow in Forest Research, Harvard Forest, Petersham, MA, United States, [4] Senior Ecologist, Highstead Foundation, Redding, CT, United States

Climate change and loss of biodiversity are widely recognized as the foremost environmental challenges of our time. Forests annually sequester large quantities of atmospheric carbon dioxide ($CO_2$), and store carbon above and below ground for long periods of time. Intact forests—largely free from human intervention except primarily for trails and hazard removals—are the most carbon-dense and biodiverse terrestrial ecosystems, with additional benefits to society and the economy. Internationally, focus has been on preventing loss of tropical forests, yet U.S. temperate and boreal forests remove sufficient atmospheric $CO_2$ to reduce national annual *net* emissions by 11%. U.S. forests have the potential for much more rapid atmospheric $CO_2$ removal rates and biological carbon sequestration by intact and/or older forests. The recent *1.5 Degree Warming Report* by the Intergovernmental Panel on Climate Change identifies *reforestation* and *afforestation* as important strategies to increase negative emissions, but they face significant challenges: afforestation requires an enormous amount of additional land, and neither strategy can remove sufficient carbon by growing young trees during the critical next decade(s). In contrast, growing existing forests intact to their ecological potential—termed *proforestation*—is a more effective, immediate, and low-cost approach that could be mobilized across suitable forests of all types. Proforestation serves the greatest public good by maximizing co-benefits such as nature-based biological carbon sequestration and unparalleled ecosystem services such as biodiversity enhancement, water and air quality, flood and erosion control, public health benefits, low impact recreation, and scenic beauty.

**Keywords: biodiversity crisis, Pinchot, afforestation, reforestation, forest ecosystem, biological carbon sequestration, old-growth forest, second-growth forest**

OPEN ACCESS

***Edited by:***
*Alexandra C. Morel, University of Oxford, United Kingdom*

***Reviewed by:***
*Don Waller, University of Wisconsin System, United States*
*Dominick Anthony DellaSala, Geos Institute, United States*

***Correspondence:***
*William R. Moomaw*
*william.moomaw@tufts.edu*

***Specialty section:***
*This article was submitted to Tropical Forests, a section of the journal Frontiers in Forests and Global Change*

***Received:*** *19 January 2019*
***Accepted:*** *20 May 2019*
***Published:*** *11 June 2019*

***Citation:***
*Moomaw WR, Masino SA and Faison EK (2019) Intact Forests in the United States: Proforestation Mitigates Climate Change and Serves the Greatest Good. Front. For. Glob. Change 2:27. doi: 10.3389/ffgc.2019.00027*

## INTRODUCTION

Life on Earth as we know it faces unprecedented, intensifying, and urgent imperatives. The two most urgent challenges are (1) mitigating and adapting to climate change (Intergovernmental Panel on Climate Change, 2013, 2014, 2018), and (2) preventing the loss of biodiversity (Wilson, 2016; IPBES, 2019). These are three of the Sustainable Development Goals, Climate, Life on Land and Life under Water (Division for Sustainable Development Goals, 2015), and significant international resources are being expended to address these crises and limit



FS-001571

negative impacts on economies, societies and biodiverse natural communities. The recent *1.5 Degree Warming Report* of the Intergovernmental Panel on Climate Change (2018) was dire and direct, stating the need for "rapid, far-reaching and unprecedented changes in all aspects of society." We find that growing additional existing forests as intact ecosystems, termed *proforestation*, is a low-cost approach for immediately increasing atmospheric carbon sequestration to achieve a stable atmospheric carbon dioxide concentration that reduces climate risk. Proforestation also provides long-term benefits for biodiversity, scientific inquiry, climate resilience, and human benefits. This approach could be mobilized across all forest types.

Forests are essential for carbon dioxide removal (CDR), and the CDR rate needs to increase rapidly to remain within the 1.5 or 2.0°C range (Intergovernmental Panel on Climate Change, 2018) specified by the Paris Climate Agreement (2015). Growing existing forests to their biological carbon sequestration potential optimizes CDR while limiting climate change and protecting biodiversity, air, land, and water. Natural forests are by far the most effective (Lewis et al., 2019). Technologies for direct CDR from the atmosphere, and bioenergy with carbon capture and storage (BECCS), are far from being technologically ready or economically viable (Anderson and Peters, 2016). Furthermore, the land area required to supply BECCS power plants with tree plantations is 7.7 million km$^2$, or approximately the size of Australia (Intergovernmental Panel on Climate Change, 2018). Managed plantations that are harvested periodically store far less carbon because trees are maintained at a young age and size (Harmon et al., 1990; Sterman et al., 2018). Furthermore, plantations are often monocultures, and sequester less carbon more slowly than intact forests with greater tree species diversity and higher rates of biological carbon sequestration (Liu et al., 2018). Recent research in the tropics shows that natural forests hold 40 times more carbon than plantations (Lewis et al., 2019).

Alternative forest-based CDR methods include *afforestation* (planting new forests) and *reforestation* (replacing forests on deforested or recently harvested lands). Afforestation and reforestation can contribute to CDR, but newly planted forests require many decades to a century before they sequester carbon dioxide in substantial quantities. A recent National Academy study titled *Negative Emissions Technologies and Reliable Sequestration: A Research Agenda* discusses afforestation and reforestation and finds their contribution to be modest (National Academies of Sciences, 2019). The study also examines changes in conventional forest management, but neglects proforestation as a strategy for increasing carbon sequestration. Furthermore, afforestation to meet climate goals requires an estimated 10 million km$^2$–an area slightly larger than Canada (Intergovernmental Panel on Climate Change, 2018). The massive land areas required for afforestation and BECCS (noted above) compete with food production, urban space and other uses (Searchinger et al., 2009; Sterman et al., 2018). More importantly, neither of these two practices is as effective quantitatively as proforestation in the next several decades when it is needed most. For example, Law et al. (2018) reported that extending harvest cycles and reducing cutting on public lands had a larger effect than either afforestation or reforestation on increasing carbon stored in forests in the Northwest United States. In other regions such as New England (discussed below), longer harvest cycles and proforestation are likely to be even more effective. Our assessment on the climate and biodiversity value of natural forests and proforestation aligns directly with a recent report that pinpointed "stable forests" – those not already significantly disturbed or at significant risk – as playing an outsized role as a climate solution due to their carbon sequestration and storage capabilities (Funk et al., 2019).

Globally, terrestrial ecosystems currently remove an amount of atmospheric carbon equal to one-third of what humans emit from burning fossil fuels, which is about 9.4 GtC/y ($10^9$ metric tons carbon per year). Forests are responsible for the largest share of the removal. Land use changes, i.e., conversion of forest to agriculture, urban centers and transportation corridors, emit ~1.3 GtC/y (Le Quéré et al., 2018). However, forests' potential carbon sequestration and additional ecosystem services, such as high biodiversity unique to intact older forests, are also being degraded significantly by current management practices (Foley et al., 2005; Watson et al., 2018). Houghton and Nassikas (2018) estimated that the "current gross carbon sink in forests recovering from harvests and abandoned agriculture to be −4.4 GtC/y, globally." This is approximately the current gap between anthropogenic emissions and biological carbon and ocean sequestration rates by natural systems. If deforestation were halted, and secondary forests were allowed to continue growing, they would sequester −120 GtC between 2016 and 2100 or ~12 years of current global fossil carbon emissions (Houghton and Nassikas, 2018). Northeast secondary forests have the potential to increase biological carbon sequestration between 2.3 and 4.2-fold (Keeton et al., 2011).

Existing proposals for "Natural Climate Solutions" do not consider explicitly the potential of proforestation (Griscom et al., 2017; Fargione et al., 2018). However, based on a growing body of scientific research, we conclude that protecting and stewarding intact diverse forests and practicing proforestation as a purposeful public policy on a large scale is a highly effective strategy for mitigating the dual crises in climate and biodiversity and ultimately serving the "greatest good" in the United States and the rest of the world. **Table 1** summarizes some of the key literature supporting this point.

## A SMALL FRACTION OF U.S. FORESTS IS MANAGED TO REMAIN INTACT

Today, <20% of the world's forests remain intact (i.e., largely free from logging and other forms of extraction and development). Intact forests are largely tropical forests or boreal forests in Canada and Russia (Watson et al., 2018). In the U.S.—a global pioneer in national parks and wildlife preserves—the percentage of intact forest in the contiguous 48 states is only an estimated 6–7% of total forest area (Oswalt et al., 2014), with a higher proportion in the West and a lower proportion in the East. Setting aside a large portion of U.S. forest in Inventoried Roadless Areas (IRAs) was groundbreaking yet only represents 7% of total forest area in the lower 48 states—and, ironically,

**TABLE 1** | Comparison of climate and biodiversity benefits of *intact* (either old-growth forest or younger forest managed as Gap 1 or Gap 2, and thus protected from logging and other resource extraction) and traditionally *managed* forests for multiple forest types in the United States.

| | Location | Forest type | Forest condition with greater value | References |
|---|---|---|---|---|
| **ECOSYSTEM CHARACTERISTICS** | | | | |
| Density of large trees (>60 cm DBH) | Eastern US | mid-Atlantic oak-hickory forests, northern hemlock-hardwood forests, and boreal spruce-fir forests | Intact (81% greater) | Miller et al., 2016 |
| Proportion of old forest | Eastern US | Same as above | Intact | Miller et al., 2016 |
| Basal area of dead standing trees | Eastern US | Same as above | Intact | Miller et al., 2016 |
| Coarse woody debris volume | Eastern US | Same as above | Intact (135% greater) | Miller et al., 2016 |
| Carbon storage | Pacific Northwest US | Douglas fir and western hemlock; | Intact (75–138% greater) | Harmon et al., 1990 |
| Carbon storage | Northeastern US | Northern hardwood conifer | Intact (39–118% greater) | Nunery and Keeton, 2010 |
| Forest fire burn severity | Western US | Pine and mixed conifer forests | Managed (two SEs greater) | Bradley et al., 2016 |
| **BIODIVERSITY** | | | | |
| Tree species richness | Eastern US | mid-Atlantic oak-hickory forests, northern hemlock-hardwood forests, and boreal spruce-fir forests | Intact | Miller et al., 2018 |
| Proportion rare tree species | Eastern US | Same as above | Intact | Miller et al., 2018 |
| Bird species richness and abundance | Northeastern Minnesota | Hemi-boreal | Intact (12–20% greater) | Zlonis and Niemi, 2014 |
| Trunk bryophyte and lichen species richness | Northwestern Montana | Grand-fir | Intact (33% greater) | Lesica et al., 1991 |
| Salamander density | Ozark Mountains, Missouri | Oak-hickory | Intact (395–9,500% greater) | Herbeck and Larsen, 1999 |
| Probability of occurrence of invasive plant species | Eastern US | Deciduous and mixed forest | managed | Riitters et al., 2018 |

*Intact forests range in size and previous disturbance history but they are not under active management and have been allowed to continue growing according to the procedures described for proforestation.*

management of some IRAs allows timber harvest and road building (Williams, 2000), a scenario happening currently in the Tongass National Forest in Alaska (Koberstein and Applegate, 2018). These scant percentages worldwide and particularly in the U.S. are insufficient to address pressing national and global issues such as rising $CO_2$ levels, flooding, and biodiversity loss, as well as provide suitable locations for recreation and associated public health benefits (Cordell, 2012; Watson et al., 2018). In heavily populated and heavily forested sub-regions in the Eastern U.S., such as New England, the total area dedicated as intact (i.e., primary management is for trails and hazard removals) is even more scarce, comprising only ∼3% of land area. Just 2% of the region is legally protected from logging and other resource extraction (**Figure 1**). A large portion of forest managed currently as intact or "reserved forest" – and thus functioning as "stable forest" (Funk et al., 2019) – is designated solely by administrative regulations that can be altered at any time.

Intact forests in the U.S. include federal wilderness areas and national parks, some state parks, and some privately-owned holdings and conservation trust lands. Recent studies reveal that intact forests in national parks tend to be older and have larger trees than nearby forests that are not protected from logging (Miller et al., 2016; **Table 1**). Scaling up protection of intact forests and designating and significantly expanding reserved forest areas are public policy imperatives that are compatible with public access and with the country's use of forest products. Identifying suitable forest as intact (for carbon sequestration, native biodiversity, ecosystem function, etc.) can spawn new jobs and industries in forest monitoring, tourism and recreation, as well as create more viable local economies based on wood reuse and recycling. Public lands with significant biodiversity and proforestation potential also provide wildlife corridors for climate migration and resilience for many species.

## PROFORESTATION INCREASES BIOLOGICAL CARBON SEQUESTRATION AND LONG-TERM STORAGE IN U.S. FORESTS

Net forest carbon reflects the dynamic between gains and losses. Carbon is lost from forests in several ways: damage from natural disturbances including insects and pathogens ("pests"), fire, drought and wind; forest conversion to development or other non-forest land; and forest harvest/management. Together, fires, drought, wind, and pests account for ∼12% of the carbon lost in the U.S.; forest conversion accounts for ∼3% of carbon loss; and forest harvesting accounts for 85% of the carbon lost from forests each year (Harris et al., 2016). Forests in the Southern US have the highest percentage of carbon lost to timber harvest (92%) whereas the Western US is notably lower (66%) because of the




**FIGURE 1 |** Distribution of forest cover and intact "wildland" forest across six New England states. At left, map of overall forest cover (green) vs. forest protected legally (red) or managed currently (yellow) as intact in New England. At right, regional and state specific % forest cover (green), % managed as intact Gap 1 (limited intervention other than trails and hazard removals) but not protected legally (yellow), and % legally protected as intact forest (red, designated U.S Geological Survey (USGS) Gap 1 or Gap 2 and primarily federal and state wilderness areas, and certain national parks). Adapted and compiled from National Conservation Easement Database (2014); United States Geological Survey (2019a,b), and the University of Montana (2019). USGS Gap level 1 or 2 lands receive the highest level of protection from logging and other resource extraction and generally correspond with IUCN protected categories 1a, 1b, and II (https://gapanalysis.usgs.gov/blog/iucn-definitions/).

greater contribution of fires to carbon removal. The Northern U.S. is roughly equivalent to the national average at 86% (Harris et al., 2016).

Proforestation produces natural forests as maximal carbon sinks of diverse species (while supporting and accruing additional benefits of intact forests) and can reduce significantly and immediately the amount of forest carbon lost to non-essential management. Because existing trees are already growing, storing carbon, and sequestering more carbon more rapidly than newly planted and young trees (Harmon et al., 1990; Stephenson et al., 2014; Law et al., 2018; Leverett and Moomaw, in preparation), proforestation is a near-term approach to sequestering additional atmospheric carbon: a significant increase in "negative emissions" is urgently needed to meet temperature limitation goals.

The carbon significance of proforestation is demonstrated in multiple ways in larger trees and older forests. For example, a study of 48 undisturbed primary or mature secondary forest plots worldwide found, on average, that the largest 1% of trees [considering all stems $\geq$1 cm in diameter at breast height (DBH)] accounted for half of above ground living biomass (The largest 1% accounted for ~30% of the biomass in U.S. forests due to larger average size and fewer stems compared to the tropics) (Lutz et al., 2018). Each year a single tree that is 100 cm in diameter adds the equivalent biomass of an entire 10–20 cm diameter tree, further underscoring the role of large trees (Stephenson et al., 2014). Intact forests also may sequester half or more of their carbon as organic soil carbon or in standing and fallen trees that eventually decay and add to soil carbon (Keith et al., 2009). Some older forests continue to sequester additional soil organic carbon (Zhou et al., 2006) and older forests bind soil organic matter more tightly than younger ones (Lacroix et al., 2016).

If current management practices continue, the world's forests will only achieve half of their biological carbon sequestration potential (Erb et al., 2018); intensifying current management practices will only decrease living biomass carbon and increase soil carbon loss. Forests in temperate zones such as in the Eastern U.S. have a particularly high untapped capacity for carbon storage and sequestration because of high growth and low decay rates (Keith et al., 2009) and because of recent recovery from an extensive history of timber harvesting and land conversion for agriculture in the 18th, 19th, and early 20th centuries (Pan et al., 2011; Duveneck and Thompson, 2019). In New England, median forest age is about 75 years of age (United States Forest Service, 2019), which is only about 25–35% of the lifespan of many of the common tree species in these



FS-001574

Case No. 1:23-cv-01501-RMR Document 15-3 filed 09/29/23 USDC Colorado pg 176 of 220



forests (Thompson et al., 2011). Much of Maine's forests have been harvested continuously for 200 years and have a carbon density less than one-third of the forests of Southern Vermont and New Hampshire, Northwestern Connecticut and Western Massachusetts—a region that has not been significantly harvested over the past 75–150 years (National Council for Air Stream Improvement, 2019). Western Massachusetts in particular has a significant portion classifed as Tier 1 matrix forest, defined as "*large contiguous areas whose size and natural condition allow for the maintenance of ecological processes*" (Databasin, 2019). However, forests managed as intact do not need to be large or old in absolute terms to have ecological value: disturbances create gaps and young habitats, and the official policy of the Commonwealth of Massachusetts Department of Environmental Management (now Department of Conservation and Recreation) considers an old-growth forest of at least 2 hectares ecologically significant (Department of Environmntal Management, 1999).

As shown in **Table 1**, ecosystem services accrue as forests age for centuries. Far from plateauing in terms of carbon sequestration (or added wood) at a relatively young age as was long believed, older forests (e.g., >200 years of age without intervention) contain a variety of habitats, typically continue to sequester additional carbon for many decades or even centuries, and sequester significantly more carbon than younger and managed stands (Luyssaert et al., 2008; Askins, 2014; McGarvey et al., 2015; Keeton, 2018). A recent paper affirmed that letting forests grow is an effective way to sequester carbon—but unlike previous studies it suggested that sequestration is highest in "young" forests (Pugh et al., 2019). This conclusion is problematic for several reasons. One confounding factor is that older forests in the tropics were compared to young forests in temperate and boreal areas; temperate forests in particular have the highest $CO_2$ removal rates and overall biological carbon sequestration (Keith et al., 2009) but this high rate is not limited to young temperate and boreal forests. The age when sequestration rates decrease is not known, and Pugh et al. defined "young" as up to 140 years. As noted above, Keeton et al. (2011) estimate that secondary forests in the Northeast have the potential to increase their biological carbon sequestration several-fold. More field work is needed across age ranges, species and within biomes, but the inescapable conclusion is that growing forests is beneficial to the climate and maintaining intact forest has additional benefits (**Table 1**). We conclude that proforestation has the potential to provide rapid, additional carbon sequestration to reduce *net* emissions in the U.S. by much more than the 11% that forests provide currently (United States Environmental Protection Agency, 2019). A recent report on natural climate solutions determined that negative emissions could be increased from 11 to 21% even without including proforestation (Fargione et al., 2018). Quantified estimates of increased forest sequestration and ecosystem services were based on re-establishing forests where possible and lengthening rotation times on private land; they explicitly did not account for proforestation potential on public land.

Although biological carbon storage in managed stands, regardless of the silvicultural prescription, is generally lower than in unmanaged intact forests (Harmon et al., 1990; Ford and Keeton, 2017)—even after the carbon stored in wood products is included in the calculation—stands managed with reduced harvest frequency and increased structural retention sequester more carbon than more intensively managed stands (Nunery and Keeton, 2010; Law et al., 2018). Such an approach for production forests, or "working" forests—balancing resource extraction with biological carbon sequestration—is often termed "managing for net carbon" or "managing for climate change" and an approach that should be promoted alongside dedicating significant areas to intact ecosystems. Oliver et al. (2014) acknowledge a balance between intact and managed forest and suggest that long term storage in "efficient" wood products like wood building materials (with the potential for less carbon emissions compared to steel or concrete, termed the "avoidance pathway") can offer a significant carbon benefit. To achieve this, some questionable assumptions are that 70% of the harvested wood is merchantable and stored in a lasting product, all unmerchantable wood is removed and used, harvesting occurs at optimum intervals (100 years) and carbon sequestration tapers off significantly after 100 years. Forestry models underestimate the carbon content of older, larger trees, and it is increasingly clear that trees can continue to remove atmospheric carbon at increasing rates for many decades beyond 100 years (Robert T. Leverett, pers. comm. Stephenson et al., 2014; Lutz et al., 2018; Leverett et al., under review). Because inefficient logging practices result in substantial instant carbon release to the atmosphere, and only a small fraction of wood becomes a lasting product, increasing market forces and investments toward wood buildings that have relatively short lifetimes could increase forest extraction rates significantly and become unsustainable (Oliver et al., 2014).

## HABITAT PROTECTION, BIODIVERSITY AND SCIENTIFIC VALUE OF PROFORESTATION

Large trees and intact, older forests are not only effective and cost-effective natural reservoirs of carbon storage, they also provide essential habitat that is often missing from younger, managed forests (Askins, 2014). For example, intact forests in Eastern U.S. national parks have greater tree diversity, live and dead standing basal area, and coarse woody debris, than forests that are managed for timber (Miller et al., 2016, 2018; **Table 1**). The density of cavities in older trees and the spatial and structural heterogeneity of the forest increases with stand age (Ranius et al., 2009; Larson et al., 2014), and large canopy gaps develop as a result of mortality of large trees, which result in dense patches of regeneration (Askins, 2014). These complex structures and habitat features support a greater diversity of lichens and bryophytes (Lesica et al., 1991), a greater density and diversity of salamanders (Petranka et al., 1993; Herbeck and Larsen, 1999), and a greater diversity and abundance of birds in old, intact forests than in nearby managed forests (Askins, 2014; Zlonis and Niemi, 2014; **Table 1**). Forest bird guilds also benefit from small intact forests in urban landscapes relative to unprotected matrix forests (Goodwin and Shriver, 2014). Several bird species



FS-001575

in the U.S. that are globally threatened—including the wood thrush, cerulean warbler, marbled murrelet, and spotted owl are, in part, dependent on intact, older forests with large trees (International Union for Conservation of Nature, 2019). Two species that are extinct today—Bachman's warbler and Ivory-billed woodpecker—likely suffered from a loss of habitat features associated with old forests (Askins, 2014).

Today, forest managers often justify management to maintain heterogeneity of age structures to enhance wildlife habitat and maintain "forest health" (Alverson et al., 1994). However, early successional forest species (e.g., chestnut-sided warbler and New England cottontail) that are common targets for forest management may be less dependent on forest management than is commonly believed (cf. Zlonis and Niemi, 2014; Buffum et al., 2015). Management also results in undesirable consequences such as soil erosion, introduction of invasive and non-native species (McDonald et al., 2008; Riitters et al., 2018), loss of carbon—including soil carbon (Lacroix et al., 2016), increased densities of forest ungulates such as white-tailed deer (Whitney, 1990)—a species that can limit forest regeneration (Waller, 2014)—and a loss of a sense of wildness (e.g., Thoreau, 1862).

Forest health is a term often defined by a particular set of forestry values (e.g., tree regeneration levels, stocking, tree growth rates, commercial value of specific species) and a goal of eliminating forest pests. Although appropriate in a commercial forestry context, these values should not be conflated with the ability of intact natural forests to continue to function and even thrive indefinitely and provide a diversity of habitats on their own (e.g., Zlonis and Niemi, 2014). Natural forests, regardless of their initial state, naturally develop diverse structures as they age and require from us only the time and space to self-organize (e.g., Larson et al., 2014; Miller et al., 2016).

