IOP Publishing Environ. Res. Lett. 14 (2019) 065008 Letters




**Figure 4.** Accumulation of ecosystem, products in-use and disposed, and product substitution carbon stores for a 50 year clear-cut harvest interval in the Pacific Northwest for three possible scenarios: a plantation forest established on an agricultural field (A), (D); a production forest system that is continued (B), (E); an old-growth forest replaced by a forest plantation (C), (F). For past assumptions there was no decline in displacement value, there was no leakage, and buildings were assumed to have an infinite lifespan[3,4].

to an asymptote for the plantation system depending on replacement assumptions, and for most combinations reaching a peak at 10–40 years for the old-growth forest converted to a plantation scenario. This analysis indicates that to increase the overall amount of carbon stored in the system, that conversions of old-growth forests in the Pacific Northwest to plantations should be avoided, whereas creation of plantations on old-fields should be encouraged. Moreover, existing plantation systems are unlikely to increase their carbon stores unless building longevity is substantially increased (figure 4(e)).

Regardless of the initial conditions, product substitution was lower when alternative assumptions regarding displacement decline, leakage, and relationship to building lifespan were used, ranging from virtually zero to 80% of the past assumptions at year 300 depending on the parameter values assumed (tables S-2 to S-4). At the very least this suggests product substitution estimates are extremely uncertain. However, 85% of the 141 combinations examined were <50% than currently estimated. Those few exceeding 50% involved the assumption that substitution replacement losses were zero (i.e. an infinite lifespan) and had either an unrealistically low rate of

[3] See figures S-7 to S-10 for detailed view of the first 50 years.

[4] See supplemental text and figure for similar results for a productive Southeastern US forest.

IOP Publishing Environ. Res. Lett. 14 (2019) 065008 Letters

leakage (i.e. less than one-third that indicated by the maximum depletion time) or a minimal decline in displacement. Moreover, although past assumptions would indicate product substitution forms a large share of carbon stores at year 300 (74%–80% depending on the initial conditions), 90% of the alternative combinations examined indicated it was less than 50%. The combinations in which product substitution stores comprise the majority share of stores assumed an infinite lifespan and either minimal displacement decline or extremely low cross-sector leakage rates (tables S-2 to S-4).

## Discussion

Past analyses suggest product substitution benefits at the landscape level continue to increase at a constant rate into the future [6–16]. Moreover, they imply that while a carbon debt can be created in some situations (e.g. harvest of primary forests), that this debt is eventually paid back via product substitution [10, 12, 32]. While I examined only a few illustrative cases, in the case of product substitution, these debts would not be paid back if the displacement declines or there are losses via cross-sector leakage or related to product replacement. That is because negative feedbacks associated with losses can prevent product substitution from accumulating forever. These negative feedbacks could exist regardless of the forest ecosystem, the harvest system, and the efficiency of processing harvests into products as well as the proportion allocated to buildings. Thus, while I did not examine the effect on a wide range of ecosystems, or alternative harvest systems, or systems in which buildings are minor faction of harvested carbon, these underlying relationships would not be altered for these new situations[4].

The assumption that the product substitution benefit has no losses (e.g. [10]) results in at least two sets of untenable predictions: (1) if fossil fuel carbon is stored each time a wooden building is constructed, then theoretically it would be possible for fossil fuel carbon to be stored long after this carbon has been depleted by other sectors; hence this assumption may violate the conservation of mass; (2) this assumption also views the following as the same: (a) harvest that completely replaces wood building losses, (b) harvest that does not replace wood building losses, (c) harvest that exceeds wood building losses leading to more wood buildings, and (d) wood buildings that are not replaced. These cases clearly differ [20] (see supplemental information). This assumption also introduces a logical inconsistency: products appear to have different lifespans depending on whether their direct carbon (finite) or substitution carbon (infinite) effects are being considered (figure S-4).

Although displacement decline over time influences the accumulation of product substitution benefits, its effect is smaller than leakage or replacement losses. In contrast, leakage loss has as dramatic effect as longevity even if it occurs at a very slow rate implying the effect of product substitution is to delay eventual fossil carbon release, but not to stop it altogether. This may be important because it buys time, but this is not the same as the displaced fossil carbon never being released as suggested by [10, 12].

Collectively the past assumptions commonly used to assess the mitigation benefits of product substitution lead to a carbon pool that does not saturate causing the product substitution pool to eventually exceed the carbon stores in the forest ecosystem and in the associated wood products. Moreover, because there are no losses from the products substitution pool, its highest rate of increase occurs for the harvest interval providing the highest yield, typically a very young age relative to the forest ecosystem carbon maximum [32]. With no relationship to building longevity, there is no relationship to the size of the wood products pool despite the fact that more wooden buildings would imply more success in displacing fossil carbon. Finally, this set of assumptions makes product substitution benefits relatively insensitive to the initial conditions of the forest ecosystem because product substitution benefits always increase over time.

The alternative set of assumptions explored here suggests that the highest overall climate mitigation may not necessarily be achieved by maximizing the harvest yield using short rotation forestry [33]. Moreover, if product substitution is the primary climate mitigation strategy, wood building materials need to keep their carbon advantage by maintaining or increasing their displacement value. This suggests that while wood can be used in buildings taller than the general current practice, this may have less mitigation value than anticipated if these materials embody more fossil energy than current wood-based materials. Given the strong potential relationship between building and product substitution longevity, increasing the life-span of buildings or reusing building materials could potentially help meet future demand and increase mitigation benefits. Without a policy to assure that fossil carbon displaced by one sector is not used by another sector, product substitution benefits could be quite limited. While it is unlikely any policy could completely eliminate cross-sector leakage, designating long-term reserves might delay releases until their climate impacts are reduced to acceptable levels.

## Conclusions

Despite its general and limited nature, this sensitivity analysis found that product substitution benefits

IOP Publishing Environ. Res. Lett. 14 (2019) 065008 Letters

have likely been overestimated for many scenarios and are generally smaller than those related to the forest ecosystem and their derived products. This new analysis suggests that if product substitution is to be used as part of a climate mitigation strategy, then more attention will have to be paid to maintaining the amount of carbon displaced, reducing the rate of carbon cross-sector leakage, and increasing the longevity of buildings. This new analysis also suggests that the best strategy for forest-related climate mitigation for an important timber region, the Pacific Northwest, is largely determined by the initial conditions of the management system. Afforestation leads to an increase in carbon stores in the ecosystem, wood products, and substitution benefits for many decades. On existing production forests, substitution benefits could be maintained by continuing the current system or increased by harvesting more (but only as long as ecosystem carbon stores do not decline) and/or increasing the longevity of buildings. Conversion of older, high carbon stores forests to short rotation plantations would over the long-term likely lead to more carbon being added to the atmosphere despite some of the harvested carbon being stored and production substitution occurring [33].

## Acknowledgments

This research was funded by the Kaye and Ward Richardson endowment to the College of Forestry, Oregon State University and grant from the National Science Foundation (DEB-0823380 and DEB-1440409) to the Andrews LTER. I thank Drs Darius Adams, Thomas C Maness and the anonymous reviewers for their valuable insights.

## ORCID iDs

Mark E Harmon https://orcid.org/0000-0002-4195-8288

## References

[1] Smith P *et al* 2014 Agriculture, forestry and other land use (AFOLU) *Climate Change 2014: Mitigation of Climate Change. Contribution of Working Group III to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change* ed O R Edenhofer *et al* (Cambridge and New York, NY: Cambridge University Press)

[2] Birdsey R A, Plantinga A J and Heath L S 1993 Past and prospective carbon storage in United-States forests *Forest Ecol. Manage.* **58** 33–40

[3] McKinley D C *et al* 2011 A synthesis of current knowledge on forests and carbon storage in the United States *Ecol. Appl.* **21** 1902–24

[4] Skog K E 2008 Sequestration of carbon in harvested wood products for the United States *Forest Prod. J.* **58** 56–72

[5] Skog K E and Nicholson G A 1998 Carbon cycling through wood products: the role of wood and paper products in carbon sequestration *Forest Prod. J.* **48** 75–83

[6] Bethel J S and Schreuder G F 1976 Forest resources: an overview *Science* **191** 747–52

[7] Buchann A H and Levine S B 1999 Wood-based building materials and atmospheric carbon emissions *Environ. Sci. Policy* **2** 427–37

[8] Börjesson P and Gustavsson L 2000 Greenhouse gas balances in building construction: wood versus concrete from life-cycle and forest land-use perspectives *Energy Policy* **28** 575–88

[9] Glover J, White D O and Langrish T A G 2002 Wood versus concrete and steel in house construction *J. Forestry* **100** 34–41

[10] Lippke B, Oneil E, Harrison R, Skog K, Gustavsson L and Sathre R 2011 Life cycle impacts of forest management and wood utulization: knows and unknowns *Carbon Manage.* **2** 303–33

[11] Perez-Garcia J, Lippke B, Comnick J and Manriquez C 2005 An assessment of carbon pools, storage, and wood products market substitution using life-cycle analysis results *J. Wood Fiber Sci.* **37** 140–8

[12] Schlamadinger B and Marland G 1996 The role of forest and bioenergy strategies in the global carbon cycle *Biomass Bioenergy* **10** 275–300

[13] Hennigar C R, MacLean D A and Amos-Binks L J 2008 A novel approach to optimizing management strategies for carbon stored in both forests and wood products *Forest Ecol. Manage.* **256** 786–97

[14] Upton B, Miner R, Spinny M and Heath L S 2008 The greenhouse gas and energy impacts of using wood instead of alternative in residential construction in the United States *Biomass Bioenerg* **32** 1–10

[15] Eriksson E, Gillespie A R, Gustavsson L, Langvall O, Olsson M, Sathre R and Stendahl J 2007 Integrated carbon analysis of forest management practices and wood substitution *Can. J. For. Res.* **37** 671–81

[16] Gustavsson L, Pingoud K and Sathre R 2006 Carbon dioxide balance of wood substitution: comparing concrete-and wood-framed buildings *Mitig. Adapt. Strateg. Glob. Change* **11** 667–91

[17] Hammond G and Jones C 2008 Inventory of carbon and energy (ICE) Version 1.6a (https://doi.org/10.1680/ener.2008.161.2.87)

[18] Saghafi M and Teshnizi Z S H 2011 Recycling value of building materials in building assessment systems *Energy Build.* **43** 3181–8

[19] Tormark C 2002 A low energy building in a life cycle—its embodied energy, energy need for operation and recycling potential *Build. Environ.* **37** 429–35

[20] Sathre R and O'Connor J O 2010 Meta-analysis of greenhouse gas displacement factors of wood substitution *Environ. Sci. Policy* **13** 104–14

[21] Hayhoe K, Kheshgi H S, Jain A K and Wuebbles D J 2002 Substitution of natural gas for coal: climatic effects of utility sector emissions *Clim. Change* **54** 107–39

[22] US Energy Information Agency 2017 *Int. Energy Outlook 2017* (Washington, DC: USDOE Energy Information Administration, Office of Energy Analysis) (www.eia.gov/outlooks/ieo/pdf/0484(2017).pdf)

[23] Eichner T and Pethig R 2011 Carbon leakage, the green paradox, and perfect future markets *Int. Econ. Rev.* **52** 767–805

[24] Paltsev S V 2001 The Kyoto protocol: regional and sectoral contributions to the carbon leakage *Energy J.* **22** 53–80

[25] Babiker M H 2005 Climate change policy, market structure, and carbon leakage *J. Int. Econ.* **65** 421–45

[26] Shafiee S and Topal E 2009 When will fossil fuel reserves be diminished? *Energy Policy* **37** 181–9

[27] Mohr S H, Wang J, Ellem G, Ward J and Giurco D 2015 Projection of world fossil fuels by country *Fuel* **141** 120–35

[28] Gustavsson L, Madlener R, Hoen H F, Jungmeier G, Karjalainen T, Klöhn S, Mahapatra K, Pohjola J, Solberg B and Spelter H 2006 The role of wood material for greenhouse gas mitigation *Mitig. Adapt. Strateg. Glob. Change* **11** 1097–127

[29] Dymond C C 2012 Forest carbon in North America: annual storage and emissions from British Columbia's harvest, 1965–2065 *Carbon Bal. Manage.* **7** 1–8

[30] Dymond C C and Kamp A 2014 Fibre use, net calorific value, and consumption of forest-derived bioenergy in British Columbia, Canada *Biomass Bioenergy* **70** 217–24

[31] Birdsey R A 1992 Carbon storage and accumulation in United States forest ecosystems *Gen. Tech. Rep. WO-59* (Washington DC: U.S. Department of Agriculture, Forest Service, Washington Office) (https://doi.org/10.2737/WO-GTR-59)

[32] Oliver C D, Nassar N T, Lippke B R and McCarter J B 2014 Carbon, fossil fuel, and biodiversity mitigation with wood and forests *J. Sustain. For.* **33** 248–75

[33] Mackey B, Prentice I C, Steffen W, House J I, Lindenmayer D, Keith H and Berry S 2013 Untangling the confusion around land carbon science and climate change mitigation policy *Nat. Clim. Change* **3** 552–7



# PROPOSED RESOURCE MANAGEMENT PLAN/ FINAL ENVIRONMENTAL IMPACT STATEMENT

## Western Oregon

## Volume 1

U.S. Department of the Interior
Bureau of Land Management

NATIONAL SYSTEM OF PUBLIC LANDS
U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

FS-001624

The BLM manages more than 245 million acres of public land, the most of any Federal agency. This land, known as the National System of Public Lands, is primarily located in 12 western states, including Alaska. The BLM also administers 700 million acres of sub-surface mineral estate throughout the nation.

The BLM's mission is to manage and conserve the public lands for the use and enjoyment of present and future generations under our mandate of multiple-use and sustained yield. In fiscal year 2013, the BLM generated $4.7 billion in receipts from public lands.

***blm.gov/or***

NATIONAL SYSTEM OF PUBLIC LANDS

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Oregon State Office
P.O. Box 2965, Portland, Oregon 97208
http://www.blm.gov/or

Dear Reader,

The 2.5 million acres of Bureau of Land Management (BLM)-administered lands in western Oregon play an important role in the region's social, ecological, and economic well-being. As stewards of these lands, the BLM has a responsibility to ensure that our management is meeting our legal mandates and the needs of the local communities.

On April 24, 2015, we released a Draft Resource Management Plan/Environmental Impact Statement (Draft RMP/EIS) for the revision of the 1995 RMPs for the six BLM districts in western Oregon. During the four-month comment period that followed, we received approximately 4,500 comments from government agencies, organizations, Tribes, and members of the public. Thank you for your input; your participation has helped shaped our analysis and decision-making at every step of the planning process. If you would like to read all of the comments we received during the comment period, you can do so on our website at http://www.blm.gov/or/plans/rmpswesternoregon/comments.php.

Enclosed you will find the Proposed RMP/Final EIS. We have developed the Proposed RMP in consultation with cooperating agencies and Tribes and with consideration of the comments that we received on the Draft RMP/EIS. This document explains why we are proposing a plan revision, presents our Proposed RMP and a full spectrum of different management alternatives, and analyzes their environmental effects.

Below you will find information on the Protest Period and issuance of the Records of Decision (RODs). As always, we welcome your participation and involvement. Oregonians are in need of a lasting solution that will provide predictable outcomes and sustainable management of the BLM-administered lands in western Oregon. With your help, we are building an RMP that will provide sustainable solutions for the public lands that we are privileged to manage.

**Protest Period**
Pursuant to the BLM's planning regulations at 43 CFR 1610.5–2, any person who participated in the planning process for this Proposed RMP, and has an interest which is or may be adversely affected by the planning decisions, may protest approval of the planning decisions within 30 days from the date the Environmental Protection Agency publishes the Notice of Availability in the Federal Register. Protests must comply with the requirements described in the BLM's planning regulations at 43 CFR 1610.5–2. Interested parties should take care to document all relevant facts. As much as possible, specific planning documents or available planning records (e.g., meeting minutes, summaries, and correspondence) should be referenced or cited.

Emailed protests will not be accepted as valid protests unless the protesting party also provides the original letter by either regular or overnight mail postmarked by the close of the protest period. Under these conditions, the BLM will consider the emailed protest as an advance copy and will afford it full consideration. If you wish to provide the BLM with such advance notification, please direct emailed protests to the attention of the BLM protest coordinator at protest@blm.gov.

All protests, including the follow-up letter (if emailing), must be in writing and mailed to one of the following addresses:

**Regular Mail:**
Director (210)
Attn: Protest Coordinator
P.O. Box 71383
Washington, D.C. 20024-1383

**Overnight Delivery:**
Director (210)
Attn: Protest Coordinator
20 M Street SE, Room 2134LM
Washington, D.C. 20003

Before including your address, phone number, email address, or other personal identifying information in your protest, be advised that your entire protest—including your personal identifying information—may be made publicly available at any time. While you can ask us in your protest to withhold from public review your personal identifying information, we cannot guarantee that we will be able to do so.

The BLM Director will make every attempt to render a decision on each protest promptly. The protest decision will be in writing and will be sent to the protesting party by certified mail, return receipt requested. The decision of the BLM Director shall be the final decision of the Department of the Interior for the protest.

**Records of Decision**

Following resolution of any protests and the completion of the consistency review by the Governor of Oregon, the BLM anticipates issuing two Records of Decision/Resource Management Plans (RODs/RMPs): one ROD/RMP that would apply to the Coos Bay District, Eugene District, Salem District, and the Swiftwater Field Office of the Roseburg District; and another ROD/RMP that would apply to the Klamath Falls Field Office of the Lakeview District, the Medford District, and the South River Field Office of the Roseburg District.

The RODs/RMPs will identify the decision by the State Director on the RMP revision and the rationale for the decision. The RODs/RMPs will constitute the decision documents for the enclosed Proposed RMP/Final EIS. The RODs/RMPs will also contain the approved RMPs themselves, including the land use allocations, management objectives, and management direction. The RODs/RMPs will describe the compliance with applicable laws, the alternatives evaluated and the environmentally preferable alternative, necessary mitigations, the process for plan monitoring and evaluation, and the guidance for transition from the 1995 RMPs to the approved RMPs.

The approval of the RODs/RMPs will represent the completion of this RMP revision process. Following approval of the RODs/RMPs, the BLM will take only those management actions that are specifically provided for in the approved RMPs, or, if not specifically mentioned, actions that are clearly consistent with the goals, objectives, or management direction of the approved RMPs.

The BLM will email parties when the RODs/RMPs are available online or will mail the RODs/RMPs to parties who have requested hard copies.

For more information on the Protest Period, planning process, or public participation, you can visit our website at http://www.blm.gov/or/plans/rmpswesternoregon/index.php. Thank you for your continued interest and participation in this planning process. We look forward to continuing to work with you.

Jamie Connell
Acting State Director
Bureau of Land Management
Oregon/Washington

**United States Department of the Interior**
**Bureau of Land Management**

**Proposed Resource Management Plan/Final Environmental Impact Statement for the Resource Management Plans for Western Oregon**
Coos Bay, Eugene, Medford, Roseburg, and Salem Districts,
and the Klamath Falls Field Office of the Lakeview District

Cooperating agencies:

| | |
|---|---|
| Benton County | State of Oregon |
| Clackamas County | Environmental Protection Agency |
| Columbia County | National Marine Fisheries Service |
| Coos County | U.S. Fish and Wildlife Service |
| Curry County | U.S. Forest Service |
| Douglas County | Confederated Tribes of Coos, Lower Umpqua, and Siuslaw Indians |
| Klamath County | Confederated Tribes of Grand Ronde |
| Lane County | Confederated Tribes of Siletz Indians |
| Lincoln County | Coquille Indian Tribe |
| Linn County | Cow Creek Band of Umpqua Tribe of Indians |
| Marion County | Klamath Tribes |
| Multnomah County | |
| Polk County | |
| Tillamook County | |
| Washington County | |
| Yamhill County | |

Abstract: This Proposed Resource Management Plan/Final Environmental Impact Statement addresses revision of the 1995 Resource Management Plans for the Coos Bay, Eugene, Medford, Roseburg, and Salem Districts, and the Klamath Falls Field Office of the Lakeview District. The purpose of this Resource Management Plan revision is to provide a sustained yield of timber, contribute to the conservation and recovery of threatened and endangered species, provide clean water in watersheds, restore fire-adapted ecosystems, provide recreation opportunities, and coordinate management of lands surrounding the Coquille Forest with the Coquille Tribe. The BLM analyzed the Proposed RMP, the No Action alternative of continued implementation of the 1995 Resource Management Plans, four action alternatives, and two sub-alternatives.

This Proposed RMP/Final EIS is open for a 30-day protest period beginning with the date the Environmental Protection Agency publishes the Notice of Availability of the Proposed RMP/Final EIS in the Federal Register. Protests must be filed with the Director of the BLM as described in the Dear Reader Letter.

For further information contact:

Sarah Levy, Public Affairs Specialist
RMPs for Western Oregon
Bureau of Land Management
P.O. Box 2965
Portland, Oregon 97208
Telephone: (503) 808-6217
Email: BLM_OR_RMPs_WesternOregon@blm.gov
Website: http://www.blm.gov/or/plans/rmpswesternoregon/

# Table of Contents

TABLE OF CONTENTS ......IV
TABLE OF FIGURES ......VI
TABLE OF MAPS ......XIII
TABLE OF TABLES ......XIV
SUMMARY ......XXIII
CHAPTER 1 – INTRODUCTION ......1
CHAPTER 2 – ALTERNATIVES ......29
CHAPTER 3 – AFFECTED ENVIRONMENT AND ENVIRONMENTAL CONSEQUENCES ......115
AREAS OF CRITICAL ENVIRONMENTAL CONCERN ......131
AIR QUALITY ......145
CLIMATE CHANGE ......165
CULTURAL AND PALEONTOLOGICAL RESOURCES ......213
FIRE AND FUELS ......223
FISHERIES ......277
FOREST MANAGEMENT ......307
HYDROLOGY ......369
INVASIVE SPECIES ......419
LANDS AND REALTY ......457
LANDS WITH WILDERNESS CHARACTERISTICS ......463
LIVESTOCK GRAZING ......475
MINERALS ......487
NATIONAL TRAILS SYSTEM ......505
RARE PLANTS AND FUNGI ......517
RECREATION AND VISITOR SERVICES ......555
SOCIOECONOMICS ......585
SOIL RESOURCES ......745
SUSTAINABLE ENERGY ......769
TRAILS AND TRAVEL MANAGEMENT ......775
TRIBAL INTERESTS ......799
VISUAL RESOURCES MANAGEMENT ......813
WILDLIFE ......825
Bald Eagle ......825
Bureau Sensitive, Bureau Strategic, Survey and Manage Species, and Landbird Focal Species ......830



FS-001629

Columbian White-tailed Deer....853
Deer and Elk....862
Fisher....870
Golden Eagle....881
Greater Sage-grouse....887
Gray Wolf....890
Marbled Murrelet....895
North Oregon Coast Distinct Population Segment of the Red Tree Vole....919
Northern Spotted Owl....928
Northern Spotted Owl Critical Habitat....990
Oregon Silverspot Butterfly....999
Oregon Spotted Frog....1002
Pacific Coast Distinct Population Segment of the Western Snowy Plover....1006

**WILD HORSES....1019**

**WILD AND SCENIC RIVERS....1023**

**CHAPTER 4 – CONSULTATION AND COORDINATION....1041**

**ACRONYMS AND ABBREVIATIONS....1059**

**GLOSSARY....1063**

**INDEX....1085**

# Climate Change

## Key Points

- Net carbon storage would increase under all alternatives and the Proposed RMP, with the largest increase under Alternative D and the least increase under Alternative C.
- Annual greenhouse gas emissions associated with BLM-administered lands would increase under all alternatives and the Proposed RMP, with the largest increase under Alternative C and the least increase under Alternative D. Annual greenhouse gas emissions associated with BLM-administered lands would remain less than 1 percent of the 2010 Statewide greenhouse gas emissions.
- Climate change provides uncertainty that reserves will function as intended and that planned timber harvest levels can be attained, with the uncertainty increasing over time.
- Active management would provide opportunities to implement climate change adaptive strategies and potentially reduce social and ecological disruptions arising from warming and drying conditions.

### Summary of Notable Changes from the Draft RMP/EIS

The BLM has refined the calculations of carbon storage and greenhouse gas emissions, including the following:

- Removing the acreage in roads and water from the estimated carbon stored in soils
- Correcting the number of acres affected by wildfire
- Correcting the number of acres of expected underburning/broadcast burning
- Removing unmodeled forest as a category and replacing it with non-forest estimates
- Correcting the animal unit month values for the No Action alternative in the estimated greenhouse gas emissions

These refinements in the calculations alter the absolute values in these calculations, but do not alter the relative outcomes of the alternatives and the Proposed RMP or the overall analytical conclusions.

The BLM has corrected the values in **Table 3-13** for carbon density; the Draft RMP/EIS erroneously provided carbon density data in terms of Mg/ha instead of Mg/acre.

The BLM has added discussion and estimation of the effects of hazardous fuels treatments on net carbon storage and has expanded the discussion under Issues 1 and 2 of the cumulative effect of carbon storage and greenhouse gas emissions in the context of other actions.

## Issue 1

*What would be the effects of BLM forest management on long-term net carbon storage?*

### Summary of Analytical Methods

The BLM estimated changes in the amount of carbon stored on the landscape in vegetation and soils, and in harvested wood products. This analysis accounts for the removal of carbon through wildfire, prescribed fire, and timber harvesting and the addition of carbon through vegetation growth. As such, this analysis

estimates changes in the net amount of carbon stored under the different alternatives and the Proposed RMP.

The BLM estimated net carbon storage on BLM-administered lands in the planning area by first estimating the amount of biomass on these lands and converting that to the carbon in live trees, standing and downed dead wood, understory vegetation, litter and duff, and in the upper 1 meter (3.3 ft.) of soil, except where noted. The Planning Criteria provides detailed information on analytical assumptions, methods and techniques, and geographic and temporal scales, which is incorporated here by reference (USDI BLM 214, pp. 36–38). The volume harvested, whether part of the Harvest Land Base or reserves, drives the variation in carbon storage under the different alternatives and the Proposed RMP.

The BLM assumed the following categories to be constant across all alternatives and the Proposed RMP:

- Carbon stored in soils
- Carbon stored in non-forested lands
- Carbon loss from wildland fire

The BLM assumed no carbon is stored under roads or in water, and reduced the landbase used for net carbon storage estimation accordingly. Although there is some carbon storage under roads or in water, there is no data available to quantify this storage. Furthermore, the carbon storage would not measurably differ among the alternatives and the Proposed RMP over time, and thus would not alter the relative outcomes under the alternatives or the Proposed RMP.

Although the BLM used much of the analytical approach described in the Planning Criteria, the BLM modified the data source for aboveground carbon based on the actual outputs from the Woodstock model. Instead of using stand structure as the basis for estimating the amount of above-ground carbon, as described in the Planning Criteria, the BLM used approximate stand age in combination with the information available through the Carbon OnLine Estimator version 3.0 (COLE 3.0 2015) to estimate the amount of carbon stored in standing and downed dead wood, understory vegetation, the forest floor (litter and duff) and soil. Instead of using only two regions, the BLM filtered the COLE outputs to report carbon storage for all Federal lands in the counties in which the majority of each BLM district occurs. For example, the BLM used all Federal lands in Coos and Curry Counties as the basis for estimates for Coos Bay District. This approach allowed for estimates that were more refined and better captured the variability in carbon stored than using the two regions. The BLM used all Federal lands instead of all lands, as the data for private lands tended to be skewed towards younger age classes than are typically present on the Federal lands. Furthermore, the data for only BLM-administered lands lacked a sufficient number of the Forest Inventory and Analysis plots used by COLE to provide robust estimates. The Woodstock outputs did not specifically identify which cells were woodlands, so the BLM did not carry out this portion of the analysis as described in the Planning Criteria. Because wildfire was not included in the volume estimates for year 100, the BLM dropped that year from the analysis and added year 40, resulting in estimates for years 10, 20, 30, 40, and 50. **Appendix G** describes the carbon estimation method in further detail along with sources of uncertainty in the results.

The quantified analysis of changes in net carbon storage directly or indirectly incorporates the effects of land management actions, including timber harvest, prescribed burning, activity fuels treatments, and silvicultural treatments under the alternatives and the Proposed RMP through the vegetation modeling. Carbon affected by timber harvest has four potential fates:

- Removal from the site and processed into a wood product
- Removal from the site and burned as firewood or for energy production at a mill
- Retain on the site and burned in a fuels treatment
- Retain on the site and allowed to decay

The vegetation model accounted for the changes in net carbon storage from harvesting by reducing volume and affecting average stand age in the decade when timber harvest would occur.

The quantified analysis of changes in net carbon storage under the alternatives and the Proposed RMP does not incorporate the effects of hazardous fuels treatments[38] on net carbon storage, because it is not possible to estimate such effects on net carbon storage accurately and because the BLM assumes that the amount of hazardous fuels treatments would not vary among the alternatives and the Proposed RMP.

There is insufficient information on where and when the BLM would need to implement hazardous fuels treatments and how much biomass the treatments would remove. The BLM does not collect or store data on pre- and post-treatment biomass for the hazardous fuels treatments. Hazardous fuel treatments are highly variable in terms of acres treated and treatment methods. Hazardous fuel treatments are also highly variable in terms of treatment effects on carbon storage: not all fuels treatment methods remove the harvest residue and its carbon as a direct effect of the treatment. Material from treatments such as lop-and-scatter or mastication remains on site and decays naturally. Biomass removal, primarily for personal use firewood, currently accounts for only 4 percent of the acres treated under the hazardous fuels treatments, with an unknown amount of biomass affected. While biomass removal for commercial energy production may occur or increase in the future, currently low product value and high transportation costs means very few facilities have been built or planned within or near the planning area that would use forest residues as a fuel source, and none have been built that use forest residues as a primary fuel source. Since BLM cannot parameterize the stand conditions where the hazardous fuels treatments would occur, the BLM could not include hazardous fuels treatments in the vegetation model.

The primary effect of hazardous fuels treatments on net carbon storage comes from prescribed burning of piled vegetation, underburns, or broadcast burns. Factors influencing the amount of carbon removed by burning include pile size, pile shape, number of piles per acre, and amount of fuel both available and combusted through underburns or broadcast burns. With an estimated 173,300 acres of pile burning, underburns, and broadcast burning per decade, the additional reduction in net carbon storage from the hazardous fuels program would be less than 1teragram[39] of carbon (Tg C), or less than 1 percent, per decade. Because of the insufficient information about future hazardous fuels treatments, the high variability in the implementation of hazardous fuels treatments, and the high variability in the effects of hazardous fuels treatments on carbon storage, this estimation of the effects of hazardous fuels treatments under the alternatives and the Proposed RMP at this scale of analysis is of very low accuracy. The BLM includes this estimation here to give context to the magnitude of the potential effect of hazardous fuels treatments on net carbon storage.

It is possible that hazardous fuels treatments (and other land management actions) could indirectly reduce the loss of new carbon storage resulting from wildfire by reducing the severity and extent of future wildfires. However, it is not possible to quantify any change in future wildfire effects resulting from hazardous fuels treatments (see the Fire and Fuels section in this chapter).

[38] Hazardous fuel treatments are non-commercial treatments that are designed to reduce existing, natural fuel accumulations. In contrast, activity fuel treatments are designed to reduce fuel accumulations created by management actions such as timber harvest (see the Fire and Fuels section in this chapter). The BLM assumed in this analysis that implementation of hazardous fuels treatments would not vary by alternative and the Proposed RMP. However, activity fuel treatments would vary by alternative and the Proposed RMP, because the BLM would implement activity fuel treatments in response to fuels created by differing management actions.
[39] Scientific literature on carbon storage at this scale of analysis reports carbon amounts in metric tons, which are equal to approximately 2,205 pounds. One million metric tons equals one teragram.

In addition to comparing the alternatives and the Proposed RMP, the BLM also considered two reference analyses as a means of providing additional context for the alternatives and the Proposed RMP: the No Timber Harvest Reference Analysis without wildfire (providing an estimate of potential carbon storage resulting from the vegetation growth) and the No Timber Harvest reference analysis with wildfire. Comparing these two reference analyses allowed the BLM to estimate the effect of this natural disturbance alone and then in conjunction with harvesting in the alternatives and the Proposed RMP.

The quantified analysis of changes in net carbon storage under the alternatives and the Proposed RMP does not incorporate the potential effects on carbon storage from changing climate conditions. The vegetation modeling did not incorporate projections of climate change into the simulation of the growth of stands through time (see the Vegetation Modeling section in this chapter). Climate change would alter the absolute estimates of net carbon storage over time, but would not alter the relative outcomes under the alternatives and the Proposed RMP. Based on recent research, climate change would likely result in smaller increases in future carbon storage in the decision area than estimated in this analysis, though differences may not be apparent within the time frame of this analysis. Using a different analysis method than the carbon analysis in this Proposed RMP/EIS that accounted for changing climate, Diaz *et al.* (2015) also found that net carbon storage in trees would increase on BLM-administered lands within the planning area until mid-century and then level off under lower emissions scenarios and decline under other emissions scenario. Creutzburg *et al.* (2016) found that climate change would slow expected carbon accumulation rates in the northern Coast Range by about 8 percent relative to a static climate, largely between mid-century and the end of the century, but that total carbon would continue to increase. Rogers *et al.* (2015), using three different climate models, found that in western Oregon and Washington, carbon storage would increase slightly under two of the models by the end of the century but decline substantially under the third model.

Future carbon storage on BLM-administered lands could differ from these estimates if the use of biomass for energy increases substantially. Using harvest-generated residues for bioenergy is a common proposition to reduce emissions from burning fossil fuels and both greenhouse gas and particulate emissions associated with prescribed burning to remove such residues. Although such changes in biomass utilization are possible, they are not reasonably foreseeable at this time (see the Sustainable Energy section in this chapter). A recent study in the Panther Creek watershed in northwestern Oregon indicates that if both private forests and BLM-administered lands were to ‘capture’ such residues for bioenergy production, net carbon storage would decline by only 2–3 percent relative to conventional harvest methods (Creutzburg *et al.* 2016). Rotation length and the age at which no harvesting would occur on BLM-administered lands had the main effect on carbon storage in the watershed, which includes a mix of BLM-administered and private lands. This same study also found that longer rotations and less intensive management on Federal and non-corporate private lands could counterbalance shorter rotations and more intensive management on private lands (Creutzburg *et al.* 2016).

There are multiple sources of uncertainty in estimating the amount of carbon stored on the BLM-administered lands within the planning area, which are discussed in more detail in **Appendix G**. Although it is not possible to quantify all of the sources of error, the potential error in the estimate for any one alternative and the Proposed RMP likely exceeds the amount of variance among the alternatives and the Proposed RMP. The U.S. Forest Service estimated standard errors ranging from 20 percent to slightly over 50 percent, averaging around 33 percent, for their lands in western Oregon (USDA FS 2015). The BLM standard errors are likely similar, albeit on the higher end of this range, given the estimation methods used.

## Affected Environment

The BLM-administered lands within the planning area currently store an estimated 360 Tg C (**Table 3-13**). In the 2008 FEIS, BLM estimated current carbon storage at 427 Tg, using a similar but more

simplified approach that relied primarily on regional averages (USDI BLM 2008, pp. Appendices – 28-29). The type of data available in 2008 for estimating carbon storage did not allow the more detailed approach used in this analysis.

**Table 3-13.** Estimated current total carbon stored in vegetation and soil and carbon density

| District/ Field Office | Acres | Total Carbon (Tg C) | Carbon Density (Mg C/Acre) |
|---|---|---|---|
| Coos Bay | 313,945 | 59 | 190 |
| Eugene | 300,736 | 60 | 198 |
| Klamath Falls | 210,386 | 9 | 41 |
| Medford | 782,524 | 93 | 119 |
| Roseburg | 408,680 | 63 | 155 |
| Salem | 385,806 | 76 | 196 |
| **Totals** | **2,402,076** | **360** | **-** |

The Medford District currently stores the most carbon, with an estimated 93 Tg C, largely due to the size of the district. The Klamath Falls Field Office stores the least, approximately 9 Tg C, largely due to the high proportion of non-forest plant communities within the Field Office boundaries and the small size of the Field Office. Approximately 6 Tg C is currently stored in products made from wood harvested from BLM-administered lands that are either still in use or are located in sanitary landfills where decay rates are minimal (Earles *et al.* 2012). In the 2008 FEIS, the BLM estimated carbon storage in landfills and wood products was 11 Tg C using an approach based on the assumed proportion of pulpwood to saw logs and estimates of the cumulative emissions of carbon over time by each type of product (USDI BLM 2008, pp. Appendices – 30). In this analysis, the BLM estimated carbon storage in landfills and wood products using a decay function derived from Earles *et al.* (2012) that consolidated the same type of information used in 2008 with estimates from the Oregon Department of Forestry on the annual board foot volumes harvested from BLM-administered lands within the planning area from 1965 through 2012. The combination of carbon stored on the districts and in wood products brings the total estimated carbon storage currently associated with BLM–administered lands in the planning area to 366 Tg C.

Carbon density, the amount of carbon per acre, provides a comparable measure between the districts that reflects carbon storage capability and general productivity. The Coos Bay, Eugene, and Salem Districts are moderate in size but have a high carbon density (**Table 3-13**). The Medford District has the largest acreage of BLM-administered lands of the administrative units in the decision area, and has the largest amount of total carbon storage, but has the second lowest estimated carbon density. The Klamath Falls Field Office has the smallest acreage of BLM-administered lands of the administrative units in the decision area and has the lowest carbon density.

## Environmental Consequences

Timber harvest volume removed is the primary driver of differences across the alternatives and the Proposed RMP in net carbon storage on BLM-administered lands in the planning area, although a portion of the material harvested remains stored for up to 150 years in the form of wood products in use or in sanitary landfills (Earles *et al.* 2012). Comparing the No Timber Harvest reference analysis without fire to the No Timber Harvest Reference Analysis with fire indicates that wildfire reduces estimated net carbon storage by 0.4–0.7 percent across the planning area through 2063, varying by decade. For the Coos Bay, Eugene, and Salem Districts, and the Klamath Falls Field Office, the estimated reduction would be generally less than 0.3 percent of the net carbon stored on those Districts. On the Roseburg District, the reduction would be highly variable, ranging from as little as 0.12 percent to as high as nearly 3 percent.

The expected reduction on the Medford District would be less variable, ranging from 1 to 2 percent, given that approximately 82.5 percent of the acres burned are predicted to occur on that district.

All alternatives and the Proposed RMP, including the No Action alternative, would increase net carbon storage over time relative to the current condition (**Figure 3-13** and **Figure 3-14**). Differences among the alternatives and the Proposed RMP, and in comparison to the No Timber Harvest Reference Analysis with fire, would be minor until around 2033, and afterwards would become increasing apparent. Although Alternative D has the second largest Harvest Land Base of the alternatives and the Proposed RMP, the volume removed per acre would be low due to the overall approach to timber management (see the Forest Management section in this chapter). Alternative D would store the most net carbon, followed, in order, by Alternative A, the Proposed RMP, Alternative B, No Action, and Alternative C. The differences in net storage among the Proposed RMP, Alternative A, and Alternative B would be quite small. Carbon stored in wood products would range from an estimated 5 to 10 Tg, depending on alternative and the Proposed RMP and decade.




**Figure 3-13.** Estimated carbon storage over time by alternative and the Proposed RMP[40]

[40] The 2013 value for the Proposed RMP is slightly less than the alternatives, because the BLM has updated current vegetation baseline information to incorporate the effects of the 2013 and 2014 fire seasons (see the Analytical Methodologies and Assumptions section of this chapter).



FS-001636



**Figure 3-14.** Change in carbon storage relative to the estimated total storage as of 2013

All alternatives and the Proposed RMP would increase net carbon storage, but not as much as under the No Timber Harvest reference analysis with wildfire (**Figure 3-15**). The difference in the increase in net carbon storage occurs as harvesting removes carbon and shifts stand characteristics, such as mean diameters and heights, in more of the landscape to smaller trees and younger age classes that store less carbon. Since Alternative C would harvest the most volume over time and would have the highest percentage of the landscape in younger age classes dominated by smaller trees, relative to the No Timber Harvest reference analysis, it would have the lowest increases in net carbon storage. After 2033, the Proposed RMP would store slightly less carbon than Alternative A, and slightly more carbon than Alternative B.




**Figure 3-15.** Percent reduction in aboveground carbon storage from timber harvest relative to projected carbon storage in the No Timber Harvest reference analysis with wildfire

## Effect of Net Carbon Storage on BLM-administered Lands in the Context of Other Lands

Placing carbon storage on BLM-administered lands in context of other lands in the planning area is difficult due to the nature of the data available, which is variable in extent of geographic coverage, in assessment dates, and in the carbon pools assessed. The most recent published statewide assessment covered live and dead trees and downed wood measured between 2001 and 2005, but does not include all carbon pools (Donnegan *et al*. 2008). In that assessment, all the forests in Oregon, including juniper woodlands, store an estimated 1,215 Tg C in live and dead trees and downed logs and large branches. That assessment concluded that U.S. Forest Service lands, privately owned lands, and the BLM-administered lands store 56.7, 23.3, and 11.8 percent of the statewide total, respectively. The estimated statewide total for all BLM-administered lands (which includes BLM-administered lands outside of the decision area) of 144 Tg C as of 2005 is considerably less than the BLM estimated in either the 2008 FEIS analysis or in this analysis for western Oregon. Other Federal lands, State and local government lands, Tribal lands, and other private lands stored the remaining 8.4 percent, with slightly over half of that amount on State forests.

The U.S. Forest Service has also estimated the amount of carbon stored in all pools (live and dead trees, downed wood, litter and duff, and the top meter of soil) for all U.S. Forest Service lands in 2013, providing a basis of comparison with BLM-administered lands in the decision area. The BLM obtained the data for the Fremont, Mt. Hood, Rogue River-Siskiyou, Siuslaw, Umpqua, and Willamette National Forests to compare with the BLM estimates above. The BLM-administered lands (which constitute 34.8 percent of the acreage of U.S. Forest Service lands) stored approximately 39.4 percent of the amount of carbon stored on U.S. Forest Service lands;[41] that is, carbon is stored on BLM-administered lands at 113.3 percent of the density as on U.S. Forest Service lands (**Table 3-14**).

[41] This comparison does not account for the effects of wildland fires in 2013 and 2014, which affected both BLM-administered lands and U.S. Forest Service lands.

**Table 3-14.** Estimated carbon storage and carbon density for the major land ownerships in western Oregon

| Land Owner/ Manager | Assessment Period | Total Carbon* (Tg C) | Acres | Carbon Density (Mg C/Acre) |
|---|---|---|---|---|
| BLM | 2013 | 361 | 2,402,076 | 150.4 |
| U.S. Forest Service | 2013 | 916 | 6,900,020 | 132.8 |
| State of Oregon | 2001–2010 | 96 | 789,610 | 122.0 |
| Private Landowners | 2001–2010 | 559 | 6,614,392 | 34.2 |

* Does not include carbon stored in wood products still in use or in landfills

Based on data from 2001 through 2010, forests managed by the state of Oregon in western Oregon have a slightly lower carbon density than the U.S. Forest Service lands (Gray 2015, personal communication; **Table 3-14**). This lower carbon density may be due to the amount of area in younger forests, such as the Tillamook State Forest, even though most of the State forestlands are located in the highly productive Coast Range or at similar elevations as the BLM-administered lands in the Cascade Range. Although private forestlands in western Oregon store a large amount of carbon and encompass an area similar in size as U.S. Forest Service lands, they have the lowest carbon density (Gray 2015, personal communication, **Table 3-14**), likely due to the predominance of intensively managed forests, which the owners typically manage on a 40- to 60-year rotation.

Carbon storage increased on the western Oregon U.S. Forest Service lands by approximately 1.73 Tg/yr between 1990 and 2013, despite the decreases on the Siskiyou National Forest and the apparent stabilization on the Rogue River National Forest (USDA FS 2015). Gonzalez *et al.* (2015) reported that forest ecosystems in California lost carbon between 2001 and 2010, which they attributed principally to recent large wildfires in northern California and the Sierra Nevada Mountains. Southwest Oregon may be experiencing a similar effect given the high similarity in forest types with northern California and recent increases in area burned. The BLM does not know whether the BLM-administered lands in southwest Oregon (primarily Medford and Roseburg Districts) are experiencing the same loss or stagnation in carbon storage given the lack of long-term annual carbon data.

Carbon storage on BLM-administered lands in the decision area likely increased by a similar amount given the similarity in management between the BLM and the U.S. Forest Service over that period. The BLM estimated net carbon storage would increase by a low of 1.5 Tg/yr under Alternative C to a high of 2.7 Tg/yr under Alternative D. Under the Proposed RMP, carbon sequestration would average 2.3 Tg/yr over the next 50 years. However, these estimates do not account for potential sources of mortality other than fire and potential increases in wildfire occurrence, size, or severity that might reduce that sequestration rate. The expected increase in net carbon storage as well as other forest management actions (see the Forest Management section in this chapter) under all alternatives and the Proposed RMP supports the Oregon interim strategy for reducing greenhouse gas emissions, although to what degree is not known since the State has not established specific carbon storage goals (OGWC 2010, 2013).

## Issue 2

*What would be the BLM's expected contribution to greenhouse gas emissions from vegetation management activities such as timber management and prescribed burning?*

## Summary of Analytical Methods

In this issue, the BLM estimated the gross greenhouse gas emissions from timber harvest, prescribed burning, wildfires and livestock grazing. These estimates are the direct emissions for all greenhouse gases emitted through natural processes (carbon dioxide, methane, and nitrous oxide). The carbon analysis under Issue 1 accounts for the carbon losses from fire and timber harvest by evaluating changes in net carbon storage. This analysis includes all greenhouse gases, including those that lack carbon (nitrous oxide), and all relevant sources of emissions, including those that do not directly affect net carbon storage. Because methane and nitrous oxide have higher global warming potential than carbon dioxide, the BLM followed global and national standards by reporting greenhouse gas emissions as carbon dioxide equivalents ($CO_2e$). One methane molecule effectively equals 25 carbon dioxide molecules and one nitrous oxide molecule effectively equals 298 carbon dioxide molecules.

Greenhouse gas emissions from BLM management activities that are most likely to be substantial and to vary among alternatives and the Proposed RMP are timber harvesting, grazing, and prescribed burning. A wide variety of BLM activities produce greenhouse gases, but the absence of reliable data limits the BLM's ability to estimate emissions. For example, BLM-authorized mining operations are a source of greenhouse gases, but there is no data on which to base estimates of emissions from this sector, particularly since mining operations within the decision area currently involve salable and locatable minerals only (USDI BLM 2013, pp. 57–58). The BLM has no information on the type of equipment used for mining or for how long (see also the Minerals section in this chapter). The BLM could not locate any general information on greenhouse emissions from mining other than for coal; coal mining does not occur within the planning area.

The BLM estimated greenhouse gas emissions for each alternative and the Proposed RMP, expressed in the form of carbon dioxide equivalent ($CO_2e$), using projected timber harvest, permitted levels of grazing, and prescribed burning. The Planning Criteria provides more detailed information on analytical assumptions, methods and techniques, and geographic and temporal scales, which is incorporated here by reference (USDI BLM 2014, p. 38). The BLM changed the method for this analysis from what was described in the Planning Criteria by providing a greenhouse gas emission for year 40 and by not estimating emissions past year 50, since that was the last year for which the BLM modeled wildfire.

The BLM estimated emissions from timber harvest by converting the estimates of board feet harvested to cubic feet and applying the emissions factor listed in the Planning Criteria (USDI BLM 2014, p. 38). The BLM estimated methane emissions from public lands grazing using the emission factor described by the Intergovernmental Panel on Climate Change (Eggleston *et al*. 2006). Instead of the emission factor listed in the Planning Criteria for prescribed fires, the BLM used estimated emissions from Consume 4.2 for carbon dioxide and methane and the emission factor provided by the Environmental Protection Agency for burning wood and wood products as a stationary source for nitrous oxide (EPA 2014a, Table 1) as the BLM believes these emission estimation methods are more accurate than the single emission factor initially proposed in the Planning Criteria. To provide context for the emissions from harvesting and prescribed burning, the BLM also estimated greenhouse gas emissions from wildfires. The BLM used a combination of wildfire records, fuelbeds from the Fuels Characteristic Class System (FCCS) version 3.0, and emissions estimates from Consume 4.2 to estimate emissions from wildfires. **Appendix G** details the estimation methods and associated uncertainties.

This analysis may overestimate greenhouse gas emissions from both prescribed fire and wildfire. At least some of the carbon produced by wildland fires is deposited as pyrogenic organic matter, also known as charcoal, biochar, and black carbon, instead of being emitted into the atmosphere (Lehmann *et al*. 2006, Sohi *et al*. 2010, Santín *et al.* 2015). The amount of biochar produced depends on fire intensity (Nocentini *et al*. 2010, Sohi *et al*. 2010, Santín *et al*. 2012) and lignin content (Lehmann *et al*. 2006, Makoto *et al*.

2011). Biochar produced by wildland fire can persist in soils for several hundred to several thousand years (e.g., Spokas 2010, Sohi *et al*. 2010, Criscuoli *et al*. 2014, Santín *et al*. 2015, and Wang *et al*. in press), providing storage instead of emission. Factors governing the durability of biochar in the soil include soil texture (Pingree *et al*. 2012 and references therein), particle size (Nocentini *et al*. 2010), the oxygen to carbon ratio in the particles (Spokas 2010), and fire frequency (Nocentini *et al*. 2010, Pingree *et al*. 2012). Estimates of the amount of biochar produced vary widely, however, ranging from 1 to 28 percent of the above ground biomass (Lehmann *et al*. 2006, Sohi *et al*. 2010, Pingree *et al*. 2012, Santín *et al*. 2015), making any attempt to estimate this potential reduction in greenhouse gas emissions highly uncertain.

## Background

Globally, atmospheric carbon dioxide ($CO_2$) concentrations have increased from an estimated 277 ppm (parts per million) before 1750 to 395.31 ± 0.1 ppm in 2013, the highest level in the last 800,000 years according to the Global Carbon Project (2015). Preliminary estimates indicate global atmospheric $CO_2$ concentrations reached 397.15 ppm in 2014. According to $CO_2$Earth.org (2015), monthly atmospheric $CO_2$ concentrations surpassed the 400 ppm benchmark during April through June of 2014 and February through July of 2015 at the Mauna Loa Observatory. Carbon dioxide is the primary greenhouse gas, comprising over 80 percent of total emissions globally, as well as in both the U.S. and Oregon. Fossil fuel combustion is the primary source of $CO_2$ (McConnaha *et al*. 2013, Le Quéré *et al*. 2014, 2015; EPA 2014b, 2015). United States emissions of greenhouse gasses (6,673 Tg $CO_2$e) were 14 percent of global emissions (~ 47,664 Tg $CO_2$e) in 2013 (Le Quéré *et al*. 2015; EPA 2015). In 2010, the latest year in which data are available, Oregon's emissions were about 1 percent of the U.S. emissions (McConnaha *et al*. 2013, EPA 2014b). Globally, ocean and land greenhouse gas sinks removed about 50 percent of that emitted in 2013 (Le Quéré *et al*. 2015). Land sinks in the U.S. effectively reduced total greenhouse gas emissions by 13.2 percent nationally in 2013, with forests and wood products accounting for about 11.5 percent (EPA 2015). The forests of western Oregon sequester more carbon per acre than the national average (Joyce *et al*. 2014, Figure 7.5).

Several scientific studies have concluded that greenhouse gas emissions from human activities are driving relatively rapid climate change (IPCC 2013 and references therein). Under the current state of the science, however, the BLM cannot identify the impacts of greenhouse gas emissions from any one project or program, or from its activities in western Oregon on global, national, or even local climate. In 2004, the state of Oregon released its statewide strategy for greenhouse gas reductions. Oregon's goal is to reduce statewide greenhouse gas emissions to at least 75 percent below 1990 levels by 2050, or to approximately 15 Tg $CO_2$e (ODOE 2004). To achieve this goal the State strategy calls for increased energy conservation, increased energy efficiency among natural gas and oil users, increased efficiency in transit and alternatives to driving cars and trucks, primarily in urban areas along the I-5 corridor, increased use of products that use less energy to produce and are designed for reuse or easy recycling, replacing fossil fuels with alternative energy sources, and increasing carbon capture and storage in forests and farms (ODOE 2014). Of these elements, BLM-administered lands would support this strategy through increased carbon capture and storage in forests.

## Affected Environment

Total estimated greenhouse gas emissions from timber harvest, grazing, and prescribed fire on BLM-administered lands within the planning area averaged 122,398 Mg $CO_2$e/yr over the past 19 years (1995–2013) (**Figure 3-16**), or about 0.2 percent of Oregon's in-boundary[42] 2010 emissions (McConnaha *et al.* 2013). Prescribed fires emitted about 90 percent of the BLM management-related greenhouse gases. In contrast, average emissions from wildfires that originated on BLM-administered lands were

[42] In-boundary emissions are those that occur within Oregon's borders and emissions associated with electricity use within Oregon.

approximately 69,636 Mg $CO_2$e/yr or about 36 percent of all greenhouse gas emissions originating on BLM-administered lands within the planning area over the past 19 years (**Figure 3-16**). Prescribed fires emitted more greenhouse gases, on average, than wildfires over this time period. Emissions for any one year varied widely, largely depending on the amount of prescribed fire and wildfire, although emissions from prescribed fires varied much less than those from wildfires.




**Figure 3-16.** Proportion of estimated greenhouse gas emissions from livestock grazing (enteric fermentation), timber harvest operations, prescribed fires, and wildfires on BLM-administered lands within the planning area

The estimate of current greenhouse gas emissions for BLM-administered lands within the planning area represents the actual level of activity. This is in contrast to the analysis of the No Action alternative in the following section, which projects future implementation of 1995 RMPs as written. Actual harvest levels and grazing have been below what the 1995 RMPs anticipated (USDI BLM 2013). Therefore, prescribed burning of activity fuels created by harvesting activities is generally less than what was anticipated in 1995, but prescribed burning of so-called natural fuels, or hazardous fuels, under the National Fire Plan (USDA FS and USDI BLM 2000) has partially compensated for the reduction in activity fuels burning. The National Fire Plan increased funding for hazardous fuels reduction beginning in 2001.

The available data do not indicate how much of the prescribed burning was activity fuel reduction and how much was hazardous fuels reduction. The BLM explicitly designs the hazardous fuels reduction program to reduce potential fire behavior and effects and, hence, greenhouse gas emissions from wildfires. While the BLM does not design silvicultural treatments to reduce hazardous fuels, many treatments serve to do that as a secondary benefit of enhancing tree growth on the remaining trees (see also the Fire and Fuels section for additional analysis and references). Many studies also demonstrate that

reducing the fuels created by any forest vegetation treatment, regardless of the primary purpose of the treatment, is essential to reducing potential wildfire behavior and effects and resulting greenhouse gas emissions (e.g., Pritchard *et al.* 2010, Lyons-Tinsley and Peterson 2012, Safford *et al.* 2012, and Shive *et al.* 2013).

The BLM is a relatively small emitter of greenhouse gases from harvest operations and prescribed fire within the planning area (**Figure 3-17**, the Other Federal category is largely BLM). Management on private forests and on U.S. Forest Service lands each result in greater emissions. In large part, these differences reflect the differences in land base and, in the case of private forests, management intensity. Prescribed fire emissions in private forests are largely due to clean up of harvest-generated residue (activity fuels), whereas a portion of the prescribed fire emissions from U.S. Forest Service lands and BLM-administered lands arises from the hazardous fuels reduction program in both agencies under the National Fire Plan.




**Figure 3-17.** Proportion of estimated greenhouse gas emissions from (a) timber harvest and (b) prescribed burning by different entities

Trends in emissions are more difficult to ascertain. Emissions from grazing on BLM-administered lands within the planning area have very slightly declined since 1995, as more allotments became vacant and the amount of active use declined. No trend is evident in wildfire emissions due to very high interannual variability in the acres burned on BLM-administered lands over the period of record (1980–2013).

Although interannual variability in emissions from harvest operations and prescribed burning is also high, some trends are apparent. Harvesting on private forests reflects current economic conditions, particularly in the housing market. During the recent housing boom, harvesting and the resulting greenhouse gas emissions from private land harvesting increased from the late 1990s until 2007. Between 2007 and 2009, emissions declined sharply, reflecting the economic downturn, which had a substantial impact on housing demand and lumber. This same effect on greenhouse gas emissions was also apparent nationally (EPA 2014b). Since 2009, harvesting levels and associated emissions have recovered to pre-recession levels. In contrast, harvesting levels and resulting emissions have been slowly increasing on both BLM-administered and U.S. Forest Service lands since 2001, with a slightly higher trend on the U.S. Forest Service lands.

The trends in emissions from prescribed burning do not track the trends in emissions from harvesting operations. On private forests, emissions from prescribed burning have fallen since about 2006, even when harvest levels have risen. Whether the continued fall represents a lag between time of harvest and time of site preparation, a reduction in activity fuels due to higher utilization, or a shift in how the land managers handled activity fuels is unknown. Fluctuations in emissions from prescribed burning on BLM-administered lands and the U.S. Forest Service lands within the planning area may reflect a combination of higher utilization and fluctuations in the hazardous fuels program. Since 2009, prescribed fire emissions from U.S. Forest Service lands have risen slowly, while emissions have fallen slowly on BLM-administered lands.

## Environmental Consequences

As with particulate emissions (see the Air Quality section of this chapter), the amount of activity fuels prescribed burning is the primary factor driving the differences between alternatives and the Proposed RMP and over time. Greenhouse gas emissions from BLM activities would increase substantially relative to the estimate of current actual emissions under all alternatives and the Proposed RMP, with the exception of Alternative D (**Figure 3-18** and **Figure 3-19**). This increase would be largely due to the amount of prescribed burning that would occur in conjunction with harvesting. Alternative C would result in the largest increases. However, even the highest projected emissions under Alternative C would remain less than 1 percent of Oregon's 2010 in-boundary greenhouse gas emissions and approximately 0.0008 percent of total U.S. greenhouse gas emissions in 2012 (EPA 2014b, Figure ES-1). Greenhouse gas emissions under Alternative B would be the second highest of all alternatives and the Proposed RMP. The Proposed RMP and Alternative A would result in similar emissions, lower than Alternative B and the No Action alternative. Alternative D would result in the lowest emissions of all alternatives.

The BLM has considered measures that would reduce or avoid increases in greenhouse gas emissions above current levels. The current implementation of the timber management program is not consistent with the 1995 RMPs as written (see the Purpose and Need for Action section in Chapter 1; current implementation has been predominately thinning, and the current practices are not sustainable at the declared timber harvest levels (see the Alternatives Considered but not Analyzed in Detail section of Chapter 2). The current level of greenhouse gas emissions is substantially lower than the emissions that this analysis shows would result from implementation of the No Action alternative. The level of sustained-yield timber production and associated prescribed burning generally would reflect the level of greenhouse gas emissions. Any alternative that would provide a sustained yield of timber and restore fire-adapted ecosystems would necessarily result in increases in greenhouse gas emissions above current levels. The alternatives and the Proposed RMP would result in varying amounts of increase in greenhouse gas emissions above current levels. However, it would not be possible to avoid increases in greenhouse gas emissions above current levels and meet the purposes of the action.




**Figure 3-18.** Estimated average annual greenhouse gas emissions from the combination of timber harvest, grazing, and prescribed fire

Note: Variation in activity fuels prescribed fire levels causes most of the fluctuation in expected emissions between decades.




**Figure 3-19.** Projected increases in average annual greenhouse gas emissions from timber harvest, grazing, and prescribed burning relative to average annual emissions as of 2013

## Effect of Greenhouse Gas Emissions from BLM-administered Lands in the Context of Other Sources

Placing BLM's greenhouse gas emissions in a statewide or national context is difficult for the same reasons as discussed above for carbon storage. In addition, greenhouse gas emissions are rarely estimated for the forestry subsector alone. The EPA groups emissions from forestry operations into the agricultural sector. In 2013, national emissions from the agricultural sector were 586.8 Tg $CO_2e$, or 8.8 percent of total U.S. emissions. Land use and forestry emissions accounted for 1.9 percent of agricultural emissions,

or 10.9 Tg $CO_2$e (EPA 2015). Data for the state of Oregon does not include an estimate of emissions from land use and forestry.

The 2013 estimate for BLM's greenhouse gas emissions are 0.2 percent of the U.S. 2013 estimate for the agriculture sector. The BLM greenhouse gas emissions through 2063 would range from 0.3 to 0.7 percent of the U.S. 2013 estimate for the agricultural sector. Greenhouse gas emissions for each alternative and the Proposed RMP would fluctuate over the assessment period, depending on the extent of timber harvest and subsequent prescribed burning. Greenhouse gas emissions from timber harvest operations would be a higher proportion of BLM total emissions than they are in the national emissions, ranging from as low as 4.2–5.4 percent under Alternative D to as high as 8.6–9.4 percent under Alternative C. Under the Proposed RMP, harvest emissions would account for between 5.2–6.4 percent of BLM's expected total greenhouse gas emissions. The BLM emissions differ from the national emissions for the agricultural sector in that livestock and crop cultivation produced 90 percent of the national emissions whereas prescribed burning is expected to produce 90–96 percent of the emissions from BLM, depending on the alternative and decade.

The BLM also compared how the relative proportions of greenhouse gas emissions would change for harvesting and prescribed fire assuming no change in the emissions from private forest owners, the State of Oregon, and other Federal agencies, using average annual estimates over the entire analysis period (50 years). The BLM's proportion of annual harvesting-related greenhouse gas emissions would increase from about 4 percent of the western Oregon estimate to a low of 5 percent per year under Alternative D and a high of 14 percent per year under Alternative C. The Proposed RMP annual harvesting greenhouse gas emissions would approximately double to an estimated 8 percent of western Oregon harvesting emissions, or 0.02 Tg $CO_2$e per year on average. The BLM's proportion of greenhouse gas emissions from prescribed burning would increase from approximately 8 percent per year of the western Oregon total to a low of 15 percent per year under Alternative D and a high of 20 percent per year under Alternative C. The Proposed RMP prescribed fire greenhouse gas emissions would increase to 17 percent of the western Oregon prescribed fire emissions, or 0.28 Tg $CO_2$e per year, on average.

# Issue 3

*How would climate change interact with BLM management actions to alter the potential outcomes for key natural resources?*

## Summary of Analytical Methods

In this analysis, the BLM considered both how climate change would introduce uncertainty into outcomes described in other sections of this chapter and how the alternatives and the Proposed RMP might allow the BLM to undertake actions to adapt to climate change during plan implementation. The BLM described current and projected climate trends and analyzed how these trends could affect the resources described in other sections. The BLM then considered the extent to which the alternatives and the Proposed RMP would allow BLM to consider actions that promote adaptation to climate change during the implementation of the RMP.

The potential climate change impacts of most concern to the BLM are the indirect effects of changes in temperature, precipitation, and snow within the planning area, as these factors affect forest productivity and species composition, habitat for terrestrial and aquatic wildlife, and key disturbance regimes. This analysis focuses on the possible impacts to tree species composition and growth, fire regimes, insect outbreaks, certain diseases such as Sudden Oak Death and Swiss needle cast, stream flow and temperature

Harris *et al. Carbon Balance Manage (2016) 11:24*
DOI 10.1186/s13021-016-0066-5

Carbon Balance and Management

RESEARCH Open Access

# Attribution of net carbon change by disturbance type across forest lands of the conterminous United States

N. L. Harris[1,5*†], S. C. Hagen[2†], S. S. Saatchi[3], T. R. H. Pearson[1], C. W. Woodall[4], G. M. Domke[4], B. H. Braswell[2], B. F. Walters[4], S. Brown[1], W. Salas[2], A. Fore[3] and Y. Yu[3]

**Abstract**

**Background:** Locating terrestrial sources and sinks of carbon (C) will be critical to developing strategies that contribute to the climate change mitigation goals of the Paris Agreement. Here we present spatially resolved estimates of net C change across United States (US) forest lands between 2006 and 2010 and attribute them to natural and anthropogenic processes.

**Results:** Forests in the conterminous US sequestered −460 ± 48 Tg C year$^{-1}$, while C losses from disturbance averaged 191 ± 10 Tg C year$^{-1}$. Combining estimates of net C losses and gains results in net carbon change of −269 ± 49 Tg C year$^{-1}$. New forests gained −8 ± 1 Tg C year$^{-1}$, while deforestation resulted in losses of 6 ± 1 Tg C year$^{-1}$. Forest land remaining forest land lost 185 ± 10 Tg C year$^{-1}$ to various disturbances; these losses were compensated by net carbon gains of −452 ± 48 Tg C year$^{-1}$. C loss in the southern US was highest (105 ± 6 Tg C year$^{-1}$) with the highest fractional contributions from harvest (92%) and wind (5%). C loss in the western US (44 ± 3 Tg C year$^{-1}$) was due predominantly to harvest (66%), fire (15%), and insect damage (13%). The northern US had the lowest C loss (41 ± 2 Tg C year$^{-1}$) with the most significant proportional contributions from harvest (86%), insect damage (9%), and conversion (3%). Taken together, these disturbances reduced the estimated potential C sink of US forests by 42%.

**Conclusion:** The framework presented here allows for the integration of ground and space observations to more fully inform US forest C policy and monitoring efforts.

**Keywords:** Forests, Disturbance, Harvest, Insects, Fire, Drought, Greenhouse gas, Land use, Climate change, FIA, UNFCCC

## Background

The 2015 Paris Climate Change Agreement, with consensus from 192 signatories, calls for achieving a balance between anthropogenic emissions by sources and removals by sinks in the second half of this century [1]. Forests are currently responsible for the capture and storage of an estimated 25% of global anthropogenic emissions [2]. If Paris goals are to be achieved, further enhancement of forest-based carbon (C) removals to mitigate emissions in other sectors will be a critical component of any collective global strategy [3], especially as no alternative sink technologies have yet been proven at scale. Thus, spatially identifying terrestrial sources and sinks of carbon, and understanding them well enough to predict how they will respond to management decisions or future climate change, will pose major science and policy challenges in the years to come.

Remote sensing products can provide regular and consistent observations of Earth's surface to help identify the condition of forest ecosystems and changes within them at a range of spatial and temporal scales [4]. Over the past

*Correspondence: nharris@wri.org
†N. L. Harris and S. C. Hagen contributed equally to this work
[5] Present Address: Forests Program, World Resources Institute, 10 G Street NE Suite 800, Washington, DC 20002, USA
Full list of author information is available at the end of the article

Springer Open

© The Author(s) 2016. This article is distributed under the terms of the Creative Commons Attribution 4.0 International License (http://creativecommons.org/licenses/by/4.0/), which permits unrestricted use, distribution, and reproduction in any medium, provided you give appropriate credit to the original author(s) and the source, provide a link to the Creative Commons license, and indicate if changes were made.

several years, the remote sensing research community has used these products to monitor tropical deforestation, forest C stocks and associated C emissions, largely in support of REDD+ initiatives in developing countries [5–12]. In many developed countries, periodic national forest inventories form the basis of annual greenhouse gas (GHG) reporting to the United Nations Framework Convention on Climate Change (UNFCCC). The sample-based design of these inventories may offer little in the way of detailed and spatially-explicit information on the distribution of forest biomass [13], timing and location of timber harvesting in managed forests, or the cause and timing of other types of forest disturbances. If the ultimate aim of the Paris Agreement is to introduce practices that lead to reduced emissions and enhanced removals of C from the world's managed forests, including in temperate and boreal biomes, then a lack of disaggregated, spatially-explicit information could pose challenges over the coming years related to knowledge of where changes are occurring and where interventions are likely to be most effective.

Several C budget models have been developed to simulate ecosystem response to climate drivers and other disturbances, and these models represent an established approach to estimating C fluxes at national to regional scales. For example, Canada's National Forest Carbon Monitoring Accounting and Reporting System (NFC-MARS) uses the Carbon Budget Model of the Canadian Forest Sector (CBM-CFS3), and is used also as a decision support tool for forest managers to quantify forest C dynamics at a landscape scale. Different models emphasize different aspects of ecosystem dynamics, with some accounting for competition between plant functional types, nutrient limitation, and natural disturbances. Time series of anthropogenic land-cover changes are usually prescribed based on spatially explicit data. The models can reflect spatial and temporal variability in C density and response to environmental conditions, but their modeled C stocks may differ markedly from observations [14].

Such models are not used explicitly in the GHG inventory for the US to report forest C fluxes. Instead, the current US inventory system uses the C stock-difference accounting approach [15] enabled by the annual national forest inventory conducted by the United States Department of Agriculture (USDA) Forest Service Forest Inventory and Analysis (FIA) program. The difference in C stocks in five C pools is estimated via sequential re-measurements of permanent ground inventory plots. When forest stocks decline, it is assumed that C emissions have occurred from the land to the atmosphere if not reconciled with a transfer to another land use category. Conversely, when forest C stocks increase it is assumed that C has been sequestered from the atmosphere by terrestrial vegetation. In this way, estimated net C change in the US forest sector is the integrated result of both anthropogenic and natural processes—harvest, land use change, fire, drought, insect infestation, wind damage—all of which influence the magnitude of forest C stocks in each pool. Results are most statistically robust when compiled at large spatial scales (e.g., state or regional), such that quantification of finer-scale spatial patterns is less precise. Though changes are well constrained via sequential re-measurements on inventory plots, the US [16, 17] has only recently begun using methods to disaggregate the effects of various disturbance types on forest stocks and fluxes (although this separation is not a requirement of IPCC Good Practice Guidance, [18]).

The objective of this study was to synthesize information from remote sensing observations of forest carbon stocks and disturbance with information collected by various US agencies into a framework that (1) more explicitly attributes C losses to major disturbance types (land use change, harvesting, forest fires, insect damage, wind damage and drought); and (2) disaggregates net C change into relevant IPCC reporting categories of non-forest land converted to forest land, forest land converted to non-forest land, and forest land remaining forest land. This framework allows for the integration of ground and space observations to more fully inform US forest C policy and monitoring efforts.

## Methods

We built a spatially-explicit empirical model that combines information from many data sources to infer disturbance and resulting C dynamics within each hectare of forest land in the 48 conterminous states of the US, totaling an area of more than 2.1 million km$^2$. For the purposes of regional comparison and analyses, we divided the US into three broad regions (North, South, West) based on similar histories of forestland use ([19], Fig. 1) and into nine smaller subregions based on those used in the US FIA program. Forest types were defined as hardwood or softwood, following the National Land Cover Data (NLCD) classification (deciduous forest class: hardwoods; evergreen forest class: softwoods). The time period of analysis is 1 January 2006 to 31 December 2010.

### Data inputs

#### *Forest area map (2005)*

Forest extent in the base year 2005 was determined from the NLCD and the global tree cover and tree cover change products of Hansen et al. [8]. Specifically, an area was determined to be forested if categorized as




**Fig. 1** **a** Map of aboveground live woody biomass carbon density (Mg C ha$^{-1}$) and **b** uncertainty across forest lands of the conterminous US at 1-ha resolution for circa the year 2005. **c** The regional analysis was performed by dividing the US into three sub-regions as recommended by Heath and Birdsey [19]. The above and belowground carbon density maps and the uncertainty maps can be downloaded from NASA's distributed Data Active Archive Center (http://dx.doi.org/10.3334/ORNLDAAC/1313)

hardwood or softwood in the NLCD 2006 dataset[1] and, according to the Hansen et al. [8] dataset, it (a) met the tree cover threshold of 25% in the year 2000 and was not lost between 2001 and 2005 or (b) did not meet the tree cover threshold of 25% in 2000 but was identified as having gained tree cover (i.e., afforestation/reforestation) between 2000 and 2012. The NLCD has been shown to significantly underestimate tree cover [20] and thus the forest area estimates used in this analysis—defined by both NLCD and Hansen et al. [8]—are likely to be conservative. However, these two data products currently represent the best available spatially explicit data for forest extent in the conterminous US (CONUS).

#### *Forest biomass density maps (circa 2005)*

We developed maps of C stocks (50% of biomass) in aboveground live biomass in US forest land as part of NASA's C Monitoring System (CMS) program based on a combination of remote sensing observations and FIA data (Fig. 1). The overall methodology used in mapping the aboveground live forest biomass C density is described in Saatchi et al. [5]. After filtering for cloud effects, slopes, and signal-to-noise ratio, more than 700,000 samples of lidar (light detecting and ranging) data acquired between 2003 and 2008 from the Geoscience Laser Altimeter System (GLAS), onboard the Ice, Cloud and land Elevation Satellite (ICESat) were used as samples of the vertical structure of US forest land. We used the Lorey's height [21] measured in 65,000 single-condition FIA plots (i.e., plots with a single domain mapped on each plot) to calibrate the lidar-derived height metric and used the relationship between Lorey's height and aboveground C density for 28 forest types to convert the lidar data into estimates of aboveground live C density. All FIA plots with a probability of disturbance causing reduced canopy cover (<50%) were removed from the height-biomass model development to reduce any potential discrepancy between ground and lidar height metrics. Lidar-derived biomass samples were then extrapolated over the landscape using a combination of optical and radar satellite imagery that captures the variations of forest structure and cover to create wall-to-wall maps of forest aboveground live biomass C density. We used nine remote sensing imagery layers as spatial predictor variables. Optical and thermal data from Landsat imagery (bands 3, 4, 5 and 7) were aggregated to 100 m spatial resolution from 30 m native resolution along with the leaf area index derived from Landsat imagery [22]. In addition, we used the advanced land observing satellite (ALOS) phased area L-band synthetic aperture radar (PALSAR) imagery at two polarizations (HH and HV backscatter) along with topographical data of surface elevation and slope from Shuttle Radar Topography Mission (SRTM) resampled to 100 m resolution from 20 and 30 m native resolutions, respectively. ALOS PALSAR plays an important role in quantifying variation in forest biomass. In particular, the HV polarization provides the largest contribution among the data layers to predicted biomass because it has a strong direct sensitivity to biomass up to 100–150 $\mathrm{Mg\,ha^{-1}}$ (depending on forest type), is less impacted by soil moisture and other environmental variables, and may contribute significantly in extrapolating larger biomass forests through texture and spatial correlation. Similarly, SRTM data include information on topography and also forest height. We used the national elevation data (NED) to represent the ground surface elevation and used the difference between SRTM and NED as an indicator of forest height. This variable also contributed significantly to explaining the spatial variation of biomass over forests with biomass values >150 $\mathrm{Mg\,ha^{-1}}$.

The aboveground C density samples derived from GLAS data were combined with satellite imagery using the maximum entropy estimation (MaxEnt) algorithm to estimate aboveground biomass density for each 1-ha pixel. MaxEnt is a probability-based algorithm that estimates the posterior likelihood distribution of a variable by maximizing the entropy of said probability distribution while maintaining the constraints provided by the training samples [23]. We selected a random subset consisting of 70% of the samples (~500,000 samples) for model input and used the remaining 30% for model evaluation and validation. The product from the MaxEnt estimator includes both the mean aboveground carbon (AGC) density for each 1-ha pixel and the estimation of the error derived from a Bayesian probability estimator for each pixel. Spatial uncertainty analysis and uncertainty propagation were used to evaluate the overall uncertainty of AGC at the pixel level. This process included the quantification of error at each step of the process and the use of the Gaussian error propagation approach:

$$\text{Error} = \sqrt{\varepsilon^2_{\mathbf{measurement}} + \varepsilon^2_{\mathbf{allometry}} + \varepsilon^2_{\mathbf{sampling}} + \varepsilon^2_{\mathbf{prediction}}}$$

where each of the terms are the relative errors at that pixel and represent the measurement errors of lidar for capturing the forest height, the error associated with the lidar aboveground C allometry model for each forest type, the error associated with sampling the 1-ha pixel

[1] Within each 1 ha pixel, the wet woodland class was included as forest but was not used to determine whether the pixel was hard- or softwood. Hard- or softwood was determined based on the plurality of NLCD hard- or softwood 30 m pixels within the hectare, ignoring the sub-fraction of wet woodlands and selecting softwood when hard- and softwood fractions were equal.

with GLAS footprint size (~0.25 ha), and the MaxEnt prediction error. In evaluating the errors at the state and county level, we also included the spatial correlation of the prediction error from the MaxEnt approach [24].

In the FIA, belowground forest biomass is quantified using a root-shoot ratio [25]. Knowledge of root biomass dynamics is fundamental to improving our understanding of carbon allocation and storage in terrestrial ecosystems [26]. We used the relationship between belowground carbon (BGC) and AGC from the FIA data to develop a BGC spatial distribution at the same scale as AGC [5, 27]. In estimating the uncertainty in BGC, we followed the same approach as AGC with the addition of including the errors associated with the model used in relating AGC to BGC.

#### *FIA stock change data (2006–2010)*

To estimate average net changes in the stock of live AGC and BGC between 2006 and 2010 in forests disaggregated by disturbance type, we queried the FIA database (http://apps.fs.fed.us/fiadb-downloads/datamart.html) to extract more than 141,000 records associated with re-measured permanent plots, where each extracted record represents a "condition" (i.e., domain(s) mapped on each plot according to attributes such as land use, forest type, stand size, ownership, tree density, stand origin, and/or disturbance history) of a measured plot at two points in time, typically 5 years apart. Disturbed plots were stratified into a lookup table by geographic region (North, South, or West), forest type (hardwood or softwood), disturbance type (fire, insect, wind, conversion, or harvest), and disturbance intensity (Table 1). A similar lookup table was developed for undisturbed plots stratified by geographic region, forest type, and base C stock in the year 2005 (Table 2).

#### *Disturbance maps (2006–2010)*

Sources of disturbance data used in this analysis are summarized in Table 3 and include spatially-explicit data on locations of fire, insect damage, wind damage, land use change, drought, and timberlands. The timberlands map was used to attribute net carbon gains occurring within vs. outside timberland areas. Because harvested wood may come from intermediate treatments (treatments not intended to cause regeneration), partial harvest or clearcutting forests, deforestation, and non-forest land trees, the area of clearcuts as observed within timberland areas through remote sensing imagery cannot represent all these wood sources [28]. Therefore for estimating C losses from timber harvest, we used data collected in the US based on mill surveys rather than remote sensing observations.

#### *Timber product output data (TPO 2007)*

The volume of roundwood products, mill residues and logging residues reported in the TPO database (Table 3), separated by product class and detailed species group, were used to estimate C losses from wood harvest. The spatial resolution of the data was the "combined county", which represented the minimum reportable scale from the timber product output (TPO; FIA Fiscal Year 2013 Business Report, [29]) data while retaining necessary confidentiality.

### Model assumptions

#### *IPCC Tier 2 estimation*

The terrestrial C cycle includes changes in C stocks due to both continuous processes (i.e., growth, decomposition) and discrete events (i.e., disturbances such as harvest, fire, insect outbreaks, land-use change). Continuous processes can affect C stocks in all areas every year, while discrete events (i.e., disturbances) cause emissions and redistribute C in specific areas in the year of the event. In accounting for net C change in this analysis, we use country-specific data (Tier 2) and apply the simplifying methodological assumption [15] that all post-disturbance emissions (after accounting for C storage in harvested wood products) occur as part of the disturbance event, i.e., in the year of disturbance, rather than modeling these emissions through time as in IPCC's Tier 3 approach. The application of lower tier methods also assumes that the average transfer rate into dead organic matter (dead wood and litter) is equal to the average transfer out of dead organic matter, so that the net stock change in these pools is zero [15]. This assumption means that dead organic matter (dead wood and litter) C stocks need not be quantified for land areas that remain forested. The rationale for this approach is that dead organic matter stocks, particularly dead wood, are highly variable and site-specific, depending on forest type and age, disturbance history and management. Because the FIA data used in this analysis do not include measurements of soil C or dead C pools and no robust relationships currently exist that relate these pools to a more easily measured pool (such as the derivation of belowground biomass from aboveground biomass using root:shoot ratios), we excluded the soil C and dead C pools from our analysis. As a result, our estimate of net C change using the stock-difference approach is equal to the net change in C stocks in the aboveground and belowground live biomass pools only, with a fraction of the aboveground live biomass assumed to be transferred to the wood products pool, where a portion is permanently sequestered in long-lived products and the remainder emitted to the atmosphere (see below).

Case No. 1:23-cv-01501-RMR Document 15-4 filed 09/29/23 USDC Colorado pg 33 of 176



**Table 1 Look-up table of annual fractional change (average = μ; standard error = σ) in aboveground carbon (AGC) and belowground carbon (BGC) in disturbed forests based on FIA plot data**

| Region | Forest type | Disturbance | Initial C | N | AGC μ | AGC σ | BGC μ | BGC σ |
|---|---|---|---|---|---|---|---|---|
| North | Softwood | Fire | Low | 2 | −0.003 | 0.012 | −0.001 | 0.013 |
| North | Softwood | Fire | Medium | 3 | −0.052 | 0.031 | −0.053 | 0.031 |
| North | Softwood | Fire | High | 5 | −0.150 | 0.030 | −0.157 | 0.030 |
| North | Softwood | Weather | Low | 63 | −0.013 | 0.016 | −0.014 | 0.016 |
| North | Softwood | Weather | High | 10 | −0.163 | 0.013 | −0.169 | 0.013 |
| North | Softwood | Insect | Low | 85 | −0.003 | 0.007 | −0.003 | 0.008 |
| North | Softwood | Insect | Medium | 82 | −0.044 | 0.023 | −0.046 | 0.023 |
| North | Softwood | Insect | High | 45 | −0.126 | 0.035 | −0.133 | 0.032 |
| North | Softwood | Harvested | Low | 521 | −0.046 | 0.035 | −0.048 | 0.036 |
| North | Softwood | Harvested | High | 246 | −0.152 | 0.026 | −0.158 | 0.025 |
| North | Hardwood | Fire | Low | 40 | −0.003 | 0.009 | −0.003 | 0.009 |
| North | Hardwood | Fire | Medium | 29 | −0.045 | 0.024 | −0.048 | 0.023 |
| North | Hardwood | Fire | High | 11 | −0.131 | 0.034 | −0.136 | 0.034 |
| North | Hardwood | Weather | Low | 412 | −0.011 | 0.016 | −0.011 | 0.016 |
| North | Hardwood | Weather | High | 34 | −0.160 | 0.017 | −0.164 | 0.016 |
| North | Hardwood | Insect | Low | 656 | −0.002 | 0.008 | −0.002 | 0.008 |
| North | Hardwood | Insect | Medium | 432 | −0.045 | 0.020 | −0.046 | 0.020 |
| North | Hardwood | Insect | High | 118 | −0.132 | 0.029 | −0.136 | 0.028 |
| North | Hardwood | Harvested | Low | 2177 | −0.047 | 0.035 | −0.047 | 0.035 |
| North | Hardwood | Harvested | High | 806 | −0.154 | 0.023 | −0.157 | 0.023 |
| South | Softwood | Fire | Low | 127 | −0.002 | 0.007 | −0.003 | 0.008 |
| South | Softwood | Fire | Medium | 174 | −0.048 | 0.021 | −0.052 | 0.022 |
| South | Softwood | Fire | High | 52 | −0.124 | 0.027 | −0.131 | 0.028 |
| South | Softwood | Weather | Low | 78 | −0.016 | 0.016 | −0.017 | 0.016 |
| South | Softwood | Weather | High | 16 | −0.161 | 0.026 | −0.168 | 0.023 |
| South | Softwood | Insect | Low | 46 | −0.002 | 0.008 | −0.004 | 0.008 |
| South | Softwood | Insect | Medium | 66 | −0.054 | 0.022 | −0.059 | 0.023 |
| South | Softwood | Insect | High | 60 | −0.135 | 0.030 | −0.142 | 0.029 |
| South | Softwood | Harvested | Low | 1787 | −0.044 | 0.034 | −0.048 | 0.036 |
| South | Softwood | Harvested | High | 586 | −0.149 | 0.025 | −0.157 | 0.024 |
| South | Hardwood | Fire | low | 112 | −0.002 | 0.008 | −0.003 | 0.008 |
| South | Hardwood | Fire | Medium | 86 | −0.042 | 0.021 | −0.045 | 0.022 |
| South | Hardwood | Fire | High | 37 | −0.131 | 0.033 | −0.139 | 0.030 |
| South | Hardwood | Weather | Low | 484 | −0.014 | 0.016 | −0.015 | 0.016 |
| South | Hardwood | Weather | High | 32 | −0.162 | 0.019 | −0.167 | 0.017 |
| South | Hardwood | Insect | Low | 145 | 0.000 | 0.013 | −0.002 | 0.011 |
| South | Hardwood | Insect | Medium | 121 | −0.047 | 0.022 | −0.051 | 0.022 |
| South | Hardwood | Insect | High | 38 | −0.133 | 0.031 | −0.138 | 0.031 |
| South | Hardwood | Harvested | Low | 1235 | −0.048 | 0.036 | −0.051 | 0.036 |
| South | Hardwood | Harvested | High | 609 | −0.146 | 0.029 | −0.152 | 0.027 |
| West | Softwood | Fire | Low | 13 | −0.007 | 0.008 | −0.007 | 0.008 |
| West | Softwood | Fire | Medium | 8 | −0.049 | 0.023 | −0.050 | 0.026 |
| West | Softwood | Fire | High | 0 | *−0.126* | *NA* | *−0.133* | *NA* |
| West | Softwood | Weather | Low | 5 | −0.003 | 0.008 | −0.003 | 0.008 |
| West | Softwood | Weather | High | 0 | *−0.162* | *NA* | *−0.168* | *NA* |
| West | Softwood | Insect | Low | 12 | 0.001 | 0.007 | 0.001 | 0.007 |
| West | Softwood | Insect | Medium | 3 | −0.041 | 0.016 | −0.044 | 0.018 |
| West | Softwood | Insect | High | 0 | *−0.131* | *NA* | *−0.138* | *NA* |

FS-001652

**Table 1 continued**

| Region | Forest type | Disturbance | Initial C | N | AGC μ | AGC σ | BGC μ | BGC σ |
|---|---|---|---|---|---|---|---|---|
| West | Softwood | Harvested | Low | 28 | −0.027 | 0.030 | −0.028 | 0.031 |
| West | Softwood | Harvested | High | 0 | *−0.150* | *NA* | *−0.157* | *NA* |
| West | Hardwood | Fire | Low | 4 | −0.002 | 0.008 | −0.002 | 0.008 |
| West | Hardwood | Fire | Medium | 3 | −0.057 | 0.021 | −0.059 | 0.021 |
| West | Hardwood | Fire | High | 0 | *−0.131* | *NA* | *−0.138* | *NA* |
| West | Hardwood | Weather | Low | 0 | *−0.013* | *NA* | *−0.013* | *NA* |
| West | Hardwood | Weather | High | 0 | *−0.161* | *NA* | *−0.165* | *NA* |
| West | Hardwood | Insect | Low | 13 | −0.003 | 0.008 | −0.003 | 0.009 |
| West | Hardwood | Insect | Medium | 3 | −0.041 | 0.025 | −0.044 | 0.028 |
| West | Hardwood | Insect | High | 0 | *−0.132* | *NA* | *−0.136* | *NA* |
| West | Hardwood | Harvested | Low | 4 | −0.039 | 0.031 | −0.039 | 0.033 |
| West | Hardwood | Harvested | High | 0 | *−0.151* | *NA* | *−0.155* | *NA* |

*Italics* imputed from other regions

#### *Disturbance attribution*

Forest land was assumed to be disturbed if included in at least one of the disturbance maps (Table 3) during the 2006–2010 time period: (1) maximum burn severity score of at least two (low) over the 5 years of fire data; (2) insect damage of at least three trees per acre over the 5 year study period; (3) within a path of a tornado or a buffered region around the hurricane path where wind speeds typically exceeded 95 miles per hour (category 2 hurricane)[2] between 2006 and 2010; (4) converted to agriculture, barren land or settlement in the NLCD layer between 2006 and 2011 (considered as deforestation events); or (5) had an average drought intensity score of more than two in the NDMC Drought Monitor map between the years of measurement. For fire and insect disturbance, three levels of disturbance intensity were assigned based on burn severity score (from the MTBS dataset) or insect damage per acre (from the Aerial Detection Survey), respectively. Two levels of wind disturbance intensity were assigned and areas determined to have been converted to agriculture or settlement were assumed to experience one uniform intensity of disturbance. All other forest land was assumed to be undisturbed between 2006 and 2010. In areas where multiple types of disturbance were identified within a 1 ha forest land pixel, we assumed only one disturbance type was driving the C loss. Disturbance type priority was set based on the intensity of the disturbance and level of confidence in the data sets. In general, more intense disturbances and higher quality products took priority over less intense disturbances and those products assessed as having more uncertainty. The disturbance location and intensity products were assumed to be in the following quality order, from least to most inherent uncertainty: conversion, fire, wind, insect damage. For instance, a pixel identified as experiencing an intense fire disturbance and a low intensity insect disturbance was assigned the high intensity fire disturbance as the single disturbance driving loss. This assumption simplified the processing but added additional uncertainty to the estimates. The assigned disturbance type priority varied across multiple iterations of our uncertainty analysis. It was not possible to attribute harvest disturbance to specific pixels, therefore C losses from harvest were estimated at the county scale using TPO data.

### Estimation of net carbon change

#### *Net carbon change from fire, wind, insect damage, land use change, and drought*

If a hectare of forest land in the US was categorized as disturbed between 2006 and 2010 based on the disturbance maps, then the intensity and type of disturbance was identified. The pixel was then linked to an annualized percent net change in C stock estimate, based on its identified category in the FIA-based lookup tables. These annualized percent change values were multiplied by the initial base C stock in 2005 in each pool (aboveground biomass, belowground biomass) and multiplied by 5 years to estimate total net change in C within the pixel between 2006 and 2010.

#### *Net carbon change from harvest*

Annual C losses associated with harvest activities were estimated using mill surveys compiled into the USDA

[2] This wind speed threshold was selected based on the Saffir Simpson Hurricane Wind Scale, which indicates that trees start to be uprooted and fall at category 2 sustained wind speeds between 96 and 110 mph. The hurricane tracks were buffered to a symmetrical width of 100 km.

**Table 2 Look-up table of annual fractional change (average = μ; standard error = σ) in aboveground carbon (AGC) and belowground carbon (BGC) in undisturbed forests, based on FIA plot data**

| Region | Forest type | Drought | Initial C | n | AGC μ | AGC σ | BGC μ | BGC σ |
|---|---|---|---|---|---|---|---|---|
| North | Softwood | No | <25 | 5167 | 0.064 | 0.135 | 0.080 | 0.199 |
| North | Softwood | No | 25–50 | 3459 | 0.023 | 0.034 | 0.023 | 0.034 |
| North | Softwood | No | 50–100 | 2085 | 0.016 | 0.024 | 0.016 | 0.024 |
| North | Softwood | No | ≥100 | 345 | 0.013 | 0.034 | 0.013 | 0.034 |
| North | Softwood | Yes | <25 | 50 | 0.028 | 0.030 | 0.031 | 0.035 |
| North | Softwood | Yes | 25–50 | 50 | 0.008 | 0.034 | 0.008 | 0.035 |
| North | Softwood | Yes | 50–100 | 12 | 0.016 | 0.040 | 0.016 | 0.040 |
| North | Softwood | Yes | ≥100 | 2 | 0.013 | 0.017 | 0.013 | 0.016 |
| North | Hardwood | No | <25 | 12,559 | 0.074 | 0.102 | 0.087 | 0.131 |
| North | Hardwood | No | 25–50 | 13,656 | 0.025 | 0.036 | 0.025 | 0.036 |
| North | Hardwood | No | 50–100 | 14,173 | 0.014 | 0.026 | 0.014 | 0.026 |
| North | Hardwood | No | ≥100 | 3265 | 0.010 | 0.030 | 0.010 | 0.030 |
| North | Hardwood | Yes | <25 | 19 | 0.016 | 0.058 | 0.016 | 0.062 |
| North | Hardwood | Yes | 25–50 | 12 | 0.006 | 0.040 | 0.006 | 0.041 |
| North | Hardwood | Yes | 50–100 | 7 | 0.001 | 0.026 | 0.000 | 0.027 |
| North | Hardwood | Yes | ≥100 | 1 | 0.006 | NA | 0.005 | NA |
| South | Softwood | No | <25 | 3648 | 0.314 | 0.355 | 0.452 | 0.621 |
| South | Softwood | No | 25–50 | 2940 | 0.082 | 0.069 | 0.085 | 0.072 |
| South | Softwood | No | 50–100 | 2345 | 0.039 | 0.049 | 0.039 | 0.050 |
| South | Softwood | No | ≥100 | 673 | 0.021 | 0.050 | 0.020 | 0.051 |
| South | Softwood | Yes | <25 | 464 | 0.340 | 0.407 | 0.487 | 0.694 |
| South | Softwood | Yes | 25–50 | 348 | 0.081 | 0.071 | 0.084 | 0.074 |
| South | Softwood | Yes | 50–100 | 299 | 0.038 | 0.039 | 0.038 | 0.041 |
| South | Softwood | Yes | ≥100 | 110 | 0.020 | 0.038 | 0.020 | 0.039 |
| South | Hardwood | No | <25 | 6585 | 0.133 | 0.191 | 0.176 | 0.291 |
| South | Hardwood | No | 25–50 | 6180 | 0.040 | 0.044 | 0.041 | 0.045 |
| South | Hardwood | No | 50–100 | 8244 | 0.021 | 0.032 | 0.021 | 0.032 |
| South | Hardwood | No | ≥100 | 2697 | 0.014 | 0.032 | 0.014 | 0.032 |
| South | Hardwood | Yes | <25 | 630 | 0.140 | 0.184 | 0.185 | 0.272 |
| South | Hardwood | Yes | 25–50 | 498 | 0.042 | 0.062 | 0.044 | 0.064 |
| South | Hardwood | Yes | 50–100 | 756 | 0.021 | 0.029 | 0.021 | 0.030 |
| South | Hardwood | Yes | ≥100 | 275 | 0.011 | 0.029 | 0.011 | 0.029 |
| West | Softwood | No | <25 | 56 | 0.061 | 0.102 | 0.079 | 0.123 |
| West | Softwood | No | 25–50 | 45 | 0.027 | 0.048 | 0.028 | 0.049 |
| West | Softwood | No | 50–100 | 61 | 0.022 | 0.026 | 0.022 | 0.027 |
| West | Softwood | No | ≥100 | 80 | 0.014 | 0.019 | 0.014 | 0.019 |
| West | Softwood | Yes | <25 | 0 | *0.310* | *NA* | *0.443* | *NA* |
| West | Softwood | Yes | 25–50 | 0 | *0.072* | *NA* | *0.075* | *NA* |
| West | Softwood | Yes | 50–100 | 0 | *0.037* | *NA* | *0.037* | *NA* |
| West | Softwood | Yes | ≥100 | 0 | *0.020* | *NA* | *0.020* | *NA* |
| West | Hardwood | No | <25 | 33 | 0.037 | 0.055 | 0.043 | 0.061 |
| West | Hardwood | No | 25–50 | 26 | 0.023 | 0.026 | 0.025 | 0.028 |
| West | Hardwood | No | 50–100 | 45 | 0.026 | 0.041 | 0.027 | 0.043 |
| West | Hardwood | No | ≥100 | 38 | 0.019 | 0.025 | 0.020 | 0.027 |
| West | Hardwood | Yes | <25 | 0 | *0.137* | *NA* | *0.180* | *NA* |
| West | Hardwood | Yes | 25–50 | 0 | *0.041* | *NA* | *0.043* | *NA* |

**Table 2 continued**

| Region | Forest type | Drought | Initial C | n | AGC μ | AGC σ | BGC μ | BGC σ |
|---|---|---|---|---|---|---|---|---|
| West | Hardwood | Yes | 50–100 | 0 | *0.021* | *NA* | *0.021* | *NA* |
| West | Hardwood | Yes | ≥100 | 0 | *0.011* | *NA* | *0.011* | *NA* |

*Italics* imputed from other regions

**Table 3 Fourteen independent datasets were integrated and used to produce net carbon change estimates by disturbance type**

| Product | Source | Spatial coverage | Temporal coverage | Url |
|---|---|---|---|---|
| Tree cover<br>Tree cover change | [8] | Complete CONUS | Tree cover: single snapshot in 2000<br>Loss: annual 2001–2010<br>Gain: 2000–2012 | http://earthenginepartners.appspot.com/science-2013-global-forest/download_v1.1.html |
| Fire | Monitoring trends in burn severity | Complete CONUS | Annual 2006–2010 | http://www.mtbs.gov/products.html |
| Wind | NOAA's storm prediction center—tornado tracks | Complete CONUS | Annual 2006–2010 | http://www.spc.noaa.gov/gis/svrgis/ |
| Wind | NOAA's storm prediction center—hurricane paths | Complete CONUS | Annual 2006–2010 | http://nhc.noaa.gov/gis/ |
| Insect | USFS aerial detection survey | Sub-set of CONUS | Annual 2006–2010 | http://www.fs.fed.us/foresthealth/technology/adsm.shtml |
| Forest type | National land cover database—hardwood or softwood | Complete CONUS | Single snapshot in 2000 | http://www.mrlc.gov/ |
| Conversion | National land cover database | Complete CONUS | Snapshots in 2006 and 2011 | http://www.mrlc.gov/ |
| Drought | NDMC drought monitor | Complete CONUS | Weekly between 2006 and 2011 | http://droughtmonitor.unl.edu/ |
| Timberlands | Mark Nelson USFS for 2007 resources planning act | Complete CONUS | Snapshot in 2007 | N/A |
| Biomass density<br>Carbon stocks | Sassan Saatchi | Complete CONUS | Snapshot in 2005 | http://dx.doi.org/10.3334/ORNLDAAC/1313) |
| Harvest | USFS timber products output | Combined county CONUS | Survey in 2007 | http://www.fia.fs.fed.us/program-features/tpo/ |
| FIA | USFS forest inventory and analysis program | Sites in CONUS | Between 1997 and 2013 | http://www.fia.fs.fed.us/ |

TPO database for the year 2007. Due to the periodic nature of the TPO report for 2007 data, harvest emission estimates were assumed to be representative for all 5 years included in our analysis (2006–2010). Volumes of roundwood products, mill residue and logging residues were converted to biomass using oven-dry wood densities [30]. The fraction of C in primary wood products remaining in end uses or in landfills after 100 years per product class[3] was assumed to be permanently sequestered, and was estimated from values published in Smith et al. [31]. Fuelwood, posts/poles/pilings and miscellaneous product classes were assumed to be fully emitted. Emissions from mill residues were considered equal to the summed mill residues from fuel by-products, miscellaneous by-products and unused mill residues, plus emissions from fiber by-products. All fiber by-products were assumed to form pulp and to follow the emissions assumptions of pulp products. All logging residues were assumed to be emitted. Timberlands were delineated based on the boundaries of the US timberlands map (Table 3), and annual net C gains within timberlands were estimated following the look-up tables for growth in undisturbed forests as described below.

### *Net carbon change from forest growth/regrowth*

Forest land in the US that did not experience deforestation through land use conversion or significant damage by wind, insect, fire, or drought over the analysis period, as well as new forest land (i.e., afforestation/reforestation), were linked to values of annual net change

[3] The TPO and Smith et al. [31] product classes were mapped to one another as follows: Sawlog = softwood/hardwood lumber (depending on species); veneer = softwood plywood; pulp = paper; composite = oriented strandboard.

in C stock, based on the area's identified category in the lookup tables derived from FIA measurement data. These annualized percent change values were multiplied by the initial C stock in 2005 in each pool (aboveground biomass, belowground biomass) and multiplied by 5 years to estimate total net change in C within each 1-ha pixel between 2006 and 2010.

#### *Total annual net carbon change*

The FIA-based estimated net change in C represents the sum of net C losses (caused by disturbances) and net C gains (caused by forest growth) that occurred between FIA measurement dates at the site. Similarly, our estimate of net C change ($\Delta C_{net}$) during the 5-year period at the combined county scale was calculated as:

$$\Delta C_{net} = \Delta C_{undist} + \Delta C_{A/R} + \Delta C_{conversion} + \Delta C_{timberlands} + \Delta C_{insect} + \Delta C_{fire} + \Delta C_{wind} + \Delta C_{drought}$$

where $\Delta C_{undist}$ is the net C change in forest land outside of timberlands that did not experience land use conversion or significant damage by wind, insects, fire or drought. $\Delta C_{A/R}$ is the net C change in new forest land. $\Delta C_{conversion}$, $\Delta C_{wind}$ $\Delta C_{insect}$, and $\Delta C_{fire}$ represent the net C change in forestland that was converted or significantly disturbed by conversion, wind, insects, and fire, respectively. $\Delta C_{drought}$ is the net C reduction in sequestration in forest land experiencing drought from what was expected during non-drought periods. $\Delta C_{timberlands}$ is the net C change on timberlands (as delineated by the timberlands map), calculated as the sum of net C gains (as estimated from FIA lookup tables) and C losses (as estimated from the TPO data, accounting for the fraction of harvested C stored permanently in the long-lived product pool). By convention, C losses are represented as positive values and C gains as negative values. Consequently, various forms of disturbance result in a weaker (i.e., less negative) overall sink than would occur otherwise in the absence of disturbance.

### Uncertainty analysis

We estimated statistical bounds for the estimates of net C change by conducting a Monte Carlo uncertainty analysis [32]. The four sources of uncertainty included in the simulation were associated with the forest biomass density maps, the stock-change lookup tables derived from FIA data, each of the disturbance maps, and the TPO data. The simulation was conducted at the combined county scale. Uncertainty in the biomass density maps was derived from a secondary simulation in which the input datasets were resampled to generate 100 replicate training datasets, or realizations, that had the same qualities of the original training dataset, but different random error. A new MaxEnt model was fit to each of these 100 replicated datasets and used to create 100 full resolution biomass maps. Uncertainty in the FIA-based $\Delta C$ values were calculated using the variance in the look-up tables:

$$uncertainty\% = \frac{\frac{\sigma}{\sqrt{n}} * 1.96}{\mu} * 100$$

Uncertainty in the area affected by disturbance was estimated to be 30%, with an estimated 5% bias in under reported area. We conducted the simulation using three separate rule sets for selecting a disturbance type for pixels identified as experiencing multiple disturbances during the 5-year study period. Uncertainty in the TPO data at the combined county scale was also assumed to be 30%.

We ran 10,000 Monte Carlo simulations with stochastic elements in place for the four uncertainty components. We assumed that 80% of the randomly generated error was random and 20% of the error was systematic within the simulation. To implement this assumption, we estimated the error associated with each component twice—once at the simulation iteration level and again for each individual combined county. The iteration level uncertainty was multiplied by 0.2 before it was added to the original combined county estimate, while the combined county level stochastic element was multiplied by 0.8 before it was added. In this way, we accounted for both random error as well as systematic error in our estimates.

This uncertainty analysis was intended to provide context to the estimates and assist in the process of identifying methods and data in need of refinement or replacement. The uncertainty analysis is not exhaustive, in the sense that additional sources of uncertainty exist that are not accounted for in the analysis presented here. These additional sources include but are not limited to (a) potential temporal mismatch between the biomass data providing initial carbon stocks in 2005 and the activity data beginning in 2006 and (b) uncertainty in the equations and factors used in the FIA to convert tree measurements to estimates of wood volume and carbon stocks. Given these additional sources of uncertainty, the uncertainty bounds presented here are almost certainly an underestimate of the actual uncertainty.

## Results

Forest land in the conterminous US, as defined here totaling 221 million ha in 2005, sequestered $-460 \pm 48$ Tg C year$^{-1}$ between 2006 and 2010, while average C losses from forest disturbances were $191 \pm 10$ Tg C year$^{-1}$. Combining estimates of net C gains and net C losses results in net C change of $-269 \pm 49$ Tg C year$^{-1}$ (Fig. 2). These results are broadly




**Fig. 2** Average annual net carbon change (Tg C year$^{-1}$) at the combined county scale across the CONUS. Most combined counties (91%) are net C sinks while areas with extensive forest disturbance can be net C sources to the atmosphere

consistent with estimates reported in the US. GHG inventory for forests in 2010 (−293 Tg C year$^{-1}$, [33]) but we estimate a larger net sink than reported in Zheng et al. [28] (−181 Tg C year$^{-1}$), although the spatial and temporal domains varied across these analyses, as did the C pools included.

New forests, averaging 0.4 million ha per year, sequestered −8 ± 1 Tg C year$^{-1}$, while deforestation, averaging 0.1 million ha per year, resulted in C losses of 6 ± 1 Tg C year$^{-1}$. Forest land remaining forest land lost 184 ± 10 Tg C year$^{-1}$ to disturbance (13% from natural disturbance, 87% from harvest); these were compensated by net carbon gains of 452 ± 48 Tg C year$^{-1}$, 75% of which occurred within timberland areas (Table 4). C losses from natural and human induced disturbances reduced the potential net C sink in US forests by 42% compared to the potential sink estimated without disturbance effects included, an estimate that is similar to other studies [28, 34].

Regional variation in net C change across the nation was substantial. The South sequestered more C in growing forests (−271 ± 28 Tg C year$^{-1}$) than the North (−97 ± 10 Tg C year$^{-1}$) or the West (−92 ± 11 Tg C year$^{-1}$), while at the same time losing more C to the atmosphere from disturbances (105 ± 6 Tg C year$^{-1}$) than the other regions (41 ± 2 Tg C year$^{-1}$ for the North and 44 ± 3 Tg C year$^{-1}$ for the West). Forest C change in the South was substantial, in terms of both C losses and gains, because this region is home to a majority of the wood harvest occurring in the US (60% of all C loss from harvest occurred in the South), and is therefore also home to the largest area of regenerating forests that are sequestering C at high rates. At the state level, the highest C losses occurred in the forests of Georgia, Alabama, Washington, Mississippi, Louisiana, and Oregon, with each of these states losing more than 11 Tg C year$^{-1}$ (Table 5). Georgia, Florida, Alabama, Mississippi, and North Carolina gained the most forest C in the time period, with each sequestering at least 24 Tg C year$^{-1}$. C gains exceeded C losses in all states. Forests in approximately 6% of combined counties were a net source of C to the atmosphere (Fig. 2).

We estimated net C losses from six separate disturbance processes: fire, insect infestation, wind, timber harvest, land use conversion, and drought (Fig. 3). C losses from harvest (162 ± 9.9 Tg C year$^{-1}$) were more than five times higher than losses from all other processes combined (30 ± 2.6 Tg C year$^{-1}$). Fire (7 ± 1.0 Tg C year$^{-1}$), wind (5 ± 0.7 Tg C year$^{-1}$), insect infestation (10 ± 1.3 Tg C year$^{-1}$), and deforestation (6 ± 0.7 Tg C year$^{-1}$) each contributed a similar magnitude of C losses across the CONUS, while drought

**Table 4 Average annual net C change (Tg C year$^{-1}$) across US forests between 2006 and 2010, disaggregated into categories of non-forest land to forest land, forest land to non-forest land, and forest land remaining forest land**

| Category | Area (Mha year$^{-1}$) | Net C gain (Tg C year$^{-1}$) | Net C loss (Tg C year$^{-1}$) |
|---|---|---|---|
| Non-forest land to forest land | 0.4 | −8 ± 1 | |
| Forest land to non-forest land | 0.1 | | 6 ± 1 |
| Forest land remaining forest land | 221.1 | −452 ± 47 | 185 ± 10 |
| Insect damage | 0.9 | | 9 ± 1 |
| Forest fire | 0.6 | | 7 ± 1 |
| Wind damage | 0.6 | | 5 ± 1 |
| Drought | 0.8 | | 1 ± 0 |
| Timberlands | 152.0 | −342 ± 42 | 162 ± 10 |
| Undisturbed forest | 54.9 | −109 ± 19 | |
| Total | 221.6 | −460 ± 48 | 191 ± 10 |
| Net C change | | | −269 ± 49 |

Results are further disaggregated by disturbance type within the forest land remaining forest land category

accounted for about 1 ± 0.2 Tg C year$^{-1}$. Individual disturbances had spatially distinct distributions (Fig. 4a). On average, drought affected areas had C sequestration rates 20% lower than drought-free areas.

C losses in the South were highest (105 ± 6 Tg C year$^{-1}$) with the highest fractional contributions from harvest (92%) and wind (5%), with a particularly high concentration of loss coming from the South Central region (including the states of Texas, Oklahoma, Mississippi, Louisiana, Kentucky, Tennessee, Alabama, and Arkansas; Fig. 4b). The West had the second highest C loss (44 ± 3 Tg C year$^{-1}$) with significant contributions from harvest (66%), fire (15%), and insects (13%). The North had the lowest C loss (41 ± 2 Tg C year$^{-1}$) with most significant proportional contributions coming from harvest (86%), insect damage (9%), and conversion (3%).

Our results can also be used to estimate net C impacts of localized disturbances at finer spatial scales. A tornado struck Lakewood, Wisconsin on 7 June 2007 and caused severe forest damage, resulting in net C loss of more than 0.3 Tg C across a 13,000 ha swath (Fig. 5a). The wild fire in southern California's Santa Barbara County, termed the "Zaca" fire, started on 4 July 2007 and caused extensive damage to more than 97,000 ha of forest in the Los Padres National Forest, resulting in net C loss of more than 4 Tg C (Fig. 4b).

The highest fractional contribution of C loss in all states was from harvest (Table 4), and 64% of these losses were from logging residues [both above- (19%) and below-ground (23%)] and mill residues (22%). Across all wood product classes, the production of pulpwood resulted in the highest forest C losses (26 Tg C year$^{-1}$), followed by saw logs (18 Tg C year$^{-1}$), although a high proportion of C in saw logs is in use or in landfills, both which are considered to be long-term C storage (Fig. 6).

## Discussion

### Comparison with other studies

We estimate that Hurricanes Gustav and Ike in 2008, the only two hurricanes above category 2 to make landfall during the study period, damaged forests in Texas and Louisiana and led to net C change of more than 22 ± 2 Tg C (or 4 ± 0.5 Tg C year$^{-1}$ on average over the 5 year period). Other studies report average annual C loss in US forests due to hurricane damage in the 20th century of 14 Tg C year$^{-1}$ [35]. Zhou et al. [36] estimate total C emissions from wood harvest in 35 eastern US states as 168 Tg C year$^{-1}$ between 2002 and 2010, while our estimate for the same geographic extent is 132 ± 8 Tg C year$^{-1}$ between 2006 and 2010. Other national scale estimates of emissions from wood harvest are lower, such as that of Williams et al. [37] (107 Tg year$^{-1}$ in 2005) and Powell et al. [34] (74 Tg C year$^{-1}$ between 1986 and 2004). Hicke and Zeppel [38] estimated that bark beetles and fire together resulted in gross emissions of 32 Tg C year$^{-1}$ in the western US between 1997 and 2010. We estimate that insects and fire resulted in net C change of 17 ± 2 Tg C year$^{-1}$ between 2006 and 2010. We conclude that, given the different spatial extents, time periods and C pools included, results from our analysis that cover all disturbance types are broadly consistent with these and other more specialized studies (see Williams et al. [39] for a comprehensive review).

### Priorities for improved forest carbon change estimates

Results generated from this analysis are dependent on the algorithm that assigns each hectare of forest land to a category that is then associated with a C stock change value. By including spatial data sets of carbon stocks and disturbance from remote sensing observations, the

**Table 5 State level estimates of forest area in 2005 (millions of ha), net C gains, net C losses, and net C change (Tg C $year^{-1}$) together with the percent of C loss attributable to harvest, drought, fire, wind, insect infestation, and land use conversion within the state**

| State | Forest area | C gain | C loss | Net C change | Fire (%) | Insect (%) | Wind (%) | Conversion (%) | Drought (%) | Harvest (%) |
|---|---|---|---|---|---|---|---|---|---|---|
| Alabama | 8.5 | −27.3 | 12.5 | −14.9 | 0 | 1 | 0 | 1 | 0 | 97 |
| Arizona | 2.0 | −2.4 | 0.4 | −1.9 | 22 | 0 | 1 | 0 | 0 | 77 |
| Arkansas | 7.4 | −22.6 | 8.6 | −14.0 | 1 | 2 | 0 | 2 | 0 | 95 |
| California | 9.3 | −16.8 | 9.4 | −7.4 | 32 | 0 | 7 | 1 | 0 | 60 |
| Colorado | 5.1 | −6.7 | 0.3 | −6.3 | 8 | 0 | 0 | 1 | 0 | 92 |
| Connecticut | 0.9 | −1.2 | 0.2 | −1.0 | 0 | 0 | 1 | 31 | 0 | 68 |
| Delaware | 0.2 | −0.2 | 0.1 | −0.1 | 0 | 0 | 0 | 4 | 0 | 95 |
| District of Columbia | <0.1 | 0.0 | 0.0 | 0.0 | 0 | 0 | 0 | 100 | 0 | 0 |
| Florida | 6.4 | −28.5 | 6.3 | −22.2 | 3 | 0 | 0 | 3 | 0 | 94 |
| Georgia | 9.4 | −33.2 | 14.4 | −18.8 | 1 | 1 | 0 | 2 | 0 | 96 |
| Idaho | 7.1 | −10.2 | 4.9 | −5.3 | 29 | 0 | 23 | 0 | 0 | 48 |
| Illinois | 2.3 | −2.8 | 1.1 | −1.7 | 0 | 0 | 0 | 3 | 0 | 97 |
| Indiana | 2.3 | −2.8 | 1.7 | −1.1 | 0 | 0 | 3 | 1 | 0 | 95 |
| Iowa | 1.2 | −1.5 | 0.4 | −1.1 | 0 | 1 | 0 | 3 | 0 | 96 |
| Kansas | 0.9 | −1.1 | 0.2 | −0.9 | 0 | 1 | 0 | 3 | 0 | 95 |
| Kentucky | 5.7 | −11.5 | 3.3 | −8.2 | 1 | 0 | 0 | 6 | 0 | 93 |
| Louisiana | 5.4 | −18.0 | 11.1 | −6.9 | 0 | 19 | 0 | 1 | 0 | 79 |
| Maine | 6.8 | −7.7 | 6.7 | −0.9 | 0 | 0 | 15 | 1 | 0 | 84 |
| Maryland | 1.2 | −1.5 | 0.8 | −0.8 | 0 | 0 | 6 | 7 | 0 | 86 |
| Massachusetts | 1.5 | −1.9 | 0.6 | −1.3 | 0 | 0 | 4 | 18 | 0 | 78 |
| Michigan | 8.5 | −10.3 | 4.3 | −6.0 | 0 | 0 | 1 | 1 | 11 | 87 |
| Minnesota | 7.7 | −9.5 | 3.2 | −6.3 | 1 | 0 | 3 | 1 | 0 | 96 |
| Mississippi | 7.0 | −24.3 | 11.6 | −12.7 | 0 | 2 | 0 | 2 | 0 | 96 |
| Missouri | 7.1 | −8.7 | 2.7 | −6.0 | 1 | 2 | 0 | 4 | 0 | 93 |
| Montana | 7.3 | −8.6 | 5.0 | −3.5 | 14 | 0 | 49 | 0 | 0 | 37 |
| Nebraska | 0.3 | −0.4 | 0.1 | −0.2 | 2 | 1 | 0 | 0 | 0 | 97 |
| Nevada | 0.7 | −0.8 | 0.1 | −0.7 | 15 | 0 | 0 | 0 | 0 | 84 |
| New Hampshire | 2.1 | −2.6 | 0.8 | −1.8 | 0 | 2 | 4 | 6 | 0 | 88 |
| New Jersey | 1.0 | −1.3 | 0.5 | −0.8 | 2 | 0 | 40 | 14 | 0 | 43 |
| New Mexico | 2.6 | −3.2 | 0.3 | −2.8 | 33 | 0 | 16 | 0 | 0 | 51 |
| New York | 8.3 | −10.7 | 3.1 | −7.6 | 0 | 0 | 5 | 4 | 0 | 91 |
| North Carolina | 7.6 | −23.7 | 9.6 | −14.1 | 0 | 0 | 0 | 1 | 2 | 95 |
| North Dakota | 0.2 | −0.3 | 0.0 | −0.3 | 0 | 1 | 0 | 2 | 0 | 96 |

**Table 5 continued**

| State | Forest area | C gain | C loss | Net C change | Fire (%) | Insect (%) | Wind (%) | Conversion (%) | Drought (%) | Harvest (%) |
|---|---|---|---|---|---|---|---|---|---|---|
| Ohio | 3.6 | −4.4 | 1.2 | −3.2 | 0 | 0 | 7 | 7 | 0 | 86 |
| Oklahoma | 3.6 | −9.0 | 1.6 | −7.3 | 2 | 2 | 0 | 3 | 0 | 94 |
| Oregon | 9.2 | −20.6 | 11.1 | −9.6 | 4 | 0 | 2 | 6 | 0 | 88 |
| Pennsylvania | 7.6 | −9.8 | 4.0 | −5.8 | 0 | 0 | 13 | 3 | 0 | 84 |
| Rhode Island | 0.2 | −0.2 | 0.1 | −0.2 | 0 | 0 | 3 | 11 | 0 | 85 |
| South Carolina | 4.8 | −18.4 | 6.5 | −11.9 | 1 | 1 | 0 | 2 | 0 | 97 |
| South Dakota | 0.5 | −0.6 | 0.2 | −0.3 | 2 | 0 | 0 | 0 | 0 | 98 |
| Tennessee | 6.2 | −14.2 | 4.0 | −10.1 | 0 | 1 | 0 | 3 | 0 | 95 |
| Texas | 7.9 | −23.3 | 9.8 | −13.6 | 1 | 23 | 0 | 2 | 0 | 74 |
| Utah | 2.2 | −2.2 | 0.3 | −1.8 | 24 | 0 | 38 | 0 | 0 | 38 |
| Vermont | 2.0 | −2.5 | 0.6 | −1.9 | 0 | 0 | 2 | 1 | 0 | 96 |
| Virginia | 6.7 | −16.5 | 6.1 | −10.4 | 1 | 0 | 0 | 2 | 0 | 97 |
| Washington | 7.9 | −17.3 | 11.7 | −5.6 | 3 | 0 | 8 | 19 | 0 | 70 |
| West Virginia | 5.3 | −6.9 | 2.5 | −4.4 | 0 | 0 | 1 | 6 | 0 | 93 |
| Wisconsin | 7.2 | −8.4 | 6.3 | −2.0 | 0 | 1 | 23 | 0 | 5 | 70 |
| Wyoming | 2.7 | −3.3 | 0.8 | −2.5 | 21 | 0 | 25 | 0 | 0 | 54 |
| Total | 221.5 | −459.5 | 191.1 | −268.4 | 4 | 3 | 5 | 3 | 1 | 85 |




**Fig. 3** Average annual net carbon loss (Tg C year$^{-1}$) attributed to the most likely disturbance type and estimated at the combined county scale for harvest, fire, land use conversion, wind, insect, and drought. Combining these six sources results in estimates of total annual net C loss from disturbance occurring between 2006 and 2010

methodology avoids making gross assumptions on the regional distribution of carbon stocks and disturbance, thus improving estimates of C loss. The strength of this approach is estimated in the uncertainty analysis. Our framework is therefore completely dependent on the underlying data sources and, as the data improve, so will the estimates. Although the US is among the world's leaders in technology and open data, where high quality geospatial datasets are publicly available and inventory programs are maintained by various federal and state agencies, opportunities for improvement remain.




**Fig. 4** Average annual net carbon change by disturbance type in **a** the North (79 million ha of forest), South (87 million ha), and West (56 million ha) regions and **b** by FIA region: northeast (NE; 41 million ha), southeast (SE; 35 million ha), southcentral (SC; 52 million ha), northern lake states (NLS; 23 million ha), northern plains states (NPS; 15 million ha), pacific west (PW; 17 million ha), rocky mountain northern (RMN; 14 million ha), rocky mountain southern (RMS; 15 million ha), and the pacific southwest (PSW; 9 million ha)




**Fig. 5** The forest carbon accounting framework implemented here can be useful in assessing carbon impacts of localized disturbances. **a** 2007 tornado in Lakewood, Wisconsin. The tornado track from NOAA (*right*) resulted in extensive impacts to the forest, which is evident in an aerial photo (*left*) and in the resulting estimate of net carbon change (center, in units of Mg C $ha^{-1}$). **b** 2007 wild fire in southern California's Santa Barbara County, termed the "Zaca" fire. A photo of the blaze (*left*) highlights the fire intensity, which is mirrored in the burn severity map (*right*, MTBS) and the resulting net carbon change estimate (*center*, in units of Mg C $ha^{-1}$)




**Fig. 6** Fate of C harvested from US forestlands in the year 2007, with some stored in use and landfills and the rest emitted within 100 years. *PPP* posts, poles and pilings

### *Priorities for FIA data collection*

All forest inventory data used to estimate changes in the above- and belowground C stocks in this analysis come from FIA plots measured more than once. However, many more FIA plots have been re-measured in the North and South regions of the US than in the West. The limited number of re-measured FIA plots in the West resulted in higher uncertainties in net C stock change estimates and, in some disturbance categories, required the imputation of estimates obtained from other regions (Tables 1, 2). As the FIA program continues national implementation of an annual inventory (including re-measurement), the FIA data used in this analysis can be revised accordingly so that the sample size of plots per disturbance type increases and uncertainties decrease. Until the early 2000s, the FIA program measured only live tree attributes (e.g., tree diameter) allowing for the estimation of aboveground C and modelling of the other pools based on regions, live tree, and site characteristics (although the dead wood pool was measured in some states). Therefore, we estimated changes in the aboveground C pool using measured data while we relied on models to estimate belowground C. The FIA program is in the process of replacing model predictions of C in the dead wood, litter, and soil organic C pools with estimates obtained from measurements of these pools on a subset of FIA plots [40]. These pools, excluded from the current

analysis, can be included in our framework as new data are collected.

#### *Priorities for non-forest lands*

Our analysis focused on forest areas defined in part by the NLCD data that is based on the interpretation of Landsat imagery. Comparison of our 1-ha map of carbon density of forestlands based on NLCD with high resolution lidar data over the state of Maryland has shown a significant underestimation of carbon stocks in highly fragmented and mixed urban and forest landscapes [41]. These small scale forests cover substantial areas of densely populated and fragmented landscapes of the eastern United States and appear to be highly dynamic. There is information on the disturbance and recovery of these forests over the time frame of our study, but our analysis has ignored carbon sources and sinks from these lands. By improving the carbon inventory and satellite observations to capture small scale changes, the uncertainty of carbon fluxes, particularly over the Eastern states, may be reduced. In the future (post-2020), planned satellite observations of the aboveground structure of forests by GEDI and NISAR from the National Aeronautics and Space Administration (NASA) and BIOMASS from the European Space Agency should improve the annual inventory of forest C change, as should the planned collection of FIA plot data in urban and woodland areas.

#### *Priorities for UNFCCC reporting*

Although the US has data on the magnitude of area change across land use categories, it does not have reliable and comprehensive estimates of C stocks across the entire reporting time series (e.g., 1990–2014 for the most recent UNFCCC submission) and full matrix of land use and land-use change categories to report these changes separately. For this reason, in its GHG inventory submission the US has historically deviated from IPCC guidance by reporting together C stock changes from afforestation and forest management as "forest land remaining forest land", while emissions associated with a land use conversion from forest land to a non-forest land use are reported in the non-forest land use category (per IPCC guidance). For the first time in its 2016 submission [16, 17], the US delineated net C stock changes from afforestation separately from forest land remaining forest land. An additional data need is refined C stock monitoring on non-forest lands and better coordination among land use categories to ensure complete accounting and avoidance of double counting. Our spatially resolved analysis approach allowed us to disaggregate net C change into subcategories of non-forest land to forest land ($-8 \pm 1$ Tg C year$^{-1}$), forest land to non-forest land ($6 \pm 1$ Tg C year$^{-1}$), and forest land remaining forest land ($-267$ Tg C year$^{-1}$). While the sole focus on net processes within the forest land use category in this study does not fully solve complete C accounting issues across all land uses, the methods used in this research are an incremental improvement toward resolving components of net C change within the forest land category, and these results can help inform and refine US reporting in the future.

#### *Priorities for improving disturbance attribution*

Insect and disease aerial detection surveys (ADS) are conducted annually using a variety of light aircraft by the USDA Forest Service in collaboration with other state and federal cooperators. Overview surveys map the current year's forest impact, and some regions have been conducting ADS for more than 60 years while others have become more active only within the last decade. Therefore, annual maps of insect damage with full coverage of all US forestlands are not available, but areas most likely to be affected by insect damage are surveyed more frequently. We accounted for the lack of continuous data coverage in our uncertainty analysis by assuming a 5% bias in underreported area. The Monitoring Trends in Burn Severity (MTBS) dataset, sponsored by the Wildland Fire Leadership Council, consistently maps the burn severity and perimeters across all lands of the US since 1984. Although 30 m resolution imagery is used for analysis, the minimum mapping unit for delineating fire perimeters is greater than 1000 acres (404 ha) in the West and 500 acres (202 ha) in the East. Therefore, burned forest areas smaller than these patch sizes were excluded from our analysis.

#### *Priorities for wood harvest data collection*

Information on the primary anthropogenic source of C loss in US forests—wood harvest—is available only at the level of combined counties. TPO data allow for the estimation of C losses from the extraction of wood products that are not readily detected by remote sensing observations, including the most recent Landsat based tree cover loss data from Hansen et al. [8]. We examined the relationship between TPO estimated C losses and a remote sensing-based estimate of C losses from forest disturbance that could not be readily linked to another disturbance type (i.e. wind, insect, fire, or conversion). For this comparative analysis, we assumed all tree cover loss pixels in Hansen et al. [8] data that could not be linked to another disturbance type were harvested, and subsequent C loss was estimated via our FIA look-up table approach. When aggregated to the state level, these two independent estimates of C loss associated with harvest were highly correlated (Fig. 7), and the remote




**Fig. 7** Relation between C losses from harvest as estimated from timber product output (TPO) data and from an independent remote sensing-based estimate. TPO = 1.98 × RS + 767,777; $R^2 = 0.91$). Data points represent results aggregated to the state-level

sensing-based estimates of (net) C loss from harvest were approximately half of the (gross) TPO-based estimates. This provides indications that: (1) Landsat-based remote sensing observations likely miss a significant proportion of harvest activity due to partial loss, rather than full loss, of tree canopy cover; and (2) the additional C loss not identified by the remote sensing approach is spatially proximate to larger scale C losses from harvest, at least at the state scale. Increased transparency on the spatial location, timing and type of harvesting occurring across the US would allow more explicit attribution of forest C fluxes to specific forest management activities.

### Managing US forests for climate change mitigation

Globally, the US ranks fourth in terms of forest area [42, 8]. Although large C losses occur from US forests as a result of an active wood products industry, particularly in the US South, 76% of the total US net carbon sink (342 Tg C year$^{-1}$) occurred within timberland areas, more than half of which are privately owned [43]. The income received by landowners from Intensive forest management may reduce the likelihood of forest conversion to development, but in the absence of all disturbance effects, we estimate a potential C sink between 2006 and 2010 of −460 and −436 Tg C year$^{-1}$ if only non-harvest disturbance effects (fire, drought, wind, insect damage, land-use conversion) are considered. The US has also committed to restoring 15 Mha of forest land [44], which could further increase the C sink capacity of US forests. This implies that the US C sink could be increased substantially if existing forest land were managed to achieve this goal.

In addition to sequestering and storing atmospheric carbon, US forests also generate wood products that support the energy, industry, transport and building sectors both domestically and internationally. Given that wood harvest represents the majority of C losses from US forests, increasing the US net forest C sink would require shifts in current forest management practices as well as more refined and disaggregated information to reduce the uncertainty of these estimates and resolve these with correct estimation of net C change. For example, national debate has grown over the production of wood pellets as a renewable energy source, particularly from the southeast US, with demand driven by European policies to reduce emissions of greenhouse gases and increase the use of renewable energy. Georgia, Florida, Alabama and Virginia currently account for nearly all US wood pellet exports [45]. Although wood pellets are claimed by the industry to be made from residues at lumber mills or logging sites, the industry's growth could lead to a substantial increase in demand on Southern forests, potentially creating incentives to expand plantations. The potential of bioenergy to reduce greenhouse gas emissions inherently depends on the source of the biomass and its net land use effects; bioenergy reduces greenhouse gas emissions only if the growth and harvesting of the biomass used for energy sequesters carbon above and beyond what would be sequestered anyway [46]. This additional carbon must result from land management changes that increase tree C uptake or from the use of biomass that would otherwise decompose rapidly.

New global emphasis on climate change mitigation as one of the many benefits that forests provide gives US

decision makers the opportunity to re-evaluate national and state policy agendas to consider not only the production of merchantable wood volume and biomass for bioenergy, but also enhanced C sequestration and storage for climate change mitigation. As recognized in the 2014 Farm Bill [47], there is a growing need to both reduce the uncertainty associated with estimating forest biomass and the associated monitoring of C dynamics across US forests. As it currently stands, the statistical power of detecting changes in forest C stocks exists only at large regional scales [48], disallowing the detection of C change at policy-relevant scales such as encountered in the pellet industry. Continued research to both downscale forest C inventories and correctly attribute C change to natural and anthropogenic disturbance events is needed to empower forest management policy decisions.

## Conclusions

Achieving a global, economy-wide "balance between anthropogenic emissions by sources and removals by sinks" [1] will require both more emission reductions and more C sequestration from the forest sector. Results from this analysis indicate the location and estimated magnitude of C losses from different disturbances in absolute and relative terms, and can be used to track more explicitly which losses result from natural or anthropogenic disturbances. Our national net C change estimate of $-269 \pm 49$ Tg C year$^{-1}$ is within the range of previously reported estimates, and provides spatially explicit estimates and attribution of changes to different types of disturbances. Data are synthesized from various US agencies into a common framework, which could improve inter-agency dialogue to ensure complete accounting and to avoid double counting within and between land use categories. This work may also improve collaboration that drives a more efficient and participatory process for allocating resources towards activities that meet common goals, including an increased focus on climate change mitigation. The methodological framework and accompanying results allow US policymakers and negotiators to better understand the causes of forest C change more completely so that they can participate more effectively in domestic policy discussions about forest management and monitoring as well as in international negotiations. Integration of results from this and other studies should further enable the development of future US GHG inventories that include disturbance attribution and full land use change accounting in expectation of post-2020 commitment requirements.

#### Authors' contributions

NH, SH, SS, CW, SB and WS designed the study. SH, NH and TP conducted the analysis. CW, BW and GD compiled the FIA and TPO datasets. SS, YY and AF produced the biomass maps. SH implemented model runs and designed and conducted the uncertainty analysis. BB provided guidance on C modeling and on technical implementation of the methods. SH produced figures and tables. NH and SH wrote the paper. All authors reviewed the final manuscript. All authors read and approved the final manuscript.

#### Author details

[1] Ecosystem Services Unit, Winrock International, 2121 Crystal Drive Suite 500, Arlington, VA 22202, USA. [2] Applied Geosolutions, 55 Main Street Suite 125, Newmarket, NH 03857, USA. [3] NASA Jet Propulsion Laboratory, California Institute of Technology, Pasadena, CA 91109, USA. [4] USDA Forest Service, Northern Research Station, Saint Paul, MN 55108, USA. [5] Present Address: Forests Program, World Resources Institute, 10 G Street NE Suite 800, Washington, DC 20002, USA.

#### Acknowledgements

This study was made possible by an inter-institutional grant from NASA's Carbon Monitoring System Program (Grants # NNX12AN72G and NNX12AP07G) that supported Applied GeoSolutions, Winrock International, the USDA Forest Service, NASA JPL and NASA Ames. We thank C. Ipsan for assistance with the creation of figures.

#### Competing interests

The authors declare that they have no competing interests.

#### Availability of data and materials

The datasets supporting the conclusions of this article are available on the ORNL DAAC website (http://daac.ornl.gov/).

Received: 1 August 2016 Accepted: 3 November 2016
Published online: 14 November 2016

#### References

1. UNFCCC. Report of the conference of the parties on its twenty-first session, held in Paris from 30 November to 13 December 2015. 2016. http://unfccc.int/resource/docs/2015/cop21/eng/10a01.pdf. Accessed Mar 2016.
2. Ciais P, Sabine C, Bala G, Bopp L, Brovkin V, Canadell J, Chhabra A, DeFries R, Galloway J, Heimann M, Jones C, Quéré C, Myneni RB, Piao S, Thornton P. Carbon and other biogeochemical cycles. In: Stocker TF, Qin D, Plattner G-K, Tignor M, Allen SK, Boschung J, Nauels A, Xia Y, Bex V, Midgley PM, editors. Climate change 2013: the physical science basis. Contribution of working group I to the fifth assessment report of the intergovernmental panel on climate change. Cambridge University Press, Cambridge; 2013.
3. Houghton, et al. A role for tropical forests in stabilizing atmospheric $CO_2$. Nat Clim Change. 2015;5:1022–3.
4. Moscarro VS, Coops NC, Kurz WA, Olguin M. Choice of satellite imagery and attribution of changes to disturbance type strongly affects forest carbon balance estimates. Carbon Balance Manag. 2015;10:30.
5. Saatchi SS, et al. Benchmark map of forest carbon stocks in tropical regions across three continents. Proc Natl Acad Sci USA. 2011;108(24):9899–904. doi:10.1073/pnas.1019576108.
6. Harris NL, Brown S, Hagen SC, Saatchi SS, Petrova S, Salas W, Lotsch A. Baseline map of carbon emissions from deforestation in tropical regions. Science. 2012;336(6088):1573–6.
7. Baccini A, Goetz S, Walker WS, et al. Estimated carbon dioxide emissions from tropical deforestation improved by carbon-density maps. Nat Clim Change. 2012;2:182–5.
8. Hansen MC, et al. High-resolution global maps of 21st-century forest cover change. Science. 2013;342(6160):850–3.
9. Achard F, Beuchle R, Mayaux P, Stibig HJ, Bodart C, Brink A, Carboni S, Desclee B, Donnay F, Eva HD, Lupi A, Rasi R, Seliger R, Simonetti D. Determination of tropical deforestation rates and related carbon losses from 1990 to 2010. Glob Change Biol. 2014;20:2540–54.
10. Tyukavina A, Baccini A, Hansen MC, Potapov PV, Stehman SV, Houghton RA, Krylov AM, Turubanova S, Goetz S. Aboveground carbon loss in natural and managed tropical forests from 2000 to 2012. Environ Res Lett. 2015;10:101002.
11. Kim DH, Sexton JO, Townshend JR. Accelerated deforestation in the humid tropics from the 1990s to the 2000s. Geophys Res Lett. 2015;42:3495–501.

12. Zarin DJ, Harris NL, Baccini A, et al. Can carbon emissions from tropical deforestation drop by 50% in 5 years? Glob Change Biol. 2016;22:1336–47.
13. Marvin DC, Asner GP. Spatially explicit analysis of field inventories for national forest carbon monitoring. Carbon Balance Manag. 2016;11:9.
14. Houghton RA, House JI, Pongratz J, van der Werf GR, DeFries RS, Hansen MC, Le Quere C, Ramankutty N. Carbon emissions from land use and land cover change. Biogeosciences. 2012;9:5125–42.
15. IPCC. Guidelines for national greenhouse gas inventories—volume 4: agriculture, forestry, and other land use (AFOLU). 2006. http://www.ipccnggip.iges.or.jp/public/2006gl/vol4.html. Accessed Mar 2016.
16. Woodall CW, Coulston JW, Domke GM, Walters BF, Wear DN, Smith JE, Anderson H-E, Clough BJ, Cohen WB, Griffith DM, Hagan SC, Hanou IS, Nichols MC, Perry CH, Russell MB, Westfall JA, Wilson BT. The US forest carbon accounting framework: stocks and stock change 1990–2016. Gen Tech Rep NRS-154. Newtown Square: US Department of Agriculture, Forest Service, Northern Research Station; 2015.
17. US EPA. Forest sections of the Land use change and forestry chapter, and Annex. US Environmental Protection Agency, inventory of US greenhouse gas emissions and sinks: 1990–2014. EPA 430-R-16-002. 2016. https://www3.epa.gov/climatechange/Downloads/ghgemissions/US-GHG-Inventory-2016-Main-Text.pdf. Accessed Oct 2016.
18. Penman J, Gytarsky M, Hiraishi T, Krug T, Kruger D, Pipatti R, Buendia L, Miwa K, Ngara T, Tanabe K, Wagner F. Intergovernmental panel on climate change Good practice guidance for land use, land-use change and forestry. Hayama: Institute for Global Environmental Strategies (IGES) for the Intergovernmental Panel on Climate Change; 2003. Available at: http://www.ipccnggip.iges.or.jp/public/gpglulucf/gpglulucf_files/GPG_LULUCF_FULL.pdf. Accessed 18 Nov 2016.
19. Heath LS, Birdsey RA. Carbon trends of productive temperate forests of the coterminous United States. In: Terrestrial biospheric carbon fluxes quantification of sinks and sources of $CO_2$. Netherlands: Springer; 1993. p. 279–93.
20. Nowak DJ, Greenfield EJ. Evaluating the national land cover database tree canopy across the conterminous United States: a comparison with photo-interpreted estimates. Environ Manag. 2010;46:378.
21. Curtis RO, Marshall DD. Why quadratic mean diameter? West J Appl For. 2000;15(3):137–9.
22. Zhang G, Ganguly S, Nemani RR, White MA, Milesi C, Hashimoto H, Myneni RB. Estimation of forest aboveground biomass in California using canopy height and leaf area index estimated from satellite data. Remote Sens Environ. 2014;151:44–56.
23. Phillips SJ, Anderson RP, Shapire RE. Maximum entropy modeling of species geographic distributions. Ecol Model. 2006;190:231–59.
24. Weisbin CR, Lincoln W, Saatchi S. A systems engineering approach to estimating uncertainty in above-ground biomass (AGB) derived from remote-sensing data. Syst Eng. 2014;17(3):361–73.
25. Jenkins J, Chojnacky D, Heath L, Birdsey R. National-scale biomass estimators for United States tree species. For Sci. 2003;49(1):12–35.
26. Cairns MS, Brown S, Helmer E, Baumgardner GA. Root biomass allocation in the world's upland forests. Oecologia. 1997;111:1–11.
27. Mokany K, Raison R, Prokushkin AS. Critical analysis of root:shoot ratios in terrestrial biomes. Glob Change Biol. 2006;12:84–96.
28. Zheng D, Heath LS, Ducey MJ, Smith JE. Carbon changes in conterminous US forests associated with growth and major disturbances: 1992–2001. Environ Res Lett. 2011;6:014012. doi:10.1088/1748-9326/6/1/014012.
29. FIA fiscal year 2013 business report. http://www.fia.fs.fed.us/library/bus-org-documents/docs/FIA_Annual_Report_2013.pdf. Accessed Apr 2016.
30. Miles PD, Smith WB. Specific gravity and other properties of wood and bark for 156 tree species found in North America. Newtown Square: USDA For Ser North Res Stn Res Note NRS-38; 2009.
31. Smith JE, Heath LS, Skog KE, Birdsey RA. Methods for calculating forest ecosystem and harvested carbon with standard estimates for forest types of the United States. Newtown Square: USDA For Ser North Res Stn Gen Tech Rep NE-243; 2006.
32. Hagen SC, Braswell BH, Linder E, Frolking S, Richardson AD, Hollinger DY. Statistical uncertainty of eddy flux-based estimates of gross ecosystem carbon exchange at Howland forest, Maine. J Geophys Res Biosph. 2006;111:2156–202.
33. US EPA. Forest sections of the land use change and forestry chapter, and Annex. US Environmental Protection Agency, inventory of US greenhouse gas emissions and sinks: 1990–2012. EPA 430-R-14-003. 2013. http://www.epa.gov/climatechange/emissions/usinventoryreport.html. Accessed June 2016.
34. Powell SL, et al. Observation of trends in biomass loss as a result of disturbance in the conterminous US: 1986–2004. Ecosystems. 2014;17:142–57.
35. Fisk JP, et al. The impacts of tropical cyclones on the net carbon balance of eastern US forests (1851–2000). Environ Res Lett. 2013;8(4):045017.
36. Zhou D, Liu S, Oeding J, Zhao S. Forest cutting and impacts on carbon in the eastern United States. Sci Rep. 2013;3:3547. doi:10.1038/srep03547.
37. Williams CA, Collatz GJ, Masek J, Goward SN. Carbon consequences of forest disturbance and recovery across the coterminous United States. Global Biochem Cycles. 2012;26:GB1005. doi:10.1029/2010GB003947.
38. Hicke JA, Zeppel MJB. Climate-driven tree mortality: insights from the piñon pine die-off in the United States. New Phytol. 2013;200:301–3. doi:10.1111/nph.12464.
39. Williams CA, Gu H, MacLean R, Masek JG, Collatz GJ. Disturbance and the carbon balance of US forests: a quantitative review of impacts from harvests, fires, insects and droughts. Global Planet Change. 2016;143:66–80
40. Domke GM, Walters BF, Perry CH, Woodall CW, Russell MB, Smith JE. Estimating litter carbon stocks on forest land in the United States. Sci Total Environ. 2016;557–558:469–78.
41. Huang W, Swatantran A, Johnson K, Duncanson L, Tang H, O'Neil Dunne J, Hurtt G, Dubayah R. Local discrepancies in continental scale biomass maps: a case study over forested and non-forested landscapes in Maryland, USA. Carbon Balance Manag. 2015;10:19.
42. FAO. Forest resources assessment report. 2015. http://www.fao.org/forest-resources-assessment/current-assessment/en/n. Accessed Nov 2016.
43. Hewes Jaketon H, Butler Brett J, Liknes Greg C, Nelson Mark D, Snyder Stephanie A. Map of distribution of six forest ownership types in the conterminous United States. Newtown Square: US Department of Agriculture, Forest Service, Northern Research Station; 2014.
44. IUCN. The Bonn challenge. 2011. http://www.bonnchallenge.org/content/challenge. Accessed June 2016.
45. Goetzl A. Developments in the global trade of wood pellets. Office of industries working paper no. ID-039, US International Trade Commission. 2015. https://www.usitc.gov/publications/332/wood_pellets_id-039_final.pdf. Accessed June 2016.
46. Searchinger, et al. Fixing a critical climate accounting error. Science. 2009;326:527–8.
47. Agricultural Act of 2014. H. R. 2642; Pub. L. 113–79.
48. Westfall JA, Woodall CW, Hatfield MA. A statistical power analysis of woody carbon flux from forest inventory data. Clim Change. 2013;118:919–31.



**Submit your manuscript to a SpringerOpen journal and benefit from:**

- ▶ Convenient online submission
- ▶ Rigorous peer review
- ▶ Immediate publication on acceptance
- ▶ Open access: articles freely available online
- ▶ High visibility within the field
- ▶ Retaining the copyright to your article

**Submit your next manuscript at ▶ springeropen.com**

# UNITED STATES DEPARTMENT OF THE INTERIOR
# OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT
# &
# BUREAU OF LAND MANAGEMENT

## Colowyo Coal Mine
## Collom Permit Expansion Area Project
## Federal Mining Plan and Lease Modification
## Environmental Assessment

**Moffat County, Colorado**

**Federal Coal Leases COC-0123475 01 and COC-68590**
**January 2016**



**U.S. Department of the Interior**
**Office of Surface Mining Reclamation and Enforcement**
**Program Support Division**
**1999 Broadway, Suite 3320**
**Denver, CO 80202**
**PH: 303-293-5000**
**FAX: 303-293-5032**

**U.S. Department of the Interior**
**Bureau of Land Management**
**Little Snake Field Office**
**455 Emerson Street**
**Craig, CO 81625**
**PH: 970-826-5000**
**FAX: 970-826-5002**

should be used when basin specific data is unavailable. Tier 2 is the "Country or Basin Specific Method". Both methods are recommended by the IPCC for surface mining estimates.

A Tier 2 methodology was used to determine methane emissions estimates from extraction for both Alternative A and Alternative B. In addition to methane estimates from coal extraction, post-mining estimates were also determined. Tier 2 methodologies were used because emission factors associated with Rocky Mountain coal were available.

Alternative A assumes 5.1 mtpy (4.63 million metric tons [mmt]). The IPCC has supplied default emission factors for surface mining with a range of 0.3 to 2.0 $m^3$ $CH_4$/metric ton (mt) of coal. Basin specific factors are derived from the in-situ factors, which are based on geologic regions of the U.S. The Colowyo Coal Mine falls into the Rocky Mountain region with an in-situ basin methane emission factor for coal of 0.4 $m^3$ $CH_4$/mt. The second component of total surface mining methane emissions is the methane content of the surrounding strata. Total surface mining emissions typically produce twice as much methane as in-situ coal (EPA 2006). The surrounding strata are assumed to also have an emission factor of 0.4 $m^3$ $CH_4$/mt resulting in a total factor of 0.8 $m^3$ $CH_4$/mt. A factor of 0.67 Gg/$10^6$ $m^3$ was implemented as part of the conversion from cubic meters to metric tonnes.

Post-mining coal handling also contributes to overall methane emissions. Again, the in-situ emission factor is applied, but, to avoid overestimates, only the percentage of gas released is included in the calculation. On average, western U.S. coal retains 72 percent of the methane (Kirchgessner et al. 1996). Therefore, 28 percent is released during the post-mining handling process.

After aggregating the two processes (extraction and post-mining) and assuming 4.63 mmt/year coal extraction, the total methane emitted is 2,827 metric tonnes annually. Additionally, the extraction of all 74.1 mmt (81.7 million short tons) would generate approximately 49,922 metric tonnes of methane.

### Mining Combustion Gaseous GHG Emissions

The EPA regulates several GHGs, which primarily include carbon dioxide ($CO_2$), $CH_4$, and nitrous oxide ($N_2O$). There are several other regulated GHGs, such as refrigerants, that are not emitted by the mine. $CO_2$, $CH_4$, and $N_2O$ are byproducts of incomplete combustion and are emitted via tailpipe, blasting, and drilling. Each regulated GHG has an associated global warming potential (GWP). GWP was developed to allow for direct comparisons of global warming impacts of different gases. $CO_2$ is used as the reference gas and therefore has a GWP of 1. According to the EPA, $CH_4$, and $N_2O$ have GWPs over 100 years of 25 and 298, respectively. All associated GHG emissions are multiplied by each applicable GWP and aggregated together to obtain a final value of carbon dioxide equivalent ($CO_2e$) in units of metric tons.

Utilizing EPA emissions factors and the maximum mining rate of 5.1 mtpy, the direct GHG emissions associated with Alternative A are detailed **Table 4.3-5**. In 2011, 2,245 mmt of $CO_2e$ were emitted throughout the U.S. according to the EPA NEI database. Also, 130 mmt were emitted within Colorado as stated by the 2014 Colorado Greenhouse Gas Inventory Update. Alternative A would contribute 0.40 percent of the statewide total and 0.023 percent nationwide. In comparison, the amount associated with Alternative A would be insignificant. The emissions contributable to Alternative A would be much smaller when compared to the statewide and national GHG emissions.

## Black Carbon Emission Estimates

Black carbon is a significant component of particulate emissions related to incomplete combustion. Haul trucks and locomotive use of diesel fuel are sources of black carbon. As of 2005, 93 percent of all mobile source black carbon emissions came from diesel engines (EPA 2012). Black carbon directly absorbs light and reduces the reflection of heat off snow and ice as it gets deposited. Black carbon has been linked to climate impacts such as increased temperatures and accelerated ice and snow melt.

All haul truck types were evaluated for their contribution of black carbon as a percentage of overall particulate (**Table 4.3-6**). All 240T trucks were assumed 830E Komatsu haul trucks, which all have a "2007-plus" engine. The 50T haul trucks are "pre-2007" engines. The EPA has determined black carbon to be a higher percentage of particulate matter when emitted from engines constructed prior to 2007. There is a drastic reduction for newer engines because of better design and use of diesel particulate filters (DPFs). The carbon black percentage of pre-2007 trucks is 78.97 percent compared to 9.98 percent for post-2007 trucks (MOVE 2014). Passenger vehicles also contribute to black carbon emissions, but it is approximately an order of magnitude less.

**Table 4.3-5 Direct GHG Emissions (metric tons/yr), Alternative A**

| Activity | $CO_2$ | $CH_4$ | $N_2O$ | $CO_2e$ |
|---|---|---|---|---|
| Scrapers[5] | 2,993 | 0.17 | 0.08 | 3,020 |
| Drills[8] | 26,103 | 1.05 | 0.20 | 26,191 |
| Dozers[3] | 25,171 | 1.41 | 0.64 | 25,398 |
| Graders[4] | 131,812 | 7.37 | 3.36 | 132,999 |
| Haul Trucks (240T)[6] | 50,375 | 1.26E-02 | 0.01 | 50,379 |
| STA Haul Trucks (50T)[7] | 2,484 | 2.6E-03 | 2.4E-03 | 2,485 |
| Collom Haul Trucks (50T)[7] | 6,312 | 6.6E-03 | 6.2E-03 | 6,314 |
| Water Trucks[1] | 14,916 | 0.015 | 0.01 | 14,921 |
| Blasting[2] | 185,053 | 6.54 | 1.63 | 185,704 |
| Access Road | 62 | 3.58E-03 | 7.30E-03 | 64 |
| Rail Maintenance | 602 | 0.04 | 6.85E-03 | 605 |
| Methane Release | -- | 2,827 | -- | 70,675 |
| **Total** | **445,885** | **2,844** | **6.0** | **518,754** |

[1] All water trucks use the same engine as the 793C haul trucks; assumes 10 mph speed
[2] Blasting assume 400 tons of ANFO per blast
[3] Assumes an average of 25 gal/hr fuel consumption from Caterpillar Performance Handbook edition 42 - D-11 T tractors medium consumption rate
[4] Assumes an average of 15 gal/hr fuel consumption from Caterpillar Performance Handbook edition 42 - 24 M graders medium consumption rate
[5] Assumes an average of 24 gal/hr fuel consumption from Caterpillar Performance Handbook edition 29 - 637E scrapers medium consumption rate; also average speed of 8 mph
[6] Assumes an average of 50 gal/hr fuel consumption from Komatsu Application Handbook Edition 30 - 830E haul truck high consumption rate; also average speed of 25 mph (real time fleet data)
[7] Weststar 6900XD; average speed of 25 mph; 120 gallon tank assumed to be filled after each 10 hr shift - 12 gal/hr fuel consumption
[8] Assumes 1,200 gal diesel consumed per day

**Table 4.3-6 Black Carbon Emissions (tpy) from Haul Trucks, Alternative A**

| Haul Truck | Black Carbon $PM_{2.5}$ | Black Carbon $PM_{10}$ |
|---|---|---|
| 50 Ton | 0.056 | 0.066 |
| 240 Ton | 0.302 | 0.329 |
| Access Road | 5.39E-04 | 5.82E-04 |

USDA

United States Department of Agriculture

Forest Service

United States Department of Interior

Bureau of Land Management

Office of Surface Mining Reclamation Enforcement

State of Colorado

Division of Reclamation Mining and Safety

**August 2017**

# Supplemental Final Environmental Impact Statement

## Federal Coal Lease Modifications COC-1362 & COC-67232 (including on-lease exploration plan)

**Paonia Ranger District, Grand Mesa, Uncompahgre and Gunnison National Forests; Gunnison County, Colorado**

**Sections 10, 11, 14, 15, 22, 23 T14S; R 90W, 6th PM**

**Cooperating Agencies:**

**Uncompahgre Field Office, Bureau of Land Management**

**Colorado State Office, Bureau of Land Management**

**Western Region, Office of Surface Mining Reclamation and Enforcement**

**Colorado Division of Reclamation Mining and Safety**



In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at http://www.ascr.usda.gov/complaint_filing_cust.html and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer and lender.

# Federal Coal Lease Modifications COC-1362 & COC-67232
# Supplemental Final Environmental Impact Statement
# Gunnison County, Colorado

**Lead Agency:** USDA Forest Service

**Cooperating Agencies:**
Bureau of Land Management-Uncompahgre Field Office
Bureau of Land Management, Southwest District Office
Bureau of Land Management, Colorado State Office
Office of Surface Mining Reclamation and Enforcement
Colorado Division of Reclamation Mining and Safety

**Responsible Officials:**
Scott G. Armentrout, Forest Supervisor
2250 South Main Street
Delta, CO 81416

State Director
BLM Colorado State Office
2850 Youngfield St.
Lakewood, CO 80215

**For Information Contact:**
Niccole Mortenson, NEPA Specialist
406-329-3163
nmortenson@fs.fed.us

Levi Broyles, District Ranger
970-527-4131
lbroyles@fs.fed.us

Desty Dyer, BLM Mining Engineer
970-240-5302
Desty_Dyer@blm.gov

**Abstract:** The proposed action is to modify existing federal coal leases COC-1362 and COC-67232 by adding 800 and 920 additional acres (respectively) to ensure that 10.1 million tons of compliant and super-compliant federal coal is recovered and not bypassed and to prescribe stipulations for the protection of resources. In 2012, during the preparation of the Draft Environmental Impact Statement (DEIS), the 2001 Roadless Area Conservation Rule was in effect; this represents Alternative 2 in the DEIS. On July 3, 2012 the Colorado Roadless Rule became effective; this represents Alternative 3 (Proposed Action) in the analysis. Alternative 2 was removed from the Supplemental Draft Environmental Impact Statement (SDEIS). Alternative 4 was brought forward for detailed consideration based on comments in the DEIS. Alternative 4 only considers consenting to and leasing the COC-1362 lease. Assuming lease modification(s) are approved, on-lease exploration will be used to delineate coal reserves prior to State regulatory agency mining approval. This Supplemental Final Environmental Impact Statement (FEIS) has been prepared to address Court-identified deficiencies and to provide general updates since 2012.

emissions through 2018 to evaluate the progress that would be made by 2018 toward the visibility goal. The inventories used in the modeling analysis included the emissions from the West Elk Mine at its permitted rate and projected rates using economic growth analyses. The plan was accompanied by individual technical support documents that examined impacts to each of the Class I areas in detail, including the West Elk Wilderness and Black Canyon of the Gunnison. The state will re-examine visibility progress in five year intervals and determine whether additional steps are needed to meet visibility progress goals. Because the annual coal processing rate under any alternative will not exceed the rates analyzed in Colorado's study, no additional visibility analysis was conducted for this EIS.

#### 3.4.1.5 Emissions Source Classifications and Regulatory Status

Emissions sources are generally regulated according to their type and classification. Essentially all emissions sources fall into two broad categories, stationary and mobile.

Stationary sources are non-moving, fixed-site producers of pollution such as power plants, petro-chemical refineries, manufacturing facilities, and other industrial sites such as oil and gas production pads. Stationary facilities emit air pollutants via process vents or stacks (point sources) or by fugitive releases (emissions that do not pass through a process vent or stack). Stationary sources are also classified as either major or minor. A major source is one that emits, or has the potential to emit, a regulated air pollutant in quantities above a defined threshold. Stationary sources that are not major are considered minor or area sources. A stationary source that takes federally enforceable limits on production, consumptions rates, or emissions to avoid major source status are called synthetic minors. The Colorado Department of Health and Environment, Air Pollution Control Division (APCD), has authority under their EPA approved State Implementation Plan (SIP) to regulate and issue Air Permits for stationary sources of pollution in Colorado.

The West Elk mine is classified as a synthetic minor source, and has been issued APCD permits for its surface facility operations (see Table 3-7 below). Most emissions of criteria pollutants resulting from stationary sources at the mine are in the form of particulate matter. Sources of particulate matter include various coal handling equipment such as conveyors and transfers, coal storage silos and feeders, coal storage and refuse piles, coal mine ventilation shafts, a coal preparation plant, coal hauling operations, an emergency generator, and miscellaneous exempt sources (such as heating equipment and fuel storage tanks). The APCD permits limit emissions of particulate matter by limiting the total amount of coal that can be processed in a year to 8.5 million tons of coal per year. The mine's primary permit (09GU1382) also limits the sizes of different coal stockpiles that are allowed, the hours of operation of various maintenance activities, the total quantity of refuse material from the coal preparation plant and the and the amount of coal that can be processed by the coal preparation plant. This permit also contains a requirement for the operator to follow a fugitive dust control plan which applies to all of the coal processing, handling, and management activities. In addition, the Colorado Division of Reclamation, Mining, and Safety (CDRMS) Mining and Reclamation plan includes general air pollution control requirements. These include applying water to any active unpaved roadways, parking areas, and refuse disposal area to control dust emissions from these areas, and could include compacting and spraying of coal stockpiles when necessary to eliminate particulate emissions created during coal handling operations. In addition to regular watering of the regularly travelled gravel roads on the mine site, these roads are treated at least once a year with magnesium chloride for dust suppression.

As discussed above, the mine would be required to drill and operate methane drainage wells over the life of its operations at points on the surface above active panel mining to avoid potentially unsafe accumulations of methane within the mines underground environment. The drilling technology used to drill holes the diameter and depth needed for MDWs also requires construction of drill pads and the use of heavy equipment to access these locations. MDWs are on the landscape an average of 2-3 years with an active life of 1-3 months, after which they are decommissioned and the land surface is reclaimed and returned to pre-mining land uses.

Mobile sources include any air pollution that is emitted by motor vehicles, engines, and equipment that can be moved from one location to another. Due to the large number of sources, which includes cars, trucks, buses, construction equipment, lawn and garden equipment, aircraft, watercraft, motorcycles, etc., and their ability to move from one location to another, mobile sources are regulated differently than stationary sources. In general EPA and other federal entities retain authority to set emissions standards for these sources depending on their type (on-road, off-road, and non-road), classification (light duty, heavy duty, horse power rating, weight, fuel types, etc.), and the year of manufacture or in some circumstances their reconditioning. Mobile sources are not regulated by the state unless they are covered under an applicable SIP (usually as part of an inspection and maintenance program).

Mobile sources at the West Elk mine consist primarily of heavy equipment (loaders and bulldozers, source classification code 2270002000) for surface operations and specialized underground mining equipment (source classification code 2270009000). There are also on-road trucks used to ferry personnel and smaller equipment and tools around the facility as well. Mobile source emissions estimates were developed from the mines annual diesel fuel use, utilizing area specific (county level) emissions factors from EPA's NONROAD 2008a model (http://www.epa.gov/otaq/nonrdmdl.htm).

**Table 3-7. West Elk Emissions (max tons per year)**

| Source | Permit[1,2] | $PM_{10}$ | $PM_{2.5}$ | VOC | $NO_X$ | CO | $SO_X$ | $CO_2$ | $CH_4$ | $N_2O$ | $CO_2e$ |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Multiple - Point | 09GU1382 | 60.3 | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Multiple - Fugitive | 09GU1382 | 27.9 | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Emergency Generator | 10GU1130 | --- | --- | --- | 12.36 | 15.23 | --- | --- | --- | --- | --- |
| Rock Dust Silo | 13GU1462 | 0.05 | 0.05 | --- | --- | --- | --- | --- | --- | --- | --- |
| Mobile - Underground | NA | 10.39 | 10.08 | 15.92 | 73.02 | 61.47 | 0.99 | 4,615 | 0.24 | 0.04 | 4,636 |
| Mobile - Surface | NA | 1.53 | 1.48 | 1.86 | 21.14 | 9.89 | 0.33 | 1,538 | 0.03 | 0.01 | 1,542 |
| Misc. Heaters[3] | NA | 2.04 | 2.05 | 1.47 | 27.49 | 22.08 | 0.67 | 32,682 | 0.61 | 0.58 | 32,877 |
| Fuel Tanks[4] | NA | --- | --- | 1.99 | --- | --- | --- | --- | --- | --- | --- |
| VAM[5] | NA | --- | --- | --- | --- | --- | --- | --- | 15,566 | --- | 560,376 |
| MDWs[5] | NA | --- | --- | --- | --- | --- | --- | --- | 10,483 | --- | 377,388 |
| **Totals** | | 102.21 | 13.67 | 21.24 | 134.01 | 108.67 | 1.99 | 38,835 | 26,049 | 0.63 | 976,818 |

[1] All permitted source emissions are based on the permit limits which have a corresponding production of 8.5 MMtons/yr.
[2] Non-permitted source emissions are based on the maximum analyzed annual production of 6.5 MMtons/yr, which is higher than the current 5 year average production rate.
[3] Miscellaneous heater data is estimated from 2015 GREET data & 2016 CMM Market Research Report (Appendix A)
[4] VOC data is based on maximum APEN exemption amount of 2 tons per year.
[5] Max methane is disclosed for a similar coal production year (2014 – 6.28 tons). $CH_4$ liberation rates generally follow production levels over the GHG reporting period (2011-2015), but are neither linear or consistent from year to year with respect to production to form a reasonable correlation that would enable an accurate prediction of future liberation potential.

### 3.4.1.6 Climate Baselines

Somerset Colorado is located in the North Fork Gunnison River Valley and rests at approximately 6,040 feet above sea level. The area is rural, has mountainous terrain, and supports a population of approximately 526 residents (http://2010.census.gov/2010census/). The normal temperatures (minimum and maximum) for the area range from 14.7 to 38.5 ˚F in January to 56.7 to 90.1 ˚F in July. The average annual precipitation amounts to approximately 15.07 inches, which according to historical records is

relatively evenly distributed throughout the year. Average annual wind resultants are generally from the southeast at a speed of approximately 7.1 mph. The area enjoys sunshine for approximately 70% of the time and has an annual average sky cover of around 52%.

Best available science indicates at combination of factors are combining to change the chemical composition of Earth's atmosphere. Activities such as fossil fuel combustion, industrialization, deforestation, and other changes in land use are resulting in the accumulation of trace greenhouse gases (GHGs) such as carbon dioxide ($CO_2$), methane ($CH_4$), nitrous oxide ($N_2O$), and several industrial gases in the Earth's atmosphere. The following synopsis of current climate change baseline information has been summarized from the Intergovernmental Panel on Climate Change's (IPCC), 5th Assessment Report (AR5). The IPCC is the leading international scientific body under the auspice of the United Nations charged with reviewing and assessing the most recent scientific, technical and socio-economic information produced worldwide relevant to the understanding of climate change. IPCC assessments provide rigorous and balanced scientific information that reflect a range of views and expertise to ensure an objective and complete assessment of current information.

Between 1750 and 2011, cumulative $CO_2$ emissions emitted to the atmosphere were approximately 2040 ± 310 $GtCO_2$ above the baseline About 43% of these emissions have remained in the atmosphere (880 ± 35 $GtCO_2$); the rest was removed from the atmosphere and stored in natural terrestrial ecosystems (plants and soils – 29%) and in the oceans (28%). Although $CO_2$ levels in the atmosphere have varied perpetually throughout Earth's history (along with corresponding variations in climatic conditions), $CO_2$ concentrations have increased measurably, from approximately 280 ppm in 1750 to 400 ppm in 2015 which also corresponds with industrialization and the burning of carbon based fossil fuel sources. The rate of change has also been increasing. This fact is demonstrated by data from the Mauna Loa $CO_2$ monitor in Hawaii that documents atmospheric concentrations of $CO_2$ going back to 1960, at which point the average annual concentration was recorded at approximately 317 ppm. The record shows that approximately 70% of the increases in atmospheric $CO_2$ concentration since 1750 have occurred within the last 55 years. The trend corresponds to an increasing population and rising standards of living and modernization around the globe. From 1750 to present, emissions from fossil fuel combustion and cement production have released 375 [345 to 405] GtC to the atmosphere (68%), while deforestation and other land use change are estimated to have released 180 [100 to 260] GtC (32%). Concentrations of $CO_2$, $CH_4$, and $N_2O$ now substantially exceed the highest concentrations recorded in ice cores during the past 800,000 years. Since 1750 the estimated concentrations of $CH_4$ have more than doubled (722ppb to 1,803ppb), while $N_2O$ concentrations have increased by a fifth (270ppb to 324ppb).

Scientists believe that increases in atmospheric GHG concentrations results in an increase in the earth's average surface temperature, primarily by trapping and thus decreasing the amount of heat energy radiated by the Earth back into space. The phenomenon is commonly referred to as global warming. Global warming is expected, in turn, to affect weather patterns, average sea level, ocean acidification, chemical reaction rates, and precipitation rates, all of which is collectively referred to as climate change.

Warming of the climate system is unequivocal, and since the 1950s, many of the observed changes are unprecedented over time spans of decades to millennia. The atmosphere and ocean have warmed, the amounts of snow and ice have diminished, and sea level has risen. Each of the last three decades has been successively warmer at the Earth's surface than any preceding decade since 1850. In the Northern Hemisphere, 1983–2012 was likely the warmest 30-year period of the last 1400 years (medium confidence). The globally averaged combined land and ocean surface temperature data as calculated by a linear trend, show warming of 0.85 [0.65 to 1.06] °C, over the period 1880 to 2012.

Ocean warming has dominated the increase in energy stored in the climate system, accounting for more than 90% of the energy accumulated between 1971 and 2010 (high confidence). On a global scale, the

ocean warming is largest near the surface, and the upper 75 m warmed by 0.11 [0.09 to 0.13] °C per decade over the period of 1971 to 2010. More than 60% of the net energy increase in the climate system is stored in the upper ocean (0–700 m), and about 30% is stored in the ocean below 700 m (40-year period from 1971 to 2010). The rate of sea level rise since the mid-19th century has been larger than the mean rate during the previous two millennia (high confidence). Over the period 1901 to 2010, global mean sea level rose by 0.19 [0.17 to 0.21] m. It is very likely that the mean rate of global average sea level rise was 1.7 [1.5 to 1.9] mm $yr^{-1}$ between 1901 and 2010, 2.0 [1.7 to 2.3] mm $yr^{-1}$ between 1971 and 2010, and 3.2 [2.8 to 3.6] mm $yr^{-1}$ between 1993 and 2010, a trend that is increasing.

The driver for the buildup in heat within the climate system is best described in terms of radiative forcing (RF). The term describes the energy balance that will occur (i.e. heating (+) or cooling (-)) in units of W $m^{-2}$. The total anthropogenic RF for 2011 relative to 1750 was 2.29 [1.13 to 3.33] W $m^{-2}$ (includes both heating and cooling parameter estimates). For well mixed GHG's the total positive forcing is estimated to be 2.83 [2.54 to 3.12] W $m^{-2}$. The largest contribution to total radiative forcing since 1750 is caused by the increase in the atmospheric concentration of $CO_2$. Emissions of $CO_2$ alone caused an RF of 1.82 [± 0.19] W $m^{-2}$ (64%), while $CH_4$ caused an RF of 0.48 [± 0.05] W $m^{-2}$ (17%). The data highlights methane's important role as a potent greenhouse gas, given its RF value in relation to its atmospheric loading trend, approximately 556 Tg (or million netric tons) $yr^{-1}$ (64% anthropogenic, 36% natural) and relatively short atmospheric lifetime (12 years). $N_2O$ has the third largest forcing of the anthropogenic gases, at 0.17 [± 0.03] W $m^{-2}$ (6%). Collectively the three GHG's of concern account for approximately 87% of the positive forcing within the climate system.

According to the 2014 Climate Change in Colorado synthesis report (prepared by the Colorado Department of Natural resources, Water Conservation Board), statewide annual average temperatures have increased by 2.0° F and 2.5° F over the past 30 and 50 years respectively. Warming trends have been observed over this period in most parts of the state, and show that daily minimum temperatures have warmed more than daily maximum temperatures. Additionally, temperature increases have occurred in all seasons. No long-term trends in average annual precipitation (30-50 years) have been detected across Colorado, although since 2000 the state has experienced below-average annual precipitation and snow pack. The warming trends have contributed to an earlier shift in snowmelt and peak runoff timing in spring by approximately 1 to 4 weeks.

## 3.4.2 Alternative 1 (No Action) Environmental Effects

### 3.4.2.1 Direct Effects

Under the no action alternative, consent to modify the leases would not be granted, and no mining would occur in these specific areas. Impacts from mining coal under these areas would not occur, but it is anticipated that mining operations will continue on existing leases. The mine life is currently projected to last an additional 8 years on existing federal coal reserves, with perhaps as much as an additional 2 years on non-federal minerals (fee reserves). Additionally, other activities currently authorized at the site including coal processing and venting of gases would also continue in accordance with the permits and site operations plans that are currently active. The intensities of these activities and the resulting emissions would not exceed the levels disclosed in Table 3-7 above. In conjunction with the estimated production rate of 6.5 million tons per year, the mine is estimated to have approximately 53.5 million tons of coal that could be mined.

The application for the primary permit (09GU1382) was accompanied by a dispersion modeling analysis (*PM-10 Dispersion Modeling Study, Coal Prep Plant Modification, West Elk Mine: Gunnison County, Colorado*, prepared by Air Resource Specialists, Inc., February 25, 2010) as required by CDPHE. This analysis was completed to support the mine's permit modification request, which included a proposal to build the coal preparation plant mentioned above. West Elk's air permit is included in Appendix F. The analysis examined the potential particulate matter emissions that would occur from the new facility, as

well as other facilities at the mine (which included PM emissions generated by mobile source activities). The dispersion modeling analysis also included sources from the nearby Elk Creek mine, and included a background particulate matter concentration to account for other sources of particulate matter not associated with either mine. The analysis estimated the maximum direct impact to $PM_{10}$ concentrations due to the West Elk and Elk Creek mines, as well as the resulting ambient air concentrations due to other sources (i.e., the two mines plus the background). The analysis used conservative assumptions in order to ensure that the analysis would not underestimate the particulate matter emissions (which also included slightly higher emissions levels than those currently permitted). The results are shown in Table 3-8. The maximum predicted concentration of $PM_{10}$ due to the mines and other background sources was 148 $\mu g/m^3$, which is below the primary ambient air quality standard. These results indicate that the area around the mine can be expected to remain within ambient air quality standards for $PM_{10}$. Further, these results are likely overstated now that the Elk Creek mine has been permanently shuttered.

**Table 3-8. Maximum Predicted $PM_{10}$ Impacts Due to West Elk Mine and Oxbow Mines**

| Averaging Period | $PM_{10}$ Modelled Impact ($\mu g/m^3$) | Background Concentration ($\mu g/m^3$) | Total $PM_{10}$ Impact ($\mu g/m^3$) | % NAAQS |
|---|---|---|---|---|
| 24-Hour (1st High) | 118.89 | 29.0 | 147.89 | 98.6 |
| Annual Average (1st High)[1] | 16.99 | 16.0 | 32.99 | 65.9 |

[1] Annual $PM_{10}$ NAAQS standard has since been rescinded

At the time the mine's primary permit modification request was submitted, the state did not require reporting for $PM_{2.5}$ as was allowable under the EPA's "surrogate policy". This policy allowed regulatory authorities to use $PM_{10}$ emissions as a surrogate for $PM_{2.5}$ due to technical difficulties that existed in analyzing $PM_{2.5}$ emissions (http://www.epa.gov/NSR/documents/20100204repealfs.pdf). As a result, the permit itself does not contain emissions limits for $PM_{2.5}$.

There are no other criteria pollutant emissions from stationary sources at the mine that are in excess of CDPHE's minor source permitting thresholds, and therefore the permit does not contain any limits other than those for particulate matter. By extension, no other criteria pollutant emissions associated with the mine's stationary sources would be considered to be significant with respect to their potential to degrade area air quality.

As discussed above it is inappropriate to assess potential ozone formation from the precursor emissions of a single project. However, we analyzed all of the mines that produce federal minerals in Colorado cumulatively, via the Colorado Air Resources Management Modeling study (CARMMS). The CARMMS model, the analysis scenarios, and results are all described in the cumulative impacts section below. The CARMMS model was also used to assess $PM_{2.5}$ impacts from the mines producing federal minerals in Colorado.

To provide context for the West Elk mine's potential nitrogen deposition impacts, the agencies compare emissions to the Bull Mountain Unit (a nearby oil and gas project) that was recently modeled for AQRV impacts utilizing the CALPUFF air quality model and local meteorology. The project analyzed significantly more nitrogen dioxide emissions (approximately 50 tpy more) than those generated by the West Elk mine and was able to show that total nitrogen deposition would be below the DAT of 0.005 kg/ha-yr. The Bull Mountain impacts were estimated to be the highest at the West Elk Wilderness area. Given that the mine is slightly farther removed from the West Elk Wilderness Class I area, and has about a third of the emissions of the Bull Mountain Unit, it is reasonable to conclude that the $NO_X$ emissions from the mine would also be below the deposition DAT and would not significantly impact the West Elk Wilderness Area. This same logic would apply to the Black Canyon of the Gunnison National Park, which is west of the mine. The estimated nitrogen deposition at the Park from the Bull Mountain analysis was 0.0003 kg/ha-

yr. Although the mine is slightly closer to the Class I area (by approximately 8 miles), the Bull Mountain results are so far below the DAT that it is very unlikely the West Elk mine would significantly impact on the Park. The Bull Mountain analysis is publically available for review at https://eplanning.blm.gov/epl-front-office/projects/nepa/66641/81769/95992/Bull_Mtn_DEIS_Jan2015 _reduced_web.pdf.

The amount of methane released by the West Elk Mine has varied considerably over the life of the mine, and is not well correlated with production levels. In general, the amount of methane released has decreased as the mining operations have progressed into a shallower seam, but there is no clear relationship that would make it possible to accurately predict the amount of methane that will be released to the atmosphere during future mining operations. Figure 3-7 shows the general trends for annual VAM and MDW methane releases vs. production. For the purposes of this analysis we simply assume that the total methane emissions from ventilation system (main vent(s) and bore vents) is the same as shown in Table 3-7 above, and will continue as such for future mining years.




**Figure 3-7. Methane vs. Production at West Elk Mine**

Source: EPA FLIGHT, Colorado Department of Natural Resources, Division of Mine Reclamation and Safety

In order to effectively vent methane from the mine and provide for a safe work environment, the West Elk mine will need to develop MDWs. This will require the construction of roads and well pads over active mine panels in order to move heavy equipment in to the area to bore the holes and maintain the methane pumps when active. The agencies estimated the emissions associated with the MDW development activities using a spreadsheet developed from EPA's document AP-42, Compilation of Air Pollutant Emission Factors (http://www.epa.gov/ttnchie1/ap42/), and the EPA NONROAD 2008a model. The construction and drilling of roads and vent boring is contracted out by the mining company, so the exact mix of equipment may vary slightly from the equipment assumed in this analysis. The analysis took into account dust and tailpipe emissions of typical road construction equipment (including a blade, backhoe and roller), one truck mounted drill rig, support vehicles (such as a water truck), and pickup trucks used

by site personnel to access the bore sites. It also included wind erosion of exposed road and well pad surfaces. Average emission factors were taken from AP-42 and conservative estimates were used for the amount of time needed to construct well pads and roads. The analysis did not include any assumptions regarding control of fugitive dust emissions from exposed surfaces on roads or drill pads, although the mining company does water these surfaces periodically to suppress fugitive dust emissions in accordance with its permit requirements. Actual windblown dust emissions are therefore expected to be less than those assumed in this analysis. The analysis assumes that the maximum number of MDWs the mine could develop in any single year would be 12, although the average is probably closer to 6 to 8. The data is summarized in Table 3-9, and as can be seen the construction-related emissions are relatively small and are not expected to contribute significantly to localized or regional air quality degradation.

**Table 3-9. MDW Development Emissions (tons)**

| Activity | $PM_{10}$ | $PM_{2.5}$ | $NO_x$ | $SO_2$ | CO | VOC | HAPs | $CO_2$ | $CH_4$ | $N_2O$ |
|---|---|---|---|---|---|---|---|---|---|---|
| Road / Well Pad Construction & Reclamation - Fugitive Dust | 3.192 | 0.319 | --- | --- | --- | --- | --- | --- | --- | --- |
| Heavy Equipment Combustive Emissions | 0.154 | 0.150 | 2.084 | 0.050 | 0.758 | 0.181 | 0.018 | 237.279 | 0.003 | 0.003 |
| Wind Erosion | 0.556 | 0.083 | --- | --- | --- | --- | --- | --- | --- | --- |
| Commuting Vehicles - Crew Trips | 5.823 | 0.582 | 0.057 | 0.000 | 0.332 | 0.019 | 0.002 | 18.624 | 0.001 | 0.003 |
| **Totals** | **9.726** | **1.135** | **2.141** | **0.051** | **1.090** | **0.200** | **0.020** | **255.903** | **0.004** | **0.006** |

In addition to methane, other organic gases are released through the mine ventilation boreholes in small quantities. The previous FEIS contained data that showed the compositional analysis from two CMM spot samples obtained from two MDWs. The samples were used to support a technical and economic feasibility assessment prepared by the mine at the request of the BLM (made in response to the leasing addendum placed on the original lease, described in Table 2-2). The purpose of the study was to determine if the methane could be captured for beneficial use or otherwise destroyed and not to determine the composition of the gas itself. The previous FEIS made no attempt to quantify any non-methane emissions components on an annualized basis or otherwise, and similarly no attempt is made here for the following reasons:

- There are no established protocols for sampling nor accurately analyzing VOCs in mine ventilation air from MDW or shaft emissions (for which the APCD has acknowledged).
- It is not known how accurately the sample values represent average or potential quantities of various non-methane hydrocarbons and other gaseous compounds, given that the methane emissions themselves (if used as a surrogate), have proved to be highly variable and not closely related to coal production levels.
- The limited number of samples available (two) taken on a single day (15 May 2009) within a relatively short period of time do not provide for a scientifically defensible or statistically significant basis from which to draw conclusion about potential VOC emissions levels.

The Colorado Air Pollution Control Division has examined the VOC concentration measurements submitted in the report and has since been in contact with most of the coal mines in the state, including the West Elk Mine, to gather additional data from the facilities in order to form a more accurate estimate

of potential VOC emissions, and to determine the facilities overall compliance status (personal communication, Debra Miller, USFS, with Charles Pray, Permitting Engineer, Colorado Air Pollution Control Division, 11 July 2012). As of January, 2017, CDPHE is still reviewing the facts of West Elk's specific circumstances and has not rendered a decision regarding reporting (via APEN) or permitting applicability for any VOC emissions the mine emits. In general, APCD is still trying to understand the technical issues related to accurately determining the level of VOC emissions emanating from all the various coal mines in Colorado, not just the West Elk. While manmade VOC emissions are regulated in Colorado by the CDPHE, they are not themselves considered a criteria air pollutant, and no standards exist to limit their concentrations in ambient air. We note that the concern here is for the potential of these emissions to form ground level ozone. The mine itself has been in operation since the 80's and yet the area remains in attainment for the ozone standard. That fact in and of itself speaks volumes for the potential of the issue. However, as noted above the BLM did analyze the West Elk mines criteria pollutant emissions as well as all of the mines in Colorado that produce federal coal within the CARMMS study. A link to the study itself and the results are all detailed in the cumulative section below. Finally, the sample analysis data (removed here) is still available for viewing within the above referenced addendum report itself (project file).

Although the mine's GHG emissions will directly contribute to potential climate change, the cumulative nature of the problem and the lack of currently available project specific assessment tools, does not make a direct analysis of the issue in the context of the alternative(s) a practical exercise at this time. A more detailed discussion of potential climate change impacts and how the mine emissions might contribute to it is provided in the cumulative analysis section below. This alternative is expected to produce methane emissions from the mine at a rate consistent with that shown in Table 3-7 above for approximately 10 more years. The total CO2e of the methane released under this alternative is approximately 9.38 million tons.

### 3.4.2.2 Indirect Effects

Mined coal will be transported away from the mine by rail to various facilities. Transportation by train will result in emissions of pollutants such as carbon monoxide, sulfur dioxide, nitrogen oxides, particulate matter, and volatile organic compounds. Locomotive emissions will also include greenhouse gases such as carbon dioxide. It is highly likely that criteria emissions from this source class have been decreasing, and will continue to do so in the future, due to the implementation of new emissions standards for new and reconstructed locomotives (see Control of Emissions of Air Pollution from Locomotives and Marine Compression-Ignition Engines Less Than 30 Liters per Cylinder, published May 6, 2008 and republished June 30, 2008). EPA estimates that the average useful life for these engines is 750,000 miles or 10 years, whichever occurs first, meaning that on average an engine is replaced or reconstructed every ten years and will have to comply with the most stringent emissions requirement applicable to the engine at that time. Additionally, the indirect effects of coal transport from the region are analyzed and disclosed in the 2001 North Fork Valley Coal (Iron Point) EIS for all three area mines (West Elk, Elk Creek, and Bowie). The effects for West Elk alone (the only remaining operational and producing mine) will be far less than those analyzed in the afore mentioned EIS due to the area's overall coal production reductions and for reasons outlined above concerning the locomotives themselves.

According to U.S. EPA figures contained in the Draft US Greenhouse Gas Inventory Report (2012), nearly 95% percent of all coal consumed in the U.S. during 2010 was used in the generation of electric power. Although coal's share of the electrical generating fuel market has been decreasing in recent years, it can still be reasonably assumed that the coal from the West Elk mine will be shipped to and consumed by a coal-fired power plant. According to EPA data there are approximately 463 power plants in the U.S. that use coal as a primary fuel source (approximately 61 others report coal use as a secondary fuel). In general, it is reasonable to assume that coal combustion in these facilities will result in emissions of pollutants including sulfur dioxide, nitrogen oxides, volatile organic compounds, particulate matter, sulfuric acid, and mercury, as well as some hazardous air pollutants. It is also likely that coal combustion-

related emissions will contribute to atmospheric concentrations of ozone and secondary particulates when the required proper atmospheric conditions for formation are present.

What is not clear at this point is exactly what which facilities these might be and exactly how they are configured (locations, physical and operational characteristics, controls, permit limitations, monitoring, etc.). In recent years, MCC has been selling increasing amounts of coal from the West Elk Mine on the spot market. The spot market provides for a one-time open market transaction for near term delivery of coal (where near term is the quarter following the order date quarter) where the commodity is purchased at current market rates. Due to the nature of this market, it is not possible to determine in advance where this coal will be consumed (it is unknown where the coal will be delivered until the quarter before it gets delivered (https://www.eia.gov/coal/markets/)). A detailed analysis of any current and potential future contractual agreements between MCC and any coal fired facility power plant (or fuels broker) for a time in the future when the lease modification coal would be mined and MCC is unknown and outside the scope of this analysis, and neither the Forest Service nor BLM determines at which facilities the coal will be consumed.

Although it would be possible to provide an estimate of emissions associated with the burning of the mined coal at a specific facility; the types facility controls configurations, applicable regulatory structures, age, and firing practices make this exercise speculative, and impractical from a criteria pollutant disclosure standpoint. The facilities that could combust the coal purchased on the spot market are currently unforeseeable. Further, the heavily regulated nature of these combustion sources provides limited decision space or scope to the decision makers. However, the FS and BLM can disclose estimated emissions on broad geographic scales for pollutants reported and estimated by EPA's Emissions & Generation Resource Integrated Database (eGRID, 2014 v2). eGrid is a comprehensive source of data on the environmental characteristics of almost all electric power generated in the United States, and includes emissions for nitrogen oxides, sulfur dioxide, carbon dioxide, methane, and nitrous oxide; emissions rates; net generation; resource mix; and other attributes. For this analysis, we report the total nitrogen oxide and sulfur dioxide for West Elk coal combustion relative to the Colorado and U.S. average coal fired power plant fleet mix emissions rates (these are the only criteria pollutants reported to the eGrid database). The rates are derived by dividing the subtotal of the targeted fleet emissions (tons) by their heat input (MMbtu). West Elk coal is estimated to have a btu content of approximately 11,800 btu/lb. The total Colorado and U.S. eGrid based combustions emissions are shown in Table 3-10 below and are the result of multiplying the foreseeable total coal to be mined (cumulatively) by the derived emissions factors.

Because the afore mentioned specific facility configurations are not known, any further analysis or disclosure of either the other criteria and HAP related emissions and their locality related impacts to relative near-field or regional air resources is not feasible for this analysis. However, given the nature of these facilities, in that they are major stationary source of air pollution and are heavily regulated, any impacts resulting from their continued operations are highly likely to have been appropriately analyzed by the applicable permitting authority. Any impacts to local or regional air quality from these facilities would not exceed those already authorized, and in theory should be in compliance with all applicable standards regulating their operations. Compliance with applicable operating permits should provide for compliance with air quality standards within the areas where these facilities operate. Facilities with operations producing ambient air concentrations (as the result of compliance with a permit or rule) of a regulated pollutant less than an applicable standard (as determined and set by EPA) is equivalent to an insignificant affect as it relates to human health impacts. Given that these combustion facilities have operational parameters that are fixed regardless of the alternatives analyzed here, there is very little decision space or scope available to the decision makers to consider combustion related impacts as being significantly different in the context of any of the alternatives analyzed. Simply stated, we assume for the purposes of analysis that no new coal fired facilities will be brought online as a result of this decision, and no existing facilities will go offline for any alternative, regardless of the governments influence with this decision.

We can however also disclose the estimated GHG emissions from coal combustion due to the fact that specific facility details have less of an influence over these types of emissions, and few if any potential sources provide for carbon capture or otherwise abate these emissions presently. For the purposes of disclosure, we are providing estimates for the total foreseeable coal to be mined under the alternative. The total GHG emissions presented in Table 3-10 and are the result of multiplying the foreseeable total coal to be mined by the appropriate EPA emissions factors.

**Table 3-10. Coal Combustion GHG Emissions (MMtons)**

| Coal (MMtons) | Colorado $NO_X$ | Colorado $SO_2$ | U.S. $NO_X$ | U.S. $SO_2$ | $CO_2$ | $CH_4$ | $N_2O$ | $CO_2e$ |
|---|---|---|---|---|---|---|---|---|
| 53.5 | 0.14 | 0.096 | 0.114 | 0.238 | 137.11 | 0.016 | 0.002 | 138.22 |

EPA GHG emissions factor source: https://www.epa.gov/sites/production/files/2015-07/documents/emission-factors_2014.pdf (bituminous coal)

Similar to the direct affects discussion above, the GHG emissions from coal combustion will contribute to potential climate change impacts. A more detailed discussion of these impacts, and how the coal combustion emissions might contribute to it, is provided in the cumulative analysis section below.

## 3.4.3 Alternative 3 (Proposed Action) Environmental Effects

The lease modifications are estimated to extend the life by approximately 1.6 years. In addition to these reserves, another 3.3 million tons federal coal and 4.2 million tons of fee coal would be accessible on adjacent lands already under reserve. The total coal to be mined (in addition to the reserves under Alternative 1) based on the estimated production rates would be approximately 17.6 million tons over a total of approximately 2.7 years.

### 3.4.3.1 Direct Effects

The proposed lease modifications represent a continuation of the existing activity occurring at the mine location, and will not increase the intensity of operations above currently evaluated levels (there is no proposed change in the rate of coal extraction under any alternative). The current existing facilities would also be used for mining the proposed lease modification areas (there is no additional construction or capacity required to process the additional coal). These facilities include office, warehouse, shop, and coal handling units, and are located about 6 miles north of the proposed modifications. The mine would continue to develop and operate MDWs above active coal panel mining as necessary to meet the health and safety concerns as required by law. This alternative assumes a maximum production rate of 6.5 million tons of coal per year (the same as Alternative 1), and thus all of the air quality impacts associated with this alternative would be identical to those disclosed in Alternative 1.

This alternative is expected to produce methane emissions from the mine at a rate consistent with that shown in Table 3-7 above for approximately 10.9 more years. The total $CO_2e$ of the methane released under this alternative is approximately 11.91 million tons.

In addition, this alternative includes an exploration plan proposal (see details in Table 2-3) that would allow MCC to ascertain the qualitative properties of the coal in the lease mod areas and formulate a mining strategy necessary to safety mine this coal. Given these details, the agencies estimated the emissions associated with the exploration activities (road construction, well pad construction, well drilling, and reclamation activities) using the same methods as described above for the MDW development. The data for the worst-case year out of the two years of planned exploration under this alternative (i.e., 6 pads, and acres of disturbance for the associated access roads) is summarized in Table 3-11 below. As can be seen from the table, the construction-related emissions are relatively small and are not expected to contribute significantly to localized or regional air quality degradation.

**Table 3-11. Exploration Emissions (max tons per year)**

| Activity | $PM_{10}$ | $PM_{2.5}$ | $NO_x$ | $SO_2$ | CO | VOC | HAPs | $CO_2$ | $CH_4$ | $N_2O$ |
|---|---|---|---|---|---|---|---|---|---|---|
| Road / Well Pad Construction & Reclamation - Fugitive Dust | 5.384 | 0.538 | --- | --- | --- | --- | --- | --- | --- | --- |
| Heavy Equipment Combustive Emissions | 0.135 | 0.131 | 1.798 | 0.043 | 0.662 | 0.158 | 0.016 | 201.188 | 0.002 | 0.002 |
| Wind Erosion | 0.208 | 0.031 | --- | --- | --- | --- | --- | --- | --- | --- |
| Commuting Vehicles - Crew Trips | 2.859 | 0.286 | 0.030 | 0.000 | 0.198 | 0.011 | 0.001 | 9.787 | 0.001 | 0.002 |
| **Totals** | **8.586** | **0.986** | **1.827** | **0.043** | **0.860** | **0.169** | **0.017** | **210.975** | **0.003** | **0.004** |

### 3.4.3.2 Indirect Effects

Same as Alternative 1, with the exception of the total combusted coal estimates.

This alternative will incrementally contribute GHG emissions above those disclosed in alternative 1. However, the potential affects would be similar to those disclosed in the cumulative section below. This is due to the fact that no tools exist to describe how the minor amount of incremental GHG increase (relative to the cumulative, i.e. global annual GHG burden) would directly contribute to modeled climate change impacts (2100 future year projections) evaluated by the leading international scientific bodies (for example IPCC scientists).

**Table 3-12. Coal Combustion Emissions (MMtons)**

| Coal (MMtons) | Colorado $NO_X$ | Colorado $SO_2$ | U.S. $NO_X$ | U.S. $SO_2$ | $CO_2$ | $CH_4$ | $N_2O$ | $CO_2e$ |
|---|---|---|---|---|---|---|---|---|
| 71.1 | 0.187 | 0.129 | 0.151 | 0.317 | 182.22 | 0.021 | 0.003 | 183.69 |

EPA GHG emissions factor source: https://www.epa.gov/sites/production/files/2015-07/documents/emission-factors_2014.pdf (bituminous coal)

## 3.4.4 Alternative 4 Environmental Effects

Similar to Alternative 3, the lease modifications here would be expected to extend the life of the mine by another 2.6 years, which would allow for approximately 16.8 million tons of coal (in addition to the reserves under Alternative 1) to be mined from both federal and fee reserves that would be accessed from the modification.

### 3.4.4.1 Direct Effects

The proposed lease modification represents a continuation of the existing activity occurring at the mine location, and will not increase the intensity of operations above currently evaluated levels (there is no proposed change in the rate of coal extraction under any alternative). The current existing facilities would also be used for mining the proposed lease modification areas (there is no additional construction or capacity required to process the additional coal). These facilities include office, warehouse, shop, and coal handling units, and are located about 6 miles north of the proposed modifications. The mine would continue to develop and operate MDWs above active coal panel mining as necessary to meet the health and safety concerns as required by law. This alternative assumes a maximum production rate of 6.5 million tons of coal per year (the same as alternative 1), and thus all of the air quality impacts associated with this alternative would be identical to those disclosed in alternative 1.

This alternative is expected to produce methane emissions from the mine at a rate consistent with that shown in Table 3-7 above for approximately 10.8 more years. The total $CO_2$e of the methane released under this alternative is approximately 11.82 million tons.

For this alternative, exploration would be curtailed such that there would be roughly a 21% reduction in the access roads, and a projected reduction of 2 bore holes/pads needed to define the extent and parameters of the coal contained within the lease modification area. However, we assume that all of the exploration would more or less occur within a single year and that the intensity of such exploration would be approximately the same as that disclosed for alternative 3 in Table 3-12 above (with equally similar non-significant impacts).

#### 3.4.4.2 Indirect Effects

Same as alternative 1, with the exception of the total combusted coal estimates. Same as alternative 1, with the exception of the total combusted coal estimates. This alternative will incrementally contribute GHG emissions above those disclosed in alternative 1, but less than those evaluated under alternative 3. However, the potential affects would be similar to those disclosed in the cumulative section below. This is due to the fact that no tools exist to describe how the minor amount of incremental GHG increase (relative to the cumulative, i.e. global annual GHG burden) would directly contribute to modeled climate change impacts (2100 future year projections) evaluated by the leading international scientific bodies (for example IPCC scientists).

**Table 3-13. Coal Combustion GHG Emissions (MMtons)**

| Coal (MMtons) | Colorado $NO_X$ | Colorado $SO_2$ | U.S. $NO_X$ | U.S. $SO_2$ | $CO_2$ | $CH_4$ | $N_2O$ | $CO_2$e |
|---|---|---|---|---|---|---|---|---|
| 70.3 | 0.184 | 0.127 | 0.15 | 0.313 | 180.17 | 0.021 | 0.003 | 181.62 |

EPA GHG emissions factor source: https://www.epa.gov/sites/production/files/2015-07/documents/emission-factors_2014.pdf (bituminous coal)

### 3.4.5 Cumulative Effects & Climate Change

#### 3.4.5.1 Cumulative Effects

To examine potential cumulative air quality impacts from activities that it authorizes, BLM initiated the Colorado Air Resources Management Modeling Study (CARMMS). The study was primarily concerned with assessing statewide impacts of projected oil and gas development (both federal and fee (i.e., private)) out to year 2021 for three development scenarios (low, medium, and high). Projections for development are based on either the most recent Reasonably Foreseeable Development (RFD) document (high), or a projection of the current 5-year average development pace forward to 2021 (low). The medium scenario includes the same well count projections as the high scenario, but assumes restricted emissions, whereas the high assumes current development practices and existing emissions controls required by regulations (2012). Each BLM field office was modeled with the source apportionment (SA) option, meaning that incremental impacts to regional ozone and AQRVs from development in these areas are essentially tracked to better understand the significance of such development on impacted resources and populations (see other sections and affected populations in Section 3.35).

The CARMMS study leverages the work completed by the WestJumpAQMS, and the base model platform configuration (CAMx), meteorology (WRF), and model performance metrics are based on those products. The complete report and associated data is available on our website at https://www.blm.gov/sites/blm.gov/files/program_natural%20resources_soil%20air%20water_airco_quick%20link_CARMMS.pdf. The CARMMS model domain has a minimum grid resolution of 4km.

FOUR FOREST
RESTORATION INITIATIVE

September 13, 2011

# Old Growth Protection
# &
# Large Tree Retention Strategy

# Contents

I. Old Growth Protection & Large Tree Retention Strategy (OGP&LTRS) Overview...... 3
II. OGP&LTRS Rationale: The Historical Debate Regarding Diameter Caps in the Southwest and the 4FRI's Large Tree Retention Policy.................................................... 5
III. Exception Process for Large Post-Settlement Tree Retention..................................... 8
IV. Exceptions.................................................................................................................. 9
Seeps & Springs............................................................................................................ 9
Riparian...................................................................................................................... 11
Wet Meadows ............................................................................................................. 13
Encroached Grasslands .............................................................................................. 15
Aspen Forest & Woodland.......................................................................................... 17
Ponderosa Pine/Gambel Oak Forest (Pine-Oak)......................................................... 19
Within Stand Openings ............................................................................................... 21
Heavily Stocked Stands with High Basal Area Generated By a Preponderance of Large Young Trees............................................................................................................... 23
V. Description of Desired Next Steps and Ongoing Collaborative Clarification of OGP&LTRS................................................................................................................ 25
VI. References............................................................................................................... 26

# I. Old Growth Protection & Large Tree Retention Strategy (OGP&LTRS) Overview

The goals of the Four Forests Restoration Initiative (4FRI) are to restore healthy, diverse stands, supporting abundant populations of native plants and animals; to protect communities in forested landscapes from destructive wildland fire; and to support sustainable forest industries that strengthen local economies while conserving natural resources and aesthetic values. In short, we seek to re-establish largely self-regulating forested landscapes including their associated fire regimes through a process of ecological restoration that benefits communities, economies, ecosystems and biodiversity.

Ecological restoration will require thinning post-settlement ponderosa pine trees[1] in unnaturally dense stands. While there is broad agreement for reducing small diameter tree densities, where and how this should be done has often been the subject of social and scientific debate. The purpose of this document is to affirm recommendations of the 4FRI Stakeholder Group relating to the retention of large post-settlement and old growth trees—recommendations that are critical to moving beyond those debates—and to provide specific, science-based recommendations for incorporation into 4FRI restoration plans and projects.

**Retention of Old Growth and Large Post-settlement Trees**

"The Path Forward"—a foundational document of the 4FRI—calls for blanket old growth protection, regardless of tree size. It states that, "No old-growth trees (pre-dating Euro-American settlement) shall be cut." The document also includes broad recommendations for retaining large post-settlement trees with some carefully specified exceptions.

In southwestern ponderosa pine forests, old-growth trees are important to ecosystem structure and function. They increase genetic diversity on the landscape; old trees have greater genetic diversity than even-aged groups of young trees (Kolanoski 2002) and, thus, may have a better chance of adapting to changing climatic and environmental conditions, an ability they can pass on to their progeny. In addition, when not surrounded by large amounts of fuel, the thick bark of old-growth trees makes them largely resistant to low-intensity surface fire (Agee 1998). Old-growth trees also increase forest structural diversity, which, in turn, provides more wildlife habitat. For example, large trees provide additional structure for bats, which roost under slabs of bark; nest trees for northern goshawks and Mexican spotted owls; continuous canopy for tassel-eared squirrels; and foraging habitat for bark-gleaning birds (Bull and Hohmann 1994, Humes et al. 1999, Dodd et al. 2003). In addition, old trees often become long-lasting snags when they die, which benefits many species of cavity-nesting birds and mammals (Chambers and Mast

[1] Large and old growth tree recommendations offered in this document refer specifically to ponderosa pine trees.

2005). Old, large trees also serve as long-term carbon stores (Harmon et al. 1990) and preserve a record of the past that can inform future research about insect outbreak, fire history, and climate change (Fulé et al. 1997, Soulé and Knapp 2006). Finally, old-growth trees enhance the aesthetics of forests (Brown and Daniel 1984) and, thus, increase public support for restoration projects. Old-growth trees are present on the landscape at similar or lower densities compared to presettlement times (Mast et al. 1999, Moore et al. 2004), depending on how many trees have been removed postsettlement by forest management practices (e.g., clearcut, thinning, seed tree, etc.). The three main threats to old-growth trees are high-severity wildfire, competition from mid- or under-story trees, and drought and subsequent bark beetle attacks (Kolb et al. 2007). Restoration treatments (thinning and prescribed burning) around old-growth trees can cause some mortality. However, this threat can be reduced through careful management (Hood 2010). In addition, restoration treatment should result in a reduced threat of wildfire, a release from competition, and increased tree growth (Fajardo et al. 2007, Fulé et al. 2007).

The Path Forward also calls for retaining large post-settlement trees (defined by the socio-political process as those greater than 16 inches diameter-at-breast height [dbh]) throughout the 4FRI landscape, except: (1) as necessary to meet community protection and public safety goals within the Community Protection Management Areas identified in the Analysis of Small Diameter Wood Supply in Northern Arizona and where stakeholder agreement identifies priority areas within approved CWPPs; and (2) when best available science and stakeholder agreement (as defined in the 4FRI Charter) identify sites where ecological restoration and biodiversity objectives cannot otherwise be met – specifically wet meadows, seeps, springs, riparian areas, encroached grasslands, aspen groves or oak stands, within-stand openings, and heavily stocked stands with high basal area generated by a preponderance of large, young trees.

We recognize that there are multiple causes of ecological degradation that may not be affected by mechanical thinning and different types of burning. The exceptions articulated in the following section are intended to be part of a more comprehensive and concurrent approach to treating causes (rather than just symptoms) of ecological decline. To that end, we are asking the Forests to work collaboratively on a comprehensive restoration assessment that identifies possible management actions to stem/reverse ecological decline. We believe this restoration assessment should focus on a wider range of forest resources than just timber and fire; such as hydrology, range, recreation, and wildlife. We ask the four National Forests to initiate this assessment with the 4FRI Stakeholders, upon release of the Draft EIS for the first project area.

The intention of the exception process is to increase landscape heterogeneity and conserve biodiversity. Thus we do not support implementing any exceptions where removing the trees would conflict with existing recovery/conservation plan objectives for managing sensitive, threatened or endangered species or their habitat. We also recognize there may be additional areas and/or circumstances where large trees need to be removed to achieve restoration. These circumstances should be identified through a site-specific, agreement-based, collaborative process as described in the 4FRI Charter.

# II. OGP&LTRS Rationale: The Historical Debate Regarding Diameter Caps in the Southwest and the 4FRI's Large Tree Retention Policy

**Introduction**

Diameter caps for tree cutting have been used in forest management efforts across the West. They have been and continue to be the subject of much debate. In this section of the Large Tree Retention Strategy document, two different perspectives on diameter caps are presented. Recognizing that the 4FRI Large Tree Retention and Old Growth Protection Strategy is not meant to serve as a strict diameter cap, these perspectives are offered here to illuminate elements of the historical debate that have led to the 4FRI's formulation of the existing Large Tree Retention and Old Growth Protection Strategy.

**Arguments in Favor of Diameter Caps**

There is a generally recognized need to retain larger trees and protect old growth in southwestern ponderosa pine forest restoration. Some proponents of large tree retention have suggested that a 16" diameter cap is both ecologically and socio-politically warranted given the scarcity of mature and old growth forest cover in the region; the need to quickly re-establish lost mature and old forest structure; the necessity of retaining trees larger than 16" dbh to recruit new trees into regionally-underrepresented VSS 5, 6 and "old growth" structural stages; and the regional rarity of trees larger than 16" (approximately 96% of ponderosa pine trees in northern Arizona and New Mexico are smaller than 16-inch dbh).

Such proponents have proposed diameter caps as a means to (1) prevent large-tree logging for production-oriented, uneven-aged silvicultural goals, (2) discourage large-tree logging to pay for small-tree thinning or other activities, (3) favor small-diameter-specific industries over large-tree-dependent ones, (4) avoid population-level effects to imperiled species and wildlife that are associated with larger live and dead trees and denser canopy, (5) mitigate unforeseen large tree mortality during and following restoration treatments, (6) mitigate unknown rates of future large tree mortality resulting from re-establishing natural fire regimes and future climates, (7) mitigate under-estimates of historical tree densities owing to evidence undercounting and loss to fire, logging and decay, (8) accommodate differing reference scales, choices of reference attributes, restoration objectives and desired degrees of precision or rates of change, (9) mitigate uncertainty about future national forest policy, timber and wildlife habitat management, and (10) facilitate a restoration approach that reduces immediate crown fire threat while incrementally moving the forest toward its natural range of variability through a combination of thinning and natural fire.

Diameter limits and exception-thresholds for tree cutting are a common strategy for achieving ecological objectives in western forest landscapes. In their recommendations to Congress and the President, the Eastside Forests Scientific Society Panel proposed a 20" diameter limit for trees younger than 150 years old to protect late-successional and old-growth dry forests of eastern Oregon and Washington. They cited the ecological importance and scarcity of large and old trees and the need to retain them to replenish regionally-depleted supplies of large and old trees, snags, logs and associated wildlife

habitat. Those recommendations formed the basis for interim management direction amending nine national forest plans and establishing a 21" diameter limit in dry forests which in turn carried forward into an exception-threshold of 21" diameter in legislation proposed to restore dry forests of eastern Oregon. The Sierra Nevada Framework set forth a 20" diameter limit for tree cutting to conserve late-seral forests across national forest land in the Sierra Nevada. Larger diameter limit and exception-thresholds in these examples reflect more productive forests and larger mean diameters than in southwestern forests. Diameter limits in Region 3 forest plans restrict large tree cutting in habitat for Mexican spotted owl and northern goshawk for their viability and in "old growth"; diameter-based "vegetative structural stages" guide management of those species' habitats.

**Arguments Against Diameter Caps**

Arbitrary diameter thresholds (or "caps") may assure that trees of a certain size are retained, but they do not guarantee that short- or long-term ecological restoration goals will be achieved. In fact, diameter caps can actually prevent attainment of ecological restoration objectives because they can have unintended consequences such as interfering with the restoration of herbaceous openings and, where unnaturally dense stands of larger, post-settlement trees predominate, caps can limit fuel reduction and, therefore, undermine the agency's ability to re-establish surface fire (Abella et al. 2006, Sanchez-Meador 2009). A diameter threshold also creates a "one-size-fits-all" guideline which can lead to treatments that are inconsistent with site-based conditions.

In general caps are arbitrarily chosen to achieve socio-political objectives that do not necessarily support comprehensive ecological restoration. Contemporary diameter caps, even as an informal agreement, have become <u>the</u> condition that allows fuel reduction and restoration to move forward without lengthy delays due to appeals and litigation. Examples of their arbitrary application include:

- In order to test restoration treatments in the Grand Canyon, a 5-inch cap was required by environmental advocates (Fulé 2006).
- For restoration to proceed in the White Mountains, a 16-inch cap was required (Abrams and Burns 2007).
- A 12-inch cap was employed to define forest biomass appropriate for generating renewable energy (Arizona Corporation Commission, 2006).
- On the Coconino National Forest, a 16-inch cap was imposed to allow restoration projects proposed by the Grand Canyon Forest Partnership to proceed (Friederici 2003).

Further evidence that caps undermine ecological restoration goals is reflected in a recent decision on the Marshall Fuel Reduction and Forest Restoration Project (USFS 2010). The Forest Service rejected an alternative that proposed a 16-inch diameter cap because, "A 16-inch cap would prevent the restoration of natural openings and more natural spatial distribution of clumps of trees important for wildlife habitat and forest health." When administrative and legal challenges to forest thinning and restoration projects prevail it is

generally because of issues related to agency compliance with law and policy (Brown 2009)—not because there is a scientific basis for a diameter threshold.

Finally, a static diameter cap fails to account for the fact that trees grow, that restoration will occur over decades while those trees are growing, and that over time, retention of excess trees may undermine efforts to restore ecosystem resilience in the face of drier conditions associated with climate change (Glicksman 2009, Westerling et al. 2006).

**Conclusions**

Recognizing a need to move beyond the historical debate and move forward with landscape-scale restoration that is ecologically, socially, and economically viable, the 4FRI Collaborative has agreed that the 4FRI effort should implement large tree retention and old growth protection strategies that are not based on strict diameter limits, but are based upon a 16" diameter threshold that limits the cutting of trees larger than 16" to circumstances and criteria set forth in pre-defined exception categories that follow. In addition, we are committed to monitoring the outcomes of treatments that follow this guidance to determine if they achieve our ecological restoration goals. If they do not we are committed to adapting this policy to achieve better ecological outcomes.

It is our hope and expectation that this approach will balance the approaches and opinions expressed above, and will serve as a policy mechanism for supporting comprehensive ecosystem restoration while addressing stakeholders' needs for protecting old growth and large ponderosa pine trees.

## III. Exception Process for Large Post-Settlement Tree Retention

The following section outlines a problem statement, specific identifying circumstances, ecological objectives and selection criteria for instances in which large post-settlement trees may be cut to meet restoration objectives. At specific locations, large trees may need to be removed, felled, or girdled for purposes of ecological restoration and biodiversity conservation. The purpose of this section is to provide sufficient specificity to translate those exception categories—where stakeholder agreement exists to do so—into management actions and tree-marking guidelines. For eight of the nine exception categories programmatic recommendations describe the circumstances and criteria in which large post-settlement trees may need to be removed. For the "Heavily Stocked Stands with High Basal Area Generated by a Preponderance of Large Young Trees" (or "Large Young Tree") exception category, getting to a higher level of social and scientific agreement entails more complexity and challenges, so we propose the initiation of additional collaborative discussion and planning that we hope will bolster restoration efforts by increasing confidence and knowledge-sharing, maximizing agreement and minimizing disagreement.

# IV. Exceptions

## Seeps & Springs

**Suggested Tree Marking Exception Code**: "S"

**Identifiable Circumstance**

Seeps are locations where surface-emergent groundwater causes ephemeral or perennial moist soil or bedrock, where standing or running water is infrequent or absent and that exhibit vegetation and other biological diversity adapted to mesic soils.

Springs are small areas where surface-emergent groundwater causes ephemeral or perennial standing or running water, wet or moist soils and that exhibit vegetation and other biological diversity adapted to mesic soils or aquatic environments (Feth and Hem 1963).

**Problem Statement**

Seeps exhibit unique, often isolated biophysical conditions that can sustain unique, mesic-adapted biological diversity and can facilitate endemism and speciation. In the absence of frequent fires and in the presence of livestock grazing, large post-settlement trees may have established and grown in such proximity to seeps to compromise available soil moisture or light upon that afford those unique biophysical conditions.

Springs exhibit unique, often isolated biophysical conditions that can sustain unique, mesic-adapted or aquatic biological diversity and can facilitate endemism and speciation. Springs also provide water and other habitat to terrestrial wildlife. In the absence of frequent fires and in the presence of livestock grazing, large post-settlement trees may have established and grown in such proximity to springs to compromise available soil moisture (Simonin et al. 2007) or light upon that afford those unique biophysical conditions.

Removal of these trees may constitute a relatively small part of an overall seep and spring restoration effort when compared to addressing root causes of overall degradation. Thinning alone without addressing other sources of degradation is unlikely to restore seeps and springs (Thompson et al. 2002).

**Ecological Objectives**

(1) Conserve and restore the biophysical conditions in seeps and springs upon which terrestrial, mesic-adapted and aquatic native biological diversity depend.

**Criteria**

Large (>16"dbh) post-settlement ponderosa pine trees may be removed to conserve the unique biophysical attributes of seeps & springs according to these criteria:

(1) Where large trees' roots are encroaching on mesic soils associated with a seep or spring, or such trees' drip lines are overlapping or nearly overlapping a seep or spring such that its shading compromises the integrity of a spring's unique biophysical attributes, and;

(2) Where removing the trees does not conflict with existing recovery/conservation plan objectives for managing sensitive, threatened or endangered species or their habitat.

Note:
Where there is evidence of pre-settlement trees having grown in similar root and crown proximity to said seep or spring in the past, leave an equivalent number of large replacement trees.

# Riparian

**Suggested Tree Marking Exception Code:** "R"

**Identifiable Circumstance**

Riparian areas occur along ephemeral or perennial streams or are located down-gradient of seeps or springs. These areas exhibit riparian vegetation, mesic soils, and/or aquatic environments.

**Problem statement**

Riparian areas exhibit unique biophysical conditions that can sustain unique, mesic-adapted or aquatic biological diversity. Riparian areas and the streams, springs and seeps connected to them often harbor imperiled species and can be sources of endemism. Riparian areas also provide water and other habitat to terrestrial wildlife. In the absence of frequent fires and in the presence of livestock grazing, water development projects and other factors, large post-settlement trees may have established and grown within riparian areas such that they compromise available soil moisture or light that support those unique biophysical conditions. However, it is likely to be a very rare circumstance that trees of any size will need to be removed from forested riparian zones.

Cutting of any trees within riparian areas should minimize impacts by following Best Management Practices (BMPs).

Whenever possible, large trees identified for cutting should be left onsite as snags or downed logs.

Removal of these trees may constitute a relatively small part of an overall riparian area restoration effort when compared to addressing fundamental causes of overall degradation. Thinning alone without addressing other sources of degradation is unlikely to restore riparian areas.

**Ecological Objectives**

Conserve and restore the biophysical conditions in riparian habitat upon which terrestrial and aquatic native biological diversity depend.

**Criteria**

Large (>16"dbh) post-settlement ponderosa pine trees may be removed to conserve the unique biophysical attributes of riparian areas according to these criteria:

(1) Where large trees are growing (rooted) within a riparian area and compromising available soil moisture or light that support that area's unique biophysical conditions, and

(2) Where removing the trees does not conflict with existing recovery/conservation plan objectives for managing sensitive, threatened or endangered species or their habitat.

Notes:
Where there is evidence of pre-settlement trees having grown in similar root and crown proximity to said riparian in the past, leave an equivalent number of large replacement trees.

There may be additional areas and/or circumstances identified for riparian restoration through a site specific agreement-based, collaborative process as described in the 4FRI Charter.

# Wet Meadows

**Suggested Tree Marking Exception Code**: "WM"

**Identifiable Circumstance**

High-elevation streamside or spring-fed meadows occur in numerous locations throughout the Southwest. However, less than 1% of the landscape in the region is characterized as wetland (Dahl 1990), and wet meadows are just one of several wetland types that occur. Patton and Judd (1970) reported that approximately 17,700 ha of wet meadows occur on national forests in Arizona and New Mexico.

These areas may be referred to as riparian meadows, montane (or high-elevation) riparian meadows, sedge meadows, or simply as wet meadows. Wet meadows are usually located in valleys or swales, but may occasionally be found in isolated depressions, such as along the fringes of ponds and lakes with no outlets. Where wet meadows have not been excessively altered, sedges (*Carex* spp.), rushes (*Juncus* spp.), and spikerush (*Eleocharis* spp.) are common species (Patton and Judd 1970, Hendrickson and Minckley 1984, Muldavin et al. 2000). Willow (Salix) and alder (Alnus) species often occur in or adjacent to these meadows (Long 2000, 2002, Maschinski 2001, Medina and Steed 2002). High-elevation wet meadows frequently occur along a gradient that includes aquatic vegetation at the lower end and mesic meadows, dry meadows, and ponderosa pine or mixed conifer forest at the upper end. These vegetation gradients are closely associated with differences in flooding, depth to water table, and soil characteristics (Judd 1972, Castelli et al. 2000, Dwire et al. 2006). While relatively rare, wet meadows are believed to be of disproportionate value because of their use by wildlife and the range of other ecosystem services they provide. Wet meadows perform many of the same ecosystem functions associated with other wetland types, such as water quality improvement, reduction of flood peaks, and carbon sequestration.

**Problem statement**

Wet meadows are one of the most heavily altered ecosystems. They have been used extensively for grazing livestock, have become the site of many small dams and stock tanks, have had roads built through them, and have experienced other types of hydrologic alterations, most notably the lowering of their water tables due to stream downcutting, surface water diversions, or groundwater withdrawal (Neary and Medina 1996, Gage and Cooper 2008). In the presence of livestock grazing and hydrologic changes, large post-settlement trees may have established and grown within wet meadows such that they compromise available soil moisture or light creating unique biophysical conditions.

Removal of these trees may constitute a relatively small part of an overall wet meadow restoration effort when compared to addressing root causes of overall degradation. Thinning alone without addressing other sources of degradation is unlikely to restore wet meadows.

**Ecological Objectives**

Conserve and restore the biophysical conditions of wet meadows upon which terrestrial native biological diversity depend.

**Criteria**

Large (>16"dbh) post-settlement ponderosa pine trees may be removed to conserve the unique biophysical attributes of wet meadows according to these criteria:

(1) Where large trees are growing (rooted) in a wet meadow, and

(2) Where removing the trees does not conflict with existing recovery/conservation plan objectives for managing sensitive, threatened or endangered species or their habitat.

Note:
Where there is evidence of pre-settlement trees having grown in similar root and crown proximity to said wet meadows in the past, leave an equivalent number of large replacement trees.

# Encroached Grasslands

**Suggested Tree Marking Exception Code**: "EG"

**Identifiable Circumstance**

Encroached grasslands are herbaceous ecosystems that have infrequent-to-no evidence of pine trees growing prior to settlement. The two prevalent grassland categories in the 4FRI landscape are montane (includes subalpine) grasslands and Colorado Plateau (a subset of Great Basin) grasslands, with montane grasslands being most common (Finch 2004). A key indicator of grasslands is the presence of mollisol soils, which are typically deeper with higher rates of accumulation and decomposition of soil organic matter relative to soils in the surrounding landscape. Grasslands in this region evolved during the Miocene and Pliocene periods, and the dark, rich soils observed in grasslands today have taken more than 3 million years to produce. In addition to their association with mollic soils, grasslands in this region are maintained by a combination of climate, fire, wind desiccation, and to a lesser extent by animal herbivory (Finch 2004).

Typical montane grasslands in this region are characterized by Arizona fescue (Festuca arizonica) meadows on elevated plains of basaltic and sandstone residual soils. Montane grasslands are the most naturally fragmented grasslands in the region, ranging from thousands of acres in size (e.g., in the White Mountains, Baker 1983) down to only a few acres. They generally occur in small (<100 ac.) to medium-sized (100 to 1000 ac.) patches. Historic maintenance of the herbaceous condition in these grasslands is subject to some debate though appears to be primarily driven by periodic fire. The cool-season growth of Arizona fescue also plays a large role in maintenance of parks and openings by directly competing with ponderosa pine seedlings.

Identification of grasslands in this region should use a combination of the Terrestrial Ecosystem Survey, Southwest Regional GAP Analysis, Brown and Lowe Vegetation Classification (Brown and Lowe 1982; TNC GIS Layer 2006) among other existing vegetation and soils data.

This exception category will require an iterative process of collaborative mapping, field verification, and refinement. There are some debate and questions about where and how much the grassland-forest mosaic shifts over time and space. There are also debate and questions about whether some recently-burned areas are early seral forests or stable grasslands, whether or how they may be surrogates for historical grasslands, and if or how that should factor into the overall retention of forest cover. Recognizing the importance of montane grassland restoration, we encourage all parties to seek resolution to these issues on a case-by-case basis through field visits, literature review, and/or discussion.

**Problem statement**

Prior to European settlement, pine trees rarely established in grasslands because they were either outcompeted by production of cool-season grasses or killed by frequent fire (Finch 2004). In the late 1800s, unsustainable livestock grazing practices significantly reduced herbaceous cover, releasing competition pressure on pine seedlings. Coupled with the onset of fire suppression in the early 1900s, pine trees rapidly encroached and recruited into native grasslands (e.g., Allen 1984, Moore and Huffman 2004, Coop and Givnish 2007).Pine encroachment into grasslands has contributed to a significant loss of biodiversity (Stacey 1995) and wildlife habitat particularly for grassland-dependent species such as pronghorn. Plant diversity is particularly important in grassland ecosystems: grassland plots with greater specie diversity have been found to be more resistant to drought and to recover more quickly than less diverse plots (Tilman and Downing 1994); this resilience will become even more important in a warming climate. Pine tree removal, restoration of fire, and complementary reductions in livestock grazing pressure are all necessary to restore structure and function of native grasslands.

**Ecological Objectives**

(1) Enhance, maintain, and restore naturally functioning grasslands.

(2) Ensure native grassland composition, increase native species diversity, improve resilience to drought.

(3) Restore natural fire regime.

**Criteria**

Large (>16” dbh) post-settlement ponderosa pine trees may be cut and/or removed to restore the unique biophysical attributes of grasslands according to these criteria:

(1) Where existing grasslands are being encroached, and large trees are interfering with overall restoration objectives, and

(2) Where removing the trees does not conflict with existing recovery/conservation plan objectives for managing sensitive, threatened or endangered species or their habitat.

There may be additional areas and/or circumstances identified for grassland restoration through a site specific agreement-based, collaborative process as described in the 4FRI Charter.

# Aspen Forest & Woodland

**Suggested Tree Marking Exception Code:** "AF"

**Identifiable Circumstance**

Quaking aspen (*Populus tremuloides*) occurs in small patches throughout the 4FRI area. Bartos (2001) refers to three broad categories of aspen: (1) stable and regenerating (stable), (2) converting to conifers (seral), and (3) decadent and deteriorating. Almost all of the aspen within ponderosa pine of the 4FRI area occurs as seral aspen, and regenerates after disturbance. Favorable soil and moisture conditions maintain stable aspen over time.

**Problem Statement**

Aspen occurs within ponderosa pine forests, and is ecologically important due to the high concentration of biodiversity that depends on aspen for habitat (Tew 1970, DeByle 1985, Finch and Reynolds 1987, Griffis-Kyle and Beier 2003). In addition, stable aspen stands serve as an indicator of ecological integrity (Di Orio and others 2005). However, aspen is currently declining at an alarming rate (Fairweather and others 2008).

The loss of fire as a natural disturbance regime in southwestern ponderosa pine forests since European settlement has caused much of the aspen-dominated lands to succeed to conifers (Bartos 2001). Other factors contributing to gradual aspen decline over the past 140 years include reduced regeneration from browsing by livestock and introduced and native wild ungulates in the absence of natural predators like wolves (Pearson 1914, Larson 1959, Martin 1965, Jones 1975, Shepperd and Fairweather 1994, Martin 2007). More recently, aerial and ground surveys indicate more rapid decline of aspen, with 90% mortality occurring in low elevation aspen sites and over 60% mortality observed in mid-elevations. Major factors thought to be causing this rapid decline of aspen include frost events, severe drought, and a host of insects and pathogens (Fairweather and others 2008) that have served as the "final straws" for already compromised stands.

Removal of encroaching pine trees constitutes part of an overall aspen restoration effort. Thinning alone without addressing other sources of degradation, such as excessive herbivory is unlikely to successfully restore aspen forests.

Some stakeholders expressed that considerable uncertainty exists around fire regimes for aspen in ponderosa pine, and that research questions remain unanswered around the prevalence of mixed-severity fire and its ecological role as a driving force for aspen stands at the top of its elevational range, and on steep slopes within this vegetation type.

**Ecological Objectives**

(1) Conserve and restore aspen forests and woodlands within 4FRI area by restoring appropriate fire regimes and decreasing competition from ponderosa pine.

(2) Protect regeneration, saplings, and juvenile trees from browsing.

**Criteria**

Large (>16"dbh) post-settlement trees may be cut in conifer-encroached seral aspen stands according to the following criteria:

(1) Where current post-settlement ponderosa pine tree numbers are above and beyond residual targets (identified using pre-settlement conifer tree evidences), and

(2) Where fire cannot be used safely and effectively to regenerate or maintain aspen, or

(3) Where site visitation and/or data collection and analysis indicates the need for encroachment mitigation, and

(4) Where removing large trees does not conflict with existing recovery/conservation plan objectives for managing sensitive, threatened or endangered species or their habitat

Note:
There may be additional areas and/or circumstances identified for aspen restoration through a site specific agreement-based, collaborative process as described in the 4FRI Charter.

# Ponderosa Pine/Gambel Oak Forest (Pine-Oak)

**Suggested Tree Marking Code**: "P-O"

**Identifiable Circumstance**

A number of habitat types exist in the southwestern United States that could be described as pine-oak. Ponderosa pine forests are interspersed with Gambel oak trees in locations throughout the 4FRI area in a habitat association referred to as PIPO/QUGA (USFS 1997, USDI FWS 1995). Specifically, any stand within the Pinus ponderosa series where ≥10% of stand basal area consists of Gambel oak (*Quercus gambelii*) ≥13 cm (5 in) diameter at root collar (drc) is considered to be pine-oak within the 4FRI area (USDI FWS 1995). In southwestern ponderosa pine forests, Gambel oak has several growth forms distinguished by stem sizes and the density and spacing of stems within clumps. These include shrubby thickets of small stems, clumps of intermediate-sized stems, and large, mature trees that are influenced by age, disturbance history, and site conditions (Brown 1958, Kruse 1992, Rosenstock 1998, Abella and Springer 2008, Abella 2008a). Different growth forms provide important habitat for a large number of varying wildlife species (Neff and others 1979, Kruse 1992).

Gambel oak provides high quality wildlife habitat in its various growth forms, and is a desirable component of ponderosa pine forests (Neff and others 1979, Kruse 1992, Bernardos et al. 2004). Gambel oak enhances soils (Klemmedson 1987), wildlife habitat (Kruse 1992, Rosenstock 1998, USDI FWS1995, Bernardos et al. 2004), and understory community composition (Abella and Springer 2008). Large oak trees are particularly valuable since they typically provide more natural cavities and pockets of decay that allow excavation and use by cavity nesters than conifers. In addition to its important ecological role, Gambel oak has high value to humans as it is a popular fuelwood that possesses superior heat-producing qualities compared to other tree species (Wagstaff 1984).

**Problem Statement**

Although management on public lands with regard to oak has changed to better protect the species, illegal fuelwood cutting of Gambel oak and elk and livestock grazing negatively impact oak growth and regeneration (Harper et al. 1985, Clary and Tiedemann 1992, Rick Miller, 1993, unpublished report) and continues to result in the removal of rare, large diameter oak trees (Bernardos et al. 2004).

A literature review by Abella and Fule (2008) found that Gambel oak densities appear to have increased in many areas with fire exclusion, especially in the small and medium-diameter stems (<8" dbh). Chambers (2002) found that Gambel oak on the Kaibab and Coconino National Forests was distributed in an uneven-aged distribution, dominated by smaller size classes (<5 cm dbh) and few large diameter oak trees. Because of Gambel

oak's slow growth rate, there may be little opportunity for these small Gambel oak trees to attain large diameters (>85 cm) (Chambers 2002).

Pine competition with oak has been identified as an issue in slowing oak growth, particularly for older oaks (Onkonburi 1999). Onkonburi (1999) also found that for northern Arizona forests, pine thinning increased oak incremental growth more than oak thinning and prescribed fire. Fule (2005) found that oak diameter growth tended to be greater in areas where pine was thinned relative to burn only treatments and controls. Thinning of competing pine trees may promote large oaks with vigorous crowns and enhanced acorn production (Abella 2008b), and may increase oak seedling establishment (Ffolliott and Gottfried 1991).

**Ecological Objectives:**

(1) Maintain and restore all growth forms of Gambel oak, focusing on enhancing and maintaining larger, older oak trees.

(2) Restore frequent, low intensity surface fire to ponderosa pine-Gambel oak forests.

(3) Restore and maintain brushy thicket, pole and dispersed clump growth forms of Gambel oak by allowing natural self-thinning, thinning dense clumps, and/or burning.

(4) Protect Gambel oak growth forms from fuel wood cutting, damage during restoration treatments including thinning and post thinning slash burning.

**Criteria**

In pine-oak, which occurs when ≥10% of the stand basal area consists of Gambel oak >13 cm (5 in) diameter at root collar, large (>16 dbh) post-settlement ponderosa pine trees may be removed to conserve oaks according to these criteria:

*In MSO restricted habitat*:

(1) Within MSO habitat and designated critical habitat, the Recovery Plan for the Mexican spotted owl should be followed to improve key habitat components and primary biological factors, which includes Gambel oak, or

*Outside MSO restricted habitat*: where large post-settlement trees' drip lines or roots overlap with those of Gambel oak trees exhibiting drc of >12"; and

(2) Where removing the trees does not conflict with existing recovery/conservation plan objectives for managing sensitive, threatened or endangered species or their habitat.

# Within Stand Openings

**Suggested Tree Marking Exception Code**: "WSO"

**Identifiable Circumstance**

Within Stand Openings are small openings (generally 0.05 to 1.0 acres) that were occupied by grasses and wildflowers before settlement (Pearson 1942, White 1985, Covington and Sackett 1992, Sanchez-Meador et al. 2009). Pre-settlement openings can be identified by the lack of stumps, stump holes, and other evidence of pre-settlement tree occupancy (Covington et al. 1997). These openings are most pronounced on sites with heavy textured (e.g., silt-clay loam) soils (Covington and Moore 1994). Current openings include fine scaled canopy gaps. It is not necessary that desired within stand openings and groups be located in the same location that they were in before settlement (the site fidelity assumption). Trees might be retained in areas that were openings before settlement, and openings might be established in areas which had previously supported pre-settlement trees. The within stand opening criteria described here are distinct from and should not be considered as guidance relating to regeneration openings. The stakeholder group does not support the cutting of large trees to create regeneration openings.

**Problem Statement**

Within stand openings appear to have been self-perpetuating before overgrazing and fire exclusion (Pearson 1942, Sanchez-Meador et al. 2009). Fully occupied by the roots of grasses and wildflowers as well as those of neighboring groups of trees, these openings had low water and nutrient availability because of intense root competition (Kaye et al. 1999). Heavy surface fuel loads insured that tree seedlings were killed by frequent surface fires, reinforcing the competitive exclusion of tree seedlings (Fulé et al. 1997). These natural openings appear to have been very important for some species of butterflies, birds, and mammals (Waltz and Covington 2004). Often the largest post-settlement trees, typically a single tree, became established in these natural within a stand opening as soon as herbaceous vegetation was removed by overgrazing (Sanchez-Meador et al. 2009). Contemporary within stand openings or areas dominated by smaller post-settlement trees should be the starting point for restoring more natural within stand heterogeneity.

**Ecological Objectives**

(1) Conserve and restore openings within stands to provide natural spatial heterogeneity for biological diversity.

(2) Break up fuel continuity to reduce the probability of torching and crowning.

(3) Restore natural heterogeneity within stands.

(4) Promote snow-pack accumulation and retention to benefit groundwater recharge and watershed processes at small scale.

**Criteria**

Large (>16" dbh) post-settlement ponderosa pine trees may be removed to restore the unique biophysical attributes of within stand openings according to these criteria:

(1) When the presence of such trees would prevent the re-establishment of sufficient within stand openings to emulate natural vegetation patterns based on current stand conditions, pre-settlement evidences, desired future conditions, or other restoration objectives, and

(2) Where desired openings are tentatively identified as ≥0.05 acre (these openings should be established wherever possible by enlarging current within stand openings or where small diameter trees are predominant), and

(3) Where removing the trees does not conflict with existing recovery/conservation plan objectives for managing sensitive, threatened or endangered species or their habitat.

NOTE: It is not necessary that within stand openings and groups be located in the same location that they were in before settlement. That is, trees might be retained in areas that were openings before settlement, and openings might be established in areas that had previously supported pre-settlement trees.

## [2]Heavily Stocked Stands with High Basal Area Generated By a Preponderance of Large Young Trees

**Suggested Tree Marking Exception Code**: "LYT"

**Identifiable Circumstance**
In some areas irruption of post-settlement has been so robust that current stand structure is characterized by high density and basal area of large, young ponderosa pine trees. These stands or groups of stands exhibit continuous canopy promoting unnaturally severe fire effects under severe fire weather conditions. At the small scales, this circumstance applies on a case-by-case basis where the cutting of large trees is necessary to meet site-specific ecological objectives such as reducing potential for crown fire spread into communities or important habitats such as for Mexican spotted owls and/or goshawk nest stands. This circumstance applies where other exception categories, when implemented, would not alleviate the afore-mentioned severe fire effects.

**Problem Statement**
In stands where pre-settlement evidences, restoration objectives, community protection, or other social or ecological restoration objectives indicate much lower tree density and BA would be desirable, large post-settlement pines may need to be removed to achieve post-treatment conditions consistent with a desired restoration trajectory. In stands where evidences indicate that higher tree density and BA would have occurred pre-settlement, only a few large pines may need to be removed. Many of these areas would support crown fire, and thus require structural modification to reduce crown fire potential and restore understory vegetation that supports surface fire.

**Ecological Objectives**

Natural heterogeneity of forest, savannah and grasslands occurs at the landscape scale.

Natural heterogeneity exists within stands.

Canopy fuel discontinuity reduces the probability of torching and crowning and restores herbaceous fuel continuity to carry surface fire.

Natural fire (rather than silviculture) is the principle regulator of forest structure over time.

Restore groups by retaining the largest trees on the landscape to most quickly re-establish old growth structure, where appropriate to site conditions, restoration and species conservation objectives.

---

[2] The "Large Young Tree" exception was drafted, vetted with the Stakeholder Group, finalized and submitted to the USFS on July 15, 2011.

**Criteria**

Large (>16" dbh) post-settlement ponderosa pine trees may be removed to meet restoration objectives according to these criteria:

(1) When the presence of such trees contributes to continuous canopy promoting unnaturally severe mid- or larger-scale (100+ acre) fire effects under severe fire weather conditions;

(2) When the cutting of such trees is necessary to meet site-specific social or ecological objectives such as reducing potential for crown fire spread into communities or important habitats such as for Mexican spotted owls and/or goshawk nest stands;

(3) When other exception categories, if implemented, would not alleviate the afore-mentioned severe fire effects;

(4) When removing the trees does not conflict with existing recovery / conservation plan objectives for managing sensitive, threatened or endangered species or their habitat.

Note: It is not necessary that trees or groups be located in the same location that they were in before settlement. That is, trees might be retained in areas that were openings before settlement, and openings might be established in areas that had previously supported pre-settlement trees.

## V. Description of Desired Next Steps and Ongoing Collaborative Clarification of OGP&LTRS

All of the exception categories listed in this document have been clarified such that they can be operationalized "programmatically", that is, the process of mapping and selecting areas for exceptions is ready to be tested with real data in specific areas. This means that the stakeholder group considers the guidance offered for these exception categories sufficient to operationalize large tree retention/removal per these criteria across the 4FRI area. This process will require the participation of stakeholders and USFS team members to ensure that the suggested process in this document achieves the stated restoration objectives, and is not burdensome in its approach and mechanics.

[3]The "Large Young Tree" exception category listed in this document will require additional collaborative analysis and clarification. Thus far, the group has discussed an opportunity and a need to carry these discussions forward with a combination of additional site visits to representative areas, analysis of USFS stand data, and further exploration of ForestERA remote sensing data that could inform our collective sense of the distribution and extent of areas exhibiting circumstances necessitating large tree removal, and an efficient means of analyzing data and selecting areas for treatment.

Recognizing the importance of finding additional clarity and agreement for these exception categories, the group intends to pursue additional field and data-centered explorations of these exception categories in 2011, working closely with the Forest Service to ensure that additional analysis occurs in a coordinated fashion, and that additional recommendations can be operationalized in a straightforward fashion. Analysis and visitation schedules are intended to be developed by March, 2011, and completed by May 6, 2011.

[3] The "Large Young Tree" exception was drafted, vetted with the Stakeholder Group, finalized and submitted to the USFS on July 15, 2011.

## VI. References

Abella, Scott R. 2008a. Managing Gambel oak in southwestern ponderosa pine forests: the status of our knowledge. Gen. Tech. Rep. RMRS-GTR-218. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. 27pp.

Abella, Scott R. 2008b. Gambel oak growth forms: management opportunities for increasing ecosystem diversity. Res. Note RMRSRN- 37. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. 6pp.

Abella, S. R., W. W. Covington, P. Z. Fulé, L. B. Lentile, A. J. Sánchez Meador, and P. Morgan. 2007. Past, present, and future old growth in frequent-fire conifer forests of the western united states. *Ecology and Society* 12(2):16. [online] URL: http://www.ecologyandsociety.org/vol12/iss2/art16

Abella, Scott R.; Springer, Judith D. 2008. Canopy-tree influences along a soil parent material gradient in Pinus-ponderosa-Quercus gambelii forests, northern Arizona. Journal of the Torrey Botanical Society. 135:26-36.

Abrams, J. and S. Burns. 2007. Case study of a community stewardship success: The White Mountain Stewardship Contract. Flagstaff, AZ: Ecological Restoration Institute-Issues in Forest Restoration. Northern Arizona University.

Agee, J. K. 1998. Fire and pine ecosystems. In: D. M. Richardson, editor. Ecology and biogeography of *Pinus*. Cambridge University Press, Cambridge.

Allen, C. 1984. Montane grasslands in the landscape of the Jemez Mountains, New Mexico. Unpublished MS Thesis, University of Wisconsin-Madison, 195pp.

Arizona Corporation Commission. 2006. Arizona Corporation Commission, Renewable Energy Standard & Tariff. Docket #00000C-05-030, Decision #69127, November 14, 2006. In: Section R14-2-1802.A.2. Page 5.

Baker, W.L. 1983. Alpine vegetation of Wheeler Peak, New Mexico, U.S.A.: gradient analysis, classification and biogeography. Arctic and Alpine Research 15(2): 223-240.

Bartos, D.L. 2001. Landscape dynamics of aspen and conifer forests. Pages 5-14 In: Shepperd, Wayne D.; Binkley, Dan; Bartos, Dale L.; Stohlgren, Thomas J.; and Eskew, Lane G., compilers. 2001. Sustaining Aspen in Western Landscapes: Symposium Proceedings; 13–15 June 2000; Grand Junction, CO. Proceedings RMRS-P-18. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. 460pp.

Bernardos, D.A., C.L. Chambers, and M.J. Rabe. 2004. Selection of Gambel oak roosts by Southwestern myotis in ponderosa pine-dominated forests, Northern Arizona. Journal of Wildlife Management 68(3):595-601.

Brown, S.J. 2009. Issues that lead to administrative and legal challenges in NEPA. Presented at the Conference on Dry Forests & Dependent Wildlife: Yesterday, Today, and in the Future. November 3-4, 2009. Bend, Oregon. http://nw.firelearningnetwork.org/documents/workshop_summaries?page=2

Brown, D. E., and C. H. Lowe. 1982. Biotic communities of the Southwest (scale 1:1,000,000). General Technical Report RM-78, United States Forest Service, Fort Collins, Colorado. Reprinted and revised 1994 by University Utah Press, Salt Lake City.

Brown, T. C., and T. C. Daniel. 1984. Modeling forest scenic beauty: concepts and application to ponderosa pine. Research Paper RM-256, USDA Forest Service, Rocky Mountain Forest and Range Experiment Station, Fort Collins, Colorado, USA.

Bull, E. L., and J. E. Hohmann. 1994. Breeding biology of northern goshawks in northeastern Oregon. The Northern Goshawk: Ecology and Management, Studies in Avian Biology 16:103-105.

Castelli, R.M., J.C. Chambers, and R.J. Tausch. 2000. Soil-plant relations along a soil-water gradient in Great Basin riparian meadows. Wetlands 20(2):251-266.

Chambers, C.L. 2002. Final Report: status and habitat use of oaks. Arizona Game and Fish Heritage Grant I98012. 52pp.

Chambers, C. L., and J. N. Mast. 2005. Ponderosa pine snag dynamics and cavity excavation following wildfire in northern Arizona. Forest Ecology and Management 216:227-240.

Clary, W. P., and A. R. Tiedemann. 1992. Ecology and values of Gambel oak woodlands. Pages 87-95 In P. F. Ffolliott, G. J. Gottfried, D. A. Bennett, V. M. Hernandex, C. A. Ortega-Rubio, and R. H. Hamre, eds. Ecology and management of oak and associated woodlands: perspectives in the southwestern U.S. and northern Mexico. USDA Forest Service GTR RM-218.

Coop, J.D., Thomas J. Givnish. 2007. Spatial and temporal patterns of recent forest encroachment in montane grasslands of the Valles Caldera, New Mexico, USA. Journal of Biogeography 34(5):914-27.

Covington, W.W., and S.S. Sackett. 1992. Soil mineral nitrogen changes following prescribed burning in ponderosa pine. Forest Ecology and Management 54:175-191.

Covington, W.W., and Moore, M.M. 1992. Southwestern Ponderosa Forest Structure: Changes since Euro-American settlement. Journal of Forestry 92(1):39-47.

Covington, W.W., Fulé, P.Z., Moore, M.M., Hart, S.C., Kolb, T.E., Mast, J.N., Sackett, S.S. & Wagner, M.R. 1997. Restoring ecosystem health in ponderosa pine forests of the Southwest. Journal of Forestry 95:23-29.

Dahl, T.E. 1990. Wetland losses in the United States, 1780s to 1980s. U.S. Department of the

Interior, Fish and Wildlife Service, Washington, D.C. 21pp.

DeByle N.V. 1985. Wildlife and animal impacts Pages 133–152, 115–123 In: DeByle, N.V., Winokur, R.P., eds. Aspen: ecology and management in the western United States. Gen. Tech. Rep. RM-119. Fort Collins, CO: USDA, Forest Service, Rocky Mountain Forest and Range Experiment Station.

Di Orio, AP, Callas, R, Schaefer, RJ. 2005. Forty-eight year decline and fragmentation of aspen (*Populus tremuloides*) in the South Warner Mountains of California. Forest Ecology & Management 206: 307-313.

Dodd, N. L., J. S. States, and S. S. Rosenstock. 2003. Tassel-eared squirrel population, habitat condition, and dietary relationships in north-central Arizona. Journal of Wildlife Management 67:622-633.

Dwire, K.A., J.B. Kauffman, and J.E. Baham. 2006. Plant species distribution in relation to water-table depth and soil redox potential in montane riparian meadows. Wetlands 26(1): 131-146.

Fairweather, M.L., Geils, B.W., Manthei, M. 2008. Aspen decline on the Coconino National Forest. Pages 53-62 In: McWilliams, M.G., editor. Proceedings of the 55th Western International Forest Disease Work Conference, 2007 October 15-19, Sedona, Arizona. Salem, Oregon: Oregon Department of Forestry.

Fajardo, A., J. M. Graham, J. M. Goodburn, and C. E. Fiedler. 2007. Ten-year responses of ponderosa pine growth, vigor, and recruitment to restoration treatments in the Bitterroot Mountains, Montana, USA. Forest Ecology and Management 243:50-60.

Feth, J.H., and Hem, J.D. 1963. Reconnaissance of headwater springs in the Gila River drainage basin, Arizona: U.S. Geological Survey Water-Supply Paper 1619–H. 54pp.

Ffolliott, Peter F.; Gottfried, Gerald J. 1991. Natural tree regeneration after clearcutting in Arizona's ponderosa pine forests: two long-term case studies. Res. Note RM-507. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Forest and Range Experiment Station. 6pp.

Finch, Deborah M., Editor. 2004. Assessment of grassland ecosystem conditions in the Southwestern United States. Volume 1. Gen. Tech. Rep. RMRS-GTR-135-vol. 1. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. 167pp.

Finch, D. M., and R. T. Reynolds. 1987. Bird response to understory variation and conifer succession in aspen forests. Pp. 87-96 *In* Proceedings of a national symposium: issues and technology in the management of impacted wildlife (J. Emerick, S. Q. Foster, L. Hayden-Wing)

Friederici, P. 2003. The Flagstaff model. Pages 7–25 *In* P. Friederici, editor, Ecological

restoration of southwestern ponderosa pine forests. Washington, D.C.: Island Press.

Fulé, P.Z., Covington, W.W. & Moore, M.M. 1 997. Determining reference conditions for ecosystem management of southwestern ponderosa pine forests. Ecological Applications 7: 895-908.

Fulé, Peter Z.; Laughlin, Daniel C.; Covington, W. Wallace. 2005. Pine-oak forest dynamics five years after ecological restoration treatments, Arizona, USA. Forest Ecology and Management. 218:129-145.

Fule´ P.Z., W.W. Covington, M. T. Stoddard, and D. Bertolette. 2006. ―Minimal-Impact'' Restoration treatments have limited effects on forest structure and fuels at Grand Canyon, USA. Restoration Ecology 14(3):357-368.

Fulé, P. Z., J. P. Roccaforte, and W. W. Covington. 2007. Posttreatment tree mortality after forest ecological restoration, Arizona, United States. Environmental Management 40:623-634.

Gage, E. and D.J. Cooper. 2008. Historic range of variation assessment for wetland and riparian ecosystems, US Forest Service Region 2. USDA Forest Service, Region 2, Golden, CO.

Glicksman, R.L. 2009. Ecosystem resilience to disruptions linked to global climate change: An adaptive approach to federal land management. *Nebraska Law Review* 87:833-892.

Griffis-Kyle, KL, and P. Beier. 2003. Small isolated aspen stands enrich bird communities in southwestern ponderosa pine forests. Biological Conservation 110:375-385.

Harmon, M. E., W. K. Ferrell, and J. F. Franklin. 1990. Effects on carbon storage of conversion of old-growth forests to young forests. Science 247:699-702.

Harper, K. T., F. J. Wagstaff, and L. M. Kunzler. 1985. Biology and management of the Gambel oak vegetative type: a literature review. USDA Forest Service General Technical Report INT-179. Intermountain Research Station. Ogden, Utah, USA.

Hendrickson, D. A. and W. L. Minckley. 1984. Ciénegas – vanishing climax communities of the American Southwest. Desert Plants 6:131-175.

Hodgson, J., J. W. Monarch, A. Smith, O. Thorne, II, and J. Todd, eds). Thorne Ecological Institute, Boulder, CO.

Hood, S. M. 2010. Mitigating old tree mortality in long-unburned, fire dependent forests: a synthesis. General Technical Report RMRS-GTR-238, USDA Forest Service, Rocky Mountain Research Station, Fort Collins, Colorado, USA.

Humes, M. L., J. P. Hayes, and M. W. Collopy. 1999. Bat activity in thinned, unthinned, and old-growth forests in western Oregon. The Journal of Wildlife Management 63:553-561.

Jones, J. R. 1975. Regeneration on an aspen clearcut in Arizona. U.S. Forest Service Research Note RM-285, Fort Collins, Colorado, USA.

Judd, B.I. 1972. Vegetation zones around a small pond in the White Mountains of Arizona. Great Basin Naturalist 32(2):91-96.

Kaye, J.P., Hart, S.C., Cobb, R.C., Stone, J.E. 1999. Water and nutrient outflow following the ecological restoration of a ponderosa pine-bunchgrass ecosystem. Restoration Ecology 7:252-261.

Kolanoski, K. M. 2002. Genetic variation of ponderosa pine in northern Arizona: implications for restoration. Northern Arizona University, Flagstaff, Arizona, USA.

Kolb, T. E., J. K. Agee, P. Z. Fulé, N. G. McDowell, K. Pearson, A. Sala, and R. H. Waring. 2007. Perpetuating old ponderosa pine. Forest Ecology and Management 249:141-157.
Kruse, William H. 1992. Quantifying wildlife habitats within Gambel oak/forest/woodland vegetation associations in Arizona. Pages 182-186 In: Ffolliott, Peter F.; Gottfried, Gerald J.; Bennett, Duane A.; Hernandez, C., Victor Manuel; Ortega-Rubio, Alfredo; Hamre, R.H., tech. coords. Ecology and management of oaks and associated woodlands: perspectives in the southwestern United States and northern Mexico; 1992 April 27-30; Sierra Vista, AZ. Gen. Tech. Rep. RM-218. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Forest and Range Experiment Station.

Larson, M.M. 1959. Regenerating aspen by suckering in the Southwest. Rocky Mountain Forest and Range Experimental Station, Research Note 39, 2pp.

Long, J. W. 2000. Restoration of Gooseberry Creek. p. 356-358 In P. F. Ffolliot, M. B. Baker Jr., C. B. Edminster, B. Carleton, M. C. Dillon, and K. C. Mora (tech. eds.), Proceedings of land stewardship in the 21st Century: The contributions of watershed management. U.S.D.A. Forest Service Proceedings RMRS-P-13, Rocky Mountain Research Station, Fort Collins, CO, USA.

Long, J. W. 2002. Evaluating recovery of riparian wetlands on the White Mountain Apache Reservation. Ph.D. dissertation, Northern Arizona University, Flagstaff, AZ, USA.

Machinski, J. 2001. Impacts of ungulate herbivores on a rare willow at the southern edge of its range. Biological Conservation 101:119-130.

Martin, E. C. 1965. Growth and change in structure of an aspen stand after a harvest cutting. Res. Note RM-45. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Forest and Range Experiment Station. 2pp.

Martin, T.E. 2007. Climate correlates of 20 years of trophic changes in a high-elevation riparian system. Ecology 88(2):367-380.

Mast, J. N., P. Z. Fulé, M. M. Moore, W. W. Covington, and A. E. M. Waltz. 1999. Restoration

of presettlement age structure of an Arizona ponderosa pine forest. Ecological Applications 9:228-239.

Medina, A. L. and J. E. Steed. 2002. West Fork Allotment riparian monitoring study 1993-1999. USDA Forest Service, Rocky Mountain Research Station, Final Project Report Volume I.

Miller, C. R. 1993. Oak monitoring report for summer 1993. Unpublished report prepared for Arizona Game and Fish Department.

Moore, Margaret M., D.W. Huffman. 2004. Tree Encroachment on meadows of the North Rim, Grand Canyon National Park, Arizona, USA. Arctic, Antarctic, and Alpine Research 36 (4):474-483.

Moore, M. M., D. W. Huffman, P. Z. Fulé, W. W. Covington, and J. E. Crouse. 2004. Comparison of historical and contemporary forest structure and composition on permanent plots in southwestern ponderosa pine forests. Forest Science 50:162-176.

Muldavin, E., P. Durkin, M. Bradley, M. Stuever, and P. Mehlhop. 2000. Handbook of wetland vegetation communities of New Mexico,Volume I: Classification and community descriptions. New Mexico Natural Heritage Program, Biology Department, University of New Mexico, Albuquerque, NM, USA.

Neary, D.G. and A.L. Medina. 1996. Geomorphic response of a montane riparian habitat to interaction of ungulates, vegetation, and hydrology. Pages 143-147 in Shaw, D.W. and D.M. Finch (tech. coords.), Desired future conditions for southwestern riparian ecosystems: bringing interests and concerns together. USDA Forest Service General Technical Report RM-GTR-272. Rocky Mountain Forest and Range Experiment Station, Fort Collins, CO.

Neff, Don J.; McCulloch, Clay Y.; Brown, David E.; Lowe, Charles H.; Barstad, Janet F. 1979. Forest, range, and watershed management for enhancement of wildlife habitat in Arizona. Special report no. 7. Phoenix, AZ: Arizona Game and Fish Department. 109pp.

Onkonburi, Jeanmarie. 1999. Growth response of Gambel oak to thinning and burning: implications for ecological restoration. Flagstaff, AZ: Northern Arizona University. 129pp. Unpublished dissertation.

Patton, D.R. and B.I. Judd. 1970. The role of wet meadows as wildlife habitat in the Southwest. Journal of Range Management 23(4):272-275.

Pearson, G. A. 1914. The role of aspen in the reforestation of mountain burns in Arizona and

New Mexico. Plant World 17: 249-260.

Pearson, G.A. 1942. Herbaceous vegetation a factor in natural regeneration of ponderosa pine in the Southwest. Ecological Monographs 12: 316-338.

Quinn, R.D., and L. Wu. 2001. Quaking Aspen Reproduce From Seed After Wildfire in the Mountains of Southeastern Arizona. USDA Forest Service Proceedings RMRS-P-18.

Rosenstock, Steven S. 1998. Influence of Gambel oak on breeding birds in ponderosa pine forests of northern Arizona. Condor 100:485-492.

Sanchez-Meador, A.J., M.M. Moore, J.D. Bakker, and P.F. Parysow. 2009. 108 years of change in spatial pattern following selective harvest of a Pinus ponderosa stand in northern Arizona, USA. Journal of Vegetation Science 20:79-90.

Shepperd, W.D., Fairweather, M.L. 1994. Impact of Large Ungulates in restoration of aspen communities in a Southwestern Ponderosa Pine Ecosystem. Pages 344-347 In: Conference on Sustainable Ecosystems: Implementing and Ecological Approach to Land Management. July 12-15, 1993, Northern AZ University. GTR-RM-247. Fort Collins, CO: U.S. Department of Agriculture, Rocky Mountain Forest and Range Experiment Station.

Simonin, K. T.E. Kolb, M. Montes-Helu, and G.W. Koch. 2007. The influence of thinning on components of stand water balance in a ponderosa pine forest stand during and after extreme drought. Agricultural and Forest Meteorology 143:266–276.

Soulé, P. T., and P. A. Knapp. 2006. Radial growth rate increases in naturally occurring ponderosa pine trees: a late-20th century CO2 fertilization effect? New Phytologist 171:379-390.

Tew, R.K. 1970. Seasonal variation in the nutrient content of aspen foliage. Journal of Wildlife Management 34(2):475-478.

Thompson, Bruce C., Patricia L. Matusik-Rowan, & Kenneth G. Boykin. 2002. Prioritizing conservation potential of arid-land montane natural springs and associated riparian areas. Journal of Arid Environments 50:527–547.

U.S. Department of Agriculture (USDA), Forest Service. 1996. Coconino National Forest Plan Amendment 11. Flagstaff, AZ: USDA, Forest Service, Southwestern Region, Coconino National Forest. 44pp.

U.S. Department of Agriculture (USDA), Forest Service. 2010. Marshall Fuel Reduction and Forest Restoration Project: Decision Notice and Finding of No Significant Impact. http://a123.g.akamai.net/7/123/11558/abc123/forestservic.download.akamai.com/11558/www/nepa/65970_FSPLT2_032972.pdf.

U.S. Department of Interior (USDI), Fish and Wildlife Service. 1995. Recovery Plan for the Mexican spotted owl: Vol. I. Albuquerque, New Mexico. 172pp.

U.S. Forest Service (USFS). 1997. Plant associations of Arizona and New Mexico Volume 1: Forests. Edition 3 USFS, SW Region Habitat Typing Guides. 291pp.

U.S. Geological Survey National Gap Analysis Program. 2004. Provisional Digital Land Cover Map for the Southwestern United States. Version 1.0. RS/GIS Laboratory, College of Natural Resources, Utah State University.

Wagstaff, E J. 1984. Economic considerations in use and management of Gambel oak for fuelwood. U.S. Forest Service, Intermountain Range Experiment Station, GTR INT-165, Ogden, Utah, USA.

Waltz, A.E.M., and W.W. Covington. 2004. Ecological restoration treatments increase butterfly richness and abundance: mechanisms of response. Restoration Ecology 12:85-96.

Westerling, A.L., H. G. Hidalgo, D. R. Cayan, and T. W. Swetnam. 2006. Warming and earlier spring increase Western U.S. forest wildfire activity. Science 313:940-943.

White, A.S. 1985. Pre-settlement regeneration patterns in a southwestern ponderosa pine stand. Ecology 66:589-594.

**Appendix 1 – Reservations**

From Scott Harger, Coconino NRCD

From: Scott Harger [mailto:cannonbone@msn.com] Sent: Friday, March 04, 2011 6:57 PM To: Windy Greer Subject: Re: Old Growth Protection and Large Tree Retention Strategy Document for Stakeholders' review

Dear Windy, and LTRS Sub-Group of the LSWG:

I appreciate the accelerated effort to push this document for timely delivery to the USFS.

I like the descriptions captured here for the large tree strategy overview and rationale for the document and the 8-of-9 exception categories whose language appear to be resolved. Except for some very turgid prose in section V that can be edited, I can support this draft as a partial or preliminary version, subject to review of the 9th exception. Otherwise, I can support approval of this final draft without conditions. I would also support it if "Problem Description" were changed to "Management Issue" or "Concerns driving the Exception" or something that doesn't suggest that habitats are problems.

Scott Harger
Range Conservationist
Coconino NRCD
Flagstaff, AZ
928.527.9050

From Scott Hunt, Arizona State Forester

From: Scott Hunt [mailto:ScottHunt@azsf.gov] Sent: Friday, March 11, 2011 12:00 PM To: Windy Greer; 'Ethan Aumack'; Ed Smith Cc: Kevin Boness Subject: RE: Old Growth Protection and Large Tree Retention Strategy Document for Stakeholders' review

Thank you Ed and Ethan for the dedicated work on this strategy. The State Forestry Division agrees with reservations on this large tree retention policy. The arguments against diameter caps that you provided in the policy capture most of our reservations. We have two additional items we wish to offer for consideration:

-In the category “Seeps and Springs” under criteria: there should be an allowance for removal of large trees a considerable distance from the seep or spring to help invigorate infiltration and flow. Distance will need to be determined by the effective area that benefits the seep or spring.

-We believe a consideration needs to given for stands that may have a healthy understory of regenerated ponderosa pine with an overstory of trees that are heavily infected with dwarf mistletoe. Objectives for this type of stand may encourage and favor the vigorous, healthy understory. Removal of the larger trees that are infected would be required to meet the stand objectives.

We will look forward the opportunity to comment on the Larger Young Tree removal category when it is developed. Thanks again for all your time and effort.

Scott Hunt

# New Mexico Forest Restoration Principles

## Preamble

These principles were collaboratively developed by a team of dedicated professionals representing industry, conservation organizations, land management agencies, and independent scientists. These principles for restoration should be used as guidelines for project development and they represent the "zone of agreement" where controversy, delays, appeals, and litigation are significantly reduced. They may be appropriate for application to specific restoration projects in New Mexico. These principles were developed for use in designing and implementing projects with a primary objective of ecological restoration while promoting economic and social benefits.

## Participants

The Nature Conservancy in New Mexico
Natural Resources Conservation Service
Bureau of Land Management
Sierra Club, Rio Grande Chapter
Forest Guardians
New Mexico State Forestry Office
U.S. Forest Service
Bureau of Indian Affairs
New Mexico State Land Office
Forest Guild
Center for Biological Diversity
Restoration Solutions
Public Service of New Mexico

## Principles

1. **Collaborate**. Landscape scale assessment, and project design, analysis, implementation and monitoring should be carried out collaboratively by actively engaging a balanced and diverse group of stakeholders.

2. **Reduce the threat of unnatural crown fire.** A key restoration priority must be moving stands toward a more natural restored condition and the reduction of the risk of unnatural crown fires both within stands and across landscapes. Specific restoration strategies should vary based upon forest vegetation type, fire regime, local conditions, and local management objectives. Forests and woodlands characterized by infrequent and mixed-severity fire should be managed toward a stand structure consistent with their historical ranges of variation—including, in some cases, high-density, continuous stands. Discontinuous stand structure may be appropriate to meet community protection objectives in areas such as the wildland urban interface for these forest and woodland types.

3. **Prioritize and strategically target treatment areas**. Key considerations for prioritizing restoration treatment areas are: degree of unnatural crown fire risk, proximity to human developments and important watersheds, protection of old-growth forests and habitats of federally threatened, endangered, or listed sensitive species, and strategic positioning to break up landscape-scale continuity of hazardous fuels. Treatments should be done at a landscape scale to decrease forest vulnerability to unnatural stand-replacing fire. This priority-setting should take place during fire management planning, land management planning, and community wildfire protection planning.

4. **Develop site-specific reference conditions.** Site-specific historical ecological data can provide information on the natural range of variability for key forest attributes, such as tree age structure and fire regimes that furnish local "reference conditions" for restoration design. A variety of constraints, however, prevent the development of historical information on every hectare of land needing restoration. General goals should be to restore ecological integrity and function.

5. **Use low-impact techniques.** Restoration treatments should strive to use the least disruptive techniques, and balance intensity and extensiveness of treatments. In many areas, conservative initial treatments would be the minimum necessary to adequately reduce the threat of unnatural crown fire. Wildland fire use or management ignited fires may be sufficient to reestablish natural conditions in many locations. In the extensive areas where fire alone cannot safely reduce tree densities and hazardous ladder fuels, mechanical thinning of trees may be needed before the introduction of prescribed fire. Patient, effective treatments will provide more options for the future than aggressive attempts to restore 120 years of change at once. In certain areas, however, such as some urban-wildland interfaces, trade-offs with imminent crown fire risks require considerations of rapid, heavy thinning of mostly small diameter trees.

6. **Utilize existing forest structure.** Restoration efforts should incorporate and build upon valuable existing forest structures, such as large trees, and groups of trees of any size with interlocking crowns excluding aspen. These features are important for some wildlife species, such as Abert's squirrels and goshawks, and should not be removed completely just to recreate specific historical tree locations. Since evidence of long-term stability of precise tree locations is lacking, especially for piñon and juniper, the selection of "leave" trees and tree clusters in restoration treatments can be based on the contemporary spatial distribution of trees, rather than pre-1900 tree positions. Maximizing use of existing forest structure can restore historical forest structure conditions more quickly. Leaving some relatively dense within-stand patches of trees need not compromise efforts to reduce landscape-scale crown fire risk.

   The underlying successional processes of natural tree regeneration and mortality should be incorporated into restoration design. Southwestern conifer regeneration occurs in episodic, often region-wide pulses, linked to wet-warm climate conditions and reduced fire occurrence. Periods with major regeneration pulses in the Southwest occurred in the 1910s–1920 and in 1978–1998. Some of this regeneration would have survived under natural conditions. Restoration efforts should retain a proportion of these cohorts.

7. **Restore ecosystem composition.** Missing or diminished compositional elements, such as herbaceous understories, or extirpated species also require restoration attention. The forest understory, including shrubs, grasses, forbs, snags, and down logs, is an important ecosystem

component that directly affects tree regeneration patterns, fire behavior, watershed functioning, wildlife habitat, and overall patterns of biodiversity. Similarly, soil organisms, such as mycorrhizal fungi, are vital elements that can influence community composition and dynamics. A robust understory provides a restraint on tree regeneration and is essential for carrying surface fires. The establishment and maintenance of more natural patterns of understory vegetation diversity and abundance are integral to ecological restoration.

Restoration planning should include the conservation of habitats for diminished or extirpated wildlife species. Comprehensive forest ecosystem restoration requires balancing fire risk reduction with retention of forest structures necessary for canopy dependent species.

Recovery plans and conservation plans for threatened, endangered, and sensitive species should be incorporated to the fullest extent possible in planning for comprehensive forest restoration.

8. **Protect and maintain watershed and soil integrity.** Low impact treatments will minimize sedimentation, disruption of surface runoff, and other detrimental ecosystem effects. Equipment and techniques should be managed according to soil and water conservation "best management practices" applicable to site-specific soil types, physiography and hydrological functions.

   Reconstruction, maintenance, or decommissioning of existing roads to correct for poor hydrologic alignment and drainage condition can greatly reduce soil loss and sedimentation rates. Projects should strive for no net increase in road density.

   Managing forest density and fuels to avoid uncharacteristically intense wildfire events will reduce the likelihood of catastrophic post-fire soil erosion and nutrient depletion from forested landscapes. Soil productivity should be protected and maintained by avoiding soil loss and compaction, and managing for on-site nutrient retention. Avoid repeated whole tree biomass removal from the forest to maximize nutrient retention. Whenever feasible, green foliage should be recycled by scattering on site; followed by prescribed burning to release stored nutrients.

9. **Preserve old or large trees while maintaining structural diversity and resilience.** Large and old trees, especially those established before ecosystem disruption by Euro-American settlement, are important forest components and critical to functionality of ecosystem processes. Their size and structural complexity provide critical wildlife habitat by broadly contributing crown cover, influencing understory vegetation patterns, and providing future snags. Ecological restoration should manage to ensure the continuing presence of large and old trees, both at the stand and landscape levels. This includes preserving the largest and oldest trees from cutting and crown fires, focusing treatments on excess numbers of small young trees.

   Develop "desired" forest condition objectives that favor the presence of both abundant large diameter trees and an appropriate distribution of age classes on the landscape, with a wide distribution of older trees. It is generally advisable to maintain ponderosa pines larger than 41 cm (16 inches) diameter at breast height (dbh) and other trees with old-growth morphology regardless of size (e.g. yellow-barked ponderosa pine or any species with large drooping limbs, twisted trunks or flattened tops).

   Treatments should also focus on achievement of spatial forest diversity by managing for variable densities. Overall, forest densities should be managed to maintain tree vigor and

stand resiliency to natural disturbances. Disease conditions are managed to retain some presence of native forest pathogens on the landscape, but constrained so that forest sustainability is not jeopardized. Guidelines must provide opportunities to apply differing site-specific management strategies to work towards attainment of these goals, and recognize that achievement may sometimes require more than one entry.

Stand level even-aged management may be appropriate for some objectives, including disease management, post wildfire tree regeneration, accelerating development of old growth characteristics, or for, forest types for which even-aged stands are characteristic, such as spruce or aspen. Treatments should be identified through collaboration with key stakeholders.

Some ponderosa pine forests contain extremely old trees and dead wood remnants that may be small but are important because they contain unique and rare scientific information in their growth rings. Such trees have become increasingly rare in the late 20th century, and the initial reintroduction of fire often consumes these tree-ring resources. Restoration programs should preserve them where possible.

10. **Manage to restore historic tree species composition.** Forest density levels and the presence of fire in the ecosystem are key regulators of tree species composition. Where fire suppression has allowed fire-sensitive trees like junipers or shade-tolerant white fir or spruce to become abundant in historical ponderosa pine forests, treatments should restore dominance of more fire-resistant ponderosa pines. However, fire intolerant species sometimes make up the only remaining large tree component in a stand. Retention of these large trees is important to canopy dependent wildlife species. In mixed conifer forests, landscapes should be managed for composition and structure that approximates the natural range of variability.

11. **Integrate process and structure**. Ecological sustainability requires the restoration of process as well as structure. Natural disturbance processes, including fire, insect outbreaks, and droughts, are irreplaceable shapers of the forest. In particular, fire regimes and stand structures interact and must be restored in an integrated way; mechanical thinning alone will not reestablish necessary natural disturbance regimes. At the same time, fire alone may be too imprecise or unsafe in many settings, so a combination of treatments may often be the safest and most certain restoration approach.

    The single best indicator of whether a proposed approach should be considered as “ecological restoration” is to evaluate if the treatment would help successfully restore the fire regime that is natural for that forest type. Approaches that do not restore natural fire regimes will not achieve full ecological restoration.

12. **Control and avoid using exotic species.** Seeding of exotic grasses and forbs should be prohibited as ecologically incompatible with good restoration. Once established, exotic species can be extremely difficult or impossible to remove. Seeding should be conducted with certified or weed free seeds to reduce the risk of contamination by non-native species or varieties.

    In general, it is ecologically desirable to allow native herbaceous vegetation to recover incrementally unless there is potential for serious soil erosion or the potential for establishment of non-native invasive plants. If enhancement of herbaceous vegetation is needed, especially for road closures and recovery, using locally sourced native seeds or transplanting individuals from nearby areas into treatments is ecologically desirable.

Restoration treatments should also routinely incorporate early actions to control the establishment and spread of aggressive exotics that can be expected from restoration-related site disturbance.

13. **Foster regional heterogeneity**. Biological communities vary at local, landscape, and regional scales, and so should restoration efforts. Ecological restoration should also incorporate the natural variability of disturbance regimes across heterogeneous landscapes. Heterogeneity should be fostered in planning and implementing ecological restoration and all spatial scales, including within and between stands, and across landscape and regional scales.

14. **Protect sensitive communities**. Certain ecological communities embedded within ponderosa pine or other types of forests and some riparian areas, could be adversely affected by on-site prescribed burning or mechanical thinning. Restoration efforts should protect these and other rare or sensitive habitats, which are often hotspots of biological diversity, particularly those that are declining in abundance and quality in the region.

15. **Plan for restoration using a landscape perspective that recognizes cumulative effects**. Forest restoration projects should be linked to landscape assessments that identify historical range of variation (reference condition), current condition, restoration targets, and cumulative effects of management. Ecosystems are hierarchical; changing conditions at one level arise from processes occurring at lower levels, and are constrained, in turn, by higher levels. The landscape perspective captures these complex relationships by linking resources and processes to the larger forest ecosystem. Forest restoration projects should incorporate plans for long-term maintenance of ecological processes.

16. **Manage grazing**. Grass, forbs, and shrub understories are essential to plant and animal diversity and soil stability. Robust understories are also necessary to restore natural fire regimes and to limit excessive tree seedling establishment. Where possible, defer livestock grazing after treatment until the herbaceous layer has established its current potential structure, composition, and function.

17. **Establish monitoring and research programs and implement adaptive management**. Well-designed monitoring, research, and documentation are essential to evaluate and adapt ongoing restoration efforts. Monitoring programs must be in place prior to treatment, and must evaluate responses of key ecosystem components and processes at multiple scales. Use research and monitoring results from a variety of sources to adjust and develop future restoration treatments.

    When possible, restoration projects should be set up as experiments with replicates and controls to test alternative hypotheses. The locations and prescriptions for all restoration treatments should be archived in a geographic information system, so that land managers and researchers have access to site-specific records of restoration treatments.

18. **Exercise caution and use site-specific knowledge in restoring or managing piñon-juniper ecosystems and other woodlands and savannas**. These systems are diverse and complex. Knowledge of local reference structure, composition, processes and disturbance regimes is lacking or uncertain for many piñon–juniper ecosystem types. Given the diversity, variability, and complexity of piñon–juniper systems, identification of local reference conditions is critical to the development of restoration objectives. Exercise caution and use best available science and site-specific knowledge in planning and implementing ecological restoration projects. Use the Grassland and Woodland Restoration and Management

Framework for development and implementation of specific projects (The Framework is currently under development).

Active management may be appropriate to mitigate soil erosion, community wildland fire hazard, or degraded hydrologic function in cases where historical ecological dynamics are insufficiently understood to justify ecological restoration. Piñon–juniper sites may be particularly susceptible to ecological damage from treatments, for example, soil erosion and invasion by non-native plants.

*Ecological Applications*, 12(5), 2002, pp. 1418–1433
© 2002 by the Ecological Society of America

# ECOLOGICAL RESTORATION OF SOUTHWESTERN PONDEROSA PINE ECOSYSTEMS: A BROAD PERSPECTIVE

Craig D. Allen,[1,10] Melissa Savage,[2] Donald A. Falk,[3] Kieran F. Suckling,[4] Thomas W. Swetnam,[5] Todd Schulke,[4] Peter B. Stacey,[6] Penelope Morgan,[7] Martos Hoffman,[8] and Jon T. Klingel[9]

[1]*U.S. Geological Survey, Jemez Mountains Field Station, HCR 1, Box 1, #15, Los Alamos, New Mexico 87544 USA*
[2]*Department of Geography, University of California, Los Angeles, California 90095-1524 USA*
[3]*Department of Ecology and Evolutionary Biology, University of Arizona, Tucson, Arizona 85721 USA*
[4]*Center for Biological Diversity, Tucson, Arizona 85702 USA*
[5]*Laboratory of Tree-Ring Research, University of Arizona, Tucson, Arizona 85721 USA*
[6]*Department of Biology, University of New Mexico, Albuquerque, New Mexico 87131 USA*
[7]*College of Natural Resources, University of Idaho, Moscow, Idaho 83844 USA*
[8]*Southwest Forest Alliance, Flagstaff, Arizona 86002 USA*
[9]*New Mexico Department of Game and Fish, P.O. Box 25112, Santa Fe, New Mexico 87504 USA*

*Abstract.* The purpose of this paper is to promote a broad and flexible perspective on ecological restoration of Southwestern (U.S.) ponderosa pine forests. Ponderosa pine forests in the region have been radically altered by Euro-American land uses, including livestock grazing, fire suppression, and logging. Dense thickets of young trees now abound, old-growth and biodiversity have declined, and human and ecological communities are increasingly vulnerable to destructive crown fires. A consensus has emerged that it is urgent to restore more natural conditions to these forests. Efforts to restore Southwestern forests will require extensive projects employing varying combinations of young-tree thinning and reintroduction of low-intensity fires. Treatments must be flexible enough to recognize and accommodate: high levels of natural heterogeneity; dynamic ecosystems; wildlife and other biodiversity considerations; scientific uncertainty; and the challenges of on-the-ground implementation. Ecological restoration should reset ecosystem trends toward an envelope of "natural variability," including the reestablishment of natural processes. Reconstructed historic reference conditions are best used as general guides rather than rigid restoration prescriptions. In the long term, the best way to align forest conditions to track ongoing climate changes is to restore fire, which naturally correlates with current climate. Some stands need substantial structural manipulation (thinning) before fire can safely be reintroduced. In other areas, such as large wilderness and roadless areas, fire alone may suffice as the main tool of ecological restoration, recreating the natural interaction of structure and process. Impatience, overreaction to crown fire risks, extractive economics, or hubris could lead to widespread application of highly intrusive treatments that may further damage forest ecosystems. Investments in research and monitoring of restoration treatments are essential to refine restoration methods. We support the development and implementation of a diverse range of scientifically viable restoration approaches in these forests, suggest principles for ecologically sound restoration that immediately reduce crown fire risk and incrementally return natural variability and resilience to Southwestern forests, and present ecological perspectives on several forest restoration approaches.

*Key words: anthropogenic change; ecological restoration; ecosystem management; fire suppression effects; forest restoration programs; ponderosa pine forests; reference conditions; Southwestern United States, natural range of variation.*

## Introduction

The *Pinus ponderosa* (ponderosa pine) forests of the American Southwest (Arizona, New Mexico, and adjoining portions of Utah and Colorado) have experienced major changes in ecological structure, composition, and process because of recent human activities (Fig. 1). Over a century of livestock grazing, fire suppression, logging, road construction, predator control, and exotic-species introductions have altered most Southwestern ponderosa pine forests from conditions that had prevailed for thousands of years (Covington and Moore 1994, Swetnam et al. 1999). A critical change has been a dramatically increased vulnerability of these forests to large, destructive crown fires that threaten both human and ecological communities.

A general consensus has emerged that it is urgent to restore more natural conditions to these forests, but substantial debate persists about how to best achieve this goal (Nijhuis 1999, Covington 2000, Kloor 2000, Jenkins 2001). The purpose of this paper is to promote a broad and flexible perspective on ecological restoration of Southwestern ponderosa pine forests. We sup-

Manuscript received 15 June 2001; revised and accepted 29 October 2001; final version received 2 January 2002.
[10] E-mail: craig_allen@usgs.gov



FIG. 1. Ponderosa pine forests of the American Southwest. (Top) Open ponderosa pine forest representing ''typical'' pre-1900 conditions, with grassy understory and surface fire activity. (Bottom) Altered ponderosa pine stand in need of restoration, showing changes in both stand structure and species composition. The dense midstory of mixed conifer trees provides ladder fuels that favor crown fire development.

port the development and implementation of a diverse range of scientifically viable restoration approaches in these forests that address the critical issues of forest heterogeneity, scientific uncertainty, and effects on wildlife. In addition, we suggest principles for ecologically sound restoration approaches. It is not our intention to emphasize a critique of any particular model, but we do present ecological perspectives on several alternative forest restoration approaches.

## BACKGROUND

Southwestern ponderosa pine ecosystems were shaped through time by stochastic and deterministic processes, including frequent surface fires, episodic regeneration, insect infestations, and regional climate events such as droughts (Dahm and Geils 1997, Allen and Breshears 1998, Kaufmann et al. 1998, Swetnam and Betancourt 1998). These processes contributed to heterogeneous forest spatial patterns at local and land-



FIG. 2. View looking northwest at the Cerro Grande Fire on the afternoon of 10 May 2000 as it burned toward Los Alamos, New Mexico (USA). Similar large, stand-replacing fires are becoming increasingly common in Southwestern ponderosa pine forests.

scape scales (Cooper 1960, White 1985), with pattern shifts through time within a natural range of variability (Swetnam et al. 1999).

Since European settlement in the middle to late 1800s, pervasive changes have tended to homogenize ponderosa pine forest patterns in the Southwest. Large trees have decreased in number due to logging. Historic livestock grazing and fire suppression have promoted the development of unnaturally dense stands of suppressed young trees. This condition now threatens the remaining large trees through competition and by fueling increasingly extensive crown fires (Covington and Moore 1994, Covington et al. 1994) as in ponderosa pine forests of other regions (Agee 1993, Everett et al. 1997, Smith and Arno 1999). In some stands species compositions have shifted toward less fire-resistant trees such as *Abies concolor* (white fir), *Pseudotsuga menziesii* (Douglas-fir), and *Juniperus* (juniper) species. These changed conditions now affect millions of hectares of ponderosa pine in the Southwest (U.S. General Accounting Office 1999).

Alteration of stand structures and species compositions has in turn altered natural processes in Southwestern forests. Understory grasses and forbs have decreased in abundance and diversity (Covington and Moore 1994, Bogan et al. 1998), replaced by deep mats of slowly decomposing pine needles. As a result, nutrient cycling dynamics have been disrupted (White 1994) and overall biodiversity levels decreased (Allen 1998). Old-growth ponderosa pine forests have become rare (Harrington and Sackett 1992, Noss et al. 1995) and meadows have shrunk due to tree encroachment (Swetnam et al. 1999). Some vertebrate animal species, such as the Northern Goshawk (Reynolds et al. 1992, U.S. Fish and Wildlife Service 1998; but see Kennedy 1997), are thought to have declined in abundance due to habitat alterations. Hydrologic cycles have been modified in more densely forested watersheds, likely decreasing total streamflows, peak flows, and base flows (Ffolliott et al. 1989). An increase in number, size, and severity of stand-replacing fires (Dahm and Geils 1997, Swetnam and Betancourt 1998, Hardy et al. 1999) threatens both human and ecological communities (Moir and Dieterich 1988, U.S. General Accounting Office 1999). The aftermath of such fires includes short-term amplification of erosion and flooding (Agee 1993, White 1996, Robichaud et al. 2000).

Landscape scars created by total canopy destruction may persist as grasslands or shrublands for decades to centuries because ponderosa pine seed production and recruitment is erratic, and the relatively heavy, wingless seeds cannot disperse far from surviving, mature trees. For example, large portions of the 1950 A1 fire near Flagstaff, Arizona, USA, remain as grassland, and the 1953 Circle Cross Fire in the Sacramento Mountains, New Mexico, USA, contains much persistent shrubland (M. Savage, *unpublished data*). If the current trajectories of anthropogenically driven change continue, serious ecological damage to ponderosa pine ecosystems will accumulate (Covington et al. 1994, Noss et al. 1995).

These worrisome trends have long been evident to some forest scientists and ecologists (Weaver 1951, Cooper 1960). Only recently, however, has a broad scientific, social, and political consensus emerged that restoration of ecological sustainability in Southwestern ponderosa pine forests is necessary and urgent (Covington and Moore 1994, Covington et al. 1994, 1997, Suckling 1996, Nijhuis 1999). This social and political consensus has developed rapidly in response to recent major wildfire seasons, such as 2000, when $3 \times 10^6$ ha burned nationwide (Fig. 2). Although much of this burned area was in non-forested landscapes, or in high-elevation forest types that are adapted to high-intensity

fires (Morrison et al. 2000), ecologically worrisome crown fires in ponderosa pine and mixed-conifer forests were common, and are a chief focus of concern. Much of this concern also stems from the fact that urban encroachment into these pine-dominant forests is extensive and increasing.

Ecological restoration efforts in the United States have recently been proposed for millions of hectares of public lands by federal, state, and local government agencies (e.g., USDA Forest Service 2000, USDA and USDI 2000*a*, *b*, USDI 2000, Western Governors' Association et al. 2001, Marston et al. 2001, Matthews 2001). These restoration proposals generally seek to thin forests with combinations of tree harvesting and prescribed burning to increase resilience to natural disturbance events such as fires, insects, and regional drought, and thereby reduce the risk of catastrophic fire events.

Vigorous public and scientific debates have developed over the relative risks and trade-offs of different approaches to restore forests in the Southwest (Suckling 1996, Nijhuis 1999, Covington 2000, Kloor 2000, MacNeil 2000, Jenkins 2001), as in other regions (Brown 2000, Marston et al. 2001). Silvicultural approaches focused on tree harvest have been criticized based on concerns that short-term economics rather than ecological sustainability or decreasing fire hazard are the real underlying justifications of treatments. Although prescribed fire programs have been underway for several decades, the scale and intensity of these restoration efforts have been inadequate to reverse the overall trends of degradation in Southwestern pine forests. Concerns about excessive smoke and the risks of prescribed burning (highlighted by the Cerro Grande Fire of 2000) have also constrained public support for the use of fire alone as a restoration treatment.

## A Broad Restoration Perspective

In this paper we offer a broad perspective on ecological restoration of Southwestern United States ponderosa pine forests. We propose not so much a contrast from current models as an expanded view that encompasses and supports a diverse range of scientifically viable restoration approaches. This includes the current, most widely debated and applied Southwestern ponderosa pine model, which involves a relatively precise restoration of presettlement stand structures (Moore et al. 1999). There is a clear need for reference-based approaches that integrate structure, composition, and ecosystem processes. Such restoration models need to be adequately flexible to address the diverse ecological and social conditions in Southwestern forests. We believe that the practice of ponderosa pine restoration will be best served by a variety of approaches across a broad range of forest settings.

Ecological restoration aims to enhance the resilience and sustainability of forests through treatments that incrementally return the ecosystem to a state that is within an historic range of conditions, known as the ''natural range of variability'' (Landres et al. 1999). The Society for Ecological Restoration (Tucson, Arizona, USA) offers the following definition of ''*ecologial restoration*: 'the process of assisting the recovery and management of ecological integrity. Ecological integrity includes a critical range of variability in biodiversity, ecological processes and structures, regional and historic context, and sustainable cultural practices.' ''[11] Several key issues suggest a need for a broad perspective on ecological restoration of Southwestern forests: high levels of natural heterogeneity across forest landscapes; current and future conditions that may fall outside the natural range of variability; wildlife habitat and other biodiversity considerations; and our imperfect understanding of these complex systems. We focus here on ecological considerations in ponderosa pine forest restoration, acknowledging that the success of restoration programs also requires political, financial, and social support. Our intent is not to exclude such dimensions, but to clarify the scientific basis for forest restoration programs.

### *The importance of heterogeneity in time and space*

Ecological restoration requires an understanding of, and respect for, the variability of ponderosa pine ecosystems across the Southwest. These forests are created by dynamic interactions among natural processes (such as fire) and forest structure (such as tree density and canopy openings), across variable landscapes. Regeneration and disturbance patterns interact with long- and short-term climate fluctuations and human activities to influence fire frequency, intensity, size, seasonality, and severity (Baisan and Swetnam 1997, Swetnam and Betancourt 1998, Kaye and Swetnam 1999, Grissino-Mayer and Swetnam 2000). Forest patterns and processes often exhibit lagged interactions with climate fluctuations, along with substantial inertia in the face of climate change. Consequently, forests often exist in disequilibrium with current climate.

Variability in structure and process means that patterns of stand density, species composition, and disturbance regimes differ significantly across landscapes and throughout the region. Ponderosa pine grows across a 1500-m elevational gradient in many mountain ranges (e.g., Allen and Breshears 1998), with at least 21 different ponderosa pine ''habitat types'' recognized across diverse landscape conditions in the Southwest (Alexander and Ronco 1987). Documented pre-1900 mean fire-return intervals varied from about 4 to 36 yr in Southwestern ponderosa pine forests (Swetnam and Baisan 1996). Post-suppression species compositions have been markedly affected by increased recruitment of fire-sensitive *Pinus edulis* (piñon) and juniper species at low elevations and mixed-conifer species at higher elevation (Fig. 1). Mature tree densities (>30

[11] URL: ⟨http://www.ser.org⟩

Case No. 1:23-cv-01501-RMR Document 15-4 filed 09/29/23 USDC Colorado pg 112 of 176






FIG. 3. Schematic representation of the restoration concept. If the natural range of variability is seen as a multidimensional ''envelope'' of ecological conditions, then the goal of restoration is to move an altered ecosystem back toward its pre-disruption envelope (the darkest region), and to allow natural processes over time to dynamically reestablish a range of natural structural conditions.

cm [12 inches] in diameter at breast height) measured ca. 1900 AD in Southwestern pine ecosystems ranged between 19 and 126 trees/ha (8–51 trees/acre) (Woolsey 1911), whereas today densities of all live stems often exceed 2470 trees/ha (1000 trees/acre) (Allen 1998; D. Falk, *unpublished data*).

This variability in ponderosa pine forests affects management approaches, as recognized by Pearson (1950:13): ''Foresters are constantly reminded that since conditions change from one place to another, management cannot be uniform.'' Ecological restoration should recognize and retain the natural heterogeneity characteristic of presettlement forests (White and Walker 1997). Given the heterogeneity of Southwestern ponderosa pine forests, identifying general ecological reference conditions for restoration goals can be difficult, if not arbitrary.

### *Use of the natural-range-of-variability concept for restoration*

The concept of ''natural range of variability'' has some theoretical flaws and practical limitations (Landres et al. 1999, Millar and Wolfenden 1999, Swetnam et al. 1999), but nevertheless has proven useful as a framework for evaluating the current status of ecosystems relative to past conditions, and for identifying ecologically justifiable restoration goals (Kaufmann et al. 1994, Morgan et al. 1994, White and Walker 1997, Landres et al. 1999). Southwestern forests experienced some level of human influence for thousands of years, but human-caused changes in ponderosa pine after 1850 far exceeded the influence of indigenous people (Covington et al. 1994, Kaye and Swetnam 1999, Allen 2002). In particular, the cessation of the historical regime of frequent, low-intensity fires has pushed structural characteristics of many forests well outside the natural range of variability that existed over the past millennium (Swetnam et al. 1999).

Ponderosa pine restoration treatments should be designed to reestablish trends in forest processes, particularly fire, leading to natural ranges of variation in composition and structure (Landres et al. 1999, Moore et al. 1999, Stephenson 1999). If the natural range of variability is seen as an envelope of conditions, then the goal of restoration is to move an altered ecosystem toward its pre-disruption envelope, and to allow, or use, natural processes over time to dynamically reestablish diverse natural structures (Fig. 3).

In the long term, the best way to align forest conditions to track ongoing climate changes is to restore fire, which naturally correlates with current climate. Some stands need substantial structural manipulation before fire can safely be reintroduced, but in many cases fire can then do the preponderance of the work of ecological restoration, recreating the natural interaction of structure and process.

The successful reintroduction of frequent surface fire in the Gila Wilderness, New Mexico, USA, exemplifies how incremental fire treatments can achieve substantial restoration of ponderosa pine forests. Detailed quan-

titative studies of before-and-after forest densities are lacking, but qualitative observations (including repeat photographs) by knowledgeable fire managers (Webb and Henderson 1985; P. Boucher and R. D. Moody, *unpublished report* [1996] to the Gila National Forest [Silver City, New Mexico, USA]) and fire scientists (Rollins 2000; T. W. Swetnam, *personal observations*) suggest that repeated natural fire use (as many as four events since 1975 in some areas) have successfully opened up ponderosa pine stands, and helped to reestablish grassy understories. A key to the Gila's success was a sufficiently large area where smoke and threats of occasional flare-ups during the burning season (sometimes months) do not threaten urban areas. Another key to this success was that managers were patient and incremental in implementing the burning program; most of the large fires were initially allowed to burn only during the relatively cool and wet season after the start of the Southwest monsoons in July or August. Although such large, roadless areas are uncommon, the Gila's example shows that mechnical thinning is not always a prerequisite for forest restoration treatments with fire.

Restoration aims to eventually move forests back to within the natural range of variability. However, this need not necessarily be accomplished in the first treatment or tied to a particular moment in time or past forest structure. Initial treatments can be designed to markedly decrease crown fire risks at stand and landscape scales by decreasing the continuity of hazardous fuel conditions. Conservative initial treatments would be the minimum necessary to reduce vulnerability to stand-replacement fire to an acceptable level. We propose that conservative, incremental treatments involving both mechanical thinning and fire over time periods of years to decades are ecologically appropriate and advisable for many Southwestern forests.

There is a clear need to begin widespread restoration treatments now to reduce the threat of catastrophic fire. Such treatments should use a variety of prescriptions and treatments to address trade-offs and produce diverse restoration outcomes. For example, restoration back to presettlement tree densities through intensive thinnings greatly reduces risk of crown fire spread in areas of concentrated treatment (Fulé et al. 2001), but may generate more slash surface fuels initially than lighter thinnings. Large slash loads can exacerbate the short-term fire hazard unless mitigated (Graham et al. 1999), which can be expensive and/or have substantial environmental effects (e.g., machine crushing slash into the ground surface). Less intensive treatments, sufficient to reduce crown fire risk and strategically placed to interrupt continuous fuels, may be able to more quickly address a larger proportion of the regional forest. While practical and economic considerations, such as direct risk to human communities, may drive treatment strategies in some situations, long-term ecological goals should also guide treatment actions if ecological restoration is desired. Incrementally thinning ponderosa forests over a period of years using varied combinations and intensities of chainsaws and fire may effectively reduce fire risks while maintaining ecological integrity.

### *Biodiversity considerations*

Southwestern ponderosa pine forests provide habitat for at least 250 species of vertebrate animals (Patton and Severson 1989, New Mexico Department of Game and Fish 2000), as well as many plants. When restoration treatments modify the physical and biotic environment, plants and animals are affected in various ways (Rieman and Clayton 1997, Oliver et al. 1998; W. W. Covington, A. Waltz, P. Fulé and G. Verkamp, *unpublished report* to U.S. Bureau of Land Management, Arizona Strip District). Of particular concern is the potential for restoration actions to reduce the viability of metapopulations of sensitive species through habitat alteration and fragmentation (Stacey et al. 1996, U.S. Fish and Wildlife Service 1998, Holthausen et al. 1999). This includes invertebrates and soil organisms that are critical to ecosystem function.

An incremental approach to restoration provides opportunities for the adjustment of future treatments based on wildlife responses, so as not to foreclose future options. Restoration projects should strive to minimize or spatially constrain adverse impacts to rare, sensitive, and declining species. Care should be taken to ensure that adequate habitat is maintained for sensitive species during the phase between initial treatment and final restoration.

Not all wildlife habitat elements are equally vulnerable or irreplaceable. For example, large oak trees grow slowly and are especially valuable habitat for a wide array of wildlife (Rosenstock 1998). Some areas should be left untreated to serve as habitat refuges during the stress of treatments, until new landscape conditions are known to provide adequate habitat.

Native plants and animals are adapted to the naturally high levels of heterogeneity in Southwestern ponderosa pine ecosystems, and some species are dependent upon diverse habitats for their survival (e.g., Reynolds et al. 1992, U.S. Fish and Wildlife Service 1995, Dodd et al. 1998). Thus, biodiversity considerations reinforce the need to avoid creating uniform stand and landscape conditions. A diverse landscape with patches of variable tree densities, including some areas of relatively high density, should be developed to accommodate species with different habitat adaptations. Retaining some dead, deformed, and diseased trees, and some clumps of large trees with interlocking crowns, will maintain structural complexity and important food and nesting habitat (Bennetts et al. 1996, Bull et al. 1997). Such trees are important elements of genetic diversity in their own right as well (Millar and Libby 1989, Rehfeldt 1991, Ledig 1992).

Restoration activities often involve biodiversity

Case No. 1:23-cv-01501-RMR Document 15-4 filed 09/29/23 USDC Colorado pg 114 of 176



trade-offs, particularly in the short term and at the local scale. For example, snags and downed logs provide essential habitat for many birds and mammals (Bull et al. 1997), but these woody structures are susceptible to destruction in restoration treatments, especially from fire (Tiedemann et al. 2000). However, restoration treatments also provide opportunities to increase habitat heterogeneity and biodiversity. For example, where large snags are scarce because of past management activities, new ones will be created through fire mortality and other disturbances as forests are restored (Pearson 1950). The restoration of more diverse habitat structures and of natural processes such as surface fire and associated nutrient cycling should help many native species (cf. Johnson and Wauer 1996; W. W. Covington, A. Waltz, P. Fulé, and G. Verkamp, *unpublished report* to U.S. Bureau of Land Management, Arizona Strip District). The increased vigor and diversity of native understory plant species after restoration will provide important habitat conditions for many kinds of animals (e.g., Waltz and Covington 1999) and hopefully increase resistance to ongoing and future invasions by exotic plants (Crawford et al. 2001).

### *Scientific uncertainty and the limitations of historical reference conditions*

Ecological restoration must recognize the limits of scientific knowledge. While a large body of research exists on ponderosa pine forests, we are still limited in our understanding of ecosystem function. Historical fire frequency is often the most reliable element of our reconstructions, although it too has limitations (Swetnam et al. 1999). We know less about past distributions of fire size, severity, and spatial pattern than we do about frequency (Morgan et al. 2001). Swetnam and Baisan (1996) and Baker and Ehle (2001) discuss uncertainties and biases associated with the sampling design and data analyses of fire-scar studies.

Uncertainties in the reconstruction of forest stand composition and spatial structure result from missing evidence, such as logs and stumps removed by fire, logging, and decay (M. M. Moore, D. W. Huffman, W. W. Covington, J. E. Crouse, P. Z. Fulé, and W. H. Moir, *unpublished report* to USDA Forest Service, Rocky Mountain Station, Flagstaff, Arizona). Reconstruction of the density and location of large trees is far more reliable than of small-diameter stems and seedlings that decompose rapidly or burn even in surface fires (Stephenson 1987). Reconstructed overstory-tree densities are thus best used conservatively as minimum values for establishing quantitative restoration targets for stand density, rather than as maxima. Knowledge of other ecological conditions in the past, such as wildlife population dynamics, may be highly uncertain because available methods preclude precise reconstructions. Uncertainty will also exist because society is unlikely to invest in the development of detailed reconstructions of past stand structures and fire histories for every restoration site, suggesting the need for site-specific flexibility to develop restoration targets based upon an inferred natural range of variability in stand conditions.

A sense of urgency in reducing the threat of destructive fires should be balanced with patience in accomplishing restoration, along with major commitments to thoughtful experimentation and monitoring to ensure we learn as rapidly as possible. Restoration science is young, and it is difficult to predict the results of our actions. Application of a broad restoration perspective, implemented through a variety of alternative treatments, will be more effective than any single restoration treatment.

## Principles for Ecological Restoration of Southwestern Ponderosa Pine Forests

Here we outline 16 broad principles for restoration of Southwestern United States ponderosa pine forest ecosystems. Application of these principles will foster implementation of a diverse range of ecologically justifiable restoration projects. While focused on ponderosa pine forests, these principles also apply more generally to other forest types in the Southwest, such as some piñon–juniper and mixed-conifer forests.

1) *Reduce the threat of crown fire*.—A key restoration priority must be the rapid reduction of the widespread risk of unnatural crown fires, both within stands and across landscapes. The initial treatment on any site should be substantial enough to decrease forest vulnerability to stand-replacing fire.

2) *Prioritize and strategically target treatment areas*.—Key considerations for prioritizing restoration treatment areas are degree of crown fire risk, proximity to human developments and important watersheds, protection of old-growth forests and habitats of sensitive species, and strategic positioning to break up landscape-scale continuity of hazardous fuels (Weatherspoon and Skinner 1996, Agee et al. 2000, Finney 2001). For example, a landscape of alternating north- and south-facing ridges could have restoration treatments focused on the south-aspect sites to reduce the continuity of hazardous fuels at the landscape scale, and thereby restore more natural conditions at both site and landscape scales.

3) *Develop site-specific reference conditions*.—Site-specific historical ecological data can provide information on the natural range of variability for key forest attributes, such as tree age structure and fire regimes, that furnish *local* ‘‘reference conditions’’ for restoration design. A variety of constraints, however, prevent the development of historical information on every hectare of land needing restoration. General goals should be to restore ecological integrity and functioning, rather than precise stand structural conditions as they existed at a particular point of time in the past.

4) *Implement multiple conservative interventions*.—Incremental restoration through multiple treatments is a conservative approach to achieving desired changes.

Case No. 1:23-cv-01501-RMR Document 15-4 filed 09/29/23 USDC Colorado pg 115 of 176



Restoration treatments should strive to use the least disruptive techniques, and balance intensity and extensiveness of treatments. In many areas, conservative initial treatments would be the minimum necessary to adequately reduce the threat of unnatural crown fire. For example, a conservative strategy would be the placement of treatment areas to interrupt fuel continuities and thereby reduce overall landscape risk of extensive crown fires, despite treating only a small fraction of the landscape (Agee et al. 2000). Fires ignited by lightning or by people under carefully prescribed conditions may be sufficient to reestablish natural conditions in many locations (e.g., in the Gila Wilderness of New Mexico [USA]). In the extensive areas where fire alone cannot safely reduce tree densities and hazardous ladder fuels, mechanical thinning of trees will be needed before the introduction of prescribed fire. Patient, effective treatments will provide more options for the future than aggressive attempts to restore 120 yr of change at once. In certain areas, however, such as some urban–wildland interfaces, trade-offs with imminent crown fire risks require consideration of rapid, heavy thinning of most small-diameter trees.

5) *Utilize existing forest structure*.—Restoration efforts should incorporate and build upon valuable existing forest structures such as large trees and groups of trees of any size with interlocking crowns. These features are important for some wildlife species, such as Abert's squirrels and goshawks, and should not be removed completely just to recreate specific historical tree locations. Since evidence of long-term stability of precise tree locations is lacking, the selection of ''leave'' trees and tree clusters in restoration treatments can be based on the *contemporary* spatial distribution of trees, rather than pre-1900 tree positions. Historical forest structure conditions can be restored more quickly by maximizing use of existing forest structure. Leaving some relatively dense within-stand patches of trees need not compromise efforts to reduce landscape-scale crown fire risk.

Gus Pearson, the patriarch of ponderosa pine silviculture in the Southwest, recognized the need to be flexible and use existing stand structures. Pearson (1950:29) stated that the use of theoretical tree-density distributions as guides for silvicultural treatments ''are for application in principle rather than in letter, because the stands must be taken as found and remedies must be sought in modification rather than reconstruction.'' This is also true for ecological restoration.

6) *Restore ecosystem composition*.—Where fire suppression has allowed fire-sensitive tree species like junipers or white fir to become abundant in historical ponderosa pine forests, treatments should set a trend toward restoring dominance of the more fire-resistant ponderosa pines. However, mechanical removal of all fire-sensitive invaders is inappropriate, given the heterogeneous and dynamic nature of these forests. Restoration of fire may eventually restore locally appropriate forest tree composition and structure (Miller and Urban 2000).

Missing compositional elements, such as herbaceous understories or extirpated vertebrates and invertebrates, also require restoration attention. The forest understory, including shrubs, grasses, and forbs, is an important ecosystem component that directly affects tree regeneration patterns, fire behavior, watershed functioning, wildlife habitat, and overall patterns of biodiversity. Similarly, soil organisms are vital elements that can influence community composition and dynamics (Hole 1981). A robust understory provides a restraint on tree regeneration and is essential for carrying surface fires. The establishment and maintenance of more natural patterns of understory vegetation diversity and abundance are integral to ecological restoration. Understories should be protected from overgrazing during restoration to allow full recovery of herbaceous biodiversity and biomass, and of associated ecosystem components and processes such as pollinators and surface fires.

The implementation of restoration treatments requires special care to protect soils and watersheds (Jurgensen et al. 1997, Rieman and Clayton 1997). Minimizing mechanical disturbance of soils and avoiding the construction of new roads will minimize sedimentation, disruption of surface runoff, and other detrimental ecosystem effects (Trombulak and Frissell 2000). Minimizing ground disturbance also will reduce impacts to the numerous archeological sites found in many Southwestern forests.

7) *Retain trees of significant size or age*.—Large and old trees, especially those established before ecosystem disruption by Euro-American settlement, are rare, important, and difficult to replace. Their size and structural complexity provide critical wildlife habitat by contributing crown cover, influencing understory vegetation patterns, and providing future snags. Ecological restoration should protect the largest and oldest trees from cutting and crown fires, focusing treatments on excess numbers of small young trees. Given widespread agreement on this point, it is generally advisable to retain ponderosa trees larger than 41 cm (16 inches) dbh and all trees with old-growth morphology regardless of size (i.e., yellow bark, large drooping limbs, twisted trunks, flattened tops). Despite the heterogeneity of forest site and stand conditions in the Southwest, cutting of larger trees will seldom be ecologically warranted as ''restoration'' treatments at this time due to their relative scarcity. Following this guideline would significantly reduce hazards of stand-replacing fires in most cases and also favor the development of future old-growth forest conditions (Moir and Dieterich 1988, Harrington and Sackett 1992). Public concern about forest manipulation would also be reduced by ensuring that ''large'' trees are not being targeted.

Some ponderosa pine forests contain extremely old trees and dead wood remnants that may be small but

are important because they contain unique and rare scientific information in their growth rings (Grissino-Mayer et al. 1997). Such trees have become increasingly scarce in the late 20th century, and the initial reintroduction of fire often consumes these tree-ring resources. Restoration programs should identify, inventory, sample, and preserve them where possible.

8) *Consider demographic processes*.—The underlying processes of natural tree regeneration and mortality should be incorporated in restoration design. Southwestern conifer regeneration occurs in episodic, often region-wide pulses, linked to wet–warm climate conditions and reduced fire occurrence (Savage et al. 1996, Swetnam and Betancourt 1998, Mast et al. 1999). Periods with major regeneration pulses in the Southwest during the 20th century include the 1910s–1920s and 1978–1998 (Savage et al. 1996, Swetnam and Betancourt 1998). Some of this regeneration would have survived under natural conditions. Restoration efforts should retain a proportion of these cohorts, toward the goal of maximizing options for ecosystem resiliency.

9) *Integrate process and structure*.—Ecological sustainability requires the restoration of process as well as structure (Stephenson 1999). Natural disturbance processes, including fire, insect outbreaks, and droughts, are irreplaceable shapers of the forest. In particular, fire regimes and stand structures interact and must be restored in an integrated way; mechanical thinning alone will not reestablish necessary natural disturbance regimes. At the same time, fire alone may be too imprecise or unsafe in many settings, so a combination of treatments may often be the safest and most certain restoration approach.

Perhaps the single best indicator of whether a proposed approach should be considered as ‘‘ecological restoration’’ of a ponderosa pine forest is to evaluate whether the treatment will successfully restore surface fire as a keystone process. Approaches that do not include an explicit and long-term commitment to restore frequent surface fire fail to merit the adjective ‘‘ecological.’’

10) *Control and avoid using exotic species*.—Seeding of exotic grasses and forbs should be prohibited as ecologically incompatible with good restoration. Once established, exotic species can be extremely difficult or impossible to remove. Even seeding with native species from commercial sources risks the near certainty of exotic weed contaminants and the establishment of non-local genotypes at the expense of locally evolved and adapted genotypes. The common use of annual cereal crops such as rye and barley that typically decline to low levels within a matter of years still leaves persistently altered ecosystems through ‘‘the ghost of competition past,’’ as their initial flush of growth tends to monopolize the soil resources, reduce the success of native plants (Barclay 2000), and alter long-term successional outcomes.

If enhancement of herbaceous vegetation is needed, using locally hand-collected wild seeds or transplanting individuals from nearby areas into treatments to serve as seed sources is slower and more expensive, but ecologically safer. In general, it is ecologically desirable to avoid seeding, and to instead allow native herbaceous vegetation to recover incrementally through natural processes of dispersal and establishment after restoration treatments.

The widespread practice of seeding exotic grasses to ‘‘rehabilitate’’ watersheds after severe fires could be largely eliminated by preemptive restoration treatments that reduce fire severity and foster recovery of native herbaceous ground cover before crown fires occur. Restoration treatments should also routinely incorporate early actions to control the establishment and spread of aggressive exotics that can be expected from restoration-related site disturbance (Crawford et al. 2001). Control actions should include active detection efforts to identify infestations at an early phase, and treatments ranging from hand-pulling to the careful spot application of biodegradable herbicides.

11) *Foster regional heterogeneity*.—The Southwest is a region of complex topography, hydrology, and soils. As a result, biological communities vary at local, landscape, and regional scales, and so should restoration efforts. Ecological restoration should also incorporate the natural variability of disturbance regimes across heterogeneous landscapes. Heterogeneity should be fostered in planning and implementing ecological restoration at all spatial scales, including within and between stands, and across landscape and regional scales.

12) *Protect sensitive communities*.—Certain ecological communities embedded within ponderosa pine forests, such as some riparian areas, could be adversely affected by on-site prescribed burning or mechanical thinning. Restoration efforts should protect these and other rare or sensitive habitats, which are often hotspots of biological diversity, particularly those that are declining in abundance and quality in the region.

13) *Assess cumulative effects*.—It is important to consider and plan for the cumulative effects of restoration work, since these efforts will take place synchronously throughout large areas in the Southwest. Restoration projects will also occur within a regional context of other human actions such as timber sales, private land developments, roads, and livestock grazing. These land uses have varied impacts at all scales, and often uncertain interactions with restoration efforts must be considered cumulatively.

14) *Protect from overgrazing*.—Grass, forb, and shrub understories are essential to plant and animal diversity and soil stability. Robust understories are also necessary to restore natural fire regimes and to limit excessive pine seedling establishment (Rummell 1951, Madany and West 1983). Where possible, defer livestock grazing after initial surface fire treatment until the herbaceous layer has fully recovered (Belsky and

Case No. 1:23-cv-01501-RMR Document 15-4 filed 09/29/23 USDC Colorado pg 117 of 176



TABLE 1. Variables that should be considered in the development of an ecological restoration plan. Each restoration project will have a unique plan, based on locally appropriate choices for each variable, reflecting local priorities and the diversity of ponderosa pine forests in the region.

- Post-treatment structure: age, size, density
  - Stem density, by size class
  - Basal area ($m^2$/ha), by size class
  - Crown cover (%)
  - Snags and down logs (no./ha, mass/ha), by size class
  - Thinning size cap (i.e., maximum-diameter tree removed)
  - Old tree protection measures (e.g., removal of basal fine fuels and ladder fuels; removal of competing understory stems)
- Composition
  - Retention of fire-sensitive or shade-tolerant native tree species
    - Existing canopy trees (%)
    - Understory recruitment (%)
  - Control or elimination of non-native understory species
- Spatial configuration
  - Distribution of mature trees, random to clustered
  - Reliance on presettlement cluster locations for post-treatment configuration
  - Use of existing tree clusters in post-treatment configuration
  - Retention of heterogeneous (spatially variable) structure and density at stand and landscape scales
- Ecosystem processes and disturbances
  - Restoration of natural or prescribed fire regime
  - Projected post-treatment distribution of fire intervals (e.g., mean and range)
  - Post-treatment livestock grazing regime
- Overall restoration plan
  - Site-specificity of treatment prescription
  - Time span over which thinning treatments are implemented
  - Number of restoration-treatment entries
  - Long-term monitoring commitment
    - Monitoring components (e.g., plants, animals, soil, water)
    - Level of detail of measurements
    - Frequency of measurements
    - Duration of measurements
  - Adaptive management loop in decision process

Blumenthal 1997). Prevention of overgrazing must be an integral part of ponderosa pine forest restoration.

15) *Establish monitoring and research programs*.—Given the uncertainties about effects of restoration treatments, well-designed monitoring, research, and documentation programs are essential if we are to learn from, and evaluate the success or failure of, ongoing restoration efforts. Wildlife and understory plant populations can be monitored as indicators of ecological change and restoration outcomes. Monitoring programs must be put in place before treatments begin, and must evaluate responses of key ecosystem components and processes at multiple scales (Covington and Moore 1994, Covington et al. 1997). Even better, when possible, restoration projects should be set up as experiments with replicates and controls to test alternative hypotheses (Covington et al. 1997). One benefit of the perspective proposed here is that it will test the ecological effects of restoration efforts across a wide range of treatments and prior forest conditions. The locations and prescriptions for all restoration treatments should be archived in a geographic information system (GIS), so that land managers and researchers now and into the future have access to site-specific records of restoration treatments.

16) *Implement adaptive management*.—Ecological restoration is an incremental process that may take a century or two to fully achieve. It requires a long-term management commitment, especially to maintain natural fire regimes and to protect and develop old-growth stands. Restoration will be most successful where land managers learn from treatment experiences and adaptively adjust their approaches through time (Holling 1978). Extended social and fiscal support will be needed to sustain such long-term restoration programs.

Conceptually, each of the restoration principles outlined above can be thought of as describing one or more axes of variation. For example, intensity of thinning treatment, heterogeneity within the treatment area, post-treatment species composition, experimental unit size, fidelity to location of existing tree clusters, and post-thinning fire frequency constitute design variables for restoration (Table 1). Thus, the principles describe a set of key dimensions in the design of restoration treatments, and any particular project will choose a unique set of values for the variables. These principles

FS-001736

Case No. 1:23-cv-01501-RMR Document 15-4 filed 09/29/23 USDC Colorado pg 118 of 176



support implementation of a diverse range of ecological restoration projects.

## Ecological Perspectives on Several Forest Restoration Approaches

As debate over restoration of Southwestern United States forests has intensified (Njjhuis 1999, Jenkins 2001), a variety of philosophies and approaches are being presented that differ in their core perspectives and probable on-the-ground outcomes. These approaches include emphases on: (a) fire-risk reduction, (b) economics, (c) natural regulation, and (d) structure-oriented restoration. Here we provide some reflections from an ecological perspective on these varying restoration approaches.

### *Fire risk reduction*

Concerns over catastrophic crown fire impacts to human communities and ecosystems, along with the current availability of substantial funding to reduce hazardous forest fuel conditions (see the National Fire Plan [USDA and USDI 2000*a*]), have the potential to drive ecologically insensitive projects, which are not really restorations. If the primary objective of a project is solely to reduce crown fire risk (which may be an appropriate societal goal in some areas), even ''successful'' treatments may further damage forests rather than restoring them. When ecological principles are applied, however, fire risk reduction can be an essential part of ''ecological restoration'' of ponderosa pine forests (Fulé et al. 2001).

### *Economics*

Concerns exist that legitimate and desirable economic goals, such as sustaining rural economies and minimizing subsidy costs, could also lead to ecologically insensitive thinning or logging projects masquerading as forest ''restoration'' (Hanson, 2000, Jenkins 2001, National Forest Protection Alliance 2001). Projects focused on economic outcomes do not qualify as ''ecological restoration'' unless the treatments are based on ecological principles.

However, if ecological principles are used then economic utilization of forest products may enhance forest restoration. For example, restoration treatments will occur sooner and over larger areas if some costs can be recovered through the sale of wood from small-diameter stems. Restoration can be an opportunity for the re-engagement of local communities in the creation of more sustainable forest-based economies (e.g., see the Community Forest Restoration Act of 2000).

### *Natural regulation*

One perspective on Western forests believes that: (1) stand-replacing fires do not cause severe ecological damage because crown fires are natural; and (2) the forests will heal themselves best if we take a hands-off approach and allow natural processes to function with minimum interference (Wuerthner 1999).

Extensive stand-replacing fires naturally occurred in many western forest types (Agee 1993), but not in Southwestern ponderosa pine forests (Swetnam and Baisan 1996). Recent fire history studies in the Black Hills of South Dakota (USA) (Shinneman and Baker 1997) and in the Front Range of Colorado (USA) (Brown et al. 1999) suggest that ponderosa pine forests in those regions may have sustained crown fires of unknown size in the presettlement era. Although no such evidence has been reported for Southwestern ponderosa pine forests, it is possible that localized crown fires were not unknown in this forest type before 1900. Certainly, fire effects are always variable, and even modern crown fires do not have uniformly devastating effects across all burned landscapes. However, the increasingly large crown fires of recent years in ponderosa pine forests are clearly resulting in extreme hydrological, geomorphic, and ecological responses, including amplified flooding (Veenhuis 2002), accelerated soil erosion and stream channel changes (White 1996, Robichaud et al. 2000), loss of old-growth forest (e.g., the Cerro Grande Fire affected much old-growth forest, including large portions of a ∼15 mile$^2$ contiguous patch where essentially all trees were killed [C. Allen, *personal observations*]), increasing abundance of invasive exotics (Crawford et al. 2001), and conversion of forests to different vegetation types (M. Savage, *unpublished data*). The current state of ecological and historical knowledge of Southwestern ponderosa pine forests provides compelling justifications to actively manage to restore more resilient and sustainable conditions (Covington and Moore 1994, Swetnam et al. 1999).

### *Presettlement structure restoration*

The most substantial scientific work to address the need for restoration of Southwestern ponderosa pine forests and to determine the ecosystem effects of treatments has been made by Covington and co-workers at the Ecological Restoration Institute of Northern Arizona University (Kaye and Hart 1998; W. W. Covington, A. Waltz, P. Fulé, and G. Verkamp, *unpublished report* to U.S. Bureau of Land Management, Arizona Strip District). Their efforts have focused on attempts to reconstruct and reestablish specific stand reference conditions that existed just prior to the date of cessation of the natural fire regime (Moore et al. 1999). The goal has been to replicate tree densities and spatial patterns as accurately as possible for sites where presettlement stand structures have been reconstructed. Conceptually, this approach takes a broad view of ''reference conditions,'' and incorporates the restoration of surface fire as a key process. However, there are some ecological issues concerning on-the-ground implementation of this approach.

The choice of a specific moment in time as the initial

Case No. 1:23-cv-01501-RMR Document 15-4 filed 09/29/23 USDC Colorado pg 119 of 176



restoration target—for example the date of the last widespread fire in the late 1800s (Moore et al. 1999)—is potentially problematic. Any particular moment is unique in the long-term history of an ecosystem, and forests often exist in disequilibrium with current climate to some degree (Millar and Woolfenden 1999). Moreover, an increasing body of evidence indicates that late 20th century and current climate is unprecedented on a time scale of at least 1000 yr (Mann et al. 1998, Crowley 2000).

Restoration of structural characteristics of a forest back to the date of the last widespread fire in the late 19th century implies that tree recruitment processes of the 20th century were entirely unnatural. In fact, post-settlement tree regeneration pulses would have contributed important structural elements to contemporary forests, even if tree-thinning surface fires had continued. It is difficult to estimate what proportion of these cohorts, much less which individual trees, would have survived to maturity (Mast et al. 1999). It may be unwise to automatically choose a century-old date as a regional target condition for current forests, as the replication of plant densities and spatial arrangements that existed at any particular date in the past may compromise ecosystem resilience in future decades and centuries. For example, this structure-oriented approach can result in the aggressive removal of too many trees during the initial entry, which may seriously constrain ecosystem response and management options. Given their relatively slow growth rates, existing trees represent a form of biological capital that should be conserved. Multiple, incremental treatments, using combinations of fire and thinning, may be more conservative and ecologically justifiable than the immediate restoration of a particular structural element, such as the ca. 1880 spatial distribution of overstory tree stems.

Given the great heterogeneity of Southwestern ponderosa pine forests, local data on fire history and presettlement stand structures are required to implement this precise structural restoration approach. Collecting such data is expensive and requires the persistence of presettlement forest ''evidences'' (Fulé et al. 1997), which have been lost in some locations due to logging, harvesting of fuelwood, fire, or decay. As a result, it is not practical, cost effective, or in some cases even possible to reconstruct detailed structural reference conditions for every restoration project area. Moreover, some important data (such as density and spatial distribution of small trees) cannot be reconstructed from remnant historical evidence.

A structure-oriented approach to forest restoration is being proposed for wide implementation in the Southwest because of its methodological clarity, grounding in quantifiable conditions, and scientific and political support (Covington et al. 1997, Moore et al. 1999, Jenkins 2001). We consider historic structure to be one ecologically valid reference criterion for forest restoration. There are, however, theoretical and practical concerns over regional application of a structure-oriented approach (see Morgan et al. [1994], Kaufmann et al. [1994], Landres et al. [1999], Wagner et al. [2000], and Southwest Forest Alliance [2001] for reviews and discussions). We contend that a broader conceptual basis, as outlined in this paper, provides a more comprehensive framework, and one that reflects the diverse ecological conditions that exist in Southwestern forests. We agree with Covington (2000:136) that there is no '''one size fits all' approach to restoring the ecological integrity of ponderosa pine forests.'' A diversity of restoration approaches should be applied in the Southwest.

## Conclusions

A primary goal of ecological restoration should be to enhance resilience and sustainability of ecosystems. Incremental adjustment of ecosystems back within an envelope of natural range of variability should achieve this goal (Covington and Moore 1994, Holling and Meffe 1996, Stephenson 1999). A successful restoration is one that sets ecological trends in the right direction. In Southwestern ponderosa pine ecosystems this means reducing tree density and ladder fuels along with associated crown fire risk, protecting large trees, restoring surface fires, and increasing herbaceous ground cover and overall biodiversity levels. A conservative restoration program would incorporate natural variability by avoiding uniform treatments across extensive areas. Spatial heterogeneity is critical to forest biodiversity. Existing forest structures, such as tree groups and large trees, should not be removed simply to recreate historical tree spatial patterns. While historical reference conditions are useful for identifying the types, magnitudes, and causes of ecosystem change, such reconstructions are best used as general guides rather than as precise and rigid prescriptions (Landres et al. 1999).

Theories of restoration ecology and the practice of ecological restoration are evolving rapidly. We propose not so much a departure from current models as a broader framework that encompasses a diversity of approaches. Restoration science cannot proceed without empirical tests and experimentation across a broad range of conditions, and restoration practice needs to incorporate new insights derived from the scientific and practical creativity of many individuals and institutions. We need steady progress in restoration science in order to sustain the social, political, and financial support required for an effective regional restoration program. Some restoration experiences, however, will probably prove humbling, as our knowledge and methods will always be imperfect.

Risks and trade-offs are inherent in wildland management. For example, a controversial trade-off involves consideration of merchantable timber harvest as part of restoration. Commercial activities can help fund restoration of less hazardous forest fuel conditions

more quickly, but raise the risk of extractive economic imperatives dominating decision making about ''restoration'' activities.

We need to begin large-scale restoration of ponderosa pine ecosystems now. The present vulnerability of these forest ecosystems requires that we temper our need for more complete information with an urgency created by the current risk of crown fires. Even restoration failures at this point can provide information useful in refining future work, as long as we simultaneously invest in research and monitoring. At the same time, we must be cautious in our application of restoration treatments. We must manage for surprise, whether from climate variability, human influences, or the synergies among known and unknown factors. It would be prudent to incorporate buffers for uncertainty in restoration work. Impatience, extractive economics, or hubris could lead to widespread application of unduly intrusive treatments that could further damage forest ecosystems. The broad perspective outlined here supports vigorous but conservative approaches for immediately reducing crown fire risk and restoring natural variability and long-term resilience to ponderosa pine forest ecosystems in the American Southwest.

## Acknowledgments

We appreciate the efforts of colleagues at the Grand Canyon Forest Partnership and the Ecological Restoration Institute of Northern Arizona University to share their restoration experiences and perspectives, especially Pete Fulé, Wally Covington, and Brad Ack. Carl Edminster, Bill Block, Jon Keeley, Peter Landres, Dave Parsons, Phil Weatherspoon, and an anonymous reviewer provided helpful comments on earlier versions of this paper. This material is based upon work supported by the USDA Forest Service, U.S. Geological Survey, Wilburforce Foundation, Laird Norton Foundation, New Mexico Community Foundation, and the National Science Foundation under Grant number SBR-969410.

## Literature Cited

Agee, J. K. 1993. Fire ecology of Pacific Northwest forests. Island Press, Covelo, California, USA.

Agee, J. K., B. Bahro, M. A. Finney, P. N. Omi, D. B. Sapsis, C. N. Skinner, J. W. van Wagtendonk, and C. P. Weatherspoon. 2000. The use of shaded fuelbreaks in landscape fire management. Forest Ecology and Management **127**:55–66.

Alexander, R. R., and F. Ronco, Jr. 1987. Classification of the forest vegetation on the national forests of Arizona and New Mexico. USDA Forest Service Research Note **RM-469**.

Allen, C. D. 1998. A ponderosa pine natural area reveals its secrets. Pages 551–552 *in* M. J. Mac, P. A. Opler, C. E. Puckett Haecker, and P. D. Doran, editors. Status and trends of the nation's biological resources. Two volumes. U.S. Department of Interior, U.S. Geological Survey, Reston, Virginia, USA.

Allen, C. D. 2002. Lots of lightning and plenty of people: an ecological history of fire in the American Southwest. Pages 143–183 *in* T. R. Vale, editor. Western wilderness: fire, native peoples, and the natural landscape. Island Press, Covelo, California, USA.

Allen, C. D., and D. D. Breshears. 1998. Drought-induced shift of a forest/woodland ecotone: rapid landscape response to climate variation. Proceedings of the National Academy of Sciences (USA) **95**:14839–14842.

Baisan, C. H., and T. W. Swetnam. 1997. Interactions of fire regimes and land-use history in the central Rio Grande Valley. USDA Forest Service Research Paper **RM-RP-330**.

Baker, W. L., and D. Ehle. 2001. Uncertainty in surface-fire history: the case of ponderosa pine forests in the Western United States. Canadian Journal of Forest Research **31**: 1205–1226.

Barclay, A. D. 2000. Effects of seeding with Rye grass (*Lolium multiflorum*) on vegetation recovery following fire in a ponderosa pine (*Pinus ponderosa*) forest. Thesis. University of Arizona, Tucson, Arizona, USA.

Belsky, A. J., and D. M. Blumenthal. 1997. Effects of livestock grazing on stand dynamics and soils in upland forests of the Interior West. Conservation Biology **11**:315–327.

Bennetts, R. E., G. C. White, F. G. Hawksworth, and S. E. Severs. 1996. The influence of dwarf mistletoe on bird communities in Colorado ponderosa pine forests. Ecological Applications **6**:899–909.

Bogan, M. A., C. D. Allen, E. H. Muldavin, S. P. Platania, J. N. Stuart, G. H. Farley, P. Melhop, and J. Belnap. 1998. Southwest. Pages 543–592 *in* M. J. Mac, P. A. Opler, C. E. Puckett Haecker, and P. D. Doran, editors. Status and trends of the nation's biological resources. Two volumes. U.S. Department of Interior, U.S. Geological Survey, Reston, Virginia, USA.

Brown, P. M., M. R. Kaufmann, and W. D. Shepperd. 1999. Long-term, landscape patterns of past fire events in a montane ponderosa pine forest of central Colorado. Landscape Ecology **14**:513–532.

Brown, R. 2000. Thinning, fire, and forest restoration: a science-based approach for national forests of the interior Northwest. Defenders of Wildlife, Washington, D.C., USA.

Bull, E. L., C. G. Parks, and T. R. Torgersen. 1997. Trees and logs important to wildlife in the Interior Columbia River Basin. USDA Forest Service General Technical Report **PNW-GTR-391**.

Community Forest Restoration Act. 30 October 2000. Public Law 106-393, Statutes at Large **114**:1607–1628.

Cooper, C. F. 1960. Changes in vegetation, structure, and growth of southwestern pine forests since white settlement. Ecological Monographs **30**:129–164.

Covington, W. W. 2000. Helping western forests heal: the prognosis is poor for United States forest ecosystems. Nature **408**:135–136.

Covington, W. W., R. L. Everett, R. Steele, L. L. Irwin, T. A. Daer, and A. N. D. Auclair. 1994. Historical and anticipated changes in forest ecosystems of the Inland West of the United States. Journal of Sustainable Forestry **2**:13–63.

Covington, W. W., P. Z. Fulé, M. M. Moore, S. C. Hart, T. E. Kolb, J. N. Mast, S. S. Sackett, and M. R. Wagner. 1997. Restoring ecosystem health in ponderosa pine forests of the Southwest. Journal of Forestry **95**:23–29.

Covington, W. W., and M. M. Moore. 1994. Southwestern ponderosa pine forest structure: changes since Euro-American settlement. Journal of Forestry **92**:39–47.

Crawford, J. S., C.-H. A. Wahren, S. Kyle, and W. H. Moir. 2001. Responses of exotic plant species responses to fires in *Pinus ponderosa* forests in northern Arizona. Journal of Vegetation Science **12**:261–268.

Crowley, T. J. 2000. Causes of climate change over the past 1000 years. Science **289**:270–277.

Dahm, C. W., and B. W. Geils, techical editors. 1997. An assessment of forest ecosystem health in the Southwest. USDA Forest Service General Technical Report **RM-GTR-295**.

Dodd, N. L., S. S. Rosenstock, C. R. Miller, and R. E. Schweinsburg. 1998. Tassel-eared squirrel population dynamics in Arizona: index techniques and relationships to

Case No. 1:23-cv-01501-RMR Document 15-4 filed 09/29/23 USDC Colorado pg 121 of 176



habitat condition. Technical Report 27. Arizona Game and Fish Department, Phoenix, Arizona, USA.

Everett, R., D. Schellhaas, D. Spurbeck, P. Ohlson, D. Keenum, and T. Anderson. 1997. Structure of Northern Spotted Owl nest stands and their historical conditions on the eastern slope of the Pacific Northwest Cascades, USA. Forest Ecology and Management **94**:1–14.

Ffolliott, P. F., G. S. Gottfried, and M. B. Baker, Jr. 1989. Water yield from forest snowpack management: research findings in Arizona and New Mexico. Water Resources Research **25**:1999–2007.

Finney, M. A. 2001. Design of regular landscape fuel treatment patterns for modifying fire growth and behavior. Forest Science **47**:219–228.

Fulé, P. Z., W. W. Covington, and M. M. Moore. 1997. Determining reference conditions for ecosystem management of southwestern ponderosa pine. Ecological Applications **7**:895–908.

Fulé, P. Z., A. E. M. Waltz, W. W. Covington, and T. A. Heinlein. 2001. Measuring forest restoration effectiveness in reducing hazardous fuels. Journal of Forestry **99**(11): 24–29.

Graham, R. T., A. E. Harvey, T. B. Jain, and J. R. Tonn. 1999. The effects of thinning and similar stand treatments on fire behavior in western forests. USDA Forest Service General Technical Report **PNW-GTR-463**.

Grissino-Mayer, H. D., and T. W. Swetnam. 2000. Century-scale climate forcing of fire regimes in the American Southwest. The Holocene **10**:207–214.

Grissino-Mayer, H. D., T. W. Swetnam, and R. K. Adams. 1997. The rare old-aged conifers of El Malpais: their role in understanding climate change in the American Southwest. Pages 155–161 *in* K. Mabery, compiler. Natural history of El Malpais National Monument. Bulletin 156. New Mexico Bureau of Mines and Mineral Resources, Socorro, New Mexico, USA.

Hanson, C. 2000. Chopping down the forest won't save it. [Letter to the Editor.] New York Times, National edition, 19 May 2000, Section A: p. 27 (col. 1).

Hardy, C. C., D. L. Bunnell, J. P. Menakis, K. M. Schmidt, D. G. Long, D. G. Simmerman, and C. M. Johnston. 1999. Coarse-scale spatial data for wildland fire and fuel management. USDA Forest Service, Rocky Mountain Research Station, Fire Sciences Laboratory, Missoula, Montana, USA. [Online, URL: ⟨http://www.fs.fed.us/fire/fuelman⟩.]

Harrington, M. G., and S. S. Sackett. 1992. Past and present fire influences on southwestern ponderosa pine old growth. Pages 44–50 *in* M. R. Kaufmann, W. H. Moir and R. L. Bassett, editors. Old-growth forests in the Southwest and Rocky Mountain regions. USDA Forest Service General Technical Report **RM-213**.

Hole, F. D. 1981. Effects of animals on soil. Geoderma **25**: 75–112.

Holling, C. S. 1978. Adaptive environmental assessment and management. John Wiley and Sons, New York, New York, USA.

Holling, C. S., and G. K. Meffe. 1996. Command and control and the pathology of natural resource management. Conservation Biology **10**:328–337.

Holthausen, R. S., M. G. Raphael, F. B. Samson, D. Ebert, R. Hiebert, and K. Menasco. 1999. Population viability in ecosystem management. Pages 135–156 *in* R. C. Szaro et al., editors. Ecological sewardship–a common reference for ecosystem management. Volume II. Elsevier Science, Oxford, UK.

Jenkins, M. 2001. ''Making forests safe again won't be a walk in the park.'' High Country News, 7 May, p. 10.

Johnson, T. H., and R. H. Wauer. 1996. Avifaunal response to the 1977 La Mesa fire. Pages 70–94 *in* C. D. Allen, technical editor. Fire effects in Southwestern forests. Proceedings of the Second La Mesa Fire Symposium. USDA Forest Service General Technical Report **RM-GTR-286**.

Jurgensen, M. F., A. E. Harvey, R. T. Graham, D. S. Page-Dumroese, J. R. Tonn, M. G. Larsen, and T. B. Jain. 1997. Impacts of timber harvesting on soil organic matter, nitrogen, productivity, and health of inland Northwest forests. Forest Science **43**:234–251.

Kaufmann, M. R., R. T. Graham, D. A. Boyce, Jr., W. H. Moir, L. Perry, R. T. Reynolds, R. L. Bassett, P. Mehlhop, C. B. Edminster, W. M. Block, and P. S. Corn. 1994. An ecological basis for ecosystem management. USDA Forest Service General Technical Report **RM-246**.

Kaufmann, M. R., L. S. Huckaby, C. M. Regan, and J. Popp. 1998. Forest reference conditions for ecosystem management in the Sacramento Mountains, New Mexico. USDA Forest Service General Technical Report **RMRS-GTR-19**.

Kaye, J. P., and S. C. Hart. 1998. Ecological restoration alters nitrogen transformations in a ponderosa pine-bunchgrass ecosystem. Ecological Applications **8**:1052–1060.

Kaye, M. W., and T. W. Swetnam. 1999. An assessment of fire, climate, and Apache history in the Sacramento Mountains, New Mexico, USA. Physical Geography **20**:305–330.

Kennedy, P. L. 1997. The Northern Goshawk (*Accipter gentilis atricapillus*): Is there evidence of a population decline? Journal of Raptor Research **31**:95–106.

Kloor, K. 2000. Returning America's forests to their ''natural'' roots. Science **287**:573–575.

Landres, P., P. Morgan, and F. J. Swanson. 1999. Overview of the use of natural variability concepts in managing ecological systems. Ecological Applications. **9**:1179–1188.

Ledig, F. T. 1992. Human impacts on genetic diversity in forest ecosystems. Oikos **63**:87–108.

MacNeil, J. S. 2000. Forest fire plan kindles debate. Science **289**:1448–1449.

Madany, M. H., and N. E. West. 1983. Livestock grazing–fire regime interactions within montane forests of Zion National Park. Ecology **64**:661–667.

Mann, M. E., R. Bradley, and M. K. Hughes. 1998. Northern hemisphere temperatures during the past millennium: inferences, uncertainties, and limitations. Geophysical Research Letters **26**:759–762.

Marston, E. L. Criley, A. Brower, S. Kennedy, J. Downing, H. Nolde, C. Smith, and H. Swartz. 2001. ''Restoring the range of light'' [a series of articles]. High Country News, 27 August, pp. 1, 8–14.

Mast, J. N., P. Z. Fulé, M. M. Moore, W. W. Covington, and A. E. M. Waltz. 1999. Restoration of presettlement age structure of an Arizona ponderosa pine forest. Ecological Applications **9**:228–239.

Matthews, M. 2001. ''Back into the woods: The West goes to work cleaning up its forests.'' High Country News, 7 May, pp. 1, 8–11.

Millar, C. I., and W. J. Libby. 1989. Restoration: Disneyland or a native ecosystem? A question of genetics. Fremontia **17**:3–10.

Millar, C. I., and W. B. Woolfenden. 1999. The role of climate change in interpreting historical variability. Ecological Applications **9**:1207–1216.

Miller, C., and D. L. Urban. 2000. Modeling the effects of fire management alternatives on Sierra Nevada mixed-conifer forests. Ecological Applications **10**:85–94.

Moir, W. H., and J. H. Dieterich. 1988. Old-growth ponderosa pine from succession in pine–bunchgrass forests in Arizona and New Mexico. Natural Areas Journal **8**:17–24.

Moore, M. M., W. W. Covington, and P. Z. Fulé. 1999. Reference conditions and ecological restoration: a Southwestern ponderosa pine perspective. Ecological Applications **9**: 1266–1277.

Morgan, P., G. H. Aplet, J. B. Haufler, H. C. Humphries, M. M. Moore, and W. D. Wilson. 1994. Historical range of

Case No. 1:23-cv-01501-RMR Document 15-4 filed 09/29/23 USDC Colorado pg 122 of 176



variability: a useful tool for evaluating ecosystem change. Journal of Sustainable Forestry **2**:87–111.

Morgan, P., C. Hardy, T. W. Swetnam, M. G. Rollins, and D. G. Long. 2001. Mapping fire regimes across time and space: understanding coarse and fine-scale patterns. International Journal of Wildland Fire **10**:329–342.

Morrison, P. H., J. W. Karl, K. J. Harma, L. Swope, T. K. Allen, and P. Becwar. 2000. Assessment of summer 2000 wildfires: landscape history, current condition, and ownership. Pacific Biodiversity Institute, Winthrop, Washington, USA. [Online, URL: ⟨http://www.pacificbio.org⟩.]

National Forest Protection Alliance. 2001. Restoration and Our National Forests. [Online, URL: ⟨http://www.forestadvocate.org⟩.]

New Mexico Department of Game and Fish. 2000. Biota information system of New Mexico. Electronic database, Version January 2000. New Mexico Department of Game and Fish, Santa Fe, New Mexico, USA. [Available only on CD-ROM].

Nijhuis, M. 1999. ''Flagstaff searches for its forests' future.'' High Country News, 1 March, pp. 8–12.

Noss, R. F., E. T. LaRoe, III, and J. M. Scott. 1995. Endangered ecosystems of the United States: a preliminary assessment of loss and degradation. National Biological Service Biological Report 28. U.S. Department of the Interior, Washington, D.C., USA.

Oliver, C. D., A. Osawa, and A. Camp. 1998. Forest dynamics and resulting animal and plant population changes at the stand and landscape levels. Journal of Sustainable Forestry **6**:281–312.

Patton, D. R., and K. E. Severson. 1989. WILDHARE: a wildlife habitat relationships data model for southwestern ponderosa pine. Pages 268–276 *in* A. Techle, W. W. Covington, and R. H. Hamre, technical coordinators. Multiresource management of ponderosa pine forests. USDA Forest Service General Technical Report **RM-185**.

Pearson, G. A. 1950. Management of ponderosa pine in the Southwest. USDA Forest Service, Agricultural Monograph no. 6. U.S. Government Printing Office, Washington, D.C., USA.

Rehfeldt, G. E. 1991. Models of genetic variation for *Pinus ponderosa* in the inland Northwest (U.S.A.): applications in gene resource management. Canadian Journal of Forest Research **21**:1491–1500.

Reynolds, R. T., R. T. Graham, M. H. Reiser, R. L. Bassett, P. L. Kennedy, D. A. Boyce, Jr., G. Goodwin, R. Smith, and E. L. Fisher. 1992. Management recommendations for the Northern Goshawk in the Southwestern United States. USDA Forest Service General Technical Report **RM-217**.

Rieman, B., and J. Clayton. 1997. Wildlife and native fish: issues of forest health of sensitive species. Fisheries **22**(11): 6–15.

Robichaud, P. R., J. L. Beyers, and D. G. Neary. 2000. Evaluating the effectiveness of postfire rehabilitation treatments. USDA Forest Service General Technical Report **RMRS-GTR-63**.

Rollins, M. G. 2000. Twentieth century landscape fire patterns in the Gila/Aldo Leopold Wilderness Areas, New Mexico, and Selway-Bitterroot Wilderness Area, Idaho/Montana. Dissertation. University of Arizona, Tucson, Arizona, USA.

Rosenstock, S. S. 1998. Influence of Gambel oak on breeding birds in ponderosa pine forests of northern Arizona. Condor **100**:485–492.

Rummell, R. S. 1951. Some effects of livestock grazing on ponderosa pine forest and range in central Washington. Ecology **32**:594–607.

Savage, M., P. M. Brown, and J. Feddema. 1996. The role of climate in a pine forest regeneration pulse in the southwestern United States. Ecoscience **3**:310–318.

Shinneman, D. J., and W. L. Baker. 1997. Nonequilibrium dynamics between catastrophic disturbances and old-growth forests in ponderosa pine landscapes of the Black Hills. Conservation Biology **11**:1276–1288.

Smith, H. Y., and S. F. Arno, editors. 1999. Eighty years of change in a managed ponderosa pine forest. USDA Forest Service General Technical Report **RMRS-GTR-23**.

Southwest Forest Alliance. 2001. Why the Flagstaff presettlement restoration model should not be applied to public forest lands. Southwest Forest Alliance, Flagstaff, Arizona, USA. [Online, URL: ⟨http://www.swfa.org⟩.]

Stacey, P. B., V. A. Johnson, and M. L. Taper. 1996. Migration within metapopulations: the impact upon local population dynamics. Pages 267–291 *in* I. Hanski and M. Gilpin, editors. Metapopulation biology: ecology, genetics and evolution. Academic Press, New York, New York, USA.

Stephenson, N. L. 1987. Use of tree aggregations in forest ecology and management. Environmental Management **11**: 1–5.

Stephenson, N. L. 1999. Reference conditions for giant sequoia forest restoration: structure, process, and precision. Ecological Applications **9**:1253–1265.

Suckling, K. 1996. Forests forever! A plan to restore ecological and economic integrity to the Southwest's National Forests and forest dependent communities. Southwest Forest Alliance, Flagstaff, Arizona, USA.

Swetnam, T. W., C. D. Allen, and J. L. Betancourt. 1999. Applied historical ecology: using the past to manage for the future. Ecological Applications **9**:1189–1206.

Swetnam, T. W., and C. H. Baisan. 1996. Historical fire regime patterns in the Southwestern United States since AD 1700. Pages 11–32 *in* C. D. Allen, technical editor. Fire effects in Southwestern forests. Proceedings of the Second La Mesa Fire Symposium. USDA Forest Service General Technical Report **RM-GTR-286**.

Swetnam, T. W., and J. L. Betancourt. 1998. Mesoscale disturbance and ecological response to decadal climatic variability in the American Southwest. Journal of Climate **11**: 3128–3147.

Tiedemann, A. R., J. O. Klemmedson, and E. L. Bull. 2000. Solution of forest health problems with prescribed fire: Are forest productivity and wildlife at risk? Forest Ecology and Management **127**:1–18.

Trombulak, S. C., and C. A. Frissell. 2000. Review of ecological effects of roads on terrestrial and aquatic communities. Conservation Biology **14**:18–30.

USDA Forest Service. 2000. Protecting people and sustaining resources in fire-adapted ecosystems: a cohesive strategy. USDA Forest Service, Washington, D.C., USA. [Also online, URL: ⟨http://www.fireplan.gov⟩.]

USDA and USDI [USDA Forest Service, and U.S. Department of the Interior]. 2000*a*. National fire plan: managing the impact of wildfires on communities and the environment. A report to the President in response to the wildfires of 2000. [Online, URL: ⟨http://www.fireplan.gov⟩.]

USDA and USDI [USDA Forest Service and USDI Bureau of Land Management]. 2000*b*. Interior Columbia Basin Final Environmental Impact Statement. Interior Columbia Basin Ecosystem Management Project, Boise, Idaho, USA. [Online: ⟨http//www.icbemp.gov/⟩.]

USDI [United States Department of the Interior]. 2000. Reducing the risks and consequences of catastrophic wildland fires on DOI lands. Washington, D.C.

U.S. Fish and Wildlife Service. 1995. Recovery plan for the Mexican Spotted Owl (*Strix occidentalis lucida*). U.S. Fish and Wildlife Service, Albuquerque, New Mexico, USA.

U.S. Fish and Wildlife Service. 1998. Northern goshawk status review. U.S. Fish and Wildlife Service, Portland, Oregon, USA.

U.S. General Accounting Office. 1999. Western national for-

Case No. 1:23-cv-01501-RMR Document 15-4 filed 09/29/23 USDC Colorado pg 123 of 176



ests: a cohesive strategy is needed to address catastrophic wildfire threats. GAO/RCED-99-65. U.S. Government Printing Office.

Veenhuis, J. 2002. Effects of wildfire on the hydrology of Capulin and Rito de los Frijoles Canyons, Bandelier National Monument, New Mexico, Water Resources Investigations Report. U.S. Geological Survey, Albuquerque, New Mexico, USA, *in press*.

Wagner, M. R., W. M. Block, B. W. Geils, and K. F. Wenger. 2000. Restoration ecology: A new forest management paradigm or another merit badge for foresters? Journal of Forestry **98**:22–27.

Waltz, A. F. M., and W. W. Covington. 1999. Butterfly richness and abundance increase in restored ponderosa pine ecosystem (Arizona). Ecological Restoration **17**:244–246.

Weatherspoon, C. P., and C. N. Skinner. 1996. Landscape-level strategies for forest fuel mangement. Chapter 56 *in* Sierra Nevada ecosystem project. Final report to Congress. Volume II. Assessments and scientific basis for management options. Wildland Resources Center Report number 39. Centers for Water and Wildland Resources, University of California, Davis, California, USA.

Weaver, H. 1951. Fire as an ecological factor in Southwestern ponderosa pine forests. Journal of Forestry **49**:93–98.

Webb, D. R., and R. L. Henderson. 1985. Gila Wilderness prescribed fire program. Pages 413–414 *in* J. E. Lotan, B. M. Kilgore, W. C. Fischer, and R. W. Mutch, technical coordinators. Proceedings—Symposium and Workshop on Wilderness Fire. USDA Forest Service General Technical Report **INT-182**.

Western Governors' Association, U.S. Forest Service, and U.S. Department of the Interior. 2001. A collaborative approach for reducing wildland fire risks to communities and the environment: 10-year comprehensive strategy, August 2001. [Online, URL: ⟨http://www.fireplan.gov⟩.]

White, A. S. 1985. Presettlement regeneration patterns in a southwestern ponderosa pine stand. Ecology **66**:589–594.

White, C. S. 1994. Monoterpenes: their effects on ecosystem nutrient cycling. Journal of Chemical Ecology **20**:1381–1406.

White, P. S., and J. L. Walker. 1997. Approximating nature's variation: selecting and using reference information in restoration ecology. Restoration Ecology **5**:338–349.

White, W. D. 1996. Geomorphic responses of six headwater basins fifteen years after the La Mesa fire. Pages 95–113 *in* C. D. Allen, technical editor. Fire effects in Southwestern forests: Proceedings of the Second La Mesa Fire Symposium. U.S. Forest Service General Technical Report **RM-GTR-286**.

Woolsey, T. S., Jr. 1911. Western yellow pine in Arizona and New Mexico. U.S. Forest Service Bulletin 101. U.S. Government Printing Office, Washington, D.C., USA.

Wuerthner, G. 1999. ''Friendly fire.'' Green Roots—the Newsletter of Forest Guardians, Summer 1999, no. 6, p. 5.



A.L. Sweitzer

# Forest Restoration in Southwestern Ponderosa Pine

A field study on the San Juan National Forest focused first on restoring degraded ponderosa pine forests to ecological integrity and potential productivity, and second on maximizing returns from harvesting. Results show that if landscape-scale forest restoration has a future, sale design is critical. Managers who combine financially strong and weak units, design sales to reduce logging and prescribed burning costs, and take advantage of the fluctuating market for small material can achieve both ecological and financial objectives.

By Dennis L. Lynch, William H. Romme, and M. Lisa Floyd

Questions about operational forest restoration confronted us as we began our study in 1993, and we soon found we were not alone—foresters involved in restoration projects across the country were asking similar questions. Most cost-revenue information on small-diameter harvesting had come from either plots or just estimates. No one had addressed the revenues and costs associated with achieving ecological objectives in forest restoration at the project level. We work in the Southwest, but the questions transcend region:

Will good ecology naturally translate into good economics? What types of small-diameter products can be expected from restoration treatments? What are the actual costs and revenues for a restoration project? Can restoration projects pay their way or must they be subsidized? Can harvesting operations alone achieve restoration objectives? What combinations of harvesting and prescribed fire may be needed to achieve desired ecological conditions?

Much has been written about degraded ponderosa pine *(Pinus ponderosa)* forest stand structure and processes across the Southwest and the substantial differences between current forest conditions and those existing before the influx of Europeans (Cooper 1960; Covington et al. 1997; Dahms and Geils 1997; Fulé et al. 1997). In southwestern Colorado, fire history and stand reconstruction studies (Romme et al. 1999a) confirmed similar differences in conditions. Thinning to remove small-diameter trees, accompanied by prescribed fire, has been suggested as a means of restoring structure and processes to degraded forest systems (Sackett et al. 1993; Edminster

***Above:*** **Oxen logging on the San Juan National Forest, Colorado, 1910. Note the open, park-like forest conditions.**

FS-001743



Downloaded from https://academic.oup.com/jof/article-abstract/98/8/17/4614243 by guest on 24 June 2019

**Prescribed burning is used to create openings on the San Juan National Forest, Colorado.**

***Right:*** **An area of severe crown scorch after prescribed burning but before spring green-up.**

***Center:*** **The same area one month later, after green-up; note the abundance of forbs and herbs in the understory.**

***Far right:*** **The same area one year later.**



and Olsen 1995; Hardy and Arno 1996; Omi 1998). Since the start of our study, efforts have also been made to estimate the financial potential of restoration projects (Mirth and Larson 1997; Lynch et al. 1997; Scott 1998) but with varying results.

No one, however, had seen on-the-ground operational forest restoration. The Forest Service had offered traditional timber sales that included small-diameter material, but these sales consistently failed to attract bids. Small, scattered areas had been precommercially thinned using classical spacing guides. Prescribed fire had been used in open pine stands but not in high-density stands needing restoration. In the public involvement phase that preceded our study (Richard and Burns 1998), we learned that citizens were interested in the idea of forest restoration but uncertain what it might look like.

The Dolores District Ranger of the San Juan National Forest, Montezuma County Commissioners, and Colorado Timber Industry Association formed the Ponderosa Pine Partnership in 1993 to learn how stands might be restored to the pre-1900 forest structure and processes suggested by Romme's studies. The partnership was also interested in improving a declining rural economy and maintaining traditional western lifestyles.

Romme provided a forest restoration prescription that called for retaining the largest trees and creating irregularly sized and shaped clumps interspersed with small openings and narrow glades (see "An Ecological Prescription for the San Juan Pine Zone"). Phil Kemp, of the Dolores District timber staff, translated this into a silvicultural marking guide for his crews. The district subsequently offered six units (totaling 549 acres) as a demonstration timber sale that was purchased by Montezuma County and subcontracted to local loggers associated with the Colorado Timber Industry Association. Carla Garrison, an employee of Montezuma County, acted as project coordinator for the partnership. Harvesting data were collected by Catherine Jones.

Although operational field studies reflect the real world, variables are hard

## An Ecological Prescription for the San Juan Pine Zone

*Retain large trees.* Any trees 20 inches or larger in diameter should be retained. In stands with smaller trees, the largest trees should be retained in clumps. Large-diameter oak stems should be retained as clones.

*Reduce tree densities.* Pre-1900 levels were approximately 40 to 50 trees per acre, but future mortality and ingrowth should be considered.

*Use large trees to identify clumps.* The largest trees in the stand should be used as a guide to the placement of clumps. Isolated large trees between clumps may be removed. Occasional clumps of small-diameter trees may be retained to provide variation.

*Vary clump sizes.* Clumps may vary from groups of six trees to as much as one-quarter to one-third acre in size, but considerable flexibility is possible.

*Vary distances between clumps.* The areas between clumps should be viewed as narrow glades and small openings with variation. Usually these should be 33 feet to 66 feet in width or 1 to 1.5 tree lengths across. They should exceed the lateral extent of crown and roots. Variation in opening size and shape is important.

*Create openings.* The purpose of openings is to provide for snow catch and sunlight to increase the component of grasses and forbs.

*Manage fire.* Gradually restore the fire regime to intervals of 10 to 20 years including summer burning. Protect large trees during burning. Try to reach light fuel beds that will be easy to manage even under wildfire conditions.

*Provide for wildlife.* Retain and create snags to increase this component of the stand. Clumps should include interlocking crown conditions for Aberts squirrels. Larger-diameter dead oak stems should be retained for songbirds.

FS-001744



Downloaded from https://academic.oup.com/jof/article-abstract/98/8/17/4614243 by guest on 24 June 2019





Photos by Dennis L. Lynch

to control, and not everything in this study went according to plan. However, information developed here may be useful to others contemplating forest restoration projects.

## Ecological Prescription

The six experimental restoration units were representative of a 180,000-acre area in the San Juan National Forest near Dolores, Colorado. Elevation ranges from 6,500 to 9,500 feet, and substrate is primarily Dakota sandstone. This forest, nearly pure ponderosa pine, has been heavily utilized by humans throughout the past 125 years. Livestock grazing began in the 1870s, heavy logging occurred in the early 1900s, and fires have been excluded since the 1880s. In many areas there are now seven times more trees per acre than at the turn of the 20th century. Stands are more homogeneous (mostly in the 50- to 110-year age classes) and typically lack large trees and snags. Less than 20 percent of the stands have regeneration, understory plant diversity is limited, and fires are infrequent but potentially intense (Romme et al. 1999b). Overall biodiversity, ecological integrity, and productive potential may have been diminished, a situation that prevails elsewhere in the Southwest (Cooper 1960; Covington et al. 1997; Moir et al. 1997).

Ecological goals for this project included reducing risk of uncontrollable wildfires and insect outbreaks, stimulating growth of suppressed herbaceous plants, providing germination sites for pine seedlings, and increasing large living trees and snags for structural diversity and wildlife habitat (Covington et al. 1997; Hardy and Arno 1996; Romme et al. 1999a). Six specific ecological study objectives were identified:

1. Reduce current stand density to pre-1900 conditions.
2. Increase average stand diameters.
3. Increase crown base height (distance from ground to base of living crown) to reduce risk of catastrophic fire.
4. Reduce cover of woody plants and detritus (litter and woody debris).
5. Reduce downed woody fuels.
6. Increase cover and diversity of herbaceous plants and increase pine reproduction.

## Methodology

*Ecological monitoring and analysis.* In June 1995, before treatment, we paced each stand (50 to 100 acres) and listed all vascular plant species present. We then established two permanent 100-meter transects through representative portions of each stand. To document vascular plant species present after treatment, we established 10-by-10-meter releve plots on both sides of the transect at the beginning and end of the transect, for a total of four plots per transect and eight plots per stand. We listed all vascular plant species within each plot and visually estimated cover and abundance using the Braun-Blanquet scale (Mueller-Dombois and Ellenberg 1974). We sampled all trees within a belt along each 100-meter transect. Before sampling, we selected an appropriate belt width, based on tree density, that would provide approximately 40 trees per transect. We recorded each tree species, diameter at breast height (dbh), crown base height, and condition (healthy, dying, or dead). The Forest Service measured tree density and basal area before and after treatment using stand examination techniques (USDA-FS 1999).

The point intercept method was used to evaluate percent cover of biotic and abiotic forest floor components. We sampled 25 point-frames (frequency frames) along each transect. Each frame was located randomly within sequential 4-meter sections of the transect. We established five lateral transects for planar intercept fuels sampling along each main transect, for a total of 10 planar intercept transects in each stand (Brown 1970).

In 1998, after treatment, all transects, belts, frames, and lateral transects were relocated and resampled. Using 1995 and 1998 data, we tested for significant differences in average stand dbh and crown base height by means of independent *t*-tests. We tested for significant effects on each cover component by means of ANOVA on arcsine-transformed data. Where the overall ANOVA model demonstrated significant differences between years or among stands ($p < 0.05$), we tested for significant differences in each stand using individual sample *t*-tests. Statistical tests were performed on transformed data, but results presented here are all untransformed means and standard errors. We tested for significant effects of year and stand on each fuel com-

FS-001745



Downloaded from https://academic.oup.com/jof/article-abstract/98/8/17/4614243 by guest on 24 June 2019

**Table 1. Stand characteristics. Four stands were treated and sampled for ecological objectives in this study in the San Juan National Forest, Colorado. Canopy species include ponderosa pine, aspen, and Gambel oak.**

| | A Thinned 1995 | B Thinned 1995 | C Thinned 1995 | D Thinned 1995, burned 1996 |
|---|---|---|---|---|
| Elevation (feet) | 7,900 | 7,900 | 8,000 | 8,000 |
| Substrate | Dakota sandstone, Mancos shale | Dakota sandstone, Mancos shale | Dakota sandstone, loess | Dakota sandstone, loess |
| Topography | Gentle northwest-facing slope | Gentle west-facing slope | Gentle west-facing slope on mesa top | Gentle west-facing slope on mesa top |
| Size (acres) | 95 | 56 | 108 | 65 |
| Posttreatment density in stems per acre (pine, all species) | 28, 51 | 106, 106 | 49, 49 | 56, 56 |
| Posttreatment basal area in square feet per acre (pine, all species) | 50, 58 | 93, 93 | 58, 58 | 42, 42 |
| Dominant ground layer plant species | *Bromus, Antennaria, Achillea lanulosa, Fragaria* | *Rosa woodsii, Achillea lanulosa, Wyethia arizonica, Potentilla* | *Quercus gambelii, Symphoricarpos, Amelanchier utahensis, Achillea lanulosa* | *Quercus gambelii, Carex geyeri, Wyethia arizonica, Poa fendleriana* |

**Table 2. Plant species richness (diversity) in experimentally treated stands in the San Juan National Forest.**

| Plant type | A Thinned 1995 | B Thinned 1995 | C Thinned 1995 | D Thinned 1995, burned 1996 |
|---|---|---|---|---|
| *Woody species* | | | | |
| 1995 | 9 | 8 | 9 | 8 |
| 1998 | 5 | 6 | 5 | 5 |
| *Forbs* | | | | |
| 1995 | 32 | 27 | 30 | 23 |
| 1998 | 10 | 11 | 18 | 42* |
| *Graminoids* | | | | |
| 1995 | 4 | 2 | 4 | 2 |
| 1998 | 3 | 2 | 6 | 6* |
| *Alien species* | | | | |
| 1995 | 2 | 2 | 1 | 5 |
| 1998 | 1 | 2 | 2 | 3 |
| *Noxious weeds* | | | | |
| 1995 | 1 | 1 | 0 | 2 |
| 1998 | 2 | 2 | 2 | 3 |
| *Total species* | | | | |
| 1995 | 45 | 37 | 43 | 33 |
| 1998 | 18 | 19 | 29 | 53* |

*Values represent the number of species encountered within the entire 50–100 acre stand in 1995, and in eight 100-square-meter plots in each stand in 1998. Pairs of numbers are not directly comparable because of different sampling methods.*
**Trends that appear biologically meaningful.*

ponent by means of ANOVA. Where the overall ANOVA model was significant ($p < 0.05$), we tested for significant differences between years in each stand using independent sample $t$-tests.

*Harvesting and prescribed fire.* Harvesting equipment typically used in this area might be described as "survival" technology—paid for and simple to repair. A history of inconsistent timber supply and stumpage pricing on national forest lands has discouraged local investment in new logging or milling equipment. Trees were therefore felled, limbed, and bucked manually with chainsaws; a John Deere 743 mechanical harvester assisted in two units. Slash was lopped and scattered to create a fuelbed for prescribed burning. Skidding was accomplished with either a JD 540 or CAT 518 rubber-tired, swinging grapple skidder. Skidders attempted to crush slash and small oakbrush *(Quercus gambelii)* to prepare a fuelbed, but larger oak clones were left intact for wildlife. Gentle terrain (typically flat with occasional 5 to 10 percent slopes) permitted easy construction of landings and short spur roads.

Logs were loaded onto conventional log trucks with a hydraulic knuckle boom loader and transported to various mills for processing into pine excelsior, waferwood for oriented-strand board, pulpwood, posts and poles, and sawn products. Haul distances were approximately 335 miles for pulpwood to Stone Container in Snowflake, Arizona; 160 miles for waferwood logs to Louisiana-Pacific in Olathe, Colorado; and 25 miles for excelsior logs, posts and poles, and sawlogs in Mancos, Cortez, or Dolores, Colorado.

As trees were cut, they were counted and sorted into 5–7.9-inch, 8–11 9-inch, and 12+-inch diameter classes. Skidded logs were also recorded by diameter class. Logs were separated by product and counted during loading.

FS-001746

Downloaded from https://academic.oup.com/jof/article-abstract/98/8/17/4614243 by guest on 24 June 2019

Every truck was weighed. Samples were taken from logs and sample loads were scaled to determine weight-volume conversions.

Records for labor, equipment, fuel and fluid consumption, and hourly machine use were kept in a daily journal, and costs were calculated using methods described by Miyata (1980). Other costs included insurance, workers' compensation, FICA, bookkeeping, and office and administrative expenses. Revenues were recorded for each product sold by the logger.

Slash disposal and road rock replacement money was collected by the Forest Service along with stumpage. Prescribed burning was to be accomplished within one year after harvest of each unit. However, only two units were burned because of workforce and weather restrictions. One of these units was considered to have been satisfactorily treated to reduce fuels.

**Table 3. Percent cover of biotic and abiotic ground layer components in 1995 (before treatment) and 1998 (after treatment) in four study areas in the San Juan National Forest.**

| | A Thinned 1995 | B Thinned 1995 | C Thinned 1995 | D Thinned 1995, burned 1996 |
|---|---|---|---|---|
| *Forbs* | | | | |
| 1995 | 24.6 (2.5) | 29.4 (3.3) | 11.2 (2.1) | 7.8 (1.5) |
| 1998 | 9.9 (1.3)* | 12.8 (1.6)* | 13.4 (2.4) | 12.3 (2.2) |
| *Grasses and sedges* | | | | |
| 1995 | 6.1 (1.0) | 11.1 (1.6) | 8.4 (1.6) | 0.9 (0.4) |
| 1998 | 9.9 (1.6) | 17.1 (2.8) | 4.4 (1.2)* | 1.2 (0.5) |
| *Oak* | | | | |
| 1995 | 0.64 (0.4) | 0.0 (0.0) | 8.5 (1.5) | 13.6 (2.4) |
| 1998 | 7.5 (2.3)* | 0.1 (0.1) | 23.3 (3.6)* | 18.8 (4.0) |
| *Snowberry* | | | | |
| 1995 | 0.16 (0.16) | 0.02 (0.02) | 11.2 (2.8) | 0.1 (0.1) |
| 1998 | 0.0 (0.0) | 0.64 (0.64) | 6.2 (1.4) | 0.16 (0.1) |
| *Total herbaceous vegetation* | | | | |
| 1995 | 30.8 (2.6) | 40.5 (3.6) | 30.9 (3.5) | 8.6 (1.6) |
| 1998 | 19.8 (2.3)* | 30.5 (3.0)* | 23.9 (2.7) | 13.6 (2.3) ($p = 0.07$) |
| *Total woody vegetation* | | | | |
| 1995 | 1.36 (0.7) | 0.9 (0.5) | 22.2 (3.6) | 29.5 (4.8) |
| 1998 | 15.4 (4.7)* | 0.4 (0.2) | 49.7 (7.3) | 38.4 (8.1) |
| *Total detritus* | | | | |
| 1995 | 68.3 (2.7) | 52.9 (4.1) | 54.9 (3.4) | 74.6 (2.5) |
| 1998 | 71.5 (2.8) | 65.9 (3.0)* | 46.1 (3.8) ($p = 0.08$) | 59.5 (3.6)* |
| *Bare ground* | | | | |
| 1995 | 0.0 (0.0) | 0.0 (0.0) | 0.0 (0.0) | 0.0 (0.0) |
| 1998 | 0.8 (0.5)* | 3.1 (1.0)* | 3.2 (1.5)* | 3.2 (1.5)* |

**The difference between 1995 and 1998 is significant ($p < 0.05$). For marginally significant differences ($p < 0.10$), actual p value is given. Data were arcsine transformed for analysis, but values reported here are untransformed cover values: mean (standard error). N = 50 for each.*

## Results

*Posttreatment ecological assessment.* Ecological data from transects and plots were collected in four of the six treated stands. Basal area in all but one stand was reduced to 40 to 50 square feet per acre *(table 1).* One stand was treated with an effective prescribed burn in fall 1996. This burn scorched foliage in nearly every tree, and in May 1997 the stand appeared visibly damaged. However, by July 1997 nearly all scorched trees had shed fire-killed needles and developed new ones. By summer 1998, fire-caused mortality of canopy trees was less than 5 percent. More than 95 percent of the trees sampled within belt transects in 1998 were classified healthy.

In three stands that were thinned but not burned, we documented fewer species of woody plants, forbs, and graminoids in 1998. This was largely a result of the smaller spatial area sampled for richness in 1998 (eight 100-square-meter plots versus the entire stand in 1995). In the thinned and successfully burned stand, however, we detected 20 more species in 1998 despite the smaller sampling area *(table 2).* Especially striking was the increase in forb species. Grasses and sedges also increased, but woody species did not. There was a small increase in noxious weed species in all four stands, from 0 to 2 species in 1995, to 2 to 3 species in 1998, despite the smaller sampled area *(table 2).* Litter depth increased in two thinned-only stands but did not change in other stands.

Average stand diameters increased after removal of small material, from 2.8–5.8 inches in 1995 to 7.1–10.8 inches in 1998. However, average crown base height, which ranged from 14.4 to 22.3 feet, was not different after treatment in all stands.

In the three stands that were only thinned, the percent cover of herbaceous vegetation (forbs plus graminoids) was reduced in two stands, and percent cover of graminoids was reduced in a third stand. In the thinned and burned stand there was no change in forb or graminoid cover, but total herbaceous vegetation increased *(table 3).*

Percent cover of oak and total woody vegetation increased in two thinned stands, but there was no change in cover of shrubs or total woody vegetation in other stands *(table 3).* Percent cover of detritus increased marginally in two of three thinned-only stands. However, detritus was reduced in the thinned and burned stand. Percent cover of bare ground increased in all four stands, from zero in 1995 to 0.8–3.2 percent in 1998 *(table 3).*

In thinned-only stands, fine fuels (1-hour and 10-hour timelag, both < 1 inch in diameter), important in fire spread, increased or were not different *(table 4).* Heavy fuels (100-hour and 1,000-hour timelag, both > 1 inch in diameter), important in total heat release and fire persistence during rainy weather, also increased or did not change. In the thinned and burned stand, there was no change in either

FS-001747



Downloaded from https://academic.oup.com/jof/article-abstract/98/8/17/4614243 by guest on 24 June 2019

**Table 4. Dead woody fuels mass in 1995 (before treatments) and 1998 (after treatments) in four study areas in the San Juan National Forest.**

| Fuel type | A Thinned 1995 | B Thinned 1995 | C Thinned 1995 | D Thinned 1995, burned 1996 |
|---|---|---|---|---|
| *1-hour timelag fuels (0–0.25 inch)* | | | | |
| 1995 | 0.2 (0.009) | 0.03 (0.01) | 0.08 (0.02) | 0.04 (0.02) |
| 1998 | 0.16 (0.05) | 0.21 (0.08)* | 0.17 (0.04)* | 0.1 (0.04) |
| *10-hour timelag fuels (0.25–1 inch)* | | | | |
| 1995 | 0.4 (0.5) | 0.8 (0.3) | 0.5 (0.2) | 1.4 (0.4) |
| 1998 | 1.4 (0.4)* | 1.5 (0.6) | 1.8 (0.3)* | 1.1 (0.3) |
| *100-hour timelag fuels (1–3 inches)* | | | | |
| 1995 | 2.4 (0.65) | 2.1 (0.5) | 1.5 (0.5) | 2.4 (0.7) |
| 1998 | 4.7 (1.2) | 8.1 (2.2)* | 2.7 (0.7) | 3.1 (0.8) |
| *1,000-hour timelag sound fuels (> 3 inches)* | | | | |
| 1995 | 1.2 (0.7) | 5.1 (2.8) | 3.2 (1.3) | 3.9 (1.1) |
| 1998 | 6.3 (2.4)* | 12.0 (4.7) | 4.6 (1.0) | 2.7 (0.8) |
| *1,000-hour timelag rotten fuels (> 3 inches)* | | | | |
| 1995 | 0.35 (0.3) | 3.7 (2.2) | 1.4 (0.8) | 1.1 (0.6) |
| 1998 | 6.3 (3.6) | 4.1 (1.7) | 0.9 (0.5) | 1.5 (0.9) |
| *Total fuel mass (1,10,100, and 1,000 timelag fuels)* | | | | |
| 1995 | 4.3 (1.0)* | 11.7 (3.5)* | 6.7 (1.7) | 8.7 (1.8) |
| 1998 | 19.0 (4.7) | 26.1 (5.9) | 10.1 (1.5) | 8.4 (1.9) |
| *Litter depth (cm)* | | | | |
| 1995 | 1.8 (0.2) | 3.7 (0.5) | 2.8 (1.4) | 3.3 (0.5) |
| 1998 | 10.7 (1.8)* | 18.4 (3.3)* | 8.7 (2.0) | 4.1 (0.9) |
| *Duff depth (cm)* | | | | |
| 1995 | 1.6 (0.2) | 2.8 (0.7) | 1.9 (0.5) | 2.2 (0.5) |
| 1998 | 0.2 (0.1)* | 1.3 (0.3) | 0.6 (0.2) | 1.08 (0.3) |

**The difference between 1995 and 1998 is significant ($p < 0.05$). Results are reported as mean (standard error).* N *= 10 for all variables except duff depth and litter depth, for which* n *= 20. Fuel mass values are all tons per acre, where 1 ton = 2,000 pounds.*

fine or heavy fuel loads.

*Harvesting and burning results.* In the five units for which we obtained meaningful financial information—the logger of one unit did not keep good records—a total of 31,163 trees were removed from 492.6 acres (an average of 63.3 trees per acre). Of the total trees removed, 13,468 trees (43.2 percent) were in the 5–7.9-inch dbh diameter class, 13,751 trees (44.1 percent) were in the 8–11.9-inch class, and 3,944 trees (12.7 percent) were in the 12+-inch class. A total of 6,075.8 tons of sawlogs, 7,254.71 tons of waferwood, and 1,047.15 tons of other products (posts and poles, pulpwood, and pine excelsior) were produced. This resulted in a total profit to the logger of $3,534 on gross revenues of $434,646, or less than 1 percent (0.81 percent) profit on gross revenue.

Profit came primarily from sawlog material. Smaller material—for wood products other than logs—typically resulted in financial losses. An experimental effort to develop pine excelsior as a product resulted in a loss. The logger sold pulpwood at breakeven on the landing to a trucker experimenting with back hauling to the pulp mill. The trucker's loss amounted to about $8 per ton. Posts and poles were essentially breakeven products. Waferwood logs resulted in consistent losses of $1.16 to $4.87 per ton.

Prescribed burning was estimated to cost $50 per acre in the unit that was effectively treated. About 50 percent of the cost had been collected as slash disposal money, with the balance covered by federal fuels reduction funds.

## Discussion

*Ecological effectiveness of the treatments.* Thinning only and thinning plus burning were effective in reducing tree density and basal area (ecological objective 1) and increasing average stand diameters (objective 2). However, neither treatment effectively increased crown base height (objective 3).

Thinning only did not increase herbaceous plant cover or decrease cover of woody plants and detritus (objectives 4 and 5). It increased detritus, oak cover, and shrub cover in two stands and decreased herbaceous plant cover (forbs or graminoids or both) in all three stands. Reduction in herbaceous cover was probably not a decrease in herbaceous biomass because our sampling method, which measured relative percent cover, recorded only slash above herbs as detritus. Nevertheless, thinning only did not stimulate growth of suppressed herbaceous plants and did not lead to detectable changes in diversity or composition (objective 4). We conclude that aside from small increases in percent of bare ground, thinning treatments alone did not accomplish any changes in forest floor conditions specified in objectives 4 and 5, and in fact produced some undesirable changes (e.g., increased cover of woody vegetation and detritus).

In contrast, the thinned and burned stand showed a reduction in percent cover of detritus, a small increase in bare ground, and no change in percent cover of herbs or shrubs, but herbaceous richness increased substantially. The combination of thinning and burning thus accomplished some desirable changes included in objectives 4 and 5 and did not produce undesirable changes.

At least one component of fine woody fuels increased in thinned-only stands. Heavy fuels increased in two thinned stands. In contrast, there were no significant changes in any woody fuel components in the thinned and burned stand, probably because fire consumed some old detritus but logging added new material. Therefore, objective 6 was not accomplished in any stand.

It is apparent that thinning alone cannot restore the ecological structure and processes that formerly characterized ponderosa pine forests of the San Juan National Forest. In fact, thinning actually increased some problems (downed woody fuel loads, percent cover of detritus) and decreased herbaceous plant cover. However, we hypothesize that thinning alone may have

FS-001748

Downloaded from https://academic.oup.com/jof/article-abstract/98/8/17/4614243 by guest on 24 June 2019

reduced risk of crown fire by reducing total crown fuel mass and increasing space between crowns, even though it did not increase crown base height. Additions of slash, increased temperatures, and lower humidity in surface fuels as a result of opening the canopy may have increased potential spread rate and heat release of a surface fire. However, it is likely that the magnitude of these increases in potential surface fire severity is small.

Thinning plus burning was effective in stimulating suppressed herbaceous vegetation. This result is in contrast to experiences in Florida scrublands, where a single prescribed burn failed to produce any significant increase in herbaceous cover or diversity (Abrahamson and Abrahamson 1996). Thinning plus a single prescribed fire did not increase oak cover in our study, contrary to expectations (Harrington 1985). Oak cover increased in two thinned-only stands. Other shrub cover was not reduced in any stand.

Thinning plus burning did not effectively reduce downed woody fuels, but it is our judgment that risk of crown fire is lower than before treatment because the canopy is now less dense.

Our study confirms that ponderosa pine restoration must include both thinning and burning. Thinning alone was insufficient to accomplish the ecological goals we set. In fact, it could worsen or aggravate some problems. It is also apparent that a single prescribed fire is inadequate to reduce fuels that have not burned since fire was excluded from these stands and where new fuels are added by logging. However, a single fire can apparently stimulate renewed growth and diversity in suppressed herbaceous plants.

*Financial considerations.* Forest restoration projects can achieve ecological objectives and pay for themselves in southwest Colorado even with low-value material, but careful planning and execution are required. We want to emphasize that the ecological prescription always controlled the harvesting actions. In other words, we did not deliberately take sawtimber to subsidize products other than logs to make a unit profitable. Rather, we accepted for harvest whatever material was left after ecological objectives had been met.

Nevertheless, ecological decisions—to retain or remove either sawtimber or small-diameter trees—are also financial decisions that may determine sale viability. We found that to reach a break-even point under market conditions existing during this study, harvested material had to approximate at least 40 percent sawtimber to 60 percent small material by weight. This would average six to eight sawtimber trees (12+ inches dbh) per acre with a volume of 12+ cubic feet per tree. The quality of 8–11.9-inch dbh material is very important. If it can be used as sawtimber, then the potential for profit increases. If it is poor quality and will become products other than lumber, the potential for loss increases. These findings can be used, along with an analysis of market conditions, to identify financially strong and financially weak units in this region.

Controlling harvesting costs is also critical. For example, loading and hauling costs constitute 50 percent of total harvesting costs for waferwood and are virtually fixed by product and haul distance. Given inconsistent timber supply, there is little incentive for loggers to invest in new equipment that would improve productivity. Therefore, cost containment in the other harvesting activities is needed to support profitability.

Market fluctuations are important. For example, after the study ended, waferwood prices rose from $31–$32 per ton to $35–$36 per ton. Such an increase would have created breakeven or better values for waferwood rather than losses. Sawtimber values would then increase profit margins instead of subsidizing small-tree removal. We estimate a potential profit of 7.3 percent on gross revenues under such market conditions. It is important to work toward profitability while achieving ecological objectives because breakeven projects do not spur investments to improve technology, create efficiencies, or develop value-added products.

In this area, about 50 percent of prescribed burning costs can be covered by slash disposal money collected from a sale. Considering the low profitability of these projects, it is unlikely that more money can be collected to cover all costs associated with prescribed burns. Managers should expect, therefore, that money for additional burns—necessary to achieve ecological objectives—will have to come from federal fuels reduction funds or other resource management funds.

If landscape-scale forest restoration has a future in southwest Colorado, two financial considerations are especially important. First, there must be a consistent supply of timber offered annually at prices that recognize the low quality of this wood and distances to processing plants. Second, sale design is critical to both ecological and financial objectives. Managers should carefully combine financially strong units with weak units, design sales to reduce logging and prescribed burning costs, and take advantage of markets when demand for small material is strong.

## Conclusion

This project partially answered some of our questions. We discovered what products could be removed from forest restoration projects in the region, collected actual revenues and costs associated with the work, developed a means for estimating the financial potential of projects, confronted the reality that harvesting alone cannot achieve all ecological objectives, and found that single applications of prescribed fire will not completely treat these areas. We conclude that the general approach to ponderosa pine restoration, emphasizing thinning and burning, is ecologically and financially sound, but the details will make or break any individual project. Much remains to be done, however, and we will continue to develop expanded databases and monitor ecological results. Lastly, we received personal satisfaction from participating in this attempt to restore ecological balance to 549 acres of forest for the benefit and enjoyment of future generations.

## Literature Cited

ABRAHAMSON, W.G., and C.R. ABRAHAMSON. 1996. Effects of fire on long-unburned Florida uplands. *Journal of Vegetation Science* 7:565–74.

BROWN, J.K. 1970. A method for inventorying downed

Downloaded from https://academic.oup.com/jof/article-abstract/98/8/17/4614243 by guest on 24 June 2019

FS-001749

Case No. 1:23-cv-01501-RMR Document 15-4 filed 09/29/23 USDC Colorado pg 131 of 176




woody fuel. USDA Forest Service General Technical Report INT-16.

COOPER, C.F. 1960. Changes in vegetation, structure, and growth of southwestern pine forests since white settlement. *Ecological Monographs* 30:129–64.

COVINGTON, W.W., P.Z. FULÉ, M.M. MOORE, S.C. HART, T.E. KOLB, J.N. MAST, S.S. SACKETT, and M.R. WAGNER. 1997. Restoring ecosystem health in ponderosa pine forests of the Southwest. *Journal of Forestry* 95(4):23–29.

DAHMS, C.W., and B.W. GEILS, eds. 1997. An assessment of forest ecosystem health in the Southwest. General Technical Report RM-GTR-295. Fort Collins, CO: USDA Forest Service.

EDMINSTER, C.B., and W.K. OLSEN. 1995. Thinning as a tool in restoring and maintaining diverse structure in stands of southwestern ponderosa pine. General Technical Report RM-GTR-278. Fort Collins, CO: USDA Forest Service.

FULÉ, P.Z., W.W. COVINGTON, and M.M. MOORE. 1997. Determining reference conditions for ecosystem management of southwestern ponderosa pine forests. *Ecological Applications* 7:895–908.

HARDY, C.C., and S.F. ARNO, eds. 1996. The use of fire in forest restoration. General Technical Report INT-GTR-341. Fort Collins, CO: USDA Forest Service.

HARRINGTON, M.G. 1985. The effects of spring, summer, and fall burning on Gambel oak in a southwestern ponderosa pine stand. *Forest Science* 31:156–63.

LYNCH, D.L., L.W. STARNES, and C.S. JONES. 1997. Forest restoration in southwestern Colorado. In *Proceedings on forest operations for sustainable forests and healthy ecosystems.* Corvallis, OR: Council on Forest Engineering.

MIRTH, R., and D. LARSON. 1997. Potential for using small diameter ponderosa pine resources in Arizona (A feasibility study). Flagstaff: College of Engineering and Technology, Northern Arizona University.

MIYATA, E.S. 1980. Determining fixed and operating costs of logging equipment. General Technical Report NC-55. St. Paul, MN: USDA Forest Service.

MOIR, W.H., B. GEILS, M.A. BENOIT, and D. SCURLOCK 1997. Ecology of southwestern ponderosa pine forests. In *Songbird ecology in southwestern ponderosa pine forests: A literature review,* eds. W.M. Block and D.M Finch, 3–27. USDA Forest Service General Technical Report RM-GTR-292.

MUELLER-DOMBOIS, D., and H. ELLENBERG. 1974. *Aims and methods in vegetation ecology.* New York: John Wiley & Sons.

OMI, P.N. 1998. Concerning fire impacts on air quality and tradeoffs between wild and prescribed fires. Oversight hearing on regional haze. Subcommittee on Forests and Forest Health, US House of Representatives, July 16, 1998. Serial No. 105-100, p. 47.

RICHARD, T., and S. BURNS. 1998. Beyond "scoping" Citizens and San Juan National Forest managers, learning together. *Journal of Forestry* 96(4):39–43

ROMME, W.H., M.L. FLOYD, D. HANNA, and J.S. REDDERS. 1999a. Using historic disturbance regimes as a basis for mitigating impacts of anthropogenic fragmentation. In *Forest fragmentation in the southern Rocky Mountains,* eds. R.L. Knight, F. Smith, S Buskirk, W.H. Romme, and W.L. Baker. Boulder University Press of Colorado.

ROMME, W.H., H.D. GRISSINO-MAYER, M.L. FLOYD, and D. HANNA. 1999b. Landscape condition analysis for the South Central Highlands section: Ponderosa pine forests. Unpublished final report to the San Juan National Forest, Durango, CO.

SACKETT, S.S., S. HAASE, and M.G. HARRINGTON. 1993 Restoration of southwestern ponderosa pine ecosystems with fire. General Technical Report RM-247 Fort Collins, CO: USDA Forest Service.

SCOTT, J.H. 1998. Fuel reduction in residential and scenic forests: A comparison of three treatments in a western Montana ponderosa pine stand. USDA Forest Service Research Paper RMRS-RP-5

USDA FOREST SERVICE (USDA-FS). 1999. *Silvicultural examination and prescription handbook.* FSH 2409 26d.

*Dennis L. Lynch (e-mail: denny@cnr colostate.edu) is forest products technologist, USDA Forest Service, Fort Collins, CO 80523, and professor emeritus, Department of Forest Sciences, Colorado State University; William H. Romme is professor, Biology Department, Fort Lewis College, Durango, Colorado; M Lisa Floyd is professor, Department of Environmental Studies, Prescott College, Prescott, Arizona.* *Funding: McIntire-Stennis Forestry Research Funds, Ford Foundation, San Juan National Forest, National Forest Foundation, and Colorado State University.*

FS-001750



Downloaded from https://academic.oup.com/jof/article-abstract/98/8/17/4614243 by guest on 24 June 2019

# DECISION NOTICE
and
# FINDING OF NO SIGNIFICANT IMPACT
for the
# GUARD STATION TIMBER SALE

USDA Forest Service
San Juan/Rio Grande National Forest
Mancos-Dolores Ranger District
Dolores County, Colorado

## I. Introduction

An environmental assessment (EA) describing the environmental effects of a variety of vegetation management alternatives for the proposed Guard Station Timber Sale is available for review at the San Juan/Rio Grande National Forest Supervisor's Office located in Durango, Colorado, and at the Dolores Ranger District Office in Dolores, Colorado. In accordance with the National Forest Management Act and National Environmental Policy Act, a team of interdisciplinary resource specialists conducted the analysis and documented the results.

The vegetation management actions assessed are located in the Doe Canyon and Five Pine Canyon areas of the Glade landscape, east of Dove Creek, Colorado. The specific area for the proposed activity lies in T.40N., R.17W. and R.16W., and T.39N., R.17W.

The purpose of the proposed action is to help meet the goals and objectives of the San Juan National Forest Land and Resource Management Plan (Forest Plan), provide for healthy ecosystems, and sustain communities. Implementation of the Forest Plan is required by the Forest and Rangeland Renewable Resources Planning Act of 1974 (RPA, P.L. 93-378) and the National Forest Management Act of 1976 (NFMA, P.L. 94-588).

This decision pertains only to lands currently administered by the Forest Service.

## II. Scoping and Public Involvement

The scoping process for the project was designed to gather information regarding the potential environmental effects and issues surrounding the proposal. A Forest Service interdisciplinary team, various resource specialists, and members of the public provided input into the process.

A news release requesting comments and concerns was published in June, 1995. Members of the public and other government agencies were also contacted by letter informing them of the proposed action. Additional

public notification of the project occured through the San Juan NEPA Project Update published in June and September, 1995, and in January and March, 1996.

An environmental assessment document (EA) was released for public comment on March 1, 1996. The public comment period ended on April 4, 1996. Several letters of comment were received during this time period. (See Appendix G of the EA.)

III. Issues

The following issues were identified from the internal and external scoping process:

1. **Ecosystem Restoration** - The ponderosa pine zone of the analysis area has been radically altered during the 20th Century by the introduction of grazing, timber harvest activities, and fire suppression. Current conditions do not reflect the desired condition. In particular there has been a lack of periodic fire disturbance, there is a lack of late-successional stages including old growth, and the area is deficient in standing snags.

2. **Forest Health** - This is the condition of the forest as it pertains to or threatens our capability of achieving resource management objectives. Specific primary factors include risk of catastrophic loss from mountain pine beetle outbreaks and/or wildfire, and increased potential for noxious weed infestation.

3. **Effects on the Local Economy** - This issue involves a local wood products industry that is struggling to survive, a local economy that benefits from the jobs and income provided by the local wood products industry, and local county governments that rely somewhat on timber sale receipt payments from federal timber sales.

4. **Roads** - Timber harvest offers the opportunity both to create new roads and, if desired, close existing ones. Physical effects of roads on the environment, effects to wildlife and wildlife habitat, changing opportunities for roaded recreation, and Forest Plan standards and guidelines for road densities, are all elements of this issue.

5. **Wildlife** - Effects of timber harvest and burning on various species of wildlife, such as Abert's squirrels, Merriam's turkeys, sensitive wildlife species, and deer and elk, is an issue that arose in the scoping process.

See Chapter 2, Issues, Concerns, and Opportunities, of the EA.

IV. Alternatives

The No Action alternative and five action alternatives were developed in order to analyze effects and address the issues. These alternatives aredescribed and examined in detail in the Environmental Assessment.

The No Action alternative prescribes no on-the-ground timber harvest or burning activity in the project area during the current planning period.

Alternative 2 recommends the use of timber harvest and fire in a fashion that would seek to replicate pre-1870 forest conditions on a portion of the area. Low pine stocking levels, an emphasis on retaining larger-diameter trees, a reduced Gambel oak component, and vigorous and healthy grass and forb conditions, are the featured results of prescribed activities. All activites would occur in two blocks.

Alternative 3 has the same management objectives as Alternative 2 but spreads the activity out in smaller, more widely distributed units.

Alternative 4 uses fire exclusively to conduct vegetation management in the area.

Alternative 5 is a more traditional timber management alternative. It would seek to maximize long-term wood fiber production by maintaining optimum tree stocking levels.

Alternative 6 prescribes harvest and burn treatments designed to change current stand conditions to benefit wildlife.

Refer to Chapter 2, Alternatives Considered in Detail, for more thorough descriptions.

V. Decision

Based on the analysis documented in the EA, it is my decision to implement Alternative 2 with a few design components of Alternative 6. I believe that this modified alternative presents the most effective strategy for addressing the management issues and opportunities in the Guard Station analysis area.

My selected course of action proposes the following treatments:

- Conduct harvest and prescribed-burning activities in two units on approximately 1345 acres within the pine type. Make available to industry an estimated 2900 thousand board feet (MBF) of wood fiber raw material. Apportion 50% of the volume to forest stewardship purpose and 50% to timber commodity purpose (ie. meeting timber volume objectives).

- Cut no trees greater than 16" diameter breast height (DBH) [A-6 feature] within diversity guidelines, and retain all trees of species other than ponderosa pine.

- Create a clumpy distribution of leave residual trees and a diversity of size classes to obtain a variable stand structure and an uneven-aged composition.

- Conduct a late-summer prescribed burn in all treatment areas as soon as conditions allow (preferably within the first year post-harvest).

- Regenerate created openings by natural seeding and rest at least part of the treatment area from grazing for a year after harvest.

- Close all existing non-system roads within unit boundaries. Obliterate any new temporary roads needed for harvest.

- Conduct prescribed burning in the southern-most unit included in Alternatives 4 and 6. This unit lies in pinyon-juniper woodlands. No tree harvest will occur on the site. [A-6 feature]

- Leave some unlopped tops from the harvest for turkey habitat improvement. [A-6 feature]

- Create additional snags and large woody debris if post-harvest and post-burn treatment monitoring indicates minimum standards for the area have not been met. Implementation of this design feature is dependent on the availability of KV funds. [A-6 feature]

## VI. Rationale for Decision

My selection of the preferred alternative (and the specific components that make it up) stemmed from an assessment of two key areas of consideration: 1) How well did the individual alternatives meet the purpose and need, and deal with the key issues? and 2) Public response to the initial environmental analysis document.

### Purpose and Need/Key Issues

The purpose and need for the proposal to harvest timber and prescribe burn forest stands is to help meet the goals and objectives of the Forest Plan, provide for healthy ecosystems, and sustain communities. (See Chapter 1, Purpose and Need for the Proposed Action.)

Issue #1 (Ecosystem Restoration), Issue #2 (Forest Health), and Issue #3 (Effects on the Local Economy), were first articulated during development of the Purpose and Need. Issues #4 (Road Densities) and #5 (Wildlife) derived from actions that would address the first three issues and reflect concerns expressed during internal and external scoping.

The No Action alternative (Alternative 1) does not respond proactively to any of these elements. Leaving the entire analysis area in its current condition does little to improve the radically altered pine forest community in the area. Silvicultural practices that could reduce risk of catastrophic losses from insects or wildfire would not be applied. No raw materials would be available to the local wood products industry. Finally, adverse effects of current road densities and a certain lack of diversity in wildlife habitat are not improved by no action.

Many of these same considerations made the selection of Alternative 4 as the preferred unappealing. In particular, using fire as the sole vegetation management tool does not provide needed raw materials to local industry nor would it have dealt with the road density issue.

It could provide some silvicultural benefits but not with the flexibility that the addition of timber harvest offers.

When reviewing the full range of alternatives, it became apparent that Alternatives 2, 3, 5, and 6 were all more attractive than Alternatives 1 and 4. On an issue by issue basis, the remaining four alternatives are compared.

<u>ISSUE 1 (Ecosystem Restoration)</u>: Alternative 5 is the weakest alternative in this area. The return of periodic fire disturbance and the development of late successional stages are not important elements of a philosophy to maximize long-term wood fiber production. Nor is the concern for a deficiency of snags.

The other three alternatives are nearly equal in respect to the ecosystem restoration issue. Differences between alternatives are primarily a consequence of number of acres treated, the size and location of treatment areas, and the degree to which snags and large down woody debris are increased.

<u>ISSUE 2 (Forest Health)</u>: The forest health issue addresses the condition of the forest as it pertains to or threatens our capability of achieving resource management objectives. Differences between alternatives boil down to a comparison of how many total acres were treated and of those acres, how many are considered to currently be at moderate to high risk of catastrophic insect attack. This is due to the fact that Alternatives 2, 3, 5, and 6 all prescribe silvicultural treatments that called for changing forest structures sufficiently to deal with bug and catastrophic fire risk. Additional factors to weigh are improved growing conditions for vegetation ground cover following silvicultural treatments and noxious weed potential infestation and spread.

Alternative 5 treats the most acres, but Alternative 3 treats more acres in the moderate to high bug risk rating. Alternative 6 would be expected to have the least noxious weed treatment concerns followed by Alternatives 2, then 3 and 5. Alternative 5 is considered to be a bit weaker in terms of improving grass/forb/shrub conditions because in maintains a heavier canopy closure and proposes less frequent fire.

Table 4 in the Environmental Assessment summarizes this issue well. Based on that, and the weight one applies to each of the criteria, it would appear that Alternative 3 is somewhat better than Alternative 2, and both Alternatives 2 and 3 are stronger than Alternatives 5 and 6. Differences between alternatives are not great, however, because they each have their strong and weak points.

<u>ISSUE 3 (Effects on the Local Economy)</u>: Alternatives 2 and 3 clearly provide more raw material (~2960 MBF and ~3190 MBF respectively). This is due to their relatively heavy cutting prescription as compared to Alternative 5, and the number of

acres cut is much less in Alternative 6 (thus less volume produced.)

ISSUE 4 (Road Densities): Despite the desire of the motorized recreating public to keep all roads open, negative effects of high open road densities on wildlife and the physical environment outweigh the benefits to recreation opportunities in this area. Alternatives 2 and 3 close the most non-system roads (~6 miles and ~7 miles respectively), followed closely by Alternative 6 at ~5 miles (though it requires less new temporary road construction). Alternative 5 does the least to address this issue (~1 mile).

ISSUE 5 (Wildlife): Alternative 6 was designed specifically to address this issue. Several features unique to this alternative seek to improve wildlife habitat for certain species. This alternative is most attentive to the needs of the northern goshawk (though none are currently known to inhabit the area), provides a better distribution of big game hiding cover, and calls for specific actions to improve snag and large log habitat. Alternatives 2 and 3 have about the same impacts to wildlife habitat. They are less extensive than Alternative 6 but some features are improved. Alternative 5 has potentially negative impacts to Abert squirrel habitat, big game hiding cover, Merriam's turkey nesting habitat, and northern goshawk nesting habitat.

In summary, Alternatives 2 and 3 seem to deal best with the Forest Health, Effect on Local Economies, and Road Density issues. These two alternatives respond equally to Alternative 6 on the Ecosystem Restoration Issue. While Alternative 6 appears to best address the Wildlife Issue.

**Public Response to the Environmental Assessment**

Of the six letters of response received during the comment period for the draft environmental assessment document, five expressed a specific preference for one of the alternatives. One respondent favored Alternative 5 primarily because it closed the least number of roads. One opposed Alternative 5 because it failed to adequately address the ecosystem restoration issue. One favored Alternative 2 as the best proposal to further the concepts in the local Ponderosa Pines Forest Partnership initiative, and one favored either Alternative 2 or 3. Finally, one recommended selection of Alternative 6 because it incorporated the most wildlife enhancement measures. (Appendix G of the Environmental Assessment has the full text of these letters.)

**Summary**

Given how the various alternatives addressed the purpose and need and key issues, and in light of commentors support for specific alternatives, I selected Alternative 2 as the preferred alternative with certain features from Alternative 6. (See the Decision section above.) Alternative 2 with added features appears to be the most

pragmatic approach to addressing the management challenges posed by conditions that occur in the Doe Canyon area of the Glade. The selected seeks to restore ecosystem components of ponderosa pine communities in the area, improves forest health on over 1300 acres, supplies a fair amount of raw material to the local economy, reduces open road densities both for wildlife and the physical environment, and strives to improve wildlife habitat for a variety of species.

Alternative 2 was not chosen because it would give the greatest dollar return or the greatest output of timber. Appendix B in the environmental assessment suggests that Alternative 3 would provide the highest present net value. Table 5 in the EA indicates maximum estimated volume would be obtained if Alternative 3 was selected.

Alternative 2 takes a bold approach. All harvest actions occur on acres within two large units. Burning is recommended on a couple hundred acres in pinyon-juniper woodlands considered wildlife winter range. It deals well with public concerns and implements the concept of sustaining healthy forest ecosytems while sustaining communities.

VII. Sale Area Improvement Plan Priorities

1. Reforestation needs. (Essential KV)

2. Partial funding of prescribed burns.

3. Creation of snags.

4. Noxious weed treatments.

5. Creation of additional large log woody debris.

6. Road rehabilitation.

VIII. Compliance with the National Forest Management Act (NFMA)

This decision complies with the San Juan National Forest Land and Resource Management Plan (Forest Plan) and with the National Forest Management Act.

**Forest Plan Consistency**

The Guard Station Environmental Assessment is tiered to the Forest Plan for the San Juan National Forest. Chapter I of the Environmental Assessment, Purpose and Need of the Proposed Action, lists the Forest Plan goals that are pertinent to this proposal. This section also contains the Forest Plan prescription areas that the analysis area lies within, including a map.

My decision to implement Alternative 2 with modifications is consistent with the Forest Plan prescription areas affected. Activities proposed meet the goals and standards and guidelines for Management Areas 5B and 7E.

**Clearcutting and Even-aged Management**

This decision does not involve the use of timber harvest for even-aged management. NFMA guidelines concerning clearcutting and even-age management are not germane to this action.

**Vegetative Manipulation**

The seven requirements found in 36 CFR 219.27(b) for management prescriptions that involve vegetative manipulation include:

1. Be best suited to the multiple use goals for the area.

This is addressed in detail in the Rationale for Decision section of this Decision Notice.

2. Assure that lands can be adequately restocked.

Residual stand stocking will be such that a stocked stand for ecosystem restoration purposes will remain following timber harvest and burning. Chapter 2, Alternatives Described in Detail, and Appendix A: Alternative Design Criteria, discuss residual stocking level targets for the vegetation management objective. Some natural regeneration following site disturbance and opening up of the canopy is desired for a long term uneven-aged stand structure. Evidence from past disturbance in the area indicates these regeneration objectives should be easily obtained.

3. Alternative 2 has not been chosen primarily because it will give the greatest dollar return or the greatest output of timber.

See Rationale for Decision summary.

4. Be chosen after considering potential effects on residual trees and adjacent stands.

Forest health and ecosystem restoration were key issues in the Guard Station analysis. Specifically, there was concern for the entire area and a lack of late-successional forest conditions in the pine type, a predominance of dense second growth stands, and risk of catastrophic tree losses from mountain pine beetles and/or fire. This discussion can be found in Chapter 1, Purpose and Need for the Proposed Action, Chapter 2, Issues, Concerns, and Opportunities, and Chapter 3, Old Growth and Biodiversity, of the EA.

5. Avoid permanent impairment of site productivity and ensure conservation of soil and water resources.

Chapter 4 of the EA, Other Environmental Consequences section, discusses these issues. Management requirements and mitigation measures found in Chapter 2, Features Common to All Action

Alternatives, are designed into the selected alternative for this specific purpose.

6. Provide desired effects on...wildlife habitat, regeneration of desired tree species, forage production, and other resource yields.

In the the EA, Chapter 4, Consequences by Issue, Appendix C: Biological Evaluation, and the addition of certain modifications to Alternative 2 (found in this Decision Notice), all describe how the planned timber harvest and burning resulting from this decision will provide desired effects.

7. Be practical in terms of transportation, harvesting requirements, and sale preparation and administration.

The area is accessed by existing roads. Activity is designed to be concentrated in two large units which is most efficient for logging and sale preparation. Appendix B: Economic Assessment indicates a break-even benefit/cost ratio. Assessments that Alternative 2 actions were practical were made during site visits by a timber and silviculture specialist.

## IX. Finding of No Significant Impact

Analysis of the environmental consequences indicates that this is not a major Federal action with significant effects on the quality of the human environment. Therefore, an environmental impact statement will not be prepared. This determination was made considering the following factors:

1.) The proposal conforms with the direction in the Forest Plan for the San Juan National Forest.

2.) No irreversible or irretrievable commitments of resources will occur.

3.) The proposed action will not have a significant effect on the quality of the human environment, either as an individual action, or as part of the cumulative effects of other past, present, and planned actions within this area.

4.) The proposed action does not affect public health and safety.

5.) The effects of the proposed action on the human environment are not highly uncertain, nor do they involve unique or unknown risks.

6.) The proposed action is not precedent-setting. It does not establish a precedent for future actions which may have a significant effect on the environment. It does not represent a decision in principle about a future consideration.

7.) The proposed action will not adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places. The proposed action will

not cause loss or destruction of significant cultural or historic resources.

8.) The proposed action will not adversely affect endangered or threatened species or their habitat.

9.) This action complies with other federal, state, and local laws and requirements imposed for the protection of the environment.

## X. Implementation Date

The implementation of the selected alternative, Alternative 2, may begin 45 days after the legal notice of this decision appears in the Newspaper of Record (Durango Herald).

## XI. Appeal Rights

This decision is subject to appeal pursuant to Forest Service regulation at 36 CFR 215.7. Any written appeal must be postmarked or received by the Appeal Deciding Officer, Elizabeth Estill, Regional Forester, Rocky Mountain Region, 740 Simms, P.O. Box 25127, Lakewood CO 80255, within 45 days from the day after notice of this decision is published in the Durango Herald, Durango, CO. Appellants are required to simultaneously send a copy of the Notice to Appeal to Calvin Joyner, Associate Forest Supervisor, at 701 Camino del Rio, Durango, CO 81301. Appeals must meet content requirements of 36 CFR 215.14.

For additional information concerning this decision or the environmental analysis, contact Phil Kemp, Dolores Ranger District Office, P.O. Box 210, Dolores, Colorado 81323, or call (970)-882-7296.

CAL JOYNER
Associate Forest Supervisor

5/17/96
Date

1950

# Decision Notice
and
# Finding of No Significant Impact
for the
# Ferris East Timber Sale

**USDA Forest Service**
**San Juan - Rio Grande National Forests**
**Mancos-Dolores Ranger District**
**Montezuma County, Colorado**

## Introduction

The purpose of this Decision Notice is to document the management alternative I have selected for implementation and the rationale for my choice. It also details additional mitigation measures that will be implemented with my decision. My decision is based on an environmental assessment (EA) prepared for the Ferris East Timber Sale.

The Ferris East Timber Sale EA describes the effects of two alternative ways to treat vegetation, manage road densities, maintain wildlife habitat, and comply with federal laws related to clean air and water, threatened and endangered species, and historic preservation. In accordance with the National Forest Management Act (NFMA) and National Environmental Policy Act (NEPA), an interdisciplinary team of Forest Service resource specialists (ID Team) conducted the analysis and documented the results in an EA. The EA on which I based my decision is available for review at the Mancos-Dolores Ranger District office in Dolores, Colorado.

The proposed timber sale is located in portions of Sections 3-9, T.39N., R.16W., Sections 1 and 12, T.39N., R.17W.,and Sections 28-34, T.40N., R.16W., N.M.P.M. in Montezuma County, Colorado. A map is attached.

## Purpose of and Need for Action

The San Juan National Forest Land and Resource Management Plan (LRMP) establishes management direction for the Forest in a manner similar to county land-use zoning. Each zone is assigned management emphasis (for example, recreation, grazing, or timber management). The amount of area dedicated to these management emphases reflects the balance that the LRMP attempts to establish in meeting social and economic demands and ecological needs of the Forest. The LRMP has established this project area's management emphasis as 7E -- production and utilization of wood fiber. The environmental analysis of the Ferris East Timber Sale focuses on implementing LRMP management direction within a 4,165-acre

analysis area in the vicinity of Canyon Creek and Cabin Canyon above the lower Dolores River. The area is roaded and has been periodically logged.

Current forest conditions exhibit several indicators of poor health. For example, the analysis area includes extensive acreage of overstocked stands of small-diameter ponderosa pine, heavy accumulations of ofrest floor fuels, and low levels of herbaceous production. These ecosystem structure elements could lead to severe fire behavior, reduced wildlife habitat diversity, and a decrease in other resource values. If these conditions continue, they could in turn, affect the ability to meet Forest Plan Goals and Standards and to sustain resource-dependent elements of the local community.

The purpose of and need for the proposed Ferris East Timber Sale as stated in the EA is to help meet Goals and Objectives identified in the Land and Resource Management Plan and the Western Forest Health Initiative. These Goals and Objectives include harvesting timber and the use of prescribed fire on 7E prescription areas, providing for healthy forest ecosystem elements, and contributing to sustaining a diverse economic base in local communities. The proposal also serves to maintain the productivity of the land. Implementation of the Forest Plan is required by the Forest and Rangeland Renewable Resources Planning Act of 1974 (RPA, P.L. 93-378) as amended by the National Forest Management Act of 1976 (NFMA, P.L. 94-588). This decision pertains only to lands currently administered by the Forest Service.

## Scoping and Public Involvement

In 1992, the San Juan National Forest made significant changes in the timber management direction in its LRMP. These changes included reducing the area of the Forest where scheduled timber harvest is allowed from 470,000 to 375,000 acres; reducing the maximum amount of timber the San Juan NF could sell from 413 million board feet per decade (MMBF/decade) to 240 MMBF/decade; and changing management to emphasize uneven-aged timber management systems and landscape ecosystem management. The 95,000 acres removed from timber management were primarily in unroaded areas of the Forest; the remaining 375,000 acres where timber management can take place constitute approximately 20 percent of the total Forest land base.

During the process of changing the LRMP, the Forest Service spent close to four years (1987-1991) working with concerned citizens to address the questions of where and how commercial timber management should be conducted on the San Juan NF (Amended LRMP, Record of Decision, 1992, pg. 22). The decisions made in 1992 provide the basis for current timber management, and projects such as the Ferris East Sale implement this revised management direction.

The scoping process was used to gather information regarding the potential environmental effects and issues surrounding the Ferris East proposal. The Forest Service ID Team, other resource specialists, and members of the public provided input to the process.

A wide array of individuals and organizations were contacted by letter soliciting issues in January, 1997. News releases were also made during January, 1997 informing the public that comments to the proposal needed to be submitted to the Mancos-Dolores Ranger District by February 27, 1997. In addition, public notification took place in the "San Juan National Forest NEPA Project Update" published in March and June, 1997 and the American Indian Consultation Bulletin published in May, 1997. Several letters were received in response to these solicitations. These comments were reviewed to identify the issues, concerns, and opportunities described in them.

An initial EA was released for public comment on July 15, 1997. The public comment period ended on August 15, 1997. We received comments from two organizations following public review of the draft EA. Our response to these two organizations is presented in Appendix G (p.66) of the EA.

## Decision

Based on the analysis documented in the EA, it is my decision to implement a modification of Alternative 2 which emphasizes ecosystem restoration and forest health issues by using timber harvest and fire in a fashion that would seek to replicate pre-1870 forest conditions on 938 acres (23%) of the ponderosa pine type within the analysis area. Five harvest units, ranging in size from 124 to 278 acres, will be placed adjacent to and between past harvest units, to imitate the scale of natural disturbance patterns and modify the edges of past harvest units. Small group and individual tree selection methods will remove individually marked trees with the objective of creating a clumpy distribution of trees in the residual stand. Density will vary throughout the treatment units, from open pockets with no trees on areas up to an acre in size, to dense pockets of leave trees up to three quarters of an acre in size. Average basal area per acre across treatment units will be 40-50 sq. ft./acre, leaving about 50-60 trees per acre. No ponderosa pine in excess of 20 inches in diameter at breast height (DBH) will be harvested. An adequate number of ponderosa pine trees greater than 16 inches DBH will be retained to meet desired future condition objectives for large trees in uneven-aged stands and to help meet desired snag densities. Minimum cutting diameter on ponderosa pine will be 5 inches DBH. Trees of all other species will be retained for diversity. All standing snags greater than 10 inches DBH and 15 feet tall will also be retained. About 1.9 million board feet of ponderosa pine timber will be harvested. No new road construction is required. Portions of some existing system roads will require reconstruction to provide for adequate cross drainage.

A late summer prescribed burn will be conducted in all treatment areas, as well as an additional 400-800 acres within the analysis area north of Cabin Canyon, in the first year following harvest. A second burn will be conducted in 3-10 years to reintroduce a periodic fire regime to the area. Created openings will be naturally regenerated. All existing non-system roads will be obliterated following the harvest.

The modifications of Alternative 2 are meant to balance our desire to meet the proposed timber sale's Goals and Objectives with the need to protect wildlife habitat and rehabilitate roads to reduce erosion. The modifications included with Alternative 2 reflect concerns that were received during the EA comment period.

These modifications of Alternative 2 add supplemental management requirements and mitigation measures which provide for additional habitat for Abert squirrels and establish priorities for non-system road obliteration. These additional mitigation measures are listed below. The management actions common to all alternatives on EA pages 11-14 are also included in my decision, but are not specifically listed here. The rationale for my decision is included below.

- ☐ Provide for at least two Abert squirrel nest tree clumps per six acres in all harvest units. A nest tree clump is defined as a group of 6-12 ponderosa pine trees (9-12 inches DBH) with interlocking canopies. Basal area should average 180-220 square feet per acre in these clumps.

- ☐ Close and rehabilitate all existing non-system roads within the analysis area to the extent that timber sale and other resource funding allows. The first priority will be those roads that pose soil and watershed problems and impair site productivity, the second priority will be those roads that adversely affect wildlife habitat security areas, and the third priority will be those roads which lead to

the same destination as other specified roads and are less than one-quarter of a mile away. Specific roads to be closed or rehabilitated have not yet been identified. These roads will be identified and included in the timber sale contract and sale area improvement plan.

Public access within the analysis area will be assured through retention and reconstruction of the open system road infrastructure. The area will also continue to be open to ATV use as well as non-motorized methods of travel such as horseback riding and mountain biking.

## Rationale for My Decision

During the scoping process, four key issues were identified that formed the basis for the development and comparison of alternatives. These key issues are identified in the EA on pages 6-7, and include:

1. Ecosystem restoration
2. Forest health
3. Effects on the local economy
4. Wildlife

In addition, the ID Team evaluated each alternative for its compliance with the Endangered Species Act/Region 2 Sensitive Species policy, the Clean Water Act, and the National Historic Preservation Act.

In selecting my alternative, I considered the key issues raised, as well as the Specific Features of Alternative 2,( EA, pages 11-14); the Alternative Design Criteria and Silvicultural Treatment Descriptions for Proposed Harvest Units included in Appendix A (EA, Pages 42-43); the effectiveness of proposed mitigation measures; and our ability to implement the specified management requirements. Further, I reviewed the ID Team's assessment of how each alternative complied with federal laws and policy. The following is my rationale for selecting modified Alternative 2.

## Response to Issues and Concerns

### Key Issue 1: Ecosystem Restoration

There is general concern that most pine forests on the Mancos-Dolores District are outside the range of natural variation for the Southwestern United States ponderosa pine type. These conditions were created over the last 100 years through the elimination of natural fire, the introduction of intensive livestock grazing, and the harvest of nearly all the large old-growth trees. The area now consists of relatively dense, small diameter, immature trees. Isolated pockets of trees exhibiting old growth character exist but are rare. This is in sharp contrast to conditions which existed 100 years ago when forests in the Ferris East area would have been far more diverse, and contained abundant park-like old-growth stands (EA pages 8-9, 11, 14, 18, 20-23, 26-28, 33, 35, 36, and 42-44).

If the No Action alternative were implemented, timber stands would continue to develop old-growth characteristics, but more slowly than might be otherwise possible. With no action, the forest structure would have fewer openings and a more "closed canopy" condition. Natural pine regeneration would be less common. Snag densities would improve over time.

Alternative 2 has ecosystem restoration as a primary objective. Silvicultural treatments are designed specifically to restore forest conditions which were typical prior to 1870. Alternative 2 treats 938 acres, about 25 percent of the total pine acres in the analysis area.

**Key Issue 2: Forest Health**

Stand conditions in the Ferris East area warrant a concern about overall forest health. Forest health means the project area's capability for sustaining resource conditions which satisfy long term management objectives such as: wood fiber production, forage production, protection of diverse wildlife habitat, and providing recreation opportunities. The overcrowded clumps of young ponderosa pine are growing slowly and demonstrate poor vigor. These stands are currently at risk for mountain pine beetle attack, as documented in the EA (page 18). The presence of dwarf mistletoe disease in portions of the area also contributes to reduced growth and creates deformed trees. The area is also considered a high-risk for catastrophic wildfires (EA pages 8-9, 11, 14, 18-20, 22, 28-29, 35-36, 43, and 61-64).

With the No Action alternative, there would be no abrupt change in current stand conditions. Areas of medium to high risk would remain in those states, or develop increasing risk.

Alternative 2 proposes treatment that would directly reduce risk of catastrophic losses of timber stands in the area. Alternative 2 treats 731 acres which are at moderate to high risk for mountain pine beetle and reduces the risk o;f catastrophic fire on 938 acres. Alternative 2 also treats noxious weeds on 38 acres and improves grass, forb, and shrub conditions.

**Key Issue 3: Effects on the Local Economy**

The economic dependence of local communities on National Forest resources is an issue. The local wood products industry is dependent on a supply of timber from public lands. Supply of raw wood fiber material helps sustain jobs and processing facilities. It diversifies the tax base and adds stability to the economy (EA pages 9, 29, and 46)..

Each alternative's responsiveness is based on the total pine acres harvested. Modified Alternative 2 harvests timber on 938 acres of National Forest land and is directly responsive to this issue. The No Action alternative is not responsive to this key issue.

**Key Issue 4: Wildlife**

Important habitat requirements for wildlife species found in the area are also an issue. There is a lack of habitat for wildlife species associated with old-growth ponderosa pine forests. There is a lack of dead standing ponderosa pine snags for cavity dependent wildlife species. Snag surveys conducted in this habitat have consistently found snag densities to be 0.5 snags per acre, well below the average of 2.0 considered necessary for maintaining habitat for cavity dependent wildlife in the Forest Plan. Down logs which provide habitat for small mammals are in short supply. These are all conditions more commonly found in old growth stands.

Use of the existing system of open and closed roads by motorized vehicles is also an issue that can be affected by the proposed action. Current open road density may be too high, causing disturbance to the area's wildlife species. There are about 15 miles of open system roads in the analysis area (2.2 miles per square mile of analysis area). There are about 15 additional miles of open non-system roads. Forest Plan Standards allow for 1-3 miles of open roads per square mile. The planned timber harvest activities provides the opportunity to close existing open non-system roads to improve wildlife habitat and reduce erosion.

The No Action alternative would not close existing open roads. It would not bring the area within the Forest Plan Standards for open-road densities.

Alternative 2 includes design criteria which specifies closing 5.3 miles of non-system roads inside treatment unit boundaries.

The Forest Plan requires that Abert squirrel habitat in 7E Management Prescription Areas be mitigated during harvest by retaining at least one squirrel nest tree clump per six acres harvested. The No Action alternative maintains the suitable squirrel habitat on 90 percent of the area in the short term. Over the long term, this habitat would improve.

In modified Alternative 2, two squirrel nest tree clumps would be retained per six harvested acres. Timber harvest will degrade the overall squirrel nesting habitat values in the treatment units. However, the retention of two nest tree clumps per six acres exceeds the Forest Plan Standards and Guidelines and will maintain the habitat in at least a "fair" condition.

The Forest Plan directs that hiding cover be maintained on at least 40% of forested ecosystems. The IDT determined that, conservatively, 60% of the analysis area presently provides quality hiding cover. This does not include the additional value of topographic relief as effective hiding cover. The No Action alternative would maintain hiding cover in its current distribution.

Alternative 2 would selectively remove some pine hiding cover through timber harvest. It would also remove a portion of the Gambel oak cover component during prescribed burning. In a typical prescribed burn, the hiding cover provided by oakbrush is eliminated on about 50% of the treated acreage, as the area is burned in a mosaic pattern. Based on this, about 869 acres within the analysis area would be affected for an estimated 10 years or longer until the oak again reaches 4-6 feet in height. Despite this loss of hiding cover on the treated acres, quality hiding cover would be retained throughout the analysis area in untreated stands and adjacent canyons. This other residual hiding cover still comprises an estimated 40 percent of the area, meeting the Forest Plan Standard and Guideline.

The Biological Evaluation for the Ferris East timber sale (EA, pages 47-60) determined that no federally listed Threatened, Endangered, or proposed species, including the bald eagle and Mexican spotted owl, would be affected. It was determined that the following Region 2 Sensitive species may be impacted: milk snake and northern goshawk. The determination for these species is that individuals may be impacted, but proposed treatments are not likely to result in a loss of species viability or a trend toward Federal listing. No goshawks have been found within the analysis area. Specific mitigation measures (EA page 17) protect nesting goshawks, should a nest ever be located.

## Response to Compliance Issues and Established Management Goals

The selected alternative complies with requirements of the National Forest Management Act, the National Environmental Policy Act, the Clean Water Act, the Endangered Species Act, and the National Historic Preservation Act. My selected alternative is very effective in meeting the Purpose and Need for the Proposed Action (EA pages 1-2) as well as Forest Plan Goals and Objectives.

There are three Forest Plan standards and guidelines that will not be met, due to historic, intensive management in the analysis area. It is important to recognize that none of these standards and guidelines would even be met under Alternative 1: No Action. In each case, my selected alternative will move the analysis area closer to meeting Forest Plan direction than would the No Action alternative.

The first Forest Plan standard and guideline that will not be met is the requirement to maintain a road density of 1-3 miles per square mile (Forest Plan III-222). My selected alternative includes the road rehabilitation emphasis proposed in Alternative 2, which is designed to rehabilitate as many roads as budget allows.

The second Forest Plan standard and guideline that will not be met is the requirement to provide 20 pine snags/10 acres with DBHs greater than 10 inches (Forest Plan III-214). As described in the EA, past harvest and firewood activities have caused existing snag densities to fall below the Forest Plan minimum. My selected alternative includes snag protection and creation measures proposed in Alternative 2. However, in reality, the ability to create snags will depend on KV collections. The amount of KV collections cannot be determined until a sale is sold. Other funds, such as wildlife program dollars, could also be used; however, these dollars have been declining.

The third Forest Plan standard and guideline that will not be met is the requirement to maintain 5% of the analysis area in an old-growth structural class. There are currently no stands of ponderosa pine in the analysis area that could be considered even minimal-quality old-growth. The selected alternative is specifically designed to promote old-growth stand conditions.

In summary, the alternative I have selected will:

1. Provide about 1.9 million board-feet of timber to local dependent operators.
2. Restore the health, vigor, and diversity of all vegetation types in the area ponderosa pine forest, and reduce the threat of noxious weeds on 938 acres in the analysis area.
3. Improve big-game forage quantity and quality on 938 acres.
4. Improve ponderosa pine timber stands through the use of management-ignited, fire to reduce oakbrush competition with ponderosa pine regeneration.
5. Take action to perpetuate the aspen type within the ponderosa pine type, provided sufficient KV funds are available.
6. Provide quality big-game hiding cover over 40% of the area while accomplishing restoration objectives.
7. Reduce open-road densities while retaining ATV, horseback, and mountain bike access.
8. Move aggressively towards meeting Forest Plan standards for road density,snags, and old-growth conditions.

## Other Alternatives Considered

Besides Alternatives 1 (no-action) and 2 (action), two other "action" alternatives were considered but not fully developed and analyzed in the Ferris East EA. Both alternatives required leaving higher residual stocking levels than Alternative 2. Leaving denser stands to maximize wood fiber production or improve wildlife habitat conditions would result in an economically non-viable sale.

## Public Response to Alternatives

The ID Team received 2 letters during the public comment period. In the first letter, concerns were expressed about protection of riparian areas, road densities, livestock grazing as an element of ecosystem restoration, management for wildlife snags, monitoring, habitat for squirrels and surveys for mexican spotted owls. The second letter expressed concerns about habitat fragmentation, viability of wildlife species including the northern goshawk, the scale of analysis in the EA, and the distribution of developing old-growth. These letters and the full text of our responses is on file at the Dolores office, and is included in Appendix G of the EA, pages 66-73.

# Results of Consultation

June 4, 1997, the Colorado State Historical Preservation Officier concurred with the Forest Service "no adverse effect" determination regarding cultural resources.

# Compliance with the National Forest Management Act (NFMA)

This decision complies with the San Juan National Forest's Land and Resource Management Plan and wiht the National Forest Management Act, including the management requirements found in 36 CFR 219.27. This Act requires documentation of several specific findings at the project level:

## Forest Plan Consistency

All resource plans are to be consistent with the Forest Plan (16 U.S.C. 1640(i)). The Forest Plan guides all natural resource management activities (36 CFR 219.1(b)). All administrative activity must be based on the current Forest Plan (36 CFR 210.10 (E)).

The EA (pages 1-2), lists the Forest Plan management area prescriptions and desired Goals and Objectives. The ID Team reviewed and affirmed that my selected alternative is consistent with current Forest Plan management direction.

## Lands Suited for Timber Production

When timber is to be harvested, a determination that the harvesting will either: (1) occur on lands suited for timber production or (2) occur on lands classified as not suited for timber production only in the cases of salvage sales, sales necessary to protect other multiple-use values or activities that meet other objectives on such lands if the forest plan establishes that such actions are appropriate (36 CFR 219.27(c)(1)).

I have determined that the harvest will occur on lands suited for timber production

## Clearcutting and Even-Aged Management

This decision does not involve clearcutting or the use of timber harvest for even-aged management. NFMA guidelines concerning clearcutting and even-aged management are not relevant to this action.

## Vegetative Manipulation

The seven requirements in 36 CFR 219.27(b) for management prescriptions that involve vegetative manipulation are:

1. *Be best suited to the multiple-use goals for the area.* This is addressed in the Rationale for My Decision section, on pages 3-7 of this document. It is also referenced in the EA, Chapter 1, Purpose of and Need for the Proposed Action.

2. *Assure that lands can be adequately stocked.* Treatment prescriptions for harvested stands in this proposal are designed to leave adequately stocked stands using the existing tree component. Additional stocking is desired but not necessary to meet this requirement.

3. *Do not choose an alternative primarily because it provides the greatest dollar return or the greatest output of timber.* My selected alternative will provide about 1.9 MMBF of timber to be harvested. It was chosen because it best met the issues of ecosystem restoration, forest health, effects on the local economy, and wildlife. Dollar return and output of timber were neither the exclusive nor the primary reasons for selecting Alternative 2. They were only two factors among many.

4. *Be chosen after considering potential effects on residual trees and adjacent stands.* The key issues of ecosystem restoration and forest health address these concerns. Only about 23% of the analysis area was selected for harvest. I have not precluded any future management options within the analysis area.

5. *Avoid permanent impairment of site productivity and insure conservation of soil and water resources.* No units lie on unstable soils, nor will riparian areas be directly affected. My selected alternative provides for long-term improvement of soil and water resources through the rehabilitation of non-system roads. Site productivity should be enhanced through implementation of the selected alternative.

6. *Provide desired effects on...wildife habitat, regeneration of desired tree species, forage production, and other resource yields.* Chapter 4 of the EA, Affected Environment and Environmental Consequences, details the effects on wildlife habitat, regeneration of desired tree species, forage production, and other resource yields. The chosen alternative will maintain existing wildlife habitat capabilities in both the short term and long term, regenerate the desired tree species and enhance forage production.

7. *Be practical in terms of transportation, harvesting requirements, and sale preparation and administration.* The area is well accessed by existing roads. Only minor amounts of road improvements will be needed. No major harvesting, sale prep, or administration problems were evident during site visits by the ID Team.

## Finding of No Significant Impact

Analysis of the environmental consequences indicates this is not a major federal action with significant effects on the quality of the human environment. Therefore, an Environmental Impact Statement is not required for this proposal. This determination was made considering the following factors:

1. The proposal conforms with the direction provided in the 1992 Amended Land and Resource Management Plan for the San Juan National Forest.
2. No irreversible or irretrievable commitment of resources will occur.
3. The proposed action will not have a significant effect on the quality of the human environment, either as an individual action or as part of the cumulative effects of other past, present, and planned actions within this area.
4. The proposed action does not affect public health and safety.
5. The effects of the proposed action on the human environment are not highly uncertain, nor do they involve unique or unknown risks.
6. The proposed action is not precedent-setting. It does not establish a precedent for future actions that may have a significant effect on the environment. It does not represent a decision in principle about a future consideration.
7. The proposed action will not adversely affect districts, sites, highways, structures, or objects listed in, or eligible for listing in, the National Register of Historic Places. The proposed action will not cause loss or destruction of significant cultural or historic resources.
8. The proposed action will not adversely affect Endangered or Threatened species.
9. This action complies with other federal, state, and local laws and requirements imposed for the protection of the environment.
10. The effects of this action on the quality of the human environment are not likely to be controversial.

## Implementation Date

Implementation of the selected alternative may begin 45 days after publication of the Legal Notice for this decision appears in the *Durango Herald*, the paper of record.

## Appeal Rights

This decision is subject to appeal, pursuant to Forest Service regulation 36 CFR 215.7. Any written appeal must be postmarked or received by the Appeals Deciding Officer, Lyle Laverty, Regional Forester, Rocky Mountain Region, 740 Simms P.O. Box 25127, Lakewood, Colorado 80225, within 45 days from the day after notice of this decision is published in the *Durango Herald*, Durango, Colorado. Appellants are required to simultaneously send a copy of the Notice of Appeal to Calvin N. Joyner, Associate Forest Supervisor, at 701 Camino del Rio, Durango, Colorado 81301. Appeals must meet content requirements of 36 CFR 215.14.

For additional information concerning this decision of the environmental analysis, contact Phil Kemp, Mancos-Dolores Ranger District, P.O. Box 210, Dolores, Colorado 81323, or call (970) 882-7296.

Calvin N. Joyner 2/9/98

CALVIN N. JOYNER
Associate Forest Supervisor

Date

# Projected Impacts of Climate Change on Forests of the Dolores Watershed

## A Practical Management Strategy



**Jim Worrall**
**Suzanne Marchetti**

US Forest Service
Rocky Mountain Region
Gunnison, Colorado

**Jerry Rehfeldt**
**Nick Crookston**

US Forest Service
Rocky Mtn. Res. Station
Moscow, Idaho

FS-001773

# Outline

1. Impacts of turn-of-the-century drought

2. Bioclimate models and projections

3. Strategy for applying projections to forest management

Impacts to Forests

# TURN-OF-THE-CENTURY DROUGHT



# Southern Rockies

Drying trend since mid '80s

Record drought 2001-2003




FS-001776

Schwalm et al. 2012
Nature Geosciences

# The turn-of-the-century drought in the context of the past




Conclusion:

Most recent drought that severe West-wide occurred >800 yr ago.

# Piñon mortality SW CO

Dominique Bachelet, Data Basin




2.5 million acres in 4-corner states

# Mountain pine beetle



3.4 million acres in Colorado

2002
927,000 acres burned
in Colorado

# SAD



1.2 million acres in Colorado

# Spruce beetle



FS-001778

1.7 million acres in Colorado

# Future Droughts

- By the 2030's, moisture conditions during the turn-of-the-century drought ". . . will become the new norm in western North America." (Schwalm et al. 2012, Nature Geosciences)
- Later in the century, conditions may be worse than during TOC.
- How can we anticipate forest impacts so that we can manage appropriately?

Characterize climate suitable for a species

# BIOCLIMATE MODELS



FS-001780




Southwest Colorado
Bioclimate Project




FS-001782

Full model window, southwestern Colorado


Telluride
Rico
Dolores
Cortez
Mancos
Dolores Watershed

# Bioclimate Models

- Train on real point locations
  - Known presence/absence of species
  - Known historic/reference climate
  - Known slope and aspect
- Learn the combinations and interactions of variables associated with presence
- Given a topoclimate, can then predict the likelihood of presence

# How they were built

- Training data
  - 854,000 points of known presence/absence
    - Mostly spatial veg data like FSVeg and FIA plots
  - Long-term historical climate at each point
    - Use reference climate 1961-1990
    - Also slope and aspect
- "Random forests" algorithm in R
  - "forests" of many decision "trees", using random subsets of training data

# Output

- Proportion of decision trees that ‘vote’ for the topoclimate being suitable.
- If we run each pixel on a map through the model, using each pixel’s climate, slope and aspect . . .



PIPO Proportion of votes

| | | | | |
|---|---|---|---|---|
| 0-10 | 20-30 | 40-50 | 60-70 | 80-90 |
| 10-20 | 30-40 | 50-60 | 70-80 | 90-100 |

FS-001787




ABLA occurrence in shapefiles (black) vs. reference period votes >=0.5 (blue overlay)

# Subalpine fir




PIEN occurrence in shapefiles (black) vs. reference period votes >=0.5 (blue overlay)

**Engelmann spruce**

FS-001789




QUGA occurrence in shapefiles (black) vs. reference period votes >=0.5 (blue overlay)

# Gambel oak

# Process for projecting into the future

3 GCMs x 3 RCPs → 9 climates → downscaled → bioclimate models

↓

9 outputs

↓

votes averaged

Global climate models used by IPCC:
CCSM4
GFDLCM3
HadGEM2ES

Greenhouse-gas scenarios (RCPs)
RCP 4.5
RCP 6.0
RCP 8.5




# Ponderosa pine 2060

Applying bioclimate models

# A FOREST MANAGEMENT STRATEGY



# Project Change

1. Make grids of suitability based on reference and future climates.
2. Use difference in model output between reference and future periods to classify change zones.
   a) Model output ("votes") are 0 (no chance) to 1 (very likely)

| Change classes | Reference period votes | 2056-2065 votes |
|---|---|---|
| **Lost** | ≥ 0.5 | < 0.3 |
| **Threatened** | ≥ 0.5 | 0.3-0.5 |
| **Persistent** | ≥ 0.5 | ≥ 0.5 |
| **Emergent** | < 0.5 | ≥ 0.5 |




CGH Change Zones for ABCO: Lost | Threatened | Persistent | Emergent

## White fir