340690

**Legal Notice: Opportunity to Object Salter Vegetation Management Project Environmental Assessment USDA Forest Service Dolores Ranger District, San Juan National Forest Montezuma and Dolores Counties, CO**

The Dolores Ranger District of the San Juan National Forest has released an Environmental Assessment (EA), Finding of No Significant Impact (FONSI) and Draft Decision Notice (DN) for the Salter Vegetation Management project in Montezuma County and Dolores County, CO. The District Ranger for the Dolores Ranger District is the responsible official for this project. It is the responsible official's intention to select the Alternative 2 (Modified Proposed Action) for this project. The modified proposed action includes single tree selection, commercial thinning, post fledgling area thinning, and brush thinning primarily, as well as additional actions for fuels disposal, including pile burning. Additional actions include the installation of four wildlife guzzlers. The modified proposed action also includes an adaptive management approach to respond to changing environmental conditions. The final EA, FONSI, and draft DN are available on-line at: https://www.fs.usda.gov/project/?project=57671. These documents are also available for review at the Dolores Ranger District office at 29211 Hwy 184, Dolores, CO 81321. Additional information may be obtained by contacting David Casey, Supervisory Forester, at (970) 882- 7296 or by email at david.casey2@usda.gov.

The Salter Vegetation Management project is subject to the objection process pursuant to 36 CFR 218, subpart A and B. Objections will only be accepted from those who have previously submitted specific written comments regarding the proposed project during scoping or other designated opportunities for public comment in accordance with §218.5(a). Issues raised in objections must be based on previously submitted specific written comments regarding the proposed project, unless the issue is based on new information that arose after the opportunities to comment (§218.8[c]).

Objections, including attachments, must be filed (regular mail, fax, email, hand-delivery, express delivery, or messenger service) with the appropriate reviewing officer within 45 days following the publication of this legal notice in the Cortez Journal. The publication date in the newspaper of record is the exclusive means for calculating the time to file an objection. Those wishing to object should not rely upon dates or timeframe information provided by any other source. The regulations prohibit extending the time to file an objection. It is the objector's responsibility to ensure timely filing of a written objection with the reviewing officer.

Objections should be submitted to Objection Reviewing Officer, Forest Supervisor Kara Chadwick, San Juan National Forest. Electronic submissions are preferred and may be submitted at http://www.fs.fed.us/nepa/nepa_project_exp.php?project=57671
Electronically submitted objections must be in plain text (.txt), Word (.doc or .docx), Portable Document Format (.pdf), or Rich Text Format (.rtf) file formats.
Objections may also be mailed or hand delivered to: Objection Review Officer: Forest Supervisor Kara Chadwick, San Jun National Forest, USDA Forest Service, Attn: 1570 Objections, 15 Burnett Court, Durango, CO 81301. The fax number is 970-375-2331. Please include in the heading of the fax: Forest Supervisor, Attn: 1570 Objections. Objections delivered by mail must be postmarked no later than the last day of the 45-day objection filing period. At this time, the building is closed, therefore, those who wish to send an objection via hardcopy mail or fax must contact Mark Lambert at 970-799-2331 or mark.b.lambert@usda.gov to ensure their objection is received. Also, due to the building closure, those submitting hand-delivered objections must contact Mark Lambert in advance, to make an appointment.

The objection must be in writing and meet the content requirements at 36 CFR 218.8(d). All objections are available for public inspection during and after the objection process. Names, contact information, and comments will become part of the public record and may be released under the Freedom of Information Act. The U.S. Department of Agriculture is an equal opportunity provider and employer.

Published in The Journal June 23, 2021.

United States Department of Agriculture | Forest Service | Dolores Ranger District San Juan National Forest | 29211 Highway 184
Dolores, CO 81323
Voice: 970-882-7296
FAX: 970-882-6841
http://www.fs.usda.gov/sanjuan

**File Code:** 1950
**Date:** June 22, 2021

Dear Interested Party,

The Dolores Ranger District of the San Juan National Forest has released the Final Environmental Assessment (EA), Finding of No Significant Impact (FONSI) and Draft Decision Notice (DN) for the *Salter Vegetation Management* project. As described in the Draft Decision Notice, it is the responsible official's intent to implement Alternative 2 (Modified Proposed Action) as described in the Environmental Assessment for the *Salter Vegetation Management* project. The final EA, FONSI, and Draft DN are available on-line at: https://www.fs.usda.gov/project/?project=57671. These documents are also available for review at the Dolores Ranger District office.

Regulations at 36 CFR 218 provide for a pre-decision administrative review rather than a post-decision appeal process. At this time, I am releasing a DRAFT decision. The *Salter Vegetation Management* project is subject to the objection process pursuant to 36 CFR 218, subpart A and B. Objections will only be accepted from those who have previously submitted specific written comments regarding the proposed project during scoping or other designated opportunities for public comment in accordance with §218.5(a). Issues raised in objections must be based on previously submitted specific written comments regarding the proposed project, unless the issue is based on new information that arose after the opportunities to comment (§218.8[c]).

Objections, including attachments, must be filed (regular mail, fax, email, hand-delivery, express delivery, or messenger service) with the appropriate reviewing officer within 45 days following the publication of this legal notice in the *Cortez Journal* (scheduled to publish on **June 23, 2021**). The publication date in the newspaper of record is the exclusive means for calculating the time to file an objection. Those wishing to object should not rely upon dates or timeframe information provided by any other source. The regulations prohibit extending the time to file an objection. It is the objector's responsibility to ensure timely filing of a written objection with the reviewing officer.

Objections should be submitted to Objection Reviewing Officer, Forest Supervisor Kara Chadwick, San Juan National Forest. Electronic submissions are preferred and may be submitted at http://www.fs.fed.us/nepa/nepa_project_exp.php?project=57671.

Electronically submitted objections must be in plain text (.txt), Word (.doc or .docx), Portable Document Format (.pdf), or Rich Text Format (.rtf) file formats.

Objections may also be mailed or hand delivered to: Objection Review Officer: Forest Supervisor Kara Chadwick, San Jun National Forest, USDA Forest Service, Attn: 1570 Objections, 15 Burnett Court, Durango, CO 81301. The fax number is 970-375-2331. Please include in the heading of the fax: Forest Supervisor, Attn: 1570 Objections. Objections delivered by mail must be postmarked no later than the last day of the 45-day objection filing period. At this time, the building is closed, therefore, those who wish to send an objection via hardcopy mail or fax must contact Mark Lambert at 970-799-2331 or mark.b.lambert@usda.gov to ensure their objection is received. Also, due to the building closure, those submitting hand-delivered objections must contact Mark Lambert in advance, to make an appointment.

You may obtain additional information about this project by calling David Casey, Supervisory Forester, at (970) 882-7296 or by email at david.casey2@usda.gov. Names and addresses of objectors will become part of the public record. All objections are available for public inspection during and after the objection process and may be released under the Freedom of Information Act.

Thank you for your interest in the project and the management of the San Juan National Forest.

Sincerely,

DEREK PADILLA
District Ranger

USDA United States Department of Agriculture | Forest Service | San Juan National Forest | 15 Burnett Court DurangoCO81301 (970) 247-4874(970) 375-2319

**File Code:** 1950
**Date:** June 22, 2021

Dear Interested Party,

The Dolores Ranger District of the San Juan National Forest has released the Final Environmental Assessment (EA), Finding of No Significant Impact (FONSI) and Draft Decision Notice (DN) for the *Salter Vegetation Management* project. As described in the Draft Decision Notice, it is the responsible official's intent to implement Alternative 2 (Modified Proposed Action) as described in the Environmental Assessment for the *Salter Vegetation Management* project. The final EA, FONSI, and Draft DN are available on-line at: https://www.fs.usda.gov/project/?project=57671. These documents are also available for review at the Dolores Ranger District office.

Regulations at 36 CFR 218 provide for a pre-decision administrative review rather than a post-decision appeal process. At this time, I am releasing a DRAFT decision. The *Salter Vegetation Management* project is subject to the objection process pursuant to 36 CFR 218, subpart A and B. Objections will only be accepted from those who have previously submitted specific written comments regarding the proposed project during scoping or other designated opportunities for public comment in accordance with §218.5(a). Issues raised in objections must be based on previously submitted specific written comments regarding the proposed project, unless the issue is based on new information that arose after the opportunities to comment (§218.8[c]).

Objections, including attachments, must be filed (regular mail, fax, email, hand-delivery, express delivery, or messenger service) with the appropriate reviewing officer within 45 days following the publication of this legal notice in the *Cortez Journal* (scheduled to publish on **June 23, 2021**). The publication date in the newspaper of record is the exclusive means for calculating the time to file an objection. Those wishing to object should not rely upon dates or timeframe information provided by any other source. The regulations prohibit extending the time to file an objection. It is the objector's responsibility to ensure timely filing of a written objection with the reviewing officer.

Objections should be submitted to Objection Reviewing Officer, Forest Supervisor Kara Chadwick, San Juan National Forest. Electronic submissions are preferred and may be submitted at http://www.fs.fed.us/nepa/nepa_project_exp.php?project=57671.

Electronically submitted objections must be in plain text (.txt), Word (.doc or .docx), Portable Document Format (.pdf), or Rich Text Format (.rtf) file formats.

Objections may also be mailed or hand delivered to: Objection Review Officer: Forest Supervisor Kara Chadwick, San Jun National Forest, USDA Forest Service, Attn: 1570 Objections, 15 Burnett Court, Durango, CO 81301. The fax number is 970-375-2331. Please include in the heading of the fax: Forest Supervisor, Attn: 1570 Objections. Objections delivered by mail must be postmarked no later than the last day of the 45-day objection filing period. At this time, the building is closed, therefore, those who wish to send an objection via hardcopy mail or fax must contact Mark Lambert at 970-799-2331 or mark.b.lambert@usda.gov to ensure their objection is received. Also, due to the building closure, those submitting hand-delivered objections must contact Mark Lambert in advance, to make an appointment.

You may obtain additional information about this project by calling David Casey, Supervisory Forester, at (970) 882-7296 or by email at david.casey2@usda.gov. Names and addresses of objectors will become part of the public record. All objections are available for public inspection during and after the objection process and may be released under the Freedom of Information Act.

Thank you for your interest in the project and the management of the San Juan National Forest.

Sincerely,

X THOMAS RICE

Digitally signed by THOMAS RICE
Date: 2021.06.22 16:26:55 -06'00'

Thomas B Rice acting for
Derek J Padilla, District Ranger

# Draft Decision Notice and Finding of No Significant Impact for the Salter Vegetation Management Project

USDA Forest Service
Dolores Ranger District
San Juan National Forest
Montezuma and Dolores Counties, CO

## Introduction

The condition of today's ponderosa pine-Gambel oak forest is largely a legacy of historically high levels of human activities occurring from the late 19th century into the 20th century. Large scale commercial harvesting of the pine forest was underway by the early 20th century. In these early days, the vast majority of the logging occurred in the ponderosa pine type and focused on harvesting very large trees while leaving smaller trees and species of lesser value. The most obvious effect of the early logging of ponderosa pine forests is the general lack of large, old trees and snags in these forests today (Romme 2009).

Heavy and largely unregulated livestock grazing was occurring simultaneously with the early logging operations and active fire suppression had also become a widespread policy in the early 20th century. This unique combination of historic events -- the elimination of extensive fires, removal of grass competition by livestock, and the removal of a large component of the forest overstory -- coincided with unusually wet weather and good seed crops to establish abundant pine regeneration in the early 20th century (Covington & Moore 1994).

A comparison between the current and desired conditions utilizing common stand exam data, Forest Vegetation Simulation modeling, and field observation shows that the condition of the ponderosa pine cover type found within the Salter vegetation management activity area today is different from the desired conditions associated with that vegetative cover type identified in the San Juan National Forest Land and Resource Management Plan (2013). Based on field reconnaissance and inventory data, the structure and size class distributions in the stands identified for this analysis are not within desired conditions described in 2.2.23 of the Forest Plan. Additionally, bark beetles have infested adjacent landscapes causing significant mortality. The early stages of a bark beetle infestation is now being observed in the Salter project area.

Portions of the Salter project area have also been moderately burned by wildfire and there are areas immediately adjacent to the Salter project area that have been severely impacted by wildfire. It is well documented that dense, over-stocked, even-age, closed canopy ponderosa pine stands are more susceptible to insect outbreaks and uncharacteristic stand replacing fire events (Negron et al. 2008). It is also is well documented that a lack of structural diversity corresponds directly to a reduction in forest resiliency and consequently a decline in long term resistance to detrimental natural and human disturbance events (Negron et al. 2008, Negron et al. 2000, USDA-rmrs_2009_gibson_k0022000).

Based on this comparison, the need to 1) improve resilience and resistance to epidemic insect and disease outbreaks; 2) to increase the structural diversity of the ponderosa pine forest across the project area, and 3) to provide economic support to local communities by providing timber products to local industries in a

sustainable manner were identified. The Salter Vegetation Management environmental assessment documents the analysis of the proposal to meet this need.

## Decision and Reasons for the Decision

### Decision

Based on my review of the Salter Environmental Assessment, the project record, and direct consultation with resource specialists, I have decided to implement alternative 2 with modifications (environmental assessment, section 2 – modified proposed action). This decision would authorize treatment of approximately 22,346 acres of the ponderosa pine-Gambel oak vegetation type on the Dolores Ranger District of the San Juan National Forest.

This decision authorizes four silvicultural treatments to move the treatment area towards the desired conditions described in section 1 of the environmental assessment. Table 1 summarizes the silvicultural prescriptions that would be applied based on the condition of stands at the time of implementation. Immediately prior to harvesting, a condition-specific prescription based on stand exam data, local knowledge of the area, and walk-thru exams would be applied to each stand. The final prescriptions would vary depending on stand-specific objectives and current conditions.

**Table 1. Vegetation treatment type and treatment description**

| Treatment Type | Treatment Description[1] |
|---|---|
| Single Tree Selection | An uneven-aged regeneration method where individual trees of all size classes up to 26 inches diameter at breast height are evaluated and removed more or less uniformly throughout the stand creating or maintaining a multiage structure of groups, clumps and individuals to promote growth of remaining trees and to provide space for regeneration. Multiple entries of this activity ultimately results in an uneven-aged stand of 3 or more age classes. This would be the preferred and dominate prescription used. 50-to-70 basal area per acre of residual basal area depending upon stand condition. There are 19,675 acres of this treatment type. |
| Commercial Thinning | Silviculture "Free Thinning" with enhancement objectives in mixed stocking ponderosa pine with a variable residual square feet of tree stem basal area of 50 -70 basal area per acre depending upon stand condition. Individual trees of all size classes up to 26 inches diameter at breast height are evaluated and removed throughout the stand creating or maintaining a multiage structure of groups, clumps and individuals.<br>These stands have some of the following characteristics: recent treatment, structure is more clump than group, inconsistent harvestable volume per acre. Goal is to enhance current qualities of the stand to promote resiliency to disturbances. Includes the plantation units. There are 3,115 acres of this treatment. |
| Post Fledgling Area Thinning (PFAT) | PFA prescription is a free thinning in which trees of all size classes up 22 inches are evaluated for harvest while retaining a 100-to-120 residual basal area target. A focus on large groups of 20-30 trees or more is desired with internal clumps made up of 3-to-5 large and mature trees with interlocking crowns. Individual tree structure and isolated clumping is not desired structure in this treatment type. When structure is not available, thinning should focus on creating conditions for long-term structure moving towards PFA desired conditions. |
| Pre-commercial Thinning | Thinning of ponderosa pine (Less than 5 inches diameter) to variable spacing specifications. Would be implemented in any treatment unit. |
| Brush Thinning | Thinning of understory brush species (generally target brush less than 6 inches diameter at root collar), mainly Gambel oak; to create openings for seedling recruitment and reduce ladder fuel effects on residual trees. Would be implemented in any treatment unit. This prescription is limited to treating no more than 5,000 acres. |

[1] No tree larger than 26.9 inch diameter at breast height would be cut in alternative 2 – modified proposed action.

Prescriptions are generally for the mechanical harvesting of vegetation; however, hand manipulation and mastication of vegetation may also occur. Processing of the vegetation would occur in harvest units and would be concentrated at landings within the units for final processing prior to transport off the forest. Slash created during treatments would be treated by removal, piling or lop and scattering, based upon recommendations from fuels specialist. Detailed descriptions of each silvicultural prescription are located in the environmental assessment, (section 2 - proposed action and alternatives).

Ponderosa pine trees established prior to approximately 1880 would be retained in nearly all situations during harvest designation. Exceptions may be made in rare instances for safety reasons and to reduce declining trees with severe dwarf mistletoe infestation, root rot or bark beetles. Old-aged trees would be identified using a combination of physical characteristics including large diameter relative to other trees in the localized area, large diameter branches, irregular crowns, flat tops, tall height and canopy position and bark thickness, color and pattern. (Huckaby et al. 2003). When a determination of tree age cannot be made using physical characteristics, these trees would either be retained or assessed and documented at the harvest-unit scale to ensure old-aged trees are retained.

Tree evaluation would be accomplished through a descending order of choice made by the designator. Evaluation occurs at every step of the decision-making process by applying sound judgement based on parameters from the analysis and direction from a certified silviculturist. Below is an example of a descending order of choice that would be used to evaluate trees and ultimately designated them for removal if the stand has a basal area greater than 50 square feet per acre (ft$^2$/acre).

a. Tree can be evaluated for harvest if it is less than 27.0 inch diameter at breast height
b. Do not cut trees with a combination of pre-settlement visually apparent physical indicators (Huckbay et al. 2003)
c. Cut dead trees (brown or red needles/no needles)
d. Cut live trees with visible evidence of bark beetle infestation (for example, pitch tubes, frass, and woodpecker activity on tree bole)
e. Cut live trees with dwarf mistletoe infecting more than 50 percent of the live crown

In addition to a-e above, trees with a 25 inch diameter at breast height and less can also be cut if they meet the following condition or structure:

f. Live crown declining more than 25 percent including poor needle conditions
g. Evidence of conks, cankers or advanced decay
h. Weak or multiple forks
i. Broken or dead tops
j. Leans greater than 35 percent
k. Grossly poor form
l. To achieve a basal area target within 50-70 ft$^2$/ac.

### *Connected Actions*

Connected actions associated with vegetation treatments would include maintenance-related road-work. The work would be performed prior to, during, and/or following treatments. Table 2 displays the proposed primary haul routes. Some primary haul routes would require upgrades to the surface and could include the change of surfacing type to accommodate the volume of forest products being removed.

**Table 2. Proposed primary haul route**

| Treatment Block | Forest Service Road Number and Name |
|---|---|
| Salter | FSR 510 Dry Canyon; FSR 521 Ormiston Point |
| Plateau | FSR 523 Trimble; FSR 514 The Glade; FSR 521 Ormiston Point |
| Carlyle Point | FSR 524 Plateau; FSR 525 Trail Canyon; FSR 514 The Glade; FSR 526 Dolores Norwood |
| Boggy Draw | FSR 527 Boggy Draw; FSR 526 Dolores Norwood |
| Turkey Knoll | FSR 249 Bald Hill Res; FSR 527 Boggy Draw; FSR 532 Cottonwood; FSR 526 Dolores Norwood |
| House Creek | FSR 526 Dolores Norwood; FSR 529 Beaver Rim |

No new permanent roads would be built with this project, though temporary roads may be required to reduce the need for excessive tractor skidding and allow wood products to be moved to the permanent road system. Creating these roads would involve clearing vegetation and minimal construction. They would be constructed, utilized and reclaimed when rainfall and erosion potential is minimal. These segments would be decommissioned within five years of first use. Up to 117 miles of temporary road construction could be made available for use under this decision.

Other related forestry activities would include the reduction of activity fuels. Concentrations of activity fuels would be disposed of by either piling for later burning, lopping and scattering throughout the unit, a combination of scattering and piling/burning, and/or removal from the site. The method used would be dependent upon the amount of slash generated, the mechanical means employed for removal, and specific conditions within the unit.

Vegetation management activities may also result in post-treatment vegetation management actions such as site-preparation and reforestation, if deemed necessary through monitoring.

Additional actions that would be authorized by this decision include the installation of four wildlife guzzlers in strategic locations within the Salter and Plateau treatment units to provide connectivity to other perennial waters sources. The goal is to provide additional water sources for wildlife during dry months and in years when drought conditions are present, as well as to encourage large game to remain upland on Forest Service land ownership to decrease the potential for damage to private property.

### *Project Design Features*

Project design features have been developed to minimize or eliminate potential adverse effects during implementation of the Salter Vegetation Management project. The design features identified in the environmental assessment, (section 2 – project design features) are essential to the selected alternative, including all actions that would occur as the result of adaptive management, and are expected to provide adequate resource protection under the treatments proposed for this project.

### *Monitoring and Adaptive Management*

Because conditions continue to change on the landscape analyzed in the Salter Environmental Assessment, a combination of pre-implementation reviews and an adaptive management approach would be utilized to inform implementation and to provide the opportunity to solicit input from partners that could be incorporated into the decision making process when addressing changing conditions on the ground in real-time. A detailed discussion relative to the specific process and protocols to be used in adaptive management modifications are identified in the environmental assessment under Monitoring and

Adaptive Management (section 2). This discussion also identifies specific monitoring elements and associated threshold and triggers for adaptation.

## Rationale

My decision is based on an examination of the information in the environmental assessment, the project file, and direct consultation with resource specialists. Particular attention was paid to how well the purpose and need would be met and whether the selected alternative would provide opportunities to respond to rapidly changing conditions. In addition, much time and effort was devoted to reviewing public comments, some of which provided opposing viewpoints (and references to opposing science) about what management actions should be taken.

### *Purpose and Need*

My review of the environmental assessment determined that the selected alternative meets the purpose and need as described in section 1. The vegetation analysis contained in the vegetation specialist report and summarized in section 3 of the environmental assessment states that the combined effects of commercial thinning, single tree selection, and pre-commercial thinning would be a post-harvest reduction in basal area leading to the development of stands that are less dense and reducing competition among remaining trees for water and nutrients, which would create uneven-aged conditions in which the remaining trees become healthier and more vigorous. This would increase resiliency, making these areas less susceptible to insect and disease outbreaks and severe wildfire.

The analysis also indicates that the selected alternative not only moves the vegetation toward the desired conditions described in the Land and Resource Management Plan for this land use and species, but better meets the purpose and need by allowing the silviculturist to make the final determination regarding most appropriate prescription to achieve desired conditions on a stand-by-stand basis, over time based on stand type and disturbance frequency.

The analysis also finds that that brush thinning would reduce competition for moisture and nutrients. It would also reduce ladder fuels and the potential for scorching leave trees. Along with prescribed burning (as authorized by the 2018 Final Decision Notice with a Finding of No Significant Impact for the Dolores Prescribed Fire Pine Ecosystem Restoration Project Environmental Assessment), this creates opportunities for successful natural regeneration in the treated areas. Retaining quality seed trees would also increase the chance that natural regeneration would occur. Under the no action alternative, regeneration would continue to be inhibited by dense Gambel oak and heavy duff layers, although insect and disease activity on a small scale could contribute to increasing structural diversity at a small scale significantly smaller than the selected alternative.

Alternative 3 – Large Tree Retention would limit the ability to fully utilize the silviculture systems designated by the Land and Resource Management Plan. Therefore, alternative 3 meets the desired conditions described at 2.2.23 to a lesser degree than alternative 2 – modified proposed action. At the fine scale patches of bark beetle and heavily infested dwarf mistletoe trees would have to be passed for removal due to the diameter limitation. Basal area retention goals and uneven aged characteristics would be compromised, leaving stands less resilient and making long term resistance less likely to occur.

A research paper recently provided by Dr. William Baker, 2021 *Restoration of forest resilience to fire from old trees is possible across a large Colorado dry-forest landscape by 2060, but only under the Paris 1.5℃ goal*, identifies that a diameter limitation would result in development of a stand structure that would provide for resistance and resilience against impacts from wildfire. The paper was received shortly before publication of the Final EA; however, the Interdisciplinary Team conducted a cursory review of

findings to assess relevance to the Salter project. The focus of the research paper -- resistance and resilience to wildfire -- is less of a concern than is resistance and resilience to disturbances from insect and disease. Recent wildfires and prescribed fires have not resulted in significant mortality to ponderosa pine in the project area. More mortality of ponderosa pine can be attributed to impacts from insect and disease. Therefore, placing diameter limitations, as discussed in the previous paragraph, will compromise developing the stand structure that would result in resilience and resistance to these disturbance factors.

Increasing structural diversity is also identified as a purpose of this project since there is currently very little structural diversity in ponderosa pine stands in the analysis area. As described in the project location and project area description section and the historical background discussion in section 1, the amount of mature pine stands in the Salter analysis area with closed canopies is well above the desired condition as defined by the 2013 Forest Plan while the amount of young stands are below the desired conditions. The analysis in the environmental assessment concludes that the actions proposed under the selected alternative would help move the stands that are treated toward an uneven aged heterogeneous structure, and as stated above, would provide opportunities for regeneration, thus increasing the amount of young stands in the area. Under the no action alternative, even-aged stands would continue to dominate. Applying a large tree harvest restriction (above 26.9 inches diameter at breast height) would also add to the structural diversity by increasing old and large trees in the long-term.

The selected alternative would meet the purpose of providing wood products for both commercial and non-commercial uses. The quantity of wood products available for commercial and non-commercial uses under the selected alternative would also be much higher than under the no action alternative because it would allow for tree cutting and removal thru a variety of means, including but not limited to, traditional timber sale contracts, service contracts, integrated resource contracts, small product permits (such as post and poles or firewood). The proposed action would also meet the identified need of managing forest vegetation to move current and foreseeable future conditions closer to desired conditions on landscapes available for active management. The no action alternative would not contribute to providing wood products for commercial and non-commercial uses, and it would not meet the need of managing forest vegetation to move current and foreseeable future conditions closer to desired conditions on landscapes available for active management.

### *Ability to Respond to Changing Conditions*

Due to the potential for vegetative conditions to change rapidly in response to both actively moving insect and disease outbreaks in and adjacent to the analysis area and climate change, the prescriptions identified now may no longer be applicable in some areas. For this reason, I feel having the ability to respond to changing conditions through the use of pre-implementation reviews and adaptive management is an essential part of the selected alternative for the Salter project.

As discussed in the environmental assessment in section 2, the use of pre-implementation reviews, checklists, and adaptive management would allow for timely application of appropriate prescriptions based on actual site conditions at the time of implementation. The environmental assessment describes a well-defined approach, with requirements to review project areas prior to implementation, during implementation, and after implementation as well as requirements to monitor project effects during and after implementation. The adaptive management process also includes a commitment to public notification thru news releases and discussions with local stakeholders, and public field trips to keep interested stakeholders informed about the progress of implementation and the results of monitoring. The monitoring plan includes details relative to what would be monitored and what adjustments may be made under adaptive management.

### *Response to Public Comment*

In making my decision, I carefully considered concerns raised by the public during the scoping and public comment periods. My staff and I reviewed and considered all of the comments and reference materials received. Many of the comments received during the public comment period were supportive of the proposed actions, but there were several commenters that voiced concern over various aspects of the proposed actions including, but not limited to: harvesting of old and large trees and other aspects of the silvicultural prescriptions; the potential for adverse impacts to the trails in the Boggy Draw and other treatment blocks; limited access to the area during project implementation and the duration of the project; increased traffic on the Dolores-Norwood Road; effects to big game and other wildlife species. In direct response to the public comments received, numerous clarifications and changes were made to the final environmental assessment. This includes but is not limited to clarification of design features and the effects of the design features, refinement of design features for invasives, recreation, and wildlife, the addition of additional design features for recreation, addition of adaptive management actions, and providing additional information regarding the current vegetative conditions and other relevant information from the vegetation specialist report.

I also found that the final environmental assessment shows a thorough review using the best available science (section 1 - need for the proposal, section 3 - vegetation effects analysis, and vegetation specialist report). The Interdisciplinary Team used information from a broad range of sources as appropriate, including regional and national-level research, local research, and recent site-specific field inspections and reviews of the analysis area, and referenced the scientific sources which informed the analysis. The opposing science references provided during the comment period were reviewed and the interdisciplinary team utilized the best available science to meet the purpose and need. The comments are filed in the project record and located in the Reading Room on the San Juan National Forest project webpage.

I have acknowledged the environmental trade-offs of my decision. The watershed and soils analysis in section 3 - watersheds found that the activities associated with the proposed action may have localized, short-term effects (less than 3 years) on watershed and soils, riparian areas, and water quality. It also found that the hydrology and soils design elements listed in section 2 would help minimize or eliminate potential adverse effects during implementation, and no negative long-term impacts would occur.

The wildlife analysis in section 3 - wildlife and fisheries determined that with all proposed activities combined and resource protection measures, the selected alternative "may impact individuals or their habitat, but would not likely contribute to a trend towards federal listing or loss of species viability to the population or species". For Abert's squirrel, big game, hairy woodpecker and migratory birds, the effects are expected be short-term (less than 10 years) while the long-term (more than 10 years) impacts are intended to be beneficial by providing higher quality habitat that is well distributed in the future. Other potential impacts to the species may include disturbance or displacement during harvest activities. Design features are intended to minimize impacts to these species.

The fuels analysis in section 3 - fuels and fire management also identifies the selected alternative as having short-term impacts for long-term trade-offs with respect to increases in fuel loadings in the short-term for stands more resistant to future disturbances and able to recover more rapidly without human intervention over the longer-term.

In summary, the analysis of impacts of the selected alternative – the modified proposed action as described by my staff in the Salter Environmental Assessment do not indicate any unacceptable consequences, and I believe the long-term benefits of the modified proposed action (increasing resistance

and improving forest resilience, increasing structural diversity, and providing wood products for both commercial and non-commercial uses) outweighs any short-term environmental impacts.

## Alternative Development and Other Alternatives Considered

In addition to the selected alternative, I considered two additional alternatives. I considered a no action alternative where current management plans would continue to guide management of the project area. I also considered a large tree retention alternative. The large tree retention alternative includes a 20-inch diameter limitation (as compared to a 26-inch diameter limitation in the modified proposed action). This alternative limits the removal of trees over 20 inches diameter at breast height and is intended to emphasize large tree retention.

The Forest Service National Environmental Policy Act (NEPA) procedures allow the responsible official to modify a proposed action as the process progresses and requires such modifications to be made in an open and transparent process obvious to all interested parties conflicts [36 CFR 220.7 (b)(2)(i). To this end, the comments received during the scoping period were reviewed and assigned to a general subject matter category. Issues that were interrelated were combined into a set of issues or concerns. The concern groupings were developed to facilitate a comprehensive approach to identifying incremental adjustments that would result in a refined, modified proposed action or additional alternative. Refer to the environmental assessment,  section 2 for a complete listing of groupings by major concern heading. All comments received and the disposition of the comments can be located in the project record.

The potential issues and concerns associated with the concern groupings identified above were resolved through project modification, application of best management practices, project design features, or development of an alternative. The initial scoped proposed action was modified by:

- Addition of multiple project design features and identification of avoidance areas for recreation to include protection of trail quality, scenery and to minimize impacts to recreationists. Development of an implementation schedule that is intended to minimize the need for closure of trails and other recreation opportunities during project implementation (environmental assessment, figure 12, appendix A).
- Incorporation of project design features intended to mitigate the adverse impacts of allowing for maximum gross vehicle weight, when authorized.

Resolution of potential issues and concerns identified during scoping also included development of a second action alternative which includes a 20-inch diameter limitation (as compared to a 26-inch diameter limitation). This alternative limits the removal of trees over 20 inches diameter at breast height and is intended to emphasize large tree retention.

Based on comments received during the 30-day comment period, additional modifications were made between the draft environmental assessment and the final environmental assessment which include: refinement of project design features for invasive species, wildlife and recreation; the addition of new project design features for recreation and transportation; and bringing additional existing condition information contained in the vegetation specialist report into the text of the environmental assessment document for context and clarity.

## Public Involvement and Scoping

The Forest Service consulted the following Federal, State, and Tribal governments, local agencies and individuals during the development of the Salter Environmental Assessment.

## Tribal Consultation

A government-to-government consultation package with an initial invitation to consult was distributed to 24 consulting Native American Tribes on February 20, 2020. Two Tribes requested to continue consultation for the proposal. A notification package containing the results of the class I literature review would be sent to these Tribes when complete. Consultation on subsequent implementations under the NEPA decision would follow the process outlined in the Cultural Resources Vegetation Management Programmatic Agreement. The Colorado State Historic Preservation Officer agreed on June 12, 2020 on the use of the 2017 programmatic agreement for vegetation management undertakings.

## Public Involvement

Scoping packages were distributed to 62 individuals, organizations, permittees, agencies, and congressional representatives on February 21, 2020. A public news release was also made to local media on February 21, 2020. The Salter Vegetation Management project was identified on the San Juan National Forest Schedule of Proposed Actions beginning February 2020. Scoping packages were also made available to participants attending the Dolores Watershed Resilient Forest Collaborative (DWRF) with periodic updates as the project developed. The scoping period was 30 days long and ended March 23, 2020, with 11 comment letters were received. Please refer to the previous section - alternative development and other alternatives considered for a summary of the comments received.

Opportunity for public comment was also provided during a 30-day comment period beginning February 10, 2021 with the issuance of the draft environmental analysis. The comment period was announced via a press release, direct mailing to those who previously showed interest, and a legal notice in the Cortez Journal, the paper of record. One-hundred and twenty-four comment letters were received. Individual comment letters resulted in approximately 1,024 individual comments. Each comment was reviewed and assigned to a concern category. The concern groupings were again utilized to facilitate a comprehensive approach to further refining the proposed action and alternatives through additional incremental adjustments. Project mailing lists of the Federal, State, and local agencies, Tribes, and non-Forest Service individuals that were consulted regarding the Salter Vegetation Management project are included in the project record.

## Collaboration

The Dolores Watershed Resilient Forest Collaborative is a diverse group of stakeholders that have worked since 2015 to support and enhance forest, watershed, and community resilience in Montezuma and Dolores Counties, Colorado. With the goal of building trust, public involvement, and enhancing ecosystem resilience, the group provides one avenue for public engagement, discussion, and input on vegetation projects and strives to expand and build support for efforts that improve resilience.

Through efforts like the Rocky Mountain Restoration Initiative and the Collaborative Landscape Restoration Forest Restoration program, Dolores Watershed Resilient Forest Collaborative members have identified treatment priorities for areas within the Dolores Watershed Resilient Forest Collaborative upper Dolores River watershed, which includes the Salter landscape. This provides information to the agency to take into consideration when determining treatment priorities. The collaborative has also identified a set of ponderosa pine desired conditions that outlines components of ponderosa pine forest resiliency that are a priority for the collaborative (DWRF. 2020. Ponderosa Pine Ecosystem Resilience Metrics and Desired Conditions). The desired conditions developed by the collaborative are consistent with and integrate well with the standards and guidelines identified in the Land and Resource Management Plan for this landscape. The information and recommendations provided by the collaborative have been given consideration in the design of the Salter Vegetation Management project.

## Finding of No Significant Impact

### Context

For the modified proposed action and alternatives, the context of the environmental effects is based on the environmental analysis in the environmental assessment. This project is limited in scope, the decision made here applies to the Salter Vegetation Management area on public land. The project is also limited in duration. Spatial and temporal effects would vary, and would be mostly limited to the project area. While some short-term adverse effects would occur, long-term effects would be beneficial across a range of resources. The resources affected by the proposed action are described in the Salter Environmental Assessment – section 3 – environmental effects.

The project area is located in a managed roaded-area on suitable timber lands within Management Area 5. Management Area 5 emphasizes active management and commodity production in order to meet a variety of social, economic, and ecological objectives (USDA 2013). All of the actions included under the selected alternative are confined to this management area. The actions included under the selected alternative are appropriate to implement in Management Area 5 (Forest Plan, section 2.9.14).

The San Juan National Forest includes approximately 1.9 million acres of National Forest System lands. The Dolores Ranger District encompasses about 597,373 acres of those National Forest System lands. The Salter Vegetation Management project area encompasses approximately 3.7 percent of the district (22,346 acres). The effects would be local in nature and not likely to significantly affect regional or national resources.

### Intensity

Intensity is a measure of the severity, extent, or quantity of effects, and is based on information from the effects analysis of this environmental assessment and the references in the project record.

1) **Impacts may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on the balance the effects will be beneficial.**

   Consideration of the intensity of environmental effects is not biased by beneficial effects of the action. Impacts that may be both beneficial and adverse are discussed in environmental effects section of the environmental assessment (section 3). There would be localized, short-term impacts, but the analysis indicates that the selected alternative would not result in any significant adverse effects.

2) **The degree to which the proposed action affects public health or safety.**

   There would be no negative effects on public health and safety. Project design features require that once harvest operations begin in either the Boggy Draw or Turkey Knoll treatment blocks and throughout duration of operations in either block, an information station would be set up at the Boggy Draw trailhead. Information would also be available at local bike shops, Chamber of Commerce, businesses in Cortez and Dolores, the Southwest Colorado Cycling Association and the San Juan National Forest's Facebook page. The information center would contain up-to-date maps displaying the location of cutting units with active units identified, as well as, trail locations and big game units environmental assessment section 2 – project design features).

   To further reduce conflicts with recreation users during federal holidays, hauling would not be permitted on FSR 527 from the junction of FSR 527C to FSR 259 (Boggy Draw Trailhead) from 12:00 P.M. Friday to 12:01 A.M. Monday on Memorial Day, Labor Day and Thanksgiving weekend (Thursday to Monday), Christmas Day and July 3 to July 5.

In addition to the above design features, the Salter Vegetation Management project includes an adaptive management option that provides for adjustments if speed becomes an issue with logging traffic and recreationalists. Should speed become an issue, the Forest Service would look at mechanisms to address the issue either through law enforcement or through timber sale contract provisions.

3) **Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.**

The selected alternative does not involve impacts to unique characteristics or ecologically critical areas. No park lands, prime farmlands, floodplains, wilderness, or wild or scenic rivers occur in the project area. No adverse effects to wetlands, wet meadows or riparian areas are expected because design elements are in place that minimize skidding, decking and loading in these areas. Intermittent streams and ephemeral streams with riparian vegetation would be protected during project activities by a 100 foot buffer zone where no mechanized equipment use is allowed, unless a field visit by a hydrologist determines a different site-specific buffer (environmental assessment, section 2 - hydrology and soils). Implementation of other hydrology and soils design elements (environmental assessment, section 2 – hydrology and soils) would further ensure protection of wetlands and streams in the project area (environmental assessment, section 3 - watersheds). The selected alternative does not involve impacts to historic or significant cultural resources. The project design features identified in Appendix B. Cultural Resources Programmatic Agreement Vegetation Management Activities-Specific Project Design Features would be applied consistent with the Cultural Resources Vegetation Management Programmatic Agreement. Therefore, the proposal would have no adverse effects to significant cultural resources or historic properties.

4) **The degree to which the effects on the quality of the human environment are likely to be highly controversial.**

The effects of this action on the quality of the human environment are not highly controversial. The Forest Service has extensive experience in analyzing and implementing this type of vegetation management project in similar conditions (Forest Plan, section 2.9.14). Although other perspectives on vegetation management approaches were raised during the various public comment periods, the project implements established approaches that Forest Service resource specialists deem reliable and that are supported by the best available science.

5) **The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.**

The Forest Service has extensive experience in analyzing and implementing single tree selection, commercial thinning, pre-commercial thinning, brush thinning, reforestation, slash disposal, burning, and road-related activities. Because of this, potential issues associated with this proposed action are understood and there is a low degree of uncertainty regarding the risks to the human environment. Issues brought forth by resource specialist are not unique, have been identified before on the San Juan National Forest, and tend to have clearly defined design elements or measures that would limit or fully eliminate meaningful adverse effects. Best available science was used to inform the effects analysis in chapter 3 of the environmental assessment. The effects analysis shows the effects are not uncertain and do not involve unique or unknown risks.

6) **The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.**

The action would not establish a precedent for future actions that may have significant effects on the environment. It does not represent a decision in principle about a future consideration. Future actions would require their own analyses and decisions.

**7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts.**

Cumulative effects of past, present, and reasonably foreseeable projects have been considered and evaluated in addition to the impacts of this project. No significant cumulative impacts were identified (environmental assessment, chapter 3).

**8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in the National Register of Historic Places or may cause loss or destruction of significant cultural or historical resources.**

No direct or indirect effects on significant cultural resources are anticipated given that project activities would be controlled through application of cultural resource design elements identified in the Cultural Resources Vegetation Management Programmatic Agreement (USDA 2017). Significant cultural resources would be avoided. All project undertakings identified under the selected alternative would avoid National Register eligible cultural resources per section 106 of the National Historic Preservation Act. With adherence to all cultural resource design elements (environmental assessment - section 2 and appendix B), the selected alternative would have "no adverse effect" on cultural resources (environmental assessment, section 3 – cultural resources).

**9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act.**

There would be no adverse effect to any endangered or threatened species or to critical habitat. Habitat is absent or proposed activities would not occur in habitat for Canada lynx, Mexican spotted owl, Gunnison's Sage-grouse, New Mexico meadow jumping mouse and Western yellow-billed cuckoo. Habitat for bonytail chub, Colorado pikeminnow, humpback chub and razorback sucker is absent in the project area. The Salter Vegetation Management project is outside of occupied range for these species and does not deplete water from the basin (environmental assessment, section 3 – wildlife and fisheries)

**10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.**

This action complies with relevant Federal, State, and local laws or requirements for the protection of the environment.

## Findings Required by Other Laws and Regulations

In reviewing the environmental assessment and actions associated with alternative 2 - modified proposed action, I have concluded that my decision is consistent with the following laws and requirements:

### *National Forest Management Act (NFMA)*

This decision to treat approximately 22,346 acres of the ponderosa pine-Gambel oak vegetation type on the Dolores Ranger District is consistent with the intent of the long term goals and objectives listed on pages 28 and 81 of the Forest Plan. The project was designed in conformance with land and resource management plan standards and incorporates appropriate land and resource management plan guidelines

for forested terrestrial ecosystems (tables 2.2.1 and 2.2.2; page 22; terrestrial ecosystem resource direction), forested terrestrial ecosystem with respect to representation at the landscape scale (tables 2.2.1 and 2.2.2; page 22; terrestrial ecosystem resource direction), and forested terrestrial ecosystems with respect to stand structures and tree species composition that offer resistance and resilience to changes in climate, including extreme weather events, or epidemic insect and disease outbreaks (page 22; terrestrial ecosystem resource direction).

**Other NFMA Requirements**

1. **Suitability for Timber Production: No timber harvest, other than salvage sales or sales to protect other multiple-use values, shall occur on lands not suited for timber production (16 USC 1604(k)).**

   This project does not propose timber harvest on lands considered unsuitable for timber production. All project activities would occur in Management Area (Active Management). Management Area 5 are multiple-use areas where active management occurs in order to meet a variety of social, economic, and ecological objectives. They are easily accessible, occurring mostly on roaded landscapes and relatively gentle terrain. These are lands where timber harvesting, oil and gas activities, and intensive livestock grazing occur and influence the composition, structure, and landscape patterns of the vegetation (Forest Plan, p. 187).

2. **Timber Harvest on National Forest Lands (16 USC 1604(g)(3)(E)): A Responsible Official may authorize site-specific projects and activities to harvest timber on National Forest System lands only where:**

   a. **Soil, slope, or other watershed conditions will not be irreversibly damaged (16 USC 1604(g)(3)(E)(i)).**

      The selected alternative would avoid impairment of soils or watershed conditions. Treatments would take place on gentle to moderate slopes, avoiding steep slopes. Soil types are appropriate for these kinds of management activities. Design features include buffers and altered harvest methods in proximity to streams and wetlands. Where negative effects may occur, they are expected to be short-term in duration and improve in the long-term. Further supporting rationale can be found in the vegetation and watershed discussions in the environmental assessment (section 3 – vegetation and section 3 – watersheds). Units that are adjacent to or contain soils prone to mass movement would be reviewed by forest geologist prior to implementation.

   b. **There is assurance that the lands can be adequately restocked within five years after final regeneration harvest (16 USC 1604(g)(3)(E)(ii)).**

      The primary silvicultural treatment proposed is single tree selection which is a regeneration treatment and subject to the five-year restocking requirements of the National Forest Management Act. The minimum adequate stocking required by the Forest Plan for ponderosa pine is 150 trees per acre. Similar treatments have been done on this landscape with numerous examples of success, and in many cases, the harvest itself did not bring stocking below 150 trees per acre. Uneven-aged management allows for the retention of higher stocking in the smaller diameter classes and prescription would take advantage of advanced regeneration retention. Based on this experience, and applicable research, more than adequate regeneration and or residual stocking is expected. Regeneration levels and success would be monitored and verified with post-harvest stocking

surveys. Beyond expected outcomes, the analysis has built in adapted management to allow for reforestation both of ponderosa pine and further drought resistant species, should the need arise.

**c. Protection is provided for streams, streambanks, shorelines, lakes, wetlands, and other bodies of water from detrimental changes in water temperatures, blockages of water courses, and deposits of sediment, where harvests are likely to seriously and adversely affect water conditions or fish habitat (16 USC 1604(g)(3)(E)(iii)).**

The selected alternative was designed to comply with regional watershed conservation practices, Forest Plan standards and guidelines, as well as, Colorado State best management practices. Additional information can be located in section 3 – watersheds of the environmental assessment and in the description of the design features in section 2 – hydrology and soil project design features, which are part of the modified proposed action detailed in the environmental assessment (section 2 – proposed action).

**d. The harvesting system to be used is not selected primarily because it will give the greatest dollar return or the greatest unit output of timber (16 USC 1604(g)(3)(E)(iv)).**

The selected silvicultural treatments have been chosen because they effectively address the project goals as described in the environmental assessment and in this decision notice. Economics was considered, but was only one of many factors.

**3. Clearcutting and Even-aged Management (16 USC 1604(g)(3)(F)): Ensure that clearcutting, seed tree cutting, shelterwood cutting, and other cuts designed to regenerate an even aged stand of timber will be used as a cutting method on National Forest System lands only where:**

**a. For clearcutting, it is determined to be the optimum method, and for other such cuts it is determined to be appropriate, to meet the objectives and requirements of the relevant land management plan (16 USC 1604(g)(3)(F)(i)).**

This project does not propose clearcutting.

**b. The interdisciplinary review as determined by the Secretary has been completed and the potential environmental, biological, esthetic, engineering, and economic impacts on each advertised sale area have been assessed, as well as the consistency of the sale with the multiple use of the general area (16 USC 1604(g)(3)(F)(ii)).**

An interdisciplinary team of specialists, covering a broad spectrum of resource areas, was convened to work through a process of environmental analysis and public input (via scoping notices, and comment review/summary) in order to evaluate the effects of implementation of the modified proposed action and to compare and contrast that with a no action and large tree retention alternative. The analysis has been completed and documented in an environmental assessment and related specialist reports.

**c. Cut blocks, patches, or strips are shaped and blended to the extent practicable with the natural terrain (16 USC 1604(g)(3)(F)(iii)).**

Prescriptions do not allow for large openings and design features have been identified for scenery (environmental assessment, section 2).

**d. Cuts are carried out according to the maximum size limit requirements for areas to be cut during one harvest operation, provided, that such limits shall not apply to the size of areas harvested as a result of natural catastrophic conditions such as fire, insect and disease attack, or windstorm (FSM R1 supplement 2400-2001-2 2471.1, 16 USC 1604(g)(3)(F)(iv)).**

N/A

**e. Such cuts are carried out in a manner consistent with the protection of soil, watershed, fish, wildlife, recreation, and esthetic resources, and the regeneration of the timber resource (16 USC 1604(g)(3)(F)(v)).**

An Interdisciplinary Team of specialists, covering a broad spectrum of resource areas, was utilized to work through a process of environmental analysis and public input (via scoping notices, and comment review/summary) in order to evaluate the effects of implementation of the modified proposed action and to compare and contrast that with a no-action and large tree alternative. That analysis has been completed and documented in an environmental assessment and related specialist reports.

**4. Stands of trees are harvested according to requirements for culmination of mean annual increment of growth (16 USC 1604(m)).**

N/A

**5. Construction of temporary roadways in connection with timber contracts, and other permits or leases: Unless the necessity for a permanent road is set forth in the forest development road system plan, any road constructed on land of the National Forest System in connection with a timber contract or other permit or lease shall be designed with the goal of reestablishing vegetative cover on the roadway and areas where the vegetative cover has been disturbed by the construction of the road, within ten years after the termination of the contract, permit, or lease either through artificial or natural means. Such action shall be taken unless it is later determined that the road is needed for use as a part of the National Forest Transportation System (16 USC 1608(b)).**

Temporary roads would be decommissioned prior to each sale contract close out to prevent unauthorized uses (environmental assessment, section 2 – project design features). Temporary roads not needed for post-sale treatment would be reclaimed before contract closeout. Temporary roads to remain open for post-sale treatment would be reclaimed but these actions would be the responsibility of the Forest Service after the post-sale treatment is completed. The Forest Service would complete reclamation efforts within five years of first use (environmental assessment, section 2 – project design features).

**6. Standards of roadway construction: Roads constructed on National Forest System lands shall be designed to standards appropriate for the intended uses, considering safety, cost of transportation, and impacts on land and resources (16 USC 1608(c)).**

All roads associated with the Salter Vegetation Management project would be designed to standards appropriate for the proposed vegetation management activities, as required by FSM 7700. With respect to the transportation system, the selected alternative is cost-efficient, as it utilizes the existing system for all major haul routes and uses previously utilized road templates for the majority of the temporary system. No new system roads would be constructed (environmental analysis, section 2 – modified proposed action and section 3 - environmental effects -

transportation). The primary costs associated with the proposed transportation system would be related to implementing deferred maintenance. This cost would be commensurate with the proposed use. The impacts to the land and resources associated with the transportation system have been analyzed and potential adverse impacts mitigated, and or avoided. Project design features would be implemented as part of implementation to address potential safety concerns (Refer to Finding of No Significant Impact item #2 and environmental assessment, section 2 – project design features).

### *The National Environmental Policy Act (NEPA)*

The Forest Service prepared this environmental assessment in compliance with the National Environmental Policy Act and FSH 1909.15, the National Environmental Policy Act Handbook.

### *The Endangered Species Act of 1973, as amended*

Threatened, Endangered and Forest Service sensitive species were evaluated and the impacts described in the environmental assessment (section 3 – wildlife and fish) and in a biological evaluation located in the project file. These evaluations were conducted in in accordance with section 7 of the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 et seq.). Conclusions from these evaluations are provided in the Finding of No Significant Impact, Significance Factor 9, of this decision notice and finding of no significant impact.

### *The Clean Air Act*

The reduction of activity created slash via pile burning is expected to be implemented within the established State, County, and Federal framework and standards, and would therefore, be in compliance with the Clean Air Act (environmental assessment, section 3 – air quality).

### *Clean Water Act*

Integrated project design features (which include implementation of regional and national best management practices) as outlined in the selected alternative would ensure that Colorado State water quality standards and anti-degradation policy continue to be met. Full implementation of best management practices has been shown to be an effective method in preventing and controlling nonpoint source water pollution. Monitoring would be conducted during the project in order to validate implementation and effectiveness of best management practices and assure compliance with the Clean Water Act, Colorado State water quality regulations, and San Juan National Forest plan standards (environmental assessment, section 3 – watersheds).

### *Floodplain Management (Executive Order 11988), Protection of Wetlands (Executive Order 11990)*

Integrated project design features (which include implementation of regional and national best management practices) for floodplains and riparian lands would ensure compliance with Executive Order 11988 Floodplain Management (1977), and Executive Order 11990 Wetland Protection (1977). Riparian lands and floodplains would have a no harvest/no mechanized equipment buffer for their protection. Therefore, there would be no direct impacts to riparian lands or floodplains through the selected alternative (environmental assessment, section 3 - watersheds).

### *Civil Rights and Environmental Justice*

Executive Order 12898 on environmental justice requires federal agencies to identify and address any disproportionately high and adverse human health or environmental effects on minority and low income populations. After evaluating the discussion in the environmental assessment, section 3 - socioeconomics, I have determined that there would be no discernible impacts.

### *The National Historic Preservation Act*

The Forest would comply with section 106 of the National Historic Preservation Act and its implementing regulations at 36 CFR § 800 in accordance with the procedures outlined in Stipulation VI of the Cultural Resource Vegetation Management Programmatic Agreement (USFS 2017).

### Conclusion

After consideration of the environmental analysis documented in the Salter Vegetation Management Project Environmental Assessment and the associated project record, I have determined that alternative 2 – modified proposed action would not have significant effects on the quality of the human environment considering the context and intensity of impacts. Therefore, an environmental impact statement is not warranted and will not be prepared. The selected alternative is consistent with the management direction, standards, and guidelines outlined in the Land and Resource Management Plan. This finding is made based on the context of the project and intensity of effects using the ten factors identified in 40 CFR 1508.27(b).

## Forest Service Objection Process

This draft decision notice will be subject to an objection process pursuant to 36 CFR 218, subparts A and B. Only individuals or entities (as defined by 36 CFR 218.2) who submit timely and specific written comments (as defined by 36 CFR 218.2) about this proposed project or activity during this or another public comment period established by the responsible official will be eligible to file an objection. Other eligibility requirements are defined by 36 CFR 218.25 (a)(3) and include name, postal address, title of the project and signature or other verification of identity upon request and the identity of the individual or entity who authored the comments. Individual members of an entity must submit their own individual comments in order to have eligibility to object as an individual. A timely submission will be determined as outlined in 36 CFR 218.25 (a)(4). It is the responsibility of the sender to ensure timely receipt of any comments submitted.

Comments should be within the scope of the proposed action, have a direct relationship to the proposed action, and must include supporting reasons for the Responsible Official to consider (36 CFR 218.2). Objections, including attachments, must be filed within 45 days from the publication date of the legal notice in The Cortez Journal, the newspaper of record. Objections or attachments received after the 45-day objection filing period will not be considered. The publication date in the newspaper of record is the exclusive means for calculating the time to file an objection. Those wishing to object this project should not rely upon dates or timeframe information provided by any other source (36 CFR 219.56 (b)(3)).

Objections should be submitted to Objection Reviewing Officer, Forest Supervisor Kara Chadwick, San Juan National Forest. Electronic submissions are preferred and may be submitted at http://www.fs.fed.us/nepa/nepa_project_exp.php?project=57671.

Electronically submitted objections must be in plain text (.txt), Word (.doc or .docx), Portable Document Format (.pdf), or Rich Text Format (.rtf) file formats.

Objections may also be mailed or hand delivered to: Objection Review Officer: Forest Supervisor Kara Chadwick, San Jun National Forest, USDA Forest Service, Attn: 1570 Objections, 15 Burnett Court, Durango, CO 81301. The fax number is 970-375-2331. Please include in the heading of the fax: Forest Supervisor, Attn: 1570 Objections. Objections delivered by mail must be postmarked no later than the last day of the 45-day objection filing period. At this time, the building is closed, therefore, those who wish to send an objection via hardcopy mail or fax must contact Mark Lambert at 970-799-2331 or

mark.b.lambert@usda.gov to ensure their objection is received. Also, due to the building closure, those submitting hand-delivered objections must contact Mark Lambert in advance, to make an appointment.

## Implementation

If no objections are filed within the 45-day time period, implementation of the decision may occur five business days following the last day of the objection period. When objections are filed, implementation may occur immediately following the date that all concerns and instructions identified by the Reviewing Officer in the objection response have been addressed (36 CFR 218.12(b)),

For further information concerning the Salter Vegetation Management Project, contact David Casey, Supervisory Forester, at David.casey2@usda.gov; or 970-882-6830 during normal business hours.

## Responsible Official

The District Ranger of the Dolores Ranger District of the San Juan National Forest is the official responsible for deciding the type and extent of management activities in the Salter Vegetation Management project area.

Approved by:

____________________________________ ____________________

DEREK PADILLA Date
District Ranger
Mancos-Dolores Ranger District
San Juan National Forest

We make every effort to create documents that are accessible to individuals of all abilities; however, limitations with our word processing programs may prevent some parts of this document from being readable by computer-assisted reading devices. If you need assistance with any part of this document, please contact the San Juan National Forest at (970) 247-4874.

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at http://www.ascr.usda.gov/complaint_filing_cust.html and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer, and lender.

Case No. 1:23-cv-01501-RMR Document 15-6 filed 09/29/23 USDC Colorado pg 25 of 278



# Forest Service News Release

**Media Contact:**
Lorena Williams
(970) 422-2939
lorena.williams@usda.gov

## Dolores Ranger District releases draft decision notice on Salter Vegetation Management Project

*Objection period begins June 23rd, 2021*

**DOLORES, Colo., June 23, 2021**— The Dolores Ranger District of the San Juan National Forest has released the Salter Vegetation Management Project Final Environmental Assessment, Finding of No Significant Impact, and the Draft Decision Notice. The objection period opens June 23rd, 2021, for those who have previously submitted comments regarding the proposed project.

The Salter Vegetation Management Project is located on the Dolores Ranger District in the vicinity of Salter Y, Plateau Creek, Carlyle Point, Turkey Knoll, and Boggy Draw. The analysis area covers approximately 35,000 acres of forested areas on mesa tops and canyons within the Dolores River watershed. The Forest Service is proposing to treat approximately 22,346 acres of the ponderosa pine-Gambel oak vegetation type to 1) improve resilience and maintain the resistance and adaptability of forest ecosystems in an effort to increase protection against epidemic insect and disease outbreaks, 2) increase the structural diversity of the ponderosa pine forest represented across the landscape, and 3) provide economic support to local communities by providing timber products to local industries in a sustainable manner. Proposed activities include a combination of timber harvest, tree planting, and activity fuel burning to achieve the project purpose.

The final Draft Decision Notice, Final Environmental Assessment, and Finding of No Significant Impact are available online at the project webpage. The project webpage is also where electronic objections may be submitted: https://www.fs.usda.gov/project/?project=57671. These documents are also available for review at the Dolores Ranger District office.

As described in the Draft Decision Notice, it is the responsible official's intent to implement Alternative 2 (Modified Proposed Action), which is described in the Environmental Assessment for the *Salter Vegetation Management* project. Objections will only be accepted from those who have previously submitted specific written comments regarding the proposed project during scoping or other designated opportunities for public comment. Issues raised in objections must be based on previously submitted specific written comments regarding the proposed project, unless the issue is based on new information that arose after the opportunities to comment. Objections, including attachments, must be filed (electronic, regular mail, fax, email, hand-delivery, express delivery, or messenger service) with the appropriate reviewing officer within 45 days following the publication of this legal notice on June 23, 2021 in the Cortez Journal. Objection instructions can be found on the project web page.

For additional information on the proposed Salter Vegetation Management Project, contact David Casey with the Dolores Ranger District at (970) 882-7296 or by email at david.casey2@usda.gov.

All offices on the San Juan National Forest are currently conducting business and providing services virtually. For information on the San Juan National Forest, call (970) 247-4874, visit the forest website, or follow us on social media (Twitter and Facebook).

**-USDA-**

USDA is an equal opportunity provider, employer, and lender.

Dear Interested Party,

The Dolores Ranger District of the San Juan National Forest has released the Final Environmental Assessment (EA), Finding of No Significant Impact (FONSI) and Draft Decision Notice (DN) for the Salter Vegetation Management project. As described in the Draft Decision Notice, it is the responsible official's intent to implement Alternative 2 (Modified Proposed Action) as described in the Environmental Assessment for the Salter Vegetation Management project. The final EA, FONSI, and Draft DN are available on-line at: https://www.fs.usda.gov/project/?project=57671. These documents are also available for review at the Dolores Ranger District office.

Regulations at 36 CFR 218 provide for a pre-decision administrative review rather than a post- decision appeal process. At this time, I am releasing a DRAFT decision. The Salter Vegetation Management project is subject to the objection process pursuant to 36 CFR 218, subpart A and B. Objections will only be accepted from those who have previously submitted specific written comments regarding the proposed project during scoping or other designated opportunities for public comment in accordance with §218.5(a). Issues raised in objections must be based on previously submitted specific written comments regarding the proposed project, unless the issue is based on new information that arose after the opportunities to comment (§218.8[c]).

Objections, including attachments, must be filed (regular mail, fax, email, hand-delivery, express delivery, or messenger service) with the appropriate reviewing officer within 45 days following the publication of this legal notice in the Cortez Journal (scheduled to publish on June 23, 2021). The publication date in the newspaper of record is the exclusive means for calculating the time to file an objection. Those wishing to object should not rely upon dates or timeframe information provided by any other source. The regulations prohibit extending the time to file an objection. It is the objector's responsibility to ensure timely filing of a written objection with the reviewing officer.

Objections should be submitted to Objection Reviewing Officer, Forest Supervisor Kara Chadwick, San Juan National Forest. Electronic submissions are preferred and may be submitted at http://www.fs.fed.us/nepa/nepa_project_exp.php?project=57671.

Electronically submitted objections must be in plain text (.txt), Word (.doc or .docx), Portable Document Format (.pdf), or Rich Text Format (.rtf) file formats.

Objections may also be mailed or hand delivered to: Objection Review Officer: Forest Supervisor Kara Chadwick, San Jun National Forest, USDA Forest Service, Attn: 1570 Objections, 15 Burnett Court, Durango, CO 81301. The fax number is 970-375-2331. Please include in the heading of the fax: Forest Supervisor, Attn: 1570 Objections. Objections delivered by mail must be postmarked no later than the last day of the 45-day objection filing period. At this time, the building is closed, therefore, those who wish to send an objection via hardcopy mail or fax must contact Mark Lambert at 970-799-2331 or mark.b.lambert@usda.gov to ensure their objection is received. Also, due to the building closure, those submitting hand-delivered objections must contact Mark Lambert in advance, to make an appointment.

You may obtain additional information about this project by calling David Casey, Supervisory Forester, at (970) 882-7296 or by email at david.casey2@usda.gov. Names and addresses of objectors will become part of the public record. All objections are available for public inspection during and after the objection process and may be released under the Freedom of Information Act.

Thank you for your interest in the project and the management of the San Juan National Forest.

---

Update your subscriptions, modify your password or email address, or stop subscriptions at any time on your Subscriber Preferences Page. You will need to use your email address to log in. If you have questions or problems with the subscription service, please contact subscriberhelp.govdelivery.com.

This service is provided to you at no charge by US Forest Service.

This email was sent to Email Address using GovDelivery Communications Cloud on behalf of: USDA Forest Service · 1400 Independence Ave., SW · Washington, DC 20250-0003 · 1-800-832-1355

FS-001977

Dolores, Colorado

From:
Town of Dolores
420 Central Avenue
PO Box 630
Dolores, CO 81323

TO:
U.S Department of Agriculture
Forest Service
Dolores Ranger District
San Juan National Forest
29211 Hwy 184
Dolores, CO 81323

RE: Objection to Forest Health - Salter Vegetation Management Project #57671

7.28.21

Mayor Chad Wheelus, Town of Dolores Date

This will serve as the formal objection from the Town of Dolores with the Salter Y EA and the amount of total projected heavy commercial traffic use of the FS Rd 526 to CR 31 with final exit from the Salter Y area through the town of Dolores via 11th Street. These objections were presented to the SJNF during the comment phase of the Draft EA on or around March 13, 2021.

**"Safety, Noise and Impacts to Residents**

- We ask that more specific data on how speed limits and slow down signage will be posted and enforced for contractors and the public.
- The speed limit at the point where Montezuma County Road 31 and where it becomes a town road on 11th Street is 15 m.p.h. We request this information be made known to contractors and that contractors are notified that this speed will be enforced.
- We request that the Forest Service require contractors to have Jake Brake mufflers on all applicable trucks.
- To prevent project truck traffic from using town roads other than 11th Street, we request the Forest Service work with the town to designate a truck route.
- To alleviate disturbances to residents, we request the Forest Service work with the town to notify industry that truck traffic will be limited on town streets to certain times of the day. The Town will not be allowing commercial truck traffic on 11th street from 10 pm to 6 am throughout the duration of the Salter Y project".

Contacts for the Town of Dolores objection are Mayor Chad Wheelus chad@townofdolors.com and Town Manager Ken Charles manager@townofdolores.com.

At the outset the Dolores Town Board of Trustees appreciates the additional efforts of the Forest Service in increasing communication regarding trail availability particularly in the Boggy Draw area. As stated by the Town previously, Boggy and the whole Glade area is a large economic partner to the Town of Dolores and

any impacts or information that can be developed is valued and greatly appreciated. The Town would also like to recognize the thoughtful efforts made regarding no hauling during recreational compartments that are economically important to the town of Dolores. The additional development of larger and more concise information centers and partners to ensure public awareness and continued access to recreational areas on Boggy Draw is also greatly appreciated.

This objection from the town is primarily around the Dolores Districts lack of effort or commitment to aid in the redistribution of commercial hauling traffic utilizing the 11th street route in the total project hauling expectations. The Town's concern is safety and noise.

The Town would like to restate that we will continue to strongly urge the Dolores District office to discover and pursue the development and use of alternative routes to the FS road 526, CR 31 which transitions to 11th street in town. Town officials were informed by the Dolores District office that approximately 75% of the total commercial hauling traffic would be using this route. This is a high volume of traffic over a long period of time and 11th street is adjacent to critical population areas such as Central Avenue and the elementary drop off and pickup up location of the local school.

Without any additional cooperation from the Dolores District office in diversification of commercial hauling traffic to alternative routes, currently town officials will be seeking to mitigate this traffic volume by restricting 11th street commercial traffic from 10 p.m. to 6:00 a.m. every evening, reducing speed limits to 20 miles per hour and requiring every hauling vehicle to use mufflers to reduce noise pollution. Following is a section from the Town of Dolores Model Traffic Code. The town requests that the following language be inserted into the bid documents or guidance materials for harvest contractors. If it is not possible to insert this language, then we would request the Forest Service ask as a courtesy, that the truck drivers "slow" down and use or not use their jake brakes. This could be discussed during the pre-work meeting and as the sale progresses.

We understand that in lieu of the Forest Service unable to address the Town's objections, it will fall to the Town of Dolores to mitigate the valid concerns stated above.

**Dolores Municipal Code-Model Traffic Code Section 2-225. Mufflers - prevention of noise.**
(1) Every motor vehicle subject to registration and operated on a highway shall at all times be equipped with an adequate muffler in constant operation and properly maintained to prevent any excessive or unusual noise, and no such muffler or exhaust system shall be equipped with a cut-off, bypass, or similar device. No person shall modify the exhaust system of a motor vehicle in a manner which will amplify or increase the noise emitted by the motor of such vehicle above that emitted by the muffler originally installed on the vehicle, and such original muffler shall comply with all the requirements of this section.
(1.5) Any commercial vehicle, as defined in section 235 (1) (a), subject to registration and operated on a highway, that is equipped with an engine compression brake device is required to have a muffler.
(2) A muffler is a device consisting of a series of chamber or baffle plates or other mechanical design for the purpose of receiving exhaust gas from an internal combustion engine and effective in reducing noise.
(3) Any person who violates subsection (1) of this section commits a class B traffic infraction. Any person who violates subsection (1.5) of this section shall, upon conviction, be

punished by a fine of five hundred dollars. Fifty percent of any fine for a violation of subsection (1.5) of this section occurring within the corporate limits of a city or town, or within the unincorporated area of a county, shall be transmitted to the treasurer or chief financial officer of said city, town, or county, and the remaining fifty percent shall be transmitted to the state treasurer, credited to the highway users tax fund, and allocated and expended as specified in section 205 (5.5)(a), C.R.S.

The town is aware that the District Office can develop other routes and or stipulate in industry contracts that these regulations be followed. Any effort on the Dolores Districts part to reduce the percentage of the total project commercial hauling traffic to under 50% on this route would enable the Town to also monitor and seek to modify regulations on the use of 11th street to access Highway 145. The Town considers the Dolores District office a valuable neighbor and looks forward to continuing dialogue and efforts in meeting this requested mitigation to aid the Town in maintaining public health and safety throughout the lifetime of this project.

420 Central Ave, P O Box 630 Dolores, CO. 81323
Ph. 970-882-7720 fax. 970-882-7466
https:// townofdolores.colorado.gov

**Intermountain Forest Association**
886 S. Charlo Drive Pueblo West, CO 81007
928-521-9476

August 4, 2021

Objection Review Officer
Forest Supervisor Kara Chadwick
San Juan National Forest
ATTN: 1570 Objections
15 Burnett Court
Durango, CO 81301

SUBMITTED VIA ONLINE:
http://www.fs.fed.us/nepa/nepa_project_exp.php?project=57671

SUBJECT: Salter Vegetation Management Project

Dear Ms. Chadwick:

Intermountain Forest Association (IFA) is a member-based organization that advocates for healthy forests and healthy communities, including actively promoting sound forest management that provides a stable and sustainable supply of timber from public and private forestlands. Given that several of IFA's members heavily rely on timber output from the San Juan National Forest, we are very supportive of the Salter Vegetation Management Project on the Dolores District. Recognizing the importance of being involved with the process, IFA submitted comments on the scoping and Draft Environmental Analysis. Therefore, having standing as outlined in 36 CFR Part 218, subparts A and B, we submit the following objections to the Draft Record of Decision and the final Environmental Assessment:

**<u>Environmental Assessment</u>**
***<u>Project Design Features</u>***

- Fuels
  - #6 - We object to this feature as written as we feel it is too restrictive and will be economically infeasible to implement. We request an average depth of 2 feet for lop and scatter.

- Rare Plants and Invasive Species
  - #6 - We object to this feature as written as it is not clear how it will be implemented on the ground or how it will affect sales once they have been sold. We request additional clarification be discussed and potentially added to ensure this design feature is feasible on the ground.
- Recreation and Public Safety
  - #3 – we object to this feature as written and request language be added that details, if needed, this will be responsibility of the Forest Service.
  - #6 – we object to this feature as written and request additional language be added that details, if needed, this will be the responsibility of the Forest Service.
- Scenery
  - #5 – we object to this feature as written and request language be added that states seeding will only be required "if needed."
- Transportation
  - #7 – we object to this feature as written and request language be added that details, if needed, this will be the responsibility of the Forest Service.

**Draft Decision Notice**
We fully support the decision to implement Alternative 2 with modifications (modified proposed action). We feel it is critical to be able to utilize the full silviculture system designated by the Land and Resource Management Plan to achieve the objectives of the project. We do not support a diameter cap or having areas exempted from treatment as case studies (similar to the Lone Pine project).

We forward to working with you to resolve the issues discussed above as you move forward with the Salter Vegetation Management Project.

Sincerely,

*Molly Pitts*

Molly Pitts
Intermountain Forest Association
Colorado Programs Manger

Montrose Forest Products, LLC
P.O. Box 1149, Montrose, CO 81402 T: (970) 249-0812

August 4, 2021

Objection Review Officer
Forest Supervisor Kara Chadwick
San Juan National Forest
ATTN: 1570 Objections
15 Burnett Court
Durango, CO 81301

SUBMITTED VIA ONLINE:
http://www.fs.fed.us/nepa/nepa_project_exp.php?project=57671

SUBJECT: Salter Vegetation Management Project

Dear Ms. Chadwick:

The following comments are submitted on behalf of Montrose Forest Products including our 93 direct employees and 99 indirect contract loggers/log truckers. We rely heavily on timber output from National Forests in Region 2 of the U.S. Forest Service and specifically from the San Juan National Forest. Therefore, we are very supportive of the Salter Vegetation Management Project on the Dolores District. Recognizing the importance of being involved with the process, Montrose Forest Products submitted comments on the scoping and Draft Environmental Analysis. Therefore, having standing as outlined in 36 CFR Part 218, subparts A and B, we submit the following objections to the Draft Record of Decision and the final Environmental Assessment:

<u>**Environmental Assessment**</u>
***<u>Project Design Features</u>***

- Fuels
    - #6 - We object to this feature as written as we feel it is too restrictive and will be economically infeasible to implement. We request an average depth of 2 feet for lop and scatter.
- Rare Plants and Invasive Species
    - #6 - We object to this feature as written as it is not clear how it will be implemented on the ground or how it will affect sales once they have been

sold. We request additional clarification be discussed and potentially added to ensure this design feature is feasible on the ground.

- Recreation and Public Safety
  - #3 – we object to this feature as written and request language be added that details, if needed, this will be responsibility of the Forest Service.
  - #6 – we object to this feature as written and request additional language be added that details, if needed, this will be the responsibility of the Forest Service.
- Scenery
  - #5 – we object to this feature as written and request language be added that states seeding will only be required "if needed."
- Transportation
  - #7 – we object to this feature as written and request language be added that details, if needed, this will be the responsibility of the Forest Service.

**Draft Decision Notice**

We fully support the decision to implement Alternative 2 with modifications (modified proposed action). We feel it is critical to be able to utilize the full silviculture system designated by the Land and Resource Management Plan to achieve the objectives of the project. We do not support a diameter cap or having areas exempted from treatment as case studies (similar to the Lone Pine project).

We forward to working with you to resolve the issues discussed above as you move forward with the Salter Vegetation Management Project.

Sincerely,

*Tim Kyllo*

Tim Kyllo
Resource Forester

PO Box 824
Durango, CO 81302
August 6, 2021

Objection Review Officer: Forest Supervisor Kara Chadwick
San Juan National Forest
USDA Forest Service
Attn: 1570 Objections
15 Burnett Court
Durango, CO 81301

Dear Objection Review Officer Chadwick,

I am writing to object to the Final Environmental Assessment, Finding of No Significant Impact, and Draft Decision Notice for the Salter Vegetation Management Project (Final EA hereafter). I am the "Lead Objector" and the only objector represented by this letter. This project is proposed on the Dolores Ranger District of the San Juan National Forest and the responsible official is Derek Padilla, Dolores District Ranger.

The following are my specific concerns at Scoping (Part A) and comments on the Draft EA (Part B). The Draft and Final EAs ignored 16 of 17 scientific concerns I raised about this project, and 12 of the 13 scientific sources that I submitted as the basis for these concerns. One scientific concern (A3) was insufficiently addressed, as explained below.

Thus, I object to the fact that my 17 scientific concerns, reproduced below, were completely ignored (16 of 17) or insufficiently addressed (1 of 17); indeed my scoping comments were twice completely ignored. And I object to the fact that 12 of the 13 published scientific sources I cited in my comments on Scoping and the Draft EA were not reviewed or cited in the Final EA. This is a large body of relevant scientific evidence for which there was no hard look. Lack of citation or discussion of these sources shows there was no look at all, even though required by NEPA.

The result is a document (Final EA) and draft ROD that are not adequately based on science, not congruent with the San Juan National Forest Land and Resource Management Plan (LRMP), and that do not show the public that the proposed action can actually accomplish the Purpose and Need.

Below I reproduce the 17 scientific concerns as they were presented on the Draft EA (Part A) and at Scoping (Part B), add an August 6, 2021 update to A3, and at the end (Part C) I suggest possible remedies.

**PART A. Comments I provided on the Draft EA that were not addressed in the Final EA.**

**A1. The Draft EA does not adequately meet the requirements of the 2013 San Juan National Forest Land and Resource Management Plan (LRMP). The Draft EA does not fully: (1) set the project within the LRMP Sustainable Ecosystem Strategy (LRMP 2.1.1), (2) incorporate Disturbances and the Historical Range of Variability (LRMP 2.1.2), (3) adequately use Ecosystem Management (LRMP 2.1.4), or (4) meet the only timber objective for ponderosa pine forests (LRMP 2.9.5a).**

First, the LRMP Sustainable Ecosystem Strategy (LRMP 2.1.1) explains that "Ecological sustainability is intended to provide the ecological conditions that maintain or restore the diversity of native ecosystems and natural disturbance processes...When applied effectively, the sustainable ecosystems strategy will result in ecological conditions similar to those under which native species evolved" (p. 13). The Draft EA is not consistent with this strategy because it does not specifically explain in detail how the proposed project will "provide the ecological conditions that maintain or restore the diversity of native ecosystems and natural disturbance processes." There is no mention of "restore" anywhere in the Draft EA except on p. 8, where past restoration was mentioned. Please add a new section in the Final EA, which explains in detail how the proposed actions will "maintain or restore" the project area's ponderosa pine ecosystems. Please specifically cite and review in this new section the key peer-reviewed scientific evidence about how ecological restoration relative to the HRV is to be accomplished, and implement changes in the project so that proposed actions clearly "maintain or restore the diversity of native ecosystems" in the project area. These key scientific sources, that need to be cited, reviewed, and used include, at a minimum, in addition to sources already used in the Draft EA (e.g., Baker 2018): Covington and Moore (1994), Allen et al. (2002), Romme et al. (2009), and Baker (2020).

Second, the LRMP section on Disturbances and the Historical Range of Variability (LRMP 2.1.2) explains that the Historical Range of Variability (HRV) "is an important concept used in the LRMP to guide the management of ecosystems and to achieve ecosystem sustainability...The HRV is then used to evaluate the current ecological conditions of ecosystems on TRFO and SJNF lands by comparing them to the ecological conditions that occurred during the reference period" (p. 14). This is not sufficiently implemented in the Draft EA: (1) there is only one paragraph copied from the LRMP (2.2.23) that describes the HRV in a general and qualitative way, with insufficient citation and use of published scientific sources, (2) there is no specific review of details about forest structure under the HRV, yet forest structure is the ecosystem component that will be most affected by the proposed actions, and (3) there is no detailed comparison of current forest structure and other ecological conditions to the forest structure and other ecological conditions that occurred under the HRV during the reference period. Scientific sources with this essential detailed evidence about HRV for forest structure in the study area are Romme et al. (2009) and Baker (2020). More general scientific information about HRV in southwestern ponderosa pine forests is available in many regional scientific publications (e.g., Covington and Moore 1994, Allen et al. 2002). The Final EA needs to review, present, and use this scientific evidence about the HRV relative to the same measures in current forests, from CSE data, to reformulate the project around restoring these forests so they are within the HRV, as is required by the LRMP.

Third, the LRMP section on Ecosystem Management (LRMP 2.1.4) explains that: "Ecosystem management on SJNR and TRFO lands, which uses the HRV for reference, will be implemented by maintaining or restoring the composition (plant species, animal species, and vegetation types), structure (size, density, and arrangement of live and dead vegetation, stream channel attributes) function (ecological processes and disturbances), and physical environment (soils, water, and geomorphology) of ecosystems" (p. 15). However, there is no reference at all in the Draft EA to "maintaining or restoring" or "HRV," nor is the project formulated relative to these requirements in the LRMP. The Final EA must enact Ecosystem Management by explicitly using these terms, fully elaborating the details of the HRV, particularly regarding the details of forest structure (e.g., tree density, basal area, size-class distributions, age-class distributions etc.), and explicitly restoring these forests so after harvesting they are within the HRV, with median and variability in

forest structure that is close to median and variability in forest structure under the HRV (i.e., details in Baker 2020). The Final EA must explain and document in detail how the proposed actions will maintain or restore forest structure, in particular, and other components of the HRV.

Fourth, the LRMP section on timber shows that this project is not consistent with the Forest Plan. The LRMP lists the following objective for ponderosa pine forests (2.9.5a on p. 81), and this is the only objective listed for ponderosa pine forests: "Within 10 years, conduct thinning–with an emphasis on restoration and fuels reduction of altered forest types–in the ponderosa pine and warm-dry mixed conifer vegetation types on approximately 15,000 to 20,000 acres of SJNF lands" First, this much harvesting has already been authorized in the Lone Pine project, so Salter would substantially exceed this specified timber harvesting acreage limitation in the LRMP. Second, neither Lone Pine nor Salter emphasize restoration and fuel reduction; they are instead like old-style commercial timber harvests of the pre-1990 era (before ecosystem management was declared on National Forests) when large trees were commonly logged. Commercial timber harvesting that maximizes sustained yield of timber products, rather than undertakes restoration and fuel reduction are serious departures from this specified objective for ponderosa pine in the LRMP. Please redo the goals, methods, and scale of this project so that they are specifically designed only for "restoration and fuels reduction" and the total area in Lone Pine and Salter together do not exceed the specified 15,000 to 20,000 acres over 10 years.

Fifth, the proposed alternative does not follow the LRMP and must be changed to follow it. I have heard SJNF officials several times make it clear that the LRMP must be followed, and can only be changed by amendment, which is unlikely to be a common practice. Kara Chadwick and Derrick Padilla both told us this during the development of the CFLRP proposal in January 2020. Kara Chadwick restated this during a recent collaborative training session with Jessica Western.

**A2. The DWRF document "Resilience Metrics and Desired Conditions - Vegetation - Ponderosa Pine - 10-29-20" is not reviewed or used in the Draft EA.** This document lists multiple metrics of forest structure at both stand and landscape scales that should all be reported and explained as informing desired conditions. The SJNF is a member of DWRF and accepted these resistance and resilience metrics as desirable conditions for the DWRF area, which includes this Salter project. Please explain in detail in the Final EA how these metrics will be addressed.

**A3. The Single Tree Selection (p. 13-14) harvesting diameter limit of 26.9" is far too high, given the LRMP requirement to restore and maintain ponderosa pine forests using the HRV, as explained in A1 above, and evidence from peer-reviewed scientific reconstruction of the HRV for an area including the project area, and regional established science.**

**A3.1**. **This proposed 26.9" dbh limit is not congruent with the LRMP**, which requires an emphasis on restoration or maintenance of forest structure under the HRV, as explained in A1 above. No scientific evidence is presented in the Draft EA that restoration or maintenance requires harvesting trees up to 26.9" dbh, and the best available evidence was not reviewed.

The best available scientific evidence for the project area shows harvesting trees up to 26.9" dbh will move stands in the Salter area further outside the HRV, and will not restore these forests, as required by the LRMP. Baker (2020), which presented the only detailed reconstruction of ponderosa pine diameter distributions under the HRV for an area that includes the project area, was not even cited in the Draft EA, and thus not used at all. I specifically requested in my

Scoping comments that this published, peer-reviewed scientific source be reviewed and used. Baker (2020) showed in Table 9 (p. 16) that 46.8% of ponderosa pine trees under the HRV were > 15.7" (40 cm) dbh and 33.1% were > 19.7" (50 cm). I calculated, using SJNF Common Stand Exam (CSE) data from the SJNF for the 16,997 trees in 394 active stands in the Salter project area, that only 42% of current trees are > 16" dbh and only 20% of current trees are > 20" dbh, thus there is a 5% deficit of trees > 16" and a 13% deficit of trees > 20" relative to the HRV that would need restoration under the LRMP. Proposed harvesting is not ecological restoration, and would further increase these deficits, not reduce them. Please review this evidence in the Final EA and change the preferred alternative so that it will restore these forests.

These required restorations can only be accomplished by avoiding harvest of trees > 16" dbh, since there is a documented deficit of trees of this diameter and larger in diameter. Note that a 16" diameter cap on harvesting is supported by Allen et al. (2002), a widely cited peer-reviewed scientific synthesis on how to restore southwestern ponderosa pine forests:

> "Ecological restoration should protect the largest and oldest trees from cutting and crown fires, focusing treatments on excess numbers of small young trees. Given widespread agreement on this point, it is generally advisable to retain ponderosa trees larger than 41 cm (16 inches) dbh and all trees with old-growth morphology regardless of size (i.e., yellow bark, large drooping limbs, twisted trunks, flattened tops). Despite the heterogeneity of forest site and stand conditions in the Southwest, cutting of larger trees will seldom be ecologically warranted as ''restoration'' treatments at this time due to their relative scarcity." (Allen et al. 2002, p. 1425).

**A.3.2. The proposed harvesting is not congruent with well-established scientific methods of ecological restoration of ponderosa pine forests in the Southwest, which leave <u>all</u> presettlement trees (e.g., Moore et al. 1999, Allen et al. 2002), which also requires a 16" diameter cap at Salter. And, these trees are potential old growth, which, under the LRMP, should not be logged.**

In 394 active stands with CSE data in the project area, obtained from Mark Roper in December 2020, I found 16,997 trees, but only 224 with ages. I corrected dbh ages to basal age by adding 15 years, based on the CSE data. Of the 224 ages, 10 were > 140 years, having originated in or before ca 1880, a reasonable estimate of the year of settlement by non-Indian people. Thus, the age sample shows that 4.46% of trees > 5" dbh in the project area likely would be pre-settlement trees. I do not have an estimate of current tree density for trees > 5" dbh in the Salter area, but assuming it averages 221 trees/acre over 25,000 acres and 4.46% are presettlement trees, that would be a very large number of trees, about 246,925, about half of which would be harvested under the preferred alternative. My estimate of 221trees/acre is the mean of a forest-wide CSE dataset in ponderosa pine forests. Travis Bruch of the Dolores District has an updated CSE dataset specifically for the Salter area in which only 1.86% of trees of all sizes are estimated to be presettlement. The calculation he gave me in an email is: ".0186 x 570 TPA x 25,000 acres = 265,050 trees." The two estimates are similar, but Bruch's estimate is specific to Salter. Thus, it is reasonable to assume that about half of 265,050 trees, or roughly 132,500 presettlement trees would be harvested under the preferred alternative. Please fully disclose this in the Final EA, and change the preferred alternative to protect all presettlement trees.

Please also report in the Final EA that 140-year-old presettlement trees that survive will become old-growth trees, and some stands would also likely qualify formally as old growth within 20

years, using Mehl's (1992) old-growth definition for southwestern Colorado, just a decade after this project is complete. Also please report that the current extent of formal old-growth ponderosa pine in the San Juan National Forest is well below desired conditions by reporting the current updated numbers. Protecting all these potential old-growth trees, as is required under the LRMP, is another reason that no logging of trees ≥140 years old should occur within the project area.

The LRMP makes it clear that this proposed logging of presettlement trees is not acceptable. In section 2.9.1, it says: "Forest management on SJNF and TRFO lands that results in, among other objectives, meeting needs or demands for forest product offerings...is done in a manner that: maintains or improves ecosystem function, resilience, and sustainability" (LRMP Ch. 2, p. 80). The science is clear that removing large ponderosa pines reduces stand resistance and resilience to fire. Large ponderosa pines have thicker bark that better resists mortality from the heat of fires, large ponderosa have elevated crowns and fewer branches so that they better resist high-severity fires. Higher resistance means that large ponderosa have a better chance of surviving fires and they disproportionately produce the most seed, providing a higher chance of successful regeneration by seed after severe fires or beetle outbreaks. Thus, large ponderosas, including all the 132,500 that are likely to be logged under the preferred alternative, are key to resilience after disturbances (Baker 2009 and many other scientific publications). Harvesting presettlement trees and potential old-growth trees clearly reduces both stand resistance and stand resilience to fires and other disturbances and also reduces these at the landscape scale. Please correctly report these scientific realities, and change the proposed alternative to protect all presettlement trees.

Harvesting presettlement trees for these same reasons and many others is also not supported by the best available science on ecological restoration of ponderosa pine forests in the Southwest (e.g., Moore et al. 1999, Allen et al. 2002). Please revise the project to retain all presettlement trees, as in Moore et al. (1999) and Allen et al. (2002), and as is required by the LRMP.

I estimated from the Dec. 2020 best available (n=224) dataset of tree ages in the Salter area, from Mark Roper, that a 16" diameter cap would be needed to prevent the logging of presettlement trees at Salter. There are only 10 trees ≥140 years old in the dataset of 224 tree ages and the smallest is 16" dbh. These 10 diameters are: 50", 29", 27", 25", 24", 22", 19", 18", 17", and 16").

Please accordingly cite and review Moore et al. 1999 and Allen et al. 2002 in the Final EA, adopt ecological restoration as required by the LRMP, clearly explain that all presettlement trees will not be logged, and adopt a 16" diameter cap for all harvesting in the Salter project area, as is required by the LRMP and as recommended in the best available science for southwestern ponderosa pine forests (Moore et al. 1999, Allen et al. 2002).

**A3.3. August 6, 2021 update on the treatment of A.3 in the Final EA**

The Final EA proposed using tree size and morphology of pre-settlement trees (≥140 years old) to identify and "avoid harvesting pre-settlement trees." Avoiding the harvest of pre-settlement trees is a very positive addition to the project, but the particular method that is proposed is unfortunately not validated for use in the project area (only in the Colorado Front Range), and, at best, would require that validation be completed in the project area. This method is not validated anywhere specifically for identifying pre-settlement trees (≥140 yrs old), as is proposed in the Final EA, so I doubt it can be validated in the project area for the proposed application.

The Final EA says: "Common stand exam data will be used to establish a likely frequency and typical size of old trees within a stand as a guide for tree markers at the prescription level. Including this type of data in marking guides will help the markers understand which tree sizes within a stand might have the potential of being pre-settlement in age. Combining this data indicator with the more reliable visual characteristics will be used to avoid harvesting pre-settlement trees" (p. 6). Also, the Final EA says: "Old-aged trees will be identified using a combination of physical characteristics including large diameter relative to other trees in the localized area, large diameter branches, irregular crowns, flat tops, tall height and canopy position and bark thickness, color and pattern (Huckaby et al. 2003). When a determination of tree age cannot be made using physical characteristics, these trees will either be retained or assessed and documented at the harvest-unit scale to ensure old-aged trees are retained" (p. 16).

Huckaby et al. (2003) divided trees into three categories (< 150 years old, 150-200 years old, and > 200 years old) and used crown shape, live crown ratio, branches, trunk shape, bark, and likely injuries (Huckaby et al. 2003 Table 1). They indicate that "at about 200 year of age, ponderosa pine trees begin to take on distinctive physical characteristics as the result of physiological changes" but some "may look old earlier" (p. 18). This does not suggest that it will be possible to use the Huckaby et al. method to identify trees > 140 years old. Huckaby also describe trees that are "less than 150 to 200 years old" (p. 20), but they do not find that trees >150 years old can be definitively distinguished from trees that are younger, and they also do not suggest in any way that trees >140 years (presettlement in the project area) can be distinguished from younger trees. In our case at Salter, this proposed method, which is unlikely to work to identify pre-settlement trees, would have to be validated in a trial with hundreds of trees dated using an increment borer at the same time they are placed into pre- and post-settlement categories using tree morphology. I think it is highly unlikely this would work, but if it can be shown, through this necessary validation, to have high accuracy, then of course it could be used.

Much more reliable is a diameter cap, which is widely supported by science (e.g., Allen et al. 2002) and already validated for use in the study area (Baker 2021). The reliability of this method is why this is a widely used method. I used 1,732 ponderosa pine trees aged in CSE inventories, that included the project area (Baker 2021 Table 6, p. 15), to estimate the diameter at which 90% of ponderosas of a particular age would be protected. For ponderosas ≥140 years old, this is 17.4" dbh. To protect nearly 100% would require a 16" dbh diameter cap, but I suggested that in commercial timber areas, 90% protection could be a reasonable compromise. Note that a 17" dbh diameter cap would also protect about 80% of trees ≥120 years old, which Baker (2021) identified as the best source of future old growth, which need protection to meet the LRMP.

The Final EA argues that past diameter caps "limited prescriptions in meeting the full intent for uneven aged management and economically stable harvests by removing the option for the silviculturist to establish the diameter limit based on conditions on the ground and desired future conditions," (p. 8). However, the LRMP makes it clear that it is the desired future condition, based on the HRV, that determines the harvesting prescription, not the other way around. There is no basis in the LRMP (see A.3.1 above) for simply choosing an arbitrary harvesting prescription (e.g., uneven aged) instead of basing the harvesting prescription on the need for the forest to be restored so it is within the HRV. The Salter area is deficient in large and old trees. I suggest it would be satisfactory to protect 90% of them using a 17" diameter cap. Uneven-aged criteria can then simply be applied to trees <17" dbh, which will allow the forest to be restored to the HRV. Please change the decision to this.

**A4. Brush thinning (p. 16) need is not supported by data and is not "limited."** This section implies brush thinning will be limited by the use of the phrase: "there may be instances" but Table 2 p. 13 indicates limited use is not the case, as this table says "no more than 5,000 acres," which is certainly not limited to just "instances."

Please restrict this treatment to no more than 500 acres, which could be considered "limited," while 5,000 acres is not limited under any definition. Please first present evidence from CSE data that there is a need for this treatment, and, if so, where is the need. Also, please omit all use of mastication, as this can lead to holdover fires from smoldering combustion, and mastication does not replicate any natural process in these ecosystems, thus is definitely not restorative.

**A5. The review of environmental effects in Section 3 on Fuels and Fire Management (p. 35) shows that fires have already accomplished much of the desired reduction in basal area and brush thinning, suggesting the proposed actions should be omitted where fires have occurred.** Since the Forest Plan requires "restoration" and fires are generally inherently restorative, the Draft EA must present compelling detailed evidence (current tree density and basal area versus tree density and basal area under the HRV, current shrub density versus shrub density under the HRV), by treatment unit, that show why any further removal of trees or any reduction in shrub density beyond reductions from fires is needed to restore treatment units that have burned. Show the CSE estimates of tree density, basal area, and diameter distributions for burned units relative to units that have not burned, so that it is clear whether further treatment is needed or not needed to restore these units so they are congruent with the HRV.

**A6. The Draft EA has the spatial structure component of restoration incorrect throughout.** The correct terms in the science are not "group, clump and individual structure" (p. 12, 15), but instead "individual, clump, and opening" (ICO; Churchill et al. 2013). It is important to have small openings inside stands in addition to individual trees not in clumps, and also the clumps. If there is another scientific source for the group vs. clump distinction used in the Draft EA, then cite and explain it, but in any case also include "opening" as an additional component. Otherwise, change all references to the science use of the ICO terms and cite Churchill et al.

**A7. The Draft EA needs to add monitoring of restoration of spatial structure.** Table 5, p. 29 needs to list that restoration of spatial structure using the ICO method (Churchill et al. 2013) will be monitored using pre- and post-harvest and pre- and post-prescribed fire plots.

**A8. The Draft EA needs to provide scientific sources for "Conditions Influencing Silvicultural Treatments" (p. 16).** Stand diameter index is not explained, nor is there any scientific source for its use–those must be supplied or this left out as a criterion. What is the scientific source for the 80 basal area criterion? If there is none, it must be left out.

**A9. The Draft EA says that "Forest inventory has shown one of the underrepresented size class components in these stands is seedlings" (p. 16), but presents no data, and does not evaluate this relative to the HRV as is required by the LRMP.** Please analyze the CSE data and present seedling and sapling densities per acre on a map or in a table by stand and treatment unit. I can see that this is easily calculated in the CSE data. The Final EA must specifically show, using CSE data, that seedlings are "underrepresented" relative to the HRV, as that is the LRMP standard for whether there is a need for them to be restored. To meet this standard, it is essential

to present the evidence in Baker (2020), which shows from multiple sources that ponderosa pine regeneration was typically poor or very sparse in the area under the HRV. Promoting too many seedlings relative to the HRV could set these forests up for excessive future tree density.

**A10. Proposed treatment of noxious weeds and invasive species (p. 22) does not attempt to reach desired conditions, and formal monitoring is needed.** The desired-condition summary on p. 10 says "Invasive plant species are absent or rare," but the proposed treatment on p. 22 only proposes "to prevent further spread." Cheatgrass and Kentucky bluegrass have become common and even abundant in parts of the ponderosa pine forests of the SJNF. The LRMP clearly requires that if they are found to even be just "rare," then there must be explicit treatment to remove these invasive species. It definitely is not acceptable under the LRMP to simply leave invasive species at any level–please change this section to be very clear that if invasive species are found in any part of the project area, they must be removed, and any activity that would spread them must be stopped or fully mitigated. The desired condition is none, and the proposed action must use all available means to achieve this. Also, since harvesting activities definitely can disturb vegetation and soils in ways that may increase invasive species, it is essential to set up a formal monitoring procedure to collect pre-harvesting and post-harvesting as well as pre-fire and post-fire data.

**A11. Reasons given for preferring Alternative 2 over Alternative 3 are not valid relative to the LRMP.** The DraftEA explains why Alternative 2 is preferred over Alternative 3 in a series of statements: (1) "Application of a 20-inch diameter limit would reduce the prescription effectiveness and consequently limit movement toward desired conditions as described in the Land and Resource Management Plan," (2) "Large tree retention limits the ability to fully utilize the silviculture systems designated by the Land and Resource Management Plan," and (3) "Basal area retention goals and uneven-aged characteristics are being compromised, leaving stands less resilient and making long term resistance less likely to occur" (p. 59).

These are not valid arguments. The silvicultural system, under the LRMP, does not determine what the forest structure is that is to be left after harvesting–it is clearly the management objectives that determine what the forest structure is: "The silvicultural systems shown, that meet the management objectives for the landscape or individual stands of trees within a landscape can be used..." (LRMP 2.9.14). To determine the management objectives, harvesting in ponderosa pine forests under the LRMP must first be shown to "restore or maintain" forests so they are within the HRV, in the Salter case focusing on forest structure (e.g., tree density, basal area, diameter distributions including large trees, composition etc.). The LRMP clearly requires that management objectives restore or maintain forest structure under the HRV, not forest structure that meets a particular version of an uneven-aged silvicultural system. See Section A1 above for quotes from the LRMP explaining how HRV and restoration determine harvesting goals.

**PART B. Comments I provided at Scoping that were not addressed in the Draft EA or in the Final EA.**

**B1. Please present detailed scientific evidence about current and desired forest conditions in the project area and the differences between these**
I would like to see published scientific evidence about desired forest conditions, in addition to the summary paragraph on p. 10, and detailed evidence about current conditions from analysis of common stand exam data by your office both presented in the Final EA itself that together document that the following component of the stated need is correct and explains in detail the

differences with the desired condition:

> "A comparison based on common stand exams, Forest Vegetation Simulation modeling, and field observation between the current and desired conditions shows that the condition of the ponderosa pine cover type found within the Salter Vegetation Management activity area is different from the desired conditions associated with that vegetative cover type in the San Juan National Forest Land and Resource Management Plan" (p. 11 Salter Draft EA).

The desired conditions are just a qualitative summary paragraph. Please in the Final EA analyze and present current forest conditions in the Final EA by treatment unit. For analysis of current conditions, please present in the Final EA figures, tables, and maps showing tree density, basal area, tree species composition, diameter distributions by species by at least 2" size classes, and also present summary data for trees per acre above 16", 18", and 20" dbh, and presence of seedlings and saplings separately for each treatment unit across the project area and overall for the project area. These should be derived from analysis of the CSE data in the project area. You can average or find the median for each variable within a treatment unit or polygon and present it as a label on a GIS map showing each unit. You can show the variability in each variable (e.g., tree density) by presenting a table showing the standard deviation, coefficient of variation, and the quartiles of the distribution of each variable within each treatment unit and across the project area. See Baker (2020 Table 6 on p. 12) for examples of this kind of table showing variability.

However, where there is significant variability across a treatment unit because of variability in past logging, fires, beetle outbreaks, or other significant past disturbances, it would be better to break these up into separate treatment units, or at least present these same analyses for these distinct parts of treatment units.

The following components of desired conditions for Ponderosa Pine Forests presented on p. 10 of the Draft EA are apparently not provided by CSE data. Please collect new data about current variability in these across the project area and present these data in the Final EA:
1. Clumpiness (number of trees per clump, clump area) of ponderosa pine
2. Canopy layers of ponderosa pine
3. Area of openings and percent composition (shrubs, native grasses, native forbs, introduced grasses and forbs) of openings between the clumps. Native grasses should be identified and estimated by species, since the key indicator species are specified in the desired condition.
4. Diameter-class distribution of Gambel oak central stems within patches of shrubs and the area of patches of these shrubs
5. Variability in forest litter depth. I would add that variability in duff depth is also important.
6. Extent of invasive plant species
7. Abundance and size of snags and large wood on the forest floor

Please also present and analyze the recent fire rotation for low-intensity fire in the project area using MTBS (Monitoring Trends in Burned Area) and SJNF fire records. Fire rotation, which is the estimated time to burn once across a land area, is calculated as the time period of observation / (sum of area burned by all fires that burned at low intensity/project area). For example, if the period of observation is 1980-2020, the area burned at low intensity over this period was 7,000 acres and the project area is 35,000 acres, then the fire rotation is 40 years/(7,000/35,000) = 200 years. Further explanation, if needed, is in Baker (2009). This estimate of the current rate of

burning is essential for comparison with desired conditions and planning future burning.

To provide comparable analysis of desired conditions, please present identical details and scientific evidence for the same forest variables
Please present estimated means, medians, and distributions etc. for desired conditions for all the elements of forest structure and composition described on p. 10 of the Draft EA, which I have also listed in the previous section above.

Please substantiate the scientific basis for each detail of the desired condition by presenting the details from scientific sources already in the Forest Plan, but updated with all available detailed scientific evidence since the Forest Plan. Key scientific sources for the project area must include detailed use of Romme et al. (2009), Baker (2018), and Baker (2020), which are the major scientific sources with abundant ecological information about desired conditions in the project area. I would request that details be presented for each variable in figures, tables, and maps that are otherwise identical to those presented for the modern forest, as explained above.

**B2. Please show exactly how each proposed treatment will achieve each desired condition.**
For example, the pre-commercial thinning description in Table 1 says "thinning...to spacing specifications" whereas the desired conditions (p. 2) say "Tree clumps vary in density from widely spaced large trees to tightly spaced small trees." Since the usual intention of commercial timber operations is to thin to space trees widely so they grow timber faster, how could commercial thinning lead to the desired condition–it seems that it will instead destroy any variable spacing that exists. If the specification had been to use variable-density thinning to explicitly produce clumps containing a specific range of trees within a certain distance, combined with openings etc. then it would have been clear that the proposed treatments will produce the desired condition.

In the Final EA, I would like to see a list of each desired condition, each current condition, and a detailed specification for how a particular treatment will be used to achieve each desired condition. Please put this information in tables and/or figures, and use maps to show where specific treatments will be used.

**B3. Please develop and analyze a feasible alternative that will just meet the minimum needs of Dolores-Montezuma-La Plata County local industry, so that more natural processes can be used to achieve the remainder of the desired ecological conditions. This could be called an Economy and Ecology alternative or something else that explains it briefly.**
I would like to see answered in the Final EA what is the minimum commercial timber production necessary to achieve the desired conditions and provide for existing local industry, so that a large amount of desired conditions could be achieved using natural processes, particularly prescribed fire and managed fire. I would to see an alternative developed and analyzed, after reviewing the CSE data and the disturbance history I presented above, that achieves desired conditions using just essential timber production and the rest using natural processes (e.g., fire).

I am an ecologist, so of course I am interested in using natural ecological processes wherever possible, but I am not opposed to some commercial timber harvesting either. One reason I would like to see this alternative presented and analyzed throughout the Final EA is that we already have lots of timber production occurring in the nearby Lone Pine project, and unless there is something I do not know, it seems that there is no specific need to maximize timber production

on the Salter project to sustain the local industry at this time. If there is, please present evidence.

I suggest at the outset that prescribed fire and managed fire could be the primary natural processes used to thin forests in a way that promotes the clumping and variability in forest structure that are described in the desired condition. This makes the most sense since it is fire that historically created these desired conditions. Managed fire is ecologically recognized as the best tool used to promote both stand- and landscape-scale heterogeneity in these forests and increase future forest resilience to impending disturbances. Of course, some timber harvesting/thinning and prescribed burning may first be needed in the vicinity of highly valued resources and assets.

A good starting point is that the large area of land that has a history of high-grade logging is a potentially sensible location for the commercial harvesting for wood production, whereas the large area that is recovering from past moderate- to high-severity fire (Baker 2018) is potentially a sensible location for primarily use of fire to achieve desired conditions.

**B4. Heterogeneous stands in heterogeneous landscapes needed to reduce beetles**
The project description lists two of the needs: (1) “the need to improve resilience or maintain the resistance of forest ecosystems in an effort to increase protection against epidemic insect and disease outbreaks” and (2) “the need to increase the structural diversity of the ponderosa pine forest represented across the landscape” (p. 3), both of which are ecologically sensible.

It is well established that treating individual stands to reduce attack by beetles is ineffective, as explained in Graham et al. (2016), the most comprehensive study of beetle outbreaks in ponderosa pine in North America: “...treating a single stand to be resistant to MPBs would be insufficient to alter MPB dynamics and large areas or landscapes need to be in a resilient condition to keep MPB populations at endemic levels (Bentz et al. 2009; Fettig et al 2014)” (p. 155).

Thus, these authors conclude that: “...heterogeneous landscapes composed of stands with heterogeneous structures and containing densities in the neighborhood of 80 feet$^2$ of basal area are resistant to MPB infestations...” (p. 157). Please review and incorporate the findings of this key study by Graham et al. into the proposed project.

In particular, please plan the treatments to create heterogeneous stands and heterogeneity across the project area, then document in detail that this will be achieved by showing the variability in residual basal area and tree density, after treatments, expected across the project landscape. Show this as histograms for both basal area and tree density and also show these on a map, using either labels or colors for classes of residual basal area and tree density, also showing the before-harvesting basal area and tree density in each treatment unit.

In locations affected by the roundheaded pine beetle, please leave 50% of the dead and dying trees as mitigation for the documented adverse environmental effects of salvage harvesting (Lindenmayer et al. 2008), and please do not plant trees in these areas, as this will adversely affect the future resistance and resilience of the forests in this area.

**B5. Please provide an economic analysis for all alternatives.**
The reason that I am requesting this is that I am very concerned about the cost, in public and private money provided to the Forest, of all alternatives, given the potential economic costs we

are facing with Covid-19 and other threats to our local and national economy. Please show us what the estimated costs are for each component (e.g., specific treatments) of the project, and please also show us the details of where the funding comes from. We have long heard about below-cost timber sales; will this be one, or will it not?

**B6. Please protect all extant large trees in the project area to increase resistance/resilience to fire.**

Based on direct records by land surveyors in the late-1800s, approximately 47% of ponderosa pines were larger than about 16" dbh (40 cm), about 33% were larger than about 20" dbh (50 cm), and about 17% were larger than about 24" dbh (60 cm) in the ponderosa pine zone in the San Juan Mountain study area, which includes the project area–see Baker (2020 Table 9 p. 16). About 59% of ponderosa-pine forest area in the late-1800s would meet today's definitions for old-growth forests (Baker 2020 p. 21). There is no question that high-grade logging removed most of the large, old trees from the project area by about the 1950s although high-grade logging continued into the 1980s (Romme et al. 2009).

It is well documented that in ponderosa pine forests it is these large, old trees that provide the essential resistance and resilience to fire that is now particularly needed as fire is increasing with global warming. Large trees have the thickest bark, the highest crown base height, and have the greatest ability to survive substantial crown scorching and still resprout and survive (Baker 2009). Not only do large ponderosas have the greatest likelihood of surviving, thus provide the greatest resistance to fire, but large ponderosas also disproportionately provide the most seed for sexual regeneration after fires, thus they provide most of the essential resilience to fire.

It is thus essential for the Final EA, if the goal is to include increased resistance and resilience to fire, to heed and remedy the serious deficiency in large trees as an essential part of the desired conditions for the project area. This is another reason that it is essential to restore these forests using a 16" diameter cap, which would not only protect presettlement trees, but also protect the large and old trees that provide the most resistance and resilience to fire.

**PART C. Potential remedy**

The Final EA and draft ROD, documented by the above comments, ignored highly relevant science and the San Juan National Forest LRMP, and failed to disclose to the public that the proposed action likely does not accomplish the Purpose and Need.

For each of my 17 scientific concerns, 16 of which were completely ignored in the Final EA and Draft ROD, I proposed a particular action that still represents an achievable remedy for each of these 17 concerns. I urge you to undertake all of these remedies, which would enable me to remove my objection completely.

Together, these 17 concerns indicate the need for revisions that likely require amendment to the Final EA, that analyzes an ecological restoration alternative based on sufficient review of the the HRV, as this is required by the SJNF LRMP, and is needed to remedy the omission of the large body of scientific evidence about the HRV and other ecological concerns, that I submitted at Scoping and as comments on the draft EA. An amendment is also necessary to overcome the omission of most of the essential data needed to show that the proposed project actually will accomplish the Purpose and Need.

Sincerely,



William L. Baker, PhD.

**References Cited**

Allen, C. D., M. Savage, D. A. Falk, K. F. Suckling, T. W. Swetnam, T. Schulke, P. B. Stacey, P. Morgan, M. Hoffman, and J. T. Klinger. 2002. Ecological restoration of southwestern ponderosa pine ecosystems: a broad perspective. Ecological Applications 12: 1418-1433.

Baker, W. L. 2009. Fire ecology in Rocky Mountain landscapes. Island Press, Washington, D.C.

Baker, W. L. 2018. Historical fire regimes in ponderosa pine and mixed-conifer landscapes of the San Juan Mountains, Colorado, USA, from multiple sources. Fire 1, 23. Online at: https://www.mdpi.com/2571-6255/1/2/23

Baker, W. L. 2020. Variable forest structure and fire reconstructed across historical ponderosa pine and mixed conifer landscapes of the San Juan Mountains, Colorado. Land 9, 3. Online at: https://www.mdpi.com/2073-445X/9/1/3/htm

Baker, W. L. 2021. Restoration of forest resilience to fire from old trees is possible across a large Colorado dry-forest landscape by 2060, but only under the Paris 1.5°C goal. Global Change Biology, Early View Online: https://onlinelibrary.wiley.com/doi/abs/10.1111/gcb.15714

Chappell, G. S. 1971. Logging along the Denver & Rio Grande: Narrow gauge logging railroads of southwestern Colorado and northern New Mexico. Colorado Railroad Museum, Golden, CO.

Churchill, D. J., A. J. Larson, M. C. Dahlgreen, J. F. Franklin, P. F. Hessburg, and J. A. Lutz. 2013. Restoring forest resilience: From reference spatial patterns to silvicultural prescriptions and monitoring. Forest Ecology and Management 291:442-457.

Covington, W. W. and M. M. Moore. 1994. Southwestern ponderosa pine forest structure: changes since Euro-American settlement. Journal of Forestry 92: 39-47.

Graham, R. T., L. A. Asherin, M. A. Battaglia, T. B. Jain, and S. A. Mata. 2016. Mountain pine beetles: a century of knowledge, control attempts, and impacts central to the Black Hills. USDA Forest Serve General Technical Report GTR-353, Rocky Mountain Research Station, Fort Collins, Colorado. Online at: https://www.fs.fed.us/rm/pubs/rmrs_gtr353.pdf

Lindenmayer, D. B., P. J. Burton, and J. F. Franklin. 2008. Salvage logging and its ecological consequences. Island Press, Washington, D. C.

Mehl, M. S. 1992. Old-growth descriptions for the major forest cover types in the Rocky Mountain region. Pages 106-120 In: Kaufmann, M. R., W. H. Moir, and R. L. Bassett, editors. Old-growth forests in the Southwest and Rocky Mountain regions, proceedings of a workshop.

USDA Forest Service General Technical Report RM-213, Rocky Mountain Forest and Range Experiment Station, Fort Collins, Colorado.

Moore, M. M., W. W. Covington, and P. Z. Fulé. 1999. Reference conditions and ecological restoration: a southwestern ponderosa pine perspective. Ecological Applications 9:1266-1277.

Radeloff, V. C., R. B. Hammer, S. I. Stewart, J. S. Fried, S. S. Holcomb, and J. F. McKeefry. The wildland-urban interface in the United States. Ecological Applications 15: 799-805. Online at: https://www.nrs.fs.fed.us/pubs/jrnl/2005/nc_2005_radeloff_001.pdf

Romme, W. H., M. L. Floyd, and D. Hanna. 2009. Historical range of variability and current landscape condition analysis: South central highlands section, southwestern Colorado & northwestern New Mexico. Colorado Forest Restoration Institute, Colorado State University, Fort Collins. On file at the San Juan National Forest Supervisor's Office, Durango.

**From:** Ted Zukoski
**To:** Chadwick, Kara -FS
**Cc:** Padilla, Derek -FS; Casey, David -FS
**Subject:** [External Email]Center for Biological Diversity Objection to Salter Project
**Date:** Friday, August 6, 2021 4:58:43 PM
**Attachments:** Salter EA Objection - Center for BioDiv & WildEarth Guardians - 2021-08-06 - FINAL.pdf

[External Email]
If this message comes from an **unexpected sender** or references a **vague/unexpected topic;**
Use caution before clicking links or opening attachments.
Please send any concerns or suspicious messages to: Spam.Abuse@usda.gov

Supervisor Chadwick:

Attached please find the Center for Biological Diversity's and WildEarth Guardians' objection to the Salter Vegetation Management Project.

We will provide the exhibits in batches.

Thank you for your attention to this matter.

Ted Z.

==================
Edward B. (Ted) Zukoski, Senior Attorney
(*he/him/his*)
Center for Biological Diversity
1536 Wynkoop Street, Suite 421
Denver, CO 80202
(cell) (303) 641-3149
tzukoski@biologicaldiversity.org
www.biologicaldiversity.org

August 6, 2021

Objection Reviewing Officer
c/o Forest Supervisor Kara Chadwick
San Juan National Forest
15 Burnett Court
Durango, CO 81301
Via web portal: https://cara.ecosystem-management.org/Public//CommentInput?Project=57671
Via email: kara.chadwick@usda.gov

**Re: OBJECTION Pursuant to 36 C.F.R. § 218.8 to Salter Vegetation Management Project Environmental Assessment, Project #57671, Dolores Ranger District, San Juan National Forest.**

Dear Reviewing Officer:

The Center for Biological Diversity ("the Center") and WildEarth Guardians ("Guardians"), collectively "Objectors," hereby submit these objections to the San Juan National Forest's draft Decision Notice (DN), Finding of No Significant Impact (FONSI) and final environmental assessment (Final EA) for the Salter Vegetation Management Project.

Project Objected To

Pursuant to 36 C.F.R. § 218.8(d)(4), the Center objects to the following project:

> *Project*: Salter Vegetation Management Project, Dolores Ranger District, Montezuma and Dolores Counties, Colorado
>
> *Responsible Official and Forest/Ranger District*: Derek Padilla, District Ranger, Dolores Ranger District, San Juan National Forest

Timeliness

These objections are timely filed. Notice of the draft DN and FONSI was published in the Cortez Journal (the newspaper of record) on June 23, 2021.[1]

[1] *See* Public Notice, Cortez Journal (Aug. 23, 2021), available at https://www.fs.usda.gov/nfs/11558/www/nepa/113183_FSPLT3_5653922.pdf (last viewed Aug. 6, 2021). The 45th day after the date of the June 23, 2021 notice, counting June 24 as day one, falls on August 7, a Saturday, and so the objection period expires at 11:59 PM Mountain time on the next business day, Monday, August 9. *See* 36 C.F.R. § 218.6(a) ("when the time period expires on a Saturday, Sunday, or Federal holiday, the time is extended to the end of the

Lead Objector

As required by 36 C.F.R. § 218.8(d)(3), the Objectors designate the "Lead Objector" as follows:

Edward B. (Ted) Zukoski, Senior Attorney
Center for Biological Diversity
1536 Wynkoop Street, Suite 421
Denver, CO 80202
(cell) (303) 641-3149
tzukoski@biologicaldiversity.org

Interests and Participation of the Objectors

The Center for Biological Diversity is a 501(c)(3) nonprofit organization based in Tucson, Arizona, with offices across the country including in Crested Butte and Denver, Colorado, and has 1.7 million members and online activists. The Center is dedicated to protecting and restoring imperiled species and natural ecosystems. The Center uses science, policy, and law to advocate for the conservation and recovery of species on the brink of extinction and the habitats they need to survive. The Center has and continues to actively advocate for increased protections for species and their habitats across Colorado. Center members and supporters use and enjoy the San Juan National Forest, and the lands of the Salter Project area for recreation, photography, nature study, and spiritual renewal.

The Center for Biological Diversity believes that the welfare of human beings is deeply linked to nature — to the existence in our world of a vast diversity of wild animals and plants. Because diversity has intrinsic value, and because its loss impoverishes society, we work to secure a future for all species, great and small, hovering on the brink of extinction. We do so through science, law and creative media, with a focus on protecting the lands, forests, waters and climate that species need to survive. The Center has and continues to actively advocate for increased protections for species and their habitats in southwest Colorado and across the American Southwest.

WildEarth Guardians is a nonprofit conservation organization headquartered in Santa Fe, NM with offices in several western states. With more than 182,000 members and supporters Guardians work to protect and restore wildlife, wild places, wild rivers, and the health of the American West. For many years, Guardians has advocated for an environmentally and economically sustainable transportation system on Forest Service lands, with properly managed motorized recreation. Guardians also promote and support actions that restore ecological integrity to degraded ecosystems in order to ensure at-risk species can thrive.

Summary.

We remain concerned that the Salter Project Final EA fails to meet the National Environmental Policy Act's (NEPA's) standards for disclosure and public involvement in several respects.

---

next Federal working day."); *id.* § 218.6(b) ("Starting date**.** The day ***after*** publication of the legal notice … is the first day of the objection-filing period") (emphasis added).

While we appreciate the inclusion of an alternative that protects some large, old trees, we remain concerned that the proposed action will destroy thousands of pre-settlement trees, some more than a century old. We believe there is no ecological or social basis for doing so. T

he Final EA also fails to contain critical information necessary to understand the project's impacts, including information about the baseline conditions of the project and about the location and impacts of 100+ miles of temporary roads.

The Final EA fails to disclose the project's economic impacts despite the fact that economic development is a project purpose. The Final EA fails to take a hard look at the project's climate impacts, ignoring the Biden administration's emphasis on quantifying and reducing climate pollution.

The Final EA fails to provide a robust review of the varying impacts of the two action alternatives, undermining the heart of the NEPA process, and fails to respond to critical comments and studies provided by experts contradicting the Forest Service's assumptions.

Unless the Forest Service addresses these issues and others, there is a potential for the proposal to have significant impacts, requiring the Forest Service to prepare an environmental impact statement (EIS).

We are also disappointed that the Forest Service failed to respond to nearly every concern we raised about the project. The EA fails to contain a section responding to public comments. The agency had an opportunity to engage with the public, to explain why it favored certain science over others, why it concluded it could ignore the President's directives on climate change, why it declined to use the best available science in crafting mitigation measures or design features for goshawk. The agency failed to take advantage of the opportunity and appears to have simply ignored all of these legitimate concerns. If the Forest Service is to fulfill its role as a good steward of public lands, build support for forest protection, and comply with its NEPA obligations to effectively involve the public, it must do better.

## I. BACKGROUND: THE SALTER PROJECT

The Final EA states that the Forest Service identified the following needs for the project:

- improve resilience and resistance to epidemic insect and disease outbreaks,
- increase the structural diversity of the ponderosa pine forest represented across the project area, and
- provide economic support to local communities by providing timber products to local industries in a sustainable manner.[2]

[2] San Juan National Forest, Salter Vegetation Management Project, Draft Environmental Assessment (June 2021) at 1 (hereafter, "Final EA").

The Final EA further states that the project is needed to move the forest stands in the area toward desired conditions dictated by the Forest Plan:

> The need for this project is derived from the differences between the existing forest vegetation conditions and the desired forest vegetation conditions, as defined by the San Juan National Forest Land and Resource Management Plan.[3]

The Final EA also alleges that the project is needed to address an ongoing beetle infestation:

> Bark beetles have infested adjacent landscapes causing significant mortality. The early stages of a bark beetle infestation are now being observed in the Salter project area.[4]

The proposal involves "tree-cutting, tree planting, and activity fuel burning" across "approximately 22,346 acres."[5] Those activities include "single tree selection," including the logging of trees up to 26.9" diameter at breast height (dbh), or over 7 feet in circumference, across 19,675 acres.[6] The treatment would leave "50-to-70 basal area per acre of residual basal area depending upon stand condition. There are 19,675 acres of this treatment type."[7]

The project will also involve 3,115 acres of commercial thinning, where again trees up to 26.9" dbh could be chainsawed, and again the target would be "a variable residual square feet of tree stem basal area of 50 -70 basal area per acre depending upon stand condition."[8]

---

[3] Final EA at 8. *See also id*. at 11 ("The structure and size class distributions in the stands identified for this analysis are not within desired conditions described in [San Juan Forest Plan Sec.] 2.2.23 based on field reconnaissance and inventory data.")

[4] Final EA at 11.

[5] Final EA at 12.

[6] Final EA at 12, note 1. Note that while the Draft EA several times states that no trees larger than 26" dbh will be logged, *id*. at 12 (Table 1), 13, the document also asserts that "[t]he maximum diameter to harvest would be 26.9"," or about three inches greater in circumference. *Id*. at 14. *See also id*. at 12 n.1 ("No tree larger than 26.9 inch diameter at breast height would be cut in alternatives 2 and3 [sic]."). The Forest Service ignored our request in comments on the Draft EA that the agency clarify which number was correct. *See* letter of E. Zukoski, Center for Biological Diversity *et al*. to D. Padilla, San Juan NF (Mar. 2, 2021) at 3 n.5 ("Center Draft EA Comment"), attached as Ex. 1.

[7] Final EA at 12.

[8] Final EA at 13. We note that summing the acres in Table 2 (Final EA at 12-13) for commercial thinning and single tree selection treatments results in a project area of 22,790 acres, a figure larger than the "approximately 22,346" acres the Final EA (at 1, 12) asserts would be treated. Although in our comments on the Draft EA we urged the Forest Service to address this discrepancy, the Forest Service failed to do so without explanation. *See* Center Draft EA Comment (Ex. 1) at 3.

## II. THE FINAL EA FAILS TO TAKE THE HARD LOOK AT ENVIRONMENTAL IMPACTS THAT NEPA REQUIRES.

NEPA is "'our basic national charter for protection of the environment.'"[9] In enacting NEPA, Congress recognized the "profound impact" of human activities, including "resource exploitation," on the environment and declared a national policy "to create and maintain conditions under which man and nature can exist in productive harmony."[10]

The statute has two fundamental two goals: "(1) to ensure that the agency will have detailed information on significant environmental impacts when it makes decisions; and (2) to guarantee that this information will be available to a larger audience."[11] "NEPA promotes its sweeping commitment to 'prevent or eliminate damage to the environment and biosphere' by focusing Government and public attention on the environmental effects of proposed agency action."[12] Stated more directly, NEPA's "'action-forcing' procedures ... require the [Forest Service] to take a 'hard look' at environmental consequences"[13] *before* the agency approves an action. "By so focusing agency attention, NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct."[14] To ensure that the agency has taken the required "hard look," courts hold that the agency must utilize "public comment and the best available scientific information."[15]

NEPA's review obligations are more stringent and detailed at the project level, or "implementation stage," given the nature of "individual site specific projects."[16] "[G]eneral

---

[9] *Center for Biological Diversity v. United States Forest Serv*., 349 F.3d 1157, 1166 (9th Cir. 2003) (quoting 40 C.F.R. § 1500.1).

[10] 42 U.S.C. § 4331(a).

[11] *Envtl. Prot. Info. Ctr. v. Blackwell*, 389 F. Supp. 2d 1174, 1184 (N.D. Cal. 2004) (quoting *Neighbors of Cuddy Mt. v. Alexander*, 303 F.3d 1059, 1063 (9th Cir. 2002)); *see also Earth Island v. United States Forest Serv.*, 351 F.3d 1291, 1300 (9th Cir. 2003) ("NEPA requires that a federal agency 'consider every significant aspect of the environmental impact of a proposed action ... [and] inform the public that it has indeed considered environmental concerns in its decision-making process.'").

[12] *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989) (quoting 42 U.S.C. § 4321).

[13] *Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir. 2000) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989)).

[14] *Marsh*, 490 U.S. at 371 (citation omitted).

[15] *Biodiversity Cons. Alliance v. Jiron*, 762 F.3d 1036, 1086 (10th Cir. 2014) (internal citation omitted).

[16] *Ecology Ctr., Inc. v. United States Forest Serv*., 192 F.3d 922, 923 n.2 (9th Cir. 1999); *see also Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 800-01 (9th Cir. 2003); *New Mexico ex rel. Richardson v. Bureau of Land Management*, 565 F.3d 683, 718-19 (10th Cir. 2009) (requiring site-specific NEPA analysis when no future NEPA process would occur); *Colo. Envtl. Coal. v. Ofc. of Legacy Mgmt*., 819 F. Supp. 2d 1193, 1209-10 (D. Colo. 2011) (requiring site-specific

statements about possible effects and some risk do not constitute a hard look, absent a justification regarding why more definitive information could not be provided."[17]

NEPA requires site-specificity to fulfill two basic purposes: 1) to ensure agencies are making informed decisions prior to acting; and 2) to ensure the public is given a meaningful opportunity to participate in those decision-making processes.[18] Federal courts apply these touchstone criteria when evaluating whether an EIS is adequately site-specific.[19]

Analyzing and disclosing site-specific impacts is critical because where (and when and how) activities occur on a landscape strongly determines that nature of the impact. As the Tenth Circuit Court of Appeals has explained, the actual "location of development greatly influences the likelihood and extent of habitat preservation. Disturbances on the same total surface area may produce wildly different impacts on plants and wildlife depending on the amount of contiguous habitat between them."[20] The Court used the example of "building a dirt road along the edge of an ecosystem" and "building a four-lane highway straight down the middle" to explain how those activities may have similar types of impacts, but the extent of those impacts – in particular on habitat disturbance – is different.[21] Indeed, "location, not merely total surface disturbance, affects habitat fragmentation,"[22] and therefore location data is critical to the site-specific analysis NEPA requires. Merely disclosing the existence of particular geographic or biological features is inadequate; agencies must discuss their importance and substantiate their findings as to the impacts.[23]

NEPA further mandates that the agency provide the public "'the underlying environmental data' from which the Forest Service develop[ed] its opinions and arrive[d] at its decisions."[24] "The agency must explain the conclusions it has drawn from its chosen methodology, and the reasons

---

NEPA analysis even when future NEPA would occur because "environmental impacts were reasonably foreseeable").

[17] *Or. Natural Res. Council Fund v. Brong*, 492 F.3d 1120, 1134 (9th Cir. 2007) (citation omitted); *see also Or. Natural Res. Council Fund v. Goodman*, 505 F.3d 884, 892 (9th Cir. 2007) (holding the Forest Service's failure to discuss the importance of maintaining a biological corridor violated NEPA, explaining that "[m]erely disclosing the existence of a biological corridor is inadequate" and that the agency must "meaningfully substantiate [its] finding").

[18] *Stein v. Barton*, 740 F. Supp. 743, 749 (D. Alaska 1990).

[19] *See WildEarth Guardians*, 790 F.3d at 921-25 (holding EIS inadequate for failure to disclose location of moose range); *Or. Nat. Desert Ass'n v. Rose*, 2019 WL 1855419 (9th Cir. 2019) (holding environmental analysis violated NEPA by failing to establish "the physical condition of [roads and trails] and authorizing activity without assessing the actual baseline conditions").

[20] *New Mexico ex rel. Richardson*, 565 F.3d at 706.

[21] *Id*. at 707.

[22] *Id*.

[23] *Or. Natural Res. Council Fund v. Goodman*, 505 F.3d 884, 892 (9th Cir. 2007).

[24] *WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 925 (9th Cir. 2015).

it considered the underlying evidence to be reliable."[25] In the end, "vague and conclusory statements, without any supporting data, do not constitute a 'hard look' at the environmental consequences of the action as required by NEPA."[26]

CEQ's regulations establish specific ways agencies must analyze proposed actions, including project-level decisions, including a detailed discussion of direct, indirect, and cumulative impacts and their significance; and an analysis of reasonable alternatives to the proposed action.[27] Such analysis is required for both environmental assessments and EISs.

The Salter Project is a project-level decision. As a result, any NEPA analysis must include the detailed information and analysis that NEPA and the CEQ regulations require.

While the Final EA contains some description of the location and nature of proposed vegetation treatments, it fails to comply with NEPA, as described below.

---

[25] *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1075 (9th Cir. 2011) (citation omitted).

[26] *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 973 (9th Cir. 2006); *see also Ocean Advocates v. Army Corps of Engineers*, 402 F.3d 846, 869 (9th Cir. 2004) (finding that a vague and uncertain analysis is insufficient to meet NEPA's mandate).

[27] We request that the Forest Service confirm to the public, *in writing*, that it intends to rely on the NEPA regulations promulgated in 1978 and in force as of the date scoping on the Salter Project began. Although CEQ issued a final rulemaking in July 2020 fundamentally rewriting those regulations, the new rules apply only "to any NEPA process begun *after* September 14, 2020," or where the agency has chosen to "apply the regulations in this subchapter to ongoing activities." 40 C.F.R. § 1506.13 (2020) (emphasis added). Scoping on this project began before September 14, 2020, and neither the Draft nor Final EA indicates that the agency is opting to use the 2020 CEQ NEPA regulations. The draft Decision Notice and FONSI references the ten significance factors in "40 CFR 1508.27(b)," a citation that only exists in the 1978 regulations, and not the 2020 regulations, indicating that the agency intends to rely on the 1978 rules. *See* Sand Juan National Forest, Draft Decision Notice and Finding of No Significant Impact for the Salter Vegetation Management Project (June 2021) at 17; *see also* 2020 CEQ NEPA Regulations, 85 Fed. Reg. 43304, 43376 (July 16, 2020) (containing no regulation numbered 40 C.F.R. § 1508.27) . In any event, the 2020 regulations have been challenged as illegal in no fewer than four pending lawsuits. *See, e.g., Environmental Justice Health Alliance v. CEQ*, Case 1:20-cv-06143 (S.D.N.Y. Aug. 6, 2020); *Wild Virginia v. CEQ*, Case 3:20-cv-00045-NKM (W.D. Va. July 29, 2020); *Alaska Community Action on Toxics v. CEQ*, Case 3:20-cv-05199-RS (N.D. Ca. July 29, 2020); *State of California v. Council on Environmental Quality*, Case No. 3:20-cv-06057 (N.D. Cal. Aug. 28, 2020).

### B. The Final EA Fails to Disclose Many of the Salter Project's Site-Specific Direct and Indirect Effects.

Although NEPA requires that analysis disclose specific information about the when, where, and how of any agency action, so that the impacts and alternatives can be described and weighed, the Final EA fails to contain much of this data, violating NEPA.[28]

The where and the how of new temporary road construction are not disclosed, or are disclosed incompletely.

For example, the Final EA inconsistently identifies the total mileage of temporary roads. At one point, the Final EA states noncommittally that "temporary roads *may be* required to reduce the need for excessive tractor skidding and allow wood products to be moved to the permanent road system."[29] Despite the fact the temporary roads "may be" required, the Final EA then asserts that "[a]pproximately 50-to-75 miles of temporary road construction are analyzed under this proposal."[30] Elsewhere, the EA states with more assurance that "[i]mplementing the modified proposed action *will require* development of approximately 106 miles of temporary roads," or as much as double the mileage the EA elsewhere says the document analyzes.[31] But even that number is apparently a guestimate because temporary roads will only be laid out later:

> Though these roads have been theoretically identified, the final alignment may deviate from the plan. Such deviation would be limited to that agreed by the Forest Service (Engineering Representative/Sale Administrator) and the contractor. The implementation of the modified proposed action should not result in an increase of temporary road mileage greater than 10 percent of the estimated 106 miles of primary temporary roads. Therefore, 11 miles or less of addition[al] temp roads can be expected.[32]

Thus, the Forest Service predicts that as many as 117 miles of temporary road may be built for the project, and the agency will not identify the precise location of the routes' final alignment until the Forest Service and the contractor agree, long after the NEPA process (and public involvement) has terminated.

Road construction – even for temporary roads – removes all vegetation within the area graded, eliminates and fragments habitat, alters hydrology, and can act as a vector for human-caused

---

[28] The Center and Guardians raised each of the issues discussed in this section with the Forest Service in comments on the Draft EA. *See* Center Draft EA Comment (Ex. 1) at 3-27. The Forest Service failed to respond to our letter in any way.

[29] Final EA at 19 (emphasis added).

[30] Final EA at 19.

[31] Final EA at 63 (emphasis added). *See also id*. ("The primary temporary road alignments consist of 69.8 miles of existing non-system roads, and 36.4 miles of new ground disturbance", which totals 106.2 miles).

[32] Final EA at 63.

fires and the spread of noxious weeds. Road use can cause roadkill, disturb wildlife during critical periods (winter, nesting/calving, etc.), and increase opportunities for poaching. Thus, the nature and location of the road network to be used and constructed is critical to understanding this project's impacts. However, the Final EA fails to define the location of temporary road use and road construction, and omits other data important to understanding road impacts.

The Forest Service has long acknowledged that temporary roads can have significant impacts. In its 2000 analysis of the Roadless Area Conservation Rule – which generally barred the construction of both permanent and temporary roads – the agency stated:

> Although only used for relatively short periods, temporary roads present most of the same risks posed by permanent roads, although some may be of shorter duration. Many of these roads are designed to lower standards than permanent roads, are typically not maintained to the same standards, and are associated with additional ground disturbance during their removal…. While temporary roads may be used for periods ranging up to ten years, and are then decommissioned, their short- and long-term effects can be extensive to terrestrial species and habitats.[33]

The Final EIS on the Roadless Rule also noted that "[t]he use of temporary roads may have the same long lasting and significant ecological effects as permanent roads, such as the introduction of nonnative vegetation and degradation of stream channels."[34] Temporary "[s]kid roads and trails, log landings, and similar disturbances within the [timber] sale area are the main cause of soil erosion and can contribute up to 90% of the sediment generated by timber sale activity (Patric 1976; Swift 1988)."[35] The Roadless Rule Final EIS acknowledged that temporary road construction can cause increased risk of surface erosion and landslides, but that this varies widely and depends on local site characteristics.[36] But the Final EA does not disclose local site characteristics are not disclosed, because that document fails to disclose the location of proposed temporary roads.

Maps in the Final EA apparently identify where *some* temporary road construction is likely to occur, but the maps do not appear to disclose where the routes will be constructed within cutting units.[37] This may be due to an error in the map display (in which the temporary roads are hidden

---

[33] USDA Forest Service, Final Environmental Impact Statement, Roadless Area Conservation Rule (Nov. 2000) at 3-150 excerpts attached as Ex. 2. *See also id.* at 3-30 ("temporary roads are not designed or constructed to the same standards as classified roads and are not intended to be part of the National Forest System Transportation System. The results can be a higher risk of environmental impacts over the short run."); *id.* at 3-164 (concluding that "[t]emporary roads present most of the same risks posed by permanent roads" to rare plants, "although some [impacts] may be of shorter duration.").

[34] Roadless Area Conservation Rule Final EIS (Nov. 2000) (Ex. 2) at 2-18.

[35] Roadless Area Conservation Rule Final EIS (Nov. 2000) (Ex. 2) at 3-45.

[36] Roadless Area Conservation Rule Final EIS (Nov. 2000) (Ex. 2) at 3-45.

[37] Final EA, Appendix A, at 92-99.

under the layer for logging units), or it may be because the Forest Service intends to rely on skid trails within units. Whatever the reason, it is difficult to discern where the Forest Service intends to construct temporary roads. The Transportation System report in the project file does little to help the reader understand temporary road impacts.[38] While that report provides a unique number for each temporary route and estimates its potential length, it does not provide much useful information about *where* the roads will be constructed or the resources the roads may impact.

Because the Final EA, like the draft, fails to disclose the location of temporary roads, or the values and conditions they might impact, it cannot provide the decisionmaker or the public with whether or where these mitigation measures may be required. This violates NEPA's hard look mandate.

Further, the width of new roads – which defines the level of direct habitat destruction from bulldozing – is not defined, and the Final EA provides little guidance as to when, if ever, widths might be restricted, again making it impossible for the public or the agency to know the extent of project impacts.[39] The Final EA states: "Temporary roads will be held to the minimum feasible number, width and total length and will be located sufficiently far from streams and other water bodies to minimize discharge into those waters except at necessary water crossings."[40] This provides little helpful information about the location, number, width, or impacts of the routes.

The Final EA similarly provides little information about skid trails. The Final EA states that "[s]kid trails would be held to the minimum number, width, and length."[41] This provides neither the public nor the decisionmaker with any idea as to the number, length, or scope of potential impacts from such trails, which will crush vegetation, cause a loss of habitat, and compact soil, among other impacts. Further, the amount of surface area that skid trails, roads and similar disturbance is so large that impacts from these features appears certain to be significant. The Final EA states that "[d]esign features for Hydrology and Soils also restrict roads, landings, skid trails, concentrated-use sites, and similar soil disturbances to designated sites to no more than 15 percent of any timber sale unit."[42] Because there are 22,790 acres of logging units, skid trails, roads, etc. could degrade soils on up to 3,400 acres – an area of more than five square miles.

The Final EA fails to take the required hard look at the impacts of temporary roads because it fails to disclose not only their location but also the values that could be impacted by road construction and use. For example, the Final EA fails to define the "where" of sensitive soil resources.

[38] San Juan NF, Transportation System report (no date) (Salter project file).

[39] *See* Final EA at 26 ("[t]he location and clearing widths of all temporary roads or facilities will be agreed to in writing (between the Forest Service and the contractor) before construction is started.").

[40] Final EA at 22.

[41] Final EA at 26.

[42] Final EA at 49.

With respect to wildlife, the Final EA and the associated project files provide no maps showing the location of habitat for any species (apart from elk and goshawk), or the relative value of such habitat, or where such habitat may be impacted by logging, road construction, road use, or fire. This makes it difficult for the public or the agency to understand impacts, or to evaluate whether an alternative to avoid certain areas could be crafted.

In short, specific road construction plans may be designed only after project approval, meaning that only then will the Forest Service have the site-specific information necessary to understand the project's impacts and mitigate them. This gets NEPA compliance backwards. NEPA mandates that agencies look before they leap. The Forest Service here is leaping before looking.

*Areas to be avoided/mitigated*. The Final EA notes that it will design treatments to avoid certain areas (*e.g.*, water influence zones), thus potentially concentrating logging activities in remaining areas. But the Final EA fails to disclose *where* most of these values may exist that vegetation treatments are designed to protect or avoid, thus making it difficult to understand the impact of these provisions on project design and on the environment.

The Final EA states that certain design elements will minimize or avoid potential adverse effects to resources including water influence zones (WIZ), riparian areas, and other wetlands:

- Organic soils associated with riparian areas, intermittent streams, and the water influence zone (WIZ) would be protected through a no harvest/no mechanized equipment buffer.[43]

- Intermittent streams with riparian vegetation would have a buffer strip width of 100 feet on each side of the channel unless a field visit by hydrologist determines a different site-specific buffer.[44]

- Mechanical treatments would avoid wetlands, wet meadows and riparian areas. No skidding, decking or loading would be allowed in these areas in order to protect water quality, existing soils, and vegetative cover.[45]

But the Final EA and associated documents made available to the public appear to not identify these areas on maps. Nor does the Forest Service describe or quantify the extent of these areas.

The "how" of some of the design elements is also undefined. The Final EA states, for example, that "[p]roper drainage will be constructed or reconstructed on existing system road and newly constructed temporary roads."[46] What "proper drainage" is or how it will influence the location or extent of road construction is not explained. The failure to provide this information violates NEPA.

---

[43] Final EA at 70.

[44] Final EA at 71.

[45] Final EA at 71.

[46] Final EA at 22; *see also id.* at 70 ("Log landings … will be designed to have proper drainage").

Suggested Remedy. The San Juan National Forest should prepare a supplemental NEPA document, preferably a Draft EIS, that discloses the site-specific impacts of the proposed action and alternatives.

### C. The Final EA Fails to Disclose Important Baseline Conditions in the Project Area.

The Final EA's failure to disclose the where and the how of the project also results in a failure to comply with another NEPA requirement: the mandate that agencies "succinctly describe the environment of the area(s) to be affected or created by the alternative under consideration."[47] NEPA requires the action agency to set an appropriate baseline detailing the nature and extent of the resources in the area: "The concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process."[48] "Without establishing ... baseline conditions ... there is simply no way to determine what effect [an action] will have on the environment and, consequently, no way to comply with NEPA."[49]

Without baseline data, neither the public nor the agency can understand the effects of the proposed action or craft and analyze alternatives and mitigation measures to protect these values. As such, the Forest Service has a duty to identify the environmental baseline and affected environment, as well as the scope of impacts and where those impacts are most likely to be felt.

The Final EA also contains little site-specific information on a variety of resources, including wildlife and wetlands.

Baseline information will better enable the public to understand whether there is a need for the project. The Final EA states that: "In the past ten years, approximately 34 percent of the project area has experienced fire, either wildfire or prescribed."[50] This statement raises numerous questions which the Final EA to answer: Where are these tens of thousands of acres? Are these areas contained in any cutting units? What basal area remains? Did the fires result in residual basal area that approximated what the Salter Project proposes to achieve? Has previous fire covering more than one-third of the project reduced the need for "resilience" treatments because those fires have made the landscape more resilient to beetle infestations or future fire? If not, why not? If these fires have effectively fire-proofed large portions of the project area, or at least greatly reduced the risk of future high intensity fire, is there still a need for the project?

The Forest Service's failure to address these issues, which go to the project's purpose and need as well as its impacts, violates NEPA.

---

[47] 40 C.F.R. § 1502.15.

[48] *See* Council on Environmental Quality, *Considering Cumulative Effects under the National Environmental Policy Act* 41 (January 1997).

[49] *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988).

[50] Final EA at 39.

> _Suggested Remedy_. The San Juan National Forest should prepare a supplemental NEPA document, preferably a Draft EIS, that discloses the baseline conditions of the project area.

### D. The Final EA Fails to Disclose Meaningful Information about Cumulative Effects.

The Final EA lacks the necessary detail to understand how the impacts of the Salter Project may interact with other private or Forest Service actions, in at least two key respects.

First, the Final EA fails to meaningfully address off-road vehicle travel, an activity which may have cumulative effects when viewed together with the proposed action.[51] In much of the project area, which is popular with hunters, individuals may drive off-highway vehicles up to *one mile* from Forest Service roads to retrieve game, according to the motor vehicle use map for the Dolores Ranger District. Full-sized vehicles may also travel up to 300 feet from either side of many of the open roads within the project area for dispersed camping. Thus, motor vehicle use for limited purposes can legally occur off road across the vast majority of the project area. Such vehicle use will likely hinder reforestation, compound damage to soils and watersheds, crush seedlings and make reforestation more difficult, render temporary road closures and obliteration less effective, and increase the potential for the spread of exotic weeds. The fact that the cutting units "are easily accessible, occurring mostly on roaded landscapes and relatively gentle terrain" may make it difficult to effectively close routes.[52]

The Forest Service cannot argue that a prior NEPA document (for the Oct. 2011 Boggy-Glade transportation plan) addresses these impacts. That nearly ten-year-old EA did not take into consideration the Salter Project with its more than a decade of logging, the up-to-117 miles of temporary road, nearly 150 miles of road improvement, or the beetle infestation. The existing, permissive off-road vehicle management policy is likely to have synergistic and damaging impacts with the Salter Project.

The Forest Service may have attempted to address the issue of off-road vehicle travel with a new "project design feature," but that feature does not eliminate the potential for damaging, and unanalyzed, cumulative impacts from off-road vehicles. The new feature states:

> In the event that a decrease in tree density results in easier access to dispersed camping sites beyond what is allowed by Forest Service regulations, barriers such as boulders will be installed to control the expansion of dispersed camp sites.[53]

This measure does not eliminate the mandate that the Forest Service address the potential for tree removal, skid trail and road construction, together with off-road vehicle use, to cumulatively impacts soils, hydrology, and other resources. The measure itself is vague. How will the Forest Service determine whether tree density changes "result[] in easier access to dispersed camping

---

[51] Existing levels of this activity could also be disclosed in the no action alternative.

[52] Final EA at 9.

[53] Final EA at 23.

sites beyond what is allowed by Forest Service regulations," particularly when the EA identifies *no monitoring activities* related to recreational impacts?[54] Does the San Juan National Forest know how many dispersed campsites are in the project area, and how large they are, so it can assess whether its action effectively "control the expansion of dispersed campsites?" What does "control the expansion" of such sites mean? Limit the number? The areal extent?

Further the measure does nothing to address whether tree removal, skid trail and road construction will impact, or interact synergistically with, off-road travel for game retrieval, which can occur up to one mile from roads. Logging will make longer off-road vehicle excursions more likely, and such trips will now occur in many areas where soils, vegetation, and watersheds have been disturbed by logging, compounding logging's impacts. The Final EA fails to acknowledge or evaluate these potential cumulative impacts, violating NEPA.

Second, the Final EA identifies several "follow-up" actions that will be required or are otherwise foreseeable, but whose impacts the EA does not appear to disclose. The Forest Service indicates that "[f]ollow-up [prescribed fire] treatments *must* occur within 6-15 years [of initial broadcast burns] in order to further reduce surface fuel loading."[55] This means more smoke and more activity in the project area are foreseeable because they could be occurring virtually constantly for 25 years following the initiation of the 10-year project. The Final EA also states within the 3,000+ acres of lands subject to commercial thinning, additional logging will occur in "these stands at roughly 20-to-25 year[]" intervals,[56] meaning more noise, more construction, more displacement of wildlife are virtually guaranteed to occur over not just the short-term but the long-term.

> <u>*Suggested Remedy*</u>. The San Juan National Forest should prepare a supplemental NEPA document, preferably a Draft EIS, that discloses the cumulative effects of the project together with foreseeable off-road vehicle use, and cumulative effects of the project together with foreseeable and planned follow-up actions.

### E. The Forest Service Fails to Explain Why Lone Pine and Salter Treatments Differ.

The Forest Service fails to explain why the prescriptions in the Salter Project differ from those in the nearby (and nearly overlapping) Lone Pine project approved in 2020. At Lone Pine, the Forest Service approved:

- Basal area ranging from 60 to 80 square feet per acre with a target basal area of 70 square feet per acre in the "Large Tree Emphasis/Commercial Thin Prescription."[57]

---

[54] *See* Final EA at 31-32.

[55] Final EA at 41.

[56] Final EA at 13 ("uneven-aged management calls for re-entry every 20-to-25 years. This is referred to as a cutting cycle"); *id*. at 65.

[57] San Juan National Forest, Lone Pine Decision Notice (Jan. 23, 2020) at 7, attached as Ex. 3.

- Basal area ranging from 60 to 80 square feet per acre with a target basal area of 60 square feet per acre in the commercial thinning prescription.[58]

Because the purpose and need statements for the Salter and Lone Pine projects are similar, the San Juan National Forest should explain why the agency intends to adopt different prescriptions for the Salter Project that seek to achieve a lower basal area (50-70 square feet per acre with a target of 60) than that for the Lone Pine area (60-80 square feet per acre, with a target of 70 for some prescriptions). Note that the Salter Final EA states that "[t]he infested stands [in the Salter Project area] will display similar characteristics to affected stands in the Lone Pine environment, with similar diameter classes experiencing mortality."[59] Because the two projects seek to achieve similar goals in similar stands, the Forest Service's adoption of *different* prescriptions and targets for the Salter Project, without explanation, is arbitrary.

> Suggested Remedy. The San Juan National Forest should prepare a supplemental NEPA document, preferably a Draft EIS, that discloses why the Forest Service chose differing basal area targets for the Lone Pine and Salter projects.

### F. The Final EA Fails to Take a Hard Look at the Project's Economic Impacts.

A primary purpose and need for the project is to "provide economic support to local communities by providing timber products to local industries in a sustainable manner," and the project includes "commercial thinning" on more than 3,000 acres.[60] The Final EA indicates that the San Juan National Forest considers it important to offer large trees for sale, and lots of them, as an incentive to entice timber mills to log smaller trees:

> Offering a mixture of saw log and smaller diameters [sic] timber in the right ratio is important to ensure offerings are marketable. The size of these sales is equally important in both volume and acres to ensure the work is completed on time and has a sustained profitability. The ability to include large volumes and achieve vegetation management at landscape level is possible with the existing industry.[61]

Although supporting local industry is a project goal, and the Forest Service apparently assumes such benefit will occur, the Final EA fails to contain any projections or quantification of the volume that is says is important (for example, the likely board-feet the project will make available to local mills), nor the economic impact of the project in terms of income or employment. Because the Forest Service has detailed stand data for the project area, such an analysis would seem relatively straightforward to perform.

The Final EA's failure to quantify the potential economic impacts not only violates NEPA, it is puzzling in light of the fact that the Forest Service elsewhere routinely performs this analysis as a matter of course. For example, in a 2021 final EA for a logging project in Montana, the Forest

---

[58] *Id*. at 5.

[59] Final EA at 40.

[60] Final EA at 1, 3.

[61] Final EA at 60.

Service estimates for *each alternative*: the acres harvested; the board footage to be logged; appraised stumpage rates; the predicted high bid; the total revenue to be generated; the present net value of the timber harvest and other resource activities; and the total employment and labor income estimated to be generated over the life of the project.[62] In the Rocky Mountain Region, the Forest Service has prepared similar socioeconomic analyses for logging projects.[63] The Forest Service no doubt has all of this information for the Salter Project. It is unclear why it is choosing to withhold it from the public.

Further, if an economic analysis shows no difference between Alternative 2 (cutting trees up to 26.9" dbh) and Alternative 3 (cutting trees up to 20" dbh), that would undermine the Forest Service's assertions discussed above (and those of some industry supporters) that the agency must offer significant quantities of larger trees to ensure the commercial viability of logging in this part of the San Juan National Forest.

The Final EA fails to address or estimate the potential for lost income to the town of Dolores due to the Salter Project's impacts on recreation. The area targeted for logging is popular with mountain bikers, equestrians, hikers, hunters, and other recreationists, receiving "moderate to heavy levels of recreation use" in the summer and fall.[64] In fact, "[t]he Boggy treatment block is a high use recreation area and one of the most heavily used recreation zones on the District. Over the past five years more than $300,000 of trail infrastructure projects have been completed on the Boggy non-motorized and motorized trail system."[65]

The constant presence of logging trucks, road graders, and the sound of chainsaws and heavy equipment *for a decade* (or longer, if follow-on treatments are analyzed) is likely to discourage some from visiting this part of the forest, with the potential for loss of revenue to local businesses.[66] While the Final EA admits the likelihood that recreation will be deterred,[67] it fails

---

[62] Lolo National Forest, Redd Bull Environmental Assessment (Jan. 2021) at 124-128, excerpts attached as Ex. 4, and available at http://www.fs.usda.gov/nfs/11558/www/nepa/112011_FSPLT3_5580176.pdf (last viewed Aug. 6, 2021).

[63] *See, e.g.*, Medicine Bow-Routt National Forest, Social and Economic Report, Medicine Bow LaVA Project (2019), attached as Ex. 5.

[64] Final EA at 52 ("The Salter analysis area receives moderate to heavy levels of recreation use during the summer months, moderate to heavy use during big game hunting seasons and low to moderate use during the winter.")

[65] Final EA at 47.

[66] *See* Final EA at 50 ("The potential impacts to recreation from this project are anticipated to be long-term and moderate for as long as 10 years."); *see also id*. at 64 (burying a description of "the estimated 10-year time frame of the project" in a discussion about projecting the number of log trucks per day traveling through Dolores). The Final EA, like the Draft, fails to define how long it will take to implement the project's logging, a clear failure to take the hard look NEPA requires.

[67] Final EA at 52 ("The extent of negative impacts to recreationalists can be expected to increase noticeably if treatment activities are undertaken during, hiking, biking hunting or snowmobiling

to quantify the economic impacts of that result beyond admitting that there could be such impacts.[68]

The Final EA includes design features, and analyses, beyond that included in the Draft, but these neither eliminate, nor disclose the extent of, the timber sale's impacts on recreation and the local economy. Many of the design features are conditional, making it unclear if they will have any impact on the project.[69] Given that the Town of Dolores has filed an objection seeking changes to the project's potential impacts due to logging truck traffic through residential and business areas, the Town itself is expecting potentially significant impacts.[70]

We appreciate that the Forest Service has included an EA section on Socioeconomics.[71] This analysis shows that while "[a]pproximately one quarter (24.3%) of private sector employment is in the travel and tourism sector," only about one per cent (1%) of private sector employment in the area is attributable to timber harvesting and processing.[72] Despite this huge imbalance, the Forest Service here has chosen to burden the travel and tourism sector to benefit the tiny logging industry.[73]

NEPA's hard look mandate requires more than mere qualitative statements. Given that the town has begun a transition from resource extraction to recreation, the Salter Project may represent a step backward in terms of its economic development, one that should be estimated and *quantified*, so it can be compared to the alleged economic benefits of logging.

---

seasons when this area witnesses marked increases in use."); *id*. at 60 ("some recreation visitors will either stay home or recreate elsewhere, which will temporarily reduce recreation-related economic activity in Dolores and Montezuma counties.").

[68] Final EA at 53 ("Any long-term removal of recreation opportunities would have an impact to local community's economies.")

[69] *See* Final EA at 23 ("When timber activity operations are suspended for two weeks or more, trails and roads that are closed within that unit will be reopened, *unless safety concerns cannot be mitigated*.") (emphasis added); *id*. at 24 ("Trails will be used as sales unit boundaries *when feasible*.") (emphasis added); *id*. ("Measures to protect winter grooming operations will *be considered* during the implementation checklist process.") (emphasis added); *id*. at 33 ("*Initiate collaboration* with the Town of Dolores and other vested partners to develop alternatives that resolve any newly identified issue (e.g. *consider* using alternative routes to mitigate increased traffic concerns") (emphases added). The Town of Dolores's objection demonstrates that the Town evidently concluded that this last measure was insufficient.

[70] *See* Objection, Town of Dolores (July 28, 2021), available at https://cara.ecosystem-management.org/Public/DownloadCommentFile?dmdId=FSPLT3_5656375 (last viewed Aug. 6, 2021) (Salter project file).

[71] Final EA at 57-60.

[72] Final EA at 57, 58.

[73] Final EA at 58 (noting "Some visitors may avoid the project area longer-term" as a result of logging.

If it is in fact a purpose of the project to "provide economic support to local communities," the Forest Service must evaluate and quantify the extent to which various alternatives will achieve that goal.

> *Suggested Remedy*. The San Juan National Forest should prepare a supplemental NEPA document, preferably a Draft EIS, that estimates and quantifies the project's impacts to socioeconomic values generally, and recreation specifically.

### G. The Final EA Fails to Take a Hard Look at the Project's Climate Impacts.

#### 1. The Climate Crisis

The climate crisis is the overriding environmental issue of our time, threatening to drastically modify ecosystems, alter coastlines, worsen extreme weather events, degrade public health, and cause massive human displacement and suffering.[74] Its impacts are already being felt in the United States, and recent studies confirm that time is running out to forestall the catastrophic damage that will result from 1.5 degrees Celsius of warming.[75] More recent studies have confirmed that climate change is accelerating, making the need to protect carbon stores even more urgent than it was just a few years ago.[76]

Climate change is impacting Colorado now. Most of the state has warmed one or two degrees Fahrenheit in the last century. Snowpack on average is declining. Fire season is lengthening. Drought periods are occurring more often.[77] I-70 will be closed for weeks due to landslide cause by heavy rainfall following a fire; both heavy rain and fire are increasing in the state due to climate change. Policymakers and legislators have responded by requiring Colorado to adopt a climate action plan that calls for a 25% reduction in greenhouse gas emissions by 2025 and a 50% reduction by 2030.

The Forest Service needs to be part of the solution, not part of the problem.

#### 2. President Biden requires prompt action to assess and reduce climate pollution.

On the day he was inaugurated, President Biden committed to overturning the prior administration's failure to address, and its outright denial of, the climate emergency.

---

[74] The Center and Guardians raised each of the issues discussed in this section with the Forest Service in comments on the Draft EA. *See* Center Draft EA Comment (Ex. 1) at 15-27.

[75] *See* IPCC, Summary for Policymakers, Global Warming of 1.5°C. An IPCC Special Report on the impacts of global warming of 1.5°C above pre-industrial levels and related global greenhouse gas emission pathways (2018), attached as Ex. 6.

[76] *See, e.g.*, H. Fountain, Climate Change Is Accelerating, Bringing World 'Dangerously Close' to Irreversible Change, The New York Times (Dec. 4, 2019), attached as Ex. 7.

[77] *See* EPA, What Climate Change Means for Colorado (Aug. 2016), available at https://19january2017snapshot.epa.gov/sites/production/files/2016-09/documents/climate-change-co.pdf, and attached as Ex. 8.

> It is, therefore, the policy of my Administration to listen to the science; to improve public health and protect our environment; to ensure access to clean air and water; to limit exposure to dangerous chemicals and pesticides; to hold polluters accountable, including those who disproportionately harm communities of color and low-income communities; *to reduce greenhouse gas emissions; to bolster resilience to the impacts of climate change*; to restore and expand our national treasures and monuments; and to prioritize both environmental justice and the creation of the well-paying union jobs necessary to deliver on these goals.
>
> To that end, this order directs all executive departments and agencies (agencies) to immediately review and, as appropriate and consistent with applicable law, take action to address the promulgation of Federal regulations and other actions during the last 4 years that conflict with these important national objectives, and *to immediately commence work to confront the climate crisis*.[78]

Days later, President Biden further committed to taking swift action to address the climate crisis. Per Executive Order 14,008, he has recognized that "[t]he United States and the world face a profound climate crisis. We have a narrow moment to pursue action at home and abroad in order to avoid the most catastrophic impacts of that crisis and to seize the opportunity that tackling climate change presents."[79] Pres. Biden announced that under his administration,

> The Federal Government must drive assessment, disclosure, and mitigation of climate pollution and climate-related risks in every sector of our economy, marshaling the creativity, courage, and capital necessary to make our Nation resilient in the face of this threat. Together, we must combat the climate crisis with bold, progressive action that combines the full capacity of the Federal Government with efforts from every corner of our Nation, every level of government, and every sector of our economy.[80]

Addressing the need for the accurate assessment of climate costs, Pres. Biden announced on day one that "[i]t is *essential that agencies capture the full costs of greenhouse gas emissions as accurately as possible*, including by taking global damages into account."[81] The President also re-established Interagency Working Group on the Social Cost of Greenhouse Gases, on which the Secretary of Agriculture will serve.[82] The President directed the Working Group to publish

---

[78] Executive Order 13,990, 86 Fed. Reg. 7037 (Jan. 20, 2021) at Sec. 1 (emphasis added), attached as Ex. 9.

[79] Executive Order 14,008, 86 Fed. Reg. 7619 (Jan. 27, 2021), attached as Ex. 10.

[80] *Id*. at 7622 (Sec. 201).

[81] Executive Order 13,990 (Ex. 9), 86 Fed. Reg. at 7040, Sec. 5(a) (emphasis added).

[82] *Id*., Sec. 5(b).

interim values for the social cost of carbon by February 19, 2021.[83] The Working Group that month set that price at $51/ton at a 3% discount rate.[84]

3. NEPA requires the Forest Service to disclose the climate impacts of proposed actions.

The Forest Service must analyze the direct, indirect, and cumulative impacts of a proposed action.[85] NEPA and NFMA require the Forest Service to use high quality, accurate, scientific information to assess the effects of a proposed action on the environment.[86]

Meaningful consideration of greenhouse gas emissions (GHGs) and carbon sequestration (carbon storage) lies within the scope of required NEPA review.[87] As the Ninth Circuit has held, in the context of fuel economy standard rules:

> The impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct. Any given rule setting a CAFE standard might have an "individually minor" effect on the environment, but these rules are "collectively significant actions taking place over a period of time."[88]

Courts have held that a "general discussion of the effects of global climate change" does not satisfy NEPA's hard-look requirement.[89]

Further, courts have ruled that federal agencies must consider indirect GHG emissions resulting from agency policy, regulatory, and fossil fuel leasing decisions. For example, agencies cannot

---

[83] *Id.*, Sec. 5(b)(ii)(A).

[84] Interagency Working Group on Social Cost of Greenhouse Gases, Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates under Executive Order 13990 (Feb. 2021), attached as Ex. 11, and available at https://www.whitehouse.gov/wp-content/uploads/2021/02/TechnicalSupportDocument_SocialCostofCarbonMethaneNitrousOxide.pdf (last viewed Aug. 6, 2021).

[85] *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1176 (10th Cir. 1999); *see also* 40 C.F.R. § 1508.25(c) (1978) (when determining the scope of an EIS, agencies "shall consider" direct, indirect, and cumulative impacts).

[86] *See* 40 C.F.R. § 1500.1(b); 36 C.F.R. § 219.3.

[87] *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008).

[88] *Id.*, 538 F.3d at 1216 (quoting 40 C.F.R. § 1508.7 (1978)). *See also WildEarth Guardians v. BLM*, 870 F.3d 1222, 1237 (10th Cir. 2017) (failure to disclose climate impacts of various alternatives "defeated NEPA's purpose").

[89] *High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1189-90 (D. Colo. 2014).

ignore the indirect air quality and climate change impact of decisions that would open up access to coal reserves.[90] An analysis that does not adequately consider the indirect effects of a proposed action, including climate emissions, violates NEPA.[91] Further, as the D.C. Circuit Court of Appeals ruled in August 2021, NEPA requires the agency to respond to science showing that the climate pollution impacts of an agency proposal can be quantified, and significance levels assessed.[92]

NEPA requires "reasonable forecasting," which includes the consideration of "reasonably foreseeable future actions … even if they are not specific proposals."[93] That an agency cannot "accurately" calculate the total emissions expected from full development is not a rational basis for cutting off its analysis. "Because speculation is ... implicit in NEPA," agencies may not "shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as crystal ball inquiry."[94] The D.C. Circuit has echoed this sentiment, rejecting the argument that it is "impossible to know exactly what quantity of greenhouse gases will be emitted" and concluding that "agencies may sometimes need to make educated assumptions about an uncertain future" in order to comply with NEPA's reasonable forecasting requirement.[95]

The 2016 final CEQ *Guidance on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in NEPA Review* provides useful direction on the issue of federal agency review of greenhouse gas emissions as foreseeable direct and indirect effects of a proposed action.[96] The

---

[90] *See Mid States Coal. For Progress v. Surface Transp. Bd*., 345 F.3d 520, 532, 550 (8th Cir. 2003); *High Country Conservation Advocates v. U.S. Forest Serv*., 52 F. Supp. 3d 1174, 1197-98 (D. Colo. 2014); *Montana Environmental Information Center v. U.S. Office of Surface Mining*, 274 F. Supp. 3d 1074 (D. Mont. 2017), *amended in part, adhered to in part*, 2017 WL 5047901 (D. Mont. 2017).

[91] *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 2020 U.S. App. LEXIS 38033, *20 (9th Cir. 2020).

[92] *De La Comunidad v. FERC*, 2021 U.S. App. LEXIS 22881 (D.C. Cir. Aug. 3, 2021) at *14-*15 ("Because the Commission failed to respond to significant opposing viewpoints concerning the adequacy of its analyses of the projects' greenhouse gas emissions, we find its analyses deficient under NEPA and the APA. *See, e.g*., *TransCanada Power Mktg. Ltd. v. FERC*, 811 F.3d 1, 12-13 (D.C. Cir. 2015).").

[93] *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1079 (9th Cir. 2011) (citation omitted).

[94] *Id*. (citations omitted).

[95] *Sierra Club v. Federal Energy Regulatory Commission*, 863 F.3d 1357, 1373-74 (D.C. Cir. 2017).

[96] Notice available at 81 Fed. Reg. 51,866 (Aug. 5, 2016). *See also* Council on Environmental Quality, Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews (Aug. 1, 2016) ("CEQ 2016 Climate Guidance"), attached as Ex. 12, and available at

CEQ guidance provides clear direction for agencies to conduct a lifecycle greenhouse gas analysis that quantifies GHG emissions or storage because the modeling and tools to conduct this type of analysis are available:

> If the direct and indirect GHG emissions can be quantified based on available information, including reasonable projections and assumptions, agencies should consider and disclose the reasonably foreseeable direct and indirect emissions when analyzing the direct and indirect effects of the proposed action. Agencies should disclose the information and any assumptions used in the analysis and explain any uncertainties. To compare a project's estimated direct and indirect emissions with GHG emissions from the no-action alternative, agencies should draw on existing, timely, objective, and authoritative analyses, such as those by the Energy Information Administration, the Federal Energy Management Program, or Office of Fossil Energy of the Department of Energy. In the absence of such analyses, agencies should use other available information.[97]

The guidance further specifies that estimating GHG emissions is appropriate and necessary for actions such as federal logging projects.

> In addressing biogenic GHG emissions, resource management agencies should include a comparison of estimated net GHG emissions and carbon stock changes that are projected to occur with and without implementation of proposed land or resource management actions. This analysis should take into account the GHG emissions, carbon sequestration potential, and the changes in carbon stocks that are relevant to decision making in light of the proposed actions and timeframes under consideration.[98]

Although the Trump administration withdrew the 2016 CEQ guidance, President Biden on January 20, 2021 rescinded that Trump Executive Order, and directed CEQ to "review, revise, and update" its 2016 climate guidance.[99] On February 19, 2021, CEQ effectively reinstated the 2016 GHG guidance:

> CEQ will address in a separate notice its review of and any appropriate revisions and updates to the 2016 GHG Guidance. In the interim, agencies should consider all available tools and resources in assessing GHG emissions and climate change effects of their proposed actions, including, as appropriate and relevant, the 2016 GHG Guidance.[100]

---

https://ceq.doe.gov/docs/ceq-regulations-and-guidance/nepa_final_ghg_guidance.pdf (last viewed Aug. 6, 2020).

[97] CEQ 2016 Climate Guidance (Ex. 12) at 16 (citations omitted).

[98] *Id*. at 26.

[99] Executive Order 13,990 (Ex. 9), 86 Fed. Reg. at 7040, Sec. 7, 86 Fed. Reg. at 7042.

[100] Council on Environmental Quality, National Environmental Policy Act, Guidance on Consideration of Greenhouse Gas Emissions, 86 Fed. Reg. 10,252 (Feb. 19, 2021), attached as

Further, regardless of the guidance, the underlying requirement from federal courts – that NEPA requires agencies to consider, quantify, and disclose climate change impacts, including indirect and cumulative combustion impacts and loss of sequestration foreseeably resulting from commercial logging decisions – has not changed.[101]

4. The Forest Service's failure to disclose and quantify the Salter Project's climate damage violates NEPA.

The Forest Service in the Draft EA categorized the climate change impacts of the Salter Project as a "Resource[] Dismissed from Detailed Analysis," and shunted the analysis to an appendix, spending a mere 11 sentences explaining why the issue is of no import.[102] The Final EA has relabeled the appendix "Other Resources," but contains the same 11 sentences with only a handful of cosmetic word changes.[103]

The Final EA asserts that: "Climate change analysis is guided by Climate Change Considerations in Project-Level NEPA Analysis (U.S. Forest Service 2009), which recommends consideration of both the effect of a proposed action on climate change, and the effect of climate change on a proposed action."[104] The Forest Service's reliance on discredited, and long out-of-date, guidance from the George W. Bush administration runs directly counter to the current administration's aggressive approach to both accounting for and addressing climate change, and conflicts with CEQ's 2016 climate guidance.

The Final EA violates NEPA and is arbitrary and capricious because it focuses exclusively (but qualitatively) on the alleged benefits of purporting to make the forest more "resilient" to the environmental factors made worse by climate change – drought and insect infestations – while effectively denying and declining to quantify the impacts on climate pollution and carbon storage of logging, burning, and trucking trees from the forest. Although responding to climate change appears to be a primary project purpose, the Final EA contains only bland and misleading statements on the project's impact on climate pollution or climate change. The Salter Project will have at least two types of climate impacts that the EA virtually ignores and fails to quantify: the

---

Ex. 13, and available at https://www.govinfo.gov/content/pkg/FR-2021-02-19/pdf/2021-03355.pdf (last viewed Aug. 6, 2021).

[101] *See S. Fork Band Council of W. Shoshone v. United States Dept. of Interior*, 588 F.3d 718, 725 (9th Cir. 2009); *Ctr. for Biological Diversity*, 538 F.3d at 1214-15; *Mid States Coalition for Progress*, 345 F.3d at 550; *WildEarth Guardians v. United States Office of Surface Mining, Reclamation & Enf't*, 104 F. Supp. 3d 1208, 1230 (D. Colo. 2015) (coal combustion was indirect effect of agency's approval of mining plan modifications that "increased the area of federal land on which mining has occurred" and "led to an increase in the amount of federal coal available for combustion."); *Diné Citizens Against Ruining Our Env't v. United States Office of Surface Mining Reclamation & Enf't*, 82 F. Supp. 3d 1201, 1213-1218 (D. Colo. 2015); *High Country Conservation Advocates*, 52 F. Supp. 3d at 1174.

[102] Draft EA at 102-103.

[103] Final EA at 109.

[104] Final EA at 109.

Project will deplete carbon stores by removing trees that fix carbon; and it will result in the combustion of fossil fuels to implement logging and road construction.

a. The Forest Service fails to disclose and quantify the Salter Project's impact on carbon storage.

The Salter Project will have direct, indirect, and cumulative impacts on climate change because logging and burning forests will impact the ecosystem's ability to store carbon.

Science makes clear that the Salter Project will worsen climate emissions by removing large trees that are currently fixing carbon, turning them into wood products (which results in an immediate and significant loss of that carbon fixed in wood), and leaving a landscape with fewer trees and (eventually) seedlings that fix far less carbon than mature forests.

The Final EA fails to contain any substantive or quantitative analysis of the Salter Project's impact on climate stores and carbon pollution, although the project will likely remove tens of millions (if not hundreds of millions) of board feet of timber. In addition, the project will log potentially thousands of old and mature trees, some as large as seven feet in circumference, and likely decrease the ability of those stands and that land to sequester carbon for years to come. The proposed action will involve removing some trees over a century old, which are assuredly fixing significant amounts of carbon.

Logging old trees in particular worsens climate change by releasing significant amounts of carbon and by preventing such forests from continuing to sequester carbon. As the Forest Service has admitted regarding mature forests in Alaska, such forests "likely store considerably more carbon compared to younger forests in this area (within the individual trees themselves as well as within the organic soil layer found in mature forests)."[105] This is so because when a forest is cut down, the vast majority of the stored carbon in the forest is released over time as CO2, thereby converting forests from a sink to a "source" or "emitter."[106] According to a 2019 IPCC report, deforestation causes climate pollution, and avoiding deforestation will reduce climate pollution.[107]

---

[105] Forest Service, Tongass Land and Resource Management Plan, Final EIS (2016) at 3-14, excerpts attached as Ex. 14.

[106] *See, e.g.*, D. DellaSala, The Tongass Rainforest as Alaska's First Line of Climate Change Defense and Importance to the Paris Climate Change Agreements (2016) at 5, attached as Ex. 15.

[107] Intergovernmental Panel on Climate Change, Special Report on Climate Change, Desertification, Land Degradation, Sustainable Land Management, Food Security, and Greenhouse gas fluxes in Terrestrial Ecosystems, Summary for Policymakers (Aug. 2019) at 7, 23, attached as Ex. 16. *See also* B. Law et al., Land use strategies to mitigate climate change in carbon dense temperate forests, Proceedings of the Nat'l Academy of Sciences, vol. 115, no. 14 (Apr. 3, 2018) at 3663 ("Proven strategies immediately available to mitigate carbon emissions from forest activities include ... reducing emissions from deforestation and degradation."), attached as Ex. 17.

Recent studies agree that maintaining forests rather than cutting them can help reduce the impacts of climate change. "Stakeholders and policy makers need to recognize that the way to maximize carbon storage and sequestration is to grow intact forest ecosystems where possible."[108] One report concludes:

> *Allowing forests to reach their biological potential for growth and sequestration, maintaining large trees* (Lutz et al 2018), reforesting recently cut lands, and afforestation of suitable areas *will remove additional CO2 from the atmosphere*. Global vegetation stores of carbon are 50% of their potential including western forests because of harvest activities (Erb et al 2017). Clearly, western forests could do more to address climate change through carbon sequestration *if allowed to grow longer*.[109]

A June 2020 literature review from leading experts found thinning provided little advantage for carbon storage:

> *There is absolutely no evidence that thinning forests increases biomass stored* (Zhou et al. 2013). It takes decades to centuries for carbon to accumulate in forest vegetation and soils (Sun et al. 2004, Hudiburg et al. 2009, Schlesinger 2018), and it takes decades to centuries for dead wood to decompose. We must preserve medium to high biomass (carbon-dense) forest not only because of their carbon potential but also because they have the greatest biodiversity of forest species (Krankina et al. 2014, Buotte et al. 2019, 2020).[110]

Two experts in the field concluded in 2021:

> Recent projections show that to prevent the worst impacts of climate change, governments will have to increase their pledges to reduce carbon emissions by as much as 80%. We see the next 10 to 20 years as a critical window for climate action, and believe that *permanent protection for mature and old forests is the greatest opportunity for near-term climate benefits*.[111]

---

[108] Moomaw, *et al*., Intact Forests in the United States: Proforestation Mitigates Climate Change and Serves the Greatest Good, Frontiers in Forests and Global Change (June 11, 2019) at 7), attached as Ex. 18 (emphasis added).

[109] T. Hudiburg *et al*., Meeting GHG reduction targets requires accounting for all forest sector emissions, Environ. Res. Lett. 14 (2019) (emphasis added), attached as Ex. 19.

[110] B. Law, *et al*., The Status of Science on Forest Carbon Management to Mitigate Climate Change (June 1, 2020), attached as Ex. 20.

[111] B. Law & W. Moomaw, Keeping trees in the ground where they are already growing is an effective low-tech way to slow climate change, *The Conversation* (Feb. 23, 2021) (emphasis added), attached as Ex. 21, and available at https://theconversation.com/keeping-trees-in-the-ground-where-they-are-already-growing-is-an-effective-low-tech-way-to-slow-climate-change-154618 (last viewed Aug. 6, 2021).

Further, to address the climate crisis, agencies cannot rely on the re-growth of cleared forests to make up for the carbon removed when mature forest is logged. One prominent researcher explains: "It takes at least 100 to 350+ years to restore carbon in forests degraded by logging (Law et al. 2018, Hudiburg et al. 2009). If we are to prevent the most serious consequences of climate change, *we need to keep carbon in the forests because we don't have time to regain it once the forest is logged* (IPCC, 2018)."[112]

Studies also demonstrate that significant volumes – in some cases a majority – of carbon stored in trees are *immediately* lost when trees are logged and milled, and the rest is likely to be returned to the atmosphere sooner than would occur if the trees were left standing.

> [H]arvesting carbon will increase the losses from the forest itself and to increase the overall forest sector carbon store, the lifespan of wood products carbon (including manufacturing losses) would have to exceed that of the forest. Under current practices this is unlikely to be the case. A substantial fraction (25%– 65%) of harvested carbon is lost to the atmosphere during manufacturing and construction depending on the product type and manufacturing method. The average lifespan of wood buildings is 80 years in the USA, which is determined as the time at which half the wood is no longer in use and either decomposes, burns or, to a lesser extent, is recycled. However, many forest trees have the potential to live hundreds of years ….[113]

Other studies indicate that there is little substitution benefit of using wood compared to using other products (e.g., concrete for building), and that industry talking points to the contrary vastly overestimate the carbon benefits of using wood.[114]

Even if the logging permitted in the Salter Project – when viewed in isolation – may only result in relatively minor climate impacts, NEPA expressly requires agencies to consider whether agency actions are "related to other actions with individually insignificant but cumulatively

---

[112] B. Law, *et al*., The Status of Science on Forest Carbon Management (Ex. 20) (emphasis added).

[113] B. Law & M.E. Harmon, Forest sector carbon management, measurement and verification, and discussion of policy related to mitigation and adaptation of forests to climate change. Carbon Management (2011) 2(1), attached as Ex. 22, and available at https://www.researchgate.net/publication/235591616_Forest_sector_carbon_management_measurement_and_verification_and_discussion_of_policy_related_to_climate_change (last viewed Aug. 6, 2021).

[114] "Substitution of wood for more fossil carbon intensive building materials has been projected to result in major climate mitigation benefits often exceeding those of the forests themselves. A reexamination of the fundamental assumptions underlying these projections indicates long-term mitigation benefits related to product substitution may have been overestimated 2- to 100-fold." M. Harmon, Have product substitution carbon benefits been overestimated? A sensitivity analysis of key assumptions, Environmental Research Letters (2019), attached as Ex. 23, and available at https://iopscience.iop.org/article/10.1088/1748-9326/ab1e95/pdf (last viewed Aug. 6, 2021).

significant impacts."[115] Thus, the Forest Service may not dismiss and deny the climate impacts of the Salter Project without considering the cumulative significance of the project when added to other past, present, and reasonably foreseeable logging projects and Forest Service timber sales in the Forest, state, region, and nation.[116] The Forest Service failed to address these cumulative effects, violating NEPA.

The Forest Service's approach also violates NEPA because the Forest Service did not use its best efforts or the best available information to address climate impacts. Methods exist that would have allowed the agency to quantify those impacts. For example, a 2018 study concludes that carbon storage impacts can be estimated, accounted for, and factored into a model that calculated the net amount of carbon lost due to forest logging in Oregon over two five-year periods.[117] This is precisely the type of analysis the Forest Service should, and could, have undertaken for Salter EA. The agency's failure to do so, or explain why it need not do so, violates NEPA.

Similarly, Dr. DellaSala's 2016 report addressed carbon stores from wood products and concluded that logging Tongass old-growth forest under the 2016 Forest Plan would result in net annual CO2 emissions totaling between 4.2 million tons and 4.4 million tons, depending on the time horizon chosen.[118] The Bureau of Land Management more than a decade ago completed an EIS for its Western Oregon Resource Management Plan in which that agency also predicted the net carbon emissions from its forest and other resource management programs.[119] Because agencies and academics have quantified and compared the carbon emissions of alternative logging proposals, NEPA requires the Forest Service to do so here.

Further, the agency failed to use, or explain why it could not, the numerous analytical tools touted by the agency on its website, where the Forest Service has touted the importance and merits of its own modeling tools:

> Accurate estimates of carbon in forests are crucial for forest carbon management, carbon credit trading, national reporting of greenhouse gas inventories to the United Nations Framework Convention for Climate Change, calculating estimates

[115] 40 C.F.R. § 1508.27(b)(7) (2019).

[116] 40 C.F.R. § 1508.7; *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41 (D.D.C. 2019) (holding that BLM erred by failing to consider the cumulative climate impacts of oil and gas leases together with "GHG emissions generated by past, present, and reasonably foreseeable BLM lease sales in the region and nation").

[117] *See* Law *et al.*, *Land use strategies* (Ex. 17) at 3664 ("Our LCA [life-cycle assessment] showed that in 2001–2005, Oregon's net wood product emissions were 32.61 million tCO2e [tons of carbon dioxide equivalent in net GHG emissions] (Table S3), and 3.7- fold wildfire emissions in the period that included the record fire year (15) (Fig. 2) In 2011–2015, net wood product emissions were 34.45 million tCO2e and almost 10-fold fire emissions, mostly due to lower fire emissions.").

[118] DellaSala (Ex. 15) at 14.

[119] *See* Bureau of Land Management, Western Oregon Proposed RMP Final EIS (2009) at 165-181, excerpts attached as Ex. 24.

> for the Montreal Process criteria and indicators for sustainable forest management, and registering forest-related activities for state and regional greenhouse gas registries and programs.
>
> Our scientists have contributed to developing a toolbox full of basic calculation tools to help quantify forest carbon for planning or reporting.[120]

Rather than acknowledging current science or availing itself of existing methods for disclosing the climate impacts of logging and burning that the project proposes, the Final EA dismisses any climate impacts as "immeasurable," or "small."

> During project implementation there will be *small, incremental* losses of carbon sequestration due to burning of vegetation and consumption of fossil fuels by equipment. Trees would be harvested over time; however, carbon could continue to be stored in manufactured wood products that used harvested materials (Nunery and Keeton 2010). As implementation proceeds, there will immediately be small, beneficial effects to carbon sequestration due to growth of vegetation. In the long-term, carbon sequestration would be sustainably increased through continuing growth of a healthy forest. The described changes in greenhouse gas emissions resulting from the proposed action is *immeasurable*.[121]

This analysis ignores the best available science, described above, which has concluded that:

- Carbon storage in wood products is minimal compared to the carbon stored in living trees.
- There is no proven benefit to thinning forests in terms of increasing carbon storage.
- The impacts of forest logging projects on carbon stores can be estimated/quantified.
- When the impact of logging on carbon stores is estimated, it can and should be quantified in terms of the impacts of climate pollution on the globe via the social cost of carbon.

Dismissing impacts as "small" and "immeasurable" is not only inaccurate, it is a form of climate denial. Every additional molecule of $CO_2$ emitted into the atmosphere will increase the amount of warming on Earth for centuries to come. Further, dismissing all impacts as "immeasurable" deprives the public and the decisionmaker of any understanding of the relative impacts of each alternative. For example, it is likely that the large tree retention alternative (Alternative 3) will result in the retention of more carbon stores than Alternative 2 because large trees store more carbon than smaller trees.

---

[120] Forest Service, Tools for carbon inventory, management, and reporting (Nov. 2018), attached as Ex. 25, and available at https://www.nrs.fs.fed.us/carbon/tools/#cole (last viewed Aug. 6, 2021).

[121] Final EA at 109 (emphasis added).

The Forest Service's failure to address or acknowledge that there are peer-reviewed scientific approaches to estimating net climate damage caused by logging forests is another independent NEPA violation. NEPA requires agencies to explain opposing viewpoints and their rationale for choosing one viewpoint over the other.[122] Courts have set aside agency actions where the agency failed to respond to scientific analysis that called into question the agency's assumptions or conclusions.[123] Nor can agencies decline to disclose the nature and scale of climate pollution impacts because the disclosing such information may be difficult.[124]

Here, the Final EA ignores and contradicts the most recent national policy direction and science on forests and carbon sequestration, including many of the studies attached here. The Final EA ignores years of climate science that: underscores the desperate need for action on climate change; shows that forest logging like that proposed in the Salter Project will likely worsen climate pollution and the climate emergency; and demonstrates, contrary to the Forest Service's lack of analysis, that the Forest Service can quantify the Project's carbon impacts.

The U.S. District Court for the District of Montana earlier this year set aside a federal agency NEPA analysis for failing to quantify the social costs of an agency action's climate pollution.[125] As noted above, President Biden has already announced that his administration would reinstate the Interagency Working Groups' Social Cost of Carbon using a metric that includes global damage from climate-forcing pollution, and the Working Group (which includes the U.S. Department of Agriculture, the Forest Service's parent agency) has set a price for agencies (including the Forest Service) to utilize in their analyses.

---

[122] 40 C.F.R. § 1502.9(b) (2019) (requiring agencies to disclose, discuss, and respond to "any responsible opposing view").

[123] *See De La Comunidad v. FERC*, 2021 U.S. App. LEXIS 22881 at *14-*15 (failure to respond to significant opposing viewpoints concerning the adequacy of agency's analyses of the project's greenhouse gas emissions violated NEPA); *Ctr. for Biological Diversity v. U.S. Forest Serv*., 349 F.3d 1157, 1168 (9th Cir. 2003) (finding Forest Service's failure to disclose and respond to evidence and opinions challenging EIS's scientific assumptions violated NEPA); *Seattle Audubon Soc'y v. Moseley*, 798 F. Supp. 1473, 1482 (W.D. Wash. 1992) ("The agency's explanation is insufficient under NEPA – not because experts disagree, but because the FEIS lacks reasoned discussion of major scientific objections."), aff'd sub nom. *Seattle Audubon Soc'y v. Espy*, 998 F.2d 699, 704 (9th Cir. 1993) ("[i]t would not further NEPA's aims for environmental protection to allow the Forest Service to ignore reputable scientific criticisms that have surfaced").

[124] *See* 40 C.F.R. § 1502.22 (1978) (concerning agency duty to disclose allegedly unavailable information); *De La Comunidad v. FERC* (citing same).

[125] *WildEarth Guardians v. Bernhardt*, 2021 U.S. Dist. LEXIS 20792 at *25-*32, 2021 WL 363955, CV 17-80-BLG-SPW (D. Mont. Feb. 3, 2021) (endorsing magistrate judge's determination that the Office of Surface Mining "failed to take a 'hard look' at the costs of greenhouse gas emissions and failed to reasonably justify its reasoning for not quantifying the costs of the mining plan when the Social Cost of Carbon Protocol ... was available to do just that").

We note that the Final EA, like the Draft, continues to rely on agency direction that is out of date and out of step with the present administration. The Forest Service relies on guidance entitled "Climate Change Considerations in Project Level NEPA Analysis," a flawed document that was the product of the final week of the George W. Bush administration in January 2009, and that has long been overtaken by both federal case law and CEQ's 2016 guidance, now restored, requiring robust project level NEPA analysis and improved modeling and scientific data.[126] The Forest Service cannot continue to rely on the 2009 guidance document unless and until it can explain how that guidance comports with current administration direction, CEQ guidance, and caselaw. Further, the Forest Service's approach here contradicts CEQ's 2016 guidance which directs that "resource management agencies should include a comparison of estimated net GHG emissions and carbon stock changes that are projected to occur with and without implementation of proposed land or resource management actions."[127]

Finally, while the Forest Service may assert that the logging the forest will prevent fires that will result in greater carbon pollution, at least one study found the opposite: that at least at an aggregate level, logging resulted in many times more carbon pollution than did wildfire.[128] The Forest Service failed to address or respond to this study, violating NEPA.

b. The Forest Service fails to disclose and quantify the carbon pollution of implementing the Salter Project.

Logging and burning within the project area for a decade will require the use of heavy equipment, almost certainly exclusively powered by fossil-fueled engines, to bulldoze a vast network of up to 117 miles of temporary road, to "reconstruct" other roads, and to chainsaw forests, remove trees, and take them to market. This activity will result in greenhouse gas pollution that will worsen climate change for centuries, and that pollution caused by the proposed action will be over and above the pollution that will occur under the no action alternative. The Final EA fails to estimate or otherwise address such impacts, saying only that "During project implementation there will be small, incremental losses of carbon sequestration due … consumption of fossil fuels by equipment."[129] The Final EA similarly fails to disclose how such pollution would vary by alternative.

---

[126] *See* Final EA at 109 (explicitly relying on Forest Service Jan. 2009 guidance).

[127] CEQ 2016 Climate Guidance (Ex. 12) at 26.

[128] N.L. Harris et al., Attribution of net carbon change by disturbance type across forest lands of the conterminous United States, Carbon Balance and Management (2016), attached as Ex. 26, and available at https://www.fs.fed.us/nrs/pubs/jrnl/2016/nrs_2016_harris_001.pdf (last viewed Aug. 6, 2021).

[129] Final EA at 109.

This contrasts to the approach taken elsewhere by the Forest Service and other agencies, such as the Office of Surface Mining, which have disclosed in NEPA documents the estimated pollution from internal combustion engines necessary to mine, process, and ship coal to market.[130]

We do not endorse as sufficient either the OSM or the Forest Service's Federal Coal Lease Modifications analyses cited, but they demonstrate that agencies (including the Forest Service itself) can and do attempt to disclose direct climate emissions from construction and transport activities. The Forest Service failed to respond to this comment in any way, and failed to address the science indicating such analysis is possible. The Forest Service provides no reasonable basis for failing to do the same for the Salter Project, and thus violates NEPA and the Administrative Procedure Act.

> *Suggested Remedy*. The San Juan National Forest should prepare a supplemental NEPA document, preferably a Draft EIS, that quantifies and discloses the climate impacts of the project's removal of trees, and that quantifies and discloses the climate impacts of logging, hauling, and processing timber.

## III. THE FINAL EA'S RELIANCE ON 'ADAPTIVE MANAGEMENT' VIOLATES NEPA.

The Salter Final EA relies in part on an "adaptive management" strategy to "inform implementation and to provide the opportunity to solicit input from partners that could be incorporated into the decision making process when addressing changing conditions on the ground in real-time."[131] The Final EA states that pursuant to this plan, "[a]djustments to prescriptions could be made at any time as long as they are within the scope of this analysis."[132]

To be effective and legal, adaptive management must: (1) clearly identify measurable thresholds that, if exceeded as determined by monitoring, will require a change in management; (2) clearly identify what that changed management will entail; and (3) disclose in this NEPA document the impacts caused by that change in management. Because the Final EA, like the Draft, fails on at

---

[130] *See, e.g.*, Office of Surface Mining & Bureau of Land Management, Environmental Assessment, Colowyo Coal Mine Collom Permit Expansion Area Project (Jan. 2016) at 4-15 – 4-18 (including table assessing "direct GHG emissions" from "drills," "dozers," "graders," "haul trucks," etc., for the proposed action), excerpts attached as Ex. 27; U.S. Forest Service, Supplemental Final Environmental Impact Statement, Federal Coal Lease Modifications COC-1362 & COC-67232 (Aug. 2017) at 102-113 (publishing tables estimating emissions of air pollutants, including greenhouse gases CO2 and Ch4 (methane) for activities including road and well pad construction, heavy equipment use, and commuter vehicle trips for the no action and proposed action alternatives), excerpts attached as Ex. 28.

[131] Final EA at 29.

[132] Final EA at 29.

least the last count, the Forest Service cannot rely on the adaptive management strategy as divulged in the EA.[133]

### A. The Law of Adaptive Management.

Forest Service NEPA regulations, adopted in 2008, define adaptive management as "[a] system of management practices based on *clearly identified intended outcomes and monitoring* to determine if management actions *are meeting those outcomes*; and, if not, to facilitate management changes that will best ensure that those outcomes are met or re-evaluated. Adaptive management stems from the recognition that knowledge about natural resource systems is sometimes uncertain."[134] These regulations further state that:

> An adaptive management proposal or alternative must *clearly identify the adjustment(s) that may be made* when monitoring during project implementation *indicates that the action is not having its intended effect*, or is causing unintended and undesirable effects. The EIS must disclose not only the effect of the proposed action or alternative *but also the effect of the adjustment*. Such proposal or alternative must also *describe the monitoring that would take place* to inform the responsible official during implementation whether the action is having its intended effect.[135]

The preamble to the Forest Service's regulation that adopted the adaptive management definition states that the agency must identify the proposed changes, and their impacts, in the NEPA document. "When proposing an action the responsible official may identify possible adjustments that may be appropriate during project implementation. Those possible adjustments must be described and their effects analyzed in the EIS." 73 Fed. Reg. 43,084, 43,090 (July 24, 2008).

Federal courts have found agencies violated NEPA or the Endangered Species Act (ESA) where the agency relied on an "adaptive management" plan that was vague, set no specific triggers for future action, failed to describe that future action, or failed to ensure that resources will be protected as the adaptive management plan asserts.

In *Natural Resources Defense Council v. U.S. Army Corps of Engineers*, 457 F. Supp. 2d 198 (S.D.N.Y. 2006), the court found that the Army Corps' attempt to supplement an inadequately-explained finding of no significant impact concerning a dredging project was arbitrary and capricious where the agency relied on ill-defined "adaptive management" protocols to conclude that impacts would be mitigated below the level of significance.

> The EA makes several promises that it will alter its monitoring plan should it prove necessary. For example, the EA relies on a general promise that it will "as

[133] The Center and Guardians raised each of the issues discussed in this section with the Forest Service in comments on the Draft EA. *See* Center Draft EA Comment (Ex. 1) at 27-31. The Forest Service failed to respond to our letter in any way.

[134] 36 C.F.R. § 220.3 (emphasis added).

[135] 36 C.F.R. § 220.5(e)(2) (emphasis added).

> appropriate, reevaluate, the need for altering its dredging methods" … through the use of its coordination plan and monitoring program. The EA also explains that the Corps will follow "adaptive management practices as it moves through construction of its contracts," thus allowing it to change future contracts should the data indicate it is necessary. These promises, however, provide no assurance as to the efficacy of the mitigation measures. The Corps did not provide a proposal for monitoring how effective "adaptive management" would be.[136]

*Mountaineers v. United States Forest Service*, 445 F. Supp. 2d 1235 (W.D. Wash. 2006) set aside a Forest Service decision to open motor vehicle trails where the agency proposed to monitor impacts to wildlife and potentially change the trails later based on an adaptive management plan. The court stated that these adaptive management strategies "amount … to a 'build-first, study later' approach to resource management. This backward-looking decision making is not what NEPA contemplates."[137] Other cases similarly conclude that NEPA forbids the use of ill-defined adaptive management plans to assume away likely impacts of agency action.[138]

Courts also hold unlawful agency projects that may impact species protected by the Endangered Species Act where the biological opinion is based on the assumption that a vague and ill-defined monitoring and adaptive management plan will mitigate impacts to the species at issue. These cases provide a useful analogy to adaptive management in the NEPA context. *Natural Resources Defense Council v. Kempthorne*, 506 F. Supp. 2d 322 (E.D. Ca. 2007) is key precedent. There, plaintiffs challenged a proposed plan to manage water diversions in a manner that could adversely impact the delta smelt, a species listed as threatened under the Endangered Species Act. The Fish and Wildlife Service prepared a biological opinion (BiOp) on the proposal which concluded that the project would neither jeopardize the smelt nor adversely modify the smelt's critical habitat. "Although the BiOp recognize[d] that *existing* protective measures may be inadequate, the FWS concluded that certain proposed protective measures, including … a proposed 'adaptive management' protocol would provide adequate protection."[139]

Plaintiffs alleged, among other things, that the BiOp "relie[d] upon uncertain (and allegedly inadequate) adaptive management processes to monitor and mitigate the [project's] potential impacts."[140] They asserted that the adaptive management plan, which required a working group meet and consider adaptive measures in light of monitoring, failed to meet the ESA's mandate that mitigation be

---

[136] *NRDC v. United States Army Corps of Eng'rs*, 457 F. Supp. 2d at 234 (citations omitted).

[137] *Mountaineers v. United States Forest Serv.*, 445 F. Supp. 2d at 1250.

[138] *See, e.g.*, *High Sierra Hikers Association v. Weingardt*, 521 F. Supp. 2d 1065, 1090-91 (N.D. Ca. 2007) (overturning a Forest Service decision to liberalize the rules limiting campfires in high country parts of a wilderness area on the grounds that the agency could not rely on adaptive management to overcome an inadequate response to the problems raised in the record).

[139] *NRDC v. Kempthorne*, 506 F. Supp. 2d at 333-34 (emphasis in original).

[140] *Id.* at 329.

> "'reasonably specific, certain to occur, and capable of implementation'" because: (1) the [working group] has complete discretion over whether to meet and whether to recommend mitigation measures; (2) even if the [working group] meets and recommends mitigation measures, the [agency management team] group is free to reject any recommendations; (3) there are no standards to measure the effectiveness of actions taken; (4) reconsultation is not required should mitigation measures prove ineffective; and (5) ultimately, no action is ever required.[141]

The *Kempthorne* court cited prior caselaw holding that "a mitigation strategy [in the ESA context] must have some form of measurable goals, action measures, and a certain implementation schedule; i.e., that mitigation measures must incorporate some definite and certain requirements that ensure needed mitigation measures will be implemented."[142] The court found that adaptive management plan "does not provide the required reasonable certainty to assure appropriate and necessary mitigation measures will be implemented."[143] The court concluded that

> Adaptive management is within the agency's discretion to choose and employ, however, the absence of any definite, certain, or enforceable criteria or standards make its use arbitrary and capricious under the totality of the circumstances.[144]

### B. The Final EA's Plan Does Not Comply with Law for Adaptive Management.

Although the Final EA states that it relies on adaptive management, the proposal it describes does not contain key elements required to comply with NEPA. While adaptive management may be an appropriate tool to assist in management of the Salter Project area, we urge the Forest Service, as part of the NEPA process, to develop a more detailed plan, identify specific management changes in case those triggers are met, and analyze and disclose the impacts of those changes.

The adaptive management approach described in the Final EA fails to "clearly identify the adjustment(s) that may be made when monitoring during project implementation indicates that the action is not having its intended effect."[145] The Final EA includes vaguely-described adjustments, which violates Forest Service rules concerning adaptive management. For example, proposed "adaptive management actions" for several proposed factors includes – or is limited to – a statement that the agency will "Monitor and adjust" or "Monitor and adjust … as needed."[146]

---

[141] *Id.* at 352. *See also id.* at 350 (explaining the "certain to occur" standard and citing *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002)).

[142] *Id.* at 355 (citing *Rumsfeld*, 198 F. Supp. 2d at1153).

[143] *Id.* at 356.

[144] *Id.* at 387.

[145] 36 C.F.R. § 220.5(e)(2) (emphasis added).

[146] Final EA at 32.

This provides neither the Forest Service nor the public with any detail about how the agency might "adjust" its actions.

And because the Final EA does not explain what those "adjustment" may entail, the proposed adaptive management plan violates Forest Service regulations requiring that the NEPA analysis "disclose not only the effect of the proposed action or alternative *but also the effect of the adjustment*."[147] The Final EA, like the Draft, fails to disclose what the impacts will be if actions are adjusted pursuant to adaptive management.

The Forest Service has the authority to change a project and/or approve new actions within a project area in response to changes, but it can do so only in accordance with NEPA and the agency's own regulations. The adaptive management plan in the Final EA currently fails to comply with these laws. We urge the Forest Service to develop a specific plan in cooperation with the public and all stakeholders before it issues any additional NEPA document or proposed decision.

> *Suggested Remedy*. The San Juan National Forest should prepare a supplemental NEPA document, preferably a Draft EIS, that properly applies the agency's law and policy regarding adaptive management, or explain that it is not using that approach.

## IV. THE FINAL EA FAILS TO ANALYZE A RANGE OF REASONABLE ALTERNATIVES.

In taking the "hard look" at impacts that NEPA requires, an EA must "study, develop, and describe" reasonable alternatives to the proposed action.[148] The Tenth Circuit explains that this mandate extends to EAs as well as EISs. "A properly-drafted EA must include a discussion of appropriate alternatives to the proposed project."[149] This alternatives analysis "is at the heart of the NEPA process, and is 'operative even if the agency finds no significant environmental impact.'"[150] Reasonable alternatives must be analyzed for an EA even where a FONSI is issued because "nonsignificant impact does not equal no impact. Thus, if an even less harmful alternative is feasible, it ought to be considered."[151] When an agency considers reasonable alternatives, it "ensures that it has considered all possible approaches to, and potential

---

[147] 36 C.F.R. § 220.5(e)(2) (emphasis added).

[148] 42 U.S.C. § 4332(2)(C) & (E); 40 C.F.R. § 1508.9(b) (an EA "[s]hall include brief discussions ... of alternatives").

[149] *Davis v. Mineta*, 302 F.3d 1104, 1120 (10th Cir. 2002) (granting injunction where EA failed to consider reasonable alternatives).

[150] *Diné Citizens Against Ruining Our Env't v. Klein*, 747 F. Supp. 2d 1234, 1254 (D. Colo. 2010) (quoting *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1277 (10th Cir. 2004)). *See also W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013) (in preparing EA, "an agency must still give full and meaningful consideration to *all* reasonable alternatives" (emphasis added) (internal quotation and citation omitted)); 40 C.F.R. § 1502.14 (describing alternatives analysis as the "heart of the environmental impact statement").

[151] *Ayers v. Espy*, 873 F. Supp. 455, 473 (D. Colo. 1994) (internal citation omitted).

environmental impacts of, a particular project; as a result, NEPA ensures that the most intelligent, optimally beneficial decision will ultimately be made."[152]

In determining whether an alternative is "reasonable," and thus requires detailed analysis, courts look to two guideposts: "First, when considering agency actions taken pursuant to a statute, an alternative is reasonable only if it falls within the agency's statutory mandate. Second, reasonableness is judged with reference to an agency's objectives for a particular project."[153] Any alternative that is unreasonably excluded will invalidate the NEPA analysis. "The existence of a viable but unexamined alternative renders an alternatives analysis, and the EA which relies upon it, inadequate."[154] The agency's obligation to consider reasonable alternatives applies to citizen-proposed alternatives.[155]

Courts hold that an alternative may not be disregarded merely because it does not offer a complete solution to the problem.[156] Even if additional alternatives would not fully achieve the project's purpose and need, NEPA "does not permit the agency to eliminate from discussion or consideration a whole range of alternatives, merely because they would achieve only some of the purposes of a multipurpose project."[157] If a different action alternative "would only partly meet the goals of the project, this may allow the decision maker to conclude that meeting part of the goal with less environmental impact may be worth the tradeoff with a preferred alternative that has greater environmental impact."[158]

The courts also require that an agency adequately and explicitly explain in the EA any decision to eliminate an alternative from further study.[159]

---

[152] *Wilderness Soc'y v. Wisely*, 524 F. Supp. 2d 1285, 1309 (D. Colo. 2007) (quotations & citation omitted).

[153] *Diné Citizens Against Ruining Our Env't*, 747 F. Supp. 2d at 1255 (quoting *New Mexico ex rel. Richardson*, 565 F.3d at 709).

[154] *Id.* at 1256.

[155] *See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin*., 538 F.3d 1172, 1217-19 (9th Cir. 2008) (finding EA deficient, in part, for failing to evaluate a specific proposal submitted by petitioner); *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1171 (10th Cir. 1999) (agency's "[h]ard look" analysis should utilize "*public comment* and the best available scientific information") (emphasis added).

[156] *Natural Resources Defense Council, Inc. v. Morton*, 458 F.2d 827, 836 (D.C. Cir. 1972).

[157] *Town of Matthews v. U.S. Dep't. of Transp.*, 527 F. Supp. 1055 (W.D. N.C. 1981).

[158] *North Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1542 (11th Cir. 1990).

[159] *See Wilderness Soc'y*, 524 F. Supp. 2d at 1309 (holding EA for agency decision to offer oil and gas leases violated NEPA because it failed to discuss the reasons for eliminating a "no surface occupancy" alternative); *Ayers*, 873 F. Supp. at 468, 473.

### A. The Forest Service Must Consider Alternatives that Limit the Logging of Large or Old Trees.[160]

Large and old ponderosa pine trees are relatively rare now in the Southwest compared to the period before European settlement because they were heavily logged over the last 150 years. Large, old ponderosa serve valuable ecosystem functions, have outsize value for wildlife, are more fire resistant, serve as important storehouses of genetic diversity, and store significant amounts of carbon.[161] The Forest Service confirms that large and old trees are the rarest cohort of trees in the Salter Project area, with almost no trees larger than 26" dbh, and a relatively small fraction above 20" dbh.[162]

A recent scientific review, whose authors include many Forest Service researchers, confirms the importance of protecting large, old trees to improve forest resilience and protection wildlife.[163] The study, among other things, states:

> "Forest thinning in these forest types [should be] aimed *at retaining larger, more fire-resilient tree species*, and restoring open canopy structure."[164]
>
> "Fuel treatments that modify within-stand structure to remove small trees and reduce surface fuels *while retaining large, more fire-resistant trees* and variable stand structure (Stephens et al. 2021) are most appropriate in dry pine, dry to moist mixed-conifer forests and oak woodlands, particularly where there is evidence that older fire-resistant species have been or are being replaced by younger fire-sensitive species (e.g. Yocom-Kent et al. 2015)."[165]
>
> "[*T*]*reatments that restore the ecological resilience of old-growth forests and patches with large and old trees are critical to long term maintenance of wildlife habitats* (Hessburg et al. 2020) of seasonally dry forests and terrestrial carbon

---

[160] The Center and Guardians raised each of the issues discussed in this section with the Forest Service in comments on the Draft EA. *See* Center Draft EA Comment (Ex. 1) at 31-36. The Forest Service failed to respond to our letter in any way.

[161] *See, e.g.*, Four Forest Restoration Initiative, Old Growth Protection & Large Tree Retention Strategy (Sep. 13, 2011) at 3-4 (citing numerous studies), attached as Ex. 29.

[162] *See* Final EA at 7 (Figure 4) (showing no trees over 29" dhb).

[163] S. J. Pritchard, P. *et al.*, Adapting western North American forests to climate change and wildfires: ten common questions, *Ecological Applications* (July 2021), attached as Ex. 30, and available at https://esajournals.onlinelibrary.wiley.com/doi/epdf/10.1002/eap.2433 (last viewed Aug. 6, 2021).

[164] *Id.* at PDF page 11 (emphasis added).

[165] *Id.* at PDF page 13 (emphasis added).

> stocks, and slowing the feedback cycle between fire and climate change (Hurteau and North 2009).”[166]
>
> “Several studies highlight that the most effective fuel treatments include coupled thinning and burning (Kalies and Yocom Kent 2016), *and emphasize the importance of retaining large, fire-resistant trees* in dry mixed conifer forests (Agee and Skinner 2005, DellaSala et al. 2004, Stephens et al. 2009).”[167]
>
> “Although the management situation for wNA [western North America] forests is daunting, our review of the scientific literature offers clear guidance. In seasonally dry wNA forests that were historically dominated by fire-resistant species, restoring open, fire-tolerant canopy structure and composition, *favoring larger tree sizes*, and reducing surface fuels can effectively mitigate subsequent wildfire and stabilize carbon stocks (Fig. 1).”[168]

As a result, numerous studies, collaboratives, and Forest Service decisions have emphasized the need to protect large and old ponderosa pine trees in order to achieve both ecological restoration and greater resilience to catastrophic events such as wildfire and insect infestations. These decisions have often done so by setting an upper limit for the size of trees that can be logged for forest management.

For example, the Four Forest Restoration Initiative, a collaborative guided by science and working to improve management on forests in northern Arizona, has adopted an “Old Growth Protection & Large Tree Retention Strategy.”[169] As part of that strategy, “the 4FRI Collaborative has agreed that the 4FRI effort should implement large tree retention and old growth protection strategies that are … are based upon a 16” diameter threshold that limits the cutting of trees larger than 16” to circumstances and criteria set forth in pre-defined exception categories.”[170] A similar collaborative in New Mexico agreed that “It is generally advisable to maintain ponderosa pines larger than 41 cm (16 inches) diameter at breast height (dbh) and other trees with old-growth morphology regardless of size (e.g. yellow-barked ponderosa pine or any species with large drooping limbs, twisted trunks or flattened tops).”[171]

One peer-reviewed study concludes:

---

[166] *Id.* at PDF page 22 (emphasis added).

[167] *Id.* at PDF page 27 (emphasis added).

[168] *Id.* at PDF page 34 (emphasis added).

[169] Four Forest Restoration Initiative, Old Growth Protection & Large Tree Retention Strategy (Ex. 29).

[170] *Id.* at 7.

[171] U.S. Forest Service *et al.*, New Mexico Forest Restoration Principles (May 2006), attached as Ex. 31, available at https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5207898.pdf (last viewed Aug. 6, 2021).

> Large and old trees, especially those established before ecosystem disruption by Euro-American settlement, are rare, important, and difficult to replace. Their size and structural complexity provide critical wildlife habitat by contributing crown cover, influencing understory vegetation patterns, and providing future snags. Ecological restoration should protect the largest and oldest trees from cutting and crown fires, focusing treatments on excess numbers of small young trees. Given widespread agreement on this point, *it is generally advisable to retain ponderosa trees larger than 41 cm (16 inches) dbh and all trees with old-growth morphology regardless of size (i.e., yellow bark, large drooping limbs, twisted trunks, flattened tops)*. Despite the heterogeneity of forest site and stand conditions in the Southwest, cutting of larger trees will seldom be ecologically warranted as ‘‘restoration’’ treatments at this time due to their relative scarcity. Following this guideline would significantly reduce hazards of stand-replacing fires in most cases and also favor the development of future old-growth forest conditions (Moir and Dieterich 1988, Harrington and Sackett 1992).[172]

This article notes that managing ponderosa pine forests for ecological restoration can also help increase forest resilience.[173]

For the San Juan National Forest, the Forest Service and other stakeholders joined to establish the Ponderosa Pine Partnership (PPP) in the early 1990s. The Partnership developed "An Ecological Prescription for the San Juan Pine Zone," including this prescription: "Retain large trees. Any trees 20 inches or larger in diameter should be retained. In stands with smaller trees, the largest trees should be retained."[174] The San Juan National Forest developed and partially implemented two projects under the PPP, including the Guard Station and Ferris East timber sales. Both of these timber sales included diameter limits. The Guard Station Decision Notice prohibited the logging of trees over 16 inches dbh; the Ferris East Decision notice barred logging of ponderosa over 20 inches dbh.[175] Each of the sales was designed to meet goals that included forest restoration, supplying the needs of the local wood products industry, and reducing the risk of catastrophic wildfire.[176]

---

[172] Allen *et al*., Ecological Restoration of Southwestern Ponderosa Pine Ecosystems: A Broad Perspective, Ecological Applications, 12(5) (2002) at 1425, attached as Ex. 32.

[173] *Id*. at 1429 (emphasis added).

[174] D. Lynch, Forest Restoration in Southwestern Ponderosa Pine, Journal of Forestry (Aug. 2000) at 17, attached as Ex. 33.

[175] San Juan National Forest, Guard Station Timber Sale, Decision Notice (May 1996) at 3 ("Cut no trees greater than 16" diameter breast height (DBH)"), attached as Ex. 34; San Juan National Forest, Ferris East Timber Sale, Decision Notice (Feb. 1998) at 3 ("No ponderosa pine in excess of 20 inches in diameter at breast height (DBH) will be harvested."), attached as Ex. 35.

[176] *Id*.

This science and social history demonstrate that diameter limits in ponderosa pine on the San Juan National Forest are reasonable, and should be considered in any NEPA analysis concerning logging in such pine forests.

1. The Final EA fails to address the key differences between Alternatives 2 and 3.

The Salter Project identifies purposes similar to those identified for the Guard Station and Ferris East projects, and proposes one alternative, Alternative 3, that would protect large and old trees over 20 inches dbh.

We appreciate the Forest Service analyzing Alternative 3 in detail. However, the Final EA, like the Draft, fails to disclose the different impacts of the two action alternatives.

The Final EA concludes that there would be virtually no difference in the impacts between Modified Alternative 2 (which protects the tiny fraction of trees 26.9" dbh and larger) and Alternative 3 for most of the resources analyzed. For example, the Final EA states that there would be no difference in the impacts of the two alternatives with respect to fuels and fire management: "the direct, indirect, and cumulative effects to fuels and fire management of both action alternatives *are the same*."[177] The Final EA also concludes the impacts to watersheds would be the same, and repeatedly concludes that impacts to different wildlife species under the two alternatives would be "similar."[178]

While for almost every resource the Forest Service concludes that the impacts of the two action alternatives would be the same or similar, the Final EA concludes that Alternative 3's large tree retention limits would allow the San Juan NF to meet "desired conditions … to a lesser degree" at "specific locations" (which the EA does not identify) and "over time and over cutting cycles" (though for how long is not specified).[179] The Final EA further states that under Alternative 3: "Basal area retention goals and uneven aged characteristics are being compromised, leaving stands less resilient and making long term resistance less likely to occur."[180] The EA does not disclose how much less resilient, or what the impacts of that allegedly reduced resilience might be. Because the EA concludes that there is little or no difference between Alternatives 2 and 3 in terms of their impact on fire management, watersheds, and wildlife, the level of reduced resilience would appear to be minimal at most.

The Final EA does identify one major difference: "Removing areas from treatment as result of diameter limitation reduces the amount of treatment in an area and subsequently *the amount of harvestable volume per acre*."[181] This would appear to be the primary trade-off between the two alternatives: increased volume (and perhaps a minimal amount of increased resilience) vs.

---

[177] Final EA at 41 (emphasis added).

[178] Final EA at 70-72 (watersheds), 80, 82, 84 (wildlife).

[179] Final EA at 66.

[180] Final EA at 66.

[181] Final EA at 66 (emphasis added).

increased protection for old and large trees. But the EA fails to sharply define the differences between the two action alternatives by failing to quantify (or qualify) the *level* of difference for any of these factors: how much extra timber would be available for mills under Alternative 2? How much additional resilience would Alternative 2 provide compared to Alternative 3? How many more large trees would remain under Alternative 3 and what would that mean for the potential for increased wildlife snags, carbon storage, etc.? Because the Forest Service fails to grapple with these critical issues, the alternatives analysis fails to address the "heart" of the environmental analysis, violating NEPA.

> *Suggested Remedy.* The San Juan National Forest should prepare a supplemental NEPA document, preferably a Draft EIS, that discloses and quantifies the differences between the two action alternatives, including but not limited to the differences in the volume of timber removed from the Forest.

2. The Forest Service should analyze a restoration alternative that protects trees 16" dbh and larger.

Because the PPP recommended protecting trees 16" dbh and larger in some cases, and because the Forest Service found little difference between Alternatives 2 (modified or not) and 3, we specifically requested that the Forest Service analyze in detail (or explain why it cannot) an alternative that protects trees 16" dbh and larger.[182] Analyzing such an alternative would allow the public and the decisionmaker to compare the relative merits of protecting different size classes of trees, and to understand whether protecting trees 20" dbh (per Alternative 3) is a reasonable middle ground. It is also an alternative that is most likely to protect all pre-settlement trees, which studies have concluded is critical to restore ponderosa pine forests in the Southwest.

Neither the Final EA nor the Draft Decision Notice responds in any way to this proposed alternative, violating NEPA, which federal courts in Colorado have held requires the agency to analyze reasonable alternatives suggested by the public or provide a reasonable explanation for not doing so.[183]

> *Suggested Remedy*. The San Juan NF should prepare a supplemental NEPA document, preferably a Draft EIS, that analyzes a restoration alternative that protects trees 16" dbh and larger.

## V. THE FINAL EA FAILS TO ACCOUNT FOR STUDIES PREDICTING THE IMPACT OF CLIMATE CHANGE TO THE FOREST IN THE PROJECT AREA.

For the Final EA to meet NEPA's mandate that environmental analysis include information "of high quality" and must include "[a]ccurate scientific analysis."[184]

---

[182] *See* Center Draft EA Comment (Ex. 1) at 35-36.

[183] *Wilderness Soc'y v. Wisely*, 524 F. Supp. 2d at 1309 (D. Colo. 2007).

[184] 40 C.F.R. § 1500.1(b).

Forests within the project area are likely to undergo significant changes in the coming years due to climate change. However, the Final EA, fails to account for the fact that these changes may undercut key project assumptions and goals. The Forest Service's failure to accurately address these impacts by including and addressing in detail relevant, expert information violates NEPA.[185]

The Salter Project is premised in part on the conclusion that thinning and other logging projects would, over the "long term," enhance the forest's resilience to fire, insect infestation, and drought; all of these threats are driven and exacerbated by climate change. The likelihood that the project could achieve benefits over the long term must be weighed against the predicted impacts of climate change, which could make the recovery of ponderosa pine in this area difficult if not impossible, even assuming the Salter treatments take place.

A Forest Service study concluded that by the 2050s to 2060s, current forest types in the project area will be lost due to climatic changes brought on by the warming of the planet due to anthropogenic climate change.

In 2017, Forest Service Rocky Mountain Region staff and researchers presented results from bioclimate models concluding that ponderosa pine would likely be lost from the Salter Project area in the 2056-65 time period.[186]

The Final EA fails to cite or directly respond to this expert study generated by the Forest Service; the agency must do both in any subsequently prepared NEPA document to comply with the law. Indeed, the Final EA fails to identify climate change as something likely to have a cumulative impact on vegetation, relegating discussion of the issue to a section the Draft EA entitled "Resources dismissed from detailed analysis," but that the Final EA renamed "Other Disclosures," and buried in an appendix.[187] This appears to directly conflict with Forest Plan direction that requires vegetation management will "anticipates[]climate-related plant succession changes."[188]

---

[185] The Center and Guardians raised each of the issues discussed in this section with the Forest Service in comments on the Draft EA. *See* Center Draft EA Comment (Ex. 1) at 36-37.

[186] J. Worrall *et al*., Projected Impacts of Climate Change on Forests of the Dolores Watershed, presentation to the Dolores Watershed Resilient Forest Collaborative (2017) at slides 29, 39 & 52 (showing results of bioclimate models predicting the likely persistence of various forest types, which characterize ponderosa pine as "lost" for most of the project area), attached as Ex. 36, and available at http://dwrfcollaborative.org/wp/wp-content/uploads/2018/06/projected-impacts-of-climate-change-on-forests-of-the-dolores-watershed.pdf (last viewed Aug. 6, 2021). Other forest types will suffer in the area as well. *See id.* at slide 33 (showing Gambel oak "threatened"); *id*. at slide 35 (showing aspen "lost" in the project area, even in a "favorable climate" scenario).

[187] *See* Draft EA at 102-03; Final EA at 109.

[188] Final EA at 10 (quoting San Juan Forest Plan at 2.9.1).

At a bare minimum, the Forest Service should have been honest with the public about the likely fate of the forest in the Salter area in light of climate change, and what that means about the efficacy of the project. The Final EA failed to take this required step, violating NEPA.

> Suggested Remedy. The San Juan NF should prepare a supplemental NEPA document, preferably a Draft EIS, that

## VI. THE FINAL EA FAILS TO RESPOND TO SCIENTIFIC EXPERTS AND CONFLICTING SCIENTIFIC CONCLUSIONS.

### A. NEPA Requires Agencies to Respond to Comments, Especially Opposing Scientific Views.

NEPA requires agencies to explain opposing viewpoints and their rationale for choosing one viewpoint over the other.[189] Federal courts have set aside NEPA analysis where the agency failed to respond to scientific analysis that calls into question the agency's assumptions or conclusions.[190]

### B. The Final EA Fails to Address or Acknowledge Expert Opinions of Forest Scientists.

The Final EA fails to respond or acknowledge comments timely submitted by Dr. Bill Baker in March 2020 concerning scoping, and in February 2021 responding to the Draft EA.[191] Nor does the Final EA address or respond to the studies he cited questioning the efficacy of the treatments the Forest Service proposes, or those studies demonstrating the need to protect old and large

---

[189] 40 C.F.R. § 1502.9(b) (requiring agencies to disclose, discuss, and respond to "any responsible opposing view").

[190] *See De La Comunidad v. FERC*, 2021 U.S. App. LEXIS 22881 at *14-*15 (finding agency violated NEPA where it "failed to respond to significant opposing viewpoints concerning the adequacy of its analyses"); *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1168 (9th Cir. 2003) (finding Forest Service's failure to disclose and respond to evidence and opinions challenging EIS's scientific assumptions violated NEPA); *Seattle Audubon Soc'y v. Moseley*, 798 F. Supp. 1473, 1482 (W.D. Wash. 1992) ("The agency's explanation is insufficient under NEPA – not because experts disagree, but because the FEIS lacks reasoned discussion of major scientific objections."), *aff'd sub nom. Seattle Audubon Soc'y v. Espy*, 998 F.2d 699, 704 (9th Cir. 1993) ("[i]t would not further NEPA's aims for environmental protection to allow the Forest Service to ignore reputable scientific criticisms that have surfaced"); *High Country Conservation Advocates v. Forest Service*, 52 F. Supp. 3d 1174, 1198 (D. Colo. 2014) (finding Forest Service violated NEPA by failing to mention or respond to expert report on climate impacts).

[191] Dr. Baker's comments, and studies he cited, are in the Salter project file. The Center and Guardians raised each of the issues discussed in this section with the Forest Service in comments on the Draft EA. *See* Center Draft EA Comment (Ex. 1) at 37-38.

trees. Merely citing some of these studies in the EA's "References" section is not sufficient to comply with NEPA's hard look mandate.

Among other things, Dr. Baker's comments presented a detailed reconstruction of ponderosa pine diameter distributions under the historic range of variability (HRV) for an area that includes the Salter Project area, and which demonstrated the importance of retaining trees 16" dbh and larger, given the current deficit in those size classes compared to the HRV. The Forest Service violated NEPA by failing to acknowledge, review, respond to, or incorporate the data and scientific Dr. Baker presented in comments on scoping and in comments on the Draft EA.

Further, the Final EA fails to address Worrall's conclusion that much of the Salter Project area may be devoid of ponderosa pine by 2065.

> *Suggested Remedy*. The San Juan NF should prepare a supplemental NEPA document, preferably a Draft EIS, responding to experts who question the utility and impacts of the Salter proposal.

## VII. THE FINAL EA FAILS TO ANALYZE THE EFFECTIVENESS OF MITIGATION MEASURES.

### A. NEPA Mandates That Agencies Analyze Potential Mitigation Measures.

NEPA's statutory language implicitly charges agencies with mitigating the adverse environmental impacts of their actions.[192] NEPA's implementing regulations require that agencies analyze the effectiveness of proposed mitigation measures.[193]

The CEQ also has stated: "All relevant, reasonable mitigation measures that could improve the project are to be identified, even if they are outside the jurisdiction of the lead agency or the cooperation agencies."[194] According to the CEQ, "[a]ny such measures that are adopted must be explained and committed in the ROD."[195]

The Tenth Circuit has held that an agency's analysis of mitigation measures "must be 'reasonably complete' in order to 'properly evaluate the severity of the adverse effects' of a

---

[192] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351-52 (1989); *Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1522 (10th Cir. 1992).

[193] 40 C.F.R. §§ 1502.14(f), 1502.16(h).

[194] Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18026, 18031 (March 23, 1981).

[195] Forty Questions, 46 Fed. Reg. at 18036.

proposed project prior to making a final decision."[196] Mitigation "must be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated."[197]

"[O]mission of a reasonably complete discussion of possible mitigation measures would undermine the 'action-forcing' function of NEPA. Without such a discussion, neither the agency nor other interested groups and individuals can properly evaluate the severity of the adverse effects."[198] A "perfunctory description," of mitigation, without "supporting analytical data" analyzing their efficacy, is inadequate to satisfy NEPA's requirements that an agency take a "hard look" at possible mitigating measures.[199] An agency's "broad generalizations and vague references to mitigation measures ... do not constitute the detail as to mitigation measures that would be undertaken, and their effectiveness, that the Forest Service is required to provide."[200] Moreover, in its final decision documents, an agency must "[s]tate whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not."[201]

### B. The Final EA Fails to Analyze the Effectiveness of Mitigation Measures.

The Final EA does not focus on "mitigation," instead asserting that "Project design elements … were developed to minimize or eliminate potential adverse effects during implementation."[202] While the Final EA lists many "design features,"[203] it does not evaluate the effectiveness of each measure. Whether some of these measures would be effective at all is open to question because many of them are vague or ill-defined.[204]

---

[196] *Colo. Envt'l Coalition v. Dombeck*, 185 F.3d 1162, 1173 (10th Cir. 1999) (quoting *Robertson*, 490 U.S. at 352).

[197] *City of Carmel-by-the-Sea v. U.S. Dept. of Transp.*, 123 F.3d 1142, 1154 (9th Cir. 1997) (quoting *Robertson*, 490 U.S. at 353).

[198] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 353 (1989).

[199] *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998).

[200] *Id.* at 1380-81. *See also Northwest Indian Cemetery Protective Association v. Peterson*, 795 F.2d 688, 697 (9th Cir. 1986), rev'd on other grounds, 485 U.S. 439 (1988) ("A mere listing of mitigation measures is insufficient to qualify as the reasoned discussion required by NEPA."); *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1151 (9th Cir. 1988) ("Without analytical data to support the proposed mitigation measures, we are not persuaded that they amount to anything more than a 'mere listing' of good management practices.").

[201] 40 C.F.R. § 1505.2(c).

[202] Final EA at 20.

[203] Final EA at 20-29.

[204] The Center and Guardians raised each of the issues discussed in this section with the Forest Service in comments on the Draft EA. *See* Center Draft EA Comment (Ex. 1) at 38-41.

For example, one design element directs the agency to "[m]onitor noxious weeds/invasive species and treat infestations as needed for containment, minimizing rate of spread."[205] Treating "as needed" to "minimize[e]" the rate of spread provides neither the public nor the decisionmaker with useful information as to what methods the Forest Service will employ or how effective those measures will be.

At least one mitigation measure appears almost certain to be ineffective. The Final EA proposed to "reduce conflicts with recreation users during federal holidays" by barring hauling "on FSR 527 from the junction of FSR 527C to FSR 259 (Boggy Draw Trailhead) from 12 P.M. Friday to 12:01 A.M. Monday on Memorial Day [and] Labor Day."[206] This means hauling would be allowed for all but one minute of the Mondays of Memorial and Labor Days, when recreationists are likely to be using Forest Service roads in higher-than-usual numbers, and conflicts with log hauling are likely to occur. At a minimum, the Forest Service must explain why it intends to permit log hauling on these routes on Memorial Day and Labor Day, but not on the Saturday and Sunday before those days. The Forest Service declined to respond to this comment submitted on the Draft EA.

The provision allegedly mitigating impact to "elk production habitat" allows the "line officer" to approve operations in those areas.[207] No criteria or benchmarks are provided to limit the officer's discretion, and thus it is impossible to tell whether this measure can be effective.

A design element concerning road construction states that "[t]emporary roads would be held to the minimum feasible number, width and total length," but fails to explain how the agency would do so, or how minimal that width could be.[208] The measure also states that temporary roads "would be located sufficiently far from streams and other water bodies to minimize discharge into those waters except at necessary water crossings."[209] How far will that be? How will the Forest Service determine that distance? How much discharge is "minimized" discharge? Any subsequent NEPA document must address this lack of definition.

Further, some "design elements" are little more than keeping track of damage with no proposal to respond to it. One measure states that "[e]ffectiveness of road closure would also be monitored," with no explanation as to what actions the Forest Service would take it closures were found to be ineffective.[210]

In addition, the agency failed to consider how effective "design elements" are at controlling nonpoint pollution from roads. Both the rate of implementation, and their effectiveness should be considered. The Forest Service tracks the rate of implementation and the relative effectiveness of Best Management Practices (BMPs) from in-house audits, which are typically more protective

[205] Final EA at 23.

[206] Final EA at 24.

[207] Final EA at 28.

[208] Final EA at 22.

[209] Final EA at 22.

[210] Final EA at 26.

than nebulous "design elements." Information from those audits are summarized in the National BMP Monitoring Summary Report with the most recent data being the fiscal years 2013-2014.[211] The rating categories for implementation are "fully implemented," "mostly implemented," "marginally implemented," "not implemented," and "no BMPs." "No BMPs" represents a failure to consider BMPs in the planning process. More than a hundred evaluations on roads were conducted in FY2014. Of these evaluations, only about one third of the road BMPs were found to be "fully implemented."[212]

The monitoring audit also rated the relative effectiveness of the BMP. The rating categories for effectiveness are "effective," "mostly effective," "marginally effective," and "not effective." "Effective" indicates no adverse impacts to water from projects or activities were evident. When treated roads were evaluated for effectiveness, almost half of the road BMPs were scored as either "marginally effective" or "not effective."[213]

Further, a technical report by the Forest Service entitled, "Effectiveness of Best Management Practices that Have Application to Forest Roads: A Literature Synthesis," summarized research and monitoring on the effectiveness of different BMP treatments for road construction, presence and use.[214] The report found that while several studies have concluded that some road BMPs are effective at reducing delivery of sediment to streams, the degree of each treatment has not been rigorously evaluated. Few road BMPs have been evaluated under a variety of conditions, and much more research is needed to determine the site-specific suitability of different BMPs.[215] Edwards et al. (2016) cites several reasons for why BMPs may not be as effective as commonly thought. Most watershed-scale studies are short-term and do not account for variation over time, sediment measurements taken at the mouth of a watershed do not account for in-channel sediment storage and lag times, and it is impossible to measure the impact of individual BMPs when taken at the watershed scale. When individual BMPs are examined there is rarely broad-scale testing in different geologic, topographic, physiological, and climatic conditions. Further, Edwards et al. (2016) observe, "[t]he similarity of forest road BMPs used in many different states' forestry BMP manuals and handbooks suggests a degree of confidence validation that

---

[211] Carlson, J. P. Edwards, T. Ellsworth, and M. Eberle. 2015. National best management practices monitoring summary report. Program Phase-In Period Fiscal Years 2013-2014. USDA Forest Service. Washington, D.C. attached as Ex. 37, and available at https://www.fs.fed.us/biology/resources/pubs/watershed/FS-1070BMP_MonitoringSummaryReport2015_reduced.pdf (last viewed Aug. 6, 2021).

[212] *Id.* at 12.

[213] *Id.* at 13.

[214] Edwards, P.J., F. Wood, and R. L. Quinlivan. 2016. Effectiveness of best management practices that have application to forest roads: a literature synthesis. General Technical Report NRS-163. Parsons, WV: U.S. Department of Agriculture, Forest Service, Northern Research Station. 171 p. attached as Ex. 38, and available at https://www.fs.usda.gov/treesearch/pubs/53428 (last viewed Aug. 6, 2021).

[215] *See also* Anderson, C.J.; Lockaby, B.G. 2011. Research gaps related to forest management and stream sediment in the United States. Environmental Management. 47: 303-313. Available at https://link.springer.com/article/10.1007%2Fs00267-010-9604-1 (last viewed Aug. 6, 2021).

may not be justified," because they rely on just a single study.[216] Therefore, ensuring BMP effectiveness would require matching the site conditions found in that single study, a factor land managers rarely consider.

Climate change will further put into question the effectiveness of many road BMPs.[217] While the impacts of climate will vary from region to region, more extreme weather is expected across the country which will increase the frequency of flooding, soil erosion, stream channel erosion, and variability of streamflow.[218] BMPs designed to limit erosion and stream sediment for current weather conditions may not be effective in the future. Edwards et al. (2016) states, "[m]ore-intense events, more frequent events, and longer duration events that accompany climate change may demonstrate that BMPs perform even more poorly in these situations. Research is urgently needed to identify BMP weaknesses under extreme events so that refinements, modifications, and development of BMPs do not lag behind the need."[219]

Significant uncertainties persist about BMP or design element effectiveness as a result of climate change, which compound the inconsistencies revealed by BMP evaluations and suggest that the Forest Service cannot simply rely on them to mitigate project-level activities. This is especially relevant where the Forest Service relies on the use of BMPs or design features instead of fully analyzing potentially harmful environmental consequences from road design, construction, maintenance or use, in studies and/or programmatic and site-specific NEPA analyses. Moreso, the Forest Service must demonstrate how BMP effectiveness will be maintained in the long term, especially given the lack of adequate road maintenance capacity.

Further, while the Final EA identifies several design standards for northern goshawk, one appears to be at odds with best available science, and two prescriptions suggested by that science are omitted.

The Management Recommendations for Northern Goshawk (1992) suggests that "[a]ll management activities in the PFA [northern goshawk post fledging-family area] should be limited to the period from October through February."[220] The Final EA does not limit activities in PFAs, but does state that "if active northern goshawk nests are discovered, all project operations would be restricted annually from March 1st to August 31st within one-half (½) mile

---

[216] Edwards *et al*. 2016 at 133.

[217] Edwards *et al*. 2016.

[218] Furniss, Michael J.; Roby, Ken; Cenderelli, Daniel *et al.* (2013). Assessing the vulnerability of watersheds to climate change: Results of national forest watershed vulnerability pilot assessments. USDA PNW Research Station. General Technical Report PNW-GTR-884. Attached as Ex. 39, and available at https://www.fs.usda.gov/treesearch/pubs/43898 (last viewed Aug. 6, 2021).

[219] Edwards *et al*. 2016, at 136.

[220] R.T. Reynolds *et al*. Management Recommendations for the Northern Goshawk in the Southwestern United States, GTR-RM-217 (1992) at 6. The Management Recommendations are in the Salter project file, according to the Final EA's "References" list. *See* Final EA at 89.

of the active nest."[221] Despite our request to do so, the Forest Service failed to explain why the limitation on activities for the Salter Project is one month shorter than that recommended by the Management Recommendations, which we understand remain the best available science concerning goshawk management.

Further, the Management Recommendations state that "forests in the PFAs should contain overstories with a canopy cover greater than 50%," and that in ponderosa pine forested PFAs, the Forest Service should "[l]eave 5 - 7 tons per acre of woody debris (greater than 3 inches in diameter) and downed logs distributed across areas, after timber harvesting, for small animal habitat and to maintain long-term productivity.[222] The Salter Project contains no such prescription(s) that we could find, and the Forest Service again failed to respond to our comments on this issue, violating NEPA.

The Management Recommendations also suggest that the PFAs ensure suitable prey habitat is available and that "[f]eatures of prey habitat in the PFA include:

1) large (>18 inches DBH) feeding and/or nesting trees for tree squirrels,

2) large (>18 inches DBH and >30 feet tall) snags and/or trees with exposed heartwood for nest cavity excavation by woodpeckers,

3) patches of mid-aged forests with high canopy cover (up to 70%) that provide mesic conditions for fungi (important foods for all the mammalian prey),

4) small (>2 inches in diameter and >8 feet long) downed logs and other woody debris that provide hiding, feeding, denning, and nesting sites used by goshawk prey.

5) large (>12 inches in diameter and >8 feet long) downed logs and other woody debris that provide hiding, feeding, denning, and nesting sites used by goshawk prey."[223]

Despite comments raising this issue on the Draft EA, the Final EA contains no comparable guidance, but it does permit the logging of trees up to 22 inches dbh, which could conflict with goshawk guidance to retain trees 18 inches dbh and greater for specific purposes.[224] The Forest Service failure to comply with the Northern Goshawk Management Recommendations – the best available science on these birds – or explain why it would ignore that science, violates NEPA.

In sum, because the Final EA fails to analyze the effectiveness of individual design elements, and because some of the design elements are unlikely to be effective, the EA violates NEPA.

Finally, we note that the Intermountain Forest Association has filed objections seeking to terminate specific design features, or to require clarification that the Forest Service (not the

---

[221] Final EA at 18; 80.

[222] Management Recommendations for the Northern Goshawk at 14, 24.

[223] Management Recommendations for the Northern Goshawk at 16.

[224] Final EA at 28.

companies seeking to profit from public resources) implement or pay for them.[225] Eliminating these design features or shifting costs to taxpayers as industry suggests would increase the project's environmental damage and/or economic costs, and therefore would require the Forest Service to prepare supplemental NEPA analysis and provide additional opportunities for public comment.

> *Suggested Remedy*. The San Juan National Forest should prepare a supplemental NEPA document, preferably a Draft EIS, that evaluates the effectiveness of each individual mitigation measure and design element, and must explain or correct its failure to adopt measures recommending by the Northern Goshawk Management Recommendations.

## VIII. THE FOREST SERVICE MUST PREPARE AN ENVIRONMENTAL IMPACT STATEMENT ON THE SALTER PROJECT.

### A. Agencies Must Prepare EISs When Impacts 'May' Be Significant.

NEPA requires federal agencies to prepare a full environmental impact statement (EIS) before undertaking "major Federal actions significantly affecting the quality of the human environment."[226] As the Tenth Circuit has explained, "[i]f the agency determines that its proposed action *may* 'significantly affect' the environment, the agency must prepare a detailed statement on the environmental impact of the proposed action in the form of an EIS."[227] The Ninth Circuit agrees.

> We have held that an EIS *must* be prepared if 'substantial questions are raised as to whether a project ... *may* cause significant degradation to some human environmental factor.' To trigger this requirement a 'plaintiff need not show that significant effects *will in fact occur*,' [but instead] raising 'substantial questions whether a project may have a significant effect' is sufficient.[228]

If an agency "decides not to prepare an EIS, 'it must put forth a convincing statement of reasons' that explains why the project will impact the environment no more than insignificantly. This account proves crucial to evaluating whether the [agency] took the requisite 'hard look.'"[229]

---

[225] *See* M. Pitts, Intermountain Forest Association, Objection to Salter Vegetation Management Project (Aug. 4, 2021) (Salter project file).

[226] 42 U.S.C. § 4332(C).

[227] *Airport Neighbors Alliance v. U.S.*, 90 F.3d 426, 429 (10th Cir. 1996) (citation omitted) (emphasis added).

[228] *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149-50 (9th Cir. 1998) (citations omitted) (emphasis original). *See also Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 864-65 (9th Cir. 2005) ("To trigger this [EIS] requirement a plaintiff need not show that significlant effects will in fact occur, but raising substantial questions whether a project may have a significant effect is sufficient." (internal quotations, citations, and alterations omitted)).

[229] *Ocean Advoc.*, 402 F.3d at 864.

"Significance" under NEPA requires consideration of the action's context and intensity.[230] An agency must analyze the significance of the action in several contexts, including short- and long-term effects within the setting of the proposed action (including site-specific, local impacts).[231] Intensity refers to the severity of the impact and requires consideration of ten identified factors that may generally lead to a significance determination, including: (1) whether the action is likely to be highly controversial; (2) whether the effects on the environment are highly uncertain or involve unique or unknown risks; and (3) whether the action may have cumulative significant impacts.[232] With respect to the degree to which the environmental effects are likely to be highly controversial, the word "controversial" refers to situations where "'substantial dispute exists as to the size, nature, or *effect* of the major federal action.'"[233]

### B. The Salter Project May Have Significant Impacts.

The Salter Project may have significant impacts, triggering the Forest Service's duty to prepare an EIS.[234]

***The scale of the project itself may be significant***. The proposed action alternatives permit the construction of up to 117 miles of temporary road, a significant amount, and reconstruction or "improv[ing] the condition of [another] 149 miles" of road.[235] Logging may take place on more than 35 square miles of forest land, and will occur continuously across this landscape for as long as a decade. Road construction, logging, and road use will conflict with recreational use which is categorized as "moderate to high" for much of the year. The large scale of the project supports a conclusion of significance.

***The project may significantly impact soils and watersheds***. Construction of temporary roads and landing areas, and the use of an unknown number, length and location of skid trails, have the potential to significantly impact sensitive soils and watersheds. The Final EA states that "[p]roposed design features for Hydrology and Soils also restrict roads, landings, skid trails, concentrated-use sites, and similar soil disturbances to designated sites to no more than 15 percent of any timber sale unit."[236] Because there are 22,790 acres of logging units, the design

---

[230] 40 C.F.R. § 1508.27.

[231] *Id.* § 1508.27(a).

[232] *Id.* § 1508.27(b)(4)-(5), (7)

[233] *Town of Cave Creek v. FAA*, 325 F.3d 320, 331 (D.C. Cir. 2003) (quoting *North American Wild Sheep v. U.S. Department of Agriculture*, 681 F.2d 1172, 1182 (9th Cir. 1982)) (emphasis in original). *See also Middle Rio Grande Conservancy Dist. v. Norton*, 294 F.3d 1220, 1229 (10th Cir. 2002) (same); *Town of Superior v. U.S. Fish and Wildlife Serv.*, 913 F. Supp. 2d 1087, 1120 (D. Colo. 2012) (same).

[234] The Center and Guardians raised each of the issues discussed in this section with the Forest Service in comments on the Draft EA. *See* Center Draft EA Comment (Ex. 1) at 41-44.

[235] Final EA at 62 (149 miles), 63 (up to 117 miles).

[236] Final EA at 49.

features permit skid trails, roads, etc. to impact soils on up to 3,400 acres – an area of more than five square miles, roughly a third the size of the island of Manhattan. This impact is significant.

***The project may significantly impact wildlife.*** The proposed action will render much of the project area unsuitable for northern goshawk, a potentially significant impact. The Final EA proposes to reduce basal area outside of the tiny 30-acre nest area to as low as 50 square feet per acre. Such logging may damage goshawk habitat in the short term (for years). As the EA admits:

> [The project] will reduce the number of large, live overstory trees and may negatively impact [goshawk] breeding site selection….
>
> Basal area reductions below 80 square feet per acre in mature stands will affect nesting behavior of northern goshawk because thermal and protective sight cover for nesting will be reduced, which will reduce reproduction. A reduction in canopy cover may also impact foraging success as there will be less ability to hide from prey. These impacts may reduce habitat effectiveness in the short-term … for this species….[237]

The project thus will *certainly* damage goshawk habitat over a vast area for the 10 years of project implementation and beyond. The *promise* of increased habitat effectiveness is over the "long term," so the nature of the trade-off between present, certain damage and indeterminant future benefit cannot be understood or compared. The potential for significant impacts to goshawk requires preparation of an EIS.

The EA contains contradictory information about impacts to forests that have significant repercussions for goshawk. In evaluating potential impacts to the bird, the Final EA states that: "In areas that receive single tree selection and commercial thinning, basal area after treatment is expected to average around 60-80 square feet per acre, with clumps of trees having higher basal areas."[238] Elsewhere, the EA states that both single tree selection and commercial thinning "will target a residual basal area of 50-to-70 ft2" per acre, clearly a lower residual basal area than assumed by the agency when addressing goshawk impacts.[239] The Forest Service fails to explain this significant discrepancy.

***The project is highly controversial***. The project's impacts are uncertain. The Forest Service's proposed prescription of a 26.9" dbh cap, and its rejection of 20" dbh or 16" dbh diameter caps, conflicts with that developed by the San Juan National Forest's earlier Ponderosa Pine Partnership. Scientific studies, including those cited by Dr. Baker and to which the San Juan National Forest declined to respond, suggest that the project will result in the loss of pre-settlement ponderosa pine within the project area, and trees more than a century old, and Forest Service studies indicate that ponderosa pine and aspen may be lost in the project area within a

---

[237] Final EA at 79; *see also* San Juan National Forest, Biological Evaluation, Salter Vegetation Project (2020) at 40 (making similar statement) (Salter project file).

[238] Final EA at 79. *See also* San Juan National Forest, Biological Evaluation, Salter Vegetation Project (2020) at 40 (making identical statement) (Salter project file).

[239] Final EA at 14.

few decades. But the Final EA asserts the project will lead to a diverse-aged forest able to resist future insect infestations. Thus, the effects of the Salter Project meet the "highly controversial" standard, requiring preparation of a full environmental impact statement.

The Forest Service's failure to quantify the project's climate impacts, and reliance on climate outdated guidance, conflict with new administration guidance and federal caselaw, and the Final EA appears to rely on discredited science and law. The Forest Service's climate denial also crosses the "highly controversial" threshold.

> *Suggested Remedy*. The San Juan National Forest should prepare a Draft EIS for the project.

**CONCLUSION.**

The Center and Guardians request a meeting to discuss potential resolution of issues raised in this objection, pursuant to 36 C.F.R. § 218.11(a).

We hope that the Forest Service will use the objection process and such a meeting as opportunities to engage with stakeholders, including the Center and Guardians, to develop a project that is legally and ecologically sound.

Sincerely,

Edward B. Zukoski, Senior Attorney
Center for Biological Diversity
1536 Wynkoop Street, Suite 421
Denver, CO 80202
(303) 641-3149
tzukoski@biologicaldiversity.org

Adam Rissien, ReWilding Advocate
WildEarth Guardians
PO Box 7516
Missoula, MT 59807
(406) 370-3147
arissien@wildearthguardians.org

cc: Derek Padilla, District Ranger, Dolores Ranger District, derek.padilla@usda.gov;
David Casey, Forester, San Juan National Forest, David.casey2@usda.gov

## TABLE OF EXHIBITS

| | |
|---|---|
| Exhibit 1. | Letter of E. Zukoski, Center for Biological Diversity *et al*. to D. Padilla, San Juan NF (Mar. 2, 2021) |
| Exhibit 2. | USDA Forest Service, Final Environmental Impact Statement, Roadless Area Conservation Rule (Nov. 2000) (excerpts) |
| Exhibit 3. | San Juan National Forest, Lone Pine Decision Notice (Jan. 23, 2020) |
| Exhibit 4. | Lolo National Forest, Redd Bull Environmental Assessment (Jan. 2021) (excerpts) |
| Exhibit 5. | Medicine Bow-Routt National Forest, Social and Economic Report, Medicine Bow LaVA Project (2019), |
| Exhibit 6. | IPCC, Summary for Policymakers, Global Warming of 1.5°C. An IPCC Special Report on the impacts of global warming of 1.5°C above pre-industrial levels and related global greenhouse gas emission pathways (2018) |
| Exhibit 7. | H. Fountain, Climate Change Is Accelerating, Bringing World 'Dangerously Close' to Irreversible Change, The New York Times (Dec. 4, 2019) |
| Exhibit 8. | EPA, What Climate Change Means for Colorado (Aug. 2016) |
| Exhibit 9. | Executive Order 13,990, 86 Fed. Reg. 7037 (Jan. 20, 2021) |
| Exhibit 10. | Executive Order 14,008, 86 Fed. Reg. 7619 (Jan. 27, 2021) |
| Exhibit 11. | Interagency Working Group on Social Cost of Greenhouse Gases, Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates under Executive Order 13990 (Feb. 2021) |
| Exhibit 12. | Council on Environmental Quality, Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews (Aug. 1, 2016) |
| Exhibit 13. | Council on Environmental Quality, National Environmental Policy Act, Guidance on Consideration of Greenhouse Gas Emissions, 86 Fed. Reg. 10,252 (Feb. 19, 2021) |
| Exhibit 14. | Forest Service, Tongass Land and Resource Management Plan, Final EIS (2016) (excerpts) |

| | |
|---|---|
| Exhibit 15. | D. DellaSala, The Tongass Rainforest as Alaska's First Line of Climate Change Defense and Importance to the Paris Climate Change Agreements (2016) |
| Exhibit 16. | Intergovernmental Panel on Climate Change, Special Report on Climate Change, Desertification, Land Degradation, Sustainable Land Management, Food Security, and Greenhouse gas fluxes in Terrestrial Ecosystems, Summary for Policymakers (Aug. 2019) |
| Exhibit 17. | B. Law et al., Land use strategies to mitigate climate change in carbon dense temperate forests, Proceedings of the Nat'l Academy of Sciences, vol. 115, no. 14 (Apr. 3, 2018) |
| Exhibit 18. | Moomaw, *et al*., Intact Forests in the United States: Proforestation Mitigates Climate Change and Serves the Greatest Good, Frontiers in Forests and Global Change (June 11, 2019) |
| Exhibit 19. | Hudiburg *et al*., Meeting GHG reduction targets requires accounting for all forest sector emissions, Environ. Res. Lett. 14 (2019) |
| Exhibit 20. | B. Law, *et al*., The Status of Science on Forest Carbon Management to Mitigate Climate Change (June 1, 2020) |
| Exhibit 21. | B. Law & W. Moomaw, Keeping trees in the ground where they are already growing is an effective low-tech way to slow climate change, *The Conversation* (Feb. 23, 2021) |
| Exhibit 22. | B. Law & M.E. Harmon, Forest sector carbon management, measurement and verification, and discussion of policy related to mitigation and adaptation of forests to climate change. Carbon Management (2011) |
| Exhibit 23. | M. Harmon, Have product substitution carbon benefits been overestimated? A sensitivity analysis of key assumptions, Environmental Research Letters (2019) |
| Exhibit 24. | *See* Bureau of Land Management, Western Oregon Proposed RMP Final EIS (2009) (excerpts) |
| Exhibit 25. | Forest Service, Tools for carbon inventory, management, and reporting (Nov. 2018) |
| Exhibit 26. | N.L. Harris et al., Attribution of net carbon change by disturbance type across forest lands of the conterminous United States, Carbon Balance and Management (2016) |
| Exhibit 27. | Office of Surface Mining & Bureau of Land Management, Environmental Assessment, Colowyo Coal Mine Collom Permit Expansion Area Project (Jan. 2016) (excerpts) |

Exhibit 28. U.S. Forest Service, Supplemental Final Environmental Impact Statement, Federal Coal Lease Modifications COC-1362 & COC-67232 (Aug. 2017) (excerpts)

Exhibit 29. Four Forest Restoration Initiative, Old Growth Protection & Large Tree Retention Strategy (Sep. 13, 2011)

Exhibit 30. S. J. Pritchard, P. *et al.*, Adapting western North American forests to climate change and wildfires: ten common questions, *Ecological Applications* (July 2021)

Exhibit 31. U.S. Forest Service *et al.*, New Mexico Forest Restoration Principles (May 2006)

Exhibit 32. Allen *et al*., Ecological Restoration of Southwestern Ponderosa Pine Ecosystems: A Broad Perspective, Ecological Applications, 12(5) (2002)

Exhibit 33. D. Lynch, Forest Restoration in Southwestern Ponderosa Pine, Journal of Forestry (Aug. 2000)

Exhibit 34. San Juan National Forest, Guard Station Timber Sale, Decision Notice (May 1996)

Exhibit 35. San Juan National Forest, Ferris East Timber Sale, Decision Notice (Feb. 1998)

Exhibit 36. J. Worrall et al., Projected Impacts of Climate Change on Forests of the Dolores Watershed, presentation to the Dolores Watershed Resilient Forest Collaborative (2017)

Exhibit 37. Carlson, J. P. Edwards, T. Ellsworth, and M. Eberle. 2015. National best management practices monitoring summary report. Program Phase-In Period Fiscal Years 2013-2014. USDA Forest Service. Washington, D.C.

Exhibit 38. Edwards, P.J., F. Wood, and R. L. Quinlivan. 2016. Effectiveness of best management practices that have application to forest roads: a literature synthesis. General Technical Report NRS-163. Parsons, WV: U.S. Department of Agriculture, Forest Service, Northern Research Station.

Exhibit 39. Furniss, Michael J.; Roby, Ken; Cenderelli, Daniel *et al.* (2013). Assessing the vulnerability of watersheds to climate change: Results of national forest watershed vulnerability pilot assessments. USDA PNW Research Station. General Technical Report PNW-GTR-884.

March 12, 2021

Derek Padilla, District Ranger
Dolores Ranger District
29211 Hwy 184
Dolores, CO 81321
Via email: derek.padilla@usda.gov; David.casey2@usda.gov
Via web portal: https://cara.ecosystem-management.org/Public//CommentInput?Project=57671

**Re: Comments on Salter Vegetation Management Project Environmental Assessment, Project #57671**

Dear Ranger Padilla:

On behalf of the Center for Biological Diversity (the Center) and WildEarth Guardians, thank you for the opportunity to provide these comments on the draft environmental assessment ("Draft EA") on the Salter Vegetation Management Project.

The Center is a 501(c)(3) nonprofit organization based in Tucson, Arizona, with offices across the country including in Crested Butte and Denver, Colorado, and has 1.7 million members and online activists. The Center is dedicated to protecting and restoring imperiled species and natural ecosystems. The Center uses science, policy, and law to advocate for the conservation and recovery of species on the brink of extinction and the habitats they need to survive. The Center has and continues to actively advocate for increased protections for species and their habitats across Colorado.

WildEarth Guardians is a nonprofit conservation organization headquartered in Santa Fe, NM with offices in several western states. With more than 178,000 members and supporters WildEarth Guardians work to protect and restore wildlife, wild places, wild rivers, and the health of the American West. For many years, WildEarth Guardians has advocated for an environmentally and economically sustainable transportation system on Forest Service lands, with properly managed motorized recreation. We also promote and support actions that restore ecological integrity to degraded ecosystems in order to ensure at-risk species can thrive.

We are concerned that the Salter Project Draft EA fails to meet the National Environmental Policy Act's (NEPA's) standards for disclosure and public involvement in several respects. While we appreciate the inclusion of an alternative that protects some large, old trees, we remain concerned that the proposed action will destroy thousands of pre-settlement trees, some more than a century old. We believe there is no ecological or social basis for doing so. The Draft EA also fails to contain critical information necessary to understand the project's impacts, including information about the baseline conditions of the project and about the location and impacts of

100+ miles of temporary roads. The Draft EA fails to disclose the project's economic impacts despite the fact that economic development is a project purpose. The Draft EA fails to take a hard look at the project's climate impacts, appearing to ignore the Biden administration's emphasis on quantifying and reducing climate pollution. The Draft EA fails to provide a robust review of the varying impacts of the two action alternatives, undermining the heart of the NEPA process, and fails to respond to critical comments and studies provided by experts contradicting the Forest Service's assumptions. Finally, unless the Forest Service addresses these issues and others, there is a potential for the proposal to have significant impacts, requiring the Forest Service to prepare an environmental impact statement (EIS).

## I. THE SALTER PROJECT

The Draft EA states that the Forest Service identified the following needs for the project:

- improve resilience and resistance to epidemic insect and disease outbreaks,
- increase the structural diversity of the ponderosa pine forest represented across the project area, and
- provide economic support to local communities by providing timber products to local industries in a sustainable manner.[1]

The Draft EA further states that the project is needed to move the forest stands in the area toward desired conditions dictated by the Forest Plan:

> The need for this project is derived from the differences between the existing forest vegetation conditions and the desired forest vegetation conditions, as defined by the San Juan National Forest Land and Resource Management Plan.[2]

The Draft EA also alleges that the project is needed to address an ongoing beetle infestation:

> Bark beetles have infested adjacent landscapes causing significant mortality. The early stages of a bark beetle infestation is now being observed in the Salter project area.[3]

The proposal involves "tree-cutting, tree planting, and activity fuel burning" across "approximately 22,346 acres."[4] Those activities include "single tree selection," including the logging of trees up to 26.9" diameter at breast height (dbh), or over 7 feet in circumference,

---

[1] San Juan National Forest, Salter Vegetation Management Project, Draft Environmental Assessment (Feb. 2021) at 12 (hereafter, "Draft EA").

[2] Draft EA at 9. *See also id.* at 11 ("The structure and size class distributions in the stands identified for this analysis are not within desired conditions described in [San Juan Forest Plan Sec.] 2.2.23 based on field reconnaissance and inventory data.")

[3] Draft EA at 11.

[4] Draft EA at 12.

across 19,675 acres.[5] The treatment would leave "50-to-70 basal area per acre of residual basal area depending upon stand condition. There are 19,675 acres of this treatment type."[6] The project will also involve 3,115 acres of commercial thinning, where again trees up to 26.9" dbh could be chainsawed, and again the target would be "a variable residual square feet of tree stem basal area of 50 -70 basal area per acre depending upon stand condition."[7]

We request that the Forest Service explain why the prescriptions in the Salter Project differ from those in the nearby Lone Pine project approved last year. There, the Forest Service approved:

- Basal area ranging from 60 to 80 square feet per acre with a target basal area of 70 square feet per acre in the "Large Tree Emphasis/Commercial Thin Prescription."[8]

- Basal area ranging from 60 to 80 square feet per acre with a target basal area of 60 square feet per acre in the commercial thinning prescription.[9]

Because the purpose and need statements for the Salter and Lone Pine projects are similar, the Forest Service should explain why the San Juan National Forest is proposing to adopt different prescriptions.

## II. THE DRAFT EA LACKS THE SITE-SPECIFIC DETAIL NEPA REQUIRES.

NEPA is "'our basic national charter for protection of the environment.'"[10] In enacting NEPA, Congress recognized the "profound impact" of human activities, including "resource exploitation," on the environment and declared a national policy "to create and maintain conditions under which man and nature can exist in productive harmony."[11]

---

[5] Draft EA at 13. Note that while the Draft EA several times states that no trees larger than 26" dbh will be logged, *id*. at 13 (Table 1), 14, the document also asserts that "[t]he maximum diameter to harvest would be 26.9"," or about three inches greater in circumference. *Id*. at 14. *See also id*. at 13 n.1 ("No tree larger than 26.9 inch diameter at breast height would be cut in alternatives 2 and3 [sic]."). We find the use of two different numbers confusing and request that the Forest Service make clear in any subsequent NEPA document that the diameter limit is 26.9 inches, not 26 inches.

[6] Draft EA at 13.

[7] Draft EA at 13. We note that summing the acres in Table 2 (Draft EA at 13) for commercial thinning and single tree selection treatments results in a project area of 22,790 acres, a figure larger than the "approximately 22,346" acres the Draft EA (at 12) asserts would be treated. We urge the Forest Service to address this discrepancy in any subsequent NEPA document.

[8] San Juan National Forest, Lone Pine Decision Notice (Jan. 23, 2020) at 7.

[9] *Id*. at 5.

[10] *Center for Biological Diversity v. United States Forest Serv*., 349 F.3d 1157, 1166 (9th Cir. 2003) (quoting 40 C.F.R. § 1500.1).

[11] 42 U.S.C. § 4331(a).

The statute has two fundamental two goals: "(1) to ensure that the agency will have detailed information on significant environmental impacts when it makes decisions; and (2) to guarantee that this information will be available to a larger audience."[12] "NEPA promotes its sweeping commitment to 'prevent or eliminate damage to the environment and biosphere' by focusing Government and public attention on the environmental effects of proposed agency action."[13] Stated more directly, NEPA's "'action-forcing' procedures ... require the [Forest Service] to take a 'hard look' at environmental consequences"[14] *before* the agency approves an action. "By so focusing agency attention, NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct."[15] To ensure that the agency has taken the required "hard look," courts hold that the agency must utilize "public comment and the best available scientific information."[16]

NEPA's review obligations are more stringent and detailed at the project level, or "implementation stage," given the nature of "individual site specific projects."[17] "[G]eneral statements about possible effects and some risk do not constitute a hard look, absent a justification regarding why more definitive information could not be provided."[18]

NEPA requires site-specificity to fulfill two basic purposes: 1) to ensure agencies are making informed decisions prior to acting and 2) to ensure the public is given a meaningful opportunity

---

[12] *Envtl. Prot. Info. Ctr. v. Blackwell*, 389 F. Supp. 2d 1174, 1184 (N.D. Cal. 2004) (quoting *Neighbors of Cuddy Mt. v. Alexander*, 303 F.3d 1059, 1063 (9th Cir. 2002)); *see also Earth Island v. United States Forest Serv.*, 351 F.3d 1291, 1300 (9th Cir. 2003) ("NEPA requires that a federal agency 'consider every significant aspect of the environmental impact of a proposed action ... [and] inform the public that it has indeed considered environmental concerns in its decision-making process.'").

[13] *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989) (quoting 42 U.S.C. § 4321).

[14] *Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir. 2000) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989)).

[15] *Marsh*, 490 U.S. at 371 (citation omitted).

[16] *Biodiversity Cons. Alliance v. Jiron*, 762 F.3d 1036, 1086 (10th Cir. 2014) (internal citation omitted).

[17] *Ecology Ctr., Inc. v. United States Forest Serv.*, 192 F.3d 922, 923 n.2 (9th Cir. 1999); *see also Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 800-01 (9th Cir. 2003); *New Mexico ex rel. Richardson v. Bureau of Land Management*, 565 F.3d 683, 718-19 (10th Cir. 2009) (requiring site-specific NEPA analysis when no future NEPA process would occur); *Colo. Envtl. Coal. v. Ofc. of Legacy Mgmt.*, 819 F. Supp. 2d 1193, 1209-10 (D. Colo. 2011) (requiring site-specific NEPA analysis even when future NEPA would occur because "environmental impacts were reasonably foreseeable").

[18] *Or. Natural Res. Council Fund v. Brong*, 492 F.3d 1120, 1134 (9th Cir. 2007) (citation omitted); *see also Or. Natural Res. Council Fund v. Goodman*, 505 F.3d 884, 892 (9th Cir. 2007) (holding the Forest Service's failure to discuss the importance of maintaining a biological corridor violated NEPA, explaining that "[m]erely disclosing the existence of a biological corridor is inadequate" and that the agency must "meaningfully substantiate [its] finding").

to participate in those decision-making processes.[19] Federal courts apply these touchstone criteria when evaluating whether an EIS is adequately site-specific.[20]

Analyzing and disclosing site-specific impacts is critical because where (and when and how) activities occur on a landscape strongly determines that nature of the impact. As the Tenth Circuit Court of Appeals has explained, the actual "location of development greatly influences the likelihood and extent of habitat preservation. Disturbances on the same total surface area may produce wildly different impacts on plants and wildlife depending on the amount of contiguous habitat between them."[21] The Court used the example of "building a dirt road along the edge of an ecosystem" and "building a four-lane highway straight down the middle" to explain how those activities may have similar types of impacts, but the extent of those impacts – in particular on habitat disturbance – is different.[22] Indeed, "location, not merely total surface disturbance, affects habitat fragmentation,"[23] and therefore location data is critical to the site-specific analysis NEPA requires. Merely disclosing the existence of particular geographic or biological features is inadequate; agencies must discuss their importance and substantiate their findings as to the impacts.[24]

NEPA further mandates that the agency provide the public "'the underlying environmental data' from which the Forest Service develop[ed] its opinions and arrive[d] at its decisions."[25] "The agency must explain the conclusions it has drawn from its chosen methodology, and the reasons it considered the underlying evidence to be reliable."[26] In the end, "vague and conclusory statements, without any supporting data, do not constitute a 'hard look' at the environmental consequences of the action as required by NEPA."[27]

CEQ's regulations establish specific ways agencies must analyze proposed actions, including project-level decisions, including a detailed discussion of direct, indirect, and cumulative impacts

---

[19] *Stein v. Barton*, 740 F. Supp. 743, 749 (D. Alaska 1990).

[20] *See WildEarth Guardians*, 790 F.3d at 921-25 (holding EIS inadequate for failure to disclose location of moose range); *Or. Nat. Desert Ass'n v. Rose*, 2019 WL 1855419 (9th Cir. 2019) (holding environmental analysis violated NEPA by failing to establish "the physical condition of [roads and trails] and authorizing activity without assessing the actual baseline conditions").

[21] *New Mexico ex rel. Richardson*, 565 F.3d at 706.

[22] *Id.* at 707.

[23] *Id.*

[24] *Or. Natural Res. Council Fund v. Goodman*, 505 F.3d 884, 892 (9th Cir. 2007).

[25] *WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 925 (9th Cir. 2015).

[26] *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1075 (9th Cir. 2011) (citation omitted).

[27] *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 973 (9th Cir. 2006); *see also Ocean Advocates v. Army Corps of Engineers*, 402 F.3d 846, 869 (9th Cir. 2004) (finding that a vague and uncertain analysis is insufficient to meet NEPA's mandate).

and their significance; and an analysis of reasonable alternatives to the proposed action.[28] Such analysis is required for both environmental assessments and EISs.

The Salter Project is a project-level decision. As a result, any NEPA analysis must include the detailed information and analysis that NEPA and the CEQ regulations require.

While the Draft EA contains some description of the location and nature of proposed vegetation treatments, we are concerned that it still fails to comply with NEPA, as described below.

### B. The Draft EA Fails to Disclose Some of the Salter Project's Site-Specific Direct and Indirect Effects.

Although NEPA requires that analysis disclose specific information about the when, where, and how of any agency action, so that the impacts and alternatives can be described and weighed, the Draft EA does not appear to contain some of this data. We request that the Forest Service more directly address these issues.

The where and the how of new temporary road construction are not disclosed, or are disclosed incompletely.

For example, the Draft EA inconsistently identifies the total mileage of temporary roads. At one point, the Draft EA states noncommittally that "temporary roads *may be* required to reduce the need for excessive tractor skidding and allow wood products to be moved to the permanent road system."[29] Despite the fact the temporary roads "may be" required, the Draft EA then asserts that "[a]pproximately 50-to-75 miles of temporary road construction are analyzed under this proposal."[30] Elsewhere, the EA states with more assurance that "[i]mplementing the proposed

---

[28] We request that the Forest Service confirm to the public, in writing, that it intends to rely on the NEPA regulations promulgated in 1978 and in force as of the date scoping on the Salter Project began. Although CEQ issued a final rulemaking in July 2020 fundamentally rewriting those regulations, the new rules apply only "to any NEPA process begun *after* September 14, 2020," or where the agency has chosen to "apply the regulations in this subchapter to ongoing activities." 40 C.F.R. § 1506.13 (2020) (emphasis added). Scoping on this project began before September 14, 2020, and the Draft EA does not indicate that the agency is opting to use the 2020 CEQ NEPA regulations. In any event, the 2020 regulations have been challenged as illegal in no fewer than four pending lawsuits. *See, e.g.*, *Environmental Justice Health Alliance v. CEQ*, Case 1:20-cv-06143 (S.D.N.Y. Aug. 6, 2020); *Wild Virginia v. CEQ*, Case 3:20-cv-00045-NKM (W.D. Va. July 29, 2020); *Alaska Community Action on Toxics v. CEQ*, Case 3:20-cv-05199-RS (N.D. Ca. July 29, 2020); *State of California v. Council on Environmental Quality,* Case No. 3:20-cv-06057 (N.D. Cal. Aug. 28, 2020).

[29] Draft EA at 18 (emphasis added).

[30] Draft EA at 18.

action *would require* development of approximately 106 miles of temporary roads."[31] But even that number is apparently a guestimate because temporary roads will only be laid out later:

> Though these roads have been theoretically identified, the final alignment may deviate from the plan. Such deviation would be limited to that agreed by the Forest Service (Engineering Representative/Sale Administrator) and the contractor. The implementation of the proposed action should not result in an increase of temporary road mileage greater than 10 percent of the estimated 106 miles of primary temporary roads. Therefore, 11 miles or less of addition temp roads can be expected.[32]

Thus, the Forest Service predicts that as many as 117 miles of temporary road may be built for the project, and the agency will not identify the precise location of the routes' final alignment until the Forest Service and the contractor agree, long after the NEPA process has terminated.

Road construction – even for temporary roads – removes all vegetation within the area graded, eliminates and fragments habitat, alters hydrology, and can act as a vector for human-caused fires and the spread of noxious weeds. Road use can cause roadkill, disturb wildlife during critical periods (winter, nesting/calving, etc.), and increase opportunities for poaching. Thus, the nature and location of the road network to be used and constructed is critical to understanding this project's impacts. However, the Draft EA fails to define the location of temporary road use and road construction, and omits other data important to understanding road impacts.

The Forest Service has long acknowledged that temporary roads can have significant impacts. In its analysis of the Roadless Area Conservation Rule – which generally barred the construction of both permanent and temporary roads – the agency stated:

> Although only used for relatively short periods, temporary roads present most of the same risks posed by permanent roads, although some may be of shorter duration. Many of these roads are designed to lower standards than permanent roads, are typically not maintained to the same standards, and are associated with additional ground disturbance during their removal…. While temporary roads may be used for periods ranging up to ten years, and are then decommissioned, their short- and long-term effects can be extensive to terrestrial species and habitats.[33]

---

[31] Draft EA at 56 (emphasis added). *See also id.* at 57 ("The primary temporary road alignments consist of 69.8 miles of existing non-system roads, and 36.4 miles of new ground disturbanc").

[32] Draft EA at 57.

[33] USDA Forest Service, Final Environmental Impact Statement, Roadless Area Conservation Rule (Nov. 2000) at 3-150 excerpts attached as Ex. 1. *See also id.* at 3-30 ("temporary roads are not designed or constructed to the same standards as classified roads and are not intended to be part of the National Forest System Transportation System. The results can be a higher risk of environmental impacts over the short run."); *id.* at 3-164 (concluding that "[t]emporary roads

The Final EIS on the Roadless Rule also noted that "[t]he use of temporary roads may have the same long lasting and significant ecological effects as permanent roads, such as the introduction of nonnative vegetation and degradation of stream channels."[34] Temporary "[s]kid roads and trails, log landings, and similar disturbances within the [timber] sale area are the main cause of soil erosion and can contribute up to 90% of the sediment generated by timber sale activity (Patric 1976; Swift 1988)."[35] The Roadless Rule Final EIS acknowledges that temporary road construction can cause increased risk of surface erosion and landslides, but that this varies widely and depends on local site characteristics.[36] But "local site characteristics" are not disclosed in the Draft EA because that document fails to disclose the location of proposed temporary roads.

Maps in the Draft EA fail to appear to hint at where some temporary road construction will occur, but the maps do not appear to disclose where the routes will be constructed within cutting units.[37] This may be due to an error in the map display (in which the temporary roads are hidden under the layer for logging units). Whatever the reason, it is difficult to discern where the Forest Service intends to construct temporary roads. The Transportation System report in the project file does little to help the reader understand temporary road impacts.[38] While that report provides a unique number for each temporary route and estimates its potential length, it does not provide much useful information about *where* the roads will be constructed or the resources the roads may impact.

Because the Draft EA fails to disclose the location of temporary roads, or the values and conditions they might impact, it cannot provide the decisionmaker or the public with any idea whether or where these undefined measures may be required. This violates NEPA's hard look mandate.

Further, the width of new roads – which defines the level of direct habitat destruction from bulldozing – is not defined, and the Draft EA provides little guidance as to when, if ever, widths might be restricted, again making it impossible for the public or the agency to know the extent of project impacts.[39] The Draft EA states: "Temporary roads would be held to the minimum feasible number, width and total length and would be located sufficiently far from streams and other water bodies to minimize discharge into those waters except at necessary water

---

present most of the same risks posed by permanent roads" to rare plants, "although some [impacts] may be of shorter duration.").

[34] Roadless Area Conservation Rule Final EIS (Nov. 2000) (Ex. 1) at 2-18.

[35] Roadless Area Conservation Rule Final EIS (Nov. 2000) (Ex. 1) at 3-45.

[36] Roadless Area Conservation Rule Final EIS (Nov. 2000) (Ex. 1) at 3-45.

[37] Draft EA, Appendix A, at 84-89.

[38] San Juan NF, Transportation System report (no date) (project file).

[39] *See* Draft EA at 24 ("[t]he location and clearing widths of all temporary roads or facilities would be agreed to in writing (between the Forest Service and the contractor) before construction is started.").

crossings."[40] This provides little helpful information about the location, number, width, or impacts of the routes.

The Draft EA similarly provides little information about skid trails. The Draft EA states that "[s]kid trails would be held to the minimum number, width, and length."[41] This provides neither the public nor the decisionmaker with any idea as to the number, length, or scope of potential impacts from such trails, which will crush vegetation, cause a loss of habitat, and compact soil, among other impacts. Further, the amount of surface area that skid trails, roads and similar disturbance is so large that impacts from these features appears certain to be significant. The Draft EA states that "[p]roposed design features for Hydrology and Soils also restrict roads, landings, skid trails, concentrated-use sites, and similar soil disturbances to designated sites to no more than 15 percent of any timber sale unit."[42] Given that there are 22,790 acres of logging units, skid trails, roads, etc. could impact up to 3,400 acres – an area of more than five square miles.

The Draft EA cannot take the required hard look at the impacts of temporary roads because it fails to disclose not only the location of these roads but also of the values that could be impacted by road construction and use. For example, the Draft EA fails to define the "where" of sensitive soil resources.

With respect to wildlife, the Draft EA provides no maps showing the location of habitat for any species (apart from elk and goshawk), or the relative value of such habitat, or where such habitat may be impacted by logging, road construction, road use, or fire. This makes it difficult for the public or the agency to understand impacts, or to evaluate whether an alternative to avoid certain areas could be crafted.

In short, specific road construction plans may be designed only after project approval, meaning that only then will the Forest Service have the site-specific information necessary to understand the project's impacts and mitigate them. This gets NEPA compliance backwards. NEPA mandates that agencies look before they leap. We urge the agency to provide the when, where, and how of the project – including temporary roads – in any subsequently prepared NEPA document.

*Areas to be avoided/mitigated*. The Draft EA notes that it will design treatments to avoid certain areas (*e.g.* water influence zones), thus potentially concentrating logging activities in remaining areas. But the Draft EA fails to disclose *where* most of these values may exist that vegetation treatments are designed to protect or avoid, thus making it difficult to understand the impact of these provisions on project design and on the environment.

---

[40] Draft EA at 21.

[41] Draft EA at 24.

[42] Draft EA at 44.

The Draft EA states that certain design elements will minimize or avoid potential adverse effects to resources including water influence zones (WIZ), riparian areas, and other wetlands. For example, the Draft EA states:

- Organic soils associated with riparian areas, intermittent streams, and the water influence zone (WIZ) would be protected through a no harvest/no mechanized equipment buffer.

- Intermittent streams with riparian vegetation would have a buffer strip width of 100 feet on each side of the channel unless a field visit by hydrologist determines a different site-specific buffer.[43]

- Mechanical treatments would avoid wetlands, wet meadows and riparian areas. No skidding, decking or loading would be allowed in these areas in order to protect water quality, existing soils, and vegetative cover.[44]

But the Draft EA and associated documents made available to the public as part of the EA appear to not identify these areas on maps. Nor is the extent of these areas described or quantified.

The "how" of some of the design elements is also undefined. The Draft EA states, for example, that "[p]roper drainage would be constructed or reconstructed on existing system road and newly constructed temporary roads."[45] What "proper drainage" is or how it will influence the location or extent of road construction is not explained. The failure to provide this information violates NEPA.

### C. The Draft EA Fails to Disclose Important Baseline Conditions in the Project Area.

The Draft EA's failure to disclose the where and the how of the project also results in a failure to comply with another NEPA requirement: the mandate that agencies "succinctly describe the environment of the area(s) to be affected or created by the alternative under consideration."[46] NEPA requires the action agency to set an appropriate baseline detailing the nature and extent of the resources in the area: "The concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process."[47] "Without establishing ... baseline conditions ... there is simply no way to determine what effect [an action] will have on the environment and, consequently, no way to comply with NEPA."[48]

---

[43] Draft EA at 64.

[44] Draft EA at 64.

[45] Draft EA at 21; *see also id.* at 64 ("Log landings … will be designed to have proper drainage").

[46] 40 C.F.R. § 1502.15.

[47] *See* Council on Environmental Quality, *Considering Cumulative Effects under the National Environmental Policy Act* 41 (January 1997).

[48] *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988).

Without baseline data, neither the public nor the agency can understand the effects of the proposed action or craft and analyze alternatives and mitigation measures to protect these values. As such, the Forest Service has a duty to identify the environmental baseline and affected environment, as well as the scope of impacts and where those impacts are most likely to be felt.

For example, the Draft EA fails disclose significant information about existing forest conditions. While the Draft EA alleges that some forest stands within the project area are impacted by insect infestations,[49] it fails to disclose the location of those stands or the extent of the beetle attack. The effectiveness of the type of treatments could be influenced by beetle activity. But the Draft EA fails to provide maps juxtaposing treatment units and the infestations. The "where" of these infestations on the landscape is not disclosed.

The Draft EA also contains little site-specific information on a variety of other resources, including wildlife and wetlands, among other resources.

The Draft EA could also be improved by including maps showing existing stand information such as basal area, which the project would reduce. The Forest Service could also disclose by stand the percentage of trees above several potential size limits (e.g., 16" dbh, 20" dbh, and 26" dbh) so that the public and the decisionmaker could understand the distribution of old and large trees. We understand from reviewing Powerpoint presentations prepared for the DWRF Collaborative that the Forest Service has much of this data. Thus, the Forest Service could likely generate such maps based on existing data.

Baseline information will also better enable the public to understand whether there is a need for the project. The Draft EA states that: "In the past ten years, approximately 34 percent of the project area has experienced fire, either wildfire or prescribed."[50] This statement raises numerous questions which we urge the Draft EA to answer: Where are these tens of thousands of acres? What basal area remains in these areas? Are these areas contained in any cutting units? What basal area remains? Did the fires result in residual basal area that approximated what the Salter Project proposes to achieve? Has previous fire covering more than one-third of the project reduce the need for "resilience" treatments because those fires have made the landscape more resilient to beetle infestations or future fire? If not, why not? If these fires have effectively fire-proofed large portions of the project area, or at least greatly reduced the risk of future high intensity fire, is there still a need for the project?

We urge the Forest Service in any subsequently prepared NEPA document to include baseline, site-specific information about the project area so that the public can better understand and appreciate the values at issue and how the proposed action and alternatives may impact those values.

---

[49] Draft EA at 11 (("[t]he early stages of a bark beetle infestation is now being observed in the Salter project area").

[50] Draft EA at 35.

### D. The Draft EA Fails to Disclose Meaningful Information about Cumulative Effects.

The Draft EA lacks the necessary detail to understand how the impacts of the Salter Project may interact with other private or Forest Service actions, in at least two key respects.

First, the Draft EA fails to meaningfully address off-road vehicle travel, an activity which may have cumulative effects when viewed together with the proposed action.[51] In much of the project area, which is popular with hunters, individuals may drive off-highway vehicles up to *one mile* from Forest Service roads to retrieve game, according to the motor vehicle use map for the Dolores Ranger District. Full-sized vehicles may also travel up to 300 feet from either side of many of the open roads within the project area for dispersed camping. Thus, motor vehicle use for limited purposes can legally occur off road across the vast majority of the project area. Such vehicle use will likely hinder reforestation, compound damage to soils and watersheds, crush seedlings and make reforestation more difficult, render temporary road closures and obliteration less effective, and increase the potential for the spread of exotic weeds. The fact that the cutting units "are easily accessible, occurring mostly on roaded landscapes and relatively gentle terrain" may make it difficult to effectively close routes.[52] Any subsequently prepared NEPA should address the effectiveness of existing road closures.

The Forest Service cannot argue that a prior NEPA document (for the Oct. 2011 Boggy-Glade transportation plan) addresses these impacts. That nearly ten-year-old EA did not take into consideration the Salter Project with its more decade of logging, the up-to-117 miles of temporary road, nearly 150 miles of road improvement, or the beetle infestation. The existing, permissive off-road vehicle management policy is likely to have synergistic and damaging impacts with the Salter Project. We urge the Forest Service to disclose these impacts in any subsequently prepared NEPA document.

Second, the Draft EA identifies several "follow-up" actions that will be required or are otherwise foreseeable, but whose impacts the EA does not appear to disclose. The Forest Service indicates that "[f]ollow-up [prescribed fire] treatments must occur within 6-15 years [of initial broadcast burns] in order to further reduce surface fuel loading."[53] This means more smoke and more activity in the project area could be occurring virtually constantly for 25 years following the initiation of the 10-year project. The Draft EA also states within the 3,000+ acres of lands subject to commercial thinning, additional logging will occur in "these stands at roughly 20-to-25 year[]" intervals,[54] meaning more noise, more construction, more displacement of wildlife are virtually guaranteed to occur over not just the short-term but the long-term. We urge the Forest Service to address cumulative effects of these foreseeable follow-up actions in any subsequent NEPA document.

---

[51] Existing levels of this activity could also be disclosed in the no action alternative.

[52] Draft EA at 9.

[53] Draft EA at 37.

[54] Draft EA at 59.

## III. THE DRAFT EA FAILS TO TAKE A HARD LOOK AT POTENTIALLY SIGNIFICANT IMPACTS.

### A. The Draft EA Fails to Take a Hard Look at the Project's Economic Impacts.

A primary purpose and need for the project is to "provide economic support to local communities by providing timber products to local industries in a sustainable manner," and the project includes "commercial thinning" on more than 3,000 acres.[55] Despite these facts, the Draft EA "dismissed" the issue of economics "from detailed analysis," and instead includes a general narrative about timber markets in the area with virtually no discussion or analysis of the economic impacts of the Salter Project, and no comparison among the alternatives.[56].

What little analysis the Draft EA contains indicates that the San Juan National Forest considers it important to offer large trees for sale as an incentive to entice timber mills to log smaller trees:

> Offering a mixture of saw log and smaller diameters timber in the right ratio is important to ensure offerings are marketable. The size of these sales is equally important in both volume and acres to ensure the work is completed on time and has a sustained profitability. The ability to include large volumes and achieve vegetation management at landscape level is possible with the existing industry.[57]

Although supporting local industry is a project goal, and the Forest Service apparently assumes such benefit will occur, the Draft EA fails to contain any projections or quantification of the likely board-feet the project will make available to local mills, nor the economic impact of the project in terms of income or employment. Because the Forest Service has detailed stand data for the project area, such an analysis would seem relatively straightforward to perform.

The Draft EA's failure to quantify the potential economic impacts not only violates NEPA, it is puzzling in light of the fact that the Forest Service elsewhere performs this analysis as a matter of course. For example, in a recent final EA for a logging project in Montana, the Forest Service estimates for *each alternative*: the acres harvested; the board footage to be logged; appraised stumpage rates; the predicted high bid; the total revenue to be generated; the present net value of the timber harvest and other resource activities; and the total employment and labor income estimated to be generated over the life of the project.[58]

Further, if an economic analysis shows no difference between Alternative 2 (cutting trees up to 26.9" dbh) and Alternative 3 (cutting trees up to 20" dbh), that would undermine the argument of

---

[55] Draft EA at 12, 13.

[56] Draft EA at 102, 103-04.

[57] Draft EA at 104.

[58] Lolo National Forest, Redd Bull Environmental Assessment (Jan. 2021) at 124-128, available at http://www.fs.usda.gov/nfs/11558/www/nepa/112011_FSPLT3_5580176.pdf (last viewed Mar. 12, 2021), excerpts attached as Ex. 2.

some industry supporters that logging larger trees is necessary to ensure the commercial viability of logging in this part of the San Juan NF.

Any analysis the Forest Service performs should address the potential for lost income to the town of Dolores due to the potential impact of the Salter Project on recreation. The area targeted for logging is popular with mountain bikers, equestrians, hikers, hunters, and other recreationists, receiving "moderate to heavy levels of recreation use" in the summer and fall.[59] In fact, "[t]he Boggy treatment block is a high use recreation area and one of the most heavily used recreation zones on the District. Over the past five years more than $300,000 of trail infrastructure projects have been completed on the Boggy non-motorized and motorized trail system."[60]

The constant presence of logging trucks, road graders, and the sound of chainsaws and heavy equipment *for a decade* (or longer, if follow-on treatments are analyzed) is likely to discourage some from visiting this part of the forest, with the potential for loss of revenue to local businesses.[61] While the Draft EA admits the likelihood that recreation will be deterred,[62] it fails to address or quantify the economic impacts of that result beyond admitting that there could be such impacts.[63] NEPA's hard look mandate requires more. Given that the town has begun a transition from resource extraction to recreation, the Salter Project may represent a step backward in terms of its economic development, one that should be estimated and quantified, so it can be compared to the alleged economic benefits of logging.

If it is in fact a purpose of the project to "provide economic support to local communities," the Forest Service must evaluate and quantify the extent to which various alternatives will achieve that goal.

---

[59] Draft EA at 47 ("The Salter analysis area receives moderate to heavy levels of recreation use during the summer months, moderate to heavy use during big game hunting seasons and low to moderate use during the winter.")

[60] Draft EA at 47.

[61] *See* Draft EA at 50 ("The potential impacts to recreation from this project are anticipated to be long-term and moderate for as long as 10 years."); *see also id.* at 58 (burying a description of "the estimated 10-year time frame of the project" in a discussion about projecting the number of log trucks per day traveling through Dolores). We could not locate a clear statement in the Draft EA defining how long it will take to implement the project's logging. We request that the Forest Service estimate and disclose the project's duration in a clear manner in any subsequent NEPA document.

[62] Draft EA at 50 ("Disruptions and impacts to recreationists would result from the sights, sounds and activities associated with the proposed treatments such as road work, truck hauling and cutting operations during project implementation").

[63] Draft EA at 50 ("Any long-term removal of recreation opportunities would have an impact to local community's economies.")

### B. The Draft EA Fails to Take a Hard Look at the Project's Climate Impacts.

1. The Climate Crisis

The climate crisis is the overriding environmental issue of our time, threatening to drastically modify ecosystems, alter coastlines, worsen extreme weather events, degrade public health, and cause massive human displacement and suffering. Its impacts are already being felt in the United States, and recent studies confirm that time is running out to forestall the catastrophic damage that will result from 1.5 degrees Celsius of warming.[64] More recent studies have confirmed that climate change is accelerating, making the need to protect carbon stores even more urgent than it was just a few years ago.[65]

Climate change is impacting Colorado now. Most of the state has warmed one or two degrees Fahrenheit in the last century. Snowpack on average is declining. Fire season is lengthening. Drought periods are occurring more often.[66] Policymakers and legislators have responded by requiring Colorado to adopt a climate action plan that calls for a 25% reduction in greenhouse gas emissions by 2025 and a 50% reduction by 2030. The Forest Service needs to be part of the solution, not part of the problem.

2. President Biden requires prompt action to assess and reduce climate pollution.

On the day he was inaugurated, President Biden committed to overturning the prior administration's failure to address, and its outright denial of, the climate emergency.

> It is, therefore, the policy of my Administration to listen to the science; to improve public health and protect our environment; to ensure access to clean air and water; to limit exposure to dangerous chemicals and pesticides; to hold polluters accountable, including those who disproportionately harm communities of color and low-income communities; *to reduce greenhouse gas emissions; to bolster resilience to the impacts of climate change*; to restore and expand our national treasures and monuments; and to prioritize both environmental justice and the creation of the well-paying union jobs necessary to deliver on these goals.
>
> To that end, this order directs all executive departments and agencies (agencies) to immediately review and, as appropriate and consistent with applicable law, take action to address the promulgation of Federal regulations and other actions

---

[64] *See* IPCC, Summary for Policymakers, Global Warming of 1.5°C. An IPCC Special Report on the impacts of global warming of 1.5°C above pre-industrial levels and related global greenhouse gas emission pathways (2018), attached as Ex. 3.

[65] *See, e.g.*, H. Fountain, Climate Change Is Accelerating, Bringing World 'Dangerously Close' to Irreversible Change, The New York Times (Dec. 4, 2019), attached as Ex. 4.

[66] *See* EPA, What Climate Change Means for Colorado (Aug. 2016), available at https://19january2017snapshot.epa.gov/sites/production/files/2016-09/documents/climate-change-co.pdf.

> during the last 4 years that conflict with these important national objectives, and *to immediately commence work to confront the climate crisis*.[67]

Days later, President Biden further committed to taking swift action to address the climate crisis. Per Executive Order 14,008, he has recognized that "[t]he United States and the world face a profound climate crisis. We have a narrow moment to pursue action at home and abroad in order to avoid the most catastrophic impacts of that crisis and to seize the opportunity that tackling climate change presents."[68] Pres. Biden announced that under his administration,

> The Federal Government must drive assessment, disclosure, and mitigation of climate pollution and climate-related risks in every sector of our economy, marshaling the creativity, courage, and capital necessary to make our Nation resilient in the face of this threat. Together, we must combat the climate crisis with bold, progressive action that combines the full capacity of the Federal Government with efforts from every corner of our Nation, every level of government, and every sector of our economy.[69]

Addressing the need for the accurate assessment of climate costs, Pres. Biden announced on day one that "[i]t is *essential* that agencies capture the full costs of greenhouse gas emissions as accurately as possible, including by taking global damages into account."[70] The President also re-established Interagency Working Group on the Social Cost of Greenhouse Gases, on which the Secretary of Agriculture will serve.[71] The President directed the Working Group to publish interim values for the social cost of carbon by February 19, 2021.[72] The Working Group that month set that price at $51/ton at a 3% discount rate.[73]

---

[67] Executive Order 13,990, 86 Fed. Reg. 7037 (Jan. 20, 2021) at Sec. 1 (emphasis added), attached as Ex. 5.

[68] Executive Order 14,008, 86 Fed. Reg. 7619 (Jan. 27, 2021), attached as Ex. 6.

[69] *Id*. at 7622 (Sec. 201).

[70] Executive Order 13,990 (Ex. 5), 86 Fed. Reg. at 7040, Sec. 5(a) (emphasis added).

[71] *Id*., Sec. 5(b).

[72] *Id*., Sec. 5(b)(ii)(A).

[73] Interagency Working Group on Social Cost of Greenhouse Gases, Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates under Executive Order 13990 (Feb. 2021), available at https://www.whitehouse.gov/wp-content/uploads/2021/02/TechnicalSupportDocument_SocialCostofCarbonMethaneNitrousOxide.pdf (last viewed Mar. 12, 2021) and attached as Ex. 7.

3. NEPA requires the Forest Service to disclose the climate impacts of proposed actions.

The Forest Service must analyze the direct, indirect, and cumulative impacts of a proposed action.[74] NEPA and NFMA require the Forest Service to use high quality, accurate, scientific information to assess the effects of a proposed action on the environment.[75]

Meaningful consideration of greenhouse gas emissions (GHGs) and carbon sequestration (carbon storage) lies within the scope of required NEPA review.[76] As the Ninth Circuit has held, in the context of fuel economy standard rules:

> The impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct. Any given rule setting a CAFE standard might have an "individually minor" effect on the environment, but these rules are "collectively significant actions taking place over a period of time."[77]

Courts have held that a "general discussion of the effects of global climate change" does not satisfy NEPA's hard-look requirement.[78]

Further, courts have ruled that federal agencies must consider indirect GHG emissions resulting from agency policy, regulatory, and fossil fuel leasing decisions. For example, agencies cannot ignore the indirect air quality and climate change impact of decisions that would open up access

---

[74] *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1176 (10th Cir. 1999); *see also* 40 C.F.R. § 1508.25(c) (1978) (when determining the scope of an EIS, agencies "shall consider" direct, indirect, and cumulative impacts).

[75] *See* 40 C.F.R. § 1500.1(b); 36 C.F.R. § 219.3.

[76] *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008).

[77] *Id.*, 538 F.3d at 1216 (quoting 40 C.F.R. § 1508.7 (1978)). *See also WildEarth Guardians v. BLM*, 870 F.3d 1222, 1237 (10th Cir. 2017) (failure to disclose climate impacts of various alternatives "defeated NEPA's purpose").

[78] *High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1189-90 (D. Colo. 2014).

to coal reserves.[79] An analysis that does not adequately consider the indirect effects of a proposed action, including climate emissions, violates NEPA.[80]

NEPA requires "reasonable forecasting," which includes the consideration of "reasonably foreseeable future actions … even if they are not specific proposals."[81] That an agency cannot "accurately" calculate the total emissions expected from full development is not a rational basis for cutting off its analysis. "Because speculation is ... implicit in NEPA," agencies may not "shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as crystal ball inquiry."[82] The D.C. Circuit has echoed this sentiment, rejecting the argument that it is "impossible to know exactly what quantity of greenhouse gases will be emitted" and concluding that "agencies may sometimes need to make educated assumptions about an uncertain future" in order to comply with NEPA's reasonable forecasting requirement.[83]

The 2016 final CEQ *Guidance on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in NEPA Review* provides useful direction on the issue of federal agency review of greenhouse gas emissions as foreseeable direct and indirect effects of a proposed action.[84] The CEQ guidance provides clear direction for agencies to conduct a lifecycle greenhouse gas analysis that quantifies GHG emissions or storage because the modeling and tools to conduct this type of analysis are available:

> If the direct and indirect GHG emissions can be quantified based on available information, including reasonable projections and assumptions, agencies should consider and disclose the reasonably foreseeable direct and indirect emissions when analyzing the direct and indirect effects of the proposed action. Agencies should disclose the information and any assumptions used in the analysis and explain any uncertainties. To compare a project's estimated direct and indirect emissions with GHG emissions from the no-action alternative, agencies should

---

[79] *See Mid States Coal. For Progress v. Surface Transp. Bd.*, 345 F.3d 520, 532, 550 (8th Cir. 2003); *High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1197-98 (D. Colo. 2014); *Montana Environmental Information Center v. U.S. Office of Surface Mining*, 274 F. Supp. 3d 1074 (D. Mont. 2017), *amended in part, adhered to in part*, 2017 WL 5047901 (D. Mont. 2017).

[80] *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 2020 U.S. App. LEXIS 38033, *20 (9th Cir. 2020).

[81] *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1079 (9th Cir. 2011) (citation omitted).

[82] *Id.* (citations omitted).

[83] *Sierra Club v. Federal Energy Regulatory Commission*, 863 F.3d 1357, 1373-74 (D.C. Cir. 2017).

[84] Notice available at 81 Fed. Reg. 51,866 (Aug. 5, 2016); full guidance available at https://ceq.doe.gov/docs/ceq-regulations-and-guidance/nepa_final_ghg_guidance.pdf (last viewed Mar. 12, 2020).

> draw on existing, timely, objective, and authoritative analyses, such as those by the Energy Information Administration, the Federal Energy Management Program, or Office of Fossil Energy of the Department of Energy. In the absence of such analyses, agencies should use other available information.[85]

The guidance further specifies that estimating GHG emissions is appropriate and necessary for actions such as federal logging projects.

> In addressing biogenic GHG emissions, resource management agencies should include a comparison of estimated net GHG emissions and carbon stock changes that are projected to occur with and without implementation of proposed land or resource management actions. This analysis should take into account the GHG emissions, carbon sequestration potential, and the changes in carbon stocks that are relevant to decision making in light of the proposed actions and timeframes under consideration.

Although the Trump administration withdrew the 2016 CEQ guidance, President Biden on January 20, 2021 rescinded that Trump Executive Order, and directed CEQ to "review, revise, and update" its 2016 climate guidance.[86] On February 19, 2021, CEQ effectively reinstated the 2016 GHG guidance:

> CEQ will address in a separate notice its review of and any appropriate revisions and updates to the 2016 GHG Guidance. In the interim, agencies should consider all available tools and resources in assessing GHG emissions and climate change effects of their proposed actions, including, as appropriate and relevant, the 2016 GHG Guidance.[87]

Further, regardless of the guidance, the underlying requirement from federal courts – that NEPA requires agencies to consider, quantify, and disclose climate change impacts, including indirect and cumulative combustion impacts and loss of sequestration foreseeably resulting from commercial logging decisions – has not changed.[88]

---

[85] *Id*. at 16 (citations omitted).

[86] Executive Order 13,990 (Ex. 5), 86 Fed. Reg. at 7040, Sec. 7, 86 Fed. Reg. at 7042.

[87] Council on Environmental Quality, National Environmental Policy Act, Guidance on Consideration of Greenhouse Gas Emissions, 86 Fed. Reg. 10,252 (Feb. 19, 2021), attached as Ex. 8, and available at https://www.govinfo.gov/content/pkg/FR-2021-02-19/pdf/2021-03355.pdf (last viewed Mar. 12, 2021).

[88] *See S. Fork Band Council of W. Shoshone v. United States Dept. of Interior*, 588 F.3d 718, 725 (9th Cir. 2009); *Ctr. for Biological Diversity*, 538 F.3d at 1214-15; *Mid States Coalition for Progress*, 345 F.3d at 550; *WildEarth Guardians v. United States Office of Surface Mining, Reclamation & Enf't*, 104 F. Supp. 3d 1208, 1230 (D. Colo. 2015) (coal combustion was indirect effect of agency's approval of mining plan modifications that "increased the area of federal land on which mining has occurred" and "led to an increase in the amount of federal coal available for combustion."); *Diné Citizens Against Ruining Our Env't v. United States Office of Surface*

4. The Forest Service's failure to disclose and quantify the Salter Project's climate damage violates NEPA.

The Forest Service categorizes the climate change impacts of the Salter Project as a "Resource[] Dismissed from Detailed Analysis," and spends a mere 10 sentences explaining why the issue is of no import.[89] The Draft EA asserts that: "Climate change analysis is guided by Climate Change Considerations in Project-Level NEPA Analysis (U.S. Forest Service 2009), which recommends consideration of both the effect of a proposed action on climate change, and the effect of climate change on a proposed action."[90] The Forest Service's reliance on discredited, and long out-of-date, guidance from the George W. Bush administration runs directly counter to the current administration's aggressive approach to both accounting for and addressing climate change, and further conflicts with CEQ's 2016 guidance.

The Draft EA violates NEPA and is arbitrary and capricious because it focuses exclusively (but qualitatively) on the alleged benefits of purporting to make the forest more "resilient" to the environmental factors made worse by climate change – drought and insect infestations – while effectively denying and declining to quantify the impacts on climate pollution and carbon storage of logging, burning, and trucking trees from the forest. Although responding to climate change appears to be a primary project purpose, the Draft EA contains almost nothing on the project's impact on climate pollution or climate change. The Salter Project will have at least two types of climate impacts that the EA ignores: it will deplete carbon stores by removing trees that fix carbon; and it will result in the combustion of fossil fuels to implement logging and road construction.

a. The Forest Service fails to disclose and quantify the Salter Project's impact on carbon storage.

The Salter Project will have direct, indirect, and cumulative impacts on climate change because logging and burning forests will impact the ecosystem's ability to store carbon.

Science makes clear that the Salter Project will worsen climate emissions by removing large trees that are currently fixing carbon, turning them into wood products (which results in a significant loss of that carbon fixed in wood), and leaving a landscape with no trees and (eventually) seedlings that fix far less carbon than mature forests.

The Draft EA fails to contain any analysis of the Salter Project's impact on climate stores and carbon pollution, although the project will likely remove millions of board feet of timber. In addition, the project will log potentially thousands of old and mature trees, some as large as 7 feet in circumference, and likely decrease the ability of those stands and that land to sequester

---

*Mining Reclamation & Enf't*, 82 F. Supp. 3d 1201, 1213-1218 (D. Colo. 2015); *High Country Conservation Advocates*, 52 F. Supp. 3d at 1174.

[89] Draft EA at 102-103.

[90] Draft EA at 102.

carbon for years to come. The proposed action will involve removing some trees over a century old, which are assuredly fixing significant amounts of carbon.

Logging old trees in particular worsens climate change by releasing significant amounts of carbon and by preventing such forests from continuing to sequester carbon. As the Forest Service has admitted regarding mature forests in Alaska, such forests "likely store considerably more carbon compared to younger forests in this area (within the individual trees themselves as well as within the organic soil layer found in mature forests)."[91] This is so because when a forest is cut down, the vast majority of the stored carbon in the forest is released over time as CO2, thereby converting forests from a sink to a "source" or "emitter."[92] According to a 2019 IPCC report, deforestation causes climate pollution, and avoiding deforestation will reduce climate pollution.[93]

Recent studies agree that maintaining forests rather than cutting them can help reduce the impacts of climate change. "Stakeholders and policy makers need to recognize that the way to maximize carbon storage and sequestration is to grow intact forest ecosystems where possible."[94] One report concludes:

> *Allowing forests to reach their biological potential for growth and sequestration, maintaining large trees* (Lutz et al 2018), reforesting recently cut lands, and afforestation of suitable areas *will remove additional CO2 from the atmosphere*. Global vegetation stores of carbon are 50% of their potential including western forests because of harvest activities (Erb et al 2017). Clearly, western forests could do more to address climate change through carbon sequestration *if allowed to grow longer*.[95]

---

[91] Forest Service, Tongass Land and Resource Management Plan, Final EIS (2016) at 3-14, excerpts attached as Ex. 9.

[92] *See, e.g.*, D. DellaSala, The Tongass Rainforest as Alaska's First Line of Climate Change Defense and Importance to the Paris Climate Change Agreements (2016) at 5, attached as Ex. 10.

[93] Intergovernmental Panel on Climate Change, Special Report on Climate Change, Desertification, Land Degradation, Sustainable Land Management, Food Security, and Greenhouse gas fluxes in Terrestrial Ecosystems, Summary for Policymakers (Aug. 2019) at 7, 23, attached as Ex. 11. *See also* B. Law et al., Land use strategies to mitigate climate change in carbon dense temperate forests, Proceedings of the Nat'l Academy of Sciences, vol. 115, no. 14 (Apr. 3, 2018) at 3663 ("Proven strategies immediately available to mitigate carbon emissions from forest activities include ... reducing emissions from deforestation and degradation."), attached as Ex. 12.

[94] Moomaw, *et al*., Intact Forests in the United States: Proforestation Mitigates Climate Change and Serves the Greatest Good, Frontiers in Forests and Global Change (June 11, 2019) at 7), attached as Ex. 13 (emphasis added).

[95] T. Hudiburg *et al*., Meeting GHG reduction targets requires accounting for all forest sector emissions, Environ. Res. Lett. 14 (2019) (emphasis added), attached as Ex. 14.

A June 2020 literature review from leading experts found thinning provided little advantage for carbon storage:

> *There is absolutely no evidence that thinning forests increases biomass stored* (Zhou et al. 2013). It takes decades to centuries for carbon to accumulate in forest vegetation and soils (Sun et al. 2004, Hudiburg et al. 2009, Schlesinger 2018), and it takes decades to centuries for dead wood to decompose. We must preserve medium to high biomass (carbon-dense) forest not only because of their carbon potential but also because they have the greatest biodiversity of forest species (Krankina et al. 2014, Buotte et al. 2019, 2020).[96]

Two experts in the field recently concluded:

> Recent projections show that to prevent the worst impacts of climate change, governments will have to increase their pledges to reduce carbon emissions by as much as 80%. We see the next 10 to 20 years as a critical window for climate action, and believe that *permanent protection for mature and old forests is the greatest opportunity for near-term climate benefits*.[97]

Further, to address the climate crisis, agencies cannot rely on the re-growth of cleared forests to make up for the carbon removed when mature forest is logged. One prominent researcher explains: "It takes at least 100 to 350+ years to restore carbon in forests degraded by logging (Law et al. 2018, Hudiburg et al. 2009). If we are to prevent the most serious consequences of climate change, *we need to keep carbon in the forests because we don't have time to regain it once the forest is logged* (IPCC, 2018)."[98]

Studies also demonstrate that significant volumes – in some cases a majority – of carbon stored in trees are *immediately* lost when trees are logged and milled, and the rest is likely to be returned to the atmosphere sooner than would occur if the trees were left standing.

> [H]arvesting carbon will increase the losses from the forest itself and to increase the overall forest sector carbon store, the lifespan of wood products carbon (including manufacturing losses) would have to exceed that of the forest. Under current practices this is unlikely to be the case. A substantial fraction (25%– 65%) of harvested carbon is lost to the atmosphere during manufacturing and construction depending on the product type and manufacturing method. The

---

[96] B. Law, *et al*., The Status of Science on Forest Carbon Management to Mitigate Climate Change (June 1, 2020), attached as Ex. 15.

[97] B. Law & W. Moomaw, Keeping trees in the ground where they are already growing is an effective low-tech way to slow climate change, *The Conversation* (Feb. 23, 2021) (emphasis added), attached as Ex. 16, and available at https://theconversation.com/keeping-trees-in-the-ground-where-they-are-already-growing-is-an-effective-low-tech-way-to-slow-climate-change-154618 (last viewed Mar. 12, 2021).

[98] B. Law, *et al*., The Status of Science on Forest Carbon Management (Ex. 15) (emphasis added).

> average lifespan of wood buildings is 80 years in the USA, which is determined as the time at which half the wood is no longer in use and either decomposes, burns or, to a lesser extent, is recycled. However, many forest trees have the potential to live hundreds of years ….[99]

Other studies indicate that there is little substitution benefit of using wood compared to using other products (e.g., concrete for building), and that industry talking points to the contrary vastly overestimate the carbon benefits of using wood.[100]

Even if the logging permitted in the Salter Project – when viewed in isolation – may only result in relatively minor climate impacts, NEPA expressly requires agencies to consider whether agency actions are "related to other actions with individually insignificant but cumulatively significant impacts."[101] Thus, the Forest Service may not dismiss and deny the climate impacts of the Salter Project without considering the cumulative significance of the project when added to other past, present, and reasonably foreseeable logging projects and Forest Service timber sales in the state, region, and nation.[102] The Forest Service failed to address these cumulative effects, violating NEPA.

The Forest Service's approach also violates NEPA because the Forest Service did not use its best efforts or the best available information to address climate impacts. Methods exist that would have allowed the agency to quantify those impacts. For example, a 2018 study concludes that carbon storage impacts can be estimated, accounted for, and factored into a model that calculated the net amount of carbon lost due to forest logging in Oregon over two five-year periods.[103] This

---

[99] B. Law & M.E. Harmon, Forest sector carbon management, measurement and verification, and discussion of policy related to mitigation and adaptation of forests to climate change. Carbon Management (2011) 2(1), attached as Ex. 17, and available at https://www.researchgate.net/publication/235591616_Forest_sector_carbon_management_measurement_and_verification_and_discussion_of_policy_related_to_climate_change (last viewed Mar. 12, 2021).

[100] "Substitution of wood for more fossil carbon intensive building materials has been projected to result in major climate mitigation benefits often exceeding those of the forests themselves. A reexamination of the fundamental assumptions underlying these projections indicates long-term mitigation benefits related to product substitution may have been overestimated 2- to 100-fold." M. Harmon, Have product substitution carbon benefits been overestimated? A sensitivity analysis of key assumptions, Environmental Research Letters (2019), attached as Ex. 18, and available at https://iopscience.iop.org/article/10.1088/1748-9326/ab1e95/pdf (last viewed Mar. 12, 2021).

[101] 40 C.F.R. § 1508.27(b)(7) (2019).

[102] 40 C.F.R. § 1508.7; *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41 (D.D.C. 2019) (holding that BLM erred by failing to consider the cumulative climate impacts of oil and gas leases together with "GHG emissions generated by past, present, and reasonably foreseeable BLM lease sales in the region and nation").

[103] *See* Law *et al.*, *Land use strategies* (Ex. 12) at 3664 ("Our LCA [life-cycle assessment] showed that in 2001–2005, Oregon's net wood product emissions were 32.61 million tCO2e

is precisely the type of analysis the Forest Service should, and could, have undertaken for Salter EA.

Similarly, Dr. DellaSala's 2016 report addressed carbon stores from wood products and concluded that logging Tongass old-growth forest under the 2016 Forest Plan would result in net annual CO2 emissions totaling between 4.2 million tons and 4.4 million tons, depending on the time horizon chosen.[104] The Bureau of Land Management more than a decade ago completed an EIS for its Western Oregon Resource Management Plan in which that agency also predicted the net carbon emissions from its forest and other resource management programs.[105] Because agencies and academics have quantified and compared the carbon emissions of alternative logging proposals, NEPA requires the Forest Service to do so here.

Rather than acknowledging current science or availing itself of existing methods for disclosing the climate impacts of logging and burning that the project proposes, the Draft EA dismisses any climate impacts as "immeasurable," or "small."

> During project implementation there would be small, incremental losses of carbon sequestration due to burning of vegetation and consumption of fossil fuels by equipment. Trees would be harvested over time; however, carbon could continue to be stored in manufactured wood products that used harvested materials (Nunery and Keeton 2010). As implementation proceeds, there would immediately be small, beneficial effects to carbon sequestration due to growth of vegetation. In the long-term, carbon sequestration would be sustainably increased through continuing growth of a healthy forest. The described changes in greenhouse gas emissions resulting from the proposed action is immeasurable.

This analysis ignores the best available science, described above, which has concluded that:

- Carbon storage in wood products is minimal compared to the carbon stored in living trees.
- There is no proven benefit to thinning forests in terms of increasing carbon storage.
- The impacts of forest logging projects on carbon stores can be estimated/quantified.
- When the impact of logging on carbon stores is estimated, it can and should be quantified in terms of the impacts of climate pollution on the globe via the social cost of carbon.

---

[tons of carbon dioxide equivalent in net GHG emissions] (Table S3), and 3.7- fold wildfire emissions in the period that included the record fire year (15) (Fig. 2) In 2011–2015, net wood product emissions were 34.45 million tCO2e and almost 10-fold fire emissions, mostly due to lower fire emissions.").

[104] DellaSala (Ex. 10) at 14.

[105] *See* Bureau of Land Management, Western Oregon Proposed RMP Final EIS (2009) at 165-181, excerpts attached as Ex. 19.

Dismissing impacts as "small" and "immeasurable" is not only inaccurate, it is a form of climate denial. Every additional molecule of CO2 emitted into the atmosphere will be increasing the amount of warming on Earth for centuries to come. Further, dismissing all impacts as "immeasurable" deprives the public and the decisionmaker of any understanding of the relative impacts of each alternative. For example, it is likely that the large tree retention alternative (Alternative 3) will result in the retention of more carbon stores than Alternative 2 because large trees store more carbon than smaller trees.

The Forest Service's failure to address or acknowledge that there are peer-reviewed scientific approaches to estimating net climate damage caused by logging forests is another independent NEPA violation. NEPA requires agencies to explain opposing viewpoints and their rationale for choosing one viewpoint over the other.[106] Courts will set aside a NEPA document where the agency fails to respond to scientific analysis that calls into question the agency's assumptions or conclusions.[107]

Here, the Draft EA fails to grapple with the most recent national policy direction and science on forests and carbon sequestration, including many of the studies attached here. The Draft EA ignores years of climate science that: underscores the desperate need for action on climate change; shows that forest logging like that proposed in the Salter Project will likely worsen climate pollution and the climate emergency; and demonstrates, contradictory to the Forest Service's lack of analysis, that the climate impacts of the Project can be quantified.

The U.S. District Court for the District of Montana last month set aside a federal agency NEPA analysis for failing to quantify the social costs of agency action's climate pollution.[108] As noted above, President Biden has already announced that his administration would reinstate the Interagency Working Groups' Social Cost of Carbon using a metric that includes global damage from climate-forcing pollution, and the Working Group has set a price for agencies to utilize in their analyses.

---

[106] 40 C.F.R. § 1502.9(b) (2019) (requiring agencies to disclose, discuss, and respond to "any responsible opposing view").

[107] *See Ctr. for Biological Diversity v. U.S. Forest Serv*., 349 F.3d 1157, 1168 (9th Cir. 2003) (finding Forest Service's failure to disclose and respond to evidence and opinions challenging EIS's scientific assumptions violated NEPA); *Seattle Audubon Soc'y v. Moseley*, 798 F. Supp. 1473, 1482 (W.D. Wash. 1992) ("The agency's explanation is insufficient under NEPA – not because experts disagree, but because the FEIS lacks reasoned discussion of major scientific objections."), aff'd sub nom. *Seattle Audubon Soc'y v. Espy*, 998 F.2d 699, 704 (9th Cir. 1993) ("[i]t would not further NEPA's aims for environmental protection to allow the Forest Service to ignore reputable scientific criticisms that have surfaced").

[108] *WildEarth Guardians v. Bernhardt*, 2021 U.S. Dist. LEXIS 20792 at *25-*32, 2021 WL 363955, CV 17-80-BLG-SPW (D. Mont. Feb. 3, 2021) (endorsing magistrate judge's determination that the Office of Surface Mining "failed to take a 'hard look' at the costs of greenhouse gas emissions and failed to reasonably justify its reasoning for not quantifying the costs of the mining plan when the Social Cost of Carbon Protocol ... was available to do just that").

We note that the Draft EA relies on agency direction that is out of date and out of step with the present administration. The Forest Service relies on guidance entitled "Climate Change Considerations in Project Level NEPA Analysis," a flawed document that was the product of the final week of the George W. Bush administration in January 2009, and that has long been overtaken by both federal case law and CEQ's 2016 guidance, now restored, requiring robust project level NEPA analysis and by improved modeling and scientific data.[109] The Forest Service cannot continue to rely on this guidance document unless and until it can explain how the 2009 guidance comports with current CEQ guidance and caselaw.

Finally, while the Forest Service may assert that the logging the forest will prevent fires which will result in greater carbon pollution, at least one study found the opposite: that at least at an aggregate level, logging resulted in many times more carbon pollution than did wildfire.[110]

b. The Forest Service fails to disclose and quantify the carbon pollution of implementing the Salter Project.

Logging and burning within the project area for a decade will require the use of heavy equipment, almost certainly exclusively powered by fossil-fueled engines, to bulldoze a vast network of up to 117 miles of temporary road, to "reconstruct" other roads, and to chainsaw forests, and remove trees and take them to market. This activity will result in greenhouse gas pollution that will worsen climate change for centuries, and that pollution caused by the proposed action will be over and above the pollution that will occur under the no action alternative. The Draft EA fails to estimate or otherwise address such impacts, or how such pollution would vary by alternative.

This contrasts to the approach taken elsewhere by the Forest Service and other agencies, such as the Office of Surface Mining, which have disclosed in NEPA documents the estimated pollution from internal combustion engines necessary to mine, process, and ship coal to market.[111]

We do not endorse as sufficient either the OSM or Federal Coal Lease Modifications analyses cited, but they demonstrate that agencies (including the Forest Service itself) can and do attempt

[109] *See* Draft EA at 102 (explicitly relying on Forest Service Jan. 2009 guidance).

[110] N.L. Harris et al., Attribution of net carbon change by disturbance type across forest lands of the conterminous United States, Carbon Balance and Management (2016), attached as Ex. 20, and available at https://www.fs.fed.us/nrs/pubs/jrnl/2016/nrs_2016_harris_001.pdf (last viewed Mar. 12, 2021).

[111] *See, e.g.*, Office of Surface Mining & Bureau of Land Management, Environmental Assessment, Colowyo Coal Mine Collom Permit Expansion Area Project (Jan. 2016) at 4-15 – 4-18 (including table assessing "direct GHG emissions" from "drills," "dozers," "graders," "haul trucks," etc., for the proposed action), excerpts attached as Ex. 21; U.S. Forest Service, Supplemental Final Environmental Impact Statement, Federal Coal Lease Modifications COC-1362 & COC-67232 (Aug. 2017) at 102-113 (publishing tables estimating emissions of air pollutants, including greenhouse gases CO2 and Ch4 (methane) for activities including road and well pad construction, heavy equipment use, and commuter vehicle trips for the no action and proposed action alternatives), excerpts attached as Ex. 22.

to disclose direct climate emissions from construction and transport activities. The Forest Service provides no reasonable basis for failing to do the same for the Salter Project, and thus violates NEPA.

## IV. THE DRAFT EA'S RELIANCE ON 'ADAPTIVE MANAGEMENT' VIOLATES NEPA.

The Salter Draft EA relies in part on an "adaptive management" strategy to "inform implementation and to provide the opportunity to solicit input from partners that could be incorporated into the decision making process when addressing changing conditions on the ground in real-time."[112] The Draft EA states that pursuant to this plan, "[a]djustments to prescriptions could be made at any time as long as they are within the scope of this analysis."[113]

To be effective and legal, adaptive management must: (1) clearly identify measurable thresholds that, if exceeded as determined by monitoring, will require a change in management; (2) clearly identify what that changed management will entail; and (3) disclose in this NEPA document the impacts caused by that change in management. Because the Draft EA fails on at least the last counts, the Forest Service cannot rely on the adaptive management strategy as currently divulged in the EA.

### A. The Law of Adaptive Management.

Forest Service NEPA regulations, adopted in 2008, define adaptive management as "[a] system of management practices based on *clearly identified intended outcomes and monitoring* to determine if management actions *are meeting those outcomes*; and, if not, to facilitate management changes that will best ensure that those outcomes are met or re-evaluated. Adaptive management stems from the recognition that knowledge about natural resource systems is sometimes uncertain."[114] These regulations further state that:

> An adaptive management proposal or alternative must *clearly identify the adjustment(s) that may be made* when monitoring during project implementation *indicates that the action is not having its intended effect*, or is causing unintended and undesirable effects. The EIS must disclose not only the effect of the proposed action or alternative *but also the effect of the adjustment*. Such proposal or alternative must also *describe the monitoring that would take place* to inform the responsible official during implementation whether the action is having its intended effect.[115]

The preamble to the Forest Service's regulation that adopted the adaptive management definition states that the agency must identify the proposed changes, and their impacts, in the NEPA document. "When proposing an action the responsible official may identify possible adjustments

---

[112] Draft EA at 27.

[113] Draft EA at 27.

[114] 36 C.F.R. § 220.3 (emphasis added).

[115] 36 C.F.R. § 220.5(e)(2) (emphasis added).

that may be appropriate during project implementation. Those possible adjustments must be described and their effects analyzed in the EIS." 73 Fed. Reg. 43,084, 43,090 (July 24, 2008).

Federal courts have found agencies violated NEPA or the Endangered Species Act (ESA) where the agency relied on an "adaptive management" plan that was vague, set no specific triggers for future action, failed to describe that future action, or failed to ensure that resources will be protected as the adaptive management plan asserts.

In *Natural Resources Defense Council v. U.S. Army Corps of Engineers*, 457 F. Supp. 2d 198 (S.D.N.Y. 2006), the court found that the Army Corps' attempt to supplement an inadequately-explained finding of no significant impact concerning a dredging project was arbitrary and capricious where the agency relied on ill-defined "adaptive management" protocols to conclude that impacts would be mitigated below the level of significance.

> The EA makes several promises that it will alter its monitoring plan should it prove necessary. For example, the EA relies on a general promise that it will "as appropriate, reevaluate, the need for altering its dredging methods" … through the use of its coordination plan and monitoring program. The EA also explains that the Corps will follow "adaptive management practices as it moves through construction of its contracts," thus allowing it to change future contracts should the data indicate it is necessary. These promises, however, provide no assurance as to the efficacy of the mitigation measures. The Corps did not provide a proposal for monitoring how effective "adaptive management" would be.[116]

*Mountaineers v. United States Forest Service*, 445 F. Supp. 2d 1235 (W.D. Wash. 2006) set aside a Forest Service decision to open motor vehicle trails where the agency proposed to monitor impacts to wildlife and potentially change the trails later based on an adaptive management plan. The court stated that these adaptive management strategies "amount … to a 'build-first, study later' approach to resource management. This backward-looking decision making is not what NEPA contemplates."[117] Other cases similarly conclude that NEPA forbids the use of ill-defined adaptive management plans to assume away likely impacts of agency action.[118]

Courts also hold unlawful agency projects that may impact species protected by the Endangered Species Act where the biological opinion is based on the assumption that a vague and ill-defined monitoring and adaptive management plan will mitigate impacts to the species at issue. These cases provide a useful analogy to adaptive management in the NEPA context. *Natural Resources Defense Council v. Kempthorne*, 506 F. Supp. 2d 322 (E.D. Ca. 2007) is key precedent. There, plaintiffs challenged a proposed plan to manage water diversions in a manner that could

---

[116] *NRDC v. United States Army Corps of Eng'rs*, 457 F. Supp. 2d at 234 (citations omitted).

[117] *Mountaineers v. United States Forest Serv.*, 445 F. Supp. 2d at 1250.

[118] *See, e.g.*, *High Sierra Hikers Association v. Weingardt*, 521 F. Supp. 2d 1065, 1090-91 (N.D. Ca. 2007) (overturning a Forest Service decision to liberalize the rules limiting campfires in high country parts of a wilderness area on the grounds that the agency could not rely on adaptive management to overcome an inadequate response to the problems raised in the record).

adversely impact the delta smelt, a species listed as threatened under the Endangered Species Act. The Fish and Wildlife Service prepared a biological opinion (BiOp) on the proposal which concluded that the project would neither jeopardize the smelt nor adversely modify the smelt's critical habitat. "Although the BiOp recognize[d] that *existing* protective measures may be inadequate, the FWS concluded that certain proposed protective measures, including … a proposed 'adaptive management' protocol would provide adequate protection."[119]

Plaintiffs alleged, among other things, that the BiOp "relie[d] upon uncertain (and allegedly inadequate) adaptive management processes to monitor and mitigate the [project's] potential impacts."[120] They asserted that the adaptive management plan, which required a working group meet and consider adaptive measures in light of monitoring, failed to meet the ESA's mandate that mitigation be

> "'reasonably specific, certain to occur, and capable of implementation'" because: (1) the [working group] has complete discretion over whether to meet and whether to recommend mitigation measures; (2) even if the [working group] meets and recommends mitigation measures, the [agency management team] group is free to reject any recommendations; (3) there are no standards to measure the effectiveness of actions taken; (4) reconsultation is not required should mitigation measures prove ineffective; and (5) ultimately, no action is ever required.[121]

The *Kempthorne* court cited prior caselaw holding that "a mitigation strategy [in the ESA context] must have some form of measurable goals, action measures, and a certain implementation schedule; i.e., that mitigation measures must incorporate some definite and certain requirements that ensure needed mitigation measures will be implemented."[122] The court found that adaptive management plan "does not provide the required reasonable certainty to assure appropriate and necessary mitigation measures will be implemented."[123] The court concluded that

> Adaptive management is within the agency's discretion to choose and employ, however, the absence of any definite, certain, or enforceable criteria or standards make its use arbitrary and capricious under the totality of the circumstances.[124]

[119] *NRDC v. Kempthorne*, 506 F. Supp. 2d at 333-34 (emphasis in original).

[120] *Id.* at 329.

[121] *Id.* at 352. *See also id.* at 350 (explaining the "certain to occur" standard and citing *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002)).

[122] *Id.* at 355 (citing *Rumsfeld*, 198 F. Supp. 2d at1153).

[123] *Id.* at 356.

[124] *Id.* at 387.

### B. The Draft EA's Plan Does Not Comply with Law for Adaptive Management.

Although the Draft EA states that it relies on adaptive management, the proposal it describes does not contain key elements required to comply with NEPA. While adaptive management may be an appropriate tool to assist in management of the Salter Project area, we urge the Forest Service, as part of the NEPA process, to develop a more detailed plan, identify specific management changes in case those triggers are met, and analyze and disclose the impacts of those changes.

The adaptive management approach described in the Draft EA fails to "clearly identify the adjustment(s) that may be made when monitoring during project implementation indicates that the action is not having its intended effect."[125] The Draft EA includes vaguely-described adjustments, which violates Forest Service rules concerning adaptive management. For example, proposed "adaptive management actions" for several proposed factors includes – or is limited to – a statement that the agency will "Monitor and adjust" or "Monitor and adjust … as needed."[126] This provides neither the Forest Service nor the public with any detail about how the agency might "adjust" its actions.

And because the Draft EA does not explain what those "adjustment" may entail, the proposed adaptive management plan violates Forest Service regulations requiring that the NEPA analysis "disclose not only the effect of the proposed action or alternative *but also the effect of the adjustment*."[127] The Draft EA fails to disclose what the impacts will be if actions are adjusted pursuant to adaptive management.

Finally, the Draft EA states that a purpose of adaptive management

> is to set up a formal communication protocol with outside partners; for example, the DWRF [Dolores Watershed and Resilient Forests] collaborative. If conditions change, or if approaches are not working as described, the adaptive management process identified here would be used to notify partners about the agency's findings. The process would also serve as an opportunity for the public to have direct and formal communication with agency decision makers and resource managers on specific projects.

We support the Forest Service working with outside stakeholders, but we urge the Forest Service not to play favorites. The agency cannot rely on select group as a substitute for the public involvement NEPA requires. We urge the Forest Service to use available tools – posting documents on its project page, open houses, press releases, emails, etc. – to engage the *entirety* of the interested public, including those persons or groups that cannot spend scores of hours participating in collaborative groups. We note that the Forest Service cannot legally rely on a process outside of NEPA in which to test measures previously unidentified and un-analyzed in a NEPA document. For the adaptive management proposal to be legal and sound, the Forest

---

[125] 36 C.F.R. § 220.5(e)(2) (emphasis added).

[126] Draft EA at 30.

[127] 36 C.F.R. § 220.5(e)(2) (emphasis added).

Service must identify the "adjustments" it intends to make and evaluate or estimate their impacts *before* approving the project.

In sum, the Forest Service has the authority to change a project and/or approve new actions within a project area in response to changes, but it can do so only in accordance with NEPA and the agency's own regulations. The adaptive management plan in the Draft EA currently fails to comply with these laws. We urge the Forest Service to develop a specific plan in cooperation with the public and all stakeholders before it issues any additional NEPA document or proposed decision.

## IV. THE DRAFT EA FAILS TO ANALYZE A RANGE OF REASONABLE ALTERNATIVES.

In taking the "hard look" at impacts that NEPA requires, an EA must "study, develop, and describe" reasonable alternatives to the proposed action.[128] The Tenth Circuit explains that this mandate extends to EAs as well as EISs. "A properly-drafted EA must include a discussion of appropriate alternatives to the proposed project."[129] This alternatives analysis "is at the heart of the NEPA process, and is 'operative even if the agency finds no significant environmental impact.'"[130] Reasonable alternatives must be analyzed for an EA even where a FONSI is issued because "nonsignificant impact does not equal no impact. Thus, if an even less harmful alternative is feasible, it ought to be considered."[131] When an agency considers reasonable alternatives, it "ensures that it has considered all possible approaches to, and potential environmental impacts of, a particular project; as a result, NEPA ensures that the most intelligent, optimally beneficial decision will ultimately be made."[132]

In determining whether an alternative is "reasonable," and thus requires detailed analysis, courts look to two guideposts: "First, when considering agency actions taken pursuant to a statute, an alternative is reasonable only if it falls within the agency's statutory mandate. Second,

---

[128] 42 U.S.C. § 4332(2)(C) & (E); 40 C.F.R. § 1508.9(b) (an EA "[s]hall include brief discussions ... of alternatives").

[129] *Davis v. Mineta*, 302 F.3d 1104, 1120 (10th Cir. 2002) (granting injunction where EA failed to consider reasonable alternatives).

[130] *Diné Citizens Against Ruining Our Env't v. Klein*, 747 F. Supp. 2d 1234, 1254 (D. Colo. 2010) (quoting *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1277 (10th Cir. 2004)). *See also W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013) (in preparing EA, "an agency must still give full and meaningful consideration to *all* reasonable alternatives" (emphasis added) (internal quotation and citation omitted)); 40 C.F.R. § 1502.14 (describing alternatives analysis as the "heart of the environmental impact statement").

[131] *Ayers v. Espy*, 873 F. Supp. 455, 473 (D. Colo. 1994) (internal citation omitted).

[132] *Wilderness Soc'y v. Wisely*, 524 F. Supp. 2d 1285, 1309 (D. Colo. 2007) (quotations & citation omitted).

reasonableness is judged with reference to an agency's objectives for a particular project."[133] Any alternative that is unreasonably excluded will invalidate the NEPA analysis. "The existence of a viable but unexamined alternative renders an alternatives analysis, and the EA which relies upon it, inadequate."[134] The agency's obligation to consider reasonable alternatives applies to citizen-proposed alternatives.[135]

Courts hold that an alternative may not be disregarded merely because it does not offer a complete solution to the problem.[136] Even if additional alternatives would not fully achieve the project's purpose and need, NEPA "does not permit the agency to eliminate from discussion or consideration a whole range of alternatives, merely because they would achieve only some of the purposes of a multipurpose project."[137] If a different action alternative "would only partly meet the goals of the project, this may allow the decision maker to conclude that meeting part of the goal with less environmental impact may be worth the tradeoff with a preferred alternative that has greater environmental impact."[138]

The courts also require that an agency adequately and explicitly explain in the EA any decision to eliminate an alternative from further study.[139]

### A. The Forest Service Must Consider Alternatives that Limit the Logging of Large or Old Trees.

Large and old ponderosa pine trees are relatively rare now in the Southwest compared to the period before European settlement because they were heavily logged over the last 150 years. Large, old ponderosa serve valuable ecosystem functions, have outsize value for wildlife, are more fire resistant, serve as important storehouses of genetic diversity, and store significant amounts of carbon.[140]

---

[133] *Diné Citizens Against Ruining Our Env't*, 747 F. Supp. 2d at 1255 (quoting *New Mexico ex rel. Richardson*, 565 F.3d at 709).

[134] *Id.* at 1256.

[135] *See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217-19 (9th Cir. 2008) (finding EA deficient, in part, for failing to evaluate a specific proposal submitted by petitioner); *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1171 (10th Cir. 1999) (agency's "[h]ard look" analysis should utilize "*public comment* and the best available scientific information") (emphasis added).

[136] *Natural Resources Defense Council, Inc. v. Morton*, 458 F.2d 827, 836 (D.C. Cir. 1972).

[137] *Town of Matthews v. U.S. Dep't. of Transp.*, 527 F. Supp. 1055 (W.D. N.C. 1981).

[138] *North Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1542 (11th Cir. 1990).

[139] *See Wilderness Soc'y*, 524 F. Supp. 2d at 1309 (holding EA for agency decision to offer oil and gas leases violated NEPA because it failed to discuss the reasons for eliminating a "no surface occupancy" alternative); *Ayers*, 873 F. Supp. at 468, 473.

[140] *See, e.g.*, Four Forest Restoration Initiative, Old Growth Protection & Large Tree Retention Strategy (Sep. 13, 2011) at 3-4 (citing numerous studies), attached as Ex. 23.

As a result, numerous studies, collaboratives, and Forest Service decisions have emphasized the need to protect large and old ponderosa pine trees in order to achieve both ecological restoration and greater resilience to catastrophic events such as wildfire and insect infestations. These decisions have often done so by setting an upper limit for the size of trees that can be logged for forest management.

For example, the Four Forest Restoration Initiative, a collaborative guided by science and working to improve management on forests in northern Arizona, has adopted an "Old Growth Protection & Large Tree Retention Strategy."[141] As part of that strategy, "the 4FRI Collaborative has agreed that the 4FRI effort should implement large tree retention and old growth protection strategies that are … are based upon a 16" diameter threshold that limits the cutting of trees larger than 16" to circumstances and criteria set forth in pre-defined exception categories."[142] A similar collaborative in New Mexico agreed that "It is generally advisable to maintain ponderosa pines larger than 41 cm (16 inches) diameter at breast height (dbh) and other trees with old-growth morphology regardless of size (e.g. yellow-barked ponderosa pine or any species with large drooping limbs, twisted trunks or flattened tops)."[143]

One peer-reviewed study concludes:

> Large and old trees, especially those established before ecosystem disruption by Euro-American settlement, are rare, important, and difficult to replace. Their size and structural complexity provide critical wildlife habitat by contributing crown cover, influencing understory vegetation patterns, and providing future snags. Ecological restoration should protect the largest and oldest trees from cutting and crown fires, focusing treatments on excess numbers of small young trees. Given widespread agreement on this point, *it is generally advisable to retain ponderosa trees larger than 41 cm (16 inches) dbh and all trees with old-growth morphology regardless of size (i.e., yellow bark, large drooping limbs, twisted trunks, flattened tops)*. Despite the heterogeneity of forest site and stand conditions in the Southwest, cutting of larger trees will seldom be ecologically warranted as ''restoration'' treatments at this time due to their relative scarcity. Following this guideline would significantly reduce hazards of stand-replacing fires in most cases and also favor the development of future old-growth forest conditions (Moir and Dieterich 1988, Harrington and Sackett 1992).[144]

---

[141] *Id.*

[142] *Id.* at 7.

[143] U.S. Forest Service *et al.*, New Mexico Forest Restoration Principles (May 2006), attached as Ex. 24, available at https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5207898.pdf (last viewed July 15, 2019).

[144] Allen *et al.*, Ecological Restoration of Southwestern Ponderosa Pine Ecosystems: A Broad Perspective, Ecological Applications, 12(5) (2002) at 1425, attached as Ex. 25.

This article notes that managing ponderosa pine forests for ecological restoration can also help increasing forest resilience.[145]

For the San Juan National Forest, the Forest Service and other stakeholders joined to establish the Ponderosa Pine Partnership (PPP) in the early 1990s. The Partnership developed "An Ecological Prescription for the San Juan Pine Zone," including this prescription: "Retain large trees. Any trees 20 inches or larger in diameter should be retained. In stands with smaller trees, the largest trees should be retained."[146] The San Juan National Forest developed and partially implemented two projects under the PPP, including the Guard Station and Ferris East timber sales. Both of these timber sales included diameter limits. The Guard Station Decision Notice prohibited the logging of trees over 16 inches dbh; the Ferris East Decision notice barred logging of ponderosa over 20 inches dbh.[147] Each of the sales was designed to meet goals that included forest restoration, supplying the needs of the local wood products industry, and reducing the risk of catastrophic wildfire.[148]

This science and social history demonstrate that diameter limits in ponderosa pine on the San Juan National Forest are reasonable, and should be considered in any NEPA analysis concerning logging in such pine forests.

1. The Draft EA fails to address the key differences between Alternatives 2 and 3.

The Salter Project identifies purposes similar to those identified for the Guard Station and Ferris East projects, and proposes one alternative, Alternative 3, that would protect large and old trees over 20 inches dbh.

We appreciate the Forest Service analyzing Alternative 3 in detail. However, the Draft EA fails to disclose the different impacts of the two action alternatives.

The Draft EA concludes that there would be virtually no difference in the impacts between Alternative 2 (which protects trees 26.9" dbh and larger) and Alternative 3 for most of the resources analyzed. For example, the Draft EA states that there would be no difference in the impacts of the two alternatives with respect to fuels and fire management.[149] The Draft EA also

---

[145] *Id.* at 1429. (emphasis added).

[146] D. Lynch, Forest Restoration in Southwestern Ponderosa Pine, Journal of Forestry (Aug. 2000) at 17, attached as Ex. 26.

[147] San Juan National Forest, Guard Station Timber Sale, Decision Notice (May 1996) at 3 ("Cut no trees greater than 16" diameter breast height (DBH)"), attached as Ex. 27; San Juan National Forest, Ferris East Timber Sale, Decision Notice (Feb. 1998) at 3 ("No ponderosa pine in excess of 20 inches in diameter at breast height (DBH) will be harvested."), attached as Ex. 28.

[148] *Id.*

[149] Draft EA at 37-38.

concludes the impacts to watersheds would be the same, and repeatedly concludes that impacts to different wildlife species under the two alternatives would be "similar."[150]

While for almost every resource the Forest Service concludes that the impacts of the two action alternatives would be the same or similar, the Draft EA concludes that Alternative 3's large tree retention limits would allow the San Juan NF to meet "desired conditions … to a lesser degree" at "specific locations" (which the Draft EA does not identify) and "over time and over cutting cycles" (though for how long is not specified).[151] The Draft EA further states that under Alternative 3: "Basal area retention goals and uneven aged characteristics are being compromised, leaving stands less resilient and making long term resistance less likely to occur."[152] The EA does not disclose how much less resilient, or what the impacts of that allegedly reduced resilience might be. Because the EA concludes that there is little or no difference between Alternatives 2 and 3 in terms of their impact on fire management, watersheds, and wildlife, the level of reduced resilience would appear to be minimal at most.

The Draft EA does identify one major difference: "Removing areas from treatment as result of diameter limitation reduces the amount of treatment in an area and subsequently *the amount of harvestable volume per acre*."[153] This would appear to be the primary trade-off between the two alternatives: increased volume (and perhaps a minimal amount of increased resilience) vs. increased protection for old and large trees. But the EA fails to sharply define the differences between the two action alternatives by failing to quantify (or qualify) the level of difference for any of these factors: how much extra timber would be available for mills under Alternative 2? How much extra resilience? How many more large trees would remain under Alternative 3 and what would that mean for the potential for increased wildlife snags, carbon storage, etc.? Unless and until the EA grapples with these critical issues, the alternatives analysis fails to address the "heart" of the NEPA analysis.

2. The Forest Service should also analyze a restoration alternative that protects trees 16" dbh and larger.

Because the PPP recommended protecting trees 16" dbh and larger in some cases, and because the Draft EA finds little difference between Alternatives 2 and 3, the Forest Service should also analyze in detail (or explain why it cannot) an alternative that protects trees 16" dbh and larger. This would allow the public and the decisionmaker to compare the relative merits of protecting different size classes of trees, and to understand whether protecting trees 20" dbh is a reasonable middle ground. It is also an alternative that is most likely to protect all pre-settlement trees, which studies have concluded is critical to restore ponderosa pine forests in the Southwest.

We understand that Dr. Bill Baker will present evidence that an alternative that protects trees 16" dbh and larger best constitutes a restoration alternative. Analyzing this alternative will also

---

[150] Draft EA at 63-65 (watersheds), 76-78 (wildlife).

[151] Draft EA at 59.

[152] Daft EA at 59.

[153] Draft EA at 59 (emphasis added).

require the Forest Service to explain why its proposed action (Alternative 2) appears to be out of compliance with Forest Plan direction on restoring ponderosa pine.

## IV. THE DRAFT EA FAILS TO ACCOUNT FOR STUDIES PREDICTING THE IMPACT OF CLIMATE CHANGE TO THE FOREST IN THE PROJECT AREA.

For the Draft EA to meet NEPA's mandate that environmental analysis include information "of high quality" and must include "[a]ccurate scientific analysis."[154]

Forests within the project area are likely to undergo significant changes in the coming years due to climate change. However, the Draft EA, fails to account for the fact that these changes may undercut key project assumptions and goals. We urge the Forest Service to accurately address these impacts by including and addressing in detail the new, relevant, expert information in any subsequently prepared NEPA document.

The Salter Project is premised in part on the conclusion that thinning and other logging projects would, over the "long term," enhance the forest's resilience to fire, insect infestation, and drought; all of these threats are driven and exacerbated by climate change. The likelihood that the project could achieve benefits over the long term must be weighed against the predicted impacts of climate change, which could make the recovery of ponderosa pine in this area difficult if not impossible, even assuming the Salter treatments take place.

A Forest Service study concluded that by the 2050s to 2060s, current forest types in the project area will be lost due to climatic changes brought on by the warming of the planet due to anthropogenic climate change.

In 2017, Forest Service Rocky Mountain Region staff and researchers presented results from bioclimate models concluding that ponderosa pine would likely be lost from the Salter Project area in the 2056-65 time period.[155]

The Draft EA fails to cite or directly respond to this expert study generated by the Forest Service; the agency must do both in any subsequently prepared NEPA document to comply with the law. Indeed, the Draft EA fails to identify climate change as something likely to have a cumulative impact on vegetation, relegating discussion of the issue to a section entitled

---

[154] 40 C.F.R. § 1500.1(b).

[155] J. Worrall et al., Projected Impacts of Climate Change on Forests of the Dolores Watershed, presentation to the Dolores Watershed Resilient Forest Collaborative (2017) at slides 29, 39 & 52 (showing results of bioclimate models predicting the likely persistence of various forest types, which characterize ponderosa pine as "lost" for most of the project area), attached as Ex. 29, and available at http://dwrfcollaborative.org/wp/wp-content/uploads/2018/06/projected-impacts-of-climate-change-on-forests-of-the-dolores-watershed.pdf (last viewed Mar. 12, 2021). Other forest types will suffer in the area as well. *See id.* at slide 33 (showing Gambel oak "threatened"); *id.* at slide 35 (showing aspen "lost" in the project area, even in a "favorable climate" scenario).

"Resources dismissed from detailed analysis."[156] This appears to directly conflict with Forest Plan direction that requires vegetation management will "anticipates[]climate-related plant succession changes."[157]

At a bare minimum, the Forest Service should be honest with the public about the likely fate of the forest in the Salter area in light of climate change, and what that means about the efficacy of the project. The Draft EA fails to do so.

## V. THE DRAFT EA FAILS TO RESPOND TO SCIENTIFIC EXPERTS.

### A. NEPA Requires Agencies to Respond to Comments, Especially Opposing Scientific Views.

NEPA requires agencies to explain opposing viewpoints and their rationale for choosing one viewpoint over the other.[158] Federal courts have set aside NEPA analysis where the agency failed to respond to scientific analysis that calls into question the agency's assumptions or conclusions.[159]

### B. The Draft EA Fails to Address or Acknowledge Expert Opinions of Forest Scientists.

The Draft EA fails to respond or acknowledge comments timely submitted by Dr. Bill Baker in March 2020 concerning scoping. Among other things, his comments presented a detailed reconstruction of ponderosa pine diameter distributions under the historic range of variability (HRV) for an area that includes the Salter Project area, and which demonstrated the importance of retaining trees 16" dbh and larger, given the current deficit in those size classes compared to the HRV. We urge the Forest Service to comply with NEPA by acknowledging, reviewing, and incorporating into any subsequent NEPA analysis the information Dr. Baker presented in scoping, as well as any comments he may submit on the Draft EA.

---

[156] *See* Draft EA at 102-03.

[157] Draft EA at 10 (quoting San Juan Forest Plan at 2.9.1).

[158] 40 C.F.R. § 1502.9(b) (requiring agencies to disclose, discuss, and respond to "any responsible opposing view").

[159] *See Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1168 (9th Cir. 2003) (finding Forest Service's failure to disclose and respond to evidence and opinions challenging EIS's scientific assumptions violated NEPA); *Seattle Audubon Soc'y v. Moseley,* 798 F. Supp. 1473, 1482 (W.D. Wash. 1992) ("The agency's explanation is insufficient under NEPA – not because experts disagree, but because the FEIS lacks reasoned discussion of major scientific objections."), *aff'd sub nom. Seattle Audubon Soc'y v. Espy,* 998 F.2d 699, 704 (9th Cir. 1993) ("[i]t would not further NEPA's aims for environmental protection to allow the Forest Service to ignore reputable scientific criticisms that have surfaced"); *High Country Conservation Advocates v. Forest Service*, 52 F. Supp. 3d 1174, 1198 (D. Colo. 2014) (finding Forest Service violated NEPA by failing to mention or respond to expert report on climate impacts).

Further, the Draft EA fails to address Worrall's conclusion that much of the Salter Project area may be devoid of ponderosa pine by 2065.

To comply with NEPA, the Forest Service must respond to these experts who question the utility and impacts of the Salter proposal.

## VI. THE DRAFT EA FAILS TO ANALYZE THE EFFECTIVENESS OF MITIGATION MEASURES.

### A. NEPA Mandates That Agencies Analyze Potential Mitigation Measures.

NEPA's statutory language implicitly charges agencies with mitigating the adverse environmental impacts of their actions.[160] NEPA's implementing regulations require that agencies analyze and proposed mitigation measures.[161]

The CEQ also has stated: "All relevant, reasonable mitigation measures that could improve the project are to be identified, even if they are outside the jurisdiction of the lead agency or the cooperation agencies ...."[162] According to the CEQ, "[a]ny such measures that are adopted must be explained and committed in the ROD."[163]

The Tenth Circuit has held that an agency's analysis of mitigation measures "must be 'reasonably complete' in order to 'properly evaluate the severity of the adverse effects' of a proposed project prior to making a final decision."[164] Mitigation "must be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated."[165]

"[O]mission of a reasonably complete discussion of possible mitigation measures would undermine the 'action-forcing' function of NEPA. Without such a discussion, neither the agency nor other interested groups and individuals can properly evaluate the severity of the adverse effects."[166] A "perfunctory description," of mitigation, without "supporting analytical data" analyzing their efficacy, is inadequate to satisfy NEPA's requirements that an agency take a "hard look" at possible mitigating measures.[167] An agency's "broad generalizations and vague

---

[160] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351-52 (1989); *Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1522 (10th Cir. 1992).

[161] 40 C.F.R. §§ 1502.14(f), 1502.16(h).

[162] Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18026, 18031 (March 23, 1981).

[163] Forty Questions, 46 Fed. Reg. at 18036.

[164] *Colo. Envt'l Coalition v. Dombeck*, 185 F.3d 1162, 1173 (10th Cir. 1999) (quoting *Robertson*, 490 U.S. at 352).

[165] *City of Carmel-by-the-Sea v. U.S. Dept. of Transp.*, 123 F.3d 1142, 1154 (9th Cir. 1997) (quoting *Robertson*, 490 U.S. at 353).

[166] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 353 (1989).

[167] *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998).

references to mitigation measures ... do not constitute the detail as to mitigation measures that would be undertaken, and their effectiveness, that the Forest Service is required to provide."[168] Moreover, in its final decision documents, an agency must "[s]tate whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not."[169]

### B. The Draft EA Fails to Analyze the Effectiveness of Mitigation Measures.

The Draft EA does not focus on "mitigation," instead asserting that "Project design elements … were developed for the proposed action to minimize or eliminate potential adverse effects during implementation."[170] While the Draft EA lists many "design elements,"[171] it does not evaluate the effectiveness of each measure. Whether some of these measures would be effective at all is open to question because many of them are vague or ill-defined.

For example, one design element directs the agency to "[m]onitor noxious weeds/invasive species and treat as needed to contain established infestations and minimize rate of spread."[172] Treating "as needed" to "minimize the rate of spread" provide neither the public nor the decisionmaker with useful information as to what methods the Forest Service will employ or how effective those measures will be.

At least one mitigation measure appears almost certain to be ineffective. The Draft EA proposed to "reduce conflicts with recreation users during federal holidays" by barring hauling "on FSR 527 from the junction of FSR 527C to FSR 259 (Boggy Draw Trailhead) from 12 P.M. Friday to 12:01 A.M. Monday on Memorial Day [and] Labor Day."[173] This means hauling would be allowed for all but one minute of the Mondays of Memorial and Labor Days, when recreationists are likely to be using Forest Service roads in higher-than-usual numbers, and conflicts with log hauling are likely to occur. At a minimum, the Forest Service must explain why it intends to permit log hauling on these routes on Memorial Day and Labor Day, but not on the Saturday and Sunday before those days.

---

[168] *Id*. at 1380-81. *See also Northwest Indian Cemetery Protective Association v. Peterson*, 795 F.2d 688, 697 (9th Cir. 1986), rev'd on other grounds, 485 U.S. 439 (1988) ("A mere listing of mitigation measures is insufficient to qualify as the reasoned discussion required by NEPA."); *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1151 (9th Cir. 1988) ("Without analytical data to support the proposed mitigation measures, we are not persuaded that they amount to anything more than a 'mere listing' of good management practices.").

[169] 40 C.F.R. § 1505.2(c).

[170] Draft EA at 19.

[171] Draft EA at 19-27.

[172] Draft EA at 22.

[173] Draft EA at 23.

The provision allegedly mitigating impact to "elk production habitat" allows the "line officer" to approve operations in those areas.[174] No criteria or benchmarks are provided to limit the officer's discretion, and thus it is impossible to tell whether this measure can be effective.

A design element concerning road construction states that "[t]emporary roads would be held to the minimum feasible number, width and total length," but fails to explain how the agency would do so, or how minimal that width could be.[175] The measure also states that temporary roads "would be located sufficiently far from streams and other water bodies to minimize discharge into those waters except at necessary water crossings."[176] How far will that be? How will the Forest Service determine that distance? How much discharge is "minimized" discharge? Any subsequent NEPA document must address this lack of definition.

Further, some "design elements" are little more than keeping track of damage with no proposal to respond to it. One measure states that "[e]ffectiveness of road closure would also be monitored," with no explanation as to what actions the Forest Service would take it closures were found to be ineffective.[177]

While the Draft EA identifies several design standards for northern goshawk, one appears to be at odds with best available science, and two prescriptions suggested by that science is omitted. The Management Recommendations for Northern Goshawk (1992) suggests that "[a]ll management activities in the PFA [northern goshawk post fledging-family area] should be limited to the period from October through February."[178] The Draft EA does not limit activities in PFAs, but does state that "if active northern goshawk nests are discovered, all project operations would be restricted annually from March 1st to August 31st within one-half (½) mile of the active nest."[179] We request that the Forest Service explain why the limitation on activities for the Salter Project is one month shorter than that recommended by the Management Recommendations. Further, the Management Recommendations state that "forests in the PFAs should contain overstories with a canopy cover greater than 50%," and further that in ponderosa pine forested PFAs, the Forest Service should "[l]eave 5 - 7 tons per acre of woody debris (greater than 3 inches in diameter) and downed logs distributed across areas, after timber harvesting, for small animal habitat and to maintain long-term productivity.[180] The Salter Project contains no such prescription that we could find. Any subsequent NEPA document should address these omissions.

---

[174] Draft EA at 26.

[175] Draft EA at 21.

[176] Draft EA at 21.

[177] Draft EA at 25.

[178] R.T. Reynolds *et al*. Management Recommendations for the Northern Goshawk in the Southwestern United States, GTR-RM-217 (1992) at 6.

[179] Draft EA at 73-74.

[180] Management Recommendations for the Northern Goshawk at 14, 24.

The Management Recommendations also suggest that the PFAs ensure suitable prey habitat is available and that "[f]eatures of prey habitat in the PFA include:

1) large (>18 inches DBH) feeding and/or nesting trees for tree squirrels,

2) large (>18 inches DBH and >30 feet tall) snags and/or trees with exposed heartwood for nest cavity excavation by woodpeckers,

3) patches of mid-aged forests with high canopy cover (up to 70%) that provide mesic conditions for fungi (important foods for all the mammalian prey),

4) small (>2 inches in diameter and >8 feet long) downed logs and other woody debris that provide hiding, feeding, denning, and nesting sites used by goshawk prey.

5) large (>12 inches in diameter and >8 feet long) downed logs and other woody debris that provide hiding, feeding, denning, and nesting sites used by goshawk prey."[181]

The Draft EA contains no comparable guidance, but it does permit the logging of trees up 22 inches dbh, which could conflict with guidance to retain trees 18 inches and greater for specific purposes.[182] We request that the Forest Service explain how it intends to resolve this apparent omission/conflict.

In sum, because the Draft EA fails to analyze the effectiveness of individual design elements, and because some of the design elements are unlikely to be effective, the Draft EA violates NEPA. We urge the Forest Service to address this issue by evaluating the effectiveness of each individual mitigation measure or design element in any subsequently prepared NEPA document, and to propose measures that are certain to be implemented and likely to reduce impacts.

## VII. THE FOREST SERVICE MUST PREPARE AN ENVIRONMENTAL IMPACT STATEMENT ON THE SALTER PROJECT.

### A. Agencies Must Prepare EISs When Impacts 'May' Be Significant.

NEPA requires federal agencies to prepare a full environmental impact statement (EIS) before undertaking "major Federal actions significantly affecting the quality of the human environment."[183] As the Tenth Circuit has explained, "[i]f the agency determines that its proposed action *may* 'significantly affect' the environment, the agency must prepare a detailed statement on the environmental impact of the proposed action in the form of an EIS."[184] The Ninth Circuit agrees.

[181] Management Recommendations for the Northern Goshawk at 16.

[182] Draft EA at 26.

[183] 42 U.S.C. § 4332(C).

[184] *Airport Neighbors Alliance v. U.S.*, 90 F.3d 426, 429 (10th Cir. 1996) (citation omitted) (emphasis added).

> We have held that an EIS *must* be prepared if 'substantial questions are raised as to whether a project ... *may* cause significant degradation to some human environmental factor.' To trigger this requirement a 'plaintiff need not show that significant effects *will in fact occur*,' [but instead] raising 'substantial questions whether a project may have a significant effect' is sufficient.[185]

If an agency "decides not to prepare an EIS, 'it must put forth a convincing statement of reasons' that explains why the project will impact the environment no more than insignificantly. This account proves crucial to evaluating whether the [agency] took the requisite 'hard look.'"[186]

"Significance" under NEPA requires consideration of the action's context and intensity.[187] An agency must analyze the significance of the action in several contexts, including short- and long-term effects within the setting of the proposed action (including site-specific, local impacts).[188] Intensity refers to the severity of the impact and requires consideration of ten identified factors that may generally lead to a significance determination, including: (1) whether the action is likely to be highly controversial; (2) whether the effects on the environment are highly uncertain or involve unique or unknown risks; and (3) whether the action may have cumulative significant impacts.[189] With respect to the degree to which the environmental effects are likely to be highly controversial, the word "controversial" refers to situations where "'substantial dispute exists as to the size, nature, or *effect* of the major federal action.'"[190]

### B. The Salter Project May Have Significant Impacts.

The Salter Project may have significant impacts, triggering the Forest Service's duty to prepare an EIS.

***The scale of the project itself may be significant***. The proposed action alternatives permit the construction of up to 117 miles of temporary road, a significant amount, and reconstruction or

---

[185] *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149-50 (9th Cir. 1998) (citations omitted) (emphasis original). *See also Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 864-65 (9th Cir. 2005) ("To trigger this [EIS] requirement a plaintiff need not show that significlant effects will in fact occur, but raising substantial questions whether a project may have a significant effect is sufficient." (internal quotations, citations, and alterations omitted)).

[186] *Ocean Advoc.*, 402 F.3d at 864.

[187] 40 C.F.R. § 1508.27.

[188] *Id.* § 1508.27(a).

[189] *Id.* § 1508.27(b)(4)-(5), (7)

[190] *Town of Cave Creek v. FAA*, 325 F.3d 320, 331 (D.C. Cir. 2003) (quoting *North American Wild Sheep v. U.S. Department of Agriculture*, 681 F.2d 1172, 1182 (9th Cir. 1982)) (emphasis in original). *See also Middle Rio Grande Conservancy Dist. v. Norton*, 294 F.3d 1220, 1229 (10th Cir. 2002) (same); *Town of Superior v. U.S. Fish and Wildlife Serv.*, 913 F. Supp. 2d 1087, 1120 (D. Colo. 2012) (same).

"improv[ing] the condition of [another] 149 miles" of road.[191] Logging may take place on more than 35 square miles of forest land, and will occur continuously across this landscape for as long as a decade. Road construction, logging, and road use will conflict with recreational use which is categorized as "moderate to high" for much of the year. The large scale of the project supports a conclusion of significance.

***The project may significantly impact soils and watersheds***. Construction of temporary roads and landing areas, and the use of an unknown number, length and location of skid trails, have the potential to significantly impact sensitive soils and watersheds. The Draft EA states that "[p]roposed design features for Hydrology and Soils also restrict roads, landings, skid trails, concentrated-use sites, and similar soil disturbances to designated sites to no more than 15 percent of any timber sale unit."[192] Because there are 22,790 acres of logging units, the design features permit skid trails, roads, etc. to impact soils on up to 3,400 acres – an area of more than five square miles. This impact is significant.

***The project may significantly impact wildlife.*** The proposed action will render much of the project area unsuitable for northern goshawk, a potentially significant impact. The Draft EA proposes to reduce basal area outside of the tiny 30-acre nest area to as low as 50 square feet per acre. Such logging may damage goshawk habitat in the short term (for years). As the Draft EA admits:

> Basal area reductions below 80 square feet per acre in mature stands would affect nesting behavior of northern goshawk because thermal and protective sight cover for nesting will be reduced, which will reduce reproduction. A reduction in canopy cover may also impact foraging success as there will be less ability to hide from prey. These impacts may reduce habitat effectiveness in the short-term … for this species….[193]

The project thus will *certainly* damage goshawk habitat over a vast area for the 10 years of project implementation and beyond. The *promise* of increased habitat effectiveness is over the "long term," so the nature of the trade-off between present, certain damage and indeterminant future benefit cannot be understood or compared. The potential for significant impacts to goshawk requires preparation of an EIS.

***The project is highly controversial***. The project's impacts are uncertain. The Forest Service's proposed prescription of a 26.9" dbh cap conflicts with that developed by the San Juan National Forest's earlier Ponderosa Pine Partnership. Scientific studies suggest that the project will result in the loss of pre-settlement ponderosa pine within the project area, and trees more than a century old, and Forest Service studies indicate that ponderosa pine and aspen may be lost in the project area within a few decades. But the Draft EA assert the project will lead to a diverse-aged forest

---

[191] Draft EA at 55 (149 miles), 57 (up to 117 miles).

[192] Draft EA at 44.

[193] Draft EA at 73.

able to resist future insect infestations. Thus, the effects of the Salter Project meet the “highly controversial” standard, requiring preparation of a full environmental impact statement.

The Forest Service’s failure to quantify the project’s climate impacts, and reliance on outdated guidance, conflict with new administration guidance and federal caselaw, and the Draft EA appears to rely on discredited science and law. The Forest Service’s climate denial also crosses the “highly controversial” threshold.

**CONCLUSION.**

With a project of this scale and potential for significant impact, we are concerned that the Forest Service must undertake additional disclosure – of baseline information; of mitigation measures; of the location and impacts of roads, among other things – to comply with NEPA. We further oppose adoption of an alternative that permits the logging of large and old trees as proposed in Alternative 2.

Sincerely,

Edward B. Zukoski, Senior Attorney
Center for Biological Diversity
1536 Wynkoop Street, Suite 421
Denver, CO 80202
(303) 641-3149
tzukoski@biologicaldiversity.org

Adam Rissien, ReWilding Advocate
WildEarth Guardians
PO Box 7516
Missoula, MT 59807
(406) 370-3147
arissien@wildearthguardians.org

## TABLE OF EXHIBITS

| | |
|---|---|
| Exhibit 1. | USDA Forest Service, Final Environmental Impact Statement, Roadless Area Conservation Rule (Nov. 2000) (excerpts) |
| Exhibit 2. | Lolo National Forest, Redd Bull Environmental Assessment (Jan. 2021) (excerpts) |
| Exhibit 3. | IPCC, Summary for Policymakers, Global Warming of 1.5°C. An IPCC Special Report on the impacts of global warming of 1.5°C above pre-industrial levels and related global greenhouse gas emission pathways (2018) |
| Exhibit 4. | H. Fountain, Climate Change Is Accelerating, Bringing World 'Dangerously Close' to Irreversible Change, The New York Times (Dec. 4, 2019) |
| Exhibit 5. | Executive Order 13,990, 86 Fed. Reg. 7037 (Jan. 20, 2021) |
| Exhibit 6. | Executive Order 14,008, 86 Fed. Reg. 7619 (Jan. 27, 2021) |
| Exhibit 7. | Interagency Working Group on Social Cost of Greenhouse Gases, Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates under Executive Order 13990 (Feb. 2021) |
| Exhibit 8. | Council on Environmental Quality, National Environmental Policy Act, Guidance on Consideration of Greenhouse Gas Emissions, 86 Fed. Reg. 10,252 (Feb. 19, 2021) |
| Exhibit 9. | Forest Service, Tongass Land and Resource Management Plan, Final EIS (2016) (excerpts) |
| Exhibit 10. | D. DellaSala, The Tongass Rainforest as Alaska's First Line of Climate Change Defense and Importance to the Paris Climate Change Agreements (2016) |
| Exhibit 11. | Intergovernmental Panel on Climate Change, Special Report on Climate Change, Desertification, Land Degradation, Sustainable Land Management, Food Security, and Greenhouse gas fluxes in Terrestrial Ecosystems, Summary for Policymakers (Aug. 2019) |
| Exhibit 12. | B. Law et al., Land use strategies to mitigate climate change in carbon dense temperate forests, Proceedings of the Nat'l Academy of Sciences, vol. 115, no. 14 (Apr. 3, 2018) |
| Exhibit 13. | Moomaw, *et al*., Intact Forests in the United States: Proforestation Mitigates Climate Change and Serves the Greatest Good, Frontiers in Forests and Global Change (June 11, 2019) |
| Exhibit 14. | Hudiburg *et al*., Meeting GHG reduction targets requires accounting for all forest sector emissions, Environ. Res. Lett. 14 (2019) |

Exhibit 15. B. Law, *et al*., The Status of Science on Forest Carbon Management to Mitigate Climate Change (June 1, 2020)

Exhibit 16. B. Law & W. Moomaw, Keeping trees in the ground where they are already growing is an effective low-tech way to slow climate change, *The Conversation* (Feb. 23, 2021)

Exhibit 17. B. Law & M.E. Harmon, Forest sector carbon management, measurement and verification, and discussion of policy related to mitigation and adaptation of forests to climate change. Carbon Management (2011)

Exhibit 18. M. Harmon, Have product substitution carbon benefits been overestimated? A sensitivity analysis of key assumptions, Environmental Research Letters (2019)

Exhibit 19. *See* Bureau of Land Management, Western Oregon Proposed RMP Final EIS (2009) (excerpts)

Exhibit 20. N.L. Harris et al., Attribution of net carbon change by disturbance type across forest lands of the conterminous United States, Carbon Balance and Management (2016)

Exhibit 21. Office of Surface Mining & Bureau of Land Management, Environmental Assessment, Colowyo Coal Mine Collom Permit Expansion Area Project (Jan. 2016) (excerpts)

Exhibit 22. U.S. Forest Service, Supplemental Final Environmental Impact Statement, Federal Coal Lease Modifications COC-1362 & COC-67232 (Aug. 2017) (excerpts)

Exhibit 23. Four Forest Restoration Initiative, Old Growth Protection & Large Tree Retention Strategy (Sep. 13, 2011)

Exhibit 24. U.S. Forest Service *et al.*, New Mexico Forest Restoration Principles (May 2006)

Exhibit 25. Allen *et al*., Ecological Restoration of Southwestern Ponderosa Pine Ecosystems: A Broad Perspective, Ecological Applications, 12(5) (2002)

Exhibit 26. D. Lynch, Forest Restoration in Southwestern Ponderosa Pine, Journal of Forestry (Aug. 2000)

Exhibit 27. San Juan National Forest, Guard Station Timber Sale, Decision Notice (May 1996)

Exhibit 28. San Juan National Forest, Ferris East Timber Sale, Decision Notice (Feb. 1998)

Exhibit 29. J. Worrall et al., Projected Impacts of Climate Change on Forests of the Dolores Watershed, presentation to the Dolores Watershed Resilient Forest Collaborative (2017)

USDA United States Department of Agriculture

**Forest Service**

Washington Office

November 2000

# Forest Service Roadless Area Conservation

## Final Environmental Impact Statement Volume 1



# Acronyms and Abbreviations

| | |
|---|---|
| ANILCA | Alaska National Interest Lands Conservation Act |
| ASQ | Allowable Sale Quantity |
| BBF | Billion board feet |
| BLM | Bureau of Land Management |
| BMP | Best Management Practices |
| CAET | Content Analysis Enterprise Team |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| CFR | Code of Federal Regulations |
| DEIS | Draft Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| ESA | Endangered Species Act |
| FEIS | Final Environmental Impact Statement |
| FEMAT | Forest Ecosystem Management Assessment Team |
| GIS | Geographic Information System |
| ICBEMP | Interior Columbia Basin Ecosystem Management Project |
| LUD | Land Use Designation (Tongass National Forest) |
| MMBF | Million board feet |
| NEPA | National Environmental Policy Act |
| NFMA | National Forest Management Act |
| NFS | National Forest System (includes national forests and grasslands) |
| NOI | Notice of Intent |
| NMFS | National Marine Fisheries Service |
| OHV | Off-highway Vehicle |
| RARE | Roadless Area Review and Evaluation |
| RARE II | Second Roadless Area Review and Evaluation |
| ROD | Record of Decision |
| ROS | Recreation Opportunity Spectrum |
| SAA | Southern Applachian Assessment |
| TEP | Threatened, Endangered, and Proposed |
| TEPS | Threatened, Endangered, Proposed, and Sensitive |
| TLMP | Tongass Land Management Plan |
| USC | United States Code |
| USDA | United States Department of Agriculture |
| USDI | United States Department of the Interior |
| USFWS | United States Fish and Wildlife Service |
| USGS | United States Geological Survey |

United States Department of Agriculture

Forest Service

Washington Office

201 14th & Independence, SW
Post Office Box 96090
Washington, DC 20090-6090

**File Code:** 1950-3
**Date:** November 9, 2000

Dear Citizen:

I am pleased to present the Roadless Area Conservation Final Environmental Impact Statement. These volumes describe a strategy for conserving National Forest System inventoried roadless areas and their important values. They contain an analysis of management options and the Forest Service's preferred alternative. I expect to render a final decision on this matter in no sooner than 30 days.

I want to thank all those who participated in this rulemaking. The wealth of insights and experience they provided contributed to improvements in development of the proposal and the analysis of social, economic, and environmental effects.

I remain confident that taking action now to conserve roadless areas through this national effort will result in these lands providing lasting values for future generations. I appreciate your participation in achieving this goal.

Sincerely,

Mike Dombeck

MIKE DOMBECK
Chief

# Forest Service Roadless Area Conservation Final Environmental Impact Statement

**Lead Agency:** **USDA Forest Service**

**Responsible Official:** **Mike Dombeck, Chief**
Yates Building
14th and Independence Avenues, SW
Washington, DC 20024

**For Information Contact:** **Scott Conroy, Project Director**
USDA Forest Service
National Forest System Roadless Project
P.O. Box 96090
Washington, DC 20090-6090
(703) 605-5299

**Abstract:** The Forest Service is proposing new regulations to protect inventoried roadless areas within the National Forest System. This final environmental impact statement (FEIS) responds to strong public sentiment for protecting roadless areas and the clean water, biological diversity, dispersed recreational opportunities, wildlife habitat, forest health, and other public benefits provided by these areas. This action also responds to budgetary concerns and the need to balance management objectives with funding priorities. Public comments on the DEIS were considered in development of this FEIS in order to refine the scope of the decision to be made, verify significant issues, modify alternatives, identify possible mitigation measures, and direct the analysis of effects. The preferred alternative would prohibit road construction, reconstruction, and timber harvest except for stewardship purposes in all inventoried roadless areas. Implementation of the preferred alternative on the Tongass National Forest would begin in April 2004 to provide those communities in Southeast Alaska most impacted by the decision a transition period in which to adjust to possible economic changes that may result. Eight alternatives were fully developed and considered, including 4 sets of prohibited activities (including no action), and 4 alternative methods for applying the prohibitions to the Tongass. The procedural alternatives described in the DEIS are not included in this FEIS, since the decision was made to include procedures for roadless area conservation in the final rule for the Land and Resource Management Planning Regulations at 36 CFR 219.

# Forest Service
# Roadless Area Conservation

Final Environmental Impact Statement
Volume 1

## Table of Contents

**SUMMARY OF CHANGES BETWEEN DRAFT AND FINAL EIS ...................... XI**

**EXECUTIVE SUMMARY ........................................................................ ES-1**

**CHAPTER 1. PURPOSE OF AND NEED FOR ACTION...................................... 1-1**

- Introduction ........................................................................................ 1-1
- Background.......................................................................................... 1-5
- Public Review and Comment on the Draft EIS and Issues Considered .......... 1-7
- Purpose and Need.............................................................................. 1-16
- Decision to be Made .......................................................................... 1-19
- The Proposed Action .......................................................................... 1-19
- Other Related Planning Efforts ........................................................... 1-20
- Organization of the Document............................................................ 1-23

**CHAPTER 2. ALTERNATIVES CONSIDERED................................................... 2-1**

- Introduction ........................................................................................ 2-1
- Alternatives Considered in Detail......................................................... 2-3
  - Prohibition Alternatives ................................................................. 2-5
    - Alternative 1.............................................................................. 2-6
    - Alternative 2.............................................................................. 2-6
    - Alternative 3.............................................................................. 2-8
    - Alternative 4.............................................................................. 2-9
  - Tongass National Forest Alternatives .............................................. 2-11
    - Tongass Not Exempt.................................................................. 2-11
    - Tongass Exempt......................................................................... 2-12
    - Tongass Deferred ....................................................................... 2-12
    - Tongass Selected Areas .............................................................. 2-13
  - The Preferred Alternative .............................................................. 2-15
- Alternatives Considered but Eliminated from Detailed Study .................. 2-17
- Comparison of Alternatives ................................................................ 2-27

**CHAPTER 3. AFFECTED ENVIRONMENT AND ENVIRONMENTAL CONSEQUENCES .......... 3-1**

Overview of Inventoried Roadless Areas .......... 3-1
Demographic Trends .......... 3-7
Balancing Demands .......... 3-16
Active and Passive Forest Management .......... 3-19
Effects of the Prohibition Alternatives .......... 3-21
National Forest System Roads .......... 3-21
Access .......... 3-39
Ecological Factors .......... 3-42
Physical Resources .......... 3-44
Water Quantity and Timing .......... 3-46
Water Quality and Drinking Water Source Areas .......... 3-49
Channel Morphology .......... 3-54
Soil Loss, Sedimentation, and Site Productivity .......... 3-55
Landslides .......... 3-58
Air Resources .......... 3-62
Forest Health and Fire Ecology .......... 3-72
Fuel Management .......... 3-76
Fire Suppression .......... 3-97
Burned Area Emergency Rehabilitation .......... 3-117
Insects and Disease .......... 3-118
Biodiversity .......... 3-123
Ecoregions .......... 3-126
Fragmentation .......... 3-128
Size Considerations .......... 3-136
Elevation Distribution .......... 3-141
Terrestrial Animal Habitat and Species .......... 3-142
Aquatic Animal Habitat and Species .......... 3-160
Terrestrial and Aquatic Plant Species .......... 3-173
Threatened, Endangered, Proposed, and Sensitive Species .......... 3-179
Research, Monitoring, and Reference Landscapes .......... 3-191
Human Uses .......... 3-193
Timber Harvest .......... 3-193
Recreation .......... 3-207
Dispersed Recreation Activities .......... 3-208
Developed and Road-based Recreation Activities .......... 3-216
Recreation Special Uses .......... 3-222
Dispersed Recreation Activities .......... 3-222
Developed and Road-based Recreation Activities .......... 3-225
Scenic Quality .......... 3-228
Heritage Resources .......... 3-232
Wilderness .......... 3-237
Other Special Designated Areas .......... 3-242
Real Estate Management .......... 3-247
Boundary Management and Landownership Adjustments .......... 3-247
Access to Non-Federal Ownership within the National Forest System .......... 3-248

Non-recreation Special Uses .......... 3-249
Minerals and Geology .......... 3-252
Locatable Minerals .......... 3-253
Leasable Minerals .......... 3-254
Salable Minerals .......... 3-260
Abandoned and Inactive Mines .......... 3-261
Geological and Paleontological Resources .......... 3-262
Social and Economic Factors .......... 3-264
Non-commodity Values .......... 3-265
Recreation, Scenic Quality,Wilderness, and Recreation Special Uses .......... 3-271
Hunting and Fishing .......... 3-280
Livestock Grazing .......... 3-287
Non-timber Forest Products .......... 3-290
Timber Harvest .......... 3-295
Energy and Non-energy Minerals .......... 3-308
Road Construction .......... 3-324
Forest-dependent Communities .......... 3-326
Local Involvement .......... 3-351
American Indian and Alaska Native Issues .......... 3-352
Civil Rights and Environmental Justice .......... 3-355
Agency Costs .......... 3-362
EFFECTS OF THE TONGASS NATIONAL FOREST ALTERNATIVES .......... 3-371
SUMMARY OF CUMULATIVE EFFECTS .......... 3-392
Effects of the Prohibition Alternatives Across Resources .......... 3-392
Other Federal Policies .......... 3-396
National Forest Management Act Planning Regulations .......... 3-397
Forest Service Transportation Policy .......... 3-397
Unified Federal Policy .......... 3-399
Report to the President on the Wildland Fires of 2000 .......... 3-399
Cohesive Strategy .......... 3-400
Forest Service Strategic Plan .......... 3-401
Sierra Nevada Framework .......... 3-401
Interior Columbia Basin Ecosystem Management Project .......... 3-402
Lynx and Other Listings by the U.S. Fish and Wildlife Service .......... 3-402
Land Management Planning .......... 3-403
SHORT-TERM USES AND LONG-TERM PRODUCTIVITY .......... 3-403
UNAVOIDABLE ADVERSE EFFECTS .......... 3-404
MITIGATION OPTIONS .......... 3-404
IRREVERSIBLE AND IRRETRIEVABLE COMMITMENTS OF RESOURCES .......... 3-406
OTHER REQUIRED DISCLOSURES .......... 3-406

**CHAPTER 4. CONSULTATION AND COORDINATION .......... 4-1**

PUBLIC INVOLVEMENT .......... 4-1
PREPARERS AND CONTRIBUTORS .......... 4-5
DISTRIBUTION OF THE FINAL ENVIRONMENTAL IMPACT STATEMENT .......... 4-15

Case No. 1:23-cv-01501-RMR Document 15-6 filed 09/29/23 USDC Colorado pg 162 of 278



**APPENDIX A**: Inventoried roadless area acreage summarized by State, region, and forest ........ A-1

**APPENDIX B:** State-by-State summaries of key information for the preferred alternative. ........ B-1

**APPENDIX C:** Summary of threatened, endangered, proposed and sensitive species........ C-1

**APPENDIX D**: Civil rights impact analysis population distribution maps ........ D-1

**APPENDIX E:** Tongass National Forest land and resource management plan Prescriptions in Tongass Selected Areas Alternative ........ E-1

**GLOSSARY** ........ G-1

**REFERENCES CITED** ........ R-1

**INDEX** ........ X-1



FS-002111

### *No Net Loss and Rotation of Roadless Areas*

These alternatives would provide that the current amount of roadless acres be maintained. Existing roadless areas could be roaded provided new roadless areas are created through **decommissioning** or **obliteration** of temporary and classified roads. One approach would involve rotating the roaded and unroaded areas on different parts of each national forest in a one-for-one exchange to maintain the same amount of roadless areas. As an example, after timber harvest activities are completed and the area planted with trees, the roads in the area would be closed or decommissioned returning it to a roadless status. Roads would then be allowed for access to timber in other areas. In this manner, roadless areas would be restored, timber harvest from current roadless areas would continue at the current level, and overall road miles on NFS lands would neither increase or decrease.

These various alternatives were eliminated from detailed study, as they could have the same effects as the No Action Alternative. These options do not meet the purpose and need of the proposed action. The use of temporary roads may have the same long lasting and significant ecological effects as permanent roads, such as the introduction of non-native vegetation and degradation of stream channels. Vegetation recovery after timber harvest can take decades to restore **structure** and **composition**. These alternatives would postpone roaded entry to harvest unroaded areas until the vegetation in the in neighboring harvested areas was sufficiently recovered to mitigate anticipated effects caused by the new entry. Additionally, no-net-loss programs can lead to complicated systems of monitoring, excessive procedural requirements, and complex definitions and criteria.

### *Return Treaty-Ceded Lands*

There was a request for alternatives to return treaty-ceded lands back to American Indian Tribes to be held in perpetuity as natural ecological and wildlife reserves. This is a legal matter that is outside the scope of this proposal.

## Alternative Sets of Prohibitions Applicable To Inventoried Roadless Areas

A list of possible prohibitions could include off-highway vehicles (OHVs), rights-of-way, grazing, special uses, developed recreation, trails, mineral withdrawal, and other uses in addition to road construction, reconstruction, and timber harvesting. Another possibility is the closure or decommissioning of all roads in inventoried roadless areas.

The criteria used during RARE I and II allowed the presence of some roads in areas that were inventoried for Wilderness consideration (USDA Forest Service 1992). Subsequent roadless area inventories used the same criteria. Today, approximately 9,660 miles of roads currently exist on 5% of the land area in inventoried roadless areas. Some of these roads pre-date the inventories, while others have been constructed where land management plans have allowed development in inventoried roadless areas.

### *Alternative 1 – No Action*

An estimated 1,160 miles of classified and temporary roads (including public roads not under Forest Service jurisdiction and private roads) are planned to be constructed or reconstructed in inventoried roadless areas over the years 2000 to 2004. Table 3-6 shows the miles of classified and temporary road construction and reconstruction in inventoried roadless areas, required to support the **timber offer** volume projected over the same years. The estimated percentage of the classified roads that would be closed after planned use is also displayed. Forty-two percent of the planned timber-related roads are single-purpose roads closed to traffic between uses or are short-term roads that would be decommissioned. In addition, all of the planned temporary roads would be decommissioned within 10 years after use. The Forest and Rangeland Renewable Resources Planning Act of 1974, generally requires temporary roads to be closed and revegetated after use. By closing or decommissioning roads after use, the long-term effects on the environment are reduced. On the other hand, while temporary road construction must comply with law, regulation, and policy, in general, temporary roads are not designed or constructed to the same standards as classified roads and are not intended to be part of the National Forest System Transportation System. The results can be a higher risk of environmental impacts over the short run. The effects of the road construction and reconstruction are described for the prohibition alternatives for each resource later in this chapter.

**Table 3-6. Miles of planned timber-related road construction activities, 2000-2004.**

| Region | Classified road const | Classified road reconst | Temporary road const | Total all categories | Estimated closures of classified roads | Estimated closures of classified roads (%) |
|---|---|---|---|---|---|---|
| Northern (1) | 12 | 33 | 7 | 52 | 26 | 58 |
| Rocky Mountain (2) | 16 | 25 | 18 | 59 | 31 | 76 |
| Southwestern (3) | 0 | 0 | 3 | 3 | 0 | 0 |
| Intermountain (4) | 73 | 15 | 28 | 116 | 49 | 56 |
| Pacific Southwest (5) | 4 | 3 | 4 | 11 | 4 | 57 |
| Pacific Northwest (6) | 16 | 1 | 2 | 19 | 17 | 100 |
| Southern (8) | 5 | 16 | 4 | 25 | 18 | 86 |
| Eastern (9) | 6 | 6 | 35 | 47 | 11 | 92 |
| Alaska (10) | 214 | 0 | 77 | 291 | 32 | 15 |
| **Total** | **346** | **99** | **178** | **623** | **188** | **42** |

Generally, the ecological benefits of protecting more inventoried roadless areas from development and roading include:

Physical Resources

- Conserving water, soil, and air resources
- Protecting aquatic ecosystems
- Ensuring that community drinking water sources are protected
- Protecting overall watershed health

Forest Health

- May reduce the occurrence of human-caused fires
- May reduce the spread of some damaging insects and diseases

Biological Diversity

- Increasing habitat protection
- Protecting areas from additional landscape fragmentation and further loss of connectivity
- Maintaining and/or enhancing native plant and animal communities and reducing opportunities for the spread of nonnative invasive species
- Increasing the protection of a diversity of habitats from low to high elevations
- Conserving habitat for threatened, endangered, proposed, and sensitive species (TEPS)
- Providing important habitat for populations of wide ranging animals that need large areas
- with low human activity levels

## *Physical Resources*

Water, soil, and air resources have measurable characteristics that operate within naturally variable ranges of values. Water yield, timing, and quality, soil erosion, air quality, and other characteristics can vary widely, even in undisturbed situations. Land management practices, such as roading, timber harvest, **prescribed burning**, and other similar activities, can affect these values, and their variability. Sometimes the effects are within natural ranges; sometimes they are not. The most common effects of road construction and timber harvest activities on water, soil, and air resources are loss of ground cover vegetation, soil erosion and compaction, loss of soil productivity, increased potential for landslides, reduced transpiration (use of water by plants), increased water runoff, reduced water quality, and reduced air quality. In this analysis, the specific characteristics discussed are water quantity and timing, water quality, drinking water source areas, channel morphology, soil loss and sedimentation, site productivity, landslides, and air resources. Effects of fire on watersheds are discussed in the Forest Health and Fire Ecology section.

Roads have long been recognized as the primary human-caused source of soil and water disturbances in forested environments (Patric 1976; Egan and others 1996). Most impacts occur during initial road construction and then gradually decrease as roadside vegetation is reestablished and disturbed soil surfaces stabilize. Effects such as landslides persist when a road permanently undercuts unstable soils or landforms, or when roads are continually disturbed by road maintenance. Periodic maintenance activities can cause some of the impacts to briefly, but repeatedly, recur. Areas of particular concern are the

road surface and associated drainage structures such as ditches and water crossings (bridges, culverts, and fords). Poorly maintained roads can result in greater impacts as surface water is diverted, culverts plug, and other road design characteristics are compromised. Lack of maintenance commonly has detrimental effects on water, soil, and air resources. Insufficient maintenance funding is a key reason for the lack of adequate road maintenance (USDA Forest Service 2000h).

Temporary road construction has most of the same effects as permanent road construction, but generally for a shorter term and for a more limited physical extent. Long-term effects can occur if temporary roads receive extended use, and they are not decommissioned. Generation of sediment within timber harvest units is most strongly related to roading and associated facilities (**skid roads and trails**, log landings, etc.) that are needed to remove logs, as opposed to tree cutting (Anderson and others 1976). Skid roads and trails, log landings, and similar disturbances within the sale area are the main cause of soil erosion and can contribute up to 90% of the sediment generated by timber sale activity (Patric 1976; Swift 1988).

Until recently, poorly managed timber harvest activities have been a major source of sediment from a timber sale area (Stone and others 1979; Martin and Hornbeck 1994). Generally, monitoring has shown compliance rates for implementing best management practices to be between 85% and 98%, with compliance rates increasing over time as awareness and training programs take effect (Stuart 1996, State of Oregon 1999, State of Montana 1998, Phillips and others 2000). Results vary between States and ownerships, with Federal lands and large forest industry entities showing highest compliance, but small non-industrial landowners with little access to professional forestry assistance falling behind. A recent report from Oregon found overall compliance rates of 98% to 99% across all ownership classes (State of Oregon 1999), while a study in Maine reported only 34% of best management practices with compliance rates grater than 80% (State of Montana 1998, University of Maine 1996).

Although, best management practices do not completely eliminate water quality impacts, they do reduce impacts to acceptable levels. “Best management practices may not be completely effective, but they do provide a level of protection that the states and the Environmental Protection Agency judged sufficient to meet the goals of the Clean Water Act” (Ice and others 1997). “Audit results showed that 96 percent of the individual practices audited were effective in protecting soil and water resources” (State of Montana 1998). “When used, the forestry BMPs work well” (University of Maine 1996). Concern remains in some aspects of BMP compliance, however. For example, reports from Montana and Oregon both cited below average compliance rates with road maintenance, road drainage, and temporary crossings (State of Montana 1998, University of Maine 1996, State of Oregon 1999). These aspects of best management practices compliance may require additional education and compliance reviews. Although some excellent work is under way on assessing the effectiveness of best management practices, additional work is need is this area (Seyedbagheri 1996).

Currently, all Forest Service permanent and temporary roads needed for timber sales are designed and constructed using water, soil, and air best management practices that meet or exceed those required by individual States under Environmental Protection Agency

Fire regimes have become altered in some vegetation types because of increasing fuel loads and flammability. These changes in vegetation have resulted in habitat losses for species using open old growth and early seral stages such as the flammulated owl and northern goshawk (Smith 2000). Conversely, multi-storied, late-successional forested habitats preferred by species such as the northern spotted owl, pileated woodpecker, and American marten, have been enhanced in some areas.

Response activities for fire suppression in inventoried roadless areas have likely been more limited in the past, due in part to a lower priority being placed on rapid suppression of fires in these areas, relative to fires in roaded and more developed areas. Many of these areas have also had lower levels of commodity timber harvest, which can remove larger and more fire resistant trees, leaving smaller diameter, less fire resistant stems. Stand conditions within these areas may lie within or closer to the historic range of variability, and they may have more normal levels of fuel loading and stand composition and structure. The precise condition of these areas relative to risk of uncharacteristic wildland fire effects has not been determined, but estimates made indicated that approximately 8 million acres, or 14%, of inventoried roadless areas in all fire regimes may be at high risk of uncharacteristic wildfire effects. This compares to an estimate of 38 million acres or 20% of all NFS lands estimated to be at high risk. Further discussion relative to regional levels of risk can be found in the Fuel Management section in this chapter.

Many inventoried roadless areas include plant associations (for example Rocky Mountain lodgepole pine, spruce/fir/whitebark pine and true fir/hemlock) where long fire intervals (70 to 400 years) and stand-replacement fires are consistent with the historic range of variability. In many cases, these are associated with upper elevation fire regimes that encompass a significant amount of inventoried roadless areas. For example, in the western United States 32% and 39% of inventoried roadless areas are > 9,000 feet and 8000-9000 feet in elevation respectively. As exemplified by the 1988 Yellowstone fires, both uniform stand-replacing fire events and mosaic mixed severity fire events are possible in these areas.

For many terrestrial ecosystems, fire has played an important role in creating and maintaining suitable habitat at varying temporal and spatial scales. Many species evolved under the influence of recurrent fire, including stand replacing events, and their long-term persistence relies heavily on the maintenance of important habitat components by these disturbance events. For example, wildland fires that create habitat mosaics can improve foraging habitat for lynx (USDA Forest Service and others 2000a), wild turkey, black bear, elk, and northern goshawk (Smith 2000).

### *Alternative 1 - No Action*

Approximately 40% of the 58.5 million acres of inventoried roadless areas are covered by land management-plan prescriptions that currently prohibit road construction and reconstruction, while the other 60% does not. Projecting future roaded entry using historic levels of road construction, an additional 5% to 10% of inventoried roadless areas are likely to be entered within the next 20 years under Alternative 1. If this rate of entry continues, over the next century, this could equal 50% of inventoried roadless areas being

affected by roaded entry. The actual amount, however, would probably be much lower due to rugged terrain in many of these areas, and public controversy over entry into inventoried roadless areas.

An estimated 1,160 miles of permanent and temporary road construction or reconstruction is planned through 2004. Table 3-32 displays total planned offer volumes and miles of road construction and reconstruction through 2004, by alternative, both with and without the Tongass exemption. Timber harvest under this alternative would occur on an estimated 18,000 acres of inventoried roadless areas per year initially, dropping to about 14,000 acres annually in the long term.

The type and extent of impacts to terrestrial species and habitats from this road construction would depend on road location and design, mitigation measures applied, the activities that are enabled, the amount and kinds of other activities occurring in adjacent areas, current condition of species populations, and the kinds and intensities of natural and human-induced disturbances in the area. With application of current design standards and best management practices, the effects of these kinds of activities have been mitigated or avoided in many situations. Some effects, however, cannot be mitigated, such as increased levels of habitat fragmentation.

**Table 3-32. Total planned timber offer and miles of road construction and reconstruction for all activities through 2004, by alternative.**

| | Total planned offer (MMBF [a]) | | Total miles road construction/reconstruction | |
|---|---|---|---|---|
| Alternative | With Tongass National Forest exemption | Without Tongass National Forest exemption | With Tongass National Forest exemption | Without Tongass National Forest exemption |
| 1 | 1,100 | 1,100 | 1,160 | 1,160 |
| 2 | 840 | 300 | 597 | 293 |
| 3 | 700 | 160 | 597 | 293 |
| 4 | 0 | 0 | 597 | 293 |

[a] Million board feet

Some of the potential direct and indirect adverse effects of road construction and timber harvest include:

- Increased fragmentation and loss of connectivity,
- Adverse edge effects for some species,
- Habitat loss, and losses of habitat suitability and effectiveness for some species,
- Increased risk of introduction and establishment of nonnative invasive species, and
- Increased potential for negative interactions with humans and illegal collection or over harvest of some species.

Some of the potential beneficial effects of road construction and timber harvest include:

- Enhanced access for some plant and wildlife management activities (for example, census survey and collection, and structure maintenance),

- Easier access for habitat restoration and enhancement for some species through stand manipulation,
- Creation of edge habitat and early successional habitat used by some species, and
- Easier access for hunting and wildlife viewing activities.

Almost all roads present some level of benefits and risks. These effects can vary greatly in degree (USDA Forest Service 2000h), and can shift over time. Some effects are immediately apparent, but others may require external events, such as a large storm, to become visible. Still other effects may be subtle, such as increased susceptibility to invasion by nonnative species or pathogens noticed only when they become widespread in the landscape, or with increased road use as recreation styles and motor vehicles change (USDA Forest Service 2000h). A road-related beneficial effect for one species, may, in fact, represent an adverse effect for another. For example, although forest edges, such as those created by road construction and timber harvest, may benefit some species, such as deer and bobwhite quail, they also provide access to interior forest patches for opportunistic or predator species (Norse and others 1986).

Beneficial effects to terrestrial species from timber harvest activities are often due to creating or maintaining some specific habitat condition. Timber harvest creates forest age-class diversity and mosaic habitats used by some species (Wisdom and others 2000; USDA and others 2000; Southern Appalachian Man and the Biosphere 1996c; USDA Forest Service 1995a; USDI Fish and Wildlife Service 1990; USDI Fish and Wildlife Service 1976). Some species require early seral or open-forest habitats that can be created and maintained by properly planned, restorative timber harvest. Timber harvest activities may also reduce the risk of uncharacteristic large stand-replacing insect and disease outbreaks and severe wildland fires. These disturbance events, can present both benefits and risks to some species (Wisdom and others 2000; USDI Fish and Wildlife Service 1995a; USDA and others 1993), at least at a local level. Some examples of timber harvest potential beneficial effects include the following:

- Timber harvest can be used to benefit species like the red-cockaded woodpecker (USDA Forest Service 1995a), Florida scrub jay (USDI Fish and Wildlife Service 1990), and Kirtland’s warbler (USDI Fish and Wildlife Service 1976) by creating and maintaining open forest or early seral conditions.
- The Mexican spotted owl may benefit from timber harvest activities that maintain and develop large old-growth pine habitats, and alleviate risk from wildland fire, insects, and disease (USDI Fish and Wildlife Service 1995a).
- The snowshoe hare, a primary lynx prey species, can benefit from properly planned regeneration harvests (USDA Forest Service and others 2000).
- Reynolds and others (1991) suggest that active management activities like tree thinning may be beneficial in producing and maintaining the desired conditions for sustaining goshawks and their prey species.

*Fragmentation and Connectivity* – Landscape fragmentation and loss of connectivity from road and timber harvest causes habitat loss, increases in edge effects, and increases in habitat isolation (British Columbia Ministry of Forest Research Program 1997). As described under the previous section on fragmentation, roads can increase forest fragmentation by breaking up large patches and converting interior forest into edge habitat (Reed and others 1996).

Forest fragmentation affects terrestrial species to different extents and at different scales. In studying fragmentation in Douglas fir forests in northwestern California, Rosenberg and Raphael (1986) found that species showing the most sensitivity to fragmentation included fisher, gray fox, spotted owl, and pileated woodpecker. As road construction, reconstruction, and timber harvest activities increase habitat fragmentation across large areas, populations of some species may become isolated into smaller groups, which increase the risk of local extirpations or extinctions (Noss and Cooperrider 1994). In examining the effects of road construction on wetland biodiversity, Findlay and Bourdages (2000) found increases in local extinction rates and decreases in re-colonization rates, with effects sometimes taking decades to be apparent.
Roads can fragment habitat for some invertebrates, particularly for less mobile, ground dwelling species. In the Klamath-Siskiyou province, researchers have identified habitat fragmentation for common land snails caused by roads and other land-disturbing activities (Frest personal communication). Reasons cited included microclimate changes on the road surface, loss of habitat complexity and structure, effective width of roads greater than actual width, and avoidance of exhaust residues, petroleum products, and other chemicals. Baur and Baur (1990) documented similar road avoidance findings for the land snail *Arianta arbustorum*, which avoids crossing even small, unpaved roads. Timber harvest, particularly where associated with extensive ground disturbance and canopy removal, may have adverse effects on some invertebrate populations (Frest 1993; Frest and Johannes 1995).

*Edge Effects* – Roads create environmental edges whose effects may extend well beyond the actual road. Loss of canopy along road corridors may result in greater temperature extremes, more exposure to winds, more direct sunlight within adjacent zones, and changes in relative humidity (Chen and others 1996; Chen and others 1993). The distance that this effect may extend is highly variable. The zone of disturbance related to road noise is estimated to be as great as one-half mile in forested areas (Forman and Deblinger 2000). Haskell (2000) found a large drop in abundance and diversity of macro invertebrate soil fauna close to NFS roads, with effects extending up to 100 meters into the forest.

Forest edges, such as those created by timber harvest and road construction, may benefit some species, such as deer and bobwhite quail. The close proximity of cover and forage areas at forest edges provides ideal habitat for many game species (see Game Species). However, edges also provide access to interior forest patches for opportunistic species, such as the brown-headed cowbird, with effects extending into forest interiors as far as 600 meters from an edge (Norse and others 1986). Cowbirds are implicated in the decline of certain songbirds in the Sierra Nevada, including the willow flycatcher, least Bell's vireo, yellow warbler, chipping sparrow, and song sparrow (Sierra Nevada Ecosystem Project 1996).

*Habitat Suitability and Effectiveness* – For some mammals, open road density has been shown to be indicative of habitat suitability, with increases in road density related to declines in habitat effectiveness and population viability (Noss and Cooperrider 1994). Some research has shown that the presence of a few large areas with low road density, even when found within an area with an overall high road density, is a key indicator of

suitable habitat for large vertebrates (Rudis 1995). Unroaded areas may provide important security habitat for some species year round. Black bear population size was shown to be negatively associated with road density in the Adirondack Mountains (USDA Forest Service 2000h). Road density is a major determining factor for suitability of habitat for grizzly bear, a species with a home range size of 50 to 300 square miles for females and 200 to 500 square miles for males (USDI Fish and Wildlife Service 1993).

With an expected increase in roaded access into these areas, a corresponding increase in human disturbance is expected. Potential for harassment, disruption, and poaching of some species would increase. Species, such as forest carnivores, that require sites free from human disturbance are likely to be adversely affected. Habitat effectiveness for deer and elk has been shown to decrease with increases in open road density in some areas (Thomas and others 1979). Rowland and others, (in press) found that female elk in the Starkey Experimental Forest consistently used areas away from open roads in spring and summer, and that spatial distribution and distance to roads were more accurate predictors of habitat effectiveness than overall road density.

In their proposal to list the Canada lynx under the ESA, the U.S. Fish and Wildlife Service (USDI Fish and Wildlife Service 1998b) found that this species is threatened by human alteration of forests and by increased levels of human access into lynx habitats. Factors identified as threats to this species included timber management, forest and **backcountry** roads and trails, fragmentation and degradation of lynx **refugia**, and habitat degradation by nonnative invasive plant species. The lynx was listed as threatened on March 24, 2000.

In evaluating species-road relationships for 91 vertebrate species in the Interior Columbia River Basin, Wisdom and others (2000) found that more than 70% of those species could be negatively affected by one or more factors associated with roads. They concluded, from their review of scientific literature, that there are numerous potential adverse effects related to road construction and use. Some of their findings include:

- Road construction converts large areas of habitat to nonhabitat (Hann and others 1997; Reed and others 1996).
- Loss of large trees, snags, and logs in areas adjacent to roads through commercial harvest or firewood cutting has adverse effects on cavity dependent birds and mammals (Hann and others 1997).
- Roads facilitate poaching (Cole and others 1997) of many large mammals such as caribou, pronghorn, mountain goat, bighorn sheep, wolf, and grizzly bear (Dood and others 1985; Knight and others 1988; McLellan and Shackleton 1988; Mech 1970; Stelfox 1971; Yoakum 1978).
- Roads provide access for chronic, negative interactions of humans with wolves and grizzly bears (Mace and others 1996; Mattson and others 1992; Thiel 1985), which increases mortality of both species and often causes high-quality habitats near roads to serve as population sinks (Mattson and others 1996; Mech 1973).
- Reptiles seek roads for thermal cooling and heating and experience substantial mortality from motorized vehicles (Vestjens 1973). Roads facilitate human access into habitats for collection and killing of reptiles.

- Many species are sensitive to harassment or human presence during particular seasons, with potential reductions in productivity, increases in energy expenditures, or displacements in population distribution or habitat use (Bennett 1991; Mader 1984).
- Roads often restrict the movements of small mammals (Mader 1984; Merriam and others 1988; Swihart and Slade 1984) and function as barriers to population dispersal (Oxley and Fenton 1974).

Trombulak and Frissell (2000) drew similar conclusions in their review of scientific literature on the ecological effects of roads. They identified seven general, potential effects of roads: mortality related to construction, mortality from being hit by vehicles, behavioral modifications, changes in the physical environment, changes in the chemical environment, introduction and establishment of nonnative species, and increased human use of roaded areas. They concluded that, although not all species and ecosystems are affected to the same degree by roads, in general, the presence of roads in an area is associated with negative effects for both terrestrial and aquatic ecosystems. These effects included detrimental changes in species distribution, composition, and population size.

Although only used for relatively short periods, temporary roads present most of the same risks posed by permanent roads, although some may be of shorter duration. Many of these roads are designed to lower standards than permanent roads, are typically not maintained to the same standards, and are associated with additional ground disturbance during their removal. Also, use of temporary roads in an area to support timber harvest or other activities often involves construction of multiple roads over time, providing a more continuous disturbance to the area than a single, well-designed, maintained, and use-regulated road. While temporary roads may be used for periods ranging up to ten years, and are then decommissioned, their short- and long-term effects can be extensive to terrestrial species and habitats.

In addition to posing many of the same risks as road construction, road reconstruction could result in substantial changes in the kinds and amount of human uses in an area. Improvements such as realignment or improving road surfacing or gradient to provide easy access for low clearance vehicles may promote increases in the amount of human disturbances and disruptions to species and habitats, exceeding those previously experienced before reconstruction.

*Early Successional Habitat* – Although early successional habitat is well represented in many parts of the country, questions have been raised in some areas relative to the potential effects of the road and timber harvest prohibitions on the availability of this type of habitat, particularly in the Eastern and Southern Forest Service regions. Early successional communities are characterized and shaped by differences in structure, composition, and successional pathways. Such communities can include grasslands, shrublands, semi-forested habitat, and open land communities within larger forest patches.

Types of disturbance affecting the development, availability, and distribution of some early successional habitat include natural processes and events such as fire, wind, insect and disease, and management-induced disturbance associated with land use practices,

significant ecological shifts in vegetation composition and structure, resulting in altered fire regimes by increasing fuel loads and flammability. As discussed under the Terrestrial Habitats and Species section, response activities for fire suppression in inventoried roadless areas have likely been more limited in the past due to a lower priority placed on rapid suppression of fires in these areas, relative to fires in roaded and more developed areas. When this is considered in conjunction with the lower level of past timber harvest activities in many of these areas, it is likely that stand conditions within these areas may lie within or closer to the historic range of variability, with more normal levels of fuel loading and stand composition and structure, as compared to conditions within roaded and more heavily timbered areas.

### *Alternative 1 - No Action*

Alternative 1 would have the greatest potential for additional aquatic habitat loss, degradation, and disturbance associated with roads, timber harvest, and other activities. Approximately 40% of the 58.5 million acres of inventoried roadless areas are covered by land-management plan prescriptions that currently prohibit road construction and reconstruction. Projecting future roaded entry using historic levels of road construction, an additional 5% to 10% of inventoried roadless areas are likely to be entered within the next 20 years under Alternative 1, predominantly in those areas currently open to road construction. The planned timber harvest offer of 1.1 BBF through 2004 would occur on approximately 90,000 acres. Table 3-32 displays planned offer volumes and miles of road construction or reconstruction through 2004, both with and without the Tongass exemption, for each alternative.

*Potential Effects from Roads* – Road construction, maintenance, use, and even the presence of roads in a watershed, can have numerous adverse effects to aquatic systems and the species they support. Recent changes in road designs and application of best management practices have been effective in some instances at moderating or avoiding many adverse effects. The discussion in this section captures the principal effects that have been associated with roads, but these are potential effects, and not every road would necessarily exhibit each or even many of these effects. The Physical Resources section provides a full discussion of potential geomorphic and hydrologic effects of roads on watershed and stream channel conditions.

These effects can potentially include (Furniss and others 1991; USDA Forest Service 2000h):

- Increasing sediment loads in streams;
- Modifying watershed hydrology and stream flows;
- Altering stream channel morphology;
- Increasing habitat fragmentation and loss of connectivity;
- Degrading water quality, including increasing chance of chemical pollution;
- Altering water temperature regimes.

These physical alterations can potentially result in a variety of adverse effects to aquatic species including:

- Loss of spawning and rearing habitat, and deep pools, from excess sediment deposition;
- Increased mortality of eggs and young from lower levels of oxygen in stream gravels;
- Increased susceptibility to disease and predation;
- Increased reproductive failure;
- Shifts in macro invertebrate communities to those tolerating increased sediment or other types of diminished water quality;
- Increased susceptibility to over harvest and poaching;
- Loss of protective cover and resting habitat through changes in channel structure including large woody debris, overhanging banks, and deep pools;
- Competition from nonnative species;
- Loss of habitat caused by habitat degradation, barriers to passage, increased gradient, high temperatures, and other factors; and
- Increased vulnerability of subpopulations to catastrophic events and loss of genetic fitness, related to loss of habitat connectivity.

Trombulak and Frissell (2000) concluded that, although all species and ecosystems are not affected to the same degree by roads, in general, the presence of roads in an area is associated with negative effects for both terrestrial and aquatic ecosystems including changes in species composition and population size.

Temporary roads present most of the same risks posed by permanent roads, although some may be of shorter duration. Many of these roads are designed to lower standards than permanent roads, are typically not maintained to the same standards, and are associated with additional ground disturbance during their removal. Also, use of temporary roads in a watershed to support timber harvest or other activities often involves construction of multiple roads over time, providing a more continuous disturbance to the watershed than a single, well-designed, maintained, and use-regulated road. While temporary roads may be used temporarily, for periods ranging up to 10 years before decommissioning, their short- and long-term effects on aquatic species and habitats can be extensive.

*Potential Effects of Timber Harvest* - The effects of activities associated with timber harvesting (e.g., tree felling, yarding, landings, site preparation by burning or scarification, fuels reduction, brush removal and whip felling, and forest regeneration) are often difficult to separate from the effects of roads and road construction. The road systems developed to harvest timber are often a significant factor affecting aquatic habitats, as discussed above. Some of the potential effects to aquatic habitat from timber harvest can include the following (Chamberlin and others 1991, Hicks and others 1991, Beschta and others 1987):

- Increasing sediment supply and storage in channels,
- Modifying watershed hydrology and streamflow, including the timing or magnitude of runoff events,
- Decreasing stream bank stability, and altering stream channel morphology,
- Degrading water quality,
- Altering energy relationships involving water temperature, snowmelt and freezing,
- Diminishing habitat complexity, and
- Altering riparian composition and function

United States Department of Agriculture
Forest Service

# Lone Pine Vegetation Management Project

## Final Decision Notice & Finding of No Significant Impact

**USDA Forest Service**
**Dolores Ranger District, San Juan National Forest**
**Montezuma County, Colorado**

**January 2020**

### Introduction

This Decision Notice documents my decision to approve Alternative 2, with modifications, for the Lone Pine Vegetation Management Project. My decision is based on an Environmental Assessment (EA) prepared for this project, dated August 2019. In this notice, I have documented important elements of the management alternative I have selected for implementation and the rationale for my choice. This notice also references the design elements that will be implemented with my decision. The EA associated with this Decision Notice was prepared to document the environmental effects of sanitation/salvage, pre-commercial thinning, commercial thinning, single tree selection, oak thinning, reforestation, and pile burning, treatment outside of the fifteen project areas due to small mapping and GIS errors, and adaptive management actions which may be implemented to respond to changing environmental conditions.

In accordance with the National Forest Management Act (NFMA) and National Environmental Policy Act (NEPA), an interdisciplinary team of Forest Service specialists (ID team) conducted the analysis and documented the results in an EA. The EA on which I based my decision is available for review at the Dolores Ranger District office in Dolores, Colorado (Tel. 970-882-7296) and on the web at: www.fs.usda.gov/project/?project=54682 .

The Lone Pine analysis area includes approximately 66,719 acres in the northwest corner of the Dolores Ranger District. Elevations in the Lone Pine analysis area range from 7,700 – 8,300 feet. Figure 1 on page 3 of the Final EA displays the location of the analysis area.

### Background

Since 2013, there has been a dramatic increase in ponderosa pine mortality in the Lone Pine analysis area. The roundheaded pine beetle is the primary mortality agent, with western pine beetle, pine engraver beetles, and/or mountain pine beetles also found. By 2018, the total area impacted by beetles was estimated at nearly 27,000 acres, with 24,000 acres of that in the Lone Pine analysis area. Aerial surveys conducted by the Colorado State Forest Service in 2018 found the intensity of infestations on a majority

of the 24,000 acres were of light severity (56%) or very light severity (41%). The remaining areas were moderately severe (2%) or severe (1%)[1]. Dwarf mistletoe is also present in almost every pine stand in the analysis area, and although it rarely causes mortality, it does weaken infected trees and increases their susceptibility to other mortality factors. (Colorado State Forest Service, 2018). Final numbers for 2019 will not be released by the Colorado State Forest Service until November 2019, but a look at the preliminary numbers collected in 2019 indicate that the rate of increase has slowed. Some of the main differences noted between 2018 and 2019 are a small increase in activity in the southeastern portion of the analysis area and a small increase in the number of acres showing moderate severity levels.

Working with stakeholders to discuss land-management issues is an ongoing and crucial part of land management on the Dolores Ranger District. The most recent example of the effort to engage local stakeholders is the USFS participation in the Dolores Watershed and Resilient Forests Collaborative (DWRF). Established in 2015, DWRF was formed in response to the current bark beetle outbreak with the intent of formulating a plan for dealing with natural disturbances such as the current beetle outbreak. Members of the DWRF collaborative, including the USFS, all expressed strong concerns about the bark beetle epidemic and how it was affecting ponderosa pine forests in the area. These preliminary discussions with DWRF and other members of the public helped frame the situation so that stakeholders could provide meaningful feedback during the various comment periods.

## Purpose and Need

The purpose of this project is to increase forest resiliency, increase age class diversity, promote recovery of forest vegetation, reduce the risk of high severity wildfires, and provide wood products for both commercial and non-commercial uses. Given the high amounts of ponderosa pine mortality in the area over the past six years, combined with Forest Plan direction, the need for the proposed action is to manage forest vegetation to move current and foreseeable future conditions closer to desired conditions (DCs) on landscapes available for active management. Relevant desired conditions described in the 2013 San Juan National Forest Land and Resource Management Plan (LRMP) include: providing resilient terrestrial ecosystems (DC 2. 2. 9), having all development stages of ponderosa pine well represented at the landscape scale and occurring within specified ranges (DC 2. 2. 6), and meeting needs or demands for forest product offerings (DC 2. 9. 1).

## Public Involvement

*Scoping*

On September 13, 2018, the proposal was listed in the Forest Service Schedule of Proposed Actions (https://www.fs.usda.gov/project/?project=54682), and a press release was provided to local media. Local, state, and federal agencies, interested tribes, as well as other interested parties, were notified of the opportunity to provide comments during the scoping period. The scoping period ended on October 18, 2018. As a result of the scoping effort, input was received from 22 interested parties, 14 of which were form letters expressing support. This input, along with input received from internal specialists, was considered in the analysis of potential issues discussed in Section 1. 7 and the formulation of the alternatives described in Chapter 2.

[1] Severity levels indicate the intensity of infestation. Very light severity has 1-3% of trees impacted, light severity 4-10%, moderate severity 11-29%, and severe 30-50%. Due to the nature of aerial surveys, this data represents only a rough estimate of intensity for agents detectable from the air.

*Draft and Revised Draft Environmental Assessment*

Opportunities for public comment continued for a 30-day period beginning on February 23, 2019 following the issuance of the EA in draft form. The comment period was announced with a press release, direct mailing to those who previously showed interest, and a legal notice in the *Cortez Journal*. Twelve comments were received during the 30-day comment period. The second comment period began on June 15, 2019 with the publication of an Opportunity to Comment legal notice in the Cortez Journal. The second comment period generated nine (9) written responses. Comments from both public comment periods are summarized in Appendix D – Public Comment Summary, which is posted on the San Juan National Forest website. A formal invitation to consult was also mailed to 25 tribes on September 17, 2018. The Hopi Tribe and the Pueblo of San Felipe requested to continue consultation for the proposal. In addition, the Colorado State Historic Preservation Officer agreed (October 31, 2018) on the use of the 2017 programmatic agreement for vegetation management undertakings.

*Pre-Decisional Objection Process*

A Draft DN selecting Alternative 2 and the Final Environmental Assessment were issued on August 30, 2019. A legal notice in the Cortez Journal began the pre-decisional objection process under 36 CFR 218. Only those persons who had commented previously during scoping or the other opportunities to comment had standing to object to the Draft DN. The project received four objection letters from five unique objectors. The objection issues submitted by all parties included concerns with law, regulation, and policy; wildlife analysis and design criteria; applicable science; vegetation management prescriptions; and adaptive management provisions.

Objection resolution meetings were held in an effort to resolve objectors' issues. Objection resolution meetings were held with 3 of the objectors on October 29 and December 5, 2019. Objection resolution meetings were held with the other 2 objectors on October 31 and December 5, 2019. Multiple proposals submitted by the objectors and the FS were considered and discussed. A resolution with two of the parties was reached based on adoption of agreed upon changes. These changes have been incorporated into this Decision Notice and include changes to and the addition of design elements related to temporary roads, changes to the number of acres outside of the fifteen project areas that may be treated, changes to prescriptions in certain defined areas, changes to the requirements for Supplemental Information Reports, the clarification of adaptive management actions for noxious weeds, and the inclusion of a description of monitoring areas and control units (including a map). A resolution between the Forest Service and the other three parties was not reached.

## Decision

Based upon my review of the analysis documented in the EA (dated August 2019), and after consideration of the agreements reached during the objection resolution meetings, I have decided to implement Alternative 2, with modifications, for the Lone Pine Vegetation Management Project.

The tree-cutting and removal activities, oak thinning, reforestation, slash disposal, burning, and road related activities will to be applied in 15 specific project areas on up to 36,810 acres. Table 1 below shows what is proposed in each project area and when implementation is anticipated; the location of these project areas is shown on the map in Attachment 2. As a result of agreements reached during the objection resolution meetings, a large tree emphasis/commercial thin prescription will be implemented in

several areas (as shown on the map in Attachment 2 and discussed in more detail on pages 6-7). A combination of pre-implementation reviews and an adaptive management approach will be utilized to help inform actual implementation and allow for more flexibility to respond to changing environmental conditions (described in Section 2. 2. 4 and in Appendix A and B). Adoption of design elements and the ability to treat additional acreage outside the fifteen project areas are also included in this decision. Design elements and treatment of additional acreage are discussed in more detail on pages 10-11.

**Table 1: Summary of Proposed Treatments by Project Area**

| Project Area | Proposed Treatments | Estimated Acres | Anticipated Implementation Dates[2] |
|---|---|---|---|
| Bradfield | Single Tree Selection | 4,595 | 2019-2021 |
| Glade Canyon | Commercial Thinning | 586 | 2019-2021 |
| Lake Canyon | Salvage | 1,186 | 2019-2021 |
| Wolf Den Plantations | Plantation Thinning | 4,999 | 2019-2029 |
| Glade Point | Single Tree Selection | 1,701 | 2020-2022 |
| Fader | Single Tree Selection | 2,920 | 2020-2022 |
| Lake Canyon | Commercial Thinning | 5,722 | 2020-2025 |
| Glade Point | Commercial Thinning | 656 | 2021-2022 |
| Brumley | Single Tree Selection | 3,219 | 2021-2023 |
| Canyon Creek | Single Tree Selection | 3,057 | 2022-2025 |
| Big Water Spring | Commercial Thinning | 665 | 2023-2026 |
| Ormiston | Commercial Thinning | 1,073 | 2023-2026 |
| Wolf Den | Commercial Thinning | 2,359 | 2023-2028 |
| Narraguinnep Plantations | Plantation Thinning | 1,243 | 2023-2029 |
| Ormiston | Single Tree Selection | 2,829 | 2024-2027 |
| | | **Estimated Acres = 36,810** | **Time to Implement=11 years** |

Alternative 2 (modified), hereafter referred to as the Selected Alternative, authorizes the following actions:

### *Tree Cutting and Removal*

*Sanitation/salvage treatments* will be used to remove merchantable dead, dying, or deteriorating trees where there is beetle induced mortality. This will be done as either a salvage, or a sanitation/salvage treatment. *Salvage* treatments will be conducted in stands where bark beetle activity has caused over 70% mortality in the overstory and mid-story. Where this prescription is applied, all dead trees will be removed, except those required to meet SJNF wildlife snag requirements. Live trees that are infested with bark beetles will also be removed, but isolated green trees that are not infested will not be cut. Salvage will occur across 1,168 acres of the Lone Pine analysis area. *Sanitation/salvage* will be used in stands where there are individual trees or small patches of dead or dying trees. In these areas, individual trees or small groups of dead or infested trees ⅒ to 2 acres in size may be harvested, retaining quality seed trees around the openings as a seed source. Sanitation/salvage will also be used to remove mistletoe infected trees where more than 50% of the branches have been infected. Where the sanitation/salvage prescription is applied, enough dead trees will be retained to meet SJNF wildlife snag requirements. These sanitation/salvage treatments may be applied in any of the 15 project areas.

[2] This is an estimate of when a project may be implemented, and may change based on site-specific conditions at time of implementation.

*Single tree selection* will be used in even-aged, mature stands to improve the vigor of individual trees, encourage regeneration, foster the development of uneven-aged stand structure, and improve overall resilience of ponderosa pine stands. Individual trees representing all size classes above 10 inches dbh may be harvested to promote the growth of remaining trees and to provide space for regeneration, thereby maintaining or moving the stand toward a multi-age, heterogeneous structure. Emphasis will be placed on retaining clumps of even-aged, healthy green trees, while creating openings in other areas that may eventually support regeneration. Trees will be individually selected for removal based on spacing, tree form, and insect or disease evidence, but emphasis will be placed on retention of the largest, oldest trees in the stand as biological legacies, as well as the retention of mature seed trees that are healthy and have good potential for cone production. There are an estimated 18,321 acres where single tree selection and pre-commercial thinning (described below) is proposed.

*Pre-commercial thinning* will be used as a follow-up treatment after single tree selection where there is an overabundance of trees smaller than 10 inches dbh. The intent of this treatment is to improve growth rates and vigor of the remaining trees, thus improving overall stand resilience. The trees removed during pre-commercial thinning after single tree selection will be in the 4-10 inch dbh range. Suppressed trees and trees with poor form will be prioritized for removal. Poor form includes trees with forks, mistletoe or insect damage, or other structural defects. Spacing criteria may also be used to determine which trees to thin. The desired spacing for trees ranges from 10 to 15 feet apart. During implementation, this will be adjusted on a stand by stand basis, taking into account the location of overstory trees when determining the final spacing requirements.

Basal area of live, green trees in stands that receive both single tree selection and pre-commercial thinning will vary, but will generally range from 50 to 60 square feet per acre, with a stand average of 55 square feet per acre following treatment. In general, the clumps of trees will have a higher basal area than the forest between these clumps.

*Pre-commercial thinning in plantations* will occur with the intent of improving growth rates and vigor of remaining trees, thus improving overall resiliency. Trees in the 4-10 inch dbh size class will be thinned based on tree form or spacing, as described above. Desired spacing for trees in this size class is from 10 to 15 feet apart, but this will be adjusted on a stand by stand basis and will take into account the location of overstory trees in the final spacing requirements. A limited amount of commercial thinning of trees 10 inches or larger may also occur in plantation areas to improve site conditions. This is discussed in more detail under commercial thinning. Thinning in plantations will occur on approximately 6,242 acres.

*Commercial thinning* will be used in even-aged, mature stands that have lower volume and more difficult access than those stands where single tree selection is proposed. The intent of commercial thinning is to improve growth rates and vigor of individual trees and improve overall resilience of ponderosa pine stands. Regeneration may be encouraged when combined with oak thinning and/or prescribed burning, which will foster the development of uneven-aged heterogeneous stand structure. Trees in all size classes over 10 inches dbh may be harvested during commercial thinning, with emphasis placed on retaining the healthiest green trees in the groups. In the less dense pine between these groups, healthy isolated trees or less dense groups of healthy trees will not be treated. However, if there are trees with mistletoe infections or bark beetles, some sanitation/salvage (as described above) will likely occur. The target basal area in these areas will be 60 square feet per acre, but basal area will likely vary between 60 to 80 square feet per acre. There are an estimated 11,061 acres across six project areas where commercial thinning is proposed. In stands

where there are an overabundance of trees smaller than 10 inches dbh, pre-commercial thinning may be used as a follow-up treatment.

*Removal preference for single tree selection and commercial thinning units*: In single tree selection units the goal is to leave a stand average basal area of 55 square feet per acre. In commercial thinning units, the goal is to leave a stand average basal area of 60 square feet per acre. The current stands are unregulated, so a strict application of the ideal target structure will not be applied in this initial harvest. Trees will be evaluated and organized into characteristic categories of *defective*, *acceptable*, and *desirable*. The prime directive is to remove all trees in the *defective* class and the worst trees in the *acceptable* class while maintaining the specified basal area for the treatment type. *Defective* trees have many of the following characteristics: severely overtopped/suppressed, a mistletoe rating ≥3, major physical defects, dead/damaged terminal leader, are expected to die within 10 years or not respond to release, are beetle infested, and/or have extremely limited crown or very poor vigor. *Acceptable* trees have several of the following characteristics: moderate or minor defects mostly in upper logs that reduce but do not exclude sawlog yield, are expected to respond to release and increase in merchantable volume/value, and have a mistletoe rating ≤ 1. *Desirable* trees have the following characteristics: vigorous, very minor or no volume defects, and no evidence of disease or insect activity.

In terms of how trees will be selected for retention in various size classes, the first step will be to identify the *desirable* and most *acceptable* leave trees in the smallest size classes (5 – 11 inches dbh) and the *desirable* and most *acceptable* leave trees in the largest size classes (22 inches dbh and above). Next, enough *desirable* and *acceptable* mid-sized trees in the 12 – 20 inch dbh size class will be selected for retention to fill in stocking to the desirable stand density. Because there are typically more poor quality trees in the small size class, a simple focus on leaving most of the *desirable* trees will likely be sufficient for those size classes. In the largest size classes, all trees over 26 inches in diameter will be retained unless they show evidence of active bark beetle infestation, in which case they will be harvested. Trees in the 21 – 24 inch size class will be retained unless they show evidence of active beetle infestation or severe defects. After the smallest and largest leave trees are identified, the *desirable* and most *acceptable* mid-sized trees will be selected for retention to meet the desired residual stocking for the treatment type.

Some irregularity in the residual stocking is expected and desirable. Basal area outside of designated clumps and openings (both pre-existing openings and openings created by bark beetle mortality) may range between 30 and 70 square feet per acre. Even aged clumps with interspace, along with isolated individual trees with good form, are desired and will be incorporated into the tree retention choices. The percentage of each size class that will be retained to form the future desired structure of stands is as follows:

- 5” to 13” dbh Trees (4”, 6”, 8”, 10”, and 12” diameter classes) leave approximately 75%
- 13. 1” to 19. 0” dbh Trees ( 14”, 16”, and 18” diameter classes) – leave approximately 40-50%
- 19. 1” to 21. 0” dbh Trees (20” diameter class) – leave approximately 50%
- 21. 1” to 25. 9” dbh Trees (22” and 25. 9” diameter class) - leave approximately 75% (remove trees from this size class only if defective or they show evidence of active bark beetle infestations as nearly half of the stands don’t have enough trees to warrant any removal in this class)
- 26. 0” dbh trees and up will only be cut if they show evidence of active bark beetle infestation

*Large Tree Emphasis/Commercial Thin Prescription*: As part of the modified Alternative 2, a large tree emphasis/commercial thin prescription will be implemented on the proposed harvest areas shown on the map

in Attachment 2. The overall goal of this prescription is large tree retention and subsequent old growth which would represent historical pine stands from the 1850's. The future desired condition of these stands is to have an old growth component and representation on the landscape, knowing it will take many years to achieve this goal. These stands are lacking old relic trees larger than 30" in diameter with the exception of a few trees.

All trees larger than 20" DBH would be retained. All size classes will be managed up to 20" DBH with the goal of leaving a mix of residual trees smaller than 20" DBH. Basal area (BA) ranges would vary from 60 to 80 sq/ft per acre with a target BA of 70 sq/ft per acre. Part of the purpose and need for this project is to increase age class diversity, therefore every attempt will be made to retain an uneven aged component regardless of the final basal area. Clumps and groups of trees would be identified, smaller diameter trees would be thinned and all trees greater than 20" DBH would be retained in these clumps. These clumps will often have higher basal areas and may exceed 100 BA or more in some locations. This is acceptable as long as the trees retained have good form, are dominant or co-dominant, and are otherwise in good condition. Clumps of trees may vary from groups of 6 trees to as much as one-third acre to an acre in size. Variation in clump size is encouraged and should be promoted when possible. The small areas and openings between clumps should also vary in size and distance from other clumps, usually spanning a distance of 1 to 1.5 tree lengths across, and exceeding the lateral extent of crown and roots.

In areas where clumps and groups are not dominant on the landscape, thin trees from all size classes up to 20" DBH to maintain uneven aged stand characteristics even if the final basal area is higher than the target. Do not remove well-formed dominant or co-dominant trees just to achieve a basal area target if the residual trees have a good spacing and will persist into the next age class. Use natural openings and gaps in the stands to create open areas, these will exist naturally in areas that present a groupy/clumpy component. Additional openings will be created in time by fire or beetles and this is acceptable for the future landscape. Prescribed fire will be used to remove fuels, increase crown height and control density in future years.

The proposed harvest areas where this prescription will be applied represent a range of stand and site conditions. The implementation of this prescription will be monitored to provide comparisons between this prescription and the other prescriptions proposed as part of this project. Several areas in the landscape offer an opportunity to implement this prescription directly adjacent to control areas and single tree selection prescriptions. Every effort will be made, where practical, to provide a side by side comparison to other management prescriptions in an effort to truly discern the differences between the prescriptions.

### *Oak Thinning and Reforestation*

*Oak thinning* may be used where pine regeneration is inhibited by dense Gambel oak to create openings where pine may be more likely to regenerate. Oak thinning will be accomplished thru hand thinning and piling, fuel-wood cutting and removal, or mechanical mastication. Oak thinning may also occur where existing regeneration or seed trees are at risk of being damaged by fire (prescribed burning or wildfires). In these areas, either hand thinning or mechanical mastication may be used, depending on the extent of the area in need of treatment.

Widespread *reforestation/tree planting* is not expected but may be desired in areas where natural regeneration is not successful. If monitoring indicates that natural regeneration has not become established after five years, these areas will be considered for reforestation. Reforestation will be done with native tree species germinated from locally collected seed stock. Areas where supplemental planting is desired will be planted with tree seedlings grown from locally collected ponderosa pine seed.

*Other Related Activities*

*Slash disposal* will be done where necessary in areas where tree cutting and removal occurs to reduce unwanted accumulations of activity fuels in the project areas. Limbs and fine branches may be lopped and scattered within harvest units or scattered across areas of exposed soil on skid trails, decommissioned temporary roads, and landings. Accumulations of unmerchantable sections of stems (i. e. cull material) or tops may be lopped and scattered back into units or scattered across landings. Sound tops or other cull material may also be decked within 300 feet of open roads in order to facilitate public fuelwood gathering. This material may also be piled and burned if necessary to reduce accumulations of activity fuels. *Pile burning* may be conducted where piles have been created for slash disposal. Broadcast burning may also occur in certain areas to help reduce fuels and will continue to be conducted as authorized in the 2018 Dolores Prescribed Fire Pine Ecosystem Restoration decision.

*No new permanent roads* will be developed for project implementation, but existing system roads within the analysis area may be used during project activities. Maintenance Level (ML) 2-5 roads may be used as the primary haul roads. ML 1 roads may also be used for this project, but may require temporary road improvements. All ML1 roads used for this project will be closed again upon project completion. Any other currently closed system roads that are opened for project implementation will also be closed upon project completion. This proposal does not change forest road designations, so at no time will currently closed system roads or temporary roads be open to public use. *Maintenance of existing roads* will be performed prior to, during, or following treatments. This could include graveling, reshaping and grading of the road surface, replacement of culverts as needed, and maintenance of road ditches or rolling dips. Existing system road spot reconstruction may occur and may involve installation or replacement of culverts or other drainage features, or excavation to repair the degraded road grade.

*Temporary road construction* may occur; the exact locations and lengths of temporary road segments will be determined through agreement between the Forest Service and timber purchaser. Temporary roads will be decommissioned, obliterated (by recontouring and reseeding), and permanently obstructed within five years of construction. All temporary road segments will be closed to wheeled motorized use by the public during operations.

*Pre-Implementation Reviews, Adaptive Management, and Additional Acreage Treated*

In order to ensure timely application of appropriate treatments based on actual site conditions at the time of implementation, the USFS will use a combination of pre-implementation reviews and an adaptive management approach. Adaptive management includes reviews of project areas during and after implementation. This adaptive management approach also includes periodic reviews of NEPA adequacy at various points in the project.

*Prior to implementation*, appropriate treatments will be identified by vegetation management specialists based on site-specific conditions and management priorities. After proposed projects have been identified, and prior to implementation, district resource specialists will:

- Review proposed projects to determine if effects will be consistent with those outlined in this EA
- Determine if additional field work is necessary and complete as needed
- Complete necessary cultural clearances
- Complete required raptor surveys
- Complete pre-implementation consultations with resource specialists regarding project layout

If conditions are the same as analyzed, implementation will move forward without further specialist review except for required cultural clearances, required raptor surveys, and required consultation regarding project layout including reviews of the proposed transportation plan and slash disposal plan (as outlined in Appendix A – Pre-Implementation Checklist). In order to document the review of proposed projects, the "Pre-Implementation Checklist" (included in Appendix A) will be completed and filed in the project record. Implementation will not be allowed until this checklist has been completed by the appropriate resource specialists and reviewed and approved by the Dolores District Ranger. In addition, the Forest Service will notify the public of proposed projects prior to implementation thru news releases and discussions with local stakeholders. The main venue for discussions with stakeholders will be through the DWRF collaborative. Once all necessary reviews and public notifications have been completed, implementation will be scheduled. If it is determined during pre-implementation review and public notification that conditions have changed enough that the originally proposed treatment is no longer applicable, an alternate treatment method may be implemented. This is most likely to occur where beetle-caused mortality has occurred in an area that was originally planned for single-tree selection or commercial thinning. Where this occurs, salvage operations may be more appropriate. Changes to proposed treatments would occur only if the pre-implementation review in Appendix A shows that project effects will be consistent with effects described in this EA. If the impacts of changing from a single tree selection or commercial thinning treatment to a salvage treatment are not consistent with the effects described in this EA, then the area will be removed from consideration for treatments.

*During implementation*, vegetation management specialists and other resource specialists will be responsible for monitoring project effects. Monitoring may also be done in conjunction with interested stakeholders. This will include but is not limited to:

- Determining whether or not the actions implemented are having the intended effect
- Assessing how well design elements achieved expected outcomes
- Validating if assumptions made in the EA regarding expected consequences of actions are accurate

In addition to the monitoring discussed above, other monitoring requirements were added as a result of agreements reached during the objection resolution meetings. A description of this additional monitoring, control areas, and maps of where this monitoring will occur are included in Attachment 4 (Lone Pine monitoring areas).

If monitoring during implementation indicates that the originally proposed actions are not having the intended effect, or they are causing unintended or undesirable effects, then adaptive management actions may be taken. A list of the conditions that may trigger adaptive management and a list of the adaptive management actions that may be taken is given in Tables 6 – 8 in Appendix B. Monitoring will be documented and the results of the monitoring, and documentation of steps taken to address unintended outcomes will be included in the project record and will be available for public review. In addition, public fieldtrips will be held to keep interested stakeholders informed about the progress of implementation and the results of monitoring. The Dolores Watershed and Resilient Forests Collaborative (DWRF) Coordinating Committee will be specifically utilized to provide feedback to the agency on the results after implementation.

*After implementation*, resource specialists will be responsible for reviewing the results of project monitoring and will provide feedback to agency managers regarding if and how future projects need to be

adapted going forward. This will ensure adequate and continuing progress toward project objectives, while remaining flexible and able to adapt to changing conditions. A list of the conditions that may trigger adaptive management and a list of the adaptive management actions that may be taken is given in Tables 6 – 8 in Appendix B.

In order to clarify the proposed adaptive management actions for noxious weeds, the following language will replace the second and fourth bulleted statements under the Noxious Weeds heading in Table 6 in Appendix B:

- Purchaser follows procedures described in the "Equipment Cleaning" provision of the governing contract (Attachment 3).

As part of the modifications of Alternative 2, if monitoring indicates that prescriptions should be changed from Single Tree Selection (STS) or Commercial Thinning (CT) to salvage, a new NEPA analysis will be completed before a prescription is changed from STS or CT to salvage.

*NEPA Adequacy Reviews/Supplemental Information Reports* (SIRs) are required to be completed at least every 3 years. SIRs will be completed consistent with Sections 18.1 and 18.4 of the Forest Service NEPA Handbook (Forest Service Handbook 1909.15, Chap. 10, Sec. 18). As described in the Final EA on page 19, the public will be notified of the results of SIRs thru news releases and discussions with local stakeholders. This would include the Dolores Watershed and Resilient Forest collaborative.

There is no specific method described in law, regulation or policy for conducting a SIR, except that the review be interdisciplinary (FSH 1909.15, Chap. 10, Sec. 18.1). The process for completing a SIR typically includes the following:

- Identify the decision, when it was made, who issued it, and the status of implementation.
- Identify the reason the review is being conducted.
- Identify any new information and why it is relevant to the standing decision
- Identify any changed circumstances and why these are relevant to the standing decision.
- Review the importance of the new information and changed circumstances.
- Formally document the analysis conducted.
- The responsible official writes and signs a deliberate determination, based on: whether the new events/information are within the scope of the original analysis; whether the original analysis might change if the new events/information had been considered at the time; whether the original decision might have been different had the new events/information been considered at the time.
- The choices for a determination are:
    - There is no need to change the original decision and implementation may continue; or
    - There is a need to re-enter the NEPA process including public involvement and there may be a need to change the original decision.

*Additional Acreage*

*Additional acreage outside the fifteen project areas* may also be treated to allow for the correction of small mapping and GIS errors. The additional acreage that may be treated will be reduced to 300 acres. This acreage may only be treated if adjacent to existing units, and must be consistent with the treatments described in this Decision Notice, and the pre-implementation review of the treatment must show that effects will be consistent with effects described in the EA and that the design elements are adequate to

keep impacts within those analyzed. All monitoring and adaptive management actions described in Appendix B would apply to any additional areas where treatment occurs.

*Design Elements*

My decision also includes adoption of the design elements shown in Section 2. 2. 5 of the EA, with changes and additions, as discussed below.

Design element 2 under the Transportation heading will be changed to read:

- Temporary roads shall be closed within 5 years of construction.

The following design elements will be added under the Transportation heading:

- Temporary road surface width shall be limited to truck bunk width plus four (4) feet, except for needed turnouts which shall not exceed two (2) times the bunk width plus four (4) feet. If shovels or cranes with revolving carriage are used to skid or load, temporary road surface width equal to track width plus tail swing shall be permitted.
- Cut/fill techniques in the construction of temporary roads are not needed and will not be used in the Lone Pine project area due to the gentle terrain. Cut/fill is defined as installing a cut that is more than 6” deep and over 50’ long, with the cut located on the uphill side, and the intent of placing the cut materials on the downhill as fill, to create a flat, drivable road prism.

The following design elements will be added under the Hydrology and Soils heading:

- No skidding, temporary road construction, or harvesting on slopes over 40%.
- No skidding, temporary road construction, or harvesting in areas with soils prone to mass movement, as shown on the attached map (Attachment 1 of this DN).

Attachment 3 at the end of this decision includes a complete listing of all of the design elements included as part of this decision, including the changes and additions shown above.

## Rationale

My decision is based on an examination of the information in the EA, the project file, and direct consultation with resource specialists. Particular attention was paid to how well the purpose and need will be met and whether the Selected Alternative provides opportunities to respond to rapidly changing conditions. In addition, much time and effort was devoted to reviewing public comments, some of which provided opposing viewpoints (and references to opposing science) about what management actions should be taken given the possibility that beetle activity will continue to escalate due to warming temperatures and the potential for more and longer duration drought cycles. The objections received and the discussions that occurred during the objection resolution meetings were also considered.

**Purpose and Need:** My review of the EA shows that the Selected Alternative meets the purpose and need as shown in Section 1. 3 of the Final EA. In the Lone Pine landscape, increasing forest resiliency and promoting the recovery of forest vegetation is of particular importance given the mortality that has been caused by the ongoing beetle outbreak. The analysis in the Vegetation/Forestry section in Chapter 3 of the EA states that commercial thinning and single tree selection will create stands that are less dense, reducing competition among remaining trees for water and nutrients, thus creating conditions in which the remaining trees can become healthier and more vigorous. This will increase resiliency, making these areas less susceptible to damage by insect and disease outbreaks or fire. The analysis also finds that oak

thinning and burning will reduce heavy duff layers, creating opportunities for successful natural regeneration in the treated areas. Retaining quality seed trees will also increase the chance that natural regeneration will occur. Even if bark beetle activity continues or increases and commercial thinning and single tree selection occurs on fewer acres, or not at all, planting/ reforestation activities could still occur under the Selected Alternative, providing at least some opportunities to promote the recovery of forest vegetation. Under the no action alternative, regeneration will continue to be inhibited by dense Gambel oak and heavy duff layers, although bark beetle activity on a small scale could contribute to increasing age class diversity and the recovery of forest vegetation in areas where prescribed burning occurs and there are sufficient healthy green trees to provide seed. However, this would be on a smaller scale than under the Selected Alternative. Overall, the no action alternative provides far fewer opportunities for the recovery of forest vegetation than the Selected Alternative. Resiliency will also remain low under the no action alternative and pine stands in the analysis area will remain susceptible to damage by insect and disease outbreaks and fire.

Increasing age class diversity is also of high importance since there is currently very little age class diversity in ponderosa pine stands in the analysis area. As shown in the Vegetation/Forestry affected environment discussion in Section 3. 1. 1, the amount of mature pine stands in the Lone Pine analysis area with closed canopies is well above the desired condition as defined by the 2013 SJNF Forest Plan while the amount of young stands are below the desired conditions (Table 3). The analysis in the EA concluded that the actions proposed under the Selected Alternative will help move the stands that are treated toward an uneven aged heterogeneous structure, and as stated above, will provide opportunities for regeneration, thus increasing the amount of young stands in the area. Under the no action alternative, even-aged stands will continue to dominate. Using a large tree emphasis/ commercial thin prescription in some areas will also add to age class diversity by increasing old growth in the long-term.

The Selected Alternative also meets the purpose of reducing risk of high severity wildfires. As stated in the Final EA on page 28, the treatments proposed under the Selected Alternative would make prescribed burning easier to implement, making it more likely to occur where treatments are conducted. Prescribed burning that occurs as a result of these treatments will reduce horizontal and vertical fuel continuity and reduce surface fuels, thus reducing the risk of high severity wildfires. The Fire/Fuels discussion in Section 5. 3. 5 in Appendix C states that under the no action alternative, the risk that stand replacing wildfires may occur remains high in mature, even-aged pine stands with dense Gambel oak understories. Prescribed burning may still occur under the no action alternative, but will be more challenging to implement in dense pine stands with dense Gambel oak understories where horizontal and vertical fuel continuity is high. In addition, the high number of snags potentially occupying the area if bark beetle activity continues to increase will increase exposure and risk to firefighters during suppression actions or prescribed burning. Overall, the analysis in the EA found that the no action alternative does not meet the purpose and need of reducing the risk of high severity wildfires.

The Selected Alternative meets the purpose of providing wood products for both commercial and non-commercial uses. The quantity of wood products available for commercial and non-commercial uses under the Selected Alternative is much higher than under the no action alternative because it allows for tree cutting and removal thru a variety of means, including but not limited to, traditional timber sale contracts, service contracts, integrated resource contracts, small product permits (such as post and poles or firewood). The proposed action also meets the identified need of managing forest vegetation to move

current and foreseeable future conditions closer to desired conditions on landscapes available for active management. The no action alternative does not contribute to providing wood products for commercial and non-commercial uses, and it does not meet the need of managing forest vegetation to move current and foreseeable future conditions closer to desired conditions on landscapes available for active management.

**Ability to Respond to Changing Conditions:** As discussed above, the EA shows that the treatments proposed under the Selected Alternative will promote recovery of forest vegetation, increase resilience, and meet the other purpose and needs of the project. However, if the beetle outbreak continues and conditions continue to change, the prescriptions proposed may no longer be applicable in some areas. An example of this was seen on the 2013 Lake Canyon Fuels Reduction and Forest Health Project that was developed in response to the initial bark beetle outbreak in 2013. As discussed in Section 1. 1 of the Lone Pine Vegetation Management EA, the Lake Canyon project was only partially implemented, in part due to the changing conditions caused by the expansion of bark beetle outpacing the conventional planning and decision-making process that was conducted for that project. The strictly designated cutting units approved for the Lake Canyon project did not allow managers to adapt or be flexible to move treatments where they would be more effective in the face of the rapid expansion of bark beetle activity. For this reason, I feel having the ability to respond to changing conditions through the use of pre-implementation reviews and adaptive management is an essential part of the Selected Alternative for the Lone Pine project.

As discussed in the EA in Sections 1. 4 and 2. 2. 4, the use of pre-implementation reviews and adaptive management will allow for timely application of appropriate treatments based on actual site conditions at the time of implementation. The EA describes a well-defined approach, with requirements to review project areas prior to implementation, during implementation, and after implementation as well as requirements to monitor project effects during and after implementation. The adaptive management process also includes a commitment to public notification thru news releases and discussions with local stakeholders, and public field trips to keep interested stakeholders informed about the progress of implementation and the results of monitoring. Concerns were raised during the public comment periods that the procedures put in place and documented in Appendix A and B do not provide enough specific details related to what would be monitored and what adjustments may be made under adaptive management. To address these concerns, more detail has been added to the monitoring plan (Table 5 in Appendix B) and adaptive management actions have been defined that clearly describe what actions may be taken in response to conditions observed during monitoring (Tables 6 – 8 in Appendix B).

The proposed action also allows treatment outside of the fifteen project areas if needed to correct small mapping or GIS errors. Comments received during the comment period expressed concern about the lack of details surrounding this part of the proposed action. In order to address these concerns, additional detail has been added under the proposed action to describe the constraints that will be applied when determining if treatments will be applied outside of the fifteen project areas. The areas where this may occur was further reduced after the objection resolution meetings were completed. This included limiting the amount of additional area that may be treated to 300 acres, and only allowing treatments to correct small mapping or GIS errors, rather than in response to changing conditions. In addition, any treatment conducted in additional areas must be consistent with the treatments described in the EA, and the pre-implementation review of the treatment must show that effects will be consistent with effects described in the EA and that the design elements listed in Section 2. 2. 5 are adequate to keep impacts within those

analyzed in the EA. All monitoring and adaptive management actions described in Appendix B would apply to any additional areas where treatment occurs. By allowing work on up to 300 additional acres, the Forest Service will be able to conduct more precise layout of unit boundaries, taking actual on-the-ground conditions into account rather than relying on imprecise boundaries shown on the small scale maps used during planning.

**Public Participation**: In making my decision, I carefully considered concerns raised by the public during each of the public comment periods and the objection period. My staff and I reviewed and considered the comments and reference materials received during the public comment periods and have provided a summary of the comments and Forest Service responses in Appendix D – Public Comment Summary, posted on the San Juan National Forest website, and filed in the project record. Many of the comments received during the public comment period were supportive of the proposed actions, but there were several commenters that voiced concern over the lack of site specific detail regarding where or how treatments would be applied. They were also concerned that the original draft EA did not address a No Action Alternative. To address these concerns, the draft EA was revised to include more site-specific detail, a No Action Alternative was included and analyzed in detail, and a second 30-day public comment period was offered. The revised EA also more clearly displayed how public comments were addressed. A field trip to the project area was also conducted (at the request of several of the commenters) in order to provide interested stakeholders the opportunity to gain a better understanding of the proposed action and to discuss their concerns with Forest Service staff prior to the issuance of the Revised Draft EA.

In my review of the Final EA and the project record, I found numerous clarifications and changes were made in direct response to the public comments. This includes but is not limited to clarifications of design elements and the effects of the design elements, a more detailed monitoring plan (Table 5, Appendix B), and clearly defining what adaptive management steps may be taken in response to changing conditions (Tables6 – 8, Appendix B). I also found that the Final EA and project record addressed the opposing science that was brought up during the comment periods with opposing science specifically addressed in Section 1. 7 – Issues. The environmental analyses shows a thorough review using the best available science. The ID Team used information from a broad range of sources as appropriate, including Regional- and National-level research, local research, and recent site-specific field inspections and reviews of the analysis area, and referenced the scientific sources which informed the analysis.

I have acknowledged the environmental trade-offs of my decision. The watershed and soils analysis in Section 3. 2. 2 found that the activities associated with the proposed action may have localized, short-term effects (less than 3 years) on watershed and soils, riparian areas, and water quality. It also found that the hydrology and soils design elements listed in Section 2. 2. 5 will help minimize or eliminate potential adverse effects during implementation, and no negative long-term impacts will occur. The wildlife analysis in Section 3. 3 found the selected alternative may adversely impact individual sensitive species (northern goshawk, Lewis' woodpecker, flammulated owl, spotted bat, Townsend's big-eared bat, hoary bat, and northern leopard frog) but is not likely to result in a loss of viability in the planning area nor cause a trend toward federal listing or loss of species viability rangewide. This analysis concluded that the short-term effects are both positive and negative, but the long-term effects are expected to be beneficial as proposed treatments will help promote the recovery of forest vegetation and create more resilient pine stands across the landscape. For management indicator species (elk, Abert's squirrel, and hairy woodpecker), implementation of the proposed action will result in short-term negative impacts at the

project area scale, but long-term positive impacts as forest resilience improves and forest vegetation recovers. Overall, the proposed action would not measurably alter forest-wide habitat or population trends over the long-term. For migratory bird species, the effects of the proposed action are expected be minimal or discountable to Golden eagle, Grace's warbler, and Virginia's warbler.

To summarize, the analysis of impacts of the Selected Alternative as described by my staff in the EA do not indicate any unacceptable consequences, and I believe the long-term benefits of the Selected Alternative (increasing forest resilience, increasing age-class diversity, promoting the recovery of forest vegetation, reducing the risk of wildfire, and providing wood products for both commercial and non-commercial uses) outweighs any short-term environmental impacts.

## Other Alternatives Considered

In addition to the Selected Alternative, I considered one other alternative in detail. I did not choose Alternative 1-*No Action* because it does not meet the purpose and need for action. This alternative is the existing condition and was used as a basis for comparison of impacts between the alternatives. Because it does not propose any vegetation management activities, Alternative 1 does not adequately address the purpose and need of increasing forest resilience, increasing age-class diversity, promoting the recovery of forest vegetation, reducing the risk of wildfire, or providing wood products for both commercial and non-commercial uses. Alternative 1 also does not contribute to bringing current and foreseeable future conditions closer to desired conditions.

## Finding of No Significant Impact

Based on the environmental analysis documented in the Lone Pine Vegetation Management Project EA and the associated project record, I have determined that the activities described will not significantly affect the quality of the human environment. Therefore, an environmental impact statement is not needed. The proposed action is consistent with the management direction, standards, and guidelines outlined in the LRMP. This finding is made based on the following significance factors (40 CFR 1508. 27):

*Context*

The *Lone Pine Vegetation Project* will occur within an approximately 62,000 acre project area; these site-specific actions are limited in duration. Spatial and temporal effects will vary, and would be mostly limited to the project area. Some short-term adverse effects could be meaningful, while long-term effects will be beneficial across a range of resources. The resources affected by the proposed action are described in the EA.

The setting of the project is a managed, roaded area within the following management areas (MAs) that are designated in the *San Juan National Forest Land and Resource Management Plan* (LRMP 2013). All of the actions included under the selected alternative are confined to these management areas. Both of these management areas are appropriate for the actions in the proposal:

- MA 5 – Approximately 89% of the analysis area is in MA 5, which are areas where active management occurs to meet a variety of social, economic, and ecological objectives.
- MA 3 – Approximately 10% of the analysis area is in MA 3, which are natural landscapes with limited management that can include a variety of silvicultural approaches to meet desired conditions.

*Intensity*

Intensity has been assessed based on the factors identified in 40 CFR 1508. 27. Intensity is a measure of the severity, extent, or quantity of effects. The conclusions of the FONSI are based on information from the

effects analysis of this EA and material in the project record. The agency has taken a hard look at the environmental effects using relevant scientific information, as well as knowledge of site-specific conditions gained from field visits, site-specific stand exam data collected in 2018, use of Forest Vegetation Simulator (FVS) models, SJNF Geographic Information System (GIS) data, information gathered during aerial surveys conducted by the Colorado State Forest Service on the intensity of bark beetle infestations, professional knowledge of Forest Service vegetation management specialists, and interdisciplinary team input. My finding of no significant impact is based on the context of the project and intensity of effects using the ten factors identified in 40 CFR 1508. 27(b). My finding of no significant impact is based on the context of the project and intensity of effects using the ten factors identified in 40 CFR 1508. 27(b).

1. *Consideration of both beneficial and adverse impacts*: Both beneficial and adverse impacts were disclosed and considered. There will be localized, short-term impacts, but the analysis indicates that the Selected Alternative would not result in any significant adverse effects (EA Chapter 3).
2. *Consideration of the effects on public health and safety*: There will be no negative effects on public health and safety. Project design features have been included that require clear and prominent signage altering the public to the presence of log trucks, and prohibiting hauling on NFSR 521 and 504 over the Labor Day and Memorial Day holiday weekends, or during July 4th and 5th. In addition, all temporary road segments will be closed to wheeled motorized use by the public during operations.
3. *Consideration of unique characteristics of the geographic area*: The Selected Alternative does not involve impacts to unique characteristics or ecologically critical areas. No park lands, prime farmlands, floodplains, wilderness, or wild or scenic rivers occur in the project area. No adverse effects to wetlands are expected because design elements are in place that minimize activities in these areas. Intermittent streams and ephemeral streams with riparian vegetation will be protected during project activities by a 100 foot buffer zones where no mechanized equipment use is allowed, unless a field visit by a hydrologist determines a different site-specific buffer (EA, Section 3. 2. 2). Implementation of other hydrology and soils design elements (EA, Section 2. 2. 5) will further ensure protection of wetlands and streams in the project area (EA, Section 3. 2. 2).
4. *Consideration of the degree to which the effects are likely to be highly controversial*: The effects of this action on the quality of the human environment are not highly controversial. The Forest Service has extensive experience in analyzing and implementing this type of vegetation management project in similar conditions. Although other perspectives on vegetation management approaches were raised during the various public comment periods, the project implements established approaches that Forest Service resource specialists deem reliable and is supported by science.
5. *Consideration of the degree to which effects are uncertain or unknown*: The Forest Service has extensive experience in analyzing and implementing sanitation, salvage, single tree selection, commercial thinning, pre-commercial thinning, oak thinning, reforestation, slash disposal, burning, and road related activities. Because of this, potential issues associated with this proposed action are understood and there is a low degree of uncertainty regarding the risks to the human environment. Issues brought forth by resource specialist are not unique, have been identified before on the San Juan National Forest, and tend to have clearly defined design elements or measures that will limit or fully eliminate meaningful adverse effects. Best available science was used to inform the effects

analysis in Chapter 3 of the EA. The effects analysis shows the effects are not uncertain and do not involve unique or unknown risks.

6. *Consideration of the degree to which this action will set a precedent for future actions with significant effects:* The action will not establish a precedent for future actions that may have significant effect on the environment. It does not represent a decision in principle about a future consideration. Future actions will require their own analyses and decisions.
7. *Consideration of the action in relation to other actions with individually insignificant but cumulatively significant impacts*: Cumulative effects of past, present, and reasonably foreseeable projects have been considered and evaluated in addition to the impacts of this project. No significant cumulative impacts were identified (EA, Chapter 3).
8. *Consideration of the degree to which the action may adversely affect district, sites, highways, structures, or objects listed or eligible for listing in the National Register of Historic Places, or cause loss or destruction of significant scientific, cultural, or historic resources*: No direct or indirect effects on cultural resources are anticipated given that project activities would be controlled through application of cultural resource design elements. Cultural resources will be avoided. All project undertakings identified under Alternative 2 would avoid National Register eligible cultural resources per Section 106 of the NHPA. With adherence to all cultural resource design elements (EA, Section 2. 2. 5), the proposed action will have “no adverse effect” on cultural resources (EA, Section 5. 3. 2).
9. *Consideration of the degree to which the action may affect threatened or endangered species, or critical habitat*: There is no critical habitat in the analysis area, and no federally listed plant, wildlife, or fish species or their habitat are known or suspected to occur within the Lone Pine analysis area. Therefore, there will be no effect to these species from the proposed action. (EA, Sections 3. 3 and 5. 3. 7)
10. *Consideration of whether the action violates or threatens to violate federal, state, local laws or requirements imposed for protection of the environment*: This action complies with relevant Federal, State, and local laws or requirements for the protection of the environment.

After considering the environmental effects described in the EA, I have determined that this action will not have a significant effect on the quality of the human environment considering the context and intensity of impacts (40 CFR 1508. 27). Thus, an environmental impact statement will not be prepared.

## Findings Required by Other Laws and Regulations

The Selected Alternative complies with relevant requirements of Federal laws including the National Environmental Policy Act, the Endangered Species Act, the National Historic Preservation Act, and the National Forest Management Act, as well as other applicable State and local legal requirements and Executive Orders. The project was designed to be in conformance with Forest Plan direction, standards, and guidelines. The ID Team reviewed direction in the Forest Plan and determined that the Selected Alternative complies with the Forest Plan.

## Administrative Review and Objection Opportunities

This decision was subject to objection pursuant to 36 CFR Part 218. A legal notice of the opportunity to object was published on August 30, 2019 in the Cortez Journal. A cover letter announcing availability of

the Draft Decision and Final Environmental Assessment was sent to those who provided comments during the project's development. The project received four objection letters from five unique objectors.

Objections resolution meeting were held with all objectors. During these meetings, issues and potential resolution of those issues were discussed in accordance with 36 CFR 218.11(a). During the objection resolution meetings, the reviewing official proposed certain changes be made to the project for the purpose of resolving objections. One of these objections (from two unique objectors) was dropped after it was agreed that certain changes be made to the project for the purpose of resolving objections. Instructions were issued to the responsible official to adopt and implement the provisions agreed upon as part of the Final DN. These provisions have been included in this DN as required.

The remaining three objectors did not drop their objections. Based on the review of the remaining three objections, the Final EA, and project record, it was determined that the analysis in the project record supports the reasoning in the draft DN for Alternative B (Modified). No instructions for the remaining three objections were issued by the reviewing officer.

## Implementation Date

Implementation on this project may occur immediately following the close of the objection resolution period (§218. 12[a]).

## Contact and Project Information

For additional information concerning this decision, project details, or to obtain a copy of the Final EA or DN, contact David Casey at the Dolores Ranger District, 29211 Highway 184, Dolores, CO 81323, (970) 882-7296. You may download the Final EA and Final Decision Notice from www.fs.usda.gov/project/?project=54682 .

[signature]

Derek Padilla
Dolores District Ranger

1/23/2020
Date

*In accordance with Federal civil rights law and U. S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident. Persons with disabilities who require alternative means of communication for program information (e. g. , Braille, large print, audiotape, American Sign Language, etc. ) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.*

*To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at http://www. ascr. usda. gov/complaint_filing_cust. html and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U. S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D. C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program. intake@usda. gov . USDA is an equal opportunity provider, employer and lender.*

**Attachment 1**

**Lone Pine Soils Prone to Mass Movement**



## Attachment 2

## Project Area Locations including Large Tree Emphasis/Commercial Thin Prescription Areas






FS-002143

## Attachment 3

**Excerpt from USDA F B – Standard Provisions for Scaled Timber Sales:**

**B6.35 Equipment Cleaning**.

(a) Areas, known by Forest Service prior to timber sale advertisement, that are infested with invasive species of concern are shown on Sale Area Map. A current list of invasive species of concern and a map showing the extent of known infestations is available at the Forest Supervisor's Office. For purposes of this provision, "Off-Road Equipment" includes all logging and construction machinery, except for log trucks, chip vans, service vehicles, water trucks, pickup trucks, cars, and similar vehicles.

(b) Purchaser shall adhere to the following requirements with regard to cleaning "Off-Road Equipment":

(i) Prior to moving Off-Road Equipment onto the Sale Area, Purchaser shall identify the location of the equipment's most recent operation. Purchaser shall not move any Off-Road Equipment that last operated in an area infested with one or more invasive species of concern onto Sale Area without having cleaned such equipment of seeds, soil, vegetative matter, and other debris that could contain or hold seeds, and having notified Forest Service, as provided in (iii). If the location of prior operation cannot be identified, then Purchaser shall assume that the location is infested with invasive species of concern.

(ii) Prior to moving Off-Road Equipment from a cutting unit that is shown on Sale Area Map to be infested with invasive species of concern to, or through any other area that is shown as being free of invasive species of concern, or infested with a different invasive species, Purchaser shall clean such equipment of seeds, soil, vegetative matter, and other debris that could contain or hold seeds, and shall notify the Forest Service, as provided in (iii).

(iii) Prior to moving any Off-Road Equipment subject to the cleaning requirements set forth above, Purchaser shall advise Forest Service of its cleaning measures and make the equipment available for inspection. Forest Service shall have 2 days, excluding weekends and Federal holidays, to inspect equipment after it has been made available. After satisfactory inspection or after such 2 day period, Purchaser may move the equipment as planned. Equipment shall be considered clean when a visual inspection does not disclose seeds, soil, vegetative matter, and other debris that could contain or hold seeds. Purchaser shall not be required to disassemble equipment unless so directed by the Forest Service after inspection.

(iv) If Purchaser desires to clean Off-Road Equipment on National Forest land, such as at the end of a project or prior to moving to, or through an area that is free of invasive species of concern, Purchaser shall obtain prior approval from Contracting Officer as to the location for such cleaning and measures, if any, for controlling impacts.

(v) Contracting Officer may order delay, interruption, or modification of this Contract pursuant to B8.33.

(c) Nothing contained in this Section shall be interpreted as creating any warranty on the part of the Forest Service that all locations of invasive species of concern have been described herein, elsewhere in this Contract, or designated on the ground. Following sale advertisement, additional locations may be described or designated, and other species may be added to the list of invasive species of concern. In such event, Contracting Officer may order delay, interruption, or modification of this Contract pursuant to B8.33.

(d) The parties shall promptly communicate with one another with respect to description or designation of additional locations; discovery of locations of new species or new infestation; and, addition of species to the list of invasive species of concern.

## Attachment 4

Lone Pine Monitoring Areas

The Lone Pine monitoring areas are a mixture of previously harvested areas, areas proposed for harvest under Lone Pine EA, and no harvest (control) areas. They were identified as a result of conversations within the DWRF collaborative and a desire to have areas to compare conditions on inventoried lands. One of the main goals is to monitor the impacts to determine if the actions proposed in the Lone Pine EA are achieving or moving toward general attainment of desired conditions.

Monitoring areas were selected that represent a spectrum of conditions and are representative of the stands across the project area. Monitoring areas were established to study how conditions change after treatment and to compare this to untreated control areas. If monitoring indicates that conditions have changed, the monitoring will further identify how the treatment affected the change. Additionally, treatment units are being monitored to establish a baseline. To do so, Mountain Studies Institute (MSI) will conduct monitoring both before and after treatment. Monitoring Area Descriptions found below list each monitoring area and briefly describe the unique conditions of each.

The majority of data collection will be completed by MSI with help from the Rocky Mountain Research Station and other agency personnel. MSI will house all the data and process it for release to the collaborative group and agency. The San Juan National Forest and MSI will continue monitoring efforts as implementation continues across the Lone Pine landscape.

Monitoring Area Descriptions

### Control Areas (only treatment that will occur is burning)

1. **Haycamp 1** (Smoothing Iron): This area was an early demonstration site for the Ponderosa Pines Partnership (PPP). Recently a series of common stand exams across many of the old demonstration sites was implemented to evaluate current conditions. 2019 Forest Health Flights observed round headed bark beetle (RHBB) in this area. Monitoring will be conducted to track RHBB activity, determine which trees are impacted, as well as monitor for other information, as determined in consultation with MSI and/or DWRF. Additional studies could be done once monitoring is in place.
2. **Haycamp 2**: No recent or current scheduled treatments in this area. The area was chosen for monitoring because 2019 Forest Health Flight data found RHBB moving into the area.
3. **Haycamp 3**: No recent or current scheduled treatments in this area. The area was chosen for monitoring because 2019 Forest Health Flight data found RHBB moving into the area.
4. **Narraguinepp Plantation**: This area is representative of the plantations on the east side of the project area.
5. **Fader**: Representative unit of single tree selection (STS).
6. **Salvage**: Representative unit of salvage.
7. **Glade Canyon**: this area is representative of a commercial thinning unit. This unit has a heavy to moderate infestation of bark beetles.
8. **5 Pine 1**: This area was cut to a 60-80 BA (75BA +) in 2017-18 under the Lake Canyon EA decision and has light bark beetle activity. Area is to be burned when Snaggletooth units are

complete. No management is currently scheduled beyond the broadcast burn and future follow-up burns.

9. **5 Pine 2**: This area was cut to a 60-80 BA (75+) in 2018-19 (sale is still active and 90% complete) under the Lake Canyon EA decision and there is light bark beetle activity. Area is to be burned when Snaggletooth units are complete. No management is currently scheduled beyond the broadcast burn and future follow-up burns.
10. **Wolf Plantation**: Representative unit of the plantations on the west side of the project area.
11. **Ferris Sites**: These area were originally part of the Ferris East decision and treatments were implemented under the Pines Partnership umbrella with a 20" diameter retention cut for ponderosa pine. Post-harvest, one unit was cut and burned and one unit was only cut. (This is the same RX that has been suggested to be used on the commercial thin areas of Lone Pine EA.) This area will provide a good future look at potential of the area under such prescription to meet desired conditions.

Other Areas

12. **Snaggletooth**: Part of the Lake Canyon EA decision and currently under contract to be harvested in 2020-2021. A burn plan is in place and upon harvest completion the unit will be burned. No management is currently scheduled beyond the broadcast burn and future follow-up burns.
13. **Bradfield Test Mark**: Area is attached to and under the same contract as the Bradfield Single Tree Selection harvest. This area was marked to work out the STS prescription internally and was intensely inventoried as a result. It will be used as a training site for sale purchasers to study the mark associated with the STS prescription, ask questions and then cut the area as a demonstration. This area will receive the same mitigations and treatments as the Bradfield Single Tree Selection and will have an inventory to provide improved monitoring information for the study.
14. **Bradfield Monitoring Area**: This area is located directly across the road from the Bradfield Single Tree Selection unit and exhibits many of the same stand qualities and conditions. This area is designated as commercial thinning in the Lone Pine proposed action. Recently a proposal was submitted through the USFS Regional Office for a demonstration project to study various basil area treatments (50 BA and up) and the resulting response to RHBB. This area was designated as the site for the study if funding is received.

Lone Pine Monitoring Area Overview



Lone Pine Monitoring Area – Detail Map 1 (Lone Pine Area)






FS-002148

Lone Pine Monitoring Area – Detail Map 2 (Haycamp Mesa Area)






FS-002149

# Attachment 5

## Design Elements

The design elements listed below are mandatory elements of the proposed action, including all actions that occur as the result of adaptive management, and are expected to provide adequate resource protection under the treatments proposed for this project.

### Botany

1. Limit each burn pile to ¼ acre or less.
2. All off-road heavy equipment must be cleaned and free of foreign soil or debris that might facilitate spread of invasive species before entering the forest boundary.
3. Sale and contract areas shall be monitored for weeds; infestations are to be reported to the Rangeland Management Specialist.
4. All seed used for revegetation shall be tested for, and free of, invasive non-native species that are problematic for this forest. Contact the agency for the most current list.

### Cultural Resources

1. The boundaries of all historic properties, including a 100 foot buffer, shall be clearly delineated on the ground prior to treatment implementation. Boundary marking information shall be conveyed to appropriate Forest Service administrators or employees responsible for project implementation. Information shall be incorporated into implementation documents, contracts, and permits.
2. No ground-disturbing project activities, staging of equipment or materials, or stockpiling of equipment or materials shall occur within the boundary of any historic property.
3. In the event that vegetation treatments will occur within the boundary of a historic property, all vegetation shall be cut using hand tools and removed from the property by hand.
   a. Prior to the felling of any large-diameter tree, all features within the historic property shall be flagged or otherwise demarcated and a SJNF archaeologist shall visit the site with project implementers to discuss the locations of the features. The large-diameter tree shall be felled away from all features.
   b. No material shall be dragged across or within the boundary of a historic property.
4. If a previously undocumented historic property is discovered, or if inadvertent effects occur to a historic property, all work in the vicinity of the property shall cease and the SJNF archaeologist shall be notified immediately. The property shall be protected and project activities in the immediate vicinity of the property shall not resume until any actions necessary to resolve adverse effects to the property have been completed.
5. Upon the discovery of human remains, funerary items, sacred objects, or objects of cultural patrimony, a SJNF archaeologist shall be immediately notified by telephone, with written confirmation. All project activities shall cease in the vicinity of the discovery, and the discovery shall be protected for 30 days, or until the contractor is given notice to proceed by a SJNF archaeologist or the Dolores District Forest Service Representative.

### Fuels

1. Timber sale or stewardship contracts shall require concentrations of activity fuels to be disposed of by piling and burning, lopping and scattering throughout the unit, and/or removal.
2. During slash disposal, limit the amount of slash scattered in areas where existing pine regeneration or seed trees are present in order to minimize damage to existing regeneration. When building piles, locate them where damage to existing pine regeneration or seed trees is minimized when burned.

3. Machines used to pile slash shall be equipped with a brush blade or acceptable equivalent.
4. Develop the slash disposal plan for each project area in consultation with the wildlife biologist, hydrologist and fire management officer.

**Hydrology and Soils**

1. Heavy equipment and vehicles will be prohibited in the water influence zone (WIZ) unless the ground is protected by either one foot of packed snow or two inches of frozen soil. Intermittent streams and ephemeral streams with riparian vegetation will have a buffer strip width of 100 feet on each side of the channel (based on standard 2. 6. 30). No-equipment buffer zones do not apply to designated stream crossings, but limit stream crossings to the minimum number necessary. Cross streams perpendicular to the direction of flow in straight and shallow locations and where channels are hardened by gravel, cobble or bedrock. Do not cross streams where banks exceed a 30% slope.
2. Limit equipment operations to sustained slopes less than 40%. Avoid locating landing and staging areas that have high potential for mass movement; have shale soils of the Mancos shale, Lewis, Fruitland, and Morrison geologic formations; or have other highly erosive Fivepine-Nortez or Fughes-Sheek complex soil types (figure 7). Restrict roads, landings, skid trails, concentrated-use sites, and similar soil disturbances to designated sites to no more than 15% of any activity area.
3. No skidding, temporary road construction, or harvesting on slopes over 40%.
4. No skidding, temporary road construction, or harvesting in areas with soils prone to mass movement, as shown on the attached map (Attachment 1 of this DN).
5. When soils are saturated, equipment operations will cease until the ground dries out or freezes. Soils are considered saturated when ruts created by equipment are 4 inches deep (beyond the lug tread of the tire) for 10 feet or longer. Repair any rutting deeper than 4 inches.
6. Avoid mechanical treatments in wetlands, wet meadows and riparian areas. No skidding, decking or loading will be allowed in these areas in order to protect water quality, groundwater hydrology, existing soils and vegetative cover. Removal or mechanical treatment of riparian or wetland vegetation will be prohibited (based on guideline 2. 4. 28). Establish a 100 foot no treatment buffer zone around riparian and wetland areas unless field visit by hydrologist determines a different site-specific buffer.
7. Avoid ground skidding on sustained slopes steeper than 40%. Conduct logging to disperse runoff as practicable. Landings and skid trails will be located and designed to disperse runoff and minimize soil disturbance. Landings should not be located in the water influence zone (WIZ). Roads and skid trails adjacent to the landings will be cross-drained or shaped so that runoff does not reach the landing. Skid trails will be located perpendicular to slope angles (along the contour) as much as possible. Avoid skidding up or down drainage bottoms. As needed, install waterbars or outslope, and spread slash on skid trails upon completion of use. Landings will be ripped or scarified and seeded immediately upon completion of use.
8. Logging slash, when processed by "lop and scatter," will be well-distributed throughout the cutting units to protect soils from erosion and retain nutrients and organic matter on site. Wood chips produced by mechanical treatments should be dispersed on the ground at a maximum depth of three inches over at least 80% of the covered areas, and no chip piles should exceed 6 inches in depth (based on guideline 2. 2. 78). Logging debris may not enter intermittent stream courses to an extent that it adversely affects the natural flow of the stream or diminishes water quality.
9. Temporary roads shall be held to the minimum feasible number, width and total length and shall be located sufficiently far from streams and other water bodies to minimize discharge into those waters except at necessary water crossings. Stream crossings will be installed on straight and resilient

stream reaches as perpendicular to flow as feasible. Maintain stream channel width, depth, and slope. Culverts placed within the drainage network will be positioned at the natural grade of the drainage and will not be modified (i. e. raised or lowered) to maintain the grade of the road. The table below provides guidelines for maximum spacing of cross-drainage (e. g. culverts, rolling dips) on temporary roads. All temporary roads will be obliterated and seeded upon completion of use.

**Table 2: Maximum Cross-Drain Spacing in Feet Based on Soil Types**

| Road Grade (percent) | Extra Erodible Silts-Sands with little or no binder | Highly Erodible Silts-Sands with moderate binder | Erodible Gravels + fines & sands with little or no fines | Low Erodible Gravels with little or no fines |
|---|---|---|---|---|
| 1-3 | 600 | 1000 | 1000 | 1000 |
| 4-6 | 300 | 540 | 680 | 1000 |
| 7-9 | 200 | 360 | 450 | 670 |
| 10-12 | 150 | 270 | 340 | 510 |
| 13-15 | 120 | 220 | 270 | 410 |

(Source: Forest Service Handbook 2509. 25 Management Measure 13. 3)

10. Proper drainage will be constructed or reconstructed on existing system road and newly constructed temporary roads. Some existing road sections may need to be realigned out of low-lying areas for proper drainage. Road-stream crossings and dips through habitually wet areas on roads open to motorized public use will be hardened. All drainage structures on roads shall be inspected by the Timber Sale Administrator or a hydrologist at treatment completion to make sure they are in good condition and functioning properly.

### Rangelands

1. Rangeland Management Specialists will be annually informed of the schedule of treatments.
2. Timber purchasers/contractors are required to repair any damages to range improvements that occur as a result of their operations.
3. Timber will contact Rangeland Management Specialist for approval if it is necessary to alter fence lines for operations.
4. Keep pasture gates closed when cattle are in or adjacent to pastures or when instructed by agency personnel.

### Recreation and Public Safety

1. No hauling will be permitted on NFSR 521 and 504 over the Labor Day and Memorial Day holiday weekends (starting on Friday at 12:00 am and extending through Tuesday at 12:00am). No hauling on July 4th and 5th (starting at 12:00 am on July 4th and ending at 12:00 am on July 6th).
2. Plan for and accommodate winter recreational users. If NFSR 504 or 514 are plowed for winter operations, snowmobile passage would be accommodated to the extent possible. Plowing operations would be required to leave at least 2 inches of snow on plowed roadways to allow snowmobiles to pass through.
3. Clear and prominent signage alerting the public to the presence of log trucks will be required at all times.

### Scenery

1. Openings in the canopy should have a natural appearance with uneven edges. The shape should be an irregular pattern that mimics existing natural openings and should avoid straight-line edges.

Blend with natural landscape features such as natural meadows or openings and rock outcrops when possible.

2. Unit boundary paint shall face away from open system roads and trails or be removed; standards for boundary marks should be minimized along these routes.
3. Stumps should be 12” high or less.
4. All equipment and construction debris (man-made debris and trash, including old culverts) caused by project operations shall be removed from the site at sale completion.
5. Disturbed areas where soils are exposed, such as temporary roads, skid trails or landings should be re-vegetated with a seed mixture consisting of species that are as close as possible to the existing desirable species in the area. Effectiveness of closures should be monitored yearly for success of revegetation as well as travel management compliance. If ineffective, roads will be reclosed or reseeded by the timber program.
6. Where feasible, construction of skid trails should be slightly curved to avoid creating straight line corridors when the skid trails connect with open system roads and trails. Skid trails will be held to the minimum number, width, and length. Forest system trails will not be utilized as a skid path unless the trail utilizes a level 1 road or use is approved by the line officer. In these cases, there shall be coordination between the timber and recreation programs.
7. When constructing temporary roads, excessive cut/fill slopes shall be avoided. Leave cuts/fills in a roughened condition to facilitate revegetation. Stabilize fills and reestablish natural drainage configuration to the highest degree possible.

## Timber

1. Normal operating season will extend from April 1st to November 30th, depending on site-specific conditions. Winter harvesting and hauling operations will also be allowed from December 1st through February 28th, depending on conditions. Additional time in the shoulder seasons may be granted by Line Officer.
2. If it is determined that cattle or big game are damaging aspen regeneration, temporary exclusions may be put in place if necessary to deter browsing (e. g. fence, electric wire, or slash barrier).
3. In salvage units 40 or more acres in size, require leave groups of 10-15% of the total unit acres. Leave groups should be ½ - 5 acres in size.

## Transportation

1. Roads to be used for hauling or equipment access will be used in the following order of preference:
    a. First preference is to use National Forest System Roads identified on the Motor Vehicle Use Map for general public use. These roads are maintained in an “open”’ status with either gravel surface (ML3) or native surface (ML2).
    b. Second preference is to use ML1 roads (only open to limited administrative use), which might require reconstruction (e. g., removal of trees and shrubs, reshaping, blading, adding surface material or installing drainage features). After use the road would be put back in ML1 status or decommissioned. Consult with Forest engineering staff and project hydrologist for input on road reconstruction.
    c. Third preference is to use existing unauthorized roads (which would be considered temporary roads and obliterated when use is complete). Roads in this category might require removal of trees and shrubs, reshaping, blading, adding surface material, installing drainage features, etc.
    d. Fourth preference is to create temporary roads. The Forest Service and the purchaser/contractor shall agree upon locations of temporary routes, resource protection requirements employed during road construction, clearing widths, and closure or rehabilitation requirements, which

must be consistent with all design elements and implementation requirements of the Lone Pine EA.

2. Temporary road surface width shall be limited to truck bunk width plus four (4) feet, except for needed turnouts which shall not exceed two (2) times the bunk width plus four (4) feet. If shovels or cranes with revolving carriage are used to skid or load, temporary road surface width equal to track width plus tail swing shall be permitted.
3. Cut/fill techniques in the construction of temporary roads are not needed and will not be used in the Lone Pine project area due to the gentle terrain. Cut/fill is defined as installing a cut that is more than 6" deep and over 50' long, with the cut located on the uphill side, and the intent of placing the cut material on the downhill as fill, to create a flat, drivable road prism.
4. Temporary roads shall be closed within 5 years of construction.
5. Temporary roads shall be designed to the minimum standard for their use and be located to "roll" with the terrain as feasible.

### Wildlife and Fisheries

1. Surveys for northern goshawks and other raptors (generally Cooper's hawk and sharp-shinned hawk) would be completed prior to project implementation. If active northern goshawk nests are discovered, all project operations would be restricted annually from March 1st to August 31st within one-half (½) mile of the active nest. If other raptor nests are discovered, all project operations would be restricted annually from March 1st to August 31st within one-quarter (¼) mile of the active nest.
2. Operations in Colorado Parks and Wildlife (CPW)-mapped elk production habitat (Figure 7: Elk Production Areas) shall not occur from May 15th to June 30th without line officer approval. The only operations that will be approved are travel through mapped production areas to units outside of the production areas. This will only be approved after consultation with Colorado Parks and Wildlife about the amount of proposed use and access routes.
3. Operations in CPW-mapped critical elk winter range shall not occur from December 1 to April 30 without line officer approval. The only operations that the line officer will approve are travel through mapped winter range areas to units outside of the critical winter range. This will only be approved after consultation with Colorado Parks and Wildlife about the amount of proposed use and access routes.
4. Leave a minimum of 1 snag per acre of at least 12 inches dbh and 25 feet tall. If trees in this size class are not available, then leave 2-3 snags per acre of at least 9 inches dbh and 15 feet tall.
5. Consult with wildlife biologist prior to layout of projects that include oak treatment in order to identify areas to be treated (assure benefit wildlife and maintain clumps of dense understory oak for turkey nesting habitat).
6. Mechanized equipment must not operate within exclosure areas that protect wildlife. Consult with the wildlife biologist when developing marking guidelines for trees within exclosures.

United States
Department of
Agriculture

Forest
Service

January 2021

# REDD BULL

## Environmental Assessment

**Superior Ranger District, Lolo National Forest**
**Mineral County, Montana**



**For More Information Contact:**

Project Leader Pat Partyka (patricia.partyka@usda.gov)

Plains/Thompson Falls Ranger District
P.O. Box 429
Plains, MT 59859

Telephone: 406-826-3821

Superior District Ranger Carole Johnson (carole.johnson@usda.gov)

Superior Falls Ranger District
P.O. Box 460
Superior, MT 59872

Telephone: 406-822-4233

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at http://www.ascr.usda.gov/complaint_filing_cust.html and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by:

(1) mail: U.S. Department of Agriculture
Office of the Assistant Secretary for Civil Rights
1400 Independence Avenue, SW
Washington, D.C. 20250-9410;

(2) fax: (202) 690-7442; or

(3) Email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer, and lender.

# Contents


UPDATES TO THE ENVIRONMENTAL ASSESSMENT ........ 1
CHAPTER 1: PURPOSE AND NEED FOR ACTION ........ 1
1.1 Introduction ........ 1
1.2 Background and Setting ........ 2
1.3 Purpose and Need for Action ........ 3
1.4 Original Proposed Action ........ 8
1.4.1 Design Criteria ........ 8
1.5 Public Involvement ........ 9
1.5.1 Issue Resolution ........ 10
CHAPTER 2: ALTERNATIVES ........ 17
CHAPTER 3: ENVIRONMENTAL EFFECTS ........ 31
3.1 Past, Present, and Reasonably Foreseeable Future Actions ........ 31
3.2 Vegetation ........ 33
3.2.1 Resilient Vegetative Conditions ........ 33
3.2.2 Old Growth ........ 39
3.2.3 Weeds ........ 44
3.2.4 Botany ........ 46
3.3 Fire and Fuels ........ 50
3.4 Soils ........ 62
3.5 Hydrology ........ 68
3.6 Fisheries ........ 79
3.7 Wildlife ........ 85
3.8 Transportation System ........ 121
3.9 Economics ........ 124
3.10 Roadless ........ 128
3.11 Recreation ........ 156
Literature Cited ........ 163

Appendix A: Maps

Appendix B: Detailed Vegetation Treatments

Appendix C: Resource Protection Measures and Monitoring

Appendix D: Science Basis for Vegetation Restoration Treatments

Appendix E: Forest Plan Amendments and associated maps

Under Alternative 3, recurrent maintenance on NFSR 3848 would be more costly than typical forest roads due to the relatively steep grades that naturally develop more erosion and wash-boarding. More frequent blading would be required to maintain the level of driver comfort currently provided by the existing NFSR 221 route.

Based on experience with similar treatments elsewhere on the Forest, the surface hardening on the 2.5 segment of NFSR 221 would remain effective for several years, but would eventually require maintenance. The low traffic volume and speed on the road would help extend the longevity of the treatment.

### *Forest Plan Consistency*

Alternatives 2, 3, and 4 are consistent with the Lolo Forest Plan. A project-specific travel analysis was conducted to ensure roads within the project area would be the minimum number and meet the design standards to provide for safety and to meet user and resource needs (Forest-wide standard 49, page II-17). Roads within the project area would be managed to provide for resource protection, wildlife needs, commodity removal, and a wide range of recreation opportunities (Forest-wide standard 52, page II-18).

## 3.9 Economics

Three factors were considered in the economic analysis: project feasibility which addresses only the timber harvest component of this project; financial efficiency, which addresses present net value (PNV) or the net monetary costs and benefits of the project; and economic impacts, which are the effects of this project on local jobs and labor income.

*Project feasibility* is used to determine if the timber harvest would be feasible, that is, would it sell, given current market conditions. The determination of feasibility relies on a residual value analysis (price of the timber = revenues – costs) that uses local delivered log prices and stump-to-mill costs. The appraised stumpage rate from this analysis is compared to the base (minimum) rate. The project is considered feasible if the appraised stumpage rate exceeds the base rate.

*Financial efficiency* provides information relevant to the future financial position of the government as the project is implemented. Financial efficiency considers anticipated Forest Service costs and revenues. PNV is the difference between the present value of the revenues and present value of the costs. PNV converts costs and revenues over the entire time frame of the project into a single figure for a selected year. A positive PNV means that the project would generate more financial revenues than financial costs. The NEPA planning is a sunk cost at the time of the decision and is not included in the PNV analysis.

Financial efficiency analysis is not intended to be a comprehensive analysis that incorporates monetary expressions of all known market and non-market benefits and costs. Many of the values associated with natural resource management are best handled apart from, but in conjunction with, a more limited financial efficiency framework. These non-market benefits and costs associated with the project are discussed throughout the various resource sections of this EA.

*Economic impacts* are used to evaluate potential direct, indirect, and cumulative effects of the project on the economy. They are measured by estimating the direct jobs and labor income generated by 1) the processing of the timber volume from the project and 2) Forest Service expenditures for contracted other activities. The direct economic and labor income benefit employees and their families and, therefore, directly affect the local economy. Additional indirect and induced multiplier effects (ripple effects) are generated by the direct activities. Indirect effects are felt by the producers of materials

used by the directly affected industries. Induced effects occur when employees of the directly and indirectly affected industries spend the wages they receive. Together the direct and multiplier effects comprise the total economic impacts to the local economy.

Economic impacts are estimated using input-output analysis, which is a means of examining relationships within an economy, both between businesses and between businesses and final consumers. It captures all monetary market transactions for consumption in a given time period. The resulting mathematical representation allows one to examine the effect of a change in one or several economic activities on an entire economy, all else constant. The model used for this analysis is the 2017 IMPLAN data in conjunction with response coefficients that relate timber harvest quantity to direct jobs and income (Sorenson et al. 2016). IMPLAN translates changes in final demand for goods and services into resulting changes in economic effects, such as labor income and employment of the affected area's economy.

Data used to estimate the direct effects from the timber harvesting and processing were provided by the University of Montana's Bureau of Business and Economic Research (BBER) (Sorenson et al. 2016). This national dataset is broken into multi-state regions and is considered more accurate than that which is available from IMPLAN. The Northern Rockies BBER Region (Montana and Idaho) is used for this analysis. The BBER data represents the results of mill censuses that correlate production, employment, and labor income. The economic impact area for this analysis consists of Mineral and Sanders Counties. Potential limitations of these estimates are the time lag in IMPLAN and the uncertainty of where the timber will ultimately be processed. The analysis assumes the harvested timber volume would be processed in the Mineral and Sanders County impact area. However, if some of the timber were processed outside the region, then a portion of the jobs and income would be lost by this regional economy.

**Table 3.9-1 Project Feasibility and Financial Efficiency Summary (2018 dollars)**

| Category | Measure | Alternative 2 | Alternative 3 | Alternative 4 |
|---|---|---|---|---|
| Timber Harvest Information | Acres Harvested* | 13,136 | 10,701 | 12,514 |
| | Volume Harvested* (CCF) | 223,329 | 181,917 | 212,755 |
| | Base Rates ($/CCF) | $17.35 | $20.12 | $19.54 |
| | Appraised Stumpage Rate ($/CCF) | $19.17 | $17.74 | $19.89 |
| | Predicted High Bid ($/CCF) | $24.82 | $23.39 | $25.54 |
| | Total Revenue | $5,542,000 | $4,255,000 | $5,434,000 |
| Timber Harvest & Required Design Criteria | PNV | $412,000 | $109,000 | $527,000 |
| Timber Harvest & All Other Resource Activities | PNV | -$8,906,000 | -$8,638,000 | -$8,627,000 |

* Volume and acres are estimations
CCF= hundred cubic feet

**Table 3.9-2: Total Employment and Labor Income over the Life of the Project***

| Non-Timber Harvest-related Activities | Alternative 2 | | Alternative 3 | | Alternative 4 | |
|---|---|---|---|---|---|---|
| **Part and Full Time Jobs Contributed** | **Total** | **Annual** | **Total** | **Annual** | **Total** | **Annual** |
| Direct | 63 | 6 | 64 | 6 | 70 | 7 |
| Indirect and Induced | 35 | 4 | 35 | 3 | 37 | 4 |
| **Total** | 98 | 10 | 99 | 9 | 106 | 11 |
| **Labor Income Contributed ($)** | | | | | | |
| Direct | $3,623,000 | $362,000 | $3,592,000 | $359,000 | $3,802,000 | $380,000 |
| Indirect and Induced | $1,215,000 | $121,000 | $1,199,000 | $120,000 | $1,265,000 | $126,000 |
| **Total** | $4,838,000 | $484,000 | $4,791,000 | $479,000 | $5,067,000 | $507,000 |
| **Timber Harvest and Processing** | **Alternative 2** | | **Alternative 3** | | **Alternative 4** | |
| **Part and Full Time Jobs Contributed** | **Total** | **Annual** | **Total** | **Annual** | **Total** | **Annual** |
| Direct | 569 | 81 | 464 | 66 | 543 | 78 |
| Indirect and Induced | 794 | 113 | 646 | 92 | 756 | 108 |
| **Total** | 1,363 | 195 | 1,110 | 159 | 1,299 | 186 |
| **Labor Income Contributed ($)** | | | | | | |
| Direct | $28,273,000 | $4,039,000 | $23,030,000 | $3,290,000 | $26,934,000 | $3,848,000 |
| Indirect and Induced | $29,855,000 | $4,265,000 | $24,319,000 | $3,474,000 | $28,442,000 | $4,063,000 |
| **Total** | $58,128,000 | $8,304,000 | $47,349,000 | $6,764,000 | $55,376,000 | $7,911,000 |
| **All Activities** | **Alternative 2** | | **Alternative 3** | | **Alternative 3** | |
| **Part and Full Time Jobs Contributed** | **Total** | **Annual** | **Total** | **Annual** | **Total** | **Annual** |
| Direct | 632 | 88 | 528 | 73 | 612 | 84 |
| Indirect and Induced | 829 | 117 | 681 | 96 | 793 | 112 |
| **Total** | 1,461 | 205 | 1,209 | 169 | 1,405 | 196 |
| **Labor Income Contributed ($)** | | | | | | |
| Direct | $31,896,000 | $4,401,000 | $26,622,000 | $3,649,000 | $30,737,000 | $4,228,000 |
| Indirect and Induced | $31,070,000 | $4,386,000 | $25,518,000 | $3,594,000 | $29,706,000 | $4,190,000 |
| **Total** | $62,966,000 | $8,788,000 | $52,141,000 | $7,243,000 | $60,443,000 | $8,418,000 |

* It is important to note that these may not be new jobs or income, but rather jobs and income supported by this project.

**Part and Full Time Jobs Contributed** is the total full and part-time wage, salaried, and self-employed jobs contributed to the economic impact area from the change in final demand associated with this project.

**Labor Income Contributed** includes the wages, salaries and benefits of workers who are paid by employers and income paid to proprietors in the economic impact area from the change in final demand associated with this project.

**Direct effects** represent the impacts for the expenditures and/or production values specified as direct final demand changes.
**Indirect effects** represent the impacts caused by the iteration of industries purchasing from industries resulting from direct final demand changes.
**Induced effects** represent the impacts of all local industries caused by the expenditures of new household income generated by the direct and indirect effects of final demand changes.
**Total effects** are the sum of direct, indirect, and induced effects.

### *Alternative 1: Direct, Indirect, and Cumulative Effects*

Under Alternative 1, no activities would occur. Thus, the public would incur no costs or realize any benefits of improved forest health, watershed, and wildlife habitat, reduced fuels, and recreation improvements in this area. Alternative 1 would yield a present net value of $0. However, there would be no return on the planning costs that have already been incurred.

Alternative 1 would support no direct, indirect, or induced employment, and no labor income contribution to local economies. This alternative has the potential to contribute to the decline of timber-related employment in the rural communities of the economic impact area. Decline in timber harvest from NFS lands could potentially impact wood product employment and associated indirect and induced employment.

### *Alternatives 2, 3, and 4: Direct and Indirect Effects*

*Project Feasibility*
The appraised stumpage rate from the feasibility analysis was compared to base rates. As displayed in Table 3.9-1, the appraised stumpage rate for Alternatives 2 and 4 is greater than the base rate, indicating that these alternatives are feasible (likely to sell). However, for Alternative 3, the appraised stumpage is less than the base rates, indicating this alternative is not feasible under the given cost and revenue estimates. In Alternative 3, the timber volume to be harvested isn't sufficient enough to generate the revenue to pay for the post-harvest activities such as site preparation burning and planting. The costs of post-harvest activities and roads would need to be reduced and/or the timber volume would need to be increased in order for Alternative 3 to become feasible.

*Financial Efficiency*
The financial efficiency analysis is specific to the timber harvest and other activities (as directed in Forest Service Manual 2400-Timber Management and guidance found in Forest Service Handbook 2409.18). Costs for sale preparation, sale administration, regeneration, and vegetation restoration activities are included. If exact costs were not known, the maximum of the cost range was used to produce the most conservative PNV result. If actual costs are lower, all else equal, PNV would be higher than the estimates in Table 3.9-1. The expected revenue for the project is the corresponding predicted high bid from the sale feasibility analysis. The predicted high bid is used for the expected revenue (rather than the appraised stumpage rate) since the predicted high bid is the best estimate of the high bid resulting from the timber sale auction.

Because not all costs of the project are related to the timber sale, two PNVs were calculated. One PNV indicates the financial efficiency of the alternatives, including all costs and revenues associated with the timber harvest and required design criteria. A second PNV includes all costs for the alternatives with the required design criteria and for the timber harvest and all other resource activities (e.g., non-commercial thinning, prescribed burning, watershed and recreation improvements).

Results shown in Table 3.9-1 indicate that all action alternatives are financially efficient (positive PNV) for the timber harvest with designed criteria. However, they are financially inefficient (negative PNV) when the other resource activities are added to the timber harvest.

The Responsible Official takes many factors into account in making the decision. When evaluating trade-offs, the use of efficiency measures is just one factor that is considered.

*Economic Impacts*

Alternatives 2, 3, and 4 would support existing jobs through timber harvest-related and other non-commercial activities. Table 3.9-2 displays the direct, indirect and induced, and total estimates for employment (part and full-time) and labor income that may be attributed to the project. Alternative 2 would produce the most jobs and labor income, followed by Alternatives 4 and 3 (Table 3.9-2). The majority of jobs and labor income would stem from the vegetative treatments that yield timber products. Since the expenditures would occur over time, the estimated impacts of jobs and labor income would be spread out over the life of the project. It is important to note that these may not be new jobs or income, but rather jobs and income that are supported by this project.

### *Cumulative Effects*

Management of the Lolo National Forest has an impact on the economies of local counties. However, there are many additional factors that influence and affect the local economies, including changes to industry technologies, management of adjacent National Forests and private lands, economic growth and international trade. The project would provide a variety of opportunities for contracts that may contribute to the local economy and have the potential to attract new business and residents and retain existing businesses and residents.

In addition, there are other foreseeable future Forest Service projects within Mineral County and counties closest to the project area that are in various stages of planning that potentially may add to the Forest's annual timber offerings during the time of implementation of the project. These ongoing and foreseeable projects are expected to add cumulatively to the employment and income of the economic impact area within the life of the Redd Bull project.

### *Forest Plan Consistency*

Consistent with the Forest Plan, an economic analysis has been completed that includes the probable marketability (i.e. economic feasibility) of the commercial timber harvest portion of the project (Forest-wide standard 11, Forest Plan page II-11). The project also contributes to one of the Forest Plan's goals to provide a sustained yield of timber and other outputs at a level that will help to support the economic structure of local communities (Forest Plan, page II-1).

## 3.10 Roadless

Approximately 21,182 acres (26 percent) of NFS land in the Redd Bull project area overlaps 3 inventoried roadless areas (IRAs) (see maps in Appendix A):

- Marble Point (12,607 acres). Redd Bull includes the entire IRA.
- Ward Eagle (4,843 acres). Redd Bull overlaps about 57 percent of the 8,570-acre IRA.
- Sheep Mountain-Stateline (3,732 acres). Redd Bull overlaps approximately 6 percent of the 67,479-acre IRA.

The Wilderness Act of 1964 created the National Wilderness Preservation System. In addition to designating nine million acres of NFS land as wilderness, the Act directed the Secretary of Agriculture to complete a study of 34 administratively designated 'primitive areas' and determine their suitability for wilderness designation.

United States
Department of
Agriculture

Forest
Service

Medicine Bow –
Routt National
Forests &
Thunder Basin
National
Grassland

Laramie,
Wyoming

Oct 2019

# Social and Economic Report

## Medicine Bow LaVA Project

**Medicine Bow National Forest**

**Albany and Carbon Counties, Wyoming**

__/s/ Kawa Ng________________________________ _3/27/2019________

**Kawa Ng, Regional Economist** **Date**

**Rocky Mountain Regional Office**

**1617 Cole Blvd, Bldg 17, Lakewood, CO 80401**

**303-275-5152, kng@fs.fed.us**

__/s/ Delilah Jaworski___________________________ __10/7/2019_______

**Delilah Jaworski, Regional Social Scientist** **Date**

**Rocky Mountain Regional Office**

**1617 Cole Blvd, Bldg 17, Lakewood, CO 80401**

**303-275-5052, drjaworski@fs.fed.us**

The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, gender, religion, age, disability, political beliefs, sexual orientation, or marital or family status. (Not all prohibited bases apply to all programs.) Persons with disabilities who require alternative means for communication of program information (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at (202) 720-2600 (voice and TDD). To file a complaint of discrimination, write USDA, Director, Office of Civil Rights, Room 326-W, Whitten Building, 14th and Independence Avenue, SW, Washington, DC 20250-9410 or call (202) 720-5964 (voice and TDD). USDA is an equal opportunity provider and employer.

# TABLE OF CONTENTS

**Table of Contents** ... **2**
**Regulatory Framework** ... **4**
Federal Laws and Regulations ... 4
Forest Service Direction ... 4
Forest Plan Direction ... 4
Analysis Methodology ... 4
**Introduction** ... **6**
**Affected Environment** ... **6**
Key Socioeconomic Characteristics ... 6
Economic Resilience ... 7
Employment and Wages in the Area Timber Industry ... 8
Wildland-Urban Interface ... 10
Environmental Justice ... 11
Ecosystem Services ... 13
Values, Beliefs, and Attitudes ... 13
**Environmental Consequences** ... **14**
Alternative 1 - No Action ... 14
Direct and Indirect Effects – No Action ... 14
Cumulative Effects – No Action ... 18
Alternative 2 – Modified Proposed Action ... 18
Direct and Indirect Effects – Modified Proposed Action ... 18
Cumulative Effects – Modified Proposed Action ... 21
**Compliance with Regulatory Direction** ... **22**
**References** ... **23**

# List of Tables

Table 1. Key economic indicators for the two-county LaVA project area and state average (WY)....................................6

Table 2: Employment change during national recessions and recovery for the two-county LaVA project area. ................7

Table 3. Employment in timber, 2015 ..........................................................................................................................8

Table 4. Wages (in real terms, 2016) from employment in the timber industry, including sub-sectors, compared to wages from employment in all non-timber sectors combined. ..................................................................................10

Table 5. Wildfire Risk to Development, West-wide and State-wide County Rankings, 2010 ...........................................11

Table 6. Environmental justice indicators ...................................................................................................................12

Table 7: Annual average employment, labor income, and GDP contributions from timber harvest under current conditions. .................................................................................................................................................15

Table 8: Prices per Unit ...............................................................................................................................................16

Table 9: Estimated Annual Treatment Acres, No Action Alternative..............................................................................16

Table 10: Estimated Annual Costs, No Action Alternative ............................................................................................16

Table 11: Estimated Annual Revenue, No Action Alternative........................................................................................17

Table 12: Estimated Annual Treatment Acres, Modified Proposed Action ....................................................................19

Table 13: Estimated Annual Costs, Modified Proposed Action......................................................................................19

Table 14: Estimated Annual Revenue, Modified Proposed Action .................................................................................20

# Table of Figures

Figure 1: Long-term trends in timber employment as a percent of all jobs in the LaVA project area. ...............................9

Figure 2: Percent of Total Homes Built in the Wildland-Urban Interface, 2010 .............................................................11

# REGULATORY FRAMEWORK

## Federal Laws and Regulations

National Environmental Policy Act of 1969. (83 Stat. 852; 42 U.S.C. 4321, 4331-4335, 4341-4347). This act requires the use of natural and social sciences in planning and decisionmaking to fulfill the social, economic, and other requirements of present and future generations of Americans.

Multiple-Use Sustained-Yield Act of 1960. (74 Stat. 215; 16 U.S.C. 528-531). This act sets forth guiding principles for managing the resources of the National Forest System. The direction to manage these resources for the greatest good over time necessitates the use of economic and social analysis in determining management of the National Forest System.

Executive Order 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, directs federal agencies to identify and address disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority and low-income populations.

## Forest Service Direction

Forest Service Manual (FSM) 1970 provides policy and principles for conducting economic and social evaluation of programs, resource plans, and projects in the Forest Service.

Forest Service Handbook (FSH) 1909.17 discusses how the policies and guidelines set forth in FSM 1970 should be used in the evaluation of the economic and social effects of policies, programs, plans, and projects.

## Forest Plan Direction

The Medicine Bow National Forest Revised Land and Resource Management Plan (Forest Plan) has goals for social and economic conditions. The Forest Plan identifies a goal of providing multiple benefits to people, including a “sustainable level of uses, values, products, and services” (USFS 2003, pg. 1-9). This includes a sustainable supply of timber from the forest. Additionally, the plan aims to “implement vegetation management practices to reduce the threat of wildfire damage to communities and to reduce fuel loadings in the interface next to homes, cabins, and other structures” (USFS 2003, pg. 1-5).

## Analysis Methodology

In this report, economic contributions (jobs, labor income and GDP) associated with timber harvest under the Modified Proposed Action is modeled using input-output analysis. Input-output analysis is a method of examining relationships within an economy, both between businesses and between businesses and final consumers. It captures all monetary market transactions for consumption in a given time period.  The resulting mathematical representation allows one to examine the effect of a change in one or several economic activities on an entire economy, all else constant. This examination is called impact analysis. The IMPLAN® modeling system allows the user to build regional economic models of one or more counties for a particular year. The model for this analysis employed 2015’s IMPLAN data.[1]

[1] The latest licensed IMPLAN data available to US Forest Service analysts at the time of the DEIS analysis.

IMPLAN translates changes in final demand for goods and services into resulting changes in economic effects, such as labor income and employment of the affected area's economy.

The economic effects are measured by estimating the direct jobs and labor income generated by the processing of the timber volume from the project. The direct employment and labor income benefit employees and their families and, therefore, directly affect the local economy. Additional indirect and induced multiplier effects (ripple effects) are generated by the direct activities. Indirect effects are felt by the producers of materials used by the directly affected industries. Induced effects occur when employees of the directly and indirectly affected industries spend the wages they receive. Together the direct and multiplier effects comprise the total economic contributions to the local economy.

# INTRODUCTION

The description, location, purpose and need and proposed action can be found in Chapter one and two of the DEIS. This section highlights the socioeconomic conditions and key issues raised during scoping, and not a comprehensive analysis of all socioeconomic aspects of restoration in the project area. The project area is located within Albany and Carbon counties, Wyoming. The Affected Environment section summarizes the existing socioeconomic conditions for the two-county area.

# AFFECTED ENVIRONMENT

The existing economic and social conditions of the project area are necessary to set context for comparison of alternatives and consideration of the decision described in this section. Summaries of existing demographic, social and economic conditions are examined for counties within the project area (Albany and Carbon counties in Wyoming). Unless otherwise noted, sources consist of 2016 data from the U.S. Department of Commerce, Census Bureau, American Community Survey, Department of Labor and other official sources retrieved using the EPS-HDT (2016) software system maintained by Headwater Economics®. Only major trends and benchmark comparisons (State of Wyoming) are presented below; detailed data with complete, county-by-county statistics are found in the project record.

## Key Socioeconomic Characteristics

A number of indicators determine the economic health of a place. No single indicator should be used by itself. Rather, a range of indicators should be analyzed together to get a comprehensive view of the economy. Table 1. summarizes and compares key demographic and economic indicators from the study area (Albany and Carbon counties) to the benchmark area – The State of Wyoming. Indicators are organized by groups (trends, prosperity, stress, and structure) that highlight potential competitive strengths and weaknesses.

When compared to the Wyoming state average, the two-county project area experienced lower growth in population, employment, personal income, and per capita income from 2000 to 2015; but with higher growth in average earnings per job. The area also has a lower unemployment rate and a higher percentage of workers in the government sector.

Some indicators require a judgment call to decide whether they represent positive or negative well-being. For example, having a high percentage of personal income in a place in the form of non-labor income could mean that place has done a good job of attracting retirees and investment income, or, it could also mean there is very little labor income. When considering the benefits of growth, it is important to distinguish between standard of living (such as earnings per job and per capita income) and quality of life (such as leisure time, crime rate, and sense of well-being).

Table 1. Key economic indicators for the two-county LaVA project area and state average (WY)

| Group | Indicator | LaVA Project Area | Benchmark: State Average |
|---|---|---|---|
| **Trends** | Population (percent change, 2000-2015) | 12.5% | 18.6% |
| **Trends** | Employment (percent change, 2000-2015) | 11.0% | 25.5% |
| **Trends** | Personal Income (percent change, 2000-2015) | 44.9% | 66.8% |

| Group | Indicator | LaVA Project Area | Benchmark: State Average |
|---|---|---|---|
| **Trends** | Average Earnings per Job (percent change, 2000-2015) | 32.3% | 29.7% |
| **Trends** | Per Capita Income (percent change, 2000-2015) | 28.7% | 40.7% |
| **Prosperity** | Average Earnings per Job | $46,901 | $54,576 |
| **Prosperity** | Per Capita Income | $42,721 | $56,810 |
| **Prosperity** | Average Annual Wages - Services Related | $31,081 | $38,223 |
| **Prosperity** | Average Annual Wages - Non-Services Related | $63,687 | $67,861 |
| **Prosperity** | Average Annual Wages - Government Related | $49,277 | $48,609 |
| **Stress** | Unemployment Rate (change 2000-2015) | -0.4% | 0.3% |
| **Stress** | Unemployment Rate | 3.3% | 4.2% |
| **Structure** | Percent of Employment in Proprietors | 21.4% | 25.7% |
| **Structure** | Percent of Personal Income in Non-Labor | 37.1% | 41.9% |
| **Structure** | Percent of Services Related Jobs | 54.1% | 58.8% |
| **Structure** | Percent of Non-Services Related Jobs | 14.9% | 22.5% |
| **Structure** | Percent of Government Jobs | 30.5% | 18.6% |
| **Structure** | Commuting (net residential adjustment share of personal income) | 1.7% | n/a |

# Economic Resilience

One measure of economic well-being is the resilience of the local economy during periods of national recession. It is a positive sign if local employment continues to grow (or does not decline) during a recession. Another sign of economic well-being is how well the local economy recovers from a recession, measured as growth of employment from the trough (at the depth of the recession) to the peak (just before the next period of decline). Table 2 shows employment change during national recessions and as well as during recovery periods.

Table 2: Employment change during national recessions and recovery for the two-county LaVA project area.

| **Employment Change During National Recessions, 1976-2015** | **Jan '80 - July '80** | **July '81 - Nov '82** | **July '90 - Mar '91** | **Mar '01 - Nov '01** | **Dec '07 - June '09** |
|---|---|---|---|---|---|
| Employment Change (Net Jobs) | 1,798 | -1,309 | -346 | 101 | -950 |
| Employment Change (Monthly % Change) | 1.2% | -0.3% | -0.2% | 0.0% | -0.2% |
| **Employment Change During Recovery from National Recessions, 1976-2015** | **Aug '80 - June '81** | **Dec '82 - June '90** | **Apr '91 - Feb '01** | **Dec '01 - Nov '07** | **Jul '09- Dec '15** |
| Employment Change (Net Jobs) | 253 | 1,938 | 1,371 | 1,341 | 4,003 |
| Employment Change (Monthly % Change) | 0.1% | 0.1% | 0.0% | 0.1% | 0.2% |

Data Sources: U.S. Department of Labor. 2017a. Bureau of Labor Statistics, Local Area Unemployment Statistics, Washington, D.C.; National Bureau of Economic Research. 2009. U.S. Business Cycle Expansions and Contractions, Cambridge, MA

These employment data are presented for the two-county LaVA project area during the last five recession periods: January 1980 to July 1980; July 1981 to November 1982; July 1990 to March 1991; March 2001 to November 2001; and December 2007 to June 2009. Local employment continued to grow during the 1980 and 2001 recessions; while during the other three recessions, local employment declined minimally (from 0.2 to 0.3 percent).

Another sign of economic well-being is how well the local economy recovers from a recession. As shown in Table 2, local employment increased minimally during periods of recovery. As the economy of a place diversifies, it can become more resilient and less affected by economic downturns. This is particularly true of places that are able to attract in-migration, retain manufacturing, and support a high-tech economy. Government employment, including in public land agencies, can help to absorb some of the losses in private sector economic activity during a recession. The negligible changes in employment in the LaVA project area during national recession as well as recovery periods suggest that the local economy is fairly insulated from the national economy (or, isolated when viewed from a different perspective), rather than an indication of economic diversity.

# Employment and Wages in the Area Timber Industry

To understand the potential impact of the proposed action associated with this project, it is important to grasp the relative size of the timber industry and its components, how these have changed over time, and how local trends compare to trends in other geographies. The following table displays the number of jobs (full and part-time) in the timber industry, broken out by three major categories: growing and harvesting, sawmills and paper mills, and wood products manufacturing.

Table 3. Employment in timber, 2015

| Geographic Area | Carbon County, WY | Albany County, WY | LaVA Project Area | State Average |
|---|---|---|---|---|
| Total Private Employment | 4,397 | 9,892 | 14,289 | 219,881 |
| Timber | 153 | 29 | 182 | 630 |
| Growing & Harvesting | 7 | 14 | 21 | 71 |
| Forestry & Logging | 7 | 13 | 20 | 64 |
| Support Activities for Forestry | 0 | 1 | 1 | 7 |
| Sawmills & Paper Mills | 146 | 15 | 161 | 416 |
| Sawmills & Wood Preservation | 146 | 1 | 147 | 255 |
| Pulp, Paper, & Paperboard Mills | 0 | 0 | 0 | 0 |
| Veneer, Plywood, & Engineered Wood | 0 | 14 | 14 | 161 |
| Wood Products Manufacturing | 0 | 0 | 0 | 143 |
| Other Wood Product Mfg. | 0 | 0 | 0 | 141 |
| Converted Paper Product Mfg. | 0 | 0 | 0 | 2 |
| Non-Timber | 4,244 | 9,863 | 14,107 | 219,251 |

Data Sources: U.S. Department of Commerce. 2017. Census Bureau, County Business Patterns, Washington, D.C.

In 2015, 3.48 percent of Carbon County's employment was in the timber industry, while the State (WY) had 0.29 percent as a whole. Timber employment is classified in three major categories. Specifically, growing and harvesting jobs are associated with growing and harvesting of trees on a long production

FS-002171

cycle. It includes people employed in forest nurseries, as well as those involved in the cutting of trees and transportation of timber. Sawmills and paper mills are jobs associated with converting logs into lumber, boards, poles, shingles, and similar milled products. It includes those involved in the conversion of logs and chips into pulp and paper as well as the creation of veneer and plywood. And finally, wood products manufacturing includes those jobs associated with production of corrugated boxes, gum and wood chemical products, cabinets, furniture, and other wood manufactured products.

In the two-county LaVA project area, from 1998 to 2015, non-timber employment grew from 12,953 to 14,107 jobs, an 8.9 percent increase. During the same period, timber employment shrank from 460 to 182 jobs, a 60.4 percent decrease. Overall, timber represented 3.43 percent of total employment in 1998; by 2015, timber represented 1.27 percent of total employment (Figure 1). In some areas the timber industry can be a significant driver in the economy. If it is, other sectors of the economy, as well as total employment and total personal income, will likely follow trends in the timber industry. However, that is not the case in the two-county LaVA project area. Data from Table 3 and Figure 1 suggest that the local economy is growing independent of trends in the timber industry, this indicates that management actions that potentially affect the timber industry may have impacts that are limited to the local economy.




U.S. Department of Commerce. 2017. Census Bureau, County Business Patterns, Washington, D.C.

Figure 1: Long-term trends in timber employment as a percent of all jobs in the LaVA project area.

The timber industry has the potential to provide high-wage jobs, but this may differ by timber sub-sector and by geography. Table 4 shows wages (in real terms) from employment in the timber industry, including sub-sectors, compared to wages from employment in all non-timber sectors combined.

Table 4. Wages (in real terms, 2016) from employment in the timber industry, including sub-sectors, compared to wages from employment in all non-timber sectors combined.

| Geographic Area | Carbon County, WY | Albany County, WY | LaVA Project Area | State Average |
|---|---|---|---|---|
| All Sectors | $46,799 | $39,110 | $41,511 | $44,974 |
| Private | $46,798 | $32,104 | $37,236 | $43,814 |
| Timber | $29,869 | $28,864 | $29,178 | $41,127 |
| Forestry & Logging | $29,869 | n/a | $29,869 | n/a |
| Wood Products Manufacturing | n/a | $28,864 | $28,864 | $41,127 |
| Non-Timber | $38,062 | $31,138 | $33,397 | $43,639 |
| Government | $46,802 | $58,944 | $47,755 | $48,536 |

U.S. Department of Labor. 2017b. Bureau of Labor Statistics, Quarterly Census of Employment and Wages, Washington, D.C.

This table uses employment data from the Bureau of Labor Statistics, which does not report data for proprietors or the value of benefits and uses slightly different industry categories than those shown on previous pages of this report.

In 2016, timber sector average wages in forestry & logging were $29,869; while the average wages in the wood products manufacturing sector was $28,864. Some important issues to consider are how timber industry wages compare to wages in other sectors, whether some components of the timber industry pay higher wages than others, and if there are significant wage differences between geographies. The above data show that average wages in the private sector (including timber industry wages) tend to be lower in Albany County; while Carbon county's non-timber private sector wages exceeded the State average.

## Wildland-Urban Interface

The wildland-urban interface is the area where urban development contacts natural or undeveloped land. The wildland-urban interface is especially vulnerable to wildland fire. Figure 2 displays the share of homes in the wildland-urban interface in the planning area. Approximately two percent of homes in the planning area are in the wildland-urban interface. In contrast, seven percent of homes West-wide are in the wildland-urban interface (Headwaters Economics 2018, Gude et al. 2008). This indicates that the project area is less likely to have private property at risk of wildland fire than other areas in the western United States.




Source: Headwaters Economics 2018

Figure 2: Percent of Total Homes Built in the Wildland-Urban Interface, 2010

Table 5 displays the risk of wildfire for lands already developed in the wildland-urban interface (existing) and the potential risk of wildfire should homes be built on undeveloped land in the wildland-urban interface (potential). This risk is measured using the 11 western most states and their counties. There are 414 counties, therefore a rank of 1 in 414 indicates that it is considered the most at-risk county for wildland fire, whereas a rank of 414 would indicate very low risk.

Albany and Carbon counties are both rank in the top half of counties vulnerable to wildland fire. In addition, both counties have among the highest risk (both existing and potential) in the state of Wyoming.

Table 5. Wildfire Risk to Development, West-wide and State-wide County Rankings, 2010

| Geographic Area | Carbon County, WY | Albany County, WY |
|---|---|---|
| West-Wide Rank by Existing Risk | 205 of 414 | 183 of 414 |
| West-Wide Rank by Potential Risk | 128 of 414 | 159 of 414 |
| State-Wide Rank by Existing Risk | 6 of 23 | 4 of 23 |
| State-Wide Rank by Potential Risk | 2 of 23 | 5 of 23 |

Source: Headwaters Economics 2018

Therefore, while the share of homes in the wildland-urban interface is low in the project area compared to the rest of the western United States, Albany and Carbon counties have some of the highest wildfire risk to development in Wyoming.

# Environmental Justice

In 1994, President Clinton issued Executive Order 12898. This order directs federal agencies to consider the human health and environmental conditions in minority and low-income communities. The purpose of EO 12898 is to identify and address, as appropriate, disproportionately high and adverse human

health or environmental effects on minority and low-income populations (Executive Office of the President 1994).

Environmental justice is the fair treatment and meaningful involvement of people of all races, cultures, and incomes, with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies. The goal of environmental justice is for federal agency decision-makers to identify impacts that are disproportionately high and adverse with respect to minority and low-income populations and identify alternatives that will avoid or mitigate those impacts. According to USDA DR5600-002 (USDA 1997), environmental justice, minority, minority population, low-income, and human health and environmental effects, are defined as follows:

**Environmental Justice** means that, to the greatest extent practicable and permitted by law, all populations are provided the opportunity to comment before decisions are rendered on, are allowed to share in the benefits of, are not excluded from, and are not affected in a disproportionately high and adverse manner by, government programs and activities affecting human health or the environment.

**Minority** means a person who is a member of the following population groups: American Indian or Alaskan Native; Asian or Pacific Islander; Black, not of Hispanic origin; or Hispanic.

**Minority Population** means any readily identifiable group of minority persons who live in geographic proximity to, and, if circumstances warrant, migrant farm workers and other geographically dispersed/transient persons who will be similarly affected by USDA programs or activities.

**Low-Income Population** means any readily identifiable group of low-income persons who live in geographic proximity to, and, if circumstances warrant, migrant farm workers and other geographically dispersed/transient persons who will be similarly affected by USDA programs or activities. Low-income populations may be identified using data collected, maintained and analyzed by an agency or from analytical tools such as the annual statistical poverty thresholds from the Bureau of the Census' Current Population Reports, Series P-60 on Income and Poverty.

**Human Health and/or Environmental Effects** as used in this Departmental Regulation include interrelated social and economic effects.

The emphasis of environmental justice is on health effects and/or the benefits of a healthy environment. The CEQ has interpreted health effects with a broad definition: "Such effects may include ecological, cultural, human health, economic or social impacts on minority communities, low-income communities or Indian Tribes …when those impacts are interrelated to impacts on the natural or physical environment" (CEQ 1997).

Table 6 displays data on the share of low-income and minority residents in the project area.

Table 6. Environmental justice indicators

| Geographic Area | Carbon County, WY | Albany County, WY | LaVA Project Area | State Average |
|---|---|---|---|---|
| Share of People Living in Poverty | 14% | 26% | 22% | 12% |
| Share of Population Other than Non-Hispanic White | 22% | 17% | 18% | 16% |

Source: U.S. Census Bureau 2017 (from Headwaters Economics 2018)

Overall, the project area has a somewhat higher share of minority residents – those who identify as race other than "white alone" and/or as Hispanic or Latino – than Wyoming as a whole. In particular, Carbon County has a large share of Hispanic or Latino residents relative to the state.

The poverty rate in Albany County is substantially greater than the poverty rate statewide, with more than double the share of people living in poverty. The poverty rate in Carbon County is comparable to the statewide poverty rate.

These data indicate variation across the project area, but overall suggest the presence of environmental justice communities. The environmental consequences analysis will consider the potential for Forest Service management actions to disproportionately and adversely affect low-income and minority populations.

# Ecosystem Services

The project area provides numerous ecosystem services, including water, timber, forage for livestock, recreation opportunities, and wildlife habitat.

Water resources from the project area contribute to municipal water supplies and wells, irrigation, recreation, stock water facilities, wildlife habitat, and aesthetic and spiritual values. Rob Roy Reservoir, Lake Owen, and Hog Park Reservoir provide water for the City of Cheyenne’s public water supply. Runoff from the project area provides drinking water to a number of communities, including Albany, Baggs, Centennial, Dixon, Elk Mountain, Encampment, Jelm, Laramie, Medicine Bow, Riverside, Rock River, Ryan Park and Savery. The hydrology specialist report describes watershed, wetland, and stream health in the project area in detail.

The project area provides timber and other forest products. Insect infestations have caused large-scaled mortality on the Medicine Bow National Forest. The silviculture specialist report describes vegetation types and disturbances in the project area. As noted above, the project area has a relatively high share of employment in timber-related sectors compared to the state. However, the share of timber employment declined considerably between 1998 and 2015.

Cattle, horses, and domestic sheep herds graze on lands in the Brush Creek/Hayden and Laramie ranger districts. Both forage and water supplies in the project area contribute to the financial feasibility of livestock grazing. Public land livestock grazing contributes to both economic well-being and the maintenance of ranching culture and heritage.

The project area supports a variety of developed and primitive recreation opportunities, as described in the recreation specialist report. Tree mortality in the project area due to insects and disease create both safety and access problems for recreational users. Furthermore, the visibility of dead trees across the landscape contributes to a loss of aesthetic values for recreational users.

A number of socially-valued species are present in the project area, including the threatened Canada lynx. Habitat that supports wildlife populations contributes to human well-being in a number of ways, including opportunities for wildlife viewing, hunting, or the value of simply knowing that particular species exist. The wildlife specialist report describes how insect and disease outbreaks in the project area affect species and their habitat.

# Values, Beliefs, and Attitudes

**Values** are “relatively general, yet enduring, conceptions of what is good or bad, right or wrong, desirable or undesirable.”

**Beliefs** are “judgments about what is true or false – judgments about what attributes are linked to a given object. Beliefs can also link actions to effects.”

**Attitudes** are “tendencies to react favorably or unfavorably to a situation, individual, object, or concept. They arise in part from a person’s values and beliefs regarding the attitude object” (Allen et al. 2009).

While many comments agreed with the Agency's concern with tree mortality due to insect and disease outbreaks in the project area and shared a desire to improve forest health, comments revealed differing beliefs about the appropriate management response. One comment noted that, "I have seen what logging on this scale can do. Real estate values plummet, businesses will suffer, roads closed and logging truck traffic. Some types of wildlife habitat will improve and some wildlife will all but disappear. Ask a pine marten how he feels about the 'improvement'. There will be a select few logging contractors who will benefit greatly but the people who use the MBNF will be the big losers" (Scoping Letter #2).

Several comments expressed concern with the Medicine Bow National Forest's road system, contending that: "The Forest Service's current road system is over-sized and unaffordable. Identifying a sustainable future road system is one of the most important endeavors the Forest Service can undertake to restore aquatic systems and wildlife habitat, facilitate adaptation to climate change, enhance recreation, and lower operating expenses" (Scoping Letter #3). The comment further noted that temporary roads would allow for "harassment of wildlife, segmenting of habitat, littering, fires, invasive plant distribution, and negative impacts to aquatic and riparian habitat, as well as the fish that depend on that habitat" (Scoping Letter #3).

Other comments requested avoiding treatment activities in proximity to the Platte River Wilderness, Savage Run Wilderness, and BLM's Prospect Mountain Wilderness Study Area, noting that this area "is critical wildlife habitat and forest on the West side of the North Platte River" and provides a connection between these wilderness areas and BLM's wilderness study area (Scoping Letter #5).

# ENVIRONMENTAL CONSEQUENCES

## Alternative 1 - No Action

The National Environmental Policy Act (NEPA) requires the study of the No Action Alternative and directs that this alternative be used as a basis for comparing the effects of the Proposed Action.

The No Action Alternative assumes that the Modified Proposed Action would not be implemented within the analysis area. Current management plans would guide management of the project area and ongoing management programs would be implemented. Current management programs, such as timber sales, watershed and wildlife habitat restoration, and fuels management would continue at levels similar to those that have occurred over the past 15 years (since 2003). Other projects would proceed under separate NEPA analyses or authorities.

### Direct and Indirect Effects – No Action

#### *Regional Economic Contributions*

Ongoing forest management activities and planned harvests would continue to occur, including timber currently scheduled for sale, and those that have been sold but not yet cut. Commercial timber harvest would be expected to continue at a rate consistent with that of the past 15 years.

In order to meaningfully consider the contributions stemming from this project, an economic impact analysis is conducted here for the No Action Alternative to reflect planned timber harvests for the National Forest unit under existing condition. The IMPLAN® modeling software and data system is used for this economic impacts analysis – for estimating direct and indirect employment, labor income and contributions to GDP associated with timber harvest and processing in the regional economy. The study area used is as shown in the Affected Environment section.

Ground condition as well as budgetary limitations will ultimately dictate the amount of products removed, but current estimate of potential timber volume to be harvested commercially is between 40 thousand CCF and 50 thousand CCF annually over the next 15 years. Given these specifications, the project area is estimated to support approximately 190 – 250 jobs, $7.7 - $9.8 million in total labor income, and $10 – 12.7 million in GDP contribution for the local economy on an annual average basis. Table 7 displays the direct, indirect and induced, and total estimates for employment (part and full-time), labor income and GDP contribution under existing condition. It is important to note that these are not new jobs or income, but rather existing jobs and income in the regional economy that are supported or sustained by National Forest timber management.

The direct employment and labor income benefit employees and their families and, therefore, directly affect the local economy. Additional indirect and induced multiplier effects (ripple effects) are generated by the direct activities. Indirect effects are felt by the producers of materials used by the directly affected industries. Induced effects occur when employees of the directly and indirectly affected industries spend the wages they receive. Together the direct and multiplier effects comprise the total economic contributions to the local economy.

Table 7: Annual average employment, labor income, and GDP contributions from timber harvest under current conditions.

| **Effect** | **Employment** |
|---|---|
| Direct | 107 - 136 |
| Indirect and Induced | 87 - 111 |
| **Total** | **194 - 247** |
| **Effect** | **Labor Income (2017$)** |
| Direct | $4,937,106 – $6,254,624 |
| Indirect and Induced | $2,777,940 – $3,550,898 |
| **Total** | **$7,715,045 – $9,805,522** |
| **Effect** | **Contribution to GDP (2017$)** |
| Direct | $4,998,857 – $ 6,331,345 |
| Indirect and Induced | $5,036,346 – $ 6,436,577 |
| **Total** | **$10,035,203 – $12,767,921** |

*Employment is the total full- and part-time wage, salaried, and self-employed jobs in the region.

**Labor income includes the wages, salaries and benefits of workers who are paid by employers and income paid to proprietors.

All estimates above are the expected economic contributions stemming from planned timber harvests on the National Forest unit in the next decade. Note that if future harvest levels were to drop, then the associated economic contributions would also decrease accordingly. Based upon silvicultural and resource management planning expectations, the upper-end employment / income / GDP values likely represent contribution in the first part of the decade (year 1 – 5); while the lower end values likely represent contribution during the second half of the decade (year 6 – 10). Also note that economic contribution estimates are expressed in terms of annual averages, therefore, year-to-year results might vary.

### *Financial Efficiency*

Under the No Action Alternative, approximately 5,000 acres per year would be treated in the project area using timber sales, pre-commercial thinning, weed and release treatments, prescribed fire, and fuels treatments. These activities are expected to cost the agency approximately $5,000,000 to implement and would produce approximately $400,000 in revenue from stumpage receipts per year.

Table 8: Prices per Unit

| Prices per Unit | Unit | Price |
|---|---|---|
| Timber sale prep | ccf | $50 |
| Timber sale admin | ccf | $8 |
| Stumpage receipts | ccf | $8.66 |
| Pre-commercial thinning | acre | $300 |
| Weed & release treatments | acre | $150 |
| Prescribed fire | acre | $350 |
| Fuels treatments | acre | $600 |
| Watershed and wildlife habitat restoration (Rx $500, mech $2000) | acre | $1,250 |

Table 9: Estimated Annual Treatment Acres, No Action Alternative

| Estimated Treatment Acres | No Action Alternative |
|---|---|
| Timber harvest | 1,352 |
| *Avg Annual Volume Cut (ccf)* | *45,000* |
| Pre-commercial thinning | 334 |
| Weed & release treatments | 62 |
| Prescribed fire | 1,000 |
| Fuels treatments | 2,017 |
| Watershed and wildlife habitat restoration | 124 |
| *Total annual acres* | *4,889* |
| *15-year total* | *73,335* |

Table 10: Estimated Annual Costs, No Action Alternative

| Estimated Annual Costs | No Action Alternative |
|---|---|
| Timber sale prep | $2,250,000 |
| Timber sale administration | $360,000 |
| Road maintenance | $576,000 |
| Pre-commercial thinning | $100,000 |
| Weed & release treatments | $9,000 |
| Prescribed fire | $350,000 |

| Estimated Annual Costs | No Action Alternative |
|---|---|
| Fuels treatments | $1,210,000 |
| Habitat improvement | $155,000 |
| AVERAGE ANNUAL TOTAL | $5,010,000 |

Table 11: Estimated Annual Revenue, No Action Alternative

| Estimated Annual Revenue | No Action Alternative |
|---|---|
| Stumpage receipts | $389,700 |

### *Ecosystem Services*

The No Action Alternative would not accelerate forest restoration in the project area. The risk of wildfire, insect infestations, and disease would continue in the project area. Wildfire and other disturbances could affect a number of ecosystem services and infrastructure on the forest. Water supplies to Cheyenne, Laramie, and other communities that rely on the forest for water could have their supplies adversely affected. Smoke emissions, damage to infrastructure, and the risk of falling trees due to fire, insects, and disease could displace recreationists and other forest users. These consequences are described in more detail in other specialist reports, including fire and fuels, range, recreation, and soils.

### *Wildland-Urban Interface*

Development is expected to continue in the project area's wildland-urban interface, which would increase the number of people exposed to health and safety risks due to fire, insects, and disease. Fire would continue to threaten homes, businesses, and infrastructure in the wildland-urban interface. Forest disturbances would also continue to pose public health and safety concerns due to fire, smoke emissions, and the risk of falling trees. The No Action Alternative would not contribute to achieving desired conditions for forest health in the project area and forest disturbances, including fire, insects, and disease would continue to affect the wildland-urban interface.

### *Environmental Justice*

As described in the affected environment section, the project area has a relatively high share of minority and low income residents. Minority and low income residents may experience differential exposure to wildland fire, changes in employment opportunities, or changes in the provision of ecosystem services.

The No Action Alternative would not contribute to achieving desired conditions for fire and fuels. Wildland fire would continue to threaten human safety and property in the project area. Low income individuals have fewer resources to engage in averting behavior (e.g., leaving town during a wildfire to avoid smoke emissions). However, since the vast majority of homes in the wildland-urban interface in the project area are second homes, the individuals with the highest exposure to wildfire risk are expected to be relatively affluent (Headwaters Economics 2018).

The No Action Alternative would not affect employment or labor income in the project area relative to current conditions. Therefore, no disproportionate or adverse effects related to changes in economic opportunities would occur as a result of this alternative.

The provision of ecosystem services may be affected by the No Action Alternative, however, these effects would not disproportionately affect low income and minority residents. The effects to low income and minority populations are expected to be consistent with those described above in the "ecosystem services" portion of this analysis above.

## Cumulative Effects – No Action

Reasonably foreseeable projects include:

- Battle Mountain Prescribed Burn CE (Carbon County) – prescribed burn
- North Savery EIS (Carbon County) – hazard tree clearing, precommercial thinning and salvage harvest, road proposals
- Ryan Park Vegetation and Fuels CE (Albany and Carbon counties) – hazardous fuels treatment
- West Side Snowy Range Travel Management EA (Carbon County) – modify road and trail system
- Fox Creek Vegetation Management CE (Albany County) – treat Mountain Pine Beetle infested stands
- Owen Timber Sale Additional Treatment in Cheyenne BoPU Catchments CE (Albany County) – hazardous fuels treatment

Past and on-going activities, including fuels treatment, hazard tree removal, road and trail system management, and timber harvest activities affect social and economic conditions in the project area. The employment and labor income associated with current and planned timber harvest activities are described as part of the direct and indirect effects analysis.

Reasonably foreseeable activities may reduce the risk of falling trees and wildfire relative to current conditions, but these activities are insufficient to move toward desired conditions (per fire and fuels specialist report). The No Action Alternative would not contribute to achieving desired conditions. Wildfire, smoke emissions, and falling trees would continue to pose safety risks and potentially displace recreation visitors, nearby residents, and other forest users.

# Alternative 2 – Modified Proposed Action

The Forest Service proposes to conduct vegetation management activities on National Forest System lands, including inventoried roadless areas, within the Sierra Madre and Snowy Range mountain ranges of the Medicine Bow National Forest. Vegetation management activities, including prescribed fire, mechanical, and hand treatment methods could be applied on up to 360,000 acres to make areas more resilient to future disturbance; protect, restore, and enhance forest ecosystem components; supply forest products to local industries; provide for human safety; reduce wildfire risk to communities, infrastructure, and municipal water supplies; and improve, protect, and restore wildlife habitat. Specific treatments would be developed and authorized for implementation over a 15-year period beginning in 2020. A combination of commercial timber sales, service contracts, cooperative authorities, partner capacity, and Forest Service crews would be used to implement the project.

## Direct and Indirect Effects – Modified Proposed Action

### *Regional Economic Contributions*

An economic impact analysis is conducted here to include planned timber harvests for the National Forest unit with the implementation of the Modified Proposed Action. The IMPLAN® modeling software and data system is used for this economic impacts analysis – for estimating direct and indirect employment, labor income and contributions to GDP associated with timber harvest and processing in the regional economy. The study area used is as shown in the Affected Environment section.

Under the Modified Proposed Action, timber harvest is estimated at approximately 325,000 ccf per year for the first 6.5 years and 190,000 ccf per year for the latter 8.5 years. This is estimated to support approximately 1,585 jobs, $63 million in total labor income, and $82 million in GDP contributions for the

local economy annually for the first 6.5 years and 925 jobs, $37 million in total labor income, and $48 million in GDP contributions for the latter 8.5 years of project implementation.

Ground condition as well as budgetary limitation will ultimately dictate the amount of products removed. Note that if future harvest levels were to drop – commercial volume associated with LaVA or otherwise – then the associated economic contributions would also decrease accordingly.

It should be noted that IMPLAN's method of reporting employment as annual averages means that one cannot discern the number of hours worked or the proportion that is full time vs. part time. This method of accounting means that one job lasting 12 months = two jobs lasting six months each = three jobs lasting four months each. Each of those examples would appear as one job in IMPLAN and as reflected by the above results.

It is also important to note that there may be additional jobs, labor income and GDP contributions associated with other restoration related activities (those without product removal components). Because restoration firms also incur various expenditures (labor costs, fuel, equipment, etc.) associated with MBNF contracted activities. The direct ecosystem restoration employment and labor income benefit employees and their families; while additional indirect and induced multiplier effects (ripple effects) are generated by, or associated with various direct restoration activities, from mechanical and manual fuel treatments, to thinning or burning understory vegetation.

### *Financial Efficiency*

Under the Modified Proposed Action, approximately 24,000 acres per year would be treated in the project area using timber sales, pre-commercial thinning, weed and release treatments, prescribed fire, and fuels treatments. These activities are expected to cost the agency approximately $19,000,000 to implement and would produce approximately $2,000,000 in revenue from stumpage receipts per year. The Modified Proposed Action was developed in consultation with partner agencies. In addition to Forest Service activities and expenditures under this alternative, partners would conduct additional activities that would increase the pace and scale of forest restoration.

Table 12: Estimated Annual Treatment Acres, Modified Proposed Action

| Estimated Annual Treatment Acres | Modified Proposed Action |
|---|---|
| Timber harvest | 16,300 |
| *Avg Annual Volume Cut (ccf)* | *245,000* |
| Pre-commercial thinning | 334 |
| Weed & release treatments | 300 |
| Prescribed fire | 2,500 |
| Fuels treatments | 4,000 |
| Watershed and wildlife habitat restoration | 400 |
| *Total annual acres* | *23,834* |
| *15-year total* | *357,510* |

Table 13: Estimated Annual Costs, Modified Proposed Action

| Estimated Annual Costs | No Action Alternative | Modified Proposed Action |
|---|---|---|
| Timber sale prep | $2,250,000 | $12,250,000 |

| Estimated Annual Costs | No Action Alternative | Modified Proposed Action |
|---|---|---|
| Timber sale administration | $360,000 | $1,960,000 |
| Road maintenance* | $576,000 | $672,000 |
| Pre-commercial thinning | $100,000 | $100,000 |
| Weed & release treatments | $9,000 | $45,000 |
| Prescribed fire | $350,000 | $875,000 |
| Fuels treatments | $1,210,000 | $2,400,000 |
| Habitat improvement (Rx fire & mech treatment) | $155,000 | $250,000** |
| AVERAGE ANNUAL TOTAL | $5,010,000 | $18,552,000 |

*Road maintenance includes only system road (ML1-5) maintenance costs. Temporary road costs are assumed to be covered by timber sale contracts.

**This is the FS share of costs only. Assume partners pay for half under the modified proposed action.

Table 14: Estimated Annual Revenue, Modified Proposed Action

| Estimated | Modified Proposed Action |
|---|---|
| Stumpage receipts | $2,121,700 |

The costs of project implementation would exceed Agency revenues from the project. However, the project would also produce indirect benefits. The Modified Proposed Action would increase the options to respond to high intensity and high severity fire that threatens values at-risk, including human safety and property. The costs of a single large fire routinely cost millions of dollars in direct suppression expenditures alone. Researchers have evaluated the financial returns to ecological restoration and hazardous fuel reduction treatments. Thompson and others address whether fuel treatments can pay for themselves via reduced fire suppression costs (Thompson et al. 2017). They find that large-scale fuel treatments are necessary to meaningfully affect wildfire risk and hazard. They note that "due to the relative rarity of fire and corresponding rarity of fire-treatment interactions, median annual savings in avoided suppression costs will be zero" (Thompson et al. 2017, pg. 7). However, their modeling suggests that over time fuel treatments can pay for themselves through reduced suppression spending, but that uncertainty related to location, intensity, and other characteristics of fire events complicate the analysis of return on investment.

Furthermore, the Modified Proposed Action would affect ecosystem services, which benefit people who live near the project area or who otherwise value the forest. The ecosystem services analysis below describes the non-monetary benefits of the project.

### *Ecosystem Services*

The Modified Proposed Action would contribute to forest restoration in the project area. Forest restoration is expected to provide more options to respond to high intensity and high severity wildland fire, and address insect infestation and disease in the project area. The Modified Proposed Action would enhance and protect a number of ecosystem services and infrastructure on the forest. Water supplies to Cheyenne, Laramie, and other communities that rely on the forest for water would be less likely to experience negative shocks to water quality or quantity than under the No Action Alternative. Smoke emissions, damage to infrastructure, and the risk of falling trees due to fire, insects, and disease, which displace recreationists, livestock operations, and other forest users would be less likely under the Modified Proposed Action than the No Action Alternative. These consequences are described in more detail in other specialist reports, including fire and fuels, range, recreation, and soils.

However, proposed project activities also have the potential to damage ecosystem services. Roads and skid trails could increase sedimentation. Vegetation management activities in inventoried roadless areas may interfere with visitors' sense of solitude in these areas. These consequences are described in more detail in other specialist reports, including recreation and soils.

### *Wildland-Urban Interface*

Development is expected to continue in the project area's wildland-urban interface, which would increase the number of people exposed to health and safety risks due to fire, insects, and disease. Fire would continue to threaten homes, businesses, and infrastructure in the wildland-urban interface. Forest disturbances would also continue to pose public health and safety concerns due to fire, smoke emissions, and the risk of falling trees. The Modified Proposed Action would prioritize restoration treatments in the wildland-urban interface to reduce the likelihood that wildfire would threaten lives and property. The Modified Proposed Action would reduce threats to property and human safety relative to the No Action Alternative.

### *Environmental Justice*

As described in the affected environment section, the project area has a relatively high share of minority and low income residents. Minority and low income residents may experience differential exposure to wildland fire, changes in employment opportunities, or changes in the provision of ecosystem services.

The Modified Proposed Action could affect the potential for wildland fire to threaten human safety and property in the project area. The Modified Proposed Action would authorize restoration activities across the forest. Low income individuals have fewer resources to engage in averting behavior (e.g., leaving town during a wildfire to avoid smoke emissions). However, since the vast majority of homes in the wildland-urban interface in the project area are second homes, the individuals with the highest exposure to wildfire risk are expected to be relatively affluent (Headwaters Economics 2018).

The Modified Proposed Action would support employment and labor income in the project area, as described in the "regional economic contributions" section above. Low income individuals may particularly benefit from new economic opportunities in the project area. However, it is unknown whether those jobs would provide opportunities to currently unemployed or underemployed individuals.

The provision of ecosystem services may be affected by the Modified Proposed Action Alternative, however, these effects would not disproportionately affect low income and minority residents. The effects to low income and minority populations are expected to be consistent with those described above in the "ecosystem services" portion of this analysis above.

## Cumulative Effects – Modified Proposed Action

Reasonably foreseeable projects include:

- Battle Mountain Prescribed Burn CE (Carbon County) – prescribed burn
- North Savery EIS (Carbon County) – hazard tree clearing, precommercial thinning and salvage harvest, road proposals
- Ryan Park Vegetation and Fuels CE (Albany and Carbon counties) – hazardous fuels treatment
- West Side Snowy Range Travel Management EA (Carbon County) – modify road and trail system
- Fox Creek Vegetation Management CE (Albany County) – treat Mountain Pine Beetle infested stands

- Owen Timber Sale Additional Treatment in Cheyenne Board of Public Utilities Catchments CE (Albany County) – hazardous fuels treatment

Past and on-going activities, including fuels treatment, hazard tree removal, road and trail system management, and timber harvest activities affect social and economic conditions in the project area. The employment and labor income associated with current and planned timber harvest activities, as well as proposed LaVA activities, are described as part of the direct and indirect effects analysis.

Reasonably foreseeable activities may reduce the risk of falling trees and wildfire relative to current conditions. These reasonably foreseeable activities complement the Modified Proposed Action Alternative to move toward desired conditions (per fire and fuels specialist report). The cumulative effect of the Modified Proposed Action Alternative and reasonably foreseeable activities would reduce the safety risks and potential displacement of forest users associated with falling trees. Fuel reduction activities could reduce the potential for smoke emissions to displace or adversely affect forest users and nearby residents and reduce the risk of damage to infrastructure and important ecosystem services (e.g., public water supplies).

# COMPLIANCE WITH REGULATORY DIRECTION

This analysis complies with law, regulation, and policy, which direct the Forest Service to evaluate and disclose social and economic effects, including environmental justice consequences, associated with the agency's policies, programs, plans, and projects.

The Modified Proposed Action is consistent with Forest Plan goals to provide sustainable levels of forest goods and services and to reduce the threat of wildfire damage to communities. The Forest Plan does not identify standards and guidelines specific to social and economic conditions.

# REFERENCES

Allen, Stewart D., Wickwar, Denise A., Clark, Fred P., Potts, Robert, & Snyder, Stephanie A. 2009. Values, Beliefs, and Attitudes Technical Guide for Forest Service Land and Resource Management, Planning, and Decisionmaking. USDA Forest Service General Technical Report, PNW-GTR-788.

Council on Environmental Quality (CEQ). 1997. Environmental Justice Guidance under the National Environmental Policy Act. Accessed March 6, 2018 from <https://www.epa.gov/environmentaljustice/ceq-environmental-justice-guidance-under-national-environmental-policy-act>.

Executive Office of the President. 1994. Executive Order 12898: Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations. Accessed March 6, 2018 from <https://www.archives.gov/files/federal-register/executive-orders/pdf/12898.pdf>.

Gude, P.H., Rasker, R., and van den Noort, J. 2008. Potential for Future Development on Fire-Prone Lands. Journal of Forestry 106(4):198-205.

Headwaters Economics. 2018. Economic Profile System. Accessed March 6, 2018 from <https://headwaterseconomics.org/tools/economic-profile-system>.

National Bureau of Economic Research. 2010. U.S. business cycle expansions and contractions. Retrieved from https://www.nber.org/cycles.html

Thompson, M.P., K.L. Riley, D. Loeffler, and J.R. Haas. (2017). Evaluating Spatiotemporal Tradeoffs under Alternative Fuel Management and Suppression Policies: measuring returns on investment. Boise, ID: Joint Fire Science Program. 38 p.

U.S. Census Bureau. 2017. American Community Survey. Accessed February 13, 2018 from <https://headwaterseconomics.org/tools/economic-profile-system>.

U.S. Department of Agriculture. 1997. Departmental Regulation: Environmental Justice. Accessed March 6, 2018 from <https://www.aphis.usda.gov/regulations/pdfs/compliance/5600-002.pdf>.

U.S. Department of Agriculture, Forest Service (USFS). 2003. Medicine Bow National Forest Revised Land and Resource Management Plan. Laramie, WY. 65 p.

U.S. Department of Commerce. 2017. County business patterns. Retrieved from <https://headwaterseconomics.org/tools/economic-profile-system>.

U.S. Department of Labor. 2017a. Local Area Unemployment Statistics. Bureau of Labor Statistics. Washington, D.C. Accessed February 13, 2018 from <https://headwaterseconomics.org/tools/economic-profile-system>.

U.S. Department of Labor. 2017b. Quarterly Census of Employment and Wages. Bureau of Labor Statistics. Washington, D.C. Accessed February 13, 2018 from <https://headwaterseconomics.org/tools/economic-profile-system>.

# Summary for Policymakers

Case No. 1:23-cv-01501-RMR Document 15-6 filed 09/29/23 USDC Colorado pg 240 of 278





SPM

# Summary for Policymakers

**Drafting Authors:**

Myles Allen (UK), Mustafa Babiker (Sudan), Yang Chen (China), Heleen de Coninck (Netherlands/EU), Sarah Connors (UK), Renée van Diemen (Netherlands), Opha Pauline Dube (Botswana), Kristie L. Ebi (USA), Francois Engelbrecht (South Africa), Marion Ferrat (UK/France), James Ford (UK/Canada), Piers Forster (UK), Sabine Fuss (Germany), Tania Guillén Bolaños (Germany/Nicaragua), Jordan Harold (UK), Ove Hoegh-Guldberg (Australia), Jean-Charles Hourcade (France), Daniel Huppmann (Austria), Daniela Jacob (Germany), Kejun Jiang (China), Tom Gabriel Johansen (Norway), Mikiko Kainuma (Japan), Kiane de Kleijne (Netherlands/EU), Elmar Kriegler (Germany), Debora Ley (Guatemala/Mexico), Diana Liverman (USA), Natalie Mahowald (USA), Valérie Masson-Delmotte (France), J. B. Robin Matthews (UK), Richard Millar (UK), Katja Mintenbeck (Germany), Angela Morelli (Norway/Italy), Wilfran Moufouma-Okia (France/Congo), Luis Mundaca (Sweden/Chile), Maike Nicolai (Germany), Chukwumerije Okereke (UK/Nigeria), Minal Pathak (India), Antony Payne (UK), Roz Pidcock (UK), Anna Pirani (Italy), Elvira Poloczanska (UK/Australia), Hans-Otto Pörtner (Germany), Aromar Revi (India), Keywan Riahi (Austria), Debra C. Roberts (South Africa), Joeri Rogelj (Austria/Belgium), Joyashree Roy (India), Sonia I. Seneviratne (Switzerland), Priyadarshi R. Shukla (India), James Skea (UK), Raphael Slade (UK), Drew Shindell (USA), Chandni Singh (India), William Solecki (USA), Linda Steg (Netherlands), Michael Taylor (Jamaica), Petra Tschakert (Australia/Austria), Henri Waisman (France), Rachel Warren (UK), Panmao Zhai (China), Kirsten Zickfeld (Canada).

**This Summary for Policymakers should be cited as:**

IPCC, 2018: Summary for Policymakers. In: *Global Warming of 1.5°C. An IPCC Special Report on the impacts of global warming of 1.5°C above pre-industrial levels and related global greenhouse gas emission pathways, in the context of strengthening the global response to the threat of climate change, sustainable development, and efforts to eradicate poverty* [Masson-Delmotte, V., P. Zhai, H.-O. Pörtner, D. Roberts, J. Skea, P.R. Shukla, A. Pirani, W. Moufouma-Okia, C. Péan, R. Pidcock, S. Connors, J.B.R. Matthews, Y. Chen, X. Zhou, M.I. Gomis, E. Lonnoy, T. Maycock, M. Tignor, and T. Waterfield (eds.)]. In Press.

FS-002189

# Introduction

This Report responds to the invitation for IPCC '... to provide a Special Report in 2018 on the impacts of global warming of 1.5°C above pre-industrial levels and related global greenhouse gas emission pathways' contained in the Decision of the 21st Conference of Parties of the United Nations Framework Convention on Climate Change to adopt the Paris Agreement.[1]

The IPCC accepted the invitation in April 2016, deciding to prepare this Special Report on the impacts of global warming of 1.5°C above pre-industrial levels and related global greenhouse gas emission pathways, in the context of strengthening the global response to the threat of climate change, sustainable development, and efforts to eradicate poverty.

This Summary for Policymakers (SPM) presents the key findings of the Special Report, based on the assessment of the available scientific, technical and socio-economic literature[2] relevant to global warming of 1.5°C and for the comparison between global warming of 1.5°C and 2°C above pre-industrial levels. The level of confidence associated with each key finding is reported using the IPCC calibrated language.[3] The underlying scientific basis of each key finding is indicated by references provided to chapter elements. In the SPM, knowledge gaps are identified associated with the underlying chapters of the Report.

# A. Understanding Global Warming of 1.5°C[4]

**A.1 Human activities are estimated to have caused approximately 1.0°C of global warming[5] above pre-industrial levels, with a *likely* range of 0.8°C to 1.2°C. Global warming is *likely* to reach 1.5°C between 2030 and 2052 if it continues to increase at the current rate. (*high confidence*) (Figure SPM.1) {1.2}**

A.1.1 Reflecting the long-term warming trend since pre-industrial times, observed global mean surface temperature (GMST) for the decade 2006–2015 was 0.87°C (*likely* between 0.75°C and 0.99°C)[6] higher than the average over the 1850–1900 period (*very high confidence*). Estimated anthropogenic global warming matches the level of observed warming to within ±20% (*likely range*). Estimated anthropogenic global warming is currently increasing at 0.2°C (*likely* between 0.1°C and 0.3°C) per decade due to past and ongoing emissions (*high confidence*). {1.2.1, Table 1.1, 1.2.4}

A.1.2 Warming greater than the global annual average is being experienced in many land regions and seasons, including two to three times higher in the Arctic. Warming is generally higher over land than over the ocean. (*high confidence*) {1.2.1, 1.2.2, Figure 1.1, Figure 1.3, 3.3.1, 3.3.2}

A.1.3 Trends in intensity and frequency of some climate and weather extremes have been detected over time spans during which about 0.5°C of global warming occurred (*medium confidence*). This assessment is based on several lines of evidence, including attribution studies for changes in extremes since 1950. {3.3.1, 3.3.2, 3.3.3}

1 Decision 1/CP.21, paragraph 21.

2 The assessment covers literature accepted for publication by 15 May 2018.

3 Each finding is grounded in an evaluation of underlying evidence and agreement. A level of confidence is expressed using five qualifiers: very low, low, medium, high and very high, and typeset in italics, for example, *medium confidence*. The following terms have been used to indicate the assessed likelihood of an outcome or a result: virtually certain 99–100% probability, very likely 90–100%, likely 66–100%, about as likely as not 33–66%, unlikely 0–33%, very unlikely 0–10%, exceptionally unlikely 0–1%. Additional terms (extremely likely 95–100%, more likely than not >50–100%, more unlikely than likely 0–<50%, extremely unlikely 0–5%) may also be used when appropriate. Assessed likelihood is typeset in italics, for example, *very likely*. This is consistent with AR5.

4 See also Box SPM.1: Core Concepts Central to this Special Report.

5 Present level of global warming is defined as the average of a 30-year period centred on 2017 assuming the recent rate of warming continues.

6 This range spans the four available peer-reviewed estimates of the observed GMST change and also accounts for additional uncertainty due to possible short-term natural variability. {1.2.1, Table 1.1}

**A.2 Warming from anthropogenic emissions from the pre-industrial period to the present will persist for centuries to millennia and will continue to cause further long-term changes in the climate system, such as sea level rise, with associated impacts (*high confidence*), but these emissions alone are *unlikely* to cause global warming of 1.5°C (*medium confidence*). (Figure SPM.1) {1.2, 3.3, Figure 1.5}**

A.2.1 Anthropogenic emissions (including greenhouse gases, aerosols and their precursors) up to the present are *unlikely* to cause further warming of more than 0.5°C over the next two to three decades (*high confidence*) or on a century time scale (*medium confidence*). {1.2.4, Figure 1.5}

A.2.2 Reaching and sustaining net zero global anthropogenic $CO_2$ emissions and declining net non-$CO_2$ radiative forcing would halt anthropogenic global warming on multi-decadal time scales (*high confidence*). The maximum temperature reached is then determined by cumulative net global anthropogenic $CO_2$ emissions up to the time of net zero $CO_2$ emissions (*high confidence*) and the level of non-$CO_2$ radiative forcing in the decades prior to the time that maximum temperatures are reached (*medium confidence*). On longer time scales, sustained net negative global anthropogenic $CO_2$ emissions and/or further reductions in non-$CO_2$ radiative forcing may still be required to prevent further warming due to Earth system feedbacks and to reverse ocean acidification (*medium confidence*) and will be required to minimize sea level rise (*high confidence*). {Cross-Chapter Box 2 in Chapter 1, 1.2.3, 1.2.4, Figure 1.4, 2.2.1, 2.2.2, 3.4.4.8, 3.4.5.1, 3.6.3.2}

**A.3 Climate-related risks for natural and human systems are higher for global warming of 1.5°C than at present, but lower than at 2°C (*high confidence*). These risks depend on the magnitude and rate of warming, geographic location, levels of development and vulnerability, and on the choices and implementation of adaptation and mitigation options (*high confidence*). (Figure SPM.2) {1.3, 3.3, 3.4, 5.6}**

A.3.1 Impacts on natural and human systems from global warming have already been observed (*high confidence*). Many land and ocean ecosystems and some of the services they provide have already changed due to global warming (*high confidence*). (Figure SPM.2) {1.4, 3.4, 3.5}

A.3.2 Future climate-related risks depend on the rate, peak and duration of warming. In the aggregate, they are larger if global warming exceeds 1.5°C before returning to that level by 2100 than if global warming gradually stabilizes at 1.5°C, especially if the peak temperature is high (e.g., about 2°C) (*high confidence*). Some impacts may be long-lasting or irreversible, such as the loss of some ecosystems (*high confidence*). {3.2, 3.4.4, 3.6.3, Cross-Chapter Box 8 in Chapter 3}

A.3.3 Adaptation and mitigation are already occurring (*high confidence*). Future climate-related risks would be reduced by the upscaling and acceleration of far-reaching, multilevel and cross-sectoral climate mitigation and by both incremental and transformational adaptation (*high confidence*). {1.2, 1.3, Table 3.5, 4.2.2, Cross-Chapter Box 9 in Chapter 4, Box 4.2, Box 4.3, Box 4.6, 4.3.1, 4.3.2, 4.3.3, 4.3.4, 4.3.5, 4.4.1, 4.4.4, 4.4.5, 4.5.3}

## Cumulative emissions of $CO_2$ and future non-$CO_2$ radiative forcing determine the probability of limiting warming to 1.5°C




**Figure SPM.1 |** Panel a: Observed monthly global mean surface temperature (GMST, grey line up to 2017, from the HadCRUT4, GISTEMP, Cowtan–Way, and NOAA datasets) change and estimated anthropogenic global warming (solid orange line up to 2017, with orange shading indicating assessed *likely* range). Orange dashed arrow and horizontal orange error bar show respectively the central estimate and *likely* range of the time at which 1.5°C is reached if the current rate of warming continues. The grey plume on the right of panel a shows the *likely* range of warming responses, computed with a simple climate model, to a stylized pathway (hypothetical future) in which net $CO_2$ emissions (grey line in panels b and c) decline in a straight line from 2020 to reach net zero in 2055 and net non-$CO_2$ radiative forcing (grey line in panel d) increases to 2030 and then declines. The blue plume in panel a) shows the response to faster $CO_2$ emissions reductions (blue line in panel b), reaching net zero in 2040, reducing cumulative $CO_2$ emissions (panel c). The purple plume shows the response to net $CO_2$ emissions declining to zero in 2055, with net non-$CO_2$ forcing remaining constant after 2030. The vertical error bars on right of panel a) show the *likely* ranges (thin lines) and central terciles (33rd – 66th percentiles, thick lines) of the estimated distribution of warming in 2100 under these three stylized pathways. Vertical dotted error bars in panels b, c and d show the *likely* range of historical annual and cumulative global net $CO_2$ emissions in 2017 (data from the Global Carbon Project) and of net non-$CO_2$ radiative forcing in 2011 from AR5, respectively. Vertical axes in panels c and d are scaled to represent approximately equal effects on GMST. {1.2.1, 1.2.3, 1.2.4, 2.3, Figure 1.2 and Chapter 1 Supplementary Material, Cross-Chapter Box 2 in Chapter 1}

# B. Projected Climate Change, Potential Impacts and Associated Risks

**B.1 Climate models project robust[7] differences in regional climate characteristics between present-day and global warming of 1.5°C,[8] and between 1.5°C and 2°C.[8] These differences include increases in: mean temperature in most land and ocean regions (*high confidence*), hot extremes in most inhabited regions (*high confidence*), heavy precipitation in several regions (*medium confidence*), and the probability of drought and precipitation deficits in some regions (*medium confidence*). {3.3}**

B.1.1 Evidence from attributed changes in some climate and weather extremes for a global warming of about 0.5°C supports the assessment that an additional 0.5°C of warming compared to present is associated with further detectable changes in these extremes (*medium confidence*). Several regional changes in climate are assessed to occur with global warming up to 1.5°C compared to pre-industrial levels, including warming of extreme temperatures in many regions (*high confidence*), increases in frequency, intensity, and/or amount of heavy precipitation in several regions (*high confidence*), and an increase in intensity or frequency of droughts in some regions (*medium confidence*). {3.2, 3.3.1, 3.3.2, 3.3.3, 3.3.4, Table 3.2}

B.1.2 Temperature extremes on land are projected to warm more than GMST (*high confidence*): extreme hot days in mid-latitudes warm by up to about 3°C at global warming of 1.5°C and about 4°C at 2°C, and extreme cold nights in high latitudes warm by up to about 4.5°C at 1.5°C and about 6°C at 2°C (*high confidence*). The number of hot days is projected to increase in most land regions, with highest increases in the tropics (*high confidence*). {3.3.1, 3.3.2, Cross-Chapter Box 8 in Chapter 3}

B.1.3 Risks from droughts and precipitation deficits are projected to be higher at 2°C compared to 1.5°C of global warming in some regions (*medium confidence*). Risks from heavy precipitation events are projected to be higher at 2°C compared to 1.5°C of global warming in several northern hemisphere high-latitude and/or high-elevation regions, eastern Asia and eastern North America (*medium confidence*). Heavy precipitation associated with tropical cyclones is projected to be higher at 2°C compared to 1.5°C global warming (*medium confidence*). There is generally *low confidence* in projected changes in heavy precipitation at 2°C compared to 1.5°C in other regions. Heavy precipitation when aggregated at global scale is projected to be higher at 2°C than at 1.5°C of global warming (*medium confidence*). As a consequence of heavy precipitation, the fraction of the global land area affected by flood hazards is projected to be larger at 2°C compared to 1.5°C of global warming (*medium confidence*). {3.3.1, 3.3.3, 3.3.4, 3.3.5, 3.3.6}

**B.2 By 2100, global mean sea level rise is projected to be around 0.1 metre lower with global warming of 1.5°C compared to 2°C (*medium confidence*). Sea level will continue to rise well beyond 2100 (*high confidence*), and the magnitude and rate of this rise depend on future emission pathways. A slower rate of sea level rise enables greater opportunities for adaptation in the human and ecological systems of small islands, low-lying coastal areas and deltas (*medium confidence*). {3.3, 3.4, 3.6}**

B.2.1 Model-based projections of global mean sea level rise (relative to 1986–2005) suggest an indicative range of 0.26 to 0.77 m by 2100 for 1.5°C of global warming, 0.1 m (0.04–0.16 m) less than for a global warming of 2°C (*medium confidence*). A reduction of 0.1 m in global sea level rise implies that up to 10 million fewer people would be exposed to related risks, based on population in the year 2010 and assuming no adaptation (*medium confidence*). {3.4.4, 3.4.5, 4.3.2}

B.2.2 Sea level rise will continue beyond 2100 even if global warming is limited to 1.5°C in the 21st century (*high confidence*). Marine ice sheet instability in Antarctica and/or irreversible loss of the Greenland ice sheet could result in multi-metre rise in sea level over hundreds to thousands of years. These instabilities could be triggered at around 1.5°C to 2°C of global warming (*medium confidence*). (Figure SPM.2) {3.3.9, 3.4.5, 3.5.2, 3.6.3, Box 3.3}

---

7 Robust is here used to mean that at least two thirds of climate models show the same sign of changes at the grid point scale, and that differences in large regions are statistically significant.

8 Projected changes in impacts between different levels of global warming are determined with respect to changes in global mean surface air temperature.

B.2.3 Increasing warming amplifies the exposure of small islands, low-lying coastal areas and deltas to the risks associated with sea level rise for many human and ecological systems, including increased saltwater intrusion, flooding and damage to infrastructure (*high confidence*). Risks associated with sea level rise are higher at 2°C compared to 1.5°C. The slower rate of sea level rise at global warming of 1.5°C reduces these risks, enabling greater opportunities for adaptation including managing and restoring natural coastal ecosystems and infrastructure reinforcement (*medium confidence*). (Figure SPM.2) {3.4.5, Box 3.5}

**B.3 On land, impacts on biodiversity and ecosystems, including species loss and extinction, are projected to be lower at 1.5°C of global warming compared to 2°C. Limiting global warming to 1.5°C compared to 2°C is projected to lower the impacts on terrestrial, freshwater and coastal ecosystems and to retain more of their services to humans (*high confidence*). (Figure SPM.2) {3.4, 3.5, Box 3.4, Box 4.2, Cross-Chapter Box 8 in Chapter 3}**

B.3.1 Of 105,000 species studied,[9] 6% of insects, 8% of plants and 4% of vertebrates are projected to lose over half of their climatically determined geographic range for global warming of 1.5°C, compared with 18% of insects, 16% of plants and 8% of vertebrates for global warming of 2°C (*medium confidence*). Impacts associated with other biodiversity-related risks such as forest fires and the spread of invasive species are lower at 1.5°C compared to 2°C of global warming (*high confidence*). {3.4.3, 3.5.2}

B.3.2 Approximately 4% (interquartile range 2–7%) of the global terrestrial land area is projected to undergo a transformation of ecosystems from one type to another at 1°C of global warming, compared with 13% (interquartile range 8–20%) at 2°C (*medium confidence*). This indicates that the area at risk is projected to be approximately 50% lower at 1.5°C compared to 2°C (*medium confidence*). {3.4.3.1, 3.4.3.5}

B.3.3 High-latitude tundra and boreal forests are particularly at risk of climate change-induced degradation and loss, with woody shrubs already encroaching into the tundra (*high confidence*) and this will proceed with further warming. Limiting global warming to 1.5°C rather than 2°C is projected to prevent the thawing over centuries of a permafrost area in the range of 1.5 to 2.5 million $km^2$ (*medium confidence*). {3.3.2, 3.4.3, 3.5.5}

**B.4 Limiting global warming to 1.5°C compared to 2°C is projected to reduce increases in ocean temperature as well as associated increases in ocean acidity and decreases in ocean oxygen levels (*high confidence*). Consequently, limiting global warming to 1.5°C is projected to reduce risks to marine biodiversity, fisheries, and ecosystems, and their functions and services to humans, as illustrated by recent changes to Arctic sea ice and warm-water coral reef ecosystems (*high confidence*). {3.3, 3.4, 3.5, Box 3.4, Box 3.5}**

B.4.1 There is *high confidence* that the probability of a sea ice-free Arctic Ocean during summer is substantially lower at global warming of 1.5°C when compared to 2°C. With 1.5°C of global warming, one sea ice-free Arctic summer is projected per century. This likelihood is increased to at least one per decade with 2°C global warming. Effects of a temperature overshoot are reversible for Arctic sea ice cover on decadal time scales (*high confidence*). {3.3.8, 3.4.4.7}

B.4.2 Global warming of 1.5°C is projected to shift the ranges of many marine species to higher latitudes as well as increase the amount of damage to many ecosystems. It is also expected to drive the loss of coastal resources and reduce the productivity of fisheries and aquaculture (especially at low latitudes). The risks of climate-induced impacts are projected to be higher at 2°C than those at global warming of 1.5°C (*high confidence*). Coral reefs, for example, are projected to decline by a further 70–90% at 1.5°C (*high confidence*) with larger losses (>99%) at 2°C (*very high confidence*). The risk of irreversible loss of many marine and coastal ecosystems increases with global warming, especially at 2°C or more (*high confidence*). {3.4.4, Box 3.4}

9 Consistent with earlier studies, illustrative numbers were adopted from one recent meta-study.

B.4.3 The level of ocean acidification due to increasing $CO_2$ concentrations associated with global warming of 1.5°C is projected to amplify the adverse effects of warming, and even further at 2°C, impacting the growth, development, calcification, survival, and thus abundance of a broad range of species, for example, from algae to fish (*high confidence*). {3.3.10, 3.4.4}

B.4.4 Impacts of climate change in the ocean are increasing risks to fisheries and aquaculture via impacts on the physiology, survivorship, habitat, reproduction, disease incidence, and risk of invasive species (*medium confidence*) but are projected to be less at 1.5°C of global warming than at 2°C. One global fishery model, for example, projected a decrease in global annual catch for marine fisheries of about 1.5 million tonnes for 1.5°C of global warming compared to a loss of more than 3 million tonnes for 2°C of global warming (*medium confidence*). {3.4.4, Box 3.4}

## B.5 Climate-related risks to health, livelihoods, food security, water supply, human security, and economic growth are projected to increase with global warming of 1.5°C and increase further with 2°C. (Figure SPM.2) {3.4, 3.5, 5.2, Box 3.2, Box 3.3, Box 3.5, Box 3.6, Cross-Chapter Box 6 in Chapter 3, Cross-Chapter Box 9 in Chapter 4, Cross-Chapter Box 12 in Chapter 5, 5.2}

B.5.1 Populations at disproportionately higher risk of adverse consequences with global warming of 1.5°C and beyond include disadvantaged and vulnerable populations, some indigenous peoples, and local communities dependent on agricultural or coastal livelihoods (*high confidence*). Regions at disproportionately higher risk include Arctic ecosystems, dryland regions, small island developing states, and Least Developed Countries (*high confidence*). Poverty and disadvantage are expected to increase in some populations as global warming increases; limiting global warming to 1.5°C, compared with 2°C, could reduce the number of people both exposed to climate-related risks and susceptible to poverty by up to several hundred million by 2050 (*medium confidence*). {3.4.10, 3.4.11, Box 3.5, Cross-Chapter Box 6 in Chapter 3, Cross-Chapter Box 9 in Chapter 4, Cross-Chapter Box 12 in Chapter 5, 4.2.2.2, 5.2.1, 5.2.2, 5.2.3, 5.6.3}

B.5.2 Any increase in global warming is projected to affect human health, with primarily negative consequences (*high confidence*). Lower risks are projected at 1.5°C than at 2°C for heat-related morbidity and mortality (*very high confidence*) and for ozone-related mortality if emissions needed for ozone formation remain high (*high confidence*). Urban heat islands often amplify the impacts of heatwaves in cities (*high confidence*). Risks from some vector-borne diseases, such as malaria and dengue fever, are projected to increase with warming from 1.5°C to 2°C, including potential shifts in their geographic range (*high confidence*). {3.4.7, 3.4.8, 3.5.5.8}

B.5.3 Limiting warming to 1.5°C compared with 2°C is projected to result in smaller net reductions in yields of maize, rice, wheat, and potentially other cereal crops, particularly in sub-Saharan Africa, Southeast Asia, and Central and South America, and in the $CO_2$-dependent nutritional quality of rice and wheat (*high confidence*). Reductions in projected food availability are larger at 2°C than at 1.5°C of global warming in the Sahel, southern Africa, the Mediterranean, central Europe, and the Amazon (*medium confidence*). Livestock are projected to be adversely affected with rising temperatures, depending on the extent of changes in feed quality, spread of diseases, and water resource availability (*high confidence*). {3.4.6, 3.5.4, 3.5.5, Box 3.1, Cross-Chapter Box 6 in Chapter 3, Cross-Chapter Box 9 in Chapter 4}

B.5.4 Depending on future socio-economic conditions, limiting global warming to 1.5°C compared to 2°C may reduce the proportion of the world population exposed to a climate change-induced increase in water stress by up to 50%, although there is considerable variability between regions (*medium confidence*). Many small island developing states could experience lower water stress as a result of projected changes in aridity when global warming is limited to 1.5°C, as compared to 2°C (*medium confidence*). {3.3.5, 3.4.2, 3.4.8, 3.5.5, Box 3.2, Box 3.5, Cross-Chapter Box 9 in Chapter 4}

B.5.5 Risks to global aggregated economic growth due to climate change impacts are projected to be lower at 1.5°C than at 2°C by the end of this century[10] (*medium confidence*). This excludes the costs of mitigation, adaptation investments and the benefits of adaptation. Countries in the tropics and Southern Hemisphere subtropics are projected to experience the largest impacts on economic growth due to climate change should global warming increase from 1.5°C to 2°C (*medium confidence*). {3.5.2, 3.5.3}

10 Here, impacts on economic growth refer to changes in gross domestic product (GDP). Many impacts, such as loss of human lives, cultural heritage and ecosystem services, are difficult to value and monetize.

B.5.6 Exposure to multiple and compound climate-related risks increases between 1.5°C and 2°C of global warming, with greater proportions of people both so exposed and susceptible to poverty in Africa and Asia (*high confidence*). For global warming from 1.5°C to 2°C, risks across energy, food, and water sectors could overlap spatially and temporally, creating new and exacerbating current hazards, exposures, and vulnerabilities that could affect increasing numbers of people and regions (*medium confidence*). {Box 3.5, 3.3.1, 3.4.5.3, 3.4.5.6, 3.4.11, 3.5.4.9}

B.5.7 There are multiple lines of evidence that since AR5 the assessed levels of risk increased for four of the five Reasons for Concern (RFCs) for global warming to 2°C (*high confidence*). The risk transitions by degrees of global warming are now: from high to very high risk between 1.5°C and 2°C for RFC1 (Unique and threatened systems) (*high confidence*); from moderate to high risk between 1°C and 1.5°C for RFC2 (Extreme weather events) (*medium confidence*); from moderate to high risk between 1.5°C and 2°C for RFC3 (Distribution of impacts) (*high confidence*); from moderate to high risk between 1.5°C and 2.5°C for RFC4 (Global aggregate impacts) (*medium confidence*); and from moderate to high risk between 1°C and 2.5°C for RFC5 (Large-scale singular events) (*medium confidence*). (Figure SPM.2) {3.4.13; 3.5, 3.5.2}

**B.6 Most adaptation needs will be lower for global warming of 1.5°C compared to 2°C (*high confidence*). There are a wide range of adaptation options that can reduce the risks of climate change (*high confidence*). There are limits to adaptation and adaptive capacity for some human and natural systems at global warming of 1.5°C, with associated losses (*medium confidence*). The number and availability of adaptation options vary by sector (*medium confidence*). {Table 3.5, 4.3, 4.5, Cross-Chapter Box 9 in Chapter 4, Cross-Chapter Box 12 in Chapter 5}**

B.6.1 A wide range of adaptation options are available to reduce the risks to natural and managed ecosystems (e.g., ecosystem-based adaptation, ecosystem restoration and avoided degradation and deforestation, biodiversity management, sustainable aquaculture, and local knowledge and indigenous knowledge), the risks of sea level rise (e.g., coastal defence and hardening), and the risks to health, livelihoods, food, water, and economic growth, especially in rural landscapes (e.g., efficient irrigation, social safety nets, disaster risk management, risk spreading and sharing, and community-based adaptation) and urban areas (e.g., green infrastructure, sustainable land use and planning, and sustainable water management) (*medium confidence*). {4.3.1, 4.3.2, 4.3.3, 4.3.5, 4.5.3, 4.5.4, 5.3.2, Box 4.2, Box 4.3, Box 4.6, Cross-Chapter Box 9 in Chapter 4}.

B.6.2 Adaptation is expected to be more challenging for ecosystems, food and health systems at 2°C of global warming than for 1.5°C (*medium confidence*). Some vulnerable regions, including small islands and Least Developed Countries, are projected to experience high multiple interrelated climate risks even at global warming of 1.5°C (*high confidence*). {3.3.1, 3.4.5, Box 3.5, Table 3.5, Cross-Chapter Box 9 in Chapter 4, 5.6, Cross-Chapter Box 12 in Chapter 5, Box 5.3}

B.6.3 Limits to adaptive capacity exist at 1.5°C of global warming, become more pronounced at higher levels of warming and vary by sector, with site-specific implications for vulnerable regions, ecosystems and human health (*medium confidence*). {Cross-Chapter Box 12 in Chapter 5, Box 3.5, Table 3.5}

SPM

# How the level of global warming affects impacts and/or risks associated with the Reasons for Concern (RFCs) and selected natural, managed and human systems

Five Reasons For Concern (RFCs) illustrate the impacts and risks of different levels of global warming for people, economies and ecosystems across sectors and regions.

## Impacts and risks associated with the Reasons for Concern (RFCs)




**Purple** indicates very high risks of severe impacts/risks and the presence of significant irreversibility or the persistence of climate-related hazards, combined with limited ability to adapt due to the nature of the hazard or impacts/risks.
**Red** indicates severe and widespread impacts/risks.
**Yellow** indicates that impacts/risks are detectable and attributable to climate change with at least medium confidence.
**White** indicates that no impacts are detectable and attributable to climate change.

## Impacts and risks for selected natural, managed and human systems




**Confidence level for transition:** *L*=Low, *M*=Medium, *H*=High and *VH*=Very high

**Figure SPM.2 |** Five integrative reasons for concern (RFCs) provide a framework for summarizing key impacts and risks across sectors and regions, and were introduced in the IPCC Third Assessment Report. RFCs illustrate the implications of global warming for people, economies and ecosystems. Impacts and/or risks for each RFC are based on assessment of the new literature that has appeared. As in AR5, this literature was used to make expert judgments to assess the levels of global warming at which levels of impact and/or risk are undetectable, moderate, high or very high. The selection of impacts and risks to natural, managed and human systems in the lower panel is illustrative and is not intended to be fully comprehensive. {3.4, 3.5, 3.5.2.1, 3.5.2.2, 3.5.2.3, 3.5.2.4, 3.5.2.5, 5.4.1, 5.5.3, 5.6.1, Box 3.4}
**RFC1 Unique and threatened systems:** ecological and human systems that have restricted geographic ranges constrained by climate-related conditions and have high endemism or other distinctive properties. Examples include coral reefs, the Arctic and its indigenous people, mountain glaciers and biodiversity hotspots.
**RFC2 Extreme weather events:** risks/impacts to human health, livelihoods, assets and ecosystems from extreme weather events such as heat waves, heavy rain, drought and associated wildfires, and coastal flooding.
**RFC3 Distribution of impacts:** risks/impacts that disproportionately affect particular groups due to uneven distribution of physical climate change hazards, exposure or vulnerability.
**RFC4 Global aggregate impacts:** global monetary damage, global-scale degradation and loss of ecosystems and biodiversity.
**RFC5 Large-scale singular events:** are relatively large, abrupt and sometimes irreversible changes in systems that are caused by global warming. Examples include disintegration of the Greenland and Antarctic ice sheets.

# C. Emission Pathways and System Transitions Consistent with 1.5°C Global Warming

**C.1 In model pathways with no or limited overshoot of 1.5°C, global net anthropogenic $CO_2$ emissions decline by about 45% from 2010 levels by 2030 (40–60% interquartile range), reaching net zero around 2050 (2045–2055 interquartile range). For limiting global warming to below 2°C[11] $CO_2$ emissions are projected to decline by about 25% by 2030 in most pathways (10–30% interquartile range) and reach net zero around 2070 (2065–2080 interquartile range). Non-$CO_2$ emissions in pathways that limit global warming to 1.5°C show deep reductions that are similar to those in pathways limiting warming to 2°C. (*high confidence*) (Figure SPM.3a) {2.1, 2.3, Table 2.4}**

C.1.1 $CO_2$ emissions reductions that limit global warming to 1.5°C with no or limited overshoot can involve different portfolios of mitigation measures, striking different balances between lowering energy and resource intensity, rate of decarbonization, and the reliance on carbon dioxide removal. Different portfolios face different implementation challenges and potential synergies and trade-offs with sustainable development. (*high confidence*) (Figure SPM.3b) {2.3.2, 2.3.4, 2.4, 2.5.3}

C.1.2 Modelled pathways that limit global warming to 1.5°C with no or limited overshoot involve deep reductions in emissions of methane and black carbon (35% or more of both by 2050 relative to 2010). These pathways also reduce most of the cooling aerosols, which partially offsets mitigation effects for two to three decades. Non-$CO_2$ emissions[12] can be reduced as a result of broad mitigation measures in the energy sector. In addition, targeted non-$CO_2$ mitigation measures can reduce nitrous oxide and methane from agriculture, methane from the waste sector, some sources of black carbon, and hydrofluorocarbons. High bioenergy demand can increase emissions of nitrous oxide in some 1.5°C pathways, highlighting the importance of appropriate management approaches. Improved air quality resulting from projected reductions in many non-$CO_2$ emissions provide direct and immediate population health benefits in all 1.5°C model pathways. (*high confidence*) (Figure SPM.3a) {2.2.1, 2.3.3, 2.4.4, 2.5.3, 4.3.6, 5.4.2}

C.1.3 Limiting global warming requires limiting the total cumulative global anthropogenic emissions of $CO_2$ since the pre-industrial period, that is, staying within a total carbon budget (*high confidence*).[13] By the end of 2017, anthropogenic $CO_2$ emissions since the pre-industrial period are estimated to have reduced the total carbon budget for 1.5°C by approximately 2200 ± 320 $GtCO_2$ (*medium confidence*). The associated remaining budget is being depleted by current emissions of 42 ± 3 $GtCO_2$ per year (*high confidence*). The choice of the measure of global temperature affects the estimated remaining carbon budget. Using global mean surface air temperature, as in AR5, gives an estimate of the remaining carbon budget of 580 $GtCO_2$ for a 50% probability of limiting warming to 1.5°C, and 420 $GtCO_2$ for a 66% probability (*medium confidence*).[14] Alternatively, using GMST gives estimates of 770 and 570 $GtCO_2$, for 50% and 66% probabilities,[15] respectively (*medium confidence*). Uncertainties in the size of these estimated remaining carbon budgets are substantial and depend on several factors. Uncertainties in the climate response to $CO_2$ and non-$CO_2$ emissions contribute ±400 $GtCO_2$ and the level of historic warming contributes ±250 $GtCO_2$ (*medium confidence*). Potential additional carbon release from future permafrost thawing and methane release from wetlands would reduce budgets by up to 100 $GtCO_2$ over the course of this century and more thereafter (*medium confidence*). In addition, the level of non-$CO_2$ mitigation in the future could alter the remaining carbon budget by 250 $GtCO_2$ in either direction (*medium confidence*). {1.2.4, 2.2.2, 2.6.1, Table 2.2, Chapter 2 Supplementary Material}

C.1.4 Solar radiation modification (SRM) measures are not included in any of the available assessed pathways. Although some SRM measures may be theoretically effective in reducing an overshoot, they face large uncertainties and knowledge gaps

11 References to pathways limiting global warming to 2°C are based on a 66% probability of staying below 2°C.

12 Non-$CO_2$ emissions included in this Report are all anthropogenic emissions other than $CO_2$ that result in radiative forcing. These include short-lived climate forcers, such as methane, some fluorinated gases, ozone precursors, aerosols or aerosol precursors, such as black carbon and sulphur dioxide, respectively, as well as long-lived greenhouse gases, such as nitrous oxide or some fluorinated gases. The radiative forcing associated with non-$CO_2$ emissions and changes in surface albedo is referred to as non-$CO_2$ radiative forcing. {2.2.1}

13 There is a clear scientific basis for a total carbon budget consistent with limiting global warming to 1.5°C. However, neither this total carbon budget nor the fraction of this budget taken up by past emissions were assessed in this Report.

14 Irrespective of the measure of global temperature used, updated understanding and further advances in methods have led to an increase in the estimated remaining carbon budget of about 300 $GtCO_2$ compared to AR5. (*medium confidence*) {2.2.2}

15 These estimates use observed GMST to 2006–2015 and estimate future temperature changes using near surface air temperatures.

as well as substantial risks and institutional and social constraints to deployment related to governance, ethics, and impacts on sustainable development. They also do not mitigate ocean acidification. (*medium confidence*) {4.3.8, Cross-Chapter Box 10 in Chapter 4}

## Global emissions pathway characteristics

General characteristics of the evolution of anthropogenic net emissions of $CO_2$, and total emissions of methane, black carbon, and nitrous oxide in model pathways that limit global warming to 1.5°C with no or limited overshoot. Net emissions are defined as anthropogenic emissions reduced by anthropogenic removals. Reductions in net emissions can be achieved through different portfolios of mitigation measures illustrated in Figure SPM.3b.




**Figure SPM.3a |** Global emissions pathway characteristics. The main panel shows global net anthropogenic $CO_2$ emissions in pathways limiting global warming to 1.5°C with no or limited (less than 0.1°C) overshoot and pathways with higher overshoot. The shaded area shows the full range for pathways analysed in this Report. The panels on the right show non-$CO_2$ emissions ranges for three compounds with large historical forcing and a substantial portion of emissions coming from sources distinct from those central to $CO_2$ mitigation. Shaded areas in these panels show the 5–95% (light shading) and interquartile (dark shading) ranges of pathways limiting global warming to 1.5°C with no or limited overshoot. Box and whiskers at the bottom of the figure show the timing of pathways reaching global net zero $CO_2$ emission levels, and a comparison with pathways limiting global warming to 2°C with at least 66% probability. Four illustrative model pathways are highlighted in the main panel and are labelled P1, P2, P3 and P4, corresponding to the LED, S1, S2, and S5 pathways assessed in Chapter 2. Descriptions and characteristics of these pathways are available in Figure SPM.3b. {2.1, 2.2, 2.3, Figure 2.5, Figure 2.10, Figure 2.11}

## Characteristics of four illustrative model pathways

Different mitigation strategies can achieve the net emissions reductions that would be required to follow a pathway that limits global warming to 1.5°C with no or limited overshoot. All pathways use Carbon Dioxide Removal (CDR), but the amount varies across pathways, as do the relative contributions of Bioenergy with Carbon Capture and Storage (BECCS) and removals in the Agriculture, Forestry and Other Land Use (AFOLU) sector. This has implications for emissions and several other pathway characteristics.

### Breakdown of contributions to global net $CO_2$ emissions in four illustrative model pathways




**P1:** A scenario in which social, business and technological innovations result in lower energy demand up to 2050 while living standards rise, especially in the global South. A downsized energy system enables rapid decarbonization of energy supply. Afforestation is the only CDR option considered; neither fossil fuels with CCS nor BECCS are used.

**P2:** A scenario with a broad focus on sustainability including energy intensity, human development, economic convergence and international cooperation, as well as shifts towards sustainable and healthy consumption patterns, low-carbon technology innovation, and well-managed land systems with limited societal acceptability for BECCS.

**P3:** A middle-of-the-road scenario in which societal as well as technological development follows historical patterns. Emissions reductions are mainly achieved by changing the way in which energy and products are produced, and to a lesser degree by reductions in demand.

**P4:** A resource- and energy-intensive scenario in which economic growth and globalization lead to widespread adoption of greenhouse-gas-intensive lifestyles, including high demand for transportation fuels and livestock products. Emissions reductions are mainly achieved through technological means, making strong use of CDR through the deployment of BECCS.

| **Global indicators** | P1 | P2 | P3 | P4 | **Interquartile range** |
|---|---|---|---|---|---|
| *Pathway classification* | No or limited overshoot | No or limited overshoot | No or limited overshoot | Higher overshoot | No or limited overshoot |
| *$CO_2$ emission change in 2030 (% rel to 2010)* | -58 | -47 | -41 | 4 | (-58,-40) |
| *└ in 2050 (% rel to 2010)* | -93 | -95 | -91 | -97 | (-107,-94) |
| *Kyoto-GHG emissions* in 2030 (% rel to 2010)* | -50 | -49 | -35 | -2 | (-51,-39) |
| *└ in 2050 (% rel to 2010)* | -82 | -89 | -78 | -80 | (-93,-81) |
| *Final energy demand** in 2030 (% rel to 2010)* | -15 | -5 | 17 | 39 | (-12,7) |
| *└ in 2050 (% rel to 2010)* | -32 | 2 | 21 | 44 | (-11,22) |
| *Renewable share in electricity in 2030 (%)* | 60 | 58 | 48 | 25 | (47,65) |
| *└ in 2050 (%)* | 77 | 81 | 63 | 70 | (69,86) |
| *Primary energy from coal in 2030 (% rel to 2010)* | -78 | -61 | -75 | -59 | (-78, -59) |
| *└ in 2050 (% rel to 2010)* | -97 | -77 | -73 | -97 | (-95, -74) |
| *from oil in 2030 (% rel to 2010)* | -37 | -13 | -3 | 86 | (-34,3) |
| *└ in 2050 (% rel to 2010)* | -87 | -50 | -81 | -32 | (-78,-31) |
| *from gas in 2030 (% rel to 2010)* | -25 | -20 | 33 | 37 | (-26,21) |
| *└ in 2050 (% rel to 2010)* | -74 | -53 | 21 | -48 | (-56,6) |
| *from nuclear in 2030 (% rel to 2010)* | 59 | 83 | 98 | 106 | (44,102) |
| *└ in 2050 (% rel to 2010)* | 150 | 98 | 501 | 468 | (91,190) |
| *from biomass in 2030 (% rel to 2010)* | -11 | 0 | 36 | -1 | (29,80) |
| *└ in 2050 (% rel to 2010)* | -16 | 49 | 121 | 418 | (123,261) |
| *from non-biomass renewables in 2030 (% rel to 2010)* | 430 | 470 | 315 | 110 | (245,436) |
| *└ in 2050 (% rel to 2010)* | 833 | 1327 | 878 | 1137 | (576,1299) |
| *Cumulative CCS until 2100 ($GtCO_2$)* | 0 | 348 | 687 | 1218 | (550,1017) |
| *└ of which BECCS ($GtCO_2$)* | 0 | 151 | 414 | 1191 | (364,662) |
| *Land area of bioenergy crops in 2050 (million km²)* | 0.2 | 0.9 | 2.8 | 7.2 | (1.5,3.2) |
| *Agricultural $CH_4$ emissions in 2030 (% rel to 2010)* | -24 | -48 | 1 | 14 | (-30,-11) |
| *in 2050 (% rel to 2010)* | -33 | -69 | -23 | 2 | (-47,-24) |
| *Agricultural $N_2O$ emissions in 2030 (% rel to 2010)* | 5 | -26 | 15 | 3 | (-21,3) |
| *in 2050 (% rel to 2010)* | 6 | -26 | 0 | 39 | (-26,1) |

*NOTE: Indicators have been selected to show global trends identified by the Chapter 2 assessment. National and sectoral characteristics can differ substantially from the global trends shown above.*

** Kyoto-gas emissions are based on IPCC Second Assessment Report GWP-100*
*** Changes in energy demand are associated with improvements in energy efficiency and behaviour change*

**Figure SPM.3b |** Characteristics of four illustrative model pathways in relation to global warming of 1.5°C introduced in Figure SPM.3a. These pathways were selected to show a range of potential mitigation approaches and vary widely in their projected energy and land use, as well as their assumptions about future socio-economic developments, including economic and population growth, equity and sustainability. A breakdown of the global net anthropogenic $CO_2$ emissions into the contributions in terms of $CO_2$ emissions from fossil fuel and industry; agriculture, forestry and other land use (AFOLU); and bioenergy with carbon capture and storage (BECCS) is shown. AFOLU estimates reported here are not necessarily comparable with countries' estimates. Further characteristics for each of these pathways are listed below each pathway. These pathways illustrate relative global differences in mitigation strategies, but do not represent central estimates, national strategies, and do not indicate requirements. For comparison, the right-most column shows the interquartile ranges across pathways with no or limited overshoot of 1.5°C. Pathways P1, P2, P3 and P4 correspond to the LED, S1, S2 and S5 pathways assessed in Chapter 2 (Figure SPM.3a). {2.2.1, 2.3.1, 2.3.2, 2.3.3, 2.3.4, 2.4.1, 2.4.2, 2.4.4, 2.5.3, Figure 2.5, Figure 2.6, Figure 2.9, Figure 2.10, Figure 2.11, Figure 2.14, Figure 2.15, Figure 2.16, Figure 2.17, Figure 2.24, Figure 2.25, Table 2.4, Table 2.6, Table 2.7, Table 2.9, Table 4.1}

**C.2 Pathways limiting global warming to 1.5°C with no or limited overshoot would require rapid and far-reaching transitions in energy, land, urban and infrastructure (including transport and buildings), and industrial systems (*high confidence*). These systems transitions are unprecedented in terms of scale, but not necessarily in terms of speed, and imply deep emissions reductions in all sectors, a wide portfolio of mitigation options and a significant upscaling of investments in those options (*medium confidence*). {2.3, 2.4, 2.5, 4.2, 4.3, 4.4, 4.5}**

C.2.1 Pathways that limit global warming to 1.5°C with no or limited overshoot show system changes that are more rapid and pronounced over the next two decades than in 2°C pathways (*high confidence*). The rates of system changes associated with limiting global warming to 1.5°C with no or limited overshoot have occurred in the past within specific sectors, technologies and spatial contexts, but there is no documented historic precedent for their scale (*medium confidence*). {2.3.3, 2.3.4, 2.4, 2.5, 4.2.1, 4.2.2, Cross-Chapter Box 11 in Chapter 4}

C.2.2 In energy systems, modelled global pathways (considered in the literature) limiting global warming to 1.5°C with no or limited overshoot (for more details see Figure SPM.3b) generally meet energy service demand with lower energy use, including through enhanced energy efficiency, and show faster electrification of energy end use compared to 2°C (*high confidence*). In 1.5°C pathways with no or limited overshoot, low-emission energy sources are projected to have a higher share, compared with 2°C pathways, particularly before 2050 (*high confidence*). In 1.5°C pathways with no or limited overshoot, renewables are projected to supply 70–85% (interquartile range) of electricity in 2050 (*high confidence*). In electricity generation, shares of nuclear and fossil fuels with carbon dioxide capture and storage (CCS) are modelled to increase in most 1.5°C pathways with no or limited overshoot. In modelled 1.5°C pathways with limited or no overshoot, the use of CCS would allow the electricity generation share of gas to be approximately 8% (3–11% interquartile range) of global electricity in 2050, while the use of coal shows a steep reduction in all pathways and would be reduced to close to 0% (0–2% interquartile range) of electricity (*high confidence*). While acknowledging the challenges, and differences between the options and national circumstances, political, economic, social and technical feasibility of solar energy, wind energy and electricity storage technologies have substantially improved over the past few years (*high confidence*). These improvements signal a potential system transition in electricity generation. (Figure SPM.3b) {2.4.1, 2.4.2, Figure 2.1, Table 2.6, Table 2.7, Cross-Chapter Box 6 in Chapter 3, 4.2.1, 4.3.1, 4.3.3, 4.5.2}

C.2.3 $CO_2$ emissions from industry in pathways limiting global warming to 1.5°C with no or limited overshoot are projected to be about 65–90% (interquartile range) lower in 2050 relative to 2010, as compared to 50–80% for global warming of 2°C (*medium confidence*). Such reductions can be achieved through combinations of new and existing technologies and practices, including electrification, hydrogen, sustainable bio-based feedstocks, product substitution, and carbon capture, utilization and storage (CCUS). These options are technically proven at various scales but their large-scale deployment may be limited by economic, financial, human capacity and institutional constraints in specific contexts, and specific characteristics of large-scale industrial installations. In industry, emissions reductions by energy and process efficiency by themselves are insufficient for limiting warming to 1.5°C with no or limited overshoot (*high confidence*). {2.4.3, 4.2.1, Table 4.1, Table 4.3, 4.3.3, 4.3.4, 4.5.2}

C.2.4 The urban and infrastructure system transition consistent with limiting global warming to 1.5°C with no or limited overshoot would imply, for example, changes in land and urban planning practices, as well as deeper emissions reductions in transport and buildings compared to pathways that limit global warming below 2°C (*medium confidence*). Technical measures

and practices enabling deep emissions reductions include various energy efficiency options. In pathways limiting global warming to 1.5°C with no or limited overshoot, the electricity share of energy demand in buildings would be about 55–75% in 2050 compared to 50–70% in 2050 for 2°C global warming (*medium confidence*). In the transport sector, the share of low-emission final energy would rise from less than 5% in 2020 to about 35–65% in 2050 compared to 25–45% for 2°C of global warming (*medium confidence*). Economic, institutional and socio-cultural barriers may inhibit these urban and infrastructure system transitions, depending on national, regional and local circumstances, capabilities and the availability of capital (*high confidence*). {2.3.4, 2.4.3, 4.2.1, Table 4.1, 4.3.3, 4.5.2}

C.2.5 Transitions in global and regional land use are found in all pathways limiting global warming to 1.5°C with no or limited overshoot, but their scale depends on the pursued mitigation portfolio. Model pathways that limit global warming to 1.5°C with no or limited overshoot project a 4 million $km^2$ reduction to a 2.5 million $km^2$ increase of non-pasture agricultural land for food and feed crops and a 0.5–11 million $km^2$ reduction of pasture land, to be converted into a 0–6 million $km^2$ increase of agricultural land for energy crops and a 2 million $km^2$ reduction to 9.5 million $km^2$ increase in forests by 2050 relative to 2010 (*medium confidence*).[16] Land-use transitions of similar magnitude can be observed in modelled 2°C pathways (*medium confidence*). Such large transitions pose profound challenges for sustainable management of the various demands on land for human settlements, food, livestock feed, fibre, bioenergy, carbon storage, biodiversity and other ecosystem services (*high confidence*). Mitigation options limiting the demand for land include sustainable intensification of land-use practices, ecosystem restoration and changes towards less resource-intensive diets (*high confidence*). The implementation of land-based mitigation options would require overcoming socio-economic, institutional, technological, financing and environmental barriers that differ across regions (*high confidence*). {2.4.4, Figure 2.24, 4.3.2, 4.3.7, 4.5.2, Cross-Chapter Box 7 in Chapter 3}

C.2.6 Additional annual average energy-related investments for the period 2016 to 2050 in pathways limiting warming to 1.5°C compared to pathways without new climate policies beyond those in place today are estimated to be around 830 billion USD2010 (range of 150 billion to 1700 billion USD2010 across six models[17]). This compares to total annual average energy supply investments in 1.5°C pathways of 1460 to 3510 billion USD2010 and total annual average energy demand investments of 640 to 910 billion USD2010 for the period 2016 to 2050. Total energy-related investments increase by about 12% (range of 3% to 24%) in 1.5°C pathways relative to 2°C pathways. Annual investments in low-carbon energy technologies and energy efficiency are upscaled by roughly a factor of six (range of factor of 4 to 10) by 2050 compared to 2015 (*medium confidence*). {2.5.2, Box 4.8, Figure 2.27}

C.2.7 Modelled pathways limiting global warming to 1.5°C with no or limited overshoot project a wide range of global average discounted marginal abatement costs over the 21st century. They are roughly 3-4 times higher than in pathways limiting global warming to below 2°C (*high confidence*). The economic literature distinguishes marginal abatement costs from total mitigation costs in the economy. The literature on total mitigation costs of 1.5°C mitigation pathways is limited and was not assessed in this Report. Knowledge gaps remain in the integrated assessment of the economy-wide costs and benefits of mitigation in line with pathways limiting warming to 1.5°C. {2.5.2; 2.6; Figure 2.26}

16 The projected land-use changes presented are not deployed to their upper limits simultaneously in a single pathway.

17 Including two pathways limiting warming to 1.5°C with no or limited overshoot and four pathways with higher overshoot.

**C.3 All pathways that limit global warming to 1.5°C with limited or no overshoot project the use of carbon dioxide removal (CDR) on the order of 100–1000 $GtCO_2$ over the 21st century. CDR would be used to compensate for residual emissions and, in most cases, achieve net negative emissions to return global warming to 1.5°C following a peak (*high confidence*). CDR deployment of several hundreds of $GtCO_2$ is subject to multiple feasibility and sustainability constraints (*high confidence*). Significant near-term emissions reductions and measures to lower energy and land demand can limit CDR deployment to a few hundred $GtCO_2$ without reliance on bioenergy with carbon capture and storage (BECCS) (*high confidence*). {2.3, 2.4, 3.6.2, 4.3, 5.4}**

C.3.1 Existing and potential CDR measures include afforestation and reforestation, land restoration and soil carbon sequestration, BECCS, direct air carbon capture and storage (DACCS), enhanced weathering and ocean alkalinization. These differ widely in terms of maturity, potentials, costs, risks, co-benefits and trade-offs (*high confidence*). To date, only a few published pathways include CDR measures other than afforestation and BECCS. {2.3.4, 3.6.2, 4.3.2, 4.3.7}

C.3.2 In pathways limiting global warming to 1.5°C with limited or no overshoot, BECCS deployment is projected to range from 0–1, 0–8, and 0–16 $GtCO_2\ yr^{-1}$ in 2030, 2050, and 2100, respectively, while agriculture, forestry and land-use (AFOLU) related CDR measures are projected to remove 0–5, 1–11, and 1–5 $GtCO_2\ yr^{-1}$ in these years (*medium confidence*). The upper end of these deployment ranges by mid-century exceeds the BECCS potential of up to 5 $GtCO_2\ yr^{-1}$ and afforestation potential of up to 3.6 $GtCO_2\ yr^{-1}$ assessed based on recent literature (*medium confidence*). Some pathways avoid BECCS deployment completely through demand-side measures and greater reliance on AFOLU-related CDR measures (*medium confidence*). The use of bioenergy can be as high or even higher when BECCS is excluded compared to when it is included due to its potential for replacing fossil fuels across sectors (*high confidence*). (Figure SPM.3b) {2.3.3, 2.3.4, 2.4.2, 3.6.2, 4.3.1, 4.2.3, 4.3.2, 4.3.7, 4.4.3, Table 2.4}

C.3.3 Pathways that overshoot 1.5°C of global warming rely on CDR exceeding residual $CO_2$ emissions later in the century to return to below 1.5°C by 2100, with larger overshoots requiring greater amounts of CDR (Figure SPM.3b) (*high confidence*). Limitations on the speed, scale, and societal acceptability of CDR deployment hence determine the ability to return global warming to below 1.5°C following an overshoot. Carbon cycle and climate system understanding is still limited about the effectiveness of net negative emissions to reduce temperatures after they peak (*high confidence*). {2.2, 2.3.4, 2.3.5, 2.6, 4.3.7, 4.5.2, Table 4.11}

C.3.4 Most current and potential CDR measures could have significant impacts on land, energy, water or nutrients if deployed at large scale (*high confidence*). Afforestation and bioenergy may compete with other land uses and may have significant impacts on agricultural and food systems, biodiversity, and other ecosystem functions and services (*high confidence*). Effective governance is needed to limit such trade-offs and ensure permanence of carbon removal in terrestrial, geological and ocean reservoirs (*high confidence*). Feasibility and sustainability of CDR use could be enhanced by a portfolio of options deployed at substantial, but lesser scales, rather than a single option at very large scale (*high confidence*). (Figure SPM.3b) {2.3.4, 2.4.4, 2.5.3, 2.6, 3.6.2, 4.3.2, 4.3.7, 4.5.2, 5.4.1, 5.4.2; Cross-Chapter Boxes 7 and 8 in Chapter 3, Table 4.11, Table 5.3, Figure 5.3}

C.3.5 Some AFOLU-related CDR measures such as restoration of natural ecosystems and soil carbon sequestration could provide co-benefits such as improved biodiversity, soil quality, and local food security. If deployed at large scale, they would require governance systems enabling sustainable land management to conserve and protect land carbon stocks and other ecosystem functions and services (*medium confidence*). (Figure SPM.4) {2.3.3, 2.3.4, 2.4.2, 2.4.4, 3.6.2, 5.4.1, Cross-Chapter Boxes 3 in Chapter 1 and 7 in Chapter 3, 4.3.2, 4.3.7, 4.4.1, 4.5.2, Table 2.4}

# D. Strengthening the Global Response in the Context of Sustainable Development and Efforts to Eradicate Poverty

**D.1 Estimates of the global emissions outcome of current nationally stated mitigation ambitions as submitted under the Paris Agreement would lead to global greenhouse gas emissions[18] in 2030 of 52–58 $GtCO_2eq\ yr^{-1}$ (*medium confidence*). Pathways reflecting these ambitions would not limit global warming to 1.5°C, even if supplemented by very challenging increases in the scale and ambition of emissions reductions after 2030 (*high confidence*). Avoiding overshoot and reliance on future large-scale deployment of carbon dioxide removal (CDR) can only be achieved if global $CO_2$ emissions start to decline well before 2030 (*high confidence*). {1.2, 2.3, 3.3, 3.4, 4.2, 4.4, Cross-Chapter Box 11 in Chapter 4}**

D.1.1 Pathways that limit global warming to 1.5°C with no or limited overshoot show clear emission reductions by 2030 (*high confidence*). All but one show a decline in global greenhouse gas emissions to below 35 $GtCO_2eq\ yr^{-1}$ in 2030, and half of available pathways fall within the 25–30 $GtCO_2eq\ yr^{-1}$ range (interquartile range), a 40–50% reduction from 2010 levels (*high confidence*). Pathways reflecting current nationally stated mitigation ambition until 2030 are broadly consistent with cost-effective pathways that result in a global warming of about 3°C by 2100, with warming continuing afterwards (*medium confidence*). {2.3.3, 2.3.5, Cross-Chapter Box 11 in Chapter 4, 5.5.3.2}

D.1.2 Overshoot trajectories result in higher impacts and associated challenges compared to pathways that limit global warming to 1.5°C with no or limited overshoot (*high confidence*). Reversing warming after an overshoot of 0.2°C or larger during this century would require upscaling and deployment of CDR at rates and volumes that might not be achievable given considerable implementation challenges (*medium confidence*). {1.3.3, 2.3.4, 2.3.5, 2.5.1, 3.3, 4.3.7, Cross-Chapter Box 8 in Chapter 3, Cross-Chapter Box 11 in Chapter 4}

D.1.3 The lower the emissions in 2030, the lower the challenge in limiting global warming to 1.5°C after 2030 with no or limited overshoot (*high confidence*). The challenges from delayed actions to reduce greenhouse gas emissions include the risk of cost escalation, lock-in in carbon-emitting infrastructure, stranded assets, and reduced flexibility in future response options in the medium to long term (*high confidence*). These may increase uneven distributional impacts between countries at different stages of development (*medium confidence*). {2.3.5, 4.4.5, 5.4.2}

**D.2 The avoided climate change impacts on sustainable development, eradication of poverty and reducing inequalities would be greater if global warming were limited to 1.5°C rather than 2°C, if mitigation and adaptation synergies are maximized while trade-offs are minimized (*high confidence*). {1.1, 1.4, 2.5, 3.3, 3.4, 5.2, Table 5.1}**

D.2.1 Climate change impacts and responses are closely linked to sustainable development which balances social well-being, economic prosperity and environmental protection. The United Nations Sustainable Development Goals (SDGs), adopted in 2015, provide an established framework for assessing the links between global warming of 1.5°C or 2°C and development goals that include poverty eradication, reducing inequalities, and climate action. (*high confidence*) {Cross-Chapter Box 4 in Chapter 1, 1.4, 5.1}

D.2.2 The consideration of ethics and equity can help address the uneven distribution of adverse impacts associated with 1.5°C and higher levels of global warming, as well as those from mitigation and adaptation, particularly for poor and disadvantaged populations, in all societies (*high confidence*). {1.1.1, 1.1.2, 1.4.3, 2.5.3, 3.4.10, 5.1, 5.2, 5.3. 5.4, Cross-Chapter Box 4 in Chapter 1, Cross-Chapter Boxes 6 and 8 in Chapter 3, and Cross-Chapter Box 12 in Chapter 5}

D.2.3 Mitigation and adaptation consistent with limiting global warming to 1.5°C are underpinned by enabling conditions, assessed in this Report across the geophysical, environmental-ecological, technological, economic, socio-cultural and institutional

18 GHG emissions have been aggregated with 100-year GWP values as introduced in the IPCC Second Assessment Report.

dimensions of feasibility. Strengthened multilevel governance, institutional capacity, policy instruments, technological innovation and transfer and mobilization of finance, and changes in human behaviour and lifestyles are enabling conditions that enhance the feasibility of mitigation and adaptation options for 1.5°C-consistent systems transitions. (*high confidence*) {1.4, Cross-Chapter Box 3 in Chapter 1, 2.5.1, 4.4, 4.5, 5.6}

**D.3 Adaptation options specific to national contexts, if carefully selected together with enabling conditions, will have benefits for sustainable development and poverty reduction with global warming of 1.5°C, although trade-offs are possible (*high confidence*). {1.4, 4.3, 4.5}**

D.3.1 Adaptation options that reduce the vulnerability of human and natural systems have many synergies with sustainable development, if well managed, such as ensuring food and water security, reducing disaster risks, improving health conditions, maintaining ecosystem services and reducing poverty and inequality (*high confidence*). Increasing investment in physical and social infrastructure is a key enabling condition to enhance the resilience and the adaptive capacities of societies. These benefits can occur in most regions with adaptation to 1.5°C of global warming (*high confidence*). {1.4.3, 4.2.2, 4.3.1, 4.3.2, 4.3.3, 4.3.5, 4.4.1, 4.4.3, 4.5.3, 5.3.1, 5.3.2}

D.3.2 Adaptation to 1.5°C global warming can also result in trade-offs or maladaptations with adverse impacts for sustainable development. For example, if poorly designed or implemented, adaptation projects in a range of sectors can increase greenhouse gas emissions and water use, increase gender and social inequality, undermine health conditions, and encroach on natural ecosystems (*high confidence*). These trade-offs can be reduced by adaptations that include attention to poverty and sustainable development (*high confidence*). {4.3.2, 4.3.3, 4.5.4, 5.3.2; Cross-Chapter Boxes 6 and 7 in Chapter 3}

D.3.3 A mix of adaptation and mitigation options to limit global warming to 1.5°C, implemented in a participatory and integrated manner, can enable rapid, systemic transitions in urban and rural areas (*high confidence*). These are most effective when aligned with economic and sustainable development, and when local and regional governments and decision makers are supported by national governments (*medium confidence*). {4.3.2, 4.3.3, 4.4.1, 4.4.2}

D.3.4 Adaptation options that also mitigate emissions can provide synergies and cost savings in most sectors and system transitions, such as when land management reduces emissions and disaster risk, or when low-carbon buildings are also designed for efficient cooling. Trade-offs between mitigation and adaptation, when limiting global warming to 1.5°C, such as when bioenergy crops, reforestation or afforestation encroach on land needed for agricultural adaptation, can undermine food security, livelihoods, ecosystem functions and services and other aspects of sustainable development. (*high confidence*) {3.4.3, 4.3.2, 4.3.4, 4.4.1, 4.5.2, 4.5.3, 4.5.4}

**D.4 Mitigation options consistent with 1.5°C pathways are associated with multiple synergies and trade-offs across the Sustainable Development Goals (SDGs). While the total number of possible synergies exceeds the number of trade-offs, their net effect will depend on the pace and magnitude of changes, the composition of the mitigation portfolio and the management of the transition. (*high confidence*) (Figure SPM.4) {2.5, 4.5, 5.4}**

D.4.1 1.5°C pathways have robust synergies particularly for the SDGs 3 (health), 7 (clean energy), 11 (cities and communities), 12 (responsible consumption and production) and 14 (oceans) (*very high confidence*). Some 1.5°C pathways show potential trade-offs with mitigation for SDGs 1 (poverty), 2 (hunger), 6 (water) and 7 (energy access), if not managed carefully (*high confidence*). (Figure SPM.4) {5.4.2; Figure 5.4, Cross-Chapter Boxes 7 and 8 in Chapter 3}

D.4.2 1.5°C pathways that include low energy demand (e.g., see P1 in Figure SPM.3a and SPM.3b), low material consumption, and low GHG-intensive food consumption have the most pronounced synergies and the lowest number of trade-offs with respect to sustainable development and the SDGs (*high confidence*). Such pathways would reduce dependence on CDR. In modelled pathways, sustainable development, eradicating poverty and reducing inequality can support limiting warming to 1.5°C (*high confidence*). (Figure SPM.3b, Figure SPM.4) {2.4.3, 2.5.1, 2.5.3, Figure 2.4, Figure 2.28, 5.4.1, 5.4.2, Figure 5.4}

SPM

## Indicative linkages between mitigation options and sustainable development using SDGs (The linkages do not show costs and benefits)

Mitigation options deployed in each sector can be associated with potential positive effects (synergies) or negative effects (trade-offs) with the Sustainable Development Goals (SDGs). The degree to which this potential is realized will depend on the selected portfolio of mitigation options, mitigation policy design, and local circumstances and context. Particularly in the energy-demand sector, the potential for synergies is larger than for trade-offs. The bars group individually assessed options by level of confidence and take into account the relative strength of the assessed mitigation-SDG connections.

**Length shows strength of connection**



The overall **size of the coloured bars** depict **the relative potential** for synergies and trade-offs between the sectoral mitigation options and the SDGs.

**Shades show level of confidence**




The shades depict **the level of confidence** of the assessed potential for **Trade-offs**/**Synergies**.






FS-002206

**Figure SPM.4 |** Potential synergies and trade-offs between the sectoral portfolio of climate change mitigation options and the Sustainable Development Goals (SDGs). The SDGs serve as an analytical framework for the assessment of the different sustainable development dimensions, which extend beyond the time frame of the 2030 SDG targets. The assessment is based on literature on mitigation options that are considered relevant for 1.5°C. The assessed strength of the SDG interactions is based on the qualitative and quantitative assessment of individual mitigation options listed in Table 5.2. For each mitigation option, the strength of the SDG-connection as well as the associated confidence of the underlying literature (shades of green and red) was assessed. The strength of positive connections (synergies) and negative connections (trade-offs) across all individual options within a sector (see Table 5.2) are aggregated into sectoral potentials for the whole mitigation portfolio. The (white) areas outside the bars, which indicate no interactions, have *low confidence* due to the uncertainty and limited number of studies exploring indirect effects. The strength of the connection considers only the effect of mitigation and does not include benefits of avoided impacts. SDG 13 (climate action) is not listed because mitigation is being considered in terms of interactions with SDGs and not vice versa. The bars denote the strength of the connection, and do not consider the strength of the impact on the SDGs. The energy demand sector comprises behavioural responses, fuel switching and efficiency options in the transport, industry and building sector as well as carbon capture options in the industry sector. Options assessed in the energy supply sector comprise biomass and non-biomass renewables, nuclear, carbon capture and storage (CCS) with bioenergy, and CCS with fossil fuels. Options in the land sector comprise agricultural and forest options, sustainable diets and reduced food waste, soil sequestration, livestock and manure management, reduced deforestation, afforestation and reforestation, and responsible sourcing. In addition to this figure, options in the ocean sector are discussed in the underlying report. {5.4, Table 5.2, Figure 5.2}

Information about the net impacts of mitigation on sustainable development in 1.5°C pathways is available only for a limited number of SDGs and mitigation options. Only a limited number of studies have assessed the benefits of avoided climate change impacts of 1.5°C pathways for the SDGs, and the co-effects of adaptation for mitigation and the SDGs. The assessment of the indicative mitigation potentials in Figure SPM.4 is a step further from AR5 towards a more comprehensive and integrated assessment in the future.

D.4.3 1.5°C and 2°C modelled pathways often rely on the deployment of large-scale land-related measures like afforestation and bioenergy supply, which, if poorly managed, can compete with food production and hence raise food security concerns (*high confidence*). The impacts of carbon dioxide removal (CDR) options on SDGs depend on the type of options and the scale of deployment (*high confidence*). If poorly implemented, CDR options such as BECCS and AFOLU options would lead to trade-offs. Context-relevant design and implementation requires considering people's needs, biodiversity, and other sustainable development dimensions (*very high confidence*). (Figure SPM.4) {5.4.1.3, Cross-Chapter Box 7 in Chapter 3}

D.4.4 Mitigation consistent with 1.5°C pathways creates risks for sustainable development in regions with high dependency on fossil fuels for revenue and employment generation (*high confidence*). Policies that promote diversification of the economy and the energy sector can address the associated challenges (*high confidence*). {5.4.1.2, Box 5.2}

D.4.5 Redistributive policies across sectors and populations that shield the poor and vulnerable can resolve trade-offs for a range of SDGs, particularly hunger, poverty and energy access. Investment needs for such complementary policies are only a small fraction of the overall mitigation investments in 1.5°C pathways. (*high confidence*) {2.4.3, 5.4.2, Figure 5.5}

## D.5 Limiting the risks from global warming of 1.5°C in the context of sustainable development and poverty eradication implies system transitions that can be enabled by an increase of adaptation and mitigation investments, policy instruments, the acceleration of technological innovation and behaviour changes (*high confidence*). {2.3, 2.4, 2.5, 3.2, 4.2, 4.4, 4.5, 5.2, 5.5, 5.6}

D.5.1 Directing finance towards investment in infrastructure for mitigation and adaptation could provide additional resources. This could involve the mobilization of private funds by institutional investors, asset managers and development or investment banks, as well as the provision of public funds. Government policies that lower the risk of low-emission and adaptation investments can facilitate the mobilization of private funds and enhance the effectiveness of other public policies. Studies indicate a number of challenges, including access to finance and mobilization of funds. (*high confidence*) {2.5.1, 2.5.2, 4.4.5}

D.5.2 Adaptation finance consistent with global warming of 1.5°C is difficult to quantify and compare with 2°C. Knowledge gaps include insufficient data to calculate specific climate resilience-enhancing investments from the provision of currently underinvested basic infrastructure. Estimates of the costs of adaptation might be lower at global warming of 1.5°C than for 2°C. Adaptation needs have typically been supported by public sector sources such as national and subnational government budgets, and in developing countries together with support from development assistance, multilateral development banks, and United Nations Framework Convention on Climate Change channels (*medium confidence*). More recently there is a

growing understanding of the scale and increase in non-governmental organizations and private funding in some regions (*medium confidence*). Barriers include the scale of adaptation financing, limited capacity and access to adaptation finance (*medium confidence*). {4.4.5, 4.6}

D.5.3 Global model pathways limiting global warming to 1.5°C are projected to involve the annual average investment needs in the energy system of around 2.4 trillion USD2010 between 2016 and 2035, representing about 2.5% of the world GDP (*medium confidence*). {4.4.5, Box 4.8}

D.5.4 Policy tools can help mobilize incremental resources, including through shifting global investments and savings and through market and non-market based instruments as well as accompanying measures to secure the equity of the transition, acknowledging the challenges related with implementation, including those of energy costs, depreciation of assets and impacts on international competition, and utilizing the opportunities to maximize co-benefits (*high confidence*). {1.3.3, 2.3.4, 2.3.5, 2.5.1, 2.5.2, Cross-Chapter Box 8 in Chapter 3, Cross-Chapter Box 11 in Chapter 4, 4.4.5, 5.5.2}

D.5.5 The systems transitions consistent with adapting to and limiting global warming to 1.5°C include the widespread adoption of new and possibly disruptive technologies and practices and enhanced climate-driven innovation. These imply enhanced technological innovation capabilities, including in industry and finance. Both national innovation policies and international cooperation can contribute to the development, commercialization and widespread adoption of mitigation and adaptation technologies. Innovation policies may be more effective when they combine public support for research and development with policy mixes that provide incentives for technology diffusion. (*high confidence*) {4.4.4, 4.4.5}.

D.5.6 Education, information, and community approaches, including those that are informed by indigenous knowledge and local knowledge, can accelerate the wide-scale behaviour changes consistent with adapting to and limiting global warming to 1.5°C. These approaches are more effective when combined with other policies and tailored to the motivations, capabilities and resources of specific actors and contexts (*high confidence*). Public acceptability can enable or inhibit the implementation of policies and measures to limit global warming to 1.5°C and to adapt to the consequences. Public acceptability depends on the individual's evaluation of expected policy consequences, the perceived fairness of the distribution of these consequences, and perceived fairness of decision procedures (*high confidence*). {1.1, 1.5, 4.3.5, 4.4.1, 4.4.3, Box 4.3, 5.5.3, 5.6.5}

**D.6 Sustainable development supports, and often enables, the fundamental societal and systems transitions and transformations that help limit global warming to 1.5°C. Such changes facilitate the pursuit of climate-resilient development pathways that achieve ambitious mitigation and adaptation in conjunction with poverty eradication and efforts to reduce inequalities (*high confidence*). {Box 1.1, 1.4.3, Figure 5.1, 5.5.3, Box 5.3}**

D.6.1 Social justice and equity are core aspects of climate-resilient development pathways that aim to limit global warming to 1.5°C as they address challenges and inevitable trade-offs, widen opportunities, and ensure that options, visions, and values are deliberated, between and within countries and communities, without making the poor and disadvantaged worse off (*high confidence*). {5.5.2, 5.5.3, Box 5.3, Figure 5.1, Figure 5.6, Cross-Chapter Boxes 12 and 13 in Chapter 5}

D.6.2 The potential for climate-resilient development pathways differs between and within regions and nations, due to different development contexts and systemic vulnerabilities (*very high confidence*). Efforts along such pathways to date have been limited (*medium confidence*) and enhanced efforts would involve strengthened and timely action from all countries and non-state actors (*high confidence*). {5.5.1, 5.5.3, Figure 5.1}

D.6.3 Pathways that are consistent with sustainable development show fewer mitigation and adaptation challenges and are associated with lower mitigation costs. The large majority of modelling studies could not construct pathways characterized by lack of international cooperation, inequality and poverty that were able to limit global warming to 1.5°C. (*high confidence*) {2.3.1, 2.5.1, 2.5.3, 5.5.2}

**D.7 Strengthening the capacities for climate action of national and sub-national authorities, civil society, the private sector, indigenous peoples and local communities can support the implementation of ambitious actions implied by limiting global warming to 1.5°C (*high confidence*). International cooperation can provide an enabling environment for this to be achieved in all countries and for all people, in the context of sustainable development. International cooperation is a critical enabler for developing countries and vulnerable regions (*high confidence*). {1.4, 2.3, 2.5, 4.2, 4.4, 4.5, 5.3, 5.4, 5.5, 5.6, 5, Box 4.1, Box 4.2, Box 4.7, Box 5.3, Cross-Chapter Box 9 in Chapter 4, Cross-Chapter Box 13 in Chapter 5}**

D.7.1 Partnerships involving non-state public and private actors, institutional investors, the banking system, civil society and scientific institutions would facilitate actions and responses consistent with limiting global warming to 1.5°C (*very high confidence*). {1.4, 4.4.1, 4.2.2, 4.4.3, 4.4.5, 4.5.3, 5.4.1, 5.6.2, Box 5.3}.

D.7.2 Cooperation on strengthened accountable multilevel governance that includes non-state actors such as industry, civil society and scientific institutions, coordinated sectoral and cross-sectoral policies at various governance levels, gender-sensitive policies, finance including innovative financing, and cooperation on technology development and transfer can ensure participation, transparency, capacity building and learning among different players (*high confidence*). {2.5.1, 2.5.2, 4.2.2, 4.4.1, 4.4.2, 4.4.3, 4.4.4, 4.4.5, 4.5.3, Cross-Chapter Box 9 in Chapter 4, 5.3.1, 5.5.3, Cross-Chapter Box 13 in Chapter 5, 5.6.1, 5.6.3}

D.7.3 International cooperation is a critical enabler for developing countries and vulnerable regions to strengthen their action for the implementation of 1.5°C-consistent climate responses, including through enhancing access to finance and technology and enhancing domestic capacities, taking into account national and local circumstances and needs (*high confidence*). {2.3.1, 2.5.1, 4.4.1, 4.4.2, 4.4.4, 4.4.5, 5.4.1 5.5.3, 5.6.1, Box 4.1, Box 4.2, Box 4.7}.

D.7.4 Collective efforts at all levels, in ways that reflect different circumstances and capabilities, in the pursuit of limiting global warming to 1.5°C, taking into account equity as well as effectiveness, can facilitate strengthening the global response to climate change, achieving sustainable development and eradicating poverty (*high confidence*). {1.4.2, 2.3.1, 2.5.1, 2.5.2, 2.5.3, 4.2.2, 4.4.1, 4.4.2, 4.4.3, 4.4.4, 4.4.5, 4.5.3, 5.3.1, 5.4.1, 5.5.3, 5.6.1, 5.6.2, 5.6.3}

### Box SPM.1: Core Concepts Central to this Special Report

**Global mean surface temperature (GMST):** Estimated global average of near-surface air temperatures over land and sea ice, and sea surface temperatures over ice-free ocean regions, with changes normally expressed as departures from a value over a specified reference period. When estimating changes in GMST, near-surface air temperature over both land and oceans are also used.[19] {1.2.1.1}

**Pre-industrial:** The multi-century period prior to the onset of large-scale industrial activity around 1750. The reference period 1850–1900 is used to approximate pre-industrial GMST. {1.2.1.2}

**Global warming:** The estimated increase in GMST averaged over a 30-year period, or the 30-year period centred on a particular year or decade, expressed relative to pre-industrial levels unless otherwise specified. For 30-year periods that span past and future years, the current multi-decadal warming trend is assumed to continue. {1.2.1}

**Net zero $CO_2$ emissions:** Net zero carbon dioxide ($CO_2$) emissions are achieved when anthropogenic $CO_2$ emissions are balanced globally by anthropogenic $CO_2$ removals over a specified period.

**Carbon dioxide removal (CDR):** Anthropogenic activities removing $CO_2$ from the atmosphere and durably storing it in geological, terrestrial, or ocean reservoirs, or in products. It includes existing and potential anthropogenic enhancement of biological or geochemical sinks and direct air capture and storage, but excludes natural $CO_2$ uptake not directly caused by human activities.

**Total carbon budget:** Estimated cumulative net global anthropogenic $CO_2$ emissions from the pre-industrial period to the time that anthropogenic $CO_2$ emissions reach net zero that would result, at some probability, in limiting global warming to a given level, accounting for the impact of other anthropogenic emissions. {2.2.2}

**Remaining carbon budget:** Estimated cumulative net global anthropogenic $CO_2$ emissions from a given start date to the time that anthropogenic $CO_2$ emissions reach net zero that would result, at some probability, in limiting global warming to a given level, accounting for the impact of other anthropogenic emissions. {2.2.2}

**Temperature overshoot:** The temporary exceedance of a specified level of global warming.

**Emission pathways:** In this Summary for Policymakers, the modelled trajectories of global anthropogenic emissions over the 21st century are termed emission pathways. Emission pathways are classified by their temperature trajectory over the 21st century: pathways giving at least 50% probability based on current knowledge of limiting global warming to below 1.5°C are classified as 'no overshoot'; those limiting warming to below 1.6°C and returning to 1.5°C by 2100 are classified as '1.5°C limited-overshoot'; while those exceeding 1.6°C but still returning to 1.5°C by 2100 are classified as 'higher-overshoot'.

**Impacts:** Effects of climate change on human and natural systems. Impacts can have beneficial or adverse outcomes for livelihoods, health and well-being, ecosystems and species, services, infrastructure, and economic, social and cultural assets.

**Risk:** The potential for adverse consequences from a climate-related hazard for human and natural systems, resulting from the interactions between the hazard and the vulnerability and exposure of the affected system. Risk integrates the likelihood of exposure to a hazard and the magnitude of its impact. Risk also can describe the potential for adverse consequences of adaptation or mitigation responses to climate change.

**Climate-resilient development pathways (CRDPs):** Trajectories that strengthen sustainable development at multiple scales and efforts to eradicate poverty through equitable societal and systems transitions and transformations while reducing the threat of climate change through ambitious mitigation, adaptation and climate resilience.

---

19 Past IPCC reports, reflecting the literature, have used a variety of approximately equivalent metrics of GMST change.

The New York Times | https://nyti.ms/2reaFi7

# *Climate Change Is Accelerating, Bringing World 'Dangerously Close' to Irreversible Change*

**By Henry Fountain**

Published Dec. 4, 2019 Updated Dec. 5, 2019

More devastating fires in California. Persistent drought in the Southwest. Record flooding in Europe and Africa. A heat wave, of all things, in Greenland.

Climate change and its effects are accelerating, with climate related disasters piling up, season after season.

"Things are getting worse," said Petteri Taalas, Secretary General of the World Meteorological Organization, which on Tuesday issued its annual state of the global climate report, concluding a decade of what it called exceptional global heat. "It's more urgent than ever to proceed with mitigation."

But reducing greenhouse gas emissions to fight climate change will require drastic measures, Dr. Taalas said. "The only solution is to get rid of fossil fuels in power production, industry and transportation," he said.

Seas are warming and rising faster, putting more cities at risk of tidal flooding or worse. Glaciers are melting at a pace many researchers did not expect for decades. The amount of Arctic sea ice has declined so rapidly that the region may see ice-free summers by the 2030s.

Even the ground itself is warming faster. Permanently frozen ground, or permafrost, is thawing more rapidly, threatening the release of large amounts of long-stored carbon that could in turn make warming even worse, in what scientists call a climate feedback loop.

In a recent commentary in the journal Nature, scientists from the Potsdam Institute for Climate Impact Research in Germany and other institutions warned that the acceleration of ice loss and other effects of climate change have brought the world "dangerously close" to abrupt and irreversible changes, or tipping points. Among these, the researchers said, were the collapse of at least part of the West Antarctic ice sheet — which itself could eventually raise sea levels by four feet or more — or the loss of the Amazon rainforest.

"In our view, the consideration of tipping points helps to define that we are in a climate emergency," they wrote.

The societal toll is accelerating, too, United Nations Secretary General António Guterres said in Madrid before the opening this week of the U.N.'s annual climate conference. "Climate-related natural disasters are becoming more frequent, more deadly, more destructive, with growing human and financial costs," he said.



Flooding in Mogadishu, Somalia, in October. Feisal Omar/Reuters

FS-002213



Burnt farms in Piseux, northwest France, in July during a heat wave. Agence France-Presse — Getty Images

FS-002214

For individual extreme weather events or other disasters it can be difficult to fully separate the effects of global warming from those of natural climate variability and other factors. Warming can make wildfires worse, for example — it makes vegetation drier and more combustible — but forest management practices, as well as decisions about where to build, also affect the degree of devastation.

Yet a growing number of studies have shown the influence of global warming in many disasters. Heat waves in Europe in June and July, extreme rainfall in Texas during Tropical Storm Imelda in September, the drought that precipitated the "Day Zero" water crisis in Cape Town in 2018 are among many events shown to have been made more likely, more intense, or both, by climate change.

Effects like loss of sea ice, more severe heat waves and changes in rainfall patterns were long predicted by scientists and described in reports like those of the Intergovernmental Panel on Climate Change and, in the United States, the National Climate Assessments produced by federal researchers.

"So much of what we're seeing is exactly consistent with what's expected from climate change," said Philip B. Duffy, a physicist and president of the Woods Hole Research Center, which studies the environment.

*Want climate news in your inbox? Sign up here for **Climate Fwd:**, our email newsletter.*

At the root of the changes is the basic process of global warming. As carbon dioxide and other greenhouse gases build up in the atmosphere, they trap more of the heat that radiates from Earth's surface as it absorbs sunlight.

The W.M.O.'s state of the global climate report, released at the Madrid talks, said that this decade will almost certainly be the warmest decade on record. And the second half of the decade was much warmer than the first, with global temperatures averaged over the second half about 0.2 degree Celsius (about 0.4 degree Fahrenheit) higher.

"All the time we're breaking records in temperatures," Dr. Taalas said.

The records extend to the oceans as well, which absorb about 90 percent of the excess heat retained by Earth as a result of increased greenhouse gases. Average ocean temperatures so far this year exceed those of 2018, which were records, the report said.

Since the rise of industry in the second half of the 19th century, when widespread emissions of greenhouse gases began, the world has warmed by about 1.1 degrees Celsius.

But how fast temperatures will continue to increase, and how much worse things may get, depends in large part on whether the world reins in greenhouse gas emissions, and by how much. After flattening between 2014 and 2016, annual emissions from burning fossil fuels for energy have risen again.

FS-002215




Filling water buckets from a government water pump in the drought-ravaged Lamhata village in Uttar Pradesh, India, earlier this year. Bryan Denton for The New York Times

Bathing in a fountain in St. Petersburg, Russia, during unseasonably hot temperatures in July. Dmitri Lovetsky/Associated Press

The 2015 Paris agreement called for countries to pursue efforts to limit warming this century to 2 degrees Celsius (3.6 degrees Fahrenheit) above preindustrial levels, with an even stricter target of 1.5 degrees Celsius. But the United States under President Trump is leaving the agreement, and a United Nations report last month suggested that even if countries meet their pledges to cut emissions, and many are far off track, warming would be more than twice the 1.5-degree target.

Acceleration of some elements of climate change has been expected, and has now been detected thanks to improvements in measurements. Sea level readings, for example, are now far more extensive, frequent and precise thanks to satellite sensors in use for the last quarter-century. In the past, scientists had to rely on tide gauges.

Using satellite data, a 2018 study found that global sea level rise is now about 4.5 millimeters a year, or a little less than one-fifth of an inch. The rate is increasing by about a 10th of a millimeter a year.

"We knew the rate of sea level rise was increasing, but we had difficulty detecting that," said Steven Nerem, a University of Colorado researcher and lead author of the study.

The study estimated that the acceleration would result in sea level rise by the end of this century of 65 centimeters, or about 25 inches, which is more than double the rise if the rate had remained constant.

Sea level rise results from a combination of melting glaciers and ice sheets, and the thermal expansion of seawater as ocean temperatures rise. As with most of the projected effects of climate change, there is a high level of uncertainty about future sea levels.

"No one is terribly sure about what will happen by 2100," Dr. Nerem said. "If the ice sheets really start to go, things could change dramatically."

Greenland and Antarctica hold enough ice to raise seas by about 220 feet if it all melted. Complete melting would take many centuries, but melting is speeding up on the Greenland sheet, which currently contributes about two-thirds of a millimeter to sea level rise annually, and on much of the West Antarctic sheet.

"This is a consequence of the warming temperatures of climate change," said Marco Tedesco, a climate scientist at the Lamont-Doherty Earth Observatory at Columbia University.

"Overall we do not expect Greenland to slow down," he said. "And we definitely expect an acceleration in mass loss of the West Antarctic ice sheet." While the West Antarctic sheet currently contributes a small amount to sea level rise, eventually it could contribute as much as Greenland, he said.

Melting permafrost threatening a home in Kivalina, Alaska, a coastal village 83 miles above the Arctic Circle. Joe Raedle/Getty Images

Rivulets of meltwater cleaving the Greenland ice sheet near Ilulissat in August. Sean Gallup/Getty Images

Amid the long term increase in ice-sheet melting there have been some exceptional periods, including this summer in Greenland, when heat from Europe spread north, resulting in temperatures as much as 15 degrees Fahrenheit above normal. Overall this year, Greenland had a net ice loss of about 350 billion tons, about 20 percent more than the average in recent years and enough to add one millimeter to sea levels by itself.

A recent analysis by Dr. Tedesco and a colleague showed that a rare combination of atmospheric conditions, related to instability of the polar jet stream that encircles Earth at high northern latitudes, led to this summer's melting. Some scientists have suggested that this jet stream instability, or wobbling, is a result of climate change, although the idea is not completely accepted.

Warming in the Far North affects more than ice. Louise Farquharson, a geologist and researcher at the University of Alaska-Fairbanks, studies the effect of climate change on permafrost. In the Arctic, ground can be permanently frozen from near the surface to several thousand feet deep.

"We see warming across the board, and generally the rate of warming is increasing," Dr. Farquharson said. "But the impact varies significantly."

Her recent research found rapid thawing of permafrost high in the Canadian Arctic, where there is little surface vegetation to insulate the frozen ground. By 2016 the permafrost had already thawed at depths not expected until 2090 under a model of "moderate" global warming.

While the permafrost at her study sites contains little organic matter, much of the Arctic's permafrost contains large amounts of dead vegetation built up over hundreds or thousands of years. This makes it a huge storehouse of carbon: By some estimates, Arctic permafrost contains about twice as much carbon as is currently in the atmosphere.

When it thaws, the organic matter begins to decompose, and the carbon enters the atmosphere as methane or carbon dioxide, adding to warming.

A floating iceberg in Disko Bay in Ilulissat, Greenland, in August. Sean Gallup/Getty Images

For more news on climate and the environment, follow @NYTClimate on Twitter.

Case No. 1:23-cv-01501-RMR Document 15-6 filed 09/29/23 USDC Colorado pg 273 of 278

EPA United States Environmental Protection Agency

August 2016
EPA 430-F-16-008

# What Climate Change *Means for* Colorado

**Colorado**'s climate is changing. Most of the state has warmed one or two degrees (F) in the last century. Throughout the western United States, heat waves are becoming more common, snow is melting earlier in spring, and less water flows through the Colorado River. Rising temperatures and recent droughts in the region have killed many trees by drying out soils, increasing the risk of forest fires, or enabling outbreaks of forest insects. In the coming decades, the changing climate is likely to decrease water availability and agricultural yields in Colorado, and further increase the risk of wildfires.

Our climate is changing because the earth is warming. People have increased the amount of carbon dioxide in the air by 40 percent since the late 1700s. Other heat-trapping greenhouse gases are also increasing. These gases have warmed the surface and lower atmosphere of our planet about one degree during the last 50 years. Evaporation increases as the atmosphere warms, which increases humidity, average rainfall, and the frequency of heavy rainstorms in many places—but contributes to drought in others.

Greenhouse gases are also changing the world's oceans and ice cover. Carbon dioxide reacts with water to form carbonic acid, so the oceans are becoming more acidic. The surface of the ocean has warmed about one degree during the last 80 years. Warming is causing snow to melt earlier in spring.




*Rising temperatures in the last century. The last decade was the warmest on record throughout the West. Source: EPA, Climate Change Indicators in the United States.*

## Snowpack

Changes in temperature and precipitation are affecting snowpack—the amount of snow that accumulates on the ground. In most of the West, snowpack has decreased since the 1950s, due to earlier melting and less precipitation falling as snow. The amount of snowpack measured in April has declined by 20 to 60 percent at most monitoring sites in Colorado.

Diminishing snowpack can shorten the season for skiing and other forms of winter tourism and recreation. It also enables subalpine fir and other high-altitude trees to grow at higher elevations. The upward movement of the tree line will shrink the extent of alpine tundra and fragment these ecosystems, possibly causing the loss of some species.



*Mount Evans in late August with Summit Lake in the foreground. During the winter, the mountain is covered by snowpack, which melts during spring and summer. The water runs off the mountain into streams that eventually flow into the South Platte River. These streams are an important part of the water supply for cities and towns along the Front Range. By August, little of the snowpack remains, as shown in the photo. As climate warms, even less snow will remain at this time of year. Credit: Boilerinbtown, Creative Commons.*




*Trends in April snowpack in Colorado, 1955–2013. The snowpack has declined at most monitoring sites in Colorado. Source: EPA.*

## Water Availability

Throughout the West, much of the water needed for agriculture, public supplies, and other uses comes from mountain snowpack, which melts in spring and summer and runs off into rivers and fills reservoirs. Over the past 50 years, snow has been melting earlier in the year, and more late-winter precipitation has been falling as rain instead of snow. Thus, water drains from the mountains earlier in the year. In many cases, dams capture the meltwater and retain it for use later in the year. But upstream of these dams, less water is available during droughts for ecosystems, fish, water-based recreation, and landowners who draw water directly from a flowing river.

Rising temperatures also increase the rate at which water evaporates (or transpires) into the air from soils and plants. Unless rainfall increases to the same extent as evaporation, soils become drier. As a result, the soil retains more water when it rains, and thus less water runs off into rivers, streams, and reservoirs. During the last few decades, soils have become drier in most of the state, especially during summer. In the decades to come, rainfall during summer is more likely to decrease than increase in Colorado, and periods without rain are likely to become longer. All of these factors would tend to make droughts more severe in the future.

## Agriculture

Changing the climate is likely to have both positive and negative effects on Colorado's farms and ranches. Livestock and field crops in the eastern part of the state rely primarily on ground water pumped from the High Plains Aquifer, which is becoming depleted. About 20 percent of crop land in eastern Colorado is irrigated. Higher evaporation rates will increase irrigation demands and reduce natural recharge of the aquifer, further lowering the water table. Reduced water availability will force some farms to switch from irrigation to dry land farming, which typically cuts yields in half. Increasingly severe heat waves would harm livestock. Even where ample water is available, higher temperatures would reduce yields of corn.

Shorter winters are likely to reduce yields of winter wheat. Colorado is currently the fourth largest grower of winter wheat, which is an important source of food for livestock. Increased concentrations of carbon dioxide, however, may increase yields of wheat enough to offset the impact of higher temperatures. Warmer and shorter winters may allow for a longer growing season, which could allow two crops per year instead of one in some instances.

## Wildfires

Higher temperatures and drought are likely to increase the severity, frequency, and extent of wildfires in Colorado, which could harm property, livelihoods, and human health. In 2013, the Black Forest Fire burned 14,000 acres and destroyed over 500 homes. Wildfire smoke can reduce air quality and increase medical visits for chest pains, respiratory problems, and heart problems. The size and number of western forest fires have increased substantially since 1985.



*In 2013, Colorado experienced the most destructive wildfire (the Black Forest Fire, shown here) and the second-largest wildfire (the West Fork Fire Complex) in the state's recorded history. Credit: National Wildfire Coordinating Group.*

## Pests

Warmer, drier conditions also make forests more susceptible to pests. Temperature controls the life cycle and winter mortality rates of pests such as the mountain pine beetle. With higher winter temperatures, some pests can persist year-round, and new pests and diseases may become established. Drought also reduces the ability of trees to mount a defense against attacks from beetles and other pests. A mountain pine beetle outbreak in 2006 covered nearly half of Colorado's forests and killed nearly five million lodgepole pines.



*In the northern Williams Range Mountains, beetles have killed more than 80 percent of mature lodgepole pines over many square kilometers. Credit: USGS.*

## Human Health

Extreme temperatures and heat events can cause heat stroke and dehydration, and affect people's cardiovascular, respiratory, and nervous systems. Higher temperatures are amplified in urban settings where paved and other surfaces tend to store heat. Certain people are especially vulnerable, including children, the elderly, the sick, and the poor.

Rising temperatures also increase the formation of ground-level ozone, a key component of smog. Ozone has a variety of health effects, aggravates lung diseases such as asthma, and increases the risk of premature death from heart or lung disease. EPA and the Colorado Department of Public Health and Environment have been working to reduce ozone concentrations. As the climate changes, continued progress toward clean air will be more difficult.

The sources of information about climate and the impacts of climate change in this publication are: the national climate assessments by the U.S. Global Change Research Program, synthesis and assessment products by the U.S. Climate Change Science Program, assessment reports by the Intergovernmental Panel on Climate Change, and EPA's *Climate Change Indicators in the United States*. Mention of a particular season, location, species, or any other aspect of an impact does not imply anything about the likelihood or importance of aspects that are not mentioned. For more information about climate change science, impacts, responses, and what you can do, visit EPA's Climate Change website at www.epa.gov/climatechange.

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



# Presidential Documents

**Executive Order 13990 of January 20, 2021**

## Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1**. *Policy.* Our Nation has an abiding commitment to empower our workers and communities; promote and protect our public health and the environment; and conserve our national treasures and monuments, places that secure our national memory. Where the Federal Government has failed to meet that commitment in the past, it must advance environmental justice. In carrying out this charge, the Federal Government must be guided by the best science and be protected by processes that ensure the integrity of Federal decision-making. It is, therefore, the policy of my Administration to listen to the science; to improve public health and protect our environment; to ensure access to clean air and water; to limit exposure to dangerous chemicals and pesticides; to hold polluters accountable, including those who disproportionately harm communities of color and low-income communities; to reduce greenhouse gas emissions; to bolster resilience to the impacts of climate change; to restore and expand our national treasures and monuments; and to prioritize both environmental justice and the creation of the well-paying union jobs necessary to deliver on these goals.

To that end, this order directs all executive departments and agencies (agencies) to immediately review and, as appropriate and consistent with applicable law, take action to address the promulgation of Federal regulations and other actions during the last 4 years that conflict with these important national objectives, and to immediately commence work to confront the climate crisis.

**Sec. 2**. *Immediate Review of Agency Actions Taken Between January 20, 2017, and January 20, 2021.* (a) The heads of all agencies shall immediately review all existing regulations, orders, guidance documents, policies, and any other similar agency actions (agency actions) promulgated, issued, or adopted between January 20, 2017, and January 20, 2021, that are or may be inconsistent with, or present obstacles to, the policy set forth in section 1 of this order. For any such actions identified by the agencies, the heads of agencies shall, as appropriate and consistent with applicable law, consider suspending, revising, or rescinding the agency actions. In addition, for the agency actions in the 4 categories set forth in subsections (i) through (iv) of this section, the head of the relevant agency, as appropriate and consistent with applicable law, shall consider publishing for notice and comment a proposed rule suspending, revising, or rescinding the agency action within the time frame specified.

(i) Reducing Methane Emissions in the Oil and Gas Sector: ''Oil and Natural Gas Sector: Emission Standards for New, Reconstructed, and Modified Sources Reconsideration,'' 85 FR 57398 (September 15, 2020), by September 2021.

(ii) Establishing Ambitious, Job-Creating Fuel Economy Standards: ''The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program,'' 84 FR 51310 (September 27, 2019), by April 2021; and ''The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021–2026 Passenger Cars and Light Trucks,'' 85 FR 24174 (April 30,

2020), by July 2021. In considering whether to propose suspending, revising, or rescinding the latter rule, the agency should consider the views of representatives from labor unions, States, and industry.

(iii) Job-Creating Appliance- and Building-Efficiency Standards: ''Energy Conservation Program for Appliance Standards: Procedures for Use in New or Revised Energy Conservation Standards and Test Procedures for Consumer Products and Commercial/Industrial Equipment,'' 85 FR 8626 (February 14, 2020), with major revisions proposed by March 2021 and any remaining revisions proposed by June 2021; ''Energy Conservation Program for Appliance Standards: Procedures for Evaluating Statutory Factors for Use in New or Revised Energy Conservation Standards,'' 85 FR 50937 (August 19, 2020), with major revisions proposed by March 2021 and any remaining revisions proposed by June 2021; ''Final Determination Regarding Energy Efficiency Improvements in the 2018 International Energy Conservation Code (IECC),'' 84 FR 67435 (December 10, 2019), by May 2021; ''Final Determination Regarding Energy Efficiency Improvements in ANSI/ASHRAE/IES Standard 90.1–2016: Energy Standard for Buildings, Except Low-Rise Residential Buildings,'' 83 FR 8463 (February 27, 2018), by May 2021.

(iv) Protecting Our Air from Harmful Pollution: ''National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units—Reconsideration of Supplemental Finding and Residual Risk and Technology Review,'' 85 FR 31286 (May 22, 2020), by August 2021; ''Increasing Consistency and Transparency in Considering Benefits and Costs in the Clean Air Act Rulemaking Process,'' 85 FR 84130 (December 23, 2020), as soon as possible; ''Strengthening Transparency in Pivotal Science Underlying Significant Regulatory Actions and Influential Scientific Information,'' 86 FR 469 (January 6, 2021), as soon as possible.

(b) Within 30 days of the date of this order, heads of agencies shall submit to the Director of the Office of Management and Budget (OMB) a preliminary list of any actions being considered pursuant to section (2)(a) of this order that would be completed by December 31, 2021, and that would be subject to OMB review. Within 90 days of the date of this order, heads of agencies shall submit to the Director of OMB an updated list of any actions being considered pursuant to section (2)(a) of this order that would be completed by December 31, 2025, and that would be subject to OMB review. At the time of submission to the Director of OMB, heads of agencies shall also send each list to the National Climate Advisor. In addition, and at the same time, heads of agencies shall send to the National Climate Advisor a list of additional actions being considered pursuant to section (2)(a) of this order that would not be subject to OMB review.

(c) Heads of agencies shall, as appropriate and consistent with applicable law, consider whether to take any additional agency actions to fully enforce the policy set forth in section 1 of this order. With respect to the Administrator of the Environmental Protection Agency, the following specific actions should be considered:

(i) proposing new regulations to establish comprehensive standards of performance and emission guidelines for methane and volatile organic compound emissions from existing operations in the oil and gas sector, including the exploration and production, transmission, processing, and storage segments, by September 2021; and

(ii) proposing a Federal Implementation Plan in accordance with the Environmental Protection Agency's ''Findings of Failure To Submit State Implementation Plan Revisions in Response to the 2016 Oil and Natural Gas Industry Control Techniques Guidelines for the 2008 Ozone National Ambient Air Quality Standards (NAAQS) and for States in the Ozone Transport Region,'' 85 FR 72963 (November 16, 2020), for California, Connecticut, New York, Pennsylvania, and Texas by January 2022.

(d) The Attorney General may, as appropriate and consistent with applicable law, provide notice of this order and any actions taken pursuant to section 2(a) of this order to any court with jurisdiction over pending litigation related to those agency actions identified pursuant to section (2)(a) of this order, and may, in his discretion, request that the court stay or otherwise dispose of litigation, or seek other appropriate relief consistent with this order, until the completion of the processes described in this order.

(e) In carrying out the actions directed in this section, heads of agencies shall seek input from the public and stakeholders, including State local, Tribal, and territorial officials, scientists, labor unions, environmental advocates, and environmental justice organizations.

**Sec. 3**. *Restoring National Monuments.* (a) The Secretary of the Interior, as appropriate and consistent with applicable law, including the Antiquities Act, 54 U.S.C. 320301 *et seq.,* shall, in consultation with the Attorney General, the Secretaries of Agriculture and Commerce, the Chair of the Council on Environmental Quality, and Tribal governments, conduct a review of the monument boundaries and conditions that were established by Proclamation 9681 of December 4, 2017 (Modifying the Bears Ears National Monument); Proclamation 9682 of December 4, 2017 (Modifying the Grand Staircase-Escalante National Monument); and Proclamation 10049 of June 5, 2020 (Modifying the Northeast Canyons and Seamounts Marine National Monument), to determine whether restoration of the monument boundaries and conditions that existed as of January 20, 2017, would be appropriate.

(b) Within 60 days of the date of this order, the Secretary of the Interior shall submit a report to the President summarizing the findings of the review conducted pursuant to subsection (a), which shall include recommendations for such Presidential actions or other actions consistent with law as the Secretary may consider appropriate to carry out the policy set forth in section 1 of this order.

(c) The Attorney General may, as appropriate and consistent with applicable law, provide notice of this order to any court with jurisdiction over pending litigation related to the Grand Staircase-Escalante, Bears Ears, and Northeast Canyons and Seamounts Marine National Monuments, and may, in his discretion, request that the court stay the litigation or otherwise delay further litigation, or seek other appropriate relief consistent with this order, pending the completion of the actions described in subsection (a) of this section.

**Sec. 4**. *Arctic Refuge.* (a) In light of the alleged legal deficiencies underlying the program, including the inadequacy of the environmental review required by the National Environmental Policy Act, the Secretary of the Interior shall, as appropriate and consistent with applicable law, place a temporary moratorium on all activities of the Federal Government relating to the implementation of the Coastal Plain Oil and Gas Leasing Program, as established by the Record of Decision signed August 17, 2020, in the Arctic National Wildlife Refuge. The Secretary shall review the program and, as appropriate and consistent with applicable law, conduct a new, comprehensive analysis of the potential environmental impacts of the oil and gas program.

(b) In Executive Order 13754 of December 9, 2016 (Northern Bering Sea Climate Resilience), and in the Presidential Memorandum of December 20, 2016 (Withdrawal of Certain Portions of the United States Arctic Outer Continental Shelf From Mineral Leasing), President Obama withdrew areas in Arctic waters and the Bering Sea from oil and gas drilling and established the Northern Bering Sea Climate Resilience Area. Subsequently, the order was revoked and the memorandum was amended in Executive Order 13795 of April 28, 2017 (Implementing an America-First Offshore Energy Strategy). Pursuant to section 12(a) of the Outer Continental Shelf Lands Act, 43 U.S.C. 1341(a), Executive Order 13754 and the Presidential Memorandum of December 20, 2016, are hereby reinstated in their original form, thereby restoring the original withdrawal of certain offshore areas in Arctic waters and the Bering Sea from oil and gas drilling.