The BMPs Rx rating is "All," "Some," or "None" depending on the degree to which BMP prescriptions were established for the project or activity and were included in the project implementing document. If there is no planning or other BMP guidance document, the BMPs Rx rating is "No BMPs." If there is a planning or other BMP guidance document but it does not contain site-specific BMP prescriptions, the BMPs Rx rating is "No BMPs Rx."

**BMPs were implemented (BMPs Imp):** This grouping of implementation questions addresses operational execution of planning, or "Were the site-specific BMP prescriptions implemented as intended?" In most protocols, the BMPs Imp rating is based on one comprehensive implementation question about which BMP provisions in the project implementing document were implemented fully on the ground. Some protocols have additional implementation questions that address implementation of site-specific BMP prescriptions, which are also factored into the BMPs Imp rating. For example, protocol WatUses A asks if the well apron or collar meets all State and local requirements for materials, size, and thickness.

The BMPs Imp rating is "All," "Some," or "None" depending on the degree to which BMP prescriptions were implemented fully at the site.

**Corrective actions were implemented (C.A.):** This grouping of implementation questions also addresses operational execution and looks at whether water quality problems are recognized and corrected during project implementation or ongoing activities. The types of implementation questions used for the C.A. rating include questions about whether inspections of the project site were made, if supplemental erosion control was needed, and if the site was closed or improvement treatments were applied. The C.A. rating is "All," "Some," or "None" depending on the degree to which water quality problems were identified and corrected during project implementation.

**Implementation rating:** The BMPs Rx, BMPs Imp, and C.A. ratings are combined into the implementation rating for an evaluation, as shown in Table B-2.

## BMP Effectiveness Rating Outcomes

BMP effectiveness monitoring answers the question, "Were the site-specific BMP prescriptions, as implemented, effective at protecting water quality?" Effectiveness monitoring assesses the prevention of pollutants from moving into a waterbody and prevention of adverse effects to a waterbody. Pollutant movement and potential threat are judged by how many occurrences and the type of visible evidence of pollutants attributable to the project or activity being evaluated are found in the Aquatic Management Zone (AMZ) or waterbody. "Adverse effects to a waterbody" refers to negative physical disturbance or other change to waterbody morphology from the project or activity being evaluated. Effectiveness questions in the monitoring protocols are designed to obtain information about the presence and movement of pollutants offsite and observable disturbances to a waterbody. The effectiveness rating categories are shown in Table B-3.

To determine the effectiveness rating, selected effectiveness questions are divided into groups of related questions, typically by pollutant type or location at the project site. For example, in a particular protocol, all questions about erosion and sedimentation may be grouped together in one group and questions about trash and sanitary waste are placed in a separate group. For another, in a different protocol, all erosion and sedimentation questions pertaining to the AMZ may be in one group and all erosion and sedimentation questions pertaining to the waterbody crossing may be placed in a separate group. The number of groups in each protocol depends on the number of effectiveness questions and how they are organized. Some protocols have as few as 2 effectiveness groups, and more complicated protocols may have as many as 12. A Group effectiveness rating is assigned to each grouping of effectiveness questions. Depending on the nature of the questions and the ability to distinguish effects from the questions asked, the group effectiveness rating is either a three-category scale or four-category scale. The three-category scale is "Effective," "Moderately Effective," and "Not Effective." The four-category scale is

**Table B-2.** Matrix to determine the implementation rating.

| Implementation rating | BMPs Rx | BMPs Imp | C.A. |
|---|---|---|---|
| Fully Implemented (all are true) | All | All | All |
| Mostly Implemented (all are true) | Some | All | All or some |
| | All | All | Some |
| Marginally Implemented (all are true) | All or some | Some | All or some |
| Not Implemented (any one is true) | None | None | None |
| No BMPs (either is true) | No BMPs or no BMPs Rx | | |

BMP = Best Management Practice.



FS-002763

**Table B-3.** Definitions of rating categories for BMP effectiveness.

<table>
<tr><th>Effectiveness rating</th><th colspan="2">Interpretation</th></tr>
<tr><td>Effective</td><td colspan="2">No pollutants reached the waterbody and there is no potential threat evident,<br>–and–<br>Waterbody received no adverse effects from the project or activity (e.g., physical disturbance).</td></tr>
<tr><td>Mostly Effective</td><td colspan="2">Minor amounts of pollutants reached the waterbody or there is a potential threat evident,<br>–and/or–<br>Waterbody received minor adverse effects from the project or activity,<br>–and/or–<br>Impacts to water quality are temporary, lasting less than 1 year.</td></tr>
<tr><td>Marginally Effective</td><td>Minor amounts of pollutants reached the waterbody or there is a potential threat evident,<br>–and/or–<br>Waterbody received minor adverse effects from the project or activity,<br>–and/or–<br>Impacts to water quality are prolonged, lasting more than 1 year.</td><td>Major amounts of pollutants reached the waterbody or there is a potential threat evident,<br>–and/or–<br>Waterbody received major adverse effects from the project or activity,<br>–and/or–<br>Impacts to water quality are temporary, lasting less than 1 year.</td></tr>
<tr><td>Not Effective</td><td colspan="2">Major amounts of pollutants reached the waterbody or are very close to entering the waterbody,<br>–or–<br>Waterbody received major adverse effects from the project or activity,<br>–and–<br>Impacts to water quality are prolonged, lasting more than 1 year.</td></tr>
</table>

BMP = Best Management Practice.

"Effective," "Mostly Effective," "Marginally Effective," and "Not Effective." The group ratings are then combined to determine the overall effectiveness rating for the evaluation.

To determine the Group effectiveness rating, the answer choices for each question within the group are rated as "Not Applicable," "Effective," "Mostly Effective," "Moderately Effective," "Marginally Effective," "Not Effective," "No Potential Threat," "Potential Threat," or "Major Potential Threat." For example, the answer choice "no evidence of erosion or sedimentation" is rated as "Effective," whereas the answer choice "flow was poorly controlled or uncontrolled" is rated as "Potential Threat." Each group has at least one effectiveness question, and some can have five or more. The Group effectiveness rating is generally based on the worst rating of the answer choices selected within that grouping. That is, generally all questions in the group need to be rated as "Effective" or "No Potential Threat" in order for the Group effectiveness rating to be "Effective." If any of the questions within the group are rated as "Not Effective," the Group effectiveness rating is also "Not Effective."

The overall effectiveness rating for the evaluation is also based on the worst rating of the group ratings in that evaluation. In order for the overall effectiveness rating to be "Effective," all the group ratings have to be "Effective." If any of the group ratings are "Not Effective," the overall effectiveness rating is "Not Effective" as well. An overall effectiveness rating of "Mostly Effective" results when at least one of the group ratings is "Mostly Effective" and none are "Marginally Effective" or "Not Effective." For example, Table B-4 shows the criteria for the overall effectiveness rating for protocol Road E.

**Table B-4.** Matrix to determine the effectiveness rating for protocol Road E, active road decommissioning.

| Road E effectiveness rating | ER[WBC][a] | ER[RS][b] | ER[CF][c] |
|---|---|---|---|
| Effective (all are true) | Effective –or– no waterbody crossing | Effective | Effective |
| Mostly Effective | Any combination of **ER[WBC]** or **ER[RS]** is Mostly Effective or **ER[CF]** is Moderately Effective, –and– neither **ER[WBC]** or **ER[RS]** is Marginally Effective, –and– none of **ER[WBC]**, **ER[RS]**, or **ER[CF]** is Not Effective. | | |
| Marginally Effective | Any combination of **ER[WBC]** or **ER[RS]** is Marginally Effective, –and– none of **ER[WBC]**, **ER[RS]**, or **ER[CF]** is Not Effective. | | |
| Not Effective (any are true) | Not Effective | Not Effective | Not Effective |

[a] ER[WBC] is effectiveness rating for waterbody crossing.
[b] ER[RS] is effectiveness rating for road segment.
[c] ER[CF] is effectiveness rating for chemicals and fuels.

## Overall BMP Performance Rating Outcomes

Once the evaluation ratings for BMP implementation and effectiveness have been decided, an overall BMP performance rating for that BMP evaluation will be determined according to the matrix in Table B-5. There are five possible overall BMP performance ratings: “Excellent,” “Good,” “Fair,” “Poor,” and “No Plan.” In determining the overall performance rating, greater weight is given to the effectiveness rating. For example, an overall rating of “Excellent” can be achieved even if the implementation rating is not “Fully Implemented” as long as the effectiveness rating is “Effective.” The overall performance rating of “No Plan” is assigned to an evaluation for which the implementation rating is “No BMPs,” which means that no BMPs were prescribed for the project or activity during planning. This rating represents a total failure of the BMP process and is a negative outcome, even if the effectiveness rating is “Effective.”

**Table B-5.** Matrix for determining overall BMP performance rating for a site evaluation.

| Combined scoring | | Implementation rating (IR) | | | | |
|---|---|---|---|---|---|---|
| | | Fully Implemented | Mostly Implemented | Marginally Implemented | Not Implemented | No BMPs |
| Effectiveness rating (ER) | **Effective** | Excellent | Excellent | Good | Good | No Plan |
| | **Mostly Effective** | Good | Good | Fair | Fair | No Plan |
| | **Marginally Effective** | Fair | Fair | Poor | Poor | No Plan |
| | **Not Effective** | Poor | Poor | Poor | Poor | No Plan |

BMP = Best Management Practice.




Best Management Practice (BMP) training participants discuss BMP effectiveness at a log landing in a commercial timber sale, Coconino National Forest, Arizona.

# Appendix C
# BMP Evaluation Ratings by Protocol

**Figure C-1.** BMP implementation ratings, by protocol, for evaluations completed in FY 2014.




BMP = Best Management Practice. FY = fiscal year.
Note: Appendix A includes protocol explanations.

**Figure C-2.** BMP effectiveness ratings, by protocol, for evaluations completed in FY 2014.




BMP = Best Management Practice. FY = fiscal year.
Note: Appendix A includes protocol explanations.



FS-002767

**Figure C-3.** Composite BMP evaluation ratings, by protocol, for evaluations completed in FY 2014.




BMP = Best Management Practice. FY = fiscal year.
Note: Appendix A includes protocol explanations.


FS-002768

USDA
United States Department of Agriculture

# Effectiveness of Best Management Practices that Have Application to Forest Roads:

## A LITERATURE SYNTHESIS

Pamela J. Edwards, Frederica Wood, and Robin L. Quinlivan



Forest Service
Northern Research Station
General Technical Report NRS-163
October 2016

FS-002770

# ABSTRACT

Literature describing the effectiveness of best management practices (BMPs) applicable to forest roads is reviewed and synthesized. Effectiveness is considered from the perspective of protecting water quality and water resources. Both paved and unpaved forest roads are considered, but BMPs that involve substantial engineering are not considered. Some of the BMPs included are commonly used on roads; others are used less often. The synthesis focuses on quantitative BMP effectiveness and descriptions of processes or characteristics that influenced the effectiveness. Qualitative results and observations not supported by data are excluded. Most of the effectiveness results describe sediment losses and sediment delivery, but there is also some coverage of chemicals used as BMPs, such as dust palliatives and soil conditioners. Chapters and subheadings are based on how or where protection is provided, or type of BMP. The final chapter provides information on research needs and potential direction of BMP implementation in the future. Although there remains a great need to quantify BMP effectiveness more rigorously across more physiographic, topographic, climate, and soil conditions, the data provided in this synthesis give road and watershed managers and landowners a starting place for evaluating and selecting BMPs.

**Cover photos:** Inset photos, clockwise from top left: Compost filter sock in a roadside ditch (Composting Association of Vermont, used with permission); a forest road with a broad-based dip (U.S. Forest Service, San Dimas Technology and Development Center); erosion control blanket with slope interrupters on a road fillslope (Filtrexx International, used with permission); a newly constructed bridge at a forest stream crossing (Barb Ellis-Sugai, U.S. Forest Service). Background photo: Vista overlooking an eastern mixed forest (U.S. Forest Service, Southern Research Station via Bugwood.org).

**Quality Assurance:** This publication conforms to the Northern Research Station's Quality Assurance Implementation Plan which requires technical and policy review for all scientific publications produced or funded by the Station. The process included a blind technical review by at least two reviewers, who were selected by the Assistant Director for Research and unknown to the author. This review policy promotes the Forest Service guiding principles of using the best scientific knowledge, striving for quality and excellence, maintaining high ethical and professional standards, and being responsible and accountable for what we do.

The use of trade or firm names in this publication is for reader information and does not imply endorsement by the U.S. Department of Agriculture of any product or service.

Manuscript received for publication January 2016

Published by:

U.S. FOREST SERVICE
11 CAMPUS BLVD., SUITE 200
NEWTOWN SQUARE, PA 19073-3294

**October 2016**

For additional copies, contact:

U.S. Forest Service
Publications Distribution
359 Main Road
Delaware, OH 43015-8640
Fax: 740-368-0152

www.nrs.fs.fed.us

# Effectiveness of Best Management Practices that Have Application to Forest Roads:

# A LITERATURE SYNTHESIS

**Pamela J. Edwards, Frederica Wood, and Robin L. Quinlivan**

*PAMELA J. EDWARDS is a research hydrologist with the U.S. Forest Service, Northern Research Station in Parsons, WV; FREDERICA WOOD is an information technology specialist with the U.S. Forest Service, Northern Research Station in Parsons, WV; and ROBIN L. QUINLIVAN was formerly a biological science technician with the U.S. Forest Service, Northern Research Station in Parsons, WV.*

# TABLE OF CONTENTS

CHAPTER 1 Introduction . . . 1
CHAPTER 2 Road Planning . . . 5
Road Location . . . 5
Road Profiles . . . 10
Road Drainage Structures . . . 14
Cross-Drain Spacing . . . 17
CHAPTER 3 Protecting the Driving Surface . . . 21
Road Surfacing . . . 21
Dust Palliatives . . . 26
Environmental Effects of Dust Palliatives . . . 38
CHAPTER 4 Road Use . . . 45
Axle Load, Vehicle Weight, and Tire Pressure . . . 45
Traffic Intensity . . . 48
Traffic Speed . . . 49
CHAPTER 5 Stream Crossings, Stream Crossing Approaches, and Wet Soil Crossings . . . 51
Stream Crossings . . . 51
Crossing Effectiveness . . . 53
Stream Crossing Approaches . . . 57
Wet Soil Crossings . . . 59
CHAPTER 6 Protecting Soil off the Driving Surface . . . 63
Soil Conditioners . . . 63
Soil Cover Protection . . . 71
Effectiveness of Vegetation . . . 72
Effectiveness of Mulch . . . 84
Effectiveness of Rolled Erosion Control Products . . . 88
CHAPTER 7 Barriers and Biofilters . . . 95
Non-engineered Barriers . . . 95
Nonreactive Barriers . . . 95
Reactive Barriers . . . 103
Comparative Studies of Nonreactive and Reactive Barriers . . . 108
Biofilters . . . 111
Buffer Strips . . . 111
Vegetated Filter Strips . . . 112
Forest Buffers and Windrows . . . 119
Vegetated Waterways and Swales . . . 126
CHAPTER 8 Research Needs, Potential Direction, and Concluding Thoughts . . . 133
Research Gaps and Potential Future Direction . . . 133
Concluding Thoughts . . . 136
ACKNOWLEDGMENTS . . . 138
REFERENCES . . . 139
APPENDIX English, Metric, and Gradient Conversions . . . 170

## CHAPTER 1

# Introduction

Every year, the U.S. Forest Service's San Dimas Technology and Development Center (SDTDC) sends out a Request for Proposals to agency field units to identify field personnel's priority needs that fall within SDTDC's mission areas. The need for a literature synthesis describing the effectiveness of road best management practices (BMPs) originated from such a request. Field personnel identified potential applications of a literature synthesis. One use would be to provide information that could be used for selecting appropriate BMPs and supporting mitigation strategies in environmental documents (for example, environmental impact statements and environmental analyses). Another would be to furnish material to support adaptive management for reducing problems associated with road construction and use.

Literature and associated data included in this synthesis come from a variety of sources; some of the references have been peer reviewed and some have not been. Journal papers; books; interim and final reports submitted to local, state, and federal agencies; graduate student theses; unpublished reports by research scientists, students, and companies; published state and federal documents; published and unpublished university documents; and information from Internet sites that we consider to be reputable (i.e., primarily federal, state, and university extension sites) are among the pieces of information that we reviewed. Data of unknown origin or data of obviously suspect quality found on the World Wide Web are not included. We have not attempted to rate or evaluate the quality of the data from the perspective of scientific rigor or statistical power. That analysis is outside the objectives and scope of this review, though the reader can pursue that objective if desired by returning to the originally cited sources. Instead, data are presented to provide the greatest breadth of information possible; this was deemed important because the amount of effectiveness data available for many BMPs is relatively limited (Anderson and Lockaby 2011a, Moore and Wondzell 2005). International System (metric) and English units are employed in this synthesis, and with few exceptions the units used are those in the citations. For readers' convenience, English, metric, and gradient conversions can be found in the Appendix on pages 170 and 171.

BMP effectiveness is at the heart of this report; however, descriptions of the BMP characteristics or processes that reduce pollutants are provided to augment explanations of BMP success or failure in specific situations and to provide the reader with a better understanding of the appropriate applications or limitations of the BMP. Rarely are only qualitative or observational results given from a reference. Where they are used in this synthesis, they were extracted from research studies that included data, and the lack of data supporting the observation is noted. Some reports (especially those by agencies in state departments of highway or transportation) included comments or observations by motor-grader operators or other equipment operators on BMP effectiveness. We did not include these observations because they are subjective and lack measured data or any other type of quantified BMP information to support them. We are not suggesting such observations have no merit, but because they are not otherwise scientifically supportable, they have been excluded. Along this same line, we emphasize that this synthesis **does not** simply describe or summarize BMPs that are used on or are applicable to roads (e.g., from state BMP manuals), because our intent was to avoid implying that broad acceptance and implementation of a BMP guarantee effectiveness or that its performance is well supported by research.

To maximize the amount of available effectiveness data presented in this literature synthesis, studies and results are not restricted to road research or road applications.

BMP information and effectiveness results that have application to roads but originate from a variety of other resources, particularly agriculture, have also been included. As such, readers should be aware that levels of effectiveness reported in nonroad applications may not represent the degree of effectiveness if the BMP were applied to roads.

BMPs are discussed within this document only from the context of their effectiveness for controlling nonpoint source pollution. This was the original context of the term “best management practices” within the Federal Water Pollution Control Act (Clean Water Act) of 1972 as amended, even though the term “BMP” has since been appropriated and applied to management considerations far beyond nonpoint source pollution (Aust and Blinn 2004).

This review does not consider passage of aquatic organisms. Although aquatic organism passage clearly has application to the Clean Water Act, it is not central to the theme of nonpoint source pollution **control**. Readers interested in aquatic passage are directed to annotated bibliographies by Anderson and Bryant (1980) and Moore et al. (1999). Road decommissioning (including “putting skid roads to bed”) also is explicitly excluded because the focus of this review is road construction, presence, and use. A wide variety of actions can be taken to decommission a road (e.g., for the U.S. Forest Service, see U.S. National Archives and Records Administration 2015), so this topic is sufficiently broad to warrant its own literature review in another outlet. However, some effectiveness information provided for BMPs associated with road construction/use may be applicable to decommissioned roads.

Forest roads are constructed to a wide range of standards. For example, the U.S. Forest Service has the largest single ownership of roads in the United States: about 370,000 mi of system roads (Foltz 1999, Peters and Peters 2009), which can be maintained at one of five different levels (Ruiz 2005) (Table 1). Most of these roads are typical of what people envision when they think of forest roads: unsurfaced or graveled roads. But the quality of those varies from low-standard roads passable only by high-clearance four-wheel drive vehicles to high-standard roads that can be traveled comfortably at moderate speeds. Some forest roads are paved because they have high traffic volumes or high volumes of very heavy vehicles and thus require paving to protect the road surface from degrading. Most BMP studies included in this document involve lower-to-moderate standard roads, and skid roads when information is available. Because woods roads can include paved roads, however, there is some consideration of those roads (i.e., paving as a BMP) when effectiveness data were available. BMPs that require substantial design and engineering to implement and that are prescribed for very high volume roads (i.e., maintenance level 5 roads in Table 1) are beyond the scope of this synthesis.

The primary focus of BMP effectiveness in this synthesis is erosion and sediment control as sediment is the most common water pollutant associated with forest roads and forest operations (Stuart and Edwards 2006). Runoff and sediment also may carry other road- or traffic-derived pollutants (e.g., motor oil or other petroleum by-products), so other pollutants are discussed when applicable. For example, because road use can result in toxic metal contamination (Rogge et al. 1993), some BMPs have been evaluated for their effectiveness in reducing metal concentrations. Likewise, some chemicals that are used as BMPs (e.g., dust abatement chemicals, soil conditioners, deicing chemicals) have the potential to pollute nearby water bodies, so the pollution potential of such chemicals also is discussed. The effectiveness of BMPs at controlling nutrient losses, including phosphorus (P), which often is bound to mobile sediment, is not considered. Nutrients are excluded for two reasons: 1) Most nutrients are not pollutant concerns during road construction, use, or maintenance; and 2) in the case of P, focusing on sediment control typically is more informative in the context of BMP effectiveness—if sediment is controlled by a BMP, sediment-bound P usually is controlled.

Within the text, we sometimes use wording such as “the BMP was effective.” In these instances we simply mean that the BMP resulted in greater reduction of a pollutant (usually sediment) compared to no implementation of the BMP or compared to another BMP. However, such broad use of the concept of “effectiveness” fails to address the more essential question: What level of effectiveness is sufficient to label the BMP as effective? That question is complicated because it does not have a single answer. For some uses, BMP effectiveness may be


FS-002777

**Table 1.—Abbreviated descriptions of U.S. Forest Service road maintenance levels from Forest Service Handbook 7709.59, Chapter 60, 62.32 (U.S. Forest Service 2009)**

| Road maintenance level[a] | Associated road characteristics |
|---|---|
| **1** | These are roads that have been placed in storage between intermittent uses. The period of storage must exceed 1 year. Basic custodial maintenance is performed to prevent damage to adjacent resources and to perpetuate the road for future resource management needs. Emphasis is normally given to maintaining drainage facilities and runoff patterns. Planned road deterioration may occur at this level. Appropriate traffic management strategies are "prohibit" and "eliminate" all traffic.<br>Roads receiving level 1 maintenance may be of any type, class, or construction standard, and may be managed at any other maintenance level during the time they are open for traffic. However, while being maintained at level 1, they are closed to vehicular traffic but may be available and suitable for nonmotorized uses. |
| **2** | Assigned to roads open for use by high clearance vehicles. Passenger car traffic, user comfort, and user convenience are not considerations. Warning signs and traffic control devices are not provided with the exception that some signing, such as "No Traffic Signs" may be posted at intersections. Motorists should have no expectations of being alerted to potential hazards while driving these roads. Traffic is normally minor, usually consisting of one or a combination of administrative, permitted, dispersed recreation, or other specialized uses. Log haul may occur at this level. Appropriate traffic management strategies are either to:<br>a. Discourage or prohibit passenger cars, or<br>b. Accept or discourage high clearance vehicles. |
| **3** | Assigned to roads open and maintained for travel by a prudent driver in a standard passenger car. User comfort and convenience are not considered priorities. Warning signs and traffic control devices are provided to alert motorists of situations that may violate expectations.<br>Roads in this maintenance level are typically low speed with single lanes and turnouts. Appropriate traffic management strategies are either "encourage" or "accept." "Discourage" or "prohibit" strategies may be employed for certain classes of vehicles or users. |
| **4** | Assigned to roads that provide a moderate degree of user comfort and convenience at moderate travel speeds. Most roads are double lane and aggregate surfaced. However, some roads may be single lane. Some roads may be paved and/or dust abated. The most appropriate traffic management strategy is "encourage." However, the "prohibit" strategy may apply to specific classes of vehicles or users at certain times. |
| **5** | Assigned to roads that provide a high degree of user comfort and convenience. These roads are normally double lane, paved facilities. Some may be aggregate surfaced and dust abated. The appropriate traffic management strategy is "encourage." |

[a] See Ruiz (2005) for photographs of roads in each maintenance level.

interpreted as we did in this document—any reduction in a nonpoint source pollutant. In other circumstances, BMP effectiveness may need to meet some minimum threshold of nonpoint source pollutant reduction before it is considered effective. The cost-to-benefit ratio of the BMP may be another factor in determining if a BMP is sufficiently effective for implementation. Due to the subjective nature of and many ways for defining and interpreting effectiveness, we intentionally have made no further attempt to define effectiveness throughout the chapters. Just as the reader is left to evaluate the rigor of the research and quality of the data and studies presented, the reader also is responsible for further interpretation of the pollutant reduction values cited from these works. It is up to the reader to determine if the BMP is sufficiently effective to warrant implementation in the field or citation in written documents (e.g., environmental analyses).

In describing BMP effectiveness, the fundamental "unit" we have concentrated on is the individual BMP or a few bundled BMPs (i.e., several BMPs were grouped and effectiveness was reported for the group). Consequently, the focus is on studies where effectiveness of the individual or bundled practices was isolated and quantified. This approach thereby excludes many studies that conventionally are used to demonstrate overall BMP effectiveness on a watershed basis (e.g., Arthur

et al. 1998, Brown 2010, Kochenderfer and Hornbeck 1999, Kochenderfer et al. 1997, Lynch and Corbett 1990, Reinhart et al. 1963). These types of studies depend upon the examination of water quality (e.g., turbidity, sediment concentrations, or total suspended solid loads) at the mouth of a watershed. Thus, in addition to not being able to ascribe quantifiable levels of effectiveness to specific BMPs, readers are advised to use caution in interpreting the results of these studies. Hillside and in-channel storage of eroded sediment as well as lags in sediment delivery to the mouth of the watershed may result in incorrect interpretations or overestimations of BMP effectiveness (Edwards 2003).

The approach of examining individual BMPs clearly is at odds with how BMPs are applied within a project or watershed. Typically, multiple BMPs are planned and applied, with some BMPs even providing overlapping or redundant protection (Stuart and Edwards 2006). For example, cross-drain spacing requirements and road graveling both contribute to controlling overland flow energy and sediment transport. The interdependency and redundancy of some BMPs created some challenges to deciding how this literature synthesis should be organized. Ultimately we decided to define chapters and subheadings based on categories of how or where protection is provided or on types of BMPs. In the end, we strived to condense information from almost 800 references into a state-of-the-science document that will be useful to a diversity of landowners and forest resource specialists, and for a variety of applications, both within and outside the U.S. Forest Service.



A forest road in West Virginia during autumn. (Photo by U.S. Forest Service, Northern Research Station.)

CHAPTER 2

# Road Planning

Research has consistently shown that roads increase erosion and sedimentation more than any other practice associated with forest management (Megahan and King 2004). This is the reason that road planning is repeatedly noted as the single most important BMP (Grace 2002b, Kochenderfer 1970). Through proper planning, most deleterious effects to soil and water resources are thought to be avoidable, thereby reducing the need for additional BMPs to mitigate less-than-optimally-planned roads. Planning is believed to provide greater environmental protection (versus without planning) while simultaneously controlling costs of road construction, BMP implementation, and long-term maintenance.

Road planning really involves all phases of road construction, including the pre- and post-activities to ensure the road meets objectives such as duration and level of use. As such, every chapter in this document could be included under the heading Road Planning. As stated in the Introduction (Chapter 1), however, BMP topics have been artificially separated to simplify presentation of material. Consequently, in this chapter, road planning topics are restricted to a subset of issues that would be defined during the preconstruction period. These are: road location, road profiles (i.e., construction designs, such as cut-and-fill or full bench), on-road drainage techniques (including drainage accomplished by road surface geometry and drainage structures), and cross-drain spacing. Note that road drainage considerations in this chapter focus only on BMPs associated with drainage **on** the driving surface. The effectiveness of BMPs used to control the effects of water diverted off the road is covered in Chapter 7.

## Road Location

To the degree possible, well-located roads simultaneously 1) avoid high-risk areas (Megahan and King 2004), 2) maximize the distance between the road and water bodies (Megahan and King 2004), 3) minimize the number of water body crossings (Egan 1999, Megahan and King 2004), 4) minimize the total area disturbed by roads (miles and width of road) (Megahan and King 2004), and 5) control road grades at acceptable levels (Haussman and Pruett 1978, Packer 1967). The first four of these location criteria are considered within this section. Road grades are discussed later in this chapter within the context of cross-drain spacing. Road location, with respect to streams and stream crossings, is discussed from the more general perspective of whether distance acts as an effective BMP for controlling sediment delivery. More in-depth discussion of the effects of distance on sediment delivery with respect to buffer lengths can be found in Chapters 5 and 7.

No single optimal road location exists within any parcel of land because the final location depends on the importance (qualitatively or quantitatively) implicitly or explicitly assigned to each of the road location criteria during road layout. But no matter how each variable is weighted, planning can benefit all of these variables. For example, early research showed planning skid road locations reduced per-acre lengths an average of 37 percent, and reduced the total area in skid roads by 40 percent compared to allowing layout at the time of logging. Planned skid road grades also were an average of 33 percent less (Mitchell and Trimble 1959, Trimble and Weitzman 1953).

From the perspective of road BMPs and the Clean Water Act of 1972, high-risk areas are primarily three types of areas susceptible to mass failures (specific regions, specific geology or soil, steep terrain) and water bodies (predominantly streams). Mass failures are a concern because they can deliver excessive amounts of sediment to downslope streams and rivers (DeGraff 1990, Larsen and Torres-Sánchez 1992, Megahan et al. 1978), which can degrade aquatic habitats (Beschta 1978, Cederholm

FS-002780

et al. 1981, Eaglin and Hubert 1993, Harr and Nichols 1993) as well as water quality. Streams and other water bodies are critical because they are the objects of protection for the Clean Water Act, and because roads can act as channel extensions or provide direct conduits for sediment delivery. Furthermore, disregarding water bodies during road planning can make a road impassable periodically or even permanently.

Mass failures are not common everywhere. They tend to be more prevalent in specific regions, geologies, or soil types, and often in steep terrain with excess water (Anderson 1983, Beschta 1978, DeGraff 1990, Kingsbury et al. 1991, Maharaj 1993, Montgomery and Dietrich 1994). Duncan et al. (1987) showed the frequency of mass failures in parts of the Pacific Northwest increased exponentially with slope from 12 percent to ≥35 percent. Apparently, however, this relationship does not increase infinitely, as other characteristics of steeper slopes often make them less susceptible to landslides (Maharaj 1993, Megahan et al. 1978, Mehrotra et al. 1991). Not surprisingly, landslides also are often linked to the occurrence of large rain events or extremely wet periods (Anderson 1983, Chatterjea 1994, DeGraff 1990, Larsen and Torres-Sánchez 1992, Maharaj 1993, Moore et al. 1991, Scatena and Larsen 1991). In addition, many local naturally occurring variables contribute to landslide potential. The list of these is long, and an in-depth discussion of them is beyond the scope of this review. But some important factors are soil characteristics (Carrara et al. 1991, Maharaj 1993, Megahan et al. 1978, Sessions et al. 1987, Swanston 1974), lithology and bedrock characteristics (Carrara et al. 1991, DeGraff 1990, Maharaj 1993, Mehrotra et al. 1991, Swanston 1974), and hillside shape, including curvature and topographic convergence (Anderson 1983, Duncan et al. 1987, Montgomery and Dietrich 1994, Sidle et al. 1985). More uncommon events, such as seismic activity, also can trigger landslides (Brabb 1995, Moore et al. 1991).

The existence or construction of roads has been found to exacerbate landslide potential. Roads have more effect on landslide creation than does any other forest management activity (Megahan and King 2004, Moore et al. 1991). In Idaho, 88 percent of new winter and spring landslides surveyed over a 3-yr period (1974-1976) and 57 percent of new landslides inventoried after the winter of 1995–1996 were associated with the presence of roads (McClelland et al. 1997, Megahan et al. 1978). In an unpublished 1965 U.S. Forest Service report, Jensen and Cole reported 90 percent of landslides surveyed in parts of the South Fork of the Salmon River in Idaho were associated with roads (Megahan et al. 1978). An analysis in the Olympic National Forest in Washington state showed that 90 percent of sites with slope failures or high risk for slope failures had road-related factors (Lewis 1995), and Amaranthus et al. (1985) found that 60 percent of debris slides inventoried in the Klamath Mountains of Oregon were associated with roads. Debris avalanche erosion was 25 to 340 times greater where roads were present in the Pacific Northwest than in unroaded forests (Swanston and Swanson 1976). In the northern Rocky Mountain province in Idaho, Megahan et al. (1978) used a number of reconnaissance techniques and estimated that roads were associated with 58 percent of landslides, whereas only 3 percent of landslides occurred on undisturbed hillsides. Road cuts were twice as likely to cause landslides as road fills, but the latter were more likely to reach streams downslope. In highly fractured and weathered bedrock and soils, roads with steep road cuts were the most common sites of landslides in Jamaica; more than 50 percent of the landslides were associated with road cuts (Maharaj 1993). In contrast to many other studies, in western Oregon landslide frequency was not strongly tied to the presence of roads, but road-associated landslides contributed far more sediment to stream channels than did landslides at all other locations (Fredriksen 1970). Mass failures most commonly affected locations where roads intersected stream channels.

In some instances, areas of landslide activity also contained other hillside disturbances associated with the road, such as logging. In the northern Rocky Mountain province of Idaho, 30 percent more mass failures occurred in the presence of logging or fires with roads than from roads alone (Megahan et al. 1978). Landslide frequency was 3 to 26 times greater on hillsides with road building and logging in northwestern California, compared to nearby undisturbed forest land (Wolfe and Williams 1986).

Because of the influence of soil wetness on mass failures, road drainage control is critical to reducing slope failures (Megahan and King 2004). Poor drainage

or the lack of drainage from roads concentrates flow (including intercepted interflow from upslope contributing areas), and has been responsible for hillslide failures after large rainfalls (Maharaj 1993, Sidle et al. 1985). Megahan et al. (1978) determined that lack of road drainage caused 27 percent of the landslides studied in Idaho. Dyrness (1967) reported that 4 of 47 slope failures in the Oregon Cascades, including the largest (in terms of material moved), were associated with blocked road drainage systems.

Relationships between mass failures and the presence of roads are illustrated by these and many other studies worldwide (for example, see Sidle et al. [1985] for a comprehensive review of mass failures and land use). Consequently, locating roads to avoid landslide-prone areas is a prudent BMP; however, the effectiveness of locating new roads outside these high-risk areas cannot be quantified directly. Thus, the existing known relationships, such as those described earlier, must be employed as surrogates of measurements of their effectiveness.

Locating roads to avoid landslide-prone areas can be achieved most successfully by identifying areas believed to be susceptible to mass failures based on local conditions and risk factors (Chatwin et al. 1994, Hammond et al. 1992, Larsen and Parks 1997, McClelland et al. 1997, Megahan et al. 1978, Montgomery and Dietrich 1994, Swanston 1974) and identifying the length (i.e., perpendicular to the contour) of the area typically influenced by mass wasting disturbance. This can be done with soil mapping, geotechnical investigations, and measurements of where roads have been constructed and landslides have occurred (Larsen and Parks 1997). Lower, middle, and upper landscape positions are all susceptible to mass failures (Amaranthus et al. 1985, Beschta 1978, Duncan et al. 1987, Fredriksen 1970, Megahan et al. 1978), so the analyses should include all slope positions. Roads outside of areas susceptible to mass failures still may trigger mass failure due to long lengths of influence, and alternatively, roads within the length of influence also may be affected by mass failures (e.g., covered by debris during failure) that other factors such as large precipitation events caused (Larsen and Parks 1997, Wemple et al. 2001).

Where roads cannot be avoided, the occurrence of mass failures can be reduced by controlling road width or length, or both dimensions. Widening an existing road in Malaysia resulted in a landslide during an intense rain event (Douglas 1967). Main access roads in Idaho had 3.4 mass failures per kilometer of road compared to narrower spur roads, which averaged only 0.8 mass failures per kilometer (Megahan et al. 1978). Sessions et al. (1987) found that using steeper roads with fewer miles across steep landslide-prone areas reduced landslide frequency as long as they were well maintained. This is because the shorter total road length resulted in two advantages: a greater proportion of the road system located on ridgetop areas, which are less susceptible to landslides, and smaller volumes of excavated material.

Although road-location BMPs for landslide-prone areas are focused primarily on entirely avoiding those areas, the objectives for reducing road impacts to streams in areas not prone to landslides are focused largely on maximizing distances between roads and streams, minimizing road length, and minimizing the number of stream crossings to the degree possible. There is broad acceptance that proper location of roads is critical to reducing stream sedimentation; roads are a major source of sediment and as much as 90 percent of sediment is attributable to roads (Megahan and King 2004, Packer and Christensen 1964). Much of the consensus about the importance of road location originates from the extensive amount of data that show the connection between the presence of roads and changes in watershed hydrology and sediment delivery, rather than from designed road location studies.

Differences in the degree of connectivity within different watersheds are due to topographic factors, road location and density, road drainage characteristics, and other conditions (Croke et al. 2005, Mockler and Croke 1999, Montgomery 1994, Skaugset and Allen 1998, Takken et al. 2008, Wemple et al. 1996), but road-to-stream connectivity is common. In the western Cascade Mountains, Wemple et al. (1996) found that 57 percent of the 350 km of road lengths surveyed were hydrologically connected to stream channels, so drainage density was effectively increased by 35 and 39 percent for two different basins. In Australia, Mockler and Croke (1999) estimated that hydrologic connections with the road system affected 44 percent of a stream network and 100

percent of the main channel of a 57-$km^2$ basin. Skaugset and Allen (1998) in Oregon and Bilby et al. (1989) in southwestern Washington state reported similar levels of road-to-stream connectivity: 31 to 39 percent and 34 percent, respectively. La Marche and Lettenmaier (2001) found 24 percent of ditch relief culverts in a 149-$km^2$ watershed in Washington were hydrologically connected to streams, and 33 percent of all culverts were stream crossing culverts that therefore were connected directly.

Because roads result in much greater sediment production than undisturbed hillsides, their hydrologic connection to streams consequently increases sediment delivery to levels much greater than would occur without roads (Mockler and Croke 1999). This is referred to as “sedimentological connectivity” (though it is not restricted to road-derived sediment) (Bracken and Croke 2007). However, the ubiquity of connectivity between roads and streams and consequent sediment delivery provide a more compelling argument for the effectiveness of minimizing road density (i.e., length per area) than for retaining maximum distance between roads and streams. If distance is important, evidence to support the latter should instead come from relationships between slope position and sediment delivery.

In the absence of roads, landscape position is not always related directly to hydrologic connectivity due to the complexities of hillslope, soil, and flowpath characteristics, but there is a greater probability of that connection if the transport distance is short (Bracken and Croke 2007). In the presence of roads, the potential for hydrologic and sedimentological connectivity is believed to increase as the distance between roads and streams becomes smaller (La Marche and Lettenmaier 2001), but illustrating that increasing the road-to-stream distance alone necessarily reduces hydrologic connectivity or sediment delivery is very difficult due to other factors such as slope and cover. This is because isolating the effectiveness of distance requires sediment reductions to occur solely from deposition on the hillside due to the increased opportunity for infiltration attributable to greater slope length. In reality many other natural hillside features and human-made structures reduce connectivity by slowing drainage or capturing sediment; these include natural obstructions, windrow filters, litter, vegetative cover, and designed erosion control structures (Burroughs and King 1989, Cook and King 1983, Ketcheson and Megahan 1996, King 1979, Megahan and King 2004, Packer 1967, Packer and Christensen 1964, Wasniewski 1994) and can be at least as important as available distance between roads and streams.

Another problem with demonstrating the effectiveness of maximizing distance between roads and streams is the high variability in the amounts of sediment that originate from different road segments, as most sediment comes from only a small minority of road segments (Croke et al. 2005, Luce and Black 1999, Takken et al. 2008). Many problematic road segments are the result of inadequately spaced drainage features that allow concentrated flow from cross drains to reach streams (Skaugset and Allen 1998, Takken et al. 2008, Wemple et al. 1996). This is the principal source of connectivity aside from the direct connection at stream crossings. Skaugset and Allen (1998) found that 10 percent of drainage locations on roads that delivered sediment to streams (i.e., non-crossings) were from random, non-engineered points along roads in Oregon, whereas about twice that many origination points (19 percent) were cross drains. Wemple et al. (1996) reported that gullies which acted as stream channel extensions occurred below 25 percent of the cross drains surveyed. In a study by Croke et al. (2005), cross-drain culverts were 10 percent of all drain types surveyed, but 90.5 percent of them connected directly to streams by gullies. Because gullies can transport runoff and associated sediment almost unimpeded very long distances once they become established, even very long hillside distances between roads and water bodies can be rendered ineffective in preventing sediment delivery.

Even with acknowledging the difficulties of isolating hillside distance as an important variable in controlling sediment transport, it seems intuitive that decreasing the distance between roads and streams should increase the potential for road to stream connectivity. Some evidence supports high risk of sediment delivery from valley bottom roads that are close to parallel streams (Takken et al. 2008). In watersheds throughout several geographic regions in western Oregon, Skaugset and Allen (1998) reported that roads in lower valley segments constituted only 11 percent of the roads surveyed, but 59 percent of those delivered, or possibly delivered, sediment directly to streams. In these situations, advantages that distance could have provided are largely unavailable;

the flexibility and choices of other suitable mitigation strategies (e.g., erosion control structures between roads and water bodies) become much more limited, making sediment delivery very difficult to control (Swift 1985). It is also almost impossible to add enough cross drains on valley bottom roads to reduce runoff volumes enough to eliminate hydrologic and sedimentologic connectivity. Takken et al. (2008) calculated that cross-drain spacing in some situations on roads in valley bottom segments would have to be no more than 5 m, which is infeasible.

The relationship between distance and sediment delivery is not so clear for midslope and ridgetop positions. Skaugset and Allen (1998) rated about 30 percent of both midslope and ridgetop road segments as delivering or possibly delivering sediment to streams, though the total number of midslope road segments surveyed was much greater than the number of ridgetop segments (~2,450 versus 500, respectively). Midslope connectivity may be more common than often anticipated because these roads are most likely to intercept subsurface flow in cutbanks (Jones 2000b, Wemple et al. 2001), so more water must be handled by cross drains on midslope roads. Cutbanks can intercept subsurface flow when the depth of the cutslope extends below the permanent water table (O'Loughlin 1975, Parizek 1971), when there are transient (e.g., seasonal) water tables that rise above the base of cutslopes, or when discontinuous saturated zones (e.g., springs) exist above the water table (Dutton 2000, Tague and Band 2001, Wemple and Jones 2003). The locations where cutslopes will intercept subsurface flow is difficult to predict and plan for during road construction (Toman 2004). Experience in the physiographic region may be of limited usefulness in anticipating where problems might occur because seemingly similar road segments may not have similar potential for or amounts of cutbank interception (Toman 2004). Midslope roads contribute additional challenges during road location because they also tend to have more stream crossings than upper slope or lower slope roads due to the high drainage densities in midslopes (Takken et al. 2008). These provide a direct connection of runoff and sediment to streams (Weaver and Hagans 2004).

Locating roads in midslope and upslope positions may be somewhat more effective at controlling sediment than locating roads in valley bottoms immediately adjacent to streams, but the degree of protection often may be overassumed, particularly for midslope locations. Concentrated road drainage from midslope roads can extend to streams, even for streams that are relatively far away (Croke and Mochler 2001, Ketcheson and Megahan 1996, Wemple et al. 1996). The length of such connectivity that is possible may be underestimated due to misconceptions about the objectives of road drainage BMPs. Most BMP cross-drain spacing recommendations in the United States are designed to control the energy of water at volumes small enough to control erosion and damage on the road surface (see Cross-Drain Spacing section). Maintaining concentrated road runoff at volumes that do not create hydrologic or sedimentologic connectivity once the water is diverted onto the hillside is not an objective of many recommendations, and the spacings required to meet these two different objectives are probably not equivalent in most instances (Edwards and Evans 2004). Therefore, control of hillside connectivity becomes dependent in part upon hillside erosion control, and also in part on limiting the volumes of water delivered at any one point from the road (described in Chapter 7).

Maintaining distance between roads and streams is probably most effective as a BMP when erosion or sediment transport is associated with dispersed road runoff, or with fillslope erosion from rainfall or dry ravel. In these situations, infiltration and sediment deposition can be achieved relatively easily in short distances because interrill and dry ravel erosion (versus rill and gully erosion) dominate sediment transport (Ketcheson and Megahan 1996).

The presence of stream crossings can strongly influence water quality and stream health because crossings directly contribute runoff and sediment (Kruetzweiser and Capell 2001, Lane and Sheridan 2002, Swift 1988, Weaver and Hagans 2004; also see Chapter 5), suggesting that planning to control the number of crossings can be an effective BMP. Croke et al. (2005) modeled runoff and sediment delivery from a variety of dispersive pathways to streams in a catchment in New South Wales, Australia, and found that the point with the greatest inputs of both was a stream crossing; other individual sources, such as cross drains, yielded substantially less sediment by dispersed pathways. Eaglin and Huber (1993) provide additional evidence of the effects of stream crossing density on sediment

FS-002784

delivery. Stream embeddedness and the amount of fine sediment in streams were both significantly and directly related to stream crossing density, and the amount of cobble substrate was significantly and indirectly related to crossing density. Bill (2005) also found stream crossing construction increased the percentage of fines downstream of the crossings and when compared to a stream in an unroaded watershed followed through several years of monitoring.

## Road Profiles

The profile of a road refers to the general shape of the road prism and the driving surface. Most forest roads are constructed as cut-and-fill roads. A cut is made into the hillside and the removed material is side cast downslope (Fig. 1). About half of the road driving surface is built on residual soils in the cut portion and half is built on the side-cast fill material. The area from the top of the cutslope above the road to the bottom of the fillslope below the road constitutes the road prism.

Beyond the sediment associated with road driving surfaces (see Chapters 3 and 4) and with landslides or sediment delivery due to the location of roads, fillslopes and cutbanks of cut-and-fill roads have their own unique set of challenges with respect to erosion and sediment control. The design of cut-and-fill roads alters the surface and subsurface hydrology and oversteepens both cutbanks and fillslopes compared to the original hillside slope, though fillslopes tend not to be as steep as cutbanks (Burroughs and King 1989). Additionally, fillslopes generally are composed of unconsolidated material (Edwards and Evans 2004, Megahan and King 2004, Rothwell 1978). Together, these attributes make




Figure 1.—Schematic of a cut-and-fill road. Soil removed from the cut is used to construct the fill. The road driving surface is composed of both cut and fill areas.

these areas susceptible to erosion until their soils become stabilized, usually through revegetation (see Chapter 6).

Through the life of the road, sediment contributions are generally much less from fillslopes and cutbanks than from an active driving surface (Croke et al. 2006, Reid and Dunne 1984, Swift 1984b). But fillslope and cutbank contributions can be substantial during construction, and they can be chronic in the long term if slope stabilization is not fully successful and concentrated flow from road surfaces is not controlled. Because fillslopes are on the downhill side of road prisms, they can deliver more sediment during construction than cutbanks. Stedman (2008) measured 1,178 kg of soil that was mechanically delivered to a stream from fillslope construction in the approaches[1] (a total of 152 m of length) of three stream crossings in West Virginia.

Even where road fills do not encroach on streams during construction, initial losses from fillslopes are elevated. This is because fillslopes are composed of unconsolidated material that is susceptible to water erosion and dry ravel (King 1984, Megahan 1974a). Conversely, the unconsolidated soil also provides high infiltration capacities (at least for nonconcentrated flow), reducing the potential for runoff and allowing rapid revegetation (Arnáez et al. 2004, Edwards and Evans 2004, Jordán-López et al. 2009). As a result, erosion rates on fillslopes typically decline relatively quickly once vegetation becomes established (Stedman 2008).

The primary situation in which fillslopes result in greater losses of soil than cutbanks after revegetation has become established is associated with fillslope failures. These can be large mass failures or small slides or slumps (Arnáez and Larrea 1995, Pitts 1992). As with other types of mass failures, fillslope failures commonly are related to poor road drainage control (Arnáez and Larrea 1995). Lewis (1995) reported that 70 percent of slope failures or locations where the risk for slope failure was high were on fillslopes, some of which were fillslopes where road drainage had failed and was destabilizing fills.

[1]Approaches are defined as the length of road or ditch line from which water would drain directly to the crossing. The outer boundaries of an approach are usually definable by road-surface drainage features or grade changes on the road surface and ditch line.

FS-002785

Cutbanks can lose substantial amounts of soil during construction. Cerdà (2007) found soil erosion from cutbanks during construction was 30 times greater than previously constructed cutbanks that had about 35- to 55-percent vegetative cover. However, cutbanks tend to be more of a concern in the longer term than fillslopes because sediment production is more chronic due to gravity sloughing, undercutting, disturbance of cutbank vegetation with mowing, and bank failures. Several similarly designed experiments from existing cutbanks and fillslopes in the Mediterranean region of southern Spain illustrate this tendency. Using simulated rain events on 12 cutbanks (1 to 4 m high) and 12 fillslopes, Jordán-López et al. (2009) found cutslopes resulted in 18 times more total average soil loss (486.7 g $m^{-2}$) than fillslopes (27.2 g $m^{-2}$). On average, the cutbanks were 50 percent steeper (40-percent grade) than fillslopes (29-percent grade), but soil loss on the fillslopes was statistically ($p < 0.05$) explained only by soil texture and not by other soil cover or slope variables.

Arnáez et al. (2004) measured average total soil losses from simulated rain events on 12 cutbanks and 6 fillslopes of 160.7 g $m^{-2}$ and 10.5 g $m^{-2}$, respectively. In their study, cutbank slope, which ranged from 60 to 120 percent, was significant (and positive) in explaining soil loss, and coarse fragment cover was significant (and positive) for the fillslopes. Rather than protecting the soil from erosion, increasing gravel content on the fillslope soil surface concentrated water and runoff locations between gravel particles; this is similar to processes noted for stone mulch (Poesen and Ingelmo-Sanchez 1992; also see Chapter 6). Jordán and Martínez-Zavala (2008) measured an average of 106 g $m^{-2}$ from 10 cutslopes and 17 g $m^{-2}$ from 10 fillslopes from simulated rain events, but neither slope gradient, rock cover, nor plant cover was statistically important in explaining the soil losses from either type of slope. Arnáez and Larrea (1995) used erosion pins and also found cutslope erosion exceeded fillslope erosion.

Although these Mediterranean studies do not consistently show cutslope gradient to be important in explaining erosion, it often is. For example, 0.75:1 (horizontal:vertical) slopes resulted in sediment reductions of just 32 to 47 percent over a 3-yr period after mulch, seed, and fertilizer treatments, compared to the 90-percent reductions estimated for more gentle slopes of 1.25:1 (Burroughs and King 1989). Diseker and Sheridan (1971) found steepness to be important in predicting roadside sediment yield in Georgia. For granitic cutslopes in Idaho, Megahan et al. (2001) reported that cutslope gradient was the most important variable when predicting cutslope sediment yield. Results from a road cutslope study by Odemerho (1986) in Nigeria showed a curvilinear relationship between cutslope gradient and sediment yield. Soil losses increased from about 35 tonne $ha^{-1}$ $yr^{-1}$ to 125 tonne $ha^{-1}$ $yr^{-1}$ as cutslope gradient increased from 2 percent to 7 percent, then decreased to less than 20 tonne $ha^{-1}$ $yr^{-1}$ as cutslope gradient continued to increase to approximately 50 percent.

Steep cutbanks are difficult to stabilize with vegetation and to keep vegetated for several reasons. Infiltration often is poor on cutbanks because of crusts that form due to erosion and low organic matter content in cutbank soils (Cerdà 2007). Runoff can wash seed, poorly established vegetation, and even mulch from cutbanks (Bochet and García-Fayos 2004, Buchanan et al. 2002, Burroughs and King 1989, Meyer et al. 1972) (also see Chapter 6). Freeze–thaw processes, frost heaving, and ground ice contribute by uprooting shallowly rooted vegetation and loosening soil, which continues the cycle of erosion (Arnáez and Larrea 1995). Intercepted subsurface flow can destabilize areas on the cutbank near where water comes to the surface and saturates the soil. Soil that has eroded and blocked drainage at the base of the cutbank can further saturate soil and contribute to destabilization of the cutbank (Arnáez and Larrea 1995). Cutslopes also are susceptible to small failures through undercutting or removal of the toe of the slope during ditch or road maintenance (Chatwin et al. 1994, Yee 1976).

Even after 10 yr, Cerdà (2007) found cutbanks at two locations in Spain generally had <50-percent vegetative cover. Bold (2007) also found revegetation was slow to occur on cutbanks with a mean slope of 96 percent in the moist climate of West Virginia. About 2 yr were required for moderate levels of vegetation to become established after cutbank construction and seeding, and after 4 yr the percent cover for cutbank sections with southern aspects averaged only 36 percent compared to 64 to 82 percent for other aspects. In eastern Spain, Bochet and García-Fayos (2004) reported almost no vegetation cover on road cutslopes greater than 100 percent, and <10-percent

cover on slopes less than 100 percent, for 6- to 8-yr-old roads; where vegetation did develop, cover was about twice as thick on north-facing versus south-facing cutbanks.

Several types of practices have been developed as BMPs to reduce some of the erosion and sedimentation problems associated with the fillslopes and cutbanks of cut-and-fill roads. These BMPs include using full bench construction and end hauling in place of cut-and-fill roads (at least in high-risk locations), compacting fillslopes, and terracing cutbanks (all of which are described in the following paragraphs) (Burroughs et al. 1976, Cameron and Henderson 1979, Chatwin et al. 1994, Gwynne 1950, Megahan and King 2004, Megahan et al. 2001, Stedman 2008) as well as a myriad of techniques to control drainage on fillslopes (Bethlahmy and Kidd 1966, Burroughs and King 1989, Cook and King 1983, Dudeck et al. 1970, Swift 1985) that are covered in Chapter 7.

Full bench construction involves constructing the driving surface fully from residual soil material so no material is side cast and no fillslope is created (Fig. 2). All of the excavated soil is used to supplement material where needed, including on the road surface and turnouts, and unneeded excess soil is stored in a location safe from sediment transport or taken offsite (i.e., end hauling) (Cameron and Henderson 1979). Thus, the primary advantage of full bench construction is that it eliminates fillslopes and problems associated with fillslope erosion and failure. A disadvantage of this alternative is that building a road of the same driving-surface width requires excavation farther into the upslope hillside, which typically results in a higher cutbank.




Figure 2.—Schematic of a full bench construction road. The road driving surface is entirely within the cut area since a fillslope is not developed in full bench construction.

Given that large mechanical additions of sediment to streams can result from cut-and-fill roads during construction where roads approach streams (Stedman 2008), and fillslopes are relatively common sources of hillside failures (Arnáez and Larrea 1995, Lewis 1995, Pitts 1992), full bench construction might be considered to be an effective means of reducing erosion and sedimentation in some situations. However, few studies have examined its effectiveness, so there is little direct evidence to support it as a BMP, to illustrate the improvement in effectiveness compared to cut-and-fill-roads, or to identify those situations where it is most effective. An analysis by Sessions et al. (1987) of landslide occurrence compared old construction techniques (late 1960s and early 1970s) using moderately sloped cut-and-fill roads to more modern construction techniques of steeper roads that included a subset of full bench roads (37 percent of new roads were full bench; the remaining were cut-and-fill). They found lower landslide occurrence in full bench roads, but attributed the reduction to the steepness of the roads and not to full bench construction, because steep roads, regardless of construction techniques, could reach ridgetop locations more quickly with shorter road lengths. They suggested construction of steeper cut-and-fill roads with adequate maintenance as an alternative to full bench construction to reduce landslide occurrence.

Whether roads are constructed using cut-and-fill or full bench techniques, cutbanks are created; therefore associated problems must be considered during road planning. In some locations, cutslope height has been associated with intercepted flow (Wemple and Jones 2003); in contrast, La Marche and Lettenmaier (2001) found no relationship between the two. Thus, designing roads to reduce cutbank heights to the degree possible will not guarantee that subsurface flow is not intercepted. Wemple and Jones (2003) found that road segments with the largest cutbank heights tended to respond rapidly to precipitation, resulting in higher unit area peak runoff, and hence, more energy for sediment production (Piehl et al. 1988). Skaugset and Allen (1998) reported that 72 percent of midslope road segments with cutbank heights more than 5 ft were rated as delivering or possibly delivering sediment to streams whereas 60 percent with cutslope heights less than 5 ft had those same ratings.

FS-002787

Much less information is available about other techniques that have been recommended as BMPs to reduce fillslope or cutbank erosion. There is little information in the literature to suggest that fillslope compaction reduces erosion. Instead, compaction may increase erosion. Fillslopes in Idaho were rolled and compacted, and runoff and erosion were compared to uncompacted fillslopes (Boise State University 1984). Compaction reduced infiltration rates and increased runoff and erosion. Sediment yields were 107 to 532 percent greater than for uncompacted fillslopes and averaged 282 percent more.

Similarly there is little information about or support for the effectiveness of terracing cutbanks. Terracing is rarely performed on forest road cutbanks, probably because on forest roads the cutbanks are usually not very tall. Creating terraces on short cutbanks with heavy equipment is difficult, especially in rocky soils. Terraces are more commonly used where cutbanks are relatively tall, and therefore vertical or nearly vertical walls would be unstable, such as along highways or U.S. Forest Service maintenance level 5 roadways. Gwynne (1950) described the appearance of 15-ft-high and 15-ft-wide step terraces that had been created in loess cutbanks that were up to 80 ft tall along an Iowa state highway. A year after construction, some of the risers had started to break apart. North-facing terraces underwent far more damage than south-facing terraces. In some instances so much of the risers had broken off that the cutbank slope had become an almost continuous slope with rills forming. The combination of spalling and water erosion was expected to eventually return the cutbanks to approximately 1:1 slopes. Megahan et al. (2001) found no significant differences in erosion rates of cutslopes treated with hydroseeding and mulch compared to cutslopes that were terraced, hydroseeded, and mulched. Rather than terracing or sloping cutbanks, Swift (1985) recommended building vertical cutbanks on roads that do not have ditch lines and letting them slump and settle to their natural angle of repose, as this technique can reduce both the width needed for the road prism (less distance for laying the slope back) and the size of fills because less material is excavated to create the cutbank. Swift (1985) did not report how much soil was eroded in this process when soil loosened during slumping. This technique is not possible with high vertical banks because too much of the driving surface would be lost to accumulation of sloughing cutbank material, similar to that reported by Gwynne (1950).

The driving surface is the last major part of the road profile. Road shape is used to aid in road drainage to reduce the amount of erosion and sediment transport that occurs along with the amount of water discharged from a road's surface. Road drainage can be achieved with a variety of techniques. These include exploiting natural drainage attributable to road location or hillside shape (e.g., natural outsloping on the noses of ridges) and shaping the road surface (outsloping, insloping, crowning) or installing surface drainage structures (e.g., broad-bassed dips, open-top culverts, water deflection devices).

Outsloping has long been considered a simple and affordable technique to transversely drain water from along much of the road surface so that it cannot accumulate sufficiently to cause erosion or contribute to rutting (Swift 1985, Trimble and Weitzman 1953). An outsloped road is constructed so that the entire driving-surface road width is sloped away from the cutbank at about a 2- to 4-percent grade (Moll et al. 1997). This angle is considered to be sufficient to disperse the water and be safe enough to keep vehicles on the road at allowable speeds, particularly in wet or winter weather. However, slippage off outsloped roads has occurred under wet or icy conditions (Hafterson 1973). Analogously, insloping is designed to transfer all water toward the cutbank at a 2- to 4-percent grade (Moll et al. 1997) and transfer it into a ditch at the toe of the cutbank. The ditch parallels the road and then transfers drainage water (both road drainage and intercepted subsurface flow from upslope) under the road through cross-drain or relief culverts. Crowning includes both of these designs so that half of the drainage water is diverted to the outside of the road and half to the inside of the road. Taking advantage of both insloping and outsloping further reduces the risk of the vehicle sliding to the inside or outside of the road under wet or icy conditions. Crowning is probably the most common road surface shape used on roads (Skaugset and Allen 1998).

There are many claims in the literature about the benefits of each of these types of drainage in reducing erosion on the road surface because water is removed in small quantities, a primary tenet of controlling road erosion

(Croke and Hairsine 2006, Packer 1967). Unfortunately, no field data show that one road shape is preferable to another, or suggest in which situations each is most applicable (Elliot et al. 1999). Nor is there published research to indicate that any of these techniques generally is effective at draining water from roads in the way intended.

Each of these road surface drainage techniques works only if rainwater or snowmelt is effectively dispersed transversely from the road surface over the entire road length (or most of it). However, it is easy for the road surface to become deformed so that transverse drainage is inhibited, and instead, water runs down the driving surface, draining off only sporadically along the road length (Swift 1985). Road deformation and the loss of transverse (inslope or outslope) drainage can occur due to a number of processes. Longitudinal depressions are created in wheel tracks by vehicle loads being concentrated and translated to the road surface by the tires. Wheel tracks develop on all types of roads, including paved roads (Aycock 2009, Moll et al. 1997), where they contribute substantially to hydroplaning (Aycock 2009) and can concentrate flow meant to be dispersed or controlled in ditches. Unpaved roads are particularly susceptible to wheel track development when subjected to heavy equipment such as loaded log trucks. Wheel tracks can become ruts with continued heavy vehicle use during wet weather as the tracks retain water (Elliot et al. 2009). Berms also can form on the inside and outside edges of the driving surface (Swift 1985) and further exacerbate poor functioning of insloped, outsloped, and crowned roads.

## Road Drainage Structures

Relief or cross-drain culverts that cross under the road from a ditch line adjacent to the road are the most common way to move water from roads (Piehl et al. 1988). Culverts are an efficient way to transfer drainage onto the hillslope below the road. However, several attributes can influence their effectiveness. Culverts are susceptible to plugging if cutslopes or hillsides fail and deposit soil or debris in the ditch line, or if they are not designed with sufficient slope to flush deposited sediment or organic debris, such as leaves and woody material. Plugging can be exacerbated by mechanical ditch cleaning because the toe of the slope is disturbed, which can increase cutslope erosion or failure and provide a source of sediment. Ditch line cleaning also can disturb the cutbank proper, and remove established vegetation (Luce and Black 2001), which may increase erosion and culvert plugging. In Oregon, Skaugset and Allen (1998) found that 54 percent of cross-drain culverts surveyed were obstructed to some degree, and 60 percent of obstructed cross-drain culverts were blocked by sediment. Piehl et al. (1988) found that 48 percent of ditch relief culverts surveyed had inlets blocked by sediment (24 percent), physical damage (17 percent), or both. Careless road and ditch maintenance also can contribute to culvert failure by partially or fully crushing the inlet of relief culverts with heavy equipment. One-quarter of the relief culverts that had problems reported by Skaugset and Allen (1998) had crushed inlets.

Relief culverts are constructed from a variety of materials, but can have two basic designs: smooth-bored or corrugated. BMP manuals typically recommend corrugated culverts over smooth-bored culverts because the former provides roughness to the inflow, which reduces velocity and erosive potential of discharged water (on the outlet side). In a study of culvert hydraulics related to fish passage, Barber and Downs (1995) measured maximum pipe centerline velocities for a range of discharges and slopes for corrugated and smooth pipes of the same diameter. The smooth pipe produced maximum velocities that were 16 percent higher on average.

Incorrect cross-drain culvert installation and sizing are believed to result in increased sediment production. Improperly sized culverts can plug more easily, leading to culvert overtopping and road surface erosion. Culverts installed too deep at the inlet or at an incorrect gradient can cause sediment deposition, as can culverts installed more perpendicular (less skewed) to the road. Hanging culvert outlets that extend beyond the edge of the fillslope can cause increased scour and gullying. Guidelines for proper cross-drain culvert sizing and installation are widely available (e.g., Johansen et al. 1997, Keller and Sherar 2003, Kramer 2001, Rothwell 1978) and generally are based on federal design standards (Normann et al. 1985). However, research documenting the effectiveness of the guidelines is generally lacking in the literature. A survey by Piehl et al. (1988) of ditch-relief culverts in Oregon found that even though culvert skew angles

averaged half the recommended value of 30º, skew angle was not correlated with sediment accumulation at the culvert inlet.

Ditches are inherently a component of cross-drain culverts. The amount of sediment they provide can vary widely. Croke et al. (2006) found that road ditches, when isolated from the road surface and cutslope, contributed 17 to 45 percent of the total sediment yield from cut-and-fill insloping road segments in Australia. Ditch lines can become vegetated because they are moist and accumulate unconsolidated soil. But vegetation is not always effective at controlling ditch erosion, because grasses and herbaceous vegetation may be uprooted and scoured out when subjected to high amounts of energy from concentrated flow (Barrett et al. 1998b).

Ditch hardening with rock is presented commonly as a BMP to reduce ditch erosion (e.g., Berkshire Regional Planning Commission 2001, Elliot and Tysdal 1999), but only a few studies in the literature show how much of a reduction can be achieved with rock lining. Burroughs et al. (1984b) compared sediment production from cutslopes and rocked or unrocked ditches in Idaho. A 4-inch layer of 1.5-inch-diameter clean gneiss rock in ditch segments reduced sediment by 2.3 times compared to unrocked ditch segments. The characteristics of rock (e.g., size, compaction versus loose placement) that provide the most benefit are unknown. These characteristics may be very different from those of rock best suited for driving surfaces due to the amount of water that is intentionally concentrated in ditches.

A possible alternative to ditch hardening with rock is the use of soil conditioners for erosion control (also see Chapter 6). Soil conditioners have been shown to reduce erosion from irrigated agricultural furrows (Lentz et al. 1992; Zhang and Miller 1996a, 1996b), which may have some similarity with bare soil in roadside ditches. But there are no studies in which soil conditioners have been used specifically for erosion control in forest road ditch lines. Although soil conditioners are ideally suited for erosion control by concentrated flow, they are applicable only for the short term (e.g., during vegetation establishment). If long-term erosion control in ditches is possible with soil conditioners, it would be feasible only with repeated treatments.

Broad-based dip installation is another cross-drain technique used commonly on haul roads and other roads of comparable standard to overcome some of the problems associated with maintaining proper road surface shape for cross-drain culverts or for outsloping (Swift 1985). A broad-based dip (Fig. 3) is built as a gentle roll in the road centerline profile, which is carefully outsloped (Haussman and Pruett 1978, Swift 1988). The dip captures road surface drainage and directs it down the fillslope. Dip geometry—length and depth—must be designed to accommodate the traffic levels and vehicle types expected to use the road (Copstead et al. 1998, Hafterson 1973). The road surface contributing drainage to a broad-based dip is usually relatively flat (i.e., neither insloped nor outsloped) or slightly outsloped (Cook and Hewlett 1979). Broad-based dips are best suited for road segments that are no more than 8- to 10-percent grade (Cook and Hewlett 1979, Kochenderfer 1970, Swift 1985). On steeper roads, dips are difficult to build for effective drainage control (Kochenderfer 1995); dips on steeply sloped roads can become overtopped by water during large events so they become ineffective and create the potential for road gullying. If dips are deep enough to contain and drain water on steep roads, they are very difficult to drive over without vehicles bottoming out or high centering (Hafterson 1973).

Wheel ruts can form along the contributing road length of broad-based dips, but the dip itself theoretically compensates for that because water is meant to be turned off the road only at the dips. This suggests that



Figure 3.—A broad-based dip on a forest haul road. From Keller and Sherar (2003).

roads with broad-based dips may be more effective at reducing the occurrence of rill or gully formation than insloped, outsloped, or crowned roads, where wheel tracks may confine drainage for potentially long distances. However, there are no data that compare these road drainage techniques, so broad-based dips cannot be shown to be superior at controlling on-road erosion compared to other drainage techniques. Nor should this assumption be accepted widely without supporting data because much can happen to retard the effectiveness of dips. Ruts can continue through the entire dip so that the top of the dip (at least in the tracks) deteriorates. Water is not diverted across the road but instead remains trapped within the tracks, bypasses the dip, and continues running down the road. Hafterson (1973) showed that 3-inch ruts with 3-inch ridges on the sides of the wheel tracks were sufficient to prohibit lateral drainage and cause a 6-inch-deep dip to fail. An unobstructed downward outsloped angle in the base of the dip (Fig. 3) also must be maintained for dips to function properly. The accumulation of sediment can turn the dip into a mud hole and eventually fill the dip base enough to allow water to run down the road instead of drain off it (Swift 1985).

Drainage obstruction by grass at the outlet of a well-functioning dip can trap sufficient sediment to block the dip outlet (Swift 1985); the effectiveness of one BMP thereby can negate the effectiveness of another. A study by Bold et al. (2007) of 130 broad-based dips on haul roads of multiple ages on the Monongahela National Forest (MNF) in West Virginia reported that only 58 percent were outsloped to MNF specifications (2- to 5-percent outslope), and all dips had some obstruction to outward drainage by berms on each side of the wheel tracks. The dips were not fully dysfunctional in that the differences in elevation were not generally enough to result in overtopping the lower dip boundary. But they were not fully effective either, because most of the dips retained water or the base of the dip remained moist even between storm events. An earlier survey of dips on MNF roads by Eck and Morgan (1987) showed similar results with 27.5 percent of 255 dips categorized as drainage failures due to fillslope erosion, rutting, siltation, or ponding.

Road maintenance is required to restore dip function. However, restoration requires that road maintenance affect the source of the problem, which is the subsoil from which the roadbed was constructed. Swift (1985) found that small dozers or front-end loaders were better at maintaining road dips compared to motor-graders, which tended to fill in the dips.

Open-top culverts are alternatives to broad-based dips on steep road segments (Kochenderfer 1995). A variety of open-top culvert designs and materials have been developed and used (Copstead et al. 1998, Haussman and Pruett 1978, Kochenderfer 1995). If effective, they too provide some of the advantages of broad-based dips in that they can overcome some of the difficulties of water draining down wheel ruts by intercepting it at regular intervals. However, there are no studies showing the effectiveness of open-top culverts or illustrating the situations where they are best suited. But because open-top culverts require regular maintenance to keep them clean and operational (Hafterson 1973, Swift 1985) and erosion increases with increased traffic (Reid and Dunne 1984), the frequency of required maintenance rises substantially as traffic increases. Consequently, this type of drainage structure is appropriate only for very low volume roads.

The “proof” that cross drains are effective BMPs comes primarily from observations and limited measurements of physical road characteristics (e.g., road rutting, washouts) comparing roads with cross drains and those without cross drains. Long-term utility of drained roads also provides evidence of road drainage BMPs. Properly functioning cross-drain structures can maintain roads in conditions that are usable in the long term, though other protection on the road surface, such as surfacing, contributes substantially to reducing soil losses (see Chapter 3). Therefore, it is often difficult to separate the effectiveness of drainage BMPs from other road surface BMPs.

Additionally, there are no studies comparing the effectiveness of different types of cross drains to each other in situations where multiple types might be applicable. This also applies to less common water deflection devices, such as water bars (Copstead et al. 1998) or used tires or rubber belting (Wiest 1998), that are used on low standard roads or skid roads. Thus, no data-based prescriptions for specific types of drainage can be made for specific site conditions at this time. Instead, current recommendations are based on the

limitations or capabilities of the drainage features themselves relative to the physical site conditions (e.g., whether the road grade is suitable for a technique), the standard to which the road will be built (e.g., traffic levels, type and speed of traffic expected), and economic considerations. Even though the applications of techniques that will physically match the situation provide some degree of potential for erosion control, this is far from the desired outcome: the ability to choose the technique that provides the best degree of erosion control for the specific conditions.

## Cross-Drain Spacing

Roads other than outsloped roads require features or structures, such as relief culverts, broad-based dips, and water bars, to ensure that drainage occurs. The retention of water on the road or the delivery of water from the road is determined by cross-drain spacing (Bracken and Croke 2007). The spacing and location of cross drains are critical as water concentrated on the road surface provides the energy for erosion and sediment transport. Road surfaces concentrate water because they are highly compacted with low infiltration rates (Reid and Dunne 1984), leading to rapid generation of overland flow. In terms of stream power, the erosion potential of overland flow routed to cross drains is proportional to the product of road surface slope and discharge (Croke and Hairsine 2006). For roads studied in the Oregon Coast Range, sediment production was correlated to the product of road segment length and the square of the slope, showing slope was most important (Luce and Black 1999). Thus, longer and steeper gradients result in surface runoff with greater velocity and energy (i.e., shear strength) and greater potential for erosion than low-gradient roads. Increased spacing between cross drains on low-gradient roads has much less effect on erosion than it does on high-gradient roads (Luce and Black 1999) because kinetic energy increases with the square of velocity, which is tied to gradient.

Road surfacing in the form of gravel or other coarse fragments can substantially decrease the potential for erosion by providing greater roughness and tortuosity than would otherwise occur without the surfacing (see Chapter 3). However, even when surfacing materials are present on unpaved roads, rill and gully formation can result if sufficient water concentrates on the surface (Packer 1967). This tendency has led to the development of BMPs that focus on spacing drainage control features based on road gradient. Following these recommendations for the spacing of road drainage features is considered crucial to limiting overland flow and sediment delivery (Croke and Hairsine 2006).

The earliest study of and recommendations for cross-drain spacings in the United States were by Trimble and Weitzman (1953) on the Fernow Experimental Forest in the central Appalachian Mountains. Their recommendations were based on spacings that would maintain maximum allowable erosion of no more than 0.6 inch on skid roads after they had been closed (Table 2). These recommendations were calculated by using road gradient, road length (segment lengths between adjacent surface drainage features), and measured erosion data for skid roads located on benches overlaying limestone-derived soil following road closure. Forty-one profile stations were established on the skid roads, with 13 falling into slope gradients between 0 and 20 percent and road lengths from 0 to 132 ft. Twenty-three profile stations were between 21-and 40-percent grade with lengths from 0 to 132 ft. The remaining five were between 2- and 40-percent slope and 133 to 264 ft long. The authors used two approaches to develop recommendations; one was an "alignment table," where depth of erosion associated with pairs of slope gradients and road segment lengths

**Table 2.—Recommendations for skid road water-bar spacing for the central Appalachian Mountains (from Trimble and Weitzman 1953)**

| Skid road grade | Distance between water bars | |
|---|---|---|
| *percent* | *feet* | *meters* |
| 2 | 250 | 76 |
| 5 | 135 | 40 |
| 10 | 80 | 24 |
| 15 | 60 | 18 |
| 20 | 45 | 14 |
| 25 | 40 | 12 |
| 30 | 35 | 11 |
| 40 | 30 | 9 |

FS-002792

was identified and recommendations were based on those relationships. Because of limited data on the low and high ends of slope/distance pairs, they also used a modification of Manning's formula to calculate values and develop recommendations that included spacing recommendations for slope values beyond those used for the initial method. Although Trimble and Weitzman (1953) noted the importance of other factors (e.g., climate, soil organic matter, soil stoniness, and soil series-dependent characteristics) in affecting water bar spacing, the formula-derived spacings (Table 2) became the standard recommendation that these authors and others (e.g., Haussman and Pruett 1978, Weitzman 1952) presented in other general forest management publications.

Kidd (1963) also developed spacing recommendations for controlling erosion on skid roads (Table 3). His recommendations for western Idaho are based on amounts of erosion associated with cross drains derived from a combination of information in an unpublished 1954 report by Packer; spacings commonly used by the Boise National Forest at that time; and visual, qualitative scores of erosion from 569 skid trail segments on granitic and basaltic soils in Idaho surveyed for Kidd's (1963) study. Kidd found that erosion differed not only between the soils but also between ravine and hillside positions, so his recommendations were separated by those variables, as well as by skid road gradient.

Arnold (1957) developed maximum lateral drainage culvert spacing recommendations for Pacific Northwest truck roads based on soil erosion class, road grade, and rainfall intensities. Soils were assigned to 1 of 10 erosion classes based on the unified soil classification system used in engineering, and soil texture and parent material. Recommendations were made for road grades from 2 to 18 percent and rainfall intensities of 1 to 2 inches $h^{-1}$. Factors were included for the adjustment of the spacings for higher and lower rainfall intensities (e.g., spacings should be divided by 1.75 for rainfall intensities of 3 to 4 inches $h^{-1}$). However, no information was provided about how the spacing values were derived, and the recommended culvert spacings were much longer than those developed later. For a 10-percent road grade, spacings ranged from 180 to 845 ft, whereas spacings ranged from 120 to 565 ft on a road with a 15-percent grade.

**Table 3.—Recommendations for skid trail control-structure spacing for soils and topographic locations found in west-central Idaho (from Kidd 1963)**

| | SKID TRAIL SPACING | | | |
|---|---|---|---|---|
| | Granite-derived soil | | Basalt-derived soil | |
| Slope | Sidehill | Ravine | Sidehill | Ravine |
| *percent* | *feet* | | | |
| 10 | 65 | 50 | 90 | 80 |
| 20 | 50 | 35 | 70 | 65 |
| 30 | 40 | 25 | 60 | 50 |
| 40 | 30 | 20 | 50 | 40 |
| 50 | 20 | 15 | 40 | 35 |
| 60 | 15 | 10 | 25 | 20 |
| 70 | 10 | 10 | 15 | 15 |

Packer and Christensen (1964) and Packer (1967) employed by far the largest quantitative dataset of those in the United States to develop cross-drain spacing guidelines for haul roads in the Rocky Mountain region. They gathered data from 720 study sites, with 120 sites in each of 6 major soil groups (Table 4). These were further stratified into 60 sites with southern aspects and 60 sites with northern aspects. Data from 20 sites in each of 3 slope positions (upper, middle, and lower one-third of slopes), and 5 study sites within each of those slope positions from each of 4 road gradient classes (0 to 3 percent, 4 to 7 percent, 8 to 11 percent, and 12 to 15 percent) on each aspect were used. They determined the distances that water could flow for various combinations of these variables between consecutive drainage structures before 1-inch-deep rills formed. The 1-inch-deep rill values were determined to be the depth beyond which the road surface would rapidly deteriorate (Packer 1967). From these strata of data, tables of cross-drain spacings were developed from regression equations for each topographic position, aspect, and upslope gradient of the hillside (Table 4). Roads on south-facing slopes are likely to erode more than on north-facing slopes due to earlier spring snowmelt, so they generally require closer cross-drain spacings (Packer 1967).



FS-002793

**Table 4.—Cross-drain spacing recommendations for secondary logging roads in the upper topographic position[a] of north-facing slopes[b] having a gradient of 80 percent[c] (from Packer 1967)**

| Road grade | CROSS-DRAIN SPACING | | | | | |
|---|---|---|---|---|---|---|
| | Hard sediment | Basalt | Granite | Glacial silt | Andesite | Loess |
| *percent* | ---- *feet* ---- | | | | | |
| 2 | 167 | 154 | 137 | 135 | 105 | 95 |
| 4 | 152 | 139 | 122 | 120 | 90 | 80 |
| 6 | 144 | 131 | 114 | 112 | 82 | 72 |
| 8 | 137 | 124 | 107 | 105 | 75 | 65 |
| 10 | 128 | 115 | 98 | 96 | 66 | 57 |
| 12 | 119 | 106 | 89 | 87 | 57 | 48 |
| 14 | 108 | 95 | 78 | 76 | 46 | 37 |

[a] On middle topographic position, reduce spacings 18 ft; on lower topographic position, reduce spacings 36 ft.

[b] On south aspects, reduce spacings 15 ft.

[c] For each 10-percent decrease in slope steepness below 80 percent, reduce spacings 5 ft.

Swift (1985) presented an equation for broad-based dip spacing on forest access roads:

Spacing in feet = 320 - (20 × road segment gradient in percent)

But this equation is based only on visual observations of functioning structures. Similarly, Rothwell (1978) stated that for Alberta, Canada, the distance in meters between water bars on skid roads should be calculated as:

350/ the road grade (presumably in percent)

There is no citation to identify what data were used to develop this method, however. In some instances spacings have been designed arbitrarily, and stated as such (e.g., Haupt and Kidd 1965).

As mentioned previously in this chapter, cross-drain spacings have been designed primarily to control erosion on the road surface (Croke and Mockler 2001, Edwards and Evans 2004). However, a few spacing studies have recognized the importance of considering the cross-drain spacing to control sediment delivery or erosion downslope of the cross-drain outfall. Croke and Mockler (2001) developed a table of cross-drain spacing recommendations specifically for Cuttagee Creek catchment, New South Wales, Australia, based on contributing road length and upslope contributing area. They surveyed road and road-to-stream linkage characteristics for 224 cross-drain structures. Discriminant function analyses were used to first determine the threshold value for contributing road length (distance between cross drains) that best predicted presence or absence of channels or gullies at drain outlets for a range of hillside gradients onto which runoff was cast. The threshold values for contributing length and upslope area were used to calculate recommended cross-drain spacings (for a range of road slopes and drain discharge hillslope gradients) which would minimize channel or gully initiation at drain outlets.

One of the most recent studies of cross-drain positioning was by Damian (2003). He focused on the location of cross drains that are nearest to stream crossings to reduce connectivity between roads and streams. Road segments that contain stream crossings have the greatest connectivity with streams, and thus, the greatest potential for sediment delivery, so their management is critical (Skaugset and Allen 1998). Conventionally, recommendations for those cross drains have been to position them close to crossings. This location was intended to minimize the amount of water and sediment delivered directly from the road and ditch line to the stream (i.e., the drainage and associated sediment

originating between the nearest cross drain and the stream crossing). In some states, placement within 50 to 100 ft of crossings is a recommended practice (Washington Forest Practices Board Manual 2000). Damian (2003) used a modeling approach to optimize cross-drain location and found that the last cross drain in most cases should be positioned between 100 and 200 ft from the stream. Closer positions did not allow effective filtration of sediment because the buffer strip was too short. Consequently, there was a much greater net delivery of sediment to streams when the nearest cross drains were positioned close to streams compared to when they were moved farther away. For two watersheds in Washington state with 28 and 39 stream crossings, the reduction in sediment delivery by repositioning cross drains through modeling was calculated to be about 75 percent in both watersheds. However, no cross drains were actually relocated in the field, so no data were collected to measure and verify any reduction in sediment inputs.

The lack of independent data to verify cross-drain spacing recommendations more broadly within a region or across regions is a limitation of all of these studies. Studies which were designed as more rigorous experiments (e.g., Packer and Christensen 1964) may provide more robust data that are likely to be applicable elsewhere in the region compared to studies with little experimental design or those that were based primarily on observations or measurements from only a few road segments. However, no studies are available to verify the applicability of these studies within or across regions, even though many of these recommendations, or slight variations, are used fairly widely. For example, Trimble and Weitzman's (1953) recommendations became the foundation for many eastern states' skid road BMPs (Elliot et al. 2014) and some western states' (e.g., Colorado State Forest Service 2010), even though the East and the West have very different physiographic, soil, and climate conditions. Additionally, cross-drain spacings defined in each study were developed for a specific type of road (e.g., skid roads or haul roads), but the recommendations are also commonly applied to other types of road systems (Copstead et al. 1998).

The more intensive studies of cross-drain spacing (e.g., Packer 1967, Packer and Christensen 1964) illustrate that cross-drain spacing is vital to controlling erosion and that cross-drain spacing should decrease as road gradients increase. But the lack of studies specifically comparing erosion resulting from cross drains installed at a variety of replicated spacings in similar conditions and the lack of validation of the recommended spacings within regions, across regions, or across road types make it impossible to quantify the effectiveness of current recommended spacings. Nor is it possible to determine if spacings closer than those currently used are warranted, and in what conditions they should be implemented. Modeled data by Damian (2003) suggest that improvements on cross-drain spacing on forest roads are possible, at least in some locations, but these results also have not been field verified.

## CHAPTER 3

# Protecting the Driving Surface

This chapter includes information about the two types of BMPs most commonly applied to the roadbed: surfacing to control water-driven erosion and dust suppressants to control primarily wind- and vehicle-caused erosion.

The driving surface is inherently different from the rest of the road prism. It is purposely compacted during construction, and it is repeatedly disturbed by traffic. Consequently, it is highly susceptible to loss of soil and geologic materials due to vehicle use, especially during wet or extremely dry weather. So while surfacing and dust control techniques used to protect the road surface have value at all times, they are particularly aimed at these more extreme conditions.

## Road Surfacing

Roads can be surfaced with a variety of materials, including asphalt or concrete pavement, quarried washed rock or stone, crushed rock, and gravel and sand materials (Beaty and Raymond 1995, Bolander and Yamada 1999, Dawson and Kolisoja 2006). Pavement is the most common type of road surfacing material (Succarieh 1992), but its use is typically restricted to moderate- and high-use roads due to its cost (Bolander and Yamada 1999, Sanders and Addo 1993). The primary reason that roads are paved is to provide a durable, smooth driving surface. Sediment control is obviously a benefit of paving because the surface is fully covered by a thick and relatively impermeable material, but few studies actually have quantified paving's effectiveness at controlling water-driven erosion. Reid and Dunne (1984) developed sediment rating curves and unit hydrographs for different types of surfaced road segments in Washington state and calculated that paved road segments yielded only 0.4 percent of the sediment that was generated from a heavily used gravel road. Clinton and Vose (2003) found much lower sediment concentrations in runoff from a paved asphalt road than from the dirt or gravel road segments to which it was compared. However, because of differences in frequency of maintenance and maintenance procedures applied to the three road treatments, quantifying the reductions in sediment specifically due to paving could not be done cleanly. Even with the general lack of data showing reductions in sediment losses due to paving, it is commonly recommended as a technique for reducing erosion and sedimentation (e.g., MacDonald et al. 1997).

Runoff from asphalt-paved roads has the potential to affect water quality in other ways. Petroleum hydrocarbons can be washed or leached from pavement and move into terrestrial or aquatic ecosystems. Hydrocarbons also can result from tire abrasion, exhaust, and lubricating oils from vehicles on the roads (Ngabe et al. 2000). In the aforementioned study by Clinton and Vose (2003), measurable levels of total petroleum hydrocarbons (TPH) were found in the runoff from the 2-yr-old paved road (<0.5 ppm), but the concentrations were well below those permitted in sediment. No federal water quality standards exist for TPH because these hydrocarbons include complex aliphatic and aromatic hydrocarbons that are not well understood chemically (Todd et al. 1999). Clinton and Vose (2003) did not attempt to determine the concentrations of the individual compounds in the TPH in the runoff. Their study is the only one found in the literature review that examined runoff chemistry from paved roads in predominantly forested watersheds. Hydrocarbon data were found for urban areas but were measured in samples collected from water bodies (e.g., Hunter et al. 1979, Latimer et al. 1990, Whipple and Hunter 1979) rather than from roadway drainage. Thus, those data would not be applicable for assessing petroleum hydrocarbon levels on paved roads in most forested watersheds or even in surface waters in forested watersheds (Sanger et al. 1999).

Although paving may be the preferred method to surface roads for long-term protection, many miles of rural roads exist for which paving cannot be justified. Nearly all of the road miles managed by the U.S. Forest Service are unpaved roads (Foltz and Truebe 1995), and 53 percent of all roads in the United States are unpaved (Koch and Ksaibati 2010). In these types of situations, other surfacing materials, such as quarried washed rock or stone and crushed rock or alluvial gravel, may be applied to provide strength and protection against soil displacement from the driving surface. Raindrop impact and consequent soil displacement are eliminated if the surface is completely covered (Quinton et al. 1997, Stuart and Edwards 2006). Additionally, pores between large surfacing aggregate allow drainage and movement of water from the road. Road runoff is slowed, and its energy for detachment and entrainment of particles is reduced by the tortuosity and friction resulting from water moving among the coarse fragments (Wisconsin Transportation Information Center [WTIC] 1997). However, large aggregates that do not have sufficient fines to help bind them together are susceptible to being kicked off the road by traffic or washed off the road, depending upon the aggregate and overland flow conditions present (Sanders and Addo 1993).

Smaller aggregates create a smoother driving surface and help to hold larger particles together (Bennett 1994, Bolander and Yamada 1999), but their presence retards internal drainage. In graded materials, fines should be present in mixtures that minimize water infiltration (Foltz and Truebe 1995) so that water runs off the surface as dispersed overland flow. If the percentage of fines is too small, water will be retained in the existing fines during wet weather due to capillary forces. The road then will perform poorly due to the development of ruts and susceptibility to surface failure because of freeze/thaw processes (Dawson and Kolisoja 2006). Conversely, during dry periods, excessive levels of fines are susceptible to being detached from the road surface by wheel contact (Bolander and Yamada 1999). As fines are lost, larger aggregates loosen and begin to abrade the surface materials as the aggregates move under traffic. This then leads to displacement of particles and road raveling (Sanders and Addo 1993).

There is little published research concerning the effectiveness of specific aggregate types (e.g., clean gravel, various graded mixtures) on controlling erosion on unpaved, low-volume roads. The lack of data about relationships between road surfacing and erosion is somewhat unexpected given the relatively easy nature of designing and implementing such studies. Based on the review of literature, the most commonly cited papers concerning the effectiveness of road surfacing involve three studies: in the Idaho Batholith (Burroughs et al. 1984a, 1984b, 1984c); in the central Appalachian Mountains of West Virginia (Kochenderfer et al. 1997, Kochenderfer and Helvey 1987); and in the southern Appalachians of North Carolina (Swift 1984a). Each of these studies showed that adequate surfacing results in substantial reductions of soil losses from graveled roads (Tables 5 and 6).

Using four simulated rain events, Burroughs et al. (1984a, 1984b) provide a straightforward illustration of the effectiveness of a single type of gravel with a single application thickness. A fresh application of 10-cm-deep hard crusher run (38-mm diameter and smaller) gneissic rock reduced erosion by 77 percent compared to a segment with no surfacing material. Scheetz and Bloser (2008) and Bloser and Scheetz (2012) reported similar results during simulated rain events on Pennsylvania roads. They compared erosion before and after application of Driving Surface Aggregate (DSA), a specific gradation of crushed stone surfacing material designed to establish a well-packed driving surface (Penn State Center for Dirt and Gravel Roads 2014). The DSA surfacing treatment reduced sediment losses on four road segments by 67 to 95 percent compared to the original native surfacing (Scheetz and Bloser 2008). In a subsequent study, Bloser and Scheetz (2012) found that a year after applying pit run aggregate (locally obtained material from "borrow pits" that is variable in composition and quality) to two existing native-surface roads, sediment losses were reduced by an average of 39 and 64 percent during 30-min simulated rain events. These sediment losses were similar to average losses on other roads surfaced with pit run aggregate that they measured in the region. Analogous treatments of DSA on two road segments reduced soil losses by an average of 67 and 95 percent during identical simulated rain events. DSA produced one-tenth of the sediment that the pit run segments produced, but sediment losses from the road segments slated for pit-run treatment were about

three to four times as large as the DSA-treated segments prior to pit-run additions. In the southwestern Virginia Piedmont, Brown et al. (2013) monitored sediment delivery to streams through road approaches from newly reopened roads with bare soil surfaces and from legacy graveled roads, though no information was given about the gravel characteristics. During the year of study, sediment delivery from the five newly bladed bare-soil road segments averaged 98 Mg $ha^{-1}$ $yr^{-1}$ compared to 13 Mg $ha^{-1}$ $yr^{-1}$ from the four graveled road segments.

Kochenderfer et al. (1984) and Kochenderfer and Helvey (1987) compared the effectiveness of crusher run and clean gravel over a much longer timeframe with natural rain events and with vehicle traffic. Applications of 6-inch-deep layers of 3-inch-diameter crusher run and clean limestone gravel to replicated sections of a newly constructed haul road resulted in an average of 4.5 to 9 times less erosion than occurred on native soil, and the clean gravel was about twice as effective as the crusher run material in reducing soil losses (Table 5). Sediment yields from both aggregate surfaces were statistically less than from the dirt road sections. Because cutbank erosion contributed to the driving surface measurements in this study, the effectiveness of the road surfacing may be better than the data suggest, particularly for the crusher run treatment, which had a small cutbank slump in one road section that contributed to soil losses (Kochenderfer and Helvey 1987).

One reason that crusher run surfacing can result in more erosion than clean gravel is that the fines within the aggregate matrix contribute to loss of mineral material. Fines in crusher run material are susceptible to displacement and kick-off from the road surface by traffic, and water can displace and transport them fairly easily, particularly during intense rain events if the surface can be infiltrated (Swift 1984a). Thus, the loosened fines contribute to the overall losses (Bilby et al. 1989, Kochenderfer and Helvey 1987, Swift 1984a, Toman and Skaugset 2011, Ziegler et al. 2001). Toman and Skaugset (2011) found that aggregate with the largest percentage of fines less than 0.6-mm diameter produced the highest amount of sediment of any of the surfacing treatments they examined. Sediment loss was higher than that from two other sites with the same treatments, but percentages of fines less than 0.6-mm diameter were lower.

The quality of surfacing material also can influence sediment production. Aggregate that is weak and friable under loads or that cannot resist breakdown in the presence of water makes poor-quality surfacing material

**Table 5.—Sediment yield by surfacing treatment**

| Treatment | Average or total sediment yield | Reference |
|---|---|---|
| Native untreated soil | 54.5 kg 100 $m^{-2}$ | Burroughs et al. (1984a), Burroughs et al. (1984b) |
| Rolled native surface | 67.1 kg 100 $m^{-2}$ | |
| Rolled gravel surface with 10 cm of hard crushed gneissic rock | 11.7 kg 100 $m^{-2}$ | |
| Unsurfaced, bare soil | 44 ton $ac^{-1}$ * <br> 47.2 ton $ac^{-1}$ ** | Kochenderfer et al. (1984), Kochenderfer and Helvey (1987) |
| 3-inch crusher run on new road, 6-inch uncompacted depth | 10.1 ton $ac^{-1}$ ** | |
| 3-inch clean gravel on new road, 6-inch uncompacted depth | 5 ton $ac^{-1}$ * <br> 5.7 ton $ac^{-1}$ ** | |
| 1-inch crusher run on ≥50-yr-old road, depth not specified | 5 ton $ac^{-1}$ * <br> 5.9 ton $ac^{-1}$ ** | Kochenderfer and Helvey (1987) |

* Mean over first 2 yr of study.
** Mean over 4 yr of measurement.

(Rodgers et al. 2014). The percentage of fines increases and the percentage of coarser particles decreases as a result of breakdown, thereby creating an aggregate mixture that becomes more prone to road raveling, rutting, and overall failure. Foltz and Truebe (1995) compared a good-quality (resistant to breakdown) and marginal-quality (subject to breakdown) aggregate applied to existing roads and subjected to log truck traffic over 2 yr in Oregon. The marginal-quality aggregate broke down, and 3.7 and 17.3 times as much sediment came off that road section during years 1 and 2, respectively, compared to the road section with the good-quality aggregate. Most of the increase in sediment was due to breakdown of the smallest fines in the clay fraction.

Swift (1984a) further confirmed the reductions in soil loss resulting from using clean gravel compared to crusher run on unpaved roads, but his experimental design also provided insight into how other variables influence the effectiveness of road surfacing. His study was overlain on a commercial logging job, so the experimental design was somewhat complicated. It involved four surfacing thicknesses (5, 15, 20, and 0 cm/bare soil), two types of gravel with different maximum diameters (38-mm-diameter crusher run and 7.5-cm-diameter clean stone, both hard gneiss), two roadbed soil textures (sandy loam and sandy clay loam), and periods with a variety of road disturbance intensities (Table 6). Treatments involving sandy loam roadbeds were monitored during road construction; those on the sandy clay loam were added just after road construction was completed. The bare soil segment was planted to grass immediately after logging ended.

The presence of surfacing was critical during road construction (Swift 1984a). Total soil losses during road construction from both the 15- and 20-cm-thick treatments on sandy loam soil were about 78 percent less than from bare soil (Table 6). Soil loss during construction from the 5-cm-thick crusher run gravel on the sandy loam soil was about half that of the other two surfacing treatments, but the former included only the last month of the construction period compared to the entire construction period for the latter two treatments. However, erosion rates during the subsequent light traffic period suggest that 5 cm of the crusher run material would have been insufficient had it been in place during

**Table 6.—Sediment yield from forest roads with different surfacing treatments and soil types (derived from Swift 1984a)**

| | TIME PERIOD | | | | |
|---|---|---|---|---|---|
| **Treatment** | **Road construction May–June 1976** | **Light truck traffic July–December 1976** | **Active logging January–June 1977** | **Light truck traffic July 1977–June 1978** | **Light truck traffic July 1978–April 1979** |
| | *tonne ha⁻¹* | | | | |
| Bare soil control on sandy loam[a] | 141[b] | 61 | 198 | --- | --- |
| Bare soil control planted to grass[a] | --- | --- | --- | 134 | 40 |
| 15-cm-deep crusher run on sandy loam | 30[b] | 3 | 18 | 20 | Not measured |
| 20-cm-deep clean stone on sandy loam | 31[b] | 0.5 | 12 | 3 | Not measured |
| 5-cm-deep crusher run on sandy loam | 16[c] | 58 | 146 | 258 | 52 |
| 15-cm-deep crusher run on sandy clay loam | --- | 20 | 146 | 187 | 75 |
| 5-cm-deep crusher run on sandy clay loam | --- | 33 | 212 | 161 | 97 |

[a] The road segment used as the control between May 1976 and June 1977 was planted to grass in July 1977.
[b] Loss during entire road construction period.
[c] Loss during last ~1 month of road construction.



FS-002799

the entire construction period. Five centimeters of crusher run gravel yielded more soil loss with only light traffic than thicker applications of crusher run or clean gravel, and rutting in both of the 5-cm-thick sections began under light traffic.

In contrast, there were substantial reductions in the amounts of sediment that originated from the control, the 15-cm-thick, and the 20-cm-thick surface treatments on the sandy loam during the first period of light truck traffic. Soil losses from the control dropped by almost 60 percent, whereas soil losses from the gravel treatments were only about 0.1 and 0.02 percent of what they had been during construction—even though the period with light truck traffic was three times as long (Table 6). The influence of higher percentages of clay on erosion is obvious from comparisons of the 15-cm crusher run treatments on the sandy clay loam and sandy loam roadbeds throughout the study. Similarly, the influence of a lower clay percentage on erosion control under heavy traffic with large loads is apparent by comparing the erosion losses of the two 15-cm crusher run treatments during logging; soil yields were an order of magnitude lower for the sandy loam than the sandy clay loam. Recovery to much lower erosion levels also was notably quicker for the sandy loam roadbed. Once grass became well established, it controlled erosion even better than the thinly graveled sandy loam section and both sandy clay loam sections.

Soil texture has been found to influence soil loss in other road studies. Sugden and Woods (2007) found relatively low road-erosion rates (5.4 Mg $ha^{-1}$ $yr^{-1}$) from unpaved roadbeds composed of gravelly sandy loams and gravelly silt loams. Roadbeds with sandier soils in Colorado had 2 to 3.5 times less soil loss than roadbeds with higher silt content in Idaho, even though the sandier roadbeds had more loose soil (Foltz and Burroughs 1990). More energy is required to entrain and move coarser particles in overland flow compared to finer particles (Sugden and Woods 2007), so even if particle detachment occurs, soil loss from the road may be less than the detachment rate.

All of the studies cited in Tables 5 and 6 reported that rut formation increased erosion from the road tread, and this finding is common to many other studies as well. Sediment losses in the range of 100 to 500 percent greater have been reported from rutted road segments compared to unrutted segments (Burroughs et al. 1984a, 1984b; Foltz 1995; Foltz and Burroughs 1990). The amount of increase depends upon specific road and site factors, but it is proportional to the severity of rutting (Burroughs and King 1989, Foltz 1995). The percentage increase also tends to be higher on rutted unsurfaced (i.e., dirt) roads than on rutted roads surfaced with aggregate (Kennedy 1997). Because rut formation increases erosion, it follows that actions taken to control ruts can result in concomitant reductions of sediment production. Reductions in the range of 50 to 75 percent were achieved when rut production was controlled, with the degree of reduction depending on the depth of the rut and site conditions (Foltz 1995, Kennedy 1997). If ruts form, simply filling the ruts with clean or crushed rock probably will not have a substantial effect on controlling soil losses, as Swift (1984a) found. Instead, regrading the road so that the road is reworked down to at least the bottom of the deepest ruts is needed to reduce aggregate losses and road breakdown (Bolander 1997, Bolander and Yamada 1999, Roads and Transportation Association of Canada [RTAC] 1987, Skorseth and Selim 2000).

Four factors lead to rut formation (Dawson and Kolisoja 2006): 1) compaction of unsaturated materials in the surfacing aggregate; 2) local shear on the aggregate road surface, which pushes aggregate located below the wheel downward and then upward to the outside of the wheel tracks; 3) shear deformation of the subgrade soil, in which the mechanisms described for factor 2 occur in the subgrade, and the surface materials sink; and 4) local shear on the aggregate road surface from contact with wheels, which damages and displaces particles. Toman and Skaugset (2011) found that ruts developed only within the surfacing aggregate on three newly built roads in California and Oregon. However, it is usually a combination of all four factors that causes ruts to form (Dawson and Kolisoja 2006), so rutting control requires that all of these causes be addressed in roadbed preparation and surfacing/resurfacing considerations.

In most cases, the greatest gains in erosion control from surfacing come from newly built or newly disturbed (e.g., widened) roads, such as those involved in the studies just described. However, applying aggregate to existing roads can provide some protection against road erosion (Kochenderfer and Helvey 1987). Kahklen and Hartsog (1999) found that resurfacing

existing roads generally reduced sediment yields by an order of magnitude at three sites in southeast Alaska. Improvements on existing roads tend to be less because, as most studies show, erosion rates decrease substantially as roads age (e.g., Beschta 1978, Megahan and Kidd 1972, Sullivan 1985). The exceptions to this generalization may be roads that are severely damaged and unmaintained, or roads that have been recently maintained. MacDonald et al. (2001) found no difference in erosion between older and newer roads on the island of St. John in the U.S. Virgin Islands, but the older roads were deeply rutted and had not been regraded for years. Appelboom et al. (2002) compared three freshly graded road sections with different surface treatments—preexisting gravel, 10 cm of new gravel over geotextile, and bare soil—in the lower Coastal Plain of North Carolina. Sediment production from the new and older graveled sections was not significantly different at 49.2 and 69.1 kg km$^{-1}$, respectively, whereas both graveled sections yielded less than half the sediment of the bare soil section (151.1 kg km$^{-1}$). For 109 native surface road segments monitored over 3 yr in the Sierra Nevada Mountains of California, Coe (2006) found that recently graded segments produced about twice as much sediment as ungraded segments.

## Dust Palliatives

Dust is fine particulate matter (SynTech Products 2011), and it is an important issue for road managers. Fine particulates emanating from roads are more than a nuisance to drivers and those who live near roads; these particles also can affect human health, vegetative growth, water quality, and aquatic habitats (Forman and Alexander 1998, Sanders and Addo 1993, Succarieh 1992, WTIC 1997). Of particular concern are particulates that are less than 10-µm diameter. These are referred to as $PM_{10}$ and are regulated by the U.S. Environmental Protection Agency (EPA) (Jones 2000a), primarily because of their influence on human health. Although both paved and unpaved roads contribute to particulates of this size (Claiborn et al. 1995, Jones 2000a, Norman and Johansson 2006, U.S. EPA 1996), unpaved roads are the largest sources of $PM_{10}$-sized particles in the United States (U.S. EPA 1996). Dust levels from unpaved roads are directly related to the percentage of fines (particles <75 µm) present in the road surfaces (Sanders et al. 1997, U.S. EPA 1995). Consequently, application of dust control agents on unpaved roads is important in airsheds that do not meet the $PM_{10}$ standards established by the U.S. EPA (Watson et al. 1989). Normally, paved roads receive dust abatement treatments only when an area is out of attainment of the $PM_{10}$ standards (Claiborn et al. 1995, Norman and Johansson 2006).

Dusts generated in open areas are termed "fugitive dusts" (U.S. EPA 1995). Fugitive dusts from roads come from a variety of sources, including wear of vehicle parts (e.g., brakes, clutches, tires), vehicle exhaust, abrasion of the road surface and aggregate pullout due to traffic, and deposition from the atmosphere (U.S. EPA 1995, Watson 1996). But in general, most originate from fine particles in the bed of dirt roads or from the matrix of the surfacing materials (Jones 2000a, WTIC 1997). These become loosened primarily as the result of slippage of tires on the road surface (Succarieh 1992), and they then can be transported from the road surface by water or wind erosion (WTIC 1997). With the increasing loss of fines, the road surface becomes more dominated by larger particles that are susceptible to being kicked off the road by subsequent traffic or eroded by water. The loss of small and large particles leads to the formation of ruts, potholes, and corrugations (washboarding), which further contribute to erosion potential (Jones 2000a).

Aggregate applications, such as crushed rock or gravel, can be used to suppress dust on roads (Alaska Department of Environmental Conservation [DEC] 2010); however, proper composition of the aggregate is needed because some aggregate mixtures can contribute to dust generation. The proper amount of fines (including dust-sized fines) and the composition across all particle size classes in the aggregate matrix are important. A proper mixture ensures that voids are filled and held together by sufficient fines so the surfacing is strong enough to resist raveling, washboarding, and rutting by traffic (Bennett 1994, Bolander and Yamada 1999). Conversely, too many fines will create a surface mixture that cannot resist displacement by tires (American Society of Civil Engineers 1992), and too few fines will not effectively bind together particles in the road matrix (Bolander and Yamada 1999, Jones 2000a, WTIC 1997). However, it is often difficult to obtain desired mixtures or to ensure that aggregate mixtures meet

specifications before their application (Foltz and Truebe 1995, Lunsford and Mahoney 2001). In these situations another method may be needed to address dust control.

Other techniques include limiting road use and traffic speed, paving, applying dust control agents, or implementing some combination of these techniques (U.S. EPA 1995). Road use and traffic speed controls are discussed in Chapter 4. Paving with asphalt or concrete is the most common and most efficient dust control technique. Paving can suppress dust generation by as much as 90 percent (Succarieh 1992, Watson 1996). But paving is usually restricted to higher-volume roads because its high cost usually can be justified only where there is greater potential for excessive dust creation (Bolander and Yamada 1999). Dust palliatives typically are used on roads with moderately low to moderate traffic volume, such as 150 to 500 vehicle passes per day, and they are most beneficial and most cost effective on these types of roads. On low-volume roads, the cost of dust palliatives typically cannot be justified and dust generation may not be much of a concern due to infrequent traffic (Kirchner and Gall 1991, WTIC 1997).

Dust palliatives are chemicals that work in one of three ways: agglomerating fine particles (i.e., causing them to ball up), adhering or binding surface particles together, or increasing the density of the road surface (Bergeson and Brocka 1996, Bolander and Yamada 1999). Once a road is treated, particles resist being suspended in the air by traffic or the wind (Bolander and Yamada 1999).

Dust palliatives should not be confused with soil conditioners (see Chapter 6); they are designed to do two different things. Soil conditioners focus on controlling water-driven erosion by binding clay particles at the surface of soils that do not receive repeated disturbances. Soil conditioners are ineffective on surfaces that are mechanically disturbed after treatment (e.g., Orts et al. 2007); therefore, they do not abate dust on roads. Additionally, with respect to forest road prisms, soil conditioners are applied primarily only as a short-term stopgap measure until vegetation becomes established to control erosion. In contrast, dust generation is expected in the long term on unpaved roads unless road use is suspended or drastically reduced. As such, palliative retreatment is required through the long term.

Road surface characteristics influence the success of dust palliatives. In general, they are much less effective on roads that have more than 30-percent fines in the surface aggregate material or in the soil surface (in the case of dirt roads). Excessive amounts of fines (>30 percent) tend to overwhelm the ability of the dust palliative to control dust. Conversely, there is limited benefit in applying dust control to roads with less than 5-percent fines because these roads generate little dust (WTIC 1997). Dust suppression also is generally less effective for sandy soils that have little plasticity. These soils tend to lack sufficient fines (i.e., clays) to allow binding to occur, so the palliative may simply leach through the road materials (Kirchner and Gall 1991). However, these limitations are only generalizations, and some agents are more effective than others for either extreme of fines or low soil plasticity. Consequently, to maximize effectiveness and reduce the need for maintenance and retreatment, selection of a specific type of dust palliative should be based on the local road characteristics, weather, available equipment, and expected needs (Bolander and Yamada 1999, Jones 2000a, Langdon and Williamson 1983, Succarieh 1992). In addition, for dust palliatives to be effective, the road surface must be prepared properly before the dust control agent is applied. For unpaved roads this typically involves scarification and regrading the road surface, smoothing the road and ensuring proper crowning and surface drainage, and creating optimal compaction (Bolander 1997, Jacobson 1992, Sanders et al. 1997).

Dust palliatives have been in use since at least the 1940s (Gebhart et al. 1996). They exist in many forms and formulations and can be assigned to a variety of different classifications depending upon the user (e.g., Jones 2000a, Succarieh 1992, WTIC 1997). Bolander and Yamada (1999) suggested seven broad categories: water, water-absorbing (hygroscopic and deliquescent chemicals), organic petroleum, organic nonpetroleum, electrochemical, synthetic polymers, and clay additives (Table 7); they also provide tabular summaries of the attributes, limitations, application, origin, and environmental impacts of each type of road dust suppressant. An abbreviated summary of that information is given in Table 8.

Water is the simplest, but the most short-lived, dust control agent (Addo and Sanders 1995). It controls

**Table 7.—Categories of dust suppressants with examples (after Bolander and Yamada 1999)**

| Dust suppressant category | Examples |
|---|---|
| Water | Water |
| Water-absorbing | Calcium chloride<br>Magnesium chloride<br>Sodium chloride |
| Organic petroleum | Asphalt emulsions<br>Cutback asphalt<br>Dust oils<br>Bitumens |
| Organic nonpetroleum | Animal fats<br>Lignosulfonates<br>Molasses/sugar beet<br>Tall oil emulsions<br>Vegetable oils |
| Electrochemical | Enzymes<br>Ionic products<br>Sulfonated oils |
| Synthetic polymers | Polyvinyl acetate<br>Vinyl acrylic |
| Clay additives | Bentonite |

**Table 8.—Common dust suppressants, treatment rates[a], limitations, application methods, and longevity of effectiveness (abbreviated summary, developed from information in Bolander and Yamada 1999)**

| Dust suppressant | Treatment rates | Limitations | Application methods | Longevity |
|---|---|---|---|---|
| Water | Frequent, low rates | Very short duration | Spray | ≤1 day |
| Calcium chloride | Flakes: 0.9 kg $m^{-2}$<br>Liquid: 1.6 L $m^{-2}$ | Corrosive to vehicles, potential pollutant | Mix solids into surface, or spray brine on surface | 6 months |
| Magnesium chloride | 2.3 L $m^{-2}$ | Corrosive to vehicles, potential pollutant | Mix solids into surface, or spray brine on surface | 6 months |
| Organic petroleum products | 0.5–4.5 L $m^{-2}$ | Rutting in weak bases, could be toxic | Mix into or spray on surface | 6 months |
| Lignosulfonates | 2.3–4.5 L $m^{-2}$ | Potential pollution from leaching | Mix into or spray on surface | 6 months |
| Vegetable oils | 1.1–2.3 L $m^{-2}$ | Limited availability, becomes brittle | Mix into or spray on surface | 1 yr |
| Tall oils | 2.3 L $m^{-2}$ | Highly soluble | Mix into or spray on surface | ≥1 yr |
| Electrochemical derivatives | Diluted 1/100 or 1/600 | Depends on clay mineralogy | Mix into surface with light compaction | Unknown |
| Synthetic polymers | 2.3 L $m^{-2}$ | Not studied well, difficult to maintain as hard surface | Mix into or spray on surface | ≥1 yr |
| Clay additives | 1–3% by weight | Rutting in wet conditions | Mix uniformly into surface | 1–5 yr |

[a] Treatment rates often depend upon characteristics of residual concentrate.



FS-002803

dust by flocculating particles through capillary cohesion (Hoover 1987). Repeated applications, sometimes as frequent as every few hours, are necessary for continued effectiveness (Bolander and Yamada 1999). Therefore, its use typically is limited to applications where dust suppression needs are very short term (Jones 2000a). Seawater is preferred to fresh water, if available, because the salts are water absorbing, and thus provide better and longer-duration dust control (Addo and Sanders 1995; also see the description of chloride salt palliatives that follows). Water should be applied in small amounts frequently to avoid overwetting the road surface, as overwetting can promote rutting (Bolander and Yamada 1999, Foley et al. 1996, Koch and Ksaibati 2010) and pullout and carryout of sediment on tires of vehicles traveling on the road (Watson 1996), especially on dirt roads with no surfacing.

Water-absorbing chemicals used for dust control are primarily calcium chloride and magnesium chloride (Bennett 1994). Calcium chloride is derived from the manufacture of soda ash, and magnesium chloride is obtained from seawater (Heffner 1997). Both of these salts are hygroscopic (sometimes erroneously referred to as hydroscopic, e.g., as described in RTAC 1987, Singer et al. 1982) and deliquescent, though calcium chloride is more so. Hygroscopic chemicals can absorb water from the surrounding environment, including the atmosphere, to help maintain a moist film around the soil particles and bind them together. Deliquescent chemicals can absorb so much moisture from the surrounding atmosphere that they dissolve and convert to a solution, so the generated moisture contributes to the soil binding properties and improves soil compaction (Bennett 1994, Kirchner and Gall 1991, Succarieh 1992, WTIC 1997). The ability to absorb and retain moisture also retards evaporation from the road surface, thereby prolonging the presence of moisture in the surface matrix (Kirchner and Gall 1991, Morgan et al. 2005, Sanders and Addo 1993, WTIC 1997). A crust is created on the road surface by the salts' absorption of water, which contributes to retaining fines on the road surface (WTIC 1997). Although sodium chloride can be used as a dust palliative, it is much less deliquescent and less hygroscopic than either calcium chloride or magnesium chloride (Addo and Sanders 1995).

The greater hygroscopic and deliquescent characteristics of calcium chloride allow it to be applied within a broader range of conditions than magnesium chloride. Calcium chloride can enter into solution at very low humidities (as low as 18 percent) in high temperatures (Addo and Sanders 1995, Kirchner 1988), so it works in dry conditions when dust formation is most likely (Sanders and Addo 1993). In contrast, magnesium chloride works as a dust suppressant only above 70 ºF and greater than 32-percent relative humidity (Kirchner and Gall 1991, WTIC 1997). Outside those values it does not remain in solution, so its ability to control dust varies through time depending upon the ambient conditions (Kirchner and Gall 1991). When conditions are suitable for magnesium chloride, it is sometimes preferred because it creates a harder crust that is less prone to dust formation; however, it requires about 18 percent more salt to be used compared to calcium chloride (Kirchner and Gall 1991, WTIC 1997).

Both of these salts are hygroscopic under reasonably low humidities, but they are generally less effective at controlling dust than many organic petroleum and nonpetroleum products in those conditions. For example, in the Las Vegas Valley under desert conditions, disturbed soils treated with magnesium chloride as a dust suppressant resulted in more soil loss than no dust treatment (Loreto et al. 2002). Consequently, salts tend to be recommended for use in more humid climates (Langdon 1980). In addition, hygroscopic dust control agents should not be used on roads with more than about 25-percent clay in the surface because the water retained by the palliative will be passed to the clay and the road will remain wet, potentially compromising stability (Kirchner and Gall 1991). Chloride salts work best on roads of which 10 to 20 percent of the surface materials are composed of particles less than 75-µm diameter (Bolander 1997).

Salts can be sprayed onto the road surface as brine, or they can be mixed into the road surface during construction or maintenance as dry granules (Addo and Sanders 1995, Bennett 1994). Salts have little dust control effectiveness if applied during or immediately before rain events because they are water soluble and will leach or wash from the road (Federation of Canadian Municipalities and National Research Council 2005). They also are ineffective in wet climates because of

FS-002804

losses due to leaching (Addo and Sanders 1995, Bennett 1994, Federation of Canadian Municipalities and National Research Council 2005). On the other hand, some road moisture is needed for them to maximize their hygroscopic character, so wetting a dry road before application can improve effectiveness (Kirchner and Gall 1991). In dry conditions, salts that have penetrated into the road over time can be rejuvenated to some degree with light applications of water. The water allows salts to migrate back to the surface by capillary forces; however, at the surface, they again become susceptible to washoff (Slesser 1943, Succarieh 1992). Because effectiveness is lost due to washoff and leaching, reapplication of chloride salts two to three times per year typically is necessary to control dust continuously (Bennett 1994, Bolander and Yamada 1999, Monlux 1993). With no retreatment, salts provide no dust control within a year or less from the time of initial application, depending upon local conditions (Morgan et al. 2005).

Organic petroleum products are used commonly for dust suppression (Succarieh 1992). These chemicals include tars from coal distillation, bitumens from crude oil distillation, cutback asphalt (solvents such as gasoline, napthal, or kerosene combined with asphalt cement), and asphalt emulsions (asphalt dispersed in water + an emulsifier) (Addo and Sanders 1995). They act by binding or agglomerating road surface particles (Bolander and Yamada 1999). Petroleum products exist in a variety of viscosities, so they are suitable for a wide range of road surface characteristics. Higher viscosity petroleum agents are more effective on surfaces dominated by larger particles, and lower viscosity agents are more effective with higher amounts of fines (Giummarra et al. 1997). However, petroleum products are relatively ineffective when large percentages of clay exist in the road surface because the clay absorbs the petroleum rather than allowing it to act as a binding agent, so more binder must be added (Bennett 1994, Hoover et al. 1981). Asphalt recycled from roadways and roof shingles also is becoming a more common road surface treatment. It is typically used in highway resurfacing, but can be used as aggregate or as stabilizing material in the road base, sub-base, or embankment fills, or applied in thin coats, such as with chip seal (Koch and Ksaibati 2010).

Waste oils are organic petroleum products that once were used commonly for dust suppressants in the United States. However, because they were environmentally damaging and were contaminated with toxic materials (Addo and Sanders 1995, U.S. EPA 1990, Yanders et al. 1989), their use for dust control has been banned in this country (Foley et al. 1996, U.S. EPA 1991). This ban is not problematic because waste oils provide inadequate dust control due to poor aggregate binding capabilities (Addo and Sanders 1995), and other available organic petroleum dust suppressants provide better adhesive properties, are insoluble and resistant to washoff by water, and have fewer environmental concerns attached to their use (Addo and Sanders 1995).

Aside from pavement, asphalt emulsions are probably the most commonly applied petroleum-based dust control agents. They tend to remain effective longer than many products if applied under appropriate conditions, though they still require occasional retreatment to retain low dust emissions (Table 8). Repeated use of asphalt emulsion products can harden the road surface and create a surface similar to thicker recycled asphalt, making it particularly effective at dust control (Bennett 1994). However, recycled asphalt is prone to rutting in areas where turning, accelerating, or decelerating is concentrated (WTIC 1997), so asphalt emulsion treatments may have the same problem. Once ruts develop, erosion of subgrade materials can occur, but the emulsion-hardened surface makes regrading and the removal of ruts difficult (Monlux 1993, WTIC 1997). Tars and bitumens have been used for dust palliation (Addo and Sanders 1995, Jacobson 1992, Jones 2000a), but there is relatively little research on their effectiveness on aggregate surfaced roads (Jones 1999, 2000a). In general, bitumens require reapplication at least once or twice a year (Bennett 1994, Bolander and Yamada 1999), though the thickness and type of application affect their life span. Spray applications tend to be effective for only short periods (e.g., weeks to months), whereas thick applications mixed with sand and applied to the surface have been reported to be effective for up to 3 yr (Jones 1999, 2000a; WTIC 1997). Often tars and bitumens are used to temporarily control dust and stabilize roads until road upgrades can be made (Jones 1999).

Many types of organic nonpetroleum binders exist, but almost all of those that are used for dust suppression

are lignosulfonates (Succarieh 1992), which are alternatively termed "lignin sulfonates" (WTIC 1997). Lignosulfonates are residues resulting from the sulfite wood pulping digestion process (Heffner 1997, WTIC 1997). Consequently, their chemical composition depends upon the tree species from which they were derived and the chemicals added during the pulping process (Bolander 1999, Jones 2000a, Morgan et al. 2005, Succarieh 1992).

The lignin and sugars that are present naturally in lignosulfonates (Addo and Sanders 1995, Ledingham and Adams 1942, Pandila 1973) adhesively bind soil particles together, which prevents fines from forming and being released into the air by traffic (Jones 2000a). The sugar also makes them hygroscopic (Bolander and Yamada 1999), thereby giving them some of the dust control advantages of hygroscopic salts. Other advantages of treating unpaved roads with lignosulfonates are that they remain slightly plastic, which permits maintenance (e.g., regrading and reshaping) of the treated road, and the surface aggregate can become more compacted (Morgan et al. 2005).

Like many other palliatives that work by binding soil particles, lignosulfonates can be used effectively on roads with low levels of surface fines (e.g., 4 to 8 percent) (WTIC 1997), though they are most effective when between 8 and 20 percent of the road surface materials can pass through a 75-µm sieve (Bolander 1997). Lignosulfonates can be applied in liquid or solid form, but because of their physical composition, they do not penetrate well and are ineffective if not mixed into the road surface at the time of application (Kirchner and Gall 1991, WTIC 1997). When mixed into the top 2.5 to 5 cm of the road surface, they provide better penetration and dust control than at other depths (Bolander 1997, WTIC 1997). Lignosulfonates are biodegradable and water soluble over time (Adams 1988, Bolander and Yamada 1999, Lunsford and Mahoney 2001, Succarieh 1992), so at least annual applications are needed to retain effective dust suppression (Bennett 1994, Bolander and Yamada 1999) (Table 8). Lignosulfonates are particularly susceptible to being washed off during heavy rain events, so they are better suited to application in drier conditions (Giummarra et al. 1997; Jones 1999, 2000a). Although they remain a relatively common dust palliative, lignosulfonates are used less today than in the past due to changes in waste stream management by pulp producers (WTIC 1997).

The other types of nonpetroleum chemicals (Table 8) bind or agglomerate particles (Bolander and Yamada 1999), but they tend to be less effective at dust control and less available than lignosulfonates (Batista et al. 2002, Federation of Canadian Municipalities and National Research Council 2005). Animal fats and vegetable oils, of which soybean oil soapstock (or simply soapstock) is most common, agglomerate particles; molasses residues, sugar beet extract, and tall oils bind particles (Batista et al. 2002, Lohnes and Coree 2002). Soapstock is a fatty acid by-product from the refining of edible oils, so its availability is subject to soybean market conditions (Morgan et al. 2005). Some vegetable oils do not work well as palliatives, both during and following application, due to their physical characteristics at ambient temperatures (Morgan et al. 2005). After application they become brittle, which diminishes their effectiveness (Federation of Canadian Municipalities and National Research Council 2005). $PM_{10}$-sized dust losses are strongly associated with roads treated with dust suppressants that create brittle surfaces (Gillies et al. 1999). Because organic nonpetroleum compounds are derived from animals or plants, they also have associated unappealing odors for up to several weeks (Morgan et al. 2005). Molasses residues are water soluble, and substantial amounts will dissolve and wash off roads during heavy rains, meaning multiple applications may be needed annually (Addo and Sanders 1995). No specific recommendations on application intervals are available.

Electrochemical dust palliatives are prepared from sulfonated petroleum or highly ionic chemicals, such as enzymes or ammonium chloride. Climatic conditions have little influence on their effectiveness, and they are not easily lost by leaching (Federation of Canadian Municipalities and National Research Council 2005, Giummarra et al. 1997, Lunsford and Mahoney 2001). However, enzymes must be protected from freezing conditions during transport and application, and sufficient moisture must be present at the time of application (Lunsford and Mahoney 2001). Electrochemical materials interact with the clay fraction of soils (Batista et al. 2002, Lunsford and Mahoney 2001), so they are most effective when at least

FS-002806

moderate percentages of clay are present (Giummarra et al. 1997, Lunsford and Mahoney 2001) although there apparently is substantial variability in their effectiveness (Federation of Canadian Municipalities and National Research Council 2005). Many of the most common electrochemical enzymes are cultured bacteria; when exposed to air, they begin to reproduce and create large molecules that are absorbed into the soil clay lattice and form a tight compacted surface within days or hours. This process prohibits water absorption (Lunsford and Mahoney 2001) and increases compaction, thereby reducing dust generation (Jones 1999, Lunsford and Mahoney 2001). Electrochemical palliatives generally are mixed into the road surface during application (Bolander and Yamada 1999). There has been little widespread testing of electrochemicals, so almost no information is available on their duration as dust suppressants (Lohnes and Coree 2002) (Table 8).

Synthetic polymers are monomers that have been polymerized in an aqueous medium (Jones 2000a). They are usually by-products of paint and adhesive manufacturing (Bolander 1999, Lunsford and Mahoney 2001), so they suppress dust by binding particles together and forming a thin semi-rigid tackifier coating on the road surface (Alaska DEC 2010). They are currently some of the most expensive dust palliatives available (Lunsford and Mahoney 2001). When used for dust control, these polymers are applied in liquid form and require a drying or curing time at well above freezing temperatures for 12 to 24 h. During summer temperature and moisture conditions, they can increase the tensile strength of roads, which presumably would mean greater dust control. Tensile strength increases are as much as 10 times that of clay additives (described next), depending upon the product. Freeze-thaw cycles reduce the tensile strength of synthetic polymers, but it still remains about two to three times greater than that of clay additives (Bolander 1999).

Clay additives are made of bentonite, or impure montmorillonite clays (Bolander 1999). The most common bentonite clays are sodium and calcium montmorillonite. Sodium montmorillonite is a swelling clay in the presence of moisture, which allows it to seal and become waterproof (Murray 2000). Consequently, sodium montmorillonite is the clay used for dust suppression. Clays control dust through agglomeration (Bergeson and Brocka 1996). Because they have a net negative charge, bentonite clays are best suited for use as dust suppressants on unpaved roads that are surfaced with limestone or other material that has a net positive charge. This allows the formation of agglomerates through electrostatic bonding (Wahbeh 1990). Bentonite also is most effective in conditions where low levels of fines are present in the surface materials because the added clay particles provide fines needed to bind surface aggregates (Bennett 1994, Lohnes and Coree 2002). Relatively small levels of clay are applied to avoid retaining too much moisture in the road surface (Bergeson and Brocka 1996, Wahbeh 1990). Recommendations include 1- to 3-percent clay by weight of aggregate (Bennett 1994, Bolander 1997), with the total materials passing through a 75-µm sieve at ≤15 percent (Bolander 1997). Because of their affinity for moisture, clays are best suited to drier climates (Lohnes and Coree 2002). If the treated road surface remains stable and unrutted, clay may have the longest effectiveness of all palliatives; Bolander and Yamada (1999) estimated that the longevity of clay additives is 1 to 5 yr.

Although dust suppressants have been used for decades, there are remarkably few quantitative studies of their effectiveness (Sanders and Addo 1993, Sanders et al. 1997). Far more studies involving dust suppressant chemicals focus on road strength and stability (e.g., Bolander 1999, Butzke 1974, Monlux 2003). Although the relationship between road strength/stability and dust control is acknowledged (e.g., see Bader 1997 and Foley et al. 1996), papers that did not specifically describe dust reduction results are not included in this synthesis because they did not focus on the control of nonpoint source pollution. Also, many unpublished reports of dust control effectiveness are based on interviews with state highway agency personnel or contracted grader operators rather than on measurements. These observations may have merit, but these reports also are excluded from this review of effectiveness due to the lack of supporting data.

A major limitation of dust suppressant research is the lack of standard ways to measure dust emissions (Addo and Sanders 1995). Many techniques have been used to measure dust, but the equipment and protocols usually have been developed for the local research purposes (e.g., Addo and Sanders 1995, Hoover et al. 1973, Irwin et al. 1986, Jones 1999, Koch and Ksaibati 2010, Morgan et al. 2005, Schultz 1993, Taylor et al. 1987, Wellman



FS-002807

and Barraclough 1972). Some methods measure dust at stationary points along the road with passive or active collection devices; others use a variety of devices that measure dust behind a moving vehicle traveling at one or several fixed speeds (Sanders and Addo 1993). Consequently, individual studies can show dust reduction from palliative use and relative effectiveness among agents, but interstudy quantitative comparisons typically cannot be made (Addo and Sanders 1995).

Another limitation of dust abatement studies is that they do not quantify the contribution of dust control to the reduction of soil losses from roads. Dust control agents commonly have been reported to reduce dust by 30 to 80 percent compared to no dust control (WTIC 1997), but a given reduction in dust does not correspond to an equivalent reduction in soil material losses from the road during the same period. This is because about two-thirds of fugitive dusts are estimated to return to the unpaved road surface after settling out of the air (Jones 2000a). Much of the remaining dust is believed to settle out within 20 m of the road unless wind carries it farther (Forman and Alexander 1998, WTIC 1997). But dust has been shown to affect corridors of more than 140 ft, which were up to six times the right-of-way width (Hoover et al. 1981). Therefore, the lack of specific information on the transport and fate of dust particulates (Forman and Alexander 1998) from various types of dust suppressants makes it virtually impossible to estimate the soil losses that accompany these reductions without field measurements.

Of all the studies reviewed for this synthesis, only one directly measured the effectiveness of dust palliatives on reducing erosion losses from roads (Burroughs et al. 1984a). They applied dust oil and a bitumen treatment to road segments in Idaho and applied artificial rain events to the untrafficked road segments. They compared soil losses from them to an unsurfaced road segment made of native granitic soil material. All road segments were newly reshaped and graded before treatment, and ranged in slope from 5.3- to 10.3-percent grade. Both the dust oil and bitumen treatments had substantially lower soil losses than the bare soil, but the bitumen was much more effective (Table 9). Compared to the unsurfaced road, sediment losses from the bitumen were 28.7 times lower on an area basis, whereas the losses from the dust oil were only 3.2 times less. The bituminous treatment also was superior to a 10-cm-thick application of 3.8-cm crusher run gravel in terms of controlling soil losses from the road (Table 9). However, this study involved only four simulated rain events closely spaced in time and the longevity of bitumen effectiveness is only about 6 months (Table 8), so in the longer term, erosion protection would diminish without repeated treatments.

In terms of dust reduction alone, petroleum-based products (excluding asphalt paving) sometimes have been found to be inferior to many other products, especially salts. Kirchner (1988) measured dust with air samplers for five road segments treated with different dust suppressants and one control. The suppressants were an asphalt emulsion, a natural brine, a semi-processed brine, liquid calcium chloride, and liquid magnesium chloride. A truck was driven on the road 50 times at 45 mi $h^{-1}$ (mph). At the end of the first summer season, the section treated with asphalt emulsion performed almost as poorly as the control section even though it received two application treatments. A thin

**Table 9.—Sediment yield from road surfacing treatments in the Silver Creek experimental watershed, Idaho (data from Burroughs et al. 1984a)**

| Treatment | Average sediment yield | Sediment loss compared to untreated soil | Sediment reduction from treatment |
|---|---|---|---|
| | *kg 100 $m^{-2}$* | *percent* | |
| Native untreated soil | 54.5 | | |
| Native soil with dust oil | 17.2 | 31.6 | 3.2 times less |
| Native soil with bituminous surface treatment | 1.9 | 3.5 | 28.7 times less |

FS-002808

crust had formed but became broken up, allowing the road surface to show through. The natural brine also did not work well because it did not retain moisture effectively. Consequently, it rutted and substantial dust was generated. The semi-processed brine exhibited slightly better dust control, but it also rutted and developed potholes. In contrast, the calcium chloride- and magnesium chloride-treated sections performed much better, though slightly more dust was generated in the sections treated with magnesium chloride than in those treated with the calcium salt. They generated 48 to 65 percent less dust than the control during the summer season. The road segments treated with these two salts also resisted rutting and pothole development. At the end of the summer, a second treatment of each road section except the asphalt emulsion did little to improve the effectiveness of the brines, but the magnesium and calcium chloride treatments retained high levels of dust control through the next 9 months (i.e., a full year from the time of first treatment). The effectiveness of both salts was within a few percentage points at the end of the year compared to the effectiveness observed soon after retreatment.

A year-long study in Colorado that compared asphalt emulsion to calcium chloride found similar results (Kirchner and Gall 1991). At the end of just 4 wk, calcium chloride resulted in average dust control of 72.6 percent compared to only 31.1 percent for the asphalt emulsion. The road segment treated with emulsion also developed many potholes, and a substantial amount of road surface aggregate was lost and accumulated along the side of the road. A common petroleum emulsion, Coherex® PM (Tricor Refining, LLC, Bakersfield, CA), was not considered effective at controlling $PM_{10}$ dust emissions from unpaved roads in California for a 3-month period (Gillies et al. 1999), though its average efficiency over nine measurement periods was 67 percent. However, about 1 yr after the application, the average efficiency dropped to 44 percent.

In other studies, petroleum-based products performed well as dust suppressants. Hoover et al. (1975) found that two different asphalt emulsions performed well and had significantly lower dust emissions after a year compared to untreated controls. Conversely, at the end of that year, calcium chloride had become ineffective. In light of the inconsistent performance of petroleum-based dust suppressants, Langdon (1980) suggested that petroleum products would be more effectively applied toward meeting the nation's energy needs than used for dust control.

In a visual rating (qualitative) study reported by Monlux (1993) on 3 mi of road in Montana, a concentrated emulsified oil, an emulsified asphalt, a polymer emulsion, an emulsion copolymer, a light mineral oil, a lignosulfonate, and magnesium chloride were examined for dust control and compared to a control section over 7 wk. Emulsified asphalt was outperformed by magnesium chloride, but both controlled dust better than all other treatments. Potholes and corrugations developed on all road segments due to insufficient crowning and inadequate drainage. Regrading was performed to improve the road surface, but the emulsified asphalt surface was the most difficult to reshape because of the crust that had formed. The magnesium chloride and emulsified asphalt continued to provide dust control benefits following maintenance even without further treatment. Magnesium chloride was an effective dust suppressant for 12 wk, the emulsified asphalt for 8 wk, and all other treatments for 5 wk or less.

Although lignosulfonates were not particularly effective in the study by Monlux (1993), they have been at least as effective as other types of treatments in many other situations. For example, Fox (1972) found that treatments of ammonium lignosulfonate, and ammonium lignosulfonate in combination with calcitic lime or aluminum sulfate as additives, each were effective and reduced dust by 80 percent on granular surfaced secondary roads. A 1 percent ammonium lignosulfonate treatment with no additives was as effective as a 1 percent ammonium lignosulfonate treatment + 0.5 percent of either of the additives. Measurements 1 yr after treatment in Iowa showed that lignosulfonate and lignosulfonate + herbicide each significantly lowered dust emissions compared to untreated roads (Hoover et al. 1975).

Lignosulfonate appears to be particularly effective for conditions with moderately high traffic levels and more effective than many treatments with poor-quality aggregate surfacing. In Colorado, 2-km-long graveled road segments that had been treated with lignosulfonate, magnesium chloride, calcium chloride, and a formulation

of calcium chloride containing no magnesium all had lower dust emissions than an untreated segment (Fig. 4), but lignosulfonate was most effective (Addo and Sanders 1995, Sanders and Addo 1993, Sanders et al. 1997). This occurred even though vehicle use on the treated sections was twice that of the untreated control section (400 versus 200 vehicle passes day$^{-1}$). This study was continued a second year following regraveling and retreatment of the road sections (Fig. 4). The calcium chloride treatment with no magnesium was not used as a treatment the second year, but instead that road segment was used as the untreated section (Addo and Sanders 1995, Sanders et al. 1997). Dust levels were more similar among the three palliatives than they had been in the first test period, and again all three were more effective than no treatment (Fig. 4). The lignosulfonate treatment usually had the lowest dust emissions, and aggregate losses from public road use calculated from cross-sectional measurements were least from the section treated with lignosulfonate (Fig. 4). Losses equated to depths of 5.8, 5.2, and 7.0 mm for the lignosulfonate, magnesium chloride, and calcium chloride treatments, respectively, and were about one-half to one-third the 15.6-mm depth of aggregate lost from the untreated graveled road segment. Unexpectedly, even though the temperatures were high and relative humidity was generally low throughout the study, magnesium chloride resulted in lower dust generation and aggregate pullout than the more deliquescent calcium chloride.




Figure 4.—Mean dust weight by dust suppressant treatment and year (graphs developed from data in Addo and Sanders 1995, and Sanders and Addo 1993). Calcium chloride (Special) includes magnesium chloride.

Morgan et al. (2005) measured dust generation in Iowa from road segments treated at the start of the study and again at 8 wk with lignosulfonate, calcium chloride, and a soybean oil soapstock. Their study also allowed investigation of the influence of road aggregate quality (crushed limestone rock and alluvial sand/gravel mixture), traffic volume (low = 45 to 60 vehicles day$^{-1}$ and high = 240 vehicles day$^{-1}$) and time (16 wk and 52 wk). During the first 16 wk, average dust reduction was similar, about 50 percent, for both road surfaces compared to similarly surfaced roads with no palliation (Table 9). Traffic volume made the influence of road surface quality much more apparent over that short timeframe, with much poorer effectiveness on the gravel/sand surface compared to the crushed limestone. Only the lignosulfonate was effective on the alluvial surfacing, and it reduced dust by only one-fourth to one-third during the first 16 wk. Suppressant effectiveness declined through time, and by the end of 1 yr, average dust reductions of the palliatives that remained effective were between 10 and 30 percent (Table 10). In the long term, traffic volume was deemed to be a more important factor for controlling dust than surfacing, and lignosulfonate was the only palliative that consistently contained dust at levels below that of the untreated road segments.

Gebhart et al. (1996) also studied soybean oil soapstock effectiveness on unsurfaced roads and tank trails at the U.S. Army's Construction Engineering Research Laboratories in Fort Hood, TX, and Fort Sill, OK. It was compared to a 38 percent calcium chloride mixture, calcium lignosulfonate, and a polyvinyl acrylic polymer

**Table 10.—Average dust reduction by surface, traffic volume, and treatment over two time periods for Story County, Iowa (data from Morgan et al. 2005)**

| Surface | Traffic volume | Dust suppressant | Dust reduction compared to no treatment[a] | |
|---|---|---|---|---|
| | | | Average over 16 wk | Average over 52 wk |
| | | | ----------- *percent* ----------- | |
| Alluvial sand/gravel | Low | Lignosulfonate | 56 | 28.2 |
| | | Calcium chloride | 40 | 17.9 |
| | | Soapstock | 50 | 27.8 |
| | High | Lignosulfonate | 27 | Not tested |
| | | Calcium chloride | -1[b] | -26.0 |
| | | Soapstock | -2 | -27.4 |
| Crushed limestone rock | Low | Lignosulfonate | 76 | 22.0 |
| | | Calcium chloride | 51 | 11.6 |
| | | Soapstock | 51 | 6.9 |
| | High | Lignosulfonate | 61 | 10.5 |
| | | Calcium chloride | 46 | -24.0 |
| | | Soapstock | 24 | 14.6 |

[a] Percentage by weight of aggregate.
[b] Negative values indicate an increase in dust.

emulsion (PVA; the latter results are described in greater detail on page 37). At Fort Hood after 30 days, all four treatments resulted in at least 50-percent dust reduction compared to a control. The calcium chloride salt was most effective at abating dust, but it was not significantly better than the soapstock or other treatments. By day 60, the soapstock continued to have lower dust emissions than the control, and was not significantly different from the lignosulfonate or PVA. But the soapstock was significantly less effective than the chloride salt. At that time the calcium chloride reduced dust levels by at least 50 percent; the soapstock and lignosulfonate did not retain that level of protection.

Only a few studies have measured dust abatement from bentonite. Bergeson and Brocka (1996) used sodium montmorillonite as a dust palliative on limestone-surfaced secondary roads in Texas. Applications tested ranged from 0.5 to 9 percent by weight of aggregate. Dust generation was reduced by about 45 percent on sites where 3-percent bentonite was employed and 70 percent on sites with 9-percent bentonite. Wahbeh (1990) also examined the effectiveness of different application rates of sodium montmorillonite using two application techniques on limestone-surfaced roads in two counties in Iowa. The treatments were a spray slurry application of bentonite + water + soda ash to loose-surface material, and a dry application of bentonite mechanically mixed with the crushed limestone surface aggregate and then saturated with water and soda ash. Bentonite application rates were 0.5, 1.0, 1.5, 2.0, 2.5, and 3.0 percent in Adair County; only the first three application rates were used on Dallas County roads. The bentonite treatments also were compared to spray applications of calcium chloride or magnesium chloride. Dallas County roads received 75 to 80 vehicle passes day$^{-1}$ over the 2-yr study, though the dust measurements were determined only from 10 test passes by a ½-ton truck traveling at 40 to 45 mph in or out of the wheel tracks. Wheel track performance was tested on 21 days and out-of-the-wheel track performance was tested on 16 days throughout the 2 yr. In Dallas County, the maximum bentonite concentration (1.5 percent) and both chloride treatments resulted in similar dust control originating from the wheel track: about a 20-percent reduction compared to no palliative



FS-002811

treatment of the limestone aggregate (Table 11). Dust was best controlled out of the wheel tracks by the 1.5-percent bentonite treatment, where a 27-percent reduction in dust was obtained.

Bentonite effectiveness endured in Dallas County even with a reapplication of limestone aggregate to the road surfaces about halfway through the study. The short-term effectiveness of calcium chloride is apparent in the 3-month-long study on Adair County roads (Table 11). The best dust reduction both in and out of the wheel tracks occurred with the calcium chloride treatments and the highest percentage of bentonite clay (3.0 percent).

Little information could be found on the effectiveness of other dust control agents. Only a small discussion about the effectiveness of a sugar beet molasses, Molex, was available (U.S. Roads 1998). Even though its effectiveness was praised, only general, qualitative comments were given. There are few field applications with measures of dust control effectiveness from electrochemical palliatives or comparisons of their effectiveness to more traditional suppressants in the literature. This may be because many electrochemical palliatives are relatively new to the market (Jones 1999, 2000a; Lunsford and Mahoney 2001). A product called EMC SQUARED® (Soil Stabilization Products Co. Inc., Merced, CA) is the most commonly tested electrochemical palliative. Gillies et al. (1999) found that it was only marginally effective (33-percent dust reduction) during a period of 1 wk, and then its effectiveness declined quickly. McHattie (1994) reported that a single application of EMC SQUARED was as effective as montmorillonite clay and calcium chloride about 1 yr after application on a 2.5-mi length of a highway reconstruction project in Alaska, but an additional treatment was required after 20 months. The degrees of effectiveness of EMC SQUARED may vary because of the need for very specific moisture content during application; many papers also have noted that electrochemical dust suppressants may work only with certain types of soils (Bolander 1999, Piechota et al. 2002, Scholen 1992).

**Table 11.—Average percent dust reductions with bentonite clay and chloride salts for Dallas and Adair Counties, Iowa (data from Wahbeh 1990)**

| Location | Treatment | Dust reduction | |
|---|---|---|---|
| | | In wheel track | Out of wheel track |
| | | ---------- *percent* ---------- | |
| Dallas County[a] (21 test passes) | 0.5% bentonite | 2 | 6 |
| | 1.0% bentonite | 6 | 15 |
| | 1.5% bentonite | 20 | 27 |
| | Calcium chloride | 20 | 6 |
| | Magnesium chloride | 22 | 16 |
| Adair County[b] (11 test passes) | 0.5% bentonite | 8 | 9 |
| | 1.0% bentonite | 11 | 11 |
| | 1.5% bentonite | 17 | 12 |
| | 2.0% bentonite | 5 | 14 |
| | 2.5% bentonite | 10 | 19 |
| | 3.0% bentonite | 42 | 33 |
| | Calcium chloride | 30 | 48 |

[a] Data are from October 1987–October 1989.

[b] Data are from August 1989–November 1989.

Synthetic polymers traditionally have been used primarily as soil conditioners, and there is little research on their ability to suppress dust on traveled roadways (Jones 2000a, Lunsford and Mahoney 2001). The information that does exist is mixed and typically provided as general statements with no data; for example, Jones (1999, 2000a) indicated that studies from South Africa showed little effectiveness for synthetic polymers due to poor penetration into the road surface. Scholen (1992) also reported poor dust control by an acrylic polymer in Florida. Bolander (1997) stated that polymers provide some promise from tests in the Pacific Northwest. Two studies at the U.S. Army's Construction Engineering Research Laboratories showed limited success of PVA (Gebhart et al. 1996). At Fort Sill, OK, PVA was tested over a 60-day period on unsurfaced roadways and tank trails. Thirty days after application, the PVA had three to four times lower dust emissions than untreated controls. At day 60, dust levels still were less than from the control road segment, but dust emissions had doubled from those present at day 30. The heavy track and wheel equipment traveling the roads broke up the PVA surface seal. Similar results were obtained from an identical study at Fort Hood, TX, though the levels of dust abatement at 60 days were even less than those measured at Fort Sill. Gillies et al. (1999)

FS-002812

found a polymer emulsion to be highly effective over 12 months, even with reasonably heavy use (6,400 vehicle passes) and wet winter conditions. They found the product, Soil-Sement® (Midwest Industrial Supply, Inc., Canton, OH), reduced $PM_{10}$-sized dust by an average of more than 80 percent throughout the entire study.

## Environmental Effects of Dust Palliatives

The studies just summarized illustrate that most of these various chemicals have the ability to abate dust on unsurfaced roads, and thus, provide some control of soil and aggregate losses, at least temporarily. However, because of their chemical composition, some dust suppressant chemicals can themselves be nonpoint source pollutants.

There are two general types of studies that have been performed to examine the impacts of dust palliatives: 1) those that have worked toward establishing toxic thresholds for animals, humans, or plants, and 2) those that have quantified the chemistry of runoff and leachate or have examined the environmental effects of the chemicals or runoff/leachate on flora and fauna following field application or accidental spills. The first type of study dominates the literature, and despite the relatively common and widespread use of many types of dust suppressants, few studies have quantitatively examined their environmental impacts (Sanders et al. 1997). Toxicology studies and studies with extremely high loads or concentrations of palliatives indicate that most mammals and humans show little effect from most palliatives. Instead, the primary environmental concerns about their use at concentrations normally encountered tend to be their potential effects on groundwater quality, freshwater aquatic organisms, and to some degree plants (for some specific chemicals) (Bolander and Yamada 1999).

The effects of lignosulfonates have been studied far more than any other dust suppressant. In part, this may be because there are many studies showing the toxic effects of spent sulfite liquors on aquatic organisms, including trout (*Salvelinus* and *Oncorhynchus* spp.) (Fisher 1939, Griffin and West 1976, Walden 1976). Because spent sulfite liquors are precursors to lignosulfonates and a common waste product of the pulping industry, there also has been concern about potential effects of lignosulfonates. However, lignosulfonates are created by evaporating water from spent sulfite liquors, and during distillation, sulfur dioxide, and acetic and formic acids also are removed to yield about 50- to 60-percent solids. Thus, the resulting calcium, sodium, or ammonium lignosulfonates are less toxic than the original wastes (Adams 1988). Lignosulfonate toxicity also has undergone extensive study because the Food and Drug Administration allows the same formulations used for dust palliation (ammonium, calcium, magnesium, and sodium lignosulfonates) to be used as binders in pelletized animal feeds and in paper and paperboard products used to package liquid and fatty foods (Singer et al. 1982; Watt and Marcus 1974, 1976).

Overall, lignosulfonates seem to pose little toxicity to mammals and humans at concentrations or loads that normally would be encountered with dust suppressant use (Adams 1988, Bolander and Yamada 1999, Succarieh 1992). Studies of direct fluid ingestion of calcium, magnesium, or sodium lignosulfonates at concentrations of 40 g $L^{-1}$ by guinea pigs (*Cavia porcellus*) over 8 wk found average lower weight gain by animals receiving sodium and calcium lignosulfonate (117 g and 144 g, respectively) compared to animals receiving no lignosulfonate (253 g). The guinea pigs treated with each of these chemicals also developed ulcerated colons. In contrast, the guinea pigs receiving magnesium lignosulfonate had much less difference in average weight (210 g) than the control animals and no development of ulcerated colons (Watt and Marcus 1976). These results confirmed earlier findings of lower weight gain and development of ulcerated colons when only sodium lignosulfonate was administered at several concentrations to guinea pigs (Watt and Marcus 1974). The data to support nontoxicity of lignosulfonates to humans primarily comes from workers handling lignosulfonates. No chronic health problems have been reported over the 40 yr they have been commonly used—including from people who have worked over the long term with these chemicals (Adams 1988).

Lignosulfonates are most harmful to aquatic species (Bolander and Yamada 1999, Schwendeman 1981). The sensitivity to lignosulfonates is attributed to the effects that these chemicals have on the biological oxygen demand (BOD) and through direct toxicity (Adams 1988, Poole et al. 1978). Lignosulfonates may contain

as much as 35 percent wood sugars, and these are fermented relatively easily by microorganisms, which increases BOD and reduces available oxygen in the short term (Adams 1988). The remaining fraction of the chemicals that are low molecular weight are degraded much more slowly, primarily by fungi (Engen et al. 1976, Pandila 1973, Singer et al. 1982, Stapanian and Shea 1986, Watkins 1970), allowing long-term elevations in BOD (Raabe 1968). Because microbial breakdown of lignin in lignosulfonates is incomplete (Ledingham and Adams 1942, Watkins 1970), the remaining compounds of higher molecular weight undergo decomposition via desulfonation, demethoxylation, and depolymerization, similar to the processes that occur for natural breakdown of lignin in wood (Engen et al. 1976).

Even in trout, which are considered to be the fish species most sensitive to lignosulfonates (Succarieh 1992), concentrations at which toxicity occurs are fairly high. In a study of sodium lignosulfonate effects on rainbow trout (*Oncorhynchus mykiss*), the 48-h LC50 was 7,300 ppm, and 50-percent survival occurred for 25 h even at a concentration of 2,500 ppm (Roald 1977a). The LC50 is the concentration of a chemical in water or air required to kill 50 percent of the test population during the observation period. Survival was 100 percent over 28 days for concentrations up to 1,875 ppm. In a follow-up study, rainbow trout were subjected to sublethal concentrations of 0 (control), 40, 80, 160, and 320 ppm for 60 days and concentrations of 0, 640, 1,280, and 1,920 ppm for 35 days (Roald 1977b). Fish exposed to concentrations of 160 ppm or greater had slower growth rates than those with no exposure. All rainbow trout subjected to the 1,920-ppm concentrations died during the 35-day exposure. The lignosulfonates did not affect the bacterial flora in the intestines, but the activities of some digestive enzymes were lower than the controls at concentrations as low as 320 ppm. It was not clear whether the lowered growth from reduced food consumption was due to decreases in enzyme activities, or if enzyme activities declined because of lower food consumption.

Lignosulfonates also are considered to be of little risk to plants, though this assumption is based on few studies. Stapanian and Shea (1986) applied calcium lignosulfonate with 50-percent solids at rates of 12, 42, and 63 ton of solids $ac^{-1}$ (Adams 1988) directly to the ground of two clearcuts planted to Douglas-fir (*Pseudotsuga menziesii*) 1 or 3 yr before treatment. These rates were much higher than rates typically applied to roads for stabilization or for dust control (5 and 1.3 ton of solids $ac^{-1}$, respectively) (Adams 1988). Neither the growth of the Douglas-fir nor the aboveground woody biomass was affected through 12 wk of monitoring. Applications of 42 and 63 ton $ac^{-1}$ significantly reduced herbaceous biomass, though the mechanism driving the decrease was unknown. Lignosulfonate migration through the soil occurred at approximately the same rates, regardless of the amount initially applied, but over the 12 wk it disappeared from the top 0.2 m of soil because of its high water solubility (Stapanian and Shea 1986). Yardley et al. (1980) found that lignosulfonate application to soil did not prevent seed germination.

The greatest risks related to use of lignosulfonates are associated with contamination of water. Lignosulfonates are water soluble, especially when associated with soil or road surface matrix pH values of 6 or greater. Consequently, lignosulfonates can leach through the soil, especially as rainfall increases (Singer et al. 1982). However, they also have low penetrability in soil because clays can adsorb lignosulfonates and retard leaching. Mobility can be retarded even in regions with high rainfall if the percent clay is sufficiently high, but even clay cannot stop transport of lignosulfonates by flowing water (e.g., concentrated overland flow) (Singer et al. 1982). Schwendeman (1981) suggested that 70 to 100 percent of road surface materials should pass through a ¾-inch sieve and 20 to 50 percent should be composed of silt or clay for optimal lignosulfonate retention and dust abatement.

Whether there are harmful or even measurable levels of lignosulfonates in soil leachate, streamwater, or groundwater will depend upon the concentrations applied (Stapanian and Shea 1986), road surface and soil texture, precipitation characteristics, and general road condition. At the levels applied as dust suppressants and when applied according to manufacturer's instructions, threats to these parts of the environment are believed to be minimal (Bennett 1994, Morgan et al. 2005, Singer et al. 1982, WTIC 1997). Any effects that do occur would be expected to be in the immediate area around the application site (Singer et al. 1982).

Only one study was found in which runoff from a lignosulfonate applied to abate dust on disturbed land (not a road) was measured and analyzed for concentrations of toxic materials, including volatile and semivolatile organic compounds, organic pesticides, metals, BOD, and a variety of other chemicals (Loreto et al. 2002). The lignosulfonate used, Dustac® (Quattro Solutions, Welshpool, Western Australia), had the fewest contaminants present in runoff of all the types of palliatives compared (Table 12). Volatile organic compound concentrations were less than 25 µg $L^{-1}$, and semivolatile organics and pesticides were not detected. Some of the highest concentrations of copper, chromium, and manganese were found in runoff from this plot, but none of these metal concentrations was more than 34 ppb. BOD was only about 1 mg $L^{-1}$, but chemical oxygen demand (COD) was approximately 350 mg $L^{-1}$. In this study, some of the chemicals measured may have been from the palliative itself, from chemical reactions (e.g., exchange) resulting from palliative chemicals, or from chemicals in the soil that would have been present in runoff regardless of whether the palliative was used.

Consequently, many of the statements describing the limited concern about lignosulfonates in the environment are based upon current understanding of their biogeochemical behavior rather than on data.

The environmental effects of petroleum-based dust suppressants are largely unknown. These may be the most difficult products about which to make generalizations because they exist in many different formulations, and new products are being developed regularly. To further complicate matters, very little field monitoring of contamination by these products using typical application rates has been accomplished. Therefore, much of the research applied to this subject extends from environmental emergencies (e.g., spills), or from toxicology studies that use concentrations exceeding the small amounts of petroleum in dust palliatives (Succarieh 1992).

Ettinger (1987) examined the effects of an accidental spill of commonly applied petroleum emulsion dust suppressant (Coherex) on aquatic organisms. An

**Table 12.—Constituents with the highest concentrations, and other negative characteristics[a], observed in runoff from dust suppressant-treated plots (data from Loreto et al. 2002)**

| DUST SUPPRESSANT TYPE AND PRODUCT NAME | | | | | | |
|---|---|---|---|---|---|---|
| **Acrylic polymer EK35®** | **Lignosulfonate Dustac®** | **Petroleum-based ------------ Coherex® ------------** | | **Nonpetroleum-based Road Oyl®** | **Mulch Plas-Bond[b]** | **Salt ($MgCl_2$) Dust Gard®** |
| 2-butanone | Nitrate | Acetone | Thallium | Acetone | Hardness | Chloride |
| Acetone | COD | Benzoic acid | Lead | Ammonia-nitrogen | Conductivity | pH >8 |
| Nitrate | TOC | Ammonia-nitrogen | Arsenic | Sulfide | pH >8 | Cyanide |
| Cyanide | Chromium | Sulfate | Selenium | pH >8 | TDS | Turbidity |
| Turbidity | Barium | Sulfide | Copper | BOD | TSS | TS, TSS |
| TS, TDS, TSS | Silver | Conductivity | Manganese | COD | Sulfate | Thallium |
| Arsenic | Conductivity | Coliform | Nickel | TOC | Nickel | Lead |
| Benzoic acid | Copper | Alkalinity | Zinc | Aluminum | | Arsenic |
| Pentachlorophenol | | Cyanide | Cadmium | Iron | | Boron |
| Hardness | | BOD | Barium | Zinc | | Zinc |
| BOD | | Hardness | TVS | TSS | | Silver |
| COD | | TDS | Iron | Nickel | | Sulfate |
| TOC | | TSS | | Cadmium | | |
| TVS | | COD | | | | |
| Alkalinity | | | | | | |

[a] BOD = biological oxygen demand, COD = chemical oxygen demand, TOC = total organic carbon, TS = total solids, TDS = total dissolved solids, TSS = total suspended solids, TVS = total volatile solids.

[b] Manufactured by Soil Solutions Co.



FS-002815

unknown amount of the material was spilled into a ditch that led directly into a tributary of the Schuylkill River in southeastern Pennsylvania. The resin in the mixture adheres to soil and quickly attached to the stream bed. Concentrations of Coherex in tributary streambed sediments were as high as 3,550 mg $kg^{-1}$ during the first 3 days. Within the first 8 hours of the spill, benthic macroinvertebrate density in the affected reach was significantly less than in unaffected reaches, and there were 6.5 times more dead benthic macroinvertebrates as live ones. By day 3, most macroinvertebrates and many of the fish, both adult and larval forms, in the area had died. The dead fish were primarily blacknose dace (*Rhinichthys atratulus*) and white suckers (*Catostomus commersonii*). Crayfish (*Cambarus* spp.) were not as severely affected, but they were very sluggish. Thirty two-lined salamander larvae (*Eurycea bislineata*) and one adult American toad (*Bufo americanus*) also were found dead. Coherex is biodegradable, and by day 10 the concentrations declined substantially and the affected reach had become repopulated with macroinvertebrates at numbers similar to unaffected reaches. There was little change in the streambed concentrations of the product from day 10 through day 59; the concentration at day 59 was 385 mg $kg^{-1}$.

Coherex was included in the runoff study of dust palliatives applied to disturbed soils in the Las Vegas Valley by Loreto et al. (2002). By a substantial amount, Coherex had the largest number of contaminants with the highest concentrations in the collected runoff (Table 12). Most notably, the concentration of acetone (a toxic volatile organic compound) was 66.2 µg $L^{-1}$, and the concentration of benzoic acid (a toxic semivolatile compound) was 225 µg $L^{-1}$. Coherex also had high concentrations of copper, chromium, and manganese.

Hoffman and Eastin (1981) examined the toxicity of a dust oil called RDCO on mallard duck (*Anas platyrhynchos*) embryos. Eggs exposed to 0.5 µl of oil on day 3 after being laid had 60-percent mortality by day 18. Exposure to the same concentration 8 days after being laid reduced mortality by about half (32 percent) by day 18. All of the ducks that survived this dose to be hatched had bill, brain, or eye defects, or incomplete ossification of the skeleton. A more dilute (2 percent) aqueous emulsion spray of RDCO applied at day 3 or day 8 resulted in lower mortalities by day 18: 13 percent and 17 percent, respectively. Ducks exposed at day 3 showed no abnormalities; 12 percent of those exposed at day 8 had abnormalities.

Kimball (1997) evaluated the potential for pollution of groundwater by PennzSuppress® D (PennzSuppress Corp., Lago Vista, TX), a petroleum-based dust suppressant and road stabilizer. In place of a road study, he examined the chemistry of laboratory leachate obtained from limestone road-base material treated with the product. The leaching results were employed in a mathematical modeling exercise of fate and transport of those materials. He concluded that there was a low risk for this specific product to negatively affect groundwater quality, but warned against extrapolating these results to other geologic (soil and bedrock) situations or other products.

A cursory review of the literature suggests that chloride-based salt palliatives have undergone the most extensive studies related to their environmental effects. However, deeper examination of these studies indicates that these evaluations typically rely on information obtained from deicing studies using chloride salts (e.g., Ettinger 1987, Piechota et al. 2002, Singer et al. 1982). There have been very few studies in which off-road salt levels or environmental effects from dust control by chloride salts have been measured. Although the physics and chemistry related to environmental impacts for both types of applications are the same for like salts, the specific environmental effects that can be expected may be very different due to the different objectives, timing and frequency, and application techniques used for deicing versus dust abatement. For example, deicers may be applied to road surfaces repeatedly during and immediately after snow and ice events, resulting in high chloride concentrations in snowmelt runoff. In contrast, effective use of chloride salt dust suppressants requires application during dry periods with the compound either mixed into or sprayed on the road surface. Applications are made as needed, but generally occur one to two times per season (Bolander and Yamada 1999).

Chloride and magnesium salts are highly soluble, so they can move through the environment relatively easily with moisture (Addo and Sanders 1995, Federation of Canadian Municipalities and National Research Council 2005). Their deliquescent behavior and capillarity provide short-term retention (e.g., over

months), but eventually they will fully succumb to leaching or washoff (Singer et al. 1982, Slesser 1943, Succarieh 1992).

The potential environmental effects of calcium chloride and magnesium chloride come from the chloride anion and the base cation, calcium or magnesium. The chloride anions dissociate from the calcium or magnesium ions. Because soil has a net negative charge due to the presence of clay particles, the chloride ions are repelled by soil and largely will remain in solution. In contrast, the positive charges of calcium and magnesium ions allow them to be retained by soil clays via cation exchange (Bohn et al. 1985). Initially, they will be exchanged for other base cations held less tightly by the soil, such as sodium and potassium. Because anions pair with cations to retain electroneutrality during leaching, the cations that have been released from the soil during cation exchange will pair with the chloride ions (Christ et al. 1999, Reuss and Johnson 1986). Thus, sodium chloride and potassium chloride will be leached first. As inputs of calcium and magnesium increase, reserves of sodium and potassium become depleted so incoming calcium and magnesium ions must exchange for other cations held on exchange sites; these can include toxic metals such as mercury, copper, and lead (Feick et al. 1972). These metals have been found in runoff and soil leachate in association with the use of deicing salts (Bäckström et al. 2004, Feick et al. 1972, Granato et al. 1995). Increases of calcium and magnesium from dust palliatives applied properly and at rates normally associated with dust control generally would be expected to be small compared to background levels of those base cations, so damaging environmental effects from release of toxic metals would not be expected (Singer et al. 1982). However, no studies could be found in which toxic metal concentrations were monitored to confirm this expectation.

One of the largest concerns of salt mobilization is contamination of domestic wells, because humans tend to be much more sensitive to salt intake than most organisms (Hanes et al. 1970). Elevated salt consumption by humans is linked to a number of health effects, including hypertension, coronary heart disease, and cardiovascular disease (Asaria et al. 2007). Increased salt concentrations have been found in wells, groundwater, and surface water from deicing (Bäckström et al. 2004, Granato et al. 1995, Kaushal et al. 2005), but similar studies could not be found for the use of dust control chloride salts. This does not mean that dust palliatives cannot pollute wells—only that studies of this type are rare or nonexistent, based on the available literature. It should be noted that because salinity levels in fresh waters are very low, small additions of salt can result in measurable increases; with sustained increases over time, elevated salinity can persist and result in ecosystem changes (Kaushal et al. 2005).

Fish, animals, and plants—unlike humans—can tolerate high concentrations of chlorides and salts before detrimental effects occur. Most freshwater fish species can withstand salt concentrations at least up to 400 ppm (Hanes et al. 1970), and many species can tolerate concentrations in thousands or tens of thousands of parts per million (Doudoroff and Katz 1953, Hanes et al. 1970). Salt tolerance or toxicity for fish depends not only on the concentrations and duration of exposure, but also the type of salt. Wiebe et al. (1934) found that golden shiners (*Notemigonus crysoleucas*) were much more sensitive to magnesium chloride and calcium chloride than sodium chloride, and fish that appear to be killed in high concentrations of sodium chloride could be revived if placed in fresh water; that was not the case for fish killed in magnesium or calcium chloride solutions.

Doudoroff and Katz (1953) reported that newly hatched rainbow trout could not tolerate concentrations of chloride (in sodium chloride) of about 3,256 ppm. However, older trout withstood chloride concentrations that were five to six times that level. One-day-old pickerel (*Stizostedion v. vitreum*) and whitefish (*Coregonus clupeaformis*) fry could withstand calcium chloride concentrations of 12,060 ppm and 22,080 ppm (i.e., 5,632 ppm and 10,326 ppm of chloride), respectively (Edmister and Gray 1948). Pike (*Esox* spp.), bass (*Micropterus* spp.), and perch (*Perca* spp.) were harmed when chloride concentrations reached 4,000 ppm (Hanes et al. 1970). Golden shiners exposed to 20,000 ppm sodium chloride survived an average of 1.33 h compared to 6.4 h and 0.5 h in the same concentrations of calcium chloride and magnesium chloride, respectively. At only 5,000 ppm chloride, survival times increased substantially, and were 148, 143, and 96.5 h for the three respective salts. There was little difference in survival times for calcium chloride salt at

20,000 ppm and 15,000 ppm for bream (*Abramis brama*). Survival times were 19.5 h and 17.7 h, respectively, but increased by more than double to about 49 h at 10,000 ppm (Wiebe et al. 1934).

Mortality of some small mammals and game birds, as well as pets, has been reported due to the consumption of deicing salts, but there is some debate as to whether the salt was responsible for the death. Deicing salts also contain chemicals, such as sodium ferrocyanide, to help prevent caking or reduce corrosion of vehicles, and these are highly toxic; thus, they may be responsible for or contribute to salt toxicity in birds, mammals, and fish (Hanes et al. 1970). However, controlled studies of salt intake by domestic animals have shown that toxicity and even death can occur at relatively high concentrations. Concentrations of 15,000 and 20,000 ppm resulted in reductions in food consumption and toxicity, respectively, to sheep (*Ovis aries*) (Peirce 1966). Dairy cows (*Bos* spp.) showed no health effects at sodium chloride levels of 9,000 to 10,000 ppm over 1 to 3 months, but they did show illness and reduced growth when drinking water contained 15,000 to 20,000 ppm sodium chloride (Weeth and Haverland 1961, Weeth et al. 1960). Conversely, nonlactating cattle could tolerate salt concentrations of 20,000 ppm (Heller 1933). Horses (*Equus caballus*) and sheep did not show any symptoms from drinking salt water with concentrations of 9,123 and 11,400 ppm, respectively (Ramsey 1924). In the laboratory, Heller (1932) and Heller and Larwood (1930) studied rats (*Rattus* spp.) supplied with drinking water containing 10,000, 15,000, 20,000, and 25,000 ppm of calcium chloride. These doses resulted in reproduction interferences, growth rate reductions, lactation problems, and mortality, respectively.

Chloride can be toxic to plants in low concentrations in the soil, but plants overall have a wide range of tolerance for salt that depends upon plant species, age, tissue type, overall nutrient conditions, and season (Hanes et al. 1976). Grasses are not easily injured by salts, but trees can be susceptible to damage (Hanes et al. 1970). Some of the tree and shrub species that are most intolerant to chloride concentrations are green ash (*Fraxinus pennsylvanica*), yellow-poplar (*Liriodendron tulipifera*), eastern white pine (*Pinus strobus*), Norway spruce (*Picea abies*), Canadian hemlock (*Tsuga canadensis*), spirea (*Spiraea* spp.), and rose bushes (*Rosa* spp.) (Hanes et al. 1976). Vegetation damage reported from deicing salts includes reduction in leaf color, leaf browning, premature leaf fall, twig and branch dieback, and mortality of roadside trees (Sucoff 1975). If dust-control salts are properly applied, plant damage or toxicity should result only through elevated salt concentrations in the soil and not through spray, as often occurs with deicing. Even with spray applications, if the liquid is applied following appropriate techniques, salt in soil should be the dominant concern, as splash from cars and plowing would not occur with dust palliation. Additionally, chloride movement (without splash) is primarily vertical; the lack of horizontal movement tends to limit terrestrial effects to near the area of application (Singer et al. 1982).

Slesser (1943) confirmed that there was little movement of chloride dust control suppressants laterally from roads. He found that 23 percent of calcium chloride added to a road to improve its stability was present in the upper 15 inches of the road 55 months after treatment, and horizontal transport was limited. Only 4.1 percent of calcium chloride was found to a depth of 15 inches 2 ft from the road edge after 55 months. On a second road, 9.6 percent of the calcium chloride salt was found in the upper 15 inches of the road 46 months after treatment, and only 6.2 percent was measured to a depth of 14 inches 1 ft from the road edge 25 months after application.

The few studies specifically focused on dust palliative salts suggest they do have lower potential for environmental effects than deicing salts. This is probably largely due to the much lower application rates used for dust control (Singer et al. 1982). Capillarity also contributes to slowing losses vertically by pulling salt back up toward the road surface during dry periods. Consequently, if chloride-salt dust palliatives are applied during appropriate conditions (i.e., avoiding rain and wet conditions), large slugs of salts normally would not be leached in short time periods (Singer et al. 1982). Monlux and Mitchell (2006) compared the performance of magnesium chloride liquid, calcium chloride liquid, and two solid calcium chloride applications (77 percent and 94 percent) on unpaved roads in four western states. They measured chloride concentrations pre- and post-application in river water, in soil samples (48 samples each, before and after application, including controls),

and in 101 conifer trees adjacent to the road. After 2 yr there were no increases in chloride concentrations in river water samples. Chloride concentration increases were found in soil samples and tree tissue, but in both cases the concentrations were below levels that would be of concern for soils or that would threaten tree survival. Loreto et al. (2002) included magnesium chloride (DustGard®, Compass Minerals, Overland Park, KS) in the study of runoff quality in the Las Vegas Valley. The only notable chemicals in the runoff were chloride, boron, thallium, lead, and arsenic (though these soils have high naturally occurring arsenic concentrations). Thallium is very poisonous, but the concentrations found were only about 0.23 mg $L^{-1}$, and fish and aquatic invertebrate toxicity occurs at much higher concentrations: 10 to 60 mg $L^{-1}$ and 2 to 4 mg $L^{-1}$, respectively (Zitko et al. 1975).

For all of the other types of dust suppressants, there is little specific information available about their environmental effects. Bennett (1994) stated that because clays are naturally occurring geologic materials, they are harmless to the environment. This probably is a reasonable assumption. Lunsford and Mahoney (2001) stated that enzymes are nontoxic and harmless to the environment, but they offered no studies or literature to substantiate that statement. Little is known about the environmental effects of synthetic polymers, but their cost and the high amount of quality control required during application may impede their widespread use (Lunsford and Mahoney 2001). Loreto et al. (2002) found that an acrylic polymer (EK35®, Midwest Industrial Supply, Inc., Canton, OH) applied to disturbed soil was second only to a petroleum-based dust suppressant for the number of contaminants and the concentrations of those contaminants in runoff. This polymer had the highest concentrations of volatile organic compounds in runoff (slightly less than 200 µg $L^{-1}$) and the second highest concentrations of semivolatile organic compounds (~160 µg $L^{-1}$). BOD and COD also were high, about 42 mg $L^{-1}$ and 900 mg $L^{-1}$, respectively. Runoff from a nonpetroleum-based road oil (Road Oyl®, BoVill Industries LLC, Redmond, WA) contained moderate numbers of contaminants, but most were at very low concentrations. Aluminum was the exception, with the highest concentrations in runoff of any suppressant tested, and exceeding 2,800 ppb.

Clearly, an important key to reducing the potential environmental impacts of every type of dust palliative is to follow the manufacturer's instructions for application after reviewing the safety data sheets (SDS). Further, local, state, or federal regulations should be understood and followed at all times. Particular attention should be paid to ensure that chemicals are not unintentionally applied to water bodies or ditches leading directly into water bodies (Bolander and Yamada 1999). Spray and mechanical applications should cease when crossing bridges (Piechota et al. 2002).



Gravel application on a new cut-and-fill forest road, and woody material from the right-of-way positioned as a windrow on the fillslope. (Photo by U.S. Forest Service, Northern Research Station.)

FS-002819

# CHAPTER 4
# Road Use

Road use results in soil losses through both water-driven erosion, and wind- and traffic-generated dust. The road use variables that are most influential in generating sediment losses and that can be manipulated with respect to BMP implementation are axle load and wheel configuration, vehicle weight, tire pressure, traffic intensity (number and timing of vehicle passes), and vehicle speed. This chapter is divided into sections by these major variables.

## Axle Load, Vehicle Weight, and Tire Pressure

Large axle loads, vehicle weights, and tire pressures all contribute to increased soil compaction, which in turn can result in several negative soil-related effects. Among these effects are restricted root growth, poor root zone aeration and gas diffusion, poor drainage, and decreased vegetative growth (Abu-Hamdeh et al. 2000, Håkansson and Petelkau 1994, Helms and Hipkin 1986, Johnson et al. 1986, Stone and Elioff 1998). Much of the early research on these variables was in agricultural studies in an attempt to identify ways to avoid reductions in crop yields as a result of using farm equipment in fields. Other significant preliminary information came from studies in the early 20th century by the military in an attempt to alleviate problems with transporting and operating extremely heavy pieces of equipment. Not until relatively recently have research studies involving use of low-volume roads for forestry-related practices been initiated. Because soil loss on low-volume roads is tied strongly to rut formation (Foltz and Burroughs 1990, 1991), maintaining optimal compaction without rutting and avoiding pavement breakup have been the objectives for unpaved and paved roads, respectively.

Road surface damage is a function of three variables: surface materials and thickness, environmental conditions, and the traffic applied to the road (Kestler et al. 2007). However, damage to the road surface by traffic can occur as the result of changes to both surface layers and subsurface soil. Large axle loads and vehicle weights primarily contribute to elevated soil compaction in subsoil layers (Danfors 1994, Håkansson and Petelkau 1994, Janzen 1990), whereas high tire pressures primarily affect compaction near the soil surface (Danfors 1994, Janzen 1990).

The depth to which subsoil compaction occurs increases with the axle load (Danfors 1994). Axle loads of 4 Mg resulted in significant compaction at a depth of 30 cm, while 6-Mg and 10-Mg axle loads showed significant compaction extending down to 40- and 50-cm depths, respectively (Håkansson and Petelkau 1994). Subsoil compaction resulting from large axle loads or vehicle weights can be lessened by reducing the weight of the vehicle and its load, or alternatively by adding more axles and wheels (McLeod et al. 1966, Sebaaly 1992). However, the position of added wheels has a substantial influence on whether changes to subsurface compaction will ultimately result. For example, dual wheels mounted close together may reduce surface compaction but not subsurface compaction; therefore widely spaced extra wheels are preferable (Håkansson and Petelkau 1994). The use of tandem axles does not allow for doubling the load that can be carried because there is an interaction of the two axles that will increase compaction at some depth in the subsoil by more than the sum of each axle individually (Danfors 1994, Håkansson and Petelkau 1994).

Studies involving alterations of wheel or axle configurations sometimes entail reduced tire pressures because more wheels are used (e.g., Danfors 1994, McLeod et al. 1966, Shalaby and Reggin 2002). This makes it difficult to tease out the reductions in compaction that are attributable to changing wheel or axle configurations from those attributable to changing tire pressures. However, because tire pressure is primarily responsible for contact pressure at the soil

surface (Janzen 1990), changing tire pressures exerts little influence on subsoil compaction. Danfors (1990) reported only minimal differences in soil compaction at 30- and 50-cm depths among tire pressures of 21.75, 14.5, and 7.25 lb inch$^{-2}$ (psi) with the same loads. Similarly, changes in subsoil porosity were very similar for 30- to 40-cm or 40- to 50-cm depths from passes made by single-axle vehicles with 7.25- and 21.75-psi tire pressures (Danfors 1994).

Of the three variables described in this section, tire pressure has been the most studied on low-volume forest roads, though forest applications still remain less studied compared to agricultural applications (Kestler et al. 2007). Ground contact pressure is primarily responsible for compaction at the soil surface (Håkansson and Petelkau 1994), and reduced tire pressure acts as a BMP by reducing the pressure of the tires transferred to the road surface as the tire flattens out and elongates to support the vehicle weight (Fig. 5). This increase in the tire footprint reduces the pressure exerted at any point where the tire is in contact with the road surface compared to a normally inflated tire. However, every tire has inflation design limits to ensure the tire can support its load and keep tire deflection at levels that will allow tires to remain sealed on the wheel and resist failure (Janzen 1990). These limits vary with the materials and techniques used to manufacture the tire (Yap 1989), so different types of tires can have markedly different low-end inflation pressures. Under reduced tire pressures, 20-percent sidewall deflection is optimal (Kestler et al. 2007). Reduced vehicle weight also can reduce pressure on the road surface, but if the tires are inflated within their design limits, the reduced vehicle weight translates to a much smaller difference in tire deflection and tire footprint than changes that result from reducing tire inflation (Douglas et al. 2000, Steward 1994).




Figure 5.—Example of tire surface area contacting the driving surface at different tire pressures (psi = lb inch$^{-2}$). From U.S. Forest Service (1993).

Wide tires specifically designed to be driven under high loads with very low inflation pressures, known as "terra tires," have been developed for agricultural use to achieve the advantages of tire underinflation. Terra tires that ran under 4, 6, and 9 psi resulted in less soil compaction than single or dual tires at higher or even similar tire pressures when run off-road (McLeod et al. 1966). Under 100 ft of forward travel at 6 psi, the terra tires displaced 31.1 ft$^3$ of soil compared to 44.0 ft$^3$ for dual tires. At 6 psi and 9 psi, the terra tires displaced 24.6 ft$^3$ and 29.2 ft$^3$ of soil compared to 32.4 ft$^3$ and 38.0 ft$^3$ of soil for dual tires at those inflation rates.

There are two ways to reduce tire pressures. One is to manually reduce the pressure so that re-inflation can occur only at a garage or similar facility; this is called the constant reduced pressure method, or CRP (Foltz 1994). In this approach, the target pressure is determined by the vehicle gross weight, the type of tire employed, and the maximum speed of travel that will be used. Because the tire pressure stays low, it has a low ground contact pressure on all of the roads the vehicle travels. Therefore, tire pressures are near optimal for low-volume roads, but suboptimal for highway use where higher travel speeds are used (Kestler et al. 2007). Conversely, if normal highway tire pressures are used continually, these higher pressures result in higher contact pressures that are less than optimal for controlling soil losses on low-volume roads.

The second method to reduce tire pressures allows the driver to change tire pressures while the vehicle is moving (Foltz and Elliot 1997). This automatic pressure changing system is called the central tire inflation system (CTIS) and allows optimal tire pressures to be used for



FS-002821

the conditions present. Because tire pressures can be adjusted to lower values on low-volume, unpaved roads, rut creation and erosion can be reduced and greater comfort and longer tire wear can be achieved by re-inflating the tires for paved surfaces.

CTIS has existed since before World War II to improve the mobility of large military vehicles (Foltz 1994, Foltz and Elliot 1997, Kestler et al. 2007). It is expensive to install ($15,000 to $20,000; reported in 2007), so in the United States its use and testing have been confined largely to within the military. The U.S. Forest Service has been the other primary user, with objectives of using CTIS to reduce road maintenance and aggregate thickness of low-volume roads, but the agency has far fewer vehicles equipped with CTIS than does the military (Kestler et al. 2007).

Studies of reduced tire pressures have shown fairly consistent and substantial reductions in rutting and sediment losses compared to higher tire pressures. Foltz (1995) measured sediment losses and rut formation attributable to highway tire pressures (90 psi in all tires), CRP (70 psi in all tires), and CTIS (70 psi on wheels on steering axles, 30.5 psi on other axles for unloaded trucks, or 50 psi on other axles on loaded trucks) on segments of a low-volume road with marginal-quality aggregate. Total sediment losses after three winter/early spring seasons of use in Oregon from the three respective tire pressure systems were 2,678 kg, 1,465 kg, and 530 kg. This equates to average reductions of 80 percent for the CTIS and 45 percent for CRP compared to highway pressures. The best improvements for both systems occurred during the wettest of the 3 yr, and the least during the driest year.

Tests using an individual simulated rain event showed a similar pattern of sediment loss and nearly identical percentage reductions compared to the highway pressure. Highway tire pressures resulted in 116 kg, CRP 54 kg (47-percent reduction), and CTIS 38 kg (83-percent reduction) (Foltz 1995). Foltz and Burroughs (1991) also found reduced tire pressure to be more effective at decreasing sediment losses under wet conditions than dry. Three replicate runs with loaded log trucks using normal tire pressures (95 psi) had only 7 percent greater sediment losses than reduced tire pressures (70 psi) during use with no simulated rain. Under wet conditions with simulated rainfall, normal tire pressures yielded 120 percent more sediment than reduced tire pressures. Under very wet conditions, the normal tire pressures yielded 73 percent more sediment than reduced tire pressures.

Differences in sediment losses reported in most tire pressure studies have been attributed to the degree of rut development. Foltz (1995) and Foltz and Elliot (1997) reported 70- to 87-percent reductions in sediment losses from lower tire pressures because of less rutting. Ruts worsen under wet conditions because surface soil and subsoil are more susceptible to compaction, and as water concentrates in ruts, soil detachment accelerates. For the three tire pressures examined by Foltz (1995), rut depths were 133 mm for highway inflation rates, 32 mm for the CRP, and 8 mm for the CTIS after 3 yr (January–March only) of use. There was little change in the latter two depths from year 2 to year 3, but the highway rut depths continued to increase throughout the study and deepened from 38 mm to 127 mm from year 2 to year 3. Rutting also occurred more quickly with tire pressures of 100 psi than with 60 psi on a bituminous surface treatment applied over a 20-cm-thick aggregate layer (Kestler and Nam 1999). Tests with reduced tire pressures in Canada decreased rut development and even allowed ruts to be healed and smoothed out if truck drivers varied their wheel paths slightly (Kestler et al. 2007, Shalaby and Reggin 2002). Foltz and Burroughs (1991) found that ruts formed under wet conditions with normal tire pressures were 23 cm deep after 16 passes with a loaded log truck compared to 4 cm under reduced tire pressure; after 16 passes the subgrade also began to fail under normal tire pressures.

Research findings have supported the U.S. Forest Service's objectives for testing reduced tire pressures. The frequency of required road maintenance is reduced due to less rut development (Foltz 1995, Foltz and Elliot 1997, Steward 1994), and the amount of aggregate required for surfacing roads can be decreased by as much as 50 percent (Steward 1994). Both of these advantages can result in substantial savings in construction and maintenance (Smith 1993, Steward 1994). Because disproportionate amounts of sediment loss and road damage, including rutting, occur during wet periods, one of the additional major benefits of reduced tire pressures is earlier access to sites (e.g., 1 to 2 wk earlier) during spring thaw or wet periods (Kestler et al. 2007). This is

particularly applicable for poor-quality roads or roads surfaced with poor-quality aggregate because these are simultaneously most susceptible to damage during wet seasons and most helped by reductions in tire pressures (Foltz 1995). However, if the road's subgrade is extremely weak, tire pressure reductions will not be sufficient to overcome these problems and early reentry will not be possible (Taylor 1988).

## Traffic Intensity

Traffic intensity (number of passes) on unpaved roads, particularly by heavy equipment, substantially influences sediment losses and the persistence of sediment availability (Kahklen and Hartsog 1999, Luce and Black 1999, Reid and Dunne 1984). Therefore, controlling traffic, including requiring periods of no use, is considered an important management tool for limiting sediment supply and sediment transport from unpaved roads (Croke and Hairsine 2006). Unused and abandoned roads have more-permeable road surfaces than actively used roads (Reid and Dunne 1984), in part because freeze/thaw and wet/dry cycles help break up road surfaces (Gatto 1998, Knapp 1992) and vegetation can become established (Jordán and Martínez-Zavala 2008, Knapp 1992), both of which improve infiltration. On lightly used roads, sediment control comes from the reduced production of available (loosened) sediment from tire friction, slippage, and other factors. Croke et al. (2006) measured available sediment levels that were half as great per unit area from infrequently used roads as those from well-used main access roads.

Reid and Dunne (1984) estimated sediment production on unpaved roads across a range of use levels using mathematical relationships between precipitation and culvert runoff characteristics for watersheds in the Pacific Northwest. Sediment losses were strongly related to the amount and type of traffic to which the road was subjected. Heavily used roads (more than four loaded log trucks per day) accounted for almost 71 percent of the average sediment yield, while moderate use (fewer than four log trucks per day) and temporary non-use (heavy use for 2 days, then no use) roads each accounted for slightly less than 10 percent of the annual sediment yield. Light use (light vehicle use but no log trucks) and abandoned roads accounted for 3.8 percent and 1.2 percent of sediment production, respectively. MacDonald et al. (2001) found sediment production doubled in a road segment subjected to heavy traffic compared to one with only light vehicle use on the island of St. John in the U.S. Virgin Islands.

Annual yields of sediment from a heavily used existing graveled road were 13 times greater (44.2 ton $mi^{-1}$ of road) than from an unused road (3.4 ton $mi^{-1}$) in western Washington state (Wald 1975). The average suspended sediment concentration from the heavily used road was 1,306 mg $L^{-1}$. Much higher suspended peak concentrations were measured from sediment generated by 30-min simulated rain events performed before, during, or after 20 passes of loaded trucks in New Zealand (Coker et al. 1993). Rainfall simulation during the truck passes resulted in the highest peak sediment concentration of 130,000 mg $L^{-1}$, which fell to 12,000 mg $L^{-1}$ when use stopped. Road use generated peaks of 21,000 mg $L^{-1}$ and 10,000 mg $L^{-1}$, respectively, when the rain was applied immediately after and before the 20 passes, and fell to 6,000 mg $L^{-1}$ and 3,000 mg $L^{-1}$, respectively. Similar results were reported by van Meerveld et al. (2014) for rainfall simulation events with loaded log truck traffic in British Columbia. Peak sediment concentrations ranged from 5,200 to 15,000 mg $L^{-1}$ during medium-intensity (~15 mm $h^{-1}$) rainfall simulations with three to six truck passes compared to peak concentrations of 900 to 3,800 mg $L^{-1}$ with no truck traffic. Thirteen to 40 percent of the total sediment captured during simulated events was attributed to truck traffic. Wooldridge (1979) also observed increased suspended sediment as a result of heavy-truck traffic during periods of light and moderate rainfall in Washington.

Not surprisingly, traffic intensity also affects sediment generation at stream fords. Thompson and Kyker-Snowman (1989) evaluated the effects of individual and simulated multiple vehicle crossings (4 to 10 trips in rapid succession) by four-wheel all-terrain vehicles (ATVs), four-wheel-drive pickup trucks, and motorcycles on unimproved ford crossings on two small streams. Turbidity and total suspended solids increased from the off-road vehicles, but the average increases were significantly lower than values obtained from heavier logging equipment measured in an earlier phase of the study. Some individual passes by the pickup truck in spring and summer generated turbidities as high as that of some of the individual logging equipment passes 15 ft



FS-002823

downstream of the crossing. The impacts of ATVs and motorcycles traveling in groups were similar to that of logging equipment 15 ft downstream of the crossing, but 100 ft downstream the impact was much less than that of logging equipment. Individually, the four-wheel-drive pickup trucks generated more sediment than the ATVs and motorcycles. Less sediment was generated from streambanks with steeper approaches because vehicles had to slow down to enter and exit the fords.

Foltz and Truebe (1995) studied the simultaneous effects of traffic intensity and aggregate quality on sediment production. Log trucks with an inflation rate of 90 psi made 268 and 616 passes during the winters of 1992 and 1993, respectively, on road segments with good- and marginal-quality surface aggregate (Table 13). Sediment production (kg) was 30 times lower for the lower traffic intensity on marginal-quality aggregate in 1992 than it was for approximately double the traffic in 1993. By comparison, reduced traffic in 1992 resulted in six times lower sediment losses compared to higher traffic in 1993 on the good-quality aggregate. Some of the differences in sediment loss between years were due to greater precipitation during 1993; but when those differences are accounted for by expressing losses as kilograms of sediment per millimeter of precipitation, sediment production was 13 times higher in 1993 with the increased traffic loads for marginal aggregate and 3 times higher with good aggregate. Foltz (1999) extended this study by adding a year with another approximate doubling of the number of passes (1,205) in 1994 and then adding a fourth year when no traffic was allowed on the road. Even after 3 yr of heavy traffic use, as defined by Reid and Dunne (1984), eliminating traffic in 1995 substantially reduced sediment losses (Table 14) where significant rut formation had occurred in the marginal-quality surface materials (Foltz 1999, Foltz and Truebe 1995).

## Traffic Speed

Little research has been published in which the influence of changing travel speed has been studied in relation to changing water-driven sediment losses on unpaved low-volume roads. Travel speed probably has some effect for a given road surface in that speeds that result in tire slippage hasten rut development and washboarding (Shoop et al. 2006), and presumably result in elevated

**Table 14.—Sediment production from forest road sections with different aggregate quality (data from Foltz 1999)**

| Year | Number of passes | Aggregate quality | Sediment loss | | |
|---|---|---|---|---|---|
| | | | *kg* | *kg ha⁻¹* | *g mm⁻¹ᵃ* |
| 1992 | 268 | Marginal | 47.3 | 1,850 | 334.7 |
| | | Good | 12.7 | 500 | 82.0 |
| 1993 | 616 | Marginal | 1,400.0 | 54,800 | 2,643.0 |
| | | Good | 81.0 | 3,170 | 157.8 |
| 1994 | 1,205 | Marginal | 1,231.3 | 48,180 | 3,875.1 |
| | | Good | 262.1 | 10,260 | 823.7 |
| 1995 | 0 | Marginal | 149.0 | 5,830 | 188.7 |
| | | Good | 32.2 | 1,260 | 41.6 |

[a] Mass of sediment in g per mm of precipitation.

**Table 13.—Sediment production from forest road sections with different aggregate quality following natural precipitation events (data from Foltz and Truebe 1995)**

| Year | Aggregate quality | Sediment mass | Mass ratio | Sediment production | | Average concentration |
|---|---|---|---|---|---|---|
| | | *kg* | *marginal:good* | *kg ha⁻¹* | *kg mm⁻¹ᵃ* | *g L⁻¹* |
| 1992 | Marginal | 47.3 | 3.7 | 1,850 | 0.57 | 2.1 |
| | Good | 12.7 | | 500 | 0.15 | 1.2 |
| 1993 | Marginal | 1,400.0 | 17.3 | 54,800 | 7.58 | 27.6 |
| | Good | 81.0 | | 3,170 | 0.44 | 7.7 |

[a] Mass of sediment in kg per mm of precipitation.

sediment production. However, because the surfaces of low-volume roads normally are not smooth or conducive to high speeds in terms of either comfort or safety, there are already de facto physical limitations in place that dictate lower speeds on these roads, which may explain the general lack of research in this area.

The published literature involving studies of traffic speed focuses primarily on dust suspension. Road dust can be generated from both paved and unpaved roads. It includes many different types of particles, including metals, organometals, rubber, and exhaust chemicals, as well as soil materials (Rogge et al. 1993). More than 100 types of chemicals are associated with nonsoil particulates, and these tend to be of most concern in urban environments, where humans are subjected to high concentrations of potentially toxic fine particles and aerosols through respiration (Nicholson et al. 1989). On unpaved roads where traffic intensity is much less than on paved roads, most fine particles originate from the bed of dirt roads or from the matrix of the surfacing materials (Jones 2000a, Wisconsin Transportation Information Center [WTIC] 1997). Consequently, these particulates are the focus of this section.

The premise that decreased traffic speeds reduce dust emissions from roads is well accepted—probably because this phenomenon is commonly and easily observed. Decreasing speed reduces turbulence, which lowers particle suspension (Nicholson et al. 1989); however, the specific reduction is dependent upon the road and traffic conditions. For example, increased moisture at the road surface reduces particle suspension (Nicholson et al. 1989). Taller and heavier vehicles also suspend greater amounts of dust at a given speed than shorter, lighter vehicles (Dyck and Stukel 1976, Gillies et al. 2005). The recency of past traffic can influence the amount of particles available for resuspension. Fewer particles, especially large particles, remain available at the road surface for resuspension if several vehicles have recently used the road at moderate speeds (Nicholson et al. 1989).

Even though these other variables have some influence on dust emissions by traffic, substantial reductions have been reported as the result of reducing travel speeds. A reduction from 45 mph to 35 mph resulted in a 22-percent reduction in dust (SynTech Products 2011). Reducing speeds from 40 mph to 35 mph and from 40 mph to 20 mph reduced dust emissions by 40 percent and 65 percent, respectively (Succarieh 1992, WTIC 1997). On paved roads, the minimum speed needed to suspend dust into the air is about 15 to 20 mph depending on particle size (Nicholson et al. 1989), but the threshold velocity on unpaved roads is probably much less (Watson 1996). Sanders and Addo (1993) determined that dust generation was linearly related to vehicle speed during tests on an unpaved road in Colorado. For speeds from 20 to 50 mph, the approximate equation was:

$$Y = 0.85 + 0.16X,$$

where Y was grams of dust generated and X was vehicle speed in mph ($r^2 = 0.98$; equation derived from Figure 10 in Sanders and Addo 1993).

On unpaved roads, dust particles suspended in the atmosphere by traffic are composed of aggregates of fine clays to sand-sized particles; thus, emitted particles can vary in size by several orders of magnitude (Pinnick et al. 1985). Small clay particles are particularly susceptible to loss (Succarieh 1992). In certain cases the linearity between vehicle speed and dust observed by Sanders and Addo (1993) extended across the entire suite of particle sizes within the $PM_{10}$ class size (Etyemezian et al. 2003, Gillies et al. 2005); in another situation, linearity existed only for particle sizes less than or equal to $PM_{2.5}$ (Williams et al. 2008).

Conventional theory regarding $PM_{10}$ dust emissions from roads has been that they redeposit near their sources (Countess 2001, Watson et al. 2000), particularly when wind speeds are low. Consequently, implications for water quality effects would be expected to be limited to water bodies that are next to or cross under roadways, or to water bodies that are connected to ditches adjacent to roadways. However, where moderate wind speeds (3 to 5 m $s^{-1}$) have been present in combination with little roadside vegetation, equivalent amounts of road dust have been measured at towers located 9 m and 50 m downwind of unpaved test-road sections (Etyemezian et al. 2003). More recent literature reflects a great deal of uncertainty about deposition velocity and dispersion of dusts, and the actual fate of road-dust emissions is not well understood (Gillies et al. 2005). Thus, it is not currently possible to make generalized statements about how well controlling vehicle speed protects water quality.

CHAPTER 5

# Stream Crossings, Stream Crossing Approaches, and Wet Soil Crossings

This chapter examines crossings in two fundamentally different types of environments: streams and wet soils (i.e., wet/weak soils, wet meadows, and wetlands). Studies of the effectiveness of stream crossing BMPs are focused directly on water quality or channel condition. In contrast, wetland studies focus primarily on BMPs to control rutting depth and damage to the surface because those effects can alter hydrology (especially subsurface flow). As noted in the Introduction (Chapter 1), BMP effectiveness of aquatic passage designs is not considered in this synthesis, but information about effects on fluvial geomorphology and substrate characteristics upstream and downstream of stream crossings is included.

## Stream Crossings

An abundance of forest hydrology and watershed management literature states that stream crossings (or water body crossings in the broader sense) are the road areas with the greatest potential for contributing nonpoint source pollution to water (e.g., see Kruetzweiser and Capell 2001, Lane and Sheridan 2002, Rothwell 1983, Swift 1988, Weaver and Hagans 2004). This conclusion has been based largely on measurements of in-stream sedimentation or turbidity after stream-crossing construction and from comparisons of substrate, habitat, or channel condition above and below existing water body crossings. For example, Eaglin and Hubert (1993), Schnackenberg and MacDonald (1998), and Cornish (2001) reported increases in turbidity and sediment input to streams from stream crossings. Eaglin and Hubert (1993) found lower amounts of cobble substrate associated with stream crossings. Similarly, Schnackenberg and MacDonald (1998) found that the percentage of fine particles (<8-mm diameter) in the streambed was significantly and positively related to the number of road crossings, and explained 61 percent of the variability in the amount of those particles present. Because of the relatively large numbers of these types of studies and the inherent connectivity between crossings and water bodies (Weaver and Hagans 2004), crossings are well accepted as the primary conduit of sediment inputs to water in forested watersheds.

Given the broad acceptance of this tenet, one would expect that a substantial amount of research would have focused on identifying types of crossings, crossing features, or construction techniques that could reduce sediment inputs. Instead, there is surprisingly little research in these arenas, and this lack of information on crossings is noted commonly (Blinn et al. 1998; Bouska et al. 2010; Thompson et al. 1994, 1996; Tornatore 1995; Welch et al. 1998). Papers by Thompson et al. (1994, 1995, 1996) were the first that documented the effects of different types of stream crossings on water quality. Before their research, most studies focused on forest roads as a whole, rather than the stream crossings in particular (Welch et al. 1998).

Stream crossings include a wide variety of techniques and structures. Fords, culverts, and bridges are the most common types of stream crossings, and virtually every type of crossing used for streams and rivers (Clarkin et al. 2006) can be placed into one of these three categories. For lower order streams (e.g., ephemeral and intermittent channels), less complicated and less expensive crossings typically are employed (Clarkin et al. 2006). As stream width and discharge increase, the cost and complexity of crossing structures increase.

For the purpose of motorized vehicle use, a ford is a location in a stream or river that is shallow enough, and without large rocks or boulders, to allow traffic to pass

through. Fords can be classified as either unimproved (or natural) or improved (or mitigated or renovated) (Milauskas 1988, Welch et al. 1998). Unimproved fords have had no changes made to the water body or approaches[1] to help with vehicle passage or resource protection. Sediment levels in unimproved fords can originate from many causes. Waves produced by vehicles moving through the ford can erode soil from streambanks. Ruts can be created in wheel tracks in the approaches that allow overland runoff during storm events to become concentrated and directed to the channel. Sediment can be washed off vehicles as they contact streamwater in the ford. Sediment present in the channel that would not otherwise move under some flow conditions (e.g., baseflow) can become mobilized by the presence of the vehicle or the influence of the vehicle on the water in the stream (Clarkin et al. 2006). Additionally, streamwater can be polluted from vehicles traveling through fords. No studies could be located where pollutants from cars or trucks were measured, but U.S. Forest Service monitoring found measurable levels of naphthalene and hydrocarbons present in streamflow during an off-highway vehicle event that had 200 to 500 vehicle crossings day$^{-1}$ for 6 days (Clarkin et al. 2006).

[1]Approaches are defined as the length of road or ditch line from which water would drain directly to the crossing. The outer boundaries of an approach are usually definable by road-surface drainage features or grade changes on the road surface and ditch line.

However, all of the compound concentrations were within limits established in water quality standards.

In contrast, at a minimum, improved crossings typically involve laying back streambanks to reduce the slope of the approaches to the channel, and installation of gravel, rock, or some type of synthetic pavement in the approaches and on the streambed to reduce the amount of rutting and detachment or suspension of sediment that occurs with travel through the ford. Improved fords also can employ other techniques to reduce contact and disturbance between vehicles and the streambed and banks (Looney 1981). A fairly common type of improved ford uses multiple small culverts encased in concrete (Fig. 6) which allow passage of low flows through the culverts, and the concrete pavement is overtopped during higher flows (Milauskas 1988); these structures are termed "vented fords."

Culvert crossings are composed of single or multiple pipes or box-shaped or arched structures placed into the channel, and positioned parallel to the flow of streamwater with the road surface located above the normal bankfull level. Culverts can be constructed of metal, plastic, or masonry products. Culvert installation normally involves excavating the streambed or banks, or both, within the area where the culvert will be placed and then refilling over and around the culvert after installation. These disturbances can result in short-term inputs of sediment to the stream, even if water is



Figure 6.—A vented ford. From Keller and Sherar (2003).

controlled (e.g., by diversion) during the installation. Redisturbance of the stream can result in another subsequent short-term pulse of sediment into the channel if the culvert is temporary and removed after its required use has ended. Such redisturbance often is considered acceptable because long-term, chronic sediment inputs associated with permanent culverts are avoided. Permanent culverts that remain in place for the long term may have chronic inputs of sediment because of road drainage (see Chapter 2), or even more-extreme inputs during high flows that cause washouts, especially if there is diversion potential. Temporary and permanent culverts are installed on small and moderate-sized streams, but as streams become very wide, bridge installation becomes economically competitive.

Bridges, like culverts, can be temporary or permanent installations. Temporary bridges are portable structures that typically are used on lower volume roads crossing smaller streams (Blinn et al. 1998, Taylor et al. 1996b), whereas permanent bridges are installed on wider streams and rivers where decadeslong use is planned (Taylor et al. 1996b). Temporary bridges almost never include pilings (i.e., supports extending into the channel bottom) and simply span from streambank to streambank. They may be hinged and foldable, or modular (disassembled) to allow easier transport and installation (Blinn et al. 1998, Keliher et al. 1995). Bridges with no pilings may result in little or no streambed disturbance, but bridges that require pilings necessarily involve channel disturbance during construction.

## Crossing Effectiveness

Studies investigating the effectiveness of stream crossings fall into two categories: those that are relatively short-term, such as during crossing installation/improvement or during discrete periods (e.g., logging use), and those that examine longer term influences. The former tend to involve monitoring of the receiving stream's water column for suspended solids/sediment or turbidity. The latter tend to focus on geomorphic and substrate conditions.

Improved fords consistently produce less erosion and sedimentation than unimproved fords. Sample et al. (1998) found that hardening a ford by replacing the original streambed materials with compacted rock and gravel resulted in substantially less measurable sediment downstream than the amount measured downstream of an unimproved ford with traffic. A pole ford (i.e., a ford filled with logs and two 16-inch-diameter iron pipes laid parallel to flow) and a ford filled with randomly oriented sawmill slabs in conjunction with hay bales anchored downstream from the ford to capture and filter sediment had significantly lower turbidity and suspended solids concentrations 15 ft and 100 ft downstream (resulting from passes by logging equipment) than unimproved fords (Thompson and Kyker-Snowman 1989). During some periods, elevated turbidity was measured as far as 1,000 ft and 2,640 ft downstream of the unimproved fords.

Tornatore (1995) and Tornatore et al. (1994) employed a similar crossing on a skid road in which a metal pipe culvert was placed in a stream with pole-sized logs filled in around it. Installation of the crossing occurred during extremely low flow, but median suspended solids concentrations were 412 mg $L^{-1}$ and 28.5 mg $L^{-1}$ 1 m and 61 m, respectively, downstream from the outlet during installation, compared to only 1 mg $L^{-1}$ upstream. The peak suspended solids concentration was more than 1,000 mg $L^{-1}$ 1 m downstream. Installation effects disappeared after about 96 hours, and high flows during snowmelt several months later did not result in increased suspended solids from the poled ford. About 6 months after installation, six simulated skidder passes during a period of baseflow yielded median suspended solids concentrations of 6.2 mg $L^{-1}$ and turbidity of 7.2 NTU 1 m downstream, compared to 2,560 mg $L^{-1}$ and 863 NTU 1 m downstream of an unimproved rocky-bottom ford.

Looney (1981) observed that unimproved fords had between 70 and 150 percent greater sediment losses during short periods of whole-tree skidding compared to improved fords in which rubber mats with side walls (constructed from conveyor belting) were installed. Although this design was referred to as a "dam bridge," it acted as an improved ford during use. The mat floated on the water surface when not in use, but was pressed to the stream bottom when a vehicle drove on it, thereby providing protection to the channel bed and banks. During 1.33 h of skidding, an unimproved ford yielded 52.7 kg of sediment, compared to 31.2 kg from the dam bridge. Two hours of skidding at another site yielded 208.4 kg of sediment from the ford, and 82.3 kg from the dam bridge.

Improvements to fords may help decrease total sediment inputs to streams compared with unimproved fords, but the process of installation or removal of ford mitigation measures can contribute to short-term sediment inputs. Thompson et al. (1996) examined the immediate effects of improving two existing fords in a third-order stream. The fords were cleared mechanically of logs that had been placed in the channel, ruts were removed, and 132 tonne of surge stone was placed in the bed and on the approaches of each ford. The mechanical in-channel work resulted in the highest peak sediment concentrations for ford 1 (2,815 mg $L^{-1}$), whereas the addition of gravel to ford 2 resulted in its peak sediment concentration (1,355 mg $L^{-1}$). By comparison, Blinn et al. (1998) reported that a ford containing a pipe mat constructed of bundled polyvinyl chloride (PVC) pipe laid parallel to flow and underlain with geotextile material was very effective at controlling sediment losses during use by logging equipment. They provided no data, but reported no visual increase in turbidity immediately below or farther downstream from the ford after 20 passes with a log forwarder. However, some sediment did enter the stream when the geotextile was removed as the ford was being dismantled. Such sediment losses are common when fabrics used to protect streambeds are extracted (Mason and Greenfield 1995).

Fords (including those that have been improved) tend to be less effective at controlling sediment inputs than other structural types of crossings—at least in the short term. A portable bridge with cribbing (logs laid parallel to streamflow against each bank and at the middle of the bridge to support the portable bridge) had much lower downstream turbidity measurements and suspended sediment concentrations than a pole ford and a ford filled with sawmill slabs and downstream hay bales (Thompson and Kyker-Snowman 1989). The pole ford was more effective than the ford filled with slabs, and the effectiveness of the slabs + hay bales was reduced further when the hay bales were less than 50 ft downstream from the ford because they backed water up into the ford. Looney (1981) found a culvert also to be more effective at controlling sediment than an improved ford (dam bridge) and unimproved ford. This is because the primary periods of sediment generation for the culvert occurred during installation and removal, whereas sediment continued to be generated by the dam bridge and unimproved crossings with each pass. Consequently, within only a few hours of use, total sediment yields for both types of fords could easily exceed that associated with culvert installation and removal.

Thompson et al. (1994, 1995) compared sediment concentrations from the installation of one temporary corrugated metal culvert and two temporary glue-laminated (glulam) timber bridges. Mean net sediment concentration increases (downstream minus upstream) were 341 mg $L^{-1}$ for the culvert, compared to 66 mg $L^{-1}$ and 38 mg $L^{-1}$ for the bridges. The mean sediment increase was higher for the culvert because its installation involved channel excavation, placement of crusher run gravel for a bed, and refilling around the culvert after placement of the pipe. Neither bridge installation disturbed the streambanks or channel other than preparing the top of the streambanks for bridge placement, making sediment inputs much lower. Sediment contributions remained negligible when one of the bridges was removed during the study, presumably due to the lack of in-channel disturbance and limited bank disturbances. In contrast, when even limited (one equipment pass) in-channel disturbance was required for installation of a portable steel bridge, Tornatore (1995) found that turbidity 1 m downstream was significantly greater than upstream (483 NTU 1 m downstream versus 1.8 NTU upstream, respectively), and exceeded that associated with a pole ford (238 NTU 1 m downstream). However, the effects from bridge installation were more localized, with turbidity of 14.6 NTU compared to 56 NTU 61 m downstream from the pole ford during installation. After installation, there was little difference in median turbidity among the portable bridge, the pole ford, or a culvert backfilled with shale on skid roads, but during use these all performed significantly better than an unimproved ford.

Witt et al. (2011) reported similar results when suspended solids and turbidity from unimproved fords were compared to PVC-pipe bundle crossings, culvert crossings, and portable bridges on ephemeral channels after logging equipment use. The improved crossings resulted in significant turbidity reductions ranging from 67 percent for the pipe bundles to 77 percent for culverts and 84 percent for the bridges versus the unimproved ford. A study by Aust et al. (2011) comparing temporary bridge, culvert, and pipe + pole crossings to improved fords found no significant

FS-002829

differences between crossing types though average sediment concentrations were 217 mg $L^{-1}$ higher below the crossings compared to above the crossings. Mean sediment increases were highest at 253 mg $L^{-1}$ for culvert crossings and 249 mg $L^{-1}$ for improved fords, and lowest for the pipe + pole crossings at 145 mg $L^{-1}$. Sediment concentration increases of 221 mg $L^{-1}$ for the temporary bridge crossings were similar to the overall mean increase of 217 mg $L^{-1}$ for all crossings.

Thompson and colleagues' (1994, 1995, 1996) culvert installation and ford renovation studies illustrate how in-channel work can alter short-term streamwater sediment concentrations, and the bridge study by Thompson et al. (1994) illustrates the advantages of avoiding in-channel work. However, when in-channel work cannot be avoided, there are data, though extremely limited, that support the importance of controlling streamflow during the disturbance period. In a comparison of sediment generated from the installation of a culvert at two sites, where flow was diverted around construction, 0.2 lb of sediment was contributed to the stream. In contrast, where flow was not diverted or controlled in the construction area, 46 lb of sediment was contributed to the stream (U.S. Forest Service 1981).

In the longer term, culverts often result in the greatest changes to sediment inputs when compared with other types of crossing structures. For example, Tchir et al. (2004) found that 73 percent and 65 percent of crossings in two watersheds in Canada that were categorized as having at least moderate sediment inputs were culvert crossings. Sediment originated primarily from unstable soils where mass slumping occurred (e.g., in crossing fills) and from areas adjacent to crossings with exposed soil. Witmer et al. (2009) also identified poor crossing fill condition as a factor contributing to increased sedimentation risk at round culvert crossing structures compared to box culverts (i.e., rectangular reinforced concrete culverts) and bridges on unpaved roads in southeastern Alabama.

Norman (2006) reviewed seven 3-barrel pipe culverts, one 4-barrel pipe culvert, one box culvert, and two 3-barrel box culverts in Georgia for changes to channel geomorphology. Although there was substantial variation in the geomorphic conditions and changes present among sites, the only consistent changes observed across all types of culverts were shallower upstream thalweg depths and increased fining of streambed substrate downstream of culverts. Like Tchir et al. (2004), Norman (2006) attributed these changes to unstable banks around the crossings, as well as overwidening of the channel for culvert installation and undersized culvert diameters. Miller et al. (1997) evaluated 40 culverts, 21 bridges (temporary and permanent), and 9 fords that were between 2 and 28 yr old on first- and second-order streams. They examined geometric, sediment, habitat, and channel stability differences above and below the crossings, and found that most of the metrics were not affected by the crossings, but streambed fine sediment levels were elevated near the crossings due to the road and stream crossing fills. Wellman et al. (2000) measured the effects of construction or replacement for 18 culverts and 23 bridges on second- and third-order streams in Tennessee. Areas at and downstream of the culverts again had elevated percentages of fines (silt and clays) and greater depths of fines, whereas there was no evidence of elevated sediment accumulations at or downstream of bridges. Box culverts tended to be most susceptible to elevated sediment because their placement was not level with the streambeds, which resulted in scour pool formation and deposition of sediment near the culvert outflow. Perched pipe culverts that restricted high flows also resulted in scour pools downstream of their outlets (Merrill 2005).

Bouska (2008) and Bouska et al. (2010) found increasing entrenchment ratios, and hence, greater channel incision downstream of four of five vented fords, three of five box culverts, and one of two single, large corrugated pipe culverts in Kansas. The changes in entrenchment ratios were large enough to cause a shift in Rosgen stream classifications (Rosgen 1996). Spacing between riffles was increased by low-water crossings, but the influence was an upstream effect due to water backing up and causing inundation and submergence of upstream riffles. Mean riffle spacing was 8.6 bankfull widths upstream, compared to about 4.4 bankfull widths downstream (Bouska 2008, Bouska et al. 2010). Merrill (2005) also reported that channels downstream from all eight culvert and six bridge crossings in North Carolina had increased cross-sectional areas and they tended to have decreased hyporheic zone depths downstream of the crossings. The effects were greater for culverts than bridges. He

FS-002830

attributed the changes observed for all types of crossings to channel constriction and disconnection of the channel from the floodplain caused by the presence of the culverts. Channel morphology changes were least for box culverts, apparently because they tended to be oversized compared to other crossing structures, including bridges on small streams.

Similarly, Norman (2006) reported that large box culverts had less effect on cross-sectional areas downstream of crossings than pipe culverts. In contrast, Bill (2005) found no significant changes in channel width or depth characteristics in cross sections measured downstream from three large pipe culvert crossings 1 yr after construction. Although changes downstream from box culverts may be limited, Bouska (2008) and Bouska et al. (2010) found that the average cross-sectional area within box culverts at bankfull discharge was five times greater than regional curves and regional control streams (41.2 $m^2$ versus 8.29 $m^2$, respectively).

Bridges often are considered to result in the least effect to fluvial geomorphology because they are believed to modify and restrict channel geometry the least (Blinn et al. 1998, Norman 2006). However, even small bridges without in-channel pilings can constrict the channel and disconnect it from the floodplain, as Merrill (2005) found. Additionally, the driving surface of the bridge can influence water quality, even if channel geometry is unaffected. Gaps in bridge floors can allow excess organic material, sediment, and other pollutants to fall into the water from vehicles and transported materials (Blinn et al. 1998, Tchir et al. 2004). This is particularly a concern with temporary bridges, which tend not to be solid to simplify their transport and installation (Tornatore 1995).

Bridges with in-channel supports typically show evidence of bed scour around pilings. Wellman et al. (2000) found scour around pilings of all of the 18 bridges they evaluated. Downstream changes in channel morphology also can result from the presence of bridges if they constrict the channel, and the effects can be long lasting. Gregory and Brookes (1983) evaluated local channel adjustments for four types of 18th- and 19th-century bridges in England; three of the four types caused channel constriction (Table 15). Increases in width-to-depth ratios were evident from bridges that constricted the channel, but where channel constriction did not occur and the channel bed was not hardened, the downstream channel was not changed by the bridge (Table 15). Channel adjustments associated with the three former types of bridges persisted downstream for as much as 20 bridge widths. Further analyses using maps and aerial photographic techniques of 15 other 18th- and 19th-century multiple- or single-arched bridges showed channel widening 1.14 to 2.78 times more than observed upstream of the crossings. Resulting changes in capacity were evident 8 to 390 m downstream. In many cases, the effects of lateral and bed scour were evident to the first major meander in the river downstream of the bridges.

**Table 15.—Changes to channel geometry downstream of 18th- and 19th-century bridges in England (data from Gregory and Brookes 1983)**

| Bridge type | Increase in downstream width–depth ratio | | Distance change is observable downstream |
|---|---|---|---|
| | Average | Maximum | (Bridge or channel widths)[a] |
| Bridges with constricted channel width, paved bottom | 1.6 | 2.35 | 4–20 |
| Bridges with constricted channel width, unpaved bottom | 2.0 | 4.5 | Up to 12 |
| Bridges with 1.25-m-diameter culverts conveying water beneath the road | Data not provided, but significant increases were noted | | Less than 20 but the actual values were not specified |
| Bridges with no channel constriction, unpaved bottom | ~0 | ~0 | ~0 |

[a] Channel and bridge widths were used interchangeably in the paper, so bridge width is assumed to approximate channel width.

Changes to channel morphology from crossing installation or reconstruction appear to occur relatively rapidly; however, the few studies that include older crossing structures suggest that changes reach equilibrium soon after their installation, and although they do not continue to worsen over time they do persist as long as the constricting features remain in place. Wellman et al. (2000) found that the depth of sediment downstream was not related to the age of the associated culvert. Similarly, the analysis of the geomorphology of 18th- and 19th-century bridges in England (Gregory and Brookes 1983) indicated relatively small increases in downstream width-to-depth ratios relative to the age of the respective bridges (Table 15).

Constricting structures can result in scour and increased channel capacity, width-to-depth ratios, and incision, but channel widening and the installation of oversized crossing structures also can result in changes to sediment routing and channel morphology. Merrill (2005) reported that in-channel bars were formed during low flows downstream of oversized culverts. Channel widening caused the cross-sectional area also to be oversized, so normal sediment transport could not occur and deposition resulted.

Geomorphic and substrate changes tend to be expressed most near crossing structures. Wellman et al. (2000) observed decreasing sediment deposition with distance from culvert outlets. For smaller and intermediate streams, measurable changes were typically confined to within 50 m of the structure (Bouska 2008, Miller et al. 1997, Norman 2006, Wellman et al. 2000). Although crossings can alter sediment erosion and transport at the reach scale (Wargo and Weisman 2006), such effects were reported only for some of the larger rivers (30 to 60 m wide) examined by Gregory and Brookes (1983). Even for those rivers, most of the channel adjustments remained more localized and within 20 channel widths downstream of the bridges.

Turbidity and sediment increases within the water column can extend much farther downstream, but they typically are short-lived, such as during installation activities, during fording with heavy equipment, or during isolated storm events. Only one study was found where elevated sediment inputs from crossing installation were reported as resulting in visually observable accumulations of silt on the streambed surface downstream beyond the reach scale (Bill 2005). However, the sediment inputs were not sufficient to alter width-to-depth ratios locally or downstream of the installed culverts.

## Stream Crossing Approaches

Virtually all of the sediment that is eroded at or delivered to a crossing from the road surface or ditch line enters the associated water body (Weaver and Hagans 2004). This type of sediment delivery occurs by movement through the crossing approaches, so their length and design can substantially influence sediment transport and delivery. For example, Thompson et al. (1994, 1995) found that better road drainage in the approaches to a bridge (broad-based dips at 20 m on one side and 50 m on the other side) resulted in about one-half the average sediment concentrations delivered to the receiving waters (38 mg $L^{-1}$) during construction compared to another bridge (66 mg $L^{-1}$) that had no drainage control in the approaches. Brown et al. (2015) used simulated rainfall events to compare mean sediment concentrations attributable to three surface treatments on six additional stream ford approaches in the southwestern Virginia Piedmont. The “low gravel” treatment (9.8 m of approach closest to the stream was graveled; 34 to 60 percent of the approach had gravel cover) resulted in a median total suspended sediment concentration of 1.1 g $L^{-1}$, which was not significantly different from the 0.82 g $L^{-1}$ median concentration reported for the “high gravel” treatment (19.6 m of the approach length was graveled; 50 to 99 percent of the approach had gravel cover). Both gravel treatments resulted in significantly lower total suspended sediment concentrations than the ungraveled approaches, where the median concentration was 2.84 g $L^{-1}$.

Other sources of sediment delivery to the stream channel in approaches originate from crossing fills, and adjacent cutbanks and fillslopes (Lane and Sheridan 2002, Swift 1985). However, almost no data exist that quantify the importance or effectiveness of BMPs associated with these sources of inputs, either during crossing construction or in the longer term. The only applicable data found during this review are provided in Hamons (2007) and Stedman (2008), which both involve a single study in West Virginia. Sediment inputs from three crossings and their approaches were quantified during and for several years following the installation

**Table 16.—Characteristics of three culvert crossings and their approaches on a newly constructed forest haul road in West Virginia (data from Stedman 2008)**

| Culvert crossing | Culvert diameter | Fill depth downstream | Road approach angle (left; right) | Sediment reaching the channel |
|---|---|---|---|---|
| | ---------------- *m* ---------------- | | *degrees* | *kg* |
| 1 | 1.52 | 7.4 | 15; 7.5 | 1,143.7 |
| 2 | 1.22 | 7.9 | 46; 42 | 25.8 |
| 3 | 0.91 | 4.5 | 39; 24 | 7.6 |

of culverts on a logging haul road. All of the crossings had deep fills (Table 16) and the approaches all had high, steep fillslopes. Most of the sediment that was delivered to the channel originated from the construction of the fillslopes in the approaches by mechanical additions (bulldozer pushing sediment into the streams) and from the approach fillslopes before they became vegetated.

However, the amount of sediment that reached the stream channels at each crossing during that time differed substantially (Table 16). This difference was attributed to the differences in the angle at which the road approached the stream channels. Sediment inputs attributable to 153 m of approaches to the stream crossing at angles of 8 to 15º (i.e., the road was nearly parallel and very close to the stream) exceeded the annual hillside contributions of sediment to that entire 33-ha watershed before road construction (Stedman 2008). The close proximity of the stream to the road made it virtually impossible to keep fillslope soil out of the channel during construction and before revegetation. Based on the results from the three crossings, the author recommended that approach angles of ≥25º should be used if fillslopes are constructed, or alternatively, full bench construction (i.e., in which no fillslopes are created) should be used where small approach angles cannot be avoided. However, these suggestions were not tested at the West Virginia location or elsewhere to determine their degree of effectiveness in this type of situation (see Chapter 2 for additional discussion of full bench construction).

Although the Stedman (2008) study showed that sediment inputs from approaches can be relatively short-term with fillslope revegetation, flow diversion at culvert crossings also can contribute to elevated, long-term sediment inputs. Diversion potential (Fig. 7) exists where the road and ditch system (if present) of the approaches slope away from the crossing on one or both approaches (Hagans et al. 1986). During high flows when culverts are overtopped, streamflow can become diverted down



Figure 7.—Illustration of a stream crossing with diversion potential. If at least one of the approaches to the stream crossing slopes away from the crossing, overflowing water will flow down the road or ditch when the culvert is overtopped, creating erosion and damage to the road prism and surrounding hillside. From Keller and Sherar (2003).



FS-002833

the road or ditch line, forming new gullies on the road or hillside where constructed or natural drainage features turn water off the road. Hagans and Weaver (1987) estimated that gullies created by stream diversions were responsible for at least 40 percent of the total sediment production in the 419-km$^2$ Redwood Creek basin in California, and 89 percent of the gully erosion that followed harvesting in the lower portion of the watershed also resulted from streamflow diversions (Hagans et al. 1986). Hagans and colleagues recommended ensuring roads and trails are constructed without diversion potential, incorporating adequately sized culverts with debris filters, performing routine maintenance on roads and drainage features, and removing culverts and other crossings and their fills when the road or trail is no longer needed to reestablish an unobstructed channel. Again, however, there are no data to indicate how effective these suggestions are for long-term control of sediment inputs.

## Wet Soil Crossings

Many road and crossing techniques are used to travel over wet soils (e.g., see Blinn et al. 1998, Mason 1990), yet there have been few tests of effectiveness for most techniques or few comparisons of alternative techniques. Rummer (1999) found that conventional crowned roads in bottomland hardwoods underwent sediment deposition during the flooding season, whereas those with a “zero profile” (i.e., trees were cut at the ground surface in the right of way, but root wads were not grubbed and no ditches were constructed) had net losses of sediment. However, the differences were explained in part by differences in flow direction but more by the speed of flood flows resulting from the variable water depths across the road prism due to its shape. The crowned road was oriented perpendicular to flow, so the ditches served as areas of deposition because there were slower velocities in the deeper waters present in the ditches. The zero-profile road was parallel to the direction of flood flows, and the velocities and water depths were about the same over the entire prism. As a result, erosion of the exposed soil occurred with no concomitant deposition within the prism.

One of the few studies comparing road surfacing effectiveness on sediment losses in wet soils in Georgia bottomland hardwoods showed no significant differences among native soil, 15 cm of gravel over geotextile, and seeded native soil during the flooding season (Rummer et al. 1997). However, a 6-cm thickness of gravel on native soil had significantly greater sediment yields than all the other treatments except native soil. The relatively high losses from the gravel were attributed to the lack of embeddedness into the roadbed because the gravel was applied to an exising road. As a result, the floodwaters transported some of the gravel, which contributed to the sediment load. For all of the surfacing treatments, sediment movement and deposition were confined to the area within the road right-of-way due to the low water velocities during flooding.

As these aforementioned studies suggest, sediment is not typically much of a concern for roads traversing wetlands and wet soils because slower flows and the greater roughness can keep sediment effectively contained near the area of displacement. Instead, the focus of roads in wetlands and on wet soils is on maintaining hydrologic function, as the integrity of wetlands and wet soils depends upon surface and subsurface hydrologic function (Blinn et al. 1998).

Hydrologic alteration associated with roads often occurs because of the development of ruts in wet soils, so most studies of wet soil crossing BMPs look at techniques to allow transportation while controlling the negative effects. Results of studies involving several types of surface BMPs to reduce rutting in wetlands are shown in Table 17. For those studies in which a control (no crossing mitigation) was employed, all of the techniques tested controlled rutting depth better than the control. Wooden mats and wooden pallets underlain by geotextiles resulted in similar reductions in rutting (Table 17), but wooden mats are generally considered a better alternative because they tend to cost less, are easier to assemble and install, and have less breakage and fewer repair needs than wooden pallets (Hislop 1996b).

Although none of the individual studies in Table 17 compared specific techniques (e.g., wooden mats or pallets, metal grating) with and without geotextile underlayment, comparisons of studies employing geotextiles (Hislop 1996a, Mason and Greenfield 1995) to the study by Blinn et al. (1998) where some of the same techniques were used without geotextiles suggest underlying geotextiles contribute substantially to

## Table 17.—Rutting depths in wet soils using a variety of surfacing BMPs

| Location/ Soil | Type and number of passes | Treatment | Rutting depth | Reference |
|---|---|---|---|---|
| | | | *inches* | |
| Florida silty sand | Loaded log truck, 300 passes | Geotextile beneath wooden pallets | 0.5 | Mason and Greenfield (1995) |
| | | Control | 6–10 | |
| | Loaded log truck, 260 passes | Geotextile beneath deck span safety grating and expanded metal grating | 0.5–1 | Mason and Greenfield (1995) |
| | | Control | 12 | |
| Florida silty sand | Loaded log truck, 240 passes | Geotextile beneath wooden pallets | 1.5 | Hislop (1996a)[a] |
| | | Geotextile beneath wooden mats | 1.5 | |
| | | Control | 8 | |
| | Loaded log truck, 75 passes | Geotextile beneath expanded metal grating | 5 | Hislop (1996a)[a] |
| | | Control | 15 | |
| | Log truck, 30 loaded passes and 30 unloaded passes per day for 14 days | Geotextile beneath wooden pallets and wooden mats[b] | 1–1.5 | Hislop (1996b) |
| | | Control | 3.8–7.6 | |
| Michigan deep black muck | Unloaded flatbed truck with a loader, 20 passes for mitigations, 1 pass for control | Wooden mat | 12.5 | Blinn et al. (1998)[a] |
| | | Expanded metal grating | 8 | |
| | | Tire mat | 6.5 | |
| | | Wooden planks | 4.5 | |
| | | Control | 11.5 | |
| Minnesota ponded histosol | Loaded forwarder, 20 passes | Geotextile beneath wooden mat | 5.1 | Blinn et al. (1998)[a] |
| | | Geotextile beneath expanded metal grating | 4.8 | |
| | | Geotextile beneath tire mat | 21 | |
| | | Geotextile beneath wooden planks | 6.8 | |
| | | Geotextile beneath PVC pipe mat | 1.3 | |

[a] Reported as maximum rutting depth.

[b] Both techniques were used in series, but measurements were not separated between the two.

controlling rutting depth. The exception is for tire mats. The improvement observed with geotextiles may be because they help distribute loads more evenly and allow water to move through the fabric when under load while maintaining the soil below the fabric (Hislop 1996b, Mason and Greenfield 1995).

The effectiveness of tire mats has been inconsistent. In Michigan, Blinn et al. (1998) showed tire mats to be comparable to other methods when no geotextiles were used, but they were far inferior to other methods tested in Minnesota when used in combination with geotextile fabric (Table 17). Mason and Greenfield (1995) also reported problems with using tire mats made from recycled sidewalls (Terra Mat) on wet soils, but the soil disturbance came from equipment during placement of these heavy mats, rather than use of the mats.

After road use, removal of commonly used surfacing materials on wet or weak soils is generally relatively easy, but the removal of underlying geotextiles can be difficult. Because most are nonwoven materials (see the section on Effectiveness of Rolled Erosion Control Products in Chapter 6 for a description of nonwoven geotextiles), they tend to retain soil and water, which can make them too heavy to remove. To alleviate this problem, they can be installed in shorter lengths, rather than directly off a roll. This technique helps with removal, and still allows the material to be reused (Hislop 1996b).

Some wet soil crossing techniques involve application of wood chunks or wood fibers on the road surface or placed within the road subgrade. For these materials, there are concerns about water quality and aquatic health effects associated with the wood leachate and wood decomposition processes. The effects have not been examined in detail, and much of the information comes from sources not directly related to road investigations. Taylor et al. (1996a) reported that chemicals that are potentially toxic to aquatic organisms can be leached from trembling aspen (*Populus tremuloides*) wood, so care should be taken if these woods are used for road surfacing. They did not investigate the application on roads, however. Leachate from wood waste (mostly bark) disposed of in rock quarries near St. John Harbor on Zarembo Island, Alaska, was found to substantially reduce dissolved oxyen levels in nearby settling ponds and receiving streams to below 7 mg $L^{-1}$, with some values below 1 mg $L^{-1}$ (Reed and Wolanek 1994). However, after the water was aerated by running through about 1,000 linear ft of small cascades in the stream, oxygen increased to acceptable levels (>7 mg $L^{-1}$). Sphagnum (*Sphagnum* spp.) moss in contact with the leachate died, but filamentous bacteria and slime mold growth appeared to benefit from the leachate effects.

The influences of mill-generated wood fiber and bark used as the principal subgrade material on a road in the Tongass National Forest in Alaska generally were found to be small, and in some cases beneficial to water quality (Wolanek 1995). Total organic carbon (TOC) and chemical oxygen demand (COD) levels (indicators of the influence of wood materials on dissolved oxygen concentrations) in leachate collected within the road increased to levels that exceeded 800 mg $L^{-1}$ several times during the first 50 days after construction. These concentrations then exponentially declined. The influence on stream chemistry was examined by using water samples collected from two streams crossed by the road. Downstream (below the crossings) chemistries were adjusted using upstream (above the crossings) chemistries to determine the effects of the leachate. Dissolved oxygen was not affected, but pH was increased by 0.5 to 1.5 pH units. The receiving streams were naturally acidic (mean pH 5.5 and 5.8 prior to road construction), so the pH increases slightly buffered the streamwater. All of the water quality data were within limits of the state's water quality standards.



A temporary bridge installed over a perennial stream to reach a timber harvest area. (Photo by U.S. Forest Service, Northern Research Station.)

FS-002836

CHAPTER 6

# Protecting Soil off the Driving Surface

During construction and sometimes during road maintenance activities, the width of disturbed soils can extend well beyond the width of the driving surface of the road. This is especially true on steeply sloping lands where road cutbanks are laid back to reduce their slopes to a more stable grade. Fillslope construction on the downhill side of roads also results in oversteepened areas with unconsolidated soil that is particularly susceptible to erosion (Edwards and Evans 2004, Megahan and King 2004, Rothwell 1978). Consequently, the need to provide soil cover on cutbanks, fillslopes, and drainage areas of forest roads has long been acknowledged (Hursh 1939). The focus of this chapter is restricted to protecting large areas of exposed soils, such as fillslopes and cutbanks; it excludes areas in which road drainage is or has become concentrated, as these are covered in Chapter 7. The following review considers two distinct types of practices to protect disturbed soils off the driving surface: soil conditioners applied to exposed soil and more conventional types of soil cover.

Soil conditioners traditionally have had more use in agriculture, especially tilled soils, but they have been used to some extent where soils have been disturbed at construction sites (including roads), open pit and strip mines, and landfills (Faucette et al. 2006; McLaughlin et al. 2009a, 2009b; Sojka et al. 2007; Soupir et al. 2004; Vacher et al. 2003). Soil conditioners also have been considered as a rehabilitation treatment to reduce erosion on burned forested sites (Davidson et al. 2009, MacDonald and Robichaud 2007, Wohlgemuth and Robichaud 2007).

The more conventional soil protection techniques described in this chapter are vegetation, mulches, rolled erosion control products (RECPs), and surficial slope stabilization techniques that primarily are aimed at controlling shallow mass failures from road construction and are particularly applied on fillslopes.

The effectiveness of mulches and RECPs is focused on controlling erosion only. Even though their application often includes the objective of restoring vegetation, the success of these materials at achieving that objective is not considered here. This is because vegetation establishment depends upon many other conditions that are extremely site-specific (e.g., seed selection and viability, soil nutrient levels, precipitation characteristics) and are independent of the soil cover treatment; often they are not described well enough to determine what factors contributed to or detracted from vegetative success.

## Soil Conditioners

Soil conditioners are chemicals applied to soil to improve soil stability and aggregation, which in turn results in reductions in erosion and increases in infiltration (or reductions in surface runoff). Their use began in the 1940s and 1950s (Green and Stott 2001, Weeks and Colter 1952), when they were developed primarily for application on temporary roads and runways during wartime (Seybold 1994). It was not until the 1990s, however, that research began to suggest field use of soil conditioners could be effective and economical (Sojka et al. 2007).

The chemical composition of soil conditioners has evolved substantially since their initial development. Some of the first soil conditioners were water-soluble polymers of hydrolyzed polyacrylonitrile, vinyl acetate maleic acid, or calcium carboxylate (Trout et al. 1995, Weeks and Colter 1952). Today, soil conditioners primarily take the form of gypsum, less pure forms of other gypsiferous materials, and polyacrylamides (PAMs). Use of PAMs far exceeds that of other soil conditioners. A few other natural polymers, such as polysaccharides, also have been tested as erosion control agents (Agassi and Ben-Hur 1992, Lentz et al. 1992, Levy et al. 1992). They often do not perform as well as other conventional soil conditioners and they are more

expensive (Sojka et al. 2007). Research is continuing into development of organic biopolymers derived from by-products of crop production and shellfish processing because they are considered to have more environmental benefits and to be more sustainable (Sojka et al. 2007).

Contemporary gypsiferous materials are by-products of air pollution control technologies at coal-burning power plants. These include compounds resulting from flue gas desulfurization and fluidized bed combustion (Norton et al. 1993). Until 1989, a gypsiferous compound known as phosphogypsum also was used commonly as a soil conditioner in the United States. Phosphogypsum is a by-product of the phosphate fertilizer industry (Norton et al. 1993) and is composed of high percentages (~97 percent) of calcium sulfate (Shainberg et al. 1990, Zhang and Miller 1996a). However, it is commonly contaminated with radon gas (Norton et al. 1993), so phosphogypsum now can be used in the United States only if its average radium-226 levels are less than 10 pCi $g^{-1}$ (Florida Industrial and Phospate Research Institute 2010).

PAMs are water-soluble, synthetic organic polymers (Seybold 1994). Like naturally occurring polymers, such as humic substances and polysaccharides, PAMs provide soil stability (Shainberg et al. 1990), but they provide better erosion control than their natural counterparts (Shainberg and Levy 1994). PAMs are manufactured in a broad range of molecular weights, charge types, and charge densities (Barvenik 1994, Lentz and Sojka 1994, Shainberg and Levy 1994), so their formulations can be tailored to a wide variety of soil conditions and mineralogies (Lentz and Sojka 1994, Shainberg and Levy 1994). In general, however, PAM formulations that have been the most successful for erosion control, prevention of seal formation, and duration of effect are anionic with moderate to high charge densities and high molecular weights (Lentz et al. 1993, Seybold 1994, Shainberg and Levy 1994, Sojka and Lentz 1997, Trout and Ajwa 2001). Low, medium, and high charge densities are defined as <10 mol %, 10 to 30 mol %, and >30 mol %, respectively. Low, medium, high, and very high molecular weights of PAMs are defined as $<10^5$ g $mol^{-1}$, $10^5$ to $10^6$ g $mol^{-1}$, 1 to $5 \times 10^6$ g $mol^{-1}$, and $>5 \times 10^6$ g $mol^{-1}$, respectively (Barvenik 1994).

Crosslinked superabsorbent or gel-forming PAMs and cationic PAMs also are available commercially, but neither is suitable for erosion control. Crosslinked superabsorbent PAMs do not prevent erosion because they are not water soluble (Sojka and Lentz 1997) and they have been shown to seal soil pores and actually increase surface runoff and erosion due to their viscosity (Ajwa and Trout 2006). Cationic PAMs are toxic to aquatic organisms such as fish and macroinvertebrates (Barvenik 1994, Sojka and Lentz 1997).

In contrast, anionic PAMs show essentially no toxicity to fish ($LC_{50}$ >100 mg $L^{-1}$) (Barvenik 1994); Seybold (1994) presents ranges of toxicities for fish and invertebrates. PAMs in any form (anionic, cationic, and nonionic) have low toxicity to humans and typically result in only slight dermal or eye irritations in small mammals, even at high concentrations (Stephens 1991). PAMs are also nontoxic to plants, though at very high levels in the soil (i.e., ≥5 percent of soil dry weight, which is orders of magnitude higher than used for erosion control) PAMs can result in phosphorus deficiencies in plants (Wallace et al. 1986).

Anionic PAMs that are manufactured for and used at concentrations suitable for soil conditioning and erosion control are not considered to pose an environmental or human health threat (Barvenik 1994, Leib et al. 2005, Seybold 1994). The primary environmental or health threats related to PAMs involve the amount of residual acrylamide monomer that remains behind from product synthesis and potential contamination of groundwater (Abdelmagid and Tabatabai 1982, Seybold 1994).

The residual monomer is a human neurotoxin (Leib et al. 2005, Seybold 1994). However, all of the products available in the United States for erosion control are formulated to meet U.S. EPA and Food and Drug Administration standards for other common PAM applications, including wastewater treatment, potable water treatment, and food processing and packaging (Barvenik 1994, Sokja and Lentz 1997). Consequently, PAMs may contain no more than 0.05 percent monomer (Barvenik 1994), and actual residual monomer levels are usually less than 0.0002 percent (Seybold 1994). The free monomer that exists from the manufacturing process is metabolized in biologically active environments fairly quickly following application to the soil and does not accumulate in the soil; it has a half-life of hours (Barvenik 1994, Seybold 1994). During breakdown, there is no release of free acrylamide monomers from



FS-002839

the synthesized PAM itself (Barvenik 1994). Breakdown of PAM requires several weeks and occurs as a result of mechanical disturbances (e.g., rainfall impact, wetting/drying cycles, tilling), chemical and biological hydrolysis, and ultraviolet radiation from sunlight (Barvenik 1994, Seybold 1994, Sojka and Lentz 1997). Biological hydrolysis of PAMs by soil microorganisms produces ammonium that may then undergo further oxidation to nitrite and nitrate (Abdelmagid and Tabatabai 1982, Seybold 1994).

Anionic PAMs are a potential source of groundwater pollution because they are highly water soluble, and have low soil adsorption potentials (Seybold 1994) in the absence of cations in the soil or application solution. If PAM reaches water before breakdown and hydrolyzation, its degradation in water requires longer than in soil—typically 100 to 700 h (Seybold 1994). However, PAMs are generally applied at relatively low rates only to the soil surface, and they tend not to penetrate more than a few millimeters or centimeters below the surface (Lentz et al. 1995, Mitchell 1986, Seybold 1994). The exceptions to this are if they are applied to dry, cracked soil, in which case they may penetrate more deeply (Malik et al. 1991); this soil condition would be rare in forests.

Contemporary soil conditioners all work in similar ways, though the physical or chemical mechanisms involved may differ. They interact with the clay fraction of soil, and they depend upon cations to flocculate clays and to form cation bridges (Agassi and Ben-Hur 1991, 1992; Chaudhari and Flanagan 1998; Shainberg et al. 1990). That is, anionic conditioners can attach to multiple cations that have become attached to negatively charged clays, thereby forming bridges across clay particles. Cation bridging is most effective with multivalent, rather than monovalent, cations (Levy et al. 1992, Shainberg et al. 1990). Monovalent cations can participate in cation bridging, but these have weaker bonds than multivalent cations (Laird 1997). The conditioner itself may contain and release the bridging cation (e.g., $Ca^{2+}$ in gypsum and gypsiferous materials). In the case of anionic polymers, an additional cation source must be applied with the polymer (e.g., combining the polymer with a gypsiferous material), or cations must be present in sufficiently high concentrations in the soil or in the water used to prepare the application solution (Green and Stott 2001, Orts et al. 2007, Shainberg et al. 1990, Warrington et al. 1989). Depending upon the chemistry of the local water source, tap water may have sufficient cations present to contribute to cation bridging (Shainberg et al. 1990, Smith et al. 1990). Applications should not depend upon subsequent rain events to provide the necessary amount of cations; Wohlgemuth and Robichaud (2007) found the cation loads in rainfall were insufficient to allow PAMs to be effective.

Cation bridges help strengthen aggregate bonding of clay particles by reducing repulsion of the net negative charges of clay particles (Ben-Hur 1994, Seybold 1994, Sojka and Lentz 1997). Bridging maintains large soil aggregates and pore integrity at the surface. In turn, bridging leads to other positive outcomes, including increases in soil wettability (Jańczuk et al. 1991), increased resistance to slaking during rapid wetting (Mitchell 1986), stabilization of shrinking and swelling in clays (Malik et al. 1991), increased resistance to aggregate breakdown and detachment by surface flows and rainfall impact (Bryan 1992, Helalia and Letey 1989, Shainberg et al. 1992, Terry and Nelson 1986, Trout and Ajwa 2001), increased soil infiltration, prevention of soil crusts, and reduction of soil sealing (Davidson et al. 2009, Kazman et al. 1983, Lentz and Sojka 1994, Seybold 1994, Sojka and Lentz 1996, Trout and Ajwa 2001). Thus, the physical conditions of soil, such as structure and permeability, are not improved by soil conditioners; instead they are stabilized against breakdown (Lentz and Sojka 1994, Trout and Ajwa 2001). In addition, conditioners and associated cations act as flocculants (Shaviv et al. 1988, Sojka and Lentz 1996), so fine dispersed clay particles flowing in runoff can clump together and settle out as the aggregate mass increases (Sojka and Lentz 1996, Warrington et al. 1989). Flocculation further helps combat soil sealing because the particles that settle out are larger and ineffective at filling fine voids among soil aggregates (Shainberg and Levy 1994).

Because soil conditioners depend upon flocculation and stabilization of clay particles, they are most effective in soils that have moderate to higher clay content. Indeed, most studies and applications of soil conditioners have focused on finer textured soils (Trout and Ajwa 2001), probably because these soils are most erodible and need stabilization. PAM effectiveness is most likely when the soil clay content is at least 30 percent (Davidson et al.

2009). PAM effectiveness in fine textured soils is further improved by using a formulation with an appropriate charge density (Green et al. 2000, Levy and Agassi 1995); effectiveness has been most commonly associated with charge densities in the mid-teens to mid-30 mol % range (Green et al. 2000, Malik et al. 1991, Michaels and Morelos 1955, Peterson et al. 2002, Sojka et al. 2007). The charge density is the percent hydrolysis of the polymer, which describes the percentage of hydroxyl groups that have been substituted for acrylamide groups in the polymer (Green et al. 2000). High charge densities (e.g., 40 mol %) can result in repulsion of the polymer and the clay particles, thereby reducing adsorption onto clays and effectiveness of PAMs (Ben-Hur et al. 1992, Green et al. 2000).

In a silty clay soil in Indiana, wet and dry applications of PAM both were found to be effective at controlling erosion and runoff (Peterson et al. 2002). Total runoff was reduced by 62 to 76 percent by using wet applications, and sediment yields were reduced 93 to 98 percent. Dry applications were slightly less effective at controlling both variables. Aase et al. (1998) examined PAM use at low concentrations (1, 2, 4, and 6 kg $ha^{-1}$) on a silt loam. For concentrations greater than 2 kg $ha^{-1}$, runoff and soil loss were each reduced 70 percent on average. PAM at high concentrations (10, 20, and 40 kg $ha^{-1}$) in a clay loam retained infiltration at rates substantially higher than clay loam with no soil conditioner (Shainberg et al. 1990). However, the addition of phosphogypsum with PAM resulted in the retention of even higher infiltration rates. The phosphogypsum dissolved over time, and provided a continued source of cations that allowed the soil clay to remain flocculated, thereby helping to retain soil bridging with the PAMs. Phosphogypsum also was found to be an effective soil conditioner in a clay loam in the Midwest (Norton et al. 1993). After 2 h of rainfall (74 mm), total soil yield on a 5-percent sloped plot was only one-third of the amount from an untreated control. Levy et al. (1991) recorded 50- to 70-percent reductions in runoff in a clay loam using PAM; this was the case for plots with and without a crop (cotton, *Gossypium hirsutum*) present. Reductions in erosion were more pronounced for bare soil (62 to 83 percent less than controls) than when the crop was present (22 to 52 percent less than controls), presumably because the crop contributed to soil stabilization.

Soupir et al. (2004) saw 82-percent reductions to sediment yields from a clay soil soon after the application of a dry form of PAM. A wet formulation applied at the manufacturer's recommended rate resulted in only a 40-percent reduction. Higher and lower application rates were not as effective, and resulted in only 28- and 33-percent sediment reductions compared to no treatment.

In coarser textured soils, the effectiveness of soil conditioners is not guaranteed due to the lower clay percentages present. This is especially the case for soils with high sand contents like sandy loams. Separate studies by Trout and Ajwa (2001) and Ajwa and Trout (2006) reported reductions in infiltration with the use of PAM compared to controls. Gypsiferous soil conditioners may result in more desirable effects with sandy loams. Final infiltration rates following phosphogypsum application were almost triple that of controls in a study by Warrington et al. (1989), and they were double that of controls in a study by Miller (1987) using two sandy loams in the Southeast. In the latter study, cumulative and average infiltration rates significantly increased compared to untreated soils. Erosion was reduced by 30 percent and 50 percent in the two soils, and there was essentially no loss of clay particles in runoff; however, silt losses were greater than in the controls. Zhang and Miller (1996a) found that a gypsum application allowed a sandy loam to have a 26-percent higher final infiltration rate after one rain event than with no soil conditioner. In an even coarser soil (loamy sand), erosion was not reduced with the use of PAM after a wildfire in southern California (Wohlgemuth and Robichaud 2007).

To improve the potential for PAM effectiveness in soils with high percentages of sand, the molecular weight of the PAM formulation is key (Green et al. 2000, Levy and Agassi 1995). It is important because it is directly related to the polymer length: the longer the polymer, the greater the molecular weight (Green et al. 2000). Polymers with lower molecular weights may not have chain lengths that are sufficiently long to bind together the relatively small number of clay particles present (Levy and Agassi 1995); polymers with very high molecular weights may be too

large to penetrate soil voids (Barraclough and Nye 1979). The molecular weight is not important in clayey soils because the clay particles are close enough together that even short polymer lengths can bind them (Green et al. 2000, Levy and Agassi 1995). However, using a PAM formulation of high molecular weight with a sandy loam still does not guarantee its effectiveness. Although Green et al. (2000) found that a high molecular weight PAM formulation ($12 \times 10^6$ g mol$^{-1}$) was effective, molecular weights below ($10^6$ and $6 \times 10^6$ g mol$^{-1}$) and above ($18 \times 10^6$ g mol$^{-1}$) that formulation were not effective. Likewise, similar molecular weights ($15 \times 10^6$ g mol$^{-1}$ and $12 \times 10^6$ g mol$^{-1}$ to $15 \times 10^6$ g mol$^{-1}$) were not effective in studies by Trout and Ajwa (2001) and Ajwa and Trout (2006), respectively.

Medium-textured soils, such as silt loams and loams, tend to be responsive to soil conditioners and seem to be less sensitive to the molecular weight of the PAM formulation. Green et al. (2000) studied PAM formulations across a range of molecular weights ($10^6$, $6 \times 10^6$, $12 \times 10^6$, and $18 \times 10^6$ g mol$^{-1}$) and charge densities (0, 20, 30, and 40 mol %) in a silt loam, and all formulations except the one with the highest molecular weight and the highest charge density showed improvements in soil stabilization. Lentz et al. (1992) applied PAM with an even higher molecular weight ($10^7$ g mol$^{-1}$) to a silt loam and found that the mean sediment loss was reduced 97 percent compared to untreated soil, but the charge density of this formulation was in the more typical range of 20 mol %. Lentz and Sojka (1994) and Trout et al. (1995) both used PAMs with $15 \times 10^6$ g mol$^{-1}$ molecular weights and 18-percent hydrolysis. Lentz and Sojka found soil losses were reduced by an average of 94 percent and infiltration was increased by an average of 15 percent. Trout et al. (1995) found similar reductions in erosion (ranging from 85 to 99 percent, average 70 percent) and 30-percent increases in average infiltration rates.

Gypsiferous compounds alone and in combination with PAM also are effective in medium-textured soils. Lepore et al. (2009) measured soil losses from silt loam soil using six soil conditioners (lime, gypsum, PAM-coated lime, PAM-coated gypsum, gypsum + PAM applied separately, and lime + PAM applied separately) and bare soil. All soil conditioners significantly reduced soil losses compared to untreated soil. Treatments involving lime resulted in less erosion than their gypsum counterparts, but the differences among the conditioners were not significant. Adding PAM to lime and gypsum also improved soil stability more than lime or gypsum alone, and coating the lime or gypsum with PAM was more effective than adding the PAM separately. Soil losses from PAM-coated lime and lime + PAM were 75 and 53 percent, respectively, less than lime alone, and 83 and 67 percent, respectively, less than soil with no conditioner treatments. PAM-coated gypsum and gypsum + PAM also had significantly lower soil erosion than gypsum alone (63 and 49 percent, respectively). The two treatments reduced erosion by 69 and 58 percent, respectively, compared to bare soil. The PAM coating on the lime and gypsum reduced the dissolution rates of both, and this may explain why PAM-coated treatments were more effective than applying lime or gypsum alone or separately with PAM.

In another study with a silt loam, Norton et al. (1993) measured lower soil losses using a nearly pure gypsum conditioner from fluidized bed combustion and using a gypsiferous material from flue gas desulfurization than with no treatment. A second gypsiferous material from flue gas desulfurization resulted in poorer erosion control than no treatment. Infiltration results paralleled those results. Phosphogypsum also improved erosion control and infiltration compared to the control. Miller (1987) found phosphogypsum applied to a silt loam increased infiltration rates and resulted in significant increases in cumulative and average infiltration rates compared to untreated soil. Soil losses also were half of those for the untreated soil. Shainberg et al. (1990) applied PAM to a loam soil and the final infiltration and cumulative infiltration rates were three and four times higher, respectively, than without treatment. Combining PAM with a phosphogypsum application increased the final infiltration rates to levels that were 10 times greater than the controls.

Many of the studies of soil conditioner effectiveness, including those just described, have been performed for agricultural uses. This raises the question of whether soil conditioners have application to nonagricultural soils, and for the purposes of this review, steep soils. These types of applications of soil conditioners have not been examined as extensively. But there are some studies that illustrate the potential for soil conditioner use on

disturbed soils of forest road prisms, including some studies directly from road construction, albeit generally highway construction. However, the results across all studies have been mixed. On a 30-percent gradient, Norton et al. (1993) found all of the four treatments tested (phosphogypsum, two gypsiferous materials from flue gas desulfurization, and almost pure gypsum conditioner from fluidized bed combustion) were ineffective at reducing erosion or increasing infiltration, even though three of them had been effective on a 5-percent slope. On the steeper gradient, sediment losses rose 3.5 to 4.8 times and were similar to the control. Warrington et al. (1989) found that phosphogypsum was less effective on steeper slopes than gentle slopes, but outperformed controls with no treatments. On 5-percent slopes, erosion from phosphogypsum treatments was 60 percent less than controls. At a 25-percent slope, the erosion rates doubled with the soil conditioner, but that same increase in slope resulted in a sevenfold increase in soil loss from untreated soil.

After a wildfire in Utah, Davidson et al. (2009) studied the effect of aerially applied granular PAM pellets (made with recycled paper) on soil losses over 3 yr. The slopes to which PAM was applied were 33-percent grade. They found that PAM resulted in significantly lower erosion rates than control soils. But because the controls were located on only 16-percent slopes, the impact of the improvement by the soil conditioner is probably underrepresented by the statistical comparison. MacDonald and Robichaud (2007) tested two PAM treatments in a burn area emergency rehabilitation treatment in the Colorado Front Range. They reported somewhat mediocre results because PAM became preferentially bound to the ash from the fire, rather than the soil. One treatment reduced erosion during two storm events and the other treatment was ineffective.

Flanagan et al. (2002b) examined PAM and PAM + gypsum applications on a 35-percent sloped highway cutbank in a clay loam and a 45-percent sloped reclaimed landfill in a silt loam in Indiana. The responses were compared to untreated controls following individual storm events over summer seasons. For individual storm events on the highway cutbank, erosion was reduced from 44 to 100 percent by PAM alone and from 26 to 100 percent for PAM + gypsum. Cumulative sediment reductions across the entire study period compared to no treatment were 54 and 45 percent for PAM and PAM + gypsum, respectively; the results from these two treatments were not significantly different from one another.

Additionally, reductions in runoff from the two treatments compared to the controls were similar across storms and ranged from 25 to 91 percent for PAM and 36 to 90 percent for PAM + gypsum. Cumulative runoff for the entire study was reduced by an average of 33 percent for both treatments. At the landfill, soil yields were 39 to 100 percent less than the control for PAM and 44 to 100 percent less than the control for PAM + gypsum. Percent cumulative sediment reductions from the landfill were similar to the less steep cutbanks; they were 40 and 53 percent less than untreated soil for PAM and PAM + gypsum treatments, respectively, and again the results from the two were not significantly different from each other. However, PAM + gypsum was more effective at controlling erosion during very large events, even though runoff was similar. In the largest two storms, PAM + gypsum reduced sediment by 58 percent and 85 percent compared to the control, whereas soil losses from the PAM treatments during those events were not significantly different from using no soil conditioner. At the landfill, runoff for individual storms also was not significantly different between the two treatments, but PAM reduced runoff 30 to 55 percent and PAM + gypsum reduced runoff 27 to 74 percent compared to the controls. PAM + gypsum had significantly lower cumulative runoff (28 percent less) than the controls or PAM.

In another study by Flanagan et al. (2002a) in which a silt loam soil at 32-percent grade was subjected to repeated simulated rainfalls following PAM and PAM + gypsum treatments, total runoff over the entire experiment was reduced by 40 percent and 52 percent, respectively, by the two treatments compared to a control. After the first event, runoff and sediment losses were reduced by more than 90 percent by both treatments. Even when subjected to a 25-yr rain event, sediment yields were 60 percent and 77 percent less than the control for PAM and PAM + gypsum, respectively. Total sediment losses following a cumulative rainfall that equated to more than a 100-yr event were 83 percent and 91 percent less than the control for PAM and PAM + gypsum, respectively. On a sandy loam with a 48-percent slope, phosphogypsum significantly reduced runoff and erosion compared to untreated soils (Agassi and Ben-Hur 1991). Runoff

was reduced from 23 to 31 percent by the conditioner versus the control, and erosion was reduced two to three times that from the control. However, erosion increased substantially as the plot length increased on these steep slopes. As the length increased from 1.5 m to 10 m, soil loss increased by 6.4 times, but sediment yields still were less than from untreated soil.

In another study by Agassi and Ben-Hur (1992), PAM + phosphogypsum and phosphogypsum + polysaccharide conditioners were compared to a control on earthen dikes in Israel ranging in slope from 33 to 60 percent. Over a winter season, they observed that the soil losses from both treatments were 10 times less than with no treatments. Soil erosion from the two treatments was not significantly different from each other. On 58-percent slopes, a variety of application rates and approaches using both dry and wet applications of PAM were successful in reducing erosion from 75 to 100 percent in a sandy clay soil and a loam soil when subjected to simulated rainfall (Wallace and Wallace 1986). On a 50-percent fillslope at a highway construction site in the North Carolina Piedmont on sandy clay loam soil material, two PAM formulations each were applied at two different (albeit low compared to most literature) rates (0.8 and 1.5 kg ha$^{-1}$ for formulation 1, and 5.2, and 10.5 kg ha$^{-1}$ for formulation 2) (Hayes et al. 2005). Runoff, turbidity, and total sediment losses after seven storms were not significantly different from the control. However, average turbidity and total sediment yield did decrease with increasing polymer application rates. On a 20-percent cutslope of nearly the same soil material, the same PAM formulations and application rates resulted in no differences in runoff or sediment loss compared to the control, but turbidity was reduced.

Soil conditioners have been applied in several ways: furrow advance, overhead sprinkler/irrigation, spraying under high pressure, dry broadcasting or spreading over the surface, and dry or wet aerial application (e.g., Agassi and Ben-Hur 1991; Flanagan et al. 2002a, 2002b; Fox and Bryan 1992; Green and Stott 2001; MacDonald and Robichaud 2007; Mitchell 1986; Terry and Nelson 1986). Based on review of the literature, aerial applications have been undertaken only for wildfire restoration when a substantial area has been severely burned and the potential for catastrophic impact to watershed values is high, and for agricultural purposes when the soil conditioner was spread over an entire field by crop dusting planes (e.g., MacDonald and Robichaud 2007, Wallace and Wallace 1986). Aerial application is not likely to be used to meet road BMP objectives, so it is not discussed further. The others are described further because the technique used to apply a soil conditioner influences its efficacy and the needed application rate.

Furrow advance is directed at reducing erosion from irrigation waters and improving infiltration in agricultural furrows. The actual treatment of the furrow, referred to as "furrow advance," typically is performed by mixing the soil conditioner with irrigation water or injecting it into irrigation water as the water is released into the dry furrow. If cation levels in the conditioner, irrigation water, or the soil are not believed to be sufficient to allow cation bridging, some form of cation is mixed in with the conditioner. This release continues until runoff through the entire furrow is achieved (Sojka and Lentz 1996). Once runoff occurs, irrigation is stopped. Effective erosion control via furrow irrigation illustrates the applicability of soil conditioners to controlling erosion in concentrated flow. Applications of PAM and other soil conditioners to concentrated flow associated with roads and construction (e.g., within swales and in combination with erosion barriers) are considered in Chapter 7. However, additional discussion of furrow irrigation is included in this chapter to keep the fundamental information about soil conditioners in one place.

All other soil conditioner application techniques are aimed at treating larger land areas, with the intent to protect soil from rainfall impact and surface runoff. As with furrow advance, cations also are applied, if needed, in dry or wet form; this can be done before or at the same time as application of the conditioner. Basic information about wet and dry applications is provided in subsequent paragraphs, but Lentz et al. (1995) provide detailed information about some of the pros and cons related to dry and wet applications of PAMs. Although these are directed at agricultural uses, many of the points also are applicable to any field use of PAM.

In general, wet applications of soil conditioners have been found to be more effective than dry applications (Cook and Nelson 1986, Peterson et al. 2002, Shaviv et al. 1987). Applications of solutions should be made to

dry soil. Studies in which soil conditioners have been applied to wet soil have shown inferior infiltration and erosion control benefits compared to applications to dry soil (Roa-Espinosa et al. 1999, Shainberg et al. 1990). Dry soil conditioners can be applied to slightly moist soil, or the soil can be lightly moistened before or after application; however, only enough water to moisten the first millimeter or two of soil should be used to dissolve the conditioner and enhance binding (Wallace and Wallace 1986). On dry soils, dry soil conditioners may not become adequately activated before the first precipitation event (Peterson et al. 2002). Following wet or dry application, a period that allows the soil to dry fully before it is contacted by rainfall (or irrigation water) is critical for maximizing conditioner effectiveness (El-Morsy et al. 1991, Shainberg et al. 1990). The drying or curing period allows the soil conditioner to fully adsorb onto soil clays, and allows PAM to become irreversibly adsorbed to the soil so desorption is negligible (Nadler et al. 1992, Shainberg et al. 1990).

Furrow advance treatments allow more dilute applications than sprinkler or spray treatments (Sojka et al. 2007). This is partly because furrow advance involves treatment of only a relatively small surface area (Lentz and Sojka 1994). Typical furrow advance loads for PAM have been in the range of 0.5 to 1.3 kg $ha^{-1}$ (Lentz and Sojka 1994, Lentz et al. 1992, Sojka and Lentz 1997), though rates above 0.7 kg $ha^{-1}$ had substantially smaller soil losses than rates below 0.7 kg $ha^{-1}$ (Lentz and Sojka 1994). Overhead sprinkling systems have shown success with PAM with rates as low as 2 to 4 kg $ha^{-1}$ (Aase et al. 1998, Bjorneberg et al. 2003), but overhead delivery is more commonly successful in the 20 to 70 kg $ha^{-1}$ range (Agassi and Ben-Hur 1992, Flanagan et al. 1992, Fox and Bryan 1992, Levy et al. 1991, Norton 1992, Wallace and Wallace 1986). Spray application rates of PAM tend to be in this same range. Zhang and Miller (1996b) used rates of 15 kg $ha^{-1}$ and 30 kg $ha^{-1}$, Green et al. (2000) used 20 kg $ha^{-1}$, and Flanagan et al. (2002a, 2002b) used a rate of 80 kg $ha^{-1}$ for treating soils on steep slopes. However, Petersen et al. (2007) applied a specially designed PAM emulsion using a hand sprayer and found that only 5 kg $ha^{-1}$ effectively curtailed erosion. Dry application rates of PAMs are less than what has been used for wet applications, 5.6 kg $ha^{-1}$, but the actual granular forms including the carriers result in much larger total application rates (e.g., 224 kg $ha^{-1}$ and 280 kg $ha^{-1}$) (Lepore et al. 2009). It should be noted that manufacturer-recommended rates for PAM are sometimes much lower than the typical rates that have been tested in the literature, or states have set maximum loads for application to construction sites; sometimes these low rates have resulted in poor erosion control or runoff control (Hayes et al. 2005, Soupir et al. 2004).

In contrast to PAM treatments, gypsiferous and cationic soil conditioners typically require much higher application rates. Zhang and Miller (1996a) used 5 tonne of phosphogypsum $ha^{-1}$, and Flanagan et al. (1997) applied fluidized bed combustion bottom ash at a rate of 5 tonne $ha^{-1}$. Miller (1987) also applied phosphogypsum at 5 tonne $ha^{-1}$. Lepore et al. (2009) applied gypsum and lime each at 280 kg $ha^{-1}$.

Except for furrow irrigation, where vegetation is undesirable in the furrows of agricultural fields, the purpose of soil conditioners in field applications typically is to provide soil aggregation and protection against soil sealing until vegetation becomes established (Vacher et al. 2003). Once vegetative cover reaches 50 to 60 percent, it is considered to be capable of taking over the role of soil stabilization (Carroll et al. 2000, Loch 2000). For disturbed soils on forest road prisms, this means that soil conditioners must remain effective long enough for revegetation to occur; otherwise retreatment with the soil conditioner will be necessary. Agricultural studies often recommend reapplication of conditioners repeatedly throughout the growing season (Sojka and Lentz 1997), but that is because repeated mechanical disturbances to the soil are expected during such activities as tilling and pesticide application.

Most soil conditioner studies have been performed for agricultural soils, so the available data on the expected life of soil conditioners are limited. There are, however, a few studies for PAM that show it has been effective over nearly season-long periods. Fox and Bryan (1992) found PAM was effective for 6 wk and Petersen et al. (2007) found it effective for at least 10 wk. Petersen et al. (2007) found runoff was reduced by an average of 100 percent after 2 days following application of PAM, by 59 percent after 3 wk, and by 55 percent after 10 wk. Erosion control was even better, with soil losses reduced by 100, 80, and 74 percent for those three respective time



FS-002845

periods. Shainberg et al. (1990) found PAM effective throughout at least 3 wk of study. A study by Soupir et al. (2004) showed relatively poor results for separate wet and dry applications of PAM after only about 4 wk for a construction site on clay soil in Virginia. At 1 month, the wet and dry treatments, respectively, had only 25 percent and 11 percent lower sediment yields than the control. However, they used an application rate of only 3.36 kg $ha^{-1}$, which was below typical spray application rates, though it was the manufacturer-recommended rates for this formulation.

## Soil Cover Protection

Dozens, if not hundreds, of types of soil cover materials have been used for controlling erosion. Some of these are exclusive to specific land uses, such as stubble mulches in agricultural fields (Freebairn et al. 1986, Tibke 1988), that have little applicability to road-related soil disturbances. Consequently, the types of soil covers that are reviewed here emphasize techniques that have been used in forest road settings or have application to forested hillsides where roads may be constructed.

The major types of soil cover applicable to roads fall into four categories (Table 18). Vegetation and nonorganic mulches generally are meant to provide long-term soil cover. Organic mulches and rolled erosion control products are designed to have short-term (e.g., several months) to moderate-term (several seasons to a few years) lifetimes. Organic mulches and rolled erosion control products typically are used in conjunction with vegetative seeding, as these products are designed to allow vegetation to grow through them as they biodegrade or photodegrade. A few types of rolled erosion control products, such as plastic sheeting, are not biodegradable, but these rarely have utility in forest applications off the road surface. Inorganic mulches are nonbiodegradable, though some types may be photodegradable or thermo-degradable (e.g., plastics) over relatively long time periods. Inorganic mulches are designed to stabilize soil by physically keeping it in place, and revegetation typically is not an objective; it may even be an undesirable outcome with their use. However, inorganic mulches are not always incompatible with revegetation. Meyer et al. (1972) observed very good grass establishment with stone mulch, and it exceeded revegetation with wood chips, which seemed to have negatively affected the carbon/nitrogen ratio of the soil.

From the perspective of erosion control there is one primary objective common to all soil cover materials—preventing or reducing raindrop impact. Raindrop energy has been shown to be the most important process by which soil particle detachment occurs (Young and Wiersma 1973); it exceeds detachment even by concentrated flow. This is because of the great amount of energy that raindrops transfer to the soil (Berglund 1976). For example, a 30-minute thunderstorm in the Midwest is capable of resulting in an impact of cumulative dead weight of more than 100 ton $ac^{-1}$ and expending >2,000,000 ft-lb $ac^{-1}$ (Wischmeier and Smith 1958). Hudson (1957) demonstrated the importance of controlling raindrop impact by covering a plot of exposed soil with mosquito gauze. The gauze absorbed the raindrop energy, yet allowed most of the rain water to reach the soil surface. Soil loss from the gauze-protected plot was 127 times less and runoff was 13 times less than from a paired unprotected, bare soil plot. In laboratory studies, reducing raindrop energy by 89 percent resulted in nearly equivalent reductions (90 to 94 percent) in

**Table 18.—Types of soil covers generally applicable to disturbed soils off the driving surface**

| Type of soil cover | Examples |
|---|---|
| Vegetation | Grasses and herbaceous plants primarily through seeding, tree seedlings less commonly |
| Organic mulches | Wheat straw, rice straw, barley straw, hay, other agricultural plant residues, wood chips, wood strips, sawdust, needles/leaves, fruit hulls, tree bark, shredded paper/cellulose |
| Inorganic mulches | Crushed or washed stone, geologic waste materials, shredded/recycled rubber or plastic materials |
| Rolled erosion control products | Excelsior blankets, jute netting, coir mats, and other types of erosion control mats or blankets; geocells; and various types of synthetic sheets, filaments, and meshes |

FS-002846

total soil loss from three soils, whereas eliminating rills (and therefore rill erosion) resulted in only 17- to 37-percent reductions in erosion (Young and Wiersma 1973). Controlling raindrop impact reduces soil particle dislodgement, and associated compaction and sealing of the soil surface, which help reduce surface runoff and associated erosion (Bhatt and Khera 2006, Elwell and Stocking 1976, Lattanzi et al. 1974, Meyer and Mannering 1963, Moss 1991, Quinton et al. 1997, Young and Wiersma 1973).

An additional benefit common to many soil cover materials is that they provide roughness at the soil surface (Berglund 1976, Bhatt and Khera 2006) and sometimes tortuosity (Meyer et al. 1970). Surface roughness and tortuosity slow the movement of interrill and rill runoff and dissipate its energy, further contributing to erosion control (Lattanzi et al. 1974). With organic soil covers, decaying material also returns organic matter to the soil, which improves soil structure, forms stronger soil aggregates, and maintains high soil infiltration capacities—all of which decrease erosion (Baver 1956, Berglund 1976, Bhattacharyya et al. 2007, Loch 2000, Tengbeh 1993, Traoré et al. 2000). In 44 agricultural soils, organic matter content was the most important variable for explaining infiltration and controlling runoff (Wischmeier and Mannering 1965). A variety of soil cover materials improve growing conditions by providing shade that reduces soil surface temperatures, conserves moisture, and encourages fast vegetative growth (Berglund 1976, Bhatt and Khera 2006, McKee et al. 1964, Sheldon and Bradshaw 1977). However, some soil cover materials can increase the temperature at the soil surface (Anderson et al. 1996, Benoit et al. 1986), which can improve or degrade growing conditions, depending upon other variables, such as available moisture (Barkley et al. 1965, Dudeck et al. 1970) and time of year (Benoit et al. 1986, Kohnke and Werkhoven 1963).

The belowground biological processes that plants carry out provide additional benefits that are not available from other types of soil cover. Root growth improves soil structure and maintains high soil permeability, thereby reducing runoff and interrill and rill erosion (Baver 1956, Elwell and Stocking 1976). Plant roots also hold soil in place physically due to the presence of fibrous roots and chemically by binding soil particles with root exudates (De Baets et al. 2006, Gyssels and Poesen 2003, Tengbeh 1993, Traoré et al. 2000). Tengbeh (1993) found soil shear strength (binding between roots and soil) in soil containing fibrous grass roots was at least 500 percent greater than that of bare soil. While aboveground vegetation provides protection against raindrop splash and interrill erosion, roots are at least equally important in controlling rill and gully erosion (Gyssels et al. 2005).

## Effectiveness of Vegetation

Of all the types of soil cover used in rehabilitation and stabilization of disturbed soils that are associated with forest roads, the most common is revegetation through seeding of grasses and herbaceous species. Except when expensive native seed mixtures are used to revegetate, seeding is the most cost-effective measure to provide soil cover and erosion control (Miles et al. 1989, Robichaud 2005). Established vegetation (e.g., tree seedlings) can be planted (Megahan 1974a), but tree planting is usually inappropriate for road prism rehabilitation. It is preferable to keep tall vegetation away from the road to maximize visibility for safety and to provide light during the day to reduce moisture and control rutting on the road surface (see Chapter 3).

Unlike soil cover techniques that provide immediate protection, soil erosion control from seeding is ineffective until vegetation becomes sufficiently established. During the initial period of vegetation establishment, soil losses from seeded and untreated, bare soil can be comparable, both in amounts and patterns of loss. For example, Bethlahmy and Kidd (1966) measured nearly similar amounts of soil produced from untreated (no soil cover) and seed + fertilized plots (Table 19). Most of the soil losses occurred during the first 100 days, but they declined exponentially (Fig. 8). Similar exponential declines in sediment yields from seeded and bare soils have been reported by others through the first growing season (e.g., Burroughs and King 1989, Dyrness 1975, Harrison 2011, Megahan et al. 2001, Orr 1970, Wade 2010), and even over periods as short as a week (Burroughs et al. 1984c). This exponential pattern of sediment losses is common when no initial soil cover is available because large amounts of loosened soil from ground disturbance

## Table 19.—Results from select erosion studies

| Reference | Treatment | Soil loss, as specified | Duration | Field plot/ Simulation |
|---|---|---|---|---|
| | | Average (*ton ac*$^{-1}$) | | |
| Barnett et al. (1967) | Bare soil | 96.57 | 2 simulated storm events: (1) 1.3 inches of rain in 30 min (2) 2.7 inches in 60 min | Field (highway construction site) |
| | Checkered dams (mulch punched into soil) | 44.48 | | |
| | Surface mulch and asphalt | 31.54 | | |
| | Mulch mixed in surface | 27.14 | | |
| | Mulch mixed in surface + asphalt | 27.59 | | |
| | Whisker dams (mulch pressed into soil) | 9.88 | | |
| | Surface mulch | 11.20 | | |
| | | Average (of maximum and minimum sediment yields per event) (*kg ha*$^{-1}$) | | |
| Benik et al. (2003) | Disc-anchored straw mulch | 108 | 5 single storm events | Field (hillslope of a sedimentation basin at a highway construction site) |
| | | 99 | | |
| | | 54 | | |
| | | 2,125 | | |
| | | 732 | | |
| | Straw blanket | 16 | | |
| | | 10 | | |
| | | 9 | | |
| | | 103 | | |
| | | 79 | | |
| | Straw/coconut blanket | 18 | | |
| | | 17 | | |
| | | 7 | | |
| | | 228 | | |
| | | 179 | | |
| | Wood fiber blanket | 29 | | |
| | | 15 | | |
| | | 19 | | |
| | | 258 | | |
| | | 157 | | |
| | Bare treatment | 763 | | |
| | | 788 | | |
| | | 189 | | |
| | | 5,438 | | |
| | | 4,296 | | |

*(continued)*

## Table 19.—Results from select erosion studies

| Reference | Treatment | Soil loss, as specified | | Duration | Field plot/ Simulation |
|---|---|---|---|---|---|
| | | Total (*1,000 lb ac*$^{-1}$) | | | |
| Bethlahmy and Kidd (1996) | Control | 84.2 | | 322 days, 20.40 inches of precipitation | Field (newly constructed road fillslope) |
| | Seed, fertilizer (2 plots) | 104.7 | | | |
| | | 89.4 | | | |
| | Seed, fertilizer, straw mulch | | | | |
| | Contour furrows, seed, straw mulch, fertilizer, holes | 11.9 | | | |
| | Seed, fertilizer, straw mulch with asphalt emulsion | 36.0 | | | |
| | Seed, fertilizer, straw mulch, netting | | | | |
| | Paper netting | 1.1 | | | |
| | Jute netting | 0 | | | |
| | Chicken-wire netting | 0.4 | | | |
| | | Average (of total sediment yield for two plots) (*g*) | | | |
| Bhattacharyya et al. (2008) (see also Bhattacharyya et al. 2007) | Bare | 85.79 | | March 25, 2002–May 10, 2004 | Field (hillslope) |
| | Grass | 13.04 | | | |
| | Buffer (of borassus mats) | 37.16 | | | |
| | Covered (completely by borassus mats) | 31.22 | | | |
| | | Average eroded solids (3 plots) (*kg*) | | | |
| Buchanan et al. (2002) | Control (bare) | 3.90 | | 8 storm events over 130 days | Field (steep construction slope; 55%) |
| | Small wood chips (6.4–13 mm) | 3.03 | | | |
| | Mixture of wood chip sizes (13–25 mm) | 0.53 | | | |
| | Large wood chips (>25 mm) | 0.86 | | | |
| | | Average (*lbs 1,000 ft*$^{-2}$) | | | |
| Burroughs et al. (1984c) | Bare soil (2 plots) | 116.72 | (4 reps) | Simulated rainfall for 23–30 min, rate ~2 inches h$^{-1}$ | Field (road fillslope) |
| | | 210.65 | (1 rep) | | |
| | Vegetated (2 plots) | 0.52 | (4 reps) | | |
| | | 1.14 | (3 reps) | | |
| | Curlex mulch (1 plot) | 10.50 | (4 reps) | | |
| | Filter windrow (1 plot) | 15.33 | (4 reps) | | |
| | | Cumulative averages (*cm*) (+ indicates soil accumulation) | | | |
| Carr and Ballard (1980) | Hydroseed + fertilizer + binder | + 1.1 | | 7 months | Field (forest roadside slopes) |
| | Hydroseed+fertilizer+binder+mulch | + 1.3 | | | |
| | Control | 2.3 | | | |

*(continued)*



FS-002849

**Table 19.—Results from select erosion studies**

| Reference | Treatment | Soil loss, as specified | Duration | Field plot/ Simulation |
|---|---|---|---|---|
| | | Total (*g m*$^{-2}$) | | |
| Döring et al. (2005) | Control (bare soil) | 1,606 | 1 h simulated rainfall with total amount of 73 mm | Field (agricultural; 8% slope) |
| | Chopped winter wheat straw (mean length 58 mm) | | | |
| | 1.25 tonne ha$^{-1}$ | 31 | | |
| | 2.5 tonne ha$^{-1}$ | 42 | | |
| | 5 tonne ha$^{-1}$ | 26 | | |
| | Unchopped winter wheat straw (avg. length 75 mm; 25% of pieces exceeding 100 mm length) | | | |
| | 2.5 tonne ha$^{-1}$ | 133 | | |
| | | Cumulative averages (*inches*) (+ indicates soil accumulation) | | |
| Dyrness (1970) (see also Dyrness 1975) | Control | 0.83 | 1 yr following construction 2 replicates | Field (forest road cutslopes) |
| | | 0.84 | | |
| | Mulch (wheat straw mulch, 2 ton ac$^{-1}$) | + 0.05 | | |
| | | 0.07 | | |
| | Blue River District mixture (25 lb ac$^{-1}$, no mulch) | 0.77 | | |
| | | 0.31 | | |
| | Oregon highway mixture (40 lb ac$^{-1}$ with straw mulch 2 ton ac$^{-1}$) | 0.20 | | |
| | | 0.23 | | |
| | Experimental mixture 1 (43 lb ac$^{-1}$ with straw mulch 2 ton ac$^{-1}$) | 0.65 | | |
| | | + 0.17 | | |
| | Experimental mixture 2 (43 lb ac$^{-1}$ with straw mulch 2 ton ac$^{-1}$) | 0.07 | | |
| | | + 0.11 | | |
| | | Average (*kg*) | | |
| Foltz and Dooley (2003) | Bare | | 3 simulated repetitions: (1) rainfall only (2) rainfall + 1st inflow (3) rainfall + 2nd inflow | Simulation (30% slope) |
| | Rainfall only | 2.0 | | |
| | Rainfall + 1st inflow | 4.2 | | |
| | Rainfall + 2nd inflow | 29.4 | | |
| | Straw mulch (“agricultural straw”) | | | |
| | Rainfall only | 0 | | |
| | Rainfall + 1st inflow | 0.03 | | |
| | Rainfall + 2nd inflow | 0.53 | | |
| | Wide wood strand (16 mm wide) | | | |
| | Rainfall only | 0 | | |
| | Rainfall + 1st inflow | 0 | | |
| | Rainfall + 2nd inflow | 0.39 | | |
| | Narrow wood strand (4 mm wide) | | | |
| | Rainfall only | 0 | | |
| | Rainfall + 1st inflow | 0.20 | | |
| | Rainfall + 2nd inflow | 0.61 | | |

*(continued)*

FS-002850

**Table 19.—Results from select erosion studies**

| Reference | Treatment | Soil loss, as specified | Duration | Field plot/ Simulation |
|---|---|---|---|---|
| | | Average (*kg*) | | |
| Grace et al. (1996) (see also Grace et al. 1998) | Bare (control) | | 6-month study period 3 replications for each treatment (i.e., 3 cutslope, 3 fillslope) | Field (forest roads) |
| | Cutslope | 24,769 | | |
| | Fillslope | 20,204 | | |
| | Erosion mat (wood excelsior) | | | |
| | Cutslope | 345 | | |
| | Fillslope | 2,358 | | |
| | Native grass (11.23 kg $ha^{-1}$) | | | |
| | Cutslope | 8,352 | | |
| | Fillslope | 3,866 | | |
| | Exotic grass (11.23–28.07 kg $ha^{-1}$) | | | |
| | Cutslope | 1,742 | | |
| | Fillslope | 2,669 | | |
| | | Average (*g* $m^{-2}$) | | |
| Grushecky et al. (2009) | Control | | 2 yr | Field (downslope terminus of newly constructed skid roads; average slope 18%) |
| | Year 1 | 174.3 | | |
| | Year 2 | 615.5 | | |
| | Fiber mat | | | |
| | Year 1 | 34.8 | | |
| | Year 2 | 62.3 | | |
| | | Terminal erosion rate (*kg* $ha^{-1}$ $s^{-1}$) | | |
| Jennings and Jarrett (1985) | Fallow soil | 4.32 | 1 10-min simulated rainfall | Simulation |
| | Straw (2.24 Mg $ha^{-1}$, 35% coverage) | 1.75 | | |
| | Straw (8.96 Mg $ha^{-1}$, 98% coverage) | 0.27 | | |
| | Small bark (22.4 Mg $ha^{-1}$, 85% coverage) | 0.78 | | |
| | Large bark (22.4 Mg $ha^{-1}$, 40% coverage) | 1.89 | | |
| | Large bark (56 Mg $ha^{-1}$, 98% coverage) | 0.54 | | |
| | Jute net (1 layer, 50% coverage) | 0.42 | | |
| | Burlap (1 layer, 60% coverage) | 0.83 | | |
| | 5-mm-wide cellulose with netting (1 layer, 50% coverage) | 1.61 | | |
| | Small rocks (10 mm thick, 30 mm diameter, 212 Mg $ha^{-1}$, 80% coverage) | 2.10 | | |
| | Large rocks (25 mm thick, 100 mm diameter, 506 Mg $ha^{-1}$, 70% coverage) | 1.38 | | |

*(continued)*

## Table 19.—Results from select erosion studies

| Reference | Treatment | Soil loss, as specified | Duration | Field plot/ Simulation |
|---|---|---|---|---|
| | | Average (*ton ac*$^{-1}$) | | |
| Kill and Foote (1971) | Straw + an asphalt emulsion tack | 19.3 | About 1 month (3.7 inches of precipitation)<br><br>5 replicates | Field<br>(highway roadside) |
| | Short-fibered wood pulp mulch (paper pulp) | 59.3 | | |
| | Short-fibered wood pulp mulch (whole pulp bolt) | 62.5 | | |
| | Short-fibered wood pulp mulch (using Douglas-fir) | 40.4 | | |
| | Long-fiber green wood excelsior fiber | 15.3 | | |
| | | Average erosion rate (*kg min*$^{-1}$ *m*$^{-1}$) | | |
| Kramer and Meyer (1969) | Simulated straw mulch, 4% slope | | 30 min<br><br>2 replicates | Simulation<br>(100 ft length) |
| | Control | 0.35 | | |
| | 0.125 ton ac$^{-1}$ | 0.32 | | |
| | 0.5 ton ac$^{-1}$ | 0.16 | | |
| | Simulated straw mulch, 10% slope | | | |
| | Control | 17.53 | | |
| | 0.125 ton ac$^{-1}$ | 12.26 | | |
| | 0.5 ton ac$^{-1}$ | 11.41 | | |
| | | Average (*g m*$^{-2}$) | | |
| Lattanzi et al. (1974) | Wheat straw mulch, 2% slope | | 60 min<br><br>2 replicates | Simulation<br>(0.37 m$^2$) |
| | Control | 951 | | |
| | 0.5 tonne ha$^{-1}$ | 602 | | |
| | 2 tonne ha$^{-1}$ | 244 | | |
| | 8 tonne ha$^{-1}$ | 7 | | |
| | Wheat straw mulch, 20% slope | | | |
| | Control | 2,142 | | |
| | 0.5 tonne ha$^{-1}$ | 1,246 | | |
| | 2 tonne ha$^{-1}$ | 485 | | |
| | 8 tonne ha$^{-1}$ | 2 | | |
| | | Total (*tonne ha*$^{-1}$) | | |
| Lekha (2004) | Control | 151.1 | 1 yr | Field<br>(hillslope) |
| | Coir net geotextile | 7.75 | | |
| | | Average at peak discharge (*mg L*$^{-1}$) | | |
| Lemly (1982) | Low-intensity rainfall event (1.5 cm h$^{-1}$) | | 60 min | Field<br>(highway cutslopes; 30% slope) |
| | Control | 118 | | |
| | Tacked straw | 48 | | |
| | Jute netting | 40 | | |
| | Mulch blanket | 26 | | |
| | Wood chips | 22 | | |
| | Excelsior blanket | 21 | | |

*(continued)*

## Table 19.—Results from select erosion studies

| Reference | Treatment | Soil loss, as specified | Duration | Field plot/ Simulation |
|---|---|---|---|---|
| | High-intensity rainfall event (4 cm h$^{-1}$) | | 20 min | |
| | Control | 720 | | |
| | Tacked straw | 507 | | |
| | Jute netting | 489 | | |
| | Mulch blanket | 316 | | |
| | Wood chips | 308 | | |
| | Excelsior blanket | 300 | | |
| | | Total (*ton ac$^{-1}$*) | | |
| Mannering and Meyer (1963) | Wheat straw mulch | | Simulated storm events over 3 days with a total of 6.25 inches of precipitation | **Field** (agricultural; 5% slope) |
| | 0 (control) ton ac$^{-1}$ | 12.42 | | |
| | 0.25 ton ac$^{-1}$ | 3.23 | | |
| | 0.5 ton ac$^{-1}$ | 1.42 | | |
| | 1 ton ac$^{-1}$ | 0.30 | | |
| | 2 ton ac$^{-1}$ | 0 | | |
| | 4 ton ac$^{-1}$ | 0 | | |
| | | Average annual erosion (*ton mi$^{-2}$ day$^{-1}$*) | | |
| Megahan (1974a, estimated from Fig. 8 of that paper) | Control | | 3 yr | **Field** (road fillslopes) |
| | 1970 | 11.6 | | |
| | 1971 | 3.4 | | |
| | 1972 | 14.5 | | |
| | Trees without mulch | | | |
| | 1970 | 6.1 | | |
| | 1971 | 2.4 | | |
| | 1972 | 7.2 | | |
| | Straw mulch with netting | | | |
| | 1970 | 0.3 | | |
| | 1971 | 0.2 | | |
| | 1972 | 1.1 | | |
| | | Average (*tonne ha$^{-1}$ yr$^{-1}$*) | | |
| Megahan et al. (2001) | Control | 16.4 | 4 yr | **Field** (road cutslopes) |
| | Dry seed alluvial soil | 1.7 | | |
| | Hydroseed + mulch | 7.1 | | |
| | Dry seed shallow soil + bedrock | 7.8 | | |
| | Terrace + hydroseed + mulch | 9.8 | | |
| | | Total soil loss (*ton ac$^{-1}$*) | | |
| Meyer et al. (1970) | Wheat straw mulch applied | | 3 simulated storm events over 2 days | **Field** (agricultural; 15% slope) |
| | 0 (control) ton ac$^{-1}$ | 27.8 | | |
| | 0.25 ton ac$^{-1}$ | 9.0 | | |
| | 0.5 ton ac$^{-1}$ | 8.7 | | |
| | 1 ton ac$^{-1}$ | 5.1 | | |
| | 2 ton ac$^{-1}$ | 1.1 | | |
| | 4 ton ac$^{-1}$ | 0.7 | | |

*(continued)*

## Table 19.—Results from select erosion studies

| Reference | Treatment | Soil loss, as specified | Duration | Field plot/ Simulation |
|---|---|---|---|---|
| | | Total (*ton ac*$^{-1}$) | | |
| Meyer et al. (1972) | No mulch (control) | 39.6 | 5 inches of simulated rain, at an intensity of 2.5 inches h$^{-1}$ | Field (side slope of a borrow pit that had been dug during highway construction; 20% slope steepness; 35 ft slope length) |
| | Straw (wheat straw mulch, chopper-blower, 2.3 ton ac$^{-1}$) | 12.1 | | |
| | Stone (crushed limestone ranging from 0.25 to 1.5 inches diameter) | | | |
| | 15 ton ac$^{-1}$ | 25.6 | | |
| | 60 ton ac$^{-1}$ | 11.4 | | |
| | 135 ton ac$^{-1}$ | 3.5 | | |
| | 240 ton ac$^{-1}$ | <2 | | |
| | 375 ton ac$^{-1}$ | <2 | | |
| | Gravel (washed road gravel ranging from 0.25 to 1.5 inches diameter) | | | |
| | 70 ton ac$^{-1}$ | 14.7 | | |
| | Wood chips | | | |
| | 2 ton ac$^{-1}$ | 27.1 | | |
| | 4 ton ac$^{-1}$ | 8.5 | | |
| | 7 ton ac$^{-1}$ | 5.5 | | |
| | 12 ton ac$^{-1}$ | <2 | | |
| | 25 ton ac$^{-1}$ | <2 | | |
| | Portland cement | 32.7 | | |
| | | Average erosion rate (*tonne ha*$^{-1}$) | | |
| Mitchell et al. (2003) | Geotextile net | 0.08 | April 10, 1995– April 15, 1996 (446 mm precipitation) | Field (hillslope) |
| | Geotextile mat | 0.09 | | |
| | Grass | 3.45 | | |
| | Bare soil | 7.47 | | |
| | | Average (*g*) | | |
| Rickson (2006) | RECP 'Geojute' | 29 | 10 min 3 replicates | Simulation |
| | RECP 'Geojute' fine | 30 | | |
| | RECP 'Enviromat' | 149 | | |
| | RECP 'Enkamat' surface laid | 133 | | |
| | RECP 'Enkamat' buried | 100 | | |
| | RECP 'Tensarmat' | 167 | | |
| | RECP 'Bachbettgwebe' | 68 | | |
| | Control | 197 | | |
| Robichaud et al. (2010) | Various mulch treatment effectiveness results in Appendix C of cited paper | | | Field (hillslopes; primarily wildfire-burned areas) |

*(continued)*

FS-002854

**Table 19.—Results from select erosion studies**

| Reference | Treatment | Soil loss, as specified | Duration | Field plot/ Simulation |
|---|---|---|---|---|
| | | Average (*kg ha⁻¹*) | | |
| Robichaud et al. (2013) | Control | | 2 yr | Field (hillslope) |
| | Year 0 (postfire) | 697 | | |
| | Year 1 | 104 | | |
| | Year 2 | 5.2 | | |
| | Straw mulch | | | |
| | Year 0 (postfire) | 60 | | |
| | Year 1 | 22 | | |
| | Year 2 | 1.3 | | |
| | Wood shred mulch | | | |
| | Year 0 (postfire) | 77 | | |
| | Year 1 | 29 | | |
| | Year 2 | 2.0 | | |
| | | Average total (3 sites) (*kg day⁻¹ ha⁻¹*) | | |
| Rothwell (1983) | Unmulched (control) | 6,033 | 4 months | Field (stream crossings) |
| | Mulched (brush mulch/logging debris) | 1,033 | | |
| | | Average erosion rate (*g m⁻² h⁻¹ mm precip⁻¹*) | | |
| Sutherland and Ziegler (1997) | RECP 'Futerra' | 0.93 | Simulated rainfall events over 6 wk | Field (hillslope) |
| | RECP 'C125' | 2.10 | | |
| | RECP 'Curlex I' | 5.05 | | |
| | RECP 'P300' | 5.12 | | |
| | RECP 'TerraJute' | 7.86 | | |
| | RECP 'Geojute' | 9.98 | | |
| | RECP 'SC150BN' | 10.77 | | |
| | RECP 'BioD-Mat 70' | 16.02 | | |
| | RECP 'BioD-Mat 40' | 33.70 | | |
| | RECP 'PEC-MAT' | 41.16 | | |
| | Control (bare) | 134.90 | | |
| | | Average (*Mg ha⁻¹ yr⁻¹*) | | |
| Wade (2010) | Control | 137.7 | May 2009–July 2010 | Field (skid trails) |
| | Seed (grass seed, 300 kg $ha^{-1}$) | 31.5 | | |
| | Hardwood slash | 8.9 | | |
| | Pine slash | 5.9 | | |
| | Straw mulch | 3.0 | | |

*(continued)*



FS-002855

## Table 19.—Results from select erosion studies

| Reference | Treatment | Soil loss, as specified | Duration | Field plot/ Simulation |
|---|---|---|---|---|
| | | Average annual (*Mg ha*$^{-1}$ *yr*$^{-1}$) | | |
| Wagenbrenner et al. (2006) | Control | | 4 yr | Field (hillslope) |
| | 2000 (8 plots) | >6.2 | | |
| | 2001 (12 plots) | >9.5 | | |
| | 2002 (12 plots) | 1.2 | | |
| | 2003 (12 plots) | 0.7 | | |
| | Seeding (grass seeding, 34 kg ha$^{-1}$) | | | |
| | 2000 (1 plots) | >3.9 | | |
| | 2001 (4 plots) | 12.0 | | |
| | 2002 (4 plots) | 1.2 | | |
| | 2003 (4 plots) | 0.3 | | |
| | "Old"[a] mulch (weed-free wheat straw) | | | |
| | 2000 (3 plots) | 8.8 | | |
| | 2001 (4 plots) | 0.5 | | |
| | 2002 (4 plots) | 0.02 | | |
| | 2003 (4 plots) | 0.001 | | |
| | "New"[a] mulch (weed-free wheat straw) | | | |
| | 2000 (0 plots) | --- | | |
| | 2001 (3 plots) | 0.02 | | |
| | 2002 (3 plots) | 0.006 | | |
| | 2003 (3 plots) | 0.000 | | |
| | "Old"[a] contour felling | | | |
| | 2000 (4 plots) | >5.8 | | |
| | 2001 (4 plots) | >5.7 | | |
| | 2002 (4 plots) | 0.03 | | |
| | 2003 (4 plots) | 0.02 | | |
| | "New"[a] contour felling | | | |
| | 2000 (0 plots) | --- | | |
| | 2001 (7 plots) | 2.8 | | |
| | 2002 (7 plots) | 0.2 | | |
| | 2003 (7 plots) | 0.07 | | |
| | | Annual accumulation (*ton ac*$^{-1}$) | | |
| Wollum (1962) | Bare (control) | | 3 yr | Field (road cutbank) |
| | Year 1 | 12.7 | | |
| | Grassed | | | |
| | Year 2 | 4.2 | | |
| | Year 3 | 2.3 | | |

[a]The terms "old" and "new" in this case refer to pre- and post-storm, which occurred Aug. 16, 2000. Plots installed before that date are referred to as "old" and after that date as "new."




Figure 8.—Soil erosion loads measured from plots on a steep road fillslope in Idaho. The control plot (●) was untreated. One plot (■) was contour furrowed before grass seeding and fertilizing. One plot (▲) was treated with a soil emulsion before and after grass seeding and fertilizing. Data are from Bethlahmy and Kidd (1966).




Figure 9.—Erosion loads from the temporal data shown in Figure 8 expressed as cumulative erosion rates.

are easily displaced by gravity and water (and wind in some situations). Once fines are eroded away, coarser materials are left behind at the soil surface (Megahan 1974b, Ollesch and Vacca 2002) because these are more resistant to displacement and transport (Hairsine and Rose 1992). This is often referred to as “armoring” or creation of an erosion pavement (Megahan 1974b).

As vegetation begins to become established, differences in soil losses between unseeded (and otherwise unprotected) and seeded soil become apparent. Erosion from bare soil continues to increase for a longer time than from seeded soil, so sediment yields typically take longer to reach the “minimum” constant values shown in Figure 8. This difference is illustrated by using the same data graphed in Figure 8 but by plotting them as percent cumulative erosion over time (Fig. 9). About 95 percent of total erosion occurred within the first 100 days on the seeded plots, but cumulative erosion did not reach 95 percent for another ~150 days, approximately day 255, on the unseeded plots (Bethlahmy and Kidd 1966). Grace (2002a) reported substantial cumulative increases in erosion until about day 700 from unseeded/unprotected fillslopes and from 900 to 1,000 days on unseeded/unprotected cutbanks.

The greatest benefits from revegetation occur over the long term because erosion can be returned to approximately pre-disturbance levels (Burroughs et al. 1984c). Four years after grass planting on roadside slopes, Grace (2002a) found erosion was at only 0.05 tonne ha$^{-1}$ yr$^{-1}$, compared to an unseeded control, which continued to have erosion rates that were 80 times greater (4 tonne ha$^{-1}$ yr$^{-1}$). Cycles of elevated erosion can continue, and may become more chronic for bare soil or soil that has had poor revegetation success. For example, following an exponential decline in erosion (similar to that found in Figure 8) during the first summer of soil disturbance on unseeded plots, Wade (2010) found high erosion rates (10 tonne ha$^{-1}$) were reinitiated in spring, whereas plots that had been seeded and revegetated that same summer had only small erosion increases during the subsequent winter and spring (2 tonne ha$^{-1}$). The reinitiation of soil erosion is attributable to freeze/thaw and wet/dry cycles in winter or spring (or other wet seasons), which loosen soil particles and make them available for erosion (Diseker and McGinnis 1967, Hipps et al. 1990, Putthacharoen et al. 1998, Römkens and Wang 1987, Shiel et al. 1988, Tisdall et al. 1978, Vandaele and Poesen 1995). In the presence of vegetation, the amount of soil that is loosened is less, and much of it is trapped by aboveground plant parts, so it is not lost to erosion (Berglund 1976). Carr and Ballard (1980) found net sediment accumulations resulting from vegetation on fillslopes and cutbanks in British Columbia.

FS-002857

A central question about the influence of vegetation is: “How much vegetative cover is necessary to protect soil?” This question has been examined from the perspective of both erosion and runoff, as sediment loss cannot occur without both detachment and transport. However, research on both variables has resulted in similar answers. Almost universally, vegetative cover in the range of about 50 to 75 percent is required to effectively control runoff or erosion, or both (Gifford 1985, Gutierrez and Hernandez 1996, Lang 1979, Loch 2000, Moreno-de las Heras et al. 2009, Orr 1970, Packer 1951, Quinton et al. 1997, Snelder and Bryan 1995), though erosion control often is achieved on the lower end of that range. If litter is present (i.e., on soil not newly disturbed), it also contributes to ground cover, so the 50- to 75-percent cover range may include vegetation plus litter, rather than just vegetation (e.g., Gifford 1985, Orr 1970, Pannkuk and Robichaud 2003, Robichaud et al. 2000). Generally the cover in these studies has been provided by low-growing plants, such as grasses, herbs, shrubs, or even agricultural plants, but from the perspective of erosion control the species present have been far less important than the total amount of ground cover (Gifford 1985, Grace 2002a, Packer 1951). Even on a landscape scale, restoration of ground cover or revegetation of forest trees to a level of about 75 percent has resulted in restoration of erosion rates to levels similar to those before large area disturbance or land conversion (Bailey and Copeland 1961, Vanacker et al. 2007).

Considering that different studies involved different types of soil (e.g., texture and structure, bulk density, antecedent moisture conditions), different experimental settings (e.g., field versus laboratory, slope, size of plot, vegetative species), and different precipitation characteristics (e.g., frequency, intensity, duration, quantity, simulated versus actual rain events), the cover percentages that have been found to keep erosion low are in good agreement. Even gully erosion has been shown to be stopped with a vegetative cover of just over 50 percent (Rey 2003). Heavy fern growth (near 100-percent cover) in a rill in South China also was successful at reducing erosion by an order of magnitude during a single monitored storm compared to a rill with no vegetation due to the greater roughness, higher infiltration, and greater shear strength of soil in the vegetated rill (Woo et al. 1997). However, the effectiveness of vegetation at controlling rill and gully erosion may depend upon the source of concentrated flow, the frequency of flow, and discharge levels. Grasses and herbaceous plants typically are not well suited for controlling erosion via concentrated flow from road drainage features that can carry large amounts of water on a frequent recurring basis (see Chapter 7 for further discussion).

Just as higher percentages of ground cover show good erosion control, ground cover below 30 to 40 percent shows consistently poor erosion control. Ground cover less than 30 percent (including litter) on grazed lands in Rhodesia was associated with much greater soil losses than denser ground cover (Elwell and Stocking 1974, 1976). After a wildfire, cover of 39 percent on forested hillsides with slopes averaging about 15 percent had erosion rates that were similar to hillsides with no remaining cover (Groen and Woods 2008). In northern Mexico, mean sediment concentrations were significantly higher where grass cover was less than 30 percent than where cover was greater than 60 percent during the growing season (Gutierrez and Hernandez 1996). Grass cover of only 35 percent in the Lake Tahoe Basin along the border of California and Nevada was not effective at controlling erosion (Grismer and Hogan 2005). The increases in erosion that are associated with less-dense vegetation apparently occur when individual bare areas begin to come in contact with one another and allow unimpeded runoff to occur (Lang 1979).

There is broad agreement in the literature from research studies across many land types and ecosystems showing that vegetation provides a high degree of protection against soil erosion when coverage is adequate (Descheemaeker et al. 2006, Elwell and Stocking 1976, Gutierrez and Hernandez 1996, Lang 1979, Loch 2000, Moreno-de las Heras et al. 2009, Quinton et al. 1997, Rey 2003). At almost any scale, the importance of vegetation to erosion control cannot be overstated (Tibke 1988). This is particularly true in the long term as vegetation is usually self-sustaining if not subjected to extreme disturbances, which makes it extremely cost-effective.

Ironically, despite vegetation’s effectiveness as a long-term approach, additional techniques are needed to control erosion in the short term immediately after seeding; otherwise erosion will not be appreciably

FS-002858

different than from bare soil (e.g., Fig. 8). This is the period for which most mulches and rolled erosion control products are designed (Ingold and Thomson 1986, Rickson 2006, Smets et al. 2008).

## Effectiveness of Mulch

A large variety of mulches have been tested for use, but in most applied field applications, the type of mulch that is used depends chiefly upon availability, cost, and the land use to which it is applied (Morgan and Rickson 1995). Grain and hay mulches are the most common mulches used where revegetation is the goal. Grain mulches can be derived from many plant species including oats (*Avena* spp.), rice (*Oryza* spp.), or barley (*Hordeum* spp.) (Jennings and Jarrett 1985, Robichaud 2005), but wheat (*Triticum* spp.) straw probably has been the dominant type for road applications (Foltz and Dooley 2003). Rice straw is being used increasingly because it is believed that its use will result in the spread of fewer invasive weed species. This is because rice straw is a wetland plant, so if the straw is used in areas away from water bodies and hydric soils, rice seeds and any associated weed seeds that also presumably require those wet conditions will not be able to survive (Beyers 2004). In contrast, hay is a mixture of all the plant species present in the field during cutting; consequently, it can contain much greater amounts of weed seeds than straw mulch (Cornell University Weed Ecology and Management Laboratory, n.d.). Old straw has been shown to be less effective at controlling erosion than new straw (Grismer and Hogan 2005), presumably because decay has already begun.

Other types of commonly tested mulches associated with forest roads include wood mulches (bark chips, wood strands, wood shreds, pulp wastes) and stone or rock. Because these are free of weed seeds, there has been some interest in shifting more toward some of these types of mulches (e.g., wood materials) and away from straws and hay (Yanosek et al. 2006). Many kinds of these mulches are available, but most of the available varieties are used for landscaping purposes. Therefore, large-scale erosion control with them has been fairly uncommon and limited to only a few major types. Asphalt emulsions alone or as tackifiers mixed with some types of mulches, and cement (Dudeck et al. 1967, 1970; King 1979, 1984; McKee et al. 1964; Meyer et al. 1972) also have been used as mulches, though these are expensive, and result in inconsistent erosion control compared to many other types of mulches (Table 19). Asphalt also can have a negative effect on vegetation establishment (Dudeck et al. 1970), which can be long-lasting, so little current research involves asphalt tackifiers.

All types of mulches have been shown to provide better erosion control than leaving the soil bare (Table 19). Even small applications of mulch measurably reduce soil losses (Mannering and Meyer 1963, Meyer et al. 1970). Mulch provides soil cover, so it is not surprising that most types of mulch typically are most effective in the same soil coverage ranges as vegetation (50 to 75 percent) (Foltz and Copeland 2009, Foltz and Wagenbrenner 2010). Additional soil coverage results in diminishing rates of erosion control. Given the propensity for rill formation on poorly protected soils, mulch applied more evenly across the entire area of exposed soil provides more effective erosion control than mulch applied in strips along the contour or along the lower one-third of plots (Bhatt and Khera 2006). However, other variables also come into play in determining its effectiveness, especially beyond the short term. These variables include the type and character of mulch used, slope steepness and length, soil texture, and pattern of application to the soil (Bhatt and Khera 2006, Foltz and Copeland 2009).

The type and characteristics of a mulch determine its shape, size, weight, and ability to absorb moisture. These characteristics influence its coverage (per unit weight), its ability to remain in place, and its ability to deter runoff, particularly rill flow. Chopped and unchopped straw provide a good example of how the shape and size of straw affect its coverage. About twice as much unchopped (long) straw was needed to achieve 90-percent soil cover as chopped straw (4.43 tonne $ha^{-1}$ versus 2.16 tonne $ha^{-1}$) (Döring et al. 2005). Straw loses its structural integrity and tends to split longitudinally when chopped into shorter-length pieces; consequently, chopped straw approximately doubles its effective coverage for a given weight of material compared to whole, long straw. Similarly, a much greater mass of large wood chips (16.54 tonne $ha^{-1}$) was needed to achieve 80-percent soil cover than mixed-sized chips (10.25 tonne $ha^{-1}$), whereas only a comparatively small

mass of small wood chips (3.31 tonne ha$^{-1}$) was needed for the same coverage (Buchanan et al. 2002).

Short-length or small-sized materials also can provide other benefits toward controlling erosion. Döring et al. (2005) found two classes of chopped straw (50 mm long and <35 mm long) reduced soil losses by 97.4 to 98.4 percent compared to untreated soil. Straw that was an average 75 mm long but included pieces >100 mm long reduced soil losses by 91.7 percent. Shorter pieces of mulch were more effective at filling the spaces between soil ridges and contacting the soil in the valleys. Chopped straw pieces also fitted more tightly into gaps between pieces of mulch, allowing a smoother, flat mat to be created that was not attainable with the longer pieces of straw (Döring et al. 2005). Long pieces of mulch tend to bridge across the ridges, leaving the soil underneath more susceptible to rill erosion (Döring et al. 2005, Foltz and Dooley 2003, Meyer et al. 1972). However, 6.5-inch-long ponderosa pine (*Pinus ponderosa*) needles were more able to weave together to form mini-dams and retard rill development than 1-inch-long Douglas-fir (*Pseudotsuga menziesii*) needles, though the latter had better overall soil contact and controlled interrill erosion (Pannkuk and Robichaud 2003). Similar mini-dams were formed by 60- and 120-mm-long wood strands, but not by 240-mm strands (Foltz and Dooley 2003). Thus, size, shape, flexibility, and strength all have a role in determining the effectiveness of a given type of mulch.

It should be noted that these studies were very short-term and performed in controlled conditions. Under ambient field conditions or in the long term, small-sized, lightweight mulch may exhibit erosion control rates that are much less than those in the studies cited earlier. This is because short-length lightweight mulch, such as straw or wood, is susceptible to movement by water and wind (Barnett et al. 1967, Buchanan et al. 2002, Meyer et al. 1972). Dudeck et al. (1970) found short strand lengths of chopped mulch (wood excelsior) became detached and transported off steep slopes, making it ineffective at controlling erosion. Even long straw has been shown to be susceptible to movement on slopes with high precipitation inputs (Harding 1988). The presence of relatively high percentages of lightweight fines in wood shreds was a dominant factor in undermining erosion control effectiveness on 40-percent burned slopes (Foltz and Wagenbrenner 2010). Wood shred blends containing 18 percent and 24 percent fines could not resist movement from concentrated flow and had poor erosion control. In contrast, when fines were limited to less than 2 percent, effective erosion control occurred with 50-percent cover. Likewise, mixed-sized (13- to 25-mm diameter) and large-sized (>25-mm diameter) wood chips provided superior erosion control on a 55-percent slope compared to small-sized chips (6.4- to 13-mm diameter) because the small-sized chips moved during natural rain events over 130 days (Buchanan et al. 2002; Table 19). After only three rain events, there was a reduction in soil cover from an original 80-percent cover to 37 percent for the small-sized chips, with only 10-percent and 5-percent reductions for the mixed-sized and large-sized chips, respectively. Most of the change in coverage for small-sized chips occurred in the bottom two-thirds of the 11.4-m-long slopes, whereas for the other two size classes, the average reduction in cover along the entire plot length never exceeded 10 percent. If mulch does not retain the level of soil cover that was intended due to mobilization, erosion control effectiveness can be reduced significantly over any timeframe.

Another potential problem with using small-sized or short mulch is that it can become partially or fully buried as soil is detached and redistributed over time. Foltz and Dooley (2003) observed rapid burial of short straw to 10 mm into the soil. In the short term, burial may help protect the soil against rill formation by providing organic matter to bind soil particles and contributing to roughness near the soil surface. But as burial progresses and deepens, mulch protection at the soil surface may be sacrificed. Loss of erosion protection has been observed when mulch was intentionally mixed into the soil compared to when it was applied at the soil surface (Barnett et al. 1967).

For wood mulch, fiber length or the degree of processing apparently influences its effectiveness. In general, short fibers (more processed) decrease effectiveness. Three short-fiber wood pulp products applied by using a hydroseeder provided significantly poorer erosion control than a long-fiber excelsior product (blown product, not rolled) (Kill and Foote 1971; Table 19). Soil losses from short-fiber products were more than twice as high per unit area as from the excelsior product. Most of the difference in sediment yields was from rill erosion on the short-fiber treatment plots; more grass became established on the long-fiber plots, which also

FS-002860

contributed to controlling soil losses. Zellmer et al. (1991) also observed much greater soil losses from a processed wood fiber mulch than from straw mulches on a 28-percent-gradient pipeline right-of-way in Pennsylvania.

Paper mulches manufactured from wood pulps have a mixed record of effectiveness. Zellmer et al. (1991) found paper strips in netting performed comparably to straw mulch (Table 19), yet Swanson et al. (1967) found poor erosion control from Kraft paper netting on 3:1 (horizontal:vertical) construction slopes. Stedman (2008) did not measure erosion directly from mulched cutbanks, but he reported that hydroseeded cellulose mulch (small-sized shredded paper) provided essentially no soil cover because rainfall washed it off within a few days of application.

Stone and gravel are unlike most mulches in that they are heavy mineral materials. They are used less commonly than other mulches on road prisms off the driving surface, and their typical application is confined to drainage areas where flow is intentionally concentrated (see Chapter 7). However, stone and gravel mulches occasionally have been used more broadly, especially where a high risk of erosion is anticipated. In some instances, the natural occurrence of stones at the surface of some soils also has been exploited as a type of mulch to protect against raindrop impact, increase soil roughness, and decrease rill and interrill erosion (Poesen and Ingelmo-Sanchez 1992).

Stone and gravel have shown somewhat inconsistent results in controlling erosion compared to other types of more traditional mulches. Although rock fragment cover of at least 10 percent at the soil surface almost always reduces sediment yields compared to no soil cover (Poesen et al. 1994), the degree of effectiveness varies substantially. In some studies, stone and gravel have provided reasonable erosion control (Meyer et al. 1972), yet in others erosion control has been relatively poor (Jennings and Jarrett 1985) (Table 19). Based on reported observations, the inconsistencies apparently are related to whether the protection they provided to the soil was sufficient to control rill erosion. Because of its weight, stone can resist movement by surface runoff and rill formation. When stone cover rates exceeded 88 percent, runoff could not create rills even on a 20-percent slope, so stone provided more effective erosion control than lighter, mobile wood chips (Meyer et al. 1972; Table 19). At lower percentages of soil cover (60 to 70 percent), rills were able to form among the stones, so erosion rates exceeded that of wood chips (Meyer et al. 1972). Jennings and Jarrett (1985) similarly found that on relatively flat ground with soil cover between 70 and 80 percent, organic mulch (straw and bark) had better erosion control than stone; they attribute these results to organic mulch's capacity to absorb and retain moisture, which reduced runoff and erosion (Jennings and Jarrett 1985; Table 19).

The control of interrill and rill erosion resulting from stone cover is a function of the scale at which they are examined, and should be considered when interpreting erosion control effectiveness. At microscale ($4 \times 10^{-6}$ to 1 $m^2$) and macroscale (10 to 10,000 $m^2$) plot levels, coarse fragments will reduce erosion (relative to no soil cover); however, at the mesoscale (0.01 to 100 $m^2$), coarse fragment cover can result in increases or decreases in erosion, depending upon the porosity of the surface soil (Poesen et al. 1994). If the soil surface is dominated by what Childs (1969) called structural porosity (i.e., it contains voids and pores characteristic of newly excavated or tilled material), coarse fragments on or slightly embedded into the soil surface will reduce runoff and erosion (Poesen et al. 1994) due to the high infiltration capacity of macropores at the surface.

In contrast, a soil with textural porosity (essentially a sealed surface [Childs 1969]) will have lower infiltration rates. Coarse fragments on the surface of these soils may allow some infiltration, but it will be reduced compared to soils with structural porosity, and there will be little infiltration with embedded coarse fragments (Poesen et al. 1994). Consequently, overland flow can develop, and without 100-percent cover, erosion can increase with increasing cover (Poesen et al. 1999). Interrill and possibly rill erosion will result as flows are channeled into narrower pathways between more densely spaced fragments, thereby increasing the velocity, depth, and energy of the runoff (Poesen and Ingelmo-Sanchez 1992, Poesen et al. 1999). Although larger-scale processes ultimately overwhelm processes at smaller scales (Poesen and Ingelmo-Sanchez 1992), the processes at smaller scales contribute to the final efficacy of stone cover, and it is hypothesized that

erosion increases at the mesoscale may help explain poorer erosion control seen in some studies (Poesen et al. 1994). This further suggests the importance of applying stone cover soon after soil disturbance so that structural porosity is maximized and soil sealing is minimized.

It would seem logical that the porosity of the soil surface also would affect the performance of other types of mulches and perhaps rolled erosion control products, but there are no similar investigations of this phenomenon in the literature for other soil cover products. It is possible in the moderate-to-long term that other types of mulches may be less prone to the effects of initial soil sealing. Less heavy materials may allow rapid re-creation of macropores after sealing through freeze/thaw and wet/dry cycles and through biological processes, such as the growth and extension of roots and churning by soil fauna.

The actual influence that scale has on erosion under mulched conditions is largely dependent upon whether erosion is dominated by interrill or rill erosion or a combination of both. Long plots present greater opportunity for severe rill or gully erosion to develop because of their length, and thus for greater overall erosion if mulch is insufficient to protect the soil (Snelder and Bryan 1995). King (1979) and Meyer et al. (1972) observed these outcomes. In contrast, when present in sufficient amounts mulch can become more effective on long plots because of the greater potential to buffer runoff and sediment; that is, there is greater potential for runoff to infiltrate and for sediment to be deposited on the plot due to the greater length (Smets et al. 2008). This was apparently the situation in a study Smets et al. (2008) performed using a worldwide dataset for plots that exceeded a length of 11 m. Mulch became more effective from 11 m to 50 m (the maximum plot length). Of course, even with greater mulch effectiveness on longer plots, the absolute amount of erosion increases with length (Hudson 1957, King 1979, Meyer et al. 1972, Smets et al. 2008), simply because of the greater surface area and length from which soil loss can originate (Smets et al. 2008).

On short plots there is almost no chance for infiltration or deposition to occur, so effects of simulated or real rain or inflow events are almost immediately measured (Smets et al. 2008). This explains the substantial variation in the effectiveness to control runoff or erosion by all of the mulches in the 65 plots that were less than 11 m long (Smets et al. 2008). Although rills can form on short plots, interrill erosion is typically more dominant, especially in the short term. But because both can exist and the buffering capacity of long plots is absent, it is much more difficult to make generalizations about whether mulch becomes increasingly effective with length on short plots.

Although slope length and scale are important site factors, slope gradient is sometimes the single most important factor in controlling erosion (Megahan et al. 2001). There are interactions between slope gradient and length, however, and the two together substantially affect the ability of mulch to remain in place and the likelihood of rill development (Foltz and Copeland 2009).

Flatter areas tend to be dominated by interrill erosion, and rill erosion dominates steeper gradients (Lattanzi et al. 1974, Meyer et al. 1972), but both interrill and rill erosion increase with increasing gradient (Lattanzi et al. 1974). The increase in both types of erosion occurs at least up to some point, after which soil armoring may form and thereby reduce erosion on some steep slopes (Descroix et al. 2001). Because soil detachment by raindrop impact—and not by runoff detachment—dominates interrill erosion, increasing slope increases the amount of soil detached (and therefore erosion) through the change in angle of impact. Gravity contributes to further downslope movement of detached particles (Lattanzi et al. 1974).

The generally direct relationship between slope and erosion, especially on newly disturbed soils, means that steeper slopes tend to require greater amounts of mulch than less steep slopes to provide the same level of protection (Kramer and Meyer 1969, Meyer et al. 1970). With a sufficient amount of mulch, interrill erosion is preventable on virtually any slope because raindrop impact can be nullified completely at 100-percent cover (Lattanzi et al. 1974). However, mulches that tend to be mobile (transported by water or wind) on steep slopes may require some type of anchoring, such as netting, to maintain their effectiveness (Megahan 1974a). Increasing the mass of a mobile mulch on increasing slopes without any anchoring may provide

little additional benefit because exposed soil would be susceptible to raindrop splash and rill erosion (Bethlahmy and Kidd 1966, Lattanzi et al. 1974, Meyer et al. 1972). Similarly, if the type of mulch applied cannot control rill erosion because of its physical characteristics (e.g., Foltz and Wagenbrenner 2010, Meyer et al. 1972), the mulch may be largely ineffective at controlling erosion on sloped land, especially steep slopes (Lattanzi et al. 1974).

Few studies specifically compare a variety of types of mulches at equivalent soil covers over a range of slopes, so it impossible to recommend types of mulch that are best suited for specific situations. However, Lemly (1982) and Meyer et al. (1970), respectively, reported tacked straw and straw provided poor protection on steep slopes. Erosion control by tacked straw declined by 10 percent from a slope of 10 percent to a slope of 20 percent, and erosion control on a 50-percent slope was about half of what it was on a 10-percent slope (Lemly 1982).

On probably any slope, but especially on steep slopes, soil texture is a large factor in the absolute amount of erosion control that any mulch will have. The ability to control erosion of the finest sized particles is key to erosion control. Small-sized particles are not necessarily the easiest to detach, as structure has a big influence on shear strength, but they are the easiest to transport once detached (Sharma 1996). Eroded particles smaller than 0.04 mm from a red clay soil were much more poorly controlled by mulches than particles that exceeded 0.04 mm (Lemly 1982). Yanosek et al. (2006) similarly found that wood strand mulch was much more effective at controlling erosion of coarse-grained gravelly sand than of a fine-grained sandy loam. Kramer and Meyer (1969) used glass spheres to simulate two fine soil particle sizes (33-µm and 121-µm diameters) to examine the effect of steepness, plot length, and mulch rates on controlling erosion of the different sized particles. They simulated straw mulch with ⅛-inch-wide × 6-inch-long fiberglass strips. As slopes steepened for any given mulch rate and slope length, the erosion rate (kg $min^{-1}$ $m^{-1}$) was greater for the smaller particles than larger particles (Table 19). The difference between the two particle sizes increased markedly with increasing slope gradient and length for all mulch rates.

## Effectiveness of Rolled Erosion Control Products

Rolled erosion control products (RECPs), sometimes referred to as "geotextiles," have been used for more than 50 yr (Bhattacharyya et al. 2008). They come in many forms and may be all natural, all synthetic, or a combination of the two. They may be made from jute, coconut fibers (also called coir), sisal, paper, wood chips, cereal straw, nylon, polypropylene, polyester, polyethylene, or other materials (Rickson 2006). The composition of an RECP determines its longevity in the field. Natural products typically last about 2 to 5 yr and synthetic products may last more than 25 yr (Rickson 2006). Jute-containing products, which are common RECPs, can deteriorate measurably in less than a year (Mitchell et al. 2003). Some products are woven; others are blankets or mats (Fig. 10). Some have netting; others are net-free (Smith 2007). There has been a shift toward products composed of all or greater amounts of natural



Figure 10.—Examples of woven (top) and nonwoven (bottom) geotextiles.

FS-002863

fibers because of their biodegradability (Smith 2007). However, as long as netting remains intact, it can trap some smaller wildlife species (Barton and Kinkead 2005, Kapfer and Paloski 2011, Walley et al. 2005), so net-free products may be a better choice in areas that contain species of interest.

RECPs differ from traditional mulches in that the latter are not associated with specific manufacturers, whereas each RECP is trademarked and manufactured according to a standard set of specifications. New products are placed on the market regularly and existing products are removed or their specifications changed. This can make it difficult for RECP users to keep pace with the available information about effectiveness and be familiar with the specifications of available products.

However, most of the published papers and available reports on the erosion control effectiveness of RECPs have been reviewed in detail in four comprehensive publications. Sutherland (1998b) and Sutherland (1998c) provide thorough reviews and critiques of studies available before 1990 and from 1990 to about 1997, respectively. Sutherland (1998a) assesses the research on RECPs done at the Hydraulics and Erosion Control Laboratory at Texas A&M University. Smith (2007) reviews many of the same studies evaluated by Sutherland (1998a, 1998b, 1998c) and also includes studies that were completed after Sutherland's papers were published. Rather than providing a lengthy review of individual product comparisons here that would be redundant with and probably less detailed than the information in those papers, we direct the reader to those publications for a thorough evaluation of available studies. The focus of this portion of the chapter will instead be a broader discussion of product characteristics that appear to be important in controlling their effectiveness. We use the word "appear" intentionally in the preceding sentence because there are limited studies of the processes that contribute to RECP effectiveness, and this is an identified weakness when improving the manufacture of RECPs and selecting the appropriate RECP for specific field conditions (Smith 2007).

Comparative tests with other types of erosion control products indicate that in virtually all instances, RECPs can reduce erosion of bare soil substantially (Benik et al. 2003, Grace et al. 1996, Mitchell et al. 2003, Rickson 2006), and their performance is comparable to and usually better than mulches (Dudeck et al. 1970, Harding 1988, Kill and Foote 1971, Swanson et al. 1967, Urroz and Israelsen 1995) (Table 19). Neither of these statements is surprising because RECPs are subject to market demand, and if they perform poorly they are unlikely to make it to market or to outcompete better-performing products. However, erosion control varies substantially among products or in different situations, so selecting the best product for erosion control is not straightforward or necessarily easy. There are no standard ways in which the erosion control by individual products is evaluated or in which different products are compared in a given situation. Most studies are empirical or "black box" studies (e.g., Krenitsky and Carroll 1994, Sutherland and Ziegler 1996, Thompson et al. 2001, Urroz and Israelsen 1995) in which RECPs are applied in a specific setting and the results are monitored with little if any replication or consideration of other experimental design components (Ziegler and Sutherland 1998). Further, little effort is given in most studies to understanding the specific processes contributing to or controlling erosion (Morgan and Rickson 1995, Smith 2007, Thompson et al. 2001, Ziegler and Sutherland 1998).

Standardized or uniform testing procedures for evaluating and comparing erosion control effectiveness of RECPs have long been identified as a need for the industry (Harding 1988, Rickson 2006, Sutherland 1998c), though the need has generally been ignored in practice (Sutherland 1998c). Despite some movement in developing standard approaches, industry-wide standardization still does not exist (Sutherland 1998c). Instead, major users, such as members of the American Association of State Highway and Transportation Officials (AASHTO) in their National Transportation Product Evaluation Program (NTPEP), use results from a collection of standard American Society for Testing and Materials (ASTM) tests developed by the Erosion Control Technology Council to standardize comparison of RECPs (AASHTO 2012, Smith 2007). However, manufacturer participation is voluntary (AASHTO 2012) and ASTM tests evaluate physical components of materials, such as strength and flexibility, that do not equate to erosion control effectiveness (Harding 1988).

In addition to the lack of uniform testing across the industry, there is also no way to know how well results

FS-002864

can be extrapolated to other geographic situations or larger spatial scales (Sutherland and Ziegler 1997). Comparison of products across all types of field conditions would be an informative but extremely expensive, tedious, and lengthy process (Thompson et al. 2001) that might be unable to keep up with product development. Thompson et al. (2001) suggested an alternative approach to hastening those types of comparisons by focusing on understanding how each RECP or RECP attribute affects erosion, contributes to erosion control, or interacts with processes that influence erosion, such as shear stress. General processes and controls are understood somewhat. But a detailed understanding of processes would allow product selection on the basis of erosion control potential rather than other known, yet not useful, variables (from the perspective of erosion control effectiveness), even if a product has not been fully tested in a wide variety of situations. Understanding processes and interactions also would improve the development of more-effective erosion control products (Smith 2007). Without process-based studies, improvement of erosion control products will occur primarily through slow trial-and-error applications rather than through scientific study (Sutherland 1998c). Study duration would have to be considered in process studies to understand when, why, and how interrill erosion makes the transition to rill erosion and to understand when, why, and how erosion becomes self-healing through time (Sutherland et al. 1997).

Like other soil cover techniques discussed in this chapter, the effectiveness of an RECP depends on its ability 1) to control raindrop splash, runoff, and associated sediment transport; and 2) to allow, if not enhance the ability of, vegetation to become established (Benik et al. 2003, Lekha 2004). The second ability includes physically allowing developing vegetation to grow through the material and in some cases improving the microclimate for seed germination and plant growth, such as by providing moderating temperatures and improving soil moisture levels. And like mulches, the physical attributes of the RECP influence its effectiveness in preventing erosion and runoff processes and allowing vegetation establishment.

Few studies evaluate the effectiveness of RECPs in controlling raindrop splash (Bhattacharyya et al. 2010), but existing studies generally show that splash erosion is substantially less or statistically less compared to splash from exposed soil (e.g., Bhattacharyya et al. 2010; Sutherland and Ziegler 1996, 2007; Ziegler et al. 1997). The limited number of studies that have analyzed or discussed results in the context of the product characteristics suggest that controlling raindrop impact is most dependent upon two attributes: a low amount of open area in the material (i.e., high surface coverage) and a complex, thick, three-dimensional design (Harding 1988, Ingold and Thomson 1986, Smith 2007, Sutherland et al. 1997). The first characteristic is somewhat analogous to the need to have mulch soil coverage of 50 to 70 percent to achieve substantial benefit. However, there has been little analysis to identify the surface area coverage required by different types of RECPs to provide effective protection against raindrop splash (Sutherland et al. 1997).

Sutherland and Ziegler (2007) compared raindrop splash erosion of two open-weave coir RECPs. They found that the one with the higher mass per area and 30- to 40-percent open space had significantly lower splash erosion than the product with lower mass per area and 50- to 80-percent open space. Sediment concentrations and yields were 6.5 and 6 times, respectively, greater for the material with more open space than for the more closed coir product. A randomly oriented coir fiber RECP with the least open space (less than 10 percent) had the smallest splash erosion concentrations and yields; both were about one-third that of the material with high mass and low open space. Bhattacharyya et al. (2010) found borassus mats (black rhun palm; *Borassus aethiopum*) with about 23-percent open area significantly reduced splash erosion and splash height compared to bare soil. Splash erosion was reduced by about 89 percent, and splash height by about 54 percent. In contrast, splash erosion from buriti mats (buriti palm; *Mauritia flexuosa*) with about 56-percent open area was not significantly different from bare soil.

Product thickness generally contributes to the material's ability to absorb raindrop energy instead of transferring it to the soil surface (Bhattacharyya et al. 2010, Ziegler and Sutherland 1998, Ziegler et al. 1997). RECPs that are thick also may do a better job of catching and retaining detached soil particles in their matrix than RECPs that are relatively thin (i.e., more sheet-like), especially on steep slopes (Sutherland and Ziegler 1996). However,

thickness alone does not guarantee energy absorption. Without a complex three-dimensional internal structure, raindrops can pass unimpeded to the soil, limiting energy dissipation by the product. Of 13 tested RECPs, Ziegler et al. (1997) found the only one that did not mitigate raindrop splash was the thickest one because it had the highest amount of open area, and thus, least soil cover. Because nonwoven blanket or mat products have thick, complex internal designs, they are often better at preventing raindrop impact than woven products, which tend to be thinner with holes extending through the entire product thickness (Smith 2007; Sutherland and Ziegler 1996, 1997).

If the RECP is effective at controlling raindrop splash, it necessarily absorbs much of the raindrop energy. As a result, soil sealing is prevented, infiltration is maintained, and the ability to transport sediment is reduced (Sutherland et al. 1997, Ziegler et al. 1997). However, the elimination of splash also can result in temporary ponding of water at the soil surface (Bhattacharyya et al. 2010) as water droplets make their way through the RECPs. With sufficient mass, these accumulations can be transformed into interrill and rill flow, especially on sloped land. Research suggests that in these situations, controlling runoff and sediment transport is dependent largely upon having good contact between the RECP and the soil surface, a characteristic termed "drapability" (Sutherland and Ziegler 1996, 1997).

Drapability is believed to be critical to reducing runoff velocity by impounding flow and increasing flow depth, and providing roughness for flowpaths even if the product has little effect on reducing overall runoff volume (Rickson 2006). Interrill and rill erosion and flow processes are poorly understood for RECPs, but there is a general belief that drapability creates conditions that favor interrill flow and discourage rill flow (Lekha 2004). RECPs that are most effective at controlling runoff and sediment loss apparently are those that prevent the transition from interrill flow to rill flow (Smith 2007, Sutherland and Ziegler 1997). Thus, even if sediment is available, little of it will be transported as long as the RECP remains highly drapable because runoff will occur primarily as interrill flow—which has lower velocity and energy than rill flow (Sutherland and Ziegler 1997).

Fiber flexibility is an important variable controlling drapability (Sutherland and Ziegler 1997), and flexibility can increase or decrease with moisture for some RECPs, particularly organic materials (Cazzuffi et al. 1994; Rustom 1993; Sutherland and Ziegler 1996, 1997). Consequently, declines in drapability can result in the initiation of rill erosion. Rustom (1993) observed these effects when stiff coconut fibers expanded and lost contact with the soil during wetting.

Although it may be possible to control rill erosion with RECPs, complete elimination of interrill erosion with a single RECP currently on the market is probably impossible on sloping hillsides because interrill runoff is extremely difficult to prevent. As with mulches, the soil particles detached by interrill erosion are dominated by small particles, and these can be transported with very little flow energy (Lemly 1982). Interrill erosion is related directly to runoff velocity and velocity increases with slope length, so on long slopes interrill erosion expands (Fox and Bryan 1999) and can be very challenging to control. Hence, stopping interrill erosion entirely probably is achievable only by immediate infiltration or by retaining water (through the formation of small dams by the product or absorption of surface water by the product) until complete infiltration can occur, or by treating the surface soil underlying the RECP with a soil conditioner to prevent detachment (see Soil Conditioners section in this chapter).

This bias for small-particle transport was illustrated by Lemly (1982), who examined erosion resulting from a variety of RECPs (and mulches) on clay soils at highway construction sites (Table 19). Consistently across five different slopes, the sediment in runoff at peak discharge was dominated by soil particles smaller than 0.038 mm (Table 20) for all types of erosion control products used. In most cases more than 90 percent of eroded soil was in this smallest size class and in all cases the majority was in this class. And while erosion control for size classes smaller than 0.038 mm improved with increasing slope for all RECP (and mulch) treatments, erosion control of particle sizes less than 0.04 mm was always much poorer than that of the larger particle sizes for slopes of 10 percent or greater (Table 21). For example, RECPs reduced sediment yields by 50 percent or more at 10-percent slopes, but silt- and clay-sized particles

**Table 20.—Mean composition of sediment, as percentages, in runoff during peak discharge[a] (from Lemly 1982)**

| Treatment[b] and particle size (*mm*)[c] | Percent slope | | | | |
|---|---|---|---|---|---|
| | 10 | 20 | 30 | 40 | 50 |
| No treatment | | | | | |
| 0.50 | 99 | 96 | 93 | 90 | 85 |
| 0.25 | 98 | 91 | 88 | 83 | 79 |
| 0.10 | 97 | 89 | 86 | 80 | 73 |
| 0.038 | 96 | 87 | 83 | 77 | 67 |
| Tacked straw | | | | | |
| 0.50 | 99.5 | 99 | 97 | 95 | 94 |
| 0.25 | 99 | 98 | 96 | 93 | 90 |
| 0.10 | 98 | 97 | 94 | 91 | 88 |
| 0.038 | 97.5 | 96 | 93 | 88 | 85 |
| Jute netting | | | | | |
| 0.50 | 99.6 | 99 | 98 | 96 | 92 |
| 0.25 | 99 | 98.5 | 97 | 94 | 90 |
| 0.10 | 98.6 | 98 | 94 | 93 | 89 |
| 0.038 | 98 | 97 | 93 | 90 | 86 |
| Mulch blanket | | | | | |
| 0.50 | 99.7 | 99.2 | 98.8 | 97 | 95 |
| 0.25 | 99.2 | 99 | 98 | 96 | 94 |
| 0.10 | 99 | 98.5 | 97 | 95 | 93 |
| 0.038 | 98.8 | 98 | 96 | 93 | 91 |
| Wood chips | | | | | |
| 0.50 | 99.6 | 99 | 97 | 96 | 95 |
| 0.25 | 99.1 | 98.5 | 96 | 95 | 93 |
| 0.10 | 98.8 | 98 | 95 | 93 | 91 |
| 0.038 | 98 | 97 | 94 | 91 | 90 |
| Excelsior blanket | | | | | |
| 0.50 | 99.7 | 99.3 | 99 | 98 | 97 |
| 0.25 | 99.3 | 99 | 98.5 | 97 | 96 |
| 0.10 | 99 | 98.7 | 98 | 96 | 94 |
| 0.038 | 98 | 98 | 97 | 94 | 93 |
| Multiple treatments | | | | | |
| 0.50 | 99.9 | 99.8 | 99.5 | 99 | 99 |
| 0.25 | 99.8 | 99.6 | 99.2 | 98.7 | 98.5 |
| 0.10 | 99.6 | 99.4 | 99 | 98 | 98 |
| 0.038 | 99.3 | 99.1 | 98.7 | 97 | 97 |

[a] Data were pooled and averaged for 14 precipitation events.

[b] Rolled erosion control product treatments are jute netting, mulch blanket, and excelsior blanket; mulch treatments are tacked straw and wood chips; multiple treatments involve a chemical binder applied to the soil surface, a fiberglass erosion check dam at the base of the plot slope, and asphalt-tacked straw covered with secured jute netting.

[c] Values represent percent finer than the particle size indicated, based on dry weight.

**Table 21.—Effect of treatment on sediment reductions[a] for different experimental construction plot slopes (from Lemly 1982)**

| Treatment[b] and sediment component | Percent slope | | | | |
|---|---|---|---|---|---|
| | 10 | 20 | 30 | 40 | 50 |
| Tacked straw | | | | | |
| Total | 42 | 39 | 36 | 29 | 23 |
| >0.04 mm | 98.5 | 91 | 90 | 89 | 82 |
| <0.04 mm | 1.5 | 9 | 10 | 11 | 18 |
| Jute netting | | | | | |
| Total | 55 | 43 | 32 | 31 | 30 |
| >0.04 mm | 98 | 90 | 90 | 87 | 81 |
| <0.04 mm | 2 | 10 | 10 | 13 | 19 |
| Mulch blanket | | | | | |
| Total | 76 | 70 | 61 | 55 | 52 |
| >0.04 mm | 96.2 | 89 | 87 | 84 | 76 |
| <0.04 mm | 3.8 | 11 | 13 | 16 | 24 |
| Wood chips | | | | | |
| Total | 78 | 74 | 63 | 58 | 51 |
| >0.04 mm | 98 | 90 | 89 | 86 | 77 |
| <0.04 mm | 2 | 10 | 11 | 14 | 23 |
| Excelsior blanket | | | | | |
| Total | 78 | 73 | 62 | 58 | 52 |
| >0.04 mm | 98 | 89 | 86 | 81 | 76 |
| <0.04 mm | 2 | 11 | 14 | 19 | 25 |

[a] "Total" values are percent reductions, dry weight, of average total sediment concentrations (mg $L^{-1}$) during peak discharge compared to untreated plots. Values for ">0.04 mm" and for "<0.04 mm" are the sediment concentration reductions as a percentage of the total for each particle-size class.

[b] Rolled erosion control product treatments are jute netting, mulch blanket, and excelsior blanket; mulch treatments are tacked straw and wood chips.

were the dominant particle size in runoff, which was primarily interrill flow.

Long-term effectiveness of an RECP also depends upon its ability to retain good drapability throughout its intended life. Wind, water, and, on steep slopes, gravity can cause the loss of contact of RECPs with the soil over time. Consequently, many products require the use of staples or pegs designed for the RECP to keep it attached to the ground properly (Ingold and Thomson 1986, Lekha 2004, Rimoldi and Zhao 1996). Thompson et al. (2001) found that the density of the placement of staples used to attach erosion control blankets was critical for retarding particle detachment because greater blanket contact reduced shear stress at the soil surface. Moisture absorbed by RECPs with high water-holding capacity can contribute to an RECP's drapability and help hold it in place due to the weight of the wet material (Rickson 2006).

Water absorption also reduces the amount of free water available for interrill or rill flow (Ziegler et al. 1997). Jute-containing RECPs particularly are known for their ability to retain moisture and increase their drapability (Cazzuffi et al. 1994, Sutherland and Ziegler 1996). Conversely, as some RECPs become wet, they expand and get heavier, which can result in their drifting down steep slopes. They will lose contact with the soil and lose their erosion control effectiveness if sufficient vegetation does not become established quickly to hold the product in place (Mitchell et al. 2003). If a product has high drapability because of high moisture absorbance but has low strength, it will be highly susceptible to tearing on slopes containing sharp rocks, debris, and perhaps even gravel (Sutherland and Ziegler 1997). This means that some RECPs are not suitable for all situations, particularly if large rocks, soil clods, root wads, and other debris are not removed or cannot be removed fully to achieve drapability and to avoid damaging or tearing the material (Rimoldi and Zhao 1996).

Even with good drapability, RECPs applied on a soil surface that is already sealed by fines (e.g., due to delayed application of the RECP) may not provide effective erosion control, and will be less effective than on a similar unsealed surface (Smets and Poesen 2009). Likewise, an RECP that has excellent drapability, moisture absorption characteristics, and other physical characteristics that encourage interrill flow can be challenged if there is a soil layer beneath the surface that impedes percolation. Saturation excess overland flow can result, creating rill flow and erosion even if the product is functioning at its best (Rustom 1993).

In addition to drapability, surface area coverage, and thickness, fiber orientation is important for controlling sediment transport. Three-dimensional, randomly oriented fibers are most effective at reducing rill erosion (Sutherland and Ziegler 1996, 1997). Sutherland and Ziegler (2007) compared two open-weave coir products. Random fiber orientation in one RECP resulted in significantly lower sediment concentrations and loads, as well as less rill formation, compared to the second RECP, which had a more regular fiber orientation. Further, if the dominant fiber orientation is across the slope (i.e., along the contour) rather than vertical, interrill erosion of detached soil particles can be retarded (Sutherland and Ziegler 1997).

Fiber length also may play an important role in sediment transport, at least for natural fibers. Smith (2007) found that RECPs containing short fibers and low amounts of synthetic materials were most effective at controlling erosion and sediment transport. Essentially all of the 13 products she tested were effective at controlling raindrop splash, but only natural materials with short fibers were similarly successful at stopping or largely controlling sediment movement. These materials all had high percent ground coverage, high water absorption capacities, high drapability (in part due to the short fiber length) especially with wetting, and adherence to the soil from product tackiness. Long-fiber products were less effective and sometimes fairly ineffective at controlling runoff because the fibers were too long to conform to irregularities of the soil surface. Often they were thin so as not to absorb water well; thus, their flexibility remained poor in wet conditions. A fully synthetic product constructed from polypropylene was the least effective product. Its structure was the most regular, and it had poor water absorption, which led to the most rill formation.

Sutherland and Ziegler (1997) also reported that a PVC product provided poor erosion control because of its poor drapability, even though it had randomly oriented fibers and high mass density (an index of ground cover). Thin nylon monofilament materials provide poor erosion

control, in part due to their inability to trap and retain loose soil particles (Harding 1988). Even when they have good contact with the soil, structures can be so thin that water flows on top of the material (Smith 2007).

A few types of RECPs are designed to be laid on the soil surface and then covered or filled with topsoil (e.g., geoweb and geocells, respectively). The effectiveness of these types of products has been inconsistent, and in some cases erosion has been reported to be as high as or even exceeding that of bare soil (Cazzuffi et al. 1994, Ingold and Thomson 1986). Soil losses are elevated due to the combination of raindrop splash and increased runoff. The webbed nature of these products disrupts normal drainage patterns, causing soil saturation within the cells and greater surface flows.

The physical factors of RECPs that retard raindrop splash and sediment transport also often encourage the success of seed germination and vegetation establishment, and the converse is true as well. In open-weave or other products that permit substantial raindrop impact, seeds have become displaced from the soil surface or redistributed so that developing cover is not even (Rickson 2000). Redistribution or complete loss of seed also has resulted when RECP expansion during wetting has allowed rill flow and rill formation to occur. In some cases, the effects have resulted in seed germination that has been no better than bare soil with no protection (Krenitsky and Carroll 1994, Rickson 2000). In contrast, RECPs that provide good protection against raindrop impact, soil detachment, and sediment transport can result in very good seed germination. Dudeck et al. (1970) reported mulch and RECP effectiveness on fillslope plots, with the best grass seed establishment occurring on soil protected by excelsior or jute netting. However, there may be an antagonism between high surface area coverage and the complexity/thickness of products in that germinated seeds may not be able to penetrate the material easily (Krenitsky and Carroll 1994). Instead, germinating plants sometimes lift the product off the ground (Theisen 1992). Erosion rates can increase due to the loss of RECP contact with the soil surface and the reductions in roughness (Rickson 2006) and water absorption (Ziegler et al. 1997) that result from loss of drapability.

Only recently has research begun to focus on identifying specific RECP characteristics that provide erosion control benefits, including controlling raindrop splash, absorbing and temporarily detaining water, controlling the transition from interrill to rill erosion, limiting interrill flow, and encouraging successful germination of vegetation. Some of this work has required a new approach to analyses, such as understanding how cellular structures of organic materials behave temporally through short-term wetting and drying cycles, and through extended periods of use in which product degradation may occur (Smith 2007). As the conditions and interactions that affect RECP performance become better understood, new products are expected to be developed that exploit that information and improve their erosion control effectiveness; also anticipated is guidance that better defines situations and sites best suited for specific product application (Smith 2007).



Riprap applied to a forest road cutbank for stabilization after initial erosion control measures following road construction were not adequate during winter storms. (Photo by U.S. Forest Service, Umpqua National Forest.)

CHAPTER 7

# Barriers and Biofilters

The focus in this chapter is on drainage, and hence, sediment control once water is diverted off the road surface or from a relief ditch. On forest roads, most road drainage typically is discharged onto roadside fillslopes or onto the original hillside adjacent to the area disturbed by road construction. The water's energy, erosive potential, and sediment delivery/deposition then are expected to be controlled by infiltration and sediment deposition, via the natural landscape attributes and features or humanmade structures, or a combination thereof. There are varying degrees of sophistication in the design of BMPs that rely on infiltration and deposition, but those that require substantial engineering, such as concrete energy dispersion ditches and settling ponds with designed outflow devices, are not included in this chapter or elsewhere in this document because they are rarely used in most forest road applications.

The barriers that are described in this chapter are non-engineered barriers—in other words, barriers that are installed with little or no design requirements other than standard installation guidelines (e.g., standard techniques given in BMP manuals for anchoring to the ground). Non-engineered barriers include such techniques as silt fence, straw bales, and fiber rolls or logs. In most cases, barriers are applied in two types of situations. One is when discharge is concentrated, including where concentrated discharge is cast onto adjacent land. This application typically is associated with roads, such as for water turnouts, ditches, and other similar features. The second is along the perimeter of, or as slope interrupters within, disturbed areas of construction sites (Faucette et al. 2009b). Barriers in both types of applications tend to be meant only for short-term use because the reestablishment of vegetation is the primary long-term erosion control technique.

The second section of this chapter is devoted to the class of BMPs known as "biofilters," which depend upon vegetation to reduce pollutant levels. These include buffer strips, such as vegetated filter strips and conventional forest buffers, and vegetated waterways and swales.

## Non-engineered Barriers

Many types of non-engineered barriers are used to control erosion, but they fall into two general categories. One type will be called nonreactive barriers, which include the more commonly applied and more conventional types of barriers such as silt fence, straw bales, rock/stone berms, and fiber rolls or logs (also called wattles). These are in contrast to reactive barriers, the term given by Shipitalo et al. (2010) to the more recently developed techniques of filter berms and filter socks (Faucette et al. 2009b).

### Nonreactive Barriers

Except for rare situations where barriers are used only to trap gravity-transported material (i.e., dry ravel), most nonreactive barriers involve water transport of pollutants and depend upon ponding and particle settling as the mechanisms for pollutant removal. The emphasis in this section is on this latter type of nonreactive barriers. The specific processes that lead to ponding and settling have been identified and described in detail only for silt fence, but all nonreactive barriers probably depend upon those same processes to one degree or another.

The initial key step for effective pollutant control is blinding and clogging of the openings in the barrier by large particles in runoff (Barrett et al. 1996, Kouwen 1990, Theisen 1992). Multiple small particles also can clog barriers if they reach an opening simultaneously and form bridges that clog barrier openings (Barrett et al. 1996). Blinding is a surface phenomenon where a crust forms across pores along the outer surface of the

receiving side of the barrier, whereas clogging occurs when the interior pores become filled with solids and obstruct water flow (Holtz et al. 1998, Ossege 1993). Because it is impossible to distinguish between the two processes during testing or field use, the terms may be used interchangeably or no distinction may be made between the two in the literature (e.g., see Crebbin 1988, Kouwen 1990). Many people erroneously believe nonreactive barriers remove sediment by filtering (especially silt fence, which is often referred to as "filter fabric"), but particle filtering by nonreactive barriers happens only over the short time during which blinding and clogging occur (Barrett et al. 1996). Ponding and settling follow as a result of clogging and blinding.

Clogging and blinding reduce the permeability of the barrier material, which encourages temporary ponding, thereby allowing sediment to settle out during the much longer periods of inflow detention (Barrett et al. 1996, Kouwen 1990, Theisen 1992). Thus, barrier characteristics that contribute to ponding and increasing the time of detention are the ones that are most effective at retaining sediment (Barrett et al. 1998a). Such materials tend to be thick (three-dimensional) and have small pore sizes, as these characteristics reduce permeability and create slower, more tortuous flow paths that are conducive to greater particle interception and clogging, as well as longer ponding times (Barrett et al. 1996, Crebbin 1988).

Larger particles, particularly sands, dominate the settling process because settling velocities of smaller particles (silts and clays) are too low for deposition to occur during the time that water is ponded (Barrett et al. 1998a, Keener et al. 2007). Clays also are affected by Brownian forces that can keep them in suspension almost indefinitely (Smith 1920); thus, particles less than 0.02-mm diameter (i.e., medium-sized silt and smaller particles) are not removed effectively by ponding or by filtering/clogging with nonreactive barriers (Kouwen 1990). To illustrate, silt fence materials tend to remove 80 to 99 percent of sands compared to 50 to 80 percent of silt loams, and only up to 20 percent of silty clay loams (U.S. Environmental Protection Agency [EPA] 1993). Consequently, as the percentage of smaller particles in runoff increases, the trapping efficiency of nonreactive barriers decreases (Wishowski et al. 1998).

Silt fence is the industry standard for sediment control barriers during construction (Barrett et al. 1996, Faucette et al. 2008), so it is commonly used at road construction sites. Silt fence (and most nonreactive barriers) is meant to be used with sheet flow or small quantities of overland flow; it is not intended for use with concentrated flow or large amounts of overland flow, even if that flow occurs as sheet flow (Crebbin 1988, Island County Public Works 2003, Wyant 1980). Large volumes of inflow can overwhelm the ponding capacity and potentially compromise silt fence strength (Farias et al. 2006), which can result in overtopping, undercutting, circumventing, or tearing the fence material (Keener et al. 2007). Therefore, silt fence fabrics are not designed to control erosion at the outlet of most road drainage features (e.g., culverts, broad-based dips) even though they commonly are placed in those locations. Instead, silt fences are designed for use around the perimeters of disturbed areas, downslope of areas that contribute sheet flow, in small swales or ditches that carry very limited runoff, or upslope of points of concentrated flow to keep sediment from entering that flow (Barrett et al. 1996).

Silt fence is manufactured as either woven or nonwoven fabrics, using the same techniques described for woven and nonwoven rolled erosion control products in Chapter 6. Both woven and nonwoven materials are permeable to flow because the purpose of the fabric is to slow and temporarily pond water but not detain it indefinitely or until infiltration is complete. Consequently, fabric permittivity, as determined by the American Society for Testing and Materials (ASTM), is important for controlling flow-through rates and ponding (Barrett et al. 1998a, Farias et al. 2006).

Permittivity is a measure of the quantity of water that can pass through the fabric with a head of 50 mm of water (Chopra et al. 2010). The rate of ponding is inversely related to the permittivity of a fabric (Farias et al. 2006). However, ASTM-determined permittivity values for a given geotextile material are not equivalent to permittivity that would occur in field conditions (Denkler et al. 2000). This is because ASTM permittivity evaluates the quantity of clean water that can pass vertically through a specified cross-sectional area of a given fabric (subjected to 50-mm head of water; ASTM 2009), which is very different from field runoff that contains sediment and other contaminants,

passes through the fence laterally, and has a variable and sometimes large head of water behind the fence.

Silt fence permittivity declines during use within and across storms as successive sediment-laden inflows increasingly clog the fabric (Wishowski et al. 1998). During flume studies, Barrett et al. (1998a) measured flow-through rates that were two orders of magnitude less than ASTM permittivity specifications. Farias et al. (2006) found permittivity was reduced to 62 percent and 85 percent of that for clean silt fence after two simulated rain events. For the four types of nonwoven geotextiles they tested, reductions in permittivity were greatest for thicker, less open geotextiles. Using woven silt fence fabrics, Denkler et al. (2000) measured initial flow-through rates that were four orders of magnitude less than the permittivity values specified for the material, and after long-term measurements of continuous flow-through (up to 2,000 h), they determined that flow-through decreased by as much as 50 percent compared to flow-through rates 1 h into the experiment.

Although permittivity affects water flow-through, sediment retention is not dependent upon flow-through rates (Wishowski et al. 1998). Instead, sediment retention has been found to be a function of the fabric's apparent opening size (AOS) (Theisen 1992) because the AOS provides an estimate of the size of the largest opening in a fabric through which soil particles can pass (ASTM 2004, Barrett et al. 1996, Chopra et al. 2010). The AOS is based on standard U.S. sieve sizes, and the AOS number and size of the opening are inversely related (Robichaud and Brown 2002). Some of the evidence linking AOS with sediment retention comes from findings that large particles are trapped more effectively than small ones; that is, fewer larger particles pass through material because the AOS estimates the largest size opening, but not all openings are that size and many are smaller. Wishowski et al. (1998) recorded trapping efficiencies of 99, 91, 74, 60, 54, and 45 percent, for the respective particle size classes >50 µm, >20 to 50 µm, >12.5 to 20 µm, >5 to 12.5 µm, ≥2 to 5 µm, and <2 µm. Similarly, retention of sand by four nonwoven silt fence fabrics over four replicate runs ranged from 84 to 99 percent (all but three runs for one fabric were 99 percent), whereas three nonwoven fabrics over four replicate runs all retained less than 7 percent of the fine silt/clay fractions (Fisher and Jarrett 1984). Coarse silt retention was between these two, ranging from 43 to 81 percent.

However, the relationship between retention and AOS is fairly weak and comparisons of fabrics with different AOS values have shown inconsistent results with respect to sediment retention. Britton et al. (2001) did find that the largest AOS corresponded to the fabric with the greatest particle transport (simulated with glass beads) through the material, but all three of the fabrics tested had similar particle retention (55, 65, and 66 percent) even though their AOS values spanned a fairly wide range relative to soil particle sizes (AOS=10, 30, and 40, which correspond to diameter openings of 0.80, 0.59, and 0.42 mm, respectively). Crebbin (1988) also reported that a fabric with a high AOS had markedly greater sediment retention than a fabric from the same manufacturer with a lower AOS.

Several factors contribute to the weak relationship between AOS and sediment retention. One is that AOS corresponds to the largest size opening, but not the frequency of those openings, which may be inconsistent across the fabric (Barrett et al. 1996, Ossege 1993). The frequency at which the manufactured AOS-sized opening occurs affects the probability that a given sized particle in inflow will encounter an opening of sufficient size to allow the particle to pass through the material. Second, the AOS is not uniform through the thickness of three-dimensional (i.e., nonwoven) fabrics, so particles transferred through larger openings on the surface may be captured in smaller openings within the interior of the material (Ossege 1993). Third, the AOS also decreases as clogging and blinding progress (Farias et al. 2006). Consequently, while permittivity and AOS have some control on flow-through and particle retention/loss, neither specification as determined through ASTM testing gives an accurate prediction of silt fence effectiveness in the field (Barrett et al. 1996, Martin 1985).

The temporal decreases in permittivity and AOS make geotextile materials increasingly susceptible to excessive ponding, and failure (Farias et al. 2006); therefore, although it is not discussed directly in the literature, it is probably important to anticipate and plan for changes in flow-through rates when selecting silt fence fabric. Selection of poorly suited materials for the

soil texture, inflow rates, and erosion rates can result in structural failures that can substantially reduce silt fence effectiveness and yield large amounts of scour downslope from the fence when great volumes of ponded water are released suddenly (Storey et al. 2006, U.S. EPA 2002, Yeri et al. 2005). Broad guidance exists for selecting silt fence fabrics (e.g., California Stormwater Quality Association 2003, Wisconsin Department of Natural Resources 2006), but specific recommendations for material selection in different field conditions (e.g., soil, inflows, slopes, contributing areas) are not present in the literature. Denkler et al. (2000) described the appropriate silt fence for a given soil and situation as one that eventually reaches a steady rate of flow through the fence. Under steady state flow, clogging is no longer occurring and piping of fines through the fence is not increasing. However, steady state flow can take an excessively long time to achieve (for example, 360 to 2,000 h of inflow was required for loess soils in Denkler et al. [2000]), so this recommendation is probably not particularly valuable as a selection criterion.

Because the performance of silt fence cannot be accurately predicted from its simple physical characteristics, much of the effectiveness testing has defaulted to laboratory and flume studies that use controlled inflow and sediment (or simulated-sediment) composition. These studies have been useful in providing insight into the processes of clogging and deposition by which silt fence and other nonreactive barriers control pollutant transport (described previously). They suggest that some silt fence fabrics are capable of good to excellent sediment retention in controlled, short-term situations, whereas other fabrics result in very poor control (Table 22).

The variability in effectiveness is attributable to differences in the physical silt fence characteristics just described, as well as inflow rates, soil characteristics, and sediment slurry concentrations. Increasing inflow rates tend to result in lower sediment retention when all other variables are held constant (see Keener et al. [2007] in Table 22) because high inflow rates can cause overtopping or other failure of the fence (Keener et al. 2007). To avoid overtopping and failure, fabrics designed for high inflows have larger pore sizes and higher flow-through rates, which also contribute to poorer erosion control (Carroll et al. 1992). Retention increases when the soil suspended in inflow is dominated by larger particles (e.g., sands), as these can be trapped by the fabric or settled by ponding; in contrast, clays are more likely to stay suspended in water as it passes through the fence fabric (U.S. EPA 1993).

Elevated sediment concentrations tend to clog and blind silt fence fabric more quickly than inflow with low sediment concentrations (Henry et al. 1999), so fabrics with large pores can improve sediment trapping as long as the inflow rates are not so great that ponding results in overtopping or other silt fence failures. High-density silt fence fabrics, which tend to be nonwoven, typically trap more sediment than low-density fabric (Wishowski et al. 1998). This is because nonwoven silt fence materials have longer and more tortuous pores, so the probability of clogging, ponding, and sediment trapping are increased (Bell and Hicks 1980), and they are stronger so they can support greater volumes of ponded water (Wyant 1980). However, most geotextiles used for silt fence are woven (Crebbin 1988) so they often do not have optimal sediment retention or water detention characteristics (Wyant 1980).

Expectations of silt fence performance in the field should not be based on flume and laboratory experiments (Barrett et al. 1998a, U.S. EPA 2002). Flume and laboratory studies provide exaggerated estimates of silt fence performance compared to field conditions because the former often employ disproportionately large percentages of sand particles in inflows (Barrett et al. 1998a). In contrast, because fines are displaced by runoff and suspended easily, the percentages of clay and silt present in runoff in the field generally will exceed the percentages of clay and silt particles in the parent soil from which the eroded particles originated (Schueler and Lugbill 1990). Fines tend to pass through silt fence (Barrett et al. 1996, Yeri et al. 2005), so field performance can be poor under certain soil, fence, and inflow combinations. For example, when the median value of silt + clay in inflow was 96 percent in field studies, Barrett et al. (1998a) recorded a median retention efficiency of 0 percent with a standard deviation of just 26 percent.

Other field tests of silt fence performance show a wide range of effectiveness (Table 23), with some field effectiveness values being very low or even negative (i.e., sediment losses are increased with the presence of the silt

**Table 22.—Trapping efficiencies of various types of silt fence fabric measured from flume or laboratory experiments**

| Reference | Trapping efficiencies | Description of study charactersistics |
|---|---|---|
| | *percent* | |
| Barrett et al. (1998a) | 70, 90, 68 | 3 woven fabrics |
| | 90 | 1 nonwoven fabric |
| Britton et al. (2001) | 55, 65, 66 | 3 different woven fabrics; used glass beads to simulate soil particles |
| Crebbin (1988) | 79, 87, 91, 91 | 4 woven silt fence fabrics |
| Farias et al. (2006) | 62–85 | 4 types of needle-punched nonwoven fabric |
| Fisher and Jarrett (1984) | 12–31 | 5 nonwoven fabrics using a sand slurry |
| | 1–19 | 5 nonwoven fabrics using a coarse silt slurry |
| | 0.7–2.6 | 5 nonwoven fabrics using a silt–clay slurry |
| | 1.8 | 1 woven fabric using a sand slurry |
| | 0.8 | 1 woven fabric using a coarse silt slurry |
| | 0.1 | 1 woven fabric using a silt–clay slurry |
| Keener et al. (2007) | 56 | Average for 0.126 L $s^{-1}$ inflow |
| | 42 | Average for 0.252 L $s^{-1}$ inflow |
| | 33 | Average for 0.315 L $s^{-1}$ inflow |
| | | All with a silt loam slurry |
| Kouwen (1990) | >99 | 3 woven geotextiles using a 0.22-mm-diameter sand |
| Wishowski et al. (1998) | 81 | High density clean fabric |
| | 69 | Low density clean fabric |
| Wyant (1980) | 97–99 | 9 nonwoven fabrics using a sandy soil slurry |
| | 90–100 | 9 nonwoven fabrics using a silty soil slurry |
| | 93–99 | 9 nonwoven fabrics using a clayey soil slurry |
| | 92–98 | 6 woven fabrics using a sandy soil slurry |
| | 49–99; only one was <84 | 6 woven fabrics using a silty soil slurry |
| | 85–98 | 6 woven fabrics using a clayey soil slurry |

FS-002874

**Table 23.—Trapping efficiencies of various types of silt fence fabric measured from field experiments or field applications**

| Reference | Sediment retention | Comments |
|---|---|---|
| | *percent* | |
| Barrett et al. (1996) | -61 to 54[a] | One silt fence sample removed more than 26% TSS; 54% removal was a nonwoven fabric; measurements after 8 h following 1 storm; inflow contained mostly silt- and clay-sized particles |
| Ettlin and Stewart (1993) | 16 | From 5 storms on 34% slopes; as TSS |
| Grace (2003) | 85 | Silt fence installed in road turnout ditches; 3 replicates; 90 flow events; over 42 months; as TSS concentration |
| Horner et al. (1990) | 85.7 | Average from 2 plots with silt fence compared to 2 bare plots over 7 storms; as TSS |
| Yeri et al. (2005) | 91 | Sandy loam slurry at 10% slope |
| | 51 | Sandy loam slurry at 13% slope |
| | 94 | Loam slurry at 10% slope |
| | 88 | Loam slurry at 13% slope |
| | 97 | Silt loam slurry at 10% slope |
| | 95 | Silt loam slurry at 13% slope<br>All 6 tests included new design of silt fence to improve effectiveness; as total sediment mass |

[a]Negative values indicate that sediment in outflows exceeded that in inflows.

fence). In addition to the limitations of silt fence materials even under laboratory conditions, poor performance in field tests and field use often is associated with silt fence structural failures (e.g., Barrett et al. 1996, 1998a). Common reasons for silt fence failure include: improper installation, which can result in undercutting of the toe, erosion of poorly compacted fill in the toe trench, or flow around one or both ends of the fence; excessive stretching and tearing; and overtopping the fence at low points (Barrett et al. 1996, Harbor 1999, U.S. EPA 2002, Yeri et al. 2005). Supplemental support, such as the additional stakes (Robichaud and Brown 2002) or wire woven into the silt fence fabric during manufacturing (Wyant 1980), can help provide greater strength to silt fence, but even these extra precautions may not be sufficient to keep silt fence operational with high volumes of inflow or when installed improperly or in the wrong location. Lack of maintenance, even for short-term use, also is often cited as a reason for silt fence failure (Landphair et al. 1997, Stevens et al. 2007). Because the need for maintenance increases with duration of use, the effectiveness of silt fence for erosion control during field applications may be poorer than "effective" short-term field tests suggest (e.g., Horner et al. 1990, Yeri et al. 2005) (Table 23). However, if fences are maintained, Grace (2003) (Table 23) has shown them to provide reasonable levels of sediment retention over periods typical of field use.

Given the general inability of silt fence fabrics to retain fines (Yeri et al. 2005), it is not surprising that silt fence typically is ineffective at controlling turbidity (Barrett et al. 1996, 1998a). Turbidity is influenced primarily by fine particles with low settling velocities (Barrett et al. 1998a, Horner et al. 1990, Leytem and Bjorneberg 2005), which correspond to the particles most apt to be carried by flow through the fence fabric. Horner et al. (1990) reported only 3-percent reduction in turbidity. Barrett et al. (1998a) measured a median turbidity reduction of 2 percent, though removal during individual experimental tests ranged from -32 percent (i.e., an increase in turbidity) to 49 percent. Results from a study by Faucette et al. (2008) were unusual compared to other published literature. From four experiments of individual simulated rainfall-runoff events, silt fence consistently resulted in relatively high turbidity reductions of 45, 50, 54, and 76 percent.

The tendency of silt fence to allow fine particles to pass through the fabric also can influence other pollutant losses. Metals on roadways and in roadway runoff exist across the spectrum of sizes ranging from settleable particulates to dissolved colloidal forms; the size/form is related to the type of metal involved (Butler et al. 1992, Pitt 1979). Many metals attach to particles, of which the great majority are small diameter (Pitt 1979, Pitt and Amy 1973, Revitt and Ellis 1980, Sartor and Boyd 1972, Wilber and Hunter 1979), so it is likely that silt fence will have poor retention of metals. However, there is scant research about the effectiveness of silt fence on metal or other road-associated pollutant removal, perhaps because silt fence is designed primarily to remove settleable sediment. A single study by Büyüksönmez et al. (2012) examined "first flush" loss of metals from a single simulated runoff event. Silt fence removed 82 percent of total zinc and more

than 50 percent of total cadmium, total lead, and total copper compared to a control. In contrast, for soluble forms of those metals only copper levels were reduced significantly. Loads of soluble forms of the other three metals increased compared to the control due to leaching from the silt fence material.

Far fewer studies have considered effectiveness for other types of nonreactive barriers (Table 24). Most available information about nonreactive barriers aside from silt fence involves straw or hay bales. But even these barriers have had very limited investigations of effectiveness (U.S. EPA 2002) despite their common use (Brown and Caraco 1997).

The effectiveness of straw and hay bales as barriers is greatest when they are positioned at the base of a slope to capture loose sediment (transported by gravity or small amounts of water), rather than erosion associated with overland or concentrated flow (U.S. EPA 2002). Collins and Johnston (1995) found straw bales positioned in rows downslope of urban road cuts were very effective at capturing the ubiquitous but manageable levels of sediment inputs. Results also suggested that straw bales installed to collect dispersed sources of sediment stay in place and function for longer periods than bales regularly affected by inflows of water.

In the presence of overland flow (even as sheet flow), straw and hay bale effectiveness depends largely on securely anchoring the bales to the ground (with stakes or rebar) and on keeping them wedged tightly together (U.S. EPA 2002) to resist failure and encourage sedimentation behind them. Models indicate that straw bales can be effective at sediment reduction in field use, but the results assume ideal conditions for installation and proper installation techniques (U.S. EPA 2002). Proper installation apparently is rare, however. In a visual review of field applications, Collins and Johnston (1995) found that straw bales regularly were not installed or maintained properly. As a result they were undercut or water flowed between bales, making them ineffective at controlling sediment losses. In a survey of experts on erosion and sediment control, Brown and Caraco (1997) reported inconsistencies between perceptions of straw bale effectiveness and use in the field. Only 27 percent of the surveyed

**Table 24.—Sediment retention by nonreactive barriers other than silt fence**

| Reference | Type of erosion control barrier | Sediment retention | Comments |
|---|---|---|---|
| | | *percent* | |
| Faucette et al. (2009b) | Straw bales | 65.1 | Total solids concentration |
| | | 71.3 | Total solids load |
| | | 53.8 | Total suspended solids concentration |
| | | 61.5 | Total suspended solids load<br>All replications: to simulate construction site perimeter erosion control |
| Kelsey et al. (2006) | 6-inch excelsior fiber logs | 55.2 | All replications: 12.5% slope; to simulate slope interrupter and perimeter barriers; as sediment concentrations |
| | 12-inch excelsior fiber logs | 71.2 | |
| | 9-inch straw wattles | 34.3 | |
| | 12-inch straw wattles | 19.5 | |
| Kouwen (1990) | Weighted or clamped-in-place straw bales | >95 | Laboratory study to simulate check dams; sediment slurry composed of medium-sized sand |
| | Loose straw bales | 70–80 | |
| Line and White (2001) | Washed stone and rock check dam | 69 | Average for 34 storms; as TSS mass |
| McLaughlin (2003) | Large rock dam | 77 | Retention decreased through time |
| | Gravel check dam | 90 | |
| Wright (2010) | Riprap check dam | ~80 | As mass of sediment |

FS-002876

experts considered straw bale barriers installed around the perimeter of construction sites to be an effective erosion control technique, yet straw bales were still allowed in more than half of the communities that were surveyed. The tradition of using straw bales for erosion control is linked to their affordability compared to other techniques (U.S. EPA 2002) rather than to proven effectiveness, as there are more data that show straw to be a far more effective BMP when applied as mulch (see Chapter 6) than when used as nonreactive barriers.

A controlled short-term study using test plots with flumes did suggest perimeter application of straw bales could remove relatively large amounts of solids when overland flows are limited if the bales were installed properly. From a single simulated storm, reductions in pollutants by straw bales around the perimeter of construction sites were 65.1 percent for total solids concentrations, 71.3 percent for total solids loads, 53.8 percent for total suspended solids (TSS) concentrations, 61.5 percent for TSS loads, and 11.8 percent for turbidity (Faucette et al. 2009b). However, performance typically is much poorer with increasing inflows. During the 1991–1992 wet season in southern California, Collins and Johnston (1995) examined straw bales installed as erosion barriers on alluvial fans (outside of channels) and at drop inlets following wildfires. Straw bales at drop inlets on roads increased erosion levels because the bales restricted water entry into the drains; water instead flowed downhill and eroded fillslopes. Decaying straw bales also clogged the inlets, resulting in the same type of consequences from overflow. On alluvial fans, straw bales were ineffective because they were displaced by overland flows that quickly overwhelmed the barriers. The bales were also susceptible to rapid decay in this situation.

Kelsey et al. (2006) studied straw-containing wattles and showed their effectiveness also was dependent upon good contact with the ground rather than the diameters of the barriers. Denser (72.62 kg $m^{-3}$), smaller diameter (22.9 cm) straw wattles were more effective at capturing sediment than less dense (61.2 kg $m^{-3}$), larger diameter (30.5 cm) wattles during 30-min applications of 10.2-cm $h^{-1}$ simulated rain events. The greater density resulted in better contact of the barriers with the ground, making them less susceptible to rill formation and sediment transport than their larger diameter, but lighter weight, counterparts. Increased diameter of excelsior (wood fibers) logs became important only for barriers that had similar densities (Kelsey et al. 2006). Their more complex structure (curled and barbed) expanded and pieces linked to each other when wetted, such that even though the excelsior density (dry) was less than half of that of straw wattles it trapped substantially more sediment than the straw wattles (Table 24), as long as the excelsior logs were secured to the soil surface. In this test, stakes holding the excelsior logs in place were half as far apart (0.6 m) as for the straw wattles (1.2 m).

Effectiveness of barriers may be most challenged when they are employed as check dams (i.e., barriers applied to channels, gullies, ditches, or convergent topography where concentrated flow is present at least ephemerally). However, check dams generally are considered poor choices for overall erosion control because the primary role of check dams is to prevent or reduce erosion of the channel itself, and sediment capture is only a secondary objective (Collins and Johnston 1995).

Studies suggest that materials which are dislodged or displaced easily are most at risk for poor performance as check dams. In two watersheds in which 440 straw bale check dams were installed in ephemeral channels and gullies for postfire erosion control, 67 percent and 54 percent failed due to undercutting, side cutting, filling, or displacement, or a combination thereof, about 3.5 months after installation (Collins and Johnston 1995). In short-term experiments by Storey et al. (2006), bales were not displaced, but water moved under instead of through them. On sandy soils, this created substantial scouring immediately downstream of the bales, whereas on clay soils underflow remained dispersed and did not cause scouring. Kouwen (1990) found properly installed straw bales could provide high retention of sand in short-term flume studies with concentrated flows (Table 24), but the composition of the slurry mixture and duration of study do not represent realistic conditions of field applications of straw bale barriers.

Check dams constructed from rock materials, such as riprap, are more resistant to displacement and failure if the materials are the proper size. The limited data available suggest that rock check dams can perform surprisingly well, though the effectiveness probably depends primarily upon the type and grading of the

coarse fragments. Over about 19 months of monitoring, a sediment trap with rock check dams in a drainage ditch of a construction site in the Coastal Plain of North Carolina had an average trapping efficiency of 69 percent, and a similarly constructed sediment trap installed in an intermittent channel draining a construction site in the Piedmont trapped an average of 59 percent of total suspended sediment (Line and White 2001). A third rock check dam installed at the outlet of a storm drain in the Piedmont was sampled for just over 2 months and had an overall efficiency of 58 percent. As with silt fence, all three sediment traps were more effective at retaining sand-sized particles compared to smaller silt- and clay-sized particles, as sands settle more easily. Silt- and clay-sized particles that were trapped tended to be associated with larger aggregates.

Wright (2010) examined 0.3-m-high trapezoidal rock (riprap) in 24:1 (horizontal:vertical) or 2.4-degree sloped field plots with natural rain events, as well as in the laboratory with simulated slopes of 6:1, 9:1, and 12:1 (horizontal:vertical) using artificial rain events. In the field study, about 80 percent of sediment was retained across three replicate rock check dams compared to losses from bare soil. The performance of the rock check dams in the laboratory was similar across all slopes and similar to the field results; they removed about 70 to 85 percent of sediment in inflow, with the best performance from the 9:1 slope (horizontal:vertical).

Standard state BMPs in North Carolina involving 1.5-ft-deep sediment traps in combination with rock check dams in road ditches were much less effective at sediment capture than combinations of stiff coir logs and malleable straw wattles (King and McLaughlin 2007, McLaughlin et al. 2009b). Average per storm sediment losses were 428 kg for the standard BMPs compared to 2.1 kg for the fiber check dams; respective average turbidity levels in outflow were 3,813 NTU and 202 NTU. When polyacrylamide (PAM) (see Soil Conditioners section in Chapter 6) was added to the coir log and straw wattle check dams, sediment retention increased even more: average per storm sediment and turbidity in outflow were 0.9 kg and 34 NTU, respectively. Similar results occurred at another site, where fiber check dams with PAM and standard state BMPs were used in road ditches, though the differences between the standard rock check dams and the fiber check dams were not nearly as great as at the other site (McLaughlin et al. 2009b). Average per storm sediment loss with the standard BMPs was 3.3 kg compared to 0.8 kg for the fiber check dam + PAM. Average per storm turbidity with the standard BMPs was 867 NTU compared to 115 NTU for the fiber check dams + PAM. Because the cost of the fiber check dams was comparable to the standard BMPs and water quality discharges were close to or below regulatory requirements, the authors recommended fiber check dams as an alternative to the sediment traps and rock check dams (McLaughlin et al. 2009b).

Check dams also are used in vegetated swales and grassed waterways to improve sediment deposition. Application in vegetated swales and waterways is described in subsequent sections of this chapter, where those biofilters are covered in greater detail.

## Reactive Barriers

Filter berms and filter socks are the two types of reactive barriers currently on the market. Filter berms and filter socks physically differ from one another only in that the former are non-encased, and the latter are encased, accumulations of compost or mulch material. Thus, filter berms are simply piles or dikes of compost or mulch material used to control erosion (U.S. EPA 2010a). Filter socks are 8-, 12-, 18-, or 24-inch-diameter (Faucette et al. 2006) tubes made from mesh netting (e.g., polypropylene) that are filled with an organic compost or mulch, or both, and sealed on both ends (Faucette et al. 2009a, Shipitalo et al. 2010). During installation, filter berms and socks are laid on the ground along the perimeter of disturbed areas and along the contour at intervals (i.e., as slope interrupters) on the slope to detain sheet flow (Miller and Joaquin 2011). Filter berms are incompatible with concentrated flow (Alexander 2006, Storey et al. 2006, U.S. EPA 2012) because they are prone to washouts and failure in concentrated flow. Filter socks also may be used in vegetated waterways, swales, ditches, and similar (nonperennial) channels to control limited amounts of concentrated runoff (Alexander 2006, Shipitalo et al. 2012). Filter socks and berms are recommended for relatively steeply sloping surfaces, ranging from >4:1 to 2:1 grade (horizontal:vertical), where the likelihood for erosion is high and other types of surface erosion control may be less suited (Alexander

FS-002878

2006, Risse and Faucette 2001, Storey et al. 2006). Their ability to absorb substantial amounts of water allows them to remain effective on steep slopes (Risse and Faucette 2001), as long as inflows do not become concentrated.

The material in filter berms and socks may be nonmineralized (e.g., mulch), mineralized commercial or municipal organic wastes, or both (Alexander 2006). In most cases at least some portion is mineralized (i.e., humus), in which case these barriers are referred to as "compost filter berms" or "compost filter socks." However, the composts in filter berms and socks have substantially larger particle size distributions than that of composts used for planting and growing purposes (Faucette et al. 2006). The U.S. EPA provides recommendations for particle-size mixtures in its menu of BMPs for construction (U.S. EPA 2012). These recommendations essentially follow the specifications developed by the American Association of State Highway and Transportation Officials (AASHTO) (Alexander 2003).

Both filter berms and filter socks can be seeded to provide vegetative growth on the structure to help enhance stability (Storey et al. 2006). Seeding is usually done when at least part of the structure is made of compost rather than simply nondecomposed mulch, as the former provides a more suitable growing medium. Seeds can be mixed into the organic material as it is fed into the netting or before it is positioned on the ground, or they can be applied to the structure's surface after the material is positioned on the ground (Miller and Joaquin 2011; U.S. EPA 2010a, 2010b). In the case of filter socks, the mesh netting does not interfere with seed establishment because it has relatively large openings through which the seed can come into contact with the compost (Faucette et al. 2009a).

If filter socks are not seeded, they generally are used as temporary structures. When no longer needed, they are cut open, the mulch is spread around the area, and the synthetic netting is removed (U.S. EPA 2010b). When filter socks are left onsite, the netting should be biodegradable so it mineralizes in place (Miller and Joaquin 2011). Filter berms also may be left intact onsite following use, or the organic material may be dispersed around the area as a soil amendment (Storey et al. 2006).

In contrast to nonreactive barriers, reactive barriers depend only partially on ponding for sediment retention (Shipitalo et al. 2010; U.S. EPA 2010a, 2010b). As water passes through reactive barriers, chemical sorption onto the organic mulch or compost materials also is critical for sediment retention (Faucette et al. 2008)—it is this chemical adsorption that has led to characterizing these barriers as "reactive" (Shipitalo et al. 2010). The initial demonstration of the importance of filtration and sorption in compost barriers is largely credited to Keener et al. (2007). They documented slower and shallower ponding behind compost filter socks than behind silt fence even though the filter socks retained approximately the same amounts of sediment as silt fence (Faucette et al. 2008). It is believed that some small particles are filtered out when water passes by the sorption sites of larger sediment particles that previously have been adsorbed onto the filter media in the barrier (Demars and Long 2001). Faster flow-through rates with comparable or greater retention by reactive barriers means that they do not have to be as tall as silt fence to accommodate a given nonconcentrated inflow rate (Faucette et al. 2006, Keener et al. 2007).

Filtering and sorption occur by the combination of physical retention of solids among organic particles (i.e., blinding and clogging) and by chemical adsorption of charged particles onto the organic material in berms and socks (Faucette et al. 2009a). The humus fraction of compost provides both positively and negatively charged exchange sites (Faucette et al. 2006), both of which adsorb oppositely charged particles contained in runoff (Faucette et al. 2006). This ability is very important for retaining small particles that are not well retained by traditional nonreactive barriers. Clay- and silt-sized particles are difficult to retain without adsorption because they have very low settling velocities and can pass through porous barriers. Clay particles have net negative charges (Brady 1984), so they can be adsorbed by positive sites in filter media (Faucette and Tyler 2006). Silt particles do not possess a charge per se, but organic matter bound to them can provide positive or negative charges (Schafer 2008) for adsorption onto oppositely charged sites in filter berm or filter sock media. Faucette et al. (2009a) found filter socks removed 65 percent of both clay- and silt-sized particles (< 2-µm and 2- to 50-µm diameter,

respectively); 60 percent of 0.01- to 5.75-µm-diameter particles, and 80 percent of 5.75- to 19.95-µm-diameter particles, were removed.

For both filter berms and filter socks, the three-dimensionality of the organic media and the mixture of organic particle sizes play important roles in filtration (Faucette et al. 2006, 2009b; U.S. EPA 2012). The open design of the sock mesh itself does not impede water entry into the organic material (Faucette et al. 2009a, 2009b). But too many small particles in a berm or filter sock hinder flow through the structure, reducing the sediment control effectiveness; conversely, too many large particles will not effectively trap sediment particles (Storey et al. 2006). Optimally, the three-dimensionality and the particle-size mixture allow runoff to flow through the media along tortuous pathways, thereby increasing the surface area and spatial area of compost contacted by inflow to encourage filtration and sorption (Faucette and Tyler 2006).

Ion exchange and filtration are a function of time of contact (Shipitalo et al. 2010), so it is not surprising that the amount of suspended solids retained by filter socks has been shown to be inversely related to flow-through rates (Faucette et al. 2006). Based on a review of particle sizes used in compost mixtures for sediment control, Faucette et al. (2006) concluded that smaller particle size distributions (i.e., <0.25 inch) of compost filter media remove more fines from runoff than larger filter-media particles. Thus, if pollutant removal by a given mixture is found to be inadequate, a greater portion of smaller particles can be added to improve retention; these particles can be added to the surface of the barrier (Demars and Long 2001). However, smaller particle sizes result in slower flow-through rates, which can lead to overtopping of filter socks and berms if inflow contains high concentrations of sediment that clog large amounts of voids and reduce flow-through rates (Faucette et al. 2006). Clogging and reductions in flow-through rates also can occur as increasingly more small particles from runoff are retained (Demars and Long 2001). Taller berms or larger diameter socks may compensate for the reduced hydraulic flow rate, so these factors should be considered in the design of the barriers (Faucette et al. 2006).

Most filter berm studies have been flume or laboratory studies, or short-term field studies on small plots. Reported removal rates of solids from these studies have been variable. About 92 percent of total settleable solids and 96 percent of TSS were removed by using filter berms constructed of mixed-material residential yard wastes on 32-ft-long slopes of 34-percent grade during five rain events (Ettlin and Stewart 1993). From a single simulated storm event, Faucette et al. (2009b) observed that a compost filter berm reduced total solids concentrations and loads by 54.8 percent and 63.5 percent, respectively, and reduced TSS concentrations and loads by 51.3 percent and 60.4 percent, respectively. With an inflow sediment concentration of 340 g $L^{-1}$, Demars et al. (2000) found that 99 percent of the total solids were removed with a compost medium having a particle size distribution adhering to U.S. EPA specifications. With higher inflow concentrations of sediment (500 g $L^{-1}$) two compost particle size distributions not meeting EPA specifications also removed 99 percent of total solids. In a separate study by Faucette et al. (2005), more than doubling the sediment concentration (to 1,200 g $L^{-1}$) did not reduce the removal efficiency (98-percent efficiency) of a filter berm containing compost medium with a particle size distribution not meeting EPA specifications. In contrast, another compost medium that did not meet EPA specifications subjected to an inflow sediment concentration of 500 g $L^{-1}$ removed only 20 percent of total solids (Demars and Long 2001). The latter compost mixture had the lowest percentage (6 percent) of compost particles capable of passing through a 0.25-inch mesh compared to 18 to 93 percent of particles in the other studies; therefore, it could not effectively trap/sorb sediment particles (Storey et al. 2006).

Physical failure of filter berms results in runoff bypassing much of the organic medium, making them ineffective at removing pollutants. Storey et al. (2006) found 14 of 15 unseeded filter berms failed within 16 min of exposure to 0.25 $ft^3$ $s^{-1}$ inflow rates on a 3-percent slope (i.e., simulating a shallow concentrated runoff). Each berm was constructed to Texas Department of Transportation specifications by using one of three different materials: dairy manure compost, yard waste compost, or biosolid compost. Longitudinal displacement of berm materials and berm breakthroughs were common on clay soil, whereas berms on sandy soil were susceptible to undercutting of the soil on which

the berm was constructed after runoff infiltrated into the soil behind the berm. Seeding appeared to have increased stability and decreased failures; the filter berms had been seeded 45 days before the introduction of runoff although there was little evidence of vegetative growth on the composted yard waste berms at the time of experimentation. All of the berms were capable of structurally withstanding three runs with inflows of 0.35 $ft^3$ $s^{-1}$ (Storey et al. 2006), even though these inflow rates resulted in overtopping the berm and were higher than inflow rates that caused failures of the unseeded berms. There are, however, few other data to suggest that seeding provides more stable berms or more effective pollutant removal.

The quality of compost and mulch in filter berms and socks also has consequences for the quality of the water flowing from these barriers. Leaching from the organic material composing the berm or sock can result in increased levels of TSS and total dissolved solids in water flowing from the barriers compared to inflow waters. This was the case during "first flush" effects for berms constructed of composted yard wastes, composted dairy manure, and composted biosolids (Raut Desai 2004, Storey et al. 2006). The yard waste compost resulted in the highest TSS in flow-through water, but leached the least amount of nutrients. The authors noted that the leachate concentrations were insufficient to have caused a problem in receiving waters, but in practice the outcome may be different with actual storm inputs. Consequently, the quality of compost materials is an important consideration and the reason that media for filter berms and socks should meet physical and chemical specifications (Alexander 2006). Criteria for compost quality are changing as research becomes available (Alexander 2006).

Filter socks provide a significant design improvement over filter berms because the encasement of organic materials makes the barriers less susceptible to failure (Raut Desai 2004). Almost all reports of sediment capture by filter socks originate from laboratory studies, but they consistently show good to excellent performance. Tests of 10 compost products from commercial and municipal composting operations in the United States, Canada, Japan, and New Zealand showed that 4 of the products removed 100 percent of total solids and the remaining 6 products each removed more than 95 percent of total solids in single test runs (Faucette and Tyler 2006). Through three consecutive runs, the average removal of TSS was 71 percent. The rate increased from 58 percent to 69 percent to 84 percent with each successive run, showing that the ability to retain particles was not diminished through the short term by repeated sediment-laden inflows.

A comparison of 12- and 18-inch-diameter filter socks containing identical mixtures of compost materials found that both removed an average of 70 percent of total suspended sediment (Faucette et al. 2006). Another comparison of 8- and 12-inch-diameter compost filter socks showed average TSS concentration removal efficiencies of 75.9 percent and 71.4 percent, respectively, for a single simulated runoff event (Faucette et al. 2009b). When expressed as loads, effectiveness was higher by about 10 percent, at 83.9 percent and 84.9 percent for the 8- and 12-inch socks, respectively. The percentages of total solids removed were similar to these values. Removal efficiencies for total solids concentrations were 76.3 percent and 72.7 percent and for loads, 84.3 percent and 85.0 percent, respectively, for 8- and 12-inch-diameter filter socks. In a bench study by Faucette et al. (2008) that used several different runs with different compost media (not all particle-size mixtures met AASHTO specifications), compost filter socks removed 62 to 87 percent of TSS. Sadeghi et al. (2006) found almost identical removal efficiencies during tests of six types of filter socks. Total suspended solid loads were reduced by 68.3 to 89.7 percent.

The ability of filter berms and filter socks to filter and sorb clay and silt particles can contribute to controlling turbidity, but the actual effectiveness is largely dependent upon the chemical constituency of the organic materials used in the barrier. Faucette et al. (2009b) observed turbidity reductions of 8.1, 28.6, and 19.1 percent, using a mulch filter berm, an 8-inch-diameter filter sock, and a 12-inch-diameter filter sock, respectively, after a single storm. Using bench studies, Sadeghi et al. (2006) reported turbidity reductions by compost filter socks of 52.5 to 77.8 percent. Turbidity was reduced an average of 24 percent across 45 different compost media in filter socks, and even with high inflow, a filter sock reduced turbidity by 21 percent (Faucette et al. 2006).



FS-002881

The addition of flocculating coagulants and polymers (including PAM; see the Soil Conditioners section in Chapter 6 for more information on these chemicals) can enhance retention of sediment by filter socks and berms. Flocculants and polymers can be added internally or externally to filter berms and socks. In a comparison of compost filter socks with and without flocculating and coagulating agents, Faucette et al. (2008) reported TSS removals in the range of 91 to 97 percent compared to 62 to 87 percent without the chemical agents. When identical particle-size mixtures were used in all tests, TSS removal remained at 91 to 97 percent with sediment-targeting flocculating agents but was 78 percent without polymers. Sadeghi et al. (2006) reported similar high levels of removals of TSS loads by compost filter socks with polymers, ranging from 94 to 98 percent.

However, the benefit provided by polymers is more apparent for turbidity. Sadeghi et al. (2006) reported turbidity reductions of 79 to 98 percent by compost filter socks with polymers. Faucette et al. (2006) found that 12- and 18-inch-diameter filter socks with PAM or polysaccharide polymers reduced turbidity by averages of 74 percent and 84 percent, respectively. The larger reductions with the larger diameter socks were attributable to the greater distance that runoff had to travel within the barrier, which resulted in greater contact with the compost medium within the sock.

Polymer additions may be most useful when the barrier is designed to handle large inflows for which some degree of sediment retention otherwise may be sacrificed (Faucette et al. 2006). Under high flow situations, turbidity was reduced by up to 90 percent with PAM and up to 77 percent when the polysaccharide polymer was applied to the media in an 18-inch-diameter filter sock, compared to 58 percent with no polymers (Faucette et al. 2006). Thus, compost filter socks, especially in combination with polymer flocculants or coagulants, may provide an effective alternative BMP in situations where turbidity-based water-quality standards are not attainable with barriers unable to retain suspended fines. The longevity of polymer effectiveness has not been studied with filter socks or berms (Faucette et al. 2006), and it is unknown whether the duration of efficacy is similar to that found when polymers are applied to the soil surface for erosion control (see Chapter 6).

The charged nature of compost also provides opportunities for sorption of other ions and chemicals by filter berms or filter socks. These constituents include nutrients (e.g., phosphorus), bacteria, herbicides, metals, and petroleum products, though removal only of petroleum compounds and metals is discussed here as these materials are the most often associated with road construction and use. Papers by Faucette and Tyler (2006), Faucette et al. (2006, 2008, 2009a), Shipitalo et al. (2010), and Storey et al. (2006) provide information on the efficacies associated with nonmetal and nonpetroleum types of chemicals and organisms.

Only a couple of studies have examined the efficacy of filter berms or filter socks in removing petroleum compounds or metals. The existing data suggest that both types of materials can be removed from runoff with berms and socks, but petroleum products are captured more effectively. In individual test runs, six of seven compost mixtures in filter socks removed at least 96 percent of motor oil and the seventh removed 85 percent (Faucette and Tyler 2006). With three consecutive runs, seven filter socks removed nearly 100 percent of the motor oil. Tests of 45 organic media in filter socks had a similar high average removal rate (89 percent) for motor oil (Faucette et al. 2006), and an average of 84 percent in another study using U.S. EPA-approved compost medium in 3 replicate filter socks (Faucette et al. 2009a). Average diesel fuel removal was 99 percent, whereas gasoline capture averaged only 43 percent (Faucette et al. 2009a). Additions of a petroleum flocculating agent had a negligible effect on the amounts of petroleum chemicals removed (Faucette et al. 2009a). The flocculating agent increased removal of the motor oil to 99 percent and removal of gasoline to 54 percent, but neither was significantly higher than without the flocculating agent. Diesel fuel capture with the flocculating agent stayed at 99 percent.

Faucette et al. (2009a) reported moderately effective capture of metals with filter socks, though there was little increase in effectiveness when a metal flocculating agent was added externally to the socks (Table 25). Additionally, specific forms of some metals were poorly retained; only 17 percent and 29 percent of soluble chromium was retained with and without the flocculating agent, respectively, and less than 50 percent of sediment-bound copper was captured regardless of use of the flocculating agent.

FS-002882

**Table 25.—Percentage of metals in inflow removed by compost filter socks alone and compost filter socks in combination with a metal flocculating agent applied externally to the socks (data from Faucette et al. 2009a)**

| Erosion control | Constituent form[a] | Cadmium | Chromium | Copper | Nickel | Lead | Zinc |
|---|---|---|---|---|---|---|---|
| | | *percent* | | | | | |
| Filter sock only | Soluble | 64 | 17 | 68 | 61 | 72 | 53 |
| | Sediment-bound | 73 | 75 | 42 | 60 | 70 | 64 |
| | Total | 64 | 37 | 67 | 61 | 71 | 54 |
| Filter sock + metal flocculant | Soluble | 72 | 29 | 70 | 69 | 79 | 57 |
| | Sediment-bound | 77 | 78 | 45 | 63 | 61 | 47 |
| | Total | 73 | 47 | 70 | 69 | 73 | 53 |

[a] Inflow inputs included 500 ml of 15 ppm concentrations of each metal.

## Comparative Studies of Nonreactive and Reactive Barriers

It is difficult to compare the effectiveness of nonreactive and reactive barriers as determined in different studies, even qualitatively, because of the myriad differences in conditions that could influence overall performance. However, a few papers have compared different types of reactive and nonreactive barriers, so the opportunity is taken here to review these studies. They tend to have little, if any replication, but they do provide insight into performance with identical inflows, sediment concentrations, slopes, and other variables.

Results from Demars et al. (2000) may be the most applicable to field use as the tests were longer term and involved natural rain events. They compared silt fence, a hay bale berm, and a compost (wood waste) filter berm during 11 events of varying intensity and magnitude over about 5 months. Compared to controls of bare ground plots with no erosion control, all three erosion control techniques performed well on 2:1 (horizontal:vertical) slopes; the compost filter berm performed best, followed by the silt fence and hay bale berm (Table 26).

Keener et al. (2007) reported nearly the same level of performance for both compost filter socks and silt fence (Table 26), but compost filter sock effectiveness was mediocre compared to most other filter sock studies (e.g., those described previously). Keener and colleagues found compost filter sock effectiveness to be consistently less than 50 percent, even for low inflows.

Faucette et al. (2009b) compared two different diameter filter socks with and without polymer additives, a mulch filter berm, and a straw bale barrier. All barriers significantly reduced both concentrations and loads of total solids and TSS (Table 26). The compost sock treatments retained significantly more total solids and TSS (concentration and load) than either the mulch filter berm or straw bale barrier. The filter berm and straw bale also were less effective than all other treatments at reducing turbidity (Table 26); the addition of the polymer to the filter socks significantly improved their ability to reduce turbidity (Faucette et al. 2009b). The TSS removal effectiveness reported by Faucette et al. (2005) for mulch filter berms was much better than the aforementioned study, and silt fence performance in the 2005 study also was much better than many other studies (Tables 26 and 23).

Ettlin and Stewart (1993) compared the effectiveness of filter barriers against silt fence placed at the base of 32-ft-long plots on 34-percent slopes on a closed landfill in Oregon. The filter barriers were composed of mixed types of yard debris compost. They removed substantially more settleable solids and TSS for five events (1.6 inches of rainfall) than the silt fence. Final results for settleable solids and TSS were 2.9 mg $L^{-1}$ and 1,300 mg $L^{-1}$, respectively, for the filter barriers



FS-002883

**Table 26.—Comparisons of different types of nonreactive and reactive barriers within individual studies**

| Reference/Comments | Type of erosion control barrier | Removal efficiency | | | | Turbidity reduction |
|---|---|---|---|---|---|---|
| | | Total solids concentration | Total solids load | TSS[a] concentration | TSS load | |
| | | *percent* | | | | |
| Demars et al. (2000) | Geosynthetic silt fence | | | | 98.4 | |
| 11 natural rain events of varying intensity and duration | Hay bale | | | | 98.0 | |
| | Wood compost filter berm | | | | 99.8 | |
| Faucette et al. (2009b) | 8-inch-diameter compost filter sock | 76.3 | 84.3 | 75.9 | 83.9 | 28.6 |
| | 12-inch-diameter compost filter sock | 72.7 | 85.0 | 71.4 | 84.9 | 19.1 |
| | 8-inch-diameter compost filter sock + polymer | 77.1 | 86.3 | 75.8 | 84.7 | 49.1 |
| | 12-inch-diameter compost filter sock + polymer | 80.7 | 88.2 | 83.1 | 89.5 | 41.8 |
| | Mulch filter berm | 54.8 | 63.5 | 51.3 | 60.4 | 8.1 |
| | Straw bale | 65.1 | 71.3 | 53.8 | 61.5 | 11.8 |
| Faucette et al. (2008) | 8-inch-diameter compost filter socks with various particle size distributions | | | 62–87 | | 53–78 |
| | 8-inch-diameter compost filter sock + polyacrylamide | | | 91 | | 79 |
| | 8-inch-diameter compost filter sock + polymer | | | 97 | | 94 |
| | 8-inch-diameter compost filter sock + copolymer | | | 97 | | 98 |
| | Silt fence | | | 63–87 | | |

*(continued)*

**Table 26.—Comparisons of different types of nonreactive and reactive barriers within individual studies**

| Reference/Comments | Type of erosion control barrier | Removal efficiency | | | | |
|---|---|---|---|---|---|---|
| | | Total solids concentration | Total solids load | TSS[a] concentration | TSS load | Turbidity reduction |
| | | *percent* | | | | |
| Faucette et al. (2005) | Mulch filter berms | | 96 | | | |
| | Silt fence | | 95 | | | |
| Keener et al. (2007) Flume study with 30-min flows for each structure | 8-inch-diameter compost filter sock with 0.126 L $s^{-1}$ inflow | 42.8[b] | | | | |
| | 8-inch-diameter compost filter sock with 0.252 L $s^{-1}$ inflow | 20.4[b] | | | | |
| | 8-inch-diameter compost filter sock with 0.315 L $s^{-1}$ inflow | 30.0[b] | | | | |
| | 12-inch-diameter compost filter sock with 0.126 L $s^{-1}$ inflow | 50.0[b] | | | | |
| | 12-inch-diameter compost filter sock with 0.252 L $s^{-1}$ inflow | 43.1[b] | | | | |
| | 12-inch-diameter compost filter sock with 0.315 L $s^{-1}$ inflow | 26.1[b] | | | | |
| | 24-inch-width silt fence with 0.126 L $s^{-1}$ inflow | 56.0[b] | | | | |
| | 24-inch-width silt fence with 0.252 L $s^{-1}$ inflow | 41.9[b] | | | | |
| | 24-inch-width silt fence with 0.315 L $s^{-1}$ inflow | 32.7[b] | | | | |
| Sadeghi et al. (2006) Bench study | Compost filter socks | | | | 68.3–89.7 | 52.5–77.8 |
| | Compost filter socks + polymer | | | | 94.0–98.2 | 79.2–98.0 |
| | Silt fence | | | | 71.5–89.1 | 44.8–76.0 |

[a] TSS = total suspended solids.
[b] Estimated from Figure 10 in Keener et al. (2007).
Empty cells indicate variable was not measured.

compared to 32 mg $L^{-1}$ and 26,000 mg $L^{-1}$, respectively, for silt fence. These silt fence values were similar to controls, where no erosion control devices were installed (34 mg $L^{-1}$ and 31,000 mg $L^{-1}$, respectively).

## Biofilters

Biofilters take many different forms, but are always composed of vegetation. While the vegetation itself contributes to erosion control through soil stabilization and soil cover (see Chapter 6), the primary role of biofilters is to stop sediment transported by water from reaching downslope water bodies. This is achieved through sediment deposition, by slowing water, encouraging water infiltration, or both. For some types of biofilters, such as forest buffer strips, other features that provide roughness at the soil surface are critical for limiting sediment transport.

There tends to be inconsistency in the terms "length" and "width" in biofilter literature. Consequently, to avoid confusion, the terms used in most of the literature are used here; that is, in this chapter the direction along the contour is referred to as the "width" and the downslope direction of flow is referred to as the "length." Note that this is opposite of the terminology typically used for buffer strips in forestry literature, where "width" denotes the downslope distance.

### Buffer Strips

Buffer strips are a major category of vegetation-based pollution controls. They are designed to remove primarily sediment (Correll 1996, Dillaha et al. 1989, Hayes et al. 1984, Magette et al. 1989), though they also have some ability to remove nutrients and other chemical constituents (Dillaha et al. 1989, Magette et al. 1989). They differ from vegetated swales and waterways (described later) in two distinct ways. First, buffer strips are not channels, so they are not designed to be submerged; and second, their largest dimension (i.e., width) runs approximately along the contour, perpendicular to the direction of runoff that is cast onto them (Deletic and Fletcher 2006).

The two types of buffers described in this chapter are vegetated filter strips (VFS), and forested buffer strips. VFS have most commonly been associated with agricultural applications, but their use in urban areas and along or in the medians of roadways has been increasing. However, their effectiveness for these latter areas has not been studied as intensively as for agriculture (Deletic 2005). They typically are composed of herbaceous cover, primarily grasses, although in agricultural fields they may consist of agricultural crops (Hayes et al. 1984).

Forest buffers are used in forests for a variety of reasons in addition to sediment trapping, including aquatic habitat protection such as shade and water body bank stabilization. For sediment control, forest buffers differ from VFS in several ways. They predominantly depend upon overstory vegetation and resultant litter to provide infiltration and filtration mechanisms, and they tend to be longer than VFS. Typical VFS might be 5 to 15 m long (e.g., Abu-Zreig et al. 2003, Daniels and Gilliam 1996, Dillaha et al. 1987, Schmitt et al. 1999), whereas typical forest buffer length in the United States and Canada ranges from 15 to 30 m (Lee et al. 2004). Additionally, VFS are positioned immediately adjacent to or are interspersed within the potential pollutant source (e.g., a roadway or an agricultural field, respectively); a forest buffer is located adjacent to the water body it is intended to protect. Forest buffers and VFS positioned along water bodies commonly are called riparian buffers. However, when a forest road is located sufficiently close to a water body, the forest buffer also may be adjacent to the road and span the entire distance between it and the water body.

VFS and forest buffers very frequently are collocated along forest roads: the area immediately adjacent to the road (typically the fillslope) has grass or herbaceous vegetation that serves as a VFS, which leads into a forest buffer farther downslope. However, most forest buffer literature makes little distinction between the VFS and the forest buffer, and both features are collectively referred to as the "forest buffer." Only a few papers have examined the importance of the VFS separately from the adjoining forest buffer, so to ensure that these papers are described, they are discussed at the end of the VFS subsection. The Forest Buffers and Windrows subsection includes the more conventional review of forest buffers, and discusses them only in relation to water quality (primarily sediment). Even though forest buffers provide a myriad of other benefits (e.g., for wildlife), the attributes that make them effective for protecting water quality do not necessarily make them effective for other

purposes (Richardson 2004). Readers interested in other facets of forest buffers are directed to papers by Barling and Moore (1994) and Belt et al. (1992).

Forest buffers used in an agricultural setting are a specialized, third type of buffer. They are composed of trees, sometimes in association with other herbaceous, grass, or shrub vegetation, positioned along waterways. Their purpose is to protect waterways from sediment, nutrients, pesticides, and other chemicals in runoff originating from upslope agricultural areas. Because the high nutrient and chemical loads present in agricultural runoff are not associated with forest road construction or use, these buffers are considered only from the context of sediment reduction. Readers who are interested primarily in forest buffers from the perspective of other nutrients and chemicals may review papers by Peterjohn and Correll (1984), Corley et al. (1999), Schmitt et al. (1999), Lee et al. (2003), and Schoonover et al. (2005) as a starting point for coverage of these topics.

## Vegetated Filter Strips

There are two primary types of VFS used for erosion control: conventional strips that are composed of relatively common types of flexible vegetation, such as fescue (*Festuca* spp.), ryegrass (*Lolium* spp.), bluegrass (*Poa* spp.), and orchardgrass (*Dactylis glomerata*) (Abu-Zreig et al. 2004), and those composed of stiff, erect (and usually tall) vegetation (Blanco-Canqui et al. 2004). The term "VFS" often is used for both, but the stiff grasses are distinct from conventional VFS (Dabney et al. 1993) and are often specifically referred to as "grass hedges" or "grass barriers" (Blanco-Canqui et al. 2004, Meyer et al. 1995). Switchgrass (*Panicum virgatum*), which is native or has become naturalized in much of the United States, along with nonnative tropical grasses, especially vetiver (*Chrysopogon zizanioides*, formerly known as *Vetiveria zizanioides*), are commonly employed in stiff grass hedges (e.g., see Dabney et al. 1995, Dalton et al. 1996, Desbonnet et al. 1994, Owino and Gretzmacher 2002, Shariff 2000, Truong 2000).

Conventional VFS and grass hedges have some important differences but also share many similarities. The most important similarity is that they both depend upon the vegetation in the strip as the key for providing sediment control. The vegetation provides roughness, which reduces energy and transport capacity (Deletic and Fletcher 2006, Gumiere et al. 2011, Hösl et al. 2012) by decreasing the speed of flow to encourage sediment deposition, filtering, and infiltration (Prosser et al. 1995). The abatement of water's shear stress by vegetation also reduces soil scour within the filter strip (Prosser et al. 1995).

The ability to provide these benefits across a variety of inflows depends in large part upon the flexibility or stiffness of the plants in the filter strip. That is, energy control is derived primarily from the roughness of the vegetation, which is directly related to the flexibility or stiffness of the plant and stem density. Flexible grasses, even when dense, have less strength and lower moduli of elasticity (i.e., less ability to return to their original shape when deformed by a force) than stiff grasses. As a result they will bend and fail in the presence of high velocities, submergence, or sediment inundation (Dillaha et al. 1982, Kouwen et al. 1981) more easily than stiff grasses, which can withstand much greater inflow rates, water depths, and sediment weights (Dillaha et al. 1982, Dunn and Dabney 1996, Kouwen et al. 1981). In a prone position, grass blades provide substantially less roughness and energy dissipation than when upright (Fiener and Auerswald 2006, Kouwen and Unny 1973) and hence little ability to retain sediment. For example, Meyer et al. (1995) found that fescue grass failed under a range of tested inflow rates and was only marginally effective at trapping sediment. In contrast, stiff grasses can become fully inundated and overtopped with water and still withstand bending or breakage (Boubakari and Morgan 1999). Consequently, even though the water column above the top of the plants may have high velocity and shear stress, the shear velocities within the plant's (upright) height are much lower, allowing sedimentation to occur (Pethick et al. 1990, Prosser and Dietrich 1995).

Because flexible plants have limited strength and moduli of elasticity, conventional VFS are effective only when inflow occurs as sheet flow (Barfield et al. 1979; Blanco-Canqui et al. 2004; Dillaha et al. 1986, 1989; Hösl et al. 2012). Sediment removal rates exceeding 70 percent have been reported with conventional VFS for sheet flow (Dillaha et al. 1986, 1988, 1989; Neibling and Alberts 1979), but as inflow rates increase they tend to become less effective (Dabney et al. 1995, Gharabaghi et al. 2006, Meyer et al. 1995).

The strength and density of most grasses used for hedges (i.e., typically stiff, erect grasses) allow them to be employed in concentrated flow in rills, and even ephemeral gullies (Blanco-Canqui et al. 2004, Dabney et al. 1993, Van Dijk et al. 1996). However, even though grass hedges can retain sediment in concentrated flow, they still perform best when subjected only to sheet flow (Xiao et al. 2010) as deposition, filtering, and infiltration depend upon the ability to spread water out (Prosser et al. 1995).

Even though the means for energy dissipation and particle settling depend upon vegetation's roughness, a substantial portion of sediment deposition ironically occurs before (i.e., upslope of) the leading edge of the vegetated strip. In most applications, conventional VFS and grass hedges receive inflows from areas with little roughness (e.g., agricultural fields, feed lots, roads, urban areas), so when inflow reaches a strip, water spreads out along the contour and builds up in response to hitting the "plant wall" (Blanco-Canqui et al. 2004, Dillaha et al. 1987, Neibling and Alberts 1979). The wall slows the water and promotes sedimentation behind the leading edge of the strip (Boubakari and Morgan 1999, Spaan et al. 2005). For grass hedges this is typically referred to as "ponding" because the water may become deep. For conventional VFS the term "ponding" may be used, but the more subtle term "back water" is sometimes favored (e.g., Loch et al. 1999) to denote the generally lower amount and depth of water because incoming water should be as sheet flow.

Ponding and back water development are critical to sedimentation because settling is inversely related to flow velocity (Spaan et al. 2005), and slowed water results in greater sediment deposition than would occur from the presence of the vegetation alone, even if all inflow occurs as sheet flow. Detention of water behind the vegetative wall also helps encourage infiltration (Blanco-Canqui et al. 2004, Deletic 2001), which contributes to sediment settling.

Ponded water and back water are concentrated water, but they differ from concentrated flow in that ponded water or back water moves into the VFS as sheet flow (Loch et al. 1999) and not in discrete pathways or rills. Flow delivered as concentrated flow can become ponded and transformed to sheet flow if the density and stiffness of stems or grass blades are sufficient to back water up and disperse it laterally without plants failing (Blanco-Canqui et al. 2004).

Ponding, infiltration, and sediment trapping efficiencies of VFS are directly related to the density of vegetation (Boubakari and Morgan 1999, Polyakov et al. 2005, Spaan et al. 2005). Sparse or open vegetation may have little influence on slowing velocities, backing up water, and promoting sediment settling. Depending upon the characteristics of the plants involved, sparse vegetation can sometimes increase the velocity of water moving through the vegetated strip by concentrating water into the spaces between plant stems or bunched plants (Spaan et al. 2005). As the water is compressed through smaller openings that have little roughness, velocities increase, thereby negating the potential for settling while increasing the tendency for rill erosion (Boubakari and Morgan 1999, De Ploey et al. 1976).

Ponding or back water can be enhanced by positioning the VFS (including grass hedges) at or slightly above the elevation of the upslope contribution lands and installing the strip on a gentler slope or with an inverse slope compared to the contributing area. Slope control techniques allow water to slow and pile up more than if the strip simply was positioned adjacent to and on the same slope gradient as the contributing area (Deletic 2001), thereby encouraging sheet flow, settling, and infiltration to occur. Sediment capture typically is strongly related to the slope of a VFS (conventional or grass hedge). Dillaha et al. (1989) reported that sediment retention was inversely related to slope for VFS gradients ranging from 5 to 16 percent. Sediment concentrations in runoff from the outflow of a VFS on a 12-percent slope were twice as high as those from a 7-percent slope (Robinson et al. 1996). Xiao et al. (2010) found a slope of 20 percent resulted in a 54-percent reduction in runoff compared to a 77-percent reduction with a 5-percent slope. Even under concentrated flow, greater sediment retention has been documented on gentle slopes (5 percent) compared to sheet flow on steeper slopes (11 percent and 16 percent) (Dillaha et al. 1989).

However, care must be used when ponding is enhanced to encourage sediment deposition. Even if inflow occurs as sheet flow, there is a maximum degree of inundation that can occur before the vegetation becomes ineffective

at controlling the factors that contribute to pollution reduction, especially when the VFS is dominated by flexible vegetation. When water becomes too fast or deep, hydrostatic, hydrodynamic, and sediment weight forces can cause herbaceous plants to bend and fail (Dunn and Dabney 1996). The modulus of elasticity and the strength of switchgrass are four and three times, respectively, that of fescue, which explains why switchgrass has greater resistance to bending or breaking than fescue (Dunn and Dabney 1996). But even stiff-bladed plants will reach a point of failure at some level of water velocity or depth (Dillaha et al. 1989, Kouwen et al. 1981). Failure of vegetation in a VFS not only substantially reduces sediment deposition, but can also lead to scour within the VFS because preferential flow paths and rills can develop where vegetation has failed (Blanco-Canqui et al. 2004).

Ponding and settling also have the potential to create sediment berms at the front edge of the vegetated strip. Berms can retard movement of sheet flow into conventional VFS and grass hedges and can cause breakthroughs at weak points by the water stored behind them. Concentrated flow paths develop at the breakthroughs (Barrett et al. 1998b, Parsons et al. 1994), which can create cascading problems of preferential flow and scour pathways (Barrett et al. 1998b). Routine removal of these berms (Pankau et al. 2012) or installation of longer berms to encourage dispersion of concentrated flow to sheet flow over the long term (Parsons et al. 1994) may be necessary. This may be difficult to do effectively, however, because berm breakthroughs with measurable erosion have been observed even where only very small berms exist (including those less than a few centimeters in height) (Pankau 2010, Pankau et al. 2012).

Studies suggest that sediment deposition within a conventional VFS or grass hedge does not cause the same problems as berm formation at the leading edge. Sediment deposited in either type of VFS does not simply lie on the soil surface, but instead tends to become incorporated with the soil surface (Barrett et al. 1998b, Dillaha et al. 1989). Vegetation grows through it, and the roots and stems help bind captured soil and reduce its potential for resuspension.

Sedimentation is a function of the velocity of surface flow, so it is not surprising that large particles are removed most effectively by vegetated strips, as these settle out most easily (Neibling and Alberts 1979, Zanders 2005). In a flume study performed by Meyer et al. (1995), vetiver and switchgrass hedges trapped more than 90 percent of sediment greater than 125-µm diameter. The percentages that were retained declined as sediment size decreased, with only about 20-percent capture of particles smaller than 32-µm diameter. Pan et al. (2010) found that grass strips removed 30 percent more 10- to 25-µm-diameter particles than smaller fines. Gharabaghi et al. (2006) observed more than 95-percent retention of sediment particles larger than 40-µm diameter in runoff compared to about 65 percent for particles smaller than 12-µm diameter. Deletic and Fletcher (2006) found that VFS removed almost all particles from 57- to 180-µm diameter, but there was almost no reduction in particles less than 5.8-µm diameter. It should be noted that the percentage of fine clay and silt particles captured can be significant if soils are well aggregated and may contribute to the high retention rates just reported for larger diameter classes.

The slope of a VFS also influences the retention of large particles; as the slope increases, a smaller percentage of large particles is captured. VFS retained about 92 percent of particles greater than 50-µm diameter on 3-percent slopes compared to 75 percent on 15-percent slopes (Pan et al. 2010). For particles less than 10-µm diameter, about 46 percent was retained on 3-percent slopes and about 25 percent was retained on 15-percent slopes. Although the difference between retention on the gentle and steep slopes was only slightly greater for the small particles, the influence of steepness is of particular concern for small particles because they have an overall lower potential to be retained at all gradients.

Increasing the grade of the VFS decreases the effective length of the VFS; that is, a greater flow length is required to achieve the same sediment trapping efficiency (Pan et al. 2010), especially for small particles (Barfield et al. 1979, Line 1991). Increasing sediment concentrations and inflow rates similarly decreases the effective flow length. In some situations, flow rates and sediment concentrations or loads can be controlled by reducing the overall size of the contributing area relative to the area of the VFS (Magette et al. 1989, Van Dijk et

al. 1996). If variables that control the effective length cannot be altered or adjusted sufficiently, the length of the VFS may have to be increased (Deletic and Fletcher 2006), or additional BMPs, such as adding a mulch soil cover to all or part of the contributing area (Xiao et al. 2010), may be warranted. In all situations, techniques that encourage complete or nearly complete infiltration of inflow are required to retain very fine particles (Gharabaghi et al. 2006).

Although increasing the length of the VFS encourages greater sediment retention, a maximum length apparently exists for each field condition beyond which there is little advantage, in terms of sediment capture, to further increasing the length (Gharabaghi et al. 2006). The optimal flow length required to meet sediment retention goals may be fairly short for both conventional VFS and grass hedges because: 1) most sediment retention occurs in the back water area and first few meters of a VFS (Gharabaghi et al. 2006, Line 1991, Meyer et al. 1995, Neibling and Alberts 1979, Van Dijk et al. 1996), and 2) grass hedges are much shorter than conventional VFS (Dabney et al. 1993), yet they are reported to be more effective than VFS (Blanco-Canqui et al. 2004).

No rigorous, replicated experiments have been performed to identify VFS flow length guidelines for specific sets of environmental conditions, but 10 m may be sufficiently long to capture the majority of retainable sediment (Liu et al. 2008). Increasing the length from about 5 m to 10 m generally results in some improvement, though it can vary widely from almost no change in sediment retention to increases up to 30 to 40 percent (Dillaha et al. 1987, 1989; Magette et al. 1989; Van Dijk et al. 1996) (also see Table 27). Van Dijk et al. (1996) found that 90 to 99 percent of incoming sediment was removed within 10 m. Schmitt et al. (1999) found little improvement in sedimentation between 7.5 m and 15 m in three types of VFS composed of mixed grass, mixed grass and trees/shrubs, and sorghum (*Sorghum bicolor*), suggesting that extending VFS lengths up to 15 m provides little benefit to sediment retention.

The greatest advantage to using VFS lengths of a full 10 m may come in situations where sediment in runoff is dominated by fines (Gharabaghi et al. 2006), as capture of these particles (<0.45-µm diameter) is by infiltration into soil pores (Gumiere et al. 2011). Doubling VFS length from about 5 m to 10 m approximately doubled infiltration rates (Dillaha et al. 1987). Neibling and Alberts (1979) also showed that clay concentrations in outflow from bluegrass VFS were directly related to strip length. More than 90 percent of the particles larger than 20-µm diameter were captured by strips as short as 0.6 m long compared to only 37 percent of the clay fraction. Increasing the VFS length to 1.2, 2.5, and 4.8 m substantially increased the clay fraction retention rates to 78, 82, and 83 percent, respectively.

Most studies show conventional VFS and grass hedges are reasonably effective at reducing sediment in runoff (Table 27). However, almost all of these studies have been nonreplicated or poorly replicated, or the data are observations from simple monitoring efforts (Gumiere et al. 2011, Hayes and Hairston 1983) done in small-scale settings, such as plots and flume experiments (Gumiere et al. 2011). In most of these situations, contributing areas, inflow rates, sediment levels, study duration, and overall conditions do not mimic field situations; consequently, their reported effectiveness may bear little resemblance to effectiveness measured in actual field conditions (Daniels and Gilliam 1996, Dillaha et al. 1989, Dosskey et al. 2008). A case-in-point comes from Dillaha et al.'s (1989) examination of 24 km of conventional VFS on 18 working farms in Virginia. They found most VFS (they did not specify how many or the length) were not functioning effectively because runoff was collecting in natural drainages due to the hilly terrain, causing the runoff to reach the VFS as concentrated flow rather than sheet flow. In fewer situations with flat terrain, sediment accumulations in older VFS (1 to 3 yr old) became so great that they caused runoff to flow parallel to the VFS until a low point. At those low points, runoff was directed through the VFS as concentrated flow, rendering the VFS less effective.

Variables contributing to or detracting from VFS effectiveness have been identified primarily from observations or small-scale, short-term empirical studies, and these have yielded only a general understanding about the sediment retention processes occurring under VFS installation as a working BMP. Little effort has been put into rigorous and quantitative examinations of physical processes or interactions that would allow prediction of expected runoff responses in different

**Table 27.—Studies documenting the effectiveness of vegetated filter strips (VFS) in reducing sediment**

| Reference/ Type of runoff | Type of VFS[a] | Slope | VFS length or distance through VFS | Sediment reduction | | Comments |
|---|---|---|---|---|---|---|
| | | | | Concen- tration | Mass | |
| | | | | ----- *percent* ----- | | |
| Ahearn and Tveten (2008)/Highway | Mixed grasses | ~4% | 2 m | 59–82 | | As TSS[b] |
| | | | 4 m | 93–96 | | |
| Barrett et al. (2004)/ Highway | Nonnative flexible grasses | 5–33% | 4.2–13 m | | 77–97 | Range represents results from 8 locations; as TSS |
| Chaubey et al. (1995)/Agriculture | Fescue | 3% | 3.1–21.4 m | 35 | | Sediment reduction not significantly different at 3-, 6-, 9-, 15-, and 21-m sampling points within VFS; as TSS |
| Dabney et al. (1995)/Flume experiment | Fescue hedge | 5% | 280 mm | | 15–46 | Multiple flow rates; Dubbs I soil; flexible grass VFS identified as a hedge; as sediment |
| | Vetiver hedge | | 200 mm | | 34–60 | |
| | Wild switchgrass hedge | | 200 mm | | 35–61 | |
| Dillaha et al. (1988)/ Agriculture | Orchardgrass | 3 replicates each of 5, 11, and 16% | 4.6 m | | 81 | VFS received inflow from simulated feedlot plots; average from 3 simulated rainfall events; as TSS |
| | | | 9.1 m | | 91 | |
| Dillaha et al. (1989)/ Agriculture | Orchardgrass | 3 replicates each of 5, 11, and 16% | 4.6 m | | 74 | VFS received inflow from cropland plots; average from 6 simulated rainfall events; as TSS |
| | | | 9.1 m | | 87 | |
| Gharabaghi et al. (2006)/Agriculture | A variety of flexible grasses | ~5% | First 2.5 m | 50 | | Sediment reduction in second 2.5 m dependent upon inflow rate; most >40-μm-diameter particles removed in 5 m |
| | | | Next 2.5 m | 25–45 | | |
| Ghate et al. (1997)/ Aquaculture effluent | Bermuda grass and bahaigrass | 3% | 24 m | 18–90 | | High effluent application rate |
| | | | | 14–82 | | Low effluent application rate |
| | | 1.5% | 24 m | 45–73 | | High effluent application rate |
| | | | | 27–84 | | Low effluent application rate |
| | | | | | | As suspended sediment for all 4 tests |
| Hayes and Hairston (1983)/Agriculture | Kentucky-31 fescue | ~2.4% | 25.7 m | 23–89 | | Average percentage of sediment trapped during individual storms over 16 months; 2 replicates |
| | | | | 38–87 | | |
| Lee et al. (1999)/ Agriculture | Switchgrass | 3% | 3 m | | 69 | As sediment |
| | | | 6 m | | 78 | |
| | Cool season grasses | | 3 m | | 62 | Cool season grasses were bromegrass, timothy, and fescue; as sediment |
| | | | 6 m | | 75 | |
| Lee et al. (2000)/ Agriculture | Switchgrass | 5% | 7.1 m | | 70 | As sediment |
| | Switchgrass + woody | | 7.1 m + 9.2 m | | 92 | VFS order: switchgrass upslope, mixed shrubs and trees downslope; as sediment |
| Lee et al. (2003)/ Agriculture | Switchgrass | 5% | 7.1 m | | 95 | As sediment |
| | Switchgrass + shrubs + trees | | 7.1 m + 4.6 m + 4.6 m | | 97 | VFS order: switchgrass upslope, shrubs in middle, and trees downslope; as sediment |
| Line (1991)/ Agriculture | Ryegrass + fescue | 5–5.5% | 1.5 m | | 40–80 | Contributing area was tilled soil; VFS had ~100% ground cover; both 3 and 6.1 m VFS had approximately the same efficiency; as sediment |
| | | | 3.0 m | | 72–95 | |
| | | | 6.1 m | | 72–95 | |

*(continued)*

FS-002891

## Table 27.—Studies documenting the effectiveness of vegetated filter strips (VFS) in reducing sediment

| Reference/ Type of runoff | Type of VFS[a] | Slope | VFS length or distance through VFS | Sediment reduction: Concen- tration | Sediment reduction: Mass | Comments |
|---|---|---|---|---|---|---|
| | | | | ----- *percent* ----- | | |
| Magette et al. (1989)/Agriculture | Kentucky-31 fescue | Not stated | 4.6 m | | 66 | As TSS mass |
| | | | 9.2 m | | 82 | |
| Meyer et al. (1995)/ Flume study | Vetiver | 5% | 200 mm | | 34–60 | Sediment removal efficiency generally decreased with increasing flow rates |
| | Tall fescue | | 280 mm | | 15–46 | --- |
| | Wild switchgrass | | 200 mm | | 35–61 | |
| | Fescue + wild switchgrass | | 350 mm | | 44–62 | Fescue in front of wild switchgrass |
| | Kanlow switchgrass | | 760 mm | | 36–62 | |
| Neibling and Alberts (1979)/ Agriculture | Commercially available bluegrass sod | 7% | 0.6 m | | 37 | Retention for sediment particle sizes <0.002 mm; all tests with shallow sheet flow |
| | | | 1.2 m | | 78 | |
| | | | 2.4 m | | 82 | |
| | | | 4.9 m | | 83 | |
| | | | 0.6 m | | 56 | Retention for sediment particle sizes 0.002–0.01 mm; all tests with shallow sheet flow |
| | | | 1.2 m | | 70 | |
| | | | 2.4 m | | 94 | |
| | | | 4.9 m | | 95 | |
| Paterson et al. (1980)/Agriculture | Fescue | 3.4% | 35 m | 71 | | Dairy waste used for inflow; as suspended solids |
| Robinson et al. (1996)/Agriculture | Bromegrass | 7% | 3 m | 70 | | As sediment concentrations |
| | | | 9.1 m | 85 | | |
| | | 12% | 3 m | 80 | | |
| | | | 9.1 m | 85 | | |
| Schmitt et al. (1999)/Agriculture | Sorghum | 6–7% | 7.5 m | 63 | 79 | As TSS |
| | | | 15 m | 65 | 93 | |
| | 2-yr-old grass | | 7.5 m | 76 | 84 | Predominantly switchgrass and fescue: as TSS |
| | | | 15 m | 87 | 96 | |
| | 2-yr-old grass + shrubs + trees | | 7.5 m | 79 | 89 | Grass upslope, shrubs in middle, trees downslope; as TSS |
| | | | 15 m | 88 | 94 | |
| | 25-yr-old grass | | 7.5 m | 89 | 95 | Mixed-grass hay field; as TSS |
| | | | 15 m | 93 | 99 | |
| Van Dijk et al. (1996)/Agriculture | Grass strips | 2–9% | 1 m | 50–60 | | Species not given; results from 2 sites with differing soil porosity; as sediment concentrations |
| | | | 4–5 m | 60–90 | | |
| | | | 10 m | 90–99 | | |
| Yonge (2000)/ Highway | Native grass mix | Not stated | 4.6 m | 72 | | Period 1: 18 months; as sediment concentration |
| | | | | 95 | | Period 2: 3 months; as sediment concentrations; as sediment concentration |

[a] Scientific names of VFS species may be provided in reference.
[b] TSS = total suspended solids.
Empty cells indicate variable was not measured.

FS-002892

types of field conditions with a reasonable degree of confidence (Deletic 2001). Consequently, even though a variety of design recommendations and suitability checklists for VFS installation have been developed (e.g., Dillaha and Hayes 1992), they are not well supported by a breadth of scientific or process-based studies (Dabney et al. 1993, Deletic 2001). Mathematical models, such as the Vegetative Filter Strip Model (Muñoz-Carpena and Parsons 2012), are available to assist with or evaluate VFS design (Dosskey et al. 2008, 2011), but most were developed for agricultural fields.

Applying results from VFS for mostly agricultural land uses to forests has even more unknowns because there have been so few studies of VFS in forests, particularly in association with roads. Roadside vegetation is different from traditional VFS vegetation. Most notably, roadside vegetated strips are not designed to intentionally back up and pond runoff due to the steepness of most forest roadside areas (e.g., fillslopes), the majority of flow received by the roadside vegetation is concentrated flow from road cross-drain features, and the attributes of areas that contribute to VFS from roads are very different from the attributes in agricultural applications. These differences could have a major influence on the specific processes at play in road-applied VFS performance and the consequent effectiveness of roadside vegetated strips.

Barrett et al. (2004) studied the effectiveness of grass strips adjacent to eight freeways in northern and southern California. Using VFS lengths ranging from 4.2 m to 13 m at 31 sites, they measured TSS reductions ranging from 77 to 97 percent. Ahearn and Tveten (2008) observed moderate to high TSS removals, with the effectiveness improving substantially with short distances. At 2 m from the edge of a road pavement, 59 to 89 percent of TSS was removed compared to 93 to 96 percent at 4 m from the edge. Yonge (2000) found that VFS along highways removed an average of 72 percent of TSS. The favorable BMP effectiveness of VFS in many agricultural settings and along highways suggests that VFS should be at least moderately effective in the application to both paved and unpaved forest roads.

As noted earlier, there are few studies associated with forest roads that have examined VFS effectiveness separately from the total vegetated strip/forest buffer combination. Those that exist frequently show the VFS provides a greater contribution to sediment reduction than does the forest buffer. This is the case for sediment transport associated with nonconcentrated as well as concentrated runoff, though effectiveness is greater with nonconcentrated flow (e.g., with outsloped roads rather than cross-drain discharge).

Swift (1986) found that grass on the fillslope of newly constructed roads was capable of reducing sediment transport more than bare soils and more than mulched, ungrassed fillslopes. Maximum and minimum sediment transport distances (based on visual evidence) from roads were twice as long through bare soils and ungrassed fills compared to grassed fillslopes; these included measurements associated with concentrated culvert discharge and nonconcentrated drainage. Even on 60-percent slopes, sediment deposits did not extend more than 45 m on grassed fillslopes.

Hairsine (1997) found VFS to be more effective at retaining sediment than forest buffers of the same length, especially as runoff velocities increased. The combination of VFS and forest buffer within a riparian forest did little to increase sediment trapping compared to the VFS alone. Grass filter strips positioned downslope of the fillslopes and in forest plantations also had greater sediment retention and were more resistant to erosion than the forest floor (i.e., forest litter) on both steep and gentle slopes (29.1-percent and 6.3-percent grade, respectively) (Loch et al. 1999). Some litter scour was visible on the steep slope even when litter was thick, but where litter was thin all litter was scoured from the area. The grass filter strips captured sediment on both types of slopes, but effectiveness was much greater in the strips on the gentle slopes, especially with increasing grass strip length. Because these grass filters were positioned downhill from the fillslope on a gentler grade, they were capable of ponding water at the leading edge, which improved sediment retention. In the North Carolina Piedmont, most of the sediment reduction originating from two agricultural plots occurred as the result of the grass strip portion of a grass/riparian forest buffer because there was not enough roughness to slow flow and settle particles in the forest buffer (Daniels and Gilliam 1996).



FS-002893

Not surprisingly, in the studies by Swift (1986), Daniels and Gilliam (1996) and Hairsine (1997), larger sediment particles were more easily retained than small ones. Hairsine (1997) and Loch et al. (1999) reported that fines tended to move through the entire buffer. Hairsine (1997) did not clarify the diameters of fines, but Loch et al. (1999) defined fines for that study as < 0.125- to 0.05-mm diameter. Daniels and Gilliam (1996) found greater removal of sand-sized particles than silt + clay-sized particles, and the finer particles moved farther through the buffers. Where roadside mowing may take place, the height of the residual grass may be an important consideration during management for influencing both the overall effectiveness and the ability to retain finer particles, though this subject has been only minimally investigated. Overall sediment capture by montane riparian grasses was not significantly different for unclipped grass and grass clipped to 10-cm height; however, much greater sediment transport resulted when the grasses were clipped to the soil surface (Pearce et al. 1998). In contrast, significantly more sediment was captured more quickly by uncut sedges (*Carex* spp.) than by sedges cut to 10 cm. Sedges cut to the ground trapped significantly less sediment than natural or 10-cm-tall vegetation. The differences in all of these comparisons were most pronounced for a fine soil compared to a coarse soil. Overall, larger particles did not move as far as fine particles.

The retention or lack of retention of fines by deposition, filtration, and infiltration in a VFS can have a direct influence on the capture of or transport of metals to receiving waters as metal sorption tends to be dominated by small clay particles (Zanders 2005). Barrett et al. (2004) measured substantial reductions in copper (77 to 97 percent), lead (84 to 99 percent), and zinc (87 to 99 percent) from freeway VFS that were 4.2 to 13 m in length. Metal capture is probably a more important issue for filter strips applied to roads or in urban areas than for agricultural land, where VFS use is more traditional, because metal concentrations in runoff from the former two can greatly exceed those from agricultural land. Even if clays are retained in a VFS it is possible that metals and other clay-bound pollutants eventually may leach into receiving surface water or groundwater. But there has been little research into the fate of these constituents (Barrett et al. 1998b).

There have been no substantive efforts to identify effective flow lengths for forest road VFS. Based on Swift's (1986) findings, the 10-m flow length that generally serves as an effective guideline for agricultural applications may not be sufficient to control erosion associated with roads, where cutslopes and fillslopes usually are steeper. Sediment in runoff that moved through paired upslope VFS and riparian forest buffers could be traced visually (during nonstorm periods) a maximum of 148 ft. This maximum was applicable to situations with and without brush barriers, as well as dispersed runoff and runoff that originated from cross-drain culverts. The lack of visually traceable sediment suggested little or no sediment movement farther downslope. Given the extremely limited data from VFS applications in forests, it is impossible to provide recommendations for VFS lengths appropriate for forest roads.

## Forest Buffers and Windrows

Forest buffers are subjected to both diffuse discharge from along the overall road length and to highly concentrated discharge from road drainage features (Swift 1986). Diffuse discharge may be composed of sheet flow or small amounts of concentrated flow, but for the latter the volume of water is usually small enough that concentrated flow paths do not develop or their development is limited in extent and severity. Points of planned discharge from drainage features make up only a small percentage of the road length, but the volumes and velocities of water flowing from those outlets are much greater. Such concentrated flows are the greatest challenge to a buffer's effectiveness in controlling associated erosion and sediment transport (Megahan and Ketcheson 1996, Polyakov et al. 2005, Swift 1986) because infiltration and sediment deposition are difficult to induce with concentrated flow.

The inherent differences in the delivery mechanisms for diffuse and concentrated discharge result in considerable variation in sediment transport distances. Sediment transport by concentrated discharge from road drainage structures typically results in much longer travel distances than by diffuse flow alone (Belt et al. 1992, Burroughs and King 1989), and thus, would require substantially greater buffer lengths for infiltration and sediment retention. Ketcheson and Megahan (1996)

measured the length of visibly identifiable sediment deposits originating from roads in Idaho. From 4 yr of monitoring during and after road construction, they found that downslope sediment movement from road cross-drains averaged 49.6 m, which was 3.5 times and 5.7 times the average distance associated with berm drains and rock drains, respectively. The maximum transport distance from cross drains was 275 m, whereas maximum distances for the other sources barely exceeded 100 m. They concluded there was a 15-percent probability that sediment associated with concentrated flow could travel more than 100 m, and for some large cross-drain discharges it could travel as far as 450 m downslope. Eighty-five percent of the individual observations of sediment movement were associated with fillslope erosion and not cross drains, and had an average travel distance of only 3.8 m. A similar result was observed in northern Idaho (Burroughs and King 1989, Croke and Hairsine 2006), where about 90 percent of sediment movement was attributable to fillslopes not influenced by road drains. Sediment associated with fillslopes moved less than 88 ft, whereas sediment transport associated with cross-drain discharge was up to 200 ft.

High levels of erosion and the consequent formation of gullies below drainage features often contribute to the longer sediment transport distances (Mockler and Croke 1999, Takken et al. 2008, Wemple et al. 1996). Gullies or other convergent topographic features that keep flow concentrated substantially increase transport distances (Rivenbark and Jackson 2004), thereby increasing the probability that road-to-stream connections will develop (Croke and Hairsine 2006). Once gullies form, they are difficult to rehabilitate (Barfield et al. 1979), making it challenging to reduce sediment transport distances. On the other hand, divergent topographic features disperse runoff, promote infiltration, and result in short transport distances (Swift 1986). In North Carolina, soil movement never exceeded 20 ft below roads on the hillsides on the outside of curves despite substantial disturbance from road construction on the noses of ridges (Swift 1986).

Because sediment can be transported far downslope from forest roads, recommended forest buffer strip lengths are fairly long (Table 28) compared to recommended VFS lengths (Table 27). Commonly used forest buffer lengths are 30 m, or 60 to 100 m (Barling and Moore 1994, Belt et al. 1992, Clinnick 1985, Davies and Nelson 1994). Different criteria are used to estimate sediment trapping efficiencies for VFS and forest buffers. Sediment trapping efficiencies for VFS are determined from comparisons of incoming sediment and sediment at some point within or at the downslope end of the strip. Studies from which forest buffer lengths are derived usually involve visual observations (Clinnick 1985) of whether sediment is transported through the full length of one or a few buffers (Wenger 1999). There is no comparison between sediment inputs and outputs, so efficiency calculations (percent removal) cannot be made. Consequently, the resulting recommendations from forest buffer studies tend to be by-products of the sampling design rather than experimentally determined (Fennessy and Cronk 1997).

Many of the most basic questions about buffer effectiveness remain unanswered, in part due to the limitations of this type of study design and lack of information about basic site factors that may substantially influence sediment transport distances (Clinnick 1985). These questions include what effective buffer lengths are and how acceptable forest buffer lengths should be established given the widely varying conditions within and among forested watersheds (Correll 1996, Croke and Hairsine 2006, Norris 1993). Despite the lack of this basic knowledge, there is popular acceptance about the effectiveness of forest buffers for protecting water quality (Norris 1993). This acceptance may be attributable to anecdotal observations or monitoring results following forest operations (primarily harvesting or harvesting combined with road construction) with buffers that have shown no or only small turbidity or sediment increases in streamwater during or soon after ground disturbance (e.g., Kochenderfer et al. 1997, Lynch and Corbett 1990). Although these studies typically do not measure or provide visual observations of hillside sediment movement through or retention within the buffer, the lack of evidence in the water column at some point downstream (usually the watershed outlet) is interpreted as evidence of buffer effectiveness. The danger in this indirect approach of determining buffer effectiveness is that sediment may be transported through the buffer at some locations upstream, but storage within the channel



FS-002895

**Table 28.—Forest buffer strip lengths recommended for use or stated as being effective within the associated study conditions or review paper**

| Reference | Geographic location | Hillside gradient | Buffer length | Comments |
|---|---|---|---|---|
| Aubertin and Patric (1974) | West Virginia | 10–65% | 10–20 m | Clearcut |
| Balmer et al. (1976) | Georgia | Level ground and stable soils | 9 m | Minimum length required |
| | | Up to 60% and erodible soils | Up to 97 m | |
| Belt et al. (1992) | Literature review | Not stated | 200–300 ft | Lengths that are "generally effective at controlling sediment that is not channelized" (p. 16) |
| Bren and Turner (1980) | Northeastern Victoria, Australia | Not stated | 20 m | Length of undisturbed forest buffer on either side of the channel |
| Broadmeadow and Nisbet (2004) | Literature review | Not stated | 20–30 m | --- |
| Burroughs and King (1989) | Idaho | Various | 88 ft | Length needed to capture 90% of sediment flows below road fillslopes |
| | | | 200 ft | Length needed to capture 90% of sediment flows below road fillslopes where road drains influence runoff |
| Castelle and Johnson (2000) | Literature review | Various | 5–30 m | Lengths were at least 50% and often greater than 75% effective at protecting streams |
| Castelle et al. (1994) | Literature review | Not stated | 15–30 m | Minimum buffer length to protect streams and wetlands in most circumstances |
| Chalmers (1979) | New South Wales, Australia | Various | 30 m | Length is maximum sediment travel distance |
| Clinnick (1985) | Literature review | Various | 30 m | Length is the most commonly recommended, but length should increase with site limitations (e.g., slope, impermeable soil) |
| Corbett et al. (1978) | Literature review for eastern United States | Not stated | 11–22 m | Length needed to prevent water quality deterioration |
| | | | 20–40 m | Length required to maintain stream ecosystem |
| Cornish (1975) | Literature review | Not stated | 20 m | --- |
| Curry et al. (2002) | Newfoundland | Not stated | 20 m | Length "successful in reducing the magnitude of sedimentation following a major storm event (in a stream) subject to clear felling" |
| Erman et al. (1977) | California | 17–22° | ≥30 m | --- |
| Graynoth (1979) | New Zealand | 17–22° | 30 m | --- |

*(continued)*

**Table 28.—Forest buffer strip lengths recommended for use or stated as being effective within the associated study conditions or review paper**

| Reference | Geographic location | Hillside gradient | Buffer length | Comments |
|---|---|---|---|---|
| Haupt (1959a, 1959b) | Idaho | >56% | 185 ft | Length needed to trap 83.5% of sediment flows |
| | | | 230 ft | Length needed to trap 97.5% of sediment flows |
| Haupt and Kidd (1965) | Idaho | 35–55% | 3–10 m | Proximity of streams to roads was directly related to frequency of sediment delivery |
| Haussman and Pruett (1978) | Technical guide | | 8–50 m | 8 m needed for 0% slope; 0.6-m increase in buffer length needed for each additional 1% slope, with a maximum of 50 m for slopes of 70% |
| Ketcheson and Megahan (1996) | Idaho | 15–40° | 450 m | Length is maximum sediment travel distance originating at cross drains with large water supply; only a 15% probability that it will exceed 100 m |
| | | | 60 m | Length needed to capture sediment from all other road sources (e.g., fillslopes, berm drains, and rock drains) |
| Lynch et al. (1985) | Pennsylvania | Not stated | 30 m | Length needed to remove about 75 to 80% of suspended sediment |
| Packer (1967) | Northern Rocky Mountain Region | Various | 35–127 ft | Length depends on types and spacing of obstruction; length needed to capture 83.5% of sediment flows |
| | | | 95–187 ft | Length depends on types and spacing of obstruction; length needed to capture 97.5% of sediment flows |
| Plamondon (1982) | Canada | 5–30% | 10–15 m | --- |
| Rashin et al. (2006) | Washington state | Average near-stream hillslope gradient ranges from 4 to 75% | 10 m | Length needed for ground disturbances; can be expected to reduce sediment delivery to streams from harvest-related erosion features |
| Swift (1986) | North Carolina | 47% | 65 ft | Lengths represent average sediment travel; maximum travel lengths were 314 ft and 198 ft, respectively |
| | | 42% (also burned) | 96 ft | |
| Trimble and Sartz (1957) | New Hampshire | 0% | 25 ft | Lengths needed to trap 90% of sediment flows |
| | | 70% | 165 ft | For 100% efficiency, they recommend doubling the distance |
| van Groenewoud (1977) | Canada | Relatively flat | 15 m | --- |
| | | Moderately sloping | 65 m | |
| Wong and McCuen (1982) | Maryland | 2° | 30 m | Length needed for 90% sediment removal |
| | | | 60 m | Length needed for 95% sediment removal |

is sufficient to mask that delivery downslope where the water column is monitored or sampled (Edwards 2003).

Only a small number of published papers have used large datasets or rigorous approaches to define recommended buffer lengths in specific physiographic areas. The most notable are Haupt (1959a, 1959b) and Packer (1967). Haupt (1959a, 1959b) mathematically related sediment movement to site and road drainage factors for 75 sections of haul road in southwestern Idaho; variables included aspect, cross-drain spacing, road gradient, fillslope length, and number and types of obstructions on the hillside. Packer (1967) performed a similar analysis on 720 study sites in the northern Rocky Mountains. He examined sediment travel distances as a function of soil type, road age, cross-drain spacing, distance to first obstruction on the hillside, and fillslope cover density.

Haupt's (1959b) analysis showed that numbers, kinds, and spacings of obstructions on the hillside were the most important variables in determining sediment transport distances. The cross-drain interval was the next most important variable: transport distance increased with the square of cross-drain spacing. Packer (1967) used variables that were statistically significant in explaining sediment movement to develop recommended buffer lengths suitable for 5-yr-old logging roads built in basalt geology with 9-m cross-drain spacings and various obstruction spacings. He also provided adjustments for a variety of conditions, such as different geologic materials, increasing cross-drain spacings, and decreasing fillslope cover. From these analyses, he determined that to retain about 85 percent of sediment flows from cross drains installed on 9-m spacings, the required buffer lengths ranged from 11 to 46 m, with the distance depending upon obstructions, soil characteristics, road width, and vegetative cover associated with the area from which and onto which the structure drained.

It is not surprising that these studies reported the presence of hillside obstructions, or roughness features, as critical to controlling sediment movement in forest buffers. Obstructions, including vegetation, forest floor litter, downed wood, and rocks, along with hillside depressions, provide means to slow or temporarily trap water and allow sediment to settle and be stored (Barling and Moore 1994, Belt et al. 1992, Croke and Hairsine 2006, Ohlander 1976). Obstructions restrict travel distances, as shown in two locations in Idaho where sediment transport lengths were strongly inversely related to the density of hillside obstructions (Burroughs and King 1989, Megahan and Ketcheson 1996). Beasley et al. (1984) found hillside depressions allowed water to accumulate or infiltrate, and dense vegetation and other debris on the soil surface slowed runoff and allowed sediment to settle out during events in which there were small to moderate amounts of water discharged onto the forest floor.

In forests, trees play a much more limited role in controlling sediment delivery through the presence of their stems compared to grasses and herbaceous vegetation along the roadside (i.e., VFS) at the upslope edge of forest buffers (Dorman et al. 1996). This is because overstory stems are not dense enough to sufficiently slow water and promote sedimentation. But tree root growth creates high soil infiltration rates that can substantially contribute to controlling sediment transport through deposition (Lyons et al. 2000). Litter also provides limited roughness because it is not anchored to the soil surface. Even thick litter layers have been shown to be susceptible to scour by concentrated flow (Loch et al. 1999).

The presence of obstructions and depressions varies by site and within sites, making dependence on natural features for energy dissipation, infiltration, and sediment deposition unpredictable and inconsistent. Consequently, filter windrows (or brush barriers) are commonly created during road construction. Windrows are composed of woody slash from right-of-way clearing placed along the contour at or near the base of the fillslope (Burroughs and King 1989). The debris provides a barrier, albeit a porous one, to slow and spread concentrated flow, thereby encouraging water infiltration and sediment deposition (Burroughs and King 1989, Cook and King 1983). Slash presumably is most useful when it is in contact with the ground, so road contracts often include provisions requiring slash to be cut into short lengths to improve contact with the ground and contact with other pieces of debris. However, no studies could be found to compare the effectiveness of simply placing the slash on the hillside to this practice, so the degree of improvement is unknown.

Experiments with filter windrows involve a variety of data collection techniques, so the results are not entirely comparable, but they do tend to show that these barriers are generally effective at reducing sediment delivery. The first year after road construction in Idaho, filter windrows retained all but an average of 0.22 $ft^3$ of eroded material per 100 ft of road length. Fillslope slumping did result in some larger amounts of soil passing through or over the windrows during spring snowmelt (King 1979). Machine-constructed filter windrows resulted in 75 to 85 percent lower sediment losses from fillslopes than hydromulched fillslopes (Cook and King 1983). Hand-constructed windrows resulted in 88-percent reductions in fillslope sediment losses in the Intermountain Region compared to 99 percent for Curlex® (American Excelsior Co., Arlington, TX) mulch, but the creation of filter windrows is much less expensive than is procuring and applying Curlex mulch (Burroughs and King 1989). Rill formation also was less common on fillslopes that had windrows, and even when rills formed, the average and maximum sediment transport distances (3.8 ft and 33 ft, respectively) were much less than in a variety of permutations of conditions without windrows (average = 25.8 to 80.4 ft and maximum = 85 to 125 ft) (Burroughs and King 1989). In North Carolina, sediment movement on vegetated fillslopes with brush barriers at the toe of fillslopes never exceeded 75 ft (Swift 1985).

Log barriers or log + brush barriers have been used as an alternative to conventional windrows in a variety of situations. Rothwell (1983) experimented with close placement of logging debris barriers on roads. He placed log/brush barriers along the contour 60 and 120 cm apart on road shoulders, ditches, and cutslopes at three stream crossings. These resulted in an average reduction of 75 percent of total suspended sediment production during a summer season. Log erosion barriers installed on two hillsides in California after a wildfire reduced sediment yields by 66 percent compared to a hillside with no log barriers (Wohlgemuth and Robichaud 2007). As with the windrows on fillslopes, site characteristics, including differences in runoff and sediment loads, influenced the effectiveness of log barriers (Wohlgemuth and Robichaud 2007). In some cases the areas behind the logs were completely filled with sediment within only a few years.

These findings by Wohlgemuth and Robichaud (2007) show that vegetative roughness features have a finite capacity for sediment accumulation. They also have a limited life expectancy due to decay and mineralization (Ohlander 1976), but longevity will vary depending upon the size and species of the material. No information was found in the literature concerning how long windrows remain effective in different climates, nor was information found about whether road-to-water body connectivity increases as windrows lose functionality or whether previously deposited sediment becomes remobilized. Other barrier techniques also exist that can be applied in buffers, including silt fence. But because these tools have application other than just within buffers, they are covered elsewhere in this chapter (see the subsection on Vegetated Waterways and Swales, and the section on Non-engineered Barriers).

In addition to roughness, buffer gradient is the other landscape variable that most influences forest buffer effectiveness. Slope is important primarily with respect to sediment in concentrated runoff because velocity and hence energy are directly related to slope. From a review of the effective buffer lengths in the literature, Clinnick (1985) concluded that buffer lengths should increase with increasing slope, and increases in length become most critical on slopes over 30-percent gradient where the topography is concave. In these situations, spreading flows out, and encouraging infiltration on the hillside is very difficult. Trimble and Sartz (1957) recommended increasing forest buffer flow lengths as the hillside slope between roads and streams increased because they observed substantial differences in sediment transport across the range of slopes present in the White Mountains of New Hampshire. Only 8 m of buffer length was needed to retain 90 percent of incoming sediment from roads on fairly level ground, but 51 m of length was necessary to trap that amount on 70-percent slopes.

There is relatively little discussion in the literature to indicate at what gradient a forest buffer becomes too steep to be effective and should be replaced with other types of BMPs for erosion control or sediment retention. That so many other important factors, such as roughness, road discharge rates, sediment concentrations, and soil permeability, vary among sites and through time may make simple generalizations impossible.

Buffers can be fixed or variable lengths (Polyakov et al. 2005). Fixed-length buffers have a pre-determined

minimum length that is applied to all or part of the area adjacent to a water body (Lee et al. 2004). Fixed lengths are most commonly used in forest buffer application because they typically are specified in governmental regulations or guidelines, and they are simple to apply. All of the field-based studies on VFS and forest buffer effectiveness reported previously in this chapter were derived from fixed-length buffers.

Variable-length buffers are used less commonly. As their name indicates, their length along a water body varies, depending upon physical characteristics present in the catchment near that location. These characteristics include contributing area, hillside slope, soil characteristics, and pollution sources (Polyakov et al. 2005). Little field-based research has been devoted to developing techniques to define variable-length forest buffers or to validate their effectiveness. Most research in this area has taken the form of heuristic or optimization models (e.g., Dosskey et al. 2002, 2011; Polyakov et al. 2005; Weller et al. 1998).

Based on heuristic modeling, Weller et al. (1998) found limitations to using variable-length buffers because they may capture lower pollutant loads than fixed-length buffers (i.e., when the average buffer lengths of the two types are equal). This is because pollutant transport through the buffer occurs primarily where the buffer length is narrow. Therefore, the average length of a variable-length buffer must be greater than the average length of a fixed-length buffer to attain a specified level of pollutant removal. The Weller modeling used uniform sheet flow from the uphill source areas whereas Dosskey et al. (2002) modeled filter strip pollutant trapping efficiencies using nonuniform runoff and the buffer area ratio (i.e., the ratio of filter strip area to upslope contributing area) from agricultural fields with variable-length buffers. Sediment trapping efficiency was predicted to be 7 to 56 percent less across four sites for nonuniform flow conditions compared to model results for uniform flow, which agreed with the Weller et al. (1998) results.

Establishing variable-length buffer boundaries on the ground can be difficult because buffer lengths that have been defined spatially from models can result in complex patterns that are impractical for field staff to implement (Polyakov et al. 2005). The theoretical advantage of variable buffers is that if properly designed and implemented, they should result in less land within the buffer. This situation can have economic benefits as most buffers have defined limits on disturbance, which can take some land or material out of production.

In highly dissected landscapes with a high density of nonperennial channels, there is a constant tension between protection and production with respect to buffer application. A type of compromise between fixed- and variable-length buffers has been the application of different (usually fixed-length) buffer designations to different types of water bodies (e.g., perennial versus intermittent versus ephemeral streams) (Norris 1993) or to specially designated water bodies. This arrangement recognizes the need to protect water quality and the connectedness of water bodies, while trying to alleviate some of the economic impacts associated with applying buffer protection. However, often the assignment of the specific buffer lengths to a given type of water body is arbitrary (Phillips 1989). At best, research-based lengths are applied to perennial channels, while nonperennial channels, particularly ephemeral channels, typically receive less protection. Nonperennial channels typically have buffers based on lengths that are palatable to users but not defined or supported by scientific data.

The economic impacts of applying buffers to headwater channels are probably the main reason that headwater channel reaches are not consistently buffered, but inconsistent application of buffers to these channels leads to the question posed by Cornish (1975: 10): "Which watercourses require filter strips?" He argued that neither permanence nor frequency of flow should be used to identify water body segments that should receive buffer protection, and instead suggested that any length of stream that has high peakflows and is susceptible to receiving pollutants should be accorded protection from a forest buffer. Norris (1993) went further and stated that ensuring water quality protection requires that buffers extend along all tributaries to the end of the headwaters where flow initiation begins.

The modeling results by Weller et al. (1998) support the need for providing buffers along the entire channel. They showed that eliminating gaps in buffer widths would yield greater protection than providing longer buffers along only parts of a channel. Their work provides further support for avoiding stream crossings

and keeping roads far from streams if possible, because stream crossings necessarily create gaps in buffers and provide direct conduits for sediment delivery (along the road). Road impingement in streamside areas (including in the approaches to crossings) necessarily creates short buffer lengths and high potential for sediment delivery in those areas, even if the rest of the buffer has long fixed lengths (i.e., akin to the problems with narrow buffers in variable-length buffers).

Qiu and Prato (1998) noted that riparian buffers in agriculture have a positive economic value, but the prices of agricultural products do not include the value of maintaining water quality, so there is little incentive for buffer installation. Similar challenges exist in forests because of the low profit margins associated with most forest products (Blinn et al. 2000, Timberharvesting.com 2011). To improve the acceptability of applying forest buffers to the entire channel length, nonmarket incentives need to be considered (Polyakov et al. 2005), particularly because headwater forests already have more buffer length and width than downstream lands dominated by multiple-use (Norris 1993). Acceptance of implementing buffers along the full channel length in forested watersheds might increase if the improvement to water quality attained by buffering headwater forests could be shown to influence water quality downstream in lands that do not include buffers. Currently there is a lack of data demonstrating that local forest buffer implementation provides any measurable improvements to water quality at the landscape scale (Norris 1993, Polyakov et al. 2005).

## Vegetated Waterways and Swales

Vegetated waterways and vegetated swales are open channels that are lined with low-growing, flood-tolerant vegetation (usually grass) (Dorman et al. 1996). They are oriented in the direction of the slope, and stormwater runoff (both sheet flow and concentrated flow) from upslope contributing areas is collected and transmitted through them (Deletic and Fletcher 2006) with the objective of reducing pollutants in the runoff (Mazer et al. 2001). A properly designed vegetated waterway or swale transmits runoff slowly to allow complete or nearly complete pollutant retention, if not also complete water infiltration (Burkhard et al. 2000, Mazer et al. 2001). Runoff that does not infiltrate fully within the swale or waterway's length is transported with outflow and discharged into additional drainage or treatment systems, or receiving waters (Daniels and Gilliam 1996, Deletic and Fletcher 2006). Some vegetated channels are used only to convey drainage water to another pollution control structure (usually some type of detention pond) and there is no pollution-reduction objective for the waterway itself (Novotny and Olem 1994). However, in this chapter, only the pollution control aspects of vegetated waterways are considered.

Although the terms "vegetated waterways" and "vegetated swales" often are used interchangeably, for some practitioners the appropriate term depends upon the shape of the feature, with the shape being a function of available space (especially width). When a distinction is made, vegetated waterways usually are narrower and V-shaped (e.g., see Resource Conservation District of Monterey County 2005), or trapezoidal (e.g., see Natural Resources Conservation Service 2003). Swales tend to be wider and shallower (Iowa State University 2009). Typical locations for vegetated waterways and swales are in medians of divided highways, along roadways or parking areas, or adjacent to or within commercial or residential developments (Burkhard et al. 2000, Donaldson 2009, Iowa State University 2009, Yu et al. 2001, Zanders 2005). Their application in urban areas also is increasing substantially (Deletic 2005).

Pollution reduction in vegetated waterways and swales occurs by biochemical and physical processes (Deletic and Fletcher 2006) that are influenced by standing vegetation, organic matter, and soil (Mazer et al. 2001). Biochemical processes control retention of dissolved forms of pollutants; these processes involve uptake by vegetation, adsorption onto soil and organic matter (Deletic 2005, Iowa State University 2009, Yu et al. 2001), and transformation into less harmful substances by microbial decomposition (Mazer et al. 2001). Physical processes dominate pollutant removal in vegetated waterways and swales; these include particulate deposition, vegetative filtration, and infiltration of chemicals into the soil with infiltrating water (Deletic 2005, Deletic and Fletcher 2006, Iowa State University 2009, Yu et al. 2001). Particulate deposition, or settling, is the most important means of pollution retention (Bäckström 2002, Claytor and Schueler 1996, Deletic and Fletcher 2006, Dorman et al. 1996). Aboveground plant



FS-002901

parts induce sedimentation of particulates by providing roughness and slowing velocity of inflow, while plant roots stabilize sediment deposits and discourage sediment resuspension (Claytor and Schueler 1996, Kadlec and Knight 1996). Filtration of particulates by grass blades or other vegetative parts is much less important for sediment capture (Claytor and Schueler 1996, Deletic and Fletcher 2006, Kadlec and Knight 1996).

The interrelationships between vegetative characteristics and inflow are important to the effectiveness of vegetated waterways and swales. Because vegetated waterways and swales are channels (Barling and Moore 1994, Dorman et al. 1996, U.S. EPA 1999), the depth of water in them changes through time with the size of storm and runoff events (Dorman et al. 1996). Vegetation can be fully submerged (submerged flow) or only partially submerged (nonsubmerged flow) (Tollner et al. 1976). The length of time that plants in a vegetated waterway or swale are subjected to submergence can affect their condition. Greenhouse experiments showed biomass and leaf blade density of grasses were affected by growing them in inundated pots. Biomass and the number of leaf blades were least for pots with 2 to 4 cm of water inundation above the soil surface for two 14-day cycles (Mazer et al. 2001). In contrast, plants grown without inundation had the greatest number of leaf blade and biomass accumulations, regardless of species tested. Biomass averaged across the four inundated turf grass species studied was only about 11 percent of biomass for the same species kept moist but not inundated.

Even establishment of plants well adapted to limited inundation can be reduced by extended inundation (Crawford 1992, 1996; Ernst 1990; Ewing 1996; Kozlowski 1984). In field experiments, swales that were inundated with water for more than 35 percent of the time during summer had significantly less vegetative growth and biomass accumulations in litter (Mazer et al. 2001). Water stagnation also should be avoided as it has similar effects (Burkhard et al. 2000), though standing water in the short term (1 to 14 days) may have slightly less effect on vegetative growth than flowing water over the same duration (Temple 1991).

To be effective, vegetation must have characteristics that allow it to accommodate the range of expected flows without failing, or inflow must be controlled in a way to ensure vegetation can be effective. Substantial reduction in settling potential results during submergence if vegetation becomes prone, breaks (i.e., is shortened) (see Vegetated Filter Strips subsection in this chapter for details on how roughness is affected when vegetation is prone or broken), or is scoured from the feature. Scouring of vegetation from swales is predominantly a problem when flows or inundation persists for long periods (Mazer et al. 2001) or when the feature is too narrow and water becomes too concentrated (Barrett et al. 1998b).

Research by Bäckström (2002) illustrated the importance of vegetative condition in controlling roughness and influencing sedimentation for swales. Using nine grassed swales with a standardized runoff event simulation process, he found short, thin grass had the lowest removal of TSS, at 80 percent. In contrast, swales with well-developed thick turf had the greatest TSS removal (90 to 100 percent). Colwell et al. (2000) examined roadside ditches in Washington state and found that those that were well vegetated and lacked rocks or other coarse roughness features appeared to perform like vegetated swales based upon indirect estimates of vegetative cover, siltation, scour, and energy profiles. Though pollutant removal was not measured directly, their survey data suggested that these ditches resulted in a net removal of pollutants compared to those that had less vegetation or rocky bottoms, or were created in rocky soils. The latter ditches appeared to serve as sources of pollutants, especially sediment.

The removal of particulates by vegetated swales or waterways ultimately depends upon achieving some balance between flow rate and particle settling velocity (Deletic and Fletcher 2006). Although vegetation abundance contributes to controlling velocity and particle retention, it is not the only controlling feature, because even nonsubmerged flows can have high flow rates that are not conducive to particle settling (Mazer et al. 2001). Altering the longitudinal slope, length, and overall shape of vegetated waterways and swales can change the inflow rate and depth of water; these in turn influence the degree of infiltration and deposition (Deletic and Fletcher 2006). Reducing the longitudinal slope and increasing the length of the vegetated waterway or swale both help to increase retention times

and potential sediment deposition (Deletic and Fletcher 2006, Yu et al. 2001).

Mazer et al. (2001) observed that vegetated swale performance was most effective when inflow was controlled in such a way that it was always shallow (<37 mm) and hydrologic retention time within the feature was long (>9 min). They did not recommend specific slopes because they found that a slope of even 1.5 percent was too much for some swales to handle the high flow rates that developed for even small storms. Yu et al. (2001) tested swale performance in Virginia, comparing a swale with a 1-percent grade to one with a 3-percent grade. Based on sediment reductions that they measured and results of eight other studies from the literature, they concluded that a 3-percent longitudinal slope performed better and was optimal for swale construction. Similarly, Colwell et al. (2000) examined roadside ditches in Washington state; those that behaved like vegetated swales had slopes of 2 to 3 percent in combination with gentle side slopes of no more than 3:1 (horizontal:vertical). Those that were flatter longitudinally would retain too much water, whereas those that were steeper had high energy and vegetative and soil scouring. These studies suggest that the maximum longitudinal slope for swales and waterways is probably no more than 3 percent. However, slopes of swales generally range from 0.5 to 6.0 percent (Mazer et al. 2001), so many existing swales may be challenged by their associated inflow velocities.

The actual effect that any change in vegetated swale or waterway shape has on sediment capture depends in some part on the particle size distribution of incoming sediment. Most pollutant reduction by vegetation follows exponential decay (Deletic and Fletcher 2006); that is, most occurs in the first few meters of length (Bäckström 2002, Kaighn and Yu 1996) and then retention falls off exponentially. This is because the largest/heaviest particles settle out most easily throughout the entire range of flow velocities, and these particles compose most of what is captured (Deletic and Fletcher 2006, Yu et al. 2001). For this reason Bäckström (2002) found no relationship between pollutant removal and swale length; the heaviest particles settled out in the first few meters of the feature, so extending the flow length contributed little to sedimentation.

Increasing swale length is important for retaining fine particles (e.g., clays) and dissolved constituents (Bäckström 2002, Wang et al. 1981), but only as long as infiltration rates remain high (Bäckström 2002). This is because fines and dissolved constituents are not captured easily through sedimentation, but instead depend upon having sufficient flow-through or residence time in the swale or waterway to allow infiltration to occur (Kaighn and Yu 1996, Yousef et al. 1985). Bäckström (2002) found the advantage of increasing swale length was associated primarily with particles less than 25-µm diameter. In Washington state, about 90 percent of lead levels were removed by a 60-m-long swale compared to 60-percent removal by a 20-m-long swale (Wang et al. 1981). However, even when infiltration capacity is high, infiltration may become inadequate to allow for retention of small particles (<50 µm diameter) when velocities become too great or flow too deep (Mazer et al. 2001). For this reason, swales work best when they are exposed to frequent light rainfalls—even those of extended duration—rather than large intense events (Yu et al. 2001).

Some studies have shown that the presence of a strip of vegetation located between the edge of the pavement and the beginning of the swale or waterway is an important physical attribute in their design (Barrett et al. 1998b, Wu et al. 1998). This strip acts as a vegetated filter strip (VFS; described previously in this chapter), which "pretreats" runoff (Stagge et al. 2012) before it enters the swale or waterway. However, other studies have shown the swale or waterway to be more important than the VFS (Bäckström 2003, Schueler 1994).

Low concentrations of incoming pollutants to vegetated waterways or swales, whether due to initial removal by VFS or by naturally low inflow pollutant levels, generally result in poor performance (Welborn and Veenhuis 1987). When influent TSS concentrations were less than 30 mg $L^{-1}$, no sediment reduction occurred in Maryland swales (Dorman et al. 1996). Similarly, Bäckström (2003) found no significant reduction in TSS when inflow concentrations were less than 40 mg $L^{-1}$. In contrast, when TSS concentrations have been in ranges normally associated with highway runoff (i.e., where swales and vegetated waterways normally are installed), substantially improved TSS removal usually results. For example, 93 and 94

percent of TSS was removed during two storms when influent concentrations were between 100 and 200 mg $L^{-1}$ in Florida (Dorman et al. 1996). Bäckström (2003) summarized three studies and showed that 79 to 89 percent of TSS was removed during simulated storm events and the parameter that best explained TSS removal was TSS concentrations in inflow.

Because so many factors influence pollutant retention in swales and vegetated waterways, it is not surprising that a wide range of pollutant removal efficiencies is reported in the literature (Table 29). Total suspended solids (i.e., primarily sediment) tend to be removed more efficiently than other constituents (Horner et al. 1994, Municipality of Metropolitan Seattle 1992), but even suspended solids removals have ranged from being ineffective to completely effective (Weiss et al. 2010). Metals (Table 29) tend to be removed more effectively than dissolved nutrients because metals commonly adsorb to sediment (Dorman et al. 1996, Schueler et al. 1992).

The inconsistency in retention efficiencies among studies has resulted in a general lack of confidence in the effectiveness of vegetated waterways and swales (Bäckström 2002, Barrett et al. 1998b). Many stormwater handbooks recommend these techniques primarily as pretreatment techniques (Barrett et al. 1998b) before releasing water into other filtration or stormwater controls.

Structural barriers, known as check dams, can be installed in vegetated waterways and swales (Fig. 11) to increase detention times, thereby helping to compensate for poor infiltration or poor vegetative cover (Mazer et al. 2001) by temporarily ponding and storing water (Yu et al. 2001). Ponding water slows its velocity, and storing water increases the time of detention; both of these factors increase the opportunity for deposition and infiltration (Kaighn and Yu 1996, Yu et al. 2001). During low runoff events, check dams in swales have been found to double the detention times of water compared to where there was no check dam in place (Yu et al. 2001). Check dams can be constructed from a variety of materials, including stone berms, railroad ties, riprap, gabions (large wire cages usually containing rocks or broken concrete), pressure-treated wood, and natural wood that is resistant to decay (U.S. EPA 2004). Specific details about pollutant retention processes associated with barriers are provided in the previous section of this chapter (Non-engineered Barriers). The effectiveness of using barriers aside from those in vegetated swales and waterways also is covered in the previous section.

A few studies have demonstrated that swales and waterways containing check dams tend to be more effective than those without check dams. Not surprisingly, the greatest improvement in pollutant retention by check dams typically results for fine particles and dissolved chemicals (Kaighn and Yu 1996)



Figure 11.—A series of rock check dams in a grassed swale to create storage potential within the swale. Photo by Virginia Department of Conservation and Recreation (1999), used with permission.

FS-002904

**Table 29.—Sediment, metal, and other chemical removal efficiencies reported for vegetated waterways and swales**

| Reference | Type of feature | Sediment removed (as TSS[a]) | Metals and other constituents removed | | Comments |
|---|---|---|---|---|---|
| | | *percent* | *percent* | | |
| Bäckström (2003) | Grassed swale | 79–98 | | | Simulated runoff events |
| Barrett (2008) | Grassed swales | Mean = 60<br>Range 6–70 | | | Data extracted from 14 swales in international BMP database |
| Goldberg et al. (1993) | Grassed swale | 67.8 | | | 8 storm events |
| Kercher et al. (1983) | Grassed swale | 97.9 | | | Residential area |
| Mazer et al. (2001) | Grassed swales | 60–99 | | | Non-roadside swales |
| Municipality of Metropolitan Seattle (1992) | Grassed swale | 83 | 72 | Total iron | All values from 200-ft-long swale; THP = total petroleum hydrocarbons |
| | | | 67 | Total lead | |
| | | | 46 | Total copper | |
| | | | 63 | Total zinc + total aluminum | |
| | | | 30 | Dissolved zinc | |
| | | | 75 | Oil + grease/THP | |
| Oakland (1983) | Grassed waterway | 33 | | | 11 storm events |
| Walsh et al. (1998) | Grassed swale | 35–59 | | | At 10 m through swale |
| | | 54–77 | | | At 20 m through swale |
| | | 50–76 | | | At 30 m through swale |
| | | 51–75 | | | At 40 m through swale |
| Wang et al. (1981) | Grassed swale | 90.4 | | | At 21 m length |
| | | 93.2 | | | At 43 m length |
| | | 94.5 | | | At 67 m length |
| Yousef et al. (1985) | Grassed swale | | 90 | Total zinc | Reductions of metal concentrations in highway runoff through swales over 8 months |
| | | | 82 | Dissolved zinc | |
| | | | 91 | Total lead | |
| | | | 50 | Dissolved lead | |
| | | | 41 | Total copper | |
| | | | 19 | Dissolved copper | |
| | | | 71 | Total iron | |
| | | | 44 | Dissolved iron | |
| | | | 44 | Total chromium | |
| | | | 13 | Dissolved chromium | |
| | | | 29 | Total cadmium | |
| | | | 18 | Dissolved cadmium | |
| | | | 86 | Total nickel | |
| | | | 47 | Dissolved nickel | |

[a] TSS = total suspended solids.
Empty cells indicate variable was not measured.

as fines and dissolved species have low settling velocities (which require lengthy detention times) or depend upon infiltration, or both (see Non-engineered Barriers section). Kaighn and Yu (1996) compared pollutant retention from highway runoff by a swale without a check dam to one with a weir-type check dam during eight rain events. Removal of TSS ranged from 73 to 100 percent with a single check dam compared to a range from -4.1 percent (i.e., there was a net increase in TSS through the swale) to 57.4 percent for a swale of the same slope and length with no check dam (Table 30). Likewise, reductions in zinc, chemical oxygen demand, and total phosphorus were much greater with the check dam (Table 30). The 100-percent pollutant reductions observed in this study correspond to storms in which 100 percent of inflow was infiltrated into the soil, which occurred due to the check dams. Yu et al. (2001) examined the effects of length, longitudinal slope, and the presence of check dams in swales and also found the most important feature for improving retention of TSS and total phosphorus was a check dam.

Shipitalo et al. (2010) examined the efficacy of check dams constructed from compost filter socks (see Non-engineered Barriers section in this chapter for more description of compost filter socks) placed in grassed waterways that received drainage from tilled or no-till corn (*Zea mays*) fields. Sediment concentrations from the no-till fields were not reduced significantly by filter socks, presumably because sediment concentrations in inflow were very low. However, from tilled fields, which had much higher inflow sediment concentrations, the filter socks decreased the sediment concentrations by an average of 49 percent. The filter socks worked well even with high runoff volumes in the waterway, where many other types of BMPs may have been challenged. The composition of compost media (e.g., particle-size mixture) may be designed specifically to handle large inflow volumes, but these designs usually require higher flow-through rates to avoid overtopping, which translates to less-effective control of suspended sediment and turbidity (Faucette et al. 2006).

**Table 30.—Percent reductions in various constituents without and with a weir-type check dam in a swale during eight storm events in Virginia (data from Kaighn and Yu 1996)**

| Constituent[a] | Range removed | | Average removed | |
|---|---|---|---|---|
| | Without check dam | With check dam | Without check dam | With check dam |
| | ------------ percent | ------------ | | |
| TSS | -4.1–57.4 | 73–100 | 23.3 | 87 |
| Total zinc | 5.1–35.4 | 58–100 | 17.8 | 83.8 |
| COD | -27.8–54.9 | 67–100 | 29.8 | 84 |
| TP | -14.9–55.6 | 80–100 | 11 | 91.5 |

[a]TSS = total suspended solids; COD = chemical oxygen demand; TP = total phosphorus.

Straw or hay bales are sometimes used as check dams in swales and waterways, but there is no information in the literature on their application to these types of biofilters. However, the U.S. EPA (2002) recommends against their use as check dams with flowing water because they are easily undercut or overtopped due to their impermeability and proclivity to dislodge and collapse when flow concentrates in channels (Indiana Department of Natural Resources 1992, Robichaud 2010, U.S. EPA 2002). In addition, hay and straw bales decay easily, so even if they are installed properly and are effective in the short term (<3 months) (Harbor 1999, U.S. Department of Transportation 1995), failure in the long term is likely despite intensive maintenance. Additional information about straw bales as check dams in ditches or as general erosion control barriers to overland flow is provided in the section on Non-engineered Barriers.

Additives show promise for increasing the effectiveness of vegetated waterways and swales. A wide variety of chemical and organic material additives have been tested, primarily in laboratory studies, for their potential use for increasing pollutant retention in vegetated waterways or swales. These include activated charcoal, compost, metal compounds, clay compounds, and other chemical additives. However, because many of these materials have undergone little if any field testing—and they probably would not be used much in swales or waterways associated with forest roads—they are not described here. Interested readers are directed to Weiss et al. (2010), who have synthesized this literature.

There has been little research on the moderate- to long-term fate of particulates or dissolved chemicals that have been removed by vegetated waterways and swales (Davis et al. 2003, Yu et al. 1993). Intense storms create the potential for resuspension of settled particles in the short term (Yu et al. 2001), but little information is available about whether particles become part of the general soil substrate through time, as they can with VFS (Barrett et al. 1998b, Dillaha et al. 1989). Chemicals that were retained through plant uptake or adsorption onto plant or organic surfaces have the potential for remobilization during mineralization (Bäckström 2003). Consequently, clippings from mowed waterways and swales should be removed to reduce the potential for transport of metals and other pollutants released by decomposition (Colwell et al. 2000, Dorman et al. 1996, Schultz 1998).



Straw bales installed in a ditch line to slow drainage and capture sediment, and straw mulch and silt fence on a cutbank used to control erosion after construction of an access road to a natural gas well pad. (Photo by U.S. Forest Service, Northern Research Station.)

CHAPTER 8

# Research Needs, Potential Direction, and Concluding Thoughts

## Research Gaps and Potential Future Direction

There is a common perception that the effectiveness of forestry BMPs, including forest road BMPs, is well supported by scientific research (e.g., see Hornbeck and Kochenderfer 2001 or Ice, n.d.). Many road BMP effectiveness studies do exist; however, the effectiveness of most forest road BMPs has not been investigated rigorously (including replicated and quantitative studies) under a wide variety of geologic, topographic, physiographic, and climatic conditions since their development decades ago. Much more quantification of effectiveness is needed (Anderson and Lockaby 2011a, Moore and Wondzell 2005, Stafford et al. 1996) to understand the site characteristics for which each BMP is most suitable and for proper selection of the most effective BMP techniques (Carroll et al. 1992, Weggel and Rustom 1992).

The divergence between the general belief of well-supported science and lack of critical analysis may result from several factors:

1 Many of the most commonly cited studies that provide the basis for illustrating forestry BMP effectiveness are paired watershed tests in which a treated watershed (e.g., harvesting with road construction) is compared to a control or reference watershed in which no land-disturbing activities were undertaken (Hewlett 1971). Some of these studies were designed and analyzed following classic paired watershed regression techniques (e.g., Arthur et al. 1998, Brown and Krygier 1971, Lynch and Corbett 1990, Rice et al. 1979); others simply compared water quality results between watersheds (e.g., Reinhart et al. 1963). These studies interpreted small changes in water quality (usually sediment loads or turbidity) at the mouth of a treated watershed compared to a control as "proof of effectiveness."

Although paired watershed studies are common, they are limited in their ability to demonstrate and quantify BMP effectiveness for water quality protection. Most paired watershed studies have less than 5 yr of pretreatment measurements, which limits the amount of variation that can be captured for the comparisons. Therefore, it is difficult to accurately interpret post-treatment data that fall outside pretreatment ranges (Lewis et al. 2001). Sediment measurements at the mouth of a watershed do not account for in-channel storage of delivered sediment and the associated lag times in sediment delivery to the mouth of the watershed (Edwards 2003, Rice et al. 1979). Finally, in paired watershed studies BMPs are considered en masse, making it impossible to quantify the effectiveness of individual BMPs or to identify the individual BMPs that were most or least effective.

2 Studies have investigated the effectiveness of individual road BMPs, but the lack of replication and broad-scale testing across different physiographies, climates, soil types, and other factors for most BMPs weakens the argument that their effectiveness is scientifically well proven. As a result, a single study or just a few studies typically are cited in the literature to support a BMP's effectiveness or the overall general effectiveness of BMPs.

3 The similarity of forest road BMPs used in many different states' forestry BMP manuals and handbooks suggests a degree of confidence in their

validation that may not be justified. For example, many eastern state BMPs employ recommendations for waterbar spacings on skid roads developed from a single study (Elliot et al. 2014) performed in West Virginia (Trimble and Weitzman 1953, Weitzman 1952).

However, the lack of replicated testing of individual BMPs under different conditions should not dismiss them from consideration as tools for protecting water quality. Because most BMPs are based on the laws of physics and chemistry, they typically contribute some degree of nonpoint source pollution control if installed and maintained properly (Anderson and Lockaby 2011b, Stuart and Edwards 2006). For example, it is well understood that controlling the mass or velocity of water reduces its energy available to do work, so it is logical that incorporating that principle into BMPs will reduce erosion. But the dearth of information about most individual BMPs leaves many important questions unanswered, such as: How effective (i.e., quantified) is the BMP in different situations or conditions? and Does its level of effectiveness warrant its implementation or would another technique be more effective and possibly more cost-effective? These questions are particularly applicable to skid road BMPs, as skid roads are included in only a small minority of road BMP research, and those that do involve skid roads focus on BMPs applied once they are "put to bed" (i.e., removed from service). There is scant information on the effectiveness of BMPs applied during skid road use when the potential for water quality impact is high.

As indicated in the previous chapters of this document, most BMP effectiveness studies have focused on the initiation of erosion and quantifying erosion rates. Historically, this information was critical for promoting the acceptance of BMPs and their implementation. But in the future it will no longer be sufficient for BMP effectiveness studies to measure only erosion rates, as these do not provide the necessary information to quantify sediment delivery to water bodies (Anderson and Lockaby 2011b, Dickinson and Wall 1977, Grace 2005, Walling 1983). In conjunction with sediment delivery measurements, there is a pressing need to identify the locations or sources where sediment originates, understand why/how sediment delivery is controlled and explain the mechanisms by which BMPs protect water quality (Anderson and Lockaby 2011b, Dickinson and Wall 1977, Sutherland 1998c). These questions generally have been ignored in forest road research (Anderson and Lockaby 2011b, Rivenbark and Jackson 2004). Most BMP studies report only outcomes, such as erosion rates or captured volumes of sediment, and they were not designed to provide information about the processes or environmental variables that contributed to or resulted in those outcomes. Being able to predict sources of sediment and understand the mechanisms and processes that control or contribute to sediment losses and mobility are critical for improving BMP effectiveness (Anderson and Lockaby 2011b, Rivenbark and Jackson 2004).

Understanding the sources, mechanisms, and processes also will improve models used to predict sediment delivery (Anderson and Lockaby 2011b). Commonly used contemporary road erosion models (e.g., the Water Erosion Prediction Project; U.S. Forest Service, n.d.) typically are driven by physical parameters, including road geometry or contributing area. These models exclude important hillslope hydrology mechanisms and processes, including subsurface flow interception by the road prism and infiltration of water discharged off the road. They also exclude the conditions that influence those processes, which may be the most critical factors controlling sediment delivery (Thompson et al. 2010). Improving prediction models by incorporating source and mechanism/process information should help validate BMP effectiveness and illustrate BMP robustness across many different conditions when replicated rigorous field testing has not been performed in a specific region or condition.

BMP studies tend to extend over only one or a few years, which is much shorter than the life of most forest roads. Due to the potential lag in sediment delivery that can occur, long-term studies of road BMP effectiveness are warranted (Anderson and Lockaby 2011b, Daigle 2010). The conditions to which a road is subjected over the long term also are likely to include more interannual extremes than would occur during an individual study.

Many of the initial studies of the effectiveness of individual road BMPs (e.g., surfacing material, cross-drain spacing) were conducted at U.S. Forest Service experimental forests or similar institutional research

locations. Thus, for some studies it may be possible to return to the location of the initial study and resume data collection after reinstrumentation of the site. Current (i.e., long-term) results can be compared to data collected when the road was newer. If current circumstances do not allow studies to be resumed or would confound interpretation, or if it is impossible to pinpoint past research locations, space-for-time (SFT) studies of long-term effectiveness may produce useful findings. For example, studies of the effectiveness of road BMPs that were implemented several years or decades ago provide the opportunity to evaluate responses to years of wetting and drying cycles, extreme storm and runoff events, and long-term use and maintenance (e.g., Bold et al. 2007).

SFT studies also allow comparison of effectiveness for BMPs that have undergone refinement through time (e.g., cross-drain spacings may have changed with revisions to state BMPs over time) (e.g., Henderson 2001). The effectiveness from road segments containing a range of the prescription for that BMP can be compared. Of course, SFT studies must account for differences in road and landscape conditions (e.g., soil erodibility, road design) when comparisons are made across sites. Whenever possible, long-term studies should be coupled with validated models or used to improve models so the spatial and temporal variability of sediment delivery can be better understood and predicted (Anderson and Lockaby 2011b).

Understanding the mechanisms and processes that affect whether sediment delivery to water bodies will occur and the differences between short- and long-term effectiveness will move the science toward the ability to develop the most effective site-specific BMP prescriptions, a need identified for many years (Aust and Blinn 2004). Site-specific BMP prescriptions involve selecting the most effective BMPs for the site conditions and locating them where they provide the greatest benefit. This approach requires acknowledgment that some BMPs do not perform as well as others in a given situation (Sutherland 1998a).

Site-specific BMPs would result in much different BMP implementation strategies than current approaches, in which blanket applications of state recommendations are employed. Blanket application typically allows the user to identify the BMPs that will be applied. Without the advantage of scientifically based studies to guide the decision, however, the individual BMPs may not be the most effective. Furthermore, blanket application typically allows little flexibility in where BMPs are applied. Blanket application of BMPs within a watershed or managed area presupposes that all areas have more or less equal potential for being the source of delivered sediment. For forest roads, where sediment tends to originate from discrete segments or features on only a small percentage of the corridor length (Cafferata et al. 2007, Mills 2006, Rice and Lewis 1991, Skaugset et al. 2007), this assumption is false. Consequently, although blanket application is probably the easiest and most efficient way to ensure BMP implementation, it can be economically inefficient and suboptimally effective (Thompson et al. 2010). Blanket BMP implementation also can create disincentive to apply extra dollars where they are most needed to protect water quality; available funds, which typically are limited, are expended across the entire project area/road length, including where they provide little benefit to water protection. The lack of flexibility in BMP application may cause some to question the environmental benefits they provide (Brynn and Clausen 1991), thereby reducing the likelihood of their implementation.

As suggested above, BMP flexibility inherently includes an economic component— that is, being able to define and apply funds where they are most needed to address current or potential impacts. As such, application of BMP treatments is increasingly being viewed as inefficient if it does not include an analysis of the overall cost-effectiveness of the outcome (Thompson et al. 2010). This approach requires an analysis of environmental performance measures (e.g., what, if any, BMPs can provide the desired environmental outcome, including consideration of their location) for forest roads (Mills 2006) and a technique to simultaneously achieve economic and environmental goals. The latter includes determining the point at which increasing benefits end.

Optimization modeling is one approach to meeting these outcomes (Veith et al. 2003), but field measurements of the effectiveness of specific BMPs are necessary to validate optimization models. Optimization modeling requires that incommensurate objectives (e.g., cost of road construction and mass of sediment delivered, or cost of BMPs and cost of environmental impacts)

be developed and compared to determine the optimal outcomes (Rackley and Chung 2008, Thompson et al. 2010). However, research into the valuation of many environmental factors, such as maintenance of water quality or soil loss, is in its infancy.

Different people value environmental consequences differently, so there is no unique answer within optimization modeling (Thompson et al. 2010). This factor impedes the broad use of optimization, particularly as an alternative to current blanket applications of BMPs. If optimization modeling becomes widely used for helping to more efficiently prescribe BMPs, states (to whom the U.S. EPA has delegated BMP authority) could set sediment reduction objectives (e.g., on a watershed scale) to achieve environmental outcomes and water quality protection.

All the previous issues and needs presented in this chapter will be complicated in the future by potentially significant changes to climate. Although the specific changes and their magnitude will vary by region, more-extreme weather conditions are expected to increase the frequency of flooding, soil surface and in-channel erosion, and annual variability in streamflow (e.g., greater peakflows and lower baseflows) (Furniss et al. 2010, Marshall and Randhir 2008). Maintaining forest road integrity and protecting water quality may become more difficult during more-extreme events (i.e., changing precipitation timing, intensity, and volume) as these may create conditions that challenge BMP performance. Even under the conditions in which BMPs were developed, intense events have been observed to severely test road BMPs, sometimes resulting in failure or suboptimal performance. More-intense events, more frequent events, and longer duration events that accompany climate change may demonstrate that BMPs perform even more poorly in those situations. Research is urgently needed to identify BMP weaknesses under extreme events so that refinements, modifications, and development of BMPs do not lag behind the need.

The focus of road BMPs is controlling erosion and sediment transport on the road prism and on hillsides where road runoff is influential; in other words, the ultimate objective of BMPs is to control nonpoint source pollutant delivery to water bodies (Blinn and Kilgore 2001). Under climate change, hydrologic changes are predicted to increase on-the-ground erosion/sediment transport as well as to increase in-stream erosion and alter channel characteristics (Furniss et al. 2010). Although some road BMPs do include aspects of hydrology (e.g., turning water off roads in small parcels), they are not designed to control in-stream erosion or channel modifications (with the exceptions of controlling substrate changes from sedimentation and channel morphology alterations from road crossings). However, because roads have such a significant effect on watershed hydrology, under climate change the onus of controlling in-stream hydrologic changes attributable to roads (e.g., increased discharge attributable to cross drains connected to the stream) may fall to BMPs. Tempering road-induced hydrologic changes may become necessary for maintaining healthy and resilient aquatic habitats as climate-induced changes in streamflow regimes and resultant changes to habitat conditions are expected to stress some aquatic systems (Marshall and Randhir 2008). If controlling road-induced hydrologic changes becomes a BMP objective, substantive changes to existing BMP prescriptions and development of entirely new BMP techniques may be necessary.

## Concluding Thoughts

At the opening of this chapter, we indicated that the effectiveness of most BMPs has not been well quantified from the perspective of statistical rigor and replicated studies across many different types of conditions. But the sheer number of papers included in this document shows there are many studies of road BMP effectiveness as well as studies with results that may be applicable to roads. Based on the results of most of these studies, the case can be made that most BMPs result in some level of effectiveness in terms of reduced sediment generation or transport. Until more extensive and rigorous comparisons of effectiveness become available for specific types or categories of BMPs, the information and tabulated data herein provide the reader a starting place for selecting BMPs for local use.

During the compilation of this document we decided to include some techniques that are rarely used for forest roads, but that we believe have application to them. For some BMPs this was somewhat of a controversial position, even during the manuscript review period. In the end, we retained all the sections we originally

included so as to provide a breadth of BMP possibilities for individuals wanting to extend their options beyond those that they have traditionally used. Considering and perhaps trying new techniques when those typically employed do not perform to expectations is key to adaptive management. Especially as new stressors are placed on the ecosystem, adaptive management is essential for continued watershed protection and improvement.

Wide ranges of BMP effectiveness were reported in many studies in which different techniques were tested under identical conditions. Comparisons of specific types of BMPs across studies also show variability. This variability is evidence that use of the phrases "BMPs minimize erosion" or "BMPs minimize nonpoint source pollution," which are often found in BMP literature, should be discontinued. If one BMP performs more poorly than another in the same or similar situations, both cannot be minimizing pollution. Furthermore, if the intention is to minimize pollution, the actions taken are likely to be much more intensive and involve much greater costs than simply implementing BMPs. In many cases the only action that would truly minimize pollution would arguably be the decision not to implement any management or cause any disturbance. The Society of American Foresters' dictionary of forestry (Society of American Foresters 2008) defines best management practices as "a practice or usually a combination of practices that are determined by a state or a designated planning agency to be the most effective and practicable means (including technological, economical, and institutional considerations) of controlling point and nonpoint source pollutants at levels compatible with environmental quality goals." The ideas of "practicable means" and "compatible with environmental goals" describe the essence of BMPs: Neither the most complex/costly techniques nor the total elimination of pollutants is required or expected with BMP use. Using statements such as "BMPs minimize pollution" can create a false impression about the degree of pollutant generation and transport to be expected with BMP implementation. This false impression in turn provides fodder for individuals and groups who argue for a shift to regulatory means of pollution control for roads. It is best to portray BMPs for what they are because they play such an important role in protecting watersheds and water quality.

## ACKNOWLEDGMENTS

The authors thank the U.S. Forest Service's San Dimas Technology and Development Center, and in particular Kim Clarkin, Mohammad Nash, and Ed Messerlie, and the U.S. Environmental Protection Agency for their input and support for publishing this synthesis. Special thanks go to the National Agricultural Library staff who expeditiously fulfilled our hundreds of requests for publications and reports that we could not have otherwise obtained. We also thank Kim Clarkin, Mohammad Nash, Peter Adams, Johnny Boggs, Mike Dosskey, Bill Hansen, and Julianne Thompson of the U.S. Forest Service, Jon Schoonover of Southern Illinois University, and two anonymous reviewers for contributing comments to improve previous drafts of this manuscript. Finally, we extend our sincere gratitude to Cynthia Moser, who expeditiously and expertly edited this document.

# REFERENCES


Aase, J.K.; Bjorneberg, D.L.; Sojka, R.E. 1998. **Sprinkler irrigation runoff and erosion control with polyacrylamide – laboratory tests.** Soil Science Society of America Journal. 62(6): 1681-1687.

Abdelmagid, H.M.; Tabatabai, M.A. 1982. **Decomposition of acrylamide in soils.** Journal of Environmental Quality. 11(4): 701-704.

Abu-Hamdeh, N.H.; Abu-Ashour, J.S.; Al-Jalil, H.F.; Khdair, A.I.; Reeder, R.C. 2000. **Soil physical properties and infiltration rate as affected by tire dynamic load and inflation pressure.** Transactions of the American Society of Agricultural Engineers. 43(4): 785-792.

Abu-Zreig, M.; Rudra, R.P.; Lalonde, M.N.; Whiteley, H.R.; Kaushik, N.K. 2004. **Experimental investigation of runoff reduction and sediment removal by vegetated filter strips.** Hydrological Processes. 18: 2029-2037.

Abu-Zreig, M.; Rudra, R.P.; Whiteley, H.R.; Lalonde, M.N.; Kaushik, N.K. 2003. **Phosphorus removal in vegetated filter strips.** Journal of Environmental Quality. 32: 613-619.

Adams, J.W. 1988. **Environmental effects of applying lignosulfonate to roads.** [Internal report]. Rothschild, WI: Daishowa Chemicals Inc. 11 p.

Addo, J.Q.; Sanders, T.G. 1995. **Effectiveness and environmental impact of road dust suppressants.** MPC Report No. 95-28A. Fargo, ND: Mountain-Plains Consortium. 132 p.

Agassi, M.; Ben-Hur, M. 1991. **Effect of slope length, aspect, and phosphogypsum on runoff and erosion from steep slopes.** Australian Journal of Soil Research. 29: 197-207.

Agassi, M.; Ben-Hur, M. 1992. **Stabilizing steep slopes with soil conditioners and plants.** Soil Technology. 5: 249-256.

Ahearn, D.; Tveten, R. 2008. **Legacy LID: stormwater treatment in unimproved embankments along highway shoulders in western Washington.** In: Proceedings, ASCE 2008 international low impact development conference. Reston, VA: American Society of Civil Engineers. 10 p.

Ajwa, H.A.; Trout, T.J. 2006. **Polyacrylamide and water quality effects on infiltration in sandy loam soils.** Soil Science Society of America Journal. 70: 643-650.

Alaska Department of Environmental Conservation [DEC]. 2010. **Air non-point and mobile sources.** Anchorage, AK: State of Alaska Department of Environmental Conservation, Division of Air Quality. 3 p. http://www.dec.state.ak.us/air/anpms/pm/pm10_ctrl.htm (accessed February 23, 2011).

Alexander, R. 2003. **Standard specifications for compost for erosion/sediment control.** Prepared for: University of New Hampshire, Recycled Materials Resource Center. Apex, NC: R. Alexander Associates, Inc. 9 p. Available at http://www.alexassoc.net (accessed October 25, 2012).

Alexander, R. 2006. **Filter berms and filter socks: standard specifications for compost for erosion/sediment control.** Apex, NC: R. Alexander Associates, Inc. 8 p.

Amaranthus, M.P.; Rice, R.M.; Barr, N.R.; Ziemer, R.R. 1985. **Logging and forest roads related to increased debris slides in southwestern Oregon.** Journal of Forestry. 83(4): 229-233.

American Association of State Highway and Transportation Officials [AASHTO]. 2012. **Standard practice for NTPEP evaluation of erosion control products [draft].** Washington, DC. 7 p. http://www.ntpep.org/Documents/Technical_Committee/ECP/Documents/ECP%20-%203-6-12%20FINAL.pdf (accessed September 5, 2012).

American Society of Civil Engineers. 1992. **Local low volume roads and streets.** New York: American Society of Civil Engineers: Chapter II: 17-22.

American Society for Testing and Materials [ASTM]. 2004. **ASTM standard D4751-04 standard test method for determining apparent opening size of a geotextile.** West Conshohocken, PA: ASTM International.

American Society for Testing and Materials [ASTM]. 2009. **ASTM standard D4491-99a(2009) standard test methods for water permeability of geotextiles by permittivity.** West Conshohocken, PA: ASTM International.

Anderson, C.J.; Lockaby, B.G. 2011a. **The effectiveness of forestry best management practices for sediment control in the southeastern United States: a literature review.** Southern Journal of Applied Forestry. 35(4): 170-177.

Anderson, C.J.; Lockaby, B.G. 2011b. **Research gaps related to forest management and stream sediment in the United States.** Environmental Management. 47: 303-313.

Anderson, D.F.; Garisto, M.; Bourrut, J.; Schonbeck, M.W.; Jaye, R.; Wurzberger, A.; DeGregorio, R. 1996. **Evaluation of a paper mulch made from recycled materials as an alternative to plastic film mulch for vegetables.** Journal of Sustainable Agriculture. 7(1): 39-61.

Anderson, L.; Bryant, M. 1980. **Fish passage at road crossings: an annotated bibliography.** Gen. Tech. Rep. PNW-117. Portland, OR: U.S. Department of Agriculture, Forest Service, Pacific Northwest Forest and Range Experiment Station. 10 p.


FS-002914

Anderson, M.G. 1983. **Road-cut slope topography and stability relationships in St Lucia, West Indies.** Applied Geography. 3(2): 105-114.

Appelboom, T.W.; Chescheir, G.M.; Skaggs, R.W.; Hesterberg, D.L. 2002. **Management practices for sediment reduction from forest roads in the coastal plains.** Transactions of the American Society of Agricultural Engineers. 45(2): 337-344.

Arnáez, J.; Larrea, V. 1995. **Erosion processes and rates on road-sides of hill-roads (Iberian System, La Rioja, Spain).** Physics and Chemistry of the Earth. 20(3-4): 395-401.

Arnáez, J.; Larrea, V.; Ortigosa, L. 2004. **Surface runoff and soil erosion on unpaved forest roads from rainfall simulation tests in northeastern Spain.** Catena. 57: 1-14.

Arnold, J. 1957. **Engineering aspects of forest soil.** In: An introduction to forest soils of the Douglas-fir region of the Pacific Northwest. Portland, OR: Western Forestry and Conservation Association. Chapter XIII. 15 p.

Arthur, M.A.; Coltharp, G.B.; Brown, D.L. 1998. **Effects of best management practices on forest streamwater quality in eastern Kentucky.** Journal of the American Water Resources Association. 34(3): 481-495.

Asaria, P.; Chisholm, D.; Mathers, C.; Ezzati, M.; Beaglehole, R. 2007. **Chronic disease prevention: health effects and financial costs of strategies to reduce salt intake and control tobacco use.** The Lancet. 370: 2044-2053.

Aubertin, G.M.; Patric, J.H. 1974. **Water quality after clearcutting a small watershed in West Virginia.** Journal of Environmental Quality. 3(3): 243-249.

Aust, W.M.; Blinn, C.R. 2004. **Forestry best management practices for timber harvesting and site preparation in the eastern United States: an overview of water quality and productivity research during the past 20 years (1982-2002).** Water, Air, and Soil Pollution: Focus. 4: 5-36.

Aust, W.M.; Carroll, M.B.; Bolding, M.C.; Dolloff, C.A. 2011. **Operational forest stream crossings effects on water quality in the Virginia Piedmont.** Southern Journal of Applied Forestry. 35(3): 123-130.

Aycock, E. 2009. **The hydrology of road defects.** Alpharetta, GA: Atlanta Engineering Services Inc. http://161.58.137.120/Images/The%20Hydrology%20of%20Road%20Defects%20Submitted%2007%2006%2009%20to%20AIH.pdf (accessed December 29, 2011).

Bäckström, M. 2002. **Sediment transport in grassed swales during simulated runoff events.** Water Science and Technology. 45(7): 41-49.

Bäckström, M. 2003. **Grassed swales for stormwater pollution control during rain and snowmelt.** Water Science and Technology. 48(9): 123-132.

Bäckström, M.; Karlsson, S.; Bäckman, L.; Folkeson, L.; Lind, B. 2004. **Mobilisation of heavy metals by deicing salts in a roadside environment.** Water Research. 38: 720-732.

Bader, C.D. 1997. **Controlling dust.** Erosion Control, Journal of the International Erosion Control Association. 4(5): 20-32.

Bailey, R.W.; Copeland, O.L. 1961. **Vegetation and engineering structures in flood and erosion control.** In: Proceedings, 13th congress. Vienna, Austria: International Union of Forest Research Organizations. 23 p.

Balmer, W.E.; Williston, H.L.; Dissmeyer, G.E.; Pierce, C. 1976. **Site preparation – why and how.** Forest Management Bulletin SA-FB2. Atlanta, GA: U.S. Department of Agriculture, Forest Service, State and Private Forestry, Southeastern Area. 8 p.

Barber, M.E.; Downs, R.C. 1995. **Investigation of culvert hydraulics related to juvenile fish passage: research report.** Olympia, WA: Washington State Department of Transportation. 268 p.

Barfield, B.J.; Tollner, E.W.; Hayes, J.C. 1979. **Filtration of sediment by simulated vegetation: I. Steady-state flow with homogeneous sediment.** Transactions of the American Society of Agricultural Engineers. 22(3): 540-545, 548.

Barkley, D.G.; Blaser, R.E.; Schmidt, R.E. 1965. **Effect of mulches on microclimate and turf establishment.** Agronomy Journal. 57: 189-192.

Barling, R.D.; Moore, I.D. 1994. **Role of buffer strips in management of waterway pollution: a review.** Environmental Management. 18: 543-558.

Barnett, A.P.; Diseker, E.G.; Richardson, E.C. 1967. **Evaluation of mulching methods for erosion control on newly prepared and seeded highway backslopes.** Agronomy Journal. 59: 83-85.

Barraclough, D.; Nye, P.H. 1979. **The effect of molecular size on diffusion characteristics in soil.** Journal of Soil Science. 30: 29-42.

Barrett, M.; Lantin, A.; Austrheim-Smith, S. 2004. **Storm water pollutant removal in roadside vegetated buffer strips.** Transportation Research Record. 1890: 129-140.

Barrett, M.E. 2008. **Comparison of BMP performance using the international BMP database.** Journal of Irrigation and Drainage Engineering. 134(5): 556-561.

Barrett, M.E.; Kearney, J.E.; McCoy, T.G.; Malina, J.F., Jr.; Charbeneau, R.J. 1996. **An evaluation of the use and effectiveness of temporary sediment controls.** Report No. FHWA/TX-96/1943-2. Prepared for: Texas Department of Transportation. Austin, TX: University of Texas, Center for Transportation Research, Bureau of Engineering Research. 149 p.

Barrett, M.E.; Malina, J.F., Jr.; Charbeneau, R.J. 1998a. **An evaluation of geotextiles for temporary sediment control.** Water Environment Research. 70(3): 283-290.

Barrett, M.E.; Walsh, P.M.; Malina, J.F., Jr.; Charbeneau, R.J. 1998b. **Performance of vegetative controls for treating highway runoff.** Journal of Environmental Engineering. 124(11): 1121-1128.

Barton, C.; Kinkead, K. 2005. **Do erosion control and snakes mesh?** Journal of Soil and Water Conservation. 60(2): 33A-35A.

Barvenik, F.W. 1994. **Polyacrylamide characteristics related to soil applications.** Soil Science. 158(4): 235-243.



FS-002915

Batista, J.; Piechota, T.; James, D.; Stave, K. 2002. **Literature review: dust suppression and its environmental impacts.** In: Piechota, T.; Van Ee, J.; Batista, J.; Stave, K.; James, D., eds. Potential environmental impacts of dust suppressants: "avoiding another Times Beach." EPA/600/R-04/031. Appendix A. Washington, DC: U.S. Environmental Protection Agency; Las Vegas, NV: University of Nevada: 45-58.

Baver, L.D. 1956. **Soil physics.** New York: John Wiley and Sons, Inc. 489 p.

Beasley, R.S.; Miller, E.L.; Gough, S.C. 1984. **Forest road erosion in the Ouachita Mountains.** In: Peters, P.A.; Luchok, J., eds. Proceedings, mountain logging symposium. Morgantown, WV: West Virginia University: 202-213.

Beaty, A.N.S.; Raymond, G.P. 1995. **Concrete block road paving.** Concrete International. 17(5): 36-41.

Bell, J.R.; Hicks, R.G. 1980. **Evaluation of test methods and use criteria for geotechnical fabrics in highway applications.** Corvallis, OR: Oregon State University, Department of Engineering. 202 p.

Belt, G.H.; O'Laughlin, J.; Merrill, T. 1992. **Design of forest riparian buffer strips for the protection of water quality: analysis of scientific literature.** Idaho Forest, Wildlife, and Range Policy Analysis Group Report No. 8. Moscow, ID: University of Idaho. 35 p.

Ben-Hur, M. 1994. **Runoff, erosion, and polymer application in moving-sprinkler irrigation.** Soil Science. 158(4): 283-290.

Ben-Hur, M.; Malik, M.; Letey, J.; Mingelgrin, U. 1992. **Adsorption of polymers on clays as affected by clay charge and structure, polymer properties, and water quality.** Soil Science. 153(5): 349-356.

Benik, S.R.; Wilson, B.N.; Biesboer, D.D.; Hansen, B.; Stenlund, D. 2003. **Evaluation of erosion control products using natural rainfall events.** Journal of Soil and Water Conservation. 58(2): 98-105.

Bennett, F.L. 1994. **Gravel roadway maintenance in cold regions.** Report No. INE/TRC-94.05. Fairbanks, AK: University of Alaska Fairbanks, Institute of Northern Engineering, Transportation Research Center. 74 p.

Benoit, G.R.; Mostaghimi, S.; Young, R.A.; Lindstrom, M.J. 1986. **Tillage-residue effects on snow cover, soil water, temperature and frost.** Transactions of the American Society of Agricultural Engineers. 29(2): 473-479.

Bergeson, K.L.; Brocka, S.G. 1996. **Bentonite treatment for fugitive dust control.** In: 1996 semi-sesquicentennial transportation conference proceedings. Ames, IA: Iowa Department of Transportation; Iowa State University, Center for Transportation Research and Education. 3 p.

Berglund, E.R. 1976. **Seeding to control erosion along forest roads.** Extension Circular 885. Corvallis, OR: Oregon State University Extension Service. 19 p.

Berkshire Regional Planning Commission. 2001. **Unpaved roads BMP manual: a guidebook on how to improve water quality while addressing common problems.** Guidebook, Project 98-06/319. Pittsfield, MA: Berkshire Regional Planning Commission: 15-16.

Beschta, R.L. 1978. **Long-term patterns of sediment production following road construction and logging in the Oregon Coast Range.** Water Resources Research. 14(6): 1011-1016.

Bethlahmy, N.; Kidd, W.J., Jr. 1966. **Controlling soil movement from steep road fills.** Res. Note INT-45. Ogden, UT: U.S. Department of Agriculture, Forest Service, Intermountain Forest and Range Experiment Station. 4 p.

Beyers, J.L. 2004. **Postfire seeding for erosion control: effectiveness and impacts on native plant communities.** Conservation Biology. 18(4): 947-956.

Bhatt, R.; Khera, K.L. 2006. **Effect of tillage and mode of straw mulch application on soil erosion in the submontaneous tract of Punjab, India.** Soil and Tillage Research. 88: 107-115.

Bhattacharyya, R.; Davies, K.; Fullen, M.A.; Booth, C.A. 2008. **Effects of palm-mat geotextiles on the conservation of loamy sand soils in east Shropshire, UK.** Advances in GeoEcology. 39: 527-538.

Bhattacharyya, R.; Davies, K.; Fullen, M.A.; Booth, C.A.; Subedi, M. 2007. **Effects of palm-mat geotextiles on conservation of temperate agricultural soils in the United Kingdom.** Wolverhampton, UK: University of Wolverhampton, School of Applied Sciences. 1 p.

Bhattacharyya, R.; Fullen, M.A.; Davies, K.; Booth, C.A. 2010. **Use of palm-mat geotextiles for rainsplash erosion control.** Geomorphology. 119: 52-61.

Bilby, R.E.; Sullivan, K.; Duncan, S.H. 1989. **The generation and fate of road-surface sediment in forested watersheds of southwestern Washington.** Forest Science. 35(2): 453-468.

Bill, M.D. 2005. **Channel morphology and substrate responses to high flows and road construction in forested mid-Appalachian watersheds.** Carbondale, IL: Southern Illinois University. 64 p. M.S. thesis.

Bjorneberg, D.L.; Santos, F.L.; Castanheira, N.S.; Martins, O.C.; Reis, J.L.; Aase, J.K.; Sojka, R.E. 2003. **Using polyacrylamide with sprinkler irrigation to improve infiltration.** Journal of Soil and Water Conservation. 58(5): 283-289.

Blanco-Canqui, H.; Gantzer, C.J.; Anderson, S.H.; Alberts, E.E. 2004. **Grass barriers for reduced concentrated flow induced soil and nutrient loss.** Soil Science Society of America Journal. 68: 1963-1972.

Blinn, C.R.; Dahlman, R.; Hislop, L.; Thompson, M.A. 1998. **Temporary stream and wetland crossing options for forest management.** Gen. Tech. Rep. NC-202. St. Paul, MN: U.S. Department of Agriculture, Forest Service, North Central Research Station. 61 p.

Blinn, C.R.; Kilgore, M.A. 2001. **Riparian management practices: a summary of state guidelines.** Journal of Forestry. 99(8): 11-17.

Blinn, C.R.; Taff, S.J.; Thompson, M.J.; Mlinar, M.; Townsend, N. 2000. **Assessing the financial effects associated with implementing Minnesota's timber harvesting and forest management guidelines.** Report #RR-0900. St. Paul, MN: Minnesota Forest Resources Council. 164 p.

Bloser, S.M.; Scheetz, B.E. 2012. **Sediment production from unpaved oil well access roads in the Allegheny National Forest. Final report.** University Park, PA: Pennsylvania State University, Center for Dirt and Gravel Road Studies. 62 p.

Bochet, E.; García-Fayos, P. 2004. **Factors controlling vegetation establishment and water erosion on motorway slopes in Valencia, Spain.** Restoration Ecology. 12(2): 166-174.

Bohn, H.L.; McNeal, B.L.; O'Connor, G.A. 1985. **Soil chemistry.** 2nd ed. New York: John Wiley and Sons, Inc. 341 p.

Boise State University. 1984. **Project completion report: sediment yield from cut and fill slopes, Silver Creek research road, Boise National Forest, Idaho.** Cooperative Agreement INT-80-003-CA. Boise, ID: Boise State University, Department of Geology and Geophysics. 97 p.

Bolander, P. 1997. **Chemical additives for dust control: what we have used and what we have learned.** Transportation Research Record. 1589: 42-49.

Bolander, P. 1999. **Laboratory testing of nontraditional additives for stabilization of roads and trail surfaces.** Transportation Research Record. 1652(2): 24-31.

Bolander, P.; Yamada, A. 1999. **Dust palliative selection and application guide.** Project Report 9977 1207-SDTDC. San Dimas, CA: U.S. Department of Agriculture, Forest Service, San Dimas Technology and Development Center. 20 p.

Bold, K.; Edwards, P.; Williard, K. 2007. **A case study of an erosion control practice: the broad-based dip.** In: Sessions, J.; Havill, Y., eds. Proceedings, international mountain logging and 13th Pacific Northwest skyline symposium. Corvallis, OR: Oregon State University: 65-71.

Bold, K.C. 2007. **Erosion control practices in managed forested watershed: vegetation establishment and broad-based dips.** Carbondale, IL: Southern Illinois University. 115 p. M.S. thesis.

Boubakari, M.; Morgan, R.P.C. 1999. **Contour grass strips for soil erosion control on steep lands: a laboratory evaluation.** Soil Use and Management. 15(1): 21-26.

Bouska, W.W. 2008. **Road crossing designs and their impact on fish assemblages and geomorphology of Great Plains streams.** Manhattan, KS: Kansas State University, College of Arts and Sciences. 158 p. M.S. thesis.

Bouska, W.W.; Keane, T.; Paukert, C.P. 2010. **The effects of road crossings on prairie stream habitat and function.** Journal of Freshwater Ecology. 25(4): 499-506.

Brabb, E.E. 1995. **The San Mateo County California GIS project for predicting the consequences of hazardous geologic processes.** In: Carrara, A.; Guzzetti, F., eds. Geographical information systems in assessing natural hazards. Advances in Natural and Technological Hazards Research. Norwell, MA: Kluwer Academic Publishers: 299-334.

Bracken, L.J.; Croke, J. 2007. **The concept of hydrological connectivity and its contribution to understanding runoff-dominated geomorphic systems.** Hydrologic Processes. 21: 1749-1763.

Brady, N.C. 1984. **The nature and properties of soils.** 9th ed. New York: MacMillan Publishing Company. 750 p.

Bren, L.J.; Turner, A.K. 1980. **Hydrologic output of small forested catchments: implications for management.** Australian Forestry. 43(2): 111-117.

Britton, S.L.; Robinson, K.M.; Barfield, B.J. 2001. **Modeling the effectiveness of silt fence.** In: Proceedings, seventh federal interagency sedimentation conference. [N.p.]: Advisory Committee on Water Information, Subcommittee on Sedimentation: V75-V82.

Broadmeadow, S.; Nisbet, T.R. 2004. **The effects of riparian forest management on the freshwater environment: a literature review of best management practice.** Hydrology and Earth System Sciences. 8(3): 286-305.

Brown, G.W.; Krygier, J.T. 1971. **Clear-cut logging and sediment production in the Oregon Coast Range.** Water Resources Research. 7(5): 1189-1198.

Brown, K. 2010. **Effectiveness of forestry best management practices in minimizing harvesting impacts on streamflow and sediment loading in low-gradient headwaters of the Gulf Coastal Plain.** Baton Rouge, LA: Louisiana State University. 75 p. M.S. thesis. http://etd.lsu.edu/docs/available/etd-09222010-164535/ (accessed September 12, 2012).

Brown, K.R.; Aust, W.M.; McGuire, K.J. 2013. **Sediment delivery from bare and graveled forest road stream crossing approaches in the Virginia Piedmont.** Forest Ecology and Management. 310: 836-846.

Brown, K.R.; McGuire, K.J.; Aust,W.M.; Hession, W.C.; Dolloff, C.A. 2015. **The effect of increasing gravel cover on forest roads for reduced sediment delivery to stream crossings.** Hydrological Processes. 29(6): 1129-1140.

Brown, W.E.; Caraco, D.S. 1997. **Muddy water in – muddy water out.** Watershed Protection Techniques. 2(3): 393-403.

Bryan, R.B. 1992. **The influence of some soil conditioners on soil properties: laboratory tests on Kenyan soil samples.** Soil Technology. 5: 225-247.

Brynn, D.J.; Clausen, J.C. 1991. **Postharvest assessment of Vermont's acceptable silvicultural management practices and water quality impacts.** Northern Journal of Applied Forestry. 8(4): 140-144.

FS-002917

Buchanan, J.R.; Yoder, D.C.; Denton, H.P.; Smoot, J.L. 2002. **Wood chips as a soil cover for construction sites with steep slopes.** Applied Engineering in Agriculture. 18(6): 679-683.

Burkhard, R.; Deletic, A.; Craig, A. 2000. **Techniques for water and wastewater management: a review of techniques and their integration in planning.** Urban Water. 2: 197-221.

Burroughs, E.R., Jr.; Chalfant, G.R.; Townsend, M.A. 1976. **Slope stability in road construction.** Portland, OR: U.S. Department of the Interior, Bureau of Land Management, Oregon State Office. 102 p.

Burroughs, E.R., Jr.; King, J.G. 1989. **Reduction of soil erosion on forest roads.** Gen. Tech. Rep. INT-264. Ogden, UT: U.S. Department of Agriculture, Forest Service, Intermountain Research Station. 21 p.

Burroughs, E.R., Jr.; Watts, F.J.; Haber, D.F. 1984a. **Surfacing to reduce erosion of forest roads built in granitic soils.** In: O'Loughlin, C.L.; Pearce, A.J., eds. Proceedings, symposium on effects of forest land use on erosion and slope stability. Honolulu, HI: University of Hawaii, East-West Center: 255-264.

Burroughs, E.R., Jr.; Watts, F.J.; King, J.G.; Haber, D.F.; Hansen, D.; Flerchinger, G. 1984b. **Relative effectiveness of rocked roads and ditches in reducing surface erosion.** In: Proceedings, 21st annual engineering, geology, and soils engineering symposium. Moscow, ID: University of Idaho: 251-263.

Burroughs, E.R., Jr.; Watts, F.J.; King, J.G.; Hansen, D. 1984c. **Relative effectiveness of fillslope treatments in reducing surface erosion, Horse Creek Road, Nezperce National Forest, Idaho.** Unpublished report on file with: U.S. Department of Agriculture, Forest Service, Moscow, ID. 34 p.

Butler, D.; Thedchanamoorthy, S.; Payne, J.A. 1992. **Aspects of surface sediment characteristics on an urban catchment in London.** Water Science and Technology. 25(8): 13-19.

Butzke, M.R. 1974. **Organic cationic and sodium chloride soil stabilization.** Ames, IA: Iowa State University. 155 p. M.S. thesis.

Büyüksönmez, F.; Yang, L.; Beighley, R.E. 2012. **Evaluation of best management practice products in preventing discharge of metals: a laboratory evaluation.** Journal of Environmental Quality. 41: 800-806.

Cafferata, P.H.; Coe, D.B.R.; Harris, R.R. 2007. **Water resource issues and solutions for forest roads in California.** In: Proceedings, American Institute of Hydrology 2007 annual meeting and international conference. Hydrological Science and Technology. 23(1-4): 39-56.

California Stormwater Quality Association. 2003. **Silt fence.** California Stormwater BMP Handbook. Menlo Park, CA: California Stormwater Quality Association. 8 p.

Cameron, A.L.; Henderson, L.E., eds. 1979. **Logging roads.** In: Environmental considerations for forest harvesting. Canberra, Australia: CSIRO: 27-37. Chapter 4.

Carr, W.W.; Ballard, T.M. 1980. **Hydroseeding forest roadsides in British Columbia for erosion control.** Journal of Soil and Water Conservation. 35(1): 33-35.

Carrara, A.; Cardinali, M.; Detti, R.; Guzzetti, F.; Pasqui, V.; Reichenbach, P. 1991. **GIS techniques and statistical models in evaluating landslide hazard.** Earth Surface Processes and Landforms. 16: 427-445.

Carroll, C.; Merton, L.; Burger, P. 2000. **Impact of vegetative cover and slope on runoff, erosion, and water quality for field plots on a range of soil and spoil materials on central Queensland coal mines.** Australian Journal of Soil Research. 38(2): 313-327.

Carroll, R.G., Jr.; Rodencal, J.; Collin, J.G. 1992. **Geosynthetics in erosion control – the principles.** Geotextiles and Geomembranes. 11: 523-534.

Castelle, A.J.; Johnson, A.W. 2000. **Riparian vegetation effectiveness.** Tech. Bull. No. 799. Research Triangle Park, NC: National Council for Air and Stream Improvement. 26 p.

Castelle, A.J.; Johnson, A.W.; Conolly, C. 1994. **Wetland and stream buffer size requirements – a review.** Journal of Environmental Quality. 23: 878-882.

Cazzuffi, D.; Monferino, F.; Monti, R.; Rimoldi, P. 1994. **Experimental evaluation of the erosion on bare and geosynthetically protected slopes.** In: Rickson, R.J., ed. Conserving soil resources: European perspectives. Cambridge, UK: University Press: 413-421. Chapter 38.

Cederholm, C.J.; Reid, L.M.; Salo, E.O. 1981. **Cumulative effects of logging road sediment on salmonid populations in the Clearwater River, Jefferson County, Washington.** In: Proceedings of the conference, Salmon-spawning gravel: A renewable resource in the Pacific Northwest? Pullman, WA: Washington Water Research Center: 38-74.

Cerdà, A. 2007. **Soil water erosion on road embankments in eastern Spain.** Science of the Total Environment. 378: 151-155.

Chalmers, R.W. 1979. **Erosion from snig-tracks on granite/adamellite-derived soils.** Australian Forest Research Newsletter. 6: 142-143.

Chatterjea, K. 1994. **Dynamics of fluvial and slope processes in the changing geomorphic environment of Singapore.** Earth Surface Processes and Landforms. 19: 585-607.

Chatwin, S.C.; Howes, D.E.; Schwab, J.W.; Swanston, D.N. 1994. **A guide for management of landslide-prone terrain in the Pacific Northwest.** Victoria, BC: British Columbia Ministry of Forests. 229 p.

Chaubey, I.; Edwards, D.R.; Daniel, T.C.; Moore, P.A., Jr.; Nichols, D.J. 1995. **Effectiveness of vegetative filter strips in controlling losses of surface-applied poultry litter constituents.** Transactions of the American Society of Agricultural Engineers. 38(6): 1687-1692.

Chaudhari, K.; Flanagan, D.C. 1998. **Polyacrylamide effect on sediment yield, runoff, and seedling emergence on a steep slope.** In: Proceedings, ASAE annual international meeting. Paper No. 98-2155. St. Joseph, MI: American Society of Agricultural Engineers. 18 p.

Childs, E.C. 1969. **An introduction to the physical basis of soil water phenomena.** London, England: John Wiley and Sons, Ltd. 439 p.

FS-002918

Chopra, M.; Wanielista, M.; Gogo-Abite, I.; Hardin, M. 2010. **Index testing to support the stormwater management erosion and sediment control laboratory.** FDOT Project No. BD521, RPWO #5. Prepared for: Florida Department of Transportation. Orlando, FL: University of Central Florida, Stormwater Management Academy. 101 p.

Christ, M.J.; Driscoll, C.T.; Likens, G.E. 1999. **Watershed- and plot-scale tests of the mobile anion concept.** Biogeochemistry. 47: 335-353.

Claiborn, C.; Mitra, A.; Adams, G.; Bamesberger, L.; Allwine, G.; Kantamaneni, R.; Lamb, B.; Westberg, H. 1995. **Evaluation of PM10 emission rates from paved and unpaved roads using tracer techniques.** Atmospheric Environment. 29(10): 1075-1089.

Clarkin, K.; Keller, G.; Warhol, T.; Hixson, S. 2006. **Low-water crossings: geomorphic, biological, and engineering design considerations.** San Dimas, CA: U.S. Department of Agriculture, Forest Service, San Dimas Technology and Development Center. 366 p.

Claytor, R.A.; Schueler, T.R. 1996. **Design of stormwater filtering systems.** Silver Spring, MD: Center for Watershed Protection. 220 p.

**Clean Water Act of 1972**; 33 U.S.C. s/s 1251 et seq.

Clinnick, P.F. 1985. **Buffer strip management in forest operations: a review.** Australian Forestry. 48(1): 34-45.

Clinton, B.D.; Vose, J.M. 2003. **Differences in surface water quality draining four road surface types in the southern Appalachians.** Southern Journal of Applied Forestry. 27(2): 100-106.

Coe, D.B.R. 2006. **Sediment production and delivery from forest roads in the Sierra Nevada, California.** Fort Collins, CO: Colorado State University. 110 p. M.S. thesis.

Coker, R.J.; Fahey, B.D.; Payne, J.J. 1993. **Fine sediment production from truck traffic, Queen Charlotte Forest, Marlborough Sounds, New Zealand.** Journal of Hydrology (N.Z.). 31(1): 56-64.

Collins, L.M.; Johnston, C.E. 1995. **Effectiveness of straw bale dams for erosion control in the Oakland Hills following the fire of 1991.** In: Keeley, J.E.; Scott, T., eds. Brushfires in California wildlands: ecology and resource management. Fairfield, WA: International Association of Wildland Fire: 171-183.

Colorado State Forest Service. 2010. **Forestry best management practices to protect water quality in Colorado.** Fort Collins, CO: Colorado State University. 28 p.

Colwell, S.; Horner, R.R.; Booth, D.B.; Gilvydis, D. 2000. **A survey of ditches along county roads for their potential to affect storm runoff water quality.** General Report. Seattle, WA: University of Washington, Center for Urban Water Resources Management. 26 p. + appendices.

Cook, D.F.; Nelson, S.D. 1986. **Effect of polyacrylamide on seedling emergence in crust-forming soils.** Soil Science. 141(5): 328-333.

Cook, M.J.; King, J.G. 1983. **Construction cost and erosion control effectiveness of filter windrows on fill slopes.** Res. Note INT-335. Ogden, UT: U.S. Department of Agriculture, Forest Service, Intermountain Forest and Range Experiment Station. 5 p.

Cook, W.L., Jr.; Hewlett, J.D. 1979. **The broad-based dip on Piedmont woods roads.** Southern Journal of Applied Forestry. 3(3): 77-81.

Copstead, R.L.; Johansen, D.K.; Moll, J. 1998. **Water/road interaction: introduction to surface cross drains.** Report 9877 1806-SDTDC. San Dimas, CA: U.S. Department of Agriculture, Forest Service, Technology and Development Program. 15 p.

Corbett, E.S.; Lynch, J.A.; Sopper, W.E. 1978. **Timber harvesting practices and water quality in the eastern United States.** Journal of Forestry. 76(8): 484-488.

Corley, C.J.; Frasier, G.W.; Trlica, M.J.; Smith, F.M.; Taylor, E.M., Jr. 1999. **Technical note: nitrogen and phosphorus in runoff from 2 montane riparian communities.** Journal of Range Management. 52(6): 600-605.

Cornell University Weed Ecology and Management Laboratory. [N.d.]. **Organic weed management.** http://weedecology.css.cornell.edu/manage/manage.php?id=23 (accessed September 5, 2012).

Cornish, P.M. 1975. **The impact of forest operations on water quality.** Tech. Paper No. 24. Sydney, Australia: Forestry Commission of New South Wales. 12 p.

Cornish, P.M. 2001. **The effects of roading, harvesting, and forest regeneration on streamwater turbidity levels in a moist eucalypt forest.** Forest Ecology and Management. 152: 293-312.

Correll, D.L. 1996. **Buffer zones and water quality protection: general principles.** In: Naycock, N.E.; Burt, T.P.; Goulding K.W.T.; Pinay, G., eds. Buffer zones: their processes and potential in water protection. Proceedings of the international conference on buffer zones. Hertfordshire, UK: Quest Environmental: 7-20.

Countess, R. 2001. **Methodology for estimating fugitive windblown and mechanically resuspended road dust emissions applicable for regional air quality modeling.** Prepared for: Western Governors' Association. Westlake Village, CA: Countess Environmental. 14 p.

Crawford, R.M.M. 1992. **Oxygen availability as an ecological limit to plant distribution.** In: Begon, M.; Fitter, A.H., eds. Advances in Ecological Research, vol. 23. Cambridge: Academic Press: 93-185.

Crawford, R.M.M. 1996. **Whole plant adaptations to fluctuating water tables.** Folia Geobotanica & Phytotaxonomica. 31: 7-24.

Crebbin, C. 1988. **Laboratory evaluation of geotextile performance in silt fence applications using a subsoil of glacial origin.** Seattle, WA: University of Washington. 90 p. M.S. thesis.

Croke, J.; Mockler, S. 2001. **Gully initiation and road-to-stream linkage in a forested catchment, southeastern Australia.** Earth Surface Processes and Landforms. 26: 205-217.

Croke, J.; Mockler, S.; Fogarty, P.; Takken, I. 2005. **Sediment concentration changes in runoff pathways from a forest road network and the resultant spatial pattern of catchment connectivity.** Geomorphology. 68: 257-268.



FS-002919

Croke, J.; Mockler, S.; Hairsine, P.; Fogarty, P. 2006. **Relative contributions of runoff and sediment from sources within a road prism and implications for total sediment delivery.** Earth Surface Processes and Landforms. 31: 457-468.

Croke, J.C.; Hairsine, P.B. 2006. **Sediment delivery in managed forests: a review.** Environmental Review. 14: 59-87.

Curry, R.A.; Scruton, D.A.; Clarke, K.D. 2002. **The thermal regimes of brook trout incubation habitats and evidence of changes during forestry operations.** Canadian Journal of Forest Research. 32: 1200-1207.

Dabney, S.M.; McGregor, K.C.; Meyer, L.D.; Grissinger, E.H.; Foster, G.R. 1993. **Vegetative barriers for runoff and sediment control.** In: Mitchell, J.K., ed. Proceedings, integrated resource management and landscape modification for environmental protection. ASAE Publ. 93-13. St. Joseph, MI: American Society of Agricultural Engineers: 60-70.

Dabney, S.M.; Meyer, L.D.; Harmon, W.C.; Alonso, C.V.; Foster, G.R. 1995. **Depositional patterns of sediment trapped by grass hedges.** Transactions of the American Society of Agricultural Engineers. 38(6): 1719-1729.

Daigle, P. 2010. **A summary of the environmental impacts of roads, management responses, and research gaps: a literature review.** BC Journal of Ecosystems and Management. 10(3): 65-89.

Dalton, P.A.; Smith, R.J.; Truong, P.N.V. 1996. **Vetiver grass hedges for erosion control on a cropped flood plain: hedge hydraulics.** Agricultural Water Management. 31: 91-104.

Damian, F. 2003. **Cross-drain placement to reduce sediment delivery from forest roads to streams.** Seattle, WA: University of Washington. 52 p. M.S. thesis.

Danfors, B. 1990. **Compaction in the subsoil.** In: Proceedings, 1990 international conference on agricultural engineering. Dusseldorf, Germany: VDI-Gesellschaft Agrartechnik, Verein Deutcher Ingenieure: 27-28.

Danfors, B. 1994. **Changes in subsoil porosity caused by heavy vehicles.** Soil and Tillage Research. 29: 135-144.

Daniels, R.B.; Gilliam, J.W. 1996. **Sediment and chemical load reduction by grass and riparian filters.** Soil Science Society of America Journal. 60: 246-251.

Davidson, R.A.; Davidson, C.F.; Roa-Espinosa, A. 2009. **Linear anionic polyacrylamide as an effective post-fire soil treatment: understanding the chemistry and physical science.** Journal of Soil and Water Conservation. 64(4): 243-252.

Davies, P.E.; Nelson, M. 1994. **Relationships between riparian buffer widths and the effects of logging on stream habitat, invertebrate community composition and fish abundance.** Australian Journal of Marine and Freshwater Research. 45: 1289-1305.

Davis, A.P.; Shokouhian, M.; Sharma, H.; Minami, C.; Winogradoff, D. 2003. **Water quality improvement through bioretention: lead, copper, and zinc removal.** Water Environment Research. 75: 73-82.

Dawson, A.; Kolisoja, P. 2006. **Managing rutting in low volume roads. Roadex III Project: northern periphery.** Lulea, Sweden: Swedish Road Administration. 26 p.

De Baets, S.; Poesen, J.; Gyssels, G.; Knapen, A. 2006. **Effects of grass roots on the erodibility of topsoils during concentrated flow.** Geomorphology. 76: 54-67.

De Ploey, J.; Savat, J.; Moeyersons, J. 1976. **The differential impact of some soil loss factors on flow, runoff creep, and rainwash.** Earth Surface Processes. 1(2): 151-161.

DeGraff, J.V. 1990. **Landslide dams from the November 1988 storm event in southern Thailand.** Landslide News. 4: 12-15.

Deletic, A. 2001. **Modelling of water and sediment transport over grassed areas.** Journal of Hydrology. 248: 168-182.

Deletic, A. 2005. **Sediment transport in urban runoff over grassed areas.** Journal of Hydrology. 301: 108-122.

Deletic, A.; Fletcher, T.D. 2006. **Performance of grass filters used for stormwater treatment – a field and modelling study.** Journal of Hydrology. 317: 261-275.

Demars, K.R.; Long, R.P. 2001. **Performance specifications for wood waste materials as an erosion control mulch and as a filter berm.** Report No. NETCR 25. Prepared for: New England Transportation Consortium. Storrs, CT: University of Connecticut, Department of Civil and Environmental Engineering. 28 p.

Demars, K.R.; Long, R.P.; Ives, J.R. 2000. **Use of wood waste materials for erosion control.** Report No. NETCR 20. Prepared for: New England Transportation Consortium. Storrs, CT: University of Connecticut, Department of Civil and Environmental Engineering. 63 p.

Denkler, P.; Bowders, J.; Loehr, E. 2000. **Geotextiles and loess: long-term flow.** In: Proceedings, mid-continent transportation symposium. Ames, IA: Iowa State University: 249-253.

Desbonnet, A.; Pogue, P.; Lee, V.; Wolff, N. 1994. **Vegetated buffers in the coastal zone – a summary review and bibliography.** Coastal Resources Tech. Rep. 2064. Narragansett, RI: University of Rhode Island Graduate School of Oceanography. 72 p.

Descheemaeker, K.; Nyssen, J.; Poesen, J.; Raes, D.; Haile, M.; Muys, B.; Deckers, S. 2006. **Runoff on slopes with restoring vegetation: a case study from the Tigray highlands, Ethiopia.** Journal of Hydrology. 331: 219-241.

Descroix, L.; Viramontes, D.; Vauclin, M.; Gonzalez Barrios, J.L.; Esteves, M. 2001. **Influence of soil surface features and vegetation on runoff and erosion in the Western Sierra Madre (Durango, northwest Mexico).** Catena. 43: 115-135.

Dickinson, W.T.; Wall, G.J. 1977. **Theme 2: The relationship between source-area erosion and sediment yield.** Hydrological Sciences Bulletin. 22(4): 527-530.

Dillaha, T.A.; Beasley, D.B.; Huggins, L.F. 1982. **Using the ANSWERS model to estimate sediment yields on construction sites.** Journal of Soil and Water Conservation. 37: 117-120.

Dillaha, T.A.; Hayes, J.C. 1992. **Vegetative filter strips: II. Application of design procedures.** Paper No. 92-2103. St. Joseph, MI: American Society of Agricultural Engineers. 18 p.

Dillaha, T.A.; Reneau, R.B.; Mostaghimi, S.; Lee, D. 1989. **Vegetative filter strips for agricultural nonpoint source pollution control.** Transactions of the American Society of Agricultural Engineers. 32(2): 513-519.

Dillaha, T.A.; Reneau, R.B.; Mostaghimi, S.; Shanholtz, V.O.; Magette, W.L. 1987. **Evaluating nutrient and sediment losses from agricultural lands: vegetative filter strips.** Project No. X-00315-01-0. Annapolis, MD: U.S. Environmental Protection Agency, Region III, Chesapeake Bay Liaison Office. 93 p.

Dillaha, T.A.; Sherrard, J.H.; Lee, D. 1986. **Long-term effectiveness and maintenance of vegetative filter strips.** Bull. 153. Blacksburg, VA: Virginia Polytechnic Institute and State University, Virginia Water Resources Research Center. 31 p.

Dillaha, T.A.; Sherrard, J.H.; Lee, D.; Mostaghimi, S.; Shanholtz, V.O. 1988. **Evaluation of vegetative filter strips as a best management practice for feed lots.** Journal (Water Pollution Control Federation). 60(7): 1231-1238.

Diseker, E.G.; McGinnis, J.T. 1967. **Evaluation of climatic, slope, and site factors on erosion from unprotected roadbanks.** Transactions of the American Society of Agricultural Engineers. 10: 9-11, 14.

Diseker, E.G.; Sheridan, J.M. 1971. **Predicting sediment yield from roadbanks.** Transactions of the American Society of Agricultural Engineers. 14(1): 102-105.

Donaldson, S. 2009. **Low impact development in northern Nevada: vegetated swales and buffers.** Fact Sheet FS-09-26. Reno, NV: University of Nevada Cooperative Extension, Nonpoint Education for Municipal Officials. http://www.unce.unr.edu/publications/files/nr/2009/fs0926.pdf (accessed July 9, 2012).

Döring, T.F.; Brandt, M.; Heß, J.; Finckh, M.R.; Saucke, H. 2005. **Effects of straw mulch on soil nitrate dynamics, weeds, yield and soil erosion in organically grown potatoes.** Field Crops Research. 94: 238-249.

Dorman, M.E.; Hartigan, J.P.; Steg, R.F.; Quasebarth, T.F. 1996. **Retention, detention, and overland flow for pollutant removal from highway stormwater runoff. Vol. 1: Research report.** Report No. FHWA-RD-96-095. McLean, VA: U.S. Department of Transportation, Federal Highway Administration, Office of Research, Development and Technology. 179 p.

Dosskey, M.G.; Helmers, M.J.; Eisenhauer, D.E. 2008. **A design aid for determining width of filter strips.** Journal of Soil and Water Conservation. 63(4): 232-241.

Dosskey, M.G.; Helmers, M.J.; Eisenhauer, D.E. 2011. **A design aid for sizing filter strips using buffer area ratio.** Journal of Soil and Water Conservation. 66(1): 29-39.

Dosskey, M.G.; Helmers, M.J.; Eisenhauer, D.E.; Franti, T.G.; Hoagland, K.D. 2002. **Assessment of concentrated flow through riparian buffers.** Journal of Soil and Water Conservation. 57(6): 336-343.

Doudoroff, P.; Katz, M. 1953. **Critical review of literature on the toxicity of industrial wastes and their components to fish: II. The metals, as salts.** Sewage and Industrial Wastes. 25: 802-839.

Douglas, I. 1967. **Natural and man-made erosion in the humid tropics of Australia, Malaysia, and Singapore.** Publications of the International Association of Scientific Hydrology. 75: 17-30.

Douglas, R.A.; Woodward, W.D.H.; Woodside, A.R. 2000. **Road contact stresses and forces under tires with low inflation pressure.** Canadian Journal of Civil Engineering. 27: 1248-1258.

Dudeck, A.E.; Swanson, N.P.; Dedrick, A.R. 1967. **Mulches for grass establishment on steep construction slopes.** Highway Research Record. 206: 53-59.

Dudeck, A.E.; Swanson, N.P.; Mielke, L.N.; Dedrick, A.R. 1970. **Mulches for grass establishment on fill slopes.** Agronomy Journal. 62(6): 810-812.

Duncan, S.H.; Ward, J.W.; Anderson, R.J. 1987. **A method for assessing landslide potential as an aid in forest road replacement.** Northwest Science. 61(3): 152-159.

Dunn, G.H.; Dabney, S.M. 1996. **Modulus of elasticity and moment of inertia of grass hedge stems.** Transactions of the American Society of Agricultural Engineers. 39(3): 947-952.

Dutton, A.L. 2000. **Process-based simulations of near-surface hydrologic response for a forested upland catchment: the impact of a road.** Stanford, CA: Stanford University. 151 p. M.S. thesis.

Dyck, R.I.J.; Stukel, J.J. 1976. **Fugitive dust emissions from trucks on unpaved roads.** Environmental Science and Technology. 10(10): 1046-1048.

Dyrness, C.T. 1967. **Mass soil movements in the H.J. Andrews Experimental Forest.** Res. Pap. PNW-42. Portland, OR: U.S. Department of Agriculture, Forest Service, Pacific Northwest Forest and Range Experiment Station. 13 p.

Dyrness, C.T. 1970. **Stabilization of newly constructed road backslopes by mulch and grass-legume treatments.** Res. Note PNW-123. Portland, OR: U.S. Department of Agriculture, Forest Service, Pacific Northwest Forest and Range Experiment Station. 5 p.

Dyrness, C.T. 1975. **Grass-legume mixtures for erosion control along forest roads in western Oregon.** Journal of Soil and Water Conservation. 30(4): 169-173.

Eaglin, G.S.; Hubert, W.A. 1993. **Effects of logging and roads on substrate and trout in streams of the Medicine Bow National Forest, Wyoming.** North American Journal of Fisheries Management. 13: 844-846.

Eck, R.W.; Morgan, P.J. 1987. **Culverts versus dips in the Appalachian region: a performance-based decision-making guide.** In: Proceedings, fourth international conference on low-volume roads. Transportation Research Record 1106. Washington, DC: National Research Council, Transportation Research Board: 330-340.

Edmister, J.O.; Gray, J.W. 1948. **The toxicity threshold for three chlorides and three acids to the fry of whitefish and yellow pickerel.** Progressive Fish-Culturist. 10: 105-106.

Edwards, P.J. 2003. **Forestry best management practices: where we've been, where we're going.** In: Proceedings, 2003 Penn State forest resources issues conference. University Park, PA: Pennsylvania State University: 26-33.

Edwards, P.J.; Evans, G.L. 2004. **Giving greater consideration to cross-drainage discharge from forest roads.** In: Proceedings, riparian ecosystems and buffers: multi-scale structure, function, and management. AWRA summer specialty conference. Middleburg, VA: American Water Resources Association. 6 p.

Egan, A.F. 1999. **Forest roads: where soil and water don't mix.** Journal of Forestry. 97(8): 18-21.

Elliot, W.J.; Edwards, P.J.; Foltz, R.B. 2014. **Research related to roads in USDA experimental forests.** In: Hayes, D.C.; Stout, S.L.; Hoover, A.P.; Crawford, R.H., eds. USDA Forest Service experimental forests and ranges: research for the long term. New York: Springer: 367-385. Chapter 16.

Elliot, W.J.; Foltz, R.B.; Luce, C.H. 1999. **Modeling low-volume road erosion.** Transportation Research Record. 1652: 244-249.

Elliot, W.J.; Foltz, R.B.; Robichaud, P.R. 2009. **Recent findings related to measuring and modeling forest road erosion.** In: Anderssen, R.S.; Braddock, R.D.; Newham, L.T.H., eds. Proceedings, 18th world IMACS congress and MODSIM09 international congress on modelling and simulation. Melbourne, Australia: Modelling and Simulation Society of Australia and New Zealand; International Association for Mathematics and Computers in Simulation: 4078-4084.

Elliot, W.J.; Tysdal, L.M. 1999. **Understanding and reducing erosion from insloping roads.** Journal of Forestry. 97(8): 30-34.

El-Morsy, E.A.; Malik, M.; Letey, J. 1991. **Polymer effects on the hydraulic conductivity of saline and sodic soil conditions.** Soil Science. 151(6): 430-435.

Elwell, H.A.; Stocking, M.A. 1974. **Rainfall parameters and a cover model to predict runoff and soil loss from grazing trials in the Rhodesian Sandveld.** Proceedings of the Annual Congresses of the Grassland Society of Southern Africa. 9: 157-164.

Elwell, H.A.; Stocking, M.A. 1976. **Vegetal cover to estimate soil erosion hazard in Rhodesia.** Geoderma. 15: 61-70.

Engen, R.J.; Denison, J.G.; Goldschmid, O. 1976. **Chemical changes in lignin sulfonates during exposure to seawater.** Cellulose Chemistry and Technology. 10: 219-234.

Erman, D.C.; Newbold, J.D.; Roby, K.B. 1977. **Evaluation of streamside buffer strips for protecting aquatic organisms.** Contribution No. 165. Davis, CA: University of California, California Water Resources Center. 48 p.

Ernst, W.H.O. 1990. **Ecophysiology of plants in waterlogged and flooded environments.** Aquatic Botany. 38: 73-90.

Ettinger, W.S. 1987. **Impacts of a chemical dust suppressant/soil stabilizer on the physical and biological characteristics of a stream.** Journal of Soil and Water Conservation. 42(2): 111-114.

Ettlin, L.; Stewart, B. 1993. **Yard debris compost for erosion control.** BioCycle. 34(12): 46-47.

Etyemezian, V.; Kuhns, H.; Gillies, J.; Green, M.; Pitchford, M.; Watson, J. 2003. **Vehicle-based road dust emission measurement: I. Methods and calibration.** Atmospheric Environment. 37: 4559-4571.

Ewing, K. 1996. **Tolerance of four wetland plant species to flooding and sediment deposition.** Environmental and Experimental Botany. 36(2): 131-146.

Farias, R.J.C.; Palmeira, E.M.; Carvalho, J.C. 2006. **Performance of geotextile silt fences in large flume tests.** Geosynthetics International. 13(4): 133-144.

Faucette, L.B.; Cardoso-Gendreau, F.A.; Codling, E.; Sadeghi, A.M.; Pachepsky, Y.A.; Shelton, D.R. 2009a. **Storm water pollutant removal performance of compost filter socks.** Journal of Environmental Quality. 38: 1233-1239.

Faucette, L.B.; Governo, J.; Tyler, R.; Gigley, G.; Jordan, C.F.; Lockaby, B.G. 2009b. **Performance of compost filter socks and conventional sediment control barriers used for perimeter control on construction sites.** Journal of Soil and Water Conservation. 64(1): 81-88.

Faucette, L.B.; Jordan, C.F.; Risse, L.M.; Cabrera, M.; Coleman, D.C.; West, L.T. 2005. **Evaluation of stormwater from compost and conventional erosion control practices in construction activities.** Journal of Soil and Water Conservation. 60(6): 288-297.

Faucette, L.B.; Sefton, K.A.; Sadeghi, A.M.; Rowland, R.A. 2008. **Sediment and phosphorus removal from simulated storm runoff with compost filter socks and silt fence.** Journal of Soil and Water Conservation. 63(4): 257-264.

Faucette, L.B.; Shields, F.; Kurtz, K. 2006. **Removing storm water pollutants and determining relations between hydraulic flow-through rates, pollutant removal efficiency, and physical characteristics of compost filter media.** In: Fowler, D.L., comp., ed. Proceedings, second interagency conference on research in the watersheds. Otto, NC: U.S. Department of Agriculture, Forest Service, Southern Research Station,Coweeta Hydrologic Laboratory: 107-115.

Faucette, L.B.; Tyler, R. 2006. **Organic BMPs used for stormwater management.** In: Proceedings, annual international erosion control conference. Denver, CO: International Erosion Control Association: 101-108.

Federation of Canadian Municipalities and National Research Council. 2005. **Dust control for unpaved roads.** National Guide to Sustainable Municipal Infrastructure (Infraguide). Ottawa, ON: National Research Council of Canada. 42 p.

Feick, G.; Horne, R.A.; Yeaple, D. 1972. **Release of mercury from contaminated freshwater sediments by the runoff of road deicing salt.** Science. 175(4026): 1142-1143.

Fennessy, M.S.; Cronk, J.K. 1997. **The effectiveness and restoration potential of riparian ecotones for the management of nonpoint source pollution, particularly nitrate.** Critical Reviews in Environmental Science and Technology. 27(4): 285-317.

Fiener, P.; Auerswald, K. 2006. **Seasonal variation of grassed waterway effectiveness in reducing runoff and sediment delivery from agricultural watersheds in temperate Europe.** Soil and Tillage Research. 87: 48-58.

Fisher, L.M. 1939. **Pollution kills fish.** Scientific American. 160: 144-146.

Fisher, L.S.; Jarrett, A.R. 1984. **Sediment retention efficiency of synthetic filter fabrics.** Transactions of the American Society of Agricultural Engineers. 27(2): 429-436.

Flanagan, D.C.; Chaudhari, K.; Norton, L.D. 2002a. **Polyacrylamide soil amendment effects on runoff and sediment yield on steep slopes: Part I. Simulated rainfall conditions.** Transactions of the American Society of Agricultural Engineers. 45(5): 1327-1337.

Flanagan, D.C.; Chaudhari, K.; Norton, L.D. 2002b. **Polyacrylamide soil amendment effects on runoff and sediment yield on steep slopes: Part II. Natural rainfall conditions.** Transactions of the American Society of Agricultural Engineers. 45(5): 1-13.

Flanagan, D.C.; Norton, L.D.; Shainberg, I. 1992. **Water chemistry effects on infiltration, runoff, and erosion.** Paper No. 92-2053. St. Joseph, MI: American Society of Agricultural Engineers. 13 p.

Flanagan, D.C.; Norton, L.D.; Shainberg, I. 1997. **Effect of water chemistry and soil amendments on a silt loam soil: Part II. Soil erosion.** Transactions of the American Society of Agricultural Engineers. 40(6): 1555-1561.

Florida Industrial and Phosphate Research Institute. 2010. **Phosphate primer.** Bartow, FL: University of South Florida Polytechnic, Florida Industrial and Phosphate Research Institute. http://www1.fipr.state.fl.us/PhosphatePrimer (accessed August 19, 2013).

Foley, G.; Cropley, S.; Giummarra, G. 1996. **Road dust control techniques: evaluation of chemical dust suppressants' performance.** Special Report 54. Melbourne, Australia: ARRB Transport Research Ltd. 143 p.

Foltz, R.B. 1994. **Reducing tire pressure reduces sediment.** Tech Tips: Roads/Timber. San Dimas, CA: U.S. Department of Agriculture, Forest Service, Technology and Development Program. 1 p.

Foltz, R.B. 1995. **Sediment reduction from the use of lowered tire pressures.** SAE Technical Paper Series, 942244. In: Central tire inflation systems: managing the vehicle to surface. Warrendale, PA: Society of Automotive Engineers: 47-52.

Foltz, R.B. 1999. **Traffic and no-traffic on an aggregate surfaced road: sediment production differences.** In: Proceedings, seminar on environmentally sound forest roads and wood transport. Rome, Italy: Food and Agriculture Organization of the United Nations: 195-204.

Foltz, R.B.; Burroughs, E.R., Jr. 1990. **Sediment production from forest roads with wheel ruts.** In: Watershed planning and analysis in action symposium: proceedings, IR conference. Reston, VA: American Society of Civil Engineers: 266-275.

Foltz, R.B.; Burroughs, E.R., Jr. 1991. **A test of normal tire pressure and reduced tire pressure on forest roads: sedimentation effects.** In: Stokes, B.J.; Rawlins, C.L., eds. Proceedings, forestry and environment – engineering solutions. ASAE Publ. 09-91. St. Joseph, MI: American Society of Agricultural Engineers: 103-112.

Foltz, R.B.; Copeland, N.S. 2009. **Evaluating the efficacy of wood shreds for mitigating erosion.** Journal of Environmental Management. 90: 779-785.

Foltz, R.B.; Dooley, J.H. 2003. **Comparison of erosion reduction between wood strands and agricultural straw.** Transactions of the American Society of Agricultural Engineers. 46(5): 1389-1396.

Foltz, R.B.; Elliot, W.J. 1997. **Effect of lowered tire pressures on road erosion.** Paper No. 970638. Transportation Research Record. 1589: 19-25.

Foltz, R.B.; Truebe, M.A. 1995. **Effect of aggregate quality on sediment production from a forest road.** In: Low volume roads: proceedings, sixth conference conducted by the Transportation Research Board. Washington, DC: Transportation Research Board: 49-57.

Foltz, R.B.; Wagenbrenner, N.S. 2010. **An evaluation of three wood shred blends for post-fire erosion control using indoor simulated rain events.** Catena. 80: 86-94.

Forman, R.T.T.; Alexander, L.E. 1998. **Roads and their major ecological effects.** Annual Review of Ecology and Systematics. 29: 207-231.

Fox, D.; Bryan, R.B. 1992. **Influence of a polyacrylamide soil conditioner on runoff generation and soil erosion: field tests in Baringo District, Kenya.** Soil Technology. 5: 101-119.

Fox, D.E. 1972. **Ammonium lignosulfonates as dust palliatives and surface improvement agents for unpaved secondary roads.** Ames, IA: Iowa State University. 112 p. M.S. thesis.

Fox, D.M.; Bryan, R.B. 1999. **The relationship of soil loss by interrill erosion to slope gradient.** Catena. 38: 211-222.

Fredriksen, R.L. 1970. **Erosion and sedimentation following road construction and timber harvest on unstable soils in three small western Oregon watersheds.** Res. Pap. PNW-104. Portland, OR: U.S. Department of Agriculture, Forest Service, Pacific Northwest Forest and Range Experiment Station. 15 p.

Freebairn, D.M.; Wockner, G.H.; Silburn, D.M. 1986. **Effects of catchment management on runoff, water quality and yield potential from vertisols.** Agricultural Water Management. 12: 1-19.

Furniss, M.J.; Staab, B.P.; Hazelhurst, S.; Clifton, C.F.; Roby, K.B.; Ilhardt, B.L.; Larry, E.B.; Todd, A.H.; Reid, L.M.; Hines, S.J.; Bennett, K.A.; Luce, C.H.; Edwards, P.J. 2010. **Water, climate change, and forests: watershed stewardship for a changing climate.** Gen. Tech. Rep. PNW-812. Portland, OR: U.S. Department of Agriculture, Forest Service, Pacific Northwest Research Station. 75 p.

Gatto, L.W. 1998. **Freeze-thaw effects on vehicular ruts and natural rills: importance to soil-erosion and terrain modelling.** In: Summer, W.; Klaghofer, E.; Zhang, W., eds. Modelling soil erosion, sediment transport and closely related hydrological processes: proceedings of a symposium. IAHS Publ. No. 249. Wallingford, UK: International Association of Hydrological Sciences: 71-79.

Gebhart, D.L.; Hale, T.A.; Michaels-Busch, K. 1996. **Dust control material performance on unsurfaced roadways and tank trails.** USAEC/USACERL Tech. Rep. Champaign, IL: U.S. Army Construction Engineering Research Laboratories. 34 p.

Gharabaghi, B.; Rudra, R.P.; Goel, P.K. 2006. **Effectiveness of vegetative filter strips in removal of sediments from overland flow.** Water Quality Research Journal of Canada. 41(3): 275-282.

Ghate, S.R.; Burtle, G.J.; Vellidis, G.; Newton, G.L. 1997. **Effectiveness of grass strips to filter catfish (Ictalurus punctatus) pond effluent.** Aquacultural Engineering. 16: 149-159.

Gifford, G.F. 1985. **Cover allocation in rangeland watershed management (a review).** In: Jones, E.B.; Ward, T.J., eds. Proceedings, watershed management in the eighties. New York: American Society of Civil Engineers: 23-31.

Gillies, J.A.; Etyemezian, V.; Kuhns, H.; Nikolic, D.; Gillette, D.A. 2005. **Effect of vehicle characteristics on unpaved road dust emissions.** Atmospheric Environment. 39: 2341-2347.

Gillies, J.A.; Watson, J.G.; Rogers, C.F.; DuBois, D.; Chow, J.C.; Langston, R.; Sweet, J. 1999. **Long-term efficiencies of dust suppressants to reduce PM10 emissions from unpaved roads.** Journal of Air and Waste Management Association. 49: 3-16.

Giummarra, G.J.; Foley, G.; Cropley, S. 1997. **Dust control: Australasian experiences with various chemical additives.** Transportation Research Record. 1589: 50-53.

Goldberg, J.S.; Woelfel, C.; Chinn, A.; McDaniel, M.; Paston, C.; Thibert, N.; She, N. 1993. **Dayton Avenue swale biofiltration study.** Seattle, WA: Seattle Engineering Department, Drainage and Wastewater Utility. 36 p. + appendices.

Grace, J.M., III. 2002a. **Effectiveness of vegetation in erosion control from forest road sideslopes.** Transactions of the American Society of Agricultural Engineers. 45(3): 681-685.

Grace, J.M., III. 2002b. **Overview of best management practices related to forest roads: the southern states.** In: Proceedings, ASAE annual international meeting. Paper No. 025013. St. Joseph, MI: American Society of Agricultural Engineers. 14 p.

Grace, J.M., III. 2003. **Minimizing the impacts of the forest road system.** In: Proceedings, conference 34. Denver, CO: International Erosion Control Association: 301-310.

Grace, J.M., III. 2005. **Forest operations and water quality in the South.** Transactions of the American Society of Agricultural Engineers. 48(2): 871-880.

Grace, J.M., III; Rummer, B.; Stokes, B.J.; Wilhoit, J. 1998. **Evaluation of erosion control techniques on forest roads.** Transactions of the American Society of Agricultural Engineers. 41(2): 383-391.

Grace, J.M., III; Wilhoit, J.; Rummer, R.; Stokes, B. 1996. **Surface erosion control techniques on newly constructed forest roads.** In: Proceedings, ASAE annual international meeting. Paper No. 965017. St. Joseph, MI: American Society of Agricultural Engineers. 14 p.

Granato, G.E.; Church, P.E.; Stone, V.J. 1995. **Mobilization of major and trace constituents of highway runoff in groundwater potentially caused by deicing chemical migration.** Transportation Research Record. 1483: 92-104.

Graynoth, E. 1979. **Effects of logging on stream environments and faunas in Nelson.** New Zealand Journal of Marine and Freshwater Research. 13(1): 79-109.

Green, V.S.; Stott, D.E. 2001. **Polyacrylamide: a review of the use, effectiveness, and cost of a soil erosion control amendment.** In: Stott, D.E.; Mohtar, R.H.; Steinhardt, G.C., eds. Sustaining the global farm: proceedings, tenth international soil conservation organization meeting. West Lafayette, IN: Purdue University: 384-389.

Green, V.S.; Stott, D.E.; Norton, L.D.; Graveel, J.G. 2000. **Polyacrylamide molecular weight and charge effects on infiltration under simulated rainfall.** Soil Science of America Journal. 64: 1786-1791.

Gregory, K.J.; Brookes, A. 1983. **Hydrogeomorphology downstream from bridges.** Applied Geography. 3: 145-159.

Griffin, J.M.; West, J.L. 1976. **Acute toxicity of ammonia-base neutral sulfite pulp mill waste liquor to rainbow trout.** Bulletin of Environmental Contamination and Toxicology. 15(5): 608-612.

Grismer, M.E.; Hogan, M.P. 2005. **Simulated rainfall evaluation of revegetation/mulch erosion control in the Lake Tahoe basin – 3: Soil treatment effects.** Land Degradation and Development. 16: 489-501.

Groen, A.H.; Woods, S.W. 2008. **Effectiveness of aerial seeding and straw mulch for reducing post-wildfire erosion, north-western Montana, USA.** International Journal of Wildland Fire. 17: 559-571.

Grushecky, S.T.; Spong, B.D.; McGill, D.W.; Edwards, J.W. 2009. **Reducing sediments from skid roads in West Virginia using fiber mats.** Northern Journal of Applied Forestry. 26(3): 118-121.

Gumiere, S.J.; Bissonnais, Y.L.; Raclot, D.; Cheviron, B. 2011. **Vegetated filter effects on sedimentological connectivity of agricultural catchments in erosion modelling: a review.** Earth Surface Processes and Landforms. 36: 3-19.

Gutierrez, J.; Hernandez, I.I. 1996. **Runoff and interrill erosion as affected by grass cover in a semi-arid rangeland of northern Mexico.** Journal of Arid Environments. 34: 287-295.

Gwynne, C.S. 1950. **Terraced highway side slopes in loess, southwestern Iowa.** Geological Society of America Bulletin. 61(12): 1347-1354.

Gyssels, G.; Poesen, J. 2003. **The importance of plant root characteristics in controlling concentrated flow erosion rates.** Earth Surface Processes and Landforms. 28: 371-384.

Gyssels, G.; Poesen, J.; Bochet, E.; Li, Y. 2005. **Impact of plant roots on the resistance of soils to erosion by water: a review.** Progress in Physical Geography. 29(2): 189-217.

Hafterson, H.D. 1973. **Dip design.** Engineering Field Notes. 5(10): 1-18. http://www.fs.fed.us/t-d/pubs/pdfpubs/pdf73713807/pdf73713807.pdf (accessed June 29, 2016).

Hagans, D.K.; Weaver, W.E. 1987. **Magnitude, cause and basin response to fluvial erosion, Redwood Creek basin, northern California.** In: Beschata, R.L.; Blinn, T.; Grant, G.E.; Swanson, F.J.; Ice, G.G., eds. Erosion and sedimentation in the Pacific Rim. Publ. No. 165. Wallingford, UK: International Association of Hydrologic Sciences Press: 419-428.

Hagans, D.K.; Weaver, W.E.; Madej, M.A. 1986. **Long term on-site and off-site effects of logging and erosion in the Redwood Creek basin, northern California.** In: Proceedings, American Geophysics Union meeting on cumulative effects. Tech. Bull. 490. New York: National Council of the Paper Industry for Air and Stream Improvement: 38-65.

Hairsine, P.B. 1997. **Controlling sediment and nutrient movement within catchments.** Industry Report 97/9. Melbourne, Australia: Cooperative Research Centre for Catchment Hydrology. 22 p.

Hairsine, P.B.; Rose, C.W. 1992. **Modeling water erosion due to overland flow using physical principles: 1. Sheet flow.** Water Resources Research. 28(1): 237-243.

Håkansson, I.; Petelkau, H. 1994. **Benefits of a limited axle load.** In: Soane, B.D.; Ouwerkerk, C.V., eds. Soil compaction in crop production. Amsterdam, the Netherlands: Elsevier Science B.V.: 479-499. Chapter 20.

Hammond, C.; Hall, D.; Miller, S.; Swetick, P. 1992. **Level I stability analysis (LISA) documentation for version 2.0.** Gen. Tech. Rep. INT-285. Ogden, UT: U.S. Department of Agriculture, Forest Service, Intermountain Research Station. 130 p.

Hamons, G. 2007. **Modeling sediment movement in forested watersheds using hill-slope attributes.** Morgantown, WV: West Virginia University. 123 p. M.S. thesis.

Hanes, R.E.; Zelazny, L.W.; Blaser, R.E. 1970. **Effects of deicing salts on water quality and biota: literature review and recommended research.** National Cooperative Highway Research Program Report 91. Washington, DC: National Research Council, Highway Research Board, National Academy of Sciences. 70 p.

Hanes, R.E.; Zelazny, L.W.; Verghese, K.G.; Bosshart, R.P.; Carson, E.W., Jr.; Blaser, R.E.; Wolf, D.D. 1976. **Effects of deicing salts on plant biota and soil: experimental phase.** National Cooperative Highway Research Program Report 170. Washington, DC: National Research Council, Transportation Research Board. 88 p.

Harbor, J. 1999. **Engineering geomorphology at the cutting edge of land disturbance: erosion and sediment control on construction sites.** Geomorphology. 31: 247-263.

Harding, M.V. 1988. **Erosion control effectiveness: comparative studies of alternative mulching techniques.** In: Proceedings, 67th annual meeting of the Transportation Research Board. Paper No. 870244. Washington, DC: Transportation Research Board. 11 p.

Harr, R.D.; Nichols, R.A. 1993. **Stabilizing forest roads to help restore fish habitats: a northwest Washington example.** Fisheries. 18(4): 18-22.

Harrison, B. 2011. **Erosion from a cross country gas pipeline in the central Appalachians.** Carbondale, IL: Southern Illinois University. 69 p. M.S. thesis.

Haupt, H.F. 1959a. **A method for controlling sediment from logging roads.** Misc. Publ. No. 22. Ogden, UT: U.S. Department of Agriculture, Forest Service, Intermountain Forest and Range Experiment Station. 22 p.

Haupt, H.F. 1959b. **Road and slope characteristics affecting sediment movement from logging roads.** Journal of Forestry. 57(5): 329-332.

Haupt, H.F.; Kidd, W.J., Jr. 1965. **Good logging practices reduce sedimentation in central Idaho.** Journal of Forestry. 63: 664-670.

Haussman, R.F.; Pruett, E.W. 1978. **Permanent logging roads for better woodlot management.** Broomall, PA: U.S. Department of Agriculture, Forest Service, Northeastern Area State and Private Forestry. 43 p.

Hayes, J.C.; Barfield, B.J.; Barnhisel, R.I. 1984. **Performance of grass filters under laboratory and field conditions.** Transactions of the American Society of Agricultural Engineers. 27(5): 1321-1331.

Hayes, J.C.; Hairston, J.E. 1983. **Modeling the long-term effectiveness of vegetative filters as on-site sediment controls.** Paper No. 83-2081. St. Joseph, MI: American Society of Agricultural Engineers. 27 p.

Hayes, S.A.; McLaughlin, R.A.; Osmond, D.L. 2005. **Polyacrylamide use for erosion and turbidity control on construction sites.** Journal of Soil and Water Conservation. 60(4): 193-199.

Heffner, K. 1997. **Water quality effects of three dust-abatement compounds.** Engineering Field Notes. 29(Jan.-April): 35-43. http://www.fs.fed.us/t-d/pubs/pdfpubs/pdf97713801/pdf97713801.pdf (accessed June 29, 2016).

Helalia, A.M.; Letey, J. 1989. **Effects of different polymers on seedling emergence, aggregate stability, and crust hardness.** Soil Science. 148(3): 199-203.

Heller, V.G. 1932. **Saline and alkaline drinking waters.** The Journal of Nutrition. 5(4): 421-429.

Heller, V.G. 1933. **The effect of saline and alkaline waters on domestic animals.** Oklahoma Agricultural Experiment Station Bull. No. 217. Stillwater, OK: Oklahoma Agricultural and Mechanical College, Agricultural Experiment Station. 23 p.




FS-002925

Heller, V.G.; Larwood, C.H. 1930. **Saline drinking water.** Science. 71(1834): 223-224.

Helms, J.A.; Hipkin, C. 1986. **Effects of soil compaction on tree volume in a California ponderosa pine plantation.** Western Journal of Applied Forestry. 1(4): 121-124.

Henderson, Z.L. 2001. **The influence of geology and timber harvesting on non-perennial stream channels on the Appalachian Plateau.** University Park, PA: Pennsylvania State University. 208 p. M.S. thesis.

Henry, K.S.; Walsh, M.R.; Morin, S.H. 1999. **Selection of silt fence filter to retain suspended toxic particles.** Geotextiles and Geomembranes. 17: 371-387.

Hewlett, J.D. 1971. **Comments on the catchment experiment to determine vegetal effects on water yield.** Water Resources Bulletin. 7(2): 376-381.

Hipps, N.A.; Hazelden, J.; Fairall, G.B.N. 1990. **Control of erosion in a mature orchard.** Soil Use and Management. 6: 32-35.

Hislop, L.E. 1996a. **Improving access and environmental sensitivity with portable surfaces on low volume roads.** 9624 1211-SDTDC. Washington, DC: U.S. Department of Agriculture, Forest Service, Technology and Development Program. 11 p.

Hislop, L.E. 1996b. **Portable surfaces for crossing unstable roadbeds.** In: Ritter, M.A.; Duwadi, S.R.; Lee, P.D.H., eds. Proceedings, national conference on wood transportation structures. Gen. Tech. Rep. FPL-GTR-94. Madison, WI: U.S. Department of Agriculture, Forest Service, Forest Products Laboratory: 138-144.

Hoffman, D.J.; Eastin, W.C., Jr. 1981. **Effects of industrial effluents, heavy metals, and organic solvents on mallard embryo development.** Toxicology Letters. 9: 35-40.

Holtz, R.D.; Christopher, B.R.; Berg, R.R. 1998. **Geosynthetic design and construction guidelines.** Publ. No. FHWA HI-95-038. Washington, DC: U.S. Department of Transportation, Federal Highway Administration, National Highway Institute. 460 p.

Hoover, J.M. 1987. **Dust control on construction sites.** Report No. FHWA-AZ86-807. Phoenix, AZ: Arizona Department of Transportation. 61 p.

Hoover, J.M.; Bergeson, K.H.; Fox, D.E.; Denny, C.K.; Handy, R.L. 1973. **Surface improvement and dust palliation of unpaved secondary roads and streets.** Final report. ISU-ERI-AMES-72316. ERI Project 856-S. Ames, IA: Iowa State University, Engineering Research Institute. 228 p.

Hoover, J.M.; Pitt, J.M.; Lustig, M.T.; Fox, D.E. 1981. **Mission-oriented dust control and surface improvement processes for unpaved roads.** Final report. ISU-ERI-AMES-81225. ERI Project 1308. Ames, IA: Iowa State University, Engineering Research Institute. 216 p.

Hoover, J.M.; Squier, L.D.; Solomon, P.L.; Handy, R.L. 1975. **Evaluation of chemically stabilized secondary roads – Linn County, Iowa.** Progress Report 2. ISU-ERI-Ames-76202. ERI Project 1049S. Ames, IA: Iowa State University, Engineering Research Institute. 102 p.

Hornbeck, J.W.; Kochenderfer, J.N. 2001. **A century of lessons about water resources in northeastern forests.** In: A monumental event. Proceedings, Society of American Foresters 2000 national convention. Bethesda, MD: Society of American Foresters: 31-37.

Horner, R.R.; Guedry, J.; Kortenhof, M.H. 1990. **Improving the cost effectiveness of highway construction site erosion and pollution control.** Report No. WA-RD 200.1. Olympia, WA: Washington State Department of Transportation. 64 p.

Horner, R.R.; Skupien, J.J.; Livingston, E.H.; Shaver, H.E. 1994. **Urban runoff treatment practices.** In: Fundamentals of urban runoff management: technical and institutional issues. Washington, DC: Terrene Institute: 113-142. Chapter 8.

Hösl, R.; Strauss, P.; Glade, T. 2012. **Man-made linear flow paths at catchment scale: identification, factors, and consequences for the efficiency of vegetated filter strips.** Landscape and Urban Planning. 104: 245-252.

Hudson, N.W. 1957. **Erosion control research: progress report on experiments at Henderson Research Station 1953-1956.** Zimbabwe Agricultural Journal. 54: 297-323.

Hunter, J.V.; Sabatino, T.; Gomperts, R.; MacKenzie, M.J. 1979. **Contribution of urban runoff to hydrocarbon pollution.** Journal (Water Pollution Control Federation). 51(8): 2129-2138.

Hursh, C.R. 1939. **Roadbank stabilization at low cost: a progress report.** Tech. Note 38. Asheville, NC: U.S. Department of Agriculture, Forest Service, Appalachian Forest Experiment Station. 20 p.

Ice, G. [N.d.]. **Forty years of lessons learned about the impacts of forest practices on watershed hydrology and water quality.** Available at http://faculty.washington.edu/emer/eic/Forty%20 Years%20of%20Lessons.htm (accessed May 19, 2016).

Indiana Department of Natural Resources. 1992. **Indiana handbook for erosion controls in developing areas: guidelines for protecting water quality through the control of soil and erosion and sedimentation on construction sites. Practice 3.75, straw bale dam (straw bale filter).** Indianapolis, IN: Indiana Department of Natural Resources, Division of Soil Conservation: 3.75-1 through 3.75-2.

Ingold, T.S.; Thomson, J.C. 1986. **Results of current research of synthetic and natural fiber erosion control systems.** In: Proceedings, erosion control: protecting our future: conference XVII. Denver, CO: International Erosion Control Association: 63-75.

Iowa State University. 2009. **Iowa stormwater management manual: ver. 3.** Ames, IA: Iowa State University, Institute for Transportation. http://www.intrans.iastate/edu/publications/posts/?publications=stormwater-management-manual (accessed July 10, 2012).

Irwin, L.H.; Taylor, D.J.; Aneshansley, D.J. 1986. **Device to measure road dustiness on aggregate surfaced roads.** Cornell Local Roads Program Report 86-5. Ithaca, NY: Cornell University, Department of Agricultural Engineering. 101 p.


FS-002926

Island County Public Works. 2003. **Island County best management practices field manual for small construction sites.** Coupeville, WA: Island County Public Works. 51 p.

Jacobson, T. 1992. **Low traffic roads stabilised with bitumen binders.** Nordic Road and Transport Research. 1: 22-23.

Jańczuk, B.; Bialopiotrowicz, T.; Kliszcz, A.; Biliński, B.; Stawiński, J. 1991. **Influence of polyacrylamide on the surface free energy and wettability of a chernozem soil.** Geoderma. 50: 173-184.

Janzen, D.C. 1990. **An industry response to compaction concerns in agriculture.** In: Proceedings, international summer meeting of the ASAE. Paper No. 90-1074. St. Joseph, MI: American Society of Agricultural Engineers. 15 p.

Jennings, G.D.; Jarrett, A.R. 1985. **Laboratory evaluation of mulches in reducing erosion.** Transactions of the American Society of Agricultural Engineers. 28(5): 1466-1470.

Johansen, D.K.; Copstead, R.; Moll, J. 1997. **Relief culverts.** 9777 1812-SDTDC. San Dimas, CA: U.S. Department of Agriculture, Forest Service, San Dimas Technology and Development Center. 7 p.

Johnson, B.S.; Erickson, A.E.; Smucker, A.J.M. 1986. **Alleviation of compaction on a fine-textured soil.** Paper No. 86-1517. St. Joseph, MI: American Society of Agricultural Engineers. 10 p.

Jones, D. 1999. **Holistic approach to research into dust and dust control on unsealed roads.** Transportation Research Record. 1652(2): 3-9.

Jones, D. 2000a. **Road dust – just a nuisance or a significant road management issue?** In: Proceedings, South African transport conference. Pretoria, South Africa; Washington, DC: Transportation Research Board: 12 p.

Jones, J.A. 2000b. **Hydrologic processes and peak discharge response to forest removal, regrowth, and roads in 10 small experimental basins, western Cascades, Oregon.** Water Resources Research. 36(9): 2621-2642.

Jordán, A.; Martínez-Zavala, L. 2008. **Soil loss and runoff rates on unpaved forest roads in southern Spain after simulated rainfall.** Forest Ecology and Management. 255: 913-919.

Jordán-López, A.; Martínez-Zavala, L.; Bellinfante, N. 2009. **Impact of different parts of unpaved forest roads on runoff and sediment yield in a Mediterranean area.** Science of the Total Environment. 407: 937-944.

Kadlec, R.H.; Knight, R.L. 1996. **Treatment wetlands.** Boca Raton, FL: Lewis Publishers. 928 p.

Kahklen, K.; Hartsog, W. 1999. **Results of road erosion studies on the Tongass National Forest.** Unpublished report on file with: U.S. Department of Agriculture, Forest Service, Pacific Northwest Research Station, Juneau, AK. 47 p.

Kaighn, R.J., Jr.; Yu, S.L. 1996. **Testing of roadside vegetation for highway runoff pollutant removal.** Transportation Research Record. 1523: 116-123.

Kapfer, J.M.; Paloski, R.A. 2011. **On the threat to snakes of mesh deployed for erosion control and wildlife exclusion.** Herpetological Conservation and Biology. 6(1): 1-9.

Kaushal, S.S.; Groffman, P.M.; Likens, G.E.; Belt, K.T.; Stack, W.P.; Kelly, V.R.; Band, L.E.; Fisher, G.T. 2005. **Increased salinization of fresh water in the northeastern United States.** Proceedings of the National Academy of Sciences. 102(38): 13517-13520.

Kazman, Z.; Shainberg, I.; Gal, M. 1983. **Effect of low levels of exchangeable sodium and applied phosphogypsum on the infiltration rate of various soils.** Soil Science. 135(3): 184-192.

Keener, H.M.; Faucette, B.; Klingman, M.H. 2007. **Flow-through rates and evaluation of solids separation of compost filter socks versus silt fence in sediment control applications.** Journal of Environmental Quality. 36: 742-752.

Keliher, K.P.; Taylor, S.E.; Ritter, M.A. 1995. **Performance of portable bridges for skidder traffic.** In: Proceedings, 18th annual meeting of the Council on Forest Engineering. Corvallis, OR: Council on Forest Engineering: 37-46.

Keller, G.; Sherar, J. 2003. **Low-volume roads engineering: best management practices field guide.** Produced for the U.S. Agency for International Development in cooperation with USDA, Forest Service, International Programs and Conservation Management Institute, Virginia Polytechnic Institute and State University. 158 p. Available at http://ntl.bts.gov/lib/24000/24600/24650/Index_BMP_Field_Guide.htm (accessed May 31, 2016).

Kelsey, K.; Johnson, T.; Vavra, R. 2006. **Needed information: testing, analyses, and performance values for slope interruption and perimeter control BMPs.** In: Proceedings, International Erosion Control Association conference technical session. Denver, CO: International Erosion Control Association: 171-181.

Kennedy, R. 1997. **Road maintenance frequency vs. sediment production.** Engineering Field Notes. 29(Sept.-Dec.): 11-15. http://www.fs.fed.us/t-d/pubs/pdfpubs/pdf97713815/pdf97713815.pdf (accessed June 29, 2016).

Kercher, W.C., Jr.; Landon, J.C.; Massarelli, R. 1983. **Grassy swales prove cost-effective for water pollution control.** Public Works. April: 53-54.

Kestler, M.A.; Berg, R.L.; Nam, S.; Smith, C.E. 2007. **Reduced tire pressure: review of an alternate road usage technique for reducing springtime damage on low volume roads.** In: Proceedings, 11th international conference on cold regions engineering. Reston, VA: American Society of Civil Engineers: 382-393.

Kestler, M.A.; Nam, S. 1999. **Reducing damage to low volume asphalt-surfaced roads, and improving local economies: update on variable tire pressure project.** In: Zufel, J.E., ed. Cold regions engineering: putting research into practice – Proceedings, tenth international conference. Reston, VA: American Society of Civil Engineers: 461-471.

Ketcheson, G.L.; Megahan, W.F. 1996. **Sediment production and downslope sediment transport from forest roads in granitic watersheds.** Res. Pap. INT-RP-486. Ogden, UT: U.S. Department of Agriculture, Forest Service, Intermountain Research Station. 11 p.

Kidd, W.J., Jr. 1963. **Soil erosion control structures on skidtrails.** Res. Pap. INT-1. Ogden, UT: U.S. Department of Agriculture, Forest Service, Intermountain Forest and Range Experiment Station. 8 p.

Kill, D.L.; Foote, L.E. 1971. **Comparisons of long and short-fibered mulches.** Transactions of the American Society of Agricultural Engineers. 14(5): 942-944.

Kimball, C.E. 1997. **Evaluating groundwater pollution susceptibility of dust suppressants and roadbed stabilizers: case study of a petroleum-based product.** Paper No. 970815. Transportation Research Record. 1589: 64-69.

King, J.G. 1979. **Fill slope erosion from forest roads.** In: Proceedings, 34th annual meeting, Pacific Northwest Region. PNW 79-404. St. Joseph, MI: American Society of Agricultural Engineers. 11 p.

King, J.G. 1984. **Ongoing studies in Horse Creek on water quality and water yield.** Tech. Bull. 435. New York: National Council of the Paper Industry for Air and Stream Improvement: 28-35.

King, S.; McLaughlin, R.A. 2007. **Improved erosion control BMPs for road construction projects in the North Carolina mountains.** Sediments. 14(3): 1-2.

Kingsbury, P.A.; Hastie, W.J.; Harrington, A.J. 1991. **Regional landslip hazard assessment using a geographic information system.** In: Proceedings, sixth international symposium on landslides. Rotterdam, the Netherlands: Balkema Publishers: 995-999.

Kirchner, H.; Gall, J.A. 1991. **Liquid calcium chloride for dust control and base stabilization of unpaved road systems.** Transportation Research Record. 1291: 173-178.

Kirchner, H.W. 1988. **Road dust suppressants compared.** Public Works. 119(13): 27-28.

Knapp, P.A. 1992. **Soil loosening processes following the abandonment of two arid western Nevada townsites.** Great Basin Naturalist. 52(2): 149-154.

Koch, S.; Ksaibati, K. 2010. **Performance of recycled asphalt pavement in gravel roads.** Laramie, WY: University of Wyoming, Department of Civil and Architectural Engineering. 285 p.

Kochenderfer, J.N. 1970. **Erosion control on logging roads in the Appalachians.** Res. Pap. NE-158. Upper Darby, PA: U.S. Department of Agriculture, Forest Service, Northeastern Forest Experiment Station. 28 p.

Kochenderfer, J.N. 1995. **Using open-top pipe culverts to control surface water on steep road grades.** Gen. Tech. Rep. NE-194. Radnor, PA: U.S. Department of Agriculture, Forest Service, Northeastern Forest Experiment Station. 7 p.

Kochenderfer, J.N.; Edwards, P.J.; Wood, F. 1997. **Hydrologic impacts of logging an Appalachian watershed using West Virginia's best management practices.** Northern Journal of Applied Forestry. 14(4): 207-218.

Kochenderfer, J.N.; Helvey, J.D. 1987. **Using gravel to reduce soil losses from minimum-standard forest roads.** Journal of Soil and Water Conservation. 42(1): 46-50.

Kochenderfer, J.N.; Hornbeck, J.W. 1999. **Contrasting timber harvesting operations illustrate the value of BMPs.** In: Stringer, J.W.; Loftis, D.L., eds. Proceedings, 12th central hardwood forest conference. Gen. Tech. Rep. SRS-24. Asheville, NC: U.S. Department of Agriculture, Forest Service, Southern Research Station: 128-136.

Kochenderfer, J.N.; Wendel, G.W.; Smith, H.C. 1984. **Cost of and soil loss on "minimum-standard" forest truck roads constructed in the central Appalachians.** Res. Pap. NE-544. Broomall, PA: U.S. Department of Agriculture, Forest Service, Northeastern Forest Experiment Station. 8 p.

Kohnke, H.; Werkhoven, C.H. 1963. **Soil temperature and soil freezing as affected by an organic mulch.** Soil Science Society of America Journal. 27(1): 13-17.

Kouwen, N. 1990. **Silt fences to control sediment movement on construction sites.** MAT-90-03. Downsview, ON: Ontario Ministry of Transportation. 67 p.

Kouwen, N.; Li, R.; Simons, D.B. 1981. **Flow resistance in vegetated waterways.** Transactions of the American Society of Agricultural Engineers. 24(3): 684-690, 698.

Kouwen, N.; Unny, T.E. 1973. **Flexible roughness in open channels.** Journal of the Hydraulics Division. 99(5): 713-728.

Kozlowski, T.T. 1984. **Plant responses to flooding of soil.** BioScience. 34(3): 162-167.

Kramer, B.W. 2001. **Forest road contracting, construction, and maintenance for small forest woodland owners.** Research Contribution 35. Corvallis, OR: Oregon State University, College of Forestry, Forest Research Laboratory. 79 p.

Kramer, L.A.; Meyer, L.D. 1969. **Small amounts of surface mulch reduce soil erosion and runoff velocity.** Transactions of the American Society of Agricultural Engineers.12: 638-641, 645.

Krenitsky, E.C.; Carroll, M.J. 1994. **Use of erosion control materials to establish turf.** In: Sustaining environmental quality: the erosion control challenge – proceedings of conference XXV. Denver, CO: International Erosion Control Association: 79-90.

Kreutzweiser, D.P.; Capell, S.S. 2001. **Fine sediment deposition in streams after selective forest harvesting without riparian buffers.** Canadian Journal of Forest Research. 31: 2134-2142.

La Marche, J.L.; Lettenmaier, D.P. 2001. **Effects of forest roads on flood flows in the Deschutes River, Washington.** Earth Surface Processes and Landforms. 26: 115-134.

Laird, D.A. 1997. **Bonding between polyacrylamide and clay mineral surfaces.** Soil Science. 162(11): 826-832.

Landphair, H.C.; McFalls, J.A.; Peterson, B.E.; Li, M. 1997. **Alternatives to silt fence for temporary sediment control at highway construction sites: guidelines for TxDOT.** Report No. FHWA/TX-98/1737-S. Prepared for: Texas Department of Transportation, Research and Technology Transfer Office. College Station, TX: Texas A&M University System, Texas Transportation Institute. 104 p.

Lane, P.N.J; Sheridan, G.J. 2002. **Impact of an unsealed forest road stream crossing: water quality and sediment sources.** Hydrological Processes. 16: 2599-2612.

Lang, R.D. 1979. **The effect of ground cover on surface runoff from experimental plots.** Journal of Soil Conservation. 35: 108-114.

Langdon, B. 1980. **An evaluation of dust abatement materials used in Region 6.** Final report. Prepared for: U.S. Forest Service, Region 6. Corvallis, OR: Oregon State University, Transportation Research Institute. 109 p.

Langdon, B.; Williamson, R.K. 1983. **Dust-abatement materials: evaluation and selection.** Transportation Research Record. 898: 250-257.

Larsen, M.C.; Parks, J.E. 1997. **How wide is a road? The association of roads and mass-wasting in a forested montane environment.** Earth Surface Processes and Landforms. 22: 835-848.

Larsen, M.C.; Torres-Sánchez, A.J. 1992. **Landslides triggered by hurricane Hugo in eastern Puerto Rico, September 1989.** Caribbean Journal of Science. 28(3-4): 113-125.

Latimer, J.S.; Hoffman, E.J.; Hoffman, G.; Fasching, J.L.; Quinn, J.G. 1990. **Sources of petroleum hydrocarbons in urban runoff.** Water, Air, and Soil Pollution. 52: 1-21.

Lattanzi, A.R.; Meyer, L.D.; Baumgardner, M.F. 1974. **Influences of mulch rate and slope steepness on interrill erosion.** Soil Science Society of America Proceedings. 38(6): 946-950.

Ledingham, G.A.; Adams, G.A. 1942. **Biological decomposition of chemical lignin. II. Studies of the decomposition of calcium lignosulphonate by wood destroying and soil fungi.** Canadian Journal of Research. 20c(1): 13-27.

Lee, K.; Isenhart, T.M.; Schultz, R.C. 2003. **Sediment and nutrient removal in an established multi-species riparian buffer.** Journal of Soil and Water Conservation. 58: 1-8.

Lee, K.; Isenhart, T.M.; Schultz, R.C.; Mickelson, S.K. 1999. **Nutrient and sediment removal by switchgrass and cool-season grass filter strips in central Iowa, USA.** Agroforestry Systems. 44(2): 121-132.

Lee, K.; Isenhart, T.M.; Schultz, R.C.; Mickelson, S.K. 2000. **Multispecies riparian buffers trap sediment and nutrients during rainfall simulations.** Journal of Environmental Quality. 29: 1200-1205.

Lee, P.; Smyth, C.; Boutin, S. 2004. **Quantitative review of riparian buffer width guidelines from Canada and the United States.** Journal of Environmental Management. 70: 165-180.

Leib, B.G.; Redulla, C.A.; Stevens, R.G.; Matthews, G.R.; Strausz, D.A. 2005. **Erosion control practices integrated with polyacrylamide to reduce sediment loss in furrow irrigation.** Applied Engineering in Agriculture. 21(4): 595-603.

Lekha, K.R. 2004. **Field instrumentation and monitoring of soil erosion in coir geotextile stabilised slopes – a case study.** Geotextiles and Geomembranes. 22(5): 399-413.

Lemly, A.D. 1982. **Erosion control at construction sites on red clay soils.** Environmental Management. 6(4): 343-352.

Lentz, R.D.; Shainberg, I.; Sojka, R.E.; Carter, D.L. 1992. **Preventing irrigation furrow erosion with small applications of polymers.** Soil Science Society of America Journal. 56(6): 1926-1932.

Lentz, R.D.; Sojka, R.E. 1994. **Field results using polyacrylamide to manage furrow erosion and infiltration.** Soil Science. 158(4): 274-282.

Lentz, R.D.; Sojka, R.E.; Carter, D.L. 1993. **Influence of polymer charge type and density on polyacrylamide ameliorated irrigated furrow erosion.** In: Proceedings, 24th annual International Erosion Control Association conference. Denver, CO: International Erosion Control Association: 161-168.

Lentz, R.D.; Stieber, T.D.; Sojka, R.E. 1995. **Applying polyacrylamide (PAM) to reduce erosion and increase infiltration under furrow irrigation.** In: Proceedings, Winter Commodity Schools. Moscow, ID: University of Idaho Cooperative Extension System: 79-92.

Lepore, B.J.; Thompson, A.M.; Petersen, A. 2009. **Impact of polyacrylamide delivery method with lime or gypsum for soil and nutrient stabilization.** Journal of Soil and Water Conservation. 64(3): 223-231.

Levy, G.J.; Agassi, M. 1995. **Polymer molecular weight and degree of drying effects on infiltration and erosion of three different soils.** Australian Journal of Soil Research. 33: 1007-1018.

Levy, G.J.; Ben-Hur, M.; Agassi, M. 1991. **The effect of polyacrylamide on runoff, erosion, and cotton yield from fields irrigated with moving sprinkler systems.** Irrigation Science. 12: 55-60.

Levy, G.J.; Levin, J.; Gal, M.; Ben-Hur, M.; Shainberg, I. 1992. **Polymers' effects on infiltration and soil erosion during consecutive simulated sprinkler irrigations.** Soil Science Society of America Journal. 56: 902-907.

Lewis, J.; Mori, S.R.; Keppeler, E.T.; Ziemer, R.R. 2001. **Impacts of logging on storm peak flows, flow volumes and suspended sediment loads in Caspar Creek, California.** In: Wigmosta, M.S.; Burges, S.J., eds. Land use and watersheds: human influence on hydrology and geomorphology in urban and forest areas. Water Science and Application, vol. 2. Washington, DC: American Geophysical Union: 85-125.

Lewis, L. 1995. **Olympic National Forest partnerships for slope repair and erosion control.** Restoration and Management Notes. 13(1): 37-39.



FS-002929

Leytem, A.B.; Bjorneberg, D.L. 2005. **Removing soluble phosphorus in irrigation return flows with alum additions.** Journal of Soil and Water Conservation. 60(4): 200-208.

Line, D.E. 1991. **Sediment trapping effectiveness of grass strips.** In: Proceedings, fifth federal interagency conference on sedimentation. Washington, DC: Federal Energy Regulatory Commission. 2: PS56-PS63.

Line, D.E.; White, N.M. 2001. **Efficiencies of temporary sediment traps on two North Carolina construction sites.** Transactions of the American Society of Agricultural Engineers. 44(5): 1207-1215.

Liu, X.; Zhang, X.; Zhang, M. 2008. **Major factors influencing the efficacy of vegetated buffers on sediment trapping: a review and analysis.** Journal of Environmental Quality. 37: 1667-1674.

Loch, R.J. 2000. **Effects of vegetation cover on runoff and erosion under simulated rain and overland flow on a rehabilitated site on the Meandu Mine, Tarong, Queensland.** Australian Journal of Soil Research. 38(2): 299-312.

Loch, R.J.; Espigares, T.; Costantini, A.; Garthe, R.; Bubb, K. 1999. **Vegetative filter strips to control sediment movement in forest plantations: validation of a simple model using field data.** Australian Journal of Soil Research. 37(5): 929-946.

Lohnes, R.A.; Coree, B.J. 2002. **Determination and evaluation of alternate methods for managing and controlling highway-related dust.** Final Report TR449. Prepared for: Iowa Department of Transportation, Iowa Highway Research Board. Ames, IA: Iowa State University, Department of Civil and Construction Engineering. 26 p.

Looney, T.E. 1981. **A comparison of the dam bridge with current methods of crossing streams with skidders.** Blacksburg, VA: Virginia Polytechnic Institute and State University. 58 p. M.S. thesis.

Loreto, D.; Batista, J.; Piechota, T.; Singh, V. 2002. **Impacts of dust suppressant application on the quality of urban runoff from disturbed lands.** Faculty Publications, Paper 37. Las Vegas, NV: University of Nevada, Department of Civil and Environmental Engineering. 11 p.

Luce, C.H.; Black, T.A. 1999. **Sediment production from forest roads in western Oregon.** Water Resources Research. 35(8): 2561-2570.

Luce, C.H.; Black, T.A. 2001. **Effects of traffic and ditch maintenance on forest road sediment production.** In: Proceedings, seventh federal interagency sedimentation conference. [N.p.]: Advisory Committee on Water Information, Subcommittee on Sedimentation: V67-V74.

Lunsford, G.B.; Mahoney, J.P. 2001. **Dust control on low volume roads: a review of techniques and chemicals used.** Technical Study Report No. FHWALT-01-002. Prepared for: U.S. Department of Transportation, Federal Highway Administration, Office of Professional Development. Seattle, WA: University of Washington. 59 p.

Lynch, J.A.; Corbett, E.S. 1990. **Evaluation of best management practices for controlling nonpoint pollution from silvicultural operations.** Water Resources Bulletin. 26(1): 41-52.

Lynch, J.A.; Corbett, E.S.; Mussallem, K. 1985. **Best management practices for controlling nonpoint-source pollution on forested watersheds.** Journal of Soil and Water Conservation. 40(1): 164-167.

Lyons, J.; Trimble, S.W.; Paine, L.K. 2000. **Grass versus trees: managing riparian areas to benefit streams of central North America.** Journal of the American Water Resources Association. 36(4): 919-930.

MacDonald, L.H.; Anderson, D.M.; Dietrich, W.E. 1997. **Paradise threatened: land use and erosion on St. John, US Virgin Islands.** Environmental Management. 21(6): 851-863.

MacDonald, L.H.; Robichaud, P.R. 2007. **JFSP final report: postfire erosion and the effectiveness of emergency rehabilitation treatments over time.** Project 03-2-3-22. Boise, ID: Joint Fire Science Program. 17 p.

MacDonald, L.H.; Sampson, R.W.; Anderson, D.M. 2001. **Runoff and road erosion at the plot and road segment scales, St. John, US Virgin Islands.** Earth Surface Processes and Landforms. 26: 251-272.

Magette, W.L.; Brinsfield, R.B.; Palmer, R.E.; Wood, J.D. 1989. **Nutrient and sediment removal by vegetated filter strips.** Transactions of the American Society of Agricultural Engineers. 32(2): 663-667.

Maharaj, R.J. 1993. **Landslide processes and landslide susceptibility analysis from an upland watershed: a case study from St. Andrew, Jamaica, West Indies.** Engineering Geology. 34: 53-79.

Malik, M.; Amrhein, C.; Letey, J. 1991. **Polyacrylamide to improve water flow and salt removal in a high shrink-swell soil.** Soil Science Society of America Journal. 55: 1664-1667.

Mannering, J.V.; Meyer, L.D. 1963. **The effects of various rates of surface mulch on infiltration and erosion.** Soil Science Society of America Proceedings. 27: 84-86.

Marshall, E.; Randhir, T. 2008. **Effect of climate change on watershed system: a regional analysis.** Climatic Change. 89: 263-280.

Martin, J.S. 1985. **Use of silt fences for control of sediment run-off.** In: Erosion control: a challenge in our time. Proceedings, International Erosion Control Association conference XVI. Pinole, CA: International Erosion Control Association: 79-84.

Mason, L. 1990. **Portable wetland area and stream crossings.** Publ. 9024-1203. San Dimas, CA: U.S. Department of Agriculture, Forest Service, Technology and Development Center. 110 p.

Mason, L.E.; Greenfield, P.H. 1995. **Portable crossings for weak soil areas and streams.** Transportation Research Record. 1504: 118-124.

Mazer, G.; Booth, D.; Ewing, K. 2001. **Limitations to vegetation establishment and growth in biofiltration swales.** Ecological Engineering. 17: 429-433.

McClelland, D.E.; Foltz, R.B.; Falter, C.M.; Wilson, W.D.; Cundy, T.; Schuster, R.L.; Saurbier, J.; Rabe, C.; Heinemann, R. 1997. **Relative effects on a low-volume road system of landslides resulting from episodic storms in northern Idaho.** Transportation Research Record. 1652: 235-243.

McHattie, R.L. 1994. **Elliott Highway dust control and stabilization with EMC2 and montmorillonite. Final evaluation of experimental features; Projects AK8701A and AK8701B.** Juneau, AK: Alaska Department of Transportation and Public Facilities. 6 p.

McKee, W.H., Jr.; Blaser, R.E.; Barkley, D.G. 1964. **Mulches for steep cut slopes.** Highway Research Record. 53: 35-42.

McLaughlin, R.A. 2003. **The potential for substantial improvements in sediment and turbidity control.** In: Saleh, A., ed. Proceedings, total maximum daily load (TMDL) environmental regulations-II. ASAE Publ. No. 701P1503. St. Joseph, MI: American Society of Agricultural Engineers: 262-272.

McLaughlin, R.A.; Hayes, S.A.; Clinton, D.L.; McCaleb, M.S.; Jennings, G.D. 2009a. **Water quality improvements using modified sediment control systems on construction sites.** Transactions of the American Society of Agricultural and Biological Engineers. 52(6): 1859-1867.

McLaughlin, R.A.; King, S.E.; Jennings, G.D. 2009b. **Improving construction site runoff quality with fiber check dams and polyacrylamide.** Journal of Soil and Water Conservation. 64(2): 144-154.

McLeod, H.E.; Reed, I.F.; Johnson, W.H.; Gill, W.R. 1966. **Draft, power efficiency, and soil-compaction characteristics of single, dual, and low-pressure tires.** Transactions of the American Society of Agricultural Engineers. 9(1): 41-44.

Megahan, W.F. 1974a. **Deep-rooted plants for erosion control on granitic road fills in the Idaho Batholith.** Res. Pap. INT-161. Ogden, UT: U.S. Department of Agriculture, Forest Service, Intermountain Forest and Range Experiment Station. 18 p.

Megahan, W.F. 1974b. **Erosion over time on severely disturbed granitic soils: a model.** Res. Pap. INT-156. Ogden, UT: U.S. Department of Agriculture, Forest Service, Intermountain Forest and Range Experiment Station. 15 p.

Megahan, W.F.; Day, N.F.; Bliss, T.M. 1978. **Landslide occurrence in the western and central northern Rocky Mountain physiographic province in Idaho.** In: Youngberg, C.T., ed. Forest soils and land use: proceedings, fifth North American forest soils conference. Fort Collins, CO: Colorado State University: 116-139.

Megahan, W.F.; Ketcheson, G.L. 1996. **Predicting downslope travel of granitic sediments from forest roads in Idaho.** Water Resources Bulletin. 32(2): 371-382.

Megahan, W.F.; Kidd, W.J. 1972. **Effect of logging roads on sediment production rates in the Idaho Batholith.** Res. Pap. INT-123. Ogden, UT: U.S. Department of Agriculture, Forest Service, Intermountain Forest and Range Experiment Station. 14 p.

Megahan, W.F.; King, J.G. 2004. **Erosion, sedimentation, and cumulative effects in the northern Rocky Mountains.** In: Ice, G.G.; Stednick, J.D., eds. A century of forest and wildland watershed lessons. Bethesda, MD: Society of American Foresters: 201-222. Chapter 9.

Megahan, W.F.; Wilson, M.; Monsen, S.B. 2001. **Sediment production from granitic cutslopes on forest roads in Idaho, USA.** Earth Surface Processes and Landforms. 26: 153-163.

Mehrotra, G.S.; Sarkar, S.; Dharmaraju, R. 1991. **Landslide hazard assessment in Rishikesh-Tehri area, Garhwal Himalaya, India.** In: Proceedings, sixth international symposium on landslides. Rotterdam, the Netherlands: Balkema Publishers: 1001-1007.

Merrill, M.A. 2005. **The effects of culverts and bridges on stream geomorphology.** Raleigh, NC: North Carolina State University. 153 p. M.S. thesis.

Meyer, L.D.; Dabney, S.M.; Harmon, W.C. 1995. **Sediment-trapping effectiveness of stiff-grass hedges.** Transactions of the American Society of Agricultural Engineers. 38(3): 809-815.

Meyer, L.D.; Johnson, C.B.; Foster, G.R. 1972. **Stone and woodchip mulches for erosion control on construction sites.** Journal of Soil and Water Conservation. 27(6): 264-269.

Meyer, L.D.; Mannering, J.V. 1963. **Crop residues as surface mulches for controlling erosion on sloping land under intensive cropping.** Transactions of the American Society of Agricultural Engineers. 6(4): 322-323, 327.

Meyer, L.D.; Wischmeier, W.H.; Foster, G.R. 1970. **Mulch rates required for erosion control on steep slopes.** Soil Science Society of America Proceedings. 34(6): 928-931.

Michaels, A.S.; Morelos, O. 1955. **Polyelectrolyte adsorption by kaolinite.** Industrial and Engineering Chemistry. 47(9): 1801-1809.

Milauskas, S.J. 1988. **Low-water stream crossing options for southern haul roads.** Southern Journal of Applied Forestry. 12: 11-15.

Miles, S.R.; Haskins, D.M.; Ranken, D.W. 1989. **Emergency burn rehabilitation: cost, risk, and effectiveness.** In: Berg, N.H., ed. Proceedings, symposium on fire and watershed management. Gen. Tech. Rep. PSW-109. Berkeley, CA: U.S. Department of Agriculture, Forest Service, Pacific Southwest Forest and Range Experiment Station: 97-102.

Miller, R.L., Jr.; Dewalle, D.R.; Brooks, R.P.; Finley, J.C. 1997. **Long-term impacts of forest road crossings of wetlands in Pennsylvania.** Northern Journal of Applied Forestry. 14(3): 109-116.

Miller, S.M.; Joaquin, A.C. 2011. **Geosynthetic stabilized earth using compost filter socks for sustainable vegetated walls and slopes.** In: Proceedings, 42nd conference and expo of the International Erosion Control Association. Denver, CO: International Erosion Control Association. 12 p.

Miller, W.P. 1987. **Infiltration and soil loss of three gypsum-amended ultisols under simulated rainfall.** Soil Science Society of America Journal. 51: 1314-1320.

Mills, K. 2006. **Environmental performance measures for forest roads.** In: Proceedings, 29th Council on Forest Engineering conference: working globally – sharing forest engineering challenges and technologies around the world. Morgantown, WV: Council on Forest Engineering: 291-300.

Mitchell, A.R. 1986. **Polyacrylamide application in irrigation water to increase infiltration.** Soil Science. 141(5): 353-358.

Mitchell, D.J.; Barton, A.P.; Fullen, M.A.; Hocking, T.J.; Zhi, W.B.; Yi, Z. 2003. **Field studies of the effects of jute geotextiles on runoff and erosion in Shropshire, UK.** Soil Use and Management. 19: 182-184.

Mitchell, W.C.; Trimble, G.R., Jr. 1959. **How much land is needed for the logging transport system?** Journal of Forestry. 57(1): 10-12.

Mockler, S.; Croke, J. 1999. **Prescriptive measures for the prevention of road to stream linkage.** In: Rutherford, I.; Bartley, R., eds. Proceedings, second Australian stream management conference. Canberra, Australia: Cooperative Research Centre for Catchment Hydrology: 2: 451-456.

Moll, J.; Copstead, R.; Johansen, D.K. 1997. **Traveled way surface shape.** 9777 1808-SDTDC. San Dimas, CA: U.S. Department of Agriculture, Forest Service, San Dimas Technology and Development Center. 10 p.

Monlux, S. 1993. **Dust abatement product comparisons in the Northern Region.** Engineering Field Notes. 26(May-June): 26-36. http://www.fs.fed.us/t-d/pubs/pdfpubs/pdf93713815/pdf93713815.pdf (accessed June 29, 2016).

Monlux, S. 2003. **Stabilizing unpaved roads with calcium chloride.** Paper No. LVR8-1110. Transportation Research Record. 1819: 52-56.

Monlux, S.; Mitchell, M.R. 2006. **Surface-aggregate stabilization with chloride materials.** 0677 1805-SDTDC. San Dimas, CA: U.S. Department of Agriculture, Forest Service, National Technology and Development Program. 23 p.

Montgomery, D.R. 1994. **Road surface drainage, channel initiation, and slope instability.** Water Resources Research. 30(6): 1925-1932.

Montgomery, D.R.; Dietrich, W.E. 1994. **A physically based model for the topographic control on shallow landsliding.** Water Resources Research. 30(4): 1153-1171.

Moore, K.; Furniss, M.; Firor, S.; Love, M. 1999. **Fish passage through culverts: an annotated bibliography.** Eureka, CA: U.S. Department of Agriculture, Forest Service, Six Rivers National Forest Watershed Interactions Team. http://stream.fs.fed.us/fishxing/biblio.pdf (accessed December 4, 2014).

Moore, R.; Dibb, T.M.; Billing, D.W. 1991. **The distribution and causes of mass movement in Aurora Province, Philippines.** In: Proceedings, sixth international symposium on landslides. Rotterdam, the Netherlands: Balkema Publishers: 1023-1029.

Moore, R.D.; Wondzell, S.M. 2005. **Physical hydrology and the effects of forest harvesting in the Pacific Northwest: a review.** Journal of the American Water Resources Association. 41(4): 763-784.

Moreno-de las Heras, M.; Merino-Martín, L.; Nicolau, J.M. 2009. **Effect of vegetation cover on the hydrology of reclaimed mining soils under Mediterranean-Continental climate.** Catena. 77: 39-47.

Morgan, R.J.; Schaefer, V.R.; Sharma, R.S. 2005. **Determination and evaluation of alternative methods for managing and controlling highway-related dust: Phase II – demonstration project.** IHRB Project TR-506. Iowa Highway Research Board. Ames, IA: Iowa State University: Department of Civil, Construction, and Environmental Engineering. 107 p.

Morgan, R.P.C.; Rickson, R.J. 1995. **Slope stabilization and erosion control: a bioengineering approach.** London, England: Chapman and Hall. 274 p.

Moss, A.J. 1991. **Rain-impact soil crust I: Formation on a granite-derived soil.** Australian Journal of Soil Research. 29: 271-289.

Municipality of Metropolitan Seattle. 1992. **Biofiltration swale performance, recommendations, and design considerations.** Publication 657. Seattle, WA: Municipality of Metropolitan Seattle, Water Pollution Control Department.

Muñoz-Carpena, R.; Parsons, J.E. 2012. **VFSMOD-W: Vegetative Filter Strip Modeling System.** Gainesville, FL: University of Florida, Department of Agriculture and Biological Engineering. http://abe.ufl.edu/carpena/vfsmod/ (accessed December 2, 2014).

Murray, H.H. 2000. **Traditional and new applications for kaolin, smectite, and palygorskite: a general overview.** Applied Clay Science. 17: 207-221.

Nadler, A.; Malik, M.; Letey, J. 1992. **Desorption of polyacrylamide and polysaccharide polymers from soil materials.** Soil Technology. 5: 91-95.

Natural Resources Conservation Service. 2003. **Grassed waterway and vegetated filter.** Conservation Practice Job Sheet 412. Washington, DC: U.S. Department of Agriculture, Natural Resources Conservation Service. Available at http://www.mn.nrcs.usda.gov/technica/ecs/agron/crp/plan%20forms/cp8a%20plan%204-03.pdf (accessed July 9, 2012).

Neibling, W.H.; Alberts, E.E. 1979. **Composition and yield of soil particles transported through sod strips.** Paper No. 79–2065. St. Joseph, MI: American Society of Agricultural Engineers. 13 p.

Ngabe, B.; Bidleman, T.F.; Scott, G.I. 2000. **Polycyclic aromatic hydrocarbons in storm runoff from urban and coastal South Carolina.** The Science of the Total Environment. 255: 1-9.

Nicholson, K.W.; Branson, J.R.; Giess, P.; Cannell, R.J. 1989. **The effects of vehicle activity on particle resuspension.** Journal of Aerosol Science. 20(8): 1425-1428.

Norman, J.R. 2006. **Effects of road–stream crossings on stream geomorphology and the movement of small bodied fishes in the Etowah River Basin, USA.** Athens, GA: University of Georgia. 154 p. M.S. thesis.

Norman, M.; Johansson, C. 2006. **Studies of some measures to reduce road dust emissions from paved roads in Scandinavia.** Atmospheric Environment. 40: 6154-6164.

Normann, J.M.; Houghtalen, R.J.; Johnston, W.J. 1985. **Hydraulic design of highway culverts.** Report No. FHWA-IP-85-15. McLean, VA: U.S. Department of Transportation, Federal Highway Administration, Office of Research, Development and Technology. 272 p.

Norris, V. 1993. **The use of buffer zones to protect water quality: a review.** Water Resources Management. 7(4): 257-272.

Norton, L.D. 1992. **Chemical amendments for erosion control.** Paper No. 92-2562. St. Joseph, MI: American Society of Agricultural Engineers. 9 p.

Norton, L.D.; Shainberg, I.; King, K.W. 1993. **Utilization of gypsiferous amendments to reduce surface sealing in some humid soils of the eastern USA.** Catena Supplement. 24: 77-92.

Novotny, V.; Olem, H. 1994. **Water quality: prevention, identification, and management of diffuse pollution.** New York: Van Nostrand Reinhold. 1054 p.

Oakland, P.H. 1983. **An evaluation of urban storm water pollutant removal through grassed swale treatment.** In: De Vore, R.W., ed. Proceedings, 1983 international symposium on urban hydrology, hydraulics, and sediment control. New York: OES Publications: 183-185.

Odemerho, F.O. 1986. **Variation in erosion-slope relationship on cut-slopes along a tropical highway.** Singapore Journal of Tropical Geography. 7(2): 98-107.

Ohlander, C.A. 1976. **Defining the sediment trapping characteristics of a vegetative buffer. Special case: road erosion.** In: Proceedings, third federal interagency sedimentation conference. Paper PB-245 100. Washington, DC: Sedimentation Committee, Water Resources Council: 77-82.

Ollesch, G.; Vacca, A. 2002. **Influence of time on measurement results of erosion plot studies.** Soil and Tillage Research. 67: 23-39.

O'Loughlin, C. 1975. **The effects of forest removal on the slope stability and hydrology of steep catchments.** In: Proceedings, Water and Soil Division Course No. 2. Rotorua, New Zealand: National Water and Soil Conservation Organisation. 8 p.

Orr, H.K. 1970. **Runoff and erosion control by seeded and native vegetation on a forest burn: Black Hills, South Dakota.** Res. Pap. RM-60. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Forest and Range Experiment Station. 12 p.

Orts, W.J.; Roa-Espinosa, A.; Sojka, R.E.; Glenn, G.M.; Imam, S.H.; Erlacher, K.; Pedersen, J.S. 2007. **Use of synthetic polymers and biopolymers for soil stabilization in agricultural, construction, and military applications.** Journal of Materials in Civil Engineering. 19: 58-66.

Ossege, A.L. 1993. **Why percent open area?** 4 p. http://carthagemills.com/pdf/Why_Percent-Open-Area%20in%20Geotextiles.pdf (accessed June 29, 2016).

Owino, J.; Gretzmacher, R. 2002. **Performance of narrow strips of vetiver grass (*Vetiveria zizanioides*) and napier grass (*Pennisetum purpureum*) as barriers against runoff and soil loss on a clay loam soil in Kenya.** In: Deininger, A., comp. ed. Challenges to organic farming and sustainable land use in the tropics and subtropics. Deutscher Tropentag 2002. Kassel, Germany: Kassel University Press. 8 p.

Packer, P.E. 1951. **An approach to watershed protection criteria.** Journal of Forestry. 49(9): 639-644.

Packer, P.E. 1967. **Criteria for designing and locating roads to control sediment.** Forest Science. 13: 2-18.

Packer, P.E.; Christensen, G.F. 1964. **Guides for controlling sediment from secondary logging roads.** Ogden, UT: U.S. Department of Agriculture, Forest Service, Intermountain Forest and Range Experiment Station; Missoula, MT: U.S. Department of Agriculture, Forest Service, Northern Region. 42 p.

Pan, C.; Ma, L.; Shangguan, Z. 2010. **Effectiveness of grass strips in trapping suspended sediments from runoff.** Earth Surface Processes and Landforms. 35: 1006-1013.

Pandila, M.M. 1973. **Micro-organisms associated with microbiological degradation of lignosulphonates: a review of literature.** Pulp and Paper Magazine of Canada. 74: 80-84.

Pankau, R.C. 2010. **Concentrated flow paths in riparian buffer zones of southern Illinois.** Carbondale, IL: Southern Illinois University. 102 p. M.S. thesis.

Pankau, R.C.; Schoonover, J.E.; Williard, K.W.J.; Edwards, P.J. 2012. **Concentrated flow paths in riparian buffer zones of southern Illinois.** Agroforestry Systems. 84: 191-205.

Pannkuk, C.D.; Robichaud, P.R. 2003. **Effectiveness of needle cast at reducing erosion after forest fires.** Water Resources Research. 39(12): 1333-1341.

Parizek, R.R. 1971. **Impact of highways on the hydrogeologic environment.** In: Coates, D.R., ed. Environmental geomorphology. Binghamton, NY: New York University: 151-199. Chapter 9.

Parsons, J.E.; Daniels, R.B.; Gilliam, J.W.; Dillaha, T.A. 1994. **Reduction in sediment and chemical load agricultural field runoff by vegetative filter strips.** UNC-WRRI-94-286. Washington, DC: U.S. Department of Agriculture and U.S. Environmental Protection Agency; Chapel Hill, NC: University of North Carolina, Water Resources Research Institute. 95 p.

Paterson, J.J.; Jones, J.H.; Olsen, F.J.; McCoy, G.C. 1980. **Dairy liquid waste distribution in an overland flow vegetative-soil filter system.** Transactions of the American Society of Agricultural Engineers. 23(4): 973-977, 984.

Pearce, R.A.; Trlica, M.J.; Leininger, W.C.; Mergen, D.E.; Frasier, G. 1998. **Sediment movement through riparian vegetation under simulated rainfall and overland flow.** Journal of Range Management. 51(3): 301-308.



FS-002933

Peirce, A.W. 1966. **Studies on salt tolerance of sheep: VI. The tolerance of wethers in pens for drinking waters of the types obtained from underground sources in Australia.** Australian Journal of Agricultural Research. 17: 209-218.

Penn State Center for Dirt and Gravel Road Studies. 2014. **Driving surface aggregate.** Informational Bulletin. University Park, PA: Pennsylvania State University. 4 p.

Peterjohn, W.T.; Correll, D.L. 1984. **Nutrient dynamics in an agricultural watershed: observations on the role of a riparian forest.** Ecology. 65(5): 1466-1475.

Peters, S.; Peters, G. 2009. **Wildland CPR issues new report on Forest Service road management.** Missoula, MT: Wildlands CPR. 2 p. Available at http://www.wildlandscpr.org/road-riporter/wildlands-cpr-issues-new-report-forest-service-road-management (accessed September 12, 2012).

Petersen, A.L.; Thompson, A.M.; Baxter, C.A.; Norman, J.M.; Roa-Espinosa, A. 2007. **A new polyacrylamide (PAM) formulation for reducing erosion and phosphorus loss in rainfed agriculture.** Transactions of the American Society of Agricultural and Biological Engineers. 50(6): 2091-2101.

Peterson, J.R.; Flanagan, D.C.; Tishmack, J.K. 2002. **PAM application method and electrolyte source effects on plot-scale runoff and erosion.** Transactions of the American Society of Agricultural Engineers. 45(6): 1859-1867.

Pethick, J.; Leggett, D.; Husain, L. 1990. **Boundary layers under salt marsh vegetation developed in tidal currents.** In: Thornes, J.B., ed. Vegetation and erosion: processes and environments. Hoboken, NJ: John Wiley & Sons Ltd.: 113-124. Chapter 9.

Phillips, J.D. 1989. **An evaluation of the factors determining the effectiveness of water quality buffer zones.** Journal of Hydrology. 107: 133-145.

Piechota, T.; Van Ee, J.; Batista, J.; Stave, K.; James, D., eds. 2002. **Potential environmental impacts of dust suppressants: "avoiding another Times Beach."** EPA/600/R-04/031. Washington, DC: U.S. Environmental Protection Agency; Las Vegas, NV: University of Nevada. 97 p.

Piehl, B.T.; Beschta, R.L.; Pyles, M.R. 1988. **Ditch-relief culverts and low-volume forest roads in the Oregon Coast Range.** Northwest Science. 62(3): 91-98.

Pinnick, R.G.; Fernandez, G.; Hinds, B.D.; Bruce, C.W.; Schaefer, R.W.; Pendelton, J.D. 1985. **Dust generated by vehicular traffic on unpaved roadways: size and infrared extinction characteristics.** Aerosol Science and Technology. 4(1): 99-121.

Pitt, R. 1979. **Demonstration of non point pollution abatement through improved street cleaning practices.** Report No. EPA 600/2-79-161. Cincinnati, OH: U.S. Environmental Protection Agency, Office of Research and Development. 288 p.

Pitt, R.E.; Amy, G. 1973. **Toxic materials analysis of street surface contaminants.** Environmental Protection Series Report No. EPA-R2-72-283. Washington, DC: U.S. Environmental Protection Agency, Office of Research and Development. 145 p.

Pitts, J. 1992. **Slope stability in Singapore.** In: Physical adjustments in a changing landscape, the Singapore story. Queenstown, Singapore: Singapore University Press: 259-300. Chapter 9.

Plamondon, A.P. 1982. **Augmentation de la concentration des sédiments en suspension suite à l'exploitation forestière et durée de l'effet** [**Increase in suspended sediments after logging, and duration of the effect**]. Canadian Journal of Forest Research. 12: 883-892.

Poesen, J.; De Luna, E.; Franca, A.; Nachtergaele, J.; Govers, G. 1999. **Concentrated flow erosion rates as affected by rock fragment cover and initial soil moisture content.** Catena. 36: 315-329.

Poesen, J.; Ingelmo-Sanchez, F. 1992. **Runoff and sediment yield from topsoils with different porosity as affected by rock fragment cover and position.** Catena. 19: 451-474.

Poesen, J.W.; Torri, D.; Bunte, K. 1994. **Effects of rock fragments on soil erosion by water at different spatial scales: a review.** Catena. 23: 141-166.

Polyakov, V.; Fares, A.; Ryder, M.H. 2005. **Precision riparian buffers for the control of nonpoint source pollutant loading into surface water: a review.** Environmental Review. 13: 129-144.

Poole, N.J.; Wildish, D.J.; Kristmanson, D.D. 1978. **The effects of the pulp and paper industry on the aquatic environment.** CRC Critical Reviews in Environmental Control. 8: 153-195.

Prosser, I.P.; Dietrich, W.E. 1995. **Field experiments on erosion by overland flow and their implication for a digital terrain model of channel initiation.** Water Resources Research. 31(11): 2867-2876.

Prosser, I.P.; Dietrich, W.E.; Stevenson, J. 1995. **Flow resistance and sediment transport by concentrated overland flow in a grassland valley.** Geomorphology. 13: 71-86.

Putthacharoen, S.; Howeler, R.H.; Jantawat, S.; Vichukit, V. 1998. **Nutrient uptake and soil erosion losses in cassava and six other crops in a psamment in eastern Thailand.** Field Crops Research. 57: 113-126.

Qiu, Z.; Prato, T. 1998. **Economic evaluation of riparian buffers in an agricultural watershed.** Journal of the American Water Resources Association. 34(4): 877-890.

Quinton, J.N.; Edwards, G.M.; Morgan, R.P.C. 1997. **The influence of vegetation species and plant properties on runoff and soil erosion: results from a rainfall simulation study in south east Spain.** Soil Use and Management. 13: 143-148.

Raabe, E.W. 1968. **Biochemical oxygen demand and degradation of lignin in natural waters.** Journal (Water Pollution Control Federation). 40(5): R145-R150.

Rackley, J.; Chung, W. 2008. **Incorporating forest road erosion into forest resource transportation planning: a case study in the Mica Creek watershed in northern Idaho.** Transactions of the American Society of Agricultural and Biological Engineers. 51(1): 115-127.

Ramsey, A.A. 1924. **Waters suitable for live stock: analyses and experiences in New South Wales.** Agricultural Gazette of New South Wales. 35: 339-342.

Rashin, E.B.; Clishe, C.J.; Loch, A.T.; Bell, J.M. 2006. **Effectiveness of timber harvest practices for controlling sediment related water quality impacts.** Journal of the American Water Resources Association. 42(5): 1307-1327.

Raut Desai, A.B. 2004. **Use of compost filter berms for sediment trapping: primary focus on water quality and structural stability.** College Station, TX: Texas A&M University. 79 p. M.S. thesis.

Reed, D.; Wolanek, M.D. 1994. **Fisheries and water quality monitoring summary for woodwaste disposal sites near St. John Harbor, Zarembo Island.** Unpublished report on file with: U.S. Department of Agriculture, Forest Service, Tongass National Forest, Petersburg, AK. 15 p.

Reid, L.M.; Dunne, T. 1984. **Sediment production from forest road surfaces.** Water Resources Research. 20(11): 1753-1761.

Reinhart, K.G.; Eschner, A.R.; Trimble, G.R., Jr. 1963. **Effect on streamflow of four forest practices in the mountains of West Virginia.** Res. Pap. NE-1. Upper Darby, PA: U.S. Department of Agriculture, Forest Service, Northeastern Forest Experiment Station. 79 p.

Resource Conservation District of Monterey County. 2005. **Vegetated waterways.** Salinas, CA. Available at http://www.rcdmonterey.org/Growers_Ranchers_Landowners/Planning_Design/vegetated_waterway.html (accessed July 9, 2012).

Reuss, J.O.; Johnson, D.W. 1986. **Acid deposition and the acidification of soils and waters.** Ecological Studies 59. New York: Springer-Verlag. 119 p.

Revitt, D.M.; Ellis, J.B. 1980. **Rain water leachates of heavy metals in road surface sediments.** Water Research. 14(10): 1403-1407.

Rey, F. 2003. **Influence of vegetation distribution on sediment yield in forested marly gullies.** Catena. 50: 549-562.

Rice, R.M.; Lewis, J. 1991. **Estimating erosion risks associated with logging and forest roads in northwestern California.** Water Resources Bulletin 27(5): 809-818.

Rice, R.M.; Tilley, F.B.; Datzman, P.A. 1979. **A watershed's response to logging and roads: South Fork of Caspar Creek, 1967-1976.** Res. Pap. PSW-146. Berkeley, CA: U.S. Department of Agriculture, Forest Service, Pacific Southwest Forest and Range Experiment Station. 12 p.

Richardson, J.S. 2004. **Meeting the conflicting objectives of stream conservation and land use through riparian management: another balancing act.** In: Scrimgeour, G.J.; Eisler, G.; McCulloch, B.; Silins, U.; Monita, M., eds. Proceedings, forest land – fish conference II: ecosystem stewardship through collaboration. Ottawa, ON: Natural Resources Canada, Canadian Forest Service: 1-6.

Rickson, R.J. 2000. **The use of geotextiles for vegetation management.** Aspects of Applied Biology. 58: 107-114.

Rickson, R.J. 2006. **Controlling sediment at source: an evaluation of erosion control geotextiles.** Earth Surface Processes and Landforms. 31: 550-560.

Rimoldi, P.; Zhao, A. 1996. **A three dimensional geosynthetic product for erosion control.** In: Erosion control technology: bringing it home – proceedings of conference XXVII. Denver, CO: International Erosion Control Association: 337-343.

Risse, M.; Faucette, B. 2001. **Compost utilization for erosion control.** Cooperative Extension Services Bull. 1200. Athens, GA: University of Georgia, Cooperative Extension Service. 7 p.

Rivenbark, B.L.; Jackson, C.R. 2004. **Concentrated flow breakthroughs moving through silvicultural streamside management zones: southeastern Piedmont, USA.** Journal of the American Water Resources Association. 40(4): 1043-1052.

Roads and Transportation Association of Canada [RTAC]. 1987. **Guidelines for cost effective use and application of dust palliatives.** Ottawa, ON: Roads and Transportation Association of Canada. 87 p.

Roa-Espinosa, A.; Bubenzer, G.D.; Miyashita, E.S. 1999. **Sediment and runoff control on construction sites using four application methods of polyacrylamide mix.** In: Proceedings, ASAE annual international meeting. Paper No. 99-2013. St. Joseph, MI: American Society of Agricultural Engineers. 6 p.

Roald, S.O. 1977a. **Acute toxicity of lignosulphonates on rainbow trout (*Salmo gairdneri*).** Bulletin of Environmental Contamination and Toxicology. 17(6): 702-706.

Roald, S.O. 1977b. **Effects of sublethal concentrations of lignosulphonates on growth, intestinal flora and some digestive enzymes of rainbow trout (*Salmo gairdneri*).** Aquaculture. 12: 327-335.

Robichaud, P.R. 2005. **Measurement of post-fire hillslope erosion to evaluate and model rehabilitation treatment effectiveness and recovery.** International Journal of Wildland Fire. 14: 475-485.

Robichaud, P.R. 2010. **Post-fire stabilization and rehabilitation.** In: Cerdà, A.; Robichaud, P.R., eds. Fire effects on soils and restoration strategies. Boca Raton, FL: CRC Press: 299-320. Chapter 10.

Robichaud, P.R.; Ashmun, L.E.; Sims, B.D. 2010. **Post-fire treatment effectiveness for hillslope stabilization.** Gen. Tech. Rep. RMRS-GTR-240. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. 62 p.

Robichaud, P.R.; Beyers, J.L.; Neary, D.G. 2000. **Evaluating the effectiveness of postfire rehabilitation treatments.** Gen. Tech. Rep. RMRS-GTR-63. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. 85 p.

Robichaud, P.R.; Brown, R.E. 2002. **Silt fences: an economical technique for measuring hillslope soil erosion.** Gen. Tech. Rep. RMRS-GTR-94. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. 24 p.




FS-002935

Robichaud, P.R.; Jordan, P.; Lewis, S.A.; Ashmun, L.E.; Covert, S.A.; Brown, R.E. 2013. **Evaluating the effectiveness of wood shred and agricultural straw mulches as a treatment to reduce post-wildfire hillslope erosion in southern British Columbia, Canada.** Geomorphology. 197: 21-33.

Robinson, C.A.; Ghaffarzadeh, M.; Cruse, R.M. 1996. **Vegetative filter strip effects on sediment concentration in cropland runoff.** Journal of Soil and Water Conservation. 50(3): 227-230.

Rodgers, M.; Kielty, A.; Healy, M.G. 2014. **Performance of granitic, shale, and limestone forest road aggregates subjected to repeated loading.** Journal of Transportation Engineering. 140(4): 04014002. 8 p.

Rogge, W.F.; Hildemann, L.M.; Mazurek, M.A.; Cass, G.R.; Simoneit, B.R.T. 1993. **Sources of fine organic aerosol. 3. Road dust, tire debris, and organometallic brake lining dust: roads as sources and sinks.** Environmental Science and Technology. 27(9): 1892-1904.

Römkens, M.J.M.; Wang, J.Y. 1987. **Soil roughness changes from rainfall.** Transactions of the American Society of Agricultural Engineers. 30(1): 101-107.

Rosgen, D. 1996. **Applied river morphology.** Pagosa Springs, CO: Wildland Hydrology. 350 p.

Rothwell, R.L. 1978. **Watershed management guidelines for logging and road construction in Alberta.** Information Report NOR-X-208. Edmonton, AB: Fisheries and Environment Canada, Canadian Forestry Service, Northern Forest Research Centre. 43 p.

Rothwell, R.L. 1983. **Erosion and sediment control at road–stream crossings.** Forestry Chronicle. 23: 62-66.

Ruiz, L. 2005. **Guidelines for road maintenance levels.** 0577 1205-SDTDC. Washington, DC: U.S. Department of Agriculture, Forest Service, Technology and Development Program. 54 p.

Rummer, B. 1999. **Water quality effects of forest roads in bottomland hardwood stands.** Paper 99-5051. St. Joseph, MI: American Society of Agricultural Engineers. 9 p.

Rummer, B.; Stokes, B.; Lockaby, G. 1997. **Sedimentation associated with forest road surfacing in a bottomland hardwood ecosystem.** Forest Ecology and Management. 90: 195-200.

Rustom, R.N.H. 1993. **Experimental study of soil erosion control systems: behavior and effectiveness.** Philadelphia, PA: Drexel University. 206 p. Ph.D. dissertation.

Sadeghi, A.M.; Sefton, K.A.; Faucette, L.B. 2006. **Sediment and nutrient removal from storm runoff with compost filter socks and silt fence.** In: Proceedings, annual international meeting of the ASABE. St. Joseph, MI: American Society of Agricultural and Biological Engineers. 15 p.

Sample, L.J.; Steichen, J.; Kelley, J.R., Jr. 1998. **Water quality impacts from low water fords on military training lands.** Journal of the American Water Resources Association. 34(4): 939-949.

Sanders, T.G.; Addo, J.Q. 1993. **Effectiveness and environmental impact of road dust suppressants.** Fort Collins, CO: Colorado State University, Department of Civil Engineering. 33 p.

Sanders, T.G.; Addo, J.Q.; Ariniello, A.; Heiden, W.F. 1997. **Relative effectiveness of road dust suppressants.** Journal of Transportation Engineering. 123(5): 393-397.

Sanger, D.M.; Holland, A.F.; Scott, G.I. 1999. **Tidal creek and salt marsh sediments in South Carolina coastal estuaries: II. Distribution of organic contaminants.** Archives of Environmental Contamination and Toxicology. 37: 458-471.

Sartor, J.D.; Boyd, G.B. 1972. **Water pollution aspects of street surface contaminants.** Environmental Protection Series Report No. EPA-R2-72-081. Washington, DC: U.S. Environmental Protection Agency, Office of Research and Monitoring. 257 p.

Scatena, F.N.; Larsen, M.C. 1991. **Physical aspects of hurricane Hugo in Puerto Rico.** Biotropica. 23(4a): 317-323.

Schafer, S. 2008. **Size up your soil.** 2 p. http://www.agweb.com/article/Size_Up_Your_Soil_203112 (accessed November 19, 2012).

Scheetz, B.E.; Bloser, S.M. 2008. **Environmentally sensitive maintenance practices for unpaved roads: sediment reduction study.** Final report. University Park, PA: Pennsylvania State University, Center for Dirt and Gravel Road Studies. 58 p.

Schmitt, T.J.; Dosskey, M.G.; Hoagland, K.D. 1999. **Filter strip performance and processes for different vegetation, widths, and contaminants.** Journal of Environmental Quality. 28: 1479-1489.

Schnackenberg, E.S.; MacDonald, L.H. 1998. **Detecting cumulative effects on headwater streams in the Routt National Forest, Colorado.** Journal of the American Water Resources Association. 34(5): 1163-1177.

Scholen, D.E. 1992. **Non-standard stabilizers.** Report No. FHWA-FLP-92-011. Washington, DC: U.S. Department of Transportation, Federal Highway Administration. 113 p.

Schoonover, J.E.; Williard, K.W.J.; Zaczek, J.J.; Mangun, J.C.; Carver, A.D. 2005. **Nutrient attenuation in agricultural surface runoff by riparian buffer zones in southern Illinois, USA.** Agroforestry Systems. 64: 169-180.

Schueler, T. 1994. **Performance of grassed swales along east coast highways.** Tech. Note No. 32. Watershed Protection Techniques. 1(3): 122-123.

Schueler, T.R.; Kumble, P.A.; Heraty, M.A. 1992. **A current assessment of urban best management practices: techniques for reducing non-point source pollution in the coastal zone.** Prepared for: U.S. Environmental Protection Agency, Office of Wetlands, Oceans, and Watersheds. Washington, DC: Metropolitan Washington Council of Governments, Department of Environmental Programs, Anacostia Restoration Team. 127 p.

Schueler, T.R.; Lugbill, J. 1990. **Performance of current sediment control measures at Maryland construction sites.** Final report. Washington, DC: Metropolitan Washington Council of Governments, Department of Environmental Programs. 89 p.

Schultz, D. 1998. **Current status of vegetation management in roadside ditches and stormwater management facilities.** General report. Seattle, WA: University of Washington, Center for Urban Water Resources Management. 14 p. Available at https://digital.lib.washington.edu/researchworks/handle/1773/16322 (accessed September 22, 2016).

Schultz, E. 1993. **Size-fractionated measurement of coarse black carbon particles in deposition samples.** Atmospheric Environment. Part A. General Topics. 27(8): 1241-1249.

Schwendeman, T. 1981. **Dust control study – Gallatin National Forest. Part II: Dust palliative evaluation.** Bozeman, MT: U.S. Department of Agriculture, Forest Service, Gallatin National Forest. 31 p.

Sebaaly, P.E. 1992. **Pavement damage as related to tires, pressures, axle loads, and configurations.** In: Henry, J.J.; Wambold, J.C., eds. Vehicle, tire, pavement interface, ASTM STP 1164. Philadelphia, PA: American Society for Testing and Materials: 54-68.

Sessions, J.; Balcom, J.C.; Boston, K. 1987. **Road location and construction practices: effects on landslide frequency and size in the Oregon Coast Range.** Western Journal of Applied Forestry. 2(4): 119-124.

Seybold, C.A. 1994. **Polyacrylamide review: soil conditioning and environmental fate.** Communications in Soil Science and Plant Analysis. 25(11&12): 2171-2185.

Shainberg, I.; Levy, G.J. 1994. **Organic polymers and soil sealing in cultivated soils.** Soil Science. 158(4): 267-273.

Shainberg, I.; Levy, G.J.; Rengasamy, P.; Frenkel, H. 1992. **Aggregate stability and seal formation as affected by drops' impact energy and soil amendments.** Soil Science. 154(2): 113-119.

Shainberg, I.; Warrington, D.N.; Rengasamy, P. 1990. **Water quality and PAM interactions in reducing surface sealing.** Soil Science. 149(5): 301-307.

Shalaby, A.; Reggin, A. 2002. **Surface rutting of thin pavements and gravel roads under standard and reduced tire inflation pressures.** Canadian Journal of Civil Engineering. 29(5): 679-691.

Shariff, M. 2000. **The U.S. Army experience: cold tolerance and seed viability characteristics of vetiver.** In: Proceedings of the second international vetiver conference. San Antonio, TX: The Vetiver Network International: 412-415.

Sharma, P.P. 1996. **Interill erosion.** In: Agassi, M., ed. Soil erosion, conservation, and rehabilitation. Boca Raton, FL: CRC Press: 125-152. Chapter 7.

Shaviv, A.; Ravina, I.; Zaslavsky, D. 1987. **Field evaluation of methods of incorporating soil conditioners.** Soil and Tillage Research. 9: 151-160.

Shaviv, A.; Ravina, I.; Zaslavsky, D. 1988. **Flocculation of clay suspensions by an anionic soil conditioner.** Applied Clay Science. 3: 193-203.

Sheldon, J.C.; Bradshaw, A.D. 1977. **The development of a hydraulic seeding technique for unstable sand slopes. I. Effects of fertilizers, mulches, and stabilizers.** Journal of Applied Ecology. 14: 905-918.

Shiel, R.S.; Adey, M.A.; Lodder, M. 1988. **The effect of successive wet/dry cycles on aggregate size distribution in a clay texture soil.** Journal of Soil Science. 39: 71-80.

Shipitalo, M.J.; Bonta, J.V.; Dayton, E.A.; Owens, L.B. 2010. **Impact of grassed waterways and compost filter socks on the quality of surface runoff from corn fields.** Journal of Environmental Quality. 39: 1009-1018.

Shipitalo, M.J.; Bonta, J.V.; Owens, L.B. 2012. **Sorbent-amended compost filter socks in grassed waterways reduce nutrient losses in surface runoff from corn fields.** Journal of Soil and Water Conservation. 67(5): 433-441.

Shoop, S.; Haehnel, R.; Janoo, V.; Harjes, D.; Liston, R. 2006. **Seasonal deterioration of unsurfaced roads.** Journal of Geotechnical and Geoenvironmental Engineering. 132(7): 852-860.

Sidle, R.C.; Pearce, A.J.; O'Loughlin, C.L. 1985. **Hillslope stability and land use.** Washington, DC: American Geophysical Union. 140 p.

Singer, R.D.; Stevens, J.B.; Gleason, J.R.; Baker, D.A.; Baker, T.M.; McEmber, A.V. 1982. **An environmental evaluation of dust suppressants: calcium chloride and ligninsulfonates.** Final report. Prepared for: U.S. Department of the Interior, Bureau of Mines. Minneapolis, MN: University of Minnesota, School of Public Health. 33 p.

Skaugset, A.; Allen, M.M. 1998. **Forest road sediment and drainage monitoring project report for private and state lands in western Oregon.** Prepared for: Oregon Department of Forestry; Corvallis, OR: Oregon State University, Forest Engineering Department. 20 p.

Skaugset, A.E.; Marbet, C.E.; Gilbert, E.H.; Ellingson, K.S. 2007. **The hydrology of forest roads in the central Oregon Coast Range.** In: McFarland, A.; Saleh, A., eds. Watershed management to meet water quality standards and TMDLs (total maximum daily load). Paper 701P0207. St. Joseph, MI: American Society of Agricultural Engineers: 598-604.

Skorseth, K.; Selim, A.A. 2000. **Gravel roads: maintenance and design manual – Section 1: Routine maintenance and rehabilitation.** Pierre, SD: U.S. Department of Transportation, Federal Highway Administration and South Dakota Local Transportation Assistance Program. 32 p.

Slesser, C. 1943. **Movement of calcium chloride and sodium chloride in soil.** Highway Research Board Proceedings. 23: 460-468.

Smets, T.; Poesen, J. 2009. **Effects of initial soil condition on the effectiveness of biological geotextiles in reducing interrill runoff and erosion [abstract].** In: Geophysical research abstracts: 6th European Geosciences Union general assembly. Gottingen, Germany: Copernicus Publications: 11.




FS-002937

Smets, T.; Poesen, J.; Bochet, E. 2008. **Impact of plot length on the effectiveness of different soil-surface covers in reducing runoff and soil loss by water.** Progress in Physical Geography. 32(6): 654-677.

Smith, D.M. 1993. **Effects of variable tire pressure on road surfacings. Vol. II: Analyses of test results.** Tech. Rep. GL-93-20. Vicksburg, MS: U.S. Army Corps of Engineers, Waterways Experiment Station. 67 p.

Smith, H.J.C.; Levy, G.J.; Shainberg, I. 1990. **Water-droplet energy and soil amendments: effect on infiltration and erosion.** Soil Science Society of America Journal. 54: 1084-1087.

Smith, J.L. 2007. **The use of rolled erosion control products (RECPs) for minimizing soil erosion.** Syracuse, NY: Syracuse University. 272 p. Ph.D. dissertation.

Smith, O.M. 1920. **The removal of clay and silica from water.** Journal of American Water Works Association. 7(3): 302-314.

Snelder, D.J.; Bryan, R.B. 1995. **The use of rainfall simulation tests to assess the influence of vegetation density on soil loss on degraded rangelands in the Baringo District, Kenya.** Catena. 25: 105-116.

Society of American Foresters. 2008. **Dictionary of forestry.** Bethesda, MD. http://dictionaryofforestry.org/ (accessed June 29, 2016).

Sojka, B.; Lentz, R. 1996. **Polyacrylamide for furrow-irrigation erosion control.** Irrigation Journal. 46(1): 8-11.

Sojka, R.E.; Bjorneberg, D.L.; Entry, J.A.; Lentz, R.D.; Orts, W.J. 2007. **Polyacrylamide in agriculture and environmental land management.** Advances in Agronomy. 92: 75-162.

Sojka, R.E.; Lentz, R.D. 1997. **Reducing furrow irrigation erosion with polyacrylamide (PAM).** Journal of Production Agriculture. 10(1): 47-51.

Soupir, M.L.; Mostaghimi, S.; Masters, A.; Flahive, K.A.; Vaughan, D.H.; Mendez, A.; McClellan, P.W. 2004. **Effectiveness of polyacrylamide (PAM) in improving runoff water quality from construction sites.** Journal of the American Water Resources Association. 40: 53-66.

Spaan, W.P.; Sikking, A.F.S.; Hoogmoed, W.B. 2005. **Vegetation barrier and tillage effects on runoff and sediment in an alley crop system on a Luvisol in Burkina Faso.** Soil and Tillage Research. 83: 194-203.

Stafford, C.; Leathers, M.; Briggs, R. 1996. **Forestry-related nonpoint source pollution in Maine: a literature review.** Misc. Rep. 399. Orono, ME: Maine Agricultural and Forest Experiment Station. 20 p.

Stagge, J.H.; Davis, A.P.; Jamil, E.; Kim, H. 2012. **Performance of grass swales for improving water quality from highway runoff.** Water Research. 46: 6731-6742.

Stapanian, M.A.; Shea, D.W. 1986. **Lignsulfonates: effects on plant growth and survival and migration through the soil profile.** International Journal of Environmental Studies. 27: 45-56.

Stedman, J.T. 2008. **To-stream sediment delivery and associated particle size distributions in unmanaged and managed forested watersheds.** Carbondale, IL: Southern Illinois University. 117 p. M.S. thesis.

Stephens, S.H. 1991. **Final report on the safety assessment of polyacrylamide.** Journal of the American College of Toxicology. 10(1):193-203.

Stevens, E.; Yeri, S.; Barfield, B.; Gasem, K.; Hayes, J. 2007. **Modeling the effectiveness of the FAEST silt fence technology.** In: Proceedings, 2007 world environmental and water resources congress. Reston, VA: American Society of Civil Engineers. 10 p.

Steward, J.E. 1994. **Tire pressure control through central tire inflation – the "lightest foot" on the road.** In: Proceedings, international road federation conference. Ottawa, ON: Transportation Association of Canada: C29-C52.

Stone, D.M.; Elioff, J.D. 1998. **Soil properties and aspen development five years after compaction and forest floor removal.** Canadian Journal of Soil Science. 78: 51-58.

Storey, B.B.; Raut Desai, A.B.; Li, M.; Landphair, H.C.; Kramer, T. 2006. **Water quality characteristics and performance of compost filter berms.** Report No. FHWA/TX-06/0-4572-1. Prepared for: Texas Department of Transportation, Research and Technology Implementation Office. College Station, TX: Texas A&M University System, Texas Transportation Institute. 119 p.

Stuart, G.W.; Edwards, P.J. 2006. **Concepts about forests and water.** Northern Journal of Applied Forestry. 23(1): 11-19.

Succarieh, M. 1992. **Final report: control of dust emissions from unpaved roads.** Report No. INE/TRC/QRP-92.05. Prepared for: Alaska Cooperative Transportation and Public Facilities Research Program. Fairbanks, AK: University of Alaska Fairbanks, School of Engineering, Institute of Northern Engineering, Transportation Research Center. 54 p.

Sucoff, E. 1975. **Effect of deicing salts on woody vegetation along Minnesota roads.** Tech. Bull. 303, Forestry Series 20. St. Paul, MN: University of Minnesota, College of Forestry; Minnesota Highway Department, Minnesota Local Road Research Board. 49 p.

Sugden, B.D.; Woods, S.W. 2007. **Sediment production from forest roads in western Montana.** Journal of the American Water Resources Association. 43(1): 193-206.

Sullivan, K. 1985. **Long-term patterns of water quality in a managed watershed in Oregon: 1. Suspended sediment.** Water Resources Bulletin. 21(6): 977-987.

Sutherland, R.A. 1998a. **A critical assessment of the research conducted at the hydraulics and erosion control laboratory—a focus on rolled erosion control systems applied to hillslopes.** Geotextiles and Geomembranes. 16: 87-118.

Sutherland, R.A. 1998b. **Rolled erosion control systems for hillslope surface protection: a critical review, synthesis and analysis of available data. I. Background and formative years.** Land Degradation and Development. 9: 465-486.

Sutherland, R.A. 1998c. **Rolled erosion control systems for hillslope surface protection: a critical review, synthesis and analysis of available data. II. The post-1990 period.** Land Degradation and Development. 9: 487-511.

Sutherland, R.A.; Ziegler, A.D. 1996. **Geotextile effectiveness in reducing interrill runoff and sediment flux.** In: Erosion control technology: bringing it home – proceedings of conference XXVII. Denver, CO: International Erosion Control Association: 393-405.

Sutherland, R.A.; Ziegler, A.D. 1997. **A field examination of rolled erosion control systems and their influence on runoff and sediment transport.** In: Working in harmony: proceedings of conference XXVIII. Denver, CO: International Erosion Control Association: 301-315.

Sutherland, R.A.; Ziegler, A.D. 2007. **Effectiveness of coir-based rolled erosion control systems in reducing sediment transport from hillslopes.** Applied Geography. 27: 150-164.

Sutherland, R.A.; Ziegler, A.D.; Tran, L.T. 1997. **Rolled erosion control systems and their effect on sediment redistribution by rainsplash – a laboratory investigation.** In: Working in harmony: proceedings of conference XXVIII. Denver, CO: International Erosion Control Association: 427-443.

Swanson, N.P.; Dedrick, A.R.; Dudeck, A.E. 1967. **Protecting steep construction slopes against water erosion.** Highway Research Record. 206: 46-52.

Swanston, D.N. 1974. **The forest ecosystem of southeast Alaska: 5. Soil mass movement.** Gen. Tech. Rep. PNW-17. Portland, OR: U.S. Department of Agriculture, Forest Service, Pacific Northwest Forest and Range Experiment Station. 22 p.

Swanston, D.N.; Swanson, F.J. 1976. **Timber harvesting, mass erosion, and steepland forest geomorphology in the Pacific Northwest.** In: Coates, D.R., ed. Geomorphology and Engineering. Stroudsburg, PA: Dowden, Hutchinson & Ross Inc.: 199-221. Chapter 10.

Swift, L.W., Jr. 1984a. **Gravel and grass surfacing reduces soil loss from mountain roads.** Forest Science. 30(3): 657-670.

Swift, L.W., Jr. 1984b. **Soil losses from roadbeds and cut and fill slopes in the southern Appalachian Mountains.** Southern Journal of Applied Forestry. 8(4): 209-216.

Swift, L.W., Jr. 1985. **Forest road design to minimize erosion in the southern Appalachians.** In: Blackmon, B.G., ed. Proceedings, forestry and water quality: a mid-south symposium. Monticello, AR: University of Arkansas: 141-151.

Swift, L.W., Jr. 1986. **Filter strip widths for forest roads in the southern Appalachians.** Southern Journal of Applied Forestry. 10(1): 27-34.

Swift, L.W., Jr. 1988. **Forest access roads: design, maintenance, and soil loss.** In: Swank, W.T.; Crossley, D.A., eds. Forest hydrology and ecology at Coweeta. Ecological Studies Vol. 66. New York: Springer-Verlag: 313-324. Chapter 23.

SynTech Products. 2011. **Understanding your dust problem and choosing the right solution.** Toledo, OH. Available at http://www.syntechproducts.com/syntech4.ivnu (accessed February 23, 2011).

Tague, C.; Band, L. 2001. **Simulating the impact of road construction and forest harvesting on hydrologic response.** Earth Surface Processes and Landforms. 26: 131-151.

Takken, I.; Croke, J.; Lane, P. 2008. **A methodology to assess the delivery of road runoff in forestry environments.** Hydrological Processes. 22: 254-264.

Taylor, B.R.; Goudey, J.S.; Carmichael, N.B. 1996a. **Toxicity of aspen wood leachate to aquatic life: laboratory studies.** Environmental Toxicology and Chemistry. 15(2): 150-159.

Taylor, D.J. 1988. **National central tire inflation program – Olympic National Forest field operational tests.** Project Report 8871 1201. San Dimas, CA: U.S. Department of Agriculture, Forest Service, Technology and Development Center. 38 p.

Taylor, D.J.; Irwin, L.H.; Aneshansley, D.J. 1987. **A device to measure road dustiness on aggregate-surfaced roads.** Report EM 7170-8. Washington, DC: U.S. Department of Agriculture, Forest Service. 72 p.

Taylor, S.E.; Ritter, M.A.; Keliher, K.P.; Thompson, J.D. 1996b. **Portable glulam timber bridge systems.** In: Proceedings, international wood engineering conference. Vol. 2. Baton Rouge, LA: Louisiana State University: 368-375.

Tchir, J.P.; Hvenegaard, P.J.; Scrimgeour, G.J. 2004. **Stream crossing inventories in the Swan and Notikewin River basins of northwest Alberta: resolution at the watershed scale.** In: Scrimgeour, G.J.; Eisler, G.; McCulloch, B.; Silins, U.; Monita, M., eds. Proceedings, forest land – fish conference II: ecosystem stewardship through collaboration. Ottawa, ON: Natural Resources Canada, Canadian Forest Service: 53-62.

Temple, D.M. 1991. **Changes in vegetal flow resistance during long-duration flows.** Transactions of the American Society of Agricultural Engineers. 34(4): 1769-1774.

Tengbeh, G.T. 1993. **The effect of grass roots on shear strength variations with moisture content.** Soil Technology. 6: 287-295.

Terry, R.E.; Nelson, S.D. 1986. **Effects of polyacrylamide and irrigation method on soil physical properties.** Soil Science. 141(5): 317-320.

Theisen, M.S. 1992. **The role of geosynthetics in erosion and sediment control: an overview.** Geotextiles and Geomembranes. 11: 535-550.

Thompson, A.M.; Wilson, B.N.; Nguyen, H.V. 2001. **Effectiveness of erosion control blankets on reducing shear stress acting on soil particles.** In: Ascough, J.C., II; Flanagan, D.C., eds. Soil erosion research for the 21st century: proceedings of the international symposium. St. Joseph, MI: American Society of Agricultural Engineers: 28-31.



FS-002939

Thompson, C.H.; Kyker-Snowman, T.D. 1989. **Evaluation of non-point source pollution problems from crossing streams with logging equipment and off-road vehicles in Massachusetts: 1987-1988.** Amherst, MA: University of Massachusetts, Department of Forestry and Wildlife Management. 78 p.

Thompson, J.D.; Taylor, S.E.; Gazin, J.E.; Rummer, R.B.; Albright, R.A. 1996. **Water quality impacts from low-water stream crossings.** In: Proceedings, annual international meeting of the ASAE. Paper No. 96-5015. St. Joseph, MI: American Society of Agricultural Engineers. 15 p.

Thompson, J.D.; Taylor, S.E.; Yoo, K.H.; Brinker, R.W.; Tufts, R.A. 1994. **Water quality impacts from different forest road stream crossings.** In: Proceedings, international ASAE winter meeting. Paper No. 94-7510. St. Joseph, MI: American Society of Agricultural Engineers. 12 p.

Thompson, J.D.; Taylor, S.E.; Yoo, K.H.; Brinker, R.W.; Tufts, R.A. 1995. **Water quality impacts from different forest road stream crossings.** In: Proceedings, 18th annual meeting of the Council on Forest Engineering. Corvallis, OR: Council on Forest Engineering: 68-76.

Thompson, M.; Sessions, J.; Boston, K.; Skaugset, A.; Tomberlin, D. 2010. **Forest road erosion control using multiobjective optimization.** Journal of the American Water Resources Association. 46(4): 712-723.

Tibke, G. 1988. **Basic principles of wind erosion control.** Agriculture, Ecosystems & Environment. 22/23: 103-122.

Timberharvesting.com. 2011. **2011 Logging business survey: big squeeze.** Montgomery, AL: Timber Harvesting. 17 p. http://www.timberharvesting.com/2011-logging-business-survey-big-squeeze/ (accessed July 6, 2013).

Tisdall, J.M.; Cockroft, B.; Uren, N.C. 1978. **The stability of soil aggregates as affected by organic materials, microbial activity and physical disruption.** Australian Journal of Soil Research. 16: 9-17.

Todd, G.D.; Chessin, R.L.; Colman, J. 1999. **Toxicological profile for total petroleum hydrocarbons (TPH).** Atlanta, GA: U.S. Department of Health and Human Services, Agency for Toxic Substances and Disease Registry. 38 p.

Tollner, E.W.; Barfield, B.J.; Haan, C.T.; Kao, T.Y. 1976. **Suspended sediment filtration capacity of simulated vegetation.** Transactions of the American Society of Agricultural Engineers. 19: 678-682.

Toman, E.M. 2004. **Forest road hydrology: the influence of forest roads on stream flow at stream crossings.** Corvallis, OR: Oregon State University. 78 p. M.S. thesis.

Toman, E.M.; Skaugset, A.E. 2011. **Reducing sediment production from forest roads during wet-weather hauling.** Transportation Research Record. 2203: 13-19.

Tornatore, T.A. 1995. **Short-term impacts of forest road and skid trail stream crossings on suspended solids and turbidity.** State College, PA: Pennsylvania State University. 160 p. M.S. thesis.

Tornatore, T.A.; DeWalle, D.R.; Sharpe, W.E. 1994. **Short stream impacts associated with forest road and skid trail crossings.** Gen. Tech. Rep. NE-219. Radnor, PA: U.S. Department of Agriculture, Forest Service, Northeastern Forest Experiment Station: 162-166.

Traoré, O.; Groleau-Renaud, V.; Plantureux, S.; Tubeileh, A.; Bœuf-Tremblay, V. 2000. **Effect of root mucilage and modelled root exudates on soil structure.** European Journal of Soil Science. 51: 575-581.

Trimble, G.R., Jr.; Sartz, R.S. 1957. **How far from a stream should a logging road be located?** Journal of Forestry. 55(5): 339-341.

Trimble, G.R., Jr.; Weitzman, S. 1953. **Soil erosion on logging roads.** Soil Science Society Proceedings. 17(2): 152-154.

Trout, T.J.; Ajwa, H. 2001. **Polyacrylamide effects on infiltration in San Joaquin Valley sandy loam soils.** In: Proceedings, ASAE annual international meeting. Paper No. 01-2259. St. Joseph, MI: Society of Agricultural and Biological Engineers. 8 p.

Trout, T.J.; Sojka, R.E.; Lentz, R.D. 1995. **Polyacrylamide effect on furrow erosion and infiltration.** Transactions of the American Society of Agricultural Engineers. 38(3): 761-765.

Truong, P. 2000. **Vetiver grass system: potential applications for soil and water conservation in northern California.** In: Proceedings, stiff grass technology seminar. Woodland, CA: Yolo County Flood Control and Water Conservation District: 562-571.

Urroz, G.E.; Israelsen, C.E. 1995. **Effectiveness of selected erosion control materials under simulated rain and sunlight.** Mountain-Plains Consortium Report No. 95-44. Logan, UT: Utah State University, College of Engineering, Utah Water Research Laboratory. 30 p.

U.S. Department of Transportation. 1995. **Best management practices for erosion and sediment control.** Report No. FHWA-FLP-94-005. Sterling, VA: U.S. Department of Transportation, Federal Highway Administration. 187 p.

U.S. Environmental Protection Agency [U.S. EPA]. 1990. **EPA Superfund explanation of significant differences.** EPA/ESD/R07-90/509. Kansas City, MO: U.S. Environmental Protection Agency, Region 7. 9 p.

U.S. Environmental Protection Agency [U.S. EPA]. 1991. **Standards for managing specific hazardous wastes and specific types of facilities (Part 266).** EPA/530-SW-91-0621. Washington, DC: U.S. Environmental Protection Agency, Office of Solid Waste and Emergency Response. 392 p.

U.S. Environmental Protection Agency [U.S. EPA]. 1993. **Guidance specifying management measures for sources of nonpoint source pollution in coastal waters.** EPA 840-B-92-002. Washington, DC: U.S. Environmental Protection Agency, Office of Water. 822 p.

FS-002940

U.S. Environmental Protection Agency [U.S. EPA]. 1995. **Compilation of air pollutant emission factors. Vol. 1: Stationary point and area sources.** Publ. No. AP-42. 5th ed. Research Triangle Park, NC: U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards. Available at https://www.epa.gov/air-emissions-factors-and-quantification/ap-42-compilation-air-emission-factors (accessed September 28, 2016).

U.S. Environmental Protection Agency [U.S. EPA]. 1996. **National air pollutant emission trends, 1900-1995.** EPA-454/R-96-007. Research Triangle Park, NC: U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards. 74 p.

U.S. Environmental Protection Agency [U.S. EPA]. 1999. **Vegetated swales.** Storm Water Technology Fact Sheet No. 832-F-99-006. Washington, DC: U.S. Environmental Protection Agency, Office of Water. 7 p.

U.S. Environmental Protection Agency [U.S. EPA]. 2002. **Development document for proposed effluent guidelines and standards for the construction and development category.** EPA-821-R-02-007. Washington, DC: U.S. Environmental Protection Agency, Office of Water. 245 p.

U.S. Environmental Protection Agency [U.S. EPA]. 2010a. **Compost filter berm fact sheet.** Washington, DC. Available at http://cfpub.epa.gov/npdes/stormwater/menuofbmps/index.cfm?action=factsheet_results&view=specific&bmp=119 (accessed October 18, 2012).

U.S. Environmental Protection Agency [U.S. EPA]. 2010b. **Compost filter socks fact sheet.** Washington, DC. Available at http://cfpub.epa.gov/npdes/stormwater/menuofbmps/index.cfm?action=browse&Rbutton=detail&bmp=120&minmeasure=4 (accessed October 18, 2012).

U.S. Environmental Protection Agency [U.S. EPA]. 2012. **National menu of stormwater best management practices.** Washington, DC: U.S. Environmental Protection Agency, National Pollutant Discharge Elimination System (NPDES). Available at http://cfpub.epa.gov/npdes/stormwater/menuofbmps/index.cfm (accessed November 19, 2012).

U.S. Forest Service. 1981. **Interim report in research, Horse Creek Administration Research Project.** Boise, ID: U.S. Department of Agriculture, Forest Service, Intermountain Forest and Range Experiment Station: 126-129.

U.S. Forest Service. 1993. **Central tire inflation: What's in it for me?** FS-415. San Dimas, CA: U.S. Department of Agriculture, Forest Service, San Dimas Technology and Development Center. 3 p.

U.S. Forest Service. 2009. **Forest Service handbook (FSH) 7709.59-Road system operations and maintenance handbook.** Chapter 60 – Road maintenance. Available at http://www.fs.fed.us/cgi-bin/Directives/get_dirs/fsh?7709.59 (accessed June 30, 2016).

U.S. Forest Service. [N.d.]. **Forest Service Water Erosion Prediction Project.** U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. Air, Water, & Aquatic Environments Program. http://www.fs.fed.us/rm/boise/AWAE/projects/water_erosion_prediction_project.shtml (accessed May 19, 2016).

U.S. National Archives and Records Administration. 2015. **Code of federal regulations.** Title 36, chapter II, part 212, subpart A, section 212.5. Road system management. Available at https://www.law.cornell.edu/cfr/text/36/212.5 (accessed June 30, 2016).

U.S. Roads. 1998. **Dust: Don't eat it! Control it!** Reprinted with permission in Road Management and Engineering Journal. 4 p. Available at http://www.usroads.com/journals/rmej/9806/rm980603.htm (accessed March 9, 2011).

Vacher, C.A.; Loch, R.J.; Raine, S.R. 2003. **Effect of polyacrylamide additions on infiltration and erosion of disturbed lands.** Australian Journal of Soil Research. 41: 1509-1520.

Van Dijk, P.M.; Kwaad, F.J.P.M.; Klapwijk, M. 1996. **Retention of water and sediment by grass strips.** Hydrological Processes. 10(8): 1069-1080.

van Groenewoud, H. 1977. **Interim recommendation for the use of buffer strips for the protection of small streams in the Maritimes.** Information Report M-X-74. Fredericton, NB: Canadian Forestry Service, Maritimes Forest Research Centre. 18 p.

van Meerveld, H.J.; Baird, E.J.; Floyd, W.C. 2014. **Controls on sediment production from an unpaved resource road in a Pacific maritime watershed.** Water Resources Research. 50: 4803-4820.

Vanacker, V.; von Blanckenburg, F.; Govers, G.; Molina, A.; Poesen, J.; Deckers, J.; Kubik, P. 2007. **Restoring dense vegetation can slow mountain erosion to near natural benchmark levels.** Geology. 35(4): 303-306.

Vandaele K.; Poesen, J. 1995. **Spatial and temporal patterns of soil erosion rates in an agricultural catchment, central Belgium.** Catena. 25: 213-226.

Veith, T.L.; Wolfe, M.L.; Heatwole, C.D. 2003. **Optimization procedure for cost effective BMP placement at a watershed scale.** Journal of the American Water Resources Association. 39(6): 1331-1343.

Virginia Department of Conservation and Recreation. 1999. **Virginia stormwater management handbook, vol. 1.** Richmond, VA: Virginia Department of Conservation and Recreation, Division of Soil and Water Conservation. 619 p.

Wade, C.R. 2010. **Evaluation of best management practices for bladed skid trail erosion control and determination of erosion model accuracy and applicability.** Blacksburg, VA: Virginia Polytechnic Institute and State University. 109 p. M.S. thesis.

Wagenbrenner, J.W.; MacDonald, L.H.; Rough, D. 2006. **Effectiveness of three post-fire rehabilitation treatments in the Colorado Front Range.** Hydrological Processes. 20: 2989-3006.

Wahbeh, A.M. 1990. **Dust control for secondary limestone roads using bentonite.** Ames, IA: Iowa State University. 90 p. M.S. thesis.

Wald, A.R. 1975. **The impact of truck traffic and road maintenance on suspended-sediment yield from a 14' standard forest road.** Seattle, WA: University of Washington. 38 p. M.S. thesis.

Walden, C.C. 1976. **The toxicity of pulp and paper mill effluents and corresponding measurement procedures.** Water Research. 10: 639-664.

Wallace, A.; Wallace, G.A.; Abouzamzam, A.M. 1986. **Effects of excess levels of a polymer as a soil conditioner on yields and mineral nutrition of plants.** Soil Science. 141(5): 377-380.

Wallace, G.A.; Wallace, A. 1986. **Control of soil erosion by polymeric soil conditioners.** Soil Science. 141(5): 363-367.

Walley, H.D.; King, R.B.; Ray, J.M.; Robinson, J. 2005. **What should be done about erosion mesh netting and its destruction of herpetofauna?** Journal of Kansas Herpetology. 16: 26-28.

Walling, D.E. 1983. **The sediment delivery problem.** Journal of Hydrology. 65: 209-237.

Walsh, F.M.; Barrett, M.E.; Malina, J.F., Jr.; Charbeneau, R.J. 1998. **Use of vegetative controls for treatment of highway runoff.** Tech. Rep. No. FHWA/TX-7-2954-2. Austin, TX: University of Texas at Austin, Center for Transportation Research. 130 p.

Wang, T.; Spyridakis, D.E.; Mar, B.W.; Horner, R.R. 1981. **Transport deposition and control of heavy metals in highway runoff.** Report No. WA-RD-39.10. Olympia, WA: Washington State Department of Transportation. 43 p.

Wargo, R.S.; Weisman, R.N. 2006. **A comparison of single-cell and multicell culverts for stream crossings.** Journal of the American Water Resources Association. 42(4): 989-995.

Warrington, D.; Shainberg, I.; Agassi, M.; Morin, J. 1989. **Slope and phosphogypsum's effects on runoff and erosion.** Soil Science Society of America Journal. 53: 1201-1205.

Washington Forest Practices Board. 2000. **Washington Forest Practices Board manual.** Olympia, WA. 36 p.

Wasniewski, L.W. 1994. **Hillslope sediment routing below new forest roads in central Idaho.** Corvallis, OR: Oregon State University. 105 p. M.S. thesis.

Watkins, S.H. 1970. **Bacterial degradation of lignosulfonates and related model compounds.** Journal (Water Pollution Control Federation). 42(2), Part 2: R47-R56.

Watson, J.; Frazier, C.; Chow, J.; Farber, R.J.; Countess, R.J. 1989. **Survey of fugitive dust control methods for PM10.** In: Proceedings, 82nd annual meeting and exhibition. Pittsburgh, PA: Air and Waste Management Association. 20 p.

Watson, J.G. 1996. **Final study plan for: Effectiveness demonstration of fugitive dust control methods for public unpaved roads and unpaved shoulders on paved roads.** DRI Doc. No. 685-5200.1F2. Prepared for: San Joaquin Valley Unified Air Pollution Control District. Reno, NV: Desert Research Institute, Energy and Environmental Engineering Center.

Watson, J.G.; Chow, J.C.; Pace, T.G. 2000. **Fugitive dust emissions.** In: Davis, W.T., ed. Air pollution engineering manual. New York: John Wiley & Sons, Inc.: 117-135. Chapter 4.

Watt, J.; Marcus, R. 1974. **Effect of lignosulfonate on the colon of guinea-pigs.** Proceedings of the Nutritional Society. 33: 65A-66A.

Watt, J.; Marcus, S.N. 1976. **Effect of various salts of lignosulfonate on the colon of guinea-pigs.** Proceedings of the Nutritional Society. 35: 76A.

Weaver, W.; Hagans, D. 2004. **Road upgrading, decommissioning and maintenance – estimating costs on small and large scales.** In: Allen, S.T.; Thomson, C.; Carlson, R., eds. Proceedings, salmon habitat restoration cost workshop. Portland, OR: Pacific States Marine Fisheries Commission: 80-103.

Weeks, L.E.; Colter, W.G. 1952. **Effects of synthetic soil conditioners on erosion control.** Soil Science. 73: 473-484.

Weeth, H.J.; Haverland, L.H. 1961. **Tolerance of growing cattle for drinking water containing sodium chloride.** Journal of Animal Science. 20: 518-521.

Weeth, H.J.; Haverland, L.H.; Cassard, D.W. 1960. **Consumption of sodium chloride water by heifers.** Journal of Animal Science. 19: 845-851.

Weggel, J.R.; Rustom, R. 1992. **Soil erosion by rainfall and runoff – state of the art.** Geotextiles and Geomembranes. 11: 551-572.

Weiss, P.T.; Gulliver, J.S.; Erickson, A.J. 2010. **The performance of grassed swales as infiltration and pollution prevention practices: a literature review.** 50 p. http://stormwater.dl.umn.edu/sites/g/files/pua941/f/media/weiss-gulliver-erickson_2010_-_performance_of_grassed_swales_as_infiltration_and_pollutation_prevention_practices.pdf (accessed June 30, 2016).

Weitzman, S. 1952. **Mountain log roads – design and construction.** Facts from Fernow Forest. Parsons, WV: West Virginia Conservation. 16: 16-21.

Welborn, C.T.; Veenhuis, J.E. 1987. **Effects of runoff controls on the quantity and quality of urban runoff at two locations in Austin, Texas.** Water-Resources Investigation Report No. 87-4004. Austin, TX: U.S. Geological Survey. 101 p.

Welch, R.A., Jr.; Taylor, S.E.; Yoo, K.H.; Thompson, J.D.; Rummer, R.B.; Albright, R.A. 1998. **Life-cycle water quality impacts from low-water stream crossings.** Paper No. 98-7027. St. Joseph, MI: American Society of Agricultural Engineers. 24 p.

Weller, D.E.; Jordan, T.E.; Correll, D.L. 1998. **Heuristic models for material discharge from landscapes with riparian buffers.** Ecological Applications. 8(4): 1156-1169.

Wellman, E.A.; Barraclough, S. 1972. **Establishment of acceptable dusting criteria for aggregate surface roads.** Administrative Study 7110. Klamath Falls, OR: U.S. Department of Agriculture, Forest Service, Winema National Forest.

Wellman, J.C.; Combs, D.L.; Cook, S.B. 2000. **Long-term impacts of bridge and culvert construction or replacement on fish communities and sediment characteristics of streams.** Journal of Freshwater Ecology. 15(3): 317-328.

Wemple, B.C.; Jones, J.A. 2003. **Runoff production on forest roads in a steep, mountain catchment.** Water Resources Research. 39(8): SWC 8-1 through 8-17.

Wemple, B.C.; Jones, J.A.; Grant, G.E. 1996. **Channel network extension by logging roads in two basins, western Cascades, Oregon.** Water Resources Bulletin. 32(6): 1195-1207.

Wemple, B.C.; Swanson, F.J.; Jones, J.A. 2001. **Forest roads and geomorphic process interactions, Cascade Range, Oregon.** Earth Surface Processes and Landforms. 26: 191-204.

Wenger, S. 1999. **A review of the scientific literature on riparian buffer width, extent and vegetation.** Athens, GA: University of Georgia, Institute of Ecology, Office of Public Service and Outreach. 59 p.

Whipple, W., Jr.; Hunter, J.V. 1979. **Petroleum hydrocarbons in urban runoff.** Water Resources Bulletin. 15(4): 1096-1105.

Wiebe, A.H.; Burr, J.G.; Faubion, H.E. 1934. **The problem of stream pollution in Texas with special reference to salt water from oil fields.** Transactions of the American Fisheries Society. 64: 81-86.

Wiest, R.L. 1998. **A landowner's guide to building forest access roads.** Tech. Publ. NA-06-98. Radnor, PA: U.S. Department of Agriculture, Forest Service, Northeastern Area State and Private Forestry. 45 p.

Wilber, W.G.; Hunter, J.V. 1979. **Distribution of metals in street sweepings, stormwater solids, and urban aquatic sediments.** Journal (Water Pollution Control Federation). 51: 2810-2822.

Williams, D.S.; Shukla, M.K.; Ross, J. 2008. **Particulate matter emission by a vehicle running on unpaved road.** Atmospheric Environment. 42: 3899-3905.

Wischmeier, W.H.; Mannering, J.V. 1965. **Effect of organic matter content of the soil on infiltration.** Journal of Soil and Water Conservation. 20(4): 150-152.

Wischmeier, W.H.; Smith, D.D. 1958. **Rainfall energy and its relationship to soil loss.** Transactions of the American Geophysical Union. 39(2): 285-291.

Wisconsin Department of Natural Resources. 2006. **Silt fence (1056).** Madison, WI: Wisconsin Department of Natural Resources. 4 p. http://dnr.wi.gov/topic/stormwater/documents/silt_fence_1056_v2.pdf (accessed June 9, 2016).

Wisconsin Transportation Information Center [WTIC]. 1997. **Dust control on unpaved roads.** Wisconsin Transportation Bull. No. 13. Madison, WI: University of Wisconsin. 6 p.

Wishowski, J.M.; Mamo, M.; Bubenzer, G.D. 1998. **Trap efficiencies of filter fabric fence.** In: Proceedings, annual meeting of the ASAE. Paper No. 98-2158. St. Joseph, MI: American Society of Agricultural Engineers. 14 p.

Witmer, P.L.; Stewart, P.M.; Metcalf, C.K. 2009. **Development and use of a sedimentation risk index for unpaved road–stream crossings in the Choctawhatchee watershed.** Journal of the American Water Resources Association. 45(3): 734-747.

Witt, E.L.; Barton, C.D.; Stringer, J.W.; Bowker, D.W.; Kolka, R.K. 2011. **Evaluating best management practices for ephemeral channel protection following forest harvest in the Cumberland Plateau – preliminary findings.** In: Fei, S.; Lhotka, J.M.; Stringer, J.W.; Gottschalk, K.W.; Miller, G.W., eds. Proceedings, 17th central hardwood forest conference. Gen. Tech. Rep. NRS-GTR-P-78. Newtown Square, PA: U.S. Department of Agriculture, Forest Service, Northern Research Station: 365-374.

Wohlgemuth, P.M.; Robichaud, P.R. 2007. **The effects of selected post-fire emergency rehabilitation techniques on small watershed sediment yields in southern California.** In: Furniss, M.; Clifton, C.; Ronnenberg, K., eds. Proceedings, Forest Service national earth sciences conference: advancing the fundamental sciences. Gen. Tech. Rep. PNW-GTR-689. Portland, OR: U.S. Department of Agriculture, Forest Service, Pacific Northwest Research Station: 36-42.

Wolanek, M.D. 1995. **Wood fiber road construction influences on stream water quality in southeast Alaska.** Unpublished report (draft), on file with: U.S. Department of Agriculture, Forest Service, Tongass National Forest. 26 p.

Wolfe, M.D.; Williams, J.W. 1986. **Rates of landsliding as impacted by timber management activities in northwestern California.** Bulletin of the Association of Engineering Geologists. 23(1): 53-60.

Wollum, A.G., II. 1962. **Grass seeding as a control for roadbank erosion.** Res. Note PNW-218. Portland, OR: U.S. Department of Agriculture, Forest Service, Pacific Northwest Forest and Range Experiment Station. 5 p.

Wong, S.L.; McCuen, R.H. 1982. **The design of vegetative buffer strips for runoff and sediment control.** Tech. Paper. College Park, MD: University of Maryland. 25 p.

Woo, M.; Fang, G.; diCenzo, P.D. 1997. **The role of vegetation in the retardation of rill erosion.** Catena. 29: 145-159.

Wooldridge, D.D. 1979. **Suspended sediment from truck traffic on forest roads, Meadow and Coal Creeks.** Seattle, WA: University of Washington, College of Forest Resources. 33 p.

Wright, K.N. 2010. **Evaluation of check dams for sediment control on disturbed land surfaces.** Urbana, IL: University of Illinois at Urbana-Champaign. 114 p. M.S. thesis.

Wu, J.S.; Allan, C.J.; Saunders, W.L.; Evett, J.B. 1998. **Characterization and pollutant loading estimation for highway runoff.** Journal of Environmental Engineering. 124: 584-592.

Wyant, D.C. 1980. **Evaluation of filter fabrics for use as silt fences.** VHTRC 80-R49. Charlottesville, VA: Virginia Highway & Transportation Research Council. 37 p. + appendices.

Xiao, B.; Wang, Q.; Wu, J.; Huang, C.; Yu, D. 2010. **Protective function of narrow grass hedges on soil and water loss on sloping croplands in northern China.** Agriculture, Ecosystems & Environment. 139: 653-664.



FS-002943

Yanders, A.F.; Orazio, C.E.; Puri, R.K.; Kapila, S. 1989. **On translocation of 2,3,7,8-tetrachlorodibenzo-p-dioxin: time dependent analysis at the Times Beach experimental site.** Chemosphere. 19(1-6): 429-432.

Yanosek, K.A.; Foltz, R.B.; Dooley, J.H. 2006. **Performance assessment of wood strand erosion control materials among varying slopes, soil textures, and cover amounts.** Journal of Soil and Water Conservation. 61(2): 45-51.

Yap, P. 1989. **Truck tire types and road contact pressures.** In: Proceedings, second international symposium on heavy vehicle weights and dimensions. Ottawa, ON: Transportation Association of Canada. 17 p.

Yardley, D.H.; Lacabanne, W.D.; Nelson, C.R. 1980. **Airborne dust from taconite tailings.** Washington, DC: U.S. Department of the Interior, Bureau of Mines. 51 p.

Yee, C.S. 1976. **Small rock buttresses – useful for some forest road slump failures.** Journal of Forestry. 74(10): 688-689.

Yeri, S.; Barfield, B.; Stevens, E.; Gasem, K.; Jeyarathan, A.; Hayes, J. 2005. **Effective storm water and sediment control during pipe line construction using new filter fence concept.** In: Proceedings, 12th annual international petroleum environmental conference. Tulsa, OK: Integrated Petroleum Environmental Consortium (IPEC). 15 p.

Yonge, D. 2000. **Contaminant detention in highway grass filter strips.** Res. Rep. No. WA-RD 474.1. Prepared for: Washington State Department of Transportation, Research Office. Pullman, WA: Washington State University, Department of Civil and Environmental Engineering. 66 p.

Young, R.A.; Wiersma, J.L. 1973. **The role of rainfall impact in soil detachment and transport.** Water Resources Research. 9(6): 1629-1636.

Yousef, Y.A.; Wanielista, M.P.; Harper, H.H. 1985. **Removal of highway contaminants by roadside swales.** Transportation Research Record. 1017: 62-68.

Yu, S.L.; Barnes, S.L.; Gerde, V.W. 1993. **Testing of best management practices for controlling highway runoff.** Report No. VTRC 93-R16. Charlottesville, VA: Virginia Transportation Research Council. 60 p.

Yu, S.L.; Kuo, J.; Fassman, E.A.; Pan, H. 2001. **Field test of grassed-swale performance in removing runoff pollution.** Journal of Water Resources Planning and Management. 127(3): 168-171.

Zanders, J.M. 2005. **Road sediment: characterization and implications for the performance of vegetated strips for treating road run-off.** Science of the Total Environment. 339: 41-47.

Zellmer, S.D.; Edgar, D.E.; Isaacson, H.R. 1991. **Erosion control on a steeply sloped pipeline right-of-way in southwestern Pennsylvania.** Gas Research Institute Final Report 005832. Des Plaines, IL: Gas Research Institute. 19 p.

Zhang, X.C.; Miller, W.P. 1996a. **Physical and chemical crusting processes affecting runoff and erosion in furrows.** Soil Science Society of America Journal. 60: 860-865.

Zhang, X.C.; Miller, W.P. 1996b. **Polyacrylamide effect on infiltration and erosion in furrows.** Soil Science Society of America Journal. 60: 866-872.

Ziegler, A.D.; Sutherland, R.A. 1998. **Reduction in interrill sediment transport by rolled erosion control systems.** Soil and Tillage Research. 45: 265-278.

Ziegler, A.D.; Sutherland, R.A.; Giambelluca, T.W. 2001. **Interstorm surface preparation and sediment detachment by vehicle traffic on unpaved mountain roads.** Earth Surface Processes and Landforms. 26: 235-250.

Ziegler, A.D.; Sutherland, R.A.; Tran, L.T. 1997. **Influence of rolled erosion control systems on temporal rainsplash response – a laboratory rainfall simulation experiment.** Land Degradation and Development. 8: 139-157.

Zitko, V.; Carson, W.V.; Carson, W.G. 1975. **Thallium: occurrence in the environment and toxicity to fish.** Bulletin of Environmental Contamination and Toxicology. 13(1): 23-30.

# APPENDIX

## English, Metric, and Gradient Conversions Applicable to Text, Tables, and Figures

### Converting metric units to English units

| If you know | Multiply by | To convert to |
|---|---|---|
| cm | 0.394 | inch |
| g | 0.0022 | lb |
| g $L^{-1}$ | 0.0624 | lb $ft^{-3}$ |
| g $L^{-1}$ | 0.00835 | lb $gal^{-1}$ |
| g $m^{-2}$ | 0.000205 | lb $ft^{-2}$ |
| g $mm^{-1}$ | 0.056 | lb $inch^{-1}$ |
| g $m^{-2}$ $h^{-1}$ (mm precip)$^{-1}$ | 3.613 x $10^{-5}$ | lb $inch^{-2}$ $h^{-1}$ (inch precip)$^{-1}$ |
| ha | 2.471 | ac |
| kg | 2.205 | lb |
| kg $ha^{-1}$ | 0.892 | lb $ac^{-1}$ |
| kg 100 $m^{-2}$ | 0.205 | lb 100 $ft^{-2}$ |
| kg $km^{-1}$ | 3.548 | lb $mi^{-1}$ |
| kg $m^{-2}$ | 0.205 | lb $ft^{-2}$ |
| kg $m^{-3}$ | 0.0624 | lb $ft^{-3}$ |
| kg $min^{-1}$ $m^{-1}$ | 0.672 | lb $min^{-1}$ $ft^{-1}$ |
| kg $mm^{-1}$ | 55.99 | lb $inch^{-1}$ |
| km | 0.621 | mi |
| $km^2$ | 0.386 | $mi^2$ |
| kPa | 0.145 | psi (lb $inch^{-2}$) |
| L $m^{-2}$ | 0.0245 | gal $ft^{-2}$ |
| L $s^{-1}$ | 0.0353 | $ft^3$ $s^{-1}$ |
| m | 3.281 | ft |
| $m^2$ | 10.76 | $ft^2$ |
| $m^3$ | 35.31 | $ft^3$ |
| Mg | 1.102 | ton |
| ml | 0.0338 | oz |
| mm | 0.0394 | inch |
| $m^3$ $ha^{-1}$ | 14.29 | $ft^3$ $ac^{-1}$ |
| Mg $ha^{-1}$ $yr^{-1}$ | 0.446 | ton $ac^{-1}$ $yr^{-1}$ |
| µg $L^{-1}$ | 1 | ppb |
| µm | 3.937 x $10^{-5}$ | inch |
| mg $kg^{-1}$ | 1 | ppm |
| mg $L^{-1}$ | 1,000 | ppb |
| mg $L^{-1}$ | 1 | ppm |
| N·m $ha^{-1}$ | 0.298 | ft-lb $ac^{-1}$ |
| tonne | 1.102 | ton |
| tonne $ha^{-1}$ | 0.446 | ton $ac^{-1}$ |
| tonne $km^{-1}$ | 1.774 | ton $mi^{-1}$ |
| tonne $km^{-2}$ $day^{-1}$ | 2.855 | ton $mi^{-2}$ $day^{-1}$ |

### Converting English units to metric units

| If you know | Multiply by | To convert to |
|---|---|---|
| ac | 0.405 | ha |
| ft | 0.305 | m |
| $ft^2$ | 0.0929 | $m^2$ |
| $ft^3$ | 0.0283 | $m^3$ |
| ft-lb $ac^{-1}$ | 3.350 | N·m $ha^{-1}$ |
| $ft^3$ $ac^{-1}$ | 0.07 | $m^3$ $ha^{-1}$ |
| $ft^3$ $s^{-1}$ | 28.32 | L $s^{-1}$ |
| gal $ft^{-2}$ | 40.75 | L $m^{-2}$ |
| inch | 2.54 | cm |
| inch | 25.4 | mm |
| inch | 25,400 | µm |
| lb | 453.6 | g |
| lb | 0.454 | kg |
| lb $ac^{-1}$ | 1.121 | kg $ha^{-1}$ |
| lb $ft^{-2}$ | 4,882.43 | g $m^{-2}$ |
| lb $ft^{-2}$ | 4.882 | kg $m^{-2}$ |
| lb 100 $ft^{-2}$ | 4.882 | kg 100 $m^{-2}$ |
| lb $ft^{-3}$ | 16.019 | kg $m^{-3}$ |
| lb $ft^{-3}$ | 16.019 | g $L^{-1}$ |
| lb $gal^{-1}$ | 119.83 | g $L^{-1}$ |
| lb $inch^{-1}$ | 17.86 | g $mm^{-1}$ |
| lb $inch^{-1}$ | 0.0179 | kg $mm^{-1}$ |
| lb $inch^{-2}$ $h^{-1}$ (inch precip)$^{-1}$ | 27,680.37 | g $m^{-2}$ $h^{-1}$ (mm precip)$^{-1}$ |
| lb $mi^{-1}$ | 0.282 | kg $km^{-1}$ |
| lb $min^{-1}$ $ft^{-1}$ | 1.488 | kg $min^{-1}$ $m^{-1}$ |
| mi | 1.609 | km |
| $mi^2$ | 2.59 | $km^2$ |
| oz | 29.57 | ml |
| ppb | 0.001 | mg $L^{-1}$ |
| ppb | 1 | µg $L^{-1}$ |
| ppm | 1 | mg $L^{-1}$ |
| ppm | 1 | mg $kg^{-1}$ |
| psi (lb $inch^{-2}$) | 6.895 | kPa |
| ton | 0.907 | tonne |
| ton | 0.907 | Mg |
| ton $ac^{-1}$ | 2.242 | tonne $ha^{-1}$ |
| ton $ac^{-1}$ | 2.242 | Mg $ha^{-1}$ |
| ton $mi^{-1}$ | 0.564 | tonne $km^{-1}$ |
| ton $mi^{-2}$ $day^{-1}$ | 0.350 | tonne $km^{-2}$ $day^{-1}$ |



FS-002945

# APPENDIX

## English, Metric, and Gradient Conversions Applicable to Text, Tables, and Figures

### Factors for gradient conversions

| If you know | Multiply by | To convert to |
|---|---|---|
| degrees[a] (°) | tan (degrees) × 100 | percent slope (%) |
| percent slope (%) | $\tan^{-1}$ (percent slope/100) | degrees (°) |

[a] The conversion from degrees to percent slope holds only for gradients that are <90°.

Edwards, Pamela J.; Wood, Frederica; Quinlivan, Robin L. 2016. **Effectiveness of best management practices that have application to forest roads: a literature synthesis.** Gen. Tech. Rep. NRS-163. Newtown Square, PA: U.S. Department of Agriculture, Forest Service, Northern Research Station. 171 p.

Literature describing the effectiveness of best management practices (BMPs) applicable to forest roads is reviewed and synthesized. Effectiveness is considered from the perspective of protecting water quality and water resources. Both paved and unpaved forest roads are considered, but BMPs that involve substantial engineering are not considered. Some of the BMPs included are commonly used on roads; others are used less often. The synthesis focuses on quantitative BMP effectiveness and descriptions of processes or characteristics that influenced the effectiveness. Qualitative results and observations not supported by data are excluded. Most of the effectiveness results describe sediment losses and sediment delivery, but there is also some coverage of chemicals used as BMPs, such as dust palliatives and soil conditioners. Chapters and subheadings are based on how or where protection is provided, or type of BMP. The final chapter provides information on research needs and potential direction of BMP implementation in the future. Although there remains a great need to quantify BMP effectiveness more rigorously across more physiographic, topographic, climate, and soil conditions, the data provided in this synthesis give road and watershed managers and landowners a starting place for evaluating and selecting BMPs.

KEY WORDS: erosion, sediment delivery, road location, drainage control, soil protection, road characteristics, research needs

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at http://www. ascr.usda.gov/complaint_filing_cust.html and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer, and lender.

Northern Research Station

www.nrs.fs.fed.us

United States Department of Agriculture
Forest Service

Pacific Northwest Research Station

General Technical Report PNW-GTR-884

July 2013

# Assessing the Vulnerability of Watersheds to Climate Change

## Results of National Forest Watershed Vulnerability Pilot Assessments



FS-002950

The **Forest Service** of the U.S. Department of Agriculture is dedicated to the principle of multiple use management of the Nation's forest resources for sustained yields of wood, water, forage, wildlife, and recreation. Through forestry research, cooperation with the States and private forest owners, and management of the national forests and national grasslands, it strives—as directed by Congress—to provide increasingly greater service to a growing Nation.

The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, sex, religion, age, disability, sexual orientation, marital status, family status, status as a parent (in education and training programs and activities), because all or part of an individual's income is derived from any public assistance program, or retaliation. (Not all prohibited bases apply to all programs or activities).

If you require this information in alternative format (Braille, large print, audiotape, etc.), contact the USDA's TARGET Center at (202) 720-2600 (Voice or TDD).

If you require information about this program, activity, or facility in a language other than English, contact the agency office responsible for the program or activity, or any USDA office.

To file a complaint alleging discrimination, write USDA, Director, Office of Civil Rights, 1400 Independence Avenue, S.W., Washington, D.C. 20250-9410, or call toll free, (866) 632-9992 (Voice). TDD users can contact USDA through local relay or the Federal relay at (800) 877-8339 (TDD) or (866) 377-8642 (relay voice users). You may use USDA Program Discrimination Complaint Forms AD-3027 or AD-3027s (Spanish) which can be found at: http://www.ascr.usda.gov/complaint_filing_cust.html or upon request from a local Forest Service office. USDA is an equal opportunity provider and employer.

## Authors*

**Michael J. Furniss** (retired), Pacific Northwest Research Station
**Ken B. Roby** (retired), Lassen National Forest
**Dan Cenderelli**, Stream Systems Technology Center
**John Chatel**, Sawtooth National Forest
**Caty F. Clifton**, Umatilla National Forest
**Alan Clingenpeel** (retired), Ouachita National Forest
**Polly E. Hays**, Rocky Mountain Regional Office
**Dale Higgins**, Chequamegon-Nicolet National Forest
**Ken Hodges**, Chugach National Forest
**Carol Howe**, Grand Mesa, Uncompahgre, and Gunnison National Forests
**Laura Jungst**, Helena National Forest
**Joan Louie**, Gallatin National Forest
**Christine Mai**, Shasta-Trinity National Forest
**Ralph Martinez**, Plumas National Forest
**Kerry Overton**, Rocky Mountain Research Station
**Brian P. Staab**, Pacific Northwest Region
**Rory Steinke**, Coconino National Forest
**Mark Weinhold**, White River National Forest

* All are USDA Forest Service, with units specified.

## Contributors and Reviewers**

**Christopher P. Carlson,** Washington Office National Forest System
**Jim Morrison,** Northern Regional Office
**Janine Rice,** Rocky Mountain Research Station
**Jeremy Littel,** Climate Impacts Group, University of Washington
**Dan Isaak,** Rocky Mountain Research Station
**Charlie H. Luce,** Rocky Mountain Research Station
**Linda Joyce,** Rocky Mountain Research Station
**David Cleaves,** Washington Office Research and Development
**Sherry Hazelhurst,** Washington Office National Forest System
**Sarah J. Hines,** Rocky Mountain Research Station
**John Potyondy,** Stream Systems Technology Center
**Ryan Foote,** Lassen National Forest
**Ann Rosecrance,** Ventura River Watershed Council
**Derik Olson**, Council on Environmental Quality

** All are USDA Forest Service, with units specified, except Jeremy Littel, Ann Rosecrance, and Derik Olson.

## Cover Photograph

North Pole Basin, Sopris Ranger District, White River National Forest, by Cindy Dean.

## Abstract

**Furniss, Michael J.; Roby, Ken B.; Cenderelli, Dan; Chatel, John; Clifton, Caty F.; Clingenpeel, Alan; Hays, Polly E.; Higgins, Dale; Hodges, Ken; Howe, Carol; Jungst, Laura; Louie, Joan; Mai, Christine; Martinez, Ralph; Overton, Kerry; Staab, Brian P.; Steinke, Rory; Weinhold, Mark. 2013.** Assessing the vulnerability of watersheds to climate change: results of national forest watershed vulnerability pilot assessments. Gen. Tech. Rep. PNW-GTR-884. Portland, OR: U.S. Department of Agriculture, Forest Service, Pacific Northwest Research Station. 32 p. plus appendix.

Existing models and predictions project serious changes to worldwide hydrologic processes as a result of global climate change. Projections indicate that significant change may threaten National Forest System watersheds that are an important source of water used to support people, economies, and ecosystems.

Wildland managers are expected to anticipate and respond to these threats, adjusting management priorities and actions. Because watersheds differ greatly in: (1) the values they support, (2) their exposure to climatic changes, and (3) their sensitivity to climatic changes, understanding these differences will help inform the setting of priorities and selection of management approaches. Drawing distinctions in climate change vulnerability among watersheds on a national forest or grassland allows more efficient and effective allocation of resources and better land and watershed stewardship.

Eleven national forests from throughout the United States, representing each of the nine Forest Service regions, conducted assessments of potential hydrologic change resulting from ongoing and expected climate warming. A pilot assessment approach was developed and implemented. Each national forest identified water resources important in that area, assessed climate change exposure and watershed sensitivity, and evaluated the relative vulnerabilities of watersheds to climate change. The assessments provided management recommendations to anticipate and respond to projected climate-hydrologic changes.

Completed assessments differed in level of detail, but all assessments identified priority areas and management actions to maintain or improve watershed resilience in response to a changing climate. The pilot efforts also identified key principles important to conducting future vulnerability assessments.


Keywords: Watersheds, hydrology, climate change, vulnerability, restoration, national forests.

## Contents


1 **The Challenge**

2 **Watershed Condition, Health, and Resilience...What's the Difference?**

3 **The Pilot Assessment Approach**

5 **Identify Water Resource Values and Scales of Analysis**

5 Water Resource Values

7 Scale(s) of Analysis and Reporting

8 **Assess Exposure**

8 Using Historical Data

8 Climate Change Projections

11 Evaluating Hydrologic Changes

11 Applying Exposure Projections

16 **Evaluate Watershed Sensitivity**

21 **Evaluate and Categorize Vulnerability**

25 **Identify Adaptive Management Responses**

28 **Critique the Assessment**

28 Data Gaps and Uncertainty

29 Other Lessons Learned

30 **Summary**

31 **References**

32 **Appendix: Pilot National Forest Reports**
Pilot reports are available online only at
http:/www.fs.fed.us/pnw/pubs/pnw-gtr884_appendix.pdf

## The Challenge

*Water and its availability and quality will be the main pressures on, and issues for, societies and the environment under climate change.*

—Intergovernmental Panel on Climate Change

**Clean and abundant water** is often considered the most valuable ecosystem service provided by the national forests and grasslands, and most climate changes affect hydrologic processes. Water from these lands is important for domestic, agricultural, and industrial uses, and for hydropower generation. It supports recreational uses and provides crucial habitat for threatened, endangered, and sensitive aquatic species.

Climate change poses important challenges to the U.S. Department of Agriculture Forest Service, the agency charged with management of more than 193 million acres of public forests and grasslands. Current and projected trends in global warming present risks to a wide range of ecosystem values and services, and the impacts are most closely associated with water resources, including changes in their volume, timing, and quality.

In response, initial priorities of the Forest Service climate change strategy are to build knowledge, skills, and expertise, and to develop experience and partnerships. These initial steps build toward planning and designing management actions to improve ecosystem resilience (Furniss et al. 2010). (In this report, “resilience” means both the resistance to adverse changes and the ability of a watershed to recover following adverse changes.)

Maintaining or improving resilience is widely accepted as the best means to adapt to climate change (Williams et al. 2007). Forest Service managers have extensive experience in implementing practices that improve watershed health and resilience, such as restoring connectivity to aquatic habitats, restoring degraded wetlands, and using prescribed burning to restore fire regimes.

Although much is known about the hydrologic impacts of climate change and the means to improve watershed resilience, linkages to integrate this knowledge into existing programs and priorities are needed. The capacity of national forests and grasslands to implement effective management measures is constrained by available resources (budgets and staffing). Priorities that integrate the impacts of climate change are needed to effectively allocate resources and focus management activities.

Climatic changes are not expressed uniformly across the landscape. Not all watersheds are equally vulnerable. Some support more water resource values, and some are inherently more sensitive to change. Identifying these important differences is critical to setting priorities and identifying responses for management.

Despite these challenges, Forest Service managers are being directed to act. The agency’s climate change strategy has been launched, and efforts to adapt to climate change are now a reporting requirement for forest supervisors. A Climate Change Scorecard measures progress made by each national forest and grassland in four areas, including assessment of resource vulnerabilities.

Currently, there are few examples of assessments that inform managers about the vulnerability of watersheds to climate change. Existing assessments are limited to analyses of vulnerability of particular species or habitats (e.g., Gardali 2012). Likewise, existing protocols for vulnerability assessments (e.g., Glick et al. 2011) focus primarily on single species or specific biological communities. Not widely available are informative examples of place-based assessments that provide relative ratings of vulnerability of watersheds to climate change.

In response to this information gap, the Forest Service Stream Systems Technology Center funded the Watershed Vulnerability Assessment (WVA) pilot project to determine if watershed-focused climate change assessments could be prepared by national forest staff, using existing data sources. The goal of the pilot project was to provide land managers with assessments of the relative vulnerability of watersheds to climate change. The project involved substantial collaboration between National Forest System (NFS) and Forest Service Research and Development staff; the task group included representation from two research stations and each of the nine Forest Service regions.

This report summarizes the pilot effort. Because each NFS unit has different levels of staffing and data availability, the results represent a diversity of approaches on how to conduct a vulnerability assessment. We provide an overview of core assessment components, and highlight similarities and differences of the 11 pilot assessments. We also share important concepts that emerged during completion of the assessments. These "Assessment Principles" could be applied in assessments in other national forests and grasslands, and are described in boxes located throughout the report.

Each individual pilot assessment is locally based and has relevance at local scales. We do not attempt to summarize all of the findings of these assessments. The assessments represent a broad range of conditions similar to those found on national forests and grasslands across the country, and provide examples of approaches for a wide variety of environmental contexts. Readers are encouraged to review the individual pilot reports for details on methods used and results produced. These reports are available online at http:/www.fs.fed.us/pnw/pubs/pnw_gtr884_appendix.pdf.

## Watershed Condition, Health, and Resilience...What's the Difference?

For the purposes of this report, two frequently used terms—watershed condition and health—are considered interchangeable. Resilience is the capacity of a system to absorb disturbance and reorganize while undergoing change and still retain the same functions, structure, identity, and feedbacks (Walker et al. 2004). Because the term "resilience" is used most frequently in the climate change literature, we have used this term throughout this project and report. Watershed resilience can be described as a subset or synthesis of "watershed health" or "watershed condition" (Furniss et al. 2010).

The Forest Service has recently published a methodology to assess watershed condition (defined in box below), and has conducted baseline assessments across the entire 193-million-acre NFS (USDA FS 2011a). This national program was initiated concurrent with the pilot WVAs.

### Principles of Vulnerability Assessment Derived from WVA Pilot Forests

1. Use resource values to focus the analysis.
2. The HUC-6 (hydrologic unit code level 6) subwatershed is currently the best scale for analysis and reporting.
3. Local climate data provides context.
4. Analyze exposure before sensitivity.
5. Don't get lost in exposure data.
6. Keep the end product in mind.

**Watershed condition** is the state of the physical and biological characteristics and processes within a watershed that affect the soil and hydrologic functions supporting aquatic ecosystems…. When watersheds are functioning properly, they create and sustain functional terrestrial, riparian, aquatic, and wetland habitats that are capable of supporting diverse populations of native aquatic- and riparian-dependent species. In general, the greater the departure from the natural pristine state, the more impaired the watershed condition is likely to be… .

Watersheds that are functioning properly have five important characteristics (Williams et al. 1997):

1. They provide for high biotic integrity, which includes habitats that support adaptive animal and plant communities that reflect natural processes.
2. They are resilient and recover rapidly from natural and human disturbances.
3. They exhibit a high degree of connectivity longitudinally along the stream, laterally across the floodplain and valley bottom, and vertically between surface and subsurface flows.
4. They provide important ecosystem services, such as high quality water, the recharge of streams and aquifers, the maintenance of riparian communities, and the moderation of climate variability and change.
5. They maintain long-term soil productivity.

—From the *USFS Watershed Condition Framework* (USDA FS 2011b)

## The Pilot Assessment Approach

*The scientist is not a person who gives the right answers; he's the one who asks the right questions.*
—Claude Levi-Strauss

The WVA pilot team was composed of watershed and aquatic specialists from each Forest Service region, stationed on 11 national forests (see fig. 1). The group was supported by a steering committee composed of representatives from two research stations and two regional offices. Pilot national forests were selected to provide a range of water resource issues and environmental factors, and each national forest brought different levels of staffing, expertise, and existing information to the project. A few pilot forests had taken initial steps to consider how climate change might affect management priorities, though most had not. The goal was to conduct pilot assessments with a range of analytical rigor, in different geographic settings and organizational structures, with varying subject-matter focus.

The pilot team and steering committee met to develop a methodology to guide the assessments. The initial step was to define the purpose of the assessments, which was to identify (for each unit) areas with the highest priority for implementing actions to maintain or improve watershed resilience. This approach is based on two assumptions. The first is that there is a strong correlation between the condition and resilience of watersheds, with watersheds in better condition displaying more resilience than comparable watersheds in poor condition. The second assumption is that climate change is one of many factors, both natural and anthropogenic, that affect hydrology and watershed condition. A conceptual model illustrating these factors and linkages is displayed in figure 2.

The objective of the pilot assessments stemmed from the need to prioritize where to concentrate management activities to improve or maintain resilience. Comparing analysis options against this objective helped national forest staff focus their efforts.




Figure 1—Location of national forests participating in the pilot Watershed Vulnerability Assessments (WVA). Coordination was provided by representatives from regional staffs in Regions 2 and 6, and the Pacific Northwest and Rocky Mountain Research Stations. A parallel WVA was conducted on the Shoshone National Forest (Rice et al. 2012) and coordinated with the core WVA group of 11 pilot forests.




Figure 2—Conceptual model for assessing vulnerability, showing linkages between exposure, resource values, and system condition (sensitivity). We found utility in separating three components of sensitivity. "Buffers" and "stressors" are human-induced, whereas intrinsic sensitivity is based on inherent characteristics independent of human influence.

The process was intended to produce useful results with differing levels of data availability and resource investment. Given the variety of watershed types, water resource issues, experience, and data availability on the pilot forests, a flexible assessment method was needed. The team developed an analysis method that relied heavily on previous experience with watershed analysis (USDA FS 1995) and the basic model of vulnerability (fig. 2). The assessment steps are summarized below.

**Steps in the Watershed Vulnerability Assessments**

1. Identify water resource values and scales of analysis.
2. Assess exposure.
3. Evaluate watershed sensitivity.
4. Evaluate and categorize vulnerability.
5. Identify adaptive management responses.
6. Critique the assessment.

The pilot assessments benefited from having leaders identified at the outset of the project. Leaders coordinated the assessment on their units, and at times acted as a one-person analysis team. A defined project leader was important to making key decisions on what to include in the assessment, identifying available data, determining how to analyze the information, and making adjustments when necessary.

Each pilot forest took a slightly different approach, depending on the resources selected for analysis, the type and amount of data available, and the staff time that could be devoted to analysis. After the assessments were initiated, the pilot team met monthly via video conference to discuss progress and share ideas and approaches. These discussions led to changes in the stepwise process and to the methods used in individual assessments.

For the WVA, vulnerability was defined as the interaction of climatic exposure with values at risk and watershed sensitivity. In the framework model, management actions are intended to increase the resilience or buffering capacity of watersheds by modifying the effect of stressors that decrease resilience. Each of the primary components of the assessment: values, exposure, sensitivity, vulnerability, and application and lessons learned from applying the conceptual model, are further described in the following section.

## Identify Water Resource Values and Scales of Analysis

> *Ecosystem management is most successful when it considers and connects all spatial and temporal scales. For collaborative analysis, a specific scale and unit of land must be chosen, but this does not imply that only the collaborative analysis scale matters: they all matter.*
>
> —The authors

### Water Resource Values

Identifying the water resources to be included is vital to the overall assessment. Water resources are the prism through which all the other assessment steps are viewed and focused. For example, factors used to characterize sensitivity and exposure are selected because they have strong linkages or they most directly affect the selected water resources.

Each pilot forest considered including at least three designated water resource values in their assessments. These were aquatic species, water uses (diversions and improvements), and infrastructure. The rationale was that climate change would influence these resources in different ways, and that including them in the pilot analysis would broaden the range of analytical methods and approaches.

Given this objective, each pilot forest selected water resource values based on their importance and perceived susceptibility to climate changes. All pilot forests included aquatic species (or habitat for selected aquatic species) and infrastructure in their analyses. Eight of the 11 pilot forests included the vulnerability of water uses in their assessments. The water resource issues addressed by each pilot forest, and the reporting scale, are listed in table 1.

The species (and aquatic habitats) selected for analysis represent the range of aquatic habitats found on the pilot forests. Anadromous fishes were a focus on each national forest where they occurred. Other salmonids included in the analyses were red-band trout, bull trout, brook trout, and three species of cutthroat trout. Brook trout are of note: they were a resource of concern within their historical habitat on the Chequamegon-Nicolet National Forest (NF), and a stressor (invasive species) on several of the Western pilot forests. Other fishes included as resource issues were warm water species on the Ouachita and Coconino NFs. Amphibian species and habitat were included in three analyses.

The evaluation of water resources resulted in maps and descriptions displaying the location and relative importance by subwatersheds for each resource or combination of resources. For example, the Shasta-Trinity NF analyzed the density of springs and small lakes at three watershed scales (fig. 3). The Sawtooth NF displayed the relative importance of infrastructure (road crossings and near-stream recreation facilities) by subwatershed in the Sawtooth National Recreation Area (fig. 4). The characterization of watersheds in terms of the resources they support is an important step in any watershed planning effort and a first step in informing managers where limited resources might be invested. The assessment goal was to identify the most important places, categorize their relative value (high, moderate, low), and map the individual and composite values.

***Assessment Principle One***

**Use resource values to focus the analysis**

One of the major challenges in conducting a broad-scale analysis is deciding what to address. The land areas under consideration are large and ecosystems and social systems are extremely complex. Narrowing the focus of the pilot assessments was considered essential and was achieved by identifying key water resource issues using iterative analyses.

One aspect of the approach instrumental in focussing the pilot efforts was using water resource values, identified at the outset, to drive the assessment. Once resources of concern are identified, assessment questions are narrowed. The question then is not what exposure attributes to use, but what exposure attributes have the strongest effect on the resource value. Likewise, the question "What elements influence watershed sensitivity?" narrows to "What watershed sensitivity elements most strongly influence the water resource?"

Using a specific set of resource values as the prism through which exposure and sensitivity were evaluated also provided for comparison of responses between resource values. Often, analysts found commonality among resources and were able to combine resources and methods to streamline the assessment.

**Table 1—Water resource issues, scope of analysis, and reporting scales included in pilot assessments**

| Region | National forest | Scale of analysis | Reporting scale | Water resource issues |
|---|---|---|---|---|
| 1 | Gallatin | National forest | HUC-6 (subwatershed) | West-slope cutthroat trout, Yellowstone cutthroat trout, water uses, infrastructure |
| 1 | Helena | National forest | HUC-6 (subwatershed) | West-slope cutthroat trout, bull trout, recreational fisheries, infrastructure |
| 2 | Grand Mesa, Uncompahgre, and Gunnison (GMUG) | National forest | HUC-6 (subwatershed) | Aquatic habitats and species, water uses, infrastructure |
| 2 | White River | National forest | HUC-6 (subwatershed) | Boreal toad and cutthroat trout habitat, water uses, infrastructure |
| 3 | Coconino | Five HUC-5 watersheds | HUC-6 (subwatershed) | Amphibians, stream and riparian habitat, water uses, infrastructure |
| 4 | Sawtooth | Recreation area | HUC-6 (subwatershed) | Salmon, bull trout, water uses, infrastructure |
| 5 | Shasta-Trinity | National forest | HUC-6 (subwatershed) | Springs, salmon, redband trout, water uses, infrastructure |
| 6 | Umatilla | National forest | HUC-6 (subwatershed) | Springs, salmon, bull trout, water uses, infrastructure |
| 8 | Ouachita | National forest | HUC-6 (subwatershed) | Warm-water fishes, infrastructure |
| 9 | Chequamegon-Nicolet | National forest | HUC-6 (subwatershed) | Wetlands; cold-, cool-, and warm-water fishes; ground water; infrastructure |
| 10 | Chugach | Eyak Lake and Resurrection Creek watersheds | HUC-6 (subwatershed) | Salmon, hydropower, infrastructure |

HUC = hydrologic unit code.




Figure 3—Density of springs and small lakes on the Shasta-Trinity National Forest. Results are shown at the scales of HUC-4 (hydrologic unit code level 4) (left), HUC-5 (middle), and HUC-6 (right). The Shasta-Trinity assessment evaluated resource value, sensitivity, and vulnerability at the three scales, all showing that identifying priority locations for management actions was best done by using HUC-6.



Figure 4—Amount of infrastructure (roads and developed recreation facilities) within the Sawtooth National Recreation Area. Red-shaded subwatersheds have the highest density of infrastructure, yellow show moderate density, and green show the lowest density. Red lines are HUC-4 (hydrologic unit code level 4) boundaries.

**Important Considerations in Assessing Water Resources**

- Identify partners who can improve the assessment and engage with them.
- Identify the most important places (if possible), categorize their relative values (high, moderate, low), and map them.
- Determine what relevant broad-scale evaluations, assessments, and plans are available.
- Consider all downstream uses (such as species and diversions).
- Identify any ecological thresholds or risk levels (flow requirements, temperatures, and so on) associated with specific resource values.
- As the assessment progresses, look for similarities (and differences) in response of resource values and consider grouping resource values where appropriate.

## Scale(s) of Analysis and Reporting

The pilot assessments were conducted over relatively large geographic areas, typically (8 of the 11 pilots) an entire national forest. Three forests analyzed smaller areas for specific reasons. The Chugach NF (Region 10) focused on subwatersheds where management activities would be most influenced by the results of the assessment. The Coconino NF (Region 3) included five watersheds (at the HUC-5 scale) that support the majority of aquatic resources on the forest. The Sawtooth NF limited its evaluation to the Sawtooth National Recreation Area because it supports remaining strongholds for steelhead, bull trout, and Chinook and sockeye salmon listed under the Endangered Species Act, and significant data were available for this area of the forest.

All of the pilot forests used the subwatershed (HUC-6) scale for analysis and reporting. This arose from the shared conclusion that subwatersheds provide a logical unit and scale for setting priorities and implementing management activities on NFS lands.

The Shasta-Trinity NF also used the HUC-6 as the scale to apply results of the vulnerability assessment, and, in addition, evaluated water resource values, watershed sensitivity, and vulnerability at two broader scales (HUC-4 and

> ***Assessment Principle Two***
>
> **The HUC-6 (hydrologic unit code level 6) is currently the best scale for analysis and reporting**
>
> The scale for the pilot assessments was not prescribed, but all pilot forests elected to use the HUC-6 (subwatershed) scale to characterize and map results. Climatic exposure data was often available, displayed, and assessed at scales larger than HUC-6; the work by the Shasta-Trinity National Forest demonstrated that HUC-4 and HUC-5 scales are usually too large to effectively manage for water values, sensitivity, adaptive capacity, and resilience. The HUC-6 is the appropriate size for planning and implementing management strategies to sustain or improve watershed condition. In addition, HUC-6 is also the scale used to assess and report conditions for the Classification portion of the Watershed Condition Framework.

HUC-5). The results from the Shasta-Trinity suggest that general trends can be expressed at broader scales, but as might be expected, detail shown at the HUC-6 scale is lost at each higher level (fig. 3).

Although HUC-6 was determined to be the best reporting unit for displaying water resource values, sensitivity, and vulnerability, exposure information is generally available and appropriately used only at broader scales. As a result, most pilot forests evaluated exposure at the HUC-5 scale.

## Assess Exposure

> *So why worry about global warming, which is just one more scale of climate change? The problem is that global warming is essentially off the scale of normal in two ways: the rate at which this climate change is taking place, and how different the "new" climate is compared to what came before.*
>
> —Anthony D. Barnosky

The consideration of climate change exposure data is the primary difference between the WVA and evaluations that Forest Service professionals have previously produced. Past assessments have been conducted for watershed analysis, restoration planning, and watershed condition. Pilot team members built upon this experience but few team members had used or were familiar with climate change projections.

Analysis of exposure included four components: (1) review and evaluation of pertinent local historical climatic data, (2) selection and use of one or two modeled projections of future climate conditions, (3) analyses of historical and projected changes to hydrologic processes that might affect water resources, and (4) selection of metrics to analyze and display differences in exposure across each analysis area.

### Using Historical Data

One finding consistent to all the pilots was the value of local historical data in providing local context and understanding of climate change. Display of historical changes with strong connection to local water resource values is typically easier to understand and appreciate than projections of future conditions. Projections are uncertain because they are associated with future emission scenarios and modeling assumptions. Differences between models increase because they are projected multiple decades into the future and display high variability that may be unsettling to managers. Historical data help both analysts and decisionmakers by providing local context and trends in climatic conditions.

Two examples from the pilot assessments are included here. The first shows changes to ice cover on Lake Mendota in southern Wisconsin (fig. 5). This historical trend was obtained from the Wisconsin Initiative on Climate Change Impacts (WICCI) by the Chequamegon-Nicolet NF during the assessment process. The second example shows changes in snow depth from the Trinity and Sacramento River basins in the Shasta-Trinity NF (fig. 6).

### Climate Change Projections

Evaluation of climate exposure was the most difficult component of the assessment for several pilot forests, owing primarily to lack of experience with downscaled global climate modeling data. There were two basic challenges: deciding which climate change projections to use, and selecting the climate metrics.

> ***Assessment Principle Three***
>
> **Local climate data provides context**
>
> Local or regional examples of historical changes in climate and to valued resources should be incorporated as components of the assessment. Such information (e.g., historical trends in temperature and precipitation, changes in ice duration, or species phenology) can readily illustrate current influences on water resources. These data are local, and usually of high confidence. Use of local and regional climatological data, field observations, and local knowledge helps to frame the importance of climate change in terms that are better understood and appreciated than relying only on model-based projections of future climate.




Figure 5—Duration of ice cover (days) on Lake Mendota in Wisconsin, 1855–2009. Source: J. Magnuson, University of Wisconsin-Madison.

The availability of downscaled climate model data has increased substantially since the WVA pilot project was initiated. Of particular note are data now available from the Climate Impacts Group (CIG) at the University of Washington. The CIG has evaluated available Global Circulation Models (GCMs), and determined which models and ensembles of models produce the best fit with historical data, for the major river basins of the Western United States. Data provided by CIG were used for evaluations conducted in Regions 1, 2, 3, 4, and 6. The Grand Mesa, Uncompahgre,




Figure 6—Changes in average snow depths from snow courses located in the Trinity River basin (1945–2009) and Sacramento River basin (1930–2009).

and Gunnison (GMUG) NFs used projections from CIG, and additional projections for the Upper Gunnison River (Barsugli and Mearns 2010). In retrospect, providing data available from CIG at the outset would have expedited some analyses and greatly assisted the process.

In Region 2, the White River NF used projections supplied by the Colorado Water Conservation Boards (Ray et al. 2008, Spears et al. 2009). The Shasta-Trinity NF (Region 5) used the World Climate Research Programme's Coupled Model Intercomparison Project phase 3 (CMIP3) multi-model dataset. This is a downscaled global temperature modeling output available from the University of California, Santa Barbara. The Ouachita NF (Region 8) relied on information from The Nature Conservancy's Climate Change Wizard (table 2). The Chequamegon-Nicolet NF (Region 9) employed data from WICCI, and the Chugach NF (Region 10) used projections provided by the University of Alaska, Fairbanks Scenarios Network for Alaska Planning Project (fig. 7).

All the pilot assessments used air temperature change projections in their analyses and most pilots included projected changes to precipitation. These projections were obtained from the variety of publically available state or regional climate sources listed above. All projections of future climate are based on GCMs. These models are mathematical representations of atmospheric and oceanic motion, physics, and chemistry, and employ different emission scenarios to yield predictions of temperature and precipitation change. The global-scale model outputs are very coarse, so data are often downscaled and used as inputs to macro-scale hydrologic models for use in regional and finer scale analysis, such as the WVA pilots. The accuracy of the data becomes more uncertain with each subsequent layer of modeling. The greatest certainty is associated with air temperature projections. Precipitation projections are highly variable, with even less certainty for derived attributes like snowmelt, runoff, and stream baseflows. Precise changes in hydrologic extremes, such as flood and drought frequency, cannot be credibly modeled at the stream-reach scale at present.

The WVA pilot experience points to the value of broader scale (e.g., regional) vulnerability analyses in providing exposure data and recommending future climate scenarios to national forests. Interpreting exposure data at a broad scale would be useful for several reasons. First, exposure data are not available at finer scales. Second, consistency among national forests in selected emissions scenarios and modeling assumptions would allow comparisons of expected climate changes across national forests.

**Table 2—Modeled exposure data from the Ouachita National Forest assessment showing monthly and annual changes in temperature and precipitation derived from the B1 and A1B climate scenarios**

| | Increases in temperature (°F) | | | | Percent change in precipitation | | | |
|---|---|---|---|---|---|---|---|---|
| | B1 2050 | B1 2080 | A1B 2050 | A1B 2080 | B1 2050 | B1 2080 | A1B 2050 | A1B 2080 |
| January | 2.70 | 4.42 | 4.38 | 6.00 | (0.69) | 8.85 | 5.98 | 1.68 |
| February | 3.50 | 4.01 | 4.46 | 5.19 | (0.97) | (4.50) | (2.54) | (1.24) |
| March | 3.46 | 4.25 | 4.70 | 5.74 | (0.75) | (4.30) | 0.63 | (5.17) |
| April | 2.99 | 4.46 | 4.49 | 5.93 | 5.42 | 2.45 | (1.19) | 0.67 |
| May | 3.68 | 4.48 | 5.02 | 7.16 | (8.46) | (1.28) | (6.26) | (10.68) |
| June | 3.90 | 4.64 | 5.34 | 7.04 | (5.87) | (7.17) | (8.76) | (12.37) |
| July | 4.14 | 4.98 | 5.40 | 7.28 | (8.34) | (2.70) | (7.39) | (12.84) |
| August | 4.13 | 5.04 | 5.21 | 6.84 | 1.20 | 6.97 | 1.52 | 2.61 |
| September | 4.23 | 5.49 | 5.35 | 7.45 | (0.49) | 1.10 | (3.47) | 1.32 |
| October | 4.12 | 5.46 | 5.29 | 7.15 | (13.81) | (8.17) | (9.75) | (8.17) |
| November | 3.52 | 4.36 | 4.93 | 6.15 | 0.91 | (5.08) | (7.93) | (8.75) |
| December | 3.18 | 4.40 | 4.11 | 5.97 | 5.20 | (9.39) | (1.69) | (1.68) |
| Annual | 3.63 | 4.67 | 4.89 | 6.49 | (2.22) | (1.93) | (3.40) | (4.55) |

Note: Decreases in precipitation are in parentheses.

Source: The Nature Conservancy Climate Change Wizard.




Figure 7—An example of a downscaled, gridded projection of future climate conditions. The maps display projected precipitation (mm). The projections are based on the A1B model. The figure is from the Chugach National Forest watershed vulnerability assessment.

## Evaluating Hydrologic Changes

Using projections of future temperatures and other climatic changes, most pilot forests then considered what specific hydrologic changes would result from projected climate changes, and how water resource values would be affected by these changes. This step was integrative. In addition to the obvious connection between exposure and water resources, the evaluation served to stimulate thinking about which watershed characteristics might influence (either moderate or exacerbate) the hydrologic response to climate change, providing a segue to evaluating watershed sensitivity. An example of this type of analysis, which tracks climate changes through hydrologic responses to potential impacts on water resources from the Helena NF, is provided in table 3.

## Applying Exposure Projections

Once the hydrologic processes important to selected water resource values were established, exposure metrics closely linked to those processes were identified. The list of metrics used to characterize exposure was limited because of the commonality in water resources in the assessments (table 4). The selection of exposure metrics differed among national forests for three reasons. The first is the water resources themselves. The Chequamegon-Nicolet was the only pilot forest to include assessment of changes to ground-water recharge, and the only forest to use soil-water balance as an exposure metric. The second difference in selecting metrics was data availability. Both the Sawtooth and Umatilla assessments included finer scaled analysis of

> ***Assessment Principle Four***
>
> **Analyze exposure before sensitivity**
>
> The first iteration of the watershed vulnerability assessment process used in the pilot project called for assessment of sensitivity before evaluating exposure. The result was development of rather generic sensitivity factors that did not have the strongest links to hydrologic processes most likely to be affected by climate.
>
> Exposure is considered first in order to produce a list of the most important hydrologic changes affecting each water resource. Sensitivity elements that strongly modify these hydrologic changes are then selected.

**Table 3—Projected hydrologic changes relative to identified values (Helena National Forest)**

| Projected climatic changes | Anticipated hydrologic response | Potential consequences to watershed resources |
|---|---|---|
| Warmer air temperatures | Warmer water temperature in streams | Decrease in coldwater aquatic habitats |
| Changes in precipitation amounts and timing | Altered timing and volume of runoff<br>Altered erosion rates | Increases or decreases in availability of water supplies<br>Complex changes in water quality related to flow and sediment changes |
| Less snowfall, earlier snowmelt, increased snowpack density | Higher winter flows<br>Lower summer flows<br>Earlier and smaller peak flows in spring | Changes in the amounts, quality, and distribution of aquatic and riparian habitats and biota |
| Intensified storms, greater extremes of precipitation and wind | Greater likelihood of flooding<br>Increased erosion rates and sediment yields | Changes in aquatic and riparian habitats<br>Increased damage to roads, campgrounds, and other facilities |

Adapted from Furniss et al. 2010.

**Table 4—National forests and metrics included to evaluate exposure effects in water vulnerability assessments**

| National forest | Exposure metrics |
|---|---|
| Gallatin | Combined flow, snowpack vulnerability |
| Helena | Winter water temps, summer air temps, snow water equivalent (SWE), precipitation |
| Grand Mesa, Uncompahgre and Gunnison (GMUG) | Seasonal temperature, aridity index |
| Ouachita | Monthly precipitation and temperature |
| White River | Snowpack vulnerability |
| Sawtooth | Winter peak flows, summer stream temperature, summer flows |
| Coconino | Snowpack vulnerability |
| Shasta-Trinity | Air temperature, stream aspect, snowpack vulnerability |
| Umatilla | Winter and summer temperatures, SWE |
| Chequamegon-Nicolet | Air temperature, precipitation, soil water balance, rainstorm frequency and intensity |
| Chugach | Air temperature, precipitation, freeze and thaw days |

potential changes to water temperature in evaluating change to bull trout habitat. These analyses were possible because of the availability of stream temperature data and predictive models, and the support of the Rocky Mountain Research Station (RMRS). The third difference in exposure metrics was the level of analysis. Differences in the depth of analysis were partly the result of data availability, as in the example described above. But the amount of time team leads could devote to the assessment was also a factor. Available time and perceived need for detailed analysis were practical matters in the exposure analysis. Some pilots chose to make use of more detailed information that was available, and provided metrics with closer links to the subject water resources. Baseflow, for example, may be more closely linked with trout habitat than snowpack vulnerability, but the decision to conduct more detailed analysis was largely driven by the anticipated need for adequate detail to rate watersheds and set priorities. Some analysts thought that more detailed analysis would further discriminate areas at risk. Others thought the objective of rating watersheds could be met adequately with coarser evaluation of exposure.

There are advantages and limitations to both the coarser and more detailed approaches to characterizing exposure. The common factor in cases where the most detailed analyses were conducted is that they evaluated effects on species which, because of population status and trend, were already the focal point of restoration strategies and management emphasis. In such cases, additional detail may be warranted. At the same time, exposure is the assessment component with the greatest level of uncertainty. Though there may be uncertainty in characterizing resource value, especially when ratings comprise more than one resource (e.g., frog plus fish species), descriptions of resource locations generally have little error. Likewise, assessments of sensitivity, as we will see in the next section, are composites of both intrinsic and anthropogenic factors. Schemes to combine or weigh the factors contain error, relative to how these factors are expressed in nature. Nevertheless, these assessment components are likely to be more accurate than projections of future temperature and snowpack, especially regarding what will actually occur decades from now.

On the White River, Gallatin, and Coconino NFs, changes to snowmelt hydrology were determined to be the primary hydrologic change affecting selected resources. In both the White River and Coconino assessments, changes to the existing snow line resulting from projected temperature increases were anticipated. The watershed area within zones of predicted snow elevation change was used to characterize relative exposure of subwatersheds. The Gallatin NF assessment used projected changes in snowpack from the CIG (fig. 8). The Gallatin also included assessments of changes to summer and winter flow (from the variable infiltration capacity [VIC] model) in its assessment. A similar approach was taken on the Shasta-Trinity NF.

The impact of climate change on stream temperatures and habitat for salmonids was the focus on four national




Figure 8—Projected changes in snowpack vulnerability between historical and two future scenarios, Gallatin National Forest. Data are from the Climate Impacts Group (CIG) at the University of Washington, using the CIG composite model.

> ***Assessment Principle Five***
>
> **Don't get lost in exposure data**
>
> Pilot forests used exposure data of different specificity and detail (e.g., in one case, only air temperature change; in another, predicted stream temperatures). The level of detail influenced the analysis, but the take-home message is that all levels of exposure projections produced useable vulnerability assessments. Detailed projections at management-relevant scales are not necessary to gauge relative vulnerability of watersheds. It is more productive to move forward with the analysis than to get lost in the details of refining exposure data.

forests (Umatilla, Sawtooth, Helena, and Shasta-Trinity). These pilots employed data that looked deeper at potential hydrologic changes than other assessments. The Chequamegon-Nicolet NF included a salmonid (brook trout) in their assessment of potential impacts of stream temperature increases on 16 species of cold-, cool-, and warm-water fishes. In addition to stream temperature, the Sawtooth NF evaluated potential changes to frequency of flood flows critical to bull trout habitat condition. This evaluation was possible because of support from RMRS, a leader in assessing potential climate change impacts on aquatic ecosystems.

The Ouachita NF selected aquatic communities as the resource of concern, and identified increased sediment production as the most likely adverse effect to that resource. Changes in precipitation and temperature from The Nature Conservancy's Climate Wizard (see table 2) were captured by month from the composite climate change models. The predicted changes in climate were then used to modify the climate generator in the Watershed Erosion Prediction Project (WEPP) model (Elliot et al. 1995), which were then used to estimate sediment production under different climatic scenarios.

The Chequamegon-Nicolet NF's assessment considered how climate change might affect important aquatic habitats, including lakes and wetlands. A soil water balance model was used to assess how potential ground-water recharge might change in the future and whether any change will differ by soil type. A ground water flow model will eventually be used to determine changes in ground water levels and flow rates to lakes, streams, and wetlands.

The analysis on the GMUG NFs differed from other assessments, in that results were displayed at a large scale. Six large geographic areas, stratified by climatic regime and elevation, were used for graphical analysis. Projected changes to maximum and minimum air temperatures and an index of aridity were factors used to rate exposure in each of these geographical areas. This analysis technique was at least partially driven by the resolution of the downscaled exposure data, which is typically on a grid of 6 $km^2$ (fig. 7). This fairly gross resolution results in as few as two or three data points for an HUC-6, making discrimination at this scale inappropriate. As a result, pilots typically used HUC-6 for distinguishing differences in resource densities and sensitivity, overlaid with a larger scale rating of exposure.

Climate models typically provide predictions of temperature and precipitation. These data are then combined with characterizations of watershed characteristics and vegetation in modeling of other hydrologic variables. The CIG has also developed predictions of hydrologic change based on the VIC model (Gao et al., n.d.). The CIG was extremely helpful in releasing data for use during the pilot study, and in explaining its utility and limitations. Variable Infiltration Capacity is a distributed, largely physically based macro-scale model that balances water and energy fluxes at the land surface and takes into account soil moisture, infiltration, runoff, and baseflow processes within vegetation classes. It has been widely used in the Western United States to study past and potential future changes to water flow regimes (e.g., Hamlet et al. 2009), snowpacks (Hamlet et al. 2005), and droughts (Luo and Wood 2007). Several pilot forests (Helena, GMUG, Coconino, and Sawtooth) made use of the VIC model outputs to evaluate exposure; VIC attributes evaluated by pilots included runoff, baseflow, and snow water equivalent.

Several pilot forests employed projections of changes to flow characteristics. These were selected because of their important influence on habitat for species of concern. Flow

metrics were also useful in describing relative exposure of water uses. In contrast, predictions of peak- and low-flow responses to climate change are limited and consist primarily of generalized predictions of higher peaks and more severe droughts with warming climate (Casola et al. 2005). Only the Sawtooth NF applied a tool useful in describing exposure relative to increased peak flows and infrastructure. This analysis used the VIC-generated "Winter 95" metric. Winter 95 represents the number of days during winter that are among the highest 5 percent of flows for the year. Winter was defined as Dec. 1–Feb. 28. Changes in Winter 95 were determined by comparing the increase in the number of days with the highest 5 percent of flows between current and predicted conditions (2040 and 2080). Subwatersheds with less than a 0.5-day increase were considered low risk, those with 0.5- to 2-day increases were considered moderate risk, and subwatersheds with increases greater than 2 days were considered high risk. Results of this analysis for 2040 are depicted in figure 9.

At first glance, the difference in metrics and the level of detail might suggest that pilot forests took very different paths in their characterization of exposure. In fact, all took very similar approaches. All used review of historical data to display the trend in local climatic conditions. All pilot forests also first looked at projected temperature and precipitation changes. Sometimes this information had been compiled for states, sometimes for river basins or larger geographical areas. The commonality is that the analysis was broad scale. Next, pilot forests considered what impacts the climatic changes would have on hydrologic processes, and then how the hydrologic changes would affect water resources. Differences in pilot outputs resulted from decisions made at this point, primarily influencing the level of detail used to characterize the hydrologic changes. Perhaps the most valuable lesson learned by pilot forests in assessing exposure was that you do not have to become a climate scientist to do a climate change vulnerability assessment.




Figure 9—Winter peak flow risk from the Sawtooth National Forest watershed vulnerability assessment; showing current data (top) and projected data for 2040 (bottom). Ratings for subwatersheds are highest risk (red), moderate risk (yellow), and lowest risk (green). Ratings were developed by assessing change to frequency of highest streamflows occurring during the winter. Red lines are hydrologic unit code level 4 (HUC-4) boundaries.

**Important Considerations in Evaluating Exposure**

- Quantify trends in available, relevant, historical climate datasets. Local and regional data that display significant changes demonstrate the likelihood that changes will continue into the future. Observed changes and trends in ecosystem traits, such as ice duration, species phenology, and species composition, are of great value.
- Use best available climate change projections. Focus on near-term timeframes.
- Identify the effects of a changing climate on watershed processes to inform iterations of exposure data acquisition and assessment.
- Identify hydrologic processes important to the identified resource value.
- Determine how projected changes in hydrologic processes might affect each resource value.
- Quantify the relative magnitude of differences in effects, including spatial and temporal variability.
- Include disturbance regimes in the analysis and quantify disturbance-related effects.
- Document critical data gaps, rationale, and assumptions for inferences, references for data sources, and confidence associated with assessment outputs.

## Evaluate Watershed Sensitivity

*Models are tools for thinkers, not crutches for the thoughtless.*

—Michael Soulé

The goal of assessing sensitivity was to place areas (subwatersheds) into categories based on how they would respond to the expected climate-induced changes to hydrologic processes. The sensitivity of watersheds to any change is partially a function of parent geology, soils, typical climate, topography, and vegetation. Human influences also affect watershed resilience, depending on the extent and location of management-related activities.

The Forest Service often evaluates watershed condition; watershed specialists routinely describe watershed condition in National Environmental Policy Act (NEPA) analyses, and many national forests have watershed or aquatic species restoration plans in place that weigh heavily on assessments of watershed condition. Several pilot forests were able to take advantage of existing watershed condition ratings and apply them to their WVA. This included use of the Blue Mountains Forest Plan Revision watershed condition (Umatilla NF) and "Matrix of Pathways and Indicators" determination of watershed condition factors in conjunction with Endangered Species Act compliance for several salmonid species (Helena, Gallatin, and Sawtooth NFs).

Sensitivity indicators were selected that most influenced the hydrologic process and water resource value in question. Some indicators tend to dampen effects (buffers) and others to amplify effects (stressors). For example, road density may amplify peak flow response and the potential for flood damage to vulnerable infrastructure near streams. In contrast, investment in road improvements such as disconnection of road surfaces from streams would tend to buffer effects.

Attributes selected by pilot forests to characterize sensitivity included both intrinsic factors and anthropogenic or management-related factors (table 5). In some cases, pilot forests termed the "natural" factors as sensitivity, and the anthropogenic factors as risks, combining the two types of indicators to derive a measure of sensitivity. Most pilots included both types of indicators (intrinsic and anthropogenic), although two pilots (Chequamegon-Nicolet and Ouachita NFs) employed only intrinsic factors, and the Coconino NF selected only factors that related to management activities. A sample output (relative erosion

**Table 5—Attributes most commonly used in assessing sensitivity by the pilot forests**

| Intrinsic | Anthropogenic |
|---|---|
| Geology | Road density |
| Soil types | Road-stream proximity |
| Risk of mass wasting | Road crossings |
| Ground water baseflow | Range condition |
| Slope | Water diverted |
| Aspect | Vegetation condition |

sensitivity of subwatersheds on the GMUG NFs) is shown in figure 10. Soil hydrologic groups used to classify watershed sensitivity on the Chequamegon-Nicolet NF are shown in figure 11.

The Chugach NF assessment used many of the same sensitivity attributes as the other pilot forests, but the approach differed in that the analysis consisted of comparing two watersheds with significant management activity (primarily undeveloped watersheds or those in wilderness were not included).

Ratings from National Watershed Condition Classification were used in the sensitivity evaluation by the Coconino and Gallatin NFs. The Coconino was completing the condition classification at the same time the WVA was underway, and staff realized the utility that data developed would have in both efforts. The Coconino used few intrinsic factors to characterize watershed sensitivity. Most were derived from the Watershed Condition Classification (fig. 12). The Gallatin NF characterization of sensitivity had two components: one included intrinsic watershed attributes, the other included levels of disturbance. The Watershed Condition Classification ratings of "functioning," "functioning at risk," and "nonfunctioning" were used to characterize disturbance. Because national forests and grasslands now have completed the Watershed Condition Classification, these data would be useful in conducting future WVAs.

Pilot forests that took advantage of existing condition ratings tended to apply them to all resource issues. Several pilots, however, identified different indicators for each resource value. Although many indicators are important influences on multiple water resources, some are not. For instance, the most important factors affecting peak




Figure 10—Erosion sensitivity rating from the Grand Mesa, Uncompahgre, and Gunnison National Forests watershed vulnerability assessment. This rating was derived from subwatershed characterizations of runoff potential, rainfall intensity, stream density, density of response channels, and mass wasting potential.




Figure 11—Average annual difference in potential ground water recharge by hydrologic soil group (HSG) (2046–2065 minus 1971–1990). HSG was one of two sensitivity attributes applied to the ground water resource issue in the Chequamegon-Nicolet National Forest watershed vulnerability assessment.

| Aquatic biological | Terrestrial physical | Terrestrial biological |
|---|---|---|
| • Life form presence | • Density | • Fire condition class |
| • Native species | • Road maintenance | • Wildfire effects |
| • Exotic and/or invasive species | • Proximity to water | • Loss of forest cover |
| • (Riparian) vegetation condition | • Mass wasting | • (Rangeland) vegetation condition |
| | • Soil productivity | • (Riparian) invasive condition |
| | • Soil erosion | • (Forest) insects and disease |
| | • Soil contamination | |

Figure 12—Watershed condition factors from the Forest Service Watershed Condition Classification. Aquatic-physical attributes are not included. Factors shown in blue are those used as sensitivity indicators in the Coconino National Forest watershed vulnerability assessment.

flows and infrastructure may differ from those that most influence springs and other aquatic habitats.

Pilot forests took several approaches to developing ratings of watershed sensitivity. In the simplest applications (Ouachita and Chequamegon-Nicolet NFs), sensitivity indicators (e.g., basin slope, peat land type) were used to place watersheds into different categories. Other pilot forests produced sensitivity ratings based on numerous indicators. When multiple indicators were used, pilots developed methods of weighting and rating the relative influence of the attributes. For example, when considering influences on stream habitat, the amount of water withdrawn from a subwatershed is likely more important than the condition of terrestrial vegetation, and would therefore be given greater weight in calculating a sensitivity score. One approach to weighting sensitivity indicators, from the White River NF assessment, is shown in table 6. In several cases, pilot forests distinguished intrinsic and anthropogenic factors, and used a categorical matrix approach to combining and categorizing sensitivity, into a single rating. An example of such an approach (from the GMUG NFs) is displayed in figure 13.

On the Sawtooth NF, assessment of watershed condition was aided by use of Bayesian belief networks (Lee and Rieman 1997). The networks were used to evaluate relative differences in predicted physical baseline outcomes. The basic structure employs a box-and-arrow diagram depicting hypothesized causes, effects, and ecological interactions (see fig. 14). The system was used to weight the relative importance of, and connections between, a comprehensive list of intrinsic and management attributes, and watershed and habitat elements. As with the other pilot assessments, results from this process were used to rate watershed condition as high, moderate, or low.

Although there was no detailed comparison of the products developed from these varied approaches, they

**Table 6—Summary of attribute types affecting subwatershed resilience to climate change (White River National Forest)**

| Subwatershed attribute | Type of attribute | Relative weight | Net effect relative to climate change |
|---|---|---|---|
| Geochemistry of parent geology | Inherent to watershed | 0.25 | Buffer |
| Extent of glaciation | Inherent to watershed | 0.75 | Buffer |
| Aspect | Inherent to watershed | 0.50 | Additive |
| Hydroclimatic regime | Inherent to watershed | 1.0 | Additive |
| Weighted precipitation | Inherent to watershed | 1.0 | Buffer |
| Extent of surface water features | Inherent to watershed | 1.0 | Buffer |
| Extent of large-scale pine beetle mortality | Inherent to watershed | 0.5 | Buffer (short term) |
| Water uses | Anthropogenic | 1.0 | Additive |
| Development (primarily roads) | Anthropogenic | 0.5 | Additive |
| Extent of beetle salvage | Anthropogenic | 0.5 | Additive (short term) |

| Sensitivity × Stressors Risk Ranking Matrix | | Stressors | | |
|---|---|---|---|---|
| | | Low | Moderate | High |
| Sensitivity | Low | Low | Low | Low |
| | Moderate | Low | Low | High |
| | High | High | High | High |

Figure 13—Scheme used to rate watershed sensitivity on the Grand Mesa, Uncompahgre, and Gunnison National Forests. The matrix combines ratings for watershed stressors and sensitivity. Ratings of erosion sensitivity (six elements) and runoff sensitivity (seven elements) were combined to produce the sensitivity rating. The stressor rating was derived by combining ratings of past management (two elements), roads (three elements), vegetation treatments, private land, and mining.

had one thing in common: they all made use of available information to the greatest degree possible. By using existing condition or sensitivity ratings or developing them from scratch, each pilot forest produced useful ratings of watershed vulnerability. It is very important to determine what intrinsic and management-related attributes are important influences on watershed condition, as they strongly affect the selected water resources. If available data, analyses, or assessments include attributes that match those identified in the WVA process or may serve as surrogates, it makes sense to use them.

**Important Considerations in Evaluating Sensitivity**

- Determine the intrinsic factors (such as geology, soils, and topography) affecting the hydrologic processes of concern—those that can most affect the resource values.
- Determine the management factors (such as roads and reservoirs) affecting the hydrologic processes of concern.
- Determine if management activities will serve as buffers or stressors.
- Consider weighing the relative importance of the buffers and stressors in influencing condition and response.
- Evaluate trends or expected trends in stressors, and how management actions and restoration could affect them.

The sensitivity evaluation typically resulted in maps showing relative sensitivities of subwatersheds. Two examples of this type of product are displayed. Figure 15 shows the sensitivity rating from the Umatilla NF, where (like the GMUG example) a matrix was used to produce a combined rating of intrinsic and anthropogenic factors. A combined sensitivity rating was applied to a composite of resource values. The Coconino NF developed different sensitivity ratings for each water resource issue (fig. 16).

Recent trends and projected future trends in resource conditions should also be included. For example, increased water diversion could exacerbate effects on a resource, whereas anticipated road improvements could improve condition and reduce effects that might otherwise occur.




Figure 14—Bayesian belief network for determining overall physical condition, from the Sawtooth National Forest watershed vulnerability assessment. Contributing factors included habitat access, flow, channel condition, habitat elements, water quality, and watershed conditions.




Figure 15—Composite rating of watershed sensitivity from the Umatilla National Forest. Factors used in the rating include ground-water dependence, watershed restoration investment category, road density, near stream road length, road grade, range condition, forest vegetation condition, and aquatic habitat condition. White areas have no National Forest System ownership.




Figure 16—Watershed sensitivity for stream habitats, Coconino National Forest. Attributes contributing to this rating were derived from the forest's watershed condition classification. Stressors included water diversions, terrestrial vegetation condition, riparian vegetation condition and invasive species, road proximity to streams, and wildfire. Buffers included holding instream water rights and degree of implementation of regional ground-water policy.

Case No. 1:23-cv-01501-RMR Document 16-4 filed 09/29/23 USDC Colorado pg 212 of 459



## Evaluate and Categorize Vulnerability

> *Climate change is a risk-multiplier... any decline in the ecological resilience of one resource base or ecosystem increases the fragility of the whole.*
>
> —Charles, Prince of Wales, addressing United Nations climate conference COP15 in Copenhagen (December 2009)

A relative rating of vulnerability of water resources to climate change was produced by combining information from the evaluation of resource values, exposure, and sensitivity. Pilot forests used a variety of approaches to complete this step. Primary determinants were the number of water resources selected for analysis, and the way that values, sensitivities, and responses had been described. Some pilot forests classified vulnerability based on a threshold or ecological value (such as the amount of wetland area in each watershed, as shown in the Chequamegon-Nicolet example in fig. 17). The most common approach used by pilot forests was to merge the location of values with ratings of watershed sensitivity, and then overlay that summary rating with differences in exposure. The result of combining these elements is a classification, typically by subwatershed (HUC-6), that displays the relative vulnerability of the identified values. All pilot forests provided a narrative and mapped their results. Some pilots combined resource values in the analysis (see fig. 18), and others displayed resource values separately (figs. 17 and 19). The GMUG NFs' summary rating of vulnerability was presented in tabular format (table 7). The GMUG assessed exposure and rated vulnerability at the watershed scale. The GMUG's adjusted vulnerability ranking combines the ratings of values, sensitivity, and exposure.

Based on its strong partnership with RMRS and its access to considerable habitat condition data (including stream temperature data), the Sawtooth NF conducted the most detailed evaluation. The Sawtooth analysis included assessing the effects of potential changes to stream temperature and flow on bull trout. Potential temperature effects were analyzed by summarizing the available stream miles that were within or exceeded 15 °C within each bull trout patch for 2008, 2040, and 2080 timeframes. Impacts on both low flow and winter flows were also assessed. Change




Figure 17—Classification of climate-change risk to wetlands on the Chequamegon-Nicolet National Forest. The rating is based on the proportion of total wetland and acid wetland within the national forest boundary in each HUC-6 subwatershed. Total wetland area ranged from 0 to 55.8 percent of the area for all HUC-6 watersheds. The HUC-6s with less than 10 percent were rated "low," those with 10 to 30 percent were rated "moderate," and those with greater than 30 percent were rated "high." The HUC-6s with less than 5 percent acid wetland area were rated "low," those with 5 to 15 percent were rated "moderate," and those with greater than 15 percent were rated "high," and above that value were "very high." These two risk classes were combined to form one vulnerability classification for each watershed.



FS-002974

in mean summer flow was evaluated by looking at the percentage of change in flow from current to 2040 and 2080. Changes of less than 20 percent of baseflow were considered low risk, 20 to 40 percent were considered moderate, and greater than 40 percent were considered high risk. Winter flow analysis compared how the number of days with the highest 5 percent flows increased from current to 2040 and 2080. Subwatersheds with less than a 0.5-day increase from current conditions were considered at low risk, 0.5- to 2-day increase were considered at moderate risk, and greater than 2-day increase from current conditions were considered at high risk. Once the individual elements were analyzed, a Bayesian Belief Network was used to rate the impact of the change on bull trout population persistence. The vulnerability rating resulting from this process (the extinction risk for bull trout) is shown in figure 20.

On the Ouachita NF, predicted changes to precipitation were applied to WEPP:Road modeling of road sediment production and compared to modeled estimates of existing condition. Changes in future conditions were then compared to existing correlations between aquatic assemblages and sediment production, which include high, moderate, and low risk categories. In this case, the assessment illustrates the differences in risk categories that exist presently, and those projected to result from climate change.

As with some other aspects of the WVA, the Chugach NF took a different approach to assessing vulnerability, owing to the fact that they analyzed only the two subwatersheds in their analysis area that are subject to management activities. Their objective was to look at those two subwatersheds and identify specific vulnerabilities and possible mitigations. The Chugach assessment focused on potential changes to salmonid habitat. The creeks and tributaries in the two subwatersheds are currently cold enough that the projected increase in water temperatures would not exceed optimal temperatures. The key concern was the unknown response of other organisms (including aquatic invertebrates). Of specific interest was whether increased water temperatures would alter the life cycles of prey species currently synchronous with newly emerged salmon fry.




Figure 18—Vulnerability ratings from the Coconino National Forest. The map displays the subwatersheds with the highest density of water resource values (native fishes, amphibians, water uses, stream habitat, riparian and spring habitat, and infrastructure) that also have high or moderate sensitivity and high or moderate exposure.




Figure 19—Climate change vulnerability rating for the water uses resource value, White River National Forest. Red shading depicts subwatersheds with the highest vulnerability. Points of diversion for water uses are shown as black dots.

**Table 7—Vulnerability ratings from the Grand Mesa, Uncompahgre, and Gunnison National Forests[a]**

| Geographic areas | Exposure ranking | Value risk ranking (weighted average) | Vulnerability ranking[b] | Adjusted vulnerability ranking[c] |
|---|---|---|---|---|
| Uncompahgre | 6 | 1 | 7/12 = | 0.583 |
| Grand Mesa | 5 | 2 | 7/12 = | 0.584 |
| San Juans | 4 | 6 | 10/12 = | 0.836 |
| West Elk | 3 | 3 | 6/12 = | 0.502 |
| Upper Taylor | 2 | 5 | 7/12 = | 0.585 |
| Cochetopa | 1 | 4 | 5/12 = | 0.411 |

[a] Exposure was ranked for the six landscape units (a composite of HUC-6 subwatersheds) on the forest (1 is the lowest), based on biggest change in annual average maximum temperature, annual average minimum temperature, and percentage of change in annual aridity index. Value risk ranking is the highest risk to values based on weighted average of acres × count of high rankings for each subwatershed.

[b] Exposure ranking + value risk ranking)/12.

[c] Upper Taylor adjusted > Grand Mesa and Uncompahgre (area in high risk); Grand Mesa adjusted > Uncompahgre (higher concentration of values).




Figure 20—Predicted bull trout persistence in 2040 for subwatersheds in the Sawtooth National Recreation Area. Red-shaded subwatersheds are at high extinction risk, yellow-shaded are at moderate risk, and green are at low risk (subwatersheds without bull trout are not colored). Red lines are HUC-4 boundaries.

Pilot forest staff brought a variety of skills and backgrounds to their assessments. Some assessments were prepared by teams, some primarily by one person. In addition, there was great variation in the types and amount of available information. Despite these differences, each pilot forest was able to conduct an assessment and report the results in an effective way. There were many differences in how the individual steps were approached, and the results reflect these differences. All the vulnerability ratings were derived by combining values, sensitivity, and exposure. We believe that the performance of the pilots in completing meaningful assessments using the basic process should encourage other units desiring to conduct vulnerability assessments.

### Important Considerations in Evaluating Vulnerability

- Identify where the location of water resource values overlaps with highest sensitivity and greatest exposure.
- Determine how changes in hydrologic processes affect water resource values.
- Determine the relative vulnerabilities of watersheds across the assessment area (e.g.: low, moderate, high) to inform priorities for adaptive response to predicted climate change.

## Identify Adaptive Management Responses

*Nobody made a greater mistake than he who did nothing because he could only do a little.*

—Edmund Burke

Each pilot forest produced an assessment that effectively displays the location of water resources of concern, key climate change metrics, and watershed sensitivities of the resources to the projected changes. The combination of these elements yielded relative ratings of watershed vulnerability to climate change. As such, the assessments met the objective of providing managers with information necessary to identify priority areas to undertake management actions.

Management priorities should focus on maintaining or improving watershed resilience. Resilience is the capacity of an ecosystem to respond to a perturbation or disturbance by resisting damage and recovering quickly (Holling 1973). By definition, resilient watersheds are better able to continue delivery of ecosystem services when subjected to ecological change, including changes that might result from a warming climate. A related assumption is that watershed resilience is closely tied to watershed sensitivity. Watershed resilience is a product of both inherent sensitivity and anthropogenic influences on watershed condition.

The results of the WVAs will be useful in development of management options and strategies. This includes discussion of which vulnerability classes should be highest priority for management actions. If, for instance, a highly valued water resource has a very limited distribution, management options are limited. If the value is more widely dispersed, managers must decide if the most vulnerable areas should be highest priority, or if they should focus their efforts on sustaining the values in areas with lower vulnerability. Scale must be considered in this discussion. Naturally, for resources (especially species) whose range is greater than the analysis area, discussion of results with other land managers will be necessary.

The greatest value of WVA results is in identifying geographical areas that are priorities for actions designed to maintain or improve watershed resilience. Several pilot forests are already using the results to this end. The recently completed Watershed Condition Classification (fig. 21) led to the designation of priority subwatersheds for improvement actions. The connection of the WVA to setting these priorities is clear. One pilot forest (Coconino NF) applied WVA findings during this priority-setting process. On many national forests and grasslands, strategic plans have been developed to guide restoration and management efforts. In these cases, the vulnerability assessment process will be used to reassess existing priorities and to determine if changes are warranted. None of the pilot forests was engaged in land management planning during the WVA, but results have clear application to that effort in helping to identify priority areas for management.

One pilot forest (Ouachita NF) incorporated potential management actions in its sensitivity ratings. A tabular result from the Ouachita (table 8) displays the number of subwatersheds in different watershed risk classes. These ratings were derived from estimates of current and future sediment production. In this assessment, future changes to

### *Assessment Principle Six*

#### Keep the end product in mind

A plethora of climate change exposure data are now available. Models are continually refined. The number, types, and detail of climate projections can be confusing and overwhelming. Managers and analysts should realize that projections have substantial uncertainty and that uncertainty grows with down-scaling and time.

Most pilot forests structured their analyses such that actual values for temperature changes, runoff changes, etc., were not critical. The focus was, instead, on the ranges and direction of projected changes.

This approach was appropriate, because the objective was to produce a relative vulnerability rating to inform decisions about priority areas for management.

Periodically reflecting on the goal—what decisions need to be informed—helps put the need for data and precision in perspective. The necessary depth of analysis is that which will produce these relative ratings.




Figure 21—U.S. Department of Agriculture Forest Service Watershed Condition Framework. Watershed vulnerability assessments contribute directly to steps 1, 2, and 3.

**Table 8—Vulnerability ratings (by risk class) of subwatersheds on the Ouachita National Forest, as influenced by climate change scenarios and application of road management actions (maintenance to standard and closure of user-created trails)**

| | Climate change scenarios | | | | | |
|---|---|---|---|---|---|---|
| Risk | 2010 current | 2010 with road management | 2050 B1 | 2050 B1 with road management | 2080 B1 | 2080 B1 with road management |
| High | 88 | 82 | 93 | 85 | 93 | 85 |
| Moderate | 46 | 40 | 42 | 43 | 42 | 43 |
| Low | 56 | 68 | 55 | 62 | 55 | 62 |
| | 2050 A1B | 2050 A1B with road management | 2080 A1B | 2080 A1B with road management | | |
| High | 105 | 96 | 105 | 96 | | |
| Moderate | 44 | 43 | 45 | 43 | | |
| Low | 41 | 51 | 40 | 51 | | |

precipitation were predicted to increase sediment production, with subsequent impacts on aquatic communities. Shown are the projected change in watershed condition class caused by climate changes from conditions in 2010 to those projected for 2050 and 2080, and potential modifications to the response from road management activities. The analysis demonstrates that implementation of road management activities could reduce the number of subwatersheds with high risk ratings. In terms of setting priorities for management, subwatersheds where implementation of road improvements would reduce vulnerability should be considered for high priority.

Road improvements were identified as a key action to improve condition and resilience of watersheds on all the pilot forests. In addition to treatments that reduce erosion, road improvements can reduce the delivery of runoff from road segments to channels, prevent diversion of flow during large events, and restore aquatic habitat connectivity by providing for passage of aquatic organisms.

As stated previously, watershed sensitivity is determined by both inherent and management-related factors. Managers have no control over the inherent factors, so to improve resilience, efforts must be directed at anthropogenic influences such as instream flows, roads, rangeland, and vegetation management.

In subwatersheds with the highest vulnerability, any activity that maintains or increases water quantity or quality would ultimately be beneficial. In addition to roadwork, management actions to maintain or improve resilience could include contesting new water rights proposals, exploring ways to convert existing water rights into instream flows, improving conditions in grazing allotments, restoring natural function in meadows, and implementing silvicultural treatments aimed at moving toward more natural fire regimes.

Results from WVA can also help guide implementation of travel management planning by informing priority setting for decommissioning roads and road reconstruction/maintenance. As with the Ouachita NF example, disconnecting roads from the stream network is a key objective of such work. Similarly, WVA analysis could also help prioritize aquatic organism passage projects at road-stream crossings to allow migration by aquatic residents to suitable habitat as streamflow and temperatures change.

Pilot forests in the Rocky Mountains recognized the utility of WVA results in selecting the subset of high-vulnerability watersheds in areas with high pine beetle mortality. These areas are of high priority for upgrades of road-stream crossings to protect them from floods and debris flows. The same watersheds are also priorities for vegetation management to enhance natural reproduction, hydrologic recovery, stream shading, and future large woody debris recruitment. Both sets of actions would improve watershed condition and resilience.

Not all the findings in the vulnerability assessments are good news. In some cases, projected changes may indicate that maintaining certain water resources (especially aquatic species) may be extremely difficult, even with restoration or improved management. In such cases, results from the vulnerability assessment may be used to rethink local or broad-scale improvement or protection strategies to prioritize limited management resources.

The rating of vulnerability is based almost entirely on ecological considerations. Management activities are a key component in assessing watershed sensitivity, but only in terms of how they influence water resource values through hydrologic processes. Although such characteristics are significant, social, economic, and administrative factors may be more important in determining where management activities can be effectively undertaken. Such factors include availability of expertise, land ownership, the presence of willing partners, land and resource management planning guidance, and opportunities for internal or external funding. These factors need to be considered when determining where management activities should be focused.

Almost all the pilot forests encountered data gaps, and all encountered uncertainties during their analyses. Such data gaps (e.g., distribution of key species and uncertainty on road condition in key watersheds) can be used to identify inventory or monitoring priorities. Results from these efforts can, in turn, improve the utility of management and restoration plans.

It is noteworthy that the specific management activities discussed above, including road improvements, improving aquatic organism passage, thinning forests to improve stand resilience, and improving range condition, are not new treatments designed to address climate change. Rather, they are activities for which wildland resource managers have a long record of accomplishment. In land management and statutory jargon, they are established Best Management Practices (USDA FS 2012). Climate change increases the need for application of these practices nearly everywhere.

### Important Considerations in Applying the Assessment Results

- Consider whether additional information, analysis, or consultation is needed before setting priorities.
- Identify approaches that can enhance resilience sufficiently to protect resource values.
- Consider which effects of climate change might be irreversible, and how that can inform priority setting.
- In places where vulnerabilities are high, can resource values be sustained?
- Determine how management actions from watershed vulnerability assessment can be integrated into existing programs and priorities.
- Identify management practices that would enhance resilience in both the short and long term, and assess the magnitude of treatment that would be required to meet improvement objectives.
- Determine if land ownership patterns and administrative status of National Forest System lands are conducive to planning and implementing treatments.
- Identify areas where partnerships would improve the likelihood of success.
- Determine if sufficient technical and financial capacity is available to implement treatments.

## Critique the Assessment

*Test fast, fail fast, adjust fast.*

—Tom Peters

The purpose of the WVA pilot was to determine if worthwhile assessments could be conducted with available information and expertise. Within a relatively short period of time and despite limited funding and other pressing business, watershed and aquatic specialists from the pilot forests were able to develop a watershed-vulnerability approach and complete useful assessments. Four pilot forests were able to complete the process within 8 months, and an additional five were completed within a year.

With an eye toward sharing approaches and experiences, each pilot forest was asked to critique its assessment. These reviews are key in applying the principles of adaptive management to the vulnerability assessments. In this final section, we discuss how access to information affected the assessments and share additional lessons learned by the pilots.

### Data Gaps and Uncertainty

Assessing the sensitivity and vulnerability of watersheds to climate change is complex. At each step of the assessment process, pilot forests encountered data gaps and uncertainty. Uncertainty was prevalent in estimates of exposure, but each analytical step contained some uncertainty (e.g., the expected response of hydrologic processes to climate change, and the response of aquatic resources to the hydrologic change).

Lack of information also contributes to uncertainty; at the least, it limits the detail of the assessment. Every pilot forest identified data needs, and each made assumptions about system responses and interactions. These were captured in the pilot reports as monitoring needs and included validating assumptions made in the assessment, tracking trends in key resource values, and providing data to inform key adaptive responses.

Acquiring and applying data to improve the analysis would produce assessments with a higher level of confidence, but lack of data should not be used as a reason for not conducting an assessment. Some pilot forests were data-

rich, in terms of water resource, watershed sensitivity, and exposure information, and some were data-poor. Despite these differences, all were able to apply the available information and complete a vulnerability assessment. Again, the objective of producing a relative rating of vulnerability (rather than a more rigorous, quantitative description of vulnerability) explains the favorable outcome.

## Other Lessons Learned

The pilot assessment effort was successful in that it demonstrated that vulnerability assessments could be completed by national forest staff using existing information and tools. Some of the primary reasons for this success have already been discussed; a few others are worth noting.

Although we have discussed how availability of data influenced the results, we have not articulated the importance of the data format. National forests with digital data progressed much faster than those that had to convert paper summaries to digital formats. In some cases, lack of useable data caused elements of the assessment (e.g., sensitivity factors) to be deferred. Ideally, necessary data would be gathered and prepared in anticipation of assessments. A credible expectation that watershed vulnerability assessments will occur could help make this happen.

Connection of the pilot forests with ongoing climate change research and experienced scientists resulted in a more detailed analysis. The partnership between the Sawtooth NF and RMRS yielded the most detailed pilot assessment. Collaborative work in downscaling climate change projections to assess potential changes in stream temperature was underway, and was well utilized by the Sawtooth. Connection to sources of exposure data (especially CIG) also aided pilot forests.

As with most endeavors, the resulting products were strongly influenced by the experience and expertise of those participating. Participants with the greatest localized knowledge of forest resources and interactions tended to have the easiest time with the process. Use of the pilot participants as trainers or facilitators for future assessments would streamline and focus those efforts.

At the outset of the pilot project, several national forests declined to participate, owing to other priorities. The reality is that all participating national forests managed to work on the WVA despite heavy workloads. Agreeing to participate in the WVA process reflected recognition of the potential value of conducting WVAs. Pilot forests where line and staff were more engaged with the assessments made resources (interdisciplinary team members and geographic information system expertise) available to project leads, generally completed assessments sooner, and produced assessments of greater depth and detail.

Recently available electronic communication tools that facilitate information exchange proved extremely useful to the pilot effort. The pilot project applied both a collaborative Web space (a wiki bulletin board and a file repository) and videoconferencing to great advantage. Pilot leads were located across the country; monthly videoconferencing facilitated sharing of information and approaches, and helped cultivate a community of practice. The collaborative Web space proved a very effective means of sharing written information, publications, announcements, and Web links. The exchange of information enabled team members to learn from each other about processes and approaches that were working, and those that were posing difficulties. As a result, individual pilot efforts were strongly influenced

**The Forest Service Climate Change Resource Center**

The Climate Change Resource Center (CCRC) (http://www.fs.fed.us/ccrc) provides land managers with an online portal to science-based information and tools concerning climate change and ecosystem management options. The CCRC's objectives are to

- Synthesize scientific literature on ecosystem response, adaptation, and mitigation;
- Highlight recent scientific research that has practical applications for practitioners on public and private lands;
- Support communication of information through a user-friendly interface and appropriate use of multimedia; and
- Work with scientists to develop educational resources.

by each other. Readers who anticipate conducting an assessment are encouraged to contact members of the pilot assessment team, who can provide advice and counsel.

Finally, it is clear that establishing an analytical methodology was of great value. As the WVA pilots evolved, participants made modifications to meet their needs, but the basic approach provided a consistent framework for pilot forests to apply. The success of the pilots, which encompass a wide range of geographies, uses, and sensitivities, demonstrates that the conceptual basis of the approach is sound and likely applicable across the entire NFS. It will probably be applicable for all types of climate vulnerability assessments, not just water resources. Also of note is that we defined the component vulnerability terms at the outset, as this can be a source of confusion and unproductive debate; consistently sticking to and applying the terminology throughout the process assisted in moving the assessments forward.

## Summary

Observations clearly demonstrate that the Earth's climate is warming and ecosystems are changing in response. Climate models predict substantial additional changes to worldwide temperatures and hydrologic processes throughout the 21st century. These changes will have complex and variable effects on the Nation's watersheds and affect their ability to sustain the ecosystem services upon which people depend. These effects pose significant challenges to the Forest Service and other land management agencies. To date, limited resources have been directed specifically towards planning for or responding to these changes on national forests and grasslands. This is largely because managers have limited experience applying global- or regional-scale climate change information at the local scale. This has led to uncertainties about likely impacts and appropriate responses for individual national forests or grasslands.

To address this need, we implemented a Pilot Watershed Vulnerability Assessment Project that developed and tested a process that national forest personnel can use to complete useful, locally based assessments of water resource vulnerability to climate change. These evaluations followed a process patterned after watershed analysis on federal lands in the Pacific Northwest (USDA FS 1995). The assessments covered relatively large areas (e.g., entire national forests) with modest investments of time and effort. Regional climate projections, local historical data, and the Watershed Condition Classification recently completed by all national forests in the United States (http://www.fs.fed.us/publications/watershed) provided a solid base of information to support the assessments.

In conducting the vulnerability assessments, forest staff became familiar with available historical climate data and climate projections for their geographic areas. Sorting through this information and learning how to use it was an important step in the process. Many forests found that partners had already compiled climate data and projections that could be used for the forest-level assessments. Knowing future climates precisely or accurately is not possible, but this was not a barrier to producing effective, efficient, informative assessments.

In addition to climate data, the pilot assessments used existing information on watershed sensitivity and water resource values, data with which land managers are familiar and rely upon in many resource decisionmaking processes. The resulting assessments provided place-based identification of priority areas, with discernment of the watersheds most vulnerable and most resilient to climate change.

Assessing vulnerability is the essential first step in adapting to climate change, and this information provides a basis for managers to target investment of limited resources to sustain or improve watershed resilience. The good news is that the knowledge and tools to maintain and improve watershed resilience are already in place, while the National Watershed Condition Framework (USDA 2011a) serves as a foundation for setting priorities and restoring watersheds and watershed services. Other Forest Service programs to improve watersheds, meadows, and streams include diverse partners and programs across the country (Furniss et al. 2010). Implementation of this wide array of management activities is supported by decades of technical experience in planning, analysis, and collaboration. These existing core strengths can be effectively applied to address the growing challenge to public natural resources posed by our changing climate.

## References

**Barsugli, J.J.; Mearns, L.O. 2010.** Climate change scenarios for the Gunnison Basin. In: Neely, B.; McCarthy, P.; Cross, M.; Enquist, C.; Garfin, G.; Gori, D.; Hayward, G.; Schulz, T., eds. Climate change adaptation workshop for natural resource managers in the Gunnison Basin. Gunnison, CO: The Nature Conservancy: 12–14.

**Casola, J.H.; Kay, J.E.; Snover, A.K.; Norheim, R.A.; Whitely Binder, L.C.; Climate Impacts Group. 2005.** Climate impacts on Washington's hydropower, water supply, forests, fish and agriculture. Seattle, WA: Center for Science and the Earth System, University of Washington. 43 p.

**Elliot, W.J.; Foltz, R.B.; Luce, C.H. 1995.** Validation of water erosion prediction project (WEPP) model for low-volume forest roads. Conference proceedings, sixth international conference on low-volume roads. Washington, DC: Transport Research Board, National Academy Press: 178–186.

**Furniss, M.J.; Staab, B.P.; Hazelhurst, S.; Clifton, C.F.; Roby, K.B.; Ilhadrt, B.L.; Larry, E.B.; Todd, A.H.; Reid, L.M.; Hines, S.J.; Bennett, K.A.; Luce, C.H.; Edwards, P.J. 2010.** Water, climate change, and forests: watershed stewardship for a changing climate. Gen. Tech. Rep. PNW-GTR-812. Portland, OR: U.S. Department of Agriculture, Forest Service, Pacific Northwest Research Station. 75 p.

**Gao, H.; Tang, Q.; Shi, X.; C.; Bohn, T.J.; Su, F.; Sheffield, J.; Pan, M.; Lettenmaier, D.P.; Wood, E.F. [N.d.].** Water budget record from variable infiltration capacity (VIC) model. In: Algorithm Theoretical Basis Document for Terrestrial Water Cycle Data Records. Manuscript in preparation. http://www.hydro.washington.edu/SurfaceWaterGroup/Publications/Water_Cycle_MEaSUREs_ATBD_VICmodel_submit.doc.

**Gardali, T.; Seavy, N.E.; DiGaudio, R.T.; Comrack, L.A. 2012.** A climate change vulnerability assessment of California's at-risk birds. PLoS One. 7(3): e29507. doi:10.1371/journal.pone.0029507.

**Glick, P.; Stein, B.A.; Edelson, N.A., eds. 2011.** Scanning the conservation horizon: a guide to climate change vulnerability assessment. Washington, DC: National Wildlife Federation. 168 p.

**Hamlet, A.F.; Lee, S.; Mickelson, K.E.B.; Elsner, M.M. 2009.** Effects of projected climate change on energy supply and demand in the Pacific Northwest and Washington State. In: Littell, J.S.; Elsner, M.M.; Binder, L.C.W.; Snover, A.K., eds. The Washington Climate Change Impacts Assessment: evaluating Washington's future in a changing climate. Seattle, WA: University of Washington Climate Impacts Group: 165–190.

**Hamlet, A.F.; Mote, P.W.; Clark, M.P.; Lettenmaier, D.P. 2005.** Effects of temperature and precipitation variability on snowpack trends in the western United States. Journal of Climatology. 18: 4545–4561.

**Holling, C.S. 1973.** Resilience and stability of ecological systems. Annual Review of Ecology and Systematics. 4: 1–23.

**Lee, D.C.; Rieman, B.E. 1997.** Population viability assessment of salmonids by using probabilistic networks. North American Journal of Fisheries Management. 17: 1144–1157.

**Luce, C.H.; Holden, Z.A. 2009.** Declining annual streamflow distributions in the Pacific Northwest United States, 1948–2006. Geophysical. Research Letters. 36: L16401. doi:10.1029/2009GL039407.

**Luce, C.; Morgan, P.; Dwire, K.; Isaak, D.; Holden, Z.; Rieman, B. 2012.** Climate change, forests, fire, water, and fish: building resilient landscapes, streams, and managers. Gen. Tech. Rep. RMRS-GTR-290. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. 207 p.

**Luo, L.F.; Wood, E.F. 2007.** Monitoring and predicting the 2007 U.S. drought. Geophysical Research Letters. 34: 6.

**Mote, P.W.; Hamlet, A.F.; Clark, M.P.; Lettenmaier, D.P. 2005.** Declining mountain snowpack in western North America. Bulletin of the American Meteorological Society. 86: 39–49.

**Ray, A.J.; Barsugli, J.J.; Averyt, K.B.; Wolter, K.; Hoerling, M.; Doesken, N.; Udall, B.; Webb, R.S. 2008.** Climate change in Colorado: a synthesis to support water resources management and adaptation. Boulder, CO: Western Water Assessment. 52 p.

**Rice, J.; Tredennick, A.; Joyce, L.A. 2012.** Climate change on the Shoshone National Forest, Wyoming: a synthesis of past climate, climate projections, and ecosystem implications. Gen. Tech. Rep. RMRS-GTR-264. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. 60 p.

**Spears, M.; Brekke, L.; Harrison, A.; Lyons, J. 2009.** Literature synthesis on climate change implications for Reclamation's water resources. Technical memorandum 86-68210-091. Denver, CO: U.S. Department of the Interior, Bureau of Reclamation, Research and Development Office. 250 p.

**U.S. Department of Agriculture, Forest Service [USDA FS]. 1995.** Ecosystem analysis at the watershed scale. Federal Guide for Watershed Analysis. Portland, OR: Pacific Northwest Region, Regional Ecosystem Office. 26 p.

**U.S. Department of Agriculture Forest Service [USDA FS]. 2011a.** Forest Service watershed condition classification technical guide. FS-978. Washington, DC: U.S. Department of Agriculture, Forest Service, Watershed, Fish, Wildlife, Air, and Rare Plants Program. 41 p. http://www.fs.fed.us/publications/watershed/watershed_classification_guide.pdf. (19 June 2013).

**U.S. Department of Agriculture Forest Service [USDA FS]. 2011b.** Forest Service watershed condition classification framework. FS-977. Washington, DC: U.S. Department of Agriculture, Forest Service, Watershed, Fish, Wildlife, Air, and Rare Plants Program. 24 p. http://www.fs.fed.us/publications/watershed/Watershed_Condition_Framework.pdf. (19 June 2013).

**U.S. Department of Agriculture Forest Service [USDA FS]. 2012.** National Best Management Practices for water quality management on National Forest System Lands. Vol. 1. National Core BMP Technical Guide. FS-990a. Washington, DC. 165 p.

**Walker, B.; Holling, C.S.; Carpenter, S.R.; Kinzig, A. 2004.** Resilience, adaptability and transformability in social-ecological systems. Ecology and Society. 9(2): 5. http://www.ecologyandsociety.org/vol9/iss2/art5/. (19 June 2013).

**Williams, J.E.; Haak, A.L.; Neville, H.M.; Colyer, W.T.; Gillespie, N.G. 2007.** Climate change and western trout: strategies for restoring resistance and resilience in native populations. In: Carline, R.F.; LoSapio, C.; eds. Sustaining wild trout in a changing world. Proceedings of the wild trout IX symposium. Bozeman, MT: Joseph Urbani & Associates, Inc.: 236–246.

## Appendix: Pilot National Forest Reports

The 11 pilot reports discussed in this report are available online only at http:/www.fs.fed.us/pnw/pubs/pnw_gtr884_appendix.pdf.

**Pacific Northwest Research Station**

| | |
|---|---|
| **Web site** | http://www.fs.fed.us/pnw |
| **Telephone** | (503) 808-2592 |
| **Publication requests** | (503) 808-2138 |
| **FAX** | (503) 808-2130 |
| **E-mail** | pnw_pnwpubs@fs.fed.us |
| **Mailing address** | Publications Distribution<br>Pacific Northwest Research Station<br>P.O. Box 3890<br>Portland, OR 97208-3890 |


Federal Recycling Program
Printed on Recycled Paper

SAN JUAN CITIZENS ALLIANCE

August 6, 2021

Objection Reviewing Officer
c/o Kara Chadwick, Supervisor
San Juan National Forest
15 Burnett Court
Durango, CO 81301
E-mail: kara.chadwick@usda.gov
Posted to: https://cara.ecosystem-management.org/Public/CommentInput?Project=57671

RE: Objection (36 C.F.R. § 218.8 )to the Draft Decision to the Salter Vegetation Management Environmental Assessment (Dolores District - #57671)

Objection Reviewing Officer and San Juan National Forest Staff,

This letter serves as San Juan Citizens Alliance (SJCA) Objection to the Final Environmental Assessment with Finding of No Significant Impact carried by the Draft Decision Notice for the Salter Vegetation Management Environmental Assessment. I am the Lead Objector for SJCA.

Our Objections and associated comments represent the concerns and recommendations of the San Juan Citizens Alliance's staff and board, our 1,000+ members, an additional 5,000 supporters, and members of the public including residents of Southwest Colorado and public land owners and users across the United States who are committed to scientifically based and legal stewardship of our national forest lands.

**Introduction to Objection**

We submit this Objection to the Salter Environmental Assessment (EA) Draft Decision with great disappointment that the San Juan National Forest has been unable to design and implement a NEPA process that is successful in gathering the necessary resource-related data, latest relevant scientific research findings and stakeholder inputs which when collated and

balanced should be able to produce a Draft Decision that adequately meets the ecologic, social and economic objectives across the Salter landscape. SJCA fully enaged the Salter NEPA process from the start with the aim of avoiding the need to submit an Objection. Indeed, SJCA was hopeful that with an adequate NEPA process woven together from the Dolores Watershed and Resilience Forest Collaborative's initiatives, on-the-ground tours, the dissemination of various scientific findings, "side conversations" and other efforts would result in no Objections to the Draft Decision being submitted. Perhaps we were naïve in our "no-Objection" hopes, but we are deeply discouraged that there are many Objections submitted representing numerous points of view on the design and proposed implementation aspects of the Salter project. We believe this is an indication that the Draft Decision is significantly flawed rather than it being an endpoint that is sometimes opined as "no one fully like the decision so it must be well balanced."

SJCA and many other entities and individuals submitted comments during the scoping and draft EA periods that we believe, if examined and reviewed carefully, "pointed the way" to a scientifically-based Draft Decision that would support the agency's "three-legged" stool of objectives. While we have not systematically reviewed all of the scoping comments received by the District to determine if issues brought forth had been addressed in the draft EA, we do know (as we will detail below) that many if not most of our suggestions per issues to address in the NEPA process were ignored and through a cursory review we know this to be true for other scoping commenters. We must ask, was the Dolores District truly earnest with an interest to gather ideas from the diversity of the community to help build a viable, balanced and durable Draft Decision? Unfortunately, our conclusion to this question has been "no", and because the District from the outset of scoping pursued a seemingly predetermined path we have collectively before us an inadequate Draft Decision that is deficient with huge components of necessary information on which any decision of worthy would be predicated. We certainly don't have the "keys to the lock" to understand why this approach was taken, but the District's approach has led to a slowed process, a lack of trust that all stakeholder input will seriously be considered, and of course to the need to engage an Objection process and perhaps subsequent litigation.

As detailed below, our Objection (and the specific objection points within) is predicated on both the NEPA process and the aspects of the resulting decision. Paramount is the reality that because the District refused to provide critical information that was requested during the scoping process and/or was elemental to the design and alternatives of a Salter area project, there was an inadequacy of information and the subsequent forming of Alternatives which rendered the Draft EA to be a document with a narrow focus. We emphasis that the NEPA process was significantly flawed and that an Objection resolution process that attempts to "jump over" the process aspect of the shortcomings of the Salter promise would be profoundly "missing the point."

**1. Inadequacy of the Purpose and Need Statement (PNS)**

As written in the February 2020 scoping package, "The purpose and need for this project is derived from the differences between the existing forest vegetation conditions and the desired forest vegetation conditions, as defined by the SJNF LRMP." While we understand that this project is focused on MA-5 lands and within the suitable timber base, we believe the overly narrow focus of the PNS is foundational to the shortcomings of this NEPA process and the Draft Decision. While the scoping document mentions (very briefly) other values and resources within the Salter landscape, the PNS fails to recognize such and therefore their relative importance is minimized in the process and decision. The PNS fails to articulate, and therefore lacks in providing the necessary goal and guidance these MA-5 and suitable base for timber lands are also lands utilized by grazers, hunters, the full array of recreationists (campers, bikers, hikers, equestrians, etc.), firewood cutters, and others as well as being important for watershed/water users interests. Despite the diverse use of this landscape the PNS statement is so narrow that it negates the inherent multiple use foundation of this region, the "backporch" to Dolores and nearby residents. Perhaps the Dolores District was hoping to address these other resource and user interests through the Interdisciplinary Team (IDT) involvement, however, to anoint the IDT with this work without a clear set of resource objectives has shown not be a successful approach.

The design and application of this narrowly focused PNS has not served the Dolores District well as the resulting process and Draft Decision are commensurately narrow which we believe is a central reason as to why the District received the voluminous number of comments of concern on the EA and undoubtedly the array of Objections, too. In our scoping comments (Appendix A) we specifically call out the need to broaden the PNS and obviously our suggestions were ignored. We reiterate here in our Objection that the PNS should have included, which we believe would have resulted in a more balanced and accepted Draft Decision, language that would have at least acknowledged the other resources on this landscape and its multiple use standing. As is, the PNS went forward as originally crafted and gave rise to the opinion I have heard from many that "this just looks like a logging project." Well, maybe it is and the entire EA is an attempt at a showpiece that it is not, but if the Salter project is truly intended to be more than a "logging project" than an appropriate PNS is a missing keystone to that aim. Even from a "marketing perspective" the Dolores District would have been smart to include something per the importance of wildfire mitigation in the PNS, but no, that opportunity was also missed.

We do note that the Final EA includes three bullets under the Purpose and Need (Section 1) below "Introduction" (page 1) that represents a broader concept of the project's evident objectives. The text, however, does not indicate that this is an updated Purpose and Need Statement and therefore without such a specific declaration of this being a revised PNS we are operating with the understanding that the PNS shared with the public in the scoping package is still the "official/NEPA" PNS.

<u>Suggested Remedy</u>

Because the PNS is the foundational statement to a NEPA process the errant and incomplete PNS of the Salter NEPA process "got out to a bad start." With a big lift and a well communicated fresh start, the Dolores District could perhaps begin again with perhaps a coalesced combination of the scoping process and the draft EA element with a broader and more inclusive PNS that reflects the multiple use nature of the Salter. This would only be possible if the Alternatives and design features that were spawned by a PNS would adequately reflect a changed PNS. Otherwise we would recommend a full fresh start at the scoping phase with a more diverse and extensive PNS.

**2. Lack of Response to Scoping Comments**

The Dolores District is required to respond to substantive issues raised in scoping comments received from the public and stakeholders. Despite this requirement, there was a failure to address four of the substantive issues we submitted in our scoping comments that we recommended be included (see Appx. A – SJCA Scoping Comments):

- We recommended the "Presentation of Possible Management Actions and Development of NEPA Alternatives" which included the concept of exploring and presenting a diversity of specific project design and implementation. Instead, the Draft EA minimizes the need to explore Alternatives and only presents one action Alternative in detail, the Proposed Action (Alternative 2).
- The inclusion of the Common Stand Exam (CSE) data in a "layperson-friendly" form - the term "common stand exam" is only mentioned once in the entire Draft EA (page 11) despite the entire project is predicated on the current condition that is evidently derived from the CSE.
- The inclusion of economic information and associated analysis regarding "varying actions that could potentially be elements of the project." While there is some text within the regarding the forest products industry benefits there are no dollar-figure specifics as we asked for that would give the public an understanding of various possible revenue streams along with costs associated with the project. For a project with significant economically important aspects from various points of view the economics related context is sorely lacking.
- Climate change is minimally addressed in the Draft EA despite scoping comment recommendations that both Salter site and larger scale specific information regarding critical climate-related information should be determined and analyzed. The carbon cycle/sequestration is minimally covered and is devoid of any metrics regarding the carbon balance of this proposed project. The climate/carbon component within the Salter NEPA is reminiscent of a NEPA process from the previous century rather than 2021.

A. Within our scoping comments " We recommend that the EA provide an array and diversity of possible actions and tools that could be combined to best meet the desired conditions as relevant to the varying conditions on the ground. Providing only a Proposed Action and a No Action Alternative is an insufficient approach to detailing and sharing with the public a diversity of actions that could be utilized for the project as we had requested be enumerated. Rather than attempting to wrap any subset of these possible actions into one or two alternatives, we recommend detailing a list of possible actions that pertain specifically to specific desired conditions and a "discussion" in the draft EA regarding their relative merits and disadvantages. Though the Salter project area is quite often considered a homogenous forest, there is indeed significant variance across this landscape, therefore a variety of management tools/actions will need to be utilized across the region to move the forest structure from the current condition(s) to the desired condition(s)." (Appx A, page 2)

Despite our recommendations that a variety of approaches and Alternatives be examined, we have come away firming believing that the silvicultural vision of the Dolores District was already pre-determined and the possibility for input from stakeholders is apparently closed. For example, there is no discussion per the possible use of a different basal area (BA) ranges relative to site indices or other metrics and no discussion of possible use of POL (products other than logs) with a supposition that there will be lop and scatter and then pile burning. It is clear that the supposed Alternative 3 is not really a fully described Alternative and therefore one that can neither be vetted on its own merits or even fully understood due to the lack of descriptive text in the EA. The Contents pages (pages i-iii) clearly reveal the disinterest in any other possible Alternative beyond the Proposed Action (Alternative 2) – Alternative 3 is not even listed in the Contents!!

B. The Scoping Package (page 2) outlines the proposed "starting point" for the project by noting the current conditions will be defined by the agency: "The purpose and need for this project is derived from the differences between the existing forest vegetation conditions and the desired forest vegetation conditions, as defined by the SJNF LRMP." Certainly, this approach is no surprise and we would expect SJNF to detail the current conditions, however, the draft EA document failed to include and therefore share with the public the Common Stand Exam (CSE) data upon which we would assume the current conditions are founded. This information was not shared with the public despite the specific request in our scoping comments (see Appendix A, page 2) that "strongly recommended" the inclusion of CSE data:

"First, the agency should organize and make available the common stand exam (CSE) data and associated files, shapefiles, etc. along with a key or instructions to access this information for use in providing comments in this NEPA project. The CSE should be organized and exhibited to the public in a manner that is easily understandable to the public, preferably in a format that has a visual representation of the data. For the public to "weigh in" from an informed point of view there likely will be a need to explain the data and provide points of context. This is a great opportunity for the public to be further educated about the forest that is their watershed, recreation area, hunting grounds, firewood collection acreage, etc. Ideally the public will be able to review the document and be able to make informed remarks as related to various metrics of their forest from the shared CSE data and other current condition information."

The scoping package (page 1) goes on to describe the current conditions in the Salter area: "The forest conditions in the proposed treatment blocks reflect an even-age structure comprised of densely spaced, over-stocked medium and large pine trees in a single structural layer." While this is useful general information, it fails to provide any type of detailed overview of the current conditions including addressing critical data-sourcing questions such as "what is the range of density (basal area) across the Salter landscape that would imply the area is "over-stocked with medium and large trees?" Further, this page 1 description provides no information about the age of trees across the Salter landscape and what percentage of the trees might represent various cohort groups. The assumption seems

to be made by the District, or perhaps "just" in their portrayal of the current conditions, that because the area consists of "a single structural layer" that the area is entirely homogenous across numerous metrics including density and age classes. Though the scoping package text notes "Smaller trees, saplings, and seedling are infrequent or lacking entirely." (page 1) there is no mention of the specifics regarding (for example) of other cohorts such as older trees, which are of a particular interest to our organization. The scoping package fails to describe, or even note the existence, of the diversity of the forest within the Salter project area – neither by age class, diversity of tree species, or basal area (BA) per acre. The public is being delivered a "snapshot" of the Salter area as being very much a homogenous ponderosa forest, and it is not – an hour long visit to the area easily dispels that myth.

Minimally the district should have provided the CSE from the get-go, that is, included in the scoping package which would have provided the best "picture" of the landscape for the public/stakeholders on which comments could have been predicated. Even better would have been providing to the public a "layperson's version" of the CSE making it even easier for the public to understand the Salter forest rubric. And while it would have been best for this info to be provided at the scoping phase, it most certainly should have been available in the Draft EA as requested by ourselves and other commenters. Unfortunately, our takeaway from this lapse on the district's part is that there was not truly an interest in sharing this current condition with the public as part of the process – we're quite sure the information exists, so why not share it with others? The addition of "Figure 4 Diameter range of Ponderosa pine in the Salter treatment area" into the Final EA is of course welcome as shared information, but this is the type of data that should have been shared at the scoping phase ideally, or at least in the Draft. Withholding critical information until after the decision is made eliminated the public's ability to provide data-based comments (along with possible Alternative), eroded trust in the process,decidedly narrowed the project design elements considered, and in sum set the stage for a process with a seemingly pre-determined outcome.

C. We recommended the inclusion of <u>economic</u> information and associated analysis regarding "varying actions that could potentially be elements of the project." While there is some text within the regarding the forest products industry benefits there are no dollar-figure specifics as we asked for that would give the public an understanding of various possible revenue streams along with costs associated with the project. There is no financial information describing various forest management options and therefore absolutely no sharing with the public of the financial status and foundations of the projects – certainly public lands owners who are footing the bill for any type of forest treatments deserve to have this information shared directly with them.

The only "dollar sign" ($) within the entire Draft EA relates to the investment in the recreational sector (trails) within the project area. Though we did not request information regarding the recreational economic sector that relates to the Town of Dolores and the Salter/Boggy Draw area (naïvely believing that such foundation project area information

would be included without us asking) there is essentially no specific information about the recreation economy's current status and how it might be affected positively or negatively by the project. Neither is there context per grazing permit economic and the specific hunting-related economy.

D. Climate change and related issues included carbon sequestration, the carbon footprint of the forest treatments, the management direction from climate change models, and others should have been fully explored in the Draft EA and our scoping comments offered some recommendations to follow to that end. Rather, the Draft EA minimally explores and address these issues despite this apparent direction from the US Forest Service's homepage:

"To stay healthy and vigorous, our National Forests and Grasslands will need to adapt quickly to the changing climate. The Forest Service is incorporating the best ecological and climate science into its management to ensure that National Forests continue to produce the benefits that the American people enjoy. Healthy forests and grasslands will also help mitigate climate change by removing carbon dioxide from the atmosphere and storing it in plants and soils. In addition to our work on public lands, the Forest Service works with private landowners, non-governmental organizations, and tribal governments to foster climate-informed, sustainable land management."

The Draft EA either glosses over or completely avoids many climate/carbon related issues such as:

- Though noting from the 2013 LRMP, Volume 3, Appendix G, 2.9.1, Timber Management and Special Forest Products, Desired Conditions (page 11) that forest management "anticipates climate-related plant succession changes (such as favoring heat- or drought-resistant tree species as leave trees, or in reforestation).", there is no discussion or even mention of the what the agency's own climate modeling indicates for the ponderosa pine forest type on the Dolores District and on nearby lands. Climate modeling including this recent compilation from USFS's Jim Worrall (http://dwrfcollaborative.org/wp/wp-content/uploads/2018/06/projected-impacts-of-climate-change-on-forests-of-the-dolores-watershed.pdf indicates significant decline in the health and range of the Ponderosa pine forest/vegetation including the Salter area.
- There is no analysis of the actual carbon "footprint" of the proposed project and therefore no subsequent discussion and "weighing" of the choices to be made relative to climate/carbon issues.
- The Salter NEPA process also ignores (not mentioned either in the Draft or Final EA's) our recommendation within our scoping comments that due to continually changing forest conditions regular reviews should be undertaken at "possible decision points" to consider adjustments to the project implementation. And a methodology recommended in our scoping comments derived directly from the forest plan, "This approach is reinforced in 2.9.9 from Appendix G, "Every 3 years review silvicultural prescriptions for incorporation of strategies that anticipate potential plant succession changes relative to warmer and/or drier forested conditions." (page 3) was evidently ignored.

From the SJNF's lack of response to our scoping comments on these issues and the minimal attention given to this carbon/climate realm it is clear to us that the Dolores District does not have an earnest issue in exploring this topic and how the Salter project "fits into" the challenge we face with a changing climate. Despite the apparent direction given by Secretary of Agriculture Tom Vilsack this past February, "President Biden's nominee for secretary of agriculture, pledged Tuesday to focus on climate change initiatives and work to address racial inequities in agricultural assistance programs.", we observe a lack of commitment and interest at the project level as evidenced by the belittling of the climate/carbon issue in this NEPA process. Examining the carbon context of silviculture is a relatively new issue for the USFS to examine, but that is not a license to ignore its overarching importance to all forest management decisions.

**Suggested Remedy**

**The CSE data (and preferably in "layperson form"), a diversity of economic information directly related to the project including the recreation economic section, and in-depth information and analysis regarding the carbon/climate aspects are all critical to the design and implementation of any project in the Salter area. This information should be made available to the public within the issue of a new draft EA which will give the opportunity to the public to view the material and comment. The review and integration of the information noted above might very well indicate and support the need for additional Alternatives which would be added to the Draft EA.**

**Ideally, the project should be entirely "restarted" with at least some of the missing information being shared initially (such as the CSE data) in a new scoping process which would allow stakeholder's full involvement in the process including the development of Alternatives, however, a "combined" scoping and Draft EA phase of the NEPA process coule be a way forward if the public had enough information to create and submit Alternatives or management strategies and tactics.**

From our experience with this NEPA process we seriously question if the Dolores District was truly interested in garnering, reviewing and possibly including information submitted in scoping comments. From our experience, and from the experience of some other stakeholders, we have unfortunately come to the conclusion the District was not earnest in their outreach for input as so much of it was ignored or minimized. This approach is a breach of the public trust, it is poor policy, does not serve the agency well in its standing with the public – plus it is unlawful.

We note that the SJNF "backtracked" after the February 2021 release of the Draft EA with a presentation to provide more information to the public which appeared to be a response to the public's early feedback that the Draft EA was woefully deficient of critical information on which to consider and make an informed decision on any Salter-situated project design choices. Much of the information shared in the Powerpoint presentation I observed in early March 2020 seems to be information not included within the Draft EA, which we are guessing was a central reason for the presentation – to provide more data. Because this "visually-shared" information

was not a part of the Draft EA it was not a part of the NEPA process, and we remain baffled as to why the agency withheld useful information (presented visually) without including it in the Draft EA.

### 3. Environmental Assessment Lacks Sufficient Information and Best Available Science to Support a Decision

As is integral to any National Environmental Policy Act (NEPA) process and as specified in the Act, relevant and necessary information must be generated and made available to the public to understand and comment upon a project being examined within NEPA. The San Juan National Forest (SJNF) opened the public input for this project with a Scoping Notice (February 21, 2020) after presumably gathering sufficient information internally to share the preliminary project design with the public.

SJCA submitted scoping comments (see Appendix A) that addressed salient project issues and specifically asked for specific information to be incorporated into the NEPA process to be analyzed and shared to aid in the development of the project, decision and project implementation. Section 2. above delineates the information and subsequent analyses that we requested through the scoping process. Subsequent to the scoping phase it came to our attention that there was additional information critical to the NEPA and subsequent decision making process that was either inadequate or entirely missing including:

- Information regarding the economic aspects that will be affected by the proposed Salter project another than for the woods products industry. This would minimally include the investment made in trails in the Salter area, the value of the components of the local economy related to the public use of the Salter area, and an understanding of businesses (and their employees) whose well-being is closely associated with the non-timber aspect of the Salter area including outfitters, guides, rental businesses, hunting-related businesses, grazing permitees and others.
- As we have stated above the CSE data was not shared which make it difficult, if not impossible to understand the current conditions. Anticipating the need to have this information "in hand" for use by agency staff, other land management agencies and the public should have been obvious and the NEPA process should never have commenced without the ready availability of the CSE data.

<u>**Suggested Remedy**</u>

**Similar to our other Suggested Remedies, the project needs a restart to include the necessary data and context from scientific research upon which to base the project design. We note the comments (scoping and Draft EA) in which the agency received recommendations from an "outside professional" source to review various research to help guide the project and we observe most of these suggested sources were evidently not utilized. Even "inside" sources with the best available science were seemingly ignored such as the aforementioned work by USFS's Jim Worral.**

**4. Lack of Range of Alternatives[1]**

NEPA lays out the need for a range of Alternatives based on the premise that (in the case of a potential Salter projedt) the best forest management practices and their implementation are derived from reviewing a diverse array of management choices as opposed to (for example) moving ahead with an approach of "this is always have we do this."

Even a cursory examination of the Salter project area indicates that examining a variety of Alternatives based on an array of management actions is a smart approach. The size of the proposed Salter project, even after it was trimmed to include only suitable base lands, is still very significant in size, approximately 35 square miles. These 35 miles, as we have noted above, are multiple use lands that provide access to thousands of users/visitors per year for a diversity of purposes, many of which relate to the economic foundations of the Town of Dolores and Montezuma County – in sum, this is a heavily used multiple-use area. As well, while the common stand exam data or another form of the current forest/vegetation condition was never shared with the public during the NEPA process (and still remains an unknown to us) we are sure there is a good measure of homogeneity in the forest due to the varied characteristics such as soils, aspect, elevation, etc.

Bringing together these basic elements of the Salter area (large size, heavy multiple use, heterogeneity of the forest/vegetation condition) indicates that there is sufficient diversity that an array of management strategies needs to be employed and therefore, through the lens of NEPA, numerous Alternative must be developed and presented in the Draft EA. This approach, however, was not undertaken and besides the minimum requirements of the No Action and Proposed Action Alternatives there really is no other. While "lip service" is given to a third Alternative, this Alternative is never fully described in the Draft EA – as we noted above it is not even listed in the Contents. Minimally, one other action Alternative should be fully described though it is evident to us that there was the need and possibility for another Alternative presented that could have (for example) been a balanced "mix of wood products and recreation interests" as these are the two most significant uses of the area. The minimization of the Alternatives detailed in this process calls into the question the Dolores District's interest and commitment to examining other possibilities, including those that might be a minimal "tweak" for the commonplace approach to forest thinning or those that might detail a radically different approach to the opportunities and challenges of the Salter landscape. As the NEPA process was managed, there was no range of Alternatives offered – and of course, without the public availability of the CSE it was impossible to know fully what is "out there" on the landscape representing the current conditions. We fully understand that these are MA-5 lands and within the suitable base, but it is true that these are not the only uses of these 35 square miles nor that timber harvest is necessarily the highest and best use for this area at this time.

[1] As use as capitalized, "Alternative(s)" is utilized in this document to specifically denote NEPA Alternatives.

<u>**Suggested Remedy**</u>

**As we have suggested above, the only corrective course would be to restart the Salter NEPA process. A new start would include providing a more thorough assessment of the current conditions (including the CSE), information regarding other economic interests on the Salter area and associated areas (this would include the Town of Dolores, recreational economy values, etc.), potential other "federal financials elements" (such as road support monies – including building and/or decommsioning) and other factors that would be important to the development of Alternatives. If the agency holds all of the informational "cards" they are the only ones in the "NEPA game", rather the necessary information must be disseminated to the public so they can also development and share forest management approaches including Alternatives that support the agency in sharing the required range of Alternatives.**

**5. Non-disclosure within the NEPA process of the Best Available Science and other Relevant Project Information**

We note that the Dolores District evidently considered issuing a new version of the Draft EA after receiving scores of comments with varying concerns regarding the project design and implementation as outlined in the February 10, 2021 document (with a 30 day comment period) along with the lack of an array of salient information. The district attempted to "backfill" the lack of specific information in the Draft EA by providing additional information in a presentation made on March 9, 2021. While this information shared with the public was significant in substance, we find it odd and troubling that much of the information provided in the presentation was not provided in the Draft EA – why was this information presented outside of the NEPA process? We would assume that the information presented on March 9 was readily available to the SJNF as it was available to share with the public less than a month after the Draft EA was released which leaves us baffled as to why this info was not included in the Draft EA. The release of this information as a presentation that was available only to those who per chance heard/read of the presentation (we are not aware that it was not an officially noticed event) **is not a substitute for the disclosure of critical information foundational to the design and implementation of the Salter project.** This information should have been included in the Draft EA from the "get-go" (some of it should also have been included in the scoping package), but it was not – though it's particularly relevant data:

- As previously noted the Common Stand Data was not made available.
- The Draft EA fails to provide sufficient information to understand the current conditions, for example, the % of forest species components; the range, distribution and occurrence of acreage by BA (basal area).
- The EA fails to consider the ramifications of utilizing a 50-70 square foot BA across the entire 35 square mile project area and in that fails to fulfill its stated objective of a "landscape approach" to the project:
    - The SJNF utilizes the reoccurring mantra that a management goal is to work at "landscape scale" that is reiterated throughout the document as it relates to many values, interests and resources (as is detailed in these

Final EA excerpts: 1) This goal is detailed throughout the Final EA including: "…increase the structural diversity of the ponderosa pine forest represented across the landscape," (within "Introduction" 2nd bullet, page 1), 2) "The goal is to move stands to desired conditions given the variables of this landscape. "(page 16) and 3) "These stand components will continue to influence management on this landscape to meet desired conditions." (page 66). Despite this professed aim of landscape-scale the agency is seemingly desirous of locking into a narrow BA target.

- The detailed 50-70 BA target and the connected approach of desiring to reach this BA on every acre is both unjustified and has applied self-imposed and scientifically unsound approaches to project design elements. For example, on numerous occasions over the past two years I have been told by SJNF that a diameter cap will not be utilized as it prohibits the agency from meeting the BA target and therefore "desired conditions cannot be reached."[2] Unfortunately, the Dolores District is stuck on the thinking that every treated acre must meet the BA range, yet it is evident from any aerial photograph or significant hike through the Salter area that there is a great diversity across these 22,000+ acres – there are differences in aspect, slope, soils, site index, understory context, current conditions per cohorts and canopy, and so on. A project that is restricted to a 50-70 BA target across all of these acres is inherently flawed – conditions to meet resilience and resistance objectives (as noted in the Introduction, page 1) will certainly never be meant by applying at 50-70 BA across this landscape. Though the Salter is a more homogenous forest now than was indicated by the historical range of variability (HRV) and then we desire it to be in an FRV (future range of variability), locking in a 50-70 BA across 35 square would certainly be an errant forest management approach, especially considering that the professed aim is to increase resilience and resistance through a more diverse/heterogenous forest.
- The lack of a landscape approach strategy for management on this project is exampled by the agency's decision to using the same BA range across the entire landscape which likely neither mimics the historical range of variability nor is a wise target for the future range of variability.

- Perhaps we have missed something in the Final EA, but we have found nothing that indicates there are research findings or other science-based thinking that informs the 26.9" inch cap to harvesting. It strikes us as peculiar that no trees will evidently be cut

---

[2] I cannot corroborate the date and the SJNF staffer who made the statement, but I was told that 38% of the Salter project area would not be able to meet desired conditions if the BA area target (somewhere in the 50-70 range) if a diameter cap (perhaps this could be also referenced as "large tree retention" approach, too) was utilized. This thinking is apparently based on the management scheme to fit every acre into the BA target which of course was neither the historical range of variability or should it the future range of variability. This "every care the same approach" is counter to resiliency and restoration foundations and objectives – "cookie cuttering" the landscape with the 50-70 BA strategy is from another era of forestry, long ago.

above this size (even if it pushes beyond the 70BA?) while the agency refuses diameter caps as a management strategy elsewhere for the project. We have heard that one of the larger wood products industry companies cannot not saw logs larger than 27" which leads to the concern that this diameter cap designated by the forest is specifically designed to fit one company's production equipment. Needless to say, that very much appears to be an approach that is not based on science and matched for the needs of one potential contractor – which certainly leads one to wonder about favoritism as associated to potential contract letting.

Suggested Remedy

**The Dolores District should withdraw the Draft Decision and reissue a new Draft EA that includes all of the available and best scientific information that would inform the design and implementation of any Salter project. Pending the public release of the common stand exam data, there is perhaps some useful speculation in suggesting a range in the basal area that is a good match to the target for a future forest with of a more heterogenous stature per its age and class structure as well as other variables. We would suggest that the BA be established at a much wider range, perhaps 30-120 which would support the need to utilize a greater diversity of project design elements as it be possible to better "mimic" the inherent diversity across the landscape as well as to enhance the diversity. Amongst the project design components could be a diameter cap as it would support the need to increase the diversity through the retention of large trees, of which the information provided on page 7 of the Final EA indicates are rare across the Salter area with seemingly a sizeable diameter size drop of trees more than 22". Also, "breaking free" of the 50-70 BA focus would allow the better support of other features of a heterogenous forest such as clumps and groups which we know are important forest aspects for numerous purposes. A greater range in the BA would allow a more dense set of acres where the site index is high, moisture and aspect are favorable, etc. allowing desired (for increased homogeneity) clumps, groups, cluster of bigger and older trees that might very well push the BA (for example) toward the 120 edge of a range, while allowing another set of acres to remain or become more open as a meadowed area, an area particularly well situated for ponderosa pine regeneration or to leave "as is" knowing it is a dry are with limited productivity possibility.**

6. Specific Design Criteria Objection Points

   1). **Fuels** #6. (page 21) We are concerned that a depth as much as one foot for lop and scattered materials would be represent too much fuel left on the forest floor at least in some locales depending of forest density and soils. We would suggest 6" or a range of 6" to 9".

   2) **Need for Proposal** It is stated that: areas treated previously in order to maintain sustainable conditions and improve scenic integrity (fifth bullet, page 9). Our rPeview of he Final EA and Draft Decision don't convince us that there is sufficient protections for this scenic objective that would need to be detailed in project contracts to protect the "scenic integrity of the desires of other users/interests of the Salter area including recreational trails.

3) The responsibility for implementing various project elements is unclear to us. For example, in the **Recreation and Public Safety section: 3**. In the event that a decrease in tree density results in easier access to dispersed camping sites beyond what is allowed by Forest Service regulations, barriers such as boulders will be installed to control the expansion of dispersed camp sites. (page 23) it is not clear whether the SJNF or contractor is responsibility for installing such boulders. We would think it would be contractor who 1) has equipment on the site already and 2) it is an apparent "cost of doing business", but the text is unclear regarding this (and other) important contract responsibilities.

4) Also, within the **Recreation and Public Safety section: 4 j**. Sections of trails will remain open for use if detours via system roads are available. If timber operations (harvesting and hauling) do not pose a safety risk to users of trails within an active sale unit the trail will remain open.(page 24). From what we can discern from this statement and elsewhere in the Final EA is unclear who will be responsible for bringing the existing trails back into their current condition and in what timeline. Southwest Colorado Cycling Association and partners have invested hundreds of thousands of dollars in the Boggy Draw trails system, but we see no guarantee this this investment will be honored by returning the trails to their original operational condition.

**Conclusion**

As San Juan Citizens Alliance's Land and Forest Protection Program Manager, I am the organization's lead on forest, fire, forest watershed and other forest related issues and am a founder/co-organizer of the three forest/fire/watersheds that correspond with the three ranger districts on the SJNF. From my more than a decade's worth of experience and involvement with all projects on the forest I have a somewhat unique perspective of assessing the relative approaches to forest/vegetation related "entries" on the forest, being it WUI treatments, timber harvest, firewood access activities, "salvage logging" and others. As part of my assessment of these projects I review the relative "balance" of these proposed projects as well as the worthiness of the associated NEPA. The balance I refer to associates with the USFS's target of the "balanced three-legged stool" of social, ecologic and economic.

Of all the projects that I have reviewed over the past decade the Salter project is the one is most errant related to its failure to reach the social/economic/ecologic balance point as well as in the shortcomings of its NEPA process. Many aspects of the project appear to be specifically driven by the desires of the forest product industry, despite the negative consequences to the ecologic realm and other social and economic realms, most notably recreation. These observations are further supported by observing the content of the formal Objections submitted as of August 6, 2021 with 1) two (identical) letters from wood products industry representatives who points of objection are quite minimal and mostly related to insuring their maximum financial benefit, 2) the Town of Dolores letter highlighting project design concerns that they believe will adversely affect the town's residents and infrastructure as well as the town's economic well-being of which there has been a decided increase in recreation-based income in the last few years, 3) the comments of a very experienced forest ecologist and the objection and 4) of the most involved bike trail advocacy group in Montezuma and Dolores counties.

While, as we have noted above, we recognize that this project is located on MA-5 lands and the vegetation manipulation/removal would be located on lands designated in the 2013 SJNF forest plan as suitable timber base, it remains critically important that any management action taken on these 35 square miles whether it be forest products, grazing, recreation, watershed management or other resource must meet the "three-legged stool" standard. The Salter project, as outline in the Final EA and Draft Decision does not, and as noted in our specific objections above it fails to meet needs in all three of components, especially ecologic. We fully believed that the era of "1960's/1970's MBFT-first management has passed, but clearly this is not the case. Just because the term "restoration" is hung on project label (as it is with the Salter project" does not mean necessarily that it is truly a restoration project from a sound scientific standing. The Salter project, through many indicators, appears to be a project designed to boost the timber harvest numbers of the SJNF and meet industry's eagerness to reap financial rewards off of the unfortunate status of our ill-managed national forests without considering the likely "costs" to the forest health/structure in the long term, to the residents of the Town of Dolores, to the recreationists likely to use the Salter area over the next deade, and to the economic well-being of the town of Dolores. Indeed, even the third bullet in the Purpose and Need Introduction "gives away" the Dolores District's thinking as to economic priorities when it details "provide economic support to local communities by providing timber products to local industries in a sustainable manner." Certainly, most of us know that there is an already existing economic foundation in Dolores **not** based on timber products – how about their sustainability?

SJCA has invested scores of hours in meetings, side conversations, submitting comments, reading research, visiting the project area, conversing with stakeholders and more – all of this being oriented to finding a balanced solution, a win-win-win, and a balanced position on the three-legged stool, with little positive result. Our scoping comments were entirely dismissed and most of our Draft EA input was as well – indeed, we are not suggesting we have "the answer, the solution" to this rubric, but it has been become clear to us that the Dolores District and its parent SJNF had no serious intention to alter their envisioned and pre-determined outcome to this NEPA process. There really is only one sensible, ethical and trust-promoting avenue to effectively move ahead, that is, start over.

Sincerely,

Jimbo Buickerood
Program Manager
Lands and Forest Protection
www.sanjuancitizens.org
jimbo@sanjuancitizens.org
970 259-3583, Ext. 2

Attachments

Appendix A: SJCA Scoping Comments – Salter EA Process (March 20, 2020)

Cc: Mark Lambert, SJNF Staff Officer – Planning
Lindsey Hansen, SJNF Staff Officer – Renewable Resources
Travis Burch, SJNF Silviculture

SAN JUAN CITIZENS ALLIANCE
1309 East Third Avenue
PO Box 2461
Durango, CO 81302
970.259.3583
sanjuancitizens.org

March 20, 2020

Dolores Ranger District
San Juan National Forest
Attention: Derek Padilla
29211 Highway184
Dolores, CO 81323

RE: SJCA Scoping Comments on Salter Vegetation Management Project

Dolores District Staff,

Thank you for considering our comments on the Salter Project. We note that neither the scoping letter or the Salter Project Scoping Package provide a NEPA project number for reference. Our comments are targeted to address both the design of the upcoming Draft or Preliminary EA as well as the topics and issues we view as necessary to be addressed and included in the document.

Purpose and Need

The Salter scoping document includes this Purpose and Need for Action statement: "The purpose and need for this project is derived from the differences between the existing forest vegetation conditions and the desired forest vegetation conditions, as defined by the SJNF LRMP." We strongly recommend that the Purpose and Need (PN) statement be written to reflect much more than "the existing forest vegetation" condition as defined by the forest plan. While the forest/veg condition may be a starting place, the PN statement should include numerous other desired conditions that are detailed in the LRMP and/or have been recognized in the seven years since the plan was finalized. There are numerous ecological desired conditions that should be recognized in the PN statement such as those associated with overall landscape resiliency as related to climate change, watershed function, wildlife, non-forest vegetation, etc. As well, there are numerous social-related desired conditions that need to be recognized in the PN to be sure they are addressed in the project design as well including recreation, the wildland-urban interface, hunting, etc. And finally, there are economic issues expressed in the LRMP to be included regarding such issues as grazing and timber products.

We believe it is vital to provide a robust and all-inclusive list of desired conditions in an effort to design a project that will "as much as possible" meet the wide range, and sometimes conflictive, desired conditions. Unless all of the objectives are delineated and therefore can be addressed in the project design there remains a possibility that important desired conditions will be overlooked and the goal of "finding the sweet spot" of designing a project that meets as many of the conditions as possible will be unobtainable.

Presentation of Possible Management Actions and Development of NEPA Alternatives

The EA should explore and provide numerous possible management actions to meet the desired conditions that are detailed in the 2013 Land and Resource Management Plan. We recommend that the EA provide an array and diversity of possible actions and tools that could be combined to best meet the desired conditions as relevant to the varying conditions on the ground. Providing only a Proposed Action and a No Action Alternative is an insufficient approach to detailing and sharing with the public a diversity of actions that could be utilized for the project. Rather than attempting to wrap any subset of these possible actions into one or two alternatives, we recommend detailing a list of possible actions that pertain specifically to specific desired conditions and a "discussion" in the draft EA regarding their relative merit and disadvantages. Though the Salter project area is quite often considered a homogenous forest, there is indeed significant variance across this landscape, therefore and by necessity a variety of management tools/actions will need to be utilized across the region to move the forest structure from the current condition(s) to the desired condition(s).

Understanding Current Conditions

As noted in the Purpose and Need for Action statement, the Salter project aims to move the project area from current conditions to the desired conditions that are detailed in the LRMP. While the desired conditions are mostly detailed sufficiently in the forest plan, the current conditions across the 35,000 acre project are not, or at least not as currently available to the public. Fortunately, the Dolores District has taken steps through presentations during the "pre-scoping phase" of the Salter project to lay out the current conditions in a generalized manner, and this has been of good service to stakeholders and the public who have been involved to date.

We strongly recommend that the Dolores District take two actions that are the next steps in disseminating information about the project area that will be necessary to the public's involvement in the NEPA process. First, the agency should organize and make available the common stand exam (CSE) data and associated files, shapefiles, etc. along with a key or instructions to access this information for use in providing comments in this NEPA project. The CSE should be organized and exhibited to the public in a manner that is easily understandable to the public, preferably in a format that has a visual representation of the data. For the public to "weigh in" from an informed point of view there likely will be a need to explain the data and provide points of context. This is a great opportunity for the public to be further educated about the forest that is their watershed, recreation area, hunting grounds, firewood collection acreage, etc. Ideally the public will be able to review the document and be able to make informed remarks as related to various metrics of their forest from the shared CSE data and other current condition information.

We recommend a thorough examination within the EA of the possible actions that might be employed per the emphasis on the Salter project area being an MA-5 zone. Over the past several years, both in the field and in meetings with the Dolores Watershed and Resilient Forest, I have heard a variety of suggestions from wood products industry members on how best to proceed per the long term goal of maintaining timber production. An examination of the possible costs and benefits of these various approaches would be a helpful addition to the Draft EA to allow the public to understand and weigh these choices. Amongst the possibilities that have been shared with me (and I'm confident that there are many more) are: 1) key the basal area target entirely off the site index, 2) engage a fairly "light" timber harvest in the coming couple years to better set up an earlier return (25 years was suggested) and 3) open the canopy a good deal and target a low remaining basal area to support faster growth among the remaining trees. Hopefully comments from industry will be of sufficient depth and diversity to set a course for the examination of these possibilities within the EA.

Economic Specific Issues

The Draft EA should include an economic analysis utilizing the most current information regarding the varying actions that could potentially be elements of the project. This should include a review of the costs or income streams from the mix of actions including timber harvest, stewardship contracts, small diameter contracts, firewood, mastication, etc. as well as "non-traditional" funding such as RMRI.

We also suggest that the SJNF foster dialog with the county governments associated with the Salter project area (including associated the haul routes for derived wood products) due to the concern that industry has regarding the viability and funding for maintaining and/or improving these routes. Advance and collaborative planning will provide the opportunity to make the smartest investments in the road system necessary to affect the treatments within the Salter area.

Wildland Urban Interface (WUI) Issues

If the SJNF LRMP has a specific definition of WUI we have yet to find it, however, the Salter project needs to have a firm definition of WUI that will support specific management actions in the WUI. Certainly, with all of the work done with the HVRA and other federal as well as state wildfire hazard mapping there will be much data to utilize for project planning – that's the good news. However, we have the concern that the entire Salter project area will be approached as being WUI which is non-sensical per the reality to apply resources and capacity in a targeted basis per fire mitigation efforts. Intensive "WUI style" treatments are unnecessary numerous miles from critical infrastructure, homes, businesses, etc., however, mis-applying available resources in areas that are truly "beyond the WUI" is a poor use of time, capacity and resources. We all know that the landscape cannot be fire-proofed and therefore we have expectation that the fire hazard mitigation will be defined clearly in the EA and backed by the latest available science.

It would be also useful to the public if opportunities were delineated for "cross-boundary" WUI-related vegetation treatment with the state and private sectors. Identifying these opportunities and anticipating who the partners are along the necessary authorization and funding would beneficial to potentially maximize the benefits of federal land management actions.

Climate Change

Appendix G in the LRMP provides a good measure of guidance per what should be considered in NEPA processes as related to climate. Though Appendix G is somewhat slim on specifics it does layout some avenues that should be considered in a process such as the Salter project and we suggest that the climate change related issues of forest resilience along with the overall carbon sequestration/balance issue be examined and relayed to the public.

In Appendix G this very specific statement provides the direction we should follow per adaptation and mitigation, "Our primary strategy is to manage for healthy, resilient ecosystems." The Salter NEPA process should detail the possible management actions to be taken that will provide the forest with increased resilience as related to climate change. Such issues should include choices relevant to canopy composition, vegetation/forest species diversity, basal area, relevance to varying site indexes, and others. With climate models indicating significant change across the ponderosa forest landscape, the EA should map possible decision points and opportunities related to enhancing the resiliency of the forest in the project area. This approach is reinforced in 2.9.9 from Appendix G, "Every 3 years review silvicultural prescriptions for incorporation of strategies that anticipate potential plant succession changes relative to warmer and/or drier forested conditions."

Appendix G also supplies very specific direction regarding the carbon sequestration/balance issue, from 2.2.19, "The SJNF and TRFO forested ecosystems provide net positive carbon storage" Of course to meet this recommendation the agency will necessarily need to invest in the determination of the carbon metrics related to the Salter project.

Temporary Roads

The Lone Pine objection process spawned language regarding temporary roads that was utilized in the Decision Notice that should be carried forth into the Slater project. The added specificity per road width, grade, decommissioning timeline, etc. are helpful both to the ecologic well-being of the landscape as well as being helpful to contractors by providing the specifics they need from project bidding all the way to termination.

Conclusion

Thank you for your consideration of our comment and please contact me if there is a need to clarify or discuss any of our recommendations.

Sincerely,

Jimbo Buickerood
Program Manager
Lands and Forest Protection

Data Submited (UTC 11): 8/7/2021 1:32:23 AM
First name: Dani
Last name: Gregory
Organization:
System.Data.Entity.DynamicProxies.Organization_816762DAD2F69D2F948FD803742E2AF188F4967BAFCF869BFB089A893774B244
Title: President
Official Representative/Member Indicator :
Address1: PO Box 1302
Address2:
City: Cortez
State: Colorado
Province/Region:
Zip/Posstal Code: 81321
Country: United States
Email: swcca@swcocycling.com
Phone: 970-749-1060
Comments:

Southwest Colorado Cycling association recognizes that some of the concerns from our comments were incorporated into the EA, but we object to the draft decision. Here are some of the reasons for filing this objection:

The draft EA was released in the winter; thus, the snow limited the access to inspect the example Chicken Creek project. Over the summer, SWCCA members have been able to see the logging operations at Chicken Creek in more detail, and at various stages in the process. Observations include differences in the quality and level of finish work. Overall, there is a significant loss of scenery and diminished canopy. This greatly reduces available shade, which provides an escape from the heat in the summer, and the ability to maintain a quality groomed surface in the winter. There are large, ugly, uprooted stumps used to form long term barriers. It looks like an industrial mess that will take years, even decades, before looking natural. This diminishment of scenery is not acceptable at Boggy Draw. Boggy Draw is a designated recreation area within 10 minutes of Dolores and is next to, or near, hundreds of residents. Boggy Draw is a prized area, and its designation has driven long-term decisions, volunteers have dedicated thousands of volunteer hours to the area, grants and donors have financially invested in Boggy, and the local economy depends on the recreation designation. Boggy is a backyard recreation area to Dolores and Cortez - it is not a remote area that receives limited visitation. Thus, Boggy Draw deserves a high level of attention in the decision that will protect its current assets. Including, but not limited to, scenery, trails, routes, and camping areas. The proposed buffers around the trail for various types of logging activity is miniscule. Input SWCCA has received emphasizes that the buffer should be widened to minimize visibility of logging equipment and the logging operation impacts.

It is also clear that the new logging roads cannot be returned to singletrack without significant effort, money, and time. While the decision has wording about rerouting trails where logging roads will be constructed, it is very vague, and lacks solid commitment and definition. One person's view of a road returned to a singletrack trail could be very different than another's. SWCCA feels the best solution is guaranteed reroutes prior to the logging project road reconstruction.

There does not seem to be adequate motivation or penalties for logging contractors to adhere to EA requirements. There were specifically protected trees in the Chicken Creek decision that logging contractors cut down during the logging operation. The absence will negatively affect the winter grooming operations indefinitely. The buffer around the Boggy trails is too small and leaves no room for error given the varying accuracy of GPS locating equipment and mapping. A large buffer, penalties, and/or continuous oversight would help with this potential problem.

Socioeconomics affected environment includes limited outdoor recreation economic data that is significantly higher than the economic data presented for the timber industry. Eight times the labor income annually and 10.8 times the number of jobs. However, under the environmental consequences for Alternative 2, the proposed action, the economic impact of the project on recreation does not seem appropriately weighted compared to the timber industry given the socioeconomic data referenced.

The proposed action contemplates recreation visitors going elsewhere, but still contributing to the local economy. Boggy Draw, based on its recreation designation, world class trail system, and gentle topography has a unique and high [auto-markup:Threats]appeal[auto-markup end] with mountain bikers and families. It draws users from Durango, Telluride, Cortez, Moab, and beyond. These users play a significant role in the Dolores economy. If those users go elsewhere, they will no longer be contributing to the Dolores economy, this could include locals as well. Late spring, summer, and early fall is the peak time of year at Boggy. There is not another trail system in Montezuma County on par with Boggy during that time. Phil's World, near Cortez, is typically hotter, has less shade/canopy, no camping, and is less desirable mid-summer. The trails upriver require significantly more effort and skill than Boggy Draw and are not a viable option for many Boggy Draw users and visitors. The theory that users will use the other open trails at Boggy Draw is also flawed when it relates to economic impact. The economic boost that Montezuma County has experienced from visitors to Boggy Draw is a result of the recent trail expansion. The trail system now offers enough alternatives to entice users to stay multiple days in the area versus just one day while passing through, or not stopping at all. Even a partial closure will detour potential visitors and they will spend their money somewhere else. The funds and time spent in advertising and promotion will be wasted, and visitors will alter their plans and bypass Dolores/Cortez for other riding areas and towns outside of Montezuma County. Just seeing the noticeable number of vehicles with bikes outside local restaurants and stores supplies an immediate insight to the real economic impact that benefits Dolores. Those are just the visible bikes, many are inside vehicles, campers, hotel rooms, or campgrounds, out of sight. In a nutshell, temporary displaced trail users will have a far more devastating economic impact on Dolores than contemplated in the decision. Local businesses that depend on the trail tourism will noticeably struggle as "temporarily" displaced trail users find new areas to ride.

USDA United States Department of Agriculture | Forest Service | San Juan National Forest | 15 Burnett Court
Durango, CO 81301
(970) 247-4874
Fax: (970) 375-2319

File Code: 1570

**Date:** October 20, 2021

Ken Charles
Dolores Town Manager
420 Central Ave
P.O. Box 630
Dolores, CO 81323
townofdolores.colorado.gov

Dear Ken Charles:

On July 21, 2021, the Dolores District of the San Juan National Forest published a legal notice in the *Cortez Journal* initiating the 45-day objection filing period for the Salter Vegetation Management Project's Environmental Assessment (EA), Finding of No Significant Impact, and draft Decision Notice. Subsequently, I received the Town of Dolores' timely objection to this project on July 28, 2021.

In follow-up to your objection letter, you engaged in negotiations with the Dolores District. Subsequently, you withdrew your objection on October 14, 2021 (enclosed), with the understanding that the following resolutions would be incorporated into the final Decision Notice:

1. The district will provide Timber Operator with a handout detailing Town of Dolores requirements for logging trucks (enclosed).
2. The district will clarify in the Final Decision that all treatments that originate from the Salter and Plateau treatment areas and require the removal of forest products utilizing commercial log trucks will be required to utilize the western transportation route and will not travel through the Town of Dolores.

Because you have withdrawn your objection, I am setting it aside from further review pursuant to Title 36 of the Code of Federal Regulations (CFR), Part 218, Section 10(a)(6). Additionally, I am instructing the Responsible Official, Derek Padilla, to implement the terms of the agreement as described in this letter. This response is not subject to further administrative review by the Forest Service or the U.S. Department of Agriculture pursuant to 36 CFR 218.11(b)(2).

I appreciate your willingness to find a resolution.

If you have any questions or concerns, please contact Lillis Urban, Regional Administrative Review Coordinator, at Lillis.Urban@usda.gov. Thank you for your interest in the management of public land.

Sincerely,

KARA CHADWICK Digitally signed by KARA CHADWICK
Date: 2021.10.20 11:56:32 -06'00'

KARA L. CHADWICK
Forest Supervisor

Enclosures – 2 (Ken Charles objection withdrawal letter and Logging truck requirements)

cc: Marcelle (Marcy) Anderson and Lillis Urban

Dolores, Colorado
Est. 1900

October 14
Mark B. Lambert
Public Service Staff Officer
U.S. Forest Service
San Juan National Forest

RE: Town of Dolores Salter Vegetation Management Objections

Dear Mark:

This is to inform the USFS San Juan National Forest that the Town of Dolores withdraws its objections to the Salter Vegetation Management Project. The mayor and trustees and voted at their regularly scheduled October 11th, 2022 meeting.

The town would like to thank the Forest Service staff for their genuine concern for the town's values and concerns.

Sincerely,

Ken Charles

Ken Charles
Dolores Town Manager

420 Central Ave, P O Box 630 Dolores, CO. 81323
Ph. 970-882-7720 fax. 970-882-7466
https:// townofdolores.colorado.gov

**Town of Dolores Information for Pre-work Meetings with Timber Operator**

1. Montezuma County Road 31 turns into Town of Dolores 11th Street when the road crosses city limits and the speed limit is **15MPH.**
2. The Town of Dolores requires that all trucks hauling logs off of Forest Service contracts are equipped with Jake Brakes Mufflers
3. The town of Dolores requires that all trucks hauling logs off of Forest Service contracts do not deviate from 11th Street (go either left or right at junction of 11st (CR 31) and Railroad Ave (HWY 145)
4. Commercial truck traffic is not allowed on 11th Street from 10:00pm to 6:00am
5. The town of Dolores has the following ordinance for muffler requirements:

   **Dolores Municipal Code-Model Traffic Code Section 2-225. Mufflers - prevention of noise.**

   *(1) Every motor vehicle subject to registration and operated on a highway shall at all times be equipped with an adequate muffler in constant operation and properly maintained to prevent any excessive or unusual noise, and no such muffler or exhaust system shall be equipped with a cut-off, bypass, or similar device. No person shall modify the exhaust system of a motor vehicle in a manner which will amplify or increase the noise emitted by the motor of such vehicle above that emitted by the muffler originally installed on the vehicle, and such original muffler shall comply with all the requirements of this section.*

   *(1.5) Any commercial vehicle, as defined in section 235 (1) (a), subject to registration and operated on a highway, that is equipped with an engine compression brake device is required to have a muffler.*

   *(2) A muffler is a device consisting of a series of chamber or baffle plates or other mechanical design for the purpose of receiving exhaust gas from an internal combustion engine and effective in reducing noise.*

   *(3) Any person who violates subsection (1) of this section commits a class B traffic infraction. Any person who violates subsection (1.5) of this section shall, upon conviction, be punished by a fine of five hundred dollars. Fifty percent of any fine for a violation of subsection(1.5) of this section occurring within the corporate limits of a city or town, or within the unincorporated area of a county, shall be transmitted to the treasurer or chief financial officer of said city, town, or county, and the remaining fifty percent shall be transmitted to the state treasurer, credited to the highway users tax fund, and allocated and expended as specified in section 205 (5.5)(a), C.R.S.*

USDA United States Department of Agriculture | Forest Service | San Juan National Forest | 15 Burnett Court
Durango, CO 81301
(970) 247-4874
Fax: (970) 375-2319

File Code: 1570

**Date:** October 20, 2021

Dani Gregory
SWCCA – Board President
Dani@icnolimits.com

Dear Dani Gregory:

On July 21, 2021, the Dolores District of the San Juan National Forest (SJNF) published a legal notice in the *Cortez Journal* initiating the 45-day objection filing period for the Salter Vegetation Management Project's Environmental Assessment (EA), Finding of No Significant Impact, and draft Decision Notice. Subsequently, I received Southwest Colorado Cycling Association's timely objection to this project on August 7, 2021.

In follow-up to your objection letter, you engaged in negotiations with the Dolores District. Subsequently, you withdrew your objection on October 14, 2021 (enclosed), with the understanding that the following resolutions would be incorporated into the final Decision Notice:

1. Clarify in the Final Decision that the SJNF commits to initiating the NEPA analysis referred to in Recreation design feature No. 4 (i) in the EA (page 24), in calendar year 2022 and will complete the analysis prior to beginning implementation in affected blocks.
2. In the Final Decision, revise Scenery design feature No. 7 (page 26 of the EA) as follows: *A visual corridor will be established on each non-motorized system trail within Boggy Draw treatment block utilizing a 50-foot from center line area of influence. The recreation and timber staff will identify leave trees for retention, marking them with temporary paint or flagging. Protection of trees within 50 feet of center line of the corridor is intended to reduce scenic impacts by maintaining unique trail features such as tight turns or challenging obstacles that improve the feel and flow of a single track trail as well as maintaining shade on groomed winter trails.*

Because you have withdrawn your objection, I am setting it aside from further review pursuant to Title 36 of the Code of Federal Regulations (CFR), Part 218, Section 10(a)(6). Additionally, I am instructing the Responsible Official, Derek Padilla, to implement the terms of the agreement as described in this letter. This response is not subject to further administrative review by the Forest Service or the U.S. Department of Agriculture pursuant to 36 CFR 218.11(b)(2).
I appreciate your willingness to find a resolution.

If you have any questions or concerns, please contact Lillis Urban, Regional Administrative Review Coordinator, at Lillis.Urban@usda.gov. Thank you for your interest in the management of public land.

Sincerely,

KARA CHADWICK Digitally signed by KARA CHADWICK
Date: 2021.10.20 11:57:01 -06'00'

KARA L. CHADWICK
Forest Supervisor

Enclosure: Dani Gregory Objection Withdrawal Email

cc: Marcelle (Marcy) Anderson and Lillis Urban

**From:** Dani Gregory
**To:** Lambert, Mark -FS
**Cc:** Chadwick, Kara -FS; Padilla, Derek -FS; Rice, Thomas -FS
**Subject:** [External Email]RE: Proposed Resolutions for Salter project - SWCCA Objection Withdrawl
**Date:** Thursday, October 14, 2021 11:46:38 AM
**Attachments:** image001.png
image002.png
image003.png
image004.png

---

[External Email]
If this message comes from an **unexpected sender** or references a **vague/unexpected topic;**
Use caution before clicking links or opening attachments.
Please send any concerns or suspicious messages to: Spam.Abuse@usda.gov

Mark, Kara, Derek, and Tom,

The SWCCA Board approved the withdrawal of our objection to the Salter projection. Our withdrawal is based on:

- Proposed resolutions to Southwest Colorado Cycling Association:
    - clarify in the Final Decision that the San Juan NF commits to initiating the NEPA analysis referred to in Recreation design feature #4 (i) in the EA (page 24), in calendar year 2022 and will complete the analysis prior to beginning implementation in affected blocks.

    - in the Final Decision, revise Scenery design feature #7 (page 26 of the EA) as follows: *A visual corridor will be established on each non-motorized system trail within Boggy Draw treatment block utilizing a ~~9 foot~~ 50-foot from center line area of influence. ~~To this end, t~~The recreation and timber staff will identify leave trees for retention, marking them with ~~a 360 degree band of~~ temporary paint or flagging. Protection of trees within ~~9~~ 50 feet of center line of the corridor is intended to reduce scenic impacts by maintaining unique trail features such as tight turns or challenging obstacles that improve the feel and flow of a single track trail as well as maintaining shade on groomed winter trails*.
- Language in the Draft EA that allows for our involvement with the Implementation Checklist and post implementation review.
    - SWCCA acknowledges that we will have 2 – 4 weeks to provide feedback on tree selection/retention. We ask that notification be given as soon as possible, so we can plan and organize our volunteers.

On behalf of SWCCA and our board, I would like to thank all of you for your efforts regarding the Salter Project, and for evaluating our concerns.

Please contact me if you have any questions.

Thank you,
Dani Gregory
SWCCA – Board President
970-749-1060

**From:** Lambert, Mark -FS <mark.b.lambert@usda.gov>
**Sent:** Wednesday, September 29, 2021 3:58 PM
**To:** Dani Gregory <Dani@icnolimits.com>; Kenneth Charles <manager@townofdolores.com>
**Cc:** Chadwick, Kara -FS <kara.chadwick@usda.gov>; Padilla, Derek -FS <derek.padilla@usda.gov>; Rice, Thomas -FS <thomas.b.rice@usda.gov>
**Subject:** Proposed Resolutions for Salter project

Dani and Ken,
After considering the objections you filed on the Salter project, and your comments from the September 8 objection resolution meeting, Forest Supervisor Kara Chadwick is offering the resolutions below to address your concerns. Please review these proposed resolutions prior to the scheduled meeting on 10/4 at 2pm.

1. Proposed resolution to Town of Dolores: provide Timber Operator with a handout detailing Town of Dolores requirements for logging trucks. Handout attached.

2. Proposed resolutions to Southwest Colorado Cycling Association:
   a. clarify in the Final Decision that the San Juan NF commits to initiating the NEPA analysis referred to in Recreation design feature #4 (i) in the EA (page 24), in calendar year 2022 and will complete the analysis prior to beginning implementation in affected blocks.

   b. in the Final Decision, revise Scenery design feature #7 (page 26 of the EA) as follows: *A visual corridor will be established on each non-motorized system trail within Boggy Draw treatment block utilizing a ~~9 foot~~ 50-foot from center line area of influence. ~~To this end, t~~The recreation and timber staff will identify leave trees for retention, marking them with ~~a 360 degree band of~~ temporary paint or flagging. Protection of trees within ~~9~~ 50 feet of center line of the corridor is intended to reduce scenic impacts by maintaining unique trail features such as tight turns or challenging obstacles that improve the feel and flow of a single track trail as well as maintaining shade on groomed winter trails.*

**Mark B. Lambert**
**Public Service Staff Officer**
**U.S. Forest Service**
**San Juan National Forest**

**office: 970-385-1240**
**mobile: 970-799-2331**
**mark.b.lambert@usda.gov**

15 Burnett Court
Durango, CO 81301
www.fs.fed.us

Caring for the land and serving people

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

USDA United States Department of Agriculture | Forest Service | San Juan National Forest | 15 Burnett Court
Durango, CO 81301
(970) 247-4874
Fax: (970) 375-2319

File Code: 1570

**Date:** October 22, 2021

Mr. Jimbo Buickerood
jimbo@sanjuancitizens.org

Dear Mr. Buickerood :

This letter is in response to your objection to the draft Decision Notice (DN) and Finding of No Significant Impact (FONSI) for the Salter Vegetation Management Project, Dolores Ranger District, San Juan National Forest. I have read your objection and reviewed the project record, the draft DN/FONSI, and the final Environmental Assessment (EA). My review of your objection was conducted in accordance with the regulation at 36 CFR 218 (2013).

**PROJECT DESCRIPTION**

On July 21, 2021, the Dolores District Ranger released the Salter Vegetation Management Project EA, draft DN, and FONSI for objection. The District Ranger proposes to implement Alternative 2 in the draft decision, which authorizes the following:

- Single tree selection on 19,675 acres, harvested trees not to exceed 26.9 inches diameter at breast height (dbh);
- Commercial thinning on 3,115 acres, harvested trees not to exceed 26.9 inches dbh;
- Post fledging area thinning, pre-commercial thinning and brush thinning as appropriate in any treatment unit;
- Up to 117 miles of temporary road construction;
- Reduction of activity fuels through a variety of means;
- Installation of four wildlife guzzlers.

**OBJECTION ISSUE DISCUSSION**

The eligible objectors raised a number of concerns that fell under the themes of NEPA adequacy (adequacy of the analysis, adequacy of the purpose and need, consideration of reasonable alternatives and consideration of comments), use of best available science, effects related to climate change, effects related to economics, and impacts to the project area (impacts to aquatic/hydrologic resources, visuals and recreation, soils, wildlife, and vegetation).

The objection resolution meeting was held on September 8, 2021. I found the dialogue with all of the objectors helpful and thoughtful. I appreciate the passion and dedication of the objectors for the San Juan National Forest and the variety of resources it provides to the public. I understand the concerns raised and I also understand the balance that must be considered by the Responsible Official when it comes to managing forest resources. During the resolution meeting and subsequent conversations with objectors, I found that four specific concerns could be clarified in the final decision.

1. The district will provide Timber Operator with a handout detailing Town of Dolores requirements for logging trucks (enclosed).
2. The district will clarify in the Final Decision that all treatments that originate from the Salter and Plateau treatment areas and require the removal of forest products utilizing commercial log trucks will be required to utilize the western transportation route and will not travel through the Town of Dolores.
3. Clarify in the Final Decision that the Dolores District commits to initiating the NEPA analysis referred to in Recreation design feature No. 4 (i) in the EA (page 24), in calendar year 2022 and will complete the analysis prior to beginning implementation in affected blocks.
4. In the Final Decision, revise Scenery design feature No. 7 (page 26 of the EA) as follows: *A visual corridor will be established on each non-motorized system trail within Boggy Draw treatment block utilizing a 50-foot from center line area of influence. The recreation and timber staff will identify leave trees for retention, marking them with temporary paint or flagging. Protection of trees within 50 feet of center line of the corridor is intended to reduce scenic impacts by maintaining unique trail features such as tight turns or challenging obstacles that improve the feel and flow of a single-track trail as well as maintaining shade on groomed winter trails.*
5. Clarify in the Final Decision that the Dolores District commits to using the "descending order" tree evaluation decision process as described on page 17 (items *a* through *l*) of the EA within the Salter project area.
6. Clarify in the Final Decision that for Wildlife Design Feature 2b (page 28 of the EA), the percent post-fledgling family area canopy cover should be 50 percent or greater.

**CONCLUSION**
I conducted my review of the record, final EA and draft DN/FONSI. Based on my review, I conclude the following:

- The draft decision clearly describes the actions to be taken in sufficient detail that the reader can easily understand what will occur as a result of the draft decision.
- The draft decision considered a range of alternatives that was adequate to respond to the Purpose and Need for action. The purpose and need and alternatives considered in the final EA reflect a reasonable range of alternatives, consistent with law, regulation, and policy.
- The draft decision is consistent with Forest Plan and Comprehensive Management Plan standards and guidelines.
- The draft decision is consistent with policy, regulation, law, direction, and the final EA contains adequate evidence to support the decision. The record and final decision contain site-specific documentation regarding resource conditions, and the Responsible Official's draft decision document is based on the record and reflects a reasonable conclusion.
- For the sake of clarity, I am directing the Responsible Official to make these additional clarifications in the final Decision Notice:
  - The EA contains a discrepancy in how proposed temporary road mileage is described; I therefore direct the Responsible Official to address this discrepancy in the final Decision Notice and describe the correct mileage.
  - The EA's wildlife analysis and supporting specialist report identify a project design feature that was not included in those that were proposed to be authorized by the Responsible Official; I therefore direct the Responsible Official to clarify in the final

Decision Notice that the referenced design element is not included in the authorized activities and provide rationale why the analysis of effects to elk would not be changed with that design element removed.

This concludes my written review of the project. By copy of this letter and the enclosed response document, the Responsible Official may sign the decision after including the clarifications noted above, then notify interested and affected persons in accordance with the regulation at 36 CFR 218.12 and 36 CFR 220.7(d). This written response is the final administrative review by the Forest Service or the Department of Agriculture [36 CFR 218.11(b)(2)].

If you have any questions and/or concerns, please contact Mark Lambert at mark.b.lambert@usda.gov.

Sincerely,

KARA CHADWICK Digitally signed by KARA CHADWICK
Date: 2021.10.22 13:52:03 -06'00'

KARA L. CHADWICK
Forest Supervisor

Enclosures - 2

**Town of Dolores Information for Pre-work Meetings with Timber Operator**

1. Montezuma County Road 31 turns into Town of Dolores 11th Street when the road crosses city limits and the speed limit is **15MPH.**
2. The Town of Dolores requires that all trucks hauling logs off of Forest Service contracts are equipped with Jake Brakes Mufflers
3. The town of Dolores requires that all trucks hauling logs off of Forest Service contracts do not deviate from 11th Street (go either left or right at junction of 11st (CR 31) and Railroad Ave (HWY 145)
4. Commercial truck traffic is not allowed on 11th Street from 10:00pm to 6:00am
5. The town of Dolores has the following ordinance for muffler requirements:
   **Dolores Municipal Code-Model Traffic Code Section 2-225. Mufflers - prevention of noise.**
   *(1) Every motor vehicle subject to registration and operated on a highway shall at all times be equipped with an adequate muffler in constant operation and properly maintained to prevent any excessive or unusual noise, and no such muffler or exhaust system shall be equipped with a cut-off, bypass, or similar device. No person shall modify the exhaust system of a motor vehicle in a manner which will amplify or increase the noise emitted by the motor of such vehicle above that emitted by the muffler originally installed on the vehicle, and such original muffler shall comply with all the requirements of this section.*
   *(1.5) Any commercial vehicle, as defined in section 235 (1) (a), subject to registration and operated on a highway, that is equipped with an engine compression brake device is required to have a muffler.*
   *(2) A muffler is a device consisting of a series of chamber or baffle plates or other mechanical design for the purpose of receiving exhaust gas from an internal combustion engine and effective in reducing noise.*
   *(3) Any person who violates subsection (1) of this section commits a class B traffic infraction. Any person who violates subsection (1.5) of this section shall, upon conviction, be punished by a fine of five hundred dollars. Fifty percent of any fine for a violation of subsection(1.5) of this section occurring within the corporate limits of a city or town, or within the unincorporated area of a county, shall be transmitted to the treasurer or chief financial officer of said city, town, or county, and the remaining fifty percent shall be transmitted to the state treasurer, credited to the highway users tax fund, and allocated and expended as specified in section 205 (5.5)(a), C.R.S.*

Forest Service
U.S. DEPARTMENT OF AGRICULTURE

Rocky Mountain Regional Office

Sept. 2021

# Response to Objections on the Salter Vegetation Management Project on the San Juan National Forest

## Objectors

Molly Pitts, Intermountain Forest Association
Tim Kyllo, Montrose Forest Products, LLC
William L. Baker, PhD.
Edward B. Zukoski, Center for Biological Diversity/Adam Rissien, WildEarth Guardians
Jimbo Buickerood, San Juan Citizens Alliance

## Organization of this Document

Due to the number of objectors and the similarity between several of the objections, I as the Objection Reviewing Officer elected to lump objection issues to the extent possible. This approach allowed for increased efficiency in reviewing and responding to objection statements.

## Objection Statements and Responses

### *Issue #1*

This issue relates to Objectors' concerns that the affected environment was not sufficiently described in the EA; Objectors allege insufficient location information was provided for a variety of resources, that baseline information was not provided and that common stand exam (CSE) data were not provided to the public. Objectors contend that this constituted a violation of NEPA.

### *Analysis #1*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives; there is no requirement for an affected environment section in an EA.

The final EA (p. 1-8) provides context of the affected environment (also called existing condition or environmental baseline), which indicates that age and size are variable and provides average basal area. Project Design Features (Final EA pp. 20-29) indicate where additional surveys or layout requirements are needed to ensure that the affected environment and effects analysis align. Each resource in Section 3 of the Final EA addresses affected environment (Final EA pp. 35 – 85). Of specific note, the Final EA affected environment describes the affected watersheds and riparian areas (Final EA pp. 67 and 68) and where sensitive soils occur (EA p. 68). Additional baseline information for other species is included in the project Biological Evaluation (BE; Project Record). Detailed maps displaying locations of treatment units by treatment type, transportation system, proposed temporary roads, goshawk post-fledging areas, trails and streams are included in Appendix A of the Final EA.

Common stand exam (CSE) data, which comprise on-the-ground site-specific information, were referenced in the Final EA (Final EA pp. 6, 11, 12, 14). While CSE data in raw format are not included in the Final EA, data are summarized in the Timber Silvicultural Report in the project file.

Also see response to Issue #4.

### *Conclusion #1*

I find that the Responsible Official has taken the required hard look at existing conditions and that the description of affected environment is consistent with applicable regulation

### *Issue #2*

This issue relates to Objectors' allegation that the EA fails to accurately describe and document effects of temporary roads and skid trails. Objectors claim that mileage of temporary roads is inconsistently described and there is a lack of site-specificity, which objectors claim is a violation of NEPA.

### *Analysis #2*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives; there is no requirement for an affected environment section in an EA.

The Transportation section of the EA states that 106 miles of temporary road will likely be required for project implementation; this consists of 69.8 miles of existing non-system roads and 36.4 miles of new ground disturbance (Final EA p. 63). In order to account for on the ground layout, an additional 10% (11 miles) was added to the anticipated temporary road mileage (Final EA p. 63; DN p. 4); therefore a total of 117 miles of temporary roads were analyzed. Appendix A of the EA provides maps of proposed temporary road locations (Final EA p. 92-97).

The EA does state that 50-75 miles of temporary road construction are analyzed under this proposal Final EA p. 19). The District clarified that this was a mistake in the final EA, and that the mile estimates disclosed in the Transportation section are correct.

The EA contains a general description of temporary roads being constructed with minimal disturbance (length and width), proper drainage, and appropriate stream crossings to withstand flood flows (Final EA pp. 19, 22, 26, 63 and 70) and a statement that all drainage structures on roads will be inspected by the Timber Sale Administrator, Engineering Representative or Forest hydrologist at treatment completion to make sure they are in good condition. Hydrology and Soils Design Feature #7 states that temporary roads will be held to the minimum number feasible and will be located sufficiently far from streams and other water bodies to minimize discharge into those waters except at stream crossings (Final EA p. 22).

The EA states that all temporary road segments will be decommissioned within five years after first use (Final EA p. 19). Transportation Design Feature #2 (Final EA p. 26) states that the location and clearing widths of all temporary roads will be agreed to in writing before construction is started and that all temporary roads will be decommissioned after use, which involves re-contouring where significant side slope exists, elimination of ditches and other structures, out-sloping during construction, removal of ruts and berms, effectively blocking the road to normal vehicular traffic where feasible, and construction of drainage features such as cross ditches and water bars.

Hydrology and Soils Design Feature #5 describes skid trails as being perpendicular to the slope as much as possible, outside of drainages, and away from sustained steep slopes (greater than 40 percent) and specifies that they will be located and designed to disperse runoff and minimize soil disturbance (Final EA pp. 21 and 70). Hydrology and Soils Design Feature #4 states that skidding will not be allowed in wetlands, wet meadows and riparian areas (Final EA pp. 21 and 71). There is a no treatment buffer zone around riparian and wetland areas (Final EA p. 21). Skid trails will be closed after use by adding waterbars or outsloping and spreading slash (Final EA p. 21).

Effects to resources are based on the design features as described above. The final EA includes discussion of the effects of temporary roads and road use on invasive plants (final EA pp. 42-43), grazing (final EA pp. 46-47), rare and sensitive plants (final EA p. 49), recreation (final EA pp. 52-54), transportation (final EA pp. 61-64), watersheds, soils and water quality (final EA pp. 70-72), and wildlife (final EA pp. 78-79). The final EA also indicates that businesses local to the project area may complete roadwork, creating a minor local socioeconomic effect (final EA p. 60).

The EA mentions a process by which a temporary road system will be developed as described in the Project Design Features (Final EA p. 63), but this process is not found in the Transportation Design Features of the EA. I directed my staff to talk to the project's Roads Engineer; the following is standard operating procedure for the development of a timber sale transportation system, and was therefore not included in the EA. It will be included in the sale contract language:

1. Roads to be used for hauling or equipment access will be used in the following order of preference:
    a. First preference is to use National Forest System Roads identified on the Motor Vehicle Use Map for general public use. These roads are maintained in an "open"' status with either gravel surface (ML3) or native surface (ML2).
    b. Second preference is to use ML1 roads (only open to limited administrative use), which might require reconstruction (e.g., removal of trees and shrubs, reshaping, blading, adding surface material or installing drainage features). After use the road would be put back in ML1 status or decommissioned. Consult with Forest engineering staff and project hydrologist for input on road reconstruction.
    c. Third preference is to use existing unauthorized roads (which would be considered temporary roads and obliterated when use is complete). Roads in this category might require removal of trees and shrubs, reshaping, blading, adding surface material, installing drainage features, etc.
    d. Fourth preference is to create temporary roads. The Forest Service and the purchaser/contractor shall agree upon locations of temporary routes, resource protection requirements employed during road construction, clearing widths, and closure or rehabilitation requirements, which must be consistent with all design elements and implementation requirements of the Lone Pine EA.
2. Temporary roads must be seeded and closed within five years after final use.
3. Temporary roads shall be designed to the minimum standard for their use and be located to "roll" with the terrain as feasible.

### *Conclusion #2*

I find that the final EA adequately described and documented the location and effects associated with temporary roads.

For the sake of clarity and given the oversight in the final EA related to mileage of temporary roads, I will direct the Responsible Official to clarify the mileage in the final Decision Notice.

### *Issue #3*

This issue relates to objectors' allegation that the range of alternatives documented in the EA is insufficient. Specific concerns relate to the EA not considering an alternative that limits removal of large trees, and not considering multiple uses when developing the range of alternatives.

### *Analysis #3*

The regulation at 36 CFR 220.7(b)(2) states that an EA "shall briefly describe the proposed action and alternative(s) that meet the need for action. No specific number of alternatives is required or prescribed." Objectors allege the requirements of NEPA (40 CFR 1502.14) have not been met; it should be noted that the regulation at 40 CFR 1502 is specific to Environmental Impact Statements and is not applicable to an EA, except as described in 40 CFR 1501.5(g).

Alternative 3, which was developed to address commenters' concerns about cutting of large or old trees, was fully developed (Final EA pp. 29-30, 35). Alternative 3 limited the removal of trees over 20"

and was intended to emphasize large tree retention. Common Stand Exam data collected for the project indicate there is not necessarily a correlation between tree size and tree age within the project area (Final EA, pp. 3, 6-7, 11). The District identified specific prescriptions and prioritized additional considerations for determining which trees met old and large requirements (Final EA, pp. 14-17).

Objector also wishes an additional alternative to be considered that didn't include harvesting trees over 16 inches DBH or larger since there is minimal difference between Alternatives 2 and 3. This appears to have originated from Objector's March 22, 2020 comment letter (emphasis added):

> *We therefore request that the Forest Service consider an alternative that will: retain large trees, **either** larger than 16" DBH **or** 20" DBH, and any old trees, as determined by their size, appearance and morphology. The size of the cap may depend on the results of stand exam data. To the extent that the CSE data show few if any trees 20" DBH or larger, the Forest Service should consider a smaller diameter cap to protect the largest trees that remain.*

The district considered a publication "Diameter Caps and Forest Restoration: Evaluation of a 16" Cut Limit on Achieving Desired Conditions Southwestern Region" (Final EA. p. 66). This document was reviewed in relationship to findings from the adjacent Lone Pine project implementation. Final EA, p. 66 provides rationale based on existing conditions, "Removing areas from treatment as result of diameter limitation reduces the amount of treatment in an area…" While a specific alternative was not addressed related to a 16" diameter, the Final EA (p. 4) specifies the "12-25 inch size class is the most represented on the landscape with reduced representation as the diameter increases" This provides additional rationale for not considering smaller diameter trees as the cut off toward meeting desired basal area. A 16" cap appears to represent an average-sized tree in this area, not one that was exceptionally large or necessarily old (Final EA, Figure 4). A standard diameter for old growth was not specified for ponderosa pine in the SJNF's Forest Plan.

One objector expressed that the range of alternatives is invalid because it didn't include "multiple uses;" however, I find that the proposed action and Alternative 3 were developed to be consistent with objectives identified in the LRMP for Management Area 5, which provide for active management in order to meet multiple-use goals (EA pg. 8). By maintaining consistency with LRPM direction for Management Area 5, the District allowed for multiple uses in the project area. The various uses in the project area were considered in alternative development, including project design, and effects to these resources were disclosed in Chapter 3 of the EA.

The draft Decision Notice (p. 8) includes discussion of alternatives considered and how public comments were used in modifying the proposed action and developing another action alternative.

### *Conclusion #3*

I find that the Responsible Official has considered an adequate range of alternatives, consistent with regulation.

### *Issue #4*

Objectors allege that the Salter Vegetation Management project is inconsistent with the San Juan National Forest Land and Resource Management Plan (LRMP) in a number of ways, including deficiencies in addressing Historical Range of Variability (HRV) and ecosystem management, failure to meeting LRMP objectives for ponderosa pine forest, use of a 26.9" diameter limit and logging of presettlement trees.

### *Analysis #4*

The San Juan National Forest Land and Resource Management Plan (LRMP) states that the Historical Range of Variability (HRV) "can be used to establish an ecological baseline." It also states that the intent is not to mandate that HRV conditions be achieved in all cases (LRMP p. 12). The San Juan LRMP states that Ecosystem Management, which uses HRV for reference, will be implemented by maintaining or restoring the composition, structure, function, and physical environment of ecosystems" (LRMP p.13). The LRMP does not include specific requirements related to the Ecosystem Management approach.

The Ecosystem Management section of the LRMP also states that many ponderosa pine forests on the SJNF are currently outside their HRV in terms of vegetation stand structure and fire frequency. Ponderosa pine forests have fewer acres in both young and old growth development stages and have less diversity and less cover of native grasses compared to HRV conditions (LRMP p. 18). The desired condition for ponderosa pine forests described in the LRMP is for forests to display variable density and structure reflecting uneven-age structure comprising variable-sized trees (LRMP p. 20).

The San Juan LRMP states that there are many opportunities for vegetation management and that the timber program will focus treatment on "landscapes at high risk for developing epidemic levels of insect and/or disease infestation; landscapes where disturbance has resulted in dead or dying trees…" (LRMP p. 73). One of the objectives outlined in the LRMP states that the most common applications of timber harvest to meet the desired condition could be to conduct thinning-with an emphasis on restoration and fuels reduction of altered forest types-in ponderosa pine and warm-dry mixed conifer vegetation types on approximately 15,000 to 20,000 acres: (LRMP p. 75). Objectives in the LRMP are defined as aspirations, not commitments or final project decisions (LRMP p. 6).

The EA describes the current condition of the forest in the project area and references modeling that was done to suggest two underrepresented size classes relative to the stand structure. These include large trees (greater than 27" DBH) and seedlings and saplings (EA p. 4). Also included within the project area are plantation areas. This has resulted in areas within the project where the diversity is both desired and undesired. Beetle mortality in the over story and density induced mortality is also present (EA p. 4). These infestations are growing and appear to be moving to the east. Data obtained from two consecutive years of flights show a general expansion of the beetle infestation and indicates a need to establish an uneven-age stand structure to increase resistance to beetle infestation and promote resilience (EA p. 5). The EA provides a description of the age and size class of ponderosa pine found within the project area (Final EA p. 6).

The analysis states that a comparison between the current and desired conditions was done utilizing common stand data and that Forest Vegetation Simulation modeling and field observation shows that the condition of the ponderosa pine cover type within the project area is different from the desired condition (DN p. 1, Final EA p. 11).

The dbh limit was set at 26.9 inches due to this size class being underrepresented in the treatment area (Final EA p. 6). There is a description of the stand exam inventory that was done in the project area which describes that using the dbh of trees does not correlate well to the age of the tree. Therefore, it is necessary to rely on visual, as well as size correlation to determine pre-settlement trees within a stand (Final EA p. 6). The forest will use stand exam data to establish likely frequency and typical size of old trees within a stand as a guide for tree markers at the prescription level, which will help to avoid harvesting pre-settlement trees (Final EA p. 6). The draft DN outlines the rationale behind why choosing a smaller dbh limit would not meet the purpose and need of the project (dDN p. 6).

### *Conclusion #4*

I find that Responsible Official provided adequate information in the analysis to show that the proposed action meets direction outlined in the San Juan Land and Resource Management Plan (LRMP).

### *Issue #5*

Objectors allege that the purpose and need for the Salter Project is flawed for a variety of reasons, including that it is too narrow and does not account for multiple uses in the project area, is not valid regarding brush removal over 5,000 acres, and does not provided site-specific data. Objectors further allege that because the purpose and need for Salter is different than the purpose and need for the nearby Lone Pine project, it is arbitrary.

### *Analysis #5*

The regulation at 36 CFR 220.7(b)(1) states that an EA, "…must briefly describe the need for the project."

The purpose and need for the Salter Project relies on site-specific data. Common Stand Exams (CSEs) have been conducted in the project area and proposed actions are specific to this project.

Common stand exam data, which is on-the-ground site-specific information, were referenced in multiple sections of the Final EA (Need for this Proposal and Modified Proposed Action). Basal area was addressed in response to recent fires at Final EA pp 11. The District states the following in regard to purpose and need to achieve desired conditions:

> The desired conditions for the ponderosa pine cover type and lands managed for forest product offerings are further defined in sections 2.2.23 and 2.9.1 of the San Juan National Forest Land and Resource Management Plan (USDA 2013) (final EA, p. 9).

Further:

> A comparison based on common stand exam data, Forest Vegetation Simulation modeling, and field observation between the current and desired conditions shows that the condition of the ponderosa pine cover type found within the Salter vegetation management activity area is different from the desired conditions associated with that vegetative cover type in the San Juan National Forest Land and Resource Management Plan.
>
> The structure and size class distributions in the stands identified for this analysis are not within desired conditions described in 2.2.23 based on field reconnaissance and inventory data. Bark beetles have infested adjacent landscapes causing significant mortality. The early stages of a bark beetle infestation are now being observed in the Salter project area. There are portions within the Salter project area that have been moderately burned by wildfire and there are immediately adjacent areas that have been severely impacted by wildfire. It is well documented that dense, over-stocked, even-age, closed canopy ponderosa pine stands are more susceptible to insect outbreaks (Negron et al. 2008). It is also is well documented that a lack of structural diversity corresponds directly to a reduction in forest resiliency and consequently long term resistance to detrimental natural and human disturbance events, such as, large-scale stand replacing fires (Canard 2013, Negron et al. 2008, Negron et al. 2000, USDA-rmrs_2009_gibson_k0022000) (final EA, p.11).

Approximately 34 percent of the Salter project area has been impacted by fire in the past 10 years. The District states: "The majority of disturbance is due to the 2018 Plateau Wildfire, which burned nearly 20,000 acres during exceptional drought. This fire reduced basal area across the footprint by approximately 32 percent, with most of the fire area (58 percent) experiencing between a 0-to-25 percent reduction in basal area (US Forest Service Rapid Assessment of Vegetation Condition after Wildfire, 2018)" (final EA, pgs. 39-40).

Further, the District has outlined current stand conditions in the following statement: "The average basal area of 336 stands measured in 2020 was 112 $ft^2$/acre and included a range of 12 $ft^2$/acre to 236

ft$^2$/acre. Of the 336 stands measured, the majority of the stands in the project area have basal areas over 100 ft$^2$/acre (200 stands). Seventy-two stands had basal areas over 140 ft$^2$/acre (twice the preferred basal area target)" (final EA, pgs. 6-7).

Therefore, the reduction in basal area by 32 percent across the fire footprint did not achieve the desired effect of 50-70 ft$^2$/acre as shown in the 2020 CSE data output above. Commercial thinning to a 50-70 basal area per acre will only occur depending on current stand conditions, as shown in Table 2, "Vegetation treatment type and treatment description" in the final EA, pages 12-13.

Further rationale and data to support the purpose and need can be found in the Project Record (Vegetation Analysis pp. 27 -39).

Regarding objectors' concern related to the differences between the purpose and need for Salter as opposed to the nearby Lone Pine project, the Final EA at p. 65-66 to describes the differences in Salter's basal areas based upon field recent field observations during the implementation of the Lone Pine project:

> *Preliminary feedback of Lone Pine EA Large Tree Retention study areas from post decision reconnaissance and layout of leave tree units have shown mixed results. The effects of applying a diameter limit appear to be more easily tangible at the fine scale. At the fine scale patches of bark beetle and heavily infested dwarf mistletoe trees have to be passed for removal due to the diameter limitation. Basal area retention goals and uneven aged characteristics are being compromised, leaving stands less resilient and making long term resistance less likely to occur. Removing areas from treatment as result of diameter limitation reduces the amount of treatment in an area and subsequently the amount of harvestable volume per acre. The effects described for the small scale are also documented from the mid-scale and potentially the landscape scale (USDA 2013d; USDA 2011).*

These observations indicate that basal area requirements were not factoring in the extent of insect and disease in the area. Final EA (p. 86) states: "The Salter Vegetation management project proposes an adaptive management approach intended to accommodate changing conditions and additional strategies to achieve the identified desired conditions." Final EA (pp. 29-30) describes the adaptive management and monitoring process.

Regarding brush treatment, the purpose and need is stated in the Final EA, pages 7, 13, and 15-16; and the Vegetation Analysis report, page 10. The final EA indicates that Gambel oak dominates the understory in many of the stands and outcompetes young pines and seedlings for essential light, moisture, and nutrients (final EA, pg. 15). The District states: *"This competition for limited moisture is probably most detrimental to pine when the trees are very young and seedlings are competing directly with the extensive oak layer. Pine germination and establishment will also likely be hindered when micro sites are fully occupied by oak and heavy leaf litter covers mineral soil. Some research has even indicated a possible inhibiting allelopathic effect of oak leaves on pine germination (Harrington 1987)"* (Project Record, Vegetation Analysis, p. 10).

Regarding the EA's statement that seedlings are an underrepresented size class (final EA p. 16), this is supported by the Vegetation Analysis report, which states:

> *There is also the ability for good establishment of seedlings and regeneration as seen in stands currently meeting desired conditions in LRMP or areas that have seen various types of disturbance. As seen in the structure of areas of stands during field reviews cone crops can be episodic in nature leading to very patchy and variable regeneration. Yet where represented it*

> *often has 400 to 500 seedlings per acre. This size class is the other under-represented component of stands' structures identified for treatment* (Vegetation Analysis report, p. 6).

The Vegetation Analysis report further describes the relationship between overstocking of Gambel Oak and understocking of conifer seedlings:

> *The understory/shrub layer is overwhelmingly comprised of Gambel oak with minimal growing space available for seedlings and saplings. In case of Ponderosa Pine numbers this component of structure is lacking and mostly a monoculture of Gambel oak* (Vegetation Analysis report, p. 14).

Regarding Objectors' concerns that "desirable conditions" described by the Dolores Watershed Resilient Forest Collaborative (DWRF) were not considered, The District states the following on the collaborative process and consistency with *Ponderosa Pine Ecosystem Resilience Metrics and Desired Conditions*:

> *Through efforts like the Rocky Mountain Restoration Initiative and the Collaborative Landscape Restoration Forest Restoration program, DWRF collaborative members have identified treatment priorities for areas within the DWRF upper Dolores River watershed, which includes the Salter landscape. This provides information to the agency to take into consideration when determining treatment priorities. The collaborative has also identified a set of ponderosa pine desired conditions that outlines components of ponderosa pine forest resiliency that are a priority for the collaborative (DWRF. 2020. Ponderosa Pine Ecosystem Resilience Metrics and Desired Conditions). The desired conditions developed by the collaborative are consistent with and integrate well with the standards and guidelines identified in the Land and Resource Management Plan for this landscape. The information and recommendations provided by the collaborative have been given consideration in the design of the Salter Vegetation Management project"* (final EA, pg. 86).

Finally, regarding Objectors' concerns that the purpose and need doesn't include multiple uses in the project area, NEPA does not require that multiple uses within a specific project area need to be part of every proposal. Multiple uses have, however, been considered in the effects analysis in Section 3 of the Final EA. Numerous design features protect multiple uses (final EA, pp. 20-29).

Also see response to Issue #3.

### *Conclusion #5*

I find that the purpose and need for the Salter Project was properly focused on vegetation conditions and was based on best available science and site-specific information.

### *Issue #6*

Objectors allege that the Salter Project will result in significant impacts and therefore requires preparation of an EIS; specific concerns relate to the effects of skid trails and 177 miles of temporary roads, logging on 35 square miles of forest land and duration of project (10 years) on soils and watersheds. Objectors also allege significant effects to the northern goshawk and to presettlement ponderosa pine.

### *Analysis #6*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives.

The rebulation at 40 CFR 1508.13 describes a Finding of No Significant Impact (FONSI) as:

> "Finding of no significant impact means a document by a Federal agency briefly presenting the reasons why an action, not otherwise excluded (§1508.4), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared. It shall include the environmental assessment or a summary of it and shall note any other environmental documents related to it (§1501.7(a)(5)). If the assessment is included, the finding need not repeat any of the discussion in the assessment but may incorporate it by reference."

The final EA states: "This environmental assessment is prepared to determine whether the effects of the proposed action may be significant and therefore warrant the preparation of an environmental impact statement……Consistency findings are disclosed in the individual resource-specific environmental effects section of this environmental assessment" (Final EA, page 1).

Anticipated effects to soils and watersheds are documented in the EA (p. 69-72). Erosion and runoff will be minimized due to the application of design features (EA p. 21-22, 26, 71). There is an acknowledgement that the proposed action will result in a small, temporary increase in runoff due to water running off compacted areas immediately after harvest and that the effects will be of limited extent and severity due to several factors described (EA. p. 70). There is also an acknowledgment that soil erosion will occur as a result of temporary road construction and that some sediment delivery to ephemeral and intermittent streams is expected at stream crossings, but that these effects will be short-term and of limited intensity (EA p. 70). Road density will not increase in the watersheds and is within the Forest Plan guidance (EA p. 67-68, 70). Road maintenance will occur on more roads in the area improving the overall road condition (EA p. 65).

The method for identifying pre-settlement trees is stated in the EA, pages 6, 16-17. The District determined during the stand inventory process that there is high variability between age classes relative to size diameter at breast height (Vegetation Analysis, pages 13-14).

The District states: *"Data analysis is a good guide for overall management but when in the field, visual characteristics have proven to be more reliable in determining age (GTR-110 2003 Huckaby etal.)."* (Project record, Vegetation Analysis page 14).

The District further states: "*CSE data will be used to establish a likely frequency and typical size of trees as a guide for tree markers. Of the 7,461 trees measured in 2020 within the treatment area the oldest tree cored and aged was 137 years old and had a diameter of 19.6 inches at Breast Height. While the largest tree measured was over 50" DBH. This demonstrates the variability within the age to size correlation and makes it necessary to rely on visual as well as data for indicators of pre-settlement trees within a stand. Including this type of data in marking guides will help the markers understand which tree sizes within a stand might have the potential of being pre-settlement in age."* (Project record, Vegetation Analysis page 14).

The District outlines the following indicators for evaluating pre-settlement trees:

*"Tree evaluation will be accomplished through a descending order of choice made by the designator. Evaluation occurs at every step of the decision-making process applying sound judgement based on parameters from the analysis and direction from a certified silviculturist. Below is an example of a descending order of choice that will be used to evaluate trees and ultimately designated them for removal if the stand has a basal area greater than 50 ft2/acre.*

*a. Tree can be evaluated for harvest if it is less than 27.0 inch DBH*
*b. Do not cut trees with a combination of pre-settlement visual indicators*
*c. Cut dead trees (brown or red needles/no needles)*
*d. Cut live trees with visible evidence of bark beetle infestation (e.g., pitch tubes, frass, and woodpecker activity on tree bole)*

*e. Cut live trees with dwarf mistletoe infecting more than 50% of the live crown*

*In addition to b-e above, trees 25 inch DBH and less can also be cut if they meet the following condition or structure.*

*f. Live crown declining more than 25% including poor needle conditions*
*g. Evidence of conks, cankers or advanced decay*
*h. Weak or multiple forks*
*i. Broken or dead tops*
*j. Leans greater than 35%*
*k. Grossly poor form*
*l. To achieve a basal area target within 50-70 ft2/ac.*

*When all components are represented, uneven-aged stand structure mirrors a reverse J curve when graphed (Refer to the Vegetation Report). Most stands are not this uniform, and adjustments will be made on a stand level basis to begin moving toward a more traditional uneven aged structure. The reverse J curve is a model and does not account for variability caused by additional desired conditions such as group, clump and individual structure, tree retention for aesthetics, old and large tree retention or supplementary resource based design elements. Each stand will have a different approach to uneven aged management from the current benchmark to achieving the desired structure, while meeting design elements. This provides flexibility in prescription writing an essential component of this analysis and ultimately meeting desired conditions."* (EA, page 17)

Therefore, pre-settlement trees will be retained if they do not meet the above indicators and each stand will require a unique approach in prescriptions to achieve desired conditions while meeting design elements.

Regarding northern goshawk, Forest Service Manual 2672.42 describes the standards for Biological Evaluations and 2672.43 outlines the procedure for conducting a Biological Evaluation.

The analysis of effects to goshawks is documented in the EA (Pg 73, 76-80) and BE (Pg 36-41). The analysis determination states, "…effects are expected be short-term (less than 10 years) and the long-term (more than 10 years) impacts are intended to be beneficial by providing higher quality habitat that is well distributed in the future. Two design features that place temporal and spatial restrictions on management actions were developed to minimize adverse effects (EA Pg 28, Fig 15 of App A). A specific harvest treatment was developed with technical input from the district wildlife biologist and "designed to improve the overall stand functionality and improve growth rates by reducing trees per acre while maintaining or promoting a relatively closed canopy structure to meet goshawk habitat." (EA Pg 15).

The draft Decision Notice includes a Finding of No Significant Impact, which is well-supported by the final EA and the project record (draft DN pp. 10-13).

## *Conclusion #6*

I find that the Responsible Official has found that the Salter Vegetation Project would not result in significant impacts to the human environment and has provided sufficient evidence, supported by the final EA and project record, in the Decision Notice.

### *Issue #7*

Several Objectors allege that NEPA is violated because comments they submitted during the scoping period and/or the comment period were not acknowledged or responded to; Objectors allege a violation of the NEPA regulations at 40 CFR 1503.1 and 1503.4.

### *Analysis #7*

The regulation at 36 CFR 218.25(b) requires the responsible official to consider all written comments submitted and that all written comments received be placed in the project file and become a matter of public record. NEPA does not require an EA to include a specific response to comments.

The regulations cited by the Objectors are specific to Environmental Impact Statements and do not apply to EAs.

The Salter project record includes an Excel spreadsheet (file name "20210323SalterCommentResponse") that identifies comments and specific concerns raised by commenters, indicating that the comments were considered. The project record also includes a document (file name "Salter EA Changes based on Comments_060121") that enumerates changes made to the final EA in response to public comment.

District Ranger Padilla has specifically noted that he has considered Objectors' comments and other comments received in his Draft DN (pp. 5-9). Final EA (pp. 34-35) similarly addresses grouped issues. Final EA analysis relies on best available scientific information including CSE data from 2020 and peer-reviewed literature. Furthermore, District Ranger Padilla's Draft DN (pp. 6-9) discusses issues and the public processes that surround them.

### *Conclusion #7*

I find that the Responsible Official has considered the comments received by Objectors as issues or analysis in project record in compliance with regulations for an EA. There is no requirement to cite any particular body of science and District has demonstrated that it has considered relevant material and used area-specific and project-specific data, where appropriate.

### *Issue #8*

Objectors allege that analysis of the effects of climate change on the project area, the effects of the project on climate change, and the effects of the project on carbon storage is insufficient.

### *Analysis #8*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives.

The 2013 San Juan National Forest Land and Resource Management Plan (LRMP) calls for forest vegetation management to be done in a manner that "anticipates climate-related plant succession changes (such as favoring heat- or drought-resistant tree species as leave trees, or in reforestation)" (section 2.9.1, p. 75).

Treatment of climate change in project-level NEPA analysis is guided by "Climate Change Considerations in Project-Level NEPA Analysis" (U.S. Forest Service 2009), which recommends consideration of both i) the effect of a proposed action on climate change, and ii) the effect of climate change on a proposed action.

Regarding the effect of the proposed action on climate change:

The 2009 Agency guidance notes that "there will be some situations where quantitative analysis will be useful and others where qualitative analysis will best serve decisionmaking" (p. 4). Examples of the types of projects for which quantitative analysis may be required include "energy facilities, transmission lines, [and] oil & gas development or leases" (p. 4).

Vegetation management activities such as those proposed in the Salter project have a small climate impact in the global context, and therefore a qualitative discussion about the potential for greenhouse gases sequestered and emitted is more appropriate. The EA provides a qualitative, ecosystem-based description of the small carbon fluxes associated with the proposed project in Appendix C (Final EA p. 109).

Regarding the effect of climate change on the proposed action:

The Environmental Assessment refers to a 2014 Ecosystem Vulnerability Assessment to support its determination that the future vulnerability of the Ponderosa pine is "presumed stable." This determination is based on climate modeling performed by Crookston et al. (2010).

The Draft Decision Notice states that the adaptive management approach will allow work to be modified "in response to both actively moving insect and disease outbreaks in and adjacent to the analysis area **and climate change**" (dDN p. 6, emphasis added). Table 6 ("Adaptive Management Actions") in the EA contains the following action associated with post-planting Silviculture: "2.9.1 Anticipates climate-related plant succession changes (such as favoring heat or drought-resistant tree species as leave trees, or in reforestation)" (Final EA p. 32). This approach will enable project implementers to be responsive to changing conditions on the ground, including succession changes due to climate change.

### *Conclusion #8*

Based on my review of the project record and referenced documents, and considering the size and scope of the project, I find that the Responsible Official adequately considered issues surrounding climate change. The level of analysis was consistent with agency guidance and of comparable depth to previous projects on the forest (such as the Lone Pine EA).

### *Issue #9*

Objectors allege that the EA does not include sufficient analysis of economic information, especially because economics is identified as part of the purpose and need.

### *Analysis #9*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives.

The Responsible Official determined that the need for the actions proposed in the Salter Project includes "Provide economic support to local communities by providing timber products to local industries in a sustainable manner" (final EA p. 11). Supporting the local recreation economy is not included in the purpose and need of the proposed treatment activities. However, impacts to recreation visitors and associated economic activity is disclosed in the EA socioeconomic (EA p. 58) and Recreation Activities and Experience (EA p. 52-60) sections.

The socioeconomic section of the EA (final EA p. 58-60) details the industry demand for fiber, saw log, products other than logs, as well as niche markets for beetle killed dead ponderosa pine—all products

that would be removed through the treatment activities. The analysis also documents the niche and limited demand for smaller diameter and inconsistent material that can result from vegetation management activities. The analysis demonstrates providing timber products to local timber harvesting and processing firms supports the local economy through jobs, labor income and value added in the forest sectors, as well as supporting sectors and industries.

The affected environment of the socioeconomic section documents the size of the travel and tourism sectors (final EA p. 57). The affected environment of the Recreation Activities and Experience section documents the high use of the recreation area within the project area (final EA p. 51-52). The socioeconomic section highlights survey data from general forest visitors' response to survey questions on their behavior if unable to visit the national forest (final EA p. 58). The socioeconomic section of the EA addresses this potential for displaced recreation visitors due to treatment activities and the potential negative impact that displacement may have on recreation visitor spending and associated economic activity in communities near the project area (final EA p. 58). Potential impacts from the proposed treatments to the local recreation economy were assessed and documented in the socioeconomic sections of the EA.

### *Conclusion #9*

Based on a review of the project record, I find that the Responsible Official adequately considered the effects of the proposed action on the economic environment. I find sufficient analysis of the economic effects of the modified proposed action on the local recreation economy. I also find the socioeconomic analysis to show the proposed treatments support the purpose and need.

### *Issue #10*

Objectors are concerned that project design elements related to recreation are insufficient. Specifically, concerns relate to a design element associated with minimizing effects to recreation from hauling over holiday weekends and to rerouting trails where they can't be avoided by haul routes. Objectors were concerned that their comments were not considered by the Responsible Official.

### *Analysis #10*

The regulation at 36 CFR 220.7(b)(2) states that an EA "shall briefly describe the proposed action and alternative(s) that meet the need for action." The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives. The regulation at 36 CFR 218.25(b) requires the responsible official to consider all written comments submitted and that all written comments received be placed in the project file and become a matter of public record. NEPA does not require an EA to include a specific response to comments.

The project record confirms the Forest Service received and considered the comments related to the recreation resource submitted by objectors; also see response to Issue #7.

A discussion with the San Juan National Forest Recreation Program Management Specialist established it was the judgement and experience of the forest specialists that determined the haul closure dates, as written, the closure dates would address the most problematic times of recreation use of the forest resources and holiday hauling (Final EA p. 24). Excluding the Mondays of Labor Day and Memorial Day was intentional. These days were not determined to be among the most problematic holiday days for the users of the recreation resources.

### *Conclusion #10*

I find that the design features are written appropriately to address the affected resources.

### *Issue #11*

Objectors are concerned that design elements related to protection of elk and northern goshawk are insufficient.

### *Analysis #11*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives. Forest Service Manual (FSM) 2672.42 describes the standards for Biological Evaluations.

The action alternatives analyzed in the Salter EA include specific design elements to protect elk habitat (Final EA p. 28). The two design features place temporal and spatial restrictions on management actions in coordination with Colorado Parks and Wildlife (CPW) expertise and guidance. These design features are intended to reduce the potential for temporary displacement of elk, in accordance with LRMP Guidelines 2.3.59 and 2.3.60 (Final San Juan National Forest Land and Resource Management Plan, pp. 36 & 37).

Effects to elk were analyzed in the Wildlife Report (project record) and disclosed in the EA (Final EA pp. 82 – 83). The EA described the potential for temporary displacement of elk due to project-related disturbance, but indicated that in the long term, habitat would benefit from an increase in foraging opportunities and an overall improvement in habitat quality due to increasing the resilience of pine stands to insect infestation (final EA p. 83).

The analysis described in the EA indicates an additional design element that was not included in the description of alternatives (final EA p. 83; also see Wildlife Report); my staff determined, in conversation with the ID team wildlife biologist, that the additional design element was referenced by mistake and is not intended as part of the proposed action.

Design features specific to goshawks were included in the action alternatives (Final EA p. 28) in order to avoid or minimize potential adverse effects to goshawks in alignment with Land and Resource Management Plan (LRMP) Desired Conditions 2.3.7, Guideline 2.3.49 and Table 2.3.2 (Final San Juan National Forest Land and Resource Management Plan Pg 33, 36 & 39 respectively). The EA describes the potential for short-term impacts due to effects to available habitat, and anticipates that these effects would last for about 10 years post-project implementation; however, improved forest resiliency is expected to improve habitat for northern goshawk in the long term. The Responsible Official determined, based on the analysis, that the project may impact individual goshawk but will not contribute to a trend toward federal listing or loss of species viability (final EA p. 79).

Management recommendations referenced by objectors (Reynolds et al 1992) do not apply in all cases or situations. The analysis completed for goshawk acknowledge the referenced recommendations and specifically the territory occupancy timeframes (EA Pg 76). The goshawk timing design feature is directly from the LRMP Guideline 2.3.49 (Table 2.3.2).

### *Conclusion #11*

I find that the EA sufficiently documented design elements associated with protection of elk and northern goshawks adequately in alignment with Land and Resource management Plan Guidelines, and that the analysis of effects to these species is sufficient to support the decision and Finding of No Significant Impact.

However, because the erroneous design element referenced in the EA and wildlife report may create confusion, I direct the Responsible Official to clarify in the final Decision Notice that the design element

described in the final EA, p. 83, is not included in the decision and provide rationale why the analysis of effects to elk would not be changed with that design element removed.

### *Issue #12*

Objectors are concerned that design elements related to invasive plant species are insufficient.

### *Analysis #12*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives.

The Final EA addresses invasive species. Project Design Features include six actions related to control and prevention of invasive plants (final EA p. 23). EA table 5 addresses the type and frequency of surveys (final EA pg. 31), and Table 6 describes actions and triggers associated with adaptive management (final EA pg. 33).

The final EA discusses presence and treatment of invasive plants in the project area (final EA pp 42-43); and the EA specifies that inventory and treatment of invasive plants is ongoing under previous NEPA decisions. The EA acknowledges that project activities may increase noxious weed establishment, but also discloses that Project Design Features are expected to reduce the likelihood of increased invasive plant establishment (Table 8, final EA p. 44).

### *Conclusion #12*

I find that the EA and its supporting documentation adequately address the presence of and likelihood of introducing invasive plants, and that the project incorporates sufficient measures to address existing invasive plant populations in the project area and to limit the risk of new invasive plant introductions.

### *Issue #13*

Objectors allege that the design features associated with temporary roads are vague and that effectiveness is not properly analyzed.

### *Analysis #13*

The regulation at 36 CFR 220.7(b)(2) states that an EA “shall briefly describe the proposed action and alternative(s) that meet the need for action. No specific number of alternatives is required or prescribed.” The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives.

Design features associated with temporary roads are found in the EA under the Hydrology and Soils section (Final EA p. 22) and the Transportation section (Final EA p. 26). The hydrology design features are taken from the Watershed Conservation Practices Handbook (Forest Service Handbook 2509.25). These design features are considered the most effective practical means of preventing or reducing the amount of pollution generated by nonpoint sources (Watershed Conservation Practices Handbook p. 5). The Watersheds section of the EA outlines the specific design features included to minimize impacts from temporary roads (Final EA p. 69-72). These include holding temporary roads to the minimum number feasible and locating them sufficiently far from streams and other water bodies to minimize discharge into those waters except at stream crossings; building stream crossings with appropriate drainage features and stream crossings to provide for the flow and passage of sediment and to withstand expected flood flow; and locating stream crossings at straight and shallow locations (slope banks will not exceed 30 percent) where channels are hardened by gravel, cobble, or bedrock (Hydrology design elements 7 and 8; Final EA p. 22, 70). Transportation design feature 2 (Final EA p. 26)

states that the location and clearing widths of all temporary roads will be agreed to in writing before construction is started. Additionally, the majority of the temporary roads proposed (68.9 miles) are on non-system roads that are already on the ground (Final EA p. 63). These roads will be properly designed for the type of equipment that will be using them and will be decommissioned within 5 years after their first use (Final EA p. 22, 70). Decommissioning will involve re-contouring where significant side slope exists, elimination of ditches and other structures, out-sloping during construction, removal of ruts and berms, effectively blocking the road to normal vehicular traffic where feasible, and construction of drainage features such as cross ditches and water bars (Final EA p. 26).

### *Conclusion #13*

I find that the final EA sufficiently documented the specific design features necessary to reduce potential impacts from temporary roads. The design features are taken from the Watershed Conservation Practices Handbook, which is considered the guiding document for best management practices. The Responsible Official concluded that these design features would reduce potential impacts to an acceptable level. I do not see a need to address this further in the Decision Notice.

### *Issue #14*

Objector alleges a violation of NEPA due to failure to analyze effectiveness of mitigation measures. Objector appears to acknowledge that mitigation measures were not included, but maintains that design features are vague and inadequately analyzed.

### *Analysis #14*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives.

Design Features are part of the Action Alternatives (Final EA, pp. 20-29) and, therefore, have been analyzed in detail in Section 3 of the Final EA. Final EA (p. 20) notes "These design features come from a variety of sources including, but not limited to, Land and Resource Management Plan Standards and Guidelines, direction and guidance provided in Forest Service Handbooks and Manuals (including the Region 2 Watershed Conservation Practices Handbook), Vegetation Management Programmatic Agreement between the Forest Service and Colorado State Historic Preservation Officer (2017), and professional judgement." Per FSM direction, the design features are generally included as contract terms (i.e., specific conditions, standard provisions or special provisions) where those actions such as logging are contracted. They are then monitored by a Forest Service Representative during and after implementation (FSM 2450).

### *Conclusion #14*

I find that the Responsible Official has properly included and analyzed design features in compliance with appropriate NEPA regulations (36 CFR 220.7(b)(3)).

### *Issue #15*

An objector asserts that the EA must incorporate monitoring of restoration of spatial structure using ICO method.

### *Analysis #15*

The regulation at 36 CFR 220.7(b)(2) states that an EA "shall briefly describe the proposed action and alternative(s) that meet the need for action. No specific number of alternatives is required or prescribed."

Monitoring and Adaptive management are included and described in the Final Salter EA, pages 29-33, Tables 5-6. Table 5 clearly outlines the activities to be monitored but does not include monitoring of structural components such as individual, clump, and opening (ICO) Churchill et al. 2013), or group, individual, or clump (GCI) structures (EA, pgs. 12, 15; Project Record, Vegetation Analysis pg. 24). Table 5 does articulate monitoring of silvicultural prescription and fuel loading to determine treatment effectiveness relative to desired conditions and restoration (final EA p. 31).

### *Conclusion #15*

I find that the Responsible Official is consistent with the regulation at 36 CFR 220.7(b)(2) by clearly identifying and monitoring activities as they relate to silviculture prescriptions and post-treatment effectiveness.

### *Issue #16*

An objector alleges that the proposed action is flawed because the target basal area and the proposed diameter cap are not supported by best available science.

### *Analysis #16*

The regulation at 40 CFR 1502.23[1]states that, "Agencies shall ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents. Agencies shall make use of reliable existing data and resources. Agencies may make use of any reliable data sources, such as remotely gathered information or statistical models. They shall identify any methodologies used and shall make explicit reference to the scientific and other sources relied upon for conclusions in the statement."

The Responsible Official demonstrated they used the best available scientific information to determine basal area target and diameter cap; this is documented within the Final EA, pages 9-14.

The District refers to the use of best available scientific information in the following statement: "A comparison based on common stand exam data, Forest Vegetation Simulation modeling, and field observation between the current and desired conditions shows that the condition of the ponderosa pine cover type found within the Salter vegetation management activity area is different from the desired conditions associated with that vegetative cover type in the San Juan National Forest Land and Resource Management Plan." (EA, page 11)

The District describes selecting the target basal area and diameter cap in detail in the EA and provided in the following statement:

"Single tree selection prescriptions will all have the same basic components and will use a BDQ method where "B" is the desired residual basal area, "D" is the maximum tree size (all trees 26.9" and larger diameter at breast height will be retained in all stands) and "Q" describes the diameter distribution as a ratio of the number of trees in succeeding size classes. Based on stand exam data the general prescriptions will target a residual basal area of 50-to-70 ft2/acre with a mean or target of 66 basal area when conditions allow.

For the average stand in the project area, the residual basal area will be 60-to-68 ft2/acre depending upon the silviculture treatment. The maximum diameter to harvest will be 26.9" and the q-factor will be 1.3 (applied to 2 inch diameter classes). The residual stocking level of 50-to-70 ft2 was chosen to allow sufficient growing space to establish new regeneration while reducing severe fire risk and promoting

---

[1] The regulation at 40 CFR 1502 is specific to Environmental Impact Statements; however, pursuant to the regulation at 40 CFR 15019(g)(2), Section 1502.23 may be applied to EAs.

tree vigor. The maximum diameter of 26.9" addresses management objectives by providing a continuous supply of desirable saw timber products without allowing trees to progress into age related decadence while at the same time maintaining a large tree emphasis on the landscape. A q-factor of 1.3 keeps sub-merchantable trees fully stocked for the next cohort. The harvests will take place on a 20 to 25-year cutting cycle to allow for sufficient stand growth while at the same time keeping stand density within the target range." (EA, page 14)

Therefore, based on the best scientific information available and most recent inventory data, the District Silviculturalist has determined a 26.9" diameter cap and a basal area of 50-to-70 square feet per acre will meet the desired conditions stated in the San Juan LRMP (2013).

### *Conclusion #16*

I find the Responsible Official provides adequate documentation within the analysis, demonstrating the use of best scientific information available to determine the target basal area and diameter cap to achieve desired conditions stated within the San Juan LRMP (2013).

### *Issue #17*

An Objector alleges that the EA improperly relies on adaptive management because information required by regulation is not included in the analysis.

### *Analysis #17*

The regulation at 36 CFR 220.7 (b)(2)(iv) states that, "The proposed action and one or more alternatives to the proposed action may include adaptive management. An adaptive management proposal or alternative must clearly identify the adjustment(s) that may be made when monitoring during project implementation indicates that the action is not having its intended effect, or is causing unintended and undesirable effects. The EA must disclose not only the effect of the proposed action or alternative but also the effect of the adjustment. Such proposal or alternative must also describe the monitoring that would take place to inform the responsible official whether the action is having its intended effect."

Monitoring and Adaptive management are included and described in the final EA, pages 29-33, Tables 5-6. Table 5 clearly outlines the activities to be monitored and Table 6 outlines the threshold or undesirable effect that triggers a need for action to achieve desired conditions. I find the Final EA is consistent with 36 CFR 220.7(b)(2)(iv).

### *Conclusion #17*

I find that the Responsible Official provides adequate information in the analysis by clearly identifying adaptive management actions and monitoring activities as required by regulation.

### *Issue #18*

Objector alleges that the EA fails to take into account the cumulative effects of off-road vehicle recreation and does not feel that the design feature that addresses access to dispersed camping sites is adequate.

### *Analysis #18*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives. Objector alleges the requirements of NEPA have not been met regarding cumulative effects.

Final EA (p. 54) and 2020 Motor Vehicle Use Map notes off-road vehicle use is not permitted except in limited circumstances (i.e., limited big game motorized big game retrieval and dispersed camping) per

travel management decision issued under 36 CFR 212. Also, Final EA, p. 54 specifically addresses cumulative effects, "The Boggy Glade Travel Management Project resulted in some roads that were once open to public use being closed to public use or decommissioned. This will create minor displacement recreation activities that could overlap in time with the Salter Vegetation Management project." Objectors tie their concern to ability to successfully reclaim routes and resource concerns. The Final EA does consider resource concerns related to dispersed recreation. In addition to recreation design feature mentioned by Objector, there is a design feature for transportation (Final EA, p. 26) which includes, "Following use for harvest and treatment implementation, both temporary AND designed roads will be decommissioned, which involves re-contouring where significant side slope exists, elimination of ditches and other structures, out-sloping during construction, removal of ruts and berms, effectively blocking the road to normal vehicular traffic where feasible, and construction of drainage features such as cross ditches and water bars. Final acceptance of the closure will be made by the Forest hydrologist or engineering representative." Final EA (p. 72) considers dispersed use for watershed resources. Similarly, for wildlife, "Recreation opportunities within the area are expected to increase some, but they are not expected to become significant enough to reduce the functionality of any species' habitat." Final EA, p. 85. Further, it is not within the agency purview to speculate that illegal activities will occur.

### *Conclusion #18*

I find the Responsible Official has considered cumulative effects related to potential for increased accessibility of Forest lands in compliance with NEPA (36 CFR 220.7(b)(3)) and travel regulations.

### *Issue #19*

The objector alleges that the EA does not address the key differences between Alternatives 2 and 3, primarily in terms of forest resilience and timber economics.

### *Analysis #19*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives.

The Vegetation Analysis report (pp. 38-39) compares alternatives in relation to desired conditions which are related to forest resilience criteria. The report discusses the limitation of diameter caps and the effects of forest resilience in the following:

"Limiting prescription effectiveness with a blanket diameter cap such as alternative 3 has been applied to the "Large Tree Retention Areas" (LTR) of Lone Pine as study opportunity. Has shown the potential of limiting or even interrupting long term approaches to meeting desired conditions described in LRMP for ponderosa pine. The Lone Pine LTR study areas have shown a limitation on sanitation approaches within stands and forced the leaving of entire groups of trees infested with bark beetles. As management begins to bring stands back into an uneven aged state, volume or basil area that would normally be prescribed for harvest under an uneven aged management approach would be locked up in upper diameters under alternative 3."

In alternative 3 (EA, p. 66), an explanation of how diameter caps hinder forest health and resilience is provided:

"Large tree retention limits the ability to fully utilize the silviculture systems designated by the Land and Resource Management Plan. Therefore, alternative 3 meets the desired conditions described at 2.2.23 to a lesser degree than alternative 2 – Modified proposed action. The data indicates that the differences between alternatives 2 and 3 are associated with specific locations over time and over cutting cycles.

Preliminary feedback of Lone Pine EA Large Tree Retention study areas from post decision reconnaissance and layout of leave tree units have shown mixed results. The effects of applying a diameter limit appear to be more easily tangible at the fine scale. At the fine scale patches of bark beetle and heavily infested dwarf mistletoe trees have to be passed for removal due to the diameter limitation. Basal area retention goals and uneven aged characteristics are being compromised, leaving stands less resilient and making long term resistance less likely to occur.

Continuing in alternative 3 (EA, p.66), the following mentions a difference in timber economics:

“Removing areas from treatment as result of diameter limitation reduces the amount of treatment in an area and subsequently the amount of harvestable volume per acre.”

In the Vegetation Analysis report, Economics (pp. 40-41), the summary describes how the local markets are increasing in the recent past 5-6 years and how bids for various products have gone from “no-bid” to competitive bids for those products:

“The fiber demand of the local area based on current sales over the past 2 years will keep in

pace with what this EA can provide as a byproduct of the vegetation management activities to meet desired conditions. However, an increase in demand will result in competitive prices for fiber and the ability to utilize funds to perform service and stewardship items such as pre-commercial thinning.”

The “saw log” (=>9” DBH) market demand continues to increase with bid premiums seen on almost every sale including stewardship contracts within the last 4 years. Sales with premiums also included additional charges for brush disposal, essential KV and road maintenance which have caused no bid sales on the district in the past. The ability to include large volumes and achieve vegetation management at landscape level is possible with the current industry. Offering a mixture of saw log and smaller diameters timber in the right ratio is important to keep sales marketable. The size of these sales is equally important in both volume and acres to ensure the work is completed on time and has a sustained profitability.”

### *Conclusion #19*

I find that the Responsible Official adequately considered disclosed the economic effects of the action alternatives and, where applicable, demonstrated the differences between the action alternatives.

### *Issue #20*

Objector alleges that justification for preferred/selected alternative is not valid.

### *Analysis #20*

The regulation at 36 CFR 220.7(c) states that “A decision notice must document the conclusions drawn and the decision(s) made based on the supporting record, including the EA and FONSI.” Objector alleges that the decision was based on silvicultural methods instead of achieving the desired condition in the Forest Plan.

Project is designed to meet Forest Plan desired conditions for Management Area 5 and all project areas are within suitable timber base. Final EA, pp. 8-9. The desired conditions for the ponderosa pine cover type and lands managed for forest product offerings are further defined in sections 2.2.23 and 2.9.1 of the San Juan National Forest Land and Resource Management Plan (USDA 2013). Final EA (pp. 9-11) addresses how existing stands do not meet Forest Plan components. Silvicultural prescriptions are the tools used to meet desired conditions. Final EA at pp 12-13; Draft DN, pp. 1, 2-3, 12-13. Disagreements occur between Objector and District regarding how to meet the desired conditions based on old or large tree caps. See other issues addressed in this document. This does not invalidate analysis completed.

District used site-specific CSE data, analyzed NFMA requirements (Draft DN, pp. 12-16) and considered past fire suppression activities (Final EA, pp. 7-8) and insect outbreaks (Final EA, pp. 4- 5) that led to desired conditions not being met. Additionally, Final EA (p. 6) describes, "Generally, the project area is in fair to good health with areas displaying indicators of good future forest health conditions. The stands that have been treated within the last 15 years under earlier ponderosa pine management efforts, display many of the desired conditions identified in the Land and Resource Management Plan for ponderosa pine. These include a reduction in small diameter overtopped and suppressed trees and improved structural dynamics. Areas that have not been treated are over-stocked and lack disturbance." Lastly, it was articulated in Draft DN (pp. 5-8) why Alternative 2 was selected over Alternative 3 and acknowledged that environmental trade-offs do occur.

### *Conclusion #20*

I find the Responsible Official's decision is neither arbitrary nor capricious as it relates to selection of an alternative in meeting desired conditions. Draft DN relies on analysis completed and documents rationale and considerations for the decision.

### *Issue #21*

The objector asserts that the EA uses improper terminology ("group, clump and individual structure") and requests correction and use of best available science.

### *Analysis #21*

The regulation at 40 CFR 1502.23 states that, "Agencies shall ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents. Agencies shall make use of reliable existing data and resources. Agencies may make use of any reliable data sources, such as remotely gathered information or statistical models. They shall identify any methodologies used and shall make explicit reference to the scientific and other sources relied upon for conclusions in the statement."

Definitions of the terms "group, clump, and individual structure" are provided in the Vegetation Analysis report (p.22) "Focus on Groups/Clumps/Individuals and the final EA (p.12); the terms are discussed but are not specifically defined as "GCI."

### *Conclusion #21*

I find that the Responsible Official adequately analyzed and described their methodology and it is consistent with appropriate laws, regulations, and policies.

### *Issue #22*

An Objector asserts that information provided by the forest at a public meeting was not part of the NEPA process and alleges that the forest withheld useful information from the public.

### *Analysis #22*

Objector alleges that useful, visual informational materials from a public meeting in March 2020 were not included in the Draft EA. While there is no requirement to include this particular information (i.e., PowerPoint presentation) in the analysis. Documentation is required by 40 CFR 1508.9 for persons consulted and for public involvement in the decision notice per 36 CFR 220.7(c)(3). The Final EA at pp. 34-35 (Issues) and 85-87 and Draft DN at pp. 6-8, 9 meet these regulatory requirements. Moreover, the Draft DN (p. 9) and Final EA ( p. 86) state, "The information and recommendations provided by the collaborative have been given consideration in the design of the Salter Vegetation Management project.). Final EA (p. 86) also describes the collaborative (emphasis added):

> *As part of the Salter planning process, the Agency entered into an agreement with the DWRF Collaborative that described commitments and an overall goal of "transparent deliberation and discussion on all proposed projects". **The agency and collaborative have met on many occasions throughout the planning process to share information and exchange data. The agreement outlines the use of the collaborative exchange folder (CEF) to facilitate open exchange of information and data.** The CEF is located on the agency's corporate system and is accessible as an external shared link specifically for exchange of data, including: maps, geodatabases, inventory data, documents, etc. The CEF is also intended to be used by the Collaborative and other partners to share information with the agency of any desirable or undesirable trends that are being observed and to provide an avenue to discuss those trends or for further exchange of general information.*

### Conclusion #22

I find the Responsible Official has met the regulatory requirements 40 CFR 1508.9 and 36 CFR 220.7(c)(3)) related to public involvement.

### Issue #23

The objector asserts that the EA needs to provide scientific sources for "conditions influencing silviculture treatments" (draft EA p. 16) and explain other parameters, providing scientific references.

### Analysis #23

The regulation at 40 CFR 1502.23 states that, "Agencies shall ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents. Agencies shall make use of reliable existing data and resources. Agencies may make use of any reliable data sources, such as remotely gathered information or statistical models. They shall identify any methodologies used and shall make explicit reference to the scientific and other sources relied upon for conclusions in the statement."

Scientific sources that influenced silviculture treatments are provided in the Vegetation Analysis Specialist Report within the section "*Conditions Influencing Silviculture Treatments*" (Vegetation Report pp. 19-20) and in the EA under Section 2, Alternative 2 – Conditions Influencing Silvicultural Treatments.

### Conclusion #23

I find that the final EA and the Vegetation Analysis Specialist Report include appropriate scientific references that support the analysis and conclusions in those documents.

### Issue #24

An Objector disputes method for identifying pre-settlement trees and asks forest to adopt a 17" diameter cap for harvest.

### Analysis #24

The regulation at 36 CFR 220.7 states that an EA "Shall briefly provide sufficient evidence and analysis, including the environmental impacts of the proposed action and alternative(s), to determine whether to prepare either and EIS or a FONSI (40 CFR 1508.9)" and indicates that an EA "May incorporate by reference data, inventories, other information and analyses."

The method for identifying pre-settlement trees is stated in the EA, pages 6 & 16. The District determined during the stand inventory process that there is high variability between age classes relative to size diameter at breast height (Vegetation Analysis, pages 13-14). The District states: *"Data analysis is*

*a good guide for overall management but when in the field, visual characteristics have proven to be more reliable in determining age (GTR-110 2003 Huckaby etal.).”* (Project record, Vegetation Analysis page 14).

The District further states: “*CSE data will be used to establish a likely frequency and typical size of trees as a guide for tree markers. Of the 7,461 trees measured in 2020 within the treatment area the oldest tree cored and aged was 137 years old and had a diameter of 19.6 inches at Breast Height. While the largest tree measured was over 50” DBH. This demonstrates the variability within the age to size correlation and makes it necessary to rely on visual as well as data for indicators of pre-settlement trees within a stand. Including this type of data in marking guides will help the markers understand which tree sizes within a stand might have the potential of being pre-settlement in age.”* (Project record, Vegetation Analysis page 14).

Finally, the District states: “*Old-aged trees will be identified using a combination of physical characteristics including large diameter relative to other trees in the localized area, large diameter branches, irregular crowns, flat tops, tall height and canopy position and bark thickness, color and pattern. (Huckaby et al. 2003). When a determination of tree age cannot be made using physical characteristics, these trees will either be retained or assessed and documented at the harvest-unit scale to ensure old-aged trees are retained.”* (EA page 16).

The Final Salter EA addresses Dr. William Baker’s research paper from 2021. The IDT conducted a cursory review of findings to assess the relevance to the Salter project. The IDT found the focus of the paper was on wildfire resiliency and irrelevant to the concern of insect and disease (Draft DN, pgs. 5-6).

Therefore, determination of pre-settlement trees in the proposed action will be selected based on a combination of physical characteristics rather than tree size at DBH. When tree age cannot be determined using this method, trees will be assessed and/or retained and documented.

### *Conclusion #24*

I find that the Responsible Official provides adequate rationale that supports the method for identifying pre-settlement trees in the project area.

### *Issue #25*

Objectors suggested several minor edits to design features.

### *Analysis #25*

I reviewed the design features identified by objectors and discussed the suggested edits with the Responsible Official. After a thorough review of the design features in question, I agree with the Responsible Official that the current language is sufficient, meets the intent of the project, and provides sufficient clarity for implementation.

### *Conclusion #25*

I find that the design features, as written, are consistent with law, regulation and policy. No changes are necessary.

USDA United States Department of Agriculture | Forest Service | San Juan National Forest | 15 Burnett Court
Durango, CO 81301
(970) 247-4874
Fax: (970) 375-2319

File Code: 1570

**Date:** October 22, 2021

Ms. Molly Pitts
coloradopitts@gmail.com

Dear Ms. Pitts

This letter is in response to your objection to the draft Decision Notice (DN) and Finding of No Significant Impact (FONSI) for the Salter Vegetation Management Project, Dolores Ranger District, San Juan National Forest. I have read your objection and reviewed the project record, the draft DN/FONSI, and the final Environmental Assessment (EA). My review of your objection was conducted in accordance with the regulation at 36 CFR 218 (2013).

**PROJECT DESCRIPTION**

On July 21, 2021, the Dolores District Ranger released the Salter Vegetation Management Project EA, draft DN, and FONSI for objection. The District Ranger proposes to implement Alternative 2 in the draft decision, which authorizes the following:

- Single tree selection on 19,675 acres, harvested trees not to exceed 26.9 inches diameter at breast height (dbh);
- Commercial thinning on 3,115 acres, harvested trees not to exceed 26.9 inches dbh;
- Post fledging area thinning, pre-commercial thinning and brush thinning as appropriate in any treatment unit;
- Up to 117 miles of temporary road construction;
- Reduction of activity fuels through a variety of means;
- Installation of four wildlife guzzlers.

**OBJECTION ISSUE DISCUSSION**

The eligible objectors raised a number of concerns that fell under the themes of NEPA adequacy (adequacy of the analysis, adequacy of the purpose and need, consideration of reasonable alternatives and consideration of comments), use of best available science, effects related to climate change, effects related to economics, and impacts to the project area (impacts to aquatic/hydrologic resources, visuals and recreation, soils, wildlife, and vegetation).

The objection resolution meeting was held on September 8, 2021. I found the dialogue with all of the objectors helpful and thoughtful. I appreciate the passion and dedication of the objectors for the San Juan National Forest and the variety of resources it provides to the public. I understand the concerns raised and I also understand the balance that must be considered by the Responsible Official when it comes to managing forest resources. During the resolution meeting and subsequent conversations with objectors, I found that four specific concerns could be clarified in the final decision.

1. The district will provide Timber Operator with a handout detailing Town of Dolores requirements for logging trucks (enclosed).
2. The district will clarify in the Final Decision that all treatments that originate from the Salter and Plateau treatment areas and require the removal of forest products utilizing commercial log trucks will be required to utilize the western transportation route and will not travel through the Town of Dolores.
3. Clarify in the Final Decision that the Dolores District commits to initiating the NEPA analysis referred to in Recreation design feature No. 4 (i) in the EA (page 24), in calendar year 2022 and will complete the analysis prior to beginning implementation in affected blocks.
4. In the Final Decision, revise Scenery design feature No. 7 (page 26 of the EA) as follows: *A visual corridor will be established on each non-motorized system trail within Boggy Draw treatment block utilizing a 50-foot from center line area of influence. The recreation and timber staff will identify leave trees for retention, marking them with temporary paint or flagging. Protection of trees within 50 feet of center line of the corridor is intended to reduce scenic impacts by maintaining unique trail features such as tight turns or challenging obstacles that improve the feel and flow of a single-track trail as well as maintaining shade on groomed winter trails.*
5. Clarify in the Final Decision that the Dolores District commits to using the "descending order" tree evaluation decision process as described on page 17 (items *a* through *l*) of the EA within the Salter project area.
6. Clarify in the Final Decision that for Wildlife Design Feature 2b (page 28 of the EA), the percent post-fledgling family area canopy cover should be 50 percent or greater.

**CONCLUSION**

I conducted my review of the record, final EA and draft DN/FONSI. Based on my review, I conclude the following:

- The draft decision clearly describes the actions to be taken in sufficient detail that the reader can easily understand what will occur as a result of the draft decision.
- The draft decision considered a range of alternatives that was adequate to respond to the Purpose and Need for action. The purpose and need and alternatives considered in the final EA reflect a reasonable range of alternatives, consistent with law, regulation, and policy.
- The draft decision is consistent with Forest Plan and Comprehensive Management Plan standards and guidelines.
- The draft decision is consistent with policy, regulation, law, direction, and the final EA contains adequate evidence to support the decision. The record and final decision contain site-specific documentation regarding resource conditions, and the Responsible Official's draft decision document is based on the record and reflects a reasonable conclusion.
- For the sake of clarity, I am directing the Responsible Official to make these additional clarifications in the final Decision Notice:
    - The EA contains a discrepancy in how proposed temporary road mileage is described; I therefore direct the Responsible Official to address this discrepancy in the final Decision Notice and describe the correct mileage.
    - The EA's wildlife analysis and supporting specialist report identify a project design feature that was not included in those that were proposed to be authorized by the Responsible Official; I therefore direct the Responsible Official to clarify in the final

Decision Notice that the referenced design element is not included in the authorized activities and provide rationale why the analysis of effects to elk would not be changed with that design element removed.

This concludes my written review of the project. By copy of this letter and the enclosed response document, the Responsible Official may sign the decision after including the clarifications noted above, then notify interested and affected persons in accordance with the regulation at 36 CFR 218.12 and 36 CFR 220.7(d). This written response is the final administrative review by the Forest Service or the Department of Agriculture [36 CFR 218.11(b)(2)].

If you have any questions and/or concerns, please contact Mark Lambert at mark.b.lambert@usda.gov.

Sincerely,

KARA CHADWICK Digitally signed by KARA CHADWICK Date: 2021.10.22 13:54:34 -06'00'

KARA L. CHADWICK
Forest Supervisor

Enclosures - 2

**Town of Dolores Information for Pre-work Meetings with Timber Operator**

1. Montezuma County Road 31 turns into Town of Dolores 11th Street when the road crosses city limits and the speed limit is **15MPH.**
2. The Town of Dolores requires that all trucks hauling logs off of Forest Service contracts are equipped with Jake Brakes Mufflers
3. The town of Dolores requires that all trucks hauling logs off of Forest Service contracts do not deviate from 11th Street (go either left or right at junction of 11st (CR 31) and Railroad Ave (HWY 145)
4. Commercial truck traffic is not allowed on 11th Street from 10:00pm to 6:00am
5. The town of Dolores has the following ordinance for muffler requirements:
   **Dolores Municipal Code-Model Traffic Code Section 2-225. Mufflers - prevention of noise.**
   *(1) Every motor vehicle subject to registration and operated on a highway shall at all times be equipped with an adequate muffler in constant operation and properly maintained to prevent any excessive or unusual noise, and no such muffler or exhaust system shall be equipped with a cut-off, bypass, or similar device. No person shall modify the exhaust system of a motor vehicle in a manner which will amplify or increase the noise emitted by the motor of such vehicle above that emitted by the muffler originally installed on the vehicle, and such original muffler shall comply with all the requirements of this section.*
   *(1.5) Any commercial vehicle, as defined in section 235 (1) (a), subject to registration and operated on a highway, that is equipped with an engine compression brake device is required to have a muffler.*
   *(2) A muffler is a device consisting of a series of chamber or baffle plates or other mechanical design for the purpose of receiving exhaust gas from an internal combustion engine and effective in reducing noise.*
   *(3) Any person who violates subsection (1) of this section commits a class B traffic infraction. Any person who violates subsection (1.5) of this section shall, upon conviction, be punished by a fine of five hundred dollars. Fifty percent of any fine for a violation of subsection(1.5) of this section occurring within the corporate limits of a city or town, or within the unincorporated area of a county, shall be transmitted to the treasurer or chief financial officer of said city, town, or county, and the remaining fifty percent shall be transmitted to the state treasurer, credited to the highway users tax fund, and allocated and expended as specified in section 205 (5.5)(a), C.R.S.*

Forest Service
U.S. DEPARTMENT OF AGRICULTURE

Rocky Mountain Regional Office Sept. 2021

# Response to Objections on the Salter Vegetation Management Project on the San Juan National Forest

## Objectors

Molly Pitts, Intermountain Forest Association
Tim Kyllo, Montrose Forest Products, LLC
William L. Baker, PhD.
Edward B. Zukoski, Center for Biological Diversity/Adam Rissien, WildEarth Guardians
Jimbo Buickerood, San Juan Citizens Alliance

## Organization of this Document

Due to the number of objectors and the similarity between several of the objections, I as the Objection Reviewing Officer elected to lump objection issues to the extent possible. This approach allowed for increased efficiency in reviewing and responding to objection statements.

## Objection Statements and Responses

### *Issue #1*

This issue relates to Objectors' concerns that the affected environment was not sufficiently described in the EA; Objectors allege insufficient location information was provided for a variety of resources, that baseline information was not provided and that common stand exam (CSE) data were not provided to the public. Objectors contend that this constituted a violation of NEPA.

### *Analysis #1*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives; there is no requirement for an affected environment section in an EA.

The final EA (p. 1-8) provides context of the affected environment (also called existing condition or environmental baseline), which indicates that age and size are variable and provides average basal area. Project Design Features (Final EA pp. 20-29) indicate where additional surveys or layout requirements are needed to ensure that the affected environment and effects analysis align. Each resource in Section 3 of the Final EA addresses affected environment (Final EA pp. 35 – 85). Of specific note, the Final EA affected environment describes the affected watersheds and riparian areas (Final EA pp. 67 and 68) and where sensitive soils occur (EA p. 68). Additional baseline information for other species is included in the project Biological Evaluation (BE; Project Record). Detailed maps displaying locations of treatment units by treatment type, transportation system, proposed temporary roads, goshawk post-fledging areas, trails and streams are included in Appendix A of the Final EA.

Common stand exam (CSE) data, which comprise on-the-ground site-specific information, were referenced in the Final EA (Final EA pp. 6, 11, 12, 14). While CSE data in raw format are not included in the Final EA, data are summarized in the Timber Silvicultural Report in the project file.

Also see response to Issue #4.

### *Conclusion #1*

I find that the Responsible Official has taken the required hard look at existing conditions and that the description of affected environment is consistent with applicable regulation

### *Issue #2*

This issue relates to Objectors' allegation that the EA fails to accurately describe and document effects of temporary roads and skid trails. Objectors claim that mileage of temporary roads is inconsistently described and there is a lack of site-specificity, which objectors claim is a violation of NEPA.

### *Analysis #2*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives; there is no requirement for an affected environment section in an EA.

The Transportation section of the EA states that 106 miles of temporary road will likely be required for project implementation; this consists of 69.8 miles of existing non-system roads and 36.4 miles of new ground disturbance (Final EA p. 63). In order to account for on the ground layout, an additional 10% (11 miles) was added to the anticipated temporary road mileage (Final EA p. 63; DN p. 4); therefore a total of 117 miles of temporary roads were analyzed. Appendix A of the EA provides maps of proposed temporary road locations (Final EA p. 92-97).

The EA does state that 50-75 miles of temporary road construction are analyzed under this proposal Final EA p. 19). The District clarified that this was a mistake in the final EA, and that the mile estimates disclosed in the Transportation section are correct.

The EA contains a general description of temporary roads being constructed with minimal disturbance (length and width), proper drainage, and appropriate stream crossings to withstand flood flows (Final EA pp. 19, 22, 26, 63 and 70) and a statement that all drainage structures on roads will be inspected by the Timber Sale Administrator, Engineering Representative or Forest hydrologist at treatment completion to make sure they are in good condition. Hydrology and Soils Design Feature #7 states that temporary roads will be held to the minimum number feasible and will be located sufficiently far from streams and other water bodies to minimize discharge into those waters except at stream crossings (Final EA p. 22).

The EA states that all temporary road segments will be decommissioned within five years after first use (Final EA p. 19). Transportation Design Feature #2 (Final EA p. 26) states that the location and clearing widths of all temporary roads will be agreed to in writing before construction is started and that all temporary roads will be decommissioned after use, which involves re-contouring where significant side slope exists, elimination of ditches and other structures, out-sloping during construction, removal of ruts and berms, effectively blocking the road to normal vehicular traffic where feasible, and construction of drainage features such as cross ditches and water bars.

Hydrology and Soils Design Feature #5 describes skid trails as being perpendicular to the slope as much as possible, outside of drainages, and away from sustained steep slopes (greater than 40 percent) and specifies that they will be located and designed to disperse runoff and minimize soil disturbance (Final EA pp. 21 and 70). Hydrology and Soils Design Feature #4 states that skidding will not be allowed in wetlands, wet meadows and riparian areas (Final EA pp. 21 and 71). There is a no treatment buffer zone around riparian and wetland areas (Final EA p. 21). Skid trails will be closed after use by adding waterbars or outsloping and spreading slash (Final EA p. 21).

Effects to resources are based on the design features as described above. The final EA includes discussion of the effects of temporary roads and road use on invasive plants (final EA pp. 42-43), grazing (final EA pp. 46-47), rare and sensitive plants (final EA p. 49), recreation (final EA pp. 52-54), transportation (final EA pp. 61-64), watersheds, soils and water quality (final EA pp. 70-72), and wildlife (final EA pp. 78-79). The final EA also indicates that businesses local to the project area may complete roadwork, creating a minor local socioeconomic effect (final EA p. 60).

The EA mentions a process by which a temporary road system will be developed as described in the Project Design Features (Final EA p. 63), but this process is not found in the Transportation Design Features of the EA. I directed my staff to talk to the project's Roads Engineer; the following is standard operating procedure for the development of a timber sale transportation system, and was therefore not included in the EA. It will be included in the sale contract language:

1. Roads to be used for hauling or equipment access will be used in the following order of preference:
    a. First preference is to use National Forest System Roads identified on the Motor Vehicle Use Map for general public use. These roads are maintained in an "open"' status with either gravel surface (ML3) or native surface (ML2).
    b. Second preference is to use ML1 roads (only open to limited administrative use), which might require reconstruction (e.g., removal of trees and shrubs, reshaping, blading, adding surface material or installing drainage features). After use the road would be put back in ML1 status or decommissioned. Consult with Forest engineering staff and project hydrologist for input on road reconstruction.
    c. Third preference is to use existing unauthorized roads (which would be considered temporary roads and obliterated when use is complete). Roads in this category might require removal of trees and shrubs, reshaping, blading, adding surface material, installing drainage features, etc.
    d. Fourth preference is to create temporary roads. The Forest Service and the purchaser/contractor shall agree upon locations of temporary routes, resource protection requirements employed during road construction, clearing widths, and closure or rehabilitation requirements, which must be consistent with all design elements and implementation requirements of the Lone Pine EA.
2. Temporary roads must be seeded and closed within five years after final use.
3. Temporary roads shall be designed to the minimum standard for their use and be located to "roll" with the terrain as feasible.

### *Conclusion #2*

I find that the final EA adequately described and documented the location and effects associated with temporary roads.

For the sake of clarity and given the oversight in the final EA related to mileage of temporary roads, I will direct the Responsible Official to clarify the mileage in the final Decision Notice.

### *Issue #3*

This issue relates to objectors' allegation that the range of alternatives documented in the EA is insufficient. Specific concerns relate to the EA not considering an alternative that limits removal of large trees, and not considering multiple uses when developing the range of alternatives.

### *Analysis #3*

The regulation at 36 CFR 220.7(b)(2) states that an EA "shall briefly describe the proposed action and alternative(s) that meet the need for action. No specific number of alternatives is required or prescribed." Objectors allege the requirements of NEPA (40 CFR 1502.14) have not been met; it should be noted that the regulation at 40 CFR 1502 is specific to Environmental Impact Statements and is not applicable to an EA, except as described in 40 CFR 1501.5(g).

Alternative 3, which was developed to address commenters' concerns about cutting of large or old trees, was fully developed (Final EA pp. 29-30, 35). Alternative 3 limited the removal of trees over 20"

and was intended to emphasize large tree retention. Common Stand Exam data collected for the project indicate there is not necessarily a correlation between tree size and tree age within the project area (Final EA, pp. 3, 6-7, 11). The District identified specific prescriptions and prioritized additional considerations for determining which trees met old and large requirements (Final EA, pp. 14-17).

Objector also wishes an additional alternative to be considered that didn't include harvesting trees over 16 inches DBH or larger since there is minimal difference between Alternatives 2 and 3. This appears to have originated from Objector's March 22, 2020 comment letter (emphasis added):

> *We therefore request that the Forest Service consider an alternative that will: retain large trees,* ***either*** *larger than 16" DBH* ***or*** *20" DBH, and any old trees, as determined by their size, appearance and morphology. The size of the cap may depend on the results of stand exam data. To the extent that the CSE data show few if any trees 20" DBH or larger, the Forest Service should consider a smaller diameter cap to protect the largest trees that remain.*

The district considered a publication "Diameter Caps and Forest Restoration: Evaluation of a 16" Cut Limit on Achieving Desired Conditions Southwestern Region" (Final EA. p. 66). This document was reviewed in relationship to findings from the adjacent Lone Pine project implementation. Final EA, p. 66 provides rationale based on existing conditions, "Removing areas from treatment as result of diameter limitation reduces the amount of treatment in an area…" While a specific alternative was not addressed related to a 16" diameter, the Final EA (p. 4) specifies the "12-25 inch size class is the most represented on the landscape with reduced representation as the diameter increases" This provides additional rationale for not considering smaller diameter trees as the cut off toward meeting desired basal area. A 16" cap appears to represent an average-sized tree in this area, not one that was exceptionally large or necessarily old (Final EA, Figure 4). A standard diameter for old growth was not specified for ponderosa pine in the SJNF's Forest Plan.

One objector expressed that the range of alternatives is invalid because it didn't include "multiple uses;" however, I find that the proposed action and Alternative 3 were developed to be consistent with objectives identified in the LRMP for Management Area 5, which provide for active management in order to meet multiple-use goals (EA pg. 8). By maintaining consistency with LRPM direction for Management Area 5, the District allowed for multiple uses in the project area. The various uses in the project area were considered in alternative development, including project design, and effects to these resources were disclosed in Chapter 3 of the EA.

The draft Decision Notice (p. 8) includes discussion of alternatives considered and how public comments were used in modifying the proposed action and developing another action alternative.

### *Conclusion #3*

I find that the Responsible Official has considered an adequate range of alternatives, consistent with regulation.

### *Issue #4*

Objectors allege that the Salter Vegetation Management project is inconsistent with the San Juan National Forest Land and Resource Management Plan (LRMP) in a number of ways, including deficiencies in addressing Historical Range of Variability (HRV) and ecosystem management, failure to meeting LRMP objectives for ponderosa pine forest, use of a 26.9" diameter limit and logging of presettlement trees.

### *Analysis #4*

The San Juan National Forest Land and Resource Management Plan (LRMP) states that the Historical Range of Variability (HRV) “can be used to establish an ecological baseline.” It also states that the intent is not to mandate that HRV conditions be achieved in all cases (LRMP p. 12). The San Juan LRMP states that Ecosystem Management, which uses HRV for reference, will be implemented by maintaining or restoring the composition, structure, function, and physical environment of ecosystems” (LRMP p.13). The LRMP does not include specific requirements related to the Ecosystem Management approach.

The Ecosystem Management section of the LRMP also states that many ponderosa pine forests on the SJNF are currently outside their HRV in terms of vegetation stand structure and fire frequency. Ponderosa pine forests have fewer acres in both young and old growth development stages and have less diversity and less cover of native grasses compared to HRV conditions (LRMP p. 18). The desired condition for ponderosa pine forests described in the LRMP is for forests to display variable density and structure reflecting uneven-age structure comprising variable-sized trees (LRMP p. 20).

The San Juan LRMP states that there are many opportunities for vegetation management and that the timber program will focus treatment on “landscapes at high risk for developing epidemic levels of insect and/or disease infestation; landscapes where disturbance has resulted in dead or dying trees…” (LRMP p. 73). One of the objectives outlined in the LRMP states that the most common applications of timber harvest to meet the desired condition could be to conduct thinning-with an emphasis on restoration and fuels reduction of altered forest types-in ponderosa pine and warm-dry mixed conifer vegetation types on approximately 15,000 to 20,000 acres: (LRMP p. 75). Objectives in the LRMP are defined as aspirations, not commitments or final project decisions (LRMP p. 6).

The EA describes the current condition of the forest in the project area and references modeling that was done to suggest two underrepresented size classes relative to the stand structure. These include large trees (greater than 27” DBH) and seedlings and saplings (EA p. 4). Also included within the project area are plantation areas. This has resulted in areas within the project where the diversity is both desired and undesired. Beetle mortality in the over story and density induced mortality is also present (EA p. 4). These infestations are growing and appear to be moving to the east. Data obtained from two consecutive years of flights show a general expansion of the beetle infestation and indicates a need to establish an uneven-age stand structure to increase resistance to beetle infestation and promote resilience (EA p. 5). The EA provides a description of the age and size class of ponderosa pine found within the project area (Final EA p. 6).

The analysis states that a comparison between the current and desired conditions was done utilizing common stand data and that Forest Vegetation Simulation modeling and field observation shows that the condition of the ponderosa pine cover type within the project area is different from the desired condition (DN p. 1, Final EA p. 11).

The dbh limit was set at 26.9 inches due to this size class being underrepresented in the treatment area (Final EA p. 6). There is a description of the stand exam inventory that was done in the project area which describes that using the dbh of trees does not correlate well to the age of the tree. Therefore, it is necessary to rely on visual, as well as size correlation to determine pre-settlement trees within a stand (Final EA p. 6). The forest will use stand exam data to establish likely frequency and typical size of old trees within a stand as a guide for tree markers at the prescription level, which will help to avoid harvesting pre-settlement trees (Final EA p. 6). The draft DN outlines the rationale behind why choosing a smaller dbh limit would not meet the purpose and need of the project (dDN p. 6).

### *Conclusion #4*

I find that Responsible Official provided adequate information in the analysis to show that the proposed action meets direction outlined in the San Juan Land and Resource Management Plan (LRMP).

### *Issue #5*

Objectors allege that the purpose and need for the Salter Project is flawed for a variety of reasons, including that it is too narrow and does not account for multiple uses in the project area, is not valid regarding brush removal over 5,000 acres, and does not provided site-specific data. Objectors further allege that because the purpose and need for Salter is different than the purpose and need for the nearby Lone Pine project, it is arbitrary.

### *Analysis #5*

The regulation at 36 CFR 220.7(b)(1) states that an EA, "…must briefly describe the need for the project."

The purpose and need for the Salter Project relies on site-specific data. Common Stand Exams (CSEs) have been conducted in the project area and proposed actions are specific to this project.

Common stand exam data, which is on-the-ground site-specific information, were referenced in multiple sections of the Final EA (Need for this Proposal and Modified Proposed Action). Basal area was addressed in response to recent fires at Final EA pp 11. The District states the following in regard to purpose and need to achieve desired conditions:

> The desired conditions for the ponderosa pine cover type and lands managed for forest product offerings are further defined in sections 2.2.23 and 2.9.1 of the San Juan National Forest Land and Resource Management Plan (USDA 2013) (final EA, p. 9).

Further:

> A comparison based on common stand exam data, Forest Vegetation Simulation modeling, and field observation between the current and desired conditions shows that the condition of the ponderosa pine cover type found within the Salter vegetation management activity area is different from the desired conditions associated with that vegetative cover type in the San Juan National Forest Land and Resource Management Plan.
>
> The structure and size class distributions in the stands identified for this analysis are not within desired conditions described in 2.2.23 based on field reconnaissance and inventory data. Bark beetles have infested adjacent landscapes causing significant mortality. The early stages of a bark beetle infestation are now being observed in the Salter project area. There are portions within the Salter project area that have been moderately burned by wildfire and there are immediately adjacent areas that have been severely impacted by wildfire. It is well documented that dense, over-stocked, even-age, closed canopy ponderosa pine stands are more susceptible to insect outbreaks (Negron et al. 2008). It is also is well documented that a lack of structural diversity corresponds directly to a reduction in forest resiliency and consequently long term resistance to detrimental natural and human disturbance events, such as, large-scale stand replacing fires (Canard 2013, Negron et al. 2008, Negron et al. 2000, USDA-rmrs_2009_gibson_k0022000) (final EA, p.11).

Approximately 34 percent of the Salter project area has been impacted by fire in the past 10 years. The District states: "The majority of disturbance is due to the 2018 Plateau Wildfire, which burned nearly 20,000 acres during exceptional drought. This fire reduced basal area across the footprint by approximately 32 percent, with most of the fire area (58 percent) experiencing between a 0-to-25 percent reduction in basal area (US Forest Service Rapid Assessment of Vegetation Condition after Wildfire, 2018)" (final EA, pgs. 39-40).

Further, the District has outlined current stand conditions in the following statement: "The average basal area of 336 stands measured in 2020 was 112 $ft^2$/acre and included a range of 12 $ft^2$/acre to 236

ft$^2$/acre. Of the 336 stands measured, the majority of the stands in the project area have basal areas over 100 ft$^2$/acre (200 stands). Seventy-two stands had basal areas over 140 ft$^2$/acre (twice the preferred basal area target)" (final EA, pgs. 6-7).

Therefore, the reduction in basal area by 32 percent across the fire footprint did not achieve the desired effect of 50-70 ft$^2$/acre as shown in the 2020 CSE data output above. Commercial thinning to a 50-70 basal area per acre will only occur depending on current stand conditions, as shown in Table 2, "Vegetation treatment type and treatment description" in the final EA, pages 12-13.

Further rationale and data to support the purpose and need can be found in the Project Record (Vegetation Analysis pp. 27 -39).

Regarding objectors' concern related to the differences between the purpose and need for Salter as opposed to the nearby Lone Pine project, the Final EA at p. 65-66 to describes the differences in Salter's basal areas based upon field recent field observations during the implementation of the Lone Pine project:

> *Preliminary feedback of Lone Pine EA Large Tree Retention study areas from post decision reconnaissance and layout of leave tree units have shown mixed results. The effects of applying a diameter limit appear to be more easily tangible at the fine scale. At the fine scale patches of bark beetle and heavily infested dwarf mistletoe trees have to be passed for removal due to the diameter limitation. Basal area retention goals and uneven aged characteristics are being compromised, leaving stands less resilient and making long term resistance less likely to occur. Removing areas from treatment as result of diameter limitation reduces the amount of treatment in an area and subsequently the amount of harvestable volume per acre. The effects described for the small scale are also documented from the mid-scale and potentially the landscape scale (USDA 2013d; USDA 2011).*

These observations indicate that basal area requirements were not factoring in the extent of insect and disease in the area. Final EA (p. 86) states: "The Salter Vegetation management project proposes an adaptive management approach intended to accommodate changing conditions and additional strategies to achieve the identified desired conditions." Final EA (pp. 29-30) describes the adaptive management and monitoring process.

Regarding brush treatment, the purpose and need is stated in the Final EA, pages 7, 13, and 15-16; and the Vegetation Analysis report, page 10. The final EA indicates that Gambel oak dominates the understory in many of the stands and outcompetes young pines and seedlings for essential light, moisture, and nutrients (final EA, pg. 15). The District states: *"This competition for limited moisture is probably most detrimental to pine when the trees are very young and seedlings are competing directly with the extensive oak layer. Pine germination and establishment will also likely be hindered when micro sites are fully occupied by oak and heavy leaf litter covers mineral soil. Some research has even indicated a possible inhibiting allelopathic effect of oak leaves on pine germination (Harrington 1987)"* (Project Record, Vegetation Analysis, p. 10).

Regarding the EA's statement that seedlings are an underrepresented size class (final EA p. 16), this is supported by the Vegetation Analysis report, which states:

> *There is also the ability for good establishment of seedlings and regeneration as seen in stands currently meeting desired conditions in LRMP or areas that have seen various types of disturbance. As seen in the structure of areas of stands during field reviews cone crops can be episodic in nature leading to very patchy and variable regeneration. Yet where represented it*

> *often has 400 to 500 seedlings per acre. This size class is the other under-represented component of stands' structures identified for treatment* (Vegetation Analysis report, p. 6).

The Vegetation Analysis report further describes the relationship between overstocking of Gambel Oak and understocking of conifer seedlings:

> *The understory/shrub layer is overwhelmingly comprised of Gambel oak with minimal growing space available for seedlings and saplings. In case of Ponderosa Pine numbers this component of structure is lacking and mostly a monoculture of Gambel oak* (Vegetation Analysis report, p. 14).

Regarding Objectors' concerns that "desirable conditions" described by the Dolores Watershed Resilient Forest Collaborative (DWRF) were not considered, The District states the following on the collaborative process and consistency with *Ponderosa Pine Ecosystem Resilience Metrics and Desired Conditions*:

> *Through efforts like the Rocky Mountain Restoration Initiative and the Collaborative Landscape Restoration Forest Restoration program, DWRF collaborative members have identified treatment priorities for areas within the DWRF upper Dolores River watershed, which includes the Salter landscape. This provides information to the agency to take into consideration when determining treatment priorities. The collaborative has also identified a set of ponderosa pine desired conditions that outlines components of ponderosa pine forest resiliency that are a priority for the collaborative (DWRF. 2020. Ponderosa Pine Ecosystem Resilience Metrics and Desired Conditions). The desired conditions developed by the collaborative are consistent with and integrate well with the standards and guidelines identified in the Land and Resource Management Plan for this landscape. The information and recommendations provided by the collaborative have been given consideration in the design of the Salter Vegetation Management project"* (final EA, pg. 86).

Finally, regarding Objectors' concerns that the purpose and need doesn't include multiple uses in the project area, NEPA does not require that multiple uses within a specific project area need to be part of every proposal. Multiple uses have, however, been considered in the effects analysis in Section 3 of the Final EA. Numerous design features protect multiple uses (final EA, pp. 20-29).

Also see response to Issue #3.

### *Conclusion #5*

I find that the purpose and need for the Salter Project was properly focused on vegetation conditions and was based on best available science and site-specific information.

### *Issue #6*

Objectors allege that the Salter Project will result in significant impacts and therefore requires preparation of an EIS; specific concerns relate to the effects of skid trails and 177 miles of temporary roads, logging on 35 square miles of forest land and duration of project (10 years) on soils and watersheds. Objectors also allege significant effects to the northern goshawk and to presettlement ponderosa pine.

### *Analysis #6*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives.

The rebulation at 40 CFR 1508.13 describes a Finding of No Significant Impact (FONSI) as:

> "Finding of no significant impact means a document by a Federal agency briefly presenting the reasons why an action, not otherwise excluded (§1508.4), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared. It shall include the environmental assessment or a summary of it and shall note any other environmental documents related to it (§1501.7(a)(5)). If the assessment is included, the finding need not repeat any of the discussion in the assessment but may incorporate it by reference."

The final EA states: "This environmental assessment is prepared to determine whether the effects of the proposed action may be significant and therefore warrant the preparation of an environmental impact statement……Consistency findings are disclosed in the individual resource-specific environmental effects section of this environmental assessment" (Final EA, page 1).

Anticipated effects to soils and watersheds are documented in the EA (p. 69-72). Erosion and runoff will be minimized due to the application of design features (EA p. 21-22, 26, 71). There is an acknowledgement that the proposed action will result in a small, temporary increase in runoff due to water running off compacted areas immediately after harvest and that the effects will be of limited extent and severity due to several factors described (EA. p. 70). There is also an acknowledgment that soil erosion will occur as a result of temporary road construction and that some sediment delivery to ephemeral and intermittent streams is expected at stream crossings, but that these effects will be short-term and of limited intensity (EA p. 70). Road density will not increase in the watersheds and is within the Forest Plan guidance (EA p. 67-68, 70). Road maintenance will occur on more roads in the area improving the overall road condition (EA p. 65).

The method for identifying pre-settlement trees is stated in the EA, pages 6, 16-17. The District determined during the stand inventory process that there is high variability between age classes relative to size diameter at breast height (Vegetation Analysis, pages 13-14).

The District states: *"Data analysis is a good guide for overall management but when in the field, visual characteristics have proven to be more reliable in determining age (GTR-110 2003 Huckaby etal.)."* (Project record, Vegetation Analysis page 14).

The District further states: *"CSE data will be used to establish a likely frequency and typical size of trees as a guide for tree markers. Of the 7,461 trees measured in 2020 within the treatment area the oldest tree cored and aged was 137 years old and had a diameter of 19.6 inches at Breast Height. While the largest tree measured was over 50" DBH. This demonstrates the variability within the age to size correlation and makes it necessary to rely on visual as well as data for indicators of pre-settlement trees within a stand. Including this type of data in marking guides will help the markers understand which tree sizes within a stand might have the potential of being pre-settlement in age."* (Project record, Vegetation Analysis page 14).

The District outlines the following indicators for evaluating pre-settlement trees:

*"Tree evaluation will be accomplished through a descending order of choice made by the designator. Evaluation occurs at every step of the decision-making process applying sound judgement based on parameters from the analysis and direction from a certified silviculturist. Below is an example of a descending order of choice that will be used to evaluate trees and ultimately designated them for removal if the stand has a basal area greater than 50 ft2/acre.*

*a. Tree can be evaluated for harvest if it is less than 27.0 inch DBH*
*b. Do not cut trees with a combination of pre-settlement visual indicators*
*c. Cut dead trees (brown or red needles/no needles)*
*d. Cut live trees with visible evidence of bark beetle infestation (e.g., pitch tubes, frass, and woodpecker activity on tree bole)*

*e. Cut live trees with dwarf mistletoe infecting more than 50% of the live crown*

*In addition to b-e above, trees 25 inch DBH and less can also be cut if they meet the following condition or structure.*

*f. Live crown declining more than 25% including poor needle conditions*
*g. Evidence of conks, cankers or advanced decay*
*h. Weak or multiple forks*
*i. Broken or dead tops*
*j. Leans greater than 35%*
*k. Grossly poor form*
*l. To achieve a basal area target within 50-70 ft2/ac.*

*When all components are represented, uneven-aged stand structure mirrors a reverse J curve when graphed (Refer to the Vegetation Report). Most stands are not this uniform, and adjustments will be made on a stand level basis to begin moving toward a more traditional uneven aged structure. The reverse J curve is a model and does not account for variability caused by additional desired conditions such as group, clump and individual structure, tree retention for aesthetics, old and large tree retention or supplementary resource based design elements. Each stand will have a different approach to uneven aged management from the current benchmark to achieving the desired structure, while meeting design elements. This provides flexibility in prescription writing an essential component of this analysis and ultimately meeting desired conditions."* (EA, page 17)

Therefore, pre-settlement trees will be retained if they do not meet the above indicators and each stand will require a unique approach in prescriptions to achieve desired conditions while meeting design elements.

Regarding northern goshawk, Forest Service Manual 2672.42 describes the standards for Biological Evaluations and 2672.43 outlines the procedure for conducting a Biological Evaluation.

The analysis of effects to goshawks is documented in the EA (Pg 73, 76-80) and BE (Pg 36-41). The analysis determination states, "…effects are expected be short-term (less than 10 years) and the long-term (more than 10 years) impacts are intended to be beneficial by providing higher quality habitat that is well distributed in the future. Two design features that place temporal and spatial restrictions on management actions were developed to minimize adverse effects (EA Pg 28, Fig 15 of App A). A specific harvest treatment was developed with technical input from the district wildlife biologist and "designed to improve the overall stand functionality and improve growth rates by reducing trees per acre while maintaining or promoting a relatively closed canopy structure to meet goshawk habitat." (EA Pg 15).

The draft Decision Notice includes a Finding of No Significant Impact, which is well-supported by the final EA and the project record (draft DN pp. 10-13).

### *Conclusion #6*

I find that the Responsible Official has found that the Salter Vegetation Project would not result in significant impacts to the human environment and has provided sufficient evidence, supported by the final EA and project record, in the Decision Notice.

### *Issue #7*

Several Objectors allege that NEPA is violated because comments they submitted during the scoping period and/or the comment period were not acknowledged or responded to; Objectors allege a violation of the NEPA regulations at 40 CFR 1503.1 and 1503.4.

### *Analysis #7*

The regulation at 36 CFR 218.25(b) requires the responsible official to consider all written comments submitted and that all written comments received be placed in the project file and become a matter of public record. NEPA does not require an EA to include a specific response to comments.

The regulations cited by the Objectors are specific to Environmental Impact Statements and do not apply to EAs.

The Salter project record includes an Excel spreadsheet (file name "20210323SalterCommentResponse") that identifies comments and specific concerns raised by commenters, indicating that the comments were considered. The project record also includes a document (file name "Salter EA Changes based on Comments_060121") that enumerates changes made to the final EA in response to public comment.

District Ranger Padilla has specifically noted that he has considered Objectors' comments and other comments received in his Draft DN (pp. 5-9). Final EA (pp. 34-35) similarly addresses grouped issues. Final EA analysis relies on best available scientific information including CSE data from 2020 and peer-reviewed literature. Furthermore, District Ranger Padilla's Draft DN (pp. 6-9) discusses issues and the public processes that surround them.

### *Conclusion #7*

I find that the Responsible Official has considered the comments received by Objectors as issues or analysis in project record in compliance with regulations for an EA. There is no requirement to cite any particular body of science and District has demonstrated that it has considered relevant material and used area-specific and project-specific data, where appropriate.

### *Issue #8*

Objectors allege that analysis of the effects of climate change on the project area, the effects of the project on climate change, and the effects of the project on carbon storage is insufficient.

### *Analysis #8*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives.

The 2013 San Juan National Forest Land and Resource Management Plan (LRMP) calls for forest vegetation management to be done in a manner that "anticipates climate-related plant succession changes (such as favoring heat- or drought-resistant tree species as leave trees, or in reforestation)" (section 2.9.1, p. 75).

Treatment of climate change in project-level NEPA analysis is guided by "Climate Change Considerations in Project-Level NEPA Analysis" (U.S. Forest Service 2009), which recommends consideration of both i) the effect of a proposed action on climate change, and ii) the effect of climate change on a proposed action.

Regarding the effect of the proposed action on climate change:

> The 2009 Agency guidance notes that "there will be some situations where quantitative analysis will be useful and others where qualitative analysis will best serve decisionmaking" (p. 4). Examples of the types of projects for which quantitative analysis may be required include "energy facilities, transmission lines, [and] oil & gas development or leases" (p. 4).
>
> Vegetation management activities such as those proposed in the Salter project have a small climate impact in the global context, and therefore a qualitative discussion about the potential for greenhouse gases sequestered and emitted is more appropriate. The EA provides a qualitative, ecosystem-based description of the small carbon fluxes associated with the proposed project in Appendix C (Final EA p. 109).

Regarding the effect of climate change on the proposed action:

> The Environmental Assessment refers to a 2014 Ecosystem Vulnerability Assessment to support its determination that the future vulnerability of the Ponderosa pine is "presumed stable." This determination is based on climate modeling performed by Crookston et al. (2010).
>
> The Draft Decision Notice states that the adaptive management approach will allow work to be modified "in response to both actively moving insect and disease outbreaks in and adjacent to the analysis area **and climate change**" (dDN p. 6, emphasis added). Table 6 ("Adaptive Management Actions") in the EA contains the following action associated with post-planting Silviculture: "2.9.1 Anticipates climate-related plant succession changes (such as favoring heat or drought-resistant tree species as leave trees, or in reforestation)" (Final EA p. 32). This approach will enable project implementers to be responsive to changing conditions on the ground, including succession changes due to climate change.

### *Conclusion #8*

Based on my review of the project record and referenced documents, and considering the size and scope of the project, I find that the Responsible Official adequately considered issues surrounding climate change. The level of analysis was consistent with agency guidance and of comparable depth to previous projects on the forest (such as the Lone Pine EA).

### *Issue #9*

Objectors allege that the EA does not include sufficient analysis of economic information, especially because economics is identified as part of the purpose and need.

### *Analysis #9*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives.

The Responsible Official determined that the need for the actions proposed in the Salter Project includes "Provide economic support to local communities by providing timber products to local industries in a sustainable manner" (final EA p. 11). Supporting the local recreation economy is not included in the purpose and need of the proposed treatment activities. However, impacts to recreation visitors and associated economic activity is disclosed in the EA socioeconomic (EA p. 58) and Recreation Activities and Experience (EA p. 52-60) sections.

The socioeconomic section of the EA (final EA p. 58-60) details the industry demand for fiber, saw log, products other than logs, as well as niche markets for beetle killed dead ponderosa pine—all products

that would be removed through the treatment activities. The analysis also documents the niche and limited demand for smaller diameter and inconsistent material that can result from vegetation management activities. The analysis demonstrates providing timber products to local timber harvesting and processing firms supports the local economy through jobs, labor income and value added in the forest sectors, as well as supporting sectors and industries.

The affected environment of the socioeconomic section documents the size of the travel and tourism sectors (final EA p. 57). The affected environment of the Recreation Activities and Experience section documents the high use of the recreation area within the project area (final EA p. 51-52). The socioeconomic section highlights survey data from general forest visitors' response to survey questions on their behavior if unable to visit the national forest (final EA p. 58). The socioeconomic section of the EA addresses this potential for displaced recreation visitors due to treatment activities and the potential negative impact that displacement may have on recreation visitor spending and associated economic activity in communities near the project area (final EA p. 58). Potential impacts from the proposed treatments to the local recreation economy were assessed and documented in the socioeconomic sections of the EA.

### *Conclusion #9*

Based on a review of the project record, I find that the Responsible Official adequately considered the effects of the proposed action on the economic environment. I find sufficient analysis of the economic effects of the modified proposed action on the local recreation economy. I also find the socioeconomic analysis to show the proposed treatments support the purpose and need.

### *Issue #10*

Objectors are concerned that project design elements related to recreation are insufficient. Specifically, concerns relate to a design element associated with minimizing effects to recreation from hauling over holiday weekends and to rerouting trails where they can't be avoided by haul routes. Objectors were concerned that their comments were not considered by the Responsible Official.

### *Analysis #10*

The regulation at 36 CFR 220.7(b)(2) states that an EA "shall briefly describe the proposed action and alternative(s) that meet the need for action." The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives. The regulation at 36 CFR 218.25(b) requires the responsible official to consider all written comments submitted and that all written comments received be placed in the project file and become a matter of public record. NEPA does not require an EA to include a specific response to comments.

The project record confirms the Forest Service received and considered the comments related to the recreation resource submitted by objectors; also see response to Issue #7.

A discussion with the San Juan National Forest Recreation Program Management Specialist established it was the judgement and experience of the forest specialists that determined the haul closure dates, as written, the closure dates would address the most problematic times of recreation use of the forest resources and holiday hauling (Final EA p. 24). Excluding the Mondays of Labor Day and Memorial Day was intentional. These days were not determined to be among the most problematic holiday days for the users of the recreation resources.

### *Conclusion #10*

I find that the design features are written appropriately to address the affected resources.

### *Issue #11*

Objectors are concerned that design elements related to protection of elk and northern goshawk are insufficient.

### *Analysis #11*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives. Forest Service Manual (FSM) 2672.42 describes the standards for Biological Evaluations.

The action alternatives analyzed in the Salter EA include specific design elements to protect elk habitat (Final EA p. 28). The two design features place temporal and spatial restrictions on management actions in coordination with Colorado Parks and Wildlife (CPW) expertise and guidance. These design features are intended to reduce the potential for temporary displacement of elk, in accordance with LRMP Guidelines 2.3.59 and 2.3.60 (Final San Juan National Forest Land and Resource Management Plan, pp. 36 & 37).

Effects to elk were analyzed in the Wildlife Report (project record) and disclosed in the EA (Final EA pp. 82 – 83). The EA described the potential for temporary displacement of elk due to project-related disturbance, but indicated that in the long term, habitat would benefit from an increase in foraging opportunities and an overall improvement in habitat quality due to increasing the resilience of pine stands to insect infestation (final EA p. 83).

The analysis described in the EA indicates an additional design element that was not included in the description of alternatives (final EA p. 83; also see Wildlife Report); my staff determined, in conversation with the ID team wildlife biologist, that the additional design element was referenced by mistake and is not intended as part of the proposed action.

Design features specific to goshawks were included in the action alternatives (Final EA p. 28) in order to avoid or minimize potential adverse effects to goshawks in alignment with Land and Resource Management Plan (LRMP) Desired Conditions 2.3.7, Guideline 2.3.49 and Table 2.3.2 (Final San Juan National Forest Land and Resource Management Plan Pg 33, 36 & 39 respectively). The EA describes the potential for short-term impacts due to effects to available habitat, and anticipates that these effects would last for about 10 years post-project implementation; however, improved forest resiliency is expected to improve habitat for northern goshawk in the long term. The Responsible Official determined, based on the analysis, that the project may impact individual goshawk but will not contribute to a trend toward federal listing or loss of species viability (final EA p. 79).

Management recommendations referenced by objectors (Reynolds et al 1992) do not apply in all cases or situations. The analysis completed for goshawk acknowledge the referenced recommendations and specifically the territory occupancy timeframes (EA Pg 76). The goshawk timing design feature is directly from the LRMP Guideline 2.3.49 (Table 2.3.2).

### *Conclusion #11*

I find that the EA sufficiently documented design elements associated with protection of elk and northern goshawks adequately in alignment with Land and Resource management Plan Guidelines, and that the analysis of effects to these species is sufficient to support the decision and Finding of No Significant Impact.

However, because the erroneous design element referenced in the EA and wildlife report may create confusion, I direct the Responsible Official to clarify in the final Decision Notice that the design element

described in the final EA, p. 83, is not included in the decision and provide rationale why the analysis of effects to elk would not be changed with that design element removed.

### *Issue #12*

Objectors are concerned that design elements related to invasive plant species are insufficient.

### *Analysis #12*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives.

The Final EA addresses invasive species. Project Design Features include six actions related to control and prevention of invasive plants (final EA p. 23). EA table 5 addresses the type and frequency of surveys (final EA pg. 31), and Table 6 describes actions and triggers associated with adaptive management (final EA pg. 33).

The final EA discusses presence and treatment of invasive plants in the project area (final EA pp 42-43); and the EA specifies that inventory and treatment of invasive plants is ongoing under previous NEPA decisions. The EA acknowledges that project activities may increase noxious weed establishment, but also discloses that Project Design Features are expected to reduce the likelihood of increased invasive plant establishment (Table 8, final EA p. 44).

### *Conclusion #12*

I find that the EA and its supporting documentation adequately address the presence of and likelihood of introducing invasive plants, and that the project incorporates sufficient measures to address existing invasive plant populations in the project area and to limit the risk of new invasive plant introductions.

### *Issue #13*

Objectors allege that the design features associated with temporary roads are vague and that effectiveness is not properly analyzed.

### *Analysis #13*

The regulation at 36 CFR 220.7(b)(2) states that an EA "shall briefly describe the proposed action and alternative(s) that meet the need for action. No specific number of alternatives is required or prescribed." The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives.

Design features associated with temporary roads are found in the EA under the Hydrology and Soils section (Final EA p. 22) and the Transportation section (Final EA p. 26). The hydrology design features are taken from the Watershed Conservation Practices Handbook (Forest Service Handbook 2509.25). These design features are considered the most effective practical means of preventing or reducing the amount of pollution generated by nonpoint sources (Watershed Conservation Practices Handbook p. 5). The Watersheds section of the EA outlines the specific design features included to minimize impacts from temporary roads (Final EA p. 69-72). These include holding temporary roads to the minimum number feasible and locating them sufficiently far from streams and other water bodies to minimize discharge into those waters except at stream crossings; building stream crossings with appropriate drainage features and stream crossings to provide for the flow and passage of sediment and to withstand expected flood flow; and locating stream crossings at straight and shallow locations (slope banks will not exceed 30 percent) where channels are hardened by gravel, cobble, or bedrock (Hydrology design elements 7 and 8; Final EA p. 22, 70). Transportation design feature 2 (Final EA p. 26)

states that the location and clearing widths of all temporary roads will be agreed to in writing before construction is started. Additionally, the majority of the temporary roads proposed (68.9 miles) are on non-system roads that are already on the ground (Final EA p. 63). These roads will be properly designed for the type of equipment that will be using them and will be decommissioned within 5 years after their first use (Final EA p. 22, 70). Decommissioning will involve re-contouring where significant side slope exists, elimination of ditches and other structures, out-sloping during construction, removal of ruts and berms, effectively blocking the road to normal vehicular traffic where feasible, and construction of drainage features such as cross ditches and water bars (Final EA p. 26).

### *Conclusion #13*

I find that the final EA sufficiently documented the specific design features necessary to reduce potential impacts from temporary roads. The design features are taken from the Watershed Conservation Practices Handbook, which is considered the guiding document for best management practices. The Responsible Official concluded that these design features would reduce potential impacts to an acceptable level. I do not see a need to address this further in the Decision Notice.

### *Issue #14*

Objector alleges a violation of NEPA due to failure to analyze effectiveness of mitigation measures. Objector appears to acknowledge that mitigation measures were not included, but maintains that design features are vague and inadequately analyzed.

### *Analysis #14*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives.

Design Features are part of the Action Alternatives (Final EA, pp. 20-29) and, therefore, have been analyzed in detail in Section 3 of the Final EA. Final EA (p. 20) notes "These design features come from a variety of sources including, but not limited to, Land and Resource Management Plan Standards and Guidelines, direction and guidance provided in Forest Service Handbooks and Manuals (including the Region 2 Watershed Conservation Practices Handbook), Vegetation Management Programmatic Agreement between the Forest Service and Colorado State Historic Preservation Officer (2017), and professional judgement." Per FSM direction, the design features are generally included as contract terms (i.e., specific conditions, standard provisions or special provisions) where those actions such as logging are contracted. They are then monitored by a Forest Service Representative during and after implementation (FSM 2450).

### *Conclusion #14*

I find that the Responsible Official has properly included and analyzed design features in compliance with appropriate NEPA regulations (36 CFR 220.7(b)(3)).

### *Issue #15*

An objector asserts that the EA must incorporate monitoring of restoration of spatial structure using ICO method.

### *Analysis #15*

The regulation at 36 CFR 220.7(b)(2) states that an EA "shall briefly describe the proposed action and alternative(s) that meet the need for action. No specific number of alternatives is required or prescribed."

Monitoring and Adaptive management are included and described in the Final Salter EA, pages 29-33, Tables 5-6. Table 5 clearly outlines the activities to be monitored but does not include monitoring of structural components such as individual, clump, and opening (ICO) Churchill et al. 2013), or group, individual, or clump (GCI) structures (EA, pgs. 12, 15; Project Record, Vegetation Analysis pg. 24). Table 5 does articulate monitoring of silvicultural prescription and fuel loading to determine treatment effectiveness relative to desired conditions and restoration (final EA p. 31).

### *Conclusion #15*

I find that the Responsible Official is consistent with the regulation at 36 CFR 220.7(b)(2) by clearly identifying and monitoring activities as they relate to silviculture prescriptions and post-treatment effectiveness.

### *Issue #16*

An objector alleges that the proposed action is flawed because the target basal area and the proposed diameter cap are not supported by best available science.

### *Analysis #16*

The regulation at 40 CFR 1502.23[1]states that, "Agencies shall ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents. Agencies shall make use of reliable existing data and resources. Agencies may make use of any reliable data sources, such as remotely gathered information or statistical models. They shall identify any methodologies used and shall make explicit reference to the scientific and other sources relied upon for conclusions in the statement."

The Responsible Official demonstrated they used the best available scientific information to determine basal area target and diameter cap; this is documented within the Final EA, pages 9-14.

The District refers to the use of best available scientific information in the following statement: "A comparison based on common stand exam data, Forest Vegetation Simulation modeling, and field observation between the current and desired conditions shows that the condition of the ponderosa pine cover type found within the Salter vegetation management activity area is different from the desired conditions associated with that vegetative cover type in the San Juan National Forest Land and Resource Management Plan." (EA, page 11)

The District describes selecting the target basal area and diameter cap in detail in the EA and provided in the following statement:

"Single tree selection prescriptions will all have the same basic components and will use a BDQ method where "B" is the desired residual basal area, "D" is the maximum tree size (all trees 26.9" and larger diameter at breast height will be retained in all stands) and "Q" describes the diameter distribution as a ratio of the number of trees in succeeding size classes. Based on stand exam data the general prescriptions will target a residual basal area of 50-to-70 ft2/acre with a mean or target of 66 basal area when conditions allow.

For the average stand in the project area, the residual basal area will be 60-to-68 ft2/acre depending upon the silviculture treatment. The maximum diameter to harvest will be 26.9" and the q-factor will be 1.3 (applied to 2 inch diameter classes). The residual stocking level of 50-to-70 ft2 was chosen to allow sufficient growing space to establish new regeneration while reducing severe fire risk and promoting

---

[1] The regulation at 40 CFR 1502 is specific to Environmental Impact Statements; however, pursuant to the regulation at 40 CFR 15019(g)(2), Section 1502.23 may be applied to EAs.

tree vigor. The maximum diameter of 26.9" addresses management objectives by providing a continuous supply of desirable saw timber products without allowing trees to progress into age related decadence while at the same time maintaining a large tree emphasis on the landscape. A q-factor of 1.3 keeps sub-merchantable trees fully stocked for the next cohort. The harvests will take place on a 20 to 25-year cutting cycle to allow for sufficient stand growth while at the same time keeping stand density within the target range." (EA, page 14)

Therefore, based on the best scientific information available and most recent inventory data, the District Silviculturalist has determined a 26.9" diameter cap and a basal area of 50-to-70 square feet per acre will meet the desired conditions stated in the San Juan LRMP (2013).

### *Conclusion #16*

I find the Responsible Official provides adequate documentation within the analysis, demonstrating the use of best scientific information available to determine the target basal area and diameter cap to achieve desired conditions stated within the San Juan LRMP (2013).

### *Issue #17*

An Objector alleges that the EA improperly relies on adaptive management because information required by regulation is not included in the analysis.

### *Analysis #17*

The regulation at 36 CFR 220.7 (b)(2)(iv) states that, "The proposed action and one or more alternatives to the proposed action may include adaptive management. An adaptive management proposal or alternative must clearly identify the adjustment(s) that may be made when monitoring during project implementation indicates that the action is not having its intended effect, or is causing unintended and undesirable effects. The EA must disclose not only the effect of the proposed action or alternative but also the effect of the adjustment. Such proposal or alternative must also describe the monitoring that would take place to inform the responsible official whether the action is having its intended effect."

Monitoring and Adaptive management are included and described in the final EA, pages 29-33, Tables 5-6. Table 5 clearly outlines the activities to be monitored and Table 6 outlines the threshold or undesirable effect that triggers a need for action to achieve desired conditions. I find the Final EA is consistent with 36 CFR 220.7(b)(2)(iv).

### *Conclusion #17*

I find that the Responsible Official provides adequate information in the analysis by clearly identifying adaptive management actions and monitoring activities as required by regulation.

### *Issue #18*

Objector alleges that the EA fails to take into account the cumulative effects of off-road vehicle recreation and does not feel that the design feature that addresses access to dispersed camping sites is adequate.

### *Analysis #18*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives. Objector alleges the requirements of NEPA have not been met regarding cumulative effects.

Final EA (p. 54) and 2020 Motor Vehicle Use Map notes off-road vehicle use is not permitted except in limited circumstances (i.e., limited big game motorized big game retrieval and dispersed camping) per

travel management decision issued under 36 CFR 212. Also, Final EA, p. 54 specifically addresses cumulative effects, "The Boggy Glade Travel Management Project resulted in some roads that were once open to public use being closed to public use or decommissioned. This will create minor displacement recreation activities that could overlap in time with the Salter Vegetation Management project." Objectors tie their concern to ability to successfully reclaim routes and resource concerns. The Final EA does consider resource concerns related to dispersed recreation. In addition to recreation design feature mentioned by Objector, there is a design feature for transportation (Final EA, p. 26) which includes, "Following use for harvest and treatment implementation, both temporary AND designed roads will be decommissioned, which involves re-contouring where significant side slope exists, elimination of ditches and other structures, out-sloping during construction, removal of ruts and berms, effectively blocking the road to normal vehicular traffic where feasible, and construction of drainage features such as cross ditches and water bars. Final acceptance of the closure will be made by the Forest hydrologist or engineering representative." Final EA (p. 72) considers dispersed use for watershed resources. Similarly, for wildlife, "Recreation opportunities within the area are expected to increase some, but they are not expected to become significant enough to reduce the functionality of any species' habitat." Final EA, p. 85. Further, it is not within the agency purview to speculate that illegal activities will occur.

### *Conclusion #18*

I find the Responsible Official has considered cumulative effects related to potential for increased accessibility of Forest lands in compliance with NEPA (36 CFR 220.7(b)(3)) and travel regulations.

### *Issue #19*

The objector alleges that the EA does not address the key differences between Alternatives 2 and 3, primarily in terms of forest resilience and timber economics.

### *Analysis #19*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives.

The Vegetation Analysis report (pp. 38-39) compares alternatives in relation to desired conditions which are related to forest resilience criteria. The report discusses the limitation of diameter caps and the effects of forest resilience in the following:

"Limiting prescription effectiveness with a blanket diameter cap such as alternative 3 has been applied to the "Large Tree Retention Areas" (LTR) of Lone Pine as study opportunity. Has shown the potential of limiting or even interrupting long term approaches to meeting desired conditions described in LRMP for ponderosa pine. The Lone Pine LTR study areas have shown a limitation on sanitation approaches within stands and forced the leaving of entire groups of trees infested with bark beetles. As management begins to bring stands back into an uneven aged state, volume or basil area that would normally be prescribed for harvest under an uneven aged management approach would be locked up in upper diameters under alternative 3."

In alternative 3 (EA, p. 66), an explanation of how diameter caps hinder forest health and resilience is provided:

"Large tree retention limits the ability to fully utilize the silviculture systems designated by the Land and Resource Management Plan. Therefore, alternative 3 meets the desired conditions described at 2.2.23 to a lesser degree than alternative 2 – Modified proposed action. The data indicates that the differences between alternatives 2 and 3 are associated with specific locations over time and over cutting cycles.

Preliminary feedback of Lone Pine EA Large Tree Retention study areas from post decision reconnaissance and layout of leave tree units have shown mixed results. The effects of applying a diameter limit appear to be more easily tangible at the fine scale. At the fine scale patches of bark beetle and heavily infested dwarf mistletoe trees have to be passed for removal due to the diameter limitation. Basal area retention goals and uneven aged characteristics are being compromised, leaving stands less resilient and making long term resistance less likely to occur.

Continuing in alternative 3 (EA, p.66), the following mentions a difference in timber economics:

"Removing areas from treatment as result of diameter limitation reduces the amount of treatment in an area and subsequently the amount of harvestable volume per acre."

In the Vegetation Analysis report, Economics (pp. 40-41), the summary describes how the local markets are increasing in the recent past 5-6 years and how bids for various products have gone from "no-bid" to competitive bids for those products:

"The fiber demand of the local area based on current sales over the past 2 years will keep in

pace with what this EA can provide as a byproduct of the vegetation management activities to meet desired conditions. However, an increase in demand will result in competitive prices for fiber and the ability to utilize funds to perform service and stewardship items such as pre-commercial thinning."

The "saw log" (=>9" DBH) market demand continues to increase with bid premiums seen on almost every sale including stewardship contracts within the last 4 years. Sales with premiums also included additional charges for brush disposal, essential KV and road maintenance which have caused no bid sales on the district in the past. The ability to include large volumes and achieve vegetation management at landscape level is possible with the current industry. Offering a mixture of saw log and smaller diameters timber in the right ratio is important to keep sales marketable. The size of these sales is equally important in both volume and acres to ensure the work is completed on time and has a sustained profitability."

### *Conclusion #19*

I find that the Responsible Official adequately considered disclosed the economic effects of the action alternatives and, where applicable, demonstrated the differences between the action alternatives.

### *Issue #20*

Objector alleges that justification for preferred/selected alternative is not valid.

### *Analysis #20*

The regulation at 36 CFR 220.7(c) states that "A decision notice must document the conclusions drawn and the decision(s) made based on the supporting record, including the EA and FONSI." Objector alleges that the decision was based on silvicultural methods instead of achieving the desired condition in the Forest Plan.

Project is designed to meet Forest Plan desired conditions for Management Area 5 and all project areas are within suitable timber base. Final EA, pp. 8-9. The desired conditions for the ponderosa pine cover type and lands managed for forest product offerings are further defined in sections 2.2.23 and 2.9.1 of the San Juan National Forest Land and Resource Management Plan (USDA 2013). Final EA (pp. 9-11) addresses how existing stands do not meet Forest Plan components. Silvicultural prescriptions are the tools used to meet desired conditions. Final EA at pp 12-13; Draft DN, pp. 1, 2-3, 12-13. Disagreements occur between Objector and District regarding how to meet the desired conditions based on old or large tree caps. See other issues addressed in this document. This does not invalidate analysis completed.

District used site-specific CSE data, analyzed NFMA requirements (Draft DN, pp. 12-16) and considered past fire suppression activities (Final EA, pp. 7-8) and insect outbreaks (Final EA, pp. 4- 5) that led to desired conditions not being met. Additionally, Final EA (p. 6) describes, "Generally, the project area is in fair to good health with areas displaying indicators of good future forest health conditions. The stands that have been treated within the last 15 years under earlier ponderosa pine management efforts, display many of the desired conditions identified in the Land and Resource Management Plan for ponderosa pine. These include a reduction in small diameter overtopped and suppressed trees and improved structural dynamics. Areas that have not been treated are over-stocked and lack disturbance." Lastly, it was articulated in Draft DN (pp. 5-8) why Alternative 2 was selected over Alternative 3 and acknowledged that environmental trade-offs do occur.

### *Conclusion #20*

I find the Responsible Official's decision is neither arbitrary nor capricious as it relates to selection of an alternative in meeting desired conditions. Draft DN relies on analysis completed and documents rationale and considerations for the decision.

### *Issue #21*

The objector asserts that the EA uses improper terminology ("group, clump and individual structure") and requests correction and use of best available science.

### *Analysis #21*

The regulation at 40 CFR 1502.23 states that, "Agencies shall ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents. Agencies shall make use of reliable existing data and resources. Agencies may make use of any reliable data sources, such as remotely gathered information or statistical models. They shall identify any methodologies used and shall make explicit reference to the scientific and other sources relied upon for conclusions in the statement."

Definitions of the terms "group, clump, and individual structure" are provided in the Vegetation Analysis report (p.22) "Focus on Groups/Clumps/Individuals and the final EA (p.12); the terms are discussed but are not specifically defined as "GCI."

### *Conclusion #21*

I find that the Responsible Official adequately analyzed and described their methodology and it is consistent with appropriate laws, regulations, and policies.

### *Issue #22*

An Objector asserts that information provided by the forest at a public meeting was not part of the NEPA process and alleges that the forest withheld useful information from the public.

### *Analysis #22*

Objector alleges that useful, visual informational materials from a public meeting in March 2020 were not included in the Draft EA. While there is no requirement to include this particular information (i.e., PowerPoint presentation) in the analysis. Documentation is required by 40 CFR 1508.9 for persons consulted and for public involvement in the decision notice per 36 CFR 220.7(c)(3). The Final EA at pp. 34-35 (Issues) and 85-87 and Draft DN at pp. 6-8, 9 meet these regulatory requirements. Moreover, the Draft DN (p. 9) and Final EA ( p. 86) state, "The information and recommendations provided by the collaborative have been given consideration in the design of the Salter Vegetation Management project.). Final EA (p. 86) also describes the collaborative (emphasis added):

> *As part of the Salter planning process, the Agency entered into an agreement with the DWRF Collaborative that described commitments and an overall goal of "transparent deliberation and discussion on all proposed projects".* ***The agency and collaborative have met on many occasions throughout the planning process to share information and exchange data. The agreement outlines the use of the collaborative exchange folder (CEF) to facilitate open exchange of information and data.*** *The CEF is located on the agency's corporate system and is accessible as an external shared link specifically for exchange of data, including: maps, geodatabases, inventory data, documents, etc. The CEF is also intended to be used by the Collaborative and other partners to share information with the agency of any desirable or undesirable trends that are being observed and to provide an avenue to discuss those trends or for further exchange of general information.*

### *Conclusion #22*

I find the Responsible Official has met the regulatory requirements 40 CFR 1508.9 and 36 CFR 220.7(c)(3)) related to public involvement.

### *Issue #23*

The objector asserts that the EA needs to provide scientific sources for "conditions influencing silviculture treatments" (draft EA p. 16) and explain other parameters, providing scientific references.

### *Analysis #23*

The regulation at 40 CFR 1502.23 states that, "Agencies shall ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents. Agencies shall make use of reliable existing data and resources. Agencies may make use of any reliable data sources, such as remotely gathered information or statistical models. They shall identify any methodologies used and shall make explicit reference to the scientific and other sources relied upon for conclusions in the statement."

Scientific sources that influenced silviculture treatments are provided in the Vegetation Analysis Specialist Report within the section "*Conditions Influencing Silviculture Treatments*" (Vegetation Report pp. 19-20) and in the EA under Section 2, Alternative 2 – Conditions Influencing Silvicultural Treatments.

### *Conclusion #23*

I find that the final EA and the Vegetation Analysis Specialist Report include appropriate scientific references that support the analysis and conclusions in those documents.

### *Issue #24*

An Objector disputes method for identifying pre-settlement trees and asks forest to adopt a 17" diameter cap for harvest.

### *Analysis #24*

The regulation at 36 CFR 220.7 states that an EA "Shall briefly provide sufficient evidence and analysis, including the environmental impacts of the proposed action and alternative(s), to determine whether to prepare either and EIS or a FONSI (40 CFR 1508.9)" and indicates that an EA "May incorporate by reference data, inventories, other information and analyses."

The method for identifying pre-settlement trees is stated in the EA, pages 6 & 16. The District determined during the stand inventory process that there is high variability between age classes relative to size diameter at breast height (Vegetation Analysis, pages 13-14). The District states: *"Data analysis is*

*a good guide for overall management but when in the field, visual characteristics have proven to be more reliable in determining age (GTR-110 2003 Huckaby etal.).”* (Project record, Vegetation Analysis page 14).

The District further states: “*CSE data will be used to establish a likely frequency and typical size of trees as a guide for tree markers. Of the 7,461 trees measured in 2020 within the treatment area the oldest tree cored and aged was 137 years old and had a diameter of 19.6 inches at Breast Height. While the largest tree measured was over 50” DBH. This demonstrates the variability within the age to size correlation and makes it necessary to rely on visual as well as data for indicators of pre-settlement trees within a stand. Including this type of data in marking guides will help the markers understand which tree sizes within a stand might have the potential of being pre-settlement in age.”* (Project record, Vegetation Analysis page 14).

Finally, the District states: “*Old-aged trees will be identified using a combination of physical characteristics including large diameter relative to other trees in the localized area, large diameter branches, irregular crowns, flat tops, tall height and canopy position and bark thickness, color and pattern. (Huckaby et al. 2003). When a determination of tree age cannot be made using physical characteristics, these trees will either be retained or assessed and documented at the harvest-unit scale to ensure old-aged trees are retained.”* (EA page 16).

The Final Salter EA addresses Dr. William Baker’s research paper from 2021. The IDT conducted a cursory review of findings to assess the relevance to the Salter project. The IDT found the focus of the paper was on wildfire resiliency and irrelevant to the concern of insect and disease (Draft DN, pgs. 5-6).

Therefore, determination of pre-settlement trees in the proposed action will be selected based on a combination of physical characteristics rather than tree size at DBH. When tree age cannot be determined using this method, trees will be assessed and/or retained and documented.

### *Conclusion #24*

I find that the Responsible Official provides adequate rationale that supports the method for identifying pre-settlement trees in the project area.

### *Issue #25*

Objectors suggested several minor edits to design features.

### *Analysis #25*

I reviewed the design features identified by objectors and discussed the suggested edits with the Responsible Official. After a thorough review of the design features in question, I agree with the Responsible Official that the current language is sufficient, meets the intent of the project, and provides sufficient clarity for implementation.

### *Conclusion #25*

I find that the design features, as written, are consistent with law, regulation and policy. No changes are necessary.

United States Department of Agriculture
Forest Service
San Juan National Forest
15 Burnett Court
Durango, CO 81301
(970) 247-4874
Fax: (970) 375-2319

File Code: 1570

**Date:** October 22, 2021

Mr. Tim Kyllo
Tim.Kyllo@montrosefp.com

Dear Mr. Kyllo:

This letter is in response to your objection to the draft Decision Notice (DN) and Finding of No Significant Impact (FONSI) for the Salter Vegetation Management Project, Dolores Ranger District, San Juan National Forest. I have read your objection and reviewed the project record, the draft DN/FONSI, and the final Environmental Assessment (EA). My review of your objection was conducted in accordance with the regulation at 36 CFR 218 (2013).

**PROJECT DESCRIPTION**

On July 21, 2021, the Dolores District Ranger released the Salter Vegetation Management Project EA, draft DN, and FONSI for objection. The District Ranger proposes to implement Alternative 2 in the draft decision, which authorizes the following:

- Single tree selection on 19,675 acres, harvested trees not to exceed 26.9 inches diameter at breast height (dbh);
- Commercial thinning on 3,115 acres, harvested trees not to exceed 26.9 inches dbh;
- Post fledging area thinning, pre-commercial thinning and brush thinning as appropriate in any treatment unit;
- Up to 117 miles of temporary road construction;
- Reduction of activity fuels through a variety of means;
- Installation of four wildlife guzzlers.

**OBJECTION ISSUE DISCUSSION**

The eligible objectors raised a number of concerns that fell under the themes of NEPA adequacy (adequacy of the analysis, adequacy of the purpose and need, consideration of reasonable alternatives and consideration of comments), use of best available science, effects related to climate change, effects related to economics, and impacts to the project area (impacts to aquatic/hydrologic resources, visuals and recreation, soils, wildlife, and vegetation).

The objection resolution meeting was held on September 8, 2021. I found the dialogue with all of the objectors helpful and thoughtful. I appreciate the passion and dedication of the objectors for the San Juan National Forest and the variety of resources it provides to the public. I understand the concerns raised and I also understand the balance that must be considered by the Responsible Official when it comes to managing forest resources. During the resolution meeting and subsequent conversations with objectors, I found that four specific concerns could be clarified in the final decision.

1. The district will provide Timber Operator with a handout detailing Town of Dolores requirements for logging trucks (enclosed).
2. The district will clarify in the Final Decision that all treatments that originate from the Salter and Plateau treatment areas and require the removal of forest products utilizing commercial log trucks will be required to utilize the western transportation route and will not travel through the Town of Dolores.
3. Clarify in the Final Decision that the Dolores District commits to initiating the NEPA analysis referred to in Recreation design feature No. 4 (i) in the EA (page 24), in calendar year 2022 and will complete the analysis prior to beginning implementation in affected blocks.
4. In the Final Decision, revise Scenery design feature No. 7 (page 26 of the EA) as follows: *A visual corridor will be established on each non-motorized system trail within Boggy Draw treatment block utilizing a 50-foot from center line area of influence. The recreation and timber staff will identify leave trees for retention, marking them with temporary paint or flagging. Protection of trees within 50 feet of center line of the corridor is intended to reduce scenic impacts by maintaining unique trail features such as tight turns or challenging obstacles that improve the feel and flow of a single-track trail as well as maintaining shade on groomed winter trails.*
5. Clarify in the Final Decision that the Dolores District commits to using the "descending order" tree evaluation decision process as described on page 17 (items *a* through *l*) of the EA within the Salter project area.
6. Clarify in the Final Decision that for Wildlife Design Feature 2b (page 28 of the EA), the percent post-fledgling family area canopy cover should be 50 percent or greater.

**CONCLUSION**

I conducted my review of the record, final EA and draft DN/FONSI. Based on my review, I conclude the following:

- The draft decision clearly describes the actions to be taken in sufficient detail that the reader can easily understand what will occur as a result of the draft decision.
- The draft decision considered a range of alternatives that was adequate to respond to the Purpose and Need for action. The purpose and need and alternatives considered in the final EA reflect a reasonable range of alternatives, consistent with law, regulation, and policy.
- The draft decision is consistent with Forest Plan and Comprehensive Management Plan standards and guidelines.
- The draft decision is consistent with policy, regulation, law, direction, and the final EA contains adequate evidence to support the decision. The record and final decision contain site-specific documentation regarding resource conditions, and the Responsible Official's draft decision document is based on the record and reflects a reasonable conclusion.
- For the sake of clarity, I am directing the Responsible Official to make these additional clarifications in the final Decision Notice:
    - The EA contains a discrepancy in how proposed temporary road mileage is described; I therefore direct the Responsible Official to address this discrepancy in the final Decision Notice and describe the correct mileage.
    - The EA's wildlife analysis and supporting specialist report identify a project design feature that was not included in those that were proposed to be authorized by the Responsible Official; I therefore direct the Responsible Official to clarify in the final

Decision Notice that the referenced design element is not included in the authorized activities and provide rationale why the analysis of effects to elk would not be changed with that design element removed.

This concludes my written review of the project. By copy of this letter and the enclosed response document, the Responsible Official may sign the decision after including the clarifications noted above, then notify interested and affected persons in accordance with the regulation at 36 CFR 218.12 and 36 CFR 220.7(d). This written response is the final administrative review by the Forest Service or the Department of Agriculture [36 CFR 218.11(b)(2)].

If you have any questions and/or concerns, please contact Mark Lambert at mark.b.lambert@usda.gov.

Sincerely,

KARA CHADWICK Digitally signed by KARA CHADWICK
Date: 2021.10.22 13:54:59 -06'00'

KARA L. CHADWICK
Forest Supervisor

Enclosures - 2

**Town of Dolores Information for Pre-work Meetings with Timber Operator**

1. Montezuma County Road 31 turns into Town of Dolores 11th Street when the road crosses city limits and the speed limit is **15MPH.**
2. The Town of Dolores requires that all trucks hauling logs off of Forest Service contracts are equipped with Jake Brakes Mufflers
3. The town of Dolores requires that all trucks hauling logs off of Forest Service contracts do not deviate from 11th Street (go either left or right at junction of 11st (CR 31) and Railroad Ave (HWY 145)
4. Commercial truck traffic is not allowed on 11th Street from 10:00pm to 6:00am
5. The town of Dolores has the following ordinance for muffler requirements:
   **Dolores Municipal Code-Model Traffic Code Section 2-225. Mufflers** - **prevention of noise.**
   *(1) Every motor vehicle subject to registration and operated on a highway shall at all times be equipped with an adequate muffler in constant operation and properly maintained to prevent any excessive or unusual noise, and no such muffler or exhaust system shall be equipped with a cut-off, bypass, or similar device. No person shall modify the exhaust system of a motor vehicle in a manner which will amplify or increase the noise emitted by the motor of such vehicle above that emitted by the muffler originally installed on the vehicle, and such original muffler shall comply with all the requirements of this section.*
   *(1.5) Any commercial vehicle, as defined in section 235 (1) (a), subject to registration and operated on a highway, that is equipped with an engine compression brake device is required to have a muffler.*
   *(2) A muffler is a device consisting of a series of chamber or baffle plates or other mechanical design for the purpose of receiving exhaust gas from an internal combustion engine and effective in reducing noise.*
   *(3) Any person who violates subsection (1) of this section commits a class B traffic infraction. Any person who violates subsection (1.5) of this section shall, upon conviction, be punished by a fine of five hundred dollars. Fifty percent of any fine for a violation of subsection(1.5) of this section occurring within the corporate limits of a city or town, or within the unincorporated area of a county, shall be transmitted to the treasurer or chief financial officer of said city, town, or county, and the remaining fifty percent shall be transmitted to the state treasurer, credited to the highway users tax fund, and allocated and expended as specified in section 205 (5.5)(a), C.R.S.*

Forest Service
U.S. DEPARTMENT OF AGRICULTURE

Rocky Mountain Regional Office Sept. 2021

# Response to Objections on the Salter Vegetation Management Project on the San Juan National Forest

## Objectors

Molly Pitts, Intermountain Forest Association
Tim Kyllo, Montrose Forest Products, LLC
William L. Baker, PhD.
Edward B. Zukoski, Center for Biological Diversity/Adam Rissien, WildEarth Guardians
Jimbo Buickerood, San Juan Citizens Alliance

## Organization of this Document

Due to the number of objectors and the similarity between several of the objections, I as the Objection Reviewing Officer elected to lump objection issues to the extent possible. This approach allowed for increased efficiency in reviewing and responding to objection statements.

## Objection Statements and Responses

### *Issue #1*

This issue relates to Objectors' concerns that the affected environment was not sufficiently described in the EA; Objectors allege insufficient location information was provided for a variety of resources, that baseline information was not provided and that common stand exam (CSE) data were not provided to the public. Objectors contend that this constituted a violation of NEPA.

### *Analysis #1*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives; there is no requirement for an affected environment section in an EA.

The final EA (p. 1-8) provides context of the affected environment (also called existing condition or environmental baseline), which indicates that age and size are variable and provides average basal area. Project Design Features (Final EA pp. 20-29) indicate where additional surveys or layout requirements are needed to ensure that the affected environment and effects analysis align. Each resource in Section 3 of the Final EA addresses affected environment (Final EA pp. 35 – 85). Of specific note, the Final EA affected environment describes the affected watersheds and riparian areas (Final EA pp. 67 and 68) and where sensitive soils occur (EA p. 68). Additional baseline information for other species is included in the project Biological Evaluation (BE; Project Record). Detailed maps displaying locations of treatment units by treatment type, transportation system, proposed temporary roads, goshawk post-fledging areas, trails and streams are included in Appendix A of the Final EA.

Common stand exam (CSE) data, which comprise on-the-ground site-specific information, were referenced in the Final EA (Final EA pp. 6, 11, 12, 14). While CSE data in raw format are not included in the Final EA, data are summarized in the Timber Silvicultural Report in the project file.

Also see response to Issue #4.

### *Conclusion #1*

I find that the Responsible Official has taken the required hard look at existing conditions and that the description of affected environment is consistent with applicable regulation

### *Issue #2*

This issue relates to Objectors' allegation that the EA fails to accurately describe and document effects of temporary roads and skid trails. Objectors claim that mileage of temporary roads is inconsistently described and there is a lack of site-specificity, which objectors claim is a violation of NEPA.

### *Analysis #2*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives; there is no requirement for an affected environment section in an EA.

The Transportation section of the EA states that 106 miles of temporary road will likely be required for project implementation; this consists of 69.8 miles of existing non-system roads and 36.4 miles of new ground disturbance (Final EA p. 63). In order to account for on the ground layout, an additional 10% (11 miles) was added to the anticipated temporary road mileage (Final EA p. 63; DN p. 4); therefore a total of 117 miles of temporary roads were analyzed. Appendix A of the EA provides maps of proposed temporary road locations (Final EA p. 92-97).

The EA does state that 50-75 miles of temporary road construction are analyzed under this proposal Final EA p. 19). The District clarified that this was a mistake in the final EA, and that the mile estimates disclosed in the Transportation section are correct.

The EA contains a general description of temporary roads being constructed with minimal disturbance (length and width), proper drainage, and appropriate stream crossings to withstand flood flows (Final EA pp. 19, 22, 26, 63 and 70) and a statement that all drainage structures on roads will be inspected by the Timber Sale Administrator, Engineering Representative or Forest hydrologist at treatment completion to make sure they are in good condition. Hydrology and Soils Design Feature #7 states that temporary roads will be held to the minimum number feasible and will be located sufficiently far from streams and other water bodies to minimize discharge into those waters except at stream crossings (Final EA p. 22).

The EA states that all temporary road segments will be decommissioned within five years after first use (Final EA p. 19). Transportation Design Feature #2 (Final EA p. 26) states that the location and clearing widths of all temporary roads will be agreed to in writing before construction is started and that all temporary roads will be decommissioned after use, which involves re-contouring where significant side slope exists, elimination of ditches and other structures, out-sloping during construction, removal of ruts and berms, effectively blocking the road to normal vehicular traffic where feasible, and construction of drainage features such as cross ditches and water bars.

Hydrology and Soils Design Feature #5 describes skid trails as being perpendicular to the slope as much as possible, outside of drainages, and away from sustained steep slopes (greater than 40 percent) and specifies that they will be located and designed to disperse runoff and minimize soil disturbance (Final EA pp. 21 and 70). Hydrology and Soils Design Feature #4 states that skidding will not be allowed in wetlands, wet meadows and riparian areas (Final EA pp. 21 and 71). There is a no treatment buffer zone around riparian and wetland areas (Final EA p. 21). Skid trails will be closed after use by adding waterbars or outsloping and spreading slash (Final EA p. 21).

Effects to resources are based on the design features as described above. The final EA includes discussion of the effects of temporary roads and road use on invasive plants (final EA pp. 42-43), grazing (final EA pp. 46-47), rare and sensitive plants (final EA p. 49), recreation (final EA pp. 52-54), transportation (final EA pp. 61-64), watersheds, soils and water quality (final EA pp. 70-72), and wildlife (final EA pp. 78-79). The final EA also indicates that businesses local to the project area may complete roadwork, creating a minor local socioeconomic effect (final EA p. 60).

The EA mentions a process by which a temporary road system will be developed as described in the Project Design Features (Final EA p. 63), but this process is not found in the Transportation Design Features of the EA. I directed my staff to talk to the project's Roads Engineer; the following is standard operating procedure for the development of a timber sale transportation system, and was therefore not included in the EA. It will be included in the sale contract language:

1. Roads to be used for hauling or equipment access will be used in the following order of preference:
    a. First preference is to use National Forest System Roads identified on the Motor Vehicle Use Map for general public use. These roads are maintained in an "open"' status with either gravel surface (ML3) or native surface (ML2).
    b. Second preference is to use ML1 roads (only open to limited administrative use), which might require reconstruction (e.g., removal of trees and shrubs, reshaping, blading, adding surface material or installing drainage features). After use the road would be put back in ML1 status or decommissioned. Consult with Forest engineering staff and project hydrologist for input on road reconstruction.
    c. Third preference is to use existing unauthorized roads (which would be considered temporary roads and obliterated when use is complete). Roads in this category might require removal of trees and shrubs, reshaping, blading, adding surface material, installing drainage features, etc.
    d. Fourth preference is to create temporary roads. The Forest Service and the purchaser/contractor shall agree upon locations of temporary routes, resource protection requirements employed during road construction, clearing widths, and closure or rehabilitation requirements, which must be consistent with all design elements and implementation requirements of the Lone Pine EA.
2. Temporary roads must be seeded and closed within five years after final use.
3. Temporary roads shall be designed to the minimum standard for their use and be located to "roll" with the terrain as feasible.

### *Conclusion #2*

I find that the final EA adequately described and documented the location and effects associated with temporary roads.

For the sake of clarity and given the oversight in the final EA related to mileage of temporary roads, I will direct the Responsible Official to clarify the mileage in the final Decision Notice.

### *Issue #3*

This issue relates to objectors' allegation that the range of alternatives documented in the EA is insufficient. Specific concerns relate to the EA not considering an alternative that limits removal of large trees, and not considering multiple uses when developing the range of alternatives.

### *Analysis #3*

The regulation at 36 CFR 220.7(b)(2) states that an EA "shall briefly describe the proposed action and alternative(s) that meet the need for action. No specific number of alternatives is required or prescribed." Objectors allege the requirements of NEPA (40 CFR 1502.14) have not been met; it should be noted that the regulation at 40 CFR 1502 is specific to Environmental Impact Statements and is not applicable to an EA, except as described in 40 CFR 1501.5(g).

Alternative 3, which was developed to address commenters' concerns about cutting of large or old trees, was fully developed (Final EA pp. 29-30, 35). Alternative 3 limited the removal of trees over 20"

and was intended to emphasize large tree retention. Common Stand Exam data collected for the project indicate there is not necessarily a correlation between tree size and tree age within the project area (Final EA, pp. 3, 6-7, 11). The District identified specific prescriptions and prioritized additional considerations for determining which trees met old and large requirements (Final EA, pp. 14-17).

Objector also wishes an additional alternative to be considered that didn't include harvesting trees over 16 inches DBH or larger since there is minimal difference between Alternatives 2 and 3. This appears to have originated from Objector's March 22, 2020 comment letter (emphasis added):

> *We therefore request that the Forest Service consider an alternative that will: retain large trees,* ***either*** *larger than 16" DBH* ***or*** *20" DBH, and any old trees, as determined by their size, appearance and morphology. The size of the cap may depend on the results of stand exam data. To the extent that the CSE data show few if any trees 20" DBH or larger, the Forest Service should consider a smaller diameter cap to protect the largest trees that remain.*

The district considered a publication "Diameter Caps and Forest Restoration: Evaluation of a 16" Cut Limit on Achieving Desired Conditions Southwestern Region" (Final EA. p. 66). This document was reviewed in relationship to findings from the adjacent Lone Pine project implementation. Final EA, p. 66 provides rationale based on existing conditions, "Removing areas from treatment as result of diameter limitation reduces the amount of treatment in an area…" While a specific alternative was not addressed related to a 16" diameter, the Final EA (p. 4) specifies the "12-25 inch size class is the most represented on the landscape with reduced representation as the diameter increases" This provides additional rationale for not considering smaller diameter trees as the cut off toward meeting desired basal area. A 16" cap appears to represent an average-sized tree in this area, not one that was exceptionally large or necessarily old (Final EA, Figure 4). A standard diameter for old growth was not specified for ponderosa pine in the SJNF's Forest Plan.

One objector expressed that the range of alternatives is invalid because it didn't include "multiple uses;" however, I find that the proposed action and Alternative 3 were developed to be consistent with objectives identified in the LRMP for Management Area 5, which provide for active management in order to meet multiple-use goals (EA pg. 8). By maintaining consistency with LRPM direction for Management Area 5, the District allowed for multiple uses in the project area. The various uses in the project area were considered in alternative development, including project design, and effects to these resources were disclosed in Chapter 3 of the EA.

The draft Decision Notice (p. 8) includes discussion of alternatives considered and how public comments were used in modifying the proposed action and developing another action alternative.

### *Conclusion #3*

I find that the Responsible Official has considered an adequate range of alternatives, consistent with regulation.

### *Issue #4*

Objectors allege that the Salter Vegetation Management project is inconsistent with the San Juan National Forest Land and Resource Management Plan (LRMP) in a number of ways, including deficiencies in addressing Historical Range of Variability (HRV) and ecosystem management, failure to meeting LRMP objectives for ponderosa pine forest, use of a 26.9" diameter limit and logging of presettlement trees.

### *Analysis #4*

The San Juan National Forest Land and Resource Management Plan (LRMP) states that the Historical Range of Variability (HRV) "can be used to establish an ecological baseline." It also states that the intent is not to mandate that HRV conditions be achieved in all cases (LRMP p. 12). The San Juan LRMP states that Ecosystem Management, which uses HRV for reference, will be implemented by maintaining or restoring the composition, structure, function, and physical environment of ecosystems" (LRMP p.13). The LRMP does not include specific requirements related to the Ecosystem Management approach.

The Ecosystem Management section of the LRMP also states that many ponderosa pine forests on the SJNF are currently outside their HRV in terms of vegetation stand structure and fire frequency. Ponderosa pine forests have fewer acres in both young and old growth development stages and have less diversity and less cover of native grasses compared to HRV conditions (LRMP p. 18). The desired condition for ponderosa pine forests described in the LRMP is for forests to display variable density and structure reflecting uneven-age structure comprising variable-sized trees (LRMP p. 20).

The San Juan LRMP states that there are many opportunities for vegetation management and that the timber program will focus treatment on "landscapes at high risk for developing epidemic levels of insect and/or disease infestation; landscapes where disturbance has resulted in dead or dying trees…" (LRMP p. 73). One of the objectives outlined in the LRMP states that the most common applications of timber harvest to meet the desired condition could be to conduct thinning-with an emphasis on restoration and fuels reduction of altered forest types-in ponderosa pine and warm-dry mixed conifer vegetation types on approximately 15,000 to 20,000 acres: (LRMP p. 75). Objectives in the LRMP are defined as aspirations, not commitments or final project decisions (LRMP p. 6).

The EA describes the current condition of the forest in the project area and references modeling that was done to suggest two underrepresented size classes relative to the stand structure. These include large trees (greater than 27" DBH) and seedlings and saplings (EA p. 4). Also included within the project area are plantation areas. This has resulted in areas within the project where the diversity is both desired and undesired. Beetle mortality in the over story and density induced mortality is also present (EA p. 4). These infestations are growing and appear to be moving to the east. Data obtained from two consecutive years of flights show a general expansion of the beetle infestation and indicates a need to establish an uneven-age stand structure to increase resistance to beetle infestation and promote resilience (EA p. 5). The EA provides a description of the age and size class of ponderosa pine found within the project area (Final EA p. 6).

The analysis states that a comparison between the current and desired conditions was done utilizing common stand data and that Forest Vegetation Simulation modeling and field observation shows that the condition of the ponderosa pine cover type within the project area is different from the desired condition (DN p. 1, Final EA p. 11).

The dbh limit was set at 26.9 inches due to this size class being underrepresented in the treatment area (Final EA p. 6). There is a description of the stand exam inventory that was done in the project area which describes that using the dbh of trees does not correlate well to the age of the tree. Therefore, it is necessary to rely on visual, as well as size correlation to determine pre-settlement trees within a stand (Final EA p. 6). The forest will use stand exam data to establish likely frequency and typical size of old trees within a stand as a guide for tree markers at the prescription level, which will help to avoid harvesting pre-settlement trees (Final EA p. 6). The draft DN outlines the rationale behind why choosing a smaller dbh limit would not meet the purpose and need of the project (dDN p. 6).

### *Conclusion #4*

I find that Responsible Official provided adequate information in the analysis to show that the proposed action meets direction outlined in the San Juan Land and Resource Management Plan (LRMP).

### *Issue #5*

Objectors allege that the purpose and need for the Salter Project is flawed for a variety of reasons, including that it is too narrow and does not account for multiple uses in the project area, is not valid regarding brush removal over 5,000 acres, and does not provided site-specific data. Objectors further allege that because the purpose and need for Salter is different than the purpose and need for the nearby Lone Pine project, it is arbitrary.

### *Analysis #5*

The regulation at 36 CFR 220.7(b)(1) states that an EA, "…must briefly describe the need for the project."

The purpose and need for the Salter Project relies on site-specific data. Common Stand Exams (CSEs) have been conducted in the project area and proposed actions are specific to this project.

Common stand exam data, which is on-the-ground site-specific information, were referenced in multiple sections of the Final EA (Need for this Proposal and Modified Proposed Action). Basal area was addressed in response to recent fires at Final EA pp 11. The District states the following in regard to purpose and need to achieve desired conditions:

> The desired conditions for the ponderosa pine cover type and lands managed for forest product offerings are further defined in sections 2.2.23 and 2.9.1 of the San Juan National Forest Land and Resource Management Plan (USDA 2013) (final EA, p. 9).

Further:

> A comparison based on common stand exam data, Forest Vegetation Simulation modeling, and field observation between the current and desired conditions shows that the condition of the ponderosa pine cover type found within the Salter vegetation management activity area is different from the desired conditions associated with that vegetative cover type in the San Juan National Forest Land and Resource Management Plan.
>
> The structure and size class distributions in the stands identified for this analysis are not within desired conditions described in 2.2.23 based on field reconnaissance and inventory data. Bark beetles have infested adjacent landscapes causing significant mortality. The early stages of a bark beetle infestation are now being observed in the Salter project area. There are portions within the Salter project area that have been moderately burned by wildfire and there are immediately adjacent areas that have been severely impacted by wildfire. It is well documented that dense, over-stocked, even-age, closed canopy ponderosa pine stands are more susceptible to insect outbreaks (Negron et al. 2008). It is also is well documented that a lack of structural diversity corresponds directly to a reduction in forest resiliency and consequently long term resistance to detrimental natural and human disturbance events, such as, large-scale stand replacing fires (Canard 2013, Negron et al. 2008, Negron et al. 2000, USDA-rmrs_2009_gibson_k0022000) (final EA, p.11).

Approximately 34 percent of the Salter project area has been impacted by fire in the past 10 years. The District states: "The majority of disturbance is due to the 2018 Plateau Wildfire, which burned nearly 20,000 acres during exceptional drought. This fire reduced basal area across the footprint by approximately 32 percent, with most of the fire area (58 percent) experiencing between a 0-to-25 percent reduction in basal area (US Forest Service Rapid Assessment of Vegetation Condition after Wildfire, 2018)" (final EA, pgs. 39-40).

Further, the District has outlined current stand conditions in the following statement: "The average basal area of 336 stands measured in 2020 was 112 $ft^2$/acre and included a range of 12 $ft^2$/acre to 236

ft$^2$/acre. Of the 336 stands measured, the majority of the stands in the project area have basal areas over 100 ft$^2$/acre (200 stands). Seventy-two stands had basal areas over 140 ft$^2$/acre (twice the preferred basal area target)" (final EA, pgs. 6-7).

Therefore, the reduction in basal area by 32 percent across the fire footprint did not achieve the desired effect of 50-70 ft$^2$/acre as shown in the 2020 CSE data output above. Commercial thinning to a 50-70 basal area per acre will only occur depending on current stand conditions, as shown in Table 2, "Vegetation treatment type and treatment description" in the final EA, pages 12-13.

Further rationale and data to support the purpose and need can be found in the Project Record (Vegetation Analysis pp. 27 -39).

Regarding objectors' concern related to the differences between the purpose and need for Salter as opposed to the nearby Lone Pine project, the Final EA at p. 65-66 to describes the differences in Salter's basal areas based upon field recent field observations during the implementation of the Lone Pine project:

> *Preliminary feedback of Lone Pine EA Large Tree Retention study areas from post decision reconnaissance and layout of leave tree units have shown mixed results. The effects of applying a diameter limit appear to be more easily tangible at the fine scale. At the fine scale patches of bark beetle and heavily infested dwarf mistletoe trees have to be passed for removal due to the diameter limitation. Basal area retention goals and uneven aged characteristics are being compromised, leaving stands less resilient and making long term resistance less likely to occur. Removing areas from treatment as result of diameter limitation reduces the amount of treatment in an area and subsequently the amount of harvestable volume per acre. The effects described for the small scale are also documented from the mid-scale and potentially the landscape scale (USDA 2013d; USDA 2011).*

These observations indicate that basal area requirements were not factoring in the extent of insect and disease in the area. Final EA (p. 86) states: "The Salter Vegetation management project proposes an adaptive management approach intended to accommodate changing conditions and additional strategies to achieve the identified desired conditions." Final EA (pp. 29-30) describes the adaptive management and monitoring process.

Regarding brush treatment, the purpose and need is stated in the Final EA, pages 7, 13, and 15-16; and the Vegetation Analysis report, page 10. The final EA indicates that Gambel oak dominates the understory in many of the stands and outcompetes young pines and seedlings for essential light, moisture, and nutrients (final EA, pg. 15). The District states: *"This competition for limited moisture is probably most detrimental to pine when the trees are very young and seedlings are competing directly with the extensive oak layer. Pine germination and establishment will also likely be hindered when micro sites are fully occupied by oak and heavy leaf litter covers mineral soil. Some research has even indicated a possible inhibiting allelopathic effect of oak leaves on pine germination (Harrington 1987)"* (Project Record, Vegetation Analysis, p. 10).

Regarding the EA's statement that seedlings are an underrepresented size class (final EA p. 16), this is supported by the Vegetation Analysis report, which states:

> *There is also the ability for good establishment of seedlings and regeneration as seen in stands currently meeting desired conditions in LRMP or areas that have seen various types of disturbance. As seen in the structure of areas of stands during field reviews cone crops can be episodic in nature leading to very patchy and variable regeneration. Yet where represented it*

> *often has 400 to 500 seedlings per acre. This size class is the other under-represented component of stands' structures identified for treatment* (Vegetation Analysis report, p. 6).

The Vegetation Analysis report further describes the relationship between overstocking of Gambel Oak and understocking of conifer seedlings:

> *The understory/shrub layer is overwhelmingly comprised of Gambel oak with minimal growing space available for seedlings and saplings. In case of Ponderosa Pine numbers this component of structure is lacking and mostly a monoculture of Gambel oak* (Vegetation Analysis report, p. 14).

Regarding Objectors' concerns that "desirable conditions" described by the Dolores Watershed Resilient Forest Collaborative (DWRF) were not considered, The District states the following on the collaborative process and consistency with *Ponderosa Pine Ecosystem Resilience Metrics and Desired Conditions*:

> *Through efforts like the Rocky Mountain Restoration Initiative and the Collaborative Landscape Restoration Forest Restoration program, DWRF collaborative members have identified treatment priorities for areas within the DWRF upper Dolores River watershed, which includes the Salter landscape. This provides information to the agency to take into consideration when determining treatment priorities. The collaborative has also identified a set of ponderosa pine desired conditions that outlines components of ponderosa pine forest resiliency that are a priority for the collaborative (DWRF. 2020. Ponderosa Pine Ecosystem Resilience Metrics and Desired Conditions). The desired conditions developed by the collaborative are consistent with and integrate well with the standards and guidelines identified in the Land and Resource Management Plan for this landscape. The information and recommendations provided by the collaborative have been given consideration in the design of the Salter Vegetation Management project"* (final EA, pg. 86).

Finally, regarding Objectors' concerns that the purpose and need doesn't include multiple uses in the project area, NEPA does not require that multiple uses within a specific project area need to be part of every proposal. Multiple uses have, however, been considered in the effects analysis in Section 3 of the Final EA. Numerous design features protect multiple uses (final EA, pp. 20-29).

Also see response to Issue #3.

### *Conclusion #5*

I find that the purpose and need for the Salter Project was properly focused on vegetation conditions and was based on best available science and site-specific information.

### *Issue #6*

Objectors allege that the Salter Project will result in significant impacts and therefore requires preparation of an EIS; specific concerns relate to the effects of skid trails and 177 miles of temporary roads, logging on 35 square miles of forest land and duration of project (10 years) on soils and watersheds. Objectors also allege significant effects to the northern goshawk and to presettlement ponderosa pine.

### *Analysis #6*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives.

The rebulation at 40 CFR 1508.13 describes a Finding of No Significant Impact (FONSI) as:

> "Finding of no significant impact means a document by a Federal agency briefly presenting the reasons why an action, not otherwise excluded (§1508.4), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared. It shall include the environmental assessment or a summary of it and shall note any other environmental documents related to it (§1501.7(a)(5)). If the assessment is included, the finding need not repeat any of the discussion in the assessment but may incorporate it by reference."

The final EA states: "This environmental assessment is prepared to determine whether the effects of the proposed action may be significant and therefore warrant the preparation of an environmental impact statement……Consistency findings are disclosed in the individual resource-specific environmental effects section of this environmental assessment" (Final EA, page 1).

Anticipated effects to soils and watersheds are documented in the EA (p. 69-72). Erosion and runoff will be minimized due to the application of design features (EA p. 21-22, 26, 71). There is an acknowledgement that the proposed action will result in a small, temporary increase in runoff due to water running off compacted areas immediately after harvest and that the effects will be of limited extent and severity due to several factors described (EA. p. 70). There is also an acknowledgment that soil erosion will occur as a result of temporary road construction and that some sediment delivery to ephemeral and intermittent streams is expected at stream crossings, but that these effects will be short-term and of limited intensity (EA p. 70). Road density will not increase in the watersheds and is within the Forest Plan guidance (EA p. 67-68, 70). Road maintenance will occur on more roads in the area improving the overall road condition (EA p. 65).

The method for identifying pre-settlement trees is stated in the EA, pages 6, 16-17. The District determined during the stand inventory process that there is high variability between age classes relative to size diameter at breast height (Vegetation Analysis, pages 13-14).

The District states: *"Data analysis is a good guide for overall management but when in the field, visual characteristics have proven to be more reliable in determining age (GTR-110 2003 Huckaby etal.)."* (Project record, Vegetation Analysis page 14).

The District further states: "*CSE data will be used to establish a likely frequency and typical size of trees as a guide for tree markers. Of the 7,461 trees measured in 2020 within the treatment area the oldest tree cored and aged was 137 years old and had a diameter of 19.6 inches at Breast Height. While the largest tree measured was over 50" DBH. This demonstrates the variability within the age to size correlation and makes it necessary to rely on visual as well as data for indicators of pre-settlement trees within a stand. Including this type of data in marking guides will help the markers understand which tree sizes within a stand might have the potential of being pre-settlement in age."* (Project record, Vegetation Analysis page 14).

The District outlines the following indicators for evaluating pre-settlement trees:

*"Tree evaluation will be accomplished through a descending order of choice made by the designator. Evaluation occurs at every step of the decision-making process applying sound judgement based on parameters from the analysis and direction from a certified silviculturist. Below is an example of a descending order of choice that will be used to evaluate trees and ultimately designated them for removal if the stand has a basal area greater than 50 ft2/acre.*

*a. Tree can be evaluated for harvest if it is less than 27.0 inch DBH*
*b. Do not cut trees with a combination of pre-settlement visual indicators*
*c. Cut dead trees (brown or red needles/no needles)*
*d. Cut live trees with visible evidence of bark beetle infestation (e.g., pitch tubes, frass, and woodpecker activity on tree bole)*

*e. Cut live trees with dwarf mistletoe infecting more than 50% of the live crown*

*In addition to b-e above, trees 25 inch DBH and less can also be cut if they meet the following condition or structure.*

*f. Live crown declining more than 25% including poor needle conditions*
*g. Evidence of conks, cankers or advanced decay*
*h. Weak or multiple forks*
*i. Broken or dead tops*
*j. Leans greater than 35%*
*k. Grossly poor form*
*l. To achieve a basal area target within 50-70 ft2/ac.*

*When all components are represented, uneven-aged stand structure mirrors a reverse J curve when graphed (Refer to the Vegetation Report). Most stands are not this uniform, and adjustments will be made on a stand level basis to begin moving toward a more traditional uneven aged structure. The reverse J curve is a model and does not account for variability caused by additional desired conditions such as group, clump and individual structure, tree retention for aesthetics, old and large tree retention or supplementary resource based design elements. Each stand will have a different approach to uneven aged management from the current benchmark to achieving the desired structure, while meeting design elements. This provides flexibility in prescription writing an essential component of this analysis and ultimately meeting desired conditions."* (EA, page 17)

Therefore, pre-settlement trees will be retained if they do not meet the above indicators and each stand will require a unique approach in prescriptions to achieve desired conditions while meeting design elements.

Regarding northern goshawk, Forest Service Manual 2672.42 describes the standards for Biological Evaluations and 2672.43 outlines the procedure for conducting a Biological Evaluation.

The analysis of effects to goshawks is documented in the EA (Pg 73, 76-80) and BE (Pg 36-41). The analysis determination states, "…effects are expected be short-term (less than 10 years) and the long-term (more than 10 years) impacts are intended to be beneficial by providing higher quality habitat that is well distributed in the future. Two design features that place temporal and spatial restrictions on management actions were developed to minimize adverse effects (EA Pg 28, Fig 15 of App A). A specific harvest treatment was developed with technical input from the district wildlife biologist and "designed to improve the overall stand functionality and improve growth rates by reducing trees per acre while maintaining or promoting a relatively closed canopy structure to meet goshawk habitat." (EA Pg 15).

The draft Decision Notice includes a Finding of No Significant Impact, which is well-supported by the final EA and the project record (draft DN pp. 10-13).

### *Conclusion #6*

I find that the Responsible Official has found that the Salter Vegetation Project would not result in significant impacts to the human environment and has provided sufficient evidence, supported by the final EA and project record, in the Decision Notice.

### *Issue #7*

Several Objectors allege that NEPA is violated because comments they submitted during the scoping period and/or the comment period were not acknowledged or responded to; Objectors allege a violation of the NEPA regulations at 40 CFR 1503.1 and 1503.4.

### *Analysis #7*

The regulation at 36 CFR 218.25(b) requires the responsible official to consider all written comments submitted and that all written comments received be placed in the project file and become a matter of public record. NEPA does not require an EA to include a specific response to comments.

The regulations cited by the Objectors are specific to Environmental Impact Statements and do not apply to EAs.

The Salter project record includes an Excel spreadsheet (file name "20210323SalterCommentResponse") that identifies comments and specific concerns raised by commenters, indicating that the comments were considered. The project record also includes a document (file name "Salter EA Changes based on Comments_060121") that enumerates changes made to the final EA in response to public comment.

District Ranger Padilla has specifically noted that he has considered Objectors' comments and other comments received in his Draft DN (pp. 5-9). Final EA (pp. 34-35) similarly addresses grouped issues. Final EA analysis relies on best available scientific information including CSE data from 2020 and peer-reviewed literature. Furthermore, District Ranger Padilla's Draft DN (pp. 6-9) discusses issues and the public processes that surround them.

### *Conclusion #7*

I find that the Responsible Official has considered the comments received by Objectors as issues or analysis in project record in compliance with regulations for an EA. There is no requirement to cite any particular body of science and District has demonstrated that it has considered relevant material and used area-specific and project-specific data, where appropriate.

### *Issue #8*

Objectors allege that analysis of the effects of climate change on the project area, the effects of the project on climate change, and the effects of the project on carbon storage is insufficient.

### *Analysis #8*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives.

The 2013 San Juan National Forest Land and Resource Management Plan (LRMP) calls for forest vegetation management to be done in a manner that "anticipates climate-related plant succession changes (such as favoring heat- or drought-resistant tree species as leave trees, or in reforestation)" (section 2.9.1, p. 75).

Treatment of climate change in project-level NEPA analysis is guided by "Climate Change Considerations in Project-Level NEPA Analysis" (U.S. Forest Service 2009), which recommends consideration of both i) the effect of a proposed action on climate change, and ii) the effect of climate change on a proposed action.

Regarding the effect of the proposed action on climate change:

> The 2009 Agency guidance notes that "there will be some situations where quantitative analysis will be useful and others where qualitative analysis will best serve decisionmaking" (p. 4). Examples of the types of projects for which quantitative analysis may be required include "energy facilities, transmission lines, [and] oil & gas development or leases" (p. 4).
>
> Vegetation management activities such as those proposed in the Salter project have a small climate impact in the global context, and therefore a qualitative discussion about the potential for greenhouse gases sequestered and emitted is more appropriate. The EA provides a qualitative, ecosystem-based description of the small carbon fluxes associated with the proposed project in Appendix C (Final EA p. 109).

Regarding the effect of climate change on the proposed action:

> The Environmental Assessment refers to a 2014 Ecosystem Vulnerability Assessment to support its determination that the future vulnerability of the Ponderosa pine is "presumed stable." This determination is based on climate modeling performed by Crookston et al. (2010).
>
> The Draft Decision Notice states that the adaptive management approach will allow work to be modified "in response to both actively moving insect and disease outbreaks in and adjacent to the analysis area **and climate change**" (dDN p. 6, emphasis added). Table 6 ("Adaptive Management Actions") in the EA contains the following action associated with post-planting Silviculture: "2.9.1 Anticipates climate-related plant succession changes (such as favoring heat or drought-resistant tree species as leave trees, or in reforestation)" (Final EA p. 32). This approach will enable project implementers to be responsive to changing conditions on the ground, including succession changes due to climate change.

### *Conclusion #8*

Based on my review of the project record and referenced documents, and considering the size and scope of the project, I find that the Responsible Official adequately considered issues surrounding climate change. The level of analysis was consistent with agency guidance and of comparable depth to previous projects on the forest (such as the Lone Pine EA).

### *Issue #9*

Objectors allege that the EA does not include sufficient analysis of economic information, especially because economics is identified as part of the purpose and need.

### *Analysis #9*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives.

The Responsible Official determined that the need for the actions proposed in the Salter Project includes "Provide economic support to local communities by providing timber products to local industries in a sustainable manner" (final EA p. 11). Supporting the local recreation economy is not included in the purpose and need of the proposed treatment activities. However, impacts to recreation visitors and associated economic activity is disclosed in the EA socioeconomic (EA p. 58) and Recreation Activities and Experience (EA p. 52-60) sections.

The socioeconomic section of the EA (final EA p. 58-60) details the industry demand for fiber, saw log, products other than logs, as well as niche markets for beetle killed dead ponderosa pine—all products

that would be removed through the treatment activities. The analysis also documents the niche and limited demand for smaller diameter and inconsistent material that can result from vegetation management activities. The analysis demonstrates providing timber products to local timber harvesting and processing firms supports the local economy through jobs, labor income and value added in the forest sectors, as well as supporting sectors and industries.

The affected environment of the socioeconomic section documents the size of the travel and tourism sectors (final EA p. 57). The affected environment of the Recreation Activities and Experience section documents the high use of the recreation area within the project area (final EA p. 51-52). The socioeconomic section highlights survey data from general forest visitors' response to survey questions on their behavior if unable to visit the national forest (final EA p. 58). The socioeconomic section of the EA addresses this potential for displaced recreation visitors due to treatment activities and the potential negative impact that displacement may have on recreation visitor spending and associated economic activity in communities near the project area (final EA p. 58). Potential impacts from the proposed treatments to the local recreation economy were assessed and documented in the socioeconomic sections of the EA.

### *Conclusion #9*

Based on a review of the project record, I find that the Responsible Official adequately considered the effects of the proposed action on the economic environment. I find sufficient analysis of the economic effects of the modified proposed action on the local recreation economy. I also find the socioeconomic analysis to show the proposed treatments support the purpose and need.

### *Issue #10*

Objectors are concerned that project design elements related to recreation are insufficient. Specifically, concerns relate to a design element associated with minimizing effects to recreation from hauling over holiday weekends and to rerouting trails where they can't be avoided by haul routes. Objectors were concerned that their comments were not considered by the Responsible Official.

### *Analysis #10*

The regulation at 36 CFR 220.7(b)(2) states that an EA "shall briefly describe the proposed action and alternative(s) that meet the need for action." The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives. The regulation at 36 CFR 218.25(b) requires the responsible official to consider all written comments submitted and that all written comments received be placed in the project file and become a matter of public record. NEPA does not require an EA to include a specific response to comments.

The project record confirms the Forest Service received and considered the comments related to the recreation resource submitted by objectors; also see response to Issue #7.

A discussion with the San Juan National Forest Recreation Program Management Specialist established it was the judgement and experience of the forest specialists that determined the haul closure dates, as written, the closure dates would address the most problematic times of recreation use of the forest resources and holiday hauling (Final EA p. 24). Excluding the Mondays of Labor Day and Memorial Day was intentional. These days were not determined to be among the most problematic holiday days for the users of the recreation resources.

### *Conclusion #10*

I find that the design features are written appropriately to address the affected resources.

### *Issue #11*

Objectors are concerned that design elements related to protection of elk and northern goshawk are insufficient.

### *Analysis #11*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives. Forest Service Manual (FSM) 2672.42 describes the standards for Biological Evaluations.

The action alternatives analyzed in the Salter EA include specific design elements to protect elk habitat (Final EA p. 28). The two design features place temporal and spatial restrictions on management actions in coordination with Colorado Parks and Wildlife (CPW) expertise and guidance. These design features are intended to reduce the potential for temporary displacement of elk, in accordance with LRMP Guidelines 2.3.59 and 2.3.60 (Final San Juan National Forest Land and Resource Management Plan, pp. 36 & 37).

Effects to elk were analyzed in the Wildlife Report (project record) and disclosed in the EA (Final EA pp. 82 – 83). The EA described the potential for temporary displacement of elk due to project-related disturbance, but indicated that in the long term, habitat would benefit from an increase in foraging opportunities and an overall improvement in habitat quality due to increasing the resilience of pine stands to insect infestation (final EA p. 83).

The analysis described in the EA indicates an additional design element that was not included in the description of alternatives (final EA p. 83; also see Wildlife Report); my staff determined, in conversation with the ID team wildlife biologist, that the additional design element was referenced by mistake and is not intended as part of the proposed action.

Design features specific to goshawks were included in the action alternatives (Final EA p. 28) in order to avoid or minimize potential adverse effects to goshawks in alignment with Land and Resource Management Plan (LRMP) Desired Conditions 2.3.7, Guideline 2.3.49 and Table 2.3.2 (Final San Juan National Forest Land and Resource Management Plan Pg 33, 36 & 39 respectively). The EA describes the potential for short-term impacts due to effects to available habitat, and anticipates that these effects would last for about 10 years post-project implementation; however, improved forest resiliency is expected to improve habitat for northern goshawk in the long term. The Responsible Official determined, based on the analysis, that the project may impact individual goshawk but will not contribute to a trend toward federal listing or loss of species viability (final EA p. 79).

Management recommendations referenced by objectors (Reynolds et al 1992) do not apply in all cases or situations. The analysis completed for goshawk acknowledge the referenced recommendations and specifically the territory occupancy timeframes (EA Pg 76). The goshawk timing design feature is directly from the LRMP Guideline 2.3.49 (Table 2.3.2).

### *Conclusion #11*

I find that the EA sufficiently documented design elements associated with protection of elk and northern goshawks adequately in alignment with Land and Resource management Plan Guidelines, and that the analysis of effects to these species is sufficient to support the decision and Finding of No Significant Impact.

However, because the erroneous design element referenced in the EA and wildlife report may create confusion, I direct the Responsible Official to clarify in the final Decision Notice that the design element

described in the final EA, p. 83, is not included in the decision and provide rationale why the analysis of effects to elk would not be changed with that design element removed.

### *Issue #12*

Objectors are concerned that design elements related to invasive plant species are insufficient.

### *Analysis #12*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives.

The Final EA addresses invasive species. Project Design Features include six actions related to control and prevention of invasive plants (final EA p. 23). EA table 5 addresses the type and frequency of surveys (final EA pg. 31), and Table 6 describes actions and triggers associated with adaptive management (final EA pg. 33).

The final EA discusses presence and treatment of invasive plants in the project area (final EA pp 42-43); and the EA specifies that inventory and treatment of invasive plants is ongoing under previous NEPA decisions. The EA acknowledges that project activities may increase noxious weed establishment, but also discloses that Project Design Features are expected to reduce the likelihood of increased invasive plant establishment (Table 8, final EA p. 44).

### *Conclusion #12*

I find that the EA and its supporting documentation adequately address the presence of and likelihood of introducing invasive plants, and that the project incorporates sufficient measures to address existing invasive plant populations in the project area and to limit the risk of new invasive plant introductions.

### *Issue #13*

Objectors allege that the design features associated with temporary roads are vague and that effectiveness is not properly analyzed.

### *Analysis #13*

The regulation at 36 CFR 220.7(b)(2) states that an EA "shall briefly describe the proposed action and alternative(s) that meet the need for action. No specific number of alternatives is required or prescribed." The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives.

Design features associated with temporary roads are found in the EA under the Hydrology and Soils section (Final EA p. 22) and the Transportation section (Final EA p. 26). The hydrology design features are taken from the Watershed Conservation Practices Handbook (Forest Service Handbook 2509.25). These design features are considered the most effective practical means of preventing or reducing the amount of pollution generated by nonpoint sources (Watershed Conservation Practices Handbook p. 5). The Watersheds section of the EA outlines the specific design features included to minimize impacts from temporary roads (Final EA p. 69-72). These include holding temporary roads to the minimum number feasible and locating them sufficiently far from streams and other water bodies to minimize discharge into those waters except at stream crossings; building stream crossings with appropriate drainage features and stream crossings to provide for the flow and passage of sediment and to withstand expected flood flow; and locating stream crossings at straight and shallow locations (slope banks will not exceed 30 percent) where channels are hardended by gravel, cobble, or bedrock (Hydrology design elements 7 and 8; Final EA p. 22, 70). Transportation design feature 2 (Final EA p. 26)

states that the location and clearing widths of all temporary roads will be agreed to in writing before construction is started. Additionally, the majority of the temporary roads proposed (68.9 miles) are on non-system roads that are already on the ground (Final EA p. 63). These roads will be properly designed for the type of equipment that will be using them and will be decommissioned within 5 years after their first use (Final EA p. 22, 70). Decommissioning will involve re-contouring where significant side slope exists, elimination of ditches and other structures, out-sloping during construction, removal of ruts and berms, effectively blocking the road to normal vehicular traffic where feasible, and construction of drainage features such as cross ditches and water bars (Final EA p. 26).

### *Conclusion #13*

I find that the final EA sufficiently documented the specific design features necessary to reduce potential impacts from temporary roads. The design features are taken from the Watershed Conservation Practices Handbook, which is considered the guiding document for best management practices. The Responsible Official concluded that these design features would reduce potential impacts to an acceptable level. I do not see a need to address this further in the Decision Notice.

### *Issue #14*

Objector alleges a violation of NEPA due to failure to analyze effectiveness of mitigation measures. Objector appears to acknowledge that mitigation measures were not included, but maintains that design features are vague and inadequately analyzed.

### *Analysis #14*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives.

Design Features are part of the Action Alternatives (Final EA, pp. 20-29) and, therefore, have been analyzed in detail in Section 3 of the Final EA. Final EA (p. 20) notes "These design features come from a variety of sources including, but not limited to, Land and Resource Management Plan Standards and Guidelines, direction and guidance provided in Forest Service Handbooks and Manuals (including the Region 2 Watershed Conservation Practices Handbook), Vegetation Management Programmatic Agreement between the Forest Service and Colorado State Historic Preservation Officer (2017), and professional judgement." Per FSM direction, the design features are generally included as contract terms (i.e., specific conditions, standard provisions or special provisions) where those actions such as logging are contracted. They are then monitored by a Forest Service Representative during and after implementation (FSM 2450).

### *Conclusion #14*

I find that the Responsible Official has properly included and analyzed design features in compliance with appropriate NEPA regulations (36 CFR 220.7(b)(3)).

### *Issue #15*

An objector asserts that the EA must incorporate monitoring of restoration of spatial structure using ICO method.

### *Analysis #15*

The regulation at 36 CFR 220.7(b)(2) states that an EA "shall briefly describe the proposed action and alternative(s) that meet the need for action. No specific number of alternatives is required or prescribed."

Monitoring and Adaptive management are included and described in the Final Salter EA, pages 29-33, Tables 5-6. Table 5 clearly outlines the activities to be monitored but does not include monitoring of structural components such as individual, clump, and opening (ICO) Churchill et al. 2013), or group, individual, or clump (GCI) structures (EA, pgs. 12, 15; Project Record, Vegetation Analysis pg. 24). Table 5 does articulate monitoring of silvicultural prescription and fuel loading to determine treatment effectiveness relative to desired conditions and restoration (final EA p. 31).

### *Conclusion #15*

I find that the Responsible Official is consistent with the regulation at 36 CFR 220.7(b)(2) by clearly identifying and monitoring activities as they relate to silviculture prescriptions and post-treatment effectiveness.

### *Issue #16*

An objector alleges that the proposed action is flawed because the target basal area and the proposed diameter cap are not supported by best available science.

### *Analysis #16*

The regulation at 40 CFR 1502.23[1]states that, "Agencies shall ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents. Agencies shall make use of reliable existing data and resources. Agencies may make use of any reliable data sources, such as remotely gathered information or statistical models. They shall identify any methodologies used and shall make explicit reference to the scientific and other sources relied upon for conclusions in the statement."

The Responsible Official demonstrated they used the best available scientific information to determine basal area target and diameter cap; this is documented within the Final EA, pages 9-14.

The District refers to the use of best available scientific information in the following statement: "A comparison based on common stand exam data, Forest Vegetation Simulation modeling, and field observation between the current and desired conditions shows that the condition of the ponderosa pine cover type found within the Salter vegetation management activity area is different from the desired conditions associated with that vegetative cover type in the San Juan National Forest Land and Resource Management Plan." (EA, page 11)

The District describes selecting the target basal area and diameter cap in detail in the EA and provided in the following statement:

"Single tree selection prescriptions will all have the same basic components and will use a BDQ method where "B" is the desired residual basal area, "D" is the maximum tree size (all trees 26.9" and larger diameter at breast height will be retained in all stands) and "Q" describes the diameter distribution as a ratio of the number of trees in succeeding size classes. Based on stand exam data the general prescriptions will target a residual basal area of 50-to-70 ft2/acre with a mean or target of 66 basal area when conditions allow.

For the average stand in the project area, the residual basal area will be 60-to-68 ft2/acre depending upon the silviculture treatment. The maximum diameter to harvest will be 26.9" and the q-factor will be 1.3 (applied to 2 inch diameter classes). The residual stocking level of 50-to-70 ft2 was chosen to allow sufficient growing space to establish new regeneration while reducing severe fire risk and promoting

[1] The regulation at 40 CFR 1502 is specific to Environmental Impact Statements; however, pursuant to the regulation at 40 CFR 15019(g)(2), Section 1502.23 may be applied to EAs.

tree vigor. The maximum diameter of 26.9" addresses management objectives by providing a continuous supply of desirable saw timber products without allowing trees to progress into age related decadence while at the same time maintaining a large tree emphasis on the landscape. A q-factor of 1.3 keeps sub-merchantable trees fully stocked for the next cohort. The harvests will take place on a 20 to 25-year cutting cycle to allow for sufficient stand growth while at the same time keeping stand density within the target range." (EA, page 14)

Therefore, based on the best scientific information available and most recent inventory data, the District Silviculturalist has determined a 26.9" diameter cap and a basal area of 50-to-70 square feet per acre will meet the desired conditions stated in the San Juan LRMP (2013).

### *Conclusion #16*

I find the Responsible Official provides adequate documentation within the analysis, demonstrating the use of best scientific information available to determine the target basal area and diameter cap to achieve desired conditions stated within the San Juan LRMP (2013).

### *Issue #17*

An Objector alleges that the EA improperly relies on adaptive management because information required by regulation is not included in the analysis.

### *Analysis #17*

The regulation at 36 CFR 220.7 (b)(2)(iv) states that, "The proposed action and one or more alternatives to the proposed action may include adaptive management. An adaptive management proposal or alternative must clearly identify the adjustment(s) that may be made when monitoring during project implementation indicates that the action is not having its intended effect, or is causing unintended and undesirable effects. The EA must disclose not only the effect of the proposed action or alternative but also the effect of the adjustment. Such proposal or alternative must also describe the monitoring that would take place to inform the responsible official whether the action is having its intended effect."

Monitoring and Adaptive management are included and described in the final EA, pages 29-33, Tables 5-6. Table 5 clearly outlines the activities to be monitored and Table 6 outlines the threshold or undesirable effect that triggers a need for action to achieve desired conditions. I find the Final EA is consistent with 36 CFR 220.7(b)(2)(iv).

### *Conclusion #17*

I find that the Responsible Official provides adequate information in the analysis by clearly identifying adaptive management actions and monitoring activities as required by regulation.

### *Issue #18*

Objector alleges that the EA fails to take into account the cumulative effects of off-road vehicle recreation and does not feel that the design feature that addresses access to dispersed camping sites is adequate.

### *Analysis #18*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives. Objector alleges the requirements of NEPA have not been met regarding cumulative effects.

Final EA (p. 54) and 2020 Motor Vehicle Use Map notes off-road vehicle use is not permitted except in limited circumstances (i.e., limited big game motorized big game retrieval and dispersed camping) per

travel management decision issued under 36 CFR 212. Also, Final EA, p. 54 specifically addresses cumulative effects, "The Boggy Glade Travel Management Project resulted in some roads that were once open to public use being closed to public use or decommissioned. This will create minor displacement recreation activities that could overlap in time with the Salter Vegetation Management project." Objectors tie their concern to ability to successfully reclaim routes and resource concerns. The Final EA does consider resource concerns related to dispersed recreation. In addition to recreation design feature mentioned by Objector, there is a design feature for transportation (Final EA, p. 26) which includes, "Following use for harvest and treatment implementation, both temporary AND designed roads will be decommissioned, which involves re-contouring where significant side slope exists, elimination of ditches and other structures, out-sloping during construction, removal of ruts and berms, effectively blocking the road to normal vehicular traffic where feasible, and construction of drainage features such as cross ditches and water bars. Final acceptance of the closure will be made by the Forest hydrologist or engineering representative." Final EA (p. 72) considers dispersed use for watershed resources. Similarly, for wildlife, "Recreation opportunities within the area are expected to increase some, but they are not expected to become significant enough to reduce the functionality of any species' habitat." Final EA, p. 85. Further, it is not within the agency purview to speculate that illegal activities will occur.

### *Conclusion #18*

I find the Responsible Official has considered cumulative effects related to potential for increased accessibility of Forest lands in compliance with NEPA (36 CFR 220.7(b)(3)) and travel regulations.

### *Issue #19*

The objector alleges that the EA does not address the key differences between Alternatives 2 and 3, primarily in terms of forest resilience and timber economics.

### *Analysis #19*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives.

The Vegetation Analysis report (pp. 38-39) compares alternatives in relation to desired conditions which are related to forest resilience criteria. The report discusses the limitation of diameter caps and the effects of forest resilience in the following:

"Limiting prescription effectiveness with a blanket diameter cap such as alternative 3 has been applied to the "Large Tree Retention Areas" (LTR) of Lone Pine as study opportunity. Has shown the potential of limiting or even interrupting long term approaches to meeting desired conditions described in LRMP for ponderosa pine. The Lone Pine LTR study areas have shown a limitation on sanitation approaches within stands and forced the leaving of entire groups of trees infested with bark beetles. As management begins to bring stands back into an uneven aged state, volume or basil area that would normally be prescribed for harvest under an uneven aged management approach would be locked up in upper diameters under alternative 3."

In alternative 3 (EA, p. 66), an explanation of how diameter caps hinder forest health and resilience is provided:

"Large tree retention limits the ability to fully utilize the silviculture systems designated by the Land and Resource Management Plan. Therefore, alternative 3 meets the desired conditions described at 2.2.23 to a lesser degree than alternative 2 – Modified proposed action. The data indicates that the differences between alternatives 2 and 3 are associated with specific locations over time and over cutting cycles.

Preliminary feedback of Lone Pine EA Large Tree Retention study areas from post decision reconnaissance and layout of leave tree units have shown mixed results. The effects of applying a diameter limit appear to be more easily tangible at the fine scale. At the fine scale patches of bark beetle and heavily infested dwarf mistletoe trees have to be passed for removal due to the diameter limitation. Basal area retention goals and uneven aged characteristics are being compromised, leaving stands less resilient and making long term resistance less likely to occur.

Continuing in alternative 3 (EA, p.66), the following mentions a difference in timber economics:

"Removing areas from treatment as result of diameter limitation reduces the amount of treatment in an area and subsequently the amount of harvestable volume per acre."

In the Vegetation Analysis report, Economics (pp. 40-41), the summary describes how the local markets are increasing in the recent past 5-6 years and how bids for various products have gone from "no-bid" to competitive bids for those products:

"The fiber demand of the local area based on current sales over the past 2 years will keep in

pace with what this EA can provide as a byproduct of the vegetation management activities to meet desired conditions. However, an increase in demand will result in competitive prices for fiber and the ability to utilize funds to perform service and stewardship items such as pre-commercial thinning."

The "saw log" (=>9" DBH) market demand continues to increase with bid premiums seen on almost every sale including stewardship contracts within the last 4 years. Sales with premiums also included additional charges for brush disposal, essential KV and road maintenance which have caused no bid sales on the district in the past. The ability to include large volumes and achieve vegetation management at landscape level is possible with the current industry. Offering a mixture of saw log and smaller diameters timber in the right ratio is important to keep sales marketable. The size of these sales is equally important in both volume and acres to ensure the work is completed on time and has a sustained profitability."

### *Conclusion #19*

I find that the Responsible Official adequately considered disclosed the economic effects of the action alternatives and, where applicable, demonstrated the differences between the action alternatives.

### *Issue #20*

Objector alleges that justification for preferred/selected alternative is not valid.

### *Analysis #20*

The regulation at 36 CFR 220.7(c) states that "A decision notice must document the conclusions drawn and the decision(s) made based on the supporting record, including the EA and FONSI." Objector alleges that the decision was based on silvicultural methods instead of achieving the desired condition in the Forest Plan.

Project is designed to meet Forest Plan desired conditions for Management Area 5 and all project areas are within suitable timber base. Final EA, pp. 8-9. The desired conditions for the ponderosa pine cover type and lands managed for forest product offerings are further defined in sections 2.2.23 and 2.9.1 of the San Juan National Forest Land and Resource Management Plan (USDA 2013). Final EA (pp. 9-11) addresses how existing stands do not meet Forest Plan components. Silvicultural prescriptions are the tools used to meet desired conditions. Final EA at pp 12-13; Draft DN, pp. 1, 2-3, 12-13. Disagreements occur between Objector and District regarding how to meet the desired conditions based on old or large tree caps. See other issues addressed in this document. This does not invalidate analysis completed.

District used site-specific CSE data, analyzed NFMA requirements (Draft DN, pp. 12-16) and considered past fire suppression activities (Final EA, pp. 7-8) and insect outbreaks (Final EA, pp. 4- 5) that led to desired conditions not being met. Additionally, Final EA (p. 6) describes, “Generally, the project area is in fair to good health with areas displaying indicators of good future forest health conditions. The stands that have been treated within the last 15 years under earlier ponderosa pine management efforts, display many of the desired conditions identified in the Land and Resource Management Plan for ponderosa pine. These include a reduction in small diameter overtopped and suppressed trees and improved structural dynamics. Areas that have not been treated are over-stocked and lack disturbance.” Lastly, it was articulated in Draft DN (pp. 5-8) why Alternative 2 was selected over Alternative 3 and acknowledged that environmental trade-offs do occur.

### *Conclusion #20*

I find the Responsible Official’s decision is neither arbitrary nor capricious as it relates to selection of an alternative in meeting desired conditions. Draft DN relies on analysis completed and documents rationale and considerations for the decision.

### *Issue #21*

The objector asserts that the EA uses improper terminology ("group, clump and individual structure") and requests correction and use of best available science.

### *Analysis #21*

The regulation at 40 CFR 1502.23 states that, “Agencies shall ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents. Agencies shall make use of reliable existing data and resources. Agencies may make use of any reliable data sources, such as remotely gathered information or statistical models. They shall identify any methodologies used and shall make explicit reference to the scientific and other sources relied upon for conclusions in the statement.”

Definitions of the terms “group, clump, and individual structure” are provided in the Vegetation Analysis report (p.22) “Focus on Groups/Clumps/Individuals and the final EA (p.12); the terms are discussed but are not specifically defined as “GCI.”

### *Conclusion #21*

I find that the Responsible Official adequately analyzed and described their methodology and it is consistent with appropriate laws, regulations, and policies.

### *Issue #22*

An Objector asserts that information provided by the forest at a public meeting was not part of the NEPA process and alleges that the forest withheld useful information from the public.

### *Analysis #22*

Objector alleges that useful, visual informational materials from a public meeting in March 2020 were not included in the Draft EA. While there is no requirement to include this particular information (i.e., PowerPoint presentation) in the analysis. Documentation is required by 40 CFR 1508.9 for persons consulted and for public involvement in the decision notice per 36 CFR 220.7(c)(3). The Final EA at pp. 34-35 (Issues) and 85-87 and Draft DN at pp. 6-8, 9 meet these regulatory requirements. Moreover, the Draft DN (p. 9) and Final EA ( p. 86) state, “The information and recommendations provided by the collaborative have been given consideration in the design of the Salter Vegetation Management project.). Final EA (p. 86) also describes the collaborative (emphasis added):

> *As part of the Salter planning process, the Agency entered into an agreement with the DWRF Collaborative that described commitments and an overall goal of "transparent deliberation and discussion on all proposed projects".* ***The agency and collaborative have met on many occasions throughout the planning process to share information and exchange data. The agreement outlines the use of the collaborative exchange folder (CEF) to facilitate open exchange of information and data.*** *The CEF is located on the agency's corporate system and is accessible as an external shared link specifically for exchange of data, including: maps, geodatabases, inventory data, documents, etc. The CEF is also intended to be used by the Collaborative and other partners to share information with the agency of any desirable or undesirable trends that are being observed and to provide an avenue to discuss those trends or for further exchange of general information.*

### *Conclusion #22*

I find the Responsible Official has met the regulatory requirements 40 CFR 1508.9 and 36 CFR 220.7(c)(3)) related to public involvement.

### *Issue #23*

The objector asserts that the EA needs to provide scientific sources for "conditions influencing silviculture treatments" (draft EA p. 16) and explain other parameters, providing scientific references.

### *Analysis #23*

The regulation at 40 CFR 1502.23 states that, "Agencies shall ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents. Agencies shall make use of reliable existing data and resources. Agencies may make use of any reliable data sources, such as remotely gathered information or statistical models. They shall identify any methodologies used and shall make explicit reference to the scientific and other sources relied upon for conclusions in the statement."

Scientific sources that influenced silviculture treatments are provided in the Vegetation Analysis Specialist Report within the section "*Conditions Influencing Silviculture Treatments*" (Vegetation Report pp. 19-20) and in the EA under Section 2, Alternative 2 – Conditions Influencing Silvicultural Treatments.

### *Conclusion #23*

I find that the final EA and the Vegetation Analysis Specialist Report include appropriate scientific references that support the analysis and conclusions in those documents.

### *Issue #24*

An Objector disputes method for identifying pre-settlement trees and asks forest to adopt a 17" diameter cap for harvest.

### *Analysis #24*

The regulation at 36 CFR 220.7 states that an EA "Shall briefly provide sufficient evidence and analysis, including the environmental impacts of the proposed action and alternative(s), to determine whether to prepare either and EIS or a FONSI (40 CFR 1508.9)" and indicates that an EA "May incorporate by reference data, inventories, other information and analyses."

The method for identifying pre-settlement trees is stated in the EA, pages 6 & 16. The District determined during the stand inventory process that there is high variability between age classes relative to size diameter at breast height (Vegetation Analysis, pages 13-14). The District states: *"Data analysis is*

*a good guide for overall management but when in the field, visual characteristics have proven to be more reliable in determining age (GTR-110 2003 Huckaby etal.).”* (Project record, Vegetation Analysis page 14).

The District further states: “*CSE data will be used to establish a likely frequency and typical size of trees as a guide for tree markers. Of the 7,461 trees measured in 2020 within the treatment area the oldest tree cored and aged was 137 years old and had a diameter of 19.6 inches at Breast Height. While the largest tree measured was over 50” DBH. This demonstrates the variability within the age to size correlation and makes it necessary to rely on visual as well as data for indicators of pre-settlement trees within a stand. Including this type of data in marking guides will help the markers understand which tree sizes within a stand might have the potential of being pre-settlement in age.”* (Project record, Vegetation Analysis page 14).

Finally, the District states: “*Old-aged trees will be identified using a combination of physical characteristics including large diameter relative to other trees in the localized area, large diameter branches, irregular crowns, flat tops, tall height and canopy position and bark thickness, color and pattern. (Huckaby et al. 2003). When a determination of tree age cannot be made using physical characteristics, these trees will either be retained or assessed and documented at the harvest-unit scale to ensure old-aged trees are retained.”* (EA page 16).

The Final Salter EA addresses Dr. William Baker’s research paper from 2021. The IDT conducted a cursory review of findings to assess the relevance to the Salter project. The IDT found the focus of the paper was on wildfire resiliency and irrelevant to the concern of insect and disease (Draft DN, pgs. 5-6).

Therefore, determination of pre-settlement trees in the proposed action will be selected based on a combination of physical characteristics rather than tree size at DBH. When tree age cannot be determined using this method, trees will be assessed and/or retained and documented.

### *Conclusion #24*

I find that the Responsible Official provides adequate rationale that supports the method for identifying pre-settlement trees in the project area.

### *Issue #25*

Objectors suggested several minor edits to design features.

### *Analysis #25*

I reviewed the design features identified by objectors and discussed the suggested edits with the Responsible Official. After a thorough review of the design features in question, I agree with the Responsible Official that the current language is sufficient, meets the intent of the project, and provides sufficient clarity for implementation.

### *Conclusion #25*

I find that the design features, as written, are consistent with law, regulation and policy. No changes are necessary.

USDA United States Department of Agriculture | Forest Service | San Juan National Forest | 15 Burnett Court
Durango, CO 81301
(970) 247-4874
Fax: (970) 375-2319

File Code: 1570

**Date:** October 22, 2021

Mr. Ted Zukoski
tzukoski@biologicaldiversity.org

Dear Mr. Zukoski:

This letter is in response to your objection to the draft Decision Notice (DN) and Finding of No Significant Impact (FONSI) for the Salter Vegetation Management Project, Dolores Ranger District, San Juan National Forest. I have read your objection and reviewed the project record, the draft DN/FONSI, and the final Environmental Assessment (EA). My review of your objection was conducted in accordance with the regulation at 36 CFR 218 (2013).

**PROJECT DESCRIPTION**

On July 21, 2021, the Dolores District Ranger released the Salter Vegetation Management Project EA, draft DN, and FONSI for objection. The District Ranger proposes to implement Alternative 2 in the draft decision, which authorizes the following:

- Single tree selection on 19,675 acres, harvested trees not to exceed 26.9 inches diameter at breast height (dbh);
- Commercial thinning on 3,115 acres, harvested trees not to exceed 26.9 inches dbh;
- Post fledging area thinning, pre-commercial thinning and brush thinning as appropriate in any treatment unit;
- Up to 117 miles of temporary road construction;
- Reduction of activity fuels through a variety of means;
- Installation of four wildlife guzzlers.

**OBJECTION ISSUE DISCUSSION**

The eligible objectors raised a number of concerns that fell under the themes of NEPA adequacy (adequacy of the analysis, adequacy of the purpose and need, consideration of reasonable alternatives and consideration of comments), use of best available science, effects related to climate change, effects related to economics, and impacts to the project area (impacts to aquatic/hydrologic resources, visuals and recreation, soils, wildlife, and vegetation).

The objection resolution meeting was held on September 8, 2021. I found the dialogue with all of the objectors helpful and thoughtful. I appreciate the passion and dedication of the objectors for the San Juan National Forest and the variety of resources it provides to the public. I understand the concerns raised and I also understand the balance that must be considered by the Responsible Official when it comes to managing forest resources. During the resolution meeting and subsequent conversations with objectors, I found that four specific concerns could be clarified in the final decision.

1. The district will provide Timber Operator with a handout detailing Town of Dolores requirements for logging trucks (enclosed).
2. The district will clarify in the Final Decision that all treatments that originate from the Salter and Plateau treatment areas and require the removal of forest products utilizing commercial log trucks will be required to utilize the western transportation route and will not travel through the Town of Dolores.
3. Clarify in the Final Decision that the Dolores District commits to initiating the NEPA analysis referred to in Recreation design feature No. 4 (i) in the EA (page 24), in calendar year 2022 and will complete the analysis prior to beginning implementation in affected blocks.
4. In the Final Decision, revise Scenery design feature No. 7 (page 26 of the EA) as follows: *A visual corridor will be established on each non-motorized system trail within Boggy Draw treatment block utilizing a 50-foot from center line area of influence. The recreation and timber staff will identify leave trees for retention, marking them with temporary paint or flagging. Protection of trees within 50 feet of center line of the corridor is intended to reduce scenic impacts by maintaining unique trail features such as tight turns or challenging obstacles that improve the feel and flow of a single-track trail as well as maintaining shade on groomed winter trails.*
5. Clarify in the Final Decision that the Dolores District commits to using the "descending order" tree evaluation decision process as described on page 17 (items *a* through *l*) of the EA within the Salter project area.
6. Clarify in the Final Decision that for Wildlife Design Feature 2b (page 28 of the EA), the percent post-fledgling family area canopy cover should be 50 percent or greater.

**CONCLUSION**

I conducted my review of the record, final EA and draft DN/FONSI. Based on my review, I conclude the following:

- The draft decision clearly describes the actions to be taken in sufficient detail that the reader can easily understand what will occur as a result of the draft decision.
- The draft decision considered a range of alternatives that was adequate to respond to the Purpose and Need for action. The purpose and need and alternatives considered in the final EA reflect a reasonable range of alternatives, consistent with law, regulation, and policy.
- The draft decision is consistent with Forest Plan and Comprehensive Management Plan standards and guidelines.
- The draft decision is consistent with policy, regulation, law, direction, and the final EA contains adequate evidence to support the decision. The record and final decision contain site-specific documentation regarding resource conditions, and the Responsible Official's draft decision document is based on the record and reflects a reasonable conclusion.
- For the sake of clarity, I am directing the Responsible Official to make these additional clarifications in the final Decision Notice:
  - The EA contains a discrepancy in how proposed temporary road mileage is described; I therefore direct the Responsible Official to address this discrepancy in the final Decision Notice and describe the correct mileage.
  - The EA's wildlife analysis and supporting specialist report identify a project design feature that was not included in those that were proposed to be authorized by the Responsible Official; I therefore direct the Responsible Official to clarify in the final

Decision Notice that the referenced design element is not included in the authorized activities and provide rationale why the analysis of effects to elk would not be changed with that design element removed.

This concludes my written review of the project. By copy of this letter and the enclosed response document, the Responsible Official may sign the decision after including the clarifications noted above, then notify interested and affected persons in accordance with the regulation at 36 CFR 218.12 and 36 CFR 220.7(d). This written response is the final administrative review by the Forest Service or the Department of Agriculture [36 CFR 218.11(b)(2)].

If you have any questions and/or concerns, please contact Mark Lambert at mark.b.lambert@usda.gov.

Sincerely,

KARA CHADWICK Digitally signed by KARA CHADWICK
Date: 2021.10.22 13:52:33 -06'00'

KARA L. CHADWICK
Forest Supervisor

Enclosures - 2

**Town of Dolores Information for Pre-work Meetings with Timber Operator**

1. Montezuma County Road 31 turns into Town of Dolores 11th Street when the road crosses city limits and the speed limit is **15MPH.**
2. The Town of Dolores requires that all trucks hauling logs off of Forest Service contracts are equipped with Jake Brakes Mufflers
3. The town of Dolores requires that all trucks hauling logs off of Forest Service contracts do not deviate from 11th Street (go either left or right at junction of 11st (CR 31) and Railroad Ave (HWY 145)
4. Commercial truck traffic is not allowed on 11th Street from 10:00pm to 6:00am
5. The town of Dolores has the following ordinance for muffler requirements:
   **Dolores Municipal Code-Model Traffic Code Section 2-225. Mufflers - prevention of noise.**
   *(1) Every motor vehicle subject to registration and operated on a highway shall at all times be equipped with an adequate muffler in constant operation and properly maintained to prevent any excessive or unusual noise, and no such muffler or exhaust system shall be equipped with a cut-off, bypass, or similar device. No person shall modify the exhaust system of a motor vehicle in a manner which will amplify or increase the noise emitted by the motor of such vehicle above that emitted by the muffler originally installed on the vehicle, and such original muffler shall comply with all the requirements of this section.*
   *(1.5) Any commercial vehicle, as defined in section 235 (1) (a), subject to registration and operated on a highway, that is equipped with an engine compression brake device is required to have a muffler.*
   *(2) A muffler is a device consisting of a series of chamber or baffle plates or other mechanical design for the purpose of receiving exhaust gas from an internal combustion engine and effective in reducing noise.*
   *(3) Any person who violates subsection (1) of this section commits a class B traffic infraction. Any person who violates subsection (1.5) of this section shall, upon conviction, be punished by a fine of five hundred dollars. Fifty percent of any fine for a violation of subsection(1.5) of this section occurring within the corporate limits of a city or town, or within the unincorporated area of a county, shall be transmitted to the treasurer or chief financial officer of said city, town, or county, and the remaining fifty percent shall be transmitted to the state treasurer, credited to the highway users tax fund, and allocated and expended as specified in section 205 (5.5)(a), C.R.S.*

Forest Service
U.S. DEPARTMENT OF AGRICULTURE

Rocky Mountain Regional Office Sept. 2021

# Response to Objections on the Salter Vegetation Management Project on the San Juan National Forest

## Objectors

Molly Pitts, Intermountain Forest Association
Tim Kyllo, Montrose Forest Products, LLC
William L. Baker, PhD.
Edward B. Zukoski, Center for Biological Diversity/Adam Rissien, WildEarth Guardians
Jimbo Buickerood, San Juan Citizens Alliance

## Organization of this Document

Due to the number of objectors and the similarity between several of the objections, I as the Objection Reviewing Officer elected to lump objection issues to the extent possible. This approach allowed for increased efficiency in reviewing and responding to objection statements.

## Objection Statements and Responses

### *Issue #1*

This issue relates to Objectors' concerns that the affected environment was not sufficiently described in the EA; Objectors allege insufficient location information was provided for a variety of resources, that baseline information was not provided and that common stand exam (CSE) data were not provided to the public. Objectors contend that this constituted a violation of NEPA.

### *Analysis #1*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives; there is no requirement for an affected environment section in an EA.

The final EA (p. 1-8) provides context of the affected environment (also called existing condition or environmental baseline), which indicates that age and size are variable and provides average basal area. Project Design Features (Final EA pp. 20-29) indicate where additional surveys or layout requirements are needed to ensure that the affected environment and effects analysis align. Each resource in Section 3 of the Final EA addresses affected environment (Final EA pp. 35 – 85). Of specific note, the Final EA affected environment describes the affected watersheds and riparian areas (Final EA pp. 67 and 68) and where sensitive soils occur (EA p. 68). Additional baseline information for other species is included in the project Biological Evaluation (BE; Project Record). Detailed maps displaying locations of treatment units by treatment type, transportation system, proposed temporary roads, goshawk post-fledging areas, trails and streams are included in Appendix A of the Final EA.

Common stand exam (CSE) data, which comprise on-the-ground site-specific information, were referenced in the Final EA (Final EA pp. 6, 11, 12, 14). While CSE data in raw format are not included in the Final EA, data are summarized in the Timber Silvicultural Report in the project file.

Also see response to Issue #4.

### *Conclusion #1*

I find that the Responsible Official has taken the required hard look at existing conditions and that the description of affected environment is consistent with applicable regulation

### *Issue #2*

This issue relates to Objectors' allegation that the EA fails to accurately describe and document effects of temporary roads and skid trails. Objectors claim that mileage of temporary roads is inconsistently described and there is a lack of site-specificity, which objectors claim is a violation of NEPA.

### *Analysis #2*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives; there is no requirement for an affected environment section in an EA.

The Transportation section of the EA states that 106 miles of temporary road will likely be required for project implementation; this consists of 69.8 miles of existing non-system roads and 36.4 miles of new ground disturbance (Final EA p. 63). In order to account for on the ground layout, an additional 10% (11 miles) was added to the anticipated temporary road mileage (Final EA p. 63; DN p. 4); therefore a total of 117 miles of temporary roads were analyzed. Appendix A of the EA provides maps of proposed temporary road locations (Final EA p. 92-97).

The EA does state that 50-75 miles of temporary road construction are analyzed under this proposal Final EA p. 19). The District clarified that this was a mistake in the final EA, and that the mile estimates disclosed in the Transportation section are correct.

The EA contains a general description of temporary roads being constructed with minimal disturbance (length and width), proper drainage, and appropriate stream crossings to withstand flood flows (Final EA pp. 19, 22, 26, 63 and 70) and a statement that all drainage structures on roads will be inspected by the Timber Sale Administrator, Engineering Representative or Forest hydrologist at treatment completion to make sure they are in good condition. Hydrology and Soils Design Feature #7 states that temporary roads will be held to the minimum number feasible and will be located sufficiently far from streams and other water bodies to minimize discharge into those waters except at stream crossings (Final EA p. 22).

The EA states that all temporary road segments will be decommissioned within five years after first use (Final EA p. 19). Transportation Design Feature #2 (Final EA p. 26) states that the location and clearing widths of all temporary roads will be agreed to in writing before construction is started and that all temporary roads will be decommissioned after use, which involves re-contouring where significant side slope exists, elimination of ditches and other structures, out-sloping during construction, removal of ruts and berms, effectively blocking the road to normal vehicular traffic where feasible, and construction of drainage features such as cross ditches and water bars.

Hydrology and Soils Design Feature #5 describes skid trails as being perpendicular to the slope as much as possible, outside of drainages, and away from sustained steep slopes (greater than 40 percent) and specifies that they will be located and designed to disperse runoff and minimize soil disturbance (Final EA pp. 21 and 70). Hydrology and Soils Design Feature #4 states that skidding will not be allowed in wetlands, wet meadows and riparian areas (Final EA pp. 21 and 71). There is a no treatment buffer zone around riparian and wetland areas (Final EA p. 21). Skid trails will be closed after use by adding waterbars or outsloping and spreading slash (Final EA p. 21).

Effects to resources are based on the design features as described above. The final EA includes discussion of the effects of temporary roads and road use on invasive plants (final EA pp. 42-43), grazing (final EA pp. 46-47), rare and sensitive plants (final EA p. 49), recreation (final EA pp. 52-54), transportation (final EA pp. 61-64), watersheds, soils and water quality (final EA pp. 70-72), and wildlife (final EA pp. 78-79). The final EA also indicates that businesses local to the project area may complete roadwork, creating a minor local socioeconomic effect (final EA p. 60).

The EA mentions a process by which a temporary road system will be developed as described in the Project Design Features (Final EA p. 63), but this process is not found in the Transportation Design Features of the EA. I directed my staff to talk to the project's Roads Engineer; the following is standard operating procedure for the development of a timber sale transportation system, and was therefore not included in the EA. It will be included in the sale contract language:

1. Roads to be used for hauling or equipment access will be used in the following order of preference:
    a. First preference is to use National Forest System Roads identified on the Motor Vehicle Use Map for general public use. These roads are maintained in an "open"' status with either gravel surface (ML3) or native surface (ML2).
    b. Second preference is to use ML1 roads (only open to limited administrative use), which might require reconstruction (e.g., removal of trees and shrubs, reshaping, blading, adding surface material or installing drainage features). After use the road would be put back in ML1 status or decommissioned. Consult with Forest engineering staff and project hydrologist for input on road reconstruction.
    c. Third preference is to use existing unauthorized roads (which would be considered temporary roads and obliterated when use is complete). Roads in this category might require removal of trees and shrubs, reshaping, blading, adding surface material, installing drainage features, etc.
    d. Fourth preference is to create temporary roads. The Forest Service and the purchaser/contractor shall agree upon locations of temporary routes, resource protection requirements employed during road construction, clearing widths, and closure or rehabilitation requirements, which must be consistent with all design elements and implementation requirements of the Lone Pine EA.
2. Temporary roads must be seeded and closed within five years after final use.
3. Temporary roads shall be designed to the minimum standard for their use and be located to "roll" with the terrain as feasible.

### *Conclusion #2*

I find that the final EA adequately described and documented the location and effects associated with temporary roads.

For the sake of clarity and given the oversight in the final EA related to mileage of temporary roads, I will direct the Responsible Official to clarify the mileage in the final Decision Notice.

### *Issue #3*

This issue relates to objectors' allegation that the range of alternatives documented in the EA is insufficient. Specific concerns relate to the EA not considering an alternative that limits removal of large trees, and not considering multiple uses when developing the range of alternatives.

### *Analysis #3*

The regulation at 36 CFR 220.7(b)(2) states that an EA "shall briefly describe the proposed action and alternative(s) that meet the need for action. No specific number of alternatives is required or prescribed." Objectors allege the requirements of NEPA (40 CFR 1502.14) have not been met; it should be noted that the regulation at 40 CFR 1502 is specific to Environmental Impact Statements and is not applicable to an EA, except as described in 40 CFR 1501.5(g).

Alternative 3, which was developed to address commenters' concerns about cutting of large or old trees, was fully developed (Final EA pp. 29-30, 35). Alternative 3 limited the removal of trees over 20"

and was intended to emphasize large tree retention. Common Stand Exam data collected for the project indicate there is not necessarily a correlation between tree size and tree age within the project area (Final EA, pp. 3, 6-7, 11). The District identified specific prescriptions and prioritized additional considerations for determining which trees met old and large requirements (Final EA, pp. 14-17).

Objector also wishes an additional alternative to be considered that didn't include harvesting trees over 16 inches DBH or larger since there is minimal difference between Alternatives 2 and 3. This appears to have originated from Objector's March 22, 2020 comment letter (emphasis added):

> *We therefore request that the Forest Service consider an alternative that will: retain large trees,* ***either*** *larger than 16" DBH* ***or*** *20" DBH, and any old trees, as determined by their size, appearance and morphology. The size of the cap may depend on the results of stand exam data. To the extent that the CSE data show few if any trees 20" DBH or larger, the Forest Service should consider a smaller diameter cap to protect the largest trees that remain.*

The district considered a publication "Diameter Caps and Forest Restoration: Evaluation of a 16" Cut Limit on Achieving Desired Conditions Southwestern Region" (Final EA. p. 66). This document was reviewed in relationship to findings from the adjacent Lone Pine project implementation. Final EA, p. 66 provides rationale based on existing conditions, "Removing areas from treatment as result of diameter limitation reduces the amount of treatment in an area…" While a specific alternative was not addressed related to a 16" diameter, the Final EA (p. 4) specifies the "12-25 inch size class is the most represented on the landscape with reduced representation as the diameter increases" This provides additional rationale for not considering smaller diameter trees as the cut off toward meeting desired basal area. A 16" cap appears to represent an average-sized tree in this area, not one that was exceptionally large or necessarily old (Final EA, Figure 4). A standard diameter for old growth was not specified for ponderosa pine in the SJNF's Forest Plan.

One objector expressed that the range of alternatives is invalid because it didn't include "multiple uses;" however, I find that the proposed action and Alternative 3 were developed to be consistent with objectives identified in the LRMP for Management Area 5, which provide for active management in order to meet multiple-use goals (EA pg. 8). By maintaining consistency with LRPM direction for Management Area 5, the District allowed for multiple uses in the project area. The various uses in the project area were considered in alternative development, including project design, and effects to these resources were disclosed in Chapter 3 of the EA.

The draft Decision Notice (p. 8) includes discussion of alternatives considered and how public comments were used in modifying the proposed action and developing another action alternative.

### *Conclusion #3*

I find that the Responsible Official has considered an adequate range of alternatives, consistent with regulation.

### *Issue #4*

Objectors allege that the Salter Vegetation Management project is inconsistent with the San Juan National Forest Land and Resource Management Plan (LRMP) in a number of ways, including deficiencies in addressing Historical Range of Variability (HRV) and ecosystem management, failure to meeting LRMP objectives for ponderosa pine forest, use of a 26.9" diameter limit and logging of presettlement trees.

### *Analysis #4*

The San Juan National Forest Land and Resource Management Plan (LRMP) states that the Historical Range of Variability (HRV) “can be used to establish an ecological baseline.” It also states that the intent is not to mandate that HRV conditions be achieved in all cases (LRMP p. 12). The San Juan LRMP states that Ecosystem Management, which uses HRV for reference, will be implemented by maintaining or restoring the composition, structure, function, and physical environment of ecosystems” (LRMP p.13). The LRMP does not include specific requirements related to the Ecosystem Management approach.

The Ecosystem Management section of the LRMP also states that many ponderosa pine forests on the SJNF are currently outside their HRV in terms of vegetation stand structure and fire frequency. Ponderosa pine forests have fewer acres in both young and old growth development stages and have less diversity and less cover of native grasses compared to HRV conditions (LRMP p. 18). The desired condition for ponderosa pine forests described in the LRMP is for forests to display variable density and structure reflecting uneven-age structure comprising variable-sized trees (LRMP p. 20).

The San Juan LRMP states that there are many opportunities for vegetation management and that the timber program will focus treatment on “landscapes at high risk for developing epidemic levels of insect and/or disease infestation; landscapes where disturbance has resulted in dead or dying trees…” (LRMP p. 73). One of the objectives outlined in the LRMP states that the most common applications of timber harvest to meet the desired condition could be to conduct thinning-with an emphasis on restoration and fuels reduction of altered forest types-in ponderosa pine and warm-dry mixed conifer vegetation types on approximately 15,000 to 20,000 acres: (LRMP p. 75). Objectives in the LRMP are defined as aspirations, not commitments or final project decisions (LRMP p. 6).

The EA describes the current condition of the forest in the project area and references modeling that was done to suggest two underrepresented size classes relative to the stand structure. These include large trees (greater than 27” DBH) and seedlings and saplings (EA p. 4). Also included within the project area are plantation areas. This has resulted in areas within the project where the diversity is both desired and undesired. Beetle mortality in the over story and density induced mortality is also present (EA p. 4). These infestations are growing and appear to be moving to the east. Data obtained from two consecutive years of flights show a general expansion of the beetle infestation and indicates a need to establish an uneven-age stand structure to increase resistance to beetle infestation and promote resilience (EA p. 5). The EA provides a description of the age and size class of ponderosa pine found within the project area (Final EA p. 6).

The analysis states that a comparison between the current and desired conditions was done utilizing common stand data and that Forest Vegetation Simulation modeling and field observation shows that the condition of the ponderosa pine cover type within the project area is different from the desired condition (DN p. 1, Final EA p. 11).

The dbh limit was set at 26.9 inches due to this size class being underrepresented in the treatment area (Final EA p. 6). There is a description of the stand exam inventory that was done in the project area which describes that using the dbh of trees does not correlate well to the age of the tree. Therefore, it is necessary to rely on visual, as well as size correlation to determine pre-settlement trees within a stand (Final EA p. 6). The forest will use stand exam data to establish likely frequency and typical size of old trees within a stand as a guide for tree markers at the prescription level, which will help to avoid harvesting pre-settlement trees (Final EA p. 6). The draft DN outlines the rationale behind why choosing a smaller dbh limit would not meet the purpose and need of the project (dDN p. 6).

### *Conclusion #4*

I find that Responsible Official provided adequate information in the analysis to show that the proposed action meets direction outlined in the San Juan Land and Resource Management Plan (LRMP).

### *Issue #5*

Objectors allege that the purpose and need for the Salter Project is flawed for a variety of reasons, including that it is too narrow and does not account for multiple uses in the project area, is not valid regarding brush removal over 5,000 acres, and does not provided site-specific data. Objectors further allege that because the purpose and need for Salter is different than the purpose and need for the nearby Lone Pine project, it is arbitrary.

### *Analysis #5*

The regulation at 36 CFR 220.7(b)(1) states that an EA, "…must briefly describe the need for the project."

The purpose and need for the Salter Project relies on site-specific data. Common Stand Exams (CSEs) have been conducted in the project area and proposed actions are specific to this project.

Common stand exam data, which is on-the-ground site-specific information, were referenced in multiple sections of the Final EA (Need for this Proposal and Modified Proposed Action). Basal area was addressed in response to recent fires at Final EA pp 11. The District states the following in regard to purpose and need to achieve desired conditions:

> The desired conditions for the ponderosa pine cover type and lands managed for forest product offerings are further defined in sections 2.2.23 and 2.9.1 of the San Juan National Forest Land and Resource Management Plan (USDA 2013) (final EA, p. 9).

Further:

> A comparison based on common stand exam data, Forest Vegetation Simulation modeling, and field observation between the current and desired conditions shows that the condition of the ponderosa pine cover type found within the Salter vegetation management activity area is different from the desired conditions associated with that vegetative cover type in the San Juan National Forest Land and Resource Management Plan.
>
> The structure and size class distributions in the stands identified for this analysis are not within desired conditions described in 2.2.23 based on field reconnaissance and inventory data. Bark beetles have infested adjacent landscapes causing significant mortality. The early stages of a bark beetle infestation are now being observed in the Salter project area. There are portions within the Salter project area that have been moderately burned by wildfire and there are immediately adjacent areas that have been severely impacted by wildfire. It is well documented that dense, over-stocked, even-age, closed canopy ponderosa pine stands are more susceptible to insect outbreaks (Negron et al. 2008). It is also is well documented that a lack of structural diversity corresponds directly to a reduction in forest resiliency and consequently long term resistance to detrimental natural and human disturbance events, such as, large-scale stand replacing fires (Canard 2013, Negron et al. 2008, Negron et al. 2000, USDA-rmrs_2009_gibson_k0022000) (final EA, p.11).

Approximately 34 percent of the Salter project area has been impacted by fire in the past 10 years. The District states: "The majority of disturbance is due to the 2018 Plateau Wildfire, which burned nearly 20,000 acres during exceptional drought. This fire reduced basal area across the footprint by approximately 32 percent, with most of the fire area (58 percent) experiencing between a 0-to-25 percent reduction in basal area (US Forest Service Rapid Assessment of Vegetation Condition after Wildfire, 2018)" (final EA, pgs. 39-40).

Further, the District has outlined current stand conditions in the following statement: "The average basal area of 336 stands measured in 2020 was 112 $ft^2$/acre and included a range of 12 $ft^2$/acre to 236

$ft^2$/acre. Of the 336 stands measured, the majority of the stands in the project area have basal areas over 100 $ft^2$/acre (200 stands). Seventy-two stands had basal areas over 140 $ft^2$/acre (twice the preferred basal area target)" (final EA, pgs. 6-7).

Therefore, the reduction in basal area by 32 percent across the fire footprint did not achieve the desired effect of 50-70 $ft^2$/acre as shown in the 2020 CSE data output above. Commercial thinning to a 50-70 basal area per acre will only occur depending on current stand conditions, as shown in Table 2, "Vegetation treatment type and treatment description" in the final EA, pages 12-13.

Further rationale and data to support the purpose and need can be found in the Project Record (Vegetation Analysis pp. 27 -39).

Regarding objectors' concern related to the differences between the purpose and need for Salter as opposed to the nearby Lone Pine project, the Final EA at p. 65-66 to describes the differences in Salter's basal areas based upon field recent field observations during the implementation of the Lone Pine project:

> *Preliminary feedback of Lone Pine EA Large Tree Retention study areas from post decision reconnaissance and layout of leave tree units have shown mixed results. The effects of applying a diameter limit appear to be more easily tangible at the fine scale. At the fine scale patches of bark beetle and heavily infested dwarf mistletoe trees have to be passed for removal due to the diameter limitation. Basal area retention goals and uneven aged characteristics are being compromised, leaving stands less resilient and making long term resistance less likely to occur. Removing areas from treatment as result of diameter limitation reduces the amount of treatment in an area and subsequently the amount of harvestable volume per acre. The effects described for the small scale are also documented from the mid-scale and potentially the landscape scale (USDA 2013d; USDA 2011).*

These observations indicate that basal area requirements were not factoring in the extent of insect and disease in the area. Final EA (p. 86) states: "The Salter Vegetation management project proposes an adaptive management approach intended to accommodate changing conditions and additional strategies to achieve the identified desired conditions." Final EA (pp. 29-30) describes the adaptive management and monitoring process.

Regarding brush treatment, the purpose and need is stated in the Final EA, pages 7, 13, and 15-16; and the Vegetation Analysis report, page 10. The final EA indicates that Gambel oak dominates the understory in many of the stands and outcompetes young pines and seedlings for essential light, moisture, and nutrients (final EA, pg. 15). The District states: *"This competition for limited moisture is probably most detrimental to pine when the trees are very young and seedlings are competing directly with the extensive oak layer. Pine germination and establishment will also likely be hindered when micro sites are fully occupied by oak and heavy leaf litter covers mineral soil. Some research has even indicated a possible inhibiting allelopathic effect of oak leaves on pine germination (Harrington 1987)"* (Project Record, Vegetation Analysis, p. 10).

Regarding the EA's statement that seedlings are an underrepresented size class (final EA p. 16), this is supported by the Vegetation Analysis report, which states:

> *There is also the ability for good establishment of seedlings and regeneration as seen in stands currently meeting desired conditions in LRMP or areas that have seen various types of disturbance. As seen in the structure of areas of stands during field reviews cone crops can be episodic in nature leading to very patchy and variable regeneration. Yet where represented it*

> *often has 400 to 500 seedlings per acre. This size class is the other under-represented component of stands' structures identified for treatment* (Vegetation Analysis report, p. 6).

The Vegetation Analysis report further describes the relationship between overstocking of Gambel Oak and understocking of conifer seedlings:

> *The understory/shrub layer is overwhelmingly comprised of Gambel oak with minimal growing space available for seedlings and saplings. In case of Ponderosa Pine numbers this component of structure is lacking and mostly a monoculture of Gambel oak* (Vegetation Analysis report, p. 14).

Regarding Objectors' concerns that "desirable conditions" described by the Dolores Watershed Resilient Forest Collaborative (DWRF) were not considered, The District states the following on the collaborative process and consistency with *Ponderosa Pine Ecosystem Resilience Metrics and Desired Conditions*:

> *Through efforts like the Rocky Mountain Restoration Initiative and the Collaborative Landscape Restoration Forest Restoration program, DWRF collaborative members have identified treatment priorities for areas within the DWRF upper Dolores River watershed, which includes the Salter landscape. This provides information to the agency to take into consideration when determining treatment priorities. The collaborative has also identified a set of ponderosa pine desired conditions that outlines components of ponderosa pine forest resiliency that are a priority for the collaborative (DWRF. 2020. Ponderosa Pine Ecosystem Resilience Metrics and Desired Conditions). The desired conditions developed by the collaborative are consistent with and integrate well with the standards and guidelines identified in the Land and Resource Management Plan for this landscape. The information and recommendations provided by the collaborative have been given consideration in the design of the Salter Vegetation Management project"* (final EA, pg. 86).

Finally, regarding Objectors' concerns that the purpose and need doesn't include multiple uses in the project area, NEPA does not require that multiple uses within a specific project area need to be part of every proposal. Multiple uses have, however, been considered in the effects analysis in Section 3 of the Final EA. Numerous design features protect multiple uses (final EA, pp. 20-29).

Also see response to Issue #3.

### *Conclusion #5*

I find that the purpose and need for the Salter Project was properly focused on vegetation conditions and was based on best available science and site-specific information.

### *Issue #6*

Objectors allege that the Salter Project will result in significant impacts and therefore requires preparation of an EIS; specific concerns relate to the effects of skid trails and 177 miles of temporary roads, logging on 35 square miles of forest land and duration of project (10 years) on soils and watersheds. Objectors also allege significant effects to the northern goshawk and to presettlement ponderosa pine.

### *Analysis #6*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives.

The rebulation at 40 CFR 1508.13 describes a Finding of No Significant Impact (FONSI) as:

> "Finding of no significant impact means a document by a Federal agency briefly presenting the reasons why an action, not otherwise excluded (§1508.4), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared. It shall include the environmental assessment or a summary of it and shall note any other environmental documents related to it (§1501.7(a)(5)). If the assessment is included, the finding need not repeat any of the discussion in the assessment but may incorporate it by reference."

The final EA states: "This environmental assessment is prepared to determine whether the effects of the proposed action may be significant and therefore warrant the preparation of an environmental impact statement……Consistency findings are disclosed in the individual resource-specific environmental effects section of this environmental assessment" (Final EA, page 1).

Anticipated effects to soils and watersheds are documented in the EA (p. 69-72). Erosion and runoff will be minimized due to the application of design features (EA p. 21-22, 26, 71). There is an acknowledgement that the proposed action will result in a small, temporary increase in runoff due to water running off compacted areas immediately after harvest and that the effects will be of limited extent and severity due to several factors described (EA. p. 70). There is also an acknowledgment that soil erosion will occur as a result of temporary road construction and that some sediment delivery to ephemeral and intermittent streams is expected at stream crossings, but that these effects will be short-term and of limited intensity (EA p. 70). Road density will not increase in the watersheds and is within the Forest Plan guidance (EA p. 67-68, 70). Road maintenance will occur on more roads in the area improving the overall road condition (EA p. 65).

The method for identifying pre-settlement trees is stated in the EA, pages 6, 16-17. The District determined during the stand inventory process that there is high variability between age classes relative to size diameter at breast height (Vegetation Analysis, pages 13-14).

The District states: *"Data analysis is a good guide for overall management but when in the field, visual characteristics have proven to be more reliable in determining age (GTR-110 2003 Huckaby etal.)."* (Project record, Vegetation Analysis page 14).

The District further states: "*CSE data will be used to establish a likely frequency and typical size of trees as a guide for tree markers. Of the 7,461 trees measured in 2020 within the treatment area the oldest tree cored and aged was 137 years old and had a diameter of 19.6 inches at Breast Height. While the largest tree measured was over 50" DBH. This demonstrates the variability within the age to size correlation and makes it necessary to rely on visual as well as data for indicators of pre-settlement trees within a stand. Including this type of data in marking guides will help the markers understand which tree sizes within a stand might have the potential of being pre-settlement in age."* (Project record, Vegetation Analysis page 14).

The District outlines the following indicators for evaluating pre-settlement trees:

*"Tree evaluation will be accomplished through a descending order of choice made by the designator. Evaluation occurs at every step of the decision-making process applying sound judgement based on parameters from the analysis and direction from a certified silviculturist. Below is an example of a descending order of choice that will be used to evaluate trees and ultimately designated them for removal if the stand has a basal area greater than 50 ft2/acre.*

*a. Tree can be evaluated for harvest if it is less than 27.0 inch DBH*
*b. Do not cut trees with a combination of pre-settlement visual indicators*
*c. Cut dead trees (brown or red needles/no needles)*
*d. Cut live trees with visible evidence of bark beetle infestation (e.g., pitch tubes, frass, and woodpecker activity on tree bole)*

*e. Cut live trees with dwarf mistletoe infecting more than 50% of the live crown*

*In addition to b-e above, trees 25 inch DBH and less can also be cut if they meet the following condition or structure.*

*f. Live crown declining more than 25% including poor needle conditions*
*g. Evidence of conks, cankers or advanced decay*
*h. Weak or multiple forks*
*i. Broken or dead tops*
*j. Leans greater than 35%*
*k. Grossly poor form*
*l. To achieve a basal area target within 50-70 ft2/ac.*

*When all components are represented, uneven-aged stand structure mirrors a reverse J curve when graphed (Refer to the Vegetation Report). Most stands are not this uniform, and adjustments will be made on a stand level basis to begin moving toward a more traditional uneven aged structure. The reverse J curve is a model and does not account for variability caused by additional desired conditions such as group, clump and individual structure, tree retention for aesthetics, old and large tree retention or supplementary resource based design elements. Each stand will have a different approach to uneven aged management from the current benchmark to achieving the desired structure, while meeting design elements. This provides flexibility in prescription writing an essential component of this analysis and ultimately meeting desired conditions."* (EA, page 17)

Therefore, pre-settlement trees will be retained if they do not meet the above indicators and each stand will require a unique approach in prescriptions to achieve desired conditions while meeting design elements.

Regarding northern goshawk, Forest Service Manual 2672.42 describes the standards for Biological Evaluations and 2672.43 outlines the procedure for conducting a Biological Evaluation.

The analysis of effects to goshawks is documented in the EA (Pg 73, 76-80) and BE (Pg 36-41). The analysis determination states, "…effects are expected be short-term (less than 10 years) and the long-term (more than 10 years) impacts are intended to be beneficial by providing higher quality habitat that is well distributed in the future. Two design features that place temporal and spatial restrictions on management actions were developed to minimize adverse effects (EA Pg 28, Fig 15 of App A). A specific harvest treatment was developed with technical input from the district wildlife biologist and "designed to improve the overall stand functionality and improve growth rates by reducing trees per acre while maintaining or promoting a relatively closed canopy structure to meet goshawk habitat." (EA Pg 15).

The draft Decision Notice includes a Finding of No Significant Impact, which is well-supported by the final EA and the project record (draft DN pp. 10-13).

### *Conclusion #6*

I find that the Responsible Official has found that the Salter Vegetation Project would not result in significant impacts to the human environment and has provided sufficient evidence, supported by the final EA and project record, in the Decision Notice.

***Issue #7***

Several Objectors allege that NEPA is violated because comments they submitted during the scoping period and/or the comment period were not acknowledged or responded to; Objectors allege a violation of the NEPA regulations at 40 CFR 1503.1 and 1503.4.

***Analysis #7***

The regulation at 36 CFR 218.25(b) requires the responsible official to consider all written comments submitted and that all written comments received be placed in the project file and become a matter of public record. NEPA does not require an EA to include a specific response to comments.

The regulations cited by the Objectors are specific to Environmental Impact Statements and do not apply to EAs.

The Salter project record includes an Excel spreadsheet (file name “20210323SalterCommentResponse”) that identifies comments and specific concerns raised by commenters, indicating that the comments were considered. The project record also includes a document (file name “Salter EA Changes based on Comments_060121”) that enumerates changes made to the final EA in response to public comment.

District Ranger Padilla has specifically noted that he has considered Objectors’ comments and other comments received in his Draft DN (pp. 5-9). Final EA (pp. 34-35) similarly addresses grouped issues. Final EA analysis relies on best available scientific information including CSE data from 2020 and peer-reviewed literature. Furthermore, District Ranger Padilla’s Draft DN (pp. 6-9) discusses issues and the public processes that surround them.

***Conclusion #7***

I find that the Responsible Official has considered the comments received by Objectors as issues or analysis in project record in compliance with regulations for an EA. There is no requirement to cite any particular body of science and District has demonstrated that it has considered relevant material and used area-specific and project-specific data, where appropriate.

***Issue #8***

Objectors allege that analysis of the effects of climate change on the project area, the effects of the project on climate change, and the effects of the project on carbon storage is insufficient.

***Analysis #8***

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives.

The 2013 San Juan National Forest Land and Resource Management Plan (LRMP) calls for forest vegetation management to be done in a manner that “anticipates climate-related plant succession changes (such as favoring heat- or drought-resistant tree species as leave trees, or in reforestation)” (section 2.9.1, p. 75).

Treatment of climate change in project-level NEPA analysis is guided by “Climate Change Considerations in Project-Level NEPA Analysis” (U.S. Forest Service 2009), which recommends consideration of both i) the effect of a proposed action on climate change, and ii) the effect of climate change on a proposed action.

Regarding the effect of the proposed action on climate change:

> The 2009 Agency guidance notes that "there will be some situations where quantitative analysis will be useful and others where qualitative analysis will best serve decisionmaking" (p. 4). Examples of the types of projects for which quantitative analysis may be required include "energy facilities, transmission lines, [and] oil & gas development or leases" (p. 4).
>
> Vegetation management activities such as those proposed in the Salter project have a small climate impact in the global context, and therefore a qualitative discussion about the potential for greenhouse gases sequestered and emitted is more appropriate. The EA provides a qualitative, ecosystem-based description of the small carbon fluxes associated with the proposed project in Appendix C (Final EA p. 109).

Regarding the effect of climate change on the proposed action:

> The Environmental Assessment refers to a 2014 Ecosystem Vulnerability Assessment to support its determination that the future vulnerability of the Ponderosa pine is "presumed stable." This determination is based on climate modeling performed by Crookston et al. (2010).
>
> The Draft Decision Notice states that the adaptive management approach will allow work to be modified "in response to both actively moving insect and disease outbreaks in and adjacent to the analysis area **and climate change**" (dDN p. 6, emphasis added). Table 6 ("Adaptive Management Actions") in the EA contains the following action associated with post-planting Silviculture: "2.9.1 Anticipates climate-related plant succession changes (such as favoring heat or drought-resistant tree species as leave trees, or in reforestation)" (Final EA p. 32). This approach will enable project implementers to be responsive to changing conditions on the ground, including succession changes due to climate change.

### *Conclusion #8*

Based on my review of the project record and referenced documents, and considering the size and scope of the project, I find that the Responsible Official adequately considered issues surrounding climate change. The level of analysis was consistent with agency guidance and of comparable depth to previous projects on the forest (such as the Lone Pine EA).

### *Issue #9*

Objectors allege that the EA does not include sufficient analysis of economic information, especially because economics is identified as part of the purpose and need.

### *Analysis #9*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives.

The Responsible Official determined that the need for the actions proposed in the Salter Project includes "Provide economic support to local communities by providing timber products to local industries in a sustainable manner" (final EA p. 11). Supporting the local recreation economy is not included in the purpose and need of the proposed treatment activities. However, impacts to recreation visitors and associated economic activity is disclosed in the EA socioeconomic (EA p. 58) and Recreation Activities and Experience (EA p. 52-60) sections.

The socioeconomic section of the EA (final EA p. 58-60) details the industry demand for fiber, saw log, products other than logs, as well as niche markets for beetle killed dead ponderosa pine—all products

that would be removed through the treatment activities. The analysis also documents the niche and limited demand for smaller diameter and inconsistent material that can result from vegetation management activities. The analysis demonstrates providing timber products to local timber harvesting and processing firms supports the local economy through jobs, labor income and value added in the forest sectors, as well as supporting sectors and industries.

The affected environment of the socioeconomic section documents the size of the travel and tourism sectors (final EA p. 57). The affected environment of the Recreation Activities and Experience section documents the high use of the recreation area within the project area (final EA p. 51-52). The socioeconomic section highlights survey data from general forest visitors' response to survey questions on their behavior if unable to visit the national forest (final EA p. 58). The socioeconomic section of the EA addresses this potential for displaced recreation visitors due to treatment activities and the potential negative impact that displacement may have on recreation visitor spending and associated economic activity in communities near the project area (final EA p. 58). Potential impacts from the proposed treatments to the local recreation economy were assessed and documented in the socioeconomic sections of the EA.

### *Conclusion #9*

Based on a review of the project record, I find that the Responsible Official adequately considered the effects of the proposed action on the economic environment. I find sufficient analysis of the economic effects of the modified proposed action on the local recreation economy. I also find the socioeconomic analysis to show the proposed treatments support the purpose and need.

### *Issue #10*

Objectors are concerned that project design elements related to recreation are insufficient. Specifically, concerns relate to a design element associated with minimizing effects to recreation from hauling over holiday weekends and to rerouting trails where they can't be avoided by haul routes. Objectors were concerned that their comments were not considered by the Responsible Official.

### *Analysis #10*

The regulation at 36 CFR 220.7(b)(2) states that an EA "shall briefly describe the proposed action and alternative(s) that meet the need for action." The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives. The regulation at 36 CFR 218.25(b) requires the responsible official to consider all written comments submitted and that all written comments received be placed in the project file and become a matter of public record. NEPA does not require an EA to include a specific response to comments.

The project record confirms the Forest Service received and considered the comments related to the recreation resource submitted by objectors; also see response to Issue #7.

A discussion with the San Juan National Forest Recreation Program Management Specialist established it was the judgement and experience of the forest specialists that determined the haul closure dates, as written, the closure dates would address the most problematic times of recreation use of the forest resources and holiday hauling (Final EA p. 24). Excluding the Mondays of Labor Day and Memorial Day was intentional. These days were not determined to be among the most problematic holiday days for the users of the recreation resources.

### *Conclusion #10*

I find that the design features are written appropriately to address the affected resources.

### *Issue #11*

Objectors are concerned that design elements related to protection of elk and northern goshawk are insufficient.

### *Analysis #11*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives. Forest Service Manual (FSM) 2672.42 describes the standards for Biological Evaluations.

The action alternatives analyzed in the Salter EA include specific design elements to protect elk habitat (Final EA p. 28). The two design features place temporal and spatial restrictions on management actions in coordination with Colorado Parks and Wildlife (CPW) expertise and guidance. These design features are intended to reduce the potential for temporary displacement of elk, in accordance with LRMP Guidelines 2.3.59 and 2.3.60 (Final San Juan National Forest Land and Resource Management Plan, pp. 36 & 37).

Effects to elk were analyzed in the Wildlife Report (project record) and disclosed in the EA (Final EA pp. 82 – 83). The EA described the potential for temporary displacement of elk due to project-related disturbance, but indicated that in the long term, habitat would benefit from an increase in foraging opportunities and an overall improvement in habitat quality due to increasing the resilience of pine stands to insect infestation (final EA p. 83).

The analysis described in the EA indicates an additional design element that was not included in the description of alternatives (final EA p. 83; also see Wildlife Report); my staff determined, in conversation with the ID team wildlife biologist, that the additional design element was referenced by mistake and is not intended as part of the proposed action.

Design features specific to goshawks were included in the action alternatives (Final EA p. 28) in order to avoid or minimize potential adverse effects to goshawks in alignment with Land and Resource Management Plan (LRMP) Desired Conditions 2.3.7, Guideline 2.3.49 and Table 2.3.2 (Final San Juan National Forest Land and Resource Management Plan Pg 33, 36 & 39 respectively). The EA describes the potential for short-term impacts due to effects to available habitat, and anticipates that these effects would last for about 10 years post-project implementation; however, improved forest resiliency is expected to improve habitat for northern goshawk in the long term. The Responsible Official determined, based on the analysis, that the project may impact individual goshawk but will not contribute to a trend toward federal listing or loss of species viability (final EA p. 79).

Management recommendations referenced by objectors (Reynolds et al 1992) do not apply in all cases or situations. The analysis completed for goshawk acknowledge the referenced recommendations and specifically the territory occupancy timeframes (EA Pg 76). The goshawk timing design feature is directly from the LRMP Guideline 2.3.49 (Table 2.3.2).

### *Conclusion #11*

I find that the EA sufficiently documented design elements associated with protection of elk and northern goshawks adequately in alignment with Land and Resource management Plan Guidelines, and that the analysis of effects to these species is sufficient to support the decision and Finding of No Significant Impact.

However, because the erroneous design element referenced in the EA and wildlife report may create confusion, I direct the Responsible Official to clarify in the final Decision Notice that the design element

described in the final EA, p. 83, is not included in the decision and provide rationale why the analysis of effects to elk would not be changed with that design element removed.

### *Issue #12*

Objectors are concerned that design elements related to invasive plant species are insufficient.

### *Analysis #12*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives.

The Final EA addresses invasive species. Project Design Features include six actions related to control and prevention of invasive plants (final EA p. 23). EA table 5 addresses the type and frequency of surveys (final EA pg. 31), and Table 6 describes actions and triggers associated with adaptive management (final EA pg. 33).

The final EA discusses presence and treatment of invasive plants in the project area (final EA pp 42-43); and the EA specifies that inventory and treatment of invasive plants is ongoing under previous NEPA decisions. The EA acknowledges that project activities may increase noxious weed establishment, but also discloses that Project Design Features are expected to reduce the likelihood of increased invasive plant establishment (Table 8, final EA p. 44).

### *Conclusion #12*

I find that the EA and its supporting documentation adequately address the presence of and likelihood of introducing invasive plants, and that the project incorporates sufficient measures to address existing invasive plant populations in the project area and to limit the risk of new invasive plant introductions.

### *Issue #13*

Objectors allege that the design features associated with temporary roads are vague and that effectiveness is not properly analyzed.

### *Analysis #13*

The regulation at 36 CFR 220.7(b)(2) states that an EA "shall briefly describe the proposed action and alternative(s) that meet the need for action. No specific number of alternatives is required or prescribed." The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives.

Design features associated with temporary roads are found in the EA under the Hydrology and Soils section (Final EA p. 22) and the Transportation section (Final EA p. 26). The hydrology design features are taken from the Watershed Conservation Practices Handbook (Forest Service Handbook 2509.25). These design features are considered the most effective practical means of preventing or reducing the amount of pollution generated by nonpoint sources (Watershed Conservation Practices Handbook p. 5). The Watersheds section of the EA outlines the specific design features included to minimize impacts from temporary roads (Final EA p. 69-72). These include holding temporary roads to the minimum number feasible and locating them sufficiently far from streams and other water bodies to minimize discharge into those waters except at stream crossings; building stream crossings with appropriate drainage features and stream crossings to provide for the flow and passage of sediment and to withstand expected flood flow; and locating stream crossings at straight and shallow locations (slope banks will not exceed 30 percent) where channels are hardened by gravel, cobble, or bedrock (Hydrology design elements 7 and 8; Final EA p. 22, 70). Transportation design feature 2 (Final EA p. 26)

states that the location and clearing widths of all temporary roads will be agreed to in writing before construction is started. Additionally, the majority of the temporary roads proposed (68.9 miles) are on non-system roads that are already on the ground (Final EA p. 63). These roads will be properly designed for the type of equipment that will be using them and will be decommissioned within 5 years after their first use (Final EA p. 22, 70). Decommissioning will involve re-contouring where significant side slope exists, elimination of ditches and other structures, out-sloping during construction, removal of ruts and berms, effectively blocking the road to normal vehicular traffic where feasible, and construction of drainage features such as cross ditches and water bars (Final EA p. 26).

### *Conclusion #13*

I find that the final EA sufficiently documented the specific design features necessary to reduce potential impacts from temporary roads. The design features are taken from the Watershed Conservation Practices Handbook, which is considered the guiding document for best management practices. The Responsible Official concluded that these design features would reduce potential impacts to an acceptable level. I do not see a need to address this further in the Decision Notice.

### *Issue #14*

Objector alleges a violation of NEPA due to failure to analyze effectiveness of mitigation measures. Objector appears to acknowledge that mitigation measures were not included, but maintains that design features are vague and inadequately analyzed.

### *Analysis #14*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives.

Design Features are part of the Action Alternatives (Final EA, pp. 20-29) and, therefore, have been analyzed in detail in Section 3 of the Final EA. Final EA (p. 20) notes “These design features come from a variety of sources including, but not limited to, Land and Resource Management Plan Standards and Guidelines, direction and guidance provided in Forest Service Handbooks and Manuals (including the Region 2 Watershed Conservation Practices Handbook), Vegetation Management Programmatic Agreement between the Forest Service and Colorado State Historic Preservation Officer (2017), and professional judgement.” Per FSM direction, the design features are generally included as contract terms (i.e., specific conditions, standard provisions or special provisions) where those actions such as logging are contracted. They are then monitored by a Forest Service Representative during and after implementation (FSM 2450).

### *Conclusion #14*

I find that the Responsible Official has properly included and analyzed design features in compliance with appropriate NEPA regulations (36 CFR 220.7(b)(3)).

### *Issue #15*

An objector asserts that the EA must incorporate monitoring of restoration of spatial structure using ICO method.

### *Analysis #15*

The regulation at 36 CFR 220.7(b)(2) states that an EA “shall briefly describe the proposed action and alternative(s) that meet the need for action. No specific number of alternatives is required or prescribed.”

Monitoring and Adaptive management are included and described in the Final Salter EA, pages 29-33, Tables 5-6. Table 5 clearly outlines the activities to be monitored but does not include monitoring of structural components such as individual, clump, and opening (ICO) Churchill et al. 2013), or group, individual, or clump (GCI) structures (EA, pgs. 12, 15; Project Record, Vegetation Analysis pg. 24). Table 5 does articulate monitoring of silvicultural prescription and fuel loading to determine treatment effectiveness relative to desired conditions and restoration (final EA p. 31).

### *Conclusion #15*

I find that the Responsible Official is consistent with the regulation at 36 CFR 220.7(b)(2) by clearly identifying and monitoring activities as they relate to silviculture prescriptions and post-treatment effectiveness.

### *Issue #16*

An objector alleges that the proposed action is flawed because the target basal area and the proposed diameter cap are not supported by best available science.

### *Analysis #16*

The regulation at 40 CFR 1502.23[1]states that, "Agencies shall ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents. Agencies shall make use of reliable existing data and resources. Agencies may make use of any reliable data sources, such as remotely gathered information or statistical models. They shall identify any methodologies used and shall make explicit reference to the scientific and other sources relied upon for conclusions in the statement."

The Responsible Official demonstrated they used the best available scientific information to determine basal area target and diameter cap; this is documented within the Final EA, pages 9-14.

The District refers to the use of best available scientific information in the following statement: "A comparison based on common stand exam data, Forest Vegetation Simulation modeling, and field observation between the current and desired conditions shows that the condition of the ponderosa pine cover type found within the Salter vegetation management activity area is different from the desired conditions associated with that vegetative cover type in the San Juan National Forest Land and Resource Management Plan." (EA, page 11)

The District describes selecting the target basal area and diameter cap in detail in the EA and provided in the following statement:

"Single tree selection prescriptions will all have the same basic components and will use a BDQ method where "B" is the desired residual basal area, "D" is the maximum tree size (all trees 26.9" and larger diameter at breast height will be retained in all stands) and "Q" describes the diameter distribution as a ratio of the number of trees in succeeding size classes. Based on stand exam data the general prescriptions will target a residual basal area of 50-to-70 ft2/acre with a mean or target of 66 basal area when conditions allow.

For the average stand in the project area, the residual basal area will be 60-to-68 ft2/acre depending upon the silviculture treatment. The maximum diameter to harvest will be 26.9" and the q-factor will be 1.3 (applied to 2 inch diameter classes). The residual stocking level of 50-to-70 ft2 was chosen to allow sufficient growing space to establish new regeneration while reducing severe fire risk and promoting

---

[1] The regulation at 40 CFR 1502 is specific to Environmental Impact Statements; however, pursuant to the regulation at 40 CFR 15019(g)(2), Section 1502.23 may be applied to EAs.

tree vigor. The maximum diameter of 26.9" addresses management objectives by providing a continuous supply of desirable saw timber products without allowing trees to progress into age related decadence while at the same time maintaining a large tree emphasis on the landscape. A q-factor of 1.3 keeps sub-merchantable trees fully stocked for the next cohort. The harvests will take place on a 20 to 25-year cutting cycle to allow for sufficient stand growth while at the same time keeping stand density within the target range." (EA, page 14)

Therefore, based on the best scientific information available and most recent inventory data, the District Silviculturalist has determined a 26.9" diameter cap and a basal area of 50-to-70 square feet per acre will meet the desired conditions stated in the San Juan LRMP (2013).

### *Conclusion #16*

I find the Responsible Official provides adequate documentation within the analysis, demonstrating the use of best scientific information available to determine the target basal area and diameter cap to achieve desired conditions stated within the San Juan LRMP (2013).

### *Issue #17*

An Objector alleges that the EA improperly relies on adaptive management because information required by regulation is not included in the analysis.

### *Analysis #17*

The regulation at 36 CFR 220.7 (b)(2)(iv) states that, "The proposed action and one or more alternatives to the proposed action may include adaptive management. An adaptive management proposal or alternative must clearly identify the adjustment(s) that may be made when monitoring during project implementation indicates that the action is not having its intended effect, or is causing unintended and undesirable effects. The EA must disclose not only the effect of the proposed action or alternative but also the effect of the adjustment. Such proposal or alternative must also describe the monitoring that would take place to inform the responsible official whether the action is having its intended effect."

Monitoring and Adaptive management are included and described in the final EA, pages 29-33, Tables 5-6. Table 5 clearly outlines the activities to be monitored and Table 6 outlines the threshold or undesirable effect that triggers a need for action to achieve desired conditions. I find the Final EA is consistent with 36 CFR 220.7(b)(2)(iv).

### *Conclusion #17*

I find that the Responsible Official provides adequate information in the analysis by clearly identifying adaptive management actions and monitoring activities as required by regulation.

### *Issue #18*

Objector alleges that the EA fails to take into account the cumulative effects of off-road vehicle recreation and does not feel that the design feature that addresses access to dispersed camping sites is adequate.

### *Analysis #18*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives. Objector alleges the requirements of NEPA have not been met regarding cumulative effects.

Final EA (p. 54) and 2020 Motor Vehicle Use Map notes off-road vehicle use is not permitted except in limited circumstances (i.e., limited big game motorized big game retrieval and dispersed camping) per

travel management decision issued under 36 CFR 212. Also, Final EA, p. 54 specifically addresses cumulative effects, "The Boggy Glade Travel Management Project resulted in some roads that were once open to public use being closed to public use or decommissioned. This will create minor displacement recreation activities that could overlap in time with the Salter Vegetation Management project." Objectors tie their concern to ability to successfully reclaim routes and resource concerns. The Final EA does consider resource concerns related to dispersed recreation. In addition to recreation design feature mentioned by Objector, there is a design feature for transportation (Final EA, p. 26) which includes, "Following use for harvest and treatment implementation, both temporary AND designed roads will be decommissioned, which involves re-contouring where significant side slope exists, elimination of ditches and other structures, out-sloping during construction, removal of ruts and berms, effectively blocking the road to normal vehicular traffic where feasible, and construction of drainage features such as cross ditches and water bars. Final acceptance of the closure will be made by the Forest hydrologist or engineering representative." Final EA (p. 72) considers dispersed use for watershed resources. Similarly, for wildlife, "Recreation opportunities within the area are expected to increase some, but they are not expected to become significant enough to reduce the functionality of any species' habitat." Final EA, p. 85. Further, it is not within the agency purview to speculate that illegal activities will occur.

### *Conclusion #18*

I find the Responsible Official has considered cumulative effects related to potential for increased accessibility of Forest lands in compliance with NEPA (36 CFR 220.7(b)(3)) and travel regulations.

### *Issue #19*

The objector alleges that the EA does not address the key differences between Alternatives 2 and 3, primarily in terms of forest resilience and timber economics.

### *Analysis #19*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives.

The Vegetation Analysis report (pp. 38-39) compares alternatives in relation to desired conditions which are related to forest resilience criteria. The report discusses the limitation of diameter caps and the effects of forest resilience in the following:

"Limiting prescription effectiveness with a blanket diameter cap such as alternative 3 has been applied to the "Large Tree Retention Areas" (LTR) of Lone Pine as study opportunity. Has shown the potential of limiting or even interrupting long term approaches to meeting desired conditions described in LRMP for ponderosa pine. The Lone Pine LTR study areas have shown a limitation on sanitation approaches within stands and forced the leaving of entire groups of trees infested with bark beetles. As management begins to bring stands back into an uneven aged state, volume or basil area that would normally be prescribed for harvest under an uneven aged management approach would be locked up in upper diameters under alternative 3."

In alternative 3 (EA, p. 66), an explanation of how diameter caps hinder forest health and resilience is provided:

"Large tree retention limits the ability to fully utilize the silviculture systems designated by the Land and Resource Management Plan. Therefore, alternative 3 meets the desired conditions described at 2.2.23 to a lesser degree than alternative 2 – Modified proposed action. The data indicates that the differences between alternatives 2 and 3 are associated with specific locations over time and over cutting cycles.

Preliminary feedback of Lone Pine EA Large Tree Retention study areas from post decision reconnaissance and layout of leave tree units have shown mixed results. The effects of applying a diameter limit appear to be more easily tangible at the fine scale. At the fine scale patches of bark beetle and heavily infested dwarf mistletoe trees have to be passed for removal due to the diameter limitation. Basal area retention goals and uneven aged characteristics are being compromised, leaving stands less resilient and making long term resistance less likely to occur.

Continuing in alternative 3 (EA, p.66), the following mentions a difference in timber economics:

“Removing areas from treatment as result of diameter limitation reduces the amount of treatment in an area and subsequently the amount of harvestable volume per acre.”

In the Vegetation Analysis report, Economics (pp. 40-41), the summary describes how the local markets are increasing in the recent past 5-6 years and how bids for various products have gone from “no-bid” to competitive bids for those products:

“The fiber demand of the local area based on current sales over the past 2 years will keep in

pace with what this EA can provide as a byproduct of the vegetation management activities to meet desired conditions. However, an increase in demand will result in competitive prices for fiber and the ability to utilize funds to perform service and stewardship items such as pre-commercial thinning.”

The “saw log” (=>9” DBH) market demand continues to increase with bid premiums seen on almost every sale including stewardship contracts within the last 4 years. Sales with premiums also included additional charges for brush disposal, essential KV and road maintenance which have caused no bid sales on the district in the past. The ability to include large volumes and achieve vegetation management at landscape level is possible with the current industry. Offering a mixture of saw log and smaller diameters timber in the right ratio is important to keep sales marketable. The size of these sales is equally important in both volume and acres to ensure the work is completed on time and has a sustained profitability.”

### *Conclusion #19*

I find that the Responsible Official adequately considered disclosed the economic effects of the action alternatives and, where applicable, demonstrated the differences between the action alternatives.

### *Issue #20*

Objector alleges that justification for preferred/selected alternative is not valid.

### *Analysis #20*

The regulation at 36 CFR 220.7(c) states that “A decision notice must document the conclusions drawn and the decision(s) made based on the supporting record, including the EA and FONSI.” Objector alleges that the decision was based on silvicultural methods instead of achieving the desired condition in the Forest Plan.

Project is designed to meet Forest Plan desired conditions for Management Area 5 and all project areas are within suitable timber base. Final EA, pp. 8-9. The desired conditions for the ponderosa pine cover type and lands managed for forest product offerings are further defined in sections 2.2.23 and 2.9.1 of the San Juan National Forest Land and Resource Management Plan (USDA 2013). Final EA (pp. 9-11) addresses how existing stands do not meet Forest Plan components. Silvicultural prescriptions are the tools used to meet desired conditions. Final EA at pp 12-13; Draft DN, pp. 1, 2-3, 12-13. Disagreements occur between Objector and District regarding how to meet the desired conditions based on old or large tree caps. See other issues addressed in this document. This does not invalidate analysis completed.

District used site-specific CSE data, analyzed NFMA requirements (Draft DN, pp. 12-16) and considered past fire suppression activities (Final EA, pp. 7-8) and insect outbreaks (Final EA, pp. 4- 5) that led to desired conditions not being met. Additionally, Final EA (p. 6) describes, "Generally, the project area is in fair to good health with areas displaying indicators of good future forest health conditions. The stands that have been treated within the last 15 years under earlier ponderosa pine management efforts, display many of the desired conditions identified in the Land and Resource Management Plan for ponderosa pine. These include a reduction in small diameter overtopped and suppressed trees and improved structural dynamics. Areas that have not been treated are over-stocked and lack disturbance." Lastly, it was articulated in Draft DN (pp. 5-8) why Alternative 2 was selected over Alternative 3 and acknowledged that environmental trade-offs do occur.

### *Conclusion #20*

I find the Responsible Official's decision is neither arbitrary nor capricious as it relates to selection of an alternative in meeting desired conditions. Draft DN relies on analysis completed and documents rationale and considerations for the decision.

### *Issue #21*

The objector asserts that the EA uses improper terminology ("group, clump and individual structure") and requests correction and use of best available science.

### *Analysis #21*

The regulation at 40 CFR 1502.23 states that, "Agencies shall ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents. Agencies shall make use of reliable existing data and resources. Agencies may make use of any reliable data sources, such as remotely gathered information or statistical models. They shall identify any methodologies used and shall make explicit reference to the scientific and other sources relied upon for conclusions in the statement."

Definitions of the terms "group, clump, and individual structure" are provided in the Vegetation Analysis report (p.22) "Focus on Groups/Clumps/Individuals and the final EA (p.12); the terms are discussed but are not specifically defined as "GCI."

### *Conclusion #21*

I find that the Responsible Official adequately analyzed and described their methodology and it is consistent with appropriate laws, regulations, and policies.

### *Issue #22*

An Objector asserts that information provided by the forest at a public meeting was not part of the NEPA process and alleges that the forest withheld useful information from the public.

### *Analysis #22*

Objector alleges that useful, visual informational materials from a public meeting in March 2020 were not included in the Draft EA. While there is no requirement to include this particular information (i.e., PowerPoint presentation) in the analysis. Documentation is required by 40 CFR 1508.9 for persons consulted and for public involvement in the decision notice per 36 CFR 220.7(c)(3). The Final EA at pp. 34-35 (Issues) and 85-87 and Draft DN at pp. 6-8, 9 meet these regulatory requirements. Moreover, the Draft DN (p. 9) and Final EA ( p. 86) state, "The information and recommendations provided by the collaborative have been given consideration in the design of the Salter Vegetation Management project.). Final EA (p. 86) also describes the collaborative (emphasis added):

> *As part of the Salter planning process, the Agency entered into an agreement with the DWRF Collaborative that described commitments and an overall goal of "transparent deliberation and discussion on all proposed projects".* ***The agency and collaborative have met on many occasions throughout the planning process to share information and exchange data. The agreement outlines the use of the collaborative exchange folder (CEF) to facilitate open exchange of information and data.*** *The CEF is located on the agency's corporate system and is accessible as an external shared link specifically for exchange of data, including: maps, geodatabases, inventory data, documents, etc. The CEF is also intended to be used by the Collaborative and other partners to share information with the agency of any desirable or undesirable trends that are being observed and to provide an avenue to discuss those trends or for further exchange of general information.*

### Conclusion #22

I find the Responsible Official has met the regulatory requirements 40 CFR 1508.9 and 36 CFR 220.7(c)(3)) related to public involvement.

### Issue #23

The objector asserts that the EA needs to provide scientific sources for "conditions influencing silviculture treatments" (draft EA p. 16) and explain other parameters, providing scientific references.

### Analysis #23

The regulation at 40 CFR 1502.23 states that, "Agencies shall ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents. Agencies shall make use of reliable existing data and resources. Agencies may make use of any reliable data sources, such as remotely gathered information or statistical models. They shall identify any methodologies used and shall make explicit reference to the scientific and other sources relied upon for conclusions in the statement."

Scientific sources that influenced silviculture treatments are provided in the Vegetation Analysis Specialist Report within the section "*Conditions Influencing Silviculture Treatments*" (Vegetation Report pp. 19-20) and in the EA under Section 2, Alternative 2 – Conditions Influencing Silvicultural Treatments.

### Conclusion #23

I find that the final EA and the Vegetation Analysis Specialist Report include appropriate scientific references that support the analysis and conclusions in those documents.

### Issue #24

An Objector disputes method for identifying pre-settlement trees and asks forest to adopt a 17" diameter cap for harvest.

### Analysis #24

The regulation at 36 CFR 220.7 states that an EA "Shall briefly provide sufficient evidence and analysis, including the environmental impacts of the proposed action and alternative(s), to determine whether to prepare either and EIS or a FONSI (40 CFR 1508.9)" and indicates that an EA "May incorporate by reference data, inventories, other information and analyses."

The method for identifying pre-settlement trees is stated in the EA, pages 6 & 16. The District determined during the stand inventory process that there is high variability between age classes relative to size diameter at breast height (Vegetation Analysis, pages 13-14). The District states: *"Data analysis is*

*a good guide for overall management but when in the field, visual characteristics have proven to be more reliable in determining age (GTR-110 2003 Huckaby etal.).”* (Project record, Vegetation Analysis page 14).

The District further states: “*CSE data will be used to establish a likely frequency and typical size of trees as a guide for tree markers. Of the 7,461 trees measured in 2020 within the treatment area the oldest tree cored and aged was 137 years old and had a diameter of 19.6 inches at Breast Height. While the largest tree measured was over 50” DBH. This demonstrates the variability within the age to size correlation and makes it necessary to rely on visual as well as data for indicators of pre-settlement trees within a stand. Including this type of data in marking guides will help the markers understand which tree sizes within a stand might have the potential of being pre-settlement in age.”* (Project record, Vegetation Analysis page 14).

Finally, the District states: “*Old-aged trees will be identified using a combination of physical characteristics including large diameter relative to other trees in the localized area, large diameter branches, irregular crowns, flat tops, tall height and canopy position and bark thickness, color and pattern. (Huckaby et al. 2003). When a determination of tree age cannot be made using physical characteristics, these trees will either be retained or assessed and documented at the harvest-unit scale to ensure old-aged trees are retained.”* (EA page 16).

The Final Salter EA addresses Dr. William Baker’s research paper from 2021. The IDT conducted a cursory review of findings to assess the relevance to the Salter project. The IDT found the focus of the paper was on wildfire resiliency and irrelevant to the concern of insect and disease (Draft DN, pgs. 5-6).

Therefore, determination of pre-settlement trees in the proposed action will be selected based on a combination of physical characteristics rather than tree size at DBH. When tree age cannot be determined using this method, trees will be assessed and/or retained and documented.

### *Conclusion #24*

I find that the Responsible Official provides adequate rationale that supports the method for identifying pre-settlement trees in the project area.

### *Issue #25*

Objectors suggested several minor edits to design features.

### *Analysis #25*

I reviewed the design features identified by objectors and discussed the suggested edits with the Responsible Official. After a thorough review of the design features in question, I agree with the Responsible Official that the current language is sufficient, meets the intent of the project, and provides sufficient clarity for implementation.

### *Conclusion #25*

I find that the design features, as written, are consistent with law, regulation and policy. No changes are necessary.

United States Department of Agriculture | Forest Service | San Juan National Forest | 15 Burnett Court
Durango, CO 81301
(970) 247-4874
Fax: (970) 375-2319

File Code: 1570

**Date:** October 22, 2021

Mr. William Baker
landscape@fastmail.com

Dear Mr. Baker:

This letter is in response to your objection to the draft Decision Notice (DN) and Finding of No Significant Impact (FONSI) for the Salter Vegetation Management Project, Dolores Ranger District, San Juan National Forest. I have read your objection and reviewed the project record, the draft DN/FONSI, and the final Environmental Assessment (EA). My review of your objection was conducted in accordance with the regulation at 36 CFR 218 (2013).

**PROJECT DESCRIPTION**

On July 21, 2021, the Dolores District Ranger released the Salter Vegetation Management Project EA, draft DN, and FONSI for objection. The District Ranger proposes to implement Alternative 2 in the draft decision, which authorizes the following:

- Single tree selection on 19,675 acres, harvested trees not to exceed 26.9 inches diameter at breast height (dbh);
- Commercial thinning on 3,115 acres, harvested trees not to exceed 26.9 inches dbh;
- Post fledging area thinning, pre-commercial thinning and brush thinning as appropriate in any treatment unit;
- Up to 117 miles of temporary road construction;
- Reduction of activity fuels through a variety of means;
- Installation of four wildlife guzzlers.

**OBJECTION ISSUE DISCUSSION**

The eligible objectors raised a number of concerns that fell under the themes of NEPA adequacy (adequacy of the analysis, adequacy of the purpose and need, consideration of reasonable alternatives and consideration of comments), use of best available science, effects related to climate change, effects related to economics, and impacts to the project area (impacts to aquatic/hydrologic resources, visuals and recreation, soils, wildlife, and vegetation).

The objection resolution meeting was held on September 8, 2021. I found the dialogue with all of the objectors helpful and thoughtful. I appreciate the passion and dedication of the objectors for the San Juan National Forest and the variety of resources it provides to the public. I understand the concerns raised and I also understand the balance that must be considered by the Responsible Official when it comes to managing forest resources. During the resolution meeting and subsequent conversations with objectors, I found that four specific concerns could be clarified in the final decision.

1. The district will provide Timber Operator with a handout detailing Town of Dolores requirements for logging trucks (enclosed).
2. The district will clarify in the Final Decision that all treatments that originate from the Salter and Plateau treatment areas and require the removal of forest products utilizing commercial log trucks will be required to utilize the western transportation route and will not travel through the Town of Dolores.
3. Clarify in the Final Decision that the Dolores District commits to initiating the NEPA analysis referred to in Recreation design feature No. 4 (i) in the EA (page 24), in calendar year 2022 and will complete the analysis prior to beginning implementation in affected blocks.
4. In the Final Decision, revise Scenery design feature No. 7 (page 26 of the EA) as follows: *A visual corridor will be established on each non-motorized system trail within Boggy Draw treatment block utilizing a 50-foot from center line area of influence. The recreation and timber staff will identify leave trees for retention, marking them with temporary paint or flagging. Protection of trees within 50 feet of center line of the corridor is intended to reduce scenic impacts by maintaining unique trail features such as tight turns or challenging obstacles that improve the feel and flow of a single-track trail as well as maintaining shade on groomed winter trails.*
5. Clarify in the Final Decision that the Dolores District commits to using the "descending order" tree evaluation decision process as described on page 17 (items *a* through *l*) of the EA within the Salter project area.
6. Clarify in the Final Decision that for Wildlife Design Feature 2b (page 28 of the EA), the percent post-fledgling family area canopy cover should be 50 percent or greater.

**CONCLUSION**
I conducted my review of the record, final EA and draft DN/FONSI. Based on my review, I conclude the following:

- The draft decision clearly describes the actions to be taken in sufficient detail that the reader can easily understand what will occur as a result of the draft decision.
- The draft decision considered a range of alternatives that was adequate to respond to the Purpose and Need for action. The purpose and need and alternatives considered in the final EA reflect a reasonable range of alternatives, consistent with law, regulation, and policy.
- The draft decision is consistent with Forest Plan and Comprehensive Management Plan standards and guidelines.
- The draft decision is consistent with policy, regulation, law, direction, and the final EA contains adequate evidence to support the decision. The record and final decision contain site-specific documentation regarding resource conditions, and the Responsible Official's draft decision document is based on the record and reflects a reasonable conclusion.
- For the sake of clarity, I am directing the Responsible Official to make these additional clarifications in the final Decision Notice:
    - The EA contains a discrepancy in how proposed temporary road mileage is described; I therefore direct the Responsible Official to address this discrepancy in the final Decision Notice and describe the correct mileage.
    - The EA's wildlife analysis and supporting specialist report identify a project design feature that was not included in those that were proposed to be authorized by the Responsible Official; I therefore direct the Responsible Official to clarify in the final

Decision Notice that the referenced design element is not included in the authorized activities and provide rationale why the analysis of effects to elk would not be changed with that design element removed.

This concludes my written review of the project. By copy of this letter and the enclosed response document, the Responsible Official may sign the decision after including the clarifications noted above, then notify interested and affected persons in accordance with the regulation at 36 CFR 218.12 and 36 CFR 220.7(d). This written response is the final administrative review by the Forest Service or the Department of Agriculture [36 CFR 218.11(b)(2)].

If you have any questions and/or concerns, please contact Mark Lambert at mark.b.lambert@usda.gov.

Sincerely,

KARA CHADWICK Digitally signed by KARA CHADWICK Date: 2021.10.22 13:53:59 -06'00'

KARA L. CHADWICK
Forest Supervisor

Enclosures - 2

**Town of Dolores Information for Pre-work Meetings with Timber Operator**

1. Montezuma County Road 31 turns into Town of Dolores 11th Street when the road crosses city limits and the speed limit is **15MPH.**
2. The Town of Dolores requires that all trucks hauling logs off of Forest Service contracts are equipped with Jake Brakes Mufflers
3. The town of Dolores requires that all trucks hauling logs off of Forest Service contracts do not deviate from 11th Street (go either left or right at junction of 11st (CR 31) and Railroad Ave (HWY 145)
4. Commercial truck traffic is not allowed on 11th Street from 10:00pm to 6:00am
5. The town of Dolores has the following ordinance for muffler requirements:
   **Dolores Municipal Code-Model Traffic Code Section 2-225. Mufflers - prevention of noise.**
   *(1) Every motor vehicle subject to registration and operated on a highway shall at all times be equipped with an adequate muffler in constant operation and properly maintained to prevent any excessive or unusual noise, and no such muffler or exhaust system shall be equipped with a cut-off, bypass, or similar device. No person shall modify the exhaust system of a motor vehicle in a manner which will amplify or increase the noise emitted by the motor of such vehicle above that emitted by the muffler originally installed on the vehicle, and such original muffler shall comply with all the requirements of this section.*
   *(1.5) Any commercial vehicle, as defined in section 235 (1) (a), subject to registration and operated on a highway, that is equipped with an engine compression brake device is required to have a muffler.*
   *(2) A muffler is a device consisting of a series of chamber or baffle plates or other mechanical design for the purpose of receiving exhaust gas from an internal combustion engine and effective in reducing noise.*
   *(3) Any person who violates subsection (1) of this section commits a class B traffic infraction. Any person who violates subsection (1.5) of this section shall, upon conviction, be punished by a fine of five hundred dollars. Fifty percent of any fine for a violation of subsection(1.5) of this section occurring within the corporate limits of a city or town, or within the unincorporated area of a county, shall be transmitted to the treasurer or chief financial officer of said city, town, or county, and the remaining fifty percent shall be transmitted to the state treasurer, credited to the highway users tax fund, and allocated and expended as specified in section 205 (5.5)(a), C.R.S.*

Forest Service
U.S. DEPARTMENT OF AGRICULTURE

Rocky Mountain Regional Office — Sept. 2021

# Response to Objections on the Salter Vegetation Management Project on the San Juan National Forest

## Objectors

Molly Pitts, Intermountain Forest Association
Tim Kyllo, Montrose Forest Products, LLC
William L. Baker, PhD.
Edward B. Zukoski, Center for Biological Diversity/Adam Rissien, WildEarth Guardians
Jimbo Buickerood, San Juan Citizens Alliance

## Organization of this Document

Due to the number of objectors and the similarity between several of the objections, I as the Objection Reviewing Officer elected to lump objection issues to the extent possible. This approach allowed for increased efficiency in reviewing and responding to objection statements.

## Objection Statements and Responses

### *Issue #1*

This issue relates to Objectors' concerns that the affected environment was not sufficiently described in the EA; Objectors allege insufficient location information was provided for a variety of resources, that baseline information was not provided and that common stand exam (CSE) data were not provided to the public. Objectors contend that this constituted a violation of NEPA.

### *Analysis #1*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives; there is no requirement for an affected environment section in an EA.

The final EA (p. 1-8) provides context of the affected environment (also called existing condition or environmental baseline), which indicates that age and size are variable and provides average basal area. Project Design Features (Final EA pp. 20-29) indicate where additional surveys or layout requirements are needed to ensure that the affected environment and effects analysis align. Each resource in Section 3 of the Final EA addresses affected environment (Final EA pp. 35 – 85). Of specific note, the Final EA affected environment describes the affected watersheds and riparian areas (Final EA pp. 67 and 68) and where sensitive soils occur (EA p. 68). Additional baseline information for other species is included in the project Biological Evaluation (BE; Project Record). Detailed maps displaying locations of treatment units by treatment type, transportation system, proposed temporary roads, goshawk post-fledging areas, trails and streams are included in Appendix A of the Final EA.

Common stand exam (CSE) data, which comprise on-the-ground site-specific information, were referenced in the Final EA (Final EA pp. 6, 11, 12, 14). While CSE data in raw format are not included in the Final EA, data are summarized in the Timber Silvicultural Report in the project file.

Also see response to Issue #4.

### *Conclusion #1*

I find that the Responsible Official has taken the required hard look at existing conditions and that the description of affected environment is consistent with applicable regulation

### *Issue #2*

This issue relates to Objectors' allegation that the EA fails to accurately describe and document effects of temporary roads and skid trails. Objectors claim that mileage of temporary roads is inconsistently described and there is a lack of site-specificity, which objectors claim is a violation of NEPA.

### *Analysis #2*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives; there is no requirement for an affected environment section in an EA.

The Transportation section of the EA states that 106 miles of temporary road will likely be required for project implementation; this consists of 69.8 miles of existing non-system roads and 36.4 miles of new ground disturbance (Final EA p. 63). In order to account for on the ground layout, an additional 10% (11 miles) was added to the anticipated temporary road mileage (Final EA p. 63; DN p. 4); therefore a total of 117 miles of temporary roads were analyzed. Appendix A of the EA provides maps of proposed temporary road locations (Final EA p. 92-97).

The EA does state that 50-75 miles of temporary road construction are analyzed under this proposal Final EA p. 19). The District clarified that this was a mistake in the final EA, and that the mile estimates disclosed in the Transportation section are correct.

The EA contains a general description of temporary roads being constructed with minimal disturbance (length and width), proper drainage, and appropriate stream crossings to withstand flood flows (Final EA pp. 19, 22, 26, 63 and 70) and a statement that all drainage structures on roads will be inspected by the Timber Sale Administrator, Engineering Representative or Forest hydrologist at treatment completion to make sure they are in good condition. Hydrology and Soils Design Feature #7 states that temporary roads will be held to the minimum number feasible and will be located sufficiently far from streams and other water bodies to minimize discharge into those waters except at stream crossings (Final EA p. 22).

The EA states that all temporary road segments will be decommissioned within five years after first use (Final EA p. 19). Transportation Design Feature #2 (Final EA p. 26) states that the location and clearing widths of all temporary roads will be agreed to in writing before construction is started and that all temporary roads will be decommissioned after use, which involves re-contouring where significant side slope exists, elimination of ditches and other structures, out-sloping during construction, removal of ruts and berms, effectively blocking the road to normal vehicular traffic where feasible, and construction of drainage features such as cross ditches and water bars.

Hydrology and Soils Design Feature #5 describes skid trails as being perpendicular to the slope as much as possible, outside of drainages, and away from sustained steep slopes (greater than 40 percent) and specifies that they will be located and designed to disperse runoff and minimize soil disturbance (Final EA pp. 21 and 70). Hydrology and Soils Design Feature #4 states that skidding will not be allowed in wetlands, wet meadows and riparian areas (Final EA pp. 21 and 71). There is a no treatment buffer zone around riparian and wetland areas (Final EA p. 21). Skid trails will be closed after use by adding waterbars or outsloping and spreading slash (Final EA p. 21).

Effects to resources are based on the design features as described above. The final EA includes discussion of the effects of temporary roads and road use on invasive plants (final EA pp. 42-43), grazing (final EA pp. 46-47), rare and sensitive plants (final EA p. 49), recreation (final EA pp. 52-54), transportation (final EA pp. 61-64), watersheds, soils and water quality (final EA pp. 70-72), and wildlife (final EA pp. 78-79). The final EA also indicates that businesses local to the project area may complete roadwork, creating a minor local socioeconomic effect (final EA p. 60).

The EA mentions a process by which a temporary road system will be developed as described in the Project Design Features (Final EA p. 63), but this process is not found in the Transportation Design Features of the EA. I directed my staff to talk to the project's Roads Engineer; the following is standard operating procedure for the development of a timber sale transportation system, and was therefore not included in the EA. It will be included in the sale contract language:

1. Roads to be used for hauling or equipment access will be used in the following order of preference:
   a. First preference is to use National Forest System Roads identified on the Motor Vehicle Use Map for general public use. These roads are maintained in an "open"' status with either gravel surface (ML3) or native surface (ML2).
   b. Second preference is to use ML1 roads (only open to limited administrative use), which might require reconstruction (e.g., removal of trees and shrubs, reshaping, blading, adding surface material or installing drainage features). After use the road would be put back in ML1 status or decommissioned. Consult with Forest engineering staff and project hydrologist for input on road reconstruction.
   c. Third preference is to use existing unauthorized roads (which would be considered temporary roads and obliterated when use is complete). Roads in this category might require removal of trees and shrubs, reshaping, blading, adding surface material, installing drainage features, etc.
   d. Fourth preference is to create temporary roads. The Forest Service and the purchaser/contractor shall agree upon locations of temporary routes, resource protection requirements employed during road construction, clearing widths, and closure or rehabilitation requirements, which must be consistent with all design elements and implementation requirements of the Lone Pine EA.
2. Temporary roads must be seeded and closed within five years after final use.
3. Temporary roads shall be designed to the minimum standard for their use and be located to "roll" with the terrain as feasible.

### *Conclusion #2*

I find that the final EA adequately described and documented the location and effects associated with temporary roads.

For the sake of clarity and given the oversight in the final EA related to mileage of temporary roads, I will direct the Responsible Official to clarify the mileage in the final Decision Notice.

### *Issue #3*

This issue relates to objectors' allegation that the range of alternatives documented in the EA is insufficient. Specific concerns relate to the EA not considering an alternative that limits removal of large trees, and not considering multiple uses when developing the range of alternatives.

### *Analysis #3*

The regulation at 36 CFR 220.7(b)(2) states that an EA "shall briefly describe the proposed action and alternative(s) that meet the need for action. No specific number of alternatives is required or prescribed." Objectors allege the requirements of NEPA (40 CFR 1502.14) have not been met; it should be noted that the regulation at 40 CFR 1502 is specific to Environmental Impact Statements and is not applicable to an EA, except as described in 40 CFR 1501.5(g).

Alternative 3, which was developed to address commenters' concerns about cutting of large or old trees, was fully developed (Final EA pp. 29-30, 35). Alternative 3 limited the removal of trees over 20"

and was intended to emphasize large tree retention. Common Stand Exam data collected for the project indicate there is not necessarily a correlation between tree size and tree age within the project area (Final EA, pp. 3, 6-7, 11). The District identified specific prescriptions and prioritized additional considerations for determining which trees met old and large requirements (Final EA, pp. 14-17).

Objector also wishes an additional alternative to be considered that didn't include harvesting trees over 16 inches DBH or larger since there is minimal difference between Alternatives 2 and 3. This appears to have originated from Objector's March 22, 2020 comment letter (emphasis added):

> *We therefore request that the Forest Service consider an alternative that will: retain large trees, **either** larger than 16" DBH **or** 20" DBH, and any old trees, as determined by their size, appearance and morphology. The size of the cap may depend on the results of stand exam data. To the extent that the CSE data show few if any trees 20" DBH or larger, the Forest Service should consider a smaller diameter cap to protect the largest trees that remain.*

The district considered a publication "Diameter Caps and Forest Restoration: Evaluation of a 16" Cut Limit on Achieving Desired Conditions Southwestern Region" (Final EA. p. 66). This document was reviewed in relationship to findings from the adjacent Lone Pine project implementation. Final EA, p. 66 provides rationale based on existing conditions, "Removing areas from treatment as result of diameter limitation reduces the amount of treatment in an area…" While a specific alternative was not addressed related to a 16" diameter, the Final EA (p. 4) specifies the "12-25 inch size class is the most represented on the landscape with reduced representation as the diameter increases" This provides additional rationale for not considering smaller diameter trees as the cut off toward meeting desired basal area. A 16" cap appears to represent an average-sized tree in this area, not one that was exceptionally large or necessarily old (Final EA, Figure 4). A standard diameter for old growth was not specified for ponderosa pine in the SJNF's Forest Plan.

One objector expressed that the range of alternatives is invalid because it didn't include "multiple uses;" however, I find that the proposed action and Alternative 3 were developed to be consistent with objectives identified in the LRMP for Management Area 5, which provide for active management in order to meet multiple-use goals (EA pg. 8). By maintaining consistency with LRPM direction for Management Area 5, the District allowed for multiple uses in the project area. The various uses in the project area were considered in alternative development, including project design, and effects to these resources were disclosed in Chapter 3 of the EA.

The draft Decision Notice (p. 8) includes discussion of alternatives considered and how public comments were used in modifying the proposed action and developing another action alternative.

### *Conclusion #3*

I find that the Responsible Official has considered an adequate range of alternatives, consistent with regulation.

### *Issue #4*

Objectors allege that the Salter Vegetation Management project is inconsistent with the San Juan National Forest Land and Resource Management Plan (LRMP) in a number of ways, including deficiencies in addressing Historical Range of Variability (HRV) and ecosystem management, failure to meeting LRMP objectives for ponderosa pine forest, use of a 26.9" diameter limit and logging of presettlement trees.

### *Analysis #4*

The San Juan National Forest Land and Resource Management Plan (LRMP) states that the Historical Range of Variability (HRV) "can be used to establish an ecological baseline." It also states that the intent is not to mandate that HRV conditions be achieved in all cases (LRMP p. 12). The San Juan LRMP states that Ecosystem Management, which uses HRV for reference, will be implemented by maintaining or restoring the composition, structure, function, and physical environment of ecosystems" (LRMP p.13). The LRMP does not include specific requirements related to the Ecosystem Management approach.

The Ecosystem Management section of the LRMP also states that many ponderosa pine forests on the SJNF are currently outside their HRV in terms of vegetation stand structure and fire frequency. Ponderosa pine forests have fewer acres in both young and old growth development stages and have less diversity and less cover of native grasses compared to HRV conditions (LRMP p. 18). The desired condition for ponderosa pine forests described in the LRMP is for forests to display variable density and structure reflecting uneven-age structure comprising variable-sized trees (LRMP p. 20).

The San Juan LRMP states that there are many opportunities for vegetation management and that the timber program will focus treatment on "landscapes at high risk for developing epidemic levels of insect and/or disease infestation; landscapes where disturbance has resulted in dead or dying trees…" (LRMP p. 73). One of the objectives outlined in the LRMP states that the most common applications of timber harvest to meet the desired condition could be to conduct thinning-with an emphasis on restoration and fuels reduction of altered forest types-in ponderosa pine and warm-dry mixed conifer vegetation types on approximately 15,000 to 20,000 acres: (LRMP p. 75). Objectives in the LRMP are defined as aspirations, not commitments or final project decisions (LRMP p. 6).

The EA describes the current condition of the forest in the project area and references modeling that was done to suggest two underrepresented size classes relative to the stand structure. These include large trees (greater than 27" DBH) and seedlings and saplings (EA p. 4). Also included within the project area are plantation areas. This has resulted in areas within the project where the diversity is both desired and undesired. Beetle mortality in the over story and density induced mortality is also present (EA p. 4). These infestations are growing and appear to be moving to the east. Data obtained from two consecutive years of flights show a general expansion of the beetle infestation and indicates a need to establish an uneven-age stand structure to increase resistance to beetle infestation and promote resilience (EA p. 5). The EA provides a description of the age and size class of ponderosa pine found within the project area (Final EA p. 6).

The analysis states that a comparison between the current and desired conditions was done utilizing common stand data and that Forest Vegetation Simulation modeling and field observation shows that the condition of the ponderosa pine cover type within the project area is different from the desired condition (DN p. 1, Final EA p. 11).

The dbh limit was set at 26.9 inches due to this size class being underrepresented in the treatment area (Final EA p. 6). There is a description of the stand exam inventory that was done in the project area which describes that using the dbh of trees does not correlate well to the age of the tree. Therefore, it is necessary to rely on visual, as well as size correlation to determine pre-settlement trees within a stand (Final EA p. 6). The forest will use stand exam data to establish likely frequency and typical size of old trees within a stand as a guide for tree markers at the prescription level, which will help to avoid harvesting pre-settlement trees (Final EA p. 6). The draft DN outlines the rationale behind why choosing a smaller dbh limit would not meet the purpose and need of the project (dDN p. 6).

### *Conclusion #4*

I find that Responsible Official provided adequate information in the analysis to show that the proposed action meets direction outlined in the San Juan Land and Resource Management Plan (LRMP).

### *Issue #5*

Objectors allege that the purpose and need for the Salter Project is flawed for a variety of reasons, including that it is too narrow and does not account for multiple uses in the project area, is not valid regarding brush removal over 5,000 acres, and does not provided site-specific data. Objectors further allege that because the purpose and need for Salter is different than the purpose and need for the nearby Lone Pine project, it is arbitrary.

### *Analysis #5*

The regulation at 36 CFR 220.7(b)(1) states that an EA, "…must briefly describe the need for the project."

The purpose and need for the Salter Project relies on site-specific data. Common Stand Exams (CSEs) have been conducted in the project area and proposed actions are specific to this project.

Common stand exam data, which is on-the-ground site-specific information, were referenced in multiple sections of the Final EA (Need for this Proposal and Modified Proposed Action). Basal area was addressed in response to recent fires at Final EA pp 11. The District states the following in regard to purpose and need to achieve desired conditions:

> The desired conditions for the ponderosa pine cover type and lands managed for forest product offerings are further defined in sections 2.2.23 and 2.9.1 of the San Juan National Forest Land and Resource Management Plan (USDA 2013) (final EA, p. 9).

Further:

> A comparison based on common stand exam data, Forest Vegetation Simulation modeling, and field observation between the current and desired conditions shows that the condition of the ponderosa pine cover type found within the Salter vegetation management activity area is different from the desired conditions associated with that vegetative cover type in the San Juan National Forest Land and Resource Management Plan.
>
> The structure and size class distributions in the stands identified for this analysis are not within desired conditions described in 2.2.23 based on field reconnaissance and inventory data. Bark beetles have infested adjacent landscapes causing significant mortality. The early stages of a bark beetle infestation are now being observed in the Salter project area. There are portions within the Salter project area that have been moderately burned by wildfire and there are immediately adjacent areas that have been severely impacted by wildfire. It is well documented that dense, over-stocked, even-age, closed canopy ponderosa pine stands are more susceptible to insect outbreaks (Negron et al. 2008). It is also is well documented that a lack of structural diversity corresponds directly to a reduction in forest resiliency and consequently long term resistance to detrimental natural and human disturbance events, such as, large-scale stand replacing fires (Canard 2013, Negron et al. 2008, Negron et al. 2000, USDA-rmrs_2009_gibson_k0022000) (final EA, p.11).

Approximately 34 percent of the Salter project area has been impacted by fire in the past 10 years. The District states: "The majority of disturbance is due to the 2018 Plateau Wildfire, which burned nearly 20,000 acres during exceptional drought. This fire reduced basal area across the footprint by approximately 32 percent, with most of the fire area (58 percent) experiencing between a 0-to-25 percent reduction in basal area (US Forest Service Rapid Assessment of Vegetation Condition after Wildfire, 2018)" (final EA, pgs. 39-40).

Further, the District has outlined current stand conditions in the following statement: "The average basal area of 336 stands measured in 2020 was 112 $ft^2$/acre and included a range of 12 $ft^2$/acre to 236

$ft^2$/acre. Of the 336 stands measured, the majority of the stands in the project area have basal areas over 100 $ft^2$/acre (200 stands). Seventy-two stands had basal areas over 140 $ft^2$/acre (twice the preferred basal area target)" (final EA, pgs. 6-7).

Therefore, the reduction in basal area by 32 percent across the fire footprint did not achieve the desired effect of 50-70 $ft^2$/acre as shown in the 2020 CSE data output above. Commercial thinning to a 50-70 basal area per acre will only occur depending on current stand conditions, as shown in Table 2, "Vegetation treatment type and treatment description" in the final EA, pages 12-13.

Further rationale and data to support the purpose and need can be found in the Project Record (Vegetation Analysis pp. 27 -39).

Regarding objectors' concern related to the differences between the purpose and need for Salter as opposed to the nearby Lone Pine project, the Final EA at p. 65-66 to describes the differences in Salter's basal areas based upon field recent field observations during the implementation of the Lone Pine project:

> *Preliminary feedback of Lone Pine EA Large Tree Retention study areas from post decision reconnaissance and layout of leave tree units have shown mixed results. The effects of applying a diameter limit appear to be more easily tangible at the fine scale. At the fine scale patches of bark beetle and heavily infested dwarf mistletoe trees have to be passed for removal due to the diameter limitation. Basal area retention goals and uneven aged characteristics are being compromised, leaving stands less resilient and making long term resistance less likely to occur. Removing areas from treatment as result of diameter limitation reduces the amount of treatment in an area and subsequently the amount of harvestable volume per acre. The effects described for the small scale are also documented from the mid-scale and potentially the landscape scale (USDA 2013d; USDA 2011).*

These observations indicate that basal area requirements were not factoring in the extent of insect and disease in the area. Final EA (p. 86) states: "The Salter Vegetation management project proposes an adaptive management approach intended to accommodate changing conditions and additional strategies to achieve the identified desired conditions." Final EA (pp. 29-30) describes the adaptive management and monitoring process.

Regarding brush treatment, the purpose and need is stated in the Final EA, pages 7, 13, and 15-16; and the Vegetation Analysis report, page 10. The final EA indicates that Gambel oak dominates the understory in many of the stands and outcompetes young pines and seedlings for essential light, moisture, and nutrients (final EA, pg. 15). The District states: *"This competition for limited moisture is probably most detrimental to pine when the trees are very young and seedlings are competing directly with the extensive oak layer. Pine germination and establishment will also likely be hindered when micro sites are fully occupied by oak and heavy leaf litter covers mineral soil. Some research has even indicated a possible inhibiting allelopathic effect of oak leaves on pine germination (Harrington 1987)"* (Project Record, Vegetation Analysis, p. 10).

Regarding the EA's statement that seedlings are an underrepresented size class (final EA p. 16), this is supported by the Vegetation Analysis report, which states:

> *There is also the ability for good establishment of seedlings and regeneration as seen in stands currently meeting desired conditions in LRMP or areas that have seen various types of disturbance. As seen in the structure of areas of stands during field reviews cone crops can be episodic in nature leading to very patchy and variable regeneration. Yet where represented it*

> *often has 400 to 500 seedlings per acre. This size class is the other under-represented component of stands' structures identified for treatment* (Vegetation Analysis report, p. 6).

The Vegetation Analysis report further describes the relationship between overstocking of Gambel Oak and understocking of conifer seedlings:

> *The understory/shrub layer is overwhelmingly comprised of Gambel oak with minimal growing space available for seedlings and saplings. In case of Ponderosa Pine numbers this component of structure is lacking and mostly a monoculture of Gambel oak* (Vegetation Analysis report, p. 14).

Regarding Objectors' concerns that "desirable conditions" described by the Dolores Watershed Resilient Forest Collaborative (DWRF) were not considered, The District states the following on the collaborative process and consistency with *Ponderosa Pine Ecosystem Resilience Metrics and Desired Conditions*:

> *Through efforts like the Rocky Mountain Restoration Initiative and the Collaborative Landscape Restoration Forest Restoration program, DWRF collaborative members have identified treatment priorities for areas within the DWRF upper Dolores River watershed, which includes the Salter landscape. This provides information to the agency to take into consideration when determining treatment priorities. The collaborative has also identified a set of ponderosa pine desired conditions that outlines components of ponderosa pine forest resiliency that are a priority for the collaborative (DWRF. 2020. Ponderosa Pine Ecosystem Resilience Metrics and Desired Conditions). The desired conditions developed by the collaborative are consistent with and integrate well with the standards and guidelines identified in the Land and Resource Management Plan for this landscape. The information and recommendations provided by the collaborative have been given consideration in the design of the Salter Vegetation Management project"* (final EA, pg. 86).

Finally, regarding Objectors' concerns that the purpose and need doesn't include multiple uses in the project area, NEPA does not require that multiple uses within a specific project area need to be part of every proposal. Multiple uses have, however, been considered in the effects analysis in Section 3 of the Final EA. Numerous design features protect multiple uses (final EA, pp. 20-29).

Also see response to Issue #3.

### *Conclusion #5*

I find that the purpose and need for the Salter Project was properly focused on vegetation conditions and was based on best available science and site-specific information.

### *Issue #6*

Objectors allege that the Salter Project will result in significant impacts and therefore requires preparation of an EIS; specific concerns relate to the effects of skid trails and 177 miles of temporary roads, logging on 35 square miles of forest land and duration of project (10 years) on soils and watersheds. Objectors also allege significant effects to the northern goshawk and to presettlement ponderosa pine.

### *Analysis #6*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives.

The rebulation at 40 CFR 1508.13 describes a Finding of No Significant Impact (FONSI) as:

> "Finding of no significant impact means a document by a Federal agency briefly presenting the reasons why an action, not otherwise excluded (§1508.4), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared. It shall include the environmental assessment or a summary of it and shall note any other environmental documents related to it (§1501.7(a)(5)). If the assessment is included, the finding need not repeat any of the discussion in the assessment but may incorporate it by reference."

The final EA states: "This environmental assessment is prepared to determine whether the effects of the proposed action may be significant and therefore warrant the preparation of an environmental impact statement……Consistency findings are disclosed in the individual resource-specific environmental effects section of this environmental assessment" (Final EA, page 1).

Anticipated effects to soils and watersheds are documented in the EA (p. 69-72). Erosion and runoff will be minimized due to the application of design features (EA p. 21-22, 26, 71). There is an acknowledgement that the proposed action will result in a small, temporary increase in runoff due to water running off compacted areas immediately after harvest and that the effects will be of limited extent and severity due to several factors described (EA. p. 70). There is also an acknowledgment that soil erosion will occur as a result of temporary road construction and that some sediment delivery to ephemeral and intermittent streams is expected at stream crossings, but that these effects will be short-term and of limited intensity (EA p. 70). Road density will not increase in the watersheds and is within the Forest Plan guidance (EA p. 67-68, 70). Road maintenance will occur on more roads in the area improving the overall road condition (EA p. 65).

The method for identifying pre-settlement trees is stated in the EA, pages 6, 16-17. The District determined during the stand inventory process that there is high variability between age classes relative to size diameter at breast height (Vegetation Analysis, pages 13-14).

The District states: *"Data analysis is a good guide for overall management but when in the field, visual characteristics have proven to be more reliable in determining age (GTR-110 2003 Huckaby etal.)."* (Project record, Vegetation Analysis page 14).

The District further states: "*CSE data will be used to establish a likely frequency and typical size of trees as a guide for tree markers. Of the 7,461 trees measured in 2020 within the treatment area the oldest tree cored and aged was 137 years old and had a diameter of 19.6 inches at Breast Height. While the largest tree measured was over 50" DBH. This demonstrates the variability within the age to size correlation and makes it necessary to rely on visual as well as data for indicators of pre-settlement trees within a stand. Including this type of data in marking guides will help the markers understand which tree sizes within a stand might have the potential of being pre-settlement in age."* (Project record, Vegetation Analysis page 14).

The District outlines the following indicators for evaluating pre-settlement trees:

*"Tree evaluation will be accomplished through a descending order of choice made by the designator. Evaluation occurs at every step of the decision-making process applying sound judgement based on parameters from the analysis and direction from a certified silviculturist. Below is an example of a descending order of choice that will be used to evaluate trees and ultimately designated them for removal if the stand has a basal area greater than 50 ft2/acre.*

*a. Tree can be evaluated for harvest if it is less than 27.0 inch DBH*
*b. Do not cut trees with a combination of pre-settlement visual indicators*
*c. Cut dead trees (brown or red needles/no needles)*
*d. Cut live trees with visible evidence of bark beetle infestation (e.g., pitch tubes, frass, and woodpecker activity on tree bole)*

*e. Cut live trees with dwarf mistletoe infecting more than 50% of the live crown*

*In addition to b-e above, trees 25 inch DBH and less can also be cut if they meet the following condition or structure.*

*f. Live crown declining more than 25% including poor needle conditions*
*g. Evidence of conks, cankers or advanced decay*
*h. Weak or multiple forks*
*i. Broken or dead tops*
*j. Leans greater than 35%*
*k. Grossly poor form*
*l. To achieve a basal area target within 50-70 ft2/ac.*

*When all components are represented, uneven-aged stand structure mirrors a reverse J curve when graphed (Refer to the Vegetation Report). Most stands are not this uniform, and adjustments will be made on a stand level basis to begin moving toward a more traditional uneven aged structure. The reverse J curve is a model and does not account for variability caused by additional desired conditions such as group, clump and individual structure, tree retention for aesthetics, old and large tree retention or supplementary resource based design elements. Each stand will have a different approach to uneven aged management from the current benchmark to achieving the desired structure, while meeting design elements. This provides flexibility in prescription writing an essential component of this analysis and ultimately meeting desired conditions."* (EA, page 17)

Therefore, pre-settlement trees will be retained if they do not meet the above indicators and each stand will require a unique approach in prescriptions to achieve desired conditions while meeting design elements.

Regarding northern goshawk, Forest Service Manual 2672.42 describes the standards for Biological Evaluations and 2672.43 outlines the procedure for conducting a Biological Evaluation.

The analysis of effects to goshawks is documented in the EA (Pg 73, 76-80) and BE (Pg 36-41). The analysis determination states, "…effects are expected be short-term (less than 10 years) and the long-term (more than 10 years) impacts are intended to be beneficial by providing higher quality habitat that is well distributed in the future. Two design features that place temporal and spatial restrictions on management actions were developed to minimize adverse effects (EA Pg 28, Fig 15 of App A). A specific harvest treatment was developed with technical input from the district wildlife biologist and "designed to improve the overall stand functionality and improve growth rates by reducing trees per acre while maintaining or promoting a relatively closed canopy structure to meet goshawk habitat." (EA Pg 15).

The draft Decision Notice includes a Finding of No Significant Impact, which is well-supported by the final EA and the project record (draft DN pp. 10-13).

### *Conclusion #6*

I find that the Responsible Official has found that the Salter Vegetation Project would not result in significant impacts to the human environment and has provided sufficient evidence, supported by the final EA and project record, in the Decision Notice.

### *Issue #7*

Several Objectors allege that NEPA is violated because comments they submitted during the scoping period and/or the comment period were not acknowledged or responded to; Objectors allege a violation of the NEPA regulations at 40 CFR 1503.1 and 1503.4.

### *Analysis #7*

The regulation at 36 CFR 218.25(b) requires the responsible official to consider all written comments submitted and that all written comments received be placed in the project file and become a matter of public record. NEPA does not require an EA to include a specific response to comments.

The regulations cited by the Objectors are specific to Environmental Impact Statements and do not apply to EAs.

The Salter project record includes an Excel spreadsheet (file name "20210323SalterCommentResponse") that identifies comments and specific concerns raised by commenters, indicating that the comments were considered. The project record also includes a document (file name "Salter EA Changes based on Comments_060121") that enumerates changes made to the final EA in response to public comment.

District Ranger Padilla has specifically noted that he has considered Objectors' comments and other comments received in his Draft DN (pp. 5-9). Final EA (pp. 34-35) similarly addresses grouped issues. Final EA analysis relies on best available scientific information including CSE data from 2020 and peer-reviewed literature. Furthermore, District Ranger Padilla's Draft DN (pp. 6-9) discusses issues and the public processes that surround them.

### *Conclusion #7*

I find that the Responsible Official has considered the comments received by Objectors as issues or analysis in project record in compliance with regulations for an EA. There is no requirement to cite any particular body of science and District has demonstrated that it has considered relevant material and used area-specific and project-specific data, where appropriate.

### *Issue #8*

Objectors allege that analysis of the effects of climate change on the project area, the effects of the project on climate change, and the effects of the project on carbon storage is insufficient.

### *Analysis #8*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives.

The 2013 San Juan National Forest Land and Resource Management Plan (LRMP) calls for forest vegetation management to be done in a manner that "anticipates climate-related plant succession changes (such as favoring heat- or drought-resistant tree species as leave trees, or in reforestation)" (section 2.9.1, p. 75).

Treatment of climate change in project-level NEPA analysis is guided by "Climate Change Considerations in Project-Level NEPA Analysis" (U.S. Forest Service 2009), which recommends consideration of both i) the effect of a proposed action on climate change, and ii) the effect of climate change on a proposed action.

Regarding the effect of the proposed action on climate change:

> The 2009 Agency guidance notes that "there will be some situations where quantitative analysis will be useful and others where qualitative analysis will best serve decisionmaking" (p. 4). Examples of the types of projects for which quantitative analysis may be required include "energy facilities, transmission lines, [and] oil & gas development or leases" (p. 4).
>
> Vegetation management activities such as those proposed in the Salter project have a small climate impact in the global context, and therefore a qualitative discussion about the potential for greenhouse gases sequestered and emitted is more appropriate. The EA provides a qualitative, ecosystem-based description of the small carbon fluxes associated with the proposed project in Appendix C (Final EA p. 109).

Regarding the effect of climate change on the proposed action:

> The Environmental Assessment refers to a 2014 Ecosystem Vulnerability Assessment to support its determination that the future vulnerability of the Ponderosa pine is "presumed stable." This determination is based on climate modeling performed by Crookston et al. (2010).
>
> The Draft Decision Notice states that the adaptive management approach will allow work to be modified "in response to both actively moving insect and disease outbreaks in and adjacent to the analysis area **and climate change**" (dDN p. 6, emphasis added). Table 6 ("Adaptive Management Actions") in the EA contains the following action associated with post-planting Silviculture: "2.9.1 Anticipates climate-related plant succession changes (such as favoring heat or drought-resistant tree species as leave trees, or in reforestation)" (Final EA p. 32). This approach will enable project implementers to be responsive to changing conditions on the ground, including succession changes due to climate change.

### *Conclusion #8*

Based on my review of the project record and referenced documents, and considering the size and scope of the project, I find that the Responsible Official adequately considered issues surrounding climate change. The level of analysis was consistent with agency guidance and of comparable depth to previous projects on the forest (such as the Lone Pine EA).

### *Issue #9*

Objectors allege that the EA does not include sufficient analysis of economic information, especially because economics is identified as part of the purpose and need.

### *Analysis #9*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives.

The Responsible Official determined that the need for the actions proposed in the Salter Project includes "Provide economic support to local communities by providing timber products to local industries in a sustainable manner" (final EA p. 11). Supporting the local recreation economy is not included in the purpose and need of the proposed treatment activities. However, impacts to recreation visitors and associated economic activity is disclosed in the EA socioeconomic (EA p. 58) and Recreation Activities and Experience (EA p. 52-60) sections.

The socioeconomic section of the EA (final EA p. 58-60) details the industry demand for fiber, saw log, products other than logs, as well as niche markets for beetle killed dead ponderosa pine—all products

that would be removed through the treatment activities. The analysis also documents the niche and limited demand for smaller diameter and inconsistent material that can result from vegetation management activities. The analysis demonstrates providing timber products to local timber harvesting and processing firms supports the local economy through jobs, labor income and value added in the forest sectors, as well as supporting sectors and industries.

The affected environment of the socioeconomic section documents the size of the travel and tourism sectors (final EA p. 57). The affected environment of the Recreation Activities and Experience section documents the high use of the recreation area within the project area (final EA p. 51-52). The socioeconomic section highlights survey data from general forest visitors' response to survey questions on their behavior if unable to visit the national forest (final EA p. 58). The socioeconomic section of the EA addresses this potential for displaced recreation visitors due to treatment activities and the potential negative impact that displacement may have on recreation visitor spending and associated economic activity in communities near the project area (final EA p. 58). Potential impacts from the proposed treatments to the local recreation economy were assessed and documented in the socioeconomic sections of the EA.

### *Conclusion #9*

Based on a review of the project record, I find that the Responsible Official adequately considered the effects of the proposed action on the economic environment. I find sufficient analysis of the economic effects of the modified proposed action on the local recreation economy. I also find the socioeconomic analysis to show the proposed treatments support the purpose and need.

### *Issue #10*

Objectors are concerned that project design elements related to recreation are insufficient. Specifically, concerns relate to a design element associated with minimizing effects to recreation from hauling over holiday weekends and to rerouting trails where they can't be avoided by haul routes. Objectors were concerned that their comments were not considered by the Responsible Official.

### *Analysis #10*

The regulation at 36 CFR 220.7(b)(2) states that an EA "shall briefly describe the proposed action and alternative(s) that meet the need for action." The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives. The regulation at 36 CFR 218.25(b) requires the responsible official to consider all written comments submitted and that all written comments received be placed in the project file and become a matter of public record. NEPA does not require an EA to include a specific response to comments.

The project record confirms the Forest Service received and considered the comments related to the recreation resource submitted by objectors; also see response to Issue #7.

A discussion with the San Juan National Forest Recreation Program Management Specialist established it was the judgement and experience of the forest specialists that determined the haul closure dates, as written, the closure dates would address the most problematic times of recreation use of the forest resources and holiday hauling (Final EA p. 24). Excluding the Mondays of Labor Day and Memorial Day was intentional. These days were not determined to be among the most problematic holiday days for the users of the recreation resources.

### *Conclusion #10*

I find that the design features are written appropriately to address the affected resources.

### *Issue #11*

Objectors are concerned that design elements related to protection of elk and northern goshawk are insufficient.

### *Analysis #11*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives. Forest Service Manual (FSM) 2672.42 describes the standards for Biological Evaluations.

The action alternatives analyzed in the Salter EA include specific design elements to protect elk habitat (Final EA p. 28). The two design features place temporal and spatial restrictions on management actions in coordination with Colorado Parks and Wildlife (CPW) expertise and guidance. These design features are intended to reduce the potential for temporary displacement of elk, in accordance with LRMP Guidelines 2.3.59 and 2.3.60 (Final San Juan National Forest Land and Resource Management Plan, pp. 36 & 37).

Effects to elk were analyzed in the Wildlife Report (project record) and disclosed in the EA (Final EA pp. 82 – 83). The EA described the potential for temporary displacement of elk due to project-related disturbance, but indicated that in the long term, habitat would benefit from an increase in foraging opportunities and an overall improvement in habitat quality due to increasing the resilience of pine stands to insect infestation (final EA p. 83).

The analysis described in the EA indicates an additional design element that was not included in the description of alternatives (final EA p. 83; also see Wildlife Report); my staff determined, in conversation with the ID team wildlife biologist, that the additional design element was referenced by mistake and is not intended as part of the proposed action.

Design features specific to goshawks were included in the action alternatives (Final EA p. 28) in order to avoid or minimize potential adverse effects to goshawks in alignment with Land and Resource Management Plan (LRMP) Desired Conditions 2.3.7, Guideline 2.3.49 and Table 2.3.2 (Final San Juan National Forest Land and Resource Management Plan Pg 33, 36 & 39 respectively). The EA describes the potential for short-term impacts due to effects to available habitat, and anticipates that these effects would last for about 10 years post-project implementation; however, improved forest resiliency is expected to improve habitat for northern goshawk in the long term. The Responsible Official determined, based on the analysis, that the project may impact individual goshawk but will not contribute to a trend toward federal listing or loss of species viability (final EA p. 79).

Management recommendations referenced by objectors (Reynolds et al 1992) do not apply in all cases or situations. The analysis completed for goshawk acknowledge the referenced recommendations and specifically the territory occupancy timeframes (EA Pg 76). The goshawk timing design feature is directly from the LRMP Guideline 2.3.49 (Table 2.3.2).

### *Conclusion #11*

I find that the EA sufficiently documented design elements associated with protection of elk and northern goshawks adequately in alignment with Land and Resource management Plan Guidelines, and that the analysis of effects to these species is sufficient to support the decision and Finding of No Significant Impact.

However, because the erroneous design element referenced in the EA and wildlife report may create confusion, I direct the Responsible Official to clarify in the final Decision Notice that the design element

described in the final EA, p. 83, is not included in the decision and provide rationale why the analysis of effects to elk would not be changed with that design element removed.

### *Issue #12*

Objectors are concerned that design elements related to invasive plant species are insufficient.

### *Analysis #12*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives.

The Final EA addresses invasive species. Project Design Features include six actions related to control and prevention of invasive plants (final EA p. 23). EA table 5 addresses the type and frequency of surveys (final EA pg. 31), and Table 6 describes actions and triggers associated with adaptive management (final EA pg. 33).

The final EA discusses presence and treatment of invasive plants in the project area (final EA pp 42-43); and the EA specifies that inventory and treatment of invasive plants is ongoing under previous NEPA decisions. The EA acknowledges that project activities may increase noxious weed establishment, but also discloses that Project Design Features are expected to reduce the likelihood of increased invasive plant establishment (Table 8, final EA p. 44).

### *Conclusion #12*

I find that the EA and its supporting documentation adequately address the presence of and likelihood of introducing invasive plants, and that the project incorporates sufficient measures to address existing invasive plant populations in the project area and to limit the risk of new invasive plant introductions.

### *Issue #13*

Objectors allege that the design features associated with temporary roads are vague and that effectiveness is not properly analyzed.

### *Analysis #13*

The regulation at 36 CFR 220.7(b)(2) states that an EA "shall briefly describe the proposed action and alternative(s) that meet the need for action. No specific number of alternatives is required or prescribed." The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives.

Design features associated with temporary roads are found in the EA under the Hydrology and Soils section (Final EA p. 22) and the Transportation section (Final EA p. 26). The hydrology design features are taken from the Watershed Conservation Practices Handbook (Forest Service Handbook 2509.25). These design features are considered the most effective practical means of preventing or reducing the amount of pollution generated by nonpoint sources (Watershed Conservation Practices Handbook p. 5). The Watersheds section of the EA outlines the specific design features included to minimize impacts from temporary roads (Final EA p. 69-72). These include holding temporary roads to the minimum number feasible and locating them sufficiently far from streams and other water bodies to minimize discharge into those waters except at stream crossings; building stream crossings with appropriate drainage features and stream crossings to provide for the flow and passage of sediment and to withstand expected flood flow; and locating stream crossings at straight and shallow locations (slope banks will not exceed 30 percent) where channels are hardended by gravel, cobble, or bedrock (Hydrology design elements 7 and 8; Final EA p. 22, 70). Transportation design feature 2 (Final EA p. 26)

states that the location and clearing widths of all temporary roads will be agreed to in writing before construction is started. Additionally, the majority of the temporary roads proposed (68.9 miles) are on non-system roads that are already on the ground (Final EA p. 63). These roads will be properly designed for the type of equipment that will be using them and will be decommissioned within 5 years after their first use (Final EA p. 22, 70). Decommissioning will involve re-contouring where significant side slope exists, elimination of ditches and other structures, out-sloping during construction, removal of ruts and berms, effectively blocking the road to normal vehicular traffic where feasible, and construction of drainage features such as cross ditches and water bars (Final EA p. 26).

### *Conclusion #13*

I find that the final EA sufficiently documented the specific design features necessary to reduce potential impacts from temporary roads. The design features are taken from the Watershed Conservation Practices Handbook, which is considered the guiding document for best management practices. The Responsible Official concluded that these design features would reduce potential impacts to an acceptable level. I do not see a need to address this further in the Decision Notice.

### *Issue #14*

Objector alleges a violation of NEPA due to failure to analyze effectiveness of mitigation measures. Objector appears to acknowledge that mitigation measures were not included, but maintains that design features are vague and inadequately analyzed.

### *Analysis #14*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives.

Design Features are part of the Action Alternatives (Final EA, pp. 20-29) and, therefore, have been analyzed in detail in Section 3 of the Final EA. Final EA (p. 20) notes “These design features come from a variety of sources including, but not limited to, Land and Resource Management Plan Standards and Guidelines, direction and guidance provided in Forest Service Handbooks and Manuals (including the Region 2 Watershed Conservation Practices Handbook), Vegetation Management Programmatic Agreement between the Forest Service and Colorado State Historic Preservation Officer (2017), and professional judgement.” Per FSM direction, the design features are generally included as contract terms (i.e., specific conditions, standard provisions or special provisions) where those actions such as logging are contracted. They are then monitored by a Forest Service Representative during and after implementation (FSM 2450).

### *Conclusion #14*

I find that the Responsible Official has properly included and analyzed design features in compliance with appropriate NEPA regulations (36 CFR 220.7(b)(3)).

### *Issue #15*

An objector asserts that the EA must incorporate monitoring of restoration of spatial structure using ICO method.

### *Analysis #15*

The regulation at 36 CFR 220.7(b)(2) states that an EA “shall briefly describe the proposed action and alternative(s) that meet the need for action. No specific number of alternatives is required or prescribed.”

Monitoring and Adaptive management are included and described in the Final Salter EA, pages 29-33, Tables 5-6. Table 5 clearly outlines the activities to be monitored but does not include monitoring of structural components such as individual, clump, and opening (ICO) Churchill et al. 2013), or group, individual, or clump (GCI) structures (EA, pgs. 12, 15; Project Record, Vegetation Analysis pg. 24). Table 5 does articulate monitoring of silvicultural prescription and fuel loading to determine treatment effectiveness relative to desired conditions and restoration (final EA p. 31).

### *Conclusion #15*

I find that the Responsible Official is consistent with the regulation at 36 CFR 220.7(b)(2) by clearly identifying and monitoring activities as they relate to silviculture prescriptions and post-treatment effectiveness.

### *Issue #16*

An objector alleges that the proposed action is flawed because the target basal area and the proposed diameter cap are not supported by best available science.

### *Analysis #16*

The regulation at 40 CFR 1502.23[1]states that, "Agencies shall ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents. Agencies shall make use of reliable existing data and resources. Agencies may make use of any reliable data sources, such as remotely gathered information or statistical models. They shall identify any methodologies used and shall make explicit reference to the scientific and other sources relied upon for conclusions in the statement."

The Responsible Official demonstrated they used the best available scientific information to determine basal area target and diameter cap; this is documented within the Final EA, pages 9-14.

The District refers to the use of best available scientific information in the following statement: "A comparison based on common stand exam data, Forest Vegetation Simulation modeling, and field observation between the current and desired conditions shows that the condition of the ponderosa pine cover type found within the Salter vegetation management activity area is different from the desired conditions associated with that vegetative cover type in the San Juan National Forest Land and Resource Management Plan." (EA, page 11)

The District describes selecting the target basal area and diameter cap in detail in the EA and provided in the following statement:

"Single tree selection prescriptions will all have the same basic components and will use a BDQ method where "B" is the desired residual basal area, "D" is the maximum tree size (all trees 26.9" and larger diameter at breast height will be retained in all stands) and "Q" describes the diameter distribution as a ratio of the number of trees in succeeding size classes. Based on stand exam data the general prescriptions will target a residual basal area of 50-to-70 ft2/acre with a mean or target of 66 basal area when conditions allow.

For the average stand in the project area, the residual basal area will be 60-to-68 ft2/acre depending upon the silviculture treatment. The maximum diameter to harvest will be 26.9" and the q-factor will be 1.3 (applied to 2 inch diameter classes). The residual stocking level of 50-to-70 ft2 was chosen to allow sufficient growing space to establish new regeneration while reducing severe fire risk and promoting

---

[1] The regulation at 40 CFR 1502 is specific to Environmental Impact Statements; however, pursuant to the regulation at 40 CFR 15019(g)(2), Section 1502.23 may be applied to EAs.

tree vigor. The maximum diameter of 26.9" addresses management objectives by providing a continuous supply of desirable saw timber products without allowing trees to progress into age related decadence while at the same time maintaining a large tree emphasis on the landscape. A q-factor of 1.3 keeps sub-merchantable trees fully stocked for the next cohort. The harvests will take place on a 20 to 25-year cutting cycle to allow for sufficient stand growth while at the same time keeping stand density within the target range." (EA, page 14)

Therefore, based on the best scientific information available and most recent inventory data, the District Silviculturalist has determined a 26.9" diameter cap and a basal area of 50-to-70 square feet per acre will meet the desired conditions stated in the San Juan LRMP (2013).

### *Conclusion #16*

I find the Responsible Official provides adequate documentation within the analysis, demonstrating the use of best scientific information available to determine the target basal area and diameter cap to achieve desired conditions stated within the San Juan LRMP (2013).

### *Issue #17*

An Objector alleges that the EA improperly relies on adaptive management because information required by regulation is not included in the analysis.

### *Analysis #17*

The regulation at 36 CFR 220.7 (b)(2)(iv) states that, "The proposed action and one or more alternatives to the proposed action may include adaptive management. An adaptive management proposal or alternative must clearly identify the adjustment(s) that may be made when monitoring during project implementation indicates that the action is not having its intended effect, or is causing unintended and undesirable effects. The EA must disclose not only the effect of the proposed action or alternative but also the effect of the adjustment. Such proposal or alternative must also describe the monitoring that would take place to inform the responsible official whether the action is having its intended effect."

Monitoring and Adaptive management are included and described in the final EA, pages 29-33, Tables 5-6. Table 5 clearly outlines the activities to be monitored and Table 6 outlines the threshold or undesirable effect that triggers a need for action to achieve desired conditions. I find the Final EA is consistent with 36 CFR 220.7(b)(2)(iv).

### *Conclusion #17*

I find that the Responsible Official provides adequate information in the analysis by clearly identifying adaptive management actions and monitoring activities as required by regulation.

### *Issue #18*

Objector alleges that the EA fails to take into account the cumulative effects of off-road vehicle recreation and does not feel that the design feature that addresses access to dispersed camping sites is adequate.

### *Analysis #18*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives. Objector alleges the requirements of NEPA have not been met regarding cumulative effects.

Final EA (p. 54) and 2020 Motor Vehicle Use Map notes off-road vehicle use is not permitted except in limited circumstances (i.e., limited big game motorized big game retrieval and dispersed camping) per

travel management decision issued under 36 CFR 212. Also, Final EA, p. 54 specifically addresses cumulative effects, "The Boggy Glade Travel Management Project resulted in some roads that were once open to public use being closed to public use or decommissioned. This will create minor displacement recreation activities that could overlap in time with the Salter Vegetation Management project." Objectors tie their concern to ability to successfully reclaim routes and resource concerns. The Final EA does consider resource concerns related to dispersed recreation. In addition to recreation design feature mentioned by Objector, there is a design feature for transportation (Final EA, p. 26) which includes, "Following use for harvest and treatment implementation, both temporary AND designed roads will be decommissioned, which involves re-contouring where significant side slope exists, elimination of ditches and other structures, out-sloping during construction, removal of ruts and berms, effectively blocking the road to normal vehicular traffic where feasible, and construction of drainage features such as cross ditches and water bars. Final acceptance of the closure will be made by the Forest hydrologist or engineering representative." Final EA (p. 72) considers dispersed use for watershed resources. Similarly, for wildlife, "Recreation opportunities within the area are expected to increase some, but they are not expected to become significant enough to reduce the functionality of any species' habitat." Final EA, p. 85. Further, it is not within the agency purview to speculate that illegal activities will occur.

### *Conclusion #18*

I find the Responsible Official has considered cumulative effects related to potential for increased accessibility of Forest lands in compliance with NEPA (36 CFR 220.7(b)(3)) and travel regulations.

### *Issue #19*

The objector alleges that the EA does not address the key differences between Alternatives 2 and 3, primarily in terms of forest resilience and timber economics.

### *Analysis #19*

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed action and alternatives.

The Vegetation Analysis report (pp. 38-39) compares alternatives in relation to desired conditions which are related to forest resilience criteria. The report discusses the limitation of diameter caps and the effects of forest resilience in the following:

"Limiting prescription effectiveness with a blanket diameter cap such as alternative 3 has been applied to the "Large Tree Retention Areas" (LTR) of Lone Pine as study opportunity. Has shown the potential of limiting or even interrupting long term approaches to meeting desired conditions described in LRMP for ponderosa pine. The Lone Pine LTR study areas have shown a limitation on sanitation approaches within stands and forced the leaving of entire groups of trees infested with bark beetles. As management begins to bring stands back into an uneven aged state, volume or basil area that would normally be prescribed for harvest under an uneven aged management approach would be locked up in upper diameters under alternative 3."

In alternative 3 (EA, p. 66), an explanation of how diameter caps hinder forest health and resilience is provided:

"Large tree retention limits the ability to fully utilize the silviculture systems designated by the Land and Resource Management Plan. Therefore, alternative 3 meets the desired conditions described at 2.2.23 to a lesser degree than alternative 2 – Modified proposed action. The data indicates that the differences between alternatives 2 and 3 are associated with specific locations over time and over cutting cycles.

Preliminary feedback of Lone Pine EA Large Tree Retention study areas from post decision reconnaissance and layout of leave tree units have shown mixed results. The effects of applying a diameter limit appear to be more easily tangible at the fine scale. At the fine scale patches of bark beetle and heavily infested dwarf mistletoe trees have to be passed for removal due to the diameter limitation. Basal area retention goals and uneven aged characteristics are being compromised, leaving stands less resilient and making long term resistance less likely to occur.

Continuing in alternative 3 (EA, p.66), the following mentions a difference in timber economics:

"Removing areas from treatment as result of diameter limitation reduces the amount of treatment in an area and subsequently the amount of harvestable volume per acre."

In the Vegetation Analysis report, Economics (pp. 40-41), the summary describes how the local markets are increasing in the recent past 5-6 years and how bids for various products have gone from "no-bid" to competitive bids for those products:

"The fiber demand of the local area based on current sales over the past 2 years will keep in

pace with what this EA can provide as a byproduct of the vegetation management activities to meet desired conditions. However, an increase in demand will result in competitive prices for fiber and the ability to utilize funds to perform service and stewardship items such as pre-commercial thinning."

The "saw log" (=>9" DBH) market demand continues to increase with bid premiums seen on almost every sale including stewardship contracts within the last 4 years. Sales with premiums also included additional charges for brush disposal, essential KV and road maintenance which have caused no bid sales on the district in the past. The ability to include large volumes and achieve vegetation management at landscape level is possible with the current industry. Offering a mixture of saw log and smaller diameters timber in the right ratio is important to keep sales marketable. The size of these sales is equally important in both volume and acres to ensure the work is completed on time and has a sustained profitability."

### *Conclusion #19*

I find that the Responsible Official adequately considered disclosed the economic effects of the action alternatives and, where applicable, demonstrated the differences between the action alternatives.

### *Issue #20*

Objector alleges that justification for preferred/selected alternative is not valid.

### *Analysis #20*

The regulation at 36 CFR 220.7(c) states that "A decision notice must document the conclusions drawn and the decision(s) made based on the supporting record, including the EA and FONSI." Objector alleges that the decision was based on silvicultural methods instead of achieving the desired condition in the Forest Plan.

Project is designed to meet Forest Plan desired conditions for Management Area 5 and all project areas are within suitable timber base. Final EA, pp. 8-9. The desired conditions for the ponderosa pine cover type and lands managed for forest product offerings are further defined in sections 2.2.23 and 2.9.1 of the San Juan National Forest Land and Resource Management Plan (USDA 2013). Final EA (pp. 9-11) addresses how existing stands do not meet Forest Plan components. Silvicultural prescriptions are the tools used to meet desired conditions. Final EA at pp 12-13; Draft DN, pp. 1, 2-3, 12-13. Disagreements occur between Objector and District regarding how to meet the desired conditions based on old or large tree caps. See other issues addressed in this document. This does not invalidate analysis completed.

District used site-specific CSE data, analyzed NFMA requirements (Draft DN, pp. 12-16) and considered past fire suppression activities (Final EA, pp. 7-8) and insect outbreaks (Final EA, pp. 4- 5) that led to desired conditions not being met. Additionally, Final EA (p. 6) describes, "Generally, the project area is in fair to good health with areas displaying indicators of good future forest health conditions. The stands that have been treated within the last 15 years under earlier ponderosa pine management efforts, display many of the desired conditions identified in the Land and Resource Management Plan for ponderosa pine. These include a reduction in small diameter overtopped and suppressed trees and improved structural dynamics. Areas that have not been treated are over-stocked and lack disturbance." Lastly, it was articulated in Draft DN (pp. 5-8) why Alternative 2 was selected over Alternative 3 and acknowledged that environmental trade-offs do occur.

### *Conclusion #20*

I find the Responsible Official's decision is neither arbitrary nor capricious as it relates to selection of an alternative in meeting desired conditions. Draft DN relies on analysis completed and documents rationale and considerations for the decision.

### *Issue #21*

The objector asserts that the EA uses improper terminology ("group, clump and individual structure") and requests correction and use of best available science.

### *Analysis #21*

The regulation at 40 CFR 1502.23 states that, "Agencies shall ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents. Agencies shall make use of reliable existing data and resources. Agencies may make use of any reliable data sources, such as remotely gathered information or statistical models. They shall identify any methodologies used and shall make explicit reference to the scientific and other sources relied upon for conclusions in the statement."

Definitions of the terms "group, clump, and individual structure" are provided in the Vegetation Analysis report (p.22) "Focus on Groups/Clumps/Individuals and the final EA (p.12); the terms are discussed but are not specifically defined as "GCI."

### *Conclusion #21*

I find that the Responsible Official adequately analyzed and described their methodology and it is consistent with appropriate laws, regulations, and policies.

### *Issue #22*

An Objector asserts that information provided by the forest at a public meeting was not part of the NEPA process and alleges that the forest withheld useful information from the public.

### *Analysis #22*

Objector alleges that useful, visual informational materials from a public meeting in March 2020 were not included in the Draft EA. While there is no requirement to include this particular information (i.e., PowerPoint presentation) in the analysis. Documentation is required by 40 CFR 1508.9 for persons consulted and for public involvement in the decision notice per 36 CFR 220.7(c)(3). The Final EA at pp. 34-35 (Issues) and 85-87 and Draft DN at pp. 6-8, 9 meet these regulatory requirements. Moreover, the Draft DN (p. 9) and Final EA ( p. 86) state, "The information and recommendations provided by the collaborative have been given consideration in the design of the Salter Vegetation Management project.). Final EA (p. 86) also describes the collaborative (emphasis added):

> *As part of the Salter planning process, the Agency entered into an agreement with the DWRF Collaborative that described commitments and an overall goal of "transparent deliberation and discussion on all proposed projects". **The agency and collaborative have met on many occasions throughout the planning process to share information and exchange data. The agreement outlines the use of the collaborative exchange folder (CEF) to facilitate open exchange of information and data.** The CEF is located on the agency's corporate system and is accessible as an external shared link specifically for exchange of data, including: maps, geodatabases, inventory data, documents, etc. The CEF is also intended to be used by the Collaborative and other partners to share information with the agency of any desirable or undesirable trends that are being observed and to provide an avenue to discuss those trends or for further exchange of general information.*

### *Conclusion #22*

I find the Responsible Official has met the regulatory requirements 40 CFR 1508.9 and 36 CFR 220.7(c)(3)) related to public involvement.

### *Issue #23*

The objector asserts that the EA needs to provide scientific sources for "conditions influencing silviculture treatments" (draft EA p. 16) and explain other parameters, providing scientific references.

### *Analysis #23*

The regulation at 40 CFR 1502.23 states that, "Agencies shall ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents. Agencies shall make use of reliable existing data and resources. Agencies may make use of any reliable data sources, such as remotely gathered information or statistical models. They shall identify any methodologies used and shall make explicit reference to the scientific and other sources relied upon for conclusions in the statement."

Scientific sources that influenced silviculture treatments are provided in the Vegetation Analysis Specialist Report within the section "*Conditions Influencing Silviculture Treatments*" (Vegetation Report pp. 19-20) and in the EA under Section 2, Alternative 2 – Conditions Influencing Silvicultural Treatments.

### *Conclusion #23*

I find that the final EA and the Vegetation Analysis Specialist Report include appropriate scientific references that support the analysis and conclusions in those documents.

### *Issue #24*

An Objector disputes method for identifying pre-settlement trees and asks forest to adopt a 17" diameter cap for harvest.

### *Analysis #24*

The regulation at 36 CFR 220.7 states that an EA "Shall briefly provide sufficient evidence and analysis, including the environmental impacts of the proposed action and alternative(s), to determine whether to prepare either and EIS or a FONSI (40 CFR 1508.9)" and indicates that an EA "May incorporate by reference data, inventories, other information and analyses."

The method for identifying pre-settlement trees is stated in the EA, pages 6 & 16. The District determined during the stand inventory process that there is high variability between age classes relative to size diameter at breast height (Vegetation Analysis, pages 13-14). The District states: *"Data analysis is*

*a good guide for overall management but when in the field, visual characteristics have proven to be more reliable in determining age (GTR-110 2003 Huckaby etal.).”* (Project record, Vegetation Analysis page 14).

The District further states: “*CSE data will be used to establish a likely frequency and typical size of trees as a guide for tree markers. Of the 7,461 trees measured in 2020 within the treatment area the oldest tree cored and aged was 137 years old and had a diameter of 19.6 inches at Breast Height. While the largest tree measured was over 50” DBH. This demonstrates the variability within the age to size correlation and makes it necessary to rely on visual as well as data for indicators of pre-settlement trees within a stand. Including this type of data in marking guides will help the markers understand which tree sizes within a stand might have the potential of being pre-settlement in age.”* (Project record, Vegetation Analysis page 14).

Finally, the District states: “*Old-aged trees will be identified using a combination of physical characteristics including large diameter relative to other trees in the localized area, large diameter branches, irregular crowns, flat tops, tall height and canopy position and bark thickness, color and pattern. (Huckaby et al. 2003). When a determination of tree age cannot be made using physical characteristics, these trees will either be retained or assessed and documented at the harvest-unit scale to ensure old-aged trees are retained.”* (EA page 16).

The Final Salter EA addresses Dr. William Baker’s research paper from 2021. The IDT conducted a cursory review of findings to assess the relevance to the Salter project. The IDT found the focus of the paper was on wildfire resiliency and irrelevant to the concern of insect and disease (Draft DN, pgs. 5-6).

Therefore, determination of pre-settlement trees in the proposed action will be selected based on a combination of physical characteristics rather than tree size at DBH. When tree age cannot be determined using this method, trees will be assessed and/or retained and documented.

### *Conclusion #24*

I find that the Responsible Official provides adequate rationale that supports the method for identifying pre-settlement trees in the project area.

### *Issue #25*

Objectors suggested several minor edits to design features.

### *Analysis #25*

I reviewed the design features identified by objectors and discussed the suggested edits with the Responsible Official. After a thorough review of the design features in question, I agree with the Responsible Official that the current language is sufficient, meets the intent of the project, and provides sufficient clarity for implementation.

### *Conclusion #25*

I find that the design features, as written, are consistent with law, regulation and policy. No changes are necessary.

# Decision Notice and Finding of No Significant Impact for the Salter Vegetation Management Project

USDA Forest Service
Dolores Ranger District
San Juan National Forest
Montezuma and Dolores Counties, CO

## Introduction

The condition of today's ponderosa pine-Gambel oak forest is largely a legacy of historically high levels of human activities occurring from the late 19th century into the 20th century. Large scale commercial harvesting of the pine forest was underway by the early 20th century. In these early days, the vast majority of the logging occurred in the ponderosa pine type and focused on harvesting very large trees while leaving smaller trees and species of lesser value. The most obvious effect of the early logging of ponderosa pine forests is the general lack of large, old trees and snags in these forests today (Romme 2009).

Heavy and largely unregulated livestock grazing was occurring simultaneously with the early logging operations and active fire suppression had also become a widespread policy in the early 20th century. This unique combination of historic events -- the elimination of extensive fires, removal of grass competition by livestock, and the removal of a large component of the forest overstory -- coincided with unusually wet weather and good seed crops to establish abundant pine regeneration in the early 20th century (Covington & Moore 1994).

A comparison between the current and desired conditions utilizing common stand exam data, Forest Vegetation Simulation modeling, and field observation shows that the condition of the ponderosa pine cover type found within the Salter vegetation management activity area today is different from the desired conditions associated with that vegetative cover type identified in the San Juan National Forest Land and Resource Management Plan (2013). Based on field reconnaissance and inventory data, the structure and size class distributions in the stands identified for this analysis are not within desired conditions described in 2.2.23 of the Forest Plan. Additionally, bark beetles have infested adjacent landscapes causing significant mortality. The early stages of a bark beetle infestation are now being observed in the Salter project area.

Portions of the Salter project area have also been moderately burned by wildfire and there are areas immediately adjacent to the Salter project area that have been severely impacted by wildfire. It is well documented that dense, over-stocked, even-age, closed canopy ponderosa pine stands are more susceptible to insect outbreaks and uncharacteristic stand replacing fire events (Negron et al. 2008). It is also well documented that a lack of structural diversity corresponds directly to a reduction in forest resiliency and consequently a decline in long term resistance to detrimental natural and human disturbance events (Negron et al. 2008, Negron et al. 2000, Gibson et al. 2009).

Based on this comparison, the need to 1) improve resilience and resistance to epidemic insect and disease outbreaks; 2) to increase the structural diversity of the ponderosa pine forest across the project area, and 3) to provide economic support to local communities by providing timber products to local industries in a

sustainable manner was identified. The Salter Vegetation Management environmental assessment documents the analysis of the proposal to meet this need.

## Decision and Reasons for the Decision

### Decision

Based on my review of the Salter Environmental Assessment, the project record, public comments received, and direct consultationwith resource specialists, I have decided to implement alternative 2 with modifications (environmental assessment, section 2 – modified proposed action, page 12). This decision authorizes treatment of approximately 22,346 acres of the ponderosa pine-Gambel oak vegetation type on the Dolores Ranger District of the San Juan National Forest.

This decision authorizes five silvicultural treatments to move the treatment area towards the desired conditions described in section 1 of the environmental assessment. Table 1 summarizes the silvicultural prescriptions that would be applied based on the condition of stands at the time of implementation.

Immediately prior to harvesting, a condition-specific prescription based on stand exam data, local knowledge of the area, and walk-thru exams will be applied to each stand. The final prescriptions will vary depending on stand-specific objectives and current conditions.

**Table 1. Vegetation treatment type and treatment description**

| Treatment Type | Treatment Description[1] |
|---|---|
| Single Tree Selection | An uneven-aged regeneration method where individual trees of all size classes up to 26 inches diameter at breast height are evaluated and removed more or less uniformly throughout the stand creating or maintaining a multiage structure of groups, clumps and individuals to promote growth of remaining trees and to provide space for regeneration. Multiple entries of this activity ultimately result in an uneven-aged stand of 3 or more age classes. This will be the preferred and dominant prescription used. 50-to-70 basal area per acre of residual basal area depending upon stand condition. There are 19,675 acres of this treatment type. |
| Commercial Thinning | Silviculture “Free Thinning” with enhancement objectives in mixed stocking ponderosa pine stands with a variable residual square feet of tree stem basal area of 50 -70 basal area peracre depending upon stand condition. Individual trees of all size classes up to 26 inchesdiameter at breast height are evaluated and removed throughout the stand creating or maintaining a multiage structure of groups, clumps, and individuals.<br>These stands have some of the following characteristics: recent treatment, structure is more clump than group, inconsistent harvestable volume per acre. Goal is to enhance current qualities of the stand to promote resiliency to disturbances. Includes the plantation units. There are 3,115 acres of this treatment. |
| Post Fledgling Area Thinning (PFAT) | PFA prescription is a free thinning in which trees of all size classes up 22 inches are evaluated for harvest while retaining a 100-to-120 residual basal area target. A focus on large groups of 20-30 trees or more is desired with internal clumps made up of 3-to-5 large and mature trees with interlocking crowns. Individual tree structure and isolated clumping is not desired structure in this treatment type. When structure is not available, thinning should focus on creating conditions for long-term structure moving towards PFA desired conditions. |
| Pre-commercial Thinning | Thinning of ponderosa pine (less than 5 inches diameter) to variable spacing specifications. Can be implemented in any treatment unit. |
| Brush Thinning | Thinning of understory brush species (generally target brush less than 6 inches diameter at root collar), mainly Gambel oak; to create openings for seedling recruitment and reduce ladder fuel effects on residual trees. Can be implemented in any treatment unit. This prescription is limited to treating no more than 5,000 acres. |

[1] No tree larger than 26.9 inch diameter at breast height would be cut in alternative 2 – modified proposed action.

Prescriptions are generally for the mechanical harvesting of vegetation; however, hand manipulation and mastication of vegetation may also occur. Processing of the vegetation will occur in harvest units and will be concentrated at landings within the units for final processing prior to transport off the forest. Slash created during treatment will be treated by removal, piling or lop and scattering, based upon recommendations from a District fuels specialist. Detailed descriptions of each silvicultural prescription are located in the environmental assessment, (section 2 - proposed action and alternatives, pages 12-16).

Ponderosa pine trees established prior to approximately 1880 will be retained in nearly all situations during harvest designation. Exceptions may be made in rare instances for safety reasons and to reduce declining trees with severe dwarf mistletoe infestation, root rot, or bark beetles. Old-aged trees will be identified using a combination of physical characteristics including large diameter relative to other trees in the localized area, large diameter branches, irregular crowns, flat tops, tall height and canopy position and bark thickness, color, and pattern. (Huckaby et al. 2003). When a determination of tree age cannot be made using physical characteristics, these trees will either be retained or assessed and documented at the harvest-unit scale to ensure old-aged trees are retained.

Tree evaluation will be accomplished through a descending order of choice made by the designator. Evaluation occurs at every step of the decision-making process by applying sound judgement based on parameters from the analysis and direction from a certified silviculturist. Below is the descending order of choice protocol that would be used to evaluate trees and ultimately designate them for removal if the stand has a basal area greater than 50 square feet per acre ($ft^2$/acre).

a. Tree can be evaluated for harvest if it is less than 27.0 inch diameter at breast height
b. Do not cut trees with a combination of pre-settlement visually apparent physical indicators (Huckbay et al. 2003)
c. Cut dead trees (brown or red needles/no needles)
d. Cut live trees with visible evidence of bark beetle infestation (for example, pitch tubes, frass, and woodpecker activity on tree bole)
e. Cut live trees with dwarf mistletoe infecting more than 50 percent of the live crown

In addition to a-e above, trees with a 25 inch diameter at breast height and less can also be cut if they meet the following condition or structure:

f. Live crown declining more than 25 percent including poor needle conditions
g. Evidence of conks, cankers, or advanced decay
h. Weak or multiple forks
i. Broken or dead tops
j. Leans greater than 35 percent
k. Grossly poor form
l. To achieve a basal area target within 50-70 $ft^2$/ac.

### *Connected Actions*

Connected actions associated with vegetation treatments include maintenance-related road-work. The work would be performed prior to, during, and/or following treatments. Table 2 displays the proposed primary haul routes as well as the mandatory haul routes for the Plateau and Salter treatment areas. Some primary haul routes will require upgrades to the surface and could include the change of surfacing type to accommodate the volume of forest products being removed.

**Table 2. Primary haul route**

| Treatment Block | Forest Service Road Number and Name |
|---|---|
| Salter* | FSR 510 Dry Canyon; FSR 521 Ormiston Point |
| Plateau* | FSR 523 Trimble; FSR 514 The Glade; FSR 521 Ormiston Point |
| Carlyle Point | FSR 524 Plateau; FSR 525 Trail Canyon; FSR 514 The Glade; FSR 526 Dolores Norwood |
| Boggy Draw | FSR 527 Boggy Draw; FSR 526 Dolores Norwood |
| Turkey Knoll | FSR 249 Bald Hill Res; FSR 527 Boggy Draw; FSR 532 Cottonwood; FSR 526 Dolores Norwood |
| House Creek | FSR 526 Dolores Norwood; FSR 529 Beaver Rim |

* Commercial log trucks must exclusively use the specified primary haul route listed in this table.

No new permanent roads will be built with this project, though temporary roads will be required to reduce the need for excessive tractor skidding and allow wood products to be moved to the permanent road system. Creating these roads will involve clearing vegetation and minimal construction. They will be constructed, utilized, and reclaimed when rainfall and erosion potential is minimal. These segments will be decommissioned within five years of first use. Up to 117 miles of temporary road construction is available for use under this decision.

Other related forestry activities include the reduction of activity fuels. Concentrations of activity fuels will be disposed of by piling and burning, lopping and scattering, and removal from the site. The method used will be dependent upon the amount of slash generated, the mechanical means employed for removal, and specific conditions within the unit.

Vegetation management activities may also result in post-treatment vegetation management actions such as site-preparation and reforestation, if deemed necessary through monitoring and adaptive management.

Additional actions authorized by this decision include the installation of four wildlife guzzlers in strategic locations within the Salter and Plateau treatment units to provide connectivity to other perennial waters sources. The goal is to provide additional water sources for wildlife during dry months and in years when drought conditions are present, as well as to encourage large game to remain upland on Forest Service land ownership to decrease the potential for damage to private property.

### *Project Design Features*

This decision incorporates and authorizes design features that minimize or eliminate potential adverse effects during implementation of the Salter Vegetation Management project. The design features identified in the environmental assessment, (section 2 – project design features, pages 20-29 and listed in Attachment 2) are essential to the selected alternative, including all actions that will occur as the result of adaptive management, and are expected to provideadequate resource protection under the treatments proposed for this project.

### *Monitoring and Adaptive Management*

Because conditions continue to change on the landscape analyzed in the Salter Environmental Assessment, a combination of pre-implementation reviews and an adaptive management approach will be utilized to inform implementation and to provide the opportunity to solicit input from partners that could be incorporated into the decision-making process when addressing changing conditions on the ground in real-time. A detailed discussion relative to the specific process and protocols to be used in adaptive management modifications is included in the environmental assessment under Monitoring and Adaptive Management (section 2, page 29-30). This discussion also identifies specific monitoring elements and associated threshold and triggers for adaptation.

## Rationale

My decision is based on an examination of the information in the environmental assessment (including three alternatives, Alternative 1: No Action, Alternative 2: Modified Proposed Action, and Alternative 3: Large Tree Retention), the project file, public comments received, and direct consultation with resource specialists. Particular attention was paid to how well the purpose and need would be met by each alternative and whether the selected alternative would provide opportunities to respond to rapidly changing conditions. In addition, much time and effort were devoted to reviewing public comments, some of which provided opposing viewpoints (and references to opposing science) about what management actions should be taken.

### *Purpose and Need*

My review of the environmental assessment determined that the selected alternative meets the purpose and need as described in section 1. The vegetation analysis contained in the vegetation specialist report and summarized in section 3 (page 65) of the environmental assessment states that the combined effects of commercial thinning, single tree selection, post fledgling area thinning, brush thinning and pre-commercial thinning will be a post-harvest reduction in basal area leading to the development of stands that are less dense, reducing competition among remaining trees for sunlight, water, and nutrients, which will create uneven-aged conditions in which the remaining trees become healthier and more vigorous. This will increase resiliency, making these areas less susceptible to insect and disease outbreaks and severe wildfire.

The analysis also indicates that the selected alternative not only moves the vegetation toward the desired conditions described in the Land and Resource Management Plan for this land use and species, but best meets the purpose and need by allowing the silviculturist to make the final determination regarding most appropriate prescription to achieve desired conditions on a stand-by-stand basis, over time based on stand type and disturbance frequency.

The analysis also finds that that brush thinning will reduce competition for moisture and nutrients. It will also reduce ladder fuels and the potential for scorching leave trees. Along with prescribed burning (as authorized by the 2018 Final Decision Notice with a Finding of No Significant Impact for the Dolores Prescribed Fire Pine Ecosystem Restoration Project Environmental Assessment), this creates opportunities for successful natural regeneration in the treated areas. Retaining quality seed trees will also increase the chance that natural regeneration would occur. Under the no action alternative, regeneration would continue to be inhibited by dense Gambel oak and heavy duff layers, although insect and disease activity on a small scale could contribute to increasing structural diversity at a small scale significantly smaller than the selected alternative.

Alternative 3 – Large Tree Retention would limit the ability to fully utilize the silviculture systems designated by the Land and Resource Management Plan. Therefore, alternative 3 meets the desired conditions described at 2.2.23 to a lesser degree than alternative 2 – modified proposed action. At the fine scale, patches of bark beetle and heavily infested dwarf mistletoe trees would have to be passed over for removal due to the diameter limitation. Basal area retention goals and uneven aged characteristics would be compromised, leaving stands less resilient and making long term resistance less likely to occur.

A research paper provided by Dr. William Baker, 2021 *Restoration of forest resilience to fire from old trees is possible across a large Colorado dry-forest landscape by 2060, but only under the Paris 1.5°C goal*, indicates that a diameter limitation would result in development of a stand structure that would provide resistance and resilience against impacts from wildfire. The paper was received shortly before publication of the Final EA; however, the Interdisciplinary Team conducted a review of its findings to assess relevance to the Salter project. This research paper focuses on resistance and resilience to wildfire; however, the focus of the Salter Vegetation Management project is to also improve resistance and

resilience to disturbances from insect and disease, not just wildfire. A diameter limitation would hamper the ability to address insect and disease concerns as described previously. In addition, recent wildfires and prescribed fires have not resulted in significant mortality to ponderosa pine in the project area. More mortality of ponderosa pine can be attributed to impacts from insect and disease. Therefore, placing diameter limitations will compromise developing the stand structure that would result in resilience and resistance to these disturbance factors.

Increasing structural diversity is also identified as a purpose of this project since there is currently very little structural diversity in ponderosa pine stands in the analysis area. As described in the project location and project area description section and the historical background discussion in section 1, the amount of mature pine stands in the Salter analysis area with closed canopies is well above the desired condition as defined by the 2013 Forest Plan, while the amount of young stands is below the desired conditions. The analysis in the environmental assessment concludes that the actions proposed under the selected alternative will help move the stands that are treated toward an uneven aged heterogeneous structure, and as stated above, will provide opportunities for regeneration, thus increasing the amount of young stands in the area. Under the alternative 1: No Action, even-aged stands would continue to dominate.

Applying a large tree harvest restriction (above 26.9 inches diameter at breast height) will also add to the structural diversity by increasing old and large trees in the long-term.

The selected alternative will meet the purpose of providing wood products for both commercial and non-commercial uses. The quantity of wood products available for commercial and non-commercial uses under the selected alternative will also be much higher than under the no action alternative because it will allow for tree cutting and removal through a variety of means, including but not limited to traditional timber sale contracts, service contracts, integrated resource contracts, and small product permits (such as post and poles or firewood). The proposed action will also meet the identified need of managing forest vegetation to move current and foreseeable future conditions closer to desired conditions on landscapes available for active management. The no action alternative would not contribute to providing wood products for commercial and non-commercial uses, and it would not meet the need of managing forest vegetation to move current and foreseeable future conditions closer to desired conditions on landscapes available for active management.

### *Ability to Respond to Changing Conditions*

Due to the potential for vegetative conditions to change rapidly in response to actively moving insect and disease outbreaks in and adjacent to the analysis area and climate change, the prescriptions identified now may no longer be applicable in some areas. For this reason, having the ability to respond to changing conditions through the use of pre-implementation reviews and adaptive management is an essential part of the selected alternative for the Salter project.

As discussed in the environmental assessment in section 2 (page 11), the use of pre-implementation reviews, checklists, and adaptive management will allow for timely application of appropriate prescriptions based on actual site conditions at the time of implementation. The environmental assessment describes a well-defined approach, with requirements to review project areas prior to implementation, during implementation, and after implementation as well as requirements to monitor project effects during and after implementation. The adaptive management process also includes a commitment to public notification through news releases, discussions with local stakeholders, and public field trips to keep interested stakeholders informed about the progress of implementation and the results of monitoring. The monitoring plan includes details regarding what would be monitored and what adjustments may be made under adaptive management.

### *Response to Public Comment*

In making my decision, I carefully considered concerns raised by the public during the scoping and public comment periods. My staff and I reviewed and considered all of the comments and reference materials received. Many of the comments received during the public comment period were supportive of the proposed actions, but there were several commenters that voiced concern over various aspects of the proposed actions including but not limited to: harvesting of old and large trees and other aspects of the silvicultural prescriptions; the potential for adverse impacts to the trails in the Boggy Draw area and other treatment blocks; limited access to the area during project implementation and the duration of the project; increased traffic on the Dolores-Norwood Road; and effects to big game and other wildlife species. In direct response to the public comments received, numerous clarifications and changes were made to the final environmental assessment. This includes, but is not limited to: clarification of design features and the effects of the design features; refinement of design features for invasives, recreation, and wildlife; the addition of additional design features for recreation; addition of adaptive management actions; and providing additional information regarding the current vegetative conditions and other relevant information from the vegetation specialist report.

I found that the final environmental assessment shows a thorough review using the best available science (section 1 - need for the proposal, section 3 - vegetation effects analysis, and vegetation specialist report). The Interdisciplinary Team used information from a broad range of sources as appropriate, including regional and national-level research, local research, and recent site-specific field inspections and reviews of the analysis area, and referenced the scientific sources which informed the analysis. The opposing science references provided during the comment period were reviewed and the interdisciplinary team relied upon the best available science to develop the purpose and need. The comments are filed in the project record and are located in the Reading Room on the San Juan National Forest's project webpage.

I have acknowledged the environmental trade-offs of my decision. The watershed and soils analysis in section 3 - watersheds (page 67) found that the activities associated with the proposed action may have localized, short-term effects (less than 3 years) on watershed and soils, riparian areas, and water quality. It also found that the hydrology and soils design elements listed in section 2 will help minimize or eliminate potential adverse effects during implementation, and no negative long-term impacts would occur.

The wildlife analysis in section 3 - wildlife and fisheries (page 72) determined that with all proposed activities combined and resource protection measures, the selected alternative "may impact individuals or their habitat, but would not likely contribute to a trend towards federal listing or loss of species viability to the population or species". For Abert's squirrel, big game, hairy woodpecker and migratory birds, the effects are expected be short-term (less than 10 years) while the long-term (more than 10 years) impacts are intended to be beneficial by providing higher quality habitat that is well distributed in the future. Other potential impacts to the species may include disturbance or displacement during harvest activities. Designfeatures will minimize impacts to these species.

The fuels analysis in section 3 - fuels and fire management (page 46) also identifies the selected alternative as having short-term impacts for long-term trade-offs with respect to increases in fuel loadings in the short-term for stands more resistant to future disturbances and able to recover more rapidly without human intervention over the longer-term.

In summary, the analysis of impacts of the selected alternative (the modified proposed action as described by my staff in the Salter Environmental Assessment) does not indicate any unacceptable consequences, and the long-term benefits of the modified proposed action (increasing resistance

and improving forest resilience, increasing structural diversity, and providing wood products for both commercial and non-commercial uses) outweigh any short-term environmental impacts.

### *Objection Resolution*

After the Final EA was made publicly available, objections were received from seven interested parties who had previously submitted comments on the draft EA. Objections were considered by USFS and an objection resolution meeting was held on September 8, 2021. During the objection resolution meeting and in subsequent conversations with objectors, six concerns were found that could be addressed.

1. The district will provide Timber Operator with a handout detailing Town of Dolores requirements for logging trucks (included as Attachment 1).
2. All treatments that originate from the Salter and Plateau treatment areas and require the removal of forest products utilizing commercial log trucks will be required to utilize the western transportation route and will not travel through the Town of Dolores. These routes are listed in Table 2.
3. The Dolores District commits to initiating the NEPA analysis referred to in Recreation design feature No. 4 (i) in the EA (page 24), in calendar year 2022 and will complete the analysis prior to beginning implementation in affected blocks.
4. Scenery feature No. 7 (page 26 of the EA) is revised as follows: *A visual corridor will be established on each non-motorized system trail within Boggy Draw treatment block utilizing a 50-foot from center line area of influence. The recreation and timber staff will identify leave trees for retention, marking them with temporary paint or flagging Protection of trees within 50 feet of center line of the corridor is intended to reduce scenic impacts by maintaining unique trail features, such as tight turns or challenging obstacles, that improve the feel and flow of a single-track trail as well as maintaining shade on groomed winter trails.*
5. The Dolores District commits to using the “descending order” tree evaluation decision protocol as described on page 17 (items *a* through *l*) of the EA, and on page 3 of this document, within the Salter project area.
6. The percent post-fledgling family area canopy cover of Wildlife Design Feature 2b (page 28 of the EA) will be 50 percent or greater.

Two of the objectors (Town of Dolores and Southwest Colorado Cycling Association) felt that these revisions sufficiently addressed their concerns and dropped their objections. Attachment 2 to this document includes a final list of all design elements to be implemented as part of this decision.

## Alternative Development and Other Alternatives Considered

In addition to the selected alternative, I considered two additional alternatives. I considered a no action alternative, alternative 1, where current management plans would continue to guide management of the project area. I also considered a large tree retention alternative, alternative 3. The large tree retention alternative includes a 20-inch diameter limitation (as compared to a 26-inch diameter limitation in the modified proposed action). This alternative limits the removal of trees over 20 inches diameter at breast height and is intended to emphasize large tree retention.

The Forest Service National Environmental Policy Act (NEPA) procedures allow the responsible official to modify a proposed action as the process progresses and requires such modifications to be made in an open and transparent process obvious to all interested parties conflicts (36 CFR 220.7 (b)(2)(i)). To this end, the comments received during the scoping period were reviewed and assigned to a general subject matter category. Issues that were interrelated were combined into a set of issues or concerns. The concern groupings were developed to facilitate a comprehensive approach to identifying incremental adjustments that would result in a refined, modified proposed action or additional alternative. Refer to the

environmental assessment, section 2, page 34, for a complete listing of groupings by major concern heading. All comments received are located in the project record.

The potential issues and concerns associated with the concern groupings identified above were resolved through project modification, application of best management practices, project design features, or development of an alternative. The initial scoped proposed action was modified by:

- Addition of multiple project design features and identification of avoidance areas for recreation to include protection of trail quality, scenery, and to minimize impacts to recreationists.
- Development of an implementation schedule that is intended to minimize the need for closure of trails and other recreation opportunities during project implementation (environmental assessment, figure 12, appendix A).
- Incorporation of project design features intended to mitigate the adverse impacts of allowing for maximum gross vehicle weight, when authorized.

Resolution of potential issues and concerns identified during scoping also included development of a second action alternative, Alternative 3 (page 29), that includes a 20-inch diameter limitation (as compared to a 26-inch diameter limitation). This alternative limits the removal of trees over 20 inches diameter at breast height and is intended to emphasize large tree retention.

Based on comments received during the 30-day comment period, additional modifications were made between the draft environmental assessment and the final environmental assessment that include: refinement of project design features for invasive species, wildlife, and recreation; the addition of new project design features for recreation and transportation; and bringing additional existing condition information contained in the vegetation specialist report into the text of the environmental assessment document for context and clarity.

## Public Involvement and Scoping

A list of the Federal, State, and Tribal governments, local agencies and individuals during contacted by the Forest Service during the development of the Salter Environmental Assessment can be found on page 85 of the EA.

## Tribal Consultation

A government-to-government consultation package with an initial invitation to consult was distributed to 24 consulting Native American Tribes on February 20, 2020. Two Tribes responded to the invitation, and only the Hopi Tribe requested to continue consultation for the proposal. A notification package containing the results of the class I literature reviewwas sent to the Hopi Tribe on June 4, 2020. Consultation on subsequent implementation under the NEPA decision would follow the process outlined in the Cultural Resources Vegetation Management Programmatic Agreement. The Colorado State Historic Preservation Officer agreed on June 12, 2020 on the use of the 2017 programmatic agreement for vegetation management undertakings.

## Public Involvement

Scoping packages were distributed to 62 individuals, organizations, permittees, agencies, and congressional representatives on February 21, 2020. A public news release was made to local media on February 21, 2020. The Salter Vegetation Management project was identified on the San Juan National Forest Schedule of Proposed Actions beginning February 2020. Scoping packages were made available to participants attending the Dolores Watershed Resilient Forest Collaborative (DWRF) meetings with periodic updates as the project developed. The scoping period was 30 days long and ended March 23, 2020; 11 comment letters were received. Please refer to the previous section - alternative development and other alternatives considered for a summary of the comments received.

Opportunity for public comment was also provided during a 30-day comment period beginning February 10, 2021, with the issuance of the draft environmental analysis. The comment period was announced via a press release, direct mailing to those who previously showed interest, and a legal notice in the Cortez Journal, the paper of record. One-hundred and twenty-four comment letters were received. Individual comment letters resulted in approximately 1,024 individual comments. Each comment was reviewed and assigned to a concern category. The concern groupings were again utilized to facilitate a comprehensive approach to further refining the proposed action and alternatives through additional incremental adjustments. Project mailing lists of the Federal, State, and local agencies, Tribes, and non-Forest Service individuals that were consulted regarding the Salter Vegetation Management project are included in the project record.

## Collaboration

The Dolores Watershed Resilient Forest Collaborative is a diverse group of stakeholders that have worked since 2015 to support and enhance forest, watershed, and community resilience in Montezuma and Dolores Counties, Colorado. With the goal of building trust, public involvement, and enhancing ecosystem resilience, the group provides an avenue for public engagement, discussion, and input on vegetation projects and strives to expand and build support for efforts that improve resilience.

Through efforts like the Rocky Mountain Restoration Initiative and the Collaborative Landscape Restoration Forest Restoration program, Dolores Watershed Resilient Forest Collaborative members have identified treatment priorities for areas within the Dolores Watershed Resilient Forest Collaborative upper Dolores River watershed, which includes the Salter landscape. This provides information to the agency to take into consideration when determining treatment priorities. The Collaborative has also identified a set of desired conditions for ponderosa pine forest and outlined components of ponderosa pine forest resiliency that are a priority for the Collaborative (DWRF. 2020. Ponderosa Pine Ecosystem Resilience Metrics and Desired Conditions). The desired conditions developed by the collaborative are consistent with and integrate well with the standards and guidelines identified in the SJNF Land and Resource Management Plan for this landscape, described in section 2.9. I considered the information and recommendations provided by the Collaborative in the design of the Salter Vegetation Management project.

# Finding of No Significant Impact

## Context

For the modified proposed action and alternatives, the context of the environmental effects is based on the environmental analysis in the environmental assessment. This project is limited in scope, the decision made here applies to the Salter Vegetation Management area on public land. The project is also limited in duration. Spatial and temporal effects would vary, and would be mostly limited to the project area. While some short-term adverse effects will occur, long-term effects would be beneficial across a range of resources. The resources affected by the proposed action are described in the Salter Environmental Assessment – section 3 – environmental effects.

The project area is located in a managed roaded area on suitable timber lands within Management Area 5. Management Area 5 emphasizes active management and commodity production in order to meet a variety of social, economic, and ecological objectives (USDA 2013). All of the actions included under the selected alternative are confined to this management area. The actions included under the selected alternative are appropriate to implement in Management Area 5 (Forest Plan, section 2.9.14).

The San Juan National Forest includes approximately 1.9 million acres of National Forest System lands. The Dolores Ranger District encompasses about 597,373 acres of those National Forest System lands. The Salter Vegetation Management project area encompasses approximately 3.7 percent of the district (22,346 acres). The effects will be local in nature and will not significantly affect regional or national resources.

## Intensity

Intensity is a measure of the severity, extent, or quantity of effects, and is based on information from the effects analysis of this environmental assessment and the references in the project record.

1) **Impacts may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on the balance the effects will be beneficial.**

   Consideration of the intensity of environmental effects is not biased by beneficial effects of the action. Impacts that may be both beneficial and adverse are discussed in environmental effects section of the environmental assessment (section 3 – page 35). There will be localized, short-term impacts, but the analysis indicates that the selected alternative would not result in any significant adverse effects.

2) **The degree to which the proposed action affects public health or safety.**

   There will be no negative effects on public health and safety. Project design features require that once harvest operations begin in either the Boggy Draw or Turkey Knoll treatment blocks and throughout duration of operations in either block, an information station will be set up at the Boggy Draw trailhead. Information will also be available at local bike shops, Chamber of Commerce, businesses in Cortez and Dolores, the Southwest Colorado Cycling Association, and the San Juan National Forest's Facebook page. The information center will contain up-to-date maps displaying the location of cutting units with active units identified, as well as trail locations and big game units (environmental assessment section 2 – project design features).

   To reduce potential for conflicts with recreation users during federal holidays, hauling would not be permitted on FSR 527 from the junction of FSR 527C to FSR 259 (Boggy Draw Trailhead) from 12:00 P.M. Friday to 12:01 A.M. Monday on Memorial Day, Labor Day, Thanksgiving weekend (Thursday to Monday), Christmas Day, and July 3 to July 5.

In addition to the above design features, the Salter Vegetation Management project includes an adaptive management option (environmental assessment, section 2 – adaptive management) that provides for adjustments if speed becomes an issue with loggingtraffic and recreationalists. Should speed become an issue, the Forest Service would look at mechanisms to address the issue either through law enforcement or through timber sale contract provisions.

**3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.**

The selected alternative does not involve impacts to unique characteristics or ecologically critical areas. No park lands, prime farmlands, floodplains, wilderness, or wild or scenic rivers occur in the project area. No adverse effects to wetlands, wet meadows, or riparian areas will occur because design elements are in place that minimize skidding, decking and loading in these areas. Intermittent streams and ephemeral streams with riparian vegetation will be protected during project activities by a 100-foot buffer zone where no mechanized equipment use is allowed, unless a field visit by a hydrologist determines a different site-specific buffer (environmental assessment, section 2 - hydrology and soils). Implementation of other hydrology and soils design elements (environmental assessment, section 2 – hydrology and soils) will further ensure protection of wetlands and streams in the project area (environmental assessment, section 3 - watersheds). The selected alternative does not involve impacts to historic or significant cultural resources. The project design features identified in Appendix B (Cultural Resources Programmatic Agreement Vegetation Management Activities-Specific Project Design Features) will be applied consistent with the Cultural Resources Vegetation Management Programmatic Agreement. Therefore, the proposal will have no adverse effects to significant cultural resources or historic properties.

**4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.**

The effects of this action on the quality of the human environment are not highly controversial. The Forest Service has extensive experience in analyzing and implementing this type of vegetation management project in similar conditions (Forest Plan, section 2.9.14). Although other perspectives on vegetation management approaches were raised during the various public comment periods, the project implements established approaches that Forest Service resource specialists deem reliable and that are supported by the best available science.

**5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.**

The Forest Service has extensive experience in analyzing and implementing single tree selection, commercial thinning, pre-commercial thinning, brush thinning, reforestation, slash disposal, burning, and road-related activities. Because of this, potential issues associated with this proposed action are understood and there is a low degree of uncertainty regarding the risks to the human environment. Issues brought forth by resource specialist are not unique, have been identified before on the San Juan National Forest, and tend to have clearly defined design elements or measures that would limit or fully eliminate meaningful adverse effects. Best available science was used to inform the effects analysis in chapter 3 of the environmental assessment. The effects analysis shows the effects are not uncertain and do not involve unique or unknown risks.

**6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.**

The action will not establish a precedent for future actions that may have significant effects on the environment. It does not represent a decision in principle about a future consideration. Future actions would require their own analyses and decisions.

**7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts.**

Cumulative effects of past, present, and reasonably foreseeable projects have been considered and evaluated in addition to the impacts of this project. No significant cumulative impacts were identified (environmental assessment, section 3).

**8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in the National Register of Historic Places or may cause loss or destruction of significant cultural or historical resources.**

No direct or indirect effects on significant cultural resources are anticipated given that project activities would be controlled through application of cultural resource design elements identified in the Cultural Resources Vegetation Management Programmatic Agreement (USDA 2017). Significant cultural resources will be avoided. All project undertakings identified under the selected alternative will avoid National Register eligible cultural resources per section 106 of the National Historic Preservation Act. The cultural resource design elements (environmental assessment, section 2 and appendix B) included in the selected alternative ensure the project will have "no adverse effect" on cultural resources (environmental assessment, section 3 – cultural resources).

**9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act.**

There will be no adverse effect to any endangered or threatened species or to critical habitat (biological assessment, page 15). Habitat is absent or proposed activities would not occur in habitat for Canada lynx, Mexican spotted owl, Gunnison's Sage-grouse, New Mexico meadow jumping mouse and western yellow-billed cuckoo. Habitat for bonytail chub, Colorado pikeminnow, humpback chub and razorback sucker is absent in the project area. The Salter Vegetation Management project is outside of occupied range forthese species and does not deplete water from the basin (environmental assessment, section 3 – wildlife and fisheries).

**10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.**

This action complies with relevant Federal, State, and local laws or requirements for the protection of the environment.

## Findings Required by Other Laws and Regulations

In reviewing the environmental assessment and actions associated with alternative 2 - modified proposed action, I have concluded that my decision is consistent with the following laws and requirements:

### *National Forest Management Act (NFMA)*

This decision to treat approximately 22,346 acres of the ponderosa pine-Gambel oak vegetation type on the Dolores Ranger District is consistent with the intent of the long-term goals and objectives listed on pages 28 and 81 of the Forest Plan. The project was designed in conformance with land and resource management plan standards and incorporates appropriate land and resource management plan guidelines

for forested terrestrial ecosystems (Forest Plan, tables 2.2.1 and 2.2.2; page 22; terrestrial ecosystem resource direction), forested terrestrial ecosystem with respect to representation at the landscape scale (Forest Plan, tables 2.2.1and 2.2.2; page 22; terrestrial ecosystem resource direction), and forested terrestrial ecosystems with respect to stand structures and tree species composition that offer resistance and resilience to changes in climate, including extreme weather events, or epidemic insect and disease outbreaks (Forest Plan, page 22; terrestrial ecosystem resource direction).

**Other NFMA Requirements**

1. **Suitability for Timber Production: No timber harvest, other than salvage sales or sales to protect other multiple-use values, shall occur on lands not suited for timber production (16 USC 1604(k)).**

   This project does not propose timber harvest on lands considered unsuitable for timber production. All project activities will occur in Management Area 5 (Active Management). Lands classified as part of Management Area 5 are designated as multiple-use areas where active management occurs in order to meet a variety of social, economic, andecological objectives. They are easily accessible, occurring mostly on roaded landscapes and relatively gentle terrain. These are lands where timber harvesting, oil and gas activities, and intensive livestock grazing occur and influence the composition, structure, and landscape patterns of the vegetation (Forest Plan, page 187).

2. **Timber Harvest on National Forest Lands (16 USC 1604(g)(3)(E)): A Responsible Official may authorize site-specific projects and activities to harvest timber on National Forest System lands only where:**

   a. **Soil, slope, or other watershed conditions will not be irreversibly damaged (16 USC 1604(g)(3)(E)(i)).**

      The selected alternative will avoid impairment of soils or watershed conditions. Treatments would take place on gentle to moderate slopes, avoiding steep slopes. Soil types are appropriate for these kinds of management activities. Design features include buffers and altered harvest methods in proximity to (less than 100 feet from) streams and wetlands. Where negative effects may occur, they are expected to be short-term in duration and improve in the long-term. Further supporting rationale can be found in the vegetation and watershed discussions in the environmental assessment (environmental assessment, section 3 – vegetation, page 65 and section 3 – watersheds, page 67). Units that are adjacent to or contain soils prone to mass movement will be reviewed by forest geologist prior to implementation.

   b. **There is assurance that the lands can be adequately restocked within five years after final regeneration harvest (16 USC 1604(g)(3)(E)(ii)).**

      The primary silvicultural treatment proposed is single tree selection which is a regeneration treatment and subject to the five-year restocking requirements of the National Forest Management Act. The minimum adequate stocking required by the Forest Plan for ponderosa pine is 150 trees per acre (Forest Plan, table 2.9.3). Similar treatments have been done on this landscape with numerous examples of success,and in many cases, the harvest itself did not bring stocking below 150 trees per acre. Uneven-aged management allows for the retention of higher stocking in the smaller diameter classes and prescription would take advantage of advanced regeneration retention. Based on this experience, and applicable research, more than adequate regeneration and or residual stocking is expected.
      Regeneration levels and success would be monitored and verified with post-harvest stocking

surveys. Beyond expected outcomes, the analysis has built in adapted management to allow for reforestation both of ponderosa pine and further drought resistant species, should the need arise.

**c. Protection is provided for streams, streambanks, shorelines, lakes, wetlands, and other bodies of water from detrimental changes in water temperatures, blockages of water courses, and deposits of sediment, where harvests are likely to seriously and adversely affect water conditions or fish habitat (16 USC 1604(g)(3)(E)(iii)).**

The selected alternative was designed to comply with regional watershed conservation practices, Forest Plan standards and guidelines, as well as, Colorado State best management practices. Additional information can be located in section 3 – watersheds of the environmental assessment and in the description of the design features in section 2 – hydrology and soil project design features, which are part of the modified proposed action detailed in the environmental assessment (section 2 – proposed action).

**d. The harvesting system to be used is not selected primarily because it will give the greatest dollar return or the greatest unit output of timber (16 USC 1604(g)(3)(E)(iv)).**

The selected silvicultural treatments have been chosen because they effectively address the project goals as described in the environmental assessment and in this decision notice. Economics was considered, but was only one of many factors.

**3. Clearcutting and Even-aged Management (16 USC 1604(g)(3)(F)): Ensure that clearcutting, seed tree cutting, shelterwood cutting, and other cuts designed to regenerate an even aged stand of timber will be used as a cutting method on National Forest System lands only where:**

**a. For clearcutting, it is determined to be the optimum method, and for other such cuts it is determined to be appropriate, to meet the objectives and requirements of the relevant land management plan (16 USC 1604(g)(3)(F)(i)).**

This project does not propose clearcutting.

**b. The interdisciplinary review as determined by the Secretary has been completed and the potential environmental, biological, esthetic, engineering, and economic impacts on each advertised sale area have been assessed, as well as the consistency of the sale with the multiple use of the general area (16 USC 1604(g)(3)(F)(ii)).**

An interdisciplinary team of specialists, covering a broad spectrum of resource areas, convened to work through a process of environmental analysis and public input (via scoping notices and comment review/summary) in order to evaluate the effects of implementation of the modified proposed action and to compare and contrast that with a no action and large tree retention alternative. The analysis has been completed and documented in an environmental assessment and related specialist reports.

**c. Cut blocks, patches, or strips are shaped and blended to the extent practicable with the natural terrain (16 USC 1604(g)(3)(F)(iii)).**

Prescriptions do not allow for large openings and design features have been identified for scenery (environmental assessment, section 2, page 25).

**d. Cuts are carried out according to the maximum size limit requirements for areas to be cut during one harvest operation, provided, that such limits shall not apply to the size of areas harvested as a result of natural catastrophic conditions such as fire, insect and disease attack, or windstorm (FSM R1 supplement 2400-2001-2 2471.1, 16 USC 1604(g)(3)(F)(iv)).**

N/A

**e. Such cuts are carried out in a manner consistent with the protection of soil, watershed, fish, wildlife, recreation, and esthetic resources, and the regeneration of the timber resource (16 USC 1604(g)(3)(F)(v)).**

An Interdisciplinary Team of specialists, covering a broad spectrum of resource areas, was utilized to work through a process of environmental analysis and public input (via scoping notices and comment review/summary) in order to evaluate the effects of implementation of the modified proposed action and develop a set of design elements (environmental assessment, section 2, page 20) that would protect soil, watersheds, fish, wildlife, recreation, and esthetic resources. A comprehensive list of these design measures can be found in Attachment 2 to this document.

**4. Stands of trees are harvested according to requirements for culmination of mean annual increment of growth (16 USC 1604(m)).**

N/A

**5. Construction of temporary roadways in connection with timber contracts, and other permits or leases: Unless the necessity for a permanent road is set forth in the forest development road system plan, any road constructed on land of the National Forest System in connection with a timber contract or other permit or lease shall be designed with the goal of reestablishing vegetative cover on the roadway and areas where the vegetative cover has been disturbed by the construction of the road, within ten years after the termination of the contract, permit, or lease either through artificial or natural means. Such action shall be taken unless it is later determined that the road is needed for use as a part of the National Forest Transportation System (16 USC 1608(b)).**

Temporary roads will be decommissioned prior to each sale contract close out to prevent unauthorized uses (environmental assessment, section 2 – project design features). Temporary roads not needed for post-sale treatment will be reclaimed before contract closeout. Temporary roads to remain open for post-sale treatment will be reclaimed but these actions would be the responsibility of the Forest Service after the post-sale treatment is completed. The Forest Service will complete reclamation efforts within five years of first use (environmental assessment, section 2 – project design features).

**6. Standards of roadway construction: Roads constructed on National Forest System lands shall be designed to standards appropriate for the intended uses, considering safety, cost of transportation, and impacts on land and resources (16 USC 1608(c)).**

All roads associated with the Salter Vegetation Management project will be designed to standards appropriate for the proposed vegetation management activities, as required by FSM 7700. With respect to the transportation system, the selected alternative is cost-efficient, as it utilizes the existing system for all major haul routes and uses previously utilized road templates for the majority of the temporary system. No new system roads would be constructed (environmental analysis, section 2 – modified proposed action and section 3 - environmental effects -

transportation). The primary costs associated with the proposed transportation system will be related to implementing deferred maintenance. This cost will be commensurate with the proposed use. The impacts to the land and resources associated with the transportation system have been analyzed and potential adverse impacts mitigated, and or avoided. Project design features will be implemented as part of implementation to address potential safety concerns (Refer to Finding of No Significant Impact item #2 and environmental assessment, section 2 – project design features).

### *The National Environmental Policy Act (NEPA)*

The Forest Service prepared this environmental assessment in compliance with the National Environmental Policy Act and FSH 1909.15, the National Environmental Policy Act Handbook.

### *The Endangered Species Act of 1973, as amended*

Threatened, Endangered and Forest Service sensitive species were evaluated and the impacts described in the environmental assessment (section 3 – wildlife and fish), biological assessment, and biological evaluation located in the project file. These evaluations were conducted in in accordance with section 7 of the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 et seq.). Conclusions from these evaluations are provided in theFinding of No Significant Impact, Significance Factor 9, of this decision notice and finding of no significant impact.

### *The Clean Air Act*

The reduction of activity created slash via pile burning will be implemented within the established State, County, and Federal framework and standards, and would therefore, be in compliance with the Clean Air Act (environmental assessment, section 3 – air quality).

### *Clean Water Act*

Integrated project design features (which include implementation of regional and national best management practices) as outlined in the selected alternative will ensure that Colorado State water quality standards and anti-degradation policy continue to be met. Full implementation of best management practices has been shown to be an effective method in preventing and controlling nonpoint source water pollution. Monitoring will be conducted during the project in order to validate implementation and effectiveness of best management practices and assure compliance with the Clean Water Act, Colorado State water quality regulations, and San Juan National Forest plan standards (environmental assessment, section 3 – watersheds).

### *Floodplain Management (Executive Order 11988), Protection of Wetlands (Executive Order 11990)*

Integrated project design features (which include implementation of regional and national best management practices) for floodplains and riparian lands will ensure compliance with Executive Order 11988 Floodplain Management (1977), and Executive Order 11990 Wetland Protection (1977). Riparian lands and floodplains would have a no harvest/no mechanized equipment buffer for their protection. Therefore, there would be no direct impacts to riparian lands or floodplains through the selected alternative (environmental assessment, section 3 - watersheds).

### *Civil Rights and Environmental Justice*

Executive Order 12898 on environmental justice requires federal agencies to identify and address any disproportionately high and adverse human health or environmental effects on minority and low income populations. After evaluating the discussion in the environmental assessment, section 3 - socioeconomics, I have determined that there would be no discernible impacts.

### *The National Historic Preservation Act*

The Forest will comply with section 106 of the National Historic Preservation Act and its implementing regulations at 36 CFR § 800 in accordance with the procedures outlined in Stipulation VI of the Cultural Resource Vegetation Management Programmatic Agreement (USFS 2017).

### Conclusion

After consideration of the environmental analysis documented in the Salter Vegetation Management Project Environmental Assessment and the associated project record, I have determined that alternative 2 – modified proposed action will not have significant effects on the quality of the human environment considering the context and intensity of impacts. Therefore, an environmental impact statement is not warranted and will not be prepared. The selected alternative is consistent with the management direction, standards, and guidelines outlined in the Land and Resource Management Plan. This finding is made based on the context of the project and intensity of effects using the ten factors identified in 40 CFR 1508.27(b).

## Implementation

Implementation of this project may occur immediately, as the objection resolution period is closed (36 CFR 218.12[b]).

## Responsible Official

The District Ranger of the Dolores Ranger District of the San Juan National Forest is the official responsible for deciding the type and extent of management activities in the Salter Vegetation Management project area.

Approved by:

Digitally signed by DEREK PADILLA
Date: 2021.11.18 11:16:01 -07'00'

DEREK PADILLA
District Ranger
Mancos-Dolores Ranger District
San Juan National Forest

11/18/2021
Date

We make every effort to create documents that are accessible to individuals of all abilities; however, limitations with our word processing programs may prevent some parts of this document from being readable by computer-assisted reading devices. If you need assistance with any part of this document, please contact the San Juan National Forest at (970) 247-4874.

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at http://www.ascr.usda.gov/complaint_filing_cust.html and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer, and lender.

## Attachment 1
## Town of Dolores Information for Pre-work Meetings with Timber Operator

1. Montezuma County Road 31 turns into Town of Dolores 11th Street when the road crosses city limits and the speed limit is 15MPH
2. The Town of Dolores requires that all trucks hauling logs off of Forest Service contracts are equipped with Jake Brakes Mufflers
3. The town of Dolores requires that all trucks hauling logs off of Forest Service contracts do not deviate from 11th Street (go either left or right at junction of 11st (CR 31) and Railroad Ave (HWY 145)
4. Commercial truck traffic is not allowed on 11th Street from 10:00pm to 6:00am
5. The town of Dolores has the following ordinance for muffler requirements:

**Dolores Municipal Code-Model Traffic Code Section 2-225. Mufflers - prevention of noise.**

(1) Every motor vehicle subject to registration and operated on a highway shall at all times be equipped with an adequate muffler in constant operation and properly maintained to prevent any excessive or unusual noise, and no such muffler or exhaust system shall be equipped with a cut-off, bypass, or similar device. No person shall modify the exhaust system of a motor vehicle in a manner which will amplify or increase the noise emitted by the motor of such vehicle above that emitted by the muffler originally installed on the vehicle, and such original muffler shall comply with all the requirements of this section.

(1.5) Any commercial vehicle, as defined in section 235 (1) (a), subject to registration and operated on a highway, that is equipped with an engine compression brake device is required to have a muffler.

(2) A muffler is a device consisting of a series of chamber or baffle plates or other mechanical design for the purpose of receiving exhaust gas from an internal combustion engine and effective in reducing noise.

(3) Any person who violates subsection (1) of this section commits a class B traffic infraction. Any person who violates subsection (1.5) of this section shall, upon conviction, be punished by a fine of five hundred dollars. Fifty percent of any fine for a violation of subsection (1.5) of this section occurring within the corporate limits of a city or town, or within the unincorporated area of a county, shall be transmitted to the treasurer or chief financial officer of said city, town, or county, and the remaining fifty percent shall be transmitted to the state treasurer, credited to the highway users tax fund, and allocated and expended as specified in section 205 (5.5)(a), C.R.S.

**Attachment 2**
**Project Design Features**

The design features listed below are essential to implementing the project activities, including all actions that occur as the result of adaptive management, and are expected to provide adequate resource protection under the treatments for this project. Changes made during objection resolution are italicized.

## Cultural Resources

The procedure set forth in the 2017 Programmatic Agreement among the United States Forest Service, Rocky Mountain Regional Office, Pike-San Isabel National Forest and Cimarron and Comanche National Grasslands, Routt National Forest, San Juan National Forest and the Colorado State Historic Preservation Officer Regarding Vegetation Management Undertakings (Programmatic Agreement) will be followed to satisfy compliance with Section 106 of NHPA. The Programmatic Agreement may be used for landscape-scale vegetation management undertakings implemented in phases and for which effects to historic properties have not been fully determined prior to the NEPA decision.

## Fuels

1. Vegetation management contracts will require concentrations of activity fuels to be disposed of by piling and burning, lopping, and scattering throughout the unit, and/or removal, as specified in the slash disposal plan for each project area.
2. Machines used to pile slash will be equipped with a brush blade or acceptable equivalent. Piles should consist of only clean forest fuel as described in the California Air Pollution Control Division smoke permit application.
3. Develop a slash disposal plan for each project area in consultation with the wildlife biologist, hydrologist, and fire management officer.
4. When in Stage 1 Fire Restrictions or greater all mechanized equipment should be equipped with fire suppression equipment (Fire extinguisher, hand tools and or portable water tank, minimum 100 gallons).
5. Piles of activity fuels generated by the project must be no greater than 3,000 $ft^3$ per acre, regardless of individual pile size in order to remove all piled slash within one average winter season while following Colorado Air Pollution Control Division requirements for pile prescribed fires.
6. Activity fuels that are lopped and scattered must be evenly distributed at an average depth less than one foot in order to maintain residual overstory through broadcast prescribed fire implementation.

## Hydrology and Soils

Design features for hydrology and soils are generated from the National Best Management Practices (BMPs) for Water Quality Management on National Forest System Lands Volume 1: National Core BMP Technical Guide, the Region 2 Watershed Conservation Practices Handbook, standard practices described in Forest Service Handbooks, and standard practices described in Technical Guides. Collectively, these guides and handbooks provide BMPs that have been evaluated, tested, and revised over time to effectively protect soil and water resources.

1. Heavy equipment and vehicles will be prohibited in riparian areas which will include the aquatic management zone (AMZ) unless the ground is protected by either one foot of packed snow or two inches of frozen soil. Seeps and springs with riparian vegetation will have a buffered perimeter of 100 feet. Intermittent streams with riparian vegetation will have a buffer strip width of 100 feet on each side of the channel (based on standard 2.6.30). No-equipment buffer zones do not apply to designated stream crossings, but limit stream crossings to the minimum number necessary. Cross streams perpendicular to the direction of flow in straight and shallow locations and where channels are hardened by gravel, cobble, or bedrock. Do not cross streams where banks exceed a 30% slope.
2. Limit equipment operations to sustained slopes less than 40%.
3. When soils are saturated, equipment operations will cease until the ground dries out or freezes. Soils are considered saturated when ruts created by equipment are 4 inches deep (beyond the lug tread of the tire) for 10 feet or longer. Repair any rutting deeper than 4 inches.
4. Avoid mechanical treatments in wetlands, wet meadows, and riparian areas. No skidding, decking, or loading will be allowed in these areas in order to protect water quality, groundwater hydrology, existing soils, and vegetative cover. Removal or mechanical treatment of riparian or wetland vegetation will be prohibited (based on guideline 2.4.28). Establish a 100 foot no treatment buffer zone around riparian and wetland areas unless field visit by hydrologist determines a different site-specific buffer.
5. Avoid ground skidding on sustained slopes steeper than 40 percent. Conduct logging to disperse runoff as practicable. Landings and skid trails will be located and designed to disperse runoff and minimize soil disturbance. Landings should not be located in the aquatic management zone (AMZ). Roads and skid trails adjacent to the landings will be cross-drained or shaped so that runoff does not reach the landing. Skid trails will be located perpendicular to slope angles (along the contour) as much as possible. Avoid skidding up or down drainage bottoms. As needed, install waterbars or outslope, and spread slash on skid trails upon completion of use. Landings will be ripped or scarified and seeded immediately upon completion of use.
6. Where erosion is a concern, enough slash will be well-distributed throughout the cutting units to protect soils from erosion. Wood chips produced by mechanical treatments should be dispersed on the ground at a maximum depth of three inches over at least 80 percent of the covered areas, and no chip piles should exceed 6 inches in depth (based on guideline 2.2.78). Logging debris may not enter intermittent stream courses to an extent that it adversely affects the natural flow of the stream or diminishes water quality.
7. Temporary roads will be held to the minimum feasible number, width and total length and will be located sufficiently far from streams and other water bodies to minimize discharge into those waters except at necessary water crossings. Stream crossings will be installed on straight and resilient stream reaches as perpendicular to flow as feasible. Maintain stream channel width, depth, and slope. Culverts placed within the drainage network will be positioned at the natural grade of the drainage and will not be modified (for instance, raised or lowered) to maintain the grade of the road. Table 2 below, provides guidelines for maximum spacing of cross-drainage (for example, culverts, rolling dips) on temporary roads. All temporary roads will be obliterated and seeded upon completion of use.

**Table 1. Maximum cross-drain spacing in feet based on soil types**

| Road Grade (percent) | Extra Erodible Silts-Sands with little or no binder | Highly Erodible Silts-Sands with moderate binder | Erodible Gravels + fines & sands with little or no fines | Low Erodible Gravels with little or no fines |
|---|---|---|---|---|
| 1-3 | 600 | 1000 | 1000 | 1000 |
| 4-6 | 300 | 540 | 680 | 1000 |
| 7-9 | 200 | 360 | 450 | 670 |
| 10-12 | 150 | 270 | 340 | 510 |
| 13-15 | 120 | 220 | 270 | 410 |

Source: Forest Service Handbook 2509.25 Management Measure 13.3

8. Proper drainage will be constructed or reconstructed on existing system road and newly constructed temporary roads. Some existing road sections could need to be realigned out of low-lying areas for proper drainage. Road-stream crossings and dips through habitually wet areas on roads open to motorized public use will be hardened. All drainage structures on roads will be inspected by the Timber Sale Administrator, Engineering Representative, or Forest hydrologist at treatment completion to make sure they are in good condition and functioning properly.

## Rangelands

1. U.S. Forest Service rangeland management specialists will be annually informed of the schedule of timber harvest activities.
2. Coordination between the U.S. Forest Service rangeland management specialist and affected grazing permittees will be conducted to discuss harvest timing, potential impacts, and adjustments to rotation schedules needed to mitigate impacts.
3. To mitigate impacts to livestock operations, when possible, timber harvest operations will be concentrated within individual pastures.
4. When determined necessary by the rangeland management specialist, timber harvest operations will avoid long-term range trend monitoring plots. The need to avoid monitoring plots will be made on a case-by-case bases.
5. Timber purchasers/contractors are required to repair any damages to range improvements that occur as a result of their operations within the time-frames instructed by the U.S. Forest Service. To address the immediacy of livestock control, purchasers/contractors will be required to repair any range fences or gates damaged during operations. No fences will be cut unless necessary and agreed to in writing by the U.S. Forest Service. When fences lie within cutting units, effort will be made to design skidding patterns to be parallel to fence lines, pull timber away from fences, or to go through existing gates as feasible. In the event temporary roads and skid trails need to cross livestock fences at locations other than existing gate locations, breach points must be closed with wire or a gate while operations are being conducted to a standard that does not reduce control integrity of the fence for livestock. Should a road have high traffic use from operations, consideration should be given to the installment of a cattleguard. Upon completion of operations, any section of impacted fence will be repaired to the original state of integrity.
6. Pasture gates will remain closed when cattle are in or adjacent to affected pastures or when instructed by Forest Service.

## Rare Plants and Invasive Species

1. Limit each burn pile to ¼ acre or less.
2. Under timber sale contract provisions, all off-road heavy equipment must be washed and free of foreign soil or debris before entering the operations area to minimize spread of invasive species.
3. Sale and contract areas will be monitored for weeds; infestations are to be reported to the U.S. Forest Service rangeland management specialist for management.
4. All seed used for revegetation will be tested for, and free of, invasive non-native species that are problematic for this forest. Contact the agency for the most current list.
5. Monitor noxious weeds/invasive species and treat infestations as needed for containment, minimizing rate of spread, and eradication.
6. If noxious weeds and invasive species are found to be increasing in infestation size within a treatment unit as direct result of harvest and associated activities, one or both of the following options will be implemented to prevent further spread:
   - Prohibit harvest equipment or vehicles from driving through infestations.
   - Require onsite weed decontamination stations for equipment washing.

## Recreation and Public Safety

1. For public safety purposes once harvest operations begin in either the Boggy Draw or Turkey Knoll treatment blocks and throughout duration of operations in either block, an information station will be set up at the Boggy Draw trailhead. Information will also be available at local bike shops, Chamber of Commerce, businesses in Cortez and Dolores, the Southwest Colorado Cycling Association, and the San Juna National Forest's Facebook page. The information center will contain up to date maps displaying location of cutting units with active units identified, as well as, trail locations and big game units.
2. When timber activity operations are suspended for two weeks or more, trails and roads that are closed within that unit will be reopened, unless safety concerns cannot be mitigated.
3. In the event that a decrease in tree density results in easier access to dispersed camping sites beyond what is allowed by Forest Service regulations, barriers such as boulders will be installed to control the expansion of dispersed camp sites.
4. Within the Boggy Draw treatment block the following specific project design features apply (unless waiver or variance is recommended by the Recreation Staff, in coordination with the Timber Staff, and is approved by the Line Officer which will be documented on the implementation checklist)
   a. Locations of all landings and slash piles will be identified during the implementation checklist process to avoid long-term physical impacts to any system trails.
   b. To avoid long-term physical impacts to system trails and minimize the number of crossings, the sale administrator will designate crossing corridors for all skidding that requires crossing a system trail. Crossing corridors will be designated during the implementation checklist process.

c. No tracked or wheeled equipment will be allowed within 15 feet of the center line of a system trail to protect the integrity of the trail except where a trail crossing for skidding or hauling has been identified. Chain saws are authorized.

d. Vegetation management activities (except Rx burning) are limited to 1 compartment at a time when operating within recreation compartments 1 thru 3 (Figure 14, appendix A). Sale units will be designed to ensure as many trails as possible remain open. Following the recreation compartment concept will provide for access via one arterial trail (Maverick or Boggy Draw) to other trails within the system.

e. No harvest activities or hauling will be allowed in recreation compartments 1 thru 4 during the annual Boggy Draw Beatdown mountain bike race day. From 12:00 A.M. the day of the event to 12:01 A.M. the following day (one day). (Occurs early August). No hauling will be allowed on Escalante Days (August), the Dolores River Festival (June), Ride of the Ancients Gravel Grinder (June) and the Dolores Harvest Festival and Car Show (October).

f. Starting December 1, no plowing of FSR 527 from Junction of 527C to FSR 259 (Boggy Draw trailhead).

g. To reduce conflicts with recreation users during federal holidays, hauling will not be permitted on FSR 527 from the junction of FSR 527C to FSR 259 (Boggy Draw Trailhead) from 12 P.M. Friday to 12:01 A.M. Monday on Memorial Day, Labor Day, and Thanksgiving weekend (Thursday-Monday), Christmas Day and July 3-July 5.

h. Trails will be used as sales unit boundaries when feasible.

i. Where haul routes create long term impacts to system trails or they cannot be reclaimed to single track condition, opportunities for trail reroutes (including the route from the Forest boundary to Little Bean trail via CR 31) will be analyzed in a subsequent NEPA analysis.

j. Sections of trails will remain open for use if detours via system roads are available. If timber operations (harvesting and hauling) do not pose a safety risk to users of trails within an active sale unit the trail will remain open.

k. Measures to protect winter grooming operations will be considered during the implementation checklist process.

5. For public safety purposes, clear and prominent signage, including maps and cutting units status, will be posted at the Boggy Draw trail head and at key trail points alerting the public to the presence of log trucks, trail closures and the status of cutting units where operations impact any system trails within the Boggy Draw and Turkey Knoll treatment blocks. In the event transportation routes cross system trails, caution signs alerting trail users of timber traffic or activity will be installed. If monitoring indicates speed is an issue, a clause requiring a 15 MPH speed limit within a quarter mile of trailheads or parking lots could be included in contract language to address the issue. Information signs will include the Forest Service number to report any unsafe activity or trail conditions.

6. If trails are substantially damaged by vegetation management activities they will be repaired immediately after timber operations have been completed. Repairs will meet Trail

Management Objectives included in the Forest Service publication *Standard Specifications for Construction and Maintenance of Trails (USDA USFS EM-7720-103, September 1996).*

7. When necessary for public safety, Special Closure Orders will be applied to trails and roads.
8. Opportunities to limit trail closure and provide access to multiple trails from the Boggy Draw trailhead will be developed during the project implementation checklist process.
9. Where timber operations result in full size vehicles accessing trails width restrictors will be installed.
10. Trail Management Objective will be followed for all impacted trail segments as part of post timber operation trail reconstruction. Reclamation will be performed to standards outlined in the Forest Service publication *Standard Specifications for Construction and Maintenance of Trails (USDA USFS EM-7720-103, September 1996)* and will be referenced in all contracts associated with the project.
11. In an effort to acknowledge the contributions of local trail partners, there will be collaboration with key members during the implementation checklist process. Inspections by Forest Service staff during project implementation will be conducted to ensure design features are followed. Post-harvest inspections will also be conducted to ensure design features were implemented. If damage to trails occur repair to the trails will be the responsibility of the Forest Service. Trail repairs will be done as quickly as feasible.

## Scenery

1. Openings in the canopy will have a natural appearance with uneven edges. The shape will be an irregular pattern that mimics existing natural openings and will avoid straight-line edges. Blend openings with natural landscape features such as natural meadows or openings and rock outcrops.
2. Unit boundary paint will face away from open system roads and trails or be removed; standards for boundary marks should be minimized along these routes.
3. Stumps will be 12 inches high or less.
4. All equipment and construction debris (man-made debris and trash) caused by project operations will be removed from the site at sale completion.
5. Disturbed areas where soils have been exposed, such as temporary roads, skid trails or landings will be closed and re-vegetated with a seed mixture consisting of native grasses and forbs which is as close as possible to the existing native species in the area. Effectiveness of closures will be monitored yearly for revegetation success, as well as, travel management compliance. If ineffective, roads will be reclosed or reseeded.
6. Skid trails will cross at a perpendicular angle but slightly curved to avoid creating straight line corridors when the skid trails connect with open system roads and trails. Skid trails will be held to the minimum number, width, and length (See Recreation Design Features). Forest system trails will not be utilized as a skid path unless the trail utilizes a Level 1 Road.
7. A visual corridor will be established on each system trail within Boggy Draw treatment block utilizing a *50-foot* area of influence. The recreation staff will identify leave trees for retention, marking them with a 360-degree band of temporary paint or flagging. Protection of trees within *50 feet* of center line of the corridor is intended to reduce scenic impacts by

maintaining unique trail features, such as tight turns or challenging obstacles, that improve the feel and flow of a single track trail *as well as maintaining shade on groomed winter trails*.

## Timber

1. Normal operating season will be from April 1 until November 30. Winter season will be from December 1 until February 28 (plowing will be allowed for access). Additional time outside of these defined above may be granted by the line officer if conditions allow.
2. During slash disposal, limit the amount of slash scattered or piled in areas where existing pine regeneration is present and minimize the placement of slash within the driplines.
3. *Tree evaluation will be accomplished through a descending order of choice made by the designator. Evaluation occurs at every step of the decision-making process applying sound judgement based on parameters from the analysis and direction from a certified silviculturist. Below is the descending order of choice that will be used to evaluate trees and ultimately designated them for removal if the stand has a basal area greater than 50 $ft^2$/acre.*
    a. *Tree can be evaluated for harvest if it is less than 27.0 inch DBH*
    b. *Do not cut trees with a combination of pre-settlement visual indicators*
    c. *Cut dead trees (brown or red needles/no needles)*
    d. *Cut live trees with visible evidence of bark beetle infestation (e.g., pitch tubes, frass, and woodpecker activity on tree bole)*
    e. *Cut live trees with dwarf mistletoe infecting more than 50% of the live crown*

*In addition to b-e above, trees 25 inch DBH and less can also be cut if they meet the following condition or structure.*

    f. *Live crown declining more than 25% including poor needle conditions*
    g. *Evidence of conks, cankers, or advanced decay*
    h. *Weak or multiple forks*
    i. *Broken or dead tops*
    j. *Leans greater than 35%*
    k. *Grossly poor form*
    l. *To achieve a basal area target within 50-70 $ft^2$/ac.*

## Transportation

1. Existing roads will be used for equipment access to the extent road location and condition permit reasonable access. Implementation of mechanical treatments and harvests will attempt to minimize road construction whenever possible.
2. Temporary roads may be used where a designed road is not needed, as determined by the Forest Service. The location and clearing widths of all temporary roads or facilities will be agreed to in writing (between the Forest Service and the contractor) before construction is

started. Following use for harvest and treatment implementation, both temporary AND designed roads will be decommissioned, which involves re-contouring where significant side slope exists, elimination of ditches and other structures, out-sloping during construction, removal of ruts and berms, effectively blocking the road to normal vehicular traffic where feasible, and construction of drainage features such as cross ditches and water bars. Final acceptance of the closure will be made by the Forest hydrologist or engineering representative. Invasive species monitoring will occur after road decommissioning and will be followed by weed treatments where needed, which will be specifically implemented under a different forest-wide weeds NEPA analysis and decision. Effectiveness of road closure will also be monitored.

3. Require commercial haulers to perform maintenance commensurate with their use; depositing sufficient funds with the Forest Service may be used in lieu of performance. Surface rock replacement deposits will be collected to maintain currently surfaced roads that are used for timber hauling. Deposits will be collected commensurate with the use. Quarry materials will be collected from a site that has been found to be free of invasive plants.
4. Timber hauling operations will be restricted during wet or thawed conditions, when needed to protect the road surface. When logging occurs over snow or frozen ground, standard Forest Service practices will be followed.
5. Safety signing will be used to alert the public that logging operations are in progress and will meet the requirements of the Manual of Uniform Traffic Control Devices.
6. Use of private roads, encroachment of public roads and rights-of-way, and other access needs outside Forest Service jurisdiction will have the proper approval or authorization in place prior to use.
7. Use suitable road surface stabilization practices and dust abatement supplements on roads where road surface conditions, traffic use and proximity to recreation or public occupancy justify the need. (See FSH 7709.56 and FSH 7709.59).
8. Move snow in a manner that will avoid or minimize disturbance of or damage to road surfaces and drainage structures. Use existing standard contract language (C5.316# or similar) for snow removal during winter logging operations to avoid, minimize, or mitigate adverse effects to soil, water quality, and riparian resources.
9. Use the following measures to conserve water when managing roads for vegetation treatment projects:
    a. When possible, schedule road maintenance activities to coincide with higher moisture content for ease of grading and better compaction.
    b. Minimize road widths to provide for safe use while limiting impermeable surfaces.
    c. Keep ditches open, but do not remove vegetation that does not impede drainage. Vegetation holds the soil in place and reduces sediment loading which is the greater problem.
    d. When installing drainage features, return intercepted runoff to its natural path at the first opportunity.
10. Road maintenance will be conducted in accordance with the T-800 specifications provided in the Timber sale contract.

11. General reconstruction requirements for **standard haul** on aggregate surface ML3 – 4 roads:
    a. Aggregate surface depth of 6 inches (assuming adequate base course)
    b. All culverts have minimum 12 inches of structural cover.
    c. All culverts have been evaluated for structural integrity.
    d. Cattle guards must have design specification for HL 93 load ratings.
    e. Bridges have a completed inspection and meet safety requirements
12. General reconstruction requirements for **overweight haul** on aggregate surface ML3 – 4 roads:
    a. Aggregate surface depth of 8 inches (assuming adequate base course)
    b. All culverts have minimum 18 inches of structural cover.
    c. All culverts have been evaluated for structural integrity.
    d. Cattle guards must have design specification for HL 93 load ratings.
    e. Bridges have a completed inspection and meet safety requirements
13. *The following haul routes would be used for each treatment block:*

*Table 2. Primary haul route*

| *Treatment Block* | *Forest Service Road Number and Name* |
|---|---|
| *Salter** | *FSR 510 Dry Canyon; FSR 521 Ormiston Point* |
| *Plateau** | *FSR 523 Trimble; FSR 514 The Glade; FSR 521 Ormiston Point* |
| *Carlyle Point* | *FSR 524 Plateau; FSR 525 Trail Canyon; FSR 514 The Glade; FSR 521 Ormiston Point* |
| *Boggy Draw* | *FSR 527 Boggy Draw; FSR 526 Dolores Norwood* |
| *Turkey Knoll* | *FSR 249 Bald Hill Res; FSR 527 Boggy Draw; FSR 532 Cottonwood; FSR 526 Dolores Norwood* |
| *House Creek* | *FSR 526 Dolores Norwood; FSR 529 Beaver Rim* |

**Commercial log trucks must exclusively use the specified primary haul route listed in this table*

## Wildlife

1. Surveys for northern goshawks and other raptors (generally Cooper's hawk and sharp-shinned hawk) will be completed prior to project implementation. If active northern goshawk nests are discovered, all project operations will be restricted annually from March 1 to August 31 within one-half (½) mile of the active nest. If other raptor nests are discovered, all project operations will be restricted annually from March 1 to August 31 within one-quarter (¼) mile of the active nest.
2. Northern Goshawk Prescription (Figure 15, appendix A)
    a. Nest Area. No harvest or treatment of any kind will occur in the nest area (includes 30 acres around nest) of a goshawk nest. This design feature only applies to the Boggy Draw, Carlyle Point and House Creek treatment blocks.
    b. Post-Fledgling Family Area (PFA). An intermediate harvest treatment will be applied to this area adjacent to occupied nest sites. This prescription is designed to improve the overall stand functionality while maintaining or promoting a relatively closed

canopy *with a canopy cover of 50% or greater*. Trees of all size classes up to 22-inches diameter at breast height are evaluated for harvest and designated for removal, with an emphasis on large leave groups with 20-to-30 trees per group. The objective is to promote clumps of 3-to-5 mature and older trees with interlocking crowns within groups. Individual tree structure and isolated clumping is not desired structure in this treatment type nor is promoting aspen. Small openings of two acres or less could be created when implemented for insects (e.g., bark beetles) or disease (e.g., mistletoe) (Reynolds et al. 1992). Where existing conditions do not provide for application of this prescription, thinning will focus on enhancing what is desirable and creating conditions for recruitment of the desired structure over time (Reynolds et al. 1992).

3. Elk Production Habitat - Operations in Colorado Parks and Wildlife mapped elk production habitat will not occur from May 15 to June 30 without line officer approval. The only operation that will be approved is travel through mapped production areas to units outside of the production areas. This will only be approved after consultation with Colorado Parks and Wildlife about the amount of proposed use and access routes. This design feature only applies to the Turkey Knoll treatment block (Figure 15, appendix A).

4. Critical Elk Winter Range - Operations in Colorado Parks and Wildlife mapped critical elk winter range will not occur from December 1 to April 30 without line officer approval. The only operation that the line officer will approve is travel through mapped winter range areas to units outside of the critical winter range. This will only be approved after consultation with Colorado Parks and Wildlife about the amount of proposed use and access routes. This design feature only applies to a portion of the Boggy treatment block (figure 14, appendix A).

5. To meet the desired conditions, leave a minimum of 1 snag per acre of at least 12 inches diameter at breast height and 25 feet tall. If trees in this size class are not available, then leave 2-to-3 snags per acre of at least 9 inches diameter at breast height and 15 feet tall.

6. Consult with wildlife biologist prior to layout of projects that include oak and brush treatment in order to identify areas to be treated (assure benefit wildlife and maintain clumps of dense understory oak for turkey nesting habitat). Restrict oak and brush thinning treatments from April 1st to July 31st to reduce or eliminate impacts to ground nesting species during the general breeding season (birds, mammals, etc.).

7. Mechanized equipment must not operate within the Glade riparian enclosures area that protects wildlife habitat. Consult with the wildlife biologist when developing marking guidelines for trees within the Glade riparian enclosures if harvest is deemed necessary.

# National Ambient Air Quality Standards (NAAQS)

The Clean Air Act, which was last amended in 1990, requires EPA to set National Ambient Air Quality Standards (40 CFR part 50) for pollutants considered harmful to public health and the environment. The Clean Air Act identifies two types of national ambient air quality standards. ***Primary standards*** provide public health protection, including protecting the health of "sensitive" populations such as asthmatics, children, and the elderly. ***Secondary standards*** provide public welfare protection, including protection against decreased visibility and damage to animals, crops, vegetation, and buildings.

EPA has set National Ambient Air Quality Standards for six principal pollutants, which are called "criteria" pollutants. They are listed below. Units of measure for the standards are parts per million (ppm) by volume, parts per billion (ppb) by volume, and micrograms per cubic meter of air (µg/m$^3$).

| Pollutant [final rule cite] | | Primary/ Secondary | Averaging Time | Level | Form |
|---|---|---|---|---|---|
| Carbon Monoxide [76 FR 54294, Aug 31, 2011] | | primary | 8-hour | 9 ppm | Not to be exceeded more than once per year |
| | | | 1-hour | 35 ppm | |
| Lead [73 FR 66964, Nov 12, 2008] | | primary and secondary | Rolling 3 month average | 0.15 µg/m$^3$ (1) | Not to be exceeded |
| Nitrogen Dioxide [75 FR 6474, Feb 9, 2010] [61 FR 52852, Oct 8, 1996] | | primary | 1-hour | 100 ppb | 98th percentile of 1-hour daily maximum concentrations, averaged over 3 years |
| | | primary and secondary | Annual | 53 ppb (2) | Annual Mean |
| Ozone [73 FR 16436, Mar 27, 2008] | | primary and secondary | 8-hour | 0.075 ppm (3) | Annual fourth-highest daily maximum 8-hr concentration, averaged over 3 years |
| Particle Pollution Dec 14, 2012 | $PM_{2.5}$ | primary | Annual | 12 µg/m$^3$ | annual mean, averaged over 3 years |
| | | secondary | Annual | 15 µg/m$^3$ | annual mean, averaged over 3 years |
| | | primary and secondary | 24-hour | 35 µg/m$^3$ | 98th percentile, averaged over 3 years |
| | $PM_{10}$ | primary and secondary | 24-hour | 150 µg/m$^3$ | Not to be exceeded more than once per year on average over 3 years |
| Sulfur Dioxide [75 FR 35520, Jun 22, 2010] [38 FR 25678, Sept 14, 1973] | | primary | 1-hour | 75 ppb (4) | 99th percentile of 1-hour daily maximum concentrations, averaged over 3 years |
| | | secondary | 3-hour | 0.5 ppm | Not to be exceeded more than once per year |

as of October 2011

(1) Final rule signed October 15, 2008. The 1978 lead standard (1.5 µg/m3 as a quarterly average) remains in effect until one year after an area is designated for the 2008 standard, except that in areas designated nonattainment for the 1978, the 1978 standard remains in effect until implementation plans to attain or maintain the 2008 standard are approved.

(2) The official level of the annual NO2 standard is 0.053 ppm, equal to 53 ppb, which is shown here for the purpose of clearer comparison to the 1-hour standard.

(3) Final rule signed March 12, 2008. The 1997 ozone standard (0.08 ppm, annual fourth-highest daily maximum 8-hour concentration, averaged over 3 years) and related implementation rules remain in place. In 1997, EPA revoked the 1-hour ozone standard (0.12 ppm, not to be exceeded more than once per year) in all areas, although some areas have continued obligations under that standard (“anti-backsliding”). The 1-hour ozone standard is attained when the expected number of days per calendar year with maximum hourly average concentrations above 0.12 ppm is less than or equal to 1.

(4) Final rule signed June 2, 2010. The 1971 annual and 24-hour SO2 standards were revoked in that same rulemaking.

FS-003186

Case No. 1:23-cv-01501-RMR Document 10-4 filed 09/29/23 USDC Colorado pg 425 of 459

However, these standards remain in effect until one year after an area is designated for the 2010 standard, except in areas designated nonattainment for the 1971 standards, where the 1971 standards remain in effect until implementation plans to attain or maintain the 2010 standard are approved.

See historical tables of NAAQS standards

- Carbon Monoxide
- Lead
- Nitrogen Dioxide
- Ozone
- Particle Pollution
- Sulfur Dioxide

**Menu of Control Measures for NAAQS Implementation**

The Menu of Control Measures (MCM) provides state, local and tribal air agencies with the existing emission reduction measures as well as relevant information concerning the efficiency and cost effectiveness of the measures. State, local and tribal agencies will be able to use this information in developing emission reduction strategies, plans and programs to assure they attain and maintain the National Ambient Air Quality Standards (NAAQS). The MCM is a living document that can be updated with newly available or more current data as it becomes available.

- Menu of Control Measures (PDF) (66pp, 999k)
- Menu of Control Measures (Excel) (480k)

FS-003187

# Rare Plant Details

**Scientific Name :** *Astragalus iodopetalus*
**Author :** (Rydb.) Barneby
NatureServe Explorer

**Common Name :** Violet Milkvetch
Current Research Activities

Rare Plant Tracking Lists >

Print PDF



Close up of *Astragalus iodopetalus* by Teresa Burkert

**Click link below for details.**

- Taxonomy
- Ranks and Status
- Description and Phenology
- Habitat
- Distribution
- Threats and Issues
- References

## Taxonomy

Back to top

**Family :**

Fabaceae (pea family)

## Ranks and Status

Back to top

**Global Rank :** G3

**State Rank :** S2

**State Rank Reason :** *Astragalus iodopetalus* is known from four counties in southwest Colorado, USA. As of 2021 there are 15 occurrences, with over half considered historical. Threats to the species include non-motorized recreation and the effects of climate change.

**U.S. Endangered Species Act :** none

**Colorado Threatened and Endangered List :** none

**Other Statuses :** SWAP Tier 2, USFS

## Description and Phenology

Back to top

**General Description:**

*Astragalus iodopetalus* is a perennial legume that grows to 10 to 20 cm tall and has reddish violet flowers that are 18-23 mm long. The leaves are pinnate with 8-15 elliptic to ovate leaflets (5-15 mm long) that are variably pubescent. Its crescent-shaped pods are about 20-30 mm long, and glabrous (Harrington 1979, Weber and Wittmann 2012, pers. comm. Burkert 2012).

**Look Alikes:**

No look-alikes have been noted for this species. Available habitat descriptions do not include any other species of *Astragalus*.

**Phenology:**

Flowers in late May and June (Colorado Natural Heritage Program 2012).



*Astragalus iodopetalus* by Teresa Burkert



*Astragalus iodopetalus*by Teresa Burkert

## Habitat

Back to top

This species occurs on dry stony hillsides and benches, commonly on granite, often about oak thickets, in the pinyon-juniper and ponderosa pine zones, in oak-pinyon forests, or among

sagebrush (Barneby 1964). Weber and Wittmann (2012) report that this species is found in sagebrush habitat in Colorado.

*click on image to enlarge*



Habitat of *Astragalus iodopetalus* by Teresa Burkert

**Elevation Range:**

6,611 - 10,218 feet (2,015 - 3,115 meters)

## Distribution

Back to top

**Colorado Endemic:**

No

**Range:**

*Astragalus iodopetalus* is known from Archuleta, Gunnison, Hinsdale and Montrose counties in Colorado. The range extent including historical sites with known locations is 11,272 sq km as of 2021. If historical occurrences (last documented prior to 2001) are excluded, range extent is 580 sq km (calculated using GeoCAT in 2021). Also known from New Mexico, USA.



Distribution of *Astragalus iodopetalus* in Colorado
Click on map to enlarge




Distribution in Colorado by land status (COMaP v20211005)

## Threats and Management Issues

Back to top

The primary threat at this time is considered to be recreation/hiking (Rondeau et al. 2011). It is not known if all of the occurrences are or are not threatened by these activities. The most well documented occurrence is within an archeological area, and may be threatened there by recreationist's. This species is considered to be extremely vulnerable to climate change (Handwerk et al. 2015).




Summary results of an analysis of the status of *Astragalus iodopetalus* based on several ranking factors. This species was concluded to be Moderately Conserved. From Rondeau et al. 2011.

## References

Back to top

- Ackerfield, J. 2015. Flora of Colorado. BRIT Press, Botanical Research Institute of Texas, Fort Worth, TX. 818 pp.
- Barneby, R.C. 1964. Atlas of North American Astragalus. 2 Vols. New York Botanical Garden, Bronx, New York. 1188 pp.
- Colorado Natural Heritage Program. 2008. The Fifth Annual Colorado Rare Plant Symposium: G2 Plants of Colorado. Symposium Minutes. Available on-line http://www.cnhp.colostate.edu/teams/botany.asp#symposia.
- Colorado Natural Heritage Program. 2012. Biodiversity Tracking and Conservation System. Colorado State University, Fort Collins, CO.

- Handwerk, J., L. Grunau, and S. Panjabi. 2015. Colorado Wildlife Action Plan: 2015 Rare Plant Addendum. Colorado Natural Heritage Program, Colorado State University, Fort Collins, Colorado, USA.
- Harrington, H. D. 1964. Manual of the plants of Colorado. Sage Books, Swallow Press, Chicago. Second edition. 666 pp.
- Heil, K.D., S.L. O'Kane Jr., L.M. Reeves, and A. Clifford, 2013. Flora of the Four Corners Region, Vascular Plants of the San Juan River Drainage; Arizona, Colorado, New Mexico, and Utah. Missouri Botanical Garden Press, St. Louis, Missouri. 1098 pp.
- Kartesz, J., and the Biota of North America Program (BONAP). 1998. A Synonymized Checklist of the Vascular Flora of the United States, Puerto Rico, and the Virgin Islands. http://plants.usda.gov.
- Neely, B., S. Panjabi, E. Lane, P. Lewis, C. Dawson, A. Kratz, B. Kurzel, T. Hogan, J. Handwerk, S. Krishnan, J. Neale, and N. Ripley. 2009. Colorado Rare Plant Conservation Strategy, Developed by the Colorado Rare Plant conservation Initiative. The Nature Conservancy, Boulder, Colorado, 117 pp.
- Rondeau, R., K. Decker, J. Handwerk, J. Siemers, L. Grunau, and C. Pague. 2011. The state of Colorado's biodiversity 2011. Prepared for The Nature Conservancy. Colorado Natural Heritage Program, Colorado State University, Fort Collins, Colorado.
- USDA, NRCS. 2022. The PLANTS Database. National Plant Data Team, Greensboro, NC 27401-4901 USA.
- USDI United States Geological Survey. 2003. National Assessment of Oil and Gas Project - San Juan Basin Province (022) Boundary. Vector digital data. U.S. Geological Survey, Central Eneergy Resources Team. Denver, CO.
- Weber, W. A. and R. C. Wittmann. 2012. Colorado Flora, Western Slope, A Field Guide to the Vascular Plants, Fourth Edition. Boulder, Colorado. 532 pp.
- Welsh, S.L. 2007. North American Species of Astragalus Linnaeus (Leguminosae) A Taxonomic Revision. Brigham Young University, Provo, Utah. 932 pp.

## Version Date : 2012-10-03

⚠ For the latest updates about COVID-19, visit https://covid.colostate.edu/.

**Rare Plant Guide**

# Rare Plant Details

**Scientific Name :** *Physaria pulvinata*

**Author :** O'Kane & Reveal

NatureServe Explorer

**Common Name :** Cushion Bladderpod

Current Research Activities

Rare Plant Tracking Lists >

Print PDF



Close up of *Physaria pulvinata* fruit. Photo �Al Schneider, www.swcoloradowildflowers.com.

**Click link below for details.**

- Taxonomy
- Ranks and Status
- Description and Phenology
- Habitat
- Distribution
- Threats and Issues
- References

## Taxonomy

Back to top

**Family :**

Brassicaceae (mustard family)

**Taxonomic Comments :**

FS-003195

Described by O'Kane and Reveal in 2006. *Physaria pulvinata* was split from *P. rectipes* (=*Lesquerella rectipes*), the latter being a variable species (Flora North America vol. 7 2010).

## Ranks and Status

Back to top

**Global Rank :** G1

**State Rank :** S1

**State Rank Reason :** *Physaria pulvinata* is a long-lived perennial herb that is endemic to Colorado in the western United States. It is known from only San Miguel and Dolores counties, where it is confined to shale outcrops that are often used for road gravel. This species is primarily threatened by inappropriate livestock grazing and recreation (motorized and non-motorized). In addition, it is threatened by competition with aggressive non-native plant species (*Cirsium arvense, Carduus nutans*), removal of shale for road work, and the effects of climate change, including long term drought.

**U.S. Endangered Species Act :** none

**Colorado Threatened and Endangered List :** none

**Other Statuses :** BLM, SWAP Tier 1, USFS

## Description and Phenology

Back to top

**General Description:**

Plants are low and compact, densely matted and densely hairy. A long lived perennial, less that 3 dm across with reddish stems and gray-green foliage arising from a deep-seated taproot terminated by a buried, densely branched caudex system of up to several hundred branches each ending in a tufted cluster of leaves. Flowers are yellow with four narrowly spatulate petals 4-7 mm long. Fruit are ellipsoid, compressed, 4-6 mm long and densely pubescent (O'Kane and Reveal 2006).

**Look Alikes:**

Not likely to be confused with other species in this habitat in this part of Colorado.

**Phenology:**

Plants flower in June-July and produce fruit in July-August (Colorado Natural Heritage Program 2012).

## Habitat

Back to top

This species is known from widely scattered outcrops of grayish, argillaceous (Mancos) shale. It grows in openings between low shrubs *Artemisia nova, Chrysopsis,* and *Tetraneuris*, and forbs *Sphaeralcea* and *Cryptantha* (O'Kane and Reveal 2006).

*click on image to enlarge*


Habitat of *Physaria pulvinata* by Bernadette Kuhn


Habitat of *Physaria pulvinata.* Photo �Al Schneider, www.swcoloradowildflowers.com.

**Elevation Range:**

7,543 - 8,487 feet (2,299 - 2,587 meters)

## Distribution

Back to top

**Colorado Endemic:**

Yes

**Range:**

*Physaria pulvinata* is endemic to Colorado in the western United States. It is known from San Miguel and Dolores counties. The estimated range extent is 115 square kilometers, calculated in GeoCAT by drawing a minimum convex polygon around the known occurrences in the Colorado Natural Heritage Program database (NatureServe 2022).



Distribution of *Physaria pulvinata* in Colorado
Click on map to enlarge




Distribution in Colorado by land status (COMaP v20211005)

## Threats and Management Issues

Back to top

This species is primarily threatened by inappropriate livestock grazing and recreation (motorized and non-motorized). In addition, it is threatened by competition with aggressive non-native plant species (*Cirsium arvense, Carduus nutans*), removal of shale for road work, and prolonged drought resulting from climate change (CNHP 2022, Panjabi et al. 2011, O'Kane and Reveal 2006). This species is considered to be extremely vulnerable to climate change (Handwerk et al. 2015).




Summary results of an analysis of the status of *Physaria pulvinata* based on several ranking factors. This species was concluded to be Weakly Conserved. From Rondeau et al. 2011.

## References

Back to top


- Ackerfield, J. 2012. The Flora of Colorado. Colorado State University Herbarium. 433 pp.
- Colorado Natural Heritage Program (CNHP). 2022. Biodiversity Tracking and Conservation System (Biotics 5). Colorado Natural Heritage Program, Colorado State University, Fort Collins.
- Flora of North America Editorial Committee. 2010. Flora of North America North of Mexico. Vol. 7. Magnoliophyta: Salicaceae to Brassicaceae. Oxford University Press, New York. xxii + 797 pp.
- Handwerk, J., L. Grunau, and S. Panjabi. 2015. Colorado Wildlife Action Plan: 2015 Rare Plant Addendum. Colorado Natural Heritage Program, Colorado State University, Fort Collins, Colorado, USA.
- Handwerk, J.E., D.G. Malone, and J.P. Smith. 2022. Monitoring Colorado�s SWAP Tier 1 plant species Physaria pulvinata, 2021. Colorado Natural Heritage Program, Colorado State University, Fort Collins, Colorado.
- Lavender, A.E., M.M. Fink, S.E. Linn, D.M. Theobald. 2011. Colorado Ownership, Management, and Protection v9 Database. Colorado Natural Heritage Program and Geospatial Centroid, Colorado State University, Fort Collins, CO. (30 September).
- Neely, B., S. Panjabi, E. Lane, P. Lewis, C. Dawson, A. Kratz, B. Kurzel, T. Hogan, J. Handwerk, S. Krishnan, J. Neale, and N. Ripley. 2009. Colorado Rare Plant Conservation

Strategy, Developed by the Colorado Rare Plant conservation Initiative. The Nature Conservancy, Boulder, Colorado, 117 pp.

- O'Kane, S. L., and J. L. Reveal. 2006. Physaria pulvinata (Brassicaceae), a new species from southwestern Colorado. Brittonia 58(1):74-77.
- Panjabi, S., B. Neely and P. Lyon. 2011. Preliminary Conservation Action Plan for Rare Plants in the Plateau Creek and Miramonte Reservoir West Priority Action Areas. Prepared by The Nature Conservancy and the Colorado Natural Heritage Program. Unpublished report prepared for the National Fish and Wildlife Foundation. 28 pp.
- Reveal, J.L. 2005. University of Maryland: An Array of Botanical Images, Physaria pulvinata. http://www.life.umd.edu/emeritus/reveal
- Schneider, A. 2013. Wildflowers, Ferns, and Trees of the Four Corners Regions of Colorado, New Mexico, Arizona, and Utah. Accessed on-line at http://www.swcoloradowildflowers.com.
- Weber, W. A. and R. C. Wittmann. 2012. Colorado Flora, Western Slope, A Field Guide to the Vascular Plants, Fourth Edition. Boulder, Colorado. 532 pp.

## Version Date : 2013-02-04

For the latest updates about COVID-19, visit https://covid.colostate.edu/.

**Rare Plant Guide**

NatureServe Explorer

*Astragalus proximus*

**Aztec Milkvetch**

GX Presumed Extinct | GH Possibly Extinct | G1 Critically Imperiled | G2 Imperiled | G3 Vulnerable | **G4 Apparently Secure** | G5 Secure | No Status Rank

View on Explorer Pro




New Mexico State University, Esri, HERE, Garmin, FAO, NOAA, USGS, EPA Powered by Esri

## Classification

**Scientific Name:** *Astragalus proximus* (Rydb.) Woot. & Standl.

**Kingdom:** Plantae
**Phylum:** Anthophyta
**Class:** Dicotyledoneae
**Order:** Fabales
**Family:** Fabaceae
**Genus:** Astragalus

**Scientific Name Reference:** Kartesz, J.T. 1994. A synonymized checklist of the vascular flora of the United States, Canada, and Greenland. 2nd edition. 2 vols. Timber Press, Portland, OR.

FS-003202

**Concept Reference:** Kartesz, J.T. 1994. A synonymized checklist of the vascular flora of the United States, Canada, and Greenland. 2nd edition. 2 vols. Timber Press, Portland, OR.
**Name Used in Concept Reference:** *Astragalus proximus*
**NatureServe Unique Identifier:** ELEMENT_GLOBAL.2.130863
**NatureServe Element Code:** PDFAB0F740
**Related ITIS Names:** *Astragalus proximus* (Rydb.) Woot. & Standl. (TSN 25642)

## Conservation Status

### NatureServe Status

**Global Status:** G4
**Global Status Last Reviewed:** 12/4/2006
*Global status needs review.*

#### National & State/Provincial Statuses

**United States:** N4

**Colorado:** S2, **New Mexico:** S3

### Other Statuses

**U.S. Endangered Species Act:** None
**Committee on the Status of Endangered Wildlife in Canada (COSEWIC):** None

### NatureServe Global Conservation Status Factors

**Range Extent Comments:**

Known from Northwestern New Mexico and adjoining Southwestern Colorado (southern La Plata, and southwest Archuleta and Conejos counties) (Barneby 1964).

**Estimated Number of Element Occurrences Comments:**

There are 13 principal occurrences documented in the Colorado Natural Heritage Program data system. 5 of the 13 occurrences have not been observed in over twenty years.

**Global Abundance Comments:**

According to Bob Sivinsky, this species is common in San Juan County, NM along road side ditches.

## Distribution

**National and State/Provincial Distribution:**

**United States :** CO , NM

## Ecology and Life History

### Habitat

## Economic Attributes

**Economically Important Genus:** Yes

## Population / Occurrence Delineation

The default minimum separation distance is 1 km; see the Habitat-based Plant Element Occurrence Delimitation Guidance for details.

## Population / Occurrence Viability

See the Generic Guidelines for the Application of Occurrence Ranks (2008).

## Authors and Contributors

**NatureServe Conservation Status Factors Edition Date:** 5/17/1996
**NatureServe Conservation Status Factors Edition Authors:** Fayette, K.

## References

1. Kartesz, J.T. 1994. A synonymized checklist of the vascular flora of the United States, Canada, and Greenland. 2nd edition. 2 vols. Timber Press, Portland, OR.

**Page Last Published:** 9/1/2023

NatureServe Explorer

*Gutierrezia elegans*

**Lone Mesa Snakeweed**

GX Presumed Extinct | GH Possibly Extinct | **G1 Critically Imperiled** | G2 Imperiled | G3 Vulnerable | G4 Apparently Secure | G5 Secure | No Status Rank

View on Explorer Pro




Esri, HERE, Garmin, FAO, NOAA, USGS, EPA, NPS Powered by Esri

## Classification

**Scientific Name:** *Gutierrezia elegans* A. Schneider & P. Lyon

**Kingdom:** Plantae
**Phylum:** Anthophyta
**Class:** Dicotyledoneae
**Order:** Asterales
**Family:** Asteraceae
**Genus:** Gutierrezia

**Scientific Name Reference:** Schneider, A., P. Lyon, and G. Nesom. 2008. *Gutierrezia elegans* sp. nov. (Asteraceae: Astereae), a shale barren endemic of southwestern Colorado. Journal of the Botanical Research Institute of Texas 2(2): 771-774.

FS-003205

**Concept Reference:** Schneider, A., P. Lyon, and G. Nesom. 2008. *Gutierrezia elegans* sp. nov. (Asteraceae: Astereae), a shale barren endemic of southwestern Colorado. Journal of the Botanical Research Institute of Texas 2(2): 771-774.
**Name Used in Concept Reference:** *Gutierrezia elegans*
**NatureServe Unique Identifier:** ELEMENT_GLOBAL.2.821145
**NatureServe Element Code:** PDAST4B0D0
**Taxonomic Comments:**

*Gutierrezia elegans* was published after the FNA treatment (2006b).

## Conservation Status

### NatureServe Status

**Global Status:** G1
**Global Status Last Reviewed:** 5/27/2021
**Rank Method Used:** Ranked by calculator
**Reasons:**

*Gutierrezia elegans* occurs in the western United States where it is endemic to Dolores County, Colorado. It is known from a single, large, continuous occurrence that spans public lands including Lone Mesa State Park and those managed by the U.S. Forest Service and Bureau of land Management. However, a portion of the occurrence is on private land. There are a number of potential and likely threats but the impact and severity of these towards this species is unknown.

### National & State/Provincial Statuses

**United States:** N1

**Colorado:** S1

### Other Statuses

**U.S. Endangered Species Act:** None
**Committee on the Status of Endangered Wildlife in Canada (COSEWIC):** None

### NatureServe Global Conservation Status Factors

**Range Extent:** <100 square km (less than about 40 square miles)
**Range Extent Comments:**

*Gutierrezia elegans* occurs in the western United States where it is endemic to Dolores County, Colorado.

**Area of Occupancy:** 1 4-km2 grid cells
**Estimated Number of Element Occurrences:** 1 - 5
**Estimated Number of Element Occurrences Comments:**

There is a single occurrence comprised of over 80 suboccurrences that are in close proximity.

**Number of Occurrences with Good Viability/Integrity:** Very few (1-3)
**Global Protection:** Few (1-3) occurrences appropriately protected and managed
**Global Protection Comments:**

This species occurs in Lone Mesa State Park, San Juan National Forest, and on BLM lands. A portion of the occurrence is on private land where it is not protected or managed (Panjabi et al. 2011).

**Degree of Threat:** Unknown

**Threat Comments:**

The species may be threatened by oil and gas development, roads supporting seismic testing, excessive or repeated erosion, motorized recreation, livestock grazing, water development, and climate change. As of 2011, there was no active oil and gas development but there is potential for that to change. Some portions of the occurrence are on private land where development could be a threat. While livestock do not eat the plants, they trample and uproot them. If carefully managed, it could be compatible. Erosion, primarily along an old road, can cause the loss of plants and habitat degradation (Panjabi et al. 2011).

**Long-term Trend:** Unknown
**Short-term Trend:** Unknown
**Global Abundance:** 10,000 - 100,000 individuals
**Global Abundance Comments:**

In 2009, approximately 31,000 individuals were documented.

## Distribution

**National and State/Provincial Distribution:**

**United States :** CO

**Endemism:** endemic to a single state or province

## Ecology and Life History

**Duration:** BIENNIAL

### Habitat

**Terrestrial Habitats:** Barrens, Bare rock/talus/scree
**Habitat Comments:**

This species is found on outcrops of grayish, argillaceous, bare Mancos shale outcrops with thin soil over the shale. *Gutierrezia elegans* is scattered to abundant in the barrens and also occurs with *Artemisia nova* and other species in sites with deeper soil over the shale. Associated species include *Helianthella microcephala, Tetraneuris acaulis, Eriogonum lonchophyllum, Petradoria pumila, Astragalus missouriensis* var. *amphibolus,* and *Heterotheca villosa. Pinus ponderosa* and pinyon-juniper characterize the surrounding slopes (Schneider et al. 2008, CNHP 2013).

## Economic Attributes

**Economically Important Genus:** No

## Management Summary

**Stewardship Overview:**

All occurrences need to be monitored to determine the status of threats, site condition, and abundance of plants. Potential habitat should be surveyed to identify new populations. The most critical threats should be identified, and the feasibility of their removal/control evaluated, as well as how those efforts will impact the quality of habitat for the species, and other species of interest. Management actions that are directed towards the species or habitat should be recorded and monitored. Off road vehicle use should be minimized. If livestock continue to be grazed where the species occurs, compatible routines and number of livestock should be considered to benefit the species while preserving the activity, if possible.

## Population / Occurrence Delineation

**Minimum Criteria for an Occurrence:**

A natural occurrence of one or more plants.

The default minimum separation distance is 1 km; see the Habitat-based Plant Element Occurrence Delimitation Guidance for details.

**Author:** Handwerk, J.

## Population / Occurrence Viability

See the Generic Guidelines for the Application of Occurrence Ranks (2008).

## Authors and Contributors

**NatureServe Conservation Status Factors Edition Date:** 5/27/2021

**NatureServe Conservation Status Factors Edition Authors:** Handwerk, J. (2010), rev. Treher (2021)

## References


1. Colorado Natural Heritage Program (CNHP). 2013. Colorado Rare Plant Guide. Online. Available: www.cnhp.colostate.edu.
2. Flora of North America Editorial Committee. 2006b. Flora of North America North of Mexico. Vol. 20. Magnoliophyta: Asteridae, part 7: Asteraceae, part 2. Oxford Univ. Press, New York. xxii + 666 pp.
3. Panjabi, S., B. Neely, and P. Lyon. 2011. Preliminary Conservation Action Plan for Rare Plants in the Plateau Creek and Miramonte Reservoir West Priority Action Areas. Prepared by The Nature Conservancy and the Colorado Natural Heritage Program. Unpublished report prepared for the National Fish and Wildlife Foundation. 28 pp.
4. Schneider, A., P. Lyon, and G. Nesom. 2008. *Gutierrezia elegans* sp. nov. (Asteraceae: Astereae), a shale barren endemic of southwestern Colorado. Journal of the Botanical Research Institute of Texas 2(2): 771-774.


**Page Last Published:** 9/1/2023

NatureServe Explorer

*Physaria pulvinata*

**Cushion Bladderpod**

GX Presumed Extinct | GH Possibly Extinct | G1 Critically Imperiled | G2 Imperiled | G3 Vulnerable | G4 Apparently Secure | G5 Secure | No Status Rank

View on Explorer Pro




Esri, HERE, Garmin, FAO, NOAA, USGS, EPA, NPS Powered by Esri

## Classification

**Scientific Name:** *Physaria pulvinata* O'Kane & Reveal

**Kingdom:** Plantae
**Phylum:** Anthophyta
**Class:** Dicotyledoneae
**Order:** Capparales
**Family:** Brassicaceae
**Genus:** Physaria

**Scientific Name Reference:** Flora of North America Editorial Committee. 2010. Flora of North America North of Mexico. Vol. 7. Magnoliophyta: Salicaceae to Brassicaceae. Oxford University Press, New York. xxii + 797 pp.

**Concept Reference:** O'Kane, S. L., and J. L. Reveal. 2006. *Physaria pulvinata* (Brassicaceae), a new species from southwestern Colorado. Brittonia 58(1):74-77.

FS-003209

**Name Used in Concept Reference:** *Physaria pulvinata*
**NatureServe Unique Identifier:** ELEMENT_GLOBAL.2.768522
**NatureServe Element Code:** PDBRA220R0
**Taxonomic Comments:**

*Physaria pulvinata* was split from *P. rectipes (=Lesquerella rectipes)*, the latter being a variable species (FNA 2010).

## Conservation Status

### NatureServe Status

**Global Status:** G1
**Global Status Last Reviewed:** 9/8/2022
**Rank Method Used:** Ranked by calculator
**Reasons:**

*Physaria pulvinata* is a long-lived perennial herb that is endemic to Colorado in the western United States. It is confined to shale outcrops that is widely used for road gravel. This species is also on federal land, including BLM and Forest Service lands. Currently, it is known from only San Miguel and Dolores counties, and it is suspected that it won't be found much further than those counties but could be found at more sites within this range. *Physaria pulvinata* is threatened by over-grazing and trampling by livestock, ORV activities, non-native species, the removal of shale for road work and long term drought.

### National & State/Provincial Statuses

**United States:** N1

**Colorado:** S1

### Other Statuses

**U.S. Endangered Species Act:** None
**Committee on the Status of Endangered Wildlife in Canada (COSEWIC):** None

### NatureServe Global Conservation Status Factors

**Range Extent:** 100-250 square km (about 40-100 square miles)
**Range Extent Comments:**

*Physaria pulvinata* is endemic to Colorado in the western United States. It is known from San Miguel and Dolores counties. The estimated range extent is 115 square kilometers, calculated in GeoCAT by drawing a minimum convex polygon around the known occurrences in the Colorado Natural Heritage Program database (CNHP 2022, NatureServe 2022).

**Area of Occupancy:** 6-25 4-km2 grid cells
**Area of Occupancy Comments:**

The estimated area of occupancy is 6 2km by 2km grid, calculated in GeoCAT with the known occurrences in the Colorado Natural Heritage Program database (CNHP 2022, NatureServe 2022). There are 63 occupied acres documented in the occurrences (CNHP 2022)

**Estimated Number of Element Occurrences:** 6 - 20
**Estimated Number of Element Occurrences Comments:**

There are 6 principal occurrences documented in the Colorado Natural Heritage Program database (2022)

**Number of Occurrences with Good Viability/Integrity:** Few (4-12)

FS-003210

**Viability/Integrity Comments:**

there are five occurrences with good or excellent viability (CNHP 2022).

**Global Protection:** None. No occurrences appropriately protected and managed

**Global Protection Comments:**

This species occurs in San Juan National Forest and Lone Mesa State Park. GIS analyses (CNHP Scorecard 2006) did not identify any occurrences that were afforded protection. However, a recent natural area designation provides some protection for one occurrence on state land. An occurrence was considered protected if a portion of it fell within a protected area. Protected areas were defined as all public and private land with special designations or stipulations that limit use (for example, Research Natural Areas, Wilderness Areas, National Parks, Areas of Critical Environmental Concern, conservation easements, etc.).

**Degree of Threat:** Very high - high

**Threat Comments:**

This species is primarily threatened by inappropriate livestock grazing and recreation (motorized and non-motorized). In addition, it is threatened by competition with aggressive non-native plant species (*Cirsium arvense, Carduus nutans*), removal of shale for road work, and prolonged drought resulting from climate change (CNHP 2022, Panjabi et al. 2011, O'Kane and Reveal 2006)

**Long-term Trend:** Unknown

**Short-term Trend:** Decline of 30-90%

**Short-term Trend Comments:**

Rangewide monitoring by the Colorado Natural Heritage Program indicates that *Physaria pulvinata* has declined in density since 2016, with a precipitous drop-off in 2020 and no significant increase between 2020 and 2021. Plant density per square meter decreased at all macroplots with a range of a 30-91% decline across locations. The region has been experiencing below normal precipitation in most seasons since 2016, and the decline in plant density is likely due to prolonged drought throughout *Physaria pulvinata's* range (Handwerk et al. 2022).

**Environmental Specificity:** Very narrow. Specialist or community with key requirements scarce.

**Environmental Specificity Comments:**

This species is restricted to shale outcrops.

## Distribution

**National and State/Provincial Distribution:**

**United States :** CO

**Endemism:** endemic to a single state or province

## Ecology and Life History

**Duration:** Long-lived, PERENNIAL

### Habitat

**Terrestrial Habitats:** Bare rock/talus/scree

**Habitat Comments:**

This species is known from widely scattered outcrops of grayish, argillaceous (Mancos) shale. It grows in openings between low shrubs *Artemisia nova, Chrysopsis* spp., and *Tetraneuris* spp., and forbs *Sphaeralcea* spp. and *Cryptantha* spp. (O'Kane and Reveal 2006).

## Economic Attributes

**Economically Important Genus:** Yes

## Management Summary

**Biological Research Needs:**

Field inventories are recommended to identify the full range and distribution of this species (Rondeau et al. 2011)

## Population / Occurrence Delineation

**Group Name:** Default
**Separation Distance for Unsuitable Habitat:** 1 kilometers
**Separation Distance for Suitable Habitat:** 1 kilometers
The default minimum separation distance is 1 km; see the Habitat-based Plant Element Occurrence Delimitation Guidance for details.

## Population / Occurrence Viability

See the Generic Guidelines for the Application of Occurrence Ranks (2008).

## Authors and Contributors

**NatureServe Conservation Status Factors Edition Date:** 9/9/2022
**NatureServe Conservation Status Factors Edition Authors:** L. Oliver (2006), rev. Neuhaus, K., J. Handwerk, and S. Panjabi (2006), rev. Handwerk (2010), rev. Handwerk and Treher (2022)

## References

1. Colorado Natural Heritage Program (CNHP). 2022. Biodiversity Tracking and Conservation System (Biotics 5). Colorado Natural Heritage Program, Colorado State University, Fort Collins.
2. Flora of North America Editorial Committee. 2010. Flora of North America North of Mexico. Vol. 7. Magnoliophyta: Salicaceae to Brassicaceae. Oxford University Press, New York. xxii + 797 pp.
3. Handwerk, J.E., D.G. Malone, N.C. Swayze and J.P. Smith. 2022. Monitoring Colorado's SWAP Tier 1 plant species Penstemon debilis, 2021. Colorado Natural Heritage Program, Colorado State University, Fort Collins, Colorado.
4. NatureServe. 2022. NatureServe Network Biodiversity Location Data. NatureServe, Arlington, Virginia.
5. O'Kane, S. L., and J. L. Reveal. 2006. *Physaria pulvinata* (Brassicaceae), a new species from southwestern Colorado. Brittonia 58(1):74-77.
6. Panjabi, S., B. Neely, and P. Lyon. 2011. Preliminary Conservation Action Plan for Rare Plants in the Plateau Creek and Miramonte Reservoir West Priority Action Areas. Prepared by The Nature Conservancy and the Colorado Natural Heritage Program. Unpublished report prepared for the National Fish and Wildlife Foundation. 28 pp.
7. Reveal, J.L. 2005. University of Maryland: An Array of Botanical Images, *Physaria pulvinata*. http://www.life.umd.edu/emeritus/reveal
8. Rondeau, R., K. Decker, J. Handwerk, J. Siemers, L. Grunau, and C. Pague. 2011. The state of Colorado's biodiversity 2011. Prepared for The Nature Conservancy. Colorado Natural Heritage Program, Colorado State University, Fort Collins, Colorado.

**Page Last Published:** 9/1/2023

*Triteleia grandiflora*

**Large-flowered Triteleia**

GX Presumed Extinct | GH Possibly Extinct | G1 Critically Imperiled | G2 Imperiled | G3 Vulnerable | **G4 Apparently Secure** | G5 Secure | No Status Rank

View on Explorer Pro




Esri, Garmin, FAO, NOAA, USGS, EPA — Powered by Esri

## Classification

**Scientific Name:** *Triteleia grandiflora* Lindl.

**Other Common Names:** Tritéléia à grandes fleurs (FR)

**Kingdom:** Plantae
**Phylum:** Anthophyta
**Class:** Monocotyledoneae
**Order:** Asparagales
**Family:** Asparagaceae
**Genus:** Triteleia

**Scientific Name Reference:** Flora of North America Editorial Committee. 2002a. Flora of North America North of Mexico. Vol. 26. Magnoliophyta: Liliidae: Liliales and Orchidales. Oxford Univ. Press, New York. xxvi + 723 pp.

FS-003213

**Concept Reference:** Kartesz, J.T. 1994. A synonymized checklist of the vascular flora of the United States, Canada, and Greenland. 2nd edition. 2 vols. Timber Press, Portland, OR.
**Name Used in Concept Reference:** *Triteleia grandiflora*
**NatureServe Unique Identifier:** ELEMENT_GLOBAL.2.155444
**NatureServe Element Code:** PMLIL21060
**Related ITIS Names:** *Triteleia grandiflora* Lindl. (TSN 43097)
**Taxonomic Comments:**

FNA(vol. 26, 2002) lumps subspecific taxa.

**Infraspecies:**

*Triteleia grandiflora* var. *howellii*

## Conservation Status

### NatureServe Status

**Global Status:** G4G5
**Global Status (Rounded):** G4
**Global Status Last Reviewed:** 8/13/2015
**Rank Method Used:** Ranked by inspection
**Reasons:**

*Triteleia grandiflora* (which is comprised of two varieties) ranges from southern British Columbia to northern California, and inland from Oregon across Idaho to Montana, Colorado and Utah.

### National & State/Provincial Statuses

**Canada:** N5

**British Columbia:** S5

**United States:** N4N5

**California:** S1, **Colorado:** S1, **Idaho:** SNR, **Montana:** S4, **Oregon:** SNR, **Utah:** SNR, **Washington:** SNR, **Wyoming:** S2

### Other Statuses

**U.S. Endangered Species Act:** None
**Committee on the Status of Endangered Wildlife in Canada (COSEWIC):** None
**Implied Status of the Committee on the Status of Endangered Wildlife in Canada (COSEWIC):** PS:E
**Comments on COSEWIC:**

Triteleia grandiflora var. howellii (recognized by COSEWIC as Triteleia howellii) is designated Endangered.

### NatureServe Global Conservation Status Factors

**Range Extent Comments:**

E from s BC, s to e OR and n CA, e across ID to sw MT, WY, CO and n UT.

**Global Abundance Comments:**

Infrequent in se OR, rare in s ID, rather common in n UT (Cronquist et al. 1977).

### Other NatureServe Conservation Status Information

**Inventory Needs:**

Search for the species in Nevada (note Kartesz 1999).

## Distribution

**National and State/Provincial Distribution:**

**Canada :** BC
**United States :** CA , CO , ID, MT , OR, UT, WA, WY

## Ecology and Life History

### Habitat

**Habitat Comments:**

Grasslands or sagebush and pinyon-juniper woodlands to pine-forest slopes and hills (Cronquist et al. 1977).

## Economic Attributes

**Economically Important Genus:** No

## Population / Occurrence Delineation

The default minimum separation distance is 1 km; see the Habitat-based Plant Element Occurrence Delimitation Guidance for details.

## Population / Occurrence Viability

See the Generic Guidelines for the Application of Occurrence Ranks (2008).

## Authors and Contributors

**NatureServe Conservation Status Factors Edition Date:** 2/25/2001
**NatureServe Conservation Status Factors Edition Authors:** Annable, C., 12/91; rev. B. MacBryde 2/2001.

## References

1. Cronquist, A., A.H. Holmgren, N.H. Holmgren, J.L. Reveal, and P.K. Holmgren. 1977. Intermountain flora: vascular plants of the intermountain West, U.S.A. Vol. Six. Monocotyledons. Columbia Univ. Press, New York. 584 pp.

2. Dorn, R.D. 1984. Vascular plants of Montana. Mountain West Publishing, Cheyenne, Wyoming. 276 pp.

3. Douglas, G.W., G.B. Straley, and D. Meidinger (eds). 1994. The Vascular Plants of British Columbia: Part 4 - Monocotyledons. Ministry of Forests Research Program, Victoria, British Columbia. 257 pp.

4. Flora of North America Editorial Committee. 2002a. Flora of North America North of Mexico. Vol. 26. Magnoliophyta: Liliidae: Liliales and Orchidales. Oxford Univ. Press, New York. xxvi + 723 pp.

5. Hickman, J. C., ed. 1993. The Jepson manual: Higher plants of California. University of California Press, Berkeley, CA. 1400 pp.

6. Hitchcock, C.L., A. Cronquist, M. Ownbey, and J.W. Thompson. 1969. Vascular plants of the Pacific Northwest. Part 1: Vascular cryptogams, gymnosperms, and monocotyledons. Univ. Washington Press, Seattle. 914 pp.

7. Kartesz, J.T. 1994. A synonymized checklist of the vascular flora of the United States, Canada, and Greenland. 2nd edition. 2 vols. Timber Press, Portland, OR.

8. Welsh, S.L., N.D. Atwood, S. Goodrich, and L.C. Higgins (eds.) 1993. A Utah flora. 2nd edition. Brigham Young Univ., Provo, Utah. 986 pp.

**Page Last Published:** 9/1/2023

Forest Ecology and Management 259 (2010) 1363–1375

Contents lists available at ScienceDirect

Forest Ecology and Management

journal homepage: www.elsevier.com/locate/foreco

# Forest carbon storage in the northeastern United States: Net effects of harvesting frequency, post-harvest retention, and wood products

Jared S. Nunery, William S. Keeton *

*343 Aiken Center, Rubenstein School of Environment and Natural Resources, University of Vermont, Burlington, VT 05405, United States*

ARTICLE INFO

*Article history:*
Received 5 October 2009
Received in revised form 18 December 2009
Accepted 26 December 2009

*Keywords:*
Carbon sequestration
Wood products
Structural retention
Harvesting frequency
Sustainable forest management
Northern hardwood forests

ABSTRACT

Temperate forests are an important carbon sink, yet there is debate regarding the net effect of forest management practices on carbon storage. Few studies have investigated the effects of different silvicultural systems on forest carbon stocks, and the relative strength of *in situ* forest carbon versus wood products pools remains in question. Our research describes (1) the impact of harvesting frequency and proportion of post-harvest structural retention on carbon storage in northern hardwood-conifer forests, and (2) tests the significance of including harvested wood products in carbon accounting at the stand scale. We stratified Forest Inventory and Analysis (FIA) plots to control for environmental, forest structural and compositional variables, resulting in 32 FIA plots distributed throughout the northeastern U.S. We used the USDA Forest Service's Forest Vegetation Simulator to project stand development over a 160 year period under nine different forest management scenarios. Simulated treatments represented a gradient of increasing structural retention and decreasing harvesting frequencies, including a "no harvest" scenario. The simulations incorporated carbon flux between aboveground forest biomass (dead and live pools) and harvested wood products. Mean carbon storage over the simulation period was calculated for each silvicultural scenario. We investigated tradeoffs among scenarios using a factorial treatment design and two-way ANOVA. Mean carbon sequestration was significantly ($\alpha = 0.05$) greater for "no management" compared to any of the active management scenarios. Of the harvest treatments, those favoring high levels of structural retention and decreased harvesting frequency stored the greatest amounts of carbon. Classification and regression tree analysis showed that management scenario was the strongest predictor of total carbon storage, though site-specific variables were important secondary predictors. In order to isolate the effect of *in situ* forest carbon storage and harvested wood products, we did not include the emissions benefits associated with substituting wood fiber for other construction materials or energy sources. Modeling results from this study show that harvesting frequency and structural retention significantly affect mean carbon storage. Our results illustrate the importance of both post-harvest forest structure and harvesting frequency in carbon storage, and are valuable to land owners interested in managing forests for carbon sequestration.

© 2010 Elsevier B.V. All rights reserved.

## 1. Introduction

While deforestation accounts for about 20% of total global carbon dioxide ($CO_2$) emissions, due primarily to tropical deforestation (IPCC 2007), forests in United States are currently a carbon (C) sink sequestering approximately 10% of U.S. annual $CO_2$ emissions (Birdsey et al., 2006). Developing carbon markets have recognized the important role of forests in the terrestrial C cycle and the potential contribution of sustainable forest management to climate change mitigation efforts (Canadell and Raupach, 2008; Ray et al., 2009b). A working hypothesis is that "improved forest management" could achieve higher levels of C storage (termed "additionality") compared to "business as usual" or a baseline condition (Ruddell et al., 2007). While forest management clearly impacts terrestrial C storage (Birdsey et al., 2007), little information is available describing how specific forest management alternatives might affect C storage and sequestration. This understanding is vital, because the dynamics of storage and fluxes among the different sinks impacted by management (e.g., forest C versus wood products pools) are complex, rendering accounting of net effects on C storage challenging (Birdsey et al., 2006; Ray et al., 2009b). The purpose of this study is to inform forest C management practices using empirical data coupled with forest-stand development modeling. We investigate the impacts of harvesting frequency and post-harvest retention on C sequestration in managed forests in the northeastern U.S. We also

* Corresponding author. Tel.: +1 802 656 2518; fax: +1 802 656 2623.
*E-mail address:* William.Keeton@uvm.edu (W.S. Keeton).

0378-1127/$ – see front matter © 2010 Elsevier B.V. All rights reserved.
doi:10.1016/j.foreco.2009.12.029

specifically address the importance of accounting for C stored in wood products when determining net effects on sequestration (Seidl et al., 2007).

Some researchers have suggested that sustainably managed forests sequester more C than unmanaged forests, stressing the high tree growth rates achieved in harvested stands (Ruddell et al., 2007), and C stored in wood products (Malmsheimer et al., 2008). However, other studies have demonstrated that unmanaged forests, such as old-growth forests in the U.S. Pacific Northwest (Harmon et al., 1990; Harmon and Marks, 2002) and boreal forests in northwestern Russia (Krankina and Harmon, 1994), sequester greater amounts of C than managed forests. These authors have argued that intensified forest management actually leads to a net flux of C to the atmosphere due to lower biomass in harvested stands and the often short lifespan of wood products. These conclusions, however, are based primarily on studies involving conversion of old-growth forest to young plantations (Harmon et al., 1990) and the effects of intensive harvesting practices, such as clearcutting (Krankina and Harmon, 1994). Net effects on C dynamics across a range of silvicultural systems, including modified even-aged and less intensive uneven-aged forest management practices, remain poorly explored and thus are a focus of this study.

Recently, interest has developed in the use of reduced harvesting frequency (Curtis, 1997) and post-harvest structural retention (Franklin et al., 1997; Keeton, 2006; Swanson, 2009) as approaches favoring maintenance and development of high levels of *in situ* forest C storage. However, previous analyses of harvesting frequency (also termed "extended rotations") were focused primarily on even-aged forest management (Liski et al., 2001; Harmon and Marks, 2002; Balboa-Murias et al., 2006). Few studies have addressed the coupled effects of variations in harvesting frequency and post-harvest structural retention in mature, even to multi-aged forests, such as those now dominant on the New England landscape. Decreased harvesting frequency increases C storage in managed stands (Liski et al., 2001; Balboa-Murias et al., 2006); however, the resulting sequestration remains less than the total C storage in unmanaged forests, even accounting for fluxes caused by natural disturbances at landscape scales (Krankina and Harmon, 1994). In other studies, accounting for C stored in durable, long-lived wood products increased the estimated net C storage for intensively managed forests in which rotation periods were also increased (Perez-Garcia et al., 2005). Discrepancies among previous studies signal that further research is needed to quantify the coupled effects of harvesting frequency and post-harvest structural retention, informing the on-going debate within the forest management community (Ray et al., 2009b). Moreover, the effects of "harvesting intensity" (used here to refer to the combination of harvesting frequency and structural retention) on C sequestration remains poorly investigated for northern hardwood forests specifically, though some research has been conducted in the U.S. Pacific Northwest (Harmon and Marks, 2002) and the U.S. Central Appalachian region (Davis et al., 2009). The specific C pools considered when defining "sequestration" affect the net accounting result (Harmon, 2001). In this study we are particularly interested in aboveground C storage, and thus use the term "sequestration" to refer to total C stocks (aboveground forest biomass + wood products), rather than uptake rates. We explicitly describe "forest carbon uptake rates" as such whenever they are discussed.

Quantifying mean C sequestration under a given forest management scenario requires a temporal scale spanning at least one complete harvesting cycle. For this reason, simulation modeling is often used to quantify C sequestration in forests. Numerous process-based, empirical, and hybrid models have been developed to project forest C dynamics in response to management activities. These models have been used in a variety of forest types in Europe (Seidl et al., 2007), northwest Russia (Krankina and Harmon, 1994), the U.S. Pacific Northwest (Harmon and Marks, 2002), Chile (Swanson, 2009), and the U.S. Central Appalachian region (Davis et al., 2009). While absolute predictions generated by models carry uncertainty, they are useful for comparing relative differences among alternate management and forest development scenarios (Eriksson et al., 2007; Seidl et al., 2007).

This study uses a widely accepted forest growth model to examine C sequestration tradeoffs among harvesting frequency and post-harvest structural retention under even- and uneven-aged forest management, while incorporating fluxes to wood products. We address a fundamental research question facing forest managers, namely: what is the most effective way to store C through forest management? Is C sequestration greater under more intensive approaches favoring high rates of uptake and C transfer to wood products? Or are less intensive approaches, favoring *in situ* forest C storage, more effective at maximizing C storage? We test two key variables with the potential to affect forest C sequestration: (1) harvesting frequency (rotation length or entry cycle), and (2) post-harvest structural retention (residual biomass following a harvest). Our first hypothesis is that unmanaged forests sequester greater amounts of C than actively managed forests, even accounting for C storage in durable wood products. The second hypothesis focuses on the effects of management intensity. We hypothesize that silvicultural prescriptions with increased structural retention coupled with decreased harvesting frequency will sequester the greatest amount of C relative to other active management scenarios.

## 2. Methods

### 2.1. Study area and selection of study sites

The geographic focus of this study is the northern hardwood region of the northeastern U.S., encompassing portions of upstate New York, Vermont, New Hampshire, and Maine (Fig. 1). The study area is dominated by northern hardwood-conifer forests, in which *Acer saccharum* (sugar maple), *Fagus grandifolia* (American beech), *Tsuga canadensis* (eastern hemlock), and *Betula alleghaniensis* (yellow birch) form the major late-successional species. We used Mapmaker 2.1 (*accessed* 7/22/2008, *available at*: www.fia.fs.fed.us/tools-data/other/) to stratify the study area by eco-subregions (Bailey, 2004) and then selected Forest Inventory and Analysis (FIA) plots (or sites) from within these to ensure that our sample was representative and well-distributed (Fig. 1). We used the most recent FIA inventory data (Maine: 2003, New York: 2004, New Hampshire: 2005, Vermont: 2005) to avoid potential discrepancies among survey periods. We further stratified FIA plots using US Forest Service defined site-specific variables to select only financially mature stands ready for harvest at the beginning of the simulation period. Variables included stand age (80–100 years old), slope (0–50%), forest type (maple-beech-birch), stand origin (natural), site productivity (site class 1–5 out of 7), physiographic class (mesic classes 21–25), basal area (BA > 23 $m^2$ $ha^{-1}$), and total merchantable cubic volume (>141 $m^3$ $ha^{-1}$). To obtain a sufficient sample size, our selection criteria encompassed a degree of heterogeneity in initial stand conditions. The stratification process, applied to the entire FIA database for the selected subregions, resulted in a total of 32 FIA plots meeting these criteria (14 sites in the White Mountain Region and western Maine, 3 sites in the Green Mountain Region, and 15 sites in the Adirondack Mountain Region); these are hereafter referred to as our study sites (Table 1).

### 2.2. Model description

FVS was chosen for its ability to simulate forest management activities, the availability of a model variant calibrated for northern

Case No. 1:23-cv-01501-RMR Document 16-4 filed 09/29/23 USDC Colorado pg 457 of 459






**Fig. 1.** Map of approximate locations of FIA plots used in simulation modeling. In total, we selected 32 stands spanning 10 eco-subregions and 4 states.

hardwoods, its accessibility to the general public, and its compatibility with FIA data (Ray et al., 2009a). In addition, FVS is one of several simulation models identified by voluntary C markets for estimating C sequestration in managed forests as part of climate change mitigation projects. Site specific stand structure and composition data were input into FVS to project stand development under alternate management scenarios. The FVS model has been used by North American forest managers for over 30 years in a variety of applications, and can be used in multiple biomes (Teck et al., 1996; Crookston and Dixon, 2005). FVS is a distance-independent, individual tree-based forest growth model, specifically designed for even- and uneven-aged stands with simple to mixed species composition (Crookston and Dixon, 2005). Aboveground biomass estimates are based on species group-specific allometric equations (Jenkins et al., 2003). The temporal scope of model projections ranges from five to several hundred years, with five-to-ten-year resolution. FVS calculates carbon sequestration in a variety of aboveground and belowground carbon pools at each time step; however, this study examined only the aboveground live and dead tree biomass model outputs. FVS also tracks C fluxes among wood products pools throughout their life cycles, from production to landfill or incineration, following methodologies developed by the USDA Forest Service (Smith et al., 2006). To simulate C fluxes in wood products, FVS identifies pulp and sawlogs (Dixon, 2002), and applies product-specific (i.e., paper, durable wood product, etc.) life span curves based on recent data specific to North American forest types (Smith et al., 2006).

Component models (variants) are used to adjust model behavior to reflect regional climatic conditions and growth rates. We used the Northeast Variant (NE-FVS), which uses growth and yield equations from NE-TWIGS (Hilt and Teck, 1989) and embedded height equations and bark ratios specific to northeastern species. A comprehensive validation study is not available for all sub-routines within NE-FVS. However, regional validation studies of NE-FVS have shown adequate predictions of forest growth in northern hardwood forests, with modeled volume predictions within 10–15% of actual volumes (Yaussy, 2000). FVS is effective at simulating forest growth under different management scenarios (Crookston and Dixon, 2005; Ray et al., 2009a). Modeling efficiencies of 77–99% were found in short term projections, however, regionally calibrated regeneration inputs are necessary to increase model accuracy in projections greater than 20 years (Bankowski et al., 1996). Furthermore, FVS is not an appropriate model for simulating impacts of climate change on forest growth (Yaussy, 2000).

Our stand development simulations assumed: (1) no natural disturbances; (2) constant climate; and (3) stable soil C storage. Excluding these sources of variability allowed us to isolate forest management effects on aboveground C and explore the relative differences between scenarios. Intensive forest management practices leading to heavy soil scarification can significantly increase soil carbon flux rates (Lal, 2005). While we recognize the uncertainty inherent to this approach, it is consistent with previous modeling work that also focused on relative differences among forest management trajectories (Eriksson et al., 2007; Seidl et al., 2007).

### *2.3. Silvicultural simulations*

To test our two hypotheses, we evaluated a variety of even-aged (Table 2) and uneven-aged (Table 3) silvicultural prescriptions. In total, we simulated nine different management scenarios, including one passive (i.e., a reserve-based) "no management" scenario and eight active management scenarios. The latter were representative of silvicultural systems used commonly in the Northeast, but were modified to encompass a range of harvesting intensities. Specific prescription parameters were derived from silvicultural guides and studies in the Northeast (Leak et al., 1986; Nyland, 1996; Keeton, 2006). The silvicultural prescriptions included four even-aged scenarios and four uneven-aged scenarios. Within these broad groups, individual treatments were derived by factoring two levels for each of two categories: harvesting frequency and degree of structural retention (Tables 2 and 3), for a total of 8 active management scenarios.

To test the effect of harvesting frequency on C sequestration, stand development simulations for the four active management scenarios were run under two different harvesting intervals, long (120 years for even-aged scenarios; 30 years for uneven-aged scenarios) and short (80 years for even-aged scenarios; 15 years for uneven-aged scenarios) (Tables 2 and 3).

To evaluate the effect of structural retention, we developed two different even-aged management scenarios representing different levels of structural retention. A clearcut represented low structural retention and the most intensive management practice, with a complete removal of all trees greater than 5 cm diameter at breast height (DBH). A shelterwood (Nyland, 1996) represented greater structural retention, with the retention of six legacy trees (canopy

**Table 1**
Environmental, structural, and compositional attributes for the 32 Forest Inventory and Analysis (FIA) plots used in simulation modeling.

| FIA plot code | Starting stand age | Eco-subregion[a] | Site index | Slope (%) | Elevation (meters) | Aspect (degrees) | Percent conifer (%BA) | Basal area ($m^2$/ha) | SDI | Trees per hectare | QMD (cm) | MAI ($m^3\,ha^{-1}\,yr^{-1}$) | Number of strata [b] | Canopy height (m) | Percent canopy cover |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2320030702501505 | 94 | M211Af | 44 | 14 | 518 | 195 | 13 | 37.6 | 510 | 10,843 | 6.6 | 2.6 | 1 | 18.6 | 80 |
| 2320030702502686 | 97 | M211Af | 42 | 12 | 427 | 235 | 21 | 31.5 | 444 | 11,125 | 6.1 | 1.6 | 1 | 19.5 | 82 |
| 2320030900702261 | 86 | M211Af | 34 | 8 | 549 | 215 | 34 | 33.1 | 506 | 17,423 | 4.8 | 1.8 | 1 | 19.2 | 76 |
| 2320030900703046 | 80 | M211Ae | 42 | 9 | 701 | 100 | 18 | 30.5 | 480 | 18,318 | 4.6 | 2.2 | 1 | 17.4 | 73 |
| 2320030900703313 | 87 | M211Ag | 51 | 12 | 183 | 2 | 50 | 35.1 | 430 | 5997 | 8.6 | 2.5 | 1 | 17.1 | 80 |
| 2320030900703677 | 89 | M211Af | 81 | 10 | 488 | 140 | 1 | 26.2 | 384 | 11,191 | 5.3 | 1.6 | 1 | 19.5 | 79 |
| 2320030901700110 | 84 | M211Ag | 37 | 14 | 366 | 22 | 62 | 42.2 | 604 | 16,032 | 5.8 | 3.2 | 2 | 21.3 | 72 |
| 2320030901700852 | 81 | M211Af | 37 | 13 | 823 | 248 | 42 | 29.4 | 372 | 6005 | 7.9 | 1.9 | 1 | 16.2 | 59 |
| 2320030901701013 | 96 | M211Ae | 41 | 14 | 610 | 124 | 17 | 34.7 | 450 | 8058 | 7.4 | 2.4 | 1 | 18.6 | 69 |
| 2320030901702963 | 85 | M211Ag | 65 | 27 | 274 | 65 | 0 | 24.6 | 334 | 7117 | 6.6 | 1.8 | 2 | 21.3 | 78 |
| 3320050200300163 | 82 | M211Ad | 81 | 17 | 274 | 250 | 0 | 30.5 | 398 | 7122 | 7.4 | 2.9 | 1 | 24.4 | 78 |
| 3320050200700781 | 80 | M211Af | 62 | 5 | 549 | 60 | 22 | 28.7 | 355 | 5300 | 8.4 | 2.3 | 1 | 21.9 | 71 |
| 3320050200900018 | 85 | M211Ba | 83 | 12 | 579 | 343 | 0 | 26.6 | 395 | 11,826 | 5.3 | 2.8 | 1 | 26.8 | 73 |
| 3320050200900904 | 97 | M211Ad | 49 | 3 | 427 | 0 | 34 | 32.6 | 454 | 10,939 | 6.1 | 2.1 | 1 | 23.5 | 82 |
| 3620040303506767 | 81 | M211Db | 62 | 0 | 335 | 0 | 44 | 47.8 | 477 | 2894 | 14.5 | 4.6 | 1 | 23.2 | 86 |
| 3620040304303762 | 80 | M211Dd | 60 | 12 | 457 | 179 | 3 | 38.1 | 465 | 6440 | 8.6 | 3.5 | 1 | 24.4 | 82 |
| 3620040304303966 | 80 | M211Dd | 43 | 6 | 549 | 256 | 27 | 33.1 | 403 | 5545 | 8.6 | 2.4 | 1 | 21.3 | 85 |
| 3620040403101088 | 95 | M211Df | 46 | 16 | 640 | 85 | 18 | 29.8 | 437 | 12,639 | 5.6 | 2.1 | 1 | 24.4 | 71 |
| 3620040403102007 | 92 | M211Df | 88 | 20 | 549 | 81 | 4 | 30.5 | 354 | 4040 | 9.9 | 2.5 | 1 | 25.9 | 76 |
| 3620040403102851 | 97 | M211Df | 35 | 18 | 335 | 148 | 37 | 35.1 | 413 | 4982 | 9.4 | 2.4 | 1 | 20.1 | 79 |
| 3620040403105127 | 100 | M211Df | 50 | 13 | 701 | 287 | 7 | 24.6 | 330 | 6808 | 6.9 | 1.5 | 1 | 20.1 | 66 |
| 3620040403105218 | 90 | M211Df | 57 | 33 | 305 | 137 | 57 | 33.5 | 443 | 8599 | 7.1 | 2.1 | 1 | 21.0 | 75 |
| 3620040404102413 | 82 | M211Dd | 47 | 0 | 640 | 0 | 15 | 48.0 | 525 | 4663 | 11.4 | 4.8 | 1 | 25.3 | 75 |
| 3620040404102456 | 86 | M211Dd | 60 | 12 | 671 | 12 | 15 | 29.6 | 362 | 5115 | 8.6 | 2.3 | 1 | 25.0 | 73 |
| 3620040404102703 | 90 | M211Dd | 62 | 18 | 579 | 327 | 57 | 26.2 | 345 | 6588 | 7.1 | 2.0 | 2 | 21.9 | 57 |
| 3620040404104669 | 91 | M211Dd | 41 | 22 | 732 | 306 | 20 | 29.2 | 363 | 5488 | 8.1 | 2.1 | 1 | 20.1 | 72 |
| 3620040404106138 | 86 | M211Dd | 60 | 12 | 579 | 12 | 27 | 38.3 | 480 | 7480 | 8.1 | 3.2 | 1 | 22.6 | 80 |
| 3620040411302486 | 80 | M211De | 88 | 12 | 488 | 166 | 0 | 44.3 | 506 | 5382 | 10.2 | 5.0 | 1 | 33.8 | 90 |
| 3620040411305029 | 100 | M211De | 48 | 14 | 518 | 169 | 51 | 25.5 | 357 | 8819 | 6.1 | 1.8 | 1 | 23.5 | 59 |
| 5020050200900479 | 91 | M211Ae | 37 | 11 | 396 | 276 | 44 | 38.8 | 507 | 9160 | 7.4 | 3.0 | 2 | 21.3 | 81 |
| 5020050201701120 | 85 | M211Ba | 64 | 27 | 671 | 235 | 0 | 29.6 | 400 | 828 | 6.9 | 2.4 | 1 | 22.9 | 80 |
| 5020050202300275 | 81 | M211Ca | 89 | 47 | 183 | 10 | 0 | 23.0 | 261 | 2743 | 10.4 | 2.9 | 2 | 27.4 | 59 |
| Mean | 88 | – | 56 | 14 | 503 | 146 | 23 | 33 | 423 | 7985 | 7.6 | 2.6 | 1 | 22.2 | 75 |
| Standard deviation | 7 | – | 17 | 9 | 162 | 109 | 20 | 6 | 72 | 4121 | 2.0 | 0.9 | 0.4 | 3.5 | 8 |

*Note*: All values were measured by USDA Forest Service Forest Inventory and Analysis Program, and retrieved through the stand list file in FVS.
[a] As defined in Cleland et al. (1997).
[b] As defined in Crookston and Stage (1999).

**Table 2**
Description of the four even-aged silvicultural prescriptions used as management scenarios. We used a factorial design to test the independent effects of and interactions among two levels each for harvesting frequency and structural retention.

| Structural retention | Harvesting frequency | |
|---|---|---|
| | High (80 years) | Low (120 years) |
| | *Clearcut_High* | *Clearcut_Low* |
| Low | (1) Commercial thin: implement when stand reaches stocking density above fully stocked<br>(2) Clearcut: 2005 and 2085<br>Number of permanently retained trees/ha: 0<br>Slash removed from site | (1) Commercial thin: implement when stand reaches stocking density above fully stocked<br>(2) Clearcut: 2005 and 2125<br>Number of permanently retained trees/ha: 0<br>Slash removed from site |
| Structural retention | Harvesting frequency | |
| | High (80 years) | Low (120 years) |
| | *Shelterwood_High* | *Shelterwood_Low* |
| High | (1) Commercial thin: implement when stand reaches stocking density above fully stocked<br>(2) Shelterwood harvest: 2005 and 2085<br>Residual basal area: 14 $m^2$/ha<br>Number of permanently retained trees/ha: 6<br>Smallest diameter in removal cut: 15 cm<br>Slash left on site | (1) Commercial thin: implement when stand reaches stocking density above fully stocked<br>(2) Shelterwood harvest: 2005 and 2125<br>Residual basal area: 14 $m^2$/ha<br>Number of permanently retained trees/ha: 6<br>Smallest diameter in removal cut: 15 cm<br>Slash left on site |

trees never harvested) per hectare (Table 2). In uneven-aged scenarios, two individual tree selection (ITS) systems were used. For ITS, harvesting was based on a pre-defined diameter distribution (q factor) that directed harvesting towards diameter classes with stem densities above target levels (Table 3). Slash was not included in the aboveground dead wood carbon calculations when removed from the site as part of management prescriptions.

We ran all the management scenarios over 160 year simulation periods in order to capture a minimum of two complete harvesting cycles in the high frequency even-aged management scenarios. Estimates of average C sequestration under lower frequency harvesting were thus lower than if these scenarios had been simulated through two complete cycles. This resulted in conservative evaluations of the relative differences among scenarios, while minimizing uncertainty associated with projections run over longer timeframes. Model calculations (e.g., predicted growth and mortality) were performed on 5 year time steps (Dixon, 2002).

### *2.4. Regeneration inputs in model simulations*

Because NE-FVS includes only a vegetative regeneration submodel (i.e., limited stump sprouting only), user-defined parameters (including species, spatial distribution, total number per acre, and seedling size) must be defined in order to simulate regeneration. We acquired information on natural regeneration rates in northern hardwood forests from the literature (Graber and Leak, 1992) and from field data in the northeastern U.S. for similar silvicultural treatments and site/stand conditions (Vermont Forest Ecosystem Management Demonstration Project, unpublished data) (Table 4). We used these data to develop background regeneration rates based on site-specific average overstory species proportions. Background regeneration rates (intermediate to shade tolerant species only), input at 10 year intervals, emulated natural regeneration within stands, independent of forest management activities.

**Table 3**
Description of the four different uneven-aged silvicultural prescriptions used as management scenarios. We used a factorial design to test the independent effects of and interactions among two levels each for harvesting frequency and structural retention. ITS = individual tree selection.

| Structural retention | Harvesting frequency | |
|---|---|---|
| | High (15 years) | Low (30 years) |
| | *ITS_LowHigh* | *ITS_LowLow* |
| Low | *q*-factor[a]: 1.3<br>Residual basal area: 15 $m^2$/ha<br>Min DBH class: 5 cm<br>Max DBH class: 50 cm<br>DBH class width: 5 cm<br>Number of legacy trees/ha[b]: 0<br>Slash left on site | *q*-factor[a]: 1.3<br>Residual basal area: 15 $m^2$/ha<br>Min DBH class: 5 cm<br>Max DBH class: 50 cm<br>DBH class width: 5 cm<br>Number of legacy trees/ha[b]: 0<br>Slash left on site |
| Structural retention | Harvesting frequency | |
| | High (15 years) | Low (30 years) |
| | *ITS_HighHigh* | *ITS_HighLow* |
| High | *q*-factor[a]: 1.3<br>Residual basal area: 19 $m^2$/ha<br>Min DBH class: 5 cm<br>Max DBH class: 61 cm<br>DBH class width: 5 cm<br>Number of legacy trees/ha[b]: 12<br>Average diameter of legacy tree: 41 cm<br>Slash left on site | *q*-factor[a]: 1.3<br>Residual basal area: 19 $m^2$/ha<br>Min DBH class: 5 cm<br>Max DBH class: 61 cm<br>DBH class width: 5 cm<br>Number of legacy trees/ha: 12[b]<br>Average diameter of legacy tree: 41 cm<br>Slash left on site |

[a] *q*-Factor is defined as the ratio of the number of stems to those in each successively larger diameter class.
[b] Legacy tree is defined as a permanently retained tree larger than the maximum diameter used to define the target diameter distribution.