# Timber

## Selected Counties

## Timber Sectors

### What do we measure on this page?

This page describes the number of jobs (full- and part-time) and the share of total jobs in the timber industry, broken out by three major categories: growing and harvesting, sawmills and paper mills, and wood products manufacturing.

**Growing and Harvesting**: Jobs associated with growing and harvesting trees on a long production cycle. This category includes people employed in forest nurseries, as well as those involved in the cutting of trees and transportation of timber.

**Sawmills and Paper Mills**: Jobs associated with converting logs into lumber, boards, poles, shingles, and other milled products. This category includes those involved in the conversion of logs and wood chips into pulp and paper as well as the creation of veneer and plywood.

**Wood Products Manufacturing**: Jobs associated with manufacturing. This category includes the production of corrugated boxes, gum and wood chemical products, cabinets, furniture, and other wood manufactured products.

The categories "growing and harvesting," "sawmills and paper mills," and "woods products manufacturing" are aggregations of multiple North American Industry Classification System (NAICS) codes.[1, 2] They are used in this report to differentiate major components of the timber and wood products industry and to distinguish between different levels of value-added production. The first level of production is the growing and harvesting of trees. This is followed by milling. In some cases the milling results in a final product such as paper, while in others it is an intermediary product such as pulp. Some milled products go on to further value-added production (for example, cabinets). This last level includes products that are typically manufactured after leaving a mill.

Data on this page were obtained from the Bureau of Labor Statistics' Quarterly Census of Employment and Wages, which does not report data for proprietors (the self-employed). QCEW may under-count the size of industry sectors for industries in which self-employment is common. In those cases, the data may be most useful for showing long-term trends, displaying differences between places, and showing relationships between sectors over time.

Some data are withheld by the federal government to avoid the disclosure of potentially confidential information. Headwaters Economics provides estimates for these data gaps.[3] Estimates for data that were not disclosed are indicated with tildes (~).

### Why is it important?

Forest and timberland comprise one-quarter of the contiguous United States.[4, 5] To understand the potential impact of timber-related policies and land management practices, it is important to grasp the relative size of the timber industry and its components, how these have changed over time, and how local trends compare to trends in other locations. Important issues to consider are whether policies or management actions stimulate growth or decline in the industry, how proposed actions relate to ongoing trends shown in the data, whether some locations would be affected more than others, and given the relative size of the industry whether changes to it will affect the broader economy.

# Timber

## Selected Counties

## Timber Employment Trends

- In 2001, timber represented 1.74 percent of total employment. By 2022, timber represented 1.08 percent of total employment.




- From 2001 to 2022, timber employment shrank from 165 to 106 jobs, a 35.8 percent decrease.
- From 2001 to 2022, non-timber employment grew from 9,324 to 9,747 jobs, a 4.5 percent increase.




Data Sources: U.S. Department of Labor. 2023. Bureau of Labor Statistics, Quarterly Census of Employment and Wages, Washington, D.C.

# Timber Employment Trends

## What do we measure on this page?

This page describes long-term trends in timber employment as a percent of all jobs and compares timber to non-timber employment over time.

The line charts begin in 2001 because that is the year the Quarterly Census of Employment and Wages shifted to using the North American Industrial Classification System (NAICS).

Some data are withheld by the federal government to avoid the disclosure of potentially confidential information. Headwaters Economics provides estimates for these data gaps.[3]

## Why is it important?

When the timber industry is a significant driver of the economy, other sectors of the economy, total employment, and total personal income will likely follow trends in the timber industry.[6, 7] In timber-dependent communities, policies and management actions that impact the timber industry can impact the overall economy. If, on the other hand, jobs in the rest of the economy are growing independently of trends in the timber industry, then policies and management actions that potentially affect the timber industry may have impacts that are limited to that industry.

# Timber

## Selected Counties

## Timber Employment Trends (cont.)

- From 2001 to 2022, timber employment shrank by 59 jobs.
- From 2001 to 2022, non-timber employment grew by 423 jobs.




- From 2001 to 2022, Harvest grew from 11 to 14 jobs, a 27.3% increase.
- From 2001 to 2022, Mills shrank from 48 to 6 jobs, a 87.5% decrease.
- From 2001 to 2022, Mfg shrank from 106 to 86 jobs, a 18.9% decrease.




Data Sources: U.S. Department of Labor. 2023. Bureau of Labor Statistics, Quarterly Census of Employment and Wages, Washington, D.C.

# Timber Employment Trends (cont.)

## What do we measure on this page?

This page describes the change in timber jobs compared to the change in non-timber jobs and compares how employment in various timber sectors has changed over time.[8]

The line charts begin in 2001 because that is the year the Quarterly Census of Employment and Wages shifted to using the North American Industrial Classification System (NAICS).

Some data are withheld by the federal government to avoid the disclosure of potentially confidential information. Headwaters Economics provides estimates for these data gaps.[3]

## Why is it important?

To understand the importance of timber and wood products in the local economy, it is useful to grasp the source of new jobs and the relative contribution of the timber industry to net new jobs.[7]

Components of the timber industry may create or lose jobs at different rates. A growth in wood products manufacturing employment, for example, can indicate increased value-added activity. Alternatively, a loss of employment at sawmills and paper mills can indicate the closure of a mill with important impacts on the community.

Some places are more dependent on timber-related employment than others. This is important to understand because policies and management activities that impact the timber industry may affect other sectors of the economy.

Locations with economies that focus on resource extraction and commodity production can be subject to boom-and-bust cycles as well as other economic challenges such as slower long-term economic growth.

In the case of timber and wood products, mechanization, rising transportation costs, volatile prices, competition from abroad, shifting public values related to the management of public lands, the restructuring of timber companies as Real Estate Investment Trusts, and other factors have led to business and employment declines in many communities.[9]

# Timber

## Selected Counties

## Self-Employment

| | Dolores County, CO | Montezuma County, CO | Combined Counties | United States |
|---|---|---|---|---|
| Total Proprietors, 2020 | 195 | 2,386 | 2,581 | 27,151,987 |
| Timber | na | 12 | 12 | 69,862 |
| Forestry & Logging | na | 9 | 9 | 43,095 |
| Wood Products Manufacturing | na | 3 | 3 | 25,737 |
| Paper Manufacturing | na | na | na | 1,030 |
| Non-Timber | na | 2,374 | 2,374 | 27,082,125 |
| **Percent of Total** | | | | |
| Timber | na | 0.5% | 0.5% | 0.3% |
| Forestry & Logging | na | 0.4% | 0.3% | 0.2% |
| Wood Products Manufacturing | na | 0.1% | 0.1% | 0.1% |
| Paper Manufacturing | na | na | na | 0.0% |
| Non-Timber | na | 99.5% | 92.0% | 99.7% |

Table values that appear as "na" are not reported by the Census, either because there are no self-employed individuals in the industry or because the data are not disclosed due to privacy considerations.




- From 1998 to 2020, timber proprietors in the Combined Counties shrank from 14 to 12, a 14.3% decrease.




Data Sources: U.S. Department of Commerce. 2023. Census Bureau, Nonemployer Statistics, Washington, D.C.



FS-003604

# Self-Employment

## What do we measure on this page?

This page describes the number of nonemployer businesses (in most cases self-employed individuals) in timber by sector and location. It offers data to supplement previous pages of this report that do not include the self-employed.

**Nonemployer Business**: A business with no paid employees, with annual business receipts of $1,000 or more, and subject to federal income taxes. Nonemployer businesses can be individual proprietorships, partnerships, or corporations. Most nonemployers are self-employed individuals operating very small unincorporated businesses that may or may not be the owner's principal source of income.[10]

The U.S. Census Bureau's Nonemployer Statistics database provides the only source of detailed and comprehensive data on the scope, nature, and activities of U.S. businesses with no paid employment and payroll.[11]

The three timber sub-categories in the upper table Proprietors in Timber are 3-digit NAICS categories from Nonemployer Statistics.[12]

Depending on the geographies selected, some data may not be available due to disclosure restrictions.

## Why is it important?

Significant portions of the timber industry—especially those related to forestry and logging activities that include activities such as cutting, harvesting, and transporting timber—may be conducted by nonemployer businesses. These nonemployer businesses are not reported by County Business Patterns but are reported by Nonemployer Statistics. It is important to use these two data sources in tandem when evaluating the size and trends in timber employment.



FS-003605

# Timber

## Selected Counties

## Wages

| Wages*, 2022 | Dolores County, CO | Montezuma County, CO | Combined Counties | United States |
|---|---|---|---|---|
| All Sectors, 2022 (2022 $s) | $38,679 | $43,463 | $43,177 | $69,985 |
| Private | $43,216 | $42,820 | $42,841 | $70,343 |
| Timber | $0 | $43,931 | $43,931 | $66,521 |
| Forestry & Logging | $0 | $91,603 | $91,603 | $51,758 |
| Wood Products Manufacturing | $0 | $37,712 | $37,712 | $59,217 |
| Paper Manufacturing | $0 | $0 | $0 | $101,306 |
| Non-Timber | $43,216 | $42,802 | $30,465 | $60,335 |
| Government | $30,900 | $45,114 | $44,019 | $67,821 |

- In 2022, United States had the highest wages in timber ($66,521), and Dolores County, CO had the lowest ($0).




Data Sources: U.S. Department of Labor. 2023. Bureau of Labor Statistics, Quarterly Census of Employment and Wages, Washington, D.C.

# Timber

## Selected Counties

## Wages

### What do we measure on this page?

This page describes wages (in real terms) from employment in the timber industry, including sub-sectors, compared to wages from employment in all non-timber sectors combined.[13]

The wage and employment data on this page are from the Bureau of Labor Statistics, which does not report data for proprietors or the value of benefits.[14, 15, 16]

The three timber sub-sectors in the tables are 3-digit NAICS categories.[17]

Some data are withheld by the federal government to avoid the disclosure of potentially confidential information. Headwaters Economics provides estimates for these data gaps.[3] Estimates for data that were not disclosed are indicated with tildes (~).

### Why is it important?

The timber industry has the potential to provide high-wage jobs, but this may differ by timber sub-sector and by location. Important issues to consider are how timber industry wages compare to wages in other sectors, whether some components of the timber industry pay higher wages than others, and whether there are significant wage differences between locations.

# Timber

## Selected Counties

## Wages (cont.)

- In 2022, timber sector average wages, from highest to lowest, were: forestry & logging ($91,603), wood products manufacturing ($37,712), and paper manufacturing ($0).

- In 2022, timber sector percent of total employment, from highest to lowest, were: wood products manufacturing (0.9%), forestry & logging (0.1%), and paper manufacturing (0%).




- From 2001 to 2022, average wages in forestry & logging grew (in real terms) from $35,925 to $91,603, a 155% increase.

- From 2001 to 2022, average wages in wood products manufacturing shrank (in real terms) from $40,071 to $37,712, a 6% decrease.




Data Sources: U.S. Department of Labor. 2023. Bureau of Labor Statistics, Quarterly Census of Employment and Wages, Washington, D.C.

# Timber

## Selected Counties

## Wages (cont.)

### What do we measure on this page?

This page describes wages (in real terms) and employment levels in different timber sectors. It also shows average wage trends (in real terms) for timber sectors.

The wage and employment data on this page are from the Bureau of Labor Statistics, which does not report data for proprietors nor the value of benefits.[14, 15]

The three timber sub-sectors in the tables are 3-digit NAICS categories[17] and are different than the categories shown on the initial pages of this report.

The line charts begin in 2001 because that is the year the Quarterly Census of Employment and Wages shifted to using the North American Industrial Classification System (NAICS).

Some data are withheld by the federal government to avoid the disclosure of potentially confidential information. Headwaters Economics provides estimates for these data gaps.[3]

### Why is it important?

While the timber industry has the potential to offer high wages, not all components of the timber industry pay the same wages or employ the same number of people. A significant increase in timber jobs that pay above the average for all industries will increase overall average earnings per job. On the other hand, a significant increase in timber jobs that pay below the average for all industries will decrease overall average earnings per job. A modest change in timber employment, especially when this industry is a small share of total employment, will not likely affect average earnings in a local area.

# Timber

## Selected Counties

## Comparisons

| Timber Sector | Employment Share, 2022: Combined Counties | Employment Share, 2022: United States | Location Quotient |
|---|---|---|---|
| Growing & Harvesting | ˜0.1% | ˜0.1% | 1.0 |
| Sawmills & Paper Mills | ˜0.1% | ˜0.2% | 0.5 |
| Wood Products Mfg. | ˜0.9% | ˜0.4% | 2.3 |

Employment Share: Combined Counties vs. United States

Location Quotient: Combined Counties vs. United States




- In 2022, wood products mfg. had the highest location quotient score (2.3), and sawmills & paper mills had the lowest (0.5).

# Timber

## Selected Counties

# Comparisons

## What do we measure on this page?

This page describes whether the region is specialized (or under-specialized) in timber employment. The chart illustrates the difference between the selected region and the selected comparison area.[18] (If no custom comparison area was selected, EPS defaults to compariing against the U.S.)

**Location Quotient**[19]: A ratio that compares an industry's share of total employment in a region to the comparison area. More precisely, it is the percent of local employment in a sector divided by the percent employment in the same sector in the comparison area. In other words, it is a ratio that measures specialization using the comparison area for comparison. A location quotient of more than 1.0 means the local area is more specialized in that sector relative to the comparison area. A location quotient of less than 1.0 means it is less specialized.[20]

Another way to think about location quotients is as a measure of whether a place produces enough goods or services from an industry to satisfy local demand for those goods or services. Results above or below the 1.0 standard indicate the degree to which a place may import or export a good or service. Although there is no precise cutoff, location quotients above 2.0 indicate a strong industry concentration (and that an area is likely exporting goods or services) and those less than 0.5 indicate a weak industry concentration (and that an area is likely importing goods or services).

Some data are withheld by the federal government to avoid the disclosure of potentially confidential information. Headwaters Economics provides estimates for these data gaps.[3] Estimates for data that were not disclosed are indicated with tildes (~).

## Why is it important?

Locations with economies that focus on resource extraction and commodity production can be subject to boom-and-bust cycles as well as other economic challenges such as slower long-term economic growth. In the case of timber and wood products, mechanization, rising transportation costs, volatile prices, competition from abroad, shifting public values related to the management of public lands, the restructuring of timber companies as Real Estate Investment Trusts, and other factors have led to business and employment declines in many communities. In some cases, rural economies that have historically been tied to commodity production are becoming more diverse.[9, 21]

A few caveats: (1) A large location quotient for a particular sector does not necessarily mean that sector is a significant contributor to the economy. (2) LQs greater than 1.0 only suggest potential export capacity when compared to the comparison area and do not take into account local demand. Local demand may be greater than average, and therefore all goods and services may be consumed locally (i.e., not exported). (3) LQs can change from year to year. (4) LQs can vary when one uses income or wage data rather than employment.

# Timber

## Selected Counties

## Comparisons Over Time




Data Sources: U.S. Department of Labor. 2023. Bureau of Labor Statistics, Quarterly Census of Employment and Wages, Washington, D.C.

# Comparisons Over Time

## What do we measure on this page?

This page describes the change in timber employment for all selected locations and the comparison area.[18] The information is indexed (2001=100) so that data from locations with different-sized economies can be compared. Indexing makes it easier to understand the relative rate of growth or decline of timber employment over time.

**Index**: Indexed numbers are compared with a base value. In the line chart, employment in 2001 is the base value and is set to 100. The employment values for subsequent years are expressed as 100 times the ratio to the base value. The indexing used in the line chart enables easier comparisons between locations over time. (If many locations are selected, it may be difficult to read the figure on this page.)

The line chart begins in 2001 because that is the year the Quarterly Census of Employment and Wages shifted to using the North American Industrial Classification System (NAICS).

Some data are withheld by the federal government to avoid the disclosure of potentially confidential information. Headwaters Economics provides estimates for these data gaps.[3]

## Why is it important?

Not all locations have attracted or lost timber industries and employment at the same rate.[8] An index makes it clear where the rate of timber growth or decline has been the fastest. Lines above 100 indicate positive absolute growth while those below 100 show absolute decline. The steeper the curve, the faster the rate of change.

It may be helpful to look for large year-to-year rises or dips in the lines on the chart to identify rapid employment changes. If the reasons behind these fluctuations are not evident, it may be helpful to talk with regional experts or locals to learn more about what caused abrupt changes.[22]

Locations with economies that focus on resource extraction and commodity production can be subject to boom-and-bust cycles as well as other economic challenges such as slower long-term economic growth.

Locations with economies that focus on resource extraction and commodity production can be subject to boom-and-bust cycles as well as other economic challenges such as slower long-term economic growth. In the case of timber and wood products, mechanization, rising transportation costs, volatile prices, competition from abroad, shifting public values related to the management of public lands, the restructuring of timber companies as Real Estate Investment Trusts, and other factors have led to business and employment declines in many communities. In some cases, rural economies that have historically been tied to commodity production are becoming more diverse.[6, 9]

# Timber

## Selected Counties

## Data Sources & Methods

This EPS Timber report uses national statistics from public government sources. All data used in EPS can be readily verified with the original sources:

- **Quarterly Census of Employment and Wages**
  Bureau of Labor Statistics, U.S. Department of Labor
  https://www.bls.gov/cew/
  Contact
  https://www.bls.gov/bls/contact.htm

- **Nonemployer Statistics**
  Bureau of the Census, U.S. Department of Commerce
  https://www.census.gov/programs-surveys/nonemployer-statistics.html
  Contacts:
  https://www.census.gov/programs-surveys/nonemployer-statistics/about/contact-us.html

**EPS core approaches**
EPS is designed to focus on long-term trends across a range of important measures. Trend analysis provides a more comprehensive view of changes than spot data for select years. We encourage users to focus on major trends rather than absolute numbers. EPS displays detailed industry-level data to show changes in the composition of the economy over time and the mix of industries at points in time. EPS employs cross-sectional benchmarking—comparing smaller areas such as counties to larger regions, states, and the nation—to give a sense of relative performance. EPS allows users to aggregate data for multiple locations to allow for more sophisticated cross-sectional comparisons.

**Adjusting dollar figures for inflation**
Because a dollar in the past was worth more than a dollar today, data reported in current dollar terms should be adjusted for inflation. The U.S. Department of Commerce reports personal income figures in terms of current dollars. All income data in EPS are adjusted to real (or constant) dollars using the Consumer Price Index. Figures are adjusted to the latest date for which the annual Consumer Price Index is available.

**Data gaps and estimation**
Some data are withheld by the federal government to avoid the disclosure of potentially confidential information. Headwaters Economics provides estimates for these data gaps. These are indicated with tildes (~) in tables. Documentation explaining methods developed by Headwaters Economics for estimating disclosure gaps is available at https://headwaterseconomics.org/eps.

# Timber

## Selected Counties

## Endnotes

1 - The three timber and wood products categories are made up of the following NAICS codes:
Growing and Harvesting: forestry and logging (113), support activities for forestry (1153).
Sawmills and Paper Mills: sawmills and wood preservation (3211), pulp, paper, and paperboard mills (3221), veneer, plywood, and engineered wood product manufacturing (3212).
Wood Products Manufacturing: other wood product manufacturing (3219) and converted paper product manufacturing (3222).

2 - For an online listing of NAICS codes, see: naics.com/search.htm and bls.gov/bls/naics.htm

3 - Documentation explaining methods developed by Headwaters Economics for estimating disclosure gaps is available at https://headwaterseconomics.org/eps.

4 - For an illustration of how Americans use their land to create wealth (including forestry), see Merrill D and L Leatherby. 2018. Here’s How America Uses Its Land. Bloomberg. https://www.bloomberg.com/graphics/2018-us-land-use/.

5 - See the U.S. Forest Service’s Forest Inventory and Analysis Program at https://www.fia.fs.fed.us/.

6 - The Forest Service produces a number of publications about the timber industry, including Resources Planning Act (RPA) Assessment reports on the status and trends of the Nation's renewable resources on all forests. See https://www.fs.fed.us/research/rpa/.

7 - The Bureau of Business and Economic Research’s (BBER) Forest Industry Research Program monitors forest products operations in the West and researches the industry’s size, diversity, and economic impacts. BBER is located at the University of Montana in Missoula, MT. http://www.bber.umt.edu/FIR/Default.asp.

8 - The Bureau of Labor Statistics provides an overview and outlook of the timber industry (as part of agriculture, forestry, and fishing). See https://www.bls.gov/ooh/farming-fishing-and-forestry/.

9 - In 2017 Headwaters Economics analyzed the economic performance of formerly timber-dependent counties. See Lessons from the Timber Transition at https://headwaterseconomics.org/economic-development/trends-performance/timber-transition/.

10 - Nonemployer definitions can be found at https://www.census.gov/programs-surveys/nonemployer-statistics.html.

11 - Nonemployer Statistics data can be found at https://www.census.gov/programs-surveys/nonemployer-statistics.html.

12 - Timber in the table and charts on this page is the sum of the following NAICS codes: Forestry and Logging (113), Wood Products Manufacturing (321), and Paper Manufacturing (322).

13 - The EPS Socioeconomic Measures report provides more information on wages in non-timber industries: https://headwaterseconomics.org/eps.

## Endnotes (cont.)

14 - For an overview of how the Bureau of Labor Statistics treats pay and benefits, see https://www.bls.gov/bls/blswage.htm.

15 - For an overview of how the Bureau of Labor Statistics treats employment, see https://www.bls.gov/bls/employment.htm.

16 - Employment and wage estimates are also available from the Bureau of Labor Statistics for more than 800 occupations. Looking at timber by occupation rather than by sector or industry is helpful because wages can vary dramatically across occupations. For more information, see https://www.bls.gov/oes/.

17 - Timber in the tables on this page is the sum of the following NAICS codes: Forestry and Logging (113), Woods Product Manufacturing (321), and Paper Manufacturing (322).

18 - The term "benchmark" in this report should not be construed as having the same meaning as in the National Forest Management Act (NFMA).

19 - LQ = (ei/e) divided by (Ei/E)
Where: ei = Local employment in industry i; e = Total local employment; Ei = U.S. employment in industry i; E = Total U.S. employment.

20 - A succinct definition of a location quotient is offered by Indiana Business Research Center at IU's Kelley School of Business. See http://www.incontext.indiana.edu/2006/march/1.asp.

21 - For a review of literature on economic diversity, see Sterling A. 1998. On the Economics and Analysis of Diversity. Electronic Working Papers Series, Paper No, 28. Brighton, UK: University of Sussex http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.144.8865&rep=rep1&type=pdf; and Malizia EE and Shanzai K. 2006. The Influence of Economic Diversity on Unemployment and Stability. Journal of Regional Science 33(2):221-235.

22 - Useful resources for investigating trends related to timber harvest on public lands are the National Forest Timber Sales and Timber Cuts and Gross Receipts from Commercial Activities data visualizations available online at https://headwaterseconomics.org/dataviz/national-forests-timber-cut-sold/ and

https://headwaterseconomics.org/dataviz/national-forests-gross-receipts/.

TOWN of McPHEE
McPHEE ROAD
MONTEZUMA COUNTY
COLORADO

HABS No. CO-36

HABS
COLO,
42-MCPHE,
1-

PHOTOGRAPHS

WRITTEN HISTORICAL AND DESCRIPTIVE DATA

HISTORIC AMERICAN BUILDINGS SURVEY
NATIONAL ARCHITECTURAL and ENGINEERING RECORD
NATIONAL PARK SERVICE
DEPARTMENT of the INTERIOR
WASHINGTON, D.C. 20243

HABS
COLO,
42-MCPHE,
1-

HISTORIC AMERICAN BUILDINGS SURVEY

"Town of McPhee, Colorado: A New Mexico Lumber Company Town" HABS No. CO-36

Location: Montezuma County, Colorado

Date of Construction: 1924-1948

Present Owner: Department of the Interior
Bureau of Reclamation
Upper Colorado Region
P.O. Box 11568
Salt Lake City, Utah 84501

Significance: The company town of McPhee, Colorado, owned and operated by the New Mexico Lumber Company, lasted from 1924-1948, serving as an important economic and cultural town of the Dolores River Valley. During the industrial town's peak of operations in 1927, it was Colorado's largest and most productive mill town, producing more than half the State's annual lumber. The town featured a lumber mill, housing for approximately 1,500 employees and the last logging railroad in Southwestern Colorado.

Historian: Lisa Mausolf, August, 1981

The whir of machinery, the shouts of workers and other sounds associated with a prosperous lumber town no longer resound from an area five miles northwest of Dolores, Colorado. Yet from 1924 until 1948 this area was occupied by the company town of McPhee, at one time Colorado's largest and most important lumber mill town. At its peak in 1927, McPhee produced more than one half of the state's 60 million board foot production of lumber. A company town of 150 acres featuring a mill and subsidiary buildings provided housing for a community numbering as many as 1,500 people. Sixty miles of logging railroad, the last in the area, stretched its tentacles outward from this center connecting logging camps as far as 26 miles away.

The story of McPhee, however, represents only one phase in the evolution of Western lumbering. As other lumber towns before it, McPhee gained sustenance from the death of other lumber areas. Like other towns, McPhee also possessed a limited future. It was a town based on planned obsolescence, utilitarian architecture and a simplistic grid street pattern. Though intended to last only 18 years, McPhee persevered for 24 years before finally being destroyed by fire. The company town has, however, survived much longer in the minds of those who lived there.

Interest in the timber reserves of the Montezuma forest and vicinity began long before McPhee was established. As early as 1874 the first mill was established in the area.[1] Lumbering in the Montezuma area as well as throughout Colorado accelerated quickly. By 1885 it was vertically integrated, with all steps of production owned by the same individual or family. At the turn of the century Dolores could claim two of the country's largest lumberyards.[2] Between 1874 and 1918

seventy-two sawmills harvested 254,477 board feet in the Montezuma National Forest.[3]

The development of mining, the construction of townsites and the growth of railroads at the end of the 19th century resulted in unrestricted cutting of timberlands. Partially in response to these shortsighted actions, the Forest Service was created in 1905 to control timber cutting and aid in reforestation.[4] In 1905 President Theodore Roosevelt created the Gunnison, San Juan, Cochetopa, Uncompaghre and Montezuma Reserves, totalling some 3.6 million acres. The Montezuma Forest Reserve would prove central to the McPhee operations.[5]

The town of McPhee represented the culmination of the endeavors of three lumber geniuses, each seeking to capitalize on these newly created reserves. McPhee's history reads like a roster of many of the area's most important lumbermen. The lumber firm of McPhee and McGinnity, one of the oldest in Colorado traces its origins to Charles McPhee's Denver carpenter shop established in 1869. McPhee, a Canadian lumberjack from Prince Edward Island, migrated westward in 1872 to become one of the pioneer lumbermen of Colorado and New Mexico. The firm expanded rapidly into building construction, followed by a shortlived partnership called McPhee and Keating. In 1879 John McGinnity, a bookkeeper in the McPhee office became a general partner.[6]

The origins of the town of McPhee began in 1892, when a subsidiary, the New Mexico Lumber Company was formed by McPhee, McGinnity and E. M. Biggs. Biggs was part of an equally well known lumber family from New Mexico. In 1900 Biggs began buying cutting rights to timber in the area north of Dolores while employed by New Mexico Lumber Company. His interest was more personal than company-related. In 1907 the struggle

for power over the timber peaked as McPhee learned of Bigg's activities and purchased the Denver lumber firm with which Biggs was negotiating for capital to establish mill operations. This incident resulted in the erosion of Bigg's authority in company operations. Although Biggs remained affiliated with the company until 1917, McPhee and McGinnity took charge of the Dolores region.[8]

The creation of the town of McPhee began with E. M. Bigg's acquiring holdings north and west of Dolores in 1900. McPhee and McGinnity subsequently filed on alternate sections of land, thus denying access to logging competitors by isolating sections. By 1913 the New Mexico Lumber Company obtained cutting rights in Dolores.[9] The company completed their holdings in 1924 with a government sale of 400 million board feet of yellow pine within 55 square miles, located in the Montezuma National Forest, seven miles north of Dolores.[10] The timber was overmature and needed to be cut immediately to salvage as much as possible. Unfortunately, McPhee and company did not realize that much of the timber reserves was overmature and of poor quality. Yet as timber at El Vado, New Mexico had recently been exhausted, plans were made for a new center of company operations and a new mill town.

The town of McPhee was only part of the company's expansive lumber monopoly. During its peak in 1927 McPhee and McGinnity had five lumberyards in Denver, five in San Luis Valley and five on Moffat Road with 25 branches in Colorado, Nebraska and Wyoming.[11] Its subsidiaries included the New Mexico Lumber Company, Sterling Lumber and Investment, and McPhee and McGinnity of Utah. The former had operations in Edith, El Vado and Chama, New Mexico and Chromo, Colorado. The equipment used at the varying locations was used again and again and moved on to the

next lumber town as timber gave out. Lumbering until this time had always been decentralized in the area and as William McPhee, grandson of Charles McPhee recently noted, "it probably always should be." Yet the owners of New Mexico Lumber Company conceived of a town based on a new and daring idea, one which would consolidate all the company's scattered holdings into one base, a town to be situated north of Dolores, Colorado.[12]

Decisions concerning the location of a mill town can be traced to the years prior to the creation of McPhee. In 1905 Biggs retained Arthur Ridgway of the Engineering Department of the Denver and Rio Grande Railroad to survey the Dolores area for timber potential. Ridgeway suggested that a mill town be built either at the town of Dolores, or four miles downstream at the mouth of House Creek. He favored Dolores as it would eliminate the need for another train to transport lumber from the mill to the Rio Grande Southern Railroad.[13] Those involved, however, rejected the idea of locating at Dolores because of local opposition. This deal failed and the town was eventually situated on the 800 acre site of the old Charlie Johnson homestead, down the river from Dolores. The site's 14 room adobe house, stables and racetrack were obliterated. All roads still in use were the original ones, dating back to the Johnsons; requiring no new roads to be added.[14] In 1924 a gang of surveyors accompanied by W. W. Norseman surveyed the ground upon which the sawmill and railroad would be located.[15]

In planning the town of McPhee, those involved were faced with two alternatives; they could construct a small plant that would survive

indefinitely if forest reserves proved sufficient and mill production moderate, or they could build a town based on high production and short term existance.[16] The New Mexico Lumber Company chose the latter scheme of planned obsolescence and rapid production. The inexpensive simple company housing and apparent lack of a professional town plan reflect this economical scheme.

The phenomenon of the company town is in many ways particularly suited to the American West where industries have had to locate in relatively isolated yet mineral rich areas. In order to attract and maintain a labor force industrial towns became essential.[17] In early years employees in the West, especially mountainous mining camps, constructed their own crude shelters or lived in what was available, abandoned box cars and the like. Employers soon learned, however, that housing even of the most primitive style, helped to stabilize the labor force. By the turn of the century most employers either provided housing, capital for building or furnished the land on which homes could be constructed. Although initially catering to bachelors, employers discovered company housing for married couples promoted a more responsible and stable labor force.

Before construction of McPhee started, "the details of the plan had been worked out with all the minuteness of a blueprint."[18] A company engineer in all likelihood designed the grid layout of the 150 acre town in 1924 consisting of the mill, homes of employees, lumberyards and subsidiary buildings. Surveyors, engineers, carpenters and grading crews all employed by the company were transferred to build the town and survey and grade the railroad routes. A document concerning the water

system of 1927 yields the names of two engineers of the New Mexico Lumber Company who could have contributed to the McPhee plan; Warren Cryder Rhoads and S. S. Houston.[19]

The town site was originally known as Ventura. It was also temporarily called Escalante. McPhee was situated on the alleged spot where in 1776 Father Escalante stopped for several weeks beside a stream he call the Dolores River. The town was given its final name after an influential visit to the site by William McPhee in 1924.

One cannot help but marvel that a mere company engineer probably designed the town of McPhee, once the largest community in Montezuma county. A main street served as a median dividing the homes from the sawmill buildings, commissary and boarding houses. Wooden sidewalks lined the side featuring the Anglo houses. No attempt was made to offset the monotony of row after row of identical employee housing. Only the railroad tracks and the section of town housing the hispanic workers interrupted the grid imposed on the land. The Mexican-American section was relegated to the outskirts of town, beyond the sawmill buildings in a crescent formation, responding to the curve of the river. The railroad effectively separated the Mexican-American section from the rest of the town.

The variety of housing in the town reflects the social hierarchy usually associated with company towns. The two largest homes belonged to the company doctor and manager. Built by the company, Dr. Speck's property contained a frame house, board-and-batten garage, two connecting sheds and a shed of frame construction. The house was one and one half stories, on a concrete foundation with a

full basement. The exterior was of shiplap construction, capped by a gable roof with projecting eaves and exposed rafters. The superintendent's house, the more elaborate of the two, was apparently designed for Thomas Orr in 1925 by a Denver architect.[20] The grounds included the main house, garage, dugout, barn, frame pump house and an outbuilding of concrete blocks. The two story frame house with full basement had a wood clapboard exterior. The roof was a single gable, with exposed rafters, featuring eaves supported by boxed corner brackets. The south wing had a frame rail deck on its roof. The wood frame garage was covered with shiplap siding. The pump house was also notable for its horizontal wood siding and decorative trim.[21]

The majority of the Anglo employee houses contained five rooms. A few seemed to have been slightly wider judging from historic aerial photographs. Some twenty houses were transported from the declining lumber town of El Vado, the rest were constructed on the site.[22] Eleven additional homes were completed in 1925 and two rows of 3 room houses were built later.[23] The houses were simple rectangles capped by a broad gable, with front and rear porches and painted siding. In many cases the rear porch was screened for an additional sleeping area. Rent was $10 a month and was deducted automatically from wages. Electricity was provided by the company as was running water. Sewers were connected to the superintendent's, doctor's and some of the larger homes. The rest of the town had outdoor privies.[24] Many bachelors resided in a rooming house, and received their meals from a nearby cookhouse.[25] The old Johnson house, a two story frame house was moved directly across the McPhee road and used as an overflow boarding house for mill hands and visitors.[25]

A separate area 3/4 mile away from the Anglo community was reserved for the Mexican-American employees. This so called "Mexican town," "Chihauaha" or "Chili town" consisted of two rows of small houses of unfinished lumber, spaced at 15 feet intervals. A road ran along the south end, with paths between the house rows. The rows formed a crescent along the river bank. The houses in the hispanic section were "shot gun houses" consisting of three rooms all in a row, with doors in alignment. Some two room houses, with two doors leading to the exterior also existed. Electricity was provided to only a few of these homes while none received refrigeration or running water. Instead, kerosene lights, ice boxes, woodboxes, and outdoor faucets sufficed. Wood was available free from the company for firewood and an ice house was located near the mill pond. The houses had no foundation, wooden floors, newspapers stuffed inside the walls acted as insulation. Rent averaged about $2 a month. In one case 13 people lived in one of these small three-room houses.[27]

McPhee's impressive mill operations began in 1924 when R. E. Pryor moved his small sawmill onto McPhee and McGinnity timber lands and began to extract lumber and bridge timbers for the mill, sawmill and ties.[28] About this time crews from El Vado arrived to aid in construction. A combination of five ton chain driven trucks and eight wheel log wagons drawn by eight horses transported the heavy equipment from El Vado. The mill took an additional year and a half to complete and contained a band saw and circular saw. The mill covered a city block and featured a three-story main building with corrugated iron siding.[29] The three acre mill pond, used as a reserve when inclement weather prevented logging, was capable of holding one million feet of logs. There was no roundhouse, rather, the trains backed up to the mill pond. Inclined

platforms carried the lumber from the sawmill to some 4 to 6 rooms of stone that housed the dry kilns. The stone sawmill powerhouse contained two 500 horsepower steam engines and nine boilers provided the steam for machinery. In the sawmill house, all waste was converted into wood chips which were used to stoke the boilers. The plant also included a planning mill, machine shop and adjacent box factory where lumber was precut for boxes. The mill was shut down in the winter when logging became difficult. Crews then worked part-time, but the boiler operated continuously.[30]

The McPhee mill has been credited by western historian Leroy Hafen for "revolutionizing the lumber mill business" of Colorado[31] At its height in the mid 1920's, the sawmill was cutting 150,000 board feet/day with the dry kiln processing 80,000 board feet/day.[32] In 1925, McPhee produced 27,445,360 board feet of lumber, 61% of the production of the entire state.[33] In the early 1940's after a fire destroyed the mill, smaller sawmills were built at strategic points in the logging area: at Lost Canon, Barlow Creek, Glades and Plateau. Wood was brought to the planner to be surfaced and milled. The same capacity was produced but savings occurred from not having to haul waste material to the central plant.[34]

Lumber from McPhee was utilized for a variety of purposes and reached many destinations. Most of the wood produced at McPhee was rough-cut, finished later at the McPhee and McGinnity plant in Denver, located at Blake and 23rd Street.[35] The lower grades of lumber were made into railroad ties, to satisfy contract with the Denver and Rio Grande Western Railroad.[6] This contract enabled the lumber company to

survive the Great Depression.[37] Lower grade woods were also precut for boxes, and shipped to fruit and vegetable producers and the Sherwin Williams Paint Company. Superior lumber grades were used for building construction and were also shipped to sash and door factories along the Missouri River.[38] The mill also received numerous federal government contracts, including one for lumber to build local Civilian Conservation Corps Camps in 1933 and another to manufacture army locker trunk trays during world War II.[39]

The McPhees pioneered logging railroads. Their decision to use the logging railroad in this area was a response to the type of lumber which they sought. Unlike species like cottonwoods which thrive in riverbottoms and can be cut, dumped into a river and floated, the tall Ponderosa pines require dry and well drained soil, normally found on mesas away from river bottoms. Land transportation either utilizing horses or logging railroads was, therefore, the only alternative.[40]

The McPhee railroad was the last narrow gauge logging railroad in southwestern Colorado. The railroad officially came to the Dolores River Valley in 1891, in the form of the Rio Grande Southern. Due to McPhee's relative isolation, the New Mexico Lumber Company decided to link the mill town with the main line railroad as well as construct track to reach into the timberlands. The participation of a main line railroad in the operation of logging lines was unprecedented in the United States.[41] Railroad construction began in 1924, using an incomplete survey commissioned for the Dolores, Paradox and Grand Junction Railroad in 1913.[42] In 1924, a line was built westward five miles from Dolores, terminating at McPhee. Many logging lines of the region, like the

Colorado and Southwestern, as the McPhee's line was named, were formally incorporated rather than operating under the lumber company name.[43]

As logging operations moved deeper into the timber, railroad spur lines followed. At its peak the company amassed sixty miles of railroad.[44] The New Mexico Lumber Company had five logging locomotives, one geared and four rod.[45] The rod locomotives were mostly obsolete, obtained second-hand from the Denver and Rio Grande Railroad with one from Rio Grande and Southwestern Railroad at El Vado. The Montezuma Lumber Company, which took over in 1936, decreased the trackage substantially and reduced the locomotives to two. Most of the 45 flat cars came from nearby declining operations. Second hand track was imported from Salida and Pagosa Springs. In the 1930's, the Montezuma Lumber Company purchased an 1880 duckbill coach (#311) from the Denver and Rio Grande Western Railroad to transport employees and their families to Dolores behind the regular lumber train. On Saturday nights the train transported the townspeople to Dolores for dances, movies and drinking in the gas-illuminated car with faded red plush seats.[46]

The end of narrow gauge logging in southwest Colorado came in 1932 when the expense of hauling logs and lumber by rail gave way to hauling by trucks. The five miles of track between McPhee and Dolores remained, however, and continued to service McPhee residents. The scrapping of the last of this segment occurred in 1948.[47] Finally in 1950, after an intense struggle and a brief period of receivership in the 1940's the Denver and Rio Grande Southern Railroad abandoned operations in the area.[48]

The logging operations at McPhee have been criticized for their continued dependence on the railroad and failure to mechanize production. Logging in Colorado, as exemplified by McPhee was marked

by the absence of mechanical loading devices used on the Pacific Coast. It represented instead a marked dedication to horse power.[49] Four horse teams, with either big wheeled rigs or eight wheeled wagons were used to haul the trees to the loading station. Instead of steam donkey engines, Colorado loggers used crosshauling, by which a team of horses dragged trees up a ramp onto log cars. Seven to ten flat cars made up a train with two locomotives used to haul from forest to mill. A third locomotive hauled the loaded cars to the unloading skids at the mill pond. It is interesting to note that most of the hay and grain for the 200-250 heavy draft horses had to be shipped in as no local 50 organized by the sales agency could regularly meet the demand.[50]

Social communities, separate from that of the company town of McPhee, sprang up as new logging camps were established. (See Appendix A for a list of company logging camps.) The sites of the camps moved every few years as logging operations ventured deeper to secure timber. The earliest, Horse Camp, was little more than a construction camp, though it did have a school. Beaver Camp in 1925 represented a more permanent encampment, with a store and post office. From then on, a small commissary was always moved along with the camp. Lawrence Sullenberger did most of the construction work and establishing of camps for the New Mexico Lumber Company.[51] Small board cabins were built on skids, easily hitched to four or six horses for transportation to new sites. Tent colonies were often constructed at the camps. Entire familes often moved to the hills so the head of family could earn a living. Characteristically the camp housed several hundred loggers and their families. No rent was charged in the log camps. During the winter people from the logging camps resided in McPhee.

Yet to understand company towns one must view them as much more than mere housing. Community functions were usually vested in the company. As the 1920 Bureau of Labor Statistics Bulletin focusing on company towns stated:

> "where an employer goes into a new district to organize and establish a new plant he must practically build his whole community; he assumes the responsibility for the creation of a new center of social life. And not until he has established the community and demonstrated the likelihood of its permanence do secondary interests establish themselves and social control and self direction by the members of the community take shape."[52]

In the absence of self government it was revealing to note how employees viewed the company, especially their perception of owners. Such views were understandably mixed yet in the case of McPhee, employees seem to have had a certain affection for the original owner, Mr. McPhee and a general distaste for those who followed. Paternalism was the key word; he served as a sort of fatherly figure. One observer recently noted that after Mr. McPhee passed away and the company reorganized, "the new management prevented things from running smoothly, as this new company exploited its employees as much as possible, giving them inadequate and unsanitary quarters in which to live, paying them in token money only good at the company store whose prices were exorbitant and otherwise treating them like animals rather than like human beings."[53] The comment, however, rings of nostalgia for the town which he described is no different than that which existed when Mr. McPhee lived. In any case, a clear affection for the original owner is apparent. Other complaints often referred to the new owners as dictators.[54]

Providing a school, like many of the McPhee community functions, was a task which fell to the New Mexico Lumber Company. It was not until years later that the county accepted the McPhee school into their

jurisdiction. Originally classes were held in one of the four room houses, eventually transferring to the rooming house. A seven room schoolhouse was constructed on the west side of town in October, 1924 with company material and the men donating their labor. At its peak, 500 students attended the school in split sessions. After completing the tenth grade in McPhee, the students were transported to Dolores by the red carpeted train to complete their high school education. After the Great Depression, McPhee was forced to discontinue paying the tuition.[55]

The commissary at McPhee was more than one of the largest company stores in southwestern Colorado; it functioned as a community center. The McPhee store functioned as a department of the New Mexico Lumber Company as opposed to other company towns where the commissary was owned by a subsidiary or leased by an outside party. Direct or indirect pressure exerted by the company on employees to shop there seems to have been a minimum.

The McPhee store, occupied half of the second largest building in town (besides the mill), the company office and the post office sharing the other half. A Butcher shop was located in a small extension next to the commissary and a gas station stood in front. Also inside the large frame building was a "picture show" and pool room. The commissary featured a high ceiling with a balcony and offered a variety of products including dry goods, hardware, meats and produce. What was not available at the store could be ordered from Montgomery Ward. The commissary was open to McPhee residents, logging camps, the CCC Camp as well as Dolores Valley residents and it accepted both cash and company scrip. Employees were charged cost plus 10% on all merchandise except dress shoes. At least one employee argued however that this was not true, "you were lucky if you got 40% above anyone else's price."[56]

McPhee employees received 40% of their wages in company issued scrip for use at the commissary, and 60% in cash. The scrip was estimated to equal living expenses per month plus rent. The coin-shaped tin scrip was accepted by many Dolores merchants.[57] Later, coupons which could not be redeemed in Dolores came into use. The employees received coupon books in five, ten and twenty denominations; the price of the books was deducted from the employee's check.[58] During difficult times employees were allowed to borrow on their next summer's wages, and were issued credit for use in the company store. Many were thus obliged to patronize the store and unfortunately a few, no doubt, became indebted to it.[59]

Area ranchers also patronized the large store, trading eggs, butter and produce at the store for scrip. Often this trade consumed a large percent of their cash flow. The scrip money allowed many area farmers to survive through financial unstable periods and shop for necessities at the commissary, especially merchandise which they could not trade for anywhere else.[60]

In terms of fuel, power and public utilities McPhee was virtually self-sufficient. The company generated all of its own fuel. Two miles from Dolores-Disappointment Highway along the road to Beaver Camp, a vein of light lignite coal was developed. Twenty tons a day were mined, all of which was consumed by company operations. The coal was loaded directly from the mine into tenders of logging engines, the rest hauled for company use.[61] All mill waste material and sawdust were put through two machines called hogs where it was made into chips. These chips were conveyed to boilers with surplus stored in a fuel house.

Beginning in 1925, parts of McPhee received electricity making use of generators powered by steam from the mill boilers.[62] Lights were

extinguished each night at ten o'clock when the generator went down. The system was comparatively advanced. Many of the surrounding districts remained without electricity for some ten to fifteen more years.[63] Only select homes in the Mexican-American section received power.[64] McPhee is typical of many southwestern company towns where generally the better classes of homes received utilities.

A water pump was installed in 1927 to provide water for domestic and manufacturing purposes. The headgate was located on the west side of the Dolores River, two miles above McPhee. The pipe was drilled six feet into a sandbar, intending the sand to act as a filter.[65] The water was pumped to two large storage tanks in town.[66]

The New Mexico Lumber Company furnished a number of important social services, including a doctor and dispensary for the employees. Married employees paid two dollars a month for the medical privilege, single employees one dollar a month. Although accidents frequently occurred at the plant, one had to miss work more than ten days before collecting compensation. Mill breakdowns lasting longer than fifteen minutes had to be made up at night on workers' time. The men at the mill apparently received no vacation.[67] The McPhee police force consisted of one deputy trained by the county and employed by the company. There was no organized fire department in the town, in case of fire everyone pitched in with the help of the Dolores fire department. Amenities sponsored by the company included a company picnic, baseball team, tennis court and basketball court. There were apparently a few telephones in town and a good number of cars.

Religious worship in McPhee was influenced by the company. Because McPhee and McGinnity were both Roman Catholic, as were a large number of

Hispanic workers, this denomination received special attention and support from the company. In the early years a train was sent into the town by the company to take Catholic employees into Dolores for mass.[68] Work began on a Catholic Church in 1928, to be located near the school, on a hill to the west overlooking the town. A cemetery was planned and constructed on adjacent land serving all employees of the New Mexico Lumber Company. Company carpenters were released from other work to build the church with lumber also donated by the company. Two dollars a month was withheld from the wages of all Mexican-American employees for the building. Apparently this met some dispute from non-Catholic hispanic workers.[69] These funds were combined with a $2500 donation by McPhee and a $100 donation from the Catholic Extension Society.[70] The church was dedicated in June, 1929 and merited a half holiday for services, work resuming at one o'clock so visitors could see the plant in operation.[71] It is indicative of the company's power over community affairs, the company refused the Archbishop's request that the land on which the church stood to be deeded to the diocese.

The church, measuring 30' x 84' was labelled the "largest and finest edifice of the kind in Montezuma County."[73] The wood frame building featured a single center bell tower extension and side wing. The roof was a single medium gable with projecting eaves and exposed rafters. The nave windows were multipaned and double hung. The interior was constructed of vertical planks to a point four feet above the floor and the horizontal planking extended to the ceiling. The planks were three inches wide with decorative grooves. A semicircular loft extended over the rear; two broad platforms atop each other formed the chancel. On Sundays the church hosted one service for all

belonged to the AFL Union of Carpenters and Joiners. The incident was sparked by the replacement of a retiring millwright by a man with reportedly little experience.[81] After the millworkers struck, management shut down the mill, demanding the loggers stop working. The non-union loggers subsequently put enough pressure on the mill workers to force them out of the union. A clearcut victory for management over the labor force resulted; the union having lasted only slightly more than a year. Significantly, the strike was in no way caused by complaints concerning wages, hours or working conditions. Many employers viewed the company town as an effective type of insurance and insulation against strikes.[82]

Despite all attempts to create a cohesive community at McPhee, the town remained a loose union of transients on their way to new lumber operations. Much of the local news in the Dolores Star related the immigration in and out of town. Many came to McPhee from neighboring lumber mills, numerous Mexican-Americans from Lumberton, Chama, Alamosa and El Vado. A group of Blacks was hired from McNary, Arizona remaining until World War II. Farmers from Oklahoma came westward pitching tent colonies. Swedes and Finns were also present, common in the logging camps. A large number of local small ranchers and farmers also sought work in the off season. There were few Indians. One of Colorado's longest lived Civilian Conservation Corp camps also located at Beaver Camp 20 miles north of Dolores between 1933 and 1945 adding yet another group of transients to the community. The CCC men sometimes shopped at the commissary and attended local dances.

worshipers, conducted in a combination of Latin, English and Spanish.[74] The church was moved to Dove Creek in 1949 where it received a stucco covering.

Other religious groups played lesser roles in the McPhee community. Many of the Mexican-Americans who migrated from El Vado brought with them a strong belief in the Penitente order. Frowned on by the Roman Catholic Church, the Penitents believed in penance such as flaggelation for sins. Private services were held in households, the believers keeping a rather low profile. A Baptist minister and reverend of the Salvation Army preached at the school at times; Latter Day Saints and Seventh Day Adventists were also active in the early years.[75]

Anti-papist sentiments permeated McPhee and McGinnity operations. The period around 1925 marked a peak in Ku Klux Klan activity in Colorado as well as in Montezuma County. The power of the Klan and their prejudices against Black, Catholic and Jewish persons during this period has been generally underestimated. The year 1924 marked a wave of bigotry witnessing the election of all KKK candidates in Denver. The Klan's influence reached McPhee in the form of a boycott on McPhee and McGinnity and their subsidiaries. The Dolores Star hailed the alleged efforts of the Klan to root out bootleggers, gamblers and the like and went so far as to declare in 1925 that today the best Americans are Klansmen.[80]

The relative impotence of unions in McPhee reflects another aspect of the company's domination. In 1939 the first strike in the history of Montezuma County occurred in McPhee as 300 workers refused to go to work resulting in a two day shutdown of mill operations. The millworkers, following the lead of Mexican-Americans from Albuquerque, largely

During the Great Depression the plant was shut down for almost three years resulting in the exodus of nearly one-third of the workers. The lumber industry was among the hardest hit and many workers remained with no where else to go. The commissary closed, but those who chose to stay did not have to pay rent.[83] Some reportedly were employed on the Dolores sewer system.[84] Others left around 1940 with empty houses becoming the site for many dances.

While attempting to foster community spirit, the company continued to encourage the tacit segregation of Mexican-Americans and Anglos. It is estimated that 75% of the community was Spanish surnamed.[85] Hispanics were present in the area well before McPhee, working as shepherds and with the railroad and cattle industry. Yet it is not until the 1920's that Hispanic names appear on land patents.[86] One local resident commented that Pre-McPhee Mexicans were an "outstanding group of citizens, but many of the McPhee Mexicans (those imported from other lumber camps) were a different breed and they didn't always get along with whites or other Mexicans.[87]

Little social interaction occurred between the two groups. Each ethnic group resided in distinct sections and maintained their own social center. The Anglos congregated in the schoolhouse while the Mexicans had a lodge near the river where dances were held and Spanish culture encouraged. One observer noted "when Anglos and Mexican-Americans mixed in social activities it usually resulted in open hostilities. Friendships never endured after children graduated. "Visiting was generally restricted to your own section of town though polite words were always exchanged if former friends should meet in the street."[88]

The 1940's witnessed the slow and gradual demise of the McPhee operations. (see Appendix B, Chain of Ownership, Chronology). Several successive fires eroded its stability, yet each time rebuilding and rebirth occurred. In 1944, the Montezuma Lumber Company was sold and future lumbering seemed doomed as the new owners talked of using the McPhee site for an oil refinery.[89] Yet a new mill plant was installed and the town revived as a lumber center. The new owners supposedly built a fireproof building to house the mill. The mill was constructed of pipe stems from oil fields and with concrete, a tin roof and a floor of four by fours.[90]

Even the fire proof construction could not delay the inevitable disassembling of McPhee begun in 1944. Most homes were sold to nearby ranchers and relocated. Houses averaged $100-$125! It averaged three days to move an Anglo house, two to jack it and one to move it. By 1945 only 25 familes remained on ranches or in Dolores.

By 1945, the timber reserves were depleted to the point where operations were unprofitable and the main mill was dismantled, with a smaller mill sufficing.[92] World War II further drained away many employees. Those who remained were faced with broken, hard to replace machinery.[93]

In January, 1948 a devastating, yet in many ways merciful, fire destroyed the sawmill at McPhee. The second in a decade, the fire destroyed all mill machinery and damaged four railroad cars. Rather than rebuild the mill, a planer and dry kiln were set up. That same year, Bert Bidwell, a former Cortez resident took over the operation of the mill to clean up the remaining timber.[94] A. J. Rust reportedly operated the McPhee mill in its last days.[95] Salvagable machinery was

sold to firms operating in Mexico. Even after 1950 there were still several sawmills in the area which accounted for a large percentage of the state timber.[97] Lumbering continued sporatically in the are until 1976.[98]

In 1948 Fred and Margaret Shepherd bought the barren 480 acres of land which once housed the town, including the commissary and several small buildings. Just as Charlie Johnson who originally homesteaded the land, the new owners planned to breed race horses. They lived in what was once the superintendent's house until the Bureau of Reclamation purchased the land for the McPhee Reservoir project.

A number of the McPhee structures remain in the surrounding area today reflecting various degrees of alteration. Most homes are now located in Cortez and Dolores as well as Lebanon, Dove Creek and Lewis Arriola. (See Appendix C: McPhee Buildings). J. E. Barret of Cortez reportedly bought and moved many of the houses.[99] J. D. Harris of Price, Utah was also responsible for moving an additional 110 homes.[100]

The superintendent's house as well as Dr. Speck's house have been moved to Summitt Ridge where they are now owned by Evelyn Royce. Dr. Speck's office was moved to Cortez where it served as his office until he retired and then his son's office until 1968 when he moved to Denver.[101]

Although the company town of McPhee lasted but a short 24 years its tenure is typical of the short life span of most Western lumbering operations. McPhee's demise can hardly be credited solely to the exhaustion of timber lands in the area. Eventual bankruptcy was the result of a number of causes, not the least of which was the company's technological conservatism caught in the crux of an increasingly

modern world. McPhee and McGinnity Company was hampered by their determination to stick with railroading, even into the age of cheap motor travel eroding the economic viability of the railroad. Changes in railroad rates in the early 1930's completed the process, wiping out the advantages the railroad once enjoyed in shipping and closing out much of McPhee's market.

The initial parent company also owes it failure to reasons quite removed from those which ended the town of McPhee. McPhee and McGinnity filed bankruptcy in 1930 as an immediate result of the panic 1929 which severly shook building and lumber industries. A hard winter in 1929 further worsened matters. The company had also overinvested in government and private timber purchases which proved too sparse for profits. Likewise, the effect of a Klan boycott of mill products should not be underestimated as a contributing factor. Yet McPhee and McGinnity's operations, as well as those which followed them were all impeded by the quality of the lumber, which did not prove as good as initially assumed. Much of the timber was overmature by grading standards and was knocked down in grade to utility construction level, resulting in losses and debts for the company.[102]

In short, the fate of the town of McPhee could have been predicted looking no further than 1930. The damage done to the company at this point proved irreparable for later owners. Fires, accidents, a war-time shortage of labor were only the latest in a succession of problems plaguing McPhee. Although later owners converted to trucks, increasing the number of mills in the forests, they could not alter the inevitable and anticipated eventual demise of the remarkable McPhee Company town.[103]

FOOTNOTES

[1] "History of the Region of the Montezuma National Forest and Vicinty," 1923 Unpublished Manuscript, Dolores Archaeological Program (D.A.P. files,) Cortez, Colorado.

[2] One of these was A. A. Rust Sawmill producing 50,000 ft/day. See Harry Pyle, Dolores: The Gateway to Montezuma Valley. (1906) Bulletin #4, in clippings file, Western History Department, Denver Public Library.

[3] "History of the Region of the Montezuma National Forest and Vicinity." D.A.P. files unpublished manuscript, undated.

[4] Historical Encyclopedia of Colorado, Thomas S. Chamblin, ed. (Denver, Colorado Historical Association, 1975. p. 295.)

[5] Paul O'Rourke, Frontier In Transition: A History of Southwestern Colorado, (Denver: Colorado State Office, Bureau of Land Management, 1980), pp. 126-27.

[6] William Vickers, History of the City of Denver, Arapahoe County and Colorado. (Chicago: O. L. Baskin & Company, 1880)

[7] Gordon Chappell, Logging Along the Denver and Rio Grande, (Golden, Colorado: Colorado Railroad Museum, 1971), p. 41.

[8] Bigg's son was general manager of McPhee in the 1940's. See O'Rourke, Frontier in Transition, p. 129.

[9] Ibid.

[10] Ibid.

[11] "McPhee has one of the Middle West's Biggest Sawmills." See Rocky Mountain News,, 18 April 1927, p. 9.

[12] William McPhee to John Bloom, 13 March 1981, (D.A.P. files).

[13] Chappell, Logging Along the Denver & Rio Grande, p. 141.

[14] John Porter Bloom, "Historic Studies" (D.A.B. Files), p. 123.

[15] Dolores Star, 13 August 1926.

[16] Dolores Star, 13 August 1926.

[17] Chappell, Logging Along the Denver & Rio Grande,, P. 186. Chappell cites the following company towns: Arloa, Azotea, Brazos, Edith, El Vado, Glencoe, Luberton, McPhee, Pagosa Junction, S. Pagosa, Willow Creek.

[18] Dolores Star, 13 August 1926.

[19] Plat Book #4, p. 52. Montezuma County Clerk Office, Cortez, Colorado.

[20] "Letter to Editor" by Robert Orr, Cortez Sentinel, 23 June 1980.

[21] Unpublished material, (D.A.P. files)

[22] Chappell, Logging Along the Denver & Rio Grande, p. 154.

[23] Interview with Art Hamilton, Dolores, Colorado, 28 July 1981.

[24] Interview with Adrian White, by Linda Dishman, Lebanon, Colorado, 15 July 1981.

[25] Dolores Star, 11 April 1924.

[26] Robert Orr, son of first superintendent, McPhee, Colorado, to Deb Duranceau, 24 July 1979, (D.A.P. files).

[27] Interview with Lobato by Michael Sampson, Cortez, Colorado, 26 July 1979.

[28] Chappell, Logging Along the Denver & Rio Grande p. 146.

[29] Montezuma Valley Journal, 26 February 1959.

[30] Interview with Art and Bill Hamilton, Dolores, Colorado, 28 July 1981.

[31] James H. Baker and Leroy R. Hafen, History of Colorado, 4 Vols. (Denver, Colorado Tinderman Co., 1927) 2:746.

[32] Montezuma Valley Journal, 26 February 1949.

[33] Dolores Renze, "A Brief Study of Lumber Industry in Colorado 1858-1948," (A University of Denver course paper, 1949.)

[34] Dolores Star, 24 July 1942.

[35] Rocky Mountain News, 8 August 1927, p. 14.

[36] Sylvia McClellan, Timber: The Story of McPhee, (Dolores, Colorado: Dolores Star, 1970) P. 18.

[37] Chappell, Logging Along the Denver & Rio Grande, p. 163.

[38] Ibid, p. 155

[39] Dolores Renze, "A Brief Study of Lumber Industry in Colorado, 1858-1948."

[40] William McPhee to John Bloom, 13 March 1981, (D.A.P. files.)

[41] Chappell, Logging Along the Denver & Rio Grande, p. 6.

[42] Mallory Hope Ferrell, Silver San Juan (Boulder, Colorado: Pruett Publishing Co., 1973), 394.

[43] Chappell, Logging Along the Denver & Rio Grande,p. 6.

[44] Josie Crum, The Rio Grande Southern Story (Durango: Colorado Railroadians, 1947).

[45] Kramer Adams, Logging Railroads of the West, (Seattle: Superior Publishing Co., 1961).

[46] Ferrell, Silver San Juan, p. 395.

[47] Chappell, Logging Along the Denver & Rio Grande, p. 57.

[48] See Robert Ormes, Railroads and the Rockies (Denver, Colorado: Sage Books, 1963), p. 335. Remnants of the McPhee railroad are still visible today. According to Robert Ormes, "The present highway downriver from Dolores follows the line of this railroad on most part where it climbs to the sage brush mesa. The railroad grade becomes visible to anyone climbing the rest of the way up the mesa from the road's highest point."

[49] Chappell, Logging Along the Denver & Rio Grande, p. 6.

[50] Dolores Star, 13 August 1926.

[51] Dolores Star, , 4 October 1928.

[52] U. S. Bureau of Labor Statistics, Housing by Employers in the United States, Federal Survey of Company Houses in 1920, by Leifer Magnuson, Washington D. C.: Government Printing Office 1920

[53] Rev. Reginald James, "St. Rita's Church: Mancos and Missions," 10 May 1945, (D.A.P. records.)

[54] Interview with Chris Gomez, Cortez Public Library, Local History Seminar, 1974.

[55] Interview John and Maurice Ritter, Mancos, Colorado, 8 September 1980.

[56] Interview with Chris Gomez.

[57] Tom Martin in Dolores has some of the McPhee tin money in $1.00,$.50, $.25, $.10 denominations. He said that $.01 pieces were not made as the scrip cost more than a penny. Interview with Tom Martin, Dolores, Colorado, 17 August 1981.

[58] Interview with Charley Artz by Newel Periman, 1979, (D.A.P. files.)

[59] McClellan, Timber: the Story of McPhee, p. 33. The State of Colorado was notable among states for passing a law which forbade the use of a "truck system" in the payment of wages. According to this law an employee could not be required to waive payment of his wages in hard currency and take the whole or any part in merchandise. See, "Legislation Relating to Payment of Wages in Scrip," Monthly Labor Review, (July 1936): 75.

[60] Interview with Ina & Jim Cline, Dunton, Colorado, 22 July 1981.

[61] Dolores Star, 13 August 1926.

[62] Dolores Star, 5 December 1924.

[63] McClelland Timber: The Story of McPhee, p. 10.

[64] Interview with Chris Brubaker, Cortez, Colorado, 13 July 1981.

[65] Plat Book #4, p.52.

[66] Interview with Artz Periman, 1979, (D.A.P. files.)

[67] Interview with Art & Bill Hamilton, July 1981 (D.A.P. files.)

[68] Interview with Gomez.

[69] Ibid.

[70] Brunner, "History of Catholic Church."

[71] Dolores Star, 7 June 1929.

[72] "Unpublished material," D.A.P. files.

[73] Dolores Star, 7 June 1929.

[74] Interview with Lucero, 1981.

[75] Dolores Star, 1924-28.

[76] Catholic Register, 16 September 1926.

[77] Catholic Register, 25 June 1923.

[78] Catholic Register, 30 July 1925.

[79] Chappell, Logging Along the Denver & Rio Grande, p. 162.

[80] Dolores Star, 22 May 1925.

[81] McClellan, Timber: The Story of McPhee, p. 25.

[82] Dolores Star, 14 July 1939.

[83] Interview with Lucero, July 1981.

[84] Cortez Journal Herald, 7 August 1930.

[85] Adrian White, "Unpublished Notes," (D.A.P. files.)

[86] Bloom, p. 117

[87] Interview with Ritter, 1980.

[88] Cynthia Kenoyer "Old Timers Still Remember McPhee as the Largest Town in Montezuma-Dolores Area," 3 April 1980, (D.A.P. files.)

[89] Dolores Star, 3 March 1944.

[90] Interview with Artz, 1979.

[91] Reverand Bruner, "History of Catholic Church."

[92] Montezuma Valley Journal, p. 26 February 1959.

[93] Rev. Bruner, "History of Catholic Church".

[94] Montezuma Valley Journal, 26 February 1959.

[95] Ormes, Railroads & the Rockies, p. 335.

[96] Dolores Star, 3 March 1934.

[97] Historical Encyclopedia of Colorado, p. 286.

[98] Steven G. Baker and Duane A. Smith, Dolores Archaeological Program Historic Studies - 1978 Research Design, Inventory & Evaluation, (Salt Lake City: Bureau of Reclamation, 1979), p. 286.

[99] Dolores Star, 3 March 1944.

[100] Interview with John Turner by Michael Sampson, 16 October 1979, (D.A.P. files.)

[101] McClellan, p. 115.

[102] Interview with Gomez.

BIBLIOGRAPHY

BOOKS

Abbey's Register of Western Sawmills. 1942. Publisher unknown.

Adams, Kramer. Logging Railroads of the West. Seattle: Superior Publishing Co., 1961.

Allen, James B. The Company Town in the American West. Norman: University Oklahoma Press, 1966.

Baker, James H. and Leroy R. Hafen. History of Colorado. Denver: Linderman Company, 1927.

Chamblin, Thomas S. ed. Historical Encyclopedia of Colorado. 2 Vol. Denver, Colorado: Colorado Historical Association 1975.

Chappell, Gordon. Logging Along the Denver and Rio Grande. Golden, Colorado: Colorado Railroad Mueseum, 1971.

Crum, Josie Moore. The Rio Grande Southern Railroad. Durango, Colorado: San Juan History, Inc., 1961.

Directory of the Lumber Industry of Western America. Portland, Oregon: Lumberman Publishers, 1939.

Ferrell, Mallory Hope. Silver San Juan. Boulder, Colorado: Pruett Pub., 1973.

Freeman, Ira. History of Montezuma County. Boulder, Colorado: Johnson Publishing Co., 1953.

McClellan, Sylvia. Timber: The Story of McPhee. Dolores, Colorado: Dolores Star, 1970.

Ormes, Robert. Railroads and Rockies. Denver: Sage Books, 1963.

O'Rourke, Paul. Frontier in Transition. Denver: Bureau of Land Management, 1980.

Vickers, William B. History of the City of Denver, Arapahoe County and Colorado. Chicago: O. L. Baskin & Company 1880.

PAMPHLETS

Pyle, Harry. "Dolores: Gateway to Montezuma Valley," 1906. Filed in Clippings File, Western History Department, Denver Public Library

NEWSPAPERS

Catholic Register

Cortez Sentinel

Dolores Star

Rocky Mountain News

PERIODICALS

Roth, Leland. "Three Industrial Towns by McKim, Mead & White," Journal of the Society of Architectural Historians, December 1979.

UNPUBLISHED PAPERS AND REPORTS

Baker, Steven and Smith, Duane. "Dolores Archaeological Program Historic Studies 1978 Research Design, Inventory and Evaluation" Salt Lake City: Bureau of Reclamation, 1979.

Bloom, John Porter. "Historic Studies: Dolores Archeological Program," Dolores, Colorado, 1981.

Bruner, Rev. Joseph. "History of Catholic Church" 23 October 1934

James, Rev. Reginald. "St. Rita's Church Mancos and Missions" 10 May 1945

Kenoyer, Cynthia. "Old Timers Still Remember McPhee as Largest Town in Montezuma Dolores Area," 3 April 1980

Renze, Dolores."A Brief Study of the Lumber Industry in Colorado 1858-1948," University of Denver course paper, 1945.

Delaney, Robert. "Rise and Fall of McPhee," course paper Fort Lewis College, Durango, Colorado.

GOVERNMENT PUBLICATIONS

U. S. Bureau of Labor Statistics, Housing by Employers in the U. S., Federal Survey of Company Houses in 1920, by Leifer Magnuson, no. 263 (Washington, D. C.: Government Printing Office, 1920)

INTERVIEWS

Banks, Sumner. Interview by Deb Duranceau, 7 November 1979.

Bowden, Bill. Interview by Deb Duranceau, 7 November 1979.

Cline, Homa. Interview by Deb Duranceau, 18 August 1979.

Gomez, Chris. Local History Seminar 1974, Interview in Cortez City Library, Colorado

Hamilton, Bill. Interview by Duranceau, 9 November 1979.

Hamilton, Bill and Art. Interview, 28 July 1981.

Johns, Rachel and Adolph. Interview by Michael Sampson, 27 October. 1979.

Lobado. Interview by Michael Sampson. 26 July 1979.

Lucero. Interview, 28 September 1979.

Lucero, Mary Louise. Interview, July 1981.

Orr, Robert. Interview by Deb Duranceau, 24 July 1979.

Ritter, John and Maurice. Interview by Susan Goulding, 8 September 1980.

Thomas, Inez. Interview by Susan Goulding, 10 October 1980.

Turner, John. Interview by Michael Sampson, 16 October 1979.

White, Adrian. Interview by Linda Dishman, July 1981.

CORRESPONDENCE

William McPhee to John Bloom, 1981, Bureau of Reclamation, Dolores Archaeological Program Files, Cortez, Colorado

APPENDIX A: LOGGING CAMPS

1924 Horse Camp, 9 miles above Dolores on road to Norwood, construction camp

1925 Beaver Creek, 9 miles north, 25 miles north of Dolores

1927 Langston's Camp, 2.5 miles north

1927 Long Draw, 2.5 miles north, 20 miles north Dolores

1928 Calf Creek, 6 miles west, 26 miles from McPhee

1929 Timber Spur, above Rico, spruce timber

1929 Others moved to Salters Canon, 19 miles north of McPhee

1933 Dry Canon

1940 Lost Canon, Glades
(1940's-smaller mills at Lost Canon, Timber Spur, Barlow Creek, Glades, Plateau)

## APPENDIX B: CHAIN OF OWNERSHIP

1924 New Mexico Lumber Company, subsidiary of McPhee and McGinnity

1927 John Zalaha purchased private interest of William McPhee, became general manager

1929 Zalaha purchases remaining New Mexico Lumber stock from McPhee and McGinnity

1929 Zalaha and Associates default on payments after stock market crash, company reverts back to McPhee and McGinnity

1930 McPhee and McGinnity bankrupt, plant closed

1931 Receivership by Interantional Trust Company, New Mexico Lumber insolvent, mill equipment and property for sale

1934 Plant reopens, expected to stay open for 3 months

1934 New firm New Mexico Lumber and Manufacturing Company reopens plant in August

1934 September, fire destroys dry kiln

1935 New Mexico Lumber and Manufacturing fails after fire

1935 Montezuma Lumber Company formed by Thomas Orr and Associates of Biggs-Kurtz, Grand Junction, Colorado

1940 Mill and entire complex destroyed by fire, dry kiln and planer saved

1942 Machine shop fire

1943 Sawmill at Glades burned

1944 Operations sold to partnership headed by Lewis Mack of Moab, Utah Mill not rebuilt, smaller one set up to keep planing, finish contracts. Removal of machinery begun

1948 January 19, plant totally destroyed

APPENDIX C: MCPHEE BUILDINGS

Cortez

Superintendent's House, Dr. Speck's house-Summitt Ridge

301 S. Ash St.

603 S. Ash St.

611 S. Ash St.

25-29 Elm St.

W. First St. (Next to Mountain Bell)

247 S. Linden St.

Dolores

3 houses on 17th Street

Dove Creek

Church and rectory

Lebanon

Unidentified residences

Lewis Arriola

School house remnants (Wayne Dennison)
Unidentifed residences

Decision Notice

# Boggy-Glade Travel Management Plan

**USDA Forest Service**
**Dolores Public Lands Office, San Juan National Forest**
**Montezuma and Dolores Counties, Colorado**

T37-42N, R14-18W

## 1.0 Introduction

The purpose of this Decision Notice is to document the management alternative selected for implementation of the Boggy-Glade Travel Management Plan and the rationale for the decision. Specific details pertaining to the recommended actions will be highlighted and findings of no significant impact will be described.

It is my decision to implement Alternative B with modifications. This modified alternative will be referred to as ***Modified Alternative B***. The specifics of my decision are described in section 4.0 of this document, followed by the decision rationale in section 5.0. Maps are attached.

This decision is based on documentation of the environmental analysis and public involvement located in the project file and environmental assessment (EA). The EA and project file is hereby incorporated by reference to this Decision Notice. The EA is available for review at the Dolores Public Lands Office, located at 29211 Hwy 184 in Dolores, Colorado or online at http://www.fs.fed.us/r2/sanjuan/projects/projects.shtml

The Boggy-Glade Travel Management Plan project area encompasses federal lands surrounding Lake McPhee, Boggy Draw, Glade Lake, Thomas Mountain, Glade Mountain, Cottonwood Draw and Doe Canyon areas.

## 2.0 Purpose and Need

In late 2005, the U.S. Forest Service adopted the Travel Management Rule. The rule changes the way that the Forest Service regulates motor vehicles on National Forests and Grasslands. The Travel Management Rule requires National Forests to designate roads, trails, and areas for motor vehicle use. This means that after the designation process is complete, the public will be able to

operate motor vehicles only on the roads, trails, and areas that have been designated. Cross-country motor vehicle travel will not be allowed during the summer months. The designations will not only list what roads and trails can be used, but also what types of vehicles can be used on the roads and trails, and what time of year they can be used.

Exceptions to these designations include persons with a Forest Service permit specifically authorizing the otherwise prohibited act, any Federal, State or local law enforcement officer, or member of an organized rescue or firefighting force engaged in the performance of an official duty, and Forest Service administrative use including authorization to access private land in-holdings.

The object of the Travel Management Rule is not to unnecessarily limit access to the Forest, but to protect the Forest from unmanaged recreational use. The Forest Service must strike a balance in managing all types of recreational activities. To this end, a designated system of roads, trails, and areas for motor vehicle use, established with public involvement, will enhance public enjoyment of the National Forests while maintaining other important values and uses on National Forest System lands. The Travel Management Rule works to manage current use so future generations can continue to enjoy access to our National Forest System lands.

As we began applying the travel rule to the Boggy-Glade area, several needs were identified to improve resource conditions, continue recreation and management access, and improve the feasibility of the road system. An interdisciplinary team (ID Team) that included specialists for watershed, wildlife, silviculture, recreation, botany, heritage, and engineering used GIS maps and on-the-ground knowledge to described existing and desired conditions. Given the above purpose the ID team identified the following needs specific to the Boggy-Glade area:

1. A designated road and trail system that specifies the uses allowed on the existing road and trail infrastructure, and provides explicit guidelines for off-road travel, dispersed camping, and day-use parking. Signage, maps, and physical roadwork to lessen driver confusion about authorized routes is also needed.

2. Improved quality and effectiveness of big-game winter habitat as that habitat relates to human uses prioritized to areas of MA4B and MA5B. Also, a need for improved effectiveness for wildlife security throughout the Boggy-Glade area.

3. Improved watershed conditions, prioritized to those watersheds identified as sensitive to disturbance.

4. Continued access for recreational driving, firewood gathering, hunting, and ATV trail riding including loop opportunities, dispersed camping, administrative needs and connections to adjacent landscapes.

5. A road system more in line with current and expected future funding trends for maintenance and increased maintenance frequencies on Level 2 and Level 5 roads.

The consideration of these factors; wildlife habitat, watershed health, feasibility and recreation opportunity led to the development of three action alternatives which were analyzed along with the No Action baseline alternative. The Boggy-Glade area has some of the highest forest road system densities on the San Juan Public Lands and the most extensive areas of non-system routes. The existing situation is impacting natural resource values and detracting from the natural values that make the area a popular place to visit. At the same time, a long history of outdoor recreation opportunities, forest product gathering and hunting occur here and each alternative continues those opportunities. In the decision rationale sections below, I explain in more detail how these purpose and need topics relate to the final decision.

## 3.0 Public Involvement

On May 7, 2009 a scoping letter describing proposed actions was mailed or e-mailed to interested parties. A map of the existing Forest road system was attached. Public service announcements describing the proposed actions were sent to media outlets for the communities of Cortez, Dolores, Dove Creek, and Durango. This project was also listed in the San Juan Public Lands Quarterly Schedule of Proposed Actions (available on line and through quarterly mailings). Using scoping comments from internal specialists, the public, and permittees; the interdisciplinary team developed two key issues (the desire for additional big game winter habitat and the availability of motorized game retrieval) that led to the development of Alternative C. Public comment continued for a 30-day period beginning in May 2010 following the issuance of the EA. The comment period was announced with public service announcements to media outlets, direct mailing to those who previously commented and a legal notice in the Durango Herald published May 24, 2010. Three public informational meetings were held, one in Dove Creek on June 2, one in Dolores on June 3 and another meeting in Dove Creek on June 15th. Sixty-five comment letters were received in response to the preliminary EA. These letters (in the form of letters, e-mails, or phone logs) are located in the project file. A *Response to Comments* document is attached to this decision and located in Appendix C.

## 4.0 Decision

Based upon my review of the alternatives and the comments received during the 30-day public comment period, I have decided to implement Alternative B, with modifications, hereafter referred to as '***Modified Alternative B***.' Below is a description of terminology, other information, and the final details of this decision.

## 4.1 Terminology

The following paragraphs describe terminology used in this Decision.

Forest Service Road Maintenance Levels include Levels 1-5 roads; Level 5 (paved), Level 4 (suitable for passenger car travel and provide comfort at moderate speeds), Level 3 (suitable for passenger car travel), Level 2 (suitable for high clearance vehicles), and Level 1 (closed roads – administrative use only). Many factors are considered when designing a road including resource conditions, volume of traffic and type of vehicle to accommodate. For the BGTMP area, Level 1 and 2 roads are usually native surface and

Level 3 and 4 roads are usually surfaced with material including gravel. Level 3 and 4 roads are usually wider to allow for passing and have greater site distances than Level 1 and 2 roads. Level 5 roads are the paved portions of Dolores-Norwood, Lake McPhee Recreation Complex and House Creek area roads.

Non-System Roads refer to any unplanned road, abandoned travelway, or off-road vehicle tracks that have not been designated and managed as a road by the Forest Service. They are also considered routes that were once under permit, once on the official system, or were under another type of authorization and were not decommissioned upon the termination of the authorization. Synonyms include unauthorized road or route, user-created road, user-created route, or way.

Decommission is a process of removing a road (or trail) from service and returning the roadbed to a vegetated state. Some roads may re-vegetate themselves over the long term once use ceases. This can be achieved by signing open roads and prohibiting use off of those roads or blocking the entrance with physical barriers such as a gate or berm. Other roads may require actions such as scattering debris, ripping and seeding, or seeding only, creating water bars, removing fills and culverts and re-establishing drainage-ways or re-contouring.

Administrative Use Only (Closed Roads) means a system road has been placed in intermittent service (Level 1) and is closed to unrestricted vehicular traffic. The road may be closed by a gate, sign, and/or other physical barrier. Level 1 roads are usually used for timber harvest, prescribed burning, fire suppression, communication sites, pipelines, drill sites or livestock facility maintenance. They are also used for access to private in-holdings. They may remain closed for many years between entries or be used occasionally in a single year. Vegetation may grow on these roads but the road bed itself remains intact. Maintaining closed roads in an area shows an anticipated need for continuing resource management. Level 1 roads are normally not open for public use.

Temporary roads are created at the time of a management activity and fully decommissioned after use. Temporary roads are not tracked on GIS maps and usually only exist for the life of a project such as a timber sale or other permitted activity. Some non-system roads may be given temporary road status, used for permitted or contracted activity, and then decommissioned by the permittee or contractor.

### 4.2 Other Decisions

Several parts of the Boggy-Glade road and trail system are carried forward and remain unchanged from the *Decision Notice and Finding of No Significant Impact for the Boggy Draw Trails Project February 2006.* No changes are made to the non-motorized trails or the Boggy Draw OHV trail designated under this previous decision. The Boggy Draw Trails decision also included decommissioning up to 5.0 miles of road in the Boggy Draw area which will be identified in this decision.

### 4.3 Description of Modified Alternative B

***Modified Alternative B*** is described below followed by my rationale for the decision. The attached maps in Appendix B are part of this Decision Notice. ***Modified Alternative B*** also includes the final design features listed in Appendix A of this document.

**Motorized Travel**

- All types of over-the-ground motorized travel are restricted to a designated system of roads and trails as part of the public lands transportation system shown on the ***Modified Alternative B*** Map located in Appendix B. All over-the-ground cross country travel is prohibited.
- Approximately 353.68 miles of Forest roads will be open for public driving in the summer months (see ***Modified Alternative B*** Map).
- In addition, all open forest roads (approximately 337.45 miles) are available for OHV driving except the Dolores-Norwood Road (16.23 miles).
- The 44.76 mile Glade OHV loop will be designated (see map in Appendix B). The trail will be created by converting portions of Level 2 and Level 1 roads, and a very short segment of a non-system road to a 50-inch width. A portion of FR532A (1.78 miles) will be a Level 1 road that is open for OHV use named the Cottonwood Connector OHV Trail. The existing Boggy Lookout and Boggy OHV trail remain unchanged.
- Informational and regulatory signing to accommodate forest users will be identified and implemented at strategic locations entering the forest and throughout the transportation system with a priority for trailheads, forest portals, and other parking areas.
- A Motor Vehicle Use Map (MVUM) will be published showing the designated motorized roads and trails, by vehicle type and time of year. This map would be the officially recognized tool for public information and enforcement. A travel map specific to the Boggy-Glade area will also be published showing motorized roads and trails, non-motorized trails, and seasonal closure areas.
- Travel management designations apply to the general public only. Exceptions may be allowed for permitted activities, administrative use, emergency access and other authorized uses including access to private land in-holdings. This decision should serve as a reference when developing proposed actions and alternatives for project planning in the Boggy-Glade area.
- The MVUM will be reviewed annually. This review will begin the first year following signature of this Decision and follow the steps outlined in Forest Service Handbook 1909.15 Section 18.
- Priority areas for road maintenance are described in the design features in Appendix A.
- Approximately 77.09 miles of Level 1 Administrative Use Only roads will be maintained.

**Road Decommissioning**

- Four priority areas for Road Decommissioning activities are identified: Thomas and Glade Mountain, Boggy Draw, Dolores Rim and Glade Canyon north to the Forest Boundary.
- Decommission approximately 93.36 miles of miles of Level 1 roads.
- Decommission approximately 61.68 miles of Level 2 roads.
- Any non-system road could receive decommissioning actions to help re-vegetate the roadbed, discourage illegal use, or correct sedimentation.
- Priorities for implementation and road decommissioning areas are described in the design features in Appendix A.

**Seasonal Closures**

- All motorized travel including snowmachine use is closed from 12/1 thru 5/1 for winter wildlife habitat as shown on the ***Modified Alternative B*** Map in the Lake McPhee and Thomas and Glade Mountain areas. This decision expands the winter wildlife seasonal closure area north of Lake McPhee and includes the existing "A" area along the Lone Dome segment of FR504.
- All motorized travel excluding snowmachines is closed from 12/1 thru 5/1 for wet weather road issues as shown on the ***Modified Alternative B*** Map in the Boggy Draw to Cottonwood Road areas. Dates of this closure are dependent on weather conditions.

**Non-Motorized Trails**

- Non-motorized trails will be established in the Sage Hen area and the House Creek connector (see map). The non-motorized Sage Hen, Little Bean and House Creek connector trails would be closed to non-motorized use including cross-country skiing from 12/1 thru 3/1 for winter wildlife habitat.
- All roads and trails in the transportation system are open for foot, bicycle, and horse travel unless specifically closed.

**Day Use Parking**

- Parking off of a designated motorized road or trail is allowed within one vehicle length from the edge of the road or trail surface when such use does not create unsafe conditions and does not cause damage to resources and facilities.

**Dispersed Camping**

- Off road motorized travel for dispersed camping is allowed 300 feet from the centerline of designated system roads, on each side of the road, provided no resource damage occurs.
- Facilities may be added to Ferris Campground within the existing footprint of the campground to encourage use by horse groups.
- The following areas will be closed to dispersed camping:
  - ✓ 300 feet either side of the FS Road 528 (House Creek Road) from its intersection with FS Road 526 (Dolores-Norwood Road) to House Creek Campground to facilitate use of the campground.

- ✓ Glade Guard Station Administrative Site within the fenced area.
- ✓ Benchmark Lookout Administrative Site and along FR493 beyond the new closure gate in the SE corner of Section 2 to the lookout. The short non-system route to a reclaimed well-pad will be designated a Level 2 road and used as a parking area.
- ✓ Glade Lake, Ferris, Cabin, Dry Lake, and Beef Trail wetland exclosures within the fenced areas;
- ✓ Lone Dome Road outside of established campgrounds to facilitate use of Ferris, Cabin and Bradfield Campgrounds;
- ✓ Rotary Park immediately adjacent to and across the Dolores River from Joe Rowell Park in Dolores;
- ✓ Roads in the Lake McPhee Recreation complex and House Creek Campground area;
- ✓ Sage Hen remains a day use only area based on a closure order signed on August 18, 2006 and as such is closed to dispersed camping.
- ✓ All existing and future trailheads and day-use areas would be closed to dispersed camping. This includes Boggy Draw Trailhead, existing and new Cottonwood Road Trailheads, and the new Glade OHV North and South Trailheads.

**Dolores-Norwood Road**

- o Jurisdiction of the Dolores-Norwood Road is hereby recommended for transfer to Montezuma and Dolores Counties upon review and approval by the County Commissioners of Dolores and Montezuma Counties. Current management will remain until this transfer occurs.

**Other Items**

- o A parking area will be constructed on the corner of Cottonwood Road and West Dolores Road for all season use. Care will be taken to accurately delineate property boundaries during construction.
- o Parking for Day Use off of a designated motorized road or trail is allowed within one vehicle length from the edge of the road or trail surface when such use does not create unsafe conditions and does not cause damage to resources and facilities.
- o Game retrieval with a motorized vehicle is not allowed. Dolores Public Lands Office will solicit outfitter and guides and other vendors to provide services for non-motorized game retrieval or to assist hunters with their own retrieval methods such as renting game carts or horses.
- o Mixed Use analysis has been completed and mitigation will include:
  - ✓ All of FR526 (Dolores-Norwood Road from milepost 2.4 to 19), will be changed to prohibit non-highway legal vehicles while it remains in Forest Service jurisdiction until time of transfer to Montezuma and Dolores Counties.
  - ✓ FR504 (Glade Road) will be signed with “Share the Road Signs” to alert drivers of highway-legal vehicles of the potential to encounter non-highway-legal vehicles (ATVs, UTVs, or motorcycles) on the road, and perform brushing where needed to improve sight distance.

- ✓ Selected locations along FR514 (Salter Y Road) from milepost 0-12.7 will be brushed to improve sight distance. Install "Share the Road" signs between milepost 12.7-24.1 to alert drivers of highway-legal vehicles of the potential to encounter non-highway-legal vehicles (ATVs, UTVs, or motorcycles) on the roadway.
- ✓ Selected locations along FR521 (Ormiston Point Road) will be brushed to improve sight distance.

## *5.0 Rationale for the Decision*

### Choosing the Motorized Transportation System

Cross-country travel existed over approximately 67% or 164,686 acres of the Boggy-Glade area. Closing this use as the National Travel Rule dictates a substantial change to the public's current ability to use and enjoy that landscape. This closure also includes prohibiting public use of the approximate 712 miles of non-system routes in the Boggy-Glade area which in many cases exist between and connect to the designated transportation system. The public is accustomed to being able to drive to most places for uses such as dispersed camping, game retrieval, and firewood gathering. Given these constraints another important factor I weighed was the ability to enforce and maintain the newly designated transportation system. The final design features outlined in Appendix A promote a practical approach to designation which should improve implementation success. It was from this baseline and an understanding of the scope and magnitude of the change that I began to make the final choices for the transportation system open to the public within the Boggy-Glade area.

If cross-country travel and non-system route use were allowed to continue the values people enjoy such as elk hunting, natural forest vegetation, and riparian areas and parks would, over time, become less and less available. The elimination of cross-country travel and prohibition of using non-system routes provides substantial improvements to wildlife habitat, wildlife security, and overall watershed health. However, just eliminating these two factors does not go far enough toward improving resource conditions, meeting the Forest Plan road density standards, and meeting the needs identified by the ID team including decreasing the road maintenance burden. Further adjustments needed to be made. When making these adjustments I kept in mind comments from the public who expressed a desire to keep a transportation system that maintained access across the area and in particular a desire to maintain a transportation system around the periphery of the area. The overall road system I chose to designate as open to motorized vehicle use in ***Modified Alternative B*** is 353.68 miles. This is a reduction of 93.55 miles from the existing designated system. The new system maintains motorized access to most of the Boggy-Glade area while further improving resource conditions including watershed health, addressing road density concerns, improving wildlife habitat and security, and moderating the road maintenance burden.

### Resource Factors Considered for the Motorized Transportation System

***Modified Alternative B*** meets the purpose and need and will provide the best overall balance between use and protection of resources. The following resource factors influenced this decision.

Many watersheds in the Boggy-Glade area are identified as sensitive to human disturbance and there are concerns related to roads and trails. The elimination of non-system routes and reduction in the Forest road system improves conditions throughout the Boggy-Glade area. Priority areas for decommissioning to correct sedimentation concerns are carried forward in the final design features. Field inspections in the area from Glade Canyon north to the Forest boundary and west of FR512 (Black Snag Road) revealed many Level 2 roads in poor condition warranting immediate maintenance actions. A design feature has been added to the final design features in Appendix A to prioritize road maintenance activities. A map of implementation priorities including maintenance and decommissioning areas is provided in Appendix B.

The Boggy-Glade landscape is important big game transition range providing important forage and cover during the spring and fall migrations. Big game species migrate out of the high elevation areas to low elevation areas, primarily Disappointment Valley and Dry Creek Basin, as well as private and federal lands west of the Dolores River canyon. ***Modified Alternative B*** provides areas which allow an animal to distance itself from noise and disturbance. This is a substantial improvement from the current situation where many non-system routes are traveled especially during hunting season and current habitat areas are not effective. The following table shows a comparison between alternative for security areas. It was re-calculated (see Response to Comments Appendix C for more information).

| Alternative | Total Acres in areas greater than 250 | Number of Security Areas | Smallest Security Area (acres) | Largest Security Area (acres) | Average Size (acres) |
|---|---|---|---|---|---|
| **A** | 128,390 | 40 | 275 | 15,833 | 3,210 |
| **B** | 139,737 | 41 | 269 | 17,739 | 3,408 |
| **C** | 148,166 | 37 | 269 | 20,785 | 4,004 |
| ***Modified B*** | 148,959 | 40 | 271 | 20,519 | 3,723 |

***Modified Alternative B*** also provides a road system more consistent with maintenance funding received. In addition, I recommend that the Dolores-Norwood Road be transferred to Montezuma and Dolores County which further reduces future road maintenance costs and focuses maintenance activities on Level 2, 3 and 4 roads throughout the area. The decision to decommission approximately 155.04 miles of Level 1 and 2 roads also reduced the maintenance burden. My choices in the Thomas and Glade Mountain area will also provide long term reduction in road costs in a highly erosive landscape while maintaining private land access. I chose to transfer the Dolores-Norwood Road to Montezuma and Dolores County because, despite recent maintenance activities, the road will require more frequent maintenance than the Forest Service is able to provide to safely serve the volume of traffic it receives. Average daily traffic (ADT) on the road has increased over time due to private land and subdivision traffic. The Forest Service is not funded to upgrade or maintain its road system for residential or commercial access to private lands. When a road gets to the point where the majority of traffic is related to private lands, it no longer fits within the mission of the Forest Service to maintain that road. At the same time, my recommendation for transfer includes the stipulation that access be maintained for land management and recreation opportunity on intersecting Forest Service roads.

There is a long-term cost savings in road maintenance with this decision. However, the up-front cost of implementing the travel management changes is extensive. The more I drove the area the more I realized how difficult it will be to place physical closures in effective locations given the flat and open topography. I asked the staff to develop a design feature that would allow physical closure points to occur beyond the road intersections at logical locations that take advantage of trees, fence lines, hills or canyons to increase implementation success. The benefit of this tactic will be that access to some popular dispersed campsites might remain open depending on their location and closures will be in well understood, reasonable, and enforceable locations.

The following sections provide more specifics on smaller geographical sections within the Boggy-Glade area with rationale for each decision.

**Thomas and Glade Mountain Area**

In the Thomas and Glade Mountain area I chose to emphasize big game winter range (MA5B), wildlife habitat for indicator species (MA4B), and semi-primitive non-motorized recreation (MA3A) as outlined in the Forest Plan. This directly addressed the following need identified by the ID team of "Improved quality and effectiveness of big-game winter habitat as that habitat relates to human uses prioritized to areas of MA4B and MA5B." The Thomas Mountain/Glade Mountain area connects to higher elevation lands on the east side, to lower elevation lands to the north and provides transition and winter habitat for wildlife. It was identified as the highest priority winter habitat area in the Boggy-Glade by staff from CDOW. In addition, it provides a linkage and migration corridor between Lone Mesa State Park and BLM lands to the north of the project area. Designating fewer system roads creates larger interspaces between them which improve wildlife habitat characteristics. The ID team and the hydrologist noted numerous watershed impacts where the road crosses drainages and these are difficult to correct in these highly erosive soils. In general, I chose the routes in Alternative C for the Thomas and Glade Mountain areas.

A review of files in the Dolores Public Lands Office revealed that in 1983 the Forest Service closed the area to motorized travel between December 1 and March 31 and decommissioned numerous roads to reduce disturbance to big game. A decade later in 1993 the Dolores Ranger District had to maintain the existing road closures because "vehicles are routinely driving over or around these tank traps." Six years after that in 1999 the Forest Service undertook further closure measures through installation of seven perimeter gates in an attempt to enforce the area closure. Despite these signing and road decommissioning activities over the past 27 years, nearly every non-system or decommissioned route I inspected had been used by a motorized vehicle. I believe the only way to effectively manage the area for a wildlife habitat emphasis is to reduce overall system road densities through reducing designated routes.

Designated system routes include FR516, FR493 to the new closure gate, and FR240. I am changing the designation of FR245A from a Level 2 to a Level 1 road. I will

continue to work with private land owners in the area to ensure appropriate access to private land parcels.

The Thomas and Glade Mountain area has the fewest open roads of any portion of the Boggy-Glade landscape. Throughout the remainder of the Boggy-Glade area with the exception of a small portion of Boggy Draw; I emphasize a balance of public driving opportunities, wildlife habitat, and watershed health.

**Game Retrieval**

My final decision does not authorize game retrieval in order to be consistent with other National Forests in Colorado and Region 2, subject to their forest plan. Although many in the public desired continued use of motorized vehicles for game retrieval; the complexities of enforcement, continued use of non-system routes, and potential for resource degradation outweighed authorization. I did consider this when determining seasonal closures dates and the final road system for the Boggy-Glade area. I considered the distance between open roads i.e. the distance of game retrieval by other means such as walking, using game carts, or pack animals. Overall road miles are similar to the original Alternative B except in the Thomas and Glade Mountain areas. The Boggy-Glade terrain is relatively flat with easy access by foot and horseback and roads available for use provide access to the forest with distances between open roads ranging from 1/2 to 1 mile (distance between the centerline in most areas varies from 1/4 to 1/2 mile).

As I explained at the public meetings, the National Forests of Colorado are working hard to make travel policies consistent with each other. This eliminates confusion for the public that may travel to more than one forest in one year. Several comments raised the issue of spoiled or wasted meat if game retrieval were not allowed and the potential fines from CDOW because of this. Discussion with CDOW confirmed their desire to have harvested animals collected as soon as possible. However, through discussions between the Dolores Public Lands Office Staff and CDOW it became apparent that enforcing restricted game retrieval would be difficult. It would be difficult for law enforcement officers to ensure ATV travel was restricted to designated times for the purpose of game retrieval only. In addition other concerns raised include disrupting the hunting experience of others, travelling outside designated times, causing additional resource damage, and creating new non-system routes. One of the main reasons behind creation of the National Travel Rule is stopping proliferation of non-system routes. Ultimately, the CDOW encourages hunters to consider their physical ability to retrieve harvested game given the access, topography and weather conditions.

**Seasonal Closures**

Because of the potential impacts to hunting from eliminating non-system routes, eliminating game retrieval and closing some forest system roads; I chose to set the winter wildlife seasonal restriction date as 12/1 thru 5/1 which will not overlap with hunting season. I heard many concerns from local communities about the potential effects to hunting access and success if the hunting season and motorized seasonal restrictions

overlapped. In addition, with game retrieval not authorized, cross-country travel eliminated, and an approximate 93.55 mile reduction in the open transportation system; I feel all the designated roads should be made available during hunting season.

I received some comments that argued the 12/1 start date of the seasonal closure is less than optimal for improving wildlife habitat. However, the extension of the seasonal closure area north of Lake McPhee and including the existing "A" area on the Lone Dome Road, decommissioning of approximately 155.04 miles of system roads, removal of non-system routes, adjustments to the location of the Glade OHV trail along the Dolores River rim, and designation of a reduced system in the Thomas and Glade Mountain areas all result in improved wildlife habitat conditions. I did not select the seasonal restrictions proposed in Alternative C for the Dolores River rim area. I feel the road reductions and adjusted location of the Glade OHV trail in addition to prioritizing the area for road decommissioning will provide the unroaded interspaces necessary to improve wildlife security and values associated with the Dolores River corridor.

The community of Dove Creek and several other comments received were concerned that seasonal closure dates overlapping with hunting seasons would decrease hunter numbers and negatively impact local economies. To address this concern I asked for help from CDOW to provide predictions about hunter use and seasonal closures. Wildlife managers at CDOW have observed that elk and deer currently move through this transition range faster than expected. They don't make use of the habitat, but rather move quickly through the area to reach winter concentration areas on public and private lands. Once on private lands there is a substantial negative impact to agricultural crops resulting in high crop loss and resultant game damage payments by CDOW to producers. It is my hope that ***Modified Alternative B*** increases habitat effectiveness so elk and deer utilize habitat on public lands for a longer period of time ultimately increasing hunt quality and reducing crop loss on private land. CDOW predicted that eliminating game retrieval and reducing the open road system may cause a small initial reduction in hunters, however; they believe in the long term hunters would return or be replaced by hunters who learn that the hunt quality has improved. A large reason why it is believed that hunter numbers will not change substantially is because the Boggy-Glade area has gentle terrain and large numbers of elk, as opposed to other areas in the state that contain large numbers of elk but contain steep terrain.

**Boggy Draw**

I received several comments suggesting emphasis of an individual use or focusing on a specific use in certain areas within the Boggy-Glade landscape. I did not propose any changes to the Forest Plan management areas within the Boggy-Glade landscape. However, because the Boggy Draw area contains the vast majority of non-motorized trails; I chose to focus on that particular recreational use in the Boggy Draw area. The area is a complex system of open roads, closed roads, non-system routes, and non-motorized trails. Emphasizing non-motorized trails will lessen confusion about the designated transportation system, increase implementation success, and minimize potential conflicts between full size vehicle and mountain bikes.

Implementation in the Boggy Draw area requires re-establishing existing closures and routes that were previously decommissioned, installing new closures gates, and designating several short routes to dispersed camping area. Specific changes include designating a short section of FR527H (.13 miles) as a Level 2 road for dispersed camping opportunities and decommissioning the remainder of FR527H (.18 miles). Two other short segments of non-system routes will be designated as Level 2 roads for dispersed camping: FR527M (.21 miles) and FR527N (.12 miles).

I am changing the designation of FR259A (.84 miles) and FR259B (3.15 miles) from Level 2 to Level 1 roads and installing closure gates. The 3.99 miles of these two roads along with the existing closure work already completed on FR259B.1 (.96 miles) fulfills the 5.0 mile road decommissioning component of the February 2006 Boggy Draw Trails decision.

In addition, I am designating current Level 1 FR527E.1 (.83 miles) as a Level 2 road from its intersection with FR526 (Boggy Draw) to just before its intersection with the Italian Canyon bike trail. FR527E.1 is a heavily used dispersed camping and day use area for locals and mountain bike users alike. I am also changing the designation of FR527E (1.23 miles) from a Level 2 to a Level 1 road as this road exists in the same area and is seldom used for the above activities.

**Glade Canyon north and FR512 (Black Snag Road) west**

I chose a blend of Alternative A and Alternative B for this area, and added a priority for both road decommissioning and maintenance actions. This area contains one of the highest route densities in the Boggy-Glade landscape, important winter wildlife habitat and most watersheds are sensitive to human disturbance. Comments highlighted the popularity of the area for dispersed camping during hunting season. After a field inspection I was concerned about the current road conditions, especially on the many Level 2 roads. To balance these two uses I prioritized this area for road maintenance activities and designated several short non-system roads to the dispersed camp sites as no resource damage was evidenced. In addition, since the hunting unit boundary proceeds onto BLM lands to Disappointment Creek, I looked for reasonable linkages between the two land ownerships. I designated FR504Q (1.10 miles) from Alternative A for this purpose. FR221 (1.69 miles) from Alternative B was not designated to maintain an appropriate balance of road density in the area. Designating this system fulfills a need identified by the ID team for "Continued access for recreational driving, firewood gathering, hunting, and ATV trail riding including loop opportunities, dispersed camping, administrative needs and connections to adjacent landscapes" while also meeting the needs identified for watershed health and wildlife habitat. The Dolores Public Lands Office has been very successful in recent years with obtaining Legacy Funding to assist with road decommissioning and road maintenance activities. It is my intent to pursue this funding strategy, as well as others, to fund implementation for the Boggy-Glade area.

**Glade OHV Trail**

In response to public comments and further field review, the location of the Glade OHV trail has been adjusted and field verified. It was confirmed that no intrusions exist into Management Area 3A (Semi-Primitive Non-Motorized Recreation). The trail was adjusted to minimize intrusions into Management Area 5B (Big Game Winter Range) and to provide trail viewpoints of the Dolores River Canyon while pulling the trail back from the rim in other instances to protect the river corridor and associated values. This meets the need identified by the ID team of "Continued access for recreational driving, firewood gathering, hunting, and ATV trail riding including loop opportunities, dispersed camping,….". Moving the trail back from the rim and minimizing the impact to MA5B areas also meets the need "…for improved effectiveness for wildlife security throughout the Boggy-Glade area."

## *6.0 Other Alternatives Considered*

Other Alternatives I considered were the No Action/Baseline, Alternative A and Alternative C.

The No Action/Baseline is the current situation which includes all system roads, all non-system roads and Level 1 roads with no change in road management, camping or game retrieval policy. It represents the baseline for resource and social effects analysis. Mapping errors exist for non-system roads so a range of estimated miles will be used. The No Action/Baseline also includes approximately 4 miles of Level 2 roads not shown on the 2005 Visitor Map. I did not select this alternative because it does not meet the purpose and need or comply with the travel rule.

Alternative A is the existing 2005 Visitor Use Map without public use of any level 1 or non-system route and without cross-country travel. It represents the current road system with the areas open to cross country travel ("F" areas) eliminated. Active decommissioning actions for re-vegetation of un-needed roads would not occur. All existing Level 1 roads would remain on the system and new OHV and non-motorized trails are not proposed under this alternative. All Level 2-5 roads would remain at their current maintenance level and type of use. I did not select this Alternative because it did not meet the purpose and need. A few roads from Alternative A were added to ***Modified Alternative B***.

Alternative C is the same as Alternative B but responds to the key issue for areas of big game winter habitat emphasis where roads are reduced further and seasonal restrictions are extended one month earlier in the fall (11/1 to 5/1). In addition, one new area of winter wildlife habitat seasonal motorized restrictions is added in the area east of FR504 and west of the Dolores River. This new area restricts all motorized travel including snowmobiles. Non-motorized trail and OHV trail proposals are the same as Alternative B. Road mileage reductions from Alternative B focused on Management Areas 5B (Big Game Wildlife Habitat), 4B (Wildlife Management Indicator Species) and 6B (Range Emphasis). Roads near canyon rims and drainages were also considered for removal compared to roads on uplands with fewer stream crossings. Road mileages in MA7E (Timber Emphasis) remain similar to Alternative B.

I did not select this alternative because of the overlap of seasonal restrictions with hunting season, and the need for more roads than provided with this Alternative. However, to address several key comments received supporting Alternative C, I included the following items in the ***Modified Alternative B*** decision: I added a road maintenance priority to the area north of Glade Canyon and west of the Black Snag Road (FR512), adopted roads similar to Alternative C within the Thomas Mountain/Glade Mountain area and adjusted the location of the Glade OHV trail. I did not choose game retrieval which as authorized in Alternative C.

## *7.0 Forest Plan*

The San Juan National Forest Land and Resource Management Plan 1983, as amended 1992, (Forest Plan) provides direction for the management of resources within the analysis area. The Forest Plan also established desired future conditions through goals and objectives, determines the suitability of land for various uses, and provides guidelines and sideboards for management of its many resources. The Forest Plan provides the framework within which other project decisions can then be made on a case by case and site-specific basis (such as, travel management plans, timber sales, livestock grazing, etc.). It is this Forest Plan that provided the direction and guidance in the development of the Boggy-Glade TMP. This decision is consistent with the Forest Plan.

Road Densities: The existing Forest Plan provides direction for road densities under the standards and guidelines section for each Management Area. Every management area individually may or may not achieve the specific road density standard and guideline; however, the aggregate of all management areas across the San Juan National Forest should progress toward the road density standards and guidelines. All management areas in the Boggy-Glade area fall within the road density standards and guidelines. The final open road density for MA6B is 1.1 mile/square mile which is 0.1 miles/square miles over the road density standard and guideline of 0.5-1.0 miles per square mile of this management area. Current GIS technology is very accurate compared to historical mapping methods, however; deviations of road alignments on the ground cause minor discrepancies to occur. Given that there are 170.86 miles of road designated in ***Modified Alternative B*** in MA6B and it is the largest management area in the Boggy-Glade landscape; the 0.1 mile over the existing road density standard and guideline is negligible. MA2A, a small 1.1 square area that contains the Dry Canyon Road. This is a popular Level 3 road on the boundary of the management area that accesses Lake McPhee. Overall, ***Modified Alternative B*** contributes to meeting the road density standards and guidelines for all management areas across the San Juan National Forest. The draft Forest Plan does not include open road density standards and guidelines but prescribes total road densities (includes Level 1 roads) to be less than 2 mile/square mile in watersheds sensitive to anthropogenic disturbance. In the Boggy-Glade area, all watersheds identified as sensitive to anthropogenic (human) disturbance meet this proposed criterion. The following table displays the road densities by alternative followed by densities under ***Modified Alternative B***.

**Road Densities of Roads (mile/square mile) Open to Public Driving by MA by Alternative (Level 2-5)**

| MA | Acres | Percent of Area | Emphasis | Forest Plan | Alt A | Alt B | Alt C | Modified Alt B |
|---|---|---|---|---|---|---|---|---|
| 2A | 710.40 | .29 | Semi-Primitive Motorized recreation | 1.0 | *2.78* | 2.78 | 2.78 | 2.78 |
| 2B | 8441.16 | 3.43 | Rural and Roaded Recreation | 1.0 | .33 | .33 | .33 | 0.33 |
| 3A | 13,036.80 | 5.3 | Semi-Primitive Non-Motorized Recreation (Roaded/Unroaded Areas) | none | .06 | .05 | .05 | 0.05 |
| 4B | 22,822.40 | 9.3 | Management Indicator Species Habitat | 0.5-1.0 | .78 | .51 | .34 | 0.48 |
| 5B | 48,985.60 | 19.92 | Winter Habitat for deer, elk, bighorn sheep, and mountain goats emphasized | 0-0.5 | .68 | .65 | .51 | 0.46 |
| 6B | 98,118.40 | 39.91 | Livestock Grazing | 0.5-1.0 | 1.35 | 1.12 | .95 | 1.13 |
| 7E | 47,948.8 | 19.52 | Wood Fiber Production | 1.0-3.0 | 1.79 | 1.47 | 1.46 | 1.40 |
| 10D | 4,531.20 | 1.84 | River Corridor – Recreational Segment | none | 1.46 | 1.46 | 1.46 | 1.46 |
| 1A | 1203.20 | .49 | Developed Recreation Sites | none | 4.22 | 4.22 | 4.22 | 4.22 |

<u>Draft Forest Plan</u>: In January 2005, the San Juan Public Lands Center began a joint long-term planning effort to revise the Forest Plan. The San Juan's joint planning process will produce a revised plan to guide management of federally owned public lands for the next 10 to 15 years. This process is referred to as the Forest Plan Revision (or Plan Revision). A Draft Environmental Impact Statement was issued in December 2007 for the Forest Plan Revision. Since the Plan Revision process is in an ongoing planning phase, the Boggy-Glade TMP analysis and decision cannot utilize direction provided in this document. However, for information purposes the alternatives were compared to the Draft management direction. No apparent conflicts were noted and several beneficial outcomes were identified.

## *8.0 Finding of No Significant Impact*

After considering the environmental effects described in the EA and project file, I have determined that these actions will not have a significant effect on the quality of the human environment considering the context and intensity of impacts (40CFR 1508.27). Thus an environmental impact statement will not be prepared. I based my finding the following.

**Context**
The biological and physical effects of this decision are located within the Boggy-Glade TMP analysis area. Social effects extend to local, State and out-of-State visitors.

**Intensity**
The following is my rationale for reaching a FONSI determination considering the 10 factors required for significance determinations under 40 CFR 1508.27:

1. *Impacts that may be both beneficial and adverse.* Based on my review of the EA and project file, I have determined that the effects of implementing this project are not significant in context or intensity. The effects are typical of transportation systems. On balance effects will be beneficial.

2. *The degree to which the proposed action affects public health or safety.* Public health and safety will be improved by following the measures outlined in the Mixed Use Analysis, and by eliminating use of non-highway licensed vehicles on the Dolores-Norwood Road. Signing and maps will clearly define which uses will be allowed on each route. Management of the transportation system is action is typical of other management actions on lands managed by the Dolores Public Lands Office. (*EA page 48)*.

3. *Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.* This proposal will not cause loss or destruction of significant park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas. The following paragraphs summarize the conclusions from the environmental analysis.

    a. While the action could have localized, short-term effects to water resources, there would be long term benefits to streams or wetland conditions where roads are a factor. (*EA section beginning on page 31*).
    b. See below for Threatened, Endangered and Sensitive species
    c. This decision does not affect inventoried roadless areas nor does it preclude future consideration of roadless areas for suitability for inclusion into the National Wilderness Preservation System (*EA section beginning on page 75*).
    d. This decision does not change conditions in the Narraguinnep Research Natural Area (*EA section beginning on page 69*).
    e. This project complies with management direction for MA10D, Wild and Scenic River corridors. The combined effect of eliminating off road driving and providing a designated OHV trail will reduce impacts along the Dolores River rim and to the canyon itself. No alternative will change the values of the river corridor or impact the river's preliminarily suitable finding for inclusion into the Wild and Scenic River System. (*EA section beginning on page 75*)

4. *The degree to which the effects on the quality of the human environment are likely to be highly controversial.* The effects of implementing this project on the quality of the human environment are not likely to be highly controversial from a scientific standpoint. For example, most of the transportation system is already in place and motorized recreation will take place on most routes where use has occurred for over 20 years. Past evidence indicates that motorized and non-motorized recreation can occur without significant environmental effects. I have considered the economic and social values including the differences of opinion between comments on various types of recreation

use. Although these comments display a wide range of viewpoints, scientific controversy over the environmental effects of roads and trails did not occur.

5. *The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.* Implementation of Travel Management decisions has been occurring nationwide for many years and do not involve unique or unknown risks. The effects analysis shows the effects are not uncertain (EA Chapter 3).

6. *The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.* This decision applies to general public use of the transportation system and provides a long term network of Level 1 Administrative Use Roads. The Boggy-Glade Plan will be used as a reference during development of proposed actions and alternatives for future projects. Examples of project include, but are not limited to, timber sales, livestock grazing permits, recreation outfitter and guide permits, oil, gas or mineral exploration or development, or road use permits. However, this decision does not preclude future proposals to construct new road or trails, use non-system roads as temporary roads, nor does this decision preclude cross-country travel if approved under separate permit, contract or for administrative use. Therefore, this decision does not establish a precedent for future actions that may have a significant effect on the environment.

7. *Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.* Cumulative effects were discussed in detail in Chapter 3 of the EA. No significant cumulative effects were identified or expected. This action will not have a significant effect on the quality of the human environment, either as an individual action or as part of the cumulative effects of other past, present, and planned actions within this area. (*EA Chapter 3*)

8. *The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.* A cultural resource investigation of the effects of the actions described in this project was performed. The Colorado State Historic Preservation Office concurred with the Agency's assessment that this project will not adversely affect districts, sites, highways, structures, or objects listed in, or eligible for listing in the National Register of Historic Places. The project will not cause loss or destruction of significant scientific, cultural or historic resources (*EA beginning on page 72*).

9. *The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.* Determinations of effects are, **No Effect** for the Humpback chub, Bonytail, Razorback sucker, Colorado Pikeminnow, and the Yellow-Billed Cuckoo; **May Affect, Not Likely to Adversely Affect** for the Southwestern Willow Flycatcher, Canada Lynx

and Mexican Spotted Owl. The US Fish and Wildlife Service has concurred with these findings. (*EA page 75*)

### *9.0 Findings Required by Other Laws*

This action complies with all other relevant federal, state, and local laws and requirements imposed for the protection of the environment. This action is consistent with the Forest Plan. I have determined that the selected alternative complies with requirements of the following: National Forest Management Act, Clean Water Act, National Environmental Policy Act, Clean Air Act, Endangered Species Act, National Historic Preservation Act, Multiple Use – Sustained Yield Act, 1960. This decision complies with Order 13112 regarding non-native invasive species (NNIS), and Executive Order 12898 on Environmental Justice.

Some commenters asked about the relationship of this project with the Americans with Disabilities Act. Under section 504 of the Rehabilitation Act of 1973, no person with a disability can be denied participation in a Federal program that is available to all other people solely because of his or her disability. Consistent with 36 CFR 212.1, FSM 2353.05, and Title V, Section 507(c), of the Americans With Disabilities Act, wheelchairs and mobility devices, including those that are battery-powered, that are designed solely for use by a mobility-impaired person for locomotion and that are suitable for use in an indoor pedestrian area are allowed on all NFS lands that are open to foot travel.

Section 504 of the Rehabilitation Act (29 U.S.C. 794) states that no otherwise qualified individual with a disability in the United States shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency. A "qualified person with the disability" must be able "to achieve the purpose of the program or activity without modification to the program or activity that fundamentally alters the nature of that program or activity".

There is no legal requirement to allow people with disabilities to use motor vehicles on roads, on trails, and in areas that are closed to motor vehicle use. Restrictions on motor vehicle use that are applied consistently to everyone are not discriminatory. Generally, granting an exemption from designations for people with disabilities would not be consistent with the resource protection and other management objectives of designation decisions and would fundamentally alter the nature of the Forest Service's travel management program (29 U.S.C. 794; 7 CFR 15e.103).

A fundamental alteration of the nature of a program occurs when a basic aspect of that program is changed. A basic aspect of the route and area designation program is to identify routes and areas where motor vehicle use is appropriate for all members of the public, after considering the criteria at 36 CFR 212.55. Allowing exemptions for persons with disabilities would generally not be consistent with the resource protection and other management objectives of route and area designations, and would therefore fundamentally alter its nature.

The environmental consequences of all alternatives and my decision to implement ***Modified Alternative B*** are consistent with the Travel Management Rule (including 36 CFR 212, 251, 261 and 295). The Forest Service amended internal directives regarding travel management on December 9, 2008 Federal Register Notice 74689. These final directives consolidate direction for travel planning for both NFS roads and NFS trails in FSM 7710 and FSH 7709.55. The final directives re-name roads analysis travel analysis. The manual directs us to use travel analysis to inform decisions through a travel analysis process and identification of a minimum road system needed for safe and efficient travel and for administration, utilization and protection of NFS lands (the 2112.5(b)(1). I considered the information in the Travel Analysis document located in the project file, prior to making this decision

### 10.0 Project Implementation

Following the publication of a Legal Notice for this decision in the Durango Herald, the newspaper of record, there is a 45 calendar day appeal period. If no appeal is received during that period, this project may be implemented 5 business days after the close of the appeal period (36 CFR 215.9)

### 11.0 Administrative Review and Appeal Rights

This decision is subject to administrative review (appeal) pursuant to 36 Code of Federal Regulations (CFR) Part 215. To be eligible to appeal this decision on this project, an individual or group must have provided a comment or otherwise expressed interest in this project during the comment period (36 CFR 215.11 (pre-2003 regulations)).

*Appeals, including attachments, must be filed within 45 days from the publication date of legal notice of this decision* in the *Durango Herald,* the newspaper of record. Attachments received after the 45 day appeal period will not be considered. The publication date in the *Durango Herald* is the exclusive means for calculating the time to file an appeal. Those wishing to appeal this decision should not rely upon dates or timeframe information provided by any other source.

*Notices of Appeal that do not meet the content requirements of 36 CFR 215.14 will be dismissed.* It is an appellant's responsibility to provide sufficient activity-specific evidence and rationale focusing on the decision to show why the Deciding Officer's decision should be reversed.

Appeals filed under 36 CFR, Part 215, must be submitted (by regular mail, hand-delivery, or express delivery) to: USDA Forest Service Region 2, Appeals Deciding Officer, 740 Simms Street, Golden, CO 80401, or (by fax) to 303-275-5134. The office business hours for those submitting hand-delivered appeals are 8:00 a.m. through 5:00 p.m. Monday through Friday, excluding holidays. Electronic appeals must be submitted in a format such as an email message, *.rtf, .pdf, or .doc* to appeals-rocky-mountain-regional-office@fs.fed.us. In cases where no identifiable name is attached to an electronic message, a verification of identity will be required. A scanned signature is one way to provide verification. For electronically mailed appeals, the sender should receive an automatic electronic acknowledgement as confirmation that the agency received the appeal; if the sender does not receive an automatic acknowledgment, it is the sender's responsibility to ensure timely receipt by other means.

Appellants are required to simultaneously send a copy of the Notice of Appeal to the Appeal Deciding Officer, Mark Stiles, Forest Supervisor - Center Manager, 15 Burnett Court, Durango, CO 81301; or e-mail to: appeals-rocky-mountain-san-juan@fs.fed.us. A copy should also be sent to District Ranger, Steven K. Beverlin, Dolores Public Lands Office, 29211, Hwy 184, Dolores, CO 81323.

For additional information concerning this decision, or the environmental analysis, contact Debbie Kill at the Dolores Public Lands Office; (970) 882-7296, 29211 Highway 184, Dolores, CO 81323.

### 12.0 Responsible Official's Decision

By my signature, I certify that I have reviewed the Environmental Assessment prepared for this proposal. I have made the determination that implementation of ***Modified Alternative B*** will result in No Significant Impact to the human environment and it is my decision to implement the action as described in this Decision Notice.

*/s/ Steven K Beverlin* 08/12/10
Steven K. Beverlin Date
District Ranger/Field Office Manager
Dolores Public Lands Office
San Juan National Forest

The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, age, disability, and where applicable, sex, marital status, familial status, parental status, religion, sexual orientation, genetic information, political beliefs, reprisal, or because all or part of an individual's income is derived from any public assistance program. (Not all prohibited bases apply to all programs.) Persons with disabilities who require alternative means for communication of program information (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at (202) 720-2600 (voice and TDD). To file a complaint of discrimination, write to USDA, Director, Office of Civil Rights, 1400 Independence Avenue, S.W., Washington, DC 20250-9410, or call (800) 795-3272 (voice) or (202) 720-6382 (TDD). USDA is an equal opportunity provider and employer.

# APPENDIX A – FINAL DESIGN FEATURES

These design features are part of the final decision (included in ***Modified Alternative B***). They include implementation strategies and are designed to minimize the effect of ground disturbing activities.

***General***

1. National Forest System Roads would be open to licensed OHV and motorcycle operators and would be subject to the State of Colorado's ORV "sticker" program, unless otherwise designated.
2. Emergency fire suppression activities would be exempt from restrictions on use, except in Wilderness or Wilderness Study Areas. Any Federal, State, tribal, or local government office, in the performance of an official duty, could receive permission to use motorized vehicles on unauthorized routes not designated as part of the transportation system. San Juan Public Lands agency personnel could be allowed administrative use of any route for the protection or management of resources. Contractors or permittees with written approval from the Forest Service through permits, contracts, or letters of approval may also use roads as specified in the contract, permit, or letter.
3. Existing Forest Regulations apply including 36CFR261.13 - Use of Vehicles Off Roads which states "It is prohibited to operate any vehicle off National Forest System, State or County roads: ….. In a manner which damages or unreasonably disturbs the land, wildlife, or vegetative resources".
4. In the spring of 2008, the state of Colorado enacted a law requiring all ATVs and dirt bikes operating on public lands in Colorado to meet a sound limit of 96dB(A) if manufactured after 1/1/1998.[1] **The law took effect on July 1, 2010.** Outreach to inform enthusiasts, local ATV and dirt bike businesses, and others who remain unaware of the noise standard will be included as part of the Boggy-Glade Travel Management Plan implementation. Coordination with the motorized educational program, *Stay the Trail*[2], offers free sound testing for compliance with the new law.
5. In the vicinity of trails, recreational shooting may be restricted in site specific areas to provide for safety and recreational experience. The intent is in areas where we anticipate high visitor use on trails i.e. Boggy Draws Non-Motorized Trail System.

---

[1] 99 dB(A) if manufactured before 1/1/1998. Testing for sound limits is done using procedures by the Society of Automotive Engineers J1287 sound measuring testing procedure. Closed course motorized uses are exempt from this sound standard.

[2] The mission of *Stay the Trail* is to encourage responsible use of the roads and trails that are open to motorized recreation in Colorado. It is partnership among the Responsible Recreation Foundation, Bureau of Land Management, Colorado Division of Wildlife, Colorado Off-Highway Vehicle Coalition, Colorado State Parks Trails Program, and the Forest Service.

### *Seasonal Restrictions*

6. Seasonal closures outlined in this decision will be implemented through Forest Orders. Existing closure orders may be updated or canceled. Additional orders (if needed) may be used to address: noise limitations; camping in proximity to campgrounds, trailheads and parking areas.

### *Resource Management Activities Including Permits or Contracts*

7. Update annual operating instructions for active grazing allotments to include the following authorization: "Travel along existing fence lines (with an ATV, UTV or small rubber-tired tractor or skid steer) for construction and maintenance of authorized improvements as needed; specified travel to springs, water sources or salt placement areas may also be allowed on a case by case basis."
8. Update annual operating instructions for livestock grazing permittees to include use of Level 1 roads or walking dozers into areas as needed for specific reservoir maintenance planned for that year.
9. Activities that include the use of vehicles or OHVs may occur on a permitted or administrative basis within the areas seasonally closed to motorized travel, however, such approvals should take into consideration the winter habitat effects.
10. In area 7E (timber emphasis), a necessary network of level 1 and 2 roads would be left in place to maintain forestry options (timber-sale, pre-commercial thinning, prescribed burning, mastication) in the future. For roads identified for decommissioning within active timber sales, do not conduct decommissioning activities until after units have been accepted by the sale administrator. Check with timber and fire staff to see if road is useful for first post-treatment burn and if so leave the road intact until after the burn, then after burn complete the decommissioning actions.
11. During the planning stages for other projects reference this Travel Management Plan prior to developing proposed actions or alternatives. Although this plan does not represent a decision about future projects, it should be considered along with other information when developing proposals.
12. Where the new Glade OHV Trail crosses existing fence lines install OHV cattleguards to minimize conflicts with livestock grazing operations.

### *Decommissioning and Road Maintenance Priorities*

The following paragraphs describe road maintenance and implementation priorities in order to encourage use of the designated road system by the public, lessen confusion about what road is open and what road is closed, address resource impacts of the open roads such as localized impacts of sedimentation, address resource impacts from selected non-system routes to correct sedimentation, restore riparian conditions, and improve overall vegetative conditions and wildlife habitat. See the *Implementation Priorities Map.*

13. Roads proposed for decommissioning will, in time, become restored to a vegetated state and no longer serve as a road or trail. The first step in decommissioning will include closing road entrances, signing open roads, and providing the public information and maps of the open road system.

14. Road decommissioning should be accomplished in the three areas identified in the Implementation Priorities map as follows;
    a. Thomas Mountain/Glade Mountain
    b. Boggy-Draw
    c. Dolores Rim
15. Road maintenance and decommissioning efforts should be prioritized to the area between Glade Canyon north to the Forest Boundary as shown on the *Implementation Priorities Map* in Appendix B. The goal is to correct resource impacts from the open roads while also decommissioning and re-vegetating the Level 1, Level 2, and non-system roads that are not part of the newly designated system. Consult with the DPLO hydrologist during implementation.
16. When selecting sites for physical barriers such as rocks or berms, utilize natural features such as steep terrain, rock outcroppings, trees, and/or fence lines. Locations should also consider the potential for future resource damage, safety and administration. When applying these basic design criteria the most logical closure point may not be at the entrance of a road but a short distance from the intersection. The objective is to choose a defensible location that is respected by users and where motor vehicles are less likely to attempt illegal access around a barrier.
17. While implementing road maintenance and decommissioning described above, consult this list of specific road intersections, or non-system routes identified by the hydrologist (map in project file) which are priority locations for correcting sedimentation concerns at stream crossings, restoring vegetation and improving riparian conditions.
    a. Forest Road (FR) 245, FR512, and FR513 have sections with watershed impacts that need correcting.
    b. Decommission non-system roads along Glade Creek including reshaping and restoring the creek drainage, revegetation as needed to improve riparian conditions.
    c. The intersection of FR504 and FR270/509 area should be evaluated for culverts or other drainage structures to decrease potential sedimentation to Glade Creek.
    d. Decommission the non-system road to Beef Trail Reservoir.
    e. Decommission the non-system spur north of the intersection of FR512 and FR516 to help improve watershed conditions.
    f. Along FR514 (level 3 road) at intersection with FR514H and FR575 evaluate for drainage structure improvements to decrease sedimentation – also slope of FR514 road immediately south of this intersection is a factor.
    g. Decommission and re-vegetate non-system roads that intersect the north end of FR526 immediately south of private lands.
    h. Decommission, re-vegetate, and restore drainage of non-system roads off of FR506 in north end of Doe Canyon.
    i. Same for non-system roads at head of the five pines canyon drainage north of FR506A.

j. Decommission non-system roads in meadows around Cabin Reservoir to restore vegetation.

k. Decommission and restore riparian vegetation along creek off of FR504H (southeast of Salter Reservoir).

l. Decommission non-system roads at upper ends of Salter Canyon off of FR510

m. Revegate non-system roads and trails on the north side of the House Creek Road near the Lake McPhee.

n. Restore riparian vegetation in vicinity of FR405 and FR405A.

o. Decommission non-system roads to restore vegetation in the Trimble Point area and near the Dolores Canyon rim to discourage use off of the designated system and improve habitat.

***Resource Coordination***

18. Under all of the following scenarios a wildlife biologist would be contacted for review of the project prior to implementation of road decommissioning, or reconstruction, and in the case of new trail construction. Based on site-specific survey and evaluation, mitigation measures may include, but are not limited to, proposed seed mixes, timing restrictions on activities, and nest protections.

    a. Implementation includes the cutting of trees of any size.

    b. Ground disturbance occurs in large, contiguous sage brush patches greater than 5 acres.

    c. Activities are within 1/4 to 1/2 mile of large cliff faces, or within ¼ mile of raptor nests.

    d. Activities occur within riparian vegetation or stream channels of any kind.

    e. The project is within ¼ mile of inactive mines (sensitive bats).

    f. There is construction of new parking areas or trailheads.

    g. There is new ground disturbance such as constructing new connecting sections between existing routes.

19. Separate cultural resource inventories and SHPO consultations will be completed as needed prior to implementation. Recreation or Engineering staff will provide information on the locations and methods of ground disturbance related to road decommissioning, or road or trail construction to the District archaeologist for review for each phase of implementation. Review by the District archaeologist may include map review only, while some areas may require cultural resource surveys, tribal consultation or SHPO consultation depending on the sites affected. All cultural resource sites determined to be eligible to the National Register of Historic Places and sites that require further work before a determination of eligibility can be made (need data sites), will be protected from potential impacts by avoidance and/or other mitigations as needed.

20. Consider property line locations in the design of the parking area at Cottonwood Road/West Dolores Road. See the cultural resources report for locations identified as priority for conducting road maintenance to address cultural resource concerns (3 small sites).
21. Necessary surveys for Sensitive plants will be conducted before any decommissioning that occurs in the implementation phase. In order to afford long-term protection to some *G. elegans* and *P. pulvinata* occurrences, non-system roads in the vicinity of these occurrences may be considered for decommissioning, including appropriate design features to ensure protection of the plants from potential adverse effects of decommissioning.
22. Noxious weeds can be transported on roads and trails by motorized as well as non-motorized means. Recreation staff will continue to coordinate with the noxious weeds specialist on treatment of invasive plant species along trails, at trailheads, campgrounds, and dispersed campsites.
23. If snowplowing occurs on the Dolores-Norwood Road either by the FS or the Counties, gate intersecting Forest Roads to discourage wet weather damage or vehicle disturbance during the snow season. Most of the intersecting Forest Roads have gates in place.

# APPENDIX B – MAPS

# APPENDIX C – RESPONSE TO COMMENTS

## 5.1 Appendix A – Pre-Implementation Checklist

The checklist below documents the pre-implementation review of projects approved as part of the Salter Vegetation Management Decision. A forester, TMA, or silviculturist will complete on-the-ground reviews of conditions, identify appropriate treatments, and make a preliminary determination of transportation and slash disposal needs. In addition, resource specialists will review the actions proposed, identify if additional field work is needed, and complete all necessary clearances.

| **Project Information** | |
|---|---|
| Project Name and Location: | |
| Existing Conditions: | |
| Project Description and Objectives: | |
| Implementation Timeline: | |
| Data File Location: | |

The checklist below documents resource specialist review of the proposed project. If additional field work or clearances are recommended, supporting documentation is attached.

| **Resource Review** | | | | |
|---|---|---|---|---|
| **Resource** | Project effects will be consistent with effects described in Salter EA | Project design elements in EA are adequate | Additional field work or clearances are recommended (see attached documentation) | **Signature / Date*** |
| Cultural | | | | |
| Fire/Fuels | | | | |
| Hydro/Soils | | | | |
| Range/Botany | | | | |
| Recreation | | | | |
| Scenery | | | | |
| Timber | | | | |
| Wildlife/Fish | | | | |
| Other | | | | |

**Signatures acknowledge participation in the review of this project, implementation of this project, or both*

| Summary of Proposed Transportation Plan | |
|---|---|
| Description of Road Work (type & miles): | |
| Estimated mileage of temp roads: | |
| Forester review completed by: | |
| Hydrologist review completed by: | |
| Wildlife biologist review completed by: | |
| Recreation review completed by: | |

| Summary of Slash Disposal Plan | |
|---|---|
| Description of Proposed Slash Disposal: | |
| Forester review completed by: | |
| Hydrologist review completed by: | |
| Wildlife biologist review completed by: | |
| Fire/Fuels review completed by: | |

Proposed By ______________________________ ______________

Project Manager Date

Reviewed By ______________________________ ______________

NEPA Coordinator Date

☐ Approve proceeding with project. Conditions remain similar to those outlined in the EA. All resource concerns have been addressed, and the project is within the effects analyzed.

☐ Do not proceed with project. Conditions have changed substantially and need to be reassessed. Justification is attached.

Approved by ______________________________ ______________

District Ranger Date

**United States Department of Agriculture**
Forest Service

# Final Decision Notice and

# Finding of No Significant Impact

## Dolores Prescribed Fire Pine Ecosystem Restoration Project

**Dolores Ranger District, San Juan National Forest,**

**Dolores and Montezuma Counties, Colorado**

September 2018

In accordance with federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, office, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov .

USDA is an equal opportunity provider, employer, and lender.

## 1.0 Introduction and Location

My decision is to implement Alternative B of the *Dolores Prescribed Fire Pine Ecosystem Restoration Project Environmental Assessment*. The specifics of my decision are described below in Section 4.0. My decision is based on the analysis described in the EA, which was prepared for this project, and the Project Record. The EA is available at the Dolores Public Lands Office in Dolores, Colorado or on the web at: http://www.fs.usda.gov/project/?project=51633

I will highlight specific details pertaining to the recommended actions and I will describe my rationale for my finding of no significant impact for this action.

The 240,000-acre project area is in the Dolores District ponderosa pine zone, which stretches from approximately the northwest corner of "The Glade" to the southeast corner of Haycamp Mesa. (Some of the project area extends into pinyon-juniper woodlands, but these areas would not be treated.) All proposed burn units consist of predominantly dry-site ponderosa pine stands with Gambel oak understory, interspersed with pockets of aspen and open parks. This landscape occurs between 7,000 feet and 8,900 feet in elevation, within Dolores and Montezuma Counties. Cattle grazing, forest product gathering and recreation activities occur in the project area.

## 2.0 Purpose of and Need for Action

Where forest composition and its structure allow, fire can play a prominent role in their restoration. Restoration provides opportunities to re-establish the characteristic disturbance patterns as well as the relationship between forest structure and fire that once sustained these forests. Restoring fire's role can improve overall ecosystem productivity and function and enhance ecosystem services described above (e.g., soil productivity, biodiversity, wildlife habitat, and erosion control).

In addition, by mimicking the high-frequency, low-severity or mixed severity wildfire regime that existed in these forests previously, the Dolores District can ensure this landscape progresses toward the desired conditions for uneven age forest structure of ponderosa pine forests described in the Forest Plan.

The overarching purpose of this project is to

- restore and maintain healthy ecosystems in areas where fire historically played an important role, and
- reduce the risk of large, high severity wildfire.

The specific needs for this project are to:

- break down the duff layer, increase nutrient recycling, and promote new growth and establishment of grasses, forbs and ponderosa pine seedlings.
- improve age-class diversity in ponderosa pine stands.

- improve the mosaic of oak/grass patches for wildlife habitat (increase the size and distribution of grass/forb openings within oak thickets, decrease competition between oak trees in order to produce more mast).
- reduce fuels in order to prevent large, high-severity wildfires – especially on National Forest System land that is adjacent to private land.

*Forest Plan Direction*

This project is consistent with the general direction, standards and guidelines provided in the 2013 San Juan National Forest Land and Resource Management Plan (Forest Plan) and would also provide progress toward meeting pertinent Forest Plan Objectives. The project area is located within Management Area 5 (emphasis is on active management). Some of the Forest Plan Desired Conditions and Objectives addressed by and relevant to this project include:

- 2.11.8: Fire is reintroduced to increase the resistance and resiliency of the warm-dry mixed conifer and ponderosa pine forest types in landscapes such as the Hermosa and Piedra areas.
- 2.2.9: Terrestrial ecosystems, including habitat for special status plant species, are productive, sustainable, and resilient, and provide goods and services over the long-term.
- 2.2.23: Ponderosa pine forests display variable density and structure. Most stands reflect uneven-age structure comprising variable-sized, even-aged clumps of trees. Clumps vary in size, ranging from as few as three trees to as many as 20 or more trees. Tree clumps vary in density from widely spaced large trees to tightly spaced small trees. Collectively, these forests contain multiple canopy layers. Between or surrounding these clumps are shrub-and/or grass/forb-dominated openings. Ponderosa pine seedlings and saplings are present, as are large old, yellow-barked ponderosa pine trees. The presence of other tree species—e.g., Douglas-fir, white fir, blue spruce (*Picea pungens*), or Rocky Mountain juniper (*Juniperus scopulorum*)—is infrequent to rare. The abundance and distribution of Gambel oak (*Quercus gamelii*) and other native shrubs in the understory of these forests is variable and includes small and large patches of all size classes. Native grasses and forbs (including bunchgrasses, Arizona fescue, muttongrass (*Poa fenderiana*), and mountain muhly (*Muhlenbergia montana*) are present and well distributed in most ponderosa pine forests. Forest litter is common, though highly variable in depth and extent due to fire. Invasive plant species are absent or rare. Presence of snags or large wood (on the ground) is also highly variable due to fire. Low-intensity, high-frequency surface fires are common in most ponderosa pine forests (with frequencies ranging from about 12 to 30 years).
- 2.3.10: Vegetation openings created through management actions preserve the natural patchiness inherent in Southern Rocky Mountain ecosystems.

### 3.0 Public Involvement and Consultation

The proposal was listed in the Schedule of Proposed Actions. The proposal was provided to the public and other agencies for comment during scoping in June of 2016. Scoping letters describing the original proposed action were mailed to interested or potentially affected persons, organizations, government agencies and tribes. Scoping comments were considered during the development of the alternatives to be analyzed in detail including the design features, monitoring and adaptive management actions.

A preliminary EA was published and a 30-day public comment period was initiated on March 6, 2018. Some comments led to edits, clarification, and additions to the final EA as described in the Response to Comments added as Appendix F. References provided by commenters were also considered.

Documents for this project are also posted on the San Juan National Forests NEPA project web site: http://www.fs.usda.gov/project/?project=51633

*Government Agencies and Tribes*

In accordance with 36 CFR § 800.3(f) and Section 106 of the National Historic Preservation Act, consultation with federally recognized Native American tribes is ongoing. Formal letters initiating consultation for the project were mailed to 26 federally recognized tribes on June 28, 2016. Two tribes responded indicating that they would like to continue consultation for the project. The list of federally recognized tribes consulted can be found in the EA page 9.

Pursuant to Stipulation V.B of the *Programmatic Agreement between the United States Forest Service, Rocky Mountain Regional Office, Pike-San Isabel National Forest and Cimarron and Comanche National Grasslands, Routt National Forest, San Juan National Forest and the Colorado State Historic Preservation Officer Regarding Vegetation Management Undertakings (Cultural PA)*, notification was sent to the State Historic Preservation Office (SHPO) on December 11, 2017. Compliance with Section 106 of the National Historic Preservation Act will be completed in accordance with the procedures outlined in Stipulation VI of the Cultural PA.

*Local and State Agencies*

The District Ranger provided information about this project during meetings with both the Montezuma and Dolores Boards of County Commissioners. Colorado Parks and Wildlife received the scoping package and the EA via mail or email and communicated with the Dolores District Wildlife Biologist.

### 4.0 Decision

I have reviewed the EA and the information contained in the project file. I have also reviewed and considered the public comments submitted on this project. I have determined that there is adequate information to make a reasoned choice among alternatives and includes consideration of the best available science. It is my decision to select Alternative B Proposed

Action as described in the EA pages 14-27 and including the Design Features, Monitoring and Adaptive Management Actions described on those pages. Maps are included in Appendix A.

My decision will continue, and expand, prescribed fire activities by conducting prescribed burns when weather and fuel conditions result in low-to-moderate intensity surface fires. Treatment areas would be larger and take advantage of existing roads, trails, to be utilized as control lines (as opposed to creating new control lines, unless new control lines are deemed necessary). The roughly 240,000-acre project area will be divided into seven polygons or "implementation areas" labeled as Lake Canyon, The Glade, Benchmark, Salter, Trimble/Carlyle, Boggy, and Haycamp Mesa (see map in Appendix A). Each implementation area will be further divided into approximately 10 to 15 burn units, and a burn plan will be created for each implementation area. Burn plans are required implementation plans, written after a NEPA decision, that describe specific implementation tactics, objectives, resources, weather parameters, smoke management, desired effects, and burn strategies (*Interagency Prescribed Fire Planning and Implementation Procedures Guide (PMS 484)*, 2013). Each burn plan will incorporate the Design Features as described in the final EA.

Prescribed burns in individual burn units or groups of burn units may be implemented at one time. Factors such as weather and fuel conditions, smoke permit constraints, and the presence of northern goshawk nests could increase the length of time needed to complete individual burns. The District goal for the first few years of implementation would be to burn 2,000 acres to 5,000 acres annually, but this number would vary depending on conditions. Eventually, the number of acres burned annually could be as many as 10,000 acres, if conditions were favorable. My decision does not specify a maximum number of acres that could be burned annually. For details about prescribed fire methods see the EA.

In addition to prescribed fire, my decision includes implementation of a 200 foot wide fuelbreak to be established along the Forest boundary adjacent to lands in private and other ownership. Vegetation treatments in this fuelbreak that include hand felling and mastication would remove understory ladder fuels of smaller trees and brush. In addition, my decision includes mastication of oak brush for wildlife habitat improvement purposes. The wildlife habitat improvement projects will create small openings in areas of dense oak to improve forage for wildlife. The specific details of these treatments are also described in the EA.

As the project is implemented the Forest Service will continue to share information with partners. CPW will be consulted for input into the design of oak mastication for wildlife habitat improvement. The Dolores Watershed Forest Resiliency partnership group will continue to be a venue for sharing information and continuing discussions about pine management.

Concerns were raised during the objection period for this project related to smoke management. I want to reiterate that the Dolores Ranger District will work in close coordination with the Colorado Department of Public Health and Environment, Air Pollution

Control Division to manage smoke from prescribed burns. Colorado's Air Pollution Control Division (APCD) smoke management permits establish in advance the conditions in which a burn may occur. Smoke permits ensure that planned ignition fires can and will be conducted in a manner that minimizes the emissions from the burn and the impacts of the smoke on visibility and on the health and welfare of the public. Conditions address forecasted smoke ventilation, smoke from other sources such as wildfire, wind direction, ignition end time, and maximum daily acres or number of piles. Permits may have additional conditions. All prescribed burn projects must be permitted by APCD prior to execution. The Dolores Ranger District will adhere to all permit requirements. I also want to emphasize the following points related to smoke management:

- The main condition that the Forest Service is looking for to implement a prescribed burn is a ventilation category of good, very good or excellent. While there may be circumstances when a ventilation category of fair is sufficient to allow a burn to be carried out, this will come with additional stipulations such as acreage limits. Ventilation categories are calculated by the National Weather Service or an onsite meteorologist based on various weather information. Good to excellent ventilation ensures that smoke generated from the prescribed burn projects is dispersed and does not impact the public.
- Public notification occurs for all prescribed fire activity. A variety of methods are utilized, including posting signs on forest roads, calls and emails to those requesting information, public service announcements in local media and Forest Service websites, and communication with local governments and fire departments. Smoke permit requirements also require notification of APCD and local county air quality officials 2 to 48 hours prior to ignition; notification by 10:00am the following day to APCD; and filing of a prescribed fire activity report and an annual report to APCD.
- Larger burns often require monitoring for air quality. APCD determines key locations based on expected smoke dispersion that we are required to monitor. If we exceed air quality requirements, we have to mitigate the smoke impacts. Mitigation measures can include halting the burn for a certain duration of time, reduced daily acres that we are allowed to burn and/or reduced hours per day that we are allowed burn.

## 5.0 Rationale

My decision is based on close and careful examination of the information in the EA and the project file, direct consultation with resource specialists and previous experience with similar activities. I have fully considered the concerns identified through the planning process and public comments received during the original proposal scoping as well as the subsequent EA comment period. Implementation of the proposed action is the best choice for addressing the needs and accomplishing the purposes discussed above in section 2.0 of this Decision Notice.

This project expands the Dolores District’s ability to use prescribed fire as a tool to progress towards uneven age ponderosa pine forests and improve forest health and resiliency to stressors such as insects, disease, or drought. As described in the EA pages 34-43. The Design

Features, Monitoring and Adaptive Management approach will allow District staff resource specialists to include pre-burn considerations in the burn plans, and assess the post-burn condition and apply follow-up measures as needed based on the specific post-burn conditions. I recognize and accept the commitment of inter-disciplinary staff participation in the Dolores District burn program.

As described within the EA, oak mastication for wildlife benefit could be carried out as a tool to treat areas that have become extensive thickets of even-aged oak which can limit the amount of mast produced on an annual basis. The use of mastication equipment is a desired 'tool' to have available because prescribed fire by itself may not create oak openings to the desired extent. In addition, having mastication as another tool could result in faster progress towards desired conditions than prescribed fire alone.

I considered taking no action at this time (Alternative A), however, the No Action alternative would progress towards desired forest structure at a much slower pace and would require more ground disturbance from the creation of control lines. The current patchwork of previously approved smaller burn areas is also not an efficient use of staff time. Analysis indicates that without mixed severity disturbance the ponderosa pine forest would trend towards a higher susceptibility to insect, disease and other stressors. The natural patchiness of pine forests provides for many wildlife species and trends towards habitat improvement would occur at a much slower pace than my decision to implement Alternative B Proposed Action.

I find that this decision represents a reasonable opportunity to realize or move toward the specific Forest Plan based objectives of the project. The analysis in the EA demonstrates that the potential for negative consequences to the environment is minimal and further considerations supporting a finding of no significant impact from this action are detailed below in Section 7.0.

## 6.0 Other Alternatives Analyzed

Besides Alternative B, Alternative A (No Action) was analyzed in detail. Under Alternative A, there would be no new areas identified for prescribed burning and no new mastication projects at this time. Previous areas approved for mechanical vegetation treatments and prescribed fire, analyzed under separate, previous analysis would continue to be implemented under those separate NEPA decisions at a smaller scale. Areas not previously approved for prescribed burning or mastication would not receive any prescribed fire treatment. Because Alternative A would include areas that would not receive prescribed fire, the impacts of a lack of prescribed fire were included in the discussion of this alternative.

## 7.0 Findings Required by Other Laws and Regulations

In reviewing the EA and actions associated with Alternative B, I have concluded that my decision is consistent with the following laws and requirements:

*The National Environmental Policy Act (NEPA)*
NEPA establishes the format and content requirements of environmental analysis and documentation as well as requirements for public involvement and disclosure. The entire process of preparing this environmental assessment was undertaken to comply with NEPA.

*The National Forest Management Act (NFMA)*

I find this decision to be consistent with the long term management objectives as discussed in the San Juan National Forest Plan as amended. All Forest Plan direction, has been adhered to and incorporated into the project's design. The Purpose and Need was derived from desired conditions highlighted in the EA pages 7-10. Appendix B of the EA describes Forest Plan standards and guidelines related to this project.

*The Endangered Species Act of 1973, as amended*

Threatened, Endangered and Forest Service sensitive species were evaluated and the impacts described in EA pages 54-55 and in documents located in the project file. These evaluations were conducted in in accordance with section 7 of the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 et seq.). Determinations include *No Effect* for Canada lynx, North American wolverine, Gunnison sage grouse, yellowbilled cuckoo, Uncompagrhe butterfly, Mexican spotted owl and New Mexico jumping mouse and *May Impact Individuals but Not Likely to Adversely Effect* southwestern willow flycatcher.

*The Clean Air Act*

The selected alternative will comply with the Clean Air Act. The Act prescribes air quality to be regulated by each individual state. The Forest Service will follow directions of the Colorado Environmental Protection Agency in conducting pile burning in order to achieve strict compliance with all aspects of the Clean Air Act and adherence to the Colorado Smoke Management guidelines. (EA page 17, and 76-77).

*Civil Rights and Environmental Justice*

Executive Order 12898 on environmental justice requires federal agencies to identify and address any disproportionately high and adverse human health or environmental effects on minority and low income populations. I have determined that there would be no discernible impacts to these groups. Public Service announcements in local media were adequate to reach out to minority and low income populations in the two counties.

*The National Historic Preservation Act*

The Forest will comply with Section 106 of the National Historic Preservation Act and its implementing regulations at 36 CFR § 800 in accordance with the procedures outlined in Stipulation VI of the Cultural PA (EA pages 77-78).

## 8.0 Finding of No Significant Impact

*Context*

Disclosure of effects in the EA may differ by the resource being analyzed and by the scale of analysis. Multiple scales and levels of analysis were used to determine the significance of the effects on the human environment.

The San Juan National Forest is 1,800,000 acres. The Dolores Prescribed Fire project area totals about 240,000 acres. The project activities comprise only a portion of the San Juan National Forest. Within this context, I find that this project is local in scope.

*Intensity*

Intensity is a measure of the severity, extent, or quantity of effects, and is based on information from the effects analysis of this EA and the references in the project record. The effects of this project have been appropriately and thoroughly considered with an analysis that is responsive to concerns and issues raised by the public. The Forest Service has taken a hard look at the environmental effects using relevant scientific information and knowledge of site-specific conditions gained from field visits. My finding of no significant impact is based on the context of the project and intensity of effects using the ten factors identified in 40 CFR 1508.27(b).

***Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.***

Both beneficial and adverse effects of the proposed action have been disclosed and considered. The proposed action would have beneficial effects within the context of addressing the stated purpose and need of the project. See the *Need for the Proposal* section (EA-page 10) and the *Vegetation* effects discussion (EA-page 29-52). However, in this assessment, the evaluation of the intensity of adverse effects on each affected resource was made without being biased by or balanced against perceived beneficial effects. See the effects analysis of the proposed action in *Section 4 – Environmental Consequences*. Viewed in this light, the disclosed adverse effects associated with the proposed action are believed to be minor in nature. The existence of considerable beneficial effects in the absence of significant adverse impacts does not impose a requirement to complete an Environmental Impact Statement.

***The degree to which the proposed action affects public health or safety.***

The proposed action would have only minor effect on public health or safety. Any potential for short term smoke or vehicle traffic on forest roads would be mitigated through implementation of Design Criteria such as signing and adherence to smoke management guidelines. For more information see the Design Criteria section on EA-

page 15-25 and the discussions of effects to recreation (EA-pages 51-53) and air quality (EA-pages 76-77).

***Unique characteristics of the geographic area such as the proximity to historical or cultural resources, parklands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.***

No actions would occur within or affect prime farmlands, wilderness areas, roadless areas, wild and scenic rivers or other designated special areas. See below for a discussion of historical and cultural resources. Adverse impacts to wetlands are not anticipated (EA pages 73-75).

***The degree to which the effects on the quality of the human environment are likely to be highly controversial.***

These types of prescribed fire treatments have been performed throughout North America for decades and their associated effects have been rigorously documented in the existing body of scientific literature. There is no evidence of any substantial scientific dispute regarding the size or nature of the effects stemming from the proposed action (*Section 4 – Environmental Consequences* EA pages 28-82 including references).

***The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.***

This project is not unique, as the San Juan National Forest has been conducting prescribed fire and forest management programs historically since the early 20th century. When professional experience is paired with the substantial body of literature on the subject, there is little uncertainty regarding effects. The effects of the proposed action are fully analyzed (*Section 4 – Environmental Consequences* EA pages 28-82).

***The degree to which the action may establish precedent for future actions with significant effects or represents a decision in principle about a future consideration.***

This is a stand-alone project and its associated actions would not set a precedent or make a decision in principle about future actions or considerations. Any new proposals for forest management, similar to or entirely different from the proposed action will be subject to further site-specific evaluation and analysis as required under the NEPA.

***Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.***

The effects of one project must overlap in time and space with the effects of other projects in order to produce a cumulative effect. The spatial and temporal scales

considered for cumulative effects varied depending on the resource analyzed. Cumulative effects are discussed within *Section 4 – Environmental Consequences* (EA pages 43, 46, 54, 64, 68, 76, 79, 82). No significant cumulative effects associated with the proposed action were identified for any resources, and when reviewed together, no major effects are considered likely.

***The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.***

Pursuant to Stipulation V.B of the Cultural PA, notification has been sent to SHPO for the project. A cultural resouces inventory of the proposed project's Area of Potential Effects will be performed prior to project implementation pursuant to Stipulation VI of the Cultural PA. The Forest anticipates that a finding of no adverse effect to historic properties will be recommended for the project pursuant to 36 CFR 800.5(b). SHPO concurrence with the recommended finding will be obtained prior to project implementation. Consequently, the proposed action is not expected to adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic places or cause loss or destruction of significant scientific, cultural, or historical resources (EA pages 77-78).

***The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.***

Threatened, Endangered and Forest Service sensitive species were evaluated and the impacts described in EA pages 54-55 and in documents located in the project file. These evaluations were conducted in in accordance with section 7 of the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 et seq.). Determinations include *No Effect* for Canada lynx, North American wolverine, Gunnison sage grouse, yellowbilled cuckoo, Uncompagrhe butterfly, Mexican spotted owl and New Mexico jumping mouse and *May Impact Individuals but Not Likely to Adversely Effect* southwestern willow flycatcher.

***Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.***

This action complies with Federal laws imposed for the protection of the environment (see Section 7.0 of this Decision Notice). Local land use plans were evaluated and there are no conflicts between those plans and this project (EA pages 12, 33-34 and 88)

## 9.0 Pre-decisional Administrative Review Process

This decision was subject to objection pursuant to 36 CFR Part 218. A legal notice of the opportunity to object was published on May 29th, 2018 in the Cortez Journal. A cover letter announcing availability of the Draft Decision and Final Environmental Assessment was sent to those who provided comments during the project's development.

The project received one objection. The objector raised concern about smoke management and an objection resolution meeting was held in an effort to resolve the objectors' issues. Language has been added to this Decision Notice that explains in more detail the manner in which the Forest Service will coordinate with the Colorado Department of Public Health and Environment, Air Pollution Control Division to manage smoke from prescribed burns. A resolution was reached and the objector withdrew his objection.

## 10.0 Contact Persons/Further Information

For additional information concerning this project, contact Patrick Seekins at the Dolores Public Lands Office at (970) 882-7296.

## 11.0 Responsible Official

The District Ranger of the Dolores Ranger District of the San Juan National Forest is the deciding official.

| | |
|---|---|
| /s/ Derek Padilla | 9/19/2018 |
| __________________________________ | ___________ |
| Derek Padilla<br>Dolores District Ranger | Date |

# Salter Vegetation Management Environmental Assessment

## Rangelands & Invasive Plants Report

**Prepared by:**
Angela Yemma
Rangeland Management Specialist

**for:**
Dolores-Mancos Ranger District
San Juan National Forest

May, 2021

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at http://www.ascr.usda.gov/complaint_filing_cust.html and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer and lender.

# Table of Contents


Introduction ........................................................................................................1
Relevant Laws, Regulations, and Policy ..............................................................1
  Regulatory Framework .......................................................................................1
Environmental Impacts .........................................................................................3
  Spatial Context for Effects Analysis ....................................................................3
Affected Environment ...........................................................................................3
  Existing Conditions ............................................................................................3
Environmental Consequences ...............................................................................6
  No Action Alternative .........................................................................................6
  Proposed Action & Modified Proposed Action ...................................................6
**Summary of Environmental Effects** ..................................................................13
Compliance with LRMP and Other Relevant Laws, Regulations, Policies and Plans.............15
  Intensity Factors for Significance (FONSI) .......................................................15
References ..........................................................................................................15


**Tables**


Table 1. Rangeland resources analysis area grazing allotment administrative permit information, total approximate allotment GIS acres, and NEPA decision date. ........................................4
Table 2. House Creek and Pease Point pastures located within the 2019 Dolores Aspen Landscape treatment units. Salter Allotment pastures located within the 2020 Lone Pine treatment units. Table includes affected pasture approximate GIS total and treatment acres, and approximate percentage of total GIS pasture acreage included within the treatments. ..............................5
Table 3. Pastures by allotment included in the analysis area, approximate GIS total and project area acres by pasture, and approximate percentage of total GIS pasture acreage included within the project area treatments.........................................................................................8
Table 4. Approximate total percentage of allotment acres affected in the rangeland resources analysis area. ........................................................................................................11
Table 5. Summary of environmental effects to rangeland resources and invasive plants from proposed action alternatives....................................................................................13

# Introduction

This report discusses the affected environment and the environmental consequences to rangeland resources and invasive species from the *Salter Vegetation Management Environmental Assessment* (EA) proposed action alternatives to harvest ponderosa pine (*Pinus ponderosa*) and implement associated activities. This report ensures rangeland resources and invasive species receive consideration in the decision-making process. Analysis focuses on the three following issues:

1. Ponderosa pine harvest and associated activity impacts on livestock forage availability.
2. Ponderosa pine harvest and associated activity impacts to livestock operations and range improvements.
3. Ponderosa pine harvest and associated activity impacts on the spread and establishment of invasive species/noxious weeds.

Refer to the *Salter Vegetation Management* EA for further details on proposed alternatives.

# Relevant Laws, Regulations, and Policy

## Regulatory Framework

### Land and Resource Management Plan

The *San Juan National Forest Land and Resource Management Plan* (LRMP) provides the following standards and guidelines regarding rangeland resources and invasive species management on the San Juan National Forest (SJNF):

- 2.2.65 The construction of new permanent roads and utilities must not occur in protected areas in order to protect the ecological integrity of the terrestrial ecosystems within them, prevent ecosystem fragmentation, prevent the disruption of wildlife travel corridors, and prevent the establishment and spread of invasive plants.
- 2.7.27 Livestock should be moved from the grazing unit or allotment when utilization guidelines on key areas are met or exceeded, as identified in Table 2.7.1, or as specified in a NEPA decision for the particular allotment's AMP or annual operating instructions.
- 2.7.32 Livestock grazing use should be deferred following vegetation treatments, such as prescribed fire or wildfire, until recovery objectives are met or it is demonstrated that such use would not be detrimental.
- 2.8.12 The SJNF and TRFO must include provisions that are necessary to prevent the spread of and to control the introduction of invasive species in contracts and permits for use of SJNF and TRFO land and resources.
- 2.8.18 For all proposed projects or activities, the risk of invasive aquatic and plant species introduction or spread should be determined and appropriate prevention and mitigation measures implemented.

### Desired Condition

The LRMP identifies the following desired conditions regarding rangeland resources and invasive species management:

- 2.7.1 Rangeland provides forage for qualified local livestock operations and helps ranches remain sustainable and intact.

- 2.7.5 Rangelands provide diverse, healthy, and sustainable plant communities and conserve soil quality.
- 2.7.6 Suitable rangelands on SJNF lands are meeting desired conditions of affected resources.
- 2.8.1 Invasive species management is coordinated with adjacent landowners.
- Invasive species, both terrestrial and aquatic, are absent or rare within the planning area, and are not influencing native populations or ecosystem function.
- Management activities do not contribute to the spread of invasive annual plants or other invasive species.

## Federal Law

- Taylor Grazing Act of 1934, as amended
- Public Rangelands Improvement Act of 1978
- Multiple-Use/Sustained- Yield Act of 1960
- Wilderness Act of 1964, Section 4(4)
- Section 504 of the Rescissions Act of 1995
- Consolidated Appropriations Resolutions, 1999–2003

## Other Guidance or Recommendations

- Colorado Public Land Health Standards EA and Finding of No Significant Impact (FONSI), 1997
- 43 CFR 4100 and 36 CFR 222 Subpart A
- FSM 2200
- FSM 1950
- FSH 1905.15, Environmental Policy and Procedures Handbook
- FSH 1909.17, Economic and Social Analysis Handbook
- FSH 2509.13, Burned Area Rehabilitation Handbook
- FSH 2509.25, Watershed Conservation Practices Handbook
- FSH 2409.19, Renewable Resource Uses for Knutson-Vandenberg (K-V) Fund Handbook
- FSH 2109.13, Grazing Permit Administration Handbook
- United States Forest Service (USFS) Rocky Mountain Region Rangeland Analysis and Management Training Guide (USFS 1996a)
- Interagency Technical References

This project is consistent with the following grazing guidelines in the *Southern Rockies Lynx Amendment Record of Decision* (November 2008):

- Guidelines GRAZ G1: In fire- and harvest-created openings, livestock grazing should be managed so impacts do not prevent shrubs and trees from regenerating.
- Guidelines GRAZ G2: In aspen stands, livestock grazing should be managed to contribute to the long-term health and sustainability of aspen.

This project is also consistent with the desired conditions for the ponderosa pine/Gambel oak vegetation community described for the 2018 *Glade Rangeland Management Project Environmental Impact Statement* (EIS) with Record of Decision. Three grazing allotments overlapping the project area – Calf, Sagehen, and Salter – were analyzed in this EIS.

# Environmental Impacts

## Spatial Context for Effects Analysis

### Effects Boundaries

#### *Rangelands*

Analysis areas for both rangeland resources and invasive species are the same for all alternatives proposed in the *Salter Vegetation Management Environmental Assessment*.

The spatial analysis area for analyzing the direct, indirect, and cumulative effects of the proposed alternatives to rangeland resources are the eleven (11) active individual livestock grazing allotments with proposed treatment units within them in the EA project area. These 11 allotments are the following: Bald Hill, Beaver Crossing, Biggs, Calf, House Creek, Koehn, Mavreeso, Oak Knolls, Pease Point, Salter, and Trimble.

Two other allotments overlap the project area – Sagehen and River Corridor – but proposed treatment acreage is minimal, and these allotments are currently vacant. Therefore, the Sagehen and River Corridor allotments are not carried forward in analysis of rangeland resource impacts.

The active allotments were selected as the analysis area for rangeland resources because rangeland and livestock grazing impacts from the proposed alternatives is confined within each individual allotment. While proposed timber harvesting does not necessarily occur in all areas or pastures in an individual allotment, the entire allotment may be affected in terms of livestock forage and operational impacts.

#### *Invasive Species*

The spatial analysis area for analyzing the direct, indirect, and cumulative effects to invasive species management is the project area total proposed treatment areas and associated roads, because noxious weed establishment would be closely related to the treatment units and associated roadways where ground disturbance or vehicle traffic occurs.

# Affected Environment

## Existing Conditions

### Rangelands

For the 11 active grazing allotments comprising the rangeland resources analysis area, **Table 1** lists their administrative information. This includes their respective permitted livestock numbers, seasons of use, approximate total Geographic Information System (GIS) allotment acreages, number of pastures, and National Environmental Policy Act (NEPA) decision years for the most recent allotment-specific grazing decisions, which disclosed and analyzed livestock grazing activities and its effects on the environment. Pastures within the allotments are discussed in further detail in **Table 3**.

**Table 1. Rangeland resources analysis area grazing allotment administrative permit information, total approximate allotment GIS acres, and NEPA decision date.**

| Allotment Name | Allotment No. | No. & Kind of Livestock | Season of Use | Total Approximate GIS Allotment Acres | NEPA Decision Year |
|---|---|---|---|---|---|
| Bald Hill | 13416 | 340 cow/calf<br>293 cow/calf | 6/1-10/12<br>10/13-10/30 | 11,634 | 2006 |
| Beaver Crossing | 13421 | 330 cow/calf, 6 horses | 6/11-10/30 | 8,959 | 2006 |
| Biggs | 13412 | 287 cow/calf | 6/11-10/30 | 7,901 | 2006 |
| Calf | 13410 | 348 cow/calf, 6 horses | 6/1-10/30 | 9,887 | 2018 |
| House Creek | 13422 | 390 cow/calf | 6/1-10/30 (10/30-11/30 optional) | 13,910 | 2006 |
| Koehn | 13415 | 75 cow/calf | Yr 1: 6/1-6/30; Yr 2: 5/15-6/16; Yr 3: rest | 1,715 | 2006 |
| Mavreeso | 13414 | 268 cow/calf | 6/1-9/30 | 7,180 | 2006 |
| Oak Knolls | 13423 | 150 cow/calf<br><br>330 cow/calf | 6/6-6/15<br><br>6/16-10/26 | 8,841 | 2006 |
| Pease Point | 13413 | 275 cow/calf | 6/1-10/30 | 11,143 | 2006 |
| Trimble | 13409 | 416 cow/calf | 6/20-10/15 | 5,478 | 2007 |

These allotments operate under a deferred rotational grazing system with the exception of Koehn. Koehn is unique as it requires full allotment rest every third year due to the presence of only one pasture. Grazing is prescribed to support periodic seasonal pasture deferments, particularly in the early part of the grazing season. All pastures are managed for proper use as livestock are removed from a pasture before or when utilization of key forage species is reached. Permittees are responsible to move and distribute livestock to maintain proper forage use guidelines.

Most of the suitable rangeland in these allotments is found in open meadow parks, as well as aspen understory vegetation types. Ponderosa pine forests in the analysis area are considered suitable for livestock grazing and do provide understory vegetation for livestock forage to varying levels, but typically not to the level of meadows and aspen understory. In ponderosa pine forests, palatable native grass species such as bunchgrasses, Arizona fescue (*Festuca arizonica*), mountain muhly (*Muhlenbergia montana*), and muttongrass (*Poa fendleriana*) and others provide livestock forage, as well as nonnative grasses like Kentucky bluegrass (*Poa pratensis*) and smooth brome (*Bromus inermis*). Forbs and palatable shrubs also provide livestock forage. Ponderosa pine stands may provide average annual understory production of air-dry vegetation in a range of approximately 900-1,400 pounds per acre dependent on environmental conditions and specific soils and ecological sites (NRCS). As ponderosa stands continue to mature in absence of other disturbances such as fire, increased tree canopy cover can reduce understory vegetation species presence and/or production levels through shading and competition for resources; this can subsequently reduce livestock forage in these areas over time.

Livestock forage in the analysis area has been affected by past historic grazing and past and current logging operations. Aspen harvest has undergone analysis and been approved in the House Creek and Pease Point allotments through the *Dolores Aspen Landscape Vegetation Project* EA with Decision Notice signed in December 2019. Ponderosa pine harvest has been approved in the Salter Allotment through the *Lone Pine Vegetation Management Project* EA with Decision Notice signed in January 2020.

Aspen and ponderosa pine harvest in specific pastures on the House Creek, Pease Point, and Salter allotments under these EAs is shown in **Table 2**. Approximately 5% of the total House Creek Allotment acreage and approximately 32% of the total Pease Point Allotment acreage fall within the Aspen Landscape treatment units. Approximately 18% of the total Salter Allotment acreage falls within Lone Pine treatment units.

**Table 2. House Creek and Pease Point pastures located within the 2019 Dolores Aspen Landscape treatment units. Salter Allotment pastures located within the 2020 Lone Pine treatment units. Table includes affected pasture approximate GIS total and treatment acres, and approximate percentage of total GIS pasture acreage included within the treatments.**

| Allotment | Pasture | Pasture GIS Acres | EA Treatment | Treatment Acres within Pasture | Percent of Pasture Ac within Treatment Ac |
|---|---|---|---|---|---|
| House Creek | Geren | 649 | Aspen | 87 | 13% |
| | Hugh-Rey | 1,283 | | 9 | 1% |
| Pease Point | Beef | 408 | Aspen | 105 | 26% |
| | South/McEwen | 3,248 | | 637 | 20% |
| Salter | Salter | 2,666 | Lone Pine | 684 | 26% |
| | Middle | 2,418 | | 1,202 | 50% |
| | Ferris | 3,340 | | 516 | 15% |

Other factors that have affected the rangeland resources analysis area forage include road infrastructure, recreation uses, wildlife use, and wildland fire, and revegetation, among others. Seeding with nonnative grass species such as smooth brome (*Bromus inermis*) has also occurred. Drought has also reduced plant forage production and subsequent livestock forage. Noxious weeds have established in certain areas, most commonly in those areas with recreation and vehicular traffic. Noxious weeds can compete with desirable plant species and negatively affect ecosystem health, thereby decreasing forage availability in some areas.

Range improvements, including fencing, cattleguards, and water developments, are found across the analysis area. Maintenance of nearly all range improvements are the responsibility of grazing permittees. Livestock operations have been and remain currently affected by aspects of many of the same general factors as forage; this includes interactions with public users such as recreationists and issues such as gates left open when livestock are present, wildfire or other natural occurrences affecting grazing rotations and range improvements, and traffic from logging operations and recreation, among others.

Additionally, USFS long-term trend plots to monitor rangeland and provide information on multi-year trends are located within the analysis area.

## Invasive Species

Several different noxious weed species are present within and near the analysis area. Inventory and treatments are ongoing. Acres affected by noxious weeds change as new infestations establish and other infestations are eradicated. The same past and present uses described for livestock grazing have affected noxious weeds in the analysis area. Public recreation, especially motorized use, can add to the spread of noxious weeds across the landscape as it allows for the widest span of distribution. Weed infestations are usually associated with roadways, high recreation use areas such as trailheads and camping areas, and areas where livestock concentrate, such as water developments, fencelines, and salting grounds, where bare ground is created, allowing for infestation.

Weeds inventory and treatment is ongoing and has been analyzed under other forest-wide weeds NEPA analysis. Weeds treatments are planned and implemented annually, and these would continue to occur

into the future under the most current and applicable NEPA analysis. High priority weed infestations are treated with herbicide with the intent of eradication, though eradication is not always achieved. All species on the Colorado Noxious Weeds List B are targeted for eradication. These species are known to be invasive and increase with disturbance. Noxious weed infestations negatively affect ecosystem health, reduce livestock forage, and reduce wildlife habitat among other detrimental effects.

# Environmental Consequences

## No Action Alternative

### Direct and Indirect Effects

#### *Rangelands*

There would be no immediate effects on forage availability as a result of the no action alternative in the 11 active grazing allotments. There would be no need for adjusting the use on the grazing allotments as it pertains to this project and no other livestock operation impacts would occur from the proposed ponderosa pine logging and associated impacts. Indirectly, as ponderosa stands continue to mature in absence of other disturbances such as fire, increased tree canopy cover would reduce understory vegetation; shading and competition for resources would subsequently reduce livestock forage in these areas over time.

#### *Invasive Species*

Invasive species and noxious weeds in the analysis area would not directly increase or decrease as a result of the proposed ponderosa pine harvesting. Impacts from the no action alternative would be the same as the existing conditions described above.

## Proposed Action & Modified Proposed Action

### Project Design Features and Mitigation Measures

The *Salter Vegetation Management EA* describes the proposed action alternatives to implement ponderosa pine harvest and associated activities. Project design features detailed below were developed for the proposed action to minimize or eliminate potential adverse effects during implementation of the Salter vegetation management project to livestock grazing and from invasive species. Design features are the same for all action alternatives. These design features are listed below:

#### *Rangelands*

1. U.S. Forest Service rangeland management specialists would be annually informed of the schedule of timber harvest activities.

2. Coordination between the U.S. Forest Service rangeland management specialist and affected grazing permittees would be conducted to discuss harvest timing, potential impacts, and adjustments to rotation schedules needed to mitigate impacts.

3. To mitigate impacts to livestock operations, when possible, timber harvest operations would be concentrated within individual pastures.

4. When determined necessary by the rangeland management specialist, timber harvest operations would avoid long-term range trend monitoring plots. The need to avoid monitoring plots would be made on a case-by-case bases

5. Timber purchasers/contractors are required to repair any damages to range improvements that occur as a result of their operations within the time-frames instructed by the U.S. Forest Service. To address the immediacy of livestock control, purchasers/contractors would be required to repair any range fences or gates damaged during operations. No fences would be cut unless necessary and agreed to in writing by the U.S. Forest Service. When fences lie within cutting units, effort would be made to design skidding patterns to be parallel to fence lines, pull timber away from fences, or to go through existing gates as feasible. In the event temporary roads and skid trails need to cross livestock fences at locations other than existing gate locations, breach points must be closed with wire or a gate while operations are being conducted to a standard that does not reduce control integrity of the fence for livestock. Should a road have high traffic use from operations, consideration should be given to the installment of a cattleguard. Upon completion of operations, any section of impacted fence would be repaired to the original state of integrity.

6. Pasture gates would remain closed when cattle are in or adjacent to affected pastures or when instructed by Forest Service.

### *Invasive Species*

1. Limit each burn pile to ¼ acre or less.

2. Under timber sale contract provisions, all off-road heavy equipment must be washed and free of foreign soil or debris before entering the operations area to minimize spread of invasive species.

3. Sale and contract areas would be monitored for weeds; infestations are to be reported to the U.S. Forest Service rangeland management specialist for management.

4. All seed used for revegetation would be tested for, and free of, invasive non-native species that are problematic for this forest. Contact the agency for the most current list.

5. Monitor noxious weeds/invasive species and treat infestations as needed for containment, minimizing rate of spread, and eradication.

6. If noxious weeds and invasive species are found to be increasing in infestation size within a treatment unit as direct result of harvest and associated activities, one or both of the following options would be implemented to prevent further spread:

    - Prohibit harvest equipment or vehicles from driving through infestations.

    - Require onsite weed decontamination stations for equipment washing.

## Direct and Indirect Effects

### *Rangelands*

The project area overlaps the following pastures within the previously described 11 active grazing allotments in the analysis area as shown in **Table 3**.

**Table 3. Pastures by allotment included in the analysis area, approximate GIS total and project area acres by pasture, and approximate percentage of total GIS pasture acreage included within the project area treatments.**

| Allotment | Pasture | Pasture GIS Acres | Project Area Acres within Pasture | Percent of Pasture Ac within Project Area |
|---|---|---|---|---|
| Bald Hill | North | 1,091 | 503 | 46% |
| | Beaver | 468 | 87 | 19% |
| | Cottonwood | 2,078 | 102 | 5% |
| | Oak Knolls | 1,352 | 340 | 25% |
| | East Riparian Exclosure | 35 | 0 | 0% |
| | West Riparian Exclosure | 17 | 0 | 0% |
| | Horse Camp | 4,395 | 2,576 | 59% |
| | Bean | 2,204 | 1,852 | 84% |
| Beaver Crossing | North Beaver Crossing | 1,396 | 0 | 0% |
| | South Beaver Crossing | 1,179 | 324 | 28% |
| | Range Exclosure | 5 | 0 | 0% |
| | Cow Camp/Horse Pasture | 186 | 92 | 49% |
| | Turkey | 2,473 | 808 | 33% |
| | East Boggy | 1,674 | 543 | 32% |
| | West Boggy | 1,521 | 828 | 54% |
| Biggs | Willow Spring | 168 | 0 | 0% |
| | Middle | 2,505 | 1,656 | 66% |
| | Gathering | 514 | 367 | 71% |
| | Cow Camp | 267 | 0 | 0% |
| | Carlyle Point | 2,250 | 1,753 | 78% |
| | Trail Point | 2,199 | 1,558 | 71% |
| Calf | Hinchman | 2,418 | 312 | 13% |
| | North Gathering | 86 | 0 | 0% |
| | Cow Camp/Horse Pasture | 144 | 1 | 1% |
| | South Gathering | 263 | 0 | 0% |
| | Salter Canyon | 600 | 27 | 4% |
| | Plantation | 849 | 39 | 5% |
| | Dunham | 2,540 | 1,070 | 42% |
| | Hoppe Point | 2,197 | 585 | 27% |
| | Tozer | 789 | 0 | 0% |
| House Creek | Lower House Creek Exclosure #1 | 17 | 0 | 0% |
| | Lower House Creek Exclosure #2 | 3 | 0 | 0% |
| | Lower House Creek Exclosure #3 | 4 | 0 | 0% |

| | | | | |
|---|---|---|---|---|
| | Lower House Creek Exclosure #4 | 16 | 0 | 0% |
| | Beaver Rim | 7,972 | 644 | 8% |
| | Brush Patch | 162 | 0 | 0% |
| | Elk | 1,483 | 0 | 0% |
| | Geren | 649 | 0 | 0% |
| | Hugh-Rey | 1,283 | 0 | 0% |
| | Improved Pasture | 163 | 0 | 0% |
| | King | 1,053 | 0 | 0% |
| | Willow SP Unit | 417 | 0 | 0% |
| | None 2 | 382 | 0 | 0% |
| | None 2 | 309 | 0 | 0% |
| Koehn | Koehn | 1,715 | 1,011 | 59% |
| Mavreeso | None | 206 | 0 | 0% |
| | Unit 6 | 1,062 | 0 | 0% |
| | Unit 5 | 1,303 | 0 | 0% |
| | Mav Sub B | 21 | 0 | 0% |
| | Mav Sub A | 133 | 0 | 0% |
| | Unit 4 | 849 | 0 | 0% |
| | Unit 3 | 1,668 | 210 | 13% |
| | Unit 2 | 1,339 | 459 | 34% |
| | Unit 1 | 600 | 0 | 0% |
| Oak Knolls | Little Beaver | 1,445 | 97 | 7% |
| | Long Draw | 788 | 324 | 41% |
| | Coffee Camp | 1,536 | 757 | 49% |
| | Range Exclosure | 2 | 0 | 0% |
| | None | 300 | 0 | 0% |
| | Cow Camp Horse Pasture | 68 | 46 | 67% |
| | North Oak Knolls | 1,483 | 233 | 16% |
| | South Oak Knolls | 1,423 | 70 | 5% |
| | Wire Corral | 1,003 | 623 | 62% |
| | Oil Well | 793 | 582 | 73% |
| Pease Point | Beef | 408 | 0 | 0% |
| | Spring #1 | 2,796 | 1,491 | 53% |
| | Gathering | 71 | 34 | 48% |
| | None | 1,580 | 0 | 0% |
| | Italian Canyon | 3,040 | 2,066 | 68% |
| | South/McEwen | 3,248 | 0 | 0% |
| Salter | Salter | 2,666 | 0 | 0% |

| | | | | |
|---|---|---|---|---|
| | Cow Camp/Horse Pasture | 314 | 0 | 0% |
| | Lower Salter Canyon | 1,406 | 322 | 23% |
| | Willow Draw | 1,096 | 97 | 9% |
| | Middle | 2,418 | 26 | 1% |
| | Ferris | 3,340 | 0 | 0% |
| | Upper Salter Canyon | 1,013 | 0 | 0% |
| | Gathering | 346 | 0 | 0% |
| | None | 645 | 0 | 0% |
| Trimble | Plateau | 352 | 0 | 0% |
| | Cow Camp/Horse Pasture | 68 | 0 | 0% |
| | Beef | 524 | 8 | 2% |
| | Darnell | 1,894 | 1,210 | 64% |
| | Middle | 1,441 | 805 | 56% |
| | Lower | 1,198 | 517 | 43% |

Greater impacts from project-related activities would occur in those allotments and pastures with higher project area treatment acreage as listed in **Table 3**. Some pastures within the allotments would have no proposed treatments, while others would have minimum to high levels. The Biggs Carlyle and Bald Hill Bean pastures would have the highest proportion of treatment acres. The approximate total percentage of allotment acres affected in the rangeland resources analysis area are summarized in **Table 4**. Of the approximate total allotment acreage, the Koehn and Biggs allotments would be most affected by the proposed activities with over approximately 50% of their respective acreage affected. All other total analysis area allotment acreage impacted would be under approximately 50% at varying levels, with the Salter Allotment affected the least by the proposed alternatives in terms of acreage.

**Table 4. Approximate total percentage of allotment acres affected in the rangeland resources analysis area.**

| Allotment | Approximate Percentage of Total Allotment Acres Affected |
|---|---|
| Bald Hill | 47% |
| Beaver Crossing | 31% |
| Biggs | 68% |
| Calf | 21% |
| House Creek | 5% |
| Koehn | 59% |
| Mavreeso | 9% |
| Oak Knolls | 31% |
| Pease Point | 32% |
| Salter | 3% |
| Trimble | 46% |

The proposed treatment units do not overlap with the pastures on the House Creek and Pease Point allotments affected by aspen harvest under the *Dolores Aspen Landscape Vegetation Project*. For the Salter Allotment affected by the *Lone Pine Vegetation Management Project*, only the Middle pasture is additionally impacted by the proposed alternatives.

Operations may occur during the grazing season. During operations, harvesting and thinning of ponderosa pine stands would temporarily reduce forage availability in thinned areas over the short-term. Forage would not be available to livestock if they are restricted from the actively logged areas during operations. Where new temporary roads, landings, and skid trails are constructed, forage would be lost for the life of the project until completion of use; however, the direct impact to forage loss within pastures due to surface disturbance would be minimal and concentrated in these areas. Changes to pasture rotations and livestock distribution patterns across the analysis area allotments may be necessary to maintain proper forage utilization levels and to maintain and/or move toward desired vegetation conditions. Coordination between US Forest Service staff and affected grazing permittees regarding the timing and location of active logging and associated activities would minimize this impact.

Once ponderosa pine harvesting operations are concluded, livestock forage in thinned areas would be expected to be similar to pre-harvest conditions or to be improved as palatable understory species potentially increase presence and production with decreased resource competition. Improvement in livestock forage would occur from increases in understory vegetation from decreased ponderosa pine canopy cover and subsequent reduction in resource competition. A study in northern Arizona ponderosa pine forests concluded that ponderosa pine thinning increased the abundance of native graminoid species within the project area (Griffis et al., 2000). Livestock grazing of palatable grass, forbs, and shrubs in treatment areas would reduce these plants' competition with ponderosa pine seedlings following harvest. Livestock grazing with proper utilization levels and distribution in thinned areas is not anticipated to prevent regeneration of ponderosa pine. Maintaining proper utilization levels, periodic pasture deferment through a rotational grazing system, and use of livestock distribution practices would reduce livestock grazing impacts on ponderosa pine regeneration and long-term ponderosa pine stand condition and

additionally help sustain potential livestock forage gains from the thinning of mature stands.

Areas with short-term disturbance that had soils exposed such as temporary roads, landings, and skidding trails would be reclaimed with native seed mixes to reestablish vegetation as described in Design Features under Hydrology and Soils and Scenery. Reclaiming these areas may contribute to livestock forage once vegetation is established.

Livestock forage in harvested areas could decline if noxious weeds are introduced and spread. Design features to mitigate increases in noxious weeds are included in the proposed alternatives.

In terms of livestock operation and range improvement impacts from ponderosa pine harvesting and associated activities, impacts would be temporary and short-term. Potential livestock operation impacts include cattle potentially dispersing more and moving into unauthorized areas with increased traffic and access, and if barriers such as fences are removed, or gates are left open. These impacts would only occur from the proposed alternatives when harvest operations occur at the same time as cattle presence on allotments. Range improvement impacts from operations primarily could occur from allotment pasture and boundary fence removal and/or damage. To help mitigate these potential impacts, design features regarding range improvement maintenance and repair, gate closures, and concentration of operations within pastures are included as part of the proposed action. Coordination with permittees as a design feature would also assist in reducing any potential additional burden on permittees to move and locate livestock due to harvesting operations.

Additionally, long-term range trend plots could be damaged if operations and soil disturbance activities such as skidding areas and roads are placed on them. Therefore, design features include avoidance of these plots.

### *Invasive Species*

Noxious weeds could potentially be introduced and/or increase in distribution and acreage as a result of proposed ponderosa pine harvest and associated activities. All vehicles and equipment can serve as vectors for the spread of noxious weeds. Therefore, vehicular traffic for harvest operations may spread noxious weeds. Activities that create bare ground can also lead to noxious weed establishment when desirable competitive species are removed and noxious weed seedbeds are established; activities such as skidding lanes, road construction, landing sites, and pile burning can lead to removal of desirable plant species and bare soil. Weeds inventory and treatment will continue to occur under other NEPA analysis and annual planning; therefore, specific invasive species/noxious weeds treatments and methods are not proposed under these alternatives. However, design features are proposed to reduce the likelihood of noxious weed establishment and the need for follow-up treatments to eradicate established populations. Additionally, design features include use of weed-free seed in reclamation implementation.

## Cumulative Effects

### *Rangeland Resources*

Past and present effects to livestock grazing are the same as those listed under existing conditions, and include impacts from many uses and disturbances. Reasonably foreseeable future actions are similar to past and present actions as activities including infrastructure building, recreation uses, wildlife use, wildland fire, logging, and others are expected to continue.

Under the proposed alternatives, livestock forage in ponderosa pine stands within the analysis area would have effects similar to those described for direct and indirect effects as understory forage may improve over time with a reduced tree canopy cover from harvesting. Therefore, livestock forage across the analysis area in ponderosa pine stands could potentially be cumulatively improved over time under the proposed alternatives if no other disturbances thin mature ponderosa pine stands.

As the Salter Allotment has current ponderosa pine treatments under the *Lone Pine Vegetation Management Project*, and the cumulative effects of this project and the proposed alternatives only results in an approximately 1% increase in treatment acreage in the Middle pasture. Overall, the cumulative effects of the Lone Pine and the proposed alternative treatment acreage would be 22% of the approximate total allotment acreage. For the House Creek Allotment undergoing aspen treatment under the *Dolores Aspen Landscape Vegetation Project*, the cumulative effects of aspen and the proposed ponderosa treatment acreage would not occur in the same pastures and the overall allotment acreage affected by treatments would remain at approximately 5%. For the Pease Point Allotment also impacted by aspen treatments under the *Dolores Aspen Landscape Vegetation Project*, the cumulative effects of both aspen and the proposed ponderosa pine harvest raise the total approximate acres affected to 39%; however, there is no overlap in pastures affected between these two projects.

Past and present effects on livestock operations are also the same as those listed under existing conditions and are expected to continue. Because direct and indirect effects to livestock operations would be short-term and be lessened with implementation of design features, there would be no long-term cumulative effects under the proposed alternatives.

### *Invasive Species*

Past and present effects to noxious weeds are the same as those listed under existing conditions, which includes influences from many uses and disturbances. Reasonably foreseeable future actions are similar to past and present actions as the same activities listed as affecting livestock grazing and are expected to continue.

Under the proposed alternatives, noxious weeds within the analysis area would have effects similar to those described for direct and indirect effects in that noxious weeds would potentially increase in distribution and acreage. In particular, potentially increased recreation from increased access would likely occur. User- created routes are sometimes formed from closed logging roads. If this occurs, a large user created route network would result in a greater likelihood of noxious weed spread and establishment. Therefore, noxious weeds in the project area could potentially cumulatively be increased over time under the proposed alternatives, requiring increased treatment and action to limit infestations.

## Summary of Environmental Effects

**Table 5** summarizes the environmental effects to rangeland resources and invasive plants under the proposed action alternatives.

**Table 5. Summary of environmental effects to rangeland resources and invasive plants from proposed action alternatives.**

| Resource Element | Indicator/Measure | No Action Alternative | Proposed Action Alternatives |
|---|---|---|---|
| Rangeland Resources – Forage Availability | Forage Availability - Palatable Plant Species Presence & Pounds of Forage per Acre (Production), Utilization levels | *Direct and Indirect Effects:* No immediate short-term effects on forage availability. Long- | *Direct and Indirect Effects:* Forage availability would decrease in the short-term during |

| Resource Element | Indicator/Measure | No Action Alternative | Proposed Action Alternatives |
|---|---|---|---|
| | | term forage availability may decline without natural or anthropogenic disturbances in the ponderosa pine community.<br>*Cumulative Effects:* Forage availability in ponderosa pine stands could potentially cumulatively decline over time. | harvesting and associated activities.<br>Over the long-term, following conclusion of proposed activities, forage availability in treated ponderosa pine stands would be expected to be similar to pre-harvest conditions or to be improved with proper use, rotations, and implementation of design features.<br>*Cumulative Effects:* Forage availability in ponderosa pine stands could potentially be cumulatively improved over time. |
| Rangeland Resources – Livestock Operations | Pasture Rotations, Forage Utilization, Range Improvement Condition | *Direct and Indirect Effects:* No immediate effects.<br>***Cumulative Effects:*** No cumulative effects. | *Direct and Indirect Effects:* Impacts would be temporary and short-term and would occur during operations. Implementation of proposed design features would reduce impacts to operations and range improvements.<br>*Cumulative Effects:* Short-term effects would occur, but no cumulative long-term effects. |
| Invasive Species | Noxious Weed Establishment/Infested Acres | *Direct and Indirect Effects:* No immediate effects to invasive species would occur. Current weed populations would continue to be targeted for treatment. | *Direct and Indirect Effects:* Activities associated with timber harvest may increase noxious weed establishment. Implementation of proposed design features would reduce the likelihood |

| Resource Element | Indicator/Measure | No Action Alternative | Proposed Action Alternatives |
|---|---|---|---|
| | | ***Cumulative Effects:*** No cumulative effects; effects may be less than under the action alternatives | of noxious weed establishment and the need for follow-up treatments to eradicate established populations. Treatment of established weed populations would continue. *Cumulative Effects:* Noxious weeds could increase primarily due to increased access over time, requiring increased treatment efforts. |

# Compliance with LRMP and Other Relevant Laws, Regulations, Policies and Plans

Based on the discussion above and following the provided design criteria and mitigation measures, the proposed alternatives will meet or move rangeland resources and invasive plant management toward desired conditions identified in the San Juan LRMP.

## Intensity Factors for Significance (FONSI)

No significant effects to rangeland resources or invasive species were identified in this report.

# References

Griffis, K. L., Crawford, J. A., Wagner, M. R., Moir, W. H. 2000. Understory Response to Management Treatments in Northern Arizona Ponderosa Pine Forests. Forest Ecology and Management. 146 (239-245).

[NRCS] United States Department of Agriculture Natural Resources Conservation Service. Soil Survey of Animas-Dolores Area, Colorado, Parts of Archuleta, Dolores, Hinsdale, La Plata, Montezuma, San Juan, and San Miguel Counties.

United States Department of Agriculture

Forest Service

Natural Resource Manager

National Visitor Use Monitoring Program

Last updated: 28 June 2023

# Visitor Use Report

## San Juan NF

## USDA Forest Service
## Region 2

## National Visitor Use Monitoring
## Data collected FY 2016

# CONTENTS

**1. Introduction**
- 1.1. Scope and purpose of the National Visitor Use Monitoring program
- 1.2. Methods
- 1.3. Definition of Terms
- 1.4. Limitations of the Results

**2. Visitation Estimates**
- 2.1 Forest Definition of Site Days
- 2.2. Visitation Estimates

**3. Description of the Recreation Visit**
- 3.1. Demographics
- 3.2. Visit Descriptions
- 3.3. Activities

**4. Economic Information**
- 4.1. Spending Segments
- 4.2. Spending Profiles
- 4.3. Total Direct Spending
- 4.4. Other Visit Information
- 4.5. Household Income
- 4.6. Substitute Behavior

**5. Satisfaction Information**
- 5.1. Crowding
- 5.2. Disabilities

**6. Wilderness Visit Demographics**

**7. Appendix Tables**

# 1. INTRODUCTION

## 1.1. Scope and purpose of the National Visitor Use Monitoring program

The National Visitor Use Monitoring (NVUM) program provides reliable information about recreation visitors to national forest system managed lands at the national, regional, and forest level. Information about the quantity and quality of recreation visits is required for national forest plans, Executive Order 12862 (Setting Customer Service Standards), and implementation of the National Recreation Agenda. To improve public service, the agency's Strategic and Annual Performance Plans require measuring trends in user satisfaction and use levels. NVUM information assists Congress, Forest Service leaders, and program managers in making sound decisions that best serve the public and protect valuable natural resources by providing science based, reliable information about the type, quantity, quality and location of recreation use on public lands. The information collected is also important to external customers including state agencies and private industry. NVUM methodology and analysis is explained in detail in the research paper entitled: Forest Service National Visitor Use Monitoring Process: Research Method Documentation; English, Kocis, Zarnoch, and Arnold; Southern Research Station; May 2002 (http://www.fs.fed.us/recreation/programs/nvum).

In 1998 a team of research scientists and forest staff developed a recreation sampling system (NVUM) that provides statistical recreation use information at the forest, regional, and national level. Several Forest Service staff areas including Recreation, Wilderness, Ecosystem Management, Research and Strategic Planning and Resource Assessment were involved in developing the program. From January 2000 through September 2003 every national forest implemented this methodology and collected visitor use information. This application served to test the method over the full range of forest conditions, and to provide a rough national estimate of visitation. Implementation of the improved method began in October 2004. Once every five years, each National Forest and Grassland has a year of field data collection.

This NVUM data is useful for forest planning and decision making. The description of visitor characteristics (age, race, zip code, activity participation) can help forest staff identify their recreation niche. Satisfaction information can help management decide where best to place limited resources that would result in improved visitor satisfaction. Economic expenditure information can help forests show local communities the employment and income effects of tourism from forest visitors. In addition, the visitation estimates can be helpful in considering visitor capacity issues.

## 1.2. Methods

To define the sampling frame, staff on each forest classify all recreation sites and areas into five basic categories called "site types": Day Use Developed Sites (DUDS), Overnight Use Developed Sites (OUDS), Designated Wilderness Areas (Wilderness), General Forest Areas (GFA), and View Corridors (VC). Only the first four categories are counted as national forest recreation visits and are included in the visit estimates. The last category is used to track the volume of people who view national forests from nearby roads; since they do not get onto agency lands, they cannot be counted as visits. For the entire sampling year, each day on each site was given a rating of very high, high, medium, low, or no use according to the expected level of recreational visitors who would be

observed leaving that location for the last time (last exiting recreation use) on that day. The combination of a calendar day and a site or area is called a site day. Site days are the basic sampling unit for the NVUM protocol. Results of this forest categorization are shown in Table 1.

In essence, visitation is estimated through a combination of traffic counts and surveys of exiting visitors. Both are obtained on a random sample of locations and days distributed over an entire forest for a year. All of the surveyed recreation visitors are asked about their visit duration, activities, demographics, travel distance, and annual usage. About one-third were also asked a series of questions about satisfaction. Another one-third were asked to provide information about their income, spending while on their trip, and the next best substitute for the visit.

## 1.3. Definition of Terms

NVUM has standardized measures of visitor use to ensure that all national forest visitor measures are comparable. These definitions are basically the same as established by the Forest Service in the 1970's. Visitors must pursue a recreation activity physically located "on" Forest Service managed land in order to be counted. They cannot be passing through; viewing from non-Forest Service managed roads, or just using restroom facilities. The visitation metrics are ***national forest visits*** and ***site visits.*** NVUM provides estimates of both and confidence interval statistics measuring the precision of the estimates. The NVUM methodology categorizes recreation facilities and areas into specific site types and use levels in order to develop the sampling frame. Understanding the definitions of the variables used in the sample design and statistical analysis is important in order to interpret the results.

***National forest visit*** is the entry of one person upon a national forest to participate in recreation activities for an unspecified period of time. A national forest visit can be composed of multiple site visits. The visit ends when the person leaves the national forest to spend the night somewhere else.

***Site visit*** is the entry of one person onto a national forest site or area to participate in recreation activities for an unspecified period of time. The site visit ends when the person leaves the site or area for the last time on that day.

A ***confidence interval*** is a range of values that is likely to include an unknown population value, where the range is calculated from a given set of sample data. Confidence intervals are always accompanied by a ***confidence level***, which tells the degree of certainty that the value lies in the interval. Used together these two terms define the reliability of the estimate, by defining the range of values that are needed to reach the given confidence level. For example, the 2008 national visitation estimate is 175.6 million visits, with a 90% confidence interval of 3.2%. In other words, given the NVUM data, our best estimate is 175.6 million visits, and given the underlying data, we are 90% certain that the true number is between 170.0 million and 181.2 million.

***Recreation trip*** is the duration of time beginning when the visitor left their home and ending when they return to their home.

***Site day -*** a day that a recreation site or area is open to the public for recreation purposes.

***Proxy*** - information collected at a recreation site or area that is directly related to the amount of

recreation visitation received. The proxy information must pertain to all users of the site and it must be one of the proxy types allowed in the NVUM pre-work directions (fee receipts, fee envelopes, mandatory permits, permanent traffic counters, group reservations, ticket sales, and daily use records).

***Nonproxy*** - a recreation site or area that does not have proxy information. At these sites a 24-hour traffic count is taken to measure total use for one site day at the sample site.

***Use level*** - for each day of the year for each recreation site or area, the site day was categorized as very high, high, medium or low last exiting recreation traffic, or no exiting use. No Use could means either that the location was administratively closed, or it was open but was expected to have zero last exiting visitors. For example a picnic area may listed as having no use during winter months (120 days), high last exiting recreation volume on all other weekends (70 days) and medium last exiting recreation use on the remaining midweek days (175 days). This accounts for all 365 days of the year. This process was repeated for every site and area on the forest.

## 1.4. Limitations of the Results

The information presented here is valid and applicable at the forest, regional, and national level. It is not designed to be accurate at the district or site level. The quality of the visitation estimate is dependent on the sample design development, sampling unit selection, sample size and variability, and survey implementation. First, preliminary work conducted by forests to identify and consistently classify sites and access points according to the type and amount of expected exiting visitation is the key determinant of the validity and magnitude of the visitation estimate. Second, the success of the forest staff in accomplishing its assigned set of sample days, correctly filling out the interview forms, and following the field protocols influence the reliability of the results, variability of the visitation estimate, and validity of the visitation descriptions. Third, the variability of traffic counts within a sampling stratum affects the reliability of the visitation estimates. Fourth, the range of visitors sampled must be representative of the population of all visitors. Finally, the number of visitors sampled must be large enough to adequately control variability. The results and confidence intervals will reflect all these factors.

Confidence intervals indicate the reliability of the visitation estimate, given the underlying data. Large confidence intervals indicate high variability in the national forest visit (NFV), site visit (SV) and Wilderness visit estimates. Variance is caused primarily by a small sample size in number of days or having a few sampled days where the observed exiting visitation volume was very different from the normal range. For example, on a particular National Forest in the General Forest Area low stratum, there were 14 sample days. Of these 14 sample days, 13 days had visitation estimates between zero and twenty. The remaining day had a visitation estimate of 440. So the stratum mean was about 37 per day, standard error was about 116, and the 90% confidence interval width is 400% of the mean. Causes for such outlier observations are not known, but could include a misclassification of the day (a high use day incorrectly categorized as a low use day), unusual weather, malfunctioning traffic counter, or reporting errors. Eliminating the unusual observation from data analysis would reduce the variability. However, unless the NVUM team had reason to suspect the observation was incorrect they did not eliminate these unusual cases.

The descriptive information about national forest visitors is based upon only those visitors that were interviewed. Every effort was made to incorporate distinct seasonal use patterns and activities that

vary greatly by season into the sampling frame. The sampling plan took into account both the spatial and seasonal spread of visitation patterns across the forest. Even so, because of the small sample size of site-days, or because some user groups decline to participate in the survey, it is possible to under-represent certain user groups, particularly for activities that are quite limited in where or when they occur.

Note that the results of the NVUM activity analysis DO NOT identify the types of activities visitors would like to have offered on the national forests. It also does not tell us about displaced forest visitors, those who no longer visit the forest because the activities they desire are not offered.

Some forest visitors were counted and included in the total forest use estimate but were not surveyed. This included visitors to recreation special events and organization camps. Their characteristics are not included in the visit descriptions.

Caution should be used in interpreting any comparisons of these results with those obtained during the 2000 - 2003 period. Differences cannot be interpreted as a trend. Several method changes account for the differences, for both visitation estimates and visit characteristics. One key factor is that the first application of the NVUM process was largely a national beta-test of the method, and significant improvements occurred following it. The NVUM process entailed a completely new method and approach to measuring visitation on National Forest lands. Simply going through the NVUM process for the first time enabled forest staff to do a much better job thereafter in identifying sites, accurately classifying days into use level strata, and ensuring consistency across all locations on the forest. These improvements enhanced the validity of all aspects of the NVUM results. Sampling plans and quality control procedures were also improved.

# 2. VISITATION ESTIMATES

## 2.1. Forest Definition of Site Days

The population of site days for sampling was constructed from information provided by forest staff. For each site, each day of the year was given a rating of very high, high, medium, low, or none according to the expected volume of recreation visitors who would be leaving the site or area for the last time (last exiting recreation use). The stratum, a combination of site type and use level, was then used to construct the sampling frame. The results of the recreation site/area stratification and days sampled are displayed in Table 1.

# Table 1. Site Days and Percentage of Days Sampled by Stratum

| Stratum* | | Days Sampled | Site Days# in Use Level/Proxy Population | Sampling Rate (%)& |
|---|---|---|---|---|
| Site Type† | Use Level‡ or Proxv Code§ | | | |
| DUDS | VERY HIGH | 8 | 177 | 4.5 |
| DUDS | HIGH | 11 | 873 | 1.3 |
| DUDS | MEDIUM | 11 | 972 | 1.1 |
| DUDS | LOW | 11 | 2,569 | 0.4 |
| DUDS | DUR4 | 5 | 129 | 3.9 |
| DUDS | FE3 | 5 | 681 | 0.7 |
| DUDS | FR1 | 5 | 214 | 2.3 |
| DUDS | SV1 | 5 | 283 | 1.8 |
| OUDS | HIGH | 7 | 108 | 6.5 |
| OUDS | MEDIUM | 8 | 324 | 2.5 |
| OUDS | LOW | 8 | 479 | 1.7 |
| OUDS | DUR4 | 9 | 3,221 | 0.3 |
| OUDS | FE3 | 10 | 2,439 | 0.4 |
| OUDS | FR5 | 5 | 272 | 1.8 |
| GFA | VERY HIGH | 8 | 56 | 14.3 |
| GFA | HIGH | 10 | 384 | 2.6 |
| GFA | MEDIUM | 18 | 2,850 | 0.6 |
| GFA | LOW | 34 | 14,144 | 0.2 |
| WILDERNESS | VERY HIGH | 8 | 50 | 16.0 |
| WILDERNESS | HIGH | 8 | 395 | 2.0 |
| WILDERNESS | MEDIUM | 10 | 1,221 | 0.8 |
| WILDERNESS | LOW | 12 | 3,383 | 0.4 |
| Total | | **216** | **35,224** | **0.6** |

* Stratum is the combination of the site type and use level or proxy code. Sample days were independently drawn within each stratum.

† DUDS = Day Use Developed Site, OUDS = Overnight Use Developed Site, GFA = General Forest Area (“Undeveloped Areas”), WILDERNESS = Designated Wilderness

‡ Use level was defined independently by each forest by defining the expected number of recreation visitors that would be last-exiting a site or area on a given day. The forest developed the range for very high, high, medium, and low and then assigned each day of the year to one of the use levels.

§ Proxy Code - If the site or area already had counts of use (such as fee envelopes or ski lift tickets) the site was called a proxy site and sampled independent of nonproxy sites.

# Site Days are days that a recreation site or area is open to the public for recreation purposes.

& 0.0 - This value is less than five one-hundredths.

## 2.2. Visitation Estimates

Visitation estimates are available at the national, regional, and forest level. This document provides only National Forest level data. Other documents may be obtained through the National Visitor Use Monitoring web page: www.fs.fed.us/recreation/programs/nvum.

When reviewing the results, users should discuss with forest staff if this forest experienced any unusual circumstances such as forest fires, floods, or atypical weather that may have created an unusual recreation use pattern for the year sampled. Table 2 displays the number of national forest visits and site visits by site type for this National Forest.

## Table 2. Annual Visitation Estimate

| Visit Type | Visits (1,000s) | 90% Confidence Level (%)# |
|---|---|---|
| Total Estimated Site Visits* | 1,743 | ±17.9 |
| → Day Use Developed Site Visits | 871 | ±18.6 |
| → Overnight Use Developed Site Visits | 223 | ±52.2 |
| → General Forest Area Visits | 549 | ±43.3 |
| → Designated Wilderness Visits† | 100 | ±41.4 |
| Total Estimated National Forest Visits§ | 1,315 | ±17.4 |
| → Special Events and Organized Camp Use‡ | 0 | ±0.0 |

* A Site Visit is the entry of one person onto a National Forest site or area to participate in recreation activities for an unspecified period of time.

† Designated Wilderness visits are included in the Site Visits estimate.

‡ Special events and organizational camp use are not included in the Site Visit estimate, only in the National Forest Visits estimate. Forests reported the total number of participants and observers so this number is not estimated; it is treated as 100% accurate.

§ A National Forest Visit is defined as the entry of one person upon a national forest to participate in recreation activities for an unspecified period of time. A National Forest Visit can be composed of multiple Site Visits.

# This value defines the upper and lower bounds of the visitation estimate at the 90% confidence level, for example if the visitation estimate is 100 +/-5%, one would say “at the 90% confidence level visitation is between 95 and 105 visits.”



FS-003722

The quality of the use estimate is based in part on how many individuals were contacted during the sample day and how many complete interviews were obtained from which to estimate NVUM numbers and visitor descriptions. Table 3 and Table 4 display the number of visitor contacts, number of completed interviews by site type and survey form type. This information may be useful to managers when assessing how representative of all visitors the information in this report may be.

## Table 3. Number of Individuals Contacted by Site Type

| Site Type | Total Individuals Contacted | Individuals Who Agreed to be Interviewed | Recreating Individuals Who Are Leaving for the Last Time That Day |
|---|---|---|---|
| Day Use Developed Sites | 818 | 725 | 467 |
| Overnight Use Developed Sites | 336 | 314 | 134 |
| Undeveloped Areas (GFAs) | 554 | 469 | 276 |
| Designated Wilderness | 174 | 156 | 117 |
| Total | **1,882** | **1,664** | **994** |

## Table 4. Number of Complete Interviews* by Site Type and Form Type

| Form Type† | Developed Day Use Site | Developed Overnight | Undeveloped Areas (GFAs) | Wilderness | Total |
|---|---|---|---|---|---|
| Basic | 177 | 47 | 96 | 37 | 357 |
| Economic | 148 | 48 | 87 | 36 | 319 |
| Satisfaction | 142 | 39 | 93 | 44 | 318 |
| Total | **467** | **134** | **276** | **117** | **994** |

* Complete interviews are those in which the individual contacted agreed to be interviewed, was recreating on the national forest and was exiting the site or area for the last time that day.

† Form Type is the type of interview form administered to the visitor. The Basic form did not ask either economic or satisfaction questions. The Satisfaction form did not ask economic questions and the Economic form did not ask satisfaction questions.

Visitors were interviewed regardless of whether they were recreating at the site or not, however the interview was discontinued after determining that the reason for visiting the site was not recreation. Figure 1 displays the various reasons visitors gave as their purpose for stopping at the sample site.

## Figure 1. Purpose of Visit by Visitors Who Agreed to be Interviewed



# 3. DESCRIPTION OF THE RECREATION VISIT

## 3.1. Demographics

Descriptions of forest recreational visits were developed based upon the characteristics of interviewed visitors (respondents) and expanded to the national forest visitor population. Basic demographic information helps forest managers identify the profile of the visitors they serve. Management concerns such as providing recreation opportunities for underserved populations may be monitored with this information. Table 5, Table 6 and Table 7 provide basic demographic information about visitors interviewed regarding Gender, Race/Ethnicity, and Age, respectively. Table 8 shows the 15 most common reported origins for recreation visitors. A complete list of reported zip codes for respondents is found in Appendix A. Table 9 provides information about self reported travel distance from home to the interview site.

Demographic results show that about 44% of visits to the San Juan NF are made by females. Among racial and ethnic minorities, the most commonly encountered are Hispanic/Latinos (10%). The age distribution shows that about 12% of visits are children under age 16. People over the age of 60 account for about 24% of visits. Over 45 percent of visits are from those living in the local area within 50 miles of the forest. About 40% of visits come from those living more than 200 miles away.

## Table 5. Percent of National Forest Visits* by Gender

| Gender | Survey Respondents† | National Forest Visits (%)‡ |
|---|---|---|
| Female | 988 | 44.2 |
| Male | 1,118 | 55.8 |
| Total | **2,106** | **100.0** |




* A National Forest Visit is defined as the entry of one person upon a national forest to participate in recreation activities for an unspecified period of time. A National Forest Visit can be composed of multiple Site Visits.

† Non-respondents to gender questions were excluded from analysis.

‡ Calculations are computed using weights that expand the sample of individuals to the population of National Forest Visits.

## Table 6. Percent of National Forest Visits* by Race/Ethnicity

| Race † | Survey Respondents‡ | National Forest Visits (%)§# |
|---|---|---|
| American Indian / Alaska Native | 44 | 4.2 |
| Asian | 17 | 2.2 |
| Black / African American | 5 | 0.5 |
| Hawaiian / Pacific Islander | 12 | 2.1 |
| White | 894 | 94.2 |
| Total | 972 | 103.2 |

| Ethnicity† | Survey Respondents‡ | National Forest Visits (%)§ |
|---|---|---|
| Hispanic / Latino | 100 | 10.0 |




* A National Forest Visit is defined as the entry of one person upon a national forest to participate in recreation activities for an unspecified period of time. A National Forest Visit can be composed of multiple Site Visits.

# Respondents could choose more than one racial group, so the total may be more than 100%.

† Race and Ethnicity were asked as two separate questions.

‡ Non-respondents to race/ethnicity questions were excluded from analysis.

§ Calculations are computed using weights that expand the sample of individuals to the population of National Forest Visits.



FS-003727

# Table 7. Percent of National Forest Visits* by Age

| Age Class | National Forest Visits (%)‡ |
|---|---|
| Under 16 | 12.0 |
| 16-19 | 2.3 |
| 20-29 | 10.8 |
| 30-39 | 18.8 |
| 40-49 | 14.9 |
| 50-59 | 17.0 |
| 60-69 | 18.5 |
| 70+ | 5.6 |
| **Total** | **99.9** |




* A National Forest Visit is defined as the entry of one person upon a national forest to participate in recreation activities for an unspecified period of time. A National Forest Visit can be composed of multiple Site Visits.

† Non-respondents to age questions were excluded from analysis.

‡ Calculations are computed using weights that expand the sample of individuals to the population of National Forest Visits.



FS-003728

## Table 8. Top 15 Most Commonly Reported ZIP Codes, States and Counties of National Forest Survey Respondents

| ZIP Code | State | County | Percent of Respondents | Survey Respondents (n) |
|---|---|---|---|---|
| 81301 | Colorado | La Plata County | 47.5 | 217 |
| 81147 | Colorado | Archuleta County | 12.5 | 57 |
| 81122 | Colorado | La Plata County | 8.5 | 39 |
| Unknown Origin* | | | 6.3 | 29 |
| 87401 | New Mexico | San Juan County | 4.4 | 20 |
| 81303 | Colorado | La Plata County | 4.2 | 19 |
| 81321 | Colorado | Montezuma County | 2.6 | 12 |
| 87410 | New Mexico | San Juan County | 2.2 | 10 |
| 81328 | Colorado | Montezuma County | 2.2 | 10 |
| Foreign Country | | | 2.0 | 9 |
| 87402 | New Mexico | San Juan County | 1.8 | 8 |
| 81137 | Colorado | La Plata County | 1.8 | 8 |
| 81326 | Colorado | La Plata County | 1.5 | 7 |
| 87111 | New Mexico | Bernalillo County | 1.3 | 6 |
| 86001 | Arizona | Coconino County | 1.3 | 6 |

* Includes respondents reporting no ZIP code or an invalid ZIP code.

## Table 9. Percent of National Forest Visits* by Distance Traveled

| Miles from Survey Respondent's Home to Interview Location† | National Forest Visits (%) |
|---|---|
| 0 - 25 miles | 30.3 |
| 26 - 50 miles | 15.8 |
| 51 - 75 miles | 5.9 |
| 76 - 100 miles | 2.2 |
| 101 - 200 miles | 4.6 |
| 201 - 500 miles | 14.1 |
| Over 500 miles | 27.0 |
| Total | 99.9 |

Note: Blank cells indicate that insufficient data were collected to make inferences.

* National Forest Visits are defined as the entry of one person upon a national forest to participate in recreation activities for an unspecified period of time. A National Forest Visit can be composed of multiple Site Visits.

† Travel distance is self-reported.

## 3.2. Visit Descriptions

Characteristics of the recreation visit such as length of visit, types of sites visited, activity participation and visitor satisfaction with forest facilities and services help managers understand recreation use patterns and use of facilities. This allows them to plan workforce and facility needs. The average national forest visit length of stay and average site visit length of stay by site type on this forest is displayed in Table 10. Since the average values displayed in Table 10 may be influenced by a few people staying a very long time, the median value is also shown.

Over 70 percent of visits last at most 6 hours, although the average duration is about 15 hours because of longer stays of those using overnight use sites and Wilderness areas. The median length of visits to overnight sites is about 20 hours. Over 60 percent of visits come from people who visit at most 10 times per year. Very frequent visitors are fairly common: about 16 percent of visits are made by people who visit more than 50 times per year.

### Table 10. Visit Duration

| Visit Type | Average Duration (hours)‡ | Median Duration (hours)‡ |
|---|---|---|
| Site Visit | 8.0 | 3.0 |
| Day Use Developed | 2.8 | 2.7 |
| Overnight Use Developed | 20.2 | 3.1 |
| Undeveloped Areas | 8.1 | 3.0 |
| Designated Wilderness | 20.8 | 4.4 |
| National Forest Visit | 15.6 | 3.8 |

* A Site Visit is the entry of one person onto a national forest site or area to participate in recreation activities for an unspecified period of time. Sites and areas were divided into four site types as listed here.

† A National Forest Visit is defined as the entry of one person upon a national forest to participate in recreation activities for an unspecified period of time. A National Forest Visit can be composed of multiple Site Visits.

‡ If this variable is blank not enough surveys were collected to make inferences.

Many of the respondents on this National Forest went only to the site at which they were interviewed (Table 11). Some visitors went to more than one recreation site or area during their national forest visit and the average site visits per national forest visit is shown below. Also displayed are the average people per vehicle and average axles per vehicle. This information in conjunction with traffic counts was used to expand observations from individual interviews to the full forest population of recreation visitors. This information may be useful to forest engineers and others who use vehicle counters to conduct traffic studies.

During the interview, visitors were asked how often they visit this national forest for all recreational activities, and how often for their primary activity. Table 12 summarizes the percent of visits that are made by those in each frequency category for this National Forest.

## Table 11. Group Characteristics

| Characteristic | Average |
|---|---|
| Percent of visits that were to just one national forest site during the National Forest Visit* | 91.2 |
| Number of national forest sites visited on National Forest Visit* | 1.1 |
| Group size | 2.3 |
| Axles per vehicle | 2.1 |



FS-003731

# Table 12. Percent of National Forest Visits* by Annual Visit Frequency

| Number of Annual Visits | Visits (%)† | Cumulative Visits (%) |
|---|---|---|
| 1 - 5 | 52.7 | 52.7 |
| 6 - 10 | 8.6 | 61.3 |
| 11 - 15 | 7.5 | 68.8 |
| 16 - 20 | 3.6 | 72.3 |
| 21 - 25 | 2.6 | 74.9 |
| 26 - 30 | 2.8 | 77.7 |
| 31 - 35 | 0.3 | 78.0 |
| 36 - 40 | 1.4 | 79.4 |
| 41 - 50 | 4.6 | 84.0 |
| 51 - 100 | 9.0 | 93.1 |
| 101 - 200 | 6.3 | 99.4 |
| 201 - 300 | 0.5 | 99.9 |
| Over 300 | 0.1 | 100.0 |




* A National Forest Visit is defined as the entry of one person upon a national forest to participate in recreation activities for an unspecified period of time. A National Forest Visit can be composed of multiple Site Visits.

† The first row indicates the percent of National Forest Visits made by persons who visit 1 to 5 times per year. The last row indicates the percent of National Forest Visits made by persons who visit more than 300 times per year.



FS-003732

## 3.3. Activities

After identifying their main recreational activity, visitors were asked how many hours they spent participating in that main activity during this national forest visit. Some caution is needed when using this information. Because most national forest visitors participate in several recreation activities during each visit, it is more than likely that other visitors also participated in this activity, but did not identify it as their main activity. For example, on one national forest 63 % of visitors identified viewing wildlife as a recreational activity that they participated in during this visit, however only 3% identified that activity as their main recreational activity. The information on average hours viewing wildlife is only for the 3% who reported it as a main activity.

The most frequently reported primary activities are hiking/walking (22%), downhill skiing (21%), and viewing natural features (15%).

## Use of Constructed Facilities and Designated Areas

About one-third of recreation visitors interviewed were asked about whether they made use of a targeted set of facilities and special designated areas during their visit. These results are displayed in Table 14.

# Table 13. Activity Participation

| Activity | % Participation* | % Main Activity‡ | Avg Hours Doing Main Activity |
|---|---|---|---|
| Viewing Natural Features | 34.1 | 14.9 | 3.5 |
| Hiking / Walking | 32.0 | 22.1 | 4.6 |
| Viewing Wildlife | 22.1 | 1.8 | 10.0 |
| Downhill Skiing | 20.9 | 20.6 | 4.1 |
| Driving for Pleasure | 17.5 | 5.3 | 3.8 |
| Relaxing | 12.5 | 4.0 | 18.5 |
| Fishing | 7.4 | 4.4 | 4.7 |
| Developed Camping | 7.2 | 5.2 | 44.1 |
| Picnicking | 7.0 | 3.8 | 2.5 |
| Bicycling | 5.8 | 4.9 | 3.2 |
| Visiting Historic Sites | 4.6 | 0.9 | 17.1 |
| Some Other Activity | 4.4 | 2.7 | 4.0 |
| Motorized Trail Activity | 3.5 | 1.3 | 6.0 |
| Hunting | 2.9 | 1.5 | 16.1 |
| Nature Study | 2.7 | 0.4 | 7.9 |
| Gathering Forest Products | 2.2 | 1.2 | 2.3 |
| OHV Use | 2.2 | 0.8 | 2.1 |
| Motorized Water Activities | 2.1 | 0.7 | 3.1 |
| Nature Center Activities | 1.8 | 0.2 | 5.9 |
| Primitive Camping | 1.6 | 0.3 | 55.8 |
| Non-motorized Water | 1.6 | 1.0 | 2.3 |
| Other Non-motorized | 1.4 | 0.5 | 2.0 |
| Horseback Riding | 1.3 | 0.7 | 7.5 |
| Cross-country Skiing | 1.3 | 0.6 | 9.5 |
| Backpacking | 1.1 | 0.4 | 37.8 |
| Resort Use | 1.0 | 0.0 | 0.0 |
| Snowmobiling | 0.6 | 0.5 | 2.5 |
| No Activity Reported | 0.0 | 0.6 | |
| Other Motorized Activity | 0.0 | 0.0 | 0.0 |






FS-003734

* Survey respondents could select multiple activities so this column may total more than 100%.

‡ Survey respondents were asked to select just one of their activities as their main reason for the forest visit. Some respondents selected more than one, so this column may total more than 100%.

## Special Facility Use

## Table 14. Percent of National Forest Visits* Indicating Use of Special Facilities or Areas

| Special Facility or Area | % of National Forest Visits† |
|---|---|
| Developed Swimming Site | 2.1 |
| Scenic Byway | 37.4 |
| Visitor Center or Museum | 3.0 |
| Designated ORV Area | 4.4 |
| Forest Roads | 4.9 |
| Interpretive Displays | 9.8 |
| Information Sites | 1.0 |
| Developed Fishing Site | 3.8 |
| Motorized Single Track Trails | 2.4 |
| Motorized Dual Track Trails | 5.4 |
| None of these Facilities | 46.7 |

* A National Forest Visit is defined as the entry of one person upon a national forest to participate in recreation activities for an unspecified period of time. A National Forest Visit can be composed of multiple Site Visits.

† Survey respondents could select as many or as few special facilities or areas as appropriate.



FS-003735

# 4. ECONOMIC INFORMATION

Forest managers are usually very interested in the impact of National Forest recreation visits on the local economy. As commodity production of timber and other resources has declined, local communities look increasingly to tourism to support their communities. When considering recreation-related visitor spending managers are often interested both in identifying the average spending of individual visitors (or types of visitors) and the total spending associated with all recreation use. Spending averages for visitors or visitor parties can be estimated using data collected from a statistically valid visitor sampling program such as NVUM. To estimate the total spending associated with recreation use, three pieces of information are needed: an overall visitation estimate, the proportion of visits in the visitor types, and the average spending profiles for each of the visitor types. Multiplying the three gives a total amount of spending by a particular type of visitor. Summing over all visitor types gives total spending.

About one-third of the NVUM surveys included questions about trip-related spending within 50 miles of the site visited. Analysis of spending data included identification of the primary visitor segments that have distinct spending profiles as well as estimation of the average spending per party per visit. Results from the FY2005 through FY2009 period are available in a report: https://www.treesearch.fs.fed.us/pubs/43869. Results from the FY2010 through FY2014 period are in the publication process.

## 4.1. Spending Segments

The spending that occurs on a recreation trip is greatly influenced by the type of recreation trip taken. For example, visitors on overnight trips away from home typically have to pay for some form of lodging (e.g., hotel/motel rooms, fees in a developed campground, etc.) while those on day trips do not. In addition, visitors on overnight trips will generally have to purchase more food during their trip (in restaurants or grocery stores) than visitors on day trips. Visitors who have not traveled far from home to the recreation location usually spend less than visitors traveling longer distances, especially on items such as fuel and food. Analysis of spending patterns has shown that a good way to construct segments of the visitor market with consistent spending patterns is the following seven groupings:

1. local visitors on day trips,
2. local visitors on overnight trips staying in lodging on the national forest,
3. local visitors on overnight trips staying in lodging off the national forest, and
4. non-local visitors on day trips,
5. non-local visitors on overnight trips staying in lodging on the national forest,
6. non-local visitors on overnight trips staying in lodging off the forest,
7. non-primary visitors.

Local visitors are those who travel less than 50 road miles from home to the recreation site visited and non-local visitors are those who travel greater than 50 road miles to the recreation site visited. Non-primary visitors are those for whom the primary purpose of their trip is something other than recreating on that national forest. The distribution of visits by spending segment is not displayed in this report. See the appendix tables in the spending analysis report cited above for spending segment distributions.

For more than 45% of visits, the trip to the forest is a day trip from home rather than a trip that includes an overnight stay. For nearly a quarter of visits, the San Juan was not the primary destination for the trip from home; rather, it was a side trip. The income distribution results show a concentration in the middle and upper range, more than one-third are from households making more than $100,000.

## Table 15 is no longer displayed here

## 4.2. Spending Profiles

Spending profiles for each segment are contained in the spending analysis report, as are tables that identify whether visitors to a particular forest are in a higher or lower than average range. It is essential to note that the spending profiles are in dollars per party per visit. Obtaining per visit spending is accomplished by dividing the spending for each segment bythe average people per party for the forest and spending segment. These data are in the appendix of the report.

## 4.3. Total Direct Spending

Total direct spending made within 50 miles of the forest and associated with national forest recreation is calculated by combining estimates of per party spending averages with the number of party trips in the segment. The number of party-trips in the segment equals the number of National Forest visits reported in table 2, times the percentage of visits in each spending segment, and divided by the average people per party.

## 4.4. Other Visit Information

There are several other important aspects of the trips on which the recreation visits to the forest are made. These are summarized in Table 16. The first aspect relates to total amount spent by the recreating party on the trip. This includes spending not just within 50 miles of the forest, but anywhere. The table shows both the average and the median. Another set describes the overall length of the trips on which the visits are made. The table shows the percent of the visits that were made on trips where the person stayed away from home overnight (even though the forest visit may be just a day visit), and the average total nights away from home and nights spent within 50 miles of the forest. For those spending one or more nights in or near the forest, the table shows the percentage that selected each of a series of lodging options. Together, these results help show the context of overall trip length and lodging patterns for visitors to the forest.

# Table 16. Trip Spending and Lodging Usage

| Trip Spending | Value |
|---|---|
| Average Total Trip Spending per Party | $685 |
| Median Total Trip Spending per Party | $43 |
| % NF Visits made on trip with overnight stay away from home | 42.4% |
| % NF Visits with overnight stay within 50 miles of NF | 39.7% |
| Mean nights/visit within 50 miles of NF | 7.3 |
| **Area Lodging Use** | **% Visits with Nights Near Forest** |
| NFS Campground on this NF | 16.9% |
| Undeveloped Camping in this NF | 8.7% |
| NFS Cabin | 3.9% |
| Other Public Campground | 2.9% |
| Private Campground | 5.2% |
| Rented Private Home | 38.3% |
| Home of Friends/Family | 21.6% |
| Own Home | 7.1% |
| Other Lodging | 0.2% |





FS-003739

## 4.5. Household Income

Visitors were asked to report a general category for their total household income. Only very general categories were used, to minimize the intrusive nature of the question. Results help indicate the overall socio-economic status of visitors to the forest, and are found in Table 17.

Table 17. Percent of National Forest Visits* by Annual Household Income

| Annual Household Income Category | National Forest Visits (%) |
|---|---|
| Under $25,000 | 9.6 |
| $25,000 to $49,999 | 17.1 |
| $50,000 to $74,999 | 20.0 |
| $75,000 to $99,999 | 17.0 |
| $100,000 to $149,999 | 21.7 |
| $150,000 and up | 14.6 |
| Total | 100.0 |

* National Forest Visits are defined as the entry of one person upon a national forest to participate in recreation activities for an unspecified period of time. A National Forest Visit can be composed of multiple Site Visits.

## 4.6. Substitute Behavior

Visitors were asked to select one of several substitute choices, if for some reason they were unable to visit this national forest (Figure 3). Choices included going somewhere else for the same activity they did on the current trip, coming back to this forest for the same activity at some later time, going someplace else for a different activity, staying at home and not making a recreation trip, going to work instead of recreating, and a residual 'other' category. On most forests, the majority of visitors indicate that their substitute behavior choice is activity driven (going elsewhere for same activity) and a smaller percentage indicate they would come back later to this national forest for the same activity. For those visitors who said they would have gone somewhere else for recreation they were asked how far from their home this alternate destination was. These results are shown in Figure 4.



FS-003740

## Figure 3. Substitute Behavior Choices




## Figure 4. Reported Distance Visitors Would Travel to Alternate Location



# 5. SATISFACTION INFORMATION

An important element of outdoor recreation program delivery is evaluating customer satisfaction with the recreation setting, facilities, and services provided. Satisfaction information helps managers decide where to invest in resources and to allocate resources more efficiently toward improving customer satisfaction. Satisfaction is a core piece of data for national- and forest-level performance measures. To describe customer satisfaction, several different measures are used. Recreation visitors were asked to provide an overall rating of their visit to the national forest, on a 5-point Likert scale. About one-third of visitors interviewed on the forest rated their satisfaction with fourteen elements related to recreation facilities and services, and the importance of those elements to their recreation experience. Visitors were asked to rate the specific site or area at which they were interviewed. Visitors rated both the importance and performance (satisfaction with) of these elements using a 5-point scale. The Likert scale for importance ranged from not important to very important. The Likert scale for performance ranged from very dissatisfied to very satisfied. Although the satisfaction ratings specifically referenced the area where the visitor was interviewed, the survey design does not usually have enough responses for any individual site or area on the forest to present information at a site level. Rather, the information is generalized to overall satisfaction within the three site types: Day Use Developed (DUDS), Overnight Use Developed (OUDS), General Forest Areas, and on the forest as a whole.

The satisfaction responses are analyzed in several ways. First, a graph of overall satisfaction is presented in Figure 5. Next, two aggregate measures were calculated from the set of individual elements. The satisfaction elements most readily controlled by managers were aggregated into four categories: developed facilities, access, services, and visitor safety. The site types sampled were aggregated into three groups: developed sites (includes both day use and overnight developed sites), dispersed areas, and designated Wilderness. The first aggregate measure is called “Percent Satisfied Index (PSI)”, which is the proportion of all ratings for the elements in the category where the satisfaction ratings had a numerical rating of 4 or 5. Conceptually, the PSI indicator shows the percent of all recreation customers who are satisfied with agency performance. The agency’s national target for this measure is 85%. It is usually difficult to consistently have a higher satisfaction score than 85% since given tradeoffs among user groups and other factors. Table 18 displays the aggregate PSI scores for this forest.

Another aggregate measure of satisfaction is called “Percent Meet Expectations (PME)”. This is the proportion of satisfaction ratings in which the numerical satisfaction rating for a particular element is equal to or greater than the importance rating for that element. This indicator tracks the congruence between the agency’s performance and customer evaluations of importance. The idea behind this measure is that those elements with higher importance levels must have higher performance levels. Figure 6 displays the PME scores by type of site. Lower scores indicate a gap between desires and performance.

An Importance-Performance Analysis (IPA) (Hudson, et al, Feb 2004) was calculated for the importance and satisfaction scores. A target level of importance and performance divides the possible set of score pairs into four quadrants. For this work, the target level of both was a numerical score of 4.0. Each quadrant has a title that helps in interpreting responses that fall into it, and that provides some general guidance for management. These can be described as:

1. Importance at or above 4.0, Satisfaction at or above 4.0: **Keep up the good work**. These are items that are important to visitors and ones that the forest is performing quite well;
2. Importance at or above 4.0, Satisfaction under 4.0: **Concentrate here**. These are important items to the public, but performance is not where it needs to be. Increasing effort here is likely to have the greatest payoff in overall customer satisfaction;
3. Importance below 4.0, Satisfaction above 4.0: **Possible overkill**. These are items that are not highly important to visitors, but the forest's performance is quite good. It may be possible to reduce effort here without greatly harming overall satisfaction;
4. Importance below 4.0; Satisfaction below 4.0: **Low Priority**. These are items where performance is not very good, but neither are they important to visitors. Focusing effort here is unlikely to have a great impact.

We present tables that show the I-P rating title for each satisfaction element. Each sitetype is presented in a separate table. Results are presented in Tables 19 - 22.

The numerical scores for visitor satisfaction and importance for each element by site type, and the sample sizes for each are presented in Appendix B (Tables B1 - B4). Most managers find it difficult to discern meaning from these raw tables; however they may wish to examine specific elements once they have reviewed the other satisfaction information presented in this section. Note that if an element had fewer than 10 responses no analyses are performed, as there are too few responses to provide reliable information. Finally, visitors were asked about their overall satisfaction with and the importance of road condition and the adequacy of signage. Figure 7a and Figure 7b show the results.

The overall satisfaction results are quite good. About 85% of people visiting indicated they were very satisfied with their overall recreation experience. Another 12% were somewhat satisfied. The results for the composite indices were also very good. Satisfaction ratings for perception of safety were over 90% for all types of sites. Ratings for the other composites were generally 80% or higher.

## Figure 5. Percent of National Forest Visits by Overall Satisfaction Rating



| | |
|---|---|
| Very Satisfied | 85.0% |
| Somewhat Satisfied | 11.8% |
| Neither Satisfied nor Dissatisfied | 2.5% |
| Somewhat Dissatisfied | 0.6% |
| Very Dissatisfied | 0.2% |
| Total: | 100.0% |

## Table 18. Percent Satisfied Index† Scores for Aggregate Categories

| Satisfaction Element | Satisfied Survey Respondents (%) | | |
|---|---|---|---|
| | Developed Sites‡ | Undeveloped Areas (GFAs) | Designated Wilderness |
| Developed Facilities | 88.5 | 64.8 | 87.6 |
| Access | 85.2 | 88.1 | 83.6 |
| Services | 85.6 | 87.9 | 81.0 |
| Feeling of Safety | 96.7 | 98.2 | 94.0 |

† This is a composite rating. It is the proportion of satisfaction ratings scored by visitors as good (4) or very good (5). Computed as the percentage of all ratings for the elements within the sub grouping that are at or above the target level, and indicates the percent of all visitors that are reasonably well satisfied with agency performance.

‡ This category includes both Day Use and Overnight Use Developed Sites.

## Figure 6. Percent Meets Expectations Scores*




* “Percent Meet Expectations (PME)” is the proportion of satisfaction ratings in which the numerical satisfaction rating for a particular element is equal to or greater than the importance rating for that element. This indicator tracks the congruence between the agency’s performance and customer evaluations of importance. The idea behind this measure is that those elements with higher importance levels must have higher performance levels. Lower scores indicate a gap between desires and performance.

‡ This category includes both Day Use and Overnight Use Developed Sites.

## Table 19. Importance-Performance Ratings for Day Use Developed Sites

| Satisfaction Element | Importance-Performance Rating |
|---|---|
| Restroom Cleanliness | Keep up the Good Work |
| Developed Facilities | Keep up the Good Work |
| Condition of Environment | Keep up the Good Work |
| Employee Helpfulness | Possible Overkill |
| Interpretive Displays | Keep up the Good Work |
| Parking Availability | Keep up the Good Work |
| Parking Lot Condition | Keep up the Good Work |
| Rec. Info. Availability | Keep up the Good Work |
| Road Condition | Keep up the Good Work |
| Feeling of Satefy | Keep up the Good Work |
| Scenery | Keep up the Good Work |
| Signage Adequacy | Keep up the Good Work |
| Trail Condition | Keep up the Good Work |
| Value for Fee Paid | Possible Overkill |

## Table 20. Importance-Performance Ratings for Overnight Developed Sites

| Satisfaction Element | Importance-Performance Rating |
|---|---|
| Restroom Cleanliness | Keep up the Good Work |
| Developed Facilities | Keep up the Good Work |
| Condition of Environment | Keep up the Good Work |
| Employee Helpfulness | Keep up the Good Work |
| Interpretive Displays | Keep up the Good Work |
| Parking Availability | Keep up the Good Work |
| Parking Lot Condition | Keep up the Good Work |
| Rec. Info. Availability | Keep up the Good Work |
| Road Condition | Keep up the Good Work |
| Feeling of Satefy | Keep up the Good Work |
| Scenery | Keep up the Good Work |
| Signage Adequacy | Keep up the Good Work |
| Trail Condition | Keep up the Good Work |
| Value for Fee Paid | Keep up the Good Work |

## Table 21. Importance-Performance Ratings for Undeveloped Areas (GFAs)

| Satisfaction Element | Importance-Performance Rating |
|---|---|
| Restroom Cleanliness | Possible Overkill |
| Developed Facilities | Possible Overkill |
| Condition of Environment | Keep up the Good Work |
| Employee Helpfulness | * |
| Interpretive Displays | Possible Overkill |
| Parking Availability | Possible Overkill |
| Parking Lot Condition | Possible Overkill |
| Rec. Info. Availability | Keep up the Good Work |
| Road Condition | Keep up the Good Work |
| Feeling of Satefy | Keep up the Good Work |
| Scenery | Keep up the Good Work |
| Signage Adequacy | Keep up the Good Work |
| Trail Condition | Keep up the Good Work |
| Value for Fee Paid | * |

* The data was not reported for items with fewer than 10 responses.

## Table 22. Importance-Performance Ratings for Designated Wilderness

| Satisfaction Element | Importance-Performance Rating |
|---|---|
| Restroom Cleanliness | Keep up the Good Work |
| Developed Facilities | Keep up the Good Work |
| Condition of Environment | Keep up the Good Work |
| Employee Helpfulness | * |
| Interpretive Displays | Possible Overkill |
| Parking Availability | Keep up the Good Work |
| Parking Lot Condition | Keep up the Good Work |
| Rec. Info. Availability | Keep up the Good Work |
| Road Condition | Keep up the Good Work |
| Feeling of Satefy | Keep up the Good Work |
| Scenery | Keep up the Good Work |
| Signage Adequacy | Keep up the Good Work |
| Trail Condition | Keep up the Good Work |
| Value for Fee Paid | * |

* The data was not reported for items with fewer than 10 responses.

## Road Conditions & Signage

### Figure 7a. Satisfaction with Forest-wide Road Conditions & Signage Adequacy




### Figure 7b. Importance of Forest-wide Road Conditions & Signage Adequacy






FS-003747

## 5.1. Crowding

Visitors rated their perception of how crowded the recreation site or area felt to them. This information is useful when looking at the type of site the visitor was using since someone visiting a designated Wilderness may think 5 people is too many while someone visiting a developed campground may think 200 people is about right. Table 23 shows the distribution of responses for each site type. Crowding was reported on a scale of 1 to 10 where 1 denotes hardly anyone was there, and a 10 indicates the area was perceived as overcrowded.

### Table 23. Percent of Site Visits* by Crowding Rating and Site Type

| Crowding Rating† | Site Types (% of Site Visits) | | | |
|---|---|---|---|---|
| | Day Use Developed Sites | Overnight Use Developed Sites | Undeveloped Areas (GFAs) | Designated Wilderness |
| 10 - Overcrowded | 0.5 | 5.9 | 0.7 | 0.0 |
| 9 | 3.7 | 1.1 | 0.7 | 2.3 |
| 8 | 7.9 | 1.8 | 3.5 | 1.2 |
| 7 | 3.3 | 1.9 | 0.8 | 1.9 |
| 6 | 3.3 | 4.0 | 5.1 | 15.9 |
| 5 | 9.9 | 11.9 | 1.3 | 16.9 |
| 4 | 11.2 | 12.2 | 10.4 | 3.1 |
| 3 | 17.1 | 6.5 | 25.4 | 15.7 |
| 2 | 37.9 | 54.1 | 52.1 | 41.9 |
| 1 - Hardly anyone there | 5.4 | 0.5 | 0.1 | 1.2 |
| **Average Rating** | **3.7** | **3.6** | **3.0** | **3.7** |




* A Site Visit is the entry of one person onto a national forest site or area to participate in recreation activities for an unspecified period of time.

† Survey respondents rated how crowded the site or area they were interviewed at was using a scale of 1 to 10 where 1 meant hardly anyone was there and 10 meant the site or area was overcrowded.

## 5.2. Disabilities

Providing barrier-free facilities for recreation visitors is an important part of facility and service planning and development. One question asked if anyone in their group had a disability. If so, the visitor was then asked if the facilities at the sites they visited were accessible for this person ( Table 24).

### Table 24. Accessibility of National Forest Facilities by Persons with Disabilities

| Item | Percent |
|---|---|
| % of visits that include a group member with a disability | 7.3 |
| Of this group, percent who said facilities at site visited were accessible | 99.6 |

# 6. WILDERNESS VISIT DEMOGRAPHICS

Visits to Wilderness are sometimes made by a particular subset of the overall visitor population. In this chapter, tables are presented that describe the demographic characteristics of those who visit designated wilderness on this forest. Table 25 shows the gender breakdown, Table 26 the racial and ethnicity distribution, and the Table 27 age composition. In Table 28, a frequency analysis of Zip Codes obtained from respondents is presented, to give a rough idea of the common origins of Wilderness visitors.

## Table 25. Percent of Wilderness Site Visits* by Gender

| Gender | Survey Respondents† | Wilderness Site Visits (%)‡ |
|---|---|---|
| Female | 114 | 38.1 |
| Male | 151 | 61.9 |
| Total | **265** | **100.0** |




* A Site Visit is the entry of one person onto a National Forest site or area to participate in recreation activities for an unspecified period of time.

† Non-respondents to gender questions were excluded from analysis.

‡ Calculations are computed using weights that expand the sample of individuals to the population of Wilderness Site Visits.



FS-003750

# Table 26. Percent of Wilderness Site Visits* by Race/Ethnicity

| Race † | Survey Respondents‡ | Wilderness Site Visits (%)§# |
|---|---|---|
| American Indian / Alaska Native | 3 | 2.4 |
| Asian | 2 | 2.0 |
| Black / African American | 1 | 0.3 |
| Hawaiian / Pacific Islander | 0 | 0.0 |
| White | 112 | 99.7 |
| Total | 118 | 104.4 |

| Ethnicity† | Survey Respondents‡ | Wilderness Site Visits (%)§ |
|---|---|---|
| Hispanic / Latino | 9 | 7.4 |




* A Site Visit is the entry of one person onto a National Forest site or area to participate in recreation activities for an unspecified period of time.

# Respondents could choose more than one racial group, so the total may be more than 100%.

† Race and Ethnicity were asked as two separate questions.

‡ Non-respondents to race/ethnicity questions were excluded from analysis.

§ Calculations are computed using weights that expand the sample of individuals to the population of Wilderness Site Visits.

# Table 27. Percent of Wilderness Site Visits* by Age

| Age Class | Wilderness Site Visits (%)‡ |
|---|---|
| Under 16 | 10.7 |
| 16-19 | 1.4 |
| 20-29 | 11.8 |
| 30-39 | 16.4 |
| 40-49 | 15.7 |
| 50-59 | 25.2 |
| 60-69 | 13.7 |
| 70+ | 5.0 |
| **Total** | **99.9** |




* A Site Visit is the entry of one person onto a National Forest site or area to participate in recreation activities for an unspecified period of time.

† Non-respondents to age questions were excluded from analysis.

‡ Calculations are computed using weights that expand the sample of individuals to the population of Wilderness Site Visits.

## Table 28. Top 15 Most Commonly Reported ZIP Codes, States and Counties of Wilderness Survey Respondents

| ZIP Code | State | County | Percent of Respondents | Survey Respondents (n) |
|---|---|---|---|---|
| 81301 | Colorado | La Plata County | 34.9 | 22 |
| 81122 | Colorado | La Plata County | 20.6 | 13 |
| 81147 | Colorado | Archuleta County | 7.9 | 5 |
| 87401 | New Mexico | San Juan County | 6.3 | 4 |
| 86001 | Arizona | Coconino County | 4.8 | 3 |
| 81303 | Colorado | La Plata County | 4.8 | 3 |
| Unknown Origin* | | | 3.2 | 2 |
| 76689 | Texas | Bosque County | 3.2 | 2 |
| 76109 | Texas | Tarrant County | 3.2 | 2 |
| 86004 | Arizona | Coconino County | 3.2 | 2 |
| 55441 | Minnesota | Hennepin County | 1.6 | 1 |
| 77025 | Texas | Harris County | 1.6 | 1 |
| 80232 | Colorado | Jefferson County | 1.6 | 1 |
| 85251 | Arizona | Maricopa County | 1.6 | 1 |
| 81137 | Colorado | La Plata County | 1.6 | 1 |

* Includes respondents reporting no ZIP code or an invalid ZIP code.



FS-003753

# 7. APPENDIX TABLES

# APPENDIX A - Complete List of ZIP Codes

## Table A-1. ZIP Codes, States and Counties of National Forest Survey Respondents

| ZIP Code | State | County | Percent of Respondents | Survey Respondents (n) |
|---|---|---|---|---|
| 81301 | Colorado | La Plata County | 21.8 | 217 |
| 81147 | Colorado | Archuleta County | 5.7 | 57 |
| 81122 | Colorado | La Plata County | 3.9 | 39 |
| Unknown Origin* | | | 2.9 | 29 |
| 87401 | New Mexico | San Juan County | 2.0 | 20 |
| 81303 | Colorado | La Plata County | 1.9 | 19 |
| 81321 | Colorado | Montezuma County | 1.2 | 12 |
| 87410 | New Mexico | San Juan County | 1.0 | 10 |
| 81328 | Colorado | Montezuma County | 1.0 | 10 |
| Foreign Country | | | 0.9 | 9 |
| 87402 | New Mexico | San Juan County | 0.8 | 8 |
| 81137 | Colorado | La Plata County | 0.8 | 8 |
| 81326 | Colorado | La Plata County | 0.7 | 7 |
| 87111 | New Mexico | Bernalillo County | 0.6 | 6 |
| 86001 | Arizona | Coconino County | 0.6 | 6 |
| 81302 | Colorado | La Plata County | 0.5 | 5 |
| 81323 | Colorado | Montezuma County | 0.5 | 5 |
| 86004 | Arizona | Coconino County | 0.5 | 5 |
| 87415 | New Mexico | San Juan County | 0.4 | 4 |
| 87124 | New Mexico | Sandoval County | 0.4 | 4 |
| 80210 | Colorado | Denver County | 0.4 | 4 |
| 81121 | Colorado | Archuleta County | 0.4 | 4 |
| 81433 | Colorado | San Juan County | 0.4 | 4 |
| 81401 | Colorado | Montrose County | 0.4 | 4 |
| 80403 | Colorado | Jefferson County | 0.3 | 3 |
| 87507 | New Mexico | Santa Fe County | 0.3 | 3 |
| 76689 | Texas | Bosque County | 0.3 | 3 |
| 87417 | New Mexico | San Juan County | 0.3 | 3 |
| 80026 | Colorado | Boulder County | 0.3 | 3 |
| 87413 | New Mexico | San Juan County | 0.3 | 3 |
| 80501 | Colorado | Boulder County | 0.3 | 3 |
| 80205 | Colorado | Denver County | 0.3 | 3 |
| 87114 | New Mexico | Bernalillo County | 0.3 | 3 |
| 81501 | Colorado | Mesa County | 0.3 | 3 |
| 80504 | Colorado | Weld County | 0.3 | 3 |
| 76109 | Texas | Tarrant County | 0.3 | 3 |
| 87508 | New Mexico | Santa Fe County | 0.3 | 3 |
| 87301 | New Mexico | McKinley County | 0.3 | 3 |
| 80215 | Colorado | Jefferson County | 0.3 | 3 |
| 87015 | New Mexico | Santa Fe County | 0.2 | 2 |

| | | | | |
|---|---|---|---|---|
| 70605 | Louisiana | Calcasieu Parish | 0.2 | 2 |
| 87008 | New Mexico | Bernalillo County | 0.2 | 2 |
| 80401 | Colorado | Jefferson County | 0.2 | 2 |
| 87068 | New Mexico | Bernalillo County | 0.2 | 2 |
| 63139 | Missouri | St. Louis city | 0.2 | 2 |
| 80911 | Colorado | El Paso County | 0.2 | 2 |
| 80909 | Colorado | El Paso County | 0.2 | 2 |
| 85251 | Arizona | Maricopa County | 0.2 | 2 |
| 80908 | Colorado | El Paso County | 0.2 | 2 |
| 87416 | New Mexico | San Juan County | 0.2 | 2 |
| 85286 | Arizona | Maricopa County | 0.2 | 2 |
| 77381 | Texas | Montgomery County | 0.2 | 2 |
| 87105 | New Mexico | Bernalillo County | 0.2 | 2 |
| 80113 | Colorado | Arapahoe County | 0.2 | 2 |
| 85254 | Arizona | Maricopa County | 0.2 | 2 |
| 86409 | Arizona | Mohave County | 0.2 | 2 |
| 08540 | New Jersey | Mercer County | 0.2 | 2 |
| 77354 | Texas | Montgomery County | 0.2 | 2 |
| 85213 | Arizona | Maricopa County | 0.2 | 2 |
| 77059 | Texas | Harris County | 0.2 | 2 |
| 19363 | Pennsylvania | Chester County | 0.2 | 2 |
| 20818 | Maryland | Montgomery County | 0.2 | 2 |
| 81435 | Colorado | San Miguel County | 0.2 | 2 |
| 80012 | Colorado | Arapahoe County | 0.2 | 2 |
| 80439 | Colorado | Jefferson County | 0.2 | 2 |
| 87109 | New Mexico | Bernalillo County | 0.2 | 2 |
| 80301 | Colorado | Boulder County | 0.2 | 2 |
| 95123 | California | Santa Clara County | 0.2 | 2 |
| 84081 | Utah | Salt Lake County | 0.2 | 2 |
| 79109 | Texas | Randall County | 0.2 | 2 |
| 81403 | Colorado | Montrose County | 0.2 | 2 |
| 77007 | Texas | Harris County | 0.2 | 2 |
| 87106 | New Mexico | Bernalillo County | 0.2 | 2 |
| 81430 | Colorado | San Miguel County | 0.2 | 2 |
| 75074 | Texas | Collin County | 0.2 | 2 |
| 81154 | Colorado | Rio Grande County | 0.2 | 2 |
| 80023 | Colorado | Arapahoe County | 0.2 | 2 |
| 87544 | New Mexico | Los Alamos County | 0.2 | 2 |
| 78749 | Texas | Travis County | 0.2 | 2 |
| 78739 | Texas | Travis County | 0.1 | 1 |
| 46236 | Indiana | Marion County | 0.1 | 1 |
| 79413 | Texas | Lubbock County | 0.1 | 1 |
| 34957 | Florida | Martin County | 0.1 | 1 |
| 55441 | Minnesota | Hennepin County | 0.1 | 1 |
| 77025 | Texas | Harris County | 0.1 | 1 |
| 80232 | Colorado | Jefferson County | 0.1 | 1 |
| 81523 | Colorado | Mesa County | 0.1 | 1 |
| 73772 | Oklahoma | Blaine County | 0.1 | 1 |
| 77358 | Texas | Walker County | 0.1 | 1 |
| 80014 | Colorado | Arapahoe County | 0.1 | 1 |
| 67801 | Kansas | Ford County | 0.1 | 1 |

| | | | | |
|---|---|---|---|---|
| 55082 | Minnesota | Washington County | 0.1 | 1 |
| 27012 | North Carolina | Forsyth County | 0.1 | 1 |
| 60031 | Illinois | Lake County | 0.1 | 1 |
| 19382 | Pennsylvania | Chester County | 0.1 | 1 |
| 80303 | Colorado | Boulder County | 0.1 | 1 |
| 60564 | Illinois | Will County | 0.1 | 1 |
| 77433 | Texas | Harris County | 0.1 | 1 |
| 89052 | Nevada | Clark County | 0.1 | 1 |
| 74604 | Oklahoma | Kay County | 0.1 | 1 |
| 74523 | Oklahoma | Pushmataha County | 0.1 | 1 |
| 85308 | Arizona | Maricopa County | 0.1 | 1 |
| 85248 | Arizona | Maricopa County | 0.1 | 1 |
| 11101 | New York | Queens County | 0.1 | 1 |
| 85737 | Arizona | Pima County | 0.1 | 1 |
| 92315 | California | San Bernardino County | 0.1 | 1 |
| 78209 | Texas | Bexar County | 0.1 | 1 |
| 78539 | Texas | Hidalgo County | 0.1 | 1 |
| 39560 | Mississippi | Harrison County | 0.1 | 1 |
| 44627 | Ohio | Wayne County | 0.1 | 1 |
| 74728 | Oklahoma | McCurtain County | 0.1 | 1 |
| 92544 | California | Riverside County | 0.1 | 1 |
| 30030 | Georgia | DeKalb County | 0.1 | 1 |
| 92869 | California | Orange County | 0.1 | 1 |
| 87528 | New Mexico | Rio Arriba County | 0.1 | 1 |
| 19701 | Delaware | New Castle County | 0.1 | 1 |
| 38556 | Tennessee | Fentress County | 0.1 | 1 |
| 76262 | Texas | Denton County | 0.1 | 1 |
| 85249 | Arizona | Maricopa County | 0.1 | 1 |
| 85355 | Arizona | Maricopa County | 0.1 | 1 |
| 33966 | Florida | Lee County | 0.1 | 1 |
| 74066 | Oklahoma | Creek County | 0.1 | 1 |
| 18103 | Pennsylvania | Lehigh County | 0.1 | 1 |
| 85178 | Arizona | Pinal County | 0.1 | 1 |
| 81007 | Colorado | Pueblo County | 0.1 | 1 |
| 68845 | Nebraska | Buffalo County | 0.1 | 1 |
| 81507 | Colorado | Mesa County | 0.1 | 1 |
| 85022 | Arizona | Maricopa County | 0.1 | 1 |
| 90731 | California | Los Angeles County | 0.1 | 1 |
| 81504 | Colorado | Mesa County | 0.1 | 1 |
| 84074 | Utah | Tooele County | 0.1 | 1 |
| 82001 | Wyoming | Laramie County | 0.1 | 1 |
| 80921 | Colorado | El Paso County | 0.1 | 1 |
| 29803 | South Carolina | Aiken County | 0.1 | 1 |
| 80477 | Colorado | Routt County | 0.1 | 1 |
| 98203 | Washington | Snohomish County | 0.1 | 1 |
| 84040 | Utah | Davis County | 0.1 | 1 |
| 92651 | California | Orange County | 0.1 | 1 |
| 88417 | New Mexico | Guadalupe County | 0.1 | 1 |
| 81402 | Colorado | Montrose County | 0.1 | 1 |
| 84404 | Utah | Weber County | 0.1 | 1 |
| 78640 | Texas | Hays County | 0.1 | 1 |

| | | | | |
|---|---|---|---|---|
| 64157 | Missouri | Clay County | 0.1 | 1 |
| 81334 | Colorado | Montezuma County | 0.1 | 1 |
| 75248 | Texas | Dallas County | 0.1 | 1 |
| 35226 | Alabama | Jefferson County | 0.1 | 1 |
| 89128 | Nevada | Clark County | 0.1 | 1 |
| 85351 | Arizona | Maricopa County | 0.1 | 1 |
| 91360 | California | Ventura County | 0.1 | 1 |
| 78132 | Texas | Comal County | 0.1 | 1 |
| 81329 | Colorado | La Plata County | 0.1 | 1 |
| 73027 | Oklahoma | Logan County | 0.1 | 1 |
| 76872 | Texas | McCulloch County | 0.1 | 1 |
| 60631 | Illinois | Cook County | 0.1 | 1 |
| 81427 | Colorado | Ouray County | 0.1 | 1 |
| 59404 | Montana | Cascade County | 0.1 | 1 |
| 36027 | Alabama | Barbour County | 0.1 | 1 |
| 81615 | Colorado | Pitkin County | 0.1 | 1 |
| 85301 | Arizona | Maricopa County | 0.1 | 1 |
| 65721 | Missouri | Christian County | 0.1 | 1 |
| 85284 | Arizona | Maricopa County | 0.1 | 1 |
| 78956 | Texas | Fayette County | 0.1 | 1 |
| 85139 | Arizona | Pinal County | 0.1 | 1 |
| 80204 | Colorado | Denver County | 0.1 | 1 |
| 80241 | Colorado | Adams County | 0.1 | 1 |
| 80016 | Colorado | Arapahoe County | 0.1 | 1 |
| 98335 | Washington | Pierce County | 0.1 | 1 |
| 46319 | Indiana | Lake County | 0.1 | 1 |
| 87059 | New Mexico | Bernalillo County | 0.1 | 1 |
| 72075 | Arkansas | Jackson County | 0.1 | 1 |
| 84107 | Utah | Salt Lake County | 0.1 | 1 |
| 86336 | Arizona | Yavapai County | 0.1 | 1 |
| 78654 | Texas | Burnet County | 0.1 | 1 |
| 90063 | California | Los Angeles County | 0.1 | 1 |
| 75002 | Texas | Collin County | 0.1 | 1 |
| 72715 | Arkansas | Benton County | 0.1 | 1 |
| 42038 | Kentucky | Lyon County | 0.1 | 1 |
| 77713 | Texas | Jefferson County | 0.1 | 1 |
| 55121 | Minnesota | Dakota County | 0.1 | 1 |
| 11203 | New York | Kings County | 0.1 | 1 |
| 74873 | Oklahoma | Pottawatomie County | 0.1 | 1 |
| 81643 | Colorado | Mesa County | 0.1 | 1 |
| 62218 | Illinois | Clinton County | 0.1 | 1 |
| 75006 | Texas | Dallas County | 0.1 | 1 |
| 85024 | Arizona | Maricopa County | 0.1 | 1 |
| 97601 | Oregon | Klamath County | 0.1 | 1 |
| 81101 | Colorado | Alamosa County | 0.1 | 1 |
| 35601 | Alabama | Morgan County | 0.1 | 1 |
| 92065 | California | San Diego County | 0.1 | 1 |
| 07076 | New Jersey | Union County | 0.1 | 1 |
| 11217 | New York | Kings County | 0.1 | 1 |
| 84041 | Utah | Davis County | 0.1 | 1 |
| 88033 | New Mexico | Dona Ana County | 0.1 | 1 |

| | | | | |
|---|---|---|---|---|
| 86406 | Arizona | Mohave County | 0.1 | 1 |
| 80112 | Colorado | Arapahoe County | 0.1 | 1 |
| 75062 | Texas | Dallas County | 0.1 | 1 |
| 75069 | Texas | Collin County | 0.1 | 1 |
| 85067 | Arizona | Maricopa County | 0.1 | 1 |
| 85207 | Arizona | Maricopa County | 0.1 | 1 |
| 83440 | Idaho | Madison County | 0.1 | 1 |
| 75703 | Texas | Smith County | 0.1 | 1 |
| 84106 | Utah | Salt Lake County | 0.1 | 1 |
| 95969 | California | Butte County | 0.1 | 1 |
| 76308 | Texas | Wichita County | 0.1 | 1 |
| 80126 | Colorado | Douglas County | 0.1 | 1 |
| 10512 | New York | Putnam County | 0.1 | 1 |
| 86327 | Arizona | Yavapai County | 0.1 | 1 |
| 78028 | Texas | Kerr County | 0.1 | 1 |
| 15642 | Pennsylvania | Westmoreland County | 0.1 | 1 |
| 80027 | Colorado | Boulder County | 0.1 | 1 |
| 27529 | North Carolina | Wake County | 0.1 | 1 |
| 80526 | Colorado | Larimer County | 0.1 | 1 |
| 87505 | New Mexico | Santa Fe County | 0.1 | 1 |
| 87041 | New Mexico | Sandoval County | 0.1 | 1 |
| 94153 | California | San Francisco County | 0.1 | 1 |
| 54915 | Wisconsin | Outagamie County | 0.1 | 1 |
| 70722 | Louisiana | East Feliciana Parish | 0.1 | 1 |
| 96734 | Hawaii | Honolulu County | 0.1 | 1 |
| 79765 | Texas | Ector County | 0.1 | 1 |
| 77377 | Texas | Harris County | 0.1 | 1 |
| 21401 | Maryland | Anne Arundel County | 0.1 | 1 |
| 07739 | New Jersey | Monmouth County | 0.1 | 1 |
| 85028 | Arizona | Maricopa County | 0.1 | 1 |
| 36693 | Alabama | Mobile County | 0.1 | 1 |
| 75087 | Texas | Rockwall County | 0.1 | 1 |
| 39834 | Georgia | Decatur County | 0.1 | 1 |
| 66441 | Kansas | Geary County | 0.1 | 1 |
| 49009 | Michigan | Kalamazoo County | 0.1 | 1 |
| 71426 | Louisiana | Sabine Parish | 0.1 | 1 |
| 71857 | Arkansas | Nevada County | 0.1 | 1 |
| 80901 | Colorado | El Paso County | 0.1 | 1 |
| 80134 | Colorado | Douglas County | 0.1 | 1 |
| 76051 | Texas | Tarrant County | 0.1 | 1 |
| 77070 | Texas | Harris County | 0.1 | 1 |
| 85233 | Arizona | Maricopa County | 0.1 | 1 |
| 71295 | Louisiana | Franklin Parish | 0.1 | 1 |
| 93422 | California | San Luis Obispo County | 0.1 | 1 |
| 77316 | Texas | Montgomery County | 0.1 | 1 |
| 15327 | Pennsylvania | Greene County | 0.1 | 1 |
| 87113 | New Mexico | Bernalillo County | 0.1 | 1 |
| 60123 | Illinois | Kane County | 0.1 | 1 |
| 76579 | Texas | Bell County | 0.1 | 1 |
| 70526 | Louisiana | Acadia Parish | 0.1 | 1 |
| 78611 | Texas | Burnet County | 0.1 | 1 |

| | | | | |
|---|---|---|---|---|
| 98003 | Washington | King County | 0.1 | 1 |
| 37363 | Tennessee | Hamilton County | 0.1 | 1 |
| 77469 | Texas | Fort Bend County | 0.1 | 1 |
| 28768 | North Carolina | Transylvania County | 0.1 | 1 |
| 44804 | Ohio | Hancock County | 0.1 | 1 |
| 80550 | Colorado | Weld County | 0.1 | 1 |
| 87102 | New Mexico | Bernalillo County | 0.1 | 1 |
| 23454 | Virginia | Virginia Beach city | 0.1 | 1 |
| 79407 | Texas | Lubbock County | 0.1 | 1 |
| 84098 | Utah | Summit County | 0.1 | 1 |
| 56187 | Minnesota | Nobles County | 0.1 | 1 |
| 77375 | Texas | Harris County | 0.1 | 1 |
| 30096 | Georgia | Gwinnett County | 0.1 | 1 |
| 38501 | Tennessee | Putnam County | 0.1 | 1 |
| 80018 | Colorado | Arapahoe County | 0.1 | 1 |
| 70001 | Louisiana | Jefferson Parish | 0.1 | 1 |
| 77954 | Texas | DeWitt County | 0.1 | 1 |
| 80222 | Colorado | Denver County | 0.1 | 1 |
| 48304 | Michigan | Oakland County | 0.1 | 1 |
| 72937 | Arkansas | Sebastian County | 0.1 | 1 |
| 78733 | Texas | Travis County | 0.1 | 1 |
| 95503 | California | Humboldt County | 0.1 | 1 |
| 17724 | Pennsylvania | Bradford County | 0.1 | 1 |
| 05673 | Vermont | Washington County | 0.1 | 1 |
| 32246 | Florida | Duval County | 0.1 | 1 |
| 64098 | Missouri | Platte County | 0.1 | 1 |
| 21702 | Maryland | Frederick County | 0.1 | 1 |
| 76063 | Texas | Tarrant County | 0.1 | 1 |
| 50265 | Iowa | Polk County | 0.1 | 1 |
| 77445 | Texas | Waller County | 0.1 | 1 |
| 99901 | Alaska | Ketchikan Gateway Borough | 0.1 | 1 |
| 80651 | Colorado | Weld County | 0.1 | 1 |
| 80220 | Colorado | Denver County | 0.1 | 1 |
| 92056 | California | San Diego County | 0.1 | 1 |
| 62611 | Illinois | Cass County | 0.1 | 1 |
| 70633 | Louisiana | Calcasieu Parish | 0.1 | 1 |
| 92307 | California | San Bernardino County | 0.1 | 1 |
| 53146 | Wisconsin | Waukesha County | 0.1 | 1 |
| 12022 | New York | Rensselaer County | 0.1 | 1 |
| 71260 | Louisiana | Union Parish | 0.1 | 1 |
| 73122 | Oklahoma | Oklahoma County | 0.1 | 1 |
| 85032 | Arizona | Maricopa County | 0.1 | 1 |
| 91910 | California | San Diego County | 0.1 | 1 |
| 85208 | Arizona | Maricopa County | 0.1 | 1 |
| 66062 | Kansas | Johnson County | 0.1 | 1 |
| 78148 | Texas | Bexar County | 0.1 | 1 |
| 80216 | Colorado | Denver County | 0.1 | 1 |
| 86033 | Arizona | Navajo County | 0.1 | 1 |
| 77014 | Texas | Harris County | 0.1 | 1 |
| 81232 | Colorado | Fremont County | 0.1 | 1 |
| 79761 | Texas | Ector County | 0.1 | 1 |



FS-003760

| | | | | |
|---|---|---|---|---|
| 80503 | Colorado | Boulder County | 0.1 | 1 |
| 81067 | Colorado | Otero County | 0.1 | 1 |
| 86321 | Arizona | Yavapai County | 0.1 | 1 |
| 80228 | Colorado | Jefferson County | 0.1 | 1 |
| 86504 | Arizona | Apache County | 0.1 | 1 |
| 80237 | Colorado | Denver County | 0.1 | 1 |
| 98107 | Washington | King County | 0.1 | 1 |
| 52501 | Iowa | Wapello County | 0.1 | 1 |
| 20784 | Maryland | Prince Georges County | 0.1 | 1 |
| 80004 | Colorado | Jefferson County | 0.1 | 1 |
| 92344 | California | San Bernardino County | 0.1 | 1 |
| 80538 | Colorado | Larimer County | 0.1 | 1 |
| 92399 | California | San Bernardino County | 0.1 | 1 |
| 85755 | Arizona | Pima County | 0.1 | 1 |
| 21784 | Maryland | Carroll County | 0.1 | 1 |
| 77995 | Texas | Lavaca County | 0.1 | 1 |
| 87108 | New Mexico | Bernalillo County | 0.1 | 1 |
| 71909 | Arkansas | Garland County | 0.1 | 1 |
| 08823 | New Jersey | Somerset County | 0.1 | 1 |
| 88201 | New Mexico | Chaves County | 0.1 | 1 |
| 80525 | Colorado | Larimer County | 0.1 | 1 |
| 86514 | Arizona | Apache County | 0.1 | 1 |
| 80917 | Colorado | El Paso County | 0.1 | 1 |
| 60060 | Illinois | Lake County | 0.1 | 1 |
| 78759 | Texas | Travis County | 0.1 | 1 |
| 64850 | Missouri | Newton County | 0.1 | 1 |
| 92833 | California | Orange County | 0.1 | 1 |
| 28203 | North Carolina | Mecklenburg County | 0.1 | 1 |
| 31328 | Georgia | Chatham County | 0.1 | 1 |
| 15143 | Pennsylvania | Allegheny County | 0.1 | 1 |
| 15963 | Pennsylvania | Somerset County | 0.1 | 1 |
| 87316 | New Mexico | McKinley County | 0.1 | 1 |
| 76712 | Texas | McLennan County | 0.1 | 1 |
| 68128 | Nebraska | Sarpy County | 0.1 | 1 |
| 76087 | Texas | Parker County | 0.1 | 1 |
| 84128 | Utah | Salt Lake County | 0.1 | 1 |
| 66206 | Kansas | Johnson County | 0.1 | 1 |
| 80021 | Colorado | Jefferson County | 0.1 | 1 |
| 72730 | Arkansas | Washington County | 0.1 | 1 |
| 80124 | Colorado | Douglas County | 0.1 | 1 |
| 85704 | Arizona | Pima County | 0.1 | 1 |
| 81335 | Colorado | Montezuma County | 0.1 | 1 |
| 81416 | Colorado | Delta County | 0.1 | 1 |
| 63376 | Missouri | St. Charles County | 0.1 | 1 |
| 66046 | Kansas | Douglas County | 0.1 | 1 |
| 85020 | Arizona | Maricopa County | 0.1 | 1 |
| 89509 | Nevada | Washoe County | 0.1 | 1 |
| 05486 | Vermont | Grand Isle County | 0.1 | 1 |
| 61701 | Illinois | McLean County | 0.1 | 1 |
| 78633 | Texas | Williamson County | 0.1 | 1 |
| 81632 | Colorado | Eagle County | 0.1 | 1 |

| | | | | |
|---|---|---|---|---|
| 93003 | California | Ventura County | 0.1 | 1 |
| 79928 | Texas | El Paso County | 0.1 | 1 |
| 07422 | New Jersey | Sussex County | 0.1 | 1 |
| 80206 | Colorado | Denver County | 0.1 | 1 |
| 55124 | Minnesota | Dakota County | 0.1 | 1 |
| 08340 | New Jersey | Atlantic County | 0.1 | 1 |
| 55304 | Minnesota | Anoka County | 0.1 | 1 |
| 76116 | Texas | Tarrant County | 0.1 | 1 |
| 68107 | Nebraska | Douglas County | 0.1 | 1 |
| 24018 | Virginia | Roanoke County | 0.1 | 1 |
| 70501 | Louisiana | Lafayette Parish | 0.1 | 1 |
| 22207 | Virginia | Arlington County | 0.1 | 1 |
| 87107 | New Mexico | Bernalillo County | 0.1 | 1 |
| 85619 | Arizona | Pima County | 0.1 | 1 |
| 52162 | Iowa | Allamakee County | 0.1 | 1 |
| 72927 | Arkansas | Logan County | 0.1 | 1 |
| 87501 | New Mexico | Santa Fe County | 0.1 | 1 |
| 80304 | Colorado | Boulder County | 0.1 | 1 |
| 76108 | Texas | Tarrant County | 0.1 | 1 |
| 81212 | Colorado | Fremont County | 0.1 | 1 |
| 76180 | Texas | Tarrant County | 0.1 | 1 |
| 75559 | Texas | Bowie County | 0.1 | 1 |
| 81611 | Colorado | Pitkin County | 0.1 | 1 |
| 76028 | Texas | Johnson County | 0.1 | 1 |
| 30075 | Georgia | Fulton County | 0.1 | 1 |
| 75254 | Texas | Dallas County | 0.1 | 1 |
| 80920 | Colorado | El Paso County | 0.1 | 1 |
| 77389 | Texas | Harris County | 0.1 | 1 |
| 75044 | Texas | Dallas County | 0.1 | 1 |
| 85257 | Arizona | Maricopa County | 0.1 | 1 |
| 44654 | Ohio | Holmes County | 0.1 | 1 |
| 73543 | Oklahoma | Comanche County | 0.1 | 1 |
| 61611 | Illinois | Tazewell County | 0.1 | 1 |
| 87036 | New Mexico | Torrance County | 0.1 | 1 |
| 87532 | New Mexico | Rio Arriba County | 0.1 | 1 |
| 79703 | Texas | Midland County | 0.1 | 1 |
| 55364 | Minnesota | Hennepin County | 0.1 | 1 |
| 79756 | Texas | Ward County | 0.1 | 1 |
| 70809 | Louisiana | East Baton Rouge Parish | 0.1 | 1 |
| 96790 | Hawaii | Maui County | 0.1 | 1 |
| 97338 | Oregon | Polk County | 0.1 | 1 |
| 85712 | Arizona | Pima County | 0.1 | 1 |
| 95670 | California | Sacramento County | 0.1 | 1 |
| 71301 | Louisiana | Rapides Parish | 0.1 | 1 |
| 80465 | Colorado | Jefferson County | 0.1 | 1 |
| 21801 | Maryland | Wicomico County | 0.1 | 1 |
| 92021 | California | San Diego County | 0.1 | 1 |
| 98328 | Washington | Pierce County | 0.1 | 1 |
| 84536 | Utah | San Juan County | 0.1 | 1 |
| 22840 | Virginia | Rockingham County | 0.1 | 1 |
| 91701 | California | San Bernardino County | 0.1 | 1 |

| | | | | |
|---|---|---|---|---|
| 80218 | Colorado | Denver County | 0.1 | 1 |
| 81332 | Colorado | Dolores County | 0.1 | 1 |
| 81428 | Colorado | Delta County | 0.1 | 1 |
| 80239 | Colorado | Denver County | 0.1 | 1 |
| 98166 | Washington | King County | 0.1 | 1 |
| 60050 | Illinois | McHenry County | 0.1 | 1 |
| 87048 | New Mexico | Sandoval County | 0.1 | 1 |
| 25271 | West Virginia | Jackson County | 0.1 | 1 |
| 85711 | Arizona | Pima County | 0.1 | 1 |
| 87120 | New Mexico | Bernalillo County | 0.1 | 1 |
| 75418 | Texas | Fannin County | 0.1 | 1 |
| 28904 | North Carolina | Clay County | 0.1 | 1 |
| 91342 | California | Los Angeles County | 0.1 | 1 |
| 28403 | North Carolina | New Hanover County | 0.1 | 1 |
| 80631 | Colorado | Weld County | 0.1 | 1 |
| 92672 | California | Orange County | 0.1 | 1 |
| 62521 | Illinois | Macon County | 0.1 | 1 |
| 85226 | Arizona | Maricopa County | 0.1 | 1 |
| 80005 | Colorado | Jefferson County | 0.1 | 1 |
| 11050 | New York | Nassau County | 0.1 | 1 |
| 30022 | Georgia | Fulton County | 0.1 | 1 |
| 85010 | Arizona | Maricopa County | 0.1 | 1 |
| 78613 | Texas | Williamson County | 0.1 | 1 |
| 97321 | Oregon | Linn County | 0.1 | 1 |
| 75032 | Texas | Rockwall County | 0.1 | 1 |
| 98072 | Washington | King County | 0.1 | 1 |
| 94597 | California | Contra Costa County | 0.1 | 1 |
| 99507 | Alaska | Anchorage Borough | 0.1 | 1 |
| 91752 | California | Riverside County | 0.1 | 1 |
| 81230 | Colorado | Gunnison County | 0.1 | 1 |
| 74442 | Oklahoma | Pittsburg County | 0.1 | 1 |
| 87112 | New Mexico | Bernalillo County | 0.1 | 1 |
| 72761 | Arkansas | Benton County | 0.1 | 1 |
| 89027 | Nevada | Clark County | 0.1 | 1 |
| 94904 | California | Marin County | 0.1 | 1 |
| 34212 | Florida | Manatee County | 0.1 | 1 |
| 93555 | California | Kern County | 0.1 | 1 |
| 77845 | Texas | Brazos County | 0.1 | 1 |
| 66054 | Kansas | Jefferson County | 0.1 | 1 |
| 77855 | Texas | Leon County | 0.1 | 1 |
| 85083 | Arizona | Maricopa County | 0.1 | 1 |
| 80424 | Colorado | Summit County | 0.1 | 1 |
| 52253 | Iowa | Linn County | 0.1 | 1 |
| 34221 | Florida | Manatee County | 0.1 | 1 |
| 10536 | New York | Westchester County | 0.1 | 1 |
| 37914 | Tennessee | Knox County | 0.1 | 1 |
| 80203 | Colorado | Denver County | 0.1 | 1 |
| 67110 | Kansas | Sedgwick County | 0.1 | 1 |
| 75048 | Texas | Dallas County | 0.1 | 1 |
| 77386 | Texas | Montgomery County | 0.1 | 1 |
| 87144 | New Mexico | Sandoval County | 0.1 | 1 |

| | | | | |
|---|---|---|---|---|
| 88012 | New Mexico | Dona Ana County | 0.1 | 1 |
| 19720 | Delaware | New Castle County | 0.1 | 1 |
| 78934 | Texas | Colorado County | 0.1 | 1 |
| 75023 | Texas | Collin County | 0.1 | 1 |

* Includes respondents reporting no ZIP code or an invalid ZIP code.

# APPENDIX B - Detailed Satisfaction Results

## Table B-1. Satisfaction for Visits to Day Use Developed Sites

| Satisfaction Element | Percent Rating Satisfaction as: | | | | | Mean Rating§ | Mean Importance† | No. Obs‡ |
|---|---|---|---|---|---|---|---|---|
| | Very Dissatisfied | Somewhat Dissatisfied | Neither Satisfied nor Dissatisfied | Somewhat Satisfied | Very Satisfied | | | |
| Restroom Cleanliness | 4.2 | 2.8 | 9.3 | 16.3 | 67.3 | 4.4 | 4.2 | 92 |
| Developed Facilities | 0.0 | 0.0 | 15.1 | 27.2 | 57.7 | 4.4 | 4.0 | 106 |
| Condition of Environment | 0.9 | 3.9 | 7.4 | 17.7 | 70.1 | 4.5 | 4.7 | 140 |
| Employee Helpfulness | 0.1 | 1.4 | 5.9 | 18.0 | 74.7 | 4.7 | 3.9 | 77 |
| Interpretive Displays | 1.8 | 3.0 | 12.9 | 25.3 | 57.0 | 4.3 | 4.0 | 115 |
| Parking Availability | 8.3 | 2.8 | 8.4 | 12.6 | 68.0 | 4.3 | 4.2 | 138 |
| Parking Lot Condition | 0.0 | 4.9 | 20.0 | 22.9 | 52.1 | 4.2 | 4.0 | 133 |
| Rec. Info. Availability | 2.9 | 1.9 | 14.9 | 14.5 | 65.8 | 4.4 | 4.4 | 102 |
| Road Condition | 1.0 | 4.9 | 9.7 | 25.0 | 59.4 | 4.4 | 4.4 | 105 |
| Feeling of Satefy | 0.0 | 0.7 | 3.1 | 12.4 | 83.7 | 4.8 | 4.4 | 133 |
| Scenery | 0.0 | 0.0 | 4.7 | 4.9 | 90.4 | 4.9 | 4.7 | 139 |
| Signage Adequacy | 1.5 | 6.1 | 12.4 | 16.0 | 64.1 | 4.4 | 4.2 | 133 |
| Trail Condition | 1.4 | 0.0 | 8.2 | 18.6 | 71.7 | 4.6 | 4.4 | 97 |
| Value for Fee Paid | 4.2 | 0.0 | 29.9 | 10.1 | 55.8 | 4.1 | 3.9 | 74 |

NOTE: The data was not reported for items with fewer than 10 responses. Satisfaction and Importance were asked as two separate questions so one of these may have 10 responses even though the other does not.

§ Scale: Very Dissatisfied = 1, Somewhat Dissatisfied = 2, Neither Satisfied nor Dissatisfied = 3, Somewhat Satisfied = 4, Very Satisfied = 5

† Scale: Not Important = 1, Somewhat Important = 2, Moderately Important = 3, Important = 4, Very Important = 5

‡ No. Obs is the number of survey respondents who responded to this item.



FS-003765

## Table B-2. Satisfaction for Visits to Overnight Developed Sites

| Satisfaction Element | Percent Rating Satisfaction as: | | | | | Mean Rating§ | Mean Importance† | No. Obs‡ |
|---|---|---|---|---|---|---|---|---|
| | Very Dissatisfied | Somewhat Dissatisfied | Neither Satisfied nor Dissatisfied | Somewhat Satisfied | Very Satisfied | | | |
| Restroom Cleanliness | 0.0 | 0.0 | 1.0 | 13.6 | 85.4 | 4.8 | 4.6 | 28 |
| Developed Facilities | 0.0 | 0.0 | 0.9 | 12.4 | 86.7 | 4.9 | 4.8 | 36 |
| Condition of Environment | 0.5 | 0.9 | 0.9 | 14.1 | 83.6 | 4.8 | 4.9 | 39 |
| Employee Helpfulness | 0.0 | 8.2 | 2.6 | 16.4 | 72.8 | 4.5 | 4.9 | 22 |
| Interpretive Displays | 2.8 | 1.1 | 1.5 | 13.6 | 81.0 | 4.7 | 4.7 | 33 |
| Parking Availability | 0.0 | 0.0 | 6.6 | 15.8 | 77.6 | 4.7 | 4.8 | 38 |
| Parking Lot Condition | 0.0 | 0.0 | 6.6 | 15.7 | 77.8 | 4.7 | 4.8 | 38 |
| Rec. Info. Availability | 0.0 | 0.0 | 0.9 | 14.4 | 84.7 | 4.8 | 4.8 | 34 |
| Road Condition | 0.0 | 0.0 | 1.4 | 23.4 | 75.2 | 4.7 | 4.9 | 35 |
| Feeling of Satefy | 0.0 | 0.0 | 0.9 | 13.5 | 85.6 | 4.8 | 4.8 | 38 |
| Scenery | 0.0 | 0.0 | 0.9 | 14.0 | 85.1 | 4.8 | 4.8 | 39 |
| Signage Adequacy | 0.0 | 0.0 | 9.2 | 17.8 | 72.9 | 4.6 | 4.7 | 39 |
| Trail Condition | 0.0 | 0.0 | 1.0 | 16.7 | 82.3 | 4.8 | 4.5 | 28 |
| Value for Fee Paid | 0.0 | 0.0 | 1.2 | 15.7 | 83.1 | 4.8 | 4.6 | 26 |

NOTE: The data was not reported for items with fewer than 10 responses. Satisfaction and Importance were asked as two separate questions so one of these may have 10 responses even though the other does not.

§ Scale: Very Dissatisfied = 1, Somewhat Dissatisfied = 2, Neither Satisfied nor Dissatisfied = 3, Somewhat Satisfied = 4, Very Satisfied = 5

† Scale: Not Important = 1, Somewhat Important = 2, Moderately Important = 3, Important = 4, Very Important = 5

‡ No. Obs is the number of survey respondents who responded to this item.



FS-003766

# Table B-3. Satisfaction for Visits to Undeveloped Areas (GFAs)

| Satisfaction Element | Percent Rating Satisfaction as: | | | | | Mean Rating§ | Mean Importance† | No. Obs‡ |
|---|---|---|---|---|---|---|---|---|
| | Very Dissatisfied | Somewhat Dissatisfied | Neither Satisfied nor Dissatisfied | Somewhat Satisfied | Very Satisfied | | | |
| Restroom Cleanliness | 1.3 | 0.0 | 16.9 | 2.6 | 79.1 | 4.6 | 3.1 | 16 |
| Developed Facilities | 0.0 | 0.0 | 42.6 | 7.4 | 50.0 | 4.1 | 3.1 | 22 |
| Condition of Environment | 0.1 | 3.7 | 4.0 | 18.5 | 73.7 | 4.6 | 4.9 | 87 |
| Employee Helpfulness | | | | | | | 3.1 | 7 |
| Interpretive Displays | 0.2 | 0.0 | 14.3 | 46.5 | 39.1 | 4.2 | 3.9 | 45 |
| Parking Availability | 0.0 | 0.2 | 3.1 | 12.1 | 84.6 | 4.8 | 3.4 | 36 |
| Parking Lot Condition | 0.0 | 9.9 | 12.7 | 13.8 | 63.6 | 4.3 | 3.2 | 35 |
| Rec. Info. Availability | 0.1 | 0.9 | 20.4 | 29.5 | 49.1 | 4.3 | 4.3 | 56 |
| Road Condition | 0.1 | 9.3 | 8.9 | 13.6 | 68.0 | 4.4 | 4.5 | 80 |
| Feeling of Satefy | 0.6 | 0.6 | 0.7 | 8.2 | 90.0 | 4.9 | 4.3 | 83 |
| Scenery | 0.0 | 0.1 | 4.4 | 14.7 | 80.8 | 4.8 | 4.8 | 88 |
| Signage Adequacy | 0.0 | 0.6 | 5.2 | 31.8 | 62.4 | 4.6 | 4.3 | 82 |
| Trail Condition | 0.0 | 0.1 | 2.0 | 32.0 | 65.9 | 4.6 | 4.5 | 68 |
| Value for Fee Paid | | | | | | | 2.9 | 5 |

NOTE: The data was not reported for items with fewer than 10 responses. Satisfaction and Importance were asked as two separate questions so one of these may have 10 responses even though the other does not.

§ Scale: Very Dissatisfied = 1, Somewhat Dissatisfied = 2, Neither Satisfied nor Dissatisfied = 3, Somewhat Satisfied = 4, Very Satisfied = 5

† Scale: Not Important = 1, Somewhat Important = 2, Moderately Important = 3, Important = 4, Very Important = 5

‡ No. Obs is the number of survey respondents who responded to this item.

## Table B-4. Satisfaction for Visits to Designated Wilderness*

| Satisfaction Element | Percent Rating Satisfaction as: | | | | | Mean Rating§ | Mean Importance† | No. Obs‡ |
|---|---|---|---|---|---|---|---|---|
| | Very Dissatisfied | Somewhat Dissatisfied | Neither Satisfied nor Dissatisfied | Somewhat Satisfied | Very Satisfied | | | |
| Restroom Cleanliness | 0.0 | 0.0 | 15.0 | 10.8 | 74.2 | 4.6 | 4.2 | 26 |
| Developed Facilities | 0.0 | 0.0 | 10.0 | 10.0 | 80.1 | 4.7 | 4.4 | 24 |
| Condition of Environment | 0.0 | 0.0 | 6.0 | 24.8 | 69.2 | 4.6 | 4.5 | 44 |
| Employee Helpfulness | | | | | | | 3.8 | 3 |
| Interpretive Displays | 0.0 | 1.8 | 12.6 | 33.8 | 51.9 | 4.4 | 3.8 | 30 |
| Parking Availability | 0.0 | 1.2 | 13.0 | 14.9 | 70.9 | 4.6 | 4.1 | 42 |
| Parking Lot Condition | 0.0 | 0.0 | 12.2 | 14.9 | 72.9 | 4.6 | 4.1 | 42 |
| Rec. Info. Availability | 1.0 | 6.7 | 13.7 | 11.9 | 66.7 | 4.4 | 4.0 | 30 |
| Road Condition | 0.0 | 5.6 | 6.9 | 18.1 | 69.3 | 4.5 | 4.4 | 37 |
| Feeling of Satefy | 0.0 | 0.0 | 6.0 | 14.0 | 80.0 | 4.7 | 4.5 | 44 |
| Scenery | 0.0 | 0.0 | 7.2 | 1.9 | 90.9 | 4.8 | 4.6 | 44 |
| Signage Adequacy | 6.1 | 3.6 | 12.1 | 20.1 | 58.1 | 4.2 | 4.3 | 43 |
| Trail Condition | 4.8 | 1.2 | 20.0 | 15.1 | 58.9 | 4.2 | 4.2 | 44 |
| Value for Fee Paid | | | | | | | 3.8 | 3 |

NOTE: The data was not reported for items with fewer than 10 responses. Satisfaction and Importance were asked as two separate questions so one of these may have 10 responses even though the other does not.

§ Scale: Very Dissatisfied = 1, Somewhat Dissatisfied = 2, Neither Satisfied nor Dissatisfied = 3, Somewhat Satisfied = 4, Very Satisfied = 5

† Scale: Not Important = 1, Somewhat Important = 2, Moderately Important = 3, Important = 4, Very Important = 5

‡ No. Obs is the number of survey respondents who responded to this item.

* Data supplied is for all Designated Wilderness on the forest combined. Data was not collected for satisfaction for each individual Wilderness on the forest.



FS-003768

# Recreation Specialist Report
# Salter Vegetation Management Project
# Tom Rice
# Recreation Staff Officer
# September 2020

## Introduction

This report addresses the potential impacts of the Salter Vegetation Management Project on recreation access, opportunity and experience.

## Regulatory Framework

### Laws and Forest Service Manual Direction

The principal laws are:

**Federal Land Policy and Management Act (FLPMA) of 1976**: This act recognizes the value of the public lands, declaring that these lands would remain in public ownership and directed land management agencies to allow a variety of uses on their land while simultaneously trying to preserve the natural resources in them. Permitted activities and wilderness direction resides under FLMPA.

**National Forest Management Act of 1976**: As an amendment to FLPMA, the National Forest Management Act (NFMA) provides for balanced consideration of all resources. It requires the Forest Service to provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives. The NFMA directs the Forest Service to prepare Land Management Plans that include interdisciplinary input and public involvement.

**Multiple Use - Sustained Yield Act of 1960** authorizes and directs the Secretary of Agriculture to develop and administer the renewable resources of timber, range, water, recreation and wildlife on the national forests for multiple use and sustained yield of the products and services.

**Forest Service Manual, Chapter 2350**. Additional agency requirements, policy, and direction for the management of the recreation and trail system are found in the Forest Service Manual, Chapter 2350.

### Forest Plan

Through allocation of allowable uses, and descriptions of desired conditions and objectives the Forest Plan provides a general 'zoning' of recreation opportunity at a broad scale. Examples include establishment of Management Areas, the depiction of recreation settings in the Recreation Opportunity Spectrum Map and depiction of over ground travel suitability for motor vehicles.

The table below lists Management Areas within the project area. The majority of the Salter project area lies within Management Area 5 while bordering some Management Area 2 zones.

*Forest Plan Management Areas in the RWD Project Area*

| MA | Direction | Location |
|---|---|---|
| MA2 | MA 2 lands possess special features or characteristics that make them and their management unique from other areas. MA 2 areas include Research Natural Areas, Archaeological areas, botanical areas and other unique areas with a mix of special features and uses. MA 2 areas are managed to protect or enhance their unique characteristics. | The Narraguinnep Research Natural Area is bounded by three priority areas but will not be included in the project area |
| MA5 | These multiple-use areas are places where active management occurs in order to meet a variety of social, economic, and ecological objectives. They are easily accessible, occurring mostly on roaded landscapes and relatively gentle terrain. In MA 5 areas, visitors can expect to see a wide range of human activities, development, and management investments (including roads, trails, fences, corrals, stock ponds, timber harvesting equipment, oil and gas wells, and livestock). Maintenance of past and current investments is anticipated to be continued for future management opportunities. Motorized and non-motorized recreation opportunities are easily accessed by the relatively dense network of roads found on these lands. Hiking trails provide access for visitors (who can expect contact with others). Developed recreation facilities that provide user comfort and resource protection are present. Motorized summer use is allowable. | Majority of Project Area is within this MA 5 |

## San Juan Niche

A discussion of recreation niche occurred in 2008 for a Recreation Facility Analysis, in 2012 for the Forest Plan revision process and was recently updated by District recreation staff and the Forest Leadership Team in preparation for the next Recreation Site analysis in 2014/2015. Excerpts from these discussions include the following,

The San Juan National Forest connects visitors with the broad vistas and rugged peaks of southwest Colorado's Rocky Mountains in relatively uncrowded settings. The contrasting sandstone-rimmed canyons, green valleys, and soaring peaks offer abundant recreational and cultural opportunities. While the backcountry offers solitude and remains relatively primitive, a limited number of highways and primary Forest roads access front-country areas, which receive higher use and have more recreational development.

Niche Statement: *Maintain and enhance opportunities for dispersed and backcountry recreational experiences that rely little on developed facilities. To that end, focus recreation resources on a limited*

*number of developed sites that directly or indirectly support dispersed and backcountry types of recreation on the Forest.*

### Desired Conditions from Forest Plan

Enhancing recreation access, opportunity or experience is not the primary purpose of this project. However, progress is made towards the following desired conditions because the project strives to maintain or improve forest health.

2.14.1 Activities are regulated primarily in order to protect the quality of the recreation settings and benefits, as well as to protect natural and cultural resources. Managers monitor conditions and implement management strategies in order to maintain desired setting characteristics. Recreation users have opportunities to benefit from the diversity of varied terrain, scenery, and nature in the canyons, mountains, and mesas, as well as on the rivers of the SJNF and TRFO.

2.14.13 Projects and activities are consistent with the established ROS settings.

2.14.20 Dispersed recreation is an important opportunity offered throughout the planning area and occurs extensively. Facilities for dispersed recreation are minimal and are provided in order to protect resources and enhance recreation experiences (and are compatible with established ROS settings, opportunities, and benefits). Access and parking, regulations, orientation, and safety information are provided only to the degree needed to protect resources and appropriately manage existing or anticipated uses.

## Methodology

### Spatial Scale

This analysis will focus on the Salter Vegetation Management Analysis area boundary which includes 50,000 acres east of the Dolores River canyon and north of the town of Dolores. Analysis further focuses on the cut units and roads that will used to access the cut units. Recreation effects will occur where harvest operations and hauling occur as well as where mechanical treatment and prescribed fire is used. Areas outside of the cut units and access roads are not discussed in detail because they are not affected.

### Temporal Scale

Effects to recreation will be considered for up to a 10-year time period. This time period was chosen because this project is anticipated to be completed within that time frame.

### Analysis Methods and Assumptions

This analysis will primarily be a qualitative discussion about the impacts to recreation from the proposed vegetation management project.

This project would not change any management decisions regarding the types of recreation activities allowed or prohibited in the analysis area. This project has no effect on the long-term designation of forest roads open for public use or the locations of types of use on trails.

This analysis assumes that all design features will be implemented as described in the Draft EA or listed below. This analysis also assumes that all ML1 roads will be put back into storage after use and all temporary roads will be re-vegetated. Public use of ML1 roads or temporary roads would be illegal in

this area. Some illegal cross-country travel and use of ML1 roads is currently occurring and is expected to continue but to a lesser degree as District travel management policies are implemented.

During initial planning, a map exercise reducing the size of blocks was undertaken. This effort reduced the footprint of some blocks as well as eliminating impacts to sections of non-motorized trails in the Boggy Block.

In order to manage units within the Boggy Block, recreation "compartments" were identified. These compartments are organized in manner that focuses on trail opportunities and will provide a method to develop sales and cut units that reduce trail closures while using routes included in the transportation plan.

### Incomplete and Unavailable Information

None identified.

## Affected Environment

The Salter Project area receives moderate to heavy levels of recreation use during the summer months, moderate to heavy use during big game hunting seasons and low to moderate use during the winter. There are no developed recreation facilities in the general area except for McPhee Reservoir and House Creek Campground. Both are not in the planning area. Dispersed forms of recreational use are dominant in the analysis area and include big game hunting, off-highway vehicle travel (ATVs/UTVs, motorcycles, snowmobiles), driving for pleasure, horseback riding, dispersed camping, hiking, mushroom gathering, firewood cutting, snow biking and cross country skiing.

The Boggy Block is a high use recreation area and one of the most heavily used recreation zones on the district. Over the past 5 years more than $300,000 of trail infrastructure projects have been completed on the Boggy non-motorized and motorized trail system. Use of the trail system as well as dispersed camping continues to grow. It is a popular destination when the lower country grows hotter throughout the summer and remains popular during the spring and fall shoulder seasons.

There is trailhead access to the Boggy Draw motorized and non-motorized trail system as well as access to other system routes mostly in the form of forest roads. The trails (and their users) in the project area do have the potential to be affected if there are no design criteria to avoid or mitigate impacts. All six blocks include popular dispersed camping areas where vegetation management operations will affect visitors. The users of this area consist of locals that live adjacent to the Forest, including residents of Mancos, Cortez, Durango and Farmington, NM as well as visitors from many states.

The Salter Project analysis area allows for motorized travel on designated system trails and roads during the summer and fall seasons. Limited cross-country OHV travel is allowed by big game hunters in some parts of the planning area who are retrieving a downed deer or elk. Winter travel by the public is open to over snow travel. Pleasure driving uses ML 2 and ML 3 roads, both of which offer a similar viewing experience.

There are commercial operators whose permits include operations within the project area. Colorado Elk Hunters offer guided hunting operations in the area during elk and deer hunting season. In addition, Open Sky operates wilderness therapy sessions in the area but is highly mobile and able to move to areas outside of timber operations. Many private big game hunters use the landscape during archery,

muzzle loading and rifle season. There are limited snow bike grooming operations that are conducted in the Boggy block.

Portions of the Boggy Draw trail systems are on Level 1 roads which are routes that are in storage for projects such as the Salter vegetation project and are intended in this case to be used as temporary haul routes. The Boggy Draw non-motorized trail system has 1.94 miles of level 1 roads while the motorized routes include 8.28 miles of level 1 roads. Visitors should expect that the trails with Level 1 roads will see significant impacts to the tread that will need to be mitigated via trail reconstruction.

The current ROS for the project is classified as *Roaded Natural Setting* depending upon the area of the project area (see map)

Roaded Natural settings are characterized by a higher degree of developments and human footprint than those of primitive and semi-primitive settings. Sights and sounds of human activity are common, as are encounters with other users and types users when in these areas. Users should also expect the presence of active management activities, areas of adjacent or interspersed private lands and development, an extensive trail network and abundant access points for recreational activities. Resource modification and utilization practices are obvious but harmonize with the natural environment.

## Resources Not Affected

There are no wilderness areas, research natural areas, special recreation areas, developed campgrounds, or restroom facilities within the analysis area.

## Effects of the Alternatives

This section describes effects of the Alternatives on recreation access, opportunity and experience as well as effects on scenery.

### Design Features

The following design criteria should be applied to this project. The effects discussion that follows assumes implementation of these design features.

**Recreation**

- To reduce holiday/weekend user conflicts, no hauling will be permitted from noon on Friday to 7:00 AM Monday on the southern portion of FSR 527 in the Boggy Block past the Boggy Draw trailhead parking lot.
- For public safety purposes, vehicles associated with logging operations will not exceed 25MPH on roads near developed trailheads.
- . In order to accommodate snow bike grooming and cross-country skiers, no plowing of FSR 527 from the Boggy Draw trail head to FSR 527 C will occur. Potential impacts to other winter snow biking routes would be mitigated by authorizing alternative over snow groomed routes. Routes would not be authorized in critical big game winter range.
- For public safety purposes, clear and prominent signage, including maps and cutting units status, will be posted at the Boggy Draw trail head and other main Forest Service roads alerting the public to the presence of log trucks, trail closures and the status of cutting units required where operations impact any system trails within the Boggy and Turkey Knolls blocks.


FS-003773

- The public would be notified monthly via press releases, web, social media and in person briefs to the Town of Dolores of any cutting units located within Recreation compartments 1-4 that will become active in the upcoming months that are
- A detailed transportation plan identifying alternative routes on OHV or single-track trails within or connected to trails in the proposed project zone would identify opportunities to close short sections of the trail in order to impact the users as minimally as possible. This task would be completed via the project implementation work sheet prior to any activity in the sale unit. Signage, trail detours, maps and on the ground implementation would be conducted in coordination with Timber and Recreation staff.
- Sign all temp roads with "no motor vehicle signs" or other approved signage to discourage illegal OHV use during logging operations.
- Cutting units and day to day operations would be designed in a manner that keeps as many trails open as possible. Because the Boggy Draw trailhead and parking lot is the main feeder to the system, there will be an emphasis on keeping trails open from the trailhead. At no time should all trails leading from the trailhead be closed at the same time. This will be done in coordination with the Dolores Recreation program and implemented via the implementation checklist process.
- Damage to trails including but not limited to culverts, drainage structures, tread construction, signage or other trail infrastructure will be required to be repaired immediately after the timber operations have been completed. The Dolores District timber shop will be responsible for rehabilitation and will work closely with the district's recreation program in order to ensure trails are rehabilitated to Forest Service trail specifications. (*See table 1 and reference to Standard Specifications for construction and maintenance)*
- Dispersed camping sites will not be used for decking. A 100' buffer will be implemented around mapped high use dispersed camping sites.
- No burn piles will be located within 250' of mapped trails or dispersed camp sites. Burn piles will not exceed 20'X20' in size.
- Equipment used for piling slash will not operate on any trail system except where skid routes already cross a system trail.
- No landings will be located within 1,000' of mapped trails or dispersed camp sites.
- No skid routes will be allowed on trails identified on the "no skid zones" map. Skid routes will cross system trails no less than every 1,000' unless the design results in an adverse skid. In adverse skid situations skid routes will cross system trails no less than every 500'. Skid routes will cross roads and trails at a slightly curved perpendicular angle.
- No mechanical harvesting, skidding equipment or processing (piling, limbing, driving) will be allowed within 25' of a system trail in order to protect the integrity of the trail except where a trail crossing for skidding or hauling has been identified. The use of forwarder equipment should be used to reach across any system trails in order to avoid impacts to system trails.
- If any slash or debris is within the trail corridor it must be removed weekly or prior to weekend trail reopening.
- Where temporary haul routes damage a trail, a new trail will be constructed adjacent to the former route by the Dolores District's Recreation program.
- All design criteria would apply to winter logging operations.
- In order to address recreation displacement from timber operations in the Salter Vegetation Management project area a parking lot will be constructed at the Dolores Norwood/House Creek road (FSR 528/526) and at the intersection of FSR 526 and 258. A ¼ mile trail reroute will be constructed to access the FSR 528/526 parking lot as well as a ½ mile reroute of the Tavah Yakweh trail where it is currently on a Level 1 road.

- In order to minimize trail closures and impacts to dispersed campers, timber operations in Recreation compartments 1-3 would be completed sequentially before moving on to next recreation compartments
- No logging operations or hauling will be authorized in Recreations compartments/blocks 1-4 on weekends or during any permitted special events including but not limited to the Escalante Day(s) mountain bike race. During those weekends, trails would be open to the public with the understanding final tread reclamation would not be completed.
- In order to reduce impacts to high recreation use areas, timber operations, including any reclamation efforts, in Recreation compartments 1-3 will be completed as quickly as possible.
- In order to implement harvesting techniques that will be “lighter on the land” in Recreation compartments 1-4, techniques such as hand thinning or other silviculture practices that leave more trees in sections of units adjacent to trails or dispersed campsites should be applied. Shorter contract periods in compartments 1-4 should be used in order to complete timber operations in a manner that reduces the public’s exposure to logging activities. These criteria can be implemented via on the ground meetings and coordination between contractors and the district’s timber and recreation programs.
- Where timber operations result in vehicles accessing motorized or non-motorized trails width restrictors would be installed to control future public access. (See table 2).
- Effectiveness of design features will be monitored. (See table 3).

**Table 1- Trail reconstruction specification summary**

| Trail Name | Location | Reconstruction Specifications |
|---|---|---|
| Boggy Draw motorized OHV System | All trail segments impacted by logging operations. | No Slash or Debris left with in Clearing Limits (8’ high x 72” wide). No Ruts or protrusions >3” and no surface obstacles >6”. 60” Tread Width |
| Boggy Draw non-motorized system | All trail segments impacted by logging operations. | No Slash or Debris left with in Clearing Limits (10’ high x 72” wide). No Ruts or protrusions >3” and no surface obstacles >12”. 18” Tread Width. |

Trail Management Objective (TMO) would be followed for all impacted trail segments as part of post timber operation trail reconstruction. Reclamation would be performed to standards outlined in the Forest Service publication *Standard Specifications for Construction and Maintenance of Trails (USDA USFS EM-7720-103, September 1996* and would be referenced in all contracts associated with the proposed project. The Dolores District’s Recreation program would be available for any technical trail support.

**Table 2-Trail closure specification summary**

| Intersection Location | Closure Specifications |
|---|---|
| Junctions of Boggy Draw OHV trail system with open Forest Service roads. | Install a road gate to prohibit public entry during logging operations. Post logging operation install a boulder closure with a 62” gap or a width limiter traffic control device. |
| Junctions of all Boggy Draw non-motorized single-track trails at road intersections utilized for timber operations | Post logging operation install a boulder closure with a 24” gap or a width limiter traffic control device set at 24” |
| Temp road and skid trail intersections with any forest service system trail. | Post logging operations install boulder closures. |

**Table 3-Monitoring**

| Monitoring item | Monitoring objective | Metric | Frequency/Duration | Completed by | Mitigation |
|---|---|---|---|---|---|
| Project design feature effectiveness | Evaluate if Recreation related project design features were effective at avoiding or minimizing adverse impacts | Yes/No, as described | During and post implementation | Recreation | If design features were not followed, contractor would be required to stop all operations and coordinate with Timber and Recreation programs to develop a plan to follow features and address and mitigate any impacts. |
| Recreation – Public Use, availability & impacts | Assess effects of prescriptions, operations, and treatments on the recreation experiences of forest users.<br><br>Evaluate the public's response to the treatment's outcomes. | Number of sites impacted | During and post implementation | Recreation | If design features were not followed, contractor would be required to stop all operations and coordinate with Timber and Recreation programs to develop a plan to follow features and address and mitigate any impacts. |

## Forest Plan Guidelines

The following section describes Forest Plan Guidelines and how they relate to the project (*italic text*)

2.14.64 Summer and winter ROS maps should guide project-specific decisions and implementation activity. These maps define broad physical, social, and administrative settings for the entire SJNF and TRFO. Site-specific analysis is necessary ensure desired setting conditions are applied at the project level.

*Treatment units fall with areas identified as 'Roaded Natural' on the Forest Plan ROS map. Harvest activities are compatible with this setting. A recreation visitor could expect to see signs of management and evidence of human activity. The cut units effect a portion of the analysis area. The remainder of the analysis area is not affected and remains naturally appearing forest with little disturbance. In the long term, after vegetation management activities are complete, treatment areas will return to naturally appearing forest.*

*Harvest activities are compatible with a Roaded Natural setting. A recreation visitor could expect to see signs of management and evidence of human activity. The cut units effect a portion of the analysis area while the remainder of the analysis area is not affected and remains naturally appearing forest with little disturbance. In the long term, after vegetation management activities are complete, treatment areas will continue as naturally appearing forest.*

## Alternative A - No Action

Under the No Action alternative, no timber harvest would occur. Disruptions to recreation activity from treatment activities would not occur. There would be no KV dollars available to help fund projects to fund recreation improvements including closing user-created/non-system roads. General human uses in the area such as winter and summer motorized activities, dispersed recreation, livestock grazing, hunting and fuel wood gathering would continue.

## Alternative B - Proposed Action

### Recreation Activities and Experience

Under this alternative, recreation activities would be impacted to various degrees depending on the season. Some disruptions and impacts to dispersed recreationists would result from the sights, sounds and activities associated with the proposed treatments such as road work, truck hauling and cutting operations during actual project implementation. Groups most likely to be affected during the project operations are motorized users (ATV/UHV), non-motorized trail users, big game hunters, hikers, firewood, mushroom gatherers, snowbikers and snowmobilers. The extent of negative impacts to recreationalists can be expected to increase noticeably if treatment activities are undertaken during hiking, horseback riding, mountain biking, hunting or snowmobiling seasons when this area witnesses marked increases in use.

Any affected commercial hunting operations, such as Colorado Elk Camp are permitted elsewhere on the district and can conduct their operations in those areas during any timber operations. Fall hunting activities and summer camping would be impacted by the timber cutting operations and noise potentially displacing hunters and campers from their campsites or hunting grounds for the short term. Dispersed camps during big game hunting seasons may be impacted for the short term.

Motorized and non-motorized trail users, especially those who frequent trails in the Boggy Block, will be impacted if any trails are closed during operations. If measures to protect the integrity of trail infrastructure are not followed there is a likelihood of long-term impacts to the tread and in turn the trail user's experience.

Visitors using both Management Level (ML) 2 and 3 roads would experience brief exposure to timber unit cuts. These visual impacts would be brief depending upon speeds of the motorized traveler. Travelers such as horseback riders, bikers, hunters or hikers would experience a negative visual impact to their recreational experience if they chose to travel through any units. Impacts would be brief depending upon their rate of travel through the units. Visual impacts would improve for all travelers as they moved beyond any cutting units.

There would be little difference in the impacts regardless of the prescription objectives, i.e. Individual Tree Selection with a Restoration Emphasis (ITS), Precommercial Thinning (PCT), Commercial Thinning (CT) or Sanitation/Salvage (SS)

The project proposes to use existing closed roads and construct temporary roads. It would impact the designated motorized and non-motorized routes where access to timber units requires the same road for project access. A transportation plan will be included in the contract package to address safety concerns linked to any road uses.

Winter recreation activities would be affected and possibly changed due to the possibility of timber activity during the winter months. However, the impact would be minimal as there is limited winter use in the project area except for a snow biking operation in the Boggy Block.

Short term, temporary closures of ML2 roads to public use may be required during harvest operations.

Potential impacts to recreationists under this alternative will be the greatest in the vicinities of the treatment units located in the Boggy, House Creek and Turkey Knolls blocks because of the relative popularity of these areas to local users. Displacement of users will occur and could close trails or dispersed sites for a period of weeks to months with reoccurring timber activity in a block for a number of years. Over the life of the timber project, the designated routes within the project area will continue to be impacted and require maintenance to sustain the integrity of the road and trail system. Road/trail maintenance and decommissioning responsibilities are included in the timber contract.

Under the Proposed Action, recreation experience would be impacted to various degrees depending on the season. Disruptions and impacts to recreationists would result from the sights, sounds and activities associated with the proposed treatments such as road work, truck hauling and cutting operations during project implementation. Groups most likely to be affected during the project operations are motorized users (ATV/UHV), non-motorized trail users (hikers, equestrians, snowbikers and mountain bikers),big game hunters and snowmobilers. Fall hunting activities would be impacted by the timber cutting operations and noise potentially displacing hunters and campers from their campsites or hunting grounds. There would be no impact to any established outfitter camps that overlay the cut units as none are currently assigned. Horseback riders may be displaced to other areas of the analysis area due to logging operations but could find similar riding opportunities in the area. The extent of negative impacts to recreationalists can be expected to increase noticeably if treatment activities are undertaken during , hiking, biking hunting or snowmobiling seasons when this area witnesses marked increases in use. There will be short to long term visual effects encountered on short sections of the trail. Trail users will move through the project area on parts of the trail impacted by operations or can use other trails in the project area not affected by timber operations.

Most recreationists are accustomed to a working forest landscape so the sights and sounds of harvest is usually accepted although not necessarily appreciated.

Winter recreation activities (snowmobiling, skiing and snow biking) would be affected and possibly changed due to the possibility of timber activity during the winter months. However, winter use is low in most blocks except for the Boggy block. Winter use of the roads for winter recreational activities would be allowed to coincide with project activities.

Any long-term removal of recreation opportunities will have an impact to local community's economies.

### Alternative C – 20" diameter tree retention

Under this alternative larger tree would remain in the view shed and users would have an experience only somewhat similar to their pre-project experience while also providing more shade to trail users.

## Cumulative Impacts

The potential impacts to recreation from this project are anticipated to be long-term and moderate for as long as 10 years. Past and current activities in the area include timber sales and prescribed fire operations. One of the goals of the project is to return stands to a healthy state.

All of the roads in this area were built to accommodate timber or mining projects and have been used by the public and permittees accessing National Forest lands. With increases in population and more leisure time available, driving, hunting, camping, winter sports and other activities are increasing on the National Forest system lands and in the analysis area. The effects to the recreating public will differ depending on the user's perceptions and the time of year but interruptions to outdoor recreationists have occurred and will continue to occur as long as management activities continue.

Designated motor vehicle use routes concentrate more use on roads and trails because off road motorized travel is prohibited on that part of the district except in the case of limited big game motorize big game retrieval that allows hunters to make one pass in and out to pick up big game taken during the hunting season. In addition, single track non-motorized uses are concentrated on the Boggy Draw system.

The Boggy Glade Travel Management Project resulted in some roads that were once open to public use being closed to public use or decommissioned. This will create minor displacement recreation activities that could overlap in time with the Salter Vegetation Management project. The combined displacement from the two projects occurs on a minor portion of the landscape. Other areas exist nearby within the analysis area and in other locations on the Dolores District allowing visitors to utilize other areas of the forest. A significant cumulative effect is not anticipated except in the Boggy Block.

# Scenery Management Specialist Report
# Salter Vegetation Management Project

## Introduction

This report addresses the potential impacts of the Salter Vegetation Management Project on scenery.

## Regulatory Framework

### Laws and Forest Service Manual Direction

The same laws listed above for recreation also apply to scenic integrity. In addition,

**Forest Service Manual, Chapter 2380.** Additional agency requirements, policy, and direction for the management of scenic integrity is found in the Forest Service Manual, Chapter 2380.

## Forest Plan

Desired Conditions from the Forest Plan include,

2.15.3 Views from developed sites, roads, trails, and viewpoints of concern are predominantly within natural-appearing landscapes. Views within developed recreation sites may appear heavily altered (due to recreation support facilities, recreation developments, hazard tree management, etc.).

2.15.8 Vegetation valued for its scenic character is sustainable and consistent with the inherent landscape character.

2.15.9 Public lands scenery is maintained in a condition that meets the minimum established scenic objectives as established in Figure 2.15.

2.15.1 Public demand is met for high-quality scenery that benefits regional tourism, the local and regional economy, the local and regional community image, and overall recreation opportunities. Existing natural appearing scenic landscapes are maintained to the extent possible through project-specific mitigation measures.

## Methodology

### Spatial Scale

This analysis will focus on the Salter Vegetation Management Analysis area boundary. The analysis further focuses on the cut units and roads or trails that will be used to access the cut units. Effects on scenery will occur where harvest operations and hauling occur. Areas outside of the cut units and access roads are not discussed in detail because they are not affected.

### Temporal Scale

Effects to scenery will be described for up to a 10-year time period. This time period was chosen because this project is anticipated to be completed within 10 years.

### Analysis Methods and Assumptions

This analysis will primarily be a qualitative discussion about the impacts to scenic integrity from the proposed vegetation management project.

This analysis assumes that all design features will be implemented as described in the Draft EA or listed below.

### Incomplete and Unavailable Information

None identified.

## Affected Environment

Major vegetation types include oak, quaking aspen forests, Ponderosa pine and mixes of these vegetation types. The goal of the project is to maintain or improve ecosystem resiliency, function and sustainability while providing timber to the local timber and firewood markets. Vegetative patterns are variable due to the diversity of vegetation types and ages as a result of past timber harvesting activities, forest fire suppression and livestock grazing. Forest stands are generally mixed with ponderosa pine and Gambel oak in the lower elevations and aspen at mid-elevation. Mature aspen in larger aspen-only patches occur in the project area and have a high scenic value to recreational users. Openings in the forest canopy occur both naturally and from previous timber harvesting activities. In both cases these openings have natural organic shapes with varied undulating edges and groups of tree islands of various sizes.

The area, especially the Boggy Block, provide trail opportunities where special and unique geologic and topographic features are enjoyed by visitors. During pre-planning efforts, portions of units were removed in order to protect these viewscapes although many similar features remain in the project area. These unique canyon vistas and rock outcroppings provide visual diversity in what is otherwise a homogeneous ponderosa pine landscape. Many visitors who use the Boggy Block are attracted by the more heavily stocked Ponderosa forest type and will experience a significant change to a trail, road or camp site where timber operations have occurred.

Primary uses in the project area include recreational OHV, 4WD and snowmobile touring, cross country skiing, mountain and snow biking, driving for pleasure, horseback riding, dispersed camping, big game hunting, firewood collecting, livestock grazing and timber harvesting. Recreational users typically travel through the project area on main Forest Service roads to access other areas, trailheads or viewpoints and spend minimal time viewing the project area. Hunters and dispersed campers spend short periods of time when camping in the area.

The scenic attractiveness of the project area based on the above characteristics is common to the lower elevations of the La Plata and San Juan Mountains on the Dolores Ranger District. The landscape provides generally positive yet common attributes of scenic quality and is classified as a Moderate Scenic Integrity Objective (SIO).

Landscapes are viewed to varying degrees from different locations and subsequently differ in their importance. Concern levels are a measure of the degree of public importance for scenic quality on National Forest lands based on landscapes viewed from travel ways and recreation sites. The type of area and its level of use are indicators of the level of interest that people are likely to have of the surrounding landscape.

The area is viewed from a variety of road and trail corridors accessible from the Dolores Norwood Road. Harvest units are proposed adjacent to roads or trails as well as away from major forest routes. Background views of the project area would show slight vegetation texture differences, vegetative color changes and natural clearings depending on where the viewer is located. Some portions of the analysis area are visible in short sections by travelers on forest roads or trails in middle ground views showing vegetative texture and color differences and obvious evidence of previous or ongoing timber management areas. Although these views do exist, viewers are typically moving quickly along travel ways resulting in limited viewing opportunities. Travelers along secondary roads within the project area see the area in foreground views where evidence of recreational use and past timber harvest activities are most visible. Travelers along single-track trails will experience the most impact due to their lower speeds on trails.

Potential impacts to scenery only occur within and immediately adjacent to the harvest units identified in the project map. However, it should be noted that most forest users are accustomed to the heavier stocked Ponderosa forests and will be impacted negatively by the project especially in the Boggy Block. This project would not affect the remainder of the analysis area directly where no harvest units are proposed. The effects of insect and disease agents on forest scenery is noted but is not the focus of this report.

## Resources Not Affected

There are no wilderness areas, research natural areas, special recreation areas, roadless areas, developed campgrounds, or restroom facilities within the analysis area. There are no developed areas with high scenic integrity concerns that would be affected. This project is not visible from the San Juan Scenic Byway.

## Effects of the Alternatives

### Design Features

The following design criteria should be applied to this project. The effects discussion that follows assumes implementation of these design features.

**Visuals**

- Openings in the canopy should have a natural appearance with uneven edges. The shape should be an irregular pattern that mimics existing natural openings and should avoid straight-line edges. Blend with natural landscape features such as natural meadows or openings and rock outcrops when possible.
- When leaving trees within treatment units, leave in clumps or groups and avoid leaving single whip trees. Groups of leave trees should contain various numbers of trees and occur at random distances and spacing for a more natural appearance (avoid regular spacing of leave trees).
- Unit boundary paint shall face away from open system roads and trails or be removed; standards for boundary marks should be minimized along these routes.
- Stumps should be 12” high or less.
- All equipment and construction debris (man-made debris and trash, including old culverts) caused by project operations shall be removed from the site at sale completion.

- In disturbed areas where soils have been exposed, such as temporary roads, skid trails or landings should be closed and re-vegetated with a seed mixture consisting of native grasses and forbs which is as close as possible to the existing native species in the area. Effectiveness of closures should be monitored yearly for success of revegetation as well as travel management compliance. If ineffective, roads will be reclosed or reseeded by the Timber program.
- Where feasible, construction of skid trails should cross at a perpendicular angle but slightly curved to avoid creating straight line corridors when the skid trails connect with open system roads and trails. Skid trails will be held to the minimum number, width and length (See Recreation Design Features). Forest system trails will not be utilized as a skid path unless the trail utilizes a Level 1 Road. In this case, coordination between the Timber and Recreation Programs is required.
- 
- A weed mitigation plan will be implemented to address invasive weed infestations where ground has been disturbed. If burn pile scars fail to reclaim themselves, they will be seeded by the timber program.
- In order to maintain desirable natural features such as tree density and oak brush islands adjacent to trails, field coordination between the District's recreation and timber projects as well as timber contractors should be held. Prescription by description measures should allow for more flexibility near trails in order to reduce the visual impacts to the trail system. This can be implemented via the pre-implementation check list.
- ~~When possible,~~ cutting unit boundaries should exclude trails if the stand meets timber stand desired conditions.
  Recreation Staff will identify leave trees that are within 9' of center line of single-track trails. The leave trees will be selected in order to maintain select trees in a trail corridor that are an important part of the trail experience. Identification and marking will be coordinated with the timber program when sales are marked.

## Forest Plan Standards

2.15.13 On USFS lands, all resource management activities must be consistent with the established scenery objectives shown on Figure 2.15 unless a decision (with supporting rationale) is made to deviate from the management guidance in a site-specific NEPA decision.

**Areas of Moderate SIO:** Harvest units fall within the Moderate Scenic Integrity Objectives displayed on the Forest Plan map. As described in the FEIS for the Forest Plan, a Moderate Scenic Integrity Level refers to landscape where the valued landscape character appears slightly altered. Noticeable deviations must remain visually subordinate to the landscape character being viewed. The Scenic Integrity Objective states "Landscape may be slightly and noticeably altered by management and other activities."

The uneven age silvicultural treatments proposed in the units do not alter the landscape because residual tree cover is maintained (see silviculture report).

In addition Forest Plan Guidelines would be applied including "2.15.25b On SJNF lands, with regard to clearcutting, sanitation salvage, thinning, shelterwood harvests, and overstory removal, foreground views from system trails and roads, and from recreation areas, should be designed in a manner that avoids dominating views of large, continuous openings and is mitigated by the presence of sufficient groups of residual trees. Uncut islands should be reserved within unit(s) in order to reduce apparent size of unit,

provide visual diversity, and achieve a more natural-appearing treatment area." Design features include creating openings with a natural appearance with uneven edges. The shape will be an irregular pattern that mimics existing natural openings and will avoid straight-line edges. Cuts would blend with natural landscape features such as natural meadows or openings and rock outcrops when possible. The FEIS for the Forest Plan also recognizes the stability of forest scenery is dependent on ecosystem resiliency.

> "Scenery is dependent on a healthy ecosystem. Natural disturbance elements (including fire, flood, landslides, and avalanches) are normal ecosystem processes and create or perpetuate natural scenic conditions. In particular, wildfire is a disturbance factor that has been profoundly affected by fire suppression and other land management activities.

The following section describes Forest Plan Guidelines and how they relate to the project (*italic text*).

2.15.25 For timber harvest activities on SJNF lands, and fuels treatment activities on both SJNF and TRFO lands:

> 2.15.25a Treatment units should be designed to minimize visual contrasts. Design features could include leaving large clumps of residual trees or shrubs located within a treatment unit, eliminating straight lines along treatment boundaries and facilitating the re-establishment of native species, as well as other similar actions.
>
> *See design features above.*
>
> 2.15.25b On SJNF lands, with regard to clearcutting, sanitation salvage, thinning, shelterwood harvests, and overstory removal, foreground views from system trails and roads, and from recreation areas, should be designed in a manner that avoids dominating views of large, continuous openings and is mitigated by the presence of sufficient groups of residual trees. Uncut islands should be reserved within unit(s) in order to reduce apparent size of unit, provide visual diversity, and achieve a more natural-appearing treatment area.
>
> *The vegetative treatments would not result in dominating views of large continuous openings because group selection and thinning only removes a portion of the trees. See design features above.*
>
> 2.15.25c Within immediate foreground of recreation sites such as campgrounds, picnic areas, and trailheads:
>
> - *There are no recreation sites impacted by this project.*

2.15.25g In sensitive foreground areas (as viewed from system roads, trails and/or developed recreation sites), unit boundaries and tree marking should be accomplished with temporary flagging and removed once need is fulfilled.

*Tree marking in sensitive foreground areas would be placed on the opposite side of the tree (see design features above). Although this guideline requires temporary flagging implementation of this project will be more efficient if paint is used.*

## Alternative A - No Action

Under the No Action alternative, no timber harvest would occur. Under this alternative, Ponderosa stands would remain in their current condition. Bark beetle decline and successional mortality would continue in mature stands as they continue to age. Disruptions to SIO from treatment activities would not occur. General human uses in the area such as winter and summer motorized activities, dispersed recreation, livestock grazing, hunting and fuel wood gathering would continue.

Current management activities and interactions between natural processes and human impacts would continue under the No Action alternative. General human uses in the area such as winter and summer trail activities, dispersed recreation, livestock grazing, hunting and fuel wood gathering would continue unchanged. Scenic quality would remain in its current condition throughout the area and scenic character would change in the long term from natural processes, livestock and human impacts.

## Alternative B - Proposed Action

The resulting clearings from the proposed treatments would be visible from near ground within the project area. In background and middle ground views, scenic value would be reduced only in the short term (1-10 years) and would be most apparent in the winter season when snow cover will highlight the open treated areas and in the fall season when fall color over the project area would be reduced. The treatment units would have varied edges, groups of leave trees and irregular sizes and shapes that mimic surrounding naturally occurring openings. As expected, Ponderosa regeneration occurs and continues to thrive in the longer term (10-30 years) in the proposed treatment areas, the visual impacts would be reduced and the scenic quality would increase.

Within the project area, the scenic resource would have negative impacts to foreground views of all treatment units in the short term (1-5 years). These impacts would be most visible along primary access routes through or along the project area that receive the highest number of visitors. This impact would be most significant on trails in the Boggy Draw block. Short-term scenery effects that would be evident in foreground views would include evidence of harvest activities such as slash, stumps, root wads, landings, skid trails, temporary roads and marking paint. In general, the longest lasting scenery impact comes from soil disturbance or color contrast generated from logging. The most significant impact will be the change in the stocking level of the forest where trails are and where visitors are attracted to the area due to the stocking rate.

Visitors using trails will see a dramatic change in the landscape, especially during and immediately after timber harvests. The trail system in the Boggy and Turkey Knolls blocks are very popular with locals and non-locals, many of whom use the system throughout the year. The impacts to those users will be significant since they have an expectation for a denser or more heavily stocked forest that provides shade and a more forested viewshed. This condition will remain that way for a period beyond the life of this analysis but will be muted as oak brush and other shrub like plants return.

## Alternative C – 20” diameter tree retention

Although Alternative C would leave some larger trees in the project area, the visitor experience would be like Alternative B.

## Cumulative Impacts

No future vegetation management projects have been proposed in proximity to the harvest units for the Salter project. Ongoing activities described in the affected environment section will continue. Ongoing implementation of the Boggy Glade travel management decision may result in new road signs, route closures, boulders, or areas of ground disturbance. These additional effects would remain within scenic integrity objectives for the Salter area because they would occur at specific locations and not encompass broad areas. Additional prescribed fire activities will result in user displacement.

Impacts to visitors who are accustomed to a more heavily stocked or denser forest will continue see the impacts to their experience into the future. As oak brush and other shrubs return the landscape will become less homogeneous resulting in more varying viewsheds.

Based on the past, present and future actions discussed above and the Proposed Action, the cumulative effects of the activities in the area will substantially raise the impact to forest scenery in the Boggy and Oak Knolls block with less impacts across the rest of the project area if the recommended design criteria are implemented. However, users accustomed to denser stands along trails will see an impact to the typical forest scenery they are accustomed to.




**Disclaimer**

The USDA Forest Service makes no warranty, expressed or implied regarding the data displayed on this map, and reserves the right to correct, update, modify, or replace this information without notification.

N

**Treatment Units**
- Rec 1
- Rec 2
- Rec 3
- Rec 4
- Rec 5
- Rec 6
- Ranger District

**Transportation System**
- 1 - BASIC CUSTODIAL CARE (CLOSED)
- 2 - HIGH CLEARANCE VEHICLES
- 3 - SUITABLE FOR PASSENGER CARS
- 4 - MODERATE DEGREE OF USER COMFORT
- 5 - HIGH DEGREE OF USER COMFORT
- Motorized Trails
- Non Motorized Trails

0 0.5 1 2 Miles

Author: Tom Kochanski

Map Creation Date - 12-09-2020
Map Revision Date - 01-21-2021

# Salter EA

San Juan
National Forest
Dolores
Ranger District




**Disclaimer**

The USDA Forest Service makes no warranty, expressed or implied regarding the data displayed on this map, and reserves the right to correct, update, modify, or replace this information without notification.

N

**Treatment Units**

- Rec 1
- Rec 2
- Rec 3
- Rec 4
- Rec 5
- Rec 6
- Ranger District

**Transportation System**

- 1 - BASIC CUSTODIAL CARE (CLOSED)
- 2 - HIGH CLEARANCE VEHICLES
- 3 - SUITABLE FOR PASSENGER CARS
- 4 - MODERATE DEGREE OF USER COMFORT
- 5 - HIGH DEGREE OF USER COMFORT
- Motorized Trails
- Non Motorized Trails

0 0.25 0.5 1 Miles

Author: Tom Kochanski
Map Creation Date - 12-09-2020
Map Revision Date - 02-23-2021

# Salter EA

San Juan National Forest
Dolores Ranger District




**Disclaimer**

The USDA Forest Service makes no warranty, expressed or implied regarding the data displayed on this map, and reserves the right to correct, update, modify, or replace this information without notification.

**Treatment Units**

- Rec 1
- Rec 2
- Rec 3
- Rec 4
- Rec 5
- Rec 6
- Ranger District

**Transportation System**

- 1 - BASIC CUSTODIAL CARE (CLOSED)
- 2 - HIGH CLEARANCE VEHICLES
- 3 - SUITABLE FOR PASSENGER CARS
- 4 - MODERATE DEGREE OF USER COMFORT
- 5 - HIGH DEGREE OF USER COMFORT
- Motorized Trails
- Non Motorized Trails

N

0 0.25 0.5 1 Miles

Author: Tom Kochanski
Map Creation Date - 12-09-2020
Map Revision Date - 02-23-2021

# Salter EA

San Juan National Forest
Dolores Ranger District




Disclaimer

The USDA Forest Service makes no warranty, expressed or implied regarding the data displayed on this map, and reserves the right to correct, update, modify, or replace this information without notification.

N

**Treatment Units**

- Rec 1
- Rec 2
- Rec 3
- Rec 4
- Rec 5
- Rec 6
- Ranger District

**Transportation System**

- 1 - BASIC CUSTODIAL CARE (CLOSED)
- 2 - HIGH CLEARANCE VEHICLES
- 3 - SUITABLE FOR PASSENGER CARS
- 4 - MODERATE DEGREE OF USER COMFORT
- 5 - HIGH DEGREE OF USER COMFORT
- Motorized Trails
- Non Motorized Trails

0 0.15 0.3 0.6 Miles

Author: Tom Kochanski

Map Creation Date - 12-09-2020
Map Revision Date - 02-23-2021

# Salter EA

San Juan National Forest Dolores Ranger District




**Disclaimer**

The USDA Forest Service makes no warranty, expressed or implied regarding the data displayed on this map, and reserves the right to correct, update, modify, or replace this information without notification.

N

| Treatment Units | Transportation System |
| --- | --- |
| Rec 1 | 1 - BASIC CUSTODIAL CARE (CLOSED) |
| Rec 2 | 2 - HIGH CLEARANCE VEHICLES |
| Rec 3 | 3 - SUITABLE FOR PASSENGER CARS |
| Rec 4 | 4 - MODERATE DEGREE OF USER COMFORT |
| Rec 5 | 5 - HIGH DEGREE OF USER COMFORT |
| Rec 6 | Motorized Trails |
| Ranger District | Non Motorized Trails |

0 0.25 0.5 1 Miles

Author: Tom Kochanski

Map Creation Date - 12-09-2020
Map Revision Date - 02-23-2021

## Salter EA

San Juan National Forest
Dolores Ranger District




**Disclaimer**

The USDA Forest Service makes no warranty, expressed or implied regarding the data displayed on this map, and reserves the right to correct, update, modify, or replace this information without notification.

| Treatment Units | Transportation System |
|---|---|
| Rec 1 | 1 - BASIC CUSTODIAL CARE (CLOSED) |
| Rec 2 | 2 - HIGH CLEARANCE VEHICLES |
| Rec 3 | 3 - SUITABLE FOR PASSENGER CARS |
| Rec 4 | 4 - MODERATE DEGREE OF USER COMFORT |
| Rec 5 | 5 - HIGH DEGREE OF USER COMFORT |
| Rec 6 | Motorized Trails |
| Ranger District | Non Motorized Trails |

0 0.5 1 2 Miles

Author: Tom Kochanski
Map Creation Date - 12-09-2020
Map Revision Date - 02-23-2021

# Salter EA

San Juan National Forest Dolores Ranger District




### Disclaimer

The USDA Forest Service makes no warranty, expressed or implied regarding the data displayed on this map, and reserves the right to correct, update, modify, or replace this information without notification.

| Treatment Units | Transportation System |
|---|---|
| Rec 1 | 1 - BASIC CUSTODIAL CARE (CLOSED) |
| Rec 2 | 2 - HIGH CLEARANCE VEHICLES |
| Rec 3 | 3 - SUITABLE FOR PASSENGER CARS |
| Rec 4 | 4 - MODERATE DEGREE OF USER COMFORT |
| Rec 5 | 5 - HIGH DEGREE OF USER COMFORT |
| Rec 6 | Motorized Trails |
| Ranger District | Non Motorized Trails |

0 0.5 1 2 Miles

Author:Tom Kochanski

Map Creation Date - 12-09-2020
Map Revision Date - 02-23-2021

# Salter EA

San Juan National Forest
Dolores Ranger District




**Disclaimer**

The USDA Forest Service makes no warranty, expressed or implied regarding the data displayed on this map, and reserves the right to correct, update, modify, or replace this information without notification.

N

0 0.5 1 2 Miles

- Ranger District
- Motorized Trails
- Non Motorized Trails
- Possible Coincidence with Non Motorized Trails

Author: Tom Kochanski

Map Creation Date - 12-09-2020
Map Revision Date - 03-02-2021

# Salter EA

San Juan
National Forest
Dolores
Ranger District




Disclaimer

The USDA Forest Service makes no warranty, expressed or implied regarding the data displayed on this map, and reserves the right to correct, update, modify, or replace this information without notification.

N

0 0.5 1 2 Miles

Boggy CT

Boggy STS

Boggy STS

Boggy PFA

Ranger District

Transportation System

1 - BASIC CUSTODIAL CARE (CLOSED)

2 - HIGH CLEARANCE VEHICLES

3 - SUITABLE FOR PASSENGER CARS

4 - MODERATE DEGREE OF USER COMFORT

5 - HIGH DEGREE OF USER COMFORT

Motorized Trails

Non Motorized Trails

Possible Coincidence with Non Motorized Trails

Author:Tom Kochanski

Map Creation Date - 12-09-2020
Map Revision Date - 03-02-2021

# Salter EA

San Juan National Forest Dolores Ranger District

06-18-2021

**David J Casey**
**Supervisory Forester**

**Travis Bruch**
**Timber Program Manager - Silviculturist**

# VEGETATION ANALYSIS

# 1 Methodology

The analysis began with extensive research of district GIS layers and associated attribute data to identify potential stands to harvest. The FS-Veg Spatial layers (stands) along with Common Stand Exam (CSE) data were used to finalize treatment need and potential prescription (rx) category along with breaking out all acres into units. Upon finalizing tentative cutting units the areas were provided to specialist spatially for them to make preliminary determination of mitigation measures and accessibility of stands. The preliminary determinations were then used to make further refinement of cutting units. The units were then locked for final analysis by the entire IDT.

## 1.1 Historical Background

The condition of today's pine-oak forest is largely a legacy of historically unprecedented levels of human activities occurring from the late 19th century into the 20th century. Following the arrival of large numbers of Euro-American settlers in the middle to late 1800s, the first sawmill was established in the area as early as 1874, approximately 30 years before the National Forest was established in 1905. Around the turn of the century, the company town and lumber mill of McPhee, Colorado was established just a few miles north and west of present day Dolores. Large scale commercial harvesting of the pine forest was underway by the early 20th century.

At its peak in 1927, while owned and operated by the New Mexico Lumber Company, McPhee was Colorado's largest and most productive mill town, producing more than half the State's annual lumber. Operations at the McPhee mill were effectively ended in 1948 when a catastrophic fire destroyed most of the facility (Mausolf 1981). In these early days the vast majority of the logging was in the ponderosa pine type and focused on harvesting very large trees while leaving smaller trees and species of lesser value (Williams 1956). The most obvious effect of the early logging of ponderosa pine forests is the general lack of large, old trees and snags in these forests today (Romme 2009).

Heavy and largely unregulated livestock grazing was occurring simultaneously with the early logging operations and active fire suppression had also become a widespread policy in the early 20th century. This unique combination of historic events -- the elimination of extensive fires, removal of grass competition by livestock, and the removal of a large component of the forest overstory coincided with unusually wet weather and good seed crops to establish an abundant cohort of pine regeneration in the early 20th century (Covington & Moore 1994).

More current events have included several efforts to restore ecological function to the project area but were met with the limitations of a poor timber market for product removal. Two EAs were developed at the time as a community effort to restore ecological function to the species and improve the economic viability of Ponderosa Pine. The district wide effort was called "Ponderosa Pine Partnership". The goal was to develop prescriptions based on the most current science from Colorado State University (CSU) and other research centers of forest management. Through aggressive harvesting and reestablishing of fire frequency the stands would be brought into a more

productive state and have wildfire and insect/disease resilience. Bill Romme (CSU) along with Phil Kemp (USFS) developed innovative prescriptions in an effort to generate economically viable sales that also met ecological restoration goals. This was a desired approach by the community and wood purchasers that were seeing a decline in the health of forest and the economic stability of the local wood industry. Through creative approaches to timber sale contracts in which the county purchased sales and then adjusted requirements of the sales to better facilitate the local industry at the time. Economic specialist were brought in from CSU to help establish and connect purchasers with sustainable outlets for forest products. Partners included both counties covering the district, Colorado State Forest Service and Colorado State University. Although the effort was successful in many ways, the lack of large scale timber markets made the process slow and cumbersome. The 3,000 acre Guard Station EA was developed in 1995 and all harvest activities were completed by1998 due in large by the bankruptcy of the largest saw mill in the area. Beyond 1998 prescribed fire activities continued in this EA including broadcast, slash pile and abandoned wood deck burning. The 3,000 acres Ferris EA was also developed in conjunction with the “Ponderosa Pine Partnership” and the decision notice was signed in 1998 and implementation went all the way until 2003 when the Narriguinep fire consumed a portion of the harvest acres identified in the EA. Once again the fragile state of the local timber industry was exposed with the purchaser of several contracts working with agency to dissolve the commitment post fire.

In 2014 the Lake Canyon EA was developed in direct response to the current bark beetle outbreak initial identification. This EA covered roughly 10,000 acres and included harvest, pre-commercial, mastication, and prescribed fire activities. Roughly 70-80 % of the harvest and pre-commercial activities have been completed. Prescribed fire activities continue within the project area with activity fuels and first entry broadcast burns. Implementation has been slow on this analysis due to lack of market for Ponderosa Pine. Another limitation of this analysis was strictly designated cutting unit and a moving infestation. Stands that had little to no infestation in 2014 have developed into 70-80% infestation.

More recently an adjacent landscape has been cleared for vegetation management on the Dolores District. The Lone Pine decision was signed in 2019 and included roughly 36,000 acres of implementation. This decision helped establish the silviculture approach, pace, scale and readied industry to make Salter EA a certainty for planning. Project implementation has started on Lone Pine and overlap in implementation periods with Salter is anticipated.

Lone Pine was the first large scale NEPA the district has taken on for a while with a focus on Ponderosa Pine. The project took the intent of Lake Canyon EA and previous ponderosa pine management efforts and developed an approach that relies on industry to remove the byproducts of vegetation management with multiple objectives. Implementation started in 2020 and will continue for roughly a 10 year period.

# 2 Forest Plan and Desired Conditions

All units proposed for treatment are located within Management Area 5. In active management areas such as 5, visitors to the forest can expect to see a wide range of activities including timber harvesting. These are multiple-use areas where active management occurs in order to meet a variety of social, economic, and ecological objectives. They are easily accessible, occurring mostly on roaded landscapes and

relatively gentle terrain. These are lands where timber harvesting and other management activities influence the composition, structure, and landscape patterns of the vegetation. Natural ecological processes and disturbance agents (including succession and fire) are often influenced by humans on many of these lands.

In addition all units proposed for treatment are identified as Suitable Timber Lands by the LRMP. Timber suitability is determined through a process established through the National Forest Management Act (NFMA) and planning regulations. Timber suitability for the SJNF, includes the Salter analysis area, and other areas determined during the 2013 forest planning effort. During that effort, all areas on the SJNF were classified as either suitable for timber production[3], tentatively suitable for timber production, or unsuitable; section 2 of the LRMP goes further into detail about the other suitability designations.

The SJNF LRMP provides further direction relative to the desired conditions associated with Management Area 5 and suitable timber lands as well as other general guidance of how to manage a vegetation management program.

LRMP Prelude Guidance

The timber program across both SJNF and TRFO lands will focus treatment in

- landscapes in the WUI that have altered fire regimes and/or have areas with high fuel loadings;
- landscapes at high risk for developing epidemic levels of insect and/or disease infestation;
- landscapes where disturbance (such as fire, or insects/disease) has resulted in dead or dying trees

- areas where vegetation management could most effectively move age classes, size classes, density, and species closer to desired conditions;
- areas treated previously in order to maintain sustainable conditions and improve scenic integrity; and
- areas where wood processing facilities can effectively and economically utilize products resulting from vegetation management.

Strategies to meet forest vegetation management objectives across the SJNF and TRFO include:

- utilization of forest resources from vegetation management activities, including providing small-diameter and biomass products from treatments in order to support emerging biomass markets;
- trees killed by fire, insects, disease, or weather events (such as wind-thrown trees);
- a balance of forest product quantity, size, species and quality in order to maintain forest products industry capacity at current or higher levels;
- integration of the timber and fuels programs to meet overlapping or common goals; and
- a combination of legal authorities and partnerships to broaden opportunities for meeting forest vegetation objectives, in priority landscapes or areas, with cost-effective treatments.

**2.2.23: Ponderosa Pine Forests -** Ponderosa pine forests display variable density and structure. Most stands reflect uneven-age structure comprising variable-sized, even-aged clumps of trees. Clumps vary in size, ranging from as few as three trees to as many as 20 or more trees. Tree clumps vary in density from widely spaced large trees to tightly spaced small trees. Collectively, these forests contain multiple canopy layers. Between or surrounding these clumps are shrub- and/or grass/forb-dominated openings. Ponderosa pine seedlings and saplings are present, as are large old, yellow-barked ponderosa pine trees. The presence of other tree species—e.g., Douglas-fir, white fir, blue spruce (*Picea pungens*), or Rocky Mountain juniper (*Juniperus scopulorum*)—is infrequent to rare. The abundance and distribution of Gambel oak (*Quercus gambelii*) and other native shrubs in the understory of these forests is variable and includes small and large patches of all size classes. Native grasses and forbs (including bunchgrasses, Arizona fescue, muttongrass [*Poa fendleriana*], and mountain muhly [*Muhlenbergia montana*]) are present and well distributed in most ponderosa pine forests. Forest litter is common, though highly variable in depth and extent due to fire. Invasive plant species are absent or rare. Presence of snags or large wood (on the ground) is also highly variable due to fire. Low-intensity, high- frequency surface fires are common in most ponderosa pine forests (with frequencies ranging from about 12 to 30 years).

**2.9.1:** Forest vegetation management on SJNF lands that results in, among other objectives, meeting needs or demands for forest product offerings (commercial, personal, or other use) is done in a manner that:

- maintains or improves ecosystem function, resilience, and sustainability;
- supports, at least, the current level of economic activity in the local timber industry;
- provides economic or social support to local communities;
- ensures current and future needs for Native American tribal use, including that associated with special forest products (e.g., teepee poles);
- utilizes, to the fullest extent practicable, potential products including sawtimber, poles, top wood, or slash (e.g., limbs, foliage);
- supports innovation in utilization, including conversion of cut-tree mass into biofuels, pellets, biochar, or other useful products;
- efficiently balances or reduces costs of implementation of treatment activities; and
- anticipates climate-related plant succession changes (such as favoring heat- or drought-resistant tree species as leave trees, or in reforestation).

**2.9.14:** The silvicultural systems shown, by forest vegetation type in Table 2.9.4, that meet the management objectives for the landscape or individual stands of trees within a landscape setting are acceptable. Both even- and uneven-aged management systems can be used and applied at scales ranging from a few acres to many hundreds of acres. These silvicultural systems are tobe applied in a manner that will ensure natural regeneration where artificial regeneration is not necessary for other resource objectives. Tree-stand vegetation management treatments must be approved by certified silviculturists.

**Table 2.9.4: Appropriate Silvicultural Systems by Forest Vegetation Type**

| Forest Vegetation Type | Even-aged | Two-aged | Uneven-aged |
|---|---|---|---|
| Ponderosa pine | Shelterwood<br>; seed tree | Irregular shelterwood | Group selection;<br>single-tree<br>selection |

**Table 2.9.5: Guidelines for Allowable Stand Improvements and Regeneration Methods by Forest Vegetation Type**

| Forest Vegetation Type | Stand Improvements | Regeneration Methods |
|---|---|---|
| Ponderosa pine | Pre-commercial thin<br>Commercial thin<br>Sanitation<br>Release and<br>weed<br>Improvement<br>cuts | Natural<br>Artificial |

**Table 2.9.3: Minimum Number of Seedlings (or aspen suckers) for Adequately Restocking of a Regeneration Site**

| Vegetation Type | Minimum Numbers of Seedlings (per acre) |
|---|---|
| Ponderosa pine | 150 |

The mixture of standards and guidelines listed above are what ultimately identified this landscape as in need of treatment to meet desired condition described LRMP. As an area identified in LRMP as suitable timber base and within Management Area 5 it was designated to meet multiple objectives with a focus on timber production.

As the LRMP describes the desired conditions, including services to be provided by this landscape. It is very apparent this analysis meets the intent of the LRMP. The area contains areas that have been moderately burned by wildfire and adjacent areas that have been devastated by wildfire. Bark beetles have moved into adjacent landscapes and have caused significant mortality and this landscape is seeing the early stages of this same complex of bark beetle starting to become established. The structure and age class distributions in the stands identified for this analysis are not within desired conditions described in 2.2.23 based on field recon and inventory data. These factors add up to a significant threat to the desired conditions for lands suitable for timber production. The LRMP covers silviculture systems for Ponderosa Pine to meet the desired conditions and the approaches described further in the document, meet this need. As this document will describe how the treatment identified in the preferred alternative meet the systems identified.

The above guidance for management is linked to having the right tools in place to implement vegetation management to meet desired conditions and outlets for the woody byproducts. The LRMP gives direction to start in “areas where wood processing facilities can effectively and economically

utilize products resulting from vegetation management". This has been a missing component to implementing vegetation management at the scale needed to meet LRMP desired conditions for Ponderosa Pine. Currently adequate industry is in place to help meet what is described above in the standards and guidelines.

The LRMP describes the need for industry to be in place as well as desired conditions within industry and the interaction with local economies. Utilizing industry to not only meet short term vegetation management goals but sustainable long term goals leading to break troughs in utilization. When additional products are introduced the potential to reduce treatment cost is developed. A recent breakthrough and an indicator of a prosperous and eager industry is the ability to now include top wood in sale volume. Also the development of new products based on what the agency plans to manage indicates a strong industry that can adapt to changes in vegetation management and associated byproducts. Advancement in utilization of vegetation management byproducts is setting the San Juan National Forest timber program apart from other forests trying to engage with similar efforts.

## Affected Environment (Current Conditions)

The dominant forest type of the proposed project areas is Ponderosa Pine with an under story of Gambel oak along with grass and forbs. The forest structure varies with intermixing of regeneration pulses with overstory trees to mature stands that are generally even aged. Although pre-dominantly even aged there are two poorly represented age classes scattered throughout these stands; making up an overall minor component of stand structure when modeled. The first of these being large 27" plus DBH trees with only a few trees per acre in some cases, these trees are relics left from the last harvest entry mostly likely as seed trees. The majority of the stocking is represented in the 12" to 24" diameter classes with an intermixing of trees occupying the 25" to 26" classes. These trees average around 80-120 years with stand initiation in the 1900 to 1940's era. The size classes less than 12" DBH were the result of recent past management or other disturbance event lining up with a cone pulse over past 60 years. All together most stands across the size classes have current basal areas ranging from 80 to 140 $ft^2$/ac per acre. There is also the ability for good establishment of seedlings and regeneration as seen in stands currently meeting desired conditions in LRMP or areas that have seen various types of disturbance. As seen in the structure of areas of stands during field reviews cone crops can be episodic in nature leading to very patchy and variable regeneration. Yet where represented it often has 400 to 500 seedlings per acre. This size class is the other underrepresented component of stands' structures identified for treatment.

The plantation areas identified in the Salter block for treatment are unique enough to mention but their treatment falls within the same variability described for commercial thinning stands. There was an extensive effort in the 1980's to regenerate or reforest stands that were below stocking as result of minimally regulated harvesting in 1940's and lack of fire disturbance. The plantation areas are located only in the Salter block for this project and do not resemble typical plantations as one may think with trees planted in rows and cultivated for a specific purpose. The plantation areas in the Salter EA are locations that were inter-planted or just simply mechanically site prepared to encourage conditions conducive to seedling recruitment. The latter method being the most widespread within the areas identified for treatment. As will be described in more detail in the silvics discussion. Ponderosa pine can be episodic when producing cones and many areas have heavy regeneration while others have none. Beetle mortality in the over story and density induced mortality in these smaller age class trees is being observed. The specific prescription to thin these plantations would be based on tree form, removing trees with forks, mistletoe, poor form, and insect evidence or simply it could be just on variable spacing to trend towards desired condition

Current bark beetle activity within the treatment units continues to be either missing or in small isolated pockets of light infestation as the below map displays. The exception to this description is the Salter block with small pockets that vary from light to very severe in intensity. Mortality can be readily seen in the over story of this area but still isolated. This appears to be an expansion area of infestation from the Lone Pine main infestation of RHBB. Isolated pockets are also located within

the area between treatment blocks Salter and Plateau; indicating an eastern movement. Isolated pockets are also located within the Boggy Draw block additional pointing to an eastern movement. The focus of resilience for this forest health issue by the silviculturist continues to be an uneven aged stands with a focus on recruitment of young trees. This is based on uneven aged stand structure linked to better bark beetle resistance and resilience (Negron-2000/2008) Also during field observation of very severe mortality areas of the Lone Pine Assessment the post outbreak size class most prevalent is 6” DBH and below.

Gambel oak can be found in most stands both tree and brush form with variable densities and diameters. A few natural meadows are found throughout the project area in low lying draws aspen often present. Aspen is a minor tree species but does persist in some areas and occupies a cohort to dominant canopy position in microsites that have adequate moisture and soils. The species does suffer from encroachment pressure and lack of disturbance which has inhibited recruitment conditions in some stands. Grass and forb production is lacking in most areas of over-story pine where pine litter dominates the ground layer. Many areas contain over 10” of litter which is creating conditions for long periods of resonance heat during ignitions creating conditions for potential adverse impacts to Ponderosa pine root systems.

2020 Forest Health Flight Data (attributed by intensity)The map shows the results of annual forest health flight data performed by the interagency forest health group. The patterns and intensities within the Salter EA treatment units follows a similar pattern to what has been observed within the Lone Pine EA project area since the onset of the bark beetle complex. The map shows the eastern edge of the Lone Pine project area with severe intensities and widespread infestation. Although Salter appears to only have a spotty infestation many of the small spots are of high intensity. The consecutive years show a general expansion of the infestation and a need current to increase resistance structure and promote resilience components to stands to meet this ongoing disturbance in a proactive manner.



# Silviculture and Ecology

**Habitat Type/Plant Association**: The Society of American Foresters would classify the current cover type of these stand as falling under the broad Interior Ponderosa Pine (#237) forest cover type. Pine-oak is probably an appropriate way to describe this cover type, as Gambel oak is also a major component of these forests and often dominates the understory. The climax community of this site can be described by the Region 2 plant association Pinus ponderosa/Quercus gambelii (Pipo/Quga)– Symphoricarpus phase described by Johnston (1987).

Youngblood and Mauk (1985) also describe a very similar habitat type as commonly occurring in the neighboring Abajo Mountains of southeastern Utah. Mature overstories of ponderosa pine are relatively dense. The understory is conspicuously shrubby. The snowberry (*Symphoricarpos oreophilus*) phase represents the cooler portions of the Pipo/Quga habitat type occurring at upper elevations and on more moderate aspects. This phase represents conditions with the highest structural diversity within the ponderosa pine series. On some sites, quaking aspen may be an early seral associate occurring in patches. The diagnostic shrubby understory is dominated by snowberry and Gambel oak, which may assume a treelike growth form. The shrub layer will also typically contain serviceberry (*Amelanchier spp.)*. The herbaceous layer often includes various sedges (*Carex sp.*), mule-ears (*Wyethia amplexicaulis*), Fendler's meadow rue (**Thalictrum fendleri**), sandwort (**Arenaria congesta**), American vetch (**Vicia Americana**), nodding brome (*Bromus anomalus*), muttongrass (*Poa fendleriana*) and prairie Junegrass (*Koeleria nitida*) (Youngblood & Mauk 1985).

**Silvics and Ecology – Ponderosa Pine:**
In Southwestern Colorado ponderosa pine encountered will likely be either one of two recognized varieties, var. *scopulorum* or var. *brachyptera*, which are distinct from the Pacific varieties. The species displays a great deal of genetic variation and studies demonstrate continuous genetic variation along geographic and elevational gradients (Rehfeldt 1993). Although ponderosa pine is classed as intolerant, ponderosa pine can be either a climax or a seral species. It is a climax species at the lower limits of the coniferous forests, such as the Pipo/Quga habitat types, and a seral species in higher elevation mesic forests. (Oliver & Ryker 1990). Ponderosa pine is the most fire resistant conifer in Region 2. Mature ponderosa pine trees are well adapted to survive surface burning, with thick bark that protects the cambium and high crowns that reduce the likelihood of fatal crown scorch or torching. Seedlings and saplings are also able to withstand relatively high temperatures. On the other hand, ponderosa pine seeds are relatively large and heavy and are not disseminated far from the seed tree, with most of the seed deposited within one or two tree heights.

This makes the species resistant to fire, but poorly adapted to rapid recolonization after a severe disturbance occurs. The best trees to retain for seed production would be large vigorous trees (24" to 28" DBH) free of disease or damage (Schubert 1974). Seeds from trees aged 60 to 160 tend to be more viable than those of younger or older trees (Oliver & Ryker 1990). Natural regeneration of ponderosa pine in this region is highly sporadic. Effective natural regeneration in any given year is unlikely because it depends largely on the chance coincidence of both a bumper seed crop and favorable spring and summer precipitation patterns. Good seed crops are produced only every 4 to 5 years on average, with no dependable periodicity (Sheppard, et. al. 2006). As much as 100% of the seed is often non-viable and/or preyed upon in the intervening years (Heidmann, et. al. 1982; Blake, et. al. 1985).

To be effective, good seed-falls must coincide with good late spring or early summer rains. However, spring and early summer are generally very dry. Adequate moisture for seed germination and establishment usually doesn't occur before July. If rains start either too early or too late,

germination may occur, but the seedling will not be able to develop adequately to survive subsequent drought or winter weather. Infrequently occurring wet summers can greatly aid seedling establishment. However, in a natural system, these events would also have to coincide with the existence of a favorable seed bed, usually the result of a wildfire. Given these requirements for germination and growing space, decades could likely pass without significant natural pine regeneration.

**Silvics and Ecology – Gambel Oak:**
The abundance of Gambel oak trees and shrubs in the ponderosa pine forests of the South Central Highlands is one of the features that makes this region especially distinctive (Romme, et. al. 2009). Gambel oak is an ecologically important species providing food and shelter for many wildlife species and probably plays an important role in soil nutrient cycling. Gambel oak grows in the pine-oak forest of southwestern Colorado primarily in its shrub form with occasional understory or midstory trees occurring. Gambel oak is a clonal species and a member of the white oak group (Abella 2008).

Reproduction is usually vegetative from both rhizomes and root crowns. Gambel oak stems generally exhibit low resistance to fire but the vigorous sprouting following disturbances make it a very resilient species. While Gambel oak was certainly present historically in the San Juan's ponderosa pine type, it is likely that the current density levels are far outside the historic range of natural variability. Abella and Fulé (2008) reviewed several studies regarding changes in oak density in the southwest since the pre-settlement period and all nine of them found that densities of small diameter oaks have escalated significantly. Gambel oak's importance to management in the pine-oak forest lies with its ability to compete with ponderosa pine for site resources as well as its contribution to fire behavior and its role in successional pathways.

Although Gambel oak cannot compete with overstory pine for light, it is very drought tolerant and its extensive root system utilizes large amounts of soil moisture (Tew 1967). Since water is more limiting than light in the pine-oak system some growing space is surely claimed and utilized by the oak component. This competition for limited moisture is probably most detrimental to pine when the trees are very young and seedlings are competing directly with the extensive oak layer. Pine germination and establishment will also likely be hindered when micro sites are fully occupied by oak and heavy leaf litter covers mineral soil. Some research has even indicated a possible inhibiting allelopathic effect of oak leaves on pine germination (Harrington 1987). From a fuels perspective, the capacity of oak foliage to release a great amount of heat during combustion combined with its relatively tall growth habit produces high flame lengths. This can cause flame to reach into the ponderosa pine canopy and initiate crown fire especially under severe wind conditions (Romme, et. al. 2009). Gambel oak also produces a large amount of leaf litter which significantly contributes to surface fuel loads. These factors make the size and stocking level of Gambel oak important from fire behavior standpoint as well.

**Disturbance Regimes:**
Prior to the period of Euro-American settlement, fire was probably the most important natural disturbance in this area's ponderosa pine forests. During a pre-Euro-American reference period, most of the San Juan's ponderosa pine forests appear to have been characterized by relatively frequent low intensity fires (USDA Forest Service 2007). Grissino-Mayer, et. al. (2004) demonstrated that the median fire interval for the ponderosa pine type in southwestern Colorado during a pre-1870 reference period ranged from 12 to 30 years. The median fire intervals from the San Juan Mountains appear to be a little longer than the median intervals from comparable sites in central and southern Arizona (Romme, et. al. 2009). Baker (2018) suggests that low intensity fires

in the San Juan's had a multi-decadal fire rotation with an average median fire entry of 31 years, however many sites had a much longer period between fires ranging from 16 to 59 years. With this longer fire return interval he surmises that understory vegetation would have fully recovered between fires. His research also shows that moderate and severe intensity fires also played a role in shaping the forests of Southwest Colorado and that Pine forests did historically encounter high severity burns. Fires of higher severity prior to 1909 have been documented to burn over 19,000 ha of ponderosa pine and his research shows that nearly all sites had high intensity fires. Larger fires on the San Juan's may have occurred in part because of the more abundant, dense understory shrubs.

The observed statistical variation in the fire intervals during this reference period is also worth considering. Occasional longer intervals between fires would seem to be required to allow pine seedlings to grow large enough to survive fire (White 1985, Brown & Wu 2005 Baker 2018). In addition to fire, other important disturbances have historically played a role in the area's ponderosa pine forests. Dwarf mistletoes and various fungal pathogens are active in ponderosa pine systems, as are lightning and windthrow. Numerous species of insects are known to affect ponderosa pine at some stage from cone to mature tree.

*Dendroctonus* spp. bark beetles are perhaps the most important insects, with the mountain pine beetle (*Dendroctonus ponderosae*) (MPB) being the most significant species in terms of potential effects historically. RMLANDS simulations for the San Juan estimated that the mean return interval between MPB epidemics in the ponderosa pine forest during the pre-1870 reference period was 251 years (USDA Forest Service 2007). Between outbreaks, beetles persist at low endemic populations for decades, infesting and killing stressed trees, resulting in scattered and often insignificant levels of tree mortality. When outbreaks develop in ponderosa pine it is usually in dense stands of midsized (8-12 inches diameter) trees. Widespread outbreaks develop over several years and can result in millions of dead trees and have significant effects on successional pathways (Gibson, et. al. 2009).

## Insects and Disease

Generally, the project area is in fair to good health with areas displaying indicators of good future forest health conditions. The stands that have had previous treatment within the last 15 years under earlier ponderosa pine management efforts, display many of the desired conditions from the LRMP for ponderosa pine. These include lower basal areas below 100 $ft^2$/ac an acre, reduced small diameter overtopped and suppressed trees, and better structural dynamics. Many of the areas that have been unmanaged display forest health issues related to over-stocking, and lack of disturbance. The disease problem is primarily dwarf mistletoe and is isolated in many cases but showing signs of spread were it does occur. Most noticeable on ridge tops and areas of shallow soils and exposed rock. Trees in most cases are able to live with the disease in a stunted state but mortality from the disease is also present stands with notable populations. The most prominent of changes within the project area is the increased presence of bark beetles. Although bark beetles are native to these stands their current rapid occupation of areas in the Lone Pine Environmental Assessment area are erratic behavior is alarming. The three main bark beetles attacking trees within the project area are Round Headed Pine, *(Dendroctonus adjunctus*), Western Pine (*Dendroctonus brevicomis*), and Mountain Pine (Dendroctonus ponderosae)

The main Dendroctonus of interest is the Round-headed pine bark beetle. When foresters were alerted of this beetle epidemic the Gunnison forest health center was called and the entomologist for the south zone, Tom Eager came out. To his surprise the predominant culprit was the round headed

pine beetle, previously only known to infect pine stands in NM and AZ with minimal impacts. In years after Tom's initial site visit additional entomologist have taken interest in this outbreak including USFS Entomologist Amy Lockner and CSFS Entomologist Dan West. The last few years have been spent trapping on federal, state and private lands to better understand the damage agents and localized behaviors. Based on the trapping data studies are underway into localized life cycles in relation to timing and number of flights per year, and spread ratio.

Descriptions of Bark Beetles

Round Headed Bark Beetle (RHBB), *(Dendroctonus adjunctus*) beetle has a 1yr life cycle depending upon elevation. It is generally understood that within the project area this species is only producing 1 life cycle per season; however studies are currently under way locally to confirm. Adults emerge and fly in late Sept thru late November with most numbers flying in September. Once the RHBB beetle finds a host it bores thru the outer bark into the phloem where an egg gallery is constructed. Limited gallery construction takes place in winter but then resumes in spring as this insect over winters as an adult. Egg hatch starts in mid- March and larvae develop rapidly. Adult beetles are present after mid -August and remain in the tree 2 to 3 months. These beetles have infested and killed pine trees from 5" and up and have flown up to ½ mile from the main infestations. The insect is relatively new to this forest but is a native species. Based on descriptions in literature, locally this insect is displaying erratic behavior with rapid spread. The species does not spread fast locally but is effective at mass mortality in all age classes and vigor. This characteristic is not generally seen in the other Dentroctonus found within the project area.

Mountain Pine Beetle - MPB (*Dendroctonus ponderosae*) beetle has a 1 year life cycle depending upon elevation. Adults emerge and fly in late June/early July although here can be shoulder flight on each side. The beetle develops through four stages: egg, larva, pupa, and adult. Except for a few days during the summer when adults emerge and fly to new trees, all stages are spent under the bark of infested trees.

All Dendroctonus species such as MPB move through most of their life cycle under the bark of trees. Once under the bark female beetles construct egg galleries as a starting place in the cycle. Packed with boring dust, these galleries are mostly in the phloem, or inner bark, although they slightly score the sapwood. For D. *ponderosae* they range from 4 to 48 inches long, averaging about 10 inches. Females lay tiny, pearl-white eggs in niches along the sides of the galleries which display unique characteristics of each beetle species. This activity takes place usually during the summer and early fall. The eggs hatch in 10 to 14 days, although they may take longer during cool weather. Sometimes, eggs are also laid in late spring by females that survived the winter. Surviving females may either reemerge and reattack trees or merely extend their egg galleries. The legless larvae are white with brown heads. This stage lasts for about 10 months from August to the following June. The larval broods feed on the phloem, constructing galleries that extend at right angles to the egg galleries. When mature, larvae excavate oval cells in which they turn into pupae. Pupae usually have been transformed into adults by July. Adults feed within the bark before they emerge. Exit holes are often shared when infestations are heavy and multiple beetles occupy the same tree in close proximity of each other. One or more beetles will then make an exit hole from which several adults will emerge. Within 1 or 2 days after emerging, the beetles will attack other trees to continue the cycle.

Western Pine Beetle-WPB (*Dendroctonus brevicomis)* in the northern part of their range and at higher elevations, the beetles can produce two generations each year. The insects emerge as an adult and seek new hosts in early June and late August. In the South and at lower elevations, the beetles can produce three and sometimes four generations each year. The WPB come out of current host and search for a new as early as March and as late as November. This life cycle is unique to this Dendroctonus species which can in many cases give this species an advantage. During an attack period or flight, which may last 3 weeks, as with the other Dendroctonus each female lays about 60 tiny pearl-white eggs individually in niches cut into the sides of the egg gallery. This species has a very district but erratic in appearance gallery. Some of these parent females may emerge and reattack to establish additional galleries elsewhere in the same tree or in other host trees. After incubating from 1 to 2 weeks, the eggs hatch. The larvae are small white grubs that feed first in the phloem, where they construct a short gallery. They then mine into the middle bark where most of their development takes place. After completing the typical Dendroctonus four larval stages, they transform into pupae and then into adults. As these brood adults feed on the middle and outer bark, fungal spores collect in their mycangia. Once the adult insects emerge, they are ready to find new host trees taking with them their symbiotic partner fungus with a blue staining indicator.

**Age**

Many of the stands are characterized as un-even aged due to the fact that there are three age classes, however the largest age class is comprised of relic trees left from the early 1900's that escaped harvest. Some of the stands have a good seedlings cohort that was established in the past 15 years. These two age classes however represent only a fraction of the basal area in the project area. 97% of the volume and trees per acre are represented in the age class that dominates the overstory between 10" DBH and 24" DBH. This age class is between 80 and 120 years old and was established prior to the harvesting that took place on the forest in the 1920's to 1940's. This dynamic of the stands would be classified as even aged from a cohort of trees that occupies the majority of the basal area capacity of the stand. Essentially this age class occupies recruitment areas and plays a large role in the overstocking of the stands identified for treatment.

In recognizing one of the desires of both agency as well as the public to retain old and large trees. The prescriptions proposed will not cut any tree over 26.9"DBH. Although many of these trees get infested with bark beetles and uneven aged management does not support a diameter cap. The size class is underrepresented here on the landscape and as such will be exempt from harvest evaluation (dead or alive).

**Composition**

Based on stand inventories the stand is relatively pure ponderosa pine (97%) with minor contributions from other species. These other species include Gambel oak, quaking aspen, as well as an occasional Rocky Mountain juniper. Though a minor player in terms of stand basal area, Gambel oak saplings and occasional small trees make up a majority of the stems per acre.

**Density:** Average basal area of all the stands measured was 112 $ft^2$/ac. This ranged from 236 to 12 on the low end. Of the 336 stands measured in 2020, 74 had basal areas below 80 $ft^2$/ac and would be deferred from harvest unless insects or disease prompted treatment to sanitize the stands. 72 stands had basal areas over 140 $ft^2$/ac which is double the preferred basal area target. 200 stands have basal areas over 100 $ft^2$/ac which is the majority of the stands in the project area and would require treatment to meet objectives.

**Structure:** Horizontal structure is quite variable throughout the stands. There are multi-acre patches of very dense pine intermixed with patches of lower density pine and small openings. Aspen occurs in small inclusions as well, usually less than an acre in size. The Gambel oak coverage is more consistent and this species can be found throughout the project area. In terms of vertical structure, the overstory layer is dominated by pine. Overstory pine trees have an average DBH just over 14 inches, however some individuals with a 32”+ DBH have been observed in the project area. Development of the midstory layer ranges from poor to moderate with some of the older, taller Gambel oak being common along with scattered younger pine and isolated junipers. This structure is in need of treatment to promote conditions for recruitment of cohorts into this position and achieve uneven aged characteristics. The understory/shrub layer is overwhelmingly comprised of Gambel oak with minimal growing space available for seedlings and saplings. In case of Ponderosa Pine numbers this component of structure is lacking and mostly a monoculture of Gambel Oak. Serviceberry and snowberry shrubs along with various grasses are also common in the understory but certainly lacking. Scattered aspen and pine advanced regeneration are present, with the aspen regeneration being restricted to the current aspen pockets and the pine regeneration occurring both in clumps and as individuals throughout the stands.




During the stand exam inventory process one tree in each stand was designated for coring and aging to determine growth rates and total age. This is used to understand current growth vs site index and to gain a spectrum of ages related to diameter. The stands within the cutting units of this project are both productive and have had a long history of logging; creating variability in size vs age results. Data analysis is a good guide for overall management but when in the field, visual characteristics have proven to be more reliable in determining age (GTR-110 2003 Huckaby etal.) CSE data will be used to establish a likely frequency and typical size of trees as a guide for tree markers. Of the 7,461 trees measured in 2020 within the treatment area the oldest tree cored and aged was 137 years old and had a diameter of 19.6 inches at Breast Height. While the largest tree measured was over 50” DBH. This demonstrates the variability within the age to size correlation and makes it necessary to rely on visual as well as data for indicators of pre-settlement trees within a stand. Including this type of data in marking guides will help the markers understand which tree sizes within a stand might have the potential of being pre-settlement in age.

| SPECIES | DIAMETER | AGE |
|---|---|---|
| PIPO | 26 | 93 |

| | | |
|---|---|---|
| PIPO | 19 | 137 |
| PIPO | 25.3 | 133 |
| PIPO | 25 | 101 |
| PIPO | 25 | 113 |
| PIPO | 24.8 | 83 |
| PIPO | 24 | 78 |
| PIPO | 24 | 108 |
| PIPO | 24 | 98 |
| PIPO | 24 | 86 |
| PIPO | 24 | 78 |
| PIPO | 23.5 | 100 |
| PIPO | 23 | 98 |
| PIPO | 23 | 94 |

*There are 336 trees with age data associated with the 2020 stand exams. The trees selected to be aged are done randomly with the largest of those trees being 26" in diameter shown at the top of the table.

The table above shows a snippet of the stand/age data from 2020 inventory and it concentrates on the largest trees recorded. This table shows trees from 26" to 23" in diameter and means to validate ages, and the variably of those ages in relation to diameter. Trees aged in the 18" diameter class from the 2020 inventory totaled 19 and had an average age of 89 years at breast height. All of the ages mentioned above are breast height ages, meaning you need to add 15-20 years to this number to get total age. Size and age indicators alone could make determination of age difficult based on variability shown in the data. Making visual indicators combined with frequencies a better approach to designating pre-settlement leave trees.

Stand Level Prescriptions (Preferred Alternative)

There are two main silviculture treatments with two supporting treatments under the preferred alternative to address desired conditions. Each individual stand during the implementation phase will receive a specific prescription prior to harvesting based on stand exam data, local knowledge of the area and walk thru exams. The final prescriptions will vary depending on stand objectives and conditions however the range of prescriptions and adaptive management described in the document will cover the variability that the implementation phase will encounter throughout the life of the project. This section of the document will address each of the four treatments. Describing in detail the objectives and goals for each prescription and will act as the basis for the individual prescriptions during the implementation phase.

## Prescription Table

| Treatment Type | Treatment Description[1] |
|---|---|
| Single Tree Selection | An uneven-aged regeneration method where individual trees of all size classes upto 26 inches diameter at breast height are evaluated and removed more or less uniformly throughout the stand creating or maintaining a multiage structure of groups, clumps and individuals to promote growth of remaining trees and to provide space for regeneration. Multiple entries of this activity ultimately results in an uneven-aged stand of 3 or more age classes. This would be the preferred and dominate prescription used. 50-to-70 basal area per acre of residual basal area depending upon stand condition. There are 19,675 acres of this treatment type. |
| Commercial Thinning | Silviculture "Free Thinning" with enhancement objectives in mixed stocking ponderosa pine with a variable residual square feet of tree stem basal area of 50 -70 basal area per acre depending upon stand condition. Individual trees of all sizeclasses up to 26 inches diameter at breast height are evaluated and removed throughout the stand creating or maintaining a multiage structure of groups, clumps and individuals.<br>These stands have some of the following characteristics: recent treatment, structure is more clump than group, inconsistent harvestable volume per acre.Goal is to enhance current qualities of the stand to promote resiliency to disturbances. Includes the plantation units. There are 3,115 acres of this treatment. |
| Post Fledgling Area Thinning (PFAT) | PFA prescription is a free thinning in which trees of all size classes up 22 inches are evaluated for harvest while retaining a 100-to-120 residual basal area target. A focus on large groups of 20-30 trees or more is desired with internal clumps made up of 3-to-5 large and mature trees with interlocking crowns. Individual treestructure and isolated clumping is not desired structure in this treatment type.<br>When structure is not available, thinning should focus on creating conditions forlong-term structure moving towards PFA desired conditions. |
| Pre-commercial Thinning | Thinning of ponderosa pine (Less than 5 inches diameter) to variable spacing specifications. Would be implemented in any treatment unit. |
| Brush Thinning | Thinning of understory brush species (generally target brush less than 6 inches diameter at root collar), mainly Gambel oak; to create openings for seedling recruitment and reduce ladder fuel effects on residual trees. Would be implemented in any treatment unit. This prescription is limited to treating no morethan 5,000 acres. |

26.9" Large Tree Retention (LTR) will be implemented universally through all prescriptions to preserve a large tree emphasis

Prescriptions are generally for the mechanical harvesting of vegetation, and acres should be analyzed for those effects including skid trails, landings and temp roads. Hand manipulation of vegetation may also occur to meet desired conditions. Processing of the vegetation will occur in harvest units and will be concentrated at landings within the units for final processing prior to transport off the forest. Slash created during treatments will be treated in three ways based upon input from fuels specialist (removed, piled or lop/scatter). The management direction driving this approach to vegetation management comes from the San Juan National Forest Land and Resource Management Plan (the Forest Plan) 2013, federal laws and regulations and Forest Service policy. The Forest Plan's forest wide goals for vegetation include managing vegetation types outside of wilderness areas to provide multiple use benefits commensurate with land capability and resource demand as well as improving the health and vigor of all vegetation types. All of the cutting units fall within Management Area 5 and are located on LRMP designated "Suitable Timber".

Normal operating season will be from April 1st until November 30th. Winter season will be from December 1st until February 28th (winter logging will be allowed with plowing). Additional time in the shoulder season may be granted by the line officer if conditions allow. Additional input will be gathered from specialists to determine the final dates for the normal operating season.

**Single Tree Selection**
Single Tree Selection or STS is an un-even aged regeneration harvest method approved for use under the LRMP 2.9.14 for Ponderosa pine. Where individual trees of all size classes are removed more or less uniformly throughout the stand creating or maintaining a multiage structure to promote the growth of remaining trees and to provide space for regeneration. Multiple entries of this activity ultimately results in an uneven-aged stand of three or more age classes. The purpose of this entry is regeneration and the prescriptions are designed to promote the propagation of a new cohort of trees. Trees are individually selected for removal based on spacing, tree form, insect or disease evidence and species preference. With any un-even aged prescription there is no terminus to the management of the stands, meaning that process continues indefinitely with re-entry every 20 to 25 years in this case, which is called a cutting cycle. The initial cut will reduce basal area but with most stands the first entry will not achieve regulation. More specifically the stands lack enough trees in all the age classes to meet the desired target per age class, to compensate for this more trees than desired will be left in certain age classes to maintain the desired basal area target. Overtime, and with continued entries, the stand will eventually become regulated and then only trees in excess in each size class would ideally be removed at each cutting cycle.

The majority of the project area will receive the STS prescription and each stand will receive a specific prescription based on stand dynamics. The prescription that follows was developed on the average stand characteristics taken from stand exam data. All the prescriptions will have the same basic background but may vary slightly due to changes in site conditions and stand locations in the project area as the stands identified for treatment are relatively uniform.

Single tree selection prescriptions will all have the same basic components and will use a BDQ method where “B” is the desired residual basal area, “D” is the maximum tree size (all trees 26.9” and larger at DBH will be retained in all stands) and “Q” describes the diameter distribution as a ratio of the number of trees in succeeding size classes. Based on stand exam data the general prescriptions will target a residual basal area of 50 to 70 $ft^2$/ac with a mean or target of 66 BA when condition allow.

For the average stand in the project area the residual basal area will be 60-68 $ft^2$/ac depending upon the silviculture treatment. The maximum diameter to harvest will be 26.9” and the q-factor would be 1.3 (applied to 2” diameter classes). The residual stocking level of 50-70 $ft^2$ was chosen to allow sufficient growing space to establish new regeneration while reducing severe fire risk and promoting tree vigor. The maximum diameter of 26.9” addresses management objectives by providing a continuous supply of desirable saw timber products without allowing trees to progress into age related decadence while at the same time maintaining a large tree emphasis on the landscape. A q-factor of 1.3 keeps sub-merchantable trees fully stocked for the next cohort. The harvests would take place on a 20 to 25-year cutting cycle to allow for sufficient stand growth while at the same time keeping stand density within the target range.

Aspen trees scattered throughout the stands will be targeted for a lower basal area around clones to increase vigor and promote recruitment conditions. This will be done by thinning around the aspen trees and removing pines trees to create space which is essential in promoting aspen regeneration. The overall goal is to increase light to the forest floor and expand the aspen cohorts which increases species diversity and improves wildlife habitat. Aspen comprises less than 1% of the stand area so this effort will provide the growing space to expand this critical species. No aspen trees will be prescribed for cutting within this analysis.

## Commercial Thinning

Thinning is defined as an intermediate harvest treatment designed to improve the overall stand functionality and improve growth rates. Thinning does not have specific silviculture objectives related to regeneration as it is an intermediate prescription which sets it apart from the Single Tree Selection prescription. Thinning will be implemented on a commercial basis to support treatment cost. In general a “Free” thinning will be implemented, meaning trees will be thinned based on quality and lack of insects or diseases and not on the size or age of the tree. Based on stand exam data the general prescriptions will target a residual basal area of 50 to 70 $ft^2$/ac with a mean or target of 60 BA when conditions tallow.

In general, emphasis will be placed on retaining the healthiest green trees in groups or clumps depending upon current structure and stand productivity. In the less dense pine stands between groups and clumps, healthy isolated trees or consolidations of trees will be promoted. Trees with mistletoe infections or bark beetle infestations will be targeted for removal

Aspen trees scattered throughout the stands will be targeted for a lower basal area around clones to increase vigor and promote recruitment conditions. This will be done by thinning around the aspen trees and removing pines trees to create space which is essential in promoting aspen regeneration. The overall goal is to increase light to the forest floor and expand the aspen cohorts which increases species diversity and improves wildlife habitat. Aspen comprises less than 1% of the stand area so this effort will provide the growing space to expand this critical species. No aspen will be prescribed for cutting within this analysis.

## Pre- Commercial Thinning

This treatment can take place in any unit identified for silviculture treatment. The prescription will aim to create variable spacing with an emphasis on clumping patterns; taking into account the overall improvement of growth and resiliency. This pre-commercial thinning prescription will increase resiliency and set the stage for healthy and productive pine stands. Due to a limited amount of trees in the <5” DBH; not all stands will require this treatment; each stand will be evaluated by a certified silviculturist to determine need.

## Brush Thinning

This treatment can take place in any unit identified for silviculture treatment. The presence of Gambel oak and other woody brush species in this pine ecosystem are both a hindrance and help in several ways. Oak specifically plays an important part in our pine stands in southwest Colorado, most notably it is a very important species for wildlife habitat providing cover and concealment for big and small game animals and as a food source for a number of species. However, in pine management, it creates problems if not controlled with fire or mechanical treatments. Oak has a role to play with nutrient cycling and providing fuels for natural and prescribed fire, but it also dominates the understory in many places and competes for light and nutrients needed for young pine trees. There may be instances where the silviculturist needs to prescribe mastication or hand cutting of brush to reduce its presence in the pine stands. This will most likely be done on a limited basis due to cost, however it is still a tool that the forest would like to pursue in some cases. The focus of prescriptions would be to remove oak but other brush may be impacted during implementation. Total removal of oak would not be implemented but rather a reduction with the purpose of creating openings for pine regeneration in areas that have insufficient stocking levels.

Focus of the treatment would be on oak, in the brush form, with a desire to remove species 6” DRC and less.

## Post-fledgling Family Area Thinning (PFAT)

The post-fledgling family area thinning is a prescription developed in unison with wildlife biologist and applies to currently mapped post-fledgling family areas both occupied and historically occupied and is a commercial thinning by definition, and as such, an intermediate harvest treatment. The prescription is also designed to improve the overall stand functionality and improve growth rates by reducing trees per acre while maintaining or promoting a relatively closed canopy structure to meet goshawk habitat. Post-fledgling family area thinning does not have specific silviculture objectives related to regeneration. No modeling was conducted related to commercial thinning due to the intermediate nature of the prescription and the related difficulty to accurately model theoutcomes. These areas are a minor component of the overall project acres. The base prescription was developed with technical input from the district wildlife biologist. Trees of all size classes upto 22-inches diameter at breast height are evaluated for harvest and designated for removal, with an emphasis on large leave groups with 20-to-30 trees per group. The objective is to promote clumps of 3-to-5 mature and older trees with interlocking crowns within groups. Individual tree structure and isolated clumping is not desired structure in this treatment type nor is promoting aspen. Small openings of two acres or less could be created when implemented for insects (e.g., bark beetles) or disease (e.g., mistletoe) or to release advanced regeneration (Reynolds et al.

1992). Where existing conditions do not provide for application of this prescription, thinning willfocus on enhancing what is desirable and creating conditions for recruitment of the desired structure over time (Reynolds et al. 1992).

## Conditions Influencing Silviculture Treatments

Adjusting basal area retention levels throughout the stands or adding in a support treatment will be linked with a condition that triggers a vegetation management action by the silviculturist. A determination will be made by a certified silviculturist during prescription development as to the suite of prescriptions and variability allowance for a stand. The below section describes scenarios that will help the reader understand how the analysis will be moved into an on the ground prescription.

Some examples of conditions that would trigger lower basal area retentions for bark beetles are SDI greater than 175, current BA or adjacent stand(s) BA greater than 100 or current infestations of bark beetle populations in or around the stand(s). These scenarios would be reason for a lower range of basal area retention moving closer to 50 $ft^2$/ac. The goal here will be to reduce basal area which in turn lowers the chance of infestation and lessens the spread of current infestations (Negron et al. 2008).

In December of 2016 a field tour was conducted for the Lone Pine Assessment Area by Jim Worrall (Forest Pathologist) and Amy Lockner (Entomologist) and the recommendation was to keep thinning and sanitizing stands of ponderosa pine to address the bark beetle outbreak (Service Trip Report GSC-17-01). Based on guidance from the 2008 Negron studies and the scientist recommendations vegetation management will be used to address this forest health issue.

Areas with heavy mistletoe especially if advanced regeneration is in place will also be targeted for the lower spectrum of basal area retention. This is based on guidance within literature to remove heavily infected trees or infected trees in key locations to reduce the occurrence and contamination on future tree populations in the stand. In managing dwarf mistletoe, reducing its distribution in the

stand is generally preferable to reducing the dwarf mistletoe rating throughout (Worrall 2015). Dwarf mistletoe can increase to its former rating relatively quickly, but it is much slower to invade sanitized areas. Thus, it may be preferable to leave small, severe infection centers where cover is needed, and aggressively sanitize in the rest of the stand.

Areas of stands with advanced regeneration and in need of releasing to improve growth will receive a lower basal area retention prescription. With general size class deficiencies on the upper and lower spectrums of stand dynamics, releasing advanced regeneration will help fill in those size class gaps. Stands with aspen present in distinguishable groups will receive the lower end of the basal area prescription in order to enhance recruitment conditions in aspen and reduce overall competition for resources.

Retention of upper basal areas will be focused on high productivity areas with minimal imminent risk of infestation from bark beetles or heavy disease. Site index will be used by the silviculturist along with current conditions and FRV to make a final call at time of prescription implementation. The goal will be to move stands to desired conditions given the variables of this landscape.

Ponderosa Pine established prior to approximately 1880 will be retained in nearly all situations during harvest designation. Exceptions for safety reasons, to reduce declining trees with severe dwarf mistletoe infestation, root rot or bark beetles may be made in rare instances. Old-aged trees will be identified using a combination of physical characteristics including large diameter relative to other trees in the localized area, large diameter branches, irregular crowns, flat tops, tall height and canopy position and bark thickness, color and pattern. (USDA-GTR110 2013) When a determination of tree age cannot be made using physical characteristics, these trees will either be retained (particularly in low productivity areas) or assessed and documented at the harvest-unit scale to ensure old-aged trees are retained (typically in higher productivity areas and/or where these trees may be present in high densities)

Stands density is measured throughout the evaluation process using a basal area factor prism that allows for field measurement of basal area. Tree choice in the field during implementation is best understood through a descending order of choice made by the designator. Evaluation occurs at every step of the decisioning applying sound judgement based on parameters from the analysis and direction from a certified silviculturist. Below is an example of a descending order of choice that would be used to evaluate trees and ultimately designated them for removal, if the stand has a basal area greater than 50 $ft^2$/ac.

a. Tree can be evaluated for harvest if it is less than 27.0” DBH
b. Do not cut trees with a combination of pre-settlement visual indicators
c. Cut dead trees (brown or red needles/no needles)
d. Cut live trees with visible evidence of bark beetle infestation (e.g., pitch tubes, frass, and woodpecker activity on tree bole)
e. Cut live trees with dwarf mistletoe infecting more than 50% of the live crown
**In addition to b-e, trees 25” DBH and less can also be cut for the following condition or structure.**
f. Cut trees with live crown declining more than 25% including poor needle conditions
g. Cut trees with evidence of conks, cankers or advanced decay
h. Cut trees with weak or multiple forks
i. Cut trees with broken or dead tops
j. Cut trees with leans greater than 35%
k. Cut trees with grossly poor form
l. Cut trees to achieve a basal area target within 50-70 $ft^2$/ac.

Uneven aged stand structure when all components are represented mirrors a reverse J curve when graphed. Most stands are not this uniform, and adjustments will be made on a stand level basis to begin moving toward a more uneven aged structure. The reverse J curve is a model and does not account for variability caused by additional desired conditions such as group, clump and individual structure, tree retention for aesthetics or supplementary resource based design elements. The three graphs below show first a modeled base stand and two actual Salter EA cutting unit stands with expected variability represented by the blue bars/current TPA modeled against the base stand/target TPA. Each stand will have a different approach to uneven aged management from current benchmark to achieving the desired structure, while meeting design elements. This makes flexibility in prescription writing an essential component of this analysis and ultimately meeting desired conditions.

A. Reverse J Model Stand




B. Stand Variability #1




C. Stand Variability # 2




**Focus on Groups/Clumps/Individuals**

A group, clump and individual structure is desired while achieving basil area targets following the above descending order of choice. Some of the variables influencing basil area retention and Group, Clump, Individual (GCI) are mitigations, soil productivity, past management, preexisting openings, LRMP goals, resilience goals, current disturbance and future range of variability (FRV) {DWRF-resilience metric}. A group, clump and individual structure is desired either through enhancement of current stand components or harvest designed to achieve desired conditions over time. Reading the forest and acting upon indicators that are not limited by DBH caps or strict basil area retentions is key to achieving a group, clump, and individual structure. Utilizing harvest to aid in the return of ecological function and resilience by incorporating historical tree patterns to facilitate function over time with fire.

A **group** is several to many trees, and can be ½ to ¾ of an acre in size with all trees growing in close proximity to each other with interlocking crowns for the most part, with a **clearly definable edge**. Defining the edge is key in determining a group size as well as undesirable cohorts in need of removal. Stems can be separated by as much as 20 feet. Typically main stems of the trees in a group have not been influenced **greatly** by the proximity of neighboring trees.

**A clump** is a small group of trees growing with stems touching at the base or nearly so. The main stems of trees in a clump have likely been influenced by the proximity of neighboring trees.

**Individual Trees** are trees within a stand's matrix that are single trees allowed to be open grown with full canopy sunlight (USFS GTR-310)

## 2.1 Geographical Areas and Blocks

The project is broken into six geographical areas which are Salter, Plateau, Carlyle, House Creek, Turkey Knoll, and Boggy Draw. The larger geographical areas have been broken down into silviculture treatments units which have been given a unique identification number in the GIS attribute table for site specific analysis or mitigations. (acres are approx). GIS Data is located:
T:\FS\NFS\SanJuan\Project\DoloresRD\2400SalterEA\GIS –

**Table 1. Treatment acres by treatment block**

| Block | Single Tree Selection (STS) | Commercial Thinning (CT) | Post Fledgling Area (PFA) | Plantation |
|---|---|---|---|---|
| Salter | 1,518 | 348 | N/A | 629 |
| Plateau Creek | 2,065 | 479 | N/A | N/A |
| Carlyle Point | 3,605 | 1,334 | 1,057 | N/A |
| House Creek | 220 | N/A | 246 | N/A |
| Boggy Draw | 9,216 | 723 | 739 | N/A |
| Turkey Knoll | 3,051 | 231 | N/A | N/A |

Proposed Silviculture Cutting Unit Map



# Monitoring and Adaptive Management

Because conditions continue to change on the landscape analyzed in the Salter environmental analysis, a combination of pre-implementation reviews and an adaptive management approach would be utilized to inform implementation and to provide the opportunity to solicit input from partners that could be incorporated into the decision making process when addressing changing conditions on the ground in real-time.

This effort is intended to provide for communication and collaboration and more flexibility to adjust if changes, such as new or increased insect and disease infestation occur or the area is affected by wildfire. This approach ensures appropriate treatment based on any changed site conditions at the time of implementation. Adaptive management includes reviews of project areas during and after implementation, as well as periodic reviews of NEPA adequacy as time progresses.

The objective of the proposed treatments is to retain ponderosa pine within the identified cutting units for as long as the species continues to regenerate for the purposes of fiber production and ecosystem services within the standards and guidelines of land and resource management plan, specifically, 2.9.14. Adjustments to prescriptions could be made at any time as long as they are within the scope of this analysis.

In addition, this section describes the adaptive management process for site preparation and planting to meet desired conditions. Site preparation and planting will be prescribed to stands that fall below Forest Plan stocking levels for ponderosa pine (i.e., 150 TPA) or are projected to do so based on forest health or lack of cone production.

Another purpose of monitoring and adaptive management approach is to set up a formal communication protocol with outside partners; for example, the DWRF collaborative. If conditions change, or if approaches are not working as described, the adaptive management process identified here would be used to notify partners about the agency’s findings. The process would also serve as an opportunity for the public to have direct and formal communication with agency decision makers and resource managers on specific projects. A Collaborative Exchange Folder (CEF) has been set up on the agency’s main database (PINYON) that allows direct exchange of documents between the agency and partners. A Collaborative Communication Form (CCF) has been developed to officially document important communication between the agency and partners. The processes and digital storage protocol of documents are in place for this project and all projects moving forward where this level of information exchange is desired by partners. Table 5 displays the proposed monitoring activities and Table 6 displays the triggers or threshold and associated adaptive management actions. The actions in this section are condition-based, and in addition to, the treatments described above.

**Table 5. Proposed monitoring activities**

| Resource Area | Objective | Methodology | Timing | Reporting |
|---|---|---|---|---|
| Timber | Track trends in mortality/infestation rates of Bark Beetles | Comparison of consecutive Forest Health Aerial Survey flights. Determine percent change in mortality or infestations within Salter treatment units | Prior to treatment at the project scale. Annually at the landscape level. | CSFS annual Forest Health flight data of the treatment units in map form, and placed in the Collaborative Exchange Folder (CEF) |
| Timber | Track silvicultural prescription effectiveness - Single Tree Selection | Regeneration Stocking Surveys | Third and fifth year stocking survey | Share stocking survey results utilizing the Collaborative Communication Form (CCF) and placed in the CEF. |
| Timber | Monitor cone presence as an influence on meeting desired conditions | Pedestrian survey of stand | If a stand fails first year stocking survey a bi-annual cone survey would be performed until stand passes stocking survey. | Initial surveys would be tracked internally and documented in the project record. Copies of this data would be included with a stocking failure CCF if one is sent post year 3 survey. |

CCF – Collaborative Communication Forum; CEF – Collaborative Exchange Folder.

**Table 6. Proposed adaptive management actions**

| Feature beingMonitored | Trigger or Threshold | Proposed Adaptive Management Actions |
|---|---|---|
| Silviculture – Stocking level | After implementation, stocking survey shows single tree selection treated stand in the 3rd year survey has failed and is trending for continued failure in 5th year stocking survey<br>Prior to implementation stand is determined by Certified Silviculturist to be currently below minimal stocking or is trending towards this status. (heavy over story mortality or infestation that would make regeneration problematic due to lack of seed trees or pattern of residual live seed trees within a stand. | Monitor<br>Inform our partners with a CCF.<br>Site Preparation as needed, with inter- planting |
| Silviculture - Post-planting | Planting survivability is less than adequate to pass stocking survey | Monitor and adjust<br>Inform our partners with a CCF.<br>Site prep as needed, with inter- planting<br>Increase seedling container size<br>Adjust elevation band of seedlings being planted within  percent mix<br>2.9.1 Anticipates climate-related plant succession changes (such as favoring heat- or drought-resistant tree species as leave trees, or in reforestation). |
| Silviculture Rx –Stand density | Residual stocking level basal area: Above or below 50-70ft$^2$/acre, Stand Density Index greater than 175. | Monitor and adjust marking, as needed. |
| Silviculture Rx –Stand structure | Physiognomy or architecture at the stand-level and fine scale does not begin to develop uneven aged characteristics with even aged definable groups, clumps and individuals. | Monitor and adjust marking, as needed. |

CCF – Collaborative Communication Forum; CEF – Collaborative Exchange Folder.

# 3 Effects

## 3.1 Direct and Indirect Effects

The Single Tree Selection (STS) silvicultural treatment proposed is a final regeneration treatment which creates regeneration needs in some cases to meet stocking requirements as such it is subject to the five-year restocking requirements of the National Forest Management Act (NFMA). STS is an approved method of management for ponderosa pine based on LRMP 2.9.14. The effects of this treatment will be a post-harvest reduction in basal area leading to increased regeneration and moving the stand towards an uneven aged condition. The commercial thinning is an intermediate treatment and a "free thin" by silviculture definition. Given the expected rotation or merchantable entry in these stands at roughly 20-25 years this approach is interim and designed to enhance or create desired conditions within a stand for more productive follow-up entries in the future. Given the small acreage of commercial thin and an intermediate treatment the modeled stand are not included in document. The below data helps the reader understand the analysis process for alternatives based on forest inventory. Making connections with descriptions above will help the reader understand conditions that require specific vegetation management actions and how alternatives could limit or enhance desired conditions.

There are three alternatives selected for analysis.

1. No Action
2. Preferred Alternative (includes all silviculture treatments in the prescription table)
3. Preferred Alternative plus a 20" DBH "Large Tree Retention" Requirement

A review of data through the growth model FVS was produced to analyze the different alternatives in meeting the desired conditions of the project. A Single Tree Selection (STS) representative stand was picked from each geographical area to be displayed within the EA. This data will show that the preferred alternative not only meets the desired conditions described in the LRMP for this land use and species but addresses many of the ecological goals of the DWRF collaborative desired conditions for ponderosa pine (REF). The data collected for the analysis of the project was converted into the Forest Vegetation Simulator or FVS for analysis of current stocking levels and project future growth through the three different alternatives. One representative stand from of STS from each of the six treatment blocks has been selected for detailed display of forest inventory data analysis as it relates to each stand's ability to meet the proposed action. All stands that have been identified for treatment analysis have been analyzed internally and the data will be used to formulate a final stand level prescription once a final alternative is chosen by the Line Officer.

**STS Display Stands**

| BLOCK | Stand ID (Poly ID) |
|---|---|
| Salter | 021305DOLCXX0111 |
| Plateau Creek | 021305MCPHXX0087 |

| | |
|---|---|
| Carlyle | 021305BEAMXX0473 |
| House Creek | 021305HOUSXX0149 |
| Boggy Draw | 021305DOBAXX0057d |
| Turkey Knoll | 021305BEAMXX0044 |

The data for this stand, BEAMXX0473, is shown below broken out by the two inch size classes. The largest tree recorded in this stand was in the 22" diameter class. The stand Basal Area is 140 $ft^2$/ac and there are 194 trees per acre. The table shows the trees compared to the preferred stand target of 66 BA dispersed across the J curve to a maximum 26" diameter. This stands has a high BA and TPA for a pine stand, most of the volume and trees are between 8" and 18" in size. Dwarf Mistletoe rating or DMR is low in this stand in 2020 with a rating of 0.3 on a scale from zero to six. FVS models the DMR growing to 3.5 in the next 100 years if the stand is undisturbed.

- ➢ BEAMXX0473 Base Data No Action




This table below shows the modeled growth potential for BEAMXX0473 in the No Action scenario. Basal area will start to decline by 2070 which correlates with the lack of accretion/growth vs an increase in mortality both seen in 2070.

| StandID | Year | Age | Tpa | BA | SDI | CCF | QMD | TCuFt | Acc | Mort |
|---|---|---|---|---|---|---|---|---|---|---|
| 021305BEAMXX0473 | 2020 | 1 | 194 | 140 | 229 | 128 | 12 | 3749 | 32 | 8 |
| 021305BEAMXX0473 | 2030 | 11 | 188 | 147 | 237 | 133 | 12 | 3989 | 32 | 8 |
| 021305BEAMXX0473 | 2040 | 21 | 182 | 153 | 245 | 138 | 12 | 4224 | 29 | 13 |
| 021305BEAMXX0473 | 2050 | 31 | 172 | 157 | 247 | 140 | 13 | 4384 | 27 | 13 |
| 021305BEAMXX0473 | 2060 | 41 | 161 | 159 | 248 | 142 | 13 | 4522 | 25 | 20 |
| 021305BEAMXX0473 | 2070 | 51 | 147 | 158 | 244 | 140 | 14 | 4566 | 23 | 27 |
| 021305BEAMXX0473 | 2080 | 61 | 132 | 155 | 236 | 136 | 15 | 4524 | 21 | 33 |
| 021305BEAMXX0473 | 2090 | 71 | 118 | 149 | 224 | 130 | 15 | 4400 | 19 | 39 |
| 021305BEAMXX0473 | 2100 | 81 | 103 | 140 | 209 | 121 | 16 | 4193 | 18 | 45 |
| 021305BEAMXX0473 | 2110 | 91 | 88 | 130 | 191 | 112 | 16 | 3920 | 16 | 45 |
| 021305BEAMXX0473 | 2120 | 101 | 75 | 119 | 173 | 102 | 17 | 3625 | 16 | 45 |

The next two tables show the preferred alternative and the preferred alternative with a 20” diameter cap. These stands are modeled out through the year 2050 which allows us to see a modeled harvest in 2020 and then again in 30 years so we can see the merchantable volume potential for the second harvest entry.

BEAMXX0473 – Preferred alternative BA 66, Diameter cap 26.9” Dq 1.3

The table below shows the stand with a harvest in 2020 targeting all trees greater than 5” DBH up to 26.9” DBH. Trees larger or smaller than these parameters have been left touched. This shows the volume removed to be 20.5 CCF per acre in 2020 and 5.49 CCF per acre in 2050.

| StandID | Year | Age | Tpa | BA | SDI | CCF | QMD | TCuFt | Removed Total CuFt |
|---|---|---|---|---|---|---|---|---|---|
| 021305BEAMXX0473 | 2020 | 1 | 194 | 140 | 229 | 63 | 12 | 3749 | 2055 |
| 021305BEAMXX0473 | 2020 | 1 | 123 | 68 | 114 | 63 | 10 | 1694 | 0 |
| 021305BEAMXX0473 | 2030 | 11 | 469 | 75 | 124 | 69 | 5 | 1897 | 0 |
| 021305BEAMXX0473 | 2040 | 21 | 456 | 81 | 134 | 74 | 6 | 2083 | 0 |
| 021305BEAMXX0473 | 2050 | 31 | 434 | 90 | 152 | 67 | 6 | 2281 | 549 |

BEAMXX0473 – Preferred alternative BA 66, Diameter cap 20.0” Dq 1.3

The table below shows the stand with a harvest in 2020 targeting all trees greater than 5” DBH up to 20.0” DBH. Trees larger or smaller than these parameters have been left touched. This shows the volume removed to be 20.5 CCF per acre in 2020 and 3.88 CCF per acre in 2050. There is no difference in volume removed in 2020 since there are none to very little trees larger than 22” in the stand. Volume in 2050 is smaller with the 20” diameter cap since trees will have grown into the larger size classes by then.

| StandID | Year | Age | Tpa | TPrdTpa | BA | SDI | CCF | QMD | TCuFt | MCuFt | Removed Total CuFt |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 021305BEAMXX0473 | 2020 | 1 | 194 | 194 | 140 | 229 | 61 | 12 | 3749 | 3357 | 2056 |
| 021305BEAMXX0473 | 2020 | 1 | 120 | 194 | 66 | 111 | 61 | 10 | 1693 | 1491 | 0 |
| 021305BEAMXX0473 | 2030 | 11 | 466 | 541 | 74 | 123 | 68 | 5 | 1925 | 1702 | 0 |
| 021305BEAMXX0473 | 2040 | 21 | 454 | 528 | 82 | 135 | 75 | 6 | 2139 | 1899 | 0 |
| 021305BEAMXX0473 | 2050 | 31 | 433 | 507 | 91 | 154 | 72 | 6 | 2361 | 2091 | 388 |

The data for this stand, BEAMXX0044, is shown below broken out by the two inch size classes. The largest tree recorded in this stand was in the 28" diameter class. The stand Basal Area is 152 ft2/ac and there are 95 trees per acre. The table shows the trees compared to the preferred stand target of 66 BA dispersed across the J curve to a maximum 26" diameter. Trees larger than 26" have been left in the stand and appear in the 28" size class. This stand has little to no regeneration or small trees below 10" and most of the volume is in the size classes between 16 and 26" in size. There are just under 2 trees per acre larger than 27" in the stand which will be retained as legacy trees.




This table below shows the modeled growth potential for BEAMXX0044 in the No Action scenario. Basal area continues to increase for the next 100 years, however growth or accretion declines every year.

| StandID | Year | Age | Tpa | BA | SDI | CCF | TopHt | QMD | TCuFt | TPrdTCuFt | Acc | Mort |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 021305BEAMXX0044 | 2020 | 1 | 108 | 155 | 223 | 132 | 72 | 16 | 4126 | 4126 | 19 | 5 |
| 021305BEAMXX0044 | 2030 | 11 | 106 | 158 | 227 | 135 | 73 | 17 | 4267 | 4267 | 18 | 5 |
| 021305BEAMXX0044 | 2040 | 21 | 104 | 161 | 230 | 138 | 73 | 17 | 4399 | 4399 | 17 | 5 |
| 021305BEAMXX0044 | 2050 | 31 | 102 | 164 | 233 | 140 | 74 | 17 | 4520 | 4520 | 17 | 5 |
| 021305BEAMXX0044 | 2060 | 41 | 100 | 167 | 236 | 142 | 75 | 18 | 4633 | 4633 | 15 | 5 |
| 021305BEAMXX0044 | 2070 | 51 | 98 | 169 | 239 | 144 | 75 | 18 | 4731 | 4731 | 14 | 6 |
| 021305BEAMXX0044 | 2080 | 61 | 96 | 172 | 241 | 146 | 75 | 18 | 4811 | 4811 | 12 | 6 |
| 021305BEAMXX0044 | 2090 | 71 | 94 | 174 | 243 | 148 | 76 | 18 | 4873 | 4873 | 11 | 0 |
| 021305BEAMXX0044 | 2100 | 81 | 94 | 179 | 249 | 152 | 76 | 19 | 4984 | 4984 | 11 | 4 |
| 021305BEAMXX0044 | 2110 | 91 | 93 | 182 | 252 | 155 | 76 | 19 | 5049 | 5049 | 11 | 5 |
| 021305BEAMXX0044 | 2120 | 101 | 91 | 185 | 255 | 157 | 77 | 19 | 5105 | 5105 | 11 | 5 |

The next two tables show the preferred alternative and the preferred alternative with a 20" diameter cap. These stands are modeled through the year 2050 which allows us to see a modeled harvest in 2020 and then again in 30 years so we can see the merchantable volume potential for the second harvest entry.

BEAMXX0044 – Preferred alternative BA 66, Diameter cap 26.9" Dq 1.3

The table below shows the stand with a harvest in 2020 targeting all trees greater than 5" DBH up to 26.9" DBH. Trees larger or smaller than these parameters have been left touched. This shows the volume removed to be 24.1 CCF per acre in 2020 and 4.36 CCF per acre in 2050. The total volume removed is smaller in 2050 since the stand is holding nearly 18 $ft^2$/ac of basal area above 26.9".

| StandID | Year | Age | Tpa | TPrdTpa | BA | SDI | CCF | TopHt | QMD | TCuFt | MCuFt | RTpa | Removed Total CuFt |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 021305BEAMXX0044 | 2020 | 1 | 108 | 108 | 155 | 223 | 58 | 60 | 16 | 4126 | 3729 | 44 | 2414 |
| 021305BEAMXX0044 | 2020 | 1 | 65 | 108 | 67 | 100 | 58 | 60 | 14 | 1712 | 1542 | 0 | 0 |
| 021305BEAMXX0044 | 2030 | 11 | 65 | 109 | 72 | 107 | 64 | 61 | 14 | 1887 | 1702 | 0 | 0 |
| 021305BEAMXX0044 | 2040 | 21 | 64 | 107 | 78 | 114 | 68 | 63 | 15 | 2056 | 1862 | 0 | 0 |
| 021305BEAMXX0044 | 2050 | 31 | 63 | 106 | 83 | 121 | 58 | 60 | 16 | 2223 | 2005 | 10 | 436 |
| 021305BEAMXX0044 | 2050 | 31 | 53 | 106 | 66 | 96 | 58 | 60 | 15 | 1787 | 1611 | 0 | 0 |

The table below shows the stand with a harvest in 2020 targeting all trees greater than 5” DBH up to 20.0” DBH. Trees larger or smaller than these parameters have been left touched. This shows the volume removed to be 15.4 CCF per acre in 2020 and 0.05CCF per acre in 2050. The reason for the lower volumes is the Diameter cap, this stand has over 90 $ft^2$/ac of basal area above 20”. The first harvest in 2020 would have to cut nearly all the trees smaller than 20” in diameter to reduce the stand BA to 87 $ft^2$/ac. This still does not get us to the target basal area of 66 $ft^2$/ac and leave us with a single story homogenous stand of pine with the smallest tree being 20” in diameter. The next entry in 30 years has no volume or trees to remove, all trees are still above 20” or smaller than 5” in the stand so potential volume to remove is zero.

| StandID | Year | Age | Tpa | TPrdTpa | BA | SDI | CCF | QMD | TCuFt | MCuFt | RTpa | Removed Total CuFt |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 021305BEAMXX0044 | 2020 | 1 | 108 | 108 | 155 | 223 | 70 | 16 | 4126 | 3729 | 67 | 1542 |
| 021305BEAMXX0044 | 2020 | 1 | 41 | 108 | 87 | 115 | 70 | 20 | 2585 | 2365 | 0 | 0 |
| 021305BEAMXX0044 | 2030 | 11 | 57 | 125 | 89 | 118 | 72 | 17 | 2676 | 2445 | 0 | 0 |
| 021305BEAMXX0044 | 2040 | 21 | 56 | 124 | 91 | 121 | 74 | 17 | 2768 | 2535 | 0 | 0 |
| 021305BEAMXX0044 | 2050 | 31 | 55 | 123 | 94 | 124 | 75 | 18 | 2855 | 2611 | 1 | 5 |
| 021305BEAMXX0044 | 2050 | 31 | 54 | 123 | 93 | 123 | 75 | 18 | 2849 | 2607 | 0 | 0 |
| 021305BEAMXX0044 | 2060 | 41 | 53 | 122 | 96 | 126 | 77 | 18 | 2932 | 2681 | 0 | 0 |

The data for this stand, DOLCXX0111, is shown below broken out by the two inch size classes. The largest tree recorded in this stand was in the 32” diameter class. The stand Basal Area is 93 $ft^2$/ac and there are 54 trees per acre. The table shows the trees compared to the preferred stand target of 66 BA dispersed across the J curve to a maximum 26” diameter. Trees larger than 26” have been left in the stand and account for just over 3 trees per acre. This stand has little to no regeneration or small trees below 12” and most of the volume is in the size classes between 16 and 20” in size. There are less than 3 trees per acre larger than 27” in the stand which will be retained as legacy trees.



This table below shows the modeled growth potential for DOLCXX0111 in the No Action scenario. Basal area stalls out in 2050, growth is already stagnant and mortality increases every year going forward.

| StandID | Year | Age | Tpa | BA | SDI | CCF | QMD | TCuFt | Acc | Mort |
|---|---|---|---|---|---|---|---|---|---|---|
| 021305DOLCXX0111 | 2020 | 1 | 57 | 93 | 132 | 78 | 17 | 2418 | 15 | 6 |
| 021305DOLCXX0111 | 2030 | 11 | 55 | 95 | 133 | 80 | 18 | 2512 | 14 | 7 |
| 021305DOLCXX0111 | 2040 | 21 | 53 | 97 | 135 | 81 | 18 | 2589 | 13 | 8 |
| 021305DOLCXX0111 | 2050 | 31 | 51 | 98 | 135 | 81 | 19 | 2641 | 13 | 10 |
| 021305DOLCXX0111 | 2060 | 41 | 49 | 98 | 134 | 81 | 19 | 2667 | 11 | 13 |
| 021305DOLCXX0111 | 2070 | 51 | 45 | 97 | 131 | 80 | 20 | 2652 | 11 | 16 |
| 021305DOLCXX0111 | 2080 | 61 | 42 | 94 | 126 | 77 | 20 | 2593 | 10 | 20 |
| 021305DOLCXX0111 | 2090 | 71 | 38 | 89 | 120 | 73 | 21 | 2491 | 9 | 22 |
| 021305DOLCXX0111 | 2100 | 81 | 34 | 84 | 112 | 69 | 21 | 2357 | 8 | 24 |
| 021305DOLCXX0111 | 2110 | 91 | 30 | 78 | 103 | 64 | 22 | 2200 | 7 | 24 |
| 021305DOLCXX0111 | 2120 | 101 | 27 | 72 | 95 | 58 | 22 | 2034 | 7 | 24 |

The next two tables show the preferred alternative and the preferred alternative with a 20" diameter cap. These stands are modeled through the year 2050 which allows us to see a modeled harvest in 2020 and then again in 30 years so we can see the merchantable volume potential for the second harvest entry.

DOLCXX0111 – Preferred alternative BA 66, Diameter cap 26.9" Dq 1.3

The table below shows the stand with a harvest in 2020 targeting all trees greater than 5" DBH up to 26.9" DBH. Trees larger or smaller than these parameters have been left touched. This shows the volume removed to be 7.0 CCF per acre in 2020 and 1.8 CCF per acre in 2050. The total volume removed in 2050 is lower since the stand is holding nearly 16 $ft^2$/ac of basal area above 26.9". To meet objectives of lowering to BA to 66 we have effectively removed all of our growing stock in the smaller diameters thus extending the time frame for future harvests. In this stand the 26.9" diameter cap is restricting future management objectives.

| StandID | Year | Age | Tpa | TPrdTpa | BA | SDI | CCF | QMD | MCuFt | RTCuFt | Acc | Mort |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 021305DOLCXX0111 | 2020 | 1 | 57 | 57 | 93 | 132 | 56 | 17 | 2197 | 700 | 14 | 4 |
| 021305DOLCXX0111 | 2020 | 1 | 43 | 57 | 66 | 93 | 56 | 17 | 1561 | 0 | 14 | 4 |
| 021305DOLCXX0111 | 2030 | 11 | 42 | 56 | 69 | 96 | 58 | 17 | 1658 | 0 | 13 | 4 |
| 021305DOLCXX0111 | 2040 | 21 | 40 | 54 | 71 | 99 | 59 | 18 | 1743 | 0 | 12 | 5 |
| 021305DOLCXX0111 | 2050 | 31 | 39 | 53 | 73 | 100 | 55 | 19 | 1813 | 184 | 12 | 6 |
| 021305DOLCXX0111 | 2050 | 31 | 36 | 53 | 66 | 91 | 55 | 18 | 1644 | 0 | 12 | 6 |
| 021305DOLCXX0111 | 2060 | 41 | 34 | 51 | 68 | 92 | 56 | 19 | 1696 | 0 | 10 | 8 |

The table below shows the stand with a harvest in 2020 targeting all trees greater than 5" DBH up to 20.0" DBH. Trees larger or smaller than these parameters have been left touched. This shows the volume removed to be 6.3 CCF per acre in 2020 and 1.25 CCF per acre in 2050. The reason for the lower volumes is the diameter cap, this stand has over 50 $ft^2$/ac of basal area above 20". The first harvest in 2020 would have to cut all the trees smaller than 19" in diameter to lower the stand BA to 66 $ft^2$/ac. The next entry in 30 years has minimal volume to remove, most trees are above 20" and the few trees that have grown into the merchantable range would be harvested to meet objectives.

| StandID | Year | Age | Tpa | TPrdTpa | BA | SDI | CCF | QMD | MCuFt | Removed Total CuFt | Acc | Mort |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 021305DOLCXX0111 | 2020 | 1 | 57 | 57 | 93 | 132 | 55 | 17 | 2197 | 639 | 13 | 4 |
| 021305DOLCXX0111 | 2020 | 1 | 38 | 57 | 66 | 91 | 55 | 18 | 1624 | 0 | 13 | 4 |
| 021305DOLCXX0111 | 2030 | 11 | 37 | 56 | 69 | 93 | 57 | 18 | 1706 | 0 | 12 | 4 |
| 021305DOLCXX0111 | 2040 | 21 | 36 | 55 | 71 | 95 | 58 | 19 | 1780 | 0 | 11 | 5 |
| 021305DOLCXX0111 | 2050 | 31 | 35 | 53 | 72 | 97 | 55 | 19 | 1839 | 124 | 10 | 6 |
| 021305DOLCXX0111 | 2050 | 31 | 31 | 53 | 67 | 89 | 55 | 20 | 1727 | 0 | 10 | 6 |
| 021305DOLCXX0111 | 2060 | 41 | 30 | 52 | 68 | 89 | 55 | 20 | 1766 | 0 | 9 | 8 |

The data for this stand, MCPHXX0087, is shown below broken out by the two inch size classes. The largest tree recorded in this stand was in the 26” diameter class. The stand Basal Area is 83 $ft^2$/ac and there are 84 trees per acre. The table shows the trees compared to the preferred stand target of 66 BA dispersed across the J curve to a maximum 26” diameter.




This table below shows the modeled growth potential for MCPHXX0087 in the No Action scenario. Basal area in this stand starts out pretty low at 84 $ft^2$/ac, this stand is borderline on needing treatment in 2020 or being deferred to the next harvest entry. The stand continues to grow in volume, however growth rates do decline slightly.

| StandID | Year | Age | Tpa | BA | SDI | CCF | QMD | TCuFt | Acc | Mort |
|---|---|---|---|---|---|---|---|---|---|---|
| 021305MCPHXX0087 | 2020 | 1 | 84 | 83 | 124 | 72 | 13 | 2290 | 22 | 4 |
| 021305MCPHXX0087 | 2030 | 11 | 82 | 88 | 130 | 76 | 14 | 2468 | 21 | 4 |
| 021305MCPHXX0087 | 2040 | 21 | 81 | 93 | 136 | 80 | 15 | 2641 | 20 | 4 |
| 021305MCPHXX0087 | 2050 | 31 | 79 | 97 | 141 | 83 | 15 | 2804 | 19 | 4 |
| 021305MCPHXX0087 | 2060 | 41 | 77 | 102 | 146 | 86 | 16 | 2952 | 18 | 4 |
| 021305MCPHXX0087 | 2070 | 51 | 76 | 106 | 151 | 89 | 16 | 3088 | 17 | 4 |
| 021305MCPHXX0087 | 2080 | 61 | 74 | 109 | 155 | 92 | 16 | 3216 | 16 | 4 |
| 021305MCPHXX0087 | 2090 | 71 | 73 | 113 | 159 | 95 | 17 | 3338 | 15 | 4 |
| 021305MCPHXX0087 | 2100 | 81 | 71 | 116 | 163 | 97 | 17 | 3446 | 15 | 4 |
| 021305MCPHXX0087 | 2110 | 91 | 70 | 119 | 166 | 99 | 18 | 3548 | 14 | 4 |
| 021305MCPHXX0087 | 2120 | 101 | 69 | 122 | 169 | 101 | 18 | 3643 | 14 | 4 |

The next two tables show the preferred alternative and the preferred alternative with a 20" diameter cap. These stands are modeled out through the year 2050 which allows us to see a modeled harvest in 2020 and then again in 30 years so we can see the merchantable volume potential for the second harvest entry.

MCPHXX0087 – Preferred alternative BA 66, Diameter cap 26.9" Dq 1.3

The table below shows the stand with a harvest in 2020 targeting all trees greater than 5" DBH up to 26.9" DBH. Trees larger or smaller than these parameters have been left touched. This shows the volume removed to be 4.7 CCF per acre in 2020 and 4.4 CCF per acre in 2050. This stand does not have any trees larger than 26 inches so the modeled harvest can evenly remove trees from all merchantable size classes to simulate an un-even aged stand without keeping legacy trees. Volume per acre is low at just under 5 CCF an acre, however, stand growth is consistent and the stand appears to be able to sustain these growth rates.

| StandID | Year | Age | Tpa | TPrdTpa | BA | SDI | CCF | QMD | TCuFt | RTCuFt | Acc | Mort |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 021305MCPHXX0087 | 2020 | 1 | 84 | 84 | 83 | 124 | 58 | 13 | 2290 | 472 | 20 | 3 |
| 021305MCPHXX0087 | 2020 | 1 | 74 | 84 | 66 | 100 | 58 | 13 | 1817 | 0 | 20 | 3 |
| 021305MCPHXX0087 | 2030 | 11 | 73 | 82 | 71 | 106 | 62 | 13 | 1985 | 0 | 20 | 3 |
| 021305MCPHXX0087 | 2040 | 21 | 71 | 81 | 76 | 112 | 66 | 14 | 2154 | 0 | 19 | 3 |
| 021305MCPHXX0087 | 2050 | 31 | 70 | 80 | 81 | 118 | 57 | 15 | 2316 | 441 | 18 | 3 |
| 021305MCPHXX0087 | 2050 | 31 | 64 | 80 | 66 | 98 | 57 | 14 | 1876 | 0 | 18 | 3 |
| 021305MCPHXX0087 | 2060 | 41 | 63 | 78 | 71 | 104 | 61 | 14 | 2027 | 0 | 17 | 3 |

The table below shows the stand with a harvest in 2020 targeting all trees greater than 5" DBH up to 20.0" DBH. Trees larger or smaller than these parameters have been left touched. This shows the volume removed to be 4.8 CCF per acre in 2020 and 3.9 CCF per acre in 2050. The reason for the lower volumes in 2050 is the diameter cap but the effect is minimal, this stand has over 35 $ft^2$/ac of basal area above 20". The first harvest in 2020 would have to cut a larger number of trees below 20 inches in diameter to lower the stand BA to 66 $ft^2$/ac. The next entry in 30 years has fewer trees in the merchantable range to harvest, however the model was able to remove most trees smaller than 20" leaving only 31 $ft^2$/ac of basal area below the diameter cap.

| StandID | Year | Age | Tpa | TPrdTpa | BA | SDI | CCF | QMD | TCuFt | RTCuFt | Acc | Mort |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 021305MCPHXX0087 | 2020 | 1 | 84 | 84 | 83 | 124 | 57 | 13 | 2290 | 485 | 19 | 3 |
| 021305MCPHXX0087 | 2020 | 1 | 73 | 84 | 65 | 99 | 57 | 13 | 1805 | 0 | 19 | 3 |
| 021305MCPHXX0087 | 2030 | 11 | 72 | 82 | 70 | 105 | 61 | 13 | 1970 | 0 | 20 | 3 |
| 021305MCPHXX0087 | 2040 | 21 | 70 | 81 | 75 | 110 | 65 | 14 | 2136 | 0 | 19 | 3 |
| 021305MCPHXX0087 | 2050 | 31 | 69 | 80 | 80 | 116 | 56 | 15 | 2297 | 391 | 16 | 3 |
| 021305MCPHXX0087 | 2050 | 31 | 59 | 80 | 66 | 95 | 56 | 14 | 1905 | 0 | 16 | 3 |
| 021305MCPHXX0087 | 2060 | 41 | 57 | 78 | 70 | 100 | 59 | 15 | 2035 | 0 | 16 | 3 |

The data for this stand, HOUSXX0149, is shown below broken out by the two inch size classes. The largest tree recorded in this stand was in the 22" diameter class. The stand Basal Area is 176 $ft^2$/ac and there are 120 trees per acre. The table shows the trees compared to the preferred stand target of 66 BA dispersed across the J curve to a maximum 26" diameter. This stand has very few trees below 12 inches and no trees larger than 22 inches. The Basal Area is very high in this stand and is almost total encompassed between 14" and 22" in size.




This table below shows the modeled growth potential for HOUSXX0149 in the No Action scenario. Basal area in this stand starts out at 176 $ft^2$/ac which is extremely high for pine stand with the largest tree being 22 inches in diameter. This stand has a huge number of trees between 14 and 22 inches and very few trees in any other size classes. It will take several cutting cycles to regulate this stand due to the low number of small trees.

| StandID | Year | Age | Tpa | BA | SDI | CCF | QMD | TCuFt | Acc | Mort |
|---|---|---|---|---|---|---|---|---|---|---|
| 021305HOUSXX0149 | 2020 | 1 | 120 | 176 | 260 | 152 | 16 | 5639 | 23 | 5 |
| 021305HOUSXX0149 | 2030 | 11 | 118 | 180 | 265 | 155 | 17 | 5826 | 21 | 7 |
| 021305HOUSXX0149 | 2040 | 21 | 116 | 184 | 268 | 157 | 17 | 5972 | 20 | 6 |
| 021305HOUSXX0149 | 2050 | 31 | 115 | 186 | 271 | 159 | 17 | 6105 | 18 | 6 |
| 021305HOUSXX0149 | 2060 | 41 | 113 | 189 | 273 | 161 | 18 | 6227 | 17 | 6 |
| 021305HOUSXX0149 | 2070 | 51 | 112 | 192 | 276 | 162 | 18 | 6343 | 16 | 5 |
| 021305HOUSXX0149 | 2080 | 61 | 110 | 194 | 278 | 164 | 18 | 6448 | 15 | 5 |
| 021305HOUSXX0149 | 2090 | 71 | 109 | 196 | 280 | 166 | 18 | 6547 | 14 | 5 |
| 021305HOUSXX0149 | 2100 | 81 | 108 | 198 | 282 | 167 | 18 | 6637 | 13 | 5 |
| 021305HOUSXX0149 | 2110 | 91 | 107 | 200 | 284 | 168 | 19 | 6722 | 12 | 4 |
| 021305HOUSXX0149 | 2120 | 101 | 106 | 202 | 285 | 170 | 19 | 6798 | 12 | 4 |

The next two tables show the preferred alternative and the preferred alternative with a 20” diameter cap. These stands are modeled out through the year 2050 which allows us to see a modeled harvest in 2020 and then again in 30 years so we can see the merchantable volume potential for the second harvest entry.

HOUSXX0149 – Preferred alternative BA 66, Diameter cap 26.9” Dq 1.3

The table below shows the stand with a harvest in 2020 targeting all trees greater than 5” DBH up to 26.9” DBH. Trees larger or smaller than these parameters have been left touched. This shows the volume removed to be 35.8 CCF per acre in 2020 and 5.5CCF per acre in 2050. This stand does not have any trees larger than 22 inches so all the volume is removed from 14 to 22 inches. The stand ends with a BA

of 66 post-harvest and then would stabilize with 5 CCF an acre. A new cohort of trees is critically needed to provide long term volume in the stand.

| StandID | Year | Age | Tpa | TPrdTpa | BA | SDI | CCF | QMD | TCuFt | RTCuFt | Acc | Mort |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 021305HOUSXX0149 | 2020 | 1 | 120 | 120 | 176 | 260 | 58 | 16 | 5639 | 3584 | 22 | 2 |
| 021305HOUSXX0149 | 2020 | 1 | 58 | 120 | 66 | 101 | 58 | 14 | 2055 | 0 | 22 | 2 |
| 021305HOUSXX0149 | 2030 | 11 | 57 | 119 | 72 | 108 | 62 | 15 | 2252 | 0 | 22 | 3 |
| 021305HOUSXX0149 | 2040 | 21 | 55 | 117 | 77 | 114 | 66 | 16 | 2439 | 0 | 21 | 3 |
| 021305HOUSXX0149 | 2050 | 31 | 54 | 116 | 82 | 120 | 57 | 17 | 2617 | 551 | 19 | 3 |
| 021305HOUSXX0149 | 2050 | 31 | 47 | 116 | 66 | 98 | 57 | 16 | 2066 | 0 | 19 | 3 |

The table below shows the stand with a harvest in 2020 targeting all trees greater than 5” DBH up to 20.0” DBH. Trees larger or smaller than these parameters have been left touched. This shows the volume removed to be 35.5 CCF per acre in 2020 and 4.5 CCF per acre in 2050. There is not a lot of difference between this prescription and the preferred alternative since the diameter caps play a very small role in the stand. Volume removed is slightly reduced in 30 years simple because the stand has a fractionally smaller number of trees.

| StandID | Year | Age | Tpa | TPrdTpa | BA | SDI | CCF | QMD | TCuFt | MCuFt | RTCuFt | Acc | Mort |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 021305HOUSXX0149 | 2020 | 1 | 120 | 120 | 176 | 260 | 57 | 16 | 5639 | 5156 | 3555 | 21 | 2 |
| 021305HOUSXX0149 | 2020 | 1 | 54 | 120 | 65 | 98 | 57 | 15 | 2084 | 1898 | 0 | 21 | 2 |
| 021305HOUSXX0149 | 2030 | 11 | 53 | 119 | 71 | 105 | 61 | 16 | 2275 | 2099 | 0 | 21 | 3 |
| 021305HOUSXX0149 | 2040 | 21 | 52 | 118 | 76 | 111 | 65 | 16 | 2459 | 2248 | 0 | 20 | 3 |
| 021305HOUSXX0149 | 2050 | 31 | 51 | 117 | 80 | 116 | 57 | 17 | 2627 | 2436 | 455 | 18 | 3 |
| 021305HOUSXX0149 | 2050 | 31 | 43 | 117 | 67 | 96 | 57 | 17 | 2172 | 2014 | 0 | 18 | 3 |

The data for this stand, DOBAXX0057, is shown below broken out by the two inch size classes. The largest tree recorded in this stand was in the 26” diameter class. The stand basal area is 119 $ft^2$/ac and there are 133 trees per acre. The table shows the trees compared to the preferred stand target of 66 BA dispersed across the J curve to a maximum 26” diameter. This stand has very few trees below 10 inches in diameter with the exception of the 2”class which is minimally stocked. The basal area is high in this stand and is mostly contained between 14 and 22” in size, this range of diameters has 96 $ft^2$/ac of basal area and the all the other size classes contain the remaining 25 $ft^2$/ac.




This table below shows the modeled growth potential for DOBAXX0057 in the No Action scenario. Basal area in this stand starts out at 119 $ft^2$/ac which is high for a pine stand with the largest tree being 26 inches in diameter. This stand has a large number of trees between 14 and 22 inches and a small scattering of trees in the other size classes with the exception of 4 to 6” trees where none have been recorded. Stand and growth will continue to decline unless disturbance alters the stand. It will take several cutting cycles to regulate this stand due to the small number of little trees. Regeneration will be critical in this stand for future growth.

| StandID | Year | Age | Tpa | BA | SDI | CCF | QMD | TCuFt | TPrdTCuFt | Acc | Mort |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 021305DOBAXX0057 | 2020 | 1 | 134 | 119 | 175 | 102 | 13 | 3448 | 3448 | 22 | 6 |
| 021305DOBAXX0057 | 2030 | 11 | 131 | 123 | 180 | 105 | 13 | 3612 | 3612 | 21 | 5 |
| 021305DOBAXX0057 | 2040 | 21 | 128 | 127 | 184 | 108 | 13 | 3766 | 3766 | 20 | 5 |
| 021305DOBAXX0057 | 2050 | 31 | 126 | 131 | 188 | 111 | 14 | 3909 | 3909 | 18 | 5 |
| 021305DOBAXX0057 | 2060 | 41 | 124 | 134 | 192 | 114 | 14 | 4042 | 4042 | 17 | 5 |
| 021305DOBAXX0057 | 2070 | 51 | 121 | 138 | 196 | 116 | 14 | 4165 | 4165 | 16 | 5 |
| 021305DOBAXX0057 | 2080 | 61 | 119 | 141 | 200 | 119 | 15 | 4276 | 4276 | 15 | 5 |
| 021305DOBAXX0057 | 2090 | 71 | 116 | 144 | 204 | 121 | 15 | 4378 | 4378 | 15 | 5 |
| 021305DOBAXX0057 | 2100 | 81 | 114 | 147 | 208 | 123 | 15 | 4476 | 4476 | 14 | 5 |
| 021305DOBAXX0057 | 2110 | 91 | 112 | 150 | 211 | 125 | 16 | 4564 | 4564 | 13 | 5 |
| 021305DOBAXX0057 | 2120 | 101 | 110 | 152 | 214 | 128 | 16 | 4645 | 4645 | 13 | 5 |

The next two tables show the preferred alternative and the preferred alternative with a 20” diameter cap. These stands are modeled out through the year 2050 which allows us to see a modeled harvest in 2020 and then again in 30 years so we can see the merchantable volume potential for the second harvest entry.

DOBAXX0057 – Preferred alternative BA 66, Diameter cap 26.9” Dq 1.3

The table below shows the stand with a harvest in 2020 targeting all trees greater than 5” DBH up to 26.9” DBH. Trees larger or smaller than these parameters have been left touched. This shows the volume removed to be 15.9 CCF per acre in 2020 and 4.2 CCF per acre in 2050. This stand does not have any trees larger than 26 inches so all the volume removed is from 13 to 26 inches. This exercise has 66 $ft^2$/ac of basal area in the growing stock range from 5 to 26” that can be managed for future volume.

| StandID | Year | Age | Tpa | TPrdTpa | BA | SDI | CCF | QMD | TCuFt | MCuFt | RTCuFt | Acc | Mort |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 021305DOBAXX0057 | 2020 | 1 | 134 | 134 | 119 | 175 | 58 | 13 | 3448 | 3138 | 1596 | 19 | 3 |
| 021305DOBAXX0057 | 2020 | 1 | 105 | 134 | 66 | 99 | 58 | 11 | 1852 | 1680 | 0 | 19 | 3 |
| 021305DOBAXX0057 | 2030 | 11 | 103 | 132 | 71 | 105 | 61 | 11 | 2016 | 1843 | 0 | 19 | 3 |
| 021305DOBAXX0057 | 2040 | 21 | 101 | 130 | 76 | 111 | 65 | 12 | 2179 | 1989 | 0 | 19 | 3 |
| 021305DOBAXX0057 | 2050 | 31 | 99 | 128 | 81 | 118 | 58 | 12 | 2338 | 2135 | 429 | 17 | 2 |
| 021305DOBAXX0057 | 2050 | 31 | 93 | 128 | 67 | 99 | 58 | 11 | 1908 | 1740 | 0 | 17 | 2 |

The table below shows the stand with a harvest in 2020 targeting all trees greater than 5" DBH up to 20.0" DBH. Trees larger or smaller than these parameters have been left touched. This shows the volume removed to be 15.3CCF per acre in 2020 and 3.6 CCF per acre in 2050. The overall volume removed from both harvest differ slightly. The biggest change, not shown here, is the distribution of diameters and basal area. The example below leaves 35 $ft^2$/ac of basal area above 20 inches, so there is only 31 $ft^2$/ac of basal area in the growing stock that can potentially be harvested from with this scenario.

| StandID | Year | Age | Tpa | TPrdTpa | BA | SDI | CCF | QMD | TCuFt | MCuFt | RTCuFt | Acc | Mort |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 021305DOBAXX0057 | 2020 | 1 | 134 | 134 | 119 | 175 | 57 | 13 | 3448 | 3138 | 1533 | 18 | 3 |
| 021305DOBAXX0057 | 2020 | 1 | 99 | 134 | 66 | 96 | 57 | 11 | 1915 | 1747 | 0 | 18 | 3 |
| 021305DOBAXX0057 | 2030 | 11 | 97 | 132 | 70 | 101 | 60 | 12 | 2061 | 1881 | 0 | 18 | 3 |
| 021305DOBAXX0057 | 2040 | 21 | 95 | 130 | 74 | 107 | 63 | 12 | 2206 | 2023 | 0 | 17 | 3 |
| 021305DOBAXX0057 | 2050 | 31 | 93 | 128 | 79 | 113 | 56 | 12 | 2347 | 2140 | 365 | 15 | 3 |
| 021305DOBAXX0057 | 2050 | 31 | 85 | 128 | 66 | 94 | 56 | 12 | 1982 | 1807 | 0 | 15 | 3 |

**Conclusion of Alternatives**

Based on the LRMP guidance for management of ponderosa pine, lands contained within the analysis' activity area should be under an uneven aged management system while allowing for multiple use. A basil area range has been identified by a certified silviculturist in the preferred alternative (Alt 2) that data and field observations show has the ability to meet or facilitate desired conditions over time as described in the LRMP. Strategies described in the LRMP for vegetation management focus on locations within the area of activity for this analysis. Avoiding such areas in a "No Action" alternative such as alternative 1 would be in contrast with one of the main management guidance documents for the San Juan National Forest. Further guidance in the LRMP under 2.2.23 describes a desired condition within forest type ponderosa pine; proposed for management under this analysis. Alternatives 1 and 3 when analyzed demonstrated limitation in meeting desired conditions described in 2.2.23. Specifically "ponderosa pine forests display variable density and structure, most stands reflect uneven age structure compromising variable-sized, even aged clumps of trees, clumps vary in size, ranging from as few as three trees to as many as 20 or more trees, tree clumps vary in density from widely spaced large trees to tightly spaced small trees". The LRMP identified system for this species of tree is identified in 2.9.14 as well as further listed in table 2.9.4 all of which describe an uneven aged management system for ponderosa pine. An uneven aged system in which trees are evaluated and selected for harvest throughout diameter ranges to meet desired conditions. Alternatives 1 and 3 limit this decision's ability to fully utilize the silviculture systems designated by the LRMP. The analysis showed how alternative 2 fully met the approach described in the LRMP for the designation of lands.

The data provided in this specialist report demonstrates more than anything a need for treatment within the area of activity based on the LRMP guidance for the lands designated suitable/MA-5. The no action alternative (1) when modeled shows clearly how stands continue to stray from desired conditions and further into areas of insect mortality risk associated with high SDI. Removal of currently infested trees

would also be limited by alternative 3 more than alternative 2 with alternative 1 not allowing removal for any reason. A loss of productivity over time is connected to over stocked stands in alternatives 1 and 3. The differences between alternatives 2 and 3 when looking at the data are found in specific areas and over time or cutting cycles. Alternative 2 better meets a uneven aged management approach by allowing the silviculturist to make the end call on a stand by stand basis within the effects analyzed as to the best approach to achieve desired conditions over time based on structure, composition and condition. Limiting prescription effectiveness with a blanket diameter cap such as alternative 3 has been applied to the "Large Tree Retention Areas"(LTR) of Lone Pine as study opportunity. Has shown the potential of limiting or even interrupting long term approaches to meeting desired conditions described in LRMP for ponderosa pine. The Lone Pine LTR study areas have shown a limitation on sanitation approaches within stands and forced the leaving of entire groups of trees infested with bark beetles. As management begins to bring stands back into an uneven aged state, volume or basil area that would normally be prescribed for harvest under an uneven aged management approach would be locked up in upper diameters under alternative 3. Essentially limiting the productivity of these lands designated for timber production. This is the production limitation of the alternative that contrasts with guidance in the LRMP for lands MA -5 and suitable timber base. Under alternative 2 the stand management focus is a evaluation of harvest through all diameters. According to a prescription and a descending order of designation developed by a certified silviculturist. Based on recent field recon of Lone Pine LTR areas prior to implementation negative impacts to meeting desired condition also include limiting desired structure of the stand and effectiveness at meeting the EA's original intent. On the fine and mid-scale of stands or even up to the landscape scale (GTR 310) specific impacts to prescriptions meeting intent of EA have been noted. Areas had to be dropped from treatment due to lack of harvestable volume per acre less than 20"DBH. At the fine scale bark beetles and heavily infested Dwarf Mistltoe trees had to be passed for harvest due to greater than 20"DBH. These examples point to potential on the ground limitations of alternative 3 to meet guidance for ponderosa pine in management area 5 and suitable timber grounds as directed by the LRMP.

## 3.2 Cumulative Effects

A variety of past and ongoing activities occurring in the analysis have influenced wildlife and wildlife habitat in the analysis area. This includes past timber harvesting and road building, livestock grazing, prescribed fires and wildfire management, and recreation activities (including dispersed camping and other activities involving legal, off-road vehicle travel). More recent activities such as wetland improvements, and actions authorized under the Dolores Prescribed Fire Pine Ecosystem Restoration Project decision (ongoing), Boggy Glade Travel Management Plan decision (ongoing), Lone Pine (ongoing) and Salter Vegetation Project EA (forthcoming), could also influence wildlife and wildlife habitat. These activities combined have the potential to cumulatively impact wildlife and wildlife habitat in the analysis area. However, because the proposed action has design elements and project-specific review that will minimize or eliminate potential adverse effects during implementation, the impacts of the proposed action combined with other past, present, and reasonably foreseeable action, is not expected to cause substantial cumulative effects. Some elements of the proposed action may contribute to short-term negative effects, but overall, there will be long-term beneficial effects.

**Economics**

Currently the fiber market (sales of CCF) and more specifically Ponderosa pine is strong on the Dolores District compared to 5-6 years ago. It has been several years since a “no-bid” sale has occurred and small product sales have been on an upward trend. Signs of longevity and a reliable supply of raw fiber again in the area have persuaded investments to occur again in the wood products industry. The appearance of new and additional equipment is apparent in many aspects of fiber harvesting and processing. The fiber demand of the local area based on current sales over the past 2 years will keep in pace with what this EA can provide as a byproduct of the vegetation management activities to meet desired conditions. However, an increase in demand will result in competitive prices for fiber and the ability to utilize funds to perform service and stewardship items such as pre-commercial thinning.

Small volume sales under 2,000 CCF of Ponderosa Pine is a continued niche market and includes post/pole, firewood on all scales, mine props and dimensional rough cut lumber. These markets have been in relatively consistent demand in the local area. In recent time markets are expanding beyond southwest Colorado as the supply for raw material has been reliable and processing facilities are consistently running. Adaptation is being witnessed as fiber supply of specific diameters become more or less available or likewise economical to get out the woods. Re-engineering and additions to processing facilities occur locally as markets decline or improve. The use of round wood or unprocessed logs for items such as mining props is an indicator that the industry can and will adapt to available byproducts. In the past that products was being made almost exclusively out of saw log sized material. This switch demonstrates that availability of byproduct can drive a change towards meeting the needs of the forest for hazardous fuel removal while still meeting economic drivers. Large scale fuelwood processing has created an increase in the utilization of non-saw material from all types of contracts on the forest. Material that has historically been very costly to remove has become either more economical or is now fully merchantable. This sector can typically use green and beetle killed trees but rarely burned trees and overall prefers a mixture of size classes to meet multiple niche markets.

Specific markets have developed in relation to the availability of beetle killed pine due to its unique appearance. This market however is limited to strictly beetle killed dead ponderosa pine, the reason for this niche market is the blue stain fungus which gives the wood a deep blue color after the trees have died. This blue hue is caused by a fungus carried by pine bark beetles, the fungus is one of a dozen or more fungus’s carried by most bark beetles. The end product is a board that has an array of blue intermixed with clear wood giving the final product a mosaic of colors. One local small scale custom furniture maker (Rustic Furniture) deals almost exclusively in blue stained wood products that is marketed all over the country for high end interior design. Interior tongue and groove paneling which is made by milling 4” 6” and 8” by 1” thick boards does have a wider market potential. The local Aspen Wall Wood mill located in Dolores, Colorado which typically used only Aspen products have bought and cut several timber sales in the vicinity of the project area in the past few years. This product has markets all over the United States and is highly sought after in many places.

Biomass material (<5”, branches and tops) and to a lesser extent “Round Wood” also known as “Product Other than Logs” (POL) {5” – 8.9”DBH} continues to be problematic in finding dependable outlets. The smaller the diameter or more inconsistent the material the harder it is to accommodate the harvesting, removal and end product costs. However, with recent markets opening up and investments being made, the right activities and focus are in place to develop a market that will be able to use these products. Current contracts for removal either include it in the volume as “timber subject to agreement” (TSA).

The TSA approach allows the purchaser the least amount of risk contractually for both not having to cut or pay for the material. However, when markets open up or are created purchasers will already have the volume available and an agreed upon price with the agency. To make this material mandatory removal without compensation appears to be an unviable option in most cases on large sales. Understanding markets is an important approach to utilizing industry for the long term on both the large and small scale.

The “saw log” (=>9” DBH) market demand continues to increase with bid premiums seen on almost every sale including stewardship contracts within the last 4 years. Sales with premiums also included additional charges for brush disposal, essential KV and road maintenance which have caused no bid sales on the district in the past. The ability to include large volumes and achieve vegetation management at landscape level is possible with the current industry. Offering a mixture of saw log and smaller diameters timber in the right ratio is important to keep sales marketable. The size of these sales is equally important in both volume and acres to ensure the work is completed on time and has a sustained profitability.

Local business are filling in the secondary needs of the wood products industry including trucking, gravel and road work needs, pre-commercial thinning, firewood sales, fuel sales and mechanic services to name a few. Although the industry and related economy is on the increase, variability in volumes and proportions of saw logs could have significant impacts on the way these businesses operate together. Achieving overall desired conditions described in the LRMP for this land use, species and area is the overarching goal of this project. With a multi-use area such as the Salter EA project area, developing an approach to greater good starts with protecting the resource by following guidance in the LRMP.

# 4 References

## 4.2 References and Literature Cited[10]

Abella, Scott R.; Fule, Peter Z; Convington, Wallace W. 2006. Diameter Caps for Thinning Southwestern Ponderosa Pine Forests: Viewpoints, Effects, and Tradeoffs. Journal of Forestry 407-414P.

Amman, G., Logan, J., 1998. Silvicultural control of mountain pine beetle: Prescriptions and the influence of

Baker, W. L. 2018a. Historical fire regimes in ponderosa pine and mixed-conifer landscapes of the San Juan Mountains, Colorado, USA, from multiple sources. Fire 1: article 1020023. Online at: https://www.mdpi.com/2571-6255/1/2/23

Baker, W. L. 2018b. Transitioning western U.S. dry forests to limited committed warming with bet-hedging and natural disturbances. Ecosphere 9: article 302288. Online at: https://esajournals.onlinelibrary.wiley.com/doi/epdf/10.1002/ecs2.2288

Bottero Alessandra; D'amato Anthony W.; Palik, Brian J; Bradford, John B 2016. Density-dependent vulnerability of forest ecosystems to drought. Journal of applied Ecology DOI 10.1111/1365

Brown, P.M., and Wu, R. 2005. Climate and disturbance forcing of episodic tree recruitment in a southwestern ponderosa pine landscape. *Ecology* 86.11: 3030-3038.

Cochran, P., Barrett, J. 1993. Long–term response of planted ponderosa pine to thinning in Oregon's Blue Mountains. Western Journal of Applied Forestry 8: 126–132.

Cochran, P., Barrett, J. 1998. Thirty–five year growth of thinned and unthinned ponderosa pine in the Methow Valley of northern Washington. USDA Forest Service, Pacific Northwest Research Station, RP–PNW–502, Portland, OR. 24 p. Cole and McGregor, 1988

Colorado State Forest Service. 2017. Colorado Forestry Best Management Practices: Forest Stewardship Guidelines for Water Quality Protection, 2014 Field Monitoring Report. https://csfs.colostate.edu/media/sites/22/2017/12/BMP_Audit_Oct2017-www.pdf

Covington, W.W. & Moore, M.M. 1994, January. Southwestern Ponderosa Forest Structure: Changes Since Euro- American Settlement. Journal of Forestry. pp.39-46.

Egan, J., Jacobi, W., Negrón, J., Smith, S., Cluck, D. 2010. Forest thinning and subsequent bark beetle–caused mortality in northeastern California. Forest Ecology and Management 260: 1832–1842.

Fettig, C.J., Klepzig, K.D., Billings, R.F., Munson, A.S., Hebecker, T.E., Negron, J.F., & Nowak, J.T. 2007. The effectiveness of vegetation management practices for prevention and control of bark beetle infestations in coniferous forests of the western and southern United States. For Ecol Manage. 238, 24-53.

Fettig, C. J., K. E. Gibson, A. S. Munson, and J. F. Negrón. 2014a. Cultural practices for prevention and mitigation of mountain pine beetle infestations. Forest Science 60: 450-463.

Fettig, C.J.; Gibson, K.E.; Munson, A.S.; Negrón, J.F. 2014b. A comment on "Management for mountain pine beetle outbreak suppression: Does relevant science support current policy?" Forests. 5: 822-826.

Fiddler, G., Hart, D., Fiddler, T., McDonald, P., 1989. Thinning decreases mortality and increases growth of ponderosa pine in northeastern California. USDA Forest Service, Pacific Southwest Research Station, RP–PSW–194, Berkeley, CA, 7 p.

Fitzgerald, J. P., Meaney, C.A., & Armstrong, D.M. 1995. *Mammals of Colorado.* Denver,CO: Denver Museum of Natural History and University Press.

Gillette, N.E.; Wood, D.L.; Hines, S.J.; Runyon, J.B.; Negrón, J.F. 2014. The once and future forest: Consequences of mountain pine beetle treatment options. For. Sci. 60, doi:10.5849/ forsci.13-040.

Gleason, Kelly E.; Bradford, John B; Bottero, Alessandra; D'Amato, AW; Fraver, Shawn. 2017. Competition amplifies drought stress in forest across broad climatic and compositional gradients. Ecosphere vol. 8(7)

Gordon, E., D. Ojima. 2015. Colorado Climate Change Vulnerability Study: A report submitted to the Colorado Energy Office. University of Colorado Boulder and Colorado State University.

Graham, R. T., Harvey, A. E., Jain, T.B., & Tonn, J. R. 1999. The Effects of Thinning and Similar Stand Treatments on Fire Behavior in Western Forests. Gen. Tech. Rep. PNW-GTR-463. Portland, OR: US Department of Agriculture, Forest Service, Pacific Northwest Research Station. 27 p.

Graham, R. T., L. A. Asherin, M. A. Battaglia, T. B. Jain, and S. Mata. 2016. Mountain pine beetles: a century of knowledge, control attempts, and impacts central to the Black Hills. USDA Forest Service General Technical Report RMRS-GTR-353, Rocky Mountain Research Station, Fort Collins, Colorado, USA. Online at: https://www.fs.usda.gov/treesearch/pubs/52308

Griffis, K. L., Crawford, J. A., Wagner, M. R., & Moir, W. H. 2000. Understory Response to Management Treatments in Northern Arizona Ponderosa Pine Forests. Forest Ecology and Management. 146 (239- 245).

Hall, R., Davies, G. 1968. Mountain Pine Beetle Epidemic at Joseph Creek Basin Modoc National Forest. USDA Forest Service, Division of Timber Management, San Francisco, CA, 22pp.

Hatfield, R., S. Jepsen, E. Mader, S.H. Black, & M. Shepherd. 2012. *Conserving Bumble Bees: Guidelines for Creating and Managing Habitat for America's Declining Pollinators.* Portland, OR: The Xerces Society for Invertebrate Conservation.

Hawksworth, F.G. 1977. The 6-class dwarf mistletoe rating system. General Technical Report RM-48. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Forest and Range Experiment Station 7 p.

Hayward, G.D. & Verner, J., editors. 1994. Flammulated, boreal, and great gray owls in the United States: A technical conservation assessment. Gen. Tech. Rep. RM-253. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Forest and Range Experiment Station.

Hoffman, Sieg, Mcmillan, Fule et al. 2012 Fuel loading 5 years after bark beetle outbreak in south western USA ponderosa pine forest.

Hood, S.M. 2010. Mitigating Old Tree Mortality in Long-Unburned, Fire-Dependent Forests: A Synthesis. Gen.

Tech. Rep. RMRS-GTR-238. Fort Collins, CO: US Department of Agriculture, Forest Service, Rocky Mountain Research Station. 71 p.

International Journal of Wildland Fire 2009. *Short Term impact of post fire salvage logging on regeneration, hazardous fuel accumulation, and understory development in ponderosa pine forests of the Black Hills vol.* 18,451-458 p.

Johnson DW, Murphy JF, Susfalk RB, Caldwell TG, Miller WW, Walker RF, Powers RF. 2005. The effects of wildfire, salvage logging, and post-fire N-fixation on the nutrient budgets of a Sierran forest. Forest Ecology and Management. 220:155-165.

Keith, J.O. 2003, August 25. Abert's Squirrel (*Sciurus aberti*): a technical conservation assessment. USDA Forest Service, Rocky Mountain Region. http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5181932.pdf

Kennedy, P.L. 1990. *Reproductive Strategies of northern goshawks and Cooper's hawks in north-central New Mexico.* Dissertation, Utah State University, Logan.

Keyser, Tara L; Smith, Fredrick W, Shepperd, Wayne D. Short Term impact of post fire salvage logging on regeneration, hazardous fuel accumulation, and understory development in ponderosa pine forests of the Black Hills International Journal of Wildland Fire 2009. vol. 18,451-458 p.

Korb, J. E., Johnson, N. C., Covington, W. W. 2004. Slash Pile Burning Effects on Soil Biotic and Chemical Properties and Plant Establishment: Recommendation for Amelioration. Restoration Ecology 12(52-62).

Ladyman, J.A.R. 2007. *Triteleia grandiflora* Lindley (largeflower triteleia): A Technical Conservation Assessment.

USDA Forest Service, Rocky Mountain Region.

Laughlin, Daniel et. al. C. 2016. Using trait-based ecology to restore resilient ecosystems: historical conditions and future of montane forests in western North America. Society of Ecological Restoration Rec. 12342

Lindenmayer, D. B., P. J. Burton, and J.F. Franklin. 2008. Salvage logging and its ecological consequences. Island Press, Washington, D.C.

Lindenmayer, D. B. D. R. Foster, J. F. Franklin, M. L. Hunter, R. F. Noss, F. A. Schmiegelow, and D. Perry. 2004.

Salvage harvesting policies after natural disturbance. Science, Volume 303.

Lockwood, Ryan. 2019. Bark beetle outbreak expanding in Colorado. College News, Colorado State University.

Accessed on line at: https://warnercnr.source.colostate.edu/bark-beetle-outbreaks-expanding-in- colorado/

MacDonald, L.H. and Stednick, J.D. 2003. Forests and Water: A State-of-the-Art Review for Colorado. Colorado Water Resources Research Institute Completion Report No. 196. https://www.fs.fed.us/rm/pubs_exp_forests/manitou/rmrs_2003_macDonald_l001.pdf

McCambridge, W. F. and Stevens, R. E. 1982. Effectiveness of Thinning Ponderosa Pine Stands in Reducing Mopuntain Pine Beetle-Caused Tree Losses in the Black Hills – Preliminary Observations. Research Note RM-414. Fort Collins, CO: US Department of Agriculture, Forest Service, Rocky Mountain Forest and Range Experiment Station. 3 p.

Meader Sanchez, Andrew J; Waring, Kristen M; Kalies, Elizabeth L. 03/2015 Implications of Diameter Caps on Multiple Forest Resource Responses in Context of the Four Forest Rest. Init. Results from FVS. Journal of Forestry 219-230p

Meigs, Garrett, Cambell John L, Zald Harold S., Bailey John D, 2015 Does wildfire likelihood increase following insect outbreaks in conifer forests. Ecospere Vol. 6(7) article 118

Morgan, P., Aplet, G.H., Haufler, J.B., Humphries, H.C., Moore, M.M., & Wilson, W.D. 1994. Historical Range of Variability. Journal of Sustainable Forestry. 2:1-2, 87-111, DOI: 10.1300/J091v02n0

Mutch, Robert W. 1994. Fighting fire with prescribed fire: a return to ecosystem health. Journal of Forestry.

92(11): 31-33.

Negron et al. 1997. Estimating probabilities of infestation and extent of damage by the Roundheaded Pine Beetle in ponderosa pine in the Sacramento Mountains

Negron, Jose F; Wilson, Jill L; Anhold, John A. 2000 Stand Conditions Associated with Roundheaded Pine Beetle Infestations in Arizona and Utah. Entomological Society of America

Negrón, J., Popp, J. 2004. Probability of ponderosa pine infestation by mountain pine beetle in the Colorado Front Range. Forest Ecology and Management 191: 17–27.

Negrón, J., Allen, K., Cook, B., Withrow, J. 2008. Susceptibility of ponderosa pine, Pinus ponderosa (Dougl. Ex Laws.), to mountain pine beetle, *Dendroctonus ponderosae* Hopkins, attack in uneven–aged stands in the Black Hills of South Dakota and Wyoming, USA. Forest Ecology and Management 254: 327–334.

Nunery, J.S. and Keeton, W.S. 2010. Forest carbon storage in the northeastern United States: Net effects of harvesting frequency, post-harvest retention, and wood products. Forest Ecology and Management 259: 1363-1375

Nydick, K., Crawford, J., Bidwell, M., Livensperger, C., Rangwala, I., & Cozetto, K. 2012. Climate Change Assessment for the San Juan Mountain Regions, Southwestern Colorado, USA: A Review of Scientific Research. Prepared by Mountain Studies Institute in cooperation with USDA San Juan National Forest Service and USDOI Bureau of Land Management Tres Rios Field Office. Durango, CO. https://static1.squarespace.com/static/53bc5871e4b095b6a42949b4/t/551997a5e4b0c6d76aa21bbd/1 427740581512/ClimateResearchReview_SJMs_FINAL.pdf

Oliver, C., Larson, B. 1996. Forest Stand Dynamics, update edition. John Wiley & Sons, Inc. 520 p.

Oliver, W., Uzoh, F. 1997. Maximum stand densities for ponderosa pine and red and white fir in Northern California. Intensive Forest Management Symposium, January 14–16, 1997. P. 57–65 in Proceedings of the 18th Annual Forest Vegetation Management Conference, University of California Cooperative Extension Forestry Program, Sacramento, CA. 125 p.

Peterson, David L.; Millar, Connie I.; Joyce, Linda A.; Furniss, Michael J.; Halofsky, Jessica E.; Neilson, Ronald P.; Morelli, Toni Lyn. 2011. Responding to climate change in National Forests: A Guidebook for Developing Adaptation Options. Gen. Tech. Rep. PNW-GTR-855. Portland, OR: U.S. Department of Agriculture, Forest Service, Pacific Northwest Research Station. 109 p.

O'Donnell Frances C.; Flatley, William T; Springer, Abraham E; Fule, Peter Z. Forest Restoration as a strategy to mitigate climate impacts on wildfire, vegetation, and water in semiarid forests

Proffett, K.M., Gude, J.A., Hamlin, K.L., & Messer, M.A. 2013. Effects of hunter access and habitat security on elk habitat selection in landscapes with public and private land matrix. Journal of Wildlife Management. 77: 514-524.

Rabinowitz, D. 1981. Seven forms of rarity. *In*: H. Synge, editor. *The Biological Aspects of Rare Plant Conservation*. New York: Wiley.

Rehfeldt, GE, BC Jaquish, C. Sáenz-Romero, D.G. Joyce, L.P. Leites, J.B. St. Clair, and J. López-Upton. 2014. Comparative genetic responses to climate in the varieties of *Pinus ponderosa* and *Pseudotsuga menziesii*: Reforestation. *Forest Ecology and Management* 324:147-157.

Reynolds, R.T. and Linkhart, B.D. 1987. Fidelity to territory and mate in Flammulated Owls. In *Biology and conservation of northern forest owls*. R.W. Nero, R.W., Clark, R.J., Knapton, R.J., & Hamre, R.H. editors. Symposium Proceedings. U.S. Forest Service Gen. Tech. Report RM-142.

Reynolds, R. T. et al. 1992. Management recommendations for the northern goshawk in the Southwestern United States. U.S. Forest Service General Technical Report RM-217, Rocky Mountain Research Station, Fort Collins, Colorado.

Romme, W.H., et al. 2006. Recent forest insect outbreaks and fire risk in Colorado forests: a brief synthesis of relevant research. Fort Collins, Colorado: Colorado Forest Restoration Institute.

Romme, W.H., M.L. Floyd, and D. Hanna. 2009. *Historical Range of Variability and Current Landscape Condition Analysis: South Central Highlands Section, Southwestern Colorado & Northwestern New Mexico*. Fort Collins, Colorado: Colorado Forest Restoration Institute.

Sartwell, C., Stevens, R. 1975. Mountain pine beetle in ponderosa pine – prospects for silvicultural control in second–growth stands. Journal of Forestry 73: 136–140.

Sartwell, C., Dolph, R. 1976. Silvicultural and direct control of mountain pine beetle in second growth ponderosa pine. USDA Forest Service, Pacific Northwest Research Station, RN–PNW–268, Portland, OR. 8 p.

Schmid, J.M., Mata, S.A. 2005. Mountain pine beetle–caused tree mortality in partially cut plots surrounded by unmanaged stands. USDA Forest Service, Rocky Mountain Research Station, RP–RM–54, Fort Collins, CO. 11 p.

Schmid, J., Mata, S., Kessler, R., Popp, J. 2007. The influence of partial cutting on mountain pine beetle–caused tree mortality in Black Hills ponderosa pine stands. USDA Forest Service, Rocky Mountain Research Station, RP–RMRS–68, Fort Collins, CO. 19 p.

Schmid, J. M. and Mata, S. A. 1992. Stand Density and Mountain Pine Beetle-caused Tree Mortality in Ponderosa Pine Stands. Research Note RM-515. Fort Collins, CO: US Department of Agriculture, Forest Service, Rocky Mountain Forest and Range Experiment Station. 4 p.

Shepperd, Wayne D. 2001. Manipulations to Regenerate Aspen Ecosystems. In Sustaining Aspen in Western Landscapes: Symposium Proceedings June 13-15, 2000, Grand Junction, CO. Proceedings RMRS-P-18. Fort Collins, CO: US Department of Agriculture, Forest Service, Rocky Mountain Research Station. 355- 365.

Six, D. L., E. Biber, and E. Long. 2014. Management for mountain pine beetle outbreak suppression: does relevant science support current policy? Forests 5: 103-133. Online at: https://www.mdpi.com/1999- 4907/5/1/103.

TACCIMO Climate Report: Dolores County, CO. Version 3.2. 2013.

https://www.fs.usda.gov/ccrc/tools/taccimo The Ponderosa Pine Forest Partnership. 2001, June. An

Ecological Assessment of Ponderosa Pine Forest

Restoration Treatments in Southwestern Colorado. U.S. Forest Service Region 2 [November 30, 2007]

Toweill, D.E. and Thomas, J.W. 2002. *North American Elk Ecology and Management.* Washington D.C.: Smithsonain Institute.

USDA, Forest Service. 2004. Species Assessments for *American elk, hairy woodpecker, and Abert's squirrel* for the San Juan National Forest. San Juan National Forest, Durango, Colorado.

USDA, Forest Service. 2011. Front Range Round Table CFLRP – 2011 Ecological, Social, and Economic Monitoring Plan. Clement, Jessica; Brown, Peter; Colorado Forest Restoration Institute http://www.frontrangeroundtable.org

USDA, Forest Service. 2011 FR-R3-16-3. Diameter Caps and Forest Restoration: Evaluation of a 16" Cut Limit on Achieving Desired Conditions Southwestern Region

USDA, Forest Service-Region 2. 2013. Volume II: Final San Juan National Forest and Proposed Tres Rios Field Office Land and Resource Management Plan. https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5435985.pdf

USDA, Forest Service. Service Trip Report GSC-17-01, December 2016 Worrall and Lockner

USDA, Forest Service-Region 2. 2013. Volume III: Appendices. Appendix I-Vulnerable Watersheds. https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5435655.pdf

USDA, Forest Service. 2013b. Biological Assessment for the Final San Juan National Forest Land and Resource Management Plan. U.S. Forest Service Region 2, San Juan National Forest, Durango, CO.

USDA, Forest Service. 2013c. Biological Evaluation for the Final San Juan National Forest Land and Resource Management Plan. U.S. Forest Service Region 2, San Juan National Forest, Durango, CO.

USDA Forest Service. 2015. Region 2 Regional Forester's Sensitive Species List, FSM 2600-2015-1, Oct. 6, 2015.

USDA Forest Service. 2015. Four Forest Restoration Initiative Adaptive Management Monitoring Plan https://www.fs.usda.gov/main/4fri/planning

USDA Forest Service. 2016. Spruce Beetle Epidemic and Aspen Decline Response EIS Process for Adaptive Implementation of the Spruce Beetle Epidemic –Aspen Decline Management Response EIS https://www.fs.usda.gov/nfs/11558/www/nepa/96623_FSPLT3_2466907.pdf

, Natural Resources Conservation Service. 1997. Soil Survey of the Cortez Area, Colorado, Parts of Dolores and Montezuma Counties. https://www.nrcs.usda.gov/Internet/FSE_MANUSCRIPTS/colorado/CO671/0/CO671%20Cortez.pdf

USDA, Natural Resources Conservation Service. 2018. Custom soil resource report for project area, Montezuma County, Dolores, Colorado. Accessed November 30, 2018: https://websoilsurvey.nrcs.usda.gov/app/HomePage.htm

USDA, Rocky Mountain Research Station. 2003. General Technical Report RMRS-GTR-110. Old Ponderosa Pine Trees in Colorado Front Range https://www.fs.usda.gov/treesearch/pubs

USDA, Rocky Mountain Research Station. 2007. General Technical Report RMRS-GTR-202. Fire Ecology and management of ecosystem of southern Utah. https://www.fs.usda.gov/treesearch/pubs/28849

USDA, Rocky Mountain Research Station. 2012. General Technical Report RMRS-GTR-290. Climate Change, Forests, Fire, Water, and Fish: Building resilient landscapes, streams and managers. https://www.fs.fed.us/rm/pubs/rmrs_gtr290.pdf

USDA, Rocky Mountain Research Station. 2013. General Technical Report RMRS-GTR-310. Restoring Composition and Structure in Southwestern Frequent-Fire Forest: A science-based framework for improving ecosystem resiliency. https://www.fs.fed.us/rm/pubs/rmrs_gtr310

USDI, BLM. 1998. A User Guide to Assessing Proper Functioning Condition and the Supporting Science for Lotic Areas. TR 1737-15.

Worrall JJ. 2015. Dwarf Mistletoes: Ecology and Management in the Rocky Mountain Region. 48 pp. Lakewood, Colorado: US Forest Service, Rocky Mountain Region, Forest Health Protection. http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd525105.pdf.

Remke, Micheal Dr. DWRF presentation " Salter - a literature review" 03/2020

DWRF Salter EA priority map .

DWRF Resilience Metrics and Desired Conditions - Vegetation - Ponderosa Pine

**From:** Bruch, Travis -FS
**To:** Lambert, Mark -FS; Hansen, Lindsey - FS; Chadwick, Kara -FS
**Subject:** FW: [External Email]Salter CSE data--confirming 384 stands (close-ish)
**Date:** Wednesday, August 25, 2021 2:38:23 PM
**Attachments:** AnExaminationOfSalter.pdf
image003.png
image004.png
image005.png
image001.png

---

**From:** Roper, Mark -FS <mark.roper@usda.gov>
**Sent:** Friday, August 6, 2021 8:37 PM
**To:** William L. Baker <landscape@fastmail.com>
**Cc:** Casey, David -FS <david.casey2@usda.gov>; Bruch, Travis -FS <travis.bruch@usda.gov>; Padilla, Derek -FS <derek.padilla@usda.gov>
**Subject:** RE: [External Email]Salter CSE data--confirming 384 stands (close-ish)

Hi Bill,

Attached is my comprehensive review of the Salter question at this time. If needed, I can provide the data subsets at a later time. This may leave you with more questions, but hopefully it narrows down the number and explains why the nuances and differences have occurred. I wanted to get this out while it was fresh on my mind. I have rerun the summaries plots layer.

The much larger number from Travis, I gave him earlier, but as I explain in the FSVEG portion of the approach, that was mostly using the "Project Name" rather than what was in the Project boundary. Some later clean up also addressed getting some old exams archived and new exams linked.

Let me know if you need the list and shapefiles.

**Mark D. Roper**
**R2 Data Services Specialist (detail)**
**R2 GPS Center of Excellence**
**Forest Service**
**Region 2 Regional Office, Resource Information Staff**
**Phone (c): 970-317-2415**
**mark.roper@usda.gov**
15 Burnett Ct
Durango, CO 81301-3647
www.fs.fed.us

**Caring for the land and serving people**

**From:** William L. Baker <landscape@fastmail.com>
**Sent:** Wednesday, July 28, 2021 8:54 PM
**To:** Roper, Mark -FS <mark.roper@usda.gov>
**Cc:** Casey, David -FS <david.casey2@usda.gov>; Bruch, Travis -FS <travis.bruch@usda.gov>
**Subject:** [External Email]Salter CSE data--confirming 384 stands

[External Email]
If this message comes from an **unexpected sender** or references a **vague/unexpected topic;**
Use caution before clicking links or opening attachments.
Please send any concerns or suspicious messages to: Spam.Abuse@usda.gov

Mark,

Sorry to trouble you. I have been trying to obtain the final set of Salter EA CSE data, and finding some discrepancies that I think I understand now, but would like some affirmation.

Way back in Dec. 2020 you sent me forest-wide CSE data and I clipped that with the Salter boundary, finding 394 active stands.

On March 5, 2021 Travis Bruch sent me an email indicating that you had sent him a clip of the Salter EA area that he said at that time included 496 stands: "Mark roper did send a Clip of the Salter EA area with all the stands used in that area and the new number is 496 Stands out of 561 or something total..."

I asked you about the differences, and on March 9, 2021 you offered three explanations that seemed to make some sense to me. I did not quite understand what you explained, but it seemed that Travis' 496 stands were "ALL the stands originally considered for Salter" implying that this was not the final Salter dataset used in the Salter EA.

I also indicated that some of the stands in my FOIA dataset were not in Travis' March 5 dataset. I was supposed to look to see which stands in mine were missing in Travis' but I never got to that.

I got confused again recently, because I requested the Salter EA data via Danny Margoles and the Exchange Folder just to be sure that I had the latest Salter EA data, and I got back a folder Draft_EA_Data which contained Access databases with a total of 923 stands, likely for a much larger area than Salter.

I explained this in an email to Dave/Travis, and on July 26, Dave Casey was kind enough to send me a polygon shapefile that contains all the stand polygons used in the Salter EA. I joined that to a pooled set of the StandInit Access data in Draft_EA_Data and got n = 384 stands in the Salter EA area.

I am not sure, but it seems to me now that there are just the 384 stands, those that I got from Dave Casey on July 26, that were finally used in the Salter EA area, not the 496 stands that Travis was working with on March 5. The 384 stands are close to the 394 that were in the CSE dataset you sent to me in Dec. 2020. The difference of 10 is likely because of some updating that was done after my

FOIA request.

I don't want anyone to have to dig into this deeply again, I just wanted to have some affirmation that this latest dataset of 384 stands is likely the correct dataset for the Salter EA, and the earlier 496-stand dataset that Travis was using is not.

Am I correct?

Best.

Bill B.

--

William L. Baker
landscape@fastmail.com

**An Examination of Salter -- Common Stand Exam within the EA**

MDR 8/6/2021 – v.1.0

William Baker, as part of the Dolores Watershed Resilient Forest Collaborative, desiring to obtain a final set of Salter EA CSE data, and after finding some discrepancies with previous provisions, requested a review of what the final "Stands-with-Exams" number is for the Salter Vegetation Project.

There is not a straightforward answer to this question. Results can vary depending on the database used and "How" the question is approached, such as by a project name or by exam plots within a project area or by using certain attribute fields.

Different results can also occur if there is ambiguity in the request, or there are ongoing Vegetation updates, or database cleanup, or different personnel responding to the problem, or even Time between similar requests as database conditions change.

Before getting into the different approaches and ultimately "final" results, the following conditions regarding the database situation must be understood.

- In the 2020-2021 season, the San Juan had a 110,000 acre Vegetation Update Pilot effort across the forest using a contractor to do photo interpretation updates using the 2019 imagery for identified stands that had experienced change due to Fire, Harvest or simple classification errors.
- In addition to the Pilot, a major effort to fully address unlinked exams, plots and Archive old exams was undertaken across the forest. This is not complete, but it is within the Salter area.
- During the Data Preparation for the Pilot's Contractor, stands that were to be excluded from the contract were those stands identified for Common Stand Exam Planned or Outstanding. The GIS Coordinator was provided with those areas and made the exclusions from the project. However,
- Reviewing the Contractor data in comparison to Salter, it was discovered that
  - Either the Coordinator missed excluding a handful of provided Exam stands or the Coordinator was not provided those stands to exclude to begin with. Regardless,
  - Data provided to the contractor included these stands as having been recently Field updated. The Forest Service provided direction to leave recent field collected (walk-through) attributes alone. The Contractor and Forest Service both missed identifying these and so were updated with photo interpretation. As a result,
  - Four (4) stands within Salter may need restored with the 2019 or 2020 field collected walk-through form data. This is related to Stand Exam as some of the updates with re-delineations archived 10-12 plots. We may reevaluate restoring some of these to Active status.
- The Salter EA Units consist of 164 polygons, most of which do not expressly follow existing vegetation stand delineations.

**Stand Exams – FSVEG database**

- There are currently **482 Active exams** entered in the FSVEG database under the Project Names of ***"SALTER"*** and "***SALTER 2020".***
- **Four (4)** of these exams, partially within the Salter EA, are missing geospatial plots in the FSVeg Spatial database, but the Exam itself is linked to the Stand.
  - 021305HOUSXX0151
  - 021305MCPHXX0121
  - 021305BEAMXX0453
  - 021305WDOLXX4779
- MANY of these Salter Named exams are not directly within the Salter EA project boundary.
- Several additional Active Exams collected under different project names ARE directly within the Salter EA boundary.
- The FSVEG database is what is used to provide the CSE raw data. To provide the data extract, either the selection is made by Project Name(s) or the Exam SETTING IDs must be individually selected and added to (or removed from) the list for export.
- There were two 2019 exams archived in favor of resurveyed 2020 exams.

**Stand Exam Geospatial Plots – using the Plot Summaries by Plot generated from FSVEG tables for Linked exams.**

- Querying the "SALTER" and "SALTER 2020" Project Names,
  - There are 479 Active and Archived exams with plot locations using these names.
  - There are **477 ACTIVE Only** exams with spatial Plots locations. However,
- Of those with Active Only Unique Setting IDs, PLOTS THAT FALL WITHIN the Salter EA boundary,
  - Portions of 360 unique ACTIVE exams are identified as belonging solely to the "Salters" CSE project names. However,
  - There are portions of *26 more Active Exams* with Plots within Salter EA boundary that include additional CSE Project Names (RMSTAND, Pines Partnership, etc.) totaling **386 Active Exams**.

**Vegetation Stands (Polygons) – as Clipped and Queried from August 6, 2021 version of FSVeg Spatial**

- A fresh Vegetation clip from FSVeg Spatial was made using the Salter EA cutting units 7/26/21
- The result of the clip includes 672 unique stand Setting IDs within the Salter EA project boundary. Of these,
- **Portions of 453 stands** have linked Active Stand Exams (Query the attribute table for "NUM_EXAMS > 0") . However, as mentioned above, four stands are missing their spatial plot locations for the exam.
- This leaves **449 stands, with geospatial plots** with a portion of their area within the EA boundary**. However,**
- Many Stand slivers were generated from the clip with the EA boundary, including 35 polygons less that 1 acre in size**. What is the sliver threshold in order to not consider the presence of a portion of exam-linked stand relevant?**

Case No. 1:23-cv-01501-RMR Document 17-1 filed 09/29/23 USDC Colorado pg 251 of 323



- There are also larger portions of stands with Exams within Units lacking any exam plots in the Unit portion. The image below illustrates such an example.



- Due to the recent unrelated concurrent Vegetation Pilot Contract,
  - o Within the Project Area, some stands had attributes and boundaries updated, some of which may be reviewed for rolling back to field collection conditions,
  - o Some previously released Common Stand Exam setting IDs may have changed. This latest would have to be used for a new request as those IDs are also in FSVEG with the Raw data.
  - o A handful of plots and exams were archived, which may eventually be reviewed and unarchived.



**Conclusion – As it applies to the Salter EA Boundary**

- From a Polygon and linked Exam perspective - While there are technically portions of 453 Stands with Active Exams in the project area, only **418 (or less)** could potentially be considered relevant with area greater than an acre. The user will need to determine what of these smaller remaining stand portions to include or exclude.
- From an Exam with Plots perspective – **386 Active Exams contain at least 1 plot** within the project boundary (not counting the exams with the 4 missing plot groups altogether).

Place holder for Common Stand Exam Data (CSE) stored in Access Database.

CSE data is filed in the DWRF Collaborative Folder and in the Salter project record under the name 20210901FVSDataAccessDB.zip and is available upon request.

ResearchGate

See discussions, stats, and author profiles for this publication at: https://www.researchgate.net/publication/262687689

# Southwestern ponderosa pine forest structure: Changes since Euro-American settlement

**Article** *in* Journal of Forestry · January 1994

CITATIONS
849

READS
825

2 authors:



William Wallace Covington
Northern Arizona University

131 PUBLICATIONS 10,469 CITATIONS

SEE PROFILE



Margaret M Moore
Northern Arizona University

105 PUBLICATIONS 7,313 CITATIONS

SEE PROFILE

Some of the authors of this publication are also working on these related projects:

Long-term mapped herbaceous vegetation quadrats for demographic, population, coexistence studies View project

Restoration Experiments and Demonstration Area at Fort Valley Experimental Forest, Arizona View project

All content following this page was uploaded by Margaret M Moore on 11 October 2016.

The user has requested enhancement of the downloaded file.

PEER REVIEWED


Peter Fule

*"Our view of the past is compromised by our failure to recognize the uncharacteristic state of our present." (Gould 1991)*

# SOUTHWESTERN PONDEROSA FOREST STRUCTURE

## Changes since Euro-American settlement

**By W. Wallace Covington and Margaret M. Moore**

BOTH NATURAL RESOURCE professionals and the general public often suffer from the mistaken notion that forests have always looked pretty much like they do today. Nothing could be further from the truth for many forest types, especially the ponderosa pine *(Pinus ponderosa)* forests of the American Southwest. Heavy grazing, logging, and fire exclusion, in conjunction with climatic oscillations and elevated atmospheric $CO_2$, have led to many more younger and smaller trees; fewer older and larger trees; accumulation of heavy forest floor fuel loads; reduced herbaceous production; and associated shifts in ecosystem structure, fire hazard, and wildlife habitat (Wright 1978, Covington et al., in press). Thus the current forest structure is quite different from conditions that were prevalent throughout the evolutionary history of the native microbes, plants, and animals living in western ponderosa forests.

A central tenet of ecology is that irruptions (outbursts) of ecologically dominant species reduce diversity and lead to declines in ecosystem health and integrity as defined by Leopold (1949). He described health as the ability of the system to recover following disturbance, and ecological integrity as maintaining the coevolved diversity of life. Although most of the public is familiar with the consequences of deer population explosions resulting, in part, from overly zealous predator control, many fail to see the analogy to pine tree population explosions as a result of Euro-American settlement.

Southwestern ponderosa pine forests are a classic example of how Euro-American populations changed forest conditions (Rasmussen 1941, Weaver 1951, Cooper 1960, Cooper 1961). Before settlement, these forests were much more open and parklike. Postsettlement increases in tree density have contributed to changes not only in ecological patterns and processes but also in timber, forage, water, wildlife, and esthetic conditions.

This study quantifies some of the as-

*Above: At an ecological restoration study site at the Gus Pearson Natural Area (Arizona), a restoration prescription applied in November 1993 reduced tree density to about 70 trees per hectare, comparable to presettlement site density. All presettlement trees were conserved. Younger trees were selected to reproduce the spatial patchiness of the mature overstory. Dense trees from the companion control area are visible behind the treated area.*

Reprinted from the *Journal of Forestry*, Vol. 92, No. 1, January 1994

sociated shifts in ecosystem structure and resource conditions and predicts changes 40 years into the future. The results from this and subsequent studies on other sites should serve as a reference point or baseline for eventual restoration of more nearly natural patterns and processes.

*If we are serious about restoring ecosystem health and ecological integrity, then we must know what the land was like to begin with.*

### Postsettlement Changes

Fire exclusion and other factors associated with Euro-American settlement have greatly altered forest conditions in southwestern ponderosa pine forests (Weaver 1951, Cooper 1960, Cooper 1961, Covington and Sackett 1984, White 1985, Covington and Sackett 1986). One line of qualitative evidence comes from various early accounts that described the large size of pine trees, the forest's open structure, the low abundance of underbrush or small trees, and the excellent grass cover; all indicated the rarity of tree establishment. Cooper (1960, p. 130) quoted E.F. Beale's 1858 report:

> We came to a glorious forest of lofty pines, through which we have travelled ten miles. The country was beautifully undulating, and although we usually associate the idea of barrenness with the pine regions, it was not so in this instance; every foot being covered with the finest grass, and beautiful broad grassy vales extending in every direction. The forest was perfectly open and unencumbered with brush wood, so that the travelling was excellent.

Cooper continued, "The overwhelming impression one gets from the older Indians and white pioneers of the Arizona pine region is that the entire forest was once much more open and parklike than it is today."

Further evidence for postsettlement changes comes from examination of photographic time series *(fig. 1)*. Similar comparisons have been published for South Dakota by Progulske (1974); for Wyoming by Gruell (1980); for Montana by Gruell et al. (1982); and for Colorado by Veblen and Lorenz (1991).

Before European settlement of northern Arizona in the 1860s and 1870s, surface fires occurred in ponderosa pine forests at frequent intervals, perhaps every 2–12 years (Weaver 1951, Cooper 1960, Dieterich 1980). Studies of fire scars suggest the average burn covered approximately 3,000 acres (Swetnam and Dieterich 1985, Swetnam 1990). Cooper's (1960) extensive review concluded that, prior to the 1950s, crown fires were extremely rare or nonexistent. Woolsey (1911, p. 11) stated that "a crown fire in mature timber [ponderosa pine] is almost unheard of."

Several factors associated with European settlement caused a reduction in fire frequency and size. Roads and trails broke up fuel continuity. Domestic livestock grazing, reportedly in the hundreds of thousands of animal units in the 1880s and 1890s, greatly reduced herbaceous fuels. Active fire suppression, which commenced as early as 1908 in the Flagstaff area, was a principal duty of early foresters in the southwestern United States. Overstocked forests were a direct result of interrupting and suppressing these periodic fires.

Postsettlement changes in forest structure (tree density, cover, age distribution) in southwestern ponderosa pine forests have been blamed for many forest management problems. The concerns, primarily attributed to fire exclusion and the resulting increased tree density (Cooper 1960, Biswell 1972, Weaver 1974, Covington and Sackett 1990, Covington and Moore 1992, Covington and Sackett 1992), include

- overstocked patches of saplings and pole-sized trees;
- reduced tree growth and increased mortality, especially of the oldest trees;
- decreased decomposition rates;
- stagnated nutrient cycles;
- irruption of insects and diseases;
- decreased herbaceous and shrub forage quality and quantity;
- ecosystem simplification (increasing dominance of ecosystem productivity by ponderosa pine and its dependent food webs);
- higher fuel loads;
- increased vertical fuel continuity due to dense sapling and pole patches;
- greater canopy closure and landscape homogeneity;
- higher severity and destructive potential of wildfires;
- decreased streamflow and onsite water balance;
- less wildlife habitat for species dependent on herbaceous vegetation; and
- lower esthetic values.

### Studies in the Southwest

Although qualitative descriptions are relatively abundant in the literature, few quantitative studies exist of presettlement ponderosa pine forest structural characteristics and patterns in the Southwest. Whipple (1856) and Beale (1858) reported that the forest "was open and parklike with a dense grass cover." These and other early descriptions agree with Pearson's (1923, p. 38) statement that "rarely does [ponderosa pine] crown cover reach more than 30%, and usually not over 25%." Recent research also found low canopy coverage by trees of presettlement origin, with ranges of 17% (Covington and Sackett 1986) to 22% (White 1985) of the surface area for lightly harvested and unharvested basalt soil sites near Flagstaff, Arizona.

In general, old-growth (presettlement) ponderosa pine trees in the pine/bunchgrass type on basalt soils follow the pattern of trees of different ages aggregated into groups of usually less than an acre. According to Woolsey (1911, p. 24), "The typical western yellow pine forest of the Southwest is a pure parklike stand made up of scattered groups from 2 to 20 trees, usually connected by scattering individuals. Openings are frequent and vary greatly in size." Spatial analyses of presettlement trees support this pattern. For example, a contiguous quadrat analysis of data from two study areas in the White Mountains of east-central Arizona determined that presettlement trees were aggregated into groups ranging from 0.16 to 0.32 acre (Cooper 1960). Cooper's 1961 analysis had similar results (0.15–0.35 acre). In another study in the G.A. Pearson Natural Area near Flagstaff (White 1985), the nearest neighbor method showed that presettlement tree groups ranged from 3 to 44 stems within a group, with group size varying from 0.05 to 0.70 acre. Moore et al. (1993) obtained similar results in the same general area—maximum variance (clumpiness) around 0.16 acre with a range of 0.08 to 0.64.

In contrast to conventional wisdom, White (1985) concluded that each presettlement tree group was uneven-aged: "Ages of stems within a group were also variable, with the most homogeneous group having a range of 33 years and the least homogeneous group having a range of 268 years." Although Cooper earlier concluded (1960, 1961) that presettlement trees in this area were in even-aged groups, he presently believes that even-agedness in presettlement times was rare (pers. commun., C.F. Cooper, San Diego State University, San Diego, California, 1992). Isolated even-agedness occurs within groups due to windthrows and other microsite disturbances. In general, seedling establishment was infrequent in presettlement times, with up to three or four decades between regeneration events (White 1985, Savage 1989).

For the southwestern ponderosa pine type, therefore, data suggest that pattern at several scales. Trees may be even-aged at the individual-tree level (2–5 trees originating from the same spot). At the group level, trees are all-aged with sporadic regeneration (White 1985). At the landscape level (several to thousands of square miles), however, several studies have shown that synchronous regeneration correlated with favorable climatic oscillations such as the La Niña (Kerr 1988, Savage 1989, Swetnam 1990). Thus confusion about whether southwestern presettlement pine forests were all-aged or even-aged may be, in part, a matter of scale. Madany and West (1983) discussed the regeneration effects of extended heavy grazing and fire suppression in southern Utah. They suggested that ponderosa pine seedling survival was probably greater in the early 1900s than in presettlement days because of less competition from grasses (through grazing) and reduced thinning effects from fires.

Moir and Dieterich (1988) stressed the role of presettlement fire regimes in directing succession toward old-growth development and reducing fuel loading so large trees could survive wildfires; they stated that most of the old-growth in southwestern ponderosa pine forests has deteriorated because recurrent natural fires have been suppressed. Their 11-stage model of succession (from open meadow to landscapes dominated by dead snags) may be a bit misleading. Several analyses of tree ages indicated that succession proceeds more on an individual tree basis rather than on a stand basis (White 1985).

Postsettlement changes are not unique to the Southwest. Studies in Utah (Madany and West 1983, Stein 1987); Montana (Gruell et al. 1982, Keane et al. 1990); Idaho (Barrett 1988, Steele et al. 1986); Oregon (Dickman 1978); Washington (Weaver 1959); and California (van Wagtendonk 1985, Laudenslayer et al. 1989) suggested that increased tree density, fuel loading, and crown fires are common consequences of fire exclusion throughout the range of the ponderosa pine type (Kilgore 1981). Therefore, although many questions remain regarding the ecological and multiresource implications of postsettlement changes, there is wide consensus that today's ponderosa pine forests are radically different from those present before Euro-American settlement.

### Study Site

A 16,200-acre experimental watershed in Bar-M Canyon (one of the Beaver Creek watersheds approximately 25 miles south of Flagstaff) encompassed the study area. Although Bar-M Canyon was lightly harvested at the turn of the century and again in the late 1940s, it is relatively undisturbed by logging. Since ponderosa pine decomposition rates are extremely slow in the Southwest, stumps and downed logs from the late 1800s are still evident so the Bar-M watershed provided an opportunity to study pre-



G.A. Pearson

*Figure 1. Photographic time series (clockwise from top: 1909, 1949, 1990) from the Pearson Natural Area, Fort Valley Experimental Forest, Coconino National Forest, Arizona.*



Frank Ronco



G.A. Pearson



FS-003855

and postsettlement vegetation structure and patterns.

The Bar-M watershed contains a gently rolling landscape dissected by many steep canyons. Elevations range from 6,360 to 7,710 feet. Plots were located between 6,800 and 7,200 feet. The underlying bedrock consists of igneous rocks of volcanic origin. The soils are mostly silty clays and silty clay loams less than 2.6 feet deep. Average annual precipitation is 25 inches; 64% of the precipitation falls during the winter (October through April) and 32% falls during the summer, particularly in July and August (Brown et al. 1974).

The forests are predominantly ponderosa pine, with a mixture of Gambel oak *(Quercus gambelii)* and alligator juniper *(Juniperus deppeana)*. The understory grasses consist primarily of mutton bluegrass *(Poa fendleriana)*, black dropseed *(Sporobolus interruptus)*, blue grama *(Bouteloua gracilis)*, and bottlebrush squirreltail *(Sitanion hysterix)*. Forbs include showy aster *(Aster commutatus)*, spreading fleabane *(Erigeron divergens)*, showy goldeneye *(Viguiera multiflora)*, western ragweed *(Ambrosia psilostachya)*, and snakeweed *(Gutierrezia* spp.). The shrubs are primarily New Mexican locust *(Robinia neomexicana)*, Gambel oak, and Oregon grape *(Berberis repens)* (Brown et al. 1974). Plant nomenclature follows Kearney and Peebles (1964).

### Field Procedures

For the stratified systematic sampling procedure, areas were stratified by soil type and topography using the USDA Forest Service Region 3 Terrestrial Ecosystem Survey (USDA Forest Service 1986). The Terrestrial Ecosystem (TE) map unit 582 was sampled since it was the most common soil-slope-vegetation unit in the watershed (Typic Argiboroll and Mollic Eutroboralf; low sun cold, with ponderosa pine and Gambel oak as the dominant trees, 0–15% slope). This map unit represents approximately one-fourth of the watershed.

Seventy 0.62-acre plots were systematically located within unit 582. Plot size was selected to incorporate the patchy nature of ponderosa pine and for spatial analysis in subsequent studies. On 62 of these plots, only the presettlement trees were sampled (using dbh and bark criteria). Working at a study area similar to Bar-M, White (1985) determined statistically that the majority of presettlement ponderosa pine would be greater than 14.6" dbh, and that smaller presettlement trees would have "yellow bark." This latter criterion is based on the observation that, in the Southwest, ponderosa pine bark changes from black to yellow as the tree ages (Pearson 1950). All presettlement trees (live, snags, stumps, and downed logs) on these 62 plots were mapped for location, species, condition, and dbh.

An additional eight 0.62-acre plots were sampled more intensively by gathering both pre- and postsettlement tree data: location, species, condition (live, snags, stumps, and downed logs), size class, and dbh. Ten percent of all trees between 3.9" and 14.6" dbh were randomly selected to determine an approximate date of postsettlement tree establishment. All larger trees were aged, as was any pine with yellow bark. Trees smaller than 3.9" dbh were counted but not aged.

Tree rings of all presettlement trees on the eight intensive plots were used to determine total age. All rings to the year of Euro-American settlement (1867 in Bar-M) were counted and measured to determine diameter of each tree at that date and average annual growth since settlement. If the tree was a stump, year of death was determined from logging records; then a regression equation was used to calculate dbh from the stump diameter. For snag or downed material, the year of death was estimated from the tree's condition class (Thomas 1979, Maser et al. 1979, Cunningham et al. 1980, Rogers et al. 1984) and presettlement diameter was determined.

### Simulation Models

To understand the trajectory of forest structure over time, data from the eight intensive plots were linked to the ECOSIM (Rogers et al. 1984) multiresource forest growth-and-yield simulation model. The results were used to project temporal changes in multiresource characteristics from 1867 to 1987, and from 1987 through 2027 (40 years from the sampling date).

The growth-and-yield ECOSIM model is based on the FREP/STEMS model (Belcher 1981, Brand 1981) calibrated with continuous forest inventory data from Arizona and New Mexico. The water yield model was based on the Baker-Kovner model (Brown et al. 1974) in which streamflow is a function of winter precipitation, aspect, slope, and tree density. For herbage production a modification of Clary's (1978) model was used, where herbage is a function of annual precipitation, tree density, and range site class. Forest floor accumulation was estimated as the difference between litterfall (calculated from tree density and canopy biomass) and litter decomposition using Fogel and Cromack's (1977) estimates for ponderosa pine decomposition rates. Near-view scenic beauty was estimated using equations developed by Daniel and Boster (1976) and Schroeder and Daniel (1981). An index of scenic beauty was calculated as a function of the number of large (greater than 16" dbh) and mid-sized (5"–16" dbh) trees, quantity of logging slash, amount of herbage, and number of shrubs.

Each simulation run consisted of entering the dbh of all presettlement trees (live trees, snags, downed trees, and stumps) by diameter class as stand conditions in 1867 for each of the eight intensive plots. Then, based on the regeneration events inferred from the age distribution of the postsettlement trees, trees were entered into the group or stand at appropriate intervals in simulated time. To simulate the logging event in the late 1940s, the harvest simulation component of ECOSIM was applied to harvest trees of dbh equal to that of the stumps present on each plot.

The output from these computer runs was a series of tables (1867–2027) that quantitatively estimated changes in forest density in southwestern ponderosa pine since settlement. From the results, we drew inferences about temporal changes in multiresource conditions since Euro-American settlement and forecasted future trends (in the absence of fire or other major disturbances).

The simulation initialized in 1867 included:

- tree density (number and dbh of trees present on each intensive plot in 1867);
- a site index of 75 (base age 100), the site index for TE map unit 582;
- a range (forage) rating factor of 9, based on the forage production potential for unit 582 (this index varies from 0 for poor range sites to 12 for the best sites);
- fuel loading of 0.1 ton/acre of fermentation plus humus layers and 0.1 ton/acre of litter layer on the forest floor.

This is based on the fuel loading data from Covington and Sackett's (1986) two-year-interval prescribed burning plots in ponderosa pine forests and the assumption that tree canopy covered approximately 20% of the surface (White 1985, Covington and Sackett 1986); and

• an average annual precipitation of 25" and average winter precipitation of 16.9". This is the 22-year average for the ponderosa pine watersheds in the Beaver Creek drainage (Campbell and Ryan 1982). Precipitation was held constant throughout the simulation.

To simulate the establishment of postsettlement trees, ponderosa pine seedlings and oak seedlings equal to the density of postsettlement trees on each plot were entered in 1904, the date for the beginning of a 26-year wet climatic cycle in northern Arizona (Schubert 1974). These seedlings were specified to take between 15 and 40 years to reach 0.5" dbh, the size at which they are entered ("ingrowth") into the tree stand table for growth simulation. As with the rest of this analysis, regeneration was modeled as a simple (and proportional) deterministic process. Trees were similarly entered into the tree stand tables for each plot between 1919 and 1944. Thus postsettlement trees that were seedlings in 1898, 1900, 1904, 1907, and so on would not reach 0.5" dbh until after 1919; and the last major postsettlement cohort (1924) would not reach this size until 1944.

Mortality in ECOSIM is simulated stochastically as a function of tree diameter. Regressions developed from continuous forest inventory data relate mortality to tree diameter, then a uniform random number is generated for each tree represented by the subject tree. If the mortality rate is greater than the random number, then that tree is removed from the tree list and enters a snag list. A locally calibrated snag fall model moves snags from standing to downed and dead woody material and then to a log decomposition model that simulates decay of that ecosystem component (Rogers et al. 1984).

To estimate changes in wildlife habitat characteristics since 1867, the output for tree density by diameter class was used to classify the simulated stand into vegetation structural stages (Thomas 1979). Then the Forest Service Southwest Region's wildlife technical report for forest planning (Byford et al. 1984) was used to determine the change in relative habitat value for individual species from 1867 to the present.

To simulate the harvesting that occurred in the late 1940s, ECOSIM's harvesting algorithm was used to "remove" presettlement trees that are currently stumps from the tree list of live trees for simulated year 1950.

**Projected Tree Data**

On the intensive (n=8) plots, presettlement trees (pine and oak) on the watershed represented only 2.2% of the tree density (trees/acre), contributed approximately 19 stems/acre, and had a basal area of approximately 65 square feet/acre *(table 1, 2)*. The density of presettlement trees for all 70 plots was 23 trees/acre, with a range of 21 to 24.

**Table 1. Present-day species composition on eight intensive plots, Bar-M Canyon.**

| Species | Percent |
|---|---|
| Ponderosa pine | |
| Presettlement[1] | 2.0 |
| Postsettlement[2] | 89.0 |
| Gambel oak | |
| Presettlement | 0.2 |
| Postsettlement | 7.4 |
| Alligator juniper (postsettlement) | 1.3 |
| Total | 99.9 |

[1] *120 years or older, including live trees, stumps, snags, and downed logs.*
[2] *Less than 120 years old including seedling, sapling, pole-sized, and small sawlog classes as well as stumps, snags, and downed logs.*

**Table 2. Average density and basal area (live and dead trees) on eight intensive plots, Bar-M Canyon.**

| Class | Density | Basal area |
|---|---|---|
| | *trees/ac* | *ft²/ac* |
| Presettlement pine (live) | 12.1 | 37.0 |
| Presettlement pine (stumps, snags, downed trees) | 5.3 | 26.0 |
| Postsettlement pine (live) | 757.0 | 120.0 |
| Postsettlement pine (stumps, snags, downed trees) | 1.4 | 0.6 |
| Presettlement oak (stumps) | 1.4 | 2.0 |
| Postsettlement oak | 62.8 | 14.0 |
| Alligator juniper (seedlings below breast height) | 11.1 | — |
| Total | 851.1 | 199.6 |

Postsettlement trees represented 97.7% of tree density, or 832 stems/acre, and had a basal area of approximately 134.6 square feet/acre *(table 1, 2)*. Of the postsettlement trees, ponderosa pine represented the largest proportion with 758 stems/acre (89%) and basal area of 120.6 square fee/acre (60%). Trees less than 4" dbh made up 59% of the stems on the TE unit sampled. Data for both pre- and postsettlement trees represented snags, downed trees, and stumps as well as live trees.

**Simulation Model Projections**

The projections provided an estimation of the trajectory of ponderosa pine forest conditions over time in the study area. Increases in tree density through 1987 caused an estimated decrease in average herbage production of approximately 1,000 pounds/acre, a 90% reduction *(table 3)*. Stream flow was estimated to have declined by 1.8", a 26% reduction, while near-view esthetics (as estimated by a scenic beauty index) declined from a high of 109 in 1867 to −1.5 in 1987. On the other hand, this same increase in tree density caused an estimated increase in average timber volume from 2,263 board feet/acre in 1867 to 7,225 in 1987, despite the decline due to harvesting in the late 1940s (simulated in year 1950). At the same time, forest floor and herbaceous fuel loads were estimated to have increased from an average of less than 1 ton/acre in 1867 to more than 19 in 1987. Vertical diversity, fuel ladder continuity as estimated by vegetation structural stage *(table 4)*, and forest floor fuel loading *(table 3)* also increased substantially.

The vegetation structural stage analysis *(table 4)* indicated that the simulated plots changed from a grass-forb structural stage (with too few trees for classification as timber) in the late 1800s, to a seedling-

**Table 3. Mean changes in multiresource characteristics of ponderosa pine (standard errors in parentheses) on eight plots, as simulated by ECOSIM.[1]**

| Simulated date | Basal area | Fuel loading | Herbage production | Stream flow | Scenic beauty index | Timber volume |
|---|---|---|---|---|---|---|
| | *ft²/ac* | *t/ac* | *lbs/ac* | *in.* | | *bd ft/ac* |
| 1867 | 17 (4) | 0.9 (0.2) | 1,134 (119) | 6.9 (.06) | 109 (15) | 2,263 (941) |
| 1887 | 23 (5) | 2.1 (0.4) | 1,000 (123) | 6.8 (.08) | 95 (15) | 3,361 (1113) |
| 1907 | 30 (6) | 3.1 (0.6) | 856 (125) | 6.7 (.11) | 85 (14) | 4,788 (1268) |
| 1927 | 38 (7) | 4.0 (0.7) | 571 (84) | 6.6 (.13) | 61 (11) | 6,560 (1437) |
| 1947 | 60 (6) | 6.5 (0.6) | 134 (9) | 6.1 (.15) | 34 (6) | 8,699 (1660) |
| 1967 | 85 (7) | 11.7 (0.5) | 124 (12) | 5.6 (.16) | 27 (4) | 5,980 (1274) |
| 1987 | 154 (14) | 19.0 (1.1) | 114 (2) | 5.1 (.16) | –1.5 (6) | 7,225 (1590) |
| 2007 | 234 (20) | 30.1 (2.2) | 112 (0) | 4.8 (.14) | –19.5 (8) | 8,719 (1808) |
| 2027 | 306 (22) | 42.0 (2.9) | 112 (0) | 4.7 (0.0) | –28.3 (10) | 12,887 (2148) |

*[1]These results differ somewhat from results presented at a 1992 workshop (Covington and Moore 1992). The 1992 results were based on simulation analysis of a single plot using average conditions; the data in this table came from eight plots simulated individually.*

dominated stage after the turn of the century, then to mature timber, and finally to old-growth trees growing over dense saplings and poles from the 1960s on.

These changes in vegetation since 1867 indicated a shift from a foraging habitat that favors grassland species (pronghorn antelope, grasshoppers, bluebirds, turkeys) to one favoring species that prefer higher tree densities (Abert squirrel, porcupine, bark beetle, pygmy nuthatch). Canopy cover had, of course, increased for all species. In sum, the shift in tree density favored species dependent on closed forest conditions at the expense of those that require some portion of their habitat in the grass/forb stage. Gruell et al. (1982) noted similar changes in wildlife habitat for ponderosa pine/Douglas-fir forests in western Montana.

Under the assumption that no substantial tree mortality (e.g., crown fire or bark beetle epidemics) or intensive forest management occurs between 1987 and 2027, many of these trends are predicted to continue. Basal area will increase to 306 square feet/acre, forest floor fuel loading will increase to 42 tons/acre, and timber volume will increase to almost 13,000 board feet/acre *(table 3)*. Scenic beauty will continue to decline, but herbage production *(table 3)* and streamflow will not be further reduced as they are now near their minimum levels. Of course, the assumptions of no substantial tree mortality and no intensive harvesting are not likely to occur (given current trends) and are addressed below.

**Table 4. Changes in vegetation structural stage (VSS) for simulated southwestern ponderosa pine plots over time (after Appendix III, Byford et al. 1984).**

| Simulated date | VSS |
|---|---|
| 1867 | Grass/forb |
| 1887 | Grass/forb |
| 1907 | Seedling |
| 1927 | Mature timber/seedling |
| 1947 | Mature timber/seedling |
| 1967 | Mature timber/sapling-pole |
| 1987 | Old-growth/sapling-pole |
| 2007 | Old-growth/sapling-pole |

## Discussion

Ponderosa pine forests on basaltic soils near Flagstaff, Arizona, were much more open and parklike than they are today. The dominant tree species are the same; however, the density of trees (especially ponderosa pine) has drastically increased. Presettlement ponderosa pine forests on sites similar to the ones in this study probably contained larger diameter trees averaging 19–24 trees/acre. Today, the forest at Bar-M Canyon has approximately 843 trees/acre (851 including dead trees), consisting primarily of trees less than 4" dbh.

Establishment of ponderosa pine seedlings in presettlement times was infrequent because of frequent low-intensity fires, competition from bunchgrasses, and climate. Successful regeneration occurred locally, especially when mineral soil was exposed (Schubert 1974, White 1985). Fire exclusion, logging (which exposed mineral soil for pine seedling establishment), grazing, and key climatic events all contributed to abundant pine regeneration after the turn of the century (Arnold 1950, Pearson 1950, Cooper 1960, Schubert 1974). The abundant regeneration has become dense thickets of pine, which accounts for most of the individuals in the present-day forests of Bar-M Canyon.

This change in age structure and density over the past 120 years has contributed to corresponding changes in multiresource yields and conditions.

Simulation results *(table 3)* are consistent with other lines of evidence for vegetation and resource change. The simulated tree density of 19 trees/acre and 4,788 board feet/acre in 1907 are consistent with Lieberg et al. (1904), who reported approximately 3,000 board feet/acre for T17N R8E, which includes the majority of the Bar-M study area. The simulated density of 154 square feet/acre in 1987 is consistent with the 1987–88 inventory of the eight intensive plots, which averaged 171 square feet/acre in live trees. The decline in herbage from 856 pounds/acre in 1907 to 134 pounds/acre in 1947 agrees with Arnold's (1950) results, which documented a similar decline for grass cover density in northern Arizona ponderosa pine. Streamflow for Bar-M Canyon, which has been monitored since 1958 by the USDA Forest Service and the School of Forestry, Northern Arizona University, varies widely with precipitation. The average streamflow from 1958 to 1986 was 5.9 inches; the simulation model predicted 6.1" in 1947, 5.6" in 1967, and 5.1" in 1987 under an unvarying simulated winter precipitation regime of 16.9".

Increases in tree density and forest floor fuels contributed to the more frequent large crown fires in southwestern ponderosa pine (Barrows 1978). Before settlement, fire behavior in southwestern ponderosa forests in this study area would have been classified as open timber over grass, fuel model 2—characterized by fast-moving fires with low flame heights (Anderson 1982). Today's forests are classified as fuel model 9, closed timber. Un-



FS-003858

der severe conditions crown fires are highly probable in this type, with high rates of spread (300–600 chains/hour) and flame heights of 80–150 feet (Rothermel 1991). Fire simulation studies of ponderosa pine and related forest types (van Wagtendonk 1985, Keane et al. 1990) are consistent with these conclusions.

Furthermore, increased tree density is responsible for decreased growth rates (Sutherland 1983) and hence decreased vigor (Waring 1983), which increases susceptibility to bark beetle attack (Sartwell 1971, Sartwell and Stevens 1975) and other agents of mortality. Numerous studies have demonstrated that the mortality of ponderosa pine increases with both diameter and stand density (McTague 1990). A trend toward increasing rates of mortality, especially of the largest and oldest presettlement trees, is supported by an analysis of Pearson Natural Area data (Avery et al. 1976).

Thus the increase in tree density following Euro-American settlement has resulted in a major increase in forest canopy cover and vertical diversity within the tree canopies and a striking decrease in herbage production. These results are consistent with studies in the northern Rocky Mountains (Gruell et al. 1982, Keane et al. 1990) and California (van Wagtendonk 1985, Laudenslayer et al. 1989).

### Management Implications

Disruptions of natural disturbance regimes coupled with postsettlement anthropogenic disturbances have led to forest and woodland conditions that bear little resemblance to natural conditions. Thus old-growth definitions and management objectives based solely on current stand structure may not be compatible with the conservation goal of preserving species diversity by providing the habitats in which species have evolved. In fact, before settlement, none of the plots sampled at Bar-M would satisfy all of the current minimum criteria for basal area, canopy closure, and number of trees per acre (in some cases) under the present old-growth definition (USDA Forest Service 1992).

Setting aside old-growth ponderosa pine stands that most closely meet current old-growth definitions may have unexpected consequences. Such stands, whose canopy closures are higher than in presettlement times, are susceptible to crown fire, low tree vigor, and mortality from drought, insects, and diseases. Definitions of old-growth should take into account conditions before Euro-American settlement, particularly the natural fire regime and patchy nature of the forest. In managing for "more nearly natural" old-growth ecosystems (using pre-European settlement conditions as the yardstick), it may be necessary to use thinning from below, manual fuel treatments, or prescribed burning to restore candidate stands.

*To restore the forests to more natural conditions, it may be necessary to thin many postsettlement trees, remove heavy fuels, and reintroduce periodic burning.*

Research and development is needed to test environmentally sound methods for reducing postsettlement tree densities and fuel loadings—to protect and conserve not only the remaining ancient trees but also the other ecological components and processes in the southwestern ponderosa pine type. It is not certain that remedial management regimes can be developed that are ecologically, economically, and politically acceptable, especially for wilderness and other natural areas. However, this study suggests we have a fairly narrow 15- to 30-year window of opportunity for doing so. Otherwise, less environmentally acceptable processes (crown fires, large insect and disease outbreaks) will not only reduce tree densities and fuel loads but also kill most of the remaining trees of presettlement origin.

Before embarking on widescale restoration, postsettlement changes in ecological conditions must be determined for a broader range of forest and woodland types in the Rocky Mountain and Southwest regions. Then a combination of adaptive resource management (Walters 1986) and process-oriented simulation modeling (e.g., van Wagtendonk 1985, Keane et al. 1990) could design restoration management regimes appropriate for each set of conditions. Simultaneously, small (10- to 100-acre) studies should examine and monitor the ecological effects and practicality of various restoration treatment scenarios. Integrating historical studies, simulation modeling, and management experiments should ensure that wildland management issues in the ponderosa pine type are addressed in a more coherent and ecologically sound manner.

### Conclusions

Aldo Leopold admonished the forestry and wildlife professions that if we are serious about restoring ecosystem health and ecological integrity, then we must know what the land was like to begin with. Nonetheless, very little is known about variations in presettlement conditions of ponderosa pine and other ecosystems across the landscape. We need adequate reference points. Clearly, one of those reference points must be the ecological conditions that existed before we overgrazed the land, put out all the fires, and liquidated most of the old-growth trees. The forests of today differ substantially from the natural conditions before Euro-American settlement. These changes in ecosystem structure imply changes in wildlife habitat, water relations, nutrient cycling, soils, forest health, and other resource characteristics.

Structural changes have also shifted the fire regime in ponderosa-dominated ecosystems from frequent, low-intensity surface fires to high-intensity crown fires. Crown fires have created increasingly large openings (1,000–5,000 acres), and dwarf mistletoe control has produced localized smaller openings (10–200 acres). In other areas, logging has resulted in forests that are as open as presettlement forests but lack their large, old trees and native bunchgrass understory. The recent occurrence of larger and larger crown fires may indicate a further shift to a regime characterized by very large (more than 10,000 acres) and destructive crown fires. In fact, these changes, in concert with ongoing global changes in atmospheric $CO_2$ and climate, imply the need for intensive ecosystem restoration and management to prevent widescale collapse of existing ecological systems, even in wilderness areas (Covington et al., in press).

It is ironic that Leopold, the father of wildlife management and in many ways

of ecologically based forestry, spent much of his life fighting with the public over deer irruptions, managing in harmony with nature, and restoring ecosystem health and integrity. Unfortunately, many individuals who now recognize the harmful effects of irruptions of dominant wildlife species in the absence of predators find it difficult to see the analogy to tree irruptions in the absence of fire. JOF

## Literature Cited


ANDERSON, H.E. 1982. Aids to determining fuel models for estimating fire behavior. USDA For. Serv. Gen. Tech. Rep. INT-122. 22 p.

ARNOLD, J.F. 1950. Changes in ponderosa pine bunchgrass ranges in northern Arizona resulting from pine regeneration and grazing. J. For. 48:118–26.

AVERY, C.C., F.R. LARSON, and G.H. SCHUBERT. 1976. Fifty-year record of virgin stand development in southwestern ponderosa pine. USDA For. Serv. Gen. Tech. Rep. RM-22. 71 p.

BARRETT, S.W. 1988. Fire suppression's effects on forest succession within a central Idaho wilderness. West. J. Appl. For. 3:76–80.

BARROWS, J.S. 1978. Lightning fires in southwestern forests. Unpubl. rep., North. For. Fire Lab., USDA For. Serv., Missoula, MT. 154 p.

BEALE, E.F. 1858. Wagon road from Fort Defiance to the Colorado River. 35th Cong. 1st Sess., Sen. Exec. Doc. 124.

BELCHER, D.M. 1981. The user's guide to STEMS: stand and tree evaluation and modeling system. USDA For. Serv. Gen. Tech. Rep. NC-70. 49 p.

BISWELL, H.H. 1972. Fire ecology in a ponderosa pine grassland. *In* Proceedings, tall timbers fire ecology conference, p. 69–97. Tall Timbers Res. Stn., Tallahassee, FL.

BRAND, G.J. 1981. GROW—a computer subroutine that projects the growth of trees in Lake States forests. USDA For. Serv. Res. Pap. NC-207. 11 p.

BROWN, H.E., M.B. BAKER, JR., J.J. ROGERS, W.P. CLARY, J.L. KOVNER, F.R. LARSON, C.C. AVERY, and R.E. CAMPBELL. 1974. Opportunities for increasing water yields and other multiple use values on ponderosa pine forest lands. USDA For. Serv. Res. Pap. RM-129. 36 p.

BYFORD, K., L. FAGER, G. GOODWIN, J. MACIVOR, and R. WADLEIGH. 1984. Wildlife coefficients technical report. USDA For. Serv., Albuquerque, NM. 21 p. + app.

CAMPBELL, R.E., and M.G. RYAN. 1982. Precipitation and temperature characteristics of forested watersheds in central Arizona. USDA For. Serv. Gen. Tech. Rep. RM-93. 12 p.

CLARY, W.P. 1978. Producer-consumer biomass in Arizona ponderosa pine. USDA For. Serv. Gen. Tech. Rep. RM-56. 4 p.

COOPER, C.F. 1960. Changes in vegetation, structure, and growth of southwestern pine forest since white settlement. Ecol. Monog. 30:129-164.

———. 1961. Pattern in ponderosa pine forests. Ecol. 42:493–99.

COVINGTON, W.W., and M.M. MOORE. 1992. Postsettlement changes in natural fire regimes: implications for restoration of old-growth ponderosa pine forests. *In* Old-growth forests in the Southwest and Rocky Mountain regions: proceedings of a workshop, p. 81–99. USDA For. Serv. Gen. Tech. Rep. RM-213. 201 p.

COVINGTON, W.W., and S.S. SACKETT. 1984. The effect of a prescribed burn in southwestern ponderosa pine on organic matter and nutrients in woody debris and forest floor. For. Sci. 30:183–92.

———. 1986. Effect of periodic burning on soil nitrogen concentrations in ponderosa pine. Soil Sci. Soc. Am. J. 50:452–57.

———. 1990. Fire effects on ponderosa pine soils and their management implications. *In* Effects of fire management of southwestern natural resources, p. 105–11. USDA For. Serv. Gen. Tech. Rep. RM-191.

———. 1992. Soil mineral nitrogen changes following prescribed burning in ponderosa pine. For. Ecol. & Manage. 54:175–91.

COVINGTON, W.W., et al. Historical changes in forests and woodlands of the Inland West of the United States. J. Sustain. For. (In press.)

CUNNINGHAM, J.B., R.P. BALDA, and W.S. GAUD. 1980. Selection and use of snags by secondary cavity-nesting birds of the ponderosa pine forest. USDA For. Serv. Res. Pap. RM-222. 15 p.

DANIEL, T.C., and R.S. BOSTER. 1976. Measuring landscape esthetics: the scenic beauty estimation method. USDA For. Serv. Res. Pap. RM-167. 66 p.

DICKMAN, A. 1978. Reduced fire frequency changes species composition of a ponderosa pine stand. J. For. 76:24–25.

DIETERICH, J.M. 1980. Chimney Spring forest fire history. USDA For. Serv. Res. Pap. RM-220. 8 p.

FOGEL, R., and K. CROMACK, JR. 1977. Effect of habitat and substrate quality on Douglas-fir litter decomposition in western Oregon. Can. J. Bot. 55:1632–40.

GOULD, S.J. 1991. This view of life: abolish the recent. Nat. Hist. 5:16-21.

GRUELL, G.E. 1980. Fire's influence on wildlife habitat on the Bridger-Teton National Forest, Wyoming. Vol. 1: Photographic record and analysis. USDA For. Serv. Res. Pap. INT-235. 207 p.

GRUELL, G.E., W.C. SCHMIDT, S.F. ARNO, and W.J. REICH. 1982. Seventy years of vegetative changes in a managed ponderosa pine forest in western Montana—implications for resource management. USDA For. Serv. Gen. Tech. Rep. INT-130. 42 p.

KEANE, R.E., S.F. ARNO, and J.K. BROWN. 1990. Simulating cumulative fire effects in ponderosa pine/Douglas-fir forests. Ecology 71:189–203.

KEARNEY, T.H., and R.H. PEEBLES. 1964. Arizona flora. Univ. Calif. Press, Berkeley. 1,085 p.

KERR, R.A. 1988. La Niña's big chill replaces El Niño. Science 241:1037–38.

KILGORE, B.M. 1981. Fire in ecosystem distribution and structure: western forests and scrublands. *In* Proceedings, fire regimes and ecosystem properties, p. 58–89. USDA For. Serv. Gen. Tech. Rep. WO-26.

LAUDENSLAYER, W.F., JR., H.H. DARR, and S. SMITH. 1989. Historical effects of forest management practices on eastside pine communities of northeastern California. *In* Multiresource management of ponderosa pine forests, A. Tecle, W.W. Covington, and R.H. Hamre, tech. coords., p. 26–34. USDA For. Serv. Gen. Tech. Rep. RM-185.

LEOPOLD, A. 1949. A Sand County almanac. Oxford Univ. Press, New York. 226 p.

LIEBERG, J.B., T.F. RIXON, and A. DODWELL. 1904. Forest conditions in the San Francisco Mountain Forest Reserve, Arizona. Ser. H, For. 7. US Dep. of Inter., Washington, DC. US Geol. Surv. Prof. Pap. 22. 95 p. + app.

MADANY, M.H., and N.E. WEST. 1983. Livestock grazing–fire regime interactions within montane forests of Zion National Park, Utah. Ecology 64:661–67.

MASER, C., R.G. ANDERSON, K. CROMACK, JR., J.T. WILLIAMS, and R.E. MARTIN. 1979. Dead and down woody material. *In* Wildlife habitats in managed forests—the Blue Mountains of Oregon and Washington. J.W. Thomas, ed., p. 78–95. USDA Agric. Handb. 553.

MCTAGUE, J.P. 1990. Tree growth and yield in southwestern ponderosa pine forests. *In* Multiresource management of southwestern ponderosa pine forests: the status of knowledge, Aregai Tecle and W.W. Covington, tech. coords., p. 24–120. USDA For. Serv., Washington, DC.

MOIR, W.H., and J.H. DIETERICH. 1988. Old-growth ponderosa pine from succession in pine-bunchgrass forests in Arizona and New Mexico. Nat. Areas J. 8:17–24.

MOORE, M.M., W.W. COVINGTON, and P.Z. FULÉ. 1993. Spatial changes in southwestern ponderosa pine since settlement. Bull. Ecol. Soc. of Am. 74:365.

PEARSON, G.A. 1923. Natural reproduction of western yellow pine in the Southwest. USDA For. Serv. Bull. 1105. 142 p.

———. 1950. Management of ponderosa pine in the Southwest. USDA For. Serv., Washington, DC. USDA Agric. Monogr. 6. 218 p.

PROGULSKE, D.R. 1974. Yellow ore, yellow hair, and yellow pine: a photographic study of a century of forest ecology. South Dakota State Univ., Brookings. Bull. 616. 169 p.

RASMUSSEN, D.I. 1941. Biotic communities of Kaibab Plateau, Arizona. Ecol. Monogr. 11:229–76.

ROGERS, J.J., J.M. PROSSER, L.D. GARRETT, and M.G. RYAN. 1984. ECOSIM: a system for projecting multiresource outputs under alternative forest management regimes. USDA For. Serv., Fort Collins, CO. 167 p.

ROTHERMEL, R.C. 1991. Predicting behavior and size of crown fires in the northern Rocky Mountains. USDA For. Serv. Res. Pap. INT-438. 46 p.

SARTWELL, C. 1971. Thinning ponderosa pine to prevent outbreaks of mountain pine beetle. *In* Proceedings, precommercial thinning of




FS-003860

coastal and intermountain forests in the Pacific Northwest. D. Baumgartner, ed., p. 41–52. Wash. State Univ., Pullman.
SARTWELL, C., and R.E. STEVENS. 1975. Mountain pine beetles in ponderosa pine: prospects for silvicultural control in second growth stands. J. For. 73:136–40.
SAVAGE, M. 1989. Structural dynamics of a pine forest in the American Southwest under chronic human disturbance. PhD diss., Univ. Colorado, Boulder. 185 p.
SCHROEDER, H., and T.C. DANIEL. 1981. Progress in predicting the perceived scenic beauty of forest landscapes. For. Sci. 27:71–80.
SCHUBERT, G.H. 1974. Silviculture of southwestern ponderosa pine: the status of our knowledge. USDA For. Serv. Res. Pap. RM-123.
STEELE, R., S.F. ARNO, and K. GEIER-HAYES. 1986. Wildfire patterns change in central Idaho's ponderosa pine–Douglas-fir forest. West. J. Appl. For. 1(1):16–18.
STEIN, S.J. 1987. Fire history of the Paunsaugunt Plateau in southern Utah. Great Basin Naturalist 48:58–63.
SUTHERLAND, E.K. 1983. Fire exclusion effects on ponderosa pine growth. MS profess. pap., Univ. Ariz., Tucson. 21 p.
SWETNAM, T.W. 1990. Fire history and climate in the southwestern United States. *In* Effects of fire management of southwestern natural resources, p. 6–17. USDA For. Serv. Gen. Tech. Rep. RM-191. 293 p.
SWETNAM, T.W., and J.H. DIETERICH. 1985. Fire history of ponderosa pine forests in the Gila Wilderness, New Mexico. *In* Proceedings—symposium and workshop on wilderness fire, J.E. Lotan et al., tech. coords., p. 390–97. USDA For. Serv. Gen. Tech. Rep. INT 182.
THOMAS, J.W. 1979. Wildlife habitats in managed forests—the Blue Mountains of Oregon and Washington. USDA For. Serv. Agric. Handb. 553. 512 p.
USDA FOREST SERVICE. 1986. Terrestrial Ecosystem Survey handbook. USDA For. Serv., Albuquerque, NM.
———. 1990. Ecological old-growth definitions for the southwestern region. USDA For. Serv., Albuquerque, NM. 13 p.
———. 1992. Recommended old-growth definitions and prescriptions and old-growth allocation procedure. USDA For. Serv., Albuquerque, NM.
VAN WAGTENDONK, J.W. 1985. Fire suppression effects on fuels and succession in short-fire-interval wilderness ecosystems. *In* Proceedings—symposium and workshop on wilderness fire, J.E. Lotan et al., tech. coords., p. 119–26. USDA For. Serv. Gen. Tech. Rep. INT 182. 434 p.
VEBLEN, T.T., and D.C. LORENZ. 1991. The Colorado Front Range: a century of ecological change. Univ. Utah Press, Salt Lake City. 186 p.
WALTERS, C. 1986. Adaptive management of renewable resources. MacMillan Publ. Co., New York. 374 p.
WARING, R.H. 1983. Estimating forest growth efficiency in relation to canopy leaf area. Adv. in Ecol. Res. 13:327–54.
WEAVER, H. 1951. Fire as an ecological factor in the southwestern ponderosa pine forests. J. For. 49:93–98.
———. 1959. Ecological changes in the ponderosa pine forest of Cedar Valley in southern Washington. J. For. 57:12–20.
———. 1974. Effects of fire on temperate forests: western United States. *In* Fire and ecosystems, T.T. Kozlowski and C.E. Ahlgren, eds., p. 279–319. Academic Press, New York.
WHIPPLE, A.W. 1856. Report of explorations for a railway route near the thirty-fifth parallel of north latitude from the Mississippi River to the Pacific Ocean. Vol. 3. Pac. Railroad Rep., 33 Congr. 2 Sess., House Exec. Doc. 91.
WHITE, A.S. 1985. Presettlement regeneration patterns in a southwestern ponderosa pine stand. Ecology 66:589–94.
WOOLSEY, T.S., JR. 1911. Western yellow pine in Arizona and New Mexico. USDA For. Serv. Bull. 101. 64 p.
WRIGHT, H.A. 1978. The effect of fire on vegetation in ponderosa pine forests: a state-of-the-art review. Texas Tech. Univ. Range & Wildl. Inf. Ser. 2. Coll. Agric. Sci. Publ. T-9-199.

## ABOUT THE AUTHORS

*W. Wallace Covington is professor and Margaret M. Moore is associate professor, School of Forestry, Northern Arizona University, Flagstaff 86011.*




View publication stats

ELSEVIER

Forest Ecology and Management 146 (2001) 239–245

Forest Ecology and Management

www.elsevier.com/locate/foreco

# Understory response to management treatments in northern Arizona ponderosa pine forests

Kerry L. Griffis[a,c,*], Julie A. Crawford[b], Michael R. Wagner[a], W.H. Moir[b]

[a]*School of Forestry, Northern Arizona University, Box 15018, Flagstaff, AZ 86011, USA*
[b]*Rocky Mountain Research Station, 2500 S Pine Knoll Dr., Flagstaff, AZ 86001, USA*
[c]*Department of Fisheries and Wildlife, Utah State University, Logan, UT 84322, USA*

Received 1 February 2000; accepted 28 April 2000

**Abstract**

A range of forest management treatments was applied to ponderosa pine (*Pinus ponderosa*) in northern Arizona. The treatments represented the full range of existing stand disturbance conditions and included forest stands that were unmanaged, thinned, thinned and prescribed burned, and burned by stand-replacing wildfire in order of increasing disturbance intensity. We assessed differences in understory diversity associated with these treatments. We identified 195 species of understory plants, focusing on the distribution of natives and exotics. The abundance of understory plants was more sensitive to changes in management treatments than the overall species richness. Exotics on the whole, responded statistically more strongly to disturbance treatments than did natives. Both the richness and abundance of exotic forbs increased significantly with treatment intensity. Species richness remained stable while abundance of native graminoids increased significantly with treatment intensity through thinned and burned stands. Both then decreased significantly in stands that experienced wildfire. The number of native shrub species decreased significantly with treatment intensity. Overall plant diversity was least in the unmanaged stands and progressively increased with intensity of disturbance/stand treatments. Both prescribed burning and wildfire increased plant diversity; however, stand-replacing wildfire also appeared to substantially increase the diversity of exotic plants. © 2001 Elsevier Science B.V. All rights reserved.

*Keywords:* Ponderosa pine; Understory plants; Thinning; Prescribed burning; Wildfire; Forest management; Species richness; Abundance

## 1. Introduction

For over a century, the natural disturbance regime of northern Arizona's ponderosa pine–bunchgrass forests has been altered through logging, grazing, and fire suppression (Weaver, 1951; Covington et al., 1997). The combination of these activities has led to structural and functional changes in these forests, often resulting in dense stands with low understory plant diversity (White, 1985; Harrington and Sackett, 1992; Covington and Moore, 1994; Fulé et al., 1997). In addition, invasion by exotic plant species has become a concern in recent decades. Exotic species are often aggressive and out-compete native species for resources. Many researchers have noted and documented the invasion of exotic species as a threat to biological integrity of native systems (Coblentz, 1990; Noss, 1990; Soulé, 1990; Tyser, 1992; Vitousek et al., 1996).

The School of Forestry at Northern Arizona University in conjunction with the USDA Forest Service,

* Corresponding author. Tel.: +1-435-797-2459; fax: +1-435-797-1871.
*E-mail address*: kerryg.@cc.usu.edu (K.L. Griffis).

0378-1127/01/$ – see front matter © 2001 Elsevier Science B.V. All rights reserved.
PII: S0378-1127(00)00461-8

Rocky Mountain Research Station investigated understory plant diversity (species richness and diversity, as defined by Magurran, 1988) in ponderosa pine (*Pinus ponderosa* Dougl. ex Laws) forests near Flagstaff, AZ as part of a larger study, Stand Impacts on Forest Health (STIFH). The goal of this cooperative project is to investigate how landscape level stand treatments affect forest health in northern Arizona and to identify ecological indicators of forest health, defined as the relative condition of a forest based on ecological indicators and collective value judgements of stakeholders (Bailey et al., 2000).

The goal of our study was to compare understory plant diversity between stands of various treatments including control (unmanaged), thinned, thinned and prescribed burned, and burned by stand-replacing wildfire. These stand treatments represent a gradient of ecological disturbance. We define unmanaged treatment as having the least impact on understory species, then thinned, thinned and burned, and the greatest impact is caused by stand-replacing wildfire. We were especially interested in the response of exotic plants within these treatments, and where along the disturbance gradient native understory species were replaced by exotics. We analyzed the data at different scales, based on how managers might view the system, to determine where differences in understory occur among treatments, and at what level managers should monitor to detect these differences. We found that most understory plant species responded positively to increasing disturbance intensity. However, exotic species exhibit a disproportionately large positive response to stand-replacing wildfire.

## 2. Methods

This study was conducted in Arizona *P. ponderosa*/*Festuca arizonica* Vasey association with and without the *Quercus gambelii* Nutt. phase (USDA Forest Service, 1997) on the Coconino National Forest, Mogollon Plateau in northern Arizona at elevations from 2150 to 2500 m. All data were collected during the summer of 1999. The dominant overstory species was *P. ponderosa* with a small component of *Q. gambelii*. The understory on our study area is characterized by the most common native species: *F. arizonica*, *Elymus elymoides* (Raf.) Swezey, *Cirsium wheeleri* (Gray) Petrak., *Carex* spp., *Muhlenbergia montana* (Nutt.) A.S. Hitchc., *Lupinus argenteus* Pursh, and *Achillea millefolium* L.; and the most common exotic species: *Salsola kali* var. *tenuifolia* Tausch., *Verbascum thapsus* L., *Poa pratensis* L., *Chenopodium graveolens* Willd., *Bromus tectorum* L., and *Descurainia obtusa* (Greene) O.E. Schulz.

Sixteen stands (four treatments×four replicates of each), each from 20 to 80 ha were randomly selected from a larger pool of stands used in the STIFH project. These stands were composed of mature, even-aged blackjack ponderosa pine (trees younger than approximately 125 years) with larger, yellow pine (greater than 64 cm dbh) not exceeding 10 trees/ha. Thinned stands had greater than 30% of their basal area removed between 1987 and 1993, with at least 50% of this coming from diameter classes greater than 30 cm (pulpwood size). Thinned stands had an average basal area of 18.7 $m^2$/ha (S.D.=6.0) and 312.5 stems/ha (S.D.=96.2). Thinned and prescribed burned stands had thinning treatments as described above and also received a broadcast burn treatment within 3–4 years of thinning (1988–1996). Overstory survival following the broadcast burn was greater than 90%. Thinned and burned stands had an average basal area of 15.4 $m^2$/ha (S.D.=2.8) and 235.6 stems/ha (S.D.=18.3). Unmanaged stands did not receive a density-altering treatment within the last 30 years, such that the stands have greater than 90% crown closure and relative density greater than 70% (and thus are actively self-thinning). Control stands had an average basal area of 31.9 $m^2$/ha (S.D.=3.1) and 796.6 stems/ha (S.D.=152.0). Wildfire areas are stands in which greater than 90% of the basal area was killed and/or consumed by wildfire since 1994 (Bailey et al., 2000). The stands that experienced wildfire had no significant remaining live trees; therefore, there is no basal area/ha or stems/ha for this treatment.

Within each stand, 10 plots were established in a grid pattern either 150 or 200 m apart with a buffer of at least 50 m to the stand edge. Two trained botanists searched for plants in a plot 375 $m^2$ for a total of 11 min (Goff et al., 1982; Moir and Bonham, 1995). After each survey period, the total number of species was tallied (observed species richness), and individual species were given an abundance rating (index of abundance) modified from Shimwell (1971, p. 111)

Table 1
Categories and midpoints used in the description of understory abundance in ponderosa pine on the Coconino National Forest (modified from Shimwell, 1971)

| Class | Description | Cover (%) | Midpoint |
|---|---|---|---|
| 0 | Rare, very sparse | <0.01 | 0.005 |
| 1 | Occasional, sparse | <1 | 0.505 |
| 2 | Frequent, here and there | <5 | 3.000 |
| 3 | Abundant, numerous, common | 5–25 | 15.000 |
| 4 | Very abundant, numerous, or common | >25 | 62.500 |

(Table 1). Each species was categorized as "native or exotic" according to McDougall (1973). Most plants were identified to species, some species were identified to genus, and unknowns were identified at the Deaver Herbarium, Northern Arizona University. We refer to species richness and the number of species, but note that several of these are actually only identified to genus and may contain more than one species.

We tested basal area/ha and stems/ha for differences between treatments using Kruskal–Wallis tests. Bonferroni-corrected multiple comparisons for rank tests were conducted on factors that varied significantly by treatment (Neter et al., 1996, pp. 779–780).

Abundance midpoints (Table 1) and species richness from plots within a stand were averaged separately to find the stand level average for total species, native and exotic species, and species split into native and exotic life forms. Life forms included native and exotic forbs, native and exotic graminoids (grasses and grass-like species) and native other species. Native other species includes both shrubs and cacti and does not include any exotic species. Kruskal–Wallis tests were used to test for variation in the different scales of abundance and species richness of native graminoids, exotic graminoids, native forbs, exotic forbs, and native other species. These tests rank the tested variable in each treatment by its abundance or richness in relation to its abundance or richness in other treatments. Bonferroni-corrected multiple comparisons for rank tests were conducted on factors that varied significantly by treatment (Neter et al., 1996, pp. 779–780).

## 3. Results

Stand treatments differed significantly from each other for basal area/ha and stems/ha in almost all cases ($X^2$=13.097, d.f.=3, $P$=0.004, for both). Thinned stands did not differ from thinned and burned stands because the thinning treatments were identical (asymptotic confidence interval (−1.331, 4.3314)). The only differences between these two stand types are that the thinned and burned stands received a prescribed burn while the thinned-only stand did not.

We identified a total of 195 species of understory plants, 156 natives and 39 exotics. Total ranked species richness did not vary by treatment; however, the total ranked abundance increased with increased treatment intensity (Table 2). Both the ranked species richness and abundance of exotics increased with treatment intensity. Native species do not appear to vary in abundance or richness in response to treatment (Table 2). The ranked species richness and abundance of exotic forbs increased with treatment intensity (Table 2). The ranked species richness of native graminoids remained constant in the control, thinned, and thinned and prescribed burned stands, then fell

Table 2
Results from Kruskal–Wallis rank tests on species richness and abundance of understory species during 1999 among four stand treatments, in ponderosa pine on the Coconino National Forest (d.f. for all comparisons is 3)

| Factor | Species richness | | Abundance | |
|---|---|---|---|---|
| | $X^2$ | $P$-value | $X^2$ | $P$-value |
| Total | 2.581 | 0.461 | 9.110 | 0.028* |
| Native | 6.589 | 0.086 | 3.199 | 0.362 |
| Exotic | 9.231 | 0.026* | 8.757 | 0.033* |
| Native forbs | 2.404 | 0.493 | 6.401 | 0.145 |
| Exotic forbs | 9.750 | 0.021* | 9.772 | 0.021* |
| Native graminoids | 8.600 | 0.035* | 13.125 | 0.004* |
| Exotic graminoids | 5.228 | 0.156 | 5.393 | 0.145 |
| Native "other" | 8.894 | 0.031* | 6.832 | 0.077* |

* Significant results (α=0.05).

Case No. 1:23-cv-01501-RMR Document 17-1 filed 09/29/23 USDC Colorado pg 267 of 323






Fig. 1. Abundance of understory species described by life form across four treatments. Letters above bars represent significant differences among treatment types for multiple comparison tests based on ranked comparisons. Lack of letters indicates multiple comparisons were not conducted because original test did not detect significant difference between treatments. Native other category includes shrubs and cacti. Data collected during the summer, 1999, Coconino National Forest, northern Arizona.

dramatically in the stands that experienced wildfire. The ranked abundance of native graminoids increased in response from control to thinned, and thinned and burned stands, then fell significantly in stands that were burned by wildfire (Table 2). The ranked species richness of native shrubs and cacti decreased with treatment intensity, but the ranked abundance did not (Table 2). The ranked abundance and ranked species richness of exotic graminoids, and native forbs did not vary by treatment (Table 2, Figs. 1 and 2).




Fig. 2. Species richness of understory species described by life form across treatments. Letters above bars represent significant differences between treatments for multiple comparison tests based on ranked comparisons. Lack of letters indicates multiple comparison tests were not conducted because original test did not detect a significant difference between treatments. Native other category includes shrubs and cacti. Data collected during the summer 1999, Coconino National Forest, northern Arizona.

Results from multiple comparison tests indicated that overall abundance and the abundance (Fig. 1) and species richness (Fig. 2) of exotic forbs were highest in stands that experienced wildfire and decreased with decreasing intensity of treatment. The abundance of native graminoids increased with increasing disturbance intensity, but then dropped dramatically in stands that experienced wildfire. The species richness of native graminoid species did not vary within the first three treatments, but again dropped dramatically in plots that experienced wildfire (Fig. 1).

There were also a number of interesting trends to note in the data. Exotic grasses showed consistent increasing trends in both abundance and species richness as intensity of treatment increased. It is also interesting to note that while abundance of native forbs appeared to have an increasing trend with treatment, the species richness appeared to decline with treatment (Figs. 1 and 2).

## 4. Discussion

The total number of species did not vary by treatment intensity, but abundance of understory species did increase in response to treatment intensity. Similar responses have been shown in other southwestern studies. Moore and Deiter (1992) found an increase in forage production with a decrease in a stand density index (based on the number of trees and their quadratic mean diameter). Ffolliott et al. (1977) found an increase in the production of herbage on the site of a prescribed burn up to 11 years after the fire. Oswald and Covington (1983) also detected increased biomass of understory in response to increased severity of fire treatment. Turner et al. (1997) noted an increase in opportunistic species with increased burn severity.

While others have demonstrated an increase in understory abundance with disturbance intensity, we demonstrate that this increase in abundance is largely because of a dramatic increase in the abundance of exotic species. Specifically, exotic forbs increased in species richness and abundance in response to an increase in intensity of treatment. Our unmanaged and thinned stands had the fewest exotic forbs, while stands that experienced wildfire had the greatest. Several authors suggest that areas that experience crown fires, like our wildfire plots, may provide good prospects for opportunistic and invading species like many exotics (Beaulieu, 1975; Turner et al., 1997).

We noted a significant, possibly threshold, relationship between native graminoids and treatment. The number of species of native graminoids remains fairly consistent in unmanaged, thinned, and thinned and burned stands, but drops significantly in wildfire stands. The abundance of native graminoids increases significantly with intensity of treatment in unmanaged, thinned, and thinned and prescribed burned stands. Naumburg and DeWald (1999) also noted an increase in the abundance of graminoids in relation to the amount of light received when they looked at grass response to ponderosa pine forest structure. However, we also show a dramatic drop in the abundance of graminoids in stands that experienced wildfire. Others have noted a decline of native grasses in response to fire severity (Harris, 1978; Vose and White, 1991). This relationship appears to indicate that native graminoid species are present across the landscape, but stand treatments, especially prescribed fire, affect their density. The apparent threshold for native graminoids may indicate high severity wildfire negatively impacts the duff layer and soil seedbed. Armour et al. (1984) noted lower grass canopy cover in intensely burned areas. They believe this was caused by the duff layer smoldering and destroying the reproductive material of grass species.

We also noted that the number of native species of shrubs and cacti tends to fall in response to treatment intensity, with a very large decline of species in response to wildfire. Unmanaged stands, with the greatest amount of overstory canopy coverage, have by far the greatest diversity of native shrubs and cacti. This diversity dropped in response to both thinning and thinning and burning, which had more open canopy coverage. The diversity declined again in response to wildfire, which had very little canopy cover. The overall abundance did not follow this pattern and did not vary significantly in response to stand treatments. Tapia et al. (1990) and Moore and Deiter (1992) did not find a pattern in shrub production in relation to overstory measures. Several other researchers found *Ceonothus fendleri*, a common shrub species in northern Arizona, to vigorously sprout after a wildfire (Pearson et al., 1972; Vose and White, 1987), although Vose and White (1991) found that high severity fire decreased *C. fendleri*

biomass. Vose and White (1987) found *Rosa woodsii*, another common northern Arizona shrub, decreased after wildfire. Shrub response to forest treatment appears to be dependent on the individual shrub species and the intensity of disturbance, specifically fire.

There appears to be little difference in understory between the unmanaged stands and the stands that were thinned only (treatments occurred 5–12 years ago). Unlike our study, Clary and Ffolliott (1966) found significantly higher herbage production in thinned stands than in unthinned stands 6 years after thinning. The significant increase in herbage production occurred in stands that had been thinned to less than 14 $m^2$/ha basal area. Our stands ranged from 16 to over 23 $m^2$/ha basal area. It may be that reducing basal area to this level (16+ $m^2$/ha) is not enough to elicit a response from the understory species in these stands.

It appears that thinning in combination with prescribed burning has the greatest positive impact on native species, while stand-replacing wildfire tends to favor exotic species. This relationship is statistically demonstrated and also supported by non-significant trends. However, we should be cautious in attributing the differences in understory to stand treatments alone. Each stand has a different disturbance history and different seed sources. All the areas we sampled have also been grazed. Areas that have been burned may have responded to fire with greater nutritional value of forage plants, and consequently, may receive greater grazing pressure from ungulates (cattle, sheep, elk, and deer) (Pearson et al., 1972; Lowe et al., 1978; Harris and Covington, 1983). In addition, the data for this study were collected only during the summer of 1999; therefore temporal changes were not assessed.

## 5. Conclusions

In fire dominated systems, such as the southwest, the flora of the region is adapted to coexist with fire, whether these adaptations are fire retardant properties or growth responses to burning. Land managers need to know at what scale and at what intensity of treatment exotic species appear to gain a significant foothold in an area. This study suggests native graminoid abundance in particular responds positively to management treatments of thinning and prescribed burning. However, we caution that exotic plants also respond to these treatments. In our study, exotic forb richness increased significantly in the combined thinned and burned treatments. This study also provides evidence of large increases in abundance and species richness of exotic species in response to stand-replacing wildfire. Under extreme treatment, such as stand-replacing wildfire, even native species that respond positively to fire are being replaced by opportunistic and disturbance driven exotic species. The full range of vegetation responses (especially exotic species) in ponderosa pine forests to natural and anthropogenic disturbance remains to be elucidated.

## Acknowledgements

This project was supported in part by funds from Research Work Unit 4251, Sustainability of Southwest Forest and Woodland Terrestrial Systems, at the USDA Forest Service Rocky Mountain Research Station and in part by the Organized Research Program at Northern Arizona University.

## References

Armour, C.D., Bunting, S.C., Neuenschwander, L.F., 1984. Fire intensity effects on the understory in ponderosa pine forests. J. Range Mgmt. 37, 44–48.

Bailey, J.D., Wagner, M.R., Smith, J., 2000. Stand treatment impacts on forest health (STIFH): structural responses associated with silvicultural treatments. In: van Riper, C. (Ed.), Proceedings of the Fifth Biennial Conference of Research on the Colorado Plateau, Flagstaff, AZ, October 25–27, 1999, in press.

Beaulieu, J.T., 1975. Effects of fire on understory plant populations in a northern Arizona ponderosa pine forest. Thesis. Northern Arizona University, Flagstaff, AZ.

Clary, W.P., Ffolliott, P.F., 1966. Differences in herbage–timber relationships between thinned and unthinned ponderosa pine stands. USDA Forest Service, Rocky Mountain Forest and Range Experiment Station, Research Note RM-74.

Coblentz, B.E., 1990. Exotic organisms: a dilemma for conservation biology. Conserv. Biol. 4, 261–265.

Covington, W.W., Moore, M.M., 1994. Southwestern ponderosa pine forest structure and resource conditions: changes since Euro-American settlement. J. For. 92, 39–47.

Covington, W.W., Fule, P.Z., Moore, M.M., Hart, S.C., Kolb, T.E., Mast, J.N., Sackett, S.S., Wagner, M.R., 1997. Restoring ecosystem health in ponderosa pine forests of the southwest. J. For. 95, 23–29.

Ffolliott, P.F., Clary, W.P., Larson, F.R., 1977. Effects of a prescribed fire in an Arizona ponderosa pine forest. USDA Forest Service, Rocky Mountain Forest and Range Experiment Station, Research Note RM-336.

Fulé, P.Z., Covington, W.W., Moore, M.M., 1997. Determining reference conditions for ecosystem management of southwestern ponderosa pine forests. Ecol. Appl. 7, 895–908.

Goff, F.G., Dawson, G.A., Rochow, J.J., 1982. Site examination for threatened and endangered plant species. Environ. Mgmt. 6, 307–316.

Harrington, M.G., Sackett, S.S., 1992. Past and present fire influences on southwestern ponderosa pine old-growth. In: Kaufmann, M.R., Moir, W.H., Bassett, R.L. (Tech. Coords.), Old-growth Forests in the Southwest and Rocky Mountain Regions, Portal Arizona; March 3–19, 1992. USDA Forest Service, GTR RM-213, Rocky Mountain Forest and Range Experiment Station, Fort Collins, CO, pp. 44–50.

Harris, G.R., 1978. The effect of prescribed burning on nutrient concentrations and production of understory vegetation in ponderosa pine. Thesis. Northern Arizona University, Flagstaff, AZ.

Harris, G.R., Covington, W.W., 1983. The effect of a prescribed fire on nutrient concentration and standing crop of understory vegetation in ponderosa pine. Can. J. For. Res. 13, 501–507.

Lowe, P.O., Ffolliott, P.F., Dieterich, J.H., Patton, D.R., 1978. Determining potential wildlife benefits from wildfire in Arizona ponderosa pine forests. USDA Forest Service, Rocky Mountain Forest and Range Experiment Station, GTR RM-52.

Magurran, A.E., 1988. Ecological Diversity and its Measurement. Princeton University Press, Princeton, NJ.

McDougall, W.B., 1973. Seed Plants of Northern Arizona. Museum of Northern Arizona, Flagstaff, AZ.

Moir, W., Bonham, C.D., 1995. Diversity indices applied in desert grassland communities of Otero Mesa, New Mexico. In: West, N.E. (Ed.), Biodiversity on Rangelands: Natural Resources and Environmental Issues, Vol. IV. Utah State University, Logan, UT, pp. 42–49.

Moore, M.M., Deiter, D.A., 1992. Stand density index as a predictor of forage production in northern Arizona ponderosa pine forests. J. Range Mgmt. 45, 267–271.

Naumburg, E., DeWald, L.E., 1999. Relationships between *Pinus ponderosa* forest structure, light characteristics, and understory graminoid species presence and abundance. For. Ecol. Mgmt. 124, 205–215.

Neter, J., Kutner, M.H., Nachtsheim, C.J., Wasserman, W., 1996. Applied Linear Statistical Models, 4th Edition. Irwin, Chicago, IL, 1408 pp.

Noss, R.F., 1990. Can we maintain biological and ecological integrity? Conserv. Biol. 4, 241–243.

Oswald, B.P., Covington, W.W., 1983. Changes in understory production following a wildfire in southwestern ponderosa pine. J. Range Mgmt. 36, 507–509.

Pearson, H.A., Davis, J.R., Schubert, G.H., 1972. Effects of wildfire on timber and forage production in Arizona. J. Range Mgmt. 25, 250–253.

Shimwell, D.W., 1971. The Description and Classification of Vegetation. University of Washington Press, Seattle, WA, 322 pp.

Soulé, M.E., 1990. The onslaught of alien species, and other challenges in the coming decades. Conserv. Biol. 4, 233–239.

Tapia, L.A.B., Ffolliott, P.F., Guertin, D.P., 1990. Herbage production–forest overstory relationships in two Arizona ponderosa pine forests. J. Range Mgmt. 43, 25–28.

Turner, M.G., Romme, W.H., Gardner, R.H., Hargrove, W.W., 1997. Effects of fire size and pattern in early succession in Yellowstone National Park. Ecol. Monogr. 67, 411–433.

Tyser, R.W., 1992. Vegetation associated with two alien plant species in a fescue grassland in Glacier National Park. Mantana. Great Basin Nat. 52, 189–193.

USDA Forest Service, 1997. Plant Associations of Arizona and New Mexico, 3rd Edition, Habitat Typing Guide, Vol. 1: Forests. USDA Forest Service Southwestern Region, Albuquerque, NM, 291 pp.

Vitousek, P.M., D'Antonio, C.M., Loope, L.L., Westbrooks, R., 1996. Biological invasion as global environmental change. Am. Sci. 84, 468–478.

Vose, J.M., White, A.S., 1987. Process of understory seedling recruitment one year after prescribed fire in an Arizona ponderosa pine community. Can. J. Bot. 65, 2280–2290.

Vose, J.M., White, A.S., 1991. Biomass response mechanisms of understory species the first year after prescribed burning in an Arizona ponderosa pine community. For. Ecol. Mgmt. 40, 175–187.

Weaver, H., 1951. Fire as an ecological factor in southwestern ponderosa pine. J. For. 49, 93–98.

White, A.S., 1985. Presettlement regeneration patterns in a southwestern ponderosa pine stand. Ecology 66, 589–594.

USDA

United States Department of Agriculture

Forest Service

**Rocky Mountain Research Station**

General Technical Report RMRS-GTR-110

September 2003

# Identification and Ecology of Old Ponderosa Pine Trees in the Colorado Front Range

**Laurie Stroh Huckaby, Merrill R. Kaufmann, Paula J. Fornwalt, Jason M. Stoker, and Chuck Dennis**



FS-003869

Huckaby, Laurie Stroh; Kaufmann, Merrill R.; Fornwalt, Paula J.; Stoker, Jason M.; and Dennis, Chuck. 2003. **Identification and ecology of old ponderosa pine trees in the Colorado Front Range.** Gen. Tech. Rep. RMRS-GTR-110. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. 47 p.

## Abstract

We describe the distinguishing physical characteristics of old ponderosa pine trees in the Front Range of Colorado, the processes that tend to preserve them, their past and present ecological significance, and their role in ecosystem restoration. Photographs illustrate identifying features of old ponderosa pines and show how to differentiate them from mature and young trees. The publication includes a photographic gallery of old ponderosa pine trees growing on poor, moderate, and good sites. We illustrate trees growing under various forest conditions and with different injuries and histories. We discuss dendrochronological methods of aging old trees and determining their fire history. The companion field guide includes a condensed description of ponderosa pine ecology, distinguishing characteristics of old ponderosa pines, and a photographic gallery illustrating their identifying features.

**Keywords:** Colorado Front Range, ponderosa pine, old growth, fire ecology

All illustrations and photos by Laurie S. Huckaby, unless otherwise noted. The trees pictured from Cheesman Lake all burned in the Hayman fire in June 2002.

*On the cover:* An old ponderosa pine growing on an open, south-facing slope in the Arapaho-Roosevelt National Forest. It is more than 350 years old.

You may order additional copies of this publication by sending your mailing information in label form through one of the following media. Please specify the publication title and series number.

**Fort Collins Service Center**

**Telephone** (970) 498-1392
**FAX** (970) 498-1396
**E-mail** rschneider@fs.fed.us
**Web site** http://www.fs.fed.us/rm
**Mailing Address** Publications Distribution
Rocky Mountain Research Station
240 West Prospect Road
Fort Collins, CO 80526

Rocky Mountain Research Station
Natural Resources Research Center
2150 Centre Avenue, Building A
Fort Collins, CO 80526

# Contents

Introduction ........ 1
Ecological Zones of the Colorado Front Range ........ 1
Ponderosa Pine and the Montane Zone of the Front Range ........ 4
How Old is Old? ........ 4
The Concept of Old Growth and Ponderosa Pine ........ 4
Old-Growth Ponderosa Pine Stands in the Front Range ........ 5
Fire Ecology of the Montane Zone ........ 5
Old Trees in the Landscape ........ 10
Stand Structure ........ 10
Historical Landscape ........ 12
Modern Landscape ........ 14
The Urban Interface Problem ........ 14
Forest Restoration and Old Trees ........ 16
Identification of Old Ponderosa Pine Trees in the Front Range ........ 16
Appearance of Old Trees (>200 years) ........ 16
The Transition From Young to Old (Canopy Trees 150 to 250 Years Old) ........ 20
Appearance of Young Trees (Canopy Trees <150 Years Old) ........ 20
Tree Size ........ 23
Open-Grown Versus Forest-Grown ........ 24
Types of Injuries ........ 24
Common Locations of Old Trees ........ 26
Gallery of Old Tree Photos ........ 31
How We Found Trees for This Publication ........ 31
Old trees on poor sites (fig. 29 a, b, c, d, e, f) ........ 32
Old trees on moderate sites (fig. 30 a, b, c, d, e, f) ........ 35
Old trees on good sites (fig. 31 a, b, c, d, e, f) ........ 38
Conclusion ........ 41
Why Keep Old Trees? ........ 41
Postscript ........ 41
Acknowledgments ........ 41
Bibliography ........ 42
Appendix ........ 45
Dendrochronology ........ 45
Glossary of Terminology ........ 46

# Identification and Ecology of Old Ponderosa Pine Trees in the Colorado Front Range

Laurie Stroh Huckaby, Merrill R. Kaufmann, Paula J. Fornwalt, Jason M. Stoker, and Chuck Dennis

## Introduction

Old trees were historically a major component of montane forests in the Colorado Front Range. They were an integral part of the spatial and temporal heterogeneity inherent in the ecosystem. Now they are relatively scarce. Many were harvested during the settlement period in the late 19th and early 20th centuries. Century-old stumps of trees that were 400 to 500 years old when cut remain like ghosts amid stands of trees that have established during the last 100 years. Other old trees were destroyed in extensive human-caused fires during the same period. Surviving old trees are now stressed by competition from dense ingrowth of younger trees and are in danger from insect outbreaks and stand-replacing fires (Biondi 1996).

Land managers are now aware that modern forest structure differs from that of the pre-Euro-American settlement landscape, and that change in structure is precipitating a change in disturbance processes such as fire and insect outbreaks. Urban encroachment into the montane zone puts pressure on land managers to mitigate the danger of wildfire. The best way to handle this danger is to restore an ecologically sustainable landscape structure in the montane zone of the Front Range, one that resembles the patterns that existed before Euro-American settlement—patterns that encouraged the survival of old trees. Ecological restoration requires that we understand what the ecosystem was like in the past and what processes regulated and maintained it. Old trees preserve much of this information. The ecosystem records its own history in the form of tree age structure, species distribution, tree ring patterns, and fire scars. Historical accounts from the settlement period, survey records, old photographs, and early research provide a human perspective on the ecosystems of the past.

Restoration of sustainable ecological conditions can be accomplished by management activities that mimic historical structure and processes through mechanical thinning and prescribed burning, guided by scientific studies that reconstruct the structure, composition and processes of the historical landscape (Kaufmann and others 1994, Swetnam and others 1999). Restoration management based on historical ecology can protect and restore old-growth stands. However, unless the old trees are explicitly identified and protected, forest restoration activities could inadvertently damage or destroy many old trees. Old ponderosa pine trees are a legacy of the pre-Euro-American settlement past—a past not so distant in time and hopefully one that it is still possible to recapture. In addition to the historical information contained within their rings, old ponderosa pine trees are resistant to surface fire, provide food and habitat for wildlife, and are a source of genetic continuity for the forest. They are aesthetically attractive, and they are an intrinsic part of the beautiful, dynamic landscape that draws thousands of people to the Front Range every year.

This guide is written to help the reader identify old trees and understand their past and present role as components of forests in the lower montane zone. The Appendix gives additional detail on dendrochronological methods used for determining ages of trees and fire history. The Glossary defines some of the more technical terminology used in this publication. The Bibliography gives references and further reading on ponderosa pine in the Front Range.

### *Ecological Zones of the Colorado Front Range*

For this publication, we define the Front Range as the area south of the Wyoming border, east of the Continental Divide, west of the Great Plains, and north of Pikes Peak (near Colorado Springs; fig. 1a,b). Two related environmental factors drive ecological processes and the distribution of species in the Front Range: elevation and moisture availability. Going up in elevation has effects similar to going up in latitude.




**Figure 1a.** Overhead view of the Front Range showing the elevational gradient. Light green designates the plains at around 5000 ft (1540 m). The montane zone is shown as dark green. The subalpine zone is shown as a gradient of tan to redish brown; white areas are above 14,000 ft (4300 m). Sampling sites are denoted by yellow stars. (Map by J. Stoker.)

At higher elevations, the growing season becomes shorter, temperatures are cooler, and precipitation is greater. Fire and other disturbances become less frequent at higher elevations. Changes in vegetation composition along this gradient reflect these environmental changes (fig. 2).

The lowest elevations, where conditions are the warmest and driest, support shortgrass prairie that grades into shrublands in the foothills. Between 5000 and 6000 ft (1540 to 1845 m) elevation, these ecosystems gradually transition into open ponderosa pine forest. The ponderosa pine commonly becomes mixed with Douglas-fir and aspen at higher elevations. The aspect of a slope has an important effect on forest species composition at low and middle elevations. Slopes that face south, west, and southwest are exposed to intense sunlight and dry prevailing winds. These warm, dry slopes support stands dominated by ponderosa pine. Douglas-fir is more common on slopes with a northerly component. Above about 8000 ft (2460 m), these species are accompanied by lodgepole pine and limber pine, forming a transitional mixed conifer forest.

Above 9000 ft (2770 m), where there is usually a persistent winter snowpack, the ponderosa pine and Douglas-fir begin to drop out of the forest mix, and are replaced by lodgepole pine, patches of aspen and limber pine, subalpine fir and Engelmann spruce. Above 10,000 ft (3077 m), the lodgepole pine and aspen become scarcer, and forests are dominated by mixtures of spruce and fir up to treeline at around 11,500 ft. (3540 m). Bristlecone pine and limber pine occur in isolated stands near treeline. Above 11,500 ft (3540 m), the growing season is too short for trees, and the vegetation is composed of low-lying tundra plants similar to those found in the Arctic (Marr 1961).

Our focus is the montane zone, between 6000 and 9000 ft (1845 to 2770 m) elevation, below the level of persistent snowpack. Most of this elevational zone is dominated by forests of ponderosa pine mixed with Douglas-fir, and interspersed with shrubs, grasses and aspen.


FS-003874




**1b.** Three-dimensional view of the Front Range, looking west from the plains. The montane zone (6000 to 9000 ft [1846 to 2770 m] elevation) is shown in blue. Maps by J. Stoker.




**Figure 2.** Changing vegetation communities along the elevational gradient of the Front Range, with approximate transitional elevations. Elevation is shown in feet.

## Ponderosa Pine and the Montane Zone of the Front Range

Ponderosa pine (*Pinus ponderosa* Dougl. ex Laws.) is one of the most widespread tree species in the western United States, ranging from northern Mexico into southern Canada, and from California to Nebraska. The Rocky Mountain variety is called *scopulorum*, to distinguish it from the variety found in the Pacific Northwest (Oliver and Ryker 1990) and from the subspecies *arizonica*, found in the Southwest near the Mexican border. In the Colorado Front Range (fig. 1b), ponderosa pine grows from the border of the prairie and the foothills, up to around 9000 ft (2770 m) elevation, depending on topography. It may be found as high as 10,000 ft (3077 m) on warm south-facing slopes. It is the dominant tree in the montane zone (6000 to 9000 ft; 1845 to 2770 m), where it often occurs with Douglas-fir (*Pseudotsuga menziesii*), especially on north-facing slopes (Peet 1991). Ponderosa pine can grow to be very large in other parts of the country, but rarely exceeds 100 ft (30 m) in height in the Front Range. It is tolerant of heat, drought, and fire (Oliver and Ryker 1990).

Ponderosa pine trees have needles in fascicles of two or three. Each tree produces both male and female reproductive structures; the female strobili mature into woody cones. Seeds are moderate in weight for tree seeds, and may be widely dispersed by wind. Ponderosa pine is susceptible to infestation by dwarf mistletoe (*Arceuthobium vaginatum*) and to attack by several insects, most notably the mountain pine beetle (*Dendroctonus ponderosae*) (Oliver and Ryker 1990). Ponderosa pine has long been an important tree for timber, though logging has not been a major industry in the Front Range in recent decades (Veblen and Lorenz 1991).

### *How Old Is Old?*

Ponderosa pine is a long-lived species. The oldest known ponderosa pine trees are more than 700 years old (843 years, Central Utah; 780 years, Mt. Rosa, CO; 742 years, NW Arizona; OLDLIST database). The oldest known ponderosa pine trees in the Front Range are a little over 600 years old (Huckaby and others 2001; C. Woodhouse, J. Lukas, P. Brown, personal communication). However, ponderosa pines of that age are uncommon in the Front Range, whether because of past land use, the frequency of past natural disturbances, or the physiological limits of the species under local conditions. Trees between 300 and 500 years old are widespread though only locally frequent, while trees more than 200 years old are fairly common throughout the Front Range above about 6500 ft (2000 m) elevation.

### *The Concept of Old Growth and Ponderosa Pine*

A single old tree does not make an old forest. Even a scattering of old trees does not necessarily define an old-growth stand. Old growth is a stand condition that develops over time. Old-growth stands have special characteristics that result from long years of growth in the absence of stand-replacing disturbance. Old-growth forest structure varies with forest type, climate, site characteristics, and disturbance regime, but it is distinguished from younger growth by large, physiologically old (for the species and local site conditions) trees as stand dominants, variation in tree size and spacing, accumulations of dead standing and fallen trees relative to younger stands, decay, multiple canopy layers, gaps, and understory patchiness (Kaufmann and others 1992).

A workable definition of old growth cannot be absolute in terms of some minimum age for the trees or some maximum number of canopy layers. The characteristics that constitute old growth vary with the forest type, local site productivity, and the natural disturbance regime. However, in all old-growth stands, competition among dominant trees is minor. Senescence and mortality are important processes, since the oldest cohorts are reaching their natural longevities as determined by site and environment. Physiologically, the old trees have reached their maximum heights for the site conditions and are no longer growing taller. Their crowns are declining, and their respiration equals or exceeds their productivity. They produce secondary metabolic products that may provide some resistance to insects and diseases. In an old stand, net productivity is low, even zero or negative, as newly produced biomass is offset on average by respiration and mortality of trees or tree parts (Kaufmann and others 1992).

Old growth is a temporary condition, as are all stages of forest development. Stand replacement will eventually occur, either by disturbance or as the stand eventually deteriorates so that it no longer functions as old growth, though this may take a very long time. There are multiple pathways by which stands can become old growth, even through disturbance. Species typically considered seral can become old growth if low intensity disturbance maintains their dominance, such as surface fire in ponderosa pine (Moir 1992).


FS-003876

Old growth forest does not necessarily have to be undisturbed, even by human activity, as long as the disturbance does not disrupt the stand structure and function.

How much old growth existed in pre-Euro-American settlement times? How much area did it cover? It is impossible to know for certain, but scientific studies reconstructing historical forests have suggested that old growth historically constituted a significant component of the landscape mosaic in ponderosa pine systems (Arno and others 1995, Fulé and others 1997, Huckaby and others 2001, Veblen and Lorenz 1991). The area occupied by old-growth stands was determined by historical disturbance regimes, and old growth may have been more common in some forest types than others. The proportion of old growth probably varied over time as well. In the current landscape, old-growth stands are usually small, fragmented, and isolated. Scattered individual old trees are more common now than are old-growth stands.

## *Old-Growth Ponderosa Pine Stands in the Front Range*

Old-growth ponderosa pine in the montane zone of the Front Range differs from the usual perception of old-growth forest, which is most commonly derived from subalpine or Pacific Northwest models. Most people think of stands of big trees as old growth, but that is not necessarily true. Young trees on good sites may be very large, and some of the oldest trees exist on poor sites and are relatively small.

Some sources define old growth as any pre-Euro-American settlement forest (Morgan 2000), but we prefer a more physiologically based definition. Ponderosa pine trees begin to change their growth and appearance at around 200 years of age (Kaufmann 1996). Stand structure begins to change around that age, too. By the time the dominant trees are 300 to 400 years old, most stands have developed old-growth characteristics, including coarse woody debris, snags, a variety of tree ages and sizes, dominant trees at the maximum size for the site conditions, and a disturbance equilibrium (Kaufmann and others 1992).

The Front Range montane zone is a dry, unpredictable environment and is relatively unproductive in terms of plant growth and diversity. Trees grow slowly and do not become very large. Disturbance is inherent in ponderosa pine forests. Low- and mixed-severity fires helped maintain open conditions and species composition over time. In the case of ponderosa pine forests, exclusion of disturbance such as fire is itself a disturbance, one that shifts species composition away from ponderosa pine. Historically, disturbances with variable effects created a complex mosaic of stands of different ages across the landscape. Without local stand-replacing disturbance, old stands reached a kind of equilibrium and could persist for centuries (Huckaby and others 2001).

Stands of old-growth ponderosa pine are now relatively rare in the Front Range because of past logging and wildfire. However, individual old trees are not uncommon, and in many locations stands of trees that were too small to be cut during the settlement period are now around 200 years old, poised to become the old growth of the future.

## *Fire Ecology of the Montane Zone*

Historically, fire was the primary regulator of forests in the Front Range. The fire regime of an area is the pattern of fire severity and frequency over a period of time. Fire regimes are influenced by climate, fuels, topography, and ignition sources, which are interrelated. Fire history reconstructions have shown that before Euro-American settlement of the Front Range (beginning with the influx of settlers in the gold rush of 1859), a fire occurred in any given location in the lower montane zone on average every 10 to 20 years (Brown and others 2000, Brown and others 1999, Donnegan and Veblen 2001, Goldblum and Veblen 1992, Veblen and others 2000). Larger fires occurred at longer intervals, on the order of 30 to 60 years (Brown and others 1999). The more frequent but less intense surface fires probably thinned out dense stands of young trees and ingrowth, maintaining an open forest (fig. 3a, b). Occasional mixed-severity fires included a stand-replacing component as well as surface fire. These fires created openings (fig. 4a, b, c) by killing all the trees in patches where the forest was dense or when burning occurred under extreme weather conditions, but they left many survivors. Most pre-Euro-American settlement fires in the montane zone were of low or mixed severity (Brown and others 1999, Heyerdahl and others 1994).

During regionally dry years such as 1851, fires burned many thousands of acres throughout the west (Swetnam and Baisan 1996). Fires with more severe effects may have occurred very infrequently; carbon 14 dating of charcoal layers in an alluvial fan near Buffalo Creek indicates that severe erosion following fires occurred there at approximately 1000-year intervals over the last 2900 years (Elliot and Parker 2001).



**Figure 3a.** Surface fire in a ponderosa pine stand burns the grass, shrubs, and small trees, but the larger trees are protected by their thick bark and pruned-up crowns. If the fire is hot enough to kill the cambium on one side, mature trees may be scarred. This prescribed fire on the Arapaho-Roosevelt National forest burned in June 2001.

**3b.** A stand of large, older trees a few days after a surface fire. The grasses, shrubs, and small trees have burned, opening up the stand, while the larger, older trees are mostly undamaged. The understory vegetation will regenerate within a few years. This area burned as a surface fire in the Bobcat Gulch fire in 2000, but it had also burned in 1993. That fire reduced fuels and made the area less susceptible to crown fire. Photo by M. Kaufmann.




FS-003878



**Figure 4.** When weather conditions are hot, dry, and windy and fuels are dense, fire in ponderosa pine forests can be intense. Crown fire may kill most of the trees in an area. Dense young stands are susceptible to this kind of fire behavior, and much of the Front Range is now covered by this type of forest. The Schoonover fire **(a)** in May 2002 burned almost 4000 acres (1670 ha) in the South Platte Basin near Trumbull, Colorado. It made a wind-driven run on the afternoon of May 22. The Hayman fire overlapped the area burned by Schoonover two weeks later.



The Bobcat Gulch fire **(b)** in June 2000 burned 10,600 acres (4417 ha), much of it as a crown fire.



**(c)** A fire at Cheesman Lake in 1851 burned some patches intensely, leaving behind openings that were only beginning to fill in with trees 150 years later when burned in the Hayman fire (**a** by Paula Fornwalt; **c** by M. Kaufmann).



**Figure 5a.** Fire scar face on an old pine along Highway 7 at Olive Park, CO. Its pith date is 1589.



**5b.** Fire scars on an old tree above Trumbull, CO, near the South Platte River.

Mature ponderosa pines have thick bark that insulates the cambium from heat. Seedlings and saplings lack this thick bark and are susceptible to fire kill. Many old trees have distinctive scars at the base from past fires that were hot enough to kill the cambium on a portion of the tree's circumference (fig. 5a, b). If the cambium is killed all the way around, the tree will die. If only part of it is killed, the tree often survives and heals in subsequent years by growing wood around the wound. This wood is often soaked with pitch, which the tree secretes to repel insects and fungi from the wound. The pitch is very flammable, so a tree scarred by fire once is likely to scar again. These scars show up as distinctive patterns in the tree rings, which allow dating fires to a precise year, and sometimes to the part of the growing season in which they occurred (fig. 6a, b, c, fig. 7b) (Arno and Sneck 1977, Brown and others 1999, McBride and Laven 1976, Stokes and Smiley 1968).

This method of cross-dating fire scars allows reconstruction of historical fire regimes (see the Appendix for details).

Fire behaves differently in different ecosystems. Fire was historically more frequent at lower elevations, especially on the plains and in the adjacent foothills (Mast and others 1998). Fire frequency decreased and severity increased with elevation. Above 9000 ft (2770 m) elevation where lodgepole pine dominates forests, most fires were stand-replacing crown fires that occurred at intervals of 150 to 300 years. Spruce-fir forests usually burned as stand-replacing crown fires within 300 to 500 years or more (Peet 1991). Humans have had much less influence on these longer fire regimes through fire exclusion than on the more frequent montane fire regime. The natural fire regime of ponderosa pine forest in the Front Range also differs from the well-known patterns in ponderosa pine in the Southwest, where more predictable summer rainfall and longer growing seasons allowed the forest to be more productive. There, surface fires were more frequent and more strongly driven by the El Niño climatic cycle, occurring on the order of every three to seven years, and most historical fires did not have a stand-replacing component (Covington and Moore 1994, Woolsey 1911).



FS-003880



**Figure 6a.** Sampling a fire-scarred stump by cutting a cross-section.



**6b.** Fire scars can be sampled from living trees by cutting out a partial section through the scar face.




**6c.** A cross-section of a fire-scarred ponderosa pine. The fire scar face is toward the top of the photo, and the fire scars are marked with black arrows. This tree was cut in a thinning operation near Trumbull in 1999. It has been sanded and cross-dated. The pith date is 1690. The tree was scarred by fires in 1717, 1765, 1820, 1860, and 1880, and it sustained another injury in 1943. The scars in 1717 and 1765 had healed completely before the next fire occurred.

In pre-1860 montane forests, grasses and shrubs in the understory of open woodlands periodically provided continuous fuels that allowed fire to spread across the landscape. Periods of wet weather allowed fuels to accumulate. Subsequent dry weather cured the fuels and made them more flammable. When fuels had built up over time and the conditions were right, larger, more intense fires occurred that usually had mixed effects (Brown and others 1999). Warm, dry periods, periods of high year-to-year variability, and periods of intense El Niño-Southern Oscillation (ENSO) activity encouraged more frequent fires. Cool, wet periods and periods of decreased variability and ENSO activity allowed for longer intervals between fires, greater buildup of fuels, and more intense fires when they did occur (Donnegan and others 2001).

The role of Native Americans in the Front Range fire regime is poorly documented and not well understood. While Native Americans may have ignited fires either intentionally or by accident, the historical fire regime was strongly climate-driven, and it seems unlikely that human ignitions altered the fire regime significantly except on a local scale (Cassells 1983). Most historical fires in the Front Range were probably started by lightning immediately before or during the growing season. Fire frequency increased in many (but not all) montane locations during the settlement period, especially around areas of mining and railroad activity (Brown and others 1999, Donnegan and others 2001, Veblen and others 2000). This was due in part to an

increase in human-set fires, but also to a change in climate. The preceding period between 1790 and 1840 was one of less annual variability and decreased ENSO activity, and this change affected fire regimes throughout the Southwest and Southern Rocky Mountains (Donnegan 2001). Fire was less frequent during this period, allowing for a build-up of fuels. After 1840, increasing fire frequency coincided with greater year-to-year variation in precipitation and drought as well as increased human ignitions due to Euro-American settlement.

By the early 1900s, fire frequency in the montane zone dropped dramatically. In some locations, heavy livestock grazing over the preceding decade or two had reduced surface fuels and retarded fire spread. Many areas had been recently logged or burned or both, which had also reduced fuels. However, organized fire suppression became effective during the early 20th century and has continued to the present.

## Old Trees in the Landscape

The persistence of old trees is the result of the coincidence and interaction of many factors, including the history of land use at a site, the history of natural disturbance, climate, topography, vegetation, and chance. Because ponderosa pines may live for hundreds of years, they are affected by patterns of climate and disturbance over centuries, as well as by individual events. Each old tree represents a single case, but old trees also have a role in the larger landscape. Entire stands of old trees are unusual, but a few old trees among younger trees in a stand are a common occurrence.

Interactions across multiple scales in space and time create a complex distribution of vegetation communities. Variable frequency and intensity of disturbances interacting with variability in climate over time and with variable topography in space created a temporally shifting mosaic of vegetation across the landscape. Old trees were always present in the landscape, though locations of old stands changed over the period of centuries. When looking at the survival of old trees, one must consider the effects of disturbance at the scale of a single tree, a stand (a group of trees with a more or less uniform history), or a landscape composed of many stands, and the effects of processes across scales in time.

### *Stand Structure*

Stand structure is the distribution of tree sizes, ages, and species in a given area. All of these have changed in the Front Range as the result of human land use, fire exclusion, and possibly climate change. Many of the largest and some of the oldest trees were cut during and after the settlement period. When fire was successfully suppressed, more seedlings survived than would have under a natural fire regime. In the absence of fire over long periods, ponderosa pine may lose dominance in a stand to other, less fire-tolerant species such as Douglas-fir (Oliver and Ryker 1990).

Because ponderosa pine seedlings require mineral soil and full sun, logging and fires create favorable opportunities for regeneration. While ponderosa pines produce cones and seeds most years, not all of the seeds are viable, and few of them are likely to germinate and survive to maturity (W. Shepperd, personal communication). When conditions are favorable, trees produce a huge crop of seeds, increasing the odds that some will survive to maturity. Because groups of trees tend to establish during good conditions, the ages of trees in a forest are usually clumped (Arno and others 1995, Savage and others 1996). It is common to see dense groups of young trees following one of these regeneration events. Before Euro-American settlement, such groups were thinned by fires that killed all but a few of the young trees (fig. 7a,b, c, d). In the absence of fire, most of them survive and create dense forest.



**Figure 7a.** A clump of young ponderosa pines thinned by surface fire. This group of saplings was killed in an area of surface fire in the Crosier Mountain prescribed burn in 1998. The largest one survived. Note the grass cover under the trees.



FS-003882

**7b.** Historical fires were sometimes locally cool enough to spare small trees. Core samples from old trees at Cheesman Lake show completely healed fire scars incurred when the trees were very small. The top core is from a tree scarred by a fire in 1587, when the tree was about 2.5 inches in diameter and about 20 years old. The bottom core is from a tree scarred by a fire in 1631, when the tree was only half an inch in diameter and 16 years old. These cores also show how slowly trees can grow in a dry environment.






**7c.** Even very small trees can survive cool surface fires. This tree will probably survive, but it may be scarred by this prescribed fire, which was intended to reduce dead fuels on the ground.



**7d.** A group of seedlings that germinated following the Snowtop fire in 1993 was scorched by surface fire during the Bobcat Gulch fire in June 2000. Most of them will probably die. Note the non-native thistles on the left side of the picture that invaded following the fire in 2000.



**Figure 8a.** An old Douglas-fir dominates a west-facing slope at Cheesman Lake where the young ponderosa pines are infested with dwarf mistletoe.



**8b.** A young Douglas-fir grows amid a post-Euro-American settlement ponderosa pine forest in Rist Canyon. Young Douglas-fir trees have thin bark and branches that extend all the way to the ground, making them susceptible to burning. Trees like these are common in the understory of ponderosa pine forests in the absence of surface fire.

Grazing by domestic animals removes grasses and allows trees to invade meadows where they had previously been excluded by frequent fire and competition with grasses (Baisan and Swetnam 1997). The warming of global climate may also be contributing to increased seedling survival in recent years. Many of these 20th century trees are now tall enough to create "ladder" fuels—a fire burning along the ground may burn from these small trees with branches close to the ground into the crowns of the larger trees.

Douglas-fir is now more abundant in the Front Range than it was historically (Kaufmann and others 2000a). While Douglas-fir has always shared the montane zone with ponderosa pine (fig. 8a), many more young Douglas-fir survive now than when fire was more frequent. Young Douglas-fir trees have thin bark and a large proportion of live crown to total tree height (live crown ratio) that make them more susceptible to fire (fig. 8b). Old Douglas-firs, however, are quite resistant to fire. They self-prune as ponderosa pines do, and they have very thick bark. Many of the older trees also have fire scars. The species composition of montane forests is now shifting toward dominance by Douglas-fir even in areas where ponderosa pine once existed in nearly pure stands.

## *Historical Landscape*

Before Euro-American settlement, the montane landscape of the Front Range was a varied, shifting mosaic of forest stands of different ages, densities, and species compositions, mixed with grassy openings, shrub fields, and riparian communities. Disturbances had different effects in different stands. A fire might


FS-003884

burn quickly and cool through an old, open ponderosa pine stand on a south-facing slope, causing minimal damage, but the same fire might burn much more intensely in a dense young stand of mixed ponderosa pine and Douglas-fir on an adjacent north-facing slope, killing many trees and scarring some of the survivors. Over the centuries, any given location might be occupied by a shrub field in the years following a stand-replacing fire, a dense young stand a century later, or an open old stand that survived fire after fire until a hot, wind-driven fire turned it back into an opening again (Kaufmann and others 2001).

Based on studies done in rare places where there was no logging, it seems that pre-Euro-American settlement forests were much more open and spatially variable than those of the present (Kaufmann et al 2001). They had a larger proportion of old trees and fewer young trees than modern forests, except where the occasional stand-replacing fire had burned. Regular fires maintained open stands—usually less than 30% canopy cover—and created non-forested areas (Kaufmann and others 2001, Fornwalt and others 2002). Competition for light and water was minimal in such stands, and danger of lethal fire to the older trees was small. A few young trees survived to become large enough to resist fire and became the next generation forest.

How common were old trees before Euro-American settlement? There is no way to know for sure, but there are ways to estimate. The few, rare stands that were not logged preserve the historical age structure, though they have also experienced fire exclusion, ingrowth, and mortality. One of the best examples of an unlogged landscape in the Front Range montane zone was the 8645 acre (3500 ha) forest around Cheesman Lake (Kaufmann and others 2001). That area burned severely in the Hayman fire, but studies done in preceding years showed that of trees selected as the five oldest in randomly selected stands, 30% were more than 400 years old, and 40% were between 200 and 400 years old (Huckaby and others 2001).

Even in stands that were logged, evidence remains of the pre-Euro-American settlement age structure. Because the climate of the Front Range is cool and dry, wood rots very slowly. The stumps of many trees cut during logging operations in the late 19th century still exist. Tree-ring dating can determine when these trees died, and how old they were at that time. Historical accounts (such as Jack 1900), government land surveys, early studies, and old photographs (as in Veblen and Lorenz 1991) give glimpses of what the landscape looked like around the time of settlement (fig. 9). Unfortunately, these sources are not quantitative and do not reflect the period much before settlement. Computer models can help visualize what the pre-Euro-American settlement landscape looked like and how disturbances behaved. Models use information on



**Figure 9.** This photograph was taken in December 1896, west of where the Cheesman Lake dam would be in a few years. There is patchy snow on the ground. There had been no logging or settlement in the area before the photograph, but scars on trees recorded a fire in 1880. Note how open the forest is, how many older trees there are (designated by yellow arrows), and how many fallen logs, probably trees killed in the 1880 fire. The foreground is now under water (photo courtesy of Denver Water).



FS-003885

climate, topography, and species characteristics to predict where and how trees grow (Fornwalt and others 2002).

### *Modern Landscape*

Much of the Front Range foothills and montane zone was logged during the settlement period, from the late 1850s through the 1920s. Sporadic logging continued through the 1960s. Many trees were cut during the 1970s and early 1980s in an attempt to control a mountain pine beetle outbreak. Ponderosa pine was the primary tree used in building homesteads, fences, railroads, and mines, and for fuel in settlements and railroads. Larger trees were preferred, particularly those without scars or other damage. In some accessible areas, no old trees remain. The same period saw an increase in fire frequency and intensity, especially around settlements and railroads, because of human-caused ignitions (Veblen and others 2000). Many forests were destroyed in these fires. By the time the US Forest Service was established in 1905, forests in the Front Range had been devastated by human-caused fire, logging, erosion, and overgrazing. The mission of the Forest Service was to stop the abuses, enforce more sensible land use, and put out fires. As Native American tribes were confined on reservations, their influence on fire regimes was removed (Veblen and Lorenz 1991).

Post-settlement land use changed the disturbance regime of the landscape and the scale at which it operated. The effects of human activities homogenized the landscape (fig. 10). Forest regeneration following widespread logging and human-caused fires created large areas where the trees are now about the same age and size. Many trees were planted during the 1930s to combat erosion (Gary and Currie 1977, Pike National Forest archives, Arapaho-Roosevelt National Forest archives). Lack of subsequent disturbance has allowed most of these trees to survive, creating dense, continuous stands. One of the consequences of a homogeneous landscape is that when disturbances do occur, they have relatively homogeneous effects, such as widespread insect epidemics or large fires. What heterogeneity exists in the current landscape is driven largely by variation in topography and land use. Artificial land ownership and management boundaries have imposed land use and management activities that now limit the mosaic from shifting spatially as it once did.

Shade-tolerant Douglas-fir and shrubs such as Rocky Mountain juniper (*Juniperus scopulorum*), mountain-mahogany (*Cercocarpus montanus*), Gambel oak (*Quercus gambelii*), and antelope bitterbrush (*Purshia tridentata*) have grown up in the understories of previously open ponderosa pine forests, creating heavy fuel conditions and ladder fuels that can carry fire into the crowns of large trees. Global warming may be contributing to increased tree growth and survivorship over the last 50 years as well. Current dense forest conditions place montane forests at risk of stand-replacing wildfires. Old trees that were well adapted to survive fires in the historical ecosystem are now at risk. The processes that preserved old trees have been altered.



**Figure 10.** The homogeneous modern landscape in the Front Range. This ponderosa pine forest in the South Platte basin west of Denver is composed of regeneration following logging and fire in the late 1800s. The trees are fairly uniform in size and age, and the forest is dense and continuous over a large area. Photo by M. Kaufmann.

How common are old trees now? Measuring the age structure of forest stands on a large scale is impractical, so there is probably no realistic way to know. It is nearly impossible to differentiate old trees from remotely sensed data like aerial photos and satellite images. The best way to locate old trees is to look for them on the ground. No one has mapped the forests based solely on age, but given the land use history in the Front Range, it is safe to say that old trees are not as common as they once were (fig. 11).

### *The Urban Interface Problem*

The human population of the Front Range montane zone has grown considerably in recent years. Many people have moved into the mountains adjacent to the large urban centers (fig. 12). Roads fragment the landscape, limiting species and processes from moving around as they once did. Fragmented ownership makes management of the land difficult, especially on the scale at which most ecosystem processes operate. Fire is one of the processes disrupted by human settlement.

Since the early 1900s, fire suppression has been very effective. The montane zone now supports forests that are younger, denser, and more continuous than those



**Figure 11.** Old trees in the modern landscape. This group of old trees (designated by yellow arrows) lives on a bench at the base of a west-facing slope along the Mt. McConnell trail off the Pingree Park road at 7592 ft (2336 m) elevation. This is a better site than the sparse, disturbed slopes above. Young ponderosa pines, Douglas-fir, and juniper are filling in the understory in the absence of surface fire. The old trees have smooth orange bark, small live crown ratios, open crowns with large branches and flattened tops, lightning scars, and fire scars. We cored the tree designated by the orange arrow. Its DBH was 24.9 inches (63 cm). Its pith date is 1642. It had a fire scar in 1707.



**Figure 12.** Urban development is expanding into the montane forest as the human population of the Front Range grows. This is an area in the foothills west of Denver (photo courtesy of the Colorado State Forest Service).

that occurred historically. Such forests are at risk of burning in large, intense wildfires, endangering human lives and property. Dense continuous stands are also more subject to the spread of disease, insect attacks, and the stress of competition for light and water.

Several recent fires have illustrated the risk of urban interface wildfire. The Buffalo Creek fire in 1996 burned nearly 12,000 acres (5000 ha.) of ponderosa pine forest, most of it as a stand-replacing crown fire. Fortunately it consumed very few homes, but subsequent flooding killed two people, and erosion had significant effects on Denver's water supply. The Bobcat Gulch fire and the Hi Meadow fire in June 2000 each burned about 10,600 acres (4292 ha) and destroyed more than 60 homes. The Hayman fire, the largest in recorded Colorado history, burned almost 138,000 acres (55,870 ha.) and 133 homes in the South Platte basin in 2002. All were human ignitions. Fires of this magnitude were unusual historically, maybe unprecedented. Now, in addition to changing forest structure, such fires endanger many thousands of people who live in the montane zone. Efforts are now being made in the Front Range to thin montane forests and to restore fire in the form of prescribed fires, especially where the risk of wildfire is great (Foster Wheeler Environmental Corporation 1999).

### *Forest Restoration and Old Trees*

The most ecologically sound way to mitigate the risk of intense wildfire is to return the forest to a structure similar to what existed before Euro-American settlement. Because fire was the main regulating process in pre-1860 forests, the logical way to do this is through prescribed fire, but some areas are too heavily populated for prescribed fire to be safe or acceptable to residents. Prescribed fires create smoke and are at risk of escaping containment should the weather change unexpectedly. In some areas, fuels have accumulated to such levels that a prescribed fire would be more intense than desired, killing more trees than intended. In such cases, a combination of mechanical treatment and prescribed fire may be necessary.

Mechanical treatment for restoration purposes involves removing trees based on scientific reconstructions of the historical forest. In general, pre-Euro-American settlement trees are retained as well as some of the larger young trees, to create a prescribed forest density and species composition. Most of the young trees are cut, possibly including some fairly large ones, to restore the forest to a historical density. On a landscape scale, it is desirable to re-create the historical mosaic of forest age and size structure, including sizeable openings. This means clear-cutting or burning intensely in some locations, while leaving open forest in other locations and somewhat denser forest in others. New harvest machines can cut individual trees and remove them with minimal disturbance to the soil. Some of them shred and broadcast the trunks, branches and needles like mulch so they can decay or be burned in a prescribed fire later. Where such activities have been done in the Front Range, there has been a positive response from the grasses and other understory plants, and under non-extreme conditions, a moderation of fire behavior.

Restoring Front Range montane forests to a historical density is controversial. Environmentalists are concerned that restoration will be an excuse to reintroduce unregulated logging. Even in areas where it is clear that thinning would reduce the risk of wildfire, diameter limits have been proposed that would limit the trees that could be cut to those less than some pre-determined size. This method is designed to save older trees, but because the relationship between tree size and age is very poor in the Front Range, it could allow for cutting small old trees, while keeping large young ones that maintain a density greater than the target, and therefore not sufficiently mitigating the risk of stand-replacing fire. There is currently only a limited local market in the Front Range for the small diameter material that will be cut in restoration activities. That makes restoration very costly, as the work must be subsidized by landowners or land management agencies and little or no cost is recouped through sale of the material.

Regardless of how restoration is accomplished, old trees will benefit from a reduction of forest density in the montane zone of the Front Range. Reducing forest density will reduce stress due to competition for water and light and will reduce the risk of insect epidemics and stand-replacing fire. Identifying individual old trees for preservation in restoration activities is essential. Long-term maintenance of restored forest conditions is critical. Unless natural processes such as fire can be reintroduced to the montane zone, the lower density forest will have to be maintained with continued thinning and prescribed fire.

## Identification of Old Ponderosa Pine Trees in the Front Range

### *Appearance of Old Trees (>200 years)*

At around 200 years of age, ponderosa pine trees begin to take on distinctive physical characteristics as the result of physiological changes (Kaufmann 1996). Trees acquire these characteristics gradually as they interact with their environment (fig. 13). Trees growing in poor sites or those that are otherwise stressed, as by dwarf mistletoe infestation, may look old earlier.


FS-003888




**Figure 13.** Typical characteristics of old ponderosa pines. This classic old tree lived on a south-facing slope at Cheesman Lake. The inside date on a cross-dated core from this tree was 1455, and that was about an inch from the pith, which was rotten. Most of the other trees on this slope were around 300 years old. They all burned in the Hayman fire in 2002.

Crown shape is determined in part by the site where the tree lives and by its history, but in general, as a tree ages and stops growing taller, the crown appears to flatten out on the top and to acquire a "bonsai" look (fig. 14). This flattening may be more pronounced on poor sites or in older trees. Older trees often have sparse or very open crowns, as branches have died off over the years, leaving a few large branches. Also, the growing tips of the branches are farther from the trunk, and the interior of the crown often has little foliage. The proportion of the live crown to the height of the tree becomes less, both through self-pruning and fire pruning. As a tree gets taller and the crown becomes longer, the lower branches become shaded by the upper branches. When the lower branches cannot get enough light to photosynthesize, they die and eventually fall off. This has the added benefit of removing ladder fuels from the lower part of the trunk, making it less likely that a surface fire will get into the crown. Fires themselves can have the same effect. A surface fire may scorch the lower branches, killing them without killing the tree. This gives the crowns of older trees on slopes or along the edges of old burns a distinctive sloped appearance (fig. 15 a, b).

Old tree trunks become more columnar over time due to differential growth in the upper crown (Kaufmann, unpublished data). As trees become larger, they have a larger surface area over which to spread growth. Old trees are usually not as vigorous as younger trees, so they have less energy for growth. They put on



**Figure 14.** Crown characteristics of old trees. This old tree lives on an open, south-facing slope along the Redfeather-Rustic road at 8349 ft (2569 m) elevation. The shape of its crown is typical of an old, open-grown tree: its top is flattened, it has a sparse, open crown with few large branches, and a small ratio of living branches relative to the tree's total height. The lower branches have died or have been killed by past surface fires. It has a columnar trunk and pale orange bark. Its pith date is 1643, meaning that it germinated more than 350 years ago. It is a moderate-sized tree, with a DBH of 20.3 inches (51.5 cm).



**Figure 15a.** An old pine on the Redfeather-Rustic road; its pith date is 1550. Its branches have been pruned on the uphill side by past fires, giving its crown a distinctive sloped shape. Recent ingrowth at its base could carry fire into the crown, endangering a tree that has resisted fire for 450 years.



FS-003890

wood in the upper crown first, and if there is any carbohydrate left, they grow wood in the lower part of the trunk. This is one reason why tree-ring samples from old trees are likely to have missing rings in the lower trunk, especially rings formed during stressful years. The tops of old trees are often killed by lightning, fungi, or insects, giving them a spiked appearance. Trees with dead tops are often hollow because the injury allows the entry of fungi.

As ponderosa pine trees age, their bark becomes paler in color, smoother and with smaller flakes. The exact color of the bark varies from location to location, perhaps because of genetics. The old trees we found in the northern Front Range tended to be more gray, while those in the southern Front Range were more orange. Sun exposure may also bleach the bark color. Old tree bark lacks the deep fissures, large flakes and black color of young tree bark (fig. 16 a, b).



**15b.** A ponderosa pine scorched on the uphill side by surface fire in a prescribed burn. This type of scorching probably explains the lopsided crown shape of some old trees and shows how trees often become scarred on the uphill side. Not only do fuels accumulate there, but fires generally burn uphill unless they are driven by strong winds. Branches already pruned by fire kept flames out of the crown.



**Figure 16a.** Typical bark on a young tree near Cheesman Lake; it is dark in color, with deep fissures and big flakes.



**16b.** Typical bark on an old tree near Cheesman Lake; it is mostly pale orange, smooth, with small flakes.

**Table 1—**Identifying characteristics of ponderosa pine trees at different life stages.

| | Crown shape | Live crown ratio | Branches | Trunk shape | Bark | Likely injuries |
|---|---|---|---|---|---|---|
| **Old trees (>200 years)** | flattened, "bonsai" shape, sparse and open, may be lopsided | small; often fire-pruned | few but large | columnar | smooth, small flakes, pale orange or gray | fire scars, dead tops, broken branches, lightning scars, rot, burls, exposed roots |
| **Transitional trees (150-250 years)** | ovoid, flattening on the top, full and rounded | moderate; perhaps half the trunk, beginning to self-prune | fine branches in the interior of the crown dying, longer branches thickening | beginning to lose taper | orange or gray flakes with dark edges, shallow fissures, becoming smoother | relatively few; possibly healed or mostly healed fire scars, lightning scars, mistletoe |
| **Young canopy trees (<150 years)** | pointed top, "teardrop" or "Christmas tree" shape, dense foliage | large | many fine branches, dense foliage near the trunk | tapered | large, coarse flakes, deep fissures, dark gray or black with dark orange | very few; possible mistletoe or lightning scars |

The longer a tree lives, the more likely it is to be damaged. Dead tops, broken branches, lightning scars, fire scars, rot pockets, and burls are all signs of past injury. A ponderosa pine with an exposed fire scar face is probably at least 150 to 200 years old, since spreading surface fires of the kind that cause such scars ceased in most of the Front Range around 1900 (see fig. 5). See table 1 for a list of identifying characteristics of trees more than 200 years old.

## *The Transition From Young to Old (Canopy Trees 150 to 250 Years Old)*

Ponderosa pine trees around 200 years old are middle-aged and their form begins to change about that time (fig. 17). They are still vigorous, but their upward growth is slowing, so their tops start to flatten out as apical dominance weakens. Lower branches have begun to die off and self-prune, either as they are shaded by upper branches or neighboring trees, or killed by old surface fires. The crown begins to open as dense, small branches on the inside die off close to the trunk. The remaining branches become longer and larger in diameter, and the needles are distributed more toward the outside of the crown. The general shape of the crown becomes round or oval rather than teardrop-shaped with a pointed top, as is common in young trees. The deep fissures in the bark begin to smooth, and the color becomes lighter, more orange or gray than black. Middle-aged trees are old enough to have a fire scar or two, but it has been long enough in most locations since the last surface fire that such scars may have nearly healed and are not readily visible. A healed scar might appear as a deep fissure low on the trunk, rather than the easily recognized "catface." Trees of this age are often the dominants in present Front Range stands. See table 1 for a list of identifying characteristics of trees 150 to 250 years old.

## *Appearance of Young Trees (Canopy Trees <150 Years Old)*

Ponderosa pine trees less than 150 to 200 years old usually have pointed tops, because they are still growing taller (fig. 18). Strong apical dominance allows young trees to grow fast and to compete for light. Seedlings less than 3 or 4 years old must compete with grasses and forbs, and their survival is always in question. Once seedlings are about six inches tall, they are considered established and are more likely to survive. However, they are still susceptible to many factors in their immediate environment as opposed to larger-scale climatic factors. When they are 3 to 6 ft (1 to 2 m) tall, they begin to interact with the other trees around them, and are more likely to reach the canopy. How long it takes a tree to reach this size varies tremendously. It may take only 20 years or so on a good site, but even tiny trees may be older than they look, especially on poor sites. We have sampled trees that were only three ft. (1 m) tall but were more than 90 years old.

The trunks of young trees are usually tapered. Branches grow relatively low on the trunk and have usually not begun to self-prune. The bark of young ponderosa pine trees is dark gray or dark orange and black, with deep

Moderate live crown ratio; some pruning



Ovoid crown shape, rounded and flattening on top

Fine branches in the interior of the crown dying, longer branches thickening, but crown is still moderately full

Bark becoming smooth, lighter in color

**Figure 17.** A middle-aged tree showing the transition in appearance to old tree characteristics. This tree, growing on a gentle south-facing slope above Lily Lake in Rocky Mountain National Park, is around 200 years old. It is beginning to take on old tree characteristics: its crown is still full but beginning to open up as fine branches die, and its top is ovoid and beginning to flatten. Its branches are beginning to self-prune. Its bark is becoming smooth and orange, losing its deep fissures.




**Figure 18.** Typical characteristics of young ponderosa pines. This vigorous young tree grew on a west-facing slope at Cheesman Lake. There were many other young trees in this stand, regeneration following a stand-replacing fire in 1851.



FS-003894

fissures and thick, flaky layers. On some small trees the bark appears almost all black; these slender youngsters are called "blackjacks." Most young trees do not have fire scars. They may have mistletoe, but if trees are infected while young, the mistletoe will be distributed throughout the crown and may distort the shape of the branches. Young trees on good sites may be very large, but they usually have a distinctive pointed top and a full crown that extends most of the length of the trunk. Crowns of healthy young trees have many dense, small-diameter branches, most of which bear live needles, so the crown looks full and thick. They usually have few dead branches. Dense forests are more likely to be composed of young trees. See table 1 for a list of identifying characteristics of canopy trees less than 150 years old. Figure 19 shows an old tree and a young tree side by side on a poor site.

### *Tree Size*

Not all old trees are large, and not all large trees are old. However, if a tree is by far the largest or tallest tree in the stand, it is probably older than its neighbors (fig. 20). Ponderosa pines in the Colorado Front Range are usually limited by the availability of water. Trees grow more quickly on sites where water is readily available. Such sites include those along streams, even intermittent streams where water may not flow on the surface year around; flat, grassy areas where water soaks into the soil; and at the base of rock outcroppings, where water collects off the rocks. A 150-year-old tree on a good site may be 30 inches (80 cm) in diameter.

Where water is less readily available, trees grow more slowly. Steep slopes, slopes that face south and



**Figure 19.** An old tree and a young tree side by side. These two trees live on a dry south-facing slope near the top of a ridge along the Redfeather-Rustic road at 8453 ft. (2601 m.) elevation. They are close to the same size, but the tree on the left is 128 years older. Its pith date is 1761. Its DBH is 13.2 inches (34 cm). Its crown has been pruned up to about a third of the length of the trunk, and its bark is pale and smooth. The tree on the right has a pith date of 1889. Its DBH is 12.4 inches (32 cm). Its crown is sparse, but still pointed at the top, and its live crown occupies more than two-thirds of its trunk. Its bark is nearly black.



**Figure 20.** A case in which size does indicate an older tree: this old tree towers above more recent ingrowth at the base of a slope along the Pingree Park Road. Its pith date is 1672 and it has a fire scar in 1846. The old tree has the sparse, pruned crown and smooth orange bark typical of old trees. Its smaller neighbors have full, pointed crowns and dark, fissured bark.

west and are exposed to sun and wind, ridgetops, rocks, and places where the soil is very shallow or well-drained do not hold water. Trees on these sites must depend on brief pulses of water from rain or snow events. Small, old trees are likely on such sites. A 400-year-old tree might be as little as 12 inches (30 cm) in diameter. On such sites, trees are usually less subject to competition and to the spread of parasites and diseases. The lack of water means that understory species like grasses and shrubs are sparse, providing little fuel for fires. Fires burning there are not likely to be intense, so old tree survival is enhanced.

### *Open-Grown Versus Forest-Grown*

Trees that have grown in the open tend to have a different appearance from those that have grown in a forest. Open-grown trees tend to have fuller, more rounded crowns and a few long, large-diameter branches (fig. 21 a). Trees that have grown in a more closed environment will be relatively slimmer, with shorter, thinner branches (fig. 21 b). Old trees can be found in closed forest environments, but the oldest trees are usually open-grown, possibly because they lack competition, or because they are less likely to be destroyed in a fire.

Ponderosa pines require full sunlight to grow well, and when stands are dense and trees shade one another, the shaded trees grow slowly, often develop poor form, and may ultimately die. However, such suppressed trees may be relatively old despite their small size (fig. 21 c). They can persist for hundreds of years under the shade of other trees. If the neighboring trees are eliminated (by fire or logging, for example), suppressed trees may be released and start growing faster. This is evident in the width of their annual rings (fig. 22 a, b, c). Douglas-fir does not suffer as much from shading as ponderosa pine. Young Douglas-fir trees benefit from shaded conditions where the soil surface does not get as hot as in the open.

### *Types of Injuries*

Fire scars are common injuries found on old pines, but trees accumulate scars from other sources as well. Old trees often have distinctive scars from lightning strikes (fig. 23 a). Lightning scars are usually long and narrow and often spiral around the trunk. They usually start in the crown, and they may or may not reach the ground. Sometimes lightning kills the top part of the tree. It may blow off branches or even split the trunk, but trees can survive this kind of damage.

Porcupines often feed on the cambium of ponderosa pines, and scars left by their gnawing are easily mistaken for fire scars (fig. 23 b). However, porcupine scars are generally irregular in shape and usually do not reach the ground. Porcupines may sit on a branch higher in the crown and gnaw a patch of the trunk above the branch. Other injuries can create similar-looking scars, including abrasion damage from logging, road-building, and neighbor trees falling against the trunk. These scars are usually irregular in shape.

Native Americans harvested the cambium of ponderosa pine for food and medicine, and their activity left detectable scars (Kaye and Swetnam 1999, Martorano 1981, Swetnam 1984). Various tribes did



**Figure 21a.** Open-grown tree: This middle-aged tree lives in a sage meadow near a south-facing ridgetop along the Redfeather-Rustic road at 8453 ft (2601 m) elevation. It is beginning to develop old-tree characteristics as well as open-grown characteristics. Note the full, rounded crown and long heavy branches. Its top is beginning to flatten out, but the lack of surface fire during the 20th century has allowed it to keep its lower branches. Its pith date is 1811; its DBH is 21 inches (53.3 cm). The core revealed a healed fire scar near the pith and relatively rapid growth.



FS-003896

this "peeling" throughout the range of ponderosa pine. The Utes were known to practice the technique in the Front Range until the late 19th century. Women used a sharp instrument to cut into the bark from as high as they could reach, down to about knee level. Then they peeled off the bark and cambium in a strip a few inches to a foot wide. Scars caused by peeling can be mistaken for lightning scars or fire scars. They usually occur on large, older trees, often in groups. The scars usually occur at mid-trunk and do not reach the ground.

Many old trees have dead tops, caused by lightning strikes, porcupine damage, or infestation by fungi. On steep slopes or on the edges of washes, tree roots may be exposed by centuries of erosion. Along streams and washes, debris washing downstream during flash floods can damage the cambium and cause scars that look somewhat like fire scars. It is possible to date flood events using these scars, which usually occur on the upstream side of the trunk. Old trees may be infested with dwarf mistletoe, a common parasite (fig. 23 c, d), though young trees are also susceptible. Old trees may survive for decades with mistletoe, with slower than normal growth. Young trees are likely to be killed or fatally weakened by an infestation. Mistletoe infestation



**21b.** Forest-grown tree: This tree grows in relatively dense ponderosa pine forest on an east-facing slope along Highway 7 at 8671 ft (2668 m) elevation. It is a dominant forest-grown tree. Note its tall, straight trunk and narrow crown with short lower branches. Its bark is beginning to look smooth and pale. Its pith date is 1762; its DBH is 22.2 inches (56.4 cm).



**21c.** Suppressed tree: This tree inhabits a small, rocky ridge in a relatively dense forest along Highway 7 near Olive Park at 8349 ft (2569 m). It is rotten at the center, but the inside date on the core was 1671, and narrow rings indicated very slow growth. Its DBH is only 10.2 inches (25.9 cm). It is small, with twisted branches, a sparse crown and a flattened, deformed top.

FS-003897




**Figure 22.** These core samples show growth releases in trees following logging at Saloon Gulch along the South Platte River. These cross-dated core samples come from old living trees that were probably too small to interest the loggers in the 1880s. The bark is on the right side of the picture; the pith or inside of the sample is to the left. Each sample is from a different tree. The growth releases are indicated by the sudden increase in the width of the annual rings, which look like vertical stripes on the samples. The area was logged in the mid-1880s. When their neighbors were cut, reducing competition for light and water, the remaining trees responded within a few seasons by growing more quickly for the next 40 years or so. Their growth rate began to slow again in the 1920s and 1930s as regeneration again closed up the stand.

can create old-growth crown characteristics in younger trees (Hawksworth and Weins 1972, Hawksworth and Geils 1990). Mistletoe infestation was locally common prior to Euro-American settlement, but may have been limited spatially by frequent fire as infected trees tend to be more flammable than healthy ones.

### *Common Locations of Old Trees*

Despite disruptions to the montane ecosystem in the last 150 years, old trees are widespread in the Front Range. Trees in inaccessible locations and on poor sites often were not cut when logging was easier elsewhere. Rock outcroppings, steep slopes, ridgetops (fig. 24 a), and higher elevations (fig. 24 b) that were historically less accessible by road, less populated, and less susceptible to fire provided havens for old trees. Rock outcrops in meadows and the edges of meadows are also havens for old trees, as they were protected from intense fires.

We found relatively few old ponderosa pine trees below about 6500 ft (2000 m) elevation. Whether this is because trees at lower elevations were more accessible from settlements and were cut, or because there were just fewer trees there originally is unclear. Frequent fires and drought at low elevations probably confined trees to ridgetops, watercourses and rock outcrops, and historical photos bear this out (fig. 25). The lower foothills are now covered with ponderosa pine up to 120 years old, established since the beginning of fire exclusion. Above 6500 ft (2000 m), old ponderosa pine trees become more common. The higher elevations were historically less accessible by road and were less heavily populated, and fire may have


FS-003898



**Figure 23a.** A lightning scar on an old tree at Cheesman Lake. Lightning scars can sometimes look like fire scars, but they are usually long and narrow, extending down from the crown but sometimes not to the ground, and often spiraling around the trunk.



**23b.** Porcupine damage on a ponderosa pine. Porcupine scars can look like fire scars, but they are usually more irregular in shape and usually do not extend to the ground. The aspen behind it was damaged by elk.



**23c.** Dwarf mistletoe causes characteristic swellings on the branches and may create tangled "witches' brooms" in the crown.



**23d.** Dwarf mistletoe infesting a ponderosa pine. This parasite deforms tree crowns and may give a younger tree an old tree crown shape prematurely.



**Figure 24a.** This old tree lives on a dry, rocky ridge along Highway 7. It is small, deformed, and rotten at the center, but it is more than 350 years old. It has a healed fire scar and a lightning scar, smooth gray bark, a flattened top, and a sparse open crown. Many of its neighbors are of similar age and are stunted by the harshness of the site.



**24b.** Though ponderosa pine forests are most common at lower elevations, older ponderosas can be found on sunny, south-facing slopes above their usual range. They may be relicts from a past climate or fire regime. This lone, old ponderosa pine lives on a south-facing slope at 10,000 ft (3077 m) elevation along the Old Flowers Road trail. Note the clone of young aspen around the old pine.

been less frequent. Rock outcrops in meadows and the edges of meadows are often havens for old trees in high valleys like Estes Park. Warm south-facing slopes as high as 10,000 feet elevation support old ponderosa pine trees, and older ponderosas are common in the mixed conifer zone, where they occur with lodgepole pine, limber pine, Douglas-fir, and aspen.

Old trees are often found on south- and west-facing slopes (fig. 26 a, b), on and around rock outcrops, at the edges of high meadows (fig. 27), and on the upper third of slopes. Even in areas that were logged and now support young forest, individuals with twisted or scarred trunks, rot, large limbs, and dead tops were often passed over by loggers. Old trees often occur in small groups, but it is unusual to find a stand in which all the trees are old. Old-growth stands are usually multi-aged. Of course, none of these suggestions is a rule. We found old ponderosa pine trees alone, on north-facing slopes, near rivers, in fairly dense stands, and right beside houses and campgrounds. Across a vista, groups of old trees are apparent as taller, rough-looking, browner areas amid the smoother, greener, more uniform-looking young forest.



FS-003900



**Figure 25.** The lower Cache la Poudre River canyon in 1920. This picture was taken from Inspiration Point, looking northwest across the river from the new Bennetts Creek auto road (now the Pingree Park Road) into the area beyond Eggers. The road construction camp is in the left center. Most of the view ranges in elevation between 6000 and 7000 ft (1846 to 2154 m). Note how few trees were growing at this elevation. Most of the trees were along the river and other drainages (photo by W.I. Hutchinson, courtesy of Arapaho-Roosevelt National Forest archives).







**Figure 26a.** Old trees growing on steep, rocky south- and west-facing slopes. These two old trees live on a rocky west-facing slope along the Crosier Mountain trail at around 7500 ft (2300 m) elevation. Both have smooth, gray-orange bark, gnarled branches, live crowns pruned up above the ground, and fire scars. The tree on the left also has a lightning scar, and its top is dead, probably killed by lightning. **b.** Old trees on open, grassy south- and west-facing slopes. This old tree lived on a barren, grassy-shrubby, south-facing slope at Cheesman Lake at 7066 ft (2174 m) elevation; its center was rotten, but its inside date was 1720, and its estimated pith date was 1550. It was typically open-grown, with a flattened top, large, gnarled branches, and pale orange smooth bark. It had a visible fire scar face with several scars.



**Figure 27.** A classic old tree along the Redfeather-Rustic road at 8320 ft (2560 m) elevation; its pith date is 1569, its DBH is 24.4 inches (62.1 cm). It lives on the west edge of a rock outcrop in the midst of a meadow and has the typical flattened top, smooth orange-gray bark, and a fire scar.



FS-003902

## Gallery of Old Tree Photos

### *How We Found Trees for This Publication*

We searched for old trees along a north-south transect of the Front Range to capture changes in soils and weather conditions that vary along this latitudinal gradient. We took four excursions, each with multiple sampling locations: one along the dirt road from Rustic in the Poudre Canyon to Redfeather Lakes; one along the Pingree Park and Crown Point roads above the Poudre Canyon; one along the Glen Haven road from Drake to Estes Park (which is full of old trees that are all on private land), and then south along Highway 7 from Estes Park to Allenspark; and one in the Cheesman Lake property in the South Platte basin, which is owned by Denver Water. Based on other research from the Cheesman Lake property, we knew old trees were common there because much of that area was never logged. Except for Cheesman Lake, we did all our sampling on U.S. Forest Service land. We deliberately avoided canyons, that are historical and modern travel corridors, and where fire probably behaved differently. Our sampling locations are marked by yellow tree shapes in figure 1.

Old trees usually occurred in small groups. We selected trees from which we felt we could get a good picture and increment core, photographed them, and cored them with an increment borer to determine their ages. Coring usually does not damage the tree. We selected trees in a variety of growing conditions, from harsh to moderate to good sites. We were probably biased by taking pictures of trees in relatively open conditions, where it was easier to get a good picture. However, old trees seem more likely to occur in open conditions.

We grouped portraits of old trees by the site conditions on which they occurred, because site condition, as well as age, affect a tree's appearance (fig. 28). We chose trees on various slope positions and aspects and in both open and closed forest (though more in open forest) to represent the range of conditions under which old trees may be found. We also included a few portraits of younger trees under different site conditions for comparison. With each tree portrait, we report the tree's diameter at breast height (DBH; standardized to 4.5 ft [1.4 m]) above the ground). This is a general measure of a tree's size and is included to indicate their relative size under different conditions. We did not measure the heights of the trees.



**Figure 28.** Idealized silhouettes of ponderosa pines of various ages and on various site conditions in the Front Range of Colorado (in the style of the Keen [1955] tree vigor classification for ponderosa pine in Oregon). The horizontal rows represent three age classes: top, the youngest, less than 150 years; middle, transitional trees 150 to 250 years old; and bottom, the oldest, trees more than 250 years old. The three site classes are represented by the vertical columns: left, good sites such as meadow edges and riparian areas; middle, moderate sites such as east-facing slopes or gentle slopes; and right, poor sites such as steep south-facing slopes or ridgetops (drawing by Joyce Vandewater).

We also report the tree's age, which we derived by cross-dating cores taken low on the trunk. We cross-dated the cores by matching ring-width patterns in the samples with composite chronologies from the area. When trees were rotten, we estimated their ages by estimating the number of rings that would fill out the remaining length of the tree radius and using a negative exponential curve to take into account age-related growth trends (see the Appendix for details). Most of the trees pictured are between 400 and 500 years old.

### *Old trees on poor sites (fig. 29 a, b, c, d, e, f)*



**Figure 29a.** DBH=18.4 inches (46.7 cm), pith date 1545. This was a typically scraggly looking old tree on a poor, rocky site. Its flattened, very sparse crown, small live crown ratio, and smooth orange bark were exaggerated by the harshness of the site. At 7319 ft (2252 m) elevation, this mostly east-facing ridge on the Cheesman Lake property is relatively low and dry, but young Douglas-fir populated the understory.



**29b.** DBH=20.8 inches (52.9 cm), pith date 1574. This tree lived in a common location for old pines: an open, south-facing slope just below a ridgetop at 7000 ft (2154 m) elevation on the Cheesman Lake property. It had a scar face with several fire scars, small live crown ratio, a sparse, slightly flattened, open-grown crown, and smooth orange bark.



FS-003904



**29c.** DBH=18.8 inches (47.7 cm), pith date 1605. This small old tree grows on a poor, rocky site at 8778 ft (2701 m) elevation, relatively high for ponderosa pine. It has been encroached by aspen and lodgepole pine. It has a somewhat flattened top, a very sparse crown and tiny live crown ratio, smooth orange-gray bark, and four fire scars. It lives along Highway 7 at Meeker Park.



**29d.** DBH=15.2 inches (38.5 cm), pith date 1560. This group of old trees lives on a rock outcrop in the middle of a meadow along the Redfeather-Rustic road at 8307 ft (2556 m) elevation. We cored the tree on the left. The flattened tops, deformed crowns, small live crown ratios and smooth orange-gray bark identify them as both old and stressed.



**29e.** DBH=21.4 inches (54.3 cm) inside date 1663, est. pith date 1521. This tree lives near seven other old trees on a steep, rocky, west-facing slope at 7592 ft. (2336 m.) elevation along the Mt. McConnell trail. Evidence of local disturbance includes many fallen trees. It and its neighbors are infested with dwarf mistletoe. Nearby trees have fire scars from 1851, 1707, and 1700. This tree has typical smooth orange-gray bark, a flattened top, twisted and pruned branches, and a big burl (caused by an injury) beside a fire scar. It is rotten in the center.



**29f.** DBH=12.5 inches (31.7 cm), pith date 1889. This younger tree lives on a south-facing slope near ridgetop at 8453 ft (2601 m) elevation along the Redfeather-Rustic road. Its pointed crown, long live crown ratio, and darker bark indicate that it is younger than some of its neighbors, though its small size attests to the harshness of the site.

## *Old trees on moderate sites (fig. 30 a, b, c, d, e, f)*



**Figure 30a.** DBH=19 inches (48.4 cm), pith date 1589. This tree grows on the edge of a north-facing ridge at 8307 ft (2557m) elevation along Highway 7 at Olive Park. It is open-grown but not very tall. It has a flattened top, smooth orange bark, large branches, and fire scars on the north side.



**30b.** DBH=20.6 inches (52.3 cm), inside date 1744, est. pith date 1626. This tree lived on an open east-facing slope just below a ridge on the Cheesman Lake property at 7319 ft (2252 m) elevation. The entire stand was old; there were many fallen trees, perhaps killed by a past fire. The tree was rotten in center, possibly because of its dead top. It had very smooth, pale bark and a sparse, open-grown crown.



**30c.** DBH=25.3 inches (64.2 cm), pith date 1595. This open-grown tree lives in an east-facing meadow at 8710 ft (2680 m) elevation along Highway 7. It has classic old-tree characteristics: the flattened, "bonsai" open crown and the smooth orange bark. Though it lacks visible fire scars on the trunk, its lower branches are charred from past surface fires.



**30d.** DBH= 23.4 inches (59.5 cm), pith date 1769. This middle-aged tree lives on a flat, rocky ridgetop along the Pingree Park Road at 7293 ft (2244 m) elevation, in a location that sees heavy recreation use and has much ingrowth of Rocky Mountain juniper. It has a full, open-grown crown that is beginning to flatten at the top, fire scars, wounds from bear scratches, and bark beginning to shift from dark gray to orange.



**30e.** DBH=24.4 inches (62 cm), pith date 1527. This tree inhabits a gentle, open, south-facing slope near the hilltop along the Redfeather-Rustic road at 8453 ft (2601 m) elevation. It has a typical flattened top and smooth orange bark. Because it is on a moderate site, it has a fuller crown than trees of similar age on poor sites. A core revealed a rot pocket from a healed fire scar—perhaps from the same fire that killed the short snag beside it?



**30f.** DBH=15.7 inches (40 cm), pith date 1887. This tree lives on a gentle east-facing slope at the edge of a meadow along the Crown Point road at 8425 ft (2500 m) elevation. It has the typical pointed top of a rapidly growing tree, no visible scars, and a long, full crown. Its bark is fissured, beginning to turn orange, and lower branches are starting to self-prune.

### *Old trees on good sites (fig. 31 a, b, c, d, e, f)*



**Figure 31a.** DBH=27 in (68.5 cm), inside date 1718; est. pith date 1581. This large tree lives on a grassy, shrubby, gentle north-facing slope at 6409 ft (1972 m) elevation above a river valley along the Glen Haven road. Its center is rotten, probably because of its dead top. It is open-grown, with large heavy branches, a dead top, smooth orange bark, a sparse crown, and a large burl near the base.



**31b.** DBH=40.8 inches (103.8 cm), inside date 1729; est. pith date 1486. This ancient tree grows on a flat bench above a southeast-facing slope, just below the ridge at 8453 ft. (2601 m.) elevation, along the Redfeather-Rustic road. It is the oldest and largest tree in the vicinity. It has a dead top, smooth red-orange bark, small live crown ratio, and large, heavy branches. No fire scars showed on the trunk, but it had an axe scar from long ago. It has been marked by the U.S. Forest Service for preservation as a wildlife habitat tree. It was rotten in the center. This was the second-largest and second-oldest tree we found.



FS-003910



**31c.** DBH=31 inches (79.1 cm) inside date=1586; est. pith date 1539. This tree lives in a flat sage meadow at the abandoned townsite of Manhattan, 300 ft (100 m) above a stream at 8460 ft (2603 m) elevation along the Redfeather-Rustic road. The center was rotten. It is typically open-grown and has smooth orange bark, but because it is on a good site, its old tree crown characters are subtle; the crown is more rounded and full than a tree of similar age on a poor site.



**31d.** DBH=25.4 inches (64.6 cm), inside date 1600, est. pith date 1462. This old tree, surrounded by a cluster of younger ones, lives at 8125 ft (2500 m) elevation along the Crown Point Road at the base of a gentle, east-facing slope near the edge of a meadow. It was rotten in the center. It has a deformed, dying top, a lopsided crown with lower branches scorched on the underside, and a scar on the uphill side. If the estimate of age is correct, this is the oldest tree that we sampled.



**31e.** DBH=42.5 inches (108 cm) inside date=1710, est. pith date 1614. This tree also lives in the flat sage meadow at the abandoned townsite of Manhattan, 300 ft (100 m) above a stream at 8460 ft (2603 m) elevation along the Redfeather-Rustic road. The tree was so large our borer could not quite reach the center, so we estimated its pith date. It is the largest tree we sampled. It is typically open-grown, and has smooth orange bark, but because it is on a good site, its old tree crown characters are subtle.



**31f.** DBH=31.9 inches (81.2 cm) pith date 1879. This large, open-grown young tree was being encroached by younger ingrowth of ponderosa pine and Douglas-fir. Its growth rate was tremendous. It lived on the Cheesman Lake property on a gentle west-facing slope not far from a perennial stream at 7157 ft (2202 m) elevation. It had dark, fissured bark, a long live crown, pointed top, and no scars. It was one of the largest trees we sampled.

## Conclusion

The pre-Euro-American settlement history of the Front Range is not recorded in the form of ruins or artifacts, but in the living monuments of old trees. Ecological restoration efforts intended to reconstruct the landscape as it was before Euro-American influence must conserve old trees, which were an integral part of the landscape. To do that, workers must be able to identify old trees, define treatment prescriptions that preserve them, and create conditions that will allow them to persist. Existing trees that are 200 years old or more will form the basis for future old growth stands.

### *Why Keep Old Trees?*

- *Restoration to a more historical and ecologically sustainable state.* We know that old trees were more common in the Front Range before Euro-American settlement than they are now. They contributed to the operation of natural processes that sustained the ecosystem. A sustainable montane ecosystem must contain old trees.
- *History.* Old trees preserve the history of climate and fire in their rings, and they continue to record this history as they grow. Older stands give us a better idea of what the area looked like before settlement and how natural processes operated in the absence of intensive human influence.
- *Wildlife benefit.* Old trees provide habitat for wildlife in their dead branches and hollow trunks. They produce seeds that are food for wildlife. Old, open stands support diverse vegetation and provide suitable cover for deer and elk. Rotting wood harbors fungi and insects that provide food for bears and other animals.
- *Fire resistance.* Old trees are fire-resistant. They survived many fires before settlement, and if the forest is thinned to reduce ladder fuels, they will likely survive many more. Surface fires can burn through older stands with historical densities without killing all the trees.
- *Aesthetics.* Many people find old trees to be beautiful. Their shapes are graceful and interesting. Older stands, with open, grassy understories and large, shapely old pines are very attractive, much more so than a dense jungle of adolescent Douglas-fir. Beautiful scenery is part of what draws tourists to Colorado.

Old ponderosa pine trees are living embodiments of the history of the Front Range. Despite dramatic changes in human land use, stand structure, climate, and disturbance regimes during their lifetimes, many old trees survive, even adjacent to urban development. The individual ponderosa pine trees pictured in this book were part of the historical landscape. Some were here when Coronado led his band of explorers into Kansas in 1541; all of them had been here for centuries before Major Long's expedition first sighted Long's Peak in 1820. These trees persisted through the gold rush and intensive land use of the 19th century. The end of the 20th century has left them in an environment unlike any they have experienced, where the danger of wildfire, competition, and disease is greater than ever before.

As we move into a new century with a new, developing philosophy regarding our relationship to our environment, old trees can assist in shaping the future of the landscape with lessons from the past. Because landscape-altering activity by humans is relatively recent in the Front Range, land managers have a better chance here than in most locations to understand and recapture the structure and function of the landscape before it was dramatically altered by human activity. To create a sustainable landscape where humans, old trees, and the other elements of a healthy forest can coexist, we must preserve the old trees as we restore the ecosystem to a more sustainable and historical state.

## Postscript

As of this writing (September 2002), the Hayman fire, which started on June 8, burned almost 138,000 acres (55,870 ha) over much of the montane zone of the South Platte basin, destroying homes and businesses—and old trees. The trees from Cheesman Lake pictured in the Gallery are all dead (fig. 32). A thousand-year-old log on the south end of the property, which survived 17 fires as a living tree and more after it was dead, is largely consumed. The Hayman fire was human-caused, driven by high winds, extreme drought, and dense, continuous fuels. The fire season of 2002 started early and burned more acreage in Colorado than in the last 10 years combined. The combination of altered stand structure, the worst drought in decades, and an increased human population have created an unprecedented situation. Hopefully restoration work in the montane forests of the Front Range will protect remaining old trees.

## Acknowledgments

We wish to thank Bill Romme, Jeff Lukas, Mike Battaglia, and Peter Brown for their reviews and helpful comments, and Denver Water for allowing us to sample on their property.




**Figure 32.** Before and after the Hayman fire, 2002. **a.** This old tree grew on a small east-facing ridge on the south end of the Cheesman lake property. We cored the tree on the right; its pith date was 1635. Though there were a number of old trees in this stand, note how dense it was, particularly with ingrowth of young Douglas-fir. **b.** The same old tree in late July 2002, about a month after the Hayman fire burned intensely through the area. Note that all of the sparse grass, shrubs, small trees and nearly all of the coarse woody debris on the ground have been consumed. The needles and small branches in the tree crowns were also consumed. Sprouting willows in the riparian area to the east are the only evidence of life in the photo. The riparian area and the hills beyond are not visible in photo a because of dense forest, evident in photo b by the charred skeletons of small trees. The smaller tree to the immediate left of the tree we cored has fallen to the right. It may be many years before trees will regenerate in this landscape, and many centuries before there is an old-growth stand on this ridge again.

## Bibliography


Arno, S.F., and K.M. Sneck. 1977. A method for determining fire history in coniferous forests of the mountain west. USDA Forest Service Research Paper INT-42, Ogden, Utah.

Arno, S.F., J.H. Scott, and M.G. Hartwell. 1995. Age-class structure of old-growth ponderosa pine/Douglas-fir stands and its relationship to fire history. USDA Forest Service Research Paper INT-RP-481.

Baker, W.L. 1992. Effects of settlement and fire suppression on landscape structure. Ecology 73(5):1879-1887.

Baisan, C. H. and T. W. Swetnam. 1997. Interactions of fire regimes and land use in the central Rio Grande Valley. Research Paper RM-RP-330. Fort Collins, CO: USDA Forest Service, Rocky Mountain Forest and Range Experiment Station. 20 p.

Biondi, F. 1996. Decadal-scale dynamics at the Gus Pearson Natural Area: evidence for inverse (a)symmetric competition? Canadian Journal of Forest Research. 26: 1397-1406.

Brown, P.M. and C.H. Sieg. 1996. Fire history in interior ponderosa pine communities of the Black Hills, South Dakota, USA. International Journal of Wildland Fire. 6(3):97-105.

Brown, P.M., M.R. Kaufmann, and W.D. Shepperd. 1999. Long-term, landscape patterns of past fire events in a montane ponderosa pine forest of central Colorado. Landscape Ecology 14:513-532.

Brown, P.M., M.G. Ryan, and T.G. Andrews. 2000. Historical surface fire frequency in ponderosa pine stands in Research




FS-003914

Natural Areas, central Rocky Mountains and Black Hills, USA. Natural Areas Journal. 20:133-139.

Cassells, S.E. 1983. The Archaeology of Colorado. Johnson Books, Boulder, CO. 80301.

Cogbill, C.V. 1977. The effect of acid precipitation on tree growth in eastern North America. Water, Air, and Soil Pollution 8: 89-93.

Cooper, C.F. 1960. Changes in vegetation, structure, and growth of southwestern pine forests since white settlement. Ecological Monographs 30(2):129-164.

Covington, W.W., and M.M. Moore. 1994. Southwestern ponderosa forest structure—changes since Euro-American settlement. Journal of Forestry 92:39-47.

Donnegan, J.A., T.T. Veblen, and J.S. Sibold. 2001. Climatic and human influences on fire history in the Pike National Forest, Central Colorado. Canadian Journal of Forest Research. 31:1526-1539.

Douglass, A.E. 1929. The secret of the Southwest solved by talkative tree rings. National Geographic Magazine 56(6): 736-770.

Duncan, R. P., and G.H. Stewart. 1991. The temporal and spatial analysis of tree age distributions. Canadian Journal of Forest Research 21:1701-1710.

Elliot, J. G., and R.S. Parker. 2001. Developing a post-fire flood chronology and recurrence probability from alluvial stratigraphy in the Buffalo Creek watershed, Colorado, USA. Hydrological Processes (15) 3039-3051.

Fornwalt, P.J., M.R. Kaufmann, L.S. Huckaby, and J.M. Stoker. 2002. Using the Forest Vegetation Simulator to Reconstruct Historical Stand conditions in the Colorado Front Range. Pages 108-115 in Crookston, Nicholas L. and Havis, Robert N., comps. Second Forest Vegetation Simulator Conference. 2002 February 12-14; Fort Collins, CO. Proc. RMRS-P-25. Ogden, UT: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station.

Foster Wheeler Environmental Corporation. 1999. Landscape Assessment Upper South Platte Watershed. Prepared for US Forest Service, Colorado State Forest Service, Denver Water Board, and US Environmental Protection Agency.

Fritts, H.C. 1976. Tree rings and climate. New York, NY: Academic Press. 567 pp.

Fritts, H.C., and Swetnam, T.W. 1989. Dendroecology: A tool for evaluating variations in past and present forest environments. Advances in Ecological Research 19: 111-188.

Fulé, P.Z., W.W. Covington, and M.M. Moore. 1997. Determining reference conditions for ecosystem management of Southwestern ponderosa pine forests. Ecological Applications 7:895-908.

Gary, H.L. and P.O. Currie 1977. The Front Range pine type—a 40-year photographic record of plant recovery on an abused watershed. USDA Forest Service Rocky Mountain Forest and Range Experiment Station, Fort Collins CO, General Technical Report RM-46. 17 p.

Goldblum, D. and T.T. Veblen. 1992. Fire history of a ponderosa pine/Douglas-fir forest in the Colorado Front Range. Physical Geography 13:133-148.

Grissino-Mayer, H. 2001. FHX-2—Software for analyzing temporal and spatial patterns in fire regimes from tree rings. Tree-Ring Research 57(1):115-124.

Hawksworth, F.G. and B.W. Geils 1990. How long do mistletoe-infested ponderosa pines live? Western Journal of Applied Forestry 5:47-48.

Hawksworth, F.G., and D. Weins. 1972. Biology and classification of the dwarf mistletoes (*Arceuthobium*). USDA Forest Service, Agricultural Handbook 401, 234 p.

Heyerdahl, E.K., D. Berry, and J.K. Agee. 1994. Fire history database of the western United States. Final Report on Interagency agreement DW 12934530. US EPA, USDA Forest Service, University of Washington.

Huckaby, L.S., M.R. Kaufmann, P.J. Fornwalt and J.M. Stoker. 2001. Landscape patterns of montane forest age structure relative to fire history at Cheesman Lake in the Colorado Front Range. Pages 19-27 in Vance, R.K., C.B. Edminster, W.W. Covington, and J.A. Blake, compilers. Ponderosa pine ecosystems restoration and conservation: steps toward stewardship. 2000 April 25-27; Flagstaff AZ. Proceedings RMRS-P-22. Ogden, UT: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station.

Jack, J.G. 1900. Twentieth Annual Report of the United States Geological Survey to the Secretary of the Interior, 1898-1899. United States Government Printing Office, Washington DC.

Kaufmann, M. 1996. To live fast or not: growth, vigor and longevity of old-growth ponderosa pine and lodgepole pine trees. Tree Physiology 16:139-144.

Kaufmann, M.R., W.H. Moir, and W.W. Covington. 1992. Old-growth forests: what do we know about their ecology and management in the Southwest and Rocky Mountain Regions? Pages 1-11 in: M.R. Kaufmann, W.H. Moir, and R.L. Basset, Technical Coordinators. Old-Growth Forest in the Southwest and Rocky Mountain Regions. Proceedings of a Workshop. March 9-13, 1992, Portal, AZ. USDA Forest Service, General Technical Report RM-213.

Kaufmann, M.R., R.T. Graham, D.A. Boyce, W.H. Moir, L. Perry, R.T. Reynolds, R.L. Bassett, P. Mehlhop, C.B. Edminster, W.M. Block, and P.S. Corn. 1994. An ecological basis for ecosystem management. USDA Forest Service General Technical Report RM-GTR-246 Fort Collins, CO. 22 pp.

Kaufmann, M.R., C.M. Regan, and P.M. Brown. 2000a. Heterogeneity in ponderosa pine/Douglas-fir forests: age and size structure in unlogged and logged landscapes of central Colorado. Canadian Journal of Forest Research 30:1-14.

Kaufmann, M.R., L.S. Huckaby, and P. Gleason. 2000b. Ponderosa pine in the Colorado Front Range: long historical fire and tree recruitment intervals and a case for landscape heterogeneity. Pages 153-160 in: L.F. Neuenschwander, K.C. Ryan, G.E. Goldberg, and J.D. Greer, editors. Proceedings from the Joint Fire Science Conference and Workshop, "Crossing the Millennium: Integrating Spatial Technologies and Ecological Principles for a New Age in Fire Management." Vol. 1. University of Idaho and the International Association of Wildland Fire. Moscow Idaho.

Kaufmann, M.R., P.J. Fornwalt, L.S. Huckaby, and J. Stoker. 2001. Cheesman Lake—a historical ponderosa pine landscape guiding restoration in the South Platte watershed of the Colorado Front Range. Pages 9-18 in Vance, R.K., C.B. Edminster, W.W. Covington, and J.A. Blake, compilers. Ponderosa pine ecosystems restoration and conservation: steps toward stewardship. 2000 April 25-27; Flagstaff AZ. Proceedings RMRS-P-22. Ogden, UT: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station.

Kaye, M.W. and T.T. Swetnam. 1999. An assessment of fire, climate and Apache history in the Sacramento Mountains, New Mexico. Physical Geography 20:305-330.

Keen, P.T. 1955. Relative susceptibility of ponderosa pines to bark-beetle attack. Journal of Forestry 53:919-927.

Martorano, M.A. 1981. Scarred ponderosa pine trees reflecting cultural utilization of bark. Master's Thesis, Department of Anthropology, Colorado State University, Fort Collins, CO. 127 pp.

Marr, J.W. 1961. Ecosystems of the East Slope of the Front Range in Colorado. Colorado Associated University Press. Boulder, Colorado.

Mast, J.N., T.T. Veblen, and Y.B. Linhart. 1998. Disturbance and climatic influences on age structure of ponderosa pine at the pine/grassland ecotone. Journal of Biogeography 25:743-755.

McBride, J.R., and R.D. Laven, 1976. Scars as an indicator of fire frequency in the San Bernardino Mountains, California. Journal of Forestry 74:439-442.

Moir, W.H. 1992. Ecological concepts in old-growth forest definition. Pages 18-23 in: M.R. Kaufmann, W.H. Moir, and R.L. Basset, Technical Coordinators. Old-Growth Forest in the Southwest and Rocky Mountain Regions. Proceedings of a Workshop. March 9-13, 1992, Portal, AZ. USDA Forest Service, General Technical Report RM-213.

OLDLIST: a database of maximum tree ages. www.rmtrr.org/oldlist.htm Maintained by Peter Brown, Rocky Mountain Tree-ring Research.

Oliver, W.W., and R.A. Ryker. 1990. *Pinus ponderosa* Dougl. ex. Laws. Ponderosa Pine. Silvics of North America. Volume 1. Conifers. USDA Forest Service Agriculture Handbook 654. Washington DC. pp. 413-424.

Peet, R.K. 1991. Forest vegetation of the Colorado Front Range. Vegetatio 45:3-75.

Savage, M., P.M. Brown, and J. Feddema. 1996. The role of climate in a pine forest regeneration pulse in the southwestern United States. Ecoscience 3(3):310-318.

Stokes, M.A., and T.L. Smiley. 1968. An Introduction to tree-ring dating. University of Chicago Press, Chicago. 68 p.

Swetnam, T.W. 1984. Peeled ponderosa pine trees: a record of inner bark utilization by Native Americans. Journal of Ethnobiology 4(2):177-190.

Swetnam, T.W., M.A. Thompson, and E.K. Sutherland. 1985. Using dendrochronology to measure radial growth of defoliated trees. USDA Agriculture Handbook # 639.

Swetnam, T.W., and Lynch, A.M. 1993. Multicentury, regional-scale patterns of western spruce budworm outbreaks. Ecological Monographs 63(4): 399-424

Swetnam, T.W., and C.H. Baisan. 1996. Historical fire regime patterns in the Southwestern United States since AD 1700. Pages 11-32 in: C.D. Allen, technical editor. Fire Effects in Southwestern Forests, Proceedings of the second La Mesa fire symposium. Los Alamos, NM, March 29-31, 1994. USDA Forest Service General Technical Report RM-GTR-286. Rocky Mountain Research Station, Fort Collins, CO.

Swetnam, T.W., C.D. Allen, and J.L. Betancourt. 1999. Applied historical ecology: using the past to manage for the future. Ecological Applications 9:1189-1206.

Tobler, M. 2000. Spatial heterogeneity in a protected ponderosa pine forest. MS thesis. Colorado State University, Fort Collins, CO. 92 p.

Veblen, T.T. and D.C. Lorenz. 1986. Anthropogenic disturbance and recovery patterns in montane forests, Colorado Front range. Physical Geography 7:1-24.

Veblen, T.T. and D.C. Lorenz. 1991. The Colorado Front Range: a century of ecological change. Salt Lake City: University of Utah Press.

Veblen, T.T., Hadley, K.S., and Reid, M.S. 1991. Disturbance and stand development of a Colorado subalpine forest. Journal of Biogeography 18: 707-716.

Veblen, T.T., T. Kitzberger, and J. Donnegan. 2000. Climatic and human influences on fire regimes in ponderosa pine forests in the Colorado Front Range. Ecological Applications 10(4): 1178-1195.

Woodhouse, C.A. 1993. Tree-growth response to ENSO events in the central Colorado Front Range. Physical Geography 14(5): 417-435.

Woodhouse, C.A. and P.M. Brown. 2001. Tree-ring evidence for Great Plains drought. Tree-ring Research 57 (1): 89-103.

Woolsey, T.S. 1911. Western yellow pine in Arizona and New Mexico. US Department of Agriculture Forest Service Bulletin 101. Washington D.C. 64 pp.

# Appendix

## Dendrochronology

Dendrochronology is the science of using tree rings dated to the exact year of their formation to analyze temporal and spatial patterns of processes. It works because in temperate regions, woody plants add a distinct layer of growth every season. The width of each annual growth ring (the wood produced in that year) is constrained by limiting factors in the plant's environment. In semiarid environments like the ponderosa pine zone of the Front Range, the variation in ring width is usually caused by variation in water availability, especially early in the growing season (Woodhouse and Brown 2001). At higher elevations, temperature is usually more limiting to tree growth.

The fundamental principle of dendrochronology is crossdating—matching the patterns of ring width with other tree ring series of known date in order to assign an exact calendar year to each ring (Stokes and Smiley 1968). Crossdating allows dendrochronologists to positively date pieces of wood for which the year of death or the pith date are not known. Without crossdating, we could only count the rings, not be sure of their year of formation. By analyzing multiple samples from an area, we can minimize the noise created by the growing conditions experienced by individual trees and statistically filter out all but the effects of interest (such as climate or disturbance).

This is important in places such as the Front Range where growing conditions are harsh and samples are likely to have false rings or missing rings. In some years a tree may be unable to produce any wood at all in the part of the stem that was sampled, and this condition shows up as a missing ring in the sequence. Some of the samples used in this publication were missing as many as 20 rings. During some years water is available in the spring but conditions become very dry in the middle of summer. The growth process slows and the tree produces cells that look like the small, thick-walled latewood cells typical of the end of the growing season. If water becomes available again in the late summer, the tree may begin to grow normally again, and a false ring is formed.

Dendrochronologists select trees growing on sites that are sensitive to some limiting environmental quantity. For example, sampling a tree growing along a riverbank will not provide information about rainfall patterns because the tree already has as much water as it needs and its growth will not respond much to variation in precipitation. Trees are usually sampled with an increment borer, a hollow instrument like an auger that removes a pencil-sized sample of wood (see fig. 7 b; 22 a, b, c). This does not usually damage the tree. Cores are glued to a strip of stronger wood and sanded with fine sandpaper so the cells within the rings can be seen under a stereomicroscope. Samples can then be cross-dated visually. The widths of the rings can be measured using a computer-based instrument and these measurements can be statistically analyzed or combined with others to create a chronology.

The principles of dendrochronology can be applied to many fields of study. Tree rings can be used to date the construction of archaeological ruins (Douglass 1929), to reconstruct past climate using the relationship between tree ring width and instrumental temperature and precipitation data (Fritts 1976), to reconstruct the history of global climate events such as the El Niño-Southern Oscillation (Woodhouse 1993), to detect the effects of pollution (Cogbill 1977), and to detect and date forest disturbances that affect tree growth (Veblen and others 1991) including insect outbreaks (Swetnam and Lynch 1993) and fires (Brown et al 1999).

Dendrochronology can be used to reconstruct fire regimes by dating fire scars and determining forest age structure. Samples are taken from fire-scarred faces on living trees and remnant wood by cutting a partial or complete section with a chainsaw. The wood is sanded finely and cross-dated just as cores are. The fire scars are localized within cross-dated rings on each sample. Fire scar dates collected from the same geographic area can then be statistically analyzed.

The mean fire interval (MFI) is the average number of years between fire dates. It can be computed for a single sample or for all samples from a site combined. Because it is possible to have a minimum number of years in an interval (1), but not necessarily a maximum interval, the data are often positively skewed. For that reason, the Weibull Median Probability Interval (WMPI) is sometimes used to express the average time between fire events because it does not assume normal distribution of the data as the MFI does. The minimum and maximum intervals between fires at a given location are also important, as they give an idea of the range of times between fires (Grissino-Mayer 2001).

Fire scar sampling gives a conservative estimate of the number of fires that occurred in a location. Not every tree is scarred by every fire that it experiences, and two adjacent trees might record different fire dates, or none at all, even though fires occurred there. Also, fire scars only occur on trees that survived fires, which

occurs when the fire at that location was a surface fire. This can occur around the edges of a crown fire, as well. The effects of stand-replacing fires are determined by sampling the age structure of a forest. If most of the oldest trees in a stand germinated around the same time following a fire date confirmed by fire scars, it is likely that the fire was stand-replacing in that location. Death dates from logs that retain their outer rings under bark can also confirm the date of a stand-replacing fire.

For excellent information on all aspects of dendrochronology, go to the Ultimate Tree-ring Web Pages, http://web.utk.edu/~grissino/.

## Glossary of Terminology

*Canopy cover*—a measure of forest density. For a given area, it is the percentage of the ground that is covered by tree crowns. This is most often measured from aerial photographs.

*Cambium*—the growing tissue of a tree immediately under the bark; every growing season, the cambium produces a layer of wood.

*Community*—an assembly of organisms that tends to occur together under similar environmental conditions; usually considered to be a smaller spatial scale than an ecosystem.

*Cross-dating*—the dendrochronological method of assigning a calendar year to a tree ring by matching patterns of ring width to patterns in a composite chronology of known dates.

*Crown*—the leaves and live branches of a tree.

*Crown fire*—an intense fire that consumes the crowns of the trees. Active crown fire burns from tree crown to tree crown, killing most of the trees. Passive crown fire involves torching of individual trees. Crown fires occur naturally in some ecosystems on an infrequent basis (about every 150 to 300 years in lodgepole pine, for example); it usually occurs under conditions of dense fuels, high winds, and severe drought.

*DBH*—(diameter at breast height) a measure of tree size; the diameter of the trunk at 4.5 ft (1.4 m) above the ground.

*Dendrochronology*—the science of precisely dating tree rings based on patterns of annual ring width; see Appendix for details.

*Disturbance*—a process that changes the structure of a population; in ponderosa pine forests, this includes fires of varying intensities, insect outbreaks, logging, grazing, windthrow, etc.

*El Niño-Southern Oscillation (ENSO)*—a climatic phenomenon characterized by weakening of trade winds and sea surface warming in the eastern and central equatorial Pacific Ocean which occurs ever 2 to 7 years and affects weather around the world. In the American Southwest and West, El Niño conditions are usually warmer and wetter than normal. Anomalously cold sea surface temperatures in the equatorial Pacific causes La Niña conditions, which are usually cool and dry in western North America. The Southern Oscillation Index (SOI) is the change in the difference in tropical sea level pressure between the eastern and western hemispheres that accompanies El Niño conditions. High SOI (large pressure difference) is associated with strong trade winds and La Niña conditions; low SOI (small pressure difference) is associated with weaker than normal trade winds and El Niño conditions.

*Front Range of Colorado*—generally described as the mountains and foothills of northern Colorado, bounded on the west by the Continental Divide, on the east by the Great Plains, on the north by the Wyoming border, and on the south by Pikes Peak.

*Fire intensity*—the heat output from a fire.

*Fire regime*—the pattern of fire frequency and intensity in a given area over time.

*Fire severity*—the ecological effects of a fire.

*Gradient*—A gradual change in a quantity that occurs with the change in a given variable; for example, temperature declines with increasing elevation.

*Live crown ratio*—the percentage of the tree trunk that supports living branches; a tree with 100% live crown ratio has branches all the way to the ground.

*Montane*—refers to middle-elevations; in the Front Range, between about 6000 and 9000 ft (1845 to 2770 m) in elevation, below the line of persistent winter snowpack. This zone is dominated by coniferous forests of ponderosa pine and Douglas-fir, with patches of aspen and openings that may be shrubby or grassy or both.

*Mixed severity fire*—a fire event that has mixed effects, burning as a surface fire in some locations and as a crown fire in others depending on fuel and weather conditions.

*Old growth*—a forest defined by well-developed structures and often complex living interrelationships; dominance by late successional species (which can be disturbance-dependent species in the case of frequent low-intensity disturbance); and only minor

competition among dominant trees. The age of the dominant trees defines old growth, and it varies from species to species and ecosystem to ecosystem.

*Pith, pith date*—the pith is the center of the tree; in a core sample or a cross section, it represents the earliest year of growth for the sample. If the pith is not present on a sample because of rot or an off-center core, it is possible to estimate the number of rings to the pith if the diameter of the tree is known.

*Prescribed fire*—a fire deliberately set by humans to accomplish some planned alteration in community structure, usually under specific, low-risk conditions.

*Surface fire*—a fire that burns primarily along the ground, consuming grasses, shrubs and small trees, but usually causing minimal damage to larger trees; historically this was the common type of fire in Southwestern ponderosa pine.

*Succession*—the gradual change in the species composition of an ecosystem over time in the absence of major disturbance or other environmental change; for example, Douglas-fir will gradually dominate upper montane forests in the absence of fire, supplanting much of the ponderosa pine.

RMRS
ROCKY MOUNTAIN RESEARCH STATION

The Rocky Mountain Research Station develops scientific information and technology to improve management, protection, and use of the forests and rangelands. Research is designed to meet the needs of National Forest managers, Federal and State agencies, public and private organizations, academic institutions, industry, and individuals.

Studies accelerate solutions to problems involving ecosystems, range, forests, water, recreation, fire, resource inventory, land reclamation, community sustainability, forest engineering technology, multiple use economics, wildlife and fish habitat, and forest insects and diseases. Studies are conducted cooperatively, and applications may be found worldwide.

**Research Locations**

| | |
|---|---|
| Flagstaff, Arizona | Reno, Nevada |
| Fort Collins, Colorado* | Albuquerque, New Mexico |
| Boise, Idaho | Rapid City, South Dakota |
| Moscow, Idaho | Logan, Utah |
| Bozeman, Montana | Ogden, Utah |
| Missoula, Montana | Provo, Utah |
| Lincoln, Nebraska | Laramie, Wyoming |

*Station Headquarters, Natural Resources Research Center, 2150 Centre Avenue, Building A, Fort Collins, CO 80526

The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, sex, religion, age, disability, political beliefs, sexual orientation, or marital or family status. (Not all prohibited bases apply to all programs.) Persons with disabilities who require alternative means for communication of program information (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at (202) 720-2600 (voice and TDD).

To file a complaint of discrimination, write USDA, Director, Office of Civil Rights, Room 326-W, Whitten Building, 1400 Independence Avenue, SW, Washington, DC 20250-9410 or call (202) 720-5964 (voice or TDD). USDA is an equal opportunity provider and employer.

Federal Recycling Program Printed on Recycled Paper

ELSEVIER

Available online at www.sciencedirect.com

ScienceDirect

Forest Ecology and Management 254 (2008) 327–334

Forest Ecology and Management

www.elsevier.com/locate/foreco

# Susceptibility of ponderosa pine, *Pinus ponderosa* (Dougl. ex Laws.), to mountain pine beetle, *Dendroctonus ponderosae* Hopkins, attack in uneven-aged stands in the Black Hills of South Dakota and Wyoming USA

José F. Negrón [a,*], Kurt Allen [b], Blaine Cook [c], John R. Withrow Jr. [d]

[a] *USDA Forest Service, Rocky Mountain Research Station, 240 West Prospect, Fort Collins, CO 80525, United States*
[b] *USDA Forest Service, Forest Health Management, Rapid City Service Center, 8221 S. Highway 16, Rapid City, SD 57702, United States*
[c] *USDA Forest Service, Black Hills National Forest, 8221 S. Highway 16, Rapid City, SD 57702, United States*
[d] *SI International, Rocky Mountain Research Station, USDA Forest Service, 240 West Prospect Road, Fort Collins, CO 80525, United States*

Received 6 April 2007; received in revised form 10 August 2007; accepted 14 August 2007

**Abstract**

Mountain pine beetle, *Dendroctonus ponderosae* Hopkins can cause extensive tree mortality in ponderosa pine, *Pinus ponderosa* Dougl. ex Laws., forests in the Black Hills of South Dakota and Wyoming. Most studies that have examined stand susceptibility to mountain pine beetle have been conducted in even-aged stands. Land managers increasingly practice uneven-aged management. We established 84 clusters of four plots, one where bark beetle-caused mortality was present and three uninfested plots. For all plot trees we recorded species, tree diameter, and crown position and for ponderosa pine whether they were killed or infested by mountain pine beetle. Elevation, slope, and aspect were also recorded. We used classification trees to model the likelihood of bark beetle attack based on plot and site variables. The probability of individual tree attack within the infested plots was estimated using logistic regression. Basal area of ponderosa pine in trees $\geq$25.4 cm in diameter at breast height (dbh) and ponderosa pine stand density index were correlated with mountain pine beetle attack. Regression trees and linear regression indicated that the amount of observed tree mortality was associated with initial ponderosa pine basal area and ponderosa pine stand density index. Infested stands had higher total and ponderosa pine basal area, total and ponderosa pine stand density index, and ponderosa pine basal area in trees $\geq$25.4 cm dbh. The probability of individual tree attack within infested plots was positively correlated with tree diameter with ponderosa pine stand density index modifying the relationship. A tree of a given size was more likely to be attacked in a denser stand. We conclude that stands with higher ponderosa pine basal area in trees >25.4 cm and ponderosa pine stand density index are correlated with an increased likelihood of mountain pine beetle bark beetle attack. Information form this study will help forest managers in the identification of uneven-aged stands with a higher likelihood of bark beetle attack and expected levels of tree mortality.
Published by Elsevier B.V.

*Keywords:* Mountain pine beetle; Ponderosa pine; *Dendroctonus ponderosae*; Bark beetles

## 1. Introduction

Periodic elevated populations of mountain pine beetle, *Dendroctonus ponderosae* Hopkins, can cause significant mortality in ponderosa pine, *Pinus ponderosa* Dougl. ex Laws., in the Black Hills of South Dakota and Wyoming. This tree mortality, although natural and caused by a native insect, can present challenges for managers and the public. Disruption of visual corridors devalues the recreational experience of visitors in areas where tourism is a major contributor to the local economy. Recreation sites, such as campgrounds and lake areas are also affected and require financial and human resources to remove hazard trees that may create unsafe conditions for visitors. Areas designated for timber production are also impacted, affecting forest planning processes and negating timber management investments. Moreover, high levels of tree mortality in stands managed for wildlife habitat, such as the northern goshawk, *Accipiter gentilis* (Linnaeus 1758) can compromise efforts.

Various studies have addressed different stand conditions and site characteristics associated with ponderosa pine susceptibility to mountain pine beetle (Fettig et al., 2007)

* Corresponding author. Tel.: +1 970 498 1252; fax: +1 970 498 1314.
*E-mail address:* jnegron@fs.fed.us (J.F. Negrón).

0378-1127/$ – see front matter. Published by Elsevier B.V.
doi:10.1016/j.foreco.2007.08.018