


**Figure 14. Salter affected HUC6 watersheds**

# Appendix B. Cultural Resources Programmatic Agreement Vegetation Management Activities-Specific Project Design Features

1. Screened Undertaking Activities

   Some activities that have limited potential to affect historic properties may be exempt from further Section 106 review and consultation once screened by the Forest Service Heritage Professional. These activities require no additional consultation beyond documentation in the annual report to the State Historic Preservation Officer (SHPO).

   The following landscape vegetation management activities either result in no ground disturbance or are conducted entirely within previously disturbed areas that are not likely to contain intact and distinct soil horizons. The screened undertakings have a low potential to affect historic properties within original depositional contexts to the depth to be excavated and/or modified.

   A. Chemical Treatments and Insect Traps
      i. Insecticide spraying on single trees and small stands of trees.
      ii. Trap tree activities: felled, debarked, hand-piled and burned in previously disturbed burn areas. No heavy machinery is used.
      iii. Lethal trap tree activities: felled, pesticide applied. No trees removed and no heavy machinery used.
      iv. Aggregate (trap-out) beetle activities: funnel traps hand placed in trees.
      v. Semiochemical treatments.
      vi. Application of pesticides that do not have the potential to affect access to or use of the resources by the Tribes.

   B. Slash Disposal
      i. Slash disposal in previously disturbed areas where the slash is piled by hand and burned. Slash is either hand-piled for chipping or bucked by hand, loaded on to rubber-tire vehicles and hauled away. This excludes the use of vehicle over vehicle type Class 3.

   C. Ladder-fuel Reduction and Pruning Activities
      i. Understory removal of non-commercial timber, including aspen and forest enhancement activities, using chainsaws to reduce ladder fuels, break up the continuity of fuel and to improve stand health and resiliency. Slash is either hand piled for chipping or bucked by hand, loaded into rubber-

tired vehicles and hauled away. This excludes the use of vehicles over vehicle type Class 3

ii. Branch pruning activities where selected trees are pruned to improve tree health and resiliency, reduce ladder fuels, and to create defensible space around structures. Slash is either hand piled for chipping or bucked by hand, loaded into rubber-tired vehicles and hauled away. This excludes the use of vehicles over vehicle type Class 3.

iii. Boundary treatments where dead standing trees, down trees, and slash within 100 feet of the national Forest/private-land boundary is cleared with chainsaws, understory ladder fuels are removed, and lower branches on retained trees are pruned to create a fuel break. Slash is either hand piled for chipping or bucked by hand, loaded into rubber- tired vehicles and hauled away. This excludes the use of vehicles over vehicle type Class 3.

D. Defensible Space

i. Creation of defensible space around homes and structures through removal of trees, brush, and other vegetation using chainsaws and hand tools, where such activities do not have the potential to affect the integrity of the setting of nearby historic properties. Slash is either hand piled for chipping or bucked by hand, loaded into rubber-tired vehicles and hauled away. This excludes the use of vehicles over vehicle type Class 3

E. Road and Trail Maintenance

i. Routine trail maintenance limited to brushing and light maintenance of existing tread with hand tools. Routine trail clearing of rocks and debris. This would include the removal of fallen trees and branches from the trail. Rock and debris will be hand carried from the trail and piled without dragging across country. Piles may be left in place, or disposed of by chipping, loaded into rubber-tired vehicles and hauled away. This excludes the use of vehicles over vehicle type Class 3.

ii. Felling and removal of hazard and wind-throw trees from road and trail prisms where deemed necessary for health, safety, or administrative reasons, so long as trees are felled into and removed from existing road or trail prisms (area clearly associated with road construction, from road surface to top of cut and/or toe of fill) where previous disturbance is such that the presence of no known unevaluated cultural resources or historic properties is considered unlikely, and so long as ground disturbance is not allowed off previously disturbed areas associated with road or trail prisms.

iii. Issuance of road-use permits for commercial hauling over existing roads.

iv. Temporary or permanent road closures involving no new ground disturbance.

v. Maintenance or replacements to non-historic (less than 50 years) culverts including placement of rip-rap at inlet and outlets of existing culverts when activities are confined to previously disturbed areas and where there are no historic properties or unevaluated cultural resources and where the culvert itself is not a historic property.

vi. Stockpiling of road related materials in or on existing roads or turnouts.

vii. Installation of roadside safety features such as guardrails, adjacent to existing forest roads, in previously disturbed areas where the road and its features are not historic properties.

F. Other

i. Areas where mowing with a brush hog or similar rubber-tired equipment is proposed, that occurs outside of known historic property boundaries and/or buffer zones as appropriate.

ii. Areas where tree sanitation is proposed, where trees are felled, peeled, piled and removed by hand. No heavy machinery is used, and activities occur outside of known historic property boundaries and/or 50 ft. buffer zones as appropriate.

2. Field Survey Strategy

As specific locations of Implementation Projects are refined, the Forest shall conduct Class II or Class III inventory to identify historic properties. The strategy below may be used, or individual forests may consult with signatories to use alternate strategies or predictive models. If a forest proposes to use something other than the strategy outlined in this appendix, they shall consult with and gain consensus with signatories on their proposed strategy prior to initiating survey.

A. The following areas shall be field surveyed using pedestrian transects within the refined APE of the Implementation Project:

i. Areas of high potential for historic properties:

a. Prehistoric Cultural Resources

- Areas of known high site density and/or known site locations.
- Ecotonal boundary areas (e.g., areas between canopied and non- canopied areas.
- Areas located within ¼ mile of permanent water sources or natural travel routes associated with mountain passes.
- Geographic features within loosely canopied areas including high points and open views, saddles, terraces, benches and ridges (e.g., hunting corridors).

- South, east and west facing slopes less than 15%. On slopes between 15% - 25%, survey will focus on those areas where ground disturbance is possible because of the use of mechanical equipment for project implementation.
- Areas known to contain geological outcrops of tool stone source material.
- Areas that include old growth Ponderosa pine and or Douglas fir that might contain fire sensitive features such as CMTs and wickiups, and other fire sensitive sites listed below.
- Areas of potential importance as identified during tribal consultation.

b. Historic Cultural Resources

- Areas within or near bedrock deposits containing precious or marketable metal ores.
- Natural travel corridors for pack trails, wagon trails, stock driveways, auto roads, and/or railroads.
- Areas located within ¼ mile of permanent water sources or areas in proximity to railroad grades.
- Potential historic cultural resource identified as a result of literature search. The Forest will follow Office of Archaeology and Historic Preservation Survey Manual guidelines with respect to the documentation of historical features including dirt roads, stock ponds, soil perms, fence lines, small irrigation ditches, pastures, or fields unless they are part of a larger site, known to be significant or are named. If the resources are not fully documented, they will be generally described in the survey report.
- Areas that might contain fire sensitive sites, as listed below.
- Areas of potential importance to the public.

ii. Areas where ground-disturbing activities are proposed including, but not limited to the following:

a. Any area where machine piling or any other activity using mechanized equipment, including machine piling, wind rowing, mechanical crushing, skid trails where identified, and cutting units where skid trails are not identified.

b. Road construction.
c. Water bars and other constructed erosional features.
d. Areas where prescribed fire is proposed.
e. Hand and mechanical control lines.
f. Staging and safety areas.
g. Fire sensitive sites, as follows:
    - Historic sites with standing, or down wooden structures or other flammable features or artifacts.
    - Rock art sites.
    - Cliff dwellings.
    - Prehistoric sites with flammable architectural elements and other flammable features or artifacts.
    - Culturally modified trees, including aspen art and peeled/scarred trees.
    - Certain traditional cultural properties (based on consultation with tribes).
    - Other Fire-Sensitive Sites: based on local field conditions, forest-specific concerns, or as recommended as a result of consultation with SHPO staff, tribes, local governments, or other interested parties, fire management staff, fire behavior specialists, or fire effects researchers.

B. The following areas within refined APE of Implementation Projects do not require field survey:
   i. Slopes greater than 25% where modeling based on the results of previous survey work in similar settings, and/or where reconnaissance field survey indicates there is no potential for cultural resources such as rock art, rock shelters, and significant mining features.
   ii. Portions of the APE affected by previous ground disturbance that has modified the surface so extensively that the likelihood of finding cultural resources is negligible.
   iii. Areas of the APE covered by previous adequate survey. Previous survey (i.e., legacy survey) will be considered adequate if it has been previously reviewed by SHPO, and meets the intent of the guidance in the Secretary of Interior's Standards for Archaeological Documentation and the Advisory Council on Historic Preservation’s "Meeting the Reasonable and Good Faith Identification Standard in Section 106 Review". When considering whether previous survey is adequate, Forest Service Heritage Professionals shall rely mostly upon agency guidance put forth in the Forest Service Heritage Program

Management Handbook, FSH 2309.12, Chapter 32, Section 11 (Date Approved 04/08/2008):

*Survey data accumulated during the initial years of Forest Service cultural resource management may not meet current standards or conform to modern technologies (for example, GPS coordinates). Field conditions and surface visibility also change. These older data provide useful information for broad-scale land use planning and for cultural resource identification strategies, but do not negate the requirement for further identification and field survey. When reviewing legacy data for planning or project purposes, Heritage professionals should:*

- *Review past and current survey coverage using project maps, survey designs, transect interval maps, GIS, survey descriptions, photographs, and related field data.*
- *Identify those areas with substandard or inadequately documented survey coverage or areas where additional field survey is warranted due to better ground visibility, new cultural resource information, or other relevant factors as identified by the Heritage professional.*

Generally, previous intensive field survey shall be considered adequate if the corresponding cultural resource report describes field methods that would be used today, and the Forest Service Heritage Professional has confidence in the previous survey. When considering whether a survey is adequate, Heritage Professional should also consider if re-survey is appropriate based on the current undertaking's potential for effects or changed conditions.

3. Site Protection Measures

Various combinations of the following protection measures may be approved by the Forest Heritage Professionals to protect historic properties for projects listed in this agreement. Any use of these measures should be reported in addendum reports. Use of these protection measures will generally be considered to result in a no adverse effect finding. Heritage Professionals may approve additional measures to further protect historic properties; additional measures not listed below shall also be discussed in addendum reports.

A. Prescribed Burning

i. Protect fire-sensitive sites:

- Exclude from project area
- Hand line
- Black line
- Wet line
- Foam retardant

- Structural fire shelter
- Remove heavy fuels from site by hand.
- Prevent in-situ heavy fuels that cannot be removed from ignition (e.g., flush-cut and bury stumps.
- Implement same protective measures for future maintenance burns.

ii. Protect selected other sites from burning (optional).

iii. Allow burning over non fire-sensitive sites, provided:

- No ignition points within site boundaries.
- No staging of equipment within site boundaries.
- No slash piles within site boundaries.

iv. Allow construction of safety zones and additional lines in 100% surveyed areas with archeological monitoring, as appropriate, to assure historic properties are avoided.

B. Thinning, Hand and Mechanical Treatments

i. No treatments or ground disturbance within site boundaries – or- allow treatments within site boundaries, provided:

- Cutting is accomplished using hand-tools only.
- Large diameter trees are felled away from all features.
- Materials removed from the site are removed by hand.
- No dragging of logs, trees, or thinned material across or within site boundaries.

ii. No use of vehicles or other mechanized equipment within site boundaries.

iii. No staging of equipment within site boundaries.

iv. No slash piles within site boundaries.

4. Fuelwood

A. No fuelwood cutting or vehicles within site boundaries -or- allow fuelwood cutting within sites provided that:

i. No vehicles allowed within site boundaries.

ii. No dragging of logs, trees, or cut material across or within site boundaries.

iii. Materials removed from the site are removed by hand.

B. Allow fuelwood cutting in areas of large, continuous, low-density artifact scatters that cover large portions of a landscape provided that:

i. All features and artifact concentrations are recorded and avoided.

ii. Use of vehicles is prohibited during wet ground conditions.

iii. Periodic monitoring is used to assess impacts and if impacts are noted fuelwood cutting will be prohibited in the area.

5. Activities Involving Hazardous Tree Removal, Grapple Piling, Mechanical Treatment, Skid Trails and Landing Areas

   A. No mechanical treatment will occur within the site boundary of a historic property, plus a 50-foot buffer around the site. If treatment is necessary, these sites and the 50-foot buffer will be hand-treated.

6. Activities Involving Road Construction, Temporary Road Construction, Fire Control Lines and Skid Trails
   A. A 50-foot buffer around the historic properties will be established. The road control line will be moved to avoid the site and the 50-foot buffer area. If the undertaking consists of construction and there is the potential for unidentified buried cultural remains, the location will be moved to avoid the site and the construction activities in the area will be monitored by an archaeologist

7. If a previously undocumented historic property is discovered, or if inadvertent effects occur to a historic property, all work in the vicinity of the property would cease and the San Juan National Forest archaeologist would be notified immediately. The property would be protected and project activities in the immediate vicinity of the property would not resume until any actions necessary to resolve adverse effects to the property have been completed.

8. Upon the discovery of human remains, funerary items, sacred objects, or objects of cultural patrimony, a San Juan National Forest archaeologist would be immediately notified by telephone, with written confirmation. All project activities would cease in the vicinity of the discovery, and the discovery would be protected for 30 days, or until the contractor is given notice to proceed by a San Juan National Forest archaeologist or the Dolores District Forest Service Representative

# Appendix C. Resources Dismissed from Detailed Analysis

## Air

Under the Clean Air Act, the Environmental Protection Agency sets limits on certain air pollutants and establishes a regulatory framework for states to follow to protect air quality. Federal land management agencies must comply with the National Ambient Air Quality Standards and Prevention of Significant Deterioration, and Air Quality Related Values (AQRVs). AQRV's are a scenic, cultural, physical, biological, ecological, or recreational resource on federal lands which may be affected by a change in air quality as defined by the Federal Land Manager.

The Clean Air Act identifies two types of national ambient air quality standards. Primary standards provide public health protection, including protecting the health of sensitive populations such as asthmatics, children, and the elderly. Secondary standards provide public welfare protection, including protection against decreased visibility and damage to animals, crops, vegetation, and buildings (Environmental Protection Agency 2011).

Prescribed burning in the Salter Vegetation Management project area would require preparation of a written Burn Plan and a Smoke Management Plan that complies with State and Montezuma County Air Quality Management District standards, notification of counties prior to burning, and monitoring of smoke production. Burning would be conducted under wind and weather conditions designed to rapidly disperse smoke and minimize drift into populated areas.

The reduction of activity created slash via pile burning is expected to be implemented within the established State, County, and Federal framework and standards described above, and would therefore, be in compliance with the Clean Air Act.

## Climate Change

Climate change analysis is guided by Climate Change Considerations in Project-Level NEPA Analysis (U.S. Forest Service 2009), which recommends consideration of both the effect of a proposed action on climate change, and the effect of climate change on a proposed action.

Emission of greenhouse gases (associated with adverse effects to climate) are inversely related to carbon sequestration. During project implementation there would be small, incremental losses of carbon sequestration due to burning of vegetation and consumption of fossil fuels by equipment. Trees would be harvested over time; however, carbon could continue to be stored in manufactured wood products that used harvested materials (Nunery and Keeton 2010). As implementation proceeds, there would immediately be small, beneficial effects to carbon sequestration due to growth of vegetation. In the long-term, carbon sequestration would be sustainably increased through continuing growth of a healthy forest. The described changes in greenhouse gas emissions resulting from the proposed action is immeasurable.

The vulnerability of the 14 terrestrial ecosystems were assessed for the San Juan National Forest (Decker 2014). Based on this assessment, the aspen vegetation type is presumed stable. Sections 1 and 2 of this environmental assessment describe current vegetation conditions that have developed, in part, as a result of climate factors such as precipitation and temperature. The

proposed activity would not change the land use and the area would remain forested, as it currently is.

# Economics

Currently the fiber market for ponderosa pine, as indicated by sales of collaborative communication form, is strong on the Dolores District when compared to five or six years ago. It has been several years since a "no-bid" sale has occurred, and small product sales have been on an upward trend. Signs of longevity and a reliable supply of raw fiber in the area have encouraged renewed investments in the wood products industry. The fiber demand of the local area, based on current sales over the past two years, would keep pace with what this proposal would provide as a byproduct of the proposed vegetation management activities. An increase in demand would result in competitive prices for fiber and the ability to utilize funds to perform service and stewardship items such as pre-commercial thinning.

The innovation and development of new equipment is contributing to many aspects of fiber harvesting and processing

Small volume sales under 2,000 collaborative communication form of ponderosa pine is a continued niche market and includes post and pole, firewood on all scales, mine props and dimensional rough cut lumber. These markets have been in relatively consistent demand in the local area. In recent times, markets are expanding beyond southwest Colorado as the supply for raw material has been reliable and processing facilities are consistently running.

Re-engineering and additions to processing facilities occur locally as markets decline or improve. Adaptation has been occurring as fiber supply of specific diameters become more or less available or economical to obtain. The use of round wood or unprocessed logs for items such as mining props is one indicator of the willingness of the industry to adapt to accommodate utilization of available byproducts. In the past that product was being made almost exclusively out of saw log sized material. This also demonstrates that availability of byproduct could contribute to the ability to meet the needs of the Forest for hazardous fuel removal and economic objectives. Large scale fuelwood processing has created an increase in the utilization of non-saw material across the Forest. Material that has historically been very costly to remove has become either more economical or is now fully merchantable. This sector can typically use green and beetle killed trees but rarely burned trees and overall prefers a mixture of size classes to meet multiple niche markets.

Specific markets have developed in relation to the availability of beetle killed dead ponderosa pine due to its unique appearance. This niche market is limited however, as it is dependent on the blue stain fungus which gives the wood a deep blue color after the trees have died. This blue hue is caused by a fungus carried by pine bark beetles, the fungus is one of a dozen or more fungus's potentially carried by bark beetles. The desired product is a board that has an array of blue intermixed with clear wood giving the final product a mosaic of colors. This product is highly sought after in many places. One local small scale custom furniture maker (Rustic Furniture) deals almost exclusively in blue-stained wood products that are marketed all over the country for high-end interior design. Interior tongue and groove paneling, which is made by milling 4 inch, 6-inch and 8-inch by 1-inch thick boards, does have a wider market potential. The local Aspen Wall Wood Mill located in Dolores, Colorado who until recently utilized only aspen products, has purchased and harvested several timber sales in the vicinity of the project area in the past few years.

Finding dependable outlets for biomass material (less than 5 inches, branches and tops) and to a lesser extent “round wood” also known as “Product Other than Logs” (POL) {5 inches to 8.9 inches diameter at breast height} continues to be problematic.

The smaller the diameter or more inconsistent the material the harder it is to accommodate the harvesting, removal and end product costs. However, with the recent opening of markets and investment, there is a potential to develop a market that would utilize these products. Current contracts for removal include the volume of this material as “timber subject to agreement”. The timber subject to agreement approach allows the purchaser the least amount of risk contractually. However, when markets open up or new markets are created, available volumes and pricing become established and agreed upon initially and risk is further reduced.

To require mandatory removal of this material without compensation is not a viable option, in most cases, on large sales. Collaborating with industry to identify markets that utilize small diameter and inconsistent material is important for both the development of sustainable markets and scale-appropriate treatments on the landscape over the long-term.

The “saw log” (equal to or greater than 9 inches diameter at breast height) market demand continues to increase with bid premiums offered on almost every sale, including stewardship contracts, within the last four years. Sales with bid premiums also included additional charges for brush disposal, essential Knutson-Vandenberg Act activities and road maintenance which have not produced bid sales on the district in the past. Offering a mixture of saw log and smaller diameters timber in the right ratio is important to ensure offerings are marketable. The size of these sales is equally important in both volume and acres to ensure the work is completed on time and has a sustained profitability. The ability to include large volumes and achieve vegetation management at landscape level is possible with the existing industry. Local business are already established and providing the secondary needs of the wood products industry including trucking, gravel and road work needs, pre-commercial thinning, firewood sales, fuel sales, mechanic services and other associated needs.

## Environmental Justice

Dolores County and Montezuma County both include low income, minority and tribal populations, however, disproportionately high and adverse human health or environmental effects would not occur. The environmental effects associated with the proposed action occur in the immediate vicinity of the project area. The public involvement process for this project as described earlier in this document included discussions with County commissioners, tribal consultation, and letters mailed to interested individuals and organizations.

# Initial Cultural Resources Report for the Salter Vegetation Management Project San Juan National Forest Dolores Ranger District Montezuma and Dolores Counties, Colorado (SJNF #2019-11)

Prepared by:
Liz Cutright-Smith
District Archaeologist
Dolores Ranger District
San Juan National Forest

June 4, 2020



FS-007966

# Abstract


Pursuant to the *Programmatic Agreement among the United States Forest Service, Rocky Mountain Regional Office, Pike-San Isabel National Forest and Cimarron and Comanche National Grasslands, Routt National Forest, San Juan National Forest and the Colorado State Historic Preservation Officer Regarding Vegetation Management Undertakings* (PA), this Initial Cultural Resources Report serves as the notification package required for use of the streamlined Section 106 compliance process, as specified in Stipulation V.B of the PA.

With the Salter Vegetation Management Project (Salter EA), the San Juan National Forest (SJNF), Dolores Ranger District (DRD) proposes vegetation management activities across approximately 35,000 acres of National Forest System land within the DRD. The Salter EA project area is located approximately 20 miles northeast of the Town of Dolores, Colorado. Proposed treatment areas are located in the vicinity of Salter Y, Plateau Creek, Carlyle Point, Turkey Knoll, Boggy Draw, and House Creek. The purpose of the project is to: 1) improve the resilience and/or maintain the resistance of forest ecosystems in an effort to increase protection against epidemic insect and disease outbreaks, 2) increase the structural diversity of the ponderosa pine forest represented across the landscape, and 3) provide economic support to local communities by providing timber products to dependent local industries in a sustainable manner. This project is being analyzed as an Environmental Assessment (EA).

The area of potential effects (APE) for the Salter EA project is defined for the purpose of this report as the EA analysis area plus a 100-meter buffer, which was applied to account for locations at which the analysis area and treatment units may be coterminous. The APE measures approximately 50,305 acres in size.

Approximately 156 previous cultural resources inventories have been conducted within the proposed project's APE. These include approximately 29 class II (reconnaissance) inventories and approximately 127 class III (intensive) inventories. In total, approximately 43,026 acres within the APE have been surveyed prior to the identification of implementation projects. This figure includes approximately 41,509 acres within the APE that were surveyed at the class II level and approximately 14,470 acres within the APE that were surveyed at the class III level.

Two hundred twenty-two previously recorded archaeological sites are located within the APE for the proposed project. This figure includes one archaeological district that is listed on the National Register of Historic Places (NRHP), one site that is contributing to the National Register eligibility of that archaeological district, two sites that are non-contributing to the National Register eligibility of that archaeological district, one multicomponent site that is listed on the NRHP, 42 sites that have been officially determined eligible to the NRHP, 35 sites that have been officially determined Needs Data, 69 sites that have been officially determined not eligible to the NRHP, and 71 sites that are currently unevaluated because an official eligibility determination has not been made.

Following the identification of implementation projects within the EA analysis area, the APE for each implementation project would be refined to encompass the area within which the proposed implementation activities had the potential to directly or indirectly cause alterations in the character or use of historic properties, if any such properties were to exist. Results of the inventory conducted for each implementation project would be documented in an Addendum Report, as specified in Stipulation VI.C of the PA.

# Contents


Abstract ........ 2

Introduction ........ 4

Description of Undertaking ........ 4

Legal Location for the Undertaking ........ 4

Local Environment ........ 4

Salter Y ........ 4

Plateau Creek ........ 5

Carlyle Point ........ 5

Turkey Knoll ........ 5

Boggy Draw ........ 5

House Creek ........ 5

Cultural Background ........ 5

Area of Potential Effects ........ 6

Class I Results ........ 6

Previous Cultural Resources Inventories within the APE ........ 6

Previously Recorded Cultural Resources within the APE ........ 6

Research Design ........ 11

Objectives of Cultural Resources Inventories for Implementation Projects ........ 11

Cultural Resources Inventory Methodology ........ 11

Cultural Resource Definitions ........ 11

Sites ........ 11

Isolated Finds ........ 12

Exclusions ........ 12

Reporting for Implementation Projects ........ 12

Works Cited ........ 13

Appendix A: Project Maps ........ 14

# Introduction

Pursuant to the *Programmatic Agreement among the United States Forest Service, Rocky Mountain Regional Office, Pike-San Isabel National Forest and Cimarron and Comanche National Grasslands, Routt National Forest, San Juan National Forest and the Colorado State Historic Preservation Officer Regarding Vegetation Management Undertakings* (PA), this Initial Cultural Resources Report serves as the notification package required for use of the streamlined Section 106 compliance process, as specified in Stipulation V.B of the PA.

## Description of Undertaking

With the Salter Vegetation Management Project (Salter EA), the San Juan National Forest (SJNF), Dolores Ranger District (DRD) proposes vegetation management activities across approximately 35,000 acres of National Forest System land within the DRD. The Salter EA project area is located approximately 20 miles northeast of the Town of Dolores, Colorado. Proposed treatment areas are located in the vicinity of Salter Y, Plateau Creek, Carlyle Point, Turkey Knoll, Boggy Draw, and House Creek. The purpose of the project is to: 1) improve the resilience and/or maintain the resistance of forest ecosystems in an effort to increase protection against epidemic insect and disease outbreaks, 2) increase the structural diversity of the ponderosa pine forest represented across the landscape, and 3) provide economic support to local communities by providing timber products to dependent local industries in a sustainable manner. This project is being analyzed as an Environmental Assessment (EA).

The proposed action includes the use of mechanical and hand thinning techniques and a range of silvicultural prescriptions to lower ponderosa pine stocking levels, reduce the presence of dwarf mistletoe disease, and remove dead and infested bark beetle trees within the project area. Silvicultural prescriptions to be applied would be based on the stand conditions at the time of project implementation. The proposed activities would create gaps and small openings in the dense forest canopy to allow sunlight to reach the forest floor. Activity-generated fuels would be burned to reduce duff, exposing bare soil and creating improved conditions for new seedlings to establish.

Other associated activities would include slash treatment, temporary road construction and obliteration, and maintenance and reconstruction of existing National Forest System roads.

## Legal Location for the Undertaking

The EA analysis area for the proposed project includes portions of:

Township 40 North, Range 14 West
Township 39 North, Range 13–16 West
Township 38 North, Range 14, 15 West
Township 37 North, Range 14, 15 West

# Local Environment

The EA analysis area for the proposed project is divided among six separate treatment blocks based on geographical location and transportation system. Refer to Appendix A, Map 1 for the location of the proposed project. Vegetation within each treatment block is predominantly ponderosa pine with an understory of Gambel oak. Each treatment block is discussed separately below.

## Salter Y

This treatment block is located just north of the Dry Canyon arm of McPhee Reservoir and the McPhee Dam facilities and extends north to the Salter Y area in Montezuma and Dolores Counties. This treatment block is relatively flat, with elevations ranging from approximately 8,000 to 8,200 feet above mean sea level (amsl).

### Plateau Creek

This treatment block is located just north of the Beaver Creek arm of McPhee Reservoir in Montezuma and Dolores Counties and is bounded by Plateau Creek to the east and Dry Canyon to the west, both of which are tributary to the reservoir. The treatment block is located partially within the burn scar of the 2018 Plateau Fire. This block is relatively flat, with elevations ranging from approximately 7,800 to 8,000 feet amsl.

### Carlyle Point

This treatment block is located just northeast of McPhee Reservoir in Montezuma and Dolores Counties and is bounded by Plateau Creak to the west, Beaver Creek to the south and east, and Forest Service Road 514 (the Glade Road) to the north. The treatment block is entirely contained within the 2018 Plateau Fire burn scar. The block is relatively flat, with elevations ranging from approximately 7,900 to 8,100 feet amsl.

### Turkey Knoll

This treatment block is located just east of the Carlyle Point treatment block in Montezuma and Dolores Counties. It is roughly bounded by the West Dolores River to the southeast, Cottonwood Creek to the northeast, and Beaver Creek and Long Draw to the west. The block is relatively flat, with elevations ranging from approximately 8,100 feet to 8,600 feet amsl. Long Draw, Rocky Draw, and Turkey Creek are all dry or ephemeral draws that run through the treatment block.

### Boggy Draw

This treatment block is located just south of the Carlyle Point treatment block in Montezuma County. It is roughly bounded by Beaver Creek to the north, the Dolores River to the east and south, the Dolores to Norwood Road (FSR 526) to the west, and the SJNF property boundary to the south. This block is relatively flat, with elevations ranging from approximately 7,600 feet amsl at the southern end of the block to approximately 7,900 feet amsl near the northern end of the block.

### House Creek

This treatment block is located due west of the Boggy Draw treatment block in Montezuma County. It is roughly bounded by the Beaver Creek arm of McPhee Reservoir to the north, FSR 526 to the east, and the transition from the ponderosa pine to the pinyon-juniper fuel types to the west. This block is relatively flat, with elevations ranging from approximately 7,300 feet to approximately 7,600 feet amsl.

## Cultural Background

A comprehensive synthesis of the culture history of Southwest Colorado is contained in *Colorado Prehistory: A Context for the Southern Colorado River Basin* (Lipe et al. 1999) and *Colorado History: A Context for Historical Archaeology* (Church et al. 2006). For an overview of the cultural resources of the SJNF, the reader is referred to *An Overview of the Archaeological Resources in the San Juan-Rio Grande National Forests: Mancos-Dolores, Columbine, and Pagosa Districts* (Duke 1998).

Evidence of use of the DRD for resource procurement and seasonal occupation extends from the Paleoindian through Pueblo periods. Paleoindian and Archaic period use of the project area is primarily characterized by open lithic scatters and open camps, with increasing variation in material culture and greater seasonal use of the uplands through time. Use of the project area from the Basketmaker II through Pueblo III periods similarly consists primarily of open lithic scatters and open camps, with a small number habitation sites with visible architecture and sheltered camps in areas with geology conducive to the formation of rock shelters.

Historic period resources within the project area are primarily related to ranching, including camps, corrals, aspen arborglyphs, and stock driveways.

# Area of Potential Effects

The area of potential effects (APE) for the Salter EA project is defined for the purpose of this report as the EA analysis area plus a 100-meter buffer, which was applied to account for locations at which the analysis area and treatment units may be coterminous. The APE measures approximately 50,305 acres in size. Refer to Appendix A, Map 2 for a depiction of the APE for the proposed project. Following the identification of implementation projects that fall under the purview of the Salter EA decision, the APE for each implementation project would be refined to encompass the area within which the proposed implementation activities had the potential to directly or indirectly cause alterations in the character or use of historic properties, if any such properties were to exist.

# Class I Results

## Previous Cultural Resources Inventories within the APE

Due to the large geographical extent of the APE for the proposed project and the large number of previous cultural resources inventories, only a preliminary review of the cultural resources survey coverage in the SJNF cultural resources GIS database was conducted. Following the identification of implementation projects within the EA analysis area for the proposed project, a more thorough review of previous cultural resources inventories within the APE for each implementation project would be conducted and areas of adequate previous inventory would be identified.

The SJNF cultural resources GIS data indicate that approximately 156 previous cultural resources inventories have been conducted within the proposed project's APE. These include approximately 29 class II (reconnaissance) inventories and approximately 127 class III (intensive) inventories. In total, approximately 43,026 acres within the APE have been surveyed prior to the identification of implementation projects. This figure includes approximately 41,509 acres within the APE that were surveyed at the class II level and approximately 14,470 acres within the APE that were surveyed at the class III level. Refer to Appendix A, Map 3 for a depiction of the previous cultural resources inventory coverage within the APE.

## Previously Recorded Cultural Resources within the APE

Two hundred twenty-two previously recorded archaeological sites are located within the APE for the proposed project. This figure includes one archaeological district that is listed on the National Register of Historic Places (NRHP), one site that is contributing to the National Register eligibility of that archaeological district, two sites that are non-contributing to the National Register eligibility of that archaeological district, one multicomponent site that is listed on the NRHP, 42 sites that have been officially determined eligible to the NRHP, 35 sites that have been officially determined Needs Data, 69 sites that have been officially determined not eligible to the NRHP, and 71 sites that are currently unevaluated because an official eligibility determination has not been made.

All previously recorded archaeological sites within the proposed project's APE are listed in Table 1. Refer to Appendix A, Map 4 for a depiction of the previously recorded sites within the APE.

| No. | Smithsonian # | Type | Site Type | FS Site # | NRHP Eligibility |
|---|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| | | | [redacted] | | |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

[redacted]

| | | | | | |
|---|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

| | | | | | |
|---|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

| | | | | | |
|---|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| | | | | | |
| | | [redacted] | | | |
| | | | | | |
| | | | | [redacted] | |
| | | | | | |
| | | | | [redacted] | |
| | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

In addition to the archaeological sites listed above, 348 isolated finds (IFs) have been previously recorded within the proposed project's APE. These IFs have been determined not eligible to the NRHP.

# Research Design

## Objectives of Cultural Resources Inventories for Implementation Projects

The cultural resources inventories that would be undertaken for each implementation project within the Lone Pine EA analysis area would include four objectives:

(1) Identify historic properties within the APE for each implementation project.
(2) Evaluate the National Register eligibility of each property identified.
(3) Examine the possible effects of the proposed undertaking on historic properties.
(4) Make recommendations to manage historic properties from the effects of the undertaking.

## Cultural Resources Inventory Methodology

The APE for each implementation project would be defined as the area within which all proposed project activities would occur. The APE would therefore encompass the locations of all timber harvest units, log landings, skid trails, and temporary roads. The entire APE for each implementation project would be intensively inventoried with parallel transects spaced no more than 15 meters apart. Consequently, the field survey strategy outlined in Appendix C of the PA would not be employed. All cultural resources identified within the APE would be recorded using a Trimble GeoExplorer GPS unit with sub-meter accuracy, photographed with a digital camera, and fully described.

## Cultural Resource Definitions

### Sites

For the purposes of the cultural resources inventory to be completed for each implementation project, a cultural resources site is defined as a locus of human activity that is more than 50 years old, including prehistoric and historic resources, at a level of intensity normally involving evidence of purposeful behavior

beyond the level of one or a few accidentally deposited artifacts. Minimal site identification criteria include at least one of the following:

(a) one or more features,
(b) one formal tool if associated with other cultural materials or more than one formal tool,
(c) an occurrence of three or more classes of artifacts,
(d) two classes of artifacts in a density of at least ten items per 100 square meters,
(e) a single class of artifact in a density of at least 25 artifacts in a definable area, or
(f) one or more culturally peeled trees.

### Isolated Finds

Occurrences of artifacts at less than the above are classified as IFs, including scatters (fewer than 25 artifacts), isolated artifacts, or isolated features. A "pot bust" is considered to be an IF, even if it contains more than 25 sherds. IF descriptions will, when possible, include associated dates, cultural affiliation, material type, ceramic type, and other information for determining the context of the IF. An isolated feature is a construction that, due to its lack of association, is not designated as a site. Examples of isolated features include isolated railroad grades, isolated trash dumps, and abandoned roads. Isolated prehistoric features, such as grinding slicks, pecked hand and toe holds, or bedrock mortars, will normally be recorded as sites.

### Exclusions

Certain constructions (i.e. modern fence lines, recreational and hunter camps, modern camp fire rings, logging roads, skid trails, modern isolated trash dumps, and modern abandoned roads) may be excluded as sites due to their recent nature, lack of association, and minimal scientific importance (FSM San Juan Supplement No. 20, 2361.05).

## Reporting for Implementation Projects

Results of the inventory conducted for each implementation project would be documented in an Addendum Report, as specified in Stipulation VI.C of the PA.

# Works Cited

Church, Minette C., Steven G. Baker, Bonnie J. Clark, Richard F. Carillo, Jonathon C. Horn, Carl D. Spath, David R. Guilfoyle, and E. Steve Cassells
2006 *Colorado History: A Context for Historical Archaeology*. Colorado Council of Professional Archaeologists, Denver, Colorado.

Duke, Phil
1998 *An Overview of the Archaeological Resources in the San Juan-Rio Grande National Forests: Mancos-Dolores, Columbine, and Pagosa Districts*. Report on file, San Juan National Forest, Dolores Public Lands Office, Dolores, Colorado.

Lipe, William, Mark Varien, and Richard H. Wilshusen
1986 *Colorado Prehistory: A Context for the Southern Colorado River Basin*. Colorado Council of Professional Archaeologists, Denver, Colorado.

# Appendix A: Project Maps


San Juan National Forest
Dolores RD
Columbine RD
Pagosa RD
Colorado
New Mexico
Salter Vegetation Management Project
SJNF #2019-11
Map 1: Project Location Map
0 2 4 8 12 16 Miles
Scale = 1:100,000
N
Project Location
San Juan NF
Other Landowners
L. Cutright-Smith, 6/3/2020
FS-007980


San Juan National Forest
Dolores RD
Columbine RD
Pagosa RD
Colorado
New Mexico
Salter Vegetation Management Project
SJNF #2019-11
Map 2: Area of Potential Effects Map
0 1 2 4 6 8 Miles
Scale = 1:50,000
Area of Potential Effects (APE)
San Juan NF
Ranger District
Other Landowners
N
L. Cutright-Smith, 6/3/2020

FS-007981




## Salter Vegetation Management Project
## SJNF #2019-11
## Map 3: Previous Cultural Resources Inventories within the APE

0 1 2 4 6 8 Miles

Scale = 1:50,000

Area of Potential Effects (APE)

Previous Class II Inventories

Previous Class III Inventories

San Juan NF

Other Landowners

N

FOREST SERVICE U S DEPARTMENT OF AGRICULTURE

L. Cutright-Smith, 6/3/2020

[redacted]

Salter Vegetation Management Project
SJNF #2019-11
Map 4: Previously Recorded Sites within the APE

0 0.75 1.5 3 4.5 6 Miles
Scale = 1:60,000

Area of Potential Effects (APE)
Prehistoric Site
Historic Site
Multicomponent Site
San Juan NF
Other Landowners

N

L. Cutright-Smith, 6/3/2020

USDA United States Department of Agriculture | Forest Service | Mancos/Dolores Ranger District | 29211 Highway 184
Dolores, CO 81323
(970) 882-7296
Fax: (970) 882-6841

**File Code:** 2360
**Date:** June 4, 2020

Mr. Steven Turner
State Historic Preservation Officer
History Colorado
1200 Broadway
Denver, CO 80203

RE: San Juan National Forest, Dolores Ranger District's Salter Vegetation Management Project (SJNF #2019-11)

Dear Mr. Turner:

Pursuant to the *Programmatic Agreement among the United States Forest Service, Rocky Mountain Regional Office, Pike-San Isabel National Forest and Cimarron and Comanche National Grasslands, Routt National Forest, San Juan National Forest and the Colorado State Historic Preservation Officer Regarding Vegetation Management Undertakings* (PA), enclosed please find the *Initial Cultural Resources Report for the Salter Vegetation Management Project, San Juan National Forest, Dolores Ranger District, Montezuma and Dolores Counties, Colorado (SJNF #2019-11)*, which serves as the notification package required for use of the streamlined Section 106 compliance process, as specified in Stipulation V.B of the PA.

With the Salter Vegetation Management Project (Salter EA), the San Juan National Forest (SJNF), Dolores Ranger District (DRD) proposes vegetation management activities across approximately 35,000 acres of National Forest System land within the DRD. The Salter EA project area is located approximately 20 miles northeast of the Town of Dolores, Colorado. Proposed treatment areas are located in the vicinity of Salter Y, Plateau Creek, Carlyle Point, Turkey Knoll, Boggy Draw, and House Creek. The purpose of the project is to: 1) improve the resilience and/or maintain the resistance of forest ecosystems in an effort to increase protection against epidemic insect and disease outbreaks, 2) increase the structural diversity of the ponderosa pine forest represented across the landscape, and 3) provide economic support to local communities by providing timber products to dependent local industries in a sustainable manner. This project is being analyzed as an Environmental Assessment (EA).

The area of potential effects (APE) for the Salter EA project is defined for the purpose of this report as the EA analysis area plus a 100-meter buffer, which was applied to account for locations at which the analysis area and treatment units may be coterminous. The APE measures approximately 50,305 acres in size. Following the identification of implementation projects that fall under the purview of the Salter EA decision, the APE for each implementation project would be refined to encompass the area within which the proposed implementation activities had the potential to directly or indirectly cause alterations in the character or use of historic properties, if any such properties were to exist. Results of the inventory conducted for each implementation

project would be documented in an Addendum Report, as specified in Stipulation VI.C of the PA.

Pursuant to Stipulation IV.B.ii of the PA, this notification packet has also been sent to federally-recognized Native American tribes that have requested to be consulting parties for the proposed project.

If you have any questions or comments, please feel free to contact Liz Cutright-Smith, Dolores District Archaeologist, at elisabeth.cutrightsmith@usda.gov or (970) 882-6833.

Sincerely,

DEREK PADILLA
DISTRICT RANGER

Enclosure: *Initial Cultural Resources Report for the Salter Vegetation Management Project, San Juan National Forest, Dolores Ranger District, Montezuma and Dolores Counties, Colorado (SJNF #2019-11)* by Liz Cutright-Smith

HISTORY Colorado

Derek Padilla
District Ranger
Mancos/Dolores Ranger District
San Juan National Forest
U.S. Forest Service
29211 Highway 184
Dolores, CO 81323

RE: San Juan National Forest, Dolores Ranger District's Salter Vegetation Management Project (SJNF #2019-11) (HC# 77951)

Dear Mr. Padilla,

Thank you for your correspondence dated June 4, 2020 and received by our office on June 8, 2020 regarding the review of the above referenced undertaking pursuant to the Programmatic Agreement among the United States Forest Service, Rocky Mountain Regional Office, Pike-San Isabel National Forest and Cimarron and Comanche National Grasslands, Routt National Forest, San Juan National Forest and the Colorado State Historic Preservation Officer Regarding Vegetation Management Undertakings (PA). The June correspondence seeks to meet the requirements of Stipulation V.B of the PA.

The provided documentation notes that your agency is conducting an environmental assessment (EA) for the proposed project and that individual implementation areas for the undertaking have not been defined or delineated. After review of the documentation provided, we understand that the area of potential effects (APE) for this project consists of approximately 50,305 acres. The APE includes the extent of the study area for the EA with a 100 meter buffer. The documentation notes that the APE for individual implementation projects will be refined and that your agency will conduct inventories of the individual implementation areas pursuant to Stipulations VI.A and VI.B of the PA. Please note that the provided report references the Lone Pine EA and appears to comprise an error. We recommend resolving the error and updating the document.

We look forward to further consultation regarding the proposed undertaking pursuant to Stipulation VI of the PA. In particular, we look forward to reviewing the findings of the inventories pursuant to Stipulation VI.C of the PA.

We request being involved in the consultation process with the local government and other consulting parties, which as stipulated in 36 CFR 800.3 and Stipulation IV of the PA, is required to be notified of the undertaking. Additional information provided by the local government or consulting parties might cause our office to re-evaluate our eligibility and potential effect findings. Please note that our compliance letter does not end the review period provided to other consulting parties.

Thank you for the opportunity to comment. If you have any questions, please contact Matthew Marques, Section 106 Compliance Manager, at (303) 866-4678, or matthew.marques@state.co.us.

Sincerely,

Dr. Holly K Norton Digitally signed by Dr. Holly K Norton
Date: 2020.06.12 14:15:05 -06'00'

Steve Turner, AIA
State Historic Preservation Officer

United States Department of Agriculture | Forest Service | Mancos/Dolores Ranger District | 29211 Highway 184
Dolores, CO 81323
(970) 882-7296
Fax: (970) 882-6841

**File Code:** 2360
**Date:** June 4, 2020

Mr. Stewart Koyiyumptewa
Program Manager
Hopi Cultural Preservation Office
P.O. Box 123
Kykotsmovi, AZ 86039

RE: San Juan National Forest, Dolores Ranger District's Salter Vegetation Management Project (SJNF #2019-11)

Dear Mr. Koyiyumptewa:

Enclosed please find the notification package prepared for the Salter Vegetation Management Project (Salter EA). With the Salter Vegetation Management Project (Salter EA), the San Juan National Forest (SJNF), Dolores Ranger District (DRD) proposes vegetation management activities across approximately 35,000 acres of National Forest System land within the DRD. The Salter EA project area is located approximately 20 miles northeast of the Town of Dolores, Colorado. Proposed treatment areas are located in the vicinity of Salter Y, Plateau Creek, Carlyle Point, Turkey Knoll, Boggy Draw, and House Creek. The purpose of the project is to: 1) improve the resilience and/or maintain the resistance of forest ecosystems in an effort to increase protection against epidemic insect and disease outbreaks, 2) increase the structural diversity of the ponderosa pine forest represented across the landscape, and 3) provide economic support to local communities by providing timber products to dependent local industries in a sustainable manner. This project is being analyzed as an Environmental Assessment (EA).

The enclosed notification package is required for use of the streamlined Section 106 compliance process outlined in the *Programmatic Agreement among the United States Forest Service, Rocky Mountain Regional Office, Pike-San Isabel National Forest and Cimarron and Comanche National Grasslands, Routt National Forest, San Juan National Forest and the Colorado State Historic Preservation Officer Regarding Vegetation Management Undertakings* (PA).

Formal invitations to consult on the proposed project were mailed to federally recognized tribes on February 20, 2020. You were identified as a recipient of this notification package following a request from your office on March 5, 2020 continue consultation for the proposed project.

If you have any questions or comments about the proposed project, please contact me at derek.padilla@usda.gov or (970) 882-6834. For questions or comments about the attached notification package or cultural resources within the proposed project, please contact Liz Cutright-Smith, Dolores District Archaeologist, at elisabeth.cutrightsmith@usda.gov or (970) 882-6833.

Sincerely,



DEREK PADILLA
DISTRICT RANGER

Enclosure: *Initial Cultural Resources Report for the Salter Vegetation Management Project, San Juan National Forest, Dolores Ranger District, Montezuma and Dolores Counties, Colorado (SJNF #2019-11)* by Liz Cutright-Smith

United States Department of Agriculture | Forest Service | Mancos/Dolores Ranger District | 29211 Highway 184
Dolores, CO 81323
(970) 882-7296
TDD: (970) 882-6841

**File Code:** 2360
**Date:** May 6, 2021

Dear Tribal Representative,

The Dolores Ranger District of the San Juan National Forest has released a draft Environmental Assessment (EA) for the *Salter Vegetation Management* project.

The proposed project consists of vegetation management activities on approximately 22,346 acres of ponderosa pine-Gambel oak vegetation type within an approximately 35,000-acre analysis area. The overall project objectives are to: 1) improve or maintain the resistance and resiliency of ponderosa pine forest ecosystems, 2) increase the diversity of ponderosa pine forest ecosystem development stages and, 3) provide economic support to local communities by providing timber products to local industries in a sustainable manner. The proposed project is located northeast of Dolores, CO in the in the vicinity of Salter Y, Plateau Creek, Carlyle Point, Turkey Knoll, and Boggy Draw.

The draft EA describes the proposed action in more detail and provides a summary of potential effects of the project on various resources. The draft EA is attached herein for your review; please forward it on to the relevant departments within your administration. The district is seeking comments on the environmental analysis associated with the proposed action and alternatives.

For this project, compliance with the National Environmental Policy Act (NEPA) and National Historic Preservation Act (NHPA) are being conducted concurrently. In order to better involve the public in the NHPA process, NEPA notification letters and public legal notices invite public comment on the proposal as stipulated by NHPA.

*How to Comment and Timeframe*

The *Salter Vegetation Management* project would implement the San Juan National Forest's existing Land and Resource Management Plan; it is subject to the objection process pursuant to 36 CFR 218 Subparts A and B. The public is encouraged to provide specific written comments (§218.2) on this analysis for the responsible official to consider. Specific comments should be within the scope of and have a direct relationship to the proposed action.

Written comments will be accepted for 30 calendar days following the sending of this letter via email. The sent date is the exclusive means for calculating the comment period (anticipated date June 7, 2021). The regulations prohibit extending the length of the comment period.

Only those who submit timely and specific written comments during this formally designated comment period will have eligibility to file an objection under §218.8. Issues raised in objections must be based on previously submitted timely, specific written comments regarding the proposed project unless based on new information arising after the designated comment opportunity.

Individuals and organizations wishing to be eligible to object must meet the information requirements in §218.25(a)(3), including that each individual or representative from each entity submitting the comments must provide the name and postal address of the individual or entity submitting the comment, and either sign the comment or verify identity upon request. Comments should also include the project title (*Salter Vegetation Management*). Names, contact information, and the comments will become part of the public record and may be released under the Freedom of Information Act.

Comments must be received by the end of the comment period and may be submitted as follows:

Comments may be submitted by email to Dolores District Ranger, Derek Padilla, at: derek.padilla@usda.gov

Comments may also be submitted by facsimile (970 882-0175) or via the U.S. Postal Service:

San Juan National Forest, Dolores Ranger District
29211 Hwy 184
Dolores, CO 81323

For questions or to discuss the project further please contact David Casey, Supervisory Forester at 970-882-7296 or David.casey2@usda.gov

Thank you for your interest in this project and management of the San Juan National Forest.

Sincerely,

DEREK PADILLA

Digitally signed by DEREK PADILLA
Date: 2021.05.06 11:39:40 -06'00'

DEREK PADILLA
District Ranger

Enclosure: Salter EA draft (pdf)

**From:** Chmelir, John - FS
**To:** Terry Morgart
**Subject:** RE: URGENT - Salter EA draft review
**Date:** Thursday, May 6, 2021 5:38:00 PM
**Attachments:** image001.png

Mr. Morgart,

We are sending electronic copies because we are currently in a maximum telework posture due to COVID-19 restrictions, and printing and mailing hard copies would necessitate a substantial amount of time in the office.

Best wishes,

**John Chmelir**
**Archaeologist**
**San Juan National Forest, Dolores Ranger District**
**phone: 970-882-6833**
**john.chmelir@usda.gov**
29211 Hwy 184
Dolores, CO 81323

**From:** Terry Morgart <TMorgart@hopi.nsn.us>
**Sent:** Thursday, May 6, 2021 3:17 PM
**To:** Chmelir, John - FS <John.Chmelir@usda.gov>
**Subject:** RE: URGENT - Salter EA draft review

why aren't you sending hard copies?

**From:** Chmelir, John - FS [John.Chmelir@usda.gov]
**Sent:** Thursday, May 06, 2021 12:08 PM
**To:** Chmelir, John - FS
**Subject:** URGENT - Salter EA draft review

Greetings,

Attached is a letter from San Juan National Forest - Dolores District Ranger Derek Padilla requesting your comments on the draft of the Salter Vegetation Management Environmental Assessment (attached as well). Please note that your written comments will be accepted for 30 days from today, May 6,2021; thus, comments are due by June 7, 2021. Please forward this message to the appropriate departments within your tribal governments (wildlife, natural resources, timber, etc…). Your written comments can be submitted via email, fax, or USPS; we are still at maximum telework, so email is the best: derek.padilla@usda.gov

My very best wishes to you and your tribe for your good health and happiness!

Sincerely,

**John Chmelir**
**Archaeologist**
**San Juan National Forest, Dolores Ranger District**
**phone: 970-882-6833**
john.chmelir@usda.gov
29211 Hwy 184
Dolores, CO 81323

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

THE HOPI TRIBE

Timothy L. Nuvangyaoma
CHAIRMAN

Clark W. Tenakhongva
VICE-CHAIRMAN

May 7, 2021

Derek J. Padilla, District Ranger
San Juan National Forest, Dolores Ranger District
29211 Highways 184
Dolores, Colorado 81323

Dear Ranger Padilla,

This letter is in response to your correspondence May 6, 2021, regarding a draft environmental assessment for the 35,000 acre Salter Vegetation Management Project. The Hopi Cultural Preservation Office appreciates your continuing solicitation of our input and your efforts to address our concerns.

The Hopi Tribe claims cultural affiliation to the Paleo, Archaic and Anasazi earlier identifiable cultural groups in southwestern Colorado. The Hopi Cultural Preservation Office supports the identification and avoidance of our ancestral sites, and we consider the prehistoric archaeological sites of our ancestors to be "footprints" and Traditional Cultural Properties.

The Hopi Cultural Preservation Office reiterated we interested in consulting on any proposal that has the potential to adversely affect prehistoric sites in southwestern Colorado. If the cultural resources report identifies prehistoric sites that may be adversely affected by project activities, we request ongoing consultation including being provided with copies of the cultural resources survey report, any proposed treatment plans and the draft environmental assessment for review and comment.

We appreciate that if any cultural features or deposits are encountered during project activities, these activities will be discontinued in the immediate area of the remains, and the State Historic Preservation Office will be consulted to evaluate their nature and significance, and if any Native American human remains or funerary objects are discovered during construction they will be reported as required by law. Thank you for your consideration.

Respectfully,

Stewart B. Koyiyumptewa, Program Manager/THPO
Hopi Cultural Preservation Office

xc: Colorado State Historic Preservation Office

| | |
|---|---|
| **From:** | Chmelir, John - FS |
| **To:** | Leingang, Jodi -FS |
| **Subject:** | FW: URGENT - Salter EA draft review |
| **Date:** | Tuesday, May 18, 2021 3:13:00 PM |
| **Attachments:** | afpiinhljejoaggi.png<br>image001.png |

For the record.

Cheers,


**John Chmelir**
**Archaeologist**
**San Juan National Forest, Dolores Ranger District**
**phone: 970-882-6833**
**john.chmelir@usda.gov**
29211 Hwy 184
Dolores, CO 81323


**From:** Mike Bremer <thpo@sanipueblo.org>
**Sent:** Tuesday, May 18, 2021 3:10 PM
**To:** Chmelir, John - FS <John.Chmelir@usda.gov>; Padilla, Derek -FS <derek.padilla@usda.gov>; Casey, David -FS <david.casey2@usda.gov>
**Subject:** Re: URGENT - Salter EA draft review

Derek, John and Dave: Good afternoon gentleman. We have received the package for the Salter Vegetation Management project. We have reviewed the draft EA and agree with the strategy to address direct and indirect effects on the Colorado Forests PA. The project lies on the edge of the ancestral domain for the Pueblo de San Ildefonso and we are not aware of any additional traditional or culturally significant resources to the Pueblo de San Ildefonso in the area. Because the project area is outside the ancestral domain we will defer the the recommendations and comments made by tribal communities with stronger ties to the area. Thank you for notifying the Pueblo de San Ildefonso about the project.

Derek and Dave: I hope you and your families are doing well during this Covid interlude. Anne and I both retired in 2019 and I've been working part-time for San Ildefonso since March of 2020. Take care and enjoy the new found freedom of release once you clear the Covid hurdles.

Best,

-Mike Bremer-

*J. Michael Bremer*
*Tribal Historic Preservation Officer*
*Pueblo de San Ildefonso*
*02 Tunyo Po*
*Santa Fe, NM 87506*
*505-455-4148 (Office)*
*505-231-6375 (Cell)*

On 5/6/2021 1:06 PM, Chmelir, John - FS wrote:

Greetings,

Attached is a letter from San Juan National Forest - Dolores District Ranger Derek Padilla requesting your comments on the draft of the Salter Vegetation Management Environmental Assessment (attached as well). Please note that your written comments will be accepted for 30 days from today, May 6,2021; thus, comments are due by June 7, 2021. Please forward this message to the appropriate departments within your tribal governments (wildlife, natural resources, timber, etc…). Your written comments can be submitted via email, fax, or USPS; we are still at maximum telework, so email is the best: derek.padilla@usda.gov

My very best wishes to you and your tribe for your good health and happiness!

Sincerely,

**John Chmelir**
**Archaeologist**
**San Juan National Forest, Dolores Ranger District**
**phone: 970-882-6833**
**john.chmelir@usda.gov**
29211 Hwy 184
Dolores, CO 81323

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

# FOREST SERVICE MANUAL
# NATIONAL HEADQUARTERS (WO)
# WASHINGTON, DC

## FSM 1900 - PLANNING

## CHAPTER - ZERO CODE

**Amendment No.:** 1900-2007-2

**Effective Date:** October 12, 2007

**Duration:** This amendment is effective until superseded or removed.

**Approved:** JACQUELINE MYERS
Associate Deputy Chief

**Date Approved:** 08/28/2007

**Posting Instructions:** Amendments are numbered consecutively by title and calendar year. Post by document; remove the entire document and replace it with this amendment. Retain this transmittal as the first page(s) of this document. The last amendment to this title was 1900-2007-1 to FSM 1900_zero_code.

| | | |
|---|---|---|
| **New Document** | 1900_zero_code | 25 Pages |
| **Superseded Document(s) by Issuance Number and Effective Date** | 1900_zero_code<br>(Amendment 1900-2007-1, 09/04/2007) | 26 Pages |

**Digest:**

1904.21 - This is a technical amendment to correct the Station Directors and Area Director responsibilities.

The contents of this guidance document do not have the force and effect of law and are not meant to bind the public in any way. This document is intended only to provide clarity to the public regarding existing requirements under the law or agency policies.

## Table of Contents

**1901 - AUTHORITY ... 3**
1901.1 - Laws ... 3
1901.2 - Regulations ... 4
**1902 - OBJECTIVE ... 4**
**1903 - POLICY ... 5**
**1904 - RESPONSIBILITY ... 5**
1904.1 - Line Officers ... 5
1904.2 - Station Directors, Area Director, International Institute of Tropical Forestry Director 5
1904.21 - Station Directors and Area Director ... 5
1904.22 - International Institute of Tropical Forestry Director ... 5
**1905 - DEFINITIONS ... 6**
**1906 - FOREST SERVICE PLANNING PROCESS ... 17**
1906.1 - Long-Range Planning ... 21
1906.11 - National Planning ... 21
1906.11a - Forest and Rangeland Renewable Resources Planning Act of 1974 (RPA) Assessment ... 21
1906.11b - Forest Service Strategic Plan ... 21
1906.12 - Regional Planning [Reserved] ... 21
1906.13 - Localized Planning ... 21
1906.13a - Land Management Plans ... 21
1906.13b - Research and Development Plans ... 22
1906.13c - State and Tribal Forest Resources Planning ... 22
1906.2 - Short-Range Tactical Planning ... 23
1906.21 - Project Planning ... 23
1906.22 - Program Development and Budgeting ... 23
**1909 - HANDBOOKS ... 24**
1909.1 - Servicewide Handbooks ... 24
1909.12 - Land Management Planning Handbook ... 24
1909.13 - Program Development and Budgeting Handbook ... 24
1909.14 - Resource Inventory Handbook ... 24
1909.15 - Environmental Policy and Procedures Handbook ... 25
1909.17 - Economic and Social Analysis Handbook ... 25
1909.2 - Unit Handbooks ... 25
1909.21 - Land Management Planning Handbook ... 25
1909.22 - Economic Analysis Handbook ... 25

Title FSM 1900 provides the foundation for all planning in the Forest Service and addresses long-term and short-term strategic, tactical, and project planning to ensure integration and coordination at all levels and within all organizational units. Specific planning activities discussed in chapters under this title are as follows:

1. FSM 1910 - National Resource Planning. Sets forth requirements and procedures for conducting an assessment of the Nation's renewable resources and using that data as the foundation for developing the Forest Service Strategic Plan as required by the Government Performance and Results Act.

2. FSM 1920 - Land Management Planning. Provides for integrated resource planning through development, amendment, and, as appropriate, revision of land management plans, hereinafter referred to as plans.

3. FSM 1930 - Program Development and Budgeting. Provides for preparation of short-term program proposals; development of budgets; communication of targets, funds, employment ceilings; and direction for the national, regional, station, Area, Institute, and local levels.

4. FSM 1950 - Environmental Policy and Procedures. Prescribes the assessment and decisionmaking processes required by the National Environmental Policy Act of 1969 and the statements and reports necessary to document project planning.

5. FSM 1960 - Policy Analysis. Provides for a systematic analysis of current and emerging issues as a basis for recommending policy changes.

6. FSM 1970 - Economic and Social Analysis. Provides for economic and social analysis of programs, resource plans, and projects.

## 1901 - AUTHORITY

### 1901.1 - Laws

The following laws set forth the requirements for Forest Service planning:

The National Environmental Policy Act (NEPA) of 1969 (16 U.S.C. 4321 et seq.). This act sets forth requirements to consider the environmental impact of proposed actions; identify adverse environmental effects which cannot be avoided; consider alternatives to the proposed action; consider the relationship between local short-term uses and long-term productivity; and identify any irreversible and irretrievable commitments of resources (FSM 1950).

The Forest and Rangelands Renewable Resources Planning Act (RPA) of 1974 (16 U.S.C. 1601 et seq.). This act directs the Secretary of Agriculture to periodically assess the national situation of the forest and rangeland resources. This assessment is called the Forest and Rangelands Renewable Resources Planning Act (RPA) assessment. See FSM 1906 and FSM 1910 for detailed requirements.

The National Forest Management Act (NFMA) of 1976 (16 U.S.C. 1600 et seq.). This act amends the Renewable Resource Planning Act (RPA) and sets forth the requirements for plans (for the National Forest System). See FSM 1920 for specific requirements.

Forest and Rangeland Renewable Resources Research Act of 1978 (16 U.S.C. 1641 et seq.). This act directs the Secretary of Agriculture to include, as appropriate, research activities when managing forest and rangeland resources.

Cooperative Forestry Assistance Act of 1978 (16 U.S.C. 2101 et seq.). This act provides authority for financial, technical, and related assistance to states for forest resource planning.

Agriculture and Food Act of 1981 (7 U.S.C. 4201 et seq.; 16 U.S.C. 590, 3401 et seq.). Title XVI of this act requires joint planning of forestry research among the Forest Service; Cooperative State Research, Education, and Extension Service; and the Nation's 61 forestry schools.

The Government Performance and Results Act (GPRA) of 1993 (5 U.S.C. 306). This act provides for the development of agency long-term strategic plans, annual performance plans, and annual performance reports. The Forest Service Strategic Plan (Strategic Plan) provides the national framework for all agency operations and activities. The Strategic Plan uses information from the periodic Renewable Resource Planning Act (RPA) assessment of the Nation's forest and range resources.

## 1901.2 - Regulations

1. Title 36, Code of Federal Regulations, Part 219, Subpart A. This regulation provides direction on land management planning procedures on National Forest System lands.

2. Title 40, Code of Federal Regulations, Sections 1500 through 1508.28. This regulation directs the Forest Service to apply environmental analysis to environmentally significant decision points during National Environmental Policy Act (NEPA) activities.

## 1902 - OBJECTIVE

The objective of planning is to provide broad guidance and information for program, project, and activity decisionmaking.

## 1903 - POLICY

Forest Service planning is an integrated process composed of discrete parts (the Strategic Plan, land management plans, project, and activity plans) joined to form a rational, logical management approach.

1. Planning should be done in a reasonable manner, at reasonable costs, and in a reasonable amount of time. Planning provides a sound and rational framework for managing National Forest System lands, for conducting Research and Development, and for working with the many state partners and cooperators who help deliver the Forest Service mission.

2. Analysis should be appropriate to the decision being made and the risks associated with that decision.

3. Terms used in planning and evaluation shall conform to prescribed definitions found in FSM 1905.

## 1904 - RESPONSIBILITY

### 1904.1 - Line Officers

Line officers are responsible for managing and controlling any planning process that leads to decisions concerning National Forest System lands or programs for which they are the responsible officials.

### 1904.2 - Station Directors, Area Director, International Institute of Tropical Forestry Director

#### 1904.21 - Station Directors and Area Director

During the land management planning process, the Station Directors and Area Director may cooperate with the responsible official in the development of data, inventory processes, and monitoring protocols, and to assist in the use of best available science, the identification of lands unsuitable for timber production, and for other scientific expertise.

The Station Directors are responsible for reviewing and concurring with that part of a plan applicable to any experimental forest within the plan area (36 CFR 219.2(b)(3)).

#### 1904.22 - International Institute of Tropical Forestry Director

The Director of the International Institute of Tropical Forestry is responsible for reviewing and concurring with the land management plan for the El Yunque National Forest.

## 1905 - DEFINITIONS

The integrated relationships among the various levels and components of planning require uniform definitions and consistent application of the terms and concepts defined in this section. If it is necessary to explain any of the following terms in a planning document, use the following definitions verbatim.

Activity. A measure, course of action, or treatment that is undertaken to directly or indirectly produce, enhance, or maintain a desired resource management condition or objective.

Adaptive Management. An approach to natural resource management where actions are designed and executed and effects are monitored for the purpose of learning and adjusting future management actions, which improves the efficiency and responsiveness of management (36 CFR 219.16).

Alternative. One of several policies, plans, or projects proposed for decisionmaking.

Alternative Dispute Resolution. Any procedure other than litigation used to resolve issues in controversy, including but not limited to, conciliation, facilitation, mediation, fact finding, mini-trials, arbitration, use of ombudspersons, or any combination thereof (Administrative Dispute Resolution Act of 1996 (5 U.S.C. 571)).

Area of Analysis. The geographic area within which ecosystems, their components, or their processes are evaluated during analysis and development of one or more plans, plan amendments, or plan revisions. This area may vary in size depending on the relevant planning issue. For a plan, an area of analysis may be larger than a plan area. For development of a plan amendment, an area of analysis may be smaller than the plan area and include multiple ownerships.

Assessment. An analysis and interpretation of the social, economic, or ecological characteristics of an area using scientific principles to describe existing conditions as they affect sustainability.

Benefit (Outcome or Result). Inclusive terms used to quantify the results of an activity, project, or program.

Capability. The ability of a unit of land, based on defined physical and biological attributes, to support a particular use or suite of products while maintaining ecosystem sustainability.

Characteristics of Ecosystem Diversity. Parameters that describe an ecosystem; composition (major vegetation types, rare communities, aquatic systems, and riparian systems), structure (successional stages, water quality, wetlands, and floodplains), principal ecological processes (stream flows and historical and current disturbance regimes), and soil, water, and air resources.

Community of Interest. A group of people connected to each other by common interests, needs, or location; for example, local landowners, senior citizens, artists, conservationists, environmentalists, or recreational users.

Conservation. Measures taken to achieve preservation, maintenance, or restoration goals without impairing the sustainable flow of uses, values, benefits, products, services, and visitor opportunities for current and future generations.

Cost Effective. Achieving specified outputs or objectives under given conditions for the least cost.

Criteria and Indicators. Criteria are broad categories of conditions or processes by which the conservation and sustainable management of ecosystems and related resources may be assessed. Indicators are measurable conditions for various aspects of a criterion.

Cultural/Heritage Resources. Such resources as archeological, historical, or architectural sites, structures, places, objects, ideas, and traditions that are identified by field inventory, historical documentation, or evidence and that are important to specified social or heritage groups or scientific and management endeavors.

Demand. The amount of an output that users are willing to take at a specified price, time, and condition of sale.

Demand Analysis. A study of the factors affecting the schedule of demand for an output, including the price-quantity relationship, if applicable.

Designated Right-of-Way (ROW) Corridor. A parcel of land with specific boundaries identified by law, Secretarial order, the land use planning process, or by some other management decision as being a preferred location for existing and future ROW facilities. The corridor may be suitable to accommodate more than one type of ROW use or facility or one or more ROW uses or facilities that are similar, identical, or compatible. A designated corridor may already be occupied by existing utility facilities. It has been adequately analyzed to provide for a high degree of assurance that in being identified as a "designated corridor," it can accommodate at least one new additional utility facility.

Desired Conditions. The social, economic, and ecological attributes toward which management of the land and resources of the plan area are to be directed. Desired conditions are aspirations and are not commitments or final decisions approving projects and activities, and may be achievable only over a long time period (36 CFR 219.7).

Discount Rate. An interest rate that represents the cost or time value of money in determining present value of future costs and benefits.

Discounting. An adjustment, using a discount rate for the values of money over time so that costs and benefits occurring in the future are reduced to a common point in time, usually the present, for comparison.

Diversity of Plant and Animal Communities. The distribution and relative abundance or extent of plant and animal communities and their component species, including tree species, occurring in an area (36 CFR 219.16).

Ecological Conditions. Components of the biological and physical environment that can affect diversity of plant and animal communities and the productive capacity of ecological systems. These components could include the abundance and distribution of aquatic and terrestrial habitats, roads and other structural developments, human uses, and invasive, exotic species (36 CFR 219.16).

Economic Efficiency. A term used to describe how well inputs (activities) are used to achieve outputs or outcomes when all inputs and all outputs or outcomes (including market and non-market) are identified and valued. Economic efficiency is usually measured in terms of the costs and benefits of a proposed action, which can be depicted as a present net value.

Economic Elements. (See Social and Economic Elements.)

Ecosystem Diversity. The variety and relative extent of ecosystem types, including their composition, structure, and processes within all or a part of an area of analysis (36 CFR 219.16).

Effect (Impact), Economic. The change, positive or negative, in economic conditions, including the distribution and stability of employment and income in affected local, regional, and national economies that directly or indirectly results from an activity, project, or program.

Effect (Impact), Physical, Biological. The change, positive or negative, in the physical or biological conditions that directly or indirectly results from an activity, project, or program.

Effect (Impact), Social. The change, positive or negative, in social and cultural conditions that directly or indirectly results from an activity, project, or program.

Evaluation. An appraisal and study of social, economic, and ecological conditions and trends relevant to a unit. The analysis of monitoring data that produces information needed to answer specific monitoring questions. Evaluation may include comparing monitoring results with a predetermined guideline or expected norm that may lead to recommendations for changes in management, a land management plan, or monitoring plan. Evaluations provide an updated compilation of information for use in environmental analysis of future project and activity decisions.

Executive Priority. A performance measure that the executive leadership feels is an important indicator of progress in delivering the mission. Executive priorities have annual, national-level accomplishments targets which are audited and reported in the annual Performance and Accountability Report.

Experimental Forest or Range. One of a series of areas established by the Forest Service in each region to provide for the research necessary to serve as a basis for managing forests and rangeland.

Federally Recognized Indian Tribe. An Indian or Alaska Native Tribe, band, nation, pueblo, village, or community that the Secretary of the Interior acknowledges to exist as an Indian Tribe pursuant to the Federally Recognized Indian Tribe List Act of 1994, 25 U.S.C. 479a (36 CFR 219.16).

Forest Land. Land at least 10 percent occupied by forest trees of any size or formerly having had such tree cover and not currently developed for nonforest use. Lands developed for nonforest use include areas for crops, improved pasture, residential or administrative areas, improved roads of any width and adjoining road clearing, and powerline clearings of any width (36 CFR 219.16).

Guidelines. Information and guidance for project and activity decisionmaking to help achieve desired conditions and objectives in the plan area.

Habitat Capability. The estimated ability of an area, given existing or predicted habitat conditions, to support a wildlife, fish, or plant population. It is measured in terms of potential population numbers.

Habitat Capability Model. A model which depicts the relationship of a species to a variety of habitat factors which provide for quantitative predictions of a species response (animal numbers) to habitat change.

Independent Peer Review. A review conducted using accepted practices that does not allow individuals to participate in the peer reviews of documents they authored or co-authored. A peer is a person who has substantially equal knowledge and standing in relation to the authors.

Indicator. A measure or measurement of an aspect of a sustainability criterion. A quantitative or qualitative variable that can be measured or described and, when observed periodically, shows trends. Indicators are quantifiable performance measures of outcomes or objectives for attaining criteria designed to assess progress toward desired conditions.

Input/Output Analysis. A technique for analyzing the interdependence of producing and consuming sectors in an economy.

Integrated Pest Management. A process for selecting strategies to regulate forest pests in which all aspects of a pest-host system are studied and weighed.

Inventoried Roadless Area. Areas identified in a set of inventoried roadless area maps, contained in the Forest Service Roadless Area Conservation, Final Environmental Impact Statement, Volume 2, dated November 2000, and any subsequent update or revision of those maps through the land management planning process (36 CFR 294.11).

ISO 14001. A consensus standard developed by the International Organization for Standardization and adopted by the American National Standards Institute that describes environmental management systems and outlines the elements of an environmental management system (36 CFR 219.16).

Issue. Issues may be considered as:

a. A potential factor for determining need for change for a plan;

b. Specific resource concerns about a proposed action under NEPA (FSM 1950);

c. Points of contention or disagreement; or

d. A subject or question of widespread public interest about management of the National Forest System.

Management Area. A specifically identified area in the plan area to which specific plan components (desired conditions, objectives, identification of suitable and unsuitable land uses, or special designations) are applied.

Mission. A major, continuing national area of concern or responsibility of the Forest Service directed by legislation, order, or regulation. The Forest Service mission represents the basic reason for its existence as a Federal agency and characterizes the agency's role in sustainably managing the Nation's forests and grasslands.

Monitoring. A systematic process of collecting information to evaluate changes in actions, conditions, and relationships over time and space or progress toward meeting desired conditions or plan objectives.

Multiple Use. The management of all the various renewable surface resources of the National Forest System so they are used in the combination that will best meet the needs of the American people: making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in the use to conform to changing needs and conditions; that some lands will be used for less than all of the resources; and harmonious and coordinated management of the various resources, each with the other, without impairment of the productivity of the land, with consideration being given to the relative values of the various resources, and not necessarily the combination of uses that will give the greatest dollar return or the greatest unit output (Multiple Use-Sustained-Yield Act 1960, U.S.C. 528-531). Consistent with the Federal Land Policy and Management Act of 1976 (FLPMA), multiple use includes Federal energy and mineral resources underlying National Forest System lands. Exploration and production of those resources is considered one of the "principle or major uses" under FLPMA which, under section 202(e)(1) of that Act, are to be given special consideration in the planning process.

National Direction. Statements of missions, goals, policy, and objectives that guide Forest Service planning.

National Forest System. All National Forest lands reserved or withdrawn from the public domain of the United States; all National Forest lands acquired through purchase, exchange, donation, or other means; the National Grasslands and land utilization projects administered under Title III of the Bankhead-Jones Farm Tenant Act (50 Stat. 525, 7 U.S.C. 1010-1012); the Midewin Tallgrass Prairie; and other lands, waters, or interests therein which are administered by the Forest Service or are designated for administration through the Forest Service as a part of the system (16 U.S.C. 1608).

Native Species. Species indigenous to an area of analysis.

Need for Change. A finding by the responsible official that there is a need to modify plan components through a review of new issues and information, monitoring and evaluation results, and changes in law or regulation.

Net Public Benefits. An expression used to signify the overall long-term value to the Nation of all outputs and positive effects (benefits) less all associated inputs and negative effects (costs) whether they can be quantitatively valued or not. Net public benefits are measured by quantitative and qualitative criteria rather than a single measure and index.

Newspaper(s) of Record. The principal newspapers of general circulation annually identified and published in the Federal Register by each regional forester to be used for publishing notices as required by 36 CFR 215.5. The newspaper(s) of record for projects in a plan area is (are) the newspaper(s) of record for notices related to planning (36 CFR 219.16).

Niche. The role of the Forests, Grasslands, Prairies, or other comparable units in contributing to social, economic, and ecological sustainability.

Non-Substantive Changes. Modifications to the plan that do not appreciably change plan components (desired conditions, objectives, guidelines, and so on).

Objectives. Concise projections of measurable, time-specific intended outcomes. The objectives for a plan are the means of measuring progress toward achieving or maintaining desired conditions. Like desired conditions, objectives are aspirations and are not commitments or final decisions approving projects and activities (36 CFR 219.7). In the Strategic Plan, objectives are a more focused statement of aim or purpose for a strategic goal.

Objector. A person(s) or organization(s) who has submitted a timely objection to the appropriate reviewing officer.

Opportunity. A proposal that is considered in developing alternative activities, projects, or programs where an option exists to invest profitably to improve or maintain a present condition.

Outcome. The long-term results of a program activity compared to its intended purpose (Government Performance and Results Act of 1993 (GPRA) (5 U.S.C. 306)).

Outcome Measure. See performance measure.

Output, Market. A good, service, or on-site use that can be purchased at a price.

Output, Nonmarket. A good, service, or on-site use not normally exchanged in a market.

Performance Measure. Indicators, statistics, or metrics used to gauge program performance.

Plan. A document, or set of documents, that integrates and displays information relevant to management of the National Forest System, Research and Development, or State and Private Forestry unit.

Plan Area. The National Forest System lands covered by a plan (36 CFR 219.16).

Plan Components. Broad guidance in a plan that identifies desired conditions, objectives, guidelines, suitability of areas, and special areas.

Plan Document. Information that documents the process of developing, amending, or revising a plan, including evaluation reports; documentation of the public involvement; the plan, including applicable maps; applicable approval documents; applicable National Environmental Policy Act (NEPA) documents, if any; the monitoring program for the plan area; descriptions of the environmental management system established for the unit, and other information. This information also includes records that support analytical conclusions made and options considered by the interdisciplinary team throughout the planning process.

Present Net Value. The difference between the discounted aggregate values (benefits) of all outputs to which monetary values or established market prices are assigned and the total discounted costs of managing the planning area.

Productivity. The capacity of National Forest System lands and their ecological systems to provide the various renewable resources in certain amounts in perpetuity. For the purposes of this subpart it is an ecological, not an economic, term (36 CFR 219.16).

Program Budget. A plan that allocates annual funds, workforce ceilings, and targets among agency management units.

Program Budget Level. A single, comprehensive integrated program responsive to the Chief's direction that specifies a level of production attainable from a given investment of dollars and other resources. Each budget level represents a complete, full, and independent package within the criteria and constraints identified.

Program Proposals. A multi-year course of action proposed under a given set of assumptions and constraints.

Project. An organized effort to achieve an objective identified by location, activities, outputs, effects, times, and responsibilities for execution.

Project Design. The process of developing specific information necessary to describe the location, timing, activities, outputs, effects, accountability, and control of a project.

Public Involvement. A Forest Service process designed to broaden the information base upon which agency approvals and decisions are made by: (a) informing the public about Forest Service activities, plans, and decisions, and (b) encouraging public understanding about and participation in the planning processes which lead to final decisionmaking.

Public Lands. Any land, and interest in land, administered by the Secretary of the Interior through the Bureau of Land Management (Federal Land Policy and Management Act of 1976). This includes the mineral estates underlying National Forest System lands.

Public Participation. Activities that include a wide range of public involvement tools and processes such as collaboration, public meetings, open houses, workshops, and comment periods (36 CFR 219.16).

Range of Variation. Spatial and temporal variation in ecosystem characteristics during a period of time when the influences of European-American settlement were minimal.

Rangeland. Land on which the indigenous vegetation (climax or natural potential) is predominately grasses, grass-like plants, forbs, or shrubs and is managed as a natural ecosystem. If plants are introduced, they are managed similarly. Rangeland includes natural grasslands, savannas, shrub lands, many deserts, tundras, alpine communities, marshes, and meadows.

Recreation Opportunity Spectrum. A framework of land delineations that identifies a variety of recreation experience opportunities categorized into classes on a continuum. The Spectrum's continuum has been divided into six major classes for Forest Service use: Urban (U), Rural (R), Roaded Natural (RN), Semi-Primitive Non-Motorized (SPNM), Semi-primitive Motorized (SPM), and Primitive (P) (FSM 2311).

Renewable Resources Assessment. An appraisal of the Nation's renewable resources that recognizes their vital importance and the necessity for long-term planning and associated program development. The Assessment meets the requirements of section 3 of the Forest and Rangelands Renewable Resources Planning Act (RPA) of l974 and includes analyses of present and anticipated uses, demands, and supplies of the renewable resources; a description of Forest Service programs and responsibilities; and a discussion of policy considerations, laws, and regulations.

Renewable Resources Program. The program for management and administration of the National Forest System, for Research and Development, for Cooperative State and Private Forest Service programs, and for conduct of other Forest Service activities developed in accordance with the Forest and Rangeland Renewable Resources Planning Act of 1974. Unless and until the Resources Planning Act is amended, annual appropriations language substitutes the Government Performance and Results Act (5 U.S.C. 306) strategic plan for the RPA Program.

Research Natural Area. A specially designated area in as near a natural condition as possible which exemplifies typical or unique vegetation and associated biotic, soil, geologic, and aquatic resources. The area is established by the Forest Service to preserve a representative sample of an ecological community primarily for scientific and educational purposes.

Responsible Official. The official with the authority and responsibility to oversee the planning process and to approve plans, plan amendments, and plan revisions (36 CFR 219.16).

Reviewing Officer. The supervisor of the responsible official. The reviewing officer responds to objections made to a plan, plan amendment, or plan revision prior to approval (36 CFR 219.16).

Right-of-way (ROW). Public or National Forest System lands authorized to be used or occupied pursuant to a ROW grant or special use authorization.

Risk. A combination of the likelihood that a negative outcome will occur and the severity of the subsequent negative consequences.

Scenery Management System. An overall framework for the orderly inventory, analysis, and management of scenery (FSM 2382).

Science. For the purposes of this manual, "science" refers to the knowledge, information, concepts, and theories based on organized systems of facts that have been learned from study, observation, experience, and testing of hypotheses.

Science Consistency Review. A process to determine whether scientific information of appropriate content, rigor, and applicability has been considered, evaluated, and synthesized in the documents that underlie the land management plan approval. The science consistency review does not advise the decisionmaker for or against a particular course of action.

Scope and Scale. The term scope usually refers to the breadth, extent, or depth of an issue such as whether it refers to one or multiple resources, ecosystems, or species. Scale usually refers to geographic scale such as an ecosystem, landscape, or eco-region.

Self-sustaining Population. A self-sustaining population is one that is sufficiently abundant and has appropriate population characteristics to provide for its persistence over many generations.

Set of Documents. (See Plan Document.)

Social and Economic Elements. The variety of tangible and intangible uses, values, products, services, opportunities, and benefits provided by National Forest System lands.

Special Areas. Areas in the National Forest System designated for their unique or special characteristics (36 CFR 219.7).

Species. Any member of the currently accepted and scientifically defined plant or animal kingdoms of organisms (36 CFR 219.16).

Species-of-concern. Species for which the responsible official determines that management actions may be necessary to prevent listing under the Endangered Species Act (36 CFR 219.16).

Species Diversity. The number and relative abundance of different species within a plan area.

Species-of-interest. Species for which the responsible official determines that management actions may be necessary or desirable to achieve ecological or other multiple-use objectives (36 CFR 219.16).

Stewardship. Natural resource management emphasizing careful and conscientious use and conservation of resources and ecosystems in a sustainable manner.

Strategic Plan. The Forest Service Strategic Plan identifies long-term strategic priorities and is the basis for integrated delivery of the agency's mission, following the criteria of the Government Performance and Results Act (5 U.S.C. 306).

Suitability. The appropriateness of a particular area of land for applying certain resource uses. A unit of land may be suitable for a variety of individual or combined management practices.

Supply. The amount of an output that producers are willing to provide at the specified price, time, and condition of sale.

Sustainability. Meeting needs of the present generation without compromising the ability of future generations to meet their needs. Sustainability is composed of desirable social, economic, and ecological conditions or trends interacting at varying spatial and temporal scales embodying the principles of multiple-use and sustained-yield.

Timber Harvest. The removal of trees for wood-fiber use and other multiple-use purposes.

Timber Production. The purposeful growing, tending, harvesting, and regeneration of regulated crops of trees to be cut into logs, bolts, or other round sections for industrial or consumer use (36 CFR 219.16). In addition, managing land to provide commercial timber products on a regulated basis with planned, scheduled entries.

Transportation and Utility Corridor. A parcel of land, without fixed limits or boundaries, which is used as the location for one or more transportation or utility right-of-ways.

Visitor Opportunities. The spectrum of settings, landscapes, scenery, facilities, services, access points, information, learning-based recreation, wildlife, natural features, cultural and heritage sites, and so forth available for National Forest System visitors to use and enjoy (36 CFR 219.16).

Watershed Condition. The state of the watershed based on physical and biogeochemical characteristics and processes such as hydrologic, geomorphic, landscape, topographic, vegetative cover, and aquatic habitat; water flow characteristics and processes such as volume and timing; and water quality characteristics and processes such as chemical, physical, and biological as they affect water quality and water resources (65 FR 62572, October 18, 2000).

Wilderness. Any area of land designated by Congress as part of the National Wilderness Preservation System that was established in the Wilderness Act of 1964 (16 U.S.C. 1131-1136), (36 CFR 219.16).

## 1906 - FOREST SERVICE PLANNING PROCESS

Exhibits 01 and 02 provide two perspectives on the Forest Service planning process. Exhibit 01 links the several parts of the process on a temporal scale. Exhibit 02 identifies the steps of the process at different organizational levels.

The Government Performance and Results Act of 1993 (Results Act) (5 U.S.C. 306; 31 U.S.C. 1115 - 1119; 31 U.S.C. 9703 - 9704) requires agency strategic plans, annual performance plans, and annual performance reports. Based on the intent of this Act, the Forest Service Strategic Plan outlines 4- to 5-year goals and objectives for the agency. Exhibit 01 displays some of the key elements and vehicles the Forest Service uses to carry out the steps called for in the Results Act. Exhibit 01 shows the performance accountability process as a cycle and illustrates that planning occurs over multiple time frames and organizational units. The cycle includes the agency Strategic Plan, Unit Plans (such as land management plans), State Forest Resource Plans, Station Research plans, Congressional Appropriations and earmarks, Integrated Programs of Work, and Performance Plans.

The Strategic Plan includes agency roles, responsibilities, and priorities informed by the Renewable Resource Planning Act (RPA) assessment. Sections three and four of the Results Act prescribe how the priorities of the Strategic Plan are translated into annual performance plans, providing a basis for agency budget requests. The annual performance plan for a particular year establishes annual goals and objectives for what must be done, in the near term, in order to make progress toward the desired outcomes articulated in the Strategic Plan and unit plans. The agency's annual performance report will include information on what was accomplished relative to annual performance measures and the status of progress toward the Strategic Plan objectives, based on multiyear trends.

Exhibit 02 summarizes how Forest Service plans achieve sustainably healthy landscapes. The model reflects the relationships between budgetary and planning processes at multiple scales. Projects and activities are designed to advance the agency mission of sustainable resource management.

1. Inventory and Assessment. Resource information is collected and assessed based upon selected criteria and indicators useful to decisionmaking. Information is derived from multiple sources and scales to inform interrelated decisionmaking processes.

2. Planning. Emerging resource management needs are addressed by identifying desired conditions and objectives. The future conditions are based on evaluation of monitoring, inventory, and assessment information. National and local issues are considered and coordinated when developing strategic, program, and annual goals and objectives. Projects are planned to contribute to accomplishing the Forest Service's mission within the context of the Strategic Plan, land management plans, and annual appropriations.

3. Implementation. Priorities are established and funding is provided to carry out actions designed to provide services and facilities to move the agency towards desired conditions. The collective outcome of project and activity level work reflects progress toward the desired conditions and objectives of strategic and unit management plans.

4. Monitoring. The agency tracks performance measures to gauge progress toward desired conditions, by monitoring at a scale that appropriately answers the monitoring questions. This monitoring provides data for informed decisionmaking, particularly so that adaptive management is responsive to emerging needs and changing conditions.

5. Corporate Information. Corporate information provides the foundation for consistent and effective information collection, analysis, storage, maintenance, and evaluation at multiple scales for various reporting requirements and needs, including the Annual Performance and Accountability Report.

## 1906 - Exhibit 01

## Forest Service Performance Accountability Process



## 1906 - Exhibit 02

## Planning Overview



## 1906.1 - Long-Range Planning

The Forest Service has an integrated long-range planning process involving national, regional, and local levels.

## 1906.11 - National Planning

## 1906.11a - Forest and Rangeland Renewable Resources Planning Act of 1974 (RPA) Assessment

Every 10 years, the Forest Service conducts a renewable resource assessment (FSM 1905) of the forest and rangeland situation including timber, range, water, wildlife and fish, outdoor recreation, and wilderness. Based on emerging trends and projections, the Renewable Resource Planning Act (RPA) assessment informs decisionmaking processes, as well as identifies potential opportunities to meet the Nation's future needs.

## 1906.11b - Forest Service Strategic Plan

The Forest Service Strategic Plan presents a national plan to the Congress and the American people on what work the agency proposes to promote sustainable management of the Nation's forests, grasslands, prairies, or other comparable units. The Strategic Plan outlines goals and objectives to help guide the agency's National Forest System, Research and Development, and State and Private Forestry programs for 4 to 5 years. Long-term trend measures are identified to gauge progress toward achieving the stated goals and objectives. The strategic plan establishes a national strategic vision, using the Renewable Resource Planning Act (RPA) assessment of social, environmental, and economic trends.

## 1906.12 - Regional Planning [Reserved]

## 1906.13 - Localized Planning

## 1906.13a - Land Management Plans

Land management plans (LMP or plans) are now in place for all national forests, grasslands, and prairies. These plans provide a strategic vision for 10 to 15 years. They establish the desired conditions to be achieved through the management of National Forest System lands to best meet the needs of the American people. The plans blend national and regional priorities with local Forest capabilities and needs. Thus, each plan provides a vision of how its unit uniquely fits within a broader landscape and community context (FSM 1920). Responsible officials revise plans every 10 to 15 years based on a comprehensive evaluation of local conditions and trends.

## 1906.13b - Research and Development Plans

The Research and Development program is organized into research work units assigned to experiment stations and the Forest Products Laboratory.

Each research work unit has a detailed description of its planned work over a period of up to 5 years. A Station research plan is the sum total of all planned work in the research work units' plans. FSM 4000 specifies research planning requirements.

## 1906.13c - State and Tribal Forest Resources Planning

The states and tribes form the primary delivery system for the Forest Service's State and Private Forestry program. Because of this partnership, there is a special need to coordinate natural resource planning among all three entities in order to identify how national goals and objectives interact with state and tribal priorities. States prepare state forest resources plans for their own long-range planning purposes. However, these plans are also an integral part of the Forest Service planning framework for national program development and implementation.

1. State Forest Resources Plans. The State Forest Resources Plans are designed to fulfill the following roles:

   a. Provide a basis for effective state forestry participation in state and Federal natural resources planning.

   b. Serve program plans, not land-use plans.

   c. Identify forest resource needs, opportunities, and issues for all forest landownerships (state, private, tribal, Federal, and industrial).

   d. Define actions and program levels to assist state and private forest resources development to meet future demands.

   e. Emphasize the utilization of forest resources to diversify and strengthen the state's economic base.

2. Integrated Natural Resources Plans. Tribes prepare Integrated Natural Resources Plans for their own long-range planning purposes. However, these plans are also an integral part of the Forest Service's planning framework for national State and Private Forestry (S & PF) program development and implementation. The Tribal Integrated Natural Resources Plans are designed to fulfill the following roles:

   a. Provide a basis for effective tribal natural resource participation in state and Federal natural resources planning.

b. May be program plans or land-use plans.

c. Identify natural resource needs, opportunities, and issues for tribal landownerships and National Forest System (NFS) lands where tribes have treaty rights.

d. Define actions and program levels to assist tribal natural resources development and management to meet future demands.

e. Emphasize the use of natural resources to diversify and strengthen the tribe's economic base.

State and tribal natural resources planning and Forest Service land management planning should be well-coordinated and portray the respective contributions of Federal, state, tribal, private, and industrial lands to the overall state economy (FSM 3900).

## 1906.2 - Short-Range Tactical Planning

The focus of short-range plans is to design projects and activities under long-term guidance of the strategic plan, land management plans, or state and tribal resources plans. This includes analysis and evaluation of the projects and activities under the plans. Examples of National Forest System short-range tactical plans include timber sale action plans, watershed analyses, fire management action plans, roads analysis processes, and wilderness implementation schedules. Such plans and processes deal with the specifics of how to get the job done. Setting priorities and the scheduling of work are major considerations in short-range tactical planning.

## 1906.21 - Project Planning

Project-level plans describe on-the-ground projects and activities designed to achieve long-term objectives identified in the strategic plan and moving the planning area toward desired conditions or to meet public demand. Most site-specific projects and activities are designed to meet the objectives of the land management plan while reflecting current local issues and needs. Projects and activities are subject to the National Environmental Policy Act and other applicable laws and regulations. The level of required environmental analysis and planning to carry out a project is dictated by the scope and complexity of the project, public issues, and the project's potential effects on the human environment.

## 1906.22 - Program Development and Budgeting

The Program Development and Budget process is key to implementing plans. It is the framework used for setting priorities to determine what projects (including facilities and management services) are to be funded. An annual process is initiated with the Chief's direction to field units to submit budget proposals tied to the Forest Service Strategic Plan, annual performance plan, and as reflected in local plans. Budget proposals represent commitments by field units to achieve certain levels of accomplishments at specified costs.

Budget proposal priorities and decisions are reviewed at many levels of government, including regional offices, research stations, Area Office, the Chief's Office, the Secretary's Office, the Office of Management and Budget, the Administration (in the annual budget to Congress), and finally, the Congress through the appropriations process.

Although the Agency's Strategic Plan and the Chief's annual formulation process serve as the bases for initial budget proposals, budget proposals are frequently adjusted to respond to current issues and administration and congressional priorities. Once an appropriation act becomes law, the budget becomes a firm commitment for which the Forest Service is held accountable for carrying out national priorities. Funds and workforce authorizations are allocated to field units based on their capabilities and opportunities as adjusted by the decisions made during the budgeting and appropriation processes (FSM 1930).

## 1909 - HANDBOOKS

### 1909.1 - Servicewide Handbooks

### 1909.12 - Land Management Planning Handbook

The Land Management Planning Handbook is intended for use by line officer(s), planning teams, resource specialists, and others involved in planning. This handbook includes:

1. Procedural guidance for developing, amending, revising, and implementing land management plans and associated documents issued pursuant to the Title 36, Code of Federal Regulations, part 219, subpart A; and

2. Procedures for evaluating potential wilderness and wild and scenic rivers, and for documenting and processing these evaluations.

### 1909.13 - Program Development and Budgeting Handbook

This handbook provides detailed guidelines and procedures to carry out the program development and budgeting process.

### 1909.14 - Resource Inventory Handbook

This handbook identifies inventory-derived information that may be needed for future Forest and Rangeland Renewable Resources Planning Act (RPA) assessments and Forest Service land management planning. The handbook provides guidance to ensure that inventories of aesthetics, air, energy and mineral, fish and wildlife, land, recreation, soil, transportation, vegetation, water, and wilderness resources are conducted in efficient ways.

## 1909.15 - Environmental Policy and Procedures Handbook

This handbook provides the procedural guidelines for implementing those portions of the Council on Environmental Quality Regulations (CEQ) (40 CFR 1500-1508) pertaining to Forest Service activities.

## 1909.17 - Economic and Social Analysis Handbook

This handbook contains qualitative and quantitative procedures for economic and social evaluation.

## 1909.2 - Unit Handbooks

## 1909.21 - Land Management Planning Handbook

Regions may issue handbooks under this code to augment planning procedures. The title must be appropriate for the Region or sub-Region; for example, "FSH 1909.21 California Region, Land Management Planning Handbook."

## 1909.22 - Economic Analysis Handbook

Regions may issue handbooks under this code to augment national procedures on economic analysis.

# FOREST SERVICE MANUAL
# NATIONAL HEADQUARTERS (WO)
# WASHINGTON, DC

## FSM 1900 - PLANNING

## CHAPTER 1920 – LAND MANAGEMENT PLANNING

**Amendment No.:** 1900-2015-1

**Effective Date:** January 30, 2015.

**Duration:** This amendment is effective until superseded or removed.

**Approved:** LESLIE WELDON
Deputy Chief

**Date Approved:** 01/30/2015

**Posting Instructions:** Amendments are numbered consecutively by title and calendar year. Post by document; remove the entire document and replace it with this amendment. Retain this transmittal as the first page(s) of this document. The last amendment to this title was 1900-2013-1 to FSM 1930.

| | | |
|---|---|---|
| **New Document** | 1920 | 42 Pages |
| **Superseded Document(s) by Issuance Number and Effective Date** | 1920<br>(Amendment 1900-2006-2, 01/31/2006) | 68 Pages |

**Digest:**

1920 – Revises chapter in its entirety.

## Table of Contents

1920.1 – Authority ..... 4
1920.11 – Statutory Authorities ..... 4
1920.12 – Regulations ..... 4
1920.2 – Objectives ..... 5
1920.3 – Policy ..... 5
1920.31 – Compliance with Legal Requirements for Civil Rights and Environmental Justice ..... 7
1920.32 – Compliance with Legal Requirements for Tribal Consultation ..... 7
1920.4 – Responsibility ..... 7
1920.41 – Chief, Forest Service ..... 7
1920.42 – Washington Office, Director, Ecosystem Management Coordination ..... 8
1920.5 – Definitions ..... 8
**1921 – LAND MANAGEMENT PLANNING UNDER THE 2012 PLANNING RULE ..... 8**
1921.02 – Objectives ..... 9
1921.03 – Policy ..... 9
1921.04 – Responsibility ..... 10
1921.04a – Regional Forester ..... 10
1921.04b – Research Station Director ..... 11
1921.04c – Director, Northeastern Area State and Private Forestry ..... 11
1921.04d – Forest, Grassland, Prairie, or Other Comparable Administrative Unit Supervisor ..... 11
1921.1 – Oversight of Land Management Planning ..... 13
1921.11 – Regional Oversight ..... 13
1921.12 – Criteria for Land Management Plans ..... 13
1921.13 – Oversight Process ..... 13
1921.14 – National Reviews for Planning ..... 14
**1922 – TRANSITION OF PRIOR RULE PLANS TO 2012 RULE COMPLIANCE ..... 15**
**1923 – WILDERNESS EVALUATION ..... 15**
1923.01 – Authority ..... 15
1923.03 – Policy ..... 15
1923.04 – Responsibility ..... 16
1923.04a – Chief, Forest Service ..... 16
1923.04b – Regional Forester ..... 18
1923.04c – Forest, Grassland, Prairie, or Other Comparable Administrative Unit Supervisor ..... 19
1923.1 – Review and Approval ..... 20
1923.11 – Proposals Resulting from Wilderness Recommendations Incorporated in Land Management Plans, Including Legislatively Mandated Studies ..... 20
1923.12 – Proposals Resulting from Wilderness Recommendations Not Incorporated in Land Management Plans, Including Legislatively Mandated Studies ..... 21

**1924 – WILD AND SCENIC RIVER EVALUATION .................................................. 21**
1924.01 – Authority ........................................................................................ 21
1924.03 – Policy ............................................................................................ 22
1924.04 – Responsibility ............................................................................... 22
1924.04b – Washington Office, Deputy Chief, National Forest System ............................. 24
1924.04c – Regional Forester ......................................................................... 24
1924.04d – Forest, Grassland, Prairie, or Other Comparable Administrative Unit Supervisor ........................................................................................................ 26
1924.1 – Review and Approval ........................................................................ 28
1924.11 – Proposals Resulting from River Studies Incorporated in Land Management Plans, Including Legislatively Mandated Studies ................................................ 28
1924.12 – Proposals Resulting from River Studies Not Incorporated in Land Management Plans, Including Legislatively Mandated Studies ............................................ 29
**1925 – MANAGEMENT OF INVENTORIED ROADLESS AREAS [RESERVED] ....... 30**
**1926 – LAND MANAGEMENT PLANNING USING PLANNING REGULATIONS IN EFFECT BEFORE NOVEMBER 9, 2000 ...................................................... 30**
1926.03 – Policy ............................................................................................ 30
1926.04 – Responsibility ............................................................................... 30
1926.04a – Regional Forester ......................................................................... 30
1926.04b – Forest, Grassland, Prairie, or Other Administrative Unit Supervisor ............... 31
1926.1 – Land Management Planning Process ................................................... 31
1926.11 – Land Management Planning Results ................................................. 31
1926.12 – Benchmark Analysis ....................................................................... 32
1926.13 – Formulation of Alternatives ............................................................. 32
1926.14 – Estimated Effects of Alternatives ..................................................... 32
1926.15 – Resource Integration Requirements When Using Planning Regulations In Effect Before November 9, 2000 ................................................................... 32
1926.2 – Land Management Plan Content ......................................................... 35
1926.21 – Standards for Land Management Plans ............................................. 35
1926.3 – Review and Approval of Land Management Plans ................................. 36
1926.31 – Internal Review ............................................................................. 36
1926.31a – Standards for Regional Review ........................................................ 36
1926.31b – Internal Review Process ................................................................. 36
1926.32 – External Review ............................................................................. 37
1926.4 – Land Management Plan Implementation .............................................. 37
1926.41 – Analysis and Evaluation .................................................................. 37
1926.5 – Amendment ..................................................................................... 38
1926.51 – Changes to the Land Management Plan That are Not Significant ...................... 39
1926.52 – Changes to the Land Management Plan That are Significant ........................... 40
1926.6 – Revision .......................................................................................... 40
1926.7 – Monitoring and Evaluation ................................................................. 41
1926.71 – Monitoring Requirements ................................................................. 41

This chapter provides a process for developing, revising, amending, and making administrative changes to land management plans (plans) for the National Forest System (NFS). This chapter should be used in conjunction with Forest Service Handbook 1909.12, which provides additional policy direction for the process of developing, revising, amending, and making administrative changes to plans.

## 1920.1 – Authority

## 1920.11 – Statutory Authorities

See FSM 1901 for a summary of the relevant acts and FSH 1909.12, zero code, section 08.1, for text of the Forest and Rangeland Renewable Resource Planning Act, the Wilderness Act of 1964, the Eastern Wilderness Act, the Wild and Scenic Rivers Act, and the regulations for National Forest System Land Management Planning. Other applicable authorities are discussed at FSM 1011.

## 1920.12 – Regulations

Under the authority of Title 36, Code of Federal Regulations, part 219 -- Planning, Subpart A -- National Forest System Land Management Planning, published April 9, 2012 (77 FR 21162) plans may be developed, revised, amended, or administratively changed. Plan development and plan revisions initiated after May 9, 2012, must conform to the requirements of the 2012 Planning Rule.

Under the 2012 Planning Rule, for plan amendments or plan revisions initiated prior to May 9, 2012, the Forest Service may continue use provisions of the prior planning rule, which was the 2000 Planning Rule, including transition provisions that permit use of the planning procedures of the 1982 Planning Rule. The provisions of the prior planning regulation can be used in certain circumstances and as follows (see 36 CFR 219.17):

1. Plan development, plan amendments, or plan revisions initiated before May 9, 2012, may be completed using the provisions of the prior planning regulation or conform to the requirements of the 2012 Planning Rule. The Responsible Official shall give public notice (see 36 CFR 219.16(a)(5)) if the ongoing planning process is changed to the 2012 planning process.

2. For plans approved or revised under a prior planning regulation, plan amendments initiated during the transition period (until May 9, 2015) (36 CFR 219.17 (b)(2)) may be initiated and completed under the provisions of the prior planning regulations or they may conform to the 2012 Planning Rule provisions. Any plan amendments initiated after May 9, 2015, must conform to the applicable provisions of the 2012 Planning Rule.

3. For units with plans developed, revised, or amended using the provisions of a prior planning regulation, no obligations remain from any prior planning regulations, except those that are specifically included in the plan.

## 1920.2 – Objectives

General objectives of land management planning are to:

1. Develop a fully integrated plan to guide the management of the land and resources of the plan area.

2. Display short- and long-term management intent for the plan area to the public, Federal, State, Tribal, and local governments.

## 1920.3 – Policy

See FSM 1903 for general policy for planning. It is the Agency's policy to:

1. Prepare and maintain a work plan to guide and manage the planning process.

2. Organize the planning record and make it available for public review when the Responsible Official files the draft environmental impact statement.

3. Write using plain language so documents are clear, concise, and well organized.

4. Amend the plan with sufficient frequency to keep plans current throughout the 15-year plan period.

5. Use the current land management plan as a starting point for revision, and make changes based on a need to do so.

6. Provide all Service-wide direction necessary for planning assessments, plan development, plan revision, plan amendment, and plan monitoring is contained or referenced in this chapter, and supplements, or handbooks thereto.

7. Encourage participation by Federal, State, and local agencies, and Tribes, as well as the public, and consider their public input in the planning process.

8. Establish clear expectations with the public of the timeline and the need for a timely and efficient planning process to be completed within the fiscal capability of the unit.

9. Ensure changes in Service-wide planning direction (FSM 1920 and FSH 1909.12) are carried out as follows:

a. For new plans, plan revisions, and plan amendments. Upon issuance of an amended directive, Responsible Officials shall comply with the amended directive for all new plans, plan revisions and plan amendments developed pursuant to the 2012 Planning Rule that are initiated after the amended directive. Note that plan amendments may be initiated under the procedures of the prior planning rule for 3 years after May 9, 2012, and may be completed and approved under those procedures (See transition provisions of the 2012 Planning Rule, 36 CFR 219.17(b)).

b. For plan amendments and revisions initiated prior to the issuance of an amended directive. If a plan amendment or a revision has been initiated prior to issuance of the amended directive, the Responsible Official should use the amended directive in any new step or phase of the planning process, but is not required to revise past steps or phases within the process: for example, a completed assessment would not need to be revised to comply with the amended directives. For a phase or step that is ongoing at the time of the issuance of the amended directive, the Responsible Official should incorporate the amended directive to the extent practicable, but may choose to complete that phase or step as planned to avoid significant disruptions to ongoing public engagement and planning schedules: for example, it may be practicable to incorporate more elements of the amended directive into development of an assessment that is 20 percent complete, while an assessment that is 90 percent complete may simply incorporate the guidance in the amended directive on how to document the assessment report. As another example, if a unit is in the process of developing a draft plan and has identified segments of rivers to study for eligibility for Wild and Scenic River designation, the Responsible Official would not be required to re-inventory segments based on the amended directives. The Responsible Official shall document in the project file the circumstance and rationale for staging compliance with the amended directive.

10. If approval of a plan, plan revision, or amendment may affect listed species or critical habitat, the Responsible Official shall consult with National Marine Fisheries Service (NMFS) or the U.S. Fish and Wildlife Service (USFWS) in accordance with the Endangered Species Act (ESA) section 7(a)(1), U.S.C 1636(a)(1). The Agency may also consult on the plan as a "conservation program" in accordance with the ESA section 7(a)(2). Additional guidance on procedures for conducting such consultations can be found in FSM 2670.

11. If approval of a plan, plan revision, or amendment may jeopardize the continued existence of species proposed for listing under the ESA or may adversely modify proposed critical habitat, the Responsible Official shall confer with NMFS or USFWS in accordance with Endangered Species Act section 7(a)(2) (FSM 2670).

## 1920.31 – Compliance with Legal Requirements for Civil Rights and Environmental Justice

The Responsible Official shall ensure that civil rights impacts are considered during the land management planning process in accordance with Departmental Regulation (DM) 4300-4 and FSM 1730.4. Consider any civil rights impacts and any disproportionate negative impacts of plan approval to minority or low-income populations early in the planning process and, if warranted, throughout the process and the land management plan itself. Further direction on civil rights impact analyses is found at FSH 1709.11, chapter 30.

Environmental justice issues that arise during the development, revision, or amendment of a plan should be examined as directed by Departmental Regulation 5600-2 and Council on Environmental Quality publication titled "Environmental Justice - Guidance under the National Environmental Policy Act," located at *http://ceq.eh.doe.gov/nepa/regs/ej/justice.pdf*.

## 1920.32 – Compliance with Legal Requirements for Tribal Consultation

The Responsible Official shall provide to federally recognized Indian Tribes and Alaska Native Corporations the opportunity to undertake consultation consistent with Executive Order 13175 of November 6, 2000, and 25 U.S.C. 450 note (36 CFR 219.4(a)). Consultation for plans should be in accord with FSH 1509.13 - American Indian and Alaska Native Relations Handbook, Chapter 10 - Consultation with Tribes.

## 1920.4 – Responsibility

General responsibilities for planning are found in Title 36, Code of Federal Regulations, sections 219.1 and 219.2 (36 CFR 219.1 and 219.2) and FSM 1904. Additional, specific responsibilities for unit-level land management planning are found in FSM 1921.04 and FSM 1926.04. Additional, specific responsibilities for wilderness recommendations and wild and scenic river system additions are found in FSM 1923.04 and 1924.04 respectively.

## 1920.41 – Chief, Forest Service

1. The Chief of the Forest Service is responsible for national planning, such as the preparation of the Forest Service Strategic Plan required under the Government Performance and Results Modernization Act of 2010 (5 U.S.C. 306; 31 U.S.C. 1115-1125; 31 U.S.C. 9703-9704).

2. The Chief reserves the authority to approve the schedule for revising individual land management plans.

3. The Chief administers a national performance oversight process for NFS land management planning (FSM 1921.1).

4. The Chief may choose to serve as the Responsible Official for any plan development, revision, or amendment.

### 1920.42 – Washington Office, Director, Ecosystem Management Coordination

The Washington Office, Director, Ecosystem Management Coordination, is responsible for:

1. Assisting the Chief, through the Deputy Chief for the NFS, in all land management planning matters, including oversight of compliance with the NFMA.

2. Coordinating NFS input into the national strategic plan.

3. Strengthening the relationship between land management plans and strategic plan goals, objectives, strategies, and related performance measures that apply to management of the NFS.

4. Providing planning and coordination assistance to the Regions about land management plans, monitoring plans and strategies, and the National Environmental Policy Act (NEPA).

5. Coordinating national performance oversight and accountability for consistency of National Forest System land management planning.

### 1920.5 – Definitions

See 36 CFR 219 and FSH 1909.12, zero code, for definitions that apply to land management planning.

## 1921 – LAND MANAGEMENT PLANNING UNDER THE 2012 PLANNING RULE

The following sections of FSM 1921 set forth Forest Service management objectives, policy, and responsibilities for meeting the requirements of Title 36, Code of Federal Regulations, part 219 -- National Forest System Land Management Planning, as published April 9, 2012 (77 FR 21162).

FSM 1921 must be used in conjunction with FSH 1909.12, which sets forth additional Forest Service management objectives, policy, and responsibilities for meeting the requirements of Title 36, Code of Federal Regulations, part 219 -- National Forest System Land Management Planning, as published April 9, 2012 (77 FR 21162). Title 36, Code of Federal Regulations, part 219 (36 CFR 219), FSM 1921, and FSH 1909.12 together present an integrated set of guidance and direction for land management planning. Line Officers and relevant staff shall meet the requirements in 36 CFR 219, FSM 1921, and FSH 1909.12 when developing, revising, or amending plans.

See FSM 1926 for guidance for any plan amendments or plan revisions that will continue to use the provisions of the planning regulations in effect before November 9, 2000, under 36 CFR 219, published at 36 CFR parts 200 to 299, revised as of July 1, 2010. See FSH 1909.12, zero code, section 08.1 for text of the regulations for National Forest System Land Management Planning.

## 1921.02 – Objectives

1. Sustain multiple use of NFS land's renewable resources in perpetuity while maintaining the long-term health and productivity of the land and contribute to the social, cultural, and economic vitality of affected communities for current and future generations, consistent with the Multiple-Use Sustained-Yield Act of 1960 (36 CFR 219.1(b)).

2. Promote the ecological integrity of National Forests and Grasslands through the collaborative, science-informed development, revision, or amendment of land management plans (36 CFR 219.1(c)).

3. Broaden and deepen the engagement of the American people in National Forest and Grasslands planning.

4. Improve the resilience of National Forests and Grasslands to climate change and other stressors.

5. Improve the efficiency, relevance, and effectiveness of land management planning.

## 1921.03 – Policy

See FSM 1903 and FSM 1920.03 for general policy for planning activities.

1. Responsible Officials shall follow policy direction stated in FSH 1909.12 for all phases of land management planning: assessments, plan development, plan revisions, plan amendments, and monitoring.

2. Responsible Officials shall ensure that new or revised plans provide for ecological sustainability and contribute to social and economic sustainability, and must:

   a. Use available information pertaining to ecosystem composition, structure, function, and connectivity when developing plan components to contribute to ecological sustainability (36 CFR 219.8 (a), FSM 1921.5, and FSH 1909.12, ch.10 and 20).

   b. Use available information pertaining to social and economic systems when developing plan components to contribute to social and economic sustainability (36 CFR 219.8 (b), and FSH 1909.12, ch. 10 and 20).

c. Use the Scenery Management System (SMS) in all plan revisions to address scenic character and develop scenery-related plan direction unless the Responsible Official provides written justification and obtains concurrence from the Regional Forester.

3. Responsible Officials shall conduct all aspects of land management planning (assessment; development, amendment or revision; monitoring) in a timely and efficient manner.

4. The Forest Service's goal is to complete plan revisions within 4 years from initiation of assessment to plan approval.

5. Responsible Officials shall use a continual assessment, planning, and monitoring process that provides a feedback loop that allows the Forest Service to adapt to changing conditions and to improve plans based on new information and monitoring (36 CFR 219.5(a)).

## 1921.04 – Responsibility

## 1921.04a – Regional Forester

The Regional Forester may choose to be the Responsible Official for a plan, plan amendment, or plan revision (36 CFR 219.2(b)(3)). Following approval of the plan, plan amendment, or plan revision, the National Forest, Grassland, Prairie or other comparable administrative unit Supervisor will be the Responsible Official for future amendment or revision unless indicated otherwise by the Regional Forester.

In addition to the responsibilities specified in FSM 1904, it is the responsibility of the Regional Forester to:

1. Coordinate planning efforts among adjoining units and Regions.

2. Coordinate monitoring among multiple units to address broader geographic scale questions and to maintain a broader-scale monitoring strategy that supports these needs.

3. Maintain quality control throughout the planning process.

4. Identify, in coordination with the Responsible Official, the species of conservation concern (36 CFR 219.7(c)(3)) to be used by Responsible Officials for meeting the requirements of diversity of plant and animal communities (36 CFR 219.9(c)).

5. Coordinate between the Responsible Official and the Chief on planning-related matters, when appropriate.

6. Coordinate on broader-scale monitoring strategies with other Regional Foresters, Research Station Directors, and the Northeastern Area State and Private Forestry Director, as appropriate.

7. Serve as the Reviewing Officer for an objection (36 CFR part 219, subpart B) when the Responsible Official is a Line Officer at the first administrative level below a Regional Forester.

8. Follow policy direction stated in FSH 1909.12 for land management planning.

9. Direct State and Private Forestry and other staffs to assist Responsible Officials with assessment information and data, plan monitoring programs, and broader-scale monitoring strategies, and provide planning support as appropriate.

## 1921.04b – Research Station Director

It is the responsibility of the Research Station Directors to provide:

1. Assistance to Responsible Officials for science reviews, as appropriate.

2. Assistance with assessment information and data, where appropriate.

3. Assistance with plan monitoring programs and broader-scale monitoring strategies.

4. Review of the proposed plan components applicable to experimental areas and, upon determining that those plan components are adequate and appropriate, concur in the plan approval with respect to those plan components.

## 1921.04c – Director, Northeastern Area State and Private Forestry

It is the responsibility of the Director for the Northeastern Area State and Private Forestry to provide within the Area:

1. Assistance with plan monitoring programs and broader-scale monitoring strategies, where appropriate.

2. Assistance with assessment information and data, and support during planning, where appropriate.

## 1921.04d – Forest, Grassland, Prairie, or Other Comparable Administrative Unit Supervisor

1. The Supervisor of the National Forest, Grassland, Prairie, or other comparable administrative unit is the Responsible Official for preparing assessment, developing, and approving a plan or plan revision, plan amendments, and developing and implementing a plan monitoring program for lands under the responsibility of the Supervisor, unless the Regional Forester, the Chief, the Under Secretary, or the Secretary chooses to act as the Responsible Official (36 CFR 219.2(b)(3)).

2. The authority for approving project-specific plan amendments cannot be delegated to District Rangers.

3. The Supervisor of the National Forest, Grassland, or Prairie or other comparable administrative unit is responsible for:

a. Adapting the plan to changing situations through amendments and administrative changes.

b. Ensuring required assessments, monitoring reports, plan, plan amendments, and plan revisions are prepared by an Interdisciplinary Team (36 CFR 219.5(b)).

c. Coordinating with Research Station Directors when experimental or research natural areas are located on the unit.

d. Determining the best available scientific information for the issues being considered and using it to inform the planning process.

e. Providing meaningful public participation opportunities early and throughout the planning process.

f. Guiding the planning process with a goal of completion of plan revisions within 4 years.

g. Conducting all aspects of land management planning (assessment; development, amendment, or revision; monitoring) in a timely and efficient manner and within the fiscal capability of the unit.

h. Ensuring the integration of assessment, planning, implementation, and monitoring into an adaptive management framework that facilitates continued management and planning improvements and changes as suggested by monitoring results.

4. The Supervisor of the National Forest, Grassland, or Prairie or other comparable administrative unit is responsible for following policy direction stated in FSH 1909.12 for land management planning.

## 1921.1 – Oversight of Land Management Planning

This section describes general requirements for oversight of land management planning.

See 36 CFR 219.2(b)(5)(ii) for additional direction.

### 1921.11 – Regional Oversight

The Regional Office staff works with the Supervisor's staff by assisting in the planning process and providing oversight throughout the planning process to support consistency and accountability among planning efforts. FSM 1921.12 lists the criteria for land management plans.

### 1921.12 – Criteria for Land Management Plans

Regional Foresters and Supervisors shall ensure that:

1. Each land management plan or amendment complies with laws, regulations, and policy, including 36 CFR part 219, FSM 1920, and FSH 1909.12, and including requirements for threatened and endangered species.

2. Each land management plan is aligned with the goals and objectives of the Forest Service Strategic Plan.

3. The analysis in the applicable NEPA document for each plan is adequate to permit an informed selection of a preferred alternative.

4. Each final land management plan or amendment and applicable NEPA document has received an appropriate interdisciplinary review.

5. Oversight supports the identification and use of best practices, and facilitates consistent approaches and outcomes among comparable planning efforts.

### 1921.13 – Oversight Process

The Regional Office staff and the Responsible Official's staff work together to develop an action plan to share resources, coordinate with the Washington Office, and prepare the assessment, plan, and plan monitoring program.

The Regional Office staff provides oversight throughout the planning process and should agree on the plan development processes and environmental document methodologies and analysis before the Forest Supervisor formally invites comments on a proposed plan or plan revision (36 CFR 219.16(a)(2).

After the proposed plan is published in the Federal Register and the 90-day comment period closes, the Regional Office staff continues to provide oversight regarding processes, methodologies, and analysis used to develop a summary of the public comments received on the proposed plan, the responses to the public comment (which are made available to the public in accordance with 36 CFR 219.216), and the plan and applicable NEPA documents before the Forest Supervisor begins the objection period for a plan or plan revision (36 CFR 219.52).

For a plan or plan revision, the Regional staff shall forward the appropriate briefing papers about the plan prepared by the Supervisor's staff to the Director of Ecosystem Management Coordination. Based on the briefing papers, the Ecosystem Management Coordination staff confirms that the criteria (FSM 1921.12) have been met. The Director of Ecosystem Management coordinates appropriate briefings in the Washington Office.

Upon briefing the Washington Office and review of the final land management plan by the Regional staff, the Forest Supervisor may print and release the final documents, except as provided in FSM 1921.14.

The Regional Office staff is also responsible before, during, and after the planning process, for coordinating among Supervisors across the Region and with other Regions and Deputy Areas to: ensure compliance with requirements, support consistency among efforts, identify and share lessons-learned and best practices, and facilitate sharing data and information across Forests, Regions, and Deputy Areas.

## 1921.14 – National Reviews for Planning

1. The Chief may require Washington Office review of a draft proposed plan or revision before Responsible Officials formally invite comments on it, (36 CFR 219.16(a)(2) and before the Responsible Official begins the objection period for a plan or plan revision (36 CFR 219.52), for example, if:

    a. The plan makes recommendations for Congressional action. Examples of congressional action are additions to or deletions from the National Wilderness Preservation System, national trails, national recreation areas, studies, or changes to the National Wild and Scenic River System, and adjustments in NFS boundaries.

    b. The Region has specifically requested Washington Office review.

    c. The plan is the first plan prepared within the Region under the 2012 Planning Rule, the degree or intensity of controversy, the extent of changes in the preferred or any other alternative, or if other circumstances warrant.

2. The Director of Ecosystem Management Coordination (EMC) shall conduct reviews of the Regional oversight for NFS land management planning including for consistency and compliance within and across Regions with 36 CFR 219, FSM 1920 and

FSH 1909.12. The Director of EMC should conduct at least one Regional review annually. The purpose of a review is to evaluate internal and administrative controls and to identify successful management, management weaknesses, and needed corrective actions. Direction for conducting reviews is found in FSM 1410.

## 1922 – TRANSITION OF PRIOR RULE PLANS TO 2012 RULE COMPLIANCE

See 36 CFR 219.12(c)(1), 36 CFR 219.17 for additional direction.

Plan development and plan revision initiated on or after May 9, 2012, must conform to the new planning requirements of the 2012 Planning Rule. Plan amendments initiated on or after May 9, 2015, must conform to the 2012 Rule; amendments initiated prior to May 9, 2015, may be developed and completed under the prior planning rule.

Monitoring programs for all NFS units must comply with the requirements of the 2012 Planning Rule by May 9, 2016, or as soon as practicable, based on the scope of needed changes, timing of planned revisions, and availability of funding.

## 1923 – WILDERNESS EVALUATION

Consideration of areas for wilderness recommendation is inherent in the land management planning process and required by the Planning Rule. Although the President and the Secretary may recommend that certain areas be designated as wilderness, Congress reserves the authority to designate wilderness areas. In addition, the Congress may direct the study of specific areas and provide other guidance on wilderness evaluations through specific wilderness legislation.

### 1923.01 – Authority

Specific authority for the study and designation of wilderness is contained in the Wilderness Act of September 3, 1964 (16 U.S.C. 1131, Pub. L. 88-577) and the Eastern Wilderness Act of January 3, 1975 (16 U.S.C. 1132, Pub. L. 93-622). The land management planning rule requires identification and evaluation of lands that may be suitable for inclusion in the National Wilderness Preservation System and a determination of whether to recommend lands for wilderness designation (36 CFR 219.7(c)(5)). The Planning Rule also requires that management of areas recommended for wilderness designation protect and maintain the ecological and social characteristics that provide the basis for their suitability for wilderness designation (36 CFR 219.10(b)(iv)). For wilderness study, see FSH 1909.15 to determine the applicable NEPA documentation.

### 1923.03 – Policy

1. Unless otherwise provided by law, all areas that may be suitable for inclusion in the National Wilderness Preservation System must be inventoried and evaluated for recommendation as designated wilderness areas during plan development or revision.

Responsible Officials shall follow policy direction stated in FSH 1909.12, chapter 70, for this inventory and evaluation process.

2. The results of the inventory and evaluation of areas recommended for designated wilderness conducted during plan revision or plan development must be included in the planning record.

3. Any area recommended for wilderness or wilderness study designation is not available for any use or activity that may reduce the wilderness potential of an area.

## 1923.04 – Responsibility

### 1923.04a – Chief, Forest Service

Exhibit 01 displays responsibilities of the Forest Service Chief when an area is recommended for wilderness or Congress authorizes a wilderness study.

## 1923.04a – Exhibit 01

## Chief's Responsibilities

| Forest Service Recommended Wilderness Using 2012 Planning Rule[1] | Forest Service Recommended Wilderness Using 1982 Planning Rule[2] | Legislatively Mandated Study |
|---|---|---|
| 1. May review before printing the final EIS for a plan, plan amendment, or plan revision if the draft plan decision would make preliminary administrative recommendations (FSH 1909.12, sec. 24.41)<br><br>2. Prepare and submit to Congress, a notification letter documenting the preliminary administrative recommendation for wilderness designation<br><br>3. Provide the final study report or legislative environmental impact statement or both from the FEIS and record of decision to Congress for further consideration.<br><br>4. Provide support, review, and coordination of the legislative proposal with the Secretary and Office of Management and Budget. | 1. May review before printing the final EIS for a plan, plan amendment, or plan revision if record of decision would make preliminary administrative recommendations (FSM 1926.31b).<br><br>2. Transmit the final study report or legislative environmental impact statement or both that are extracted from FEIS and record of decision to Secretary of Agriculture for further consideration.<br><br>3. Provide support, review, and coordination of the legislative proposal with the Secretary and Office of Management and Budget. | 1. Review before printing the preliminary and final study report and/or applicable NEPA document.<br><br>2. Transmit final study report and/or applicable NEPA document to Secretary of Agriculture for approval.<br><br>3. Provide support, review, and coordination of the legislative proposal with the Secretary and Office of Management and Budget. |

[1] 2012 Planning Rule - 36 CFR part 219.

[2] 1982 Planning Rule - The 2012 Planning Rule allows plan revisions or amendments initiated prior to the Rule's effective date (May 9, 2012), and plan amendments initiated within 3 years of the effective date, to continue to use the planning process of a prior rule (i.e., the 1982 Planning Rule process) 36 CFR 219.17. The 1982 Planning Rule was last published in the Code of Federal Regulations, 36 CFR part 219 (2000).

## 1923.04b – Regional Forester

Exhibit 01 displays Regional Forester responsibilities for an area recommended for wilderness or Congress authorizes a wilderness study.

**1923.04b – Exhibit 01**

**Regional Forester Responsibilities**

| Forest Service Recommended Wilderness Using 2012 Planning Rule[1] | Forest Service Recommended Wilderness Using 1982 Planning Rule[2] | Legislatively Mandated Study |
|---|---|---|
| 1. Forward the tentative preliminary administrative recommendations to the Chief.<br><br>2. Upon request of the Chief, review and forward the study report or applicable NEPA document or both that support the preliminary administrative recommendations of the plan, plan amendment, or plan revision.<br><br>3. Upon request of the Chief, prepare a legislative proposal (FSH 1909.12, ch. 70). | 1. Forward the tentative preliminary administrative recommendations to the Chief.<br><br>2. Make preliminary administrative recommendations in record of decision.<br><br>3. Approve plan, including the management direction for recommended wilderness or recommended wilderness study areas.<br><br>4. Upon request of the Chief, preparing a legislative proposal (FSH 1909.12, ch. 70). | 1. Review and forward the preliminary and final wilderness study report and/or applicable NEPA document to the Chief for approval to print.<br><br>2. Prepare summary material for submission to the Secretary.<br><br>3. Prepare a draft transmittal letter. |

[1] 2012 Planning Rule -- 36 CFR 219.

[2] 1982 Planning Rule -- The 2012 Planning Rule allows plan revisions or amendments initiated prior to the Rule's effective date (May 9, 2012), and plan amendments initiated within 3 years of the effective date, to continue to use the planning process of a prior rule (i.e., the 1982 Planning Rule process) 36 CFR 219.17. The 1982 Planning Rule was last published in the Code of Federal Regulations, 36 CFR part 219 (2000).

## 1923.04c – Forest, Grassland, Prairie, or Other Comparable Administrative Unit Supervisor

Exhibit 01 displays responsibilities of the Forest, Grassland, Prairie, or other comparable administrative unit Supervisor for the preparation of wilderness recommendations.

**1923.04c – Exhibit 01**

**Forest, Grassland, Prairie, or Other Comparable Administrative Unit Supervisor Responsibilities**

| Forest Service Recommended Wilderness Using 2012 Planning Rule[1] | Forest Service Recommended Wilderness Using 1982 Planning Rule[2] | Legislatively Mandated Study |
|---|---|---|
| 1. Conduct the wilderness inventory and evaluations during plan development, plan amendment, or plan revision (see FSH 1909.12 ch. 10 and 70).<br><br>2. Maintain documentation for the areas inventoried and evaluated for wilderness in the planning record.<br><br>3. Make preliminary administrative recommendations in plan decision document.<br><br>4. Approve plan, including the plan components for recommended wilderness or recommended wilderness study areas (see 36 CFR 219.10 and FSH 1909.12, ch. 20). | 1. Conduct necessary wilderness evaluations during plan development, plan amendment, or plan revision.<br><br>2. Document the process of inventory and evaluation in an appendix of an EIS.<br><br>3. Develop management direction for recommended wilderness or recommended wilderness study areas. | 1. Prepare study report and/or applicable NEPA document (FSH 1909.15).<br><br>2. Print and distribute the approved study report or applicable NEPA document or both for comment (FSH 1909.12, sec. 72.2).<br><br>3. Print and distribute the approved study report and/or applicable NEPA document to the public (FSH 1909.12, sec. 74) |

[1] 2012 Planning Rule -- 36 CFR 219

[2] 1982 Planning Rule -- The 2012 Planning Rule allows plan revisions or amendments initiated prior to the Rule's effective date (May 9, 2012), and plan amendments initiated within 3 years of the effective date, to continue to use the planning process of a prior rule (i.e., the 1982 Planning Rule process) 36 CFR 219.17. The 1982 Planning Rule was last published in the Code of Federal Regulations, 36 CFR part 219 (2000).

## 1923.1 – Review and Approval

### 1923.11 – Proposals Resulting from Wilderness Recommendations Incorporated in Land Management Plans, Including Legislatively Mandated Studies

1. Forest Service Recommended Wilderness Using 2012 Planning Rule. Before publishing the public notice commencing the 60-day objection period (36 CFR 219.16(a)(3)) for a plan, plan amendment, or plan revision, the Responsible Official, through the Regional Forester, shall notify the Chief of tentative preliminary administrative recommendations for wilderness designation of areas evaluated during the land management planning process.

The land management plan decision document that makes preliminary administrative recommendations for wilderness must contain the following statement:

> **This recommendation is a preliminary administrative recommendation that will receive further review and possible modification by the Chief of the Forest Service, the Secretary of Agriculture, and the President of the United States. The Congress has reserved the authority to make final decisions on wilderness designation. Plan implementation is not dependent upon subsequent action related recommendations for wilderness designation.**

2. Forest Service Recommended Wilderness Using 1982 Planning Rule. Before printing the applicable NEPA document for a plan, plan amendment, or plan revision, the Regional Forester shall notify the Chief by letter of the tentative preliminary administrative recommendations for wilderness designation of areas evaluated during the land management planning process.

The land management plan decision document that makes preliminary administrative recommendations for wilderness must contain the following statement:

> **This recommendation is a preliminary administrative recommendation that will receive further review and possible modification by the Chief of the Forest Service, the Secretary of Agriculture, and the President of the United States. Congress has reserved the authority to make final decisions on wilderness designation.**

When the Chief decides to forward preliminary administrative wilderness recommendations to the Secretary, the study report and information from the applicable NEPA document and plan approval document must accompany these recommendations.

3. Legislatively Mandated Study. The Chief shall coordinate an intergovernmental review, prepare any legislation proposal, and coordinate review with the Secretary and Office of Management and Budget before release of the final study report and/or applicable NEPA document.

## 1923.12 – Proposals Resulting from Wilderness Recommendations Not Incorporated in Land Management Plans, Including Legislatively Mandated Studies

For wilderness recommendations based on evaluations or studies conducted separately from the land management planning process, follow Agency policy and procedures for implementing the NEPA (FSH 1909.15) to determine the applicable NEPA documentation. The study document may be combined with any applicable NEPA document. The Forest, Grassland, Prairie, or other comparable administrative unit Supervisor shall transmit the study documents for legislatively mandated studies to the Chief, through the Regional Forester. Wilderness recommendations or studies conducted outside of the land management planning process require the same level of detail as for recommendations made as part of the land management planning process.

## 1924 – WILD AND SCENIC RIVER EVALUATION

Consideration of potential wild and scenic rivers is an inherent part of the land management planning process. A river study assesses the eligibility of a river for inclusion in the National Wild and Scenic Rivers System (National System) and evaluates the potential physical, biological, economic, and social effects of adding the river to the National System. River segments in the National System may be classified as Wild, Scenic, or Recreational. See FSH 1909.12, chapter 80, for the river study process. The study forms the basis for recommendations to the Secretary and Congress and for legislative action.

## 1924.01 – Authority

The authority for study and designation of wild and scenic rivers is the Wild and Scenic Rivers Act of October 2, 1968 (Act), as amended (16 U.S.C. 1271 *et seq.*). The act has two provisions for identification of rivers for study: (1) by act of Congress under Section 5(a) or (2) through Federal agency planning processes under Section 5(d)(1). The U.S. Department of Agriculture and U.S. Department of the Interior Guidelines for Eligibility, Classification, and Management of River Areas, 47 FR 39454-39461 (Sept. 7, 1982), (USDA-USDI Guidelines provide uniform guidelines for carrying out studies and for managing rivers that are part of the System .

The land management Planning Rule specifically requires that during plan development or revision, the eligibility of rivers must be identified unless an inventory has been completed and no changed circumstances warrant further review (219.7(vi). The Planning Rule also requires that management of eligible and suitable rivers protect the values that provide the basis for their

inclusion in the system of Wild and Scenic rivers (36 CFR 219.10(b)(v)). The Act and USDA-USDI Guidelines are referenced in FSH 1909.12, zero code, section 08.1. For river study, see FSH 1909.15 to determine the applicable NEPA documentation.

## 1924.03 – Policy

1. Complete legislatively mandated study or studies within the specified study period.

2. If a systematic inventory of Forest Service identified eligible rivers or a comprehensive Forest, Grassland, Prairie, or other comparable administrative unit suitability study has been previously completed and documented, conduct additional assessment and study at the time of a proposed plan, plan amendment, or plan revision only if changed circumstances warrants additional review of eligibility or if the Responsible Official considers the river suitability study an issue. Document the process in an appendix to the Environmental Impact Statement for the plan.

3. Conduct studies in close cooperation with affected Federal, State, and local agencies, Tribal governments, landowners, and national and local publics. Include a determination of possible State participation in the preservation and administration of the river if it is added to the National System.

4. For rivers identified eligible for study, manage until suitability is determined to protect the values for which they might be added to the National System (free-flow, water quality, and outstandingly remarkable values) by statute for legislatively mandated study, or by existing Forest Service authorities for Forest Service identified study. Refer to FSH 1909.12, section 84 for specific management guidance for each of the river classifications.

5. A river determined through a suitability study to not be suitable will no longer be considered eligible and interim protection measures no longer need to be applied to those rivers. Consideration of potential wild and scenic rivers is an inherent part of the ongoing land management planning process. A river study assesses the eligibility of a river for inclusion in the National Wild and Scenic Rivers System (National System) and evaluates the potential physical, biological, economic, and social effects of adding the river to the National System. See FSH 1909.12, chapter 80, for the river study process. The study forms the basis for recommendations to the Secretary and Congress and for legislative action.

## 1924.04 – Responsibility

The Secretary of Agriculture has designated the Forest Service as the lead coordinating Agency for the U.S. Department of Agriculture in the studies of rivers that involve NFS lands.

## 1924.04a – Chief

Exhibit 01 displays responsibilities of the Chief when a river is recommended as a Wild and Scenic River or Congress authorizes a river for study.

**1924.04a – Exhibit 01**

**Chief's Responsibilities for River Studies on National Forest System Lands**

| Forest Service Identified Study Using 2012 Planning Rule[1] | Forest Service Identified Study Using 1982 Planning Rule[2] | Legislatively Mandated Study |
|---|---|---|
| 1. May review before printing the final EIS for a plan, plan amendment, or plan revision if the draft plan decision would make preliminary administrative recommendations (FSH 1909.12, sec 85.2).<br><br>2. Prepare a notification letter documenting the preliminary administrative recommendation for river designation<br><br>3. Transmit the final study report or legislative environmental impact statement or both that are extracted from EIS and record of decision to Secretary of Agriculture for further consideration<br><br>4. Provide support, review, and coordination of the legislative proposal with the Secretary and Office of Management and Budget. | 1. May review before printing the final EIS for a plan, plan amendment, or plan revision if record of decision would make preliminary administrative recommendations (FSM 1926.31b).<br><br>2. Transmit the final study report or legislative environmental impact statement or both that are extracted from EIS and record of decision to Secretary of Agriculture for further consideration.<br><br>3. Provide support and review of legislative proposal and coordinate review of the legislative proposal with the Secretary and Office of Management and Budget. | 1. Must review before printing the preliminary and final study report and/or applicable NEPA document.<br><br>2. Transmit the preliminary study report/applicable NEPA document for intergovernmental review as required by Section 4(b) of the Act. Provide comments to the Region.<br><br>3. Transmit the final study report/applicable NEPA document to Secretary of Agriculture for approval.<br><br>4. Provide support and review of legislative proposal and coordinate review of the legislative proposal with the Secretary and Office of Management and Budget. |

[1] 2012 Planning Rule -- 36 CFR 219

[2] 1982 Planning Rule -- The 2012 Planning Rule allows plan revisions or amendments initiated prior to the Rule's effective date (May 9, 2012), and plan amendments initiated within 3 years of the effective date, to continue to use the planning process of a prior rule (i.e., the 1982 Planning Rule process) 36 CFR 219.17. The 1982 Planning Rule was last published in the Code of Federal Regulations, 36 CFR part 219 (2000).

## 1924.04b – Washington Office, Deputy Chief, National Forest System

The Washington Office, Deputy Chief, National Forest System, is responsible for:

1. Designating the lead Region when a legislatively mandated study river involves more than one Region.

2. Coordinating the Departmental review of other agency and State Wild and Scenic River designation proposals submitted pursuant to sections 5(a) and 2(a)(ii) of the Act.

## 1924.04c – Regional Forester

The Regional Forester is responsible for designating the lead unit when a legislatively mandated or Forest Service identified study river involves more than one Forest, Grassland, Prairie, or other comparable administrative unit or more than one Region.

Exhibit 01 displays the responsibilities of the Regional Forester when a river is recommended as a wild and scenic river or Congress authorizes a river for study.

## 1924.04c – Exhibit 01

## Regional Forester's Responsibilities for River Studies on National Forest System Lands

| Forest Service Identified Study Using 2012 Planning Rule[1] | Forest Service Identified Study Using 1982 Planning Rule[2] | Legislatively Mandated Study |
|---|---|---|
| 1. Forward the tentative preliminary administrative recommendations to the Chief.<br><br>2. Upon request of the Chief, review and forward the study report or applicable NEPA document, or both, that support preliminary administrative recommendations of the plan, plan amendment, or plan revision.<br><br>3. Upon request of the Chief, prepare a legislative proposal (FSH 1909.12, ch. 80). | 1. Decide whether to use the land management planning process to evaluate suitability for one or more eligible rivers.<br><br>2. Forward the tentative preliminary administrative recommendations to the Chief.<br><br>3. Make preliminary administrative recommendations in record of decision.<br><br>4. Approve management direction for eligible or suitable rivers.<br><br>5. Upon request of the Chief, prepare a legislative proposal (FSH 1909.12, ch. 80). | 1. Provide two copies of the preliminary and final study report and/or applicable NEPA document to Chief for approval to print. Submit 10 copies of approved and printed preliminary to Chief for intergovernmental review.<br><br>2. Prepare summary information document and draft transmittal letter from the President to the Congress (FSH 1909.12, ch. 80). |

[1] 2012 Planning Rule -- 36 CFR 219

[2] 1982 Planning Rule -- The 2012 Planning Rule allows plan revisions or amendments initiated prior to the Rule's effective date (May 9, 2012), and plan amendments initiated within 3 years of the effective date, to continue to use the planning process of a prior rule (i.e., the 1982 Planning Rule process) 36 CFR 219.17. The 1982 Planning Rule was last published in the Code of Federal Regulations, 36 CFR part 219 (2000).

## 1924.04d – Forest, Grassland, Prairie, or Other Comparable Administrative Unit Supervisor

The unit Supervisor is responsible for:

1. Inviting concerned State(s) to participate jointly in a legislatively mandated study where the U.S. Department of Agriculture is the lead agency (section 5(c) of the Act).

2. Where a Forest Service identified study river touch only a small part of National Forest System lands, inviting the participation of the agency(ies) with jurisdiction over the largest proportion of the lands involved (refer to FSH 1909.12, sec. 83.12).

Exhibit 01 displays responsibility of the Forest, Grassland, Prairie, or other comparable administrative unit Supervisor related to wild and scenic river studies.

## 1924.04d – Exhibit 01

## Forest, Grassland, Prairie, or Other Comparable Administrative Unit Supervisor Responsibilities for River Studies on National Forest System Lands

| Forest Service-Identified Study Using 2012 Planning Rule[1] | Forest Service-Identified Study Using 1982 Planning Rule[2] | Legislatively Mandated Study |
|---|---|---|
| 1. Identify eligible rivers within the plan area (36 CFR 219.7(c)(2)(vi) following guidance in FSH 1909.12, chapter 80.<br><br>2. Decide whether to use the land management planning process to evaluate suitability for one or more eligible rivers..<br><br>3. Conduct wild and scenic studies during plan development, plan amendment, or plan revision, as appropriate.<br><br>4. Make preliminary administrative recommendations in plan decision document.<br><br>5. Develop and approve plan components for eligible or suitable rivers (36 CFR 219.10). | 1. Identify eligible rivers within the plan area<br><br>2. Conduct any wild and scenic studies during plan development, plan amendment, or plan revision.<br><br>3. Develop management direction for eligible or suitable rivers. | 1. Prepare the study report and applicable NEPA document or both (FSH 1909.15).<br><br>2. Print and distribute the approved study report or applicable NEPA document or both for comment (FSH 1909.12, sec. 85.1).<br><br>3. Respond to intergovernmental and public comments in the final study report and/or applicable NEPA document.<br><br>4. Print and distribute the approved final study report or applicable NEPA document or both to the public (FSH 1909.12, sec. 85.1). |

[1] 2012 Planning Rule -- 36 CFR 219

[2] 1982 Planning Rule -- The 2012 Planning Rule allows plan revisions or amendments initiated prior to the Rule's effective date (May 9, 2012), and plan amendments initiated within 3 years of the effective date, to continue to use the planning process of a prior rule (i.e., the 1982 Planning Rule process) 36 CFR 219.17. The 1982 Planning Rule was last published in the Code of Federal Regulations, 36 CFR part 219 (2000).

## 1924.1 – Review and Approval

Internal review and approval of a Forest Service recommendation for wild and scenic river designation shall meet the same requirements as those for land management plans (FSH 1909.12, ch. 20, sec. 21.4 and, when in relation to plans completed using planning regulations in effect before November 9, 2000, FSM 1926.3).

## 1924.11 – Proposals Resulting from River Studies Incorporated in Land Management Plans, Including Legislatively Mandated Studies

1. Forest Service Identified Study Using 2012 Planning Rule. Before publishing the public notice commencing the 60-day objection period (36 CFR 219.16(a)(3)) for a plan, plan amendment, or plan revision, the Responsible Official, through the Regional Forester, shall notify the Chief by letter of tentative preliminary administrative recommendations on rivers evaluated during land management planning process.

The land management plan decision document that makes preliminary administrative recommendations for rivers must contain the following statement:

> **This recommendation is a preliminary administrative recommendation that will receive further review and possible modification by the Chief of the Forest Service, Secretary of Agriculture, and the President of the United States. Congress has reserved the authority to make final decisions on designation of rivers as part of the National Wild and Scenic Rivers System.**

2. Forest Service Identified Study Using 1982 Planning Rule. Before printing the applicable NEPA document for a plan, plan amendment, or plan revision, the Regional Forester shall notify the Chief by letter of the tentative preliminary administrative recommendations on rivers evaluated during land management planning process.

The land management plan decision document that makes preliminary administrative recommendations for rivers must contain the following statement:

> **This recommendation is a preliminary administrative recommendation that will receive further review and possible modification by the Chief of the Forest Service, Secretary of Agriculture, and the President of the United States. Congress has reserved the authority to make final decisions on designation of rivers as part of the National Wild and Scenic Rivers System.**

When the Chief decides to forward preliminary administrative river recommendations to the Secretary, the study report and information from the applicable NEPA document and plan approval document will accompany these recommendations.

3. Legislatively Mandated Study. The Chief shall coordinate intergovernmental review, prepare any legislation proposal, and coordinate review with the Secretary and Office of Management and Budget before release of the final study report/applicable NEPA document (FSH 1909.12, sec. 85.1).

## 1924.12 – Proposals Resulting from River Studies Not Incorporated in Land Management Plans, Including Legislatively Mandated Studies

1. Forest Service Identified Study. For river studies conducted separately from the land management planning process, follow the Agency policy and procedures for implementing the National Environmental Policy Act (NEPA) (FSH 1909.15) to determine the applicable NEPA document. To meet the requirements of NEPA, the Council on Environmental Quality (CEQ) regulations (40 CFR 1506.4), FSM 1950, and FSH 1909.15, the study document may be combined with any applicable NEPA document and meet the standard found in FSH 1909.12, section 85.21b.

Before printing the final combined study report and/or applicable NEPA document, the Regional Forester shall notify the Chief by letter of the tentative preliminary administrative recommendations.

The applicable NEPA document should include the following statement:

> **This recommendation is a preliminary administrative recommendation that will receive further review and possible modification by the Chief of the Forest Service, Secretary of Agriculture, and the President of the United States. Congress has reserved the authority to make final decisions on designation of rivers as part of the National Wild and Scenic Rivers System.**

2. Legislatively Mandated Study. The Forest, Grassland, Prairie, or other comparable administrative unit Supervisor shall transmit through the Regional Forester the combined study report and applicable NEPA documents to the Chief. The Chief shall coordinate intergovernmental review, prepare any legislation proposal, and coordinate review with the Secretary and Office of Management and Budget before release of the final study report and/or applicable NEPA document (FSH 1909.12, sec. 85.1).

## 1925 – MANAGEMENT OF INVENTORIED ROADLESS AREAS [RESERVED]

## 1926 – LAND MANAGEMENT PLANNING USING PLANNING REGULATIONS IN EFFECT BEFORE NOVEMBER 9, 2000

This section provides guidance to carry out plan development, plan amendment, or plan revision using the planning regulations in effect before November 9, 2000. See FSH 1909.15 to determine the applicable NEPA documentation.

In two situations, under 36 CFR 219.17, Responsible Officials may continue to use the provisions of the planning regulations in effect before November 9, 2000 (36 CFR parts 200 to 299, revised as of July 1, 2000).

1. Plan development, plan amendments, or plan revisions initiated before May 9, 2012.

2. Plan amendments initiated before May 9, 2015.

### 1926.03 – Policy

In addition to complying with the general policies and principles set forth in FSM 1920.3, the land management planning process must:

1. Integrate all resource programs and supporting activities.

2. Base resource inventories on sound sampling designs using common definitions and standards.

3. Estimate the goods and services, activities, and investments to be implemented or produced by decade and display these outputs for the identified Forest and Rangeland Renewable Resources Planning Act of 1974 (16 U.S.C. 1600 *et seq.)* time periods.

4. Prepare a monitoring program that is responsive to identified issues and sufficient to meet legal requirements for monitoring soil, water, air, wildlife and fish, vegetation, and other resources.

### 1926.04 – Responsibility

When Responsible Officials continue to use the provisions of the planning regulations in effect before November 9, 2000, the following responsibilities are applicable.

### 1926.04a – Regional Forester

In addition to the responsibilities specified in FSM 1904, it is the responsibility of the Regional Forester to:

1. Coordinate planning efforts between Forests, Grasslands, Prairie, or other comparable administrative unit within and between adjacent units and Regions.

2. Maintain quality control of land management plans by ensuring that required standards of FSM 1926.21 are met

3. Ensure land management plan monitoring requirements are consistent among adjoining units.

4. Review, and approve as appropriate, any amendment that results in a significant change to a land management plan.

## 1926.04b – Forest, Grassland, Prairie, or Other Administrative Unit Supervisor

In addition to the responsibilities specified in FSM 1904, it is the responsibility of the administrative unit Supervisor to:

1. Prepare the draft and final land management plan and applicable environmental analysis to meet the standards in FSM 1926.21 and 1926.31a.

2. Ensure that the Interdisciplinary Team integrates knowledge of the physical, biological, economic, and social sciences, and environmental design in the planning process.

3. Conduct planning activities in a manner fully consistent with the National Environmental Policy Act (NEPA), the Council on Environmental Quality (CEQ) implementing regulations, the Forest Service's environmental policies and procedures described in FSM 1950 and FSH 1909.15.

4. Develop and approve amendments that result in a non-significant change to the land management plan.

5. Prepare amendments that result in a significant change to the land management plan and recommend them to the Regional Forester for approval.

## 1926.1 – Land Management Planning Process

## 1926.11 – Land Management Planning Results

Minimum results required of land management planning are:

1. Identification of major public issues, management concerns, and management opportunities.

2. Development of a set of criteria to guide the formulation and evaluation of alternatives.

3. Analysis of the management situation that determines both the need for and the opportunity to establish or change management direction.

4. Formulation of a set of alternatives that responds to the significant issues.

5. Evaluation of alternatives and identification of a preferred alternative to the extent required by NEPA, CEQ regulations, and Forest Service environmental policies and procedures (FSM 1950 and FSH 1909.15).

6. A land management plan that achieves the 14 principles described in section 219.1 of the planning regulations in effect before November 9, 2000 (36 CFR parts 200 to 299, revised as of July 1, 2000).

7. A monitoring program to evaluate progress toward achieving the goals, objectives, and desired future conditions of the plan.

## 1926.12 – Benchmark Analysis

The development of benchmarks is not limited by Forest Service policy or budget, discretionary constraints, or program and staffing requirements. Benchmark analysis will be conducted in accordance with section 219.12(e)(1) of the planning regulations in effect before November 9, 2000 (see 36 CFR parts 200 to 299, revised as of July 1, 2000).

## 1926.13 – Formulation of Alternatives

Formulate alternatives to meet the requirements of sections 219.12(f) and 219.16 of the planning regulations in effect before November 9, 2000 (see 36 CFR parts 200 to 299, revised as of July 1, 2000).

## 1926.14 – Estimated Effects of Alternatives

The analysis and comparison must be sufficient to permit an informed selection of the preferred alternative as described above.

## 1926.15 – Resource Integration Requirements When Using Planning Regulations In Effect Before November 9, 2000

Requirements for integrating individual resources including designated wilderness and other special areas into the land management planning process are found in sections 219.14 through 219.27 of the planning regulations in effect before November 9, 2000 (see 36 CFR parts 200 to 299, revised as of July 1, 2000). The land management planning process must:

1. Provide land management plan direction for designated wilderness, wild and scenic rivers, national recreation areas, national trails, national monuments, national scenic areas, research natural areas, national management emphasis areas, and other identified special interest areas.

2. Use the recreation opportunity spectrum system to determine management of recreation settings, opportunities, and to provide a broad spectrum of experiences in response to user preference.

3. Estimate the silvicultural systems and practices to be applied to lands suitable for timber production.

4. Provide for management of land suitable for timber production for saw timber-size crop trees unless exceptions, such as pulpwood crop trees, are provided for in the land management plan. Also, provide for management of suitable forest land to provide multiple products including, but not limited to, saw logs, pulpwood, poles, posts, and fuel wood through appropriate silvicultural practices to utilize site productivity.

5. Estimate output levels for fuel wood and other nonindustrial wood products that do not require secondary processing where sustained demand is anticipated.

6. Permit a departure sale schedule to temporarily drop below the base timber sale schedule at or beyond the end of the first decade.

7. Meet the intent of the culmination of mean annual increment (CMAI) requirement by ensuring the total yield from stands at harvest age is equal to or greater than 95 percent of the volume production corresponding to CMAI. Base CMAI on cubic measure and on the yield from regeneration harvests and any additional yields resulting from intermediate harvests.

8. Estimate the annual net growth on lands suitable for timber production for the fifth decade of the land management plan for at least the preferred alternative.

9. Use cubic foot volume and harvest acres, by harvest method, as a dual control in regulating the amount of timber to be offered and sold as specified by the allowable timber sale quantity. Base the control for treatment practices such as site preparation, reforestation, and pre-commercial thinning on acreage measurements.

10. Ensure that the set of management indicator species meets the requirements of 36 CFR 219.14(f) and the applicable provisions of the planning regulations in effect before November 9, 2000 (see 36 CFR parts 200 to 299, revised as of July 1, 2000).

11. Ensure that management prescriptions will provide for habitat capability to meet demand for management indicator species and provide access for recreational and commercial uses with minimal disturbance to species use of suitable habitats.

12. Ensure that, consistent with other resource management needs, management prescriptions will provide for pest prevention activities to lessen host susceptibility to pest damage, increase host vigor, or otherwise minimize pest impact before an outbreak occurs.

13. Ensure the plan provides for the kinds, amounts, and distribution of habitat needed for recovery of threatened or endangered species and needed to maintain viable, well-distributed populations of all existing native and desired nonnative species.

14. Provide plan direction for wildfire protection and prescribed fire use appropriate to efficient attainment of land management goals and objectives. Except for planning units with low historic large fire occurrence or low potential for significant wildland fires, the Responsible Official should consider plan guidance for cost containment of fire suppression costs (FSH 1909.12, sec. 13).

15. Identify the desired landownership pattern and develop guidance for landownership adjustments to include purchase, donations, exchange, right-of-way acquisition, transfers, interchanges, sales, and boundary adjustments. Guidance for landownership adjustments should emphasize the following objectives:

a. Acquisition to meet identified resource management needs.

b. Acquisition contributing to consolidation that reduces administrative problems and costs and further enhances public use.

c. Conveyance of land better suited for non-Federal ownership.

16. Provide access to energy and mineral resources in the most efficient manner and encourage industry proposals for resource development on NFS lands, consistent with the rights that individuals or companies have acquired under the mineral leasing acts and mining laws and consistent with the objective of the alternatives.

17. Identify the specific access guidance and travel management options available to meet the objectives for each management prescription. Describe how access will be provided and how travel will be managed. Include the forest transportation system and air and water access. Integrate considerations of biological, physical, social, and economic factors, and environmental design criteria. Link access and travel requirements and opportunities to the full spectrum of resource objectives for each management area and alternative.

18. Develop guidance for the development and maintenance of other physical support facilities required to carry out management objectives.

19. Provide for consideration of transportation and utility corridor designation and utilization. Energy right-of-way corridors on Federal land must be designated and incorporated into the land management plan in accordance with the Energy Policy Act of 2005 (Public Law 109-58, section 368). Coordinate activities between Regions and with other Federal and State agencies to designate location, alignment, and associated use and occupancy standards for rights-of-way.

20. Determine watershed condition class and include objectives or prescriptions for improving watershed conditions when necessary.

21. Ensure municipal watershed requirements (36 CFR 251.9) are incorporated in land management plan standards and guidelines.

22. Develop guidance to maintain surface resources associated with groundwater resources.

23. Establish plan guidance that will be used to protect water quality.

24. Provide management direction to protect air quality related values, including visibility, in Class I Federal areas as required by the Clean Air Act Amendments of 1977 and FSM 2120.

25. Plan for pest prevention and protection appropriate to attainment of land management goals and objectives.

26. Provide guidance for geothermal leasing and development for areas with high geothermal resource potential in accordance with Title 30 United States Code, section 4 as amended by Energy Policy Act of 2005 (Public Law 109-58, section 222).

## 1926.2 – Land Management Plan Content

Section 219.11 of the planning regulations in effect before November 9, 2000 (see 36 CFR parts 200 to 299, revised as of July 1, 2000) establishes minimum requirements for content of the land management plan.

## 1926.21 – Standards for Land Management Plans

In addition to the other requirements of this chapter, land management plans must meet the following standards:

1. Resource information and other data are factual and accurate.

2. Guidance is adequate to guide formulation of individual resource programs and schedules needed to implement the plan.

3. Assumptions, analytical approaches, and data are consistently applied within the plan.

4. Interdisciplinary planning and resource coordination are evident.

5. A map delineating management areas and displaying future corridors is included.

## 1926.3 – Review and Approval of Land Management Plans

Section 219.10 of the planning regulations in effect before November 9, 2000 (see 36 CFR parts 200 to 299, revised as of July 1, 2000) establishes general requirements for review and approval of land management plans.

## 1926.31 – Internal Review

The Regional Forester reviews land management plans against the standards in section 1926.21.

## 1926.31a – Standards for Regional Review

Regional reviews must ensure that:

1. Each land management plan complies with laws, regulations, policy, and Chief's direction.

2. Each land management plan is reviewed against Resources Planning Act targets and related costs for the unit and the Region as a whole.

3. The analysis and comparative evaluation, documented in the applicable NEPA document, is adequate to permit an informed selection of the preferred alternative.

4. The completed land management plan and applicable NEPA document have received an interdisciplinary review.

## 1926.31b – Internal Review Process

1. Following approval by the Regional Forester, the Forest, Grassland, Prairie, or other comparable administrative unit Supervisor prints the draft plan and accompanying applicable NEPA document and makes them available for public review (see the Forest Service "National Environmental Policy Act Handbook," FSH 1909.15, ch 20, sec. 24 for direction on making draft material available to the public).

2. The Regional Forester reviews a summary of the public comment received on the draft, the response to the public comment, and the proposed final plan and applicable NEPA document (see the Forest Service "National Environmental Policy Act Handbook," FSH 1909.15, ch 20, sec. 25 for direction on making final material available to the public).

3. The Chief may require Washington Office review before printing of all final plans and their accompanying applicable NEPA documents, if the plan makes recommendations that will ultimately require congressional action. Examples of congressional action include additions to or deletions from the National Wilderness Preservation System, National Trails, National Recreation Areas, studies or changes to the National Wild and Scenic River System, and proposed adjustments in NFS boundaries. Otherwise, upon approval of final land management plan by the Regional Forester, the Forest, Grassland, Prairie, or other comparable administrative unit Supervisor may print and release the final documents unless:

a. The Region has specifically requested Washington Office review.

b. The Chief has specified Washington Office review because of the degree or intensity of controversy, the extent of changes in the preferred or any other alternative, or if other circumstances warrant.

## 1926.32 – External Review

External reviews during the land management planning process require public participation and coordination with other public planning efforts. Provide public participation at the earliest stages of the process. Use public participation to identify public issues during the formal scoping process and during review of draft documents. Prepare a public participation plan and make this plan a part of the planning records along with documented results of participation activities. Document results of coordination with other Federal agencies, Tribal, State, and local governments.

## 1926.4 – Land Management Plan Implementation

## 1926.41 – Analysis and Evaluation

Conduct analysis and evaluation to establish a rational basis for making decisions on proposed projects or activities. The analysis must provide the Responsible Official with relevant information necessary to make a decision to select or reject proposed projects or activities. The

analysis and evaluation must be sufficient to establish a determination of consistency, comply with National Environmental Policy Act (NEPA) requirements, document findings, and provide a basis for selecting actions to implement. The following provides specific requirements for analysis and evaluation:

1. Confirm and document that the proposed project or activity is consistent with the management direction in the land management plan. If an action cannot be changed to be consistent, the action must be rejected or the land management plan must be amended as directed in FSM 1926.5. Consistency determinations, including specific required findings, are described in FSH 1909.12, section 29.

2. Normally, economic evaluations of proposed projects or activities that yield or affect priced outputs should be based on cost-efficiency analysis (FSM 1970). Land management plan information may be used if the underlying analysis was sufficiently site specific and if costs and output values have not changed. Select projects or activities that are most efficient in following land management plan direction.

3. Complete environmental analysis before approving projects and activities (FSM 1950 and FSH 1909.15).

## 1926.5 – Amendment

The need to amend a land management plan may arise from several sources, including the following:

1. Recommendations of the Forest, Grassland, Prairie, or other comparable administrative unit Interdisciplinary Team that are based on findings that result from monitoring and evaluating implementation of the land management plan (FSM 1926.7).

2. Findings that existing or proposed permits, contracts, cooperative agreements, and other instruments authorizing occupancy and use are not consistent with the land management plan, but should be approved.

3. Changes necessitated by resolution of administrative appeals.

4. Changes in plan guidance needed to correct planning errors.

5. Changes in plan guidance necessitated by changed physical, social, or economic conditions.

6. Desired implementation of projects or activities outside the scope of the land management plan.

Upon receiving advice from the Interdisciplinary Team that the plan requires change, the Responsible Official shall:

1. Determine whether proposed changes to a land management plan are significant or not significant in accordance with the requirements of sections 1926.51 and 1926.52.

2. Document the determination of whether the change is significant or not significant in a decision document.

3. Provide appropriate public notification of the decision before implementing the changes as follows.

(a) The Responsible Official shall notify those who, in writing, have requested it, and to those who are known to have participated in the decision-making process.

(b) When the Chief, the Under Secretary, or the Secretary is the Responsible Official, notices must be published in the Federal Register.

(c) For a plan amendment when an official other than the Chief, the Under Secretary, or the Secretary is the Responsible Official, and for which a draft EIS is not prepared, notices must be published in the newspaper(s) of record.

(d) If plan amendment, applies to two or more units, or if a draft EIS has been prepared, notices must be published in the Federal Register and the newspaper(s) of record for the applicable units.

Findings of the Responsible Official regarding the consistency of projects or activities and actions with the land management plan and the determination of the significance of an amendment are an integral part of decisions. As such, they are subject to administrative review under 36 CFR 219.14.

## 1926.51 – Changes to the Land Management Plan That are Not Significant

Changes to the land management plan that are not significant can result from:

1. Actions that do not significantly alter the multiple-use goals and objectives for long-term land and resource management.

2. Adjustments of management area boundaries or management prescriptions resulting from further on-site analysis when the adjustments do not cause significant changes in the multiple-use goals and objectives for long-term land and resource management.

3. Minor changes in standards and guidelines.

4. Opportunities for additional projects or activities that will contribute to achievement of the management prescription.

The Forest, Grassland, Prairie, or other comparable administrative unit Supervisor shall prepare an amendment to the land management plan to accommodate a change determined not to be significant. Appropriate public notification is required before implementation of the amendment as described in FSM 1926.5.

## 1926.52 – Changes to the Land Management Plan That are Significant

The following examples indicate circumstances that may cause a significant change to a land management plan:

1. Changes that would significantly alter the long-term relationship between levels of multiple-use goods and services originally projected (see section 219.10(e) of the planning regulations in effect before November 9, 2000 (see 36 CFR parts 200 to 299, revised as of July 1, 2000)).

2. Changes that may have an important effect on the entire land management plan or affect land and resources throughout a large portion of the planning area during the planning period.

When a significant change needs to be made to the land management plan, the Forest, Grassland, Prairie, or other comparable administrative unit Supervisor shall prepare an amendment. Documentation of a significant change, including the necessary analysis and evaluation should focus on the issues that have triggered the need for the change. In developing and obtaining approval of the amendment for significant change to the land management plan, follow the same procedures as are required for developing and approving the land management plan (see secs. 219.10(f) and 219.12 of the planning regulations in effect before November 9, 2000 (36 CFR parts 200 to 299, revised as of July 1, 2000)).

## 1926.6 – Revision

The National Forest Management Act (NFMA) requires revision of land management plans at least every 15 years; however, a plan may be revised sooner if physical conditions or demands on the land and resources have changed sufficiently to affect overall goals or uses for the entire unit. To revise a land management plan, plan revisions initiated after May 9, 2012, must conform to 36 CFR 219, after obtaining approval of the Chief to schedule a revision. Plan revisions previously initiated before May 9, 2012, may continue to follow procedures set forth in section 219.12 of the planning regulations in effect before November 9, 2000 (see 36 CFR parts 200 to 299, revised as of July 1, 2000).

## 1926.7 – Monitoring and Evaluation

Conduct monitoring of the land management plan and of the individual projects or activities to determine how well objectives have been met and how closely management standards and guidelines have been applied. Monitoring and evaluation requirements for the land management plan are found at section 219.12(k) of the planning regulations in effect before November 9, 2000 (see 36 CFR parts 200 to 299, revised as of July 1, 2000).

Monitoring of the land management plan is conducted at three levels:

1. Implementation Monitoring. Implementation monitoring is designed to determine if plans, prescriptions, projects, and activities are implemented as designed and in compliance with land management plan objectives, requirements, and standards and guidelines. Evaluation of implementation monitoring may require adjustment of prescriptions and targets or changes in plan or project administration.

2. Effectiveness Monitoring. Effectiveness monitoring is designed to determine if plans, prescriptions, projects, and activities are effective in meeting management direction, objectives, and the standards and guidelines. Evaluation of the results of effectiveness monitoring is used to adjust land management plan objectives, targets, prescriptions, standards and guidelines, conservation practices, mitigation measures, and other best management practices and could result in change to or amendment of the land management plan.

3. Validation Monitoring. Validation monitoring is designed to ascertain whether the initial assumptions and coefficients used to develop the land management plan are correct or if there is a better way to meet land management planning regulations, policies, goals, and objectives. Evaluation of this type of monitoring can result in amendment of land management plans and may be used to recommend changes in laws, regulations, and policies that affect both the plan and project implementation.

## 1926.71 – Monitoring Requirements

1. Focus monitoring on those activities that:

    a. Affect significant management systems such as total silvicultural systems and other monitoring requirements.

    b. Are responsive to stated issues, concerns, and management opportunities.

    c. Affect major components of the environment.

2. Coordinate monitoring efforts with resource inventory needs to reduce duplication.

3. Monitor to ensure that:

a. The land management plan complies with applicable laws and regulations.

b. Cumulative effects of project implementation do not exceed standards or thresholds stated in the land management plan.

c. Planned mitigation actions are implemented and maintained as designed.

# FOREST SERVICE HANDBOOK
# NATIONAL HEADQUARTERS (WO)
# WASHINGTON, DC

## FSH 1909.15 – NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK

## CHAPTER 10 – ENVIRONMENTAL ANALYSIS

**Amendment No.:** 1909.15-2012-3

**Effective Date:** June 25, 2012

**Duration:** This amendment is effective until superseded or removed.

**Approved:** LARENDA KING
Service-wide Directive Manager

**Date Approved:** 06/22/2012

**Posting Instructions:** Amendments are numbered consecutively by handbook number and calendar year. Post by document; remove the entire document and replace it with this amendment. Retain this transmittal as the first page(s) of this document. The last amendment to this handbook was 1909.15-2012-2 to 1909.15_contents.

| | | |
|---|---|---|
| **New Document** | 1909.15_10 | 47 Pages |
| **Superseded Document(s) by Issuance Number and Effective Date** | 1909.15_10<br>(Amendment 1909.15-2011-1, 04/01/2011) | 47 Pages |

**Digest:**

11.6 - Makes technical corrections to revise references.

## Table of Contents

**11 - CONDUCT SCOPING ... 4**
11.1 - Organize Scoping Effort ... 6
11.2 - Proposed Action, Purpose and Need, and Decision Framework ... 7
11.21 - Purpose and Need ... 7
11.22 - Decision Framework ... 8
11.23 - Review of Existing Decisions ... 8
11.3 - Identify Responsible Official(s) and Agencies Involved ... 9
11.31 - Lead and Cooperating Agencies ... 9
11.31a - Lead Agency ... 10
11.31b - Cooperating With Other Agencies ... 11
11.32 - Elimination of Duplication With State and Local Procedures ... 12
11.32a - Combining Documents to Eliminate Duplication ... 13
11.33 - Federal Agencies With Legal Jurisdiction or Special Expertise ... 13
11.34 - Review of Other Agency Environmental Documents ... 13
11.35 - Referrals to Council on Environmental Quality ... 14
11.36 - Review of Forest Service Legislative or Service-Wide Environmental Documents 15
11.4 - Determine if Existing Documents Address Proposed Action ... 15
11.41 - Tiering ... 15
11.42 - Adoption ... 16
11.43 - Incorporation by Reference ... 16
11.5 - Look for Preliminary Issues and Identify Public Participation Needs ... 17
11.51 - Identify Preliminary Issues ... 17
11.52 - Identify Public Participation Needs ... 17
11.6 - Determine If Proposal Can Be Categorically Excluded From Documentation in Environmental Impact Statement or Environmental Assessment ... 19
11.7 - Inform Participants and the Public of Results of Scoping and the Progress of the Analysis ... 21
**12 - USE INTERDISCIPLINARY ANALYSIS ... 21**
12.1 - Project Initiation ... 21
12.2 - Interdisciplinary Team Selection ... 22
12.21 - Team Leader ... 22
12.22 - Other Team Members ... 23
12.23 - Selection of Interdisciplinary Analyst(s) in Lieu of a Team ... 24
12.24 - Responsibilities When Applicants and Contractors are Involved ... 25
12.3 - Develop a Framework for Analysis ... 26
12.4 - Identify Issues ... 27
12.41 - Considering Issues in Preparation of Environmental Impact Statements ... 27
12.42 - Considering Issues in Preparation of Environmental Assessments ... 28
12.5 - Measures ... 28
12.6 - Documenting Public Involvement ... 29
12.61 - Expand Public Involvement as Appropriate ... 30

13 - COLLECT AND INTERPRET DATA ........ 30
14 - DEVELOP ALTERNATIVES ........ 31
14.1 - Adaptive Management Strategy ........ 32
14.2 - No-Action Alternative ........ 35
14.3 - Alternative Documentation Options ........ 36
14.4 - Alternatives Not Considered in Detail ........ 36
15 - ESTIMATE EFFECTS OF EACH ALTERNATIVE ........ 37
15.1 - Cumulative Effects ........ 39
15.2 - Bounding Effects ........ 40
15.2a - Spatial Boundaries ........ 40
15.2b - Temporal Boundaries ........ 40
15.3 - Cumulative Effects Framework ........ 42
16 - EVALUATE ALTERNATIVES AND IDENTIFY PREFERRED ALTERNATIVE(S) 42
17 - DETERMINE TYPE OF ENVIRONMENTAL DOCUMENT NEEDED ........ 43
17.1 - Other Planning and Preparation Requirements for Environmental Documents ........ 44
17.1a - Consultation Requirements ........ 44
18 - CORRECTION, SUPPLEMENTATION, OR REVISION OF ENVIRONMENTAL DOCUMENTS AND RECONSIDERATION OF DECISIONS TO TAKE ACTION ........ 44
18.1 - Review and Documentation of New Information Received After Decision Has Been Made ........ 45
18.2 - Reconsideration of Decisions Based on an Environmental Impact Statement ........ 45
18.3 - Reconsideration of Decisions Categorically Excluded From Environmental Documentation ........ 46
18.4 - Reconsideration of Decisions Based on Environmental Assessment and Finding of No Significant Impact ........ 47

This chapter is organized by the sequence of events that typically occur in the environmental analysis process, from conducting scoping (sec. 11) to using an interdisciplinary analysis (sec. 12) to developing alternatives (sec. 14) and estimating effects (sec. 15). Once the analysis is underway, the type of environmental documentation can be determined (sec. 17). After a decision is made, changes or new information may be handled as described in section 18. Exhibit 01 in section 11.6 describes the environmental analysis process.

For ease of reference, Council on Environmental Quality (CEQ) regulations for implementing requirements of the National Environmental Policy Act (NEPA) are set out in boldface type and block-indented and Forest Service regulations, that supplement the CEQ regulations are in boldface type, italicized, and block indented.

Under the National Environmental Policy Act (NEPA), the Agency conducts environmental analyses to assess the nature and importance of the physical, biological, social, and economic effects of a proposed action and its reasonable alternatives. Conclusions are reached about the significance of the effects on the human environment. These conclusions about the significance of effects determine the levels of analysis and documentation.

**Forest Service Planning Model**




## 11 - CONDUCT SCOPING

Although the Council on Environmental Quality (CEQ) regulations require scoping only for environmental impact statement (EIS) preparation, the Forest Service has broadened the concept to apply to all proposed actions.

> ***Scoping is required for all Forest Service proposed actions, including those that would appear to be categorically excluded from further analysis and documentation in an EA or an EIS (§220.6).*** (36 CFR 220.4(e)(1))

The process of scoping is an integral part of environmental analysis. Scoping includes refining the proposed action, determining the responsible official and lead and cooperating agencies, identifying preliminary issues, and identifying interested and affected persons. Effective scoping depends on all of the above as well as presenting a coherent proposal. The results of scoping are used to clarify public involvement methods, refine issues, select an interdisciplinary team, establish analysis criteria, and explore possible alternatives and their probable environmental effects.

The methods and degree of the scoping effort undertaken for a given project vary depending on scope and complexity of the project (see the CEQ scoping guidance).

> ***Scoping shall be carried out in accordance with the requirements of 40 CFR 1501.7. Because the nature and complexity of a proposed action determine the scope and intensity of analysis, no single scoping technique is required or prescribed.*** (36 CFR 220.4(e)(2))

Selection of scoping techniques should consider appropriate methods to reach interested and affected parties. For example, a project with potential localized effects to a small community might consider posting fliers at locations where they are likely to be seen.

Part of scoping includes other requirements such as putting a notice of intent to prepare an EIS in the Federal Register (see ch. 20).

For projects subject to legal notice of proposed actions, consult an appeal or objections coordinator and applicable appeal or objections regulations for current direction and clarification (see also FSH 1509.12). Just complying with these notice requirements may not be adequate scoping.

Except where required by statute or regulations, the responsible official may adjust or combine the various steps of the process outlined in this chapter to aid in the understanding of the proposed action and identified issues.

The following direction on scoping from the CEQ regulations applies to the preparation of an EIS. The Forest Service applies the concept of scoping to all proposals without regard to whether or not the results of the analysis are to be documented in an EIS, an environmental assessment (EA), or categorically excluded (CE) from these documents.

> **There shall be an early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action. This process shall be termed scoping . . .**
>
> **(a) As part of the scoping process the lead agency shall:**

**(1) Invite the participation of affected Federal, State, and local agencies, any affected Indian tribe, the proponent of the action, and other interested persons (including those who might not be in accord with the action on environmental grounds), unless there is a limited exception under §1507.3(c). An agency may give notice in accordance with §1506.6.**

**(2) Determine the scope (§1508.25) and the significant issues to be analyzed in depth in the environmental impact statement.**

**(3) Identify and eliminate from detailed study the issues which are not significant or which have been covered by prior environmental review (§1506.3), narrowing the discussion of these issues in the statement to a brief presentation of why they will not have a significant effect on the human environment or providing a reference to their coverage elsewhere.**

**(4) Allocate assignments for preparation of the environmental impact statement among the lead and cooperating agencies, with the lead agency retaining responsibility for the statement.**

**(5) Indicate any public environmental assessments and other environmental impact statements which are being or will be prepared that are related to but are not part of the scope of the impact statement under consideration.**

**(6) Identify other environmental review and consultation requirements so the lead and cooperating agencies may prepare other required analyses and studies concurrently with, and integrated with, the environmental impact statement as provided in §1502.25.**

**(7) Indicate the relationship between the timing of the preparation of environmental analyses and the agency's tentative planning and decision making schedule.** (40 CFR 1501.7)

For additional direction on scoping, see CEQ's Memorandum for General Counsels, NEPA Liaisons and Participants in Scoping.

## 11.1 - Organize Scoping Effort

The NEPA requires a systematic, interdisciplinary approach to ensure integrated application of the natural and social sciences and the environmental design arts in any planning and decision making that affects the human environment (42 U.S.C. 4332(2)(A)).

The responsible official may choose whether or not to establish an interdisciplinary (ID) team and designate a team leader to conduct scoping. However, the decision not to establish an ID team does not relieve the Forest Service of the responsibility to take an interdisciplinary

approach to the scoping of the proposed action. In ensuring an interdisciplinary approach to the scoping process, responsible officials shall be guided by the direction on interdisciplinary analysis in section 12 of this chapter.

## 11.2 - Proposed Action, Purpose and Need, and Decision Framework

A proposed action is a proposal by the Forest Service to authorize, recommend, or implement an action to meet a specific purpose and need. All proposed actions have five parts that comprise their whole: who, what, how, where, and when.

> WHO is proposing the action?
> WHAT is the action being proposed?
> HOW will the action be accomplished?
> WHERE is the action being proposed?
> WHEN is the action being proposed?

The "who" is the Forest Service, even in the case of external projects. When the Forest Service accepts an external proponent's proposal (like a powerline or ski resort) it becomes an Agency proposal to authorize the action. The "who" may also be the title of the responsible official, such as "The Quemado District Ranger proposes to…"

The "what" refers to the proposed activity or activities and all their parts. Note that the "what" is almost always plural. In stating the "what" of the proposed action, focus as specifically as practicable on describing the activities. Connected actions (sec. 05) are included as part of the proposed action. Consider carefully the inclusion of similar actions (sec. 05) which may be included as part of the proposed action. Only those similar actions that are closely related to the proposal and have similar purposes and effects should be included.

The "how" is an integral part of the "what." If a fuels reduction project is proposed, describe how it will be done: thinning, burning, or both; mechanical means or by hand?

The "where" refers to the geographic location of the project. In stating the "where," describe the location as specifically as possible. A map is often the best way to illustrate the "where" instead of trying to describe it solely in a narrative format. Several scales of maps might be needed (whole district and project units).

The "when" refers to the timeframe in which the project will be implemented and completed. If a project has several identified phases, the duration of each phase should be documented.

### 11.21 - Purpose and Need

The need for action discusses the relationship between the desired condition and the existing condition in order to answer the question, "why consider taking any action?"

The breadth or narrowness of the need for action has a substantial influence on the scope of the subsequent analysis. A well-defined "need" or "purpose and need" statement narrows the range of alternatives that may need to be considered. For example, a statement like "there is a need for more developed recreation" would lead to a very broad analysis and consideration of many different types of recreation. However, a statement like "there is a need for more developed campsites along Clear Creek" would result in a more focused analysis with consideration of a much narrower range of alternatives.

"Purpose" and "need" may be discussed separately, but normally they are discussed as one because the purpose of an action will be to respond to the stated need.

It is critical that the responsible official and interdisciplinary team members all understand and agree on the need for action. An informed decision can only be made when everyone is working together to solve the same problem.

## 11.22 - Decision Framework

To fully describe the decision to be made, a decision framework may be identified. This is to ensure the scope is fully described and helps assure the purpose and need, proposed action, and alternatives are relevant to each other. The decision framework may be described in terms of whether or not to implement the action as proposed or an alternative way to achieve the desired outcome. Often a well-described proposed action (who, what, when, where) makes the decision clear. Situations that may need extra clarification include when:

1. Other agencies are involved and have their own decisions or authorizations to make.

2. Laws or previous decisions constrain the decision space.

3. More decisions will be made at a later date.

Remember to include any forest plan amendments that might be part of a decision.

## 11.23 - Review of Existing Decisions

It is important to establish whether or not a valid decision already exists. If a decision has already been made to authorize an action in a specific area, such as livestock grazing or a special use, a new decision may not be necessary. Review the environmental analysis documentation and assess whether there is sufficient new information, technology, or changed conditions to warrant a new analysis and decision. If the previous analysis and decision are still valid, document this finding and continue to implement the decision.

## 11.3 - Identify Responsible Official(s) and Agencies Involved

The Agency employee who has the authority to make and implement a decision on a proposed action (36 CFR 220.3) is the responsible official for NEPA compliance. When an action is proposed, the responsible official shall identify and contact other Federal, State, or local agencies with an interest in the action.

## 11.31 - Lead and Cooperating Agencies

The CEQ regulations address the role of the lead and cooperating agencies' responsibilities as follows:

> **The purpose of this section is to emphasize agency cooperation early in the NEPA process. Upon request of the lead agency, any other Federal agency which has jurisdiction by law shall be a cooperating agency. In addition, any other Federal agency which has special expertise with respect to any environmental issue, which should be addressed in the statement, may be a cooperating agency upon request of the lead agency. An agency may request the lead agency to designate it a cooperating agency.**
>
> **(a) The lead agency shall:**
>
> **(1) Request the participation of each cooperating agency in the NEPA process at the earliest possible time.**
>
> **(2) Use the environmental analysis and proposals of cooperating agencies with jurisdiction by law or special expertise, to the maximum extent possible consistent with its responsibility as lead agency.**
>
> **(3) Meet with a cooperating agency at the latter's request.**
>
> **(b) Each cooperating agency shall:**
>
> **(1) Participate in the NEPA process at the earliest possible time.**
>
> **(2) Participate in the scoping process (described below in §1501.7).**
>
> **(3) Assume on request of the lead agency responsibility for developing information and preparing environmental analyses including portions of the environmental impact statement concerning which the cooperating agency has special expertise.**
>
> **(4) Make available staff support at the lead agency's request to enhance the latter's interdisciplinary capability.**
>
> **(5) Normally use its own funds. The lead agency shall, to the extent available funds permit, fund those major activities or analyses it requests from cooperating agencies. Potential lead agencies shall include such funding requirements in their budget requests.**

**(c) A cooperating agency may in response to a lead agency's request for assistance in preparing the environmental impact statement (described in paragraph (b) (3), (4), or (5) of this section) reply that other program commitments preclude any involvement or the degree of involvement requested in the action that is the subject of the environmental impact statement. A copy of this reply shall be submitted to the Council.** (40 CFR 1501.6)

Refer to the definitions of lead and cooperating agency in section 05 of this handbook. For additional guidance on lead and cooperating agencies, see "NEPA's 40 Most Asked Questions," questions 14a, 14b, 14c, 14d, and 30.

## 11.31a - Lead Agency

When the proposed action will occur on National Forest System lands, the Forest Service is usually the lead agency. The Forest Service may also be a lead or cooperating agency when State and private forest lands are involved.

As soon as practical after the responsible official identifies a cooperating agency, enter the information into the Planning, Appeals, and Litigation System (PALS). (sec. 06).

The CEQ regulations address the determination and role of the lead agency as follows:

**(a) A lead agency shall supervise the preparation of an environmental impact statement if more than one Federal agency either:**

**(1) Proposes or is involved in the same action; or**

**(2) Is involved in a group of actions directly related to each other because of their functional interdependence or geographical proximity.**

**(b) Federal, State, or local agencies, including at least one Federal agency, may act as joint lead agencies to prepare an environmental impact statement (§1506.2).**

**(c) If an action falls within the provisions of paragraph (a) of this section the potential lead agencies shall determine by letter or memorandum which agency shall be the lead agency and which shall be cooperating agencies. The agencies shall resolve the lead agency question so as not to cause delay. If there is disagreement among the agencies, the following factors (which are listed in order of descending importance) shall determine lead agency designation:**

**(1) Magnitude of agency's involvement.**

**(2) Project approval/disapproval authority.**

**(3) Expertise concerning the action's environmental effects.**

**(4) Duration of agency's involvement.**

**(5) Sequence of agency's involvement.**

**(d) Any Federal agency, or any State or local agency or private person substantially affected by the absence of lead agency designation, may make a written request to the potential lead agencies that a lead agency be designated.**

**(e) If Federal agencies are unable to agree on which agency will be the lead agency or if the procedure described in paragraph (c) of this section has not resulted within 45 days in a lead agency designation, any of the agencies or persons concerned may file a request with the Council asking it to determine which Federal agency shall be the lead agency. A copy of the request shall be transmitted to each potential lead agency. The request shall consist of:**

**(1) A precise description of the nature and extent of the proposed action.**

**(2) A detailed statement of why each potential lead agency should or should not be the lead agency under the criteria specified in paragraph (c) of this section.**

**(f) A response may be filed by any potential lead agency concerned within 20 days after a request is filed with the Council. The Council shall determine as soon as possible but not later than 20 days after receiving the request and all responses to it which Federal agency shall be the lead agency and which other Federal agencies shall be cooperating agencies.** (40 CFR 1501.5)

If a responsible Forest Service official wishes to ask the CEQ to determine which Federal agency will be the lead agency, send the request through the appropriate regional office to the Washington Office Director of Ecosystem Management Coordination for processing.

## 11.31b - Cooperating With Other Agencies

The lead agency has the responsibility to solicit cooperation from other Federal, Tribal, State or local agencies with jurisdiction by law or special expertise on environmental issues that should be addressed in the environmental analysis. (see "NEPA's 40 Most Asked Questions", #14) (40 CFR 1508.5)

Whenever invited Federal, State, Tribal and local agencies elect not to become cooperating agencies, they should still be considered for inclusion in interdisciplinary teams engaged in the NEPA process and on distribution lists for review and comment on NEPA documents. (CEQ Memorandum for Heads of Federal Agencies, 1/30/2002).

Agencies are encouraged to document the cooperating agency agreements. Identify specific expectations, roles and responsibilities, and include issues such as preparation of analysis, schedules, availability of pre-decisional information and other issues. Cooperating agencies are

normally expected to fund their activities, but to the extent possible the lead agency should fund major activities or analyses (40 CFR 1501.6(b)(5)). Consider CEQ's guidance for determining whether to invite, decline, or end cooperating agency status (CEQ Memorandum, 1/30/2002, Attachment 1). Additional resources, including memorandum of understanding and interagency agreement templates, can be found in the Partnership Resource Center.

When National Forest System lands are involved and the Forest Service is not the lead agency, the responsible Forest Service official shall make a written request to participate as a cooperating agency in scoping, environmental analysis, and documentation (40 CFR 1501.6).

If the Forest Service is asked to be a cooperating agency and other program commitments preclude being able to become involved, the responsible official shall consult with the Washington Office Director of Ecosystem Management Coordination through the appropriate regional office prior to preparing a reply to this effect to the requesting agency. Send the reply to the Washington Office Director of Ecosystem Management Coordination, for transmittal to CEQ (40 CFR 1501.6(c)).

## 11.32 - Elimination of Duplication With State and Local Procedures

Other provisions of NEPA require cooperating with State and local agencies to the fullest extent possible to reduce duplication.

> **(a) Agencies authorized by law to cooperate with State agencies of statewide jurisdiction pursuant to section 102(2)(D) of the Act may do so.**
>
> **(b) Agencies shall cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and State and local requirements, unless the agencies are specifically barred from doing so by some other law. Except for cases covered by paragraph (a) of this section, such cooperation shall to the fullest extent possible include:**
>
> > **(1) Joint planning processes.**
> >
> > **(2) Joint environmental research and studies.**
> >
> > **(3) Joint public hearings (except where otherwise provided by statute).**
> >
> > **(4) Joint environmental assessments.**
>
> **(c) Agencies shall cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and comparable State and local requirements, unless the agencies are specifically barred from doing so by some other law. Except for cases covered by paragraph (a) of this section, such cooperation shall to the fullest extent possible include joint environmental impact statements. In such cases one or more Federal agencies and one or more State or local agencies shall be joint lead agencies. Where State laws or local ordinances have environmental impact statement**

**requirements in addition to but not in conflict with those in NEPA, Federal agencies shall cooperate in fulfilling these requirements as well as those of Federal laws so that one document will comply with all applicable laws.**

**(d) To better integrate environmental impact statements into State or local planning processes, statements shall discuss any inconsistency of a proposed action with any approved State or local plan and laws (whether or not federally sanctioned). Where an inconsistency exists, the statement should describe the extent to which the agency would reconcile its proposed action with the plan or law.** (40 CFR 1506.2)

## 11.32a - Combining Documents to Eliminate Duplication

**Any environmental document in compliance with NEPA may be combined with any other agency document to reduce duplication and paperwork.** (40 CFR 1506.4)

Examples include wilderness study reports and wild and scenic river study reports which may be combined with a supporting EIS.

## 11.33 - Federal Agencies With Legal Jurisdiction or Special Expertise

See the CEQ's list of agencies with jurisdiction by law or special expertise, from the 1984 Appendix II of CEQ's NEPA Implementation Procedures.

## 11.34 - Review of Other Agency Environmental Documents

Because of special agency expertise or jurisdiction by law, the Forest Service may be asked to review and comment on environmental documents prepared by other agencies.

**Duty to comment.**

**Federal agencies with jurisdiction by law or special expertise with respect to any environmental impact involved and agencies which are authorized to develop and enforce environmental standards shall comment on statements within their jurisdiction, expertise, or authority. Agencies shall comment within the time period specified for comment in §1506.10. A Federal agency may reply that it has no comment. If a cooperating agency is satisfied that its views are adequately reflected in the environmental impact statement, it should reply that it has no comment.** (40 CFR 1503.2)

**Specificity of comments.**

**(a) Comments on an environmental impact statement or on a proposed action shall be as specific as possible and may address either the adequacy of the statement or the merits of the alternatives discussed or both.**

**(b) When a commenting agency criticizes a lead agency's predictive methodology, the commenting agency should describe the alternative methodology which it prefers and why.**

**(c) A cooperating agency shall specify in its comments whether it needs additional information to fulfill other applicable environmental reviews or consultation requirements and what information it needs. In particular, it shall specify any additional information it needs to comment adequately on the draft statement's analysis of significant site-specific effects associated with the granting or approving by that cooperating agency of necessary Federal permits, licenses, or entitlements.**

**(d) When a cooperating agency with jurisdiction by law objects to or expresses reservations about the proposal on grounds of environmental impacts, the agency expressing the objection or reservation shall specify the mitigation measures it considers necessary to allow the agency to grant or approve applicable permit, license, or related requirements or concurrences.** (40 CFR 1503.3)

## 11.35 - Referrals to Council on Environmental Quality

CEQ regulations provide the following:

**(a) This part establishes procedures for referring to the Council Federal interagency disagreements concerning proposed major Federal actions that might cause unsatisfactory environmental effects. It provides means for early resolution of such disagreements.**

**(b) Under section 309 of the Clean Air Act (42 U.S.C. 7609), the Administrator of the Environmental Protection Agency is directed to review and comment publicly on the environmental impacts of Federal activities, including actions for which environmental impact statements are prepared. If after this review the Administrator determines that the matter is "unsatisfactory from the standpoint of public health or welfare or environmental quality," section 309 directs that the matter be referred to the Council (hereafter "environmental referrals").**

**(c) Under section 102(2)(C) of the Act other Federal agencies may make similar review of environmental impact statements, including judgments on the acceptability of anticipated environmental impacts. These reviews must be made available to the President, the Council and the public.** (40 CFR 1504.1)

When Forest Service field review of another agency's draft EIS concludes that the proposed action is environmentally unacceptable, the affected field unit, through the appropriate regional office, contacts the Washington Office Director of Ecosystem Management Coordination, to coordinate the referral procedure (FSM 1950.43).

## 11.36 - Review of Forest Service Legislative or Service-Wide Environmental Documents

Unless otherwise assigned by the Chief, officials in the Washington Office shall review and comment on draft environmental documents prepared on Forest Service legislative proposals, servicewide policies and regulations, or national program proposals. The Director of Ecosystem Management Coordination coordinates these reviews and responses (FSM 1950.43).

## 11.4 - Determine if Existing Documents Address Proposed Action

During scoping, determine if there are existing documents pertinent to the environmental analysis. Existing environmental documents, higher level plans; such as, resource management plans, and other pertinent documents, including State and local land use plans or data sources, may provide useful information to:

1. Help define the proposed action.
2. Narrow the scope of analysis.
3. Estimate potential environmental effects.
4. Reduce the bulk of the documentation.

In such cases, all or parts of these existing documents may be tiered to, adopted, or incorporated by reference in documenting the site-specific environmental analysis.

## 11.41 - Tiering

> **Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review (§1508.28). Whenever a broad environmental impact statement has been prepared (such as a program or policy statement) and a subsequent statement or environmental assessment is then prepared on an action included within the entire program or policy (such as a site specific action) the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the**

**broader statement by reference and shall concentrate on the issues specific to the subsequent action. The subsequent document shall state where the earlier document is available. Tiering may also be appropriate for different stages of actions.** (40 CFR 1502.20)

## 11.42 - Adoption

**(a) An agency may adopt a Federal draft or final environmental impact statement or portion thereof provided that the statement or portion thereof meets the standards for an adequate statement under these regulations.**

**(b) If the actions covered by the original environmental impact statement and the proposed action are substantially the same, the agency adopting another agency's statement is not required to re-circulate it except as a final statement. Otherwise the adopting agency shall treat the statement as a draft and re-circulate it (except as provided in paragraph (c) of this section.**

**(c) A cooperating agency may adopt without re-circulating the environmental impact statement of a lead agency when, after an independent review of the statement, the cooperating agency concludes that its comments and suggestions have been satisfied.**

**(d) When an agency adopts a statement which is not final within the agency that prepared it, or when the action it assesses is the subject of a referral under Part 1504, or when the statement's adequacy is the subject of a judicial action which is not final, the agency shall so specify.** (40 CFR 1506.3)

***

**Agencies shall reduce delay by:**

**… Eliminating duplication with State and local procedures by providing for joint preparation (Sec. 1506.2) and with other Federal procedures by providing that an agency may adopt appropriate environmental documents prepared by another agency (Sec. 1506.3).** (40 CFR 1500.5(h))

## 11.43 - Incorporation by Reference

Both the CEQ and Forest Service regulations encourage material be incorporated by reference. Both regulations also require the content to be briefly described in the environmental or decision document. Include all referenced materials not otherwise reasonably available to the public in the project record.

**Agencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action. The incorporated material shall be cited in the statement and its content briefly described. No material may be**

**incorporated by reference unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment. Material based on proprietary data which is itself not available for review and comment shall not be incorporated by reference.** (40 CFR 1502.21)

***Material may be incorporated by reference into any environmental or decision document. This material must be reasonably available to the public and its contents briefly described in the environmental or decision document (40 CFR 1502.21).*** (36 CFR 220.4(h))

## 11.5 - Look for Preliminary Issues and Identify Public Participation Needs

## 11.51 - Identify Preliminary Issues

Identify and evaluate preliminary issues based on review of similar actions, knowledge of the area or areas involved, discussions with interested and affected persons, community leaders, organizations, resource professionals within the Agency, and State and local governments, and/or consultations with experts and other agencies familiar with such actions and their direct, indirect, and cumulative effects. This review provides an early look at potential issues and sharpens the focus of the environmental analysis. See discussion of issues in section 12.4.

## 11.52 - Identify Public Participation Needs

Public involvement should occur throughout the analysis process. Continue to keep the public informed of the progress of the environmental analysis.

1. Identify potentially affected and interested parties and the nature of their concerns.

2. Establish, maintain, and use mailing lists as appropriate.

3. Determine public involvement objectives for various steps in the NEPA process.

4. Determine the methods of public involvement to meet the objectives. Ensure that the level of effort to inform and to involve the public is consistent with the scale and importance of the proposed action and the degree of public interest.

When extensive public involvement is necessary, prepare a formal public participation strategy (FSM 1626). Partnership and collaboration resources, including memorandum of understanding templates, can be found in the Partnership Resource Center.

The CEQ regulations provide the following direction on public notice and participation:

**Agencies shall: . . .**

**(b) Provide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected.**

**(1) In all cases the agency shall mail notice to those who have requested it on an individual action.**

**(2) In the case of an action with effects of national concern notice shall include publication in the FEDERAL REGISTER and notice by mail to national organizations reasonably expected to be interested in the matter . . . An agency engaged in rulemaking may provide notice by mail to national organizations who have requested that notice regularly be provided. Agencies shall maintain a list of such organizations.**

**(3) In the case of an action with effects primarily of local concern the notice may include:**

**(i) Notice to State and area wide clearinghouses . . .**

**(ii) Notice to Indian tribes when effects may occur on reservations.**

**(iii) Following the affected State's public notice procedures for comparable actions.**

**(iv) Publication in local newspapers (in papers of general circulation rather than legal papers).**

**(v) Notice through other local media.**

**(vi) Notice to potentially interested community organizations including small business associations.**

**(vii) Publication in newsletters that may be expected to reach potentially interested persons.**

**(viii) Direct mailing to owners and occupants of nearby or affected property.**

**(ix) Posting of notice on and off site in the area where the action is to be located.**

**(c) Hold or sponsor public hearings or public meetings whenever appropriate or in accordance with statutory requirements applicable to the agency. Criteria shall include whether there is:**

**(1) Substantial environmental controversy concerning the proposed action or substantial interest in holding the hearing.**

**(2) A request for a hearing by another agency with jurisdiction over the action supported by reasons why a hearing will be helpful. If a draft environmental impact statement is to be considered at a public hearing,**

**the agency should make the statement available to the public at least 15 days in advance (unless the purpose of the hearing is to provide information for the draft environmental impact statement).**

**(d) Solicit appropriate information from the public.** (40 CFR 1506.6)

**When soliciting comments from the public, the following paragraph should be included:**

> Comments received in response to this solicitation, including names and addresses of those who comment, will be part of the public record for this proposed action. Comments submitted anonymously will be accepted and considered; however, anonymous comments will not provide the Agency with the ability to provide the respondent with subsequent environmental documents.

## 11.6 - Determine If Proposal Can Be Categorically Excluded From Documentation in Environmental Impact Statement or Environmental Assessment

After determining the nature of the proposed action, identifying preliminary issues, identifying the interested and affected agencies, organizations, individuals, and the extent of existing documentation. The responsible official should have sufficient data to determine if the proposed action can be categorically excluded from documentation in an EIS or an EA or, alternatively, to determine the type of document that should be prepared.

The significance of environmental effects of a proposed action determines whether an EIS (zero code, sec. 05) must be prepared. If the proposed action falls within one of the classes of actions in section 21.2 that normally require preparation of an EIS, or if preliminary analysis indicates that there may be significant effects on the environment, publish a notice of intent to prepare an EIS in the Federal Register. There might be situations where a proposed action normally requiring an EIS is not expected to have significant impacts (see 21.1 and 21.2).

If the proposed action is within one of the categories in the Department of Agriculture policies and procedures (7 CFR 1b.3) listed in section 32.11 or one of the categories established by the Chief listed in sections 32.12 or 32.2, and if the proposed action does not involve any extraordinary circumstances (sec. 31.2), the action may be categorically excluded from documentation in an EIS or EA. See chapter 30 for documentation requirements.

If the proposed action is not within a listed category, and it is uncertain whether the proposed action may have a significant effect on the environment, prepare an EA chapter 40.

An overview of the paths that NEPA documentation can take is shown in exhibit 01. Note that notice, comment and appeal provisions are not included in the exhibit.

## 11.6 - Exhibit 01

### NEPA Documentation Overview



### 11.7 - Inform Participants and the Public of Results of Scoping and the Progress of the Analysis

Consistent with the nature and complexity of the proposed action, inform participants of the results of scoping. Keep the public informed of the progress of the environmental analysis through appropriate means. This may include, but is not limited to: personal contacts with individuals, organizations, and State, local government and Tribal officials; use of local media; and newsletters.

The status of environmental analyses for documented Forest Service decisions must be entered in PALS (sec. 06).

## 12 - USE INTERDISCIPLINARY ANALYSIS

Section 102(2)(A) of the National Environmental Policy Act requires all agencies to use an interdisciplinary approach to analysis which will ensure the integrated use of the natural and social sciences and the environmental design arts in planning and decisionmaking which may have an impact on the human environment (42 U.S.C. 4332(2)(A)). The CEQ regulations at 40 CFR 1502.6 require that:

> **The disciplines of the preparers shall be appropriate to the scope and issues identified in the scoping process (§1501.7).**

Establish interdisciplinary teams to analyze proposed actions with the potential for significant environmental effects, especially if an EIS may be needed.

Proposals for less complex actions may not require the selection of an interdisciplinary team. In such cases, a knowledgeable individual may perform the analysis that must consider all of the physical, biological, social, and economic factors pertinent to the decision.

Interdisciplinary review of the analysis also may satisfy the requirement for use of the interdisciplinary approach.

### 12.1 - Project Initiation

When documentation in an EIS or EA is required, the responsible official should provide direction to the interdisciplinary team in a project initiation letter (PIL).

The PIL should reflect the responsible official's project direction and expectations of the interdisciplinary team. The PIL can aid the responsible official in redeeming responsibilities under FSM 1950.41. The letter, often drafted by the team leader (negotiated with and signed by the responsible official) usually includes the following, depending on when it is written:

1. The purpose and need initiating the analysis and proposing the project.

2. The proposed action and some possible connected actions, including mitigation associated with the proposed action.

3. The decision framework, including any sideboards and expectations of the team.

4. Known or anticipated issues.

5. Resource areas that should be included in the analysis.

6. Scoping direction, including the responsible official's role and expectations.

7. Potential alternatives for consideration, if known.

8. An initial cross-check for forest plan consistency, such as if project is consistent or not with the forest plan.

9. Need for possible forest plan amendment(s).

10. Role assignments and responsibilities: team leader, members, consultants, including how any disputes within the team will be resolved.

11. The time frame and checkpoints for analysis.

## 12.2 - Interdisciplinary Team Selection

The disciplines and skills of the interdisciplinary team are appropriate to the scope of the action, the issues and potential effects identified, and applicable laws and regulations. Limit the team to a manageable number of persons.

Others may aid or support the ID team as determined to be necessary by the responsible official. This participation must be consistent with the Federal Advisory Committee Act of 1972 as amended (5 U.S.C. App.) and USDA Departmental Regulation (DR) 1041-1.

The team also has the expertise to identify and to evaluate the potential direct, indirect, and cumulative social, economic, physical, and biological effects of the proposed action and its alternatives.

## 12.21 - Team Leader

To ensure selection of an effective team leader, the responsible official should consider such factors as the individual's:

1. Degree of working knowledge of the NEPA process and its interrelationship with other applicable laws and regulations.

2. Knowledge of activities identified within the proposed action.

3. Ability to lead others, including the ability to communicate effectively with team members and the responsible official and to facilitate interaction among team members.

4. Ability to organize, analyze, and interpret information.

5. Past performance in meeting assigned deadlines.

6. Ability to communicate orally and in writing to others information about the field or specialty that a member represents.

The team leader's responsibilities include:

1. Communicating with the responsible official on a regular basis to facilitate their meeting responsibilities in FSM 1950.41 and to ensure the process is meeting timelines and needs.

2. Leading the team to conduct scoping and identifying preliminary issues.

3. Coordinating and sometimes leading public involvement activities.

4. Recommending data needs.

5. Leading the interdisciplinary team in developing a range of alternatives that meets the purpose and need, and addresses the issues.

6. Framing or outlining the NEPA document and providing instructions and assignments for completing sections. Ensuring interdisciplinary creation of the NEPA document.

7. Tracking the progress, including making assignments to team members to assure timely completion.

8. Reviewing the NEPA document and specialist reports. Coordinate any higher level reviews, as needed.

9. Finalizing the NEPA document and assuring a complete project record.

## 12.22 - Other Team Members

In selecting other team members, consider the variety of disciplines needed, based on issues, and resources affected, as well as such factors as an individual's:

1. Ability to participate fully and helpfully as part of a team.

2. Ability to communicate orally and in writing to others information about the field or specialty that a member represents.

3. Knowledge of and degree of experience in the subject discipline and the environmental analysis process.

4. Ability to conceptualize and solve problems.

5. Ability to distinguish between professional duties and personal opinions.

It is the responsibility of the team or assigned analyst(s) to:

1. Identify the environmental issues related to the proposed action and make recommendations to the responsible official for significant issues;

2. Develop a range of alternatives for responsible official approval, where appropriate to be analyzed in the subsequent environmental analysis; and

3. Prepare environmental documents.

A team integrates its collective knowledge of the physical, biological, economic, and social sciences and the environmental design arts into the analysis process.

Individual team member's responsibilities may include:

1. Participation in developing a range of alternatives that address the issues and are consistent with land management plan direction, or identification of a forest plan amendment, if needed.

2. Conducting effects analysis. Documenting the direct, indirect, and cumulative effects. Interpreting and comparing the effects of the alternatives.

3. Reviewing the NEPA document.

Interaction among team members often provides insight that otherwise would not be apparent.

## 12.23 - Selection of Interdisciplinary Analyst(s) in Lieu of a Team

The responsible official may select one or more persons rather than a full team to conduct the required interdisciplinary analysis. This approach is normally used for projects that are of limited scope and complexity. The analyst(s) should have a working knowledge of the NEPA process, applicable statutes and regulations, and natural resource interactions.

## 12.24 - Responsibilities When Applicants and Contractors are Involved

> ***Applicants.** The responsible official shall make policies or staff available to advise potential applicants of studies or other information foreseeably required for acceptance of their applications. Upon acceptance of an application as provided by 36 CFR 251.54(g) the responsible official shall initiate the NEPA process.* (36 CFR 220.4(i))

The responsible official may require project proponents to conduct studies and provide data and documentation for consideration and use in preparing an EIS.

> **Agency responsibility.**
>
> **(a) Information. If an agency requires an applicant to submit environmental information for possible use by the agency in preparing an environmental impact statement, then the agency should assist the applicant by outlining the types of information required. The agency shall independently evaluate the information submitted and shall be responsible for its accuracy. If the agency chooses to use the information submitted by the applicant in the environmental impact statement, either directly or by reference, then the names of the persons responsible for the independent evaluation shall be included in the list of preparers §1502.17. It is the intent of this paragraph that acceptable work not be redone, but that it be verified by the agency.**
>
> **(b) Environmental assessments. If an agency permits an applicant to prepare an environmental assessment, the agency, besides fulfilling the requirements of paragraph (a) of this section, shall make its own evaluation of the environmental issues and take responsibility for the scope and content of the environmental assessment.**
>
> **(c) Environmental impact statements. Except as provided in §1506.2 and 1506.3 any environmental impact statement prepared pursuant to the requirements of NEPA shall be prepared directly by a contractor selected by the lead agency or where appropriate under §1501.6(b), a cooperating agency. It is the intent of these regulations that the contractor be chosen solely by the lead agency, or by the lead agency in cooperation with cooperating agencies, or where appropriate by a cooperating agency to avoid any conflict of interest. Contractors shall execute a disclosure statement prepared by the lead agency, or where appropriate the cooperating agency, specifying that they have no financial or other interest in the outcome of the project. If the document is prepared by contract, the responsible Federal official shall furnish guidance and participate in the preparation and shall independently evaluate the statement prior to its approval and take responsibility for its scope and contents...** (40 CFR 1506.5)

The "NEPA's 40 Most Asked Questions" provide additional guidance when applicants and contractors are involved (#16 & #17).

## 12.3 - Develop a Framework for Analysis

1. Identify and select data sources, analysis methods, and set standards of accuracy. This may include defining:

   a. What data are currently available (in resource databases, other analyses, and so on), and

   b. What data may need to be collected (from field investigation, other databases, and so on).

2. Define what type of analysis will be conducted and why it is appropriate. For example, the analysis may include the use of a model or qualitative discussion of key characteristics based on professional expertise.

3. Define measurement indicators and effects analysis boundaries, both spatially and temporally. Measurement indicators are used in the analysis to measure change from existing condition for each of the alternatives. Examples of indicators for different types of actions and resources include "fuel loading in tons per acre" or "percent of streambanks in project area in stable or vegetated condition".

4. Define the standards of accuracy commensurate to the acceptable level of risk and to the availability of qualitative and quantitative data. Describe the relationship between risk and accuracy. For example:

   a. The number of helicopter flights is the only data available to estimate effects of noise on wildlife.

   b. A walk through cruise will obtain 80% accuracy and is acceptable risk.

5. Determine the depth or detail of the analysis. The depth or detail of analysis will depend on the important management and resource issues, and should be commensurate to the magnitude of the effect.

6. Develop a framework to assure a range of reasonable alternatives will be analyzed. This may include methods to ensure a variety of alternatives that depict the tradeoffs of resolving environmental issues, or a simple tracking table that shows all issues are addressed to some degree by at least one alternative.

7. Develop a strategy to estimate the significance of environmental effects using the context and intensity definitions in zero code, section 05.

8. Consider how alternatives will be evaluated. This may include a framework for comparison of alternatives and the function of measurement indicators.

9. Consider how to ensure compliance with the forest's land management plan, policy, laws and regulations. This may include defining the regulatory framework to which analysis and actions are subject.

When formulating analysis, be sure to consider Agency objectives identified in legislation, policies, and plans, as well as issues raised by the public in the scoping process. Refine these frameworks, as necessary, during the course of the analyses.

## 12.4 - Identify Issues

Issues serve to highlight effects or unintended consequences that may occur from the proposed action and alternatives, giving opportunities during the analysis to reduce adverse effects and compare trade-offs for the decisionmaker and public to understand. Issues are best identified during scoping early in the process to help set the scope of the actions, alternatives, and effects to consider; but, due to the iterative nature of the NEPA process, additional issues may come to light at any time.

An issue should be phrased as a cause-effect statement relating actions under consideration to effects. An issue statement should describe a specific action and the environmental effect(s) expected to result from that action. Cause-effect statements provide a way to understand and focus on the issues relevant to a particular decision.

There is no set of standard issues applicable to every proposal, so it is important for the responsible official to consider a variety of laws, regulations, executive orders and input, with the help of the interdisciplinary team. The responsible official approves the issues to be analyzed in depth by the interdisciplinary team in the environmental analysis (FSM 1950.41). It is often helpful to organize and group similar issues by common resource, cause-effect relationships, same or common geographical area, or those linked to the same action.

## 12.41 - Considering Issues in Preparation of Environmental Impact Statements

The CEQ regulations refer to issues as they relate to environmental impact statements. For example see 40 CFR 1500.4:

> **Agencies shall reduce excessive paperwork by: …**
>
> **Discussing only briefly issues other than significant ones …**(40 CFR 1500.4(c))
>
> **Using the scoping process not only to identify significant environmental issues deserving of study, but also to deemphasize insignificant issues, narrowing the scope of the environmental impact statement process accordingly …**(40 CFR 1500.4(g))

For example see 40 CFR 1501.7:

> **As part of the scoping process the lead agency shall: …**
>
> **Determine the scope … and the significant issues to be analyzed in depth in the environmental impact statement. …** (40 CFR 1501.7(a)(2))
>
> **Identify and eliminate from detailed study the issues which are not significant or which have been covered by prior environmental review (1506.3), narrowing the discussion of these issues in the statement to a brief presentation of why they will not have a significant effect on the human environment or providing a reference to their coverage elsewhere.** (40 CFR 1501.7(a)(3))

Note the references to "significant issues" in relation to EISs. Use the term "significant issues" only when referring to "significant environmental effects". This is a different interpretation of the term "significant issue" than what the Forest Service previously used. Past Forest Service guidance, training, and practice used the term "significant issues" in relation to both EAs and EISs. The present interpretation is more closely aligned with the CEQ regulations.

In summary, issues are statements of cause and effect, linking environmental effects to actions. Only use the term "significant issues" when there may be a cause-effect relationship between a proposed action and a significant effect and the disclosure of that effect is documented in an EIS. The term "significant issue" should not be used outside of the EIS context.

## 12.42 - Considering Issues in Preparation of Environmental Assessments

Since issues are phrased as cause-effect relationships, the concept of describing a specific action and the environmental effect(s) expected to result from that action applies whether one is using an EA or an EIS. Issues (cause-effect relationships) serve to highlight effects or unintended consequences that may occur from the proposed action, providing opportunities during the analysis to explore alternative ways to meet the purpose and need for the proposal while reducing adverse effects. Since the CEQ regulations use the term "significant issues" in relation to significant effects, avoid confusion by not using the term "significant issue" in an EA.

## 12.5 - Measures

Identify units of measure for or indicators of effects. Specify measures that will be useful in judging differences among actions. To be useful in predicting and characterizing consequences, measures should be:

> <u>Understandable</u> – Decisionmakers and stakeholders should be able to understand what the measure is and how it characterizes the attribute.

Quantifiable – Measures should be capable of being quantified or classified into categories, with levels, values, or other units of measure to the extent practicable. A scale of measure can be natural (temperature), proxy (status of an ecological indicator species) or constructed (fire danger index). A constructed scale may combine many measures into a single series of classes or levels. A common example is the "heart risk factor index" that uses genetic and lifestyle factors to evaluate the relative healthiness of the human cardiovascular system.

Sensitive - Responsive enough to environmental influences and management activities to show changes in the attribute.

Measures should be considered in terms of the following dimensions:

1. Magnitude - value per unit of time or space.

2. Extent - span of influence in terms of geographic area, structural characteristic, functional process, or some other scale.

3. Duration - length of time the value (magnitude, extent, and so forth) will continue.

4. Likelihood - the probability of a value becoming a reality.

5. Speed - the time to reach a value.

For example, one measure may be the acreage of a lake (extent) over which a chemical will achieve some minimum concentration (intensity) for a certain period (duration) with 95% likelihood (likelihood) in 3 years (speed). In this example, the acreage (extent) is the measure to be predicted while the values of the other measures are assumed constant.

Another example would be the years (speed) for streams in a certain watershed (extent) to achieve a distribution of channel stability classes (intensity) for 100 years (duration) with 90% likelihood. The prediction would be limited to the speed of attainment.

## 12.6 - Documenting Public Involvement

Comments and other input received during scoping should be managed and documented. Documentation should include contact information like electronic and postal mailing information.

A variety of tools, including databases, are available to assist with comment tracking and management, as well as maintaining mailing lists. Information associated with public involvement, including comments received during scoping, is part of the public record.

### 12.61 - Expand Public Involvement as Appropriate

Review comments and suggestions offered by interested and affected agencies, Tribes, organizations, and individuals in response to scoping and the listing of the action in the schedule of proposed actions (sec. 06). Consider options for expanding public involvement to keep people informed and involved as the analysis progresses.

## 13 - COLLECT AND INTERPRET DATA

The type and amount of data to collect depend on the nature of the action, agency objectives, issues, and anticipated effects. Focus data collection on the current and expected physical, biological, economic, and social conditions affecting or affected by the proposed action. Document the assumptions, analysis, methods, and data sources. See section 15.2 about setting boundaries for the effects analysis.

If, when evaluating significant or potentially significant adverse effects on the human environment, information essential to a reasoned choice among alternatives is either missing or incomplete, the CEQ regulations provide the following guidance:

> **When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking.**
>
> **(a) If the incomplete information relevant to reasonable foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement.**
>
> **(b) If the information relevant to reasonable foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known, the agency shall include within the environmental impact statement:**
>
> > **(1) A statement that such information is incomplete or unavailable;**
> >
> > **(2) a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment;**
> >
> > **(3) a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment, and**
> >
> > **(4) the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community.**

> **For the purposes of this section, "reasonably foreseeable" includes impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason.** (40 CFR 1502.22)

## 14 - DEVELOP ALTERNATIVES

Under the CEQ regulations, the Agency is required to:

> **Study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources as provided by section 102(2)(E) of the Act.** (40 CFR 1501.2(c))

No specific number of alternatives is required or prescribed. Develop other reasonable alternatives fully and impartially. Ensure that the range of alternatives does not prematurely foreclose options that might protect, restore, and enhance the environment.

Reasonable alternatives to the proposed action should fulfill the purpose and need and address unresolved conflicts related to the proposed action. Be alert for alternatives suggested by participants in scoping and public involvement activities. Consider alternatives, even if outside the jurisdiction of the Agency.

Descriptions of the alternatives should include relevant mitigation measures that could reduce the impacts of the project, even if those measures are outside the jurisdiction of the Agency. Examples include; project design features to avoid or minimize impacts, forest plan requirements, Best Management Practices, and statutory and regulatory requirements related to Federal, State, and local laws and regulations.

As established in case law interpreting the NEPA, the phrase "all reasonable alternatives" has not been interpreted to require that an infinite or unreasonable number of alternatives be analyzed, but does require a range of reasonable alternatives be analyzed whether or not they are within Agency jurisdiction to implement (40 CFR 1502.14(c)). For further guidance, see questions 1, 2, and 3 of the "NEPA's 40 Most Asked Questions" and in section 65.12.

For EISs:

> ***The EIS shall document the examination of reasonable alternatives to the proposed action. An alternative should meet the purpose and need and address one or more significant issues related to the proposed action. Since an alternative may be developed to address more than one significant issue, no specific number of alternatives is required or prescribed.*** (36 CFR 220.5(e))

Develop and consider alternatives that would reduce significant impacts.

> ***(1) The responsible official may modify the proposed action and alternative(s) under consideration prior to issuing a draft EIS. In such cases, the responsible official may consider the incremental changes as alternatives considered. The documentation of these incremental changes to a proposed action or alternatives shall be included or incorporated by reference in accord with 40 CFR 1502.21.*** (36 CFR 220.5(e))

The intent of the regulation is to encourage collaboration throughout the analysis and decisionmaking process. Ongoing collaboration may often result in modification of a proposed action or alternative(s), resulting in a better proposal and ultimately a better decision. Such changes may not necessarily require the development of a new alternative if they can be accommodated through modification of an existing alternative. Incremental modifications that occur as a result of collaboration should be clearly described and documented in the analysis record, so that interested parties have a clear understanding of the nature of and reasons for the incremental changes.

For EAs:

> ***The EA shall briefly describe the proposed action and alternative(s) that meet the need for action. No specific number of alternates is required or prescribed.***
>
> ***When there are no unresolved conflicts concerning alternative uses of available resources (NEPA, section 102(2)(E)), the EA need only analyze the proposed action and proceed without consideration of additional alternatives.*** (36 CFR 220.7(b)(2)(i))

Develop and consider alternatives that would resolve conflicts about the proposal. When scoping indicates an agreement about the proposed action, there is no need to develop additional alternatives. In this case, document that fact in the EA so the reader knows why other alternatives were not considered.

## 14.1 - Adaptive Management Strategy

Alternatives may include an adaptive management strategy allowing for adjustment of the action during implementation. As stated in the Forest Service NEPA Procedures:

> ***The proposed action and one or more alternatives to the proposed action may include adaptive management. An adaptive management proposal or alternative must clearly identify the adjustment(s) that may be made when monitoring during project implementation indicates that the action is not having its intended effect, or is causing unintended and undesirable effects. The EIS [or EA] must disclose not only the effects of***

***the proposed action or alternative but also the effect of the adjustment. Such proposal or alternative must also describe the monitoring that would take place to inform the responsible official during implementation whether the action is having its intended effect.*** (36 CFR 220.5(e)(2) and §220.7(b)(2)(iv))

Adaptive management provides an implementation tool that goes beyond the "predict-mitigate-implement" model and incorporates an "implement-monitor-adapt" strategy that provides flexibility to account for inaccurate initial assumptions, to adapt to changes in environmental conditions or to respond to subsequent monitoring information that indicates that desired conditions are not being met. (The NEPA Task Force Report to the Council on Environmental Quality: Modernizing NEPA Implementation, September 2003)

When using adaptive management, display the proposed action as an initial management action and a collection of possible adjustments or acceptable tools to be used to modify the initial action to achieve the intended effects. Disclose the site-specific effects of all of these actions, adjustments, or use of acceptable tools in the analysis along with the monitoring methods to be used to determine the effectiveness of each. If monitoring demonstrates that the intended effects are not being achieved through the initial management action, the action can be modified using one or more of the identified adaptive management actions in a way that better achieves the intended effects.

So long as monitoring indicates that the environmental effects of each action do not exceed the bounds of those anticipated in the original decision and the actions serve to move the project toward the intended effects, implementation continues using the "implement-monitor-adapt" cycle without the need for new or supplemental NEPA review. A schematic displaying a scenario with three adjustments to an initial management action in a single alternative is shown in exhibit 01.

## 14.1 - Exhibit 01

**Adaptive Management Strategy**



Not all actions lend themselves to an adaptive management strategy and this guidance should not be construed to require its use. The ability to accomplish necessary monitoring and to fully analyze the effects of the range of additional adaptive management actions needs to be carefully considered before using an adaptive management approach.

## 14.2 - No-Action Alternative

The no-action alternative provides a baseline for estimating the effects of other alternatives; therefore, include the effects of taking no-action in each environmental analysis.

A no action alternative is required in an EIS (40 CFR 1502.14(c)). There is no requirement to include a no action alternative in an EA. In an EA, the effects of a no-action alternative may be documented as follows:

> ***The EA may document consideration of a no-action alternative through the effects analysis by contrasting the impacts of the proposed action and any alternatives(s) with the current condition and expected future condition if the proposed action were not implemented.*** *(36 CFR 220.7(b)(2)(ii))*

Two interpretations of no-action are possible. The first interpretation involves an action such as the amendment or revision of a land management plan where ongoing programs described within the existing plan continue, even as new plans are being developed. In these cases, the no-action alternative means no change from current management direction. Consequently, the responsible official would compare the projected impacts of alternative management schemes to those impacts projected for the existing plans or actions.

The second interpretation of no-action is that a proposed action or activity, such as a proposal to construct a road or authorize special uses of National Forest System lands, would not take place. The nature and scope of the proposed action will aid the responsible official in determining which interpretation is appropriate to the analysis.

Occasionally, to address an issue (sec. 12.4) an analysis could include both interpretations. For example, to update a range allotment plan, the no action alternative is no grazing, as specified in the Grazing Permit Administration Handbook (FSH 2209.13, sec. 92.31). Another alternative could be to continue under the current allotment plan management direction, if it meets the stated purpose and need. Current management could also be the proposed action if it is determined to be consistent with the land and resource management plan and has been shown to be effective in meeting resource objectives through monitoring over time.

For further guidance, see question 3 of "NEPA's 40 Most Asked Questions."

## 14.3 - Alternative Documentation Options

The proposed action and alternatives may be modified as analysis proceeds:

For an EIS:

> ***The responsible official may modify the proposed action and alternative(s) under consideration prior to issuing a draft EIS. In such cases, the responsible official may consider the incremental changes as alternatives considered. The documentation of these incremental changes to a proposed action or alternatives shall be included or incorporated by reference in accord with 40 CFR 1502.21.*** (36 CFR 220.5(e)(1))

For an EA:

> ***The description of the proposal and alternative(s) may include a brief description of modifications and incremental design features developed through the analysis process to develop the alternatives considered. The documentation of these incremental changes to a proposed action or alternatives may be incorporated by reference in accord with 40 CFR 1502.21.*** (36 CFR 220.7(b)(2)(iii))

Modifications and incremental changes to the alternatives may be considered as part of the range of alternatives. Documentation of these incremental changes must be available in the record. Incorporation by reference in accord with 40 CFR 1502.21 may be used to avoid duplicating the description and analysis in an EIS. In an EA, documentation may include a brief description of modifications and other incremental changes to the proposed action and alternative(s).

## 14.4 - Alternatives Not Considered in Detail

The range of alternatives considered by the responsible official includes all reasonable alternatives to the proposed action that are analyzed in the document, as well as other alternatives eliminated from detailed study. Alternatives not considered in detail may include, but are not limited to, those that fail to meet the purpose and need, are technologically infeasible or illegal, or would result in unreasonable environmental harm.

Note that a potential conflict with local or federal law does not automatically render an alternative unreasonable, although such conflicts must be considered. See the "NEPA's 40 Most Asked Questions", #2b.

Because alternatives eliminated from detailed study are considered part of the range of alternatives, the project or case file should contain descriptions of the alternatives and the reasons for their elimination from detailed study. If an EIS is required, this information must be disclosed in the chapter on alternatives (sec. 22.3, para. 5(a)).

## 15 - ESTIMATE EFFECTS OF EACH ALTERNATIVE

> **Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.** (40 CFR 1508.8(b))

For each alternative considered in detail, analyze and document the environmental effects, including the effectiveness of the mitigation measures that would result from implementing each alternative, including the no-action alternative. See section 12.5 for a discussion of measures.

Adaptive management is appropriate for any proposal when the effects of the possible adjustments identified are included in the estimated effects. (sec. 14.1)

When social or economic impacts are important to a reasoned decision, follow the direction in FSM 1970 and FSH 1909.17. Also consider unquantifiable environmental amenities and values. Consider expressing the effects in terms of changes that would occur in the following components of the human environment.

Physical (land, water, air),
Biological (plants and animals),
Economic (money passing through society), and
Social (the way people live).

Consider the magnitude, duration, and significance of the changes.

Reaching a conclusion about the significance of the effects is critical for the analysis summarized in the EA to support a finding of no significant impact (FONSI). Conclusions from the effects analysis in an EIS are also useful to the decisionmaker and public in understanding the consequences and trade-offs. For all alternatives, be sure to consider the environmental effects in terms of their context and intensity.

> **(a) Context. This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.**

**(b) Intensity. This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:**

**1. Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.**

**2. The degree to which the proposed action affects public health or safety.**

**3. Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.**

**4. The degree to which the effects on the quality of the human environment are likely to be highly controversial.**

**5. The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.**

**6. The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.**

**7. Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.**

**8. The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.**

**9. The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.**

**10. Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment. (40 CFR 1508.27)**

## 15.1 - Cumulative Effects

For the definition of "cumulative effects" and other terms (see zero code, sec. 05). Individual actions when considered alone may not have a significant impact on the quality of the human environment. Groups of actions may have collective or cumulative impacts that are significant. Cumulative effects must be considered and analyzed without regard to land ownership boundaries or who proposes the actions. Consideration must be given to the incremental effects of the action when added to the past, present, and reasonably foreseeable related future actions of the Forest Service, as well as those of other agencies and individuals, that may have a measurable and meaningful impact on particular resources. The following regulation applies to analysis of cumulative effects of past actions:

> ***Cumulative Effects Considerations of Past Actions (40 CFR 1508.7)*. Cumulative effects analysis shall be carried out in accordance with 40 CFR 1508.7 and in accordance with The Council on Environmental Quality Guidance Memorandum on Consideration of Past Actions in Cumulative Effects Analysis dated June 24, 2005:**
>
> ***The analysis of cumulative effects begins with consideration of the direct and indirect effects on the environment that are expected or likely to result from the alternative proposals for agency action. Agencies then look for present effects of past actions that are, in the judgment of the agency, relevant and useful because they have a significant cause-and-effect relationship with the direct and indirect effects of the proposal for agency action and its alternatives. CEQ regulations do not require the consideration of the individual effects of all past actions to determine the present effects of past actions. Once the agency has identified those present effects of past actions that warrant consideration, the agency assesses the extent that the effects of the proposal for agency action or its alternatives will add to, modify, or mitigate those effects. The final analysis documents an agency assessment of the cumulative effects of the actions considered (including past, present, and reasonable foreseeable future actions) on the affected environment.***
>
> ***With respect to past actions, during the scoping process and subsequent preparation of the analysis, the agency must determine what information regarding past actions is useful and relevant to the required analysis of cumulative effects. Cataloging past actions and specific information about the direct and indirect effects of their design and implementation could in some contexts be useful to predict the cumulative effects of the proposal. The CEQ regulations, however, do not require agencies to catalogue or exhaustively list and analyze all individual past actions. Simply because information about past actions may be available or obtained with reasonable effort does not mean that it is relevant and necessary to inform decisionmaking.*** (36 CFR 220.4 (f))

## 15.2 - Bounding Effects

Spatial and temporal boundaries are the two critical elements to consider when deciding which actions to include in a cumulative effects analysis. Spatial and temporal boundaries set the limits for selecting those actions that are most likely to contribute to a cumulative effect. The effects of those actions must overlap in space and time for there to be potential cumulative effects.

### 15.2a - Spatial Boundaries

Spatial boundaries define the affected area for each resource indicator. The affected area is the area in which a specific resource may be affected by management actions; whether they are past, present, or future. Affected areas can vary in size by resource and by the type of effect that may occur.

For example, the affected area for soils in a timber thinning operation would typically be the harvest units where soils are directly disturbed. However, the affected area for elk habitat may be an elk management unit that takes in several watersheds.

Because affected areas are resource dependent, they generally have boundaries that are physical or biological rather than political. Water quality in a river may be affected by actions on National Forest System, Bureau of Land Management, State, and private lands within the same watershed.

### 15.2b - Temporal Boundaries

In addition to identifying the affected area for each resource, it is important to also understand how the proposed action may interact with other past, present and future actions across time to produce cumulative effects. The time frames used depend on the duration of effects that the actions produce on the affected resource. For example, a fence can be constructed in a matter of days, but the effects from that fence on cattle or big game movement may last 20 years or more.

Past actions and events also need to be analyzed to determine how the present situation has been affected by history, and to identify trends or patterns that may exist. The objective of doing this is to establish a baseline for assessing future events. The no-action alternative can be an effective benchmark if it incorporates cumulative effects of past activities and accurately depicts the condition of the environment.

It is important to explain why discernible cumulative effects are not expected beyond the spatial and temporal boundaries of the affected area. Exhibit 01 shows how space and time boundaries of effects must overlap to be considered in the cumulative effects analysis.

## 15.2b - Exhibit 01

### Cumulative Effects Space and Time Overlap

**In order to have cumulative effects, the effects must overlap in space *and* time**



## 15.3 - Cumulative Effects Framework

When appropriate, the following framework should assist in the development of a meaningful cumulative effects analysis for project proposals.

1. Define the affected spatial area for each resource where effects (direct and indirect) may be caused by the proposed activities.

2. Define the temporal boundaries for each resource from the proposed activities (How long will the effects last?).

3. Document the rationale and sources for the spatial and temporal boundaries of the affected area for each resource.

4. Describe the effects that overlap in time and space for past, present, and reasonably foreseeable future actions (activities), regardless of ownership, that may combine with effects of the proposed activities and result in cumulative effects. Note that cumulative effects can be additive or synergistic to the point of being greater than the sum of the parts.

5. Briefly describe any key assumptions made in the analysis and any information gaps that may exist. Cite pertinent references, monitoring results, and so on.

## 16 - EVALUATE ALTERNATIVES AND IDENTIFY PREFERRED ALTERNATIVE(S)

The CEQ regulations provide the following guidance on evaluating alternatives in an EIS:

> **…present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decision maker and the public.** (40 CFR 1502.14)

Use the scientific analysis of the effects of the alternatives described in section 15 as the analytic basis for the evaluation. Comparative evaluation of alternatives should include concise summaries of impacts considered during any incremental alternative development process and the environmental effects of any adaptive management strategy. While a comparative evaluation should be presented in an EIS, there is no such requirement for an EA.

> **Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.** (40 CFR 1502.14(e))

Identification of a "preferred alternative" in the environmental document informs the public of the Agency's current preferred course of action. The preferred alternative is the alternative that the responsible official believes would fulfill the Agency's statutory mission and responsibilities, giving consideration to economic, environmental, technical, and other factors. More than one alternative may be identified as preferred. A preferred alternative need not be identified in a draft EIS if the responsible official does not have one at that stage. The preferred alternative must, however, be identified in a final EIS.

There is no requirement to identify a preferred alternative in an EA.

For further guidance, see questions 4a, 4b, 4c, and 5a of the "NEPA's 40 Most Asked Questions."

## 17 - DETERMINE TYPE OF ENVIRONMENTAL DOCUMENT NEEDED

The significance of environmental effects of a proposed action determines whether an EIS (sec. 05) must be prepared. If the proposed action may have significant environmental effects, prepare an EIS in accord with direction in chapter 20.

The CEQ regulations provide the following direction on whether to prepare an EIS:

> **In determining whether to prepare an environmental impact statement the Federal agency shall:**
>
> **(a) Determine under its procedures supplementing these regulations (described in §1507.3) whether the proposal is one which:**
>
> **(1) Normally requires an environmental impact statement, or**
>
> **(2) Normally does not require either an environmental impact statement or an environmental assessment (categorical exclusion).**
>
> **(b) If the proposed action is not covered by paragraph (a) of this section prepare an environmental assessment (§1508.9). The agency shall involve environmental agencies, applicants, and the public, to the extent practicable, in preparing assessments required by §1508.9(a)(1).**
>
> **(c) Based on the environmental assessment make its determination whether to prepare an environmental impact statement.**
>
> **(d) Commence the scoping process (§1501.7), if the agency will prepare an environmental impact statement.** (40 CFR 1501.4)

## 17.1 - Other Planning and Preparation Requirements for Environmental Documents

### 17.1a - Consultation Requirements

> **Environmental review and consultation requirements.**
>
> **(a) To the fullest extent possible, agencies shall prepare draft environmental impact statements concurrently with and integrated with environmental impact analyses and related surveys and studies required by the Fish and Wildlife Coordination Act (16 U.S.C. 661 et seq.), the National Historic Preservation Act of 1966 (16 U.S.C. 470 et seq.), the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.), and other environmental review laws and executive orders.** (40 CFR 1502.25(a))

Compliance with NEPA, therefore, includes a demonstration of compliance during project planning and execution with other measures for the protection of environmental values.

Conduct biological assessments as a part of the environmental analysis process. Informal consultation with the Fish and Wildlife Service or National Oceanic and Atmospheric Administration Fisheries in the early project planning stages provides the best opportunity for the formulation of project or program alternatives that will not have an adverse effect on listed or proposed species or their habitat (FSM 2671.44).

Until formal consultation is concluded, make no irreversible or irretrievable commitment of resources that has the effect of jeopardizing the continued existence of any listed or proposed species or adversely modifying its critical habitat (FSM 2671.45c). Refer to FSM 2360 for consultation requirements on heritage resources.

## 18 - CORRECTION, SUPPLEMENTATION, OR REVISION OF ENVIRONMENTAL DOCUMENTS AND RECONSIDERATION OF DECISIONS TO TAKE ACTION

Be alert for new information and changed circumstances that might affect decisions for actions that are awaiting implementation and for ongoing programs or projects to determine if the environmental analysis and documentation needs to be corrected, supplemented, or revised.

After a decision to implement a proposed action has been made and when the consideration of new information leads to the supplementation or revision of environmental documents, a new decision based on the supplemented or revised environmental documents must be consistent with the scope of the new environmental analysis.

## 18.1 - Review and Documentation of New Information Received After Decision Has Been Made

If new information or changed circumstances relating to the environmental impacts of a proposed action come to the attention of the responsible official after a decision has been made and prior to completion of the approved program or project, the responsible official should review the information carefully to determine its importance. Consideration should be given to whether or not the new information or changed circumstances are within the scope and range of effects considered in the original analysis.

If, after an interdisciplinary review and consideration of new information within the context of the overall program or project, the responsible official determines that a correction, supplement, or revision to an environmental document is not necessary, implementation should continue.

Document the results of the interdisciplinary review in the appropriate program or project file. This documentation is sometimes called a supplemental information report (SIR) and should conclude with whether or not a correction, supplement, or revision is needed, and if not, the reasons why.

A SIR is not a NEPA document and therefore cannot be used to fulfill the requirements for a revised or supplemental EA or EIS. A SIR cannot repair deficiencies in the original environmental analysis or documentation, nor can it change a decision.

If the responsible official determines that a correction, supplement, or revision to an environmental document is necessary, follow the relevant direction in sections 18.2 - 18.4.

## 18.2 - Reconsideration of Decisions Based on an Environmental Impact Statement

1. Correction. Use errata sheets to make simple corrections.

2. Supplement.

   (c) Agencies:

   (1) Shall prepare supplements to either draft or final environmental impact statements if:

      (i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or

      (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

(2) May also prepare supplements when the agency determines that the purposes of the Act will be furthered by doing so.

(3) Shall adopt procedures for introducing a supplement into its formal administrative record, if such a record exists.

(4) Shall prepare, circulate, and file a supplement to a statement in the same fashion (exclusive of scoping) as a draft and final statement unless alternative procedures are approved by the Council. (40 CFR 1502.9(c))

3. Revision.

**If a draft statement is so inadequate as to preclude meaningful analysis, the agency shall prepare and circulate a revised draft of the appropriate portion . . .** (40 CFR 1502.9(a))

If the responsible official determines, based on evaluations described in section 18.1, that a supplement to or revision of an EIS is appropriate, issue a notice of intent to supplement or revise an EIS.

Distribute any corrections, supplements, and revisions to all holders of the subject EIS. If there is good reason to believe the holder of the EIS will have a copy of the draft or final EIS, only the supplement needs to be circulated. However, if there is reason to believe the holder will not have the entire EIS, both the supplement and the EIS itself should be circulated.

After completion of the final supplement or final EIS, issue a new record of decision consistent with the scope of the supplement or revision. Follow the instructions in chapter 20.

## 18.3 - Reconsideration of Decisions Categorically Excluded From Environmental Documentation

Take no further action if an interdisciplinary review of the new information shows that the proposed action still fits within the identified category in section 31, and no extraordinary circumstances exist. For decisions for which a project or case file and decision memo have been prepared, document the review in the project or case file. For decisions for which a decision memo was not prepared, no documentation of the review is necessary.

If the new information or changed circumstances require a new or changed decision that can be categorically excluded from documentation, follow the instructions in chapter 30. If the new information indicates that extraordinary circumstances are now present and the proposed action may have a significant impact on the human environment, file a notice of intent to prepare an EIS. Follow the instructions in chapter 20.

If the new information indicates that extraordinary circumstances are now present but the significance of the impacts on the human environment are uncertain, prepare an EA. Follow the instructions in chapter 40.

## 18.4 - Reconsideration of Decisions Based on Environmental Assessment and Finding of No Significant Impact

Use errata sheets to make simple corrections.

Supplement or revise an EA if the interdisciplinary review of new information or changed circumstances indicates that changes in the EA are needed to address environmental concerns that have a bearing on the action or its impacts.

Upon completion of the supplemented or revised EA, prepare a new finding of no significant impact (FONSI) which addresses the effects of the action. Reconsider the original decision; and, based upon the EA and FONSI, issue a new decision notice or document that the original decision is to remain in effect and unchanged. A new decision notice may address all or a portion of the original decision. Follow the instructions in chapter 40.

If, based on the supplemented or revised EA, the proposed action may have a significant effect, issue a notice of intent to prepare an EIS. Follow the instructions in chapter 20.

**FSH 1909.15 – NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK**
**CHAPTER 40 – ENVIRONMENTAL ASSESSMENTS AND RELATED DOCUMENTS**

## Table of Contents

**41 - ENVIRONMENTAL ASSESSMENTS AND DECISION NOTICE ..... 2**
41.1 - Purpose of Environmental Assessments ..... 2
41.2 - Content ..... 2
41.21 - Need for the Proposal ..... 3
41.22 - Proposed Action and Alternatives ..... 3
41.23 - Environmental Impacts of the Proposed Action and Alternative(s) ..... 4
41.24 - Agencies and Persons Consulted ..... 5
**42 - OTHER CONSIDERATIONS IN PREPARING ENVIRONMENTAL ASSESSMENTS ..... 5**
42.1 - Tiering ..... 5
42.2 - Incorporation by Reference ..... 5
**43 - DOCUMENTATION OF DECISIONS ..... 6**
43.1 - Finding of No Significant Impact (FONSI) ..... 6
43.2 - Decision Notice ..... 6
43.21 - Format and Content ..... 7
**44 - NOTICE OR DISTRIBUTION OF FONSI AND DECISION NOTICE ..... 8**

This chapter is focused on documentation requirements for an environmental assessment (EA). Guidance for conducting an environmental analysis is found in chapter 10; definitions are in the zero code.

For ease of reference, Council on Environmental Quality (CEQ) regulations for implementing requirements of the National Environmental Policy Act (NEPA) are set out in **boldface type** and block-indented and Forest Service regulations, that supplement the CEQ regulations, are in **boldface type**, ***italicized,*** and block-indented.

## 41 - ENVIRONMENTAL ASSESSMENTS AND DECISION NOTICE

> ***An environmental assessment (EA) shall be prepared for proposals as described in § 220.4(a) that are not categorically excluded from documentation (§ 220.6) and for which the need of an EIS has not been determined (§220.5).*** (36 CFR 220.7(a))

The CEQ regulations provide that an EA is not necessary if the Agency has decided to prepare an environmental impact statement (EIS) (40 CFR 1501.3(a)). Therefore, if, prior to completion of the EA, the responsible official determines an EIS should be prepared, discontinue the EA documentation, prepare a notice of intent, and proceed with the preparation of an EIS (ch. 20).

### 41.1 - Purpose of Environmental Assessments

The purpose of an EA is to:

> **(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.**
>
> **(2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.**
>
> **(3) Facilitate preparation of a statement when one is necessary.** (40 CFR 1508.9(a))

### 41.2 - Content

> **"Environmental Assessment" means a concise public document…** (40 CFR 1508.9(a))
>
> ***An EA may be prepared in any format useful to facilitate planning, decisionmaking, and public disclosure as long as the requirements of paragraph (b) are met***. (36 CFR 220.7(a))

The requirements of 36 CFR 220.7(a) are discussed in the following sections. The length and detail of an EA may vary; however, CEQ advises agencies that they should be concise and normally not exceed 15 pages. See "NEPA's 40 Most Asked Questions", #36.

## 41.21 - Need for the Proposal

An EA:

> **Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.** (40 CFR 1508.9(b))
>
> ***An EA must include the following:***
>
> ***(1) Need for the proposal. The EA must briefly describe the need for the project.*** (36 CFR 220.7(b)(1))

The need for action discusses the relationship between the desired condition and the existing condition in order to answer the question, "Why consider taking any action?" The breadth or narrowness of the need for action has a substantial influence in the scope of the subsequent analysis.

## 41.22 - Proposed Action and Alternatives

> ***An EA must include the following:***
>
> ***Proposed action and alternative(s). The EA shall briefly describe the proposed action and alternative(s) that meet the need for action. No specific number of alternatives is required or prescribed.*** (36 CFR 220.7(b)(2))
>
> ***When there are no unresolved conflicts concerning alternative uses of available resources (NEPA, section 102(2)(E)), the EA need only analyze the proposed action and proceed without consideration of additional alternatives.*** (36 CFR 220.7(b)(2)(i))

See section 14 for guidance on alternative development.

> ***The EA may document consideration of a no-action alternative through the effects analysis by contrasting the impacts of the proposed action and any alternative(s) with the current condition and expected future condition if the proposed action were not implemented.*** (36 CFR 220.7(b)(2)(ii))

A stand-alone no-action alternative is not required. However, the effect of taking no action should correlate closely with the purpose and need. In other words, the effects of not taking action should provide a compelling reason for taking action and, therefore, should be consistent with the purpose and need for action.

> ***The description of the proposal and alternative(s) may include a brief description of modifications and incremental design features developed through the analysis process to develop the range of alternatives considered.*** (36 CFR 220.7(b)(2)(iii))

If applicable, summarize how a proposal or alternative was changed through collaboration and analysis. Incorporate by reference any existing documents regarding alternative development.

> ***The proposed action and one or more alternatives to the proposed action may include adaptive management. An adaptive management proposal or alternative must clearly identify the adjustment(s) that may be made when monitoring during project implementation indicates that the action is not having its intended effect, or is causing unintended and undesirable effects. The EA must disclose not only the effect of the proposed action or alternative but also the effect of the adjustment. Such proposal or alternative must also describe the monitoring that would take place to inform the responsible official whether the action is having its intended effect.*** (36 CFR 220.7(b)(2)(iv))

Adaptive management strategies should include an estimate of the conditions that would cause a change in agency actions.

## 41.23 - Environmental Impacts of the Proposed Action and Alternative(s)

***An EA must include the following:***

***(3) Environmental Impacts of the Proposed Action and Alternative(s). The EA:***

***(i) Shall briefly provide sufficient evidence and analysis, including the environmental impacts of the proposed action and alternative(s), to determine whether to prepare either an EIS or a finding of no significant impact (FONSI). (40 CFR 1508.9);***

***(ii) Shall disclose the environmental effects of any adaptive management strategy.*** (36 CFR 220.7(b))

The effects discussion for an alternative with an adaptive management strategy includes not only the effects of implementing the alternative without adjustments, but also includes the effects of making any of the identified adjustments.

***The EA:***

***Shall describe the impacts of the proposed action and any alternatives in terms of context and intensity as described in the definition of "significantly" at 40 CFR 1508.27.*** (36 CFR 220.7(b)(3)(iii))

See the definition of "significantly" in section 05, for a description of context and intensity, and in section 15.

***The EA:***

***May discuss the impact(s) (direct, indirect, and cumulative) of alternatives together in a comparative description or describe the impacts of each alternative separately.*** (36 CFR 220.7(b)(3)(iv))

If certain predicted effects of several alternatives are the same (for example, the effects on soils are the same for every alternative), the effects discussion could describe those effects as being the same and then focus on describing where the resources effects differ.

### 41.24 - Agencies and Persons Consulted

> ***An EA must include the following:***
>
> ***(4) Agencies and Persons Consulted.*** (36 CFR 220.7(b))

This should be a list of Federal, State, and local agencies, Tribes, and non-Forest Service individuals with whom the Agency engaged in discussions as part of the EA. For example, the list could include structured consultation with such agencies as a State Historic Preservation Office or the US Fish and Wildlife Service and less formal consultation with a permittee or a county manager. In addition, the EA may note the total number of individuals and groups that were notified on the availability of the EA in a library, World-Wide Web, or other locations.

## 42 - OTHER CONSIDERATIONS IN PREPARING ENVIRONMENTAL ASSESSMENTS

### 42.1 - Tiering

EAs may be tiered to EISs or EAs of broader scope to eliminate repetitive discussions (sec. 11.41). While the CEQ regulations discuss tiering to programmatic EISs, CEQ also acknowledges that preparing a programmatic EA is appropriate to determine whether a broad proposed action requires an EIS. In such a case, subsequent EAs may tier to the broader, programmatic EA.

### 42.2 - Incorporation by Reference

> ***The EA may incorporate by reference information that is reasonably available to the public.*** (36 CFR 220.7(a))

Incorporate material into EAs by reference to cut down on bulk without impeding agency and public review of the EA. Include a brief summary of the material being incorporated by reference. The EA:

> ***May incorporate by reference data, inventories, other information and analyses.*** (36 CFR 220.7(b)(3)(v))

See also section 11.43, on incorporation by reference and section 11.42, on adoption of other agency NEPA documents.

## 43 - DOCUMENTATION OF DECISIONS

### 43.1 - Finding of No Significant Impact (FONSI)

The CEQ regulations define a finding of no significant impact (FONSI) as:

> **. . . a document by a Federal agency briefly presenting the reasons why an action, not otherwise excluded (§1508.4), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared. It shall include the environmental assessment or a summary of it and shall note any other environmental documents related to it (§1501.7(a)(5)). If the assessment is included, the finding need not repeat any of the discussion in the assessment but may incorporate it by reference.** (40 CFR 1508.13)

If the responsible official determines that the proposed action may have a significant effect on the quality of the human environment, publish a notice of intent to prepare an EIS (ch. 20) in the *Federal Register*. Otherwise, prepare a FONSI. A FONSI may be a separate document or included as part of a decision notice (sec. 43.2).

Use the criteria in the definition for "significantly", zero code, section 05, for determining whether the action will have a significant effect on the human environment. The conclusions of a FONSI should be supported by references to the relevant sections of the EA.

In some situations, a FONSI must be available for a minimum of 30 days before a decision to implement a proposed action can be made (sec. 44).

For additional guidance on FONSIs, see questions 37a, 37b, 38, 39, and 40 in “NEPA’s 40 Most Asked Questions”.

### 43.2 - Decision Notice

> ***If an EA and FONSI have been prepared, the responsible official must document a decision to proceed with an action in a decision notice unless law or regulation requires another form of decision documentation (40 CFR 1508.13).*** (36 CFR 220.7(c))

The interdisciplinary team (IDT) leader should brief the responsible official and provide the responsible official with a copy of the EA and FONSI for review. The responsible official’s signature on the decision notice constitutes concurrence with the EA and FONSI.

If a FONSI cannot be prepared because the proposed action may have a significant effect on the environment, a decision notice is not required. If the responsible official chooses to proceed with preparation of an EIS, see section 21, for guidance on the notice of intent to prepare an environmental impact statement. The change in status of the environmental analysis should be noted in the Planning, Appeals, and Litigation System (PALS).

## 43.21 - Format and Content

***A decision notice must document the conclusions drawn and the decision(s) made based on the supporting record, including the EA and FONSI. A decision notice must include:***

***(1) A heading, which identifies:***

***(i) Title of document,***

***(ii) Agency and administrative unit,***

***(iii) Title of the project, and***

***(iv) Location of the action, including county, and State;*** (36 CFR 220.7(c))

In some cases, it may be appropriate to include the legal land description.

***A decision notice must include:***

***(2) Decision and rationale*** (36 CFR 220.7(c))

This section should describe the selected alternative and the nature of the decision. Specifically, this section should discuss:

1. How comments were considered.

2. Factors other than environmental effects considered in making the decision.

3. Environmental document(s), by title, considered in making the decision.

4. How the preceding considerations were weighed and balanced in arriving at the decision.

Any alternatives considered, should be briefly discussed with specific citations to relevant information in the EA. Relevant mitigation measures, management requirements, and monitoring provisions should be discussed with specific citations to the EA.

***A decision notice must include:***

***(3) Brief summary of public involvement*** (36 CFR 220.7(c))

Provide a brief summary of how the public was involved in the analysis. Persons or groups raising issues or asserting viewpoints may be identified and their views discussed in light of the decision. This can be an opportunity to explain how comments received during scoping and the formal comment period were considered and used in the environmental analysis.

***A decision notice must include:***

***(4) A statement incorporating by reference the EA and FONSI if not combined with the decision notice;***

***(5) Findings required by other laws and regulations applicable to the decision at the time of decision;***

***(6) Expected implementation date;***

***(7) Administrative review or appeal opportunities and, when such opportunities exist, a citation to the applicable regulations, and directions on when and where to file a request for review or an appeal;***

***(8) Contact information, including the name, address, and phone number of a contact person who can supply additional information; and***

***(9) Responsible Official's signature and the date the notice is signed.*** (36 CFR 220.7(c))

## 44 - NOTICE OR DISTRIBUTION OF FONSI AND DECISION NOTICE

Distribute EAs, decision notices, and FONSIs to agencies, organizations, and persons interested in or affected by the proposed action or notify them of the availability of these documents.

***The responsible official shall notify interested and affected parties of the availability of the EA, FONSI and decision notice, as soon as practicable after the decision notice is signed.*** (36 CFR 220.7(d))

Certain circumstances might require issuance of a FONSI in advance of a decision notice.

**The circumstances are:**

**(i) The proposed action is, or is closely similar to, one which normally requires the preparation of an environmental impact statement under the procedures adopted by the agency pursuant to 1507.3, or**

**(ii) The nature of the proposed action is one without precedent.** (40 CFR 1501.4(e)(2))

In such cases, the FONSI must be issued first in accord with the following CEQ rule:

> **. . . the agency shall make the finding of no significant impact available for public review (including State and area wide clearinghouses) for 30 days before the agency makes its final determination whether to prepare an environmental impact statement and before the action may begin.** (40 CFR 1501.4(e)(2))

The responsible official may provide other forms of notice appropriate to the nature and scope of the decision.

Remember to enter the date of the FONSI and the decision notice in the planning, appeals, and litigation system (PALS). In addition to the decision itself, the ability of the decision to be implemented is also tracked in the PALS. The conclusion to withdraw a decision voluntarily, the reversal of a decision in appeal, or a court case directing constraint of a decision, all require notation (action) in PALS.

# FOREST SERVICE MANUAL
# NATIONAL HEADQUARTERS (WO)
# WASHINGTON, DC

## FSM 2400 - TIMBER MANAGEMENT

## CHAPTER - ZERO CODE

**Amendment No.:** 2400-2009-2

**Effective Date:** September 28, 2009

**Duration:** This amendment is effective until superseded or removed.

**Approved:** RICHARD SOWA
Acting Associate Deputy Chief

**Date Approved:** 09/03/2009

**Posting Instructions:** Amendments are numbered consecutively by title and calendar year. Post by document; remove the entire document and replace it with this amendment. Retain this transmittal as the first page(s) of this document. The last amendment to this title was 2400-2009-1 to FSM 2400_zero_code.

| **New Document** | 2400_zero_code | 28 Pages |
|---|---|---|
| **Superseded Document(s) by Issuance Number and Effective Date** | 2400_zero_code (Amendment 2400-2009-1, 09/14/2009) | 28 Pages |

**Digest:**

Technical amendment to correct Healthy Forests Restoration Act (HFRA), it was misquoted as Healthy Forests Recreation Act (HFRA) throughout the document.

2400 Zero Code - Makes minor editorial and formatting changes throughout the chapter.

2404.15 – Removes direction already covered in section 2404.21 and 2404.28.

2404.16 – Removes direction already covered in section 2404.21 and 22404.28.

2404.21 – Clarifies that line officer authority may not exceed their specific delegation letter. The values shown in Exhibit 01 are the maximum levels that may be delegated but are not an automatic delegation. Clarifies the authority of the forest supervisor to delegate contracting officers at the ranger district level. Removes duplicate policy on delegation of contracting officer.

## Digest--Continued:

2404.23 – Authorize the Washington Office, Director Forest Management to delegate authority to dispose of timber under a stewardship agreement.

2404.24 – Clarifies that delegations of authority should only be done through official correspondence to named individuals. Raises the value of free use that may be delegated during emergencies to $10,000. Removes reference to individual free use limits. Adds stewardship agreements to the authority of the regional foresters.

2404.25 – Clarifies that delegations of authority should only be done through official correspondence to name individuals. Raises the value of free use that may be delegated during emergencies to $5,000. Removes reference to individual free use limits.

2404.25a – Removes reference to individual free use limits.

2404.26 – Adds stewardship agreements as an acceptable method for the disposal of timber and forest products.

2404.28 Exhibit 01 – Adds limits for stewardship service contracts and stewardship agreements. Raises the maximum limits for free use. Raises the maximum limit for Federal free use to the regional forester. Adds CFR reference to legal authority for Exchange Timber Sales. Adds policy reference to Seized Timber Sales. Adds legal authority under Innocent Trespass Timber Sales and raises the maximum limits for the regional forester and forest supervisor. Revises the maximum delegation limits for forest supervisor and district ranger for Timber Property Sales and adds additional policy references. Reformats, renumbers and updates footnote references for exhibit 01.

2409.21d – Removes the reference to the Compartment Prescription Handbook that was previously removed from the Directives System.

2409.25 – Removes the reference to the Timber Sale ADP Handbook that was previously removed from the Directives System.

## Table of Contents

**2401 - AUTHORITY ... 5**
2401.1 - Laws ... 5
2401.2 - Timber Management Regulations ... 6
**2402 - OBJECTIVES ... 7**
**2403 - POLICY ... 7**
2403.1 - Timber Ownership ... 7
2403.2 - Forest Resource and Project Planning ... 7
2403.3 - Information Systems ... 8
2403.4 - Cost Effectiveness ... 8
2403.5 - Integration with Other Resources ... 8
**2404 - RESPONSIBILITY ... 8**
2404.1 - Timber Management Program ... 8
2404.11 - Chief ... 9
2404.12 - Deputy Chief for National Forest System ... 9
2404.13 - Associate Deputy Chief for National Forest System ... 10
2404.14 - Washington Office, Director, Forest Management ... 10
2404.15 - Regional Forester ... 11
2404.16 - Forest Supervisor ... 12
2404.17 - District Ranger ... 13
2404.2 - Delegation of Authority to Sell and Dispose of Timber and Forest Products ... 14
2404.21 - Scope of Authority ... 15
2404.22 - Designation of Actings ... 16
2404.23 - Washington Office, Director, Forest Management ... 16
2404.24 - Regional Foresters ... 17
2404.25 - Forest Supervisors ... 18
2404.25a - District Rangers ... 19
2404.26 - Contracting Officers ... 19
2404.27 - Station Directors ... 20
2404.28 - Specific Delegations of Timber Sale and Disposal Authority ... 20
**2409 - FOREST SERVICE HANDBOOKS (FSH) ... 25**
2409.1 - Internal Servicewide Handbooks ... 25
2409.11 - National Forest Log Scaling Handbook (FSH) ... 25
2409.11a - Cubic Scaling Handbook (FSH) ... 25
2409.12 - Timber Cruising Handbook (FSH) ... 25
2409.12a - Timber Volume Estimator Handbook (FSH) ... 25
2409.13 - Timber Resource Management Planning Handbook (FSH) ... 25
2409.13a - Timber Permanent Plot Handbook (FSH) ... 25
2409.14 - Timber Management Information System Handbook (FSH) ... 25
2409.15 - Timber Sale Administration Handbook (FSH) ... 26
2409.17 - Silvicultural Practices Handbook (FSH) ... 26
2409.18 - Timber Sale Preparation Handbook (FSH) ... 26

2409.19 - Renewable Resources Handbook (FSH) ..... 26
2409.2 - Internal Unit Handbooks ..... 26
2409.21e - Timber Management Control Handbook (FSH) ..... 26
2409.21h - Timber Management Data Handbook (FSH) ..... 26
2409.22 - Timber Appraisal Handbook (FSH) ..... 26
2409.26 - Silvicultural Practices Handbook (FSH) ..... 27
2409.26b - Reforestation Handbook (FSH) ..... 27
2409.26c - Timber Stand Improvement Handbook (FSH) ..... 27
2409.26d - Silvicultural Examination and Prescription Handbook (FSH) ..... 27
2409.26e - Nursery Handbook (FSH) ..... 27
2409.26f - Seed Handbook (FSH) ..... 27
2409.26g - Tree Improvement Handbook (FSH) ..... 28

## 2401 - AUTHORITY

The authority for managing National Forest System timber derives from laws enacted by Congress, which authorize the Secretary of Agriculture to administer the national forests and to issue necessary regulations.

### 2401.1 - Laws

The principal statutes governing forest management on national forests are:

1. The Organic Administration Act of 1897 (16 U.S.C. 473-475), authorizes the Secretary of Agriculture to establish regulations governing the occupancy and use of national forests and to protect the forests from destruction.

2. The Knutson-Vandenberg Act of 1930 (16 U.S.C. 576-576b), as amended by the National Forest Management Act of 1976 (16 U.S.C. 472a), directs the Secretary to provide for improvement of the productivity of renewable resources within National Forest System timber sale areas. The act also authorizes the collection and use of timber receipts for these purposes.

3. The Multiple-Use, Sustained-Yield Act of 1960 (16 U.S.C. 528-531), recognizes timber as one of five major resources for which national forests are to be managed. This act further directs the Secretary to develop and administer the renewable surface resources of national forests for multiple use and sustained yield of the many products and services obtained from these resources.

4. The National Forest Roads and Trails Act of 1964 (16 U.S.C. 532-538), directs the Secretary to provide for the existence of an adequate system of roads and trails within and near national forests.

5. The Small Business Act of 1953, as amended (15 U.S.C. 644), provides for agencies to participate in programs with the Small Business Administration (SBA). This is the authority for the Small Business Timber Sale Set-Aside program (FSM 2439).

6. The National Environmental Policy Act (NEPA) of 1969 (16 U.S.C. 4321), requires agencies to analyze the physical, social, and economic effects associated with proposed plans and decisions, to consider alternatives to the action proposed, and to document the results of the analysis.

7. The Forest and Rangeland Renewable Resources Planning Act (RPA) of 1974 (16 U.S.C. 1600-1614) (as amended by National Forest Management Act of 1976), directs the Secretary to periodically assess the forest and rangeland resources of the Nation and to submit to Congress at regular intervals recommendations for long-range Forest Service programs essential to meet future resource needs.

8. The National Forest Management Act (NFMA) of 1976 (16 U.S.C. 472a), sets forth the requirements for land and resource management plans for the National Forest System. It also amends several of the basic acts applicable to timber management. It specifically addresses most aspects of timber management and how it is related to other resources. It is the primary authority governing the management and use of timber resources on National Forests System lands.

9. The Forest Resources Conservation and Shortage Relief Act of 1990, as amended by the Forest Resources Conservation and Shortage Relief Act of 1997 (16 U.S.C. 620), sets forth restrictions on export of unprocessed timber originating from Federal lands. It addresses certain exceptions to export restrictions and establishes reporting requirements.

10. The Healthy Forests Restoration Act (HFRA) of 2003 (Pub.L. 108-148), provides processes for implementing hazardous fuel reduction projects on certain types of "at-risk" National Forest System (NFS) and Bureau of Land Management (BLM) lands, and also provides other authorities and direction to help reduce hazardous fuel and restore healthy forest and rangeland conditions on lands of all ownerships.

11. Section 323 of Public Law 108-7 (16 U.S.C. 2104 note) grants the Forest Service authority until September 30, 2013, to enter into stewardship contracting projects with private persons or public or private entities, by contract or agreement, to perform services to achieve land management goals for national forests or public lands that meet local and rural community needs.

## 2401.2 - Timber Management Regulations

The Chief's authority to manage and dispose of timber and forest products is delegated from the Secretary at 7 CFR 2.60 and further defined at 36 CFR part 223 (FSM 1233 and 1234).

1. Title 36, Code of Federal Regulations, part 223 govern the sale and disposal of timber, timber export, and substitution restrictions.

2. Title 36, Code of Federal Regulations, part 223, subpart C, prescribe the policies and procedures governing the debarment and suspension of purchasers and those persons who violate the Forest Resources Conservation and Shortage Relief Act of 1990, as amended by the Forest Resources and Shortage Relief Act of 1997 (16 U.S.C. 620, et seq.; FSM 2455.4).

3. Title 7, Code of Federal Regulations, part 3017 (FSM 2433), addressing Governmentwide nonprocurement suspension and debarment system.

## 2402 - OBJECTIVES

To cultivate and maintain tree stands in a manner that promotes and achieves a diverse pattern of vegetation that best meets the needs of people now and in the future. Specific objectives for managing the forest resource of National Forest System lands are:

1. To provide a continuous supply of National Forest System timber for the use and necessities of the citizens of the United States.

2. To provide an even flow of National Forest System timber in order to facilitate the stabilization of communities and opportunities for employment.

3. To manage and provide for regeneration of tree stands.

4. To maintain a diversity of forest vegetation types and resources consistent with forest plans.

5. To plan and conduct cost-effective timber sales and other timber management activities.

6. To restore and maintain healthy forest conditions through the reduction of hazardous fuels.

## 2403 - POLICY

### 2403.1 - Timber Ownership

To avoid unauthorized disposal of timber, the forest officer initiating an action or project must determine the status and ownership of the lands involved, including the timber thereon. This includes review of any titles held by the United States, encumbrances on those titles, use restrictions imposed by the Forest Service or other agencies of Government, and restrictions imposed by laws, Executive orders, or other legal instruments transferring lands to the stewardship of the Forest Service.

### 2403.2 - Forest Resource and Project Planning

1. Determine the magnitude of the forest management program on a given national forest through the forest land and resource management planning process (FSM 1920).

2. Select, design, and implement timber project-level activities in an economically efficient manner, consistent with the objectives and guidance of the forest plan.

3. Conduct and document environmental analysis and subsequent decisions in accordance with direction in FSM 1950.

## 2403.3 - Information Systems

Use accurate, systematically stored, and reliably retrieved data from established systems (FSM 2490) to manage and report on the forest management program.

## 2403.4 - Cost Effectiveness

1. Plan and prepare individual timber sales and stewardship projects in a manner that ensures procedures and requirements, which decrease costs or increase revenues are taken into full account in the decision making process.

2. Ensure that the timber sale program on an individual national forest reflects present and anticipated future market conditions within the flexibility provided in the Forest plan.

3. Do not select alternative courses of action primarily because of the greatest dollar return or the greatest unit output, but seek to ensure that total benefits equal or exceed total costs over time.

## 2403.5 - Integration with Other Resources

1. Prepare and administer forest management program activities to meet the resource management objectives expressed in the forest plan.

2. Use the standards and guidelines in the forest plan to integrate needs for and protection of associated natural resources during project design and administration.

3. Use the timber sale program and other forest management activities to enhance timber and other forest resource values and benefits over time. The timber sale program can provide substantial fish and wildlife habitat improvement, road building with attendant recreation access, and improved timber stand productivity; decrease hazardous fuels and associated risks of catastrophic wildfire, improve forest health, and increase water yields; and it can also improve many other resources.

4. Recognize that forest management may also adversely affect these resources, and carry out these activities in a manner that minimizes adverse effects.

# 2404 - RESPONSIBILITY

## 2404.1 - Timber Management Program

## 2404.11 - Chief

The Chief:

1. Retains the overall authority over and responsibility for the timber management program including stewardship contracting.

2. Has authority to act as a debarring and/or suspending official as follows:

   a. Pursuant to 36 CFR part 223, subpart C, is responsible for debarring individuals, organizations, or other entities for causes specified at 36 CFR 223.137 (FSM 2455.4).

   b. Pursuant to 2 CFR part 180, is responsible for debarring and/or suspending individuals, organizations, or other entities for causes specified at 7 CFR 3017.800 and 7 CFR 3017.700, respectively (FSM 2433).

3. May redelegate the authority to serve as a Forest Service nonprocurement debarring or suspending official to the Deputy Chief, or an Associate Deputy Chief, National Forest System, (7 CFR 180.930 and 7 CFR 180.1010).

## 2404.12 - Deputy Chief for National Forest System

The responsibility of the Deputy Chief for the National Forest System is to:

1. Direct the allocation of the timber program budget and targets to respond to changing market conditions, improve returns on timber investments, and meet national, social, economic, and environmental needs.

2. Provide direction, leadership, and administration of servicewide forest management programs, policies, procedures, and advise the Chief of current national timber-related issues.

3. Formulate, coordinate, and implement broad policies for administration of the national forest management program and stewardship contracting.

4. Review, advise on, and approve or disapprove policies, programs, and regulations proposed by the Washington Office, Director, Forest Management.

5. Serve as debarring and/or suspending official when designated by the Chief (FSM 2404.11).

## 2404.13 - Associate Deputy Chief for National Forest System

The responsibility of the Associate Deputy Chief for the National Forest System with the functional responsibility for forest management is to:

1. Serve as the deciding officer on appeals filed under 36 CFR part 215, or reviewing officer for appeals filed under 36 CFR part 251 for timber issues appealed to the Chief, unless a superior officer elects to conduct the review.

2. Serve as a debarring and/or suspending official when designated by the Chief (FSM 2404.11).

3. Provide guidance for and supervision of the Washington Office, Director, Forest Management, in administering the national timber management program, including the Healthy Forests Restoration Act (HFRA) projects and stewardship contracting.

4. Review, advise on, and approve or disapprove policies, programs, and regulations proposed by Washington Office, Director, Forest Management, as directed by the Deputy Chief for the National Forest System.

## 2404.14 - Washington Office, Director, Forest Management

The responsibility of the Washington Office, Director, Forest Management is to:

1. Advise the Associate and Deputy Chief, National Forest System, and the Chief on servicewide forest management program, policies, procedures, and current national forest management-related issues.

2. Maintain relationships with the public, Members of Congress, and organizations that have concerns about forest resource management on a national basis. Keep abreast of nationwide public attitudes and desires regarding the Agency's forest management program.

3. Maintain coordination among the regions for major forest management activities, including HFRA and stewardship contracting, through national meetings, committees, correspondence, and staff advice.

4. Assist regions in clearly identifying needs and opportunities for the management of forest resources.

5. Recommend, as appropriate, objectives and priorities for regional forest management activities and stewardship contracting.

6. Conduct monitoring, field reviews, functional assistance trips, and audits of forest management activities, including stewardship contracting, to ensure that forest resource management and the resulting effects of the activities on other resources meet national policy requirements. Conduct activity reviews to evaluate forest management activities (FSM 1410).

7. Maintain national systems needed to support information needs for forest management at all levels in the Forest Service, and provide the official source for minimum information requirements that give the status and condition of the forest management program (FSM 2490).

8. Approve and conduct other forest-related business delegated by the Secretary of Agriculture to the Chief (FSM 2450). Cancel, partially cancel, or unilaterally modify timber sale contracts, as appropriate (36 CFR 223.116 (a)(5)).

9. Issue national special provisions for timber sale contracts.

## 2404.15 - Regional Forester

The responsibility of each regional forester is to:

1. Prescribe and oversee the implementation of regional objectives, policies, and responsibilities for all major aspects of forest resource management, including Healthy Forests Restoration Act (HFRA) and stewardship contracting.

2. Develop standards and provide for consistency and coordination among forests and with adjacent regions in meeting forest resource management objectives and targets.

3. Establish management direction (objectives, standards, and policies) that ensures the integration of the forest resource objectives with other regional programs and in forest land and resource management plans.

4. Maintain communication with individuals and organizations with regional concerns about management of forest resources.

5. Oversee the coordination of regional forest resource management programs with State and county agencies and encourage individuals and organizations to become involved in forest resource management activities, including HFRA projects and stewardship contracting.

6. Provide training and technical assistance to forest supervisors to ensure forest resource management expertise is available at the forest level.

7. Ensure that necessary environmental analysis and documentation occurs on any timber sale, HFRA project, or stewardship project decision that is within the regional forester's authority to approve.

8. Provide that monitoring, field reviews, functional assistance trips, and audits of forest resource management activities, including HFRA projects and stewardship contracting, are conducted to ensure that forest resource needs and the resulting effects of the activities on other resources meet national and regional policy requirements. Schedule activity reviews to evaluate forest management activities (FSM 1410).

9. Delegate authority to approve sale project plans (2404.21, paragraph 1a), ensure coordination of the sale project (2404.21, paragraph 1b), serve as the deciding officer for NEPA decisions (2404.21, paragraph 1c), and to sell and dispose of National Forest System timber and forest products (2404.21, paragraph 1d, and 2404.28).

10. Issue regional special provisions for timber sale and stewardship contracts. This authority may not be delegated below the regional office level.

11. Cancel timber sale contracts (36 CFR 223.116 (a)(1) through (4)) under the regional forester's authority. Refer cases to cancel, partially cancel, or unilaterally modify timber sale contracts reserved under the Chief's authority (36 CFR 223.116 (a)(5)) to the Washington Office, Director, Forest Management.

12. Refer cases to the debarring or suspending official for suspension and/or debarment when possible violations constituting cause for suspension or debarment are identified (FSM 2433 and 2455.4).

## 2404.16 - Forest Supervisor

The responsibility of each forest supervisor is to:

1. Provide management direction (objectives, standards, and policies) that ensures the integration of forest resource objectives into programs and projects at the ranger district level, and to integrate forest resource management programs with other resource management programs in developing and implementing the forest plan.

2. Maintain communication with individuals and organizations with concerns about local forest management. Ensure public notice of decisions affecting forest resource activities implemented under the forest supervisor's authority (36 CFR part 215 and FSH 1909.15).

3. Oversee the coordination of forest and project level plans with State and county agencies and encourage involvement by local individuals and organizations in the design and implementation of forest resource management activities, giving the public an opportunity to participate in solving forest resource management problems.

4. Provide the opportunity for training and technical assistance to district rangers as needed to meet the need for staff expertise to properly implement forest resource management including Healthy Forests Restoration Act (HFRA) and stewardship contracting.

5. Require the use of the Timber Information Manager (TIM) data for resource coordination and forest resource program and project interdisciplinary planning, design, and management. Establish the minimum information requirements necessary to meet program and project management needs on the forest. Require verification of the accuracy of data entered into the system.

6. Ensure that necessary environmental analysis and documentation occurs on any timber sale, HFRA project or stewardship project decision that is within the forest supervisor's authority to approve.

7. Oversee monitoring, field reviews, functional assistance trips, and audits of forest resource management activities including HFRA and stewardship contracting to ensure that forest resource needs and the resulting effects of the activities on other resources meet regional and forest-level policy requirements. Schedule activity reviews to evaluate forest resource management activities (FSM 1410).

8. Delegate authority to approve sale project plans (2404.21, paragraph 1a), ensure coordination of the sale project (2404.21, paragraph 1b), serve as the deciding officer for NEPA decisions (2404.21, paragraph 1c), and to sell and dispose of National Forest System timber and forest products (2404.21, paragraph 1d, and 2404.28).

9. Refer cases to the regional forester for suspension and/or debarment when possible violations that constitute cause for suspension or debarment are identified (FSM 2433 and 2455.4).

10. Refer cases to cancel, partially cancel, or unilaterally modify timber sale contracts reserved under the Chief's authority (36 CFR 223.116(a)(5)) to the Washington Office, Director, Forest Management, through the regional forester.

## 2404.17 - District Ranger

Each district ranger is responsible to the forest supervisor for all forest resource management activities on the district. Except for those responsibilities specifically reserved by the forest supervisor, it is the responsibility of the district ranger to:

1. Plan and implement forest resource management programs and projects including HFRA and stewardship contracting that are responsive to the forest plan goals and objectives. Integrate forest resource management programs with other resource management programs in developing and implementing the forest plan.

2. Monitor and evaluate forest plan forest resource management prescriptions to measure compliance with goals and objectives, determine effects, and adjust subsequent management actions when needed.

3. Encourage local individuals and organizations to become involved in the management of forest resources. Provide public notice of decisions affecting forest resource activities implemented under the district ranger's authority (36 CFR part 215 and FSH 1909.15).

4. Provide for the collection and maintenance of accurate information that is necessary to meet forest resource program and project management needs and to report forest resource management activities and their results.

5. Ensure quality of work in all phases of the forest resource management program including HFRA and stewardship contracting.

6. Ensure that the necessary environmental analysis and documentation occurs on any timber sale, HFRA project or stewardship project decision that is within the district ranger's authority to approve.

7. Delegate authority to sell and dispose of National Forest System timber and forest products for each of the following separate authorities:

a. The authority and responsibility to ensure coordination of the sale project (FSM 2430, 2404.21 paragraph 1b, and 2404.28).

b. The authority to approve permits using permit form FS-2400-1 and FS-2400-8 (forest officer authority, 2404.21 paragraph 1d, and 2404.28).

8. Refer cases to the forest supervisor for suspension or debarment when possible violations that constitute cause for suspension or debarment are identified (FSM 2433 and 2455.4).

9. Refer cases to cancel, partially cancel, or unilaterally modify timber sale contracts reserved under Chief's authority (36 CFR 223.116(a)(5)) to the Washington Office, Director, Forest Management, through the forest supervisor and regional forester.

## 2404.2 - Delegation of Authority to Sell and Dispose of Timber and Forest Products

Pursuant to the delegations by the Secretary at 7 CFR 2.60, the Chief has full authority to act for the Secretary in the sale and disposal of timber and forest products. This section redelegates that authority to the Washington Office, Director, Forest Management, and Forest Service line officers, subject to the reservations and limitations specified. For ease of reference, the maximum delegations are set forth in exhibit 01, FSM 2404.28.

## 2404.21 - Scope of Authority

The granting of authority to sell and dispose of National Forest System timber and forest products is limited to the actual authorizations conferred to an individual by a line officer and is subject to the following principles and limitations:

1. The following four authorities associated with the disposal of timber and forest products may be redelegated below the regional forester level only in writing to a named individual and not to a position (FSM 2404.15, 2404.16, and 2404.17):

a. The authority to approve sale project plans, including the Sale Area Improvement (K-V) Plan, Salvage Sale Fund Plan, Brush Disposal and Collection Plan, the Gate 1-4 Certifications for the Timber Information Manager (FSM 2430), and the Timber Sale Implementation Plan (FSM 2430 and 2470). This is a line officer function and may not be delegated below the district ranger.

b. The authority and responsibility to ensure coordination of the sale project (FSM 2430). A line officer to whom authority and responsibility has been delegated to ensure coordination of the sale project may designate individual subordinates, by name and in writing, to act for that officer within the limits of the original delegation. This authority may be delegated to staff officers below the district ranger.

c. The authority and responsibility to oversee and supervise the requisite environmental analysis and documentation pursuant to the National Environmental Policy Act (NEPA) (40 CFR parts 1500-1508 and FSM 1950) and to serve as the deciding officer who signs and issues decisions that contain forest resource sale projects (NEPA decision authority). This is a line officer function and may not be delegated below the district ranger.

d. The authority to serve as an agent for the Forest Service to select a bidding method for each sale and to award and enter into timber sale contracts (contracting officer authority) or to approve permits (forest officer authority). The regional forester shall delegate to qualified individuals the authority to award and administer timber sale contracts, integrated resource timber contracts and stewardship agreements, pursuant to the Contract Disputes Act, or to approve permits. The forest supervisor shall only delegate the authority to award and administer timber sale contracts or to approve permits up to the volumes and values specified in FSM 2408.28, exhibit 01 for district rangers. The district ranger shall delegate authority to approve permits. All delegations must be to an individual named as contracting officer for contracts and forest officer for permits and not to a position.

2. Pursuant to paragraph 1c of this section, a line officer may approve multi-sale decision documents exceeding the scope (40 CFR 1508.25) of their single-sale authority, provided the volume or value of each contract or agreement offered under the decision does not

exceed the single-sale authority of the individual designated pursuant to paragraph 1d of this section to sign the contract or agreement. Regional foresters may approve multi-task order and multi-year stewardship contract projects, which include disposal of timber and forest products, provided each task order or contract does not exceed their delegated authority.

## 2404.22 - Designation of Actings

Subject to the limitations in FSM 2404.21 and consistent with direction in FSM 1231.3, subordinates may be designated to act in the absence of the line officer in the sale and disposal of timber and forest products. Each designation must be in writing and specify:

1. The area to which the designation applies (FSM 2404.21);

2. The period during which the designation is effective;

3. The timber sale and disposal activities included in the designation;

4. The kinds of material included; and

5. The maximum value or volume that may be approved in any one transaction.

In the short-term absence (2 weeks or less) of the designated contracting officer, a line officer shall act as contracting officer for the administration of the contract unless that delegation has been given to an alternate contracting officer following the procedures in FSM 2404.21. The signature of a line officer acting for a contracting officer must appear over the title of "contracting officer."

In the long-term absence (greater than 2 weeks) of the designated contracting officer, a replacement contracting officer shall be delegated authority following the procedures in section FSM 2404.21.

## 2404.23 - Washington Office, Director, Forest Management

The Washington Office, Director, Forest Management, is authorized:

1. To award and enter into timber sale contracts whose values or volumes exceed the authority granted to a regional forester as shown in FSM 2404.28, exhibit 01. In the absence of the Director, an Associate Deputy Chief or the Deputy Chief for the National Forest System, the Associate Chief, or the Chief must approve such a sale. This authority includes the authority to select bidding methods, re-determine rates, enter into contract modifications, designate contracting officers for sales made under the Chief's authority, and conduct related timber sale business.

2. On a case-by-case basis to delegate to the regional forester or to a named contracting officer, the authority to award and enter into a timber sale contract, integrated resource contract, or stewardship agreement whose value or volume exceeds the authority granted to the regional forester in FSM 2404.28, exhibit 01.

3. To exercise the authority of the Chief at 36 CFR 223.88 to specify bidding methods on any Forest Service timber sale contract in any area where evidence indicates collusive behavior or where less than normal competitive bidding practices may be occurring. This authority includes specifying a mix of sealed and oral auction bidding in these situations and concurring in proposed changes in historic bidding methods put forward by the regional foresters under other circumstances. This authority may not be redelegated.

4. To exercise the authority of the Chief at 36 CFR 223.116(b) to cancel, partially cancel, or unilaterally modify contracts when operations would result in serious environmental degradation or resource damage (36 CFR 223.116 (a)(5)).

## 2404.24 - Regional Foresters

1. General Delegations. Each regional forester is granted the authority to sell and dispose of timber in the volumes and values shown in FSM 2404.28, exhibit 01. By official correspondence to a named individual, each regional forester shall delegate to forest supervisors the authority to sell and dispose of timber within the following volume and value limitations:

a. Free Use.

(1) Up to $10,000 during times of emergencies (as determined by the regional forester) (36 CFR 223.8).

(2) Up to $5,000 for certain mining claims (36 CFR 223.9).

(3) In the Alaska region, up to 10,000 board feet of sawtimber and 25 cords of wood, or an equivalent amount in other forms (36 CFR 223.10).

b. Seized Timber. Amount delegated on a case-by-case basis (36 CFR 223.3).

2. Amounts in Excess of the Station Director's Sale Authority. The regional forester, with the concurrence of the station director, may delegate to the forest supervisor authority to enter into sales for amounts in excess of the station director's sale authority from experimental forests within the national forest boundary.

3. Federal Sustained-Yield Units. Regional foresters with Federal Sustained-Yield Units are delegated authority to designate approved responsible operators (AROs). This authority may be redelegated to forest supervisors for sales other than sawtimber (sawlogs).

4. Cancellation of Contracts Under 36 CFR 223.116(b). Regional foresters are authorized to exercise the authority of the Chief at 36 CFR 223.116(b) to cancel contracts, within their delegated authority at FSM 2404.28, that meet the criteria listed in 36 CFR 223.116 (a)(1) through (a)(4). This authority may not be redelegated.

5. Delegation of Contracting Officers. Regional foresters may delegate authority to qualified individuals at the regional or forest level, both line and staff positions, to award and administer timber sale contracts using forms FS-2400-6, FS-2400-6T, FS-2400-3S, FS-2400-3P, FS-2400-3T, FS-2400-4, and FS-2400-2, and stewardship contracts using integrated resource contract form FS-2400-13 and FS-2400-13T pursuant to the Contract Disputes Act (FSM 2404.15). Such a delegation as contracting officer must be made to a named individual in official correspondence for a specific contract or set of contracts. The delegation may not be made to a position or issued in a FSM supplement. The individual designated shall meet the minimum requirements stated in FSM 2452.4. In a case where the same individual executes line and contract authorities, it is critical to specify under which authority the individual is to carry out a given action (FSM 2404.21).

6. Delegation of Authority to Dispose of Timber or Forest Products in Stewardship Contracts and Stewardship Agreements. Regional foresters may delegate authority to qualified individuals at the regional or forest level, both line and staff positions, to dispose of timber on stewardship contracts and stewardship agreements using the integrated resource service contract or stewardship agreement formats. Such delegation must be made to a named individual in official correspondence for a specific contract or set of contracts. The delegation may not be made to a position or issued in a FSM supplement.

## 2404.25 - Forest Supervisors

Consistent with the authority delegated by the regional forester, forest supervisors shall issue supplemental direction to FSM 2404.28, exhibit 01 to redelegate to district rangers, or by official correspondence to a named individual, the authority to approve disposal of timber within the following volume and value limitations:

1. Free Use. If delegated by the regional forester, $5,000 during times of emergencies (36 CFR 223.8) and $5,000 for certain mining claims (36 CFR 223.9). If delegated by the regional forester, Region 10, forest supervisors in Region 10 may redelegate up to 10,000 board feet of sawtimber and 25 cords of wood, or an equivalent amount in other forms (36 CFR 223.10).

2. Seized Timber. If delegated by the regional forester, forest supervisors shall redelegate the amount on a case-by-case basis (36 CFR 223.3).

3. Delegation of Contracting Officers. Forest supervisors shall delegate authority to qualified individuals at the district level, both line and staff positions, to award and administer timber sale contracts using forms FS 2400-4 and FS 2400-2 pursuant to the Contract Disputes Act (FSM 2404.15). A delegation to serve as contracting officer shall be made by official correspondence to a named individual, for a specific contract or set of contracts. The delegation may not be made to a position or issued in a FSM supplement. The individual designated shall meet the minimum requirements stated in FSM 2452.4, except as provided in FSM 2404.26. In a case where the same individual executes line and contract authorities, it is critical to specify under which authority the individual is to carry out a given action (FSM 2404.21).

## 2404.25a - District Rangers

Consistent with the authority delegated by the forest supervisor, district rangers shall redelegate the authority to approve disposal of timber within the following volume and value limitations:

1. Free Use. If delegated by the forest supervisor, Region 10, district rangers in Region 10 may redelegate up to 10,000 board feet of sawtimber and 25 cords of wood, or an equivalent amount in other forms (36 CFR 223.10).

2. Delegation of Forest Officers. District rangers may delegate authority to qualified individuals at the district level to approve permits on forms FS-2400-1 and FS-2400-8 (FSM 2404.17). A delegation to serve as forest officer shall be made by official correspondence to a named individual, for a specific permit or set of permits. The delegation may not be made to a position or issued in a FSM supplement. The individual designated shall meet the minimum requirements stated in FSM 2452.4.

## 2404.26 - Contracting Officers

Authority is limited to that specified by the regional forester for regional and forest contracting officers (FSM 2404.24) and by the forest supervisor for district contracting officers (FSM 2404.25).

The contracting officer for a procurement contract (FSM 6301.3) or integrated resource service contract has authority to dispose of national forest timber and forest products when disposal of such products is included as part of a procurement stewardship contract or stewardship agreement, up to the limits specified by the regional forester. Delegation must be done by letter from the regional forester outlining stewardship contracting and stewardship agreement authority and responsibility for the sale and disposal of timber and forest products (FSH 2409.19, ch. 60).

## 2404.27 - Station Directors

Authority includes commercial, administrative, special forest products, innocent trespass sales, and administrative free use (FSM 2404.28, ex. 01).

## 2404.28 - Specific Delegations of Timber Sale and Disposal Authority

Exhibit 01 lists the maximum size or value of sales and other disposals by type, region, and officer. Regional foresters and forest supervisors shall redelegate authorities to subordinate positions on specific units. Do not use supplements to this exhibit to issue delegations to named individuals; official correspondence shall be used for such delegations. Regional foresters shall delegate authorities that exceed the amount authorized in exhibit 01 to named individuals for specific sales.

## 2404.28 - Exhibit 01

## Delegated Authority To Sell and Dispose of National Forest Timber and Forest Products

| Type of Disposal and Legal Authority | Delegated Officer 1/ | Maximum Level of Approved Authority (Volume or Value Reference) | Policy Reference |
|---|---|---|---|
| **Commercial Sales** 36 CFR 223.1 7 CFR 2.60 16 U.S.C. 2104 Note | | (CCF 2/) | |
| | Regional Forester | 100,000 | FSM 2431 |
| | Forest Supervisor | 50,000 | |
| | District Ranger | 5,000 | |
| | Station Director | 200 | |
| | Director, WO-FM | Volume or Value Exceeding RF Authority | |
| **Integrated Resource Timber Sales (IRTC)** 36 CFR 223.1 7 CFR 2.60 16 U.S.C. 2104 Note | | (CCF 2/) | |
| | Regional Forester | 100,000 | FSM 2431 |
| | Forest Supervisor | None | |
| | District Ranger | None | |
| | Station Director | None | |
| | Director, WO-FM | Volume or Value Exceeding RF Authority | |
| **Integrated Resources Service Contracts (IRSC)** 36 CFR 223.2 36 CFR 223.12 16 U.S.C. 2104 Note | | (CCF 2/3/) | |
| | Regional Forester | 10,000 | FSH 2409.19 |
| | Forest Supervisor | None | |
| | District Ranger | None | |
| | Station Director | None | |
| | Director, WO-FM | Volume or Value Exceeding RF Authority | |
| **Stewardship Agreements** 36 CFR 223.2 36 CFR 223.12 16 U.S.C. 2104 Note | | (CCF 2/3/) | |
| | Regional Forester | 10,000 | FSH 2409.19 |
| | Forest Supervisor | None | |
| | District Ranger | None | |
| | Station Director | None | |
| | Director, WO-FM | Volume or Value Exceeding RF Authority | |
| **Administrative Use Sales** 36 CFR 223.2 7 CFR 2.60 | | (CCF 2/) | |
| | Regional Forester | 100,000 | FSM 2463 |
| | Forest Supervisor | 5,000 | |
| | District Ranger | 500 | |
| | Station Director | 200 | |
| | Director, WO-FM | Volume or Value Exceeding RF Authority | |

## 2404.28 - Exhibit 01—Continued

| Type of Disposal And Legal Authority | Delegated Officer 1/ | Maximum Level of Approved Authority (Volume or Value Reference) | Policy Reference |
|---|---|---|---|
| **Special Forest Product Sales**<br>36 CFR 223.1<br>7 CFR 2.60 | Regional Forester 4/ | ($ Advertised Value)<br>$100,000 | FSM 2467 |
| | Forest Supervisor | As Delegated | |
| | District Ranger | $10,000 | |
| | Station Director | $2,000 | |
| | Director, WO-FM | Volume or Value Exceeding RF Authority | |
| **Free Use**<br>36 CFR 223.5-.10<br>7 CFR 2.60 | Regional Forester 4/ | ($ Appraised Value 3/)<br>$10,000 | FSM 2462 |
| | Forest Supervisor | $5,000 | |
| | District Ranger | $200 | |
| | Station Director | $None | |
| | Director, WO-FM | Volume of Value Exceeding RF Authority | |
| **Federal Free Use**<br>36 CFR 223.11<br>7 CFR 2.60 | Regional Forester | ($ Appraised Value 3/)<br>$10,000 | FSM 2462 |
| | Forest Supervisor 8/ | As Delegated | |
| | District Ranger | None | |
| | Station Director | None | |
| | Director, WO-FM | Volume of Value Exceeding RF Authority | |
| **Administrative Free Use** | Regional Forester | (CCF 2/)<br>5,000 | FSM 2463 |
| | Forest Supervisor 8/ | As Delegated | |
| | District Ranger | 200 | |
| | Station Director | 40 | |
| | Director, WO-FM | Volume or Value Exceeding RF Authority | |
| **Settlement Sales** | Regional Forester | (CCF 2/)<br>5,000 | FSM 2464 |
| | Forest Supervisor 8/ | As Delegated | |
| | District Ranger | 200 | |
| | Station Director | 40 | |
| | Director, WO-FM | Volume or Value Exceeding RF Authority | |

## 2404.28 - Exhibit 01—Continued

| Type of Disposal and Legal Authority | Delegated Officer 1/ | Maximum Level of Approved Authority (Volume or Value Reference) | Policy Reference |
|---|---|---|---|
| **Exchange Timber Sales** 36 CFR 223.4 36 CFR 223.14 7 CFR 2.60 | Regional Forester | (CCF 2/) 100,000 | FSM 2465 |
| | Forest Supervisor | 5,000 | |
| | District Ranger | None | |
| | Station Director | None | |
| | Director, WO-FM | Volume or Value Exceeding RF Authority | |
| **Seized Timber Sales** 36 CFR 223.3 7 CFR 2.60 | Regional Forester | (CCF 2/9/) 10,000 | FSM 2466 FSM 2469 |
| | Forest Supervisor 8/ | As Delegated | |
| | District Ranger 8/ | As Delegated | |
| | Station Director | None | |
| | Director, WO-FM | Volume or Value Exceeding RF Authority | |
| **Innocent Trespass Timber Sales** 36 CFR 223.1 36 CFR 223.3 7 CFR 2.60 | Regional Forester | ($ Appraised Value 8/) No Limit | FSM 2466 |
| | Forest Supervisor | $10,000 | |
| | District Ranger | $500 | |
| | Station Director | None | |
| | Director, WO-FM | Volume or Value Exceeding RF Authority | |
| **Cooperative and Federal Sustained-Yield Unit Sales** 36 CFR 223.117 7 CFR 2.60 | Regional Forester 10/ | (CCF 2/) 100,000 | FSM 2468 |
| | Forest Supervisor | 50,000 | |
| | District Ranger | 5,000 | |
| | Station Director | None | |
| | Director, WO-FM | Volume or Value Exceeding RF Authority | |
| **Timber Property Sales** 36 CFR 223.1 7 CFR 2.60 | Regional Forester | (CCF 2/) 10,000 | FSM 2466 FSM 2469 FSH 2409.18 |
| | Forest Supervisor | As Delegated | |
| | District Ranger | As Delegated | |
| | Station Director | None | |
| | Director, WO-FM | Volume or Value Exceeding RF Authority | |
| **Environmental Analysis** 36 CFR 223.1 36 CFR 223.2 | Regional Forester | (CCF 2/) 100,000 | FSH 1909.15 |
| | Forest Supervisor | As Delegated | |
| | District Ranger | As Delegated | |
| | Station Director | 200 | |
| | Director, WO-FM | Volume or Value Exceeding RF Authority | |

**2404.28 - Exhibit 01—Continued**

1/ Refer to FSM 2404.21, paragraphs 1a through d for the four separate authorities that may be delegated to individuals. In making delegations, line officers may not exceed the volumes and values in this exhibit unless otherwise delegated in writing.

2/ Volumes shown in hundred cubic feet (CCF) may be interpreted to mean an equivalent amount in thousands of board feet (MBF), hundred cubic meters (CCM) or tons.

3/ As part of the project approval process, regional foresters shall authorize specific volume limit delegations for the sale or disposal of timber and forest products. Delegations must be based on the experience and qualifications of the assigned contracting officer. Sale and Disposal of timber and forest products should be accomplished in a single task order, if possible.

4/ Regional forester, Region 10, is delegated 10,000 board feet of sawtimber and 25 cords of wood, or an equivalent amount in other forms and may redelegate up to this amount to forest supervisors and district rangers.

5/ Amounts listed are restricted by regulation (36 CFR 223.8).

6/ May be increased to $10,000 by regional forester in times of emergency, and regional forester may delegate up to $5000 for certain mining claims (36 CFR 223.9).

7/ If delegated by regional forester, forest supervisor may redelegate up to $10,000 in times of emergency and up to $5,000 for certain mining claims (36 CFR 223.9).

8/ Amount delegated on a case-by-case basis by the regional forester.

9/ If advertisement is impractical, sales of material with an appraised value of less than $10,000 will be made on informal bids. (36 CFR 223.3).

10/ Regional foresters in Regions 3, 5, and 6 are delegated 100,000 CCF.

## 2409 - FOREST SERVICE HANDBOOKS (FSH)

### 2409.1 - Internal Servicewide Handbooks

The following handbooks are approved for use servicewide.

### 2409.11 - National Forest Log Scaling Handbook (FSH)

This handbook describes procedures for measuring the wood content of logs in board feet and is intended for field use.

### 2409.11a - Cubic Scaling Handbook (FSH)

This handbook describes procedures for measuring the wood content of logs in cubic feet and is intended for field use.

### 2409.12 - Timber Cruising Handbook (FSH)

This handbook describes procedures for estimation of the timber volume in standing trees.

### 2409.12a - Timber Volume Estimator Handbook (FSH)

This handbook provides direction for establishing and testing mathematical equations and other volume estimators used to calculate the volume of standing trees. It also requires standard information to be collected and stored from measured trees for use in preparing the estimators.

### 2409.13 - Timber Resource Management Planning Handbook (FSH)

This handbook provides procedures, policy, and direction for planning and management of the timber resource. It covers development of the Resource Planning Act assessment and program and Forest plans.

### 2409.13a - Timber Permanent Plot Handbook (FSH)

This handbook provides direction on establishing permanent plots for sharing of timber growth and yield information. It requires consistent and standard information to be collected on permanent plots that are established for growth and yield modeling.

### 2409.14 - Timber Management Information System Handbook (FSH)

This handbook describes the overall Timber Management Information System (TMIS), the nationally supported portion of the system and reports available from it. The handbook contains national coding structure used to describe data elements pertaining to timber management.

## 2409.15 - Timber Sale Administration Handbook (FSH)

This handbook describes procedures and requirements for the administration of timber sales.

## 2409.17 - Silvicultural Practices Handbook (FSH)

This handbook describes silvicultural processes, with major emphasis on a nationally recognized method for the calculation and display of stocking levels.

## 2409.18 - Timber Sale Preparation Handbook (FSH)

This handbook describes processes and procedures used to plan and prepare timber sales, from inception through award of the timber sale contract. Appraisal instructions specific to each region may be issued in FSH 2409.22.

## 2409.19 - Renewable Resources Handbook (FSH)

This handbook provides direction for performing renewable resource protection and improvement under approved timber sale area improvement plans using Knutson-Vandenberg (K-V) funds, and provides direction for stewardship contracting. It brings together direction traditionally issued by each functional area into one place in the Directive System.

## 2409.2 - Internal Unit Handbooks

The following handbooks are approved for issuance within regions. Where subject matter would duplicate an area covered by a national handbook, regional instructions should be issued as supplements to the national handbook rather than be maintained in a separate unit handbook.

## 2409.21e - Timber Management Control Handbook (FSH)

This handbook describes procedures for timber stand record systems that are not part of a total resource inventory. It includes direction for recording, storing and retrieving information about tree stands. See FSH 6609.21, Total Resource Inventory for related processes and procedures.

## 2409.21h - Timber Management Data Handbook (FSH)

This handbook includes direction on timber management data specific to a region.

## 2409.22 - Timber Appraisal Handbook (FSH)

This handbook provides appraisal instructions and procedures specific to a region.

## 2409.26 - Silvicultural Practices Handbook (FSH)

This handbook describes cultural practices necessary to manage timber stands. Topics covered are cutting methods, reforestation, timber stand improvement, silvicultural examinations and prescriptions, nurseries, seed collection, storage and handling, genetic tree improvement, and integrated vegetation management. Regions may issue handbooks under this code by one of three methods, as follows:

1. Issue one handbook (FSH 2409.26) for all forest types with a chapter for each broad general type. Each chapter must include the applicable subjects for a given forest type.

2. Issue a handbook for each forest type that includes each of the subjects specified in the preceding paragraph 1 for this handbook. Code each forest type handbook as an expansion of FSH 2409.26 designated by a letter, starting with “n”; for example, 2409.26n, 2409.26o, 2409.26p, and so forth.

3. Issue a separate handbook for each of the following topics with codes authorized for an expansion of FSH 2409.26, starting with FSH 2409.26b.

## 2409.26b - Reforestation Handbook (FSH)

This handbook describes practices used in a region for planting of trees, care of planting stock, and verification of reforestation success.

## 2409.26c - Timber Stand Improvement Handbook (FSH)

This handbook describes practices used in timber stand improvement for the various forest types within a region.

## 2409.26d - Silvicultural Examination and Prescription Handbook (FSH)

This handbook describes procedures used to record data about tree stands. It includes instruction for the form and content of silvicultural prescriptions.

## 2409.26e - Nursery Handbook (FSH)

This handbook describes practices and procedures used in tree seedling nurseries within a region.

## 2409.26f - Seed Handbook (FSH)

This handbook describes practices and procedures that apply to collection, handling, and storage of cones and tree seed within a region.

## 2409.26g - Tree Improvement Handbook (FSH)

This handbook describes practices and procedures that apply to the genetic improvement of forest trees. It includes selection of superior trees and breeding of their offspring.

# FOREST SERVICE MANUAL
# ROCKY MOUNTAIN REGION (REGION 2)
# DENVER, CO

## FSM 2600 - WILDLIFE, FISH AND SENSITIVE PLANT HABITAT MANAGEMENT

## CHAPTER 70 – THREATENED, ENDANGERED AND SENSITIVE PLANTS AND ANIMALS

**Supplement No.**: 2600-2023-2

**Effective Date:** 05/31/20203

**Duration:** This amendment is effective until superseded or removed.

**Approved:** Steven Lohr – Deputy Regional Forester

**Date Approved:** 05/31/2023

**Posting Instructions:** Handbook supplements are numbered consecutively by Handbook number and calendar year. Post by document; remove the entire document and replace it withthis supplement. Retain this transmittal as the first page(s) of this document.

| Summary of Changes | Version or Amendment | Number of Pages |
|---|---|---|
| New Document | FSM 2600, Ch 70 | 33 |
| Superseded Document(s) by Issuance Number and Effective Date | 2600-2023-1, 02/21/2023 | 33 |

**DIGEST**

2672.11 (4) – Identification of Sensitive Species. Removes Weber's Whitlow grass (*Draba weberi*) because a recent genetics analysis confirmed it is not a distinct species. Removes the desert massasauga (*Sistrurus catenatus* ssp. *edwardsii*) because more recent genetics research showed it is not a distinct subspecies of the western massasauga.

**FSM 2600 – WILDLIFE, FISH AND SENSITIVE PLANT HABITAT MANAGEMENT**
**CHAPTER 70 – THREATENED, ENDANGERED AND SENSITIVE PLANTS AND ANIMALS**

# Contents

2670.2 – OBJECTIVES ... 4
2670.22 – Sensitive Species ... 4
2670.3 – POLICY ... 4
2670.32 – SENSITIVE SPECIES ... 4
2670.4 – RESPONSIBILITY ... 4
2670.45 – Forest Supervisors ... 4
2670.5 - Definitions ... 5
2671 – COOPERATION ... 6
2671.44 – Determination of Effects on Listed or Proposed Species ... 6
2672 – PLANNING FOR MANAGEMENT AND RECOVERY ... 6
2672.11 - Identification of Sensitive Species ... 6
2672.4 – Biological Evaluations ... 7
2672.41 – Objectives of the Biological Evaluation ... 7
2672.42 – Standards for Biological Evaluations ... 7
2672.43 – Procedure for Conducting Biological Evaluations ... 8
2676.1 – Grizzly Bear ... 27
2676.11 – Authority ... 27
2676.12 – Objectives ... 27
2676.14 – Responsibility ... 27
2676.14a – Regional Forester ... 27
2676.14b – Forest Supervisor ... 27
2676.15 – Planning ... 28
2676.15a – Habitat Analysis ... 28
2676.15c – Monitoring ... 28
2676.16 – Resource Management Coordination ... 28
2676.16d – Livestock Grazing ... 28
2676.2 – Sage-grouse and Sagebrush Habitats ... 29

**FSM 2600 – WILDLIFE, FISH AND SENSITIVE PLANT HABITAT MANAGEMENT**
**CHAPTER 70 – THREATENED, ENDANGERED AND SENSITIVE PLANTS AND ANIMALS**

2676.3 - Prairie Grouse and Grassland Habitats ....................................................................30
2676.4 – Fens and Associated At-Risk Species and Habitats.................................................31

## 2670.2 – OBJECTIVES

## 2670.22 – SENSITIVE SPECIES

3. Develop and implement conservation strategies for sensitive species and their habitats in coordination with other Forest Service units, managing agencies and landowners.

4. Coordinate management objectives to conserve sensitive species with state and federal agencies, tribes and other cooperators as appropriate. Approaches may include collaboratively developing individual species or multi-species conservation strategies, formalizing interagency conservation agreements, and incorporating recommendations into management direction set forth in Land and Resource Management Plans.

## 2670.3 – POLICY

### 2670.32 – SENSITIVE SPECIES

6. Integrate available scientific information, including Regional species evaluations, species and ecosystem assessments, and conservation strategies, into Forest Service planning and implementation.

7. Conduct appropriate inventories and monitoring of sensitive species to improve knowledge of distribution, status, and responses to management activities, coordinating efforts within the Region and with other agencies and partners where feasible.

8. Analyze and manage for sensitive species in groups and habitat complexes, when feasible, to realize efficiencies and ecological soundness of multi-species and ecosystem management approaches.

## 2670.4 – RESPONSIBILITY

## 2670.45 – Forest Supervisors

7. In accordance with guidance in FSM 2670.45, designate journey-level biologists and botanists who are qualified to review biological evaluations, specifying the type(s) of organisms (fish and aquatic invertebrates, wildlife, terrestrial invertebrates, and plants) for which the individual is qualified. Qualifications include: meeting the Office of Personnel Management Qualification Standards for General Schedule Positions for the appropriate job series (0482, 0486, 0430) at the GS-9 level or above; sufficient training in procedural and substantive requirements for biological evaluations, including knowledge of the Endangered Species Act and Forest Service policy in this FSM; and one year or more of experience in conducting biological evaluations that meet professional standards Use expert-level staffing to assess the adequacy of training and

experience (FSM 2604.21 paragraph 5). Provide a list of personnel qualified to review biological evaluations to the Regional Office annually or as updates are completed.

## 2670.5 - DEFINITIONS

Action. All activities or programs authorized, funded or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas (50 CFR 402.02). Both programmatic and project-level proposals are considered to be actions subject to the Endangered Species Act.

Biological Assessment. Information prepared to comply with Section 7 of the Endangered Species Act for major construction activities to determine whether listed and proposed species and designated and proposed critical habitat may be present in the action area, and the evaluation of potential effects of the action on such species and habitat. A "major construction activity" is a major Federal action significantly affecting the quality of the human environment, that is, for which an Environmental Impact Statement is prepared (50 CFR 402.02). A Biological Assessment may be prepared for any project for which formal consultation is required.

Biological Evaluation. A documented Forest Service review of Forest Service actions in sufficient detail to: 1) comply with the requirements of the Endangered Species Act; 2) ensure that actions do not contribute to loss of viability of native or desired non-native plant or animal species, or cause a trend towards listing under the ESA; and 3) provide a standard by which to ensure that endangered, threatened, proposed, and sensitive species and critical habitats receive full consideration in Forest Service decision-making. A biological evaluation may be used to satisfy consultation requirements for a biological assessment (FSM 2672.4, FSM 2600-2009-1).

Conserve. The use of all methods and procedures necessary to bring an endangered species or threatened species to the point at which the protections pursuant to the ESA are no longer necessary, or to avoid causing a species to become threatened or endangered, or to maintain viable populations in the planning area.

Conservation Strategy. A document that establishes conservation objectives and identifies the management actions necessary to conserve a species, species group or ecosystem. The strategy can be incorporated into Forest Service plans through the National Environmental Policy Act (NEPA) process with appropriate line officer approval.

Conservation Agreement. A formal agreement with cooperating or regulatory agencies that identifies how a conservation strategy will be implemented.

Programmatic Consultation. A generic term encompassing several different types of ESA Section 7 consultations: 1) evaluation of strategic management plans that may establish objectives, standards, guidelines, or design criteria to which future actions must adhere; 2) evaluation of an overall Federal "program"; or 3) evaluation of a group of similar proposed actions, or different types of actions proposed within a specific geographic area. Three commonly used approaches for documenting programmatic consultations are tiered,

appended, and batched Biological Opinions.

## 2671 – COOPERATION

### 2671.44 – Determination of Effects on Listed or Proposed Species

Seek to improve the efficiency and effectiveness of consultations and conferences under Section 7 of the Endangered Species Act and to enhance the conservation of imperiled species by using a streamlining process as appropriate. Streamlining is accomplished by emphasizing coordination and communication during informal consultation. Streamlining actions may include: development of criteria or screens to improve consistency in effects analysis and determinations; identification of design criteria intended to benefit particular species; standardizing the format used to present information and analysis; recommending alternative approaches, such as programmatic consultations, to handle consultation workloads; and establishing procedures to expedite dispute resolution.

## 2672 – PLANNING FOR MANAGEMENT AND RECOVERY

### 2672.11 - Identification of Sensitive Species

1. Species identified as Candidates by the U.S. Fish and Wildlife Service will automatically be placed on the sensitive species list in Region 2.

4. To be eligible for designation by the Regional Forester as sensitive, the species (or subspecies, variety or stock) must be recognized by taxonomic experts and must be known or likely to occur on National Forest System lands within the Rocky Mountain Region. Sensitive species status applies throughout the range of the species on National Forest System lands within the Rocky Mountain Region. The Regional Forester's sensitive species list for the Rocky Mountain Region is shown in exhibit 01.

5. The evaluation criteria used to determine whether a species warrants sensitive status (FSM 2670.5) are shown in exhibit 02.

6. The list of sensitive species is reviewed and updated periodically. Forest Supervisors may recommend additions or deletions to the list based on the criteria in exhibit 02. Recommendations from other interested agencies, groups, and individuals with information pertinent to sensitive species are considered in the revision process. A species will be removed from the sensitive list when sensitive status is superseded by listing or proposed listing under the Endangered Species Act. A species that is removed from listing under the ESA because recovery criteria have been met is automatically added to the sensitive species list for a period of at least 5 years to ensure that its recovery is maintained and monitored.

7. For newly designated sensitive species, current or planned Forest Service actions that are well underway (or are completed) at the time an updated sensitive species list goes

into effect are exempt from requirements to conduct a biological evaluation for that species. This exemption is intended to enable actions that have been planned to use the previous sensitive species list to go forward. Exemption in these instances does not relieve the responsible official from compliance with other statutory and regulatory mandates, including: 1) National Environmental Policy Act requirements to evaluate significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts (40 CFR 1502.9, FSH 1909.15 sec. 18), and 2) National Forest Management Act requirements specify guidelines when developing, maintaining and revising plans to provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives (16 USC 1600).

## 2672.4 – BIOLOGICAL EVALUATIONS

### 2672.41 – Objectives of the Biological Evaluation

1. To ensure that Forest Service actions do not contribute to loss of viability of threatened, endangered, proposed, or sensitive plant and animal species, or contribute to a trend towards Federal listing under the Endangered Species Act of any species.

4. To incorporate concerns for sensitive species throughout the planning process, identifying opportunities for enhancement and reducing any potential negative impacts.

### 2672.42 – Standards for Biological Evaluations

1. A list of endangered, threatened, and proposed species and critical habitat known or likely to occur in the action area may be requested from the U.S. Fish and Wildlife Service (FWS), or a list may be submitted to FWS for concurrence.

2. Coordinate mapping of habitat with the FWS and other management agencies as appropriate.

3. An analysis of the direct, indirect, and cumulative effects of the actions under all alternatives considered through the NEPA process on federally listed, proposed, or sensitive species, or habitat required for recovery or to meet Forest Service objectives.

5. A determination of the effects or impacts on each species, and summary of the rationale for each determination

    a. For federally listed species, or species proposed for such listing, and for critical habitat or proposed critical habitat, use the determination statements specified in Endangered Species Act (ESA) Section 7 regulations (50 CFR 402) and in accordance with FSM 2671.43 through 2671.45.

b. For Region 2, sensitive species make a determination of:

   i. "No impact"

   ii. "Beneficial impact"

   iii. "May adversely impact individuals, but not likely to result in a loss of viability in the Planning Area, nor cause a trend toward federal listing", or

   iv. "Likely to result in a loss of viability in the Planning Area, or in a trend toward federal listing"

## 2672.43 – Procedure for Conducting Biological Evaluations

The intensity and detail of the biological evaluation may vary and should be commensurate with the risk associated with the action and the vulnerability of the species involved. Document the biological evaluation in accordance with the standards established in FSM 2672.42 of this document. When a recovery plan or conservation strategy exists for a species and is applicable to the actions being analyzed, evaluate and document consistency of the action with the recovery plan or conservation strategy.

1. Step 1. Pre-field Review

Follow current direction in FSM 2672.42 of this document to identify all federally listed or proposed species. Review records and contact knowledgeable Forest Service employees and other experts for known occurrences, distribution maps, and habitat information. As appropriate, contact state and federal wildlife, fish, and plant management agencies, Natural Heritage Programs, research stations, universities, or other organizations about species occurrence and habitat requirements. Document all sensitive species and their habitats that are known or likely to be present in the analysis area, or that the proposed action potentially affects.

Briefly summarize the habitat needs and ecological requirements of the species. Identify seasonal patterns and recommend when field surveys can be conducted to evaluate species and/or habitat presence, if needed. Describe management direction applicable to habitat that may be affected, such as Forest Plan standards and guidelines. FSM 2672.43 Exhibit 01 outlines the procedure to use during the Pre-field Review (Step 1) to determine whether Field Reconnaissance (Step 2) is needed to complete the biological evaluation.

2. Step 2: Field Reconnaissance

The purpose of this step is to gain a more specific understanding of which habitats and species exist in the action area, and to gather information that will help to evaluate the significance of the area to the species. The need for and extent of field reconnaissance should be commensurate with the risk associated with the proposal, the degree of certainty desired, and the level of knowledge already at hand.

Identify and describe all habitats known to be important for the species in the analysis area. As needed, design and conduct field surveys to confirm species' presence and habitat suitability assess accuracy of remote sensing data, and collect any other data deemed necessary. Assess and refine knowledge of how habitats exist on the landscape and how species occupy and use their habitats.

3. Step 3. Analysis of Effects and Determination.

The purpose of this analysis for federally listed or proposed species is to determine whether the action may affect the species or critical habitat. The purpose of this analysis for sensitive species is to determine whether the action will contribute toward federal listing or loss of viability in the Planning Area. As part of the interdisciplinary process of designing alternatives under NEPA, develop design criteria to meet objectives for threatened, endangered, proposed, and sensitive species, and identify any necessary mitigation measures. The analysis must consider direct, indirect, and cumulative effects of the proposed action and any alternatives on the species and its habitat.

Factors that may be considered in the analysis of effects include: the proportion of the species' total population and range that is in the analysis area or is affected by the action; whether the habitat affected by the action is necessary for critical life functions (for example, feeding, breeding, nesting); timing, frequency and duration of human activity, especially as it relates to significant behavioral modification; any anticipated reductions in numbers or distribution of the species; and the potential of the species to recover from short-term impacts.

Based on the analysis, make a determination of the effects of each of the alternatives on federally listed or proposed species and critical habitat, and on Region 2 sensitive species. Use the appropriate language for each federally listed species, critical habitat, proposed species, proposed critical habitat (FSM 2671.43 through 2671.45), and sensitive species, and summarize the rationale for each.

4. Step 4. Documentation.

The purpose of this step is to check the documentation record that has been compiled. Documentation is essential to the biological evaluation process and is to be conducted as the biological evaluation proceeds, rather than after the fact.

Documentation may be referenced or included as part of the appropriate NEPA document, contained in the biological evaluation itself, or held in district or forest files. Ensure that all requirements and mitigation measures are included in the decision document and implementation plans or contracts.

Documentation should include contacts with agencies, especially the FWS, individuals, and organizations, (dates, names of people and organizations, summary of information), and sources of data used in developing the biological evaluation. The list of species considered must be documented. Indicate species, for which surveys were conducted, describe the survey methods used, provide maps showing which areas were surveyed, record the date(s) of

survey(s) and the people who conducted the survey(s), and provide the results. Enter new data into appropriate corporate databases and notify Natural Heritage Programs and other cooperating agencies as appropriate. Use literature citations to support conclusions on effects, habitat relationships, species ecology, and recommendations for removing or avoiding adverse effects

2672.11 – Exhibit 01

Regional Forester's Sensitive Species

Rocky Mountain Region

## ANIMALS

### AMPHIBIANS

| | |
|---|---|
| *Anaxyrus boreas* | western (boreal) toad |
| *Lithobates blairi* | plains leopard frog |
| *Lithobates pipiens* | northern leopard frog |
| *Lithobates sylvaticus* | wood frog |
| *Rana luteiventris* | Columbia spotted frog |

### BIRDS

| | |
|---|---|
| *Accipiter gentilis* | northern goshawk |
| *Aegolius funereus* | boreal owl |
| *Ammodramus savannarum* | grasshopper sparrow |
| *Artemisiospiza nevadensis* | sagebrush sparrow |
| *Asio flammeus* | short-eared owl |
| *Athene cunicularia* | burrowing owl |
| *Buteo regalis* | ferruginous hawk |
| *Calamospiza melanocorys* | lark bunting |
| *Calcarius ornatus* | chestnut-collared longspur |
| *Centrocercus urophasianus* | greater sage-grouse |
| *Charadrius montanus* | mountain plover |
| *Chlidonias niger* | black tern |
| *Circus cyaneus* | northern harrier |
| *Contopus cooperi* | olive-sided flycatcher |
| *Cygnus buccinator* | trumpeter swan |
| *Cypseloides niger* | black swift |

2672.11 – Exhibit 01—Continued

| | |
|---|---|
| *Gymnorhinus cyanocephalus* | pinyon jay |
| *Lagopus leucura* | white-tailed ptarmigan |
| *Lanius ludovicianus* | loggerhead shrike |
| *Leiothlypis virginiae* | Virginia's warbler |
| *Melanerpes lewis* | Lewis's woodpecker |
| *Numenius americanus* | long-billed curlew |
| *Peucaea cassinii* | Cassin's sparrow |
| *Picoides arcticus* | black-backed woodpecker |
| *Progne subis* | purple martin |
| Psiloscops flammeolus | flammulated owl |
| Rhynchophanes mccownii | thick-billed longspur |
| *Setophaga graciae* | Grace's warbler |
| *Spizella breweri* | Brewer's sparrow |
| *Tympanuchus cupido* | greater prairie-chicken |
| *Tympanuchus phasianellus columbianus* | Columbian sharp-tailed grouse |

**FISH**

| | |
|---|---|
| *Catostomus latipinnis* | flannelmouth sucker |
| *Chrosomus eos* | northern redbelly dace |
| *Chrosomus erythrogaster* | southern redbelly dace |
| *Chrosomus neogaeus* | finescale dace |
| *Couesius plumbeus* | lake chub |
| *Fundulus sciadicus* | plains topminnow |
| *Gila pandora* | Rio Grande chub |
| *Gila robusta* | roundtail chub |
| *Hybognathus placitus* | plains minnow |
| *Macrhybopsis gelida* | sturgeon chub |
| *Margariscus nachtriebi* | northern pearl dace |

## 2672.11 – Exhibit 01—Continued

| | |
|---|---|
| *Nocomis biguttatus* | hornyhead chub |
| *Oncorhynchus clarkii bouvieri* | Yellowstone cutthroat trout |
| *Oncorhynchus clarkii pleuriticus* | Colorado River cutthroat trout |
| *Oncorhynchus clarkii virginalis* | Rio Grande cutthroat trout |
| *Pantosteus discobolus* | bluehead sucker |
| *Pantosteus platyrhynchus* | mountain sucker |
| *Pantosteus plebeius* | Rio Grande sucker |
| *Platygobio gracilis* | flathead chub |

**INSECTS**

| | |
|---|---|
| *Atrytone arogos* | arogos skipper |
| *Bombus occidentalis* | western bumble bee |
| *Danaus plexippus* | monarch |
| *Hesperia ottoe* | Ottoe skipper |
| *Ochrotrichia susanae* | Susan's purse-making caddisfly |
| *Somatochlora hudsonica* | hudsonian emerald |
| *Speyeria idalia* | regal fritillary |

**MAMMALS**

| | |
|---|---|
| *Conepatus leuconotus* | American hog-nosed skunk |
| *Corynorhinus townsendii* | Townsend's big-eared bat |
| *Cynomys gunnisoni* | Gunnison's prairie dog |
| *Cynomys leucurus* | white-tailed prairie dog |
| *Cynomys ludovicianus* | black-tailed prairie Dog |
| *Euderma maculatum* | spotted bat |
| *Lasiurus cinereus* | hoary bat |
| *Lontra canadensis* | river otter |
| *Martes caurina* | Pacific marten |
| *Microtus richardsoni* | water vole |

2672.11 – Exhibit 01—Continued

| | |
|---|---|
| *Myotis thysanodes* | fringed myotis |
| *Ovis canadensis canadensis* | Rocky Mountain bighorn sheep |
| *Ovis canadensis nelsoni* | desert bighorn sheep |
| *Sorex hoyi* | pygmy shrew |
| *Thomomys clusius* | Wyoming pocket gopher |
| *Vulpes macrotis* | kit fox |
| *Vulpes velox* | swift fox |

**MOLLUSCS**

| | |
|---|---|
| *Acroloxus coloradensis* | Rocky Mountain capshell |
| *Oreohelix pygmaea* | pygmy mountain snail |
| *Oreohelix strigosa cooperi* | Cooper's Rocky Mountain snail, Black Hills mountainsnail |

**REPTILES**

| | |
|---|---|
| *Storeria occipitomaculata pahasapae* | Black Hills redbelly snake |

**PLANTS**

**NON-VASCULAR**

| | |
|---|---|
| *Sphagnum angustifolium* | sphagnum |
| *Sphagnum balticum* | Baltic sphagnum |

**FERNS & ALLIES**

| | |
|---|---|
| *Botrychium ascendens* | trianglelobe moonwort |
| *Botrychium campestre* | Iowa moonwort |
| *Botrychium paradoxum* | peculiar moonwort |
| *Lycopodium complanatum* | ground cedar |
| Selaginella selaginoides | club spikemoss |

## 2672.11 – Exhibit 01—Continued

| ANGIOSPERM - MONOCOT | |
|---|---|
| *Calochortus flexuosus* | winding mariposa lily |
| *Carex alopecoidea* | foxtail sedge |
| *Carex diandra* | lesser panicled sedge |
| *Carex livida* | livid sedge |
| *Cypripedium montanum* | mountain lady's slipper |
| *Cypripedium parviflorum* | lesser yellow lady's slipper |
| *Eleocharis elliptica* | elliptic spikerush |
| *Epipactis gigantea* | stream orchid |
| *Eriophorum chamissonis* | Chamisso's cottongrass |
| *Eriophorum gracile* | slender cottongrass |
| *Festuca hallii* | plains rough fescue |
| *Amerorchis rotundifolia* | roundleaf orchid |
| *Kobresia simpliciuscula* | simple bog sedge |
| *Liparis loeselii* | yellow widelip orchid |
| *Malaxis monophyllos* var. *brachypoda* | white adder's-mouth orchid |
| *Platanthera orbiculata* | lesser roundleaved orchid |
| *Ptilagrostis porteri* | Porter's false needlegrass |
| *Schoenoplectus hallii* | Hall's bulrush |
| *Triteleia grandiflora* | largeflower triteleia |

| ANGIOSPERM - DICOT | |
|---|---|
| *Aliciella sedifolia* | stonecrop gilia |
| *Aquilegia chrysantha* var. *rydbergii* | Rydberg's golden columbine |
| *Aquilegia laramiensis* | Laramie columbine |
| *Armeria maritima* ssp. *sibirica* | Siberian sea thrift |
| *Asclepias uncialis* | wheel milkweed |
| *Astragalus barrii* | Barr's milkvetch |
| *Astragalus iodopetalus* | violet milkvetch |

## 2672.11 – Exhibit 01—Continued

| | |
|---|---|
| *Astragalus leptaleus* | park milkvetch |
| *Astragalus missouriensis* var. *humistratus* | Missouri milkvetch |
| *Astragalus proximus* | Aztec milkvetch |
| *Astragalus ripleyi* | Ripley's milkvetch |
| *Braya glabella* | smooth northern-rockcress |
| *Chenopodium cycloides* | sandhill goosefoot |
| *Cuscuta plattensis* | prairie dodder |
| *Descurainia torulosa* | mountain tansymustard |
| *Draba exunguiculata* | clawless draba |
| *Draba grayana* | Gray's draba |
| *Draba smithii* | Smith's draba |
| *Drosera anglica* | English sundew |
| *Drosera rotundifolia* | roundleaf sundew |
| *Eriogonum brandegeei* | Brandegee's buckwheat |
| *Eriogonum exilifolium* | dropleaf buckwheat |
| *Eriogonum visheri* | Visher's buckwheat |
| *Gutierrezia elegans* | Lone Mesa snakeweed |
| *Ipomopsis aggregata* ssp. *weberi* | scarlet gilia |
| *Lesquerella fremontii* | Fremont's bladderpod |
| *Lesquerella pruinosa* | Pagosa Springs bladderpod |
| *Mimulus gemmiparus* | Rocky Mountain monkeyflower |
| *Oenothera coloradensis* ssp. *coloradensis* | Colorado butterfly plant |
| *Neoparrya lithophila* | Bill's neoparrya |
| *Oreoxis humilis* | Rocky Mountain alpineparsley |
| *Packera mancosana* | Mancos Shale packera |
| *Parnassia kotzebuei* | Kotzebue's grass of Parnassus |
| *Penstemon absarokensis* | Absaroka Range beardtongue |

<u>2672.11 – Exhibit 01—Continued</u>

| | |
|---|---|
| *Penstemon caryi* | Cary's beardtongue |
| *Penstemon degeneri* | Degener's beardtongue |
| *Penstemon harringtonii* | Harrington's beardtongue |
| *Physaria didymocarpa* ssp. *lanata* | common twinpod |
| *Physaria pulvinata* | cushion bladderpod |
| *Physaria scrotiformis* | silver twinpod |
| *Potentilla rupincola* | rock cinquefoil |
| *Primula egaliksensis* | Greenland primrose |
| *Pyrrocoma carthamoides* var. *subsquarrosa* | largeflower goldenweed |
| *Pyrrocoma clementis* var. *villosa* | tranquil goldenweed |
| *Pyrrocoma integrifolia* | many-stemmed goldenweed |
| *Ranunculus grayi* | ice cold buttercup |
| *Rubus arcticus* ssp. *acaulis* | dwarf raspberry |
| *Salix arizonica* | Arizona willow |
| *Salix barrattiana* | Barratt's willow |
| *Salix candida* | sageleaf willow |
| *Salix myrtillifolia* | blueberry willow |
| *Salix serissima* | autumn willow |
| *Sanguinaria canadensis* | bloodroot |
| *Shoshonea pulvinata* | Shoshone carrot |
| *Thalictrum heliophilum* | Cathedral Bluff meadow-rue |
| *Townsendia condensata* | cushion townsend daisy |
| *Utricularia minor* | lesser bladderwort |
| *Viburnum opulus* var. *americanum* | American cranberrybush |
| *Viola selkirkii* | Selkirk's violet |
| *Xanthisma coloradoense* | Colorado tansyaster |

2672.11 – Exhibit 02

Sensitive Species Evaluation Criteria

Rocky Mountain Region

Eight criteria (below) are considered in evaluating whether a species merits sensitive status. The combination of all eight factors, including uncertainty rankings, should be considered and synthesized in formulating the recommendation for sensitive status. Although information may not be complete for all 8 criteria, the available information must provide a compelling argument that population viability is of concern as evidenced by known or predicted downward trends. A species merits inclusion on the Regional list if it is at risk over a substantial part of its range.

1. **Geographic distribution within the Rocky Mountain Region.** All else being equal, species that are present in only a few locations within the Rocky Mountain Region have a higher risk of extirpation, than those that have a broad distribution. Generally, species with the widest breeding distributions are the least vulnerable to deleterious environmental changes and catastrophic events. Species with restricted distribution and limited interchange of individuals between subpopulations and subpopulations are more vulnerable to local events (for example disease, storms) that may cause extirpation. Similarly, species associated with geographically limited habitats may be more extinction prone. Finally, if the current distribution pattern differs significantly from historical distribution, this change should be considered in evaluating the influence of geographic distribution on species persistence

   **Rankings for geographic distribution within the Rocky Mountain Region:**

   A = Scarce OR isolated. If a population or habitat meets any of the following conditions:

   1. Habitat is very scarce throughout the Region, indicating a strong potential for extirpations and little likelihood of recolonization. Or,
   2. Habitat or population connectivity is very limited due to factors such as environmental gradients, introduced species, disease, and habitat loss or degradation. Dispersal among patches is limited or not possible. Or,
   3. Habitat is naturally distributed as isolated patches, with limited opportunity for dispersal among patches. Some local populations may be extirpated, and rates of recolonization will likely be slow. Or, pictorially if populations or habitat look like any of the following:

2672.11 – Exhibit 02—Continued






B = Patchy OR gaps. If a population or habitat meets any of the following conditions:

1. Habitat exists primarily as patches, some of which are small or isolated to the degree that species interactions are limited by movements between patches. Local sub-populations in most of the species' range interact as a metapopulation[1] or patchy population, but some patches are so disjunct that sub-populations in those patches are essentially isolated from other populations. Or,
2. Habitat is broadly distributed across the planning area but gaps exist within this distribution. Disjunct patches of habitat are typically large enough and close enough together to other patches to permit dispersal among patches and to allow species to interact as a metapopulation. Or, pictorially if populations or habitat look like any of the following:

[1] Many spatially structured populations will not function as metapopulations. (The degree to which a particular species occurs as a metapopulation, or several, in the Region will be unknown for most taxa).

2672.11 – Exhibit 02—Continued



C = Contiguous. If a population or habitat meets the following conditions:

1. Habitat is broadly distributed across the Region with opportunity for continuous or nearly continuous occupation by species, little or no limitation on interaction among populations. Or, pictorially if populations or habitat look like either of the following:



D = Insufficient information to draw inferences about criterion

2. **Geographic distribution outside of the Rocky Mountain Region.** Species (or subspecies/ varieties) that occur only in the Rocky Mountain Region warrant a higher level of concern. A species (or subspecies/variety) that is mostly restricted to the Rocky Mountain Region with a limited distribution outside of the Rocky Mountain Region would have a moderate level of concern. The risk of extinction associated with activities in the Rocky Mountain Region can be moderated by the potential for recolonization from populations existing elsewhere, although low recruitment from outside populations would reduce effectiveness of the rescue effect. A species with wide distribution outside the Rocky Mountain Region would generally have a substantially reduced risk as a result of activities in the Rocky Mountain Region.

2672.11 – Exhibit 02—Continued

**Rankings for geographic distribution outside the Rocky Mountain Region:**

A = Only within the boundaries of the Rocky Mountain Region (meaning local or regional endemics)

B = Limited distribution outside the Rocky Mountain Region, or widely disjunct taxa for which the main distribution is at a significant distance from the Rocky Mountain Region

C = Wide distribution outside the Rocky Mountain Region

D = Insufficient information to draw inferences about criterion

3. **Capability of the species to disperse.** Dispersal of individuals from a population may be limited because a species has low vagility or because barriers to dispersal exist. All else being equal, species that do not disperse readily across large areas of unsuitable habitat are at greater risk of extinction than species that disperse readily across a variety of habitats. Movements of aquatic species may be limited by barriers such as culverts, impoundments, or discontinuous stream networks. The ability of plant species to disperse can depend on seed dispersal agents and reproductive strategy. Species that are mobile and for which dispersal is not limited will be assigned a value of no concern. Species that are able to disperse only within suitable habitats will be assigned a moderate level of concern. Species for which dispersal is limited by behavioral patterns or physical capability will be assigned a high level of concern.

   In evaluating this criterion, the importance of dispersal to the life history of the species will be considered. For instance, dispersal is a critical characteristic of the life history of species that occupy ephemeral habitats or that occur early in succession after disturbance. In contrast, dispersal plays a less significant role in the population dynamics of some species that occupy stable habitats (such as cave dwelling insects).

2672.11 – Exhibit 02—Continued

**Rankings for capability to disperse:**

A = Very limited dispersal ability (restricted dispersal capability coupled with ephemeral habitats)

B = Disperses only through suitable habitat (dispersal areas may or may not be corridors)

C = Readily disperses across landscapes with few habitat-related limitations

D = Insufficient information to draw inferences about criterion

4. **Abundance of the species in the Rocky Mountain Region.** Population density or abundance is a primary factor in determining whether a species will persist following habitat loss. All other things being equal, the lower the abundance or density, the greater the risk of extinction. Rankings will be based on categorical estimates of abundance relative to the expected abundance of that species in good habitat. This approach avoids problems associated with using population estimates or abundance estimates for widely diverse species. Base ranking on overall condition, but rationale should draw any contrasts between abundance on NFS lands vs. other ownerships.

**Rankings for abundance in the Rocky Mountain Region:**

A = Rare - current abundance (estimated number of individuals or populations) is low enough that stochastic and other factors lead to potential imperilment

B = Uncommon - current abundance (estimated number of individuals or populations) is large enough that demographic stochasticity is not likely to lead to rapid extinction, but, in combination with highly variable environmental factors, could pose a threat

C = Common – current abundance (estimated number of individuals or populations) is large enough that species persistence is not threatened by demographic stochasticity, in combination with environmental variation

D = Insufficient information to draw inferences about criterion

5. **Population trend in the Rocky Mountain Region.** Another primary factor indicating that viability may be at risk is a persistent downward trend in population size. Consistently declining populations are an indication of concern even if current population size is large. All species can be expected to have smaller population numbers at times. In fact, variability is the rule in populations and therefore, short-term declines should be interpreted cautiously. Alternatively, what could appear to be a downward trend may be part of a cyclic population and would not be

considered a consistent downward trend. An example may be snowshoe hares, which have population highs and lows over about a 10 - 15 year period. For this species, the pattern of population abundance may need to be considered over 3-4 cycles, before a population trend could be established. Results of local and national monitoring programs may be used to assign values for this criterion.

**Rankings for population trend in the Rocky Mountain Region:**

A = Significant downward or suspected downward population trend

B = Stable population

C = Upward population trend

D = Insufficient information to draw inferences about criterion

6. **Habitat trend in the Rocky Mountain Region.** Another primary factor indicating that viability may be at risk is a persistent downward trend in habitat quality or quantity. Trends in quantity and/or quality of the species' habitat can often be indicative of population trends, if actual species trend data are unavailable. Base ranking on overall condition, but rationale should draw any contrasts between abundance on NFS lands vs. other ownerships. Terrestrial, aquatic, wetland, and riparian ecosystem assessments may provide insights into habitat trends.

**Rankings for habitat trend in the Rocky Mountain Region:**

A = Decline in habitat quality or quantity

B = Stable amounts of suitable or potential habitat, relatively unchanged habitat quality

C = Improving habitat quality or increasing amounts of suitable or potential habitat

D = Insufficient information to draw inferences about criterion

7. **Vulnerability of habitats in the Rocky Mountain Region.** Anthropogenic modifications of habitat in the Rocky Mountain Region include urban and rural development, vegetation management, mining, water diversions, and road construction. Ecosystem assessments may be useful in providing insights into natural patterns and dynamics of ecosystems, the processes that influence current habitat conditions, and the degree to which management actions mimic natural disturbances and fall within the historical range of variation. This criterion will evaluate recent and potential effects of habitat modification on wildlife and plant species. Base ranking on overall extent of habitat modifications and resiliency to modification.

**Rankings for the vulnerability of habitats in the Rocky Mountain Region:**

A = Substantial modification of habitat has occurred or is anticipated with conditions departing from HRV, and/or habitat is impacted by modern stressors such as herbicides, nonnative invasive species, water diversions and dams, and so forth

B = Habitat modification is likely to fall within the range of historical conditions, but is being impacted by modern stressors

C = Habitat resilient, changes are within HRV, and modern stressors not significant

D = Insufficient information to draw inferences about criterion

8. **Life history and demographic characteristics of the species.** Life history factors such as reproductive rate, relationship with disease organisms, interaction with mutualists or symbionts, food web dynamics, relationship with predators, or relationship with competitors, can affect population size and ability to rebound from stochastic or anthropogenic population reductions. For vertebrates, examples of characteristics that viability risk include: number of reproductive cycles/year, average number of young produced/breeding cycle, minimum age of first reproduction, age specific survival rates, and social organization. Life history characteristics that affect viability in plants include lifespan and variation in life span of individuals (for example annual vs. perennial), seed dispersal strategy, variation in germination rates, relationship with pollination agents, and susceptibility to herbivory. Annual variation in vital rates can also be important.

   Species with strong mutualistic relationships, with low reproductive rates and which are highly susceptible to negative effects of disease, predation or competition may have less ability to recover from population declines. Those species will be assigned a high level of concern. Species with higher reproductive rates have a greater ability to recover from losses caused by predation, disease, or competition. Viability risk is also higher for populations depressed by introduced diseases or competitors, or that are susceptible to genetic introgression or inbreeding.

**Rankings for life history and demographic characteristics:**

A = Low reproductive rate **and** high mortality (for example, susceptible to disease, predation, or competition); OR life history characteristics suggest populations may not recover rapidly from disturbance events or other demographic risk factors are of concern

B = Low reproductive rate **or** high mortality (for example, susceptible to disease, predation, or competition), but not both; OR life history

characteristics suggest populations have an intermediate ability to recover from disturbance events and no other demographic risk factors are known

C = High reproductive rate **and** not especially susceptible to disease, predation, or competition; OR species has life history characteristics that suggest populations will have a high ability to recover from disturbance events and no other demographic risk factors are known

D = Insufficient information to draw inferences about criterion

2672.43 - Exhibit 01

Next page

<u>2672.43 - Exhibit 01</u>

| Question | Answer | Result |
|---|---|---|
| Does the species have potential to occur in the area affected by the project, based on species range and habitat associations? | No ➔ | Site-specific inventory is not needed. Document rationale and sources of information. |

🡫 Yes or Unsure

| Question | Answer | Result |
|---|---|---|
| Has an adequate site-specific inventory of the area affected by the project already been conducted, using accepted (if available) protocols? | Yes ➔ | Additional inventory is not needed. Use existing inventory information to analyze effects. |

🡫 No or Unsure

| Question | Answer | Result |
|---|---|---|
| Is the project expected to have no effects or wholly beneficial effects regardless of the number or location of individuals in the area affected? | Yes ➔ | Assume species is present, then analyze and document expected effects. |

🡫 No or Unsure

| Question | Answer | Result |
|---|---|---|
| Would information on presence or relative abundance of the species improve design and/or application of mitigation to reduce adverse effects, or allow better assessment of effects? | No ➔ | Assume species is present, then analyze and document expected effects. |

🡫 Yes or Unsure

| Question | Answer | Result |
|---|---|---|
| Are inventory methods feasible and effective for providing information on presence/absence or number and location of individuals? | No ➔ | Assume species is present and analyze expected effects. Document why inventory is not feasible. |

🡫 Yes

Conduct site-specific inventory to inform analysis of effects.

## 2676.1 – GRIZZLY BEAR

In the Greater Yellowstone recovery zone, as a result of sustained and coordinated management across agencies and land ownerships, all grizzly bear recovery criteria have been met since 1998. The Final conservation Strategy for the Grizzly Bear in the Greater Yellowstone Area was signed by the Regional Foresters in 2003.

### 2676.11 – Authority

4. Conservation Strategy for Grizzly Bear in the Greater Yellowstone Area. The Conservation Strategy identifies a Primary Conservation Area (PCA) where occupancy by grizzly bears is anticipated and acceptable and provides guidance for coordinated management and monitoring within and outside the PCA upon de-listing of the grizzly bear. The Memorandum of Understanding Detailing Agency Agreement to Implement the Conservation Strategy, included as pages 13-14 of the Conservation Strategy, was signed by the affected Regional Foresters in 2016.

### 2676.12 – Objectives

1. To maintain or enhance grizzly bear habitat conditions on National Forest System lands as compared to the 1998 baseline, in accordance with the goals established in the Conservation Strategy and the goals, standards and guidelines in National Forest Resource Management Plans.

### 2676.14 – Responsibility

### 2676.14a – Regional Forester

11. Ensure that the grizzly bear is added to the Regional Forester's list of sensitive species immediately upon de-listing under the Endangered Species Act.

### 2676.14b – Forest Supervisor

1. As assigned, the Forest Supervisor of the Shoshone NF shall serve as a member of the IGBC ecosystem management subcommittee. Upon de-listing, the Forest Supervisor shall serve as a member of the Yellowstone Grizzly Coordinating Committee, which has the responsibility for implementing the Conservation Strategy.

2. Work cooperatively with State wildlife agencies to meet population and habitat goals established in the Conservation Strategy.

3. Ensure interagency coordination at appropriate levels and maintain contact with interested publics.

4. Work together with State agencies to explore options to address impacts from private land development on conservation of the grizzly bear on National Forest System lands, while recognizing that State and Federal agencies do not have authority over private lands.

## 2676.15 – PLANNING

### 2676.15a – Habitat Analysis

1. Complete a biological evaluation for all projects potentially affecting the grizzly bear, inside and outside the PCA, to determine if habitat standards in the Conservation Strategy will be met. Modify projects as necessary to meet the habitat standards in the Conservation Strategy.

2. Evaluate grizzly bear habitat connectivity within and between ecosystems through the NEPA process for new road construction or reconstruction.

### 2676.15c – Monitoring

4. Cooperate in interagency monitoring and evaluation of the effectiveness of the Conservation Strategy.

### 2676.16 – Resource Management Coordination

Where habitat use by grizzly bears is likely, all contracts, special use permits, easements, annual operating plans and allotment management plans, and other authorizations shall include, as terms and conditions, feasible and effective measures to meet goals and objectives for grizzly bear conservation, including specifications for food storage and garbage disposal to comply with food storage orders. Full cooperation by permittees is a condition for receiving and holding permits.

### 2676.16d – Livestock Grazing

2. Where habitat use by grizzly bears is likely, allotment management plans or annual operating instructions must specify feasible measures for the timely removal, destruction, or treatment of livestock carcasses to provide for public safety or to prevent positive conditioning of grizzly bears to livestock carrion as food.

## 2676.2 – SAGE-GROUSE AND SAGEBRUSH HABITATS

Use the following guidelines for at-risk sage-grouse species (Greater, Gunnison) and management and restoration of their sagebrush habitats.

1. Maintain, enhance and restore sage-grouse habitats, populations and connectivity. Give priority to areas determined to have important sage-grouse populations, breeding sites or seasonal habitats, such as areas identified in the Wyoming Core Area Strategy, state-led and local working group sage-grouse plans, conservation agreements, and Forest and Grassland Plans.

2. Collaborate with the State, BLM, and other agencies and landowners to promote consistent management of sagebrush and sage-grouse habitats on adjoining lands.

3. Support and participate in State-wide and local sage-grouse working groups for the conservation of sage-grouse and sagebrush habitats.

4. Incorporate sage-grouse conservation measures into Forest Plan management direction and apply conservation measures for sage-grouse and sagebrush habitats into project design.

5. Propose vegetation management projects where warranted by range condition, site potential, and limiting factors for sage-grouse. Design of spatial patterns and treatment intervals should be based on an understanding of natural disturbance regimes. Select treatments that provide desired vegetation mosaics, while minimizing habitat recovery time to the extent possible. Plan the timing of projects to avoid the periods when wintering or nesting birds are present.

6. Do not undertake conversion of sagebrush communities to other cover types in any areas known to be occupied by wintering or nesting populations of sage-grouse.

7. Sagebrush management plans must address measures to minimize the establishment or increase of invasive plant species such as cheatgrass. Seed mixes used for revegetation should include sagebrush (the subspecies appropriate to the site) and other associated shrubs, native forbs (especially legumes), and native grasses as appropriate to the specific site. Avoid use of persistent non-native plant species and do not use invasive species in seed mixes.

8. Increase the visibility of fences and other structures that may be hazardous to flying sage-grouse. Avoid construction of fences near leks or on the crest of low hills. Remove unnecessary abandoned fences.

9. Avoid building overhead power lines or other tall structures that provide perch sites for raptors within 3 km of sage-grouse habitats. Bury power lines when possible. Wind energy development is not recommended in sage-grouse core areas or important seasonal habitats.

10. Coordinate with unit fire management personnel to identify important sage-grouse areas or sagebrush habitats particularly susceptible to wildfire and develop options and strategies for their protection during wildfire incidents and management response.

11. When developing drought contingency plans, ensure that sage-grouse needs are considered, including cover requirements for nesting and brood-rearing periods.

12. Limit the amount of surface disturbance from energy and mining exploration and development, including providing appropriate buffers and timing restrictions around leks. Limit noise levels at leks during the breeding season.

13. Limit the creation of new, or design and manage new and existing, artificial water impoundments to discourage breeding mosquitoes and prevent the spread of West Nile Virus where the virus poses a threat to sage-grouse.

14. Avoid developing new roads and motorized trails in or adjacent to areas of important sage-grouse populations, breeding sites or seasonal habitats. Evaluate existing roads and trails for opportunities for closure or realignment away from these areas.

## 2676.3 - PRAIRIE GROUSE AND GRASSLAND HABITATS

Use the following guidelines for at-risk species of prairie grouse (greater prairie-chicken, lesser prairie-chicken, Columbian sharp-tailed grouse) and management and restoration of their habitat.

1. Collaborate with the State game and fish agency to identify locations of prairie grouse populations, lek complexes, and seasonal habitats (nesting, brood-rearing, summer, autumn/winter).

2. In cooperation with the State and other agencies (e.g., BLM, NRCS) and adjacent landowners, design vegetation management projects using mechanical, chemical, or prescribed burning treatments to maintain or enhance prairie grouse habitats, populations and connectivity.

3. Manage vegetation to provide desired vegetation mosaics and sufficient residual cover to sustain prairie grouse populations. Ensure that drought contingency plans

consider prairie grouse habitat needs, and that livestock stocking rates or management practices are adjusted as necessary to provide cover requirements during the nesting and brood-rearing periods.

4. Habitat enhancement or restoration plans must address measures to minimize the establishment or increase of invasive plant species. Seed mixes used for revegetation should include native grasses and forbs as appropriate to the specific site. Avoid use of non-native, invasive plant species such as crested wheatgrass and sweetclover in seed mixes.

5. Increase the visibility of fences and other structures that may be hazardous to flying prairie grouse. Avoid construction of fences near leks or on the crest of low hills. Remove all unnecessary abandoned fences.

6. Avoid building power lines or other tall structures that provide perch sites for raptors within 3 km of important seasonal grouse habitats.

7. Limit the amount of surface disturbance from energy and mining exploration and development, including providing appropriate buffers and timing restrictions around leks. Limit noise levels at leks during the breeding season.

8. Consult conservation strategies such as the Grassland Conservation Plan for Prairie Grouse and resources of the North American Grouse Partnership (see website) for additional information related to the latest science and management of prairie grouse and their habitats.

## 2676.4 – FENS AND ASSOCIATED AT-RISK SPECIES AND HABITATS

Fens are a type of wetland that occupy only a small percentage of the landscape in the Rocky Mountains and the Nebraska sandhills but represent an important element of biological diversity. Because of their water-holding capability and unique characteristics, fens provide very stable habitats and often support several globally rare plant and invertebrate species and unique species assemblages. Examples of Region 2 at-risk plant species associated with fen and other groundwater dependent habitats include mountain and lesser yellow lady's slipper, Cathedral Bluff meadow-rue, roundleaf sundew, sageleaf willow, sphagnum moss, and foxtail, lesser panicled, and livid sedges. Fens are groundwater dependent ecosystems (GDEs) and are dominated by wetland plants. Many of the fens in the Region are over 6,000 years old, with peat accumulation rates ranging from about 9 to 45 cm per thousand years. In this Region, peat develops primarily from the roots of sedges, and to a lesser extent from mosses and grasses. *Sphagnum* moss occurs in some Rocky Mountain fens, but more often brown mosses are found.

Fens are defined in the Watershed Conservation Practices Handbook (FSH 2509.25) as: Geographically restricted wetlands where perennial groundwater discharge occurs on the time scale of millennia and where little erosion or mineral sediment deposition occurs. Fens are

generally characterized by their stable presence on the landscape for thousands of years and associated plant and animal communities that may be relics from historic glaciation periods. Because the rate of accumulation of peat in fens is so slow and the species associated with fens are so unique, these ecosystems are difficult to reclaim and are essentially irreplaceable. Fens are very sensitive to changes in water chemistry and quantity. By the time one has detected long-term change in a fen, it is often too late to reverse the impacts. In the Rocky Mountains and Region 2, there is no published documentation of fen function restoration once a fen has been heavily disturbed (Cooper & MacDonald 2000). Consequently, the U.S. Fish and Wildlife Service recommended no mitigation for loss of fens (USFWS 1999).

Use the following to guide conservation and restoration of lightly to moderately impacted fens.

1. Complete inventories and evaluations of fens, and associated GDEs, on National Forest System lands when practicable.

2. Determine water source of fen and include in fen buffer to protect from ground disturbance, when possible. Avoid altering groundwater connection. Restore and rehabilitate fens when the groundwater connection is intact.

3. As part of watershed or forest planning assessments and environmental analyses, identify known or potential fens on National Forest System lands. Make every reasonable effort to design projects to avoid adversely impacting the functions and ecological services of fens.

4. When changes to the amount, timing, and quality of discharging groundwater is unavoidable consider determining the environmental flows and levels (EFL) for impacted fens. More information on the EFL method can be found at the National Groundwater Program SharePoint site.

5. Consider establishing Special Areas (FSM 2360) to protect fens and their contributing watersheds, especially those used as mitigation for loss of aquatic resources (40 CFR Part 230, see 73 FR 19594-19705).

6. Include components in Forest Plans to maintain or restore wetlands, including fens (36 CFR 219.8(a)(2)). Give special emphasis to large-size fens, unusual kinds of fens (such as iron fens and calcareous fens), and those in especially pristine condition, and the hydrologic features influencing them.

7. Establish a network of reference fens, to serve as benchmarks against which fen condition can be assessed.

8. Encourage and sponsor administrative studies and research concerning the effects of use and management on fens.

9. Work cooperatively with other state and federal agencies and adjoining private landowners to promote the conservation of fens.

10. When possible, minimize winter activities in fens as assumptions about impacts to wetlands do not necessarily hold for fens. USDA Forest Service literature (2004b) indicates compaction of snow over fens and the increased thermal conductivity in the snow permits peatland soil to freeze, thus, changing the thermal environment in the fen.

11. To the extent possible, avoid any loss of rare wetlands such as fens and springs. NOTE: These wetlands cannot be replaced in-kind.

12. Do not build firelines in or around fens unless needed to protect life or property. It is better to let a fen burn than to build firelines around/through it with the risk of altering the fen groundwater connection and water chemistry.

March 2021 update

U.S. Department of Agriculture
U.S. Forest Service – Region 2
San Juan National Forest

This version makes clerical corrections and incorporates USFS Amendments and Administrative Changes made since original publication in September 2013.

This version also removes information, language, and guidance that was relevant only to BLM lands, because the San Juan National Forest and the BLM Tres Rios Field Office are no longer managed jointly under Service First authorities, as they were when this plan was originally written.

# Volume II: Final San Juan National Forest Land and Resource Management Plan



San Juan National Forest
Land and Resource Management Plan

FS-008181

# Final San Juan National Forest
# Land and Resource Management Plan

Archuleta, Conejos, Dolores, Hinsdale, La Plata, Mineral, Montezuma, Montrose, Rio Grande, San Juan, San Miguel Counties, Colorado

| | |
|---|---|
| **Lead Agencies:** | USDA Forest Service<br>USDI Bureau of Land Management |
| **Cooperating Agencies:** | Town of Rico, Colorado |
| **Responsible Officials**: | Daniel Jiron, Regional Forester<br>USDA Forest Service, Rocky Mountain Region<br>740 Simms St.<br>Golden, CO 80401 |
| **For Information, Contact:** | Mark B. Lambert<br>Staff Officer, Planning and Public Service<br>(970-385-1240) |

**Access Document Online:** http://www.fs.usda.gov/goto/sanjuan/planning

**Cover Photo:** The U.S. Forest Service San Juan National Forest manages over 1.8 million acres of public lands in southwest Colorado. This photograph, taken from the Molas Pass Overlook near Silverton, includes high peaks of the San Juan National Forest's portion of the Weminuche Wilderness, the largest designated wilderness in Colorado.

FS-008182

# Table of Contents

**Table of Contents** ..... i
**List of Figures** ..... iii
**List of Tables** ..... iv
**List of Appendices** ..... v
**List of Amendments and Administrative Changes** ..... vi
**List of Acronyms** ..... vii
**CHAPTER 1 - Introduction** ..... 1
1.1 Purpose of the Plan ..... 1
1.2 Planning Area: San Juan National Forest ..... 1
1.3 Land and Resource Management Planning Overview ..... 2
1.4 LRMP Organization, Content, and Terminology ..... 5
1.5 Opportunities and Challenges in the San Juan National Forest ..... 7
**CHAPTER 2 – Resource Direction** ..... 11
2.1 Ecological Framework and the Conservation of Species ..... 11
2.2 Terrestrial Ecosystems and Plant Species ..... 17
2.3 Terrestrial Wildlife ..... 29
2.4 Riparian Area and Wetland Ecosystems ..... 47
2.5 Aquatic Ecosystems and Fisheries ..... 50
2.6 Water Resources ..... 57
2.7 Livestock and Rangeland Management ..... 62
2.8 Invasive Species ..... 71
2.9 Timber and Other Forest Products ..... 73
2.10 Insects and Disease ..... 80
2.11 Fire and Fuels Management ..... 81
2.12 Air Quality ..... 84
2.13 Access and Travel Management ..... 88
2.14 Recreation ..... 99
2.15 Scenery and Visual Resource Management ..... 110
2.16 Heritage and Cultural Resources ..... 115
2.17 Paleontological Resources ..... 118
2.18 Lands and Special Uses ..... 119
2.19 Minerals and Energy ..... 128
2.20 Alternative Energy: Geothermal, Wind, Solar, Biomass ..... 140
2.21 Abandoned Mine Lands and Hazardous Materials ..... 142
2.22 Interpretation and Conservation Education ..... 146
**CHAPTER 3 – Area Direction** ..... 149
3.1 Tres Rios Field Office Geographic Area ..... 152
3.2 Dolores Ranger District Geographic Area ..... 152



FS-008183

3.3 Columbine Ranger District Geographic Area ....154
3.4 Pagosa Ranger District Geographic Area .... 157
3.5 Management Areas .... 160
3.6 Wilderness Areas and Wilderness Study Areas .... 168
3.7 Recommended Wilderness .... 171
3.8 Lands Managed for Wilderness Characteristics (Tres Rios Field Office) .... 171
3.9 Wild and Scenic Rivers .... 171
3.10 Scenic, Historic, and Backcountry Byways .... 174
3.11 National Recreation and Scenic Trails and National Historic Trails.... 175
3.12 Research Natural Areas .... 177
3.13 Gypsum Valley Area of Critical Environmental Concern (Tres Rios Field Office).... 180
3.14 Anasazi Culture Area of Critical Environmental Concern (Tres Rios Field Office) .... 180
3.15 Mesa Verde Escarpment (Tres Rios Field Office) .... 180
3.16 Falls Creek Archeological Area .... 180
3.17 Chimney Rock National Monument .... 182
3.18 Spring Creek Wild Horse Herd Management Area (Tres Rios Field Office) .... 198
3.19 Perins Peak Wildlife Management Area (Tres Rios Field Office) .... 198
3.20 O'Neal Hill Special Botanical Area .... 198
3.21 Chattanooga Special Botanical Area .... 199
3.22 Smoothing Iron and Boggy Draw Old Growth Recruitment Areas .... 201
3.23 Dolores River Canyon .... 202
3.24 Silverton .... 202
3.25 HD Mountains .... 202
3.26 McPhee .... 207
3.27 Rico .... 209
3.28 Hermosa Creek Watershed .... 214

**CHAPTER 4 – Monitoring Plan .... 245**

4.1 San Juan National Forest Monitoring Plan .... 245
4.2 Tres Rios Field Office Monitoring Plan .... 265

**CHAPTER 5 – Literature Cited .... 267**

# List of Figures

Figure 1.1: San Juan National Forest ... 3
Figure 2.1.1: Protected Areas... 16
Figure 2.3.2: Mule Deer Severe Winter Range, Winter Concentration Areas and Production Areas... 44
Figure 2.3.3: Bighorn Sheep Severe Winter Range, Winter Concentration Areas and Production Areas... 45
Figure 2.3.4: Gunnison Sage-grouse Proposed Occupied and Unoccupied Critical Habitat ... 46
Figure 2.3.5: Pronghorn Overall Range ... 46
Figure 2.7.1: Lands Suitable and Capable for Cattle Grazing... 68
Figure 2.7.2: Lands Suitable and Capable for Sheep Grazing... 69
Figure 2.7.3: Available Grazing Allotments and Comparative Stocking Rates... 70
Figure 2.9: Timber Suitability... 79
Figure 2.13.1: Overground Travel Suitability and OHV Area Designations ... 97
Figure 2.13.2: Oversnow Travel Suitability and OHV Area Designations ... 98
Figure 2.13.3: Mud Springs Designated Routes... 99
Figure 2.13.4: Phil's World Designated Routes... 99
Figure 2.14.1: Special Recreation Management Areas, Tres Rios Field Office ... 107
Figure 2.14.2: Summer Recreation Opportunity Spectrum ... 108
Figure 2.14.3: Winter Recreation Opportunity Spectrum ... 109
Figure 2.15: Scenic Integrity Objective and Visual Resource Management ... 114
Figure 2.18.1: Lands Available for Disposal, Tres Rios Field Office... 126
Figure 2.18.2: Designated Utility Corridors, Communication Sites, and Transmission Lines ... 127
Figure 2.19.1: Areas of Locatable Mineral Potential... 135
Figure 2.19.2: Solid Leasable Minerals... 136
Figure 2.19.3: Oil and Gas Leasing Availability and No Surface Occupancy Stipulations... 137
Figure 2.19.4: Oil and Gas Leasing Availability and Controlled Surface Use Stipulations... 138
Figure 2.19.5: Oil and Gas Leasing Availability and Timing Limitation Stipulations ... 139
Figure 2.21: Abandoned Mine Lands Waste Rock Consolidation Areas ... 145
Figure 3.1: Geographic Areas ... 151
Figure 3.5: Management Areas, San Juan National Forest ... 161
Figure 3.6: Recommended Wilderness... 170
Figure 3.9: Suitable Wild and Scenic Rivers ... 173
Figure 3.12: Research Natural Areas ... 179
Figure 3.17.1: CRNM Vicinity Map... 184
Figure 3.17.2: Chimney Rock National Monument Boundary ... 185
Figure 3.27.1: Special Areas and Designations, Tres Rios Field Office ... 212
Figure 3.27.2: Special Areas and Designations, San Juan National Forest ... 213
Figure 3.28.1. Hermosa Creek Watershed Planning Area... 216
HCW Detail, Amended FIGURE 2.1.1 Protected Areas... 217
HCW Detail, Amended FIGURE 2.9 Timber Suitability... 222
FIGURE 3.28.2. Helispots in the HCW ... 224
HCW Detail, Amended FIGURE 2.13.1 Over-Ground Motorized Travel Suitability... 227
HCW Detail, Amended FIGURE 2.13.2 Over-Snow Motorized Travel Suitability... 228
HCW Detail, Amended FIGURE 2.14.2 Summer ROS ... 231
HCW Detail, Amended FIGURE 2.14.3 Winter ROS ... 232
HCW Detail, Amended FIGURE 2.15 Scenic Integrity Objectives... 233
HCW Detail, Amended FIGURE 2.19.3 Oil and Gas Leasing – No Surface Occupancy... 236
HCW Detail, Amended FIGURE 2.19.4 Oil and Gas Leasing – Controlled Surface Use... 237
HCW Detail, Amended FIGURE 2.19.5 Oil and Gas Leasing – Timing Limitation ... 238
HCW Detail, Amended FIGURE 3.5 Management Areas ... 239
HCW Detail, Amended FIGURE 3.6.1 Wilderness and Recommended Wilderness ... 241
HCW Detail, Amended FIGURE 3.6.2. Hermosa Creek Wilderness Management Prescriptions ... 242

# List of Tables

Table 1.4.1: Land and Resource Management Plan Components and U.S. Forest Service Decision Types .............. 5
Table 2.2.1: Desired Conditions for Development Stages on the San Juan National Forest.................................... 24
Table 2.2.2: Desired Conditions for Development Stages on Tres Rios Field Office Lands...................................... 24
Table 2.2.3: Desired Conditions for Snags and Large Wood on San Juan National Forest ...................................... 28
Table 2.3.1: Terrestrial Wildlife Focal Species on the San Juan National Forest...................................................... 32
Table 2.3.2: Raptor Timing and Buffer Zone Distance Standards and Guidelines .................................................... 38
Table 2.5.1: Special Status Aquatic Species for the San Juan National Forest ........................................................ 53
Table 2.5.2: Aquatic Focal Species for the San Juan National Forest....................................................................... 53
Table 2.5.3: Metrics Applicable to Standard 2.5.18c ................................................................................................ 55
Table 2.7.1: Allowable Use Guidelines by Livestock Grazing Management System................................................. 66
Table 2.7.2: Post-grazing Vegetation Heights under Different Seasons of Use in Riparian Areas and Wetlands ....... 66
Table 2.9.1: Estimated Volume Produced by the Timber Sale Program Quantity on San Juan National Forest Lands, Annual Average in the First Decade .................................................................................... 74
Table 2.9.2: Estimated Annual Long-Term-Sustained-Yield Capacity on San Juan National Forest Lands, Annual Average ..................................................................................................................................... 74
Table 2.9.3: Minimum Number of Seedlings (or aspen suckers) for Adequately Restocking of a Regeneration Site.. 76
Table 2.9.4: Appropriate Silvicultural Systems by Forest Vegetation Type ............................................................... 76
Table 2.9.5: Guidelines for Allowable Stand Improvements and Regeneration Methods by Forest Vegetation Type . 77
Table 2.9.6: U.S. Forest Service Utilization Standards[1]............................................................................................ 78
Table 2.11.1: Fire Management Direction for San Juan National Forest Lands ....................................................... 83
Table 2.14.1: Bureau of Land Management Recreation Setting Characteristics Matrix .......................................... 101
Table 2.18.1: Designated Energy Corridors and Energy Transmission Facilities on the San Juan National Forest.. 122
Table 2.18.2: Communication Sites, Locations, and Suitable Uses ........................................................................ 122
Table 2.19.1: Acres Available for Leasing and Lease Stipulations.......................................................................... 132
Table 3.2.1: Management Area Distribution in the Dolores Geographic Area ........................................................ 154
Table 3.3.1: Management Area Distribution in the Columbine Geographic Area.................................................... 157
Table 3.4.1: Management Area Distribution in the Pagosa Geographic Area......................................................... 159
Table 3.5.1 Management Area Allocations on San Juan National Forest Lands .................................................... 160
Table 3.5.2: Management Area 1 Allowable Uses................................................................................................... 162
Table 3.5.3: Management Area 3 Allowable Uses................................................................................................... 163
Table 3.5.4: Management Area 4 Allowable Uses................................................................................................... 164
Table 3.5.5: Management Area 5 Allowable Uses................................................................................................... 165
Table 3.5.6: Management Area 7 Allowable Uses................................................................................................... 166
Table 3.5.7: Management Area 8 Allowable Uses................................................................................................... 167
Table 3.6.1: Wilderness Areas and Wilderness Study Areas .................................................................................. 169
Table 3.9.1: Miles of River Segments Suitable for Wild and Scenic River Status by Class..................................... 172
Table 3.12.1: Existing and New Research Natural Areas on San Juan National Forest Lands............................... 177
Table 3.12.2: Research Natural Area Allowable Uses ............................................................................................. 178
Table 3.16.1: Falls Creek Archeological Area Allowable Uses................................................................................ 181
Table 3.17.1: Chimney Rock National Monument Allowable Uses.......................................................................... 197
Table 3.20.1: O'Neal Hill Special Botanical Area Allowable Uses ........................................................................... 199
Table 3.21.1: Chattanooga Special Botanical Area Allowable Uses ....................................................................... 200
Table 3.22.1: Smoothing Iron and Boggy Draw Old Growth Recruitment Areas Allowable Uses ............................ 202
Table 3.25.1: HD Mountains Allowable Uses .......................................................................................................... 207
Table 3.26.1: McPhee Allowable Uses .................................................................................................................... 209
Table 3.27.1: Rico Area Allowable Uses.................................................................................................................. 212
Table 3.28.1. Rare Plants in Hermosa Creek Watershed ........................................................................................ 218
Table 3.28.2. Vegetation Desired Conditions in Hermosa Creek Watershed .......................................................... 218
Table 3.28.3. Allowable Uses in Hermosa Creek Watershed ................................................................................. 243
Table 4.1. Monitoring Components.......................................................................................................................... 247



FS-008186

# List of Appendices

Appendices can be found in Volume III.


| | |
|---|---|
| Appendix A | BLM Lands Available for Disposal |
| Appendix B | Paleontological Resources |
| Appendix C | Roadless Area Inventory and Wilderness Evaluation |
| Appendix D | Wild and Scenic Rivers Suitability |
| Appendix E | Special Recreation Management Areas |
| Appendix F | Projected Activities for Impacts Analysis |
| Appendix G | Climate Change Trends and Management Strategy for the San Juan National Forest and Tres Rios Field Office Land and Resource Management Plan |
| Appendix H | Oil and Gas Leasing Stipulations |
| Appendix I | Vulnerable Watersheds |
| Appendix J | Biological Assessment for the San Juan National Forest 2013 Land and Resource Management Plan Revision |
| Appendix K | Fire Regime and Condition Class |
| Appendix L | Bureau of Land Management Grazing Allotments Status and Permitted Animal Units Months |
| Appendix M | Land and Resource Management Plan Components Related to Terrestrial Wildlife Species |
| Appendix N | Sage-grouse Best Management Practices |
| Appendix O | BLM Lands with Wilderness Characteristics |
| Appendix P | Federally Listed Species and Sensitive Species |
| Appendix Q | Plan Components Addressing Species Diversity and Population Viability |
| Appendix R | Bureau of Land Management Master Leasing Plan Policy and Description of Leasing Analysis |
| Appendix S | Response to Comments on the San Juan/Tres Rios Draft Land and Resource Management Plan and Draft Supplemental Environmental Impact Statements |
| Appendix T | San Juan National Forest Biological Evaluation and Bureau of Land Management Sensitive Species Analysis |
| Appendix U | Areas of Critical Environmental Concern |
| Appendix V | Final Environmental Impact Statement Maps |
| Appendix W | Analyses of Plans and Land Use Policies of Adjacent Governments and Tribes |

# List of Amendments and Administrative Changes

The following changes have been incorporated into this March 2021 update:

| | | |
|---|---|---|
| Amendment #1 | Chimney Rock Management Plan, *Replaces Section 3.17* | October 28, 2015 |
| Amendment #2 | Hermosa Creek Watershed Management Plan, Creates *Section 3.28* | December 18, 2017 |
| Amendment #3 | Purgatory Resort Permit Boundary Adjustment (Gelande Lift), Adjusts Management Area boundaries for a project | May 25, 2018 |
| Administrative Change #1 | Clarifies language in the *2.5 Aquatic Ecosystems and Fisheries* and *3. 9 Wild and Scenic Rivers* sections | January 26, 2015 |
| Administrative Change #2 | Corrects errors in *3.12 Research Natural Areas* | November 19, 2015 |
| Administrative Change #3 | Corrects Management Area boundary at Lobo Overlook | May 6, 2016 |
| Administrative Change #4 | Replaces *Chapter 4 Monitoring Plan* to conform to the 2012 Planning Rule | May 19, 2016 |
| Administrative Change #5 | Corrects *Guideline 2.18.29* regarding Scenic Integrity Objectives and Special Uses | June 20, 2017 |
| Administrative Change #6 | Replaces *Appendix H – Oil and Gas Leasing Stipulations* | July 9, 2019 |
| Administrative Change #7 | Modifies several types of boundaries to align with a corrected Purgatory Special Use Permit Boundary | January 27, 2020 |
| Administrative Change #8 | Removes BLM-specific guidance and incorporates all previous Amendments and Administrative Changes | March 15, 2021 |

# List of Acronyms

| | |
|---|---|
| AML | Abandoned Mine Lands |
| AMP | allotment management plan |
| ANC | acid neutralizing capacity |
| APHIS | Animal Plant Health Inspection Services |
| AQRV | air quality related value |
| ARSG | Animas River Stakeholders Group |
| ATV | all-terrain vehicle |
| BLM | Bureau of Land Management |
| BMP | best management practice |
| CDPHE | Colorado Department of Public Health and Environment |
| CFR | Code of Federal Regulations |
| CRNM | Chimney Rock National Monument |
| $CO_2$ | carbon dioxide |
| CPW | Colorado Parks and Wildlife |
| CRA | Colorado Roadless Area |
| CRMP | Cultural Resource Management Plan |
| dBA | A-weighted decibel |
| dbh | diameter at breast height |
| DMR | Durango Mountain Resort |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| EO | Executive Order |
| EPA | U.S. Environmental Protection Agency |
| ESA | Endangered Species Act of 1973 |
| FACTS | Forest Service Activity Tracking System |
| FEIS | Final Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act of 1976 |
| FMP | Fire Management Plan |
| FONSI | Finding of No Significant Impact |
| FRCC | Fire Regime Condition Class |
| FSH | Forest Service Handbook |
| FSM | Forest Service Manual |
| GIS | geographic information system |
| GPRA | Government Performance and Results Act |
| HMA | Herd Management Area |
| HMAP | Herd Management Area Plan |
| HRV | Historical Range of Variability |
| HUC | Hydrologic Unit Code |
| HCW | Hermosa Creek Watershed |
| IM | Instruction Memorandum |
| IOPs | interagency operating procedures |
| IRA | inventoried roadless area |
| KRCRA | Known Recoverable Coal Resource Area |
| kV | kilovolt |
| LEED | Leadership in Energy and Environmental Design |
| LRMP | Land and Resource Management Plan, also call the Forest Plan |
| LTSYC | Long-Term Sustained-Yield Capacity |
| MA | Management Area |

| | |
|---|---|
| MIS | Management Indicator Species |
| MMBF | millions of board feet |
| MMCF | million cubic feet |
| MOU | Memorandum of Understanding |
| MUSY | Multiple-Use Sustained-Yield Act |
| MW | megawatt |
| NAGPRA | Native American Graves Protection and Repatriation Act |
| NEPA | National Environmental Policy Act |
| NFMA | National Forest Management Act of 1976 |
| NFS | National Forest System |
| NHPA | National Historic Preservation Act |
| NREL | National Renewable Energy Laboratory |
| NRHP | National Register of Historic Places |
| NRM | Natural Resource Manager |
| NSO | No Surface Occupancy |
| OHV | off-highway vehicle |
| ORV | outstandingly remarkable value |
| PAS | Performance Attainment System |
| PEIS | Programmatic Environmental Impact Statement |
| PFYC | Potential Fossil Yield Classification |
| ppm | parts per million |
| PRPA | Paleontological Resources Preservation Act |
| PSD | Prevention of Significant Deterioration |
| RNA | Research Natural Area |
| ROD | Record of Decision |
| ROS | Recreation Opportunity Spectrum |
| ROW | Right-of-Way |
| SIO | Scenic Integrity Objective |
| SJNF | San Juan National Forest |
| TIM | Timber Information Manager |
| TMDL | total maximum daily load |
| TNC | The Nature Conservancy |
| TSPQ | Timber Sale Program Quantity |
| USC | United States Code |
| USDA | U.S. Department of Agriculture |
| USDI | U.S. Department of the Interior |
| USFS | U.S. Forest Service |
| USFWS | U.S. Fish and Wildlife Service |
| USGS | U.S. Geological Survey |
| WFRP | Wildlife, Fish, and Rare Plants information system |
| WSA | Wilderness Study Area |
| WSR | Wild and Scenic River |
| WSRA | Wild and Scenic River Act |
| WUI | wildland urban interface |

# CHAPTER 1 - INTRODUCTION

## 1.1 Purpose of the Plan

The purpose of this Land and Resource Management Plan (LRMP), also known as the Forest Plan, is to provide strategic guidance for future management of all National Forest System (NFS) lands managed by the San Juan National Forest (SJNF). This LRMP guides the restoration or maintenance of the health of these lands to promote a sustainable flow of uses, benefits, products, services, and visitor opportunities. It provides a framework for informed decision making, while guiding resource management programs, practices, uses, and projects. It does not include specific project and activity decisions. Those decisions are made later, after more detailed analysis and further public involvement. The LRMP is adaptive in that it can be amended to update the management direction based on new knowledge and information.

This LRMP is strategic in nature and does not attempt to prescribe detailed management direction to cover every possible situation. While all components necessary for resource protection and restoration are included, the LRMP also provides flexibility needed to respond to uncertain or unknown future events and conditions such as fires, floods, climate change, changing economies, and social changes that may be important to consider at the time future decisions are made. Implementation of the LRMP is contingent upon future funding and staffing levels.

The LRMP has been prepared pursuant to the requirements of the Federal Land Policy and Management Act of 1976 (FLPMA), the National Forest Management Act of 1976 (NFMA), and the 1982 U.S. Forest Service (USFS) planning regulations (36 CFR 219) as allowed by the transition provision of the 2000 regulations (36 CFR 219.35, revised 2004; the 2012 forest planning regulations currently in effect allow use of the previous regulations for plan revisions initiated before the 2012 regulations took effect [36 CFR 219.17 (b) (3), 2012]). This LRMP is also accompanied by a Final Environmental Impact Statement (FEIS) as required by the regulations used in its development (36 CFR 219.10).

## 1.2 Planning Area: San Juan National Forest

The SJNF lies amidst the mesas and mountains of southwest Colorado at the junction of the Southern Rockies and the Colorado Plateau (Figure 1.1). Elevations within the area range from about 6,300 to 14,200 feet above mean sea level. These lands consist of diverse landscapes, including large expanses of relatively pristine lands and other areas that are more developed, with roads and a wider variety of human activities evident. The planning area provides opportunities for a broad range of human activities and uses, as well as natural processes, to occur.

The SJNF is known for beautiful scenery, outstanding prehistoric and historic features, relatively unconfined recreation opportunities of high quality, and clean water and air. A large portion of the water in southwest Colorado originates in mountainous, headwaters areas of these public lands. The people of southwest Colorado have a strong tie to public lands and participate in their management. Many existing relationships and partnerships with a variety of interests and organizations provide tangible evidence of important attachments to these public lands and offer many opportunities for use, enjoyment, and cooperative stewardship.

SJNF lands contain some of the nearest high-elevation areas that offer a cooler-temperature refuge for visitors from states to the south and west. The area is ringed by numerous National Parks and Monuments (including Great Sand Dunes, Chaco, Mesa Verde, Grand Canyon, Canyonlands, and Arches National Parks, as well as Hovenweep, Canyons of the Ancients, and Chimney Rock National Monuments). These factors, plus scenic attractions such as the San Juan Skyway and the Alpine Loop scenic byways, make southwest Colorado a national destination for visitors.

The area has a rich heritage, ranging from pre-Puebloan culture to early Hispanic settlements, hard-rock mining, ranching, and contemporary recreation and retirement communities. There are many Native American communities within a few hundred miles that have connections to the area, including 19 Pueblo communities in New Mexico; the Southern Ute and Ute Mountain Ute in Colorado; the Jicarilla Apache,

and Navajo tribes in New Mexico; the Hopi Tribes in Arizona; and the Ute Indian Tribe (Uintah and Ouray Reservation) of northeast Utah.

## 1.3 Land and Resource Management Planning Overview

USFS land and resource management planning is an adaptive process that includes plan development, monitoring, and adjustment based on desired social, economic, and ecological conditions and the evaluation of impacts to those conditions. The overall purpose of planning is to ensure responsible land management based on current information that guides land stewardship to best meet the needs of the American people.

The mission of the USFS that drives the planning process for the agency is:

> To sustain the health, diversity, and productivity of the nation's forests and grasslands in order to meet the needs of present and future generations.

The mission is based on the relationship between the American people and their natural resource heritage. This relationship is founded on the principles of sustaining the nation's natural resources for future generations, producing personal and community well-being, and providing economic wealth for the people, communities, and businesses of the nation. The agency has a strategic plan (as required by the Government Performance and Results Act of 1993 [GPRA], 5 United States Code [USC] 306, 31 USC 1115–1119, and 31 USC 970—9704) aimed at increasing the accountability of federal agencies by measuring their progress toward achieving agency goals and objectives. The strategic plan was used during the development of this LRMP as guidance for developing desired conditions and outcomes.

### *1.3.1 U.S. Forest Service Planning*

This LRMP is based on the results of two comprehensive and complementary planning efforts, one being resource data driven and the other being public value driven. The first effort provided technical analyses of conditions and trends for social, economic, and ecological elements related to the SJNF. These analyses included consideration of new relevant information and legal and policy changes that have occurred since the current plan was developed.

The second major effort is to gather and use knowledge of the public regarding their values, knowledge, and uses of SJNF lands. The initial public participation effort focused on input related to vision, management challenges, land allocations, desired conditions, objectives, and suitable uses of the planning area. Results from the technical analyses were used in the public participation process to inform, focus, and enhance participant dialogue. Additional information from the public was also gathered during the comment periods that accompanied the release of the Draft Environmental Impact Statement (EIS) (2007) and the Supplement to the EIS (2011). The assessments and knowledge gained through public involvement were used to develop and shape the LRMP as described in this volume, as well as the other alternatives that are documented in the FEIS (Volume I). These documents do not address every potential topic that may arise in management of the SJNF. Rather, they address the issues that the Responsible Officials (USFS Regional Forester) has determined to be pertinent to this planning process. A summary of public participation activities is given in Volume III, Appendix S.

Planning generally occurs at three levels. At the national level of the USFS, the Chief is responsible for the USFS Strategic Plan, as required by the GPRA. The Strategic Plan establishes goals, objectives, performance measures, and strategies for management of the NFS. The SJNF is one administrative unit of this system. Land management plans are developed at the forest level and are approved by the Regional Forester. The third level is for site-specific projects and activities, which are actions that typically fall under the authority of the Forest Supervisor or District Ranger.



FS-008192




**Figure 1.1: San Juan National Forest**

USFS management is authorized and guided by many laws, regulations, and policies. In addition, the agency has a directives system that consists of manuals and handbooks. These contain the agency's policies and procedures, and serve as the primary basis for the internal management, control of programs, and administrative direction. Unless needed to provide context, clarity, or emphasis, direction from these sources will not be reiterated in this LRMP. Within the flexible and adaptive framework of the agency planning regulations and directives, the guidance set forth by this LRMP should continue to provide a meaningful framework and vision for management into the foreseeable future.

### *1.3.2 Relationship of the LRMP to Other Planning Documents*

This LRMP will replace the current San Juan National Forest Land and Resource Management Plan, approved in 1983 and amended 22 times, including a significant, comprehensive amendment in 1992 (USFS 1992a).

This LRMP is one key document in a set of documents that integrates and displays information relevant to management of SJNF lands. Other documents that will form the administrative record for the LRMP include the FEIS; appendices; the Record of Decision (ROD); social, economic, and ecological assessments; the Analysis of the Management Situation report; public participation documentation; objections and disposition record; administrative corrections; and other relevant material. Together these documents provide the background of information, comprehensive analyses, and public involvement that are being used to inform the final decisions for this LRMP.

A separate decision that has been incorporated into this document, apart from the LRMP, is determining the NFS lands that will be administratively available for mineral leasing and the associated stipulations for leasing. The USFS considers leasing availability decisions to be separate from planning decisions, but closely linked with both planning- and project-level components; therefore, the USFS leasing availability decision has been incorporated into this planning effort.

While this LRMP will be the primary guide to management of the SJNF lands, there are several federal, state, tribal, and local planning documents that influence management of nearby lands in southwest Colorado, which have been considered throughout this planning process and reviewed for consistency with this LRMP. An analysis of these plans is provided in Volume III, Appendix W.

### *1.3.3 LRMP Consistency*

All projects and activities authorized by the USFS must be consistent with the LRMP (16 USC 1604(i). A project or activity will be considered consistent with this LRMP if it is consistent with the desired conditions, objectives, standards, guidelines, suitability determinations, allowable uses, and other management actions and decisions approved in the LRMP.

If a project or activity as proposed would not be consistent with the LRMP, the Responsible Official has the following options:

- modify the proposal so that the project or activity will be consistent;
- reject the proposal; or
- amend the LRMP contemporaneously with the approval of the project or activity so that the project or activity is consistent with the LRMP, as amended. The amendment may be limited to apply only to the project or activity or may apply more broadly.

This LRMP does not grant, withhold, or modify any contract, permit, or other legal instrument, and does not authorize projects or activities, except where specifically noted. Decisions to approve or authorize specific projects are considered separately from the LRMP during the appropriate time to make such decisions. National Environmental Policy Act (NEPA) compliance is required for any project-level decision that may have an impact on the environment. Project-level decisions must be informed by site-specific analysis through an open, public process. This allows the latest science and public input to be employed at the time decision is to be made.

# 1.4 LRMP Organization, Content, and Terminology

The management direction and guidance presented in Chapter 2 is organized by resource and resource use, and applies across the entire SJNF landscape, except where specifically noted. Additional plan direction that applies only to specific areas within the SJNF is presented in Chapter 3. All of this direction is divided into three interrelated components: 1) *desired conditions*, which, when taken as a whole, make up the vision for management of the planning area; 2) *objectives, suitability, and allowable uses*, which comprise the plan strategy that will be used to achieve the vision; and 3) *standards and guidelines*, which are the criteria and controls used to execute the strategy. This management direction and guidance should be followed in future implementation of projects and activities, and is also referred to as the *plan components,* or *LRMP components*. The purpose of each of these plan components is described in greater detail below. The number of plan components under each resource or area varies due to the varying complexity of the resource, the extent of existing management direction already provided by law and policy, the need for action, and SJNF priorities. Some resources or areas may not include all types of plan components.

Finally, a monitoring plan has been developed to evaluate progress toward achieving desired conditions and objectives, and to determine how well management requirements, such as standards and guidelines, are being applied. Programmatic direction for monitoring and evaluation is included to provide a framework for subsequent monitoring.

The LRMP makes no decisions applicable to other ownerships or jurisdictions.

Because the 2013 LRMP originally applied to two different agencies, its format and some of its terminology vary from conventional land and resource management plans. This LRMP attempted to incorporate the format of both agencies and use the same terminology to the extent possible, but some exceptions existed where needed to match legal or policy direction that differed by agency. Table 1.4.1 shows the terminology used in this document as compared to that which the USFS typically uses to identify various types of plan decisions. Definitions for the terminology used in the LRMP tie to planning guidance as described in Section 1.4.1.

**Table 1.4.1: Land and Resource Management Plan Components and U.S. Forest Service Decision Types**

| LRMP Component Terminology | Conventional USFS Plan Decision Terminology |
|---|---|
| Desired Conditions | Desired Conditions |
| Objectives | Objectives |
| Suitability and Allowable Uses | Suitable Uses |
| Standards | Standards |
| Guidelines | Guidelines |

## *1.4.1 LRMP Components*

### Desired Conditions

Desired conditions encompass the overarching goals of land and resource management. They are statements of the social, economic, and ecological attributes and values toward which management strives to achieve and characterize or exemplify the desired outcomes of land management. They describe how the area is expected to look and function in the future. Some desired conditions are general, while others are quite specific.

Desired conditions are aspirations; they may only be achievable over the long term. Collectively, specific projects implemented subsequent to this LRMP should contribute to maintaining and/or achieving desired

conditions, but no single project should be expected to contribute to meeting all desired conditions. Identifying and establishing desired conditions is the central focus of this LRMP.

## Objectives

Objectives are concise projections of measurable, time-specific intended outcomes. Objectives are a means of progressing toward maintaining and/or achieving desired conditions. As with desired conditions, they are aspirations, not commitments or final project decisions. Implementation and achievement would rely upon sufficient funding and staffing levels.

## Suitability and Allowable Uses

Suitability is defined by the capability of an area to accommodate specific uses and activities in a sustainable manner based on the area's inherent biophysical characteristics, public input, and balancing desired conditions for multiple resources. Suitability determinations are general determinations derived from modeling exercises at the landscape level that can be refined as necessary at the project level. Suitability determinations in this LRMP are made for the timber, grazing, and travel programs. The allowable use tables in Chapter 3 portray suitability of these uses for specific areas and also identify other activities that are allowed, restricted, or prohibited within each area.

## Standards

A standard is an approach or condition that is determined to be necessary to meet desired future conditions and objectives, and/or to ensure the long-term viability of resources. A standard (worded as "must" or "shall") describes a course of action that must be followed or a level of attainment that must be reached. Deviations from standards would require analysis and documentation through a subsequent land management plan amendment.

## Guidelines

A guideline (worded as "should") is presumptively a requirement to meet desired future conditions and objectives, and/or to ensure the long-term viability of resources. Guidelines are put forward in this LRMP in recognition that there may be circumstances that could generate or require alternative, more appropriate means for meeting desired future conditions and objectives, and/or to ensure the long-term viability of resources. It is also recognized that there may be limited individual circumstances where the need for a guideline no longer exists or the applicability of a guideline is otherwise altered (e.g., changes in surrounding land use that may render a guideline ineffective). In these situations, a guideline has been determined to be more appropriate than a standard by allowing some flexibility in approach as conditions change and new information is obtained. The use of guidelines in this LRMP is an acknowledgement that a single ideal approach for meeting our desired future conditions and objectives, and/or ensuring the long-term viability of resources may yet to be identified, and that there may be nuances in any given management situation that warrant a modified approach. If the Responsible Official for a project decision finds that deviation from a guideline is necessary, he or she must record the reasons for deviation as part of the project decision and explain how the intent of the guideline—as established by the desired future conditions and objectives, and/or need to ensure long-term viability of resources—is being met through alternative means. If the intent of the guideline is met through alternative means, a land management plan amendment typically would not be required.

## Additional Guidance

The development and implementation of projects on NFS land is also guided by other sources, including applicable federal laws and regulations, executive orders, directives (manuals and handbooks), state and local laws and regulations, and best management practices (BMPs). This LRMP includes references to other applicable guidance where appropriate, but guidance from laws, regulations, policies, and agency directives is generally not detailed unless necessary to emphasize or highlight information.

### 1.4.2 Administrative Actions

Administrative actions are the day-to-day activities required to serve the public and to provide optimum management of SJNF resources. These actions are allowable by regulation and do not require authorization within this LRMP and generally do not require site-specific analysis under NEPA. For example, in day-to-day management of the SJNF, the USFS is responsible for law enforcement activities that need not be authorized under the LRMP. Additionally, the SJNF may authorize or restrict access in certain areas in emergency situations (such as wildfire) or coordinate with other agencies and organizations, such as Colorado Parks and Wildlife (CPW), for specific activities that may not require site-specific NEPA documentation efforts. Other examples of administrative actions include, but are not limited to, mapping, surveying, inventory, monitoring, and research studies. These and other administrative actions will be conducted in the within the SJNF, sometimes in partnership with other landowners, agencies, or entities. The degree to which these actions are carried out depends on agency policies, available personnel, funding levels, and further environmental analysis and decision-making, as appropriate.

## 1.5 Opportunities and Challenges in the San Juan National Forest

### 1.5.1 Distinctive Nature of the Planning Area

The SJNF has distinct characteristics that sets it apart from other places. Some key characteristics are described below.

#### Diverse Geography

The SJNF, which lies within the Colorado Plateau and Southern Rocky Mountains ecoregions, displays tremendous geographic diversity. It ranges from about 4,900 feet in the canyon country (near the Utah border) to over 14,000 feet in the high peaks of the San Juan Mountains. The tremendous geologic, topographic, climatic, and vegetative diversity associated with these lands supports an unusually broad variety of biodiversity, as well as a wide range of habitats for flora and fauna. The variety of ecosystems found throughout the planning area, including semi-desert grasslands, pinyon-juniper woodlands, ponderosa pine forests, spruce-fir forests, alpine tundra, riparian areas, and wetlands, offer exceptional diversity in scenery and recreational opportunities.

#### Scenery and Tourism

The diverse geography of the planning area provides for remarkable scenery and attracts many visitors. The proximity to numerous national parks and national monuments in the Four Corners (including Mesa Verde, Grand Canyon, Canyonlands, and Arches National Parks, as well as Hovenweep, Canyons of the Ancients, and Chimney Rock National Monuments), as well as scenic attractions (including the San Juan Skyway, the Alpine Loop Scenic Byway, and the Durango-Silverton Narrow Gauge Railroad), make southwest Colorado a national destination for visitors.

#### Recreation

The size and the diversity of the planning area make a vast array of recreational opportunities activities possible, including scenic driving, all-terrain vehicle (ATV) use, mountain biking, hiking, horseback riding, camping, fishing, hunting, boating, and guided trips. Past mining, logging, and grazing activities have created an impressive transportation network that provides people access to public lands to engage in the recreational experiences they seek.

#### Undeveloped Lands

Within the planning area, there are large undeveloped lands where natural ecological processes proceed with minimal human interference. These lands provide habitat for wide-ranging species, as well as linkages that facilitate species movements and gene flow. They act as reserves that protect the ecosystems and the full range of biological diversity within them. The planning area includes over 459,000 acres designated as

wilderness, including the Weminuche, the largest wilderness area in Colorado. Additionally, there are approximately: 529,700 acres of Colorado Roadless Areas (CRAs); 60,500 acres of the Piedra Area; 500 acres of a Wilderness Study Area (WSA); and 21,200 acres designated plus 32,000 acres recommended of Research Natural Areas (RNAs).

## Heritage Resources

The lands within the planning area have a long and rich prehistoric and historic record that goes back approximately 10,000 years. Within the area, many important discoveries and a great depth of archeological research has taken place. The archeological record of the area contains evidence of the earliest agricultural societies in the region. The historic record includes artifacts of Spanish and Euro-American explorers, trappers, miners, and settlers. This long record of human occupation has left one of the highest densities of prehistoric and historic cultural resources found anywhere in the United States.

## Energy Minerals

The lands within the planning area contribute significantly to the nation's ability to produce natural gas. At least 64 billion cubic feet are produced annually. The utilization of the rich mineral resources of the planning area need not only be done in such a way that it means getting the most amount of resource as is practicable for the minimal amount of disturbance, and that the taxpayer, federal, state, and local governments, get the maximum royalty (as applicable) for minerals produced on public lands. This means making sure that BMPs are used to prevent waste and verify production. It also means making sure that utilization of one mineral resource is not done in such a way that it might preclude or diminish the ability to be utilized in the future.

## American Indian Rights and Interest

The SJNF work collaboratively with the 25 Native American tribes and pueblos that claim cultural affiliation with lands under the SJNF's jurisdiction to ensure that management issues of concern to the tribes and pueblos are addressed. Below is a list of tribes and pueblos that claim cultural affiliation with SJNF lands. All applicable USFS policy addressing tribal treaty rights and federal trust responsibilities will continue to be followed. The SJNF recognizes the unique sovereign nation status that the Native American tribes and pueblos have with the United States government.

### *Tribes and Pueblos that Claim Cultural Affiliation with SJNF Lands*

- Jicarilla Apache Nation
- Kewa Pueblo (formerly Pueblo of Santo Domingo)
- Navajo Nation
- Ohkay Owingeh (formerly Pueblo of San Juan)
- Pueblo of Acoma
- Pueblo of Cochiti
- Pueblo of Isleta
- Pueblo of Jemez
- Pueblo of Laguna
- Pueblo of Nambe
- Pueblo of Picuris
- Pueblo of Pojoaque
- Pueblo of San Felipe
- Pueblo of San Ildefonso
- Pueblo of Sandia
- Pueblo of Santa Ana
- Pueblo of Santa Clara
- Pueblo of Tesuque
- Pueblo of Zia
- Taos Pueblo
- Southern Ute Indian Tribe
- The Hopi Tribe
- Ute Mountain Ute Tribe
- Ysleta del Sur Pueblo
- Zuni Tribe

The Ute Mountain Ute and the Southern Ute tribes are both major contributors to the area economy and are among the largest employers in Montezuma and La Plata Counties, respectively. Both tribes have diversified economies including gaming, oil and gas development, and natural resource development on tribal lands. The Southern Ute Tribe also plays a major role in land and housing development in La Plata County.

### *The Brunot Agreement*

The Brunot Agreement, ratified by Congress in 1874, withdrew over 5,000 square miles in the mountains of southwest Colorado from the 1868 Ute Reservation. The agreement, entered into between the United

States (as represented by Felix Brunot) and the Ute Indians in Colorado, was passed into law (18 Stat., 36) by the House of Representatives and the Senate of the U.S. Congress on April 29, 1974 (after Congress decided in 1871 that the United States would no longer make treaties with Native American tribes, yet continued to interact with Native American tribes in much the same manner through executive orders and agreements enacted as statutes). Under the “reserved rights doctrine,” hunting rights on reservation lands relinquished by the Utes were retained; that is, the tribes retained such rights as part of their status as prior and continuing sovereigns. Article II of the Bruno Agreement specified that “the United States shall permit the Ute Indians to hunt upon said lands so long as the game lasts and the Indians are at peace with the white people.” The Ute Mountain Ute Tribe’s hunting rights were acknowledged when the tribe sued the State of Colorado for their historical hunting rights in 1978. The rights were granted to the tribe under a consent decree that gave enrolled members of the Ute Mountain Ute Tribe the right to hunt deer and elk in the Brunot area for subsistence, religious, or ceremonial purposes. The consent decree specified that tribal members may hunt deer and elk without a state license year-round, providing that they obtain a tribal hunting permit. In 2013, the Ute Mountain Ute Tribe re-negotiated this agreement with the State of Colorado to include the Tribe’s fishing rights and the right to hunt a certain number of black bears, moose, mountain goats, big horn sheep and mountain lions, in addition to the existing take of elk and mule deer within the Brunot area. Other game animals may be hunted without a license and without bag limits, but only during hunting seasons established by CPW. In 2008, the Southern Ute Indian Tribe signed an agreement with the State of Colorado which reinstated their hunting and fishing rights within the Brunot area. The SJNF will continue to ensure that the hunting and fishing rights of the 1873 Brunot Agreement are upheld on public lands under their management jurisdictions. In exercising their Brunot hunting rights, the Ute Mountain Ute and Southern Ute tribal members are required to adhere to federal policy and regulations designed to protect natural and cultural resources.

The SJNF will continue to allow tribal members to collect botanical and other special forest products from public lands within the constraint of ecological sustainability. The SJNF will also coordinate and collaborate with tribal governments to increase awareness and knowledge of culturally significant plants, and will consider potential impacts on culturally significant plants in project design and implementation. Prescribed burn plans, noxious weed control, and other management projects should address and consider traditional uses and traditional management of culturally significant plants.

Important cultural areas and traditional cultural properties will be protected for current and future tribal use. The SJNF will continue to consult with tribes and pueblos, and knowledgeable individuals to identify important cultural areas and traditional cultural properties. If requested by the tribes, the SJNF will keep information on such localities and uses confidential.

The SJNF will maintain and strengthen the existing relationship of government-to-government consultation between the USFS and these 25 Native American tribes and pueblos. The SJNF will develop consultation protocols and other formal agreements between the USFS and Native American Indian Tribes with direct communication between USFS line officers and tribal officials. The SJNF will provide opportunities for tribal participation and partnerships in educational, interpretive, social, and economic programs and will continue to work with the tribes and pueblos to educate the public on appropriate and respectful etiquette when visiting culturally sensitive sites.

### *1.5.2 Management Challenges*

There are several unique management challenges on public lands in southwest Colorado related to the distinct characteristics of the area described above. These challenges, summarized below, were considered by the agency and the public in developing plan guidance and frame much of what is presented in this LRMP.

## Meeting Recreation Demand

The local population surrounding the SJNF is projected to increase by approximately 66,500 residents by 2040 (see Section 3.30 of the FEIS for demographic projections). Demand for recreational opportunities is expected to increase, along with the increase in the population. Anticipating demand for changing

recreational opportunities—such as greater interest in downhill-specific mountain bike routes or geo-caching—is important as well. Meeting this increasing demand without compromising the integrity of ecosystems requires careful planning and management.

## Balancing Multiple Uses

Land management conflicts are common within the planning area, especially as people engaging in different uses increasingly compete for the same piece of land. SJNF lands that are adjacent to private lands (referred to as the wildland-urban interface, or WUI) can also create a number of management challenges, including fire management, fuels reduction, recreation conflicts, and wildlife habitat preservation/protection as well as energy and mineral exploration and development. Complex land ownership patterns also create management challenges, including issues and conflicts in relation to boundaries, easements, public access, and roads.

## Managing Water-related Issues

Water-related issues will continue to present complex and significant challenges throughout the planning area. Public land managers will continue to be called upon to maintain clean water, protect water-dependent ecosystems, protect rare or threatened and endangered aquatic species, and perform watershed restoration while, at the same time, continuing to supply water for a variety of existing and future consumptive needs and multiple uses.

The population surge in the West continues to increase the diversion and the consumptive use of water and, at the same time, increases the demand for water-based recreation. Changes in the status quo of water appropriation and the complexity of federal water management policy are a deep concern of state governments and senior water rights holders. The ongoing regional drought has accelerated state initiatives designed to develop new water storage and diversion projects of various sizes. Regional climate shifts and global climate change could further exacerbate the complexity of these issues.

## Climate Change

Because we do not understand every complex interaction between a warming climate and the ecosystems of SJNF lands, the vision and strategies for climate change in this LRMP focus primarily on maintaining the health, diversity, and productivity of SJNF lands and focusing on ecosystems that have already demonstrated sensitivity or are considered most at risk. In the short term, the USFS plans to continue improving its understanding of ecosystem changes. The agency also intends to pursue long-term monitoring projects. There are many flora and fauna populations that are vulnerable because of their narrow range of habitat, small populations, or limited ability to adapt or tolerate change. Specific strategies have been developed for these vulnerable species, as well as for important ecosystems that are already undergoing rapid change.

The SJNF’s response to ecosystem change as a result of climate change includes a variety of adaptation and mitigation strategies. The primary strategy will be to manage for healthy, resilient ecosystems. It is also recognized that ecosystems have always been dynamic. Early detection of ecosystem changes that result from climate change will require detailed, regularly scheduled monitoring.

Desired conditions and objectives for climate change are interrelated with managing for healthy ecosystems. LRMP components related to climate change are dispersed throughout the resource sections of the LRMP and are all identified in Volume III, Appendix G.

Administrative and permitted activities on the SJNF will emit the lowest practicable greenhouse gas emissions and have the smallest ecological footprint possible to promote sustainable natural resource management. In addition, the SJNF will continue to explore and increase the use of renewable energy to power administrative facilities.

# CHAPTER 2 – RESOURCE DIRECTION

## 2.1 Ecological Framework and the Conservation of Species

The following strategies, concepts, and components are used in this LRMP to establish an ecological framework for the conservation and management of ecosystems, habitats, and species. These are overarching strategies that have relevance to a wide range of program areas and agency actions occurring on SJNF lands. They are especially important to the four program areas of terrestrial ecosystems and plant species, terrestrial wildlife, riparian and wetland ecosystems, and aquatic ecosystems (Sections 2.2–2.5).

### *2.1.1 Sustainable Ecosystem Strategy*

Ecosystems are communities of living organisms interacting with each other and with their physical environment (Kaufmann et al. 1994). They are dynamic systems that change in response to succession, climate, and the effects of disturbances, including those caused by fire, insects, disease, drought, wind, and humans. Humans are an integral part of ecosystems and depend on them for their short- and long-term well-being. In order to meet the social and economic needs of future generations, ecosystems are to be managed for sustainability. To ensure the long-term sustainability of ecosystems, humans must manage within the physical and biological capabilities of the land, maintain all of the ecological components and processes, and not irreversibly alter ecosystem integrity and resilience. The concept of sustainability is a fundamental component of the LRMP and is guided by the Multiple-Use Sustained-Yield Act (MUSY) and the FLPMA. The MUSY directs that federal lands are managed in a manner that provide a framework of social, economic, and ecological conditions that sustain native ecosystems, support a diversity of native plant and animal species, and provide a continuous flow of goods and services to the nation. The FLPMA directs that public lands be managed based on multiple use and sustained yield, as well as the protection of other values including, but not limited to, scenic, historical, ecological, environmental, air and atmospheric, and water resource values.

The MUSY identifies three interrelated and interdependent elements of sustainability for the USFS: social, economic, and ecological. Social and economic sustainability is associated with the provision of goods and services from the SJNF to people and communities over the long term. Sustainability takes into account the social and economic conditions of the planning area, including recreational opportunities, multiple uses that contribute to local and regional economies, and cultural resources. Ecological sustainability is intended to provide the ecological conditions that maintain or restore the diversity of native ecosystems and natural disturbance processes. This in turn will maintain suitable habitats for a wide range of plant and animal species and provide for the diversity and viability of plant and animal species, populations, and communities. When applied effectively, the sustainable ecosystems strategy will result in ecological conditions similar to those under which native species evolved. Achieving these conditions offers some assurance against further losses of biodiversity (Seymore and Hunter 1999). Managing for ecological sustainability is intended to ensure that ecosystems of the SJNF continue to maintain the ecological conditions necessary to provide goods and services needed by people and communities, now and in the future. This strategy is also consistent with the management of public lands as prescribed under the FLPMA.

The sustainable ecosystems strategy of the SJNF include 1) protected area designation and preservation (a coarse-filter approach), 2) ecosystem management using sustainable ecosystem concepts, 3) the development and application of plan components (desired conditions, objectives, standards, and guidelines) that provide a framework for the management and preservation of ecosystems, and 4) monitoring the effects of management activities on the SJNF and the application of adaptive management principles. Effective monitoring and evaluation of how management activities are affecting ecosystems and species, and the correct application of adaptive management principles, will be critical to maintaining functional, sustainable ecosystems and addressing the needs of dependent species. Refer to Chapter 4 for a description of the SJNF monitoring components.



FS-008201

### 2.1.2 Disturbances and the Historical Range of Variability

Major disturbances, including those caused by fire, insects, disease, drought, wind, floods, and humans, can have a profound effect toward shaping the composition, structure, and function of ecosystems at multiple scales and in creating a heterogeneous pattern of vegetation communities and habitats across the planning area. Disturbances vary in magnitude, size, and frequency, some of which humans have little control over. Multiple disturbances can interact in complex ways and often act in concert, which can predispose ecosystems to more intense effects. Many of these disturbances have significant long-term effects on terrestrial, riparian area and wetland, and aquatic ecosystems. It is not a question of whether disturbances will happen, but when, where, and at what scale they will happen. Disturbances can have a major influence (adverse or beneficial) on the agency's ability to achieve the desired conditions and objectives of the LRMP.

The Historical Range of Variability (HRV) of ecosystems is determined by major disturbances and also less dramatic changes occurring over a long period of time. HRV is an important concept used in the LRMP to guide the management of ecosystems and to achieve ecosystem sustainability. HRV provides a tool used to gain a better understanding of complex ecological systems. It can be used to establish an ecological baseline, allowing managers to identify trends, assess the need for ecological restoration, and evaluate the consequences of management activities (Kaufmann et al. 1994; Kulakowski and Veblen 2006; Landres et al. 1999; Moore et al. 1999; Swetnam et al. 1999; Veblen and Donnegan 2005). HRV describes a dynamic set of boundaries within which most native biota have persisted through time and across space (Landres et al. 1999; Swetnam et al. 1999).

Using a reference period of indigenous settlement that occurred from the 1500s to the late 1800s, HRV first describes the range of ecological conditions that occurred on SJNF lands under more "natural" disturbance regimes. Conditions occurring during this period represent those that existed prior to European-American settlement, which introduced sweeping ecological changes due to activities such as large-scale timber harvest, livestock grazing, fire suppression, dams, consumptive water uses, and roads.

The HRV is then used to evaluate the current ecological conditions of ecosystems on SJNF lands by comparing them to the ecological conditions that occurred during the reference period. The HRV concept assumes that as ecological conditions depart from the range of historic conditions (primarily due to human actions), the risk of species loss increases (Duffy et al. 1999). Since native species evolved under HRV conditions, maintaining a full range of similar conditions will offer some assurance against the loss of biodiversity (Seymore and Hunter 1999). As reflected in the desired conditions, objectives, and standards and guidelines that follow, the intent is to use HRV to better describe and understand ecosystems within SJNF lands and to help develop attainable LRMP components that are intended to protect and sustain ecosystems and species, while meeting a variety of public needs where possible. The intent is not to mandate that HRV conditions be achieved in all cases.

### 2.1.3 Protected Areas

Protected areas are key components of the sustainable ecosystems strategy. Protected areas are lands especially dedicated to the protection and maintenance of biological diversity (International Union for Conservation of Nature 1994). They are large, mostly unaltered, undeveloped, and roadless lands that contain terrestrial, riparian area and wetland, and aquatic ecosystems at multiple scales. They serve as conservation reserves and refuges to protect the native biodiversity within them (Norton 1999; Noss 1991). They also provide wildlife movement corridors and landscape linkage areas that connect habitats and landscapes, which in turn facilitate the interaction of species.

Management objectives for protected areas on SJNF lands include:

- Preserving habitats, ecosystems, and species in as undisturbed a state as possible;
- Conserving the area's biodiversity through protection, not through active management;
- Ensuring the integrity of its ecosystems; and
- Maintaining established ecological processes.



FS-008202

Establishing and preserving protected areas is a means to maintain ecosystem diversity, which presumably will protect the diversity and viability of native plant and animal species and communities, and the ecological processes occurring within those ecosystems. The maximum level of biodiversity will be preserved if the maximum diversity of habitats is represented in protected area networks (Noss and Peters 1995; Scott et al. 1993). The establishment and preservation of protected areas is analogous to the Nature Conservancy's (TNC) coarse-filter conservation approach, which is well-documented in the literature and has broad support in the scientific community (Hunter et al. 1988; Noss 1987; TNC 1982). Protected areas, which make up about 57% of public lands within the planning area, include wilderness areas, the Piedra Area, WSAs, Research Natural Areas (RNAs), and CRAs (see Figure 2.1.1).

Unaltered, unroaded, high-elevation terrestrial, riparian, and wetland ecosystems are very well represented in protected areas on SJNF lands. These include alpine areas, spruce-fir forests, aspen forests, Thurber fescue mountain grasslands, riparian forests and shrublands, fens, and herbaceous riparian areas and wetlands. Unaltered, unroaded, mid-elevation ecosystems are also well represented in SJNF protected areas. These include cool-moist mixed conifer forests, warm-dry mixed conifer forests, ponderosa pine forests, pinyon-juniper woodlands, mountain shrublands, Arizona fescue mountain grasslands, deciduous riparian forests and shrublands, and herbaceous riparian areas and wetlands. Unaltered, unroaded, low-elevation ecosystems are less common and not as well represented in protected areas in the planning area. These include sagebrush shrublands, semi-desert shrublands and grasslands, deciduous riparian forests, and hanging gardens. For aquatic ecosystems, both lotic (running water) and lentic (standing water) ecosystems are well represented throughout the network of protected areas in the planning area. However, these waters are almost exclusively cold water systems. Warm water systems are not well represented within SJNF protected areas.

## *2.1.4 Ecosystem Management*

Ecosystem management is an important integrating component of the sustainable ecosystems strategy. Ecosystem management uses an ecological approach to blend the social, economic, and ecological needs and values to assure productive, sustainable ecosystems, perpetuate natural disturbance regimes, and allow human uses that do not result in long-term ecological degradation (Kaufmann et al. 1994; Noss and Cooperrider 1994). Outside the designated protected areas described above, a wide range of public uses and management activities occur on SJNF lands. For these lands, the application of sustainable ecosystem management principles is critical to maintaining ecosystems, providing for biological diversity, and maintaining populations of fish, wildlife, and plant populations. Ecosystem management on SJNF lands, which uses the HRV for reference, will be implemented by maintaining or restoring the composition (plant species, animal species, and vegetation types), structure (size, density, and arrangement of live and dead vegetation, stream channel attributes), function (ecological processes and disturbances), and physical environment (soils, water, and geomorphology) of ecosystems. Ecological assessments specific to the SJNF are used to describe current ecological conditions in and adjacent to the planning area (Romme et al. 2009; USFS 2005a). The ecosystem management approach will be implemented at multiple scales using terrestrial, riparian area and wetland, and aquatic ecosystems as the primary analysis units. The approach is intended to protect and maintain these ecosystems and ensure the diversity and population viability of the majority of species within them.

### Species Management Strategy

Species that may not be adequately recognized or protected by the above ecosystems management approach, or whose specific habitat needs or other life requirements may not be fully met under the sustainable ecosystems strategy, will be given special management considerations, including the development of LRMP components that contribute to the conservation of those species. This species conservation approach is analogous to TNC's fine-filter approach that protects species with known conservation concerns (Hunter et al. 1988; Noss 1987; TNC 1982). The species conservation approach may be needed for species at risk of extinction, species that are highly vulnerable to disturbances, species whose habitat includes rare ecological components (rare soil types or geologic types) that occur at a very small scale, and species with unique hydrologic conditions. This approach may also be needed for special status species whose key habitat components are directly affected by agency management activities.



FS-008203

## Special Status Species and Focal Species

Special status species on SJNF lands include federally listed species, species proposed for federal listing, candidate species for federal listing, and Region 2 Regional Forester's sensitive species. Some of these species have immediate needs that may not be adequately recognized and addressed by the overall sustainable ecosystems strategy. As such, they are given special consideration, and additional LRMP components have been developed to address those special needs. In addition, current species-specific conservation plans and strategies are relied upon to address the needs of special status species. These plans and strategies are discussed within the applicable resource sections below and are analogous to TNC's fine-filter approach. LRMP components specific to special status species augment those components developed through the ecosystem management approach. A list of special status species can be found in Volume III, Appendix P.

The SJNF transitioned its monitoring plan in 2016 in order to comply with the requirements of the 2012 planning regulations and incorporated the monitoring of focal species at that time, in place of Management Indicator Species (MIS). Focal species are selected primarily to provide information regarding the effectiveness of the LRMP in maintaining diversity of communities and persistence of native species. The SJNF conducts monitoring of focal species at the planning area scale, and that information is used in project-level planning and analysis as appropriate.

With this transition, and because the 2012 regulations no longer require monitoring of MIS, the SJNF no longer includes MIS as a fundamental part of project-level analysis and subsequent monitoring, and the LRMP on longer contains guidance for MIS. The SJNF instead relies on terrestrial and aquatic species analysis that is issue-driven based on specialist, interdisciplinary team, and public input.

This LRMP contains several Desired Conditions, Objectives, and Guidelines related to the conservation and protection of habitat for former MIS. These plan components will continue to be adhered to in project design and implementation (except in uncommon cases where specific rationale for deviating from a Guideline is provided within project analysis).

## Biological Diversity and Population Viability

The maintenance of biological diversity and population viability on SJNF lands are addressed directly or inferred under a variety of laws, regulations, and policies. These include the NFMA, the MUSY, the FLPMA, and the Endangered Species Act of 1973 (ESA). Some of the supporting federal regulations, departmental regulations, and departmental manual direction include 36 CFR 219.19, Forest Service Manual (FSM) 2620, FSM 2622.01, and U.S. Department of Agriculture (USDA) Departmental Regulation 9500-4.

For lands managed by the USFS, 36 CFR 219.19 specifically requires that "[f]ish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area," and "[f]or planning purposes, a viable population shall be regarded as one which has the estimated numbers and distribution of reproductive individuals to insure [sic] its continued existence is well distributed in the planning area." Regulation 36 CFR 219.26 requires that "[f]orest planning shall provide for diversity of plant and animal communities and tree species consistent with the overall multiple-use objectives of the planning area. Such diversity shall be considered throughout the planning process." In addition, the FLPMA specifies that special uses granted by the Secretary of Agriculture are subject to terms and conditions that "minimize damage to fish and wildlife habitat and otherwise protect the environment." Agency actions should avoid or minimize impacts to species whose viability has been identified as a concern. USFS actions must not result in loss of population viability or create significant trends toward federal listing (FSM 2670.32).

The SJNF sustainable ecosystems and species management strategies combine to provide a foundation for addressing the legal, regulatory, and policy requirements described above. The underlying assumption is that implementing a management strategy that maintains sustainable ecosystems, along with a species strategy that addresses the specific needs of selected species, will provide for species diversity and long-term population viability, in as much as species diversity and population viability can be tied to the

management of local federal lands. These two strategies are implemented through the LRMP components, which provide a framework for the management and protection of ecosystems, populations, and individual species occurring on SJNF lands.

For each of the aforementioned ecosystem categories (riparian area and wetland ecosystems, aquatic ecosystems, and terrestrial ecosystems), specific management direction has been developed that is intended to address the legal, regulatory, and policy requirements for species diversity and population viability described above. The process applied was to identify a range of key ecosystem elements, determine the importance of those elements to maintaining species diversity and population viability (e.g. limiting factors), define desired future conditions and land management objectives for those elements, and ensure that appropriate management standards and guidelines are in place that address the ecological needs of species and populations. In general, management standards have been developed for those elements determined to have an overriding influence on species diversity or long-term population viability, while other elements that have less influence are typically addressed through the application of guidelines.



FS-008205




**Figure 2.1.1: Protected Areas**



FS-008206

## 2.2 Terrestrial Ecosystems and Plant Species

### Introduction

Terrestrial ecosystems on the SJNF occur in upland landscape positions where they depend on water derived from direct precipitation. They contain soils that are moderately well to very well drained and plants that are obligate-upland or facultative-dry species (Reed 1988). Terrestrial ecosystems are defined by soils, climate zones, and major vegetation types, the latter used for naming the ecosystems. Terrestrial ecosystems on the SJNF include spruce-fir forests, aspen forests, cool-moist mixed conifer forests, warm-dry mixed conifer forests, ponderosa pine forests, pinyon-juniper woodlands, mountain shrublands, sagebrush shrublands, semi-desert shrublands, mountain grasslands, semi-desert grasslands, and alpine (Redders 2012). Topographic variability (which includes mountains, hills, and tablelands), diverse geology (associated with volcanism, metamorphism, sedimentation, and glaciation), and microclimatic features (soil moisture regime, soil temperature regime, aspect, and elevation) add to the diversity of terrestrial ecosystems on the SJNF.

Terrestrial ecosystems encompass a majority of the land base and accompanying resources on SJNF lands. Hence, management of these ecosystems is a critical part of the LRMP's sustainable ecosystems strategy, as previously described in Section 2.1.

Terrestrial ecosystems are used in the LRMP and FEIS to describe ecosystem diversity; analyze past, current, and future ecological conditions; describe environmental impacts from management activities; and provide for the development of LRMP components (desired conditions, objectives, standards, and guidelines). These ecosystems serve as broad-scale habitat types for terrestrial wildlife species, special status wildlife species, focal species, and plant species, and as such provide habitat conditions that maintain species diversity and population viability for most terrestrial wildlife and plant species. Terrestrial ecosystems and their ecological components will be monitored to determine if impacts from management activities are adversely affecting the composition, structure, abundance, distribution, and population viability of the plant and animal species that rely on those ecosystems for their habitat needs.

Terrestrial ecosystems and the ecological indicators associated with them are used in the LRMP and FEIS to detect changes to the ecosystems and species due to management activities, natural disturbances, and climate change. Physical indicators for terrestrial ecosystems include, but are not limited to, changes in soil conditions, changes to forested stand structure and distribution, and the abundance and distribution of desirable native plants species. Biological indicators include, but are not limited to, native plant species diversity, impacts to special status plant species and other rare plant species, and changes to the extent and distribution of invasive plants.

Plant species are an important component of terrestrial ecosystems on SJNF lands. Ecological conditions that provide for ecosystem sustainability and diversity are the context for the evaluation and management of plant species. Managing for sustainable ecosystems by maintaining or restoring the composition, structure, and function of the terrestrial ecosystems, aquatic ecosystems, and riparian area and wetland ecosystems on SJNF lands will protect and sustain the diversity of those ecosystems and the majority of species within them, but additional management emphasis is needed for some species that may not be adequately protected by the sustainable ecosystems strategy. The complementary special status species strategy (fine-filter) is intended to provide a safety net for rare species whose specific habitat needs or life requirements may not be fully met under the sustainable ecosystems strategy. This strategy may be needed for species at risk of extinction, species whose habitat includes rare ecological components (rare soil types or geologic types) that occur at a very small scale, species with viability concerns, species that are highly vulnerable to disturbance, and species with unique hydrologic condition needs. This strategy may also be needed for special status plant species that occur on lands where active management activities have a high probability of adversely affecting them.

There are currently a total of 26 special status plant species on the SJNF. This includes two federally listed species and 24 sensitive species. Designated critical habitat for one of the federally listed plant species also occurs on SJNF lands. Currently, most special status plant species on SJNF lands appear to

have stable populations and trends. A list of the special status plant species known to occur or with habitat on the SJNF is found in Volume III, Appendix P, along with a brief description of the habitats where they occur.

## Background

Disturbances, including those caused by fire, insects, disease, drought, wind, floods, and humans (e.g., Native Americans and their burning practices) have played a fundamental role in shaping the composition, structure, and function of terrestrial ecosystems on SJNF lands and in creating the heterogeneous pattern of vegetation that occurs across the planning area.

Past management activities (including historic timber harvest, oil and gas development, livestock grazing, recreation, fire suppression, utility corridor construction, and solid minerals development) resulted in many adverse impacts to the soils and vegetation of terrestrial ecosystems throughout the SJNF over the last 100 years. Impacts from many of these activities, particularly those associated with oil and gas development, timber harvest, and past, unmanaged livestock grazing, are still evident. Many ponderosa pine forests and warm-dry mixed conifer forests have been significantly altered by heavy livestock grazing that began in the late 1800s, and later by timber harvest and fire suppression (Romme et al. 2009). Heavy livestock grazing decreased the abundance and distribution of native grasses that helped carry surface fire through these forests. Logging reduced the abundance and distribution of very large (and often very old) ponderosa pine (*Pinus ponderosa*) (and more recently, Douglas-fir [*Pseudotsuga menziesii*]), particularly on more accessible, gentle to moderate slopes.

Fire suppression began following the devastating fires of 1910 in the Northern Rockies. Coupled with the reduction in cover and amount of bunch grasses from grazing, much of the planning area (and other western forests and public lands) has undergone over 130 years of fire exclusion. These activities have 1) eliminated the frequent, low-severity fires that burned in these forests every 12 to 30 years (Grissino-Mayer et al. 2004); 2) altered plant species composition, vegetation stand structure, and fire regimes of many ponderosa pine forests and warm-dry mixed conifer forests on the SJNF; and 3) created more homogenous vegetation conditions across the planning area. This has resulted in heavy accumulations of dead vegetation (including tree boles, tree and shrub branches, and leaves) and an abundance of stands with high tree densities and more closed canopy covers compared to HRV conditions. This has increased the risk—and occurrence—of epidemic insect and disease outbreaks (Schmid and Mata 1996); increased the risk of destructive wildfires that are larger, spread more rapidly, and are much hotter than they used to be making them increasingly difficult to control (Moir et al. 1997); allowed white fir (*Abies concolor*) (a shade-tolerant species) to increase; and reduced ponderosa pine regeneration (Moir et al. 1997; Wu 1999). Many ponderosa pine forests on the SJNF are currently outside their HRV in terms of vegetation stand structure and fire frequency (Grissino-Mayer et al. 2004; Romme et al. 2009). Ponderosa pine and warm-dry mixed conifer forests also have less acres in both young and old growth development stages and have less diversity and less cover of native grasses compared to HRV conditions.

Other terrestrial ecosystems on SJNF lands whose current conditions differ significantly from HRV conditions include 1) mountain grasslands, semi-desert shrublands, semi-desert grasslands, sagebrush shrublands, and pinyon-juniper woodlands, all of which have less diversity and less cover of native grasses compared to HRV conditions due to past and ongoing livestock management; 2) spruce-fir and cool-moist mixed conifer forests that have less acres in the young and mid development stages; and 3) aspen forests that have less acres in the young development stage. Some alpine ecosystems also display impacts associated with long-term domestic sheep grazing, recreation, and mining.

Approximately 57% of the SJNF lands are within protected areas. A majority of the protected areas on the SJNF are found in high-elevation wilderness areas and mid-elevation roadless areas on the eastern two-thirds of the SJNF. Alpine areas, spruce-fir, aspen, cool-moist mixed conifer, and warm-dry mixed conifer are well represented in these areas. Mountain grasslands dominated by Thurber fescue (*Festuca thurberi*), as well as mountain shrublands, and ponderosa pine are also well represented on the SJNF. Pinyon-juniper, desert shrublands, desert grasslands, and sagebrush are not well represented on protected areas.

About half of the special status plant species on SJNF lands are found in habitats that are well represented within protected areas. Each of the federally listed plant species and the candidate for federal listing are found at low elevations outside protected areas or in habitat types that are not well represented in protected areas. Of the 24 sensitive plant species known to occur or with habitat on the SJNF, 14 occur within areas well represented in protected areas (including fens, high-elevation wetlands, and alpine habitat). The remaining 10 species are found at lower elevations in habitats poorly represented or entirely absent from protected areas. This includes, but is not limited to, low-elevation riparian areas and wetlands, and specific soil types such as gypsum and shale soils.

The management of terrestrial ecosystems and plant species on SJNF lands includes protecting and sustaining the composition, structure, and function of the terrestrial, aquatic, and riparian/wetland ecosystems and the diversity and viability of the species within them, including special status plant and wildlife species. It also includes designating and preserving protected areas and reference sites; maintaining adequate ground cover (vegetation and litter); protecting the physical, chemical, and biological properties of soils; maintaining and restoring soil productivity; and preventing or minimizing adverse impacts from management actions. Tools for managing terrestrial ecosystems and plant species also includes using the best available science; developing vegetation and ecological classification systems; conducting vegetation, special status plant species, soils, and ecological inventories; identifying soil types and soil properties; identifying plants and plant communities; conducting biological assessments and evaluations; monitoring; and establishing RNAs and special botanical areas.

Several LRMP components below and in other sections refer to NatureServe conservation status rankings (NatureServe 2013). NatureServe and its member Natural Heritage Programs have developed a consistent method for evaluating the relative imperilment of both species and ecological communities based on the best available science. These assessments lead to the designation of a conservation status rank. The three broad categories that factor into these rankings include rarity, trends, and threats. Conservation status rankings include secure (G5), apparently secure (G4), vulnerable (G3), imperiled (G2), critically imperiled (G1), possibly extinct or eliminated (GH), and presumed extinct or eliminated (GX). The Colorado Natural Heritage Program provides a similar state-wide conservation status rank (reported as “S” rankings). The USFS has a long history of partnership with NatureServe, and has collaborated on a broad range of projects in such areas as planning, sensitive species inventory and assessments, ecological classification and mapping, and data sharing and technology development.

## Desired Conditions

2.2.1 The composition, structure, and function of terrestrial ecosystems are influenced by natural ecological processes, including disturbance events such as fire, infestations by insects or disease, winds, and flooding.

2.2.2 Non-climate ecosystem stresses (e.g., high road densities, water depletions, air and water pollution) are reduced to improve the resilience and resistance of ecosystems to the future dynamics of a changing climate.

2.2.3 Key ecosystems that are not functioning properly are realigned/restored/renovated to survive the near-future dynamics of changing climate.

2.2.4 Future biodiversity, especially for endangered, rare, or dwindling species, is protected in the face of a changing climate by safeguarding habitats, preserving genetic diversity, and cooperating with seed banking efforts that provide secure, long-term storage of plant genetic resources.

2.2.5 Terrestrial ecosystems have a diverse composition of desirable native plants that are vigorous and self-perpetuating. Invasive plant species are absent or rare.

2.2.6 All development stages of the forested terrestrial ecosystems are well represented at the landscape scale and occur within the ranges identified in Table 2.2.1 .


FS-008209

2.2.7 Old growth ponderosa pine, old growth pinyon-juniper and old growth warm-dry mixed conifer forests are more abundant, occupy more acreage, and are well distributed on SJNF lands.

2.2.8 Aspen forests display larger patches of the young-development stage.

2.2.9 Terrestrial ecosystems, including habitat for special status plant species, are productive, sustainable, and resilient, and provide goods and services over the long-term.

2.2.10 Forested terrestrial ecosystems display a Fire Regime Condition Class of 1.

2.2.11 Canyon escarpments, and the terrestrial ecosystems that occur on them, serve as refugia for native biota. These escarpments are associated with the following canyons: Lower Dolores River, Big Glade, Lake, Doe, Narraguinnep, Cabin, Ferris, Salter, Spruce Water, and Lost.

2.2.12 The abundance and distribution of native grasses in semi-desert grasslands, sagebrush shrublands, pinyon-juniper woodlands, and semi-desert shrublands are maintained or increased.

2.2.13 The abundance and distribution of Arizona fescue (*Festuca arizonica*) in ponderosa pine forest and in Arizona fescue mountain grasslands are maintained or increased.

2.2.14 Aspen forests, ponderosa pine forests, pinyon-juniper woodlands, sagebrush shrublands, semi-desert shrublands, mountain grasslands, and semi-desert grasslands that occur in suitable rangelands have a diverse composition of native bunchgrasses that are vigorous and self-perpetuating.

2.2.15 Forested terrestrial ecosystems have stand structures and tree species composition that offer resistance and resilience to changes in climate, including extreme weather events, or epidemic insect and disease outbreaks.

2.2.16 Non-forested terrestrial ecosystems have community structure and species composition that offer resistance and resilience to changes in climate, including extreme weather events, or epidemic insect and disease outbreaks

2.2.17 Local seeds of desirable native plant species are available for revegetation and restoration efforts.

2.2.18 Suitable habitats for species vulnerable to climate change exist and serve as seed sources for revegetation and restoration efforts.

2.2.19 The SJNF forested ecosystems provide net positive carbon storage.

2.2.20 Five-needle pine species (southwestern white pine [*Pinus strobiformus*], limber pine [*P. flexilis*], and bristlecone pine [*P. aristata*]) are maintained as a component of forested ecosystems.

2.2.21 High-elevation stands dominated by aspen (*Populus tremuloides*) will be maintained or increased over time to ensure the persistence of aspen on the landscape in light of declining aspen health and loss of aspen in lower elevations associated with a warmer and drier climate.

2.2.22 Ponderosa pine, warm-dry mixed conifer, and cool-moist mixed conifer forest stands that are in the old growth development stage and that have not been previously harvested are managed for their old growth values through active or passive management.

2.2.23 **Ponderosa Pine Forests -** Ponderosa pine forests display variable density and structure. Most stands reflect uneven-age structure comprising variable-sized, even-aged clumps of trees. Clumps vary in size, ranging from as few as three trees to as many as 20 or more trees. Tree clumps vary in density from widely spaced large trees to tightly spaced small trees. Collectively, these forests contain multiple canopy layers. Between or surrounding these clumps are shrub- and/or grass/forb-dominated openings. Ponderosa pine seedlings and saplings are present, as

are large old, yellow-barked ponderosa pine trees. The presence of other tree species—e.g., Douglas-fir, white fir, blue spruce (*Picea pungens*), or Rocky Mountain juniper (*Juniperus scopulorum*)—is infrequent to rare. The abundance and distribution of Gambel oak (*Quercus gambelii*) and other native shrubs in the understory of these forests is variable and includes small and large patches of all size classes. Native grasses and forbs (including bunchgrasses, Arizona fescue, muttongrass [*Poa fendleriana*], and mountain muhly [*Muhlenbergia montana*]) are present and well distributed in most ponderosa pine forests. Forest litter is common, though highly variable in depth and extent due to fire. Invasive plant species are absent or rare. Presence of snags or large wood (on the ground) is also highly variable due to fire. Low-intensity, high-frequency surface fires are common in most ponderosa pine forests (with frequencies ranging from about 12 to 30 years).

2.2.24 **Warm-Dry Mixed Conifer Forests -** Warm-dry mixed conifer forests display variable density and structure, similar to ponderosa pine forests, with added complexity in species composition. Most stands reflect uneven-age structure composed of variable-sized, even-aged clumps of trees. Some have open canopies with widely spaced trees, especially on warmer aspects; some are dense with more closed canopies (e.g., on cooler aspects). Composition is dominated by ponderosa pine. Douglas-fir is a typical minor component. Trees range from young to old. White fir, blue spruce, or limber pine may be present, but infrequent. Shrub- and/or grass/forb-dominated openings are common. The abundance and distribution of Gambel oak and other native shrubs in the understory of these forests is variable, and includes small and large patches of all size classes. Native grasses and forb (including tall bunchgrasses) are common and well distributed in most warm-dry mixed-conifer forests. Invasive plant species are absent or rare. Forest litter is common, though variable in depth and extent due to fire. Presence of snags or large wood (on the ground) is also variable due to fire. Low-intensity, surface fires occur in most warm-dry mixed conifer forests (with frequencies ranging from about 18 to 28 years). Tree species composition is closely tied to fire frequency, with Douglas-fir and white fir (or blue spruce) increasing during longer fire-free periods, and ponderosa pine increasing during shorter fire-free periods.

2.2.25 **Cool-Moist Mixed Conifer Forests -** Cool-moist mixed conifer forests display variable stand structures and species composition. Most are dense with closed canopies and multiple canopy layers. Tree species composition includes an abundance of Douglas-fir trees (ranging from young to old); other species include white or subalpine fir (*Abies lasiocarpa*), blue or Engelmann spruce (*Picea engelmannii*), aspen, or limber pine. Patches of cool-moist mixed conifer forest, ranging from small to large, are distributed across the landscape. The canopy cover of shrubs in the understory of these forests is highly variable. Native grasses and forbs are common and well distributed in most cool-moist mixed conifer forests. Forest litter is common and well distributed. Invasive plant species are absent or rare. Snags and large wood (on the ground) are abundant in late successional stages. Mixed-severity fires occur in most cool-moist mixed conifer forests (with frequencies of about 144 years). All development stages of these forests are well represented.

2.2.26 **Spruce-Fir Forests** - Spruce-fir forests display variable stand structures and species composition. Engelmann spruce is generally dominant; subalpine (or corkbark) fir makes up a lesser, but common, component. Bristlecone pine (Pinus longaeva), limber pine, aspen, white fir, or Douglas-fir are infrequent to rare and usually found on warmer, drier aspects. Most spruce-fir forests are dense with closed canopies and multiple canopy layers. Patches of spruce-fir forest, ranging from small to large, are distributed across the landscape. The canopy cover of shrubs in the understory of these forests is highly variable. High-elevation spruce-fir forest can have bristlecone pine, but is rare. Native grasses and forbs are common and well distributed in most spruce-fir forests. Forest litter is common and well distributed. Invasive plant species are absent or rare. Snags and large wood (on the ground) are abundant in most development stages. High-intensity, stand-replacement fires can occur in most spruce-fir forests (with frequencies longer than 200 years); most fires are of limited scale and variable intensity. All development stages of these forests are well-represented.

2.2.27 **Aspen Forests -** Aspen forests display simple to variable stand structures—generally simple where conifer is rare or absent or variable where conifer comprise a substantial portion (up to 49% of the canopy cover). Patches of aspen, ranging from small to large, are distributed across the landscape. Aspen is infrequent to rare in the lowest- and highest-elevation forests (ponderosa pine and spruce-fir, respectively), and common throughout mixed conifer forests. The canopy cover of shrubs in the understory of these forests is highly variable. Native grasses and forbs are abundant and well distributed in most aspen and aspen-conifer forests. Forest litter is common and well distributed. Invasive plant species are absent or rare. Snags and large wood (on the ground) are abundant in late successional stages. Fire frequency in aspen stands is about 140 years. All development stages of these forests are well-represented.

2.2.28 **Pinyon-Juniper Woodlands -** Pinyon-juniper woodlands display variable stand structures. Some have open structures with widely spaced trees; others are dense with high canopy covers. Most stands are uneven aged. Tree species composition varies in pinyon pine (*Pinus edulis*) and/or juniper (*Juniperus* sp.) abundance, ranging from young to old. The canopy cover and size of Gambel oak, sagebrush (*Atriplex* sp.), and other shrubs in the understory of these forests is variable. Native grasses and forbs are present and well distributed. Biological soil crusts and litter are common and well distributed on most sites. Invasive plant species are absent or rare. High-intensity, stand-replacement fires occur in most pinyon-juniper woodlands (with frequencies of 100 to 123 years).

2.2.29 **Mountain Shrublands -** Mountain shrublands display variable stand structures. Most are dense with high canopy cover; others are open with widely spaced shrubs. Gambel oak and other deciduous native shrubs (including mountain mahogany [*Cercocarpus montanus*], serviceberry [*Amelanchier* sp.], chokecherry [*Prunus virginiana*], fendlerbush [*Fendlera rupicola*], and squaw apple [*Peraphyllum ramosissimum*]) are abundant and well distributed. Native grasses and forbs are abundant and well distributed. Invasive plant species are absent or rare. Litter is common and well distributed. High-intensity, replacement fires occur in most mountain shrublands.

2.2.30 **Sagebrush Shrublands -** Sagebrush shrublands display variable stand structures. Some are open with widely spaced shrubs; others are dense. Some large patches are present. Sagebrush and other native shrubs are abundant and well distributed. Native perennial grasses (including Indian ricegrass [*Oryzopsis hymenoides*], galleta [*Pleuraphis* sp.], western wheatgrass [*Pascopyrum smithii*], and needle and thread [*Hesperostipa comata*]) are abundant and well distributed. Encroachment of pinyon and juniper trees is absent or rare. Invasive plant species are absent or rare. Biological soil crusts are common and well distributed on many sites. High-intensity, replacement fires occur in most sagebrush shrublands.

2.2.31 **Semi-Desert Shrublands -** Semi-desert shrublands are dominated by native shrubs that could include shadscale saltbush (*Atriplex confertifolia*), winterfat (*Krascheninnikovia lanata*), fourwing saltbush (*Atriplex canescens*), plains pricklypear (*Opuntia polyacantha*), rubber rabbitbrush (*Ericameria nauseosa*), spiny hopsage (*Grayia spinosa*), greasewood (*Sarcobatus* sp.), and/or basin big sagebrush (*Artemisia tridentata* ssp. *tridentata*). Stand structures display open or moderately dense shrubs with native perennial grasses and forbs in the openings between them. Native grasses (including Indian ricegrass, galleta, western wheatgrass, and needle and thread) are abundant and well distributed. Invasive plant species and/or undesirable native plant species that are currently abundant on most sites are absent or rare. Biological soil crusts and litter are common on most sites.

2.2.32 **Semi-Desert Grasslands -** Semi-desert grasslands are dominated by native perennial bunchgrasses (including Indian ricegrass, galleta, and needle and thread). Invasive plant species and/or undesirable native plant species that are currently abundant on most sites are absent or rare. Biological soil crusts and litter are common on most sites.

2.2.33 **Mountain Grasslands -** Mountain grasslands display moderate to high canopy cover of desirable native grasses and forbs (including Arizona fescue at mid elevations and Thurber fescue at

higher elevations). Invasive plant species and undesirable native plant species that are currently abundant on many sites are absent or rare. Litter is common and well distributed.

2.2.34 **Alpine -** Alpine terrestrial ecosystems sustain their ecosystem diversity. They display a diverse composition of desirable native plant species and vegetation communities (including fellfield and turf types). Invasive plant species are absent or rare.

2.2.35 Soil productivity is maintained at site potential or is trending towards site potential.

2.2.36 Long-term levels of soil organic matter and soil nutrients (including soil carbon) are maintained at sustainable levels.

2.2.37 Ground cover (vegetation and litter) is adequate to protect soils and prevent erosion.

2.2.38 Management-induced soil erosion, soil compaction, soil displacement, puddling, and/or severely burned soils are rare on terrestrial ecosystems of the SJNF.

2.2.39 Upland soils exhibit infiltration and permeability rates that minimize surface runoff and allow for the accumulation of the soil moisture necessary for plant growth and ecosystem function.

2.2.40 Biological soil crusts are maintained or increased in pinyon-juniper woodlands, sagebrush shrublands, semi-desert shrublands, and semi-desert grasslands.

2.2.41 Fens, wetlands, and hanging gardens have the water sources and hydrologic systems necessary to support and sustain the special status plant species associated with them.

2.2.42 Shale and gypsum soils have the characteristics necessary to support and sustain the special status plant species associated with them.

2.2.43 Soils that provide habitat for all special status plant species maintain the soil conditions necessary to support and sustain those species.

2.2.44 Areas that are identified as critical habitat or proposed critical habitat for federally listed plant species have the characteristics necessary to provide for the growth and reproduction of the federally listed plant species for which they were designated.

**Table 2.2.1: Desired Conditions for Development Stages on the San Juan National Forest**

| Terrestrial Ecosystem | Development Stage | Structural Stage* | Current Condition NFS Lands (% of veg type) ** | Desired Condition NFS Lands (% of veg type) | Historic Range of Variation (% of veg type) | Current % of Veg Type in Old Growth** *** | Desired % of Veg Type in Old Growth*** |
|---|---|---|---|---|---|---|---|
| Spruce-fir forest | Young | 2 | 2 | 10–20 | 0–45 | 26.50% | 25–35% |
| | Mid-open | 3a | 4 | 10–15 | 5–47% | | |
| | Mid-closed | 3b,c | 3 | 10–15 | 5–47% | | |
| | Mature-open | 4a | 15 | 15–20 | # | | |
| | Mature-closed | 4b,c | 77 | 15–20 | # | | |
| Cool-moist mixed conifer forest | Young | 2 | 0 | 10–20 | 1–36 | 17.00% | 20–30% |
| | Mid-open | 3a | 1 | 10–15 | 8–49 | | |
| | Mid-closed | 3b,c | 5 | 10–15 | 8–49 | | |
| | Mature-open | 4a | 7 | 15–20 | # | | |
| | Mature-closed | 4b,c | 87 | 15–20 | # | | |
| Warm-dry mixed conifer forest | Young | 2 | 0 | 5–10 | 1–10 | 13.10% | 20–30% |
| | Mid-open | 3a | 1 | 5–10 | 5–14 | | |
| | Mid-closed | 3b,c | 6 | 5–10 | 5–14 | | |
| | Mature-open | 4a | 11 | 35–45 | # | | |
| | Mature-closed | 4b,c | 82 | 15–25 | # | | |
| Ponderosa pine forest | Young | 2 | 0 | 5–10 | 1–14 | 4.30% | 10–15% |
| | Mid-open | 3a | 3 | 5–10 | 4–14 | | |
| | Mid-closed | 3b, c | 2 | 5–10 | 4–14 | | |
| | Mature-open | 4a | 42 | 40–60 | # | | |
| | Mature-closed | 4b,c | 53 | 15–25 | # | | |
| Aspen forest | Young | 2 | 10 | 15–25 | 1–55 | 4.30% | 5-15% |
| | Mid-open | 3a | 3 | 10–15 | 4–55 | | |
| | Mid-closed | 3b,c | 19 | 15–20 | 4–55 | | |
| | Mature-open | 4a | 7 | 25–30 | 35–86 | | |
| | Mature-closed | 4b,c | 61 | 25–30 | 35–86 | | |

* 2, 3, and 4 refer to tree size (diameter at breast height [dbh]): 2 = <1 inch dbh; 3 = 1–8.99 inches dbh; 4 = >9 inches dbh; a, b, and c refer to tree crown closure percent in a stand : a = < 40%; b = 40–70%; c = >70%.
** 2013 data. More recent information may be available.
*** Old growth inclusions may be found in various habitat structural stages within each vegetation type.
# = No data available.

**Table 2.2.2: Desired Conditions for Development Stages on Tres Rios Field Office Lands**

*This table was applicable only to BLM Lands.*

## Objectives

2.2.45 Within 10 years, restore or improve soil productivity and soil carbon on at least 20 miles of road that will be closed or decommissioned.

2.2.46 Within 10 years, increase the canopy cover of Arizona fescue by at least 10% in two Arizona fescue mountain grassland sites on the SJNF that currently classify as Kentucky bluegrass mountain grasslands by using mechanical treatments, prescribed fire, and/or seeding.

2.2.47 Within 10 years, inventory and map stand structure changes that have resulted from spruce beetle (*Dendroctonus rufipennis*) mortality and wildfire on SJNF lands.

2.2.48 Within 15 years, on suitable timber lands of the SJNF reforest 15% of spruce-fir forests that have extensive mortality of overstory spruce that do not have appropriate forest cover and will not reforest within 15 years.

2.2.49 Within 15 years, increase the young development stage of cool-moist mixed conifer forests on the SJNF from 0.5% to 15% by using prescribed fire and mechanical treatments (e.g., timber harvest) in the mature cool-moist mixed conifer forests.

2.2.50 Within 15 years, increase the young development stage of aspen forests on the SJNF to 25% by clear-cutting and/or conducting prescribed fire in mature aspen stands, and mixed conifer stands with an aspen component.

2.2.51 Over the next 15 years, manage 2,000 acres of high-elevation aspen stands on SJNF lands that are conifer-dominated or at risk of converting to conifer-dominated stands to maintain or increase aspen forests.

2.2.52 Within 15 years, increase the percent of ponderosa pine forests in the young development stage from 0% to 3% on SJNF lands by using mechanical treatments (e.g., timber harvest) or fire (prescribed or natural ignitions).

2.2.53 Within 15 years, increase the percent of warm-dry mixed conifer forests in the young development stage from 0% to 3% on SJNF lands by using mechanical treatments (e.g., timber harvest) or fire (prescribed or natural ignitions).

2.2.54 Within 15 years, improve the composition, structure, and function of 25,000 acres of ponderosa pine forests by using low-intensity fire on the SJNF.

2.2.55 Within 10 years, increase the cover of Arizona fescue by at least 20% within two ponderosa pine stands on the SJNF by using mechanical treatments, prescribed fire, and/or seeding.

2.2.56 *This objective was applicable only to BLM Lands.*

2.2.57 Over the next 15 years, secure a reliable source of local seed stock for 8 or more native grass, forb, and shrub species (including Arizona fescue) to be used for revegetation and restoration after disturbance.

2.2.58 Over the life of the LRMP, collect seed from 10 local vulnerable grass, forb, and shrub species, including some alpine species, for long-term storage to protect genetic sources.

2.2.59 Use locally produced biochar to sequester carbon, reduce erosion, and enhance soil productivity and water retention on a minimum of 0.5 acre per year for five years.

2.2.60 After natural disturbance events or on restoration projects over the next 15 years, increase the variety of native non-commercial tree species and native shrubs used on a minimum of 75 acres on the SJNF.

2.2.61 Over the next 15 years, broaden tree seed collection activities on the SJNF to include non-commercial species and additional species-specific elevation zones to improve genetic diversity and the resilience of forested ecosystems.

2.2.62 Over the next 15 years, revegetate and reclaim 5 acres using native early-successional plant species developed from local plant sources to accelerate restoration success.

2.2.63 *This objective was applicable only to BLM Lands*.

2.2.64 Over the next 20 years, enhance the resiliency of alpine ecosystems and provide refugia for alpine-dependent species by removing non-climate stressors that result in adverse impacts to alpine ecosystems (e.g., unmanaged livestock grazing, unmanaged motorized recreation) from 100 acres on SJNF lands that are forb-dominated alpine habitat.

## Standards

2.2.65 The construction of new permanent roads and utilities must not occur in protected areas in order to protect the ecological integrity of the terrestrial ecosystems within them, prevent ecosystem fragmentation, prevent the disruption of wildlife travel corridors, and prevent the establishment and spread of invasive plants.

2.2.66 Projects or activities in habitat occupied by federally listed plant species, or in designated critical habitat, must be designed and conducted in a manner that preserves the primary constituent elements needed to sustain the life history processes of those federally listed plant species.

2.2.67 Projects or activities occurring in fens, wetlands, or hanging gardens that are occupied by special status plant species must be designed to maintain the hydrologic systems necessary to support and sustain those species.

2.2.68 Projects or activities that occur in shale and gypsum soils that are occupied by special status plant species must be designed to maintain the soil characteristics necessary to support and sustain those species.

## Guidelines

2.2.69 Agency actions should not adversely affect the long-term soil productivity or carbon storage of terrestrial ecosystems.

2.2.70 Ground-disturbing management activities should not occur on lands that have a high potential for mass movement, ~~including lands associated with soil survey map units 254, 386, 606, 720, 926, 20511D, 30506D, 34301D, 34306D, 34506D, 50803D, 50806D, 70806D, 70807D, 74803D, 80604D, 80803D, and 80804D~~*, or lands that display evidence of slope instability, unless site-specific field analysis indicates that mass movement is not likely to occur on those lands.
**These soil units were listed in the 2013 LRMP, however mapping information and nomenclature have changed. Refer to newer information.*

2.2.71 Projects or activities occurring in suitable habitat for federally listed plant species should be managed to minimize long-term impacts to the suitable habitat.

2.2.72 Agency actions should avoid or otherwise mitigate long-term adverse impacts in terrestrial ecosystems that have plant communities with G1 or G2 NatureServe Plant Community conservation status ranks in order to maintain the ecological integrity of those rare plant communities.

2.2.73 Agency actions should be designed to avoid or minimize impacts in canyon escarpments, unless the activity is designed to maintain or restore the composition, structure, or function of the terrestrial ecosystems within those escarpments.

2.2.74 Prior to any proposed agency actions on forested lands or woodlands, the affected stands should be screened against the current SJNF old growth database in order to determine their old growth status. Within landscapes not meeting desired conditions for old growth, ponderosa pine forest stands and mixed conifer forest stands that currently are not in the old growth development stage, but that contain significant old growth attributes should be prioritized as old growth recruitment areas, largely based on tree age and distribution across the SJNF, and managed for their old growth values.

2.2.75 Ground-disturbing projects on shale soils of the Mancos Shale, Lewis, Fruitland, and Morrison geologic formations, and other highly erosive soils, should be designed to include efforts that avoid or mitigate soil erosion or compaction (see Volume III, Appendix I).

2.2.76 Ground-disturbing activities in watersheds that are highly sensitive to anthropogenic disturbances, as identified in Volume III, Appendix I, should be designed to avoid or mitigate soil erosion or compaction.

2.2.77 Adequate slash (including tree tops and limbs), if deemed necessary for soil protection or nutrient cycling, should be left on-site following timber harvest and mechanical fuels treatments, and distributed as needed.

2.2.78 Wood chips produced by mastication treatments should be dispersed on the ground at a maximum depth of 3 inches over at least 80% of the covered area, and no chip piles should exceed 6 inches in depth.

2.2.79 Management activities in areas with biological soil crusts should be designed to minimize adverse impacts to the soil crusts.

2.2.80 Ground disturbance should be limited or otherwise mitigated on gypsum soils and organic soils (histosols) in order to protect the ecological integrity of these rare and unique soils and the rare plants associated with these soils.

2.2.81 Management activities should not decrease the abundance or distribution of southwestern white, limber, or bristlecone pine trees in order to maintain white pine species in SJNF forested environments.

2.2.82 Clearcuts in aspen forest stands that are 20 acres or greater should include wildlife leave tree groups of 0.5 to 5 acres in size on 10% to 15% of the clearcut. Where possible groups should have the following characteristics: live and/or dead large-diameter wood on the forest floor (greater than 15 inches diameter at breast height [dbh]), trees with evidence of cavities, broken or dead tops, or lightning strikes. Basal areas should exceed 100 square feet per acre.

2.2.83 Following timber harvest and mechanical fuels treatments, snags and large wood on the forest floor should meet the minimum standards described in Table 2.2.3 unless the stand did not contain these attributes before the activity, in which case treatments should be designed to help meet those standards in the future.

2.2.84 Certified, weed-free native seed mixes of local ecotypes should be used to revegetate terrestrial ecosystems where commercially available. Non-native, non-invasive plant material may be used in limited situations where considered necessary in order to protect resources and/or stabilize soils in a timely fashion. Persistent non-natives or invasive exotic plant species should be avoided.

2.2.85 If the desired conditions for the development stage of a terrestrial ecosystem type (see Tables 2.2.1 and 2.2.2) are underrepresented, management activities should be designed to move that development stage closer to the desired conditions, particularly in watersheds lacking the development stage.

2.2.86 Revegetation and reforestation plans or activities should consider the following strategies to maintain or improve resilience of forested and non-forested ecosystems:

- use a variety of species and phenotypes;
- emphasize use of native species, collected locally;
- use both commercial and non-commercial species for reforestation (non-commercial species include southwestern white, limber or bristlecone pine); and
- use seed collected from across the range of climate zones.

**Table 2.2.3: Desired Conditions for Snags and Large Wood on San Juan National Forest**

| Forest Type | Snags | | | Large Downed Wood | |
|---|---|---|---|---|---|
| | Minimum Diameter (dbh) | Number (per acre) | Minimum Height (feet) | Minimum Diameter (dbh) | Number (linear feet per acre) |
| Spruce-fir forests | 15 | 3–5 | 25 | 15 | 200 |
| | 9* | 5–10 | | | |
| Cool-moist mixed conifer forests | 15 | 2–3 | 25 | 15 | 150 |
| | 9* | 5–10 | | | |
| Aspen | 9 | 5–10 | 25 | 9 | 150 |
| Warm-dry mixed conifer forests | 15 | 1–2 | 25 | 15 | 80 |
| | 9* | 3–5 | | | |
| Ponderosa pine forests | 15 (12) | 1 | 25 (15)** | 15 (12)** | 30 |
| | 9* | 2–3 | | | |

Note: Quantities are based on an average per acre basis across treatment units. dbh = diameter at breast height.
*If larger trees are not available, then the smaller minimum will apply and requires the greater number per acre range.
**Numbers in parentheses apply to Dolores Ranger District. Due to past harvest activity on the Dolores Ranger, there is a lower abundance of larger snags available for habitat.

## Additional Guidance

- Executive Order (EO) 13112
- Plant Protection Act of 2000
- Cooperative Forestry Assistance Act of 1978
- Resource Conservation and Recovery Act of 1976
- Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (CERCLA)
- Forest Service Handbook (FSH) 2509.13, Burned Area Rehabilitation Handbook
- FSH 2509.25, Watershed Conservation Practices Handbook
- FSH 2409.19, Renewable Resource Uses for Knutson-Vandenberg (K-V) Fund Handbook
- 1992 letter from USFS Region 2 Regional Forester to Forest Supervisors regarding regional old growth descriptions (USFS 1992b)
- FSH 2509.13, Burned Area Emergency Rehabilitation
- FSH 2509.25, Watershed Conservation Practices Handbook (Region 2 Supplement)
- FSM 2600, Wildlife, Fish, and Sensitive Plant Habitat Management
- FSM 2550, Soil Management

# 2.3 Terrestrial Wildlife

## Introduction

Lands administered by the SJNF have long served an important role in supporting a wide variety of wildlife species that are critical to the needs and values of the human population. Currently, the wildlife resource remains a cherished and important aspect to the people who live within and/or visit the planning area.

A wide variety of ecosystem types represent broad-scale habitat types on SJNF lands. These ecosystems are described in detail in sections 2.2 and 2.4 of this LRMP and in corresponding sections in the FEIS. The soils, landforms, climate regimes, and major vegetation types associated with these ecosystems provide a diverse array of habitat conditions ranging from alpine tundra at the highest elevations to semi-desert shrublands and grasslands at the lowest elevations. Cliffs, caves, streams, waterfalls, and open water bodies also provide important wildlife habitat on the SJNF. Based on species distribution maps for Colorado, over 300 wildlife species use the ecosystem diversity of SJNF lands to meet their habitat needs (Fitzgerald et al. 1994; Hammerson 1999; Kingery 1998). Additional species may also pass through during migration and utilize habitats on or near the planning area for feeding or resting purposes.

Wildlife is a primary component of ecosystem function and an important part of the sustainable ecosystem strategy for SJNF lands. They also provide substantial renewable economic values on which local communities depend. The categories and types of wildlife species on the SJNF reflect the diversity of habitats available to them. Some species, such as mule deer (*Odocoileus hemionus*) and Rocky Mountain elk (*Cervus canadensis*), are steeped in the local culture and tradition and have long been important to the local people and communities. However, many non-game species are recognized for the economic, aesthetic, and ecological values they provide. Some of the wildlife species that occur on the SJNF are migratory and/or wide-ranging and utilize several different habitat types while others are more sedentary and utilize only a single vegetation type or individual component within a vegetation type. All species contribute to or influence the ecological processes that maintain biodiversity on the SJNF.

The LRMP provides guidance for project-level implementation to maintain or move the planning landscape toward desired conditions for wildlife habitat. Human population increases and better resource information are creating additional demands on wildlife resources that include increasing trends in recreation uses, extractive uses, and travel demands. The mix of multiple use management on the landscape can affect habitat effectiveness and wildlife populations in different ways. The LRMP guidance provides for multiple uses on the planning area that fall within the limits for maintaining the ecological integrity of ecosystems and protection of wildlife habitat.

Objectives for terrestrial wildlife and other resource programs will contribute to the maintenance of and/or improved wildlife habitat conditions (as described in Section 2.2). LRMP components described in other resource programs will also help the SJNF achieve terrestrial wildlife desired conditions (see Volume III, Appendix M). For example, the ponderosa pine restoration direction under the fuels section of the LRMP (see Section 2.11) is restoration of conditions to meet fuels objectives, but this direction will also be designed to provide habitat characteristics (within the pine type) that benefit terrestrial wildlife. Benefits of these fuels objectives extend to a variety of wildlife species utilizing this habitat type. All objectives are subject to future funding and available resources.

Management of effective habitat provides, in part, for the maintenance of viable populations of existing native and desired non-native wildlife distributed throughout their current geographic range on SJNF. Other elements also support the ecological framework on which wildlife species depend. As discussed in Section 2.2, these ecosystems provide basic components, including soils, vegetation, climate, air, water, and physical character of the land, that support and provide for a diversity of terrestrial wildlife within this ecosystem matrix that are well distributed across the planning area.

Habitat assessments that include condition and trends on the SJNF have identified several major factors that have influenced change in forested and non-forested habitat conditions during the reference period.

Factors include fire exclusion, timber harvesting, road and urban development, livestock grazing, and recreational uses associated with a rapidly growing human population. These conditions and trends have implications for wildlife species and populations that include:

- changes in forest structure and composition that may contribute to uncharacteristic wildfire behavior in lower-elevation forest types;
- disturbance from motorized use on roads and motorized trails;
- introduction and expansion of invasive plant species that reduces native plant diversity, wildlife habitat quality, connectivity, and reduces wildlife habitat effectiveness;
- reduction or degradation of habitats for some wildlife species where human impacts have occurred and/or where natural disturbance regimes have been altered;
- urban development and associated human disturbance in key seasonal wildlife use areas such as winter range and production areas; and
- rapidly increasing human populations and influences on the landscape that alter habitat security and contribute disturbance impacts to wildlife.

These impacts can alter habitat effectiveness and influence wildlife across the planning area. Habitats and their structural stages on SJNF lands have been monitored since the first SJNF Plan was signed in 1983, and trends have been established and recorded in habitat assessments for SJNF lands. In general, management has resulted in only relatively small changes to the vegetation condition across the SJNF since the inception of the 1983 SJNF Plan. Habitat types are well distributed across the landscape providing continuity and connectivity within and among important wildlife habitats. Trend analysis of major wildlife habitat types across the SJNF indicate that the maximum change for habitat type and structural stage has not varied by more than 5% on the landscape since the inception of the initial 1983 SJNF Plan. Most individual structural stages within each habitat type have not varied by more than 0% to 2% across the SJNF. These changes are attributed to both management actions and natural events such as wildfire. Habitat condition and plan components of the 1983 SJNF Plan have maintained sustainable wildlife populations across the planning area. Management of habitat in conjunction with the components in this LRMP is expected to continue to provide for population viability on NFS lands and maintain or move habitat conditions toward meeting desired conditions across the SJNF.

The emphasis of the SJNF wildlife program is to provide ecological conditions to support all native and desired non-native terrestrial wildlife species over the life of the LRMP and contribute to the stability and recovery of special status species. To achieve these conditions a sustainable ecosystems strategy is used in this LRMP to provide a range of habitat conditions and provide the ecological framework for the conservation and management of ecosystems, habitats, and species occurring on SJNF lands. The sustainable ecosystems strategy includes a four-pronged approach: 1) the designation and management of protected areas, 2) the application of ecosystem management using sustainable ecosystem concepts, 3) the development and application of the LRMP components (desired conditions, objectives, standards, and guidelines) that provide a framework for the management and preservation of ecosystems, and 4) the monitoring of effects of management activities on SJNF lands with application of adaptive management principles in response to monitoring results. This approach is expected to provide for viable populations on NFS lands and the diversity, sustainability, and maintenance of wildlife populations across the planning area. Each of these four applications is described in more detail below:

- **Designation and management of protected areas:** Protected areas are inclusive of large tracts of wildlife habitat types well distributed across the planning area. They will serve as conservation reserves and refuges to protect the native biodiversity within them and will provide wildlife movement corridors and linkage areas that connect landscapes and habitats, which facilitates the interaction of animals. Establishing and preserving protected areas within SJNF lands is a means to maintain ecosystem diversity, which presumably will protect the diversity and sustainability of native plant and animal species and communities, and the ecological processes occurring within those ecosystems across the planning area, along with the viability of wildlife species on NFS lands. Approximately 57% of the SJNF lies within protected areas and includes much of the alpine and mid to upper montane wildlife habitat types. These tracts are capable of supporting sustaining

populations of wildlife associated with these types.

Outside protected areas, the land is subject to greater management emphasis in order to supply a wider diversity of goods and services under multiple use management. LRMP components are developed to assure management use of the land occurs in a sustainable manner that is not limiting to the ecosystem, including terrestrial wildlife species.

- **Application of ecosystem management using sustainable ecosystem concepts:** Ecosystem management is the integrating component of the sustainable ecosystems strategy. Ecosystem management on SJNF lands, which uses the HRV for reference, will be implemented by maintaining or restoring the composition (plant species, animal species, and vegetation types), structure (size, density, and arrangement of live and dead vegetation, stream channel attributes), function (ecological processes and disturbances), and physical environment (soils, water, and geomorphology) of ecosystems. The approach is intended to protect and maintain these ecosystems and ensure the diversity, contribute to population viability on SJNF lands, and provide for sustainable wildlife populations across the planning area of the majority of species within them. Desired conditions, objectives, standards, and guidelines for management of terrestrial ecosystems are presented in Section 2.2.

  When managing for viability, and sustainability or diversity and maintenance of wildlife populations across SJNF lands, it must be recognized that many population-level stressors are largely outside the control of the USFS and many wildlife populations are landscape-level species that use a variety of habitats outside the planning area. The overall goal is to provide management of habitat on federal lands within the planning area that have all components needed for a species within various life stages. As most management activities occur on habitats outside protected areas, LRMP components are necessary to provide for and maintain ecosystem characteristics supporting populations on the matrix of actively managed lands. LRMP components have been developed to mitigate and/or minimize these influences on wildlife populations across the planning area.

- **Development and application of the LRMP components:** Wildlife species that may not be adequately recognized or protected by the above ecosystems management approach, or whose specific habitat needs or other life requirements may not be fully met under the sustainable ecosystems strategy, are given special management considerations below, including the development of LRMP components that contribute to the conservation of those species. This approach may also be needed for special status species whose key habitat components are directly affected by agency management activities. Special status species on the SJNF include federally listed species, species proposed for federal listing and proposed critical habitat, candidate species for federal listing, and Region 2 Regional Forester's sensitive species. Some of these species have immediate needs that may not be adequately recognized and addressed by the overall sustainable ecosystems strategy. As such, they have been given special consideration and additional LRMP components below, developed to address those special needs. In addition, current species-specific conservation plans and strategies will be relied upon to address the needs of special status species. These plans and strategies are analogous to TNC's fine-filter approach, which is intended to protect species with known conservation concerns (Hunter et al. 1988; Noss 1987; TNC 1982). LRMP components specific to special status species augment those components developed through the ecosystem management approach. Species lists for the SJNF are found in Volume III, Appendix P. Guidance for amphibians is included in Section 2.5, and guidance for migratory birds is found under the specific agency agreements with the U.S. Fish and Wildlife Service (USFWS) and listed within "Additional Guidance" at the end of this section.

  Highlight species were also used as a planning tool in the development of the ecosystem management approach in this LRMP. Certain species representing a broad spectrum of

conditions and needs across the planning area were selected in order to develop a strategy around those conditions and needs. Highlight species have no legal status, and no specific USFS policy or direction associated with them; they serve no further functionality past development of the ecosystem management approach and various LRMP components. LRMP components that provide direction for selected highlight species are summarized in Volume III, Appendix M.

- **Monitoring and adaptive management:** Monitoring and evaluation will be conducted to assess whether management activities on SJNF lands are providing for ecological integrity and maintaining or restoring ecological conditions. Focal species are selected primarily to provide information regarding the effectiveness of the LRMP in maintaining diversity of communities and persistence of native species. The SJNF conducts monitoring of focal species at the planning area scale, and that information is used in project-level planning and analysis as appropriate. Refer to Chapter 4, below, for a description of the wildlife monitoring questions and indicators that apply. Table 2.3.1 shows terrestrial wildlife focal species for the SJNF.

**Table 2.3.1: Terrestrial Wildlife Focal Species on the San Juan National Forest**

| Focal Species | Habitat of Concern | Management Issue Addressed |
|---|---|---|
| Abert's squirrel<br>*(Sciurus aberti)* | Ponderosa pine forests | Effects to species and habitat associated with timber harvest and fuels treatments |
| Spruce-fir Assemblage:<br>American marten *(Martes americana)*,<br>snowshoe hare *(Lepus americanus)*,<br>Canada lynx *(Lynx Canadensis)* | Spruce-fir and cool-moist mixed conifer forests | Effects to species and habitat associated with recreation and timber harvest |
| Hairy woodpecker<br>*(Picoides villosus)* | Ponderosa pine, aspen, and mixed conifer forests | Effects to species and habitat associated with timber harvest and fuels treatments |

LRMP components are also directly linked to providing for management of habitat to address population viability on NFS lands. Identified ecosystem elements that contribute to viability, such as physical habitat, biological factors, human factors, and species-specific factors are listed in Volume III, Appendix Q. As described in Section 2.1, management direction has been developed that is intended to address the legal, regulatory, and policy requirements for species diversity and population viability for terrestrial wildlife species, including associated special status wildlife species. The desired future conditions, management objectives, and standards and guidelines listed below for wildlife and special status species, as well as the other identified LRMP components, support those elements found to be most critical to the maintenance of species diversity and population viability on SJNF lands.

LRMP implementation will involve close coordination with the CPW and the USFWS. In particular, the SJNF considers these agencies to be the best source of population data for distribution and range maps and will coordinate closely with them to keep habitat data current during plan implementation. Partnerships with other state and federal agencies, as well as with tribal governments and other interested organizations and individuals, will help the SJNF better manage for wildlife habitats and populations. These cooperative efforts will serve as an important way to achieve desired conditions and to accomplish multiple-use plan objectives.

## Desired Conditions

2.3.1 Wildlife populations are viable on SJNF lands. Wildlife populations are self-sustaining, connected, and genetically diverse across SJNF lands.

2.3.2 Big game severe winter range, winter concentration areas, and production areas are capable of supporting populations that meet state population objectives. These areas provide sustainable forage and habitat in areas with acceptable levels of human disturbance which do not reduce habitat effectiveness.

2.3.3 Invasive exotic wildlife species and diseases do not become established within the planning area. Existing invasive exotic wildlife species and diseases do not spread.

2.3.4 Habitat components (e.g., snags and downed logs) are maintained. Unique habitat types (e.g., springs, seeps, willow carrs, caves, and cliffs) support associated flora and fauna (with abundance and distribution commensurate with the capability of the land).

2.3.5 Large predator species contribute to ecological diversity and ecosystem functioning.

2.3.6 Projects and activities occurring on USFS lands near state and federal highways are designed to provide for long-term connectivity and integrity of habitats to facilitate effective wildlife movement.

2.3.7 Snag and downed wood features occur in quantities that support self-sustaining populations of associated species.

2.3.8 Effective raptor nesting habitat occurs throughout the planning area with abundance and distribution commensurate with the capability of the land to sustain populations.

2.3.9 Ecosystems and habitat conditions for terrestrial wildlife species sensitive to human disturbance are maintained.

2.3.10 Vegetation openings created through management actions preserve the natural patchiness inherent in Southern Rocky Mountain ecosystems.

2.3.11 Habitat continuity and travel corridors exist and persist to facilitate species movement and establishment into newly suitable areas as a result of changing habitats.

2.3.12 Populations are conserved by maintaining or improving habitat availability and quality through the incorporation of conservation strategies and species' habitat needs during project development and implementation.

2.3.13 Riparian and aquatic habitat, including springs and fens, support well-distributed populations of invertebrate and vertebrate riparian and aquatic dependent wildlife special status species.

2.3.14 Disturbances from management activities occur at levels that support critical life functions and sustain key habitat characteristics for wildlife special status species.

2.3.15 Areas identified as critical habitat or proposed critical habitat for special status wildlife species have the characteristics to support sustainable populations, promoting recovery of the species.

2.3.16 The alpine and subalpine willow (*Salix* sp.) dominated riparian areas, providing crucial winter habitat for white-tailed ptarmigan (*Lagopus leucura*) and snowshoe hare (*Lepus americanus*), do not bioaccumulate heavy metals above historically occurring background levels which enter the food chain. Areas of contamination do not become limiting factors for wildlife population sustainability.

2.3.17 Management actions maintain or improve habitat conditions for special status species, contributing to the stability and/or recovery of these species.

2.3.18 Special status species are able to disperse within the planning area and into adjacent lands. This will allow for the interchange between populations and the maintenance of genetic diversity.

2.3.19 Focal species are able to disperse freely across the planning area allowing for the interchange between populations and the maintenance of genetic diversity.

2.3.20 **Focal Species: Abert's squirrel** (*Sciurus aberti*) - Ponderosa pine habitats provide interconnected structure in mature conifer stands that produce abundant foraging (cone crops and above- and belowground fungi) and reproductive habitat.

2.3.21 **Focal Species: American marten** (*Martes americana*) - Habitat connectivity for spruce-fir and cool-moist mixed conifer forests is maintained at broad spatial scales. These forests contain a diverse array of structural stages (including mature and old growth) and habitat attributes (snags and downed logs) to provide effective foraging, breeding and dispersal habitat for marten.

2.3.22 **Elk:** Management activities and human disturbance levels (especially in severe winter range, winter concentration areas, and calving grounds) provide effective habitat capable of meeting state population objectives.

2.3.23 **Focal Species: Hairy Woodpecker (*Picoides villosus*) -** Snags occur in numbers, size, and quality in and adjacent to aspen, ponderosa pine, and mixed conifer forests to provide effective habitat for foraging and reproduction.

## Objectives

2.3.24 Treat 2,000 or more acres of vegetation on SJNF lands over the life of the LRMP to improve habitat that supports sustainable populations of terrestrial wildlife across the planning area.

2.3.25 Conduct a minimum of six wildlife interpretive and environmental education programs to inform the public on natural resource management, wildlife species, and their habitats, and encourage youth participation and interest in wildlife and natural resources.

2.3.26 Gunnison Sage-grouse (Centrocercus minimus): improve habitat for Gunnison sage-grouse when conducting resource management actions within occupied habitat.

2.3.27 Nokomis Fritillary Butterfly (Speyeria nokomis): Over the life of the LRMP, restore the hydrologic conditions and plant communities during project implementation at springs or seeps capable of supporting Nokomis fritillary while, at the same time, retaining the water development for livestock or other uses.

2.3.28 Bats: Over the life of the LRMP, all mine closures for human safety at sites supporting bat populations include structures (such as bat gates) designed to provide for continued use as bat habitat.

2.3.29 **Inventory and Monitoring: I**mprove knowledge on the distribution of wildlife special status species and their habitats by inventorying habitat and species as identified in the LRMP monitoring section over the life of the LRMP. Work with conservation partners in the study, management, and monitoring of these species.

2.3.30 **Invasives and Disease:** Over the life of the LRMP, coordinate with CPW to prevent introductions or spread of fish or terrestrial wildlife species, as needed, where there is potential for negative impacts on wildlife special status species.

2.3.31 **Focal Species: Abert's squirrel** - Over the life of the LRMP, restore approximately 3,000 acres of ponderosa pine forest to improve habitat quality as defined in the *Abert's Squirrel Species Assessment San Juan National Forest* (USFS 2004a, 2003).

2.3.32 **Focal Species: American marten** - Over the life of the LRMP, treat approximately 2,000 acres of spruce-fir and cool-moist mixed conifer forests to increase age class diversity and provide future foraging, breeding and dispersal habitat as defined in the *American Marten Species Assessment San Juan National Forest* (USFS 2004b).

2.3.33 **Elk:** Over the life of the LRMP, improve approximately 5,000 acres of winter range through mechanical and prescribed burn treatments as defined in the *American Elk Species Assessment San Juan National Forest* (USFS 2004c).

2.3.34 **Focal Species: Hairy Woodpecker -** Over the life of the LRMP, harvest and regenerate approximately 3,000 acres of aspen forest to increase age class diversity and provide future mature aspen nesting habitat as defined in the *Hairy Woodpecker Species Assessment San Juan National Forest* (USFS 2004d).

## Standards

2.3.35 Standards for the golden eagle (Aquila chrysaetos), bald eagle (Haliaeetus leucocephalus), and peregrine falcon (Falco peregrinus) are listed in Table 2.3.2.

2.3.36 Predator Control: On SJNF lands within the planning area, predator control must be managed in cooperation with the state wildlife agencies, the USFWS, Animal Plant Health Inspection Services (APHIS) and other appropriate agencies and cooperators in order to reduce damage to other resources (and to direct control toward removing only the offending animal). Preventive methods of denning, aerial gunning, and poisons of any kind towards predators must not be allowed on SJNF lands within the planning area under any circumstances.

2.3.37 Bats: If abandoned mines are closed, surveys will be conducted to determine occupancy. If surveys cannot be completed, occupancy will be assumed, and mine closures must allow for bat access. Abandon mines that are determined to be hazardous to bats will be closed to bats.

2.3.38 Bats: Human access at occupied caves or abandoned mines will be restricted as necessary during the following periods to maintain essential life cycle processes:

- Maternity sites - April 15 through September 1
- Swarming sites - August 15 through October 15 (30 minutes before sunset to 30 minutes after sunrise)
- Winter hibernacula - October 15 through May 15

2.3.39 **Bighorn Sheep (*Ovis canadensis*):** During project-level planning on domestic sheep (*O. aries*) allotments, management options must be developed to prevent physical contact between domestic sheep and bighorn sheep. Actions may include but are not limited to boundary modification, livestock-type conversion, or allotment closures.

2.3.40 **Bighorn Sheep:** Grazing permit administration in occupied bighorn sheep habitat must utilize measures to prevent physical contact between domestic sheep and bighorn sheep. Permit administration actions may include but are not limited to use of guard dogs, grazing rotation adjustments, or relocation of salting and bed grounds.

2.3.41 **Bighorn Sheep:** Management of recreational pack goats and other domestic goats (*Capra aegagrus hircus*) must utilize measures to prevent physical contact with bighorn sheep.

2.3.42 **Bighorn Sheep:** Domestic goats used for invasive plant control must be veterinarian certified as free of pathogens transmissible to bighorn sheep, except in areas where there is no risk of contact with bighorn sheep.

2.3.43 **Butterflies:** Management actions that could adversely impact occupied habitat used by special status butterfly species for reproduction must be designed to sustain host plant species.

2.3.44 **Columbian Sharp-tailed Grouse (*Tympanuchus phasianellus columbianus*):** New noise sources resulting from management activities must not contribute to noise levels that negatively impact sharp-tailed grouse leks during the active lek season (March 1 to June 30) based on best available science

2.3.45 **Gunnison Sage-grouse:** Management activities must not occur from March 1 to June 30 within occupied habitat suitable for nesting to allow for breeding and December 1 to March 15 for known winter habitat.

2.3.46 **Gunnison Sage-grouse:** New structural improvements or surface disturbance must not occur within known winter concentration area or within a 0.6-mile radius of known Gunnison sage-grouse leks.

2.3.47 **Gunnison Sage-grouse:** In occupied habitat fuels treatments must be designed and implemented with an emphasis on protecting and enhancing existing sagebrush ecosystems

2.3.48 **Gunnison Sage-grouse:** Invasive vegetation must be monitored and controlled post-treatment.

## Guidelines

2.3.49 Guidelines for the golden eagle, bald eagle, osprey (*Pandion haliaetus*), peregrine falcon, northern goshawk (*Accipiter gentilis*), burrowing owl (*Athene cunicularia*), and all other accipiter, buteo, falcon, harrier, and owl species are listed in Table 2.3.2.

2.3.50 In order to determine site occupation, pre-implementation surveys may be required for projects occurring in habitats that may support populations of sensitive species and species listed or proposed under the ESA, as determined by an agency biologist.

2.3.51 **Bats:** Human access should be managed at caves and abandoned mines where known bat populations exist to protect bat habitat from disturbance and/or the introduction of pathogens. Management examples include, but are not limited to, seasonal or permanent closures and excluding humans by installing bat gates.

2.3.52 **Bats:** Where known bat concentrations of significant conservation concern are located outside caves or abandoned mines (such as in bridges structures, rock crevasse, or tree snags), human disturbance should be managed in order to protect those populations and the concentration site's physical features.

2.3.53 **Bats:** On the SJNF, formal mineral withdrawal of abandoned mines for conservation of special status bat species should be pursued when demonstrated necessary to prevent loss of effective or crucial habitat due to mining activity.

2.3.54 **Bats:** At swarming sites, hibernacula, and maternity sites, activities that may alter the suitability of the cave or abandoned mine for bat occupation should not occur within 500 feet of the entrance, unless to rehabilitate the suitability of the site or install mine safety closures.

2.3.55 **Migratory Birds:** Projects or activities should consider and undertake proactive bird conservation actions as practicable particularly during breeding season to maintain or improve habitat needs over the long-term for species identified by the USFS as priority for conservation action.

2.3.56 The drainage of acid-mine runoff through alpine and subalpine willow-dominated riparian areas that provide crucial winter habitat for white-tailed ptarmigan and snowshoe hare should be avoided in order to prevent physiological impacts from the effects of bioaccumulation of heavy metals.

2.3.57 **Pollinators:** Pollinators should be considered during the application of pesticides to prevent population-level impacts and maintain pollinator function in the ecosystem.

2.3.58 New structural improvements, reconstruction, and operations should be designed to provide for wildlife movement to sustain populations.

2.3.59 Projects or activities that adversely impact pronghorn (*Antilocapra americana*) and elk production areas should be limited or avoided. This will keep reproductive success from being negatively impacted from management activities by using access restrictions during the following periods:

- Pronghorn: May 1–July 1
- Elk: May 15–June 30

2.3.60 Management activities and access should be limited or avoided in critical winter range, severe winter range, and winter concentration areas for pronghorn, elk, and mule deer during the following times to keep survival and reproduction from being negatively impacted (see Figures 2.3.1, 2.3.2, and 2.3.5):

- Pronghorn: December 1–April 30
- Elk: December 1–April 30
- Mule deer: December 1–April 30

2.3.61 *This guideline was applicable only to BLM lands*.

2.3.62 **Ungulates:** Projects or activities in big game critical winter range, winter concentration areas, severe winter range, production areas, and important migration corridors should be designed and conducted in a manner that preserves and does not reduce habitat effectiveness within those mapped areas.

2.3.63 **Ungulates:** In order to provide for healthy ungulate populations capable of meeting state population objectives, anthropomorphic activity and improvements across the planning area should be designed to maintain and continue to provide effective habitat components that support critical life functions. This includes components of size and quality on the landscape providing connectivity to seasonal habitats (wildlife travel corridors), production areas, critical winter range, severe winter range, and winter concentration areas, along with other habitat components necessary to support herd viability.

2.3.64 **Bighorn Sheep:** Projects or activities that adversely impact bighorn sheep production areas by reducing habitat effectiveness should be limited or avoided, using access restrictions during the following periods (see Figure 2.3.3):

- Rocky Mountain bighorn sheep (*Ovis canadensis canadensis*): April 15–June 30
- Desert bighorn sheep (*O.c. nelsoni*): February 1–May 1

2.3.65 **Bighorn Sheep:** Projects or activities that adversely impact bighorn sheep severe winter range and winter concentration areas by reducing habitat effectiveness should be limited or avoided using access restrictions during the following periods:

- Rocky Mountain bighorn sheep: November 1–April 15
- Desert bighorn sheep: December 1–April 15

2.3.66 **Wildlife Corridors:** Public ownership of important wildlife movement corridors should be maintained. Priority areas are those adjacent to public highways or where public lands are identified as a key component in maintaining the integrity of seasonal movements by wildlife in an otherwise restricted landscape.

2.3.67 **Columbian Sharp-tailed Grouse:** Surveys for new/unknown Columbian sharp-tailed grouse leks within occupied Columbian sharp-tailed grouse habitat should be completed prior to project approval in order to determine if additional management actions to provide for habitat effectiveness are necessary.

2.3.68 **Columbian Sharp-tailed Grouse:** Management activities that adversely impact critical life functions should not occur from March 15 to July 30 within a 1.25-mile radius of mapped occupied Columbian sharp-tailed grouse leks to allow for breeding and December 1 to March 15 for known winter habitat to provide for effective winter habitat to support populations on the landscape.

2.3.69 **Columbian Sharp-tailed Grouse:** No new structural improvements or surface disturbance should occur within known winter habitat or within a 0.4-mile radius of known Columbian sharp-tailed grouse leks to maintain effective habitat for critical life functions.

### *Gunnison Sage-grouse*

2.3.70 Structures in sage-grouse habitat should be constructed to limit risk of collision and predation

2.3.71 New noise sources resulting from management activities should not contribute to noise levels that negatively impact sage-grouse leks during the active lek season (March 1 to June 30) based on best available science.

2.3.72 Projects in occupied Gunnison sage-grouse habitat should be designed to mitigate or avoid the direct or indirect loss of habitat necessary for maintenance of the local population or reduce to acceptable levels the direct or indirect loss of important habitat necessary for sustainable local populations. Projects will incorporate special reclamation measures or design features that accelerate recovery and/or re-establishment of affected sage-grouse habitat as much as possible.

2.3.73 Applicable BMPs should be applied to all mineral proposals as Conditions of Approval within occupied sage-grouse habitat to provide for adequate effective habitat and breeding, nesting, and wintering habitat.

2.3.74 Remote methodologies for monitoring, transporting fluids to centralized collection tanks, etc., should be utilized to minimize human disturbance in Gunnison sage-grouse habitat.

2.3.75 Fuels treatments should be designed to meet strategic protection of identified occupied sage-grouse habitat.

2.3.76 Use of native seeds should be used for revegetation following fuels management treatment based on availability, adaptation (site potential), and probability of success (Richards et al. 1998). Where probability of success or native seed availability is low, non-native seeds may be used as long as they meet sage-grouse habitat objectives

2.3.77 Within occupied Gunnison sage-grouse critical habitat the RCP grazing guidelines should be incorporated when appropriate.

2.3.78 Within occupied habitat, grazing in treatment areas should be deferred for 2 growing seasons after treatment, unless needed for seedbed preparation or desired understory and overstory are established.

2.3.79 When developing or modifying water developments, BMPs (see Volume III, Appendix N) should be used to mitigate potential impacts from West Nile virus on sage-grouse within occupied habitat.

**Table 2.3.2: Raptor Timing and Buffer Zone Distance Standards and Guidelines**

| Species | Impact/Risk | Time Frame | Buffer Distance**** | Source |
|---|---|---|---|---|
| Golden eagle | Structural improvements* | Year-round | New structures must not occur within a 0.5-mile radius of an active nest. (S)*** | CPW 2008 |
| | Disturbance ** | December 15–July 15 | Human encroachment should not occur within 0.5 mile of an active nest during the nesting season. (G) *** | CPW 2008 |
| Bald eagle | Structural improvements* | Year round | New structures must not occur within a 0.5-mile radius of an active nest. (S)*** | SJNF |
| | Disturbance** | November 15–July 15 | Human encroachment should not occur within 0.5 mile of an active nest during the nesting season. (G)*** | SJNF |
| Bald eagle winter roost | Structural improvements* | Year round | New structures must not occur within 0.5 mile of a communal roost site. (S) | SJNF |

| Species | Impact/Risk | Time Frame | Buffer Distance**** | Source |
|---|---|---|---|---|
| | Disturbance** | November 15 –March 15 | Human encroachment should not occur within a 0.25-mile radius (indirect line of sight) or a 0.5-mile radius (direct line of sight) of a communal winter roost site (as identified by CPW and the managing agency biologist). (G)<br><br>Limit activity between 10 a.m. and 2 p.m. if encroachment will occur within buffer zones. (G) | CPW 2008 |
| Osprey | Disturbance** | April 1–August 31 | Human encroachment should not occur within 0.25 mile of a nest during the nesting season. (G) | SJNF |
| | Structural Improvements* | Year-round | New structures should not occur within a 0.25-mile radius of an active nest. (G) | CPW 2008 |
| Peregrine falcon | Structural Improvements* | Year-round | New structures must not occur within a 0.5-mile radius of an active cliff nest complex. (S) | CPW 2008 |
| | Disturbance** | March 15–July 31 | Human encroachment should not occur within 0.5 mile of a nest during the nesting season. (G) | CPW 2008 |
| Northern goshawk | Disturbance** | March 1–August 31 | Human encroachment should not occur within 0.5 mile of a nest during the nesting season. (G) | SJNF |
| | Structural Improvements* | Year-round | New structures should not occur within a 0.5-mile radius of an active nest. (G) | CPW 2008 |
| Burrowing owl | Disturbance** | March 15–August 15 | Human encroachment should not occur within 0.25 mile of nest burrows when owls may be present during the nesting season. (G) | Romin and Muck 2002 |
| | Structural Improvements* | Year-round | New structures should not occur within a 0.25-mile radius of active nests or within occupied habitat. (G) | Romin and Muck 2002 |
| All other raptors | Disturbance** | Varies by species | Determination of the application of these specific seasonal restrictions, timing limitations, and/or buffer distances should be made by the project biologist, guided by agency requirements, along with professional knowledge and experience. They will be considered on a case-by-case basis, taking into consideration site-specific factors such as topography, vegetation, species of raptor, historic patterns of human activity and infrastructure, and observed behaviors of individual birds. (G) | Romin and Muck 2002 |

| Species | Impact/Risk | Time Frame | Buffer Distance**** | Source |
|---|---|---|---|---|
| | Structural Improvements* | Varies by species | Determination of the application of these specific seasonal restrictions, timing limitations, and/or buffer distances should be made by the project biologist, guided by agency requirements, along with professional knowledge and experience. They will be considered on a case-by-case basis, taking into consideration site-specific factors such as topography, vegetation, species of raptor, historic patterns of human activity and infrastructure, and observed behaviors of individual birds. (G) | Romin and Muck 2002 |

*Structures include improvements such as roads, trails, radio towers, power lines, aboveground transmission corridors, and wells as proposed following nest establishment. This is not intended to include structures that historically occurred in the area prior to nest establishment.

**This does not apply to historic levels and patterns of disturbance under which the nest was established and is intended to apply to additional levels and change in disturbance patterns.

***Golden and bald eagle nest as defined under the Bald and Golden Eagle Protection Act.

****Buffer distances for some species may vary based on site-specific information, current science, and agency wildlife biologists' professional judgment. Area closures may be considered where appropriate.

Note: (S) = Standard; (G) = Guideline.

Table information is based on a variety of sources, including 2008 Colorado Parks and Wildlife raptor guidelines, Romin and Muck (2002), professional knowledge of local area conditions, Reynolds et al.'s (1992) recommendations specific to the SJNF, and Bald and Golden Eagle Protection Act conformance

Where literature and other evidence shows, exceptions may occur when individuals are adapted to human activity. Management is designed to reduce impacts during sensitive periods.

## Additional Guidance

### Terrestrial Wildlife

- ESA
- FSM 2600, Wildlife, Fish and Sensitive Plant Habitat Management
- FSH 2609-13, Wildlife and Fisheries Program Management
- FSM 2550, Soil Management
- FSM 5150, Fuel Management
- FSH 2509-18, Soil Management
- FSH 2509-25, Watershed Conservation Practices Handbook (Region 2 Supplement)
- Colorado's Comprehensive Wildlife Conservation Strategy (Colorado Division of Wildlife 2006) (see Volume III, Appendix H for details on wildlife guidance in relation to leasable minerals)
- Managing Forested Lands for Wildlife (Hoover and Wills 1984)

### Special Status Species

- FSM 2600, Wildlife, Fish, and Sensitive Plant Habitat Management
- Colorado's Comprehensive Wildlife Conservation Strategy (2005)
- A Process for Finding Management Solutions to the Incompatibility Between Domestic and Bighorn Sheep (Schommer and Woolever 2001)
- Colorado Desert Bighorn Sheep Management Plan (CPW and BLM 1989)
- Colorado Bighorn Sheep Management Plan 2009-2019 (George et al. 2009)
- Recommendations for Domestic Sheep and Goat Management in Wild Sheep Habitat (Wild Sheep Working Group, Western Association of Fish and Wildlife Agencies 2012)
- San Juan National Forest LRMP Amendment #15 and associated Decision Notice for animal damage control (USFS 1992c)

- San Juan National Forest Management Indicator Species Transition Memo (USFS 2019)

Bats

- Federal Cave Resources Protection Act of 1988
- Colorado Bat Conservation Plan (Ellison et al. 2003)
- Townsend's Big-eared Bat (Corynorhinus townsendii): A Technical Conservation Assessment (Gruver et al. 2006)
- The Fringed Myotis: A Technical Conservation Assessment (Keinath 2004)

Migratory Birds

- The Migratory Bird Treaty Act of 1918
- The Migratory Bird Conservation Act of 1929
- the Neotropical Migratory Bird Conservation Act of 2000
- EO 13186, 2001
- USFWS Birds of Conservation Concern (2002a)
- Colorado Partners in Flight Land Bird Conservation Plan (2000)
- Partners In Flight North American Landbird Conservation Plan (Rich et al. 2004)
- U.S. Shorebird Conservation Plan (2nd ed.) (USFWS 2001a)
- Waterbird Conservation Plan for the Americas: The North American Waterbird Conservation Plan (Version 1) (Kushlan et al. 2002)
- Flammulated, Boreal, and Great Gray Owls in the United States: A Technical Conservation Assessment (Hayward and Verner 1994)
- USFS and USFWS MOU to Promote the Conservation of Migratory Birds, Agreement # 08-MU-1113-2400-246 (USFS and USFWS 2008)

Threatened and Endangered Species

- Final Southwestern Willow Flycatcher Recovery Plan (USFWS 2002b)
- Mexican Spotted Owl Recovery Plan (USFWS 2012a)
- Uncompahgre Fritillary Butterfly Recovery Plan (USFWS 1994)
- Annual Uncompahgre fritillary butterfly monitoring and inventory field report and status updates (USFWS 2013a)
- Final Designation of Critical Habitat for the Mexican Spotted Owl: Final Rule (USFWS 2004)
- Canada lynx conservation agreement (USFS and USFWS (2000)
- Lynx Conservation Assessment and Strategy (Ruediger et al. 2000)
- Southern Rockies Lynx Amendment (USFS 2008)
- October 23, 2012, letter regarding guidance on Section 7 consultation procedures for the southwestern willow flycatcher, USFWS concurrence to the SJNF, December 12, 2012 (USFWS 2012b)

Butterflies and Pollinators

- USFS and North American Butterfly Association MOU, USFS Agreement # 08-SU-1113-241-298 (2008)
- USFS and the Xerces Society, USFS Agreement No 09-SU-11130121-091 (2009)

Predator Control

- Colorado State level MOU between the Colorado Department of Natural Resources, the CPW, the BLM, the USFS, the Contractors State License Board (CSLB), and the APHIS Wildlife Service (1999)
- San Juan National Forest LRMP Amendment #15, and associated Decision Notice for Animal Damage Control (USFS 1992c)
- Master MOU between the USFS and the APHIS Wildlife Service (1998)

Raptors

- Bald and Golden Eagle Protection Act of 1940
- Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors (CPW 2008)
- Reducing Avian Collisions with Power Lines: State of the Art in 2012 (Edison Electric Institute and Avian Power Line Interaction Committee)

Gunnison Sage-grouse

- Conservation Plan Agreement to participate in the LRMP, signed by the Region 2 Regional Forester (April 28, 2005) and the BLM State Director (April 29, 2005), IM No. CO-2010-28 provides direction for sage-grouse (USFS and BLM 2005)
- Gunnison Sage-grouse Rangewide Conservation Plan (Gunnison Sage-grouse Rangewide Steering Committee 2005)
- A Report on National Greater Sage-Grouse, Conservation Measures, produced by the Sage-grouse National Technical Team (December 21, 2011) (BLM 2011b)

Ungulates

- FSM 2600, Wildlife, Fish, and Sensitive Plant Habitat Management
- FSH 2609.13, Wildlife and Fisheries Program Management Handbook
- Managing Forested Lands for Wildlife (Hoover and Wills 1984)
- Hermosa Deer Management Plan: Data Analysis Unit D-52 (CPW 2001a)
- San Juan Deer Management Plan: Data Analysis Unit D-30 (CPW 2001b)

Wildlife Corridors

- Linking Colorado's Landscapes, Phase II Reports (Southern Rockies Ecosystem Project 2006)
- Lynx Linkages Areas discussed in the USFS 2001 Programmatic Consultation Agreement for Canada Lynx in Colorado (USFS 2001a)




**Figure 2.3.1: Elk Severe Winter Range, Winter Concentration Areas and Production Areas**