


**Figure 2.3.2: Mule Deer Severe Winter Range, Winter Concentration Areas and Production Areas**




**Figure 2.3.3: Bighorn Sheep Severe Winter Range, Winter Concentration Areas and Production Areas**

**Figure 2.3.4: Gunnison Sage-grouse Proposed Occupied and Unoccupied Critical Habitat**

*This figure was applicable only to BLM lands.*

**Figure 2.3.5: Pronghorn Overall Range**

*This figure was applicable only to BLM lands.*

## 2.4 Riparian Area and Wetland Ecosystems

### Introduction

Riparian area and wetland ecosystems on SJNF lands occur on valley floors and other low-lying landscape positions where the water table is usually at or near the land surface. They are frequently flooded or at least seasonally saturated by a fluctuating water table, and they depend on water derived from direct precipitation and upland sources. Riparian area and wetland ecosystems have soils that are somewhat poorly to very poorly drained and hydrophytic plants that are obligate-wetland or facultative-wet species (Reed 1988). These ecosystems, which are primarily associated with perennial streams on SJNF lands, store water, enhance water quality, provide habitat for wildlife and plants, and provide recreation and aesthetic values. Natural ecological processes and disturbances including fire, drought, wind, floods, flow regimes, and succession play a fundamental role in shaping the composition, structure, and function of riparian area and wetland ecosystems on the SJNF.

Although they are small in extent, riparian area and wetland ecosystems represent a very important ecological component of the SJNF. Riparian zones of the Southwest contain the greatest diversity of native vegetation communities, birds, fish, and terrestrial vertebrates (Durkin et al. 1995; Hink and Ohmart 1984; Howe and Knopf 1991; Siegel and Brock 1990). Riparian area and wetland ecosystems on SJNF lands include a general type and four physiognomic types. The general riparian area and wetland ecosystem type is defined by its soils, topographic position, and the riparian area and wetland major vegetation type (Redders 2012). Ecosystem physiognomic types, which are defined by their soils and the dominant life form in the uppermost canopy layer, include evergreen riparian forests, deciduous riparian forests, deciduous riparian shrublands, and riparian area and wetland herbaceous lands (which include fens and hanging gardens).

These ecosystems are an important part of the LRMP's sustainable ecosystems strategy. This strategy includes maintaining or restoring the diversity and ecological integrity of ecosystems on SJNF lands, which in turn will protect the diversity and population viability of the majority of plant and animal species within the ecosystems. See Section 2.1 in the LRMP for more information on ecosystems and the sustainable ecosystems strategy.

Riparian area and wetland ecosystems types are used in the LRMP and FEIS to describe ecosystem diversity; analyze past, current, and future ecological conditions; describe environmental impacts from management activities; and develop of LRMP components (desired conditions, objectives, standards, and guidelines). The general riparian area and wetland ecosystem type also serves as a broad-scale habitat type for terrestrial wildlife species, special status wildlife species, and plant species, and as such, provides habitat conditions that maintain species diversity and population viability for most terrestrial wildlife and plant species. Riparian area and wetland ecosystems will be monitored to determine if management activities are adversely affecting those ecosystems and the composition, abundance, distribution, and population viability of the plant and animal species that rely on those ecosystems for their habitat needs.

Certain high-elevation riparian and wetland ecosystems such as evergreen riparian forests, deciduous riparian shrublands, and herbaceous riparian areas and wetlands (including fens) are well represented in protected areas on the SJNF. Mid-elevation riparian area and wetland ecosystems such as deciduous riparian forests and shrublands, and herbaceous riparian areas and wetlands are also well represented in protected areas. The ecosystems in these areas are primarily impacted by recreation use and livestock grazing, which have caused changes in species abundance and composition in localized areas such as popular camping areas and stock watering locations. Water diversions have also impacted certain riparian areas and wetlands in protected areas.

Outside protected areas, management activities such as road construction, livestock grazing, water diversions, the construction of dams and reservoirs, timber harvest, mechanical fuels treatments, oil and gas development, recreation, utility corridor construction, and solid minerals development have caused impacts to the soils and vegetation of riparian area and wetland ecosystems on the SJNF. In the

ecosystems impacted by these activities, there have been both direct and indirect changes in species abundance and composition, including a reduction of willows and cottonwood (*Populus* sp.) trees in deciduous riparian forests, a reduction of willows in deciduous riparian shrublands, and a reduction of sedges (*Carex* sp.) and rushes (*Juncus* sp.) in riparian herbaceous lands. Kentucky bluegrass (*Poa pratensis*; an exotic invasive grass) has replaced native sedges and rushes in many riparian area and wetland ecosystems impacted by historic unmanaged livestock grazing.

Riparian area and wetland ecosystem management on SJNF lands includes maintaining or restoring the composition, structure, and function of these ecosystems; maintaining adequate vegetation cover; maintaining soil productivity; protecting water quality and aquatic habitats; and preventing or minimizing adverse impacts from management actions. Management also includes developing ecosystem classification systems, conducting riparian area and wetland inventories, monitoring, identifying plants and plant communities, using the best available science, and determining the condition of riparian area and wetland ecosystems.

## Desired Conditions

2.4.1 Riparian area and wetland ecosystems have a diverse composition of desirable native hydrophytic plants that are vigorous and self-perpetuating. Invasive plant species are absent or rare.

2.4.2 Riparian area and wetland ecosystems have vegetation cover sufficient to catch sediment, dissipate energy, prevent erosion, stabilize stream banks, enhance aquatic and terrestrial wildlife habitat, and promote floodplain development.

2.4.3 Forest and shrubland types display hydrophytic trees and shrubs in a variety of size classes; they provide terrestrial and aquatic habitats, stream shading, woody channel debris, aesthetic values, and other ecosystem functions.

2.4.4 Woody debris in a variety of sizes is present in forest and shrubland riparian area and wetland ecosystem types.

2.4.5 Riparian area and wetland ecosystems are resilient to change from disturbances (including from floods, fire, and drought) and offer resistance and resilience to changes in climate.

2.4.6 Riparian area and wetland ecosystems have flow regimes and flooding processes that contribute to stream-channel and floodplain development, maintenance, and function, and facilitate the regeneration of native hydrophytic plants (including narrowleaf cottonwood [*Populus angustifolia*] and Rio Grande cottonwood [*P. deltoides* ssp. *wislizeni*]) that depend on flooding for regeneration.

2.4.7 The composition, structure, and function of fens and hanging gardens are intact (including their native plant species, organic soils, and hydrology).

2.4.8 Riparian area and wetland ecosystems that contain plant communities with G1, G2, S1, or S2 NatureServe Plant Community conservation status ranks are protected, have habitat to expand into, and have the water quantity and hydrologic systems necessary in order to support and sustain these communities.

2.4.9 Soil productivity is intact on all riparian area and wetland ecosystems on the SJNF.

2.4.10 Long-term levels of soil organic matter and soil nutrients are maintained at acceptable levels on all riparian area and wetland ecosystems of the SJNF.

2.4.11 Ground cover (vegetation and litter) is adequate to protect soils and prevent erosion on all riparian area and wetland ecosystems of the SJNF.

2.4.12 Long term impacts to soils (e.g., soil erosion, soil compaction, soil displacement, puddling, and/or severely burned soils) from management actions are rare on all riparian area and wetland ecosystems of the SJNF.

## Objectives

2.4.13 Within 10 years, restore the ecological integrity of two deciduous riparian shrubland sites that currently classify as riparian herbaceous lands by increasing the canopy cover of native hydrophytic shrubs by at least 10%.

2.4.14 Within 10 years, determine the functional condition of 15 miles of riparian area and wetland ecosystems using the Proper Functioning Condition assessment method (Prichard 1998).

2.4.15 Within 15 years, treat two fens on SJNF lands with impaired functions.

2.4.16 *This objective was applicable only to BLM lands*.

2.4.17 *This objective was applicable only to BLM lands*.

2.4.18 *This objective was applicable only to BLM lands*.

## Standards

2.4.19 Long term adverse effects to the hydrology, soils, and vegetation of fens and hanging gardens from management activities in or adjacent to them (including motorized travel, road construction, water pumping, and peat removal) must not occur.

2.4.20 Agency actions in protected areas must not adversely affect the long-term ecological integrity of the riparian area and wetland ecosystems within them.

2.4.21 Management actions must not cause long-term change away from desired conditions in riparian or wetland vegetation communities.

## Guidelines

2.4.22 Agency actions should avoid or otherwise mitigate long-term adverse impacts to riparian areas and wetlands.

2.4.23 Agency actions should avoid or otherwise mitigate long-term adverse impacts in riparian area and wetland ecosystems that have plant communities with G1, G2, S1, or S2 NatureServe Plant Community conservation status ranks, including wild privet (*Forestiera pubescens*) shrublands and boxelder/river birch (*Acer negundo/Betula fontinalis*) woodlands, in order to maintain the ecological integrity of those rare plant communities.

2.4.24 Agency actions should avoid or otherwise mitigate damage to the long-term soil productivity of riparian area and wetland ecosystems.

2.4.25 Livestock browsing should not remove more than 25% of the annual leader growth of hydrophytic shrubs and trees.

2.4.26 Agency actions should avoid or otherwise mitigate adverse impacts to the abundance and distribution of willows to maintain or improve the ecological integrity of riparian area and wetland ecosystems.

2.4.27 Certified, weed-free native seed mixes of local ecotypes should be used to revegetate riparian area and wetland ecosystems where commercially available. Non-native, non-invasive plant material may be used in limited situations where considered necessary in order to protect

resources and/or stabilize soils in a timely fashion. Persistent non-natives or invasive exotic plant species should be avoided.

2.4.28 Woody riparian vegetation along low-gradient ephemeral and permanent stream channels should be maintained or restored to ensure terrestrial food sources for invertebrates, fish, birds, and mammals, and to minimize water temperature changes.

### Additional Guidance

The principal guidelines used to protect all riparian areas and wetlands on SJNF lands are found in the Region 2 Watershed Conservation Practices Handbook (Region 2 FSH 2509.25-2006-1). This handbook contains guidelines that prevent adverse impacts, maintain or improve stream health, preserve ecosystem function, prevent stream sedimentation, and reclaim disturbed sites. Additional guidance includes:

- Colorado River Basin Salinity Control Act of 1974
- Clean Water Act of 1977
- EOs 11288, 1966; 11752, 1973; 11988, 1977;11990, 1977
- FSM 2500
- FSH 2500
- MOU between the Colorado Department of Natural Resources and the USFS, 2004
- FSM 2070
- FSH 2509.13 Burned Area Emergency Rehabilitation.
- Additional standards and guidelines associated with riparian area and wetland ecosystems are found in Sections 2.2 and 2.7.

## 2.5 Aquatic Ecosystems and Fisheries

### Introduction

Aquatic ecosystems of the SJNF support a variety of water-dependent species, populations, and communities of plants and animals. These ecosystems include various types of flowing and standing waters that provide aquatic habitats sufficient to support the many biotic communities that depend on abundant, clean waters. The major biological components of these ecosystems include fish, amphibians, macroinvertebrates, zooplankton, macrophytes, and periphyton communities. The physical components are composed of features such as stream gradient, sinuosity, substrate material, stream bank material, large woody debris, and most importantly, water (refer also to Section 2.6, Water Resources).

These aquatic ecosystems play a critical role in the social, economic, and ecological well-being of the region. In addition to supporting some of the richest and most productive habitats for a variety of wildlife and plant species, they provide municipal and industrial water to communities, and serve as one of the primary recreational resources of the area. According to the USFWS National Survey of Fishing, Hunting, and Wildlife-Associated Recreation, fishing related expenditures contributed over $41.8 billion to the U.S. economy in 2011 (USFWS 2013b). Over 33 million anglers, 27 million of which were freshwater anglers, contributed an average of $1,261 each to local economies, and the demand for fishing-related recreation continues to increase annually. The national statistics for 2011 represent an 11% increase over those observed for 2010. Waters of the SJNF provide some of the best fishing opportunities the western United States has to offer, including pristine wilderness lakes and streams that support outstanding trout fisheries and lower elevation lakes that provide exceptional fishing for warm-water species such as bass (Perciformes), pike (*Esox* sp.), and sunfishes (Centrarchidae).

Although many of the waters in the planning area are in excellent condition, just as many have been altered over time. Starting with the early settlement periods, a variety of land management activities occurring throughout the area have altered the physical integrity of SJNF aquatic ecosystems. Recreation activities, mining, oil and gas development, livestock grazing, timber harvesting, road construction, and


FS-008240

numerous water-development projects have individually and collectively reduced the quantity and quality of aquatic habitats. As a result, the ability to support healthy, self-sustaining populations of fish and other aquatic biota has been reduced in a number of the streams and rivers located within the planning area. This is most evident in areas impacted by consumptive uses of water. The cumulative impacts of hundreds of existing water developments have resulted in adverse and ongoing impacts to the composition, structure, and function of aquatic ecosystems. Where fish population monitoring has been conducted downstream of major water developments, significant decreases in population densities have been observed.

In addition to the physical alterations described above, biological components have also been altered. The introduction of non-native fish species, as well as the occurrence of potentially lethal pathogens, has contributed to the decline of some species. For example, the stocking of non-native trout species occurring over several decades has come at a significant cost to native cutthroat trout populations. Native sucker species have also declined due to the loss of aquatic habitat, and as a result of hybridization with the introduced white sucker (*Catostomus commersonii*). The parasite Myxoboluscerebralis, which causes whirling disease in trout, is becoming more widespread throughout the planning area and is known to have increased mortality rates for infected trout populations.

More recently, fish population levels have been affected by prolonged drought. The reduction in annual precipitation has reduced natural stream flows, increased water temperatures, and at the same time resulted in increased demand for water for human consumptive uses. Without proactive management efforts that address the ongoing and future demand for consumptive water uses, aquatic habitats, and fish populations are likely to experience additional adverse impacts.

The SJNF aquatics programs strive to provide the ecological conditions within their streams, rivers, and lakes, sufficient to support a diversity of native and desired non-native fish species and other aquatic biota over the long term. Proactive management of aquatic habitats and populations is critical to reversing downward population trends. Special emphasis is given to recovery efforts for native cutthroat trout (*Oncorhynchus clarkii*) subspecies. Management of the Colorado River cutthroat trout (*O.c. pleuriticus*) is guided by the Conservation Agreement and Strategy for Colorado River Cutthroat Trout in the States of Colorado, Utah, and Wyoming (Colorado River Cutthroat Trout Task Force 2001). Management of the “greenback lineage” subspecies (*O.c. stomias*) applies the same principles as those for Colorado River cutthroat, but also is also guided by the Greenback Cutthroat Trout Recovery Plan (USFWS 1998a).

Land management activities that incorporate the LRMP objectives for aquatic habitats, implement BMPs, maintain stream flows, and implement site-specific mitigation measures will reduce the risks to aquatic ecosystems. LRMP implementation and consistent monitoring of outcomes for fisheries and aquatic habitats will provide baseline data and allow for assessments of overall trends for aquatic habitats and fish populations. Periodic inventories and surveys of streams and lakes are needed in order to determine the natural range of aquatic habitat conditions, habitat quality, population levels, and overall aquatic ecosystem health. Habitat improvement projects should be designed and implemented where limiting factor assessments have specifically identified habitat-related constraints to aquatic populations. Inventory and monitoring will also provide the information necessary to help identify needs for possible LRMP amendments or other changes in management practices. Scientific efforts to track changing conditions in key habitats, and for specific species, are an important step in accomplishing objectives and achieving desired conditions for the aquatics program.

LRMP implementation involves close coordination with CPW and the USFWS. In addition, partnerships with other state and federal agencies, as well as with interested individuals and organizations, are also an important means to achieve desired conditions and accomplish multiple objectives. Partnerships will yield much needed funding for aquatic habitat management activities.

Most importantly, water developments and other authorized special uses that impact aquatic ecosystems should contain terms and conditions necessary to minimize the severity of impacts and ultimately achieve LRMP objectives and desired conditions. The FLPMA specifies that special uses granted by the Secretary of Agriculture or the Secretary of the Interior are subject to terms and conditions that “minimize damage to fish and wildlife habitat and otherwise protect the environment.”

Ensuring adequate stream flow and lake levels are prerequisites to maintaining healthy aquatic ecosystems and providing for the long-term viability of fish populations. Cooperative and collaborative efforts are the preferred approach to sustaining aquatic ecosystems and ensuring that viable populations of aquatic species are maintained or improved. While the USFS sees water development as a legitimate use of public lands, those consumptive uses must be balanced with the many other legitimate uses for water on the SJNF. Toward that end, a variety of options will be considered for the continued authorization of existing water facilities and for the development of new consumptive water uses, while ensuring that minimum levels of instream flow will be maintained adequate to meet the applicable regulatory requirements and the goals and objectives of the SJNF.

As described in Section 2.1, the LRMP applies three approaches to ensure the maintenance of species diversity and long-term population viability: the designation of protected areas, the ecosystem management strategy, and a species-specific management strategy that addresses the special needs of certain species. Management direction has been developed that is intended to address the legal, regulatory, and policy requirements for species diversity and population viability. A range of key ecosystem elements were identified and the relative importance of those elements to maintaining species diversity and population viability was determined. The desired future conditions, management objectives, and standards and guidelines listed below were developed for those elements found to be most critical to the maintenance of species diversity and population viability for aquatic species (Volume III, Appendix Q).

## Aquatic Special Status Species

Aquatic special status species for the SJNF are listed in Table 2.5.1. These species receive special management emphasis due to their historic declines and present concern about their viability. In addition to the LRMP components that specifically address some of the needs of these species, the SJNF uses additional guidance in the form of recovery plans and conservation strategies, examples of which are listed within Table 2.5.1. The common objective among the LRMP components, recovery plans, and conservation strategies are to 1) stabilize and maintain existing populations, and 2) expand the distribution and overall abundance of these species to a point where long-term viability is no longer of concern. The LRMP components were developed with these two fundamental objectives in mind.

Unless a formal change in the status of greenback lineage cutthroat trout is recognized by the USFWS, populations of greenback lineage cutthroat trout on the SJNF will be treated as a federally listed species and afforded full protection under the ESA. The Greenback Cutthroat Trout Recovery Plan (USFWS 1998a) will be used as management guidance for greenback lineage populations on the SJNF.

In addition, agency actions that result in consumptive water uses must be in compliance with the Section 7 Agreement and Recovery Implementation Program Action Plan (USFWS 1993) and San Juan Basin Recovery Implementation Program (USFWS 2003) for four endangered fish species found in the Upper Colorado and San Juan River systems (Colorado pikeminnow [*Ptychocheilus lucius*], razorback sucker [*Xyrauchen texanus*], humpback chub [*Gila cypha*], and bonytail [*G. elegans*]).



FS-008242

**Table 2.5.1: Special Status Aquatic Species for the San Juan National Forest**

| Aquatic Special Status Species | Current Status | Species Management Plan |
|---|---|---|
| Colorado River cutthroat trout (*Oncorhynchus clarkii pleuriticus*) | Region 2 Sensitive Species | Conservation Agreement and Strategy for Colorado River Cutthroat Trout in the States of Colorado, Utah, and Wyoming (Colorado River Cutthroat Trout Task Force 2001) |
| Greenback lineage cutthroat trout (*Oncorhynchus clarkii stomias*) | USFWS Threatened | Greenback Cutthroat Trout Recovery Plan (USFWS 1998a) |
| Bluehead sucker (*Catostomus discobolus*) | Region 2 Sensitive | Bluehead Sucker: A Technical Conservation Assessment (USFS 2005b) |
| Flannelmouth sucker (*Catostomus latipinnis*) | Region 2 Sensitive | Flannelmouth Sucker: A Technical Conservation Assessment (USFS 2005c) |
| Roundtail chub (*Gila robusta robusta*) | Region 2 Sensitive | Roundtail Chub: A Technical Conservation Assessment (USFS 2005d) |
| Boreal toad (*Bufo boreas boreas*) | Region 2 Sensitive | Boreal Toad Conservation Plan and Agreement (USFWS 2001b) |
| Downstream big river fishes Note: Four species (razorback sucker, humpback chub, bonytail, Colorado pikeminnow) are not present on the SJNF, but are affected by management actions on the that result in water depletions to the lower basins. | USFWS Endangered | Recovery Implementation Program for Endangered Fish Species In The Upper Colorado River Basin (USFWS 1995), San Juan River Basin Recovery Implementation Program (USFWS 2003), Razorback Sucker Recovery Plan (USFWS 1998b), Bonytail Chub Revised Recovery Plan (USFWS 1990a), Humpback Chub Recovery Plan (USFWS 1990b), Colorado Squawfish Recovery Plan (USFWS 1991) |

## Aquatic Focal Species

Conservation populations of Colorado River cutthroat trout (CRCT) trout are selected as the aquatic focal species for the SJNF (Table 2.5.2). Conservation populations of fish species are defined as having 90% genetic purity or better (CRCT Task Force 2001). The table also lists factors of concern and management issues related to these focal species populations. Focal species are selected primarily to provide information regarding the effectiveness of the LRMP in maintaining diversity of communities and persistence of native species. The SJNF conducts monitoring of focal species at the planning area scale, and that information is used in project-level planning and analysis as appropriate.  Monitoring and evaluation of population trends of these species and their habitats are specifically addressed within the LRMP Monitoring Plan (see Chapter 4, Monitoring Plan).

**Table 2.5.2: Aquatic Focal Species for the San Juan National Forest**

| Focal Species | Factors of Concern | Primary Management Issues |
|---|---|---|
| Conservation Populations of:<br><br>Colorado River cutthroat trout *(Oncorhynchus clarkii pleuriticus)* | Lentic and lotic habitats:<br><br>water quantity, water quality, physical habitat features, invasive species, disease | Effects to water quantity due to water depletions associated with reservoirs, diversions, and oil and gas development.<br><br>Effects to water quality and water temperature due to soil erosion and sedimentation associated with ground-disturbing activities (fuels treatments, oil and gas development, timber harvest, livestock grazing, road construction, and recreation).<br><br>Inadvertent exotic and invasive species introductions. |

## Desired Conditions

2.5.1 Long-term sustainability of aquatic ecosystems is maintained.

2.5.2 Streams, lakes, riparian vegetation, and adjacent uplands provide habitats adequate to maintain healthy aquatic ecosystems capable of supporting a variety of native and desired non-native aquatic communities.

2.5.3 The quantity and quality of aquatic habitats are maintained or enhanced to provide for the long-term sustainability of biological diversity and population viability of all native and/or desired non-native vertebrate species.

2.5.4 Channel characteristics, water quality, flow regimens, and physical habitat features are diverse and appropriately reflect the climate, geology, and natural biota of the area.

2.5.5 An adequate range of stream flow provides for the long-term maintenance of physical habitat features. Channel features, including bank stability, width-to-depth ratio, pool/riffle ratio, pool depth, slope, sinuosity, cover, and substrate composition, are commensurate with those expected to occur under natural ranges of stream flow.

2.5.6 Water flow conditions in streams, lakes, springs, seeps, wetlands, fens, and aquifers support functioning habitats for a variety of aquatic and semi-aquatic species and communities.

2.5.7 Macroinvertebrate diversity and abundance reflect high water quality.

2.5.8 Populations of aquatic species are adequately mobile, genetically diverse, and functionally diverse throughout the planning area.

2.5.9 Aquatic systems are connected in a manner that avoids fragmentation of aquatic habitats and isolation of aquatic species. Connectivity between water bodies provides for all life history functions of aquatic species except where barriers are beneficial and necessary to achieve conservation goals for certain aquatic species.

2.5.10 All native and desired non-native fish species are disease free and thrive in the vast majority of systems historically capable of supporting such species.

2.5.11 Abundant Colorado River cutthroat trout populations are maintained and other areas are managed for increased abundance.

2.5.12 Threats to Colorado River cutthroat trout and its habitat are eliminated or reduced to the greatest extent possible.

2.5.13 The distribution of Colorado River cutthroat trout is increased where ecologically, sociologically, and economically feasible.

## Objectives

2.5.14 Annually evaluate five streams for adequacy of instream flows sufficient to maintain population viability and otherwise achieve LRMP direction.

2.5.15 Annually enhance or restore at least 3 miles of stream habitat to maintain or restore the structure, composition, and function of physical habitat for USFS sensitive species.

2.5.16 Over the life of the LRMP, connect at least 8 miles of fragmented stream habitat to provide for aquatic species movement.

2.5.17 Over the life of the LRMP, establish two self-sustaining meta-populations on NFS lands, each consisting of five separate but interconnected sub-populations. In addition, establish one new

population in each Geographic Management Unit within the historic range (Colorado River Cutthroat Trout Task Force 2001).

## Standards and Guidelines

The following standards and guidelines are designed to maintain ecological integrity and provide for sustainable aquatic ecosystems, maintain biological diversity and manage habitat to maintain viable populations of aquatic vertebrates. These standards and guidelines are not intended to limit or compromise authorities under State and Federal law.

As noted in the introduction to Section 2.5, the USFS will utilize cooperative and collaborative approaches to meet these standards and guidelines. For example, the USFS will work with the Colorado Department of Natural Resources and the Colorado Water Conservation Board, consistent with MOUs that have been established among these parties, to identify and develop potential management options for meeting Standard 2.5.18 and Guideline 2.5.22 that also take into consideration water availability, impacts to water yield, and alternative flow protection programs and tools. The phrase “should occur” in Standard 2.5.18 refers to those aquatic species for which there is evidence of historical occurrence, and is intended to reflect the climate, geology and natural biota of the area, consistent with Desired Future Condition 2.5.4. Determinations of where such species “should occur” shall be made in dialogue with the Colorado Department of Natural Resources.

## Standards

2.5.18 Where native or desired non-native fish species occur, or should occur, a minimum level of aquatic habitat shall be maintained by identifying the minimum flow rates required to support that habitat using at least one of the following four options (2.5.18a–2.5.18d):

2.5.18a. Stream flow in each reach shall be maintained at levels that have been determined using alternate methods and where it can be clearly demonstrated, to the satisfaction of the USFS that said flows will be adequate to achieve the LRMP’s goals and objectives for population viability and sustainable aquatic ecosystems.

2.5.18b. From April 1 through September 30, an instantaneous minimum flow equal to 40% of the average annual flow; from October 1 through March 31, an instantaneous minimum flow equal to 20% of the average annual flow (Tennant 1972).

2.5.18c. Stream flow in riffle habitats shall be maintained at levels that maintain the minimum values for mean water depth, wetted perimeter, and mean velocity, as defined in Table 2.5.3, for each stream size category (e.g., bankfull width).

2.5.18d. Stream flow in each reach shall be sufficient to maintain a minimum of 50% of the weighted usable area, for each life stage of each target species (USFWS 1984). The weighted usable area baseline (100%) will be the amount of habitat that would occur under natural, unaltered flow conditions.

**Table 2.5.3: Metrics Applicable to Standard 2.5.18c**

| Bankfull Width (feet) | Mean Depth (feet) | Wetted Perimeter (%) | Mean Velocity (feet/second) |
|---|---|---|---|
| 1–2 | ≥ 0.2 | 50 | 1.0 |
| 21–40 | 0.2–0.4 | 50 | 1.0 |
| 41–60 | 0.4–0.6 | 50–60 | 1.0 |
| > 60 | > 0.6 | > 60 | 1.0 |

2.5.19 Prior to use in other waters, all agency, partnering agency, and contractor field equipment having had contact with whirling disease waters must be decontaminated using current decontamination procedures.

2.5.20 To prevent the spread of chytrid disease, established decontamination protocols must be used when working in waters and water influence zones for current and historic breeding sites for all sensitive and listed aquatic and amphibious species.

## Guidelines

2.5.21 Agency actions should maintain or improve all existing habitat for designated conservation populations of Colorado River cutthroat trout (Colorado River Cutthroat Trout Task Force 2001).

2.5.22 Minimum pool levels should be established for water storage facilities where aquatic focal species or sensitive species occur.

2.5.23 Except where barriers are beneficial and necessary to achieve conservation goals for certain aquatic species, fragmentation of aquatic habitats and isolation of aquatic species should be avoided.

2.5.24 Sediment delivery to streams occupied by focal species, or threatened, endangered, or sensitive species should be avoided.

2.5.25 Activities that may cause sedimentation to amphibian habitats should be minimized.

2.5.26 Drainage of acid-mine runoff into riparian areas and wetland amphibian habitats should be avoided.

2.5.27 Agency actions should avoid or mitigate impacts within 100 feet of boreal toad (*Bufo boreas boreas*) breeding sites between May 15 and September 30 (breeding season).

2.5.28 Agency actions should maintain or improve hydrologic function and water quality of known and historic breeding sites for all sensitive and listed aquatic and amphibious species to provide for effective habitat.

## Additional Guidance

- FSH 2509.19, Watershed Conservation Practices Handbook
- FSH 2509.25, Watershed Conservation Practices Handbook (Region 2 Supplement)
- FSM 2600, Wildlife, Fish, and Sensitive Plant Habitat Management
- FSH 2609.13, Wildlife and Fisheries Program Management Handbook
- Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development (2007)
- Greenback Cutthroat Trout Recovery Plan (USFWS 1998a)
- Recovery Implementation Program for Endangered Fish Species in the Upper Colorado River Basin (USFWS 1995)
- San Juan River Basin Recovery Implementation Program (USFWS 2003)
- Razorback Sucker Recovery Plan (USFWS 1998b)
- Colorado Squawfish Recovery Plan (USFWS 1991)
- Bonytail Chub Revised Recovery Plan (USFWS 1990a)
- Humpback Chub Recovery Plan (USFWS 1990b)
- Range-wide Conservation and Strategy for Roundtail Chub, Bluehead Sucker, and Flannelmouth Sucker (Utah Department of Natural Resources 2006)
- Conservation Agreement and Strategy for Colorado River Cutthroat Trout in the States of Colorado, Utah, and Wyoming (Colorado Cutthroat Trout Task Force 2001)
- Inventory and Monitoring: Recommended Techniques for Reptiles and Amphibians (Graeter et al. 2013)

- Boreal Toad Conservation Plan and Agreement (USFWS 2001b)
- Fungus Contamination Prevention Guidelines found in CPW Procedures for Monitoring and Surveying Boreal Toad Populations, 2004

Standards and guidelines for aquatic invasive species are also found in Section 2.8, Invasive Species.

# 2.6 Water Resources

## Introduction

The planning area encompasses the headwaters of several large river systems including the San Juan, Piedra, Los Pinos, Florida, Animas, and Dolores Rivers. These river systems are vital resources to several western states. The upper-elevation mountainous areas of the SJNF receive relatively abundant precipitation, and perennial streams, lakes, and other water features are common on the landscape. Lower-elevation lands receive much less precipitation and they generally tend to have fewer (although larger) perennial rivers and more intermittent or ephemeral water bodies.

## Water Quality

Water quality within the planning area is typically good. In the few surface water bodies exhibiting water quality problems, mercury, heavy metals, salinity, and sediment are the common pollutants. The protection of groundwater from pollution sources is a challenging issue in the planning area. Oil and gas development proposals often have potential to impact groundwater.

Water quality within the planning area is protected primarily through project design, BMPs, and other mitigation measures. BMPs are applied in an adaptive management fashion that includes implementing BMPs, monitoring the implementation and effectiveness of the BMPs, and adjusting management actions if the BMPs are found to not adequately protect water quality. Many water quality mitigation measures and additional guidance for the USFS are contained in the Rocky Mountain Region Soil and Water Conservation Practices Handbook, FSH 2509.25.

The highest priorities for improving water quality will be water bodies included on Colorado's Section 303(d) List of Impaired Waters, saline soil watersheds, priority watersheds identified through the Watershed Condition Framework (USFS 2012a), and/or watersheds identified as having the highest level of anthropogenic disturbance (see Volume III, Appendix I). Monitoring the implementation and effectiveness of water quality improvement projects and water quality protection measures will continue to be a required component to meeting the intent of the Clean Water Act throughout the planning area. In compliance with the Colorado River Basin Salinity Control Act, the SJNF will use watershed restoration, stream enhancement, erosion control, and other measures to reduce or prevent salt from entering tributaries of the Colorado River.

## Maintain or Improve Watershed Condition and the Function of Streams and Floodplains

Streams of the SJNF should effectively transport sediment and a natural range of flows, including periodic floods. Streams should also provide aquatic and riparian habitat and support a broad spectrum of recreational opportunities.

Many watersheds throughout the planning area exhibit poor watershed conditions as a result of the cumulative impacts of management activities. For example, high road densities, as well as poor road placement, design, and maintenance, have caused water quality, floodplain, and channel morphology changes in some watersheds. Poor condition watersheds have been identified through the Watershed Condition Framework (USFS 2012a) and the San Juan National Forest Aquatic Ecosystem Assessment (USFS 2006). USFS watersheds of concern are listed in Volume III, Appendix I. Priority watersheds as designated through the Watershed Condition Framework are displayed on the online USFS Watershed Condition Classification map viewer (USFS 2013). Watersheds where integrated restoration efforts have

the best chance of successfully improving impaired watershed conditions or can maintain properly functioning watershed conditions will be given priority for restoration.

## Manage Water Uses

Existing water development projects range in size from small ponds and irrigation ditches to large-scale diversion and storage projects (such as the Dolores Project/McPhee Reservoir). Many of these projects have long-term impacts to aquatic resources within the planning area. Due to increasing public demand, proposals for new water development projects continue to increase. Addressing increasing water demands while, at the same time, maintaining the integrity of aquatic ecosystems may be one of the biggest challenges to public lands management over the next few decades.

Existing non-federal water uses and proposed new uses on SJNF lands are authorized pursuant to applicable federal authorities, current agency policies and directives, and additional consideration given to applicable interagency MOUs and agreements. Surface water and groundwater development authorizations (both new and re-issuances) must contain the necessary terms and conditions to meet terrestrial, aquatic, and/or other resource management desired conditions and objectives as required by the FLPMA.

Where water is necessary for federal uses within the planning area, water rights for consumptive uses will be obtained by the USFS. Federal purposes typically include water for livestock, recreation, aesthetics, facilities, evaporation, irrigation, augmentation and exchange, administrative sites, firefighting purposes, and terrestrial and aquatic wildlife. The successful management of water uses will require extra attention to administrative process and details. One important task will be a monthly review of water rights resumes. The SJNF may engage in proceedings for new water rights applications, change applications, or reassertion of conditional water rights if necessary to protect USFS water rights or natural resources.

When evaluating priorities for flow and habitat protection, streams supporting federally listed species and/or sensitive species, streams that have a high level of recreational use(s), and perennial streams that are currently undeveloped (no existing water developments) will be emphasized.

## Desired Conditions

### *Water Quality*

2.6.1 State water quality standards and anti-degradation rules are met, and state-classified water uses are supported for all water bodies.

2.6.2 Water quality for impaired water bodies on the State of Colorado’s 303(d) list move toward fully supporting state-classified uses.

2.6.3 State “Outstanding Waters” within the planning area maintain the high levels of water quality necessary for this status.

2.6.4 Watersheds within the planning area containing saline soils exhibit stable upland, riparian, and channel conditions that produce water quality as close as possible to reference conditions (as defined in FSH 2509.25); they produce the lowest possible saline contributions to the upper Colorado River (see Volume III, Appendix I for saline watersheds).

2.6.5 Water from SJNF lands will meet applicable drinking water standards when given adequate and appropriate treatment. Management activities throughout the planning area protect and/or enhance the water quality of municipal supply watersheds (as defined in FSM 2542). Enhancement may be achieved by watershed restoration or other activities.



FS-008248

### *Stream Channels and Floodplains*

2.6.6 Stream channel types that naturally build floodplains are connected to their floodplains and riparian areas, maintain the ability to transport overbank flows (which occur on the average every 1.5 years), and are capable of transporting moderate or high flow events.

2.6.7 Physical channel characteristics are in dynamic equilibrium and commensurate with the natural ranges of discharge and sediment load provided to a stream. Streams have the most probable form and the expected native riparian vegetation composition within the valley landforms that they occupy; they function correctly without management intervention.

2.6.8 Historically disturbed and degraded stream channels recover through floodplain development; establishment of riparian vegetation with correct structure, composition, and function; and stable channel geomorphic characteristics.

### *Groundwater Resources*

2.6.9 Aquifers maintain natural conditions of recharge and discharge, especially where they are important to surface features dependent on groundwater for their existence (including caves, karst, springs, seeps, lakes, riparian areas, hanging gardens, wetland ecosystems, fens, and intermittent and perennial streams).

2.6.10 Potentially usable aquifers and water-bearing intervals possessing groundwater of quality and/or quantity that could provide multiple-use benefits and maintain water quality at natural conditions.

2.6.11 Administrative and permitted activities on the SJNF do not contribute to the reduction of surface water or groundwater that supplies seasonal springs, seeps, small ponds, and small wetlands considered most vulnerable to a changing climate.

### *Watershed Conditions, Watershed Scale, and Water Uses*

2.6.12 Upland areas function properly and do not contribute to stream-channel degradation.

2.6.13 The majority of undeveloped and unregulated or free-flowing streams within the planning area are retained in their current undeveloped condition; they provide potential reference conditions and offer unique opportunities for aquatic habitat, recreation, species conservation, and pleasing aesthetics.

2.6.14 The overall function and integrity of streams impacted by water developments are adequately protected for their baseline ecological and recreational values. This is accomplished by providing for adequate stream flows as part of water development planning for existing or new water development projects. This includes sustaining ecological processes dependent on flow within the impacted watersheds.

2.6.15 In unique cases where water is transferred from one catchment to another, water lost (i.e., there is no return flow) from watersheds as a result of water transfer does not adversely alter or impact the aquatic ecology of the watershed or the stream. Conversely, aquatic ecology and stability of the streams and watersheds receiving imported water are not adversely impacted.

2.6.16 All water developments for federal purposes have state water rights, if applicable. The beneficial use of water continues over the implementation life of the LRMP, when the water is available.

2.6.17 All approved water developments that involve the use of SJNF lands are permitted pursuant to applicable federal authorizations.

## Objectives

### *Water Quality*

2.6.18 Work with the selenium task force annually to reduce salt delivery to the upper Colorado River Basin.

2.6.19 Every 5 years rehabilitate 10 or more acres to reduce erosion and sedimentation delivery to water bodies on SJNF lands. Conduct the work in priority watersheds, including those with water bodies listed for sediment impairment or that have total maximum daily loads (TMDLs) established for sediment.

2.6.20 Over the implementation life of the LRMP, actively participate in the development of all of the TMDL determinations and/or other appropriate options for the restoration of State of Colorado 303(d) listed impaired water bodies within the planning area.

2.6.21 Over the life of the LRMP, implement BMPs to minimize management impacts to water quality on SJNF lands. The effectiveness of BMPs will be improved if necessary, through adaptive management.

### *Maintain or Improve Watershed Condition and Stream/Floodplain Function*

2.6.22 Annually, treat approximately 20 acres or more in SJNF priority watersheds in order to improve poor watershed conditions or maintain good watershed conditions. The goal is to move a watershed from an impacted condition class to a better condition class or to maintain a good condition class.

2.6.23 Annually decommission 6 linear miles or more of unneeded routes that may consist of roads and/or trails on SJNF lands Watersheds listed in Volume III, Appendix I could be considered priority for decommissioning efforts. Watersheds designated as priority through the USFS Watershed Condition Framework should also be focus areas for route decommissioning.

### *Managing Water Uses*

2.6.24 Annually acquire new appropriated water rights for 30 USFS water uses (including water rights for livestock, recreation, administrative, or other uses) within the planning area.

2.6.25 Over the implementation life of the LRMP, put all consumptive use water rights owned by the USFS to beneficial use and that use documented.

2.6.26 Based on review of monthly water court resumes, enter into any water court case necessary to protect USFS water rights and water-dependent resources.

2.6.27 Over the life of the LRMP, enforce compliance where the USFS places conditions and other requirements on special use authorizations related to water diversion or storage that are outside the jurisdiction of the Colorado Division of Water Resources.

2.6.28 Over the next 10 years, improve the efficiency of water and energy use at all administrative facilities on the SJNF by using the minimum consumption practicable.

## Standards

2.6.29 Land use activities (new projects, or replacement/retrofitted/reconstructed/reauthorized projects) must not impact potentially useable groundwater quality or quantity to the extent that groundwater-dependent features are adversely affected. Examples of some groundwater-dependent features are springs, seeps, fens, and intermittent or perennial streams.

2.6.30 Activities must not be allowed within aquatic management zones that will cause a long-term change from desired conditions. The protection or improvement of riparian values, water quality, aquatic community, and for long-term stream health in these areas must be emphasized. Aquatic management zones have a minimum horizontal width from the top of each bank of 100 feet or the mean height of the mature late-seral vegetation, whichever is greater.

2.6.31 In all places where technically feasible, pitless, self-contained drilling systems (e.g., closed loop drilling systems) must be used for all leasable fluid minerals wells.

## Guidelines

2.6.32 Roads and trails that are removed from the SJNF transportation network, as well as maintenance level 1 roads (i.e., roads that have been closed to the public but may be used in the future principally for administrative purposes), should be treated sufficiently where no further management intervention would be necessary in order to sustain long-term natural processes. This will avoid future risks to watershed functions, water quality, and/or aquatic habitat. Sufficient treatments may include removal of unstable fills, effective and permanent breaching of drainage ditches, elimination of persistent in-sloped road surfaces; complete removal of stream-crossing structures and associated fills with restoration of floodplains, and the maintenance or restoration of fish passages.

2.6.33 Ditches authorized on the SJNF should maintain a sufficient freeboard above the water line of the ditch to avoid or minimize damage to the ditch or from overtopping. Headgates and conveyance structures should be maintained in good functioning condition and should be clear of sediment and other debris in order to ensure proper operation. The operator should close the headgate at the end of the diversion (e.g., irrigation) season.

2.6.34 Water conveyance structures authorized on the SJNF should be maintained to prevent and control soil erosion and gullying on adjacent lands resulting from operations and maintenance of the structure. Design criteria may include maintaining the ditch channel to prevent downcutting and ditch failure, removal of all obstructions from the channel, and prompt remediation of pipeline breaks and ditch failures, and rehabilitation of any erosion resulting from failure of a water conveyance structure.

2.6.34a Water conveyance structures authorized on the SJNF should allow for the passage of aquatic organisms if there is the potential to obstruct such passage to potential or occupied habitat.

2.6.34b Headgates should contain measurement devices that can be used to determine compliance with land use authorization permits.

2.6.35 As a general practice non-toxic fluid, additives, and other materials should be used for well drilling to protect surface water and groundwater quality.

2.6.36 Exploration and production waste should be disposed of using BMPs that meet state regulations and specific BLM or USFS requirements. Exploration and production waste should be disposed of in such a manner as to not to inhibit reclamation success of the site.

2.6.37 Operators should use proven technologies for the recycling of fresh water, drilling fluids, and produced water for reuse in drilling and completion operations or other beneficial purposes whenever possible.

2.6.38 As individual fields are developed, centralized liquid gathering systems should be used for the delivery and gathering of drilling, completion, and produced fluids such as fresh water, waste/produced water, and condensate.

2.6.39 Water Use and Disposal Management Plans should be included in Plans of Development for fluid minerals projects and solid minerals projects.

2.6.40 Ground disturbance, facilities construction, and incompatible land management activities (those activities that may pose a risk of impacting water quality) on SJNF lands should be prohibited on lands within 1,000 horizontal feet of either side of a classified surface water supply stream segment (as measured from the average high water mark of a water body) for a distance of 5 miles upstream of public water supply intakes for towns, cities, and municipalities. These activities should also be prohibited within a minimum distance of 1,000 horizontal feet for source water protection areas for towns, cities, and municipalities using a groundwater well or spring.

### Additional Guidance

- The Colorado River Basin Salinity Control Act of 1974
- the Clean Water Act of 1977
- EO 11288, 1966
- EO 11752, 1973
- EO 11988, 1977
- EO 11990, 1977
- FSM 2500
- FSH 2500
- MOU between the Colorado Department of Natural Resources and the USFS, 2004
- Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development (2007)
- FSH 2509.13, Burned Area Emergency Rehabilitation
- National Best Management Practices for Water Quality Management on National Forest System Lands, Volume 1: National Core BMP Technical Guide (USFS 2012b)
- MOU between the Colorado Department of Public Health and Environment (CDPHE) and the USFS (USFS 2009a)
- USFS BMPs in FSM 2532 and FS 2509.19
- Region 2 Watershed Conservation Practices Handbook (Region 2 FSH 2509.25-2006-1)

## 2.7 Livestock and Rangeland Management

### Introduction

Livestock grazing initially began in the 1880s to support local mining operations and take advantage of the natural grasslands. As the rate of homesteading increased, and other laws designed to increase the rate of western settlement were passed, livestock numbers on public lands increased. With the creation of the SJNF in 1906, federal livestock management was directed toward allocating forage to local dependent users.

Generally, rangeland management activities from the 1940s through the late1980s were directed toward improving watershed conditions in the West through the use of large amounts of capital and new technology. Rangeland management practices designed to accomplish these goals included increased water development, fencing, brush control practices, reseeding, and the use of intensive grazing systems. It was generally believed that this prescriptive approach would meet management objectives.

From the late 1980s to the present, rangeland management activities have been directed toward improving rangelands through adaptive management. Factors including the increase in big game numbers, the listing of threatened and endangered species, the implementation of hazardous fuels reduction projects, ongoing drought, and persistent water quality issues have all added to management challenges.

Cattle numbers peaked in the 1920s; sheep numbers peaked in the 1930s. Currently, livestock numbers are at 50% and 5%, respectively, of their historic highs. Market factors, administrative actions, and an ongoing drought have all contributed to the USFS not meeting planned levels for permitted use in the past few decades.

## Rangeland Planning

Management decisions and their associated NEPA analyses identify grazing actions, the need for rangeland improvements required to implement a proposed action, appropriate mitigation measures, and necessary monitoring activities so that outcomes trend towards the desired conditions listed below. Adaptive management tools should be used to improve on-the-ground management and respond to changing conditions so that desired conditions are met. Per current policy, NEPA compliance should be completed on all active USFS allotments (as guided by the Rescissions Act of 1995). In addition, periodic reviews of analyses and decisions should be conducted in order to ensure that NEPA-based decisions stay current and sustainable for all permitted livestock grazing.

Management decisions, based on NEPA analyses, may result in the modification and/or development of new AMPs. New AMPs should be completed within 1 year of a grazing decision. Vacant allotments not initially analyzed under Rescissions Act planning or as part of a decision to issue a grazing permit will be evaluated over the implementation life of the LRMP in order to determine their value for restocking, use as forage reserves, altering management, or closure and dedication to other uses or values.

## Rangeland Monitoring

Implementation monitoring, or annual short-term monitoring, determines whether guidelines and management practices are implemented. This will include, but is not limited to, annual allotment monitoring in order to determine if utilization guidelines have been achieved, range improvements have been constructed and/or maintained to standards, actual use has been reported by grazing permittees, and pasture rotations have been followed. Effectiveness monitoring will help managers evaluate whether desired conditions are being achieved. Validation monitoring will help managers evaluate whether the information upon which guidelines and objectives are based is valid and correct. Grazing allotments undergoing NEPA analysis, and effectiveness monitoring on grazing allotments with a current grazing decision, will be monitoring priorities. Annually, effectiveness monitoring will be conducted on at least 10% of active SJNF allotments. All allotments will be monitored on a rotating basis. Monitoring information will be used to make management changes using adaptive management principles.

## Range Improvements

Range improvement projects (including fences, water developments, vegetation improvement projects, etc.) will be implemented, as necessary, in order to move the program toward desired conditions and/or address other resource concerns. These projects will be described and authorized in site-specific NEPA analyses. Range improvements will be prioritized in AMPs based on resource objectives. Per agency policy, prior to implementing projects that require temporary changes to current livestock management (e.g., seeding, prescribed fire, fuel reduction projects), range permittees on the SJNF will receive at least 1 year’s notice. Range betterment funds on SJNF lands are used for projects within range allotments. Grazing allotments with current NEPA decisions should be given the highest priority when considering the use of range betterment funds. Where range improvement projects benefit multiple resources, other funding sources should be considered to complete the project in addition to range betterment funds.

## Suitability and Availability of Lands for Livestock Grazing

The NFMA and the 1982 USFS planning regulations require that NFS lands be identified as suitable or unsuitable for livestock grazing. Using the processes described in the USFS Region 2 Desk Guide, a suitability analysis was conducted for all SJNF lands. It provides a determination of areas generally suitable and capable for livestock grazing

For SJNF lands, 689,628 acres are suitable for cattle, and 183,733 acres are suitable for sheep.

Figures 2.7.1 and 2.7.2 depict lands suitable for livestock grazing across the planning area, and Figure 2.7.3 depicts availability, status and stocking rates on SJNF grazing allotments.

## Desired Conditions

2.7.1 Rangeland provides forage for qualified local livestock operations and helps ranches remain sustainable and intact.

2.7.2 Rangelands and permitted livestock grazing use contribute to the maintenance of large open spaces on private lands.

2.7.3 Permitted livestock grazing fee collections contribute to the local county fund base for roads, schools, and range improvements.

2.7.4 Rangelands provide healthy and sustainable habitat for wildlife populations that, in turn, support recreational hunting, fishing, and/or viewing (thereby contributing to the local and regional economy).

2.7.5 Rangelands provide diverse, healthy, and sustainable plant communities and conserve soil quality.

2.7.6 Suitable rangelands on SJNF lands are meeting desired conditions of affected resources.

2.7.7 The abundance and distribution of native grasses in semi-desert grasslands, sagebrush shrublands, pinyon-juniper woodlands, and semi-desert shrublands do not decrease due to livestock grazing management.

2.7.8 Rangeland management maintains or increases the abundance and distribution of Arizona fescue in ponderosa pine forests.

## Objectives

2.7.9 Annually administer at least 25% of active SJNF grazing allotments to standard on a priority basis ensuring that all active grazing allotments during the life of the LRMP receive appropriate administration. Work with grazing permittees and peers to resolve livestock grazing management issues. Take appropriate administrative action as needed to improve livestock grazing management.

2.7.10 Within 15 years, working with partners and cooperators, reconstruct 25% of priority structural range improvements on SJNF lands in order to maintain infrastructure integrity.

## Standards

### *Livestock Management*

2.7.11 Grazing permit administration in occupied bighorn sheep habitat must utilize measures to prevent physical contact between domestic sheep and bighorn sheep. Permit administration actions may include but are not limited to use of guard dogs, grazing rotation adjustments, or relocation of salting and bed grounds.

2.7.12 Management of domestic sheep must utilize measures to prevent physical contact with bighorn sheep.

### *Rangeland Vegetation*

2.7.13 Project-level NEPA analysis and decisions, and the resultant AMPs, must identify key herbaceous and woody plant species and their respective utilization guidelines.

2.7.14 Project-level design must incorporate habitat needs to satisfy focal species desired conditions and objectives within USFS grazing allotments.

## Guidelines

### *Livestock Management*

2.7.15 Land managers should phase out grazing systems that allow for livestock use in an individual unit during the entire vegetative growth period (season-long), except where such management has been determined to be able to achieve or maintain desired conditions.

2.7.16 If grazing privileges are relinquished or cancelled on SJNF lands where fragile soils, low forage production, low livestock water availability, and/or conflicts with other resources make livestock grazing undesirable, the privileges should not be re-allocated.

2.7.17 Prior to allocating grazing privileges for a new grazing permittee on unallocated grazing allotments, the needs of existing rangeland management, as well as ecological diversity and species viability, should be considered.

2.7.18 Grazing systems should be designed in a manner to provide periodic rest to forage species during the critical growing season in order to promote species diversity, reproduction, and productivity.

2.7.19 Livestock grazing should be avoided during the same time, and in the same place, in consecutive years on NFS lands.

2.7.20 When designing a grazing plan, ongoing and potential forage and browse competition among livestock, big game, and wild horses should be considered.

2.7.21 The designation of grazing allotments to be used as forage reserves should be considered when grazing privileges terminate, if such designations would improve land management as well as livestock management opportunities.

2.7.22 Grazing management activities should be modified in, or livestock excluded from, riparian areas that are “nonfunctional” or “functional-at risk” with a downward trend (as rated by the Proper Functioning Condition protocol), where livestock have been determined to be a key causative agent.

2.7.23 Trailing of livestock should be avoided along riparian areas to the extent practicable.

2.7.24 Rangeland management should incorporate measures to conserve soil quality.

2.7.25 *This guideline was applicable only to BLM lands*.

### *Rangeland Vegetation*

2.7.26 Vegetation management planning should emphasize restoration needs in the sagebrush ecosystem type.

2.7.27 Livestock should be moved from the grazing unit or allotment when utilization guidelines on key areas are met or exceeded, as identified in Table 2.7.1, or as specified in a NEPA decision for the particular allotment’s AMP or annual operating instructions.

**Table 2.7.1: Allowable Use Guidelines by Livestock Grazing Management System**

| Management System | Allowable Forage Utilization Guideline* |
|---|---|
| Season-long | 30% |
| Rotation | 45% |
| Deferred rotation | 50% |
| Rest rotation | 50% |

* Utilization percentages are expressed in terms of annual forage production present at the time the livestock leave the area and are generally a measurement of designated key species on key areas.

2.7.28 The residual riparian vegetation guidelines, as shown in Table 2.7.2, should be met or exceeded at the time the livestock leave the pasture/allotment.

**Table 2.7.2: Post-grazing Vegetation Heights under Different Seasons of Use in Riparian Areas and Wetlands**

| Season of Use | Residual Riparian Vegetation Height* |
|---|---|
| Season-long (i.e., no regrowth potential) | 6 inches |
| Early growing season (i.e., significant regrowth potential) | 3 inches |
| Mid-season (i.e., limited regrowth potential) | 4 inches |
| Late season (i.e., little to no regrowth potential) | 4–6 inches |
| Late fall and winter (i.e., dormant season use) | 6 inches |

* Maximum riparian and wetland allowable use (residue) guidelines to be applied on key sedge or rush species. For riparian areas lacking sedge and/or rush species, use existing herbaceous vegetation utilization guidelines. Consider the duration livestock has access to key areas when setting allowable use guidelines—the shorter the duration, the less the opportunity for repeat grazing of individual plants.

2.7.29 Allowable use, residual vegetation, and other grazing guidelines apply to wildlife, livestock, and wild horses. If allowable use guidelines are exceeded, reductions to livestock forage utilization levels, wild horse numbers, or recommendations for reductions in wildlife numbers should be made.

2.7.30 Based on vegetation type, sheep grazing should be planned to reflect moderate use after grazing. Where appropriate, such as areas outside the aspen-forb type, forage should show that it has been topped and selectively grazed; trampling should be minimal and trailing may be evident, but not common. Within the aspen-forb type trampling and trailing may be evident, but day bedding close to water, as well as well as trailing to and from water, should not be evident.

### *Range Improvements*

2.7.31 Project planning should consider the need to retreat non-structural range improvements.

2.7.32 Livestock grazing use should be deferred following vegetation treatments, such as prescribed fire or wildfire, until recovery objectives are met, or it is demonstrated that such use would not be detrimental.

2.7.33 Where appropriate, and where the appropriate kind and class of livestock are available, livestock grazing should be considered as an invasive species management tool.

2.7.34 Wildlife needs should be considered in the design of structural and non-structural range improvements.

2.7.35 *This guideline was applicable only to BLM lands*.

## Additional Guidance

- Taylor Grazing Act of 1934, as amended
- Public Rangelands Improvement Act of 1978
- Multiple-Use/Sustained- Yield Act of 1960
- Wilderness Act of 1964, Section 4(4)
- Section 504 of the Rescissions Act of 1995
- Consolidated Appropriations Resolutions, 1999–2003
- Colorado Public Land Health Standards EA and Finding of No Significant Impact (FONSI), 1997
- 36 CFR 222 Subpart A
- FSM 2200
- FSM 1950
- FSH 1905.15, Environmental Policy and Procedures Handbook
- FSH 1909.17, Economic and Social Analysis Handbook
- FSH 2509.13, Burned Area Rehabilitation Handbook
- FSH 2509.25, Watershed Conservation Practices Handbook
- FSH 2409.19, Renewable Resource Uses for Knutson-Vandenberg (K-V) Fund Handbook
- FSH 2109.13, Grazing Permit Administration Handbook
- USFS Rocky Mountain Region Rangeland Analysis and Management Training Guide (USFS 1996a)
- Interagency Technical References




**Figure 2.7.1: Lands Suitable and Capable for Cattle Grazing**




**Figure 2.7.2: Lands Suitable and Capable for Sheep Grazing**




**Figure 2.7.3: Available Grazing Allotments and Comparative Stocking Rates**

## 2.8 Invasive Species

### Introduction

Within the planning area, invasive plants are currently managed in accordance with an Invasive Species Action Plan (2012). This plan, which covers a 3- to 5-year time frame, lists prevention practices, early detection and rapid response strategies, and priority inventory and treatment areas. All resource areas participate in invasive species management within the planning area. Invasive terrestrial wildlife species, as well as aquatic invasive species, have the potential to out-compete native species using similar niches within the ecosystem. These changes may result from influences to the biotic (relating to, produced by, or caused by living organisms, such as plant or animal) and abiotic (non-living chemical and physical factors in the environment, such as soils, hydrology, etc.) components of the ecosystem. The resulting changes may allow invasive species to directly or indirectly impact the native species and their related ecosystems.

Invasive species move across jurisdictional boundaries and property lines; therefore, LRMP implementation will involve close coordination and partnerships with local, state, other federal agencies, and tribal governments; as well as with interested organizations and individuals. Partners and contractors will be considered when implementing invasive treatment activities.

Coordination with CPW when addressing aquatic invasive species is particularly important. The USFS will cooperate with CPW to regularly determine the extent of aquatic invasives populations, develop prevention and early detection efforts, and develop appropriate management plans to eradicate or manage invasive aquatic species.

It is equally important that special use permittees and other permittees be made aware of prevention and mitigation measure regarding aquatic invasive species. In addition, Resource Advisors should also be able to provide Incident Management Teams with local, site-specific information addressing aquatic invasive species locations and appropriate mitigation measures.

### Desired Conditions

2.8.1 Invasive species management is coordinated with adjacent landowners.

2.8.2 Federal lands have a transportation system composed of specific roads and trails that do not contribute to the spread of invasive species along travel corridors.

2.8.3 Invasive species, both terrestrial and aquatic, are absent or rare within the planning area, and are not influencing native populations or ecosystem function.

2.8.4 Invasive species are not introduced or spread within protected areas.

2.8.5 Management activities do not contribute to the spread of invasive annual plants or other invasive species.

### Objectives

2.8.6 Within 15 years, contain priority Class B invasive species on SJNF lands identified in the Invasive Species Action Plan.

2.8.7 Within 15 years, increase annual treated acres of noxious weeds to 10% of known acres infested on SJNF lands.

2.8.8 Within 15 years, annual backcountry treatment (including wilderness areas and WSAs) is 10% to 15% of the total annual noxious weed treatment target on SJNF lands.

2.8.9 Over the life of the LRMP eradicate newly established invasive species especially Colorado Class A noxious species on SJNF lands.

## Standards

2.8.10 Projects or activities that would authorize the use of forage products must use certified noxious weed seed-free forage products.

2.8.11 Invasive species must be managed using integrated weed management principles.

2.8.12 The SJNF must include provisions that are necessary to prevent the spread of and to control the introduction of invasive species in contracts and permits for use of SJNF lands and resources.

## Guidelines

2.8.13 Cleaning facilities and associated educational materials should be developed for boating areas in cooperation with CPW or other state and local regulatory agencies.

2.8.14 Wildland fire operations should follow direction provided in Interagency Standards for Fire and Fire Aviation Operations (NFES 2724; USFS et al. 2013) under the Operational Guidelines for Aquatic Invasive Species section to prevent the introduction and spread of aquatic invasive species.

2.8.15 Project planning and implementation should consider the need to prevent the introduction and spread of aquatic invasive species. The SJNF Invasive Species Action Plan (USFS et al. 2012) provides a useful reference for appropriate management and mitigation measures.

2.8.16 High risk aquatic invasive species areas should be a priority for inventory and monitoring activities.

2.8.17 Proper equipment (e.g., vehicles, waders), cleaning techniques, and chemicals should be used as necessary to prevent the spread and establishment of aquatic invasive species.

2.8.18 For all proposed projects or activities, the risk of invasive aquatic and plant species introduction or spread should be determined and appropriate prevention and mitigation measures implemented.

## Additional Guidance

- EO 13112
- Carson-Foley Act of 1968
- Federal Noxious Weed Act of 1974
- Public Rangelands Improvement Act of 1978
- Plant Protection Act of 2000
- Healthy Forests Restoration Act of 2003
- Wilderness Act of 964, Section 2 (c)
- Federal Insecticide, Fungicide, and Rodenticide Act of 1972
- Cooperative Forestry Assistance Act of 1978
- Resource Conservation and Recovery Act of 1976
- CERCLA
- Management and Control of Noxious Plants on the San Juan/Rio Grande National Forests, Decision Notice and FONSI (USFS 1996b)
- FSM 2200
- FSM 2080
- FSH 2109.14, Pesticide Use-Management and Coordination Handbook
- FSH 2509.13, Burned Area Rehabilitation Handbook
- FSH 2509.25 Watershed Conservation Practices Handbook
- FSH 2409.19, Renewable Resource Uses for Knutson-Vandenberg (K-V) Fund Handbook

- Rules Pertaining to the Administration and Enforcement of the Colorado Noxious Weed Act (8 CCR 1203-10)
- USFS National Strategy and Implementation Plan for Invasive Species Management (FS-805-2004) (USFS 2004f)
- USFS Guide to Noxious Weed Prevention Practices (Version 1.0) (USFS 2001b)

## 2.9 Timber and Other Forest Products

### Introduction

The timber management program on the SJNF has followed the trend of many other national forests with regard to harvest levels. The SJNF was a source for timber products to meet demand early in the twentieth century in support of mining and settlement, with another spike in harvesting following World War II. The highest harvest levels occurred in the early 1970s when 50 to 75 million of board feet (MMBF) of timber were sold annually. Since that time, harvesting levels have continued to decline, and many larger local mills have closed. Annual timber sales recently have averaged about 10 MMBF. The planning area includes aspen, which has been actively managed since the 1940s.

The forest products industry continues to be very important to communities near the planning area. Currently, several wood processing facilities are located in Montezuma County, including Western Excelsior Corporation, Aspen Wall Wood, and the Stoner Top Sawmill. A new facility is under design, expected to be constructed in the Pagosa Springs area in 2013–2014, to process wood chips and mill cants. These facilities use/will use a variety of products (sawtimber, poles, miscellaneous biomass) and species (various conifer and aspen). Although the level of timber harvesting has declined in the past decade, ecologically based desired conditions in forested areas are, in large part, dependent on the timber program and the capacity of the timber industry to change vegetation conditions. Without the timber industry, the ability to manage vegetation would be significantly reduced. Commercial timber harvesting is an important tool for managing vegetation on the SJNF, and forest product firms provide economic balance to their respective communities.

There are many opportunities for vegetation management and for meeting the demand for products by wood-processing industries. However, the feasibility of these opportunities depends on future program levels and on forest products industry capacity and market demand. The timber program across the SJNF will focus treatment in:

- landscapes in the WUI that have altered fire regimes and/or have areas with high fuel loadings;
- landscapes at high risk for developing epidemic levels of insect and/or disease infestation;
- landscapes where disturbance (such as fire, or insects/disease) has resulted in dead or dying trees;
- areas where vegetation management could most effectively move age classes, size classes, density, and species closer to desired conditions;
- areas treated previously in order to maintain sustainable conditions and improve scenic integrity; and
- areas where wood processing facilities can effectively and economically utilize products resulting from vegetation management.

Strategies to meet forest vegetation management objectives across the SJNF include:

- utilization of forest resources from vegetation management activities, including providing small-diameter and biomass products from treatments in order to support emerging biomass markets;
- trees killed by fire, insects, disease, or weather events (such as wind-thrown trees);
- a balance of forest product quantity, size, species and quality in order to maintain forest products industry capacity at current or higher levels;
- integration of the timber and fuels programs to meet overlapping or common goals; and

- a combination of legal authorities and partnerships to broaden opportunities for meeting forest vegetation objectives, in priority landscapes or areas, with cost-effective treatments.

## Timber Product Outputs

The Timber Sale Program Quantity (TSPQ) is an estimate of annual average output of timber from the SJNF during the first decade under this LRMP based on expected budget levels, industry capacity, and other public and resource objectives. The intent is to provide a stable, predictable, and sustainable supply of wood that will contribute to a stable, sustainable, and diverse forest products industry, while concurrently meeting public demand for fuelwood and other objectives for vegetation management. The TSPQ is a combined program of timber management treatments from USFS lands designated as “Suitable for Timber Production” and other lands. Table 2.9.1 presents the volumes to be offered for sale, summarized by conifer and aspen.

The SJNF has a program of vegetation management in which timber sales are offered based on capability determined by the LTSYC, which is defined as the highest uniform wood yield that may be sustained under specified management intensities consistent with multiple-use objectives after stands have reached desired conditions. The LTSYC for both “Lands Suitable for Timber Production” and other lands are displayed in Table 2.9.2.

**Table 2.9.1: Estimated Volume Produced by the Timber Sale Program Quantity on San Juan National Forest Lands, Annual Average in the First Decade**

| TSPQ | Lands Suitable for Timber Production | | | | Other Lands | | | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Sawtimber | | Products other than Logs | | Sawtimber | | Products other than Logs | | | |
| | MMCF | MMBF | MMCF | MMBF | MMCF | MMBF | MMCF | MMBF | MMCF | MMBF |
| Aspen | | | 1.12 | 5.61 | | | 0.12 | 0.59 | 1.24 | 6.20 |
| Conifer | 1.05 | 5.26 | | | 0.07 | 0.36 | | | 1.13 | 5.63 |
| Total | | | | | | | | | 2.37 | 11.83 |
| MMCF = million cubic feet. | | | | | | | | | | |

**Table 2.9.2: Estimated Annual Long-Term-Sustained-Yield Capacity on San Juan National Forest Lands, Annual Average**

| | Lands Suitable for Timber Production | | Other Lands | |
|---|---|---|---|---|
| | MMCF/Year | MMBF/Year | MMCF/Year | MMBF/Year |
| LTSYC | 8.54 | 35.55 | 1.82 | 7.03 |
| Allowable Sale Quantity | 4.0 | 19.9 | | |
| MMCF = million cubic feet. | | | | |

## Timber Suitability

Timber suitability is determined through a process established through the NFMA and planning regulations. This process first identifies lands not suitable for harvest by excluding areas where 1) site conditions preclude tree cover, 2) harvest is prohibited by statute or regulation (e.g., wilderness), 3) irreversible resource damage could occur from timber harvest (e.g., steep or unstable slopes), and 4) adequate restocking, with trees, following harvest is not assured. The SJNF contains 1,157,820 acres not suitable for timber production. Lands remaining after this exclusionary process are deemed “tentatively suitable.” These remaining lands are broken into two classes: 1) lands suitable for timber production (“suitable timberlands”) and 2) “other tentatively suitable lands where timber harvest may occur” for multiple-use objectives other than timber production. The SJNF contains 303,740 acres of suitable timberlands, and 403,558 acres of other tentatively suitable lands where timber harvest may occur. Figure 2.9 displays these areas.

## Desired Conditions

2.9.1 Forest vegetation management on SJNF lands that results in, among other objectives, meeting needs or demands for forest product offerings (commercial, personal, or other use) is done in a manner that:

- maintains or improves ecosystem function, resilience, and sustainability;
- supports, at least, the current level of economic activity in the local timber industry;
- provides economic or social support to local communities;
- ensures current and future needs for Native American tribal use, including that associated with special forest products (e.g., teepee poles);
- utilizes, to the fullest extent practicable, potential products including sawtimber, poles, topwood, or slash (e.g., limbs, foliage);
- supports innovation in utilization, including conversion of cut-tree mass into biofuels, pellets, biochar, or other useful products;
- efficiently balances or reduces costs of implementation of treatment activities; and
- anticipates climate-related plant succession changes (such as favoring heat- or drought-resistant tree species as leave trees, or in reforestation).

2.9.2 SJNF lands classified as “suitable” for timber production have a regularly scheduled timber harvesting program (see Figure 2.9).

2.9.3 SJNF lands classified as “not suitable” for regularly scheduled timber production (but where timber harvesting could occur for other multiple-use purposes) have an irregular, unscheduled timber harvesting program (see Figure 2.9).

2.9.4 Reforestation activities on SJNF lands use native tree species germinated from locally collected seed stock to improve the resiliency of forest ecosystems.

## Objectives

2.9.5 The most common applications of timber harvest, to meet desired conditions, will include:

2.9.5a Within 10 years, conduct thinning—with an emphasis on restoration and fuels reduction of altered forest types—in the ponderosa pine and warm-dry mixed conifer vegetation types on approximately 15,000 to 20,000 acres of SJNF lands.

2.9.5b Within 10 years, emphasize selection harvests in cool-moist mixed conifer and spruce-fir vegetation types on approximately 2,500 to 5,000 acres of SJNF lands.

2.9.5c Within 10 years, utilize coppice harvest (clearcuts with regeneration by sprouting) in aspen and cool-moist mixed conifer forest types on approximately 4,000 to 5,000 acres of SJNF lands.

2.9.6 Meet or exceed average annual timber product offerings from SJNF lands to local timber industries, publics, and other users (including Native Americans), as displayed in Tables 2.9.1 and 2.9.2 above, over the life of the LRMP.

2.9.7 Every 3 years evaluate utilization of forest products from SJNF contracts and permits that result in product sales or usage, including biomass.

2.9.8 Every 3 years compare, contrast, and evaluate costs of implementation of timber management projects.

2.9.9 Every 3 years review silvicultural prescriptions for incorporation of strategies that anticipate potential plant succession changes relative to warmer and/or drier forested conditions.

2.9.10 Every 10 years assess timber suitability for forested lands on the SJNF.

2.9.11 Annually review seed inventories to ensure adequate seed from locally collected native tree species is available for planned reforestation activities on SJNF lands.

## Standards

2.9.12 Regulated timber harvest activities will occur on only those SJNF lands classified as "suitable" and "scheduled" for timber production. On unsuitable or suitable but not scheduled lands, limited timber cutting may occur for such purposes as salvage, protection or enhancement of biodiversity or wildlife habitat, scenic-resource management, or research or administrative studies consistent with Management Area (MA) direction.

2.9.13 Timber will be harvested from suitable for production SJNF lands only where there is assurance lands can be adequately restocked within 5 years after harvest. No minimum seedling height requirements are specified. Seedlings must have survived a minimum of 1 year and be expected (on the basis of research and experience) to be able to produce the desired future stand condition specified for this area in the LRMP. The number of seedlings in Table 2.9.3 represents the minimum number of seedlings required, considering natural mortality, to produce a merchantable timber stand at rotation age without intermediate treatments for even-aged management on lands scheduled for timber production. Silvicultural prescriptions must specify the minimum stocking requirements for uneven-aged management, or regeneration harvests on lands not scheduled for timber production, to achieve appropriate forest cover.

**Table 2.9.3: Minimum Number of Seedlings (or aspen suckers) for Adequately Restocking of a Regeneration Site**

| Vegetation Type | Minimum Numbers of Seedlings (per acre) |
|---|---|
| Spruce-fir | 150 |
| Aspen | 300 |
| Mixed conifer | 150 |
| Ponderosa pine | 150 |

2.9.14 The silvicultural systems shown, by forest vegetation type in Table 2.9.4, that meet the management objectives for the landscape or individual stands of trees within a landscape setting are acceptable. Both even- and uneven-aged management systems can be used and applied at scales ranging from a few acres to many hundreds of acres. These silvicultural systems are to be applied in a manner that will ensure natural regeneration where artificial regeneration is not necessary for other resource objectives. Tree-stand vegetation management treatments must be approved by certified silviculturists.

**Table 2.9.4: Appropriate Silvicultural Systems by Forest Vegetation Type**

| Forest Vegetation Type | Even-aged | Two-aged | Uneven-aged |
|---|---|---|---|
| Ponderosa pine | Shelterwood; seed tree | Irregular shelterwood | Group selection; single-tree selection |
| Warm-dry mixed conifer | Shelterwood; seed tree | Irregular shelterwood | Group selection; single-tree selection |
| Cool-moist mixed conifer | Shelterwood; clearcut seed tree | Irregular shelterwood | Group selection; single-tree selection |
| Aspen with conifer | Shelterwood; clearcut; coppice* | Irregular shelterwood; coppice with standards** | Group selection; single-tree selection |
| Aspen | Coppice | Coppice with standards | Group Selection |
| Engelmann spruce – subalpine fir | Shelterwood | Irregular shelterwood | Group selection; single-tree selection |

*Clearcut, if intent is to regenerate with conifer; coppice (vegetative reproduction with “clear felling” to stimulate aspen sprouting from residual roots) if the intent is to regenerate aspen.
**Standards are selected overstory trees reserved for a longer rotation at the time each crop of coppice material is cut.

2.9.15 The maximum size of openings created by even-age management on SJNF lands will be 40 acres, regardless of forest type, with the following exceptions:

- proposals for larger openings may be approved by the Regional Forester, subject to a 60-day public review;
- where larger openings are the result of natural catastrophic conditions (including those resulting from fire, insect or disease attack, or windstorm); or
- where the area that is cut does not meet the definition of created openings.

2.9.16 Artificially created openings on SJNF lands will no longer be considered openings when the trees reach a height and density that meets management objectives. The default criteria are when the minimum stocking standards for the forest vegetation type are met and the average height is 6 feet or greater with at least a 70% distribution for conifer species and 10 feet or greater with at least a 70% distribution for aspen. The criteria will be validated and may be modified based upon local conditions encountered during implementation. Criteria to consider in determining when an opening is no longer an opening include:

- visual sensitivity of the area;
- the character of the landscape;
- the abundance, quality, and need for cover for big game animals;
- other vegetation that may be present (such as tall shrubs);
- forest health;
- the need for seed sources;
- the need for interior forest area;
- the production of wood fiber; and
- watershed and riparian area protection.

## Guidelines

2.9.17 Table 2.9.5 shows the acceptable types of stand improvements and regeneration methods that should be used in a given forest vegetation type in order to meet the management objectives for the landscape and/or for individual stands of trees within a landscape setting.

**Table 2.9.5: Guidelines for Allowable Stand Improvements and Regeneration Methods by Forest Vegetation Type**

| Forest Vegetation Type | Stand Improvements | Regeneration Methods |
|---|---|---|
| Ponderosa pine | Pre-commercial thin, Commercial thin, Sanitation, Release and weed, Improvement cuts | Natural<br>Artificial |
| Warm-Dry mixed conifer | Pre-commercial thin, Commercial thin Sanitation, Release and weed, Improvement cuts | Natural<br>Artificial |
| Cool-Moist mixed conifer | Pre-commercial thin, Commercial thin Sanitation, Release and weed, Improvement cuts | Natural<br>Artificial |
| Aspen with conifer | Commercial thin<br>Sanitation, Release and weed, Improvement cuts | Natural<br>Artificial |
| Aspen | Sanitation<br>Improvement cuts | Natural |
| Engelmann spruce – subalpine fir | Commercial thin<br>Sanitation, Release and weed<br>Improvement cuts | Natural<br>Artificial |

2.9.18 Regeneration harvests of even-aged timber stands (sites) on SJNF lands should not be undertaken until the stands have generally reached or surpassed 95% of the culmination of the mean annual increment measured in cubic feet. Exceptions may be made where resource management objectives or special resource considerations require earlier harvest, such as:

- stands in imminent danger from insect or disease attack;
- wildlife habitat improvement;
- scenery resource enhancement or rehabilitation;
- ecosystem restoration; and
- areas managed for Christmas tree production.

2.9.19 USFS Utilization Standards for live and dead trees are shown in Table 2.9.6 and should be followed.

**Table 2.9.6: U.S. Forest Service Utilization Standards[1]**

| Type of Product | Minimum Diameter at Breast Height | Top Diameter | Minimum Length (feet) | Merchantability Factor |
|---|---|---|---|---|
| **Live Trees** | | | | |
| Coniferous sawtimber | 7–9 | 6 | 8 | 10.67 |
| Products other than sawtimber | 5 | 4 | 6.5 | Variable |
| **Dead Trees** | | | | |
| Sawtimber | 8–12 | 6–10 | 8-16 | 10.67 |
| Products other than sawtimber | 5 | 4 | 6.5 | Variable |

[1]FSH 2409.12 - Timber Cruising Handbook

Case No. 1:23-cv-01501-RMR Document 20-1 filed 09/29/23 USDC Colorado pg 36 of 183






**Figure 2.9: Timber Suitability**



FS-008269

### Additional Guidance

- 36 CFR 221, Timber Management Planning
- 36 CFR 223, Sale and Disposal of National Forest System Timber
- FSM 1920, Land Management Planning
- FSM 2400, Timber Management
- FSM 3400, Forest Pest Management
- FSH 1900 Planning
- Timber sale contract provisions and procurement contracts

## 2.10 Insects and Disease

### Introduction

Natural disturbances on SJNF lands (including fire, insects, diseases, and weather events) play a fundamental role in shaping ecosystems at the stand scale and in creating the heterogeneous pattern of vegetation communities at the landscape scale. Fire is generally viewed as having the greatest potential to impact SJNF lands, but, in actuality, many more trees are killed—and a larger area is influenced—by insects and disease, as recently evidenced by the pinyon Ips beetle (*Ips confusus*) epidemic of 2001–2004, which killed up to 90% of pinyon pine trees in the pinyon-juniper woodlands of southwest Colorado (Colorado Department of Natural Resources 2005), the ongoing spruce beetle (*Dendroctonus rufipennis*) epidemic that has killed many to most mature Engelmann spruce across an estimated 130,000 acres of the SJNF from 1996 to 2012 (Rocky Mountain Region 2012), or the other observed multi-year spikes in mortality in Douglas-fir, white fir, or aspen from bark beetles, or beetles combined with disease, since 2004.

Insects and diseases (which tend to be species-specific and often attack plants that have been weakened by other disturbances such as drought) affect tree growth, fire potential, nutrient cycling, and the composition and structure of the vegetation (Schmid and Mata 1996). At endemic levels, native insects have little impact on forest structure. At epidemic levels, insects can cause tree mortality across whole landscapes. Diseases generally increase gradually or remain at similar levels over time (Rocky Mountain Region 2010). Diseases often weaken trees, making them more susceptible to bark beetle attack. Defoliators, such as western spruce budworm (*Choristoneura occidentalis*), can cause substantial damage outside periods of drought when and where favorable moisture and stand conditions result in abundant host habitat.

Insects that can have a significant impact on forest stands on SJNF lands include spruce beetle, Douglas-fir beetle (*Dendroctonus pseudotsugae*), western pine beetle (*D. brevicomis*), mountain pine beetle (*D. ponderosae*), fir engraver beetle (*Scolytus ventralis*), and western spruce budworm (*Choristoneura occidentalis*). Other insects that impact the planning area include Douglas-fir pole beetle (*Pseudohylesinus nebulosus*), western balsam bark beetle (*Dryocoetes confusus*), engraver beetle (*Ips* sp.), roundheaded pine beetle (*D. adjunctus*), pinyon twig beetle (*Pityophthorus* sp.), aspen bark beetles (*Tryphloeus populi and Procryphalus mucronatus*), bronze poplar borer (*Agrilus liragus*), poplar borer (*Saperda calcarata*), western tent caterpillar (*Malacosoma californicum*), large aspen tortrix (*Choristoneura conflictana*), and aspen leaf miner (*Phyllocnistis populiella*). Grasshoppers (various species) and Mormon crickets (*Anabrus simplex*) can also become pests through periodic population increases.

Diseases that have a significant impact on forest stands on SJNF lands include shoestring root rot (*Armillaria ostoyae*), Indian paint fungus (*Echinodontium tinctorium*), red ring decay (*Phellinus pini*), white trunk rot (*P. tremulae*), fir broom rust (*Melampsorella caryophyllacearum*), annosus root rot (*Heterobasidium annosum*), Douglas-fir dwarf mistletoe (*Arceuthobium douglasii*), Southwestern dwarf mistletoe (*A. vaginatum* ssp. *cryptopodum*), pinyon pine dwarf mistletoe (*A. divaricatum*), sooty bark canker (*Encoelia pruinosa*), hypoxylon canker (*Hypoxylon mammatum*), black canker (*Ceratocystis fimbriata*), cytospora canker (*Valsa sordida*), and black stain root fungus (*Leptographium wageneri*).

## Desired Conditions

2.10.1 Terrestrial ecosystems have age- or size-class diversity and compositional diversity that make them resistant to insect and disease outbreaks.

2.10.2 Insect and disease processes and cycles are similar to those that occurred during the reference period (HRV conditions) in MA 1.

2.10.3 Epidemic outbreaks are rare after management actions have been completed.

2.10.4 Mortality of aspen trees in high value aspen forests due to sudden aspen decline is significantly reduced.

## Objectives

2.10.5 Within 5 years, use coppice timber treatments or prescribed fire to regenerate 500 to 1,000 acres of low-elevation aspen forests that are experiencing sudden aspen decline on SJNF lands.

2.10.6 Within the next 10 years, reduce the risk of mortality due to bark beetles by increasing the mature-open development stage of ponderosa pine forests by 20,000 to 40,000 acres by using timber harvest and prescribed fire in the mature-closed development stage of ponderosa pine forests on SJNF lands.

2.10.7 Within 10 years, continue with treatment of developed recreation facilities, ski areas, and administrative sites to reduce susceptibility and hazards from insect and disease incidence, and increase long-term forest health, vigor, and resiliency on SJNF lands.

## Additional Guidance

- FSH 2509.13, Burned Area Emergency Rehabilitation
- FSH 2509.25, Watershed Conservation Practices Handbook (Region 2 Supplement)

# 2.11 Fire and Fuels Management

## Introduction

The 1995 Federal Wildland Fire Management Policy (USDA and USDI 1995, updated 2001) contains policies that set the overall direction for federal fire agencies with regards to fire management. The policy requires fire management plans (FMPs) that are integrated with the resource management plans for the USFS.

The National Fire Plan, a joint planning effort by the USDA and the USDI aimed at reducing immediate hazards to communities in the WUI and ensuring agency preparedness for extreme fire conditions, was completed in 2001 (USDI and USFS 2001). In 2004, the San Juan Public Lands Center developed a strategy to accelerate its efforts to implement watershed and vegetation restoration components of the National Fire Plan in its Accelerated Watershed/Vegetation Restoration Plan.

The San Juan National Forest/Tres Rios Field Office Fire Management Plan (FMP) is a strategic plan defining the fire management program based on the SJNF's desired conditions and objectives. The FMP addresses strategies for all aspects of fire management activities, including implementation tiered from the National Fire Plan (USDA and USDI 2001a) and Accelerated Watershed/Vegetation Restoration Plan. The response to wildland fire, regardless of ignition source or location, is set forth in the FMP and addresses a full range of fire management activities that support ecosystem sustainability, values to be protected, firefighter and public safety, and environmental issues.

The LRMP defines the role of wildland fire and fire management activities covered by the FMP. This LRMP will result in an update or revision of the FMP. Within the FMP are goals, strategies, and

guidelines relating to fire based on the overall direction of, and compatibility with, the LRMP. The FMP relies on a cooperative and collaborative process with other federal, state, and local agencies, fire managers, and other stakeholders to develop and implement consistent fire planning. Such planning will include defining Fire Management Units and providing the appropriate management response for all wildland fire starts that are consistent with desired conditions and resource objectives on the SJNF.

Ecological and social trends posing management challenges include the following:

- Many of the ponderosa pine and warm-dry mixed conifer vegetation types are out of their HRV for fire frequency since they have missed many cycles of fire, which makes them very susceptible to large scale destructive wildfires.
- The SJNF, like the rest of the West, is facing an expansion of rural development in or near forested areas, making fire and fuels management a critical program for federal agencies to manage.
- Requirements and/or constraints associated with prescribed fire are common, collectively making proactive use of fire for ecological benefit more challenging.

The use of wildland fire, along with mechanical and other fuels management strategies, should create forest conditions that meet desired conditions for the vegetation types within the planning area. Providing appropriate response to all wildfires and allowing fire to perform its natural role in the ecosystem, as much as possible, will be an integral part of the program emphasis. Recognizing that effective fire management spans jurisdictional boundaries, the fire and fuels program will also continue to partner with, and assist, local jurisdictions and communities in order to develop community wildfire protection plans designed to reduce the risk of wildfires.

## Desired Conditions

2.11.1 Firefighter and public safety concerns are met for all fire management and fuel treatment projects.

2.11.2 Wildfire behavior in the WUI (in and around developed areas and communities) does not result in damage to property and protects public safety.

2.11.3 Wildland fire management maintains a balance between fire suppression and use of wildland fire (including both prescribed fire and natural ignitions) to regulate fuels and maintain forest ecosystems in desired conditions.

2.11.4 Use of wildland fire and fuels reduction treatments creates vegetation conditions that reduce the threat to real property and infrastructure from wildfire.

2.11.5 The WUI will have defensible space and dispersed patterns of fuel conditions that favorably modify wildfire behavior and reduce the rate of wildfire spread in and around communities at risk.

2.11.6 Major vegetation types reflect little or no departure from historic range of variation of fire frequency and intensity (e.g., reflect Fire Regime Condition Class 1).

2.11.7 Planned and unplanned fire ignitions are used to increase resiliency and diversity across all forest and rangeland vegetation types.

2.11.8 Fire is reintroduced to increase the resistance and resiliency of the warm-dry mixed conifer and ponderosa pine forest types in landscape such as the Hermosa and Piedra areas.

2.11.9 The occurrence of low elevation fires burning upward into spruce-fir forest will increase over time to promote the heterogeneity of spruce-fir forests.



FS-008272

## Objectives

2.11.10 Annually, for the next 10 years, complete an average of 7,000 acres of SJNF hazardous fuels reduction in the WUI.

2.11.11 Annually, for the next 10 years, complete an average of 4,000 acres of fuels reduction and resource enhancement using fire managed for resource benefit on SJNF lands.

2.11.12 Include evaluations for immediate suppression, management for resource benefit, or a combination of both actions for wildland fire response on both SJNF lands.

## Standards

2.11.13 Natural fire ignitions will be used, when feasible, to reintroduce fire into fire-adapted and dependent ecosystems. Fire for ecological benefit will be used as a resource management tool where and when allowed.

2.11.14 Restoration and recovery in areas, when possible, must be provided where critical resource concerns merit rehabilitation for controlling the spread of invasive species, protecting areas of cultural concern, or protecting critical or endangered species habitat.

## Guidelines

2.11.15 The response to wildland fire, including the role of natural fire, should be evaluated as described in Table 2.11.1 on SJNF lands.

**Table 2.11.1: Fire Management Direction for San Juan National Forest Lands**

| Management Area | Unplanned Ignitions | Wildland Fire Tactical Options | Planned Ignitions[c] |
|---|---|---|---|
| 1 | x[a] | x | x[b] |
| 2 | x[b] | x | x[b] |
| 3–8 | x | x | x |

[a] Within designated wilderness areas and the Piedra Area, dozers are prohibited (except with Regional Forester approval). Use of helicopters, motorized equipment, and/or mechanical transport is prohibited (except with Forest Supervisor/ District approval). Within other MA 1 areas, dozers are prohibited except with Forest Supervisor/Field Office Manager approval. Chainsaws, engines, ATVs, and pumps are allowed without Forest Supervisor approval.

[b] Mechanical equipment and prescribed fires in RNAs and cultural significant areas would have to be compatible with the overall purposes and objectives for those areas.

[c] Planned ignitions may be implemented by management action authorized by approved plans.

2.11.16 Seeding and other site rehabilitation practices should be provided, as necessary, on wildland fire and managed wildland fire areas. Fire suppression support activities and facilities (including constructed fire lines, fuel breaks and safety areas, fire camps, staging areas, heli-bases, and heli-spots), as well as mechanical and prescribed fire treatment areas, should follow the same site rehabilitation practices.

2.11.17 Aerial application of retardant in live water, wetlands, and riparian areas should be avoided unless necessitated by human safety or property loss considerations.

## Additional Guidance

- FSM 5100, Fire Management
- FSM 5110, Wildfire Prevention
- FSM 5120, Presuppression Management
- FSM 5130, Fire Suppression

- FSM 5140, Prescribed Fire
- FSM 5150, Fuel Management
- FSM 5160, Fire Management Equipment and Supplies
- FSM 5170, Fire Management Cooperation
- FSM 5180, Fire Reports
- FSM 5190, Management
- FSH 5109.14, Individual Fire Report Handbook
- FSH 5109.17, Wildland Fire Qualifications Handbook
- FSH 5109.18, Wildland and Prescribed Fire Qualifications System Guide
- PMS 310-1, Wildfire Prevention Handbook
- FSH 5109.19, Fire Management Analysis and Planning Handbook
- FSH 5109.31, Wildfire Cause Determination Handbook (NWCG Handbook 1)
- FSH 5109.32a, Fireline Handbook (NWCG Handbook 3)
- FSH 5109.34, Interagency Fire Business Management Handbook (NWCG Handbook 2)
- Nationwide Aerial Application of Fire Retardant on National Forest System Land ROD (USFS 2011)
- Departmental Manual Part 620 for Wildland Fire Management
- Guidance for Implementation of Federal Wildland Fire Management Policy (USDA and USDI 2009)
- Interagency Prescribed Fire Planning and Implementation Procedures Reference Guide (USDA and USDI 2008)
- President's Healthy Forests Initiative (2002)
- Healthy Forests Restoration Act (2003)
- National Cohesive Wildland Fire Management Strategy (Wildland Fire Leadership Council. 2011)
- 2001 Review and Update of the 1995 Federal Wildland Fire Management Policy (USDA and USDI 1995)
- A Collaborative Approach for Reducing Wildland Fire Risks to Communities and the Environment 10-Year Comprehensive Strategy (USDA and USDI 2001b)
- A Collaborative Approach for Reducing Wildland Fire Risks to Communities and the Environment 10-Year Comprehensive Strategy Implementation Plan (USDA and USDI 2002)
- Wildland Fire Use Implementation Procedures Reference Guide (USDA and USDI 2005)
- Interagency Standards for Fire and Fire Aviation Operations (Red Book), updated annually, 2005 (USFS et al. 2013)
- Fire and community wildfire protection plans for Montezuma, La Plata, Archuleta, Dolores, San Juan, Mineral, Conejos, Montrose, San Miguel, Hinsdale, and Rio Grande Counties

Other standards and guidelines that pertain to fire management are found in Sections 2.3 and 2.8.

## 2.12 Air Quality

### Introduction

Visitors to public land in southwest Colorado generally expect clear, clean air and the ability to view unobstructed vistas as part of their overall experience. Air quality is also an integral part of the natural environment and affects water quality, aquatic ecosystems, soil chemistry, snow chemistry, snowmelt processes, and vegetation.

The Weminuche Wilderness Class I Area has been designated by Congress as an "outstanding special area"—deserving the highest air quality protection in the nation. The goal is to protect natural air quality conditions (conditions substantially unaltered by humans or human activities) in the Weminuche Wilderness Class I Area. Natural conditions are measured directly through air quality monitoring and indirectly using air quality related values (AQRVs). AQRVs for the Weminuche Wilderness Class I Area are lake chemistry, soil chemistry, flora and fauna assemblages, atmospheric deposition and chemistry,

snow chemistry, and visibility. Air quality monitoring commitments will continue long term, as stated in the Weminuche Wilderness Monitoring Plan (USFS 1991) and through agreements made with air quality regulatory agencies.

Several air pollutants have become major concerns on the SJNF over the last 10 years. These include mercury, nitrogen, sulfur, methane, carbon dioxide, ozone, and ozone precursors. Many of these pollutants originate from outside the planning area. Oil and gas projects and prescribed burns and wildfire are activities that occur on the SJNF with the potential to impact air quality. SJNF managers will work with agencies, organizations, tribes, and other entities to actively pursue actions designed to reduce the impacts of pollutants from sources both within and outside the SJNF. These measures will include active membership in local and regional air quality protection stakeholder groups, Prevention of Significant Deterioration (PSD) permit review, a continued commitment to air quality monitoring, and the implementation of air pollution mitigation where appropriate. Atmospheric deposition of nitrogen from anthropogenic sources is increasing and has the potential to affect water quality and aquatic and terrestrial ecosystems. Water bodies throughout the planning area are showing increasing levels of mercury pollution. Recently, McPhee and Vallecito Reservoirs were designated as impaired water bodies because of mercury contamination, and both reservoirs have consumption advisories for mercury contamination of fish (CDPHE 2012). The numerous regional coal-fired power plants are large sources of atmospheric mercury that can pollute water on the SJNF (Wright 2011).

Fire has the potential to produce smoke that may affect the public and temporarily degrade visibility. Receptors that are sensitive to temporary air pollution (including nursing homes, hospitals, and schools) will continue to be an important consideration for smoke management. In addition, the impact of smoke on the highly valued scenic vistas within the planning area will continue to be a concern. Smoke will be managed in conjunction with the State of Colorado through burning permits and to address local concerns. Tradeoffs between short-term air quality impacts and long-term forest health are recognized and will continue to be a management challenge.

The Colorado BLM has developed a statewide Colorado Air Resource Protection Plan. The plan identifies the many components necessary for statewide air quality protection from BLM-authorized activities throughout Colorado. It includes the goals, objectives, and management actions for air quality protection. Examples of management actions include monitoring, regional air quality modeling and modeling studies, refined project analysis, emissions inventories, air pollution reduction measures, and adaptive management. It is anticipated that the Colorado Air Resource Protection Plan could provide more detailed incremental analysis that will better inform future project-level decisions (such as leasing) made as a result of this LRMP. It is also anticipated that the direction in the Colorado Air Resource Protection Plan will be modified based on implementation effectiveness. The SJNF will utilize the direction identified in the Colorado Air Resource Protection Plan to mitigate air quality impacts and supplement the air quality management direction identified in the LRMP. The current direction identified in the Colorado Air Resource Protection Plan is part of the LRMP project record.

Additional air quality control technology and emission reductions could be necessary to achieve air quality desired conditions, as identified through future air quality modeling and monitoring. Such measures would be implemented through subsequent analysis and in consultation with affected agencies, including federal land management agencies, CDPHE and EPA.

## Desired Conditions

2.12.1 Air quality in the Weminuche Wilderness Class I Area maintains natural conditions. Indicators of natural conditions include AQRVs of visibility, water and snow chemistry, precipitation/atmospheric chemistry, soils chemistry, and aquatic/terrestrial biota.

2.12.2 Air quality for the Class II areas within the planning area are maintained or improved with respect to pollutant concentrations so that human health and the integrity of associated aquatic and terrestrial ecosystem components are protected.

2.12.3 Activities conducted on the SJNF support natural air quality conditions at nearby Class I areas outside the planning area (such as Mesa Verde National Park). Determination of what constitutes "natural conditions" will be based on information provided by managers of potentially affected Class I areas.

2.12.4 Visibility at designated scenic vistas in Class II areas is maintained or improved within the planning area (see desired conditions in Section 2.15).

2.12.5 Visibility in the Weminuche Wilderness continues to improve so that natural conditions are achieved. Activities conducted on the SJNF do not hinder progress towards achieving natural visibility conditions in Class I areas managed by other agencies, such as Mesa Verde National Park.

2.12.6 Management activities on the SJNF control dust in order to minimize impacts of dust-on-snow events.

2.12.7 Administrative and permitted activities on SJNF lands emit the lowest practicable greenhouse gas emissions and have the smallest ecological footprint possible to promote sustainable natural resource management.

## Objectives

2.12.8 For the Weminuche Wilderness Class 1 Area, improve air quality so that flora and fauna AQRVs that are at risk (including lichens, amphibians, and aquatic organisms) recover to a level that is within the limits of acceptable change (compared to natural conditions) by the next planning period so that there is no humanly perceptible change in visibility (visual range, contrast, coloration) from that which would have existed under natural conditions (conditions substantially unaltered by humans or human activities).

2.12.9 Over the implementation life of the LRMP, prevent or reduce the atmospheric deposition of nitrogen and sulfur and allow no more than a 10% change from established baseline for lakes with an acid neutralizing capacity (ANC) ≥25 $\mu_{eq}$/L, and for lakes with an ANC<25 $\mu_{eq}$/L allow no more than 1 $\mu_{eq}$/L decrease in ANC within agency control.

2.12.10 Over the implementation life of the LRMP, prevent or reduce airborne nutrient and mercury deposition impacts to sensitive high-elevation lakes in the Weminuche Wilderness Class I Area; allow no detectable mercury, no more than 2 $\mu_{eq}$/L of ammonium, and no late summer nitrate.

## Standards

2.12.11 All new facilities and installations must use engines that meet the following standards within a stationary facility for fluid minerals (does not apply to non-stationary drill rigs or other temporary/mobile engines). Engines less than 300 horsepower de-rated for elevation (excluding very small engines less than 40 horsepower) must not exceed a nitrogen oxide ($NO_x$) limit of 2.0 grams per horsepower-hour or the minimum acceptable limit as determined by air quality regulatory agencies, using whichever is the most restrictive emission limit.

2.12.12 All replacement or reconditioned reciprocating internal combustion engines less than 300 horsepower de-rated for elevation (excluding very small engines less than 40 horsepower) must not exceed a $NO_x$ limit of 2.0 grams per horsepower-hour or the minimum acceptable limit as determined by air quality regulatory agencies, using whichever is the lower emission limit.

2.12.13 All new facilities and installations will use engines that meet the following standards within a stationary facility for fluid minerals (does not apply to non-stationary drill rigs or other temporary/mobile engines). Engines 300 horsepower or greater de-rated for elevation must not exceed a $NO_x$ limit of 1.0 gram per horsepower-hour or the minimum acceptable limit as determined by air quality regulatory agencies, using whichever is the lower emission limit.

2.12.14 All replacement or reconditioned reciprocating internal combustion engines 300 horsepower or greater de-rated for elevation must not exceed a $NO_x$ limit of 1.0 gram per horsepower-hour or the minimum acceptable limit as determined by air quality regulatory agencies, using whichever is the lower emission limit.

2.12.15 Green completion technology for oil and natural gas well completions and for restimulation or refracture activities during workovers is required to prevent venting and most flaring of methane gas and other air pollutants into the atmosphere. Green completion practices include, but are not limited to, 1) maximal capturing of fluids, well effluent, and flammable gases as soon as practicable during flowback and cleanout operations; 2) separation of sand, hydrocarbon and other liquids, and gas from saleable products of saleable quantity; 3) storage and delivery of saleable products to sales line; and 4) environmentally safe disposal of non-saleable waste products. Venting of flammable gas during the well completion process must not be allowed except for gas testing or for safety and emergency situations. This standard is required for all non-wildcat oil and natural gas wells and will be implemented in all places where technically feasible. (Technically feasible will be determined by the BLM and USFS, with input from air quality regulatory agencies as needed).

2.12.16 For exploration, production, transport, and processing of oil and natural gas, storage vessels must not leak and tank thief hatches must be closed when not being serviced during liquid transport, repair, or measuring activities. Valves must be maintained in a leak-free condition (<10,000 parts per million [ppm] leakage). The venting of volatile organic compounds and hazardous air pollutants emissions will achieve at least 95% emission reduction from uncontrolled emissions through the use of vapor recovery units, combustion, or other practices allowed by air quality regulatory agencies.

2.12.17 Valves and pipes in liquid hydrocarbon service must periodically (at minimum on an annual basis) be inspected visually, audibly, or by other means for evidence of leaks. If leaks are detected, equipment must either be repaired or replaced as applicable.

2.12.18 No-bleed, low-bleed, or air-driven pneumatic devices are required for all new and retrofitted oil and natural gas production sites to reduce methane emissions. Exceptions may be made for safety and operational requirements.

2.12.19 All new separators and dehydrators used for natural gas production must use 95% control efficiency or better volatile organic compound emission control technology compared to uncontrolled emissions.

2.12.20 At any one point in time, no more than four fluid mineral well pads and associated access roads will be constructed and drilled (or re-completed) with combustion engines concurrently in any given square mile. This standard does not limit the number of well pads per square mile, only the simultaneous construction and drilling of wells. This standard is necessary to minimize near-field air pollutant concentrations and ensure compliance with National Ambient Air Quality Standards (EPA 2013).

## Guidelines

2.12.21 Construction activities that disturb a surface area greater than 1 acre and are of a duration greater than 5 days should use effective dust-suppression materials and techniques to prevent dust from visibly transporting from the area of disturbance (e.g., well pad, landing, parking area, mine) or drift more than 50 feet from the road prism. In addition, all activities should handle, transport, and store material in such a way to prevent particulate matter (dust) from visibly transporting from the storage area or area of disturbance. There will be no oil, solvents, or other unacceptable contaminates in fluids used for dust abatement.

2.12.22 Volatile organic compounds, hazardous air pollutants, and greenhouse gases should not be vented from existing wells and should achieve at least 95% emission reduction from uncontrolled

emissions through capture and delivery to sales pipeline, vapor recovery units, combustion, or other practices allowed by air quality regulatory agencies. This would eliminate most venting from well blow-downs, during the well completion process, from oil wells freely venting casing gas, and from defective gas well-bores. Exceptions may be allowed for Bradenhead testing or other well tests where venting occurs for time periods of less than 10 minutes.

2.12.23 For new lease or new development areas, new mineral development facilities should be collocated and/or centralized. Facilities include roads, well pads, utilities, pipelines, compressors, power sources, fluid storage tanks, and other associated equipment. Collocation of wells (more than one well per pad) should be required where feasible.

2.12.24 Optimization (use of fewer, larger, and more efficient engines with lower emission rates, rather than using many small engines with higher cumulative emissions, less efficiency, and higher cumulative horsepower) should be required for fluid mineral development. For example, if new activities add an additional small engine(s) so that multiple combustion engines less than 40 horsepower each exist on the same location, the SJNF will review the site to determine if optimization should be used to reduce total location emissions.

2.12.25 Centralized and efficient liquid gathering systems should be used to carry condensate and produced water from wells to centralized gathering facilities to reduce mobile source emissions and other traffic impacts.

2.12.26 Drill rig engines used for new or recompleted wells on the SJNF should meet the most current non-road diesel engine rules for Tier 2, Tier 4 transitional, or Tier 4 emission standards as these standards phase in over time.

### Additional Guidance

- BLM 7300, Air Resource Management, Climate and Air Quality
- FSM 2580, Air Resource Management
- FSM 5100, Fire Management
- U.S. Environmental Protection Agency (EPA) Interim Air Quality Policy on Wildlands and Prescribed Fires (1998)
- Weminuche Wilderness Monitoring Plan for Air Quality Related Values (USFS 1991)
- Federal Land Managers AQRV Workgroup Phase I Report (FLAG 2010)

## 2.13 Access and Travel Management

### Introduction

The transportation system within the planning area consists of roads and trails that provide people with access to public lands and to private in-holdings. Virtually every activity that takes place within the planning area uses the transportation system (including outdoor recreation, wildfire management, livestock and wildlife management, natural resource development, private in-holdings access, and electronic communication site and utility corridor maintenance, as well as the management and monitoring of public lands).

There are about 3,000 miles of NFS roads and primitive roads, and more than 1,700 miles of NFS trails in the planning area that are actively managed as components of the agency’s transportation system. Many of these roads and trails were originally constructed in order to support management activities (including for fire suppression, timber harvesting, mining, livestock grazing, and recreation). Currently, the NFS road system where motorized use is authorized for public or administrative purposes is inventoried and mapped, but inventory and mapping of unmanaged routes is incomplete.

The majority of system roads are open to public use. Public use of individual roads may be allowed seasonally, or it may be permitted all year if there is a demonstrated need to provide year-round access.

Some roads are reserved for administrative use by the USFS for management purposes or by permittees to access special use permit areas.

Trails generally fall into one of two general classes: non-motorized or motorized. Non-motorized trails may be further classified as non-mechanized (foot traffic, pack and saddle, etc.) and mechanized (mountain bikes). Motorized trails are generally intended for vehicles that are less than a certain specified width (usually 50 inches), which excludes most highway-legal vehicles, except motorcycles. In some cases, motorized trails may be designated for vehicles greater than 50 inches in width when there is a demonstrated need, such as providing challenging recreational opportunities for off-highway vehicles (OHVs).

In the last few decades, funding has not been sufficient to maintain all public land roads and trails to the standards associated with the maintenance classification assigned to each. Generally, the limited funding received has been focused on maintenance of higher standard roads that serve multiple-access needs and have the highest traffic volumes. Limited funding for trails has resulted in fewer miles of trails being maintained. It has also resulted in a focus on roads and trails that are deemed unsafe, those that receive the highest use, or those that present the greatest threat to ecological integrity.

Road management activities have included the decommissioning of roads, the construction of new roads, and the closure of roads. Decommissioning roads that are not needed for access (currently or in the foreseeable future) is generally performed when there is a need to reduce resource impacts through reducing runoff, re-establishing vegetation, and preventing future motorized use. Generally, new construction may occur when access to a particular resource or private in-holding is needed. These roads may be permanent, if intended for long-term use, or they may be temporary (such as many timber sale and exploratory roads). Closing roads or limiting motorized use to administrative purposes are management strategies that may be employed for a variety of reasons (including wildlife protection, resource protection, and/or public safety), and these closures may be long-term (multiple year) or seasonal. Population growth and the increased development of private in-holdings have increased the demand for use of roads within the planning area as primary access routes to residential developments. This has created a demand to establish, monitor, and administer special use authorizations and commercial road use permits. Many of these roads require upgrades in order to accommodate all-weather, year-round traffic. This demand for private land access across public lands, or by using NFS roads, has resulted in a need for the agency to evaluate the jurisdictional status of roads that are used predominantly for residential access.

The demand for recreational motorized and non-motorized access has increased dramatically in recent years. Advances in the performance and the technology of OHVs/ATVs, utility vehicles, motorcycles, snowmobiles, mountain bikes, and wheelchairs have increased the demand for additional motorized and non-motorized recreational access and routes. New technology and increased motorized use within the planning area has resulted in some users creating new routes (also known as user-created routes or social routes). Resource problems related to these user-created routes are developing across the planning area, especially in areas that have been historically open to cross-country motorized travel.

## Motorized Travel Suitability and OHV Area Designations

A key component of access and travel management is the identification of areas where motorized travel is prohibited, where it is allowed, and any use limitations in areas where it is allowed.

The USFS has agency-specific direction for the management of motorized travel and OHV use. The USFS Travel Management Rule (36 CFR 212, Subparts A, B, and C) requires that each national forest designate a system of roads, trails, and areas for motor vehicle use by vehicle class and, if appropriate, by time of year. The rule addresses any future proliferation of user-created routes by prohibiting cross-country motorized travel (except in small designated areas). While travel management plans developed under the USFS direction cited above will result in site-specific, route by route designations, this LRMP does not. Rather, the area classifications made in this LRMP provide a framework for future route-by-route designation. Some of the criteria used for the eventual designation of specific routes would include

the need for access, impacts to private property, desired recreation opportunities, erosion potential and slope, resource protection, route density, and wildlife habitat considerations.

A travel management plan is not intended to provide evidence bearing on or addressing the validity of any assertion associated with Revised Statute 2477 (R.S. 2477). R.S. 2477 refers to a law passed by Congress in 1866 that provided that “the right-of-way for the construction of highways over public lands, not reserved for public uses, is hereby granted” (43 USC 932). Although the 1866 act was repealed by the FLPMA in 1976, rights associated with R.S. 2477 were preserved. R.S. 2477 rights are determined through a process that is entirely independent of the USFS’s LRMP planning process. Consequently, travel management planning should not take into consideration R.S. 2477 assertions or evidence. Travel management planning should be founded on an independently determined purpose and need that is based on resource uses and associated access to public lands and waters. At such time as a decision is made on R.S. 2477 assertions, the USFS will adjust its travel routes accordingly.

Travel management decisions for motorized route designations on NFS lands are illustrated on a Motor Vehicle Use Map, which is updated annually to reflect any new travel management updates. Motorized travel off the designated roads, motorized trails or areas, or otherwise inconsistent with the designations displayed on a Motor Vehicle Use Map is prohibited, unless the motorized use has been specifically exempted under USFS direction or by written authorization.

### *Motorized Use Classifications*

For NFS lands, overground motorized suitability is divided into three classes: 1) unsuitable, 2) suitable, and 3) suitable opportunity areas. Unsuitable areas include wilderness areas and other areas that are generally not conducive to road or motorized trail system development for resource, habitat, and/or constructability reasons. Suitable areas are those that have an existing developed road and/or motorized trail system that, for the most part, serves the recreation and resource access needs of the particular area. Suitable areas would not generally be considered for net overall expansion of the transportation system. Suitable opportunity areas are those that have an existing road and/or motorized trail system, and where there is potential to improve the system by adding to the existing system of routes. Changes to the existing system (such as to address resource concerns or enhance recreation experiences) are allowed within unsuitable, suitable, and suitable opportunity areas, including the elimination or decommissioning of roads and trails. Areas with specific management (as identified in Section 3.0 of the LRMP) may have additional travel management restrictions.

A number of travel landscapes on the SJNF have not undergone site-specific overground travel management planning prior to publication of this LRMP. For these landscapes, travel suitability as depicted on Figure 2.13.1 primarily reflects current management and is subject to change through a plan amendment based on site-specific analysis that will be completed through the travel management planning process. Travel management planning will be initiated in these areas after this LRMP is finalized, and in some cases is already underway.

Oversnow motorized suitability on NFS lands is divided into two classes: 1) unsuitable and 2) suitable (see Figure 2.13.2). Suitable areas allow for oversnow travel by snowmobiles, while motorized travel is prohibited in unsuitable areas. Providing a quality outdoor recreation experience for both motorized and non-motorized recreation was a primary goal in determining suitable and unsuitable areas for motorized travel. Additionally, areas that have snow cover most years (i.e., snow availability) and areas that are accessible in the winter were considered, as well as resource considerations (such as, but not limited to, critical and severe winter wildlife habitat). Subsequent oversnow travel planning following approval of this LRMP will be necessary to implement oversnow suitable and unsuitable area boundaries as delineated in the LRMP.

## Program Emphasis

Access and opportunity to experience areas through both motorized and non-motorized travel is a key component of recreation, as well as a primary management emphasis for the SJNF. Efforts will focus on the designation of effective motorized and non-motorized travel routes over the long-term, consistent with


FS-008280

desired conditions. Signing, enforcement, public information, and route maintenance and restoration will take place, as appropriate.

The transportation system program will emphasize a minimum transportation system that provides safe and efficient public and agency access to the public lands. Travel management planning processes will be used to identify management opportunities for ensuring that the systems are efficiently maintained, environmentally compatible, and responsive to agency and public needs. Agency managers will work towards aligning the total miles of roads and trails within SJNF lands with fiscal constraints. Opportunities will be sought to shift road management to the appropriate public road authority when it is determined that a specific road is primarily used for purposes other than SJNF (FRTA) access, is used for mail delivery, school bus routes, or some other local governmental purpose, or is used for year-round residential access to private property within or adjacent to SJNF.

Reconstruction and maintenance activities will focus on diminishing impacts to resources, particularly water resources and aquatic ecosystems, and improving roadway safety while reducing the backlog of deferred maintenance.

Road construction and reconstruction requirements needed to support resource development activities will be determined and evaluated at the project level. These roads will be designed and constructed to minimize surface disturbance by collocating new facilities, when feasible, and using the existing road networks to the maximum extent possible. Roads will be constructed or reconstructed to a standard commensurate with the planned use. Design and construction BMPs will be used to minimize impacts to wildlife, water resources, aquatic ecosystems, and other resource concerns identified at the project level. Unless designated as part of the SJNF transportation system, roads constructed for resource development will

- be temporary;
- be maintained to standard by the permittee or responsible party through written authorization;
- be decommissioned and revegetated with SJNF-approved native species; and
- be monitored for success for 3 years following project completion.

Travel management planning during LRMP implementation will result in the designation of a system of roads, trails, and areas for motorized use by vehicle class and season of use. The principal goal of travel management planning is to reduce the development of unmanaged roads and trails and the associated impacts to water resources and aquatic ecosystems, wildlife conflict impacts, and user conflicts. The travel management planning process aims to provide a variety of road and trail access for recreation, special uses, other forest resource management, and fire protection activities. Planning, design, and operation will seek to maximize user experience while addressing safety and resource protection needs.

## Desired Conditions

2.13.1 The transportation system within the planning area consists of roads, high-clearance or primitive roads, trails, and bridges that are fiscally sustainable and safe as appropriate for the designated use or desired user experience; they allow for the use of, and enjoyment by, the public, and they meet resource management objectives. Sufficient condition surveys and inspections are conducted to promote road safety and prioritize road maintenance expenditures.

2.13.2 The SJNF transportation system provides reasonable and legal access for resource management and recreation; it is dynamic and adaptable to resource and user needs.

2.13.3 SJNF destination and loop trails exist for motorized and non-motorized recreation users. New trail development within the planning area focuses on the creation of loop opportunities and when feasible, using existing routes to do so, when such use does not compromise the intent and sustainability of the route. New routes within the planning area are designed with the goals of preserving settings, complementing the landscape, and providing the desired user outcomes/benefits.

2.13.4 Public access to SJNF lands that cross private lands and/or cross other jurisdictions is acquired, retained or improved through proper authorization and coordination with adjacent landowners.

2.13.5 The road and trail systems on the SJNF have adequate destination signage, mapping, and route markers to assist transportation system users in navigating throughout the planning area.

2.13.6 The public has access to information about the SJNF transportation system (including specific travel route designations, available recreational opportunities, environmental stewardship guidelines, and safe travel information).

2.13.7 Motorized use on SJNF lands occurs only on designated roads and trails, as well as in small designated open areas (except as exempted by 36 CFR 212.51). No new unauthorized or user-created routes develop within SJNF lands. Any addition of new designated routes to the transportation system will be analyzed using the appropriate planning process and level of environmental analysis.

2.13.8 Roads and trails within the SJNF that are identified for closure are decommissioned and re-established with native vegetation cover.

2.13.9 Roads on SJNF lands are managed by the appropriate public road authority when any one of the following conditions exists:

- the road serves predominantly non-SJNF traffic;
- the road is necessary for mail, school, and/or other local governmental purposes; or
- the road provides year-long residential access to private property within, or adjacent to, the planning area.

2.13.10 Travel management plans are complete for all SJNF lands within 5 years of adopting this LRMP. Travel management planning remains a continuous process designed to improve the transportation system on SJNF lands.

2.13.11 Motorized and non-motorized users, as well as local, state, tribal, and other federal agencies, are actively engaged in travel management planning, route designation and implementation, and route monitoring on SJNF lands.

2.13.12 Transportation system components on SJNF lands are designed, constructed, and maintained to avoid encroaching onto streams and/or onto riparian areas and wetland ecosystems in ways that impact channel fluctuation or channel geometry (the relationships between channel discharge and channel cross-sectional factors, such as area, width, and depth). Sediment delivery from the transportation system does not measurably impact pool frequency, pool habitat, and/or spawning habitats.

2.13.13 The character of roadless areas on the SJNF is maintained in order to preserve large expanses of undeveloped lands that can be managed for wildlife habitat, scenic quality, and recreation.

2.13.14 On SJNF lands, ensure that all year-round accesses to private in-holdings are authorized. Roads are upgraded by the proponent, when deemed necessary to meet SJNF road standards for traffic type, volume, and season of use.

2.13.15 All commercial users, including timber purchasers, land stewardship contractors, and fuels management contractors, perform road maintenance commensurate with their use of SJNF NFS roads in accordance with 16 USC 537 and FSM 7732.22.

## Objectives

2.13.16 On the SJNF, transfer jurisdiction of roads identified through travel management planning as having predominant use that is inconsistent with the mission of the jurisdictional managing

authority to a managing authority whose mission is consistent with the road use and is willing to accept the road transfer. The SJNF will identify in each travel management planning decision those roads, if any, that are priority for jurisdictional transfer. The SJNF will seek transfer of ownership, to the appropriate managing authority, of 50% of the roads identified as priority for jurisdictional transfer through travel management decisions that are made within the first 5 years following the date of the LRMP's implementation. These jurisdictional transfers will be completed within 15 years of LRMP implementation.

2.13.17 Perform maintenance activities annually on 75% of SJNF roads maintained for passenger vehicles (NFS maintenance level 3, 4, and 5 roads).

2.13.18 *This objective was applicable only to BLM lands*.

2.13.19 Develop travel management plans in accordance with the designation criteria in 36 CFR 212, Subpart B, for NFS lands. Routes that are not included in the designated motorized transportation system will be evaluated for their resource impact potential. Those with high potential for resource impacts will be prioritized for decommissioning as part of the implementation plan for each individual travel management plan decision. Each implementation plan will identify those routes prioritized for decommissioning, the method(s) that may be used, and a schedule for completion.

2.13.20 Perform the required USFS schedule of condition surveys on SJNF lands for use in prioritizing road maintenance expenditures.

## Standards

### *Roads*

2.13.21 SJNF road construction and reconstruction must be designed and constructed in accordance with the most recent applicable agency design and construction direction, as well as applicable Federal Highway Administration adopted design standards for the corresponding transportation facility.

### *Temporary Roads*

2.13.22 No temporary road shall be constructed on SJNF lands prior to the development of a project-specific plan that defines how the road shall be managed and constructed. The plan must define the road design, who are the responsible parties and their roles in construction, maintenance and decommissioning, the funding source, a schedule for construction, maintenance and decommissioning, the methods(s) for decommissioning, and post-decommissioning monitoring requirements for determining decommissioning success.

## Guidelines

### *Roads*

2.13.23 On SJNF lands, the use of motor vehicles on roads constructed for specific non-public purposes should be limited to administrative use only.

### *Temporary Roads*

2.13.24 In order to minimize disturbance on SJNF lands, temporary roads should be constructed to the minimum standard needed for the specific project (the minimum standard that would provide for the protection of resource values identified during the environmental analysis).

### *Road and Trail Maintenance*

2.13.25 Road and trail maintenance investment on SJNF lands should be prioritized by a travel analysis that categorizes investment priority based on route value to public lands and loss of agency investment, as well as risk to the environment and the traveling public. The following risk categories and strategies should be used to categorize management and investments:

- **High-Value/Low-Risk Routes:** The route condition should be preserved through annual maintenance. Roads in this category that have high value for private access should be considered for transfer to the appropriate jurisdictional managing entity.

  **High-Value/High-Risk Routes:** These routes should receive first priority for investment and maintenance funding (in order for them to be restored to appropriate standard[s] and to reduce resource risks). Roads in this category that have a high value for private access should be considered for transfer to the appropriate jurisdictional managing entity.
- **Low-Value/High-Risk Routes:** These routes should receive the highest priority in order to reduce maintenance level or maintenance intensity. Roads in this category may be considered for conversion to trails or otherwise be considered for decommissioning.
- **Low-Value/Low-Risk Routes:** These routes should receive the lowest priority for maintenance funding. Consideration should be given to converting the roads to trails. These routes should be considered for decommissioning or reduction in maintenance level or intensity.

2.13.26 *This guideline was applicable only to BLM lands*.

### *Route Density*

2.13.27 **Road Density Guideline for Water Quality and Watershed Health on SJNF Lands:** In order to protect water quality and watershed function, road densities on SJNF lands should not exceed 2 miles/square mile within any U.S. Geological Survey (USGS) 6th level Hydrologic Unit Code (HUC) watershed. In order to protect major surface source water protection areas for municipalities within USGS 6th level HUC watersheds, road densities on NFS lands should not exceed 1.5 miles/square mile. If new road construction is necessary on NFS lands within an area exceeding this density guideline, management actions should be considered that would result in post-construction road densities that are equal to or less than the pre-construction density.

The following parameters and constraints will be used to calculate road density for water quality and watershed health:

2.13.27a Roads used to develop road density calculations include those roads on NFS lands only, regardless of road ownership, that are a) open year-long or seasonally to public use and b) closed to public use, but are used for administrative access or are authorized by contract, permit, or other written authorization. Included in these calculations are NFS maintenance level 2–5 roads. Non-motorized and motorized trails and those roads that are closed to all motorized use and/or are in storage are not used for road density calculations. Temporary roads to be used for 5 years or less are not included in these calculations.

2.13.27b Road densities will be calculated within USGS 6th level HUC watersheds on NFS lands only.

2.13.27c Municipal watersheds are USGS 6th level HUC watersheds where the surface source water intake exists for an incorporated town, city, or other municipality with a public water supply. The MOU between the USFS Region 2 and the CDPHE states,

"Revised Forest Plans will provide direction and desired conditions for municipal supply watersheds/source water areas to protect water quality while allowing for multiple use outputs (per 36 CFR 251.9 and FSM 2542)."

2.13.27d Data used for density calculations will be based on the best available information at the time of analysis.

2.13.28 *This guideline was applicable only to BLM lands*.

2.13.29 Road and Motorized Trail Density Guideline for Ungulate Production Areas, Winter Concentration Areas, Severe Winter Range, and Critical Winter Range on SJNF Lands: The intent of this guideline is to ensure no net loss of existing habitat effectiveness within the areas listed below. In order to maintain wildlife habitat effectiveness of SJNF lands, road and motorized trail densities should be addressed when analyzing and approving management actions that affect motorized routes. Where management actions would result in road and motorized trail densities exceeding 1 mile/square mile on SJNF lands in the areas listed below, actions should be designed to maintain habitat effectiveness on SJNF lands throughout each mapped polygon. Habitat effectiveness for this guideline is considered maintained when road densities within the CPW mapped areas on SJNF lands listed below are less than or equal to 1 mile/square mile. When road densities exceed 1 mile/square mile within the CPW mapped areas on SJNF lands listed below, densities should not be increased without mitigation designed to maintain habitat effectiveness.

- Big game production areas (calving or lambing areas)
- Elk and deer severe winter range
- Elk and deer winter concentration areas
- Deer critical winter range

The following parameters and constraints will be used to calculate road and motorized trail density for wildlife:

2.13.29a Roads used to develop route density calculations include roads on NFS lands only, regardless of road ownership, that are a) open year-long or seasonally to public use and b) closed to public use, but are used for administrative access or are authorized by contract, permit, or other written authorization. Included in these calculations are maintenance level 2–5 NFS roads. Also included for this calculation are NFS trails that are designated for motorized use. Roads and motorized trails with design features sufficient to maintain habitat effectiveness (such as seasonal closures that are determined to be sufficient mitigation), as determined by the USFS biologist, should not be used for final density calculations. Non-motorized trails and those roads that are closed to all motorized use and/or are in storage are not used for route density calculations. Temporary roads to be used for 5 years or less are not included in these calculations.

2.13.29b Data used for density calculations will be based on the best available information at the time of analysis.

2.13.30 *This guideline was applicable only to BLM lands*.

2.13.31 **Road and Motorized Trail Density Guideline for Deer and Elk General Winter Range on SJNF Lands:** Where management actions would result in road and motorized trail densities exceeding 1 mile/square mile and where CPW analysis determines that road and motorized trail densities inhibit the state's ability to meet population objectives, SJNF management actions should be designed to reduce the impacts of road density on habitat effectiveness throughout each mapped general winter range polygon. This guideline applies to the portions of each mapped general winter range polygon not covered under Guideline 2.13.29.

The following parameters and constraints will be used to calculate road and motorized trail density for wildlife:



FS-008285

2.13.31a Roads used to develop route density calculations include roads on NFS lands only, regardless of road ownership, that are a) open year-long or seasonally to public use and b) closed to public use, but are used for administrative access or are authorized by contract, permit, or other written authorization. Included in these calculations are maintenance level 2–5 NFS roads. Also included for this calculation are NFS trails that are designated for motorized use. Roads and motorized trails with design features sufficient to maintain habitat effectiveness (such as seasonal closures that are determined to be sufficient mitigation), as determined by the USFS biologist, should not be used for final density calculations. Non-motorized trails and those roads that are closed to all motorized use and/or are in storage are not used for route density calculations. Temporary roads to be used for 5 years or less are not included in these calculations.

2.13.31b Data used for density calculations will be based on the best available information at the time of analysis.

## Additional Guidance

### *Guidance and Standards Applicable to NFS Roads*

- FSH 2509.25, Watershed Conservation Practices Handbook
- FSH 2709.12, Road Rights-of-Way Grants Handbook
- FSM 5460, Right-of-Way Acquisition Manual
- FSH 5409.17, Rights-of-Way Acquisition Handbook
- FSM 7100, Engineering Operations Manual
- FSM 7700, Travel Management
- FSH 7709.55, Transportation Planning Handbook
- FSH 7709.56, Road Preconstruction Handbook
- FSH 7709.56b, Transportation Structures Handbook
- FSH 7709.57, Road Construction Handbook
- FSH 7709.58, Transportation System Maintenance Handbook
- FSH 7709.59, Transportation System Operations Handbook
- FSH 7100, Engineering Operations, Region 2 Supplement 7100-2006-1
- Guidelines for Bridge Design, USFS – Pacific Northwest Region (R6) Transportation Structures Group, January 2005
- USFS EM-7700-30, Guidelines for Engineering Analysis of Motorized Mixed Use on National Forest System Roads
- USFS EM 7100–15: Sign and Poster Guidelines for the Forest Service

### *Guidance and Standards Applicable to NFS Trails*

- FSM 2300, Recreation, Wilderness, and Related Resource Management; Chapter 2350, Trail, River, and Similar Recreation Opportunities
- FSH 2309.18, Trails Management Handbook
- Motor Vehicle Route and Area Designation Guide, USFS (v.111705)

### *Other Applicable Standards*

- Manual on Uniform Traffic Control Devices, Part 5. Traffic Control Devices for Low-Volume Roads
- American Association of State Highway and Transportation Officials Guidelines for Geometric Design of Very Low-Volume Local Roads (Average Daily Traffic ≤ 400), current edition
- Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development (USDI and USDA 2007)
- American Association of State Highway and Transportation Officials HB-17 Standard Specifications for Highway Bridges, current edition



FS-008286




**Figure 2.13.1: Overground Travel Suitability and OHV Area Designations**




**Figure 2.13.2: Oversnow Travel Suitability and OHV Area Designations**

**Figure 2.13.3: Mud Springs Designated Routes**

*This figure was applicable only to BLM lands*

**Figure 2.13.4: Phil's World Designated Routes**

*This figure was applicable only to BLM lands*

# 2.14 Recreation

## Introduction

The SJNF offer visitors and local area residents extraordinary opportunities to experience the benefits of their public lands. Local and regional economies depend on the recreation market, which is heavily influenced by the opportunities available on the public lands. Visitors value the unique and outstanding recreational assets offered by the SJNF. The "backyard" or rural recreation setting provided by many of these lands is an amenity to the active lifestyles and quality of life for local residents.

Visitors to the SJNF have an impressive range of options for experiencing the area. Past mining, logging, and grazing uses have created an extensive transportation network across the planning area that provides for various forms of access to the public lands. In contrast, the large extent of rugged mountains and canyons with limited roads and access offer vast undeveloped areas offering their own unique recreation opportunities. The planning area offers a wide range of settings that provide opportunities for solitude and personal challenge, as well as developed front-country settings. Local communities, partners, volunteers, and permit holders are involved in (and benefit from) providing recreation opportunities, and recreation benefits contribute significantly to the economy and culture of local communities.

SJNF lands have remarkable values related to cultural traditions, history, scenery, and environmental resources and ecosystems. These values help to define a sense of place and provide a unique recreation market and identity for the SJNF. Public lands within the planning area offer people resource-dependent recreation opportunities and settings in which to meaningfully experience nature, history, and culture.

The recreation management focus of the SJNF is to ensure the continued availability of resource-dependent outdoor recreation experiences that are suitable for the landscape and that are not readily available from other public or private entities. The SJNF recreation programs will emphasize the extraordinary natural, cultural and scenic resource values of the planning area and effectively manage the high public demand. The program will consider the proximity of the planning area to growing communities and recognize the need for public understanding of their stewardship role upon the SJNF.

The SJNF will provide place-based recreation management by focusing on activities and unique settings for which an area is best suited. Recreation suitability (derived through the Recreation Opportunity Spectrum [ROS]) will guide the direction of recreation management within the planning area. The ROS will guide recreation management with regard to access, intensity of visitor management, social encounters, naturalness, built environment, and carrying capacity.

## Remote Areas and Wilderness

This program area primarily focuses on monitoring and addressing activities that have the potential to degrade values related to wilderness areas, WSAs, and other primitive or remote areas within the planning area. Protection and restoration of natural conditions will continue to be important within these areas (see Chapter 3 for additional wilderness area information).Wilderness management direction contained in the San Juan-Rio Grande National Forests Wilderness Management Direction (USFS 1998a) is incorporated by reference into this LRMP and will continue to be in effect.

## Marketing

A cornerstone of successful management will be developing and providing effective public information about recreation opportunities and settings on the SJNF. Targeted marketing efforts can boost the likelihood that people could more easily find and participate in their desired recreation activities within the planning area. Marketing will also help to increase appropriate uses in underused areas while, at the same time, relieving conflicts and impacts on overused places. Marketing venues will be varied and include the use of maps, guidebooks, the internet, information signs, brochures, and other marketing tools. Interpretive signing (existing and future) will also contribute to visitors' understanding and enjoyment of their surroundings while visiting the SJNF.

## Recreation Facilities

SJNF managers will continue to assess the future of SJNF recreation facilities in order to establish a program that is balanced, sustainable, realistic, and responsive to public needs. Services will be provided with allocated funds, revenues, and partnerships. Managers will also seek other creative methods in order to maximize public benefits. Facilities will be redesigned, as necessary, in order to benefit a larger and more diverse audience and address demographic changes. New large-scale facilities are not anticipated during this planning cycle. Emphasis will be placed on the maintenance and improvement of existing developed facilities and on protection of resource issues in dispersed recreation areas.

## Communities and Partners

Local communities and partners have strong ties with SJNF. These communities and partners have become ever more critical in helping SJNF managers address complex resource management situations, declining recreation budgets, and meeting the demands of growing communities that seek to benefit economically from recreation and tourism on SJNF lands. Efforts in this area will focus on building partnerships with communities interested in protecting and enhancing public land recreation access while sustainably using the SJNF for their economic, scenic, and recreation benefits. This includes use of scenic byways and the abundant heritage resources readily accessible from the San Juan Skyway.

## Travel Corridors

Three scenic and historic byways (San Juan Skyway and Alpine Loop) and numerous lesser known routes provide for adventure and exploration of national and regional interest. In particular, historic mining, ranching, and views of rugged wilderness are easily enjoyed by thousands each year. These routes provide an important and effective interface between visitors and the public lands.

Recreation management will protect and enhance opportunities for viewing scenery and cultural resources along these travel corridors. Most visitor service developments will occur along these corridors. These travel corridors will serve as "information gateways" and facilitate access to more remote areas of the SJNF. Partnerships and grants will be a primary method for achieving objectives related to these travel corridors. See Chapter 3 of the LRMP for additional information on byways and scenic corridors.

## Dispersed Recreation Experiences

Dispersed recreation will continue to be an important benefit offered within the planning area. Dispersed recreation includes both day and overnight use and provides important recreational benefits, which include the opportunity to enjoy natural landscapes, escape from crowds, engage in physical exercise, and/or recreate with family and friends. The management of these benefits will seek to balance the strong desire people have for freedom of choice regarding recreation activities, while providing for adequate protection of cultural and natural resources and the need to manage conflicting recreation uses. In spite of the large expanse of undeveloped areas available for dispersed recreation use, not every acre is suitable for every use. Management planning must balance the competing recreational uses with resource protection.

## Recreation Opportunity Spectrum

The ROS offers a framework that establishes recreational settings (based on access, remoteness, naturalness, built environment, social encounters, visitor impacts, and management) within the planning area. The resulting recreation zones are shown on the "ROS Settings Maps," with separate maps for summer and winter activities (see Figures 2.14.2 and 2.14.3). The ROS zones for the various alternatives are presented in Volume III, Appendix E. These maps show broad desired setting conditions for the entire planning area; therefore, site-specific analysis is generally necessary in order to further refine desired setting conditions that may apply to site-specific projects. Additional management direction related to recreation setting prescriptions is found under Guidelines, below.

Future recreation management and development decisions on lands managed by the USFS will be guided by the ROS settings map.

**Primitive ROS Settings:** Primitive ROS settings include Congressionally designated wilderness areas, WSAs, and areas recommended to Congress for designation as wilderness. In general, these areas are 5,000 acres or larger and are affected primarily by the forces of nature. They offer opportunities for solitude, natural quiet, and unconfined recreation for non-motorized and non-mechanized travel year-round. Decisions made under the 1998 Wilderness Management Direction amendment to the 1983 LRMP continue to be valid and are incorporated into this LRMP by reference. Wilderness lands are categorized into three settings that describe the relative naturalness and level of remoteness of the area: 1) unspoiled pristine lands, 2) unmodified primitive lands, and 3) concentrated use, semi-primitive lands. WSAs will be managed to protect their suitability for designation as wilderness until Congress acts to create wilderness or releases those lands from consideration.

**Semi-Primitive ROS Settings:** Semi-primitive ROS settings are non-wilderness lands characterized by a predominantly naturally appearing landscape with significant opportunities for non-motorized, primitive forms of recreation. Concentrations of users are low. Opportunities are provided that allow visitors to have a high degree of interaction with the natural environment, as well as a sense of remoteness, quiet, and solitude. Trail systems are designed in order to provide challenge and opportunities for self-reliance. Semi-primitive ROS settings can be motorized, mechanized, or non-motorized. Administrative actions and commercial uses (including recreation) occur; however, they are not common.

**Roaded Natural ROS Settings:** These settings are characterized by a higher degree of development and human "footprint" than those of primitive and semi-primitive. Sights and sounds of human activity are common, as are encounters with other recreational users. Users should also expect the presence of active management activities, areas of adjacent and/or interspersed private lands and development, an extensive trail network, intensively developed recreation sites, and abundant access points for recreational activities. Commercial uses can be common in these areas.

**Rural ROS Settings:** These settings are uncommon within the SJNF and are almost entirely adjacent to existing urban development. Sights and sounds of human activities dominate the setting, and visitors can expect numerous encounters with other users and types of users when in these areas. Examples of things expected to be encountered in these areas include utility lines/corridors, paved roads, nearby residential/commercial development, developed ski areas, recreation residences, and a variety of motorized and non-motorized users, among others.

**Table 2.14.1: Bureau of Land Management Recreation Setting Characteristics Matrix**

*This table was applicable only to BLM lands.*

## Special Recreation Management Areas

*This category was applicable only to BLM lands.*

## Desired Conditions

### *Recreation*

2.14.1 Activities are regulated primarily in order to protect the quality of the recreation settings and benefits, as well as to protect natural and cultural resources. Managers monitor conditions and implement management strategies in order to maintain desired setting characteristics.

Recreation users have opportunities to benefit from the diversity of varied terrain, scenery, and nature in the canyons, mountains, and mesas, as well as on the rivers of the SJNF.

2.14.2 Established road and trail travel corridors offer high-quality scenery. Developed recreation facilities (including trailheads) provide relatively easy access for visitors, enabling them to enjoy a wide range of recreation experiences.

2.14.3 The recreation market emphasizes resource-dependent recreation settings, services, and conditions that offer the benefit of interaction between people and their natural and cultural public land heritage. With the exception of ski areas, highly developed facilities (including guest lodges, waterslides, golf courses, etc.) are not located on public lands within the planning area.

2.14.4 Recreation management is guided by recreation setting prescriptions established by the ROS maps, as well as by other resource goals and objectives. Although recreation opportunities are extensive throughout the planning area, there may be some areas where no recreation is appropriate.

2.14.5 Recreation tourism provides economic and social benefits to local communities and to the region; this is consistent with sustainable land practices, the protection of sense of place, and the market demand for SJNF-related values. The USFS collaborate with local communities, educational institutions, businesses, non-profit organizations, volunteers, and others interested in the planning area in order to market recreation opportunities effectively and appropriately, consistent with USFS goals.

2.14.6 Public access to SJNF lands near communities provide a day-to-day lifestyle connection with the foothills, canyons, and mountains. Neighborhood trailheads and convenient access points provide quick entry to a natural setting. These lands are a community asset and help contribute to a healthy lifestyle for people of all ages.

2.14.7 The SJNF offer motorized and non-motorized recreation experiences in large, predominantly naturally appearing landscapes, where active management may occur. Primitive dispersed camping sites, developed campgrounds, and trailheads are present in order to support dispersed recreation use.

2.14.8 Overground and oversnow motorized travel maps serve as guidelines for determining recreation travel within the planning area.

2.14.9 A wide variety of information, education, and interpretive venues about recreational opportunities are available through various media and resources. Interpretive and volunteer efforts are focused on attaining agency goals and objectives.

2.14.10 Adequate maintenance and services at some sites are sustained through the collection of fees and donations, as well as through the work of concessionaires, volunteers, and partnerships.

2.14.11 Trailheads only provide the minimal level of amenities, as appropriate for the setting and sufficient to protect the resources.

2.14.12 On SJNF lands, trails within MA 7 (public and private lands intermix) are constructed and maintained primarily through community partnerships.



FS-008292

### *Recreation Opportunity Spectrum*

2.14.13 Projects and activities are consistent with the established ROS settings.

2.14.14 Much of the planning area has an ROS setting of semi-primitive and roaded natural.

2.14.15 A network of roads maintained for low-clearance passenger vehicles provides access through roaded natural ROS settings and provide access to extensive semi-primitive ROS settings. Beyond these well-traveled road corridors, contact frequency between visitors is less, secondary roads are more rugged and challenging with numerous 4 × 4 routes, visitor facilities are rare, and the sights and sounds of nature predominate.

2.14.16 Primitive ROS settings are maintained at their current level of naturalness or restored, as needed.

2.14.17 Primitive ROS and semi-primitive ROS areas provide a variety of recreational opportunities, including:

- High-quality, resource-dependent recreation accessible from major travel corridors;
- Single- and multi-day challenging recreation activities and adventures;
- Non-motorized and motorized scenic backcountry experiences; and
- Self-discovery and challenge in areas with pristine natural conditions and solitude.

2.14.18 Roaded natural ROS areas provide a variety of recreational settings and activities, including:

- Motorized activities such as driving for pleasure and OHV use on designated trails and areas;
- A moderate to high degree of interaction and encounters with other users; and
- Sights and sounds of human development are evident but do not dominate users' experiences.

2.14.19 New trail construction in primitive and semi-primitive ROS settings protect resources, enhance recreation experience/challenge, mitigate user conflicts, and/or provide loops and/or links to other trail networks.

### *Dispersed Recreation*

2.14.20 Dispersed recreation is an important opportunity offered throughout the planning area and occurs extensively. Facilities for dispersed recreation are minimal and are provided in order to protect resources and enhance recreation experiences (and are compatible with established ROS settings, opportunities, and benefits). Access and parking, regulations, orientation, and safety information are provided only to the degree needed to protect resources and appropriately manage existing or anticipated uses.

2.14.21 Commercial outfitting/guiding is often provided within dispersed recreation areas in order to provide the expertise and equipment necessary for visitor safety, resource protection, and quality recreation experiences.

2.14.22 Dispersed camping opportunities are available for a wide variety of users. Motorized access to dispersed camping opportunities is addressed through travel management planning. Any new dispersed campsites are to be located outside riparian zones and other sensitive resource areas. Campsites may be closed, repaired, rehabilitated, and/or hardened when unacceptable environmental or social impacts occur. Dispersed recreation resulting in resource impacts or user conflicts is effectively addressed.

2.14.23 Dispersed camping does not interfere or conflict with the operation of developed campgrounds.

2.14.24 Effective parking and directional/information signing is in place in order to support sustainable dispersed recreation use.

2.14.25 Recreation is managed within the limits of ecosystem and species capacity for long term health and sustainability.

### *Developed Recreation*

2.14.26 Developed recreation sites meet accessibility standards and are consistent with the established recreation niche of the area. The scale of development and amenities at facilities and at sites is consistent with established ROS and identified markets. The ROS setting for most developed facilities is roaded natural or rural. Trailheads are available in a range of ROS settings.

2.14.27 Developed recreation facilities are maintained to required standards. In particular, facilities that do not meet public health and safety standards are reconstructed, closed, or decommissioned in a timely manner.

2.14.28 In developed recreation sites, the USFS provide a wide range of visitor information, education, and interpretation consistent with their interpretive and conservation education strategy.

2.14.29 Vegetation and fuels management actions within, and adjacent to, developed recreation sites maintain or enhance scenery and meet specific-site plan objectives (including privacy screening, fall color enhancement, and disease resistance).

2.14.30 Recreation sites and facilities are designed with an architectural theme intended to blend facilities with the natural environment. For new construction or site improvements, methods of construction use locally available resources and Leadership in Energy and Environmental Design (LEED) guidelines to the extent possible.

2.14.31 Developed recreation sites are withdrawn from locatable mineral entry.

### *Winter Recreation*

Winter recreation opportunities within the planning area provide important benefits to local residents and visitors. A variety of local and state partners (including both for-profit and not-for-profit) assist the USFS in managing both motorized and non-motorized winter recreation areas. Commercial outfitters/guides also offer an important service related to safe winter recreation.

2.14.32 Winter recreation access is provided via plowed roads managed as roaded natural ROS settings. Trailhead parking areas are developed at key concentration points in order to accommodate the loading and unloading of equipment and people. Safety, regulatory, and orientation information is provided at these locations.

2.14.33 Away from primary road access points, winter activities fall primarily within the ROS categories of semi-primitive non-motorized or semi-primitive motorized.

2.14.34 Winter non-motorized areas provide a variety of non-motorized recreation opportunities in a quiet, natural setting (including groomed and un-groomed snow). Noise from motorized use is less common in areas away from the main road corridors.

2.14.35 Winter motorized areas are managed in order to provide a variety of motorized recreation opportunities with a variety of challenge. In addition to areas open to cross-county, oversnow motorized use, these areas may contain groomed trails, marked trails that are not groomed, and/or unmarked/unmaintained open trails.

2.14.36 Timing restrictions for motorized oversnow recreational use may be employed in wildlife habitat areas or due to ground conditions.

2.14.37 Motorized oversnow travel should only occur when snow levels are adequate to protect the ground surface from disturbance due to snow machine use. For SJNF lands, 12-inch snow depth will be used as the standard.

2.14.38 Winter motorized use is not allowed within protected areas (see Section 2.13).

### *Ski Areas*

2.14.39 Ski areas are developed, maintained, and operated by the permitted private enterprises.

2.14.40 Ski areas on SJNF lands are characterized by a vegetation mosaic that includes natural and human-made grassy openings intermixed with forested and/or partially forested areas and rocky outcroppings. Forested areas provide sustainable cover with a variety of species and age classes in patterns typical of the area's natural landscape character. These areas are not part of the scheduled timber production base. Vegetation management (which may include herbicides, commercial harvesting, and/or grazing) is used in order to achieve and maintain desired conditions for the ski area in a sustainable manner. Vegetation conditions are manipulated to reduce the potential hazards and risks of undesirable changes from wind throw, insects, disease, and/or fire.

2.14.41 Recreation is intensively managed year-round at ski areas. Facilities directly support recreational activities and management. Winter terrain parks within ski areas are concentrated in specific locations, rather than dispersed throughout the mountain. New trail developments are generally for non-motorized recreation uses. Permittees are responsible for the design, construction, safety, maintenance, and management of agency-approved facilities/trails within their permit area.

2.14.42 Motorized travel within permitted ski areas, in both winter and summer, is generally limited to administrative or emergency purposes. Summer uses in ski areas within the planning area favor non-motorized, low-impact activities (including sight-seeing, hiking, wildlife viewing, and mountain biking) that require few permanent structures.

2.14.43 Scenery provides a range of scenic integrity objectives from low to moderate. Protection of scenic values is emphasized through basic landscape design principles.

2.14.44 Where feasible and desirable, backcountry skiing, snowshoeing, and/or snowboarding activities may be facilitated or enhanced by visitor services at established ski areas.

2.14.45 Visitors are aware, through signs and interpretive venues, that the ski area is public land.

### *Recreation Special Uses*

Recreation special use permits/special recreation permits are issued in order to provide a variety of safe high-quality recreation opportunities to visitors and provide fair return to the United States for commercial recreation use of federal lands. Local outfitters/guides and other recreation professionals provide services to visitors who want additional knowledge, guidance, equipment, and/or support for a safe and rewarding recreational experience within the planning area.

2.14.46 Allowable uses and capacity for specific activities within certain geographic areas are consistent with a capacity and needs analysis. Permitted activities are compatible with the desired ROS setting and MA designations. One time/event permits (competitive, organized group) generally occur outside high use seasons to minimize impacts to casual use visitors and their recreational experience.

2.14.47 Recreation special use facilities are rare and temporary, and they are consistent with established ROS guidelines.

2.14.48 The recreation residence program is managed within existing authorized tracts on USFS lands.

2.14.49 *This desired condition was applicable only to BLM lands*.

2.14.50 *This desired condition was applicable only to BLM lands*.

2.14.51 *This desired condition was applicable only to BLM lands*.

2.14.52 *This desired condition was applicable only to BLM lands*.

2.14.53 *This desired condition was applicable only to BLM lands*.

2.14.54 *This desired condition was applicable only to BLM lands*.

## Objectives

2.14.55 Meet or exceed maintenance standards annually for 75% of SJNF developed recreation sites with a “total rank score” of 50 or above within the most recent recreation facility analysis.

2.14.56 *This objective was applicable only to BLM lands*.

2.14.57 Decommission, close, or retrofit at least half of SJNF sites with a “total rank score” of <50 per the most recent recreation facility analysis to remove them from inventory or improve their ranking to >50 over the life of the LRMP.

2.14.58 *This objective was applicable only to BLM lands*.

2.14.59 *This objective was applicable only to BLM lands*.

2.14.60 On SJNF lands, implement plan actions from the San Juan-Rio Grande National Forests Wilderness Management Direction (USFS 1998a) to meet the wilderness standards established within that plan for all wilderness areas.

2.14.61 *This objective was applicable only to BLM lands*.

## Guidelines

2.14.62 *This guideline was applicable only to BLM lands*.

2.14.63 During implementation of projects, every effort should be made to keep recreation sites in the project vicinity open in order to provide for visitor safety and experiences.

2.14.64 Summer and winter ROS maps should guide project-specific decisions and implementation activity. These maps define broad physical, social, and administrative settings for the entire SJNF. Site-specific analysis is necessary ensure desired setting conditions are applied at the project level.

2.14.65 Dispersed sites should be closed, rehabilitated, or otherwise mitigated if there are social-use conflicts and/or resource impacts, or where dispersed sites conflict with the management of developed recreation sites (public or private).

2.14.66 The visual impacts of structures, ski lifts, roads, utilities, buildings, signs, and other built facilities should be minimized. Facilities, as seen from key viewpoints, should be architecturally designed to blend and harmonize with the surrounding land setting. Guidelines should be developed for each ski area that define the built environment (including architectural style, scale, colors, materials, and landscaping).

2.14.67 Revegetation in developed sites should use native plant material and be designed in a manner that maintains a natural appearance.

## Additional Guidance

- The San Juan/Rio Grande National Forest Wilderness Management Direction decision, 1998
- 36 CFR 212, Travel Management
- 36 CFR 219, Planning
- 36 CFR 251, Land Uses
- 36 CFR 261, Prohibitions
- 36 CFR 290, Cave Resources Management
- 36 CFR 291, Occupancy and Use of Developed Sites and Areas of Concentrated Public Use
- 36 CFR 293, Wilderness/Primitive Areas
- 36 CFR 294, Special Areas
- 36 CFR 297, Wild and Scenic Rivers
- FSM 1950, Environmental Policy and Procedures
- FSM 2300, Recreation, Wilderness, and Related Resource Management
- FSM 2710, Special-Use Authorizations
- FSM 2720, Special Uses Administration
- FSM 7300, Buildings and Other Structures
- FSM 7400, Public Health and Pollution Control Facilities
- FSH 1909.15, Environmental Policy and Procedures Handbook
- FSH 2309.18, Trails Management Handbook
- FSH 2709.11, Special Uses Handbook
- FSH 7309.11, Buildings and Related Facilities Handbook
- FSH 7409.11, Sanitary Engineering and Public Health Handbook
- USFS ROS Manual

**Figure 2.14.1: Special Recreation Management Areas, Tres Rios Field Office**

*This figure was applicable only to BLM lands*

Case No. 1:23-cv-01501-RMR Document 20-1 filed 09/29/23 USDC Colorado pg 65 of 183






**Figure 2.14.2: Summer Recreation Opportunity Spectrum**



FS-008298




**Figure 2.14.3: Winter Recreation Opportunity Spectrum**

# 2.15 Scenery and Visual Resource Management

## Introduction

The SJNF possesses outstanding and diverse scenery, capable of enhancing a wide variety of experiences. Many people choose to live in southwest Colorado, in large part, so that they can benefit from the high-quality scenery (with such views even serving as an important selling point for commercial and residential real estate). Scenery is a major draw for tourism and highway travel on the San Juan Skyway, which traverses through the planning area.

Planning for scenic resources on USFS lands involves inventorying for scenic values and then prescribing strategies to manage the resources that protect scenic resources, increasing opportunities for viewing those scenic resources, and careful development and design guidelines so that high scenic integrity may be conserved and sustained in order to meet public expectations. On USFS lands, the highest priority for protection (retention) of scenic quality will be given to the areas of heavy public use, including scenic byways and scenic travel corridors, nationally designated trails, developed recreation sites, administrative sites, and backdrops for cities and towns. The highest standards for visual resources (Scenic Integrity Objectives [SIO] rated as very high/high) are reserved for designated wilderness, roadless areas, or other specially designated areas.

This program also focuses on identifying and conserving the elements that make up the SJNF "niche" and appropriately integrating them into resource management activities, as well as into facility and site development. This includes maintaining the integrity of the expansive, unencumbered landscapes and traditional cultural features distinctive to the planning area. As residential development and populations grow, large tracts of undeveloped lands are becoming scarce and more valued in southwest Colorado. Valued natural and cultural viewsheds are being lost incrementally as lands are developed and special features are removed or destroyed. The SJNF will continue to participate with partners in feasible efforts to secure scenic easements and to acquire lands in order to protect outstanding cultural and natural viewsheds along scenic and backcountry byways and along national scenic and recreation trails.

On USFS lands, as opportunities arise, scenic integrity ratings will be conducted (or updated) for valued landscapes. In addition, a schedule of vegetation treatment locations and activities will be developed in order to address scenic quality related rehabilitation, enhancement, and maintenance. The Scenery Management System inventory for the USFS will be validated and updated as a part of ongoing site-specific project and programmatic analysis.

In order to continue to make scenery available for residents and visitors, efforts will also be made to ensure that scenic pullouts, vista points, waysides and access, and interpretive venues adequately support scenic viewing as a primary visitor activity.

## Desired Conditions

2.15.1 Public demand is met for high-quality scenery that benefits regional tourism, the local and regional economy, the local and regional community image, and overall recreation opportunities. Existing natural appearing scenic landscapes are maintained to the extent possible through project-specific mitigation measures.

2.15.2 Valued viewsheds, vistas, and cultural and natural landscape elements are protected, restored, and enhanced. Activities that protect, restore, enhance, and/or perpetuate long-term valued scenic elements may be visible to visitors in the short term. These activities may include, but are not limited to, fuel reduction, vista creation, wildland fire uses, and insect and disease prevention and suppression.

2.15.3 Views from developed sites, roads, trails, and viewpoints of concern are predominantly within natural-appearing landscapes. Views within developed recreation sites may appear heavily altered (due to recreation support facilities, recreation developments, hazard tree management, etc.).

2.15.4 Scenic and historic byways are recognized as needing to support scenic viewing and interpretation as a primary visitor activity.

2.15.5 Vegetation composition and structure valued for scenic character (including landscapes with a predominance of aspen and ponderosa pine) are showcased along scenic routes and at key viewpoints.

2.15.6 Conservation of significant cultural and natural viewsheds is established through strong partnerships between the USFS, state and local agencies, tribal governments, land trusts, and other interested individuals and organizations.

2.15.7 The built environment (including recreation facilities, utilities, and resource management structures, such as those constructed and/or maintained by permittees) reflects and complements the architectural character of the landscape, as appropriate, and reflects local vernacular architecture and natural landscape context. The quality of the built environment benefits from sound site planning and environmental design principles using efficient energy sources.

2.15.8 Vegetation valued for its scenic character is sustainable and consistent with the inherent landscape character.

2.15.9 Public lands scenery is maintained in a condition that meets the minimum established scenic objectives as established in Figure 2.15.

## Objectives

2.15.10 On USFS lands, annually, ensure compatibility with scenic, visual resources and built environment LRMP standards and guidelines and agency direction within a project area by assessing at least one project with potentially high visual impacts.

2.15.11 On USFS lands, over the life of the LRMP, undertake at least five projects that improve or restore the scenic integrity of areas that currently do not meet SIO standards.

2.15.12 *This objective was applicable only to BLM lands*.

## Standards

2.15.13 On USFS lands, all resource management activities must be consistent with the established scenery objectives shown on Figure 2.15 unless a decision (with supporting rationale) is made to deviate from the management guidance in a site-specific NEPA decision.

2.15.14 *This standard was applicable only to BLM lands*.

## Guidelines

2.15.15 On USFS lands, scenic integrity levels, as viewed from sensitive viewer locations (including National Scenic Byways, National Scenic and Recreation Trails, and developed recreation sites) should generally be managed as high SIO for foreground and moderate SIO for middle ground and background.

2.15.16 For all SJNF lands, the built environment (structures), including non-recreational structures, should conform to the Built Environment Guide (USFS 2001c) that apply to that location.

2.15.17 The quality of the built environment should benefit from sound site planning, as well as from LEED principles.

2.15.18 Straight line-of-sight road construction should be avoided. Roads through wooded areas should be designed in order to follow a curvilinear path using natural topography. Road construction

across ridge tops should be avoided where it may cause a visual contrast in the landscape or where it may add skyline alterations that are visually obvious.

2.15.19 Interim reclamation should be maximized so that supplemental/natural revegetation is facilitated to stabilize soils and reduce visual impacts.

2.15.20 All permanent structures (on-site for more than 6 months) should be painted in a flat, non-reflective, earth-tone color.

2.15.21 The number and size of long-term traffic, regulatory, and site identification signs should be minimized. All such sign backs and posts should be painted a flat, non-reflective color.

2.15.22 Landscaping should blend site developments into the surrounding landscape. Native tree, shrub, and grass species should be employed in landscaping in order to lessen the contrast between a clearing and the adjacent natural environment.

2.15.23 Linear utility corridors and pipeline installations should employ vegetative edge feathering in sloped areas that may be visible from sensitive areas (including roads, use areas, and residences). Vegetation should be cleared, where necessary and appropriate, in a non-linear fashion in order to avoid a visually dominant straight line.

2.15.24 The minimum amount of permanent lighting needed should be installed. Light-sensitive, motion-activated lighting systems that are illuminated only when needed for security and/or for maintenance should be used. Light fixtures should be hooded in order to prevent horizontal and upward light pollution.

2.15.25 For timber harvest activities and fuels treatment activities on SJNF lands:

2.15.25a Treatment units should be designed to minimize visual contrasts. Design features could include leaving large clumps of residual trees or shrubs located within a treatment unit, eliminating straight lines along treatment boundaries and facilitating the re-establishment of native species, as well as other similar actions.

2.15.25b On SJNF lands, with regard to clearcutting, sanitation salvage, thinning, shelterwood harvests, and overstory removal, foreground views from system trails and roads, and from recreation areas, should be designed in a manner that avoids dominating views of large, continuous openings and is mitigated by the presence of sufficient groups of residual trees. Uncut islands should be reserved within unit(s) in order to reduce apparent size of unit, provide visual diversity, and achieve a more natural-appearing treatment area.

2.15.25c Within immediate foreground of recreation sites such as campgrounds, picnic areas, and trailheads:

- Slash, if chipped, should be substantially disposed of unless used as mulch, mud control, or path/pad surfacing;
- stumps should be low cut or flush-ground;
- slash should be substantially reduced; and
- treatment units should be designed to enhance scenic qualities within the viewshed.

2.15.25d Fire control lines should be restored to a natural appearance in areas within view of roads, trails, or recreation sites. Work should be accomplished within 3 years of completion of burn. When opportunity allows, and when it meets the recreation objectives prescribed for an area, fire control lines may be designed for long-term use as recreational trails and left in place.

2.15.25e Design of thinning units should avoid visual uniformity as viewed from roads, trails, and recreation sites.

2.15.25f Temporary slash or chip piles, log decks, or landings in SIO Classes Very High – Moderate should:

- be located to facilitate future removal without the development of new ground disturbance (placed adjacent to pre-existing roads or primitive roads); and
- be disposed of within 3 years.

2.15.25g In sensitive foreground areas (as viewed from system roads, trails and/or developed recreation sites), unit boundaries and tree marking should be accomplished with temporary flagging and removed once need is fulfilled.

2.15.26 For developed ski areas:

2.15.26a Structures (including lift towers, cross-arms, lift terminals, sign backs, posts, utility boxes and transformers) should be painted, or in some way colored, in order to blend into the surrounding landscape, as approved by a USFS representative.

2.15.26b Glass windows of buildings at or above the tree line, or in highly visible areas, should be non-reflective.

2.15.26c Ski trail design should replicate patterns of natural landscape vegetation mosaic. Pattern, size, shape, and topographic location should be considered in mosaic.

2.15.26d Ski trail design should mimic natural landscape patterns, including size, shape, and topographic location. Size and shape of islands should avoid straight edges and geometric forms that contrast with natural openings and landforms.

2.15.26e Chair lift lines should be incorporated into trail clearings in order to reduce linear openings in forest stands.

2.15.26f Natural clearings should be incorporated into trail design.

2.15.26g Trail edges should be softened through feathering, scalloping, and/or other means.

2.15.26h Soil/plant/ground disturbances should be minimized to the smallest footprint feasible. Where disturbance is unavoidable, topsoil and organic matter should be salvaged and used for rehabilitation (so that color and textural contrast of the disturbed area is gone, and the disturbed area blends visually with the surrounding undisturbed area) within three growing seasons.

2.15.26i Topsoil should be stockpiled and used for rehabilitation of facility construction sites (so that color and textural contrast of the disturbed area is gone, and the disturbed area blends visually with the surrounding undisturbed area) within 3 growing seasons.

2.15.26j Disturbance of valued landscape elements important to foreground views (including tree groves and boulders) should be limited. Construction fencing should be used to mark limits of disturbance at all construction sites.

2.15.26k The size and disturbance associated with material staging and equipment access and parking should be limited. These areas should be located, where feasible, outside sensitive viewsheds.

2.15.26l Vegetation treatments within the immediate foreground of popular summer travel routes should achieve a moderate SIO.

## Additional Guidance

- Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development (USDI and USDA 2007)




**Figure 2.15: Scenic Integrity Objective and Visual Resource Management**

# 2.16 Heritage and Cultural Resources

## Introduction

The SJNF has a long and rich prehistoric and historic record, with human settlement of the area spanning approximately 12,000 years. The archeological record within the planning area contains some of the earliest agricultural societies in the region. The historic period brought Spanish and Euro-American explorers, trappers, miners, and settlers into the area. This long record of human occupation has left one of the highest densities of prehistoric and historic heritage and cultural resources found in the United States. These sites have national, international, and Native American tribal significance.

Heritage and cultural resources are non-renewable resources that include historic and prehistoric artifacts, structures, sites, districts, and archival materials important for their scientific, educational, economic, traditional, and social values. Visitation to heritage and cultural resource sites within the planning area is an important contributor in the region's economy, and draws great interest from people from all over the world.

The USFS is responsible for identifying, evaluating, and protecting heritage and cultural resources on the public lands they manage. Significant heritage and cultural resources within the planning area include resources that are eligible for listing, or are already listed, on the National Register of Historic Places (NRHP) and Priority Heritage Assets.

Significant heritage and cultural resources within the SJNF include the Chimney Rock National Monument, the Falls Creek Archaeological Area, the Anasazi National Register District, the Spring Creek National Register District, the Lost Canyon National Register District, and the historic mining sites along the Alpine Loop Back Country Byway.

The Old Spanish National Historic Trail briefly crosses through the USFS planning area. Authorized by Congress in December 2002, the Old Spanish National Historic Trail commemorates the first overland link from Santa Fe to California. While the Old Spanish Trail is currently mapped as crossing the planning area, very few localities associated with the trail have actually been identified and ground-truthed.

The heritage and cultural resources found within the planning area face numerous impacts from natural and human disturbances. Population and visitation growth and development impact non-renewable heritage and cultural resources both directly and indirectly. Direct impacts include disturbance from construction, vandalism, and excessive or inappropriate visitor use. Indirect impacts include accelerated erosion and visual impacts to cultural landscapes.

Under the direction of the LRMP, the SJNF heritage and cultural resources programs will be focused on three main areas of cultural resource management:

- Protecting archeological, historical, cultural, and traditional resources: this includes both proactive and reactive efforts, as well as offering support to other resource programs. Efforts and support activities include Section 106 of the National Historic Preservation Act (NHPA) support for federal undertakings and NHPA Section 110 efforts that implement proactive cultural resource management. Implementation of both Sections 106 and 110 of the NHPA can involve inventories, identification, documentation, evaluation, monitoring, consultation, nomination, preservation, site protection, mitigation, stabilization, and/or restoration of heritage and cultural resources.
- Providing research, education, and interpretive opportunities: Support research is provided by qualified permitted individuals, organizations, colleges and universities. On- and off-site educational and interpretive opportunities can be provided through a wide variety of materials and media (including signage, brochures, publications, presentations, DVDs, and websites).
- Working collaboratively with partners: This includes site stewards, volunteers, state and other federal agencies, local and tribal governments, schools and universities, and non-

profit groups. It includes funding organizations in order to provide site protection, research, educational, and interpretive opportunities.

## Desired Conditions

2.16.1 Significant heritage and cultural resources, such as USFS Priority Heritage Assets and sites on the NRHP, are maintained in good to excellent physical condition. Significant cultural values are protected or preserved. Heritage and cultural sites are preserved and stabilized and may be available for interpretation and research; they may have site-specific management plans. Sites are protected from physical damage and excessive wear and tear resulting from visitor use.

2.16.2 USFS Priority Heritage Assets have current (5 years old or less) condition assessments.

2.16.3 Significant heritage and cultural resources are listed on the NRHP.

2.16.4 The visual and aesthetic setting and physical associations of significant sites are protected so that the visitor experience of the historical/cultural landscape and setting is maintained.

2.16.5 USFS activities are compatible with management objectives for significant sites or are temporary in their impact to the site and its viewshed, as well as to the overall visitor experience.

2.16.6 A management presence at key heritage and cultural resource sites is provided to protect sensitive or heavily visited sites from inappropriate use or vandalism.

2.16.7 Interpretive displays, visitor contacts, and/or brochures are available in order to help visitors and employees understand, and appreciate, the heritage and cultural resources associated with the planning area. A wide range of heritage activities, experiences, and products (both on- and off-site) are available for visitor enjoyment and education. Off-site activities include museum displays, brochures, audio programs, classroom presentations, and field trips. Public access and interpretive efforts are compatible with the physical, cultural, and recreational settings and values of the resources.

2.16.8 Select historic cabins are restored and adaptively reused for appropriate recreation and/or for interpretive use.

2.16.9 Partnerships are encouraged and expanded in order to provide identification, documentation, monitoring, protection, preservation, education, research, and interpretation.

2.16.10 Looting of sites is reduced through increased public awareness and education related to cultural resources. Vandalism at sites is promptly remedied to prevent recurrence.

2.16.11 Heritage and cultural resource databases are managed for efficient and accurate management and research, in cooperation with the Colorado Office of Archaeology and Historic Preservation.

2.16.12 Restrictions through the use of permits and/or visitation controls are implemented when necessary to protect sites from physical damage and excessive wear and tear from visitation.

## Objectives

2.16.13 Over the implementation life of the LRMP, protect/preserve/stabilize at least 7 significant heritage/cultural resources that have identified deferred maintenance needs that if not addressed will result in loss of the resource.

2.16.14 Annually post protective signage and/or surveillance cameras on at least one heritage and cultural resources sites that are at-risk for vandalism.

2.16.15 Over the implementation life of the LRMP, list three sites and/or districts on the NRHP.



FS-008306

2.16.16 Over the implementation life of the LRMP, implement the Anasazi National Register District Monitoring Plan and new site monitoring plans for the Lost Canyon and Spring Creek National Register Districts.

2.16.17 Over the life of the LRMP, partner with the Old Spanish Trail Association to ground truth the location of the segment of the Old Spanish National Historic Trail on the SJNF.

2.16.18 Over the life of the LRMP, develop at least one interpretive product in partnership with the Old Spanish Trail Association that interprets the Old Spanish National Historic Trail within the planning area.

2.16.19 Over the life of the LRMP, inventory high potential historic sites and trail routes of the Old Spanish Trail, develop a national trail management corridor, and establish goals and objectives for national trails.

## Standards

2.16.20 The portions of the Animas City to Silverton Wagon Road (5LP1258) that are within the SJNF must be retained under federal ownership and management. All portions of this historic wagon road on federal lands are not available for future disposals or exchanges. This eligible site will be preserved and managed as a Priority Heritage Asset.

2.16.21 *This standard was applicable only to BLM lands*.

## Guidelines

2.16.22 Activities that could adversely affect sites eligible or potentially eligible for the NRHP should avoid these sites by a minimum of 300 feet, unless otherwise specified by the Authorized Officer, and/or unless other mitigating measures are developed. If a project is specified by the Authorized Officer to be within 100 feet of an eligible or unevaluated site, all ground-disturbing activity should be monitored by a qualified archaeologist.

2.16.23 **Old Spanish National Historic Trail:** A literature search and/or Class III cultural resources survey should be conducted within 0.5 mile of either side of the centerline of the Congressionally designated Old Spanish National Historic Trail in high potential segments, prior to authorization of ground-disturbing activities, or activities that could substantially interfere with the nature and purposes of the trail.

## Additional Guidance

### *Policy and Handbooks*

- FSM 2360, Special Interest Areas

### *Executive Orders*

- EO 11593, Protection and Enhancement of the Cultural Environment
- EO 13007, Providing for American Indian and Alaska Native Religious Freedom and Sacred Land Protections
- EO 13084, Consultation and Coordination with Indian Tribal Governments
- EO 13195, Trails for America in the 21st Century
- EO 13287, Preserve America

### *Management Plans*

- USFS Draft Old Spanish Trail Corridor Management Plan, 1981

### *Agreements*

- Programmatic Agreement between the BLM, the State of Colorado, the National Forests in the State of Colorado, the Forest Service, the Colorado State Historic Preservation Office, and the Advisory Council on Historic Preservation Regarding the Management of Wildland Fire for Resource Benefits (Agreement No. 1102-002-98-038) (1998)

## 2.17 Paleontological Resources

### Introduction

Paleontological resources (fossils) constitute a scientific record of the history of life on earth. Management requirements related to ground-disturbing activities are applied in order to protect paleontological resources and the scientific values they contain. Avoidance and collection are the preferred mitigations for the preservation of paleontological resources.

On March 30, 2009, the Paleontological Resources Preservation Act (PRPA) became law when President Obama signed the Omnibus Public Land Management Act of 2009, Public Law 111-011, Title VI, Subtitle D on Paleontological Resources Preservation (known by its popular name, the PRPA) (123 Stat. 1172; 16 USC 470aaa). The PRPA requires the Secretaries of the Interior and Agriculture to manage and protect paleontological resources on federal land using scientific principles and expertise. The PRPA includes specific provisions addressing management of these resources by the USFS, BLM, the National Park Service, the Bureau of Reclamation, and the USFWS.

In 1996 the USFS Paleontology Center of Excellence and the Region 2 Paleo Initiative developed a classification system called the Probable Fossil Yield Classification (PFYC) in order to promote consistency throughout and between agencies (USFS 1996c). The PFYC system provides baseline guidance for assessing the relative occurrence of important paleontological resources and the need for mitigation. Geologic units are classified at the formation, or member, level according to the probability of yielding paleontological resources of concern to land managers. Classifications range from Class 1 to 5 and are based on the relative potential to yield vertebrate, uncommon invertebrate, or plant fossils of scientific interest. A higher classification number indicates a higher fossil yield potential and greater sensitivity to adverse impacts (see Volume III, Appendix B, for a description of the five PFYC classes and the suggested management direction indicated for each class; geological formations that are known to contain significant vertebrate, invertebrate, and plant fossils include those listed in Appendix B).

In accordance with the PRPA and NEPA, paleontological resources are to be considered during the planning process using scientific principles and expertise. Known and newly discovered paleontological localities are to be monitored and managed using scientific principles and expertise in accordance with the PRPA.

Most of the planning area has not been surveyed for paleontological resources, and the extent of occurrences of most paleontological resources is not known.

### Desired Conditions

2.17.1 Acquiring better knowledge of paleontological resources on SJNF lands is emphasized.

2.17.2 Paleontological resources are available for appropriate scientific, educational, and, where appropriate, recreational uses by present and future generations.

2.17.3 Known dinosaur localities are actively managed for the relevance and importance of Jurassic fossils.

2.17.4 The McPhee Reservoir sauropod locality is actively managed through a long-term stewardship agreement to preserve dinosaur partial skeletons actively eroding along the margin of the reservoir.



FS-008308

### Objectives

2.17.5 Over the life of the LRMP, identify and document up to five paleontological sites on SJNF lands.

2.17.6 At a minimum, monitor two paleontological localities per year.

2.17.7 Where feasible, conduct fossil resource inventories in areas where they are needed on a project basis over the life of the LRMP.

2.17.8 Increase opportunities for outdoor recreational experiences and volunteer projects focused on fossil resource management, and increase the number of partnerships with educational and research institutions.

### Standards

There are no standards for paleontological resources.

### Guidelines

2.17.9 Known paleontological localities should be managed to:

a. Allow collection of paleontological resources with authorization for educational and scientific purposes;
b. Monitor casual collection of common invertebrate and plant paleontological resources localities, and institute local area closure if necessary;
c. Evaluate known localities for potential interpretive use by the public; and
d. Input known locality information into a protected database for further paleontological resources management needs.

### Additional Guidance

- PFYC, as developed by the Paleontology Center of Excellence and the Region 2 Paleo-Initiative (USFS 1996c)
- Fossil Yield Potential Classification for San Juan National Forest (Schumacher 2011)
- Public Law 111-011, Subtitle D - PRPA, 2009

## 2.18 Lands and Special Uses

### Introduction

Occupancy of public lands by private individuals or interests, or by local, state, tribal, and other federal agencies, for a variety of activities (including roads, utility lines, communication sites, dams, and other private or commercial uses that cannot be accommodated on private land) is authorized by special use permits, ROW grants, easements, and leases. The lands and special uses programs include activities such as land ownership adjustments, land use and access, and land withdrawals. Program emphasis includes:

- facilitating the efficient and effective acquisition, disposal, and management of the public lands;
- ensuring that the wide and growing variety of demands by the public, commercial interests, state and other federal agencies, and tribal and local governments are compatible with environmental protection;
- managing the legitimate needs for access to public and private lands; and
- meeting legal requirements for specific resource protection.

## Land Ownership

Public lands are generally retained in federal ownership in order to provide long-term values. The vision for the planning area is to retain in public ownership all lands that meet the long-term needs of maintaining the integrity of contiguous natural ecosystems, river frontage, riparian areas and wetland ecosystems, recreation and open space, scenery, and clean air and water. Under the direction of the LRMP, on a case-by-case basis, the SJNF would acquire lands and/or mineral estates that enhance this vision. The agency would dispose of lands that do not meet these needs or are interspersed with expanding communities where the agency mission can no longer be met. In all such cases, the primary guiding principle would be the greater public benefit.

## Land Use and Access Authorizations

The USFS issues authorizations for occupancy and use for a variety of private and commercial entities; as well as for local, state, tribal, and other federal agencies. This is accomplished through easements, ROWs, special use permits, leases, and other instruments. Trespasses and encroachment issues are resolved through removal, remediation, or authorization. The USFS maintains and enhances public access to the lands identified for retention, as well as to other public lands where improved access meets resource and/or management needs. The USFS engages in cooperative management of private and commercial access needs (with private individuals, federal, state, and local agencies, and tribal governments) and encourages the formation of “road-user associations” where multiple users require access. All authorized uses on public lands are required, by law, to meet all applicable environmental protection measures. For all proposed activities that have the potential for disturbance to lands and resources, a project design, prepared by the applicant, is required and is subject to full public environmental analysis, review, and, when necessary, appropriate monitoring.

## Land Withdrawals

Formal withdrawal of land from specific land uses is a tool designed to ensure the reservation of the land or resource for a dominant use. Withdrawals require a full public environmental analysis and decision process. The vision for the planning area is to pursue formal withdrawal of lands where this process has identified lands with high values and resources needing protection that cannot be provided by routine management, or where withdrawal is required by law.

## Acquisition and Disposal of Lands

The planning area contains numerous parcels of enclosed private land (in-holdings) that are undeveloped. Land acquisition policies of USFS recognizes the value of acquiring such parcels, especially where the affected private lands contain unique or special values or benefits. Acquisition of these parcels would protect such values for the future and contribute to the mission of the USFS. See Guidelines below for a list of criteria that would be used to identify and prioritize parcels for possible acquisition.

USFS-administered lands within the planning area are generally suitable for long-term retention under federal ownership. The USFS does not carry out comprehensive inventories of lands designed to identify potential for disposal or retention. However, USFS-administered lands are generally available for consideration for transfer of ownership where there is determined to be a public or resource benefit. Such actions may occur through land exchange, disposal of small tracts by direct sale under specific authorities, jurisdictional transfer between agencies, and/or through disposal for community purposes. Specific proposals may be considered on a case-by-case basis.

## Designated Energy Corridors and Linear Energy Transmission Authorizations

Designated energy corridors are intended to support different types of compatible energy-transport systems. Energy corridors on federal lands provide pathways for future pipelines and long-distance electrical transmission lines that are expected to help relieve congestion, improve reliability, and enhance the national electric grid. Future use of the corridors should reduce the proliferation of ROWs across the

landscape and minimize the environmental footprint from development. These corridors are defined by a centerline and a stated width that can be used for energy transmission projects. Within these areas, energy transmission projects would be an appropriate (suitable) use of land allocated to energy corridors. Project applicants would not be constrained to use an approved energy corridor, but would be encouraged to do so in order to streamline the regulatory process and/or reduce the time frames that would be required in order to develop alternative alignment site proposals. Designation of corridors does not authorize any projects, mandate that future projects be confined to the corridors, or preclude the agency from denying a project in a designated corridor. Energy projects to be located within designated corridors will require a formal, agency-approved project ROW that will contain site-specific requirements. A ROW would occupy a smaller portion of any designated energy corridor, and the granting of a ROW would require site-specific environmental and engineering information and analysis. Energy corridors, as designated, should be suitable for interstate and intrastate ROW distribution and energy-producing facilities, as required, in order to meet current and 10- to 15-year demand forecasts. Designated energy corridors differ from separate energy transmission ROWs/special use authorizations in that these types of authorizations are project-specific assignments of a relatively narrow strip of land permitted and limited to a single energy transmission project.

Section 368 of the Energy Policy Act of 2005 directs the Secretaries of Agriculture, Commerce, Defense, Energy, and the Interior to designate energy transmission corridors on federal land in 11 western states (Arizona, California, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming) for oil, gas, and hydrogen pipelines, and for electricity transmission and distribution facilities. Based on consideration of the effects of corridor designation described in the Final Programmatic Environmental Impact Statement (PEIS), Designation of Energy Corridors on Federal Land in the 11 Western States (DOE/EIS-0386) (U.S. Department of Energy [DOE] and BLM 2008), the USDA issued the Record of Decision, Designation of Section 368 Energy Corridors on National Forest System Land in 10 Western States (USFS 2009b) designating one new Section 368 corridor (No. 130-274) across lands administered by the SJNF. This corridor was designated with a default width of 3,500 feet and for compatible multimodal uses with the centerline of the existing Trans-Colorado Natural Gas Pipeline. Interagency operating procedures (IOPs) developed and evaluated in the Energy Corridors EIS and adopted in the USFS ROD amending land use plans are expected to foster long-term, systematic planning for energy transport development in the West, provide industry with a coordinated and consistent interagency permitting process, and provide practicable measures to avoid or minimize environmental harm from future development within the corridors. IOPs are incorporated here by reference and are mandatory, as appropriate, for projects proposed within the Section 368 corridors. These IOPs are also suggested guidance for all energy pipelines and electric transmission lines within designated energy corridors that were not designated through the Section 368 process.

Table 2.18.1 shows a listing of designated corridors and existing linear energy transmission authorizations in which future facilities would be encouraged to locate. Figure 2.18.2 illustrates the approximate location of corridors and existing transmission facilities across the planning area. Transmission facilities include 69-kV and greater transmission lines and ancillary facilities (USDA et al. 2005). Oil and gas interstate pipelines identified as locally designated corridors are those that do not require Congressional notification (as required by the Mineral Leasing Act of 1920, as amended, in accordance with 30 USC 185(w)) and are between 16 and 24 inches in diameter. The Trans-Colorado Natural Gas Pipeline route is an existing designated corridor in the current San Juan National Forest Land Management Plan and is designated a Section 368 Energy Corridor under the Energy Policy Act of 2005.

**Table 2.18.1: Designated Energy Corridors and Energy Transmission Facilities on the San Juan National Forest**

| Corridors and Transmission Lines | Agency | Size | Potential Uses |
|---|---|---|---|
| Western Area Power Administration – Currecanti to Lost Canyon | USFS | 230 kV | Upgrade existing facilities; additional facilities considered on a case-by-case basis |
| Western Area Power Administration – Montrose to Hesperus | BLM/ USFS | 345 kV | Upgrade existing facilities; additional facilities considered on a case-by-case basis |
| Tri-State Generation and Transmission Association, Inc. – Burro Bridge to Cascade | BLM/ USFS | 115 kV | Upgrade existing facilities; additional facilities considered on a case-by-case basis |
| Tri-State Generation and Transmission Association, Inc. – Burro Bridge to Telluride | USFS | 115 kV | Upgrade existing facilities; additional facilities considered on a case-by-case basis |
| Tri-State Generation and Transmission Association, Inc. – Nucla to Cahone | BLM/ USFS | 115 kV | Upgrade existing facilities; additional facilities considered on a case-by-case basis |
| Tri-State Generation and Transmission Association, Inc. – Durango to Bayfield | BLM | 115 kV | Upgrade existing facilities; additional facilities considered on a case-by-case basis |
| Tri-State Generation and Transmission Association, Inc. – Bayfield to Pagosa Springs | USFS | 115 kV | Upgrade existing facilities; additional facilities considered on a case-by-case basis |
| La Plata Electric Transmission | USFS | 115 kV | Upgrade existing facilities; additional facilities considered on a case-by-case basis |
| Northwest Pipeline Corridor – (includes MapCO and Kinder Morgan) | BLM/ USFS | Multiple pipelines | Upgrade existing facilities |
| **Corridors Designated under Section 368 of the Energy Policy Act of 2005** | | | |
| Designated Utility Corridor. Trans-Colorado Pipeline Corridor (368 corridor segment 130-274) | USFS | 22-inch gas | Multimodal facilities considered |
| Designated Utility Corridor. Tri-State Generation and Transmission Association, Inc. – Nucla – Trans Colorado Pipeline Corridor (368 corridor segment 130-131 [N]) | USFS | 115-kV electric transmission line | Electric transmission only; corridor jointly managed with BLM Uncompahgre Field Office |

## Communication Sites

Within the planning area, proposals for communication and electronic sites are encouraged to use existing sites, within capacity and compatibility limits. Generally, existing communication sites have a low SIO. Communication site development is generally suitable at designated communication sites when it is compatible with existing uses. Table 2.18.2 lists the location of current communication sites and suitable uses for each site. Figure 2.18.2 locates the sites geographically.

**Table 2.18.2: Communication Sites, Locations, and Suitable Uses**

| Communication Site | Geographic Location | | | Suitable Uses |
|---|---|---|---|---|
| | Latitude* | Longitude | Elevation (feet) | |
| Bayfield Ranger Station | 37.2269 | -107.6009 | 6,900 | Government use; broadcast |
| Benchmark | 37.7677 | -108.5714 | 9,264 | Government use only |
| Caviness Mountain | 37.363 | -108.1508 | 10,050 | High-power; broadcast and non-broadcast |
| Coal Bank | 37.6973 | -107.7785 | 10,660 | Low-power; non-broadcast |
| Devil Mountain | 37.2844 | -107.2759 | 9,922 | Government use only |

| Communication Site | Geographic Location | | | Suitable Uses |
|---|---|---|---|---|
| | Latitude* | Longitude | Elevation (feet) | |
| Dolores-Montezuma County | 37.4823 | -108.5113 | 7,420 | High-power; broadcast and non-broadcast, state and local government use only |
| Eagle Pass | 37.4131 | -108.013 | 11,880 | Low-power; non-broadcast |
| Eightmile Mesa | 37.1715 | -106.997 | 8,176 | Low-power; non-broadcast |
| Escalante | 37.4667 | -108.5244 | 7,080 | Low-power; broadcast |
| Expectation Mountain | 37.6924 | -108.0658 | 11,680 | Passive-reflector |
| Grassy | 37.3589 | -107.5534 | 9,525 | Government use; low-power; broadcast |
| Kennebec | 37.451 | -108.0328 | 12,240 | Government use only |
| Missionary | 37.3636 | -107.783 | 9,860 | Low-power; broadcast and non-broadcast |
| Oak Brush Hill | 37.1925 | -107.0996 | 8,623 | Government use; low-power; broadcast and non-broadcast |
| Pargin | 37.1975 | -107.4625 | 8,910 | Government use only |
| Parrott Peak | 37.3721 | -108.1026 | 11,540 | Low-power; non-broadcast |
| Spring Creek | 37.1931 | -107.4726 | 8,870 | Low-power; non-broadcast |
| Tuckerville | 37.4992 | -107.4648 | 11,640 | Government use only |
| Yellow Jacket | 37.2555 | -107.4656 | 8,397 | Low-power; non-broadcast |

* These latitude/longitude coordinates do not delineate the boundaries of the ROW use areas; rather, they give approximate locations. Boundaries of the use areas would be defined in individual site plans.

## Desired Conditions

2.18.1 Public land ownership boundaries are clearly marked on the ground, and land ownership information is easily accessible to the public.

2.18.2 Surface and mineral ownership within the planning area is consolidated in order to meet resource and community needs and to facilitate efficient land management.

2.18.3 The SJNF retains and/or acquires river frontage, riparian areas and wetland ecosystems, and other lands that would enhance or protect recreation, open space, scenery, clean air and water, and key habitat for species.

2.18.4 The SJNF acquires adequate access to isolated lands for resource or management needs.

2.18.5 Road access to private land is granted only where no other reasonable alternative exists and where it meets the appropriate road design and maintenance standards necessary for resource protection and public safety.

2.18.6 Road use authorizations for roads that serve predominantly non-SJNF purposes are provided to local road jurisdictions (reserving public access, where appropriate).

2.18.7 Energy corridors throughout the planning area improve the delivery of electricity, oil, and gas and enhance the western electric transmission grid by improving reliability, reducing congestion, and contributing to the national electrical grid.

2.18.8 Future linear transmission uses are encouraged to occur adjacent to existing authorized routes for transmission lines over 69 kV and for pipelines more than 10 inches in diameter. Local distribution lines and smaller pipelines are located in conjunction with the existing road system or other previously disturbed areas where possible.

## Objectives

2.18.9 Annually, survey and post 3 miles of property line adjacent to private land and boundaries where trespass or encroachment is most likely.

2.18.10 Annually, over the life of the LRMP, acquire an average of two new road and trail ROWs for high-priority access or to fill gaps in existing access to public lands.

2.18.11 Within 5 years, convey to appropriate county jurisdiction one high-priority road on NFS lands identified as dominantly non-USFS access or use.

2.18.12 Annually, ensure that all relevant desired conditions are being met or trending toward being met in special use permit areas by inspecting at least 5% of existing special use permit areas.

## Standards

2.18.13 *This standard was applicable only to BLM lands*.

## Guidelines

2.18.14 Land boundary lines should be surveyed, posted, marked and maintained according to these priorities: 1) lines needed to meet planned activities, 2) lines needed to protect SJNF lands and special areas from encroachment, 3) lines where trespass or encroachment are most likely or are suspected, and 4) all other land boundary lines.

2.18.15 *This guideline was applicable only to BLM lands*.

2.18.16 The SJNF should acquire or retain lands, interest in lands, or ROWs or easements:

- within designated wilderness areas, other Congressionally classified areas, such as the Piedra Area and wild and scenic rivers (WSR), and WSAs;
- that provide habitat for animal and plant species designated as threatened or endangered, and/or for other species identified for special protection;
- that contain wetlands and/or floodplains and associated riparian ecosystems, or enhance watershed protection;
- with historical or important heritage resources;
- where resource management or values are threatened by change of use or may be enhanced by public ownership;
- that enhance resource management and values, improve production of goods and services, or are needed to meet resource management goals and objectives;
- that contain resources or values of local importance such as water frontage, outstanding scenery, and outdoor recreation, or that maintain or stabilize local economies;
- that consolidate federal lands or reduce the miles of interior boundaries and number of interior corners;
- where the entire mineral estate is acquired with the surface estate or where acquisition will not include lands likely to go to patent under the 1872 Mining Law; and
- where needed to enhance public and administrative access to federal lands or to enhance recreation opportunities.

2.18.17 The SJNF should convey title in lands or interest in lands:

- to states, counties, cities, or other federal agencies when a greater public interest exists;
- where small parcels intermingle with mineral or agricultural patents or are isolated physically and/or legally from other federal lands;
- where development by the private sector is in the greater public interest and does not adversely affect management of adjoining public lands;

- where exchange of lands brings into federal ownership higher critical resources or values;
- where reservation of interest mitigates (e.g., ROW for access road) the effects of disposal;
- in developed areas that have lost or are losing their public lands character;
- to expanding local communities where requested or where a greater public interest exists, such as lands surrounding the municipalities of Durango, Cortez, Silverton, Bayfield, Pagosa Springs, Mancos, Dolores, and other communities; and
- that are encumbered by special use permits, authorized substantial structural improvements, or occupancy trespass where a greater public need for the land no longer exists.

2.18.18 *This guideline was applicable only to BLM lands*.

2.18.19 NFS roads, where private use substantially dominates public use, should be conveyed to the appropriate local government jurisdiction.

2.18.20 Cost effectiveness of invasive species management and hazardous material remediation must be evaluated when contemplating exchange or acquisition of lands or easements.

2.18.21 Jurisdictional transfers between agencies should be prioritized as follows: 1) to reduce duplication of effort, time, cost, or coordination by users and agencies; 2) to maintain or improve user access; 3) to decrease travel and enhance management; 4) to improve public understanding of management policy; and 5) to develop more effective and efficient work units.

2.18.22 Land use authorizations should avoid developed sites, unless the proposed use or occupancy is compatible with the purpose and use of the developed site.

2.18.23 Special use applications that can be reasonably met on private lands should not be approved on SJNF lands unless it is clearly in the public interest.

2.18.24 Access to public lands should be acquired through:

- reciprocal grants, where available, from grantees receiving federal easements and ROWs;
- reservations (e.g., roads, trails, easements) in land disposals; or
- purchase or donation from willing landowners.

2.18.25 Existing trespass and encroachments should be resolved according to the following priorities: 1) where public safety is threatened, 2) where damage to resources and/or resource values is occurring, 3) where public access is interfered with, 4) where the encroachment is unintentional, and 5) where no substantial damage or management concern exists.

2.18.26 New or replacement telephone lines and electrical utility lines of 33 kV or less should be buried unless:

- visual quality objectives of the area can be met using an overhead line;
- burial is not feasible due to geologic hazard or unfavorable geologic conditions; or
- greater long-term site disturbance would result.

2.18.27 Overhead electric lines should use non-specular or “dulled” wire. All utility poles and hardware should be designed to blend in with the surrounding environment, as needed, in order to meet scenic quality objectives.

2.18.28 Vegetation treatments within corridors and along linear transmission facilities should meet facility safety requirements, provide for control of invasive species, and provide for revegetation in order to reduce visual impacts.

2.18.29 The following areas are identified as avoidance areas for ROW, communications sites, and other land use authorizations: all areas having high through very high SIO, lands managed for wilderness characteristics, Dolores River Canyon, Chimney Rock National Monument, Falls Creek Archeological Area, Anasazi Archeological Area, and special botanical areas.

2.18.30 The following areas are identified as exclusion areas for ROWs, communications sites, and other land use authorizations: wilderness areas, WSAs, RNAs, wild segments of eligible WSR, and MA1.

2.18.31 Energy transmission facilities should be consolidated within existing corridors and along existing linear energy transmission facilities in order to reduce habitat loss, degradation, and fragmentation resulting from new construction.

2.18.32 Communication sites should be designed to minimize the visual appearance of structures. Communication antennas should use non-reflective surfaces or be painted, where possible, to minimize visual impacts.

## Additional Guidance

- FSM 1920, 2700, 2760, 5400, 5500, 5590
- FSH 2509.25, 2709, 5409

**Figure 2.18.1: Lands Available for Disposal, Tres Rios Field Office**

*This figure was applicable only to BLM lands*




**Figure 2.18.2: Designated Utility Corridors, Communication Sites, and Transmission Lines**

# 2.19 Minerals and Energy

## Introduction

The Minerals Policy Act of 1970 states that it is the nation's policy to "foster and encourage private enterprise in the development of economically sound and stable industries, and in the orderly and economic development of domestic resources to help assure satisfaction of industrial, security, and environmental needs." The minerals and energy programs of the USFS emphasizes the orderly and timely development of mineral and energy resources of the public lands in order to benefit the nation while, at the same time, managing all resources for multiple uses. The planning area contains both known (historic and current) and potential (geologically favorable) areas for the occurrence of valuable mineral deposits and energy resources. An assessment of the SJNF portion of the planning area was completed by the U.S. Bureau of Mines (Neubert 1992) and updated by the USFS (Van Loenen and Gibbons 1994). The 1994 update included the results of field studies, literature review, sample collection and analysis, mine site visits, and review of USFS data. A Reasonable Foreseeable Development Scenario for oil and gas potential and development was completed for the planning area (BLM and USFS 2010). SJNF managers will respond to proposals from industry, and from the public, for exploration and development of mineral and energy resources in a timely manner and will foster the development of mineral and energy resources on the public lands in compliance with all applicable laws and policies, including applicable environmental protection measures.

Federal mineral resources are managed under three categories with differing sets of laws and regulations. The three categories are locatable, saleable, and leasable minerals. In all cases, any activities related to the exploration or development of any kind of mineral on public lands must comply with other federal and state laws where applicable. These include laws such as the Clean Water Act, the Clean Air Act, and the ESA. The rights to access, explore, and develop locatable minerals, where open to the public, are guaranteed by the Mining Law of 1872. Rights to leasable and saleable minerals are granted through a process of leases, permits, and contracts.

Ownership of surface estate does not always coincide with the ownership of mineral estate. There may be cases where the surface was patented into private ownership, but all or part of the mineral estate remains in federal ownership (e.g., the Stock-Raising/Homesteading Act), or there may be cases where minerals are privately owned but the surface is federal. These instances are known as "split estate". In general, federal mineral estate is open to mineral entry unless it is withdrawn for specific reasons (e.g., wilderness areas, specified developed recreation sites). In some instances, minerals on federal lands acquired under certain authorities are only available for lease and are not subject to location under the Mining Law of 1872. Disposal of federal minerals by lease or sale is considered to be a discretionary federal action, whereas location of minerals by claimants under the Mining Law of 1872 is not discretionary. This means that in some cases, lands may be open to mining claims but administratively unavailable for leasing or mineral sale.

Federally owned mineral resources are managed under three categories with differing sets of laws and regulations:

- **Locatable Minerals:** These are subject to claim under the Mining Law of 1872, as amended.
- **Salable Minerals:** These are defined as "common varieties" of mineral. They are disposed of under a sale contract or free use permit under the Mineral Materials Act of 1947.
- **Leasable Minerals:** These minerals are subject to lease under the Mineral Leasing Act of 1920, as amended.

For the purposes of this document, locatable minerals (including precious and base metals, as well as uranium and vanadium), saleable mineral materials (including sand, gravel, and construction stone), and some leasable minerals (including coal, potash, and sodium) are discussed as "solid minerals." Oil and natural gas (including carbon dioxide [$CO_2$]) are discussed together as "fluid leasable minerals."

## Locatable Minerals

Locatable minerals include precious metals such as gold and silver, base metals such as lead, zinc, and copper, as well as uranium and vanadium, and certain uncommon varieties of mineral materials and industrial minerals.

There is a high potential for the occurrence of uranium and vanadium along the Colorado-Utah border in an area known as the Uravan mineral belt (see Figure 2.19.1). This area has been home to extensive conventional underground room and pillar type mining dating back to before World War II. There is also some potential for copper in this area, and there is a large open pit copper mine in Lisbon Valley, Utah. Most of this mining occurs on BLM lands or private lands in desert landscapes. Other areas of interest for locatable minerals include the Rico-Dunton area (molybdenum, gold, silver, lead, zinc, copper), the La Plata Mountains (the California Mining District; silver, gold, lead, copper), the Silverton area (silver, gold, lead, zinc, copper), and the Needle Mountains (silver, gold, copper, uranium). Most locatable mineral sites are historic and not currently actively being mined. There are active placer mining claims along Mineral Creek and the Animas River downstream from Silverton, in the La Plata River drainage, and the Dolores River downstream from Rico.

Limestone valuable for chemical and industrial use is characterized as locatable. No development is currently active on SJNF lands, but deposits of suitable limestone occur across the planning area. The Animas River valley may contain the most significant and accessible resources.

## Solid Leasable Minerals

The planning area holds potential for a variety of solid leasable minerals (see Figure 2.19.2). These are subject to lease under the Mineral Leasing Act of 1920, as amended. They include most chlorides, sulfates, carbonates, borates, silicates, or nitrates of sodium or potassium and related products, phosphate and related minerals, and vein-type solid hydrocarbons (gilsonite, etc.). Hard rock minerals (i.e., minerals that would otherwise be locatable: gold, silver, copper, uranium, etc.) on acquired lands (lands acquired by the federal government, rather than typical public domain lands) may also be subject to leasing. Solid leasable minerals are extracted by a broad array of extraction methods, including surface and underground mining methods. The same or similar surface use restrictions may be applied to solid leasable minerals as those applied to fluid leasable minerals.

### *Coal*

Coalbeds outcrop along the margins of the Paradox and San Juan Basins in the planning area. These outcrops are of late Cretaceous and early Tertiary age and have historically produced small quantities of coal.

Historically, small underground and surface mines to support local markets followed the northern edge of the San Juan Basin between Durango east to Pagosa Springs as well as around Dove Creek, Cortez, and Mancos (more or less along the U.S. Highway 160 and 491 corridors). These mines and related prospects are largely abandoned. Coal in the planning area is found in the Upper Cretaceous formations. From oldest to youngest, they are the Dakota Sandstone Formation, the Mesaverde Formation and Mesaverde Group, and the Fruitland Formation. Economical coal in the area is currently limited to the Chimney rock area and the west side (Cherry Creek, Hay Gulch, and La Plata Canyon areas) of the planning area. Deposits are generally low sulfur and high British thermal unit rated. Historically there have been many small operations that provided coal for heating and low volume industrial use.

### *Coal Unsuitability Assessments*

Under the terms of the Surface Mining Control and Reclamation Act of 1977, the SJNF conducted coal unsuitability assessments to determine the suitability of lands for surface coal mining, leasing and development operations. Twenty unsuitability criteria and appropriate exceptions and exemptions were applied to the Durango Known Recoverable Coal Resource Area (KRCRA) as identified by the USGS, which partially overlaps with SJNF lands. In summary, 13,400 acres (9%) of the Durango KRCRA, was

identified as unsuitable for surface coal mining operations. Based on the unsuitability assessments (SJNF 1983), 46,000 acres (31%) of the Durango KRCRA are identified as acceptable for further consideration for coal leasing, with an estimated reserve of 1.5 billion tons. One existing surface coal mine in the Durango KRCRA (Chimney Rock Coal Mine) with operations on both NFS and BLM lands was already in the lease extension application process during the unsuitability assessments. This application was denied for environmental reasons in USFS coal unsuitability assessments for this LRMP revision found that the need does not exist to revise the assessments (Van Loenen and Gibbons 1997).

### *Oil Shale*

The planning area has no known oil shale potential.

### *U.S. Department of Energy Uranium Lease Tracts*

*Uranium leases would apply only to BLM lands.*

## Common Varieties of Mineral Materials

Disposal of common varieties of mineral materials is discretionary and may occur under a sale contract or free use permit. Common varieties of mineral materials are often called “saleable minerals.” They generally have a low unit value but can still be quite valuable in bulk. In general, saleable minerals include deposits of sand, clay, and stone used for building materials, aggregate, bulk fill, riprap, road surfacing, decoration, and landscaping. Having a secure source of sand, gravel, and crushed stone for things like road base, concrete aggregate, and other construction needs is essential to local economies, since distant haul costs can exceed the value of the materials themselves.

Areas with known resources or are favorable for resources of sand and gravel may contain material ready for use or suitable for screening, washing, or crushing to meet size or fine-material requirements. Areas of Quaternary age alluvium, colluvium and glacial drift, and river terrace deposits contain sand and gravel suitable for use with minimal treatment. Talus slopes of Late Cretaceous and Tertiary age igneous rock produce material suitable for crushing, lightweight aggregate, and dimension stone. Late Cretaceous and Tertiary age igneous intrusives produce dimension stone and large aggregate. Late Cretaceous sedimentary rock produces dimension stone and aggregates.

Current mineral material collecting areas are along roads and in areas of natural accumulation of rock (glacial deposits, talus slopes, and weathered outcrops). Quarries on SJNF lands may be developed by private or commercial parties or local, state, or federal agencies. Presently, there is one permitted mineral materials sale on the SJNF, with an average of about 60 additional small, one-time sales taking place annually. Deposits that hold materials for existing and potential permits for Montezuma and San Miguel Counties have at least two decades of resources remaining, and perhaps a decade for the Dolores County permit. Additional resources may be identified in new areas to meet the public’s needs, including new competitive and non-competitive commercial sales, free use permits to non-profit and governmental agencies such as counties and USFS use, and community pits/common use areas for the public to extract small amounts of mineral materials for personal use (gardening, patios, etc.).

## Fluid Leasable Minerals

### *Oil and Gas*

This program emphasizes the orderly and environmentally responsible development of oil and gas (natural gas and $CO_2$) deposits. These minerals are subject to disposal by lease under the Mineral Leasing Act of 1920, as amended. On USFS lands, mineral leases for federally owned minerals are issued by the BLM, after consent to lease by the USFS. This LRMP implements direction (under the Energy Policy Act of 2005 and the Federal Onshore Oil and Gas Leasing Reform Act of 1987) for leasing of public lands.

The FEIS that accompanies this LRMP includes analysis necessary for offering specific lands for lease. The analysis discusses the availability of the SJNF for oil and gas leases. In addition, it describes necessary protective stipulations to be attached to leases on SJNF surface. The LRMP does not authorize surface disturbance for oil and gas exploration or development. Surface-disturbing activities on leases will require additional environmental analysis and decisions. The oil and gas leasing decision in this LRMP will not apply to existing oil and gas leases. When those existing leases expire or terminate, the leasing decision in this LRMP will apply to any new leases issued.

Oil and gas deposits occur in sedimentary basins throughout the SJNF. Areas of significant potential or known reserves and production in the vicinity are the Paradox Basin area (roughly the lands west of the Dolores River, which are high, moderate, and low for oil, shale gas, and conventional gas, respectively), the Northern San Juan Basin (approximately the area south of U.S. Highway 160 between Durango and Chimney Rock, which is high for coalbed methane, moderate for conventional gas), and the San Juan Sag (the area east of Pagosa Springs, high for oil). The central area of the planning area from the north rim of the San Juan Basin north to Silverton has no known oil and gas potential.

Development and production is underway in the Paradox Basin area north of Cortez, with exploration occurring northeast and south of Cortez. Significant development and production is underway and planned in the San Juan Basin. Exploration is intermittent in the San Juan Sag, with no production to date or planned.

### *Oil and Gas Stipulations*

All SJNF oil and gas leases are subject to standard lease terms. These are the least restrictive terms under which an oil and gas lessee may operate. They meet Energy Policy Act direction to encourage development of federal energy resources. They require operators of oil and gas leases to minimize adverse impacts to air, water, land, visual, cultural, and biological resources and to other land uses and users, and to comply with all applicable laws, regulations, and formal orders of the agency managing the leased lands. With the exceptions noted below, leases with standard lease terms allow year-round occupancy and use of leased lands. These leases provide full access and the highest potential for discovery and development of oil and gas resources. Lease notices may be included to warn a potential lessee of the likelihood of such conditions, but the extent and restrictive nature of the conditions is still not known at the lease issuance stage. Operations may be prohibited on the affected parts of the lease, or costs may substantially increase due to protective measures required to protect the resource.

### *Special Lease Stipulations*

Special lease stipulations are applied to an oil and gas lease if additional restrictions on the rights of lessees are required to protect environmental resources. Stipulations that would be applied to new oil and gas leases under this LRMP are described in Volume III, Appendix H. Areas included within the various stipulations are shown on Figures 2.19.3 through 2.19.5.

It is important to note that the special lease stipulations apply only to new leases (issued after adoption of this LRMP). Pre-existing leases are subject to the stipulations attached to them under the previous San Juan/San Miguel Resource Management Plan (BLM 1985), the Colorado Oil and Gas Leasing EIS (BLM 1991a) or SJNF Land Management Plan (USFS 1983). However, new development on existing leases must also comply with the current LRMP management direction. This direction is consistent with Interior Board of Land Appeals decisions (Yates Petroleum Corp., IBLA 2006-213, 2006-226 and William P. Maycock, IBLA 2008-197, 2008-200) which give the BLM discretion to modify surface operations to add specific mitigation measures supported by site-specific NEPA analysis undertaken during the development phase on existing leases (CO-2010-028). Any additional mitigation measures would need to be justifiable, still provide reasonable access for the lease holder and would be incorporated in a site-specific document.

Special lease stipulations for oil and gas operations are imposed at the time of lease issuance. Three general restrictive surface occupancy categories may also be used for oil and gas leases within the planning area, where justified for resource protection:

- **No Surface Occupancy (NSO):** Use or occupancy of the land surface for fluid mineral (oil and gas) exploration or development is prohibited to protect identified resource values. However, oil and gas under lands affected by NSO stipulation are legally available for extraction if extraction can be accomplished without occupying the surface (such as through directional drilling or otherwise accessing the reservoir from adjacent lands). Technological limitations and higher cost will affect the recovery of these resources, but they are available.

  The NSO stipulation is intended for application only where the SJNF determines that the standard lease terms are insufficient to provide the level of resource protection necessary to protect the public interest. An NSO stipulation is not needed if the desired level of protection can be accomplished by relocating a proposed facility or activity within the lease area or by avoiding that activity for a specified period.

- **Controlled Surface Use (CSU):** Use or occupancy of the land surface for fluid mineral (oil and gas) exploration or development is allowed but identified resource values require special operational constraints that may modify lease rights. A CSU stipulation allows the SJNF to require that a proposed facility or activity be relocated from the proposed location, or otherwise modified if necessary to achieve the desired level of protection. CSU provides operating guidance but does not substitute for NSO or TL stipulations. CSU allows year-round occupancy and accessibility to leased lands while providing mitigation of effects on other resources.

- **Timing Limitation (TL):** Use or occupancy of the land surface for fluid mineral (oil and gas) exploration or development is prohibited during a specified period of the year. The scope of the TL stipulation goes beyond ground-disturbing activities to encompass any source of protracted or high-intensity disturbance that could interfere with normal wildlife behavior and adversely affect habitat use. The limitation is applied annually for a specified period. The TL stipulation does not apply to the operation and maintenance of production facilities unless the analysis demonstrates the continued need for such mitigation and that less stringent project-specific mitigation measures (such as Conditions of Approval) would not be sufficient. The TL stipulation provides for partial accessibility for a portion of the year and maintains the potential for extraction of oil and gas, but may increase costs due to timing constraints (such as a short operating season).

- **Not Available for Lease:** The following resources and areas are not available for lease on SJNF lands—lands recommended for wilderness designation, WSAs; wild segments of suitable WSR, Chimney Rock National Monument, and the Anasazi and Falls Creek National Registered District.

Table 2.19.1 displays the availability of the SJNF by acres of land for leasing and application of stipulations to leases.

**Table 2.19.1: Acres Available for Leasing and Lease Stipulations**

| Federal Mineral Status | Acres |
|---|---|
| **SJNF Lands (surface and mineral estate)** | |
| **Total National Forest Surface Estate** | **1,866,845** |
| **Total National Forest Mineral Estate** | **1,798,224** |
| Withdrawn from leasing (designated wilderness, Piedra Area) or Coal Only | 589,272 |
| Administratively Not Available for Lease | 25,695 |
| **Total National Forest Available for Leasing** | **1,183,257** |
| Available for leasing with NSO stipulation | 939,218 |
| Available for leasing with CSU stipulation | 1,024,209 |
| Available for leasing with TL stipulation | 626,820 |
| Available for leasing with standard lease terms | 63,213 |

### *Orderly Leasing and Development of Oil and Gas Resources (SJNF)*

Because the vast majority of the SJNF (approximately 93%) is currently not leased, the SJNF may employ a strategic approach for orderly leasing and development of oil and gas resources to be applied to SJNF lands only. This strategy would guide the pace and place of development by focusing leasing in areas within or adjacent to existing oil and gas development and would allow the surface managing agency to temporally guide the location of leasing activity to minimize impacts and conflicts with other multiple uses while still allowing full extraction of oil and gas resources. The intended outcomes and benefits of implementing an orderly leasing and development approach include but are not limited to:

- orderly and concentrated development, by encouraging industry to progressively develop along geologic mineral plays and trends;
- minimizing impacts to other resources from oil and gas leasing, by monitoring impacts and adjusting development conditions as necessary (resources that are primarily affected by pace or intensity of development include wildlife, air quality, water consumption, travel management and recreation); and
- economic efficiency by concentrating infrastructure.

An orderly leasing and development approach would likely apply to the portion of the Paradox Basin that falls within the SJNF and would offer leases in phases based on an established set of criteria. For example, the first phase of lease offerings might include lands with the highest potential for oil and gas development; lands that are adjacent to leased lands; lands that contain existing oil and gas-related infrastructure; or lands that have been modified by other management and development activities where additional development would not cause significant new impacts. Criteria for offering leases for subsequent phases might require that monitoring data indicates that impacts within the previous phase are within or below the acceptable range; that development has occurred on a certain percentage of the spacing units of lands within the previous phase; or demonstration that a majority of geologically favorable lands within the previous phase have been developed.

There are many unknowns related to oil and gas exploration and future development. An orderly leasing and development approach would provide increased structure for industry and safeguard for unintended consequences while remaining adaptive to respond to new information for resource potential and development needs.

## Desired Conditions

2.19.1 The planning area supports the exploration, production, and development of energy and mineral resources in a multiple use context, as is consistent with all applicable laws.

2.19.2 Mineral materials (including gravel and decorative stone) are available to support resource management needs, personal and hobby use, and commercial pursuits.

2.19.3 Ground disturbance from development of oil and gas fields is minimized by centralizing facilities, requiring multiple wells per pad, and minimizing the road system required to access facilities.

2.19.4 Reclamation of mineral exploration, development, and production activities is stable, long term, and implemented as soon as is reasonably possible in order to minimize impacts to other resources.

2.19.5 All oil and gas well fields starting at the field development stage and all other established well fields where practicable maximize the collocation of facilities to minimize construction footprints and reduce tailpipe emissions.

2.19.6 Oil and gas leasing and development activity on the SJNF occurs in an orderly manner to minimize impacts to lands and resources and increase efficiency of operations.

## Objectives

2.19.7 Over the next 20 years, centralize facilities and engines to minimize the number of well head engines and optimize well engines so they use the minimum cumulative horsepower to obtain the maximum efficiency for all well fields beginning at the field development stage and all other established well fields where practicable.

2.19.8 Process requests for mineral materials in a timely manner consistent with LRMP direction and applicable laws. Identify areas suitable for and establish common use area(s) and/or community pits to provide sources of mineral materials to the public.

## Additional Guidance

- Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development (USDI and USDA 2007)
- Volume III, Appendix H, Resource Management Stipulations for New Oil and Gas Leases



FS-008324




**Figure 2.19.1: Areas of Locatable Mineral Potential**




**Figure 2.19.2: Solid Leasable Minerals**




**Figure 2.19.3: Oil and Gas Leasing Availability and No Surface Occupancy Stipulations**

Case No. 1:23-cv-01501-RMR Document 20-1 filed 09/29/23 USDC Colorado pg 95 of 183






**Figure 2.19.4: Oil and Gas Leasing Availability and Controlled Surface Use Stipulations**




**Figure 2.19.5: Oil and Gas Leasing Availability and Timing Limitation Stipulations**

# 2.20 Alternative Energy: Geothermal, Wind, Solar, Biomass

## Introduction

Alternative energy sources on public lands play an important role in meeting national goals of reducing America's dependence on foreign oil by promoting the development of geothermal, wind, solar, and biomass energy on public lands. Studies conducted by the National Renewable Energy Lab and the Western Governors Association have identified areas that have potential for utility scale development of these resources. For the planning area the highest potential is in providing biomass from forest and fuels management projects in support of local generation facilities. Potential also exists for direct use of geothermal and solar resources with minimal potential for utility scale production. The LRMP incorporates this information and guidance developed nationally to govern these uses.

## Geothermal

Geothermal resources within the planning area are of low or medium temperature at shallow depths. Geothermal fluid resources that occur within the planning area (as well as in the surrounding areas) include warm water emanating from geysers, springs, and wells. Most warm springs are located near faults that serve as conduits for upward flow of groundwater that is heated by deep circulation from mainly volcanic sources. Except for the town of Pagosa Springs (where hot water from hot springs is currently used in order to heat buildings and public sidewalks), the thermal springs are at present either undeveloped or developed for recreational and therapeutic uses in private and public pools. Only three springs are on public lands: Geyser, Piedra, and Rainbow.

The USFS, in cooperation with the DOE and BLM, jointly prepared a PEIS for Geothermal Resource Leasing (BLM and USFS 2008) pursuant to Section 225 of Public Law 109-58 (Energy Policy Act of 2005). Decisions included in the Record of Decision for this PEIS:

- Identified those National Forest System lands that are legally open or closed to geothermal leasing;
- Developed a reasonably foreseeable development scenario that indicated a potential for 12,210 megawatts (MW) of electrical generating capacity from 244 power plants by 2025, plus additional direct uses of geothermal resources in the western states; and
- Adopted stipulations, BMPs, and procedures for geothermal leasing and development.

The decision did not amend any USFS land use plans. The USGS (2008) estimated a mean probability of electrical power generation for identified geothermal resources on all lands in Colorado during the next 30 years at 30 MW, with a total low to high range of 8 to 67 MW (USGS 2008). Current plans for development within Colorado continue to focus on direct use, particularly for recreation, therapeutic properties, and aquaculture, which would typically occur on private land within the planning area.

## Wind

The DOE's Wind Program and the NREL published a Colorado 50-Meter Wind Map that shows wind speed estimates at 50 meters above the ground and depicts the resource that could be used for utility-scale wind development (DOE and NREL 2013). The map indicates that Colorado has wind resources consistent with utility-scale production. Significant contiguous areas of good resource with embedded regions of excellent resource are found in the eastern quarter of the state. For the planning area, the identification high potential wind resources at the tops to the ridges in the San Juan Mountains does not warrant consideration of the high ridges for commercial development of wind resources. Significant visual and other resource concerns exist for development at those higher elevations. The Western Renewable Energy Zones – Phase 1 Report (Western Governors Association and U.S. Department of Energy 2009) reiterated these findings and did not identify potential for wind or solar development within the planning area.



FS-008330

## Solar

SJNF lands within the planning area lack characteristics necessary for solar energy development.

## Biomass

The Healthy Forests Initiative, the National Fire Plan (USFS and USDI 2001), and the joint federal-state 10-year Comprehensive Strategy Implementation Plan all call for biomass and wood-fiber utilization as an integral component of restoring our nation's precious forests, woodlands, and rangelands. Biomass utilization can also meet a key objective of the National Energy Policy by contributing to diversification of the nation's energy supply.

An agreement between the USDI, DOE, and USDA was enacted to jointly promote the utilization of biomass to meet management objectives on public lands. Under this agreement, when ecologically, economically, and legally appropriate, and consistent with locally developed land management plans, agencies were directed to:

- foster communication as to how harvest and utilization of woody by-products can be an effective restoration and hazardous fuel reduction tool that delivers economic and environmental benefits and efficiencies;
- promote consideration of woody biomass utilization from restoration and fuels treatment instead of burning or other on-site disposal methods; and
- encourage development of new mechanisms that increase the benefits and efficiencies of woody biomass utilization (USDA et al. 2003).

## Desired Conditions

### *Geothermal*

2.20.1 Stipulations included in the Geothermal Resource Leasing PEIS and ROD (BLM and USFS 2008) serve as the minimal level of protection and are adopted as applicable to this LRMP. The Authorized Officer retains the discretion to issue stipulations in order to mitigate the impacts on other land uses or resource objectives. In general, oil and gas lease stipulations identified in Appendix H of this LRMP would be applied as appropriate.

2.20.2 The Final Geothermal Resource Leasing PEIS and ROD (BLM and USFS 2008) may be used to provide suitable information to facilitate subsequent consent decisions for leasing on NFS lands in the planning area and to provide environmental analysis to assist future NFS land use decisions by providing possible land use allocations and stipulations for geothermal leasing.

2.20.3 **Suggested BMPs:** Mitigation measures included in Appendix B of the Geothermal Resource Leasing ROD (BLM and USFS 2008) would be applied to the development of geothermal resources on federal lands.

### *Solar*

2.20.4 Project planning and design incorporate an appropriate analysis to determine the feasibility, cost and benefits of using photovoltaic systems on administrative facilities, range improvements, resource monitoring, public safety, and recreation projects.

2.20.5 ROW applications for solar energy development incorporate BMPs and provisions contained in the Solar Energy Development PEIS. Solar energy development is authorized by ROW grants.

### *Biomass*

2.20.6 Forest vegetation management includes evaluation opportunities for harvesting and removal of biomass to meet treatment objectives.

2.20.7 Potential partners are involved and collaborate in exploring economically efficient means for biomass utilization.

### Additional Guidance

#### *Geothermal Regulations*

- Geothermal Resource Leasing PEIS/ROD (BLM and USFS 2008)
- Geothermal BMPs from the BLM and USFS; Record of Decision for Geothermal Resource Leasing in the Western US; December 2008, Appendix B

#### *Solar*

- The Solar Energy Development PEIS is being prepared by the DOE, Energy Efficiency and Renewable Energy Program, and the BLM; the PEIS will document solar guidance and BMPs

#### *Biomass*

- The USFS Woody Biomass Utilization Desk Guide, National Technology and Development Program 2400—Forest Management, September 2007 (USFS 2007)

## 2.21 Abandoned Mine Lands and Hazardous Materials

### Introduction

The Abandoned Mine Lands (AML) program is concerned with mitigating the effects of abandoned mines on both the environment (notably mine drainage affecting water quality) and the physical safety of visitors and workers. Hard rock mining for gold, silver, and other metals began in the late 1800s and was prevalent throughout the mountainous areas of the planning area, with concentrations around Silverton and Rico. Uranium was mined in the western portion of the planning area in the Uravan Mineral Belt. There are also a few scattered abandoned coal mines.

Work on the AML program began in 1994 with an inventory of abandoned mines on NFS lands. The physical safety closure work has been ongoing since then. On uranium tracts leased to the DOE, much of the closure work has been done by the DOE. In remaining areas, the USFS has partnered with Colorado Division of Reclamation Mining and Safety to close dangerous hard rock, uranium, and coal mines.

Water quality work also began in the mid-1990s when the Colorado Water Quality Control Division proposed a watershed risk-based approach to abandoned mine remediation. This consists of four major stages:

1. statewide analysis and watershed prioritization;
2. watershed characterization and mine prioritization;
3. mine-site characterization and remediation; and
4. post-remediation monitoring.

This approach was used by state agencies and federal land management agencies to identify the upper Animas River watershed as ranking at the top of the high-priority watersheds. Funding for AML water quality projects began in 1997 with two pilot projects: the upper Animas River watershed in Colorado and the Boulder Creek watershed in Montana.

The Animas River Stakeholders Group (ARSG) was formed in 1996 to take the lead in the Animas watershed characterization and remediation. The group's members come from the public and private sectors. Their mission is to improve water quality and habitat along the Animas River. Over the last decade, the ARSG has received grants and professional support from state and federal agencies, as well as from private interests for the characterization and remediation of the watershed. A major

accomplishment of the ARSG was production of the Use-Attainability Analysis of the Upper Animas Watershed (ARSG 2001). This report includes watershed characterization, mine clean-up prioritization, and remediation plans. Watershed characterization provided baseline scientific information and enabled the reduction of necessary mine clean-ups from 1,500 to 100 (or less). Water quality objectives were also developed. Since the development of the Use-Attainability Analysis of the Upper Animas Watershed, hydrologic conditions have changed, and additional characterization and prioritization continues.

Reclamation undertaken so far has resulted in one waste rock consolidation area on USFS lands, near the Brooklyn Mine (Figure 2.21). This location will be protected from future disturbance or other accommodations made so that wastes are effectively contained.

Another area with a high concentration of hard rock mining and water quality impacts is the area around Rico, which is in the Dolores River watershed. The State of Colorado and the EPA have overseen voluntary clean-ups or conducted enforcement actions on some mine areas on private land, as well as on mixed-ownership sites.

Most of the hazardous materials incidents within the planning area are the result of transportation accidents on state and/or federal highways. Trucking accidents can result in spills of fuel (or of any hazardous products that the truck was carrying). These incidents are the responsibility of the transportation company to clean up. Clean-ups within the highway ROWs are under the jurisdiction of the Colorado State Patrol for state and federal highways, and under the jurisdiction of the local sheriff's departments for county roads. When spills go beyond the ROW, or impact USFS resources, the land management agency becomes involved. Illegal dumping on the SJNF is also a potential hazardous materials issue. In addition, hazardous materials can also be related to operations conducted or authorized by the USFS (including the use of pesticides, fuels, and/or lubricants).

The SJNF will continue to update the inventory of abandoned mine sites within the planning area in order to identify, prioritize, and track reclamation needs and progress. Reclamation of abandoned mine lands will continue and will be prioritized based on the degree of threat to human health, the environment (especially to water quality), and public safety. Known hazards at AML sites will be remediated, with the highest priority given to sites near high visitor use areas (including developed campgrounds and recreation areas), sites located near residences on adjacent private property, sites impacting water quality, and sites close to frequently traveled roads in the planning area.

All mine reclamation and emergency response actions for releases of hazardous substances will be conducted in accordance with CERCLA. Closure actions related to physical hazards will be conducted under NEPA. Precautionary measures will be taken in order to guard against releases and/or spills into the environment for all USFS -authorized management activities that involve hazardous materials. Hazardous materials and waste management policies and controls will be integrated into all SJNF programs.

## Desired Conditions

2.21.1 Abandoned mine reclamation within the planning area does not negatively impact water quality and historic resource protection.

2.21.2 Abandoned mines do not endanger the environment, wildlife, the public, or employees.

2.21.3 Mine waste repositories are protected, and physical safety closures are protected or replaced during any USFS-authorized actions.

2.21.4 USFS -authorized actions occur without causing hazardous material spills or waste contamination.

2.21.5 Over the life of the LRMP, AML closures for human safety at sites supporting bat populations include structures (such as bat gates) designed to provide for continued use as bat habitat.

2.21.6 The AML program coordinates with affected parties, partners, and stakeholder groups on AML projects.

## Objectives

2.21.7 Stabilize, rehabilitate, or restore AML on priority sites on an annual basis in order to improve water quality and watershed condition.

2.21.8 *This objective was applicable only to BLM lands*.

2.21.9 On all SJNF lands, close or mitigate high-priority sites over the life of the LRMP. Newly discovered sites will be prioritized for closure or mitigation based on hazard.

## Additional Guidance

- FSM 2160 (USFS 1994)
- USFS AML policy
- USDI Solid Waste and Hazardous Materials Management Compliance Handbook (1995)




**Figure 2.21: Abandoned Mine Lands Waste Rock Consolidation Areas**

## 2.22 Interpretation and Conservation Education

### Introduction

An important goal of the USFS is to help people understand, appreciate, and use their public lands. Due to the remote location, varied geography, and multiple-use patterns, the planning area requires a vibrant and focused interpretive program in order to support this goal. In order to protect invaluable cultural and natural resources, interpretive services and conservation education must be an integral part of implementing and maintaining the identity of the area, and implementing an effective resource management strategy that educates and informs visitors. The interpretive and conservation education program plays a critical role in effective resource management and public appreciation of natural and cultural resources. A very dynamic interpretive and conservation/education program will offer a venue designed to create emotional and intellectual connections between people and the nature and culture of the planning area.

Currently there are many facilities and services in place that deliver interpretive and conservation education services to the public. The USFS will sharpen their focus in order to more meaningfully deliver what the public wants to know, and needs to know, about the land management agencies, their mission and programs, and stakeholder responsibilities.

Strategies under this program should be designed to ensure consistent, coherent, and effective communication between the public and program managers through a variety of venues. Communication topics and themes will be identified that are of interest to the public, as well as those that will effectively convey important agency information and portray a quality image. Communication venues will target a diverse public. Important program outcomes will include increased public understanding of natural and cultural resources and their management, agency understanding of public viewpoints, cooperation in public land management, public understanding and compliance with public land regulations, and stewardship of public lands. The integration of interpretive services with public affairs and other staff areas will be fostered. Local, regional, and national partnerships with tourism and outdoor recreation providers and educators are critical in helping meet stewardship and visitor experience goals and expectations.

### Desired Conditions

2.22.1 The public benefits from a public lands interpretive and education strategy that reflects USFS priorities and key public information needs. The public understands the mission of the USFS and their diverse cultural and natural resource management priorities and exhibits effective stewardship behavior on SJNF lands.

2.22.2 Messages are consistent and effectively delivered to the public, reaching a wide variety of age, gender, class, ethnic, and cultural groups.

2.22.3 Resource management messages are articulated in all education and interpretive products, programs, and public contacts.

2.22.4 A wide variety of information, education, and interpretive venues are available through various media so that people can easily access information about recreational opportunities and resources.

2.22.5 All visitor information services, public affairs, interpretation, and conservation education functions of the USFS have a unified and clear communication strategy.

2.22.6 All SJNF personnel play a role in public communications, in terms of offering conservation education, interpretation, public affairs, and visitor information services.

2.22.7 The SJNF foster research, education, and interpretation of the area’s rich natural and cultural heritage.

2.22.8 Effective interpretation and conservation education, as well as proactive land stewardship, are accomplished with a wide range of partners (including commercial outfitters/guides; permittees; volunteer groups; local, state, tribal, and other federal agencies; interested individuals and organizations, etc.).

2.22.9 Public education opportunities, through interpretation and conservation education programs, promote ethical and non-limiting use of wildlife resources within the planning area.

*This page intentionally left blank.*

# CHAPTER 3 – AREA DIRECTION

## 3.0 Area Direction

This chapter contains management direction for geographic areas, management areas (MAs), special areas and designations on SJNF lands that have unique resources or management conditions. Geographic areas are identified that describe the social, economic, and environmental settings of the three administrative ranger districts of the SJNF. MAs describe the intensity of management, overall appearance and activities that can be expected within each MA. Specially designated lands are formal designations, including suitable WSR, RNAs, and several other special designations. Also included in this chapter is direction for other areas with unique resources and management conditions such as lands managed for wilderness characteristics, Chimney Rock National Monument, the Hermosa Watershed, and the HD Mountains. All areas described in this chapter are identified on associated maps.

In addition to desired conditions and objectives, many of the areas in this chapter include “allowable use” tables. These tables portray the suitability determinations made under the grazing, timber, and travel programs in Chapter 2 as they apply to specific areas, and also identify additional uses that are listed as allowable, restricted, or prohibited. Restricted activities are those that are allowed, but may only be allowed during certain times of the year, within specific areas, or under specific conditions. The activities in the tables are described below.

- **Fire Managed for Resource Benefit:** This activity includes managing natural fires in order to achieve a management objective and/or a desired condition. Wildfire is only part of an overall appropriate response. The application of fire managed for resource benefit will always depend on site-specific conditions, current and predicted future weather, and fuel conditions.
- **Prescribed Burning:** This activity includes igniting fires in order to achieve a management objective and/or a desired condition. Managed active burning will be prescribed and monitored to burn at specified intensities over a defined area.
- **Mechanical Fuels Treatments:** This activity includes any method to alter live or dead vegetation with hand tools or by machine (including thinning with chainsaws or any commercial machine, shredder, chipper, or similar equipment) to break up fuel connectivity, including removal of fuels from treatment sites.
- **Timber Production:** This activity involves the removal of wood fiber for commercial-utilization purposes. Harvesting for timber production purposes is scheduled and regulated.
- **Timber Harvesting as a Tool:** This involves the removal of wood fiber to achieve management objectives and/or desired conditions. If an area is suitable for timber harvesting as a tool but not suitable for timber production, timber harvesting would only occur in order to achieve a management objective and/or a desired condition (including, but not limited to fuels reduction and/or wildlife habitat improvements).
- **Commercial Use of Special Forest Products and Firewood:** This includes firewood, Christmas trees, tree transplants, mushrooms, medicinal herbs, boughs, and cones. Commercial use would occur through a permitting process. Personal use (use not involving the sale of forest products) may require a permit.
- **Land Use ROWs, Special Use Permits, and Utility Corridors:** This includes energy corridors, linear transmission, communication sites, and other land use authorizations.
- **Livestock Grazing:** This includes permitted livestock grazing as authorized by an agency grazing permit on designated grazing allotments or areas outside grazing allotments where livestock grazing could be used as a vegetation management tool. Allotments contain lands that are both suitable and unsuitable for livestock grazing. Stocking rates would be based only on lands suitable for livestock grazing as determined at the project level.

- **Facilities:** This includes infrastructure and structures placed on public lands for resource protection, administrative use, and/or public enjoyment.
- **Motorized (summer):** This includes the use of any motorized wheeled vehicle (including four-wheel drives, dirt bikes, and ATVs/OHVs) during the year when the ground is not covered by snow.
- **Motorized (winter):** This includes the use of snowmobiles and other motorized winter vehicles during the snow-covered months.
- **Non-Motorized (summer and winter)*:*** This includes hiking, horseback riding, cross-country skiing, and/or other means of non-motorized recreation. Non-motorized use does not include mountain biking because it is addressed as a separate activity below.
- **Mechanical Transport:** This includes any contrivance that moves people or material in or over land, water, or air that has moving parts, that provides a mechanical advantage to the user, and that is powered by a living or non-living power source. This includes, but is not limited to, bicycles, game carriers, carts, and wagons. It does not include wheelchairs when used as necessary medical appliances. It also does not include skis, snowshoes, rafts, canoes, sleds, travois, or similar primitive devices without moving parts.
- **Road Construction (permanent or temporary):** This includes the building of roads for a specified use or uses, either permanent or temporary.
- **Minerals - Leasable:** This includes oil and gas, coal, and other leasable minerals, including solid leasable minerals such as sodium, potassium, and others. All SJNF lands made available for lease are subject to standard lease terms, which require operators of leases, as well as leasable mineral permits and licenses, to minimize adverse impacts to air, water, land, visual, cultural, and biological resources. Special lease stipulations are applied to a lease if additional restrictions on the rights of lessees are required to protect environmental resources. Special lease stipulations include NSO, CSU, and TL. Stipulations applied to new leases are described in Appendix H, Resource Management Stipulations for New Leases, of this LRMP.
- **Minerals - Locatable:** This includes minerals that are subject to claim under the Mining Law of 1872 that are open to entry for exploration and development (unless withdrawn by law). Unless lands have been withdrawn by law, development of locatable minerals is generally allowable on SJNF lands; however, additional measures may be applied to plans and notices to prevent undue and unnecessary degradation in areas with concerns for specific resources or management designations.
- **Mineral - Salable:** This includes sand, gravel, and decorative rock for commercial or personal use, which may be disposed of through sales contract to individuals or for-profit enterprises, or through free use permits to government and non-profit entities.




**Figure 3.1: Geographic Areas**

## 3.1 Tres Rios Field Office Geographic Area

*This area is applicable only to BLM lands.*

## 3.2 Dolores Ranger District Geographic Area

The Dolores Ranger District geographic area lies predominantly in Montezuma, Dolores, and San Miguel Counties, and consists of approximately 597,126 acres of NFS lands. The social center of this geographic area is the town of Cortez (with a population of approximately 8,500 people). Cortez is the Montezuma County seat, as well as the commercial center for the smaller communities of Mancos, Dolores, Rico, and Dove Creek (which is the Dolores County seat), all with populations of 1,200 or less.

The main river systems of this geographic area are the Mancos River (which has headwaters in the La Plata Mountains) and the Dolores River (which has headwaters in the Lizard Head wilderness). Both rivers provide irrigation for pastures, hay meadows, and other crops on private lands in the area. McPhee Reservoir, on the Dolores River, is the second largest body of water in Colorado. It is an important recreation area, as well as a source of domestic and irrigation water. Use of water from these rivers has greatly affected both historical settlement patterns and current land uses.

Significant portions of the San Juan Skyway traverse the Dolores geographic area (including U.S. Highway 145, from Lizard Head Pass down through Rico to Dolores and Cortez, and from there U.S. Highway 160 to the Montezuma-La Plata County line, which is the boundary with the Columbine geographic area). Other major segments of the skyway are to the east, in the Columbine geographic area, and on the Uncompahgre National Forest to the north (going through Ouray, Ridgway, and Telluride). Since its designation as a scenic byway, the San Juan Skyway has been one of the most popular recreation attractions in southwest Colorado. It is one of only 26 All-American Roads in the United States. The skyway's diverse natural and cultural resources, combined with its unique and spectacular scenery, give it a claim as one of the crown jewels of scenic byways in the entire nation. Portions of the Trail of the Ancients Scenic Byway are also located within the Dolores geographic area.

The area includes high densities of significant Puebloan archeological sites (including the Anasazi Archeological District around McPhee Reservoir), as well as more modern mining, railroad, logging, and grazing historical sites.

The San Juan Mountains, which are part of the southern Rocky Mountains, fall into the South-Central Highlands Section. The San Juan Mountains are unusual within the north-south orientation of the Rocky Mountains, in that they are a large mountain range with an east-west orientation. This part of the geographic area includes the Lizard Head wilderness and several CRAs (including Storm Peak, Ryman, Black Hawk Mountain, and portions of San Miguel and Hermosa). This area has much less human development than the rest of the Dolores geographic area, with most of the development occurring on private land in the Dolores River valley (including the town of Rico). The area also contains some roads associated with historic, and current, timber harvesting and historic mining (especially near Rico). Big game hunting is popular in the fall. Aspen trees are an important component of the vegetation here, both for their scenic quality and to support the wood product plants in the area.

"The Pine Zone" is located on the west side of the geographic area and was heavily logged in the early 1900s. This area is still being logged; however, the emphasis is now on restoring more natural conditions. Cattle grazing occurs over most of the area. The area is also popular for big game hunting.

### Desired Conditions

3.2.1 Public lands continue to function as "working lands." Collaborative forest health and rangeland management practices reduce wildfire hazards, contribute to the viability of private ranch lands, and sustain ecosystem services (including watershed health and wildlife habitat). The local economy benefits from, and contributes to, sustainable resource management, as well as the preservation of open space.

3.2.2 The Dolores River system remains a primary water source in order to meet domestic and agricultural needs while, at the same time, contributing a wide array of recreational, ecological, and aesthetic services. Collaborative efforts support watershed health, instream water quality, scenic assets, healthy native and sport fish populations, rafting and flat water boating opportunities, and flow and spill management below McPhee Dam in support of ecological, recreational, reservoir management, and water rights imperatives.

3.2.3 A variety of looped single- and two-track opportunities for motorized and mechanized recreation exist at a range of elevations, offering different levels of difficulty. Motorized and mechanized opportunities are balanced with opportunities for foot and horseback access to areas of relative quiet and solitude at a variety of elevations. Much of the primary access to these areas is shared, based on mutual courtesy and on a strong stewardship ethic that is primarily self-enforced and maintained by individuals and user groups.

3.2.4 Cultural and historic resources are protected, interpreted, and promoted through an integrated, interagency network involving the BLM's Anasazi Heritage Center and Canyons of the Ancients National Monument, the Ute Mountain Tribal Park, Mesa Verde National Park, and community visitor centers (including the Cortez Cultural Center, the Galloping Goose Museum, and the Mancos Visitor Center). Residents and visitors are educated and oriented in a manner that enhances and encourages their participation in the enjoyment and stewardship of cultural resources (which are significant contributors to the local economy).

3.2.5 Scenic vistas are protected and enhanced through collaborative efforts with partners (including the Colorado Byways Commission, CPW, the Montezuma Land Conservancy, the Office of Community Services, CDOT, Montezuma and Dolores Counties, and the Town of Rico).

3.2.6 The McPhee Reservoir area is one of the Four Corners' "recreation gems." A viable marina facility is re-established that offers, at a minimum, basic services for those enjoying water sports and fishing. A strong connection exists between the reservoir and the town of Dolores.

3.2.7 Ponderosa pine forests on the mesa tops of the Dolores geographic area display structural diversity (including more old growth stands, stands with a clumped structure, stands with large old trees, snags, and large dead and downed wood on the forest floor).

3.2.8 Narrowleaf cottonwood riparian areas and wetland ecosystem communities throughout the low and middle elevations of the Dolores geographic area display moderate to high canopy cover (greater than 20%) of narrowleaf cottonwood trees, including young-, middle-, and old-age classes.

3.2.9 Willow riparian areas and wetland ecosystem communities throughout the low- and mid-elevations of the Dolores geographic area display moderate to high canopy cover (greater than 20%) of willows, including young-, middle-, and old-age classes.

3.2.10 Aspen management maintains age and class diversity and promotes healthy stand conditions while, at the same time, continuing to supply a sustainable supply of aspen products to the local and regional industries.

3.2.11 Timber and fire management is used in order to restore stands to an uneven-age condition where natural fire regimes and natural processes can occur, and where a multi-aged and multi-cohort forest structure resilient to disturbance is established. Timber management in the ponderosa pine incorporates restoration forestry into commercial timber sales at an appropriate scale that provide support, stabilization, and diversification of the local industry.

See relevant sections in Chapter 3 for specific management direction for the following areas within the Dolores geographic area:

- Wilderness (Lizard Head)
- USFS recommended wilderness areas (portions of the Lizard Head and Hermosa CRAs)

- RNAs (Narraguinnep and Grizzly Peak)
- Scenic, historic, and backcountry byways (portions of the San Juan Skyway and the Trail of the Ancients Scenic Byway)
- National recreation and scenic trails (Calico and Highline trails)
- Special Areas (Rico and McPhee)

**Management Area Composition:** Table 3.2.1 shows the distribution of MAs within the Dolores geographic area.

**Table 3.2.1: Management Area Distribution in the Dolores Geographic Area**

| Management Area | Acres | Percentage of Geographic Area (USFS lands) |
|---|---|---|
| MA 1: natural processes dominate | 34,829 | 5.8% |
| MA 2: special areas and designations | 34,751 | 5.8% |
| MA 3: natural landscapes, with limited management | 209,282 | 35.1% |
| MA 4: high-use recreation emphasis | 28,045 | 4.7% |
| MA 5: active management (commodity production in order to meet multiple-use goals) | 290,090 | 48.5% |
| MA 7: public and private lands intermix | 0 | 0.0% |
| MA 8: highly developed areas | 602 | 0.1% |
| **Total** | **597,599** | **100%** |

## 3.3 Columbine Ranger District Geographic Area

The Columbine geographic area forms the central part of the planning area. It is situated primarily in La Plata and San Juan Counties, with some lands in Hinsdale and Archuleta Counties, and consists of approximately 691,150 acres of NFS lands. The Columbine geographic area shares a northern border with the Uncompahgre and Rio Grande National Forests, and with the BLM Tres Rios, Uncompahgre, and Gunnison Field Offices.

The social center of this geographic area is the city of Durango (with a population of approximately 16,000 people). It is the county seat for La Plata County (with a population of approximately 47,000 people). It is also the commercial center for the smaller communities of Bayfield (approximately 1,800 people), Ignacio (approximately 775 people), and Silverton (approximately 600 people; which is the San Juan County seat). Farmington, Aztec, and Bloomfield (New Mexico) have ties to the area as trade centers, support for the oil and gas industry, and recreation users (especially of La Plata Canyon).

Durango Mountain Resort (DMR) lies between Silverton and Durango, off of U.S. Highway 550. DMR has a base area on private land, with some additional base facilities and ski runs permitted on the SJNF. La Plata and San Juan Counties have approved a Planned Unit Development for the private lands adjacent to the DMR, with the potential for over 2,000 resort housing and lodging units supported by substantial commercial development. The likely increase in population adjacent to public lands will result in a need for close coordination on issues (including trail development, fuels reduction, and wildlife habitat).

Significant portions of San Juan Skyway traverse the Columbine geographic area (including as U.S. Highway 550 from Durango north to Silverton, and over Red Mountain Pass, which is the boundary with the Uncompahgre National Forest). A lower elevation portion of the skyway follows U.S. Highway 160 from Mancos Hill to Durango. The other towns in the Columbine geographic area are situated at lower elevations (and have milder climates). Durango is situated at the intersection of U.S. Highway 550 (which connects with Silverton to the north, and Aztec and Farmington, New Mexico, to the south) and U.S. Highway 160 (which connects with Cortez to the west and Pagosa Springs to the east). The city is a hub for the area. Durango is one of the more mature tourism towns in Colorado, with a historic downtown. It is supported by tourism related to the Durango-Silverton Narrow Gauge Railroad, the Animas River, DMR, Mesa Verde National Park, and the Weminuche Wilderness area. Durango is one of a handful of towns that can make a good claim to the title “mountain bike capital of the world.” Durango is also home to Fort

Lewis College. It is the governmental, commercial, and entertainment center for southwest Colorado. Residents of Durango have easy access to public lands within the planning area. Bayfield has been a bedroom community to Durango but is developing a significant business infrastructure of its own, which is expected to grow in the coming years.

The main river systems in the Columbine geographic area are the Animas (with headwaters above Silverton) and the Los Pinos, or Pine (with headwaters in the Weminuche Wilderness). Both rivers drain into the San Juan River in northern New Mexico, which then joins the Colorado River. Water diversion for agriculture and municipal use is important on both rivers. Both river systems also contain relatively pristine stretches that are valued for their scenery and recreational opportunities.

Vallecito Reservoir is in this geographic area; it is the most developed lakeshore resort and recreation area in southwest Colorado. Above Vallecito Reservoir, and nearby Lemon Reservoir, are access points to the Weminuche Wilderness. The Los Pinos River flows south from Bayfield through the town of Ignacio, which is a tri-ethnic community that serves as the headquarters of the Southern Ute Tribe. The Southern Ute Tribe has combined decades of revenues from energy production with excellent management in order to become one of the wealthiest tribes in the country.

The higher country, part of the San Juan Mountains, is characterized by steep, rugged terrain with predominantly spruce-fir, aspen, and mixed conifer forests. Much of the area to the east of U.S. Highway 550 and the Animas River is in either the Weminuche Wilderness or in the Piedra Area (designated in the 1993 Colorado Wilderness Act to be managed to preserve its wilderness character). CRAs include Baldy, Florida River, Runlett Park, and smaller areas adjacent to the Weminuche Wilderness area and the Piedra Area.

The Missionary Ridge Fire in 2002 burned approximately 73,000 acres in the area north of Durango (east of U.S. Highway 550), over to the western edge of the Piedra Area (east of Vallecito Reservoir). Early rehabilitation efforts have gone well; however, restoration would continue to be a concern during the life of the LRMP. Continued cooperation with local communities (including Vallecito) that were greatly affected by the fire and its aftermath will continue to be a management goal.

Much of the country west of U.S. Highway 550 is unroaded, including the 37,400-acre Hermosa Creek Wilderness, and the Hermosa roadless area consisting of about 43,200 acres. This roadless area lies within the larger 70,600-acre Hermosa Creek Special Management Area, designated by Congress in 2014. The Hermosa Trail, which parallels the main stem of Hermosa Creek, is considered one of the top mountain bike rides in the country. The eastern portion of the watershed, including the trail, is managed as MA 2 - Special Areas. The San Miguel area is another large roadless area (a significant portion of which is to be managed as a MA 1, including Engineer Mountain).

This area is characterized by low- to mid-elevation mountains, mesas, hills, and valleys with mild to moderate winters and predominantly mixed confer, ponderosa pine, pinyon-juniper, and mountain grassland vegetation. Coalbed methane reserves exist in large quantities in the northern San Juan Basin area. Most of this area was leased for oil and gas development prior to the development of this LRMP with additional development authorized by the Northern San Juan Basin Coalbed Methane EIS (BLM and USFS 2006) and ROD in 2007 (USFS and BLM 2007). Direction for the area, consistent with that ROD, is found in Section 3.25 of this LRMP.

The vast amount of undeveloped land that provides a setting for backcountry recreation is a primary reason people visit this area. Additionally, the area contains some unique access into high-elevation remote areas (including the Durango-Silverton Narrow Gauge Railroad's access to Weminuche Wilderness trailheads, and historic mining roads into the high-elevation mountains around Silverton and in La Plata Canyon). Compared to the other geographic areas, the Columbine geographic area has the most trailheads providing access into the backcountry. Given local population, visitors, tourism amenities, access to the backcountry, and the proximity of other regional destinations, the Columbine geographic area experiences the greatest amount of recreation users and resulting recreation management challenges.

The economies of the communities in the Columbine geographic area have evolved towards an increasing emphasis on amenity migration (the movement of people for pleasure rather than for economic reasons), recreation tourism, and resort development, but still have ties to multiple-use management. The historic connections of La Plata County to ranching, hunting, and public land grazing are of continuing importance, as the area struggles to protect the scenic, wildlife, and cultural aspects that ranching and outfitting/guiding play in the overall appeal of the area. Although the historic ties to sawmilling have substantially diminished, the Missionary Ridge Fire was a reminder of the continued need for forest management and the economies that help support forest management on public and private lands. The fact that La Plata County is one of the top energy-producing counties in Colorado also presents multiple-use management challenges.

## Desired Conditions

3.3.1 The full spectrum of outdoor recreational opportunities, ranging from wilderness settings to in-town access, is provided. This is the result of a collaborative process for the allocation and sharing of uses and stewardship responsibilities designed to protect the quality of the human experience and health of the natural environment.

3.3.2 Extensive heritage resources remain central to the area's economy, culture, and recreational experience. Heritage resources, as well as the natural settings that make these resources so unique, are protected and sustainable.

3.3.3 Destination and resort development, especially along the river corridors, is planned, developed, and managed in order to minimize its impact on the health of surrounding landscapes, natural resources, and communities. This is the result of sustained cooperation from the land management agencies, interested citizens, state and local agencies, and developers.

3.3.4 Oil and gas development is planned, conducted, and reclaimed to a standard commensurate with the ecological, aesthetic, and human values attached to the land where the extraction is occurring.

3.3.5 Opportunities for research, particularly applied research, are fully developed with local partners (including Fort Lewis College, the Mountain Studies Institute, and the Center for Snow and Avalanche Research, as well as other interested groups and institutions).

3.3.6 Winter sports conflicts are reduced through cooperative efforts between motorized and non-motorized advocates. Some areas may emphasize one use over another, but many potential problems are resolved through agreements on locations of parking areas, grooming, and route locations. High-quality opportunities are available for both snowmobiling and backcountry skiing.

3.3.7 The wetlands and fens associated with the upper Pine River and Flint Creek watersheds in the Columbine geographic area (where a high density of fens occur) are protected and have the water sources and hydrologic systems necessary in order to support and sustain these ecosystems.

3.3.8 The wetlands and fens associated with the Lime Creek watershed and the Mountain View Crest and Molas Lake areas in the Columbine geographic area (where high concentrations of wetlands and potential fens occur) have the water sources and hydrologic systems necessary in order to support and sustain these ecosystems.

3.3.9 The Missionary Ridge wildfire area in the Columbine geographic area displays less bare soil and erosion, and a higher abundance and distribution of native herbaceous plant species.

3.3.10 The landscapes associated with the intensive gas development in the Columbine geographic area display minimal fragmentation. The major vegetation types associated with those lands, particularly the ponderosa pine forests, pinyon-juniper woodlands, and mountain shrublands, display compositions and structures similar to those that occurred before the development.

See relevant sections in Chapter 3 for specific management direction for the following areas within the Columbine geographic area:

- Wilderness (Weminuche and Hermosa Creek)
- USFS recommended wilderness areas (a portion of the Hermosa CRA and the Elk Park portion of the Weminuche Adjacent CRA)
- Recommended WSR segments (Hermosa Creek and tributaries, Los Pinos and tributaries, above Vallecito Reservoir)
- RNAs (Electra and Hermosa)
- Botanical areas (Chattanooga Iron Fen)
- Archeological areas (Falls Creek)
- Scenic, historic, and backcountry byways (portions of the San Juan Skyway)
- National recreation and scenic trails (portions of the Continental Divide National Scenic Trail and the Colorado Trail)
- Special Areas (HD Mountains)

**Management Area Composition:** Table 3.3.1 shows the distribution of MAs within the Columbine geographic area.

**Table 3.3.1: Management Area Distribution in the Columbine Geographic Area**

| Management Area | Acres | Percentage of Geographic Area (USFS lands) |
|---|---|---|
| MA 1: natural processes dominate | 300,795 | 43.7% |
| MA 2: special areas and designations | 119,204 | 17.4% |
| MA 3: natural landscapes, with limited management | 176,106 | 25.6% |
| MA 4: high-use recreation emphasis | 29,258 | 4.3% |
| MA 5: active management (commodity production in order to meet multiple-use goals) | 51,975 | 7.6% |
| MA 7: public and private lands intermix | 7,832 | 1.1% |
| MA 8: highly developed areas | 2,366 | 0.3% |
| **Total** | **687,536** | **100%** |

## 3.4 Pagosa Ranger District Geographic Area

The Pagosa geographic area is the easternmost geographic area in the planning area. It is bounded by the Continental Divide (the boundary with the Rio Grande National Forest) on the north and the east. It is predominantly situated in Archuleta, Hinsdale, and Mineral Counties, with some lands in Rio Grande and Conejos Counties. The Pagosa Ranger District consists of approximately 585,770 acres of NFS lands.

The social center of the geographic area is the town of Pagosa Springs (with a population of approximately 1,620 people). Although Pagosa Springs is the only incorporated town in the geographic area, much of the population of Archuleta County (with a population of approximately 10,000 people) is in low-density residential and second-home enclaves, most notably in the Pagosa Lakes area. The geographic area includes significant acres of Hinsdale and Mineral Counties, but the towns, as well as almost all of the population of those counties, are situated north of the Continental Divide and the Weminuche Wilderness area (with little social connection and limited road access to the residents and businesses in the Pagosa geographic area).

Pagosa Springs sits at the intersection of U.S. Highway 160 (before the road turns north to head over Wolf Creek Pass) and U.S. Highway 84 (which heads south into northern New Mexico). Pagosa Springs was historically a compact sawmill and ranching town, with a Hispanic and pioneer Anglo ranching and sawmilling culture supported by productive forest land and livestock grazing. The area has long-standing ties with people coming out of Texas and New Mexico in the summer (to where it is cool and green) and from around the county in the fall (many to hunt big game). Besides the pleasant climate, the area is

known for outstanding scenery. Many winter visitors to Wolf Creek Ski Area, as well as backcountry skiers and snowmobilers, stay in Pagosa Springs (rather than in South Fork, which is on the other side of Wolf Creek Pass).

On a percentage basis, Archuleta County is the fastest growing county in southwest Colorado. Amenity migration and second-home development began in the 1970s (with the development in the Pagosa Lakes area west of Pagosa Springs) and now fills most of the triangle of developable land between U.S. Highway 160, the Piedra Road, and the forest boundary east of Martinez Creek. Similar development has pushed against the USFS boundary to the west of Pagosa Springs and north of U.S. Highway 160. Much of the NFS lands around Pagosa Springs are in MA 7 settings (public and private lands intermix), which reflects this development. In addition to fire risk reduction in these areas, development of trails and recreation opportunities and the protection of wildlife habitat (especially winter range) are important.

The main river systems in this geographic area are the Piedra River (which has headwaters in the Weminuche Wilderness area) and the San Juan River (with the headwaters of the West Fork of the San Juan beginning north of Pagosa Springs in the Weminuche Wilderness area, and the East Fork of the San Juan beginning northeast of Pagosa Springs in the South San Juan wilderness area). These rivers, and their tributaries, are important for recreation and scenic quality, as well as for irrigation and domestic water supplies. They also support a diverse mix of aquatic habitats and riparian and wetland ecosystems that contribute to the ecologic and economic values of the area.

Approximately 85% of the public lands in the Pagosa geographic area are in the South-Central Highlands Section (including portions of the Weminuche Wilderness area, the South San Juan wilderness area, and the Piedra Area). The Treasure Mountain and Turkey Creek CRAs (which lie between the Weminuche and the South San Juan wilderness areas) contain important linkages and corridors for wildlife movement. Other IRAs include Graham Peak and areas adjacent to the Weminuche and South San Juan wilderness areas and the Piedra Area. These areas are managed, for the most part, in order to preserve their undeveloped character.

At middle and lower elevations in this geographic area, there is an extensive network of roads, primarily left by historical logging. These roads support many forms of dispersed recreational use and camping, and are heavily used during hunting season. Restoration-oriented logging is expected in the ponderosa pine and mixed conifer forest found in this area. This area receives more precipitation than most of the Southwest and has good growing conditions for timber. Large trees, including aspen, are common.

Having moderate climates, the lower elevation mountains, mesas, and valleys are dominated by mountain grasslands, and mixed conifer, ponderosa pine, and pinyon-juniper woodlands, where human settlement has evolved. Much of the human development in the Pagosa geographic area is at the interface with forest lands, presenting wildfire hazard mitigation challenges that are being actively addressed through county policy, community wildfire protection planning, and mitigation.

A related challenge is the network of access roads connecting U.S. Highway 160 and U.S. Highway 84 to the SJNF. These roads provide access to residential subdivisions and other private in-holdings. They also provide recreation access to public lands for local visitors, as well as for visitors from out of the area. The pressure on these roads presents maintenance demands and costs that must be worked out collaboratively among local, state, and other federal agencies; property owners; and public land users. Growth in the Pagosa geographic area has reached a point where more domestic water and water storage are needed in order to meet increasing demand. This requires continued cooperation, in terms of exploring alternatives that involve storage and/or diversion facilities located on federal lands (where protecting the ecological integrity of affected stream channels is mandated).

The Pagosa geographic area's most striking heritage resource is the Chimney Rock National Monument. The user-supported interpretive tours, special events, and visitor center at this unique pre-Puebloan site are conducted and staffed by a very active group of volunteer citizens.

## Desired Conditions

3.4.1 Management activities maintain or enhance the ecological sustainability and integrity of the area. The demands of residents and users are balanced with the protection of watersheds, wildlife habitat, vegetation, soil productivity, and undisturbed natural areas.

3.4.2 The Pagosa geographic area is a destination for hunters, hikers, and motor vehicle enthusiasts. It promotes partnerships and responsible stewardship in all recreational uses of the public lands.

3.4.3 The local economy is supported and diversified by agency activities and programs (including maintaining roads, facilities, and campgrounds; supporting stewardship and partnerships; and providing a wide spectrum of recreation and tourism opportunities).

3.4.4 The USFS recognizes the needs of the area's growing population of residents and visitors. SJNF facilities (including roads, bridges, campgrounds, and trailheads) are designed and maintained to the proper standards for safe and efficient access to public lands.

3.4.5 The SJNF actively cooperates with local governments, residents, and land users in order to maintain and enhance the safety and enjoyment of the public lands. This is accomplished through the protection of scenery, the mitigation of WUI fire danger, and land ownership adjustments.

3.4.6 White fir is less abundant in the warm-dry and cool-moist mixed conifer forests of the Pagosa geographic area. The rare bristlecone pine forests that only occur in the Pagosa geographic area are protected and sustainable.

Please see relevant sections in Chapter 3 for specific management direction for the following areas within the Pagosa geographic area:

- Wilderness (Weminuche and South San Juan)
- Other Congressional designations (Piedra Area)
- USFS recommended wilderness areas (portions of the Turkey Creek, Monk Rock, and Weminuche Adjacent CRAs)
- Recommended WSR segments (the Piedra River, from U.S. Highway 160 to the Forks; East Fork of the Piedra, north of the wilderness boundary; Middle Fork of the Piedra; and West and East Fork of the San Juan River)
- Chimney Rock National Monument
- RNAs (Williams Creek, Martinez Creek, Hidden Mesas, Navajo River, Piedra, Porpyry Gulch)
- Botanical areas (O'Neal Hill, site of the globally rare Pagosa Springs bladderpod [*Lesquerella pruinosa*]).
- National recreation and scenic trails (portions of the Continental Divide National Scenic Trail).

**Management Area Composition:** Table 3.4.1 shows the distribution of MAs within the Pagosa geographic area.

**Table 3.4.1: Management Area Distribution in the Pagosa Geographic Area**

| Management Area | Acres | Percentage of Geographic Area (USFS lands) |
|---|---|---|
| MA 1: natural processes dominate | 252,306 | 43.4% |
| MA 2: special areas and designations | 9,089 | 1.5% |
| MA 3: natural landscapes, with limited management | 169,612 | 29.2% |
| MA 4: high-use recreation emphasis | 8,623 | 1.5% |
| MA 5: active management (commodity production in order to meet multiple-use goals) | 100,611 | 17.3% |
| MA 7: public and private lands intermix | 40,605 | 7.0% |
| MA 8: highly developed areas | 824 | 0.1% |
| **Total** | **581,670** | **100%** |

## 3.5 Management Areas

MA designations apply to all SJNF lands within the planning area. MAs describe the intensity of management that can be expected within each MA, ranging from areas where natural processes dominate and shape the landscape to areas that are intensely managed. In addition to the level of management, MAs also provide a general sense of how the landscape will appear and identify uses and activities that are allowed. To varying degrees, multiple uses occur within all the MAs. The allowable use tables for each MA portray the suitability determinations made under the grazing, timber, and travel programs in Chapter 2 as they apply to each MA, and also identify additional uses that are listed as allowable, restricted, or prohibited (if there are discrepancies between allowable use tables and grazing, timber, or travel suitability maps, the suitability map takes precedence). Table 3.5.1 identifies the distribution of MAs across the SJNF (see also Figure 3.5).

**Table 3.5.1 Management Area Allocations on San Juan National Forest Lands**

| Management Area | Acres | Percent of SJNF |
|---|---|---|
| MA 1 Natural Processes Dominate | 587,930 | 31.5% |
| MA 2 Special Areas and Designations | 163,044 | 8.7% |
| MA 3 Natural Landscapes, with Limited Management | 555,000 | 29.7% |
| MA 4 High-Use Recreation Emphasis | 65,926 | 3.6% |
| MA 5 Active Management (commodity production in order to meet multiple-use goals) | 442,676 | 23.7% |
| MA 7 Public and Private Lands Intermix | 48,437 | 2.6% |
| MA 8 Highly Developed Areas | 3,791 | 0.2% |
| **Total** | **1,866,804** | **100%** |

Some exceptions may apply to activities, particularly those activities that are pursuant to reserved or outstanding rights, or as provided by statute or treaty. Additionally, there are 529,700 acres of CRAs on the SJNF. CRAs are governed by the Colorado Roadless Rule and may have additional restrictions beyond the general suitability identified by MAs. When guidance in a forest plan is more restrictive than direction described in the Colorado Roadless Rule, actions must be consistent with the more restrictive direction.




**Figure 3.5: Management Areas, San Juan National Forest**

## Management Area 1 (MA 1): Natural Processes Dominate

These relatively pristine lands are places where natural ecological processes operate free from human influences. Succession, fire, insects, disease, floods, and other natural processes and disturbance events shape the composition, structure, and landscape patterns of the vegetation. These areas contribute significantly to ecosystem and species diversity and sustainability, serve as habitat for fauna and flora, and offer wildlife corridors, reference areas, primitive recreation opportunities, and places for people seeking natural scenery and solitude. Roads and human structures are absent and management activities are limited on MA 1 lands. Motorized travel, and in most cases, motorized equipment are prohibited. MA 1 areas include designated wilderness areas, the Piedra Area, WSAs, and other lands where a primary desired condition is to maintain the undeveloped natural character of the landscape. See Table 3.5.2 for a list of allowable, restricted, and prohibited uses within MA 1.

**Table 3.5.2: Management Area 1 Allowable Uses**

| Activities and Uses | Allowable - Restricted - Prohibited |
|---|---|
| Fire managed for resource benefit | Allowable |
| Prescribed burning | Allowable |
| Mechanical fuels treatment | Restricted (allowable when meeting desired conditions of the area) |
| Timber production (scheduled on a rotation basis) | Prohibited |
| Timber harvesting as a tool | Prohibited |
| Commercial use of special forest products and firewood | Prohibited |
| Land use ROWs, special use permits, and utility corridors | Prohibited |
| Livestock grazing | Allowable |
| Facilities | Prohibited |
| Motorized (summer) | Prohibited |
| Motorized (winter) | Prohibited |
| Non-motorized (summer and winter) | Allowable |
| Mechanical transport | Restricted (mountain bikes are allowable in MA 1 landscapes outside designated wilderness) |
| Road construction (permanent or temporary) | Prohibited |
| Minerals - leasable (oil and gas, and other) | Restricted (designated wilderness, WSAs, and the Piedra Area are withdrawn from mineral leasing; a NSO stipulation would be applied to CRAs outside designated wilderness) |
| Minerals - locatable | Prohibited (wilderness areas are withdrawn from locatable mineral entry, subject to valid and existing rights; other MA 1 areas are open to mineral entry, but impacts to natural resource must be minimized; the agency can petition for the area to be withdrawn from mineral entry) |
| Minerals - saleable (materials) | Prohibited |

## Management Area 2 (MA 2): Special Areas and Designations

These areas possess one or more special feature or characteristic that makes them, and their management, unique from other areas within the planning area. MA 2 areas include RNAs, archeological areas, habitat areas, botanical areas, and other unique areas that have a mix of special features and uses. In general, MA 2 areas are managed in order to protect or enhance their unique characteristics; therefore, management intensity and suitability varies by each area. See subsequent sections in Chapter 3 of this LRMP for specific management direction for these MA 2 areas.



FS-008352

## Management Area 3 (MA 3): Natural Landscapes with Limited Management

MA 3 lands are relatively unaltered places where natural ecological processes operate primarily free from human influences. Succession, fire, insects, disease, floods, and other natural processes and disturbance events predominantly shape the composition, structure, and landscape patterns of the vegetation. These areas contribute to ecosystem and species diversity and sustainability, serve as habitat for fauna and flora, and offer wildlife corridors, reference areas, primitive and semi-primitive recreation opportunities, and places for people seeking natural scenery and solitude.

On the SJNF, approximately 62% of the MA 3 lands are within CRAs. Management activities are allowed in MA 3 areas but are more limited in the CRAs. For MA 3 lands that are not CRAs, roads, infrastructure, and management activities are more common. Management activities include habitat and ecosystem restoration, livestock grazing, wildland fire and prescribed burning, hazardous fuels reduction, salvage logging following fire, insect epidemics and/or wind events, and invasive species treatments. Motorized equipment may be used, and temporary road construction is allowed; however, most roads would be closed upon project completion. Most MA 3 areas emphasize non-motorized recreation opportunities, but motorized travel occurs in some areas on existing roads and motorized trails. Most MA 3 lands are available for fluid mineral leasing with specific resource stipulations; however, surface occupancy and road construction is prohibited (i.e., NSO stipulation) in CRAs. See Table 3.5.3 for a list of allowable, restricted, and prohibited uses within MA 3.

**Table 3.5.3: Management Area 3 Allowable Uses**

| Activities and Uses | Allowable - Restricted - Prohibited |
|---|---|
| Fire managed for resource benefit | Allowable |
| Prescribed burning | Allowable |
| Mechanical fuels treatment | Allowable |
| Timber production (scheduled on a rotation basis) | Prohibited |
| Timber harvesting as a tool | Allowable |
| Commercial use of special forest products and firewood | Allowable |
| Land use ROWs, special use permits, and utility corridors | Restricted (development may be conditioned or prohibited in CRAs and lands managed for wilderness characteristics) |
| Livestock grazing | Allowable |
| Facilities | Restricted (development may be prohibited in CRAs and lands managed for wilderness characteristics) |
| Motorized (summer) | Restricted (motorized travel may occur in some MA 3 locations on designated routes) |
| Motorized (winter) | Restricted (oversnow motorized travel may occur in some MA 3 locations) |
| Non-motorized (summer and winter) | Allowable |
| Mechanical transport | Allowable |
| Road construction (permanent or temporary) | Restricted (temporary road construction may occur in some MA 3 locations in order to achieve resource desired conditions; exceptions may apply for valid existing rights; additional road construction would also be allowed subject to valid existing rights and terms of development authorization) |
| Minerals - leasable (oil and gas, and other) | Restricted (special lease stipulations [i.e., NSO, CSU, TL] may apply to specific resources within MA 3 areas) |
| Minerals - locatable | Allowable (open to mineral entry per the 1872 Mining Law; however, the exploration and development of mining claims may be subject to restrictions to protect resources) |
| Minerals - saleable (materials) | Restricted (limited road access and other constraints in MA 3 landscapes may limit or preclude mineral collection.) |

## Management Area 4 (MA 4): High-Use Recreation Emphasis

These areas are places with relatively high levels of recreation use that is managed in order to provide a wide variety of opportunities and experiences to a broad spectrum of visitors. They are associated with, and often provide, access to popular destinations, transportation corridors, scenic byways, scenic vistas, lakes, and streams. Developed recreation facilities that provide user comfort and resource protection are present.

These areas tend to be altered by human activities, but also include some more undeveloped places (including backcountry travel corridors). Visitors can expect to see a wide range of human activities and development (including roads, trails, interpretive sites, campgrounds, trailheads, fences, and day-use facilities). Both motorized and non-motorized activity is common. Natural ecological processes and disturbance agents (including succession and fire) are often influenced by humans on most of these lands. Resource uses (including livestock grazing, timber management, and wildlife management) may occur in conjunction with surrounding recreation and scenic objectives. Mineral development, mining, and alternative energy infrastructure is generally not compatible within MA 4 areas, e.g., in developed recreation sites or along scenic corridors. See Table 3.5.4 for a list of allowable, restricted, and prohibited uses within MA 4.

**Table 3.5.4: Management Area 4 Allowable Uses**

| Activities and Uses | Allowable - Restricted - Prohibited |
|---|---|
| Fire managed for resource benefit | Restricted (may be used in order to meet desired conditions on adjacent lands) |
| Prescribed burning | Allowable |
| Mechanical fuels treatment | Allowable |
| Timber production (scheduled on a rotation basis) | Prohibited |
| Timber harvesting as a tool | Allowable |
| Commercial use of special forest products and firewood | Restricted (restrictions may apply within developed recreation areas) |
| Land use ROWs, special use permits, and utility corridors | Allowable |
| Livestock grazing | Restricted (restrictions may apply within developed recreation areas) |
| Facilities | Allowable |
| Motorized (summer) | Allowable |
| Motorized (winter) | Allowable |
| Non-motorized (summer and winter) | Allowable |
| Mechanical transport | Allowable |
| Road construction (permanent or temporary) | Allowable |
| Minerals - leasable (oil and gas, and other) | Restricted (special lease stipulations [i.e., NSO, CSU, TL] may apply to specific resources within MA 4 areas) |
| Minerals - locatable | Allowable (open to mineral entry per the 1872 Mining Law; however, the exploration and development of mining claims may be subject to restrictions to protect resources) |
| Minerals - saleable (materials) | Restricted (generally not compatible within developed recreation areas or scenic corridors) |

## Management Area 5 (MA 5): Active Management

These multiple-use areas are places where active management occurs in order to meet a variety of social, economic, and ecological objectives. They are easily accessible, occurring mostly on roaded landscapes and relatively gentle terrain. These are lands where timber harvesting, oil and gas activities, and intensive livestock grazing occur and influence the composition, structure, and landscape patterns of the vegetation. Natural ecological processes and disturbance agents (including succession and fire) are often influenced by humans on many of these lands. A mosaic of vegetation conditions is often present, some showing the effects (impacts) of past management activities, others appearing predominantly natural. These areas contribute to ecosystem and species diversity and serve as habitat for fauna and flora.

In MA 5 areas, visitors can expect to see a wide range of human activities, development, and management investments (including roads, trails, fences, corrals, stock ponds, timber harvesting equipment, oil and gas wells, and livestock). Maintenance of past and current investments is anticipated to be continued for future management opportunities. Motorized and non-motorized recreation opportunities are easily accessed by the relatively dense network of roads found on these lands. Hiking trails provide access for visitors (who can expect contact with others). Developed recreation facilities that provide user comfort and resource protection are present. See Table 3.5.5 for a list of allowable, restricted, and prohibited uses within MA 5.

**Table 3.5.5: Management Area 5 Allowable Uses**

| Activities and Uses | Allowable - Restricted - Prohibited |
|---|---|
| Fire managed for resource benefit | Allowable |
| Prescribed burning | Allowable |
| Mechanical fuels treatment | Allowable |
| Timber production (scheduled on a rotation basis) | Allowable |
| Timber harvesting as a tool | Allowable |
| Commercial use of special forest products and firewood | Allowable |
| Land use ROWs, special use permits, and utility corridors | Allowable |
| Livestock grazing | Allowable |
| Facilities | Allowable |
| Motorized (summer) | Allowable |
| Motorized (winter) | Allowable |
| Non-motorized (summer and winter) | Allowable |
| Mechanical transport | Allowable |
| Road construction (permanent or temporary) | Allowable |
| Minerals - leasable (oil and gas, and other) | Allowable (special lease stipulations [i.e., NSO, CSU, TL)] may apply to specific resources within MA 5 areas) |
| Minerals - locatable | Allowable (open to mineral entry per the 1872 Mining Law; however, the exploration and development of mining claims may be subject to restrictions to protect resources) |
| Minerals - saleable (materials) | Allowable |

## Management Area 7 (MA 7): Public and Private Lands Intermix

These areas are places where the public lands within the planning area are in close proximity to private lands; therefore, coordination with communities and local governments is essential in order to balance the needs of both parties. MA 7 areas are often associated with towns and cities, as well as with the houses, structures, people, and values associated with them. Visitors can expect to see a wide range of human activities and development (including roads, trails, fences, signs). In some MA 7 areas, oil and gas development is evident.

The proximity of these areas to private lands makes them a priority for fuels and vegetation treatments in order to reduce wildfire hazards. The backyard or rural recreation setting provided by many of these lands is an amenity to the active lifestyles and quality of life for local residents. Hiking, biking, and dog-walking are common activities. These areas contribute to ecosystem and species diversity, and serve as habitat for fauna and flora. Winter range for deer and elk is a common component of MA 7 areas, as are seasonal closures in order to reduce animal disturbance. Natural ecological processes and disturbance agents (including succession and fire) are influenced by humans on most of these lands.

Land exchanges, acquisitions, and disposals can be undertaken in order to improve the intermingled land ownership patterns that are common in MA 7 areas. Cooperation with adjacent landowners and local governments is common in order to improve access and convey roads to county jurisdictions, where appropriate. Cooperation is also be important in order to improve the transportation network, enhance protect resources, and allow authorized legitimate access to public lands. Utility and communication distribution lines tend to be more common in these areas. See Table 3.5.6 for a list of allowable, restricted, and prohibited uses within MA 7.

**Table 3.5.6: Management Area 7 Allowable Uses**

| Activities and Uses | Allowable - Restricted - Prohibited |
|---|---|
| Fire managed for resource benefit | Prohibited |
| Prescribed burning | Allowable |
| Mechanical fuels treatment | Allowable |
| Timber production (scheduled on a rotation basis) | Prohibited |
| Timber harvesting as a tool | Allowable |
| Commercial use of special forest products and firewood | Allowable |
| Land use ROWs, special use permits, and utility corridors | Allowable |
| Livestock grazing | Allowable |
| Facilities | Allowable |
| Motorized (summer) | Allowable |
| Motorized (winter) | Allowable |
| Non-motorized (summer and winter) | Allowable |
| Mechanical transport | Allowable |
| Road construction (permanent or temporary) | Allowable |
| Minerals - leasable (oil and gas, and other) | Allowable (special lease stipulations [i.e., NSO, CSU, TL] may apply to specific resources within MA 7 areas) |
| Minerals - locatable | Allowable (open to mineral entry per the 1872 Mining Law; however, the exploration and development of mining claims may be subject to restrictions to protect resources) |
| Minerals - saleable (materials) | Allowable (depending on location and resources present, resource restrictions may apply as identified in the LRMP standards and guidelines) |

## Management Area 8 (MA 8): Highly Developed Areas

These lands are places that have been altered with long-term development (including downhill ski areas and large dams). In these areas, human activities have created lasting changes in the composition, structure, and function (ecological processes and disturbance agents) of the associated ecosystems. These areas, which often provide large socioeconomic benefits, include DMR and the McPhee Dam. Mineral development, mining, and alternative energy infrastructure is generally not compatible within MA 8 areas, e.g., within downhill ski areas and dams. See Table 3.5.7 for a list of allowable, restricted, and prohibited uses within MA 8.

**Table 3.5.7: Management Area 8 Allowable Uses**

| Activities and Uses | Allowable - Restricted - Prohibited |
|---|---|
| Fire managed for resource benefit | Prohibited |
| Prescribed burning | Allowable |
| Mechanical fuels treatment | Allowable |
| Timber production (scheduled on a rotation basis) | Prohibited |
| Timber harvesting as a tool | Allowable |
| Commercial use of special forest products and firewood | Restricted |
| Land use ROWs, special use permits, and utility corridors | Allowable |
| Livestock grazing | Restricted |
| Facilities | Allowable |
| Motorized (summer) | Allowable |
| Motorized (winter) | Allowable |
| Non-motorized (summer and winter) | Allowable |
| Mechanical transport | Allowable |
| Road construction (permanent or temporary) | Allowable |
| Minerals - leasable (oil and gas, and other) | Restricted (stipulated with NSO to protect facilities) |
| Minerals - locatable | Allowable (open to mineral entry per the 1872 Mining Law; however, MA 8 areas contain a provision for assessing the affected area for future mineral withdrawal and/or segregation) |
| Minerals - saleable (materials) | Restricted (depending on location and resources present, restrictions may apply as identified in the LRMP standards and guidelines) |

## 3.6 Wilderness Areas and Wilderness Study Areas

Wilderness is a unique and vital resource. In addition to offering primitive recreation opportunities, it is valuable for its scientific and educational uses, as a benchmark for ecological studies, and for the preservation of historical and natural features.

The Wilderness Act of 1964 defines wilderness as:

> A wilderness, in contrast with those areas where man and his own works dominate the landscape, is hereby recognized as an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain. An area of wilderness is further defined to mean in this chapter an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.

Federal agencies manage wilderness resources in a manner that ensures that their character and values are dominant and enduring. Wilderness management must be adapted over time in order to ensure their present and future availability and enjoyment as wilderness. Wilderness is managed in order to ensure that human influence does not impede the free play of natural forces or interfere with natural succession in the ecosystems, and to ensure that wilderness areas offer outstanding opportunities for solitude and/or for a primitive and unconfined type of recreation. Wilderness is also managed as one resource rather than a series of separate resources (FSM 2320.6).

There are four wilderness areas on USFS-administered lands, as well as the Piedra Area (USFS), which is a Congressionally designated area managed to preserve its wilderness characteristics (see Figure 3.6). Wilderness areas are managed by USFS policy outlined in FSM 2320. Specifically, the wilderness areas and the Piedra Area are managed under the San Juan-Rio Grande National Forests Wilderness Management Direction (USFS 1998a) that is incorporated by reference as part of this LRMP.

There is one WSA on USFS-administered lands within the planning area (see Figure 3.6). The Molas Pass WSA was transferred from BLM to USFS jurisdiction by the Hermosa Creek Watershed Protection legislation in 2014. This WSA are was found to have wilderness characteristics during the original wilderness inventory that was conducted by BLM from 1978 to 1980 as directed by Section 603 of the FLPMA. This inventory focused on roadless areas of public lands of 5,000 acres or more, areas of less than 5,000 acres that had wilderness characteristics in association with contiguous roadless lands managed by another agency, and areas of less than 5,000 acres that had wilderness characteristics and could practicably be managed to keep those characteristics in an unimpaired condition.

The WSA was designated in the 1980s by BLM, and a final agency recommendation was forwarded to the President in 1991. Unless released by Congress from wilderness review, the WSA would be managed in accordance with FSM 1923.03, which directs that any area recommended for wilderness or wilderness study designation is not available for any use or activity that may reduce the wilderness potential of an area. The Forest Service will manage the WSA to protect its suitability for designation as wilderness.

If the WSA is released by Congress, it would be managed in accordance with the direction provided in the desired conditions below. See Table 3.6.1 for a listing of the existing wilderness areas, the Piedra Area, and WSAs.



FS-008358

**Table 3.6.1: Wilderness Areas and Wilderness Study Areas**

| Area Name and Type | Acres |
|---|---|
| **Wilderness Areas** | |
| Weminuche | 328,850 |
| South San Juan | 71,804 |
| Lizard Head | 21,088 |
| Hermosa Creek | 37,378 |
| **Total** | **459,120** |
| **Piedra Area** | **60,534** |
| **Wilderness Study Areas** | |
| Molas Pass | 499 |
| **Total** | **499** |

## Desired Conditions

3.6.1 WSAs released by Congress from wilderness review would be managed for existing values and uses, such as primitive and unconfined recreation, opportunities for solitude, naturalness, roadlessness, livestock grazing, forest resources, and biodiversity. The visual quality of WSAs released from wilderness review would be managed under the SIO class of adjacent public lands. Where more than one SIO class lies adjacent to a WSA, an interdisciplinary team would decide the SIO class of the released WSA.




**Figure 3.6: Recommended Wilderness**

## 3.7 Recommended Wilderness

Using criteria from USFS directives, the SJNF used its inventory of roadless lands as part of the process for revising the LRMP to identify lands exhibiting “roadless character.” These areas were further examined to determine whether they possess wilderness characteristics using criteria from the Wilderness Act and FSH 1909.12. With regard to size, these areas must contain 5,000 or more acres, or they can contain less than 5,000 acres, but must be contiguous to existing wilderness areas or areas that are recommended for wilderness under other federal ownerships.

Twenty areas (totaling approximately 528,337 acres) are included in the SJNF inventory as having “roadless character.” These areas were analyzed for their potential inclusion in the National Wilderness Preservation System (see Appendix C). The SJNF recommends the following areas for inclusion in the National Wilderness Preservation System (see Figure 3.6):

- portions of the Hermosa CRA (9,513 acres);
- portions of the Lizard Head CRA (2,628 acres);
- portions of the Weminuche Adjacent CRA (specifically, Elk Park and Monk Rock, totaling 1,346 acres); and
- portions of the Turkey Creek CRA (664 acres).

These areas will be managed to maintain their wilderness characteristics until Congress designates them as wilderness or releases them for other multiple-use management (in which case, they would be managed under MA 1).

## 3.8 Lands Managed for Wilderness Characteristics (Tres Rios Field Office)

*This area was applicable only to BLM lands.*

## 3.9 Wild and Scenic Rivers

### Introduction

Congress enacted the Wild and Scenic Rivers Act (WSRA) in 1968 in order to preserve the free-flowing condition, water quality, and outstandingly remarkable values (ORVs) of select rivers. The WSRA directs that each river in the National Wild and Scenic Rivers System be administered in a manner that protects and enhances its outstanding natural and cultural values. The WSRA allows existing uses of a river to continue and future uses to be considered (as long as the use does not conflict with the protection of river values).

WSRA Section 5(d)(1) directs federal agencies to consider the potential of all rivers and streams for inclusion in the National Wild and Scenic Rivers System during their planning processes. All streams and rivers within the planning area were assessed as to their WSR eligibility and suitability. The FEIS describes the process used for the planning area (also see Appendix D for additional details).

In order to be found suitable for WSR status, rivers must meet the following criteria:

- they must be free-flowing (not in a reservoir and having mostly natural banks);
- they must have at least one ORV (ORVs can be in relation to fish, wildlife, recreation, scenery, ecology, cultural, historic, and/or other resource);
- their free-flowing character, water quality, and ORVs should be protected, even if there are other competing uses; and
- their WSR status would be the best method for protecting their ORVs.

During the planning process, the SJNF determined the appropriate development level of rivers within the planning area. This was based on water resources development, shoreline development, and accessibility. These constitute a river’s classification as “wild,” “scenic,” or “recreation.” Table 3.9.1 lists the rivers that have been found to be suitable for WSR status (see also Figure 3.9).



FS-008361

The suitability determinations listed below are interim administrative recommendations that USFS may forward to the chief, Cabinet Department Secretaries, and the President for further review, possible modification, and transmission to the U.S. Congress for action. While these recommendations remain in this status, USFS can consider and pursue alternative management direction that may be recommended by other entities and/or individuals that provides appropriate river management and protection for the stream segments determined as suitable. Alternative management approaches that would affect the classification of river segments found suitable, impair or modify the identified outstandingly remarkable values, or alter the suitability determinations, would be subject to the appropriate environmental review and plan modification processes.

The identification of rivers as suitable through this land management planning process does not trigger any water rights or other protections under the WSRA. In order to manage the rivers for their potential inclusion into the National Wild and Scenic River System, existing authorities will be used to protect the identified river's free-flowing character, water quality, ORVs, and recommended classification (details of the interim protective management are listed in FSM 1990.12_80). Previous land management plans had similar direction and have provided protection for the ORVs of the Los Pinos River, and the Piedra River over the past several decades.

**Table 3.9.1: Miles of River Segments Suitable for Wild and Scenic River Status by Class**

| River Segment | Wild | Scenic | Recreation | Total |
|---|---|---|---|---|
| **Dolores River Total** FS segments McPhee to Bradfield Bridge | | | **5.5** | **5.5** |
| Animas R - Bakers Bridge to Sultan Creek | | | 27.19 | 27.19 |
| Mineral Creek | | | 8.65 | 8.65 |
| South Fork Mineral Creek | | | 7.41 | 7.41 |
| **Animas River Totals** | | | **43.25** | **43.25** |
| Big Bend Creek | 4.43 | | | 4.43 |
| Big Lick Creek | 0.76 | | | 0.76 |
| Clear Creek | | 5.36 | | 5.36 |
| Corral Creek | 1.65 | | | 1.65 |
| Deer Creek | 2.72 | | | 2.72 |
| East Fork Hermosa Creek | | | 6.70 | 6.70 |
| Elk Creek | 4.25 | | | 4.25 |
| Hermosa Creek | | 28.08 | | 28.08 |
| South Fork Hermosa Creek | 5.89 | | | 5.89 |
| West Cross Creek | 2.44 | | | 2.44 |
| **Hermosa Creek Totals** | **22.14** | **33.44** | **6.70** | **62.28** |
| Los Pinos, above Vallecito Reservoir | 21.77 | | | 21.77 |
| Lake Creek | 8.05 | | | 8.05 |
| Flint Creek | 7.03 | | | 7.03 |
| Sierra Vandera Creek | 3.67 | | | 3.67 |
| Snowslide Gulch | 3.51 | | | 3.51 |
| Rincon la Osa | 5.69 | | | 5.69 |
| Rincon la Vaca | 4.33 | | | 4.33 |
| **Los Pinos Totals** | **54.05** | | | **54.05** |
| Piedra River N of Hwy 160 | 14.09 | | 7.98 | 22.06 |
| East Fork Piedra River in Wilderness | 9.26 | | | 9.26 |
| Middle Fork Piedra River | 11.64 | | 7.66 | 19.30 |
| **Piedra River Totals** | **34.99** | | **15.64** | **50.63** |
| West Fork San Juan River | 8.50 | | 2.70 | 10.7 |
| East Fork San Juan River | | | 12.66 | 12.66 |
| **San Juan River Totals** | **8.48** | | **15.44** | **23.88** |



FS-008362




**Figure 3.9: Suitable Wild and Scenic Rivers**

# 3.10 Scenic, Historic, and Backcountry Byways

## Introduction

Currently, driving for pleasure is one of the most popular forms of recreation within the planning area, with scenic byways and backcountry byways serving as some of the most popular routes. As the population increases, and as "Baby Boomers" grow older and become less able to engage in more physically active forms of recreation, larger numbers of visitors are anticipated to take up driving for pleasure. Heritage tourism, which is among the fastest growing segments of the tourism industry, is often combined with a scenic drive.

Consistent with the primary goals of the National Scenic Byway Program, SJNF managers will guide the appropriate physical development of these travel corridors and their associated facilities, direct the conservation of unique and valued attributes surrounding the planning area, and provide leadership for byway management that supports efforts to benefit these routes.

The planning area is home to the 232-mile-long San Juan Skyway, which was designated by the USFS as a National Scenic Byway in 1988 (also designated as a State Scenic and Historic Byway and as an All-American Road in 1997). The San Juan Skyway traverses some of the most spectacular, rugged, and pristine landscapes in America. The area is rich in culture—from prehistoric habitations to the colorful mining era that marked the San Juan Mountains in the 1800s (including the development of the narrow-gauge railways throughout the area).

The 65-mile-long Alpine Loop National Backcountry Byway passes through the southern San Juan Mountains (often along routes that follow ancient paths of Native Americans as they returned to their traditional summer hunting camps). This rugged route connects the towns of Lake City, Silverton, and Ouray. Spectacular high-elevation scenery and numerous historical markers explain the mining history of the area as the route travels through the towering San Juan Mountains.

The Trail of the Ancients Scenic Byway highlights the long and intriguing inhabitation of the Four Corners region by Native Americans. It takes visitors to remote archeologically, culturally, and historically significant sites in Colorado, Utah, and Arizona. The section of the byway within the planning area travels mainly within the Canyons of the Ancients National Monument (BLM), Hovenweep National Monument (National Park Service), Ute Mountain Ute tribal lands, and communities (including Cortez and Dolores). In total, 114 miles of this scenic byway are within Colorado.

The byway program provides some safety, information, and sanitary services; protects, conserves, and interprets valued resources; and promotes a quality image of the SJNF. Planning and infrastructure for these popular driving routes is not keeping up with the increasing demand for recreation. Inventorying scenic conditions along the three byways, as well as developing or updating corridor management plans and interpretive strategies, will help identify management priorities and actions designed to enhance the visitor experience. Travel management planning will integrate effectively with the management of these byways.

SJNF managers will participate in partnerships with local communities, businesses, governmental agencies, nonprofit organizations and other interested groups and individuals to manage, develop, preserve and interpret these nationally significant routes, which have become destinations unto themselves. Potential projects should promote stewardship and ultimately provide benefits to local economies.

## Desired Conditions

3.10.1 The byways are the main access routes, or gateways, to a wide array of recreation opportunities within the planning area; they have appropriate public information and services.

3.10.2 Important cultural, historic and agricultural heritage sites along these three byways (including early historic mining, ranching, and Native American sites) are interpreted.

3.10.3 Scenic byways and adjacent landscapes provide high-quality scenery. Viewsheds along scenic byways are protected, and scenic integrity is maintained in order to meet the public's desire for attractive natural landscapes. The byways contribute to recreation tourism and the regional economy. The byways are managed in order to protect the intrinsic qualities for which they were designated, consistent with current corridor management plans.

3.10.4 Each byway corridor management plan (the community-based strategy to balance the conservation of the byway corridors' intrinsic qualities with the use and enjoyment of those same resources) is up-to-date, having been developed with participation from a variety of stakeholders interested in preserving and enhancing the scenic, natural, historic, cultural, archeological and recreational resource qualities of the byway.

3.10.5 Byway goals and objectives for the effectively integrated with the applicable agency recreation facility master plan.

3.10.6 Byway goals and objectives are considered when actions are taken that could impact the byway.

3.10.7 Significant historic structures along these three byways are preserved and stabilized.

### Additional Guidance

- San Juan Skyway Corridor Management Plan (Friends of the San Juan Skyway Association 1995)
- Trail of the Ancients Corridor Management Plan (Mesa Verde County 2001)

## 3.11 National Recreation and Scenic Trails and National Historic Trails

### Introduction

National recreation and scenic trails are federally recognized trails that connect people to local resources and improve their quality of life. More than 900 trails have been designated throughout the nation. There are two designated national recreation and scenic trails within the planning area: the Calico National Recreation Trail and the Continental Divide National Scenic Trail. A master plan for the Colorado Trail was signed in 1998 and all three trails are recognized through establishment reports and management plans for their scenic, historic, interpretive, and recreation values.

The Old Spanish National Historic Trail also briefly crosses through the USFS planning area. Authorized by Congress in December 2002, the Old Spanish National Historic Trail commemorates the first overland link from Santa Fe to California. While the Old Spanish Trail is currently mapped as crossing the planning area, very few localities associated with the trail have actually been identified and ground-truthed.

Trail stewardship is emphasized through partnerships, marketing and interpretation, monitoring efforts, and maintaining and enhancing desired conditions.

The key to sustaining a successful network of national recreation and scenic trails, and national historic trails, is to continue to engage partners (including the Continental Divide National Scenic Trail Alliance and the Colorado Trail Foundation) and effective trail stewardship (including reconstruction, relocation, monitoring, volunteer recruitment and training, signage, and production of educational materials). Regular reviews of the partnership agreements between the SJNF and partners will help ensure clear role definition for the management and operation of these trails. Coordination with adjoining USFS- and BLM-administered lands that also contain the Continental National Divide Scenic Trail and the Colorado Trail is also an important element of successful trail management and interpretation.

Marketing emphasis includes ensuring that all trailheads and trails have essential safety, orientation, and regulatory signs that are consistent with the natural setting of the trail. Marketing efforts also include the dissemination of accurate information regarding these trails to the public in an effective manner through a variety of media and venues (including the SJNF websites, guidebooks, brochures, and visitor centers).

## Desired Conditions

3.11.1 Consistent with their designation, the significant scenic, historic, recreation and natural resources for each trail are identified, interpreted, and protected. The values for which these trails were established are retained.

3.11.2 The Continental Divide National Scenic Trail and the Colorado Trail provide opportunities for remote backcountry recreation, challenge, and solitude, except where they come near area communities (where more people and development may be encountered).

3.11.3 The Continental Divide National Scenic Trail and the Colorado Trail are non-motorized trails and have high scenic integrity.

3.11.4 Interpretive venues are used to inform and educate visitors about the national recreation and scenic trails, as well as about resource stewardship.

3.11.5 Trail segments near area communities and/or major access points are planned and designed in order to be barrier-free.

3.11.6 Partnerships are encouraged and expanded in order to provide identification, documentation, monitoring, protection, preservation, education, research, and interpretation.

3.11.7 Interpretive displays, visitor contacts, and brochures are available to help visitors and employees understand and appreciate the heritage and cultural resources associated with the SJNF. A wide range of heritage activities, experiences, and products (both on-site and off-site) are available for visitor enjoyment and education. Off-site activities include museum displays, brochures, audio programs, classroom presentations, and field trips. Public access and interpretive efforts are compatible with the physical, cultural, and recreational settings and values of the resources.

## Objectives

3.11.8 Over the life of the LRMP, partner with the Old Spanish Trail Association to ground truth the location of the segment of the Old Spanish National Historic Trail on the SJNF.

3.11.9 Over the life of the LRMP, develop at least one interpretive product in partnership with the Old Spanish Trail Association that interprets the Old Spanish National Historic Trail within the planning area.

3.11.10 Over the life of the LRMP, inventory high potential historic sites and trail routes of the Old Spanish Trail, develop a national trail management corridor, and establish goals and objectives for national trails.

## Guidelines

3.11.11 Other resource activities should be designed in order to meet scenic quality objectives for these special designation trails (generally, a foreground and middle-ground of very high to high scenic integrity).

3.11.12 **Old Spanish National Historic Trail:** A literature search and/or Class III cultural resources survey should be conducted within 0.5 mile of either side of the centerline of the congressionally designated Old Spanish National Historic Trail in high potential segments, prior to authorization of

ground-disturbing activities or activities that could substantially interfere with the nature and purposes of the trail.

## Additional Guidance

- Continental Divide National Scenic Trail Comprehensive Plan (USFS 2009c)
- USFS Decision Notice, Colorado Trail Management Direction and Route Selection EA, Region 2 (USFS 1998b)
- USFS Master Plan for the Colorado Trail (USFS 1998c)
- FSM 2300, Chapter 2353, National Scenic and Historic Trails (USFS 2009d)
- Public Law 90-543, National Trails System Act of 1968, as amended 2002, (this amendment created the Old Spanish National Historic Trail
- Old Spanish Trail National Historic Trail Feasibility Study and Environmental Assessment (National Park Service 2001)
- Calico Trail Establishment Report (USFS 1979)

# 3.12 Research Natural Areas

RNAs are national forest lands designated in perpetuity for non-manipulative research and education, and for the preservation of biodiversity. They are part of a long-term national network of ecological reserves managed to allow natural ecological processes to proceed with minimum human intervention. RNAs represent relatively natural, unaltered ecosystems that serve as reference areas to assess the consequences of management actions on similar lands.

Desired conditions and objectives in the LRMP apply to RNAs in general. Specific desired conditions and objectives for individual RNAs recommended through the revised LRMP will be developed when the management plans for individual RNAs are developed. Table 3.12.1 lists existing RNAs and those that are recommended through this LRMP, as well as key features of each area. Figure 3.12 displays the location of the RNAs.

**Table 3.12.1: Existing and New Research Natural Areas on San Juan National Forest Lands**

| RNA | Key Features |
|---|---|
| Narraguinnep* | Old growth ponderosa pine forests, canyon topography |
| Williams Creek* | White fir-dominated cool-moist mixed conifer forests |
| Electra | Glacial topography, old growth ponderosa pine forests |
| Grizzly Peak | Alpine, fens, willow carrs |
| Hermosa | Ponderosa pine forests, mixed conifer forests, aspen forests, spruce-fir forests, wetlands, Thurber fescue grasslands |
| Hidden Mesas | Old growth ponderosa pine forests, mesa topography |
| Martinez Creek | Old growth spruce-fir forests unburned for centuries |
| Navajo River | Thurber fescue grasslands, volcanic geology, Colorado cutthroat trout, riparian areas |
| Piedra | Old-growth mixed conifer forests |
| Porphyry Gulch | Alpine, spruce-fir forests, wetlands |
| * Existing RNA. | |

## Desired Conditions

3.12.1 Natural ecological processes (including succession, fire, insects, diseases, and flooding) are mostly unaltered by humans and shape the composition, structure, function, and landscape pattern of the vegetation.

3.12.2 Non-native species are absent or rare.

3.12.3 Human influence and structures are absent or rare.

## Objectives

3.12.4 Within 4 years, complete the management plans and establishment records for all the newly designated RNAs on SJNF lands.

3.12.5 Within 4 years, revise the management plans for the Narraguinnep and Williams Creek RNAs.

**Table 3.12.2: Research Natural Area Allowable Uses**

| Management Activities and Uses | Allowable - Prohibited - Restricted |
|---|---|
| Fire managed for resource benefit | Allowable |
| Prescribed burning | Restricted (may be used to meet desired conditions) |
| Mechanical fuels treatment | Prohibited |
| Timber production (scheduled on a rotation basis) | Prohibited |
| Timber harvesting as a tool | Prohibited |
| Commercial use of special forest products and firewood | Prohibited |
| Land use ROWs, special use permits, and utility corridors | Prohibited |
| Livestock grazing | Restricted (may be used to meet desired conditions) |
| Facilities | Prohibited |
| Motorized (summer) | Prohibited |
| Motorized (winter) | Prohibited |
| Non-motorized (summer and winter) | Allowable |
| Mechanical transport | Prohibited |
| Road construction (permanent or temporary) | Prohibited |
| Minerals - leasable (oil and gas, and other) | Restricted, NSO |
| Minerals - locatable | Allowable (open to mineral entry, but impacts to natural resource must be minimized; the agency can petition for the area to be withdrawn from mineral entry) |
| Minerals - saleable (materials) | Prohibited |




**Figure 3.12: Research Natural Areas**

## 3.13 Gypsum Valley Area of Critical Environmental Concern (Tres Rios Field Office)

*This area was applicable only to BLM lands.*

## 3.14 Anasazi Culture Area of Critical Environmental Concern (Tres Rios Field Office)

*This area was applicable only to BLM lands.*

## 3.15 Mesa Verde Escarpment (Tres Rios Field Office)

*This area was applicable only to BLM lands.*

## 3.16 Falls Creek Archeological Area

Falls Creek Valley may contain archeological resources that could aid in efforts to study the earliest agricultural and sedentary societies in the southwestern United States. The area is an important and highly valued place for Native Americans, who view it as part of their heritage. The Falls Creek Archeological Area contains one of the earliest and best dated Basketmaker II sites ever documented. In 1988 the SJNF designated the area as the Falls Creek Archaeological Special Interest Area. These sites are preserved and protected for their scientific, educational, social, and cultural values.

The west side of the Falls Creek Archaeological Area is currently closed to the public; however, the area east of the road is frequented on a year-round, daily basis by residents and visitors taking advantage of the close proximity to Durango in order to enjoy the scenic beauty, open space, and recreational opportunities (Figure 3.27.2). The historic landscape, including the irrigated hayfields of the Hidden Valley Ranch, is managed by the SJNF. The Hidden Valley Ranch provides a window into the area's ranching heritage (offering one of the only hayfields open to public recreation anywhere in the region). These fields are managed in order to provide nutritious forage for big game dependent on this mild, southern exposure lowland for winter habitat. This area has been managed by the USFS as critical big game winter range since the land was acquired by the SJNF in 1985.

The Falls Creek Archaeological Area will continue to emphasize protection and preservation of significant archaeological deposits, wildlife diversity and maintenance of critical big game winter habitat, and compatible non-motorized recreational opportunities.

### Desired Conditions

3.16.1 Archeological sites are protected and preserved for their scientific, educational, social, and cultural values.

3.16.2 Native American values are respected and preserved, and tribal members are provided special access to the area.

3.16.3 Access to the Falls Creek Rock Shelter is allowed to educational institutions through a special use permit.

3.16.4 Historic viewsheds (including the historic hayfields) are protected, enhanced, and preserved.

3.16.5 Native American tribes and Pueblos are consulted with regard to the development of appropriate off-site educational materials.

3.16.6 NAGPRA repatriation of items removed during the 1930s excavation is completed (including analysis of these items necessary in order to complete the cultural affiliation study).

3.16.7 The area continues to provide critical big game winter range habitat.

3.16.8 Wetlands are managed in order to retain the floral and faunal diversity that currently exists.

## Objectives

3.16.9 Within 5 years, create a dispersed recreation plan that is congruent with desired conditions and that would be incorporated into the LRMP for the Falls Creek Archeological Area.

3.16.10 Within 1 year, implement a site-steward program.

3.16.11 Within 5 years, develop and implement a rock art preservation plan in order to mitigate deterioration.

3.16.12 Within 5 years, develop appropriate and sensitive off-site interpretive and educational materials. Make the information from the collection analyses available to researchers.

Table 3.16.1 shows the allowable, prohibited, and restricted management activities and uses for the Falls Creek Archeological Area.

**Table 3.16.1: Falls Creek Archeological Area Allowable Uses**

| Management Activities and Uses | Allowable - Prohibited - Restricted |
|---|---|
| Fire managed for resource benefit | Restricted in order to protect significant archaeological resources |
| Prescribed burning | Restricted (archaeological and historic resources must be protected from impacts from fire) |
| Mechanical fuels treatment | Restricted (archeological and historic resources must be protected) |
| Timber production (scheduled on a rotation basis) | Prohibited |
| Timber harvesting as a tool | Restricted (archeological and historic resources must be protected) |
| Commercial use of special forest products and firewood | Prohibited |
| Land use ROWs, special use permits, and utility corridors | Restricted to minimize impacts to archeological resources and protect viewshed |
| Livestock grazing | Prohibited |
| Facilities | Restricted to interpretive/informational signs, trailheads, and trails |
| Motorized (summer) | Restricted to designated roads and trails |
| Motorized (winter) | Restricted |
| Non-motorized (summer and winter) | Restricted |
| Mechanical transport | Restricted to designated roads and trails |
| Road construction (permanent or temporary) | Prohibited |
| Minerals - leasable (oil and gas, and other) | Administratively not available |
| Minerals - locatable | Allowable (open to mineral entry, but impacts to archaeological resource must be minimized; the agency can petition for the area to be withdrawn from mineral entry) |
| Minerals - saleable (materials) | Prohibited |

# 3.17 Chimney Rock National Monument

## Introduction

The Chimney Rock National Monument is a treasure in the public lands' system, containing spiritual, historic, and scientific resources of great value and significance. The site is recognized as an important archaeological resource dating to the Pueblo II era (roughly 900 -1150 A.D.). Within the Monument boundaries, 167 sites and structures have been identified, and many more are believed to exist. In addition to being the northeastern-most Chacoan outlier, the site is recognized as one of North America's foremost archaeoastronomy resources. Many native people hold Chimney Rock to be an important place of cultural continuity. In addition to the significant archaeological and archaeoastronomical characteristics, the site also includes significant visual and landscape characteristics, geological and biological features, as well as objects of deep cultural and educational value. It is a living landscape that shapes those who visit it and brings people together across time.

The site was listed on the National Register of Historic Places in 1970, and is one of thirty-nine Chaco Culture Archaeological Protection Sites designated under the Chacoan Outliers Protection Act of 1995. Because of the great value and significance of the spiritual, historic, and scientific resources of this site, Chimney Rock was declared a national monument by Presidential Proclamation Number 8868 on September 21, 2012.

The proclamation required a management plan be written for the Monument and directs that the management plan …

*"…provide for protection and interpretation of the scientific and historic objects identified [in the proclamation], and continued public access to those objects, consistent with their protection. The plan will protect and preserve access by tribal members for traditional cultural, spiritual, and food- and medicine-gathering purposes, consistent with the purposes of the Monument, to the maximum extent permitted by law."*

The scientific and historic objects identified in the proclamation (referred to as the "objects of the Monument) which are the focus of management within the Monument include:

- **Cultural Resources** – The Chimney Rock site contains nationally significant archaeological sites, with a total of 167 known prehistoric sites and structures within eight major site groups, or communities, including the highest Chacoan "great house" in the Southwest occurring at an elevation of 7,600 feet. The Chimney Rock site is also one of the best recognized archaeoastronomy resources in North America, with virtually all building clusters having views of Chimney Rock and Companion Rock which frame multiple astronomical alignments and illustrate the Ancestral Pueblo People's knowledge of astronomy.

- **Cultural Values** – The Chimney Rock area holds deep spiritual significance for modern pueblo and tribal communities. Descendants of the Ancestral Puebloans return to this important place of cultural continuity for ceremonial and traditional purposes. The area also contributes to our knowledge about the Ancestral Pueblo People and their understanding and command of their environment, and affords opportunities to understand how geology, ecology, and archaeology interrelate. The features of the Monument also provide recreation opportunities to visitors from near and far.

- **Visual and Landscape Characteristics** – The two soaring rock pinnacles, Chimney Rock and Companion Rock, dominate the dramatic landscape of the Monument, rising hundreds of feet from the valley floor to an elevation of 7,900 feet. The ridgeline leading to the rock pinnacles and the Peterson Ridge area both offer spectacular views of the Monument and surrounding landscape.



FS-008372

- **Biological Features** – Biological features are also significant landscape characteristics and include wildlife species such as peregrine falcons that nest on Companion Rock, mule deer and elk that migrate through the area each fall and spring and live there during the critical winter months, as well as the many other wildlife species and habitats present in the Monument. The diversity of vegetation within the Monument, ranging from ponderosa pine and mixed conifer forests to desert grasslands and rare cactus species, are also important objects of the Monument.

- **Economic Opportunities** – The lands within the Monument are part of a larger area that helps support a growing travel and tourism sector that is a source of economic opportunity for surrounding communities, especially businesses in the region. This helps attract new residents, retirees, and businesses that will further diversify the local economy.

The resource direction contained in Chapter 2 of this LRMP will continue to apply within the Monument unless specifically noted. Where the resource direction found in Chapter 2 of the LRMP has been amended for the Chimney Rock National Monument, these changes will be noted in each resource section below. In addition, plan components designed specifically to address the Chimney Rock National Monument will be adopted. These plan components are listed below.

The vicinity map in Figure 3.17.1 displays the location of the Monument relative to its location within the San Juan National Forest. Figure 3.17.2 is a map of the Monument.



FS-008373




**Figure 3.17.1: CRNM Vicinity Map**




Figure 3.17.2: Chimney Rock National Monument Boundary

## CRNM Cultural Resources

The nationally significant archaeology, archaeoastronomy, and objects of deep cultural and educational value are among the primary reasons that the Chimney Rock area was designated as a National Monument. The site offers a valuable window into the cultural developments of the Pueblo II era and affords opportunities to understand how geology, ecology, and archaeology interrelate. Maintaining and developing partnerships will be critical for preserving, interpreting, and better understanding Chimney Rock National Monument. Partnerships with tribes, the National Trust for Historic Preservation, the Chaco Interagency Management Group, the University of Colorado, History Colorado, and other research and preservation organizations have been, and will continue to be, essential to this effort.

All desired conditions, objectives, standards, and guidelines related to cultural resources in Section 2.16 will continue to apply within the Monument. In addition, plan components designed specifically to address heritage and cultural resources within the Monument will be adopted. These additional plan components focus on the conservation and proper treatment of cultural and ethnographic resources of the Monument, and conserving the viewsheds, night sky, and auditory environments that contribute to cultural values and archaeoastronomy resources of the Monument.

Ethnographic resources are objects and places, including sites, structures, landscapes, and natural resources, with traditional cultural meaning and value to associated peoples. Research and consultation with associated people identifies and explains the places and things they find culturally meaningful. Ethnographic resources may be eligible for the National Register of Historic Places as traditional cultural properties.

## Desired Conditions

3.17.1 Cultural and ethnographic resources within the Monument are preserved and protected in a manner that ensures long-term stewardship of these resources and sustainable public benefits.

3.17.2 Cultural resources in the Monument are managed on a landscape level and the cultural values provided by the viewsheds, night sky, and auditory environment are maintained.

3.17.3 Archaeological and ethnographic research and tribal consultation provide for a better understanding, appreciation, interpretation, and management of the Monument.

3.17.4 Partnerships provide opportunities for research, interpretation, and sustainable tourism at the Monument.

3.17.5 Visitors respect and leave archaeological resources and tribal offerings undisturbed.

## Objectives

3.17.6 Over the life of the plan, conduct inventories for and oversee research about archaeological, historical, and ethnographic resources to better understand and manage the resources.

3.17.7 Over the life of the plan, pursue partnerships and opportunities for grant funding for archaeological and ethnographic research and interpretation at the Monument.

3.17.8 Within 10 years, prioritize sites at the Monument for public interpretation, research, stabilization, conservation, and/or traditional uses.

3.17.9 Within five years, implement a monitoring plan for cultural resources that evaluates factors such as cultural resource use-allocation, National Register of Historic Places (NRHP) status, public use patterns, vandalism occurrences, vulnerability and cultural sensitivity.

3.17.10 Within five years, design and implement archaeological site hardening along the trail to the Great House and other areas as needed.

## Standards

3.17.11 Activities that occur within the Monument must be conducted in a manner that limits visual, auditory, and night sky impacts to help preserve the cultural and traditional values associated with the Monument.

3.17.12 All new ground-disturbing activity within 300 feet of an eligible, contributing, or unevaluated site must be reviewed and/or monitored by a qualified archaeologist.

3.17.13 If unidentified cultural resources are discovered during project activities within the Monument, activities must be halted and a Forest Service archaeologist notified before project activities may proceed. This includes, but is not limited to, the discovery of human remains, funerary objects, sacred objects, objects of cultural patrimony, and/or archaeological artifacts or deposits.

3.17.14 Employees, permittees, volunteers, contractors, and subcontractors must be informed of their responsibilities regarding 1) protective measures for cultural resources; 2) the maintenance of confidentiality of archaeological site location information; and 3) the requirement that any disturbance to, defacement of, or collection or removal of archaeological, historic, or sacred material is not legal without proper authorization and permit.

## Guidelines

3.17.15 Archaeological excavations should be designed to avoid or minimize potential impacts to human remains. If human remains are encountered, they will be treated in accordance with the San Juan National Forest Discovery Plan.

3.17.16 Excavations at archaeological sites should be backfilled, including excavations at prehistoric architectural sites. The Great House (5AA083), Parking Lot Site (5AA086), Ravine Site/Great Kiva (5AA088) sites should be the only prehistoric architectural sites that are left open/stabilized and maintained for intensive visitation. No additional prehistoric architectural sites should be left open to the elements, developed, stabilized and/or maintained for intensive visitation.

3.17.17 Proposed projects should be designed or modified so that significant cultural resources are avoided, and so that the determination of effect for the undertaking is either “no historic properties affected,” or “no adverse effect”.

3.17.18 Ground disturbing activities within 300 feet from the boundaries of identified eligible or unevaluated cultural sites should be avoided unless the purpose is to protect the cultural site. Give consideration when setting the buffer to the importance of setting, context, and natural topographic barriers in managing and preserving heritage and traditional values of particular sites and settlement clusters.

3.17.19 Wherever possible, facilities within the Monument should be located in previously disturbed or existing developed areas to help limit impacts to cultural and ethnographic resources.

3.17.20 New facilities should be located in areas that blend with cultural landscapes and should be designed and located in a manner that does not negatively impact ethnographic resources.

3.17.21 Archaeological sites should be closed to public access if damage occurs that cannot be mitigated.

3.17.22 Sites that are experiencing vandalism or damage from other sources (such as erosion) should be considered high priority for mitigation, which could include research. Research on such sites should be designed to recover remaining information potential, especially when physical in-place preservation or conservation may not be feasible over the long term.

## CRNM Tribal Interests

The Chimney Rock area holds deep spiritual significance for modern pueblo and tribal communities. Today, descendants of the Ancestral Puebloans return to this important place of cultural continuity for ceremonial and traditional purposes. The area is also an important source of traditional cultural materials that are

collected by tribal members for food and medicine. The proclamation requires the management plan to protect and preserve access by tribal members for traditional cultural, spiritual, and food and medicine gathering purposes, consistent with the purposes of the Monument, to the maximum extent permitted by law. Nothing in the proclamation, the LRMP, or the Chimney Rock Management Plan shall be deemed to enlarge or diminish the rights of any Indian tribe.

In addition to the desired conditions, objectives, standards, and guidelines for other resources listed in this management plan, plan components designed specifically to address tribal interests within the Monument will also be adopted. These additional plan components focus on consulting with tribes, protecting resources important to tribes, and providing access to these resources.

In addition to the LRMP and the plan components listed below, the SJNF will continue to ensure that the hunting rights of the Southern Ute Indian Tribe within the exterior boundaries of the Southern Ute Indian Reservation, including lands within the Monument, are upheld. The SJNF will also continue to ensure that the hunting and fishing rights of the 1873 Brunot Agreement are upheld on public lands under their management jurisdiction, including those lands within the Monument.

## Desired Conditions

3.17.23 Tribal access to the Monument for ceremonial, traditional cultural, and food and medicine gathering purposes is protected and encouraged.

3.17.24 Tribal traditions are valued by the Forest Service and the public. When appropriate, these traditions are incorporated into the interpretation of the Monument to help provide visitor experiences that foster cultural understanding. Tribes are encouraged to participate in the development of interpretive materials and to assist in the training of tour guides/interpreters.

3.17.25 Tribal consultation regarding management, interpretation, traditional uses and other issues of tribal concern within the Monument is an on-going process and is fostered to maintain open communication with tribes.

## Objectives

3.17.26 Within two years, produce an ethnographic study and tribal oral history of the Chimney Rock area.

3.17.27 Within five years, develop a policy in consultation with the tribes that specifies how traditional food and medicine gathering will occur within the Monument.

3.17.28 Conduct annual tribal consultation meetings regarding the Monument and provide additional opportunities to consult throughout the year.

## Standards

3.17.29 Projects must be designed or modified so that negative impacts to areas with high value for traditional/ceremonial uses, and food and medicine gathering uses are avoided or mitigated.

3.17.30 When possible, inadvertent discoveries of human remains will be reburied in situ, with only the minimum amount of disturbance/non-destructive analysis necessary to determine whether it is a forensic case and to determine cultural affiliation. If reburial in place is not possible, reburial in a secure location must occur as close to the original burial location as possible. Potential reburial locations will be identified through tribal consultation.

## Guidelines

3.17.31 Tribal requests to gather forest products within the Monument for traditional, non-commercial use should be considered as priority use as long as the collecting of such materials does not result in damage to the objects of the Monument or resource degradation.

## CRNM Recreation

As stated in the proclamation, the Monument is part of a larger area that supports a growing travel and tourism sector that is a source of economic opportunity for the communities and businesses in the region. Visitors are drawn to the area's archaeological sites, outstanding and diverse scenery, and the interpretive and educational opportunities offered at the Monument. Recreational visitation to the Chimney Rock area has increased over time, as have amenities designed to accommodate the increased visitation and improve visitor experiences.

The Chimney Rock area of the Monument has a Summer Recreation Opportunity Spectrum (ROS) of Roaded Natural; the Peterson Mesa area is classified as Semi-Primitive Non-Motorized. The Winter ROS for the entire Monument is semi-primitive, non-motorized. The Monument will continue to be managed to maintain the current ROS. All desired conditions, objectives, standards, and guidelines in the Recreation Section at 2.14 and the Interpretation and Conservation Education Section at 2.22 in the LRMP will continue to apply within the Monument. In addition, plan components designed specifically to address the recreation environment, interpretation, and conservation education within the Monument will be adopted. These additional plan components focus on providing increased visitor and interpretive services while still providing for the protection of the other objects of the Monument.

In addition to these plan components, the proclamation limits all motorized and mechanized vehicle use to designated roads, except for emergency or authorized administrative purposes.

## Desired Conditions

3.17.32 Management of the Monument supports recreation and tourism activities without degradation to the objects of the Monument, thereby contributing to the local and regional economy.

3.17.33 Access to the Monument for recreational activities is managed and enabled in a manner that protects and provides for the enjoyment of the objects for which the Monument was created.

3.17.34 Public education and appreciation of the objects of the Monument are enhanced through the continuation and expansion of interpretive activities and environmental education opportunities. Through these interpretive and educational activities, visitors and other users learn about and gain respect and value for the objects of the Monument and the ongoing needs for protection and stewardship.

3.17.35 Interpretation and conservation education within the Monument are accomplished with a wide range of partners.

3.17.36 Management of visitor capacity and implementation of public safety measures considers visitor experiences and resource protection needs within the Monument.

## Objectives

3.17.37 Within ten years, provide alternative opportunities to experience the objects of the Monument through the construction of additional non-motorized trails.

3.17.38 Within five years, design and implement public safety measures in the Monument, including along the trail to the Great House.

3.17.39 Within five years, develop a facilities management plan for the Monument.

3.17.40 Within three years, develop an interpretive plan and improve signage for the Monument.

3.17.41 Within one year of plan approval, issue closure orders prohibiting the following:

- Prohibit rock climbing on Chimney Rock and Companion Rock by prohibiting public entry into the 3 acre area surrounding Chimney Rock and Companion Rock (shown in Figure 6 in the EIS).

- Prohibit over-snow vehicle use within the Monument.
- Prohibit horses and dogs (with the exception of service dogs) on the Great Kiva Trail (Trail #669) and the Great House Trail (Trail #632) and the archaeological sites accessed by these trails.

3.17.42 Conduct annual interpretive activities and environmental education programs to help inform the public about the archaeology, tribal traditions, unique landscape, diverse geology, natural processes, and flora and fauna of the Monument.

## Standards

3.17.43 Motorized and mechanized vehicle use must be restricted to designated open roads except for emergencies or authorized administrative purposes.

3.17.44 Recreation special use permits shall only be issued when the proposed activity directly relates to and provides support for the protection and interpretation of the objects of the Monument.

## Guidelines

3.17.45 Persons at one time (PAOT's) should be limited if visitation results in negative impacts to the objects of the Monument, safety concerns, or recurrent perceptions of crowding that cannot otherwise be mitigated.

## CRNM Scenery and the Auditory Environment

The scenic vistas, night sky, and auditory environments are important objects of the Chimney Rock National Monument that draw tribal members and visitors to the site. The Monument possesses outstanding and diverse scenery as well as unique and significant archaeoastronomical alignments that are dependent on undisturbed views of the horizon and night sky from numerous points within the Monument. These sites and the associated landscape, viewshed, and night sky have significant traditional values for many pueblos and tribes. As a culturally significant and publicly interpreted site, the auditory environment of the Monument is also an important part of both the tribal member's and visitor's experience.

The Monument currently has a scenic integrity objective (SIO) of high in the main Chimney Rock area, and an SIO of low in the Peterson Mesa area. With implementation of this management plan, the entire Monument will be managed for an SIO of high. All desired conditions, objectives, standards, and guidelines related to scenery in Section 2.15 of the LRMP will continue to apply within the Monument. In addition, plan components designed specifically to address scenery and the auditory environment within the Monument will be adopted. Plan components addressing the scenic and auditory environment are found in both the Cultural section and the Scenery and Auditory Environment Section of this Chapter, and focus on conserving the viewsheds, night sky, and auditory environments that occur within the Monument, as well as appropriately integrating facility and site development with the natural environment.

Impacts to scenic, night sky, and auditory resources will be considered during planning for all projects and activities within the Monument. The Scenery Management System inventory and the Built Environment Image Guide for the USFS will be validated and updated as a part of ongoing site-specific project and programmatic analysis.

## Desired Conditions

3.17.46 All activities occurring in the Monument are managed in a manner that protects, enhances, or conserves the Monument's scenic and auditory resources.

3.17.47 Development of facilities and improvements within the Monument is done in a manner that is consistent with the character of the site, and does not detract from viewsheds, or the night sky and auditory environment.



FS-008380

## Objectives

3.17.48 Over the life of the plan, document existing air quality conditions, including visibility. This could include photo documentation from key viewpoints or air quality data obtained from existing monitoring facilities in the region.

3.17.49 Within five years, develop design guidelines for the Chimney Rock National Monument based on the Built Environment Image Guide.

## Standards

3.17.50 The Monument must be managed for a scenic integrity objective (SIO) of high, unless a decision (with supporting rationale) is made to deviate from the management guidance in a site-specific NEPA decision. (*Similar to LRMP standard 2.15.13, but changes the SIO on Peterson Ridge from low to high*)

3.17.51 New facilities and associated development must be located in areas where they will not detract from views of Chimney Rock, Companion Rock, or other significant cultural features or viewsheds within the Monument, and they must be designed to be consistent with the character of the site.

3.17.52 In order to preserve views of the night sky, the use of permanent lighting within the Monument must be minimized to only that needed for safe site operations. Light fixtures must be designed in a way to prevent horizontal and upward light pollution. (*Similar to LRMP guideline 2.15.24, but has been modified to become a standard*)

## Guidelines

3.17.53 Activities that occur within the Monument should be conducted in a manner that limits auditory impacts in order to preserve the cultural values associated with the Monument.

## CRNM Minerals and Geology

The geology of the Monument provides the foundation of the dramatic landscape setting and scenic vistas that are important objects of the Monument. The dominant geologic feature of the Monument is the pair of towering sandstone spires known as Chimney Rock and Companion Rock. The prominent ridgelines within the Monument served as the location for many of the structures built by the Ancestral Puebloans and command excellent vantage points from which to observe the surrounding landscape and the astronomical phenomena framed by Chimney Rock and Companion Rock. The Monument also contains mineral resources typical of the area such as oil, natural gas, coal, and saleable minerals.

Within the 4,726 acre Monument, 3,895 acres are under federal mineral ownership. The remaining 831 acres of the mineral estate are privately owned. All 3,895 acres under federal mineral ownership have been withdrawn from mineral entry by the proclamation in order to protect the objects of the Monument. However, 551 acres are part of a valid existing oil and gas lease that was issued prior to establishment of the Monument. The establishment of the Monument was subject to valid existing rights; the proclamation directs that development under existing oil and gas leases within the Monument be managed so as not to create any new impacts that would interfere with the proper care and management of the objects protected by the proclamation. The possibility also exists that the privately-owned mineral resources within the Monument may be developed at some point in the future, although to date there has been no stated interest in such development.

All desired conditions, objectives, standards, and guidelines related to minerals in Section 2.19 of the LRMP will continue to apply within the Monument. In addition, plan components designed specifically to address minerals and geology within the Monument will be adopted. These additional plan components focus on protecting the objects of the Monument when managing valid existing rights and surface impacts from development of private minerals within the Monument, and the potential future acquisition of private mineral rights.



FS-008381

## Desired Conditions

3.17.54 Management of mineral development subject to valid existing rights does not interfere with the proper care and management of the objects of the Monument.

3.17.55 Geologic processes continue to shape the landscape of the Monument.

3.17.56 All minerals within the Monument are federally owned or subject to non-surface disturbing agreements.

## Objectives

3.17.57 Within five years, develop a strategy to move valid existing federal and private mineral rights within the Monument into non-surface disturbing status. This includes pursuing opportunities to acquire private mineral rights from willing sellers.

## Standards

3.17.58 Development of valid existing federal mineral rights within the Monument shall be managed so as not to create any new impacts that would interfere with the proper care and management of the objects protected by the proclamation.

3.17.59 If non-federal minerals within the Monument are acquired by the federal government, these areas must be withdrawn from all forms of mineral entry.

## Guidelines

3.17.60 Geologic processes should be allowed to continue shaping the landscape of the Monument unless such processes would interfere with proper care and management of Monument objects, or would interfere with human health and safety.

3.17.61 Surface use within the Monument to develop private mineral rights should be mitigated to the extent practicable to minimize interference with proper care and management of Monument objects.

3.17.62 When offered by a willing entity, the federal government should acquire non-federal minerals within the Monument.

## CRNM Terrestrial and Riparian Ecosystems

The diversity of vegetation within the Monument, ranging from ponderosa pine and mixed conifer forests to desert grasslands and rare cactus species, are important objects of the Monument. The terrestrial and riparian ecosystems of the Monument contribute to scenic vistas, provide tribal members with traditional cultural materials, and provides important wildlife habitat for a diversity of species. Management of these ecosystems is a critical part of the sustainable ecosystems strategy, as described in Section 2.1 of the LRMP.

All desired conditions, objectives, standards, and guidelines related to terrestrial ecosystems in Section

2.2 and riparian area and wetland ecosystems in Section 2.4 of the LRMP will continue to apply within the Monument. In addition, plan components designed specifically to address terrestrial and riparian ecosystems within the Monument will be adopted. These additional plan components focus on managing vegetation in a way that helps protect the cultural, historic, educational, and aesthetic values of the Monument. Emphasis is also placed on protecting traditional cultural materials within the Monument, and prioritizing restoration, fuels reduction, and habitat improvement projects.

Impacts to traditional cultural materials and special status plant species (federally listed and Forest Service sensitive species) will be considered during planning for all projects and activities within the Monument. In addition to the plan components listed below, the proclamation limits timber harvest and prescribed fire

within the Monument to only those projects needed to address the risk of wildfire, insect infestations, or disease that would endanger the Monument or imperil public safety.

## Desired Conditions

3.17.63 Vegetative communities within the Monument from which traditional cultural materials are gathered are resilient and self-perpetuating.

3.17.64 Ground cover within the Monument is maintained at levels necessary to prevent accelerated rates of erosion and provide protection to archaeological sites and soils.

3.17.65 Vegetative features within the Monument that provide historic, cultural, educational, or aesthetic value are protected. Examples include protecting culturally scarred trees, fire scarred trees, or trees along trails or near cultural resources that provide shade and/or aesthetic value. It also includes protecting populations of plants that provide traditional cultural materials.

## Objectives

3.17.66 Within ten years, prioritize where restoration, fuels treatment, or habitat improvement projects may be needed within the Monument, and where important traditional cultural materials collected by tribes are located.

3.17.67 Within five years, conduct an assessment of riparian health and stream channel stability along the portions of Stollsteimer Creek and the Piedra River within the Monument.

3.17.68 Within five years, complete one streambank restoration project on Stollsteimer Creek.

3.17.69 Within five years, restore one grassland site within the Monument disturbed by unauthorized uses.

## Standards

3.17.70 Vegetation treatments must not result in fuel accumulations near cultural sites eligible or potentially eligible for the National Register of Historic Places (NRHP) except for limited-area, short-duration situations that will be mitigated soon after or as part of treatments.

## Guidelines

3.17.71 Spraying of insecticides to inhibit or reduce the potential for tree mortality by insects should be undertaken only after consultation with, and support by, Region 2 Forest Health Protection Specialists.

## CRNM Terrestrial Wildlife and Fisheries

The diversity of vegetation, geological formations, and the general location of the Monument provides habitat for many terrestrial and aquatic species including species of conservation concern, and species that are economically and socially important on the San Juan National Forest. Numerous species utilize habitat in the Monument year-round such as mule deer, Merriam's turkey, and golden eagle. Other species occupy the area seasonally such as migratory birds and bats that winter in southern latitudes and are present spring through summer. Some species such as peregrine falcon and white-throated swifts occupy the area because of the geological formations (rock spires) that provide important habitat for breeding. And finally, some species such as elk migrate to the area from higher elevations outside the Monument, or migrate from northern latitudes such as bald eagle, and reside in the Monument most of the winter. Large numbers of elk, bald eagles, and golden eagles present during winter attract the interest of local publics and visitors from outside the community. Management of terrestrial and aquatic species is a critical part of the sustainable ecosystems strategy, as described in Section 2.1 of the LRMP.

All desired conditions, objectives, standards, and guidelines related to terrestrial wildlife in Section 2.3 of the LRMP will continue to apply within the Monument, except where specifically noted below. In addition, plan

components designed specifically to address terrestrial wildlife within the Monument will be adopted. These additional plan components focus on protecting wildlife habitat within the Monument, with specific emphasis on mule deer and elk migration corridors, winter concentration areas, and severe winter range, as well as breeding habitat for peregrine falcon. Impacts to special status terrestrial wildlife species will be considered during planning for all projects and activities within the Monument.

Nothing in the proclamation, the LRMP, or the Chimney Rock Management Plan shall be deemed to enlarge or diminish the jurisdiction of the State of Colorado with respect to fish and wildlife management, or shall be deemed to enlarge or diminish the rights of any Indian tribe. The SJNF will continue to ensure that the hunting rights of the Southern Ute Indian Tribe within the exterior boundaries of the Southern Ute Indian Reservation, including lands within the Monument, are upheld. In addition, the SJNF will continue to ensure that the hunting and fishing rights of the 1873 Brunot Agreement are upheld on public lands under their management jurisdiction, including those lands within the Monument. In exercising their Brunot hunting rights, the Ute Mountain Ute and Southern Ute tribal members are required to adhere to federal policy and regulations designed to protect natural and cultural resources, including direction in the Chimney Rock Management Plan designed to protect the objects of the Monument.

## Desired Conditions

3.17.72 Wildlife habitat across the Monument continues to support the terrestrial wildlife species considered objects of the Monument.

3.17.73 Peregrine falcons continue to occupy breeding habitat on Companion Rock or Chimney Rock.

3.17.74 Migrating mule deer and elk continue utilizing winter concentration areas and severe winter range habitat across the Monument.

## Objectives

3.17.75 Over the life of the plan, conduct management actions designed to maintain or improve desired vegetative composition and structural conditions to provide for short and long-term habitat needs of species. Emphasis areas include habitat for special status species, and elk and mule deer winter concentration habitat and migration corridors.

3.17.76 Over the life of the plan, conduct monitoring of deer and elk use in winter concentration areas within the Monument to ensure that habitat capability and effectiveness are maintained during key use periods.

3.17.77 Over the life of the plan, conduct monitoring of peregrine falcon nesting on Companion Rock to ensure that habitat capability and effectiveness are maintained during key use periods.

3.17.78 Within one year of plan approval, issue a closure order prohibiting public entry into the 400 acre area surrounding Chimney Rock and Companion Rock from March 15 to July 31 to help protect breeding habitat for peregrine falcons, with the exception of use along the Great House Trail (NFST 632) (shown in Figure 6 in the EIS).

3.17.79 Coordinate with the Southern Ute Indian Tribe, Colorado Parks and Wildlife, and other resource specialists regarding management of big game within the Monument and on adjacent lands.

## Standards

### *Big game winter range and migration corridors:*

3.17.80 Projects or activities must be designed and conducted in a manner that does not reduce habitat effectiveness, and preserves big game migration corridors within the Monument. (*Similar to LRMP guideline 2.3.62 but has been modified to become a standard*)

### *Peregrine falcon:*

3.17.81 Human disturbance must be restricted if adverse impacts to peregrine falcons are detected.

3.17.82 New structures must not be developed in peregrine falcon nesting habitat surrounding Companion Rock and Chimney Rock where structures did not historically occur.

### *Wildlife-human conflict abatement:*

3.17.83 Construction, reconstruction, and placement of recreational facilities such as garbage receptacles and domestic animal kennels must incorporate design features to minimize wildlife entrapment and access to human-made attractants.

## Guidelines

3.17.84 Human disturbance should be limited in the 400 acres surrounding Companion Rock and Chimney Rock from March 15 through July 31 to minimize disturbance to peregrine falcons during the breeding season (refer to Figure 6 in the EIS). This does not apply to historic levels and patterns of disturbance under which the nest was established and occupied, but is intended to apply to additional levels or changes in disturbance patterns. (*Similar to LRMP guideline 2.3.49 and direction found in LRMP Table 2.3.2 for peregrine falcons, but has been modified based on site specific conditions within the Monument*)

3.17.85 Habitat effectiveness for raptor species should be maintained when conducting management activities within the Monument.

## CRNM Lands

Numerous land uses occur within the Chimney Rock National Monument including state highways, county roads, private roads, telephone lines, power lines, gas pipelines, oil and gas monitoring wells, ditches, water pipelines, and ponds. In the past, research projects, commercial filming, and commercial still photography have also occurred. Most of these land uses have been authorized by special use permits, ROW grants, easements, and/or leases. However, some unauthorized activities, including trespass livestock grazing and fences are occurring within the Monument.

All desired conditions, objectives, standards, and guidelines related to lands and special uses in Section 2.18 will continue to apply within the Monument, but with some minor edits. Any edits to existing plan components are noted below. In addition, plan components designed specifically to address lands and special uses within the Monument will be adopted. These additional plan components focus on proper boundary posting, addressing unauthorized uses in an appropriate manner, and protecting the objects of the Monument while still providing appropriate land uses.

In addition to the existing LRMP and the additional plan components listed below, the proclamation also provides direction for management of lands and special uses within the Monument. Specifically, the proclamation prohibits the sale or disposition of any federal lands and interests in lands within the boundaries of the Monument.

## Desired Conditions

3.17.86 Boundaries of the Monument are clearly marked on the ground.

3.17.87 Non-recreation special use authorizations are issued only if the objects of the Monument can be protected.

## Objectives

3.17.88 Within fifteen years, all unauthorized improvements within the Monument are either eliminated or authorized as appropriate.

3.17.89 Within ten years, the entire boundary of the Monument will be marked and posted.

### Standards

*3.17.90* Federal lands or interest in lands within the Monument must not be conveyed out of federal ownership. *(Similar to LRMP guideline 2.18.17, but modified to become a standard)*

*3.17.91* New non-recreation special use authorizations for new facilities shall be prohibited unless they are within existing utility corridors or along existing roads in order to protect the objects of the Monument. *(Replaces guidance related to Chimney Rock National Monument found in LRMP guideline 2.18.29)*

### Guidelines

3.17.92 When offered by a willing entity, the SJNF should acquire lands or interests in lands adjacent to the Monument that have important cultural resources, and/or when acquisition of adjacent properties would enhance protection of the objects of the Monument.

## CRNM Fuels and Fire Management

Management of fires within the Monument is dictated first and foremost by firefighter and public safety, but also includes strong consideration of impacts to the historic, cultural, and traditional resources within the Monument, as well as critical infrastructure. In recent years, approximately 750 acres of fuels reduction projects have occurred, including thinning, mastication, prescribed burning, and pile burning designed to help improve forest health, address public safety concerns, and reduce the risk of wildfires to the sensitive cultural resources within the Monument. The proclamation allows for a continuation of these activities when they are needed to address the risk of wildfire, insect infestations, or disease that would endanger the Monument or imperil public safety. Impacts to the objects of the Monument will continue to be considered when determining the appropriate management response to wildland fire and when planning for fuels management projects.

All desired conditions, objectives, standards, and guidelines related to fire and fuels management in Section of the LRMP will continue to apply within the Monument. In addition, plan components designed specifically to address fire and fuels management within the Monument will be adopted. These additional plan components focus on protecting the objects of the Monument when managing fire and fuels.

### Desired Conditions

3.17.93 Fire management tactics and strategies used within the Monument are implemented in a manner that minimizes impacts to sensitive cultural resources.

3.17.94 Fuel loading in and around sensitive cultural resources and critical infrastructure within the Monument are at levels that provide relatively low risk to cultural resources, facilities, and visitors from wildfire, and provide for firefighter and public safety.

### Objectives

3.17.95 Over the life of the plan, reduce hazardous fuels in and around sensitive cultural resources and critical infrastructure within the Monument.

3.17.96 Within five years, conduct fuel manipulation and fuel reduction on slopes adjacent to archaeological sites and facilities in order to reduce the potential for fire to negatively impact these areas.

3.17.97 Coordinate and partner with Southern Ute Indian Tribe foresters and/or fuels specialists regarding fuels management within the Monument and on adjacent lands.



FS-008386

## Standards

3.17.98 For all wildland fires within the Monument, a Forest Service archaeologist must be consulted.

## Guidelines

3.17.99 Wildland fires should be suppressed utilizing Minimum Impact Suppression Tactics (MIST) to help preserve and protect archaeological, historic, cultural, and traditional resources within the Monument.

3.17.100 Dozer operations within the Monument should be limited, and should occur only under the immediate direction of a qualified archaeologist.

Aerially applied fire retardants and ground-based fire retardant applications should only be used in consultation with a Forest Service archaeologist.

*3.17.101* When using aerially applied fire retardant and water, tactics to minimize possible erosion should be used.

3.17.102 When using aerially applied fire retardant and water, tactics to minimize possible erosion should be used.

Table 3.17.1 shows the allowable, prohibited, and restricted management activities and uses for the Chimney Rock National Monument.

**Table 3.17.1: Chimney Rock National Monument Allowable Uses**

| Management Activities and Use | Allowable – Prohibited – Restricted |
|---|---|
| Fire managed for resource benefit | Restricted to preserve and protect the objects of the Monument |
| Prescribed burning | Restricted to preserve and protect the objects of the Monument |
| Mechanical fuels treatment | Restricted to preserve and protect the objects of the Monument |
| Timber production (scheduled on a rotation basis) | Prohibited |
| Timber harvesting as a tool | Restricted to preserve and protect the objects of the Monument |
| Commercial use of special forest products and firewood | Restricted to preserve and protect the objects of the Monument |
| Lands special use authorizations, and utility corridors. Recreation special uses | Restricted to preserve and protect the objects of the Monument |
| Recreation Special Uses | Restricted to preserve and protect the objects of the Monument |
| Livestock grazing | Prohibited in Alt. B<br>Restricted in Alt. C to preserve and protect the objects of the Monument |
| Facilities | Restricted to preserve and protect the objects of the Monument |
| Motorized (summer) | Restricted to designated roads |
| Motorized (winter) | Prohibited |
| Non-motorized (summer and winter) | Restricted: All non-motorized use restricted to preserve and protect the objects of the Monument. In addition, horses are prohibited on the Great Kiva Trail (#669) & Great House Trail (#632). |
| Mechanical transport (e.g. bicycles) | Restricted to designated roads |
| Road construction (permanent or temporary) | Restricted to roads determined to be necessary for administration and protection of the objects of the Monument |
| Minerals – leasable federal (oil and gas, and other) | Prohibited on all areas of the Monument under federal mineral ownership, with the exception that development of the valid existing lease within the Monument may still occur. When this lease expires, the lands associated with the lease will no longer be available. |
| Minerals – locatable federal | Prohibited |
| Minerals – saleable federal (materials) | Prohibited |

## 3.18 Spring Creek Wild Horse Herd Management Area (Tres Rios Field Office)

*This area was applicable only to BLM lands.*

## 3.19 Perins Peak Wildlife Management Area (Tres Rios Field Office)

*This area was applicable only to BLM lands.*

## 3.20 O'Neal Hill Special Botanical Area

The O'Neal Hill Special Botanical Area is designated as a special area on the SJNF to protect and preserve its rare plant species (Figure 3.27.2). It contains the largest known population of Pagosa Springs bladderpod (*Lesquerella pruinosa*), which is a yellow-flowered member of the mustard family that occurs only near Pagosa Springs and in a small area in northern New Mexico. Pagosa Springs bladderpod has a G1 NatureServe conservation status rank, which means it is critically imperiled globally due to extreme rarity. The species is also on the Region 2 Regional Forester's Sensitive Species list. This botanical area, which is located about 14 miles north of Pagosa Springs, is about 130 acres in size and occurs at an elevation of about 8,100 feet. The area occurs on relatively flat plains and hills, and is primarily associated with the Mancos shale geologic formation.

### Desired Conditions

3.20.1 Pagosa Springs bladderpod has self-sustaining populations.

3.20.2 Favorable habitat conditions exist for Pagosa Springs bladderpod.

3.20.3 Invasive plant species in the botanical area are absent or rare.

3.20.4 Pagosa Springs bladderpod is not trending toward federal listing under the ESA.

### Objectives

3.20.5 Within 4 years, develop a management plan.

### Standards

3.20.6 Management activities (including road construction) and motorized travel must not occur in the O'Neal Hill Special Botanical Area unless they are needed to achieve desired conditions or objectives, or for research or restoration.

Table 3.20.1 shows the allowable, prohibited, and restricted management activities and uses for the O'Neal Hill Special Botanical Area.

**Table 3.20.1: O'Neal Hill Special Botanical Area Allowable Uses**

| Management Activities and Uses | Allowable - Prohibited - Restricted |
|---|---|
| Fire managed for resource benefit | Restricted (may be used to meet desired conditions) |
| Prescribed burning | Restricted (may be used to meet desired conditions) |
| Mechanical fuels treatment | Restricted (may be used to meet desired conditions) |
| Timber production (scheduled on a rotation basis) | Prohibited |
| Timber harvesting as a tool | Prohibited |
| Commercial use of special forest products and firewood | Prohibited |
| Land use ROWs, special use permits, and utility corridors | Restricted (impacts to sensitive plant species should be minimized) |
| Livestock grazing | Restricted (impacts to sensitive plant species should be minimized) |
| Facilities | Prohibited |
| Motorized (summer) | Prohibited |
| Motorized (winter) | Prohibited |
| Non-motorized (summer and winter) | Allowable |
| Mechanical transport | Restricted (impacts to sensitive plant species should be minimized) |
| Road construction (permanent or temporary) | Prohibited |
| Minerals - leasable (oil and gas, and other) | Restricted (NSO stipulation may apply) |
| Minerals - locatable | Allowable (open to mineral entry; impacts to the botanical area must be avoided or minimized to the extent practicable) |
| Minerals - saleable (materials) | Restricted (impacts to sensitive plant species should be minimized) |

## 3.21 Chattanooga Special Botanical Area

The Chattanooga Special Botanical Area is designated as a special area on SJNF lands to protect and preserve its rare plant species, rare plant communities, rare organic soils, and rare riparian area/wetland ecosystems (Figure 3.27.2). It contains iron fens, willow carrs, rich fens, ponds, and mineral springs. The iron fens are fed by highly acidic, mineralized springs from the west. Limonite terraces within the iron fens perch the water table and form an extensive network of pools and ponds. Colorado's iron fens, including the ones in this botanical area, are particularly unique because their water pH is similar to acid poor fens, whereas the ionic strength of their water is similar to rich fens (Cooper et al. 2002). The rich fens and willow carrs are fed by groundwater from the east and directly from Mineral Creek. This botanical area, which is located about 5 miles northwest of Silverton, is about 75 acres in size and occurs at 10,000 to 10,400 feet in elevation.

The iron fens of the Chattanooga Special Botanical Area are associated with the Engelmann spruce/bog birch/water sedge/sphagnum plant community, which has a G2 NatureServe conservation status rank, meaning it is imperiled globally due to its rarity. That community is characterized by an overstory of Engelmann spruce and bog birch (*Betula nana*), and a thick understory of whortleberry (*Vaccinium caespitosum*) and sphagnum (including *Sphagnum angustifolium*, *S. balticum*, and *S. girgensohnii*). *Sphagnum angustifolium* and *S. balticum* are on the Region 2 Regional Forester's Sensitive Species list. Until its discovery in this botanical area, the range of *Sphagnum balticum* in North America was thought to extend south only to southern British Columbia. Other notable species in these iron fens include bluejoint reedgrass (*Calamagrostis canadensis*), water sedge (*Carex aquatilis*), beaked sedge (*C. utriculata*), and wintergreen (*Gaultheria humifusa*). The rich fens and willow carrs are dominated by diamondleaf willow (*Salix planifolia*) and water sedge, and the mineral springs contain a rare liverwort (*Jungermannia rubra*).

## Desired Conditions

3.21.1 The rare plants are vigorous and have self-sustaining populations.

3.21.2 The ecosystems and habitats on which the rare plants and plant community depend are sustained.

3.21.3 The ecological integrity of the fens and other wetlands are intact (including their native biota, mineral and organic soils, and hydrology).

3.21.4 The fens and wetlands have sustainable hydrologic conditions.

3.21.5 Invasive plant species are absent or rare.

## Objectives

3.21.6 Determine the amount of snowmobile use that is occurring in and adjacent to the Chattanooga Special Botanical Area.

3.21.7 If snowmobile use in and adjacent to the Chattanooga Special Botanical Area increases significantly, put up interpretive signs that describe the purpose and values of the area and that notify the public that snowmobile use in the area is prohibited.

3.21.8 Within 4 years, develop a management plan.

## Standards

3.21.9 Management activities (including road construction) and motorized travel must not occur in the Chattanooga Special Botanical Area unless they are needed to achieve desired conditions or objectives, or for research or restoration.

Table 3.21.1 shows the allowable, prohibited, and restricted management activities and uses for the Chattanooga Special Botanical Area.

**Table 3.21.1: Chattanooga Special Botanical Area Allowable Uses**

| Management Activities and Uses | Allowable - Prohibited - Restricted |
|---|---|
| Fire managed for resource benefit | Prohibited |
| Prescribed burning | Prohibited |
| Mechanical fuels treatment | Prohibited |
| Timber production (scheduled on a rotation basis) | Prohibited |
| Timber harvesting as a tool | Prohibited |
| Commercial use of special forest products and firewood | Prohibited |
| Land use ROWs, special use permits, and utility corridors | Restricted (maintenance of existing utility line may be allowed) |
| Livestock grazing | Prohibited |
| Facilities | Prohibited |
| Motorized (summer) | Prohibited |
| Motorized (winter) | Prohibited |
| Non-motorized (summer and winter) | Allowable |
| Mechanical transport | Prohibited |
| Road construction (permanent or temporary) | Prohibited |
| Minerals - leasable (oil and gas, and other) | Restricted (NSO stipulation may be applied) |
| Minerals - locatable | Allowable (open to mineral entry; impacts to the botanical area must be avoided or minimized to the extent practicable) |
| Minerals - saleable (materials) | Prohibited |

## 3.22 Smoothing Iron and Boggy Draw Old Growth Recruitment Areas

Old growth recruitment areas on SJNF lands are special areas where existing or potential old growth stands are managed for their old growth values through both active and passive management (Figure 3.27.2). They are also places that can be used for research, education, and interpretation.

The Smoothing Iron Old Growth Recruitment Area, which is located on Haycamp Mesa about 6 air miles northeast of the town of Dolores near Spruce Water Canyon, occurs on about 2,500 acres at an elevation of approximately 8,200 feet. The Boggy Draw Old Growth Recruitment Area, which is located about 6 air miles northeast of Dolores near House Creek, occurs on about 2,500 acres at an elevation of approximately 8,100 feet. These areas, which display old growth ponderosa pine stands on mesa tops with gentle slopes, are rare in the tableland landscapes on the west side of the SJNF.

### Desired Conditions

3.22.1 Existing old growth ponderosa pine stands and their old growth attributes are protected.

3.22.2 Existing old growth ponderosa pine stands become larger as more of the lands adjacent to them develop old growth attributes.

3.22.3 Low-intensity ground fire occurs with a frequency that is similar to that which occurred during the reference period in ponderosa pine forests (12–30 years).

3.22.4 Desirable native plant species, including Arizona fescue, are abundant and well distributed.

3.22.5 Invasive plant species are absent or minor.

3.22.6 Evidence of active management, such as stumps and roads, are absent or minor.

3.22.7 Federal agencies and the public use these areas for research, education, and interpretation.

### Objectives

3.22.8 Within the next 15 years, use low-intensity prescribed fire or low-intensity wildfire for ecological benefit to maintain, improve, or restore the composition, structure, or function of the ponderosa pine stands.

3.22.9 Within the next 15 years, use timber harvest treatments (if necessary) to maintain, improve, or restore the composition, structure, or function of the ponderosa pine stands.

3.22.10 Within the next 15 years, decommission roads that are not needed to achieve desired conditions.

3.22.11 Within the next 10 years, develop and implement interpretive plans for both areas.

**Table 3.22.1: Smoothing Iron and Boggy Draw Old Growth Recruitment Areas Allowable Uses**

| Management Activities and Uses | Allowable - Prohibited - Restricted |
|---|---|
| Fire managed for resource benefit | Restricted (to low-intensity) |
| Prescribed burning | Restricted (to low-intensity) |
| Mechanical fuels treatment | Restricted (to meet desired conditions) |
| Timber production (scheduled on a rotation basis) | Prohibited |
| Timber harvesting as a tool | Restricted (to meet desired conditions) |
| Commercial use of special forest products and firewood | Allowable |
| Land use ROWs, special use permits, and utility corridors | Prohibited |
| Livestock grazing | Allowable |
| Facilities | Prohibited |
| Motorized (summer) | Restricted (only designated routes) |
| Motorized (winter) | Allowable |
| Non-motorized (summer and winter) | Allowable |
| Mechanical transport | Restricted (only designated routes) |
| Road construction (permanent or temporary) | Restricted (to meet desired conditions) |
| Minerals - leasable (oil and gas, and other) | NSO |
| Minerals - locatable | Allowable (open to mineral entry; impacts to old growth areas must be avoided or minimized to the extent practicable) |
| Minerals - saleable (materials) | Prohibited |

## 3.23 Dolores River Canyon

*This area was applicable only to BLM lands.*

## 3.24 Silverton

*This area was applicable only to BLM lands.*

## 3.25 HD Mountains

The HD Mountains (MA 2) total approximately 49,000 acres (see Figure 3.27.2). The area's elevation ranges from just over 6,000 feet to just under 9,000 feet. Private and state lands (located primarily along the flanks of the USFS-administered lands) make up a small portion of the HD Mountains area (and are not subject to the direction of the LRMP). A 25,140-acre CRA within the HD Mountains forms the core of the MA.

The roadless area provides many social and ecological benefits. As urban areas grow in southwest Colorado, undeveloped private lands continue to be converted to urban areas and rural infrastructure. In the increasingly developed landscape in the vicinity of the HD Mountains, this large unfragmented tract of land serves a critical role (in that it provides functioning watersheds and biological strongholds that promote diversity for plant and animal populations). The area provides a large, relatively undisturbed landscape with opportunities for dispersed outdoor recreation (opportunities that diminish as open space and natural settings are developed elsewhere). The area also serves as a bulwark against the spread of non-native invasive plant species and provides a reference area for study and research related to development in the roadless area.

The HD Mountains area encompasses the northeastern portion of the San Juan Basin (which is a geologic structure containing one of the largest natural gas reservoirs in the world). The majority of the area has been leased for oil and gas development, and markets have prompted additional interest and investments in gas wells and associated facilities and infrastructure in the San Juan Basin. Natural gas development in the HD Mountains is controversial due to the potential impacts to roadless area values, surface water and

groundwater, wildlife habitat, cultural resources, property values, tax revenues, employment, and air quality in the Weminuche Wilderness area and the Mesa Verde National Park Class 1 air quality areas.

Companies or individuals holding existing valid leases have legal, non-discretionary development rights. Over the next few decades, as gas is produced and transported, the impacts of development will be evident; however, in the long-term, the SJNF would manage its lands so that facilities (including all surface and subsurface features related to management activities) would be reclaimed when no longer needed, so that altered lands would be restored to natural conditions. Planning for, and administering, management activities with the intent to ultimately reclaim development areas will make for a more rapid and successful recovery to natural conditions. An important element of this recovery effort is the approximately 22,400 acres of the roadless area that would remain unroaded under the gas field development plan authorized by the Northern San Juan Basin FEIS and ROD (BLM and USFS 2006; USFS and BLM 2007).

Although the primary values and important characteristics listed below are not all unique to the HD Mountains, the fact that they all occur in the same area makes the HD Mountains unique and deserving of special management approaches. The overall goal of management approaches in the HD Mountains is to maintain, improve, and/or return these values and characteristics to the landscape. These values and characteristics are described below.

The Northern San Jan Basin FEIS and ROD was signed on April 4, 2007 and provides guidance for gas-field development in the HD Mountains area. The development approach required by the FEIS/ROD balances valid existing gas development lease rights with legitimate social and environmental issues. It also sets the stage for the long-term goal of returning the area to a natural condition. Under the direction of the LRMP, the program approach would include comprehensive implementation, monitoring, mitigation, and reclamation plans for all phases of project development that address gas seepage, water quality/quantity, landslides, wildlife, vegetation, recreation, transportation, visual resources, noise, health and safety, air quality issues, and the minimization of impacts to the CRA.

In addition, a CRMP will be developed in consultation with the State Historic Preservation Office and other consulting parties. The CRMP will provide a framework in which to address cumulative impacts to cultural resources and will provide strategies for proactive management of cultural resources within the Northern San Juan Basin area of potential effects (which includes the HD Mountains area).

In addition, hazardous fuels reduction projects will continue to prioritize the WUI-related to SJNF/private land boundaries.

Noxious weeds are managed cooperatively with the State of Colorado (especially in relation to impacts to the Little Squaw Creek drainage).

## Primary Values and Important Characteristics

**Roadless Area:** The HD Mountains area includes the 25,140-acre HD Mountain CRA. This area is important for recreational opportunities, pristine and primitive conditions, wildlife habitat, and roadless values (including those described above). The roadless area may also take pressure off of the more heavily used wilderness areas and WSAs within the planning area by providing solitude and quiet, as well as dispersed recreation opportunities.

**Wildlife Habitat:** The HD Mountains area, and the associated CRA, represent important, unfragmented wildlife habitat. They also provide connectivity to other important wildlife habitats. The combination of elevation, exposures, and vegetation also means that much of the area is winter range. In addition, important migration corridors for big game and other migrating wildlife are present in the area. The relatively unique occurrence of oak brush on north-facing slopes in the HD Mountains adds to the importance of the area as bear habitat.

**Archeological Resources:** The HD Mountains area contains important archeological resources (including the Spring Creek, Sauls Creek, Armstrong-Ritter, Turkey Creek, and Peterson Gulch Proposed

National Register Districts, and other archeological sites) resources offering unique information and values. These sites and districts may provide information related to Chimney Rock, neighboring populations in the lower San Juan Basin (including Gobernador Valley and Chaco Canyon), and settlements to the west (including Mesa Verde National Park and Canyons of the Ancients National Monument). They may also provide important clues about chronology and settlement patterns, relationships with temporally parallel neighboring populations, and resource utilization across the HD Mountains area landscape.

**Geology and Geomorphology:** The HD Mountains area is noteworthy for its geology, topography, and landslides. It also contains many areas of steep, unstable, erosive soils and slopes, as well as the Fruitland Formation, which is one of the most productive formations for natural gas in the San Juan Basin. The Fruitland Formation is exposed at the surface in the HD Mountains area, in a feature known locally as the Outcrop. The Outcrop is an important hydrogeologic feature connected to the Fruitland Formation coalbed methane gas reservoir and freshwater aquifer.

**Surface Water and Groundwater Resources:** Due to the area's dry climate and the unique hydrogeology of the Fruitland Formation, surface water and groundwater are critical resources in the area. There are important water resources connected to the Fruitland Formation, and freshwater springs are present in the core area of the HD Mountains area.

**Vegetation:** The HD Mountains support a variable mix of vegetation types, ranging from sagebrush to cool-moist mixed conifer forests. Old growth ponderosa pine forests and aspen forests still stand in portions of the HD Mountains area. The stands of old growth ponderosa pine in the HD Mountains area are particularly important (because this is a rare resource in the planning area). In addition, *Townsendia globella* and the riparian natural plant communities of boxelder-narrowleaf cottonwood/red osier dogwood forest, strapleaf willow shrubland, and narrowleaf cottonwood-rocky mountain juniper forest are also important vegetation types of the HD Mountains.

**Social and Economic Values:** The existing and potential natural gas resources in the HD Mountains area have significant direct and indirect economic benefits for the local and regional area related to gas-field development. The area also provides important social and economic value to the local area (including motorized and non-motorized recreation, primitive solitude, hunting, enjoyment of scenic vistas, and benefits related to gas-field revenues and taxes). Examples of these values include low residential property taxes, as well as new or improved city and county facilities, services, and infrastructure.

**Recreation:** Recreational opportunities in the HD Mountains area include wide open vistas, as well as views of Chimney Rock, the Piedra River valley (to the east), and the Pine River valley (to the west). The core roadless area provides opportunities for hiking, hunting, and horseback riding in an environment of natural sights and sounds. There are motorized trails on the western and eastern flanks of the HD Mountains.

**Livestock Grazing:** Livestock grazing is an important use of the HD Mountains area (which has several active allotments that would continue to be used). This use is not expected to increase or decrease significantly in the future.

**Fire and Fuels Management:** Fire and fuels management are important activities in the HD Mountains area. These management activities would be aimed at reducing fire risk to private lands and residences along the flanks of the core area, as well as improving the overall health of the lands within the planning area and restoring a more natural condition.

## Desired Conditions

3.25.1 Specific actions for cultural resources are protected, preserved, and interpreted as directed in the Northern San Juan Basin CRMP.

3.25.2 High-priority historic and prehistoric resources are stabilized and preserved for future generations.

3.25.3 The Spring Creek, Sauls Creek, Armstrong-Ritter, Turkey Creek, and Peterson Gulch National Register Districts/Proposed National Register Districts are maintained in an undisturbed condition and protected from impacts (including from vandalism, visual intrusion, surface disturbances, and erosion).

3.25.4 Motorized travel occurs on designated motorized roads and trails within the boundaries of the Spring Creek, Sauls Creek, Armstrong-Ritter, Turkey Creek, and Peterson Gulch National Register Districts/Proposed National Register Districts.

3.25.5 Scenic integrity meets an overall moderate scenic integrity objective, and areas of high scenic integrity are maintained, wherever practicable.

3.25.6 Although private land and mineral access may be authorized, as appropriate, opportunities to protect private and other key resources is sought through cooperative efforts with local, state, tribal, and other federal agencies.

3.25.7 Coordination between local, state, tribal, and other federal agencies is effective and ongoing (especially regarding the integration of management for the San Juan Basin gas field).

3.25.8 Water quality is maintained at current, or improved, conditions. Water quantity is maintained at current levels, unless affected by natural factors (including drought).

3.25.9 In general, management activities maintain or improve roadless area values, wherever practicable, with a long-term goal of returning the landscape to an unroaded condition. Existing roads in areas such as Spring Creek, Sauls Creek, Turkey Creek, Goose Creek, Lange Canyon, Fosset Gulch, and the Relay Tower Road, as well as motorized trails proposed under the Northern San Juan Basin FEIS/ROD Travel Management Plan (USFS and BLM 2007) remain open to motorized travel indefinitely.

3.25.10 Development practices allow for efficient extraction of fluid mineral resources in order to maximize recovery and related economic benefits (including property tax base and other indirect social and economic benefits to the local and regional area).

3.25.11 Mineral resources are developed so that the area can be returned to a relatively natural setting as production phases out.

3.25.12 Existing mineral leases are reasonably developed using the minimum size and amount of facilities necessary. Future mineral leases are issued with NSO stipulations.

3.25.13 Facilities are designed and constructed with the goal of ultimately reclaiming them to closely resemble pre-construction conditions.

3.25.14 Facilities are located in order to minimize or avoid construction in steep, erosive, unstable, highly visible, and/or other critical resource areas (including water influence zones, areas with low potential for revegetation, and areas of known habitat for sensitive, threatened or endangered plant and animal species).

3.25.15 Where facilities are required, they are collocated, to the extent practicable, in order to reduce overall disturbance and indirect impacts (e.g., vehicle trips, air quality impacts, etc.).

3.25.16 Reclamation plans are an integral component of management activities.

3.25.17 Natural resources unique to the area (including old growth ponderosa pine forests, wildlife habitat, and water sources) are effectively protected and managed in conjunction with other actions.

3.25.18 Wildlife habitat effectiveness and connectivity is maintained.

3.25.19 Wildlife habitat and big game winter range are protected, enhanced, or replaced.

3.25.20 Management activities avoid disturbance to old growth vegetation. Prescribed fire may be used in old growth vegetation areas after site-specific field review and documentation of analysis and affirmative decision is completed.

3.25.21 Forest health, restoration, and fuels management are routine and recurring management activities (especially along the flanks of the HD Mountains). Forest ecosystem health is consistent with minimally disturbed natural systems. Fire-return intervals and risks of catastrophic fire are consistent with the range of natural variability for the various forest communities. Stand structures and vegetative compositions are representative of more natural conditions.

3.25.22 Forest health, restoration, and fuels projects are completed in order to reduce fire risk to private lands and residences along the flanks of the HD Mountains, with an overall goal of improving forest health while, at the same time, maintaining and/or returning the area to a more natural forested condition.

3.25.23 Invasive plant species (including noxious weeds) are absent or rare in the HD Mountains area.

3.25.24 Management activities complement primitive recreation and roadless values.

3.25.25 Livestock grazing management complements roadless values and natural forest conditions.

3.25.26 Motorized travel occurs on designated roads and trails during appropriate times. Mineral development roads authorized by the Northern San Juan Basin FEIS/ROD are closed year-round to public motorized use (see the Northern San Juan Basin FEIS/ROD for travel management direction.)

3.25.27 Air quality impacts from management activities are reduced or avoided using BMPs and the best available technology.

## Objectives

3.25.28 Every 5 years, unless otherwise determined by the Authorized Officer, complete elk and deer habitat enhancement project(s) (to be completed by operators conducting oil and gas activities in the HD Mountains area). The project(s) must enhance acreage in elk habitat or deer winter range in the HD Mountains area (preferably on state and/or SJNF-administered lands) in an amount that is equal to, or greater than, the acreage disturbed in elk habitat or deer winter range by oil and gas activities in the area.

3.25.29 Permanently close all roads that are not designated as open in the Travel Management Plan (roads not used by industry to access coalbed methane sites and not used for administrative purposes). Measures would be taken in order to effectively close such roads to all motorized use (including to full-size vehicles, ATVs, motorcycles, OHVs, and snowmobiles). Measures would include, but are not limited to, blocking roads at least one site distance up the roadbed by placing large boulders, livestock gates, and/or earthen barriers interspersed with tree trunks and branches or obliterating and recontouring areas back to the original slope.

3.25.30 Every 5 years, stabilize, rehabilitate, or restore 1 mile or more of gullied channels in order to reduce erosion and sediment delivery.

3.25.31 Annually, treat the full length of Crowbar Creek and Sauls Creek in order to control noxious weeds (primarily musk thistle [*Carduus nutans*]) with funds provided by the USFS and/or BLM and/or obtained through collection agreements/other funding instruments executed with oil and gas permittees.

3.25.32 Twice per year, treat Spring Creek, Salt Canyon and Fosset Gulch in order to control noxious weeds (primarily musk thistle) with funds provided by the USFS and/or BLM and/or obtained through collection agreements/other funding instruments executed with oil and gas permittees.

Table 3.25.1 shows the allowable, prohibited, and restricted management activities and uses for the HD Mountains MA 2.

**Table 3.25.1: HD Mountains Allowable Uses**

| Management Activities and Uses | Allowable - Restricted - Prohibited |
|---|---|
| Fire managed for resource benefit | Allowable |
| Prescribed burning | Allowable |
| Mechanical fuels treatment | Restricted (treatments generally would not be allowable in the core roadless area) |
| Timber production (scheduled on a rotation basis) | Prohibited |
| Timber harvesting as a tool | Restricted |
| Commercial use of special forest products and firewood | Allowable |
| Land use ROWs, special use permits, and utility corridors | Restricted (to minimize impacts; should utilize existing corridors and disturbed areas where practicable) |
| Livestock grazing | Allowable |
| Facilities | Restricted (facilities would not be allowed within the roadless area and would generally be limited throughout the entire area) |
| Motorized (summer) | Restricted (summer motorized travel is suitable and may occur on designated routes; seasonal motorized restrictions may apply in order to protect resources and wildlife habitat areas) |
| Motorized (winter) | Prohibited |
| Non-motorized (summer and winter) | Allowable |
| Mechanical transport | Allowable |
| Road construction (permanent or temporary) | Restricted (road development would be limited to lease contract obligations and for restoration management, as necessary) |
| Minerals - leasable (oil and gas, and other) | Restricted (NSO, CSU or TL stipulations may apply) |
| Minerals - locatable | Allowable (open to mineral entry per the 1872 Mining Law; however, the exploration and development of mining claims may be subject to restrictions to protect resources) |
| Minerals - saleable (materials) | Prohibited |

## 3.26 McPhee

The McPhee area includes the Anasazi National Register Archeological District and McPhee Dam (see Figure 3.27.2). With over 997 archeological sites, the Anasazi National Register Archeological District contains one of the densest concentrations of Ancestral Puebloan sites in the southwestern United States. These sites were identified and documented during the Dolores Archeological Project. In 1977, the district was established in recognition of this unique concentration of nationally significant cultural resources and landscapes. These sites are associated with Basketmaker III (A.D. 500–750), Pueblo I (A.D. 750–900), and Pueblo II (A.D. 900–1150) culture periods. Rising and falling water levels associated with management of McPhee Reservoir continue to impact these sites causing erosion, loss of archaeological resources, and NAGPRA issues.

McPhee Dam was constructed on the Dolores River in order to provide storage for irrigation and municipal and industrial water in southwest Colorado. McPhee Reservoir also provides outstanding recreation opportunities for boating, fishing, hiking, and ATV use.

The McPhee area also includes the McPhee Reservoir Sauropod Locality. The sauropod is an important dinosaur fossil that will be protected and preserved as required by the PRPA. This significant fossil is

currently being managed by the USFS in partnership with Colorado Mesa University. See Section 2.17 Paleontological Resources, for specific desired conditions for the McPhee Reservoir Sauropod Locality.

Under the direction of the LRMP, management of the McPhee area emphasizes protection and preservation of archeological and paleontological sites, while at the same time providing recreation opportunities and protecting big game winter range and sage-grouse habitat. Focused management will address the intensive recreational use of the area, as well as the ongoing impacts to significant archeological and paleontological resources. An integrated archeological, recreation, and interpretive plan should be developed. The existing archaeological monitoring plan will be implemented in order to improve management and to protect archeological resources in the area. A proactive management approach will take full advantage of the educational, interpretive, scientific, and research opportunities available within the area. These proactive approaches include interpretive trails, “Passport In Time” projects, campground programs, and “Archaeology Month” programs. In order to improve management, archeological testing will be conducted on sites that are 100% surface collected in order to determine if subsurface deposits exist. This information can be used to determine future management and uses of these sites. Archeological sites could also be assessed in the waterline in order to ascertain impacts associated with fluctuations in reservoir levels. Data recovery will be conducted, if necessary, in order to mitigate adverse impacts.

## Desired Conditions

3.26.1 McPhee offers diverse recreation for communities while, at the same time, preserving archeological and paleontological resources.

3.26.2 McPhee provides big game winter range and sharp-tailed (*Tympanuchus phasianellus*) and sage-grouse habitat.

3.26.3 Vegetation is managed in order to protect and enhance cultural and paleontological resources.

3.26.4 Interpretive and educational opportunities enhance visitor experience and increase stewardship of sites.

3.26.5 User-made trails are rerouted or eliminated in order to avoid impacts to archeological and paleontological sites.

3.26.6 Hazardous fuels are managed in order to protect and preserve archeological resources, and to reduce the risk of wildfire to recreational facilities.

3.26.7 Cultural viewsheds are preserved; incompatible uses or developments are prevented.

3.26.8 The SJNF partners with the Bureau of Reclamation to address impacts to archaeological resources and NAGPRA issues.

3.26.9 The SJNF partners with research organizations to test archaeological sites and conduct data recovery if sites are being impacted.

## Objectives

3.26.10 Within 5 years, implement site-steward and “adopt-a-site” programs.

3.26.11 Over the implementation life of the LRMP, develop two interpretive trails.

3.26.12 Within 10 years, test two sites for subsurface archeological deposits.

3.26.13 Within 5 years, implement archaeological monitoring plan.

3.26.14 Within 3 years, reroute or close user-made trails that are impacting archaeological resources



FS-008398

Table 3.26.1 shows the allowable, prohibited, and restricted management activities and uses for the McPhee.

**Table 3.26.1: McPhee Allowable Uses**

| Management Activities and Uses | Allowable - Prohibited - Restricted |
|---|---|
| Fire managed for resource benefit | Restricted in order to protect significant archaeological resources |
| Prescribed burning | Restricted |
| Mechanical fuels treatment | Allowable |
| Timber production (scheduled on a rotation basis) | Restricted |
| Timber harvesting as a tool | Restricted (significant archaeological resources must be protected) |
| Commercial use of special forest products and firewood | Prohibited |
| Land use ROWs, special use permits, and utility corridors | Restricted (to minimize impacts to archaeological resources; utilize existing corridors where practicable) |
| Livestock grazing | Allowable |
| Facilities | Restricted to existing facilities (significant archaeological resources must be protected prior to the development of any new facilities) |
| Motorized (summer) | Restricted to designated routes |
| Motorized (winter) | Restricted |
| Non-motorized (summer and winter) | Restricted |
| Mechanical transport | Restricted to designated roads and trails |
| Road construction (permanent or temporary) | Restricted |
| Minerals - leasable (oil and gas, and other) | Administratively not available |
| Minerals - locatable | Allowable (open to mineral entry per the 1872 Mining Law; however, the exploration and development of mining claims may be subject to restrictions to protect resources) |
| Minerals - saleable (materials) | Restricted |

## 3.27 Rico

The Rico “special area” includes the USFS-administered lands adjacent to the town of Rico (Figure 3.27.2). Approximate boundaries include Telescope Mountain to the northeast, Spruce Gulch to the southeast, Burnett Creek to the southwest, and Horse Creek to the northwest. The Rico area is located in a subalpine region of the San Juan Mountains, with elevations ranging from 8,800 feet in town to 12,681 feet on nearby Blackhawk Mountain. The area’s climate is best described as having four distinct seasons with significant winter snows, as well as the associated springtime runoffs. The large volumes of water from the winter snowmelt support a vast conifer and aspen forest with interspersed meadows. The high altitude and southerly latitude of the Rico area offer diverse and sometimes extreme climatic conditions that can range from warm and pleasant sunny days in the middle of January to harsh snowstorms in the summer months. Due to the high altitude, significant temperature drops usually occur at night. Snowstorm events can be substantial, and it is not unusual for roads to be closed, power to be disrupted, and/or emergency services to be delayed.

The Rico area is located primarily on the east side of the Dolores River (which is fed by several tributaries). The headwaters of these tributaries begin in the cirques and basins formed by the numerous surrounding mountain peaks. The majority of these peaks (including Expectation, Dolores, and Telescope) have elevations of over 12,000 feet. The area supports an array of big game wildlife (including deer, elk, sheep, mountain lion [*Puma concolor*], and black bear [*Ursus americanus*]). Elk and deer are primary resources. Small game is also plentiful (including blue grouse [*Dendragapus obscurus*] and snowshoe hare). The Dolores River, Silver Creek, and many other local tributaries, support a diverse

plant and wildlife ecosystem. Canada lynx have recently been reintroduced into the SJNF and are often seen in the area.

The historic mining industry in the Rico area has provided a rich cultural history and is the reason the town was founded; however, it has also left behind a legacy of environmental damage. Impacts are primarily from previous mining activities (including mill tailings, mine dumps, shafts and tunnels, water quality degradation, and lead contamination to some of the area's soils). Hundreds of active unpatented mining claims continue to surround the Rico area.

The town of Rico is relatively remote. The nearest towns to the north are Telluride and Mountain Village (which are approximately 28 miles away, over Lizard Head Pass). The nearest towns to the south are Dolores (approximately 40 miles away) and Cortez (approximately 50 miles away).

Rico is a community that aims to preserve its small mountain town historic character, even as the population grows. The community uses the natural resources of the surrounding public lands in order to assist in building a new post-mining economy. The relatively undeveloped, non-resort character of Rico is rapidly becoming rare in Colorado (as it is in other western states). Preserving the feel and appearance of the historic compact "mountain town" land pattern of the existing town is extremely important to the residents and property owners of Rico. New development areas beyond the historic town plat will complement the existing town site by focusing development adjacent to town on the north and south sides while, at the same time, preserving natural forest areas to the east and west of town. Management of population growth, new development, and overall rate of growth are essential to preserving the unique character and relationship between the USFS/BLM and the Rico community (USFS and Town of Rico, Colorado 2011).

Under the direction of the LRMP, focused management of this area will address the impacts that occur in tandem with private land development and the maintenance of the interconnected SJNF resources. A sustainable management approach that maintains the close relationship between the people of Rico and the landscape of public lands will allow these goals to be met.

The Rico special area would offer an opportunity for the SJNF to work collaboratively with the people of Rico in order to develop sustainable management practices for the planning area. SJNF managers will develop an MOU for projects in the Rico area in order to outline common goals and achieve sustainable management approaches throughout the implementation life of the LRMP.

## Desired Conditions

3.27.1 Management of SJNF-administered lands contributes to or enhances the historic "mountain town"' scale and appearance of the Rico.

3.27.2 Trailheads and informational signage direct locals and visitors to the appropriate desired recreational experience.

3.27.3 Land ownership patterns are improved and consolidated between the town, private landowners, and the SJNF in order to enhance community development objectives and to reduce resource impacts (including to the viewshed on the surrounding public lands).

3.27.4 Trails accessing SJNF-administered lands from within town boundaries emphasize non-motorized recreation modes in order to emphasize the community's quiet-use character.

3.27.5 Restoration and preservation of the natural space, beauty, and terrain of the area is recognized as the principal resource asset to the town.

3.27.6 Undeveloped areas and CRAs on SJNF-administered lands near and/or around Rico provide quality elk and other large game habitat and wildlife corridors. These areas also provide quality hunting and wildlife viewing, as well as pristine backcountry non-motorized recreational experiences.

3.27.7 Undeveloped and roadless areas on SJNF-administered lands near and/or around Rico continue to provide habitat for wildlife and contribute to the sustainable reintroduction of the Canada lynx.

3.27.8 Select historic structures associated with the area's past mining history are stabilized, protected, and interpreted.

3.27.9 Area residents, as well as the visiting public, are directed to appropriate areas for non-motorized and motorized recreation opportunities through a variety of informational, educational, and interpretational venues.

3.27.10 Instream flows on the upper Dolores River above McPhee Reservoir are maintained in order to enhance and preserve the scenic quality of the Dolores River (and the surrounding watershed) and protect fisheries, riparian, and aquatic habitat.

3.27.11 The watersheds surrounding Rico are maintained and enhanced, with a focus on water quality improvement for perennial streams entering the Dolores River.

3.27.12 Water quality entering the Dolores River is improved due to collaborative remediation efforts to clean up mining-impacted lands in the Rico area.

3.27.13 The Silver Creek watershed remains the municipal water source for the town of Rico until such time as additional and/or new water sources are developed. Rico's municipal water supply source is protected from development activities that would cause negative impacts, per the town's permitting process and in coordination with the SJNF.

## Objectives

3.27.14 Emphasize a proactive working relationship between the town of Rico and the SJNF that serves to preserve and protect the uniqueness of the Rico community. Annual meetings between the town and the SJNF will be encouraged in order to review community and public land management objectives specific to the public lands within the Rico MA 2 area.

3.27.15 Within 5 years, develop a parking lot outside the town limits for the Burnett Trailhead in order to provide an adequate staging area for motorized recreational experiences, along with preserving the quiet of the community while, at the same time, providing motorized opportunities.

3.27.16 Annually, sign a minimum of one trail within the Rico area in order to inform and direct appropriate recreation use.

Table 3.27.1 shows the allowable, prohibited, and restricted management activities and uses for the Rico area.

**Table 3.27.1: Rico Area Allowable Uses**

| Management Activities and Uses | Allowable - Restricted - Prohibited |
|---|---|
| Fire managed for resource benefit | Allowable |
| Prescribed burning | Restricted to mitigating natural disturbances (including insect or disease epidemics) and preventing adverse impacts to the surrounding viewshed, watershed, and overall land health |
| Mechanical fuels treatment | Restricted to mitigating natural disturbances (including insect or disease epidemics) and preventing adverse impacts to the surrounding viewshed, watershed, and overall land health |
| Timber production (scheduled on a rotation basis) | Prohibited |
| Timber harvesting as a tool | Allowable |
| Commercial use of special forest products and firewood | Allowable |
| Land use ROWs, special use permits, and utility corridors | Allowable |
| Livestock grazing | Allowable |
| Facilities | Restricted (facilities such as parking areas, staging areas, and adequate signage, are generally suitable to direct and inform recreation activities) |
| Motorized (summer) | Restricted to motorized routes and trails designated within the Rico area |
| Motorized (winter) | Restricted to motorized areas designated within the Rico area |
| Non-motorized (summer and winter) | Allowable |
| Mechanical transport | Allowable |
| Road construction (permanent or temporary) | Restricted (permitted in order to provide access to valid existing rights, including mining claims; temporary construction may occur in some areas in order to achieve resource restoration objectives) |
| Minerals - leasable (oil and gas, and other) | Restricted (an NSO stipulation would be applied to CRAs within the Rico area; CSU and TL stipulations may be applied to specific locations, as necessary, in order to mitigate resource impacts) |
| Minerals - locatable | Allowable (open to mineral entry per the 1872 Mining Law; however, the exploration and development of mining claims may be subject to restrictions to protect resources) |
| Minerals - saleable (materials) | Restricted (limited road access and other constraints in the Rico area may limit or preclude mineral development) |

**Figure 3.27.1: Special Areas and Designations, Tres Rios Field Office**

*This figure was applicable only to BLM lands.*




**Figure 3.27.2: Special Areas and Designations, San Juan National Forest**

# 3.28 Hermosa Creek Watershed

## Introduction

In 2006, a regional grass-roots group called the River Protection Workgroup was organized to address local water resource issues. The workgroup brought diverse stakeholders together in a collaborative process to determine values needing protection, such as ecological, economic and social; to recommend the types of tools necessary to protect the values; and to make recommendations and take action in the context of striking a balance between the protection of natural values and water development. The River Protection Workgroup formed five sub-groups to focus on five local watersheds: the San Juan River, the Piedra River, the Pine River and Vallecito Creek, the Animas River, and Hermosa Creek.

The Hermosa Creek sub-Workgroup met from 2008-2010. The collaborative, community process, which operated on consensus, involved many citizens and organizations in discussions about the human and natural values in the Hermosa Creek watershed. It was a group represented by many points of view, including water users, recreational users, state agencies, the Southern Ute tribe, conservation organizations, and US Congressional representatives. After almost two years of work, the Hermosa Creek Workgroup arrived at a set of recommendations. Central to their work was recommending that special federal legislation be developed, introduced, and passed. Their final report and recommendations were forwarded to the US Congress in 2010.

After several years of drafts, working through committees, and changes in Congressional representatives, the Hermosa Creek Watershed Protection legislation was finally signed into law on December 19, 2014 as Section 3062 in the *Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015 (PL 113-291)*. Throughout the remainder of this section, this is referred to as "the legislation."

The legislation divided the watershed into a Special Management Area (SMA) and a wilderness area. Within the SMA, the legislation also delineates the East Hermosa Roadless Area (which was already a designated Colorado Roadless Area before the legislation), and Parcels A and B, which relate to minerals interests.

A brief summary of the key points of the legislation follows. The legislation states that:

> *"The purpose of the Special Management Area is to conserve and protect for the benefit of present and future generations the watershed, geological, cultural, natural, scientific, recreational, wildlife, riparian, historical, educational, and scenic resources of the Special Management Area."*

The legislation states that the following uses ***shall*** be allowed:

- Motorized and mechanized vehicles, but only on roads and trails designated by the Forest Service.
- Over-snow vehicles, subject to terms and conditions as required by the Forest Service.
- Grazing, if already established before the Act, subject to applicable laws and orders.

The legislation further ***prohibits*** the following activities:

- Road construction in the East Hermosa Roadless Area, except as allowed by the Colorado Roadless Rule.
- Commercial timber harvest in the East Hermosa Roadless Area, except as allowed by the Colorado Roadless Rule.
- Disposal of land, mining patents, and minerals leases, subject to valid existing rights, except in parcels A&B.

The legislation states that the following activities ***may occur***:

- Management of wildland fire and hazardous fuels.
- Management of insects and diseases.

The Hermosa Creek Watershed (HCW) planning area encompasses approximately 107,900 acres of federal lands within the Hermosa Creek watershed, which is located north of Durango, within La Plata and San Juan counties, Colorado, Ranges 9-11West and Townships 36-40 North, N.M.P.M. See *Figure 3.28.1 – Hermosa Creek Watershed Planning Area*. The planning area is divided into several categories as follows:

Hermosa Creek Watershed planning area – 107,900 acres total

- (1) Hermosa Creek Wilderness – 37,400 acres
  - (a) RNA – 15,500 acres
- (2) Special Management Area – 70,600 acres
  - (a) Parcels A&B – 2,400 acres
  - (b) East Hermosa Roadless Area – 43,200 acres

This section applies to the Hermosa Creek watershed only. New components will apply to the Hermosa watershed in addition to all existing LRMP components, other guidance and descriptions given in the LRMP, unless specifically noted herein as being changed. This LRMP amendment will apply to all future projects and management actions within the Hermosa watershed.

Because management actions are generally restricted in wilderness, the following direction is applicable primarily to the SMA portion of the watershed, unless it is stated that it applies to the entire watershed or specifically to the wilderness.




**Figure 3.28.1: Hermosa Creek Watershed Planning Area**

# AREA DIRECTION FOR HERMOSA CREEK WATERSHED

## HCW Ecological Framework & Conservation of Species

*Figure 2.1.1 Protected Areas* in the LRMP is amended to add the Hermosa Creek Wilderness as a protected area. This is a non-discretionary administrative change necessary to comply with the legislation. Additionally, the figure is amended so that all of the previously- recommended wilderness in the Hermosa watershed is removed from protected area status.




**HCW Detail, Amended FIGURE 2.1.1 Protected Areas**

## HCW Terrestrial Ecosystems and Plant Species

## Desired Conditions

3.28.1 Native species diversity across the watershed is high, and migration of species is not inhibited so that species may move into new sites and take advantage of changing bioclimatic envelopes and growing conditions while maintaining proper ecological function.

3.28.2 Alpine and subalpine flowers continue to propagate, are pollinated, and maintain viable populations within the watershed.

3.28.3 In areas where non-native lodgepole pine exists, spruce and fir are the dominant understory species and the forest is converting to a spruce-fir forest.

3.28.4 Rare plants ranked highly or extremely vulnerable to climate change as identified by the Colorado Natural Heritage Program are protected from non-climate stressors within the watershed. See current list below, subject to change.

**Table 3.28.1. Rare Plants in Hermosa Creek Watershed**

| Habitat | Scientific Name | Common Name | Global Status | State Status | Agency Sensitive |
|---|---|---|---|---|---|
| Alpine | Alsinanthe macrantha | house’s sandwort | G3 | S2S3 | |
| Alpine | Castilleja puberula | downy indian paintbrush | G2G3 | S2S3 | |
| Alpine | Descurainia kenheilli | hell’s tansy mustard | G1 | S1 | |
| Fens | Cryptogramma stelleri | slender rock brake | G5 | S2 | BLM |
| Fens | Erigeron kachinensis | kachina daisy | G2 | S1 | BLM |
| Fens | Mimulus eastwoodiae | Eastwood monkeyflower | G3G4 | S2 | BLM |
| Fens | Puccinella parishii | Parish’s alkali grass | G2G3 | S1 | |
| Spruce-fir | Draba malpihiacea | Whitlow-grass | G1 | S1 | |

3.28.5 The landscape is a diverse mosaic of cover types with a diversity of habitat structural stages spread across the watershed. Mountain grasslands, mountain shrublands, and wetlands are widely distributed across the watershed providing a diversity of species. All development stages of forested ecosystems are well represented across the SMA and occur within the ranges identified in the following table. Within the SMA, this table replaces the Desired Conditions found in the LRMP Table 2.2.1

**Table 3.28.2. Vegetation Desired Conditions in Hermosa Creek Watershed**

| Vegetation Local Type | % Habitat Structural Stage Desired Condition in the SMA | | |
|---|---|---|---|
| | 1 and 2, 3 | 4A | 4B, 4C |
| Aspen - TAA | 20-40% | 10-20% | 40-70% |
| Aspen with mixed conifer - TAA_SW | 20-40% | 10-20% | 40-70% |
| Spruce-Fir - TSF | 10-20% | 10-20% | 60-80% |
| Cool-moist Mixed Conifer - TMC_CM | 10-20% | 10-20% | 60-80% |
| Warm-dry Mixed Conifer - TMC_WD | 10-20% | 30-50% | 30-60% |
| Ponderosa Pine - PP | 10-20% | 35-55% | 25-45% |

## Objectives

3.28.6 To maintain a diverse and resilient forest within the aspen vegetation type, increase the amount of young and mature open stands by 20% of the vegetation type (approx. 2,000-3,000 acres) through prescribed burning and timber harvest over the next 15 years.

3.28.7 Monitor and map the changes occurring in the spruce-fir forest within the next three years and practice adaptive management to work toward the desired condition. Management tactics may include timber harvest, fire, or mechanical or chemical treatments to enhance forest resiliency.

3.28.8 To maintain a diverse and resilient cool-moist mixed conifer forest, using a combination of fire and timber harvest, create regeneration areas across approximately 10% of the cool-moist forest (approx. 600-800 acres).

3.28.9 To maintain a diverse and resilient warm-dry mixed conifer forest, using a combination of fire and timber harvest, thin approximately 35% (approx. 1,300 acres of the warm-dry forest to favor drought tolerant species such as Douglas fir and ponderosa pine.

3.28.10 To maintain a diverse and resilient ponderosa pine forest, using a combination of fire and timber harvest, create opportunities for natural regeneration across approximately 5% of the ponderosa pine forest (approx. 100-200 acres).

3.28.11 Under-plant approximately 100-200 acres of lodgepole pine plantations with native Engelmann spruce, Douglas fir, or other endemic tree species.

3.28.12 Inventory alpine and fen ecosystems, evaluate ecosystem health and diversity and identify rare and vulnerable plants for seed collection.

3.28.13 Within five years, create and maintain a seed bank of native tree, shrub and plant seed specific to the Hermosa watershed to be used in restoration and reforestation.

3.28.14 Within five years, collect seed within the watershed from rare plants moderately to extremely vulnerable to climate change.

## Guidelines

3.28.15 During any agency actions, consider whether the bioclimatic niche for pre-existing species has changed, and practice active adaptive management to plant species suitable for a new and changing climate.

3.28.16 In the stands that are dying from insect, disease and fire, healthy young trees should be maintained for a future stocked forest.

3.28.17 Roads identified for decommissioning or restoration should be restored to improve soil condition. Improvements could include increasing soil organic material, carbon, and nutrients (e.g. bio-char or revegetation).

## HCW Riparian Area and Wetland Ecosystems

## Desired Conditions

3.28.18 The East Fork of the Hermosa and the reach of Hermosa Creek just above the East Fork confluence, and their riparian corridors, are in a ‘Robust’ stream health category, as defined in the Watershed Conservation Practices Handbook.

3.28.19 Cool summer stream temperatures are maintained by shade from native riparian hydrophytic species of trees and shrubs and by maintenance of stream channel morphology (pools, riffles, small width to depth ratio, etc.).

## Objectives

3.28.20 Every ten years, restore at least five degraded riparian sites, five wetland acres, or five acres contributing sediment to the creek system.

3.28.21 Move the watershed condition classification in the East Fork Hermosa to “good” through the completion of essential projects identified in the Watershed Restoration Action Plan (*SJNF 2012*) within 10 years.

## Guidelines

3.28.22 Over-snow activities authorized under permit should not cause compaction in fens to the extent that soil temperatures and depth of frost penetration are altered in these fragile ecosystems.

3.28.23 (intentionally blank)

## HCW Aquatic Ecosystems and Fisheries

## Desired Conditions

3.28.24 Natural and manmade barriers to upstream fish migration adequately protect Colorado River cutthroat trout (CRCT) populations while allowing for stream reaches large enough to support long term population viability.

3.28.25 Manmade barriers to upstream fish migration within CRCT habitat are maintained to ensure effectiveness.

3.28.26 Free migration of aquatic organisms is not limited by roads, trails, or other infrastructure across the watershed, except under circumstances where non-native fish species are excluded to the benefit of native fish species.

## Objectives

3.28.27 Replace two road culverts identified as fish migration barriers in Forest Road 578 to reconnect fragmented habitat in Sig and Relay Creeks, within ten years.

3.28.28 Construct a barrier to upstream fish migration below the confluence of Hermosa Creek and East Fork Hermosa Creek to fully establish the CRCT meta-population within five years.

3.28.29 Implement four stream habitat improvement projects to improve over-wintering habitat and limit sedimentation to streams within ten years.

3.28.30 Install interpretive signage where appropriate to educate fishermen of the CRCT re-introduction program, within five years. Include wording about concerns and risks to CRCT populations and proper pathogen risk preventative measures.

## Guidelines

3.28.31 Road and trail stream crossings across the watershed should be designed to allow for fish passage during all flow regimes.

## HCW Invasive Species

## Desired Conditions

3.28.32 The Forest Service is an active participant in a Hermosa Cooperative Weed Management Partnership.

## Objectives

3.28.33 Annually treat 10% of known invasive weed populations in the watershed.



FS-008410

## HCW Timber & Other Forest Products

### Legislative Requirements

3.28.34 Projects undertaken for the purpose of harvesting commercial timber are prohibited, other than activities relating to the harvest of merchantable products that are byproducts of activities conducted for ecological restoration or to further the purposes of the legislation.

### Desired Conditions

3.28.35 Opportunities for personal use collection of forest products (such as firewood, stays, mushrooms and medicinal plants) are provided in such a manner that collection does not interfere with ecosystem function or resiliency.

### Objectives

3.28.36 Within 10 years after any large-scale mortality event, conduct a post disturbance assessment to evaluate areas of severe mortality and to identify and reforest portions that are accessible, have severe mortality and are not regenerating naturally within the SMA.

3.28.37 Within five years, reforest 90% of identified old timber sales to achieve full stocking.

### Guidelines

3.28.38 In the event of a large-scale disturbance, timber salvage may occur subject to all applicable laws and regulations, and in a manner consistent with the purposes if the legislation.

3.28.39 Over-snow activities authorized under permit should not cause tree-top damage in plantations to the extent that reforestation success is impaired.

### Suitability

*Figure 2.9 Timber Suitability* in the LRMP is amended to reflect that all “lands suitable for timber production” within the watershed are changed to “other tentatively suitable lands where timber harvest may occur.” This is a non-discretionary administrative change necessary to comply with the legislation.




**HCW Detail, Amended FIGURE 2.9 Timber Suitability**

## HCW Insects and Disease

### Desired Conditions

3.28.40 Insects and diseases are endemic across the watershed, adding to the diversity of the landscape. In areas of mature forest mortality, natural regeneration is healthy and abundant.

3.28.41 Indices for beetle epidemics are low to moderate across the watershed in at least 50% of the mature conifer forest.

### Guidelines

3.28.42 Insect and disease treatments may include the use of biotic controls, pheromones, chemicals, microbial organisms, mycorrhizal fungi, fire, trap trees, slash treatment or other vegetation manipulation, as long as the activity maintains or restores forest health and desired conditions.

## HCW Fire and Fuels Management

### Desired Conditions

3.28.43 Managed natural fire is encouraged within the entire watershed, except in identified Wildland-Urban Interface.

3.28.44 Prescribed fire is used as a management tool throughout the SMA.

### Objectives

3.28.45 Maintain the helispots in the southern SMA by keeping them cleared every 5-10 years. See Figure 3.28.2.

### Guidelines

3.28.46 Managed natural fire and prescribed fire should be managed to maintain identified plantations at minimum stocking levels, when possible.

3.28.47 Minimize physical control line construction within the watershed.




**FIGURE 3.28.2. Helispots in the HCW**

## HCW Access and Travel Management

### Legislative Requirements

3.28.48 The use of motorized or mechanized vehicles in the SMA shall be permitted only on roads and trails designated by the Forest Service for use by those vehicles.

3.28.49 Forest Service shall authorize the use of snowmobiles and other over-snow vehicles within the SMA when there is adequate snow coverage, and subject to terms and conditions the Forest Service may require.

3.28.50 New permanent or temporary road construction or the renovation of existing non-system roads are prohibited in the East Hermosa Area, except as allowed by the Colorado Roadless Rule.

### Desired Conditions

3.28.51 Hermosa Creek Trail is managed to accommodate multiple user types and minimize conflicts.

3.28.52 Motorized trail use is provided for within the SMA.

3.28.53 Mechanized trail use is provided for within the SMA.

3.28.54 Under agreement and supervision of the Forest Service, trails are maintained in cooperation with partners, such as user groups, special use permit holders, and volunteers.

### Objectives

3.28.55 Install educational signage where appropriate to inform users of site-specific trail designations for vehicle usage and seasonal closure dates; and to educate users about share-the-trail, leave no trace, tread lightly, and similar behaviors, within three years and as needed thereafter.

### Standards

3.28.56 Over-ground motorized and mechanized travel shall be limited to designated Forest system roads and trails; no cross-county travel is allowed. (Vehicles on user-created, unauthorized non-system, or closed routes will be considered cross-country travel.)

3.28.57 Over-ground motorized and mechanized travel shall have seasonal closures to protect resources. A travel management decision will determine the type and applicability of closures.

3.28.58 Over-snow motorized and mechanized travel shall be limited to designated Forest system roads, trails, or areas.

### Guidelines

3.28.59 Accomplish a 1:1 no net gain of over-ground trail miles within the watershed when adding new trails to the system. This does not apply to trails within the ski area permit boundary.

3.28.60 After use of Maintenance Level 1 roads for administrative use, they should be effectively revegetated and closed to prevent unauthorized travel.

## Suitability

*Figure 2.13.1 Over-Ground Motorized Travel Suitability* in the LRMP is amended in the vicinity of Corral Draw to change from unsuitable to suitable for over-ground motorized travel.

*Figure 2.13.2 Over-Snow Motorized Travel Suitability* in the LRMP is amended to expand the area of suitability. Criteria that were used to determine over-snow suitability include: critical or severe big game winter range, access for non-motorized users that could lead to user-group conflicts, sufficient snow cover in most years, and historical use patterns. Boundary mapping was made to follow topographic features on the ground that are apparent in the wintertime, such as drainage bottoms or ridgelines. Smaller-scale topography within larger suitable areas (slope, cliffs, etc.) was not used as a criteria because it is impossible to delineate or enforce on the ground. Recognition was given that vehicle technology is evolving and areas once considered inaccessible are becoming accessible. Over-snow use and grooming that are regulated under permit may have restrictions within the suitable area. Additionally, there are currently-existing special use permits allowing motorized use in these areas.