


**HCW Detail, Amended FIGURE 2.13.1 Over-Ground Motorized Travel Suitability**




**HCW Detail, Amended FIGURE 2.13.2 Over-Snow Motorized Travel Suitability**

## HCW Livestock and Rangeland Management

### Legislative Requirements

3.28.61 Permit grazing within the SMA, if established before the date of the legislation, subject to all applicable laws, regulations, and Executive Orders.

### Desired Conditions

3.28.62 Conflicts with livestock in developed recreation sites are minimized.

### Guidelines

3.28.63 Adaptive management strategies for grazing (such as herding, temporary avoidance areas, or temporary fencing) should be implemented when the stream health category is either “at risk” or “diminished” (WCPH) and where streambank and riparian restoration is occurring.

3.28.64 Fencing should blend with the natural and cultural setting and be wildlife friendly.

## HCW Recreation

### Desired Conditions

3.28.65 Residential use (taking possession of, occupying, or otherwise using National Forest System lands for residential purposes without a permit or as otherwise authorized by Federal law or regulations) does not occur within the watershed.

3.28.66 All major developed campground facilities are managed by a Forest Service permitted concessionaire.

3.28.67 Dispersed camping does not impact meadows, wetlands, or streambanks within the watershed.

3.28.68 Developed recreation sites are provided to the extent possible to meet demand, considering available Forest Service resources.

### Standards

3.28.69 New developed recreation sites must not be planned or developed in the 100-year flood plain.

### Guidelines

3.28.70 Control unacceptable or expanding impacts from dispersed camping through education and engineering features first. Restrict dispersed camping to designated sites if impacts cannot be controlled by engineering features.

3.28.71 Fence newly developed recreation sites as part of new construction where grazing is permitted.

## HCW Recreation Opportunity Spectrum

*Figures 2.14.2 Summer ROS* in the LRMP is amended to align the new wilderness with the “wilderness primitive” class. This is a non-discretionary administrative change to match the legislative designation of wilderness.

*Figure 2.14.3 Winter ROS* in the LRMP is amended to align the new wilderness with the “wilderness primitive” class. This is a non-discretionary administrative change to match the legislative designation of wilderness. Additionally, the figure is amended to change the class to “semi-primitive motorized” in the Elbert Creek drainage and near Greyrock Peak to match the motorized over-snow suitability.

## HCW Scenery and Visual Resources

*Figure 2.15 Scenic Integrity Objective* in the LRMP is amended to remove the Very High objective from all but the designated wilderness.




HCW Detail, Amended FIGURE 2.14.2 Summer ROS




HCW Detail, Amended FIGURE 2.14.3 Winter ROS




**HCW Detail, Amended FIGURE 2.15 Scenic Integrity Objectives**

## HCW Heritage and Cultural Resources

### Desired Conditions

3.28.72 Significant heritage and cultural resources associated with the historic road and trail network within the watershed are preserved, and may be available for interpretation and research.

3.28.73 Significant cultural sites within the watershed are protected from physical damage and excessive wear and tear resulting from visitor use.

3.28.74 The Harris Cabin is protected and properly maintained as a Priority Heritage Asset.

### Guidelines

3.28.75 Site-specific management plans for historic and cultural resources should be developed as protection and interpretation needs are identified.

## HCW Lands & Special Uses

### Legislative Requirements

3.28.76 Federal land (and interest in lands) within the SMA is withdrawn from all forms of entry, appropriation, and disposal under the public land laws, subject to valid existing rights, except for parcels A and B.

### Desired Conditions

3.28.77 SMA and wilderness boundaries are clearly marked at trail, road, and other major points of entry.

3.28.78 Non-recreation special use authorizations are issued only if consistent with the SMA legislation and wilderness management guidelines.

3.28.79 Land ownership within the watershed is consolidated in order to facilitate effective land management.

### Guidelines

3.28.80 When offered by a willing seller, the Forest Service should acquire lands or interest in lands within the watershed boundary, dependent upon availability of funding.

## HCW Minerals & Energy

### Legislative Requirements

3.28.81 Except for Parcels A and B, and subject to valid existing rights, federal land (and interest in lands) within the SMA is withdrawn from:

- all forms of entry, appropriation, and disposal under the public land laws;
- location, entry, and patent under the mining laws; and
- operation of the mineral leasing, mineral materials, and geothermal leasing laws.

### Desired Conditions

3.28.82 Mineral activities in Parcels A and B, and any valid existing rights in the Hermosa watershed, are managed to conserve and protect resources designated in the enabling legislation.

3.28.83 All minerals within the Hermosa watershed are federally owned or subject to non-surface disturbing agreements, except for within Parcels A and B.

## Objectives

3.28.84 Within five years, develop a strategy to move valid existing federal and private mineral rights within the Hermosa watershed into non-surface disturbing status, except for Parcels A and B. This includes pursuing opportunities to acquire private mineral rights from willing sellers.

## Standards

3.28.85 No surface use is allowed for exploration or development of leasable minerals in Parcels A and B or under valid existing rights.

3.28.86 Locatable, saleable, or private minerals exploration or development that involves surface disturbance (including dredging) in Parcels A and B, or under valid existing rights elsewhere in the SMA, can occur after a Resource Conservation and Protection Plan (RCPP) is authorized by the Forest Service describing measures in the development activity that will conserve and protect resources designated in the legislation. The RCPP is in addition to any other permits or authorizations needed for development or exploration activities.

3.28.87 If non-federal minerals within the Hermosa watershed are acquired by the federal government, these areas must be withdrawn from all forms of entry listed in 3.28.81 above.

## Guidelines

3.28.88 Short term surface disturbance that can be fully reclaimed within one year to a non-detectable status may be allowed, as determined on a case-by-case basis.

3.28.89 Geologic processes should be allowed to continue shaping the landscape of the Hermosa watershed, unless such processes would interfere with the purposes of the legislation, or would interfere with human health and safety.

## HCW Leasing Availability

*Figures 2.19.3, 2.19.4, and 2.19.5 Oil and Gas Leasing Availability* in the LRMP are amended to show the SMA and Wilderness withdrawn from leasing (except parcels A and B). These are non-discretionary administrative changes necessary to comply with the legislation.




**HCW Detail, Amended FIGURE 2.19.3 Oil and Gas Leasing – No Surface Occupancy**




**HCW Detail, Amended FIGURE 2.19.4 Oil and Gas Leasing – Controlled Surface Use**




**HCW Detail, Amended FIGURE 2.19.5 Oil and Gas Leasing – Timing Limitation**

# AREA DIRECTION FOR HERMOSA CREEK WATERSHED

## HCW Management Areas

*Figure 3.5 Management Areas* in the LRMP is amended to change the SMA portion of the watershed to Management Area 2, and to change the wilderness area of the watershed to Management Area 1. These are non-discretionary administrative changes necessary to comply with the legislative designations.




HCW Detail, Amended FIGURE 3.5 Management Areas

## HCW Wilderness and Recommended Wilderness

### Desired Conditions

3.28.90 Wilderness boundaries and regulations are clearly posted on the ground.

### Objectives

3.28.91 Make special education and enforcement efforts in first 10 years after the legislation.

3.28.92 Post boundaries within three years of the legislation.

### Standards

3.28.93 Adopt the standards in the SJNF Wilderness Management Direction.

### Guidelines

3.28.94 Adopt the guidelines from the SJNF Wilderness Management Direction, except camping and campfires are not permitted within 50 feet of streams or lakes because of terrain restrictions (instead of 100’ as in the Weminuche).

*Figure 3.6 Wilderness and Recommended Wilderness* in the LRMP is amended to add the designated Hermosa Creek Wilderness. This is a non-discretionary administrative change necessary to comply with the legislative designation. Additionally, the figure is amended to remove all previously-recommended wilderness in the watershed from recommendation (6,200 acres).

*Figure 3.6.1. Management Prescription Areas within the Hermosa Wilderness* is added to the SJNF Wilderness Management Direction (*SJNF 1998*). This figure depicts Management Prescriptions 1.11 and 1.12, as described in the Wilderness Management Direction.

.




**HCW Detail, Amended FIGURE 3.6.1 Wilderness and Recommended Wilderness**




**HCW Detail, Amended FIGURE 3.6.2. Hermosa Creek Wilderness Management Prescriptions**

Table 3.28.3 shows the allowable, prohibited, and restricted management activities and uses for the Hermosa Creek Watershed. The allowable uses in the following table are not all-inclusive.

**Table 3.28.3. Allowable Uses in Hermosa Creek Watershed**

| Management Activities and Use | Wilderness | RNA | East Hermosa Area & Roadless Areas | Remainder of the SMA |
|---|---|---|---|---|
| **Fire managed for resource benefit** | Allowed | Allowed | Allowed | Allowed except within the ski area. |
| **Prescribed burning** | Restricted - allowed as in LRMP | Restricted - allowed as in LRMP | Allowed | Allowed |
| **Mechanical fuels treatment** | Prohibited | Prohibited | Restricted–allowed as in Roadless Rule | Allowed |
| **Timber production (scheduled on a rotation basis)** | Prohibited | Prohibited | Prohibited | Prohibited |
| **Timber harvesting as a tool** | Prohibited | Prohibited | Restricted–allowed as in Roadless Rule | Restricted to purposes of the legislation |
| **Commercial use of special forest products and firewood** | Prohibited | Prohibited | Restricted–allowed as in Roadless Rule | Restricted to purposes of the legislation |
| **Lands Special Use authorizations, ROWs and utility corridors.** | Restricted - allowed as in LRMP | Restricted to purposes of the RNA. | Restricted–allowed as in Roadless Rule | Restricted to purposes of the legislation |
| **Recreation Special Uses** | Restricted to Outfitter/Guides | Restricted to Outfitter/Guides | Allowed | Allowed. Ski area uses managed under the SUP and annual operating plans. |
| **Livestock grazing (term permits)** | Prohibited by previous NEPA decision, except Divide Allot. | Prohibited by previous NEPA decision | Allowed | Allowed |
| **Facilities** | Restricted - allowed as in LRMP | Prohibited | Restricted–allowed as in Roadless Rule | Allowed |
| **Motorized transport (summer)** | Prohibited | Prohibited | Restricted to designated routes | Restricted to designated routes |
| **Motorized transport (winter)** | Prohibited | Prohibited | Restricted to designated areas | Restricted to designated areas |
| **Mechanical transport (summer)** | Prohibited | Prohibited | Restricted to designated routes | Restricted to designated routes |
| **Mechanical transport (winter)** | Prohibited | Prohibited | Restricted to designated routes or areas | Restricted to designated routes or areas |
| **Non-motorized transport (summer and winter)** | Allowed | Allowed | Allowed | Allowed |
| **Road construction (permanent or temporary)** | Prohibited | Prohibited | Restricted–allowed as in Roadless Rule | Allowed |
| **Minerals – leasable federal (oil and gas, and other)** | Prohibited | Prohibited | Prohibited | Prohibited - except for A and B, and valid existing rights |
| **Minerals – locatable federal** | Prohibited | Prohibited | Prohibited | Prohibited - except for Parcels A and B, and valid existing rights |
| **Minerals – saleable federal (materials)** | Prohibited | Prohibited | Prohibited | Prohibited - except for Parcels A and B, valid existing rights and admin. use |

*This page intentionally left blank.*

# CHAPTER 4 – MONITORING PLAN

## 4.1 San Juan National Forest Monitoring Plan

### Forest Plan Monitoring Under the 2012 Planning Rule

The NFMA requires "continuous monitoring and assessment in the field" to evaluate "the effects of each management system to the end that it will not produce substantial and permanent impairment of the productivity of the land" (16 USC 1604(g)(3)(C)). The 2012 Rule includes a three-part iterative cycle of assessment, planning, and monitoring in a continuous feedback loop. Monitoring is meant to support the assessment process and evaluate plan implementation over time. This planning framework is designed to "inform integrated resource management and allows the Forest Service to adapt to changing conditions, including climate change, and improve management based on new information and monitoring" (§ 219.5 (a)).

### Specific Requirements for Monitoring under the 2012 Rule

A monitoring plan will consist of "monitoring questions and associated indicators" which "must be designed to inform the management of resources on the plan area, including by testing relevant assumptions, tracking relevant changes, and measuring management effectiveness and progress toward achieving or maintaining the plan's desired conditions or objectives" (219.12 (a)(2)). The monitoring program must also be "coordinated with the regional forester and Forest Service State and Private Forestry and Research and Development" (§ 219.12 (a)(1)) and support and align with a broader-scale monitoring program, to be developed at the regional level, that will address monitoring questions at a geographic scale broader than one plan area (§ 219.12 (b)). Furthermore, in developing the monitoring plan, the responsible official should also provide opportunities for public participation, "taking into account the skills and interests of affected parties", as well as the scope, methods, forum and timing of those opportunities (§ 219.4 (a)).

Monitoring may involve evaluating: if standards and guidelines are implemented (implementation monitoring); if management actions and standards and guidelines are effective in achieving goals and objectives (effectiveness monitoring); the long term trend and condition of key resources (condition or surveillance monitoring).At a minimum, the plan monitoring program must contain one or more monitoring questions and associated indicators addressing the following eight items (see §219.12[a][5][i-viii]):

(i) The status of select watershed conditions;

(ii) The status of select ecological conditions including key characteristics of terrestrial and aquatic ecosystems;

(iii) The status of focal species to assess the ecological conditions required under § 219.9;

(iv) The status of a select set of the ecological conditions required under § 219.9 to contribute to the recovery of federally listed threatened and endangered species, conserve proposed and candidate species, and maintain a viable population of each species of conservation concern;

(v) The status of visitor use, visitor satisfaction, and progress toward meeting recreation objectives;

(vi) Measurable changes on the plan area related to climate change and other stressors that may be affecting the plan area;

(vii) Progress toward meeting the desired conditions and objectives in the plan, including for providing multiple use opportunities;

(viii) The effects of each management system to determine that they do not substantially and permanently impair the productivity of the land (16 U.S.C. 1604(g)(3)(C)).

As happens with many aspects of resource management, these eight categories are often interrelated. So, in some cases, a monitoring question may fit under more than one category. However, in the interest of brevity, each question is only listed once.

## Biennial Monitoring Report

A monitoring evaluation report is to be produced and made available to the public every two years (§ 219.12 (d)). It "must indicate whether or not a change to the plan, management activities, or the monitoring program, or a new assessment, may be warranted based on the new information… [and] must be used to inform adaptive management of the plan area" (§ 219.12 (d)(2)). The monitoring program and evaluation report are part of the administrative record (§ 219.14 (b)) and the Forest Supervisor must document "how the best available scientific information was used to inform planning, the plan components, and other plan content, including the plan monitoring program" (§219.13 (a)(4)).

## Monitoring Plan Components

The following table details the specific components of the monitoring plan. Specific monitoring items are organized by the required categories of monitoring questions identified in the planning rule (§219.12), with at least one monitoring question and indicator for each category.

The San Juan National Forest considered several factors when selecting appropriate monitoring questions and indicators. In line with the 2012 Planning Rule, questions and indicators were chosen because they: (1) test relevant assumptions made in the plan, (2) track relevant changes within the planning area, and/or (3) measure management effectiveness and progress toward achieving or maintaining the plan's desired conditions or objectives. Many of the questions involve major underpinning assumptions made in the plan, so that monitoring can be an efficient and effective tool to inform the need for changes in the plan. Time scale was also considered when selecting monitoring questions. The monitoring plan focuses on indicators where meaningful change can be detected in a relatively short amount of time and can therefore indicate whether changes are needed in the plan in a relatively rapid manner and be reported in the biennial monitoring report. Indicators that may take a longer time to show meaningful change are also important and will be monitored and considered using formats other than the monitoring plan.

For each question, there will be a brief description of the desired condition or objective each monitoring item is associated with, followed by the question, a description of the specific indicator or metric used to answer or evaluate the monitoring question, the data source or measurement protocol associated with the monitoring item, and finally, a rationale or justification for the specific monitoring indicator and protocol (using the numbers above). This will ensure that the requirements for best available science are met.

**Table 4.1. Monitoring Components**

| i. Status of Select Watershed Conditions | | | | | |
|---|---|---|---|---|---|
| **Monitoring Question** | **Desired Conditions and Objectives** | **Indicators** | **Scale** | **Frequency of Reporting** | **Sources and/or Partners** |
| Are conditions improving in priority watersheds within the planning area as defined by the Watershed Condition Framework? | **DC 2.6.1** State water quality standards and anti-degradation rules are met and State-classified water uses are supported for all water bodies<br><br>**DC 2.6.2** Water quality for impaired water bodies on the State's 303(d) list move toward fully supporting State-classified uses.<br><br>**DC 2.6.3** State "Outstanding Waters" within the planning area maintain the high levels of water quality necessary for this status.<br><br>**DC 2.6.5** Water from SJNF lands will meet applicable drinking water standards when given adequate and appropriate treatment. Management activities throughout the planning area protect and/or enhance the water quality of municipal supply watersheds (as defined in FSM 2542).<br>Enhancement may be achieved by watershed restoration or by other activities.<br><br>**Obj 2.6.19** Every 5 years rehabilitate 10 or more acres to reduce erosion and sedimentation delivery to water. Do the work in priority watersheds, including those with water bodies listed for sediment impairment or that have TMDLs established for sediment.<br><br>**Obj 2.6.20** Over the implementation-life of the LRMP, actively participate in the development of all of the TMDL determinations and/or other appropriate options for the restoration of State 303(d)-listed impaired water bodies within the planning area. | Acres restored. TMDLs completed. BMPs implemented and effective.<br><br>Completion of essential projects identified in the Watershed Restoration Action Plan.<br><br>Essential projects should improve overall watershed condition rating and 12 watershed condition indicators.<br><br>Majority of work should occur in designated priority watersheds. | Project or watershed | 5 years | CDPHE, EPA |

# i. Status of Select Watershed Conditions

| Monitoring Question | Desired Conditions and Objectives | Indicators | Scale | Frequency of Reporting | Sources and/or Partners |
|---|---|---|---|---|---|
| How many miles of roads prioritized for decommissioning have been decommissioned in the planning area? | **DC 2.13.8** Roads and trails within the SJNF that are identified for closure are decommissioned and reestablished with native vegetation cover.<br><br>**Obj 2.13.19** Travel management plans are developed in accordance the designation criteria in 36 CFR 212, Subpart B, for NFS lands. Routes that are not included in the designated motorized transportation system will be evaluated for their resource impact potential. Those with high potential for resource impacts will be prioritized for decommissioning as part of the implementation plan for each individual travel management plan decision. Each implementation plan will identify those routes prioritized for decommissioning, the method(s) that may be used, and a schedule for completion. | Miles of roads decommissioned | SJNF | Annually | NRMS data-base - roads and trails |
| Are streams that are on the State 303D list improving? | **DC 2.6.1** State water quality standards and anti-degradation rules are met and State-classified water uses are supported for all water bodies.<br><br>**DC 2.6.2** Water quality for impaired water bodies on the State's 303(d) list move toward fully supporting State-classified uses.<br><br>**Obj 2.6.20** Over the implementation-life of the LRMP, actively participate in the development of all of the TMDL determinations and/or other appropriate options for the restoration of State 303(d)-listed impaired water bodies within the planning area. | TMDLs completed.<br><br>Number of streams removed from the 303D List. | SJNF | 2-3 years | CDPHE |
| Are stream conditions stable or moving towards desired conditions? | **DC 3.28.18** The East Fork of the Hermosa and the reach of Hermosa Creek just above the East Fork confluence, and their riparian corridors, are in a 'Robust' stream health category, as defined in the Watershed Conservation Practices Handbook. | Number of sites monitored, and number in Robust condition. | site or reach | 5-10 years | Unit reporting |
| | | Snow compaction and mechanical impacts from over-snow motorized vehicles during low snow conditions | East Fork of Hermosa Creek | Twice a year | Unit reporting |



FS-008438

## ii. Status of Select Ecological Conditions

| Monitoring Question | Desired Conditions and Objectives | Indicators | Scale | Frequency of Reporting | Sources and/or Partners |
|---|---|---|---|---|---|
| What are the status and trends of insects and disease in and around the plan area, including old growth stands, and are they moving us toward desired conditions? | **DC 2.2.6** All development stages of the forested terrestrial ecosystems are well represented at the landscape scale and occur within the ranges identified in Table 2.2.1.<br><br>**DC 2.2.7** Old growth ponderosa pine, old growth pinyon- juniper and old growth warm-dry mixed conifer forests are more abundant, occupy more acreage, and are well distributed on SJNF lands.<br><br>**DC 2.2.9** Terrestrial ecosystems, including habitat for special status plant species, are productive, sustainable, and resilient, and provide goods and services over the long-term. | Trends in fire, insect and disease mortality; acres of natural regeneration<br><br>Trends in habitat structural stages | SJNF | Every 2 years report on forest-wide status of mortality, natural regeneration and planting via forest-wide surveys such as Aerial detection and status from localized surveys<br><br>Every 5 years for habitat structural stages or as needed | Aerial photo series (Aerial Detection Survey done annually by RO) and field sampling, natural regeneration surveys, planting survival surveys, stocking surveys; FACTS; old growth surveys; RSAC vegetation updates |
| Are LRMP implementation actions allowing us to effectively protect/maintain/ promote healthy, resilient riparian and wetland ecosystems including soils? | **DC 2.4.9** Soil productivity is intact on all riparian area and wetland ecosystems.<br><br>**DC 2.4.12** Management-induced soil erosion, soil compaction, soil displacement, puddling, and/or severely burned soils are rare on all riparian and wetland ecosystems of the SJNF. Long term impacts to soils (e.g. soil erosion, soil compaction, soil displacement, puddling and/or severely burned soils) from management actions are rare on all riparian area and wetland ecosystems of the SJNF. | BMPs implemented and effective | Site or reach--BMP monitoring is annual; burn monitoring only after a burn occurs | 5 years | |
| What are the status and trends of invasive species and aquatic invasive species on the unit? | **DC 2.8.3** Invasive species, both terrestrial and aquatic, are absent or rare within the planning area, and are not influencing native populations or ecosystem function<br><br>**Obj 2.8.6** Within 15 years, contain priority Class B invasive species identified in the Invasive Species Action Plan within the SJNF. | Acres of noxious weeds inventoried, treated, and monitored<br><br>Acres treated for Class A and Class B species<br><br>Distribution and spread maps of quagga mussel | SJNF | Annually | PAS, cooperators, contractors, FACTS, CPW |

## iii. Focal Species

| Monitoring Question | Desired Conditions and Objectives | Indicators | Scale | Frequency of Reporting | Sources and/or Partner |
|---|---|---|---|---|---|
| Are management activities providing for ecological integrity and maintaining or restoring ecological conditions as indicated by the status of focal species? | **DC 2.3.20** Abert's squirrel (*Sciurus aberti*) - Ponderosa pine habitats provide interconnected structure in mature conifer stands that produce abundant foraging (cone crops and above- and belowground fungi) and reproductive habitat.<br><br>**DC 2.3.21** American marten (*Martes americana*) - Habitat connectivity for spruce-fir and cool-moist mixed conifer forests is maintained at broad spatial scales. These forests contain a diverse array of structural stages (including mature and old growth) and habitat attributes (snags and downed logs) to provide effective foraging, breeding and dispersal habitat for marten.<br><br>**DC 2.3.22** Hairy Woodpecker (*Picoides villosus*) **-** Snags occur in numbers, size, and quality in and adjacent to aspen, ponderosa pine, and mixed conifer forests to provide effective habitat for foraging and reproduction.<br><br>**Obj 2.3.31** Abert's squirrel - Over the life of the LRMP, restore approximately 3,000 acres of ponderosa pine forest to improve habitat quality as defined in the *Abert's Squirrel Species Assessment San Juan National Forest* (USFS 2004a, 2003).<br><br>**Obj 2.3.32** American marten - Over the life of the LRMP, treat approximately 2,000 acres of spruce-fir and cool-moist mixed conifer forests to increase age class diversity and provide future foraging, breeding and dispersal habitat as defined in the *American Marten Species Assessment San Juan National Forest* (USFS 2004b). | Monitor status of focal species at the appropriate geographic scale.<br><br>**Indicators:** Status of focal species (Abert's squirrel, American marten, hairy woodpecker; cutthroat trout)<br><br>Number of acres of live ponderosa pine treated<br><br>Number of acres of live mature spruce-fir and cool-moist mixed conifer treated | SJNF | Biennially | Unit reporting, CPW, Bird Conservancy of the Rockies |

| iii. Focal Species | | | | | |
|---|---|---|---|---|---|
| **Monitoring Question** | **Desired Conditions and Objectives** | **Indicators** | **Scale** | **Frequency of Reporting** | **Sources and/or Partner** |
| | **DC 2.5.12** Threats to Colorado River cutthroat trout and its habitat are eliminated or reduced to the greatest extent possible.<br><br>**DC 2.5.13** The distribution of Colorado River cutthroat trout is increased where ecologically, sociologically, and economically feasible.<br><br>**Obj 2.5.17** Over the life of the LRMP, establish two self-sustaining meta-populations on NFS lands, each consisting of five separate but interconnected sub-populations. In addition, establish one new population in each Geographic Management Unit within the historic range (Colorado River Cutthroat Trout Task Force 2001). | Miles of stream habitat enhanced.<br><br>Number of self-sustaining metapopulations of Colorado River cutthroat trout established<br><br>Number of threats to Colorado River cutthroat trout that are reduced or eliminated | | | |
| Are non-native trout effectively excluded from CRCT occupied habitat, ensuring CRCT long-term persistence? | **DC 3.28.22** Natural and manmade barriers to upstream fish migration adequately protect CRCT populations while allowing for stream reaches large enough to support long term population viability.<br><br>**DC 3.28.23** Manmade barriers to upstream fish migration within CRCT habitat are maintained to ensure effectiveness. | Number of CRCT stream segments with no non-native trout. | Hermosa watershed | 3-5 years | unit reporting, CPW |

## iv. Threatened and Endangered Species and Species of Conservation Concern

| Monitoring Question | Desired Conditions and Objectives | Indicators | Scale | Frequency of Reporting | Sources and/or Partners |
|---|---|---|---|---|---|
| Do management actions maintain or improve habitat conditions for special status species, contributing to the stability and/or recovery of these species?<br><br>Are management actions maintaining viable bighorn herds on SJNF lands? | **DC 2.3.1** Wildlife populations are viable on SJNF lands. Wildlife populations are self-sustaining, connected, and genetically diverse across SJNF lands.<br><br>**DC 2.3.12** Populations are conserved by maintaining or improving habitat availability and quality through the incorporation of conservation strategies and species' habitat needs during project development and implementation.<br><br>**DC 2.3.14** Disturbances from management activities occur at levels that support critical life functions and sustain key habitat characteristics for wildlife special status species.<br><br>**DC 2.3.15** Areas identified as critical habitat or proposed critical habitat for special status wildlife species have the characteristics to support sustainable populations, promoting recovery of the species.<br><br>**DC 2.3.16** The alpine and subalpine willow (*Salix* sp.) dominated riparian areas, providing crucial winter habitat for white-tailed ptarmigan (*Lagopus leucura*) and snowshoe hare (*Lepus americanus*), do not bioaccumulate heavy metals above historically occurring background levels which enter the food chain. Areas of contamination do not become limiting factors for wildlife population sustainability.<br><br>**DC 2.3.17** Management actions maintain or improve habitat conditions for special status species, contributing to the stability and/or recovery of these species.<br><br>**Obj 2.3.23** Bats: Over the life of the LRMP, all mine closures for human safety at sites supporting bat populations include structures (such as bat gates) designed to provide for continued use as bat habitat.<br><br>**Obj 2.5.15** Annually enhance or restore at least 3 miles of stream habitat to maintain or restore the structure, composition, and function of physical habitat for USFS sensitive species. | The number of conservation actions or recovery actions completed for TES<br><br>Number of projects implemented that have an overall beneficial effect to TES<br><br>Number of threatened, endangered, and sensitive species occurring and trends (if known)<br><br>Number of AML Projects that are implemented with the intent of reducing heavy metals<br><br>Number of mine closure projects that implement effective bat access<br><br>Bighorn herd population data from CPW, USFS and other sources including, but not limited to, aerial surveys, coordinated ground counts, hunter harvest data | SJNF | Annually and Biennially | Unit reporting, CPW, USFWS, NGO partners (Trout Unlimited, Rocky Mountain Bighorn Society, etc.) |

## iv. Threatened and Endangered Species and Species of Conservation Concern

| Monitoring Question | Desired Conditions and Objectives | Indicators | Scale | Frequency of Reporting | Sources and/or Partners |
|---|---|---|---|---|---|
| Are management actions in accordance with the 2013 Lynx Conservation Assessment and Strategy? | **DC 2.3.5** Large predator species contribute to ecological diversity and ecosystem functioning. | Number of lynx screens used for project analysis<br><br>Reporting as required by Southern Rockies Lynx Amendment<br><br>Periodic review and update of forest-wide lynx habitat map, accounting for changes from large scale disturbances. | SJNF | Annually | Unit reporting. CPW, USFWS. |

## v. Visitor Use and Recreation

| Monitoring Question | Desired Conditions and Objectives | Indicators | Scale | Frequency of Reporting | Sources and/or Partners |
|---|---|---|---|---|---|
| What is the level and trend of recreational visitor use satisfaction on the unit? | **DC 2.14.1** Activities are regulated primarily in order to protect the quality of the recreation settings and benefits<br><br>**DC 2.14.28** In developed recreation sites, the USFS provides a wide range of visitor information, education, and interpretation consistent with their interpretive and conservation education strategy. | National Visitor Use Monitoring Report<br><br>Number of condition surveys completed | SJNF | 5 years<br><br>2 years | National Visitor Use Monitoring Report |
| What is level and trend of visitor use satisfaction on the unit related to the type, amount, and condition of roads and trails? | **DC 2.13.1** The transportation system within the SJNF planning area consists of roads, high-clearance or primitive roads, trails, and bridges that are fiscally sustainable and safe as appropriate for the designated use or desired user experience; they allow for the use of, and enjoyment by, the public, and they meet resource management objectives. Sufficient condition surveys and inspections are conducted to promote road safety and to prioritize road maintenance expenditures.<br><br>**DC 2.13.2** The SJNF transportation system provides reasonable and legal access for resource management and recreation; it is dynamic and adaptable to resource and user needs.<br><br>**DC 2.13.5** The road and trail system within the SJNF has adequate destination signage, mapping, and route markers to assist transportation system users in navigating throughout the planning area.<br><br>**DC 2.13.6** The public has access to information about the SJNF transportation systems (including specific travel route designations, available recreational opportunities, environmental stewardship guidelines, and safe travel information). | National Visitor Use Monitoring Report | SJNF | 5 years | National Visitor Use Monitoring Report |

| v. Visitor Use and Recreation | | | | | |
|---|---|---|---|---|---|
| **Monitoring Question** | **Desired Conditions and Objectives** | **Indicators** | **Scale** | **Frequency of Reporting** | **Sources and/or Partners** |
| Is **recreation** at the Chimney Rock National Monument being managed to protect the objects of the Monument? | **DC 3.17.32** Management of the Monument supports recreation and tourism activities without degradation to the objects of the Monument, thereby contributing to the local and regional economy. | Impacts to resources | Monument-wide | Annually (Obj 3.17.76 & 77) or Within 5 years (Obj 3.17.67) | Forest Service, Chimney Rock Interpretive Association, Grants |
| | **DC 3.17.33** Access to the Monument for recreational activities is managed and enabled in a manner that protects and provides for the enjoyment of the objects for which the Monument was created.<br><br>**Obj 3.17.37** Within ten years, provide alternative opportunities to experience the objects of the Monument through the construction of additional non-motorized trails.<br><br>**Monitoring Objective:** Developed recreation facilities are monitored to ensure compliance with critical National Quality Standards. | Level of visitor satisfaction (as shown in Customer Report Card analysis) | Monument-wide | Within 10 years | Forest Service, Chimney Rock Interpretive Association, Grants |
| | **DC 3.17.36** Management of visitor capacity and implementation of public safety measures considers visitor experiences and resource protection needs within the Monument.<br><br>**Obj 3.17.38** Within five years, design and implement public safety measures in the Monument, including along the trail to the Great House.<br><br>**Obj 3.17.10** Within five years, design and implement archaeological site hardening along the trail to the Great House and other areas as needed.<br><br>**Obj 3.17.40** Within three years, develop an interpretive plan and improve signage for the Monument. | Level of visitor satisfaction with safety & security of site, signage, and health & cleanliness of site | In developed areas of the Monument | Within 3-5 years | Forest Service, Chimney Rock Interpretive Association, Grants |

## vi. Climate Change and Other Stressors

| Monitoring Question | Desired Conditions and Objectives | Indicators | Scale | Frequency of Reporting | Sources and/or Partners |
|---|---|---|---|---|---|
| Is visibility and air quality improving and/or protected on the SJNF? | **DC 2.12.1** Air quality in the Weminuche Wilderness Class I Area maintains natural conditions. Indicators of natural conditions include air quality–related values of visibility, water and snow chemistry, precipitation/atmospheric chemistry, soils chemistry, and aquatic/terrestrial biota. | AQRVs; these include water quality, visibility, lichens, soils, aquatic organisms, flora, etc., within limits of acceptable change.<br>Air quality maintained at better than State air quality standards. | SJNF | 5 years | CDPHE, National Park Service, BLM, EPA, IMPROVE, NADP |
| | **DC 2.12.2** Air quality for the Class II Areas within the planning area are maintained or improved with respect to pollutant concentrations so that human health and the integrity of associated aquatic and terrestrial ecosystem components are protected.<br><br>**DC 2.12.5** Visibility in the Weminuche Wilderness continues to improve, so that best natural conditions are achieved. | Deciview graph displaying trend data for visibility.<br><br>Ozone and Nitrogen Dioxide measurements at Shamrock Mines air monitoring station | | | Shamrock Mines, Engineer, Molas Pass, and Wolf Creek Pass air monitoring station data |
| | **Obj 2.12.8** For the Weminuche Wilderness Class 1 Area, improve air quality so that flora and fauna AQRVs that are at risk (including lichens, amphibians, and aquatic organisms) recover to a level that is within the limits of acceptable change (compared to natural conditions) by the next planning period so that there is no humanly perceptible change in visibility (visual range, contrast, coloration) from that which would have existed under natural conditions (conditions substantially unaltered by humans or human activities).<br><br>**Obj 2.12.9** Over the implementation-life of the LRMP on both BLM and USFS lands, prevent or reduce the atmospheric deposition of nitrogen and sulfur and allow no more than a 10% change from established baseline for lakes with an ANC $\geq$25 µeq/L, and for lakes with an ANC<25 µeq/L allow no more than 1 µeq/L decrease in ANC.<br><br>**Obj 2.12.10** Over the implementation-life of the LRMP, prevent or reduce airborne nutrient and mercury deposition impacts to sensitive high-elevation lakes in the Weminuche Wilderness Class I Area; allow no detectable mercury, no more than 2 µeq/L of ammonium, and no late summer nitrate. | | | | USFS Rocky Mountain Region Office (for Deciview graph) |

# vi. Climate Change and Other Stressors

| Monitoring Question | Desired Conditions and Objectives | Indicators | Scale | Frequency of Reporting | Sources and/or Partners |
|---|---|---|---|---|---|
| Are LRMP implementation actions allowing us to effectively adapt to climate change and maintain/promote healthy, resilient ecosystems? | **DC 2.2.2** Non-climate ecosystem stresses (e.g., high road densities, water depletions, air and water pollution) are reduced to improve the resilience and resistance of ecosystems to the future dynamics of a changing climate.<br><br>**DC 2.2.15** Forested terrestrial ecosystems have stand structures and tree species compositions thatoffer resistance and resilience to changes in climate, including extreme weather events or epidemic insect and disease outbreaks.<br><br>**DC 2.2.16** Non-forested terrestrial ecosystems have community structure and species composition that offer resistance and resilience to changes in climate, including extreme weather events or epidemic insect and disease outbreaks. | Forest road density<br><br>Species composition reports<br><br>Stand exams<br><br>Extent of insect and disease outbreaks<br><br>Vegetation monitoring<br><br>Tree line monitoring | SJNF<br><br>Select locations<br><br>Select locations<br><br>SJNF<br><br>8 weather stations<br><br>SJNF | 2-4 years<br><br>2-4 years<br><br>Prior to project<br><br>Annually<br><br>3 years<br><br>10 years | Aerial detection survey; FSVeg; CDPHE |

# vii. Desired Conditions and Objectives Including Multiple Use

| Monitoring Question | Desired Conditions and Objectives | Indicators | Scale | Frequency of Reporting | Sources and/or Partners |
|---|---|---|---|---|---|
| Are rangelands providing diverse, healthy, and sustainable plant communities and are they conserving soil quality? | **DC 2.7.5** Rangelands provide diverse, healthy, and sustainable plant communities and conserve soil quality. | Long-term monitoring plots<br><br>Acres meeting or moving toward desired conditions | SJNF | 5 years | |
| Is water on the SJNF being managed in a way that maintains physical features of perennial streams, habitat for aquatic species and communities, and population viability of certain species in streams where they occur? | **DC 2.5.5** An adequate range of stream flow provides for the long-term maintenance of physical habitat features. Channel features, including bank stability, width-to-depth ratio, pool/riffle ratio, pool depth, slope, sinuosity, cover and substrate composition, are commensurate with those expected to occur under natural ranges of stream flow.<br><br>**DC 2.5.6** Water flow conditions in streams, lakes, springs, seeps, wetlands, fens, and aquifers support functioning habitats for a variety of aquatic and semi-aquatic species and communities.<br><br>**Obj 2.5.14** Annually, evaluate five streams on NFS lands for adequacy of instream flows sufficient to maintain population viability and otherwise achieve LRMP direction. | Number of regulated or flow-impacted streams evaluated for consistency with standard 2.5.18. | Stream-reaches forest wide | 2-3 streams per year | CO Department of Water Resources, CPW |
| How is vegetation management contributing to the local economy? | **DC 2.9.1** Forest vegetation management supports, at least, the current level of economic activity in the local timber industry; provides economic or social support to local communities; ensures current and future needs for Native American tribal use, including that associated with special forest products (e.g., teepee poles)<br><br>**Obj 2.9.6** Meet or exceed average annual timber product offerings from SJNF lands, to local timber industries, publics, and other users (including Native Americans), as displayed in Tables 2.9.1 and 2.9.2 over the life of the LRMP. | Sales data for timber products; associated volumes (e.g., CCF), or numbers, for non-convertible products (e.g., Christmas trees)<br><br>Sales data for timber products | SJNF | Annually | TIM |

# vii. Desired Conditions and Objectives Including Multiple Use

| Monitoring Question | Desired Conditions and Objectives | Indicators | Scale | Frequency of Reporting | Sources and/or Partners |
|---|---|---|---|---|---|
| Is wildland fire being effectively utilized to achieve desired conditions? | **DC 2.11.3** Wildland fire management maintains a balance between fire suppression and use of wildland fire (including both prescribed fire and natural ignitions) to regulate fuels and maintain forest ecosystems in desired conditions.<br><br>**DC 2.11.7** Planned and unplanned fire ignitions are used to increase resiliency and diversity across all forest and rangeland vegetation types.<br><br>**Obj 2.11.11** Annually, for the next 10 years, complete an average of 4,000 acres of fuels reduction and resource enhancement, utilizing fire managed for resource benefit on SJNF lands. | Number of naturally ignited wildfires managed for resource benefit<br><br>Number of naturally ignited wildfire acres managed for resource benefit<br><br>Number of acres of prescribed fire | SJNF | Annually | FIRESTAT, FACTS |
| How many significant heritage/cultural resources in danger of being lost have been protected/preserved/stabilized? | **DC 2.16.1** Significant heritage and cultural resources, such as USFS Priority Heritage Assets and sites on the NRHP, are maintained in good to excellent physical condition. Significant cultural values are protected or preserved. Heritage and cultural sites are preserved and stabilized, and may be available for interpretation and research; they may have site- specific management plans. Sites are protected from physical damage and excessive wear and tear resulting from visitor use.<br><br>**Obj 2.16.13** Over the implementation-life of the LRMP, protect/preserve/stabilize at least seven significant heritage/cultural resources that have identified deferred maintenance needs that if not addressed will result in loss of the resource.<br><br>**Obj 2.16.16** Over the implementation life of the LRMP, implement the Anasazi National Register District Monitoring Plan and new site monitoring plans for the Lost Canyon and Spring Creek National Register Districts. | Heritage program managed to standard and Secretary's report to Congress: Number of heritage/cultural sites stabilized | SJNF | 10 years | Colorado State Historic Preservation Office, Tribes, volunteers, schools, State Historical Fund, grants |

# vii. Desired Conditions and Objectives Including Multiple Use

| Monitoring Question | Desired Conditions and Objectives | Indicators | Scale | Frequency of Reporting | Sources and/or Partners |
|---|---|---|---|---|---|
| Is oil and gas leasing and development occurring in an orderly manner, including timely reclamation, colocation, centralization, and optimization of facilities to reduce ground disturbance, minimize impacts, and obtain maximum efficiency for well fields? | **DC 2.19.3** Ground disturbance from development of oil and gas fields is minimized by centralizing facilities, requiring multiple wells per pad, and minimizing the road system required to access facilities.<br><br>**DC 2.19.4** Reclamation of mineral exploration, development, and production activities is stable, long term, and implemented as soon as is reasonably possible in order to minimize impacts to other resources<br><br>**DC 2.19.5** All oil and gas well fields starting at the field development stage and all other established well fields where practicable maximize the collocation of facilities to minimize construction footprints and reduce tailpipe emissions.<br><br>**DC 2.19.6** Oil and gas leasing and development activity on the SJNF occurs in an orderly manner to minimize impacts to lands and resources and increase efficiency of operations<br><br>**Obj 2.19.7** Over the next 20 years, centralize facilities and engines to minimize the number of well head engines and optimize well engines so they use the minimum cumulative horsepower to obtain the maximum efficiency for all well fields beginning at the field development stage and all other established well fields where practicable. | Number of facilities permitted; number of colocated/centralized/ optimized facilities permitted; acres of initial disturbance for facilities (including roads); acres of interim and final reclamation for (including roads); number of leases issued; number of leases issued consistent with SJNF Orderly Leasing Strategy | Forest wide | 2-4 years | AFMSS, Work Plan |
| How many mine safety closures have been completed on the Unit? | **DC 2.21.3** Mine waste repositories are protected and physical safety closures are protected or replaced during any USFS-authorized actions.<br><br>**Obj 2.21.9** On all SJNF lands, close or mitigate high-priority sites over the life of the LRMP. On SJNF lands, newly discovered sites will be prioritized for closure or mitigation based on hazard. | Number of safety closures | SJNF | 5 years | Colorado Division of Reclamation Mining and Safety |

# vii. Desired Conditions and Objectives Including Multiple Use

| Monitoring Question | Desired Conditions and Objectives | Indicators | Scale | Frequency of Reporting | Sources and/or Partners |
|---|---|---|---|---|---|
| Are **cultural resources** in the Chimney Rock National Monument being adequately preserved and protected? | **DC 3.17.1** Cultural and ethnographic resources within the monument are preserved and protected in a manner that ensures long-term stewardship of these resources and sustainable public benefits.<br><br>**Obj 3.17.6** Over the life of the plan, conduct inventories for and oversee research about archaeological, historical, and ethnographic resources to better understand and manage the resources.<br><br>**DC 3.17.2** Cultural resources in the monument are managed on a landscape level and the cultural values provided by the viewsheds, night sky, and auditory environment are maintained.<br><br>**Obj 3.17.8** Within 10 years, prioritize sites at the Monument for public interpretation, research, stabilization, conservation, and/or traditional uses.<br><br>**DC 3.17.5** Visitors respect and leave archaeological resources and tribal offerings undisturbed.<br><br>**Obj 3.17.9** Within five years, implement a monitoring plan for cultural resources that evaluates factors such as cultural resource use-allocation, National Register of Historic Places (NRHP) status, public use patterns, vandalism occurrences, vulnerability and cultural sensitivity. | Heritage Program Managed to Standard & Secretary's Report to Congress<br><br>Tracked in Natural Resource Manager (NRM) Heritage modules | Monument-Wide | Annually to every 5 to 10 years | Forest Service, Colleges, Universities, Pueblos and Tribes, State Historical Fund National Trust, Grants |
| Are **tribal interests** related to Chimney Rock National Monument being considered? | **DC 3.17.24** Tribal traditions are valued by the Forest Service and the public. When appropriate, these traditions are incorporated into the interpretation of the monument to help provide visitor experiences that foster cultural understanding. Tribes are encouraged to participate in the development of interpretive materials and to assist in the training of tour guides/interpreters.<br><br>**Obj 3.17.26** Within five years, produce a tribal oral history of the Chimney Rock area.<br><br>**Obj 3.17.27** Within five years, develop a policy in consultation with the tribes that specifies how traditional food and medicine gathering will occur within the monument.<br><br>**Obj 3.17.28** Conduct annual tribal consultation meetings regarding the Monument and provide additional opportunities to consult throughout the year<br><br>**DC 3.17.25** Tribal consultation regarding management, interpretation, traditional uses and other issues of tribal concern within the monument is an on-going process and is fostered to maintain open communications with tribes. | | Monument-wide | Annual consultation meetings, other activities within 5 years | Forest Service, Tribes and Pueblos, Grants |

## vii. Desired Conditions and Objectives Including Multiple Use

| Monitoring Question | Desired Conditions and Objectives | Indicators | Scale | Frequency of Reporting | Sources and/or Partners |
|---|---|---|---|---|---|
| Are **scenery and the auditory environment** related to Chimney Rock National Monument being managed in a manner that protects, enhances, or conserves these resources? | **DC 3.17.46** All activities occurring in the Monument are managed in a manner that protects, enhances, or conserves the Monument's scenic and auditory resources.<br><br>**Obj 3.17.48** Over the life of the plan, document existing air quality conditions, including visibility. This could include photo documentation from key viewpoints or air quality data obtained from existing monitoring facilities in the region. | Changes in air quality | Region-wide | Every 10 years | On-site field monitoring, aerial photos. Could partner with BLM and others that conduct air quality monitoring |
| Are the **terrestrial and riparian ecosystems** located in the Chimney Rock National Monument being managed to meet desired conditions? | **DC 3.17.63** Vegetative communities within the Monument from which traditional cultural materials are gathered are resilient and self-perpetuating.<br><br>**Obj 3.17.66** Within ten years, prioritize where restoration, fuels treatment, or habitat improvement projects may be needed within the Monument, and where important traditional cultural materials collected by tribes are located.<br><br>**Obj 3.17.67** Within five years, conduct an assessment of riparian health and stream channel stability along the portions of Stollsteimer Creek and the Piedra River within the Monument. | Presence and extent of unique vegetative features | Monument-wide | Within 10 years | On-site field monitoring |
| | **DC 3.17.64** Ground cover within the Monument is maintained at levels necessary to prevent accelerated rates of erosion, and provide protection to archaeological sites and soils | Riparian health and stream channel stability | Where Stollsteimer Creek and the Piedra River occur within Monument | Within 5 years | On-site field monitoring |

# vii. Desired Conditions and Objectives Including Multiple Use

| Monitoring Question | Desired Conditions and Objectives | Indicators | Scale | Frequency of Reporting | Sources and/or Partners |
|---|---|---|---|---|---|
| Are **terrestrial wildlife and fisheries** resources in the Chimney Rock National Monument being managed to meet desired conditions? | **DC 3.17.72** Wildlife habitat across the monument continues to support the terrestrial wildlife species considered objects of the Monument.<br><br>**DC 3.17.74** Migrating mule deer and elk continue utilizing winter concentration areas and severe winter range habitat across the monument.<br><br>**Obj 3.17.76** Over the life of the plan, conduct monitoring of deer and elk use in winter concentration areas within the Monument to ensure that habitat capability and effectiveness are maintained during key use periods. | Continued use of the Monument by big game in association with increased dispersed non-motorized winter recreation. Monitoring methods will include but are not limited to: coordinated grounds counts during key use periods (Dec. 1 – April 30), obtaining population data from CPW or SUIT upon completion of annual winter big game counts overlapping the CRNM, & other appropriate methods developed in coordination with CPW and SUIT.<br><br>If monitoring shows adverse impacts to big game from dispersed non- motorized recreation, adaptive management criteria will be applied. This may include the following:<br>• Limit dispersed non-motorized winter recreation to Zone 2 from Dec. 1-April 20. This may include allowing use only from 0900-1500, limiting use to designated roads and trails, allowing use to occur up to January 30, then closing the area to public use (which coincides with periods most critical for big game survival)<br>Close Zone 2 to dispersed non-motorized recreation from Dec. 1-April 30 | Monument-wide | Annually | Forest Service, Colorado Parks and Wildlife, Southern Ute Indian Tribe |
| | **DC 3.17.73** Peregrine falcons continue to occupy breeding habitat on Companion Rock or Chimney Rock<br><br>**Obj 3.17.77** Over the life of the plan, conduct monitoring of peregrine falcon nesting on Companion Rock to ensure that habitat capability and effectiveness are maintained during key use periods. | Continued use of Companion Rock or Chimney Rock by peregrine falcons.<br><br>If monitoring information shows adverse impacts to peregrine falcon from use occurring on the Great House Trail and in the Upper Mesa area during breeding season, adaptive management criteria will be applied. This may include the following:<br>• Allow tours only from 0900-1500, or<br>• Restrict number of tours on the Upper Mesa through June 1, or<br>Close the Great House Trail and Upper Mesa to public use through June 1 | Around Companion Rock and Chimney Rock | Monitored annually & evaluated at 5 year intervals to determine impacts to breeding activity | Forest Service, Colorado Parks & Wildlife |

## vii. Desired Conditions and Objectives Including Multiple Use

| Monitoring Question | Desired Conditions and Objectives | Indicators | Scale | Frequency of Reporting | Sources and/or Partners |
|---|---|---|---|---|---|
| Are **livestock and rangeland management** resources in the Chimney Rock National Monument being managed to meet desired conditions? | **DC 3.17.103** Livestock grazing occurs in a manner that does not negatively impact archaeological resources or other objects of the Monument, and does not interfere with the protection of these objects.<br><br>**Obj 3.17.106** Annually monitor the impacts of livestock grazing in the Peterson Ridge area to determine the impacts of livestock grazing on the objects of the Monument and implement adaptive management strategies as needed.<br><br>**DC 3.17.104** Range improvements are located and utilized in a manner that does not negatively impact resources or other objects of the Monuments, and does not interfere with the protection of these objects. | Impacts to the objects of the Monument, including cultural resources, terrestrial and riparian ecosystems, terrestrial wildlife, and recreation use. | In the Peterson Ridge portion of the Monument | Annually | On-site field monitoring conducted by the Forest Service and range permittees |

| viii. Management and the Productivity of the Land (soils) | | | | | |
|---|---|---|---|---|---|
| **Monitoring Question** | **Desired Conditions and Objectives** | **Indicators** | **Scale** | **Frequency of Reporting** | **Sources and/or Partners** |
| What are the status and trends of soil productivity and hydrologic function? | **DC 2.2.35** Soil productivity is maintained at site potential, or is trending towards site potential.<br><br>**DC 2.2.36** Long-term levels of soil organic matter and soil nutrients (including soil carbon) are maintained at sustainable levels.<br><br>**DC 2.2.38** Management-induced soil erosion, soil compaction, soil displacement, puddling, and/or severely burned soils are rare on terrestrial ecosystems of the SJNF lands.<br><br>**DC 2.2.39** Upland soils exhibit infiltration and permeability rates that minimize surface run-off and allow for the accumulation of the soil moisture necessary for plant growth and ecosystem function.<br><br>**Obj 2.2.45** Within 10 years, restore or improve soil productivity and soil carbon on at least 20 miles of routes that will be closed or decommissioned on the SJNF.<br><br>**Obj 2.2.59** Within 5 years, utilize locally produced biochar to sequester carbon, to reduce erosion, and to enhance soil productivity and water retention on a minimum of 0.5 acre per year on the SJNF. | Soil penetrometer readings (before and after treatment), soil chemistry, and soil carbon results and comparisons with baseline values | Select locations forest-wide | Every 5 years | Project monitoring; TEAMS; Soil Disturbance Filed Guide |

## 4.2 Tres Rios Field Office Monitoring Plan

*This section was applicable only to BLM lands.*

*This page intentionally left blank.*

# CHAPTER 5 – LITERATURE CITED

## 5.0 Literature Cited

Animas River Stakeholders Group (ARSG). 2001. Use-Attainability Analysis of the Upper Animas Watershed. Presented to Colorado Water Quality Control Commission for the adoption of stream standards. Durango, Colorado: Animas River Stakeholders Group.

Bureau of Land Management (BLM). 1985. San Juan/San Miguel Resource Management Plan. Durango, Colorado: U.S. Department of the Interior, Bureau of Land Management, San Juan Field Office.

———. 1986a. Dolores River OHV designation (CO-030-8601).

———. 1986b. Wild Horse Herd Management Area Plan (HMAP). Rev. 1994. Durango, Colorado: San Juan Public Lands Center.

———. 1990. Dolores River Corridor Management Plan. Dolores, Colorado: U.S. Department of the Interior, Bureau of Land Management.

———. 1991a. Colorado Oil and Gas Leasing and Development Final Environmental Impact Statement and Amendment to the San Juan/San Miguel Resource Management Plan. Durango, Colorado: U.S. Department of the Interior, Bureau of Land Management, Montrose District.

———.1991b. Vegetation Treatment on BLM Lands in the 13 Western States. Reno, Nevada: U.S. Department of the Interior, Bureau of Land Management.

———.1994a. *Spring Creek Basin Wild Horse Herd Management Area Plan*. San Juan Resource Area. Durango, Colorado: U.S. Department of the Interior, Bureau of Land Management, Montrose District.

———. 1994b. Alpine Triangle Cultural Resources Management Plan. Durango, Colorado.

———. 1996. BLM Partners Against Weeds: Final Action Plan for the Bureau of Land Management. Billings, Montana: U.S. Department of the Interior, Bureau of Land Management.

———. 1997. *Colorado Public Land Health Standards and Guidelines*. Lakewood, Colorado: Colorado State Office.

———. 1998. *BLM Colorado Handbook of Guidelines and Procedures for Identification, Evaluation, and Mitigation of Cultural Resources*. Rev. 2007. Lakewood, Colorado: U.S. Department of the Interior, Bureau of Land Management.

———. 2000. BLM IM No. CO-2000, Animal Damage Control Activities.

———. 2004. Wildland-Urban Interface Hazardous Fuels Reduction Programmatic Environmental Assessment (CO-SJPLC-03-044 EA). Durango, Colorado: U.S. Department of the Interior, Bureau of Land Management.

———. 2005. Wild Horse Appropriate Management Level in the Spring Creek Basin HMA (EA #CO-800-2005-027). Durango, Colorado: San Juan Public Lands Center.

———. 2006a. IM WO 2006-073: Weed-Free Seed Use on Lands Administered by the BLM.

———. 2006b. *Roads and Trails Terminology*. Technical Note 422. BLM/WO/ST-06/006+9113. Denver: U.S. Department of the Interior, Bureau of Land Management.

———. 2007a. *BLM Vegetation Treatments Using Herbicides Final Programmatic EIS Record of Decision.* Washington, D.C.: U.S. Department of the Interior, Bureau of Land Management.

———. 2007b. *Final Programmatic Environmental Impact Statement on Wind Energy Development on BLM-Administered Lands in the Western United States*. Available at: http://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/im_attachments/2009.Par.34083.File.dat/IM2009-043_att1.pdf. Accessed July 18, 2013.

———. 2007c. BLM IM 2007-097, Solar Energy Development Policy.

———. 2008. BLM Manual 6840, Special Status Species Management (as revised, December 2008).

———. 2009. BLM IM 2009-043, Wind Energy Development Policy.

———. 2009. *Approved Resource Management Plan Amendments/Record of Decision for Designation of Energy Corridors on Bureau of Land Management-Administered Lands in the 11 Western States*. Available at: http://corridoreis.anl.gov/documents/docs/Energy_Corridors_final_signed_ROD_1_14_2009.pdf. Accessed July 18, 2013.

———. 2010a. *BLM Guidelines for a Quality Built Environment*. Washington, D.C.: U.S. Department of the Interior, Bureau of Land Management.

———. 2010b. Instruction Memorandum No. 2010-117, Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews. Washington, D.C.: U.S. Department of the Interior, Bureau of Land Management.

———. 2010c. *Alpine Triangle Recreation Area Management Plan*. Bayfield, Colorado: U.S. Department of the Interior, Bureau of Land Management.

———. 2010d. Canyons of the Ancients National Monument Record of Decision and Resource Management Plan. Dolores, Colorado: U.S. Department of the Interior, Bureau of Land Management, Canyon of the Ancients National Monument. Available at: http://www.blm.gov/pgdata/etc/medialib/blm/co/programs/land_use_planning/rmp/canm/documents/final_rmp_and_rod.Par.99533.File.dat/CANM_ROD_PLAN_with_signature_pages_scanned.pdf. Accessed July 18, 2013.

———. 2011a. BLM IM CO-2011-07 Migratory Bird Treaty Act – Interim Management Guidance (expires September 30, 2012).

———. 2011b. *Sage-grouse National Technical Team. A Report on National Greater Sage-Grouse, Conservation Measures*. December 21. Washington, D.C.: U.S. Department of the Interior, Bureau of Land Management.

———. 2011c. *Integrated Weed Management Plan* (CO-800-2008-075 EA). Durango, Colorado: San Juan Public Lands Center.

———. 2011d. BLM Manual MS-9113 – *Roads Manual*. Rel. 9-390. Washington, D.C.: U.S. Department of the Interior, Bureau of Land Management.

———. 2011e. BLM Handbook H-9113-1 – *Road Design Handbook*. Washington, D.C.: U.S. Department of the Interior, Bureau of Land Management.

———. 2011f. BLM Handbook H-9113-2 – *Roads National Inventory and Condition Assessment Guidance & Instructions Handbook*. Rel. 9-389. Washington, D.C.: U.S. Department of the Interior, Bureau of Land Management.

———. 2011g. BLM Manual MS-1626 – *Travel and Transportation Manual*. Rel. 1-1731. Washington, D.C.: U.S. Department of the Interior, Bureau of Land Management.

———. 2011h. BLM IM 2011-154. *Requirement to Conduct and Maintain Inventory Information for Wilderness Characteristics and to Consider Lands with Wilderness Characteristics in Land Use Plans*. Washington, D.C.: U.S. Department of the Interior, Bureau of Land Management.

———. 2011i. *Environmental Analysis for Fertility Control Program* (DOI-BLM-CO-SO10-2011-0062).

———. 2012a. *Assessment, Inventory, and Monitoring (AIM) Strategy Fire and Fuels.* Washington, D.C.: U.S. Department of the Interior, Bureau of Land Management.

———. 2012b. BLM Handbook H-8342. *Travel and Transportation Handbook (Public).* Rel. 8-82. Washington, D.C.: U.S. Department of the Interior, Bureau of Land Management.

———. 2012c. BLM Manual 6250. *National Scenic and Historic Trail Administration*.

———. 2012d. BLM Manual 6280. *Management of National Scenic and Historic Trails and Trails Under Study or Recommended as Suitable for Congressional Designation.*

———. 2012e. BLM Handbook H-8270-1. *General Procedural Guidance for Paleontological Resources Management*.

———. 2012f. BLM Manual 6330. *Management of Wilderness Study Areas (Public).*

———. 2013. BLM Colorado Tres Rios Field Office. Available at: http://www.blm.gov/co/st/en/fo/sjplc.html. Accessed July 18, 2013.

Bureau of Land Management (BLM) and Advisory Council on Historic Preservation. 1997. Programmatic Agreement among the BLM, the Advisory Council on Historic Preservation, and the National Conference of State Historic Preservation Officers regarding the manner in which BLM will meet its responsibilities under the National Historic Preservation Act.

Bureau of Land Management (BLM) and Animal Plant Health Inspection Services (APHIS) Wildlife Service. 1995. Master Memorandum of Understanding (MOU) between the BLM and APHIS Wildlife Service.

Bureau of Land Management (BLM) and City of Durango. 2000. *Coordinated Resource Management Plan.*

Bureau of Land Management (BLM) and Coevolution Institute. 2007. BLM and the Coevolution Institute Memorandum of Understanding (MOU) WO-230-2007-005.

Bureau of Land Management (BLM), State of Colorado, U.S. Forest Service (USFS), Colorado State Historic Preservation Office (SHPO) and Advisory Council on Historic Preservation (ACHP). 1998. Programmatic Agreement among the BLM, the State of Colorado, the USFS, the Colorado SHPO, and the ACHP regarding the Management of Wildland Fire for Resource Benefits (Agreement No. 1102-002-98-038).

Bureau of Land Management and U.S. Department of Energy (BLM and DOE). 2012. *Solar Energy Development Programmatic Environmental Impact Statement.*

Bureau of Land Management (BLM), U.S. Fish and Wildlife Service (USFWS), and Colorado Parks and Wildlife (CPW). 2003. *Perins Peak Wildlife Habitat Management Plan* (HMP, CO-03 WHA-T1). Durango, Colorado: U.S. Department of the Interior, Bureau of Land Management.

Bureau of Land Management and U.S. Forest Service (BLM and USFS). 2006. *Final Environmental Impact Statement – Northern San Juan Basin Coal Bed Methane Project*. Durango, Colorado: U.S. Department of the Interior, Bureau of Land Management, San Juan Field Office, and U.S. Department of Agriculture, Forest Service, San Juan National Forest.

———. 2008. *Programmatic Environmental Impact Statement and Record of Decision for Geothermal Resource Leasing in the Western U.S.* Washington, D.C.

———. 2010. *Oil and Gas Potential and Reasonable Foreseeable Development Scenarios in the San Juan National Forest and BLM Public Lands, Colorado*. Cortez, Colorado.

Colorado Department of Natural Resources. 2005. *Report on the Health of Colorado's Forests 2004 – Special Issue: Ponderosa Pine Forests*. Denver: Colorado Department of Natural Resources, Division of Forestry.

Colorado Department of Natural Resources, Colorado Water Conservation Board, and Bureau of Land Management (BLM). 2005. Memorandum of Understanding between the Colorado Department of Natural Resources, the Colorado Water Conservation Board, and the BLM regarding the management of water and water uses on BLM lands in Colorado. Available at: http://ocs.fortlewis.edu/forestplan/roundtable/DNR-BLM_MOU.pdf. Accessed July 18, 2013.

Colorado Department of Natural Resources and U.S. Forest Service (USFS). 2004. Memorandum of Understanding between the Colorado Department of Natural Resources and the U.S. Department of Agriculture, Forest Service. Available at: http://cwcb.state.co.us/legal/Documents/GovtAgreements/MOUUSFSApr2004.pdf. Accessed July 18, 2013.

Colorado Department of Public Health and Environment (CDPHE). 2012. Colorado's Section 303(D) List of Impaired Waters and Monitoring and Evaluation List. 5 CRR 1002-93 Regulation #93, Adopted March 30, 2012.

Colorado Department of Natural Resources, Colorado Parks and Wildlife (CPW), Bureau of Land Management (BLM), U.S. Forest Service (USFS), Contractors State License Board (CSLB), and Animal Plant Health Inspection Services (APHIS) Wildlife Service. 1999. Colorado State-level Memorandum of Understanding between the Colorado Division of Natural Resources, the CPW, the BLM, the USFS, the CSLB, and the APHIS Wildlife Service.

Colorado Division of Wildlife. 2006. *Colorado's Comprehensive Wildlife Conservation Strategy and Wildlife Action Plans*. Denver, Colorado: Colorado Division of Wildlife.

Colorado Parks and Wildlife and Bureau of Land Management (CPW and BLM). 1989. *Desert Bighorn Sheep Management Plan*. Denver, Colorado.

Colorado Parks and Wildlife. 2001a. Hermosa Deer Management Plan: Data Analysis Unit D-52.

———. 2001b. San Juan Deer Management Plan: Data Analysis Unit D-30.

———. 2008. Recommended buffer zones and seasonal restrictions for Colorado raptors. Unpublished report. Available at: http://wildlife.state.co.us/SiteCollectionDocuments/DOW/WildlifeSpecies/LivingWithWildlife/RaptorBufferGuidelines2008.pdf. Accessed July 18, 2013.

Colorado Partners in Flight. 2000. *Colorado Land Bird Conservation Plan*. Estes Park, Colorado: Colorado Partners in Flight.

Colorado River Cutthroat Trout Task Force. 2001. *Conservation Agreement and Strategy for Colorado River Cutthroat Trout (*Oncorhynchus clarki pleuriticus*) in the States of Colorado, Utah, and Wyoming*. Fort Collins, Colorado: Colorado Division of Wildlife.

Cooper, D.J., R.A. Andrus, and C.D. Arp. 2002. *Sphagnum balticum* in a Southern Rocky Mountains iron fen. *Madrono* 49:186–188.

Duffy, D.C., K. Boggs, R.H. Hagenstein, R.Y. Lipkin, and J.A. Michaelson. 1999. Landscape assessment of the degree of protection of Alaska's terrestrial biodiversity. *Conservation Biology* 13:1332–1343.

Durkin, P., M. Bradley, S.E. Carr, E. Muldavin, and P. Mehlhop. 1995. *Riparian/Wetland Vegetation Communities of the Rio Grande: A Classification and Site Evaluation*. Report submitted to the New Mexico Environment Department, Surface Water Quality Bureau. Albuquerque: New Mexico Natural Heritage Program, University of New Mexico.

Edison Electric Institute and Avian Power Line Interaction Committee (APLIC). 2012. *Reducing Avian Collisions with Power Lines: The State of the Art in 2012.* Washington, D.C.: Edison Electric Institute and APLIC.

Ellison, L.E., M.B. Wunder, C.A. Jones, C. Mosch, K.W. Navo, K. Peckham, J.E. Burghardt, J. Annear, R. West, J. Siemers, R.A. Adams, and E. Brekke. 2003. *Colorado Bat Conservation Plan.* Colorado Committee of the Western Bat Working Group. Available at: http://www.cnhp.colostate.edu/teams/zoology/cbwg/pdfs/ColoradoBatConservationPlanFebruary2004.pdf. Accessed July 18, 2013.

Federal Land Managers' Air Quality Related Values Work Group (FLAG). 2010. *Federal Land Managers' Air Quality Related Values Work Group (FLAG) Phase I Report – Revised* (2010). Natural Resources Report NPS/NRPC/NRR – 2010/232. Denver: National Park Service

Fitzgerald, J.P., C.A. Meaney and D.M. Armstrong. 1994. *Mammals of Colorado*. Denver: Denver Museum of Natural History; Niwot, Colorado: University of Colorado Press.

Friends of the San Juan Skyway Association. 1995. *San Juan Skyway Corridor Management Plan*. Durango, Colorado: Friends of the San Juan Skyway Association.

George, J.L., R. Kahn, M.W. Miller, and B. Watkins. 2009. *Colorado Bighorn Sheep Management Plan 2009-2019*. Special Report No. 81. Colorado Division of Wildlife, Terrestrial Resources. Available at: http://wildlife.state.co.us/SiteCollectionDocuments/DOW/WildlifeSpecies/Mammals/ColoradoBighornSheepManagementPlan2009-2019.pdf. Accessed July 18, 2013.

Graeter, G.J., K. Buhlmann, I. Wilkinson, and J. Gibbons. 2013. *Inventory and Monitoring: Recommended Techniques for Reptiles and Amphibians*. Partners in Amphibian and Reptile Conservation Technical Publication IM-1. Birmingham, Alabama: Partners in Amphibian and Reptile Conservation.

Grissino-Mayer, H.D., W.H. Romme, M.L. Floyd, and D.D. Hanna. 2004. Climatic and human influences on fire regimes of the southern San Juan Mountains, Colorado, USA. *Ecology* 85:1708–1724.

Gruver, J.C., and D.A. Keinath. 2006. Townsend's Big-eared Bat (*Corynorhinus townsendii*): A Technical Conservation Assessment. U.S. Department of Agriculture, Forest Service, Rocky Mountain Region. Available at: http://www.fs.fed.us/r2/projects/scp/assessments/townsendsbigearedbat.pdf. Accessed July 20, 2013.

Gunnison Sage-grouse Rangewide Steering Committee. 2005. *Gunnison Sage-Grouse Rangewide Conservation Plan*. Denver: Colorado Division of Wildlife.

Hammerson, G.A. 1999. *Amphibians and Reptiles in Colorado*. 2nd ed. Denver: Colorado Division of Wildlife; and Niwot, Colorado: University Press of Colorado.

Hayward, G.D., and J. Verner (eds.). 1994. *Flammulated, Boreal, and Great Gray Owls in the United States: A Technical Conservation Assessment.* General Technical Report RM-253. Fort Collins, Colorado: U.S. Department of Agriculture, Forest Service, Rocky Mountain Forest and Range Experiment Station.

Hink, V.C., and R.D. Ohmart. 1984. *Middle Rio Grande Biological Survey. Final Report*. Army Corps of Engineers Contract No. DACW47-81-C-0015. Tempe, Arizona: Arizona State University Center for Environmental Studies.

Hoover, R.L., and D.L. Wills (eds.) 1984. *Managing Forested Lands for Wildlife*. Denver: Colorado Division of Wildlife and U.S. Department of Agriculture Forest Service.

Howe, W.H., and F.L. Knopf. 1991. On the imminent decline of the Rio Grande cottonwoods in central New Mexico. *Southwestern Naturalist* 36:218–224.

Hunter, M.L., G.L. Jacobson, and T. Webb. 1988. Paleoecology and the coarse-filter approach to maintaining biological diversity. *Conservation Biology* 2.4:375–385.

International Union for Conservation of Nature (IUCN). 1994. Guidelines for Protected Area Management Categories. Gland and Cambridge: International Union for Conservation of Nature.

Kaufmann, M.R., R.T. Graham, D.A. Boyce, W.H. Moir, L. Perry, R.T. Reynolds, R.L. Bassett, P. Mehlhop, C.B. Edminster, W.M. Block, and P.S. Corn. 1994. *An Ecological Basis for Ecosystem Management*. General Technical Report RM-246. U.S. Fort Collins, Colorado: U.S. Department of Agriculture, Forest Service, Rocky Mountain Forest and Range Experiment Station.

Keinath, D.A. 2004. *Fringed Myotis (*Myotis thysanodes*): A Technical Conservation Assessment*. U.S. Department of Agriculture, Forest Service, Rocky Mountain Region. Available at: http://www.fs.fed.us/r2/projects/scp/assessments/fringedmyotis.pdf. Accessed July 18, 2013.

Keith, J.O. 2003. *Abert's Squirrel (*Sciurus aberti*): A Technical Conservation Assessment*. U.S. Department of Agriculture, Forest Service, Rocky Mountain Region. Available at: http://www.fs.fed.us/r2/projects/scp/assessments/abertsquirrel.pdf. Accessed July 18, 2013.

Kingery, H.E. (ed.). 1998. *Colorado Breeding Bird Atlas*. Denver: Colorado Bird Atlas Partnership and Colorado Division of Wildlife.

Kulakowski, D., and T.T. Veblen. 2006. The effect of fires on susceptibility of subalpine forests to a 19th century spruce beetle outbreak in western Colorado. *Canadian Journal of Forest Research* 36(11):2974–2982.

Kushlan, J.A., M.J. Steinkamp, K.C. Parsons, J. Capp, M.A. Cruz, M. Coulter, I. Davidson, L. Dickson, N. Edelson, R. Elliot, R.M. Erwin, S. Hatch, S. Kress, R. Milko, S. Miller, K. Mills, R. Paul, R. Phillips, J.E. Saliva, B. Sydeman, J. Trapp, J. Wheeler, and K. Wohl. 2002. Waterbird Conservation for the Americas: The North American Waterbird Conservation Plan, Version 1. Washington, D.C.: Waterbird Conservation for the Americas.

Landres, P.B., P. Morgan, and F.J. Swanson. 1999. Overview of the natural variability concepts in managing ecological systems. *Ecological Applications* 9:1179–1188.

Liyo, L.J. 2004. Fungus Contamination Prevention Guidelines. In *Procedures for Monitoring and Surveying Boreal Toad Populations.* Presentation from Colorado Division of Wildlife. Available at: http://wildlife.state.co.us/Research/Aquatic/BorealToad/Pages/BorealSurveying.aspx. Accessed July 20, 2013.

Mesa Verde County. 2001. Trail of the Ancients Corridor Management Plan. Cortez, Colorado: Mesa Verde County.

Moir, W.H., B. Geils, M.A. Benoit, and D. Scurlock. 1997. Ecology of Southwestern ponderosa pine forests. In *Songbird Ecology in Southwestern Ponderosa Pine Forests: A Literature Review*, edited by W.M. Block and D.M. Finch. USFS General Technical Report RM-GTR-92. Fort Collins, Colorado: U.S. Department of Agriculture, Forest Service, Rocky Mountain Forest and Range Experiment Station.

Moore, M.M., W.W. Covington, and P.Z. Fule. 1999. Reference conditions and ecological restoration: A southwestern ponderosa pine perspective. *Ecological Applications* 9:1266–1277.

National Park Service. 2001. *Old Spanish trail National Historic Trail Feasibility Study and Environmental Assessment*. Washington, D.C: National Park Service.

Nature Conservancy (TNC). 1982. Natural Heritage Program Operations Manual. Unpublished. Arlington, Virginia: The Nature Conservancy.

NatureServe. 2013. NatureServe Conservation Status. Arlington, Virginia: NatureServe. Available at: http://www.natureserve.org/explorer/ranking.htm. Accessed July 17, 2013.

Neubert, J.T. 1992. Mineral Appraisal of San Juan National Forest, Colorado: U.S. Bureau of Mines Mineral Land Assessment. Dolores, Colorado: U.S. Bureau of Mines.

Norton, D.A. 1999. Forest Reserves. In *Managing Biodiversity in Forest Ecosystems*, edited by M. Hunter, III, pp. 525–555. Cambridge, England: Cambridge University Press.

Noss, R.F. 1987. Protecting natural areas in fragmented landscapes. *Natural Areas Journal* 7:2–13.

———. 1991. Landscape connectivity: Different functions and different scales. In *Landscape Linkages and Biodiversity*, edited by W.E. Hudson, pp.27–39. Washington, D.C.: Island Press.

Noss, R.F., and A.Y. Cooperrider. 1994. *Saving Nature's Legacy: Protecting and Restoring Biodiversity.* Washington, D.C.: Island Press.

Noss, R.F., and R.L. Peters. 1995. *Endangered Ecosystems: A Status Report on America's Vanishing Habitat and Wildlife.* Washington, D.C.: Defenders of Wildlife.

Oliver, A., M. Kram, P. Lyons, S. Neid, R. Rondeau, T. Schulz, C. Pague, and K. Sochi. 2008. San Juan Forest Biodiversity Monitoring Framework Project. Prepared by The Nature Conservancy of Colorado.

Prichard, D. 1998. *A User Guide to Assessing Proper Functioning Condition and Supporting Science for Lotic Areas*. BLM Technical Reference 1737-15. Denver: Bureau of Land Management, National Applied Resource Sciences Center.

Redders, J.S. 2012. Vegetation of the San Juan Public Lands. Working White Paper, August 15, 2001, updated December 7, 2012.

Reed, P.B., Jr. 1988. *National List of Plant Species that Occur In Wetlands: 1988 National Summary*. U.S. Fish and Wildlife Service Biological Report 88(24). Washington, D.C.: U.S. Fish and Wildlife Service, Region 8.

Reynolds, R.T, M. Graham, H. Rieser, R.L. Bassett, P.L. Kennedy, D.A. Boyce, Jr., G. Goodwin, R. Smith, and E.L. Fisher. 1992. *Management Recommendations for the Northern Goshawk in the Southwestern United States*. General Technical Report RM-217. Fort Collins, Colorado: U.S. Department of Agriculture, Forest Service.

Rich, T.D., C.J. Beardmore, H. Berlanga, P.J. Blancher, M.S.W. Bradstreet, G.S. Butcher, D.W. Demarest, E.H. Dunn, W.C. Hunter, E.E. Iñigo-Elias, J.A. Kennedy, A.M. Martell, A.O. Panjabi, D.N. Pashley, K.V. Rosenberg, C.M. Rustay, J.S. Wendt, and T.C. Will. 2004. *Partners in Flight North American Landbird Conservation Plan*. Ithaca, New York: Cornell Lab of Ornithology.

Richards, R.T., J.C. Chambers, and C. Ross. 1998. Use of native plants on federal lands: policy and practice. *Journal of Range Management* 51:625–632.

Rocky Mountain Region. 2010. *Field Guide to Diseases and Insects of the Rocky Mountain Region*. General Technical Report RMRS-GTR-241. Lakewood, Colorado: U.S. Department of Agriculture, Forest Service, Rocky Mountain Region.

———. 2012. The 2012 Aerial Detection Survey Summary for the Rocky Mountain Region (R2) of the US Forest Service [updated 12/20/2012]. Lakewood, Colorado: U.S. Department of Agriculture, Forest Service.

Romin, L.A., and J.A. Muck. 2002. *Utah Field Office Guidelines for Raptor Protection from Human and Land-use Disturbances*. Salt Lake City: U.S. Fish and Wildlife Service, Utah Field Office.

Romme, W.H., M.L. Floyd, and D. Hanna. 2009. *Historical Range of Variability and Current Landscape Condition Analysis: South Central Highlands Section, Southwestern Colorado and Northwestern New Mexico.* Fort Collins, Colorado: Colorado Forest Restoration Institute.

Ruediger, B., J. Claar, S. Gniadek, B. Holt, L. Lewis, S. Mighton, B. Naney, G. Patton, T. Rinaldi, J. Trick, A. Vandehey, F. Wahl, N. Warren, D. Wenger, and A. Williamson. 2000. *Canada Lynx Conservation Assessment and Strategy*. Forest Service Publication R1-00-53. Missoula, Montana: U.S. Forest Service, U.S. Fish and Wildlife Service, Bureau of Land Management, and National Park Service.

San Juan Public Lands Center. 2004. Accelerated Watershed/Vegetation Restoration Plan. Durango, Colorado: San Juan Public Lands Center.

Schmid, J.M., and S.A. Mata. 1996. *Natural Variability of Specific Forest Insect Populations and their Associated Effects in Colorado*. General Technical Report RM-GTR-275. Washington, D.C.: U.S. Department of Agriculture, Forest Service.

Schommer, T., and M. Woolever. 2001. *A Process for Finding Management Solutions to the Incompatibility Between Domestic and Bighorn Sheep*. U.S. Department of Agriculture, Forest Service. Available at: http://www.fs.fed.us/biology/resources/pubs/wildlife/bighorn_domestic_sheep_final_080601.pdf. Accessed January 5, 2012.

Schumacher, B. 2011. *Fossil Yield Potential Classification for San Juan National Forest*. Document on file at the San Juan Public Lands Center, Durango, Colorado.

Scott, J.M., F. Davis, B. Csuti, R. Noss, B. Butterfield, C. Groves, H. Anderson, S. Caicco, F. Derchia, T.C. Edwards, J. Ulliman, and R.G. Wright. 1993. Gap analysis – a geographic approach to protection of biological diversity. *Wildlife Monographs* 1–41.

Seymore, R.S., and M.L.J. Hunter. 1999. *Maintaining Biodiversity in Forested Ecosystems: Part 1 - Principles of Ecological Forestry,* pp. 22–61*.* Cambridge, England: Cambridge University Press.

Siegel, R.S., and J.H. Brock. 1990. Germination requirements of key southwestern woody riparian species. *Desert Plants* 10(1):3–8, 34.

Southern Rockies Ecosystem Project. 2006. *Linking Colorado's Landscapes Phase II Reports: U.S. Highway 160, Wolf Creek Pass; U.S. Highway 160, Durango to Pagosa; U.S. Highway 160, Mancos to Durango; U.S. Highway 550, Animas Valley*. Denver: Southern Rockies Ecosystem Project.

State of Colorado, Bureau of Land Management (BLM), and Colorado State Historic Preservation Office (SHPO). 1998. State Protocol Agreement between the Colorado State Director of the BLM and the Colorado State Historic Preservation Officer regarding the manner in which BLM will meet its responsibilities under the National Historic Preservation Act and the National Programmatic Agreement among BLM, the Advisory Council on Historic Preservation, and the National Conference of State Historic Preservation Officers.

Swetnam, T.W., C.D. Allen, and J. Betancourt. 1999. Applied historical ecology: using the past to manage for the future. *Ecological Applications* 9(4):1189–1206.

Tennant, D.L. 1972. A method for determining instream flow requirements for fish, wildlife and aquatic environment. In *Proceedings of the Instream Flow Requirement Workshop*. Portland, Oregon: Pacific Northwest River Basins Commission.

U.S. Department of Agriculture and U.S. Department of the Interior (USDA and USDI). 1995. *Federal Wildland Fire Management Policy*. December 12, 1995, updated 2001.

———. 2001a. National Fire Plan. A report to the President in response to the wildfires of 2000. Washington, D.C: U.S. Department of Agriculture and U.S. Department of the Interior.

———. 2001b. A Collaborative Approach for Reducing Wildland Fire Risks to Communities and the Environment 10-Year Comprehensive Strategy. Washington, D.C: U.S. Department of Agriculture and U.S. Department of the Interior.

———. 2002. A Collaborative Approach for Reducing Wildland Fire Risks to Communities and the Environment 10-Year Comprehensive Strategy Implementation Plan. Washington, D.C: U.S. Department of Agriculture and U.S. Department of the Interior.

———. 2005. Wildland Fire Use Implementation Procedures Reference Guide. Washington, D.C: U.S. Department of Agriculture and U.S. Department of the Interior.

U.S. Department of Agriculture (USDA), U.S. Department of Interior (USDI), U.S. Department of Energy (DOE), and Council on Environmental Quality (CEQ). 2005. *Report to Congress: Corridors and Rights-of-Way on Federal Lands.* Washington, D.C..

U.S. Department of the Interior and U.S. Department of Agriculture (USDI and USDA). 2007. Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development. Denver, Colorado: U.S. Department of the Interior and U.S. Department of Agriculture.

———. 2008. *Interagency Prescribed Fire Planning and Implementation Procedures Reference Guide*. Washington, D.C: U.S. Department of the Interior and U.S. Department of Agriculture. Available at: http://www.nwcg.gov/pms/RxFire/rxfireguide.pdf. Accessed July 18, 2013.

———. 2009. *Guidance for Implementation of Federal Wildland Fire Management Policy.* Washington, D.C: U.S. Department of the Interior and U.S. Department of Agriculture. Available at: http://www.nifc.gov/policies/policies_documents/GIFWFMP.pdf. Accessed July 18, 2013.

U.S. Department of Energy and Bureau of Land Management (DOE and BLM). 2008. *Final Programmatic Environmental Impact Statement (PEIS), Designation of Energy Corridors on Federal Land in the 11 Western States* (DOE/EIS-0386). Washington, D.C: U.S. Department of Energy and Bureau of Land Management.

U.S. Department of Energy and National Renewable Energy Laboratory (DOE and NREL). 2013. Colorado 50-Meter Wind Map. Available at: http://www.windpoweringamerica.gov/maps_template.asp?stateab=co. Accessed July 18, 2013.

U.S. Department of the Interior (USDI). 1995. *U.S. Department of the Interior Solid Waste and Hazardous Materials Management Compliance Handbook*. Washington, D.C: U.S. Department of the Interior.

———. 1997. Departmental Manual Part 411, Museum Property Management.

U.S. Environmental Protection Agency (EPA). 1998. Interim Air Quality Policy on Wildlands and Prescribed Fires. Available at: http://www.epa.gov/ttn/oarpg/t1/memoranda/firefnl.pdf. Accessed July 18, 2013.

———. 2013. National Ambient Air Quality Standards. Available at: http://epa.gov/air/criteria.html. Accessed June 12, 2013.

U.S. Fish and Wildlife Service (USFWS). 1984. *User's Guide to the Physical Habitat Simulation System*. Instream Flow Information Paper 11.

———. 1990a. *Bonytail Chub Revised Recovery Plan*.

———. 1990b. *Humpback Chub Recovery Plan.*

———. 1991*. Colorado Squawfish Recovery Plan.*

———. 1993. *Section 7 Agreement and Recovery Implementation Program Action Plan.*

———. 1994. *Uncompahgre Fritillary Butterfly Recovery Plan*. Denver: U.S. Fish and Wildlife Service.

———. 1995. *Recovery Implementation Program for Endangered Fish Species in the Upper Colorado River Basin*.

———. 1998a. *Greenback Cutthroat Trout Recovery Plan*. Denver: U.S. Fish and Wildlife Service.

———. 1998b. *Razorback Sucker Recovery Plan.*

———. 2001a. *U.S. Shorebird Conservation Plan* (2nd ed.).

———. 2001b. *Boreal Toad Conservation Plan and Agreement*.

———. 2002a. *Southwestern Willow Flycatcher Recovery Plan*. Albuquerque: U.S. Fish and Wildlife Service.

———. 2002b. USFWS *Birds of Conservation Concern*.

———. 2003. *San Juan* Basin *Recovery Implementation Program.*

———. 2004. *Final Designation of Critical Habitat for the Mexican Spotted Owl: Final Rule.*

———. 2012a. *Mexican Spotted Owl Recovery Plan*.

———. 2012b. October 23, 2012, letter regarding guidance on Section 7 consultation procedures for the southwestern willow flycatcher, USFWS concurrence to the SJNF, December 12, 2012.

———. 2012c. Southwestern willow flycatcher guidance letter from USFWS to Tres Rios Field Office. Available at the Dolores Public Lands Office, Dolores, Colorado.

———. 2013a (updated annually). Annual Uncompahgre fritillary butterfly monitoring and inventory field report and status updates. Unpublished reports, available at USFWS Western Colorado Field Office, Grand Junction, Colorado.

———. 2013b. *USFWS National Survey of Fishing, Hunting, and Wildlife-Associated Recreation.*

U.S. Forest Service (USFS). 1979. Calico Trail Establishment Report. Available at Dolores Public Lands Office, Dolores, Colorado.

———. 1981. *Draft Old Spanish Trail Corridor Management Plan.*

———. 1983. *San Juan National Forest Land and Resource Management Plan*. as amended. Durango, Colorado: U.S. Department of Agriculture, Forest Service.

———. 1990. FSM 2760. Withdrawals Manual.

———. 1991. *Weminuche Wilderness Monitoring Plan for Air Quality Related Values*.

———. 1992a. *Land and Resource Management Plan for the San Juan National Forest*. Durango: U.S. Department of Agriculture, Forest Service, San Juan National Forest.

———. 1992b. Letter of August 27 from USFS Region 2 Regional Forester to Forest Supervisors, Subject: Regional Old Growth Descriptions.

———. 1992c. San Juan National Forest LRMP Amendment #15, and associated Decision Notice for Animal Damage Control.

———. 1994. FSM 2160. *Hazardous Materials Management Manual*.

———. 1996a. *Rangeland Analysis and Management Training Guide* (Rocky Mountain Region).

———. 1996b. Management and Control of Noxious Plants on the San Juan/Rio Grande National Forests, Decision Notice and Finding of No Significant Impact.

———. 1996c. Probable Fossil Yield Classification (PFYC). U.S. Forest Service Paleontology Center of Excellence and the Region 2 Paleo Initiative.

———. 1997. FSM 2700. Special Use Management Manual

———. 1998a. *The San Juan-Rio Grande National Forests Wilderness Management Direction*. Amendment to San Juan and Rio Grande National Forest Land Management Plans.

———. 1998b. Decision Notice, Colorado Trail Management Direction and Route Selection Environmental Assessment, Region 2.

———. 1998c. *Master Plan for the Colorado Trail*.

———. 2000. FSM 7700 – Travel Management, Chapter 7740-Federal Lands Highway Programs. Amendment No.: 7700-2000-1. Washington, D.C.: U.S. Department of Agriculture, Forest Service.

———. 2001a. Programmatic Consultation Agreement for Canada Lynx in Colorado. Agreement between USFS and USFWS. Denver, Colorado: U.S. Department of Agriculture, Forest Service and U.S. Fish and Wildlife Service.

———. 2001b*. USFS Guide to Noxious Weed Prevention Practices (Version 1.0).*

———. 2001c. *Built Environment Image Guide for National Forests and Grasslands*. Publication FS-710.

———. 2004a. *American Marten Species Assessment for the San Juan National Forest*. Durango, Colorado: San Juan National Forest.

———. 2004b. *American Elk Species Assessment for the San Juan National Forest*. Durango, Colorado: San Juan National Forest.

———. 2004c. *Hairy Woodpecker Species Assessment for the San Juan National Forest*. Durango, Colorado: U.S. Department of Agriculture, Forest Service, San Juan National Forest.

———. 2004f. *USFS National Strategy and Implementation Plan for Invasive Species Management* (FS-805 2004).

———. 2005. FSM 7700 – Travel Management, Chapter 7720-Development. Amendment No.: 7700-2005-1. Washington, D.C: U.S. Department of Agriculture, Forest Service.

———. 2005. Guidelines for Engineering Analysis of Motorized Mixed Use on National Forest System Roads. Publication EM-7700-30. Washington, D.C: U.S. Department of Agriculture, Forest Service.

———. 2005a. *Aquatic, Riparian, and Wetland Ecosystem Assessment San Juan National Forest*. U.S. Forest Service, Rocky Mountain Region.

———. 2005b. *Bluehead Sucker: A Technical Conservation Assessment*.

———. 2005c. *Flannelmouth Sucker: A Technical Conservation Assessment*.

———. 2005d. *Roundtail Chub: A Technical Conservation Assessment*.

———. 2006. *San Juan National Forest Aquatic Ecosystem Assessment*. Durango: U.S. Department of Agriculture, Forest Service, San Juan National Forest, Rocky Mountain Region.

———. 2006. FSM 1920. Land and Resource Management Planning Manual.

———. 2006. FSH 2509.25. Region 2 Watershed Conservation Practices Handbook (Region 2 Supplement).

———. 2007. *The Woody Biomass Utilization Desk Guide, National Technology and Development Program 2400—Forest Management, September 2007*. Available at: http://www.forestsandrangelands.gov/Woody_Biomass/documents/biomass_deskguide.pdf. Accessed July 18, 2013.

———. 2008. FSM 7700 – Travel Management, Chapter 7730-Road Operation and Maintenance. Amendment No.: 7700-2008-3. Washington, D.C.: U.S. Department of Agriculture, U.S. Forest Service. Washington, D.C.

———. 2008. Southern Rockies Lynx Management Direction, Record of Decision.

———. 2009a. Memorandum of Understanding between the Colorado Department of Public Health and Environment and the USFS.

———. 2009b. *Continental Divide National Scenic Trail Comprehensive Plan.* Washington, D.C.

———. 2009c. U.S. Forest Service Manual (FSM) 2300 – Recreation, Wilderness, and Related Resource Management, Chapter 2353, National Scenic and Historic Trails. Washington, D.C.: U.S. Department of Agriculture, U.S. Forest Service.

———. 2009d. Record of Decision, Designation of Section 368 Energy Corridors on National Forest System Land in 10 Western States. Available at: http://corridoreis.anl.gov/documents/docs/WWEC_FS_ROD.pdf. Accessed July 18, 2013.

———. 2011. Nationwide Aerial Application of Fire Retardant on National Forest System Land Record of Decision. Washington, D.C: U.S. Department of Agriculture, Forest Service.

———. 2012a. Watershed Condition Framework. Available at: http://www.fs.fed.us/publications/watershed/. Accessed July 18, 2013.

———. 2012b. *National Best Management Practices for Water Quality Management on National Forest System Lands, Volume 1: National Core BMP Technical Guide.*

———. 2013. USFS Watershed Condition Class and Prioritization Information. Available at: http://apps.fs.usda.gov/WCFmapviewer. Accessed July 18, 2013.

U.S. Forest Service (USFS) and Animal Plant Health Inspection Services (APHIS) Wildlife Service. 1998. Master Memorandum of Understanding (MOU) between the USFS and the APHIS Wildlife Service.

———. 2005. IM No. CO-2010-28. Conservation Plan Agreement to participate in the LRMP, signed by the Region 2 Regional Forester (April 28, 2005) and the BLM State Director (April 29, 2005).

———. 2007. *Northern San Juan Basin Coal Bed Methane (NSJB-CBM) project Final Environmental Impact Statement and Record of Decision.* Durango, Colorado: San Juan Public Lands Center.

———. 2012. *Invasive Species Action Plan (Draft).* San Juan National Forest and Tres Rios Field Office.

U.S. Forest Service and Bureau of Land Management (USFS and BLM). 2008. Decision Notice and Finding of No Significant Impact for the Mancos-Cortez Travel Management Plan. Dolores, Colorado: U.S. Department of Agriculture, Forest Service and Bureau of Land Management.

U.S. Forest Service (USFS), Bureau of Land Management (BLM), National Park Service, and U.S. Fish and Wildlife Service (USFWS). 2013. *Interagency Standards for Fire and Fire Aviation Operations* (NFES 2724).

U.S. Forest Service (USFS) and the North American Butterfly Association. 2008. USFS and North American Butterfly Association Memorandum of Understanding (MOU). USFS Agreement # 08-SU-1113-241-298.

U.S. Forest Service (USFS) and Town of Rico, Colorado. 2011. San Juan National Forest and Town of Rico, Colorado Memorandum of Understanding (MOU) 11-MU-11021300-001. Available at: http://www.ricocolorado.org/gov/documents/2011_San_Juan_National_Forest_Town_of_Rico_MOU.pdf. Access 7/18/2013.

U.S. Forest Service and U.S. Fish and Wildlife Service (USFS and USFWS). 2000. Canada Lynx Conservation Agreement. USFS Agreement #00-MU-11015600-013. Missoula, Montana. Unpublished. Updated in 2006.

———. 2008. MOU to Promote the Conservation of Migratory Birds between the USFWS and USFS, Agreement # 08-MU-1113-2400-246.

U.S. Forest Service (USFS) and the Xerxes Society. 2009. USFS Agreement No. 09-SU-11130121-091.

U.S. Geological Survey (USGS). 2008. Assessment of moderate- and high-temperature geothermal resources of the United States. U.S. Geological Survey Fact Sheet 2008-3082. C.F. Williams, M.J. Reed, R.H. Mariner, J. DeAngelo, and S.P. Galanis, Jr.

Utah Department of Natural Resources. 2006. *Range-Wide Conservation Agreement and Strategy for Roundtail Chub (*Gila robusta*), Bluehead Sucker (*Catostomus discobolus*), and Flannelmouth Sucker (*Catostomus latipinnis*).* Publication Number 06-18. Prepared for the Colorado River Fish and Wildlife Council. Salt Lake City: Utah Department of Natural Resources.

Van Loenen, R.E., and A.B. Gibbons (eds.). 1994. *Mineral Resource Potential and Geology of the San Juan National Forest*. U.S. Geological Survey Administrative Report.

———. 1997. *Mineral Resource Potential and Geology of the San Juan National Forest, Colorado*. U.S. Geological Survey Bulletin 2127. Washington, D.C: U.S. Geological Survey.

Veblen, T.T., and J.A. Donnegan. 2005. *Historical Range of Variability for Forest Vegetation of the National Forests of the Colorado Front Range*. Golden, Colorado: U.S. Department of Agriculture, Forest Service, Rocky Mountain Region.

Western Governors Association and U.S. Department of Energy (DOE). 2009. *Western Renewable Energy Zones – Phase 1 Report*. Washington, D.C: Western Governors Association and U.S. Department of Energy.

Wild Sheep Working Group, Western Association of Fish and Wildlife Agencies. 2012. *Recommendations for Domestic Sheep and Goat Management in Wild Sheep Habitat*. Cheyenne, Wyoming: Wild Sheep Working Group, Western Association of Fish and Wildlife Agencies.

Wildland Fire Leadership Council. 2011. Forests and Rangelands. *National Cohesive Wildland Fire Management Strategy*. Available at: http://www.forestsandrangelands.gov/strategy/. Accessed July 18, 2013.

Wright, W. 2011. *Sources of Atmospheric Mercury Concentrations and Wet Deposition at Molas Pass, Southwestern Colorado*. Mountain Studies Institute Report 2011-03. Silverton, Colorado: Mountain Studies Institute. Available at: http://www.mountainstudies.org/index.php?q=content/mercury-deposition-its-effects-san-juans. Accessed July 18, 2013.

Wu, R. 1999. Fire History and Forest Structure in the Mixed Conifer Forests of Southwest Colorado. Master’s thesis, Department of Forest Sciences, Colorado State University, Fort Collins, Colorado.

## Additional Handbooks and Manuals Cited

FSM 1900, Planning
FSH 1909.12, Land Management Planning
FSH 1909.15, Environmental Policy and Procedures Handbook
FSH 1909.17, Economic and Social Analysis Handbook
FSM 1923.03, Land Management Planning
FSM 1950, Environmental Policy and Procedures
FSM 1990.12_80 Wild and Scenic River Management.
FSM 2070, Vegetation Ecology
FSH 2109.13, Grazing Permit Administration Handbook
FSH 2109.14, Pesticide Use-Management and Coordination Handbook
FSM 2200, Range Management
FSH 2309.18, Trails Management Handbook
FSM 2360, Special Interest Areas- Heritage Program Management
FSM 2400, Timber Management
FSH 2409.19, Renewable Resource Uses for Knutson-Vandenberg (K-V) Fund Handbook
FSH 2500. Watershed and Air Management
FSH 2509.13, Burned Area Emergency Rehabilitation
FSH 2509.18, Soil Management
FSM 2542. Drinking Water Standards
FSM 2550, Soil Management
FSM 2580, Air Resource Management
FSM 2600, Wildlife, Fish, and Sensitive Plant Habitat Management
FSH 2609.13, Wildlife and Fisheries Program Management Handbook
FSH 2709.11, Special Uses Handbook
FSM 2710, Special-Use Authorizations
FSM 2720, Special Uses Administration
FSM 2900, Invasive Species Management
FSM 3400, Forest Health Protection
FSM 5100, Fire Management
FSM 5150, Fuel Management
FSM 5400, Landownership Manual
FSH 5409
FSM 5500, Landownership Title Management Manual
FSM 5509
FSM 5590, Landownership Status Manual.
FSM 7300, Buildings and Other Structures
FSH 7309.11, Buildings and Related Facilities Handbook
FSH 7409.11, Sanitary Engineering and Public Health Handbook
FSM 7400, Public Health and Pollution Control Facilities
FSH 7709, Travel Planning Handbook

12/20/2022

# Montezuma County Community Wildfire Protection Plan

## CWPP 2022

James Dietrich
MONTEZUMA COUNTY

# MONTEZUMA COUNTY
# COMMUNITY WILDFIRE PROTECTION PLAN
# (CWPP)
# July 2022

## TABLE OF CONTENTS


Adoption and Approval

CWPP CHAPTER

1.) PURPOSE

2.) PLANNING PROCESS/ INTRODUCTION

3.) DESCRIPTION OF PARTNERS AND COMMITTEES

4.) BACKGROUND AND HISTORY

5.) THE CWPP AREA

6.) FIRE POLICIES AND PROGRAMS

7.) DESCRIPTION OF THE COMMUNITY

8.) WILDFIRE RISK ASSESSMENT

9.) EMERGENCY MANAGEMENT

10.) MITIGATION AND IMPLEMENTATION PLAN

## ADOPTION and APPROVAL

This Montezuma County Wildfire Protection Plan is hereby approved and adopted this 20TH day of December, 2022 as a plan that meets all minimum Colorado State Forest Service Minimum Standards and presents a desired direction for wildfire protection and preparedness of Wildland Urban Interface residents, property, infrastructure, and valued resources.

**Montezuma County;**

Montezuma County Sheriff (Fire Warden) — *(Steve Nowlin, Sheriff)* — Date 11/15/22

Board of County Commissioners — *(Jim Candelaria, Chair)* — Date 12/20/22

*(Kent Lindsay, Vice Chair)* — Date 12/20/22

*(Gerald Kopenhafer, Commissioner of Deeds)* — Date 12/20/22

Office of Emergency Management — *(Jim Spratlen, Emergency Manager)* — Date 11/14/2022

**Fire Protection Districts**

Mancos (FPD) — *(Tony Aspromonte, Fire Chief)* — Date 11/15/22

Dolores (FPD) — *(Mike Zion, Fire Chief)* — Date 11-15-22

Cortez (FPD) — *(Charlie Borden, Fire Chief)* — Date 11/15/22

Lewis/Arriola (FPD) — *(George Deavers, Fire Chief)* — Date 11-14-2022

Pleasant View (FPD) — *(Angela Rohwer, Fire Chief)* — Date 11-14-2022

Towaoc (FPD) — *(Tom Stevenson, Fire Chief)* — Date 11/14/2022

**Colorado State Forest Service** ____________________ Date 11/21/22
*(Ryan Cox, Acting Supervisory Forester)*

**Division of Fire Prevention and Control**
____________________ Date 11/16/22
*(Logan Davis, WFMS UAS Coordinator, Battalion Chief)*

**Federal Agencies;**

National Park Service ____________________ Date 11/18/22
*(Kayci Cook Collins, Superintendent)*

U.S. Forest Service ____________________ Date 11/30/22
(*Patrick Seekins, Forest Service FMO*)

Bureau of Land Management ____________________ Date 11/21/22
(JAMES MICHELS, ACTING FIELD MANAGER)

Bureau of Indian Affairs
Ute Mountain Ute BIA Agency ____________________ Date 11-14-22
*(Irene Herder, Superintendent)*

# 1.) PURPOSE

This Community Wildfire Protection Plan CWPP is an update of the 2011 CWPP. This document has been prepared to assist Montezuma County residents, local governments and land management agencies for the following three primary purposes;

- **PROTECT THE LIVES OF RESIDENTS AND EMERGENCY PERSONNEL.**
- **PROTECT PROPERTY AND CRITICAL INFRASTRUCTURE IN THE WILD LAND-URBAN INTERFACE.**
- **PROTECT KEY ENVIRONMENTAL VALUES AND QUALITY OF LIFE.**

In addition, the purpose of this 2022 update is to;

- Review the existing Montezuma County CWPP to ensure conformance with Colorado Senate Bill 09-001, the Healthy Forest Restoration Act (HFRA) of 2003, and to the 2009 Colorado State Forest Service Minimum Standards for Community Wildfire Protection Plans (CWPP).
- Provide a comprehensive review and update of the existing community risk analysis using the best available data, and an approved methodology (HRVA Mapping) to validate and or correct identified risk areas.
- To recognize the action items that have been accomplished through the 2011 CWPP and to clarify and refine the goals, strategies, and objectives of this 2021 plan.
- Ensure broad collaboration by bringing together diverse federal, state and local interests to; identify essential community values, discuss their mutual concerns for public safety, community resiliency, and natural resources.
- To share information from the updated community risk analysis with private and public - land managers, the Sheriff and Fire Protection Districts to and reduce damage to values identified through the collaborative planning process.
- To foster coordination amongst all stakeholders by creating an “umbrella plan” for managing wildfire risks within Montezuma County.
- To ensure County eligibility for National Fire Plan (NFP) or other funding assistance, provide information to assist communities in recommending fuel reduction projects on private /federal lands.

# 2.) PLANNING PROCESS/INTRODUCTION

This plan update is the result of an ongoing collaborative effort that was started in 2002. The 2022 update builds upon the continued collaboration between stakeholders that has been fostered over the last 20 years. This County level plan is intended to be used as an umbrella for community plans but should not be considered a substitute. A county plan will not provide the detail needed for project-level planning.

The specific collaborative steps taken to create the Montezuma County CWPP have included;

- Held numerous meetings among state and federal fire-fighting entities, Montezuma County Government and local fire protection districts.
- Conducted an evaluation of wildfire risk resulting in the newly created Montezuma County Fire Risk – Communities of Concern Map (attached).
- Conducted a series of community wide and fire district level meetings to inform residents of risks/risk reduction strategies and supporting public and private sector resources, including topics such as: pinion beetle epidemic and drought, the role of fire in the ecosystem, defensible space, evacuations, care of pets and livestock during evacuations.
- Aired the video “First Line of Defense” on the local TV channel.
- Published a news article series on wildfire hazard mitigation. Sent the CWPP draft to key stakeholders for review.
- Developed prototype subdivision-level Fuels Mitigation Plan.
- Continued to improve mapping and technological resources.
- Published a Xeriscape Landscaping Guide which included defensible space strategies and fire-resistant landscaping information and suggestions.

Broad collaborative input is critical for the success of a CWPP. This CWPP update includes new data and information from federal land management agencies, the Colorado State Forest Service as well as the implementation of mitigation measures, public education improvements, and efforts to secure identified equipment needs.

Collaboration during the 2011 CWPP update;

- Met with the Board of County Commissioners to secure authorization and support for the for the current (CWPP) update.

- Held meetings between agency stakeholders including the United States Forest Service, the Bureau of Land Management, The National Park Service, the Colorado State Forest Service, The Ute Mountain Ute Tribe Bureau of Indian Affairs, local Montezuma County Fire Protections Districts, the Montezuma County Office of Emergency Management, and other Non-Governmental Organizations such as Fire wise to review the CWPP.

- Posted notification in the Local Newspaper regarding the proposed CWPP update and allowed a 45 day public comment period.

Collaboration activities during the 2020-2021 update includes;

- Ongoing monthly participation in the Dolores Watershed Resilient Forest Collaborative (DWRF) which includes all of the stakeholders including the public. Montezuma County has participated in DWRF since 2015. DWRF serves as a collaborative hub for strategic fire planning and p[public outreach in Montezuma County.

- Met with the Board of County Commissioners to secure authorization and support for the 2021-22 (CWPP) update.

- Met with Federal and State agency stakeholders to collaborate on the latest GIS and modeling data currently available.

- Held over 25 virtual meetings with local agency stakeholders, under COVID restrictions, to review the existing CWPP and solicit input on updates.

- Posted notification in the Local Newspaper regarding the proposed CWPP update and allowed a 45 day public comment period.

**THE CORE PLANNING TEAM**

The Core Planning team for the 2021 CWPP update includes the following key participants;

- The Montezuma County Sheriff (Fire Warden)
- The Montezuma County Board of County Commissioners
- The Montezuma County Office of Emergency Management
- The Montezuma County Fire Protection Districts
- The Montezuma County GIS Department
- The Montezuma County Natural Resources Department
- The Colorado State Forest Service
- The Colorado Division of Fire Prevention and Control
- The USDA Forest Service Fire/Planning Team (USFS)

- The Bureau of Land Management Fire/ Planning Team (BLM)
- The National Park Service Fire/ Planning Team (NPS)
- Wildfire Adapted Partnership (Formerly Firewise of Southwest Colorado)

The core planning team provided the primary review and re-analysis of the 2011 plan.

**Meetings Held**
The Core Planning group participated in over 20 zoom meetings under the COVID protocol. Team members reviewed the existing CWPP document for accomplishments to identify gaps that may have emerged and to evaluate its continued relevancy to the current conditions on the ground. Comments gathered are incorporated into the updated CWPP text. Mapping and other data reflect the most recent information.

**CWPP Compliance with Colorado State Minimum Standards**
The 2011 CWPP was prepared according to the minimum standards set forth by the State of Colorado. For this 2022 update the minimum standards were also used. The primary difference is that the 2022 update follows the Colorado State CWPP Template format.
In the spring of 2022 the Colorado State Forest Service issued a new set of minimum standards for CWPPs. This Montezuma County 2022 update conforms to both.

**CWPP Update Schedule**
Montezuma County intends to complete a full assessment and update of the County CWPP every 5 years as per the Colorado State Forest Service Minimum Standards.

Electronic copies of the 2022 Montezuma County CWPP can be downloaded from the Montezuma County Office of Emergency Management;
https://montezumacounty.org/services/office-of-emergency-management/

# 3.) DESCRIPTION OF PARTNERS AND COMMITTEES

The Montezuma County 2022 CWPP Update continues the collaborative partnership between the Fire warden, fire protection districts, The Colorado Division of Fire Prevention and Control, the Colorado State Forest Service, Montezuma County, Wildfire Adapted Partnership, and federal land management agencies that have been in-place. Those agencies include;

| | |
|---|---|
| The Montezuma County Sheriff's Department (Fire Warden) | Sheriff Steve Nowlin |
| The Montezuma County Board of County Commissioners | Jim Candelaria (Chair), Gerald Koppenhafer, Kent Lindsay |
| The Montezuma County Office of Emergency Management | Jim Spratlen |
| The Montezuma County Fire Protection Districts | Jay Balfour, Tony Aspromonte, Jeff Yoder, Mike Zion, George Deavers |
| The Montezuma County GIS Department | Doug Roth, Rachel Medina |
| The Montezuma County Natural Resources Department | James Dietrich |
| The Colorado State Forest Service | Mark Lovell |
| The Colorado Division of Fire Prevention and Control | Logan Sands |
| The USDA Forest Service Fire/Planning Team (FS) | Pat Seekins |
| The Bureau of Land Management Fire/ Planning Team (BLM) | |
| The National Park Service Fire/ Planning Team (NPS) | |
| Montezuma Firewise/ Fire Adapted Partnership | Samantha Torres, Becca Samulski |

In addition, private timber industry representatives and the general public all also participate in the Dolores Watershed Resilient Forest Collaborative (DWRF) on a monthly basis. The DWRF Collaborative is one of the most important interfaces Montezuma County has to continue collaborative planning.

The DWRF collaborative; *"is an inclusive local group that shares knowledge and resources to enhance ecological and community resilience to wildfire and other disturbances. We recognize direct links between social, economic, and ecological conditions, and work to enhance our communities' ability to safely live with fire.*"

DWRF partners work to:

- Collaboratively implement forest management activities, including mapping and analyses, policy discussions, direct treatments, and adaptive management.
- Use the best available science to inform community preparedness and land management projects and decisions.
- Increase the capacity of the local forest products industry, and integrate them into forest treatment initiatives that reduce risk and enhance resilience.
- Better prepare for, respond to, and aid recovery from severe wildfire, post-fire effects, and other disturbances.

**Wildfire Adapted Partnership (WAP)**
The local chapter of Wildfire Adapted Partnership (WAP) is also an essential asset to the collaborative process in Montezuma County. WAP is the primary education and outreach organization for Montezuma County. Wildfire Adapted Partnership's core mission is to inspire, educate and enable individuals and communities to protect lives and property from wildfire. WAP assists residents in creating defensible space, planning wildfire evacuations, and preparing for wildfire on the neighborhood level through education and grant opportunities offered through Wildfire Adapted programs.

Wildfire Adapted Partnership offers a defensible space cost-share program, which is designed to partially reimburse qualifying homeowners for the cost of developing defensible space to increase their home's chance of survival and increase firefighter safety when wildfires occur.

https://www.wildfireadapted.org/defensible-space-cost-share

The WAP neighborhood ambassador program empowers Neighborhood Ambassadors to mobilize their community to engage in wildfire safety and wildfire preparedness activities. Ambassadors and their neighbors are connected with trusted wildfire education, partners, assistance with mitigation projects, and more. Neighborhood Ambassadors are the neighborhoods point of contact for local firefighting entities, and more.
https://www.wildfireadapted.org/become-a-neighborhood-ambassador

# 4.) BACKGROUND AND HISTORY

**Montezuma County, Colorado**
Montezuma County is located in the southwest corner of Colorado where it joins Utah, Arizona, and New Mexico at the Four Corners.




*Figure 1.) Montezuma County in relation to the region. Montezuma County highlighted in color.*

Montezuma County elevations range from less than 6,000 feet at the southwest corner of the County to over 13,200' in the northeast portion of the County. The County generally tilts to the southwest direction, evidenced by the prominent drainage patterns in the County. The

Montezuma County landmass is about 2039 square miles in total area. Approximately 11 square miles of the surface is water. In a good year, McPhee Reservoir, the third-largest in the state, accounts for much of the water surface.

Geologists believe the Dolores River once flowed southward to the San Juan River. Around 70 million years ago, the Sleeping Ute uplift occurred, diverting the Dolores River northward on its present course. Lands north of the Dolores River drain into the Colorado River, and south of the Dolores River drain into the San Juan River.




*Figure 2.) Montezuma County significant geographic features.*

**HISTORY OF WILDFIRES IN MONTEZUMA COUNTY**

Fire is nothing new to Montezuma County or the Southwest in general. For centuries it has been a natural, healthy part of the ecosystem. An essential distinction of wildland fires is that all forests do not burn the same way. Tree species vary, and each forest type has a historical fire regime or interval and intensity at which fires occurred. This cycle has been altered over the last 120 years by human uses such as logging, livestock grazing, and fire suppression.

Before Euro-Americans moved west and homesteaded, fire played a positive and natural role in the health of western forests. Research shows that fires recurred periodically for thousands of years. Whether ponderosa pine, pinion/ juniper, or mixed-conifer, each forest type had fire as a recurring disturbance to the ecosystem. The frequent fires typified some fire regimes at low intensity (fire stayed on the ground). In contrast, others experienced fewer fires but burned hotter and more intensely, often as crown fires traveling in treetops.

Native American alterations of the landscape and use of fire from Ancestral Pueblo and Nuuche (Ute) inhabitants of what is now Montezuma County have also played a role in pre-historic fire regimes, though very limited details are available through ethnographic research, tree ring data, or historic records.

**Forest Change**

Montezuma County's forests have seen continued and notable impacts from drought and insect and disease stressors in the years since the last CWPP was written. In the decade before the last update in 2011, Colorado saw one only period of significant, extended drought stress, during 2002, where Extreme and Exceptional levels of drought were seen in the state. During the duration of the last CWPP update, from 2011 through 2020, Colorado experienced 3 periods of significant, drought stress where Extreme and Exceptional drought conditions were seen for an extended period in the state, according to the U.S. Drought Monitor. Additionally, according to NASA's soil moisture condition maps, groundwater percentiles in Montezuma County were fairly consistent from 2011 through 2017, but from 2018 into the current year of 2022, groundwater percentiles have dropped significantly. These conditions combined with significant variability in winter snowpack, which also melts earlier in the spring, pose a significant stressor to Southwest Colorado forests and make it very difficult for trees to employ their natural defenses against insect and disease outbreaks.

Although the results of massive piñon pine mortality, that were so prevalent across the county in years past, has subsided and Sudden Aspen Decline has not been nearly as prevalent as it was, there are other insect issues that are having significant effects on Montezuma County forests now.  For example, Western Spruce Budworm activity in high-country forests in the area has increased significantly. In 2018, 5,100 acres were impacted in Montezuma County, but in 2019, 9,100 acres were impacted in Montezuma County. An increase of 4,000 acres in just one year's time. While Spruce Beetle activity in Montezuma County has been relatively minimal up to this point, spruce trees significantly stressed by Western Spruce Budworm infestation become much more susceptible to future Spruce Beetle attack.

Another concerning agent of mortality in the area is the Roundheaded Bark Beetle. Roundhead Bark Beetle has traditionally been a relatively minor insect pest in h Colorado, generally following behind other bark beetles and having outbreaks of relatively short duration. On "The Glade" just north of Montezuma County, over 31,000 acres have been affected since 1996 with 22,000 acres affected in just 2019. There is also a smaller outbreak of Roundheaded Bark Beetle in Thompson Park in La Plata County just west of the Montezuma County line. So continued Roundheaded Bark Beetle activity in the area could pose a significant risk to Montezuma County's ponderosa pine forests in the future.

**HISTORIC WILDLAND FIRES**

Wildfire is a common occurrence in Montezuma County, however, over the past 30 years wildfires have become more intense and larger. They have also become more frequent, not only in Montezuma County but also in La Plata County to the east.




*Figure 3) Historic Wildfire Perimeters*

Montezuma County recorded fire history goes back as far as the early 1900's. There are 58 total records for fires in Montezuma County, 43 of the events have happened since 2000. The table below lists some of the most notable fires in Montezuma County History since 2000.

*Table 1; Montezuma County Wildfires since 2000.*

| Incident | Date | Size | Cause |
|---|---|---|---|
| Bircher Fire (MVNP) | 2000 | 22,395 | Lightning |
| Hovenweep (BLM) | 2000 | 1,007 | Lightning |
| Pony (MVNP) | 2000 | 4,737 | Lightning |
| Long Mesa (MVNP) | 2002 | 2,286 | Lightning |
| Moccasin (MVNP) | 2003 | 2,731 | Lightning |
| Cash Canyon (BLM) | 2005 | 118 | Human Caused |

| | | | |
|---|---|---|---|
| Trail East (BLM) | 2005 | 2,527 | Lightning |
| Goodman (BLM) | 2007 | 139 | Lightning |
| Little Cahone (BLM) | 2008 | 202 | Lightning |
| Bradfield (USFS) | 2009 | 2,220 | Lightning |
| Rotacap (Private) | 2012 | 320 | Human Caused |
| Weber (BLM) | 2012 | 10,142 | Human Caused |
| Sage Hen (PVT, USFS) | 2016 | 175 | Human Caused |
| Knolls (USFS) | 2016 | 364 | Lightning |
| Draw Fire (USFS) | 2017 | 1,420 | Lightning |
| Burro (USFS) | 2018 | 4593 | Lightning |
| Plateau (USFS) | 2018 | 19,677 | Lightning |
| Yellow Jacket (BLM) | 2020 | 395 | Lightning |
| East Canyon (Private) | 2020 | 2905 | Lightning |
| Hawkins Preserve | 2021 | 133 | Human Caused |

**WILDFIRE CHARACTERISTICS AND IMPACTS**

The three largest wildfires in County history have been over the last 20 years.
All three occurred primarily on public lands and were over 10,000 acres. Two, the Plateau Fire and the Bircher Fire, were around 20,000 acres. Two of the fires resulted from lightning, and one, the Weber Fire, was human-caused. Of the three, the Weber fire probably posed the most risk to human life and property. The Bircher Fire was unique because it was within Mesa Verde National Park, and it threatened priceless prehistoric architecture and historic National Park Service architecture. Major fires have occurred in Mesa Verde National Park in 1934, 1959, 1972, 1989, and 1996 — all started by lightning.

The vast majority of wildland fires historically occur on public lands, and indeed the largest fires in Montezuma County. Most of those fire starts are due to lightning. Human-caused fires have not traditionally been a common occurrence on public lands. With the increased population across the west based mainly on the interest in recreating public lands, this risk factor will likely increase.

Wildfires on private lands have historically been smaller in size primarily due to the rapid response by local fire protection districts and fuel breaks created by land-use patterns such as agriculture. Agricultural operations, irrigation systems, and the network of roads work together to break up continuous fuels making wildfire outbreaks easier to contain.

Wildfire starts on private lands that jump to public lands is a valid concern. BLM lands in the central portion of the County, and the BLM Canyons of the Ancients National Monument (CANM) interface on the west side of the County hold some risk, both from neighboring properties and recreational. The San Juan National Forest interface is also of particular concern, especially in the Summit Lake area north of Mancos. The Mesa Verde Escarpment is

also potentially at risk. However, the population density is very low along most of the interface, which helps moderate the potential human caused starts to some degree. Prevailing winds are also less likely to push fire starts on private lands towards the Mesa Verde escarpment. However, lightning starts remains a threat for the Escarpment. While lightning ignited fires are common and highly visible along the escarpment, the low population density, topography, and prevailing winds make these fires less likely to have a major impact on community residential values at risk. Fires spreading from the escarpment could spread to the Mesa top, threatening National Park structures and causing economic impacts from park closures.

Because fire is a natural part of the forest ecosystem in southwest Colorado, it will always threaten homes built in the wildland-urban interface where homes meet the forest. Understanding fire behavior will help owners determine the best course of action when creating defensible space and building and retrofitting homes and other structures to resist ember intrusion and ignition. Defensible space provides room for firefighters to do their job should wildfire threaten a home. It also improves the chances of a home surviving.

**Heat, Oxygen, Fuel**

Fire needs heat, oxygen, and fuel to burn. Take one of those elements away, and the fire can't burn. Firefighters remove fuels by creating fire lines and fuel breaks and removing oxygen and heat with water and fire retardant. Homeowners can help by eliminating fuel around their homes and creating defensible space long before a wildfire threatens.

These primary factors determine fire behavior;

**1.) Weather (Temperature and wind)**
**2.) Topography/ Terrain features**
**3.) Available Fuels**
**4.) Low moisture content in fuels and low relative humidity**
**5.) Area of fire burning**

Except for the higher mountain elevations, the Southwest Colorado climate is generally an arid climate characterized as a high desert. Wildfires within the County have also exhibited extreme fire behavior. Extreme fire behavior results when several of the components of the fire environment interact to cause the rate of fire spread to increase by 60 times or greater. Where abundant fuels with sufficiently low moisture values are located on a steep slope and combined with strong winds and unstable atmospheric conditions can lead to extreme fire behavior. Each of the conditions can potentially increase fire behavior, so the potential danger increases significantly when all of these conditions occur simultaneously.

Extreme fire behavior, defined as fire behavior that often precludes methods of direct fire suppression and usually involves one or more of the following characteristics:

- High rate of spread and frontal fire intensity
- Crown Fire
- Prolific spotting
- Presence of large fire whirls
- Well-established convective smoke column

Fires exhibiting such phenomena influence the surrounding environment and create dangerous conditions.

So far, Montezuma County has been fortunate regarding lives and property. So far, no lives have been lost directly related to any of the wildfires noted. Likewise, the structural losses across the County have been very low.

The Pony Fire of 2000 carried some of the heaviest impacts on structures within the County. All of the structures impacted were within Mesa Verde National Park. The fire devastated day-use facilities, including restrooms, a ranger station and a visitor shelter. Four shelters that protected ancient pit houses and early pueblos were destroyed, but the sites themselves suffered no damage. The fire threatened several other cliff dwellings but only charred a few ladders in Step House and spalled some rock in the alcove. The ancient building stones remained unharmed. A bridge on the entrance trail was destroyed.

A major update to this community wildfire protection plan including more advanced wildfire risk mapping and detailed mitigation strategies was accomplished in 2011. Then 2012 came as a very tough fire season in Montezuma County. A dry winter and late frost which freeze-dried new oak leaves on the stem, set the area up for a historic fire season.

The Weber Fire took off on June 22, 2012 during a red flag day, racing across Menefee Mountain and causing evacuations, burning a summer camp cabin, and putting the town of Mancos on pre-evacuation notice. Rain came within a few days of residents returning to their homes, causing post-fire debris and mudflow damage to homes, fields, and infrastructure.

Another human-caused fire took off when winds picked up on a pile burn in October. The Roatcap Fire was the second fire in 2012 requiring evacuations and represented extensive fire growth outside of what was normally considered the fire season in Montezuma County. It is now commonly acknowledged that wildfires can occur in Colorado any day of the year.

Notable fires in 2018 included two fires on the Dolores Ranger District of the San Juan National Forest. The high elevation forest was dry enough for fires on both sides of the La Plata’s to climb to treeline, including the Burro Fire which started along a forest trail. These fires demonstrated a greater need to prepare for high-elevation fires. The Plateau Fire was started

by lightning northeast of McPhee Reservoir, at which time the fire risk was determined to be great enough that the national forest was closed to recreation for the first time in history.

The 2019 fire year did not see forced evacuations in Montezuma County, but the season began with a series of arson fires which were fortunately curbed before the worst fire weather conditions.

The 2020 fire year was another intense season. Three lightning caused fires required mutual aid and extended attack. Starting June 14, the East Canyon Fire burned on the ridgetop border between Montezuma and La Plata counties demanding extensive aviation resources and forcing residential evacuations in both counties. The Yellow Jacket and Spring Fires started by lightning on July 6, burned in the pinyon-juniper canyon rims where the BLM-CANM lands meets private lands. A resident north of the airport started a fire while mowing the dry cheatgrass behind his home on July 16 which was running quickly north toward the southwest edge of Cortez.

**COMMUNITY MITIGATION EFFORTS**

Over the past twenty years, Montezuma County stakeholders have all continued to be very proactive in working towards the goals identified in the collaborative process. Each respective stakeholder has had to overcome many challenges and obstacles blocking the path toward each goal. Yet steady, and often remarkable, progress has been made. Annually, 20-25 residents participate in WAP's Chipper Rebate Program and remove fuels form their properties. Wildfire Adapted Partnership has also accomplished dozens of individual defensible-space projects with homeowners in addition to a handful of community-scale mitigation projects. Increase in the WAP Neighborhood Ambassador Program continues to support community level mitigation efforts in subdivisions across the county. Additionally, for homeowners who are interested in mitigating without outside contractors, WAP has provided countless technical expert and advisement.

**MITIGATION GOALS**

**1.) Implement Cross Boundary Landscape Level Fuels Treatment Projects on Public Land and Private Lands.**

- Support the Rocky Mountain Restoration Initiative (RMRI), the Colorado Strategic Wildfire Action Program (COSWAP), and the Collaborative Forest Landscape Restoration Program (CFLRP) and other similar landscape level initiatives.
- Support forest health projects, such as the Dolores Prescribed Fire Eco-System Restoration Project, Lone Pine and Salter Vegetation Management on SJNF public lands adjacent to the WUI.
- Focus on personal responsibility, public health and safety, and first responder safety.
- Emphasize watershed protection.
- Consider critical infrastructure (Water, Power, Gas, Roads, Bridges).

- Consider ecological values.
- Consider socio-economic values.
- Encourage public and private cross boundary fuels treatment partnerships to create fuel breaks.
- Collaborate with private landowners and public lands agencies to identify emergency and develop emergency egress routes in areas of concern.
- Identify and create treatment plans for cross boundary landscape level mitigation projects so that there is a menu of shovel ready projects when funding or crews become available to do work.
- Wildfire mitigation of McElmo Creek Watershed. The High Desert Conservation District would work with private landowners to educate and find partners to support funding/grants to do wildfire mitigation within the canyon/watershed. This could include best practices to preserve the beauty of the canyon while thinning the fuels that currently exist.

**2.) Enhance the use of mitigation and forestry contractors.**

- Support sustainably scaled local timber industries.
- Have regular training opportunities for contractors, property owners, and firefighters to improve their knowledge and skills for fuels treatment.
- Keep an updated list of mitigation contractors and the services that they offer.
- Develop programs and secure grants for treatment of properties where the homeowners do not have the personal ability to do the work or resources to hire professional assistance.
- Provide incentives for chipping and slash removal to reduce accumulation of slash piles throughout County.
- Develop a program to connect those in need of firewood with excess wood where treatment has been done, or with properties where thinning is needed. Consider adopting and promoting Chip Drop: https://getchipdrop.com/

**3.) Increase mitigation by rental and absentee home and property owners.**

- Increase property owner awareness and impress upon property owners the consequences of doing nothing, for themselves, and for their or for neighbors.
- Promote the increased property value from mitigation, and other benefits, to targeted property owners on authority figure letterhead.

**4.) Improve Access and Egress in High Risk areas.**

- Improve Access and Egress in Areas of High Risk. Work with various stakeholders to identify communities that have a larger number of citizens in high risk areas with limited access and egress. Identify/create safer or secondary means of entry/exit.

**5.) Increase Municipal Fuels Mitigation Projects.**

- City of Cortez; The City of Cortez has over 358 acres of open space areas that are in need of fire mitigation. These areas include pinion, juniper and sage brush that would jeopardize many homes if these areas were to catch fire. The areas in questions are spread throughout the City and would be tackled one area at a time. The City would need to hire contactors to complete the work. Benefits include: Reduce potential damage to the community and ecosystems for the area that could be threaten by wildland fires due to dead trees, trash, etc.
- **Town of Dolores**; Bury Electric Supply Lines Feeding Dolores. Form partnerships with Empire Electric to bury existing power line system to prevent damage from natural disasters.
- **Town of Dolores;** Town Evacuation Plan. As part of the Town EOP develop a Town Evacuation Plan that could be implemented quickly and controls the flow of people out of town.
- **Town of Dolores;** Partner with Wildfire/Dolores Watershed Resilient Forest Collaborative. The Dolores Watershed Resilient Forest Collaborative (DWRF) is a not for profit organization whose mission is to Promote forest, community, and watershed resilience through collaboration. The DWRF has developed wildfire risk assessments of every property in Dolores. The project would help property owners implement the assessment recommendations. Funding is needed for the mitigation.
- **Town of Mancos;** Create defensible spaces around properties. Provide incentives for property owners to create defensible space around properties.
- Fuels Mitigation. Reduce the grass, brush, pinon, juniper and other natural fuels density in private property lands that directly pose a threat to public lands. Benefits include: Reducing the fuel load is the first step in wildfire mitigation. Reduced fuels will provide for a healthier woodland and forest.

**6.) Increase Public Education;**

- Provide education to our community on the best way to help your local fire district. Keep it clean, Keep it trim. Remove un-necessary combustibles from around your property. Keep all grass and brush fuels cut and cleared. Social media, flyers, handouts, banners, sign boards. Benefits include engaging the community with helping reduce the severity of fire. Less fires or fewer big fires means less risk to the community.

**7.) Property Addressing.**

- Provide address signs for every property in the fire district: private or public. Benefits include Reduce delays in response. Reduce Risk, as well as assisting in Recovery.

The 2005 CWPP identified five goals and each goal was accompanied by several strategies. Many of the strategies listed have been in play since the plan was written. For unincorporated private lands some of the significant community efforts include:

- **Accomplishment:** Recruitment of neighborhood ambassadors. In 2009, Wildfire Adapted Partnership WAP, established a Chapter in Montezuma County and hired a part-time coordinator to help organize educational efforts within the community.
- **Accomplishment:** Subdivision-level CWPPs have been created for four Montezuma County subdivisions, Elk Stream Ranch, Cedar Mesa Ranches, Cash Canyon / Stinking Springs, and East Canyon.
- **Accomplishments:** The Montezuma County Planning Department keeps a list of contractors and consultants who assist developers and private landowners in developing CWPPS, Fuels Mitigation Plans, and implementing fuels reduction projects on new and existing subdivisions. Many of these contractors and consultants have completed project work in Montezuma County.
- **Accomplishment:** Fire Protection Districts created a Wildfire Prevention and Education Specialist position to provide community out-reach and mitigation consulting. This position has been filled annually since 2002 and has provided extensive educational outreach to the community.
- **Accomplishment:** Mesa Verde has completed a Wildland Fire Situation Analysis was completed, and fuel break was created along the Mesa Verde/Ute Mountain Ute boundary.

Accomplishments since the 2011 update include;

| Prevention | Accomplishments |
|---|---|
| | Calling Cortez dispatch for burning has been made mandatory with some tickets issued for failure to notify. Dispatch notifies callers of any restrictions or predicted fire weather condition concerns. |
| | Cortez Fire now provides regular planning and stand-by assistance for controlled burns in the district. Other departments continue to support controlled burning occasionally, when requested, as training opportunities. |
| | Fire Danger Rating signs have been replaced or updated, several signs added at public lands office, Boggy Draw Trail Head and generally more regularly maintained. |
| | Red Flag warnings are disseminated via Nixle Emergency Alert system to all registered users and on Sheriff's Office App to over 2,000 people as of January 2021. |
| | The county has additional variable message boards and has improved access to CDOT boards, which has established additional fixed message signs South and East of Cortez and for westbound traffic leaving Durango in addition to their mobile variable message warning signs. |
| | The Montezuma County Road Department conducts routine mowing operations in County ROW. Additional special emphasis is now being put on brush and tree removal in critical locations within County ROW. |
| | Defensible Space is continuing to be created and maintained by landowners |

| | |
|---|---|
| | The Montezuma County Fairgrounds (200 ac.) completed fuels reduction work in 2005. |

| Reduce Structure Ignitability | Accomplishments |
|---|---|
| | Presentation on fire resistant retrofitting for Four Corners Home Builders Association (2013) and ignition resistant building materials and landscaping displays at Home and Garden Show 2013, 2014, 2015 |
| | Rapid Risk Assessment program developed and conducted on 1,000+ structure including all of Dolores (completed 2019) |

| Fire Departments neighborhood trainings and | Accomplishments |
|---|---|
| | Evacuation drill in Cash Canyon/ Stinking Springs and East Canyon. East Canyon evacuation readiness was tested again during East Canyon Fire, June 2020. |
| | Mancos Fire Driveway and Response Checks: Big Pine Lake subdivision at Joe Moore and drafting, North Mancos Property Owners Association, and Jackson Gulch. |
| | Cortez Fire has done walk-throughs and community meetings with The Ridge Subdivision. |
| | Incorporation of wildland component in Fire Science Class at Montezuma-Cortez High School |

| Community Education | Accomplishments |
|---|---|
| | The Division of Fire Prevention and Control (DFPC) provided a Certified Burner course hosted by Cortez Fire in 2017, training and certifying individuals to safely and legally conduct burn piles in Montezuma County. |
| | Wildfire Adapted Partnership continues Neighborhood Ambassador Program with 23 high-risk neighborhoods engaged within the county. |
| | The Montezuma County Fire Chiefs Association (MCFCA) maintained a prevention and mitigation specialist position through summer 2013 to support risk assessments and community education programs. |
| | Your home was threatened personalized letters left following a small fire were effective in engaging the Pine Ridge/ Wapiti Rim Neighborhood. |

| | |
|---|---|
| | Wildfire Adapted Partnership began offering Community Assessments (2014) as a simpler alternative to neighborhood scale CWPPs. There are Community Assessments for Kernan Creek Ranches, North Mancos POA, Pine Ridge-Wapiti Rim and Windspread. |
| | Wildfire risk brochures available at public lands office, **fire departments?**, libraries, welcome center, title companies, planning department, town halls, and other community gathering places. |
| | Youth educational programs have been developed and are integrated opportunities with the Montezuma Inspire Coalition. Sporadic classroom and field trips have been provided for pre-school through high school throughout the county upon request. Wildfire Adapted Partnership and San Juan Mountains Association have also offered some of these lessons through summer and after school programs and topics range from prevention to post – fire and are aligned with state educational standards. |
| | Wildfire messages are shared through social media by: Twitter & Facebook? |
| | A post-Weber Fire science fair project was supported for a Mancos High School student (2013-2014). A Dolores High School student participated in a nine week paid internship on wildfire and forestry working with the DWRF Collaborative, Wildfire Adapted Partnership, a private forestry contractor, and the US Forest Service. |
| | Southwest Conservation Corps. The Corps was used for low-income and hard to access mitigation projects. |
| | There is a designated County Public Information Officer and a Joint Information Center |
| | Cortez Fire's Wildland Coordinator position integrates wildland fire into education programs. |

| Mitigation | Accomplishments |
|---|---|
| | Wildfire Adapted Partnerships implemented a Defensible Space Cost-Share program in 2017 which includes most of the county. Residents getting fuel reduction assistance must meet state thinning guidelines and complete any key structure ignitability maintenance, such as moving firewood, enclosing decks, or cleaning out gutters. |
| | Chipper Rental Rebate program offered by Wildfire Adapted Partnership 2013-2020, generally offering $250 for individuals, or $750 for communities HOA's per day for chipper rental or contracted chipping work to support slash removal following hazardous fuel treatment. |
| | The Dolores District of the SJNF has completed a 200' fuel break along the southern edge of the forest boundary. They have also ramped up forest management completing treatments and pile burning around Chicken Creek |

| | |
|---|---|
| | and broadcast burn units in previously thinned areas of Haycamp Mesa and the Boggy Draw area. Larger thinning units are being treated on Haycamp Mesa and are being planned for the entire central ponderosa pine zone of the Dolores District. This has become a target landscape of the Rocky Mountain Restoration Initiative and a Collaborative Forest Landscape Restoration Project has been awarded for the San Juan National Forest with expected funding allocation in 2021 ($10 mil/ year x 10 years). Forest Industry is beginning to grow accordingly. |
| | Larger pile burning projects in the WUI have included completion of jackpot pile burns on the Ute Mountain Tribe's Adam's Ranch, Cooperative Pile Burning at Butler Corner, slash pile burns by BLM at Summit reservoir, by Cortez Fire at Denny lake and near the softball complex, contracted on private lands adjacent to Oakview Subdivision, and by USFS in Chicken Creek Ski Area. |
| | Montezuma County purchased a boom mounted hydro axe and has done some roadside clean-up using the tool. They plan to purchase a boom-mounted drum masticator to replace their hydro axe in 2021 to complete, safer, more aesthetically pleasing roadside maintenance. |
| | BLM Fuels Program purchased a high capacity chipper (2020) to begin supporting slash reduction in the wildland-urban interface. |
| | Roadside shaded fuel breaks have been developed along portions of Roads 26, 35, 38, 38.5, 38.7, 40.2, 40.4, 40.5, 41, 46, K.8, L.4, M.5, P, P2 loop, R.5, R.6, S, T.5, U.6, U.7 |
| | Bulldozer fire lines on west edge and throughout Towaoc were re-dozed and accompanying fuel break thinning alongside (2016). |
| | Brush clearing for 150' adjacent to Vista Verde Village Mobile Home Park (2016) |
| | Defensible Space demonstration sites along Hwy 160 at west exit of Mancos and at community college campus. |
| | 2 mile north-south fuel-break within and between Tri-State and WAPA power line corridors between roads M and R (2014) |
| | City of Cortez mowing and brush removal along irrigation corridor and at Denny Lake in partnership with Cortez Fire to Burn Piles and Wildfire Adapted Partnership to help map out areas at risk within the City. |
| | Mitigation contractor capacity has increased with at least 10 contractors who complete forest thinning projects on private lands who are base in Montezuma County as of 2020. Additional Contractors out of La Plata County have increasingly more frequently completed private lands projects in Montezuma County between 2010 and 2020. |

| RESPONSE | Accomplishments |
|---|---|
| Evacuation | Triage flagging system developed (2019) |
| | Nixle Emergency Notification System developed (# registered users) 4940 and land lines at 7,484. |
| | IPAWS cell network emergency notification system access granted |

| | |
|---|---|
| | Rapid Tag identification carding system adopted for incident responders and evacuees |
| | Agreements for sheltering locations including for pets and livestock with Cortez Recreation Center, Red Cross and The Montezuma County Fairgrounds. |
| Training | Most volunteer and all paid fire protection district firefighters have taken Basic Wildland Firefighting and an annual refresher. DFPC provides support for red-carding. |
| | Private lands wildfire reporting has been improved through NFIRS and WildCAD. |
| | USFS/BLM and DFPC regularly share their training opportunities with FPDs and support FPD training as needed. |
| | The Montezuma County Sheriff's officers, posse, and Search and Rescue (SAR) have had some fire, evacuation, and security training, and experience since the last update, but more is desired. |
| | The first Four Corners Wildland Fire Academy is happening (spring 2022) |
| Response Equipment | There are more multi-frequency radios available among local and federal resources to improve communications. Additional tactical frequencies have been assigned that are programmed on most response unit radios. |
| Response Capacity | The state has mutual aid agreements through an annual operating plan with all local jurisdictions to aid in initial attack during the first 12-24 hour operational period, including aviation resources aerial attack. This has enabled fire chiefs to call for available aerial resources and the Colorado Division of Fire Prevention and Control (DFPC) ground crews during initial attack without hesitation. The federal property equipment incorporated in local departments is now administered through DFPC. |
| | The Colorado Division of Fire Prevention and Control has a type 4 engine and a 10 person seasonal hand crew based near Dolores as a regional resource (added Spring 2020). |
| Water Supplies | New Water Tanks with increased capacity (24,000 gal.) installed at Granath Mesa (2020). |
| | New tenders and pumper/tenders are in operation: Dolores (3,000), Lewis (3,500), Mancos (3,000) |
| | Additional wildland engines: Mancos (two Type 6 ), Cortez (Type 3), DFPC (Type 4) and other departments have replaced with newer equipment. Connectors for Federal and local interoperability have also been added. |

## USDA FS Accomplishments; Southern Forest Boundary (Fuel Break) mastication Project Dolores Ranger District / San Juan N.F.

**Project Description**

This mechanical hand thin, mastication project will be focused along the southern forest boundary on the Dolores Ranger District. The primary purpose of this project is to reduce the understory and ladder fuels that will provide a 200 ft. fuel break adjacent to the Wildland Urban Interface, state and private land boundary. This will provide Firefighters Wildland Fire & Fuels Managers a mitigated area to engage a wildland fire and enable future prescribed fire implementation with a pre-established fuel break adjacent to private lands. This is a proactive approach to mitigate the ever-increasing wildfire threat to our communities at risk.

**Desired Outcome;**

Provide a 24-mile 200 ft. fuel break buffer along the Dolores RD southern forest boundary where terrain allows for the implementation treatment described below (See Project Map).

- 632 total acres treated

**Predominant Fuels:**

Ponderosa Pine with Gambel Oak Understory

**Mechanical Equipment Utilized:**

Type (1, 2 or 3 masticator) & chain saws (limbing ladder fuels & low stumping)

**Project Specifications:**

- Remove 80% of Gambel Oak within the entire project area
- Remove 100% of Gambel Oak from the bole of mature Ponderosa Pine leave trees beyond the drip line.
- Limb all mature leave trees >12 inch DBH up to 8 ft.
- Remove all smaller diameter trees (all species) < 9 inch DBH, option to pile smaller diameter trees near public access for firewood removal.
- Low-Stump all cut trees and brush stubs below 4 inches (if possible)
- Masticate all slash or standing Gambel oak
- Retain all Old Growth Ponderosa Pine > 20-inch DBH
- Coordinate with Recreation staff when adjacent to system trail systems (Ex. Boggy Draw and Chicken Creek ski area)
- Coordinate with Wildlife and Timber Staff for any concerns in the project area.
- Ensure not to remove vegetation (gambel Oak brush) that is used in combination with boulders for travel management closures. (Example: vegetation near a FS gate or boulders in place around a parking area to limit vehicle travel off approved roads).



*Figure 4.) USDAFS Fuel Break Project Map*

# 5.) THE CWPP AREA

The Montezuma County CWPP area ranges from developed parcels in heavily vegetated fire-prone areas (Intermix Communities) and Federal or State lands (Interface Communities). Many other developed parcels are on dry-land farms or mixed croplands which may carry a lower flame length fast moving fires which may be adjacent to heavily forested federal lands or include heavily vegetated ravines or other isolated forest stands.

**Montezuma County WUI;**




*Figure 5; Montezuma County WUI*

WUI is an acronym for Wildland –Urban Interface, or WUI.

WUI is defined as; *"an area within or adjacent to an "at-risk community" that is identified in recommendations to the Secretary of Agriculture in a Community Wildfire Protection Plan, or A WUI is any area for which a Community Wildfire Protection Plan is not in effect, but is within ½ mile of the boundary of an "at risk community".*

*A WUI is also any area that is within 1 ½ miles of an "at risk community" AND has sustained steep slopes that may affect wildfire behavior, or has a geographic feature that aids in creating an effective fuel break, or is in fuel condition class 3. (An area classified as fuel condition class 3 implies that the current condition of the vegetation within the area would not be sustainable due to the absence of two or more natural fire cycles. In other words, an excess of vegetation and fuels has occurred due to the exclusion of fire which naturally reduces the level of forest fuels.) An area adjacent to evacuation routes for an "at risk community" is another example of a WUI."*



FS-008500

An "at risk community" is defined as a community within the wildland urban interface listed in the Federal Register notice, *"Wildland Urban Interface Communities within the Vicinity of Federal Lands that are at High Risk from Wildfire".* OR A group of home and other structures with basic infrastructure and services within or adjacent to federal land is defined as an "at risk community". "At risk communities" are areas where conditions are conducive to a large scale wildland fire disturbance event, thereby posing a significant threat to human life or property.

From Montezuma County's perspective, *all* areas of Montezuma County, both unincorporated and municipal, are adjacent to federal lands and are at some level of risk from wildfire. Therefore, the 2011 Montezuma County CWPP identified the WUI as; "*all unincorporated lands within the County."* This 2022 update goes further to include all Montezuma County municipalities, including Towaoc, within WUI.

The Marshall Fire in Boulder County and the Hawkins Preserve Fire in Montezuma County have illustrated that all our county municipalities are also at-risk communities. Therefore our CWPP area and WUI are the same, County-wide, and include all unincorporated and incorporated lands within the County boundary.

The adjacency to federally managed lands is a substantial factor in the identification of Montezuma County's WUI. While the definition of WUI varies somewhat agency by agency, Colorado Senate Bill 09-001 allows local County governments to define and identify their own WUI so that it fits each County's unique situation.

In 2004, the Colorado State Forest Service prepared an analysis of "Interface areas of High Wildfire Risk" (below) to assist communities in identifying wildland-urban interface (WUI) areas. This coarse-scale analysis identifies much of Montezuma County as a "High Risk "wildland-urban interface and sets the baseline for Montezuma County's hazard analysis. It very closely approximated the WUI as defined by this plan.

The Colorado State Forest Service describes the (WUI) as:

> *"any area where man-made improvements are built close to, or within, natural terrain and flammable vegetation, and where high potential for wildland fire exists."*

The 2005 Montezuma County CWPP identified the WUI as; *"all unincorporated lands within Montezuma County."* This definition was based partly on the default definition in HFRA, partly from the input from stakeholders, and partly due to the geographic positioning and vegetative cover-type of unincorporated lands in the County.

Stakeholder input during 2011 agreed with and validated the position that "all unincorporated lands within the County are WUI." Stakeholders from the Ute Mountain Ute Nation have also identified all Ute Mountain Nation lands (WUI). The Ute Nation definition correlates with the county definition, and this plan will recognize the most current definition of WUI on Ute Nation Lands available.

This 2022 update also concurs with previous CWPP's findings and recommends continuing the view "all lands within Montezuma County" to have a risk of wildfire. All private lands in Montezuma County are near or adjacent to large parcels of heavily vegetated public lands. This proximity increases the risk of wildfire spreading to public lands from private lands. It also increases the risk to the safety and welfare of rural residents from fire starts on public lands.

Like much of Colorado over the last two decades, Montezuma County has experienced rapid growth, especially in the County's unincorporated areas. Major and minor subdivisions created over 2,000 new lots from 1990 to 2005. As of 2022 Montezuma County has 95 major subdivisions. However many of these subdivisions are large lots subdivisions so overall residential density remains low.



*Figure 6; Major Subdivisions*

From 1990 to 2004, the population of Montezuma County grew by 6,000 people (33%), averaging a growth rate of a little over 2% per year. Between 2005 and 2009, Montezuma County's growth rate slowed due to the housing market collapse and the ensuing national recession, yet the area is still experiencing growth. From 2005 to 2009, the county population expanded by 1,208 people (4.7%), averaging a growth rate of .94% per year.

According to the Colorado State Demography Office, the Montezuma County Population has increased by 2.4% annually, going from 25,532 in 2010 to 26,160 in 2019. This growth rate accelerated during the COVID 19 Epidemic of 2020-2021. Nation-wide the same trend has been uniform across rural areas. The long-term results of the urban flight from COVID 19 remain to be seen at the time of this update.

Despite the unknown effect of COVID 19 on long-range rural population trends, newcomers worldwide still find the environs of southwest Colorado highly desirable to homebuilding. The amenity-based migration patterns seen through the late '90s and early 2000s are likely to continue. Colorado Department of Local Affairs population projections indicate that the population of the County will increase by approximately 8,000 people by 2050.

Over the past twenty years, much of the home building activity has occurred in naturally vegetated regions that newcomers hold in high regard. The vegetation which newcomers find so attractive is, in many parts of this County, at increased risk for catastrophic wildfire.

**CHARACTERISTICS OF PRIVATE LANDS IN MONTEZUMA COUNTY**

Montezuma County lies within the greater Colorado Plateau. It generally lies within a gently sloping plain known as the Dolores Plateau. This plain slopes downward toward the southwest, where it drains into McElmo Creek.

Long deep canyons dissect the Dolores Plateau. Mesa tops are generally flat with prime agricultural soils. Agricultural irrigation water return flows contribute to wetlands and riparian environments in the canyons that drain into McElmo Creek. Canyons and other undeveloped lands that are not in crop production typically are grazed.

Altitudes on private lands within Montezuma County range from a low of about 4,840 feet, along the western end of McElmo Canyon, to over 13,000 near private mining claims near the La Plata border. However, most private lands lie within the Dolores Plateau, between 6,000 and 7,200 feet in altitude. The most prominent neighboring topographic features are the La Plata Mountains to the east, The Abajo Mountains to the west in Utah. The Mesa Verde Escarpment, Sleeping Ute Mountain, and Mancos River Canyon are the prominent features to the south.




*Figure 7.) Private and Public Lands in Montezuma County*

Montezuma County has 346,346 acres of private lands, amounting to 27% of the county landmass. Private lands in Montezuma County are primarily a mix of agricultural lands, pasturelands, woodlands, urban and rural residential development. Overall density is low, averaging 12 people per square mile.

The primary irrigated crops are alfalfa and small grains. The main dryland crops are pinto beans and winter wheat. Lands that are not in crop production are often grazed. Ranching still plays a dominant role culturally and economically in Montezuma County as well as surrounding counties.

**CHARACTERISTICS OF FEDERALLY MANAGED LANDS IN MONTEZUMA COUNTY**

Approximately 73% of the total land mass of Montezuma County is under Federal Management. Management obligations are split between the National Park Service, The National Forest Service, The Bureau of Land Management, and the Bureau of Indian Affairs.

*Table 2; Public and Private Lands*

| Public Land and Private Land Area Breakdown<br>Montezuma County, calculated May 2021 | | | | |
|---|---|---|---|---|
| **Jurisdiction** | **Sqaure Feet** | **Acres** | **Square Miles** | **Percentage** |
| BIA | 19,359,281,681 | 444,428 | 694 | 34% |
| BLM | 8,444,415,270 | 193,857 | 303 | 15% |
| CO State | 424,114,037 | 9,736 | 15 | 1% |
| NPS | 2,379,341,775 | 54,622 | 85 | 4% |
| USFS | 11,147,740,090 | 255,917 | 400 | 20% |
| Privately Owned Land | 15,086,850,436 | 346,346 | 541 | 27% |
| **TOTAL** | **56,841,743,289** | **1,304,907** | **2,039** | **100%** |

North of the Dolores River, the lands are managed primarily by the USFS. These USFS lands are locally known as the Boggy - Glade area, Stoner Mesa, and Taylor Mesa. Inholdings within public lands are not abundant but do exist.  Those lands sometimes have been subdivided and have private residences. Other parcels are large and undeveloped, primarily used for grazing or timber production and sometimes conservation easements.  On the east side of the County, a minor watershed drains the Mancos River. A similar mix of public lands and private inholdings exists in the Mancos drainage as well. The timber industry commonly harvests Aspen from large stands on public lands northeast of Mancos.

To the Southwest, most of the lands within the County are BLM or BIA managed. The BLM Canyons of the Ancients National Monument make up most of the west side of the County. Recreation, Oil and Gas Production (primarily $CO_2$), and grazing are dominant natural resource uses across the monument.

The Ute Mountain Ute (UMU) Nation makes up the County's Southern half, and wildfire management is under the Bureau of India Affairs (BIA). The Ute Mountain Tribal Park makes up the eastern half of the UMU Nation, located on the Ute lands between Highway 491 and the La Plata County Line to the east, the New Mexico State Line to the south, and Mesa Verde National Park to the north. The western half of the UMU Nation is bordered by New Mexico and Arizona to the South and Utah to the West. Most of the population lives in Towaoc, located in the Central-west portion of the UMU Nation.

Mesa Verde National Park lies in the south-central portion of the County on another sloping plain dissected by long, deep canyons that drain into the Mancos River. The Ute Nation bounds the south and west sides of the park. The east side of the park and the north side of the park is

mainly managed by the BLM under Area of Critical Environmental Concern (ACEC) or BLM Wilderness Study Area (WSA).




*Figure 8) Public Land Management*

Agricultural uses on public lands consist mainly of grazing. Grazing is typical on lower elevation BLM lands during the winter and USFS lands during the summer. Permittees typically introduce livestock to USFS lands in late spring and follow the retreating snow line as it recedes to higher elevations. Significant stock numbers may be present on USFS lands during the summer and BLM lands during the winter. Evacuation of livestock on public lands during a wildfire poses a significant logistical problem and may not be possible.

Other natural resources include timber resources, Oil and Gas, and locatable minerals. The Boggy-Glade area just north of the Town of Dolores has large stands of Ponderosa Pine harvested periodically. Historically timber harvest in the region focused mainly on the production of board feet of timber. In 2021 timber harvest is viewed differently. Today the local timber industry is recognized as a collaborative partner in forest health. The commercial timber industry has the capacity, knowledge, and infrastructure to conduct prescriptive forest health treatments at a profitable landscape scale but focused on forest health and resiliency to wildfire and insect infestations.

**FIRE PROTECTION IN THE CWPP**
The Sheriff is the Fire Warden in Montezuma County.

**Colorado Revised Statutes Title 29. Government Local § 29-22.5-103. Wildland fires--general authority and responsibilities**

*(2)(a) The sheriff is the fire warden of the county and is responsible for the planning for, and the coordination of, efforts to suppress wildfires occurring in the unincorporated area of the county outside the boundaries of a fire protection district or that exceed the capabilities of the fire protection district to control or extinguish in accordance with the provisions of section 30-10-513, C.R.S .*

**(2016) Colorado Revised Statutes Title 30 - Government – County Officers Article 10 - County Officers Part 5 - Sheriff§ 30-10-512. Sheriff to act as fire warden**

*"Subject to the provisions of the community wildfire protection plan prepared by the county in accordance with section 30-15-401.7, the sheriff of every county, in addition to other duties, shall act as fire warden of his or her respective county and is responsible for the coordination of fire suppression efforts in case of prairie, forest, or wildland fires or wildfires occurring in the unincorporated area of the county outside the boundaries of a fire protection district or that exceed the capabilities of the fire protection district to control or extinguish."*

The Montezuma County Sheriff Coordinates with Local Fire Protection Districts, the State of Colorado, and Federal Wildland Fire Personnel. In addition, the County Sheriff will coordinate cross boundaries with neighboring Colorado Counties and Counties within New Mexico, Utah, and Arizona whenever necessary.

Local Montezuma County Fire Protection Districts are generally well equipped to respond to wildland fires. Each District has at least one brush truck available for initial attack. Other assorted equipment such as protective clothing, hand tools, ATV's and water bladders are also available. In short, the equipment needs for all of Montezuma County's Fire Protection Districts meet the needs reasonably well for the time being.

Montezuma County's Fire Protection Districts are primarily volunteer departments, but there are currently 20 full-time and 8 Reserve/ part-time paid staff. The Towaoc Fire Protection District has 11 full-time and eight reserve/ part-time staff.

Montezuma County firefighters participate in routine training to ensure safety and maximize efficiency. The collaboration process revealed that volunteers commit a great deal of time to

train and respond to calls. Volunteers have full-time employment to balance their commitment to the Fire Protection Districts, creating a problematic situation for additional training, especially out of District or multi-day training. Budgetary limitations also impede additional training.




*Figure 9). Montezuma County Fire Protection Districts*

All fire protection personnel are functional for wildland fire initial attack but do not uniformly hold red-cards. Additional wildland fire training would be beneficial and would expand the preparedness capacity of all Fire Protection Districts. Volunteers are always willing to participate in additional training when it is available. At a minimum, NWCG basic wildland fire training is recommended.

## FEDERAL AGENCIES

### USFS/BLM/NPS

The Dolores District of the San Juan Forest and the Bureau of Land Management Tres Rios Field Office provides wildfire management on US Forest Service and BLM lands, including Canyons of the Ancients National Monument.

The National Park Service includes wildfire management at Mesa Verde National Park, Yucca House National Monument and the Colorado Units of Hovenweep National Monument.

Although there is some annual fluctuation in available resources within the federal agencies, they always have resources on hand to manage, monitor, or suppress wildfire starts within their locality. If local resources are not sufficient to manage wildfire starts, additional resources may be requested through the Durango Interagency Dispatch Center.

During the summer, “severity resources” are often brought in to supplement locally stationed resources. The San Juan Interagency Hotshot Crew is stationed in Durango but may work elsewhere across the nation. Hotshots are a national resource, and besides fires in the local area, they can be assigned to fires across the country. This is the same for the two type III initial attack helicopters located at Ute Mountain and at Mesa Verde and the type II helicopter pre-positioned at the La Plata County Airport.

There is good coordination between federal agencies and local resources. Mutual aid response is adequate and detailed out when conditions or available resources dictate.
The Dolores District conducts prescribed fire and other fuel treatments on approximately 2,500 to 3,000 acres of National Forest land and 500 acres of BLM land per year.

**BIA**

The Bureau of Indian Affairs (BIA) provides wildland fire protection on Ute Mountain Ute Nation lands and coordinates fire suppression in interface areas between Ute Mountain Ute lands and other jurisdictions.

The community of Towaoc also has a paid Fire Protection District (FPD). The Towaoc FPD provides suppression services to the community of Towaoc, mainly with structural fires, and assists BIA with wildland fire suppression wherever needed on Tribal lands. The Towaoc FPD also provides coordinated fire suppression and emergency response in interface areas between Ute Mountain Ute lands and other jurisdictions. The BIA conducts prescribed fire and other fuel treatments on the ground within its jurisdiction as needed and as funding allows.

**WATER SUPPLIES**

Water service providers cannot guarantee fire flows in unincorporated areas of Montezuma County. Many subdivisions throughout the County have municipal fire hydrants that are either not functional or do not provide enough flow to support fire suppression. There have been instances where water lines have collapsed when drafting fire flow out of them in the past. In other cases, drafting has caused severe interruptions to the downstream water supply, creating difficult situations for Montezuma Water Company to handle. Drafting can also potentially generate a backflow contamination situation for the entire water system, potentially creating a health threat for hundreds or even thousands of residents. Water supplies are often

augmented from the Dolores River, areas Lakes, ponds, or irrigation ditches to avoid potential problems.

To further compound the water supply problem, many county residents must haul water into cisterns for their domestic use. County subdivisions can still receive approval without access to municipal water systems or wells. This lack of dependable water supply sources is a significant factor in determining the level of risk for communities and identifying the WUI. Any opportunity to upgrade existing supply infrastructure to accommodate fire flows should be examined and capitalized on if possible.

Montezuma County is fortunate because it is still primarily a rural agricultural county with an extensive irrigation water delivery system, sometimes even on federal lands. Irrigation canals & stock ponds can often supplement water supply, and many such features exist throughout the County.

The County also has three main river systems, The Dolores River, The Mancos River, and McElmo Creek. Many other minor tributaries retain perennial water flow. Return flows from irrigation supplement water flow in some of these streams. Several lakes within the County can provide supplemental water to draft from as well.

Water tenders are critical equipment for all Fire Protection Districts and are essential for initial attack capacity. Fire Protection Districts monitor the age and efficiency of the water tenders and seek repairs, replacements, or additions as the need arises.

# 6.) FIRE POLICIES AND PROGRAMS

Colorado Revised Statutes **30-11-124. Fire Planning Authority;** Provide Colorado Counties with the legal authority to prepare, adopt and implement a county fire management plan. Plans detail individual county fire management policies for prescribed burns, fuels management, or natural ignition burns on lands the State or county owns.

In 2009 Colorado Legislature passed **Senate Bill 09-001 "CONCERNING THE ESTABLISHMENT OF COMMUNITY WILDFIRE PROTECTION PLANS BY COUNTY GOVERNMENTS."**
This act required counties within the State of Colorado to determine fire hazard areas within the unincorporated portion of the county and prepare Community Wildfire Protection Plans (CWPPs) that covered these areas. The act also provided counties in the State,

***"the opportunity to establish a locally appropriate definition and boundary for the wildland urban interface area."***

The Healthy Forest Restoration Act of 2003 required the Colorado State Forest Service to establish minimum standards for developing CWPPs in Colorado. Per **Colorado Senate Bill 09-001**, this plan conforms to the 2021 revised minimum standards and guidelines that counties should consider when developing Community Wildfire Protection Plans (CWPPs).
Fire planning has been an iterative process across the nation. In 2003 the Healthy Forest Restoration Act (HFRA) was signed into law. This act focused on restoring forests and rangeland into healthy fire-adapted ecosystems while reducing wildfire threats to communities.

HFRA established four key planning concepts including;
- Collaborative planning amongst stakeholders
- Identifying and prioritizing hazardous fuels reduction projects
- Assessment of community firefighting capacity
- Reducing structural ignitability.

In 2005, The Montezuma County CFP was modified to become a Community Wildfire Protection Plan (CWPP) to conform to the requirements set forth by the Healthy Forest Restoration Act of 2009 (HFRA).

Colorado revised Statutes **30-11-124. Fire planning authority,** provides Colorado Counties with the legal authority to prepare, adopt, and implement a county fire management plan that details individual county policies on fire management for prescribed burns, fuels management, or natural ignition burns on lands owned by the state or county.

In 2009 Colorado Legislature passed into Law **Senate Bill 09-001 "CONCERNING THE ESTABLISHMENT OF COMMUNITY WILDFIRE PROTECTION PLANS BY COUNTY GOVERNMENTS."** This act

required counties within the State of Colorado to determine whether there are fire hazard areas within the unincorporated portion of the county, and to prepare Community Wildfire Protection Plans (CWPPs) that covered these areas. The act also provided counties in the State,

***"the opportunity to establish a locally appropriate definition and boundary for the wildland urban-interface area."***

The Healthy Forest Restoration Act of 2003 required the Colorado State Forest Service to establish minimum standards for the development of CWPPs in Colorado. Per **Colorado Senate Bill 09-001**, this plan conforms to the 2021 revised minimum standards and guidelines that counties should consider when developing Community Wildfire Protection Plans (CWPPs).
Fire planning has been an iterative process across the nation. In 2003 the Healthy Forest Restoration Act (HFRA) was signed into law. This act focused on restoring forests and rangeland into healthy fire-adapted ecosystems while reducing the threat of wildfire to communities.

HFRA established four key planning concepts including;

- Collaborative planning amongst stakeholders
- Identifying and prioritizing hazardous fuels reduction projects
- Assessment of community firefighting capacity
- Reducing structural ignitability.

In 2005, The Montezuma County CFP was modified to become a Community Wildfire Protection Plan (CWPP) to conform to the requirements set forth by the Healthy Forest Restoration Act of 2009 (HFRA).

## OTHER PLANS

### Montezuma County Land Use Code

The Montezuma County Land Use Code addresses the risk of wildfire under Health, Safety and Welfare. The current Land Use Code applies only to new development and does not apply retroactively to subdivisions legally created before the adoption of the Land Use Code. Minimum lot sizes (excluding special PUDs) are 3 acres. Montezuma County does not require building permits for construction. Only commercial and industrial buildings are required to follow building codes. Montezuma County enforces setbacks for new construction and requires that all interior subdivision roads be built to County Road Standards which ensure fire access. Driveway construction and maintenance is up to the individual property owner but address sign can be picked up from the Fire Protection Districts

The Montezuma County Land Use Code currently requires;

***Health, Safety and Welfare16*** *Fire and Wildfire Protection ♦ Compliance with 5101.3(G); 5304(J); and 5304.3.W.*

***5101.2 Subdivision Policies***. *The following shall be the subdivision policies of Montezuma County:*

> *G. To avoid development in areas that are unsafe or unsuitable due to natural hazards such as flooding, wildfire, unstable slopes; or due to the unfeasibility of providing basic services such as adequate road access, electricity, potable water, sanitation, telephone and fire protection.*

And;

***5101.3 General Design Guidelines***. *Approval of any subdivision will require covenants that at a minimum contain the following design guidelines.*

***G. Wildfire Mitigation.*** *All new subdivisions which are located completely or partially within areas identified as the A or B zone on the Community at Risk Map, or other areas that fall outside of the A or B zone of the Community at Risk Map that have native vegetative cover deemed to be a wildfire risk, will be reviewed for a recommendation of a Wildfire Mitigation Plan or a waiver. Wildfire Mitigation in the subdivision should take place upon development of each lot and overseen by the developer or established HOA, as recommended in Colorado State Forest Service, wildfire mitigation publications.*

***2. Submittal Requirements.*** *The developer will be required to either complete fuels mitigation in the subdivision, as defined in the Wildfire Mitigation Plan, to the following standards:*

> *a. Fuels mitigation to Zone 3 standards on all land within the development boundary.*
>
> *b. Fuels mitigation to Zone 2 standards on all land within existing and proposed roadway and utility easements.*

*Or, complete an affidavit along with minimum covenants that have to be signed and notarized as part of the subdivision to be recorded.*

***5304 Development Plan;*** *The Development Plan is intended to provide written narrative and supporting documentation addressing the issues outlined below. Where Development Plan information can best be presented on a map, it may be included in the map required in* ***5303.2*** *or attached to the narrative as a separate map.*

***J. Wildfire Mitigation Plan;*** *As recommended in Colorado State Forest Service, wildfire mitigation publications as an addendum to this Code, a Wildfire Mitigation Plan shall be prepared defining fuels mitigation requirements to be met within the development boundary.*

***5306.3 Required Accompanying Data.*** *All written submittals included with the Final Plat shall be approved according to the impact level submittal and review requirements of the development. These will include, as applicable:*

***W.*** *If a Waiver is approved by the Planning Department, then a signature of a certified wildfire mitigation specialist verifying completion of fuels mitigation will not be required.*

# 7.) DESCRIPTION OF THE COMMUNITY

**NATURAL ENVIRONMENTS**

Montezuma County has a wide range of vegetation types, climates, and elevations. Generally the elevation and precipitation gradually increase from the southwest to the northeast of the County along a gently sloping plain.

The southwestern low elevation zone is dry and sparsely vegetated with desert shrubs and grasses. This zone ranges from about 5,000 feet to 5,700 feet in elevation and receives 8 to 10 inches of precipitation per year.

The middle elevation zone is dominated by sagebrush, pinyon pine, and Utah juniper. This zone ranges from about 5,700 feet to 7,400 feet and receives 10 to 15 inches of precipitation per year. The middle elevation zone is most suited to agricultural production and is also where most residential development activity has, and will continue to occur.

The highest zone, in the northeastern portion of the County, vegetation consists of Gambel's oak, grasses, areas of Ponderosa pine, large stands of aspen and high elevation spruce and fir forest. This zone ranges from about 7,400 feet to 13,000 feet in elevation and receives 15 to 20 inches of precipitation per year.

Prevailing winds are from the southwest in the summer to the northwest in the winter and are usually strongest in the spring. Overall humidity is low across the county and the desiccating effect of this dry wind has a major impact on fuels and their susceptibility to fire.

**Wildlife**

Montezuma County like much of Colorado is rich in wildlife resources. Many wildlife species including Mule Deer, Elk, Turkey, Grouse, and a variety of songbirds are common throughout Montezuma County. Native shrub lands within the WUI are one of the most important wildlife habitats in the County.

Wildlife is a critically important resource for the state of Colorado and for Montezuma County in cultural and economic terms.

*Table 3; Total Economic Contributions of Big Game Hinting in Colorado (CPW2017)*

| | Output ($millions) | Labor Income ($millions) | GDP Contribution ($millions) | State/Local Taxes ($millions) | Federal Taxes ($millions) | Jobs |
|---|---|---|---|---|---|---|
| Resident | $374.3 | $124.5 | $197.4 | $21.3 | $29.1 | 2,999 |
| Non-resident | $228.2 | $95.1 | $138.6 | $13.0 | $21.3 | 3,305 |
| Total | $602.4 | $219.6 | $336.0 | $34.4 | $50.4 | 6,304 |

Hunting is culturally ingrained in the local community with a high level of participation amongst local community members. Participants are typically active over the course of many years and the participation is often successional, spanning many generations and increasingly, genders.

CPW has been able to characterize hunting effort by destination county within the state over a range of species pursued (CPW, 2013). The Southwest, which includes Montezuma County has the second highest hunter days in the state per year.

*Table 4; Hunter Effort (CPW 2017)*

| | Northwest | North Central | Metro | Northeast | Southeast | South Central | Southwest | **State** |
|---|---|---|---|---|---|---|---|---|
| **Hunter Days per Year** | | | | | | | | |
| Big Game | 760,237 | 110,277 | 28,392 | 43,840 | 85,998 | 237,109 | 342,758 | **1,608,611** |
| Small Game | 113,185 | 69,838 | 4,500 | 123,235 | 39,273 | 47,007 | 40,378 | **437,417** |
| Waterfowl | 16,701 | 76,185 | 958 | 32,842 | 15,826 | 8,028 | 6,704 | **157,244** |

(CPW, 2012 Big Game, Small Game & Waterfowl Hunter Days by County, 2013)
(CPW, 2017 Big Game Hunter days by County, 2018)

The economic contributions of hunting are also important to the County, and to the whole southwest region. Hunting contributions to the Montezuma County economy are estimated to be about 2.8 Million.

*Table 5; Regional Contributions of Hunting*

| County | Output ($thousands) | Salaries & Wages ($thousands) | GDP Contribution ($thousands) | State/Local Taxes ($thousands) | Federal Taxes ($thousands) | Jobs |
|---|---|---|---|---|---|---|
| **Southwest Region** | | | | | | |
| Archuleta | $4,683 | $1,723 | $2,597 | $471 | $389 | 85 |
| Delta | $6,225 | $1,944 | $3,085 | $641 | $455 | 129 |
| Dolores | $2,328 | $909 | $1,306 | $309 | $150 | 71 |
| Gunnison | $8,442 | $3,096 | $4,804 | $825 | $730 | 155 |
| Hinsdale | $1,067 | $221 | $464 | $161 | $56 | 13 |
| La Plata | $8,877 | $3,332 | $4,971 | $627 | $748 | 121 |
| Montezuma | $2,855 | $1,185 | $1,600 | $263 | $253 | 70 |
| Montrose | $8,299 | $2,682 | $4,288 | $771 | $646 | 175 |
| Ouray | $1,686 | $780 | $979 | $144 | $151 | 27 |
| San Juan | $713 | $205 | $341 | $88 | $50 | 8 |
| San Miguel | $2,832 | $1,170 | $1,735 | $273 | $254 | 35 |

Private lands in Montezuma County are especially important to big game species such mule deer, as it makes up a large portion of the winter range. Private lands generally lie within the 5,700’ to 7,400’ elevations. Big game follow predictable migration routes to and from higher elevations on a seasonable basis. Snow-fall is not typically as deep at these elevations making food more accessible. Mid-elevations also correlates with the most productive native shrub communities which is one of the most valuable habitat types.

Quality wildlife habitat is essential to maintaining healthy wildlife populations. Maintaining large areas of quality big game habitat within the private land base is critical in ensuring the health of Montezuma County Big Game. Wildfire mitigation and fuels reduction treatments can often have a positive wildlife component. Private landowners are encouraged to consult with CPW on large scale fuels reduction projects to design projects with net benefits and minimal impacts to wildlife.

## Culture

Montezuma County is a traditional western natural resource based community. Montezuma County as we know it has its roots in mining. In 1873 a small party of prospectors found what was to become the "Comstock Mine" in the La Plata Mountains of eastern Montezuma County. By 1874 the Town of Mancos was laid out to support the expanding mining operations in the Mountains.




*Figure 10.) Historic Rail Routes (Galloping Goose Historical Society)*

Montezuma County was split form La Plata County in 1889 and by 1891 the Rio Grande & Southern Railroad connected Mancos and Dolores with the mining Districts in Rico and Telluride, but also with Durango and Silverton.

Agriculture has historically been the main economic driver of the County and it is still is to a large degree. Montezuma County's geographic position also made it the gateway to the Rico Mining District which was connected by rail at one time. This locational advantage allowed local agriculture in Montezuma County to flourish. Rico proved to be a prime market for produce and livestock to sustain the Rico mining operations. The railway made shipping goods to Rico easy and profitable.

Montezuma County also had an abundance of timber resources including large stands of mature ponderosa on gently rolling, easy to log, terrain. Between the need for timbers to support mining operations, the need for rail road timbers to support expanding rail road lines, and an expanding urban demand, ponderosa pine timber stands had a ready market and lumber production became a dominant industry in the County.



*Figure 11.) Ponderosa Logs 1930's -40's (Robert Orr Collection)*

By 1924 the timber industry had consolidated and centralized its operation into one company mill and town site on the Dolores River known as McPhee.



Figure 12.) McPhee Town Site and Mill (Robert Orr Collection)

At its peak the Town had a population of approximately 1,400 individuals, and produced more than half of the State's annual timber production. The Town was destroyed by a fire in 1948, but by then most of the easily accessible timber had already been harvested. Ironically the town of McPhee had been built on "planned obsolesce" anyway.

When planning for McPhee those involved faced two choices. Either build a smaller plant scaled to the accessible resources designed to stay in business for the long term. Or, build a plant based on maximum production but designed to outstrip the supply in about 18 years. The New Mexico Lumber Company chose the latter and the Town of McPhee lasted a total of 24 years, six years longer than it was intended.




Figure 13.) Montezuma County Municiplaities.

Montezuma County has three main municipalities outside of the Ute Nation. Towaoc, population 1,153, is the only Ute Nation municipality within Montezuma County.

The Town of Dolores, population 825, is located in the north central Montezuma County, (Township 37 North, 15 West). Dolores is located on the Dolores River and adjacent to McPhee Reservoir, the third largest reservoir in the State. Dolores is also adjacent to the SJNF.

Mancos, population 1,627, is located in the east central portion of the County, (Township 36 North, 13 West). Mancos is located on the Mancos River and adjacent to the SJNF and BLM Weber and Menefee Mountains Wilderness Study Areas (BLM WSA's).

The City of Cortez, population 8,675, is the county seat of Montezuma County. Cortez is located near the geographic center of the county, (Township 34 North, 36 West). The City is adjacent to the BLM Cortez SRMA and the BLM Phi's World trail park.

The total population of the County was about 26,160 in 2019, according to the US Census Bureau. The population of the unincorporated portion of Montezuma County is about 14,904.

Growth within Montezuma County can be generalized as "moderately paced", and nearly evenly split between the municipalities and the unincorporated areas of the County.

*Table 6; Montezuma County Population Statisitics (Colorado State Demography Office)*

| COLORADO POPULATION ESTIMATES BY COUNTY, 2010-2019 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Area | July 2010 | July 2011 | July 2012 | July 2013 | July 2014 | July 2015 | July 2016 | July 2017 | July 2018 | July 2019 |
| MONTEZUMA COUNTY | 25,532 | 25,434 | 25,439 | 25,506 | 25,476 | 25,690 | 25,981 | 26,098 | 26,145 | 26,160 |
| Cortez | 8,484 | 8,468 | 8,477 | 8,508 | 8,496 | 8,543 | 8,652 | 8,715 | 8,743 | 8,723 |
| Dolores | 936 | 931 | 931 | 934 | 935 | 944 | 956 | 962 | 963 | 966 |
| Mancos | 1,337 | 1,331 | 1,335 | 1,339 | 1,346 | 1,357 | 1,398 | 1,411 | 1,418 | 1,419 |
| Unincorporated Area | 14,775 | 14,704 | 14,696 | 14,725 | 14,699 | 14,846 | 14,975 | 15,010 | 15,021 | 15,052 |

*Figure 14.) Montezuma County Population Statistics. (Colorado State Demography Office)*

The most growth in Montezuma County has occurred in the unincorporated area of the county. Population in the incorporated areas grew by 277 individuals, or 1.8% annually between 2010 and 2019. Montezuma County population is 47% urban and 53% rural.

Municipalities in Montezuma County grew at much the same rate.

- The City of Cortez had the next greatest population increase, growing by 239 individuals or 2.8% annually.

- Mancos grew by 82 individuals resulting the greatest percentage annual growth of 6.1%.
- The Town of Dolores grew by 30 individuals and an annual percentage grow of 3.2%.

*Table 7; Rental vs. Owner Occupied Units(US Census Bureau)*




Montezuma County, Colorado
Household Types

| Type | Owner | Renter |
|---|---|---|
| Married | 82.3% | 17.7% |
| All | 72.1% | 27.9% |
| Non Family | 62.4% | 37.6% |
| Male | 58.9% | 41.1% |
| Female | 56.4% | 43.6% |

72.1% Rate of Home Ownership

The rate of home ownership in Montezuma County is currently about 72 %.

Montezuma County is currently experiencing a real-estate rush largely driven by people who are fleeing the large urban areas. Partly fueled by the COVID 19 pandemic, and also the realization that remote working is more viable than ever, many urban refugees are opting to relocate to areas with greater access to public lands and recreational opportunities.

Furthermore many people are choosing to flee the violence and rioting that has dominated many of the large urban areas especially during the summer of 2020. Whether or not this trend continues remains to be seen but regardless Montezuma County is experiencing a housing crisis.

*Table 8; Current Housing Market Data 2021*

## Montezuma County

| Single Family | June | | | Year to Date | | |
|---|---|---|---|---|---|---|
| Key Metrics | 2020 | 2021 | % Change | Thru 6-2020 | Thru 6-2021 | % Change |
| New Listings | 53 | 65 | + 22.6% | 284 | 299 | + 5.3% |
| Pending Sales | 47 | 51 | + 8.5% | 192 | 234 | + 21.9% |
| Closed Sales | 31 | 42 | + 35.5% | 160 | 217 | + 35.6% |
| Days on Market Until Sale | 124 | 82 | - 33.9% | 114 | 100 | - 12.3% |
| Median Sales Price* | $279,000 | $292,500 | + 4.8% | $245,250 | $265,000 | + 8.1% |
| Average Sales Price* | $309,055 | $405,069 | + 31.1% | $281,027 | $322,715 | + 14.8% |
| Percent of List Price Received* | 95.8% | 99.2% | + 3.5% | 96.2% | 97.9% | + 1.8% |
| Inventory of Homes for Sale | 237 | 106 | - 55.3% | — | — | — |
| Months Supply of Inventory | 7.3 | 2.6 | - 64.4% | — | — | — |

Montezuma County has a relatively high percentage of residents that are considered to be especially vulnerable to wildfire. Many of these individual reside in rural residences.

Over 20% of the County population is over the age of 65 and that population appears to be increasing.

*Table 9; Vulnerable Populations*

### Vulnerable Populations

The population of Montezuma County is 25,909. Potentially vulnerable populations may experience difficulty preparing for and responding to wildfire.

| | Number | | Percent | |
|---|---|---|---|---|
| Families in poverty | 728 | ±152 | 10.6% | ±2.2% |
| People with disabilities | 4,446 | ±378 | 17.3% | ±1.5% |
| People over 65 years | 5,353 | ±353 | 20.7% | ±1.4% |
| Difficulty with English | 141 | ±121 | 0.6% | ±0.5% |
| Households with no car | 255 | ±80 | 2.4% | ±0.8% |
| Mobile homes | 2,066 | ±267 | 19.5% | ±2.5% |

**Socio-economics**

Socio-economically, Montezuma County is strongly tied to the landscape and natural resources. Montezuma County's three main economic drivers are; Oil and Gas Production (mainly $CO_2$), Agriculture and Tourism. All of which are natural resource dependent. Oil and Gas production has been the financial back bone of Montezuma County for over 30 years now.

*Table 10; Montezuma County Assessors Abstract*




Montezuma County Assessor's 2020 data shows over 56% of the County revenue comes from $CO_2$ Production. $CO_2$ production declined by over 30% in 2021 and that trend is expected to continue over time with reserves expected to be depleted within 20 years.

Despite the decline in $CO_2$ natural resource production is expected to remain a strong part of the local economy. Landscape scale forest health projects are reviving the timber industry locally, and the conversion over to renewable energy will necessitate the use of critical minerals and metals. The northeast portion of the County has numerous mineral deposits that may one day become economically feasible to recover.

Agriculture remains one of the backbone industries for Montezuma County, though not as prominent as it once was, agriculture remains an important contributor the local economy. The primary irrigated crops include alfalfa and small grains. The main dryland crops are pinto beans and winter wheat, which can also pose a fire risk as the crop matures.
Tourism has been rooted in the Montezuma County economy at some level since the turn of the century when Mesa Verde was designated as a National Park in 1906 and welcomed 27 visitors. Visitation at Mesa Verde has steadily increased over the years and is presently hovering over 500,000 annually, with a high of 613,788 in 2017.

Increasingly tourism, and in particular "recreational tourism" is being promoted at the state and national levels as a replacement for "extractive" industries. Whether or not recreation is the economic power-house being promoted remains to be seen, however, the effects of recreational tourism are already evident on many of our public lands. Public lands managers across the region have noted a substantial uptick in visitor use from 2019 -2021. Economically this is good news for Montezuma County and County municipalities. Fortunately Montezuma County is in a good position to take advantage of many of the nationally known public recreational resources including Mesa Verde National Park, Hovenweep National Monument, and The Canyons of the Ancients National Monument, The San Juan National Forest and the Bureau of Land Management Tres Rios Field Office.

The BLM also manages the Cortez Special Recreation Management Area (SRMA) which is a conglomerate of several BLM SRMA's including the nationally renowned Phil's World Trail Park, the Summit Trail Park, the Chutes and Ladders Trail Park and dispersed camping area, The Mud Springs Trail Park, and the Aqueduct Trail Park.

The key to the continued economic success of recreational tourism is to maintain a high quality recreational setting. Resident and visitors alike want to recreate in clean and healthy forests. Therefore excessive fuels and unhealthy forest conditions threaten a growing recreational industry.

Montezuma County is within easy driving distance of several cities, including Denver (382 miles), Albuquerque (275 miles), Salt Lake City (350 miles), Santa Fe (286 miles), and Phoenix (410 miles). However the County is about 150 miles form an interstate highway in any direction. The easy access into the whole four corners region is expected to draw increasing numbers of urban residents seeking to escape city life and experience their public lands. With increasing numbers of those individual able to work remotely it is anticipate that the recreational quality of Montezuma County will be a significant factor in visitation as well as migration for the foreseeable future.

As the Oil and Gas sector declines in Montezuma County it is anticipated that reliance on other economic sectors will increase, and new economic opportunities will be sought. Currently remote working and tourism seem to be the economic sectors with the most growth potential. Both favor a natural resource conservation strategy over natural resource production. Never-the-less the global demand for natural resources is increasing rather than decreasing. It is expected that natural resource production of some sort will remain important to the Montezuma County economy in the future.

One of the main obstacles to diverse economic growth in Montezuma County is its access and geographic location. The County, while nearly equidistant from major western metropolitan hubs including Denver, Salt Lake City, Phoenix and Albuquerque, is relatively remote. Everything rolls in and out of the County on rubber and the nearest interstate highways, I-70 and I-40 are nearly 150 miles north and south of the County. This isolation, combined with abundant access to public lands and cultural resources make Montezuma County very desirable for tourism and remote working, but hinders other economic development including the expansion of the forest products sector.

**MONTEZUMA COUNTY ROAD SYSTEM**

Montezuma County has a well-developed and maintained road system throughout the private lands portion of the county. Along the private-public interface county roads often continue into USFS or BLM lands. These road connections with our public lands are important economically

and culturally, by providing access to natural resources as well as recreational opportunities. They are also critical for access to complete mitigation work and for fire suppression.

The Montezuma County Road system is generally laid out on a section line grid wherever the terrain is accommodating enough. Most of the private lands, and infrastructure, lie on the Dolores Plateau which is a gently sloping mesa top, incised by deep canyon drainages running south west. Access is good to most of the private lands due to the more gentle terrain.

Montezuma County roads are classified into three categories;

1. **Green Roads**; (Montezuma County) County Jurisdiction, County maintained 60' wide public ROW. These roads are typically maintained in good condition. Some unimproved or non-maintained roads are within the County roads system in the more remote locations.
2. **Red Roads**; (Not Montezuma County) Not-owned or maintained by Montezuma County Roads and Bridges. These roads are typically privately owned and privately maintained. If the road is within a subdivision the roads is required to be built to county road standards and may be dedicated public ROW in some cases. Outside of subdivisions, many red signed roads are private driveways.
3. **Orange Roads**; (Routes managed by another jurisdiction) Orange signed roads are typically public ROW's managed by federal agencies. Travel restrictions may be in place. Some roads may be suitable only for high clearance vehicles.




*Figure 15.) Montezuma County Road System*

Generally speaking, "Green signed" County Roads are graveled or chip sealed, and regularly maintained. In some cases however roads may be "unmaintained" County Roads, not maintained in the winter, or maintained to a minimal level, for example being bladed once per year. Typically level of maintenance correlates to the level of use. The higher the level of public use, the higher the level of maintenance. Montezuma County also applies mag chloride on some select graveled County Roads to reduce the level of dust and as a binder to prevent erosion of gravel surfacing.

Montezuma County Roads are in overall excellent shape. However, few County Roads have a base that is engineered for heavy loads. In particular for large trucks. Montezuma County typically works with industries that require the regular use of heavy trucks to develop long range maintenance plans. This includes industries such as the oil and gas industry, mining industries, or timber industries.

Heavy truck traffic is the leading cause of road deterioration in the county. To offset the damage heavy loads cause, and to help alleviate associated social problems, the County typically designates truck routes and establishes a maximum speed limit on a "per project" basis. The County also may charge road impact fees, negotiate a lump sum amount to offset possible road damage, or require bonding with specific businesses.

In 2018 Montezuma County also passed a resolution in support of the timber industry which would provide a weight exception for logging truck up to 97,000 Lbs. which is commensurate with the State of Colorado CDOT weigh limits on specific roads. The Timber Industry Resolution was passed to help support the proposed San Juan National Forest Dolores District timber sales, and supports a strong and sustainable timber industry within Montezuma County and the region for the health safety and welfare of the citizens and the proper stewardship of its natural resources.

Many County roads traverse heavily vegetated landscape. Montezuma County conducts mowing operations and vegetation removal on an as-needed basis for the purpose of ensuring visibility and road safety. Mowing and vegetation removal for purposes of fuels reduction is not a typical Road Department activity. Vegetation removal along roadsides could be beneficial in certain circumstances. Removing vegetation from County ROW may require cooperation from private landowners since property lines are often the center line of the road, or across.

Maps of the Montezuma County Road system can be found on the County website at Montezuma County .org; https://montezumacounty.maps.arcgis.com/apps/webappviewer/index.html?id=c150a0ba951a4df68a31ffacde80045e

## MONTEZUMA COUNTY LAND USES

The NRCS Land Use Land Cover Type (LULC) mapping provides an excellent overview of the character of Montezuma County. Land cover refers to the surface cover on the ground like vegetation, urban infrastructure, water, bare soil etc. Land use refers to the purpose the land serves, for example, recreation, wildlife habitat, or agriculture. NRS periodically updates the LULC maps making it possible to track landscape scale trends and changes over time. For example the LULC Map for Montezuma County done in 2007 clearly shows the effects of the Mesa Verde Fires at the landscape scale.




*Figure 16.) Land Use Land Cover type (NRCS)*

The Montezuma County LULC map provides a good picture of the predominantly agricultural nature of the County. Agricultural lands uses clearly dominate the private lands within Montezuma County and illustrates the relationship between terrain and settlement patterns. Intermingled, and often intertwined with agricultural uses, is the counties rural residential base.

Many of the residential homes in the community are associated with larger agricultural tracts. Others are simply places of residence, and many are located on land not suited for agriculture, such as lands with poor soils, excessive slopes, or lack of access to irrigation water.

Residential land use is increasing across the unincorporated regions of the County. The COVID 19 Pandemic has accelerated the growth to some extent in the unincorporated area, largely due to the remote working trend. Remote working is likely to remain a lingering effect of the COVID 19 Pandemic, and could lead to increased rural development.

**MONTEZUMA COUNTY SUBDIVISIONS AND DEVELOPMENT PATTERNS**

Subdivisions can give some indication of where County growth is occurring. Subdivisions occur any time a legally created parcel of land is split, or divided, into one or more additional parcels. Subdivision of land in Colorado is governed by Colorado Revised Statutes Title 30. Government County § 30-28-133. Subdivision regulations.




*Figure 17.) Montezuma County Major Subdivisions*

Colorado Revised Statues Title 30 was enacted to provide some regulation over the subdivision of land in Colorado, and it required counties to pass regulations to regulate parcels of land smaller than 35 acres, and preclude property owners in most circumstances from unilaterally subdividing their property without complying with Title 30.

Montezuma County currently has over 600 subdivisions total; 95 are considered major subdivisions with three or more lots. Subdivisions in Montezuma County can range from 1 lot

to over 100 lots. The number of lots however does not necessarily correlate with actual residential density. Many of the subdivisions in Montezuma County are large lot subdivisions, 35 acres or larger, and could be subdivided further. However many parcels remain undeveloped, and many may never be developed to the full density allowed by the Montezuma County Land Use Code. Under County regulations each lot can potentially have two home sites made up of 1.) a primary residence and 2.) a "mother-in-law quarters". Many of the larger subdivisions in the County already voluntarily place deed restrictions to prevent additional development.

Subdivisions in Montezuma County are largely clustered within the central portion of the County. This is in part due to the accessibility of utilities, and proximity to urban services. Many of the more remote areas of the county lack access to water, gas, and electric. While this does not completely preclude development as Montezuma County has a growing off-the grid-culture, it does keep density low since larger off-the-grid parcels are financially unattainable for many local residents.




*Figure 18.) Water Service Areas*

New growth is expected to largely follow the water supply. Development within the Dolores River Valley, McElmo Canyon and the Mancos Water shed is largely dependent on well water.

Other areas outside of the water service district require cisterns for domestic use thereby limiting development density.

Private parcels adjoining public lands, both BLM and USFS are often favored for development because public lands area strong selling point. So far realty speculation for the purpose of development has not has not been a strong factor. While it may be preferable to sell parcels adjacent to public lands Montezuma County has not yet experienced a strong speculative realty market for land development.

Never-the-less, adjacency to public lands remains a strong selling point. Public lands provides a buffer against future neighboring development, and often provides access to large acreages of undeveloped land for recreational purposes thereby extending the back yard substantially. Many of the County's "high end" developments tend to be located near public land for that reason.




*Figure 19.) Montezuma County Population Distribution*

# 8.) WILDFIRE RISK ASSESSMENT

Wildfire Risk assessments have been ongoing throughout Montezuma County since the early 2000's. To begin the process Montezuma County met with stakeholders, and held open houses in all of the local Fire Protection Districts, which included a BBQ and presentation's by Montezuma County on defensible space and reducing wildfire risk in residential areas. During this outreach effort Montezuma County and local Fire Protection Districts also heard from the public about regions in the County where there was a perception of high wildfire risk.

Discussion topics within the outreach effort included; Fuel Type, residential density, land use, development pressure, access, scenic and wildlife values, economic values at risk (eg. oil and gas, recreation, tourism).

Combining public input with local professional knowledge 15 areas in the County emerged as focal areas for project development.




*Figure 20.) Montezuma County Areas of Concern (Montezuma County Stakeholders 2001)*



FS-008531

The original 15 "focal areas" can generally be characterized as region within the County where the surrounding landscape is either a moderate or high risk. Those 15 areas are described in the following table.

| Neighborhood/ Community | Overall Neighborhood Risk | Work Accomplished & Additional Needs |
|---|---|---|
| 1. Lowry Ruin Area Neighborhood | Low population densities yield a ***Moderate** overall Risk.* Mesa tops with Ag & $CO_2$ Production. Low Density but with steep heavily forested canyons & dispersed forest on mesa tops. Roads and access generally good but many roads dead end on mesa tops. Canyon edges are attractive building locations but growth potential is only moderate due to lack of electric and water. Some County roads are not improved and some are not maintained. Borders CANM. | **Accomplishments;** Limited Defensible space.<br><br>**Needs;** Continued Education, Defensible Space, Fuels Reduction/ Forest Health & Cross Boundary Treatments |
| 2. Dolores Rim Neighborhoods | Low population densities yield a ***Moderate** overall Risk.* Terrain is rolling with forested headwater canyons. Ag is a mix of dryland and irrigated. Large acreages of mixed shrub communities with PJ dominate natural areas. The Lower Dolores River is a popular recreation draw. Growth potential is moderate due to lack of water and electric. Some County roads are not improved and some are not maintained. Off grid development is common. | **Accomplishments;** Cross boundary Fuel Breaks<br><br>**Needs;** Continued Education, Defensible Space, Fuels Reduction/ Forest Health & Cross Boundary Treatments. Prescribed Fire |



FS-008532

| | | |
|---|---|---|
| | Borders State CPW, BLM & USFS. | |
| 3. McPhee Mobile Home Park Neighborhoods | Population density is medium and slowly growing in this neighborhood. *Overall Risk is* ***High.*** Terrain consists of mesa tops and steep heavily forested canyons. PJ & shrub communities dominate natural areas. Ag is present and consists mainly of irrigated crops and livestock. Development potential is high. Highway 184 bisects the area and county roads are well developed. | **Accomplishments;** Defensible Space<br><br>**Needs;** Education, Defensible Space, Evacuation Routes, Forest Health and Fuels Reduction Treatments. |
| 4. Granath Mesa Neighborhoods | ***High*** *overall Risk.* Low overall density. Terrain consists of mesa tops and steep heavily forested canyons, PJ & shrub communities dominate natural areas transitioning into Gamble Oak and Ponderosa pine. County Roads are well developed but most dead end. County Road 31 (Dolores Norwood Road) is the only road the accesses the area and evacuation can only go north or south. | **Accomplishment;** Defensible Space, Cross Boundary Fuel Treatments.<br><br>**Needs;** Education, Defensible Space, Forest Health/ Fuels Reduction, Emergency Evacuation Routes. |
| 5. Mountain View/ Black Rino Neighborhoods | ***High*** *overall Risk.* Overall population density is medium low. Terrain consists of rolling mesa tops and steep heavily forested canyons, PJ & shrub communities dominate natural areas. Much development is located within mature stands of PJ & shrubs. County Roads are well developed in the area | **Accomplishments;** Defensible Space, fuels reduction.<br><br>**Needs;** Education, Forest Health/ Fuels Reduction, Defensible space, Emergency Evacuation Routes |

| | | |
|---|---|---|
| | but some subdivisions area accessible by only one road. | **Special Note;** Ironwood Group Chip Pile needs to be reduced. |
| 6. Summit Lakes Neighborhoods | ***High*** *overall Risk.* Overall population density is medium low. Terrain consists of rolling hills punctuated by steep canyons. Ponderosa Pine and Gamble Oak dominate the natural landscape and PJ & shrub are present especially on south facing slopes. Much development is located within stands of PJ & shrubs. County Roads are well developed in the area but some subdivisions area accessible by only one road. | **Accomplishments;** Defensible Space, Fuels Reduction / Forest Health Projects, Emergency Evacuation Routes<br><br>**Needs**; Education, Defensible Space, Reduction / Forest Health Projects |
| 7. Cedar Mesa Neighborhoods | ***High*** *overall Risk.* Overall population density is medium low primarily because of large lot sizes. Terrain consists of steep hills punctuated by grassy valleys. PJ & shrub lands dominate the natural landscape. Much development is located within stands of PJ & shrubs. County Roads are well developed in the area but some subdivisions area accessible by only one road. BLM Lands are adjacent to these neighborhoods and recreational use is increasing. | **Accomplishments;** Subdivision level CWPPs Defensible Space, Fuels Reduction / Forest Health Projects, Identified safe-zones.<br><br>**Needs;** Defensible Space, Fuels Reduction / Forest Health Projects, Perfect Emergency Evacuation Routes through ROW or easements and safe-zone identification. Harden Chutes and Ladders BLM campsites and install campfire rings. Increase monitoring and enforcement of camping rules. |
| 8. Jackson Lake Neighborhoods | ***High*** *overall Risk.* Overall population density is medium | **Accomplishments;** Defensible Space, Fuels |

| | | |
|---|---|---|
| | low primarily because of large lot sizes. Terrain consists of rolling hills punctuated by steep canyons. Ponderosa Pine and Gamble Oak dominate the natural landscape and PJ & shrub are present especially on south facing slopes. Much development is located within stands of PJ & shrubs. County Roads are well developed in the area but some subdivisions area accessible by only one road. | Reduction / Forest Health Projects.<br><br>**Needs;** Defensible Space, Fuels Reduction / Forest Health Projects, Perfect Emergency Evacuation Routes through ROW or easements and safe-zone identification. |
| 9. East Canyon Neighborhoods | ***High** overall risk.* Terrain consists of mesa tops and steep heavily forested canyons. PJ, Ponderosa & Oak shrub communities dominate natural areas. Access is limited to one road down East Canyon. Road conditions are marginal at times on the lower end of the road. | **Accomplishments;** Subdivision level CWPP, Defensible Space.<br><br>**Needs;** Defensible Space, Fuels Reduction / Forest Health Projects, Perfect the Emergency Evacuation Routes through ROW or easements and safe-zone identification. Noxious weed management. |
| 10. County Landfill Neighborhoods | ***High** overall risk.* Terrain slopes upwards to the south rising to the Mesa Verde Escarpment. PJ & shrub communities dominate natural areas. Access is limited in many areas beyond the landfill to the east but little development exists. Most residential development in the area lies west of the landfill. Residential density is medium in this area. Landfill | **Accomplishments;** Limited Defensible space by landowners.<br><br>**Needs;** Defensible Space, Fuels Reduction / Forest Health Projects, |

| | | |
|---|---|---|
| | Fires are uncommon but do occur and can potentially spread to areas outside of the landfill boundaries. Especially in extreme wind events. | |
| 11. Indian Camp Ranch Neighborhoods | **Medium** *overall risk.* Terrain consists of rolling hills punctuated by deep heavily forested canyons. PJ & shrub communities dominate natural areas. Lands on the east side of the neighborhood transition into ag dominated landscape. | **Accomplishments;** Significant fuels reductions and defensible space has been done in the Indian Camp Ranch subdivision. Defensible space by landowners.<br><br>**Needs;** Defensible Space, Fuels Reduction / Forest Health Projects. Identify specific sub-area projects. |
| 12. McElmo Canyon Neighborhoods | ***High** overall risk.* Terrain consists of deep canyons on the east end transitioning into wide open rolling terrain and with mesa tops at the west end. Natural vegetation is dominated by PJ & Shrub communities at the east end transitioning into open grass dominated vegetation at the west end. McElmo Communities are served by one main access road approximately 30 miles long continuing across the Utah border. | **Accomplishments;** Limited Defensible space by landowners. Pheratophyte removal by landowners and BLM.<br><br>**Needs;** Defensible Space, Fuels Reduction / Forest Health Projects. Identify multiple “safe zones” in the event that access becomes restricted or impossible. |
| 13. Kinder-Morgan Pump Stations | ***Medium** overall risk.* Terrain consists of heavily forested mesa tops and deep heavily forested canyons of Canyons of the Ancient National Monument. | **Accomplishments;** Limited Defensible space by landowners & Kinder Morgan. Kinder Morgan has Hazard Mitigation Plans in Place and has completed |

| | | |
|---|---|---|
| | | defensible space on their properties.<br><br>**Needs;** Defensible Space, Fuels Reduction / Forest Health Projects. Identify multiple "safe zones" in the event that access becomes restricted or impossible. |
| 14. Goodman Point Neighborhood | ***Medium** overall risk.* Terrain consists of heavily forested mesa tops and deep heavily forested canyons of Canyons of the Ancient National Monument. Agriculture Present on Mesa Tops is primarily dryland wheat or beans and livestock grazing. Pinyon Juniper is the dominate forest type. | **Accomplishments;** Limited Defensible space by landowners.<br><br>**Needs;** Defensible Space, Fuels Reduction / Forest Health Projects. Identify multiple "safe zones" in the event that access becomes restricted or impossible. |
| 15. Cash Canyon Neighborhood | ***High** overall risk.* Terrain consists of heavily forested mesa tops and deep heavily forested canyons. Some agriculture is present consisting mainly of livestock production and dryland wheat. | **Accomplishments;** Limited Defensible space by landowners. Cross boundary fuels mitigation by BLM.<br><br>**Needs;** Defensible Space, Fuels Reduction / Forest Health Projects. Identify multiple "safe zones" in the event that access becomes restricted or impossible. |

Of the 15 areas originally identified as being "high risk" all 15 continue to be relevant. While a great deal of work has been accomplished by individuals in these risk areas, the broader landscape characteristics remain relatively unchanged and therefore the overall risk remains relatively unchanged in these areas.

Long range presence of high risk areas is not necessarily a detriment to our community, nor can it be reasonably expected that high risk areas can be mitigated to the point of moving into a moderate or low risk classification. Once a high risk, likely always a high risk, simply because

vegetation will grow back and maintenance will be an ongoing challenge, or because other factors such as remote access is still in play. Because fuels mitigation and risk reduction is not and one-and-done proposition the 15 areas originally identified will remain as priorities areas for monitoring, maintenance and future work even if all properties present have completed mitigation for the time being.

The first Community Wildfire Protection Plan completed in 2002 was the product of a wildfire risk effort started in 1999 called the "Red-zone Project." This project was one of the first to utilize GIS as the primary analysis tool. As an outcome of this project Montezuma County created a series of district polygons using mappable landscape features. Polygons were analyzed for fire susceptibility, likelihood, intensity, fuel type, accessibility, and proximity to residential or other structures. Other values were also considered, including scenic value, and cultural considerations. Polygons were ranked into High, Medium, and Low Risk categories.

One of the unique aspects of the early Wildfire risk assessments is that the polygon features were largely digitized over imagery and GIS layers to smooth and edit data that was at a coarse resolution by today's standards. The hand generated polygons were correlated with maps and hand drawn notes captured during public outreach meetings. The early wildfire risk assessments represent a more simplified, yet hands on, analysis that was community based and collaborative in nature.

The USDA Forest Service maintains a website in which wildfire risk has been analyzed across the nation. This website is intended to help communities understand, explore and reduce wildfire risk. A nationwide data set is available and was used in this 2021 CWPP update.

The Wildfire Risk to Communities Website can be found here; https://wildfirerisk.org/

Upon review by County staff and other collaborative stakeholders, the current wildfire risk model, developed by the USFS, appears to be accurate. The model represents an outcome that local knowledge and experience validates. The following analysis contains a map series that illustrates the County-wide wildfire risk, and the wildfire risk to the three main County municipalities.

## ANALYSIS

### Overall Fire hazard

Vegetation across Montezuma County ranges from arid desert scrublands to annual grasslands in the Southwest and transitioning to sagebrush and pinon-juniper, then Ponderosa Pine and Gamble Oak and finally Spruce-Fir forests as elevation increases into alpine tundra towards the Northeast.

The County-wide risk assessment illustrates a high level of risk in Montezuma County. Not surprisingly the highest risk areas correlate with public/federal lands. Ute Mountain, Canyons of

the Ancients, and the San Juan National Forest in the Hay camp area and Granath Mesa have consistently remained in the high risk category in all wildfire risk models developed over the last 20 years.




*Figure 21.) Montezuma County Wild Fire Risk*




The triangular area between Highway 145, Highway 184 and Highway 160, in the central portion of the County appears to hold the highest risk to private and public lands alike.

Taking a closer look at the residential densities in this region, we are able to more closely pinpoint the areas

where additional planning and outreach would be most beneficial.



*Figure 22.) Focal Areas for targeted Fuels Reduction & Defensible Space*




Comparing the new hazard model with the original areas of concern we find an exact alignment validating both the original map and the new data.

Overall density with the central portion of the County changes slowly over time and remains relatively low. Large scale residential subdivisions 5 to 20 lots for example, are rare. Most development occurs through single lot splits, or two lot minors. Active HOA's are uncommon, and generally frowned upon by a broad swath of community residents. Montezuma County currently only has 14 HOA's registered with the State (See Appendix A). Subdivision covenants are not generally very effective when they only apply to one lot, yet every lot counts and strong covenants regrading defensible space and ongoing maintenance can be helpful.

Advocating for defensible space, fire resistant construction, and visible addressing are all actionable strategies that have been successful, and will continue to be pursued in these areas of the County. New development proposals that come through the County Planning Office are required to consider wildfire hazard in the development proposal. Ongoing outreach and education to existing residents has been focused in these areas by the Wildfire Adapted Partnership (WAP).

**The City of Cortez;** The City of Cortez is bordered by moderate risk landscapes on the south and west sides. Hartman Draw on the west side is a deep canyon with moderate density vegetation consistingof pinyon and juniper forest, shrubs and mixed grasses. Steep slopes and generally oriented to the northeast, the canyon is posed to carry fire very quickly in the directin of the City of Cortez if an igintion were to happen. Improving widfire readiness on the West and south sides of town appear to be prioritites. All residences within the Cortez City Limits should attempt to be as widlfire resistant as possible. Defensible space even within municipalities is encouraged. Many municipal residencies




*Figure 23.) City of Cortez Wildfire Risk*

have accumulated materials which create ideal places for wind driven embers to embed. Fireresistant construction methods should be encouraged.

**The Town of Dolores;** The Town of Dolores lies at the bottom of the Dolores Canyon which is oriented generally east and west at this point in the canyon. Both sides of the canyon are steep and forested. Pinyon and Juniper forest dominate the south aspects and Ponderosa, spruce and fir dominate the north aspects. Heavy shrub cover exists on all aspects. Development is limited to just the bottom of the canyon due to steep slopes and geologic hazards. Wide scale fuels reduction on the canyon walls is not practical nor advisable. Some targeted fuels modification on the lower slopes adjacent to homes may be acceptable. Overall risk is unlikely to be moderated significantly within the canyon itself without causing even more ecological harm. Fuels modification can be completed on the canyon rims to reduce fuel loading, but overall it is a difficult terrain to do large scale treatment in without unintended consequences. Local projects include ongoing educational out-reach, defensible space and wild fire resistant construction on Granath Mesa. No significant development occurs on the south rim. Hay camp Gravel is at the top of the mesa on the south rim. Otherwise little to no development exists in that area. All residences within the Dolores Town Limits should attempt to be as widlfire resistant as possible. Defensible space even within municipalities is encouraged. Many municipal residencies have accumulated materials which create ideal places for wind driven embers to embed. Fireresistant construction methods should be encouraged. Fuels mitigation is planned for the Merrit Way Drive area.




*Figure 24.) Town of Dolores Wildfire Risk*

**The Town of Mancos;** The Town of Mancos is surrounded by landscape that is moderate to lower risk, according to the models. Never-the-less all residential areas are susceptible to wind driven fire events. Defensible space even within municipalities is encouraged. Many municipal residencies have accumulated materials which create ideal places for wind driven embers to embed. Improving wildfire readiness on the west side of town especially near the Aspen Wood Products facility, and on the north and south side of town would help slow any advancing wildfire. All residences within the Mancos Town Limits should attempt to be as widlfire resistant as possible. Defensible space is advised. Fire resistant construction methods should be encouraged.




*Figure 25.) Town of Mancos Wildfire Risk*

**Montezuma County Cover-Types and Fire Regimes**

Fire ecologists know that the fire regimes in Southwest Colorado have changed and are different today than they were 100 years ago due to various human impacts. Not all forest types were affected the same; the forests with historically frequent low intensity fires were impacted most severely. The following are common Montezuma County forest types.

**Pinion– Juniper Forests:** Historically fires would burn every 25 to 100 years on average. Some pinion/ juniper forests would burn less frequently because they did not have the grassy

understory to help carry the fire. Fires created openings with patches of grass, shrubs and small bunches of pinion and juniper trees. Today, because of human impacts, dense stands of pinion and junipers are encroaching on meadows and burn much more intensely.

**Ponderosa Pine Forests:** Research indicates that low-intensity fires once a decade. These fires usually burned on the ground and did not kill the ponderosa pines. This high frequency, low intensity fire regime has been documented for ponderosa pines throughout the southwestern United States. Crown fires (up in the treetops) were extremely rare since ground fuels were light and the crowns of the trees were generally spaced widely apart. Today these ponderosa pine forests are more crowded and tree crowns are much closer together or even touching, increasing the probability of more lethal crown fires. Grasses and shrubs are prevalent and create ladder fuels for fire to climb up and from one type of vegetation to another, and then into the crown of Ponderosa Pine trees.

**Mixed-Conifer:** This is a complex forest with a complex fire regime. It has dry and wet extremes. The cool moist mixed-conifer forest historically burned every 35 to 100+ years. Research suggests that suppression of fire has resulted in an increase of white fir in the understory, increasing the ability of fires to spread and intensify.

**Spruce-Fir:** This forest zone is located at higher elevations. Because of the cool, moist conditions, large fires do not occur frequently (every 200+ years). Fires that start generally remain small due to cooler temperatures, moist soil and greener vegetation. However, intense fires in the tree crowns may result. This fire regime has been impacted the least by human influences, but it is not completely unaffected.

**Sagebrush and Grasslands:** Sagebrush and grasslands are located primarily in the lower elevations of the County and often grow in association with pinion/ juniper stands. These plant communities often include saltbush and creosote bush in addition to a wide range of native grasses. In most of these sage communities fire occurrence has been altered by fire suppression and livestock grazing. Historically fires within these communities may have been infrequent due to the limited fuels. However the introduction of cheat grass has effectively increased fuel loads and the susceptibility of these communities. Furthermore fires in sage communities allow cheat grass to invade more readily.

**Agricultural:** Agricultural cover can vary greatly year to year depending on the farming practices being used. The northern and western regions of Montezuma County rely heavily on “dry-land” farming practices. The risk of wildland fire on these crop lands is more pronounced. Winter wheat, beans and sunflowers make up the majority of the dry land crops. Wheat in particular will readily carry fire when it is dry and ready for harvest. Wheat harvest typically occurs in July during the height of the summer fire season. Most other dry-land crops also dry in the field before harvest which elevates the wildfire risk.

**History of wildfire occurrences**

Fire is nothing new to Montezuma County or to the Southwest in general. For centuries it has been a natural, healthy part of the ecosystem. However, an important distinction of wildland fires is that all forests do not burn the same way. Tree species vary and each forest type has a historical fire regime, or interval and intensity at which fires occurred. This cycle has been altered over the last 120 years by human uses such as logging, livestock grazing and fire suppression.

Before Euro-Americans moved west and homesteaded, fire played a positive and natural role in the health of western forests. Research shows that fires recurred periodically for thousands of years. Each different forest type, whether ponderosa pine, pinion/ juniper, or mixed-conifer had fire as a recurring disturbance to the ecosystem. Some fire regimes were typified by the frequent fires at low intensity (fire stayed on the ground), while other fire regimes had less fires but burned hotter and more intensely, often as crown fires traveling in tree tops.




*Figure 26.) Historic Fires and Pints of Origin (Montezuma County GIS)*

**Montezuma County Topography**

Topography, or the lay of the land, plays an important role in fire behavior. Homes situated on hillsides, in canyons, and on ridge tops are particularly vulnerable. Fire travels faster uphill and afternoon winds travel upslope as hot air rises, pushing fire even faster. Homes built in steep terrain need larger areas of defensible space, particularly on the down-hill side. Aspect, or the direction the slope faces is also a factor. South-facing slopes tend to be hotter and drier, north-facing slopes cooler and wetter. The overall aspect of Montezuma County is sloping to the Southwest, and the terrain is dissected by deep heavily vegetated canyons that can allow fire to run in a Northwest direction pushed by prevailing winds.

**Seasonal weather patterns affecting wildfire behavior**

There are three peaks to fire season in Montezuma County, a spring pre-green peak in early April, then the highest fire danger of the year occurs in late June, and finally can be followed by a post-curing fall season that peaks in early November. Fires are possible any time of the year, especially if limited snow cover exists. Fire season is typically greatly moderated by the Southwest Monsoon, but before the atmosphere saturates significant lightning activity can occur, often leading to multiple ignitions during the peak of the season.

Other weather elements that determine fire behavior are relative humidity (RH), temperature, and wind. Low (RH) and high temperatures decrease the amount of moisture in the vegetation and increase the chances of a fire starting. Once a fire is started, wind can push it making it grow quickly out of control before firefighters can arrive on the scene.

**Structural vulnerability**

Many structures in Montezuma County exhibit a high degree of structural vulnerability. Newer construction, especially the higher end construction may include fire resistant siding, roofing and screens over vents. However, many of the residences in Montezuma County are older and pre-date any fire resistant construction methods.

Montezuma County does not have building codes in place for unincorporated residential and agricultural structures, therefore no mechanism is in place to mandate fire resistant building. Implementing building codes is beyond the County's capacity for the time being. Building Codes would require a new County Department and permanent funding stream which is unlikely given falling property and production tax revenues for the County.




*Figure 27.) Montezuma County Risk to Homes (USDAFS)*

**Access to structures**

Access to structures is highly variable within the County. New subdivisions are required to construct roads to Montezuma County Road and Bridge Specifications which include minimums for ROW width, road bed construction, culverts and turning radius. New construction on private lots require a driveway permit to ensure proper sightlines and culvert sizing for drainage. Older residences however may have substantially less improved access. Montezuma County has no formal mechanism in place to evaluate or correct deficiencies in access within existing subdivisions. Existing driveways that meet county maintained roads (green signed roads) are maintained to County Road and Bridge Specifications within the Pubic ROW. Evacuation routes should be evaluated and incorporated into subdivision level CWPP's and community assessments.

Catastrophic wildfire was generally recognized as a real and likely threat to many values within the wildland-urban interface in Montezuma County early on. In 2011 citizens and professionals were asked again to help discuss their concerns for public safety, and to help generate a list of values that they felt were potentially at risk within the Wildland–urban interface.

Much like the original Red-zone collaboration, discussions in 2011 were also designed to be very broad so that less obvious values could be identified, such as values relating to impacts on

natural resources, or impacts to the local economy. Also what burdens can be projected to the local tax base and basic services.

While stakeholders expressed many concerns regarding the risk of wild-land fire, participants also recognized beneficial role fire plays in the ecosystem including benefits to wildlife, forest and range land health. Participants were also notably knowledgeable and concerned about the threats to local watersheds.

**Approximate percentage of structures with wildfire mitigation treatments.**
The Colorado State Forest Service's Colorado Wildfire Risk Assessment Portal (CO-WRAP) 2017 report for Montezuma County maps the WUI Risk Index, which is a rating of the potential impact of a wildfire on people and their homes. The key input reflects housing density (Figure 26). The CO-WRAP report states that the location of people living in the WUI and rural areas is essential for defining potential wildfire impacts to people and homes. Figure 28 shows the WUI Risk Index for Montezuma County.

Data on individual properties that have that have done fire mitigation treatments is unavailable. However, the County has two Community level CWPP plans in place that generally correlate with the high risk areas identified.




*Figure 28.) Communities with Wildfire Ambassadors or CWPP's (Montezuma County GIS)*

The Following communities have a WAP Ambassador in place and two communities have CPP's in place;

- Cash Canyon
- Pine Ridge Wapiti Rim
- Kernan Creek Ranch
- Cedar Mesa Ranches (Also has CWPP)
- N. Mancos POA/ Tierra Alta
- Sundance & Cassidy Canyon
- Jackson Gulch Road 41.9
- Road 42 W. of Mancos River
- Cedar Crest Ranches
- Road 41.2 Properties
- Indian Camp Ranch
- Sun West Estates
- Oakview Subdivision
- Green Gates Tracts
- East Canyon / Elk Spring Ranch (Also has CWPP)
- McElmo/ Trail Canyon Interest
- Road 42 community

New subdivision within the High or Moderate risk areas identified must either submit an affidavit certifying that they are at low risk, or complete a wildfire mitigation plan and complete the prescribed mitigation work before the subdivision is approved by the board of County Commissioners.

**Protection Capabilities**

In May of 2002, Montezuma County in cooperation with the four surrounding counties, developed Community Fire Plans, which at the time were considered to be national models for collaborating and intergovernmental planning and action around wildlife hazards in rural communities. In 2005, this plan was updated to the Montezuma County Community Wildfire Protection Plan (CWPP), which was again updated in 2011.

Fire protection in Montezuma County is divided between fire protection districts, volunteer fire departments, Wildfire Adapted Partnership of Southwestern Colorado, Bureau of Land Management (BLM), and the U.S. Forest Service. Multiple community wildfire protection plans are in place, as discussed in Section 3.9.7. Protection capabilities in Montezuma County are robust. Multiple agencies are available and able to respond quickly to fire starts. Interagency agreements are in place to provide mutual assistance between federal and non-federal fire protection resources.

Montezuma County residents are also integral to protection capacity. Most fire starts are reported by private citizens. In some limited cases, civilian suppression efforts can be effective until the event can be delegated to proper authorities.

Wildfires are often caused by humans, intentionally or accidentally. There is no way to predict when one might break out. Because fireworks often cause brush fires, extra diligence is warranted around the Fourth of July when the use of fireworks is highest. Dry seasons and droughts are factors that greatly increase fire likelihood. Dry lightning may trigger wildfires. Severe weather can be predicted, so special attention can be paid during weather events that may include lightning.

Reliable NWS lightning warnings are available on average 24 to 48 hours before a significant electrical storm. If a fire does break out and spreads rapidly, residents may need to evacuate within days or hours. A fire's peak burning period generally is between 1 p.m. and 6 p.m. Once a fire has started, fire alerting is reasonably rapid in most cases. The rapid expansion of cellular and two-way radio communications in recent years has further contributed to a significant improvement in warning time.

**Road system accessibility**

Most roads under Montezuma County's jurisdiction are adequate for emergency response and are accessible by most residents. New subdivisions are required to build road systems to County Road and Bridge standards.

**Availability of fire hydrants/ water storage**

Water supplies for fire flow in unincorporated areas of Montezuma County cannot be guaranteed. Many subdivision throughout the county have municipal fire hydrants that are either not functional or do not provide enough flow to support fire suppression.

In the past there have been instances where water lines have been collapsed when fire flow is drafted out of them. In other instances drafting has caused serious interruptions to downstream water supply to water supply creating difficult situations for Montezuma Water Company to handle. Drafting can also potentially create a backflow contamination situation for the entire water system which could potentially create a health threat for hundreds or even thousands of residents.

To avoid these potential problems water supplies are often augmented from the Dolores River, areas Lakes, pond or irrigation ditches. All Fire Protection Districts need water tenders to provide additional initial attack capacity. Needs for this apparatus should be monitored and replacements or additions should be sought when need arises.

To further compound the water supply problem is the fact that many county residents live off grid and must haul water into cisterns for their domestic use. County subdivisions can still be approved without access to municipal water systems or to wells. This lack of dependable water supply sources is a significant factor in determining the level of risk for communities as well as for identifying the WUI. Any opportunity to upgrade existing supply infrastructure to accommodate fire flows should be examined and capitalized on if possible.

Montezuma County is fortunate in the sense that it is still primarily a low density, rural agricultural county, with an extensive irrigation water delivery system in place, sometimes even on federal lands. Irrigation canals & stock ponds can often be used to supplement water supply and many such features are found throughout the county.

Never-the -less there is a need for fire flows throughout the County. Supplemental water storage in key locations could also benefit suppression activities in dry locations. Special effort should be made to identify key water storage locations and infrastructure needed such as large storage tanks, pumps and pipeline systems. Montezuma County has authority to require additional fire protection mitigation measures, including supplemental water storage for new subdivisions which lack sufficient fire flow. However the County has no authority over the proliferation of off the grid or remote housing that occurs on existing legally created lots, or on lots which are over 35 acres. Private Homeowners Associations (HOA's) should work together to purchase and install water storage systems, especially on remote properties.

**Community Based Fire Suppression Capabilities**

Few communities (subdivisions) have formal resources or expertise to actively suppress fires on their own, however at least two subdivisions have limited suppression capacity.

Cedar Mesa Ranches, Montezuma County's, largest subdivision (139 lots), and the subdivision that is considered to be the highest risk in the county, has a Fire Substation located near the subdivision entrance, though it is not staffed full time, two of the Mancos Volunteer Firefighters live within the subdivision. The substation houses a brush truck and a water tender.

Indian Camp Ranches also has limited fire suppression capacity. The subdivision has a water truck and hand tools available on site so that it can respond to fires starts. The Homeowners Association conducts limited training with the equipment to ensure residents know how to operate the water truck, however professional training in fire suppression is not available through HOA.

Montezuma County respects the rights of individual land owners to protect their lives and property. However the right to protect lives and property are often at the mercy of the insurance industry which may prohibit locally organized fire brigades. In light of insurance restrictions the most effective roles individual homeowners can play is one of prevention,

mitigation, vigilance, and notification. While homeowner's ability to immediately respond to fire starts is commendable, it also carries some risk if the fire authorities are not notified. In numerous cases homeowners have extinguished small fires only to have them reignite later on. Qualified fire suppression training is invaluable in making sure that fires are completely extinguished.

The community could benefit from expanded water storage at key location throughout the County as discussed previously.

**Fire Risk**

The United Sates Department of Agriculture (USDA)/ USFS has completed a nationwide GIS analysis of fire risk to communities which was used extensively for this 2021 update. According to the USFS GIS analysis which evaluates wildfire risk to communities, populated areas of Montezuma County have, on average, greater wildfire risk than most of the rest of the State of Colorado. The USDA/USFS analysis can be found here; https://wildfirerisk.org/

**General Risk Level**

The general risk level for Montezuma County is, on average, is at the higher end of the scale. Private lands in Montezuma County are surrounded by heavily vegetated public lands. Extended periods of drought conditions, like the one we have been in since 2000, exacerbate the overall risk levels across the county.

A community's wildfire risk is a combination of likelihood and intensity, which together is referred to a hazard. And the combination of exposure and susceptibility, referred to as vulnerability.




*Figure 29; Risk Components Chart (CSFS)*




*Figure 30.) Montezuma County Composite Risk Map (Overall Risk)(USDAFS)*

**Wildfire Intensity**
Wildfire intensity is a measure of the energy expected from a wildfire.

Intensity is largely a condition of the physical landscape (topography) and vegetative fuel available to burn. For example, a crown fire on a forested hillside can produce a greater wildfire intensity than grasses on flat ground. While wildfire intensity is technically measured in units of heat transfer per length of fire perimeter, it is more easily observed and expressed in terms of flame length. Wildfire Risk to Communities uses wildfire intensities calculated in fire behavior modeling simulations. (USFS)

**Exposure**
Exposure is the spatial coincidence of wildfire likelihood and intensity with communities.

Any community that is located where wildfire likelihood is greater than zero is exposed to wildfire. For example, a home in a flammable forest is exposed to wildfire.

Communities can be directly exposed to wildfire from adjacent wildland vegetation, or indirectly exposed to wildfire from embers and home-to-home ignition. Communities that are not exposed are not likely to be subjected to wildfire from either direct or indirect sources.




*Figure 31.) Residential Exposure to Wildfire*

USDA data indicates that populated areas in Montezuma County are predominately exposed to wildfire from direct sources such as adjacent flammable vegetation.
Exposure is the spatial coincidence of wildfire likelihood and intensity with communities

Any community that is located where wildfire likelihood is greater than zero (in other words, where there is a chance wildfire could occur) is exposed to wildfire. For example, a home in a flammable forest is exposed to wildfire.

Communities can be directly exposed to wildfire from adjacent wildland vegetation, or indirectly exposed to wildfire from embers and home-to-home ignition.

**Susceptibility**
Susceptibility is the propensity of a home or community to be damaged if a wildfire occurs. Wildfire Risk to Communities uses a generalized concept of susceptibility for all homes. In other words, Wildfire Risk to Communities assumes all homes that encounter wildfire will be damaged, and the degree of damage is directly related to wildfire intensity. The greater the wildfire intensity (flame length), the greater the percent damage to homes.

Wildfire Risk to Communities does not account for homes that may have been mitigated, and does not measure other important resources that may be damaged by a wildfire (such as infrastructure, watersheds, or forest health).

In reality, an individual home's ability to survive wildfire is driven primarily by local conditions (known as the "Home Ignition Zone"), including the construction materials and the vegetation in the immediate area. The only way to truly assess home susceptibility is through individual home assessments, which are well beyond the scope of Wildfire Risk to Communities. (USFS)

**Wildfire Risk to Homes**
The USDA/ USFS has analyzed the potential wildfire risk to homes by integrating wildfire likelihood and intensity with a generalized set of consequences to homes on the subject landscape.

The Risk to Homes data integrate wildfire likelihood and wildfire intensity from simulation modeling. These two risk components represent wildfire hazard. To translate this into terms specific to the effect of fire on homes, Wildfire Risk to Communities uses a generalized concept of susceptibility for all homes. In other words, Wildfire Risk to Communities assumes all homes that encounter wildfire will be damaged, and the degree of damage is directly related to wildfire intensity. Wildfire Risk to Communities does not account for homes that may have been mitigated.




*Figure 32.) General Wildfire Risk to Homes (USDAFS)*

According to the modeling populated areas in Montezuma County, on average have a greater risk than 78% of the Counties in the State.

**Wildfire Likelihood**

Wildfire Likelihood is the annual probability of wildfire burning in a specific location. At the community level, wildfire likelihood is averaged where housing units occur. Evaluating populated areas only modeling suggest that populated areas in Montezuma County have on average a greater wildfire likelihood than 76% of the Counties in the State.




*Figure 33.) Wildfire Likelihood*

**POTENTIAL FOR LIGHTNING-CAUSED FIRES**

Lightning is statistically the number one cause of wildfire in Montezuma County. Based on the best available information there have been over 2,740 since 1970 which are recorded to have led to an ignition. Most have been small fires, but some the largest fires have also been due to lightning. The County's varied geography and high elevation make it prone to dry lightning strikes throughout the County. Ridgelines and high points across the County are especially at high risk throughout the warmer seasons, especially during the Monsoon season. Seasonal Monsoonal activity occurs annually, characterized by gusty winds and lightning preceding

localized thunderstorms. However monsoonal *precipitation* has decreased significantly over the last 20 years which has resulted in higher risk for lightning strikes to cause ignitions.




*Figure 34.) Recorded Lightning Caused Wildfires of any size (Montezuma County GIS)*

**POTENTIAL FOR HUMAN CAUSED FIRES**

Potential for human caused fire remains high. Again drought conditions exacerbate the potential for "accidental" human caused fire starts. Human caused fires can come from many different sources.

Agricultural burns such as ditches or fields are a common practice in Montezuma County especially in the early spring before irrigation season starts. Protocols are in place to coordinate with local authorities before agricultural burns are ignited and compliance is growing in correlation with a rising awareness of potential risk, and potential liability.

Fire starts from illegal fireworks are also a very high concern. The Weber Fire of 2012 for example was started by fireworks and quickly spread to the steep, heavily vegetated BLM lands adjacent to County Road 41. The resulting wildfire was one of Montezuma County's largest at just over 10,000 acres. Fireworks are banned in Montezuma County but compliance remains a significant challenge.

Highways and roads are vulnerable to wildfires. According to the Arizona Department of Forestry and Fire Management, dragging chains is one of the main causes of fires along highways. Dragging chains create sparks on the road surface, and one spark is all that's needed to start a fire that can potentially burn thousands of acres. Besides dragging chains, underinflated tires can also lead to rims hitting the road surface and creating sparks.
Also heat from the parts under a vehicle, particularly the catalytic converter, can catch the grass on fire if a vehicle pulls off of the road.

Other "accidental" human caused ignition sources that are common in Montezuma County include welding equipment, chains saws, and atv/ motorcycles without spark arresting mufflers.

Finally arson is another potential vector. While uncommon, arson events do happen and can have catastrophic consequences.

**VALUES AT RISK**

Through stakeholder input, the following values were identified as being at risk in Montezuma County;

- **Lives:** firefighters and the public but also livestock and pets
- **Private & Public Property:** homes, businesses, public buildings
- **Public Health:** air quality, water quality
- **Critical Infrastructure:** emergency services, hospitals, electric transmission, pipelines, irrigation ditches, compressor stations, well pads, roads etc.
- **Ecosystem:** McPhee Reservoir and watershed protection, wildlife, stable plant communities
- **Local and Regional Economies:** tourism, timber, and grazing, mineral production, hunting and fishing
- **Natural and Cultural Amenities:** views, historic structures, pre-historic structures and artifacts
- **Local Tax Base & Basic Services:** risk to property values, prohibitive costs associated with fighting wildfires, drain on community resource

Montezuma County has identified wildfire risk areas, based upon a variety of risk factors and has maintained a wildfire risk map since 2002. The wildfire risk map is reviewed for every subdivision proposal that comes through the County planning process.

The 2002 Wildfire Risk Map was digitized as a GIS layer using aerial photography and topographic maps. The resulting map included polygons drawn around areas thought to be at high or moderate wildfire risk.

Montezuma County staff digitized aerial data to complete the first risk assessment in the county because the background data layers, especially the vegetation data, were too coarse to provide enough accuracy to identify the highest risk areas.

The first risk assessment in the county (2002) was manually digitized because the background data layers, especially the vegetation data, were too coarse to provide enough accuracy to identify the highest risk areas for planning purposes.

The staff analysis also considered environmental factors, including slope, aspect, and prevailing wind. But even the 2002 risk analysis also looked at other values such as population density, scenic quality, water quality, accessibility, cultural and historic resources, and proximity to fire stations.




*Figure 35.) 2002 High and moderate Risk Polygons (Montezuma County GIS)*

GIS data is constantly evolving into better and more specific products. By 2011 more refined vegetative and terrain mapping was becoming available. Thus the 2011 wildfire risk analysis included more advanced data and a more robust GIS-based analysis than the 2005 plan or the original 2002 risk analysis.

The 2011 Community Risk Analysis utilized the most up-to-date data and methodology available for the time. GIS-based analysis and modeling ensured scientific structure to the process. The 2011 CWPP represents Montezuma County's first GIS-based fire modeling done countywide. Compared to the original 2002 mapping effort, this mapping served to validate the areas of concern already identified.




*Figure 36.) 2011 Wildfire Risk Analysis (Office of Community Services Fort Lewis College)*

**LIVES AT RISK**

The population of Montezuma County was 26,160 in 2019, which is the total number of lives at risk; however, not everyone shares the same risk. For example, the wildfire risk for residents in Cedar Mesa Ranches is considerably higher than the risk for residents living in the City of Cortez.

Generally speaking, rural residents are probably at a higher risk than those living in municipalities. However, the actual risk is site-specific. For example, a residence in the middle of an irrigated alfalfa field is probably lower than a home in a neighborhood in Cortez simply due to the exposure to adjacent flammable materials.

**Vulnerable Populations**

Another factor to consider is vulnerable populations. The USDA /USFS Wildfire Risk to Communities analysis also includes an analysis of vulnerable populations.

Vulnerable populations are more likely to be affected by wildfire because they lack resources. In addition, they experience cultural and institutional barriers, have limited mobility, and may have compromised physical health.

People's vulnerability to wildfires correlates with their ability to affect their exposure and susceptibility to wildfires. Individuals with limited mobility, for example, cannot easily mitigate their exposure by fleeing from an oncoming wildfire. Likewise, individuals with cultural, physical, or financial barriers to performing necessary home mitigation measures cannot easily reduce their susceptibility to property damage from a wildfire.

*Table 11; Percent of people with high vulnerability to wildfires*

| | Number | | Percent | |
|---|---|---|---|---|
| Families in poverty | 728 | ±152 | 10.6% | ±2.2% |
| People with disabilities | 4,446 | ±378 | 17.3% | ±1.5% |
| People over 65 years | 5,353 | ±353 | 20.7% | ±1.4% |
| Difficulty with English | 141 | ±121 | 0.6% | ±0.5% |
| Households with no car | 255 | ±80 | 2.4% | ±0.8% |
| Mobile homes | 2,066 | ±267 | 19.5% | ±2.5% |

**NUMBERS AND DENSITY OF RESIDENCES**
Montezuma County has approximately 12,473 residences, and the overall density is low, averaging 12 people per square mile. The county has about 3110 homes classified as mobile or modular homes, roughly 25%. There is a differentiation between modular and mobile dwellings which account for statistical differences in the data presented in this plan.

**OTHER ECONOMIC VALUES**
In addition to the residential values, Montezuma County also has other economic values susceptible to wildfire risks. The Montezuma County economy has three primary drivers. Agriculture, Tourism, and Oil and Gas.

**Agriculture;**
Dryland farming, orchards, and livestock production dominated the agricultural landscape until 1889, when the Montezuma Tunnel diverted water from the Dolores River flowed into the valley. Later, the Dolores Project, located in the Dolores and San Juan River Basins in

southwestern Colorado, diverts water from the Dolores River for irrigation, municipal and industrial use, recreation, fish, and fish wildlife, and production of hydroelectric power. It also provides flood control and aids in economic redevelopment. Service is provided to the northwest Dove Creek area, central Montezuma Valley area, and south to the Towaoc area on the Ute Mountain Ute Indian Reservation. A full and supplemental supply of irrigation water is available for 61,660 acres. (Bureau of Reclamation)

**Water;** The greatest threat to agriculture, and life in general for Montezuma County is the threat to its water resources. Montezuma County has three main river drainages which supply water for municipal, industrial and agricultural uses. The Dolores River is the primary water source for Montezuma County and is located in the Upper Colorado–Dolores Watershed. The Dolores River feeds into McPhee Reservoir, the third-largest reservoir in the state and most of Montezuma County's agricultural and municipal water source. The Mancos River, located in the Upper San Juan Watershed, fills Jackson Reservoir, is the primary municipal and agricultural water source for the Mancos region. McElmo Creek is situated in the Lower San Juan Watershed. McElmo Creek is not a significant source of water for municipal use. Still, it does supply agricultural water to many farms located along the McElmo drainage.

Montezuma County is concerned about all three watersheds. The DWARF Collaborative is focused on the Dolores River and its tributaries with a mission to improve forest health and resiliency to wildfire risk but significant planning work is being done in the Mancos watershed as well. All three of Montezuma County's municipalities are developing Source water Protection Plans in partnership with the State of Colorado.




*Figure 37.) Montezuma County's Three HUC 6 Watersheds*



FS-008563

Many crops can also be at risk of wildfire, especially dryland crops. The risks increase as the crop matures for harvest during mid-summer. Winter wheat, for example, matures in July and can be at significant risk when wheat stalks are dry and ready to be harvested.

Three of Montezuma County's municipalities have Source Watershed Protection Plans SWPP's which provides more specific detail on the source watersheds, values at risk, potential contaminants, buffer areas and recommended BMP's for managing specific drainages. SWPP's may be found in Appendix B. SWPP's are also discussed later in this plan.

**Oil and Gas Facilities**

Oil and gas operations can be considered a vital economic component of the Montezuma County economy. Oil and gas production makes up over half the Montezuma County tax revenues. Most of the output is related to the McElmo Dome $CO_2$ field located in the County's western portion, mainly within the Canyons of the Ancients National Monument.

The Colorado Oil and Gas Conservation Commission maintains an oil and gas infrastructure database available to the public. Montezuma County has access to this data and has inventoried assets within the County.

Oil and Gas Producers maintain Fire Protection plans specific to their particular facilities. Fire mitigation plans are a part of the High Impact Permit applicant review process and a requirement for final permitting. In addition, Wildfire Adapter Partnership also reviews each proposed Fire Mitigation Plan and provides feedback. Plans are on file in the Planning Department at Montezuma County.

**Forest Products Industry (Mills)**

Montezuma County is fortunate to have a viable forest products industry. Forest products are an essential part of the Montezuma County economic diversification strategy. The sector also plays a critical role in forest management on public and private lands.

Montezuma County has eight commercial wood product businesses County.

- Aspen Wall Wood
- Aspen Wood Products
- Muscanell Mill Works
- Stoner Top Lumber
- West Fork Lumber
- 49 Squares Ventures
- Otts Sawmill
- Val Truelson Logging

There are also a number of small-scale firewood business throughout the County, which are not at a scale that needs to document Fire Mitigation Plans through this CWPP. Minor firewood operations should follow fire restrictions and other best management practices, including defensible space, to ensure safe operations for business locations. A new business that comes through the Planning Department for High Impact Permits requires a Fire Mitigation Plan filed in the Montezuma County Planning Department. Older companies also typically have fire mitigation plans in place. Local Fire Protection Districts generally are the repository for these plans.

For wood product business that pre-date the Land Use Code, the Montezuma County Emergency Manager assists with developing Fire Mitigation Plans. Other small firewood or specialty wood product businesses also exist. However, the scale of these operations is typically small and does not require a fire mitigation plan. Mitigation is primarily accomplished by creating defensible space around the area of operation.

**Power Transmission**

Power transmission lines are vulnerable to wildfires in their vicinity, mainly due to increased conductor temperatures resulting from heat released by the fire. This may damage the conductor and lead to violation of safety clearances between conductor and ground.
Large fires burning adjacent to or under high voltage transmission lines have the potential to:

- Create electrical arcs (known as 'flashovers') that can endanger people, animals and objects.
- Damage or destroy the transmission line's wires, insulators, and supports.
- Interrupt electricity supply to households and industry.

Power Transmission infrastructure is at risk from wildfire, but the infrastructure can also be an ignition source. Ignitions can occur from various failure modes in the vast array of components making up distribution and transmission networks and their neighboring environment.

These failures fall into two general categories: elastic extension of either the conductors or surrounding objects (such as tree limbs) causing electrical contact and arcing, and fatigue failures under high strain conditions affecting system components (conductors, poles, cross arms) or surrounding objects (trees). Both failure classes show a strong dependence on increasing wind speed. (Joseph W. Mitchell; *Engineering Failure Analysis* 35:726-735 Dec. 2013)

The primary power distribution system is mapped and inventoried. Montezuma County maintains a database of power infrastructure and can readily produce maps illustrating location and type.

**Ecological Values**

Montezuma County is home to a wide variety of plants and wildlife and a correspondingly high level of biodiversity. Wildlands and agricultural lands both support a diverse habitat for the large game and small mammals, reptiles, amphibians, and birds.

**Biodiversity**

Biodiversity is defined as the variety of life. Montezuma County is home to all five of the vegetative zones found in Colorado. Each zone contributes specialized habitat for a variety of plants and wildlife. Many rural properties, including agricultural properties, include high quality wildlife habitat. Even urban environments represent a wide range of plants and animals, increasing overall biodiversity.

**Habitat**

Virtually all of the lands in Montezuma County provide habitat for mule deer.
The lower elevations, including most the County's private lands are identified as resident range for Mule Deer. The areas with highest wildfire risk also correlate with the areas mapped by CPW as winter range. A wildfire within these areas could significantly impact mule deer in the short term by displacing animals.




*Figure 38.) Mule Deer Habitat (CPW)*

https://cpw.maps.arcgis.com/apps/instant/interactivelegend/index.html?appid=b3e1f4c17e98481c85f9683b02e91250




*Figure 39.) Montezuma County Elk Habitat (CPW)*

https://cpw.maps.arcgis.com/apps/instant/interactivelegend/index.html?appid=b3e1f4c17e98481c85f9683b02e91250

Elk in Montezuma County share a similar wintertime range which correlates to the area at higher risk from wildfire. Elk winter range and severe winter range could potentially be affected by wildfire in the short term by displacing animals. Wildfire causes animals to move. When they do, they risk moving into agricultural areas or even urban areas with more contact with people they would usually avoid. Long-term, the effects of fires probably carry a benefit for Elk habitat since they are grazers vs. browsers and are more dependent on grasses that emerge after a wildfire.

According to the *Montana Natural History Center,* winter ranges where fires have not burned for more than 20 years will typically yield from 30 to 120 pounds of forage per acre. On winter ranges that burned in the last year or two, the production typically jumps to 20 pounds of forage per acre—over a 20-fold increase in forage production. Increases in forage production on burned landscapes are not news to wildlife researchers. It means that fire is not only beneficial to deer and elk, but essential if our goal is to have large numbers of deer and elk in our forests."

Most wild animals have a sharp sense of danger. Most can outrun even fast-moving extreme wildfires. Others have adapted means of riding a fire out by burying themselves in dirt or

retreating into rock piles. Some predators even capitalize on the avoidance instinct to zero in on animals fleeing the flames. Overall, wildfires are a part of a healthy ecosystem. Western wildlife has evolved with the ever-present threat of wildfire.

**Threatened and Endangered Species**

According to the State of Colorado, the following plants and animals are considered Threatened or Endangered in Montezuma County.

*Table 12; Threatened and Endangered Species*

| SPECIES | SCIENTIFIC NAME | STATUS |
|---|---|---|
| Bonytail chub | Gila elegans | Endangered |
| Canada lynx | Lynx canadensis | Threatened |
| Chapin Mesa milkvetch | Astragalus schmolliae | Endangered |
| Colorado pikeminnow | Ptychocheilus lucius | Endangered |
| Greenback cutthroat trout | Oncorhynchus clarki stomias | Threatened |
| Gunnison Sage Grouse | Centrocercus minimus | Threatened |
| Humpback chub | Gila cypha | Endangered |
| Mancos milkvetch | Astragalus humillimus | Endangered |
| Mesa Verde cactus | Sclerocactus mesae-verdae | Threatened |
| Mexican Spotted Owl | Strix occidentalis lucida | Threatened |
| New Mexico meadow jumping mouse | Zapus hudsonius luteus | Endangered |
| Razorback sucker | Xyrauchen texanus | Endangered |
| Southwestern Willow Flycatcher | Empidonax traillii extimus | Endangered |
| Wolverine | Gulo gulo luscus | Proposed |
| Yellow-billed Cuckoo | Coccyzus americanus | Threatened |

For additional information contact: U.S. Fish and Wildlife Service, Colorado Field Office, PO Box 25486 DFC (MS 65412), Denver, Colorado 80225-0486, telephone 303-236-4773 U.S. Fish and Wildlife Service, Western Colorado Field Office, 764 Horizon Drive, Building B, Grand Junction, Colorado 81506, telephone 970-243-2778

**Soils**

The soils of our area are as varied as the landscape and vegetation. Some of the best soils in the area are wind deposited. These soils blew in from Arizona and New Mexico and are reddish clay loam. They are usually not rocky and can be very deep. They occur mainly northwest of Cortez and are typically very fertile and already in agricultural production. Most of these soils are on private lands and have moderate wildfire risk related to cover type.

Another soil type found in the area comes from an ancient ocean deposit known as the Mancos Shale. The Mancos Shale is prominently visible in the steep, grey slopes at the base of the Mesa

Verde escarpment, south of Mancos and Cortez. Mancos shale contains abundant fossils of marine animals. The grey mud soil derived from this marine shale is ancient marine mud. It has high salt content and has a high shrink-swell character. The soil erodes easily and turns sticky and slimy when wet. Such soil needs significant amendments to make good garden soil and can cause extensive damage to homes and structures. Mancos shales are not typically associated with agricultural production.

Juniper and Pinion trees and a range of shrubs are adaptable to shale soils but are not as productive as in other soil types. Wildfire risk can be high in areas of Manco's shale soil type. However, poor soil conditions may also reduce wildfire risk in some instances. Groundcover, including the grasses, which can carry flames up into taller vegetation, is often absent or very sparse, reducing wildfire risk.
*(Rural Living in Southwest Colorado 2013; The Dolores and Mancos Conservation Districts)*

The last type of soil comes from materials deposited by rivers and streams. This soil occurs throughout the area in all river valleys and smaller valleys. Still, these soils can also be found on mountain slopes or plateaus. It may be sandy or heavy in clay and often has a marginal amount of stone, cobble, and gravel. Areas with this soil may have a high water table and pose a high potential post-fire flood hazard.
*(Rural Living in Southwest Colorado 2013; The Dolores and Mancos Conservation Districts)*

**Air;**
Air quality in Montezuma County is generally good; however, the air quality is also subject to short term events such as wildfires, prescribed burns and agricultural burns. Long-term air quality in Montezuma County is largely determined by cross-boundary sources.

Air quality in Montezuma County is also important from an economic and quality of life point of view. Air quality obviously carries human health implications, but it also affects the view-sheds in a five-county area where attracting businesses and tourists is contingent on maintaining high quality views. Active wildfires clearly have a negative effect on tourism and local quality of life. However air quality impacts and influences from wildfire, prescribed burns, or agricultural burns are generally temporary in nature and outside of the scope of this CWPP. CDPHE regulates air quality and all permitted prescribed fires must follow specific smoke dispersion weather parameters and community notifications prior to conducting prescribed burns.

Pollution sources within the Four Corners include coal-fired power plants, motorized vehicles, oil and gas operations, wildfires and intentional burning, road dust, and other sources. There are at least 4 existing power plants in the vicinity of the Four Corners (within a 100-mile radius). All four generation stations are scheduled for total or partial retirement by 2031.
https://www.epa.gov/airmarkets/power-plants-and-neighboring-communities#mapping
https://experience.arcgis.com/experience/2e3610d731cb4cfcbcec9e2dcb83fc94

In addition, there are currently 3,575 active oil and gas wells in southwest Colorado with an additional 13,281 active oil and gas wells in northwest New Mexico (La Plata County Energy Council – personal communication). Under the Clean Air Act, the US Environmental Protection Agency (EPA) limits certain air pollutants, using science-based standards to protect human health and the environment. A geographic area that does not meet a primary standard is a non-attainment area. States and tribes develop State Implementation Plans that outline how they control air pollution. Some of the air pollutants presenting challenges in the Four Corners area are ozone, mercury, nitrogen and sulfur oxides, and particulate matter. Ozone is normally considered a big city issue, but it is a growing concern in the Four Corners area. In this region, ozone is mainly caused by power plants and oil and gas development (CIRA). Ground-level ozone can cause chest pain, coughing, throat irritation, and congestion and worsen bronchitis, emphysema, and asthma. Many plant species, including crops, Ponderosa pines, and Aspen trees, are extremely sensitive to ozone exposure.

Mercury is a naturally-occurring element found in air, water, and soil. It can also be a toxic air pollutant. Coal-fired power plants are the largest man-made source of mercury to the air in the United States. Mercury in the air eventually settles to the ground. Precipitation can then wash it into aquatic ecosystems, such as lakes, streams, and wetlands. Bacteria in wetlands and lake bottoms can change mercury into a highly-toxic form, called methyl mercury, which affects the functioning of nerve cells. The methyl mercury bio-accumulates, increasing in concentrations up the food chain. Fish consumption advisories for mercury contamination for five lakes and reservoirs within Region 9 in Archuleta, La Plata, and Montezuma counties are in effect. Mesa Verde National Park has recorded some of the highest mercury concentrations in the nation. (Region 9 CEDS Update 2011)

The retirement of coal burning power generation stations and the transition to clean energy will improve air quality in Montezuma County over time.




| Pollutant | Stat. Lat & Long | Good % | 0-50 | 51-100 | 101-150 | 151-200 | 201-300 | 301-500 |
|---|---|---|---|---|---|---|---|---|
| Ozone | 37.2001, -108.733 | 98.89% | 89 | 1 | 0 | 0 | 0 | 0 |
| CO | | 0.00% | 0 | 0 | 0 | 0 | 0 | 0 |
| SO2 | | 0.00% | 0 | 0 | 0 | 0 | 0 | 0 |
| PM10 | 39.8281, -104.936 | 85.71% | 24 | 4 | 0 | 0 | 0 | 0 |
| PM2.5 | 39.8281, -104.936 | 80.00% | 4 | 1 | 0 | 0 | 0 | 0 |

*Figure 40. Montezuma County Air Quality Index 2021 (CDPHE*

https://www.colorado.gov/airquality/colorado_summary.aspx

**Water Quality**

Water quality in Montezuma County is generally good. About half of the water supply in the southwestern United States comes from snowfall in our high mountain forests, typically yielding higher quality water than any other source.

Yet many of Montezuma County's Lakes report elevated levels of mercury generally attributed to regional power generation. Many of the regional coal powered plants are being retired which should improve local conditions. Cross- boundary contamination remains a consistent threat however many power generating facilities are also adapting cleaner fuel sources over time which will also help to alleviate mercury loading.

Most of the watersheds in the County are more at risk from wildland fire, and water quality could potentially be degraded rapidly post-fire. Wildfires can compromise water quality during active burning and months and years after the fire. During active burning, ash can settle on lakes and reservoirs used for drinking water supplies.

Storms following wildfires are known to impair drinking water supplies in the southwestern U.S. Burn areas are prone to higher erosion rates, increasing the downstream accumulation of sediment in streams, rivers, and reservoirs. Thus, the potential impacts from past, current, and future wildfires on the quantity and quality of runoff are considerable and may significantly impact water used for domestic, agricultural, and ecological water supplies.

The potential effects on drinking water supplies are of great concern to Montezuma County residents. Possible impacts of wildfire on municipal water supplies and downstream aquatic ecosystems include the following:

- Changes in the magnitude and timing of snowmelt runoff, which influence the filling of water-supply reservoirs
- Increased sediment loading of water-supply reservoirs, shortened reservoir lifetime, and increased maintenance costs
- Increased loading of streams with nutrients, dissolved organic carbon, major ions, and metals
- Post-fire erosion and transport of sediment and debris to downstream water-treatment plants, water-supply reservoirs, and aquatic ecosystems
- Increased turbidity (cloudiness caused by suspended material), or heightened iron and manganese concentrations, which may increase chemical treatment requirements and produce larger volumes of sludge, both of which would raise operating costs
- Changes in source-water chemistry that can alter drinking-water treatment

Post-fire runoff can also harm ecosystems and aquatic life, such as fish and frogs that live in affected watersheds, some of which are critically endangered. Understanding the effects of wildfires on local water quality helps resource managers plan for and manage contaminants,

conservation, and treatment processes. U.S. Department of the Interior | U.S. Geological SurveyURL: https://ca.water.usgs.gov/wildfires/wildfires-water-quality.html

Montezuma County has two Source Water Shed Plans in place and the town of Dolores is working to complete theirs. Each plan identifies potential contaminants, including wildfire. The plans identify critical water infrastructure at risk and provide strategies to reduce wildfire risk within their watersheds.



**City of Cortez**
**Source Water Protection Plan**

**Montezuma County, Colorado**
**April 13, 2021**

Rural Water Association

CORTEZ

Written by Kimberly Mihelich, Source Water Specialist
Colorado Rural Water Association
For the Community Water Provider:
City of Cortez, PWSID# CO142200
Edited by Rich Landreth

https://co-cortez.civicplus.com/DocumentCenter/View/284/Source-Water-Protection-Plan-4-13-2021

# Mancos Source Water Protection Plan



**Montezuma County, Colorado**

**March 2009**

Written by Colleen Williams
Source Water Specialist
Colorado Rural Water Association

For the community water providers:
Town of Mancos: ID # CO0142700
Mancos Rural Water Company: ID # CO0142600
Mesa Verde National Park: ID # CO 0142750

https://montezumacountyconservationdistricts.org/mancoswatershedstreammanagementplan

**Ecosystem Health**

Almost all of Montezuma County's ecosystems are fire-dependent or fire-adapted. Fire-dependent ecosystems like Ponderosa Pine need wildfire to maintain appropriate function and health. In contrast, like the pinyon/ juniper forests, fire-adapted ecosystems have evolved to survive a wildfire.

Fire can positively affect an ecosystem by acting as a catalyst for increasing biodiversity, reducing accumulated organ debris, recycling nutrients into the soil, and initiating changes to the vegetative composition of the ecosystem.

Overall, low-intensity wildfires are a natural part of the ecosystem and yield lasting fire resilience over the long term. The increase in high intensity, severe wildland fires are the main concern for Montezuma County's ecosystems. Expanded areas of high-severity fire can impact tree regeneration, soil erosion, and water quality in a negative way.

Montezuma County places a high value on healthy, fire resilient forests and support science based forest health projects on private and public lands. Maintaining ecologically healthy, fire resistant forests, ensures forest products a place in the local economy in the future.

**Social Values**

Wildfire can be very disruptive to the whole social fabric of Montezuma County. Recreation in particular is a significate social activity in Montezuma County that could easily be disrupted by wildfire. Wildfire impacts to the social values in the short term are obvious and include loss of significant structures or iconic vegetation, area closures, air quality and water quality issues. Long-term social impacts include degraded visual aesthetics, lingering scents, and potentially the loss of access to key areas or features due to erosion or unsafe timber stands. Impacts on popular recreation infrastructure such as the Boggy Draw Trail System or the BLM Phil's World Trail system would be very disruptive for local user groups and clubs, and informal social groups that coalesce around popular recreational opportunities.

**Views**

Montezuma County has highly valued "iconic" visual topography, including expansive view-sheds and notable topographic features, including mountains, mesas, canyons, and plains. One of the most noticeable topographic features is the Mesa Verde escarpment. Located on the south side of the County, it is one of the "iconic" views people take in as they enter or leave the County. Equally important is the view from the top of the escarpment over Montezuma Valley.





FS-008574



Sleeping Ute Mountain is arguably the most prominent topographic feature in the County. Located in the southwestern region of the County, entirely within the Ute Mountain Ute Nation, the mountain is evident from all angles, and it is heavily vegetated.

The County's eastern boundary follows a high ridgeline on the La Plata Mountains. Elevations on the east portion of the County exceed 13,000' in some places. The La Plata Mountains are highly visible from nearly every part of the County. As with the Mesa Verde escarpment, the La Plata Mountains' views over the rest of Montezuma County are stunning.



Though wildfire scars are temporary, they are also long-term and harmful to the visual landscape. Fortunately, most of the prominent views discussed are about a "middle-ground" viewing distance for most viewers. The closer the viewer is to the resource, the more impact the viewer perceives. Being at least a middle–ground distance absorbs much of the visual disruption.

The importance of a view relates in part to the viewer's position to the resource; therefore, visibility and visual dominance of landscape elements depend on their placement within the view-shed. A view-shed is defined as all of the surface area visible from a particular location

(e.g., an overlook) or sequence of sites (e.g., a roadway or trail) (Federal Highway Administration 1988). A view-shed is assigned to three distance zones to identify the importance of views of a resource: foreground, middle ground, and background. Generally, the closer a resource is to the viewer, the more dominant it is and the greater its importance to the viewer. Distance zones in a view-shed may vary between different geographic regions or types of terrain; the standard foreground zone is 0.25–0.5 mile from the viewer. The middle ground zone is from the foreground to 3–5 miles from the viewer. The background zone is from the middle ground to infinity (USDA Forest Service 1995).

It is hard to find a bad view in Montezuma County; nearly every direction has a high-quality view. Maintaining the integrity of view-shed resources is vitally important to the Montezuma County economy. Maintaining high-quality views is critical for tourism, especially since tourism is one of the three economic legs upon which the County relies. No visitors want to visit public lands to find nothing but burn scars. The impact of the view on tourism is substantial.

Likewise, the impact of mitigation work can also be associated with aesthetic preferences concerning land cover and use. There are tradeoffs that residents are willing to tolerate between residential lifestyle choices and risk exposure.

**Pets & Livestock**

Pets and livestock are both abundant in Montezuma County. During a wildland fire, local animal rescue volunteer organizations coordinate with emergency personnel to save as many animals as they can. Firefighters will do all they can to protect animals, but owners are responsible for evacuating pets and livestock.

An emergency operations center (EOC) will be set up if a situation merits it. The EOC will coordinate with Emergency Support Function assignees, coordinating with the local government and other resources to evacuate as many animals as possible. The EOC will establish an orderly process for animal rescues. Evacuated animals will be housed in facilities like the Montezuma County Fairgrounds until the owners can be reunified with pets.

Owners can generally evacuate small domestic pets. Larger pets and livestock are more challenging to evacuate. Montezuma County has a significant number of larger pets and livestock.

*Table 13; Estimates of Livestock numbers in the County (USDA)*

**Livestock Inventory** (Dec 31, 2017)

| | |
|---|---|
| Broilers and other meat-type chickens | 410 |
| Cattle and calves | 26,889 |
| Goats | 735 |
| Hogs and pigs | 981 |
| Horses and ponies | 2,568 |
| Layers | 5,092 |
| Pullets | 205 |
| Sheep and lambs | 2,468 |
| Turkeys | 237 |

=

https://www.nass.usda.gov/Publications/AgCensus/2017/Online_Resources/County_Profiles/Colorado/cp08083.pdf

**Livestock**

- Clear defensible space around your barns, pastures and property just as you do your home.
- Plan ahead, know where you would evacuate the animals Contact your local fairgrounds, equestrian centers, friends etc. about their ability to take livestock temporarily in an emergency. Have several evacuation routes in mind. If you don't have your own truck and trailer, make arrangements with local companies or neighbors before disaster strikes. Make sure your neighbors have your contact numbers (Cell phone, work, home, etc.)
- Have vaccination/ medical records, registration papers and photographs of your animals (proof of ownership) and your Disaster Preparedness Kit.
- If you must leave your animals, leave them in a preselected, cleared area. Leave enough hay for 48 to 72 hours. Do not rely on automatic watering systems. Power may be lost.
- **Do not wait until the last minute to start evacuating!**

**Pets**

Data on the overall number of pets residing in Montezuma County is limited. It can be reasonably assumed however that nearly every household in the county has at least one pet.

To help ensure the safety of pets and livestock owners can steps that will increase the likelihood of pets and livestock surviving a wildland fire.

- Plan ahead. Know where you will take or leave your pets. In case you are not home when disaster strikes, arrange in advance for a neighbor to check on or transport your pets. Make sure your neighbors have your contact numbers (cell phone, work, home, etc.). In the event of evacuation pets may not be allowed inside human emergency shelters – have an alternate prearranged location to take your animals.
- Make sure your pets are always wearing properly fitted collars with personal identification, rabies and license tags.
- Each animal should have it's own pet carrier. Birds, rodents and reptiles should be transported in cages. Cover cages with a light sheet or cloth to minimize their fear.
- Store vaccination/medical records, veterinary contact information, proof of owner- ship, a current photo, and a Disaster Preparedness Kit in one location. (Cal Fire)

**Livelihood**

Wildland Fires can disrupt the livelihood of many Montezuma County Residents significantly. A wildfire that shuts down $CO_2$ production, for example, would have wide-ranging impacts on the County. Most of the $CO_2$ infrastructure in the County is protected from wildfire, vulnerabilities remain. The loss of production has far-reaching consequences for the entire County since most of the county's tax revenue is based on production value.

Wildland fires also have the potential to disrupt or threaten agricultural operations. Wildfires can potentially harm grazing, albeit temporarily. Overall, wildfire is probably more of a long-term benefit to grazing than a detriment; however, during a wildfire event, livestock may be directly threatened by a wildfire. Lingering effects may include losing access to grazing allotments on public or private lands. Loss of grazing acres could necessitate suitable replacement pasture, or feeding hay, either of which may be in short supply or more costly. In some cases, crops themselves may be at risk of wildfire. Winter wheat, for example, is highly combustible weeks before midsummer harvest.

**Tourism is also highly susceptible to wildland fires.**

Mesa Verde National Park is Montezuma County's most prominent tourism draw and has extensive experience with wildfires. During wildfire events, Mesa Verde typically closes the park to visitor access. With one access road into and out of the park, the risk of having a wildfire overrun the road and trap visitors is significant. Furthermore, the presence of visitors can be an impediment to fire suppression efforts by clogging the transportation system and preventing access by emergency personnel. In addition, visitors in the backcountry need to be alerted and accounted for during an event.

Public lands are a significant tourism draw for Montezuma County. Wildland fires can necessitate access restriction or the closure of public lands to ensure public safety, prevent interference with emergency responders, and protect resources. Restricted access to public

lands can significantly impact businesses such as guides and outfitters who rely on public lands for their business.

Wildfire could also negatively impact the timber industry. Valuable timber resources can be damaged or destroyed by wildfire. The loss of access to suitable timber resources may negatively impact businesses that rely on forest products in short and long terms.

**Recreational Resources**
The adverse effects of wildfire or wildfire mitigation are a top community concern. Generally speaking, the adverse effects of a wildfire on recreational resources would devastate the local culture, traditions, and economy more than the inconveniences posed by vegetation management projects.

The proposed USFS vegetation management project is designed, in part, to reduce the overall risk to the recreational resource on public lands.
Part of the recreational experience is rooted in healthy forest vegetation. When vegetation becomes overgrown in even-aged stands, choked with underbrush, forest health and biodiversity decline, and the overall wildlife habitat quality declines. Correspondingly the potential for insect infestations or catastrophic wildfire increases. Furthermore

USFS and BLM vegetation management projects are designed to improve overall forest health, including wildlife habitat, and build and resiliency to wildfire. Improved forest health brings a direct benefit to recreation on public lands. The intention of vegetation management projects proposed by both agencies is to reduce the overall impact on recreational resources while the project is executed. Both agencies follow the NEPA process, including a robust public outreach and feedback loop. Propose projects are adjusted based upon public input to eliminate or reduce as many conflicts identified as possible.

All recreational resources on public lands are highly valued resources to the local community and national level. BLM resources are of particular concern. Including the BLM Cortez SRMA, made up of the BLM Phil's World Trail Park, the BLM Chutes and Ladders Trail Park, and dispersed camping, the BLM Summit Trail Park, the BLM Aqueduct Trail Park, and the BLM Mud Springs Trail Park.

The USFS Boggy Draw Trail System and McPhee Reservoir are two significant recreational resources located on USFS lands that are most at risk. The USFS has many other campgrounds and trails that could also risk wildfire.

**Cultural Resources**

The direct effects of fire on archaeological materials result from either energy transported from the burning fuel to the material artifact or structure or from the deposition of combustion byproducts on the Cultural Resource (CR).

Direct, first-order fire effects result from elevated temperature's physical or chemical effects on artifacts or structures or the degradation of surface characteristics by deposition of combustion-based residues (e.g., tars and soot). Thermal results vary depending on the type of material. For example, (e.g., lithics, ceramics, organic remains, metals, etc.); the physical chemistry of the material (e.g., sandstone vs. obsidian lithics or terracotta pottery vs. porcelain ceramics). The artifact's location (provenience) to the fuels burned, fire behavior, and heat transfer. Heating can also affect other dating techinques, such as archaeomagnetic (AM), thermoluminescence (TL), and obsidian hydration (OH). Direct thermal effects include combustion of organics, including organic objects (pollen, seeds, wood, baskets, hides, etc.), organic paints and dyes used to manufacture objects, organic food residues (blood, proteins), or residues and organic substances embedded in composite materials. Fire also consumes and redistributes organic materials with potential impacts on radiocarbon dating and the ability to identify micro-and macro-fossils, proteins, and other organic diagnostics. Thermal stress associated with rapid temperature increase can physically damage artifacts, resulting in shattering fracturing, spalling, crazing, cracking, etc. Depending on the material type, e.g., glass, lithic, ceramic, et cetera.

Second-order or indirect effects include post-fire damage caused by increased weathering, erosion, and redistribution. Accelerated post-fire erosion can either wash away, bury or redistribute archaeological materials. The physical scattering of CR through erosion, combined with thermal impacts on dating techniques, may skew an archaeological interpretation, confounding the ability to assess the potential for second-order effects, which requires multidisciplinary integration of the archaeology, geology, climatology, and fire severity.

Third-order effects include the human response to fire. Fire suppression activities, particularly scouting and line construction, can cause mechanical damage to artifacts and structures. Fire retardants, foam, and water can cause chemical damage to surfaces. Rapid quenching of heated materials can lead to fractures. In the case of wildland fire, it often occurs that unknown sites and artifacts are discovered due to vegetation removal. In the absence of protection, this *can lead to increased vandalism.*
*(2010 Kevin C. Ryan Missoula fire Sciences Laboratory, U.S. Forest Service, Rocky Mountain Research Station, 5775 US Highway 10 W., Missoula, MT, USA 59808, kryan@fs.fed.us)*

**Historic Resources**

Wildfires can also harm historic properties in a very similar manner to the effects on cultural resources. Wildfire often has an even more significant impact on historic properties because

many historic resources are also constructed of wood or other combustible materials and are present on the surface,

Montezuma County has numerous historic resources at risk from wildfire. These properties include old homesteads, mining structures, mill sites, bridges, and water conveyance systems such as the McElmo Flume.

**2021 Highly Valued Resources and Assets (HVRA) Analysis**
In this 2021 update, ongoing collaboration with the Dolores Watershed Resilient Forest (DWRF) Collaborative has participated in a community-based wildfire risk analysis with input from both local and regional partners.

Montezuma County actively participants in the DWRF Collaborative. One of the benefits of working with the DWRF Collaborative is the increased access to specialized technical assistance through federal agencies.

The BLM/ USFS has provided technical assistance to the collaborative by committing a GIS/ Fire Sciences Specialist to develop Wildfire risk models. The DWRF Collaborative, in partnership with the USFS GIS Fire specialist, has been working on improved wildfire risk analysis since 2016.

**What is an HRVA Analysis?**
Wildfires can result in significant, long-lasting impacts on ecological, social, and economic systems. Therefore, it is necessary to identify and quantify the risks posed by wildfires and subsequently develop cost-effective mitigation strategies. To do so, fire and fuel managers require information on where fires are likely to occur, the intensity at which they might occur.

Furthermore, fire managers consider what impacts wildfires have on highly valued resources and assets (HVRAs; that is, the things we care about). *(A Wildfire Risk Assessment Framework for Land and Resource Management, Joe H. Scott Matthew P. Thompson David E. Calkin, 2013)*

Wildfire risk is the product of the likelihood of a fire occurring (likelihood), the associated fire behavior when a fire occurs (intensity), and the effects of the fire (susceptibility) on highly valued resources and assets *(Calkin et al. 2010, Finney 2005, Scott 2006, Scott et al. 2013)*.




Wildfire risk mitigation happens when any of these three aspects are reduced. The wildfire risk assessment framework includes four primary components: 1) wildfire simulation, 2) highly valued resource and asset (HVRA) characterization, 3) exposure analysis, and 4) effects analysis

**HRVA Characterization**

Highly valued resources and assets (HVRAs) are simply the things we care about. HVRA's can be qualitative (e.g., visual quality) or quantitative (e.g., tons of carbon). There are many HVRAs for national forests, and the choice of a single or multiple HVRAs depends on the project objectives and needs. Some resources have only modest value and may not be analyzed to focus on the more highly valued resources and assets.

Broadly HVRAs can be categorized into a critical habitat, recreation infrastructure, energy infrastructure, air quality, and municipal watersheds. However, analysts may customize HVRA's to reflect what a particular community cares about. For example; In an assessment of the Lewis and Clark National Forest, HVRAs were categorized into: green trees, wildlife habitat, infrastructure, watersheds, and urban-wildland interface. The precise HVRAs used in a fuels project depend on the issues at hand as identified in the purpose and need.

HVRA characterization involves 1) mapping the spatial extent, 2) determining the effects of fire of different intensities on each HVRA, and 3) when multiple HVRAs are assessed, the relative importance between them.

**Overall Risk Summary;**

• Overall significance of the hazard is considered high for all jurisdictions except Cortez which considers it to be medium.

• A total of 5,870 parcels and 6,463 buildings are located in areas exposed to risk wildfire, with a total value of over $2 billion. The greatest exposure is located in the unincorporated parts of the County.

• Wildfires within and in adjacent counties can deter tourism and affect the local economy and air quality.

• Wildfires could cause floods and debris flows as secondary natural hazards.

• Climate change could affect the frequency and intensity of the wildfire hazard.

• Both the natural and human-caused conditions that contribute to the wildland fire hazard are tending to exacerbate through time.

# 9.) EMERGENCY MANAGEMENT

## PROTECTION CAPABILITIES AND INFRASTRUCTURE PROTECTION

**Response Times**

Montezuma County has excellent Fire Protection Coverage, however, depending on the neighborhood area, the response could be shorter for those closer to the fire station than further from the fire station. Montezuma County fire fighter ranks are made up mostly of volunteers and response times depend largely on how quickly volunteers can report to their duty station.




*Figure 41.) Fire Stations and 5 mile radius around each. (Montezuma County GIS)*

We did not attempt to actual estimate response times for the 95 major subdivisions in the County. However we can say with confidence that nearly all of the citizens in Montezuma County live within 5 miles of a Fire Station and response times are acceptable for the setting. Notable exceptions include Lower McElmo Canyon, The Lowry Ruin area, the Dolores River

Canyon and lower Weber Canyon. Emergency Responses in the Dolores River Valley may have response teams from Rico or Dolores depending on the location and availability of first responders.

Each neighborhood should contact its local fire authority to determine the response time to your community and each residence and plan accordingly.

**INVENTORY OF FIRE PROTECTION RESOURCES**
Montezuma County has five special fire districts; The Pleasant View Fire Protection District, The Lewis- Arriola Fire Protection District, The Dolores Fire Protection District, The Cortez Fire Protection District, and the Mancos Fire Protection District are within the Montezuma County boundaries.

Also, within Montezuma County boundaries, there are several resources and entities who are also available to respond to wildland fires, including:

- United State Forest Service (USFS) – San Juan National Forest
- Bureau of Land Management (BLM) Tres Rios Field Office
- Bureau of Indian Affairs (BIA) – Ute Mountain Ute Agency
- National Park Service (NPS) - Mesa Verde National Park
- Colorado State Forest Service (CSFS)
- Ute Mountain Ute Fire Protection District and the Department of Fire Prevention and Control (DFPC)

These organizations work with each other and community partners to share resources and information. Over the years, strong partnerships have developed related to fire prevention and demonstration projects, fire suppression, public education, and access resources such as equipment, grants, and training.

These 11 agencies work together to suppress any wildland fire our County may have. Each entity brings numerous resources to the table for the initial attack and long-term suppression efforts. The inventory of all resources is constantly changing. It would not be a reliable and consistent inventory to list all the equipment in this Plan.

**LOCAL WILDLAND FIRE MANAGEMENT POLICIES**
Montezuma County enters into an Operating Plan (OP) with the fire entities listed above, including the County Sheriff and the Commissioners, every 5 years.

The last Plan entered into was for 2021 to 2026. The OP gives the guidance, spending authority and responsibilities for response, initial attack, and long-tern suppression efforts. The Plan gives clear direction on all firefighting response efforts across all the different jurisdictions. The OP is a Mutual Aid Agreement.

**TRAINING RESOURCES AND NEEDS**

The training resources throughout the County are numerous. We have several certified instructors who can deliver specific wildland fire operations classes. Instruction includes 130/190 courses for the firefighters on the ground, engine boss, division supervisors, etc. to an overhead position in the Incident Command System, Logistics Section Chief, Incident Commander, etc. Certified trainers can deliver these training sessions through formal settings like the Fire Academy held each year or by specific classes needed outside of an academy. The Law Enforcement Academy in Mancos also has instructors that deliver the ICS training at a street level for officers. Emergency Operations Center (EOC) staff and the Emergency Support Functions (ESF) personnel training is ongoing, including elective officials each year.

Regarding the need for training resources on wildland fire operations, disciplines need to train together on table-top exercises and functional exercises more often each year. More training in all areas is always better than less.

**MUTUAL AID AGREEMENTS**

The Operating Plan described above and the Montezuma County's Fire Chief's Association also have a Mutual Aid Agreement (MAA) between the 6 fire districts; Pleasant View Fire Protection District, the Lewis Arriola Fire Protection District, the Dolores Fire Protection District, the Cortez Fire Protection District, the Mancos Fire Protection District, and the Ute Mountain Ute Fire Protection District.

**EVACUATION INFORMATION**

It would not be feasible to enter all the 95 subdivisions contact information into this Plan. Individuals may elect to share personal emergency contacts with the local fire protection districts. Fire protection districts maintain these inventories.

The Montezuma County Sheriff’s Office is responsible for issuing evacuation notices and maintaining controlled access into evacuation zones. Nixel notifications on evacuations will sent by the County Emergency Manager and information will be made public through the County Public Information Officer (PIO) as it becomes available.

Livestock can be released from public lands and fences taken down in an emergency on public lands. Owners will haul some animals to locations agreed upon by the emergency team. CSU Extension will assist in this operation and care of the animals.

Alternative evacuation routes are being evaluated on a subdivision level. However, not every home will be able to have a secondary vehicular access route. Therefore residents are encouraged to develop alternative plans for evacuation in case their primary route becomes impassable. It is not feasible to all subdivision to develop secondary access routes, however emergency access is a part of the development review process.

## COMMUNITY PREPAREDNESS TO RESPOND TO WILDFIRE

There are a number of resources and entities involved in fire suppression in Montezuma County.

- The Montezuma County Sheriff's Department
- Local Fire Protection Districts (Lewis Arriola, Pleasant View, Cortez, Dolores, Mancos, Towaoc)
- The United States Forest Service (USFS) – San Juan National Forest
- The Bureau of Land Management (BLM) – Tres Rios Field Office
- The National Park Service (NPS) – Mesa Verde National Park
- The Bureau of Indian Affairs (BIA) –Ute Mountain Ute Agency
- The Colorado Sate Forest Service (CSFS)
- Colorado Division of Fire Prevention and Control (CDFPC)

All of the agencies collaborate together to share resources and information. Over the years, a strong partnership have formed related to fire prevention and demonstration projects, fire suppression, public education and access for resources such as equipment and training.

### THE MONTEZUMA COUNTY SHERIFF'S OFFICE

The Sheriff is the Fire Warden for Montezuma County. The Sheriff will initiate emergency evacuation orders, and maintain security for wildfire events. The Sheriff also coordinates information form the Fire Projection Districts and recommends fire bans to the Board of County Commissioners when it is appropriate.

**LOCAL FIRE PROTECTION DISTRICTS -** Fire protection on private lands is provided by the five Montezuma County fire districts, including Lewis Arriola, Pleasant View, Cortez, Dolores, and Mancos.

The Pleasant View Fire Protection District extends northward into a relatively small rural area of neighboring Dolores County. Likewise, the Dolores Fire Protection District provides service to the "Ground Hog" area of Dolores County, which a Fire Protection District does not cover.
Each Fire Protection District has at least one brush truck and a variety of other equipment that enable them to suppress wildland fires within their district.

Mutual-aid between Fire Protections Districts and federally managed lands are well-coordinated and used effectively when the situation dictates.

**THE UNITED STATES FOREST SERVICE (USFS) -** The Dolores District of the San Juan Forest /Bureau of Land Management provides wildfire management on US Forest Service and BLM lands, including Canyons of the Ancients National Monument. (The National Park Service includes wildfire management at Mesa Verde National Park.
The Bureau of Indian Affairs (BIA) provides wildfire management on the Ute Mountain Ute Indian Reservation.)

Although there is some annual fluctuation in funding, federal agencies typically have the resources needed to help manage, monitor, or suppress wildfire starts within their locality. Suppose local resources are not sufficient to manage wildfire starts. In that case, Fire authorities may request additional resources through the Durango Interagency Dispatch Center.

During the summer, “severity resources” are often brought in to supplement locally stationed resources. The San Juan Interagency Hotshot Crew is stationed in Durango but usually works elsewhere across the nation. The crew is considered a national resource. In addition to fires in the local area, teams may be assigned to fires across the country.
This is the same for the two type III initial attack helicopters located at Ute Mountain and at Mesa Verde and the type II helicopter pre-positioned at Ft. Lewis.

There is good coordination between federal agencies and local resources. Mutual aid response is adequate and detailed when conditions or available resources dictate.

The Dolores District conducts prescribed fire and other fuel treatments on approximately 2,500 to 3,000 acres of National Forest land and 500 acres of BLM land per year.

**THE NATIONAL PARK SERVICE (NPS) -** The National Park Service provides wildfire management at Mesa Verde National Park. The National Park Service conducts prescribed fire and other fuel treatments on land within its jurisdiction.

**THE BUREAU OF INDIAN AFFAIRS (BIA) -** The Bureau of Indian Affairs (BIA) provides wildland fire protection on Ute Mountain Ute Nation lands and coordinated fire suppression in interface areas between interface areas Ute Mountain Ute lands and other jurisdictions.

The community of Towaoc also has a paid Fire Protection District (FPD). The Towaoc FPD provides suppression services to the community of Towaoc mainly with structural fires, it but also assists BIA with wildland fire suppression wherever needed on Tribal lands. The Towaoc FPD also provides coordinated fire suppression and emergency response in interface areas between Ute Mountain Ute lands and other jurisdictions.

The BIA conducts prescribed fire and other fuel treatments on land within its jurisdiction.

**THE COLORADO STATE FOREST SERVICE (CSFS) -** The CSFS’s role has changed since the last rendition of the Montezuma County CWPP. CSFS still supports educational and training programs that promote forest health and wildfire risk reduction and most of its foresters are still certified Wildland Firefighters that take fire assignments as time allows, however it no

longer has responsibility for response and suppression of wildfire. In 2012 the Division of Fire Prevention & Control, under Colorado's Department of Public Safety, was assigned responsibility as Colorado's wildland fire suppression agency.

The agency's primary emphasis is on forest health, prevention and mitigation to reduce the chances of catastrophic wildfire on state and private lands in Colorado. The CSFS also administers several grant programs that are designed to assist private landowners or local governments with fuels reduction projects.

The CSFS activities include:

- developing education materials and programs to assist homeowners, landowners and communities in taking action to reduce their wildfire risk
- encouraging the creation of fire-adapted communities through the implementation of forest management to increase forest resilience
- supporting local nonprofits like the Wildfire Adapted Partnership in their mission of educating, training
  and equipping communities in the Wildland Urban Interface to understand and reduce their wildfire risk

**COLORADO DIVISION OF PREVENTION AND CONTROL (CDPC)-** The Colorado Division of Fire Prevention and Control is a Department of Public Safety division with a 10-person module and Battalion Chief located in Dolores, Colorado as of January 2019. The Division resources are available to assist the local Fire Protection Districts in Montezuma County, Federal lands and the County Sheriffs upon request. The Division will work with stakeholders and cooperators to develop an ANNUAL OPERATING PLAN for the county and to assist with planned and unplanned ignitions.

The Division of Fire Prevention and Control has no identified fire protection district or jurisdictional boundaries and can be utilized for suppression on lands unidentified or unincorporated or in any specific Fire Protection District. Division resources may be ordered for pre- positioning, during mutual aid periods and may be requested for extended attack.

The Division of Fire Prevention and Control may assume responsibility of any wildland fire that exceeds the capabilities of the Local Fire Protection district and the Sheriff with a Delegation of Authority. An Agency Administrator will be available on emerging incidents to help evaluate, advise, order necessary management personnel, to explore funding mechanisms, to act as a liaison between the County Sheriff, other jurisdictional Agency Administrators and incident management teams if present.

**THE DURANGO INTERAGENCY FIRE DISPATCH CENTER**

The USFS, BLM, Bureau of Indian Affairs, Mesa Verde National Park, and CSFS contribute resources to operate a full-time interagency fire dispatch center. The facility is located in the

San Juan Public Lands Center, at 15 Burnett Court, Durango. This is a sub-geographical coordination center with direct links to the Rocky Mountain Geographic Coordination Center (Denver) and the National Inter-agency Coordination Center (Boise, Idaho). The Center helps make fire response quick and effective.

**AIR SUPPORT**

An air tanker base is located in La Plata County at the airport, and the Mesa Verde Heli-tack base has been located at the Old Fort Lewis in Hesperus. Both have greatly improved local firefighting capabilities. Additional air support can be tapped into from other areas if it is available.

**OTHER RELEVANT PLANS;**

This County-Wide CWPP incorporates any subdivision level CWPPs in the County, the County Wide Hazard Mitigation Plan, and Community Source Water Protection Plans.

# 10.) MITIGATION AND IMPLEMENTATION PLAN

The original 2005 version of this Plan identified five goals. In 2011, based on a fire protection agency review and stakeholders' feedback, the fire planning collaborative narrowed the five goals to three. The 2022 Plan review found all three goals remain priorities.
The following three goals summarize the overall intent of the recommendations of the 2021 plan update.

**1.) PROTECTION OF THE LIVES OF RESIDENTS AND EMERGENCY PERSONNEL.**

**2.) PROTECTION OF PROPERTY AND CRITICAL INFRASTRUCTURE IN THE WILDLAND-URBAN INTERFACE.**

**3.) PROTECT KEY ENVIRONMENTAL VALUES AND QUALITY OF LIFE.**

The 2021 collaborative update process also reviewed six focused program areas that the fire planning collaborative initially identified as necessary to support the three overarching goals of the 2021 CWPP. Those program areas are;

| | | |
|---|---|---|
| **Education** | **Prevention** | **Mitigation** |
| **Cooperation** | **Suppression** | **Appropriation** |

Realizing the goals of this CWPP will require an extensive effort that will continue to evolve as new ideas emerge and existing ideas hit obstacles or delays. This Plan intends to support and pursue as many actions as possible in an ongoing effort to achieve the Plan's three overall goals.

The Fire Planning Collaborative initially developed strategies and action items from the five community input meetings held in 2005. In 2021 the Fire Planning Collaborative analyzed the strategy and action items and found them to remain priorities.

Many of the actions identified on this Plan will require an ongoing sustained effort to implement. This Plan does not necessarily expect that all of these actions will occur at once. The Plan intends the following tables to function as a menu of opportunities for creating a more prepared WUI community over time. Steps should follow as opportunities arise. The action language also indicates existing efforts that should be continued and strengthened.

**EDUCATION AND COMMUNITY OUTREACH**

**Audience**

The Community Education and Outreach provides information to County citizens, especially newcomers who may not have experience lining in a rural western setting. Outreach is also educating the local builders and lands developers to help new residents create safe and desirable living spaces.

**Current outreach program**

The Montezuma County Wildfire Adapted Partnership (WAP) currently takes the lead education and outreach role in Montezuma County.

The WAP Mission Statement reads, *"Wildfire Adapted Partnership (WAP) inspires, educates and enables individuals and communities to protect lives and property from wildfire".*

WAP provides the following outreach and education services;

- **Educates** and actively engages over 20 Volunteer Neighborhood Ambassadors.
- **Makes annual presentations** to local HOAs. Local workshops and education events. Bi-monthly Ambassador meetings (open to the community.)
- **Home Wildfire Risk Visits;** A Wildfire Adapted Partnership coordinator will visit properties and do a wildfire risk assessment of the home site. WAP coordinators will walk around the property and discuss what steps can be taken to be better prepared for wildfire. WAP Provides a written analysis and affirmative steps that properties can take to reduce wildfire risk. Site visits generally take 60-90 minutes.
- **Defensible Space Cost Share;** Properties may be eligible for cost-share assistance to reduce the cost of modifying vegetation that makes your home vulnerable to wildfires. WAP will send a Home Ignition Zone specialist to provide a free home wildfire risk assessment and mark trees for removal if residents choose to pursue the defensible space cost-share program.
- **Chipper Rental Rebate;** WAP administers a program that encourages private landowners to chip slash created from fuels mitigation projects on site. On any privately-owned property in La Plata, San Juan, Montezuma, Archuleta, or Dolores counties in Colorado, Wildfire Adapted will reimburse the homeowner 50% of the cost of a chipper up to $250. After meeting all requirements, residents may choose to rent a chipper or hire a mitigation company to provide chipping services.

- **Community Assessments;** Wildfire Adapted, and 1-2 of their partners (BLM, CSFS, or local fire department) will do a drive-through or walkthrough of the neighborhood with the Wildfire Adapted Ambassador and one or two more residents. The community will receive a written report, complete with pictures and 4-6 recommendations to start their wildfire preparedness efforts—no cost to homeowner other than coordinating with HOA and neighbors.

- **Wildfire Adapted Community Kickstart Grant;** The WAP program offers neighborhoods new to our Wildfire Adapted Partnerships program a chance to receive up to $7,500 for a community project. Which partners are available to help develop the Plan if requested; however, the Neighborhood Ambassador is responsible for writing the scope of work and getting contractor bids. Most neighborhoods use the funding to mitigate common space or create shaded fuel breaks along their road rights-of-way. Wildfire Adapted Partnership and CSFS inspect projects upon completion and certify quality. Residents must provide at least a 25% cash match.

- **Mini-Grants;** Mini Grants may be available for HOAs, POAs, or self-defined communities that do not have a form of governance. Mini-Grants target specific education or outreach activity or specific wildfire mitigation project. Proposals must address a community education or mitigation need. Examples of approved projects include: installing reflective signage, mailing informational handouts to community members, hosting a Wildfire Adapted outreach event for the community, etc.

**The Colorado State Forest Service (CSFS)** is also proactive in Montezuma County. The CSFS mainly supports educational and training programs that promote forest health, practical readiness, response, and suppression of wildfires. CFS's most significant emphasis is on forest health, prevention, and mitigation to lessen the chances of catastrophic wildfires on state and private lands in Colorado.

The CSFS's role has changed since the last rendition of the Montezuma County CWPP. CSFS still supports educational and training programs that promote forest health and wildfire risk reduction and most of its foresters are still certified Wildland Firefighters that take fire assignments as time allows, however it no longer has responsibility for response and suppression of wildfire. In 2012 the Division of Fire Prevention & Control, under Colorado's Department of Public Safety, was assigned responsibility as Colorado's wildland fire suppression agency.

The agency's primary emphasis is on forest health, prevention and mitigation to reduce the chances of catastrophic wildfire on state and private lands in Colorado. The CSFS also

administers several grant programs that are designed to assist private landowners or local governments with fuels reduction projects.

The CSFS activities include:

- developing education materials and programs to assist homeowners, landowners and communities in taking action to reduce their wildfire risk
- encouraging the creation of fire-adapted communities through the implementation of forest management to increase forest resilience
- supporting local nonprofits like the Wildfire Adapted Partnership in their mission of educating, training
  and equipping communities in the Wildland Urban Interface to understand and reduce their wildfire risk

**STRATEGY AND OUTREACH ACTIONS**

A focus on understanding the Home Ignition Zone is the most critical public messaging within the 2021 CWPP update.

Public messaging in Montezuma County has focused on five main strategies to reduce wildfire risk these points are still relevant to the core message and should continue to be promoted;

**1.) Master Planning**

Pre-construction planning and design can often play a significant role in increasing a home or subdivision's resistance to wildfire. Understanding and accepting that fire is a natural occurrence in the landscape can help from the beginning design stages through the final build-out. Careful design will result in communities that are attractive, livable and ultimately more valuable because they are more compatible with their natural environment which includes wildfire.

Appropriate planning includes community infrastructure considerations, site preparation, home design and layout, fire resistant building materials, landscaping layout and materials, and long-range maintenance activities. All of these planning elements are applied with the risk of wildfire in mind.

Land use planning tools such as zoning, plans, regulations, and building codes can influence the design, layout, and placement of homes built in wildfire-prone areas. However not all counties are in favor of heavy handed approaches such as these, nor do all counties have the means to fully administer regulate all of the aforementioned approaches.

The Montezuma County Land Use Code considers adequate water supply, road widths and access during the subdivision process but only on parcels less than 35 acres in size as per state

law. Montezuma County generally supports personal responsibility over governmental mandates.

**2.) Reducing Structural Ignitability Using Fire Safe Construction Materials and Techniques**
Montezuma County does not currently have a building department or building codes. Therefore it is up to the individual to educate themselves about Firewise construction.

After carefully designing a development, it is important to follow through with the appropriate building materials and techniques. Proper selection and assembly of materials for roofing, siding, and windows can significantly improve a structures resistance to fire. In addition attention must be paid to areas that can catch firebrands such as eaves, vents, and wooden decks.

**Exterior Walls** - Wood and Vinyl wall coverings are not appropriate for home construction in wildland fire environments. Vinyl melts at relatively low temperatures. Most wood, wood composite, and wood shingle exterior wall coverings are also risky for use in fire-prone environments. These coverings are better used where wildland fire is not an issue. This is especially true for hardboard and cedar shingle wall coverings, both of which quickly failed in flame exposure tests. An exception is wood treated with fire retardant, especially if tongue and groove or other 'tight' building techniques are employed, but the retardant chemicals also have a limited lifespan and may need to be reapplied. The sheathing that underlies wall coverings is also a factor. In laboratory fire tests, Oriented Strand Board (OSB) failed in about 80% of the time that plywood failed.

**Fiber-cement** - This includes cement and wood fiber mixes such as "Hardie Plank," usually applied as horizontal lap siding. The type of lap is important, with joints that interlock or tongue-and-groove performing better than plain bevel lap. Plain bevel lap is not as good since tests showed that flames penetrated walls within one minute, while shiplap resisted flames over 20 minutes. Several things can be done to assure that these cement/ fiber siding boards don't separate with age or various kinds of trauma. One manufacturer recommends leaving an eighth of an inch gap between planks and adjoining wooden members. This avoids warping when the wood members swell up during wet weather. Some plank manufacturers advise homebuilders to seal between the planks with caulk. This also makes sense for reducing the likelihood of fire entry into the house. These planks are roughly 80 percent cement. They will not burn at forest fire temperatures.

**Stucco**- Stucco is probably the best material for WUI wall construction. Stucco is simply a fine grade of cement, a sort of artificial stone that does not burn and is not a good heat conductor. An added plus for homeowners is that it is low maintenance in most western climates. One concern, though, is that protruding wooden beams can wick fire through stucco walls and ignite the interior of homes.

**Concrete wall systems-** At first glance concrete wall panels would seem to be fireproof systems, but these systems are relatively new on the market; consequently, research on their efficacy in resisting wildfire damage is not yet available. One system uses large amounts of plastic foam that may actually present some problems in a wildfire situation. In summary, covering walls with stucco or cement/fiber appears to be an economical way of reducing the flammability of exterior walls. Underlying sheathing should be made of plywood if possible.

**Roofs**

There are numerous roofing materials that will look good and keep the weather out, but only a few materials will resist ignition from wildfires. Underlayment and sheathing are important. No matter which type of roofing is chosen, use one of several nonflammable underlayments that are on the market. Also, there is considerable evidence that if fire does penetrate the roof surface, plywood sheathing will not fail as quickly as oriented strand board and other composite products. So consider plywood for roof sheathing.

**Slate** - This is very expensive, and the product is heavy enough that roofs must often be specially designed to bear the weight. For those who can use it, slate offers excellent fire protection.

**Tile-** Concrete tile passed a flaming brand test. Polymer modified fiber-cement also passed.

**Metal** - Metal roofs have an excellent record in forest fire situations. Not only are they composed of a material that will not burn, they are fairly 'slippery' and tend to shed flammable debris before it can build up. Metal roofs are moderately priced.

**Composition** - This is the classic three-tab asphalt roofing. One popularly used brand passed a 20-minute firebrand test without fire penetration.

**Fiberglass** - This is similar to three-tab, but the material is fiberglass. It has a Class A rating: flames from a firebrand did not penetrate a fiberglass shingle roof.

**Cedar Shake Roofs -** These are absolutely the worst choice for roofing in the wildland/urban interface. They are easily ignitable, highly flammable, and catch needles too well. According to research on home ignitability by Jack Cohen of the U.S. Forest Service's Fire Sciences Lab, if all a homeowner can do is to replace a wooden shake roof with a roof made of nonflammable materials, they raise the probability of their home surviving by 90 to 95 percent.

In summary, for most price ranges, metal, various tile products, fiberglass, or composition will work for roofs. The ability of metal to shed needles and leaves makes it an excellent choice for WUI roofs. Again, a non-flammable underlayment and plywood sheathing may also increase home fire resistance.

**Windows**
Windows are defined here as both the frame material and the glass. Tests at the University of California Forest Products Laboratory show that the glass is the most important factor when considering fire penetration.

**Glass**- Glass Double pane (thermopane, etc) performed far better than single pane. It is not too expensive, and saves on heating and cooling bills. It works because most windows fail when a sudden spike in the temperature of the exposed glass pane cannot equalize with the glazed portion (the part of the glass covered by the wood or metal glazing). The double panes slow down this sudden heating. Often the outer pane fails, but the inner pane does not shatter and thus embers cannot blow into and ignite the house. Tempered glass is quite expensive but performs better than regular annealed glass.

**Window frames**
Whether vertical or horizontal, frames tend to fail at the interlock between windows. Some homeowners have constructed metal shutters to place over windows in the event of a fire. This is expensive, and is very effective, but only if people are present and forewarned in time to install the shutters. Double pane windows with wood, wood clad with aluminum, or fiberglass frames did well in flame tests. Anecdotal evidence from the 1988 Florida wildfires showed that vinyl frames can melt, causing the glass to fall out and allowing flames to enter the interior of houses.

**Vents**
Vents help control of moisture coming up from the ground during winter precipitation and accumulating inside the house structure. Most codes are standardized, so vents are frequently sized to eliminate moisture problems in climates ranging from warm and wet Florida to cold and snowy Minnesota, as well as the high desert area of Montezuma County, Colorado.

In many cases these codes provide much more venting than is needed in the arid west. Montezuma County does not require residential stricture to follow a specific building code. Homes located in the dry, arid west may consider using the minimum acceptable square footage of venting recommended by standard building codes.

Minimum venting is recommended because vents are vulnerable to ember wash. Ember wash is what often happens when the flaming front of a wildfire is pushed by strong winds. Thousands of glowing embers are carried through the air by the force of the wind and by the convective air rising off the flaming front. Most of these embers are so small that they have little fuel, release very little heat, and tend to go out almost immediately. The larger the size of the ember, however, the longer it can sustain glowing combustion. If a larger ember gets pushed into a soffit vent and lands on some drill shavings or a similar material inside an attic, the house can

ignite and burn. Sometimes the advent of flaming combustion inside a house can occur hours after the flaming front has passed.

Perhaps the best mitigation for these vents is screening. The larger the ember, the more heat it can generate—and it only takes one ember landing in the wrong place to ignite a house. Soffitt vents and crawlspace vents should be screened with 1/8” steel mesh.

Some county code enforcers will frown on this, as they worry that dust, subsequent paint jobs, and other factors will tend to clog 1/8” mesh. 1/8” screens must be cleaned occasionally, and should not be painted. All forms of vents on the underside of eaves (strip, freeze block, etc) in both boxed and open eave designs will admit flames and superheated air. That is why it is so important to keep the flammable vegetation, decks and woodpiles away from the house. (Rich Fairbanks and Timothy Ingalsbee, Firefighters United for Safety, Ethics, and Ecology July 2006)

**3.) Reducing Structural Ignitability using Fire safe Landscaping**
Proper landscaping helps to improve the enjoyment and value of a home. Landscaping offers the opportunity to manipulate micro-climates to manage storm water, take advantage of cooling shade or manage solar heat. Landscaping make homes more livable and connects people with the outdoors.

Landscaping is an essential element of home ownership and special attention to proper planning will ensure a successful landscape while managing risks associated with wildfires. Homeowners typically landscape their properties with a variety of plants to provide variation in color, texture and foliage. Homeowners in fire-prone areas should make sure that the plants and landscaping materials they use are fire resistant. A fire-safe landscape shows off plants and other garden elements by leaving space between plants and groups of plants.

**Reduction of Plant Fuels-** The excess and/or dead plants surrounding your home act as fuels when fire strikes. Remove them from your defensible space, replacing more flammable varieties with fire-resistant ones recommended by your local nursery.

**Plant Selection-** Use native plants in your defensible space. "Native species—(a good southwestern Colorado example is buffalo grass)—are fire-adapted, which means that their tops may burn off in a fire, but the roots develop to such an extent that they are the first to regenerate after a fire," says Jeff Burns, a forester with the Colorado State Forest Service's Alamosa District. These plants offer the fire-wise trait of being easy to maintain, and strong root systems will reduce property damage from erosion. The fire-adaptive traits of native plants ensure the preservation of native species and allow for a landscape that is more likely to survive exposure to extreme heat.

Trees and shrubs can be used in all defensible space zones, including Zone 1, provided they are a safe distance from other plants and any structures (more on that below). The trees you select for your landscape should be low in resin and sap content, with no rough bark. Consider replacing shrubs with a less flammable groundcover.

Consider the litter that plants create in the off-season. Try to select plants that shed minimal amounts of needles, leaves, and other waste. Any area where the ground is thickly covered with pine needles is at high risk, since the presence of very aromatic, dry litter increases flammability in fire-prone locations.

Visit a local nursery and talk to a grower about which plants will work for your defensible space. You can also call your local fire authority or contact a *Firewise Community/USA representative.* https://www.nfpa.org/Public-Education/Fire-causes-and-risks/Wildfire/Firewise-USA

**Create Fuels Breaks with Hardscaping-** Incorporate fuel breaks like gravel and stone into your landscape. In the first 3 to 5 feet of Zone 1, replace all of the plants closest to the perimeter of your home with a bed of gravel. Replace mulch with flame-resistant landscaping materials by weaving gravel and stone pathways into your design. The use of these accents will provide visitors with safe passage to view your living collection and impede approaching flame in the event of a wildfire. For more information visit; https://www.thisoldhouse.com/landscaping/21015539/firesafe-landscaping-defensible-space

**Install an Automated Irrigation System**- An automated irrigation system can be a great benefit to a fire resilient landscape. Regular water application through an automated system keeps plants healthy and hydrated making them more resilient wildfire. Grasses in particular can be an excellent fuel break if they are healthy and properly maintained. Regular watering can also increase moisture content in organic mulches and plant litter which reduces the ignitability of those materials. Finally an automated irrigation system can be set up to run ahead of an advancing wildfire. Even as homes are evacuated an irrigation system can still be left running to wet the landscape as fires approach providing some level of fire resistance even if the home is not occupied.

**4.) Creating Defensible Space**

Montezuma County recommends following the Colorado State Forest Service guidelines on creating Defensible Space. The full set of guidelines can be found on the Colorado Sate Forest Services website; https://csfs.colostate.edu/wildfire-mitigation/protect-your-home-property-from-wildfire/

The majority of homes lost to wildfire are first ignited by embers and small flames. By reducing the susceptibility of the area immediately around the home and the home itself, the chances of a home surviving an ember storm or small spot fire are greatly increased. Work in the Home

Ignition Zone is also called creating defensible space and it is not a "once-and-done" undertaking. Defensible space requires ongoing commitment and maintenance.

The Home Ignition Zone is an area approximately 0' – 100' feet or more from the foundation and includes vegetation, the home itself, and other structures or attachments like decks, furniture, fences, and outbuildings.

**The Home Ignition Zone**




*Figure 42.) The Home Ignition Zone (CSFS)*

**Defensible Space;**
Defensible Space is where the rubber hits the road in Montezuma County. Defensible Space is the probably the best preventive measure a homeowner can take. Defensible space is not just for new construction though. Defensible space means an ongoing commitment to maintaining a fire safer space around values at risk throughout the county.

Thinning out vegetation and removing combustible materials around homes is the most important step in creating defensible space. Not only does this improve the chances of a home surviving a wildfire, but it is also the best thing that can be done to help keep firefighters safe and give them a *chance* to protect your property.

The Colorado State Forest Service offers the following advice on creating defensible space;

*"Defensible space is the area around a home or other structure that has been modified to reduce fire hazards. In this area, natural and manmade fuels are treated, cleared or reduced to slow the spread of wildfire.*

*Establishing defensible space reduces the likelihood of a home igniting by direct contact with flame or by exposure to the radiant heat of the fire. It also helps limit local production of embers*

*and reduces the chance a structure fire will spread to neighboring homes or surrounding vegetation." CSFS.*

Developing a defensible space plan requires an inventory of the existing site features and their hazards. Man-made elements include landscaping features, such as masonry walls, patios, footpaths and driveways. These features create fire barriers and buffer zones.




*Figure 43.) Defensible Space Zones (CSFS)*

**Defensible Space Zones**

Creating an effective defensible space involves establishing a series of management zones. Develop these zones around each building on your property, including detached garages, storage buildings, barns and other structures.

- **Zone 1** (0-5 feet from the home) is the area nearest the home and other structures. It requires the most vigilant work to reduce wildfire hazards.
- **Zone 2** (5-30 feet from the home) is the area transitioning away from the home where fuels should be reduced.
- **Zone 3** (30-100 feet from the home) is the area farthest from the home. It extends 100 feet from the home on relatively flat ground.

**Top Priorities for Defensible Space**

- Mow grass and weeds to a height of 4 inches or less.*

- Rake and remove all pine needles and other flammable debris from a 5-foot radius around the foundation of your home and deck.*
- Treat or mow shrubs that re-sprout aggressively (such as Gambel oak) every 3-5 years or more depending on growth rates.
- Remove branches that hang over the roof and chimney.
- Dispose of slash from thinning trees and shrubs by chipping, hauling to a disposal site or piling in open areas for burning later. Any accumulation of slash that's chipped or otherwise should be isolated 30 feet or more from the home.*
- Avoid creating continuous areas of wood chips on the ground when chipping logs and/or slash. Break up the layer of wood chips by adding nonflammable material, or allow for wide gaps of at least 3 feet between chip accumulations.

*Address as needed, more than once a year.

**Firewood**

- Keep firewood stacked uphill from (or at the same elevation as) any structures, and keep the woodpile at least 30 feet away from the home.
- Do not stack firewood between remaining trees, underneath the deck, or on the deck.
- Remove flammable vegetation within 10 feet of woodpiles.

**Propane Tanks**

- Keep aboveground tanks at least 30 feet from the home, preferably on the same elevation as the house.
- Remove flammable vegetation within 10 feet of all propane tanks and gas meters.

**Driveways**

- Maintain at least 10 feet between tree crowns and keep trees a minimum of 30 feet back from each side of the driveway along the entire distance from the house to the main access road.
- Remove any remaining ladder fuels beneath trees after thinning.
- Remove any shrubs that are within 10 feet of the outer edge of tree crowns.
- Space shrubs apart at least two-and-a-half times their mature height, as measured from the edge of the shrubs.
- Post signs at the end of the driveway with your house number that are noncombustible, reflective and easily visible to emergency responders.

**Solutions for Managing Slash**

Properly thin and prune trees and shrubs as you address the home ignition zone. The sticks and other debris left from cutting trees and shrubs is called slash. Slash is a fuel for wildfire, so ensure this debris is properly managed on your property. It is critical that any slash is located as far from your house as possible:

1. Spread slash and wood chips over a large area of ground to avoid heavy accumulations and large piles. Being close to the ground will help speed decomposition.
2. Burn slash piles, but before doing so, always contact your county sheriff's office or local fire department for current information or possible restrictions.
3. Lop and scatter slash by cutting it into small pieces (generally less than 24 inches long) and distributing it over a wide patch of ground, to a depth not exceeding 18 inches. Material over 4 inches in diameter should not be scattered.

**Additional Resources**

For further guidance on how to prepare your home for wildfire:

- Home Ignition Zone guide
- Protect Your Home and Property from Wildfire

Montezuma County supports the local Wildfire Adapted Partnership (WAP). WAP strives to inspire, educate and enable individuals and communities to protect lives and property from wildfire. WAP provides onsite evaluation and consultation in the development of defensible space, and also administers a Defensible Space Cost Share Program.

In Southwest Colorado, you may be eligible for cost-share assistance to reduce vegetation that makes your home vulnerable to wildfires. To find out how to make your home more fire safe and what resources are available to support forest thinning work on your property, contact your Wildfire Adapted County Coordinator. A Home Ignition Zone specialist will provide a free home wildfire risk assessment and will mark trees for removal if you choose to pursue the defensible space cost-share program at that time.

WAP's defensible space cost-share will partially reimburse qualifying homeowners for the cost of developing defensible space to increase your home's chance of survival and increase firefighter safety when wildfires occur. Available funding varies per project based on your home site size, vegetation, and terrain. Funded projects will receive an award letter detailing the award amount, which the applicant must sign and return acknowledging the award agreement before work begins with the selected contractor. For more information about WAP and the services they provide, visit; https://www.wildfireadapted.org/

Find out more about home hardening and defensible space here;
https://csfs.colostate.edu/media/sites/22/2021/04/2021_CSFS_HIZGuide_Web.pdf

Colorado State Forest Service Pinon/ Juniper Management;
https://static1.squarespace.com/static/5b28059d266c074ffe39b9b9/t/5ba8d9d7ec212d69b8593031/1537792473086/CSFS_PinonJuniperGuide.pdf

**5.) Public Awareness**

Both public and private lands are at increased risk of wildfire partly due to changing climatic conditions, and partly due to increased visitation. It is important to maintain a campaign of public awareness surrounding the risk of wildfire on both private and public lands.

Public lands agencies should continue to promote fire safe visitor information through visitors centers, campsite and other strategic points of contact.

The Mesa Verde Country Tourism Office also distributes fire safe visitor information and coordinates informational programming for hotels and other visitor accommodations. The Tourism office also coordinates infomercial television messaging for hotel TV channels.

One of the greatest public awareness challenges surrounds forest health projects. Forest health projects carry numerous benefits to the public but one of the greatest benefits is the increased fire resiliency. As climatic conditions change more rapidly it is becoming increasingly apparent that a more "hands-on" approach to forest management is required.

Forest health projects that are needed where people like to recreate, and feel they have some ownership of are particularly difficult areas to conduct forest health treatments. Short term impacts are most noticeable within high use areas and there is lingering public resentment over the timber industry participating in forest health projects. A large percentage of the public still view the timber industry as irresponsible stewards, putting profit ahead of all else.

Our challenge is to raise public awareness of the science based forest management decisions being made, the role of the timber industry in forest management projects, and the potential consequences of doing nothing.

**LANDSCAPE SCALE MITIGATION AND FOREST HEALTH PROJECTS**

Montezuma County supports vegetation management projects on public and private lands alike, however landscape level fuels treatments are most significant on public lands. Public lands consist of vast tracts of unbroken fuels, and more importantly are typically managed by one land owner. While there are a few tracts of private land potentially large enough to qualify as "landscape level", most private parcels, even the largest ones, would require the

cooperation of multiple land owners. While securing cooperation from multiple landowners to achieve a common goal is not impossible, it clearly presents a greater challenge.

Montezuma County supports landscape level projects on both private and public lands and encourages cross boundary treatments at a landscape level whenever possible. Landscape level treatments will typically involve a commercial component which the county also strongly supports from an economic perspective as well as overall community capacity building.

**USFS Projects**

Montezuma County supports landscape level forest health projects on public lands within the County. The United States Forest Service is actively implementing two landscape scale forest health projects including;

**Dolores Aspen Landscape Vegetation Management** - Treatment of 4,000 ac - 6,000 ac of mature aspen-dominated forest using even-aged treatments. Connected actions include slash treatment; temporary road construction & obliteration; and reconstruction of existing system roads. Details on this project can be found here.




Figure A- 1. Treatment blocks by geographic location by management area

*Figure 44.) Aspen Vegetation Managment Project Map*

Web Link: http://www.fs.usda.gov/project/?project=54880

**The Salter Vegetation Management Project**- This proposed vegetation management project will focus on ponderosa pine and includes tree cutting, tree planting, and active fuel-burning covering approximately 35,000 acres. The public can find details on this project here. Web Link: http://www.fs.usda.gov/project/?project=57671

**Project Map**




*Figure 45.) Salter Vegetation Management Project Map*




*Figure 46.) USDA FS Planned Prescribed Fire Units*

**Bureau of Land Management (BLM) Projects**
The BLM focuses on fuels treatments around the Cortez Special Resource Management Areas SRMA, including the Phil's World, Chutes and Ladders, Summit, and Aqueduct areas. All of the aforementioned are areas identified by the County to be at high risk of wildfire.

BLM and SLB land in the Summit and Aqueduct areas intermingle with some of the largest subdivisions in the County. The Cedar Mesa Ranches subdivision is surrounded by BLM or SLB Lands in the area known as Summit and Chutes and Ladders. The BLM is focusing treatments along the public-private boundaries. The County identifies public-private boundaries as being high-risk areas.

**CROSS-BOUNDARY LANDSCAPE-LEVEL FOREST HEALTH PROJECTS**
Montezuma County supports cross-boundary treatments whenever possible. Montezuma County has already identified high-priority areas where cross-boundary treatments would result in a healthy, fire resilient forest, benefiting public health safety and welfare.

**OTHER POTENTIAL LANDSCAPE-LEVEL FUELS TREATMENT PROJECTS**

**Collaborative Forest Landscape Restoration Program (CFLRP) -** The purpose of the Collaborative Forest Landscape Restoration Program (CFLRP) is to encourage the collaborative, science-based ecosystem restoration of priority forest landscapes.

Congress established the Collaborative Forest Landscape Restoration Program (CFLRP) with Title IV of the Omnibus Public Land Management Act of 2009 and reauthorized it in the Agriculture Improvement Act of 2018 Section 8629 (the Farm Bill).
The purpose of the Collaborative Forest Landscape Restoration Program is to encourage the collaborative, science-based ecosystem restoration of priority forest landscapes and:

- encourage ecological, economic, and social sustainability;
- leverage local resources with national and private resources;
- facilitate the reduction of wildfire management costs, including through re-establishing natural fire regimes and reducing the risk of uncharacteristic wildfire;
- demonstrate the degree to which various ecological restoration techniques achieve ecological and watershed health objectives; and,
- Encourage the utilization of forest restoration by-products to offset treatment costs, benefit local rural economies, and improve forest health.

The reauthorization establishes the Collaborative Forest Landscape Restoration Fund providing funding authority for:

- requests by the Secretary of up to $80,000,000 annually for fiscal years 2019 through 2023;
- up to 50 percent of the cost of carrying out and monitoring ecological restoration treatments on National Forest System (NFS) land for each Proposal selected;
- up to $4 million annually for any one project;
- up to two projects per year in any one FS region; and,
- up to 10 projects per year nationally

Uses and Limitations:

- The Collaborative Forest Landscape Restoration Fund may only be used on National Forest System lands and may not be used to cover planning costs.
- The Collaborative Forest Landscape Restoration Fund may be used to pay for up to 50 percent of the cost of carrying out and monitoring ecological restoration treatments on National Forest System (NFS) lands.
- The Collaborative Forest Landscape Restoration Fund can be used for any one proposal for no more than ten fiscal years. However, the reauthorization allows for one-time extensions on a case-by-case basis for no more than ten years.

The DWRF Collaborative has been actively pursuing funding through this program to address forest health needs in the Dolores watershed. In 2019 a proposal was submitted entitled *Southwest Colorado Collaborative Forest Landscape Restoration Initiative*.

The Following USDA Press release acknowledges funding for the CFLRP Project;

*"The USDA Forest Service announced Monday the San Juan National Forest will receive over $3 million for restoration work through the Collaborative Forest Landscape Restoration Program (CFLRP). This investment will expand the impact of existing projects in Southwest Colorado over the next 10 years.*




*Figure 47.) CFLRP Project Area Map (See Appendix D)*

*The CFLRP award will complete restoration and resiliency work throughout the San Juan National Forest's 1.9 million acres. The program will enable the area to adapt to future disturbance while retaining ecosystem function, productivity and ecosystem services. The CFLRP strategy is to enhance the resilience of critical watersheds, wildlife and aquatic habitats, community infrastructure, economic drivers and forest conditions.*

*This also marks the beginning of the third year of the Rocky Mountain Restoration Initiative (RMRI). RMRI has three focal landscapes across the state including the marquee landscape in Southwest Colorado.*

*CFLRP and RMRI are distinct initiatives but complement each other to improve conditions for people, animals and vegetation across all lands in Southwest Colorado. There is significant geographic overlap in the focus areas of CFLRP and RMRI, and, working together, these initiatives will be critical to accomplish our shared goals. One of the most important outcomes is to mitigate the impacts of large-scale wildfire at a landscape scale throughout Southwestern Colorado.*

*For more information about CFLRP and RMRI projects on the San Juan National Forest, please contact the Shared Stewardship Coordinator at [Jason.Lawhon@usda.gov](mailto:Jason.Lawhon@usda.gov)"* (USDA FS)

Montezuma County will participate in the CFLRP Collaborative and advocate for work in Montezuma County.

**Rocky Mountain Forest Restoration Initiative (RMRI) –** Is a joint venture between USFS and National Turkey Foundation. On Dec. 9, 2019, the Rocky Mountain Restoration Initiative unanimously selected Southwest Colorado as the first place where it wants to focus its collective efforts. The project area encompasses nearly 750,000 acres of Ponderosa Pine Zone in Dolores, Montezuma and La Plata Counties. The project stretches 120 miles along Colo. Highway 160 and includes the Towns of Dolores, Mancos, Durango and the San Juan National Forest.




Known locally as the "Southwest Colorado Restoration Initiative" this project has two overarching objectives:

- To provide ecosystem services, economic benefit, and safe recreational experiences to local and surrounding communities while creating ecologically resilient landscapes that protect critical waters and promote wildlife connectivity and habitat improvement.
- To create physical and social resilience to wildfire by increasing ecological restoration and fire risk reduction activities around communities and other infrastructure, and by increasing education and outreach efforts.

The Collaborative groups will work jointly with the San Juan National Forest, other partners, and the Science community to increase the pace and scale of this work across the RMRI landscape.

By implementing cross-boundary treatments, the following outcomes are expected:

- Mitigate 20,000 acres (30% within RMRI boundary) of private lands and associated infrastructure with high fire risk.
- Create a resilient landscape of 290,000 acres (39% of landscape and 61% of National Forest System [NFS] land within RMRI boundary) of NFS lands adjacent to communities.
- Protect water infrastructure:
- Maintain the quality and quantity of water in McPhee reservoir, which irrigates 75,000 acres and supplies multiple towns, including irrigation and domestic water to the Ute Mountain Tribe.
- Safeguard the Dolores River, which supports sensitive native fish and a premier 200-mile boating opportunity, and which delivers water to the Colorado River and Lake Powell to help meet obligations to the Lower Basin under the Colorado River Compact.

## Colorado Strategic Wildfire Action Program (COSWAP)

The Mancos Conservation District (MCD) has recently applied for $1M in COSWAP funding. Montezuma County strongly supports the MCD Grant request and approves of the full scope of work.

The Southwest Colorado RMRI COSWAP project area spans a cross-boundary landscape that encompasses two communities between the Town of Mancos and the Town of Dolores. This project boundary includes San Juan National Forest, Bureau of Land Management, private, municipal, state, and Ute Mountain Ute lands and focuses on key areas identified through the RMRI PODs prioritization process to protect local communities and infrastructure. Within the project boundary, partners identified two focal areas for COSWAP planning and treatments - around the Summit Lake Community and Jackson Gulch Community. These focal areas emerged as priority treatment areas based on community wildfire risk and the opportunity to complete projects within the COSWAP timeframe.

This COSWAP proposal strategically focuses mitigation, thinning, and pile burning activities to reduce cross-boundary wildfire risk at a landscape scale. The two focal areas are dominated by private lands and a Ute Mountain Ute tribal ranch, but directly connected to federal and state lands that have recent, current, and planned treatments. The planned projects strategically address high risk community areas in order to stitch together a multi-jurisdictional approach. A secondary but important benefit of treatments will reduce postfire risk to critical water resources for the Town of Mancos, Ute Mountain Ute Tribe, and rural users and irrigators.

Ponderosa pine and pinyon-juniper forest types dominate the focal areas, with a substantial gambel oak understory. Research shows that these dry forests in SW CO, and in particular ponderosa pine, have the greatest departure from historical structure and fire regimes as a result of legacies from fire suppression, grazing, and timber harvesting. These legacies have resulted in forests with more and generally smaller trees - conditions that put forests and communities at risk to more intense and severe wildfires. DWRF has collaboratively articulated robust desired conditions for ponderosa pine forests in the local area, emphasizing, among other conditions, reducing basal area and stand density alongside retaining rare components of landscapes. Treatments in pinyon-juniper stands also emphasize reducing fuel loads and will be focused in areas that best protect lives and homes.

This proposal focuses on landscape resilience activities at multiple scales. The focal areas are anchored on higher density and higher wildfire risk community centers and emphasize defensible space, ingress/egress clearing, and small scale fuel break projects. Expanding out, treatments on midsize parcels involve both stand-level thinning and defensible space around homes. At the largest scale, we propose strategically placed thinning projects and fuel breaks to alter fire behavior and transmission onto and from federal and state lands. Community pile burning will work at multiple scales and directly support landowners that want to complete projects on their own.

All of these projects require substantial planning and coordination. Defensible space, ingress/egress projects, and mid-size thinning projects require active community outreach and engagement programs. Planning and personnel support contractor communication and forest plan development on UMU lands. Planning will support GIS analyses and systems, ongoing prioritization activities, and future project development within and adjacent to the project boundary on all land ownerships.

Program challenges include landowner participation, local contractor capacity for plan development and implementation, and meeting timelines and coordination with matching funds for thinning projects. Activities within the project area require funding beyond COSWAP and advancing work in tandem with other funding sources will be critical.

This project works in partnership with the Ute Mountain Ute Tribe. Work with the Ute Mtn Ute Tribe will occur on a Tribal ranch that is directly adjacent to the Summit Lake community. Support will include direct implementation work based on the Tribe’s priorities and an update to the ranch’s forest plan.

This landscape scale collaborative project is made up of 6 individual projects all of which reduce wildfire risk to lives and property while improving the ecological resiliency and health of the forest.

Total treatment area for the project is estimated at 1,020 plus pile burning.




*Figure 48.) COSWAP Project Area Map*

**Project 1**: Community-scale Fuel Breaks and Private Road Ingress/Egress

| **Treatment snapshot** |
|---|

Acres: 45

Land Ownership(s):

| Private land |
|---|

Coordinates (decimal degrees): Roughly 2-mile radius around: 37.42253430547361, -108.386616398488 37.40402370748678, -108.27849071548532

Property/Location Name:

| |
|---|
| Jackson Gulch + Summit Lake |

Brief description of project (forest thinning, prescribed burning, fuel break, etc.):

| |
|---|
| This project will focus on reducing community-level wildfire risk mitigation treatments. Work includes: treating common areas, creating shaded fuel breaks across multiple properties, fuels reduction along important access/egress routes in a residential area of extremely high wildfire risk. |

**Project 2**: Community Pile Burning

| PROJECT SNAPSHOT |
|---|

Acres: 250

Land Ownership(s):

| |
|---|
| Private land |

Coordinates: Roughly 2-mile radius around: 37.42253430547361, -108.386616398488
37.40402370748678, -108.27849071548532

Property/Location Name:

| |
|---|
| Entire project area |

Brief description of project (forest thinning, prescribed burning, fuel break, etc.):

| |
|---|
| This project will hire a burn boss to burn slash piles resulting from wildfire mitigation work on private lands. There are minimal avenues for residents to remove slash from their thinning projects, and targeted pile burning is the cheapest option for local residents. |

**Project 3**: Community-wide defensible space

| PROJECT SNAPSHOT |
|---|

Acres: 85

Land Ownership(s):

| |
|---|
| Private |

Coordinates: Community-wide

Property/Location Name:

| Jackson Gulch + Summit Lake Focal Areas |
|---|

Brief description of project (forest thinning, prescribed burning, fuel break, etc.):

| Defensible space projects will occur within 100 feet of structures and along driveways. By addressing the home ignition zone on a larger, community scale it will better prepare a community for a wildfire event by making it safer for firefighters to enter the community and getting the fire to the ground for easier attack. Targeting defensible space efforts towards neighboring high risk communities helps ensure treatments are on a landscape scale, rather than just a patchwork throughout a larger community. |
|---|

**Project 4**: Mid-scale thinning projects




*Figure 49.) Summit Lake Focal Area*

| PROJECT SNAPSHOT |
| --- |

Acres: 100

Land Ownership(s):

| Private |
| --- |

Coordinates: Roughly 2-mile radius around: 37.42253430547361, -108.386616398488 37.40402370748678, -108.27849071548532

Property/Location Name:

| Jackson Gulch + Summit Lake Focal Areas |
| --- |

Brief description of project (forest thinning, prescribed burning, fuel break, etc.):

Thinning projects will reduce basal area and tree density on private properties and Ute Mountain Ute Adams Ranch. Properties with higher density ponderosa pine over-story will be principally targeted. Treatments in pinyon-juniper stands emphasize reducing fuel loads and will be focused on lands adjacent to communities to best protect lives and homes. Areas with high density Gambel oak understories will also be treated to reduce ladder fuels while also retaining heterogeneity in oak structure that is important for wildlife habitat.

Treatments here focus on properties over 15 acres in size. A variety of funding mechanisms will be used to match COSWAP funds depending on property size. Matching funds include NRCS EQIP, CSFS Forest Ag Program, FRWRM, and others in order to broadly implement treatments. A professional forester will write management plans for these projects in order to ensure treatments meet collaborative resilience and wildfire risk reduction standards as well as facilitate acquisition of outside funding sources.

**Project 5**: Large-scale thinning projects

| PROJECT SNAPSHOT |
| --- |

Acres: 700

Land Ownership(s):

| Private and Ute Mountain Ute Adams Ranch |
| --- |

Coordinates: Roughly 2-mile radius around: 37.42253430547361, -108.386616398488 37.40402370748678, -108.27849071548532

Property/Location Name:

| |
|---|
| Emphasizing Jackson Gulch + Summit Lake Focal Areas |

Brief description of project (forest thinning, prescribed burning, fuel break, etc.):

Thinning projects will reduce basal area and tree density on private properties and Ute Mountain Ute Adams Ranch. Properties with higher density ponderosa pine overstory will be principally targeted. Treatments in pinyon-juniper stands emphasize reducing fuel loads and will be focused on lands adjacent to communities to best protect lives and homes. Areas with high density gambel oak understories will also be treated to reduce ladder fuels while also retaining heterogeneity in oak structure that is important for wildlife habitat.

Treatments here focus on properties over 15 acres in size. A variety of funding mechanisms will be used to match COSWAP funds depending on property size. Matching funds include NRCS EQIP, CSFS Forest Ag Program, FRWRM, and others in order to broadly implement treatments. A professional forester will write management plans for these projects in order to ensure treatments meet collaborative resilience and wildfire risk reduction standards as well as facilitate acquisition of outside funding sources.

**Project 6**: Large fuel breaks




*Figure 50.) Jackson Gulch Focal Area*

| PROJECT SNAPSHOT |
|---|

Acres: 40

Land Ownership(s):

| Private and/or Ute Mountain Ute |
|---|

Coordinates: 37.403999976475234, -108.28099789552965

Property/Location Name:

| : Jackson Gulch Focal Area |
|---|

Brief description of project (forest thinning, prescribed burning, fuel break, etc.):

| Thinning and/or mastication to alter fire behavior. Approach will be based on Dennis (1999), Fuelbreak Guidelines for Forest Subdivisions and Communities. Basic goal is increased crown spacing and higher crown basal heights rather than a specific basal area, although basal area goals will be relatively low. Approach involves creating 10 feet spacing between crowns, removing ladder fuels within the fuelbreak, and pruning up remaining. Fuel break with will be ~200 feet. Pinyon and juniper will be pruned up about 5 feet and small trees and shrubs under the residual tree crowns will be removed to keep flame lengths low. There can be clumps of trees and shrubs (including oak) left in P-J fuel breaks but the 10 foot crown spacing between clumps and individual trees remains key. |
|---|

**GETTING THE WORK DONE AT HOME!**

None of the four recommendations to reduce home ignitions will do any good if not practiced. Montezuma County is a personal responsibility County and nearly everyone can, and must, take action on their own initiative.

*"Choosing to live in the unincorporated region of the County, the WUI, comes with extra challenges. Ultimately it is **your** responsibility to make your home site as fire resilient as possible and reduce potential risks to your neighbors."* (CSFS)

**Take Action to Prepare Your Home & Property for Wildfire !**

Wildfires are a natural part of Colorado's forests. If you live in the wildland-urban interface in Colorado, where homes and other structures intermingle with wildland vegetation, you are at risk of being affected by wildfire. Planning ahead and taking action can increase the likelihood your home survives when a wildfire occurs.

Firefighters always do their best to reduce fire damage, but ultimately, it is ***your*** responsibility to protect ***your*** property from wildfire. Taking practical steps to prepare your home does not guarantee it will survive a wildfire, but it does improve the odds. Any work completed may also allow firefighters who *might* be present to safely engage the fire and attempt to protect your property. If fire and site conditions are unsafe, firefighters will not be there.

As you address the home ignition zone on your property, always start with the home or structure and work outwards. Remember, taking action to prepare for wildfire is not a one-time effort — it requires ongoing maintenance to give your home the best chance of surviving a wildfire.

Master Planning and community design, fire-safe construction, fire-safe landscaping, and defensible space all can involve a lot of work. Many homeowners may have the knowledge, time, energy, and tools to do the job themselves and others may need to enlist the help of professionals to help get the job done.

## CONTINUING WORKPLAN;

*The following tables begin with a heading, and general explanation of the intent of the actions, followed by a sequence of objectives (in red bold), and specific actions to help meet each objective. High priority actions have been listed first under each objective (in bold italics). Some objectives are already being implemented in full, others can be expanded or simply continued. The tables are divided into six general strategy categories as follows:*

| ***PREVENTION*** |
|---|
| **Montezuma County takes a proactive approach to prevent human-caused ignitions, which pose a significant risk in Montezuma County. Many different activities can cause these ignitions, including controlled burns of all types, operation of welders or other power equipment, fireworks, smoking, and even arson. The Montezuma County Fire Protection Districts, Sheriff's Department (Fire Warden), Federal Land Agencies, and the Board of County Commissioners coordinate very effectively to implement fire bans when conditions merit the extra precaution. Burn bans restrict or modify many activities that could pose a fire risk. Another way to prevent wildfire destruction in the WUI is to pay special attention to reducing the potential for home ignitions.** |
| **Reduce the number and scope of wildfires ignited as controlled burns by residents.** |
| ***1. Develop and implement a burn permitting system for the purpose of safely disposing of slash in accordance with Colorado Senate Bill 11-110, beginning in January 2012. (This has been implemented)*** |
| ***2. Consider providing assistance from Fire Protection Districts or qualified professionals to provide oversight and stand-by on controlled burns (when requested).*** |
| 3. Widely advertise proper prescribed burning techniques. |

| |
|---|
| 4. Develop refrigerator magnets and other advertising with telephone numbers and policy on reporting controlled burns. |
| **Strengthen County Burn Bans.** |
| 1. Collaboratively develop protocol for instituting uniform countywide fire restrictions between all fire management entities & federal agencies. Continued coordination with BLM on dual implementation of fire bans on low elevation properties is an ongoing priority. |
| 2. Utilize a range of media to advertise fire restrictions and discourage cigarette ignitions. |
| 3. Enforce littering laws for cigarettes butts. Consider a (cigarette) butt busters campaign at the beginning of the wildfire season. |
| **Reduce the number of arson incidents.** |
| 1. Work with law enforcement to catch “firebugs.” |
| 2. Develop culturally appropriate messages about the use of fire, and a specific education program to implement in coordination with the Ute Mountain Ute Tribe. |
| 3. Promote alternative activities for youth when opportunities arise. |
| **Reduce Structural Ignitability.** |
| 1. Encourage appropriate building techniques through incentives and working w/ builders, hardware stores, and plant nurseries to utilize and sell appropriate materials and distribute educational materials. |
| 2. Include detailed analysis of the Home Ignition Zone and structural ignitability in all site assessments. |
| 3. Promote the use of fire-resistant building materials and landscaping in new construction and landscaping projects. |
| ***EDUCATION*** |
| **The coordinated wildfire education program that has been developed in Montezuma County between the Land Managers, Fire Districts, and the Wildfire Adapted Partnership needs to be continued and strengthened. Continue to place emphasis on the education component by all parties involved. Studies indicate that adequate education and outreach provide the foundation for accomplishing all other aspects of wildfire preparedness. Education on wildland fire prevention, mitigation, and suppression should have a broad reach in the community. Education should provide consistent and appropriate messages for WUI residents and firefighters, youth, businesses (mitigation, insurance, real estate, chainsaw, rental), governmental and non-government non-profits (Planning and Zoning, Land Conservancy, Water Conservation Districts). The public outreach at various venues and an active media campaign since 2011 have been a step in the right direction. Still, future outreach should target high-risk areas and the specific** |

| |
|---|
| **extreme risk communities identified by the Fire Protection Districts with community-specific messages.** |
| **Increase public awareness of the size and scope of wildfire hazards in the Wildland Urban Interface.** |
| 1. Increase community awareness with educational programs and materials on the fire ecology of the County. |
| 2. Utilize all media outlets to disseminate the Wildfire Risk - Communities of Concern Map and the Wildfire Risk to Communities Website https://wildfirerisk.org/ |
| 3. Develop a message that appeals to the sense of community responsibility and independent actions. Include the null alternative. |
| 4. Continue to work with existing community groups to provide information and brief wildfire awareness programs as opportunities arise. |
| 5. Include updated wildfire information on the County Website. |
| 6. Provide wildfire information, including the benefits of mitigation, and refer residents to Wildfire Adapted Communities in the County Planning Department. |
| 7. Utilize social media outlets to share wildfire messages. |
| **Involve youth in wildfire awareness activities to develop the next generation of wildfire conscious adults.** |
| 1. Provide wildfire education opportunities in the primary and secondary schools.(C.E.R.T., Service Learning, clubs) |
| 2. Continue to encourage the school districts and teachers to include fire ecology in the science curriculum. |
| 3. Engage existing youth organizations in fuels mitigation training and projects. (ie. Boy Scouts, SW CO Conservation Corps, Career Pathways) |
| 4. Encourage High School aged students to become Firewise Neighborhood Ambassadors as part of their service learning curriculum. |
| **Improve community readiness for wildfires through education on what to do when a fire is here.** |
| 1. Get youth to develop their own emergency checklists, plans, and meeting spots for their families. |
| 2. Utilize all available media outlets to promote evacuation kits and disseminate a checklist of what to do before you leave if time allows. |

3. Encourage county residents to have a personal evacuation plan in place. Identify the preferred evacuation route to a safe area and develop an alternative evacuation plan. Identify the safest place within your community to shelter in place in case all other routes are blocked and all other options exhausted.
4. Encourage County Residents to have a personal evacuation plan in place for pets and livestock. Identify the preferred evacuation route to a safe area and develop an alternative evacuation plan. Identify the safest place within your community to shelter in place in case all other routes are blocked and all other options exhausted.

**Raise awareness of high and extreme risk areas of the WUI.**

1. Display the Wildfire Risk – Communities of Concern Map and WUI wildfire images in public places, on local TV stations, at fairs and expos, in Fire Protection District Stations, and as a layer of the Montezuma County GIS viewer.
2. Encourage door-to-door education campaigns in the most extreme risk communities.

**Enhance opportunities for adult wildfire education.**

1. Work with the Colorado Community College and public land agencies to offer courses to train firefighters and mitigation contractors.

## *MITIGATION*

**"Homes ignite and burn during wildfires when the requirements for combustion, a sufficiency of fuel, heat, and oxygen are sustained at one or more places on a home. If homes do not ignite, homes do not burn, and if homes do not burn during a wildfire, then the WUI fire disaster does not occur." (p. 73, Fourmile Canyon Fire Preliminary Findings, 2011). Land managers can modify fuel sources to maintain a healthy forest that is more resistant to fire, insects, and diseases. The WUI is predominantly privately owned. Therefore, engaging private property and homeowners in mitigation activities, including defensible space development and reducing structural ignitability, are paramount to reducing the risk of catastrophic wildfire losses in the WUI. Professional experience in wildfire behavior and mitigation actions are required to capitalize on fuel reduction efforts.**

**Implement Landscape Level Fuels Treatment Projects on Public Land Adjacent to Private Land.**

1. ***Continue fuels treatment & maintenance on Federal and Private lands in Mesa Verde Entrance Area***
2. ***Fuels Treatment to develop anchor point and defensible space at the head of Alkali Canyon.***
3. ***Implement SW CO RMRI COSWAP Community Scale Fuels Breaks and private roads ingress and egress, community pile burning, community wide defensible space, mid-scale thinning projects, large scale thinning projects, and Large fuel breaks.***

| | |
|---|---|
| 4. | ***Implement USFS Aspen and Salter Vegetation Management Plans. Continue maintenance of fuel mitigation around Aqueduct, Chutes and Ladders, and Phil's World.*** |
| ***5.*** | ***Continue to identify and create treatment plans for landscape level mitigation projects on public and private lands so that there is a menu of shovel ready projects when funding or crews become available to do work.*** |
| ***6.*** | ***Continue to encourage development and implementation of subdivision Level Fuels Treatment Plans*** |
| 7. | Continue to encourage public and private treatments to create fuel breaks, safe areas, & improve or create emergency access. |
| **Enhance the use of mitigation contractors.** | |
| 1. | Encourage fast expansion of Wildfire Professionals Mitigation Association into Montezuma County and advertise these reputable businesses. |
| 2. | Have regular training opportunities for contractors, property owners, and firefighters to improve their knowledge and skills for fuels treatment. |
| 3. | Keep an updated list of mitigation contractors and the services that they offer. |
| 4. | Develop programs and secure grants for treatment of properties where the homeowners does not have the personal ability to do the work or resources to hire professional assistance. |
| 5. | Encourage chipping and slash removal to reduce accumulation of slash piles throughout County. |
| 6. | Continue to develop programs to connect those in need of firewood with excess wood where treatment has been done, or with properties where thinning is needed. |
| 7. | Utilize inmate work crews to the extent practicable to haul slash and for other public fuels treatment projects. |
| 8. | Evaluate burn permit fees as funding source for education and mitigation projects, when burn permitting system is developed in accordance with Colorado Senate Bill 11-110. |
| **Increase mitigation by rental and absentee home and property owners.** | |
| 1. | Disseminate message of null alternative, increased property value from mitigation, and other benefits, to targeted property owners on authority figure letterhead. |
| 2. | Continually seek programs that provide low cost fuels mitigation opportunities. |
| 3. | **Support County subdivision fire mitigation regulations.** |
| 4. | Provide resources for developers to perform appropriate mitigation, focusing financial resources on assistance for minor developments. |
| 5. | Explore additional regulatory options to address existing development that can be supported by existing or new programs to assist homeowners in completing required preparedness activities. |

| |
|---|
| 6. Enhance enforcement of subdivision mitigation. Consider tools such as bonding mitigation work or creating special improvements districts for wildfire mitigation. |
| **Reduce Structural Ignitability.** |
| 1. Encourage appropriate building techniques through incentives and working w/ builders, hardware stores, and plant nurseries to utilize and sell appropriate materials and distribute educational materials. |
| 2. Include detailed analysis of the Home Ignition Zone and structural ignitability in all site assessments. |
| 3. Consider requirements for the use of fire resistant building materials and landscaping in new construction and landscaping projects. |
| **Encourage residents on Summit Ridge to develop an active mitigation and preparedness program (cont'd).** |
| 1. Develop rapid notification system for emergency evacuation of Summit Ridge region. |
| 2. Assist with development of a Summit Ridge CWPP. |
| 3. Evaluate and identify evacuation routes. |
| **Encourage residents in Cedar Mesa Ranches to increase active mitigation and develop an evacuation plan.** |
| 1. Identify and prepare a "safe zone" meeting area that can accommodate all of the subdivision residents. |
| 2. Identify and prepare an alternative exit route on the southeast side of the subdivision. |
| 3. Evaluate possible exit road on the north side of subdivision across BLM lands to make a looing road system. |
| 4. Coordinate with BLM and SLB to enhance cross boundary treatments. |
| **Encourage subdivisions within the County to identify alternative evacuation routes.** |
| 1. Encourage subdivisions in the 145 corridor south of Dolores to develop a primary and alterative evacuation plan. |
| 2. Encourage subdivisions on the 184 corridor east of Dolores to develop a primary and alterative evacuation plans. |
| 3. Encourage residents county-wide to evaluate their evacuation alternatives, and form a personal plan. |
| **Maintenance / Re-Entry on completed Fuels Reduction Projects** |

| |
|---|
| 1. Regularly scheduled maintenance is essential in maintaining fuel breaks, fuels reductions and defensible space. |
| 2. Increase public lands re-entry/ maintenance on boundary line fuel breaks. |
| 3. Increase re-entry and maintenance on private land cross boundary treatments. |
| 4. Increase the re-entry and maintenance on private land defensible space treatments. |
| **COORDINATION** |
| **Continue close coordination of activities between the Fire Protection Districts and the Wildfire Adapted Partnership needs to continue. Close coordination will reduce the duplication of efforts and provide more wildfire professional expertise to the mitigation efforts. The Montezuma County Fire Chief's Association Wildfire Education and Prevention Specialist position or a Fireman assigned by the Fire Protection Districts could help provide this coordination effort and site-specific mitigation prescription recommendations. Closer coordination between the Fire Protection Districts, the Colorado State Forest Service, and the Public Lands Wildland Fire Managers may improve training opportunities, increase consistent messaging, well-coordinated response, and comradery for fires WUI. Outreach between these fire management entities, the Firewise Council, and the community should develop more community-level CWPPs. Recognizing that it takes community-wide engagement to prepare for wildfires, Firewise and the Fire Chief's educator should continue to serve as community liaisons.** |
| **Enhance Coordination throughout the community for shared responsibility for wildfire preparedness.** |
| 1. Continue to work with real estate, property management, and insurance companies to develop a shared understanding of effective risk management and the market benefits of appropriate wildfire mitigation. |
| 2. Look to service organizations, Sheriff's office, etc. to find volunteers who can assist with educational outreach and mitigation work. |
| 3. Continue coordinated mitigation on public and tribal lands adjacent to high risk areas of the WUI. |
| **Strengthen Relationships between Fire Protection Districts, Fire Management entities, and the Public.** |
| 1. Explore developing an interagency prescribed fire and hazardous fuels council. |
| 2. The County Emergency Manager should continue to coordinate with the County Public Information Fire Information Officer, FPD Education Specialists, and the Wildfire Adapted |

| |
|---|
| Partnerships messages to the community. |
| 3. Put on a Fire Fair in which all Fire Management entities, appropriate businesses and non-profits, Firewise, and the community participate. |
| **Improve emergency response through information accuracy.** |
| 1. Update wildfire risk – communities of concern maps regularly to reflect mitigation work, development patterns and access to new data. |
| 2. Participate in land database system tracking various levels of mitigation work. |
| 3. Support County addressing program. |
| 4. Fire Protection Districts should utilize wildfire risk map analysis components and community polygons to better understand conditions in specific areas of the WUI. |
| **Suppression** |
| **The wildfire suppression efforts in Montezuma County are excellent. The initial interagency attack and mutual aid provided are well-coordinated and supported by all agencies. The land management agencies and fire districts are well equipped with just a few additional equipment needs. The Fire Protection Districts rely dominantly on an aging base of volunteers, which challenges additional training and engagement in wildland fire planning and preparedness activities. Wildland fire training and assignment needs for the Fire Protection Districts to maintain and enhance the National Wildfire Coordination Group (NWCG) standards. The annual wildland fire refresher review requirements should be a high priority for every firefighter. Fire Protection Districts should explore additional high-level training and assignment opportunities. The NWCG level of Strike Team Leader, Task Force Leader, and Type III IC should be a long-term goal for every department.** |
| **Improve wildfire training for all firefighters.** |
| 1. ***Continue to provide advanced Wildfire training in Wildland Interface s-205, Intermediate Wildland Fire behavior s-290 and Strike Team Leaders-336.*** |
| 2. **Consider requiring basic wildfire training for all paid and volunteer firefighters. Coordinate with public lands agencies for joint training opportunities.** |
| 3. **Open up training opportunities between all fire management entities as often as possible.** |
| 4. **Explore additional incentives for additional training for volunteer firefighters.** |
| 5. **Include ICS training for all fire personnel and the designated fire warden.** |
| **Establish and Emergency Operations Center (EOC)** |
| **1. Include EOC Training for all support personnel.** |

| |
|---|
| **Ensure adequate water availability for structure protection.** |
| 1. Continually evaluate equipment needs for all Fire Protection Districts. |
| 2. ***Maintain tender draft sites identified by Dolores Fire Protection District; a pond on Summit Ridge and a gravel pit pond on the Dolores River.*** |
| 3. If the water district cannot supply adequate flow, cisterns, tanks, or pump points should be developed before final subdivision approval. |
| 4. Inventory water pump points and incorporate in County GIS for use by all fire management entities. |
| **Encourage the development of community scale CWPPs.** |
| 1. Provide support in the CWPP process. |
| 2. Promote the benefits of prior planning on funding and response. |
| 3. Ensure FPDs are familiar with CWPPs and their role in general and for the specific adopted plans as mutual aid agreements may have firefighters in a jurisdiction where they did not participate in a CWPP process. |
| **APPROPRIATION** |
| **An ounce of prevention is worth its weight in gold for managing the output costs of suppressing fires in the WUI. Emphasis on prevention, education, and outreach within the community should be a priority. The cheapest fire is the one you do not have to fight. We must acknowledge that we need to improve education and legislative efforts. Defensible space and structural ignitability reduction in the WUI need to be financially viable for residents to take action. Montezuma County has requirements for defensible space development in new subdivisions. Wildfire Adapted Partners or Local Fire Protections Districts should work with landowners in older subdivisions in the WUI to explore means of reducing structural ignitability. All fire management entities and the FireWise Council should be active in identifying, pursuing, and managing grants that contribute toward the goals of this CWPP. Fire management entities should promote a mitigated property's increased property values and marketability in all education and outreach efforts.** |
| **Increase grants obtained for wildfire preparedness activities.** |
| 1. Utilize the Wildfire Adapted Partnership, All Fire Management Entities, and volunteers to help write and manage grants. |
| 2. Seek continued funding for the Montezuma County Wildfire Adapted Partnership and the Fire Chief's Association Wildfire Education and Prevention Specialist. |
| 3. Explore foundation grants as a means of funding identified activities. |

| |
|---|
| 4. Leverage the cost savings of preventing wildfire threats to homes to obtain mitigation funds. |
| 5. Leverage location within Region 9 economic development district and an enterprise zone to find new funding sources. |
| 6. Utilize special improvements districts as a means of funding mitigation in some higher scale communities to stretch other dollars further in lower income |
| 7. Encourage the development of small diameter commercial wood processing businesses or use of central heating systems that utilizing local small diameter fuels from mitigation projects as a heat source. |
| 8. ***Maintain Defensible Space 200 ft. to hydro-axe project on SW edge of Towaoc.*** |
| 9. ***Restart Brush Hog Maintenance Crew in Towaoc to do fuels maintenance around homes and structures as identified by Towaoc Fire and Rescue and the Elders Council.*** |
| **Provide more property owners with the tools they need to create and maintain appropriate fuels mitigation and structure protection.** |
| 1. Continue to support WAP site assessments and keep accessible to all community residents Widely advertise and promote this service. |
| 2. Promote programs that help people take preparedness one step at a time. |
| 3. Utilize the Neighborhood Ambassador Program, incentive programs, and public firefighting agency resources to connect do-it-yourself homeowners with the tools they need for fuels treatment and home ignition zone improvements.(i.e. Neighbor may have appropriate tool; rebates may offset rental or purchase price; hydro mower on neighboring federal lands may complete projects on adjacent private lands at greatly reduced rates by eliminating transportation costs; sales on 1/8" screen and other fire resistant materials may be organized.) |
| 4. Provide Home Ignition Zone workshops to the public. |
| 5. Develop and advertise demonstration sites for appropriate access, defensible space development, and home ignition zone improvements. |
| 6. Work with the Landfill and develop additional free or low cost slash disposal sites and services. |
| **Encourage residents in the Summit Ridge region to develop their own active mitigation and preparedness program.** |
| 1. Encourage HOAs to do WUI checkpoints in their communities to raise awareness of the extreme risk in that area. |

| | |
|---|---|
| 2. | Place high priority on recruiting Firewise Neighborhood Ambassadors throughout the Summit Ridge area. |
| 3. | Utilize Summit Lake State Park as a demonstration site for quality fuels treatment in the Ponderosa Pine ecosystem. |
| 4. | Designate a private slash site in the area and arrange slash removal days. |
| 5. | Seek timber harvest opportunities for landscape scale thinning throughout private property on Summit Ridge. |

**FUELS REDUCTIONS**

**Public Lands**

Annual fuels reductions treatments on public lands are completed either by the USFS, the BLM, or the NPS. Fuels treatments are typically targeted along public lands boundaries and in areas where vegetation treatments are desirable for forest health. The public lands agencies place a high priority on cross boundary treatments and all public lands treatments are designed to be complimented by fuels treatments on the private lands side. Many fuel reductions have already been completed along the SJNF boundary and on BLM lands adjacent to private lands.

**Private Lands**

Substantial fuels reduction treatments on private lands are not commonplace. Fuel reduction that does occur on private lands mostly occurs in conjunction with commercial timber sales.

**POLICIES OR COVENANTS**

Montezuma County maintains a policy of ***personal responsibility*** for people who choose to live in the county's unincorporated areas. Rural living comes with various benefits and risks, but it is up to the landowner to advocate for their own safety, the safety of their neighbors, and the safety of first responders.

"***As more people choose to live in wildfire-prone areas, additional homes and lives are potentially threatened every year. Firefighters always do their best to protect residents, but ultimately, it is your responsibility to protect your property and investments from wildfire.***"
Colorado State Forest Service

As previously described, the Montezuma County Land Use Code requires an evaluation of wildfire risk when subdivisions are proposed. Subdivisions within areas determined to be at high risk receive extra scrutiny. Those subdivisions deemed to be at an increased risk of wildfire are required to prepare a wildfire mitigation plan. However, even if wildfire mitigation plans are implemented when a subdivision is created, ongoing maintenance must continue to follow the mitigation plan regularly or the value of the mitigation degrades over time. Montezuma County

strongly recommends that subdivision covenants provide for regular maintenance of mitigated landscapes.

Montezuma County lack sufficient resources to staff a building department and therefore cannot implement code enforcement effectively. Montezuma County strongly recommends using materials and techniques to reduce structural ignitability for new construction. For older existing homes Montezuma County recommends consulting the Colorado State Forest Services Home Ignition Zone Guide;
https://csfs.colostate.edu/wpcontent/uploads/2021/04/2021_CSFS_HIZGuide_Web.pdf
and working with reputable contractors.

# FOREST SERVICE HANDBOOK
# NATIONAL HEADQUARTERS (WO)
# WASHINGTON, DC

## FSH 7709.56 – ROAD PRECONSTRUCTION HANDBOOK

## CHAPTER 10 – PRECONSTRUCTION DECISIONS

**Amendment No.:** 7709.56-2010-1

**Effective Date:** March 24, 2010

**Duration:** This amendment is effective until superseded or removed.

**Approved:** GLORIA MANNING
Associate Deputy Chief, NFS

**Date Approved:** 03/19/2010

**Posting Instructions:** Amendments are numbered consecutively by handbook number and calendar year. Post by document; remove the entire document and replace it with this amendment. Retain this transmittal as the first page(s) of this document. The last amendment to this handbook was Amendment No. 2.

| | | |
|---|---|---|
| **New Document** | 7709.56_10 | 5 Pages |
| **Superseded Document(s) by Issuance Number and Effective Date** | 7709.56, 1 thru 1.1--2<br>(WO 5/87 Amendment 1) | 2 Pages |

**Digest:**

10 – Updates coding from 1-digit to recommended 2-digit coding. Makes minor technical and editorial changes throughout chapter. Adds references to road management objectives, travel analysis, and designations for motor vehicle use.

## Table of Contents

10.03 - Policy ..................................................... 3
**11 - DOCUMENTS** ..................................................... **3**

## 10.03 - Policy

This chapter provides guidance for planning activities necessary for making transportation system preconstruction decisions. Regardless of the project being proposed; whether the road construction is part of another resource project, a change in the transportation plan, or a standalone roads proposal recommended by unit engineers, the appropriate level of NEPA must be chosen and applied by the line officer before proceeding with implementation. Pre-proposal analysis, design work, and data collection may occur outside the NEPA process, but when and/or if a proposed action is developed, using this information, appropriate NEPA procedures must be followed, per FSH 1909.15.

## 11 - DOCUMENTS

Obtain land management plans along with implementing and supporting documents. Examine the documents for relevant information that is needed to advise technical and professional engineering judgments regarding the location, survey, design, and construction of roads. Supporting documents include environmental analyses and assessments, watershed or landscape scale analyses, biological assessments and consultations, landownership status, travel analysis reports, road management objectives (RMOs) land management plans, logging system analysis reports, and motor vehicle use maps (MVUMs) showing routes designated for motor vehicle use. These documents contain resource prescriptions and requirements that encompass vegetation, range, wildlife, fisheries, threatened and endangered species, soil and water, fire and fuels, scenery , recreation, minerals, heritage resources, and special areas (wilderness, wild and scenic rivers , and so forth. See FSH 1909.12, sec. 11.15). Use the most current documents and consider the interrelationship of all resources

Direction on RMOs is found in FSM 7714 and FSH 7709.59, chapter 10. The RMOs should complement the resource management objectives contained in the documentation. The resource prescriptions and RMOs are key items used to determine road design criteria, elements, and standards. Extract the design criteria to determine the design elements and standards (FSH 7709.59, sec. 40.2) that govern subsequent location, survey, and design. Exhibit 01 illustrates the flow and relationship of decisions from land management plans to design standards.

Be alert for changes in RMOs that may be specified during the life of the facility. For example, a road initially built as a low standard, local timber harvest road may be identified for other uses. Such changes can affect some location and design decisions. In the case of recreation use, consider the type and "quality" of the experience desired.

If not previously documented, prepare a summary of the relationship between the resource prescriptions and the proposed corridor that includes items such as the resource management objectives, public issues, management concerns, best management practices, permits, permit requirements, and mitigating measures.

Determine and document the anticipated survey methods and accuracy standards, design methods, and construction tolerances. Make selections that are compatible with the complexity of the project and that consider the cost and efficiency of accomplishing the work. Follow any applicable National Environmental Policy Act (NEPA) requirements as per FSH 1909.15, if new travel management adjustments are made, and changes have not been previously analyzed in a NEPA document.

## 11 - Exhibit 01
## Decisionmaking Flowchart



# FOREST SERVICE HANDBOOK
# NATIONAL HEADQUARTERS (WO)
# WASHINGTON, DC

## FSH 7709.56 – ROAD PRECONSTRUCTION HANDBOOK

## CHAPTER 20 – ROAD LOCATION

**Amendment No.:** 7709.56-2011-1

**Effective Date:** July 13, 2011

**Duration:** This amendment is effective until superseded or removed.

**Approved:** JAMES M. PEÑA
Associate Deputy Chief, NFS

**Date Approved:** 07/07/2011

**Posting Instructions:** Amendments are numbered consecutively by handbook number and calendar year. Post by document; remove the entire document and replace it with this amendment. Retain this transmittal as the first page(s) of this document. The last amendment to this handbook was 7709.56-2010-1 to FSH 7709.56_10.

| | | |
|---|---|---|
| **New Document** | 7709.56_20 | 28 Pages |
| **Superseded Document(s) by Issuance Number and Effective Date** | 7709.56,2<br>(Amendment No. 1, 5/1987) | 24 Pages |

**Digest:**

20 - Revises entire chapter and makes minor technical and editorial changes throughout chapter. Revises coding from 1-digit to recommended 2-digit coding. Adds references to consider existing trail locations throughout chapter. Adds direction to emphasize the importance of proper road location and states road location procedures may be required in road reconstruction.

20.2 - Adds objectives to minimize the environmental impacts and to minimize the life cycle cost of the road.

20.6 - Establishes code, caption, and sets forth new direction for "Travel Management Decisions." Adds cross-reference to direction on Travel Management Decisions in FSM 7715.

## Digest--Continued:

21 - Adds direction to review travel analysis and status of Travel Management Decisions to Road Management Objectives (RMOs) for preparation and signature by line officer, and direction in check list to plan for field crew communications. Adds reference to using data found in Geographic Information Systems (GIS). Revises Forest Service Handbook references related to job hazard analysis and safety requirements.

22 - Adds direction to emphasize the importance of a properly located road.

22.2 - Adds direction on marking road location on the ground which includes information about alternative alignments considered but not pursued, wetlands, wildlife crossings, special areas, needs for possible slope stability analysis, and Global Positioning System (GPS) coordinates in the location notes.

22.3 - Adds direction to consult with appropriate specialists, such as invasive weed specialists and cultural resource specialists when locating construction material sources. Removes direction regarding materials source surveys and recodes direction to chapter 30, section 36.

22.7 - Adds direction to consider aquatic passage, riparian, heritage resource, and other sensitive fish and wildlife issues and mitigation needs.

22.8 - Adds direction that the field review be completed by an interdisciplinary team.

22.9 - Adds direction to assure any information needed to advise environmental analysis and decisionmaking has been collected and transmitted and to assure inventory information in the Transportation Atlas is correct.

23.1 -Adds direction on the advantages of using new technology such as GPS, remote sensing, and digital terrain modeling.

23.2 - Revises direction in exhibit 01 on changing maximum grade from 4 to 6 percent. Adds direction to discourage locating sharp curves at ends of long tangents and avoid locating "S" curves unless the entire road is winding. Adds direction on locating roads in drainages and riparian areas, and direction to consider future vegetation growth outside the roadway when locating scenic views. Removes obsolete direction in exhibit 01, removes direction on maximum grade of roads with rolling dips and recodes to chapter 40.

23.4 - Adds and revises reference materials for road locators.

23.41 - Establishes code, caption, and lists references for "Publications."

23.42 - Establishes code, caption, and adds electronic hyperlinks to "Internet Sites" for selected references.

## Table of Contents

20.2 - Objective ..... 4
20.5 - Definitions ..... 4
20.6 - Travel Management Decisions ..... 4
**21 - OFFICE LOCATION STUDIES ..... 4**
**22 - FIELD LOCATION ..... 6**
22.1 - Initial Field Examination ..... 7
22.2 - Location Marking ..... 7
22.3 - Construction Material Sources and Materials Investigation ..... 9
22.4 - Related Facilities and Features ..... 10
22.5 - Preliminary Costs ..... 10
22.6 - Comparison of Proposed Routes with Management Direction and Design Criteria ..... 10
22.7 - Field Location Report ..... 10
22.8 - Field Location Review and Approval ..... 13
22.9 - Field Location Checklist ..... 14
**23 - LOCATION TECHNIQUES ..... 14**
23.1 - Office Location Techniques ..... 14
23.2 - Field Location Techniques ..... 15
23.3 - Field Location Techniques for Special Situations ..... 22
**24 - REFERENCE MATERIAL FOR ROAD LOCATORS ..... 26**
24.1 - Publications ..... 26
24.2 - Internet Sites ..... 28

This chapter provides guidance for road location activities. These activities establish the position of a road on the ground, within a predetermined corridor, in a manner that best meets the design criteria.

## 20.2 - Objective

1. To identify, on the ground, the location of a road that best satisfies the design criteria and Road Management Objectives (RMOs).

2. To accommodate the intended design elements and standards.

3. To provide access for the utilization of the specified forest resources.

4. To minimize environmental and resource impacts.

5. To minimize the life cycle costs of the road, to the extent practical.

## 20.5 - Definitions

Corridor. A strip of land within which a road can be located. A corridor can vary from several hundred feet in width to a tightly constrained centerline marked on the ground with ribbon flagging. Corridor location is affected by needs and constraints determined in environmental analysis.

## 20.6 - Travel Management Decisions

Adding a route to the National Forest System (NFS) transportation system, whether by construction of a new road or by incorporating an existing road into the system, is a "travel management decision." Travel management decisions must be advised by appropriate environmental analysis, using NEPA regulations found in 36 CFR 220, FSM 1950, and FSH 1909.15, and decisionmaking. Direction on travel management decisions is found in FSM 7715.

## 21 - OFFICE LOCATION STUDIES

The road location process should begin with office location studies. When performing office location studies, review land management plans and other documents that contain management direction affecting prospective road locations. Review travel analyses that address the project. Identify whether travel management decisions have been made to add roads to the system. When decisions have not been made, identify any issues and concerns regarding road location and potential road related resource and environmental impacts that may affect decisions. Assure that

Road Management Objectives (RMOs) have been prepared for roads (FSM 7714 and FSH 7709.59, ch. 10). When travel management decisions have been made and applicable environmental analysis has been conducted, assure the RMOs have been approved by the appropriate line officer.

In preparation for field location, resource information, control points, and proposed locations may be projected on aerial photographs, topographic maps, and Geographic Information System (GIS) displays. Make scales large enough so that they clearly depict the field location information. Special photography or maps may be useful. The use of photos and maps with compatible scales is recommended.

Review the proposed survey and design methods for the project. Select location procedures that are consistent with these methods and are appropriate to the complexity of the project.

1. Resource Coordination Checklist. As a minimum, consider at least the following items when preparing for field location:

a. Control points:

(1) Topographic: Rock outcroppings, stream crossings, saddles, wetlands, landslides, archeological sites and resources, wildlife crossings, or natural barriers.

(2) Management: Non-National Forest System land, National Forest System land dedicated to specific uses, harvest area plans, and proposed logging systems.

(3) Access: Existing landings, termini, overlooks, turnouts, roads, and trails.

b. Resource and access requirements associated with timber, range, wildlife, fire, minerals, heritage sites, wild and scenic areas, watershed, soils, visuals, and recreation.

c. Alternative locations within the planned corridor.

d. Control points must be identifiable on the ground during field location.

2. Final Checklist. Complete the following items before beginning field location activities:

a. A schedule of field activities, including coordination with affected specialists, adjoining landowners, and other interested parties.

b. A job hazard analysis and a review of the safety requirements in FSH 6709.11 and FSH 6709.12, chapter 10. Obtain appropriate safety equipment and be familiar with its use.

c. Arrangements for personnel, equipment, communications, and transportation.

d. Obtain written permission from private landowners or other agencies to work on non-National Forest System lands, when applicable. Written request should be made through the appropriate line or staff officer.

e. Identification of location procedures which are compatible with intended survey and design methods.

f. Review of applicable background files, project objectives, corridor description, and design criteria.

g. Preparation of maps and photos (or photo/map overlays) with corridors delineated and preliminary location(s), control points, and resource features marked.

## 22 - FIELD LOCATION

1. Choose the correct location. Choosing the correct location is the most important part of road construction or reconstruction. Proper field location is particularly critical for low standard roads; because the field location often becomes the final horizontal and vertical alignments. The field located alignments also determine drainage patterns that may contribute to long-term maintenance needs, disruption of natural hydrologic processes, and water quality impacts. A properly located road will result in lower costs, fewer maintenance problems, and reduced environmental impacts.

2. Road locators. Road locators should have:

a. A working knowledge of and experience in road survey, design, and road construction techniques and practices.

b. At least a basic knowledge of natural resources issues such as geology, soils, fish, wildlife, hydrology, Threatened and Endangered Species (TES), and cultural resources common to the area.

3. Resource Specialists. Resource specialists should be consulted to identify specific resource issues and concerns in the project area and to assist in road location.

Field location is not just a consideration in new road construction. It is often needed for reconstruction projects. For example, field location may be required when alternatives to the existing road alignment are under consideration to reduce impacts of the existing road.

Often the most effective resource protection measure in road location is to avoid any direct impacts on resources. For example, the best mitigation for aquatic and riparian species is to stay out of riparian areas. However, if there are no feasible alternatives, minimize the length and long-term impacts of the road within the riparian areas using mitigation measures within the design criteria.

Strive to locate roads to minimize future maintenance needs. Consider the effects of the road on the natural drainage patterns of the area and attempt to minimize the disruption of those patterns.

## 22.1 - Initial Field Examination

Make an on-the-ground examination of the corridor in which the road is to be located.

Verify the control points, critical areas, and resource and management direction identified in the applicable environmental, logging system, travel analysis, and transportation analysis documents and during the office location studies. Identify and document features within or adjacent to the corridor that would affect previous and subsequent decisions.

If possible, document these features on maps and photos. Consult with appropriate specialists and land managers to resolve conflicts or address specific problems.

## 22.2 - Location Marking

Using information from the office location studies and the initial field examination, mark road locations on the ground that conform to those identified on the maps and photos that are compatible with the design criteria and other management direction. It may be necessary to mark more than one location of a road or road segment, especially in the vicinity of critical areas such as topographic features affecting logging systems, landing locations, riparian areas, intersections, switchbacks, and private land. If a new NEPA document is being produced, these alternative locations will be analyzed for effects, according to FSH 1909.15, section 15.

Proposed road locations are usually marked on the ground with ribbon flagging. Units should develop standard flagging color schemes. Such schemes help to avoid confusion on the ground between roads and other proposed resource activities. Applying such color schemes across district and forest boundaries enhances consistency. When appropriate, use plastic or metal tags to provide additional information on the located flag line.

Locators should establish markings that are readily inter-visible from both directions along the flagged line. A guideline in brushy terrain is to flag no further apart than 20 feet and use 18- to 24-inch streamers on each flag. Use colors and material that meet the unit’s flagging color scheme and that will last for more than one season. Mark the final location so it cannot be confused with other alternate locations, removing any markings from dropped alternative locations.

Use special marking for proposed structures or other features that require collection of additional survey information, special surveys, changes in survey procedures, special consideration during design, or involve engineering specialties such as structural or geotechnical engineers.

1. Location Techniques. Depending on topography and site conditions, special location techniques may be required for the following:

a. Intersections.

b. Ridges.

c. Draws.

d. Switchbacks.

e. Grades.

f. Drainages.

g. Landings.

h. Road closure and/or decommissioning.

i. Visual considerations.

2. Location Notes. Road locators should complete location notes during on the ground field location activities to document essential information and incidental observations. Deviations from the intended survey and design methods should be clearly noted. Typical location notes may include the following:

a. Sections requiring unusually large cuts and fills.

b. Extent and type of clearing.

c. Potential disposal sites for unsuitable construction material and clearing debris.

d. Potential landing locations and key topographic breaks essential to setting of logging equipment, particularly cable machines.

e. Cross slope.

f. Classification of soils and construction materials.

g. Cultural and historical sites.

h. Constructed features.

i. Opportunities for scenic overlooks and viewing openings.

j. Survey monuments or established survey control points.

k. Type, estimated volume, and recommended extraction methods of rock materials that may be incorporated in the final design.

l. Relationship to private lands and lands managed by other agencies.

m. Areas needing additional investigation.

n. Maximum and minimum grades.

o. Proximity to riparian areas, drainage features, aquatic species, and recommended drainage structures.

p. Potential construction and maintenance problems.

q. Other control points identified during initial field examination.

r. Comments on adequacy of intended survey and design methods.

s. Alternative alignments considered and reason why they were or were not pursued.

t. Proximity to wetlands, wildlife crossings, or other sensitive or special areas.

u. Areas that may require slope stability analysis.

v. Satellite based global positioning system (GPS) coordinates for all of the above as appropriate.

## 22.3 - Construction Material Sources and Materials Investigation

In conjunction with road location, identify and mark potential sources of materials within or adjacent to the road corridor that could be used for construction. Consult with land managers, resource and engineering specialists, and private landowners regarding the use of the sources. Document specific management direction that is applicable to each site. Locate and mark needed access roads and site boundaries of approved sources. Consult with appropriate specialists, such as invasive weed specialists, cultural resource specialists, and materials engineers to determine the type and extent of subsequent investigations required. Selected locations for source material may be considered a connected action or indirect effect, according to 40 CFR 1508.8, and must be considered in the applicable environmental analysis.

## 22.4 - Related Facilities and Features

While marking road locations, identify, mark, and document the locations of related facilities and features needed for the immediate project and be aware of how future needs and projects may affect or be affected by the location and design of roads, according to 40 CFR 1508.8.

Examples of related facilities and features are log landings, critical logging corridors, road intersections, water sources, cattleguards, fences, gates, pipelines, power lines, other utilities, turnarounds, trails, parking areas, scenic overlooks, and future recreation sites.

## 22.5 - Preliminary Costs

When required, prepare preliminary cost estimates for each feasible location. Project the costs used for out-year programming to the anticipated time of construction (ch. 70). Compare preliminary cost estimates with other planning documents to validate the economic assumptions made during initial planning and document significant differences.

## 22.6 - Comparison of Proposed Routes with Management Direction and Design Criteria

Evaluate road locations to ensure that they meet the design criteria and management direction. Resolve conflicts between road locations and the design criteria and other management direction and justify the solution in terms of social, economic, and environmental effects. If an environmental document is being produced, proposed routes must be compared, according to 36 CFR 220 and FSH 1909.15.15, alternatives. Changes in design criteria or management direction require line approval.

## 22.7 - Field Location Report

Prepare a written Field Location Report (FLR) immediately upon finishing field work. The FLR documents information obtained in the field and serves as a reference for the project design criteria and preconstruction package. The FLR conveys information from the location phase to the field review and project design. The FLR should include the transportation information needed to make informed management decisions about proposed resource projects. Concisely present the findings and provide qualified recommendations for the succeeding survey, design, construction, and system management phases. One FLR may incorporate information for several roads.

If the Office Location Study and Field Location Report are completed prior to the applicable environmental analysis, use the findings from both reports to inform the NEPA document. If the FLR is conducted in tangent with the environmental analysis for the project, integrate information to avoid redundancies and ensure accuracy of data. Include all reports and documentation in the project record.

The FLR should include the following:

1. Title Sheet. The title sheet identifies the project area and lists the administrative unit; project name; date location was finalized; the proposed date of construction; the road name(s) and number(s); an index of contents, names, and working titles of location team members; and name(s) of the lead locator and report author(s).

2. Geospatial information. Geographic Information System (GIS), photography, photo overlays, vicinity maps, resource maps, and other information delineate the project area. Topographic maps show the recommended location(s), as well as other considered locations.

3. Special Problem Summary. The FLR may include a brief description highlighting areas of management, technical, or environmental concern for rapid identification of critical elements in the location. Note in particular cultural resource issues, aquatic passage issues, riparian areas, and other sensitive fish and wildlife areas.

4. Discussions and Recommendation. The FLR should summarize the results of the field location with the following:

   a. A brief summary of the RMOs, the effectiveness of the route in meeting the desired objectives, the nature of the area to be traversed, and a description of the coordination that has been accomplished.

   b. A summary statement discussing the preferred location. Be specific about the controlling factors, such as saddles, rock, drainage crossings, intended access needs for resource management, and how the preferred location addressed them. State how the preferred alternative satisfies the design criteria and management direction.

   c. A brief statement of alternate routes investigated, and why they are not the preferred location.

   d. A comparison of estimated costs of the various alternatives, with specific justification when the lowest cost alternative is not recommended.

   e. A brief description of how existing facilities are incorporated into the road location.

   f. Right-of-way necessary or granted, cost-share area inclusions, permissions granted to enter private land, and existing mining claims that may affect the road.

   g. Marking devices and colors schemes used on the ground.

h. Recommended deviations from planned corridors and associated justification for the deviations.

i. Recommendations regarding survey, design, and construction that include:

(1) Survey:

(a) Verification of, or changes to, the previously selected survey methods.

(b) Property boundaries, land survey corners, and other survey monuments to be tied to the project survey.

(c) Special survey requirements.

(d) Access instructions.

(e) Identification of known survey control points.

(2) Design:

(a) Verification of, or changes to, the previously selected design methods.

(b) Road geometry guidelines/standards incorporated.

(c) Landslide and avalanche potential.

(d) Logging system and landing requirements.

(e) Scenery management objectives

(f) Stream crossings: geomorphic and hydrologic characteristics, including potential debris load of the drainages. Describe why crossings were selected, where they are, and applicable influences on the road location.

(g) Riparian, wetlands, and meadow ecosystems: Describe special location and design considerations to preserve or enhance these features.

(h) Aquatic species: Describe aquatic species present and identify the need for special passage considerations.

(i) Wildlife protection measures: Describe sensitive wildlife areas, potential limited operating periods (LOP), and location of wildlife corridors and possible conflicts.

(j) Soils and geology observed and needs for slope stabilization, erosion control, and surfacing.

(k) Heritage resource mitigation.

(l) Other mitigation measures.

(3) Construction: Information such as material sources, water sources, weight restriction of bridges on access routes, and alternate access routes.

5. Reference Appendix. Include the following, where applicable,:

a. Specialist reports such as fish and wildlife, soil scientist, geotechnical, archeological, and visual.

b. Consultation with other entities, such as Federal, State, and local agencies or adjacent landowners.

c. Listing of reports and references not included elsewhere.

d. Changes in direction or criteria.

e. Justification for deviations and related approvals.

f. Requirement for additional permits.

## 22.8 - Field Location Review and Approval

An interdisciplinary field review of the proposed locations should be conducted when warranted by project complexity and risks. Locators and those responsible for determining the design criteria, or their designated representatives, should participate in the field review. Make the Field Location Report (FLR) available with adequate lead-time to allow participants to become familiar with the report.

Upon completion of the interdisciplinary field review:

1. Document all additions or changes resulting from the review and add them to the FLR.

2. Check the final results against design criteria and management direction.

3. Obtain necessary approval for changes to criteria or direction. The signature of the responsible engineer and the land manager, or their designated representatives, in the FLR or by letter indicates technical and management approval for the road location.

4. Obtain the concurrence of cooperators when appropriate.

## 22.9 - Field Location Checklist

Upon completion of the field reviews and FLR, check to see that:

1. The final road location has been marked for survey.

2. The final FLR has been signed and placed in the appropriate project file.

3. For purposes of environmental analysis and decisionmaking:

   a. When a Travel Management Decision is on file, assure that deviations from the transportation plan and applicable environmental documents have been properly documented (narrative and maps) and approved in accordance with applicable guidance, regulations, and policy. Significant changes may trigger additional environmental analysis for the current Travel Management Plan, prior to implementation.

   b. When the Travel Management Decision is yet to be made, because information developed during road location has been identified as necessary to advise environmental analysis and decisionmaking, assure that the information has been obtained, documented in the required format, and transmitted to the decision maker.

4. All significant construction, operation, and maintenance problems identified during or before location have been resolved so the located road can be built and utilized consistent with the design criteria and standards as initially intended or as revised. If appropriate, identify needed monitoring.

5. Work to assure that information on the proposed project is accurately reflected in the forest transportation atlas (FSM 7711.2). This includes both the required tabular data as well as spatial data, as appropriate.

## 23 - LOCATION TECHNIQUES

Following are techniques that may be used both in the office and in the field to help efficiently locate roads while meeting management objectives.

## 23.1 - Office Location Techniques

To use field time most efficiently make a thorough office study before going to the field. The corridors identified in transportation area analysis can be refined and alternative road locations studied by use of Geographic Information System (GIS), maps, stereoscopic resource

photography, and digital terrain modeling. Consider the use of appropriate remote sensing techniques. Digital terrain modeling has the advantage of not only identifying alternative locations but also providing preliminary design quantities for use in calculating preliminary cost estimates.

Preliminary grade lines can be run in the office on GIS, contour maps, orthophoto maps, and similar documents.

## 23.2 - Field Location Techniques

Exhibit 01, Field Location Technique Guidelines, outlines information and techniques that are useful in identification and marking of road locations on the ground. Other procedures may be used that also provide acceptable results. Note that the techniques generally apply to the location of very low volume roads with design speeds under 25 mph. Location of higher standard roads may require the application of other techniques that incorporate higher design standards. Check equipment frequently and prior to field work to assure it is working properly. Appropriate accuracy during field location can generally be accomplished using hand held compasses, clinometers, and cloth tapes. Hand held Global Positioning System (GPS) equipment may be useful.

## 23.2 - Exhibit 01

## Field Location Technique Guidelines

| | |
|---|---|
| 1. Overall location | Locate road using gradeline control when cross slopes are greater than 15 percent.<br><br>Locate road using horizontal control when cross slopes are less than or equal to 15 percent or in rolling hummocky ground with no specific side slope.<br><br>Fit road to the topography, minimizing landform modifications.<br><br>Start trial lines at specific control points and go from those to more general points.<br><br>Tie into previously selected control points using an altimeter, and/or a Global Positioning System (GPS).<br><br>Check against air photos, profiles, and maps.<br><br>Exhaust other feasible alignment options before locating roads on exposed slopes that will adversely impact scenery viewed from afar. |
| 2. Running grade line | The final design will often be steeper than the located line.<br><br>The shorter the "shots" and the more broken the terrain, the greater the deviation from the field location. This deviation is the least evident where the located line is essentially the final design line.<br><br>Located Grade — Design Grade<br>2-4 percent — Approx. ½ percent steeper<br>5-10 percent — Approx. 1 percent steeper<br>10-18 percent — Approx. 2 percent steeper<br><br>Grades should be slackened in broken terrain to allow sufficient design flexibility. |

## 23.2 - Exhibit 01--Continued

| | |
|---|---|
| | State logging safety codes may impose requirements for maximum grades. Often the maximum grade is stated as a percentage (that is 20 percent) with no indication over what length it should be measured. Check appropriate guidance to assure that requirements for the maximum lengths of steep grade sections are met. For example, 20 percent over a 100 foot slope distance.<br><br>When "pushing" maximum allowable grades, be sure to allow for breaks in grade to accommodate roadside features, such as log landings, as well as to assure that maximum grades are not exceeded.<br><br>Where the difference in grades between segments exceeds 5 percent, transition grade changes in increments of 5 percent or less. Separate incremental transitions by 25 to 50 feet. |
| 3. Log landings | When a road will provide access for cable logging, to the extent possible, locate roads on topographic breaks to fit logging system needs.<br><br>Coordinate landing locations with turnout opportunities.<br><br>Reduce or minimize visual impacts by avoiding locating landings on ends of ridges, if possible. |
| 4. Switchbacks | Locations should be limited to areas with side slopes of 35 percent or less.<br><br>Locate switchbacks to minimize visual impacts using vegetation or topography to screen impacts.<br><br>Mark approach grades and grades within switchbacks in accordance with design standards.<br><br>Design grades will be steeper than located grades on switchbacks.<br><br>Lay out short radius switchbacks as circular curves using radius point or by deflection angle. |

## 23.2 - Exhibit 01--Continued

| | |
|---|---|
| 5. Intersections | Locations should be limited to areas with side slopes of 25 percent or less.<br><br>Angles formed by intersecting roads should not be less than 60 degrees.<br><br>Grades of through and approach roads should be the same, until adequate horizontal separation is achieved, and should not exceed 6 percent. |
| 6. Horizontal curves | Approximate curve locations by establishing a series of points on the curve (POCs). Incremental deflection angles should be less than 30 degrees.<br><br>Lay out short radius curves as circular curves using a radius point or by using deflection angles.<br><br>Low standard roads may not require circular curves. The locator should consider the flagline to be the approximate centerline of the road.<br><br>Avoid laying out curves that coincide with sharp crest vertical curves. When a road is located with a curve on a crest or ridge, a potentially unsafe condition is created. It may be difficult or impossible to provide for adequate sight distance.<br><br>Lay out alignment along natural curvature of terrain to minimize cuts and fills and to provide self-balanced sections.<br><br>Check curves to see that they are smooth and without sharp breaks. Check topography to be sure necessary curve widening and turnouts can be accommodated.<br><br>Avoid sharp curves at the end of long tangents.<br><br>Avoid “S” curves, except when located in continuously winding road locations. |

## 23. 2 - Exhibit 01--Continued

| | |
|---|---|
| 7. Ridges (sharp and narrow) | Avoid abrupt vertical curves on ridges.<br><br>Lay out short radius curves as circular curves using a radius point and cloth tape or by deflection angles.<br><br>Reduce grade to provide sufficient design flexibility. |
| 8. Riparian Areas and Drainages | Avoid roads in riparian areas if possible.<br><br>Avoid wetlands.<br><br>Avoid paralleling riparian areas for prolonged lengths.<br><br>Avoid locations that will result in filling of natural stream channels.<br><br>Cross drainages directly, preferably at a right angle. To allow for aquatic species passage, cross where the stream is stable, gradient is low, and stream width is narrow.<br><br>Avoid crossing at braided stream channels, oxbows, and meanders.<br><br>Attempt to maintain natural flow patterns.<br><br>Understand when dredge and fill permits are required as well as when the nationwide general permit conditions are applicable.<br><br>Understand other permit requirements such as Clean Water Act and State and local requirements, and consider those requirements in the location.<br><br>Locate vertical points of intersection (VPIs) in vicinity of transition between cuts and fills (ch. 40), and provide grade relief for designer to adjust location of vertical curve to control water.<br><br>Where possible, either reduce the location grade to 0-1 percent approximately 100 to 200 feet before crossing draws and extend 100 to 200 feet beyond draws or reduce favorable grades by 5 percent, adverse grades by 2 percent (reduces the need for shifting or braking on curves). |

## 23. 2 - Exhibit 01--Continued

| | |
|---|---|
| | Minimize potential for stream diversion should culverts plug. The risk is eliminated entirely when roads have adverse grades in both directions from stream crossings. |
| 9. Surface drainage | If surface drainage is to be controlled by rolling grades and surface cross drains, incorporate grade breaks in the road location.<br><br>Avoid locating cross drainage at turnouts and intersections. |
| 10. Full bench | The marked grade line will be above the anticipated design grade line and it will be shifted into the side hill ½ road width compared to self-balanced areas. Provide for transitions into and out of full bench sections. |
| 11. Bridge sites | Locate in naturally confined and stable locations where the flow characteristics of the stream can be maintained.<br><br>Guidelines:<br>*Avoid grade changes or curves on bridges.<br>*Look for solid abutment foundations.<br>*Cross where stream courses are straight.<br>*Cross perpendicular to the stream.<br>*Location of economical crossings may control location of approaches.<br><br>*See FSH 7709.56b, Drainage Structures Handbook. |
| 12. Road closures | Locate intersections to facilitate effective road closures.<br><br>Locate closure points where turnarounds can be provided for critical vehicles.<br><br>Locate closure points that tie into natural barriers. |

## 23. 2 - Exhibit 01--Continued

| | |
|---|---|
| 13. Scenic vistas | Consult with Consult with landscape architects or visual specialists regarding scenery management objectives.<br><br>When specified in design criteria and RMOs, identify parking areas in the vicinity of scenic features.<br><br>Provide safe sight distance for vehicles entering or leaving parking areas.<br><br>Consider the effect of long-term vegetation growth outside the roadway on desired vistas. |

## 23.3 - Field Location Techniques for Special Situations

In some areas, it is necessary to mark the field location of sharp radius curves through switchbacks, draws, and ridges as a circular curve regardless of the actual design method that will be used.

1. Marking Curves by Deflection Angle. Vegetation, topography, or other factors may preclude locating a curve by using a tape held at the radius point and marking the arc of the curve. In these cases, marking the curve by deflection angle and chord can be effective, as shown in exhibit 01.

## 23.3 - Exhibit 01

## Deflection Angle (d) for Various Radii for Establishing Horizontal Curves for Road Location[1]

| Radius (ft) | 15 foot Chords | | 30 foot Chords | | 50 foot Chords | |
|---|---|---|---|---|---|---|
| | ½ d | d | ½ d | d | ½ d | d |
| 40 | 11° | 22° | 22° | 44° | - | - |
| 80 | 5° | 11° | 11° | 22° | 19° | 38° |
| 120 | 4° | 8° | 8° | 16° | 12° | 24° |
| 160 | 3° | 6° | 6° | 12° | 9° | 18° |
| 200 | 2° | 5° | 4° | 9° | 7° | 14° |
| 240 | 2° | 4° | 4° | 8° | 6° | 12° |
| 280 | 2° | 4° | 3° | 7° | 5° | 10° |
| 320 | 1° | 3° | 3° | 6° | 5° | 9° |
| 360 | 1° | 2° | 2° | 5° | 4° | 8° |
| 400 | 1° | 2° | 2° | 4° | 4° | 7° |
| | | | | | | |

[1]Turn ½ (d) at P.C. for first P.O.C., turn full (d) for remaining P.O.C.'s, and turn ½ (d) at P.T. for first P.O.T.

2. Marking Switchbacks. Switchbacks can be located in the following manner (and as illustrated in ex. 02) unless the radius is relatively large. For switchbacks with a radius greater than 100 feet, consider using the deflection angle method.

a. Step 1. Extend the upper and lower gradelines of the approaching alignment until they intersect.

b. Step 2. Shift the intersecting point uphill. The steeper the side slope, the greater the shift. This becomes the radius point of the curve. The shift results in better balance of earthwork.

c. Step 3. Mark the curve by measuring radially from the radius point.

d. Step 4. Connect the point of curvature (PC) and point of tangent (PT) of the curve to the upper and lower gradelines with a horizontal line that follows the natural ground contour.

## 23.3 - Exhibit 02

## Procedure for Locating Switchbacks




SHIFT GRADELINE INTERSECTING POINT UPHILL TO ESTABLISH THE CURVE RADIUS POINT ACCORDING TO THE FOLLOWING TABLE.

| SLIDE SLOPE % | SHIFT (ft) |
|---|---|
| 5 | 3 |
| 10 | 4 |
| 15 | 6 |
| 20 | 7 |
| 25 | 10 |
| 30 | 13 |
| 35 | 16 |

(SEE ALSO EM 7100–10, ENGINEERING FIELD TABLES, P. 171, FOR AN ALTERNATE METHOD OF SWITCHBACK LAYOUT.)

3. Locating and Carrying a Grade Through a Narrow Ridge. A road can be located to cross through a narrow ridge by using the procedures described below and illustrated in exhibit 03.

Step 1. Select a location for crossing the ridge. Extend the approaching gradeline to the beginning of the curve (Point A).

Step 2. Using the radius point or deflection angle methods, establish the horizontal alignment through the selected ridge point. The midpoint on the curve (Point B) will lie approximately at the crest of the ridge.

Step 3. From Point A, use a clinometer to mark equal vertical step(s) up the ridge on the approach side, and down the ridge on the other side at the desired grade (G), while following the horizontal alignment. The number of steps up must equal the number of steps down. The grade setting on the survey instrument must be reversed before stepping down.

Step 4. Where the topography will permit proceeding on grade with a smaller deflection angle than is required by following the horizontal curve (Point C), continue running a grade-line along the ridge.

## 23.3 - Exhibit 03

## Locating and Carrying Grade through a Narrow Ridge



# 24 - REFERENCE MATERIAL FOR ROAD LOCATORS

## 24.1 - Publications

1. AASHTO 2001. Guidelines for Geometric Design of Very Low-Volume Local Roads (ADT< 400).

2. AASHTO 2001. A Policy on Geometric Design of Highways and Streets.

3. AASHTO 1999. Guide for the Development of Bicycle Facilities, 3rd Edition.
U.S. Forest Service. 1976. Engineering Field Tables EM 7100-10 or equivalent.

4. Ashford, Wright, 1989. Transportation Engineering Planning and Design, 3rd edition , John Wiley and Sons. ISBN 0-471-83874-8.

5. British Columbia Ministry of Forests, 1994. A Guide for Management of Landslide-Prone Terrain in the Pacific Northwest Second Edition, ISSN 0229-1622.

6. Federal Highway Administration. Federal Lands Highway Project Development and Design Manual, current edition. FHWA-DF-88-003; available in electronic format from Federal Lands Highway's Internet sites.

7. Federal Highway Administration. Flexibility in Highway Design. Pub. No. FHWA-PD-97-062.

8. Federal Highway Administration. Standard Specifications for Construction of Roads and Bridges on Federal Highway Projects, current edition.

9. Garber, Nichols J. and Hoel, Lester A. Traffic and Highway Engineering, Second Edition, Revised. 1996 PWS Publishing Co., 1126 pp. Available from the Institute of Transportation Engineers.

10. Hall, Jerome W.; Homburger, Wolgang S.; Reilly, William R.; and Sullivan, Edward C. 2000. Fundamentals of Traffic Engineering, 16th ed. By Wolgang S. Homburger, Jerome W. Hall, Edward C. Sullivan and William R. Reilly. University of California, Institute of Transportation Studies, 2000. Available from the Institute of Transportation Engineers.

11. Pearce, Stenzel, and Walbridge, 1985 Logging and Pulpwood Production, ISBN 0471868221.

12. Proceedings of the Conference on Transportation Though Difficult Terrain. Aspen-Snowmass August 1993. Edited by Jonathan Wu A.A.Balkema-Rotterdam-Brookfield. Transportation Facilities through Difficult Terrain. (Interesting selection of case studies). ISBN 90-5410-343-4.

13. Rosgen, Dave, 1996. Applied River Morphology. Wildlife Hydology, Pagosa Springs, CO.

14. The Asphalt Institute 1989 Edition, Reprinted 2000 The Asphalt Handbook .MS-04. Leatherette bound, 607 pages, 150 x 225 mm (6 x 9 in.).

15. The Asphalt Institute Reprinted 1997 Soils Manual (Fifth Edition,) MS-10. Fully illustrated, 260 pages, 150 x 225 mm (6 x 9 in.).

16. The Asphalt Institute. Asphalt Surface Treatments. MS-13

17. U.S. Department of Commerce, Bureau of Public Roads (now Department of Transportation) circulars No. 5 (Dec. 1965) and No. 10 (March 1965) "Hydraulic Charts for the Selection of Highway Culverts," http://www.fhwa.dot.gov/engineering/hydraulics/pubs/hec/hec05.pdf.

18. U.S. Forest Service. 1976. Engineering Field Tables EM 7100-10 or equivalent.

19. U.S. Forest Service March 1977. National Forest Landscape Management, Volume 2, Chapter 4, Roads., USDA Handbook No. 483.

20. U.S. Forest Service, Alaska Region. April 1978 Logging Systems Guide, Series R-10-21.

21. U.S. Forest Service, Pacific Northwest Region. 1974. Cable Logging Systems,, printed by Oregon State University.

22. U.S. Forest Service, Pacific Northwest Region. 1990. Forest Engineering Handbook, Edition #1.

23. U.S. Forest Service, Technology & Development Program, 1998. Water/Road Interaction Technology Series,

24. Wenger. Forestry Handbook, 2nd Edition, Wiley and Sons Publisher. ISBN:0-471-06227-8.

## 24.2 - Internet Sites

1. American Association of State Highway and Transportation Officials (AASHTO) Home Page: http://www.transportation.org

2. American Society of Civil Engineers (ASCE) Home Page: http://www.asce.org

3. Federal Highway Administration, Context sensitive Design Home Page: http://www.fhwa.dot.gov/context/index.cfm

4. Federal Highway Administration, Manual on Uniform Traffic Control Devices for Streets and Highways (MUTCD): http://mutcd.fhwa.dot.gov

5. Federal Highway Administration, Western Federal Lands Highway Division Home Page : http://www.wfl.fha.dot.gov

6. Institute of Transportation Engineers: http://www.ite.org

7. Local Technical Assistance Program (LTAP): http://www.ltapt2.org

8. National Association of County Engineers Home Page:

http://www.countyengineers.org

9. U.S. Department of Transportation, National Transportation Library: http://ntl.bts.gov

10. U.S. Forest Service, Water/Road Interaction Technology Series http://stream.fs.fed.us/water-road/

**FOREST SERVICE HANDBOOK**
**NATIONAL HEADQUARTERS (WO)**
**WASHINGTON, DC**

# FSH 7709.56 – ROAD PRECONSTRUCTION HANDBOOK

## CHAPTER 30 – ENGINEERING SURVEY

**Amendment No.:** 7709.56-2011-2

**Effective Date:** July 13, 2011

**Duration:** This amendment is effective until superseded or removed.

**Approved:** JAMES M. PEÑA
Associate Deputy Chief, NFS

**Date Approved:** 07/07/2011

**Posting Instructions:** Amendments are numbered consecutively by handbook number and calendar year. Post by document; remove the entire document and replace it with this amendment. Retain this transmittal as the first page(s) of this document. The last amendment to this handbook was 7709.56-2011-1 to FSH 7709.56_20.

| | | |
|---|---|---|
| **New Document** | 7709.56_30 | 12 Pages |
| **Superseded Document(s) by Issuance Number and Effective Date** | 7709.56_3<br>(Amendment No. 1, 5/1987) | 9 Pages |

**Digest:**

30 - Revises entire chapter and makes minor technical and editorial changes throughout chapter. Revises coding from 1-digit to recommended 2-digit coding.

31 - Adds direction that preparation of a job hazard analysis is a requirement for administration of contract surveys.

32.2 - Adds direction that trees containing merchantable logs should not be felled during clearing of survey lines.

33.1 - Revises cross-reference for requirements for rights of way surveys from FSM 7152.6 to FSM 7153. Adds “Witness trees” to the list of features requiring coordination with cadastral surveyors when the features might be destroyed during construction.

## Digest--Continued:

33.4 - Establishes code and caption "Stream channel" and sets forth new direction for surveying of a stream channel. Adds direction for including the concept of "Bankfull Width," which is determined by trained specialists, as a consideration in collecting data for stream crossings.

34.1 - Adds direction for including the Global Positioning System (GPS) as a tool for conducting low-order surveys.

36 - Recodes to this section direction previously set out in section 2.23 on materials source surveys.

38 - Removes obsolete direction for highlight data items to be extracted for automated processing.

## Table of Contents

30.2 - Objective .......... 4
30.6 - Standards and Calibration .......... 4
30.7 - Contract Surveys .......... 4
30.8 - Data Recording .......... 5
**31 - PREPARATION FOR SURVEYS .......... 5**
**32 - PRE-TRAVERSE FIELD WORK .......... 6**
32.1 - Establishing Ground Control .......... 6
32.2 - Clearing .......... 6
**33 - TRAVERSE, PROFILE, AND CROSS SECTIONS .......... 7**
33.1 - Horizontal Traverse .......... 7
33.2 - Profile Survey .......... 8
33.3 - Cross Sections .......... 8
33.4 - Stream Channel .......... 8
**34 - RECONSTRUCTION SURVEY .......... 8**
34.1 - Minor Reconstruction .......... 8
34.2 - Major Reconstruction .......... 9
**35 - SITE SURVEY .......... 9**
**36 - INVESTIGATION AND CLASSIFICATION OF CONSTRUCTION MATERIALS .......... 9**
**37 - ALTERNATIVE SURVEY METHODS .......... 10**
**38 - VERIFICATION OF SURVEY DATA .......... 10**
**39 - ENGINEERING SURVEY ACCURACY STANDARDS .......... 11**

This chapter provides guidance for conducting a road preconstruction engineering survey.

## 30.2 - Objective

The objectives of a road preconstruction engineering survey are to:

1. Measure the ground form and conditions (along the located line or across the site).

2. Identify topographic features and other physical factors that affect design of the planned facility.

The data that is gathered includes numeric data (elevation, bearing, and distance) and nonnumeric data (drainage, materials, and resource). The amount, detail, and accuracy of the data should be commensurate with the standard of the road, value of access to resources, and risks associated with the project. The activities on the Field Location Checklist (sec. 22.9) should be completed prior to beginning work.

## 30.6 - Standards and Calibration

Make measurements to the selected engineering survey accuracy standards (sec. 39, ex. 01, *Guidelines for Engineering Survey Accuracy*). See FSM 7152 for standards for surveys for the location and marking of property boundaries and FSM 7153 for standards for surveys for acquisition of road rights-of-way.

Calibrate surveying equipment before use and check it periodically to obtain and maintain the accuracy required.

## 30.7 - Contract Surveys

Consider the following factors when determining whether to survey by force account or contract:

1. Size and complexity of projects.

2. Crew support requirements.

3. Availability of Forest Service personnel and potential contractors.

4. Lead time available.

5. Ability to define the required work.

6. Capability of Forest Service and contractor's personnel.

7. Relative costs.

Select qualification requirements for contractor's personnel considering State and local laws and regulations and the technical and professional factors of the job. For example, a contract requiring only topographic measurement might not require performance by a professional engineer, whereas a contract requiring professional judgments, such as complete classification of construction materials and recommendations regarding final design, requires the services of a professional engineer. Determine the specific type of survey contract and contract specifications by consulting with engineering staff, acquisition management, and affected resource staffs.

It may be advantageous to contract part of a survey project and do the remainder by force account. An example is clearing of the survey line by contract while using a force account crew to gather numeric survey data. This approach may result in less investment in equipment (power saws and hand cutting tools), a reduction in job hazards for force account crews, and better use of skilled personnel.

## 30.8 - Data Recording

Data may be recorded by various means, including standard field notebooks, electronic data recording equipment, programmed calculators, and voice recorders. Record data in the format and to the precision required for the planned design method. The manner of recording must provide for retention of data in accordance with previously determined requirements (sec. 31).

Record topographic features identified along the survey route. Note information about vegetation and drainage, and reference it by engineer's station or section number. Drainage data should include sketches and notation of significant characteristics, such as grade control features, high water marks, and stream channel width. See section 33.4 regarding collection of this data.

Much of the data normally recorded are nonnumeric, such as comments, descriptions, and sketches. This information can often be numerically coded for electronic recording as long as significant details are not omitted. Digital cameras with video capability may be useful. Electronic recording of data should not preclude additional handwritten comments in a companion field notebook.

# 31 - PREPARATION FOR SURVEYS

Review the project file to identify the purpose of the survey, the proposed survey method(s), and any survey control information. Verify that the proposed survey method and accuracy standards are appropriate for the intended design methods and are consistent with legal requirements and onsite constraints. Ensure that written permission has been obtained to survey on non-national forest land.

Select the data recording method. Determine and document long-term field data retention requirements.

The following guidance applies to force account surveys:

1. Prepare the Job Hazard Analysis (JHA), including hazards associated with transportation, equipment, terrain, climate, insects, flora, fauna, hygiene, and field activities. (Note: A JHA is also a requirement for administration of contract surveys.)

2. Schedule the survey crew, equipment, and transportation. Check all equipment for serviceability. Arrange for survey materials, camp needs, and vehicles.

3. Brief the survey crew. As a minimum, discuss the work to be completed, survey methods to be used, schedules to be followed, the JHA, safety plan, fire prevention, and planned logistics.

## 32 - PRE-TRAVERSE FIELD WORK

### 32.1 - Establishing Ground Control

1. Survey Line. Set controls commensurate with the selected survey accuracy standards before beginning the survey. Identify changes in direction of the proposed line. Include intermediate marking to ensure visibility and identify special sites.

2. Special Sites. Sites on or adjacent to the road centerline often require additional survey data and controls marked on the ground to indicate the limits of a site survey.

3. Photogrammetric Survey. When using photogrammetric survey methods, consult with geometronics personnel to determine the specific targeting and control survey requirements.

### 32.2 - Clearing

Clear area of trees and other potential hazards sufficiently to allow the visibility needed between points of intersection of tangents (PI) or reasonably spaced points on tangents (POT) for traversing and to permit safe and reasonable passage of personnel and equipment. Trees which will make merchantable logs should not be felled. Retain ground control markings required for traverse work. Replace markings destroyed during clearing operations to maintain the original spacing and intervisibility. Special clearing restrictions may be needed when crossing lands other than national forest and specially designated National Forest System lands.

## 33 - TRAVERSE, PROFILE, AND CROSS SECTIONS

The survey data gathered varies with the selected design method. Horizontal and vertical alignment calculations may not be needed for all design methods. For low-standard roads, collect sufficient data to allow the determination of curve widening, design speed, and design standards (sec. 42.5 of this handbook) as well as calculation of construction quantities to estimate costs.

### 33.1 - Horizontal Traverse

Mark and set control stations and points of intersection as appropriate to the complexity of the project. Run the survey line through the designated control points established during the location phase.

Mark and set intermediate stations at significant ground breaks along the located line or within the cross section limits. The degree of significance varies with accuracy standards and the anticipated construction tolerances. Surveyors should set stations at intervals not exceeding 100 feet or that distance identified in the field location report (FLR) (sec. 22.7 of this handbook). The line of the horizontal traverse should not vary from the located line more than the limits defined in the FLR.

Set reference stakes as required by the survey accuracy standard (sec. 39). Set offset stakes when a survey line stake cannot be driven at the desired survey point or when the survey line stake is likely to be disturbed. Reference and offset stakes should be set perpendicular to the survey line along tangents and on the angle bisectors at point of intersections (PIs). Set all stakes firmly and mark with appropriate station or section number data.

Measure and record bearings, deflection angles, and distances between stations to the selected survey accuracy standard using appropriate methods to minimize errors.

Reference and record the location of existing roads, trails, fences, other physical improvements, property boundaries, and monuments that intersect or are sufficiently close to the traverse to be affected by construction.

Tie the traverse to designated property corners. Ties between the traverse and property corners must be made to the minimum accuracy requirements for rights-of-way surveys (FSM 7153), when appropriate, and also must not be less accurate than the overall traverse survey. Coordinate with cadastral surveyors to identify and reference land survey corners, witness trees, and other land survey monuments that might be destroyed during construction.

## 33.2 - Profile Survey

Set benchmarks and reference points in accordance with established standards. Locate them on permanent fixed objects outside the anticipated construction limits. Establish elevations to the same accuracy standard as the road survey. Describe benchmarks and reference them to the horizontal traverse by distance and bearing. Establish benchmarks on both sides of drainages where a major structure is planned.

Measure and record the profile, including each established station, along the horizontal traverse to the selected survey accuracy standard. Turns should be made through each established benchmark to check elevations.

## 33.3 - Cross Sections

Cross sections, appropriate for the design method, must be measured and recorded at selected stations along the horizontal traverse to the selected survey accuracy standard. Cross sections should be long enough to provide sufficient information should a need to move centerline occur during the design process. Cross sections should be extended when necessary to adequately depict adjacent or cross drainages. Take cross sections on each side of the traverse. Cross sections must be perpendicular to the traverse on tangent sections and located on the angle bisector at PIs. Measure and record all significant breaks in topography along the cross section. Significant topographic features must be referenced to the traverse. The length of cross sections may vary. Cross sections should be longer in steep terrain than in flat terrain.

## 33.4 - Stream Channel

Measure and record stream data sufficient to determine channel cross section, water surface profile, grade control, geomorphic features of interest, and channel shape variations. This may require survey 500 feet or more up and downstream. If photos are taken, tie the photo points into the survey data. Involve specialists as appropriate to assure adequate survey and identify special data requirements when aquatic species passage is a design criterion. This special data includes determination of “Bankfull Width,” which is the width of the channel established at the elevation of the water during a stream flow event that occurs on average once every 1.5 years. The preferred method of establishing Bankfull Width is visual inspection of the stream channel by properly trained specialists.

# 34 - RECONSTRUCTION SURVEY

## 34.1 - Minor Reconstruction

Reconstruction projects involving little or no earthwork or having very low resource damage potential may require only a low-order survey method. This includes using an odometer (milepost), cloth tape, distance measuring wheel, satellite global positioning device (GPS), or

other distance measuring instruments for centerline stationing. Because little or no location marking may have been done before survey, many items normally documented during location, such as identification of materials sources, special design considerations, and specific work sites, may have to be done during the survey process. Establish reference stakes that identify the termini of the work locations and temporary bench marks to establish relative elevations.

## 34.2 - Major Reconstruction

Surveys for reconstruction projects requiring greater construction effort than that described in section 34.1 should use the methods described in section 33.

## 35 - SITE SURVEY

Conduct a site survey when more specific data is needed than normally obtained during a routine route survey. The need for a site survey is usually identified during project planning or location. Site surveys are most commonly required at the following locations:

1. Bridge and major culvert sites.
2. Terminal facilities (FSM 7705).
3. Earth-retaining structures.
4. Material borrow sites and waste areas.
5. Special earthwork situations.
6. Critical log landings.

Perform bridge site surveys in accordance with FSH 7709.56b.

## 36 - INVESTIGATION AND CLASSIFICATION OF CONSTRUCTION MATERIALS

Investigation and classification of construction materials refers to the gathering and analysis of rock and soils data to determine the effect work items such as clearing, excavation, and drainage have on designs and on construction costs.

Potential materials sources for aggregates and borrow adjacent to the road corridor, that could be used for construction, may have been identified in road location or may be identified during surveys. Locate and survey needed access roads and site boundaries of approved sources. Materials sources must be referenced to the survey line.

In consultation with appropriate specialists, determine the location, type, and extent of sampling and testing required. Where necessary, conduct field expedient tests (visual classification) or obtain, label, and submit samples for formal laboratory testing. American Society for Testing

and Materials (ASTM) D2488 outlines field expedient tests. Base the timing and extent of investigation and specific nature of the classification on local conditions and facility or system requirements. Survey crews or others may perform investigations, but they must use a degree of materials expertise consistent with the project requirements.

Include test results and recommendations in the project file so that they are available during the design and construction phase. Recommendations and results should include:

1. Slope ratios.

2. Classification of construction materials.

3. Areas for special consideration or further investigation.

4. Estimated quantities.

FSH 7709.56b discusses bridge foundation investigations.

## 37 - ALTERNATIVE SURVEY METHODS

Unusual data requirements, project economics, available technology, and project timing may require using alternative methods to best obtain sufficient data for design. Examples of these methods include the following:

1. Aerial and close-range photography (including standard resource photography) and photogrammetric measurements to obtain road or site design data when anticipated construction standards and tolerances, topography, and vegetation allow.

2. Specialized, site-specific information such as hydrologic and hydrographic data for design of a marine facility.

3. Non-photographic remote sensing data such as data derived by aerial or satellite survey to obtain road or site design data.

Be alert for available or potential new processes and equipment, as well as for potential modifications and new uses for existing technology.

## 38 - VERIFICATION OF SURVEY DATA

Review field survey data and subsequent calculations, whether performed by force-account or by contract, for clarity, completeness, accuracy, and omissions. Field verify when appropriate. Determine the need for supplemental or corrective work, and arrange for completion of that work. Note where survey methods used would not be appropriate for similar future applications.

## 39 - ENGINEERING SURVEY ACCURACY STANDARDS

Conduct surveys to accuracy standards consistent with the final construction tolerances and with the planned design method. Exhibit 01, "Guidelines for Engineering Survey Accuracy," illustrates typical survey accuracy associated with construction tolerances, design methods, and representative survey equipment. Use the information in exhibit 01 for guidance, but do not substitute it for sound professional judgment in relating methods, accuracy standards, and design criteria.

## 39 - Exhibit 01

## Guidelines for Engineering Survey Accuracy

| Accuracy Class | Construction Tolerance [1]/ | Distance Accuracy | Elevation Accuracy | Benchmarks | Reference to Traverse | Cross-Section Accuracy | Deflection Angles |
|---|---|---|---|---|---|---|---|
| High | A &B | 1/5000 or better | Nearest 0.01 ft each reading | Start, end, and every 1000 ft. | Two adjacent PI's every 1000 ft. | All breaks 1 ft. or more | 30 degrees or less |
| Medium | C & D | 1/1000 | Nearest 0.1 ft each reading | Start of project and every 2000 ft. | Two adjacent PI's every 1000 ft. | All breaks of 2 ft. or more; slope breaks of 5 percent or more | 30 degrees or less |
| Low | Usually E & F | 1/100 | Nearest 0.2 ft or 1 percent grade each reading | Start of project | Two adjacent PI's every 1000 ft. | All breaks of 2 ft. or more: slope breaks of 5 percent or more | 30 degrees or less |
| Flag Line | Usually F | 1/30 | Nearest 1 percent grade each reading | N/A | N/A | Average cross slope | N/A |
| Condition Survey | [2]/ | [2]/ | [2]/ | [2]/ | At each work location | [2]/ | [2]/ |

[1]/ Refer to the Construction Tolerance Table in FHWA FP-09 Specifications, or latest revision thereof, Table 152-1, and currently used Forest Service supplemental specifications.

[2]/ Determine based on local requirements.

NOTE: See FSM 7152 and 7153 for rights-of-way and easement survey methods and precisions.

# FOREST SERVICE HANDBOOK
# NATIONAL HEADQUARTERS (WO)
# WASHINGTON, DC

## FSH 7709.56 – ROAD PRECONSTRUCTION HANDBOOK

## CHAPTER 40 – DESIGN

**Amendment No.:** 7709.56-2014-1

**Effective Date:** July 3, 2014

**Duration:** This amendment is effective until superseded or removed.

**Approved:** GREGORY C. SMITH
Acting Associate Deputy Chief, NFS

**Date Approved:** 06/27/2014

**Posting Instructions:** Amendments are numbered consecutively by handbook number and calendar year. Post by document; remove the entire document and replace it with this amendment. Retain this transmittal as the first page(s) of this document. The last amendment to this handbook was 7709.56-2011-5 to FSH 7709.56_40.

| | | |
|---|---|---|
| **New Document** | 7709.56_40 | 70 Pages |
| **Superseded Document(s) by Issuance Number and Effective Date** | 7709.56_40<br>(Amendment 7709.56-2011-5, 08/19/2011 ) | 72 Pages |

**Digest:**

40 - Revises, updates, and sets forth new direction throughout the entire chapter.

## Table of Contents

40.2 - Objective .... 4
40.3 - Policy .... 4
40.5 - Definitions .... 4
40.7 - References .... 6
**41 - DESIGN CRITERIA .... 7**
**42 - DESIGN ELEMENTS AND DESIGN STANDARDS .... 11**
42.1 - Application of Design Standards .... 12
42.2 - Coordination of Design Elements .... 12
42.3 - Number of Lanes .... 13
42.4 - Road Structure .... 13
42.41 - Traveled Way .... 13
42.42 - Shoulder Width .... 17
42.43 - Turnouts .... 17
42.44 - Turnarounds .... 22
42.45 - Curve Widening .... 22
42.46 - Clearance .... 28
42.47 - Fill Widening .... 28
42.48 - Clearing Widths .... 28
42.49 - Daylighting .... 28
42.5 - Speed and Sight Distance .... 29
**43 - ALIGNMENT .... 34**
43.1 - Horizontal Alignment .... 34
43.2 - Vertical Alignment .... 39
43.3 - Intersections .... 42
43.4 - Railroad Grade Crossings .... 43
43.5 - Roadside Design .... 43
**44 - ROAD DRAINAGE .... 46**
44.1 - Traveled Way Surface Shapes .... 48
44.2 - Surface Cross Drains .... 49
44.3 - Ditches .... 51
44.4 - Culverts .... 51
44.5 - Subdrainage Systems .... 55
44.6 - Drainage Systems on Stored Roads .... 57
**45 - EROSION CONTROL AND WATERSHED PROTECTION .... 57**
45.1 - Permanent Erosion Control and Watershed Protection .... 58
45.2 - Temporary Erosion Control and Watershed Protection .... 59
45.3 - Aquatic Habitat Protection .... 59
45.4 - Disposal of Waste .... 59
45.5 - Retaining Structures .... 59
**46 - UTILITIES AND OTHER EXISTING USES, RIGHTS-OF-WAY, AND CONSTRUCTION EASEMENTS .... 60**

**47 - MATERIALS ..... 62**
47.1 - Slopes ..... 62
47.2 - Pavement Structure ..... 63
47.3 - Compaction ..... 68
47.4 - Geosynthetics ..... 69

This chapter provides guidance for design of roads. Design implies the concept of alternative solutions. It is the responsibility of the designer to apply engineering judgment to develop and evaluate alternatives that best fit project objectives.

## 40.2 - Objective

The objective of this chapter is to provide guidance for the selection of design elements and standards in order to meet design criteria and resource management prescriptions as set forth in the road management objectives (RMOs) (FSM 7714). Meeting RMOs involves collaboration with engineering peers, other Forest Service specialists, such as realty specialists, landscape architects, hydrologists, and fisheries biologists, and relevant State and Federal agencies.

## 40.3 - Policy

The geometric design of National Forest System (NFS) roads, managed as public roads, is subject to this chapter. Additional guidance for roads at level of service F and above is contained in the "Guidelines for Geometric Design of Very Low-Volume Local Roads (ADT<400)" and "A Policy on Geometric Design of Highways and Streets," issued by the American Association of State Highway and Transportation Officials (AASHTO), hereinafter referred to as the "AASHTO Guidelines".

## 40.5 - Definitions

See FSM 7721.05 for additional definitions pertaining to development of roads. Forest Service definitions for local, collector, and arterial roads are found in FSM 7705 and differ from the definitions of those terms in the AASHTO Guidelines. Most NFS roads fit the definition of a local or minor collector road in the AASHTO Guidelines.

Administrative National Forest System Road. Any National Forest System road that is not a public road.

Average Daily Traffic (ADT). The daily number of vehicles on a route, determined by dividing the annual number of vehicles on the route by 365.

Clearance. The distance from the edges of the traveled way to vertical and horizontal obstructions.

Critical Vehicle. A vehicle type, typically the largest on a road by weight, size, or unique configuration, whose limited use on the road is necessary to fulfill the RMOs.

Design Criterion. A requirement derived from management area direction, such as safety requirements, level of service, traffic types and volumes, the environmental considerations, and the economic constraints that governs the selection of design elements and design standards.

Design Element. A physical characteristic of a road (such as traveled way width, shoulder, slope, curve widening, and pavement structure) that is considered in its design.

Design Exception. A proposed variation in design that would employ a less restrictive standard than the AASHTO Guidelines.

Design Speed. The maximum speed that the design vehicle can safely maintain along a road or road segment when the design features of the road, rather than the operational limitations of the design vehicle, are taken into account. (The design speed is used to determine the design elements and design standards of a road.)

Design Standard. The definitive length, width, depth, slope, or grade of a design element.

Design Vehicle. A vehicle type that frequently travels a road, that is not subject to restrictions on use of that road, and that travels at the road's design speed and that determines the design standards for a particular design element for the road.

Forest Road. A road wholly or partly within or adjacent to and serving the NFS that the Forest Service determines is necessary for the protection, administration, and utilization of the NFS and the use and development of its resources (36 CFR 212.1).

Highway-Legal Vehicle. Any motor vehicle that is licensed or certified under State law for general operation on all public roads in the state. Operators of highway-legal vehicles are subject to State traffic law, including requirements for operator licensing.

Level of Service. A road's significant traffic characteristics and operating conditions.

National Forest System Road. A forest road other than a road which has been authorized by a legally documented right-of-way held by a State, county, or local public road authority (36 CFR 212.1).

Passing Sight Distance. The distance required to enable the driver of one vehicle to pass another vehicle safely and comfortably.

Public Road. A road that is:

1. Available, except during scheduled periods, extreme weather, or emergency conditions;

2. Passable by four-wheel standard passenger cars; and

3. Open to the general public for use without restrictive gates, prohibitive signs, or regulation other than restrictions based on size, weight, or class of registration. (23 U.S.C. 101(a)(27); 23 CFR 460.2(c) and 660.103).

Seasonal Average Daily Traffic (SADT). The daily number of vehicles on a route intended for seasonal use determined by dividing the number of vehicles using the route during the season of use by the number of days in the season of use.

Travel way. Synonymous with the term "Traveled Way," (sec. 42.4, ex 01).

## 40.7 - References

The following publications are referenced throughout this chapter.

1. AASHTO. Guide for Design of Pavement Structures. 1993. 700p.

2. AASHTO. A Policy on Geometric Design of Highways and Streets. 5th ed. 2004. 872p.

3. AASHTO. Guidelines for Geometric Design of Very Low-Volume Local Roads (ADT<400). 1st ed. 2001. 94p.

4. AASHTO. Roadside Design Guide. 3rd ed. 2002. 44p.

5. Glennon, J. Design and Traffic Control Guidelines for Low-Volume Rural Roads. National Cooperative Highway Research Program (NCHRP) Report 214. TRB, National Research Council, Washington, D.C., Oct. 1979, Appendix F.

6. Mohney, J., *et al*. 1994. Retaining Wall Design Guide. EM-7170-14. Washington, D.C. U.S. Department of Agriculture, Forest Service. 542p.

7. Steward, J., Williamson, R., and Mohney, J., 1977. Guidelines For Use of Fabrics in Construction and Maintenance of Low-Volume Roads. FHWA-TS-78-205. FHWA, Washington, D.C.

8. U.S. Department of Agriculture, Forest Service. 1999. Dust Palliative Selection and Application Guide. 9977 1207-SDTDC. San Dimas Technology Development Center, San Dimas, CA.

9. U.S. Department of Agriculture, Forest Service. 1997. Relief Culverts. 9777 1812-SDTDC. San Dimas Technology Development Center, San Dimas, CA.

10. U.S. Department of Agriculture, Forest Service. 1997. Traveled Way Surface Shape. 9777 1808-SDTDC. San Dimas Technology Development Center, San Dimas, CA.

11. U.S. Department of Agriculture, Forest Service. 1997. Water/Road Interaction Technology Series. 9777 1806-SDTDC. San Dimas Technology Development Center, San Dimas, CA.

12. U.S. Department of Agriculture, Forest Service. 1977. National Forest Landscape Management, Volume 2, Chapter 4, "Roads." Agriculture Handbook 483. Washington, D.C. 62p.

13. U.S. Department of Agriculture, Forest Service. 1994. Slope Stability Reference Guide for National Forests in the United States, Volume II. Forest Service Engineering Staff, Washington, D.C. EM 7170-13. 359p.

14. U.S. Department of Agriculture, Forest Service. 1996. Earth and Aggregate Surfacing Design Guide for Low-Volume Roads. FHWA-FLP-96,001. Washington, D.C. EM-7170-16. 302 p.

15. U.S. Department of Defense, U.S. Army Corps of Engineers. 1983. Revised Procedures for Pavement Design Under Seasonal Frost Conditions. Cold Regions Research and Engineering Laboratory, Office of the Chief of Engineers, Washington, D.C. Special Report 83-27.

16. U.S. Department of Transportation, Federal Highway Administration (FHWA). 1992. Soil and Base Stabilization and Associated Drainage Considerations, Volumes I and II. FHWA-SA-93-004.

17. U.S. Department of Agriculture, Forest Service. 2012. National Best Management Practices for Water Quality Management on National Forest Lands, Volume 1, "Road Management Activities." Washington, D.C.: U. S. Department of Agriculture, Forest Service . FS-990a. 104p.

## 41 - DESIGN CRITERIA

This section discusses design criteria and explains how it serves as a basis for selection and application of design elements and design standards. Design criteria are outputs of travel planning (FSH 7709.55, ch. 10).

1. Environmental and Resource Considerations. Environmental and resource considerations include factors such as topography, climate, and soils that affect road alignment, gradients, sight distance, quantities of cut and fill, slope selection, drainage, and pavement structure. Forest Service environmental requirements usually result in more restrictive design elements than the AASHTO Guidelines. Recreational uses, such as hiking, riding, and over-snow vehicle use, may require restricting use of roads by highway-legal vehicles.

2. Safety Considerations. Safety considerations include factors such as possible hazards and corresponding corrective action and the need for traffic control devices and maintenance. Safety considerations affect the selection of geometric elements and standards, such as design speed. Direction on safety requirements for National Forest System (NFS) roads is found in FSM 7733.

3. Traffic Requirements. Traffic requirements include volume, composition, distribution, and whether the route is a public road. Traffic requirements are used in the design of turnouts, road widths, surfacing, safety features, and traffic control devices.

4. Levels of Service. Levels of service A through F in the AASHTO Guidelines are for roads with average daily traffic (ADT) greater than 400. Section 41, exhibit 01, adds levels of service G through J which uses the design guidance of this chapter. The exhibit provides expected traffic characteristics and operating conditions of the road. Use this information in making design element decisions such as:

a. Number of lanes.

b. Turnout spacing.

c. Lane widths.

d. Type of driving surface.

e. Sight distances.

f. Design speed.

g. Clearance.

h. Horizontal and vertical alignment.

i. Curve widening.

j. Turnarounds.

## 41 – Exhibit 01

## Levels of Service G Through J for ADT Less Than 400*

| | G | H | I | J |
|---|---|---|---|---|
| **Flow** | Free flow with adequate parking facilities. | Periodically congested, such as during peak logging or recreational periods. | Interrupted by limited passing opportunities or slowed by road condition. | Slow or blocked flow. Two-way traffic is difficult and may require backing to pass. |
| **Volume** | Uncontrolled; will accommodate expected traffic volume. | Occasionally controlled during heavy use periods. | Erratic; frequently controlled as capacity is reached. | Intermittent, usually controlled, and limited to a single purpose. |
| **Vehicle Types** | Mix of vehicles normally found on public roads. | Mix of vehicles normally found on public roads. | Controlled mix: accommodate all vehicle types normally found on NFS roads. Some use may be controlled by vehicle type. | Single use; not designed for mixed traffic. Some vehicles may not be able to negotiate the road. |
| **Critical Vehicles** | Clearances are adequate to allow free travel. Overload permits are required. | Traffic controls needed where clearances are marginal. Overload permits are required. | Special provisions may be needed. Some vehicles will have difficulty negotiating some road segments. | May require special temporary road treatments, such as filling of ditches or water bar removal. Loads may have to be removed and walked in. |
| **Safety** | Safety features are part of the design. | Safety is a high priority in design. Some protection is accomplished by traffic management. | Protection may be provided by traffic management and restrictions rather than by road design. | The need for protection is minimized by low speeds and traffic management restrictions. |
| **Traffic Management** | Normally limited to regulatory, warning, and guide signs and permits. | Employed to reduce traffic volume and conflicts. | Traffic restrictions are frequently needed during periods of high volume for the primary use. | Used to discourage or prohibit traffic other than for a single purpose. |
| **User Efficiency** | Important and high. | Generally less important and may be somewhat lower than for level of service G. | Not important; may be traded for lower construction costs. | Not a consideration. |
| **Alignment** | Design speed is the predominant factor within feasible topographical limitations. | Influenced more strongly by topography than by speed and efficiency. | Generally dictated by topographical features and environmental factors. Design speeds are generally low. | Dictated by topography, environmental factors, and design and critical vehicle limitations. Speed is not important. |
| **Road Surface** | Stable and smooth, with little or no dust during the normal season of use. | Stable for the predominant traffic during the normal season of use. Periodic dust control for heavy use or environmental reasons. Smoothness is commensurate with the design speed. | May not be stable under all traffic or weather conditions during the normal season of use. Surface rutting, roughness, and dust may be present, but are controlled for environmental or investment protection. | Rough and irregular. Travel with low-clearance vehicles is difficult. Stable during dry conditions. Rutting and dusting controlled for vehicle safety, driver visibility, and soil and water protection. |

* For roads with greater than 400 ADT, refer to AASHTO Guidelines Levels of Service A Through F.

5. Vehicle Characteristics. Vehicle characteristics describe the types of vehicles using a road.

a. Design Vehicle. Design vehicles determine the design standards for each design element, from the types and configuration of vehicles using the road. Analyze each design element for its design vehicle and check for passage for the critical vehicle. A single design vehicle type rarely controls the design standards for all design elements of a road.

Section 41, exhibit 02 displays examples of typical relationships between design elements and design vehicles.

**41 - Exhibit 02**

**Typical Relationships Between Design Elements and Design Vehicles**

| Design Element | Design Vehicle |
|---|---|
| Horizontal alignment. | Large recreational vehicle (such as a motor home, tour bus, or pick-up and trailer combination) or logging truck. |
| Thickness of pavement structure:<br>• Campground or picnic area.<br>• Road with heavy commercial traffic. | • Garbage or other service truck, large recreational vehicle, or bus.<br>• Log truck, dump truck, or belly dump. |
| Curve widening:<br>• Lateral clearance. | • Large recreational vehicle with trailer or log truck.<br>• Articulated truck or fifth wheel truck. |
| Gradient | Large recreational vehicle. |

b. Critical Vehicles. A critical vehicle's convenience and/or speed of travel are not considerations in road design. The use of a critical vehicle may require a permit, a pilot car, temporary traffic control, and restrictions on other traffic. Examples of critical vehicles include:

(1) A log yarder on a timber access road.

(2) A truck with a lowboy trailer carrying an oversized load of construction or mining equipment.

(3) Wheel or track-mounted equipment using the road for construction and maintenance purposes.

(4) A motor coach bus used to bring large groups to a recreation site.

Special design features, operating considerations, or a combination of both may be required to accommodate critical vehicles according to a road's level of service. Consider both the equipment needed to construct and maintain the road, and the traffic it will carry when designing a road for critical vehicles.

6. Road Users. The selection of design elements and design standards should be based on a road user who is considered to be a safe and prudent driver. A prudent driver is a person operating within their physical and mental limitation, with a properly equipped and maintained vehicle, and who always exercises due care for the road, traffic, lighting, and weather conditions (AASHTO's "Guidelines for Geometric Design of Very Low-Volume Local Roads (ADT<400)").

7. Economics. Design NFS roads to serve the projected traffic and to meet RMOs at the lowest overall cost, consistent with environmental protection and safety considerations. Economics are a primary consideration in the determination and selection of design standards. Economic analysis of design alternatives should balance risk to the investment against risks to the environment from the selected design; this will include and is not limited to life cycle costs, including costs of initial construction, operation, maintenance, environmental mitigation, and closure or decommissioning. Road maintenance projections, performed with appropriated funds, should be based on expenditures made on similar roads with similar traffic within current annual road maintenance appropriations.

8. Other Considerations. Follow applicable best management practices (BMPs) established for compliance with the non-point source provisions of the Clean Water Act, other applicable laws, and their implementing regulations.

## 42 - DESIGN ELEMENTS AND DESIGN STANDARDS

National Forest System (NFS) roads with an objective road maintenance level of 3, 4, or 5 meet the definition of a public road and are subject to Federal safety requirements for public roads. These NFS roads are also subject to the requirements in FSM 7705, FSM 7731, FSM 7733, and FSH 7709.59. Users can expect to drive these roads in any typical design vehicle type, including standard passenger cars. They can expect some degree of consideration regarding comfort, convenience, and speed of travel.

NFS roads, with an objective maintenance level of 1 or 2, meet the definition of an administrative NFS road. User comfort, convenience, and speed of travel are not management considerations for these roads, and no provision is made to warn users regarding hazards on the

road. The design of administrative NFS roads should reflect that users of these roads assume risks associated with using roads where hazards like pot holes, washouts, and fallen trees may be present and do so knowing no warning is provided.

Commercial users may temporarily improve some design elements of objective maintenance during periods of heavy commercial use. For example, levels 1 and 2 roads may improve to standards normally associated with levels 3 to 5 roads, such as providing for a smooth and dust free road surfaces. These roads are not suitable for use as public roads unless the need for signs and traffic control devices has been assessed by a qualified engineer and any signs and devices identified by the engineer are in place and functional.

Roadside features and other design considerations, depending upon the traffic type and volume, are the determining factor as to whether NFS roads are single-lane or double-lane. The AASHTO Guidelines are primarily oriented towards double-lane roads. This chapter provides more specific information on single lane roads then the AASHTO Guidelines.

Consider the range of values associated with each design element, and select the value appropriate for the road segment. The AASHTO Guidelines and this chapter establish minimum standards for each design element. Any exception to a requirement for a design standard or design element, in the AASHTO Guidelines, must have prior written approval from the regional director of Engineering.

Proficient designs are the result of engineering judgment, rather than rigid application of techniques or automated systems. Appropriate techniques and systems include use of computers, hand designs, field designs, and flag lines. Use the technique or system most suited to a particular project. Decisions about which technique or system to use for a project depend upon many factors, including cost, user safety, and impacts on NFS resources. A combination of approaches may be appropriate for a single project.

## 42.1 - Application of Design Standards

Standards for certain design elements can be found in matrix form or graphics in this chapter, such as lane width, stopping site distance, or curve widening. Other standards can be found within the text under topic headings, such as number of lanes, or within the general body of the text, such as maximum design speed. Exceptions to design standards should be handled on a case-by-case basis with application of engineering judgment and appropriate approvals.

## 42.2 - Coordination of Design Elements

Do not consider or select a single design element independent of the others. Coordinated design elements will meet RMOs and generally result in the least resource impacts and costs.

Improved safety occurs with coordinated design elements. Consider surfacing for improving traction coefficient around curves or for stopping sight distance. Consider longer stopping sight distances than required in some areas based on other elements and local conditions, as well as turnouts on double lane roads or adjusting cut slopes for additional visibility. Avoid, to the extent practicable, combinations such as designing short stopping sight distances on horizontal or vertical curves; or designing sharp curves at the end of long tangents. A coordinated road design alleviates the extensive use of traffic warning signs due to changing and unexpected road conditions.

## 42.3 - Number of Lanes

Where the estimated seasonal ADT for the design life is 100 to 250, a double-lane road should be considered. Where the estimated ADT for the design life is over 250, a double-lane road generally is the minimum design standard. Where the estimated ADT for the design life is less than 100, a single-lane road is generally preferable. Single-lane roads may have economic and environmental advantages. Decisions regarding the number of lanes may depend largely on environmental factors and costs.

Design and construct NFS roads as single-lane or double-lane. Design widths will be established in accordance with the AASHTO Guidelines for double-lane roads or this chapter for single-lane roads. Bicycle lanes and pedestrian walkways should meet the AASHTO Guidelines.

The decision to construct or reconstruct a road as single-lane or double-lane should be made and documented during travel planning. Additional information obtained during the design process may necessitate reevaluation of the planning decision. Modifications of planning decisions should be documented as amendments to the planning documents. Construction and reconstruction decisions may depend largely on environmental factors and costs.

## 42.4 - Road Structure

The following relates to design of various elements of a roadway. Road structure terminology is found in section 42.4, exhibit 01.

## 42.41 - Traveled Way

For double-lane roads, provide sufficient lane width for vehicles traveling in opposite directions to pass each other. The types of vehicles, users, and the volume of traffic determine whether to construct or reconstruct a single-lane or double-lane road. The primary consideration for determining the width of the traveled way is the types of vehicles that will use the road. Secondary considerations are the design speed, traffic volume, anticipated driver skill, and the presence or absence of shoulders and ditches.

Use the minimum traveled way widths for the conditions shown in exhibit 02 of this section.

Do not construct or reconstruct a traveled way that is less than 10 feet wide for a single-lane road.

Each region should evaluate local conditions where off-highway haul is a factor and should establish regional standards for traveled way width where necessary (FSM 7731.04a).

a. Single-Lane Roads. For minimum widths, see section 42.4, exhibit 02 of this section and for additional information, see AASHTO's "A Policy on Geometric Design of Highways and Streets," chapter 5, "Special Purpose Roads."

A ditch may permit a narrower traveled way width because a ditch provides the necessary lateral clearance on one side.

In the absence of a ditch, a reduction below the minimum traveled way width shown in section 42.4, exhibit 02 should only occur in unusual circumstances with the understanding that such widths will probably result in higher construction costs, higher maintenance costs, and significantly reduced road utility. Use of widths which are less than those shown in section 42.4, exhibit 02 should be approved by the Regional Director of Engineering.

Traveled way widths should not exceed 14 feet, plus curve widening, unless wider lane widths are needed to accommodate off-highway haul and have been approved in a regional handbook supplement.

Limit design speed on single-lane roads to a maximum of 40 miles per hour.

b. Double-Lane Roads. See AASHTO's "A Policy on Geometric Design of Highways and Streets" or AASHTO's "Guidelines of Geometric Design of Very Low-Volume Local Roads (ADT<400)" for appropriate widths for double-lane roads.

c. Critical Vehicles. Check traveled way and shoulder widths to ensure that critical vehicles can traverse the road. Critical vehicles do not have to traverse the road at or even approaching the speeds of design vehicles. On roads with an asphalt or concrete surface, it is often appropriate to design widening to accommodate critical vehicles that are managed as an unpaved shoulder.

## 42.4 - Exhibit 01

## Road Structure Terms



*Note: X and Y denote clearing outside of final design cross section*

## 42.4 - Exhibit 02

## Traveled Way Widths for Single-Lane Roads

| Type and Size of Vehicle | | Design Speed (in miles per hour) | | |
|---|---|---|---|---|
| | | 20 or Less | 20 - 30 | 30 or More |
| | | Minimum Traveled Way Width (in feet) | | |
| Recreational, administrative, and service vehicles, 6.5 to 8.0 feet wide. | | 10 | 12 | 14 |
| Commercial hauling and commercial passenger vehicles, including buses, at least 8 feet wide. | Roads with ditch and roads without ditch where ground cross slope is less than 25 percent. | 12 | 12 | 14 |
| | Road without ditch with ground cross slope greater than 25 percent. | 12 | 14 | 14 |

## 42.42 - Shoulder Width

Shoulders may be necessary to provide:

a. Lateral support for the outside edge of asphalt or concrete pavement. The minimum shoulder width that can be economically constructed, generally 1 to 2 feet on each side, is adequate.

b. Parking areas when needed for specific activities or attractions along a road. The need for parking areas may be determined during travel planning or project planning. Provide a minimum usable width of 8 to 10 feet for parallel parking areas. Normally, parking areas are not provided along NFS roads for stalled or disabled vehicles.

c. Space for installations such as drainage structures, berms, guardrails, signs, and roadside utilities. The design of these devices or facilities determines the required width.

d. An increase in roadway width on the approach to a bridge or other structure so as to match the traveled way width of the structure.

e. A recovery zone for vehicles straying from the traveled way on roads designed under AASHTO's "Guidelines of Geometric Design of Very Low-Volume Local Roads (ADT<400)," where a risk analysis indicates the costs are justified.

f. Additional width to provide for passage by a critical vehicle.

## 42.43 - Turnouts

The purpose of turnouts on a single-lane road is to provide for safe passing of vehicles.

a. Turnout Spacing. Intervisible turnouts (where a motorist at a turnout can see the next turnout) should be provided on public roads. In situations where intervisible turnouts cannot be provided, signing should be used to advise motorists of the situation.

Turnout spacing is determined by applying engineering judgment to information derived from exhibit 03, exhibit 04, and the Turnout Spacing Equation, all of which are shown below.

Exhibit 03 displays the increased vehicle travel times that result from passing oncoming vehicles at turnouts for four different turnout spacing as a function of the number of vehicles passing over a road per hour. (When converting ADT to VPH, use a 10-hour day.)

## 42.4 – Exhibit 03

## Increased Travel Time for Various Turnout Spacings



Exhibit 04 contains turnout spacing requirements and operational constraints for levels of service G through J.

## 42.4 - Exhibit 04

## Turnout Spacing

| Level of Service | Turnout Spacing | Operational Constraints |
|---|---|---|
| G | Turnouts are intervisible, unless compliance with cost or environmental criteria would be prohibitive. Closer spacing may contribute to efficiency and convenience. Maximum spacing is 1,000 feet. | Traffic: mixed<br>Capacity: up to 25 VPH<br>Design Speed: up to 40 MPH<br>Delays: 20 sec./mile or less |
| H | Intervisible turnouts are highly desirable, but may be precluded by excessive cost or environmental constraints. Maximum spacing is 1,000 feet. | Traffic: mixed<br>Capacity: up to 25 VPH<br>Design Speed: up to 25 MPH<br>Delays: should be 30 sec./mile or less<br>Use signs to warn noncommercial users of commercial traffic. Road segments without intervisible turnouts should be signed. |
| I | When the environmental impact is low and the investment is economically justifiable, additional turnouts may be constructed. Maximum spacing is 1,000 feet. | Traffic: some mixed<br>Capacity: up to 20 VPH<br>Design Speed: up to 20 MPH<br>Delays: up to 60 sec./mile<br>Road should be managed to minimize conflicts between commercial and noncommercial users. |
| J | Generally, only naturally occurring turnouts, such as additional width on ridges or other available areas on flat terrain, are provided. | Traffic: not intended for mixed use<br>Capacity: generally 10 VPH or less<br>Design Speed: 15 MPH or less<br>Delays: at least 60 sec./mile expected<br>Road should be managed to restrict concurrent use by commercial and non-commercial users. |

**Turnout Spacing Equation:**

**T=DS/36, where:**

T = increase in travel time for the interrupted vehicle as a percentage
D = delay time per mile for the interrupted vehicle in seconds (sec. 42.4,ex. 04)
S = design speed in miles per hour

**Process for determining turnout spacing:**

1. Begin by solving the Turnout Spacing Equation for T.

2. Use the graph in exhibit 03 of this section to determine the turnout spacing required to accommodate the number of vehicles passing over the road per hour (VPH).

3. Then use engineering judgment to apply the turnout spacing considerations for levels of service displayed in exhibit 04 of this section.

a. The variables of spacing, VPH, delay time, and design speed should each be analyzed based on their relative importance. Different combinations should be investigated to determine their effect on safety, cost, and the environment. The objective is to provide turnout spacing to attain the appropriate traffic flow for the intended level of service.

b. In locating turnouts, consider the types of road users, safety, and cost. Desirable physical locations of turnouts are:

1. On the outside of cuts, such as the outside of a curve around a point of a ridge;

2. On the low side of fills, such as the upper side of curves across ravines;

3. At the runout point between through cuts and fills; and

4. On roads intended for logging traffic, so that empty haul vehicles or other traffic can use the turnouts while a loaded vehicle maintains speed and course.

c. Turnouts should not be included in designs solely to provide for waste or storage of excavated material. Turnouts may be used to provide openings for scenic vistas.

d. Standards for minimum turnout widths and lengths are shown in exhibit 05 of this section. When turnouts are located on curves, provide curve widening in addition to the turnout width (42.45).

e. When the design alignment and grade require numerous turnouts, consider constructing a two-lane road, if practicable based on cost and safety considerations.

## 42.4 – Exhibit 05

## Turnout Widths and Lengths

| Level of Service | Turnout Width | Turnout and Transition Lengths |
|---|---|---|
| G | 10 feet | Design vehicle length or at least 75 feet, whichever is greater; at least 50-foot transitions at each end. |
| H | 10 feet | Design vehicle length; at least 50-foot transitions at each end. |
| I | Minimum total width of the traveled way and turnout equals the width of two design vehicles plus 4 feet. | Design vehicle length; at least 30-foot transitions at each end. |
| J | Minimum total width of the traveled way and turnout equals the width of two design vehicles plus 4 feet. | Empty truck length; at least 30-foot transitions at each end. |

For tangent and curved section turnouts, measurement of the length and transition starts at the centerline of the road. For additional information on these turnouts, see AASHTO's "A Policy on Geometric Design of Highways and Streets," chapter 5, "Special Purpose Roads," especially exhibits 5-17 and 5-18.

## 42.44 - Turnarounds

Turnaround designs should consider both critical and design vehicles. Turnarounds should be provided at or near the end of roads, at points where the level of service or road standards change, and at closure points such as gates and barricades. Normally, when the need for turnarounds has been considered in project planning, meeting that need will not require additional extensive construction. A terminal facility can often be used as a turnaround with minor alterations.

Intermediate turnarounds are usually not necessary on most roads and should be provided only when existing facilities, such as turnouts, do not provide adequate room for users to turn around.

Consider placing signs if intermediate turnarounds create a hazard to other users. Design turnarounds to allow design vehicles to turn reasonably safely. To the extent practicable, design turnarounds to allow design vehicles to reverse direction in one backing and turning maneuver.

RMOs may require additional turnarounds for fire staging, maintenance, or other access needs. Additional turnarounds for construction purposes may be cost-effective.

## 42.45 - Curve Widening

Widening of the traveled way is required on some curves to provide for off-tracking of tractor trailers and for some light vehicle-trailer combinations. Curve widening to accommodate the design vehicle is considered a part of the traveled way.

In most cases, the design should consider several types of vehicles, most commonly:

a. Tractor trailer combinations where the fifth wheel is located directly over the drive wheels, such as a lowboy or a gravel truck.

b. Tractor trailer combinations with the towing pivot point offset to the rear of the drive wheels, such as logging trucks with a stinger to facilitate making short radius turns.

c. Tractor trailer combinations that have two fifth wheels and accessory axles.

d. Special configurations for other commercial vehicles such as tractors with double or triple trailers.

e. Large recreational vehicles such as motor homes, tour buses, and pick-up and trailer combinations.

f. Log yarding and construction equipment vehicles arranged in operational mode or travel configuration.

Curve widening is affected by the type of vehicle, radius of curvature, and the central or delta angle.

Generally, the need for curve widening increases as the radius decreases. Shorter curves require less curve widening than longer curves.

The following discussion outlines the relationship of curve widening to the level of service (sec. 41, ex. 01).

**42.4 – Exhibit 06**

**Relationship to Level of Service**

| Level of Service | Curve Widening |
|---|---|
| G | Provided to accommodate the design vehicle at the design speed for each curve. Curve widening for design vehicles should be provided in each lane of double-lane roads. Curve widening for highway-legal critical vehicles should be provided by the use of other design elements, if planned, such as turnouts and shoulders. Curve widening for non-highway legal critical vehicles should be provided only to the extent necessary for them to traverse the road safely with operational controls, such as permit-required pilot cars, in effect. |
| H | Same as for level of service G. |
| I | Same as for level of service G, except curve widening for highway legal critical vehicles may be reduced to only what is necessary to traverse the road safely with operational controls. |
| J | Generally provided only for the design vehicle. Loads carried by critical vehicles may be off-loaded and walked to the project or transferred to vehicles capable of traversing the road. Temporary widening to permit the passage of critical vehicles, such as temporary filling of the ditch at narrow sections, may also be used. |

On the level of service I and J roads, it may be desirable to design turnouts where significant curve widening would otherwise be required, such as on short-radius curves. In these situations, the minimum lane width should be the greater of the:

1. Single-lane width, plus design vehicle curve widening, plus turnout width.

2. Single-lane width plus critical vehicle curve widening.