**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

| | | |
|---|---|---|
| SAN JUAN CITIZENS ALLIANCE, and<br>CENTER FOR BIOLOGICAL DIVERSITY<br><br>Plaintiffs,<br><br>v.<br><br>DEREK PADILLA, in his Official Capacity as District Ranger, Mancos-Dolores Ranger District, San Juan National Forest;<br>DAVID NEELY (successor to Kara Chadwick), in his official capacity as San Juan National Forest Supervisor,<br>UNITED STATES FOREST SERVICE, a Federal Agency within the U.S. Department of Agriculture, UNITED STATES DEPARTMENT OF AGRICULTURE, an agency of the United States,<br><br>Defendants. | ) | Case No. 23-cv-1501-REB |

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. This lawsuit seeks judicial review and invalidation of uninformed agency actions taken by Defendants that authorize partially defined timber sales in an area of the San Juan National Forest in Southwest Colorado bordered by the Dolores River and McPhee Reservoir on the west and the West Dolores and Dolores River on the east. The Dolores River watershed is known for a diverse landscape that stretches from 14,000-foot peaks, through spectacular forests, and into redrock canyons and mesas. The watershed and project area support unique wildlife habitat, recreational opportunities, and abundant evidence of Ancestral Puebloan culture that remain important to Plaintiffs and their members.

2. The Salter Vegetation Management Project ("Salter Project") authorizes several specific types of timber sales in designated areas without further public input or disclosure.




Figure 2. Treatment type by area

This map accurately depicts the types of logging authorized to implement the Salter Project.

3. The relatively new approach to National Forest management taken by Defendants involves making project decisions as to "treatment type" over a specific area, while deferring data gathering and decisions on monitoring requirements, mitigation measures, road networks, and other matters regarding the logging project until preparation of specific terms of individual timber sale contracts. This approach to National Forest management involves a three-tiered decisionmaking process – forest wide planning, project design, and selecting terms for specific timber contracts. The three-tiered decisionmaking process resembles the process (planning, leasing, and permits to drill) used to manage oil and gas pursuant to the Mineral Leasing Act. The Forest Service approach used for the Salter Project deviates from the two-tiered approach (plan-level suitability and project/contract approval) established in the National Forest Management Act ("NFMA"), where site specific projects tier to broader Forest Plans, with public input at each stage. The new approach fails to ensure that statutory land management duties applicable to the National Forest are met during each of the three decisionmaking tiers. The Salter Project authorizes sale of private contracts to log the National Forest in a manner that violates federal laws, including the National Environmental Policy Act ("NEPA") and the National Forest Management Act.

4. Defendants have begun implementing the Salter Project by entering into at least one timber sale contract, the House Creek timber contract, which was awarded April 12, 2023. The House Creek timber contract implements the Salter Project in the

House Creek Unit without the benefit of site-specific NEPA analysis. The House Creek Unit is accurately depicted by this Forest Service map.




**Figure 10. House Creek treatment block**

5. Without judicial relief, Defendants will continue to implement the Salter Project through site-specific timber sale contracts and other actions that rely on the project-level Environmental Assessment/Finding of No Significant Impact.

6. The House Creek timber contract confirms that the Salter Project is being implemented without the benefit of interdisciplinary site-specific NEPA analysis or disclosure. The administrative record for the House Creek timber contract has not yet been produced. The decisionmakers and the public have not been informed of the pre-fire suppression conditions in the House Creek Unit of the Salter Project. The House Creek timber contract contains no site-specific survey of historical properties or cultural resources, was not based on consultation with relevant Historic Preservation Officers, and affords no protections to the abundant cultural resources and historical properties in the House Creek Unit. Defendants rated the House Creek watershed as being "most sensitive to anthropogenic disturbances," including those that cause erosion and habitat degradation.

7. Defendants have publicly promoted the Salter Project as a "NEPA-ready" component of the Collaborative Forest Landscape Restoration Program ("CFLRP"). 16 U.S.C. § 7303. CFLRP demands compliance with NEPA. Defendants developed the Salter Project, in part, through a collaborative program known as the Dolores Watershed Resilient Forest Collaborative ("DWRF"). The DWRF and Defendants have sought, and received, federal funding to assess the Salter Project through the Southwest Colorado Collaborative Forest Landscape Restoration Initiative. Plaintiffs and DWRF members proposed that the Salter Project be analyzed for CFLRP

compliance. CFLRP criteria was not addressed in the Salter Project NEPA analysis. The Salter Project is not CFLRP-compliant.

8. The Forest Service has definite plans to continue using CFLRP funds to implement the Salter Project by offering timber sales and by taking other site-specific actions. Defendants did not first comply with NEPA and other federal laws to address impacts and alternatives identified in the DWRF process, as required by CFLRP. The Forest Service participation and use of the DWRF to obtain management advice for the Salter Project was not CFLRP-compliant. The Forest Service participation and use of the DWRF in preparation and implementation of the Salter Project was not compliant with the explicit reporting and informational requirements in Federal Advisory Committee Act ("FACA"). 5 U.S.C. app. §1 *et seq.* Congress adopted FACA to control and restrict advisory committees and to allow public scrutiny of the advice provided to the Executive Branch by private individuals. Impacts and alternatives raised by Plaintiffs and others in the DWRF and the NEPA process were not analyzed in the NEPA analysis used to approve the Salter Project or the House Creek timber contract.

9. Issues raised in the DWRF meetings were considered by the Salter Project decisionmakers without the benefit of interdisciplinary NEPA analysis. Defendants failed to conduct detailed NEPA analysis of impacts and restoration alternatives identified by the DWRF process, including large tree retention, habitat connectivity, and climate resilience. Without judicial relief, Defendants will continue to spend CFLRP funding on the implementation of the Salter Project through the House Creek timber contract and other implementation actions that have not been analyzed pursuant to NEPA to ensure CFLRP compliance.

~~4.~~10. The Salter Project area is located near Dolores, Colorado and involves landscape features known as Salter Y, Plateau Creek, Carlyle Point, Turkey Knoll, and Boggy Draw. The landscape provides important wildlife habitat for elk, mule deer, forest raptors and other species. The area is world-renowned for big game hunting, including elk, deer, as well as small game hunting for dusky grouse. Thousands of people come to this area year-round to enjoy the scenery, solitude, abundance of wildlife, and myriad recreation opportunities that include biking, climbing, hiking, hunting, and skiing, to name a few. These opportunities support a robust recreation economy and draw residents and visitors alike. The Salter Project is on National Forest lands that are bordered in multiple locations by state and private lands. Major watershed features include the Dolores River and McPhee Reservoir on the west and the West Dolores and Dolores Rivers on the east. This watershed provides vital fish and riparian habitat and is tributary to the Colorado River. The Salter Project is subject to existing allocations of water pursuant to the Endangered Species Act, the Colorado River Compact, and other federal environmental and water allocation laws. A wide range of fish and wildlife depend on habitat in the Salter Project area, including species protected by the Endangered Species Act.

~~5.~~11. On November 18, 2022, on behalf of all Defendants, DEREK PADILLA District Ranger, Mancos-Dolores Ranger District San Juan National Forest, United States Forest Service (collectively, “Forest Service” or “Agency”) issued a Decision Notice and Finding of No Significant Impact (“DN/FONSI”) approving immediate implementation of the Salter Project. The DN/FONSI is a final agency action that

determines "the type and extent of management activities in the Salter Vegetation Management project area" of the San Juan National Forest near Dolores, Colorado.

~~6.~~12. Management of each unit of the National Forest System is governed by a Forest Plan that charts a general course for the planning unit over a 15-year period. Forests prepare an Environmental Impact Statement ("EIS") for each Plan and subsequent plan revision(s) to disclose the plan's impacts at a programmatic level. 42 U.S.C. 4231 et seq. (National Environmental Policy Act ("NEPA")). The broad scope of the Plan and Plan-tier EIS is based on NFMA provisions that establish that step-down, site-specific actions to implement the plan will take place at later decisionmaking tiers, subject to project-level data gathering and public participation requirements to ensure all site-specific actions within each National Forest complies with the plan. 36 U.S.C. 1604(i). The interplay between NFMA and NEPA ensures that forest-wide and site-specific impacts of such actions are disclosed pursuant to NEPA before the Forest Service can authorize any person to commence logging in the National Forest by issuing a timber sale contract.

~~7.~~13. The program-tier planning decisions involving the Salter Project were made in the San Juan National Forest ("SJNF") Forest Plan that was adopted in September 2013. The SJNF Forest Plan was informed by a program-tier Environmental Impact Statement.

~~8.~~14. The Salter Project DN/FONSI is a second-tier decision that authorizes the Forest Service to issue commercial timber sale contracts to private parties within the designated project area. The Salter Project DN/FONSI was informed by the Salter Project Environmental Assessment. (Salter Project EA). The Salter Project DN/FONSI

is a Forest Service decision to implement the Salter Project without additional NEPA analysis. This decisionmaking tier has historically disclosed and analyzed the harvest parameters and road locations and impacts across the entire project area, while ensuring consistency with the Forest Plain.