Intact forests provide irreplaceable scientific value. In addition to a biodiverse habitat an intact forest provides an area governed by natural ecological processes that serve as important scientific controls against which to compare the effects of human activities and management practices (Boyce, 1998). Areas without resource extraction (i.e., timber harvesting, hunting), pest removal, or fire suppression allow for a full range of natural ecological processes (fire, herbivory, natural forest development) to be expressed (Boyce, 1998). Only if we have sufficient natural areas can we hope to understand the effects of human activities on the rest of our forests. Additional research and monitoring projects that compare ecological attributes between intact and managed forests at a range of spatial scales will also help determine how effective protected intact forests can be at conserving a range of biota, and where additional protected areas may need to be established (e.g., Goodwin and Shriver, 2014; Jenkins et al., 2015).

## PROFORESTATION AND FOREST FIRES

Given the increase in forest area burned in the United States over the past 30 years (National Interagency Fire Center, 2019), it is important to address the relationship between forest management and forest fires. There is a widely held perception that the severity and size of recent fires are directly related to the fuels that have accumulated in the understory due to a lack of forest management to reduce these fuels (i.e., pulping, masticating, thinning, raking, and prescribed burning; Reinhardt et al., 2008; Bradley et al., 2016). However, some evidence suggests that proforestation should actually *reduce* fire risk and there are at least three important factors to consider: first, fire is an integral part of forest dynamics in the Western U.S.; second, wildfire occurrence, size, and area burned are generally not preventable even with fuel removal treatments (Reinhardt et al., 2008); and third, the area burned is actually far less today than in the first half of the twentieth century when timber harvesting was more intensive and fires were not actively suppressed (Williams, 1989; National Interagency Fire Center, 2019). Interestingly, in the past 30 years, intact forests in the Western U.S. burned at significantly *lower* intensities than did managed forests (Thompson et al., 2007; Bradley et al., 2016; **Table 1**). Increased potential fuel in intact forests appear to be offset by drier conditions, increased windspeeds, smaller trees, and residual and more combustible fuels inherent in managed areas (Reinhardt et al., 2008; Bradley et al., 2016). Rather than fighting wildfires wherever they occur, the most effective strategy is limiting development in fire-prone areas, creating and defending zones around existing development (the wildland-urban interface), and establishing codes for fire-resistant construction (Cohen, 1999; Reinhardt et al., 2008).

## PROFORESTATION AND ECOSYSTEM SERVICES: SERVING THE GREATEST GOOD

In 1905 Gifford Pinchot, Chief of the U.S. Forest Service, summarized his approach to the nation's forests when he wrote "...where conflicting interests must be reconciled, the question will always be decided from the standpoint of the greatest good of the greatest number in the long run." This ethos continues to define the management approach of the U.S. Forest Service from its inception to the present day. Remarkably, however, even in 2018 the five major priorities of the Forest Service do not mention biodiversity, carbon storage, or climate change as major aspects of its work (United States Forest Service, 2018).

Today, the needs of the nation have changed: emerging forest science and the carbon and biodiversity benefits of proforestation demand a focus on growing intact natural public and private forests, including local parks and forest reserves (Jenkins et al., 2015). There is also a growing need across the country, and particularly within reach of highly populated areas, for additional local parks and protected forest reserves that serve and provide the public with solitude, respite, and wild experiences (e.g., Thoreau, 1862). Detailed analysis of over one thousand public comments regarding management of Hoosier National Forest, a public forest near population centers in several states, revealed a strong belief that wilderness contributes to a sense of well-being. Responses with the highest frequency reflected an interest in preservation and protection of forests and wildlife, a recognition of the benefits to human physical and mental health, a sense



FS-001576

of ethical responsibility, opposition to damage and destruction, monetary concerns, and a preponderance of sadness, fear and distress over forest loss (Vining and Tyler, 1999).

Quantifiable public health benefits of forests and green spaces continue to emerge, and benefits are highest in populations with chronic and difficult-to-treat conditions like anxiety, depression, pain and post-traumatic stress disorder (Karjalainen et al., 2010; Frumkin et al., 2017; Hansen et al., 2017; Oh et al., 2017). In the United Kingdom "growing forests for health" is the motto of the National Health Service Forest (2019) and there is a recognized need for evidence-based analysis of human health co-benefits alongside nature-based ecosystem services (Frumkin et al., 2017).

## POLICY RECOMMENDATIONS

To date, the simplicity of the idea of proforestation has perhaps been stymied by inaccurate or non-existent terminology to describe it. Despite a number of non-binding international forest agreements (United Nations Conference on Environment Development, 1992; United Nations Forum on Forests, 2008; Forest Declaration, 2014) and responsibilities by a major UN organization [Food and Agriculture Organization (FAO)], current climate policies lack science-based definitions that distinguish forest condition—including the major differences between young and old forests across a range of ecosystem services. Lewis et al. (2019) further note that broad definitions and confused terminology have an unfortunate result that policymakers and their advisers mislead the public (Lewis et al., 2019). Most discussions concerning forest loss and forest protection are in terms of percentage of land area that has tree canopy cover (Food and Agriculture Organization, 2019). This lack of specificity significantly hampers efforts to evaluate and protect intact forests, to quantify their value, and to dedicate existing forests as intact forests for the future. For example, the UN Framework Convention on Climate Change and the FAO consider and group tree plantations, production forests, and mature intact forests equally under the general term "forest" (Mackey et al., 2015). In addition, "forest conservation" simply means maintaining "forest cover" and does not address age, species richness or distribution—or the degree that a forest ecosystem is intact and functioning (Mackey et al., 2015). The erroneous assumption is that all forests are equivalently beneficial for a range of ecosystem services—a conclusion that is quantitatively inaccurate in terms of biological carbon sequestration and biodiversity as well as many other ecosystem services.

Practicing proforestation should be emphasized on suitable public lands as is now done in U.S. National Parks and Monuments. Private forest land owners might be compensated to practice proforestation, for sequestering carbon and providing associated co-benefits by letting their forests continue to grow. At this time, we lack national policies that quantify and truly maximize benefits across the landscape. At a regional scale, however, some conservation visions do explicitly recognize and promote the multiple values and services associated with forest reserves or wildlands (e.g., Foster et al., 2010) and climate offset programs can be used explicitly to support proforestation. For example, a recent project by the Nature Conservancy protected 2,185 hectares (5,400 acres) in Vermont as wildland and is expected to yield ∼$2 M over 10 years for assuring long-term biological carbon storage (Nature Conservancy, 2019). Burnt Mountain is now protected by a "forever wild" easement and part of a 4,452 hectare (11,000 acre) preserve. More public education and similar incentives are needed.

## CONCLUSIONS

To meet any proposed climate goals of the Paris Climate Agreement (1.5, 2.0° C, targets for reduced emissions) it is essential to simultaneously *reduce greenhouse gas emissions from all sources* including fossil fuels, bioenergy, and land use change, and *increase CDR* by forests, wetlands and soils. Concentrations of these gases are now so high that reducing emissions alone is insufficient to meet these goals. Speculation that untested technologies such as BECCS can achieve the goal while allowing us to continue to emit more carbon has been described as a "moral hazard" (Anderson and Peters, 2016). Furthermore, BECCS is not feasible within the needed timeframe and CDR is urgent. Globally, existing forests only store approximately half of their potential due to past and present management (Erb et al., 2018), and many existing forests are capable of immediate and even more extensive growth for many decades (Lutz et al., 2018). During the timeframe while seedlings planted for afforestation and reforestation are growing (yet will never achieve the carbon density of an intact forest), proforestation is a safe, highly effective, immediate natural solution that does not rely on uncertain discounted future benefits inherent in other options.

Taken together, proforestation is a rapid and essential strategy for achieving climate and biodiversity goals and for serving the greatest good. Stakeholders and policy makers need to recognize that the way to maximize carbon storage and sequestration is to grow intact forest ecosystems where possible. Certainly, all forests have beneficial attributes, and the management focus of some forests is providing wood products that we all use. But until we acknowledge and quantify differences in forest status (Foster et al., 2010), we will be unable to develop policies (and educate landowners, donors, and the public) to support urgent forest-based benefits in the most effective, locally appropriate and cost-effective manner. A differentiation between production forests and natural forest ecosystems would garner public support for a forest industry with higher value products and a renewed focus on reducing natural resource use—and for recycling paper and wood. It could also spur long-overdue local partnerships between farms and forests—responsible regional composting keeps jobs and resources within local communities while improving soil health and increasing soil carbon (Brown and Cotton, 2011). The forest industry as a whole can benefit from proforestation-based jobs that focus on scientific data collection, public education, public health and a full range of ecosystem services.


FS-001577

In sum, proforestation provides the most effective solution to dual global crises—climate change and biodiversity loss. It is the only practical, rapid, economical, and effective means for atmospheric CDR among the multiple options that have been proposed because it removes more atmospheric carbon dioxide in the immediate future and continues to sequester it long-term. Proforestation will increase the diversity of many groups of organisms and provide numerous additional and important ecosystem services (Lutz et al., 2018). While multiple strategies will be needed to address global environmental crises, proforestation is a very low-cost option for increasing carbon sequestration that does not require additional land beyond what is already forested and provides new forest related jobs and opportunities along with a wide array of quantifiable ecosystem services, including human health.

## AUTHOR CONTRIBUTIONS

WM, SM, and EF contributed equally to conceiving, writing and editing this manuscript and all agree to its publication.

## FUNDING

Supported by Charles Bullard Fellowship in Forest Research, Harvard Forest (SM).

## ACKNOWLEDGMENTS

The authors thank the reviewers for improving the manuscript with substantive and thoughtful comments and thank David N. Ruskin, Ph.D. (Trinity College) for feedback and assistance throughout.

## REFERENCES


Alverson, W. S., Waller, D., and Kuhlmann, W. (1994). *Wild Forests: Conservation Biology and Public Policy*. Washington, DC: Island Press.

Anderson, K., and Peters, G. (2016). The trouble with negative emissions. *Science* 354, 182–183 doi: 10.1126/science.aah4567

Askins, R. A. (2014). *Saving the World's Deciduous Forests: Ecological Perspectives From East Asia, North America, and Europe*. New Haven, CT: Yale University Press.

Boyce, M. S. (1998). Ecological-process management and ungulates: Yellowstone's conservation paradigm. *Wildlife Soc. Bull.* 26, 391–398.

Bradley, C. M., Hanson, C. T., and DellaSala, D. A. (2016). Does increased forest protection correspond to higher fire severity in frequent-fire forests of the western United States? *Ecosphere* 7:e01492. doi: 10.1002/ecs2.1492

Brown, S., and Cotton, N. (2011). Changes in soil properties and carbon content following compost application: Results of on-farm sampling. *Compost Sci. Util.* 19, 87–96. doi: 10.1080/1065657X.2011.10736983

Buffum, B., McGreevy, T. J. Jr., Gottfried, A. E., Sullivan, M. E., and Husband, T. P. (2015). An analysis of overstory tree canopy cover in sites occupied by native and introduced cottontails in the Northeastern United States with recommendations for habitat management for new England Cottontail. *PloS ONE* 10:e0135067. doi: 10.1371/journal.pone.0135067

Cohen, J. D. (1999). *Reducing the Wildland Fire Threat to Homes: Where and How Much?* U.S.D.A Forest Service Gen.Tech. Rep., PSW-GTR-173, 189-195. Available online at: https://www.fs.fed.us/rm/pubs_other/rmrs_1999_cohen_j001.pdf (accessed April 15, 2019).

Cordell, H. K. (2012). *Outdoor Recreation Trends and Futures: A Technical Document Supporting the Forest Service 2010 RPA Assessment*. Asheville, NC: United States Department of Agriculture, Southern Research Station. Available online at: https://www.srs.fs.usda.gov/pubs/gtr/gtr_srs150.pdf

Databasin (2019). Available online at: https://databasin.org/datasets/68c240fb9dc14fda8ccd965064fb3321 (accessed April 15, 2019).

Department of Environmntal Management (1999). *Old Growth Policy*. State of Massachusetts, Division of Forest and Parks, Bureau of Forestry.

Division for Sustainable Development Goals (2015). *Sustainable Development Goals*. Knowledge Platform, United Nations. Available online at: https://sustainabledevelopment.un.org/?menu=1300 (accessed april 15, 2019).

Duveneck, M. J., and Thompson, J. R. (2019). Social and biophysical determinants of future forest conditions in New England: effects of a modern land-use regime. *Global Environ. Change* 55, 115–129. doi: 10.1016/j.gloenvcha.2019.01.009

Erb, K.-H., Kastner, T., Plutzar, C., Bais, A. L. S., Carvalhais, N., Fetzel, T., et al. (2018). Unexpectedly large impact of forest management and grazing on global vegetation biomass. *Nature* 553, 73–76. doi: 10.1038/nature25138

Fargione, J. E., Bassett, S., Boucher,. T., Bridgham, S. D., Conant, R. T., Cook-Patton, S. C., et al. (2018). Natural climate solutions for the United States. *Sci Adv.* 4:eaat1869. doi: 10.1126/sciadv.aat1869

Foley, J. A., DeFries, R., Asner, G. P., Barford, C., Bonan, G., Carpenter, S. R., et al. (2005). Global consequences of land use. *Science* 309, 570–574. doi: 10.1126/science.1111772

Food and Agriculture Organization (2019). *Food and Agriculture Organization of the United Nations*. Available online at: http://www.fao.org/home/en/ (accessed April 15, 2019).

Ford, S. E., and Keeton, W. E. (2017). Enhanced carbon storage through management for old-growth characteristics in northern hardwoods. *Ecosphere* 8, 1–20. doi: 10.1002/ecs2.1721

Forest Declaration (2014). *New York Declaration on Forests*. Available online at: Available online at: http://forestdeclaration.org/about/ (accessed April 15, 2019).

Foster, D. R., Donahue, B. M., Kittredge, D. B., Lambert, K. F., Hunter, M. L., Hall, B. R., et al. (2010). *Wildlands and Woodlands: A Vision for the New England Landscape*. Cambridge, MA: Harvard University Press. Available online at: https://www.wildlandsandwoodlands.org/sites/default/files/Wildlands%20and%20Woodlands%20New%20England.pdf

Frumkin, H., Bratman, G. N., Breslow, S. J., Cochran, B., Kahn, P. H. Jr., Lawler, J. J., et al. (2017). Nature contact and human health: a research agenda. *Environ. Health Perspect.* 125:075001. doi: 10.1289/EHP1663

Funk, J. M., Aguilar-Amuchastegui, N., Baldwin-Cantello, W., Busch, J., Chuvasov, E., Evans, T., et al. (2019). Securing the climate benefits of stable forests. *Clim. Policy.* doi: 10.1080/14693062.2019.1598838

Goodwin, S. E., and Shriver, W. G. (2014). Using a bird community index to evaluate national parks in the urbanized national capital region. *Urban Ecosyst.* 17, 979–990. doi: 10.1007/s11252-014-0363-2

Griscom, B. W., Adams, J., Ellis, P. W., Houghton, R. A., Lomax, G., Miteva, D. A., et al. (2017). Natural climate solutions. *Proc. Natl. Acad. Sci. U.S.A* 114, 11645–11650. doi: 10.1073/pnas.1710465114

Hansen, M. M., Jones, R., and Tocchini, K. (2017). Shinrin-Yoku (forest bathing) and nature therapy: a state-of-the-art review. *Int. J. Environ. Res. Public Health* 14:851. doi: 10.3390/ijerph14080851

Harmon, M. E., Ferrell, W. K., and Franklin, J. F. (1990). Effects on carbon storage of conversion of old-growth forests to young forests. *Science* 247, 699–702. doi: 10.1126/science.247.4943.699

Harris, N. L., Hagen, S. C., Saatchi, S. S., Pearson, T. R. H., Woodall, C. W., Domke, G. M., et al. (2016). Attribution of net carbon change by disturbance type across forest lands of the conterminous United States. *Carbon Balance Manag.* 11:24. doi: 10.1186/s13021-016-0066-5

Herbeck, L. A., and Larsen, D. R. (1999). Plethodontid salamander response to silvicultural practices in Missouri Ozark forests. *Conserv. Biol.* 13, 623–632. doi: 10.1046/j.1523-1739.1999.98097.x

Houghton, R. A., and Nassikas, A. A. (2018). Negative emissions from stopping deforestation and forest degradation, globally. *Glob. Change Biol.* 24, 350–359. doi: 10.1111/gcb.13876

Intergovernmental Panel on Climate Change (2013). "Summary for policymakers," in *Climate Change 2013: The Physical Science Basis. Contribution of Working Group I to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change*, eds T. F. Stocker, D. Qin, G.-K. Plattner, M. Tignor, S. K. Allen, J. Boschung, A. Nauels, Y. Xia, V. Bex, and P. M. Midgley (New York, NY: Cambridge University Press). Available online at: https://www.ipcc.ch/report/ar5/wg1/.

Intergovernmental Panel on Climate Change (2014). "Summary for policymakers," in *Climate Change 2014: Impacts, Adaptation, and Vulnerability. Part A: Global and Sectoral Aspects. Contribution of Working Group II to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change*, eds C. B. Field, V. R. Barros, D. J. Dokken, K. J. Mach, M. D. Mastrandrea, T. E. Bilir, M. Chatterjee, K. L. Ebi, Y. O. Estrada, R. C. Genova, B. Girma, E. S. Kissel, A. N. Levy, S. Maccracken, P. R. Mastrandrea, and L. L. White (New York, NY: Cambridge University Press). Available online at: https://www.ipcc.ch/report/ar5/wg2/.

Intergovernmental Panel on Climate Change (2018). "Summary for Policymakers," in *Global warming of 1.5°C. An IPCC Special Report on the impacts of global warming of 1.5°C Above Pre-Industrial Levels and Related Global Greenhouse Gas Emission Pathways, in the Context of Strengthening the Global Response to the Threat of Climate Change, Sustainable Development, and Efforts to Eradicate Poverty*, eds V. Masson-Delmotte, P. Zhai, H. O. Pörtner, D. Roberts, J. Skea, P. R. Shukla, A. Pirani, W. Moufouma-Okia, C. Péan, R. Pidcock, S. Connors, J. B. R. Matthews, Y. Chen, X. Zhou, M. I. Gomis, E. Lonnoy, T. Maycock, M. Tignor, and T. Waterfield. (Geneva: World Meteorological Society). Available online at: https://www.ipcc.ch/sr15/.

Intergovernmental Science-Policy Platform on Biodiversity and Ecosystem Services (IPBES). (2019). Available online at: https://www.ipbes.net/

International Union for Conservation of Nature (2019). *IUCN Red List of Threatened Species* Available online at: https://www.iucnredlist.org/ (accessed April 15, 2019).

Jenkins, C. N., Van Houtan, K. S., Pimm, S. L., and Sexton, J. O. (2015). US protected lands mismatch biodiversity priorities. *Proc. Natl. Acad. Sci.U.S.A.* 112, 5081–5086. doi: 10.1073/pnas.1418034112

Karjalainen, E., Sarjala, T., and Raitio, H. (2010). Promoting human health through forests: overview and major challenges. *Environ. Health Prev. Med.* 15, 1–8. doi: 10.1007/s12199-008-0069-2

Keeton, W. S. (2018). "Source or sink? Carbon dynamics in old-growth forests and their role in climate change mitigation," in *Ecology and Recovery of Eastern Old-growth Forests,* eds A. Barton and W. S. Keeton (Washington, DC: Island Press), 340.

Keeton, W. S., Whitman, A. A., McGee, G. C., and Goodale, C. L. (2011). Late-successional biomass development in northern hardwood-conifer forests of the Northeastern United States. *Forest Sci.* 57, 489–505. doi: 10.1093/forestscience/57.6.489

Keith, H., Mackey, B. G., and Lindenmayer, D. B. (2009). Re-evaluation of forest biomass carbon stocks and lessons from the world's most carbon-dense forests. *Proc. Natl. Acad. Sci. U.S.A.* 106, 11635–11640. doi: 10.1073/pnas.0901970106

Koberstein, P., and Applegate, J. (2018). *Trump's Great American Forest Liquidation Sal*e. Cascadia Times. Available online at: https://www.times.org/forest-liquidation-sale (accessed April 15, 2019).

Lacroix, E. M., Petrenko, C. L., and Friedland, A. J. (2016). Evidence for losses from strongly bound SOM pools after clear cutting in a northern hardwood forest. *Soil Sci.* 181, 202–207. doi: 10.1097/SS.00000000000000147

Larson, A. J., Lutz, J. A., Donato, D. C., Freund, J. A., Swanson, M. E., Hillerislambers, J., et al. (2014). Spatial aspects of tree mortality strongly differ between young and old-growth forests. *Ecology* 96, 2855–2861. doi: 10.1890/15-0628.1

Law, B. E., Hudiburg, T. W., Berner, L. T., Kent, J. J., Buotte, P. C., and Harmon, M. E. (2018). Land use strategies to mitigate climate change in carbon dense temperate forests. *Proc. Natl. Acad. Sci. U.S.A.* 115, 3663–3668. doi: 10.1073/pnas.1720064115

Le Quéré, C., Andrew, R. M., Friedlingstein, P., Sitch, S., Pongratz, J., Manning, A. C., et al. (2018). Global carbon budget 2017. *Earth Syst. Sci. Data* 10, 405–448. doi: 10.5194/essd-10-405-2018

Lesica, P., Mccune, B., Cooper, S. V., and Hong, W. S. (1991). Differences in lichen and bryophyte communities between old-growth and managed second-growth forests in the Swan Valley, Montana *Can. J. Botany* 69, 1745–1755. doi: 10.1139/b91-222

Lewis, S. L., Wheeler, C. E., Mitchard, E. T. A., and Koch, A. (2019). Restoring natural forests is the best way to remove atmospheric carbon. *Nature* 568, 25–28. doi: 10.1038/d41586-019-01026-8

Liu, X., Stefan, T., Jin-Sheng, H., Pascal, A. N., Helge, B., Zhiyao, T., et al. (2018). Tree species richness increases ecosystem carbon storage in subtropical forests. *Proc. R. Soc. B* 285:20181240. doi: 10.1098/rspb.2018.1240

Lutz, J. A., Furniss, T. J., Johnson, D. J., Davies, S. J., Allen, D., Alonso, A., et al. (2018). Global importance of large-diameter trees. *Glob. Ecol. Biogeogr.* 27, 849–864. doi: 10.1111/geb.12747

Luyssaert, S., Schulze, E. D., Börner, A., Knohl, A., Hessenmöller, D., Law, B. E., et al. (2008). Old-growth forests as global carbon sinks. *Nature* 455, 213–215. doi: 10.1038/nature07276

Mackey, B., Dellasala, D. A., Kormos, C., Lindenmayer, D., Kumpel, N., Zimmerman, B., et al. (2015). Policy options for the world's primary forests in multilateral environmental agreements. *Conserv. Lett.* 8, 139–147. doi: 10.1111/conl.12120

McDonald, R. I., Motzkin, G., and Foster, D. R. (2008). Assessing the influence of historical factors, contemporary processes, and environmental conditions on the distribution of invasive species. *J. Torrey Bot. Soc.* 135, 260–271. doi: 10.3159/08-RA-012.1

McGarvey, J. C., Thompson, J. R., Epstein, H. E., and Shugart, H. H. Jr. (2015). Carbon storage in old-growth forests of the Mid-Atlantic: toward better understanding the eastern forest carbon sink. *Ecology* 96, 311–317. doi: 10.1890/14-1154.1

Miller, K. M., Dieffenbach, F. W., Campbell, J. P., Cass, W. B., Comiskey, J. A., Matthews, E. R., et al. (2016). National parks in the eastern United States harbor important older forest structure compared with matrix forests. *Ecosphere* 7:e01404. doi: 10.1002/ecs2.1404

Miller, K. M., Mcgill, B. J., Mitchell, B. R., Comiskey, J., Dieffenbach, F. W., Matthews, E. R., et al. (2018). Eastern national parks protect greater tree species diversity than unprotected matrix forests. *Forest Ecol. Manag.* 414, 74–84. doi: 10.1016/j.foreco.2018.02.018

National Academies of Sciences, Engineering, and Medicine (2019). *Negative Emissions Technologies and Reliable Sequestration: A Research Agenda.* Washington, DC: The National Academies Press.