~~9.~~15. The Forest Service spread its site-specific NFMA duties across two decisionmaking tiers – Salter Project approval and design of specific timber sale contracts. The Salter Project authorization will be followed by a series of internal Forest Service evaluations and determinations regarding the forest conditions, roads, project design features, monitoring, mitigation, and other site-specific information that was not gathered or analyzed in the Salter Project Environmental Assessment. (Salter Project EA) or the SJNF Plan Environmental Impact Statement. The DN/FONSI authorizes the Forest Service staff to design and issue timber sale contract provisions for specific tracts and the transportation systems throughout Salter Project area without further NEPA analysis.

~~10.~~16. The DN/FONSI confirms that the public comment period during the DN/FONSI is the last public comment opportunity before implementation of the Salter Project. The third tier of NFMA decisionmaking used for the Salter Project will not be subjected to NEPA analysis.

~~11.~~17. In short, the Salter Project EA failed to disclose and analyze reasonably foreseeable impacts, alternatives, and mitigation measures for the project area, but the Salter Project DN/FONSI authorized implementation via timber sale contracts without further NEPA analysis. The Salter Project DN/FONSI unlawfully segmented and deferred NEPA analysis and disclosure of the Salter Project to internal processes

carried out by the timber sale contracting staff, thereby shielding the decisions from interdisciplinary analysis and public participation.

~~12.~~18. The Salter Project authorizes the Forest Service, without further analysis, to issue commercial timber sale contracts covering 22,790 acres. The vague authorization allows thinning as appropriate in any treatment unit, fuel reduction through a variety of means, and up to 117 miles of road construction in unspecified locations. Instead of resolving conflicts with recreational users before approving the Salter Project, the Forest Service deferred analysis of impacts, alternatives, and mitigation involving haul routes and roads authorized by Salter Project approvals to a subsequent decision without subsequent NEPA analysis. The DN/FONSI is a final agency action that confirms the Forest Service decision to not prepare an Environmental Impact Statement or any subsequent environmental review for the Salter Project.

~~13.~~19. Contrary to NEPA's interdisciplinary analysis mandate, the Forest Service merely referenced social, economic and ecological objectives to justify an authorization of commercial logging in the Salter Project area. Internal memos circulated within the Forest Service confirm the Salter Project was proposed for the sole purpose of supplying sawtimber to a local buyer. The impacts and alternatives analysis in the Salter Project EA did not thoroughly consider social, economic, and ecological conditions.

~~14.~~20. The Salter Project EA purpose and need set out in the Salter Project EA unlawfully limited the range of alternatives to a series of commercial timber sales tailored to the desires of a local mill. The Salter Project EA compared two action alternatives involving tree-cutting, tree planting, and activity fuel burning that differed

only by a limitation on the removal of trees over 20 inches. The EA fails to compare a range of reasonable alternatives that were supported by information gathered during scoping. The EA fails to analyze reasonable alternatives identified by commenters, including Plaintiffs and their members. Comparison of alternatives is at the heart of the NEPA analysis that agencies must carry out before taking agency action. Reasonable NEPA alternatives were known to the Forest Service during the NEPA process that the Forest Service did not consider in detail.

~~15.~~21. In lieu of requiring predecisional interdisciplinary NEPA analysis of the agency's NFMA and other duties in the Salter Project EA, the Salter Project DN/FONSI relies on post-NEPA consideration of timber sale contract terms and conditions during an implementation checklist process to consider design features and other mitigation measures that would resolve resource conflicts that are foreseeable and known when issuing the Salter Project DN/FONSI. The Forest Service uses the term "project design features" to exclude analysis of other types of "mitigation measures." Many "project design features" described in the Salter Project DN/FONSI and EA function as "mitigation measures" that must be subjected to NEPA analysis.

~~16.~~22. The EA states, "Project design features detailed below were developed to minimize or eliminate potential adverse effects during implementation of the Salter vegetation management project." NEPA regulations state, in part, "Mitigation means measures that avoid, minimize, or compensate for effects caused by a proposed action or alternatives. […]. 40 C.F.R. § 1508.1 "Project design features" are the only type of mitigation measure analyzed in the Salter Project EA.

~~17.~~23. Plaintiffs submitted comments that alerted the Forest Service to the substantive and procedural deficiencies in the Salter Project proposal and the Salter Project EA. Plaintiffs participated in the pre-decisional objections process and further set forth the substantive and procedural deficiencies. An objection resolution memo was issued by the Forest Service on October 22, 2021 based on objections filed by Plaintiffs and others on a draft Decision Notice and Finding of No Significant Impact (Draft DN/FONSI) issued on July 21, 2021. The pre-decisional objection process is not an administrative appeal.

~~18.~~24. The Salter Project NEPA process concluded with the issuance of the Salter Project DN/FONSI on November 18, 2021. The Salter Project DN/FONSI was not subjected to public comment. There is no administrative procedure to alert the Forest Service to the deficiencies in the final DN/FONSI. This lawsuit is timely filed.

~~19.~~25. The public has no opportunity to provide feedback or comment to the Forest Service about how any of its hundreds of miles of new roads will impact specific motorized, non-motorized or bicycle trails, or how those will impact dispersed recreation uses like backcountry campsites or hunting areas, or how those road locations might affect elk habitat or forest raptors.

~~20.~~26. If the Decision stands, Plaintiffs and their members will be injured irreparably for decades based on timber sales issued without NEPA-compliant disclosure, input, and analysis at the Project or the contracting tiers. The proper remedy is to set aside and vacate the Decision, EA, and DN/FONSI, accompanied by appropriate injunction if necessary, to ensure site-specific decisions involving the multiple use of this area of the National Forest is done in compliance with federal law.

## JURISDICTION AND VENUE

~~21.~~27. An actual, justiciable controversy exists between Plaintiffs and Defendants. Each challenged agency action is final and subject to judicial review under 5 U.S.C. §§ 702, 704, and 706. This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331, 1346 and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-2202, 2412 and 5 U.S.C. §§ 705, 706.

~~22.~~28. Venue is proper under 28 U.S.C. § 1391(b)(2) and (e)(1)(B) because all or a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district. The areas affected by the Decision are located in the mid-elevation mountainous areas of southwest Colorado, within Dolores and Montezuma counties known for its ponderosa pine forests, some of which have grown to maturity despite widespread logging in the 20th Century. One plaintiff organization (San Juan Citizens Alliance) is headquartered in Colorado, and many of Plaintiffs' members reside within Colorado. Defendants administer areas through interdisciplinary teams and a hierarchical personnel structure involving the Dolores Ranger District, San Juan National Forest, Rocky Mountain Regional Office (all located in Colorado), Washington D.C. Offices, Chief's Office, and the USDA Undersecretary of Natural Resources and Environment.

~~23.~~29. Plaintiff SAN JUAN CITIZENS ALLIANCE ("SJCA") is a non-profit organization with over 500 members in the Four Corners region. SJCA is headquartered in Durango, Colorado and is actively involved in monitoring and scrutinizing National Forest management, overseeing government decision-making and compliance with environmental laws, advocating for cleaner air quality and better stewardship of natural

systems, promoting reduced energy consumption, energy efficiency and renewable energy, and working for improvements to community health. SJCA members in the Four Corners region regularly use and have definite plans to continue to use the forest impacted by project. SJCA members are adversely affected by authorized vegetation thinning and timber sales in the area. SJCA brings this action on its own behalf and on behalf of its adversely affected members

~~24.~~30. Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("Center") is a non-profit environmental organization dedicated to the preservation, protection, and restoration of biodiversity, native species, and ecosystems. The Center is headquartered in Tucson, Arizona, with offices in Colorado, numerous other states, and Mexico. The Center uses science, policy, and law to advocate for the conservation and recovery of species on the brink of extinction and the habitats they need to survive. The Center has and continues to actively advocate for increased protections for species and their habitats in Colorado. The Center has over 84,000 members, nearly 3,000 of whom live in Colorado, and some of whom recreate within the Salter Project area.

~~25.~~31. Jimbo Buickerood is a member and retired staff member of San Juan Citizens Alliance, and a member of the Center for Biological Diversity. Mr. Buickerood is familiar with the Salter Project and has visited the Salter project area on at least 25 occasions over the last 15 years. He enjoys hiking, mountain biking, photography, picnicking with family and friends, plant and tree identification, wildlife and wildflower viewing, birding, and enjoying the fall colors of aspen and other vegetation, in this forest. Mr. Buickerood is always on the lookout for large trees, because of their beauty and heritage representing the pre-settlement era across the Salter landscape,

and likelihood of harboring wildlife. Mr. Buickerood's enjoyment of the Salter area will be irreparably harmed by the years of truck traffic, the bulldozing of roads in once unroaded landscapes, the constant noise from over a decade of project implementation, destruction of native trees, loss of wildlife habitat, likely excessive drying of the forest understory and soils resulting in native vegetation loss, unsightly slash pile burning, damaged system roads, and the resulting erosion, water pollution, and proliferation of exotic weeds which inevitably follows logging and road construction. Mr. Buickerood intends to return to the Salter project area at least once a year for the foreseeable future, and has made plans to hike within the project area in July 2023.