National Conservation Easement Database (2014) Available online at: conservationeasement.us (accessed April 15, 2019).

National Council for Air and Stream Improvement (2019). *United States Department of Agriculture Forest Service. COLE: Carbon on Line Estimator*. Available online at: https://www.fs.usda.gov/ccrc/index.php?q=tools/cole (accessed April 15, 2019).

National Health Service Forest (2019). *National Health Service*. Available online at: http://nhsforest.org/ (accessed April 15, 2019).

National Interagency Fire Center (2019). *Total Wildland Fires and Acres (1926-2017).* Available online at: https://www.nifc.gov/fireInfo/fireInfo_stats_totalFires.html (accessed April 15, 2019).

Nature Conservancy (2019). *The. "Burnt Mountain Beauty: Explore Vermont's Newest Preserve and the State's Largest Carbon Project"*. Available online at: https://www.nature.org/en-us/about-us/where-we-work/united-states/vermont/stories-in-vermont/burnt-mountain-beauty/ (accessed April 15, 2019).

Nunery, J. S., and Keeton, W. S. (2010). Forest carbon storage in the northeastern United States: net effects of harvesting frequency, post-harvest retention, and wood products. *Forest Ecol. Manag.* 259, 1363–1375. doi: 10.1016/j.foreco.2009.12.029

Oh, B., Lee, K. J., Zaslawski, C., Yeung, A., Rosenthal, D., Larkey, L., et al. (2017). Health and well-being benefits of spending time in forests: systematic review. *Environ. Health Prev. Med.* 22:71. doi: 10.1186/s12199-017-0677-9

Oliver, C. D., Nassar, N. T., Lippke, B. R., and McCarter, J. B. (2014). Carbon, fossil fuel, and biodiversity mitigation with wood and forests. *J. Sustain. Forest.* 33, 248–275. doi: 10.1080/10549811.2013.839386

Oswalt, S. N., Smith, W. B., Miles, P. D., and Pugh, S. A. (2014). *Forest Resources of the United States, 2012: A Technical Document Supporting the Forest Service*

*2010 Update of the RPA Assessment*. United States Department of Agriculture, Forest Service, Washington Office. (Washington, DC), Gen. Tech. Rep. WO-91. doi: 10.2737/WO-GTR-91

Pan, Y., Chen, J. M., Birdsey, R., McCullough, K., He, L., and Deng, F. (2011). Age structure and disturbance legacy of North American forests. *Biogeosciences* 8, 715–738. doi: 10.5194/bg-8-715-2011

Paris Climate Agreement (2015). Available online at: https://unfccc.int/sites/default/files/english_paris_agreement.pdf (accessed April 15, 2019).

Petranka, J. W., Eldridge, M. E., and Haley, K. E. (1993). Effects of timber harvesting on southern Appalachian salamanders. *Conserv. Biol.* 7, 363–370. doi: 10.1046/j.1523-1739.1993.07020363.x

Pugh, T. A. M., Lindeskog, M., Smith, B., Poulter, B., Arneth, A., Haverd, V., et al. (2019). Role of forest regrowth in global carbon sink dynamics. *Proc. Natl. Acad. Sci. U.S.A.* 116, 4382–4387. doi: 10.1073/pnas.1810512116

Ranius, T., Niklasson, M., and Berg, N. (2009). Development of tree hollows in pedunculate oak (*Quercus robur*). *Forest Ecol. Manag.* 257, 303–310. doi: 10.1016/j.foreco.2008.09.007

Reinhardt, E. D., Keane, R. E., Calkin, D. E., and Cohen, J. D. (2008). Objectives and considerations for wildland fuel treatment in forested ecosystems of the interior western United States. *Forest Ecol. Manag.* 256, 1997–2006. doi: 10.1016/j.foreco.2008.09.016

Riitters, K., Potter, K., Iannone, B., Oswalt, C., Guo, Q., and Fei, S. (2018). Exposure of protected and unprotected forest to plant invasions in the eastern United States. *Forests* 9:723. doi: 10.3390/f9110723

Searchinger, T. D., Hamburg, S. P., Melillo, J., Chameides, W., Havlik, P., Kammen, D. M., et al. (2009). Climate change. Fixing a critical climate accounting error. *Science* 326, 527–528. doi: 10.1126/science.1178797

Stephenson, N. L., Das, A. J., Condit, R., Russo, S. E., Baker, P. J., Beckman, N. G., et al. (2014). Rate of tree carbon accumulation increases continuously with tree size. *Nature* 507, 90–93. doi: 10.1038/nature12914

Sterman, J. D., Siegel, L., and Rooney-Varga, J. N. (2018). Reply to comment on 'Does replacing coal with wood lower $CO_2$ emissions? Dynamic lifecycle analysis of wood bioenergy'. *Environ. Res. Lett.* 13:128003. doi: 10.1088/1748-9326/aaf354

Thompson, J. R., Foster, D. R., Scheller, R., and Kittredge, D. (2011). The influence of land use and climate change on forest biomass and composition in Massachusetts, USA. *Ecol. Appl.* 21, 2425–2444. doi: 10.1890/10-2383.1

Thompson, J. R., Spies, T. A., and Ganio, L. M. (2007). Reburn severity in managed and unmanaged vegetation in a large wildfire. *Proc. Natl. Acad. Sci. U.S.A.* 104, 10743–10748. doi: 10.1073/pnas.0700229104

Thoreau, H. D. (1862). *Walking. The Atlantic Monthly, A Magazine of Literature, Art, and Politics*. Available online at: https://www.theatlantic.com/magazine/archive/1862/06/walking/304674/.

United Nations Conference on Environment and Development (1992). *Non-Legally Binding Authoritative Statement of Principles for a Global Consensus on the Management, Conservation and Sustainable Development of all Types of Forests*.Available online at: http://www.un-documents.net/for-prin.htm (accessed April 15, 2019).

United Nations Forum on Forests (2008). *Non-Legally Binding Instrument on All Types of Forests*. Available online at: http://www.undocs.org/A/res/62/98 (accessed April 15, 2019).

United States Environmental Protection Agency (2019). *Sources of Greenhouse Gas Emissions* Available online at: https://www.epa.gov/ghgemissions/sources-greenhouse-gas-emissions (accessed April 15, 2019).

United States Forest Service (2019). *Forest Inventory and Analysis National Program, Forest Inventory EVALIDator web-application Version 1.8.0.00.* U.S. Department of Agriculture, Forest Service, Northern Research Station. Available online at: https://apps.fs.usda.gov/Evalidator/evalidator.jsp (accessed April 15, 2019).

United States Forest Service. Leadership Corner. (2018). Available online at: https://www.fs.fed.us/blogs/five-national-priorities-build-legacy-guide-agency-forward-0 (accessed April 15, 2019).

United States Geological Survey (2019a). *Gap Analysis Program. Protected Areas Database of the United States (PADUS), version 1.3 Combined Feature Class.* (accessed April 15, 2019).

United States Geological Survey (2019b). *National Land Cover Database Land Cover Collection* Available online at: https://catalog.data.gov/dataset/national-land-cover-database-nlcd-land-cover-collection (accessed April 15, 2019).

University of Montana (2019). *Wilderness Connect.* Available online at: https://wilderness.net/ (accessed April 15, 2019).

Vining, J., and Tyler, D. E. (1999). Values, emotions and desired outcomes reflected in public responses to forest management lans. *Hum. Ecol. Rev.* 6, 21–34.

Waller, D. M. (2014). "Effects of deer on forest herb layers," in *The Herbaceous Layer in Forests of Eastern North America, Ch. 16, 2nd Edn,* ed F. S. Gilliam (New York, NY: Oxford University Press), 369–399. doi: 10.1093/acprof:osobl/9780199837656.003.0016

Watson, J. E. M., Evans, T., Venter, O., Williams, B., Tulloch, A., Stewart, C., et al. (2018). The exceptional value of intact forest ecosystems. *Nat. Ecol. Evol.* 2, 599–610. doi: 10.1038/s41559-018-0490-x

Whitney, G. G. (1990). The history and status of the hemlock-hardwood forests of the Allegheny Plateau. *J. Ecol.* 1, 443–458. doi: 10.2307/2261123

Williams, M. (1989). *Americans and Their Forests: A Historical Geography*. New York, NY: Cambridge University Press.

Williams, M. (2000). Available online at: https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fsm8_035779.pdf (accessed April 15, 2019).

Wilson, E. O. (2016). *Half-Earth: Our Planet's Fight for Life.* New York, NY: Liveright Publishing Corp.

Zhou, G., Liu, S., Li, Z., Zhang, D., Tang, X., Zhou, C., et al. (2006). Old-growth forests can accumulate carbon in soils. *Science.* 314:1417. doi: 10.1126/science.1130168

Zlonis, E. J., and Niemi, G. J. (2014). Avian communities of managed and wilderness hemiboreal forests. *Forest Ecol. Manag.* 328, 26–34. doi: 10.1016/j.foreco.2014.05.017

**Conflict of Interest Statement:** The authors declare that the research was conducted in the absence of any commercial or financial relationships that could be construed as a potential conflict of interest.

*Copyright © 2019 Moomaw, Masino and Faison. This is an open-access article distributed under the terms of the Creative Commons Attribution License (CC BY). The use, distribution or reproduction in other forums is permitted, provided the original author(s) and the copyright owner(s) are credited and that the original publication in this journal is cited, in accordance with accepted academic practice. No use, distribution or reproduction is permitted which does not comply with these terms.*

ENVIRONMENTAL RESEARCH
LETTERS

LETTER • OPEN ACCESS

# Meeting GHG reduction targets requires accounting for all forest sector emissions

To cite this article: Tara W Hudiburg *et al* 2019 *Environ. Res. Lett.* **14** 095005

View the article online for updates and enhancements.

Recent citations

- Getting the message right on naturebased solutions to climate change
  Nathalie Seddon *et al*
- Forests of the future: Climate change impacts and implications for carbon storage in the Pacific Northwest, USA
  Michael J. Case *et al*
- The use of soil nutrient balances in deriving forest biomass harvesting guidelines specific to region, tree species and soil type in the Netherlands
  Wim de Vries *et al*

This content was downloaded from IP address 107.2.29.109 on 12/03/2021 at 23:50

IOP Publishing Environ. Res. Lett. 14 (2019) 095005 https://doi.org/10.1088/1748-9326/ab28bb

Environmental Research Letters

CrossMark

OPEN ACCESS

RECEIVED
20 February 2019

REVISED
3 June 2019

ACCEPTED FOR PUBLICATION
11 June 2019

PUBLISHED
23 August 2019

Original content from this work may be used under the terms of the Creative Commons Attribution 3.0 licence.

Any further distribution of this work must maintain attribution to the author(s) and the title of the work, journal citation and DOI.

LETTER

# Meeting GHG reduction targets requires accounting for all forest sector emissions

**Tara W Hudiburg[1,4], Beverly E Law[2], William R Moomaw[3], Mark E Harmon[2] and Jeffrey E Stenzel[1]**

[1] Department of Forest, Rangeland and Fire Sciences, 875 Perimeter Dr MS 1133, University of Idaho, Moscow, ID 83844, United States of America

[2] Department of Forest Ecosystems and Society, 321 Richardson Hall, Oregon State University, Corvallis, OR 97333, United States of America

[3] Center for International Environment and Resource Policy, The Fletcher School, and Global Development and Environment Institute, Tufts University, Medford MA, United States of America

[4] Author to whom any correspondence should be addressed.

**E-mail:** thudiburg@uidaho

**Keywords:** carbon, forests, wood products, climate mitigation, GHG mandates

Supplementary material for this article is available online

## Abstract

Atmospheric greenhouse gases (GHGs) must be reduced to avoid an unsustainable climate. Because carbon dioxide is removed from the atmosphere and sequestered in forests and wood products, mitigation strategies to sustain and increase forest carbon sequestration are being developed. These strategies require full accounting of forest sector GHG budgets. Here, we describe a rigorous approach using over one million observations from forest inventory data and a regionally calibrated life-cycle assessment for calculating cradle-to-grave forest sector emissions and sequestration. We find that Western US forests are net sinks because there is a positive net balance of forest carbon uptake exceeding losses due to harvesting, wood product use, and combustion by wildfire. However, over 100 years of wood product usage is reducing the potential annual sink by an average of 21%, suggesting forest carbon storage can become more effective in climate mitigation through reduction in harvest, longer rotations, or more efficient wood product usage. Of the ~10 700 million metric tonnes of carbon dioxide equivalents removed from west coast forests since 1900, 81% of it has been returned to the atmosphere or deposited in landfills. Moreover, state and federal reporting have erroneously excluded some product-related emissions, resulting in 25%–55% underestimation of state total $CO_2$ emissions. For states seeking to reach GHG reduction mandates by 2030, it is important that state $CO_2$ budgets are effectively determined or claimed reductions will be insufficient to mitigate climate change.

## Introduction

Heat trapping greenhouse gases (GHGs) are being added to the atmosphere at an accelerating rate by fossil fuel combustion and land use change. Climate change consequences were recently described by the Intergovernmental Panel on Climate Change (IPCC) and the United States National Climate Assessment (USGCRP 2018). The IPCC Special Report (IPCC 2018), Global Warming of 1.5 °C, concludes that to keep global average temperature below 1.5 °C by 2100, it is essential to reduce fossil fuel emissions by 45% by 2030, while substantially increasing the removal of atmospheric $CO_2$. Both reports emphasize the need to increase atmospheric $CO_2$ removal strategies by forests in addition to sustaining current forest carbon uptake (Houghton and Nassikas 2018). Some states in the US have set targets for reducing GHGs that include forest climate mitigation options (Anderson *et al* 2017, Law *et al* 2018), yet consistent, rigorous accounting methods are required for evaluating options. Challenges include determining the extent that forests, harvest operations, and wood products affect GHG budgets and emissions accountability.

© 2019 The Author(s). Published by IOP Publishing Ltd

The most recent global carbon budget estimate indicates that land-based sinks remove 29% of anthropogenic emissions (including land use change) with a significant contribution from forests (Le Quéré *et al* 2018). However, none of the agreements or policies (IPCC 2006, NRCS 2010, Brown *et al* 2014, Doe 2017, EPA 2017, Duncan 2017) provides clear and consistent procedures for quantitatively assessing the extent forests and forest products are increasing or reducing carbon dioxide concentrations in the atmosphere. Assessments are challenging because they involve components that require multiple types of expertise and accounting methods (i.e. forest ecosystem processes, wood products, and inherently uncertain substitution credits). Methods are often in disagreement over the wood product Life Cycle Assessment (LCA) assumption of *a priori* carbon neutrality, where biogenic emissions from the combustion and decomposition of wood is ignored because the carbon released from wood is assumed to be replaced by subsequent tree growth in the following decades (EPA 2016). Despite a multitude of analyses that recognize that the assumption is fundamentally flawed (Harmon *et al* 1996, Gunn *et al* 2011, Haberl *et al* 2012, Schulze *et al* 2012, Buchholz *et al* 2016, Booth 2018), it continues to be used in mitigation analyses, particularly for wood bioenergy.

Forests are sustainable *net* sinks as long as forest carbon uptake from the atmosphere exceeds emissions from harvesting, wood product use and decomposition, and wildfire. Wood products ultimately release $CO_2$ to the atmosphere as they are manufactured, disposed of, and decompose or are burned. However, because of concerns about double-counting, significant emissions associated with harvest and wood product use have not been counted for any sector (EPA 2018). These emissions are often not included in state $CO_2$ budget estimates (Brown *et al* 2014, Oregon Global Warming Commission 2017), even when they are included in national budgets (EPA 2017) (table S1 is available online at stacks.iop.org/ERL/14/095005/mmedia). If US states intend to use forests for mitigation strategies, they must account for all contributing sources and sinks of forests and forest-derived products (Stockmann *et al* 2012, IPCC 2014).

By focusing on a region with sufficient information to conduct a meaningful LCA, we demonstrate how a quantitative assessment of forests, management practices and wood products can assess the actual role played by forests and forestry practices in managing atmospheric $CO_2$. We calculate the regional forest carbon balance (from 2001 to 2016) using observations from over 24 000 forest inventory plots in Washington, Oregon, and California (states with GHG reduction mandates). Net forest sector carbon balance is quantified using an improved LCA including harvest, transportation, manufacturing, wood product pool storage and decay, emissions associated with fire, and substitution for both building construction and energy production. We specifically consider global warming potential associated with carbon dioxide and do not include additional GHGs such as nitrous oxide and methane. Our aim is to provide an accurate cradle-to-grave, transparent and transferable accounting method of all forest-derived carbon for other states and countries with GHG reduction mandates (figure 1; box 1; figure S1; tables S2–S6).

## Results

### Western US forest ecosystem $CO_2$ balance (2001–2016)

Forest carbon uptake and release (net ecosystem production (NEP); figure 1(a)) controlled by ecosystem biological processes is calculated as the balance between forest carbon uptake (net primary production (NPP)) and forest carbon release through the decomposition of dead organic matter (heterotrophic respiration; $R_h$). In this study, a negative number indicates a net carbon sink (removal from the atmosphere) and a positive number indicates a net carbon source (addition to the atmosphere). The coastal Western US states together are a strong forest carbon sink with NEP of −292 ± 36 million metric tonnes (MMT) $CO_2$e per year (−857 g $CO_2$e $m^{-2}$ $yr^{-1}$) (table 1; table S1), and account for approximately 60% of total Western US forest NEP (coastal, southwestern, and intermountain regions).

In addition to NEP, disturbances from harvest and wildfire influence estimates of net ecosystem carbon balance (NECB = NEP minus losses Chapin *et al* 2006; figure 1(a)). In the Western US states, the significant carbon losses from the forest are primarily from removals of wood through harvest, decomposition or burning of aboveground and belowground harvest residues, and wildfire (Law and Waring 2015). Significant harvest has been occurring in the western US since the early 20th century (figure S2). Up to 40% of the harvested wood does not become a product and the products themselves decay over time, resulting in product accumulation much smaller than the total amount harvested (figure 2(a); solid line) (Harmon *et al* 1996, Dymond 2012, Williams *et al* 2016, EPA 2017). Emissions include combustion of wood that does not become a product, combustion for energy, decomposition and/or combustion at end-of-life (table 1; rows 5, 6, 9, and 10). When these carbon losses are accounted for, these forests remain significant carbon sinks at −187 ± 33 MMT $CO_2$e per year (−551 g $CO_2$e $m^{-2}$ $yr^{-1}$), with the largest sink in California (40%) followed by Oregon (33%) and Washington (27%). Despite California having twice the fire emissions of the other states (~10 versus ~5 MMT $CO_2$e $yr^{-1}$ per state) the ranking is due to much lower harvest removals in California (~12 MMT $CO_2$e $yr^{-1}$) compared to almost double in

IOP Publishing Environ. Res. Lett. 14 (2019) 095005 Letters




**Figure 1.** Conceptual diagram of Forest-GHG (a) describes the natural, land-based forest carbon sink where the net of growth and decomposition is net ecosystem production (NEP), and after accounting for removals from fire and harvest, the balance is net ecosystem carbon balance (NECB), (b) describes the cascade of wood products until eventual deposition in landfills or the atmosphere and shows the pathway of emissions.

Washington (~20 MMT $CO_2e$ $yr^{-1}$) and triple in Oregon (~31 MMT $CO_2e$ $yr^{-1}$). Fire emissions are a third of harvest removals region-wide.

Building on our earlier work (Harmon *et al* 1996, Hudiburg *et al* 2011, Law *et al* 2018), we developed a modified cradle-to-grave model (Forest-GHG) for combining the balance of carbon captured in forest ecosystems, wood product use, lifetime emissions, and eventual return to the atmosphere or long-term storage in landfills. Forest-GHG tracks emissions associated with harvest of wood and manufacturing, transport and use of wood products. Harvest removals result in immediate (combustion of residues on-site or as mill residues with and without energy recapture), fast (short-lived products such as paper), decadal (long-lived products such as wood) and centuries-long (older buildings and land-filled) timeframes before emissions are released back to the atmosphere (figures 1(b) and S1). Our model includes seven product pools and temporally dynamic recycling and landfill rates. Most importantly, we now include a more mechanistic representation of longer-term structural wood in buildings, by moving beyond a simple half-life with exponential decay (figure 3 and SI methods and SI tables 2–6). Our new building cohort-component method tracks decay of short- and



FS-001584

IOP Publishing Environ. Res. Lett. 14 (2019) 095005 Letters




**Figure 2.** Wood product inputs and outputs from 1900 to 2016 for Washington, Oregon, and California. (A) Cumulative production in MMT $CO_2$e per year assuming no losses over time (dotted grey line) versus the realized in-use wood product pool over time after accounting for decay (losses). (B) Yearly product inputs over time (blue line) that represents the fraction of harvest (removed wood) that becomes a product versus the decay emissions from the pool over time (red line).

**Table 1.** Average annual total fluxes by state and region from 2001 to 2016. All units are in million MT $CO_2$e. Negative numbers indicate a carbon sink ($CO_2$ is being removed from the atmosphere). The more negative the number, the stronger the sink. Grey shading is used to indicate net values that represent carbon sink strength both before and after removals are accounted for.

| Ecosystem | Washington | Oregon | California | Total |
|---|---|---|---|---|
| 1. Forested area (million hectares) | 9.7 | 12.4 | 11.9 | 34.0 |
| 2. Net ecosystem production (NEP) | **−89.9** | **−102.0** | **−99.8** | **−291.6** |
| 3. Fire emissions | 5.1 | 5.3 | 10.3 | 20.7 |
| 4. Harvest removals | 18.5 | 30.5 | 11.5 | 60.5 |
| Net ecosystem carbon balance (NECB) (sum of rows 1 through 4) | **− 66.4** | **−66.2** | **−78.0** | **−210.5** |
| **Forest industry** | **Washington** | **Oregon** | **California** | **Total** |
| 5. Harvest residue combustion (onsite) | 3.9 | 6.5 | 2.5 | 12.9 |
| 6. Harvest, transportation, manufacturing (FFE emissions) | 2.8 | 4.6 | 1.6 | 9.0 |
| 7. Wood product pool annual inputs | −18.5 | −30.5 | −11.5 | −60.5 |
| 8. Landfill annual inputs (from products) | −6.8 | −11.9 | −4.2 | −22.9 |
| 9. Wood manufacturing losses | 3.9 | 6.5 | 3.9 | 14.3 |
| 10. Wood product and landfill decomposition | 21.4 | 36.2 | 13.3 | 71.0 |
| Net forest sector carbon balance (NECB + sum of rows 5 through 10) | **−59.5** | **−54.7** | **−72.4** | **−186.6** |
| 11. Wood product substitution (wood) | −3.0 | −4.9 | −1.6 | −9.4 |
| 12. Wood product substitution (energy) | −1.8 | −3.0 | −1.8 | −6.6 |
| Net forest sector carbon balance (with credits; NECB + sum of rows 5 through 12) | **−64.3** | **−62.6** | **−75.8** | **−202.7** |

long-lived building components annually, and the lag time associated with these losses (figure S3). Our wood bioenergy substitution credits (Sathre and O'Connor 2010) include wood waste from harvest, mill residues, and wood products displacement of more fossil fuel intensive materials.