~~26.~~32. Plaintiffs and their members participated throughout the NEPA process underlying the DN/FONSI. Plaintiffs and their members submitted written comments on the Draft EA. Plaintiffs and their members submitted pre-decision objections. The administrative record contains written comments and objections filed by Plaintiffs' members.

~~27.~~33. The DN/FONSI ended the NEPA process without complying with NEPA. Ending the NEPA process at the project tier prevents Plaintiffs from providing comments on decisions that have been deferred to the timber contracting tier of the Salter Project.

~~28.~~34. Each Plaintiff and their members use, enjoy, and plan to continue to use and enjoy on a regular basis, the public lands and natural resources within and adjacent to the proposed Salter Project, including the use of county and Forest Service roads providing public access for their use and enjoyment. This use and enjoyment involve many health, recreational, moral, scientific, spiritual, professional, educational, aesthetic

and other purposes that would be degraded by the development that the Defendant's project approval makes possible. Plaintiffs' members enjoy hiking in the Salter Project area, camping in developed and remote camps, cross country skiing on public and private lands in the surrounding area, biking, hiking viewing wildlife on private and public lands in the surrounding area, and driving on National Forest System roads without the danger posed by heavy equipment logging traffic. Plaintiffs and their members benefit from the intact ecosystem of the area as it exists today. Plaintiffs and their members' interests and uses will be adversely affected by Defendant's approval of the Salter Project, the extended road access across Forest Service land, and heavy traffic. This project will harm the biological integrity of the area which Plaintiffs' strive to protect as well as the world-renowned aesthetics of the area.

~~29.~~35. The decisions and actions contained in the Salter Project DN/EA are causing, and continue to cause direct, immediate, and irreparable injury to Plaintiffs' interests by denying them and their members the right to informed decision making and full disclosure required by NEPA.

~~30.~~36. Unless the relief prayed for herein is granted, Plaintiffs and their members will continue to suffer ongoing and irreparable harm and injury to their interests, including their future use and enjoyment of the Salter Project area of the San Juan National Forest and Dolores River watershed.

~~31.~~37. A favorable decision that grants some or all the relief requested in this Complaint is likely to remedy the harms the Decision authorizing Salter Project implementation without further NEPA analysis causes to the National Forest System and the Dolores River Watershed, and therefore Plaintiffs' members' use and enjoyment

of the project area and surrounding lands by ensuring informed decisionmaking required by NEPA and ensuring the agency complies with the substantive standards imposed by federal law.

~~32.~~38. Defendant DEREK PADILLA is District Ranger, Mancos-Dolores Ranger District, San Juan National Forest who signed the Decision Notice and Finding of No Significant Impact ("DN/FONSI") approving immediate implementation of the Salter Project in November 2021, and, in that official capacity, is responsible for implementing and complying with federal law, including the federal laws implicated by this action.

~~33.~~39. Defendant DAVID NEELY is the successor to Kara Chadwick, who, in her official capacity as San Juan National Forest Supervisor, supervised Ranger Padilla, and who, on October 22, 2021, issued decisions rejecting Plaintiffs' objections to the Salter Project, effectively approving the NEPA analysis and challenged decisions herein. In his official capacity, Supervisor Neely is responsible for managing the San Juan National Forest consistent with federal law, including the federal laws implicated by this action.

~~34.~~40. Defendant UNITED STATES FOREST SERVICE is a federal agency operating as part of the U.S. Department of Agriculture. The Forest Service is responsible for overseeing and administering the National Forest System, including the San Juan National Forest and the Dolores Ranger District. Forest Service personnel in the Rocky Mountain Regional Office participated in decisionmaking for the Salter Project. Forest Service personnel in the Washington D.C. Office participated decisionmaking for Salter Project decisionmaking.

~~35.~~41. Defendant UNITED STATES DEPARTMENT OF AGRICULTURE is a federal agency. USDA personnel outside the Forest Service were active participants in the Salter Project decisionmaking. USDA personnel, including those in the Office of General Counsel and the Under Secretary for Natural Resources and Environment, are actively involved in decisions involving the National Forest System lands. Personnel in the Under Secretary's Office and the Office of General Counsel possess non-privileged and privileged documents that must be included in the administrative record.

**FEDERAL STATUTORY FRAMEWORK**

~~36.~~42. Forest Service actions must satisfy substantive provisions of federal land management law and must be reviewed in light of the procedural mandates of NEPA, 42 U.S.C. § 4321, *et seq*. and the procedural and substantive mandates of NFMA. Courts review compliance with these laws before authorizing agency action pursuant to the judicial review standards of the Administrative Procedure Act ("APA"), which empowers courts to issue relief that protect Plaintiffs' interests, the interests of their members, and the character of the San Juan National Forest and nearby public lands. 5 U.S.C. §701, *et seq*

***The National Environmental Policy Act***

~~37.~~43. Congress enacted NEPA to "promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4331. NEPA requires federal agencies to analyze the environmental impacts of a particular action before the proposed action may proceed. *Id.* § 4332(2)(C). Federal agencies must notify the public of proposed actions and allow the public to comment on the fully disclosed environmental impacts of the proposed project.

~~38.~~44. The NEPA process requires production of an Environmental Impact Statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). In some cases, when the impacts are determined to be less than "significant," an Environmental Assessment ("EA") is an "environmental document" that may be prepared to satisfy NEPA's environmental purposes and procedural requirements. 40 C.F.R. § 1501.1(i)

~~39.~~45. The trigger for NEPA compliance and use of the NEPA process to "prevent or eliminate damage" to the environment is a proposed "federal action." 42 U.S.C. § 4332(2)(C). "Major Federal Actions" include, among other things, "adoption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of federal resources, upon which future agency actions will be based," 40 C.F.R. §1508.18(b)(2) (1978); and "actions with effects that may be major and which are potentially subject to Federal control and responsibility" and "include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies…" 40 C.F.R. §1508.18 (1978).[1]

[1] This action is governed by the Council on Environmental Quality's (CEQ's) 1978 regulations. In July 2020, CEQ promulgated new regulations, which apply only "to any NEPA process begun after September 14, 2020," or where the agency has chosen to "apply the regulations in this subchapter to ongoing activities." 40 C.F.R. § 1506.13 (2020). The Forest Service initiated scoping on this project, and thus began the NEPA process, in February 2020, before September 14, 2020. In addition, the Forest Service indicates it applied the 1978 CEQ regulations. The Decision Notice and FONSI references the ten significance factors in "40 CFR 1508.27(b)," a citation that only exists in the 1978 regulations, and not the 2020 regulations. *See* San Juan National Forest, Decision Notice and Finding of No Significant Impact for the Salter Vegetation Management Project (Nov. 18, 2021) at 18; *see also* 2020 CEQ NEPA Regulations, 85 Fed. Reg. 43304, 43376 (July 16, 2020) (containing no regulation numbered 40 C.F.R. § 1508.27); *Bair v.*

40.46. A proposal for a "Federal action," whether submitted by a private party or agency staff, triggers NEPA duties early in the decisionmaking process. *Id*. A proposal "exists at that stage in the development of an action when an agency subject to the Act has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated. […] A proposal may exist in fact as well as by agency declaration that one exists." 40 C.F.R. § 1508.23 (1978).

41.47. NEPA mandates procedures involving detailed environmental documents that must ensure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. 42 U.S.C. § 4332(C), 40 C.F.R. § 1500.1(b) (1978). Environmental documents that can satisfy the NEPA duty of analyzing and disclosing impacts to the public are limited to the EIS and EA. 40 C.F.R. 1508.1(i) ("Environmental document means an environmental assessment, environmental impact statement, finding of no significant impact, or notice of intent.").

42.48. The environmental document(s) must assess: (1) the environmental impact of the proposed action; (2) any adverse environmental effects which cannot be avoided should the proposal be implemented; (3) alternatives to the proposed action; (4) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and, (5) any irreversible and

*Cal. DOT*, 982 F.3d 569, 577 n.20 (9th Cir. 2020) (court applied 1978 NEPA regulations where the agency did so).

irretrievable commitments of resources which would be involved in the proposed action should it be implemented. 42 U.S.C. §4332(C).

~~43.~~49. NEPA's statutory provisions have been interpreted by implementing regulations and well-settled NEPA caselaw to require federal agencies to take a "hard look" at environmental impacts of proposed projects, measures to mitigate these environmental impacts, the purpose and need for the proposed action, alternatives to a proposal, including a "no action alternative," and the environmental and social impacts of a range of reasonable alternatives, including no action. 42 U.S.C. § 4332(C).

~~44.~~50. Accordingly, NEPA requires federal agencies to take a hard look at the direct, indirect, and cumulative effects of their actions on the environment and to disclose those effects in draft environmental documents that are offered for informed public comment. *See* 40 C.F.R. §§ 1508.7, 1508.8, 1508.25 (1978).