Using our component tracking LCA, we found that of the ~10 700 MMT $CO_2$e of wood harvested in all three states since 1900 (figure 2), only 2028 MMT $CO_2$e are currently stored in wood products with half stored in Oregon (1043 MMT $CO_2$e). In just over 100 years, Oregon has removed the equivalent of all live trees in the state's Coast Range forests (Law *et al* 2018), and returned 65% to the atmosphere and transferred 16% to landfills. Even though these are some of the most productive and carbon dense forests in the world (Hudiburg *et al* 2009), the carbon accumulated in much of the removed biomass took up to 800 years to accumulate—and cannot be recovered if current management practices continue.

Forest harvest-related emissions have averaged 107 MMT $CO_2$e annually from 2001 to 2016 (table 1; row 5, 6, 9, and 10). Emissions are highest from decay of the wood product pool that has been accumulating for over 100 years (table 1 row 10; figures 3 and S3). This is after accounting for recycling and semi-permanent storage in landfills. Structural wood product decay for long- and short-term components (wood in buildings; figure 3) account for about 30%–35% of wood product and landfill decomposition while paper and non-building wood products account for about 65%–70%. Under this complete accounting, the



FS-001585

IOP Publishing Environ. Res. Lett. 14 (2019) 095005 Letters




**Figure 3.** Conceptual models of the Forest-GHG cohort-component method for: (a) mass loss in a cohort of buildings with a 75 year average life span that accounts for the short and long-term portions of buildings and (b) mass remaining in a single building cohort over time (with replacement). Data presented is based on the 1900 cohort of single-family homes built in Oregon.

lowest contribution to overall emissions is from fossil fuel usage during harvest, transportation, and manufacturing, i.e. less than 10% of total wood product-related emissions in the three states.

We found that wood-related substitution for construction materials (0.54 fossil fuel carbon emissions avoided per unit carbon of wood; table 1 row 11) and energy (0.68 fossil fuel carbon emissions avoided; table 1 row 12) may offset 18% of forest industry emissions. This assumes 50% of wood-derived construction products are substituted for a non-wood product and that 75% of mill residues are substituted for fossil fuel energy (Berg *et al* 2016).

We varied the maximum average life spans of the wood products used in construction (e.g. buildings) to examine its effect on emissions estimates. Emissions are minimally reduced by 2%–4% in each state when a longer average maximum lifespan is used (100 years) for the long-term building components and minimally increased by 2%–3% when a shorter average maximum lifespan is used (50 years, which is the mean lifetime of buildings in the US EPA 2013).

Combined, the US west coast state forest sector (cradle-to-grave) is a net carbon sink, removing ~187 MMT $CO_2e$ annually from the atmosphere and potentially reducing fossil fuel emissions by up to another 20 MMT $CO_2e$ through product and energy substitution. Harvest-related emissions reduce the natural sink (NEP—Fire) by 34, 46, and 27% for Washington, Oregon, and California, respectively. When substitution credits are included, this changes to reductions of 27%, 37%, and 23%. Harvest rates have been highest in Oregon (table 1), contributing to increasing wood product emissions and the largest reductions to forest sink capacity.

## Discussion

NECB is a good estimate of ecosystem carbon uptake, e.g. for carbon offsets programs (Anderson *et al* 2017), and can be compared spatially with changing environmental conditions or disturbances, but is an incomplete calculation of the entire forest sector emissions. It does not include emissions from wood products caused by machinery, transport, manufacturing and losses—emissions that can equal up to 85% of the total versus 15% from fire, insects, and land use change (Williams *et al* 2016). Nor does it account for the storage and subsequent release of carbon in varying



FS-001586

IOP Publishing Environ. Res. Lett. 14 (2019) 095005 Letters

end uses with varied product lifetimes. Given that not all harvested wood is an immediate source to the atmosphere and very little harvested wood is stored in perpetuity, it is essential to track associated emissions over time. For state- or region-level carbon budgets, a cradle-to-grave carbon LCA should be combined with the ecosystem carbon balance (NEP and NECB) to account for how much the forestry sector is contributing to or offsetting total carbon emissions.

If wood buildings are replaced by wood buildings, substitution is not occurring, and because wood is preferred for construction of single-family housing in North America, some of our substitution values are overestimated (Sathre and O'Connor 2010). Wood products store carbon temporarily, and a larger wood product pool increases decomposition emissions over time (figure 3). This emphasizes that increasing the wood product carbon sink will require shifts in product allocation from short-term to long-term pools such as reclaimed (re-used) wood products from demolition of buildings, and reduction of product manufacturing losses (EPA 2016). Clearly, there is potential for climate mitigation by using forests to sequester carbon in biomass and reduce losses associated with the wood product chain (Law *et al* 2018).

It is argued that there may be reductions in fossil carbon emissions when wood is substituted for more fossil fuel intensive building materials (e.g. steel or concrete) or used as an alternative energy source (Butarbutar *et al* 2016). Substitution is a one-time credit in the year of the input. Studies have reported a range of substitution displacement factors (from negative to positive displacement; Sathre and O'Connor 2010, Smyth *et al* 2017), but we found no study that has tracked the actual amount of construction product substitution that is occurring or has occurred in the past in the United States. This makes substitution one of the most uncertain parts of this carbon budget. It may be more easily tracked in the fossil fuel sector through a decrease in emissions because of reduction in product supply, in which case it would be double counting to then include it as a credit for the forest sector. We show results with and without the substitution credit (a decrease in forest sector emissions) because it cannot be verified. We show the potential impact it has on the overall forest sector carbon sink, even though the displacement factor may be unrealistically high (Smyth *et al* 2017, Dugan *et al* 2018). For forest sector emissions assessments, the uncertainty suggests exclusion of the credit.

Currently, state's GHG accounting budgets are incorrect because they are not full cradle-to-grave estimates of all $CO_2$ emissions associated with forest natural processes and human influences. For accurate GHG accounting, these emissions should be included in the forestry sector as they are not accounted for by state's energy and transportation sectors (IPCC 2006) (table S1). The US EPA reported average fossil fuel $CO_2$ emissions of 491 MMT $CO_2e$ $yr^{-1}$ for the three states combined (2013–2016). Forest industry harvest, transportation, and manufacturing fossil fuel emissions are included in this total. However, it is unclear to what extent wood product decay and combustion emissions are also counted in state budgets. In Oregon, they are not included at all, resulting in state $CO_2$ emissions that have been underestimated by up to 55% (Oregon Global Warming Commission 2017, Law *et al* 2018). Washington includes combustion emissions from the current year's harvest (table 1; Manufacturing losses; row 9), but not from wood product decay, resulting in up to a 25% underestimation of state $CO_2$ emissions. Because California's emissions from other sectors are so high (76% of regional total), and harvest rates have been historically lower than in Oregon and Washington, the impact of not including these emissions is very small as a proportion of the total. Although fire in California has received much attention, it only accounts for 3% of the state's total fossil fuel $CO_2$ emissions.

These underestimates are especially alarming for Oregon where GHG reduction targets are to be 10% below 1990 levels by 2020 and at least 75% below 1990 levels by 2050 (Pietz and Gregor 2014). California and Washington emissions are to be reduced to 1990 levels by 2020 (Nunez 2006), and 80% and 50% below 1990 levels by 2050 (Washington State 2008), respectively.

In contrast, the US EPA reports emissions from wood product decay and landfills (EPA 2017) per the IPCC guidelines (IPCC 2006) (table S1). However, combustion emissions from logging and mill residues are not reported (EPA 2017). Moreover, ecosystem carbon losses are indirectly estimated through changes in biomass pools with measurement uncertainty that can be greater than the change (Ferster *et al* 2015). So even at the national level, emissions (as a fraction of fossil fuel emissions) would be underestimated by 10% and 24% in Washington and Oregon, respectively. Undoubtedly, there are implications for reduction mandates when the magnitude of emissions themselves are incorrect.

## Conclusions

The goal for all societies and governments as stated in Article 2 of the *United Nations Framework Convention on Climate* Change (Oppenheimer and Petsonk 2005) should be '…stabilization of GHG concentrations in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system.' The Paris Climate Agreement (UNFCCC 2015) aims to keep global average temperature from rising by no more than 2 °C above preindustrial levels, and if possible no more than 1.5 °C. Forests are identified as part of the strategy (UNFCCC 2015).

Although some US states have attempted to quantify a portion of forest-related emissions, improved estimates are essential to track emissions to meet

IOP Publishing Environ. Res. Lett. 14 (2019) 095005 Letters

reduction goals. We identified the main components that should be part of the forest sector state estimates. We found that emissions have been underestimated by up to 55% in Oregon and 25% in Washington, and that at present, these emissions are not reported in state GHG reporting guidelines. The accuracy of forest sector emissions estimates can be improved with sub-regional data on residential and commercial building lifespans, recycling, verifiable substitution benefits and accurate monitoring of growth rates of forests. However, verifiable substitution of one material for another may be more readily quantified in the fossil fuel sector.

The 2006 IPCC GHG guidelines provide three different approaches for calculating emissions from harvested wood products (IPCC 2006) (including reporting 'zero') and reporting of this component is not required by UNFCCC. To complicate accounting further, several studies have shown that using the different recommended approaches results in emissions that differ by over 100% (Green *et al* 2006, Dias *et al* 2007). Moreover, according to IPCC and UNFCCC, emissions of $CO_2$ from forest bioenergy are to be counted under land use change and not counted in the energy sector to avoid double counting. However, this provides a 'loophole' leading to their not being counted at all.

The United States government currently requires all federal agencies to count forest bioenergy as carbon neutral because the EPA assumes replacement by future regrowth of forests somewhere that may take several decades or longer (EPA 2018). While it is theoretically possible that a replacement forest will grow and absorb a like amount of $CO_2$ to that emitted decades or a century before, there is no guarantee that this will happen, and the enforcement is transferred to future generations. In any rational economic analysis, a benefit in the distant future must be discounted against the immediate damage associated with emissions during combustion. Furthermore, the goal for climate protection is not climate neutrality, but rather reduction of net GHGs emissions to the atmosphere to avoid dangerous interference with the climate system. Allowing forests to reach their biological potential for growth and sequestration, maintaining large trees (Lutz *et al* 2018), reforesting recently cut lands, and afforestation of suitable areas will remove additional $CO_2$ from the atmosphere. Global vegetation stores of carbon are 50% of their potential including western forests because of harvest activities (Erb *et al* 2017). Clearly, western forests could do more to address climate change through carbon sequestration if allowed to grow longer.

Since it is now clear that both $CO_2$ emissions and removal rates are essential to meet temperature limitation goals and prevent irreversible climate change, each should be counted and reported. We recommend that international agreements and states utilize a consistent and transparent carbon LCA that explicitly accounts for all forest and wood product storage and emissions to determine compliance with goals to lower atmospheric GHGs. Only by using a full accounting of GHGs can the world manage its emissions of heat trapping gases to achieve concentrations in the atmosphere that will support a stable climate.

## Materials and methods

We calculated the 2001 to 2016 average net forestry sector emissions from cradle-to-grave, accounting for all carbon captured in biomass and released through decomposition by forest ecosystems and wood products industry in Washington, Oregon, and California. Building on our previous work (Harmon *et al* 1996, Hudiburg *et al* 2011, Law *et al* 2013, Law *et al* 2018), we developed a modified and expanded LCA method to combine with our ecosystem carbon balance, now called Forest-GHG (version 1.0; figure 1 and box 1). We accounted for all carbon removed from forests through fire and harvest. All harvested carbon was tracked until it either was returned to the atmosphere through wood product decomposition/combustion or decomposition in landfills, minus the amount semi-permanently stored in landfills (buried). This required calculating the carbon removed by harvest operations starting in 1900 to present day because a portion of the wood removed in the past century is still in-use or decomposing. In addition to carbon in biomass, we also accounted for all carbon emissions associated with harvest (equipment fuel, transportation, manufacturing inputs). Moreover, our wood product life-cycle assessment includes pathways for recycling and deposition in landfills. Finally, we give substitution credits for not using more fossil fuel intensive materials than wood used in construction of buildings and energy production.

### Observed carbon stocks and fluxes (ecosystem carbon balance)

Carbon stock and flux estimates were calculated from over 30 000 forest inventory plots (FIA) containing over 1 million tree records in the region following methods developed in previous studies (Law *et al* 2018) (SI Methods). Flux calculations include NPP (Clark *et al* 2001) NEP, and NECB. The NECB represents the net rate of carbon accumulation in or loss from ecosystems.

### Off-site emissions associated with harvest (LCA)

Decomposition of wood through the product cycle was computed using a LCA (Harmon and Marks 2002, Law *et al* 2018). A 117 year wood products pool (1900–2016) was simulated using reported harvest rates from 1900 to 2016 for Oregon and Washington (Harmon *et al* 1996, DNR 2017, Oregon Department of Forestry 2017) and from the California State Board of Equalization (CA 2018). Harvest was converted to

IOP Publishing Environ. Res. Lett. 14 (2019) 095005 Letters

**Box 1.** Terminology and Flux Definitions for table 1

1. Forest Area = sum of all forest area in each state derived from US Forest Service forest area map (30 m resolution). Includes all ownerships.

1. NEP = Net Primary Production—heterotrophic respiration; microbial respiration as they decompose dead organic matter in an ecosystem.

1. Fire emissions = the emissions associated with *combustion* of organic matter at the time of the fire. Most of what burns is fine surface fuels, averaging 5% of aboveground biomass in mixed severity fires of Oregon and Northern California.

1. Harvest removals = Wood actually removed from the forest (not the total aboveground biomass killed). Removals are not equal to emissions but are the removed carbon from the forests at the time of harvest. This is subtracted from NEP along with fire emissions to calculate the net forest carbon balance from the viewpoint of the forest ecosystem.

**NECB = NEP + Fire Emissions + Harvest Removals.** The term is the simplest expression of forest carbon balance without tracking wood through the product life cycle. Although not all of the harvest removals will result in instant or near-term emissions, NECB still captures the impact of the removed carbon on the forest ecosystem carbon balance, and is consistent with international agreements (REDD+, conservation).

1. Harvest Residue Combustion = the emissions associated with combustion of slash piles; the branches, foliage, and non-merchantable wood left after harvest operations (remains in the forest) and burned onsite (assumed to be 50% of slash).

1. Harvest, Transportation, Manufacturing (FFE emissions) = the fossil fuel emissions associated with harvest (skidding, sawing, etc), transportation of logs to mills, manufacturing of wood and paper products, and transportation of products to stores (see table S5 for coefficients).

1. Wood Product Pool Annual Inputs = Harvest removals

1. Landfill Annual Inputs (from products) = The amount of wood and paper that is sent to landfills at end of life. In Forest-GHG, this occurs incrementally from 1950 to 1960 and then in 1961 is assumed to be constant at the current rate.

1. Wood Manufacturing Losses = fraction of wood that is lost at the mill (sawdust, etc) and is assumed to be returned to the atmosphere within one year through combustion (with 75% energy recapture) or decomposition.

1. Wood Product and Landfill Decomposition = fraction of the total wood product and non-permanent landfill carbon pools that is returned to the atmosphere annually.

**Net Forest Sector Carbon Balance = sum of NECB and rows 5 through 10. Emission sources are rows 5, 6, 9, and 10. Sinks are rows 7 and 8.**

1. Wood product substitution (Wood) = carbon credits that account for the displaced fossil fuel emissions when wood is substituted for a fossil fuel derived product in buildings (e.g. concrete or steel). We assume 0.54 g C fossil fuel emissions avoided per g of C of wood biomass used.

**Box 1.** (Continued.)

1. Wood product substitution (Energy) = carbon credits that account for the displaced fossil fuel emissions when wood is substituted for energy. In the Oregon, Washington, and California this primarily a mix of natural gas and coal. We include the biogenic emissions from combustion of forest-derived woody biomass and include an energy substitution credit if it is combusted with energy recapture.

**Net Forest Sector Carbon Balance (with substitution credit) = sum of NECB and rows 5 through 12.**

total aboveground biomass using methods from (Law *et al* 2018). The carbon emissions to the atmosphere from harvest were calculated annually over the time-frame of the analysis (1900–2016).

The coefficients and sources for the Forest-GHG LCA (figures 1(b) and S1) are included in table S1 through S6 with all units expressed as a function of the wood biomass being cut, transported, manufactured, burned, etc. We accounted for the fossil fuel emissions that occur during harvest (fuel for equipment) and the fossil fuel emissions associated with transport of wood to mills. Then, we accounted for the fossil fuel emissions associated with manufacturing of products followed by a second transportation emission for delivery of products to stores and warehouses. Wood that is not made into a wood or paper product (e.g. waste) is assumed to be combusted onsite at the mill (with 50% energy recapture as combined heat and power) or used in a product that will return the carbon to the atmosphere within one year (table 1 and box 1; Wood Manufacturing Losses).

Wood products are divided into varying product pools and are then tracked through the wood product cascade until end of life (figure 1(b)). Wood products are split into seven product pools: single-family homes, multi-family homes, mobile homes, non-residential construction, furniture and manufacturing, shipping, and other wood. We simulated wood product storage and emissions to 2050 for display purposes in the figures assuming a constant harvest rate after 2016.

We estimate the carbon pools and fluxes associated with buildings by separating buildings into components with different life spans (figures 3 and S3). This allows components and buildings to have a lag time before significant losses occur, and recognizes the difference between building life span and the residence time of carbon in a building. This also allows capacity for Forest-GHG to have component and building life spans evolve over time as construction practices and the environment (including biophysical, economic, and social drivers) change.

In Forest-GHG, a fraction of each year's new harvest is allocated to residential (single-family, multi-family, and mobile homes) and non-residential construction (Smith *et al* 2006). This fraction is further divided into the short-term (23%) and long-term (77%) components. The



FS-001589

resulting pools are tracked independently, quantifying losses through decay and demolition from the year they start until then end of the simulation.

All the components created in a given year are considered a building cohort that is also tracked separately each year. All components are summed to give the total amount of building carbon remaining in a cohort at a given time (figure S3). For each year, the amount lost to the atmosphere or to the landfills through demolition, is simply the current year's total wood product carbon pool plus the current years inputs and minus last year's total wood product carbon pool.

### Substitution

We calculated wood product substitution for fossil fuel derived products (concrete, steel and energy). The displacement value for product substitution was assumed to be 0.54 Mg fossil C/Mg C (Smyth *et al* 2017, Dugan *et al* 2018) wood use in long-term structures (Sathre and O'Connor 2010). Although the displacement value likely fluctuates over time, we assumed it was constant for the simulation period. We accounted for losses in product substitution associated with building replacement (Harmon *et al* 2009), but ignored the leakage effect related to fossil C use by other sectors. We assumed 75% of 'waste wood' was used for fuelwood in homes or at mills (wood manufacturing losses in table 1). We accounted for displacement of fossil fuel energy sources using a displacement factor of 0.68 assuming a mix of coal and natural gas replacement (Smyth *et al* 2017, Dugan *et al* 2018).

### Uncertainty estimates and sensitivity analysis

We calculate a combined uncertainty estimate for NEP and NECB using the uncertainty in the observations and input datasets (climate, land cover, harvest amounts). For the biomass and NPP observations, we performed Monte Carlo simulations of the mean and standard deviations for NPP (Hudiburg *et al* 2011) derived for each plot using three alternative sets of allometric equations. Uncertainty in NECB was calculated as the combined uncertainty of NEP, fire emissions (10%), harvest removals (7%), and land cover estimates (10%) using the propagation of error approach. Sensitivity analysis was only used for the long-term wood product pool by varying the average life spans of buildings by ±25 years in our new cohort component method. Our estimates varied by 7%. This was combined with the uncertainty in NECB to calculate total uncertainty on the net forest sector carbon balance.

## Acknowledgments

This research was supported by the Agriculture and Food Research Initiative of the US National Institute of Food and Agriculture Grant 2013-67003-20652 and the National Science Foundation award number DEB-1553049.