~~45.~~51. NEPA requires the Forest Service to analyze the environmental impacts of a particular action before proceeding with that action. 42 U.S.C. § 4332(2)(c). 40 C.F.R. § 1500.1(b) (1978). In addition, federal agencies must notify the public of proposals and allow the public to comment on the fully-disclosed environmental impacts of a proposed action. The agency analysis must be contained in an "environmental document." 40 C.F.R. § 1508.10 (1978).

~~46.~~52. The purpose and need section of a NEPA document briefly describes the purpose and need to which the agency is responding with its range of alternatives, and helps identify impacts and scope of analysis. 40 C.F.R. § 1502.16 (1978); *see also* 40 C.F.R. § 1502.1 (1978). The purpose and need statement defines the scope of the NEPA analysis. *Id*.

~~47.~~53. To comply with NEPA, an agency must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E); 40 C.F.R. § 1508.9(b). The alternatives analysis necessarily includes "[o]ther reasonable courses of actions" as well as mitigation measures not in the proposed action. 40 C.F.R. § 1508.25(a) (1978); 40 C.F.R. § 1508.25(b)(2)-(3) (1978). The agency's treatment of alternatives must be "substantial" and present impacts of alternatives in comparative form "sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and public." 40 C.F.R. § 1502.14 (1978).

~~48.~~54. When there are no "significant impacts," an EA can satisfy NEPA's procedural mandates by presenting a draft environmental document with interdisciplinary analysis and a comparison of alternatives that solicits public comment to "[a]id an agency's compliance with [NEPA] when no environmental impact statement is necessary." 40 C.F.R § 1508.9(a)(3) (1978) (definition of "environmental assessment"). If there are no significant impacts requiring the preparation of an EIS, that determination must be made in a Finding of No Significant Impact ("FONSI"). A FONSI is a final agency action that terminates the NEPA process.

~~49.~~55. Regardless of whether an agency uses a single NEPA process or a tiered NEPA process, the agency must examine the significance of the environmental impacts of the entire proposed project in making its significance determination. 40 C.F.R. § 1508.27 (1978).

~~50.~~56. The significance inquiry requires an analysis of both the context and intensity of the project's impacts, and when this analysis concludes significant impacts may occur, the agency must prepare an EIS. 40 C.F.R. § 1508.27 (1978).

~~51.~~57. The context prong requires federal agencies to analyze different contexts, "such as society as a whole (human, national), the affected region, the affected interests, and the locality." 40 C.F.R. § 1508.27(a) (1978). For site-specific actions, significance is determined by looking at short- and long-term effects and what those effects will be on the locale. *Id.*

~~52.~~58. To assess the intensity prong agencies are directed to look at ten different factors:

> (1) beneficial and adverse impacts;
> (2) effect on public health and safety;
> (3) unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas;
> (4) the degree to which the effects are likely to be highly controversial;
> (5) the degree to which the possible effects on the environment are highly uncertain or involve unique or unknown risks;
> (6) the degree to which the action may establish a precedent for future actions;
> (7) whether the proposed action is related to other actions that individually have insignificant impacts but cumulatively significant impacts;
> (8) the degree to which the action may adversely affect districts, sites or other places listed or eligible for National Register of Historic Places or may cause destruction or loss to significant scientific, cultural, or historical resources;
> (9) the degree to which the action may adversely affect threatened or endangered species or established critical habitat; and
> (10) whether the action threatens to violate Federal, State, or local law or requirements imposed to protect the environment.

40 C.F.R. § 1508.27(b)(1)-(10). The presence of one such factor may be sufficient to deem the action significant and require the preparation, analysis, and disclosure of an EIS.

***The National Forest Management Act***

~~53.~~59. In enacting NFMA, Congress stated that "the new knowledge derived from coordinated public and private research programs will promote a sound technical and ecological base for effective management, use, and protection of the Nation's renewable resources." 16 U.S.C. § 1600(4).

~~54.~~60. Further, Congress stated that the "Forest Service . . . has both a responsibility and an opportunity to be a leader in assuring that the Nation maintains a natural resource conservation posture that will meet the requirements of our people in perpetuity." 16 U.S.C. § 1600(6).

~~55.~~61. Through NFMA, Congress established a two-tiered process for managing the National Forests. The first tier is for the Forest Service to prepare and implement comprehensive "land and resource management plans," i.e., "Forest Plans" for each National Forest. 16 U.S.C. § 1604(a).

~~56.~~62. The second tier focuses on the Forest Service duties involving a proposed federal action and ensures that site-specific management projects within a National Forest are consistent with the Forest Plan. See 16 U.S.C. § 1604(i).

~~57.~~63. NFMA does not contemplate a three-tiered decisionmaking process.

**FACTS**

***Setting***

~~58.~~64. **San Juan National Forest.** The San Juan National Forest encompasses almost 1.8 million acres in southwestern Colorado. Its spans from high alpine peaks above 14,000 feet, to mixed conifer and ponderosa forests teeming with biodiversity, down to desert mesas rich with cultural resources. The San Juan contains three

districts. The westernmost of these, the Dolores Ranger District, lies north of the Montezuma Valley near Mesa Verde National Park, Canyon of the Ancients National Monument, and Ute Mountain Ute lands. The District extends northward to the Lizard Head Wilderness, southwest of Telluride, and east to its border with the Columbine District near Durango. Its western boundary is the famed Dolores River Canyon.

~~59.~~65. **Sale Area.** The Salter Vegetation Management Project is in the ponderosa pine forest north of Dolores, Colorado. The project is bordered by state and private lands including clusters of residential areas in the wild urban interface ("WUI"). The area is prized for recreation, especially mountain biking, hunting, hiking, all-terrain vehicle use, and Nordic skiing. McPhee Reservoir and the Dolores River form the project's western border, with the West Dolores River flanking the eastern border. Ponderosa forests in the project area support abundant flora and fauna and are used extensively by big game species. Generally, ponderosa forests on the San Juan have fewer acres in the old growth development stage and less diversity and distribution of native grasses compared to desired conditions, with implications for wildlife species and populations. Timber harvest activity began in the forest in the late 19th century and continues today. Harvests peaked between 1955 and 2004. Even age silv~~a~~iculture systems like clear cutting were the predominant treatment type, leaving many stands of uniform small diameter ponderosas.

~~60.~~66. The governing San Juan National Forest Land and Resource Management Plan identifies a spectrum of Management Areas (MAs) across the forest– MA1 through MA8 – along a gradient of suitable development and uses. MAs range from MA1 ("Natural Processes Dominate") to MA8 ("Permanently developed lands").

The Salter Project falls entirely within MA5, which authorizes active management for multiple uses. Timber harvesting is a suitable activity on MA5 lands but must be balanced with other social and ecological objectives such as recreation and conserving areas that are "predominately natural" and "contribute to ecosystem and species diversity and serve as habitat for flora and fauna."

~~61.~~67. **Dolores River Watershed.** The Salter Project is located within the Dolores River Watershed, which drains an arid and rocky region of the Colorado Plateau west of the San Juan mountains and southwest of the Uncompahgre Plateau. The 4,634 square mile watershed ranges from a high elevation over 14,000 feet to 4,100 feet at the confluence of the Dolores and Colorado Rivers. Humans have inhabited the region since time immemorial, evidenced by its unmatched Ancestral Puebloan archaeological resources. The watershed provides habitat for a wealth of plant and animal biodiversity, extensive recreation opportunities that support local economies, and retains sacred and ceremonial value for Indigenous peoples. In 1976, and again in 2013, the Dolores River was found suitable for designation under the Wild and Scenic Rivers Act by the U.S. Forest Service and Bureau of Land Management.

68. **House Creek Unit**. The House Creek Unit timber contract implements the Salter Project EA on the House Creek treatment block. The contract fails to disclose important site-specific information such as road locations, does not require a field survey for cultural resources as contemplated in the Salter EA, and does not prioritize large tree retention as required by CFLRP. The contract does not identify or protect important mule deer habitat designated by Colorado Parks and Wildlife, including winter range and migration corridors that traverse the treatment block. The House Creek

timber contract was awarded without conducting the site-specific analysis that the Salter Project EA, FONSI, and Decision Notice deferred to the contracting tier.

***Administrative Process***

~~62.~~69. **Forest Plan**. The San Juan National Forest issued its decision adopting a revised Land and Resource Management Plan (Forest Plan) in September of 2013 that was based on a Final EIS detailing the impacts to the human environment that were foreseeable at the programmatic/planning tier of National Forest decisionmaking. The Forest Plan is the overarching document providing a strategic vision for, and governing the long-term management of, the SJNF. The Forest Plan describes the Dolores Ranger District, which is a geographic area known for its importance as a watershed at the headwaters of the Colorado River system, its value for public recreation, and its high density of Ancestral Puebloan cultural sites. Desired conditions for the District include reduced wildfire hazard, sustained ecosystem services, opportunities for mechanized recreation (e.g., mountain bikes), protection of cultural resources, and, importantly, structurally diverse Ponderosa pine forests "including more old growth stands, stands with a clumped structure, stands with old trees, snags, and large dead and downed wood on the forest floor."