## ORCID iDs

Tara W Hudiburg https://orcid.org/0000-0003-4422-1510
William R Moomaw https://orcid.org/0000-0003-2690-2339
Mark E Harmon https://orcid.org/0000-0002-4195-8288
Jeffrey E Stenzel https://orcid.org/0000-0001-8881-0566

## References

Anderson C M, Field C B and Mach K J 2017 Forest offsets partner climate-change mitigation with conservation *Frontiers Ecol. Environ.* **15** 359–65

Berg E, Morgan T and Simmons E 2016 *Timber Products Output (TPO): Forest Inventory, Timber Harvest, Mill and Logging Residue-Essential Feedstock Information Needed to Chracterize the NAPA Supply Chain* (Missoula, MT: University of Montana)

Booth M S 2018 Not carbon neutral: assessing the net emissions impact of residues burned for bioenergy *Environ. Res. Lett.* **13** 035001

Brown E G, Rodriquez M, Nichols M D and Corey R W 2014 First Update to the California Climate Change Scoping Plan (Sacramento, CA: California Environmental Protection Agency, Air Resources Board)

Buchholz T, Hurteau M D, Gunn J and Saah D 2016 A global meta-analysis of forest bioenergy greenhouse gas emission accounting studies *GCB Bioenergy* **8** 281–9

Butarbutar T, Köhl M and Neupane P R 2016 Harvested wood products and REDD+: looking beyond the forest border *Carbon Balance Manage.* **11** 4

CA 2018 *California Timber Harvest Statistics* ed Equalization C B O (Sacramento, CA: California Board of Equalization) (https://www.boe.ca.gov/proptaxes/pdf/harvyr2.pdf)

Chapin F *et al* 2006 Reconciling carbon-cycle concepts, terminology, and methods *Ecosystems* **9** 1041–50

Clark D A, Brown S, Kicklighter D W, Chambers J Q, Thomlinson J R and Ni J 2001 Measuring net primary production in forests: concepts and field methods *Ecol. Appl.* **11** 356–70

Department of Ecology (Washington) 2017 Washington Mandatory Greenhouse Gas Reporting Program—Reported Emissions for 2012–2015 *Report* (Olympia, WA: Washington Department of Ecology) (https://ecology.wa.gov/Air-Climate/Climate-change/Greenhouse-gas-reporting/Inventories)

Dias A C, Louro M, Arroja L and Capela I 2007 Carbon estimation in harvested wood products using a country-specific method: Portugal as a case study *Environ. Sci. Policy* **10** 250–9

DNR 2017 Washington Timber Harvest Reports (https://dnr.wa.gov/TimberHarvestReports) (Accessed: July 2017)

Dugan A J, Birdsey R, Mascorro V S, Magnan M, Smyth C E, Olguin M and Kurz W A 2018 A systems approach to assess climate change mitigation options in landscapes of the United States forest sector *Carbon Balance Manage.* **13** 13

Duncan A 2017 *Biennial Report to the Legislature* (Salem, OR: Oregon Global Warming Commission)

Dymond C C 2012 Forest carbon in North America: annual storage and emissions from British Columbia's harvest, 1965–2065 *Carbon Balance Manage.* **7** 8–8

EPA 2013 *Analysis of the Life Cycle Impacts and Potential for Avoided Impacts Associated with Single-Family Homes* (Washington DC: Environmental Protection Agency) (https://www.epa.gov/sites/production/files/2015-11/documents/sfhomes.pdf)

EPA 2016 *Documentation for Greenhouse Gas Emission and Energy Factors Used in the Waste Reduction Model (WARM)* (Washington DC: Environmental Protection Agency) (https://www.epa.gov/warm/documentation-chapters-greenhouse-gas-emission-and-energy-factors-used-waste-reduction-model)



FS-001590

IOP Publishing Environ. Res. Lett. 14 (2019) 095005 Letters

EPA 2017 *Inventory of US Greenhouse Gas Emissions and Sinks: 1990–2016* (Washington, DC: Environmental Protection Agency)

EPA 2018 *EPA's Treatment of Biogenic Carbon Dioxide ($CO_2$) Emissions from Stationary Sources that Use Forest Biomass for Energy Production* (Washington DC: Environmental Protection Agency) (https://www.epa.gov/air-and-radiation/epas-treatment-biogenic-carbon-dioxide-emissions-stationary-sources-use-forest)

Erb K-H *et al* 2017 Unexpectedly large impact of forest management and grazing on global vegetation biomass *Nature* **553** 73

Ferster C J, Trofymow J T, Coops N C, Chen B and Black T A 2015 Comparison of carbon-stock changes, eddy-covariance carbon fluxes and model estimates in coastal Douglas-fir stands in British Columbia *Forest Ecosyst.* **2** 13

Green C, Avitabile V, Farrell E P and Byrne K A 2006 Reporting harvested wood products in national greenhouse gas inventories: Implications for Ireland *Biomass Bioenergy* **30** 105–14

Gunn J S, Ganz D J and Keeton W S 2011 Biogenic versus geologic carbon emissions and forest biomass energy production *GCB Bioenergy* **4** 239–42

Haberl H, Sprinz D, Bonazountas M, Cocco P, Desaubies Y, Henze M, Hertel O, Johnson R K, Kastrup U and Laconte P 2012 Correcting a fundamental error in greenhouse gas accounting related to bioenergy *Energy Policy* **45** 18–23

Harmon M E, Harmon J M, Ferrell W K and Brooks D 1996 Modeling carbon stores in Oregon and Washington forest products: 1900–1992 *Clim. Change* **33** 521–50

Harmon M E and Marks B 2002 Effects of silvicultural practices on carbon stores in Douglas-fir western hemlock forests in the Pacific Northwest, USA: results from a simulation model *Can. J. For. Res.* **32** 863–77

Harmon M E, Moreno A and Domingo J B 2009 Effects of partial harvest on the carbon stores in Douglas-fir/western hemlock forests: a simulation study *Ecosystems* **12** 777–91

Houghton R A and Nassikas A A 2018 Negative emissions from stopping deforestation and forest degradation, globally *Glob. Change Biol.* **24** 350–9

Hudiburg T, Law B, Turner D P, Campbell J, Donato D and Duane M 2009 Carbon dynamics of Oregon and Northern California forests and potential land-based carbon storage *Ecol. Appl.* **19** 163–80

Hudiburg T W, Law B E, Wirth C and Luyssaert S 2011 Regional carbon dioxide implications of forest bioenergy production *Nat. Clim. Change* **1** 419–23

IPCC 2006 *2006 IPCC Guidelines for National Greenhouse Gas Inventories, Prepared by the National Greenhouse Gas Inventories Programme* ed H S Eggleston (Japan: IGES, Intergovernmental Panel on Climate Change)

IPCC 2014 *Climate Change 2014: Impacts, Adaptation, and Vulnerability. Part A: Global and Sectoral Aspects. Contribution of Working Group II to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change* ed C B Field (Cambridge and New York, NY: Cambridge University Press)

IPCC 2018 Global warming of 1.5°C *Summary for Policymakers* ed P Zhai (Geneva: World Meteorological Organization)

Law B E, Hudiburg T W, Berner L T, Kent J J, Buotte P C and Harmon M E 2018 Land use strategies to mitigate climate change in carbon dense temperate forests *Proc. Natl Acad. Sci.* **115** 3663–8

Law B E, Hudiburg T W and Luyssaert S 2013 Thinning effects on forest productivity: consequences of preserving old forests and mitigating impacts of fire and drought *Plant Ecol. Diversity* **6** 73–85

Law B E and Waring R H 2015 Carbon implications of current and future effects of drought, fire and management on Pacific Northwest forests *Forest Ecol. Manage.* **355** 4–14

Le Quéré *et al* 2018 Global carbon budget 2018 *Earth Syst. Sci. Data* **10** 2141–94

Lutz J A *et al* 2018 Global importance of large-diameter trees *Glob. Ecol. Biogeogr.* **27** 849–64

NRCS 2010 Soil Survey Staff, Natural Resources Conservation Service, United States Department of Agriculture (http://soildatamart.nrcs.usda.gov). Soil Survey Geographic (SSURGO) Database for Eastern US

Nunez F and Paveley F 2006 Assembly Bill 32: the California Global Warming Solutions Act of 2006 (Sacramento, CA: California State Assembly)

Oppenheimer M and Petsonk A 2005 Article 2 of the UNFCCC: historical origins, recent interpretations *Clim. Change* **73** 195–226

Oregon Department of Forestry 2017 Timber Harvest Data 1942–2016 (https://catalog.data.gov/dataset/timber-harvest-data-1942-2016)

Pietz A and Gregor B 2014 Oregon statewide transportation strategy: 2050 vision for greenhouse gas emission reduction *Transp. Res. Rec.* **2454** 45–52

Sathre R and O'Connor J 2010 Meta-analysis of greenhouse gas displacement factors of wood product substitution *Environ. Sci. Policy* **13** 104–14

Schulze E D, Körner C, Law B E, Haberl H and Luyssaert S 2012 Large-scale bioenergy from additional harvest of forest biomass is neither sustainable nor greenhouse gas neutral *GCB Bioenergy* **4** 611–6

Smith J E, Heath L, Skog K E and Birdsey R 2006 Methods for calculating forest ecosystem and harvested carbon with standard estimates for forest types of the United States Gen *Tech. Rep.* NE-343 Newtown Square, PA: US Department of Agriculture, Forest Service, Northeastern Research Station

Smyth C, Rampley G, Lemprière T C, Schwab O and Kurz W A 2017 Estimating product and energy substitution benefits in national-scale mitigation analyses for Canada *GCB Bioenergy* **9** 1071–84

Stockmann K D, Anderson N M, Skog K E, Healey S P, Loeffler D R, Jones G and Morrison J F 2012 Estimates of carbon stored in harvested wood products from the United States forest service northern region, 1906-2010 *Carbon Balance Manage.* **7** 1

UNFCCC 2015 *Article 5. Paris Agreement* (Paris, France)

USGCRP *Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment* vol II ed D R Reidmiller *et al* 2018 (Washington DC: US Global Change Research Program)

Washington State 2008 Engrossed Second Substitute House Bill 2815, State of Washington, 60th Legislature 2008 Regular Session (http://lawfilesext.leg.wa.gov/biennium/2007-08/Pdf/Bills/House%20Bills/2815-S2.E.pdf)

Williams C A, Gu H, Maclean R, Masek J G and Collatz G J 2016 Disturbance and the carbon balance of US forests: a quantitative review of impacts from harvests, fires, insects, and droughts *Glob. Planet. Change* **143** 66–80

**The Status of Science on Forest Carbon Management to Mitigate Climate Change (June 1, 2020)**

**Beverly Law**, Emeritus Professor of Global Change Biology & Terrestrial Systems Sci., College of Forestry, Oregon State University (bev.law@oregonstate.edu); **William Moomaw**, Emeritus Professor, The Fletcher School and Co-Director Global Development and Environment Inst. (william.moomaw@tufts.edu); **William Schlesinger**, James B. Duke Professor of Biogeochemistry, Dean (Em.) the School of Env.., Duke Univ., President (Em.) the Cary Inst. of Eco. Studies (schlesingerw@caryinstitute.org); **Tara Hudiburg**, Associate Professor, Dept. of Forest, Rangeland, and Fire Sciences, University of Idaho (thudiburg@uidaho.edu); Stewart Pimm, Ph.D., Doris Duke Chair of Conservation, Duke University (stuartpimm@me.com); **Dominick DellaSala**, Chief Scientist, Geos Institute (dominick@geosinstitute.org); **Chad Hanson**, Forest Ecologist, Earth Island Inst. (cthanson1@gmail.com).

**Forest Carbon and Climate Change**

1. To keep climate and temperatures within a safe range, it is necessary to simultaneously **reduce emissions** of greenhouse gases from all sources, including fossil fuels and bioenergy, and **accelerate storage** of atmospheric carbon in forests, soils and other plant-based systems. To prevent the most serious consequences of climate change, removals of atmospheric carbon dioxide must equal additions no later than 2050, and must not exceed emissions after that (IPCC 2018, 2019).

2. *Increasing cumulative carbon in forests is essential for keeping carbon dioxide out of the atmosphere.* It has been found world-wide that forests hold half of the carbon in the largest 1% diameter trees (Lutz et al, 2018), and can store twice the carbon they do now (Erb et al. 2018). Increasing forest reserves and allowing forests to meet their ecological carbon storage potential (proforestation) are the most effective climate mitigation strategies (Law et al. 2018; Moomaw et al 2019). Letting forests grow and halting land conversions would bring carbon dioxide removal rates closer to current emission rates globally (Houghton and Nassikas, 2018).

3. *Increased harvesting of forests for wood products and burning wood for bioenergy adds more carbon dioxide to the atmosphere than growing secondary forests and protecting older forests.* It takes at least 100 to 350+ years to restore carbon in forests degraded by logging (Law et al. 2018, Hudiburg et al. 2009). If we are to prevent the most serious consequences of climate change, we need to keep carbon in the forests because we don't have time to regain it once the forest is logged (IPCC, 2018).

4. *We have to get the Carbon accounting right*:
   a. It is essential that independent carbon cycle experts provide analysis for federal policy decisions. *65% of the forest carbon removed by logging Oregon's forests in the past 115 years has been returned to the atmosphere,* just 19% is stored in long-lived products and 16% is in landfills (Hudiburg et al. 2019). Half of harvested carbon is emitted to the atmosphere almost immediately after logging (Harmon, 2019). Increased harvesting of forests does not provide climate change mitigation.
   b. *Context of forest carbon emission sources* - Harvest is the major source of forest emissions in the US. Across the lower 48 states, direct harvest-related emissions are 7.6 times higher than all-natural disturbances (e.g., fire, insects) combined (Harris et al. 2016). In the West Coast states (OR, CA, WA), harvest-related emissions average 5 times fire emissions for the three states combined (Hudiburg et al. 2019).
   c. *There is absolutely no evidence that thinning forests increases biomass stored (Zhou et al. 2013).* It takes decades to centuries for carbon to accumulate in forest vegetation and soils (Sun et al. 2004, Hudiburg et al. 2009, Schlesinger 2018), and it takes decades to centuries for dead wood to decompose. We must preserve medium to high biomass (carbon-dense) forest not only because of their carbon potential but also because they have the greatest biodiversity of forest species (Krankina et al. 2014, Buotte et al. 2019, 2020).
   d. Burning wood for energy produces as much or more emissions as burning coal, so it is not an effective climate mitigation solution (Law et al. 2018, Hudiburg et al. 2011, 2019, Sterman et al. 2018). It always takes

longer for the forest to regrow and recover all of the carbon released than the age of the forest that was harvested (Schlesinger 2018). It is incorrect to describe burning of wood for energy as *carbon neutral*, because it increases carbon emissions now, when we can least afford such increases to the atmosphere. Alternatively, if the original trees continued to grow, without logging, there would be more than twice as much carbon in the trees and that much less in the atmosphere.

e. Especially troubling is the export of woodchips from deciduous forests in the Southeastern USA to Europe. These forests are rich in biodiversity. They have taken many decades to grow, constitute a large standing crop of carbon, and one that will also take many decades to recover.

f. Building or converting a power facility to use beetle and fire-killed trees ("salvage logging") immediately releases $CO_2$ to the atmosphere while causing severe damage to wildlife habitat (DellaSala and Hanson 2015) and soils. Once the dead trees have been burned, harvesting live trees would be required to sustain the supply needed to run the facility. This will not keep carbon out of the atmosphere.

**Proposed Solutions**

To address climate, biodiversity and additional ecosystem service needs, we propose designating carbon reserves on both public and private lands, and concentrating forest product production on specified timberlands - a two-track solution.

The current system where most *forestlands* are available for logging keeps too many trees at a smaller size that do not store much carbon. Providing incentives to lengthen rotation harvest cycles will increase carbon storage in production forests, and reduce atmospheric carbon dioxide.

Forest carbon accounting and verification should be done as part of climate and forest policy implementation and in Environmental Impact Analysis by independent groups of scientists with carbon accounting expertise following life cycle assessment protocols (Hudiburg et al. 2019).

Aligning policies with climate goals is essential. Rescind the requirement that all federal agencies treat forest bioenergy as carbon neutral if it comes from sustainably managed forests and remove subsidies for bioenergy facilities. 'Sustainable forest management' refers only to maintaining harvested biomass at or below the rate of annual growth. It does not maximize accumulated forest carbon storage or maintain full biodiversity and other ecosystem services.. The US government should re-engage in the Paris Climate Agreement by enhancing and maintaining natural carbon sinks.

***Proposals for Federal Forest Lands***

How can public lands policy be improved to help meet climate goals?

1. Establish Federal Forest Carbon Reserves on public forestlands with moderate to high carbon density potential. Old growth forests and roadless areas on public lands should be included in a federal carbon reserve. For example, the Tongass National Forest in Alaska contains approximately 10% of all carbon stored in US forests (USFS, 2020). The carbon stored in 9.2 million acres of at-risk roadless areas on the Tongass has a potential value of at least $234 million in future carbon markets, which exceeds the one-time timber value by orders of magnitude (DellaSala and Burma, 2020). Protecting more public lands from logging benefits private landowners by reducing competition for lower cost timber on public lands.
2. Redirect the billions of dollars currently being spent annually on harvesting public forestlands into a green jobs program to help communities become more fire-safe. Enhance the Youth Conservation Corps and/or establish a CCC. For example, the corps could work with independent expert groups to quantify and verify forest carbon on federal and private lands, help with fire-planning in communities via defensible space and home hardening, monitor forest usage and roadside idling during peak fire season, and remove old timber roadbeds that are impacting watersheds.

***Proposals for Private Lands***

How do we help communities that have become reliant on forests while reaching the goal of successful climate mitigation?

1. Rural counties with higher proportions of protected public lands that emphasize tourism and recreation have higher per capita incomes and more jobs than those that rely on logging (Rasker 2017). Enhance eco-friendly tourism and recreation in the vicinity of national forests and parks.
2. The USFS found in a survey that most private non-industrial land owners do not really want to cut their timber, but have to for financial reasons (USFS 2016). Forest Carbon Reserves on non-industrial private lands could be encouraged by providing incentives (subsidies, health care or tax abatements) to private land owners to manage for increased carbon storage.
3. Carbon offsets programs for landowners. A carbon offsets program has been demonstrated in California using private lands across the country (Anderson et al. 2017), and a California-type offsets program has been demonstrated to be feasible and sustainable for forest lands within Oregon (Law et al. 2018) and Alaska (e.g., Sealaska Native Corporation carbon transaction).

**Citations**

Anderson CM, CB Field, KJ Mach. 2017. Forest offsets partner climate-change mitigation with conservation. Front Ecol Environ 15:359–365. https://esajournals.onlinelibrary.wiley.com/doi/abs/10.1002/fee.1515

Buotte, PC, S Levis, BE Law, TW Hudiburg, DE Rupp, JJ Kent. 2019. Near-future vulnerability to drought and fire varies across the western United States. Global Change Biology 25:290-303. https://doi.org/10.1111/gcb.14490

Buotte, PC, BE Law, WJ Ripple, LT Berner. 2020. Carbon sequestration and biodiversity co-benefits of preserving forests in the western United States. Ecological Applications 30(2):e02039. https://doi.org/10.1002/eap.2039

DellaSala, DA, CT Hanson (Editors). 2015. The ecological importance of mixed- severity fires: nature's phoenix. Elsevier Inc., Waltham, MA, USA. https://www.elsevier.com/books/the-ecological-importance-of-mixed-severity-fires/dellasala/978-0-12-802749-3

DellaSala and Burma. 2020 Information submitted to the Tongass National Forest

Erb, K.-H. et al. 2018. Unexpectedly large impact of forest management and grazing on global vegetation biomass. *Nature* 553, 73–76. https://doi:10.1038/nature25138

Harris, NL et al. 2016. Attribution of net carbon change by disturbance type across forest lands of the conterminous United States. Carbon Balance Manage 11:24. https://cbmjournal.biomedcentral.com/articles/10.1186/s13021-016-0066-5

Harmon, ME. 2019. Have product substitution carbon benefits been overestimated? A sensitivity analysis of key assumptions. *Environ. Res. Lett.* **14** 065008. https://iopscience.iop.org/article/10.1088/1748-9326/ab1e95

Houghton, RA, AA Nassikas. 2018. Negative emissions from stopping deforestation and forest degradation, globally. *Glob. Change Biol.* 24, 350–359. https://doi:10.1111/gcb.13876

Hudiburg, TW, BE Law, DP Turner, J Campbell, D Donato, M Duane. 2009. Carbon dynamics of Oregon and Northern California forests and potential land-based carbon storage. Ecol Applic 19:163-180. https://esajournals.onlinelibrary.wiley.com/doi/10.1890/07-2006.1

Hudiburg, TW, BE Law, C Wirth, S Luyssaert. 2011. Regional $CO_2$ implications of forest bioenergy production. Nature Climate Change 1:419-423. https://doi.org/10.1038/nclimate1264

Hudiburg, TW, BE Law, WR Moomaw, ME Harmon, JE Stenzel. 2019. Meeting GHG reduction targets requires accounting for all forest sector emissions. *Environ. Res. Lett.* **14**: 095005. https://iopscience.iop.org/article/10.1088/1748-9326/ab28bb

IPCC 2018 Intergovernmental panel on Climate Change "Summary for Policymakers, "*Global warming of 1.5°C"* https://www.ipcc.ch/sr15/.

IPCC 2019 Intergovernmental panel on Climate Change "Summary for Policymakers," Land Report https://www.ipcc.ch/srccl/chapter/summary-for-policymakers/

Law, BE, TW Hudiburg, LT Berner, JJ Kent, PC Buotte, ME Harmon. 2018. Land use strategies to mitigate climate change in carbon dense temperate forests. Proc. Nat. Acad. Sci. 115(14):3663-3668. https://doi.org/10.1073/pnas.1720064115

Lutz, JA, TJ Furniss, DJ Johnson, SJ Davies, D Allen et al. 2018. Global importance of large-diameter trees. *Glob. Ecol. Biogeogr.* 27, 849–864. https://doi.10.1111/geb.12747

Moomaw, WR, SA Masino, EK Faison. 2019. Intact Forests in the United States: Proforestation Mitigates Climate Change and Serves the Greatest Good. Front. For. Glob. Change https://doi.org/10.3389/ffgc.2019.00027

Rasker, R. 2017. Today's economy and the role of federal lands. Headwaters Economics, Bozeman, MT. https://headwaterseconomics.org/wp-content/uploads/Todays_Economy_Federal_Public_Lands.pdf

Schlesinger, WH. 2018. Are wood pellets a green fuel? Science 359: 1328-1329. https://science.sciencemag.org/content/359/6382/1328

Sterman, JD, L Siegel, JN Rooney-Varga. 2018. Does replacing coal with wood lower $CO_2$ emissions? Dynamic life cycle analysis of wood bioenergy. Env Res Lett 13: 015007. https://iopscience.iop.org/article/10.1088/1748-9326/aaa512/pdf

Sun, O, J Campbell, BE Law, V Wolf. 2004. Dynamics of carbon stocks in soils and detritus across chronosequences of different forest types in the Pacific Northwest, USA. Global Change Biology 10:1470-1481. https://doi.org/10.1111/j.1365-2486.2004.00829.x

USFS 2016. Butler, Brett J. et al. 2016. USDA Forest Service National Woodland Owner Survey: national, regional, and state statistics for family forest and woodland ownerships with 10+ acres, 2011-2013. Res. Bull. NRS-99. 39 p. https://doi.org/10.2737/NRS-RB-99.

USFS 2020. PNW Research Station. 2020. Forestry as a natural climate solution: the positive outcome of negative carbon emissions. Science Findings Issue 225. USDA Forest Service. https://www.fs.usda.gov/treesearch/pubs/59435

Zhou, D, SQ Zhau, S Liu, J Oeding. 2013. A meta-analysis on the impacts of partial cutting on forest structure and carbon storage. Biogeosciences 10, 3691-3703. https://www.nature.com/articles/srep03547

Date submitted (UTC-11): 3/12/2021 12:00:00 AM
First name: Edward
Last name: Zukoski
Organization: Center For Biological Diversity
Title: Attorney
Comments:
Attached please find exhibits 16 - 29 of 29 exhibits to the comment letter of Center for Biological Diversity and WildEarth Guardians on the Salter Project.

Ted Zukoski

Center for Biological Diversity

ATTACHMENTS:

Ex. 16 - B. Law & W. Moomaw Keeping Trees in the Ground The Conversation - 2021-02-23

Ex. 17 - B. Law & M. Harmon Forest Sector Carbon Management (2011)

Ex. 18 - M. Harmon Have product substitution carbon benefits (2019)

Ex. 19 - BLM Western Or. RMP FEIS (2009)

Ex. 20 - Harris et al. Attribution of net carbon change (2016)

Ex. 21 - OSM & BLM Colowyo EA (2016) (excerpts)

Ex. 22 - USFS Coal Lease Mods SFEIS (2017) (excerpts)

Ex. 23 - 4FRI Stakeholders Old and Large Tree Strategy

Ex. 24 - New Mexico Forest Restoration Principles  64552

Ex. 25 - Allen et al. Ecol. restor. of SW Ponderosa Forest (2002)

Ex. 26 - Lynch Ponderosa Pine Partnership (2000)

Ex. 27 - SJNF Guard Station Decision Notice (1996)

Ex. 28 - SJNF Ferris East Decision Notice (1998)

Ex. 29 - Worrall 2017 - Projected impacts of climate change

Close

THE CONVERSATION
Academic rigor, journalistic flair



A mix of public and private forests in Oregon's Coast Range. Beverly Law, CC BY-ND

# Keeping trees in the ground where they are already growing is an effective low-tech way to slow climate change

February 22, 2021 8.23am EST •Updated February 23, 2021 6.12pm EST

Protecting forests is an essential strategy in the fight against climate change that has not received the attention it deserves. Trees capture and store massive amounts of carbon. And unlike some strategies for cooling the climate, they don't require costly and complicated technology.

Yet although tree-planting initiatives are popular, protecting and restoring existing forests rarely attracts the same level of support. As an example, forest protection was notably missing from the US$447 million Energy Act of 2020, which the U.S. Congress passed in December 2020 to jump-start technological carbon capture and storage.

In our work as forest carbon cycle and climate change scientists, we track carbon emissions from forests to wood products and all the way to landfills – and from forest fires. Our research shows that protecting carbon in forests is essential for meeting global climate goals.