~~63.~~70. **Salter Project Proposal.** The project proposes vegetation treatment (including single tree selection, commercial thinning, Post-fledgling Family Area Thinning also known as PFAT, pre-commercial thinning, and brush thinning) of ponderosa pine forest on approximately 22,346 acres of public land. The purpose and need for the project is ostensibly to restore the area to more natural conditions, increase resilience to wildfire and insect infestation, and provide wood for the commercial timber

industry. A network of temporary roads would be constructed to facilitate treatment. A Notice of Intent was not issued for the Salter Project proposal.

~~64.~~71. **Scoping.** On February 21, 2020 the USFS Dolores Ranger District of the SJNF, under the direction of District Ranger Derek J. Padilla, released a Scoping Package on its website and in local media that sought public input on the proposed Salter Vegetation Management Project.

~~65.~~72. The stated purposes of the project in the scoping document are to "1) improve or maintain the resistance and resiliency of ponderosa pine forest ecosystems, 2) increase the diversity of ponderosa pine forest ecosystem development stages, and 3) provide economic support to local communities by providing timber products to local industries in a sustainable manner." Climate change and longstanding federal policies of fire suppression have made the area vulnerable to increased wildfire risk, particularly in the WUI where rural development abuts the forest.

~~66.~~73. Release of the Scoping Package initiated a 30-day period for public comment. Commenters during the scoping period raised numerous concerns with the project proposal. The San Juan Citizens Alliance filed timely scoping comments on March 20, 2020. SJCA comments strongly recommended that the Purpose and Need statement for the project include desired conditions based on the overarching SJNF Land and Resource Management Plan ("LRMP"). SJCA explicitly requested that the SJNF publish common stand exam ("CSE") data and associated files, so that the public could be adequately informed of the projects impacts and contextualize the project's Purpose and Need in the data. SJCA further requested that SJNF conduct a cost benefit analysis of various approaches to long term maintenance of timber production in

the project area, including a review of the costs or income streams from timber harvest, stewardship contracts, small diameter contracts, firewood, mastication, and "nontraditional" funding streams such as the Rocky Mountain Research Institute ("RMRI").

~~67.~~74. The Center for Biological Diversity ("Center") filed timely scoping comments on March 22, 2020. The Center's comments emphasized the need to include baseline, site specific information about the project area in order to clarify the effects of the proposed action, craft and analyze alternatives, and mitigate impacts to public resources. The Center's comments explicitly requested that the SJNF publish CSE data for stands in the project area, including but not limited to the diameter of ponderosa pine, estimated age, and degree of impact by bark beetles. The Center requested that the SJNF analyze an alternative to protect old or large trees, based on peer reviewed scientific studies demonstrating that large and old trees are critical for ecological restoration and can increase forest resilience. Specifically, the Center requested the Forest Service "consider an alternative that will: retain large trees, either larger than 16" DBH or 20" DBH, and any old trees, as determined by their size, appearance and morphology. The size of the cap may depend on the results of stand exam data."

~~68.~~75. Dr. William Baker, an ecologist and professor specializing in fire ecology in Rocky Mountain landscapes, filed timely scoping comments on March 21, 2020. Dr. Baker's comments raised eight (8) concerns regarding the Salter Vegetation Management Project: 1) a lack of detailed differences between current conditions and desired conditions, 2) a lack of details in how treatments would achieve desired

conditions, 3) the need to consider a landscape level approach to planning that considers the cumulative impact of past disturbances, 4) the need to incorporate natural processes to achieve the desired conditions, rather than relying solely on a "maximum commercial timber production" approach, 5) a suggestion to add "heterogenous stands in heterogenous landscapes" as a desired condition, 6) an economic analysis of costs and benefits to the forest, 7) applying the standard definition of WUI, and 8) protecting "all extant large trees in the project area to increase resistance/resilience to fire.

~~69.~~76. During the scoping period and throughout the NEPA process, the Salter Project proposal was reviewed by stakeholders in the Dolores Watershed Resilient Forest Collaborative (DWRF), "an inclusive local group that shares knowledge and resources to enhance ecological and community resilience to wildfire and other disturbances" active since 2015. DWRF partners and stakeholders include federal and state agencies, the Ute Mountain Ute Tribe, local governments, the wood products industry, local conservation, recreation, and scientific organizations, among others. Despite the logistical challenges of gathering during the Covid-19 pandemic, the DWRF collaborative continued to meet regularly online beginning in March 2020, conducting 660 hours of stakeholder meetings and 202 hours developing DWRF ponderosa pine, wildlife, and water desired conditions and resilience metrics over the course of the year. DWRF aims to establish a "resilient and adaptive upper Dolores River watershed that provides ecosystem services, maintains ecological integrity and sustains community values in the face of environmental change, supported by a diverse and active collaborative group." The DWRF collaborative discussed the Salter project in depth, with the explicit goal of avoiding objections through proactive stakeholder outreach. DWRF

articulated "specific ecological trends and monitoring metrics that foster a more 'resilient and adaptive' ponderosa pine zone within the DWRF landscape" and published desired conditions that informed participants comments. The DWRF prioritized, "Restor[ing] and enhance[ing] rare components of stands that are essential for resilience to fire, particularly large and old trees, by retaining and increasing trees exhibiting old-tree characteristics" and "Restor[ing] and maintain[ing] historically guided abundance and variability of old-growth stands and scattered old trees across landscapes." Despite the extensive collaborative efforts, these priorities were not reflected in the Draft or Final EAs.

~~70.~~77. **Draft EA Comments.** The SJNF released an Draft Environmental Assessment (EA) for the Salter Project in February 2021, initiating a 30-day public comment period. The EA considered 3 alternatives – a No Action alternative, Alternative 2, the agency preferred action, which emphasized timber harvesting, and Alternative 3, a new alternative retaining trees over 20 inches in diameter at breast height. Alternative 3 was developed in response to the numerous calls for large tree retention in scoping comments. Curiously, the Forest Service determined without any analysis that "Given that the difference between the modified proposed action alternative and the large tree retention alternative is primarily silvicultural, the direct, indirect, and cumulative effects to fuels and fire management of both action alternatives are the same."

~~71.~~78. The Dolores Ranger District received 124 public comments during the comment period. Commenters expressed concerns with the proposed logging, including impacts to forest health and wildlife habitat, disruptions to recreation and hunting, the

noise and pollution of large trucks, and safety issues with heavy machinery on unpaved country roads. Numerous local business owners questioned the Project's economic justification, suggesting the economic analysis of the project focused on the projected benefits to the logging industry while ignoring negative impacts to the recreation economy. According to a May 10, 2021 article in the Four Corners Free Press, approximately one quarter of public comments specifically addressed potential impacts to trails.

~~72.~~79. Seven environmental organizations, including petitioners SJCA and the Center, filed timely public comments during the EA comment period urging the SJNF to adopt Alternative 3, the alternative retaining old and large trees. Dr. Baker filed timely comments on the EA as well stating, "Reasons given for preferring Alternative 2 over Alternative 3 are not valid… It is well documented that in ponderosa pine forests it is these large, old trees that provide the essential resistance and resilience to fire that is now particularly needed as fire is increasing with global warming. Large trees have the thickest bark, the highest crown base height, and have the greatest ability to survive substantial crown scorching and still resprout and survive. It is thus essential for the Final EA, if the goal is to include increased resistance and resilience to fire, to heed and remedy the serious deficiency in large trees as an essential part of the desired conditions for the project area."

~~73.~~80. **EA/Draft FONSI/Draft DN.** In June 2021, SJNF released a Final EA for the Salter Project and a Draft DN and FONSI, triggering a 45-day objection period pursuant to 36 C.F.R. 218, subparts A and B. The Final EA modified Alternative 2 somewhat from the Draft EA, including new design features to mitigate the worst

impacts to recreationists. The EA did not conduct any analysis on Alternative 3 (the Large Tree Retention Alternative), and made clear that the only difference between the Alternative 2 and Alternative 3 was a 20 inch diameter limit.

~~74.~~81. The DN and FONSI acknowledged that "the most obvious effect of the early logging of ponderosa pine forests is the general lack of large, old trees and snags in these forests today." Yet the Final EA failed to seriously consider an alternative protecting large, old trees, even though such an alternative was repeatedly suggested by commenters and supported by peer reviewed science. Instead, the Final EA again dismissed Alternative 3 without analysis, repeating the conclusive argument that "Given that the difference between the modified proposed action alternative and the large tree Retention alternative is primarily silvicultural, the direct, indirect, and cumulative effects to fuels and fire management of both action alternatives are the same."

~~75.~~82. **Objections**. Pursuant to Forest Service regulations, 36 C.F.R. Part 218, seven interested parties who had previously filed comments on the Draft EA filed timely objections to the Final EA and Draft DN/FONSI. Objectors noted numerous concerns with the Modified Alternative, flagging issues raised during the comment period that were not remedied or substantively addressed in the Final EA.