Ironically, we see the U.S. Strategic Petroleum Reserve as a model. This program, which was created after the 1973 oil crisis to guard against future supply disruptions, stores nearly 800 million gallons of oil in huge underground salt caverns along the coast of the Gulf of Mexico. We propose creating strategic forest carbon reserves to store carbon as a way of stabilizing the climate,

## Authors



**Beverly Law**
Professor Emeritus of Global Change Biology and Terrestrial Systems Science, Oregon State University



**William Moomaw**
Professor Emeritus of International Environmental Policy, Tufts University

much as the Strategic Petroleum Reserve helps to stabilize oil markets.

**Deep knowledge, daily, in The Conversation's newsletter**

Sign up



The U.S. has more than 800 million acres of natural and planted forests and woodlands, of which nearly 60% are privately owned. USDA/USFS

## Carbon stockpiles that grow

Forests pull about one-third of all human-caused carbon dioxide emissions from the atmosphere each year. Researchers have calculated that ending deforestation and allowing mature forests to keep growing could enable forests to take up twice as much carbon.

Half of a tree's stems, branches and roots are composed of carbon. Live and dead trees, along with forest soil, hold the equivalent of 80% of all the carbon currently in Earth's atmosphere.

Trees accumulate carbon over extremely long periods of time. For example, redwoods, Douglas firs and western red cedars in the coastal forests of the Pacific Northwest can live for 800 years or more. When they die and decompose, much of that carbon ends up in soil, where it is stored for centuries or millennia.

Mature trees that have reached full root, bark and canopy development deal with climate variability better than young trees. Older trees also store more carbon. Old-growth trees, which usually are hundreds of years old, store enormous quantities of carbon in their wood, and accumulate more carbon annually.



Log train in Washington state, 1935. Many of the oldest and largest trees in the Pacific Northwest were logged during the 20th century. John D. Cress, Farm Security Administration via Getty Images

There are many fallacies about forest carbon storage, such as the concern that wildfires in the American West are releasing huge quantities of carbon into the atmosphere. In fact, fires are a relatively small carbon source. For example, the massive Biscuit Fire, which burned 772 square miles in southwest Oregon in 2002, emitted less than 10% of Oregon's total emissions that year.

Another false claim is that it's OK from a climate perspective to cut trees and turn them into furniture, plywood and other items because wood products can store substantial amounts of carbon. These assertions fail to count cradle-to-grave emissions from logging and manufacturing, which can be substantial.

The wood products industry releases carbon in many ways, from manufacturing products and burning mill waste to the breakdown of short-lived items like paper towels. It takes decades to centuries for newly planted forests to accumulate the carbon storage levels of mature and old forests, and many planted forests are repeatedly harvested.

In a review that we conducted with colleagues in 2019, we found that overall, U.S. state and federal reporting underestimated wood product-related carbon dioxide emissions by 25% to 55%. We analyzed Oregon carbon emissions from wood that had been harvested over the past century and discovered that 65% of the original carbon returned to the atmosphere as $CO_2$. Landfills retained 16%, while just 19% remained in wood products.

In contrast, protecting high carbon-density western U.S. forests that have low vulnerability to mortality from drought or fire would sequester the equivalent of about six years of fossil fuel emissions from the entire western U.S., from the Rocky Mountain states to the Pacific coast.

## Focus on big trees

In a recently published analysis of carbon storage in six national forests in Oregon, we showed why a strategic forest carbon reserve program should focus on mature and old forests. Big trees, with trunks more than 21 inches in diameter, make up just 3% of these forests but store 42% of the above-ground carbon. Globally, a 2018 study found that the largest-diameter 1% of trees hold half of all the carbon stored in the world's forests.



This old-growth forest in Opal Creek, Ore., where some trees are 500 years old or more, stores huge quantities of carbon. Beverly Law, CC BY-ND

Findings like these are spurring interest in the idea of proforestation – keeping existing forests intact and letting them grow to their full potential. Advocates see proforestation as an effective, immediate and low-cost strategy to store carbon. Older forests are more resilient to climate change than young tree plantations, which are more susceptible to drought and severe wildfires. Like the 2,000-year-old redwoods in California that have survived recent wildfires, many tree species in old forests have lived through past climate extremes.

Creating forest carbon reserves would also conserve critical habitat for many types of wildlife that are threatened by human activities. Connecting these reserves to other parks and refuges could help species that need to migrate in response to climate change.




Less than 3% of land conserved in the Northeast U.S. is forever-wild. The Northeast Wilderness Trust is working with landowners, volunteers, and other conservation organizations to rewild the Northeastern landscape.

## Using forests to meet climate goals

More than half of U.S. forested lands are privately owned, so strategic forest carbon reserves should be established on both public and private lands. The challenge is paying for them, which will require a major shift in government and societal priorities. We believe that transferring public investment in oil

and gas subsidies to pay private land owners to keep their forests growing could act as a powerful incentive for private land owners.

Many researchers and conservation advocates have called for comprehensive actions to slow climate change and reduce species losses. One prominent example is the 30x30 initiative, which seeks to conserve 30% of the world's land and oceans by 2030. In an executive order on Jan. 27, 2021, President Biden directed his administration to develop plans for conserving at least 30% of federally controlled lands and waters by 2030.

Recent projections show that to prevent the worst impacts of climate change, governments will have to increase their pledges to reduce carbon emissions by as much as 80%. We see the next 10 to 20 years as a critical window for climate action, and believe that permanent protection for mature and old forests is the greatest opportunity for near-term climate benefits.

[*The Conversation's science, health and technology editors pick their favorite stories.* Weekly on Wednesdays.]

Fossil fuels   Climate change   Forests   Carbon   Deforestation   Trees   climate risk   Strategic Petroleum Reserve   Forest conservation   Wildfires   Greenhouse gas emissions

**Before you go...**

The world is complicated, but The Conversation helps you understand it. Our editors identify experts on topics in the news, and work with them to help them write clear, engaging and fascinating articles. Each weekday, we publish eight to 12 of these stories, ranging from health to political science, from technology to business and from history to ethics. Sign up for our free newsletter to get these articles in your inbox each day.

Subscribe now

Joel Abrams
Manager of Outreach



Y

**Restoring California's forests to reduce wildfire risks will take time, billions of dollars and a broad commitment**

**We calculated how much money trees save for your city**

ResearchGate

See discussions, stats, and author profiles for this publication at: https://www.researchgate.net/publication/235591616

# Forest sector carbon management, measurement and verification, and discussion of policy related to climate change

**Article** *in* Carbon Management · April 2014

DOI: 10.4155/CMT.10.40

CITATIONS
61

READS
615

**2 authors**, including:



Beverly E Law
Oregon State University

**415** PUBLICATIONS **44,348** CITATIONS

SEE PROFILE

All content following this page was uploaded by Beverly E Law on 31 May 2014.

The user has requested enhancement of the downloaded file.

For reprint orders, please contact reprints@future-science.com



# Forest sector carbon management, measurement and verification, and discussion of policy related to climate change



*Carbon Management* (2011) 2(1), 73–84

**Beverly Elizabeth Law†1 & Mark E Harmon1**

The objective of this review is to give ecologists, land managers and policy makers a better understanding of important issues related to forest sector carbon management, measurement and verification, as well as policy related to mitigation and the adaptation of forests to climate change. The focus is on carbon sequestration processes; appropriate measurements for international, regional and local scale assessment of net ecosystem carbon balance; and life cycle analysis, with special attention given to the concept of substitution of fossil fuels with bioenergy from forests. Given the slow dynamic of forest carbon, life cycle analysis needs to account for pre-existing forest conditions, since carbon neutrality (i.e., net ecosystem carbon balance of forests is zero) can take at least a century to achieve in many cases. The substitution of wood for more energy-intensive materials has probably been overestimated compared with cases in which additionality, permanence and saturation of wood building stores are considered. GHG emission policies will need to account for emissions associated with bioenergy, which is currently not considered internationally. Thus, GHG emissions resulting from substitution for fossil fuels will have to be more accurately represented if their true impact is to be understood.

$CO_2$ accounts for the majority of anthropogenic GHG emissions covered by the UN Framework Convention on Climate Change (UNFCCC), where approximately 74% are due to fossil fuel emissions and approximately 20% from **deforestation** and forest **degradation** [1]. Currently, approximately half the annual increase in $CO_2$ emissions accumulates in the atmosphere and half is taken up by natural **sinks** in the ocean and on land. Forests are an important component of the global carbon cycle because of the large amount of carbon stored in live and dead woody biomass as well as soil organic matter. Land-use change from forest to other uses releases carbon to the atmosphere. Thus, reducing deforestation and forest degradation, and increasing forest carbon sequestration by **afforestation**, reforestation, or increasing carbon stored per area (i.e., carbon density) via management are priorities for GHG reduction strategies. For example, carbon density can be increased by lengthening harvest rotations over a business-as-usual period (see below). To determine whether GHG targets are met, there is a need to improve the accuracy of estimates of forest carbon budgets by using scientifically based measurement approaches that account for uncertainty. This article reviews forest carbon dynamics, and important emerging issues related to forest **sector** carbon management, measurement and **verification**, as well as policy related to mitigation and adaptation of forests to climate change. Examples are provided from the US, European and Amazonian tropical forests.

## Carbon sequestration

Biologically, forests take up $CO_2$ from the atmosphere through the process of photosynthesis, and release it in the growth and maintenance of living cells in plants (autotrophic respiration) and by respiration from microbial decomposition of dead plant material and soil organic matter (heterotrophic respiration). The net of uptake and release is net ecosystem production (NEP). Mathematically, NEP is the difference between net primary productivity (NPP; the annual net carbon

1Department of Forest Ecosystems & Society, 328 Richardson Hall, Oregon State University, Corvallis, OR 97331, USA
†Author for correspondence: Tel: +1 541 737 6111; Fax: +1 541 737 1393; E-mail: bev.law@oregonstate.edu

FUTURE SCIENCE


10.4155/CMT.10.40 © 2011 Future Science Ltd
ISSN 1758-3004
FS-001603

**Key terms**

**Deforestation:** Conversion of forestland to agricultural cropland, grassland and settlements.

**Degradation:** Decrease in carbon stocks through selective harvest or burning.

**Sink:** Any process, activity or mechanism that removes a GHG, an aerosol or a precursor of a GHG or aerosol from the atmosphere. Removals of GHGs by a sink are conventionally shown as negative emissions.

**Afforestation:** Conversion of other land categories to forest.

**Sector:** An emission-producing segment of the economy. The Intergovernmental Panel on Climate Change currently specifies four sectors for GHG reporting: energy; industrial processes and product use; agriculture, forestry, and other land use; and waste.

**Verification:** An independent examination of monitoring data to help establish whether or not a country's actual emissions are consistent with its obligations under a climate treaty.

uptake, which is the net of photosynthesis and autotrophic respiration) and heterotrophic respiration. Both NEP and the size of the live and dead carbon pools including those in soil are highly sensitive to forest management activities as well as natural disturbances. For carbon accounting purposes, net biome production (NBP; NEP minus harvest removals and fire emissions) [2,3] plus net storage in long-term products, is compared with fossil fuel emissions in units of **$CO_2$ equivalence** [101]. An alternative to NBP is net ecosystem carbon balance (NECB) [4], which also considers NEP and the losses due to harvest and fire as well as other losses and gains (e.g., dissolved organic carbon, erosion and volatile organic carbon).

A forest-stand that is disturbed and then allowed to regenerate produces a large $CO_2$ **source** for 5–50 years (depending on growth rates and amount of woody debris left after disturbance) followed by a long-term $CO_2$ sink [5,6], with the shorter time-frames in warmer and wetter climates. After clear-cut harvest, the stand is a net emitter of $CO_2$ because the forest regrowth is far outweighed by heterotrophic respiration from the soil and woody debris left on the site after harvest (Figure 1); for example, a semi-arid ponderosa pine forest-stand after harvest remains a source to the atmosphere for approximately 15–20 years, after which it slowly transitions to a net sink [7].




**Figure 1. Changes in net ecosystem production after a disturbance that kills all live vegetation, showing source and sink phases over time.** The analysis is based on inventory data from the West Cascades ecoregion in Oregon, and ancillary data from 200 plots for computing heterotrophic respiration. It includes different forest types, soil conditions and disturbance histories. Thus, it does not represent a timeseries of one forest type and productivity class. It includes plots that had been partially disturbed (thinning, harvest on subplots, windthrow), as indicated by the large standard deviation (gray lines), and represents the range of conditions on the landscape.
NEP: Net ecosystem production.

Management effects on forest carbon sinks include deforestation, forest degradation and afforestation, as well as management practices that increase the overall density of carbon on a given area of land. 'Deforestation' is the conversion of forestland to agricultural cropland, grassland and settlements [8]. One can increase input by enhancing NPP, reduce losses by decreasing decomposition rates (with likely impacts on fertility), or reduce losses associated with harvests by lengthening the time between harvests [9,10] or removing less each harvest [11].

Deforestation can cause a large net emission of $CO_2$ because of decomposition of dead wood and short-lived wood products, and burning to facilitate clearing. Globally, deforestation and forest degradation in the tropics are major contributors to $CO_2$ emissions. Although degradation related to thinning of forests is thought to have minimum impact on carbon, a study in the Brazilian Amazon indicated that observed selective harvest would lead to a gross annual flux of approximately 0.1 billion metric tons of carbon to the atmosphere; the logged area was equivalent to 60–120% of previously reported deforestation area [12]. This value increases the estimated annual anthropogenic flux of carbon from Amazon forests by up to 25% over carbon losses from deforestation alone.

Owing to the global importance of deforestation and forest degradation, recent climate change negotiations requested a mechanism for reducing these sources of $CO_2$ to be operational by 2013 [13]. Compared with other methods to reduce **anthropogenic emissions** of $CO_2$, reducing deforestation and forest degradation is relatively straightforward with a minimum of new technologies involved (although developing policies that avoid perverse incentives has proven challenging). Many of these changes in management would also provide the benefit of protecting biodiversity and aiding natural adaptation to climate change by enhancing connectivity of forest land for species to migrate to a more favorable climate.

Given that vast areas of forest have been cleared, an appealing step is to afforest lands that once held forests. However, there are challenges to increasing forest area by afforestation. First, the area has to be suitable for growing forests in terms of water and nutrient availability. If irrigation is required, it will conflict with other needs for water, and can be further complicated by predicted changes in hydrologic regimes with climate change.


FS-001604

If nitrogen fertilization is required, this is a potential source of nitrous oxide ($N_2O$) to the atmosphere, which is another long-lived GHG (delays in mitigation are costly), albeit with less total **radiative forcing** than $CO_2$ ($CO_2$ is 1.66 W $m^{-2}$, $N_2O$ is 0.16 W $m^{-2}$) [14]. In some cases, forest had been converted to agricultural land decades or centuries ago, such as in the midwest and southeast USA. These areas may be suitable for afforestation, but removal of productive agricultural lands may result in clearing of forests elsewhere.

There are current proposals to protect forest carbon by removal of fuel to reduce the amount of carbon emitted by wildfires [15]. Ideally, such harvests would change forest structure such that the expected fire severity would result in survival of at least 80% of the dominant and codominant trees under 80% fire weather conditions likely to occur, otherwise known as the '80–80' rule [16]. To achieve this goal, it has been suggested that management needs to reduce above-ground biomass (and thus carbon density) by as much as 40–50% [17,18]. This is a significant reduction in live biomass and, if implemented, would result in a net emission of $CO_2$ to the atmosphere from forests for two reasons. First, the amount of carbon removed to change fire behavior is often far larger than that saved by changing fire behavior [19]. Second, more area in a forested landscape has to be harvested than will ultimately burn over the period of effectiveness of the thinning treatment, leading to a greater loss of carbon via fuel treatment [20]. Other factors may also be involved when assessing relative effects of fire prevention and fire loss on forest carbon, such as indirect effects of fire prevention on soil productivity, but the two key points above are the major issues in this assessment.

Carbon density can be increased by using longer rotations or reducing the amount harvested each time to allow forests to accumulate more carbon (similar to avoiding deforestation) [9–11]. This can potentially result in hundreds of additional years of forest carbon accumulation; for example, in the Pacific northwest USA, an analysis of inventory and remote sensing data indicated that the current carbon storage on forest land is half of the potential, and it could increase by 15% over the next several decades if allowed to grow and accumulate carbon [10]. The potential increase was greatest on private lands because of the younger age classes that currently exist in private ownership. Increasing on-site carbon stores may be of interest to private landowners if subsidies are provided for avoiding or delaying harvest. Over a large area, increasing carbon density could be challenging because of land ownership considerations, as well as conditional use on federal lands; for example, the Bureau of Land Management has a large land base in the western USA, yet the current law is that the agency is required to provide income to local communities and this is carried out through harvest taxes. Removal of Bureau of Land Management forest land from consideration for carbon sequestration can have a significant impact on the ability to meet those economic goals. In such cases, federal or state policies will need to be changed to meet forest carbon sequestration goals. Increasing rotation lengths could shift harvesting elsewhere; however, this could be countered by using harvested carbon more efficiently and/or increasing the longevity of wood buildings and other wood products. It would also depend on the magnitude of increase in rotation lengths and how long the transition takes.

In addition to changing the interval and intensity of harvest, forest carbon density could be enhanced by increasing NPP or decreasing decomposition-related losses. While thinning is commonly proposed to increase forest productivity, this increases the amount of carbon harvested but does not increase the amount of carbon being removed by photosynthesis (i.e., ecosystem production). Planting species or varieties with high growth rates will increase NPP, but will probably conflict with biodiversity goals [13]. As stated above, fertilization can also increase NPP, but the consequences for other GHGs (i.e., $N_2O$ and $CH_4$) have to be considered since they will counter benefits from NPP gains [14]. While decreasing decomposition losses would temporarily increase NEP, the accumulation of dead material would cause greater losses via fire and ultimately lead to decreased soil fertility and, thus, decreased NPP.

## Appropriate measurements for management & policy

Carbon stores and net fluxes to and from the atmosphere will have to be measured at multiple spatial scales ranging from international to local. Inventories, remote sensing and modeling will probably play a role in each, as will estimates of uncertainty. The consequences for overestimating carbon sequestration with respect to climate protection are greater than those of underestimation. Thus, discounting estimates to account for associated uncertainties will have a lower consequence than using mean estimates. In addition, estimates at

**Key terms**

**$CO_2$ equivalence:** The amount of $CO_2$ emission that would cause the same integrated radiative forcing, over a given time horizon, as an emitted amount of a well-mixed GHG. It is a standard metric for comparing emissions of different GHGs, but does not imply exact equivalence of the corresponding climate change responses. The 100-year global warming potential is used to calculate $CO_2$ equivalents.

**Source:** Any process, activity, or mechanism that releases a GHG, an aerosol, or a precursor of a GHG or aerosol into the atmosphere. Certain activities, such as forestry, can be both a source and a sink of GHG emissions.

**Anthropogenic emissions:** Emissions of GHGs, precursors of GHGs and aerosols resulting from human activities. Since it is difficult to separate anthropogenic and natural components of emissions and removals from land use, the UN Framework Convention on Climate Change considers emissions and removals on managed lands as anthropogenic.

**Radiative forcing:** A measure of the tendency of a GHG to change the climate. It multiplies the increased abundance of the gas caused by anthropogenic emissions and the gas's potency as a greenhouse agent.


FS-001605

> **Key term**
>
> **Substitution:** The substituted use of materials with lower energy costs for those with higher energy costs that have greater GHG emissions. Energy costs include those associated with transport, manufacturing, installation and maintenance.

all scales will need to be verified by independent bodies for policy and treaty agreements [14].

Inventories of existing carbon stores will need to occur at all scales. Eventually some carbon stores will be directly inventoried using remote sensing (e.g., light detection and ranging [LIDAR] estimates of above-ground biomass), but many significant stores such as soil stores will require on-site measurements. Methods of remotely estimating biomass and change at required accuracies of approximately 25% at scales of 100 m or more are still under development, especially in the tropics [21]. Inventories of some forest sector pools such as wood products and **substitution** offsets may not be possible at the local scale (i.e., a specific parcel of forest land), since the movement of wood-based materials is difficult to estimate even at a national scale. It will not be possible to track the fate of every harvested tree back to the land from which it was harvested. This makes accounting of wood products different than accounting for forest carbon. In the latter case, one can actually inventory the carbon on a specific forest area. However, inventory of wood products, is only feasible at a larger scale.

Inventories of stocks can be used to calibrate models or directly in a change in stocks approach. The latter is equivalent to NECB and can be measured directly as the change in organic carbon stock in live and dead vegetation, and soil over a measurement interval. This change in stock approach approximates NBP and/or NECB as it accounts for losses due to harvest and fire. Other losses and gains (e.g., dissolved organic carbon), while part of NECB, are usually assumed to be negligible in application.

Remote sensing methods, with some exceptions, such as LIDAR, will be best used to determine the area of forest, rates of clearing and other forms of disturbance. These data can be combined with either inventories or models to scale up local results. Remote sensing can also be used to assess whether management targets such as afforestation or slowing deforestation are being met or whether planned changes in management such as increases in harvest intervals or reductions in harvest intensity (i.e., amount taken per area) have been implemented. Remote sensing can be used to guide inventory sampling or to scale-up results, thus increasing efficiency.

Projections of impacts of changes in forest practices at all levels will involve the use of models. Changes in management should be based on practices proven to increase forest sector-related carbon stores or carbon offsets. However, these projections will still need to be validated as changes in climate, disturbance and other factors potentially reduce, or in some cases increase, the gains that actually occur. Models will also be important tools to estimate the interannual variability of carbon uptake and release, particularly if climate changes to the degree that consistent trends begin to occur.

## International & national

International agreements to limit future GHG emissions will rely on the ability of each country to estimate emissions accurately and to monitor and verify changes over time (Figure 2). Independent estimates will be necessary to confirm national or state estimates. International programs recommend a basic level for producing national estimates of forest carbon by integrating Landsat-type remote sensing data and inventories, essentially multiplying carbon densities from inventories by the land area in that forest condition and type (Figure 2). The change in stocks approach will be all that is possible in some countries. Ground-based inventories require spatially representative sampling and repeat visits to permanent plots. To reduce uncertainty, measurements should include annual growth from tree cores rather than diameters (except for species without growth rings), changes in dead material (e.g., tree stems, branches, bark, stumps and surface litter), and adequate sampling of changes in soil carbon between two measurement periods (e.g., 5-year intervals). Detailed methods for measurements are provided in Global Terrestrial Observing System-Terrestrial Carbon Observations (GTOS-TCO) protocols [22]. Improvements in quality of estimates and efficiency can be made by relying more heavily on satellite remote sensing of vegetation characteristics (to which carbon densities and emissions factors are applied), and would have variable sampling intensity based on ecosystem characteristics.

Currently, the UNFCCC uses guidelines developed by the IPCC [8]. The IPCC Good Practice Guide requires spatially explicit tracking of forest area change and estimation of forest carbon stock change or emission factors (carbon per hectare) [102,103]. The Guide provides 'Tiers' for different capabilities, where Tier 1 uses default data, Tier 2 requires *in situ* national level data (from forest inventories), and Tier 3 uses measurements of carbon stock changes for carbon pools that are spatially explicit. International policies and compensation mechanisms for implementing post-Kyoto agreements in developing countries are still under discussion by the UNFCCC. However, draft methodology refers to the need to establish national monitoring systems that use an appropriate combination of remote sensing and ground-based forest carbon inventory approaches. Countries that aim to adopt UNFCCC guidelines are expected to develop a roadmap for the establishment


FS-001606

of a system for monitoring, reporting and verification (MRV), to participate in emissions reporting and to benefit from credits. Broader application of Tier 3 should reduce uncertainties in a broad sense, since some countries do not even have resources for inventories. However, the expanded methods described here and by the National Research Council could be adopted by the UNFCCC to reduce uncertainties to acceptable levels and for independent verification [14,22].