~~76.~~83. **Objection Resolution**. Pursuant to agency regulations, 36 C.F.R. § 218.11(a), the San Juan National Forest held an objection resolution meeting on September 8, 2021. The Forest Service agreed to mitigate some impacts from logging trucks to the Town of Dolores, and to establish a 50-foot "visual corridor" of tree retention on either side of non-motorized trails in the Boggy Draw area, essentially a strip of trees alongside trails running through timber treatment areas. The Town of

Dolores and Southwest Colorado Cycling Association withdrew their objections based on these revisions. The Forest Service did not resolve other, more systemic issues, raised by SJCA and the Center, opting instead to dismiss them in the final decision document.

~~77.~~84. **Final DN/FONSI,** On November 18, 2021 the SJNF issued a Final DN/FONSI for the Salter Project signed by District Ranger Padilla, the Responsible Official for the Project, constituting a final agency action reviewable by this court. Release of the FONSI closed the objection resolution period and allowed for immediate implementation of the Salter Project, an irreversible and irretrievable commitment of federal resources. The DN/FONSI dismissed Alternative 3, explaining that "Alternative 3 – Large Tree Retention would limit the ability to fully utilize the silviculture systems designated by the Land and Resource Management Plan," and approved the agency preferred Modified Alternative 2, allowing for commercial thinning of old and large trees greater than 20 inches in diameter.

~~78.~~85. **Timber sale tier.** The Decision Notice did not make decisions concerning the location of roads and landings, slash disposal methods, the rotation of entry into stands, and specific prescribed treatments. The Forest Service will make those decisions later without the benefit of additional citizen input or disclosing the impacts of those decisions. The Forest Service originally implemented NFMA based on a two-tier planning and implementation process that examined all site-specific matters not addressed at the plan tier as a single decisionmaking process. The Salter Project segmented the site-specific decisionmaking by adding a third tier – preparation of individual timber sales based on additional data gathering and decisionmaking by the

timber program staff. The analysis and decisions deferred to contract preparation tier by the Salter Project DN/FONSI lacks the interdisciplinary approach and public input that NEPA requires. NEPA procedures will not be sued in preparing terms, conditions, road networks, and other aspects of the contracting tier.

86. **House Creek Timber Contract.** On April 12, 2023, the Forest Service awarded the House Creek timber contract. The House Creek timber contract was authorized and issued by Chad A.T. Bullock, on behalf of the Defendants. Mr. Bullock works out of Defendants' Washington D.C. Offices. Plaintiffs have been provided a copy of the contract, but have not yet been provided the full administrative record on which the House Creek contract was issued.

87. The House Creek timber contract implements the Salter Project in the House Creek Unit. The site-specific contract adopted terms that purport to address the site-specific conditions of the House Creek Unit. The terms used in the House Creek timber contract were not informed by site-specific NEPA analysis. Plaintiffs, decisionmakers, and members of the public were not offered an opportunity to participate in the post-FONSI analysis, preparation, or award of the House Creek timber contract.

88. The Forest Service has confirmed that there will be no preparation or cutting in the House Creek Unit until at least April 1, 2024.

***Issues, Impacts, and Alternatives not Subjected to Interdisciplinary Analysis***

~~79.~~89. The Forest Service authorized the Salter Project and its implementation over the next ten years. The House Creek timber contract implements the Salter Project. Decisions are still required to implement the Salter Project. Decisions made

after the Salter Project DN/FONSI closed the NEPA process will be made without notifying the public, without providing an opportunity for the public to comment on the proposed action, and without analyzing the proposal in an environmental assessment or environmental impact statement under NEPA.

~~80.~~90. Instead of disclosing impacts, alternatives, and mitigation measures for roads, the Salter Project DN/FONSI approved construction of an undefined network of existing closed roads and temporary roads. The Salter Project will impact the designated motorized and non-motorized routes where access to timber units requires the same road for project access (shared alignment). A transportation plan will be included in the contract package to address safety concerns linked to any road uses. The DN/FONSI confirms that the transportation plan will not be subjected to NEPA analysis.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

***NEPA – Failure to Use a Lawful NEPA Process to Inform the Decisionmaking***

~~81.~~91. Plaintiffs hereby reallege and reincorporate all paragraphs of this Complaint.

~~82.~~92. Defendants acted arbitrarily and capriciously by issuing the Salter Project DN/FONSI without following NEPA procedures and before conducting interdisciplinary analysis that must precede agency implementation of the Salter Project. 40 C.F.R. § 1508.21 (1978) ("'NEPA process' means all measures necessary for compliance with the requirements of section 2 and title I of NEPA.").

93. Defendants acted arbitrarily and capriciously by issuing the House Creek Unit contract to implement the Salter Project DN/FONSI without following NEPA procedures and before conducting interdisciplinary analysis that must precede agency implementation of the Salter Project. 40 C.F.R. § 1508.21 (1978) ("'NEPA process' means all measures necessary for compliance with the requirements of section 2 and title I of NEPA.").

~~83.~~94. Under NEPA, Defendants must "integrate the NEPA process with other planning at the earliest possible time to ensure that planning and decisions reflect environmental values." 40 C.F.R. § 1501.2; *see also* 40 C.F.R. § 1501.1(a) (NEPA purpose). The failure to comply with NEPA before approving implementation of the Salter Project is arbitrary and capricious, an abuse of discretion, and action without observance of procedures required by law, in violation of the APA. 5 U.S.C. § 706(2).

~~84.~~95. The Salter Project DN/FONSI divides the analysis of the commercial timber sale into three decisionmaking tiers – forest-wide planning, site-specific environmental analysis of the Salter Project, and site-specific data gathering, analysis, and implementation through the timber sale contracts themselves. The Salter Project DN/FONSI unlawfully defers important decisionmaking and implementation to the timber sale tier without conducting the interdisciplinary analysis, public participation, and informed decisionmaking required by NEPA and its implementing regulations before approving implementation of the Salter Project.

~~85.~~96. NEPA allows agencies to use a staged analysis known as "tiering." NFMA contemplates a two-tiered decisionmaking process that ensures site-specific projects comply with plan-level decisions. The Forest Service normally uses a two-tiered

decisionmaking process – Forest Plan and detailed timber sale authorizations - to implement its commercial timber sale program.

~~86.~~97. The Salter Project was approved using three decisionmaking tiers – programmatic decisions in the Forest Plan, site specific authorization of the Salter Project in the DN/FONSI, and site-specific timber sale decisions made in individual contracts without NEPA analysis. The DN/FONSI confirmed that the timber sale contracting decisions would not be subjected to further NEPA analysis. The FONSI is a final agency action that terminates the NEPA process. The House Creek timber contract was issued without a post-DN/FONSI NEPA process.

~~87.~~98. Defendants' three-tiered decisionmaking terminated the NEPA process without taking a hard look at the foreseeable environmental impacts of the Salter Project, measures to mitigate these environmental impacts, the purpose and need for the Decision, alternatives to the Decision, including a "no action alternative," and the environmental and social impacts of a reasonable range of alternatives, including no action.

99. Defendants used a novel three-tiered decisionmaking process for the Salter Project, but terminated the NEPA process at the second tier without taking a hard look at the foreseeable direct, indirect, and cumulative impacts of implementing the Salter Project via the House Creek timber contract and measures to mitigate these environmental impacts. Because NEPA was not conducted at the site-specific level for the Salter Project EA, Defendants also failed to comply with NEPA duties and procedures that require informed and transparent decisionmaking before awarding the House Creek timber contract. The site-specific NEPA duties Defendants failed to

satisfy include, but are not limited to, disclosing and analyzing: a purpose and need, site-specific alternatives, including a "no action alternative," and the environmental and social impacts of a reasonable range of alternatives, including no action. These NEPA violations are expected to similarly occur with subsequent timber contracts that will be used to implement the Salter Project in all other identified units

88.100. The Salter Project DN/FONSI terminated the NEPA Process and authorized staff to address impacts, alternatives, and mitigation measures in contracts implementing the Salter Project. The House Creek timber contract was issued without benefit of a site-specific tier of the NEPA Process. Defendants' novel practices will continue to deny Plaintiffs' will be denied the benefits of NEPA analysis and will shield the decisionmakers from public input on contract-tier decisions that. These contract-tier decisions affect Plaintiffs' legally cognizable and protectable interests in the Salter Project area.

89.101. As a result of Defendants' decision to approve the Salter Project and the House Creek timber contract without first carrying out the environmental analysis of alternative courses of action, mitigation measures, and reasonably foreseeable direct, indirect, and cumulative impacts within the NEPA Process, Defendants violated NEPA and its implementing regulations, acted arbitrarily and capriciously, abused their discretion, failed to act in accordance with law and therefore have violated the APA, 5 U.S.C. § 706(2)(A).

## SECOND CLAIM FOR RELIEF

***NEPA Failure to Prepare an Environmental Impact Statement Where the Significance Threshold is Met***

~~90.~~102. Plaintiffs repeat and incorporate by reference the allegations in all paragraphs of this Complaint.

~~91.~~103. NEPA requires agencies to prepare an Environmental Impact Statement when a federal action involves significant impacts. 42 U.S.C. § 4332(2)(c); 40 C.F.R. § 1501.4 (1978). The Salter Project DN/FONSI, when considered in context of the direct, indirect, and cumulative impacts of this and other actions is a major federal action significantly impacting the environment. *Id*.