Since deforestation is the second largest source of anthropogenic $CO_2$, and mitigation by conservation and planting are likely to be important, satellite monitoring of forest cover, age and disturbance (e.g., fire, clear felling, thinning and insects) will be critical. Satellite imagery can be used to determine areas that have been affected by deforestation, disturbance, forest degradation and afforestation. The current total annual change in forest area has an uncertainty of 10–25% in northern forests and up to 100% in tropical forests [14]. Uncertainties in annual net emissions from these activities are high, ranging from 25 to 100%, because of uncertainties in values used to translate area into $CO_2$ emissions and sinks. A goal in the next 5–7 years is to reduce these uncertainties to less than 10% [14].

A comparison of moderate resolution images at two points in time, or time-series analysis can detect changes in forest cover. Landsat-type sensors are most appropriate in that the spatial resolution is approximately 30 × 30 m. Trajectory-based image analysis, which is currently used across the Pacific northwest region of the USA, has advantages over traditional approaches in that it can detect forest thinning and trends such as progressive change from one land cover type to another, spreading mortality and slow regrowth of forests over time [23]. It can also detect a wide range of disturbance and recovery phenomena that were previously too ambiguous, capturing types of degradation with accuracies two- to five-times higher than previous change detection methods. Combining trajectory-based image analysis and high-resolution data improves the accuracy of regional estimates of terrestrial carbon fluxes and enables identification of the type of forest degradation (e.g., thinning vs mortality from insects or diseases) [23].

Subtle disturbances have potentially large cumulative impacts on carbon cycling at the regional scale (e.g., large-scale mortality of boreal forests from insect attack) [24]. Landsat data are also being used in time-series analysis across North America to identify forest areas subject to stand-replacing harvest and wildfire with a repeat interval of 2 years [25]. An assessment over southeastern and northern USA national forests indicated overall accuracy of 80%. Most of the omissions were partial disturbances, such as thinning and storm damage, although some clearing harvests may not be




**Figure 2. Planning and implementation of forest carbon projects, and measurement activities to verify GHG emissions reductions at local, national and international scales.**

detectable with temporal intervals of 2 years or more in areas of rapid forest regrowth [26]. This type of approach has the potential to be applied globally.

At the national scale, the most effective method for detecting areas of selective harvest is to apply high spatial and temporal resolution remote-sensing approaches to areas suspected of thinning, such as those determined by detection of landings along roads. For example, an automated image analysis approach was applied to annual Landsat data along with pattern recognition techniques for detecting selective logging [12]. The analysis required initial ground-based spectroscopic characterization of surface features and tree species canopy spectra from a spaceborne hyperspectral sensor (Hyperion). The authors found an overall uncertainty of up to 14% in total logged area, based on seasonal Landsat data, atmospheric modeling, detection of forest canopy openings, surface debris and bare soil exposed by forest disturbances.

For developed countries (e.g., European program on Integrated Carbon Observation System [ICOS]) and independent assessments, an improvement on the combination of satellite forest characteristics data and inventories is the integration of observation and modeling frameworks for producing annual estimates of carbon fluxes and live and dead carbon pools [27]. The observations include inventories and remote sensing data as noted above, as well as eddy covariance sites for model calibration [28]. There are approximately 100 eddy covariance sites in the Americas and 500 sites worldwide. The eddy covariance tower measures instantaneous exchange of $CO_2$ and other gases between the atmosphere and land surface for areas ranging from a hectare to a few square kilometers, depending on tower


FS-001607

and canopy height. Fluxes are computed half-hourly and summed annually to provide an estimate of the net amount of $CO_2$ absorbed or released by the forest. The calibrated models use this combination of observations to produce maps of NEP. Using such integrated frameworks can produce estimates of carbon pools and fluxes for some countries with uncertainties of approximately 30% [29]. The uncertainties can be reduced by using improved observations of disturbance, land cover and land-use change, and data assimilation methods in the modeling framework [14,28]. This framework takes into account variation from year to year due to changing weather and other factors, which aids separation of anthropogenic from other causes.

### Forest carbon at small scales

Estimates of carbon increases due to changes in management at small or local scales will probably initially be made using models that range from site-specific to very general. If general models are used, for example, look-up tables (e.g., carbon density for a specific class of forest type, age and site fertility), the subsequent estimates of carbon increases will need to be fairly accurate to account for site-to-site variation and management effects or discounting of estimates will be necessary. Methods used to project carbon increases (or decreases) will need to be certified by independent bodies if carbon credits are to be traded or sold (Figure 2). Regardless of the model used, verification of forest carbon projects (e.g., offsets) requires measurements at the scale of a forest-stand, forest land-owner or landscape with multiple small owners. The change in stocks method will probably be the most economical to use in these situations, but distinguishing management influences from those of climate change are challenging to discern because of weather and climate change-related effects on carbon uptake and release. An approach to identifying management effects on forest carbon uptake is to compare measurements against baseline carbon fluxes on similar lands without recent management [30]. If forestry offset projects are to be implemented successfully, there need to be accounting rules that are effective in preventing cheating. These rules must be conservative with respect to the amount of carbon credited, balance economic costs versus carbon gains and will only credit carbon that has a high probability of being physically present [30].

## Life cycle analysis

Life cycle analysis (LCA) of forest carbon removals considers forestry-related sinks and sources of carbon to and from the atmosphere and the associated impact on total fossil fuel emissions (FFE). LCA often emphasizes either the products' chain or on-site changes, but rarely covers both on-site and off-site carbon tracking in depth. Most LCA studies rely heavily on wood product substitution for GHG benefits, and these have been grossly overestimated, with many ambiguous assertions that gloss over forest carbon dynamics; for example:

- Biofuel emissions are assumed to be zero because they are balanced by net growth, yet this would depend on the state of the preceding forest system – they could be positive, neutral or negative;
- Old forests are assumed to always be carbon sources, while young forests are always assumed to be carbon sinks, contrary to forest carbon dynamics findings;
- Dead wood and soil carbon stores are either not included or assumed to be constant;
- In one LCA, dead wood is not present in older forests, contrary to findings in the extensive ecological literature;
- The wood product pool is assumed to be an increasing carbon stock over time.

To account for net carbon benefits and when carbon neutrality is achieved, LCA must consider pre-existing conditions of the forest system for all carbon pools, including dead wood and soil, and not just focus on live carbon. Establishment of carbon neutrality of all forest pools can take decades to centuries depending on the initial conditions and the new management system [31].

International treaties and domestic legislation account for bioenergy incorrectly by treating all bioenergy as causing a 100% reduction in emissions regardless of the source of the biomass [32]. This error is perpetuated by exempting $CO_2$ emissions from bioenergy usage from national emissions limits. Most renewable energy standards for electric utilities have the same effect because bioenergy is viewed as a renewable energy source even when the biomass harvest increases GHG emissions from the ecosystem [33,34].

A direct approach to estimating $CO_2$ emissions to the atmosphere ($FCO_2$) is:

$FCO_2$ = NEP - fire emissions - harvest and trade emissions - processing FF emissions - wood decomposition 1 - wood decomposition 2 + FF substitution

(Equation 1)

Following the sequence from forest to product, this breaks down to:

$FCO_2$ = (NEP - fire emissions - harvest removals from land) + harvest additions to product chain + import of US grown wood - export of US grown wood - harvest and trade FFE - processing FFE - decomposition emission 1 - biofuel stock from land + biofuel stock addition to product pool - decomposition emission 2 + FF substitution.

(Equation 2)



FS-001608

Harvest and trade FFE and processing FFE include refining and transport costs [35]. The terms in parentheses are the net ecosystem carbon balance mentioned earlier, assuming dissolved organic carbon, dissolved inorganic carbon and volatile organic carbon losses from the forest system are negligible. Decomposition emission 1 and 2 are emissions from wood waste at the processing facility (Equation 1) or from biomass burned for energy (Equation 2). Biomass combustion replaces fossil fuel emissions with its own emissions of $CO_2$, and emissions will be higher per unit energy produced because of the inherently lower energy content of bioenergy and energy losses associated with transformation into other fuel forms (i.e., solid to liquid fuel) [33]. This equation is a modification of an approach that did not adequately represent the land-based net ecosystem carbon balance [36]. The FORCARB2 model used in [37] calculates forest carbon stock changes from inventory data at two points in time (all predicted from volume changes in above-ground live-tree biomass) and identifies it as 'net sequestration', but this neglects changes in key pools such as soil and dead wood carbon, as well as below-ground root growth. Equation 1 is a more process-based approach [3,4]. The factors we believe should be considered in LCA are shown in Figure 3.

Conversion of natural areas or mature forests to bioenergy production has a larger loss of carbon than management on low-quality or degraded land. Converting rainforests, peatlands, savannas or grasslands to produce food-crop-based biofuels in Brazil, Southeast Asia and the USA creates a biofuel carbon debt by releasing 17–420-times more $CO_2$ than the annual GHG reductions that biofuels would provide by displacing fossil fuels [33].

Thinning of forests for bioenergy production has the short-term potential to counteract GHG reduction goals. A modeling study evaluated the impact of a global bioenergy program and found that related indirect land use will be responsible for substantially more carbon loss – up to two-times that of current conditions [34] – indicating that one cannot automatically assume near-term carbon benefits. Furthermore, because of predicted increases in fertilizer use to meet forest growth requirements, nitrous oxide emissions will be more important than carbon losses in terms of global warming potential [34].

Some clarifications are required here regarding replacement of fossil fuel with bioenergy production from forests. First, to determine whether there is a net benefit, the amount of carbon stored in forests needs to be correctly estimated. Carbon storage in forests includes live and dead wood (including stumps and roots) as well as soil carbon. If the forests are allowed to grow, they can continue to accumulate live carbon for hundreds of years as observed in inventory data from Pacific northwest US forests [8]. Second, above-ground dead wood in these forests accounts for approximately 15–20% of total wood biomass in mature and old forests, yet it is often assumed to be zero in carbon models used for estimating forest carbon storage. Thus, carbon can potentially accumulate in forests far beyond the timeframe of GHG reduction targets and to higher levels than often assumed.

Once carbon enters the forest system, management can determine to some degree where it goes. However, with the exception of enhancing NPP, management cannot influence how much carbon enters the forest system. To the extent that management can direct carbon into longer lived pools, it can increase the stores of carbon in the forest sector. Harvest of carbon is one proposed strategy to increase carbon stores. However, harvesting carbon will increase the losses from the forest itself and to increase the overall forest sector carbon store, the lifespan of wood products carbon (including manufacturing losses) would have to exceed that of the forest. Under current practices this is unlikely to be the case. A substantial fraction (25–65%) of harvested carbon is lost to the atmosphere during manufacturing and construction depending on the product type and manufacturing method [37]. The average lifespan




**Figure 3. Forest carbon life cycle analysis.** Black arrows indicate flows from one location to another. NECB (green arrows) is net primary production minus carbon losses from harvest debris on site, fire emissions and other factors assumed to be negligible (e.g., dissolved organic carbon and volatile organic carbon). Wood can be harvested directly for bioenergy production (2) or indirectly as a by-product of manufacturing (3, 4). FFEs result from ECM and ECT (orange arrows). The wood products chain is from domestic forests only; emissions from exports are accounted for by virtual processing in the country of origin, and imports are accounted for by the country of origin. Emissions sources from imports and exports in the US are less than 1% (assumed negligible). At the end of life, wood and pulp and paper products decompose in landfills or are reused and delay decomposition, resulting in DE (methane). Bioenergy production (gray ovals) produces FFEs to transport and convert biomass for ethanol production (manufacturing emission) and results in direct emission from biomass burning (red arrows). The net of bioenergy minus associated FFE is substitution.
DE: Decomposition emissions; ECM: Energy consumption in manufacturing; ECTs: Energy consumption in transportation; FFE: Fossil fuel emission; NECB: Net ecosystem carbon balance.

of wood buildings is 80 years in the USA, which is determined as the time at which half the wood is no longer in use and either decomposes, burns or, to a lesser extent, is recycled. However, many forest trees have the potential to live hundreds of years (e.g. 800 years in the Pacific northwest USA). Mortality rates of trees are generally low, averaging less than 2% of live mass per year in mature and old forests [39]; for example, in Oregon, mortality rates average 0.35–1.25% in forests that are older than 200 years in the Coast Range and Blue Mountains, respectively [8]. Moreover, the average longevity of dead wood and soil carbon is comparable to that of live trees [39]. When the loss of carbon associated with wood products manufacturing is factored in, it is highly unlikely that harvesting carbon and placing it into wood products will increase carbon stores in the overall forest sector. This explains why in all analyses conducted to date, wood products stores never form the majority of total forest sector stores [11,40–42].

Substitution of more energy-intensive building materials with a less energy intensive one can, in theory, result in a fossil fuel offset; for example, when wood replaces a construction material with higher emissions (e.g., concrete or steel), the fossil $CO_2$ emission avoided by choosing wood is credited as an offset. Thus, harvest of forest carbon and placement into buildings can impact the overall carbon balance of the forest sector [33,42]. However, several additional factors need to be considered. First, changes in the carbon stores of the forest ecosystem have to be considered relative to a base case that includes a lower level of harvests. As noted above, decreasing the interval between harvests, or increasing harvest intensity will lower the carbon store in the forest [9–11,31]; the question is whether stores in forest products combined with substitution offsets surpass losses from shorter rotations. Since the forest has a maximum carrying capacity, just the growth in carbon stores and offsets would seem to eventually exceed old forest carbon, although it could take centuries to happen, even using the most generous substitution effects. With more realistic substitution effects, it may never happen. In some cases, the amount of live and dead biomass in unharvested forests was grossly underestimated [42] leading to an overestimation of the relative benefits of substitution. Second, in substitution effects calculations, it is often tacitly assumed that wood that is removed from forests and used in long-term wood products, specifically buildings, continues to accumulate infinitely over time. While building carbon stores have increased in many areas (e.g., the USA), this is largely because more forest area is being harvested and not because the harvest-related stores per harvest area are increasing. The trend that is being used as evidence of increasing building stores is based on the fact that because a greater area has been harvested, the total store has increased. This is not the same thing as the increase associated with a particular area of forest. A fixed per area basis is how substitution effects have largely been evaluated in the past, so arguing on an expanding area basis is inappropriate. The reason that wood products saturate is that housing and other wood products have a finite lifespan and are eventually replaced [43]. Although there can be some reuse of wood, essentially assuming an infinite lifespan or 100% reuse of wood products is completely unrealistic. Carbon is always lost as wood products are used or disposed of, which means release of $CO_2$ to the atmosphere. Since long-term storage in forest products saturates over time (i.e., eventually does not increase), the effect of substituting wood for fossil fuel energy is also likely to saturate. Third, in most cases, the substitution offset was calculated based on the assumption that each time a house is to be built, the preference is for nonwood materials. This results in an estimate of the maximum substitution effect possible, but does not account for actual preferences for building materials. Granted, preferences vary by region and over time, but without accounting for these one cannot possibly estimate realistic substitution benefits. Fourth, current substitution accounting appears to violate a key principle of carbon offsets, namely permanence. In fact the ever-increasing substitution offset presented in these analyses appears to depend on impermanence of wooden buildings. Fifth, most, if not all, current analyses of substitution effects ignore the effects of additionality and whether wooden buildings are initially present. Given that many forests have already been harvested to produce wood products, replacing wooden buildings with more wooden buildings results in no additional substitution effect. Finally, these studies assume that it is a permanent benefit to GHG removal from the atmosphere. That is, they assume there is a continual increase in the carbon credit, and maintenance of a sustainable productive forest dedicated to providing substitutes for nonwood fuels and materials [44].

These caveats all suggest that while there is likely to be some building material substitution effect that is valid, it is far lower than generally estimated and as subject to saturation as other forest-related carbon pools. In summary, the substitution effect appears to have been grossly overestimated. Substitution is an offset, not a store. Offsets depend on the use of appropriate accounting rules. Until rules such as permanence, additionality and leakage are followed, the values being presented in many analyses are not credible.

## Adaptation, other ecosystem services & ecosystem sustainability

Vulnerability to climate change can be exacerbated by the presence of other stresses. Nonclimate stresses can increase vulnerability to climate change by reducing



FS-001610

resilience and can also reduce adaptive capacity because of resource deployment to competing needs; for example, current stresses on forests include human-caused wildfires as access to forests increases, and land-use change in addition to drought stress. Vulnerable regions face multiple stresses that affect exposure and sensitivity as well as capacity to adapt.

Managing forest carbon should also consider other ecosystem values and services, and ecosystem sustainability in the face of climate change, allowing for natural adaptation to climate change. Indeed, in some forest ecosystems, carbon may not be the primary focus of management or the primary ecosystem service provided by forests.

The IPCC states that [45]:

- Approximately 20–30% of known plant and animal species are likely to be at increased risk of extinction if increases in global average temperature exceed 1.5–2.5°C;
- Types of changes observed in plants include range shifts (latitude, elevation) and changes in growing season length, and threatened systems include those with physical barriers to migration (e.g., mountain ecosystems);
- Nonclimate stresses can increase vulnerability to climate change by reducing resilience and adaptive capacity.

The climate projection for North America is characterized by a variety of different patterns of precipitation, with increasing precipitation at high latitudes and a sharp decrease in precipitation across the southwest. Drought-affected areas will probably increase in extent. Warming in western mountains of the USA is projected to cause decreased snowpack, more winter flooding and reduced summer flows. This has implications for forest ecosystem sustainability and shifts in vegetation distribution that must be considered in carbon-management scenarios. Managing for carbon sequestration in forests can be pursued on lands compatible with preserving biodiversity over large areas. Careful planning and evaluation are needed to avoid practices that impact biodiversity with little to no net decrease in atmospheric $CO_2$ [13].

## Future perspective

Decisions to limit GHGs are being made within states, nationally and internationally. Mitigation and adaptation actions applied to forests will need to include more thorough carbon accounting through LCA of forest carbon stocks and fluxes, and energy use and emissions resulting from the removal of wood from forests for products and bioenergy production. GHG emission policies will need to account for emissions from bioenergy, which is currently assumed to be zero internationally. Thus, GHG emissions resulting from substitution for fossil fuels will have to be more accurately represented.

Future considerations in reducing anthropogenic GHG emissions go beyond carbon accounting. Climate mitigation policies do not account for the effects of changes in the land surface on sensible and latent heat flux, and albedo, and the distribution of energy in the climate system. Although this is important for understanding how we can reduce anthropogenic effects on the climate system, it presents challenges for policies for mitigating climate change [46]. Research has shown that changes in the energy balance after forest-stand replacing disturbance (e.g., insects, harvest and fire) can either enhance or offset carbon sources and sinks when examining the effect of both factors on net radiative forcing [47]. Others have shown that fragmentation of the landscape can cause changes in rainfall patterns locally and globally [48,49]; for example, land surface changes over 10 × 10 km can cause changes in local rainfall patterns. The spatial scale of a disturbance that would result in a global impact depends on where the disturbance occurs (e.g., climate or carbon storage). Climate model simulations with disturbed areas over




**Figure 4. Elements of a fully functioning forest sector carbon sequestration system and the roles of each component.**



FS-001611

hundreds of square kilometers have the potential to lead to global impacts [50]. Climate model sensitivity to such disturbances over larger areas needs to be tested at regional and global scales.

An envisioned forest carbon sector sequestration system is illustrated in Figure 4. The research component needs to develop models and methods, test effectiveness of practices and reduce uncertainty. Other system components include important features of practices and markets. In addition, the role of independent bodies is to set guidelines for practices and methods, verify project designs, and assess the effectiveness of the carbon sequestration system, including potential trans-boundary leakage [51].

Research will lead to improved methods for accounting for GHG emissions, and implementation of these methods will need to occur within the next 5–7 years for tracking improvements in atmospheric GHGs to meet treaty and policy obligations.

### Financial & competing interests disclosure

*The authors have no relevant affiliations or financial involvement with any organization or entity with a financial interest in or financial conflict with the subject matter or materials discussed in the manuscript. This includes employment, consultancies, honoraria, stock ownership or options, expert testimony, grants or patents received or pending, or royalties. No writing assistance was utilized in the production of this manuscript.*

## Executive summary

### Carbon sequestration

- Deforestation and forest degradation (thinning) are the second largest source of anthropogenic GHG emissions.
- Thinning forests to reduce potential carbon losses due to wildfire is in direct conflict with carbon sequestration goals, and, if implemented, would result in a net emission of $CO_2$ to the atmosphere because the amount of carbon removed to change fire behavior is often far larger than that saved by changing fire behavior, and more area has to be harvested than will ultimately burn over the period of effectiveness of the thinning treatment.
- Forest carbon density could be enhanced by changing the interval and intensity of harvest, increasing net primary productivity or decreasing decomposition-related losses.

### Measurements for management & policy

- Scientific advancements in monitoring carbon sources and sinks are expected to become operational within 5–7 years for treaty and policy verification.
- Capabilities of some countries will be limited to expansion of change in carbon stock estimates by including previously unmeasured pools (soil carbon, dead material), and improving emissions factors.
- Deforestation is the second largest source of anthropogenic $CO_2$, therefore, mitigation by conservation and planting are likely to be important; satellite monitoring of forest cover, age and disturbance (e.g., fire, clear felling, thinning and insects) will be critical.

### Life cycle analysis (including substitution, proposed considerations)

- Carbon can potentially accumulate in forests far beyond the timeframe of GHG reduction targets.
- When the loss of carbon associated with wood products manufacturing is factored in, it is highly unlikely that harvesting carbon and placing it into wood products will increase carbon stores in the overall forest sector. This explains why in all analyses conducted to-date, wood products stores never form the majority of total forest sector stores.
- Carbon is always lost as wood products are used or disposed, which means release of $CO_2$ to the atmosphere. Since long-term storage in forest products saturates over time (i.e., eventually does not increase), the effect of substituting wood for fossil fuel energy also saturates.
- To determine if there is a net substitution benefit, the amount of carbon stored in forests needs to be correctly estimated.
- Substitution of more energy-intensive building materials with less energy-intensive materials can, in theory, result in a fossil fuel offset, but important considerations suggest that the substitution effect is substantially lower than estimated, and is subject to saturation.

### Adaptation & other ecosystem services: ecosystem sustainability

- Managing forest carbon should consider other ecosystem values and services, and ecosystem sustainability in the face of climate change, allowing for natural adaptation to climate change (e.g., landscape connectivity for migration and minimizing impacts of management on species ability to survive in a new climate).

## Bibliography

Papers of special note have been highlighted as:
- ■ of interest
- ■■ of considerable interest

1 *Climate Change 2007: Mitigation, Contribution of Working Group III to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change.* Metz B, Davidson OR, Bosch PR, Dave R, Meyer LA (Eds). Cambridge University Press, NY, USA 851 (2007).

2 Law BE, Sun O, Campbell J, Van Tuyl S, Thornton P. Changes in carbon storage and fluxes in a chronosequence of ponderosa pine. *Global Change Biol.* 9, 510–524 (2003).

3 Schulze E-D, Wirth C, Heimann M. Managing forests after Kyoto. *Science* 289, 2058–2059 (2000).

4 Chapin FS, Woodwell GM, Randerson JT *et al.* Reconciling carbon-cycle concepts, terminology, and methods. *Ecosys.* 9, 1041–1050 (2006).