~~92.~~104. When an EIS is not prepared, or the agency is uncertain whether or not the significance threshold has been met, the agency prepares an Environmental Assessment. 40 C.F.R. § 1508.9 (1978). To address whether an action may have significant impacts, an agency must include an analysis "in several contexts, such as a whole (human, national), the affected region, the affected interests and the locality." 40 C.F.R. § 1508.27(a) (1978). In addition, the agency must analyze the intensity of the action, such as whether impacts "may be both beneficial and adverse," "the degree to which the proposed action affects public health or safety," "unique characteristics of the geographic area," and "the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks." 40 C.F.R. § 1508.27(b)(1)-(10) (1978).

~~93.~~105. Defendants acted arbitrarily and capriciously by authorizing the Salter Project without conducting the analysis of a transportation plan and all other features of fully-defined project, which is required to determine whether or not the Salter Project met NEPA's significance criteria.

~~94.~~106. Defendants' analysis did not address the required context and intensity variables, which include unique characteristics of the Dolores River watershed, cultural resources involving Ancestral Puebloans, scientific controversies regarding contract limitations on tree size, cumulative impacts, and adverse effects to wildlife habitat, some of which involves sensitive, threatened or endangered species. Although truncated, the EA and DN/FONSI make clear that a lawful EA would confirm that the facts and circumstances require an Environmental Impact Statement.

~~95.~~107. The Salter Project involves significant impacts that require preparation of an Environmental Impact Statement.

~~96.~~108. The DN/FONSI is the agency decision to end the NEPA process and authorize implementation without first preparing an EIS. The impacts to the National Forest, alone and in combination with the other allegations herein, satisfies the significance criteria.

~~97.~~109. Non-NEPA procedures set forth in the DN/FONSI for designing timber sales, road systems, and timber sale contracts cannot remedy the failure to prepare an EIS before approving the Salter Project.

~~98.~~110. Failure to conduct a lawful NEPA process based on the significant impacts of the Salter Project violated NEPA and its implementing regulations, was

arbitrary and capricious, an abuse of discretion, and a failure to act in accordance with the law, and therefore violated the APA, 5 U.S.C. § 706(2).

## THIRD CLAIM FOR RELIEF

### *National Environmental Policy Act – Significant Impacts Requiring an EIS Cannot Be Avoided by Listing Mitigation Measures (aka "Project Design Features")*

~~99.~~111. Plaintiffs repeat and incorporate by reference the allegations in all paragraphs of this Complaint.

~~100.~~112. A limited set of circumstances allow agencies to avoid preparation of an EIS by adopting enforceable mitigation measures that are supported by substantial evidence of their effectiveness. The Forest Service avoided preparation of an EIS by essentially assuring the public impacts will be avoided through nebulous adaptive management and "project design features." However, the possibility of mitigation cannot be used as an excuse to avoid NEPA's EIS requirement.

~~101.~~113. The EA and FONSI attempt to rely mitigation measures - often referenced as "project design features" – to minimize the intensity of impacts below the significance threshold. "Project design features" are one type of mitigation measure the Forest Service may require the contractor to implement as standard practice of construction, operation, and/or maintenance. Project-tier "design features" are the only type of mitigation measure analyzed in the Salter Project EA. Site-specific adoption of contract-tier "design features" are not addressed in the EA/FONSI. Defendants did not use the NEPA Process to analyze site-specific conditions, road locations, mitigation, or alternatives to the House Creek timber contract.

~~102.~~114. Ending the NEPA process for the Salter Project with a FONSI that relies on a "mitigated EA" with unenforceable and generically asserted mitigation measures to avoid significant impacts of the Salter Project violated NEPA and its implementing regulations, was arbitrary and capricious, an abuse of discretion, and a failure to act in accordance with the law, and therefore violated the APA, 5 U.S.C. § 706(2).

**FOURTH CLAIM FOR RELIEF**

***National Environmental Policy Act -- EA fails to identify and analyze the effectiveness of available mitigation measures***

~~103.~~115. Plaintiffs repeat and incorporate by reference the allegations in all paragraphs of this Complaint.

~~104.~~116. NEPA documents must: (1) "include appropriate mitigation measures not already included in the proposed action or alternatives," and (2) "include discussion of . . . [m]eans to mitigate adverse environmental impacts (if not already covered under 1502.14(f))." 40 C.F.R. § 1502.14(f); 40 C.F.R. § 1502.16(h).

~~105.~~117. NEPA regulations define "mitigation" as a way to avoid, minimize, rectify, or compensate for the impact of a potentially harmful action. 40 C.F.R. § 1508.20 (a)-(e). NEPA documents, including EAs, must analyze the effectiveness of mitigation measures in context of the proposed action and proposed alternatives. 40 C.F.R. § 1502.14(f).

~~106.~~118. The EA does not include any site-specific analysis of the effectiveness of mitigation measures the Forest Service may impose when implementing the Salter Project.

119. The EA does not include any site-specific analysis of the effectiveness of mitigation measures that the Forest Service may impose when implementing the Salter Project by awarding the House Creek timber contract.

~~107.~~120. Mitigation measures include "project design features." Adaptive management involves potential mitigation measures and must be subjected to NEPA analysis before decisions are made and resources are committed. Project design features, adaptive management, and contract terms are NEPA "mitigation" measures that were not addressed in the EA. 40 C.F.R. § 1508.20 (a)-(e).

~~108.~~121. Because the EA does not include analysis of mitigation measures that may avoid, minimize, rectify or compensate foreseeable impacts of the Salter Project, as implemented through the House Creek timber contract and other actions, the EA violated NEPA and its implementing regulations, was arbitrary and capricious, an abuse of discretion, and a failure to act in accordance with the law, and therefore violated the APA, 5 U.S.C. § 706(2).

**FIFTH CLAIM FOR RELIEF**

***National Environmental Policy Act – Unreasonably Narrow Range of Alternatives***

~~109.~~122. Plaintiffs repeat and incorporate by reference the allegations in all paragraphs of this Complaint.

~~110.~~123. Agencies are required under NEPA to consider, evaluate, and disclose to the public "alternatives" to the proposed action and to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of resources." 42 U.S.C. §§4332(2)(C)(iii) & (E); 40 C.F.R. §1502.14 (1978). The evaluation of

alternatives must constitute a "substantial treatment," presenting the impacts of the alternatives in comparative form "sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and public." 40 C.F.R. §1502.14 (1978).

~~111.~~124. The Forest Service unlawfully narrowed the purpose and need such that only a commercial timber sale would satisfy the purpose and need, creating a pre-determined outcome that eliminated reasonable alternatives from NEPA consideration.

~~112.~~125. Implementing a commercial timber sale is the only alternative means of satisfying the purpose and need that was considered in the EA/FONSI.

~~113.~~126. The Forest Service failed to analyze in detail reasonable alternatives that were specifically delineated in public comments. These include alternatives that avoid impacts to large and old Ponderosa pines that define the Salter Project area, and make it attractive to wildlife and recreational uses. The Forest Service also ignored a restoration alternative that provides economic and ecological benefits that does not involve a commercial timber sale, but otherwise meets the Forest Plan goals and objectives for the Salter Project area.

~~114.~~127. The EA/FONSI did not consider public comments and well-respected forest ecology experts when deciding to analyze only two action alternatives.

~~115.~~128. The EA/FONSI ended the NEPA Process without analyzing in detail a range of reasonable alternative courses of action to meet a purpose and need that is consistent with the Forest Plan violated NEPA and its implementing regulations, was arbitrary and capricious, an abuse of discretion, and a failure to act in accordance with the law, and therefore violated the APA, 5 U.S.C. § 706(2).

## SIXTH CLAIM FOR RELIEF

***National Environmental Policy Act– Identification and Analysis of Historic and Cultural Resources Unlawfully Delayed***

~~116.~~129. Plaintiffs repeat and incorporate by reference the allegations in all paragraphs of this Complaint

~~117.~~130. NEPA recognizes that "effects" that must be reviewed in an EA include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative." 40 C.F.R. § 1508.8 (1978).

~~118.~~131. Although other laws require consultation with Tribes and Pueblos, NEPA also protects Plaintiffs and their members' interests in historic and cultural resources on the National Forest. *Id.*

~~119.~~132. Although there is no NEPA analysis of impacts, alternatives or mitigation measures involving cultural resources, the impacted area involves culturally important historic sites ranging from 11,500 B.C. to 1750 A.D. The cultural landscape impacted by the Salter Project includes well-known structures and artifacts that are linked to the Ancestral Puebloans and are important to many of Plaintiffs' members. Instead of analyzing these significant features for their eligibility for listing on the National Register of Historic Places, the DN/FONSI delayed any survey or analysis until after project implementation was approved.

~~120.~~133. Despite the fact that the transportation plan, sale design, and other foreseeable aspects of the Salter Project may damage cultural resources, the EA

contains no cultural resources analysis. The cultural resource impacts of the must be analyzed in a NEPA document before the Salter Project can be approved. The House Creek timber contract was issued without any site-specific NEPA or NHPA analysis. Significant cultural resources and historic properties have been documented in the House Creek Unit.