■■ **Describes components of net ecosystem carbon balance (NECB) and terminology.**

5 Luyssaert S, Schulze ED, Borner A *et al.* Old-growth forests as global carbon sinks. *Nature* 455, 213–215 (2008).

6 Janisch JE, Harmon ME. Successional changes in live and dead wood carbon stores: implications for net ecosystem productivity. *Tree Physiol.* 22, 77–89 (2002).



FS-001612

7 Law BE, Thornton P, Irvine J, Anthoni P, Van Tuyl S. Carbon storage and fluxes in ponderosa pine forests at different developmental stages. *Global Change Biol.* 7, 755–777 (2001).

8 *2006 IPCC Guidelines for National GHG Inventories*, Eggleston HS, Buendia L, Miwa K, Ngara T, Tanabe K (Eds). Institute for Global Environmental Strategies, Hayama, Kanagawa, Japan (2006).

9 Nunery JS, Keeton WS. Forest carbon storage in the northeastern United States: net effects of harvesting frequency, post-harvest retention, and wood products. *Forest Ecol. Management* 259, 1363–1375 (2010).

10 Hudiburg T, Law BE, Turner DP, Campbell J, Donato D, Duane M. Carbon dynamics of Oregon and Northern California forests and potential land-based carbon storage. *Ecol. Applic.* 19, 163–180 (2009).

11 Harmon ME, Moreno A, Domingo JB. Effects of partial harvest and site preparation on the carbon stores in Douglas-fir/western hemlock forests: a simulation study. *Ecosys.* 12, 777–791 (2009).

12 Asner GP, Knapp DE, Broadbent EN, Oliveira PJC, Keller M, Silva JN. Selective logging in the Brazilian Amazon. *Science* 310, 480–482 (2005).

13 Huston MA, Marland G. Carbon management and biodiversity. *J. Environ. Manage.* 67, 77–86 (2003).

14 *Verifying GHG Emissions.* National Academies Press, Washington, DC, USA (2010).

■■ **Recommendations for monitoring and verifying GHG emissions. Includes methods to reduce uncertainty using inventories, models and remote sensing of deforestation, forest degradation and afforestation.**

15 Hurteau MD, Koch GW, Hungate BA. Carbon protection and fire risk reduction: toward a full accounting of forest carbon offsets. *Frontiers Ecol. Environ.* 6, 493–498 (2008).

16 Stephens SL, Moghaddas JJ, Edminster C *et al.* Fire treatment effects on vegetation structure, fuels, and potential fire severity in western US forests. *Ecol. Applic.* 19, 305–320 (2009).

17 *Sierra Nevada Forest Plan Amendment Final Supplement Environmental Impact Statement.* USDA Forest Service Pacific Southwest Region, Vallejo, CA, USA (2010).

18 Evans A, Finkral A. From renewable energy to fire risk reduction: a synthesis of biomass harvesting and utilization case studies in US forests. *GCB Bioenergy* 1, 211–219 (2009).

19 Mitchell S, Harmon ME, O'Connell KB. Forest fuel reduction reduces both fire severity and long-term carbon storage in three Pacific Northwest ecosystems. *Ecol. Applic.* 19, 643–655 (2009).

■ **Model case studies of simulated effects of fuel reduction on subsequent carbon storage.**

20 Rhodes JJ, Baker WL. Fire probability, fuel treatment effectiveness and ecological tradeoffs in Western US public forests. *Open Forest Sci. J.* 1, 1–7 (2009).

21 Treuhaft RN, Goncalves FG, Drake JB *et al.* Biomass estimation in a tropical wet forest using Fourier transforms of profiles from LIDAR or Interferometric SAR. *GRL 37, L23403 (2010).*

22 Law BE, Arkebauer T, Campbell JL *et al.* *Terrestrial Carbon Observations: Protocols for Vegetation Sampling and Data Submission. Report 55, Global Terrestrial Observing System.* FAO, Rome 87 (2008).

23 Kennedy RE, Cohen WB, Schroeder TA. Trajectory-based change detection for automated characterization of forest disturbance dynamics. *Remote Sens. Environ.* 110, 370–386 (2007).

24 Kurz WA, Dymond CC, White TM *et al.* CBM-CFS3: a model of carbon-dynamics in forestry and land-use change implementing IPCC standards. *Ecol. Modeling.* 220, 480–504 (2009).

25 Goward SN, Masek J, Cohen W *et al.* Forest disturbance and North American carbon flux. *EOS Trans. AGU* 89, 105–116 (2008).

26 Huang C, Goward SN, Masek JG *et al.* Development of time series stacks of Landsat images for reconstructing forest disturbance history. *Int. J. Digital Earth* 2, 195–218 (2009).

27 Denning S, Oren R, McGuire D *et al.* *Science Implementation Strategy for the North American Carbon Program.* Report of the NACP Implementation Strategy Group of the US Carbon Cycle Interagency Working Group. Washington, DC USA 68 (2005).

28 Law BE, Turner D, Lefsky M *et al.* Carbon fluxes across regions: observational constraints at multiple scales. In: *Scaling and Uncertainty Analysis in Ecology: Methods and Applications.* Wu J, Jones B, Li H, Loucks O (Eds). Columbia University Press, NY, USA 167–190 (2006).

29 Luyssaert S, Ciais P, Piao SL *et al.* The European carbon balance: part 3: forests. *Global Change Biol.* 16, 1429–1450 (2009).

30 Hamburg S. Simple rules for measuring changes in ecosystem carbon in forestry-offset projects. *Mitigation Adaptation Strategies Global Change* 5, 25–37 (2000).

31 Harmon ME, Marks B. Effects of silvicultural treatments on carbon stores in forest stands. *Can. J. For. Res.* 32, 863–877 (2002).

32 Searchinger TD, Hamburg SP, Melillo J *et al.* Fixing a critical climate accounting error. *Science* 326, 527–528 (2009).

■■ **Explanation of bioenergy substitution accounting error.**

33 Fargione J, Hill J, Tilman D, Polasky S, Hawthorne P. Land clearing and the biofuel carbon debt. *Science* 319, 1235–1238 (2008).

34 Mellillo JM, Reilly JM, Kicklighter DW *et al.* indirect emissions from biofuels: how important? *Science* 326, 1397–1399 (2009).

35 Gustavsson L, Eriksson L, Sathre R. Costs and $CO_2$ benefits of recovering, refining and transporting logging residues for fossil fuel replacement. *Applied Energy* 88, 192–197 (2011).

36 Heath LS, Maltby V, Miner R *et al.* GHG and carbon profile of the US forest products industry value chain. *Environ. Sci. Technol.* 44, 3999–4005 (2010).

37 Ingerson A. *Wood Products and Carbon Storage: Can Increased Production Help Solve the Climate Crisis?* The Wilderness Society Washington, DC, USA (2009).

38 Skog KE, Nicholson GA. Carbon cycling through wood products: the role of wood and paper products in carbon sequestration. *Forest Products J.* 48, 75–83 (1998).

39 Harmon ME. Moving towards a new paradigm for dead wood management. *Ecol. Bull. (Sweden)* 49, 269–278 (2001).

40 Wise M, Calvin K, Thomson A *et al.* Implications of limiting $CO_2$ concentrations for land use and energy. *Science* 324, 1183–1186 (2009).

41 Dewar RC, Cannell MGR. C sequestration in the trees, products, and soils of forest plantations: an analysis using UK examples. *Tree Physiol.* 11, 49–71 (1992).

42 Perez-Garcia J, Lippke B, Comnick J, Manriquez C. An assessment of carbon pools, storage, and wood products market substitution using life cycle analysis results. *J. Wood Fiber Sci.* 37, 140–148 (2005).

43 Winistorfer P, Chan Z, Lippke B, Stevens N. Energy consumption and GHG emissions related to the use, maintenance, and disposal of residential structure. *Fiber Sci.* 37 128–139 (2005).

44 Sathre R, O'Connor JO. *A Synthesis of Research on Wood Products and GHG Impacts.* Technical report TR-19, Vancouver, Canada 74 (2008).



FS-001613

45 *Climate Change 2007: Impacts, Adaptation and Vulnerability. Contribution of Working Group II to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change.* Parry ML, Canziani OF, Palutikof JP, van der Linden PJ, Hanson CE (Eds). Cambridge University Press, Cambridge, UK (2007).

46 Marland G, Pielke RA Sr, Apps M *et al.* The climatic impacts of land surface change and carbon management, and the implications for climate-change mitigation policy. *Climate Policy* 3, 149–157 (2003).

47 Betts RA. Offset of the potential carbon sink from boreal forestation by decreases in surface albedo. *Nature* 408, 187–190 (2000).

48 Chase TN, Peilke Sr, RA, Kittel TGF, Nemani RR, Running SW. Simulated impacts of historical land cover changes on global climate in northern winter. *Clim. Dynam*. 16, 93–105 (2000).

49 Weaver CP, Avissar R. Atmospheric disturbances caused by human modification of the landscape. *Bull. Am. Meterol. Soc.* 82, 269–281 (2001).

50 Werth D, Avissar R. The local and global effects of Amazon deforestation. *J. Geophys. Res.* 107, 8087–8094 (2002).

51 Gan J, McCarl BA. Measuring transnational leakage of forest conservation. *Ecol. Econ.* 64, 423–432 (2007).


## ▪ Websites


101 Inventory of US GHG emissions and sinks:1990–2004, *US EPA* #430-R-06–002. www.epa.gov/climatechange/emissions/usinventoryreport.htm

102 Prepared by the National GHG Inventories Program. *2006 IPCC Guidelines for National GHG Inventories.* Eggleston HS, Buendia L, Miwa K, Ngara T, Tanabe K (Eds). IGES, Japan (2006). www.ipccnggip.iges.or.jp/public/2006gl/vol4.htm

103 Penman J, Gytarsky M, Hiraishi T *et al. Good Practice Guidance for Land Use, Land-Use Change and Forestry. IPCC National GHG Inventories Program and Institute for Global Environmental Strategies*. Kanagawa, Japan. (2003). www.ipcc-nggip.iges.or.jp/public/gpglulucf/gpglulucf.htm




FS-001614

ENVIRONMENTAL RESEARCH LETTERS

LETTER • OPEN ACCESS

# Have product substitution carbon benefits been overestimated? A sensitivity analysis of key assumptions

To cite this article: Mark E Harmon 2019 *Environ. Res. Lett.* **14** 065008

View the article online for updates and enhancements.

Recent citations

- Spatial Distribution of Forest Ecosystem Service Benefits in Germany: A Multiple Benefit-Transfer Model
Peter Elsasser *et al*
- Getting the message right on naturebased solutions to climate change
Nathalie Seddon *et al*
- Robert T. Leverett *et al*

This content was downloaded from IP address 107.2.29.109 on 11/03/2021 at 19:02

IOP Publishing Environ. Res. Lett. 14 (2019) 065008 https://doi.org/10.1088/1748-9326/ab1e95

Environmental Research Letters

CrossMark

OPEN ACCESS

RECEIVED
12 May 2017

REVISED
7 March 2019

ACCEPTED FOR PUBLICATION
1 May 2019

PUBLISHED
21 June 2019

Original content from this work may be used under the terms of the Creative Commons Attribution 3.0 licence.

Any further distribution of this work must maintain attribution to the author(s) and the title of the work, journal citation and DOI.

LETTER

# Have product substitution carbon benefits been overestimated? A sensitivity analysis of key assumptions

Mark E Harmon

Department of Forest Ecosystems and Society, Oregon State University, Corvallis, OR 97331, United States of America

**E-mail:** Mark.Harmon@oregonstate.edu

**Keywords:** forest sector, carbon storage, forest management, climate mitigation, forest ecosystems

Supplementary material for this article is available online

## Abstract

Substitution of wood for more fossil carbon intensive building materials has been projected to result in major climate mitigation benefits often exceeding those of the forests themselves. A reexamination of the fundamental assumptions underlying these projections indicates long-term mitigation benefits related to product substitution may have been overestimated 2- to 100-fold. This suggests that while product substitution has limited climate mitigation benefits, to be effective the value and duration of the fossil carbon displacement, the longevity of buildings, and the nature of the forest supplying building materials must be considered.

## Introduction

Forest ecosystems represent important stores of global terrestrial carbon and are the focus of possible climate mitigation strategies [1–3]. Along with that stored in forest ecosystems, carbon can be stored in wood products in-use and after disposal [4, 5]. Another way forests could mitigate climate change is through product substitution, a process whereby products from the forest substitute for others (i.e. concrete and steel) which, if used, would result in more fossil carbon release to the atmosphere [6–16]. While wood-based building materials generally embody less fossil-derived energy in their manufacture than steel and concrete, resulting in a net displacement of fossil carbon, its effectiveness as a climate mitigation strategy depends on the amount of carbon displaced and its duration. Current estimates of climate mitigation benefits of product substitution are generally based on three critical, often unstated assumptions: (1) the carbon displacement value remains constant [8–16], (2) the displacement is permanent and therefore of infinite duration [12–16] which implies no losses via cross-sector leakage, and (3) there is no relationship between building longevity and substitution longevity [10]. Below, each of these assumptions is reviewed.

Although most analyses of product substitution benefits implicitly assume a constant displacement value over time [8–16], it is subject to change. Schlamadinger and Marland [12] hypothesized energy substitution displacement values increase over time because of increased efficiencies. For product substitution, I hypothesize it will likely move in the opposite direction for three reasons. First, changing manufacturing methods impact embodied energy: for example, as long as it is available, the addition of fly ash could lead to a 22%–38% reduction in embodied energy required for concrete reducing the displacement value [17]. At the same time, increased processing of wood to create materials suitable for taller buildings (e.g. cross laminated timbers) would likely lead to a lower displacement value given laminated beams have 63%–83% more embodied energy than sawn softwoods [9, 17]. Second, the increases in energy efficiency hypothesized by [12] related to rising energy costs and recycling [9, 18, 19] and as noted by [8, 16] would also result in a decrease in product substitution displacement because the key relationship involves the difference in emissions and not the ratio as in energy substitution [20] (see supplemental information is available online at stacks.iop.org/ERL/14/065008/mmedia for detailed analysis of the displacement formula). Finally, changing the mix of fossil fuels used to generate energy can also substantially change the amount of carbon released per unit energy consumed and if natural gas continues to increase relative

© 2019 The Author(s). Published by IOP Publishing Ltd

IOP Publishing Environ. Res. Lett. 14 (2019) 065008 Letters

to coal, as has been observed [21], then the displacement value would likely decline in the future. The same is true if non-fossil energy sources such as solar, wind, or hydropower are increasingly used as projected [22].

One possible mechanism leading to permanent displacement is that fossil carbon not used by the building sector is also not used in any other sector in the future. However, this seems unlikely given carbon leakage [20, 23–25]. While the rate of product substitution-related leakage is difficult to estimate (in part because the form and location of the fossil carbon is not specifically known), it is unlikely to be zero given fossil carbon-based fuels are expected to be depleted in the next 107–235 years [26, 27] (see supplemental information). Even if these depletion time estimates are off by centuries, the duration of the displacement is not infinite and the claim that 'saved fossil emissions are forever' [12] is untenable. I hypothesize that without a mechanism to prevent its use, that fossil carbon displaced by product substitution will gradually be released by other sectors and will not be excluded from depletion as implied by [10, 12].

The key assumption of no relationship between product longevity and product substitution longevity has been asserted [10], but not fully explained. If there always is a preference for non-wood building materials, then avoiding their use avoids fossil carbon emissions, hence the displacement would continue to accumulate [20]. However, if wood is preferred then the use of wood does not necessarily increase cumulative displacement [20]. Despite differences in regional preferences for wood [28], most if not all assessments of product substitution tacitly assume wood is not preferred and that preferences never change. As a consequence, the product substitution store never saturates and implying there is no negative feedback in the net cumulative displacement. In all other forest-related carbon pools, a negative feedback exists between pool size and output (i.e. they are donor controlled systems): the larger the pool size, the larger the output flow. This causes these pools to saturate in time as long as the input remains constant. It is striking that this behavior is true for wood products, but not for product substitution (see supplemental information). In [12] product and energy substitution are treated the same. However, I believe they are quite different. In the case of energy, once energy is used it does not have a lifespan or store per se. However, in the case of wood products when the product lifespan is exceeded it has to be replaced with either wood-based or some other materials. If it is the former, the fossil carbon displacement continues, but does not necessarily increase [20] (see supplemental information). If it is the latter, the fossil carbon that was displaced is released to the atmosphere [20]. I therefore hypothesize that when wood is or becomes the preferred building material the product substitution pool has a negative feedback directly related to building longevity.

The objective of this study is a sensitivity analysis of these three assumptions and their impact on projected climate mitigation benefits. In addition to examining each assumption separately, I examined how they might work together to determine whether product substitution carbon benefits eventually become as large relative to the forest ecosystem and harvested materials as previous analyzes suggest [10–15]. To perform this analysis I used a relatively simple landscape model assuming an idealized, regulated system and focused on conditions in which product substitution benefits would be highest (i.e. clear-cut harvest, high manufacturing efficiency, and maximum use of products in buildings). The cases examined are therefore illustrative of the kinds of behavior the assumptions create, but not an exhaustive analysis of all forest ecosystems, management or manufacturing systems. Nor does the analysis try to identify the most likely values of displacement factors, carbon leakage, or product lifespans: e.g. [29, 30].

## Methods

Each of the three assumptions was examined individually and then jointly for three contrasting initial conditions using a simple landscape model[1] that tracks the stores for the live, dead, and soil carbon pools in the forest ecosystem, the products in use and disposal, and the virtual carbon stores associated with product substitution. Each of these pools was modeled as a simple input–output, donor controlled sub-model following first order dynamics in which the output was regulated by a rate-constant describing the fraction lost per year. For product substitution, the fossil carbon displaced was the input, and losses were associated with use of fossil carbon by other sectors (hereafter called leakage losses) and those associated with the replacement of wooden buildings (hereafter called replacement losses). All simulations were conducted for a 300 year period as in [8] using a 50 year harvest cycle.

### Displacement decline

In this set of simulations I assumed no losses associated with leakage or building replacement. The initial displacement value of 2.1 Mg C per 1 Mg C wood use [20] was reduced by 25%, 50% and 100% over either a 25, 50, or 100 year period. The 100% decline represents the possibility that fossil carbon will be completely replaced as a source of energy in the location of manufacture. As a control, the displacement value was assumed to not decline.

[1] A more complete description of the model and parameters are available as supplemental information online.



FS-001617

IOP Publishing Environ. Res. Lett. 14 (2019) 065008 Letters




**Figure 1.** Accumulation of product substitution carbon when displacement is reduced 25%–100% over a 25–100 year period for a 50 year clear-cut harvest interval. For these simulations losses via leakage and replacement were zero[3].

### Leakage losses

In this set of simulations I assumed the displacement value remained 2.1 Mg C per 1 Mg C wood use and there were no losses associated with building replacement. To examine the sensitivity of substitution benefits to cross-sector leakage, I simulated five possible scenarios: (1) no leakage, (2) 12%, (3) 6%, (4) 3%, (5) 1.5%, (6) 0.75, and (7) 0.375% $yr^{-1}$. In these scenarios leakage via other sectors was assumed to be continuous and not a one-time phenomenon. While expressed as a constant percentage lost per year, these values imply depletion times ranging between 25 and 800 years, which are 71%–340% of the currently estimated range of 35–235 years [26, 27].

### Replacement losses

In this set of simulations I assumed the displacement value remained 2.1 Mg C per 1 Mg C wood use and there were no losses associated with cross-sector leakage. I varied the average building life-span to be 25, 50, 100, and 200 years, which bracket current estimates[2]. To provide a comparison to past studies, I reduced replacement losses to zero since this parameterization mimics the consequences of assuming no relationship between building longevity and product substitution longevity (see supplemental information).

### Overall effect

To assess the overall effect of product substitution assumptions I examined a clear-cut system for three possible initial conditions: (1) an old-field planted to a production forest, (2) a production forest that originated from an old-growth forest landscape that began conversion 100 years ago, and (3) an old-growth forest converted to a production forest. In each case I assumed that 65% of the live carbon would be harvested, that 75% of that harvest would be converted into buildings. To explore the sensitivity of the assumptions on their overall impact I used the displacement and leakage loss parameter values that gave the minimum, median, and maximum effect based on the earlier simulations. In the case of replacement losses, I assumed an average building lifespan of either 50 years, 100 years, or an infinite number of years. The various combinations resulted in 47 simulations per initial condition. The model parameterization was based on a productive forest in the Pacific Northwest, a major source of wood building materials and US carbon stores [31].

## Results

### Displacement decline

There was a direct relationship to the total product substitution virtual store and the degree displacement declined, although the faster the decline in the displacement, the lower the final value (figure 1). For example, a 25% decline in 25, 50, and 100 years led to a final reduction in the product substitution virtual store of 24.3%, 23.6%, and 22.3%, respectively. This suggests that while the timing of the decline had an effect, the major response was to the level. The product substitution virtual store saturated only for the cases in which displacement went to zero and even if this took 100 years, product substitution stores estimates at 300 years were reduced by ≈89%.

[2] Estimates of housing longevity are highly variable with exponential rate-constants ranging from 0.0069/y to 0.03/y [12–16]. In some cases building longevity has been modeled as a step function, with rapid losses after 80 years [10–11]. These estimates give an average lifespan or turnover time of 33–144 years. I explored a range of 25 to 200 years to bracket this uncertainty. Note that the average lifespan is not the same as the maximum lifespan of buildings: for an average lifespan of 50 years, the maximum lifespan would be over 230 years.



FS-001618

IOP Publishing Environ. Res. Lett. 14 (2019) 065008 Letters




**Figure 2.** Accumulation of product substitution carbon when the time for displacement to be lost via leakage varies from 25 to 800 years for a 50 year clear-cut harvest interval. Displacement was assumed constant and replacement losses zero[3].




**Figure 3.** Accumulation of product substitution carbon when the average longevity of building varies for a 50 year clear-cut harvest interval. For these simulations displacement was constant and there were no leakage losses[3].

### Leakage losses

Regardless of the time required for cross-sector leakage to occur, this process substantially limited the product substitution virtual store relative to the case without leakage (figure 2). With a leakage as low as 0.375% $yr^{-1}$ (≈one-third the current estimate of the minimum depletion rate [27]) the store at 300 years was ≈40% lower than when there was no leakage. If the leakage rate-constant was 12% $yr^{-1}$, then ≈97% less would be stored relative to the no leakage scenario. Moreover, if the current range of depletion times (i.e. 35–235 years) is correct, then cross-sector leakage would reduce the estimates by 78%–96%. This indicates that leakage via other sectors may substantially undermine any attempt to displace fossil carbon using product substitution.

### Replacement losses

For an average building longevity of 50 years the product substitution store at 300 years was ≈17% of that of the case in which product substitution behaved as if it had infinite lifespan (figure 3). Even when average building lifespan was 200 years, this store at 300 years was ≈52% that of when product substitutions behaved as if they had an infinite lifespan. This indicates that assuming no relationship between product substitution lifespan and building lifespan overestimates benefits.

### Overall effect

Product substitution, estimated using past assumptions regarding displacement decline, leakage, and relationship to building longevity, increased for each initial condition; increasing the most when old-growth forests were harvested (figure 4). When alternative assumptions about product substitution were used, the shape of the product substitution accumulation curve varied: generally increasing for the old-field conversion to an asymptote, decreasing or increasing



FS-001619