~~121.~~134. The EA and FONSI/DN that failed to disclose, and deferred and ignored, impacts to historic and cultural resources are arbitrary and capricious, not in accordance with law, and without observance of procedure required by law under the APA. 5 U.S.C. §§ 701-706.

**SEVENTH CLAIM FOR RELIEF**

***National Environmental Policy Act – Hard Look Duties were Not Met.***

~~122.~~135. Plaintiffs repeat and incorporate by reference the allegations in all paragraphs of this Complaint.

~~123.~~136. Before taking action, agencies must comply with NPEA's "hard look" requirement by providing an interdisciplinary analysis of "direct effects" (40 C.F.R. § 1508.8(a), "indirect effects," (40 C.F.R. § 1508.8(b)), and "cumulative impacts." 40 C.F.R. § 1508.7.

~~124.~~137. NEPA requires Defendants to take an interdisciplinary "hard look" at the consequences a proposed project may have on communities and the environment. This "hard look" duty must be satisfied in a NEPA-compliant environmental document that is finalized before the agency approves the proposed action.

~~125.~~138. NEPA is an action forcing statute that places and affirmative duty on the agency to ensure NEPA's purposes are carried out to the fullest extent possible. NEPA commands that all federal agencies, "to the fullest extent possible," must prepare an environmental impact statement (EIS) for "every recommendation or report on proposals for legislation and other major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An EA is an environmental document that may be prepared to "[a]id an agency's compliance with [NEPA] when no environmental impact statement is necessary." 40 C.F.R § 1508.9(a)(3) (1978) (definition of "environmental assessment"); 40 C.F.R. § 1508.10 (1978) (definition of "environmental document").

~~126.~~139. Although the Salter Project EA's stated purpose and need is to promote local economies, the EA lacks interdisciplinary analysis of the benefits and impacts of the Salter Project on the local and regional economies. Plaintiffs and others submitted substantive comments on the purpose, need, benefits, and impacts. Defendants did not provide a meaningful response to public comments.

~~127.~~140. While the EA emphasizes the quantifiable and perceived economic effects of a timber sale that accrue to the timber company and its employees, the EA fails to analyze the existing recreation-based economy that would be impacted by the Salter Sale, or to disclose the Salter Project's impacts to those economic values. It is arbitrary and capricious for the EA to emphasize a subset of the quantifiable and perceived economic effects of a timber sale that accrue to the timber company and its employees while ignoring the qualitative and quantifiable negative economic impact on elk hunters, deer hunters, mountain bikers, hikers, wildlife viewers, and others whose

use and enjoyment of the National Forest comprises a far larger sector of the local and regional economy.

~~128.~~141. The EA, and resulting decisions, was therefore arbitrary and capricious, not in accordance with law, and without observance of procedure required by law under the APA. 5 U.S.C. §§ 701-706.

## EIGHTH CLAIM FOR RELIEF

**Collaborative Forest Landscape Restoration Program – *Defendants have unlawfully begun implementing the Salter Project using federal funds designated for collaborative programs without NEPA disclosure and analysis of landscape restoration criteria.***

142. Plaintiffs repeat and incorporate by reference the allegations in all paragraphs of this Complaint.

143. Defendants have publicly promoted the Salter Project as a "NEPA-ready" component of the Collaborative Forest Landscape Restoration Program ("CFLRP"). 16 U.S.C. § 7303. Impacts and alternatives raised by Plaintiffs and others in the Dolores Watershed Resilient Forest Collaborative ("DWRF") and the NEPA process were not analyzed in the NEPA analysis used to approve the Salter Project. Defendants developed the Salter Project, in part, through the DWRF.

144. CFLRP demands compliance with NEPA and other federal laws. 16 U.S.C. § 7303(a).

145. The CFLRP has specific eligibility criteria based on "landscape restoration strategies." 16 U.S.C. § 7303(b). Plaintiffs, the DWRF, decisionmakers, and the public have not been informed, through NEPA analysis, of the Salter Project eligibility for CFLRP funding. A key element of the CFLRP is restoration based on the pre-fire

suppression old-growth conditions. *Id*. The pre-fire suppression old-growth conditions in the Salter Project Area were not disclosed or analyzed in the Salter Project EA. The CFLRP requirement to create a restoration strategy based on, among other things, "*maximizing* the retention of large trees, as appropriate for the forest type" was not addressed in the NEPA analysis. 16 U.S.C. § 7303 (b)(1(E)(ii) (emphasis supplied). Plaintiffs and others submitted comments that promoted analysis of alternatives that would maximize the retention of large trees.

146. Defendants have begun implementing the Salter Project by entering into at least one timber sale contract, the House Creek contract, which was awarded April 12, 2023. The House Creek timber sale contract implements the Salter Project in the House Creek Unit without the benefit of interdisciplinary site-specific NEPA analysis or disclosure of CFLRP requirements.

147. The DWRF and Defendants have sought, and received, federal CFLRP funding to assess the Salter Project through the Southwest Colorado Collaborative Forest Landscape Restoration Initiative.

148. Defendants have definite plans to continue using CFLRP funds to implement the Salter Project by offering timber sales and by taking other site-specific actions.

149. Defendants' participation and use of the DWRF to provide management advice for the Salter Project is not CFLRP-compliant.

150. Defendants' participation and use of the formal collaboration processes, including the DWRF, in preparation and implementation of the Salter Project was not

compliant with the explicit establishment, membership, reporting, and informational requirements in Federal Advisory Committee Act ("FACA"). 55 U. S. C. App. § 1 *et seq.*

151. Defendants failed to conduct detailed NEPA analysis of impacts and restoration alternatives identified by the DWRF process, including large tree retention, habitat connectivity, and climate resilience. Without judicial relief, Defendants will continue its unlawful use of CFLRP funding on the implementation of the Salter Project through the House Creek timber contract and other implementation actions that have not been analyzed pursuant to NEPA to ensure CFLRP compliance.

152. Defendants' use of collaborative processes and funding, without first complying with NEPA and other statutory restrictions on agency actions, was therefore arbitrary and capricious, not in accordance with law, and without observance of procedure required by law under the APA. 5 U.S.C. §§ 701-706.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment for Plaintiffs and against Defendants as follows:

A. Enter judicial findings that Defendants violated NEPA, APA, and/or NFMA when it decided to approve implementation of the Salter Project;

B. Enter judicial findings that Defendants violated NEPA, APA, and/or NFMA when authorizing the issuance of timber contracts ~~without~~and other site-specific implementation of the Salter Project through a series of unlawful staff decisions and collaborative processes that do not first achieve site-specific NEPA compliance;

~~C~~C. Enter judicial findings that that Defendants violated NEPA, APA, and/or NFMA when authorizing the House Creek timber contract.

D. Set aside and vacate each and every agency action taken and each and every finding, and conclusion made in reliance on the EA and DN/FONSI;

~~D~~E. In the alternative, direct by permanent injunction that Defendants issue all necessary actions to prohibit implementation of the DN/FONSI until such time as an adequate and appropriate NEPA process and a new DN/FONSI has been fully considered and completed for all Salter Project components;

~~E~~F. In the alternative, direct by permanent injunction that Defendants take all the necessary steps to avoid further impacts to, among other resources and values, vegetation, trees, water resources, wildlife, recreation, cultural resources, and other public land values that may be impacted by the challenged action;

~~F~~G. In the alternative, direct by injunction that Defendants withhold any approvals concerning implementation of the Salter Project, including prohibition of the offer and sale of timber contracts, any ground disturbance, preparatory activities, road rehabilitation, and on-site implementation;

~~G~~H. Award to Plaintiffs their costs, expenses, expert witness fees, and reasonable attorney fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and the ESA, 16 U.S.C. § 1540 and/or,

~~H~~I. Grant Plaintiffs' such additional and further relief as the Court may deem just and proper.

RESPECTFULLY SUBMITTED on ~~June14~~November 8, 2023.

*s/Travis E. Stills*
Travis E. Stills
Energy & Conservation Law
227 E. 14th Street #201
Durango, Colorado 81301
(970) 375-9231
stills@eclawoffice.org

*Attorney for Plaintiffs*

John W. Rader
San Juan Citizens Alliance
1309 E. 3rd Ave #5
Durango, CO 81301
(970) 259-3593
john@sanjuancitizens.org

*Attorney for Plaintiff San Juan Citizens Alliance*

Allison N. Henderson
P.O. Box 3024
Crested Butte, CO 81224
(970) 309-2008
ahenderson@biologicaldiversity.org

Edward B. Zukoski
Center for Biological Diversity
1536 Wynkoop Street, Suite 421,
Denver, CO 80202
(303) 641-3149
tzukoski@biologicaldiversity.org

*Attorneys for Plaintiff Center for Biological Diversity*

**Plaintiffs' Addresses:**

San Juan Citizens Alliance
1309 E. 3rd Ave #5
Durango, CO 81301

Center for Biological Diversity
P.O. Box 3024
Crested Butte, CO 81224